IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff/Respondent,* | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-8001-SJ-GAF |
| | ) | |
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| *Defendant/Movant.* | ) | |

MOTION FOR COLLATERAL RELIEF TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND FOR A NEW TRIAL

## PRELIMINARY STATEMENT

The transcript of the trial proceedings will be cited to as "Tr." followed by the page number. Transcripts of pretrial and ancillary proceedings will be cited as "Tr." followed by the date of the proceeding and the page number. All citations to "Doc." refer to documents filed under Western District of Missouri Case No. 05-06002-CR-SJ-GAF unless otherwise noted.

Citations to exhibits filed with this motion include a description of the exhibit and the exhibit number.

All other citations are either self-explanatory or will be explained.

MOTION FOR COLLATERAL RELIEF TO VACATE, SET ASIDE, OR CORRECT SENTENCE AND FOR A NEW TRIAL

COMES NOW movant, Lisa M. Montgomery, by and through her undersigned counsel, pursuant to 28 U.S.C. §2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant her a new trial, vacate the judgment entered against her, and/or vacate, set aside, or correct her sentence.

Pursuant to Local Rule 9.2, Lisa Marie Montgomery provides the following information: Mrs. Montgomery's identification number is 11072-031. Lisa Montgomery is currently incarcerated at the Carswell Federal Medical Center in Fort Worth, Texas, under a sentence of death. Respondent is the United States of America.

Mrs. Montgomery was charged by Complaint in the United States District Court for the Western District of Missouri on December 17, 2004 (Doc. #1). An Indictment was returned on January 12, 2005 charging Mrs. Montgomery with kidnapping resulting in death in violation of 18 U.S.C. §1201(a)(1) (Doc. #14). On November 16, 2005, the Government filed notice of its intent to seek the death penalty (Doc. #64).

Following a jury trial in October of 2007, Mrs. Montgomery was found guilty of the offense of kidnapping resulting in death (Doc. #341). After a subsequent penalty phase, the jury recommended that Mrs. Montgomery be sentenced to death (Doc. #353). On April 4, 2008, Judge Gary A. Fenner imposed sentence on Mrs. Montgomery and ordered that she be sentenced to death (Doc. #402).

Mrs. Montgomery appealed to the United States Court of Appeals for the Eighth Circuit on April 5, 2008 (Doc. #403). The United States Court of Appeals for the Eighth Circuit

denied Mrs. Montgomery's appeal on June 22, 2011 (Doc. #427). *United States v. Lisa M. Montgomery*, 635 F.3d 1074 (8th Cir. 2011). A Writ of Certiorari was denied to Mrs. Montgomery on March 19, 2012 (*See* Docket Sheet entry dated March 22, 2012). *Lisa M. Montgomery v. United States*, 132 S.Ct. 1741 (March 19, 2012). This is Mrs. Montgomery's first Motion for Writ of Habeas Corpus.

Mrs. Montgomery was represented at trial by John O'Connor, Fred Duchardt, and David Owen. Mrs. Montgomery was represented at sentencing by John O'Connor, Fred Duchardt, and Larry Pace. On appeal, Mrs. Montgomery was represented by Fred Duchardt and John Gromowsky.

Undersigned counsel Lisa G. Nouri and Christine M. Blegen were appointed to represent Mrs. Montgomery in this proceeding on April 17, 2012 (Doc. #430). On September 21, 2012, the Court entered an Order approving the entry of the Office of the Federal Public Defender for the Middle District of Tennessee as co-counsel in this case (Civil Case No. 12-CV-8001-SJ-GAF, Doc. #13). On November 1, 2012, Kelley Henry of the Office of the Federal Public Defender for the Middle District of Tennessee entered her appearance on behalf of Mrs. Montgomery (Civil Case No. 12-CV-8001-SJ-GAF, Doc. #20).[1]

[1] This motion is filed in compliance with the statute of limitations governing cases brought pursuant to 28 U.S.C. § 2255. Counsel have diligently assembled a team of lawyers, mitigation specialists, and investigators to investigate and uncover all claims of relief that are cognizable under this section. Each claim is pled in good faith and on the basis of what counsel have learned in their investigation and review of the voluminous record thus far. Counsel has made every effort to plead as specifically as possible each claim for relief. To be clear, counsel have not intentionally or strategically waived or withheld any claim. That said, counsel recognize that there is still much work to be done. In some instances not all facts giving rise to a particular claim are currently known (for example, Mr. Ray Conrad who we allege played a role in unconstitutionally interfering with Mrs. Montgomery's right to counsel refuses to answer certain questions and counsel will require subpoena power to compel the same). Once the Court has an opportunity to rule on the matter contemporaneously filed under seal, counsel will expeditiously seek a scheduling order for the purpose of establishing a schedule for discovery, amendment and an evidentiary hearing.

## GROUNDS FOR RELIEF

Through counsel, Ms. Montgomery states the following grounds for granting her motion:

Introduction

Lisa M. Montgomery submits that her conviction and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Mrs. Montgomery's capital trial was greatly impacted by the fact that she was represented at trial by the fourth in a series of dysfunctional defense teams that failed to comprehend the value and importance of mitigation evidence, that ignored ABA Guidelines on the development of mitigation evidence, and that neglected to understand the nature and causes of Lisa Montgomery's mental illness. The jury was presented with a disjointed defense that painted Lisa Montgomery as a "fragile creature" who had been abused by her step-father, but turned out to be a hard worker and a good mother. Her trial attorneys relied on the exotic and misguided defense of pseudocyesis to explain her actions on December 16, 2004 instead of delving more deeply into Mrs. Montgomery's mental illness. The poor choices made by Lisa Montgomery's defense team at trial resulted in an imbalanced and unjust trial and a sentence of death for Lisa Montgomery because the trial defense team failed to tell the true story of Lisa Montgomery's life, her history of abuse and her mental illness.

Lisa Montgomery is the child of John Patterson and Judy Rignell. Both of her parents families provided a legacy of severe mental illness, neurological impairments, and physical deformities. In addition, both of Lisa's parents were alcoholics. Judy drank alcohol excessively and smoked throughout her pregnancy with Lisa.

When Judy married John Patterson he already had a daughter, Diane, from a previous relationship. After the marriage, Diane lived with John and Judy. When John was sent overseas

in January of 1968, a pregnant Judy was left alone with Diane. Judy knew nothing about caring for children. After Judy gave birth to Lisa on February 27, 1968, Diane became Lisa's primary caregiver even though Diane was a small child herself.

The trial team failed to share with the jury that Lisa's childhood was spent in a terror-ridden home. Lisa Montgomery survived circumstances that are barely imaginable. Her mother, step-father, and her husbands inflicted acts of cruelty that targeted her core of identity and self. These acts, combined with Lisa's mental illness, left her not knowing what was real and what was not real. Psychiatric and neurologic disease affected every aspect of her life. The jury never heard any of this information.

When Lisa was a baby, Judy would strip Diane naked and make her stand outside their home. She would punish Lisa for making any noise, ultimately resorting to taping Lisa's mouth shut with duct tape. Judy also belittled the girls. Meanwhile, when John was around, he and Judy fought constantly in front of Diane and Lisa.

Judy's abuse escalated and she would shout, scream, yell, and hit the two girls. If Lisa did not eat all of the food Judy placed on her tray, Judy would leave Lisa strapped in her highchair for hours. Judy has bragged that Lisa's first sentence, at eighteen months of age, was, "Don't spank me. It hurts."

When John was away on military duty, Judy brought men home. One of these men molested Diane in the bedroom she shared with Lisa.

On June 3, 1970, Judy gave birth to a baby girl, Patty. Like Lisa, Patty was abandoned by Judy and Diane had to care for her. Diane tried her best to shelter the girls from the men Judy constantly brought home. Then, when Diane was eight years old, Judy sent her away to live with another family. Later, the Kansas Department of Social Services got involved and placed Diane

in foster care. From this experience, Lisa learned that Judy was powerful enough to send a child away if the child fell out of Judy's good graces. Moreover, Lisa was traumatized by the loss of her beloved sister from her life. Lisa would not see Diane again for over twenty years.

Next, Judy met Jack Kleiner. Jack Kleiner was an alcoholic, controlling tyrant who was always mean and got meaner when he drank. Jack physically and emotionally abused the children from his first marriage. Jack Kleiner moved in with Judy in April of 1972. As with John Patterson, Judy and Jack were drunk most of the time. Judy would have three more children with Jack Kleiner: Teddy, Jerri Jo, and Tommy.

Lisa and Patty were the outcasts in the Kleiner household. They were singled out for harsh and painful treatment. Jack and Judy would strip the girls naked and beat them with a belt. As before, Lisa was not allowed to make noise. If she spoke when she was not supposed to speak, Jack or Judy would tape her mouth with duct tape. Lisa learned not to cry because she was afraid she would suffocate. Lisa was not allowed to make noise during meals – even the sound of a fork tine hitting her plate could provoke a beating.

The family was extremely poor and moved numerous times during Lisa's elementary and middle school years. Lisa would retreat from the chaos of her family life by reading books and entering her own little world.

Lisa's grades began to decline in middle school. This coincides with the age at which Jack Kleiner began molesting and then raping Lisa. Jack Kleiner moved the family to an isolated rural area six miles outside of Sperry, Oklahoma where it was easy for him to escape observation. Jack had a special room built onto the trailer for Lisa so he could sexually assault her at will. Lisa's mother stored homemade liquor and wine in this special room. Lisa drank jar after jar of these homemade brews to numb herself to the actions of her step-father.

Jack Kleiner began sexually molesting Lisa one to two times per week in the summer of 1981. He threatened to hurt Lisa if she told anyone. The molestation escalated to rapes. To escape from the terror of being raped by her step-father, Lisa's mind went to a safer place. Sometimes she stayed in that safe realm of unreality. It happened without her understanding or knowledge. It also made her wonder for the rest of her life what was real and what was not real.

Later, Jeff Batson moved in with the Kleiners to make amends for damaging a fence. After he moved in with the Kleiner family, Jack encouraged Jeff Batson to have sex with Lisa. Judy believed that Jack encouraged Batson to have sex with Lisa so that if Lisa became pregnant, Jack could blame the pregnancy on Batson. Lisa was also sexually assaulted by a cousin, Kenny Alexander.

The situation in the Kleiner home exploded on February 24, 1984 when Judy walked in on Jack raping Lisa. Judy kicked Jack out of the home, but allowed him to return a few days later. Judy finally left Jack Kleiner in June of 1984, having lined up his replacement: Richard Boman.

Judy and her children moved in with Richard Boman. In October of 1984, when Lisa was 16, Richard Boman's son, Carl, visited the family. Carl was 24-years old and just out of the military. Carl began a sexual relationship with Lisa and by March of 1985, they had moved in together. Carl knew Lisa's history of being assaulted and raped by Jack Kleiner.

Lisa enlisted in the United States Air Force Reserve in May of 1986, but she was not allowed to report for duty in August because by then she was pregnant with her first child by Carl Boman. Instead of enlisting, Lisa married Carl Boman on August 15, 1985, when she was only 18 years old. Lisa's first baby, Desiree Nicole, was born on January 11, 1987. Only eighteen months later, Lisa gave birth to Chelsea Lynn on July 9, 1988. Chelsea was followed by Carl

James II (C.J.) only fifteen months later on October 20, 1989. A mere ten months after giving birth to C.J., Lisa gave birth to her youngest daughter, Kayla Deanne on August 18, 1990.

Lisa began to dress in old clothing and her houses were always a mess, symptoms of her emerging mental illness. By the fall of 1988 Lisa's mood fluctuated noticeably from day to day. She began to complain of headaches and was depressed. Lisa began to move from one place to another without notice or a plan, acting in response to her moods.

In January of 1990, Carl and Judy took Lisa's two oldest daughters, Desiree and Chelsea, to California. Lisa drove to California to get the girls back. Having no money and no job, she was left with no choice but to stay with Carl in California.

Lisa's fourth pregnancy and labor were complicated. She was admitted to the hospital with preterm labor on August 13, 1990. Lisa was anemic, uncertain of her date of conception as she had not had any periods since giving birth to C.J. "10 months ago," and the fetus had intermittent arrhythmia. Kayla was born five days later, premature and compromised. Kayla remained in the hospital for seven weeks.

On October 22, 1990, Lisa was admitted to the hospital for a bilateral tubal fulguration. There is a dispute as to why Lisa had this procedure at the young age of 22. Carl Boman and Judy say Lisa wanted to have this procedure. Lisa says she was coerced into having this procedure by Judy.

By 1991 Lisa Montgomery was unable to focus and pay sufficient attention to care for her four small children. Carl was trying to work overtime to make double payments on their home, but Lisa spent the money intended for the mortgage on frivolous items. The house continued to be a "mess."

In 1993, Lisa left Carl and developed a relationship with Brett Owens, a customer at a store where she worked. Carl filed for divorce from Lisa in June of 1993. Although they were awarded joint custody, Carl took off with the children and went to California where Judy was living at the time. Judy and Carl conspired to keep the children in California.

While Brett planned on marrying Lisa, she returned to Carl Boman in December of 1993, only a few months after their divorce had been finalized. Carl and Lisa remarried in the Mormon Church in June of 1994. Shortly thereafter, Lisa claimed to be pregnant with twins. Judy visited Lisa and saw a crib. Judy confronted Lisa and Lisa claimed that she had miscarried.

In 1995, Lisa and Carl moved to Deming, New Mexico. They lived in an old farm house with no running water, no heat, a wood stove, and a wringer washer. Later, they moved into a one-bedroom trailer with their four children. The family was very impoverished and often had no food. Carl would take off for months at a time, leaving Lisa in this small trailer with the four children. Lisa began to drink a lot of alcohol. She divorced Carl Boman for the second time in August of 1998 and returned to Kansas.

Upon her return to Kansas, Lisa met Kevin Montgomery. In 1999, Lisa made her second false pregnancy claim, telling Kevin Montgomery she was pregnant with twins. Lisa announced that she was going to New Mexico to have an abortion. Six months later Lisa told Kevin she was pregnant again, but was going to take care of it by brewing and drinking a concoction of Penny Royal leaves. Lisa reported to Kevin that the concoction worked and she had miscarried.

Lisa married Kevin Montgomery in March of 2000. Their combined income in 2000 was $31,500 of which Kevin had to pay $7,200 in child support for his three children from his previous marriage. This meant Lisa and Kevin had $24,300 for their family of six.

In 2001, Lisa and Kevin rented a neighbor's family farmhouse for $400 a month. By all accounts, Lisa loved her children, but was unable to parent them. Lisa was dealing with psychotic thinking, dissociation, loss of contact with reality, extreme emotions, and rapid, uncontrollable mood swings. Her behavior would change in an instant. Lisa could not keep up with housework. She relied on her children to help her with basic chores such as cooking and cleaning. Lisa suffered from severe migraine headaches that immobilized her.

In May of 2001, Lisa's cousin, Wendy Treibs had her tubal litigation surgery reversed. Lisa was aware of this procedure. In 2002, Lisa told Kevin that she was pregnant for the third time since their relationship began. Kevin believed that Lisa was pregnant. Later she told him that she had been to a doctor and there were "complications with blood" and "her body was rejecting the baby." Lisa refused to allow Kevin to accompany her to doctor's visits. Ultimately, Lisa told Kevin that the baby had been stillborn and she had donated the body to science.

Lisa had a long history of starting projects without completing them. Throughout her adult life those who interacted with her recognized that she talked rapidly for long periods of time, without letting the other person get in a word. By 2002, Lisa was interested in gardening, canning her own food, having livestock, and living off the land. Lisa claimed that she wanted to have an "old-fashioned" lifestyle, yet she spent most of her waking hours on the computer if she was not working one of her three jobs.

In early 2004 Lisa got involved in the custody placement hearing involving Justin Kleiner, Lisa's brother Teddy's son. Lisa showed up for court in a "Laura Ingall's" outfit. In the middle of her testimony, Lisa cried hysterically. Lisa claimed that she had had her tubes un-tied and that she had a stillborn baby on May 30, 2003. Her testimony was confusing to the judge handling the matter as Lisa rambled about her brother Teddy and her mother, Judy. During the custody

proceedings, Judy considered involuntarily committing Lisa to a psychiatric hospital. She was concerned about Lisa's mental health as Lisa seemed to be trying to be her cousin Wendy Treibs.

By early 2004, Lisa was alienated from everyone in her family. Carl Boman was not able to make his child support payments while Kevin Montgomery had his child support payments increased. Lisa was working three jobs, but the family struggled financially. While Lisa generally did not keep a clean house, matters got worse after she became obsessed with dog breeding in 2004. The house and the garden went untended.

In February of 2004, Kevin experienced his fourth false pregnancy claim with Lisa. Due to her mental illness, Lisa was unable to provide a consistent narrative about this claimed pregnancy. By Kevin's calculations, the baby was due in October of 2004, but Lisa said the baby was due in December. Lisa told some people she was expecting a boy and others that she was expecting a girl. She told other people she was carrying twins, but lost one of the babies.

Meanwhile, Lisa had a short temperament with her children, she did not clean the house, she spent all of her free time on the computer. She was very irritable. In November of 2004, when the weather turned colder, she brought the dogs into the house, but did not clean up after them. Lisa viewed dog breeding as a way to solve the family's financial problems, but she had no appreciation for the financial costs or potential profits.

Lisa displayed numerous mood swings. She always seemed tired and complained of frequent headaches during the fall of 2004. She fought with Kevin frequently. Lisa's children were distressed by their mother's increasingly bizarre behavior.

Carl McClain spoke with Lisa on the Tuesday before the offense. Lisa was "irritable and distraught." She wanted everyone to quit asking about the baby. Lisa felt Joy Montgomery was pressuring her. Kevin had arranged to have Friday of that week off from work for the baby's

induction. Lisa was served with custody papers from Carl Boman who was going to use the false pregnancy claim to obtain custody of their children.

All of these stressors led to the underlying crime in this case and the Government sought the death penalty. Unfortunately, Mrs. Montgomery's defense was plagued by errors and she received ineffective assistance of counsel.

An unreliable capital conviction is unconstitutional. Reliability in capital sentencing is achieved through effective assistance of counsel; government conduct which complies with the ethical and legal obligations to ensure fairness and not a death sentence at all costs; fair trial procedures; jury selection that appropriately excludes jurors who are unwilling or unable to consider mitigating evidence, but does not exclude jurors on the basis of race or nationality; jury instructions that properly instruct the jury on the law; a trial that excludes evidence which unfairly influences the jury; a trial that ensures that race or gender plays no part in the process; and a trial that guarantees an individualized sentencing determination based on competent evidence. As demonstrated below, nothing about the trial of Lisa Montgomery covered the hallmarks of heightened due process that is required in a capital case. The execution of a citizen is irreversible, final, and severe. It is because, as the Supreme Court recognized, "death is different" that heightened due process is required.

The injustices in this case are numerous. Perhaps most obvious, was the removal of every woman who was appointed to represent Mrs. Montgomery, a known victim of sexual violence perpetrated by multiple men. Lisa Montgomery was betrayed by the men who were appointed to represent her because they placed their own interests and egos over the best interests of Mrs. Montgomery causing her to lose as her counsel one of the country's most successful capital defense lawyers is likewise shocking. As recognized by United States Supreme Court Justice

Ruth Bader Ginsburg, "People who are well represented at trial do not get the death penalty . . . . I have yet to see a death case among the dozens coming to the Supreme Court on eve-of-execution stay applications in which the defendant was well represented at trial." (Associated Press, April 10, 2001). Lisa Montgomery was not well represented at trial.

The fact that multiple lawyers representing Mrs. Montgomery unabashedly told untruths to the Court, without Lisa's knowledge or permission, to the detriment of her defense, is clear. The fact that the lawyer ultimately appointed to represent her eschewed his professional obligations and responsibilities under the ABA Guidelines, ignored the rest of the defense team, adopted an implausible first phase theory without properly investigating it and then ignored the evidence that disputed it, and then painted a completely false picture of Lisa Montgomery to the jury and the Court, is simply beyond the pale.

Less obvious, but just as devastating is that Mrs. Montgomery was tried while incompetent. Further, she sat stoic and flat throughout the trial due to the combination of her mental illness and psychotropic drug regimen creating the impression in the minds of the jury that she was cold and remorseless. The Government capitalized on her incapacity in penalty phase closing argument.

The Government also overreached in this case. It presented bogus scientific evidence as "proof"; unconstitutionally inflamed the jury through the admission of highly prejudicial (and inadmissible) evidence and engaged in improper argument. The charging decision itself was racially biased.

The jury was selected after an incompetent *voir dire* and one juror was unconstitutionally removed after defense counsel announced, "She's Cuban."

The constitutional violations mounted, one on top of the other, resulting in an unfair trial and a death sentence that is disproportionate, arbitrary, capricious, and devoid of the heightened reliability guaranteed under the United States Constitution. For the reasons that follow, and as demonstrated by the numerous exhibits supporting this motion, Mrs. Montgomery's unconstitutional conviction and sentence should be set aside.

## I. THE REMOVAL OF JUDY CLARKE AS ONE OF LISA MONTGOMERY'S TRIAL ATTORNEYS DEPRIVED MRS. MONTGOMERY OF EFFECTIVE ASSISTANCE OF COUNSEL AT THE PRETRIAL, GUILT, AND PENALTY PHASES OF HER TRIAL IN VIOLATION OF 18 U.S.C. §§ 3005 AND 3006A AND THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND WAS AN UNCONSTITUTIONAL INTERFERENCE IN THE ATTORNEY/CLIENT RELATIONSHIP

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[3] Judy Clarke had sent out two expert contracts right before she was removed from the case. She had been in the process of retaining Dr. Dean Delis, Ph.D., an expert in neuropsychology, and Judith Herman, a psychiatrist and trauma expert who specializes in cases involving incest and traumatic stress. The subsequent defense team did not utilize these experts. (Exhibit No. 3, Dec. of Judy Clarke; Exhibit No. 19, Dec. of Chris Armstrong).

[redacted]

[4] Mrs. Montgomery believed that Mr. Ninemire had lied to her at CCA when he claimed not to know why Ms. Clarke was being refused a visit with Mrs. Montgomery. This suggests that Mr. Ninemire's representation to the Court that he had discussed the removal of Judy Clarke with her at length at CCA the day prior to the "hearing" on April 21, 2006 was false.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## II. RAY CONRAD AND DAVID OWEN PERPETRATED A FRAUD ON THE COURT BY LEADING JUDGE FENNER TO BELIEVE THAT JUDY CLARKE WAS BEING "OBSTRUCTIVE" TO THE DEFENSE TEAM EFFORTS

[redacted]

[5] The extent of the misrepresentations is not known because Mr. Conrad refuses to answer questions about what he told the Court, Mr. Owen does not remember what was said to the Court, and the only other person present was the Judge. (Exhibit #20, Dec. of Janet Santana).

[redacted]

[redacted]

[6] Dr. Dean Delis, Ph.D. and Dr. Judith Herman, M.D..

## III. LISA MONTGOMERY WAS DEPRIVED OF COUNSEL DURING A CRITICAL STAGE WHERE HER MOST EXPERIENCED AND TRUSTED COUNSEL WAS REMOVED WITHOUT HER CONSENT OR KNOWLEDGE. *SEE UNITED STATES V. CRONIC,* 466 U.S. 648 (1984). ALTERNATIVELY, COUNSEL DAVID OWEN AND HIS BOSS, RAY CONRAD, WERE OPERATING UNDER AN ACTUAL CONFLICT OF INTEREST WHICH ACTUALLY AFFECTED THEIR PERFORMANCE WHEN THEY OBTAINED THE REMOVAL OF EXPERIENCED TRIAL COUNSEL JUDY CLARKE AND DEPRIVED LISA MONTGOMERY OF CONSTITUTIONALLY EFECTIVE COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. *SEE MICKENS V. TAYLOR*, 535 U.S. 162, 122 S.CT. 1237 (2003); *CUYLER V. SULLIVAN*, 446 U.S. 335, 100 S.CT. 1708 (1980); *HOLLOWAY V. ARKANSAS*, 435 U.S. 475, 489-490, 98 S.CT. 1173 (1978).

[redacted]

[redacted]

[7] The extent of the misrepresentations is not known because Mr. Conrad refuses to answer questions about what he told the Court, Mr. Owen does not remember what was said to the Court, and the only other person present was the Judge. (Exhibit No. 20, Dec. of Janet Santana).

[redacted]

8 There is bitter irony that this motion is filed on the 50th Anniversary of *Gideon*. Sadly, the representation received by Mrs. Montgomery makes clear that Gideon's promise remains unfulfilled.

[redacted]

[9] This action resulted in the appointment of a capital trial lawyer who is tied for having the most inmates sentenced to federal death row.

## IV. THE TRIAL TEAM OF FRED DUCHARDT, JOHN O'CONNOR, AND DAVID OWEN AS WELL AS THE APPELLATE TEAM OF FRED DUCHARDT AND JOHN GROMOWSKY PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO RAISE THE ISSUE OF JUDY CLARKE'S REMOVAL FROM THE DEFENSE TEAM PRIOR TO TRIAL AND ON DIRECT APPEAL.

[redacted]

[redacted]

[redacted]

## V. IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, THE FRED DUCHARDT-LED TRIAL TEAM DENIED LISA MONTGOMERY THE EFFECTIVE ASSISTANCE OF COUNSEL IN THAT HER ATTORNEYS PERFORMED DEFICIENTLY AND UNREASONABLY BOTH PRIOR TO, DURING, AND AFTER TRIAL IN LIGHT OF PREVAILING PROFESSIONAL NORMS UNDER *STRICKLAND V. WASHINGTON*, 466 U.S. 668, 104 S.CT. 2052 (1984) AND MRS. MONTGOMERY WAS PREJUDICED AS THERE IS A REASONABLE PROBABILITY THAT BUT FOR COUNSEL'S ERRORS, THE OUTCOME OF HER TRIAL WOULD HAVE BEEN DIFFERENT.[10]

Mrs. Montgomery incorporates all of the factual averments in this motion and the exhibits appended hereto in support of this claim. Mrs. Montgomery was arrested the day after Bobbie Jo Stinnett's death. Mrs. Montgomery had Mrs. Stinnett's baby with her and promptly confessed to the crime. As a result, Mrs. Montgomery's defense team had two real needs: (1) to determine whether Mrs. Montgomery suffered from a mental disease or defect that would provide a defense to the crime and (2) to develop mitigation evidence to explain to the Department of Justice and the jury why Mrs. Montgomery should not be subjected to the death penalty for this crime. Mrs. Montgomery's defense teams failed in both respects.

Prior to trial, Mrs. Montgomery was represented by four different defense teams employing a series of mitigation specialists and investigators. Mrs. Montgomery's multiple trial defense teams lacked the training and experience necessary to deal with a client with serious mental health issues. Moreover, the fourth and final defense team made the mistake of focusing solely on the crime, hastily zeroing in on the defense of pseudocyesis, rather than their client and her complex biopscyhosocial history. (*See* Exhibit No. 16, Dec. of Jan Vogelsang, M.SW.; Exhibit No.15, Dec. of Dr. George Woods, M.D.).

[10] The ineffective assistance of counsel claims raised in this section, and elsewhere in this motion, are raised individually and cumulatively. Each claim relies on the facts as pled herein and those found in the attached exhibits, including, but not limited to, the declarations of Dr. George Woods, M.D. and Jan Vogelsang, MSW, the attachments to Ms. Vogelsang's declaration, Exhibits No. 1-30 attached to this motion, and the criminal court and appellate court record in this case. Each of these is specifically incorporated herein by reference.

First, Mrs. Montgomery was represented by Anita Burns and Susan Hunt. In what would become a theme, when Ms. Burns complained to Federal Public Defender Ray Conrad about working with Mr. Owen, she found herself removed from the case by Mr. Conrad and replaced by Mr. Owen. As a result, the second defense team became David Owen working with Susan Hunt. Recognizing that they needed assistance from an attorney with mental health experience, Mr. Owen and Ms. Hunt brought in Judy Clarke to form the third defense team. (Exhibit No. 3, Dec. of Judy Clarke; Exhibit No. 1, Dec. of Susan Hunt; Exhibit No. 2, Dec. of David Owen). The issues that developed with the third defense team have been discussed above.

Whereas Mrs. Montgomery's defense team had evolved with the addition of Ms. Clarke and her investigator and mitigation specialists, there was a devolution in the quality of her representation after Ms. Clarke and Ms. Hunt were removed from the case. Lisa Montgomery's fourth trial team, the team that had ultimate responsibility for her trial, was constitutionally deficient from start to finish and as a result this team presented a foolish, doomed-from-the-beginning, defense of not guilty by reason of insanity based on a flimsy "diagnosis" of pseudocyesis, neglected the development of a social history, the mitigation investigation, and mental health evidence, and failed to tell Lisa Montgomery's real story at trial. The fourth trial team suffered from the same types of dysfunction that had permeated the first three defense teams. Having bungled the development of Mrs. Montgomery's social history, the defense team was unable to provide the mental health experts they retained with the materials needed to properly assess Mrs. Montgomery's mental health. As a result, their experts were unable to fully understand Mrs. Montgomery's complex symptomatology and accurately identify the many ways in which she was and remains impaired. Not having been provided with the proper materials, the defense experts who were retained could not properly diagnose Mrs. Montgomery.

If the trial attorneys had developed an accurate social history and provided it to the correct experts they would have known that Mrs. Montgomery was suffering from a mental disease or defect at the time of the crime. *See* Exhibit No. 17, Dec of William Logan, M.D.; Exhibit No. 16, Dec. of Jan Vogelsang; Exhibit No. 15, Dec. of Dr. George Woods; Exhibit No.16, Attachment No. 2, Dec of Lisa Rickert; Exhibit 16, Attachment 45, Dec of Dani Waller; Exhibit No. 3, Dec. of Judy Clarke.

Similarly, if the trial attorneys had followed the appropriate standards of care set forth by the ABA, they could have developed a strong mitigation case to present either to the Department of Justice in plea negotiations or to the jury during the penalty phase of the trial. Detailed below are the many and varied ways in which trial counsel failed in every aspect of their responsibility to provide constitutionally effective assistance of counsel to Mrs. Montgomery.

A. A Fourth Trial Team Is Formed

After Judy Clarke was removed from Mrs. Montgomery's case, and Susan Hunt was asked to withdraw, John O'Connor was appointed on May 12, 2006 as learned and lead counsel (Doc. # 86). Recognizing that the defense in this case was centered wholly and completely on Mrs. Montgomery's mental health at the time of the crime, Mr. O'Connor set out to find competent co-counsel to handle the mental health aspects of the case due to his own lack of experience in that area. Mr. O'Connor quickly realized that finding co-counsel with sufficient knowledge, background, training and experience in mental health issues was going to be a difficult task because competent counsel (and competent mitigation specialists) did not want to become entangled in Mrs. Montgomery's case having heard about the removal of Judy Clarke and her team of Ms. Garvey and Mr. Freedman. Similarly, two mitigation specialists, Ms. Rickert and Ms. Jackson had already been retained only to be removed from the case for various

reasons. It is now apparent that any counsel who sought to adhere to established professional norms and the ABA Guidelines met with resistance from an entrenched Federal Public Defender office that believed throwing money at experts without a full social history and a complete set of client records was the manner in which to defend a capital case. Ethically, no competent counsel could accept appointment under those constraints.

Mr. O'Connor ultimately sought the appointment of Fred Duchardt as co-counsel to handle the mental health component of the case as well as the mitigation phase of the trial (Exhibit No. 2, Dec. of David Owen, p. 11). Former Assistant Federal Public Defender David Owen has explained that a meeting was held and it was determined that Mr. O'Connor would handle the "offense investigation and presentation during the guilt phase," Mr. Duchardt would handle the "mental health experts and present that aspect of the mitigation phase," and Mr. Owen would "fill in where necessary" and "handle all the computer forensics for both the factual and mitigation phases." (Exhibit No. 2, Dec. of David Owen, p. 11). Whereas the prior defense teams had met regularly to divide tasks and responsibilities and report information to one another, the final defense team formed in May of 2006 had very few team meetings and Mr. O'Connor did not attend many of the meetings that were held (Exhibit No. 2, Dec. of David Owen, p. 11).

While Mr. O'Connor retained the nominal title of "lead counsel," he had very little interaction with Mrs. Montgomery. He met with Mrs. Montgomery for a TOTAL of 3.5 hours prior to trial: on May 16, 2006 for 1.5 hours when initially appointed and again on January 11, 2007 for 2.0 hours. Mr. Duchardt and Mr. Owen were present for the January 11th meeting. Of the roughly 700 hours he billed for out of court time, the overwhelming majority were billed for reading discovery and documents prepared by others. Prior to September of 2007, Mr.

O'Connor recorded a TOTAL of 13.5 hours for consultation with experts and investigators. Mr. O'Connor spent a mere 63 hours on "trial prep" in September 2007. The only times Mr. O'Connor engaged in consultations with mental health experts were one hour in May 2007, one hour on October 9, 2007 (during the trial), and 2.5 hours on October 14, 2007 (during the trial).[11] In each of those mental health expert consultations, Mr. Duchardt was also present.

Ultimately, Mr. O'Connor's role in the case was minor. As a practical matter, Mr. O'Connor abdicated his role as lead counsel to Mr. Duchardt in violation of his professional responsibilities and ABA Guideline 10.4(B) (obligations of lead counsel).[12]

Though Mr. Duchardt holds himself out as an expert in capital cases and mental health issues, his conduct in this trial and his attitude and approach to the investigation, development, and presentation of mental health and mitigation evidence demonstrate that he is no expert. Mr. Duchardt was appointed on May 16, 2006 (Doc. # 87).

The other members of the trial team were David Owen,[13] whose role was quickly limited, paralegal Stephanie Elliott,[14] Ron Ninemire, Chief Investigator, who is not a qualified mitigation specialist, and Dani Waller, a mitigation specialist. Ms. Clarke described Mr. Ninemire's lack of qualification in her declaration:

> Mr. Ninemire did not have the experience or skill to serve as the lead investigator or mitigation specialist on the case. My understanding was that he had worked on only one federal capital case through sentencing (where the client received a death sentence) and he did not appear to understand the role and function of a mitigation

[11] Mr. O'Connor apparently had one other visit with Ms. Montgomery which is appropriately not reflected in his billing records when he took women from his church to visit Lisa shortly before trial. This was not a professional visit.

[12] In terms of dividing trial responsibilities and witnesses, Mr. Duchardt said of Mr. O'Connor, "John did not give a shit." (Dec. of Chris Armstrong, p.6).

[13] During the pendency of the trial, Mr. Owen was demoted from First Assistant to Assistant. He left his employment the day after the death verdict in Mrs. Montgomery's case and moved to Denver, Colorado where he is currently in private practice.

[14] Ms. Elliott was a solo practitioner working on child support and worker's compensation cases when she met Mr. Owen at a party and indicated that she would be willing to be the paralegal on the case having once handled a large document case.

> specialist, the protocol for investigating mental health and cognitive issues, or how to screen for psychiatric and cognitive impairments. He also did not understand the relationship between chronic and extreme trauma and subsequent behavior and symptoms. Given the likely extensive nature and severity of the trauma Ms. Montgomery suffered, it was imperative that the investigation be conducted by an experienced and well trained mitigation specialist.

(Exhibit No. 3, Dec. of Judy Clarke, paragraph 12). While the final team retained Dani Waller as a mitigation specialist, she was allowed to do only minimal work on the case. (Exhibit No. 16, Attachment No. 45, Dec. of Dani Waller).

B. May 2006 – December 2006

Mr. Duchardt was appointed on May 16, 2006. At the time of his appointment he was already set for trial in another federal capital case, *United States v. John Phillip Street*, Case No. 04-0298-CR-W-GAF. Mr. Street's trial began on July 24, 2006 and ended in a mistrial on August 14, 2006.

Mr. Duchardt called previously relieved counsel from trial team three, Susan Hunt and Judy Clarke. Each counsel informed Mr. Duchardt of the bizarre circumstances surrounding their removal, particularly the removal of Ms. Clarke. Ms. Clarke indicated to Mr. Duchardt that she was willing to come back into the case and alerted him to relevant case law that supported a challenge to her removal. Mr. Duchardt spent one hour and twelve minutes conducting legal research, but took no action. He did not read the transcripts relating to the removal of previous counsel until almost a full year later on May 14, 2007.

The day after he was appointed by the Court, and without a review of the defense investigation that had been performed to date, Mr. Duchardt decided that he wanted to hire Dr. Ruben Gur to evaluate Mrs. Montgomery. Mr. Duchardt had wanted to hire Dr. Gur in another case, but was unable to do so. (Exhibit No. 19, Dec. of Chris Armstrong, p. 2). Having access to the Federal Public Defender budget for Mrs. Montgomery's case, Mr. Duchardt was excited to

work with an expert of Dr. Gur's credentials (Exhibit No. 19, Dec. of Chris Armstrong, p. 2). Having spent less than ten hours in the case, having no social history or exact symptoms to share, Mr. Duchardt called Dr. Gur's office to obtain his services on May 17, 2006. It had taken Ms. Clarke, a nationally renowned death penalty defense lawyer, three months of meeting with the client and reviewing the case file to determine the appropriate experts to retain on Mrs. Montgomery's behalf. Without even meeting the client or reviewing the file, Mr. Duchardt contacted Dr. Gur (Exhibit No. 19, Dec. of Chris Armstrong, p. 2).

Similarly, unaware that Ms. Clarke had already sent a contract to Dr. Delis (a neuropsychologist), (Exhibit No. 19, Dec. of Chris Armstrong, p. 2), Mr. Duchardt then set out to hire a neuropsychologist and identified Dr. Robert Fucetola. It appears that Mr. Duchardt decided to use Dr. Fucetola on June 6, 2006. Based upon his time records, Mr. Duchardt spent a total of 3.7 hours reviewing social history data before deciding to hire two extremely important experts relating to Mrs. Montgomery's neurological impairment. This slap-dash approach to preparing the defense case would continue throughout his representation of Mrs. Montgomery.

Incredibly, and in violation of prevailing professional norms, Mr. Duchardt hired these two experts without ever having met Mrs. Montgomery. Mr. Duchardt met with Lisa Montgomery for the first time on June 13, 2006, nearly one month after his appointment and nearly two months after Ms. Clarke had been removed as counsel. Mrs. Montgomery was understandably guarded in this first meeting. Her trust in her defense team had been shaken to the core. Mr. Duchardt has described meeting Lisa Montgomery as "walking into a bomb scene" as Mrs. Montgomery had been "devastated" by the removal of Ms. Clarke. (Exhibit No. 19, Dec. of Chris Armstrong, p. 1). Mr. Duchardt came to realize that Lisa was going to have a hard time trusting him, particularly because he was a man. (Exhibit No. 19, Dec. of Chris Armstrong, p. 1).

Having identified these barriers to disclosure, based on the fact that Lisa was a victim of horrific sexual abuse and had difficulty expressing herself to men,[15] Mr. Duchardt subjected her to a neuropsychological evaluation by a man, Dr. Fucetola, just one month later in July of 2006. At the time Dr. Fucetola was conducting his evaluation, Mr. Duchardt was occupied with the Street trial.

During the remainder of the calendar year 2006, Mr. Duchardt visited Lisa just two more times. He visited her on July 7, 2006 for 1.2 hours and on October 13, 2006 for 1.5 hours. According to his time records, he spent 7 hours reviewing case materials (other than government discovery) on October 12, 2006 and 1.5 hours reviewing case materials on October 28, 2006.

Then, the capital retrial of the Street case lasted from November 28, 2006 to December 14, 2006, ending in a guilty verdict and life sentence for Mr. Street. Understandably, Mr. Duchardt spent little time on Mrs. Montgomery's case during the last quarter of 2006; however, his acceptance of the appointment in Mrs. Montgomery's case given his existing obligations to Mr. Street was a violation of prevailing professional norms that counsel should maintain his caseload in such a way as to "provide each client with high quality legal representation in accordance with these guidelines." ABA Guidelines, Guideline 10.1 (Attached as Exhibit No. 29). As will be explained below, Mrs. Montgomery was prejudiced as a result because Mr. Duchardt was caught flat-footed by his lack of preparation in Mrs. Montgomery's case and latched onto the novel defense of pseudocyesis before any expert had ever made or endorsed such a diagnosis.

[15] No thought was given to the fact that every female lawyer on the case had been removed: Anita Burns, Susan Hunt, and Judy Clarke. Each lawyer was ultimately removed because David Owen, the most inexperienced member of the team, could not get along with them. Mr. Duchardt was aware that the Kansas City FPD office was not a fan of his (Exhibit No. 19, Dec. of Chris Armstrong). The response on his part was to take over the case and ignore David Owen and the FPD office as much as possible. Interestingly, David Owen did not raise the same obstacles to Mr. Duchardt's actions as he had with Ms. Clarke despite the fact that Mr. Duchardt completely took over the case and did not involve Mr. Owen in the development of the defense strategy.

C. January 2007-March 2007

Mr. Duchardt finally turned his attention to Mrs. Montgomery's case in January 2007, over six months after he had been appointed to represent her and entrusted with the key tasks of developing both the mental health defense and a mitigation case. The case was set for trial on April 30, 2007, a mere four months later.

Up to this point, Mr. Duchardt had limited contact with the Federal Public Defender's Office staff, including Ron Ninemire. Though he had been appointed in May of 2006 and recognized immediately that the case was a mental health and mitigation case, Mr. Duchardt had yet to have a conversation with the mitigation specialist hired by Mr. Owen, Dani Waller.[16] Likewise, he had not consulted with any of the other mitigation specialists and investigators who had worked on the case prior to his appointment: Lisa Rickert, Holly Jackson, Debra Garvey, or David Freedman. In fact, Mr. Duchardt never contacted the latter four. Mr. Duchardt never contacted Dr. Judith Herman, the country's most renowned trauma expert, who had agreed to consult on the case when Judy Clarke was representing Mrs. Montgomery. Incredibly, Mr. Duchardt was unaware of the contract Judy Clarke had sent to Dr. Herman (Exhibit No. 19, Dec. of Chris Armstrong, p. 2).

The explanation for this shocking breach of his professional duties is that Mr. Duchardt finds the idea of a mitigation specialist, "laughable," despite the fact that the ABA Guidelines require a mitigation specialist be retained in capital cases. (Exhibit No. 19, Dec. of Chris Armstrong, p. 3). The ABA Guidelines, Exhibit No. 29, make clear that the prevailing professional norms in a capital case require that every defense team have ***at a minimum*** two attorneys, a fact investigator, ***and*** a mitigation specialist (emphasis added). So important is the

[16] Ms. Waller was hired by David Owen. She had very little interaction with Mr. Duchardt. She spent only a short amount of time with Lisa. David Owen and Ron Ninemire (who is not competent to serve as a mitigation specialist) directed her work. Mr. Owen was obstructive to the work that Ms. Waller was allowed to conduct.

role of a mitigation specialist who has the training and experience necessary to understand and screen for mental health symptoms that the ABA has published Supplementary Guidelines for the Mitigation Function. (Exhibit No. 30). While some excellent mitigation specialists are also lawyers, the same person cannot serve both roles on a capital defense team. Mr. Duchardt is not a lawyer who is also qualified as a mitigation specialist. His performance in this case did not measure up to the prevailing professional norms.

Yet, when asked, Mr. Duchardt recently said he was the mitigation specialist on Mrs. Montgomery's case (Exhibit No. 19, Dec. of Chris Armstrong, p. 3). While Mr. Duchardt was "ok" with the Federal Public Defender's Office hiring Dani Waller as a mitigation specialist, he maintained complete control of the mitigation investigation (Exhibit No. 19, Dec. of Chris Armstrong, p. 3). It was objectively deficient performance for him to simply take over the most important part of the case to the exclusion of every other team member, especially the mitigation specialist. The file reveals that the first time he spoke with the mitigation specialist, Dani Waller, was March 11, 2007 for twelve minutes regarding "case issues."

Ms. Waller has described her experience in working on Mrs. Montgomery's case as "frustrating" (Exhibit No. 16, Att. No. 45, Dec. of Dani Waller, p. 1). Ms. Waller met John O'Connor once and never had a conversation with him about her work on the case (Exhibit No. 16, Att. No. 45, Dec. of Dani Waller, p. 1). It was clear to Ms. Waller "that Mr. Duchardt did not have any use for mitigation specialists. I was informed that he did not believe in using mitigation specialists." (Exhibit No. 16, Att. No. 45, Dec. of Dani Waller, p. 1).

The focus of Mr. Duchardt's time and energy in the first quarter of 2007 was on the neuroimaging and analysis that was conducted by Dr. Gur and his team at the University of Pennsylvania. Despite having contacted Dr. Gur in May of 2006, right after being appointed,

Mr. Duchardt did not arrange for Mrs. Montgomery to be examined by Dr. Gur until February of 2007, approximately two months before the existing trial date. Prior to Mrs. Montgomery's transport to Pennsylvania, Mr. Duchardt visited her two times, once for 2 hours with co-counsel and again on January 29th for forty-two minutes.

Meanwhile, Mr. Duchardt brought Ruth Boutin Kuncel, Ph.D., a licensed clinical psychologist into the case in January of 2007. Dr. Kuncel evaluated Mrs. Montgomery on January 30, 2007. Dr. Kuncel's testing was to take place over two days. Unfortunately, during the night of January 30th, Mrs. Montgomery was transferred out of CCA-Leavenworth to Philadelphia, Pennsylvania. When Dr. Kuncel returned to CCA on January 31, 2007 to complete her assessment, she discovered that Mrs. Montgomery had been moved. Dr. Kuncel completed her testing in Philadelphia on March 16 and17, 2007; however, this disruption of the testing protocols led to an attack by the government on the validity of her findings during the penalty phase of the trial. Dr. Kuncel diagnosed Mrs. Montgomery as suffering from post-traumatic stress disorder, major depressive disorder, anxiety disorder, dependent personality disorder.

Having been unable to establish a relationship with Mrs. Montgomery, possibly due to the infrequent and limited number of times he visited her, yet having become aware that gender played a role, Mr. Duchardt began to try and think of ways to get Mrs. Montgomery to think of him as a "girl." (Exhibit No. 19, Dec. of Chris Armstrong, p.4). He decided that the best way to do that was to involve his wife, Ryland Duchardt, in his visits with Mrs. Montgomery (Exhibit No. 19, Dec. of Chris Armstrong, p.4). Though Mrs. Duchardt is not a trained forensic expert,[17]

[17] Mrs. Duchardt's professional experience appears to be working with autistic children through the use of horse therapy. She received a bachelor of social work in 1988 from the University of Missouri and a Master's in Counselor Psychology and Counselor Education in 1988. Certainly working with autistic children is a noble pursuit, but it comes nowhere close to the training and expertise necessary to fill the role into which her husband thrust her. Mrs. Duchardt does not have death penalty mitigation training. *See* Exhibit No. 16, Att. No. 45, Dec. of Dani Waller, p. 2.

has no death penalty experience, and did not consult with any mitigation specialist who had worked on the case, Mr. Duchardt made his wife the primary person who he relied on to help him interview Lisa.[18]

In the midst of the testing by Dr. Gur in Pennsylvania on February 18, 2007, Mr. Duchardt spent seven hours in a meeting with Mrs. Montgomery in which he included his wife, Ryland. At the conclusion of that meeting, Mr. Duchardt had finally gotten Mrs. Montgomery to say what Mr. Owen and Mr. Ninemire had been hypothesizing: that it was Lisa's brother Tommy, not Lisa, who had killed the victim. David Owen candidly admits that he and Ron Ninemire were the first ones to believe that Tommy was involved. (Exhibit No. 2, Dec. of David Owen). Due to his lack of expertise, Mr. Duchardt did not understand just how delicate Lisa's mental state was or her level of suggestibility. Mr. Duchardt pressed Lisa over and over until she finally gave him the answer he was looking for: Tommy was the culprit. Mr. Duchardt did not consider the possibility that due to Lisa's damaged mental state the "Tommy story" became a planted memory. Mr. Duchardt and his wife unwittingly reinforced this false memory by stepping up their visits with Lisa. Though Mr. Duchardt rarely visited Mrs. Montgomery in 2006, he and his wife began visiting her frequently, sixteen times between March 23 and August 31, 2007.

Excited by this new "revelation," the trial team set out to prove its new theory and ignored all the evidence that pointed to the fact that Mrs. Montgomery did not have an accomplice. The results of this foolish plan would prove disastrous.

---

[18] Mr. Duchardt misrepresented his wife's training and expertise to the team (and the Court) and did not seek their permission before involving her in the case. (Exhibit No. 2, Dec. of David Owen). Though Mr. Duchardt claims that Lisa Montgomery saw his wife as a "second mom," (Exhibit No. 19, Dec. of Chris Armstrong, p. 4), others on the team observed that Lisa did not seem close to Mrs. Duchardt.

Along with the new “Tommy defense,” Mr. Duchardt zeroed in on a new psychological defense: that Lisa had pseudocyesis and that she believed that Victoria Jo Stinnett was really her baby. Mr. Duchardt believes that he got this theory from David Owen. (Exhibit No. 19, Dec. of Chris Armstrong, p. 3). In any event, he set about developing this theory in March of 2007, a month before trial was scheduled. At the time that Mr. Duchardt decided that pseudocyesis would be his mental health defense, and filed a Notice of Intent to Rely Upon Defenses of Mental Disease or Defect on March 30, 2007 (Doc. #193), no expert had diagnosed Lisa with the disorder.

On March 22, 2007, Mr. Duchardt reached out to Dr. William Logan. Dr. Logan had seen Mrs. Montgomery two years earlier at CCA-Leavenworth for crisis intervention because of a suicide attempt. When Dr. Logan saw Lisa in March 2005, he believed that she required hospitalization and anti-psychotic medications. Mrs. Montgomery was experiencing “psychotic thoughts,” “auditory hallucinations,” and “Major Depression.” (Exhibit No. 11, Logan Letter 3/7/05). Dr. Logan did not diagnose Mrs. Montgomery with pseudocyesis, or any other somatoform disorder, in March of 2005 (Exhibit No. 11, Logan Letter 3/7/05). On March 22, 2007, Dr. Logan agreed to examine Lisa Montgomery further. Dr. Logan signed a contract for professional services on March 28, 2007. He did not diagnose Mrs. Montgomery with pseudocyesis in March or April of 2007.

Dr. Logan recounts that by the time Mr. Duchardt contacted him in March of 2007, Mr. Duchardt “had already zeroed in on pseudocyesis as the cornerstone of Ms. Montgomery’s defense. Mr. Duchardt had run across Dr. Ramachandran and was quite taken with his scientific theories.” (Exhibit No. 17, Dec. of Dr. William Logan). Dr. Logan describes Mr. Duchardt’s fascination with pseudocyesis as “clinically incomplete, myopic and misguided.” (Exhibit No.

17, Dec. of Dr. William Logan). He likened Mr. Duchardt to being afflicted with what "we used to call in medical school 'sophomore's disease' -- which is when medical students become entranced with rare and interesting diseases and begin to look for unusual and or exciting medical explanations for common symptoms." (Exhibit No. 17, Dec. of Dr. William Logan).

By the end of March, Dr. Gur had completed his testing, but his report was not yet complete. Like Dr. Logan, Dr. Gur did not diagnose Mrs. Montgomery with pseudocyesis or any other somatoform disorder in March 2007. As Mr. Duchardt explained in an interview in March of 2013, neither Dr. Gur nor Dr. Logan was on board for pseudocyesis until after Dr. Ramachandran produced his report which would not occur until May of 2007.

D. April 2007 – The Tipping Point: Trial Counsel Lies to the Court and Undermines Entire Defense

On April 2, 2007, Mr. Duchardt first recorded his efforts to obtain an expert in pseudocyesis. His CJA voucher shows 1.4 hours for "research and calls to find Dr. Ramachandran." Apparently having spoken with Dr. Ramachandran by telephone, he next spent 1.5 hours on April 2, 2007 preparing materials to send to Dr. Ramachandran. At this point, the case was set for trial on April 30, 2007 and the government had already scheduled evaluations of Mrs. Montgomery by their experts.

On April 3, 2007, the Court conducted a status conference during which Mr. Duchardt sought additional time to present his expert reports. Prior to the status conference, Mr. Duchardt had indicated that he would be producing reports from Dr. Gur and Dr. Kuncel. Though he was in no way prepared for trial, and had not conducted the complex biopsychosocial history necessary for an accurate diagnosis, for the first time, at this status conference, Mr. Duchardt affirmatively represented that the defense in the first phase was going to be that Mrs. Montgomery had pseudocyesis at the time of the crime. Mr. Duchardt stated on the record that he

had two experts who had already diagnosed Mrs. Montgomery with this disorder and that it would "impact the first phase defense in terms of mental disease or defect." (Tr. of Pretrial Conferences, April 3, 2007, p. 4). When asked to name the experts who would provide this diagnosis, Mr. Duchardt answered, "Dr. Ramachandran[19] and also Dr. Logan." (Tr. of Pretrial Conferences, April 3, 2007, p. 4). The Court then asked Mr. Duchardt if Dr. Ramachandran was preparing a report, and Mr. Duchardt replied, "He is. He has reviewed information we provided to him. He needs additional time to review additional information." (Tr. of Pretrial Conferences, April 3, 2007, p. 4).

There are several problems with this exchange. First, it was not true that two experts had diagnosed Mrs. Montgomery with pseudocyesis by April 3 nor was it true that Dr. Ramachandran was in the process of preparing a report. Second, Mr. Duchardt did not tell the Court that he had only spoken to Dr. Ramachandran the day before for the first time. He did not tell the Court that Dr. Ramachandran had never met or evaluated Mrs. Montgomery. Third, he did not tell the Court that Dr. Logan had not seen Lisa in over two years or that Dr. Logan had not yet examined Mrs. Montgomery and given any diagnosis, let alone a diagnosis of pseudocyesis..

To make matters worse, Mr. Duchardt went on to blame prior defense counsel, presumably the first three teams, for not asking Mrs. Montgomery more details about the offense. He claimed that there was a prohibition about talking to Lisa about the crime. Again, this was not true.

It should go without saying that lying to the Court is never reasonable trial strategy and is *per se* deficient performance. Moreover, a lawyer who lies to the Court is not acting as counsel

[19] Though his CV indicates that he received a M.D. in India, Dr. Ramachandran is not a licensed M.D. in the United States. The Government had to point that out to Mr. Duchardt during the trial.

for the client and as such, the client is without counsel during that critical stage of the proceeding. Further, the lying lawyer then puts himself (and his client) in a box. Now, the lawyer has to prove the lie he has told the Court to be true or risk being found out. This creates a conflict of interest between the lawyer and the client. Here Mr. Duchardt had a conflict – he had to follow through with a pseudocyesis defense whether it applied to Mrs. Montgomery or not – and it adversely affected his performance as counsel for Lisa Montgomery.

In addition to misrepresenting to the Court that two experts had diagnosed Mrs. Montgomery with pseudocyesis and were in the process of preparing reports that he could produce before the April 30, 2007 trial date, Mr. Duchardt decided to dig himself an even deeper hole. Unnecessarily, Mr. Duchardt announced to the Court and the Government attorneys that the defense was pursuing another line of defense besides not guilty by reason of insanity. (Tr. of Pretrial Conferences, April 3, 2007). Mr. Duchardt claimed that the defense had reason to believe that Mrs. Montgomery's brother, Tommy Kleiner, was present at the Skidmore home of the Stinnetts and that he was the one who actually killed the victim. Mr. Duchardt went on and on explaining to the Court and the Government attorneys how the defense team was going to prove the "Tommy defense" by showing that Tommy was present through forensic evidence. Mr. Duchardt apparently did not know, or did not care, that by attempting to pin the murder on Tommy and ascribing this revelation to Lisa, he effectively destroyed the relationship between Lisa's family and the defense team. Shortly after this hearing, Lisa's mother cut off all contact with the defense team and affirmatively worked to shut down the cooperation of all family members with the defense team. Of course, the cooperation of family members is critical to the development of both the client's social history and a mitigation case, but as Mr. Duchardt finds

such items to be "laughable," he preferred to focus on pseudocyesis and the "Tommy defense," notwithstanding the fact that these two defenses are completely inconsistent with one another.[20]

Recently, asked about the fact that pseudocyesis and the "Tommy defense" were inconsistent with one another, Mr. Duchardt provided this explanation: "I've no doubt Lisa [Montgomery] got into the situation, had the baby dropped into her lap and carried on." (Exhibit No. 19, Dec. of Chris Armstrong, p. 5). Mr. Duchardt continued, explaining that pseudocyesis works as a defense no matter who did the killing because "in Lisa's own mind the way she envisions the situation, she was Florence Nightingale who saved the baby." (Exhibit No. 19, Dec. of Chris Armstrong, p. 5). As to what his theory was as to why Tommy Kleiner (against whom Mrs. Montgomery had a restraining order) would have gone to Bobbie Jo Stinnett's house with Mrs. Montgomery, Mr. Duchardt suggested that current counsel should "sit down and talk to Tommy for a while - he did not need a lot of reason to do bad shit." (Exhibit No. 19, Dec. of Chris Armstrong, p. 5). He pointed out that both of Mrs. Montgomery's brothers, Teddy and Tommy, are a piece of work, saying, "those guys are just louses." (Exhibit No. 19, Dec. of Chris Armstrong, p. 5).[21]

In addition, the forensic testing that Mr. Duchardt hoped to utilize to put Tommy Kleiner at the scene of the crime had not been started as of April 3, 2007. Yet, Mr. Duchardt acted as if he would have no problem getting test results back prior to the April 30, 2007 trial date. Clearly, Mr. Duchardt was in no way prepared to try Lisa Mongomery's case in April of 2007. Two days after Mr. Duchardt's bold claims to have not one, but two, viable defenses for trial, the

[20] According to Tommy Kliener, the Government also played a role. According to Tommy, the Government told him that the defense was going to pin the murder on him and they knew he was innocent. They asked him to not tell the defense about his alibi and promised him help with pending charges if he were to cooperate. This misconduct is the subject of a separate claim in this motion. Exhibit No. 16, Attachment No 41.

[21] Given his opinion, it is curious that Mr. Duchardt called these witnesses at trial. However, his current observation is enlightening as to why he was unable to draw out the important information regarding Lisa's familial history of trauma, torture, violent sexual abuse, and mental illness. Exhibit No. 16, Attachment No. 41, Dec. of Teddy Kliener,

Government saved Mr. Duchardt by announcing that a continuance would be necessary in order for their experts to examine Mrs. Montgomery after Mr. Duchardt produced all of his expert reports (Tr. of Pretrial Conference, April 5, 2007). The trial was continued to October 1, 2007. A week later, on April 12, 2007, during a jury selection conference with Judge Fenner, Mr. Duchardt orally moved to have through the end of May of 2007 to produce his expert reports (Tr. of Pretrial Conferences, April 12, 2007). Although the Court questioned why he needed the extension, having stated just the week before that his reports would be ready by April 20th, the Court granted Mr. Duchardt an extension through May 15, 2007 (Tr. of Pretrial Conferences, April 12, 2007).

Dr. Logan examined Mrs. Montgomery on April 10 and May 11, 2007. These two examinations were completed in a total of 8.59 hours. Dr. Logan diagnosed Mrs. Montgomery with post-traumatic stress disorder, major depressive disorder, bipolar, and somatoform disorder. Initially, Dr. Logan did not diagnose Mrs. Montgomery as suffering from pseudocyesis which he felt was novel.

> Mr. Duchardt had run across Dr. Ramachandran and was quite taken with his scientific theories. Dr. Ramachandran, it appeared, had little to no forensic experience, and the extent of his expertise was questionable in my view. He had personally seen ten pseudocyesis cases. While I do not dispute that pseudocyesis is an acknowledged somatoform disorder, it does not take into account Mrs. Montgomery's other long standing and significant disabilities. There were more diagnostically accurate and clinically appropriate diagnoses to explain her symptoms of psychosis, symptoms that were grounded in her medical, family, psychiatric, and social history.

(Exhibit No. 17, Dec. of Dr. Logan). Dr. Logan was also critical of the methodology and protocol that was employed by the fourth defense team.

> By the time I got involved in 2007, it was full speed ahead on pseudocyesis. Mr. Duchardt was completely focused on guilt/ innocence phase of the trial and little preparation was done for the penalty phase.

Because of her severe abuse history, delusions, and psychosis, Mrs. Montgomery often dissociated, was perceptually disrupted, and suffered from memory impairment so often seen in severely traumatized, psychotic patients. At the time, Mrs. Montgomery was unable to disclose the information necessary for a reliable social history. The inability to accurately and effectively disclose details about the nature of trauma and its sequelae is often not volitional but is a direct result of the trauma, and special care must be given to avoid exacerbating symptoms of trauma and producing unreliable information. Trauma assessments and interviews must be conducted in a safe environment by trustworthy and trained persons who are provided adequate time to build a trusting relationship and sufficient information to recognize the interplay of trauma with other disorders such as cognitive impairments. That is why it is essential that interviews with severely traumatized clients be conducted by mitigation specialists, team members, or other experts with training and experience in interviewing trauma survivors and overcoming predictable barriers to disclosure.

Another problem in this case was that Mr. Duchardt did not appear to be working with a qualified mitigation expert. I have known Ron Ninemire, who is an investigator employed by the Office of the Federal Defender, for years and I respect his work, but he is not a mitigation investigator. That is simply not his role. When I consulted on this case initially in 2005, Lisa Rickert was the mitigation expert. When I began consulting on the case in 2007, I did not work with any mitigation investigator or expert over the duration of the defense investigation. It is unusual for a mitigation expert to not have contact with the client and with forensic experts such as myself. In my experience working cases in which the death penalty has been sought, the way this case was handled is the exception rather than the rule. Most often I work with mitigation investigators, identifying red flags I see in the social history or in the client interviews and request the investigator and defense team to provide me additional information on that aspect or area of a client's life so that I can better assess how that event, symptom, or relationship fits with the client's behavior or symptomatology and affects the diagnosis.

I would have been interested in knowing much more information about Mrs. Montgomery's social history. A complete history of the abuse she suffered as a child and as an adult, the temporal relationship between violence she experienced and her report of false pregnancies, and observations of her behavior before the crime would have informed my analysis. My assessment of Mrs. Montgomery established that she was clearly psychotic, that is to say out of touch with reality; in March of 2005 she was experiencing both auditory and visual hallucinations. Without a detailed and thorough social history, I was unable to discern how longstanding this psychosis was or whether it permeated all aspects of her functioning prior to incarceration or was confined to solely matters relating to pregnancy.

(Exhibit No. 17, Dec. of Dr. Logan). Dr. Logan also witnessed how the focus on pseudocyesis detracted from the investigation and preparation of the case.

> The defense did not allocate resources to the development of a social history, because of the focus on pseudocyesis. An adequate social history would have permitted a more complete discussion of Ms. Montgomery's psychotic symptomatology in the context of her complete life history and her behaviors both related and unrelated to the offense. It was necessary for me to have had a full social history that included more collateral sources rather than being forced to rely almost exclusively on the information Ms. Montgomery was able to disclose to me. While a full social history is always desirable, such was especially critical in this case in light of the evidence that Ms. Montgomery was actively psychotic. A social history would have provided patterns of behavior related to trauma, neurologic deficits, and psychiatric disease. It also would have offered examples of how severely impaired Ms. Montgomery was in her day to day functioning.

(Exhibit No. 17, Dec. of Dr. Logan).

Also in April, 2007, Mr. Duchardt received copies of Lisa's CCA Medical Records which showed that she was being treated for bipolar disorder by Dr. Linda McCandless. Mr. Duchardt met with Dr. McCandless[22] on April 18, 2007 and informed her that Dr. Logan had conducted an evaluation of Mrs. Montgomery and that Dr. Ramanchandron, a neurologist from California, would be involved with Mrs. Montgomery's case. After April 3, 2006, the "Tommy defense" and pseuodcyesis became "the script." Mr. Duchardt ignored the red flag that Lisa's treating psychiatrist had diagnosed her with a Major Mental Disorder, Bipolar Disorder, and was treating her with medication.

Dr. Ramachandran finally examined Mrs. Montgomery on May 10, 2007. He met with Mrs. Montgomey for less than four hours total. Dr. Ramachandran does not identify any testing he conducted. He merely visited with Lisa, asked her a few questions about her actual and perceived pregnancies, and created a report saying that she was suffering from pseudocyesis at the time of the offense.

[22] Dr. McCandless has refused to be interviewed by undersigned counsel.

The reckless behavior of Mr. Duchardt in announcing two inconsistent defenses to the Court and the Government at a point in time when neither had been sufficiently investigated and neither had any supporting evidence was deficient performance. As a result of Mr. Duchardt's behavior and subsequent effort to save face with the Court by pretending that he was ready to try the case in April of 2007, Mr. Duchardt created a situation in which her fourth defense team never figured out what was really going on with her psychologically and neurologically.

E. May 2007-Trial: The Scripts Plays Out with Predictable Results

Because he was backed into a corner by his own lack of preparation, defense counsel let the Government's expert, Park Dietz, in for an initial evaluation of Mrs. Montgomery before Dr. Ramachandran ever laid eyes on Lisa. The Government expert's first evaluation of Mrs. Montgomery took place on May 3, 2007. Dr. Ramachandran's contract was prepared on May 7. He evaluated Lisa on May 10, 2007. After Dr. Ramanchandran's visit, Dr. Logan evaluated Lisa for a third time and it was at that point that he was "brought along" to agree to include somatoform disorder in his opinion and report. (Exhibit No. 17, Dec. of Dr. Logan).

On May 10, 2007, Mr. Duchardt had a brief conference with Susan Hunt at CCA. Following that encounter with Ms. Hunt, he read the transcripts of the hearings where Ms. Clarke was removed and Ms. Hunt was asked to withdraw from the case, apparently for the first time. Yet, he took no action.

From May through July of 2007, the defense continued to prepare for the October 2007 trial date according to the script Mr. Duchardt had prematurely shared during the April 3 status conference: Tommy Kleiner went with Lisa to see the victim, for some unknown reason Tommy killed the victim, and Lisa picked the baby up and took the baby believing that it was her baby, Abigail. Any evidence that did not fit into Mr. Duchardt's script was simply dismissed or

ignored. As it turned out, Tommy Kleiner had an alibi. He claimed to have been with his probation officer at the time of the offense and there appeared to be documentation supporting this alibi. Yet, according to Mr. Duchardt, Tommy's alibi was "fudged." (Exhibit No. 19, Dec. of Chris Armstrong, p. 5). The fact that Lisa never told anyone that she believed that the baby was hers was ignored. The fact that Lisa confessed was minimized by Mr. Duchardt.

Meanwhile, Lisa, who everyone agrees finds it uncomfortable to be evaluated by men, was serially evaluated by male after male mental health expert in April, May, and June of 2007. Mrs. Montgomery dutifully complied and repeated the script that the defense had adopted, having come to believe by this point that Tommy really was with her at the time of the crime. The defense ignored the red flags that should have alerted them to the fact that Lisa was so mentally delicate that she was open to any suggestion; that she could not differentiate what was real and not real; that after getting used to brutality at the hands of her mother, stepfather, husbands, and multiple others, Lisa had become conditioned to simply go along with what others wanted from her.

1. The *Daubert* Proceedings.

In July of 2007, the Government moved to exclude the defense of pseudocyesis and Dr. Gur's testimony on *Daubert* grounds. (Doc. 243).[23] In the motion, the Government admitted that the testimony it sought to exclude was "arguably admissible" in the second phase. In the motion, the government did not challenge the raw data on which Dr. Gur relied. Had Mr. Duchardt simply acceded that his planned defense of pseudocyesis did not rise to a NGRI defense, then the entire *Daubert* hearing debacle would have been avoided. Mr. Duchardt knew, or should have known, that even if all of the evidence about pseudocyesis had been admitted, it still did not meet the clear and convincing evidence burden of proof required for a NGRI

[23] To be clear, Dr. Gur never opined that his testing was diagnostic of pseudocyesis.

defense. In his recent interview Mr. Duchardt explained, "the good thing about Dr. Ramachandran is that he is not afraid to embrace the frailties of the entire defense." (Exhibit No. 19, Dec. of Chris Armstrong, p. 6). According to Mr. Duchardt, Dr. Ramachandran saw the frailties of the case as facts *that could go either way*." (Exhibit No. 19, Dec. of Chris Armstrong, p. 6) (emphasis added). Mr. Duchardt further explained of his defense, "Frankly I think it was every bit as good as the government's theory." (Exhibit No. 19, Dec. of Chris Armstrong, p. 6) (emphasis added). Mr. Duchardt still does not seem to understand that evidence that could go either way does not meet the burden of proof for a not guilty by reason of insanity defense.

Yet, Mr. Duchardt pressed on. He did not appreciate the gravity of the situation and failed to timely comply with the discovery requested by the Government. Mr. Duchardt also failed to conduct an adequate investigation into the allegations made by the Government's experts, Dr. Evans and Dr. Mayberg. The hearings and proceedings surrounding Dr. Gur and his testing drug on and on until finally the Court excluded all of Dr. Gur's testimony the day after jury selection was over. Having lost his key expert, the one he had been so excited to retain mere days after being appointed to represent Mrs. Montgomery, Mr. Duchardt inexplicably failed to request a continuance in order to regroup.

2. <u>Anemic Attempt at Settlement with the Department of Justice on the Eve of Trial</u>

On Saturday, September 29, 2007, two days before jury selection, Mr. Duchardt drafted a half-hearted and weak request to the Department of Justice asking that they reconsider the decision to seek death in this case. According to Mr. Duchardt, the request was dispatched on September 30, 2007 (a Sunday). Jury selection began on October 1st. Not surprisingly, the request was denied after trial had started. No other attempts at plea negotiation are documented.

3. The Tommy Defense is Abandoned

In addition to losing Dr. Gur through his mishandling of the *Daubert* proceedings, on the eve of trial, John O'Connor "exercised [his] discretion as lead counsel" and decided that the defense team would abandon the Tommy defense because there was no solid evidence showing Tommy Kleiner's presence or involvement in the offense. (Exhibit No. 19, Dec. of Chris Armstrong). When asked how the defense team thought it could keep the "Tommy defense" out of the trial, given that all the experts had been provided information about Tommy being there, Mr. Duchardt referred undersigned counsel to Mr. O'Connor as the best source for an explanation as to how that could possibly have worked. Mr. Duchardt characterized Mr. O'Connor's position as being that Mrs. Montgomery was crazy and her belief that her brother may have been present was yet another manifestation of her mental illness. (Exhibit No. 19, Dec. of Chris Armstrong). Mr. Duchardt disagreed with Mr. O'Connor's strategy and wanted to take it on the chin and battle it out by presenting the theory to the jury that Tommy Kleiner was the actual killer. (Exhibit No. 19, Dec. of Chris Armstrong).

Because defense counsel had encouraged Lisa to talk about Tommy and the "Tommy defense" in all of the evaluations that occurred in April and May of 2007 with both the defense and government experts, the Government was able to utilize the story as a fabrication created by Mrs. Montgomery. Even more damaging, the Government used the theory that the "Tommy defense" originated with Mrs. Montgomery and argued that it proved that Lisa was a cold-blooded manipulative liar.

4. Pre-Trial Motions

Beyond a few boiler-plate form motions, Mr. Duchardt failed to engage in pre-trial motion practice. Among other things, Mr. Duchardt failed to seek a jury questionnaire that was specific to the defense. He failed to file motions to assure that the jury selection process was carried out in a fair way, a way that would provide the defense with an opportunity to learn sufficient information about the jurors to intelligently exercise their peremptory challenges. Mr. Duchardt failed to file motions to ensure that the Court and the Government would not misstate the law with respect to the imposition of a sentence of death. He failed to seek a continuance when it was clearly warranted both in April of 2007 and in October of 2007. He failed to seek exclusion of bad character evidence in the government's case-in-chief. Mr. Duchardt allowed the Government to introduce all sorts of bad character evidence without objection such that Lisa had been painted as a bad mother and a liar before any defense witness ever took the stand. Mr. Duchardt failed to file a *Daubert* motion to preclude expert testimony from Dr. Mary Case that was purely speculative and highly inflammatory.

5. Jury Selection

Mr. Duchardt's questioning of the jurors was abysmal. He failed to obtain important information about jurors which would have led to their exclusion because they were unwilling or unable to consider mitigation or a life sentence in a first degree murder case. He failed to oppose the exclusion of jurors whose views on the death penalty would not substantially impair their ability to sit as a juror on the case. He failed to object when the Court and the Government indicated that the jury must be unanimous before any individual juror may weigh and consider a mitigating factor. He failed to object when the Government indicated that the responsibility for the death sentence lay with someone other than the jury. He told the jurors that the death

sentence was mandatory if the aggravating factors outweighed the mitigating factors. His questioning was novice and showed no skill in the area of capital defense jury selection; asking simply "can you follow the law" types of questions which provided him with no useful information in selecting the jury that would hear Lisa's case.

6. The Trial

During the trial itself, all three trial attorneys failed to object to improper questioning and evidence from the Government's witnesses. Despite knowing that the Government would have several witnesses who would testify to instances where Mrs. Montgomery engaged in "bad" parenting, the defense team persisted in maintaining that Mrs. Montgomery was a "good" mother. Such bad and good labels really have no meaning in the context of Mrs. Montgomery's family unit. Mrs. Montgomery unquestionably loves her children. She also unquestionably failed as their parent in numerous ways that have nothing to do with her character and everything to do with her serious and debilitating mental and neurological illnesses. But trial counsel did not want to hear about that. Dr. Logan explains:

> Mr. Duchardt did not want any testimony that did not directly support the diagnosis of pseudocyesis. I thought it was important that Mrs. Montgomery's actions at the time of the offense be understood in the context of her psychiatric and neurological history, which showed she was gravely disabled as a result of long standing and multiple mental impairments, not simply one rare and obscure delusional disorder. Even if the impairments did not provide a defense to the charges, they explained the intensity of her desperate acts and the irrationality of her thought process, all of which was relevant to mitigation of sentence.
>
> ***
>
> Understanding Mrs. Montgomery's behavior and symptomology in context of her major psychiatric disorders would have made much more sense rather than focusing solely on the possibility of her having such a rare, specific diagnosis. Had I been asked, I would have suggested that the focus of the mitigation be placed on Mrs. Montgomery's symptomology – explaining to the jury that Mrs. Montgomery was out of touch with reality (psychotic), a condition seen in the context of a major mood disorder. Though she was able to form a plan, Mrs.

> Montgomery's frame of reference was not rational; she was psychotic and her actions resulted from that psychosis and lack of contact with reality. It would have been more consistent with the evidence if the defense had presented a complete picture of the interaction of major depression with psychotic features, severe bipolar disorder, complex trauma, and neurologic impairments.

(Exhibit No.17, Dec. of Dr. Logan).

Mr. Duchardt confirms that Dr. Logan had been skeptical of the defense pre-trial. "Dr. Logan …could only provide the team mitigating evidence." (Exhibit No. 19, Dec. of Chris Armstrong, p. 4). As Mr. Duchardt put it, Dr. Logan said he could not give the team a "first phase" defense. (Exhibit No. 19, Dec. of Chris Armstrong, p. 4). Based on Dr. Logan's inability to find a psychiatric disorder which would support insanity, Mr. Duchardt provided Dr. Logan with Dr. Ramachandran's report and Dr. Logan "was able to support Dr. Ramachandran's analysis." (Exhibit No. 19, Dec. of Chris Armstrong, p. 5).

As the case proceeded to trial, things went from bad to worse. Dr. Ramachandran, who had never testified in a criminal trial, came off poorly. He had little actual experience with anyone who actually suffered from pseudocyesis and the Government was able to effectively cross-examine him. He was not well-prepared.

The trial team further failed to prepare their other expert witnesses for trial testimony. Dr. Logan vividly recalls:

> I specifically and repeatedly asked Mr. Duchardt to provide me with copies of, or information regarding, Mrs. Montgomery's computer use. I specifically requested information regarding deletions in her internet history. Mr. Duchardt informed me that that information was not available. Ultimately, my testimony was significantly undermined by cross examination regarding the deleted emails as I was unprepared for those questions. In my view, Mr. Duchardt's failure to provide me with this critical information such that I could take this information into my clinical evaluation and be prepared to respond appropriately on cross examination was catastrophic.

(Exhibit No.19, Dec. of Dr. Logan).

As the trial went on it was clear that things were not going well. Then, suddenly, Mr. Duchardt decided that he had new witness to support his defense: the treating psychiatrist, Dr. Linda McCandless. While Mr. Duchardt now claims that Dr. Linda McCandless's testimony "sort of fell into our lap," available records suggest otherwise (Dec. of Chris Armstrong, p. 4). On October 12, 2007, a Friday in the midst of the trial, Mr. Duchardt billed .1of an hour for a telephone call to Dr. McCandless at CCA (Exhibit No. 25, Duchardt CJA Voucher). On October 13th, a Saturday, Mr. Duchardt billed for two telephone calls with Dr. McCandless (Exhibit No. 25, Duchardt CJA Voucher). Dr. McCandless's treatment notes reveal that she questioned Lisa about the offense for the first time on Saturday, October 13, after she had spoken with Mr. Duchardt. On Sunday, October 14th, Mr. Duchardt had yet another telephone call with Dr. McCandless (Exhibit No. 25, Duchardt CJA Voucher).

Then, on Monday, October 15, at 6:16 a.m., Mr. Duchardt emailed the Courtroom Deputy to Judge Fenner, the Government attorneys, David Owen, Ron Ninemire, and Stephanie Elliott and announced that he had a new witness for the first phase of the trial: Dr. McCandless. (Exhibit No. 28, Fred Duchardt email to court dated 10/15/2007). According to the email, Mr. Duchardt had called Mr. Whitworth the night before to notify him that Dr. McCandless would be testifying (Exhibit No. 28, Fred Duchardt email to court dated 10/15/2007). The Government objected to the late disclosure and as a violation of the discovery rules on mental health evidence (Exhibit No. 28, Fred Duchardt email to court dated 10/15/2007). Mr. Duchardt claimed that Dr. McCandless "reported to [him] that she had met with Lisa on Saturday . . . because she ha[d] been concerned about Lisa's mental health during the trial" (Exhibit No. 28, Fred Duchardt email to court dated 10/15/2007). Mr. Duchardt claimed that Dr. McCandless had "decided she needs to change her diagnosis of Lisa to include psychosis" (Exhibit No. 28, Fred Duchardt email to

court dated 10/15/2007). Duchardt presented this issue as if he had only just learned from Dr. McCandless herself that Dr. McCandless would support a first phase defense. The veracity of that statement is questionable. When asked recently how he obtained Dr. McCandless' treatment records over a weekend, Mr. Duchardt claimed he kept a "free flow of that stuff coming to [him]" (Exhibit No. 19, Dec. of Chris Armstrong, p. 4).

The court allowed Dr. McCandless to testify, but again, Mr. Duchardt failed to prepare her.

> Mr. Duchardt's failure to prepare his witnesses also compromised the testimony of Dr. McCandless, who was totally blindsided by the recordings of Ms. Montgomery's phone calls from CCA. Dr. McCandless was not a forensic expert, but Mr. Duchardt left Dr. McCandless vulnerable to cross examination regarding those calls by not providing her information regarding those calls prior to her testimony. I believe that had Dr. McCandless been prepared, she could have explained that in fact Ms. Montgomery was presenting herself falsely in those phone calls, in other words she was trying to present herself as more competent than she was in order to mask her deficits and impairments.

(Exhibit No. 17, Dec. of Dr. Logan, p. ).

Because he had failed to properly investigate Mrs. Montgomery's social history prior to the defense expert evaluations, failed to conduct a thorough and comprehensive mental and neurological evaluation before trial, and failed to conduct appropriate investigation and research into the backgrounds of the Government's witnesses, Mr. Duchardt further failed in his cross-examination of the Government witnesses. He failed to impeach their methodology and shoddy techniques. He failed to attack the validity of their protocols. Mr. Duchardt actually brought out damaging evidence, including testimony from Dr. Martell about Lisa's answers on the controversial PCLR test. He failed to properly impeach Dr. Dietz regarding Dr. Dietz committing perjury in the Andrea Yates trial.

Mr. O'Connor handled the cross-examinations during the guilt phase of the trial, often bringing out information damaging to Mrs. Montgomery. Mr. Owen handled all of the computer forensic evidence at trial.

Given the multiple errors made by this trial team spearheaded by Mr. Duchardt, it was not surprising to anyone other than Mr. Duchardt that the jury rejected the defense of pseudocyesis and convicted Lisa Montgomery of first degree murder. What the defense failed to comprehend was that the jury, having rejected their pseudocyesis theory in the guilt phase, would never accept it in penalty phase, nor would they be open to testimony from Dr. Logan and Dr. Kuncel.

7. The Penalty Phase

At the beginning of the penalty phase, Mr. Duchardt acknowledged the poor defense presentation in the guilt phase of the trial: "If anybody is to blame, it's us. We understand that." (Tr. p. 2870-71). Yet, the fourth defense team would fail to represent Lisa Montgomery properly in the penalty phase.

Just as Mr. Duchardt had failed to prepare Drs. Logan, Ramachandran, and McCandless, he left Dr. Kuncel similarly unprepared for the all-out assault on her testing in the penalty phase. Dr. Kuncel's testimony was so bungled that the jury was lost in a sea of test results and never heard the story of Lisa's trauma history.

The penalty phase went so poorly that Dave Owen actually called Susan Hunt during the trial to commiserate and complain that "Lisa's story is not being told." (Exhibit No. 2, Dec. of David Owen). Mr. Owen explained that "The mitigation presentation was weak and the mental health evidence lacked foundational support." Mr. Owen also states, "No matter how many times prior to the beginning of trial, the defense team, myself included, stressed to Fred Duchardt

the need to get one of the experts to testify how insane people can premeditate, he did not do that." (Exhibit No. 2, Dec. of David Owen). Mr. Owen "truly believe[s] Lisa Montgomery is on death row, not because of the crime she committed, but because of the lack of an effective mitigation presentation." (Exhibit No. 2, Dec. of David Owen).

There is no doubt that the mitigation presentation was poor. Mr. Duchardt had taken sole responsibility for the mitigation case. As he puts it, "I would have been the mitigation specialist." (Exhibit No. 19, Dec. of Chris Armstrong, p. 3). Mr. Duchardt spoke with the real mitigation specialist hired for the fourth team only a handful of times prior to trial (January 16, 2007, May 24, 2007). On the occasions that Mr. Duchardt visited with Mrs. Montgomery's children (who he interviewed in group settings) he did not bring Ms. Waller along. Ms. Waller was "iced out" of the case and only was brought in at trial to transport witnesses to and from court. Even when Ms. Waller observed Mrs. Montgomery's mother attempting to intimidate witnesses in the hallway, nothing was done. *See* Exhibit 16, Attachment #45, Dec. of Dani Waller.

Mr. Duchardt's failings as penalty phase counsel extend to his failures to object to improper victim impact testimony and argument as discussed below and his failures to object to multiple instances of improper argument by the Government in opening and closing argument as discussed more fully below.

There was so much more that could have and should have been presented on behalf of Lisa Montgomery.

8. <u>What the Jury Did Not Hear</u>

Had Mr. Duchardt and his co-counsel performed effectively, they would have recognized that all those times that Lisa was unable to express herself were because Lisa was not

competent to proceed and one of these attorneys would have raised that issue with the Court. In addition, trial counsel should have recognized that the medication that Lisa was taking made her affect flat and made her appear remorseless - a fact argued by the government to support death. Trial counsel took no steps to alleviate the prejudice of the medication on the jury's perception of her and as such she was prejudiced.

Had trial counsel followed prevailing professional norms they would have heard a very different defense, one that would have been well-supported by documents and witnesses, and one that would have put this crime in the context of Lisa's tragic social history and multiple serious medical, neurological, and mental impairments. Competent trial counsel would not have sought a not guilty by reason of insanity defense, nor would they have persisted in the ludicrous "Tommy" defense. They would have instead presented what we present here in the form of the opinions of qualified expert witnesses whose opinions are corroborated by facts and evidence and lay testimony that explains Lisa's behavior and functioning at the time of the crime. *See* Exhibit No. 16, Dec of Jan Vogelsang, Exhibit No. 15, Dec. of Dr. George Woods, Exhibit No. 17, Dec. of Dr. William Logan, and Exhibit 1-30. All of these exhibits are specifically incorporated herein. There is reasonably probability that a single juror hearing this evidence would have voted for a sentence of life. Mrs. Montgomery was prejudiced by trial counsel's unprofessional errors and omissions.

As undersigned counsel have now discovered:

> Psychiatric and neurologic disease affected every aspect of Lisa Montgomery's life in much the same way they had affected her mother's and father's lives. Lisa's father and his family and Lisa's mother and her family inherited genetic vulnerability that made them at increased risk for developing psychiatric and neurologic disorders later in their lives when triggered by particular environmental factors. Bipolar mood disorder, depression, cognitive impairments, post traumatic stress disorder, autism, and neurologic disorders took a heavy toll on Lisa's family in generation after generation. Family patterns of

behavior passed from one generation to the next in much the same way and with equally devastating results. In order to understand the events of Lisa's life and how the cascade of terrifying events she survived affected her, it is necessary to chart the interaction of mental illness and trauma in her parents' lives.

Exhibit No. 16, Dec. of Jan Vogelsang at 7.

*Lisa's Paternal Family Has a Substantial History of Psychiatric and Neurologic Impairments.*

Depression, anxiety and their destructive companion of alcoholism came to Lisa from her father's side of the family, along with neurologically based disabilities. Lisa's father is John Patterson. John's grandmother "died from sugar diabetes" and "had Lupus." When she passed away,"she was covered with scales" and sores. John's mother, Marie, also suffered miserably in her final years from Lupus, which made her "easily stressed and upset." Marie "had Alzheimer's disease and dementia when she died." Her death certificate lists her cause of death on December 22, 2007, as "failure to thrive" and "severe end stage dementia." In her younger years, Marie also experienced blackouts and uncontrollable emotions. If Marie "got into a fight she blacked out and then came to banging someone's head against the ground. She could not remember getting in the fight or actually fighting." Marie "blacked out during the whole fight and then woke back up at the end, when she was getting pulled off the person."

Lisa's father, John, attempted to quell his anxiety and depression with alcohol, and "drank all day, every day" from 1960 until 1980. He and his friends "drank way too much." John's drinking interfered with his military career, and his Army superiors noted "alcoholic tendencies and indebtedness" in his file. John's sixth wife attributed the "neuropathy in his feet" to his 20 years of drinking. John recognized his depression and anxiety. He "felt depressed" and "became withdrawn." "Nothing" gave him "any joy." His former sisters-in-law thought "there was "something strange about him."

Lisa's paternal half-sister, Diane Rae, suffered from depression and anxiety her entire life. She "was depressed for weeks at a time" and still struggles "with anxiety, fear, and depression." Her son understands that Diane has "struggled with depression and bipolar her whole life."

Lisa's paternal aunt, Mary Lee, had a series of neurological events that required surgery, medication, and rehabilitation. She underwent a craniotomy at the age of 17. Mary Lee first experienced grand mal seizures in 1970 and continued to have seizures throughout her adulthood, despite medications including Dilantin. In 1972, when she was 27 years old, Mary Lee developed a large left frontal arterovenous malformation (AVM). She suffered from migraines for most of her adult life and has had several small strokes. In 1996, Mary Lee was diagnosed with depression and prescribed Zoloft.

Lisa's paternal half uncle, Thomas Allen Hedberg (Tom), survived spinal meningitis at the age of three years old, and developed depression, anxiety and headaches, as well as uncontrollable emotions similar to his mother's blackouts. Tom's depression persists in his adulthood. "I have depression." Tom's daughter, Heather Hedberg, recognized "[d]epression runs on my paternal side." Tom's sister, Lori Mae Yates, agreed that Tom "suffers from anxiety and depression."

Lisa's paternal cousin, Heather Hedberg, struggled with major depression, was treated with Wellbutrin, and spent her school years in special education classes. Heather "was always in special ed for math and reading" and had "trouble learning and trouble reading like regular people." Heather had auditory hallucinations of "angry voices and thoughts" for "as long as" she could remember. She "was always a depressed little kid," and she "started to have suicidal thoughts" as she grew older. Her father, Tom Hedberg, agreed that "Heather has major depression, and I have depression too." Tom's son, Daniel Hedberg also struggled with depression, suicidal thoughts, and self-harming inclinations. He "was depressed too, for most of his life. When he was younger he went to Las Vegas and took a bottle of pills and drank a cup of bleach. He was trying to kill himself." Another one of Lisa's paternal cousins, Stephanie Yates, struggled with depression and Crohn's disease, according to her mother.

Lisa's paternal family has a substantial history of depression, anxiety, and neurological disorders that range from blackouts and seizures to AVMs that passed from one generation to the next. These impairments affected family dynamics and directly affected John's performance as Lisa's father and Lisa's development and functioning.

Exhibit No. 16, Dec. of Jan Vogelsang at 7 (internal citations omitted).

*Lisa Maternal Family Has a Substantial History of Neurologic and Psychiatric Impairments*

John, Lisa's father, was on a path likely to lead him to Judy, Lisa's mother. Judy's family came from "western types, one step above Amish" with its own history of bootleggers, strangeness, abandonment, and mental retardation. The severity and pervasiveness of major mental illness in Lisa's maternal family is remarkable and establishes a genetic vulnerability to mental illness in her life. Family stories, descriptions of family members, and life history documents reveal a mutigenerational predisposition to affective mood disorders, psychosis, and neurological deficits that claimed victims across time. Many of these disorders gave rise to aberrant and cruel behavior that resulted in family dynamics organized around trauma, strategies of coercive control, and shifting alliances. Family stories of mental illness start with a great, great ancestry – possible a great, great grandmother – who died in an insane asylum in Indiana. The stories culminate with two of Lisa's own grandchildren who have been diagnosed with autism and pervasive developmental disabilities.

In between the generations, an aunt was born with one hand and one of her children was born without an ear; another uncle born with intellectual disability (mental retardation). One of Lisa's maternal cousins was diagnosed with bipolar mood disorder with psychosis and hospitalized multiple times; that cousin's daughter has likewise been hospitalized with bipolar mood disorder. Another maternal cousin has been hospitalized, treated with antipsychotic medication, and diagnosed with psychotic disorders; his daughter has also been hospitalized for mental illness. Yet another male cousin has also been described as mentally ill. Both of Lisa's maternal half brothers have received treatment for substance abuse, been incarcerated for criminal behavior, and have acted violently towards others. One of her half brothers has received antipsychotic medication for his nightmares, racing thoughts, auditory hallucinations, paranoia, flashbacks. This extensive family history of maternal mental disorders provides a background for examining the manner in which Lisa's mother reared her and exerted control over her as an adult

Exhibit No. 16, Dec. of Jan Vogelsang at 24 (internal citations omitted).

Judy did not make any effort to protect her unborn child and to have a healthy pregnancy. She and John continued their "lifestyle of going out drinking and socializing the entire time she was pregnant." John only lived with Judy in Washington State for two weeks, so he "tried to make is fun for Judy in order to make her like living up near my parents." John took her out several times, "to a tavern, bar or restaurant and eating and drinking." In the late 1960s, there was little consciousness about the permanent harm drinking brought to unborn children, and no one challenged Judy's drinking. John recollected how indifferent people were to serving pregnant women alcohol:

> One time one of the waitresses at a bar asked for ID, and it was so funny because the waitress was actually pretending to ask my unborn child for ID! Another time Judy had to show ID to get into a bar, and we found out that she actually wasn't old enough to be drinking in Washington State. The drinking age in Kansas was eighteen years old, and in Washington State it was twenty one years old. She worked in a bar in Kansas, so I figured she was old enough. That time, in Washington State, even though she was underage and very pregnant, they ended up letting us into the bar.

Judy smoked and drank all the way through her pregnancy, whether or not her husband, John, was in the country. Socializing was Judy's full time job, even with a three year old Diane and a new born Lisa at home. Judy did not work in 1968.

John and Judy spent very little time together in Washington before he was shipped overseas in January of 1968. "Judy, John, and Diane lived around the corner from my parents, until John was stationed overseas again. John was sent off, and Judy was pregnant with John's baby. Judy was left with John's child from a prior woman, and Judy didn't know how to care for a child. When she had baby

Lisa on February 27, 1968, Judy did not know how to care for the new baby either. Lisa was born at the base hospital at Fort Lewis, Washington. Judy "ignored Diane, John's first daughter," and John's mother Marie "had to show Judy how to care for baby Lisa. Judy didn't change Lisa's diapers enough. . . .Judy wasn't interested in parenting."

Judy forced four year old Diane to take care of the new born baby. Diane learned how to change Lisa's diapers and make her a bottle. Diane learned how to change baby Lisa's tiny clothing and to rock her when she cried. Diane tried to protect Lisa from Judy's abuse and Judy's drunken rages. Diane "loved that little baby from the moment" she "laid eyes on he and "doted on her." At only four years old, Diane became Lisa's mother and protector as best she could:

> Judy never cared for Lisa, and so I took care of Lisa all of the time. I was only four years old, but I acted like baby Lisa's mother. I fed her and changed her, I dressed her and took care of her. I protected baby Lisa from the fighting as best as a small child can. Judy never cared for Lisa, so I felt like I was Lisa's mother. I loved her like I thought a mother should, even though I never had had any example of motherly love from Judy.

Exhibit No. 16, Dec. of Jan Vogelsang at 34 (internal citations omitted).

*Terror Filled Lisa's Infancy*

Lisa's infancy and early childhood were spent in a fearful, terror-ridden home, witnessed and experienced by her older half-sister, Diane. Diane tried to take baby Lisa and spend as much time as possible at her grandmother Marie's house around the corner. Diane feared her time with Judy and described one experience indelibly stamped in her mind:

> One time in Washington, Judy sent Diane down to her grandmother's. However, her grandmother wasn't home. Diane remembers being afraid to return to Judy's house. Finally, Judy came to retrieve Diane and began yelling at her. Diane remembers being very afraid.

Judy controlled Diane by threatening to separate Lisa and Diane or threatening to send Diane away. Diane recollected that:

> Judy's greatest pleasure was finding the one thing that I held sacred and destroying it. Judy exploited my greatest fear. Judy knew that my greatest fear was being sent away from my family. She saw that I found joy in being with baby Lisa. Judy tortured me by pretending that I was about to be sent away from the family, all of the time. She stripped me naked, packed all of my clothes into a suitcase, and forced me outside onto the stoop of the house. She told me that people were just about to come and take me away. I

> stood out on the stoop of the house, naked and afraid, many many times. Any time I found joy in something that Lisa did, Judy told me that I was just about to be taken away.

Judy drank, socialized, and looked for boyfriends while John was out of the country. She came on to John's best friend, Ronald Figg (Ron). John found out about Judy's indiscretion when Ron wrote him and told him he would not be stopping by to check on Judy anymore. Judy had "tried to have sex with Ron, and Ron was offended that she could do that" to John." Ron confirmed Judy's behavior:

> Judy got attached to me while John was out of town, and she tried to get tricky with me. She got too attached to me and I had to get rid of that. She was living next door to Marie and Gordon back then. She called me one night, late, and she was yelling at me. She told me 'if you don't come over here right now I am going to commit suicide! I will kill myself!' Well, I told her 'go ahead.' I am not getting involved in any of that. Judy was manipulative, crazy.

Later in life John learned that Judy "was notorious on the base" and "was actually entertaining men" at John and Judy's home.

Exhibit No. 16, Dec. of Jan Vogelsang at 36 (internal citations omitted).

Diane remembered the instability in the home:

> John's relationship with Judy was absolutely terrible. Judy paraded men in and out of the house constantly. She was not faithful to John, and the two of them got into terrible fights continually. Both John and Judy drank a great deal and the drinking did not help the fighting. I protected baby Lisa from the fighting as best a small child can. John lived in the house in Fort Collins for two weeks before Judy kicked him out. John went to live on the base, and Lisa and I stayed with Judy in the house that John had bought.

*Judy and John Intentionally Hurt Their Children.*

During John's short periods with his family, he inflicted great harm. He had no tolerance for children and knowingly or unknowingly took out the stress of soldiering out on Lisa and Diane. While living in Colorado, Diane told the story about a time she did "something wrong." John and Judy "stripped her naked, opened the front door and told her she had to leave. It was dark outside and she was crying. She begged them to let her stay. She doesn't recall what she had done, but she remembers promising them to never do it again."

John was too confused by constant drinking and his obsessive need to please Judy to pay attention to his children. John abused Diane and Lisa along

with Judy, but in hindsight attributes most of the real abuse to Judy: "Judy spanked the girls, and she told me to spank the girls as well. I am ashamed to say that I did what Judy told me to do, and spanked my girls. I am ashamed to say that when Judy told me to go along with this abuse, I did."

Judy punished Lisa for making any noise, a tactic Judy used with increasing cruelty over Lisa's life, ultimately resulting in Judy's taping Lisa's mouth shut with duct tape. John remembered when silencing Lisa started:

> If Lisa played and made noise, Judy screamed at her. Judy yelled at the girls for acting just like little girls do. Judy belittled the girls, making them feel poorly about themselves. I could see it. It should have stopped it. At the time, I was drinking and trying to lose myself. Judy was a terrible mother and I regret not stepping in and making her stop abusing my girls.

John and Judy fought constantly in front of Diane and Lisa. Judy's rapid mood swings and her and John's constant intoxication made things worse. Diane and Lisa observed it all, including physical fighting between Judy and John.

> Judy had a temper. If she got mad, she got mad quickly and stayed mad. She overreacted to any small thing I said. I had had it. Judy and I got into a knock down fight. She came home after being gone all night, and she acted like it was no big deal. I pushed her out of the front door and pulled her by the hair.

Judy used stress positions, extreme temperature, and physical assault with objects to silence and control the girls. Diane described what Judy did to the little girls, so small they were not yet in school:

> Judy was a very angry person. She shouted and screamed and yelled and hit us. Judy punished us in terrible ways. If little Lisa didn't want to eat all of the food on her tray, Judy left Lisa strapped into her highchair for hours. If I didn't eat all of my vegetables, Judy threw me into the shower by my hair and turned the taps on cold. Judy left me in the cold shower, naked and terrified, for hours. Judy spanked my bare bottom, strapped me across the legs, and slapped me across the face with an open hand. She hit me on the head with a broom handle repeatedly.

Exhibit No. 16, Dec. of Jan Vogelsang at 39 (internal citations omitted).

*Lisa's First Sentence: "Don't Spank Me; It Hurts*."

Diane was five years old when Judy moved her to Colorado, and Judy began to beat her and her baby sister, Lisa, consistently and frequently. She did not bother to:

act like she loved the girls at all. Judy was very authoritative towards the girls. She was hard on them. Judy slapped Lisa and Diane with the flat of her hand. She hit them in the head and in the face. Judy strapped the girls on the backs of their legs. If baby Lisa didn't eat everything on her high chair tray, Judy left her for hours at the table, strapped into the high chair, crying. Judy pulled Lisa and Diane by their pigtails and punished them for things that they did not understand. Judy was physically abusive of the girls, as well as emotionally and verbally abusive.

Judy created an unsafe home for both girls and invited many men to the home. She allowed the men to sexually assault Diane, and Lisa witnessed the repeated attacks:

> Judy never showed any love towards me, or towards Lisa. She never protected me from the men that she brought into the house. I shared a very small bedroom with Lisa and a man started coming into the bedroom and molesting me regularly. Little Lisa was in the bed next to mine every time. I never saw this man's face. I think it was the same man, but as a small child being molested, it is hard to tell.

Judy's beatings, hyper sexuality, and degrading treatment of Diane haunted Diane over the course of her life. Diane described the maltreatment she survived to her daughter Jessica, who learned the pervasive cruelty of her mother's early life: and described it:

> Judy had lots of boyfriends that came in and out of the house. One of Judy's boyfriends sexually molested my mom repeatedly. Judy never protected my mom from any of the boyfriend's sexual abuse. . . .Judy was severely physically abusive of my mom, and Judy berated and yelled at my mom constantly. Judy didn't take care of my mom. Mom was hungry all the time. Judy forced my mom into cold water showers for hours at a time as punishment. Judy found out that the smell and taste of onions make my mom gag and Judy tried to force my mom to eat onions, just to laugh at her as she sat at the table, gagging violently.

Lisa heard and saw it all, and Judy didn't spare Lisa any beatings just for being the youngest child. Later in life Judy bragged that when Lisa spoke her first sentence at eighteen months old, it was, "Don't spank me. It hurts."

Exhibit No. 16, Dec. of Jan Vogelsang at 41 (internal citations omitted).

During and after her marriage to John, Judy "often brought strange men home from the bars." Judy drank excessively and frequented bars near her home. She got into fights with these men after she brought them home, screaming and throwing things at them. On at least one occasion, Judy left one of the strange

men at home in charge of the girls. He came into Diane and Lisa's bedroom and molested Diane. Lisa and Diane shared a room; if each stretched their arms they could easily touch each other's hands. Lisa was in the room during that molestation and during all of the others.

Exhibit No. 16, Dec. of Jan Vogelsang at 42 (internal citations omitted).

> The day Diane was taken away from Lisa is indelibly stamped on her mind. Judy told Diane "it was her own fault" and "her choice." Diane knew as soon as she saw the social workers at Judy's door that "she was being taken away." In February 1972 two social workers came to Judy's house. Diane described what happened next:
>
> > The case worker assigned to me sat and talked to Judy. They talked about places that I could go and live and have a permanent home. Judy told the social worker that my Grandma Marie was dead. The social worker took me away! As I was leaving Judy leaned over and told me that I was being taken away from her because I was bad. She told me it was my fault! What a terrifying thing for a young girl to hear. I clung to Lisa as I was leaving. I knew deep down that if I left for good, the sexual abuse that I had continually experienced while living with Judy would start to happen to Lisa. I knew that when I left no one would take care of baby Patty. Lisa was only four years old so I knew that she couldn't care for a new baby.
>
> Lisa and Patty sat with Diane on the couch and tried to console her by hugging her. Diane was nervous and so upset that she kept vomiting. The caseworker who took her away had to pull her car over, because Diane continued to get sick. Diane felt she was leaving her two sisters behind, without protection. She was "leaving them to the wolves."

Exhibit No. 16, Dec. of Jan Vogelsang at 52 (internal citations omitted).

> Lisa learned that Judy was powerful enough to exile her sister. Lisa grieved for her missing sister. Twenty years later, Lisa searched the internet to try and find Diane to fill in that aching memory, but to no avail.

Exhibit No. 16, Dec. of Jan Vogelsang at 54(internal citations omitted).

> Lisa and her younger sister Patty were outcasts in the household and were singled out for harsh and painful treatment. Their older step sister, Jackie, saw firsthand that Jack and Judy inflicted senseless punishment on the little girls. When Jackie was 18, unmarried, and had her baby, Mark, she had to move in with Judy, Jack, Patty, and four year old Lisa on Archer Street in Tulsa. It turned into "a couple weeks of pure hell," and Jackie moved out. Jack always yelled at Lisa and Patty. Once at dinner time, Jack got mad at two year old Patty, "lifted her up by her pig tails" and sent her to her bedroom. Judy "sat and allowed" Jack to abuse Patty, while Lisa sat at the table shaking. Jackie fled Judy and Jack's home

to her sister Becky who gave her bus money to go home to their mother, Willadean.

Becky had a similar experience to Jackie's when Becky was 19, pregnant and married to Rex Perkey. Becky and Rex had no place to live so they moved in with Jack and Judy for about three weeks in an apartment on Peoria Street in Tulsa. Lisa and Patty slept on cots in a large walk in closet. Becky adored Lisa and Patty who received no affection from Jack or Judy. Judy was like a drill sergeant.

In another dinner time assault on Patty, Jack and Judy refused to allow Patty to leave the table to go to the bathroom. Patty wet herself, and Jack and Judy exploded. They "dragged Patty to the bathroom, stripped her," and beat her with a belt." Lisa sat helpless at the table and cried, "shaking like a leaf." Becky and Jackie were "scared to death of Jack" and knew they could not intervene to protect the little girls. Becky and Jackie felt guilty that they did not "do something" about Lisa's situation when she was growing up. They were "deathly afraid" of their father.

Even after they left Jack and Judy's home, the sisters made occasional attempts at contacting them, but interaction with Judy was demeaning. Judy was "a liar and also mean." Judy sabotaged whatever relationship Becky and Jackie tried to have with their father. Jack demanded that Becky and Jackie show respect for Judy, which was a tall order. Judy told "Becky and Jackie that their mother cheated on Jack," but the sisters knew that was not true.

Exhibit No. 16, Dec. of Jan Vogelsang at 63(internal citations omitted).

*Lisa Was Silenced with Duct Tape over her Mouth.*

Jack and Judy did not allow Lisa to make noise or speak. If she spoke when she was not supposed to speak – and she was never certain when she was allowed to speak – they taped her mouth with duct tape. Lisa was afraid she would suffocate and die if she cried when her mouth was duct taped. Lisa was not allowed to make noise, even the sound of a fork tine hitting the place during meals. If her fork tine made a noise, she was not allowed to use utensils for six months. If she made noise washing the dishes or cleaning the house, she was beaten.

The "silence in the house was deafening," as Lisa and Patty "tried to be quiet all the time. They were not allowed to play and carry on. They walked on eggshells because they didn't know where the next blow was coming from." Lisa was "afraid of her own shadow." Judy encouraged Jack to "beat the tar" out of Lisa and Patty "for nothing at all."

Others observed the consequences of forced silence, and uniformly described Lisa as a "scared little girl, timid, and dainty," like "a porcelain doll." She was "afraid to speak up." Lisa "flinched" when she thought she was "going to get hit." She was the "sweetest little girl." She was "not someone to tell

stories or lie. She was a sweet, good child" who was "quiet" and "slow paced." Lisa "was always polite, neat, clean, (and) pleasant" when Sandy Beard, Jack's employer, saw Lisa during the decade Jack worked for Sandy. Lisa "lived in a book" and "as a young child" was smart, but she could not avoid punishment by Jack and Judy. Lisa "was in her own little world growing up." She "read books all the time. She was smart and not athletic." Lisa was "very quiet and timid."

*Judy Used Stress Positioning and Forced Lisa and Patty to Beat Each Other*

Not only did Judy silence Lisa with use of duct tape, she also used stress positioning as punishment. As a small child, Lisa was forced to stand in the corner for hours – often from breakfast until time for lunch. Lisa was ordered to not move, not even to scratch. She could not touch the walls or the floor for support. She never knew when her mother was watching to check to make sure she obeyed; Judy seemed to always be watching or paying the other children to tattle. Judy seemed omnipotent and omnipresent. Lisa developed hyper-vigilance.

Judy also made Patty and Lisa fight each other. If the girls dared to disagree with each other, Judy told them that if they wanted to fight, they should really fight. She took them outside and handed them sticks or whatever was handy, including on one occasion two by fours, and did not let them return to the house until they had hit each other hard enough to draw blood.

*Jack's Beatings Were Severe, Relentless, and Sexual*

Though Judy visited numerous horrors on young Lisa, the real threat was in the long wait for Jack to come home and carry out Judy's promised reckoning. Jack routinely made the girls go to the bathroom, pull down their pants, bend over the tub and wait for beatings. Jack used belts and punched them. Jack "made the girls [Lisa and Patty] line up naked and drop their clothes before he spanked them. He didn't do that to the boys. That was known in our family." Even as a small girl, Lisa recognized that Jack's preoccupation with her naked body was dangerous and a punishment.

Exhibit No. 16, Dec. of Jan Vogelsang at 68 (internal citations omitted).

Jack began to sexually molest Lisa; he molested her one to two times a week. He threatened to hurt her if she told anyone. After the pattern of molestation had been established, Jack moved the family to a trailer in an isolated area near Sperry Oklahoma. To further isolate Lisa from her sisters and the rest of the family, Jack built a small room onto the side of the trailer over the water pump. While this room was ostensibly an acknowledging Lisa's maturation, the room actually provided Jack unimpeded access to Lisa without the possibility of detection as it was not accessible from the inside of the trailer. In this room, Jack told Lisa that he was teaching her how to be a good wife. And then he raped and sodomized her until she bled.

Lisa had mixed feelings about the room her step father built for her. She lived in sickening anticipation of what happened to her in the room, but the room also had a life sustaining secret. Lisa's mother stored homemade liquor and wine

in the special room, and Lisa drank jar after jar of the brew that made her disappear into dizzy, indifferent, and numb intoxication when her step father raped her with impunity day after day, week after week, month after month, year after year. Homemade wine cut the pain and fear of being hit on the head and back with the broom handle, being choked nearly to death, and being smothered by a pillow over her face as he violated her.

Wine and moonshine pushed her fear to a distant place at first, but they were not strong enough to keep her fear at bay. Somewhere in the dark of the special room, as her stepfather threatened to rape her younger sister if Lisa did not submit to anal rape, Lisa's mind fractured and retreated to a safer place than the reality of her daily life. Most of the time, her mind stayed in the safe realm of unreality, an altered consciousness that allowed her to walk, talk and act as if she were mentally present when she was not. She did not consciously or volitionally decide to go to the safer place; it happened without her insight, understanding, or knowledge. This loss of contact with reality made her wonder for the rest of her life what was real and what was not real.

Jack also exposed to sexual assault by his friends; Judy did nothing to protect Lisa. Jack hired Jeff Batson "to help with the animals," but Judy believed Jack encouraged Jeff to have sex with Lisa so that "if Lisa got pregnant Jack could blame it on Jeff." Jeff moved into the overcrowded house with the family. Teddy suggested everyone who worked with Jack at the salvage yard "was a child molester." Jeff Batson molested Teddy and had sex with Lisa.

Exhibit No. 16, Dec. of Jan Vogelsang at 81 (internal citations omitted).

The turmoil and threat at home exploded February 24, 1984, when Judy was forced to acknowledge that Jack was raping Lisa. Judy reported she walked in on Jack as he raped Lisa, and fetched a gun and put it to Jack's head. Lisa's description of that night differs significantly from Judy's. Judy was overwrought and furious. Judy held the gun to Lisa's head, interrogated Lisa repeatedly, and demanded to know details of the abuse. The chaos went on all night; Judy periodically left the room, stormed through the house, and returned to hold a gun to Lisa's head. It was the most terrifying night of Lisa's life.

Judy blamed Lisa for her stepfather's repeated rapes of the child. Lewis Priest, Jack's friend, saw Judy and Jack shortly after Jack's sexual abuse of Lisa was known. Jack and Judy were trying to find Jack and apartment, and Lewis asked Jack if he had sex with his daughter, Lisa. "Jack did not deny it. Jack said that he had come out of the bathroom and saw her [Lisa] lying on the covers and had to fool around with her."

A local physician learned firsthand of Lisa's ongoing sexual abuse by her stepfather. The physician, Dr. William Barnes, remembered Lisa's rape because it "made him mad." Judy showed up at Dr. Barnes's office requesting an examination of Lisa "because she had been sexually abused by her stepfather." Dr. Barnes conducted a gynecological examination of Lisa, with Judy in the

room, and determined that Lisa's "hymen was ruptured." He ordered a pregnancy test, which required taking blood. The tests were negative, and Dr. Barnes sent the results to Lisa's mother. According to Dr. Barnes, Lisa "showed little emotion and had a flat affect," observations that are characteristic of traumatized children. Lisa's mother, Judy, remembered the episode differently and stated that Lisa "lost it" when Dr. Barnes told her that if she was pregnant with her stepfather's baby he would perform an abortion. Dr. Barnes never talked to Lisa alone about what happened to her. Although Dr. Barnes' normal practice was to call the police when a child was sexually abused, he did not because Judy said she was going to call the police.

Social services investigated for abuse at the Kleiner house only once, and telephoned beforehand to announce their upcoming visit. Jack took full advantage of the notice and threatened to beat Lisa and Patty if they told the truth. Patty had bruise marks around her neck from Jack choking her, but when the caseworker asked about the marks, Patty told her that the marks were from rope burn. Jack also forced Lisa and Patty to beat each other. He sent them to the garage to fight and told them not to come back until "one of them had drawn blood." Jack "broke a broom," hitting Lisa with it. Patty once saw Jack on top of Lisa; Lisa was naked from the waist up and covered with bedding from the waist down. Patty believed that Lisa's sexual activity in school coincided with Jack's rapes of her.

Lisa grew "very distant and withdrawn" the summer before the eleventh grade and did not call or talk to her boyfriend, Carl McClain. She dropped out of band. Lisa and Carl McClain "drifted apart" the summer before the eleventh grade. By the end of the eleventh grade, Carl McClain wrote Lisa a letter to break up.

Lisa took on "a lot of responsibility" for taking care of Patty, Teddy, Jerri Jo and Tommy. Her mother thought Lisa was bitter and bottled up her temper. When Lisa was a teenager, around fifteen or sixteen years old, she became "fearful of taking showers" and was "dirty."

In the eleventh grade, Lisa's academic struggle collapsed under the weight of her stepfather's cruelty and her mother's indifference and hostility. The 16-year-old started her 1984-1985 school in Honors classes for Algebra, U.S. Government, Chemistry, and English III, but it was impossible for her to maintain superior performance. Her grades the first semester plummeted to a D in English, C's, B's and only one A in World History and continued their plummet in the second semester. Lisa was suspended from Sperry High School for three days when "she was caught with a book about incest," according to her mother's report, but school records do not show the suspension.

In October 1984, Lisa was 16 and met her soon to be stepbrother and husband, 24-year-old Carl Boman. Carl was "just out of the service, laid off from work, depressed, and recently divorced." Carl visited his father, Richard, who at that time dated Lisa's mother, Judy. Carl stayed with his father, and Judy and the

children lived one block away. Carl "took care of Judy's children occasionally and saw Lisa." Carl also drove Lisa to her therapy sessions, and she confided in him that Jack had forced himself on her.

According to Carl, Jack "threatened to have sex with Lisa's younger sister Patty if she didn't continue to have sex with him." Carl knew that Judy "blamed Lisa" for the sexual abuse and thought Lisa "encouraged Jack to have sex with her." Jack's sexual abuse of Lisa "went on for three years." Lisa was a "withdrawn young girl," and she "read a lot." Carl "knew that something was wrong" and that "Lisa had a lot of problems . . . Lisa was not emotionally present. She was in her own world and distant from everything . . . Lisa went somewhere else mentally. She just wasn't present."

Lisa's first cousin, Kenneth Alexander, admitted to having sexual intercourse with Lisa in the early to mid '80's when he was visiting; she may have been as "young as thirteen." Lisa could not escape the repeated sexual assaults by member of her own family.

Exhibit No. 16, Dec. of Jan Vogelsang at 85 (internal citations omitted).

Judy brought her new boyfriend's son into the house and encouraged a sexual relationship between the son and Lisa. Richard's son, Carl Boman, was 22 years old; Lisa was only 16. Judy spent most of her time at Richard's home and required Lisa to stay home to care for Patty, Tommy, Teddy, and Jerri Jo, plus another of Richard's sons, Michael. Judy encouraged 16 year old Lisa and 22 year old Carl to "play house" and take over responsibilities for the day to day care of the household while Judy and Richard enjoyed their new romance.

Lisa's plans for an independent life were contrary to Judy's plans, and Judy knew how to erase contrary plans. Lisa "felt powerless because she felt controlled by her mother." Judy's wrath was frightening around this period. She asked Richard, her new boyfriend and soon to be forth husband, if he "would shoot Jack Kleiner from up on the butte."

Lisa buckled under the day the day chores of rearing five children, cleaning, cooking, laundering, attending to children's needs, and getting children to and from school and simultaneously trying to maintain her grades; she lost her dream of joining the air force. Carl began a sexual relationship with Lisa, proposed marriage, and Lisa agreed in her senior year. For a brief period, Lisa regained some strength and ended the engagement, and Carl moved out. Lisa still served as a slave to Judy, cleaning, laundering, and tending to Judy's children without benefit. She reached her limit and begged Carl, who had his own apartment, to allow her to move in with him – as a friend, not as a future wife. He agreed, but the relationship again became sexual, and Lisa became pregnant.

Lisa buckled under the day the day chores of rearing five children, cleaning, cooking, laundering, attending to children's needs, and getting children to and from school and simultaneously trying to maintain her grades; she lost her

dream of joining the air force. Carl began a sexual relationship with Lisa, proposed marriage, and Lisa agreed in her senior year. For a brief period, Lisa regained some strength and ended the engagement, and Carl moved out. Lisa still served as a slave to Judy, cleaning, laundering, and tending to Judy's children without benefit. She reached her limit and begged Carl, who had his own apartment, to allow her to move in with him – as a friend, not as a future wife. He agreed, but the relationship again became sexual, and Lisa became pregnant.

Exhibit No. 16, Dec. of Jan Vogelsang at 89 (internal citations omitted).

She graduated high school with a GPS of 3.24, pregnant, and ineligible for her career in the air force. Judy won the contest and the prize of a grandchild that sealed the relationship with her husband, Richard, and kept Lisa under Judy's sphere of control. Her first day of duty was scheduled for August, but she was pregnant with her first child and separated from the Air Force effective her first day of duty.

Exhibit No. 16, Dec. of Jan Vogelsang at 91(internal citations omitted).

Lisa abandoned all hope for a future. She had no strength or will to resist Judy, Carl, and Richard, all of whom wanted her to marry Carl. 18 year old Lisa and 25 year old Carl married August 15, 1986, in Cleveland, Oklahoma, at the First United Methodist Church with the Reverend Orva G. Compton officiating. She was forlorn, frail, and childlike in her wedding picture. She had one child after another, never recovering physically or mentally from pregnancy, birth, and demands of newborns before becoming pregnant with the next child. By the time of her fourth and final child's birth, Lisa was in the throes of major mental illness and so out of touch with reality that she did not know if she had, in reality, given birth to her fourth child, or if it was a dream.

Marriage to Carl catapulted Lisa back to the days of violent sexual assault by Jack when she was powerless to protect herself. Carl's pre-marital behavior towards Lisa could have warned a normally functioning person to beware, but Lisa had no ability to recognize what was her due, what to expect, or what to prohibit based on her maltreatment as a child. In one notable incident before marriage, Carl shoved Lisa, who was naked getting out of a shower, against a wall heater that burned her flesh while he had sexual intercourse with her.

His behavior became more aggressive and more violent during their marriage. He beat her, tied her in stress positions, poured hot wax on her, forcibly inserted glass bottles in her anus and vagina, held a knife to her throat, and sexually assaulted her. He bruised and hurt her. He recorded her screams and pleas for help on his video camera. Lisa, ashamed, humiliated, and fearful, told her mother about it. Judy went to Carl and told him Lisa confided in her. Lisa did not seek help again. She grew to expect the violence and lived in sickening anticipation of its reoccurrence.

*a. Four Babies in Four Years*

> Lisa and Carl rushed from having one child to the next, without being aware or considering the impact of so many childbirths in such a short time frame on Lisa's fragile mind. Her first baby, Desiree Nicole, was born January 11, 1987, followed 18 months later by Chelsea Lynn on July 9, 1988. Even less time for recovery and stability passed before the third child was born 15 months after the second; Carl James II (C.J.) was born October 20, 1989**.** Lisa's fourth and final baby, Kayla Deanne, came a mere 10 months after the third baby.
>
> Lisa was "just a teenager and did not know how to mother," but Carl "never doubted that she loved the children." Lisa's first baby, Desiree (Desi) was a low birth weight baby, weighing only 4 pounds 8 ounces when she was born at Hominy City Hospital, Oklahoma. Eighteen year old Lisa and twenty five year old Carl lived at 703 South Wood in Hominy, Oklahoma. Lisa worked for Oklahoma Nursing Homes, Ltd, earning $1360.11, and took care of her newborn. She had to stop work when she was pregnant with her second baby but really missed it. In 1988, she earned only around $1,000 from Oklahoma Nursing, Ltd.

Exhibit No. 16, Dec. of Jan Vogelsang at 93 (internal citations omitted).

> Lisa's feeling of safety and security for her new family evaporated in the heat of her mental illness. She soon looked kind of "slobby" dressed in clothes that looked old. Lisa's houses "were always roach-infested," and she "was a messy housekeeper." They were poor. Lisa was "unhappy" with her marriage to Carl Boman.

Exhibit No. 16, Dec. of Jan Vogelsang at 95 (internal citations omitted).

> *Sterilization*
>
> Inconsistent narratives surround the decision for Lisa to be sterilized after Kyla's birth. Lisa continued to function encumbered by a loss of contact with reality. From day to day she was unsure what was real and what was not. Judy's presence and constant pressure complicated Lisa's ability to make choices as Judy had always dictated what was true for Lisa.
>
> Medical records show that she was admitted to Scripps Mercy Hospital in San Diego October 22, 1990, and that she "desire[d] permanent sterilization." Whether Lisa's participation in the counseling and authorization for the procedure is debatable: Kayla was known to not be Carl's child, Carl and Judy explained to Lisa that sterilization was the least she could do as Carl was agreeing to raise Kayla as his own child. Whether such threat was real or only in Lisa's mind, Lisa felt that if she did not have the procedure, Carl and Judy would force her to give Kayla up for adoption.
>
> *Descent into Mental Illness (1991)*
>
> By 1991, Lisa was unable to focus, pay attention, and attend to her four small children. Her symptoms of her mood disorder were more pronounced and

deepened by re-experiencing the sexual trauma of her youth at now Carl's hands. Carl described the change in her behavior:

> Lisa was unpredictable. She went from not talking to talking non-stop even to strangers. . . .[S]he even approached people she did not know and started talking to them. It was a total change. She didn't notice if you talked to her or asked her any questions. Once she started talking, she kept talking. She was sad or unhappy for days at a time and then she suddenly had a plan or an idea and nothing could stop her.

Exhibit No. 16, Dec. of Jan Vogelsang at 103 (internal citations omitted).

> By 1993, Lisa was unable to attend to basic activities of daily living. Others could not tolerate her "terrible personal hygiene" and commented "that she hadn't bathed in a long time." Her arms were "brown with caked in dirt, her hair stringy and greasy." She could not attend to her or the children's hygiene, find and maintain safe housing, prepare and serve adequate meals, dress and monitor her children, or plan for immediate needs. She was homeless, having left Carl with no place to go and no plan for housing for her and the children.

Exhibit No. 16, Dec. of Jan Vogelsang at 108 (internal citations omitted).

> Carl and Lisa remarried in a ceremony by a Bishop in the LDS Church June 11, 1994, in Springdale, Washington County, Arkansas. Lisa told people she was pregnant with twins, but "never told Carl." Sometimes she told neighbors the babies were Carl's and sometimes she told them they were Brett's. Lisa "ignored" Carl when he confronted her, and they argued. Judy and Richard moved a few hours away, and Judy came to Arkansas for a surprise visit, saw the crib, and confronted Lisa, and Lisa explained that she miscarried. When Judy continued to demand more answers, Lisa seemed to ignore her. Lisa was out of touch with reality. Lisa and Carl's life was disrupted by Judy, by the false pregnancy, and by Lisa's inability to keep up with parenting demands.

Exhibit No. 16, Dec. of Jan Vogelsang at 115 (internal citations omitted).

> When Lisa began working, she "met some people who drank a lot and were also promiscuous." Tommy lived with Lisa when she lived in Deming, New Mexico. Carl was never home and worked three jobs. Lisa lived in a little camper trailer on Judy's property that was "nasty" and barely had room for Lisa's children, much less Tommy, Lisa, and Carl. The family was extremely impoverished, and they had "no food." Tommy "sold drugs to get the kids food" and "lived in the street or in [his] car." Carl took off for "months at a time" leaving Lisa in a small trailer with the kids and "not enough food or water." Judy and Richard's marriage ended.
>
> Lisa did "whatever it took" to keep going without financial support from Carl and without the ability to work on her own with the children. She prostituted herself not, she claimed for money, but for food for her children.

> The children described these desperate times. Lisa "never seemed to have enough money to feed" all the children, and they ate "a lot of beans and rice." C.J. remembers "being hungry sometimes." Lisa's financial straits combined with mania to make her exuberant and hypersexual. She had a lot of friends in Deming. "She knew everyone." Lisa and Carl's marriage was not good in Deming. "Lisa was always kissing other guys." Lisa "drank a lot" when they lived in Deming, so much so that Desiree "had to care for Kayla." Strange men came and left the trailer while the children played outside. Lisa asked the men to pay for her services with food, and the men brought food with them for the children. Sometimes, she went to truck stops, met men, had sex with them in their trucks, and brought food home for the children. Later on, she bartered for legal services with her body. Lisa drank excessively.

Exhibit No. 16, Dec. of Jan Vogelsang at 120 (internal citations omitted).

> Kevin took Lisa to breakfast for their first date. Kevin could not afford "a nice date," and he was impressed that Lisa did not seem to mind and was appreciative of the breakfast. Dating Lisa involved seeing her on the weekends and usually involved her children and his. Lisa and Kevin's "courtship" always involved the children. They camped and went to local festivals. They camped, went to ball games, and did things that did not require a lot of money. Lisa always wanted to do things like go to the library or museums, but her plans were often interrupted by her severe migraines. The migraines occurred "a couple of times a month and "knocked her to the floor. She could not do anything – anything at all. She could not get out of bed, talk, eat, or read."
>
> As Kevin spent more time with Lisa, he learned more about the serious problems that plagued her family. Lisa's mother had been married many times; Lisa's sister Jerri Jo and her husband were separating in California, as was Patty in Ohio; and Lisa's brothers Tommy and Teddy were using drugs. Kevin also learned that Jack Kleiner, one of Lisa's step fathers, had sexually assaulted her for years. Lisa told Kevin that she had a baby, Judy took the baby away from her, and Judy placed Lisa's baby up for adoption. Lisa "spent a lot of time on the computer searching for this baby." Kevin considered everything Lisa did and everything he learned about her family as reasons for him "to rescue her" and to give her a better life.
>
> Lisa's family and friends wrongly attributed her dramatic mood swings to changes in her circumstances, and did not understand it was more likely her mood changes reflected her underlying mental disorder. Lisa "seemed very happy and enthused" about her new relationship with Kevin Montgomery in the summer of 1998 when she stopped by a friend's house. Lisa "was all dressed up in a mini skirt and heels." Lisa had two of her children with her, and her other two children were in Kansas with Carl. She asked a former neighbor if he could give her a ride to see her two children in Kansas, but he wasn't able to help her out.
>
> Lisa's enthusiasm for her Kevin waned when he insisted on sexual violence as part of their relationship. She was not surprised that Kevin wanted to

> hurt her during sex because she had come to expect nothing less; she thought it was part of maintaining a relationship with a man. Kevin, she was quick to point out, was not as violent or hurtful as Carl, but he bruised her, used a horse whip on her, and tied her in forced stress positions. Kevin liked to go to the barn to tie her up, and used clamps on her nipples. She did not seek or want the maltreatment, did not enjoy it, and did not know that forced and coerced sexual intercourse during marriage was considered a sexual assault. Instead of protesting, her mind simply went somewhere else as it had in such situations since she was a child.

Exhibit No. 16, Dec. of Jan Vogelsang at 125 (internal citations omitted).

> Lisa and Kevin talked about having children. She wanted more children, but Kevin thought they had enough but adopted an "if it happened, it happened" attitude. Lisa could not "talk about problems for very long" and "got a blank look on her face and didn't respond" when Kevin raised concerns. She "stayed in her room for days, not talking, leaving or interacting at all." She spent hour after hour on the computer. She drank, and Kevin argued with her about her drinking. She hid her alcohol, and mixed it with Pepsi. She started but did not finish project after project, and uncompleted projects piled up around the house. Her brother Tommy described the pattern: "she would get really interested in something and spend a lot of time on it and then she wouldn't be interested anymore."
>
> By all accounts, Lisa loved her children dearly, but nonetheless was unable to parent. Lisa had no insight into the harm her psychotic thinking, dissociation, loss of contact with reality, extreme emotions, and rapid, unpredictable mood swings brought her family. Her behavior changed in an instant. On one occasion, as she tried to brush Chelsea's hair, she suddenly hit Chelsea's head with the brush, striking her over and over again, as if she were in a trance. She could not teach herself how to brush her girls' hair, help them dress, or prepare for school. At other times, she whipped the children with a belt, in direct contrast to consistent reports she did not discipline or punish the children. She told Kayla that Carl Boman was not her father, and Kayla "hated" her for it. Carl confirmed that Lisa told Kayla Carl was not her father, but Carl claims that he never doubted his paternity.
>
> Lisa tried very hard to compensate for her outbursts and unpredictability. She was committed to using 'appropriate discipline such as grounding or talking to her children," but uncontrolled and intense emotions overcame her at times. Although she "was not overly affectionate," she "expressed her love and gave her children some hugs." Lisa tried to teach her children "responsibility and gave them choices about chores."
>
> Lisa could not keep up with housework, and her children had to help her with basic chores of cooking and cleaning. The children could not keep up with household chores in the confusing and unpredictable environment Lisa created. Dishes sat unwashed with mold on them. The children came up with a nickname to try and bring their mother out of her trances when she was "tuned out." Instead

> of calling her "Mom," they called her "Martha." Calling her Martha "became a joke and way of trying to get her to "tune in to us for a little while."
>
> Lisa tried to develop positive relationships with Kevin's children, but the oldest, Derrick, "resented Lisa's rules and discipline," while Dylan and Dustin "grew to love Lisa." Dustin, Kevin's youngest child, had attention deficit problems, and Lisa never thought Dustin needed to be on medication. Lisa was patient but strict with him. She "took time to explain things to him."

Exhibit No. 16, Dec. of Jan Vogelsang at 135 (internal citations omitted).

> Lisa's workers at the gas station though that Lisa was "eccentric." She "talked about her goats incessantly," and coworkers called her "goat woman." Lisa came to work "in dirty clothes many times and did not appear clean." She explained her appearance by telling coworkers that "she had spent the night in the barn with the goats."

Exhibit No. 16, Dec. of Jan Vogelsang at 139 (internal citations omitted).

> In 2002, Lisa again told Kevin she believed she was pregnant. Lisa since their relationship began in 1998. Lisa "did not go to the doctor right away," and Kevin figured she knew her own body and knew if she were pregnant or not. When Lisa told Kevin she finally went to the doctor, she gave him the very sad news that the baby "had complications with blood and that her body was rejecting the baby." Kevin believed he observed Lisa's body going "through changes that looked like she was pregnant. Her breasts were larger and tender, her belly got bigger, and her periods stopped." At night, as they slept in bed, Lisa often took Kevin's hand and placed it on her belly. Kevin "never questioned whether or not she was pregnant."
>
> As the May 2002 due date for delivery approached, Kevin worried about Lisa and the baby. He "demanded" he and Lisa got to the doctor together, and Lisa and he had a huge fight. Lisa took off by herself and would not allow Kevin to go with her. Lisa was gone six hours and returned "in so much pain" Kevin had to help her out of the car. Kevin and Lisa had discussed donating the baby to research if it died, and that is what Lisa told him she did. Kevin repeatedly asked Lisa whether or not they could get the baby's ashes. Every time he brought it up it caused an argument, and Lisa threatened to leave him. He stopped asking about the baby's ashes to keep the marriage together.
>
> Lisa had a challenging work load to carry for a fully functioning person, but for a person with longstanding impairments with ongoing family problems, it was impossible. Her house was "crowded" and "pretty filthy." Visitors "had to walk through paths in the house because it was so cluttered." She continued to work for Greyhound and earned $7,639 from the company and $6,610 from Neighborhood Markets in 2002. Kevin's income dropped notably to $12,325 from Atlantic Group; $7292 from Coachman Industries, and $136 from Reno Holdings for an annual income of $18,743, less than half what he earned the year before.

> Their situation was not eased by child support payments from Carl. Carl's wages were garnished to pay child support in the amount of $2,943. Carl no longer worked at Spear Manufacturing and started work at Zinc Corporation of America April 1, 2002.

Exhibit No. 16, Dec. of Jan Vogelsang at 140 (internal citations omitted).

> Lisa tried to function around problematic periods of sustained mental absence from her children and events around her. Her youngest daughter Kayla described how Lisa's lack of contact with reality affected Lisa and the children:
>
>> My strongest memory about growing up, as well as one of the saddest parts of my life is the fact that my mom was not present. Mom wasn't able to be either mentally or emotionally present in my life, or in the lives of my brother and sisters. She definitely was with me physically, but that is all.

Exhibit No. 16, Dec. of Jan Vogelsang at 145 (internal citations omitted).

> Teddy's time at Lisa's let him see many, many behaviors and symptoms of how mental illness affected Lisa's day to day life, everything from her disrupted sleep to her shifting and unpredictable moods. Her irrational behavior made Lisa "difficult to live with." She "never slept more than four or five hours." Lisa did "several different things at once. . . .reading . . .knitting/tatting" while she did "her spinning wheel" and helped "the kids with homework all at one time." Lisa started one project, lost track of it, and then started another. She "changed her mind a lot." Lisa frequently had "severe" migraines, so painful that "she'd lay on the couch and cry" and "could not move." Others noted Lisa's severe migraines, including Brett and Tommy. Tommy saw Lisa "always taking aspirin. . . .for headaches." Earlier, in 1993, Lisa had "vague physical complaints like headaches."
>
> Lisa talked for 45 minutes straight without letting another person get a word in. Teddy described Lisa's extreme manner of talking:
>
>> Most people would leave the room while she was still talking. She talked about different topics, which ranged from craft project, sheep, wools, lawnmowers, quilts, Judy, Patty, internet, and back and forth. She talked this way for most waking hours, except for when reading.
>
> Teddy went "outside to get away from Lisa."
>
> Lisa was like one of the kids in the house, often not doing much housework, playing with games, and "in her own little world." Lisa did not have a realistic appreciation of budgeting and finances. She "never waited until payday to buy things. Anything she wanted, she bought," and she often bought "useless stuff." Teddy witnessed Lisa's sudden mood changes. One day, as Chelsea helped her mother spin sheared Lamb's wool onto a spool, the spool slipped from Chelsea's hand and fell to the

> floor. Lisa "immediately flew into a verbal and physical rage," hitting Chelsea on her face. Lisa stopped after Teddy intervened. C.J. had chronic asthma. He had an allergic reaction to an unspecified allergen and was treated for a rash and chest pain, in March, 2003.

Exhibit No. 16, Dec. of Jan Vogelsang at 146 (internal citations omitted).

> Lisa's behavior and testimony against Judy at Justin's custody hearings were strange. She dressed in her "Laura Ingalls's" outfit, the same one that embarrassed her daughter. In the middle of Lisa's testimony she cried hysterically. When Lisa had her outburst, she looked dramatically different, "like her soul left her." Lisa brought a "computer baby" to court that was part of Desi's or Chelsea's school assignment. Tommy "could not tell if Lisa acted like it was a real baby." Tommy thought the episode was "weird and crazy." Lisa testified and rambled about how she, Tommy, and Patty had a confrontation at the trailer shortly after Teddy's arrest. Lisa also testified that she had her tubes un-tied two years previously in Topeka and that she had a stillborn baby May 30, 2003.

Exhibit No. 16, Dec. of Jan Vogelsang at 152 (internal citations omitted).

> Judy considered involuntarily committing Lisa to a psychiatric hospital. When the custody hearings were going on for Justin, Judy asked her attorney what it would take to get Lisa committed and learned "Lisa would have to be considered a threat to herself or others." There is no documentation that Judy took any further action, but Danny Shaughnessy told Justin's caseworkers "he and Judy tried to get Lisa mental health help" early in 2004.
>
> The lines of reality blurred for Lisa, and she took on the character and appearance of her cousin, Wendy. Wendy was "Lisa's best friend," according to Teddy. When the family went to court on the custody of Justin, Lisa seemed to be "trying to be her cousin Wendy Tribes. She dressed like her, acted like her, and had her hair the same as Wendy." Wendy already had many children and told Lisa the next child she had would be named Abigail---the same name Lisa ultimately gave to the Stinnett baby. Inadvertently, Wendy encouraged Lisa's false pregnancies. Towards the end of 2003, Wendy was pregnant after a tubal ligation reversal and was in a fervor about "God's miracles." Wendy begged Lisa to stay with Kevin and to recognize how much better off Lisa was than when she was homeless and destitute. Wendy pointed out that Kevin treated Lisa better than anyone else had ever treated Lisa. Wendy told Lisa not to give up on the possibility of having a child with Kevin and to have faith in God.

Exhibit No. 16, Dec. of Jan Vogelsang at 154 (internal citations omitted).

> In 2004, Lisa held three jobs, so her income increased, but her ability to manage finances – or anything else for that matter – decreased. She earned $8865 from Greyhound; $2073 from Casey's General Store; and $4225 from Legacy Restaurant Group. Judgment was entered against Lisa on behalf of Coffey County Hospital for $400 for services. Financial problems mounted. Lisa and Kevin owed James McMurray, their dentist, $1500 but he wrote off the debt.

> Lisa was not able to keep up with the day to day tasks of parenting as she raced from one unrealistic plan to the next. Lisa insisted on doing things "the old fashioned way" even though she had little time for chores. She tried to make the children "do household or gardening chores," but "stopped supervising them," and it showed in the poor state of her home. She expected the children to use an outdated wringer washer, cook, can, and keep the house clean. Although Lisa "generally did not keep a clean house," the housekeeping was "completely neglected" after she became obsessed with dog breeding in 2004. The house and garden went untended all year. Weeds took over the garden. Lisa let her garden "slide" in 2004, as she sank deeper and deeper. C.J. noticed that Lisa "was much more detached" and he "had to repeat things to her more than one time."
>
> In February, 2004, Kevin encountered his yet another false pregnancy with Lisa, although he continued to believe the pregnancies were real. He bought a home pregnancy test for Lisa, but never saw the test results. Kevin did not question that she was pregnant, because he and the children heard her vomiting. At first, Kevin and Lisa did not want to tell anyone Lisa was pregnant because of the trouble with the last pregnancy in 2002. Kevin worried about Lisa working three jobs at Greyhound, Casey's General Store and Wendy's. Kevin felt "guilty" because he couldn't get another job to help with finances because his wages "would be taken for child support." Kevin once again believed he saw physical signs of Lisa's pregnancy: her "belly got bigger, her breasts got bigger, she wore loose clothing." He believed he "felt the baby move.

Exhibit No. 16, Dec. of Jan Vogelsang at 158 (internal citations omitted).

> Lisa was mentally confused and unable to provide a consistent narrative about her pregnancy. By Kevin's calculations, the due date was October, 2004, and he was surprised when the due date moved to December. Kevin "wondered whether Lisa tricked him into not using condoms," but never made an issue of it. Lisa told some people she was expecting a boy and others she was expecting a girl. She told other people she was carrying twins and lost one of the twins.
>
> In contrast to Kevin's solid belief that Lisa was pregnant, Lisa's mother and one of Lisa's sisters, Jerri Jo, did not believe Lisa was pregnant and did their best to dispel belief in Lisa's pregnancies. Judy and Jerri Jo went to Kevin's parents' home, and told them Lisa was not pregnant. Kevin and his parents dismissed the message as animosity towards Lisa. Kevin thought Jerri Jo and Judy "were getting back" at Lisa for her stance during Justin's custody battle. Judy explained that she was "tired of listening to Lisa's and Kevin's grief over the 2002 miscarriage." Kevin also dismissed another warning that Lisa was not pregnant when Lisa's sister Patty yelled at Kevin that Lisa had a tubal ligation. Kevin "had no clue what that was."
>
> Lisa was not just out of touch with reality with her pregnancies. She was also out of touch with reality when it came to her two dogs, given to her by Carl in lieu of payment for child support. Lisa was consumed with the dogs and "paid attention only to the dogs." Even though she "was never much of a cleaner," the conditions in the home "got worse and worse."

> Lisa was not able to perform simple tasks. Kevin worried about Lisa but did not know what to do. Lisa had a "short temperament with the children, she did not clean the house, she spent too much time on the computer, paying too much attention to the dog breeding business, and she wasn't paying the bills." She was "very irritable." She was not able to make sure the family's animals were fed. In November 2004, when the weather turned colder, Lisa brought the dogs into the house to keep them warm. The dogs were not house trained, and urinated and defecated throughout the house. Lisa did not clean up after the dogs, and the rest of the family followed suit.

Exhibit No. 16, Dec. of Jan Vogelsang at 162(internal citations omitted).

> Lisa had poor judgment and made ill advised decisions to help others to the detriment of her own family. When she worked at Greyhound, Lisa brought "strangers home from work who didn't have a place to stay." The strangers Lisa brought home "were always women with children" who had no money or another place to stay. They stayed one night and left.
>
> Lisa grew increasingly obsessed with an unrealistic plan to breed dogs to solve the family's severe financial problems. No one is sure where she came up with the idea, but it was a sudden decision that came without notice or discussion of realistic financial costs and potential profits. Kevin tolerated Lisa's bizarre plans by dismissing them as the price he paid for living with a "strong and independent" woman who liked "to do things her own way." Meantime, the plan to breed dogs became another project Lisa could not complete and created more problems than it solved. On the day of Lisa's arrest, law enforcement saw that the "house was extremely fouled with days/weeks-old canine and rodent droppings."
>
> Lisa's erratic behavior concerned her father in law, Roger, who came to believe that Lisa had some "psychological problem that he doesn't understand." Roger scolded Lisa her about her poor performance as a wife and mother, told her to stop working three jobs, and to stop spending time driving to dog shows. She was sometimes up, smiling, laughing, and enthused about something and other times down and tired. She did not pay bills on time and did not keep up with their income taxes. Lisa was "always tired," had headaches, and claimed and "looked like" she was pregnant. Roger felt "Lisa needed to be home more taking care of her house and kids," but Lisa could not change her behavior and responded by avoiding Roger and his impossible demands.
>
> Kevin bought a home pregnancy test, Lisa used it, and Lisa told him that she was pregnant. She did not show him the actual results. Lisa told Kevin she would see Dr. Hutchinson for this pregnancy. She showed a sonogram picture to him and the children.

Exhibit No. 16, Dec. of Jan Vogelsang at 164(internal citations omitted).

> Lisa could not keep pace with the needs of her children, especially routine needs that others met so easily. Morning routines of getting the children up, preparing their breakfast, and helping them get ready for school exasperated and overwhelmed her. She could not structurally figure out how to go through the steps others take for granted. Lisa's coworker recognized that "Lisa's children took care of themselves." Lisa sought

and found work that took her away from frustrating, impossible tasks of morning rituals. She went to work at Casey's, where her shift started at 4:30 in the morning. Lisa "had to be there in the morning because she worked in the kitchen and it was her job to make the donuts and pizzas." Lisa later explained that she purposely chose low skilled jobs because she did not believe she could learn more complex tasks.

> Lisa's children were distressed by their mother's increasing bizarre behavior. They knew "how different [Lisa] was from the other moms." Lisa "was always distracted and seemed to be thinking about something else. Her body was around, but her mind was not with [the children.]" When she attempted to play with the children, "she played in a weird way."

Exhibit No. 16, Dec. of Jan Vogelsang at 166 (internal citations omitted).

> Lisa was coming apart in the week leading up to the offense. Lisa believed that Judy was behind Carl's efforts to regain custody of the children. Her children were deserting her. Tommy was going to prison. Teddy was in prison. Her best friend was dead. Lisa took a day off from work, but was paralyzed and could do none of the chores she needed to accomplish. Kevin was at the end of his rope with her inability to complete basic tasks and faulted her for being home and doing absolutely nothing. She wasn't able to put up the Christmas tree or wrap presents. On December 13, she really thought she had a baby that died. She was a failure. She could not do anything right. She physically felt like she had a baby.
>
> The day before the offense she drove to a hospital in Topeka and sat in her car in the parking lot. She had a terrible headache and sat crying in her car. She could not stop crying. She had a deep sense that something was very wrong with her and that she was losing her mind. She was frozen. She could not get out of the car and go into the hospital. She was too paralyzed to open the car door or to roll down the window and ask for help. She sat in the parking lot for three hours, unable to move. Lisa was unable to articulate what she would have said had she gone into the hospital. As she told the story, she cried and repeatedly stated that something was wrong with her.

Exhibit No. 16, Dec. of Jan Vogelsang at 169 (internal citations omitted).

> Lisa Marie Montgomery has suffered extreme trauma and degradation throughout her life, first at the hands of her mother, then her step-father, then each of her husbands in turn. She has never lived in an environment free of danger and fear. Her life has been characterized by extreme physical, sexual, and emotional abuse, which compromised her ability to form an identity and to develop as a moral agent. The effects of this unrelenting trauma upon Lisa must always be understood in the context of her familial linked mental illness, affective mood disorder (diagnosed by Dr. William Logan, Dr. Linda McCandless, and Dr. George Woods) and the psychotic features wrought by that mental illness which heightened and exacerbated the effects of the trauma. The extreme trauma suffered by Lisa Montgomery cannot be simply labeled "abuse:" this trauma was

complex, unrelenting, derived from multiple perpetrators and was so extreme as to constitute torture.

### 1. Lisa Was Held Captive and Tortured as a Child

Lisa Montgomery's life on its most simplistic level must be viewed against the background of the extreme physical pain, servitude, and torture wrought on her as a developing child. As a small and frail child Lisa was held captive and tortured by methods more commonly experienced by child soldiers and prisoners of war. She was isolated, brain washed, humiliated and degraded, not allowed to speak, and beaten at will and without provocation. Her childhood captors employed strategies of control that resulted in the annihilation of her autonomy, independent decision making, sense of self, and moral agency. They employed tactics and practices which are or are similar to practices that have long been recognized as torture and cruel and inhumane treatment. This torture targeted specific domains of her being, working in tandem with her familially linked mental illness to undermine her ability to discern reality, to form appropriate relationships, and act as her own moral agent.

a. *Lisa was held captive*: Lisa's mother, Judy, in collusion with a series of men, isolated Lisa from those could help her. They forced Lisa to sleep in a closet, in a laundry room, and in a structure attached to the family trailer that had no heat where she under observation 24 hours a day. Judy and her designees controlled Lisa's sleep, bodily functions, and movements.

b. *Lisa was isolated from those who could help her:* Lisa was not allowed to develop healthy and normal relationships with other children and adults in the family, neighborhood, or community. After brutal rapes increased, her parents moved the family to an isolated, rural area where rapes, beatings, and coercion continued for three years.

c. *Lisa's participation in violent sex acts as a child was induced by force and coercion:* Adults, including Lisa's mother and step-father used psychological as well as physical coercion and bondage to control Lisa. She was repeatedly raped anally, vaginally, and orally by her step-father, a male cousin, and her step-father's acquaintances. Threat of serious harm to her or her siblings, schemes and plans that caused her to believe that failure to perform a sexual act would result in serious harm to her or others

d. *The sexual degradation Lisa suffered at Jack Kleiner's hands was both violent and insidious:* Jack Kleiner forced Lisa as a small girl, to strip naked in front of him as a prelude to his savage beatings. As she advanced into puberty, he began forcibly fondling her genitalia and tiny breasts. Ultimately, Jack Kleiner slammed her head against a concrete floor until she saw stars and was nauseated from the concussions as he raped her vaginally and sodomized her.

e. *Lisa was brain washed:* Lisa's mother and others used a variety of methods to condition her to be compliant, accept control, and accept sexual assault, including confinement, beatings, physical abuse, rape, threats of violence to her or her siblings, and the threat of shaming by revealing her activities to other family members.

Judy brainwashed Lisa to believe that Judy was omnipotent and Lisa was powerless and helpless. Lisa was not allowed to speak or make any noise – even the noise of a fork tine on a plate – as a child. Often Judy duct taped Lisa's mouth shut, and forced Lisa to stand in the corner waiting on her step father to come home and beat her. Lisa was not allowed to voice an opinion. Lisa's safety depended on her ability to monitor Judy's every facial expression to determine read how to stay on Judy's good side.

f. *Lisa's mother used extreme strategies of coercive control to maintain mastery and omnipotence over her:* Lisa's mother humiliated and degraded her, controlled her bodily functions, did not allow her to speak or make sounds, subjected her to extreme temperatures, forced her to endure stress positions, forced her to confess falsely to wrongdoings of others, destroyed Lisa's treasured ideals, occasionally indulged her with small gifts or amenities, and choked, beat, and whipped her.

g. *Lisa suffers from traumatic bonding:* Lisa's mother Judy instilled in Lisa gratitude for being allowed to live and an enduring desire to please Judy. Lisa continues to perceive Judy as all powerful and all knowing, able to change reality, and able to bring harm or safety to Lisa without regard to Lisa's needs.

**2. Familially Linked Serious Mental Illness and Neurological Impairments Compounded the Effects of Torture on Lisa's Perception of Reality.**

By her early 20's Lisa experienced the full onset of major mental illness. Her perceptions, thoughts, and actions suffered under the weight of bipolar mood disorder, enduring effects of the torture from early childhood, and neurological impairments that most likely were caused by her mother's unabated drinking during her pregnancy with Lisa. Two of these profound disabilities originated in intentional acts of her parents and caregivers – torture and prenatal alcoholism. The third disability, however, evolved from genetic vulnerability and predisposition to psychiatric and neurologic impairments that were handed down through the generations.

Family stories on both maternal and paternal sides describe relatives with extreme mood swings; odd, eccentric, and strange behaviors; death in insane asylums; and auditory and visual hallucinations in aunts, uncles, cousins, grandparents and great relatives. Relatives also have significant histories of autism, pervasive childhood development disabilities, mental retardation, epilepsy, and brain abnormalities. Although the etiology of some neurologic deficits is unknown, there is no doubt that many family members experienced significant disability due to these deficits. These psychiatric symptoms and neurologic deficits acted synergistically to compromise many of Lisa's ancestors' and more immediate family members' ability to lead healthy, productive lives.

Although sexual violation and torture were devastating in their own rights, other patterns emerged that undermined any sense of safety or security for Lisa within the family unit. Chief among these patterns was kidnapping children in the

family. Lisa's paternal grandfather kidnapped her father and disappeared for a year, returning the child as "a basket case." Her father, in turn, kidnapped Lisa and her younger sister. Lisa's maternal great grandfather kidnapped and hid his children so that his wife would not flee. His wife fled, kidnapping the youngest child, and never returning. Lisa's mother, in collusion with Lisa's husband, kidnapped two of Lisa's children and fled the state to avoid detection. Lisa's mother exercised and maintained control of Lisa by threatening to take her children from her, a threat rooted in historical reality.

Other patterns of destructive family dynamics also affected Lisa's life adversely. Throughout the extended family line, mothers and fathers selected particular children for favorable relationships and others for cruel treatment or abandonment. Lisa's paternal grandmother singled out and mistreated Lisa's father, and he in turn abandoned Lisa, along with his other children. Lisa's paternal grandfather abandoned his family after returning his kidnapped son (Lisa's father) to his parents. Lisa's maternal great grandmother abandoned several children and moved with her youngest child to another state, never contacting her children again. Lisa's maternal grandfather shunned his daughter who attempted to protect her mother from his beatings. Lisa's mother exiled Lisa's half-sister, Diane, from family life – turning Diane over to the state at age 8. Once Diane was handed over to the state, Lisa's mother turned her attention to Lisa and tortured her while favoring her other children.

Lisa's family of origin was overcome by unsafe, unhealthy, and life threatening patterns of behavior demonstrated by her mother Judy, her father John, and the series of men Judy introduced into the family. Judy was a severe alcoholic who drank throughout her pregnancies with Lisa and her four other children, all of whom manifested symptoms of serious mental and cognitive disturbances. Judy moved the children from home to home and man to man without regard for her children's development. She allowed sex offenders, child rapists, alcoholics, and violent men to move in and out of their homes. She lured some of the children of these men into her home by offering alcohol and no supervision. She hid her actions in an atmosphere of terror that prevented any child from seeking help.

### 3. After the On-Set of Her Serious Mental Illness, Lisa Was Recapitulated to Childhood Captivity and Helplessness by Judy's Continued Control Over Her Life

Throughout her life, Lisa's driving assumption was that she was powerless. This helplessness was born of Judy's incessant control over Lisa's every movement and "decision." Judy was omnipresent in Lisa's life, weaving in and out and reasserting her threats to take Lisa's children and to expose Lisa as incompetent. She kidnapped Lisa's children twice but also occasionally indulged Lisa with the promise of being a good grandparent and bringing Lisa into the family fold. Judy whipsawed Lisa between offers of reunification and efforts to alienate Lisa from her spouse and in laws. Judy made sure Lisa knew Judy was present, wiling, and capable of disrupting Lisa's day to day life.

4. **Lisa's Lifetime of Enforced Silence, Domination, and Abuse Conditioned Her to Accept Violent Sexual Assault by Her Husbands**

Having spent her entire life unable to exert her own will, without control of her body, her speech, or even her opinions, Lisa was conditioned to accept the violent sexual acts forced upon her by Carl and then Kevin. As a child, she was not allowed to say no to her stepfather when he assaulted her. Had she spoken about Jack's sexual assaults, she believed her mother would have blamed and punished her, which is exactly what happened when Judy held a gun to Lisa's head and accused her of having an affair with Jack. Lisa explained that she "was not allowed" to tell Carl or Kevin no. If she said no to Carl, he hit her. She believed it was part of marital responsibility to accept brutalizing and dehumanizing sexual acts with Kevin. Kevin, after all, provided her with a home and was otherwise good to her. She did not know that criminal laws apply to marital rape, and became very agitated and irritated when the subject came up. She argued, "It wouldn't make any difference, because I could not say no anyway."

5. **Lisa's Co-Morbid Psychiatric Illness, Complex Post-Traumatic Stress Disorder, and Neurological Impairments Compromised Her Ability to Cope with the Sexual Torture Meted Out By Her Husbands: Lisa Cracked.**

Lisa survived torture, brain washing, and mind control that was so severe and chronic it is similar to the experiences of boy soldiers and children sold into sex trafficking and slavery. As a child, she was isolated, silenced by duct tape and threats, repeatedly raped, subjected to extreme temperatures, choked, beaten, humiliated, and degraded. If she did not chose her words very carefully and perfect, her mouth was duct taped and she was beaten. From the moment she got up until she went to bed at night, she thought out every move to avoid being hurt and to avoid bringing harm to her younger sister. Her beloved older sister was expelled from the family, and another sister was threatened with rape if Lisa was not compliant. Her mother exercised control over Lisa's mind and behavior even when Lisa was an adult, threatening Lisa with the loss of her children. Her first husband colluded with her mother to kidnap Lisa's children in order to obtain compliant behavior. Her first and second husbands tortured her with rapes, beatings, and bondage which further severed Lisa's tangential hold on reality. She explained that she was "right back" where she started.

Lisa suffered predictable and longstanding psychosis due to the severity of the torture she survived. Torture and coercive control by her mother destroyed Lisa's moral agency, sense of self, and independence. It made her psychotic in that she lost contact with reality, became disconnected from events and circumstances around her, and developed distorted and irrational perceptions of her place in the world. After the birth of her four children in as many years, she experienced onset of major mental illness, most likely bipolar mood disorder, which caused erratic, unpredictable and extreme mood swings. The underpinnings of a healthy brain were already compromised by her mother's excessive alcoholism during her pregnancy with Lisa. These multiple

impairments devastated Lisa's perception of reality, decision making ability, her insight, and her judgment.

6. **Lisa Suffers Extreme Psychological Harm as a Result of Torture, Sexual Violation, and Captivity**.

Lisa continues to be psychotic as a result of co-morbid conditions of serious mental illness, neurological impairment, and complex trauma reactions. Lisa experiences sustained loss of contact with reality and extremely disordered perceptions of time, personhood, and events. She experiences temporal disconnection from events, relationships, and situations in which she is a major participant. This disconnection is greater and more than dissociation associated with traumatic events. She is ashamed, fearful, distrustful, paranoid, suicidal, anxious, depressed, sleep disturbed, hyper vigilant, and self loathing.

Exhibit No. 16, Dec. of Jan Vogelsang at 172 (internal citations omitted).

In addition, Dr. George Woods determined:

A mosaic of mental impairments affects every domain of Ms. Montgomery's life, behavior, and mental functioning. She has significant neurologic deficits, including but not limited to cerebellar dysfunction that is likely the result of exposure to high levels of alcohol in utero. She also has mild atrophic changes in her brain, an unusual finding, given her relatively young age. She has symptoms of motor dysfunction.

Ms. Montgomery suffers from a significant affective mood disorder with psychosis that severely compromises her ability to function without careful medication titration and monitoring. She demonstrates pervasive and enduring consequences of surviving intentional trauma so severe that it meets the definition of torture, and she meets criteria for complex posttraumatic stress disorder and disorders of extreme stress (Briere & Spinazzola, 2005; van der Kolk, Roth, Pelcovitz, Sunday, & Spinazzola, 2005). These disorders interact synergistically and account for Ms. Montgomery's mood lability; loss of contact with reality categorized as a perceptual disorder which in its mildest form is dissociation and in its most extreme form is psychosis; impaired working memory; judgment and insight; affective dysregulaton; defective goal formation; and confusion.

The day to day expression of these multiple impairments reduced Ms. Montgomery's functioning to child-like dependence and was present long before she was arrested for the current offense. She was unable to effectively or consistently care for herself, her children, her pets, and her husband; could not effectively perform activities of daily living such as bathing and showering, dressing, grooming, shopping, and homemaking; and could not accurately perceive events and circumstances in her life. She had no control of her unpredictable mood shifts, severe bouts of irritability, and ever present mental confusion. She was mentally absent – out of contact with reality – for most of her waking hours. She often had no memory of her daily activities, like shopping for groceries, and depended on hurriedly scribbled notes on day calendars to tell her what she had done in the past. She developed a restricted and isolated routine to

minimize being overwhelmed by day to day responsibilities, but even a restricted routine overwhelmed her.

Exhibit No. 15, Dec. of George Woods, M.D., p. 3-4.

Furthermore, as recognized by Dr. Woods:

> The emotional damage and neurological effects of chronic physical and psychological trauma suffered by Ms. Montgomery are profound. She was born into a family of multi-generational mental illness that was largely undiagnosed and untreated (Deborah A. Perlick et al., 2004; Thomas G. Schulze, Donald Hedeker, Peter Zandi, Marcella Rietschel, & Francis J. McMahon, 2006). Multiple members of her family, as described in Jan Vogelsang's biopsychosocial history, appear to have suffered from neurocognitive and psychiatric impairments. Medical, pediatric, psychiatric, and education records and descriptions by first degree and extended family members document a lengthy history of familial genetic vulnerability to psychiatric and neurologic impairment.

Exhibit No. 15, Dec. of George Woods, M.D., p. 8. In addition,

> The degree of Ms. Montgomery's neurological impairment in and of itself would have severe enough impact on her development. Taken together the cumulative impact of the other psychiatric and psychosocial dysfunction she suffered, it has had a profound and debilitating impact on her social, cognitive, emotional, and behavioral development and functioning (Kim, Miklowitz, Biuckians, & Mullen, 2007).

Exhibit No. 15, Dec. of George Woods, M.D., p. 9.

> Prior to trial, mental health experts were not provided with a complete neurobehavioral history, did not identify her neurobehavioral deficits and therefore were unable to relate her behavior to those deficits and psychosocial outcomes.

Exhibit No. 15, Dec. of George Woods, M.D., p.10.

Although trial counsel has numerous red flags that Mrs. Montgomery had been exposed to traumatic events throughout her life, they failed to appreciate the extent, nature, and devastating effect of that trauma (torture) and the impact of that torture on her behavior and functioning and how the torture she experienced is inextricably intertwined with her neurological impairments they failed to obtain a competent mental and neurological evaluation. Their failures allowed the Government to minimize Lisa's trauma history and compare her to other victims of abuse which, though improper, See Claim #, *infra*, was an effective tool as encouraging the jury

to discount the mitigating history. Dr. Woods explains Lisa's Complex Post Traumatic Stress Disorder:

> Ms. Montgomery was subjected to chronic and extreme sexual violence, emotional cruelty, and life threatening physical assault as a child at the hands of those who should have protected and buffered her from harm. She exhibits the behaviors and symptoms, including psychosis, of those who have been exposed to severe sexual and emotional abuse in childhood and subsequently develop complex post-traumatic stress disorder. Impairments in her adaptive functioning are most likely related to the presence of psychotic and traumatic symptoms as well as cognitive deficits. …
>
> Ms. Montgomery survived extreme and intentional trauma like that recognized as torture by the United Nations. The following methods of torture were used against her by her mother and step father beginning in early childhood and continuing into adolescence:
>
> - forced silence by duct taped mouth;
> - blunt trauma of punches, kicks, slaps, whipping;
> - positional torture of prolonged constraint of movement;
> - asphyxiation by smothering and choking;
> - sexual violence;
> - exposure to extreme cold water and cold temperature;
> - humiliation by verbal abuse and forced wearing of urine soaked underwear of others;
> - threats of sexual assault of other family members;
> - psychological techniques to break down will, including forced betrayals;
> - accentuating feelings of helplessness:
> - exposure to contradictory messages;
> - behavioral coercion;
> - forced to harm her sister;
> - forced to witness atrocities being inflicted on her sister;
> - and threats to kill (mock execution).
>
> Additional categories of torture were inflicted on Ms. Montgomery by her first and/or second husbands, including: positional torture, using suspension, stretching limbs apart, and forced positioning; burns with hot wax; sexual violence and sexual violence by instrumentation (glass bottles); coerced sterilization; blunt trauma; whipping; and threats to kill (knife at throat).

Ms. Montgomery's half siblings and step siblings witnessed extreme acts of cruelty by her mother against Ms. Montgomery and, to a lesser extent, against other children in the home. As a small child, Ms. Montgomery's mouth was duct taped shut to prevent her from talking and in punishment for talking. She was forced to stand without moving for hours in a corner of the room, could not scratch her nose, and could not sit or lean against the wall. She was not allowed to talk, cry or make noise. She was stripped naked, beaten, and forced to stand under a cold shower for lengthy periods of time. She was forced to take a board and hit her younger sister until she bled. Her mother gave custody of Ms. Montgomery's older half-sister upon whom Ms. Montgomery depended for protection to the state. Her mother choked and beat Ms. Montgomery and encouraged a step father to beat her for insignificant or fabricated wrong doings. She was forced to confess falsely to protect her younger siblings. Her step father frequently sexually assaulted her in a room he built for that purpose, pounded her head against the concrete floor, and whipped her naked with a belt. He often held a pillow over her face when he sexually assaulted her. A younger half-brother described a time when Ms. Montgomery's mother "held a knife to Jerri Jo's tongue [a half-sister] and said she was going to cut Jerri Jo's tongue out." He prayed that his parents "wouldn't kill my sisters." A friend of his father's (Ms. Montgomery's step father) sexually molested the half-brother and Ms. Montgomery.

As the United Nations Istanbul Protocol points out "torture is an extraordinary life experience capable of causing a wide range of physical and psychological suffering." It is important to understand that Ms. Montgomery experienced torture frequently and routinely at the hands of her mother and others who were charged with caring and protecting her in her early childhood. The effects of torture on a child are not the same as the effects of torture on an adult. Torture and chronic trauma affect the developing brain of children, the child's psychological make-up, and the child's ability to recover. The sequelae to torture "occur in the context of personal attribution of meaning, personality development and social, political and cultural factors. For this reason, it cannot be assumed that all forms of torture have the same outcome." However, some forms of torture and maltreatment in childhood are more likely to contribute to psychosis than others.

Studies indicate childhood sexual trauma may be an important contributing factor in development of psychosis for some individuals who are at high risk for psychotic disorders. It also appears that previous experiences of sexual trauma are related to the severity of psychotic symptoms and have a negative impact on outcome and course of psychotic disorders. There are a number of theories for why trauma may cause psychosis:

> Biological modes of how trauma might impact on psychosis include heightened sensitivity to stress through aberrant activation of the Hypothalamic-Pituitary Adrenal (HPA) axis stress-diathesis model. Dysregulation of the HPA axis may contribute to or interact with the

> dopaminergic abnormalities that are thought to be important in psychotic disorders.

Whatever the relationship between psychosis and sexual abuse, Ms. Montgomery has experienced discreet episodes of psychotic symptomatology such as visual, tactile, and auditory hallucinations. She has also experienced sustained, chronic loss of contact with reality that is more severe than dissociation associated with post-traumatic stress disorder and is more aligned with the severe impediment associated with psychosis. She has extreme perceptual distortions wherein she is unable to determine if she is experiencing "real" events and situations or if her experiences are unreal and not occurring. This inability to recognize reality affects her judgment and insight and denies her a rational understanding of the world in which she lives.

The severity, chronic nature, and young age at which torture and maltreatment occurred have profound significance on Ms. Montgomery's neurologic and psychiatric diseases, as does the quality of the relationship between Ms. Montgomery and her mother. Her mother inflicted extreme acts of torture that broke Ms. Montgomery's will and ability to function independently. She encouraged others to harm the child, kept tally of alleged wrongdoing to increase punishment, and participated directly in life threatening physical assaults:

> Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. In addition, interpersonal traumas are likely to have more profound effects than personal ones . . . Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal . . . In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage.

The cumulative impact of mother-imposed and sanctioned torture and maltreatment starting at such an early age caused long term damage to Ms. Montgomery's brain:

> The organization and functional capacity of the human brain depends upon an extraordinary set and sequence of developmental and environmental experiences that influence the expression of the genome . . . Unfortunately, this elegant sequence is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences . . . Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan. An expanding body of evidence from rodent, primate, and human research suggests that early stressors cause long term changes in multiple brain circuits and systems.
>
> Ms. Montgomery experienced complex psychological trauma resulting from exposure to severe stressors that (1) were repetitive and prolonged, (2) involved harm and abandonment by caregivers and other ostensibly responsible adults, and (3) occurred at developmentally vulnerable times in her life during critical periods of rapid brain development. Long term consequences are evident in changes in Ms. Montgomery's mind, emotions, body, and relationships.

Exhibit No. 15, Dec. of George Woods, M.D., p. 11-16 (internal citations and footnotes omitted).

As a result of the unrelenting trauma, torture and abuse that Lisa has suffered throughout her life, she lost contact with reality, became psychotic, and dissociative. Dr. Woods explains:

> The hallmark of the extreme trauma Ms. Montgomery survived is her loss of contact with reality that is greater than brief, mild dissociative episodes that only manifest slight changes in perception or out of body experiences alone. She experiences dissociation, which is "a disruption in the integration of consciousness, self-perception, memory, and actions," Dissociation is also defined as "The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings or attitudes."
>
> In addition to disassociation, Ms. Montgomery also suffered from psychosis until placed on antipsychotic medication. She suffered delusions; auditory and visual hallucinations; perceptual distortions; paranoia and delusions of persecution; and mood disorders with psychotic features. The persuasive evidence that Ms. Montgomery has psychotic symptoms is contained in the psychiatric and medication records from her pretrial incarceration at CCA and her post trial commitment to FMC Carswell, a BOP facility.

Exhibit No. 15, Dec. of George Woods, M.D., p. 17 (internal citations and footnotes omitted).

Lay witnesses describe Lisa's behavior and demeanor in ways which, to a trained clinician, corroborate the findings of Dr.Woods, that Lisa does not know what is real and not real, is psychotic and dissociative.

> Ms. Montgomery's loss of contact with reality was long standing. One of her step sisters who babysat her as a small child reported that Ms. Montgomery "got lost in her books or stared into space so that she was not really with it. You had to yell to get her attention. She'd eventually come back to and respond." One of her half brothers recollected that she "went into her own little world a lot. She often spaced out, stared into space or lost herself in a book." A classmate from high school described it as "daydreaming a lot in class."
>
> During puberty Ms. Montgomery began to drink alcohol in response to repeated rapes by her step father. Her designated room in the trailer was a partially finished add-on to the trailer that had no lock, a concrete floor, and no heat. Her mother and step father used the room to store homemade liquor and wine. In junior high and high school Ms. Montgomery drank the wine to quell her fear and dread of the oral, vaginal, and anal rapes she endured more than weekly. As a young mother, Ms. Montgomery drank to excess and "started each day with a cup of coffee laced with Jack Daniels." The high prevalence of the comorbidity of substance use disorders and post traumatic stress disorder (PTSD) has been reported in a number of studies. In civilian populations with PTSD, estimates of lifetime prevalence of substance use disorder range from 22% to 43%, far higher than estimates for substance abuse disorders in the general population.

Exhibit No. 15, Dec. of George Woods, M.D., p. 19 (internal citations and footnotes omitted).

Beyond Complex Post Traumatic Stress Disorder, Lisa suffers from Affective Mood Disorder. Though trial counsel should have been aware of this disorder and its effects on Mrs. Montgomery, he actively and unprofessionally discouraged the presentation of affective mood disorder evidence. (See Exhibit #, Dec. of Dr. William Logan, M.D.). Dr. Woods review of the biopsychosocial history and supporting data, found that, "The course of Ms. Montgomery's behavior and symptomology meets criteria for Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features[.]" Dr. Woods explains that "She demonstrates mood lability, impulsive judgment, disinhibition, depressive episodes, persecutory delusions,

irritability, agitation, euphoria during manic and hypo manic episodes, and visual and auditory hallucinations. She has a propensity for dissociation." *Id.* Dr. Woods documents the sources of information which support his observations:

> Rapid, unpredictable mood changes were a prominent feature commented on by Ms. Montgomery's husbands and children. Her ex-husband recollected that she "was sad or unhappy for days at a time and then she suddenly had a plan or an idea and nothing could stop her . . . Lisa could not stay in one place for any length of time . . . and moved from house to trailer to apartment and back again in the same town or different towns and states without any plan." He also noticed that "her personality changed from quiet and passive to being exuberant at times" when she reached her twenties." Ms. Montgomery's youngest daughter has learned to recognize symptoms of bipolar when "moods go from very high to low," and thinks one of her sisters "is most like our mom" with mood swings.
>
> Episodes of depression kept her in bed for days. She "spent a lot of time in bed," according to her half-brother who didn't know "if it was because of her headaches or what the cause was. She would spend days in bed and just lay there in silence." Her first husband compared times when "she got bursts of energy" to "[o]ther times, she stayed in bed for days . . . .Between all her mood changes, moves to and from places, and separations and reunions, it wore me out." In contrast to depressive episodes, her husband found it "almost impossible to keep up with her at times." Her irritation and agitation presented terrible problems for her children as "[h]er fuse got shorter and shorter; she was really quick to go off yelling . . . Her outbursts were over nothing really."
>
> Ms. Montgomery's social interactions were often inappropriate, and co-workers and family commented on them. This impaired understanding of social context is both a feature of frontal lobe dysfunction and bipolar disorder (Zubieta, Huguelet, O'Neil, & Giordani, 2001). Her first husband said she "went from not talking to talking non-stop even to strangers . . . [S]he even approached people she did not know and started talking to them. It was a total change. She didn't notice if you talked to her or asked her any questions. Once she started talking she kept talking." A co-worker reported that Ms. Montgomery "was constantly talking" and "told the same stories over and over again." Another co-worker's husband opined he "did not like her after they met because he thought she talked too much." One of her half brothers advised that "[t]he best thing to do is ignore it because it [talking] will drive you crazy . . . She can talk for hours and hours."
>
> Ms. Montgomery's hygiene deteriorated significantly as an adult. She "generally smelled of body odor and rarely bathed. She wore dirty clothes a lot of the time." Her home and cars were filthy. In her twenties, "she quit bathing and being clean" and "smelled bad." She "smelled so bad that people commented on it" when she worked at Wendy's.

> Ms. Montgomery's behavior embarrassed her children. She acted on impulse, started projects, and didn't complete them. Her half brother reported "she would get really interested in something and spend a lot of time on it and then she wouldn't be interested anymore." She disappeared for days with "no notice or warning." At times in public, she "acted like a young child. She twirled around in the Wendy's and sang out loud. She swung her arms like a child does when they are skipping along . . . [N]ot only was it bizarre behavior, but it was very embarrassing for me as her daughter."

Exhibit No. 15, Dec. of George Woods, M.D., p. 20-22 (internal citations and footnotes omitted).

In addition to these disorders, Dr. Woods found that Mrs. Montgomery suffers from neurological impairments, including compromised cerebellum dysfunction. His conclusions include the following:

> Ms. Montgomery has a long standing history of serious brain impairments, exposure to extreme trauma, affective mood disorder, and psychosis. These disorders interact synergistically and account for Ms. Montgomery's mood lability; loss of contact with reality, which in its mildest form is dissociation and in its most extreme form is psychosis; and impaired memory, judgment, insight, and cognition. The interplay and severity of these multiple impairments resulted in her inability to perform basic activities of daily life, to care for herself or her family, and to act rationally and logically. She has dysfunction in her neurological systems, including her motor functioning, significant attentional problems, limbic dysfunction, memory, and visual dysfunction. These symptoms affect her behavior at all times, disrupting her ability to function normally.

Exhibit No. 15, Dec. of George Woods, M.D., p. 24.

Dr. Woods offers the following opinions to a reasonable degree of psychiatric certainty:

> In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Lisa Montgomery suffered from a complex mosaic of medical and neurobehavioral disorders that interacted with the effects of lifelong trauma that produced both brain damage and psychiatric disorders. These disorders substantially impaired her capacity to conform her conduct to the requirements of the law.
>
> In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, she was under severe mental and emotional disturbance at the time of the offense.

In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Ms. Montgomery's neurobehavioral history contained in the biopsychosocial evaluation documents the manner in which her brain damage adversely affected her life course. It is a critical component of any social history that purports to describe the factors that shaped and influenced her functioning.

In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, there was limited neuropsychological testing of those parts of the brain that are most relevant. Dr. Fucetola recognized the limitations of his battery, especially given the extreme discrepancy between performance and verbal IQ. He administered only neuropsychological testing, and it lacked a comprehensive frontal lobe and parietal lobe examination. In spite of a rich familial/genetic history that warranted further examination, neither the government experts nor defense experts investigated the relationship between her significantly impaired every day functioning, which cannot be explained by bipolar disorder and complex trauma alone, and her behavior surrounding the offense.

In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, a reliable psychiatric or psychological assessment of Ms. Montgomery must include consideration of her neurological deficits; Ms. Montgomery manifests symptoms of frontal lobe dysfunction, including poor social understanding and context, difficulty weighing and deliberating, poor sequencing ability, irritability, and asocial behavior. She was often unable to organize herself, her children, and her home in any meaningful way, while believing she was a good mother.

Ms. Montgomery has a discrepancy between her verbal and nonverbal IQ that captures her strengths, language usage, and her weaknesses, day to day organizing and daily functioning.

It is important to understand the weight of each of her impairments-her complex trauma, her mood disorder, and her cognitive deficits-in order to adequately understand her level of impairment.

In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Ms. Montgomery's ability to rationally aid and assist her counsel was severely compromised due to two factors: 1) she did not receive appropriate medication for her symptom complex, and 2) she was unable to disclose to counsel the details of the extreme abuse due to predictable trauma sequelae.

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Montgomery's cognitive and psychiatric impairments and medications caused and explained her disengaged appearance, flat and absent affect, and inability to show emotion at trial.

Exhibit No. 15, Dec. of George Woods, M.D., p. 25-27.

Constitutionally effective trial counsel would have discovered the information which led to Dr. Woods report and conclusion and presented it to competent mental health experts in order to ensure mental and neurological evaluations which meet with the appropriate standard of care. As a result, constitutionally effective trial counsel would have moved to have Lisa declared incompetent to stand trial; ensured her rights under *Riggins* were protected; effectively questioned jurors about their attitudes and opinions an ability to consider such evidence as mitigation in a capital case; put forth a competent first phase defense which would not have included a not guilty by reason of insanity defense that she suffers from pseudocyesis; put forth a competent penalty phase defense which would have established both statutory and non-statutory mitigating circumstances which, it is reasonably probable, would have caused at least one juror to vote for life.

F. Specific Ineffective Assistance of Counsel Claims

In any criminal case, an accused is entitled to competent counsel. *See, Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052 (1984). In a capital case, the stakes are higher because death is indisputably different from all other sentences. Capital cases are more complex and, as a result, more is demanded of counsel in a capital case. *See Sears v. Upton*, 130 S.Ct. 3259, 3266 (2010); *Porter v. McCollum*, 588 U.S. 30, 130 S.Ct. 447, 449 (2009); *Rompilla v. Beard*, 545 U.S. 374, 378 (2005); *Wiggins v. Smith*, 539 U.S. 510, 515-16 (2003). In Mrs. Montgomery's case, her attorneys failed to provide her with the representation demanded by 18 U.S.C. §§ 3005 & 3006A and the Sixth Amendment to the United States Constitution. Had it not been for the errors and misjudgment of her pretrial and trial defense teams, whether their impact is examined in isolation or cumulatively, there is a reasonable probability that the outcome of Mrs. Montgomery's trial would have been different and she would not be on death row. *Strickland v. Washington*, 466 U.S. at 694.

The "right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984). The constitutional adequacy of counsel is assessed according to the familiar two-part test set forth in *Strickland v. Washingon*, 466 U.S. at 687-88. The first prong asks whether counsel's performance "fell below an objective standard of reasonableness," and the second asks whether counsel's inadequate representation was prejudicial. *Id*. Counsel's performance is deficient if it is unreasonable under "prevailing professional norms." *Wiggins v. Smith*, 539 U.S. at 521; *Strickland*, 466 U.S. at 688.

The United States Supreme Court has been clear that:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

> In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Wiggins*, 539 U.S. at 521. Counsel's performance is prejudicial if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 534; *Strickland,* 466 U.S. at 695.

Due to our federal death penalty scheme, where one non-unanimous juror spares a defendant's life, confidence in the outcome of a trial is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. at 536. A "reasonable probability of a different result" is less than a preponderance of the evidence and is present when an evaluation of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 693.

In addition to the general claim of ineffective assistance of counsel stated above, Mrs. Montgomery makes the following specific allegations of constitutionally ineffective counsel:

1. <u>Failure to Retain Competent Mental Health and Neurological Experts</u>

Counsel in a capital case must conduct a sufficient investigation to allow counsel to make intelligent use of experts. *See, e.g.*, Supplementary ABA Guidelines 4.1B and 5.1, 36 HOFSTRA LAW REVIEW at 680-83. This means that defense counsel must identify and retain the appropriate experts. In this case, when presented with many "red flags" from multiple and overlapping sources of Mrs. Montgomery being stripped and beaten as a child, of Mrs. Montgomery being subjected to sexual abuse by a step-father, as well as many other forms of abuse, trial counsel failed to retain competent experts in the areas of post-traumatic stress disorder, trauma spectrum disorders, or any field relevant to the diagnosis and presentation of Mrs. Montgomery's debilitating traumatization. No expert retained by the defense was able to identify Mrs. Montgomery's dissociative states or explain to the jury how Mrs. Montgomery

could appear to be engaging in deliberate behavior that was nonetheless beyond her capacity to control.

After Mrs. Montgomery revealed limited information about the abuse and sexual abuse she had suffered at the hands of her mother and step-father, all of her female attorneys were removed from the case. She was left with a defense team comprised entirely of men who then subjected her to numerous evaluations by male experts. Defense counsel had a duty to protect Mrs. Montgomery from harmful and irrelevant testing.

2. Failure to Conduct a Mitigation Investigation That Complied With the ABA Guidelines and Prevailing and Professional Norms

i. Complete lack of understanding of importance of mitigation investigation

The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 revision) require lead counsel in a capital case to "assemble a capital defense team consisting of no fewer than two qualified attorneys, an investigator, and a mitigation specialist – with at least one member of that team qualified by training and experience to screen for the presence of mental or psychological disorders or impairments." *Guidelines 4.1 and 10.*4C, 36 HOFSTRA LAW REVIEW 677 (June 20, 2008)(Attached as Exhibit No. 30). "The duty to investigate, develop and pursue avenues relevant to mitigation of the offense or penalty, and to effectively communicate the fruits of those efforts to the decision-makers, rests upon defense counsel." *Id*. at 678. Mrs. Montgomery's defense teams failed to carry out this duty.

Guideline 10.4 recognizes that "Counsel bears ultimate responsibility for the performance of the defense team . . . . It is the duty of counsel to lead the team in *conducting an exhaustive investigation into the life history of the client*. It is therefore incumbent on the defense to

interview *all* relevant persons and obtain *all* relevant records and documents that enable the defense to develop and implement an effective defense strategy." *Id*. at 688 (*Emphasis added*). Defense counsel did not properly lead a team nor did they interview all relevant persons or obtain all relevant documents in this case as explained in greater detail below. As a result, they presented the defense that Mrs. Montgomery was a good mother and hard worker who was suffering from pseudocyesis at the time of the crime. This defense was inaccurate and was completely rejected by the jury.

As referenced above, the guidelines call for an investigator and a mitigation specialist. The initial defense team of Anita Burns and Susan Hunt retained Lisa Rickert as a mitigation specialist. Ms. Burns liked Ms. Rickert and thought she knew what she was doing and would be great at interviewing witnesses. The first defense team had Ron Ninemire, the Chief Investigator with the Office of the Federal Public Defender for the Western District of Missouri and Phil Thompson, a private investigator, as fact investigators. Mr. Ninemire attended one mitigation seminar in 2005 while working on Mrs. Montgomery's case, but he had no mitigation training prior to her case.

Ms. Rickert met Lisa Montgomery for the first time on March 1, 2005. Thereafter, Ms. Rickert began interviewing family members and compiling information on Mrs. Montgomery's life history. Often Ms. Rickert was accompanied on her interviews by Ron Ninemire.

As recognized in Guideline 10.11.C., "Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life history investigation." 36 HOFSTRA LAW REVIEW

at 689. Another goal of the mitigation investigation is to prepare and gather "demonstrative evidence, such as photographs, videotapes and physical objects (e.g. trophies, artwork, military medals), and documents that humanize the client or portray [her] positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference." *Id*. at 692.

Ms. Rickert appears to have been making progress with the mitigation investigation; however, she was asked to resign from the case in August of 2005. In her resignation letter, Ms. Rickert notes that Susan Hunt and David Owen "have insisted upon mitigation investigation methods that [she] consider[ed] questionable and you have created a working relationship fraught with mistrust and disrespect." (Exhibit No. 13, Letter from Lisa Rickert dated 8/8/2005). Ms. Rickert found that David Owen had "some kind of paranoia" about Rickert conducting interviews one-on-one in compliance with the guidelines (Exhibit No. 16, Attachment No. 2, Dec. of Lisa Rickert, p. 4). Her concerns were ignored and she was required to include Mr. Ninemire in most of her interviews (Exhibit No. 16, Attachment No. 2, Dec. of Lisa Rickert, p. 4). In her resignation letter, Ms. Rickert added that Mrs. Montgomery was not being "well served by the current relationship among defense team members." (Exhibit No. 16, Attachment No. 2, Letter from Lisa Rickert, dated 8/8/2005). Ms. Rickert describes the team led by Susan Hunt and Ron Ninemire as "dysfunctional" (Exhibit No. 16, Attachment No. 2, Dec. of Lisa Rickert, p. 5).

In contrast, Mr. Owen felt that Ms. Rickert was not keeping him and Ms. Hunt sufficiently informed about the mitigation investigation (Exhbit No. 2, Dec. of David Owen, p. 4). Ms. Burns is not surprised that Mr. Owen did not get along with Ms. Rickert noting that Mr. Owen was difficult to work with if you were a woman.

Holly Jackson was retained to replace Lisa Rickert as the mitigation specialist on Mrs. Montgomery's defense team. Ms. Jackson joined the defense team on August 16, 2005 (Exhibit No. 2, Dec. of David Owen, p. 4). Ms. Jackson left the team in May of 2006, after the removal of Judy Clarke and the withdrawal of Susan Hunt (Exhibit No. 2, Dec. of David Owen, p. 13). Ms. Jackson recognized that "counsel from the office of the federal defender in Kansas City did not recognize, know, and understand how to conduct a mitigation investigation and how to prepare a reliable social history of the client" (Exhibit No. 16, Attachment No. 57, Dec. of Holly Jackson, p. 1). Ms. Jackson found Mr. Owen and his staff to be unfamiliar with the ABA Guidelines, basic principles of penalty phase investigation, and how to analyze mitigation information (Exhibit No. 16, Attachment No. 57, Dec. of Holly Jackson, p. 1-2). Ms. Jackson efforts to discuss her findings and assist in directing the mitigation investigation caused her to be dismissed as if she "were an alien from Mars" (Exhibit No. 16, Attachment No. 57, Dec. of Holly Jackson, p. 2).

After Ms. Jackson left the team Susan Hunt noted to Judge Fenner that family members and witnesses were going to think the defense team was comprised of "idiots" because different people kept interviewing them (Tr. of Conferences in Chambers, April 25, 2006, p. 9).

The final mitigation specialist to work with the defense team was Dani Waller. Ms. Waller was retained in June of 2006 (Exhibit No. 2, Dec. of David Owen, p. 13). Mr. Owen is under the impression that Ms. Waller "did a considerable amount of new work" in the case (Exhibit No. 2, Dec. of David Owen, p. 13). Although she was hired to be the mitigation specialist, Ms. Waller did not have a good relationship with Mr. Duchardt (Exhibit No. 2, Dec. of David Owen, p. 13). Mr. Owen believes this was due to a "turf war" over the mitigation investigation (Exhibit No. 2, Dec. of David Owen, p. 13). Mr. Owen has explained that Mr.

Duchardt wanted to do everything himself "and insisted he was the only member of the team to visit and speak with Lisa's children" (Exhibit No. 2, Dec. of David Owen, p. 13). Ms. Waller had to email Ron Ninemire to find out when she should show up for the trial (Exhibit No. 14, Dani Waller email to to Ron Ninemire).

Dani Waller found her experience working on the case to be "frustrating" (Exhibit No. 16, Attachment No. 45, Dec. of Dani Waller, p. 1). Ms. Waller realized that Mr. Duchardt had no "use for mitigation specialists" (Exhibit No. 16, Attachment No. 45, Dec. of Dani Waller, p. 1). As Susan Hunt had predicted, Ms. Waller found that by the time she met with witnesses, they had "witness fatigue. Some witnesses had been interviewed by so many different people that they were tired of telling their story." (Exhibit No. 16, Attachment No. 45, Dec. of Dani Waller, p. 2).

The defense teams representing Mrs. Montgomery prior to and during trial failed to appreciate the need for a consistent mitigation strategy. During a mitigation investigation, the mitigation specialist and other team members are meeting with the client, the client's family members, and other witnesses, often asking them to reveal very personal information (Exhibit No. 3, Dec. of Judy Clarke, p. 6). It is important for the mitigation specialist to develop a relationship with these witnesses. In this case, there were three different mitigation specialists. As Susan Hunt noted, these witnesses must have questioned the abilities of the defense team when new mitigation specialists kept showing up to interview them (Transcript of Conferences in Chambers April 25 and May 3, 2006, p. 9). In addition to the turnover in mitigation specialists, there was friction within the teams. Mr. Ninemire did not like Holly Jackson and said he would not "have a woman tell me what to do." (Exhibit No. 1, Dec. of Susan Hunt, p. 4). Mr. Ninemire also had "extreme problems" with Deb Garvey (Exhibit No. 1, Dec. of Susan

Hunt, p. 6; Exhibit No. 18, Dec. of Phil Thompson). Mr. Ninemire did not like taking orders from Ms. Garvey and he "never bought into the mitigation aspect of the case." (Exhibit No. 1, Dec. of Susan Hunt, p. 6). Similarly, David Owen did not like "mitigation people" (Exhibit No. 1, Dec. of Susan Hunt, p. 6). According to Ms. Hunt, while Mr. Owen "believed in mitigation" he "did not understand what they considered to be mitigation." (Exhibit No. 1, Dec. of Susan Hunt, p. 6).

Given that this case was all about developing a strong mitigation presentation, the various defense teams should have done a better job of managing the mitigation investigation.

ii. <u>Complete failure to conduct a mitigation investigation in compliance with ABA Guidelines</u>

In this case, trial counsel failed to uncover and present readily available mitigating evidence. The trial team simply failed to properly investigate and present Mrs. Montgomery's social history. As a result of the trial team's incompetence, the jury was not given any compelling reason to spare Mrs. Montgomery's life despite the fact that numerous such reasons do exist and could have been discovered by the trial team.

The duty to investigate a client's social and mental health history has been well-settled for many years. *See, e.g., Sears v. Upton*, 130 S.Ct. 3259, 3266, 177 L.Ed.2d 1025 (2010); *Rompilla v. Beard*, 545 U.S. 374, 378, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Porter v. McCollum*, 130 S.Ct. 447, 449 (2009); *Wiggins v. Smith*, 539 U.S. 510 (2003); *ABA Guidelines*, Guideline 10.7 & Commentary (rev. ed. 2003) in 31 HOFSTRA LAW REVIEW 913, 1015-27 (2003); *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* (2008) in 36 HOFSTRA LAW REVIEW 677 (2008), Guideline 5.1 (E) at 683, Guideline 10.11(D) at 689.

A competent investigation in a capital case takes a very particular form. Counsel must search for and uncover the many sources and countless records that can detail a client's life history. These sources and records, as the United States Supreme Court has stressed, will contain "red flags" about ongoing psychological, psychiatric, and physical problems that will in turn alert counsel to other lines of investigation. *Rompilla,* 545 U.S. at 382-83 (2005). The investigation must be multi-generational and comprehensive. In addition, it must be exhaustive. As stated in the Supplementary Guidelines:

> The defense team must conduct an ongoing, exhaustive and independent investigation of every aspect of the client's character, history, record and any circumstances of the offense, or other factors, which may provide a basis for a sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

Supplementary ABA Guideline 10.11.B, 36 HOFSTRA LAW REVIEW at 689.

In a capital case, defense counsel must focus on the penalty phase theory before selecting the jury. *See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines")*. Trial counsel must expect to lose during the guilt phase and must have a comprehensive plan for explaining to the jury why their client should not be subjected to the death penalty. This requires offering the jury an explanation of how the client went from being an innocent child to committing a horrible crime. Such an explanation depends upon a thorough mitigation investigation.

To accomplish this investigation, defense counsel must assemble an appropriate team. The Supplementary Guidelines further require that capital defense teams employ at least one

mitigation specialist. Supplementary ABA Guideline 4.1, 36 HOFSTRA LAW REVIEW at 680. The mitigation specialists "must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over a client's lifetime." Supplementary ABA Guideline 5.1.C, 36 HOFSTRA LAW REVIEW at 682. "They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures." *Id*.

Mitigation specialists must employ the right methods. They must not conduct interviews by phone, as was done in this case with some witnesses. Group interviews are not proper as they are not conducive to the disclosure of sensitive information. Yet, many witnesses and family members in this case were interviewed by two or more people at the same time.

As a result, the pretrial and trial defense teams failed to uncover and understand much of Mrs. Montgomery's social history. The trial team focused on the period of time when Mrs. Montgomery was living in Deming, New Mexico in 1995 through 1998. At trial, counsel for Mrs. Montgomery portrayed her as a good and loving mother, downplaying her mental illness. Yet, the true story is that Mrs. Montgomery was a mess when she was living in Deming, New Mexico, living in a trailer, suffering from alcoholism, and reportedly prostituting herself to feed herself and her children. This information is mitigation evidence, but not the type of evidence that fits with Mrs. Montgomery being a hard worker and a good mother. The trial team got it completely wrong and failed to tell the jury the true story of Lisa Montgomery's life and how she ended up committing a terrible crime.

Assembling a life history like the one set forth above does not just happen. It is the result of a conscious effort to gather all available mitigating evidence so that it may be presented to a jury in the most compelling fashion. These are the details about Lisa Montgomery's life that should have been presented at trial. Defense counsel's failure to conduct and present an adequate social and mental health history was objectively unreasonable.

3. The defense team was ineffective because it never functioned as a cohesive team thereby effectively depriving Mrs. Montgomery of the effective assistance of counsel

Initially, Mrs. Montgomery was represented by Anita Burns and Susan Hunt. They retained Lisa Rickert as a mitigation specialist. Then, Ms. Burns could not handle David Owen supervising her. When she complained to Ray Conrad, Ms. Burns was removed from the case, notably without any explanation being given to Mrs. Montgomery, and Mr. Owen began working on the case with Ms. Hunt, but Mr. Owen decided that he did not like Ms. Rickert. So, Ms. Rickert was asked to resign and Holly Jackson was hired. Mr. Owen and Ms. Hunt recognized they needed an attorney with experience in both capital cases and mental health issues. They brought Judy Clarke into the case based upon her wealth of experience; however, Mr. Owen quickly decided that he did not like working with Ms. Clarke. A few months later, Mr. Owen orchestrated the removal of Ms. Clarke from the defense team. This led to both Susan Hunt and Holly Jackson leaving the defense team.

At that point, a year and a half had passed since the crime in this case. With the case set for trial in September of 2006, John O'Connor and Fred Duchardt were appointed to work with Mr. Owen on Mrs. Montgomery's defense. Yet another mitigation specialist was hired, Dani Waller.

Whereas prior to May of 2006 there had been team planning meetings to brainstorm and divide responsibilities, after May of 2006 Fred Duchardt largely took over the defense of Mrs. Montgomery as explained above. Mr. Duchardt did not work closely with the other attorneys or Ms. Waller, the mitigation specialist. After trying a previous capital case with Jennifer Herndon, Mr. Duchardt had proclaimed that next time he tried a capital case, he would take primary responsibility for every aspect of the case and that is what he proceeded to do in Mrs. Montgomery's case. John O'Connor seems to have been content to let Mr. Duchardt run the case and Mr. Owen had been relegated to the "computer issues" in the case and nothing more. Unfortunately, the consequences of the decision to divide up the labor and to allow Mr. Duchardt to run the defense largely by himself were disastrous for the defense team.

4. Mr. Duchardt provided ineffective assistance of counsel when he took his wife, Ryland Duchardt, to meetings with Mrs. Montgomery

Mr. Duchardt was appointed to represent Lisa Montgomery on May 16, 2006. Thereafter, he met Mrs. Montgomery for the first time on May 26, 2006 (Exhibit No. 22, CCA Visitor Logs). He met with Mrs. Montgomery a total of four more times through the remainder of 2006: (1) June 13, 2006; (2) July 7, 2006; (3) October 13, 2006; and (4) November 8, 2006 (Exhibit No. 22, CCA Visitor Logs). Meanwhile, learned counsel and supposed lead counsel John O'Connor met with Mrs. Montgomery twice prior to trial in May of 2006 when he was appointed and in January of 2007 with his co-counsel.

Mrs. Montgomery was devastated by the removal of Judy Clarke from her case. Not only had Anita Burns been removed from her case without discussion or explanation, but then Ms. Clarke was removed in much the same manner. Mrs. Montgomery wondered what was going on with her defense team. She felt helpless as decisions affecting her life were made not only without her consent, but without her being given any advance notice. Then, having become

accustomed to regular visits from her defense attorneys, often receiving multiple defense team visits per week, she saw Mr. Duchardt five times in seven months during 2006 and Mr. O'Connor one time in 2006 (Exhibit No. 22, CCA Visitor Logs). In a capital case, "counsel must consciously work to establish the special rapport with the client that will be necessary for a productive professional relationship over an extended period of stress." Commentary to *ABA Guideline* 1.1 at 6. A meaningful rapport with a client can only be established by spending time with the client.

> Establishing a relationship of trust with the client is essential both to overcome the client's natural resistance to disclosing the often personal and painful facts necessary to present an effective penalty phase defense . . . and to ensure that the client will listen to counsel's advice on important matters such as whether to testify and the advisability of a plea.

Commentary to *ABA Guideline* 10.5 at 70. Navigating the relationship with the client will likely require close consultation with a mental health professional, who can explain any difficulties the client may have in forming trusting relationships or disclosing information. This expert and the defense team should work closely with the mitigation specialist to incorporate incoming information into the strategy for working with the client. *See* Commentary to *ABA Guideline* 10.7 at 82. None of this happened in Mrs. Montgomery's case.

Neither John O'Connor nor Fred Duchardt spent significant time with Mrs. Montgomery from April of 2006, when Ms. Clarke was removed, through the remainder of 2006. None of the attorneys consulted a mental health expert on how to communicate with Mrs. Montgomery given her history of trauma and the information available to them about Mrs. Montgomery's mental health from the initial evaluation performed by Dr. William Logan. Yet another mitigation specialist had been brought into the case, Dani Waller, but there is no indication that any of the

attorneys worked closely with Ms. Waller to develop mitigation evidence or to better understand their client.

In January of 2007, as explained above, Mrs. Montgomery was transferred to the federal detention facility in Philadelphia, Pennsylvania for evaluation by defense expert Dr. Ruben Gur. While Mrs. Montgomery was in Philadelphia, Mr. Duchardt took his wife, Ryland Duchardt, to two meetings with Mrs. Montgomery, one in February and one in March (Exhibit No. 23, Memo Authored by Fred Duchardt March 7, 2007). Mr. Duchardt did not inform the defense team of his intention to take his wife to meet the client prior to either meeting (Exhibit No. 2, Dec of David Owen, p. 16 ). Mr. Owen knew that Mrs. Duchardt was going to Philadelphia, but did not know that she would be meeting Lisa Montgomery and participating in Mr. Duchardt's meetings with Mrs. Montgomery (Exhibit No. 2, Dec of David Owen, p. 16).

On March 7, 2007, Mr. Duchardt drafted a memo to the other members of the defense team in which he informed them that he had taken his wife to meetings with Mrs. Montgomery on March 5 and 6, 2007. Mr. Duchardt stated, "I believe that I shared with everyone that I took Ryland with me to visit Lisa when I went to see her in Philly last month . . . ." (Exhibit No. 23, Memo Authored by Fred Duchardt March 7, 2007). Mr. Duchardt had not shared this information with the team prior to taking Ryland into client meetings (Exhibit No. 16, Attachment No. 45, Dec. of Dani Waller, p. 2). According to Mr. Owen, when this situation came to light, the defense team was led to believe that Mrs. Duchardt was some kind of psychologist or therapist (Exhibit No. 2, Dec. of David Owen, p. 16. *See also* Exhibit No. 16, Attachment 45, Dec. of Dani Waller, p. 2). So, Mrs. Duchardt went to meetings with the client in February and March of 2007 before the other members of the defense team were informed.

Moreover, Mr. Owen learned much later that Ryland Duchardt was not a psychologist or therapist or any kind of expert (Exhibit No. 2, Dec. of David Owen, p. 16).

This matter was brought to the attention of John O'Connor; however, he deferred to Mr. Duchardt and took no action (Exhibit No. 2, Dec. of David Owen, p. 16). Contrary to Mr. Duchardt's claim that Ryland had developed a "special bond" with Lisa Montgomery, Mr. Owen felt that Mrs. Montgomery displayed a "certain aversion to Ryland." (Exhibit No. 2, Dec. of David Owen, p. 16). This "special bond" is eerily reminiscent of the one Ron Ninemire claimed to have with Mrs. Montgomery earlier in the case. In any event, Mrs. Duchardt's "special bond" with Mrs. Montgomery must not have been too special as she never visited Mrs. Mongomery at CCA-Leavenworth between the end of the trial and sentencing (*See* Exhibit No. 22, CCA Visitor Logs).

After Mrs. Montgomery returned to CCA in Leavenworth in the spring of 2007, Mr. Duchardt continued to take his wife to certain visits with the client. Mrs. Duchardt met with Mrs. Montgomery at least fifteen times at CCA during the remainder of 2007.

Mr. Duchardt disclosed his wife's participation in the case to current counsel. Mr. Duchardt's justification for involving his wife in the case was that Mrs. Montgomery seemed to have difficulty communicating with him and he felt that she had a fear of men. Mr. Duchardt also claimed that he had "more productive" visits with Lisa Montgomery when his wife was involved. Yet, the few memos that Mr. Duchardt created that correspond to dates Ryland accompanied him to CCA reveal that no significant case-related discussions occurred on those visits. Mr. Duchardt never approached the Court to suggest that Mrs. Montgomery would do better with a female attorney. He never retained an appropriate expert to work with him in exploring Mrs. Montgomery's issues with men or to work with him in communicating

effectively with Mrs. Montgomery. Similarly, Mr. Duchardt never sought assistance from his mitigation specialist, Dani Waller, in fostering communication with his client.

After Mrs. Montgomery was sentenced in this case, she was transferred to the Federal Medical Center at Carswell in Fort Worth, Texas. Mr. Duchardt handled Mrs. Montgomery's direct appeal. On two occasions Mr. Duchardt took Ryland to his meetings with Lisa Montgomery in Carswell. Once he represented to the prison that Ryland was his "legal assistant" and on the second occasion he described her as working on the defense case with him.

Mrs. Montgomery clearly does have issues communicating with men. Judy Clarke recognized this when she entered the case (Dec. of David Owen, p. 7). Ms. Clarke recognized that while all members of the defense team should interact with Mrs. Montgomery, a woman should have the closest and primary relationship with her (Dec. of David Owen, p. 7). Her fourth defense team recognized this issue, but did nothing to address it, other than permitting Mr. Duchardt to take his wife to client meetings. The trial defense team was comprised of all men, with a male investigator. While a female mitigation specialist had been retained, Mr. Duchardt iced her out of the case investigation and preparation. All but one of the experts relied upon by the defense were men. Mrs. Montgomery was not capable of disclosing the sensitive information discussed above in her social history with men, especially since she was not properly medicated at the time.

5. Mrs. Montgomery's Trial Defense team Was Ineffective for Ignoring Plea Negotiations

Fewer than one percent of federal death penalty cases that have proceeded to trial have resulted in acquittals. The odds of winning at trial are extraordinarily low. As a result, diligent and competent counsel must consider pleading the case from the beginning. Not only does this involve a prompt and thorough review of the evidence produced by the government, it involves a comprehensive mitigation investigation to determine what evidence can be marshaled to persuade the government that a death penalty sentencing procedure is not appropriate because the client is not death worthy.

As explained above, the mitigation investigation in this case was severely hampered by the constant turnover in both mitigation specialists and defense attorneys, none of which was the fault of Mrs. Montgomery. A mitigation investigation involves developing close and trusting relationships with the client and her family. Such relationships take time and are disrupted when one person is fired from or removed from the defense team and replaced by a new person who has to start over with these witnesses. It also requires having someone on the defense team that has an understanding of the client's mental health profile and can recognize barriers in the client's background or mental health that impede such a relationship or impair the client's ability to make decisions. *See ABA Guideline* 10.9.1 at 91 ("Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment in accordance with these Guidelines to achieve an agreed-upon disposition.").

In this case, Lisa Montgomery expressed a willingness to plead guilty to avoid the death penalty. She repeatedly asked her attorneys if she could just plead guilty.

Susan Hunt and David Owen traveled to Washington, D.C. and met with members of the Department of Justice during the death penalty certification process. According to Susan Hunt,

this was very early in the case and they had very little to present at that point. The committee told Ms. Hunt and Mr. Owen that they could return once they had their expert reports.

According to Judy Clarke, the key to getting a plea in a federal capital case is to develop the mitigation case and any possible mental health evidence. Then you have information to present to the Department of Justice showing why your client should not be subjected to the death penalty.

It does not appear that any member of the defense trial team sought the opportunity to make a supplemental presentation to the Department of Justice. Instead, Saturday, September 29, 2007, the weekend prior to Mrs. Montgomery's trial, Mr. Duchardt wrote a letter seeking reconsideration of the death penalty authorization and enclosed copies of his expert reports. (Exhibit No. 24, Fred Duchardt Letter to DOJ dated September 29, 2007). This did not constitute a meaningful attempt to obtain a plea agreement for Mrs. Montgomery.

6. Mr. Duchardt Provided Ineffective Assistance of Counsel During Pretrial Conferences Where He Made Numerous Misrepresentations to the Court, Failed to Request Appropriate Continuances Rather Than Admit to the Court that He Was Not Prepared for Trial, and Announced a Possible Defense to the Court and the Government Before It Had Been Fully Investigated

Mrs. Montgomery's case was originally set for trial on March 14, 2005 (Doc. #18). Upon a defense motion, the trial date was continued to April 24, 2006 (Doc. #37). On December 27, 2005, the defense team filed a second motion to continue the trial (Doc. #69). The trial was continued to October 23, 2006 by Order dated January 23, 2006 (Doc. #72). Thereafter, Judy Clarke was removed from Mrs. Montgomery's defense team on April 20, 2006 (Doc. #79). This led to the withdrawal of Susan Hunt as learned and lead counsel on May 12, 2006 (Doc. #86).

After the appointment of John O'Connor and Fred Duchardt, the trial was continued to April 30, 2007 (Docs. #86, #87, #91, and #93). This gave Mr. O'Connor and Mr. Duchardt less

than one year to review all of the evidence, locate and retain experts, and prepare for trial. In March of 2007, the government filed its witness list (Doc. #153), proposed jury instructions (Doc. #179). Meanwhile, the defense team sought additional time to file a notice of intent to rely on a defense of mental illness on March 19, 2007 (Doc. #166). On March 30, 2007, one month prior to trial, the defense team filed the notice of intent to rely on a defense of mental illness (Doc. #193). It is unclear what the defense trial team thought the mental defense would be since as of March 30th, the trial defense team did not have reports or data from Dr. Gur or Dr. Kuncel.

A status conference was held on April 3, 2007 before Judge Fenner (Doc. #201). At this status conference, Mr. Duchardt represented to the Court that he had "a couple of experts, actually three experts, whose reports - - well, sorry, four experts, whose reports, two of those we had anticipated having completed last week." (Tr. of Pretrial Conf. 4/3/2007, p. 2)[24]. Mr. Duchardt stated that the defense felt they "were on track to go forward with the trial as scheduled," but due to developments with the experts and Mrs. Montgomery "we have enlisted a couple of experts who at the inside we will be able to have their reports probably no earlier than toward the end of this month as we are getting close to trial." (Tr. of Pretrial Conf. 4/3/2007, p. 2-3).

In response to questioning from the Court, Mr. Duchardt stated that Dr. Ruben Gur and Dr. Ruth Kuncel were the reports that were supposed to have been produced the week prior to this pretrial conference (Tr. of Pretrial Conf. 4/3/2007, p. 3). Inexplicably, Mr. Duchardt then stated, "There are M.D.s who have actually been involved in conducting the MRI testing, but Dr. Gur is the one that pulls all the information together. One of them has been on the team for some period of time, but we have brought him back to the fore. That is Bill Logan." (Tr. of Pretrial

[24] The Docket Sheet identifies the April 3, 2007 conference as a Status Conference (Doc. #201). The transcript cover is labeled as "Transcript of Pretrial Conferences April 3, April 5, and April 12, 2007." Therefore, the transcript is being cited in accordance with its cover.

Conf. 4/3/2007, p. 3-4). As discussed above, Dr. Logan interviewed Mrs. Montgomery at CCA on March 6, 2005, apparently at the request of Susan Hunt, after concerns were raised that Mrs. Montgomery might attempt to commit suicide (Exhibit No. 11, Logan Letter 3/7/05). Dr. Logan found that Mrs. Montgomery was not responding to the medications being prescribed by Linda McCandless at CCA (Exhibit No. 11, Logan Letter 3/7/05). Dr. Logan found that Mrs. Montgomery was suffering from major depressive disorder with psychotic features, complicated by post-traumatic stress symptoms (Exhibit No. 11, Logan Letter 3/7/05). After that interview, Dr. Logan was not involved in any MRI testing as implied by Mr. Duchardt nor was he "on the team." Rather, Mr. Duchardt had reached out to Dr. Logan by telephone on March 22, 2007, less than two weeks before this conference with Judge Fenner (Exhibit No. 25, Duchardt CJA Voucher 5).

Mr. Duchardt announced he also had another expert, Dr. V.S. Ramachandran from the University of California, San Diego (Tr. of Pretrial Conf. 4/3/2007, p. 4). Mr. Duchardt represented to the Court that "the issue that has come to the fore because of everything is a diagnosis called pseudocyesis and that will be a diagnosis that will impact upon the first phase defense in terms of mental disease or defect." (Tr. of Pretrial Conf. 4/3/2007, p. 4). What Mr. Duchardt failed to disclose to the Court was that he had spoken to Dr. Ramachandran by telephone for the first time only two days prior to this status conference and that Dr. Ramachandran had agreed to review the case on April 2, 2007, the day prior to this conference (Exhibit No. 26, Duchardt CJA Voucher 6, 4/1/07-4/2/07 entries "4/1/07: Still trying to find Dr. Ramachandran, 4/2/07: Phone call with Dr. Ramachandran, Prep materials for Dr. Ramachandran). At the time of the status conference, Dr. Ramachandran had not examined Lisa Montgomery nor had he had an opportunity to review any of the case materials.

In fact, as of the April 3, 2007 conference, no one had diagnosed Mrs. Montgomery with pseduocyesis. Yet, Mr. Duchardt stood before the Court and announced that this diagnosis would be used in the first phase of the trial as a defense on the grounds of mental disease or defect. (Tr. of Pretrial Conf. 4/3/2007, p. 4).

The Court specifically asked Mr. Duchardt, "Who is it that is giving you a preliminary diagnosis?" (Tr. of Pretrial Conf. 4/3/2007, p. 4). Mr. Duchardt replied, "That is Dr. Ramachandran and also Dr. Logan." (Tr. of Pretrial Conf. 4/3/2007, p. 4). Again, Mr. Duchardt failed to disclose that Dr. Ramachandran had not yet examined Mrs. Montgomery or reviewed the case materials nor did he disclose that while Dr. Logan had examined Mrs. Montgomery over two years prior to this conference, Dr. Logan had not diagnosised Mrs. Montgomery with pseudocyesis.

The Court then asked, "And is Dr. Ramachandran preparing a report reflecting his opinions?" (Tr. of Pretrial Conf. 4/3/2007, p. 4). Mr. Duchardt responded, "He is. *He has reviewed information we have provided to him. He needs additional time to review additional information.*" (Tr. of Pretrial Conf. 4/3/2007, p. 4, emphasis added). Mr. Duchardt's CJA voucher reveals that he prepared information to send to Dr. Ramachandran only the day prior to this conference. Even if he sent them by overnight mail, Dr. Ramachandran had not reviewed information, had not seen Mrs. Montgomery, and was certainly not in the process of preparing a report. Mr. Duchardt did not even seek approval from the Office of the Federal Public Defender to hire Dr. Ramachandran until April 20, 2007 and his contract was not signed until May 20, 2007.

Mr. Duchardt went on to volunteer, "So him being able to generate a report we are looking at, as I understand it, at the earliest the third week of this month." (Tr. of Pretrial Conf.

4/3/2007, p. 4). In fact, Dr. Ramachandran did not evaluate Mrs. Montgomery until May 10, 2007. Mr. Duchardt informed the Court, "I take full responsibility in terms of Dr. Ramachandran. He came into the situation *later* because of a lot of things I can't explain to you in terms of the dynamics of the case, but I identified him only *recently* as the proper person for us to bring forward on this particular issue." (Tr. of Pretrial Conf. 4/3/2007, p. 4-5, emphasis added). Mr. Duchardt did not tell the Court that he had attempted to contact Dr. Ramachandran only two days prior to this hearing, had spoken with him only the day prior to the hearing, and had decided he was the "proper person" even before meeting him in person, having him evaluate Mrs. Montgomery, or seeing what type of findings and report he generated after such an evaluation. Similarly, Dr. Logan would not re-evaluate Mrs. Montgomery until April 10 and May 11, 2007, after this status conference.

Not only did Mr. Duchardt mislead the Court about the actual status of his expert witnesses, he proceeded to preview an entire defense for the Court and the government, a defense that was ultimately rejected by his co-counsel, John O'Connor. At the time of this status conference, the case was set for trial on April 30, 2007 and no continuance motion had been filed. After Mr. Duchardt represented to the Court that he needed additional time to produce reports from Dr. Ramachandran and Dr. Logan on the issue of pseudocyesis, even though neither had diagnosed her with that condition, the Court questioned why the defense was not prepared given that it was the "eve of trial" (Tr. of Pretrial Conf. 4/3/2007, p. 6-7).

Mr. Whitworth interjected that if he could locate an expert on pseudocyesis, he would like to have that expert "start maybe examining the defendant immediately" to get an independent determination of whether Mrs. Montgomery "suffers from the disease known as pseudocyesis" (Tr. of Pretrial Conf. 4/3/2007, p. 8). If Mr. Whitworth had gotten an immediate

evaluation he would have been ahead of the defense experts who were not in the process of preparing reports as both the Court and the government were led to believe, but rather had not evaluated Mrs. Montgomery for pseudocyesis as of the date of this conference. Mr. Whitworth added that pseudocyesis had been mentioned as a possible defense "two years ago" and explained that was why he was having a problem with experts on pseudocyesis being disclosed at such a late date (Tr. of Pretrial Conf. 4/3/2007, p. 9-10).

The Court then returned to Mr. Duchardt who had asked to give an explanation "as to why we find ourselves in this situation" the month of trial (Tr. of Pretrial Conf. 4/3/2007, p. 11). Mr. Duchardt told the Court that "all the way up until about the last week and a half, John [O'Connor] and I have felt confident we were on the right track and able to be ready." (Tr. of Pretrial Conf. 4/3/2007, p. 11). Mr. Duchardt informed the Court that when he and Mr. O'Connor met Mrs. Montgomery to say she was "very skeptical of the trustworthiness of lawyers in general would be an understatement." (Tr. of Pretrial Conf. 4/3/2007, p. 11). Mr. Duchardt then stated:

> What had amazed John and me when we first came into the case is that the people who were driving the first team had completely avoided talking to Lisa about the incident at all and had actually directed she not be talked to about the incident itself. And because of that dynamic we believe, and I am just representing to you my feeling and my understanding of the situation, it made it even more difficult for Lisa to get at and then discuss the things that are most important to this case and most important to the defense; and that is what happened in Skidmore at Bobbie Stinnett's house. We worked long and hard with Lisa on this issue and finally we got the trust and she did begin sharing with us her recollections, but they were just spotty recollections. To this day she still cannot tell us exactly what happened to Bobbie Joe [sic] Stinnett at the precise time that Bobbie Joe [sic] was strangled and the baby cut from her stomach.
>
> What Lisa has shared with us beginning in really late '06 and early this year, finally coming to the place was that someone else was with her in the car and was with her at Bobbie Jo Stinnett's house. And there is some independent evidence from other people, other witnesses, including Bobbie Jo's mother who talked to her on the phone just before this

> incident happened saying the people are here to see the dog, they are outside, indicating there is more than one person involved. And also there is an eyewitness who indicates seeing a car driving away from Bobbie Jo Stinnett's house with two people in the car.
>
> We finally got Lisa to confide to us in January that the other person was Tommy Kliner [sic], her brother. But Lisa insisted we were not to share that information with anyone else. She said she would not repeat it again. She was trying to protect her brother.

(Tr. of Pretrial Conf. 4/3/2007, p. 12-13). Mr. Duchardt went on to share that he was able to persuade Mrs. Montgomery to talk to defense experts about it (Tr. of Pretrial Conf. 4/3/2007, p. 13). In addition, Mr. Duchardt claimed that the defense team began looking for independent evidence of Tommy Kleiner's involvement and that the defense was in the process of having fingerprint analysis completed (Tr. of Pretrial Conf. 4/3/2007, p. 14).

Mr. Duchardt also shared that the defense had interviewed Leona Hayes, the witness in Skidmore, and claimed that she had tentatively identified Tommy Kleiner as one of the people in the car (Tr. of Pretrial Conf. 4/3/2007, p. 14-15). In fact, defense investigators had spoken with Ms. Hayes only the day prior to this conference with the Court (Leona Hayes Depo, 4/3/07, p. 16). John O'Connor took Ms. Hayes deposition *after* this status conference, on the afternoon of April 3, 2007, at 4:30 p.m. (Leona Hayes Deposition, 4/3/07, p. 1). The day prior to the status conference, two defense investigators, Ron Ninemire and Tom Moss, showed Ms. Hayes *one* photograph of Tommy Kleiner and she said it was "possible" that Tommy Kleiner was in the car (Leona Hayes Depo 4/3/07, p. 16, 18). During her deposition, Ms. Hayes was not positive that Tommy Kleiner was the individual she believes she saw in the vehicle (Leona Hayes Depo. 4/3/07, p. 18, 20). It was a stretch to say that Ms. Hayes had tentatively identified Tommy Kleiner as being in the vehicle on the day of the offense.

Mr. Duchardt told the Court, "So we have these things going on as well that we are trying to work with. But in terms of the issues about the pseudocyesis, *I will admit I am not the*

*brightest bulb in the pack in terms of filling things out* without the information but Lisa in terms of her sharing with us has, it has been difficult to understand certain of the dynamics that are going on." (Tr. of Pretrial Conf. 4/3/2007, p. 15, *emphasis added*). Certainly Mr. Duchardt was not the brightest because he had just laid out two completely different and inconsistent defenses to the Court and previewed both for the government: (1) Mrs. Montgomery was suffering from pseudocyesis and therefore had a mental disease or defect at the time she committed the crime or (2) she did not commit the crime at all, she was present while her brother Tommy committed the crime.

After discussing the efforts the defense was going through to show Tommy Kleiner was involved, Mr. Duchardt returned to the theme of false pregnancies (Tr. of Pretrial Conf. 4/3/2007, p. 15). Mr. Duchardt went through several instances where Lisa Montgomery had claimed to be pregnant (Tr. of Pretrial Conf. 4/3/2007, p. 15). Mr. Duchardt then claimed,

> [T]he situations she is describing are situations that are consistent with the condition of pseudocyesis which can, under certain circumstances, rob a person of their ability to understand the nature, quality and wrongfulness of their conduct. And that is why we are with Dr. Ramachandran who is the only person I have seen who has actually written on the subject and written fairly extensively on the subject.

(Tr. of Pretrial Conf. 4/3/2007, p. 16). Mr. Duchardt told the Court that the defense team had "tried to make sure we were doing everything else to get the case ready and doing all of this, too, and everybody doing all of those things. But what we come to is this place where for these reasons we are not as ready today as I would like to tell you we would be." (Tr. of Pretrial Conf. 4/3/2007, p. 16). This is mere weeks before the case was set for trial and the defense did not have a diagnosis of pseudocyesis nor did the defense have any actual evidence that Tommy Kleiner was involved in the offense in any way, yet Mr. Duchardt represented to the Court that

he had both, apparently without even realizing that claiming to have both was inconsistent and made no sense.

On the basis of these misleading statements and misrepresentations to the Court, Judge Fenner then proclaimed, "Well, truthfully, Mr. Duchardt, I don't know anybody who I would have more confidence in representing Miss [sic] Montgomery than you. I know you would be extremely capable and professional." (Tr. of Pretrial Conf. 4/3/2007, p. 17). Judge Fenner added, "But I don't have any reason to not believe what you tell me about the difficulties you have had and in dealing with your client on this." (Tr. of Pretrial Conf. 4/3/2007, p. 17). Then, Judge Fenner stated that he did not "see why we can't be ready to go though" with the trial setting of April 30, 2007 (Tr. of Pretrial Conf. 4/3/2007, p. 17). Then, the Court ordered the defense to produce Dr. Ramachandran's report "no later than April the 20th" (Tr. of Pretrial Conf. 4/3/2007, p. 18). Mr. Duchardt did not bother to tell the Court that Dr. Ramachandran and Dr. Logan had not examined Mrs. Montgomery and that obtaining reports from them prior to April 20, 2007 was unlikely. Instead he tells the Court, "It would be our intention to proceed regardless, Judge, to try to get everything done as quickly as possible." (Tr. of Pretrial Conf. 4/3/2007, p. 18). Mr. Duchardt appears to have been more concerned with keeping the judge happy than with whether or not he had an actual defense to present at Mrs. Montgomery's trial with appropriate experts to back up that defense.

Two days later, at a conference in chambers, the government saved Mr. Duchardt by asking that the case be continued (Tr. of Pretrial Conf., 4/5/07, p. 20). During that conference the Court expressed concern that after being in the case for almost a year, Mr. Duchardt has not yet determined "what the defense is and what needs to be done to present that defense" (Tr. of Pretrial Conf., 4/5/07, p. 23). The government then asked that deadlines be set for the remaining

expert reports to avoid further delays in the trial date (Tr. of Pretrial Conf., 4/5/07, p. 23). The court had already ordered that Dr. Ramachandran's report be produced by April 20, 2007 (Tr. of Pretrial Conf., 4/3/07, p. 18). Mr. Duchardt represented that Dr. Logan's report would be finished by April 20th, 2007 as well. (Tr. of Pretrial Conf., 4/5/07, p. 24). As noted above, Dr. Ramachandran did not evaluate Mrs. Montgomery until May 10, 2007 and Dr. Logan did not re-examine Mrs. Montgomery until April 10 and May 11, 2007. It is unclear what basis Mr. Duchardt had, if any, for representing to a judge who was already irritated with him that he could have these reports by April 20, 2007, fifteen days after this conference, when neither expert had examined Mrs. Montgomery for the purpose of writing the promised reports. Mr. Duchardt stated, "The bottom line is you made it real clear you wanted this stuff by essentially the 20th and we are on track." (Tr. of Pretrial Conf., 4/5/07, p. 24).

In fact, when the attorneys met with the Court a week later, on April 12, 2007, to take up certain strikes for cause, Mr. Duchardt orally moved to have until the end of May to produce his expert reports from Dr. Ramachandran and Dr. Logan (Tr. of Pretrial Conf., 4/12/07, p. 37). Mr. Duchardt told the Court, "both of the doctors I have talked to and that are involved in this ***now*** believe that they need additional time to make sure they get through all of the reports and do all of the things they need to do to have a real comprehensive report ready." (Tr. of Pretrial Conf., 4/12/07, p. 37)(emphasis added). This situation was created because Mr. Duchardt misled the Court on April 3, 2007 into believing these experts were in the case and merely in the process of finalizing reports when actually Mr. Duchardt had spoken to Dr. Ramachandran for the first time on April 2, 2007 and to Dr. Logan on March 20, 2007 (Duchardt CJA Voucher 5).

The Court questioned why the reports would not be ready by April 20th as Mr. Duchardt had represented the week before (Tr. of Pretrial Conf., 4/12/07, p. 37). Mr. Duchardt said

"that's what we were working toward" (Tr. of Pretrial Conf., 4/12/07, p. 37). Mr. Whitworth objected, noting that he had already re-scheduled his experts based on Mr. Duchardt's representation just the week prior that his expert reports would be produced by April 20th (Tr. of Pretrial Conf., 4/12/07, p. 38). Mr. Duchardt responded, "The fairer way of putting it, I represented to them I had to have a report by then and they were doing everything they could to meet my expectations." (Tr. of Pretrial Conf., 4/12/07, p. 39). Again, Mr. Duchardt failed to reveal that these experts had not examined Mrs. Montgomery for the purpose of preparing a report. Mr. Duchardt claimed the experts were asking for additional time so "they would have really a much more complete report they would be a lot more proud of in terms of submitting." (Tr. of Pretrial Conf., 4/12/07, p. 39). Admittedly, it would have been difficult for Dr. Ramachandran or Dr. Logan to produce a complete report they could be "a lot more proud of" since they had not evaluated Mrs. Montgomery by this date.

Ultimately, the Court gave Mr. Duchardt until May 15, 2007 to produce his expert reports (Tr. of Pretrial Conf., 4/12/07, p. 41). These conferences demonstrate that the defense team was completely unprepared for trial in April of 2007. Clearly, Mr. Duchardt was considering two separate defenses that were inconsistent with one another and blindly reaching out to experts hoping to find support for one of the defenses. Due to his lack of preparation and lack of understanding of his client and her mental health issues, he scrambled to find experts. Then he misrepresented to the Court the status of the defense team's readiness for trial and blamed the delay on expert reports that he had commissioned only days prior to meeting with the Court. The Court became irritated with Mr. Duchardt over the delays and his subsequent request for an extension of time after he boldly represented that he would have his expert reports on April 20, 2007. This caused the Court to proclaim there would be no more continuances even though Mrs.

Montgomery was being represented by a defense team that was in no way ready for trial in April of 2007 and was no more ready for trial in October of 2007.

7. Mr. Duchardt's Misrepresentations to the Court Constituted a Conflict of Interest Such That He Was No Longer Acting as Counsel for Mrs. Montgomery in April of 2007

As discussed in detail above, once Mr. Duchardt's decision to prematurely announce an intent to rely on both pseudocyesis and the "Tommy defense" created a conflict of interest such that he was no longer acting as counsel for Mrs. Montgomery as of April 3, 2006. He had put his own interest in appearing prepared for trial above the best interests of his client. Prejudice must be presumed and this violation entitles Mrs. Montgomery to a new trial. *United States v. Cronic*, 466 U.S. 648 (1984).

8. Mr. Duchardt Provided Ineffective Assistance of Counsel Because He Failed to Maintain an Appropriate Caseload

As discussed in detail above, Mr. Duchardt accepted an appointment on Mrs. Montgomery's case in May of 2006, knowing that he was scheduled to try *United States v. Street*, Case No. 04-0298-CR-W-GAF in July of 2006. Mr. Street's trial began on July 24, 2006 and ended in a mistrial on August 14, 2006. Mr. Duchardt was involved in the re-trial of Mr. Street during the fall of 2006. This meant that Mr. Duchardt was unable to focus on Mrs. Montgomery's case until January of 2007, less than four months before her case was scheduled for trial. Mr. Duchardt violated the ABA Guidelines by failing to maintain an appropriate caseload.

9. The Trial Defense Team Was Ineffective for Pleading a Not Guilty By Reason of Insanity Defense When the Defense Team Knew or Should have Known There was Insufficient Support for a Not Guilty By Reason of Insanity Defense

Mr. Duchardt filed a Notice of Intent to Rely on a Defense of Mental Disease or Defect in March of 2007. The only diagnosis to support this defense was pseudocyesis. The condition of pseudocyesis was not sufficient to support a defense of not guilty by reason of insanity. Trial counsel were ineffective for pleading and pursuing this defense without a sufficien medical diagnosis to support the defense.

10. Mr. Duchardt Was Ineffective for Representing to the Court that Dr. Gur's Opinion Was Diagnostic for Pseudocyesis and Mrs. Montgomery Was Prejudiced by Counsel's Overreaching Which Ultimately Led to the Wholesale Exclusion of Evidence that Lisa Montgomery Has Brain Damage in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution and 18 U.S.C. § 3005, 18 U.S.C. §3006, and 18 U.S.C. §3599

The transcript of the Daubert Hearing, and the testimony of Drs. Gur, Mayberg, and Evans and all exhibits thereto and subsequently presented are incorporated by reference. Mr. Duchardt was so excited to get the chance to work with Ruben Gur that he enlisted his assistance with the case before he ever met Lisa Montgomery. Dr. Gur is on the of the foremost internationally respected brain scientists. He is not a forensic expert and only works on a handful of forensic cases. Mr. Duchardt spent several months, and thousands of dollars, to obtain state of the art neuroimaging of Lisa Montgomery's brain to ascertain the nature, quality and extent of the damage to the structure and function of her brain. In the initial consultation with Dr. Gur, the diagnosis of pseudocyesis had not yet been suggested by Mr. Duchardt. In his initial report, dated April 3, 2007, Dr. Gur did not mention pseudocyesis or somatoform disorder. It was only after Mr. Duchardt retained Dr. Ramachandran to proffer the diagnosis of

pseudocyesis that Dr. Gur mentioned it in his report. Even then, Dr. Gur did not diagnose Lisa Montgomery with pseudocyesis, as Mr. Duchardt led the Court to believe. Dr. Gur merely opined that the areas of brain damage he observed in Mrs. Montgomery's brain were "potentially a source of vulnerability to pseudocyesis (by history)." This single sentence in Dr. Gur's revised report was so blown out of proportion that it led to the wholesale exclusion of some of the most powerful mitigation in a capital trial: brain damage. Quite apart from the fact that Lisa's brain was possibly vulnerable to pseudocyesis, Dr. Gur was able to say more definitively that Mrs. Montgomery has right parietal dysfunction which "manifests itself behaviorally in loss of sense of self, difficulties in emotion processing, attentional neglect, and depressed or flat affect."[25] Additionally, the PET Scan confirmed these findings and found cerebellar dysfunction.[26] Dr. Gur was able to conclude that Lisa Montgomery had brain dysfunction. According to Dr. Gur's report:

> [The] results of all of the testing, including the neuropsychological evaluation and structural and functional neuroimaging studies, are quite consistent with a history of head injuries or a neurodevelopmental brain disorder, possibly exacerbated by post-traumatic stress disorder (PTSD) as a result of childhood sexual abuse. By history, the anatomic abnormalities could also relate to poor prenatal conditions.
>
> The brain abnormalities documented in the neuropsychological and the structural and functional neuorimaging studies provide evidence that Mrs. Montgomery's actions have been influenced by a compromised neural substrate. Her brain is neither structurally nor functionally sound, and the damage is in areas that are needed for integrated behavior under full functional control.

Evidence of brain damage is so powerfully persuasive to jurors that it is often referred to as a super-mitigator. For example, in *Sears v. Upton*, 130 S.Ct. 3259 (2010)(per curiam), the Court found a substantial ineffectiveness claim worthy of further proceedings under

[25] All of these behaviors are noted in the social history data and corroborated by the observations of Dr. Woods and Jan Vogelsang, MSW. See Exhibits No. 15-16.
[26] Also found by Dr. Woods. Exhibit No. 15.

*Strickland* where trial counsel failed to present mitigating proof that petitioner had frontal lobe damage, cognitive deficits, and suffered drug and alcohol abuse (slip op. at 3-6) even though he had committed a horrific crime in which he kidnaped a 59-year-old wife and mother from her car hitting her in the face with brass knuckles, handcuffed her, raped her, and then stabbed her to death as she begged for her life. *Id*. (Scalia, J., dissenting).

Similarly, the Court granted *Strickland* relief in *Wiggins v. Smith*, 539 U.S. 510 (2003), where Wiggins committed a dreadful murder: He beat, drowned, and poured lye or ammonia over the body of his 77-year-old victim. Relief was granted because trial counsel failed to present the very types of mitigating evidence that Mrs, Montgomery's fourth defense team failed to present: Wiggins' mother was an alcoholic, his life was unstable, he manifested mental disturbance as a result, he suffered serious abuse (including sexual abuse), and had diminished mental capacities. *Wiggins*, 539 U.S. at 525, 535.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), Rompilla committed a murder and the jury found three aggravating circumstances. Rompilla's victim had been "stabbed repeatedly" and not only that, Rompilla then "set [him] on fire." *Id*. at 377. Notwithstanding the three aggravating circumstances and the brutality of Rompilla's murder, the Court granted sentencing relief under *Strickland* where the jury never heard the very type of mitigating evidence that Mrs. Montgomery presents: Rompilla's parents were alcoholics, Rompilla's father beat him mercilessly, Rompilla "lived in terror" from his father's brutality, and lived in abject poverty. *See Id*. at 391-392. *See also Porter v. McCollum*, 130 S.Ct. 447 (2009)(per curiam)(granting *Strickland* relief); *Williams v. Taylor*, 529 U.S. 362 (2000).[27]

[27] *See e.g., Foust v. Houk*, 655 F.3d 524 (6th Cir. 2011)(petitioner who had killed victim with claw hammer, raped victim's daughter several times, and set fire to victim's house was prejudiced by counsel's failure to discover "truly grisly picture of the [petitioner's] home" including history of abuse and neglect, growing up in a

Despite the powerful evidence available to him through Dr. Gur's testing, Mr. Duchardt decided to overreach and link the brain damage found by Dr. Gur to his chosen defense of pseudocyesis. Mr. Duchardt's efforts to stretch Dr. Gur's opinion to cover pseudocyesis resulted in a complicated, confusing and convoluted *Daubert* hearing and ultimately the exclusion of the only scientific, objective and quantifiable data of Lisa's brain disabilities.

Had trial counsel performed in accordance with objectively reasonable norms, Mr. Duchardt would have not offered this testimony in support of the doomed first-phase defense, but instead, offered it in penalty, where the Government admitted it was "arguably admissible." (Doc. 243, p.2). Even Mr. Duchardt admits that Dr. Gur's testimony was mostly relevant to the penalty phase and yet his bungling of this evidence and failure to appreciate the government's discovery requests led to its exclusion. Lisa Montgomery was prejudiced as a result because it is reasonably probable that at least one juror hearing this evidence would have voted for life.

---

dysfunctional family marked by an alcoholic father and incest and sexual abuse, and the infliction of emotional and physical abuse on the petitioner by his mother); *Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011)(petitioner who killed grandmother and 15-year-old cousin prejudiced by trial counsel's failure to discover extensive, disabling mental health problems and diseases including organic brain damage to the frontal lobe, bipolar disorder, and temporal lobe epilepsy, that father was physically abusive, that family was repeatedly evicted from their homes, or that mother suffered from clinical depression, suicidal ideations, rage blackouts, and urges to physically injure her children); *Mason v. Mitchell*, 543 F.3d 766 (6th Cir. 2008)(finding IAC prejudice to petitioner who raped a 19-year-old girl and beat her to death with a nail-studded board where trial counsel failed to present evidence that petitioner's parents were daily drug users and dealers, petitioner's father was violent and abusive to the whole family, petitioner's parents isolated their children from other people, petitioner began using drugs at 8-years-old, and petitioner's childhood home life caused him to develop borderline personality disorder); *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007)(petitioner who had participated in triple homicide involving kidnaping and arson prejudiced by counsel's failure to present evidence that petitioner grew up in poverty, was the 12th child of a physically and emotionally abusive mother whose inattention to her children created dysfunctional patterns in petitioner's development, suffers from brain damage to his frontal lobe, and suffers from chronic drug addiction which began at the age of nine).

11. <u>The Trial Defense Team Provided Ineffective Assistance of Counsel by Failing to Move to Exclude the Testimony of Mary Case Prior to Trial Pursuant to *Daubert* and for Failing to Object to the Testimony of Mary Case During the Trial and the Trial Court Further Erred by Allowing the Testimony of Dr. Case Despite Recognizing That Her Findings Acknowledged They Were Possibilities</u>

The government retained Mary Case as an expert witness to testify at trial with regard to the autopsy and cause of death of Bobbie Jo Stinnett. Through Dr. Case, the Government presented false and exaggerated scientific evidence suggesting that Mrs. Stinnett was conscious at the time that her baby was removed from her uterus.

The trial defense team was ineffective for failing to move to exclude Dr. Case's testimony pursuant to *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), Dr. Case relied on the autopsy performed by Miguel Laboy (Tr. p. 648). Laboy testified that the cause of death was "ligature strangulation" (Tr. p. 657). He did not elaborate or speculate as to what might have happened during the crime.

Even counsel for the Government realized that Dr. Case could not possibly know within a reasonable degree of medical certainty what happened during the murder. In his opening statement, Matt Whitworth stated, without any objection from the defense team, that Bobbie Jo Stinnett was "*probably* still" alive at the time of her murder (Tr. p. 456, emphasis added). Then, without any objection by the defense team, Whitworth added that Dr. Case would testify that Bobbie Jo was involved in a "violent struggle and most likely was still alife [sic] when her baby was being cut from her abdomen" (Tr. 456-457). There was no basis for this highly inflammatory statement. There was no evidence that Bobbie Jo was alive when the baby was removed. Laboy's finding was that her cause of death was ligature strangulation. Beyond that, any testimony about Mrs. Stinnett being alive during the removal of the baby was pure

speculation. Yet, the defense team failed to have her testimony excluded pursuant to *Daubert* and did very little to limit her testimony during the trial.

At trial, Laboy testified that Mary Case had never spoken with him about the Stinnett case (Tr. p. 665). Dr. Case conceded that she never spoke with Laboy, relying on the autopsy report, photographs, and related lab reports (Tr. p. 807).

When Mr. Whitworth referenced Dr. Case's report, Mr. O'Connor asked to approach the bench and made an objection to the report as hearsay and an objection to the fact that Dr. Case's statements as to the possibility of what happened in the case were opinions and were not based on a reasonable degree of medical certainty (Tr. 808). Mr. Whitworth responded that Dr. Case was "going to qualify her opinion" (Tr. 809).

The trial court correctly recognized, 'This says possibility. That's not admissible to just say it's a possibility. I mean she can give her theory as to what occurred within a reasonable degree of medical certainty. So I would direct that testimony that doesn't meet that standard or the portion of the report that does not meet that standard be redacted to be admitted." (Tr. 809). It is agreed that Dr. Case's report would be offered for the "limited purpose of her referring to it during her testimony and not make it available to the jury." (Tr. 809).

Mr. Whitworth then asked Dr. Case about the amount of blood in the room where Mrs. Stinnett was found and why that was significant (Tr. 810). Dr. Case responded, "It's significant, *it could be significant for a number of reasons*." (Tr. p. 810). There was no objection by Mr. O'Connor. Dr. Case proceeded to tell the jury that Mrs. Stinnett had blood on the bottoms of her feet (Tr. 810) and in her *opinion* this meant that Mrs. Stinnett had "regained consciousness, she was not dead but she regained consciousness from the asphyxiation while the incision was being made into her abdomen, bleeding had begun and then she put up a struggle and then she was

further restrained and strangulation was continued and she died as a result of that as well as blood loss from the incision made into her abdomen and uterus." (Tr. 811)(emphasis added). There was no objection to this testimony despite the fact that it was not prefaced by a showing that these opinions were based on a reasonable degree of medical certainty. Furthermore, the trial court allowed this testimony despite having just been put on notice that the report of Dr. Case did not establish such a showing. Judge Fenner had stated that these opinions were not admissible.

After Dr. Case's testimony on direct examination had been concluded, and the jury had already heard her findings, Mr. O'Connor approached the bench and asked the trial court to strike Dr. Case's opinions from the record as they were "never postured to a reasonable degree of medical certainty" and the jury had been left with an opinion that was "not a valid opinion under the law" (Tr. 820). The trial court noted that Mr. Whitworth had not asked Dr. Case if her opinions were within a reasonable degree of medical certainty (Tr. 820). Mr. Whitworth conceded that he had not made such a showing (Tr. 820). Instead of striking the testimony, the trial court instructed the government: "I think you need to ask that of all her opinions" (Tr. 820). Mr. O'Connor raised the issue of how Dr. Case could know whether Mrs. Stinnett was unconscious, regained consciousness, and then was rendered unconscious again based upon looking at photographs (Tr. 820). The trial judge stated he would take a recess and consider the matter (Tr. 821). Mr. O'Connor responded that he did not want to ask questions of Dr. Case until after the judge made a ruling on striking her testimony because "this is a critical part of our case on the torture depravity. When she postured an opinion *I tried to object*" (Tr. 821)(emphasis added). Mr. O'Connor objected to the report, but not to any of the testimony as it was shared with the jury.

The trial court allowed Mr. Whitworth to ask Dr. Case a follow-up question: "Have all the opinions you have expressed here today to this jury been made within a reasonable degree of medical certainty?" (Tr. 824). Dr. Case replied, "Yes, they have" (Tr. 824) and her testimony was allowed to stand.

Even worse, Mr. O'Connor brought out on cross-examination that for Mrs. Stinnett to have blood on her feet, in the manner shown in the autopsy photographs, her feet had to have been "drawn up after there was blood on the floor" and "having her legs drawn up" implied to Dr. Case "consciousness" because when you lose consciousness "you become placid" (Tr. 827). In trying to make the point that Dr. Case was merely testifying to a possibility, Mr. O'Connor elicited from Dr. Case that "if she was unconscious during the entire event there would be no reason to have the blood on the bottom of her feet." (Tr. 830). Dr. Case explained that Mrs. Stinnett's foot had to be on the floor and that could only happen if she was conscious (Tr. 830).

12. Trial Counsel Provided Ineffective Assistance During Jury Selection in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Counsel's Performance During Jury Selection Was Objectively Unreasonable.

By the time of trial, it was evident that the selection of a jury in this case would require particular skill (which trial counsel did not possess) and care (which trial counsel did not exercise.) This case engendered an unprecedented level of intense publicity. The case was the subject of national news and talk shows. Two books were written about the case pre-trial. The local newspapers in Kansas City and the surrounding area had covered the case extensively. Nearly every single member of the venire had heard about this case pre-trial. Beyond the nuances of picking a jury in a highly publicized capital case, the defense had chosen to plead the most controversial of defenses: not guilty by reason of insanity. All of these factors made the voir dire

phase of this case especially difficult and especially important. Trial counsel's performance was constitutionally deficient at every stage of the jury selection process and Mrs. Montgomery was prejudiced as a result.

The jury selection process employed by the defense failed to identify jurors whose views concerning the death penalty, mitigation, and mitigating factors would have resulted in their exclusion through challenges for cause. Further the selection process failed to elicit the basic information about jurors' views on these topics necessary for counsel to make effective decisions about who to strike with peremptory challenges. Trial counsel failed to object when jurors were erroneously excused for cause.

The insufficient and incompetently conducted voir dire resulted in a complete failure of the trial counsel and the court to discover whether, if Mrs. Montgomery were found guilty, a sitting juror would automatically impose death or be impaired from considering mitigation. Trial counsel inexplicably allowed the Court to excuse for cause venire members whose views on the death penalty would not have prevented them from discharging their obligations under the law. Further, several times during the course of jury selection, the court, prosecutor, and trial counsel all misstated the law applicable to the case, all without proper objection and correction. The importance of jury selection cannot be overstated.

It is understood amongst seasoned, experienced capital trial lawyers that jury selection may well be the most important aspect of the case. Jurors who are incapable of considering mitigating evidence, or who will automatically impose the death sentence upon a finding of pre-meditation, are constitutionally unable to provide the defendant the individualized sentencing decision required by the Fifth, Sixth and Eighth Amendments.

It is unconstitutional to impanel a jury that cannot and will not consider relevant mitigating evidence when assessing punishment in a capital case. *Crawford v. State*, 716 So.2d 1028, 1043 (Miss. 1998)("The defendant is entitled to ask whether potential jurors would consider mitigating circumstances"). Only through a process which requires the sentencer to "consider, in fixing the ultimate punishment of death[,] the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind," *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), can capital defendants be treated "as uniquely individual human beings." Id. The sentencer must have the ability to give effect to all mitigating evidence. *Eddings v. Oklahoma*, supra,; *Penry v. Lynaugh*, 492 U.S. 302 (1989)(reversing sentence on the grounds that the Texas special issue procedure unconstitutionally precluded the jury from full consideration of mitigating evidence of childhood abuse and mental retardation).

In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Court held that a capital defendant has a constitutional right to strike for cause any juror who believes that the death penalty is the only appropriate punishment for first degree murder, or who will fail to consider mitigating evidence. In Morgan, the Court stated:

> Surely if in a particular ... case the judge ... was to announce that, to him or her, mitigating evidence is beside the point and that he or she intends to impose the death penalty without regard to the nature or extent of mitigating evidence ... that judge ... should disqualify himself or herself.

*Morgan*, 504 U.S. at 738-739. *See also, State v. Bey*, 112 N.J. 123, 548 A.2d 887, 901-902 (1988)(trial court erred in refusing to excuse for cause juror who could not "consider all mitigating factors"); and *Skipper v. State*, 257 Ga. 802, 364 S.E.2d 835, 839 (1988)("A juror who has made up his mind prior to trial that he will not weigh evidence in mitigation is not impartial.")

Those determining the sentence in a capital case "may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998)(emphasis added). "A juror can properly determine that a particular factor is so insignificant compared to the other factors found that its presence or absence has no impact on the juror's decision. It would be improper, however, for a juror to refuse to even consider a particular factor because he or she disagrees with the court's determination that the factor is aggravating or mitigating." *United States v. Sampson*, 335 F.Supp.2d 166, 229 (D.Mass. 2004).

In *Davis v. Georgia*, 429 U. S. 122 (1976), the Court held that a death sentence could not stand if even one juror was excluded in violation of *Witherspoon*. In *Gray v. Mississippi*, 481 U.S. 648 (1987), the Court held that the erroneous exclusion of jurors because of attitudes regarding the death penalty is not subject to harmless error analysis even when the prosecutor has unexercised peremptories . "It is necessary to keep in mind the significance of a capital defendant's right to a fair and impartial jury under the Sixth and Fourteenth Amendments." *Id.*, at 658. The same reasoning applies, of course, to the wrongful inclusion of jurors who should have been excused for cause because of their attitudes regarding the death penalty. *Morgan, supra*. *See also, White v. Mitchell*, 431 F.3d 517, 537-543 (6th Cir. 2005)(habeas relief granted when court erroneously failed to excuse for cause juror who was biased in favor of the death penalty, despite "contradictory" responses by the juror); and *Wolfe v. Brigano*, 232 F.3d 499, 503 (6th Cir. 2000) (granting habeas relief based on a finding that it was unreasonable for a trial judge to fail to excuse two jurors who were unable to state unequivocally that they would set aside their personal beliefs and decide the case fairly and noting that "each juror's tentative

statements that they would try to decide this case on the evidence presented at trial . . . . [was] without more, . . . insufficient.") (emphasis added).

In *Witherspoon v. Illinois*, 391 U.S. 510 (1968), the Court held that venirepersons could be struck for cause only if they "make it unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." *Witherspoon*, 391 U.S. at 522-523 n.21. The Court condemned the practice of excluding persons other than those described above through the "death qualification" process:

> [a] state may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death. Specifically, we void that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

*Witherspoon*, 391 U.S. at 522-524.

In *Adams v. Texas*, 448 U.S. 38 (1980), the Court again visited the issue of "death qualification." In *Adams*, the Court held that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Adams*, 448 U.S. at 45. In *Adams*, the defendant was sentenced to die by a jury impaneled in accordance with a Texas statute which provided that a prospective juror in a capital case is disqualified "unless he states under oath that the mandatory penalty of death or life imprisonment for life will not affect his deliberation on any issue of fact." *Adams*, 448 U.S. at 42. The trial court excluded a number

of jurors who were unable or unwilling to take such an oath. *Id*. The Court reversed Mr. Adams' death sentence because:

> Such a test could, and did, exclude jurors who stated that they would be "affected" by the possibility of the death penalty, but who apparently meant only that the potentially lethal consequences of their decision would invest their deliberations with greater seriousness and gravity or would involve them emotionally. Others were excluded only because they were unable positively to state whether or not their deliberations would in any way be "affected". . . The grounds for excluding these jurors were consequently insufficient under the Sixth and Fourteenth Amendments. Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond a reasonable doubt, but not otherwise, yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt.

*Adams v. Texas*, 448 U.S. at 49-50.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Court reiterated the test enunciated in Adams for determining which jurors may be excused for cause due to their views on the death penalty:

> We therefore take this opportunity to clarify our decision in Witherspoon, and to reaffirm the above-quoted standard from Adams as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views of capital punishment. That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'

*Wainwright v. Witt*, 469 U.S. at 424.

In *Davis v. Georgia*, 429 U. S. 122 (1976), the Court held that a death sentence could not stand if even one juror was excluded in violation of *Witherspoon*. In *Gray v. Mississippi*, 481 U.S. 648 (1987), the Court held that the erroneous exclusion of juror because of attitudes regarding the death penalty is not subject to harmless error analysis even when prosecutor has unexercised peremptory. In fact, the Court in *Gray* recognized that many jurors, like Ms. Sharp, may change their answers slightly during the course of "death qualification" questioning. *Gray*

*v. Mississippi*, *supra*, 481 U.S. at 662-663 ("despite their initial responses, venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker than they originally stated").

The *Adams* opinion makes it clear that one who is "affected" by the possibility of the death sentence or 'who would invest their deliberations with greater seriousness or gravity" is not necessarily "substantially impaired" in the performance of his duties. *Adams v. Texas, supra*, 448 U.S. at 50. The Court specifically stated in *Adams* that a venire person's inability "positively to state whether or not their deliberations would in any way be affected" by the prospect of the death penalty was a constitutionally insufficient ground for exclusion of that juror for cause. *Id*. *See also, Ex Parte Williams*, 748 S.W.2d 461 (Tex. 1988)(juror's statement that his beliefs about capital punishment would "affect" his deliberations was insufficient basis for challenge for cause and required reversal of conviction). *See also, Gall v. Parker*, 231 F.3d 265, 331 (6th Cir. 2000), overruled on other grounds by, *Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003)(habeas relief granted when juror was erroneously excused because juror's "discomfort with the death penalty did not appear to 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'"); *Jarrell v. State*, 413 S.E.2d 710 (Ga. 1992)(potential juror who expressed some qualms about imposing death penalty but agreed that it was justifiable in some cases, and who stated that she was leaning toward a life sentence was improperly excused for cause); and *Riley v. State*, 889 S.W.2d 290 (Tex.Crim.App. 1994)(juror who "frankly acknowledged she did not believe in the death penalty," but that she would "sacrifice her conscientious objections to the death penalty" if she was selected for the jury was improperly excused for cause. "That (the juror) would find her task as a juror more difficult, or that it would violate her conscience (to vote for the death penalty) when the evidence called for it

... does not establish she could not do it, or even that she would be substantially impaired in doing it.").

Likewise, the fact that a juror does not "support" the death penalty does not render her ineligible for jury duty in a capital case. *See Durrough v. State*, 620 S.W.2d 134, 142 (Tex. Crim. App. 1981) (reversing and remanding where the "trial court ... exclude(d) a prospective juror whose only fault was to acknowledge honestly that she had conscientious scruples against capital punishment and that the mandatory penalty of death or imprisonment for life might affect her deliberations").

In *Van Cleave v. State*, 268 Ark. 514, 598 S.W.2d 65, 68-69 (1980), the Supreme Court of Arkansas stated that "only the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror. The mere disbelief in the death penalty, or conscientious or religious scruples with its infliction, will not automatically disqualify a juror from serving on a particular case. Only in cases where a juror expresses an unwillingness to consider the death penalty under any circumstances will that juror be excused for cause."

Inter alia, trial counsel's professional failings can be include the following:

A. Counsel failed to Identify Jurors Who Would Automatically Vote for the Death Penalty. Tr. 82, 83, 84, 76, 88, 90-97, 100, 113, 116-117, 119-120, 122, 124, 162-165, 176-177, 221-227, 229-230; Voir Dire Day 2 Tr. 66-67, 76-78, 80, 82, 86, 89, 100, 103-105, 107, 109-11;

B. Counsel Failed to Identify Jurors Who Could Not or Would Not Consider and Give Effect to Mitigation Tr. 82, 83, 84, 76, 88, 90-97, 100, 113, 116-117, 119-120, 122, 124, 162-165, 176-177, 221-227, 229-230; Voir Dire Day 2 Tr. 66-67, 76-78, 80, 82, 86, 89, 100, 103-105, 107, 109-11;

C. Counsel Failed to Oppose the Removal of Jurors Whose Views on Capital Punishment Would Not Substantially Impair Their Ability to Serve. Tr. 77-78, 85-87, 103, 104, 106,126-127, 131-132, 135-136, 156, 163, 192-197, 200, 206-206, 219-221, 231; Voir Dire Day 2 Tr.79-80, 84-86, 87-88, 90;

D. Counsel Failed to Correct Repeated Missatements of the Law of Mitigation, including, e.g.,

1. Throughout jury selection, the jury was led to believe that the jury must be unanimous in considering mitigation and in voting for life in violation of *Mills v. Maryland*, 486 U.S. 367 (1986). See See, e.g., Tr 7, 8, 89, 139, 142, 189; Voir Dire Day 2 Tr. 75;

2. Throughout jury selection, the jury was led to believe that responsibility for the sentence of death was borne by someone other than the jury in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). See, e.g.,p.89, 142, 189 Voir Dire Day 2 Tr. 75;

3. Throughout jury selection, the jury was told that the sentence of death was mandatory if the jury found that the aggravating circumstances outweigh the mitigating circumstances in violation of *Woodson v. North Carolina*, 428 U.S. 280 (1976). See, e.g, Tr. 73, 149, 153, 189;

E. Counsel Failed to Insure Proper Instruction And Questioning About the Defense of Mental Disease or Defect. See e.g., Tr. 6, 28, 34, 35, 39, 63-65, 67, 118-119, 127, 132-133, 163, 166-167, 173-174, 175, 213-216, 229; Voir Dire Day 2 Tr. 27-40, 73, 111-114;

F. Counsel was Ineffective in Injecting the Issue of Race of Juror Torres and then in Failing to Object When Juror Torres was Removed from the Jury for Cause Because the Record Establishes that Juror Torres Was a Competent Juror, Willing to Serve, Tr. 230. *See Also*, Claim 12, below;

G. Counsel Failed to Challenge or Correct the Processing Effect. See e.g. Tr. 10, 24-25, 59 70-72, 140, 148, 163, 182.

Lisa Montgomery was prejudiced by her trial counsel's professional failings.

13. <u>The Defense Trial Team Provided Ineffective Assistance of Counsel by Not Having a Cohesive Theory of Defense for Trial</u>

As discussed above, the trial defense team did not have Mrs. Montgomery properly evaluated prior to trial. The defense team did not have a valid medical diagnosis to support a not guilty by reason of insanity verdict. Mr. Duchardt had latched onto the idea of pseudocyesis and wanted to use this condition as a defense. In addition, both Mr. Duchardt and Mr. Owen believed Lisa's brother Tommy was somehow involved in the crime and wanted to present this information at trial; however, John O'Connor vetoed "the Tommy defense" the week prior to

trial. Even from the opening statement it was apparent that this defense team did not have a theme or theory of defense.

Mr. Duchardt began his opening by describing Mrs. Stinnett as a "fragile creature" (Tr. p. 474-475). Duchardt quickly informed the jury that the defense was not denying Mrs. Montgomery's involvement in the crime (Tr. p. 475). Mr. Duchardt stated that Mrs. Montgomery was suffering from post-traumatic stress disorder (Tr. 481). Then, Mr. Duchardt began to portray Mrs. Montgomery as a wonderful and loving mother, explaining that despite being under tremendous pressure from having four children in a row between the ages of 18 and 22, the children were doing great because of Lisa's love for them (Tr. p. 482). Mr. Duchardt claimed there were two critical events in Mrs. Montgomery's life: (1) her tubal fulguration procedure and (2) Judy's efforts to take Lisa's children away from her (Tr. p. 484-485).

Then, Mr. Duchardt told the jury about Lisa's false pregnancy claims and he explained pseudocyesis (Tr. 484-486). Mr. Duchardt proceeded to identify a number of stressors in Lisa's life for the jury: (1) finances (Tr. p. 486); (2) working three jobs (Tr. p. 486); (3) Carl Boman re-married and his new wife, Vanessa, did not like Lisa (Tr. p. 487); (4) Kevin Montgomery's ex-wife, Lori Colwell, did not like Lisa (Tr. p. 487). Then he discussed Lisa's false pregnancy claims in 2003 and 2004, detailing the witnesses who would testify that they believed Lisa was pregnant in 2004 (Tr. p. 487-489). After the false pregnancy claims, Mr. Duchardt jumped to Lisa's interest in and activities associated with dog breeding (Tr. p. 489-490).

Mr. Duchardt claimed that Lisa made contact with Bobbie Jo Stinnett because she wanted to purchase one of Bobbie Jo's dogs for Kayla (Tr. p. 490-491). Mr. Duchardt's defense: "What the evidence will show you is Lisa went for the puppy and that something horrible went after that." (Tr. p. 491). Mr. Duchardt suggested that "something horrible" happened because Lisa

was suffering from pseudocyesis (Tr. p. 494). What Mr. Duchardt failed to recognize is that pseudocyesis is not a valid defense in and of itself. It did not mean that Mrs. Montgomery was not guilty by reason of insanity. Furthermore, Mr. Duchardt overlooked so much of Lisa's story in presenting his opening to the jury. He concluded his opening by describing her as a "woman who worked throughout her life," a good mother, a person who was "liked and loved by the vast majority of people" who felt "she was quirky, but very, very nice" (Tr. p. 494-495).

Mr. Duchardt did not appreciate that "quirky" could not begin to describe Lisa's mental illness and that behaviors others may have described as "quirky" were actually red flags that should have alerted him to her severe mental illness.

14. <u>The Defense Team Provided Ineffective Assistance of Counsel During the Guilt Phase of the Trial in Relying on the Defense of Pseudocyesis</u>

During the guilt phase of the trial, Lisa Montgomery's attorneys presented a legally and factually unsustainable defense that Mrs. Montgomery was suffering from pseudocyesis at the time of the defense. After introducing the unfamiliar theory of pseudocyesis to the jury, defense counsel interjected the idea that Mrs. Mongomery's half-brother Tommy Kleiner had been with her at the time of the offense, a defense theory that had been rejected prior to trial.

The trial team made pseudocyesis the centerpiece of their defense. The key expert they retained to testify about pseudocyesis was Dr. Ramachandran. The presentation of this defense was a disaster. Dr. Ramachandran met with Mrs. Montgomery for at most four hours. His testimony was not believable. Despite the fact that Dr. Ramachandran had never testified as an expert witness at trial before, trial counsel did not prepare Dr. Ramachandran to testify. In fact, it appears that defense counsel completely failed to appreciate the manner in which Dr. Ramachandran would be destroyed on cross-examination, thereby negating the only defense being offered by the trial team. In short, Dr. Ramachandran's testimony was far more damaging

than it was helpful. It made it appear as though the defense was making an excuse for a horrible crime and that Mrs. Montgomery lacked any remorse.

Capital cases present unique strategic considerations due to the bifurcated nature of a capital trial. Defense counsel must consider how to proceed during the guilt phase knowing that if they are not successful in the guilt phase, they will be standing before the same jurors to plead for their client's life. As a result, counsel must be mindful of retaining credibility with the jury and having a consistent defense theory "that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." *ABA* Guidelines 10.10.01. Ideally,

> the theory of the trial must complement, support, and lay the groundwork for the theory of mitigation. Consistency is crucial because, as discussed in the Commentary to Guidelines 10.10.1, counsel risks losing credibility by making an unconvincing argument in the first phase that the defendant did not commit the crime, then attempting to show in the penalty phase why the client committed the crime. First phase defenses that seek to reduce the client's culpability for the crime (e.g. by negating intent) rather than to deny involvement altogether are more likely to be consistent with mitigating evidence of mental illness, retardation, domination by a co-defendant, substance abuse, or trauma.

Commentary to Guideline 10.11, p. 106 (internal citation omitted).

Counsel had a duty to prepare experts to testify in an appropriate fashion. It is not enough to hire an expert and bring them in to testify. Expert witnesses must be provided with all of the materials needed to perform their duties competently, to permit them to testify as well and as forcefully as their expertise will allow, and to defend them from hostile cross-examination by the government.

15. The Defense Team Provided Ineffective Assistance of Counsel During the Guilt Phase by Painting a False Picture of Mrs. Montgomery, Portraying Mrs. Montgomery as a Hard Worker and a Good Mother Rather Than Laying a Foundation for the Mitigation Case That Should Have Been Presented

In addition to relying on an implausible defense theory, trial counsel focused on the incorrect portions of Mrs. Montgomery's life, painting her as a hard worker and good mother when she lived in Deming, New Mexico, years before the crime in this case. Trial counsel completely and utterly failed to present certain evidence during the guilt phase of the trial that would have laid the groundwork for the penalty phase of the trial and supported the outcome of a life sentence instead of the death penalty. Mr. Owen concedes that there was no cohesive theme or theory to the guilt phase or any real plan among the three defense attorneys.

The ABA Guidelines recognize that a mitigation presentation will not "be persuasive unless it is (a) consistent with that made by the defense at the merits phase and (b) links the client's behavior to the evidence offered in mitigation." Guidelines at 7. The Guidelines also state:

> If counsel cannot establish a direct cause and effect relationship between any one mitigating factor and the commission of a capital offense, counsel should endeavor to show the combination of factors that led the client to commit the crime. In any event, it is critically important to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors.

Guidelines at 108.[28]

The fourth trial team treated this case like a non-capital offense and focused solely on the facts of the crime and sought out experts in false pregnancies without first conducting the arduous and complex investigation that is the standard of care in capital cases. The team located Dr. Ramachandran, who had never testified before as an expert witness, and made him the

[28] The government capitalized on trial counsel's professional errors in the penalty phase closing argument.

centerpiece of the planned defense. The trial team ignored all of the available evidence and information that did not fit with their defense of pseudocyesis (Exhibit No. 17, Dec. of Dr. Logan). Then, when that was not going well, Mr. Duchardt interjected the idea that Mrs. Montgomery's brother, Tommy Kleiner, was involved in the crime.

The defense team knew some of Mrs. Montgomery's history of being abused by Jack Kleiner, but failed to appreciate the extent of Judy Shaughnessy's involvement in mistreating, abusing, and even torturing Mrs. Montgomery. Mrs. Montgomery was treated as a slave and had her identity stripped away by her own mother as well as by Jack Kleiner. Later, Mrs. Montgomery was subjected to degrading forced sexual violence by her first husband, Carl Boman, as well as by her current husband, Kevin Montgomery. Both of her husbands recognized Mrs. Montgomery's inability to say no to abuse. Mrs. Mongomery did not suffer from pseudocyesis. Rather, her claims of being pregnant were a defense to the abuse. She believed that if she claimed to be pregnant, her husbands would not torture her. False pregnancies were manifestation of on-going and pervasive psychosis. The trial team failed to recognize the role that Mrs. Montgomery's mental illness and neurological impairment played. Carl and Kevin's repetition of torture would have triggered PTSD symptoms/psychosis.

16. Counsel failed to recognize impact that Mrs. Montgomery's medications would have on her demeanor during trial in violation of *Riggins v. Nevada*, 504 U.S. 127, 143-44 (1992)

Jurors in a capital case are called upon to decide whether another human being should live or die. If the defendant does not testify, the only direct information they will have about the defendant is what they observe during the trial. As a result, capital defense counsel must be aware of any factors that may affect the defendant's appearance or demeanor during the trial. Counsel failed to consider such factors in this case. In addition, Mr. Duchardt did not explain

what medications do to Mrs. Montgomery so she appeared impassive to the jurors. From observing her stoic and cold demeanor during the trial, the jurors believed she lacked remorse. As Justice Kennedy has noted, "In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins v. Nevada*, 504 U.S. 127, 143-44 (1992)(Kennedy, J., concurring).

Little is of more importance to capital jurors than expressions of remorse from the defendant. Indications of remorse come not only from the defendant's words, but from her appearance: "At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial." *Riggins v. Nevada*, 504 U.S. at 142 (Kennedy, J., concurring).

Counsel knew or should have known that the jury was observing Lisa Montgomery's demeanor during the trial. As a result, they should have been aware of any factors that would impact her demeanor so that they could either change those factors or make certain those factors were explained to the jury so the jury would not draw aggravating inferences from them. Counsel should have been monitoring Lisa Montgomery's medication regimen, regularly collecting her records from CCA, and providing such records to a defense psychiatrist so that they could then discuss the effects of any medications or whether Mrs. Montgomery's medication regimen should have been modified during the trial.

There is no indication that defense counsel sought information as to the medications being taken by Mrs. Montgomery at the time of trial. More importantly, there is no indication that defense counsel educated themselves about such medications and the side effects of the medications. Finally, defense counsel did not work with an expert who could have advised

defense counsel on the effects of the medications being taken by Mrs. Montgomery at the time of trial.

As a result, Mrs. Montgomery presented a very "flat affect" during the trial (Exhibit No. 2, Dec. of David Owen, p. 17). The jury could have interpreted Mrs. Montgomery's flat affect as evidence that she lacked remorse.

17. Trial Counsel Failed to Properly Prepare Defense Witnesses for Testifying at Trial

Mr. Duchardt spent limited, if any, time preparing the defense witnesses to testify at trial. Often, Mr. Duchardt was unable to get the testimony he expected from a witness due to this lack of preparation. Or witnesses said things that were harmful to the defense case because Mr. Duchardt had no appreciation for the likely testimony of the witness due to his lack of preparation. As an example, Mr. Duchardt decided that Lisa Montgomery's children were his witnesses and insisted he was "the only member of the team to visit and speak with Lisa's children" (Dec. of David Owen, p. 13). At trial, the childrens' testimony "went badly" (Dec. of David Owen, p. 13). Mr. Duchardt was unable to rehabilitate the children and he was "taken completely by surprise with what they said while testifying" (Dec. of David Owen, p. 13). According to Mr. Owen, Mr. Duchardt did not circulate ideas on how to approach witnesses and he did not provide written documents or proposed questions of witnesses that we could have assisted with in preparation for his examinations of our defense witnesses.

18. The Fourth Defense Team was Ineffective for Announcing and Relying on the "Tommy Defense"

As discussed in greater detail above, during the course of their work on the defense team, David Owen and Ron Ninemire developed a theory that Lisa Montgomery's brother, Tommy Kleiner, might have been present at the crime scene (Dec. of David Owen, p. 15). Mr. Duchardt

announced an intent to rely on this defense at a status conference on April 3, 2007, allegedly because Mrs. Montgomery had "finally" told him that Tommy Kleiner was present at the crime scene and involved in some vague way. Mr. Duchardt claimed that an eyewitness had tentatively identified Tommy Kleiner driving Mrs. Montgomery's vehicle away from the crime scene. Yet, John O'Connor took Ms. Hayes deposition *after* this status conference, on the afternoon of April 3, 2007, at 4:30 p.m. (Leona Hayes Depo, 4/3/07, p. 1). Mr. O'Connor told Ms. Hayes that Mrs. Montgomery was saying her brother was with her at the time of the offense (Leona Hayes Depo, 4/3/07, p. 14) and asked her to review a photograph of Tommy Kleiner. Ms. Hayes stated that it was "possible" Tommy was driving the car, but she could not be certain.

The final decision of whether or not to use the 'Tommy Defense' was not made until a week before trial when Mr. O'Connor decreed that the trial team would not use the "Tommy defense." By that point, all of the testifying experts had been made aware of the "Tommy defense" and it came out during the trial that Mrs. Montgomery had claimed her brother was involved. This was very detrimental to Mrs. Montgomery's defense at trial.

19. Trial Counsel Was Ineffective for Reaching Out to Dr. Linda McCandless in the Middle of Trial and Presenting Her as a First Phase Defense Witness

When it became obvious that the first phase of the trial was not going well for the defense team, Mr. Duchardt reached out to Dr. Linda McCandless, the treating psychiatrist at CCA in Leavenworth where Mrs. Montgomery was being detained. While Mr. Duchardt now claims that Dr. Linda McCandless's testimony "sort of fell into our lap," available records suggest otherwise (Exhibit No. 19, Dec. of Chris Armstrong, p. 4). On October 12, 2007, a Friday in the midst of the trial, Mr. Duchardt called Dr. McCandless at CCA (Exhibit No. 24, Duchardt CJA Voucher). On October 13th, a Saturday, Mr. Duchardt had two telephone calls with Dr. McCandless

(Exhibit No. 24, Duchardt CJA Voucher). Dr. McCandless's treatment notes reveal that she questioned Lisa about the offense for the first time on Saturday, October 13, after she had spoken with Mr. Duchardt. On Sunday, October 14th, Mr. Duchardt had yet another telephone call with Dr. McCandless (Exhibit No. 24, Duchardt CJA Voucher).

Then, on Monday, October 15, at 6:16 a.m., Mr. Duchardt emailed the Courtroom Deputy to Judge Fenner, the Government attorneys, David Owen, Ron Ninemire, and Stephanie Elliott and announced that he had a new witness for the first phase of the trial: Dr. McCandless. According to the email, Mr. Duchardt had called Mr. Whitworth the night before to notify him that Dr. McCandless would be testifying (Exhibit No. 28, Fred Duchardt email to the court dated 10/15/07). The Government objected to the late disclosure and as a violation of the discovery rules on mental health evidence (Exhibit No. 28, Fred Duchardt email to the court dated 10/15/07). Mr. Duchardt claimed that Dr. McCandless "reported to [him] that she had met with Lisa on Saturday . . . because she ha[d] been concerned about Lisa's mental health during the trial" (Exhibit No. 28, Fred Duchardt email to the court dated 10/15/07). Duchardt claimed that Dr. McCandless had "decided she needs to change her diagnosis of Lisa to include psychosis" (Exhibit No. 28, Fred Duchardt email to the court dated 10/15/07). Duchardt presented this issue as if he had only just learned from Dr. McCandless herself that Dr. McCandless would support a first phase defense. The veracity of that statement is questionable. When asked recently how he obtained Dr. McCandless' treatment records over a weekend, Mr. Duchardt claimed he kept a "free flow of that stuff coming to [him]" (Exhibit No. 19, Dec. of Chris Armstrong, p. 4).

The court allowed Dr. McCandless to testify, but again, Mr. Duchardt failed to prepare her.

> Mr. Duchardt's failure to prepare his witnesses also compromised the testimony of Dr. McCandless, who was totally blindsided by the recordings of Ms.

> Montgomery's phone calls from CCA. Dr. McCandless was not a forensic expert, but Mr. Duchardt left Dr. McCandless vulnerable to cross examination regarding those calls by not providing her information regarding those calls prior to her testimony. I believe that had Dr. McCandless been prepared, she could have explained that in fact Ms. Montgomery was presenting herself falsely in those phone calls, in other words she was trying to present herself as more competent than she was in order to mask her deficits and impairments.

(Exhibit No. 17, Dec. of Dr. Logan.

20. <u>Trial Counsel Was Ineffective for Eliciting Testimony Harmful to the Defense at Trial</u>

Miguel Laboy performed the autopsy of Mrs. Stinnett and testified to his findings at trial (Tr. p. 648- ). Laboy testified that the cause of death was "ligature strangulation" (Tr. p. 657). Laboy testified that Mary Case had never spoken with him about the Stinnett case (Tr. p. 665).

On cross-examination, John O'Connor asked a question that had not been asked of Laboy on direct examination: "Can someone be strangled to unconsciousness using ligature strangulation and then regain consciousness?" (Tr. p. 666). This allowed Laboy to tell the jury: "That could be possible, depending on the amount of time. The brain usually gets a resurgence of oxygen so if you get blood flow again and [sic] they can regain consciousness again." Mr. O'Connor asked a follow-up question about the ability to say, "within a medical certainty, the person after losing consciousness ever regained it based on the injuries you observed" (Tr. p. 667). This permitted Laboy to repeat that, "So someone can get strangled, regain consciousness and then get strangled again and then consciousness and get in a comatose state." (Tr. p. 667). So, Mr. O'Connor allowed Laboy to bolster the testimony of Mary Case before she testified.

Becky Harper, the mother of Bobbie Jo Stinnett, testified that when she went to the Stinnett home on December 16, 2004, Bobbie Jo was on the floor and "there was blood everywhere" (Tr. p. 518). Ms. Harper called 911 and then began performing CPR (Tr. p. 518, 521). Then, Sheriff Espey arrived and he began performing CPR (Tr. p. 521). Paramedics

arrived shortly after Sheriff Espey and transported Mrs. Stinnett to the hospital (Tr. p. 534). No pictures were taken of the crime scene prior to the arrival of the paramedics (Tr. p. 534). The first picture was taken after the paramedics had entered the room and placed Bobbie Jo on a gurney (Tr. p. 534).

The Government elicited testimony from Sheriff Ben Espey that there was blood on the floor of the room where Mrs. Stinnett's body was found (Tr. p. 536). Despite the fact that Sheriff Espey had not been present during the crime, he testified, *without any objection by the defense*, that the blood spread around the floor "meant to me there was a struggle. You could see . . . there had been a struggle on the floor." (Tr. p. 537). Espey also testified, *without any objection by the defense*, that "it was very obvious the body wasn't laying in one place. The body was all over that room for the clots of blood to be around." (Tr. p. 537). This was pure speculation on the part of Mr. Espey.

Rather than object to this inflammatory testimony, Mr. O'Connor conducted a cross-examination during which he may have intended to make the point that Ms. Harper, the sheriff, and two paramedics had been in the small room prior to any photographs being taken, but he also elicited testimony from Sheriff Espey that he told the paramedics to "be real careful how you walk" when they arrived and entered the room (Tr. p. 543).

Similarly, in cross-examining Paul Gatewood, a detective with the City of St. Joseph, Missouri, who was called upon to process the crime scene (Tr. p. 587-589), Mr. O'Connor asked Gatewood a question that had not been asked by the Government: "Did you make any determination whether or not you believed a struggle had occurred?" (Tr. p. 608). This allowed Gatewood to speculate: "It did appear there was a struggle with just the swiping of the blood just going back and forth, in different directions, no definite footwear impressions or anything like

that that we located." (Tr. p. 609). Not only did Mr. O'Connor object to speculative and inflammatory testimony about a struggle, he elicited it from a government witness.

21. Trial Counsel was Ineffective for Failing to Ask His Experts in the First Phase of the Trial Whether They Had an Opinion to a Reasonable Degree of Medical Certainty That Lisa Montgomery Was Unable to Conform Her Behavior to the Law as a Result of Her Mental Illness

Though the defense in the case was Not Guilty By Reason of Insanity, a defense for which the defendant bore the burden of proof, trial counsel never presented proof from his experts that as a result of her pseudocyesis, Mrs. Montgomery was unable to conform her behavior to the law. He also failed to explain how her pseudocyesis was in any way related to the killing of Mrs. Stinnett. This failure prejudiced Montgomery as the jury could not accept her defense without proof to support it.

22. Trial Counsel Was Constitutionally Ineffective in Preparing for and Cross Examining the Government's Mental Health Experts in Violation of the Fifth, Sixth, and Eighth Amendments

As discussed above, the defense failed to conduct a proper social history investigation. As a result Dr. Martell and Dr. Dietz testified that evidence, which we now know is symptomatic for Mrs. Montgomery's multiple mental disorders (and not pseudocyesis), was evidence that she is a manipulative liar. Dr. Martell and Dr. Dietz credited Carl Boman and Judy Shaughnessy for much of their opinion. They treated these two witnesses as credible sources. We now know that Carl Boman sadistically forced sexual violence and torture on Lisa. We know that Judy Shaughnessy subjected Lisa to a reign of terror. Her assaults on Lisa began *in utero* when she drank to excess throughout her pregnancy. But trial counsel was not prepared to address the severity and nature of what these two principles players put Lisa through and how their combined efforts to finally destroy Lisa pushed her to the edge in December, 2004. As a result, Carl Boman was presented at trial as a long-suffering devoted father. The limited testimony

regarding Judy Shaughnessy's abuse of Lisa was treated as almost benign. Armed with the information gathered here, *See* Exhibit No. 16, Dec. of Jan Vogelsang (social history and accompanying attachments), competent trial counsel would have been able to successfully undermine the theories and speculation of the government's expert witnesses.

Further, trial counsel failed to object to the testimony of Dr. Dietz respecting his role in the cases of other high profile murder cases such as Ted Bundy. Trial counsel, who should have known that Dr. Dietz routinely injects his role as a government witness in serial killer cases in his testimony, should have moved to prevent such pre-trial. The names of his famous cases are irrelevant and serve only to imply to the jury that this case has some special significance and is in the same category as notorious serial killer, Ted Bundy.

Trial counsel also failed to object to the doctor's speculative testimony about the crime and Lisa's motivations on the day of the crime. Trial counsel failed to object under *Daubert* to Dr. Dietz's improper and unscientific opinion that Lisa fit the "profile" of women who kidnap babies. The testimony was irrelevant and unreliable and served only to inflame the jury and to suggest that Lisa was a future danger, which was not in the first phase.

Trial counsel failed to object to character testimony presented by Dr. Dietz and Dr. Martell that was not the proper subject of testimony by a mental health expert in the first phase of a capital trial. Such testimony was intended to, and did, malign the character of Mrs. Montgomery which was not appropriate for the jury's consideration of whether Mrs. Montgomery suffered from a mental disease or defect that prevented her from conforming her behavior to the law.

Trial counsel failed to conduct a proper investigation into Dr. Dietz's role in testifying falsely in the Andrea Yates trial where an appellate court found his perjury to be prejudicial to Ms. Yates. Dr. Dietz's willingness to testify falsely in a high profile murder case (and his shifting of

blame to the prosecutor in that case) severely undermines his credibility. Competent trial counsel would have conducted a thorough investigation of Dietz's story about the case and how his perjury was discovered and impeached him on cross examination.

Trial counsel's errors also prejudiced Lisa Montgomery in the penalty phase as the Government relied on Drs. Martell and Dietz to undermine the credibility of the defense experts in penalty and to suggest that their testimony meant that Lisa was "the worst of the worst." But for trial counsel's errors there is a reasonable probability that at least one juror would have voted for life.

23. The Fourth Defense Team Was Ineffective for Failing to Present a Mitigation Case and Tell Lisa Montgomery's Story During the Penalty Phase

While trial counsel's presentation of a so-called defense during the guilt phase of the trial unconstitutionally fell below the standard required of reasonably competent capital defense counsel and prejudiced Mrs. Montgomery within the meaning of the Sixth Amendment and *Strickland v. Washington*, it was the penalty phase of the trial where defense counsel completely failed Mrs. Montgomery. The trial team in this case failed to conduct a culturally competent and thorough mitigation investigation. Not only did the defense team fail to present the mitigating evidence at their disposal, they failed to uncover a wealth of information about Mrs. Montgomery's life history. It seems as though the trial team gave up after the guilt phase of the trial.

David Owen called Susan Hunt because he was upset at what was happening in the presentation of the penalty phase evidence. Mr. Owen told Ms. Hunt, "Lisa's story is not being told. The mitigation presentation was weak and the mental health evidence lacked foundational

support." (Dec. of David Owen, p. 17). Ms. Hunt says Mr. Owen called her at least twice during the trial to say he did not like the way they were presenting the case (Dec. of Susan Hunt, p. 13).

No reasonable jury could have heard the evidence collected by post-conviction counsel and be unmoved. As set forth above, Mrs. Montgomery's life has been one filled with trauma, suffering, and abuse at the hands of one person after another. But for counsel's deficient performance, there is a reasonable probability that the result of the trial would have been different and Mrs. Montgomery would not be on death row today. *See Wiggins v. Smith*, 539 U.S. 523 (2002); *Rompilla v. Beard*, 545 U.S. 374 (2005). The Sixth Amendment was violated because defense counsel failed to take the necessary steps to provide the jury with information that would have helped them understand Lisa Montgomery and that would have offered an explanation for her conduct.

24. Trial Counsel Was Ineffective for Failing to Secure the Exclusion of the 911 Tape Prior to Trial, in Failing to Object to the Tape During Trial, and in Failing to Raise the Issue on Appeal in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution and 18 U.S.C. §3006

Prior to trial the Government gave notice that it intended to play the 911 recording in the penalty phase of the trial as victim impact evidence. (Doc. 115, p.3). Trial counsel filed an objection stating in relevant part that "any playing [of the recording] in the penalty phase should be limited to those portions arguably germane to the penalty phase." (Doc. 125 p. 4). The Court did not rule on the objections pre-trial, holding instead that the issue would be "adequately handled when (and if) the penalty phase commences." (Docs. 177, 197).

Trial counsel was obviously on notice of the inflammatory nature of the 911 recording and understood the importance of excluding it, at least portions of it. Yet, when the government rose and announced that it would play the tape, he did not object. This failure constitutes

deficient performance because prevailing professional norms require trial counsel to move to exclude inadmissible, inflammatory, and prejudicial evidence. Lisa Montgomery was prejudiced by trial counsel's unconstitutional errors, because absent his deficient performance there is a reasonable probability that at least one juror would have voted in favor of life.

Appellate counsel similarly failed to raise this issue on appeal. Trial counsel, Fred Duchardt, continued as counsel for Mrs. Montgomery on appeal. He was obviously aware of this error which infected Mrs. Montgomery's trial, and yet he took no steps to preserve this issue for appeal. His failures constitute deficient performance and Mrs. Montgomery was prejudiced and her constitutional rights to due process, effective assistance of counsel, and to be free from cruel and unusual punishment, and a full and fair direct appeal were violated. *Douglas v.California*, 372 U.S. 353 (1963); *Strickland, supra*. To the extent that appellate counsel failed to recognize the relevant law, his performance fell below the prevailing professional norms of capital appellate work. See *ABA Guidelines, supra,* Guideline 10.15.1.

25. <u>Cumulative Prejudicial Effect</u>

In the prior sections defense counsels' failures have been identified as discrete claims and each of these claims, standing alone, justifies relief pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). The Court should also consider the effect of defense counsels' cumulative errors from the failure to conduct a competent and thorough mitigation investigation, to the failure to recognize and develop Mrs. Montgomery's mental health issues, to the presentation of a flawed defense at trial. When viewed cumulatively, the full impact of defense counsels' failings is overwhelming and it is evidence that, but for counsels' failings, there is a reasonable probability that Mrs. Montgomery would not be one of only two women on federal death row. *Strickland, supra*.

## VI. MRS. MONTGOMERY WAS TRIED WHILE SHE WAS INCOMPETENT IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSITUTION

All of the facts, allegations, and arguments made elsewhere in this motion and its attachments are incorporated into this claim by specific reference. As explained above, Lisa Montgomery suffers from many debilitating and serious mental health problems. She was born with a genetic predisposition to mental health issues, made worse by the repeated infliction of trauma on her from the time she was a small child and continuing through the time of the crime. *See* Exhibits No. 15-16, Decs. of Dr. George Woods, M.D. and Jan Vogelsang, M.S.W.

During her childhood and adult years, Mrs. Montgomery's mental health issues were not properly diagnosed and treated. After she was incarcerated at CCA in Leavenworth pending trial, Mrs. Montgomery was placed on a number of different medications. Mrs. Montgomery's trial attorneys were aware that she was being medicated at CCA. Unfortunately, Mrs. Montgomery was not receiving the correct medications at CCA. The medication that controls Mrs. Montgomery's psychosis and allows her to function is risperdal.

Mrs. Montgomery is currently taking risperdal at the Carswell federal medical facility. This medication allows Mrs. Montgomery to understand what is real and what is not real. It allows her to share information about her life as reflected in the social history detailed in this motion.

Due to the fact that Mrs. Montgomery was not receiving Risperdal during trial, she was not able to participate in her trial and assist in her own defense. As a result, the conviction and sentence of death was rendered in violation of Mrs. Montgomery's constitutional rights to due process, to a fair and reliable determination of guilt and the appropriate penalty, to be both physically and mentally present at trial, to present a defense, to effective assistance of counsel, to

the assistance of qualified mental health experts because the conviction and sentence occurred while she was mentally incompetent to stand trial.

It is "well settled that the 'criminal trial of an incompetent defendant violates due process.'" *McGregor v. Gibson*, 248 F.3d 946, 951 (10th Cir. 2001)(en banc)(quoting *Medina v. California*, 505 U.S. 437, 453 (1992)). A defendant is mentally incompetent if, as the result of mental disease or defect, the defendant is unable to comprehend the nature of the proceedings or rationally assist counsel in conducting the defense. *Drope v. Missouri*, 420 U.S. 162, 172 (1975). *See also*, 18 U.S.C. §4241. Where a preponderance of the evidence shows that a defendant lacks the requisite understanding or ability to participate in the proceedings, the defendant may not be tried or punished. *Cooper v. Oklahoma*, 517 U.S. 348 (1996). The trial and sentencing of Mrs. Montgomery while she was mentally incompetent constitutes a deprivation of due process necessitating the granting of habeas corpus relief without a further showing of prejudice. *Pate v. Robinson*, 383 U.S. 375, 386-87 (1966); *Dusky v. United States*, 362 U.S. 402 (1960).

The trial defense team completely failed to investigate Mrs. Montgomery's mental health as it related to competency. The trial team did not consult with a qualified mental health expert despite the existence of readily available evidence of which counsel was or should have been aware showing that Mrs. Montgomery had a family history of mental illness, had been subjected to repeated trauma, and had been placed on certain, albeit incorrect, medications at CCA. Trial counsel should have investigated the medications being given to Mrs. Montgomery at CCA, should have investigated whether they were the correct medications, and should have determined Mrs. Montgomery's competency to stand trial.

If trial counsel had conducted a professionally adequate investigation into the medications being given to Mrs. Montgomery at CCA, they would have learned that she was not being given the proper medication and, as a result, Mrs. Montgomery was not able to communicate effectively with counsel or assist in her own defense.

Now that she is receiving the proper medication and is able to assist in her own defense, Mrs. Montgomery should be granted a new trial.

## VII. MRS. MONTGOMERY DID NOT RECEIVE A FAIR TRIAL BECAUSE THE JURY WAS PERMITTED TO SEE HER UNDER THE EFFECTS OF PSYCHOTROPIC MEDICATIONS WHICH ONLY PARTIALLY TREATED HER COMPLEX MENTAL ILLNESS IN VIOLATION OF *RIGGINS V. NEVADA*, 504 U.S. 127 (1992)

Mrs. Montgomery had a right, protected by the Fifth and Eighth Amendments, to have the jury receive a fair, unadulterated view of her, including her reaction to the proceedings. *See Riggins v. Nevada*, 504 U.S. 127, 142, 143-144 (1992) (Kennedy, J., concurring). Due to the actions of jailers and the unreasonable omissions of Mrs. Montgomery's trial counsel, the jury was permitted to see her under the effects of psychotropic medications which only partially treated her severe and complex mental illnesses and which did not treat her brain impairment. As a result, Mrs. Montgomery sat through trial with a flat affect. The Government capitalized on this constitutional failure by falsely arguing that Mrs. Montgomery was cold and remorseless. Mrs. Montgomery was thereby prejudiced.

However, *Riggins* error is structural. Mrs. Montgomery is entitled to have her unconstitutional conviction and sentence set aside.

## VIII. THE GOVERNMNT'S DECISIONS TO FEDERALLY PROSECUTE MRS. MONTGOMERY AND TO AUTHORIZE HER CASE AS A CAPITAL PROSECUTION WERE BASED ON IMPROPER AND INAPPLICABLE FACTORS IN VIOLATION OF MRS. MONTGOMERY'S FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

At the time of the offense, and continuing through the date of this motion, Sam Graves was the United States Congressman for the Sixth District of Missouri. Skidmore, Missouri is located in the Sixth District of Missouri. Todd Graves, the brother of Sam Graves, was the United States Attorney for the Western District of Missouri at the time of this offense.

There have been at least ten other fetal abductions cases in the United States. None of the other defendants was prosecuted in federal court and none are on death row. This raises the question of why Mrs. Montgomery was prosecuted in federal court and why her case was a capital prosecution. Upon information and belief, Todd Graves had a conflict of interest in this case.

As the Supreme Court recognized over 75 years ago:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.

*Berger v. United States*, 295 U.S. 78, 88 (1935). "Because of this unique responsibility, federal prosecutors are prohibited from representing the Government in any matter in which they, their family, or their business associates have any interest. 18 U.S.C. §208(a)." *Young v. United States ex rel. Vuittton et Fils S.A.*, 481 U.S. 787 (1987). *See also*, ABA GUIDELINES, PROSECUTORIAL FUNCTION, Guideline 3-1.3(a) (the prosecutor must "avoid a conflict of interest with respect to his duties."); Guideline 3-1.3(f) ("A prosecutor should not permit his or her professional judgment or obligations to be affected by his or her own political, financial, business, property, or personal interests.").

Mrs. Montgomery's case attracted a great deal of media attention. It appears that United States Attorney Todd Graves may have had a conflict of interest that skewed both the decision to federally prosecute Mrs. Montgomery and the determination to authorize a capital prosecution. The murder occurred in the same district where his brother was a United States Congressman. Based upon this relationship, Todd Graves should have recused himself from the decision-making process as to whether there should be a federal prosecution and as to whether to seek death penalty authorization. Mr. Todd Graves' failure to recuse himself violated Mrs. Montgomery's Due Process and Equal Protection rights.

Moreover, the federal interest in prosecuting Mrs. Montgomery was not "more substantial" than the State of Missouri's interest. The 2001 Attorney General's Manual mandated that a "Substantial Federal Interest" exist in order to authorize a case federally and capitally. 2001 Attorney General's Manual 9-10.070. In making that determination, the government is to consider three areas. First, the government must consider "the relative strength of the State's interest in prosecution." *Id*. This includes the nature of the offense, the identity of the victim, the fact that the investigation was conducted by one jurisdiction, or the possibility that the prosecution will lead to disclosure of violations which are peculiarly within the jurisdiction of either federal or state authorities or will assist an ongoing investigation. *Id*. Second, the government must consider "the extent to which the criminal activity reached beyond the local jurisdiction." *Id*. And third, the government must consider "the relative ability and willingness of the State to prosecute effectively." *Id*.

In this case, the federal interest was weak. The crime was completed in Skidmore, Missouri. The fact that Lisa Montgomery took the baby to Kansas was inconsequential. Certainly the State of Missouri had an interest in prosecuting the case and an ability to do so.

Much of the investigation was carried out by Sheriff Espy of Nodaway County, Missouri and his officers. The only possible federal interest would have been based on the fact that after the crime was committed, Lisa Montgomery crossed state lines with the baby, but this was not material to the actual offense. Certainly it did not rise to the level of making the federal interest "more substantial" than the State of Missouri's interest.

## IX. THE ADMISSION OF THE 911TAPE RECORDING DURING THE PENALTY PHASE OF TRIAL VIOLATED THE SIXTH AND EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND LISA MONTGOMERY WAS PREJUDICED.

In its penalty phase case in chief, the Government played for the jury the entirety of the 911 tape of the phone call made by the victim's mother to the Sheriff's department upon discovering her daughter. The recording, which is twelve minutes in length, records the mother's sobs at finding her daughter, her efforts to perform CPR, and the Sheriff's efforts to perform CPR while awaiting the arrival of the ambulance. The mother's voice is heard throughout exclaiming over and over, "Oh, Bobbi Jo, please. Please no."

In *Payne v. Tennessee,* 501 U.S. 808 (1991), the Supreme Court observed "*Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." *Id*., 501 U.S. at 830. Citing Booth v. Maryland, 482 U.S. 496 (1987). This holding remains the law.

Justice O'Connor concurred in the judgment in *Payne* to clarify that the opinion in *Payne* permitted the State to present only a "quick glimpse" of the victim to "remind the jury that the person taken was a unique human being." *Id,* 501 U.S. at 831-832 (*quoting Mills v. Maryland,* 486 U.S. 367, 397 (1988)(Rehnquist, C.J., dissenting)). Nothing about the Court's decision in *Payne* required the admission of otherwise relevant evidence if the admission of such was unduly inflammatory. *See* F.R.E. 401, 402, ad 403.

The 911 tape presented here was inadmissible under the holdings of *Booth*, and *Payne*. The tape was not offered to prove the existence of any fact that was in dispute. That the victim was a unique human being was already before the jury. The jury saw her wedding photos. They saw photos of the baby clothes she had purchased and the nursery she was preparing. They heard from her mother and her husband. The jury had already seen photos from the crime scene and heard the testimony of the medical examiner. They had heard from the Sheriff who was on the scene and they knew about the extraordinary measures to save the victim's life. None of those facts were in dispute at the trial.

The playing of the 911 tape was for one reason and one reason only, to so inflame the jury as to prevent them from considering and giving effect to the mitigating evidence that was presented. The 911 tape is also inadmissible under *Payne* because it constitutes inadmissible evidence of the opinion and characterization of the victim regarding the crime and appropriate punishment.

Moreover, the 911 tape was so inflammatory that even if there was some relevance to it, that relevance was far outweighed by the prejudice to Ms. Montgomery. The error here was substantial and there is grave doubt as to the effect of the error on the jury here. *Kotteakos v. United States*, 328 U.S. 750 (1946).

## X. THE PROSECUTORS'S MULTIPLE MISSTATEMENTS OF THE LAW IN THE PENALTY PHASE OPENING AND CLOSING ARGUMENT INDIVIDUALLY AND CUMULATIVELY VIOLATED MRS. MONTGOMERY'S RIGHTS TO DUE PROCESS, A FAIR AND RELIABLE TRIAL, AN IMPARTIAL JURY, TO A RELIABLE, INDIVIDUALIZED SENTENCING, AND TO BE FREE FROM AN ARBITRARY AND CAPRICIOUS SENTENCE OF DEATH IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

During the penalty phase opening and closing arguments, the government engaged in misconduct in the following non-exclusive ways: 1) In opening statement, the government implied that the jury must unanimously find mitigating factors by a preponderance of the evidence (Tr. 2865) in violation of *Mills v. Maryland*, 486 U.S. 367 (1986); 2) in closing argument the Government argued that the defense had conceded that death was the only appropriate sentence by describing the crime as "unimagineable, unspeakable, off the charts." (Tr. 3151)[29]; 3) The Government's attorneys improperly injected their personal feelings that the death penalty is the appropriate sentence in this case. (Tr. 3149, 3151, 3153, 3154, 3181, 3182, 3194); 4) The government improperly argued that Lisa had never apologized for the crime which was a) untrue and b) improper argument; (Tr. 3157) 5) In violation of *Payne v. Tennessee* and the Eighth Amendment, the government argued that the jury should give Lisa Montgomery the death penalty to provide justice to the victim's mother and husband appealing to the jury's emotions and risking that the sentence of death be imposed out of emotion, vengeance and caprice. *Zant v.*Stephens, 462 U.S. 862 (1983); Miller *v. Lockhart*, 65 F.3d 676 (1983) (Tr. 3182, 3194); 6) the government improperly denigrated the mitigation, called it a distraction, that it was an attempt for Lisa to not accept responsibility for her actions, and suggested that the jury should

[29] If the Court finds that the Government's argument is proper, then the defense counsel's remarks constitute constitutionally ineffective assistance of counsel. *Cf. Rickman v. Bell*, 131 F. 3d 1150 (6th Cir. 1997). If trial counsel concedes that the case is the worst of the worst, as the Government claims, then he is not acting as an advocate at all and Mrs. Montgomery was without counsel. *See United States v. Cronic*, 466 U.S. 648 (1984). As such, Mrs. Montgomery is entitled to a new penalty phase for all of this reason and those *supra*.

not consider it; (Tr. 3154-3157, 3183-3184, 3186-3193) 7) the government improperly argued facts not in evidence in violation of *Gardner v. Florida*, 430 U.S. 349 (1977) when it suggested that the jury should not consider the mitigating evidence of physical and sexual abuse because there are "thousands" of victims of abuse; (Tr. 3154-3156) and when the government told the story of his older brother and an abused child he helped (Tr 3183); the government improperly argued that the jury should not consider Lisa's Post-traumatic stress disorder and abuse evidence because it was not causally connected to the crime (Tr. 3155, 3184-3186, 3188-3190) in violation of *Lockett*, *supra*, and *Tennard v. Dretke*, 542 U.S. 274 (2004); *Smith v. Texas*, 550 U.S. 297 (2007); and *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); 9) The government improperly argued that she "had" to show the jury the crime scene photographs to the jury which was untrue and a blatant attempt to encourage the jury to sentence Lisa to death out of emotion, vengeance, caprice (Tr. 3149, 3150); 10) The government improperly argued that life imprisonment wasn't punishment. (Tr. 3181-3182, 3186); 11) Improperly argued that the jury could not exercise mercy or sympathy (Tr. 3185, 3190, 3193); 12) Improperly argued that the responsibility for the death service was not borne by the jury in violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985); 13) Improperly argued that it was the juror's societal obligation to impose the death penalty (Tr. 3192).

The United States Supreme Court has not hesitated to reverse a conviction or sentence when the prosecutor's improper remarks violated due process. *See Caldwell v. Mississippi*, 472 U.S. 320 (1985)(vacating death sentence because prosecutor argued in penalty phase that the responsibility for the death sentence would be borne by someone other than the jury); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)(concluding that improper closing argument in guilt phase reaches level of constitutional error if prosecutor's comments "so infected the trial with

unfairness as to make the resulting conviction a denial of due process."); *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (same). The Eighth Circuit has as well. *Weaver v. Bowersox*, 438 F.3d 832 (8th Cir. 2006)(and cases cited therein) writ of certiorari dismissed as improvidently granted *Roper v. Weaver*, 550 U.S. 598 (2007). *See also Paxton v. Ward*, 199 F.3d 1197, 1717-18 (10th Cir. 1999).

Lisa was prejudiced by the government's repeated, egregious misconduct because there is a reasonable probability that at least one juror was effected by the improper comments. Her unconstitutional sentence must be reversed.

## XI. WOMEN AND AFRICAN AMERICANS WERE UNCONSTITUTIONALLY UNDERREPRESENTED ON THE GRAND JURY WHICH INDICTED MRS. MONTGOMERY IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUION

The Supreme Court has made clear, discrimination in the selection of the grand jury "is a grave constitutional trespass," which "undermines the structural integrity of the criminal tribunal itself, and is not amendable to harmless-error review." *Vasquez v. Hillery*, 474 U.S. 254, 252, 263-264, 106 S.Ct. 617, 623 (1986). Such grand jury discrimination profoundly affects the fairness of any subsequent conviction, especially in a potentially capital case, like this one:

> [W]e [are not] persuaded that discrimination in the grand jury has no effect on the fairness of the criminal trials that result from the grand jury's actions. The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense – all on the basis of the same facts. Moreover, '[t]he grand jury is not bound to indict in every case where a conviction can be obtained.' *United States v. Ciambrone*, 601 F.2d 616, 629 (CA2 1979)(Friendly, J., dissenting). Thus, even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature or very existence of the proceedings to come.

*Vasquez v. Hillery*, 474 U.S. at 263, 106 S.Ct. at 623. *See also Duren v. Missouri*, 439 U.S. 347, 366, 99 S.Ct. 664, 669 (1979)(systemic underrepresentation found where women underrepresented for period of only nine (9) months); *Sims v. Georgia*, 389 U.S. 404, 88 S.Ct. 523 (1967)(defendant entitled to relief where blacks underrepresented by 19.7% in grand jury pool and 14.6% in petit jury pool).

Upon information and belief, Mrs. Montgomery alleges that the grand jury empaneled here unconstitutionally underrepresented women and African Americans.[30]

It is well-settled that underrepresentation of any group by greater than 2-3 standard deviations indicates that the group has been underrepresented and excluded through invidious, discriminatory means. *Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17(1977); *Jefferson v. Morgan*, 962 F.2d 1185, 1190 (6th Cir. 1992); *Hazelwood School District v. United States*, 433 U.S. 299, 308-309 n. 14, 97 S.Ct. 2736, 2741-2642 n. 14 (1977); *Vogel v. City of Cincinnati*, 959 F.2d 594, 600 (6th Cir. 1992).

When a grand jury is "plainly illegal in [its] composition" it denies the defendant due process of law to subject him to indictment by that grand jury. *Peters v. Kiff*, 407 U.S. 493, 501, 92 S.Ct. 2163, 2168 (1972). There is a "presumption of prejudice which supports the existence of the right" to a grand jury empaneled free from invidious discrimination and underrepresentation of cognizable groups. *Davis v. United States*, 411 U.S. 233, 245, 93 S.Ct. 1577, 1584 (1973)(discussing *Peters* right, but rejecting petitioner's due process claim on basis of waiver). *See United States v. Ovalle*, 136 F.3d at 1107 (presumption of prejudice arises from underrepresentation and discrimination in grand jury selection). When there is unconstitutional or invidious discrimination against cognizable groups, the indictment simply cannot stand. *See*

[30] Mrs. Montgomery will expeditiously seek discovery in order to supplement this claim with additional facts and evidence.

*also* Berryhill v. Zant, 858 F.2d 633 (11th Cir. 1988)(capital conviction overturned because of systemic underrepresentation of women in jury pool); Gibson v. Zant, 705 F.2d 1543 (11th Cir. 1983)(Black defendant granted relief because of substantial underrepresentation of women and blacks in grand and petit jury pools).

Lisa Montgomery has standing to challenge discrimination in the selection of the grand jury. In the words of the United States Supreme Court, Mrs. Montgomery's due process right to challenge the exclusion of women from the grand jury is, and has always been, "axiomatic." *Campbell v. Louisiana*, 523 U.S. 392, 4 (1998). Indeed, "[W]hen a grand or petit jury has been selected on an impermissible basis, the existence of a constitutional violation does not depend on the circumstances of the person making the claim." *Peters v. Kiff*, 407 U.S. at 498, 92 S.Ct. at 2166; *Taylor v. Louisiana*, 419 U.S. 522, 526, 95 S.Ct. 692, 696 (1975)(discussing *Peters* to acknowledge that "there is no rule that claims such as Taylor presents may be made only by those defendants who are members of the group excluded from jury service.") As the Supreme Court later stated, this was the holding of *Peters. Hobby v. United States*, 468 U.S. 339, 343 n.2, 104 S.Ct. 3093, 3096 n. 2 (1984)("*Peters* held that a white male had standing to challenge the system used to select his grand and petit juries.").

This conclusion is evident. By definition, once the jury pool has been established, either it has been created in a constitutional manner, or it has not. It is either constitutional for all, or constitutional for none. The characteristics of the person challenging the pool tell nothing about the State's earlier compliance, or lack of compliance, with the Constitution when the pool was established.

It is for this reason that as far back as 1946, the Supreme Court granted relief to Donald Ballard, a man, who challenged the exclusion of women from the federal grand jury panel.

*Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 264 (1946). That Ballard as a man had the right to demand a grand jury which did not unfairly exclude women (a cognizable group) was so obvious that it didn't merit any discussion. As here, the unfairness in the process was that the pool unfairly excluded women, removing from a vital societal decision the views and perspectives of a segment of the community.

This followed closely on the heels of *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457 (1942), in which the Supreme Court reversed the conviction of male defendants who challenged improper exclusion of women from the federal jury pool. Again, the fact that Glasser was a man merited no discussion, because the focus was on the fact that the pool was improperly constituted, removing women from their proper place in the decision making process. When confronted nearly forty years later with a man's claim that women were unconstitutionally excluded as grand jury forepersons in violation of due process, this "axiomatic" principle -- that challenge to the selection of the jury is not dependent upon the characteristics of the defendant -- again required no discussion. *Hobby v. United States*, 468 U.S. 339, 104 S.Ct. 3093 (1984).

Importantly, the Supreme Court in *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771 (1988) recognized that Tony Amadeo, a white man who was sentenced to death was entitled to habeas corpus relief because of intentional discrimination against women and blacks in the selection of the grand and petit juries. Amadeo's right to relief from the unconstitutional discriminatory exclusion of women was not questioned. Just as Amadeo received relief, Mrs. Montgomery also has standing, and if her claim is proven, is entitled to relief. *See also United States v. Cross*, 708 F.2d 631 (11th Cir. 1983)(white male has standing to challenge exclusion of women and Blacks as grand jury forepersons), vacated on other grounds 468 U.S. 1212 (1984); *Murrah v. State of Arkansas*, 532 F.2d 105 (8th Cir. 1975)(acknowledging White defendant's standing to challenge

exclusion of Blacks); *Mayfield v. Steed*, 473 F.2d 691 (8th Cir. 1973)(male defendant entitled to habeas corpus relief because of systematic exclusion of women from jury).

Because there was invidious discrimination against women and African Americans in the selection of the grand jury, the indictment against Lisa Montgomery must be quashed, and Lisa Montgomery is entitled to a new trial. "Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained." *Hill v. Texas*, 316 U.S. at 406, 62 S.Ct. at 1162, *quoted in Rose v. Mitchell*, 443 U.S. 545, 557, 99 S.Ct. 2993, 3001 (1979).

## XII. "SHE'S CUBAN." IN VIOLATION OF EQUAL PROTECTION, DUE PROCESS, THE RIGHT TO A FAIR TRIAL, THE RIGHT TO A FAIR AND IMPARTIAL JURY AS PROTECTED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS, JUROR TORRES WAS EXCUSED SIMPLY ON THE BASIS OF HER RACE.

Juror Torres read and completed a jury questionnaire that was presented to her in English.

Juror Torres answered the following questions in English:

VENIREPERSON TORRES: I would but I would be happy
to listen to both sides of the case and decide everything I
can choose.

MR. WHITWORTH: So can you agree to follow the
law --

VENIREPERSON TORRES: Yes.

Tr. 247

MR. WHITWORTH: In this case and I know you
obviously have strong religious principles and I respect

that. When you write only God should take away life, could you vote for a sentence of death.

VENIREPERSON TORRES: I think so.

MR. WHITWORTH: If you find aggravated evidence outweighing the mitigation evidence.

VENIREPERSON TORRES: Yes.

MR. WHITWORTH: If you find the aggravated evidence does not outweigh the mitigation evidence you could also consider a life sentence?

VENIREPERSON TORRES: Yes.

MR. WHITWORTH: Will you give both sides of this case a fair shake?

VENIREPERSON TORRES: Yes.

THE COURT: And Miss Torres, on the question about whether you have heard anything or read anything about the case in the media you said you had not, but then a follow up question to that asked that if what you had heard would cause you to have difficulty with being fair, and you answered you could not be fair, was that your answer, was that just mistaken.

VENIREPERSON TORRES: It was mistaken.

THE COURT: It was mistaken?

VENIREPERSON TORRES: Yes.

Tr. 272

MR. DUCHARDT: Thank you, ma'am. Miss Torres, do you feel you would be open to listening to evidence of mental illness to decide if the person was not guilty by reason of insanity.

VENIREPERSON TORRES: Yes, sir.

Tr. 273

Then, the following exchange occurred between the Court and Counsel:

THE COURT: You know that last lady, Miss Torres, I think she has a hard time understanding.

MR. DUCHARDT: She's Cuban.

THE COURT: I just think she doesn't understand.

MR. DUCHARDT: I was going to ask you to consider --

MR. WHITWORTH: There is going to be a lot of reading involved in this.

THE COURT: Do you have any objection to her being struck?

MR. WHITWORTH: No.

MR. DUCHARDT: No.

THE COURT: The others that I have, number 85, Mary Smith, any objection, Mr. Whitworth.

MR. WHITWORTH: No objection.

Tr. 274-275.

Juror Torres was excused because she was Cuban. There was no indication that she could not read or understand English. Her actions and answers in the record refute such. If there were an issue regarding her ability to understand English, then the Court was obligated to provide her with an interpreter.

This was a clear violation of the rule of *Batson v.Kentucky*¸ 476 U.S. 79 (1986). *Batson* precludes the exclusion of a juror based on race. Clearly, Juror Torres was excused on the basis of race, there wasn't even a pretense about it. *Batson* requires reversal once it has been shown that a juror was excluded for racial reasons. The error here is structural. *Rosa v. Peters*, 36 F.3d 625 (7th Cir. 1994)(Batson violation is structural error, not a "trial type" error which is subject to harmless error analysis).

Trial counsel failed to object to Juror Torres' removal, seek additional questioning and/or an accommodation for her if language was truly a barrier. Juror Torres was clearly willing to serve. Trial counsel constitutionally failed in his professional obligations and Lisa Montgomery was prejudiced. *Strickland*, *supra*. *See* Claim #, Above.

Counsel was similarly ineffective in failing to raise this issue on appeal. *Id.; Evitts v.Lucey*, *supra.*

## XIII. THE GOVERNMENT ENGAGED IN MISCONDUCT AND INTERFERED WITH THE INVESTIGATION, PREPARATION, AND PRESENTATION OF MRS. MONTGOMERY'S PENALTY PHASE DEFENSE WHEN IT ADVISED MRS. MONTOMERY'S HALF-BROTHER, TOMMY KLEINER, THAT LISA WAS BLAMING HIM FOR THE MURDER AND TO NOT TELL THE DEFENSE TEAM ABOUT HIS ALIBI IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

On April 3, 2007, trial counsel announced to the government and court that Lisa had finally (after they badgered her into it) "admitted" that her brother, Tommy, was with her and that Tommy, not Lisa, killed the victim. Trial counsel further told the court that the defense investigators had surreptitiously obtained Tommy's DNA and that they planned to test it and his fingerprints.[31]

The Government went straight to Tommy and told him that Lisa was blaming him for the crime. (Exhibit No. 16, Attachment No. 41, Declaration of Tommy Kleiner). The government took a sample of his DNA and told Tommy not to tell the defense about his alibi because they wanted to spring it on Lisa's lawyer during the trial. *Id.* According to Tommy, the government also promised him to take care of a few charges that he had pending. *Id.* Tommy says that they did not follow through on their promises. *Id.*

The government's actions constitute an interference in the preparation and investigation of the defense in this case in violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. *See Gregory v. United States,* 369 F.2d 185 (DC Cir. 1966).

[31] Trial counsel's conduct is also the subject of a separate ineffectiveness claim. Trial counsel, Mr. Duchardt, still believes that Tommy was present and killed the victim and that the probation officer's records were "fudged." (Exhibit No. 19, Dec. of Chris Armstrong). He did not understand then, or now, that Lisa had been so overly questioned by inexperienced investigators and lawyers all pressing her to come up with another perpetrator, that the "admission" that Tommy was present was the result of Lisa's mental illness and really a symptom that should have been explored. By announcing that Tommy, not Lisa, was to blame, trial counsel destroyed any and all hope of gaining any cooperation from the family, particularly Lisa's mother. Such reckless conduct is constitutionally deficient performance which prejudiced Mrs. Montgomery.

## XIV. MRS. MONTGOMERY WAS DENIED HER FIFTH AMENDMENT RIGHT TO DUE PROCESS, HER SIXTH AMENDMENT RIGHTS TO COUNSEL AND CONFRONTATION, AND HER EIGHTH AMENDMENT RIGHT TO A FAIR AND RELIABLE CAPITAL SENTENCING PROCESS DUE TO THE GOVERNMENT'S SUPPRESSION OF EXCULPATORY EVIDENCE, KNOWING USE OF PERJURED TESTIMONY, AND FAILURES TO CORRECT FALSE TESTIMONY[32]

Mrs. Montgomery incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto.

The Government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and disclose that evidence to Mrs. Montgomery's counsel. *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *Strickler v. Green*, 527 U.S. 263 (1999); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Bowen v. Maynard*, 799 F.3d 593, 610 (10th Cir. 1986) (Brady obligations extend to impeachment evidence); *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984); *United States v. Osorio*, 929F.2d 753, 761 (1st Cir. 1991); *United States v. Libby*, 429 F. Supp.2d 1, 10-11 (D. D.C. 2006). This duty extended beyond the point in time when any individual witness testified, and has continued to the present day. *Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997); *United States v. Quintanilla*, 193 F.3d 1139, 1146-49 (10th Cir. 1999)(*citing Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987)); *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007)("For evidence known to the state at the time of trial, the duty to disclose extends throughout the legal proceedings that may affect either guilt or punishment, including post-conviction proceedings"); *High v. Head*, 209 F.3d 1257, 1265 n.8 (11th Cir. 2000). *See also, Banks*, 540 U.S. at 696;

[32] Counsel have diligently investigated this claim and intend to seek discovery to further support this claim, but raise it here to preserve it for further amendment as facts come to light.

*Giglio*, 405 U.S. at 155; *United States v. Kojayan*, 8 F.3d 1315, 1320, 1323-25 (9th Cir. 1993); *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992)(prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial); Fed.R.Crim.P. 16 ( c); Fed.R.Civ.P. 26(g)(1). *Cf. Imbler v. Pachtman*, 424 U.S. 409, 427, n. 25 (1976)(under ABA Criminal Justice Standard 3-3.11, commentary, "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case ... The duty of the prosecutor is to acquire all the relevant evidence ...").

This duty also extends to any member of law enforcement acting on behalf of government agencies, whether or not the prosecutor has personal knowledge of the evidence in question, and whether or not the information is in possession of law enforcement agencies and officials outside the prosecuting agency itself. *United States v. Antone*, 603 F.3d 566, 569 (5th Cir. 1979)(facts known to state law enforcement personnel imputed to federal prosecutors when "the two governments ... pooled their investigative energies to a considerable extent.").

Further, it is error for the government to fail to correct false testimony or knowingly present false testimony. *Giglio v. United States*, 405 U.S. 150 (1972); *Giles v. Maryland*, 386 U.S. 66 (1967); *Miller v. Pate*, 386 U.S. 1 (1967); *Napue v. Illinois*, 360 U.S. 264 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1959).

## XV. WITNESSES HELEN MAYBERG AND ALAN EVANS PRESENTED FALSE, MISLEADING, UNRELIABLE, UNSCIENTIFIC, AND SPECIOUS TESTIMONY DURING THE *DAUBERT* HEARING WHICH RESULTED IN THE EXCLUSION IN THE GUILT AND PENALTY PHASE OF CRITICAL EVIDENCE SHOWING THAT LISA MONTGOMERY HAS FUNCTIONAL AND STRUCTURAL BRAIN DAMAGE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. *SEE GIGLIO V. UNITED STATES*, 405 U.S. 150(1972); *NAPUE V. ILLINOIS*, 360 U.S. 264 (1959); *BRADY V. MARYLAND*, 373 U.S. 83 (1963); *KYLES V. WHILTEY*, 514 U.S. 419 (1995). AS A RESULT, MRS. MONTGOMERY WAS PREJUDICED.[33]

All arguments, evidence, exhibits, and declarations, contained in this motion and attached hereto are incorporated by reference. In addition, the transcript of the Daubert Hearing, and the testimony of Drs. Gur, Mayberg, and Evans and all exhibits thereto and subsequently presented are also incorporated by reference.

The trial court relied on the testimony and questions raised by Dr. Mayberg and Dr. Evans to exclude the testimony of Dr. Gur as to the MRI results and used their speculative and specious allegations challenging the normative sample used for the PET analysis to require last minute production of raw (cpp) data. Because it was not possible to obtain that data until the trial was nearly over, Dr. Gur's testimony was excluded in *toto*, including in the penalty phase even where the Government had previously admitted its admissibility. Doc. 243, p. 2.

It is Drs. Mayberg and Evans that offered "junk science" to the Court. Their testimony was baseless, specious, and scientifically indefensible. Dr. Gur was finally able to address all of their questions scientifically, but the trial court refused to even consider the report. Exhibit #, Tr. 3144.

[33] This claim of error is made on information and belief. Counsel will expeditiously seek discovery on this claim.

## XVI. TRIAL COURT ERRORS

### A. THE TRIAL COURT'S EXCLUSION OF HEARSAY EVIDENCE IN THE PENALTY PHASE VIOLATED LISA MONTGOMERY'S RIGHTS UNDER THE EIGHTH AMENDMENT; APPELLATE COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE FOR FAILING TO RAISE THIS ERROR ON APPEAL; SENTENCING COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE WHEN HE FAILED TO PROPERLY LAY THE FOUNDATION FOR THE RELEVANCE, RELIABILITY AND ADMISSIBILTY OF WENDY TREIB'S TESTIMONY WHICH WAS ERRONEOUSLY EXCLUDED BY THE COURT.

In the penalty phase of the trial, the defense attempted to introduce evidence, through the testimony of Wendy Treibs, that Mrs. Montgomery's cousin, Wendy's brother Kenny Alexander, also suffered from a major mental illness, bipolar disorder. This evidence was highly relevant because it would tend to show the familial, genetic link to major mental illness in Lisa's family. Ms. Treibs testified, "[My] brother has told me they told him he had bi-polar disorder." Tr. 2978. The Government objected on relevance and hearsay grounds. Defense counsel, Mr. Owen, responded, "I was under the impression hearsay was admissible during the penalty phase." *Id.* The Court responded, "If it's otherwise reliable. She's just up here saying she doesn't know, the doctor wouldn't tell her and what her brother said." *Id.* Mr. Owen replied, "No problem." *Id.*

In *Green v. Georgia*, 442 U.S. 95 (1979), the United States Supreme Court made clear that in the penalty phase of a capital trial, due process requires the Court to allow evidence which is relevant to punishment, even if the evidence is otherwise inadmissible under state evidentiary rules. The court found this holding was compelled by the principles of *Lockett v. Ohio*, 438 U.S. 586, 604-605 (1978) which require an individualized and reliable sentencing proceeding and the right to present a defense as explained in *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The evidence respecting familial predisposition was highly relevant to the statutory and non-statutory mitigating circumstances including, *inter alia*, that Mrs. Montgomery's mental

illness substantially impaired her capacity to conform her conduct to the requirements of the law, that she was under extreme mental or emotional disturbance at the time of the crime.

The district judge was incorrect when he said that the evidence wasn't sufficiently reliable because Ms. Treibs didn't hear the bipolar diagnosis from Kenny's doctor, but rather from Kenny. In the context of the penalty phase and the rule of *Green*, that is a distinction without a difference and the testimony should have been allowed. This clear eighth amendment violation should have been raised and preserved for appeal and appellate counsel performed deficiently in failing to do so. Mrs. Montgomery was prejudiced by these errors.

Trial counsel was also ineffective in failing to meet the Government's objection. Trial counsel's response shows he was uncertain of the law. Properly prepared counsel would have explained the rule of *Lockett*, *Green*, and *Chambers* to the Court and pointed out the reliability and relevance of the testimony in the context of the defense. He performed deficiently and Mrs. Montgomery was prejudiced. The testimony would have offered credibility to the defense experts' testimony that Mrs. Montgomery suffered from major mental illness since affective disorders such as bipolar are known to be genetically linked.

## B. THE GUILT PHASE JURY INSTRUCTIONS CONTAIN MULTIPLE ERRONEOUS STATEMENTS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; LISA MONTGOMERY WAS PREJUDICED.[34]

In violation of the Fifth and Eighth Amendments, the trial court's instruction on consideration of testimony unconstitutionally limited the jury to consider only particular factors, requiring the jury to "consider" various considerations, which by definition precluded jurors from evaluating evidence using any other considerations not included in that list, such as witnesses' body language and use of words, and jurors' overall impression or intuition about the

[34] Each claim of error is raised individually and cumulatively.

witness (whether fully articulable or not) in considering the truthfulness of witnesses' testimony (R. 339-7: Instruction 4; 339-17: Instruction 12).

In violation of the Fifth and Eighth Amendments, the trial court's instruction on the consideration of statements by the defendant failed to instruct the jury that it should disregard the statements unless the jury unanimously found that: the defendant validly, knowingly, understandingly, and intelligently waived her right to counsel and right to remain silent before making any such statements; such statements were knowing, voluntary, and intelligent; and such statements, were, in fact truthful (R. 339-21: Instruction 13).

In violation of the Fifth and Eighth Amendments, the trial court's instructions on the defense of insanity violated due process, prevented a highly reliable determination of guilt in a capital case, and led to the arbitrary imposition of the death sentence, because the instructions unconstitutionally: required the jury to find that the defendant suffered from a "severe" mental disease or defect, when all that is constitutionally required is a mental disease or defect; required the defendant to prove insanity by clear and convincing evidence, which, in violation of due process, is higher than is constitutionally permissible under *Cooper v. Oklahoma*, 517 U.S. 348 (1996) which, at most, may require the defendant to prove insanity by a preponderance of the evidence (See e.g., Dupler, *The Uncommon Law: Insanity, Executions, And Oklahoma Criminal Procedure*, 55 Okla. L.Rev.1, 60 (2002)); and failed to inform the jurors that defendant's mental state evidence could, and should, be considered on the question whether the government had proven the essential elements of the offense beyond a reasonable doubt, thereby limiting the consideration of evidence relevant to whether the government had proven all elements of the offense beyond a reasonable doubt (R. 339-23: Instruction 15; R. 339-25: Instruction 17; R. 339-27: Instruction 19).

In violation of the Fifth and Eighth Amendments, the trial court's instruction on "clear and convincing evidence" overstated the burden of proof on insanity as provided to the jury by requiring a "high probability" of truth which is greater than that required by clear and convincing evidence, which only requires a "firm" belief or conviction of truth, and the instruction thus unfairly prevented a full and fair consideration of the defendant's defense of insanity (R. 339-26: Instruction 18).

In violation of the Fifth and Eighth Amendments, the trial court's instruction on reasonable doubt overstated the amount of doubt that was required to acquit and limited the consideration of reasonable doubts, where the instruction required individual jurors to reject reasonable doubts that individual jurors held if such reasonable doubt(s) would not be supported by other jurors (i.e., doubts based upon "common sense") and which precluded jurors from acquitting even if they concluded that there was a reasonable "possibility of innocence." (R. 339-24: Instruction 16).

In violation of the Fifth and Eighth Amendments, the jury was not provided any lesser included offense instructions (including attempted interstate kidnaping, which appears to be an offense that the defendant actually committed, where she had not taken Victoria Jo Stinnet across any state line when Bobbie Jo Stinnet died and therefore at most only had attempted a violation of 18 U.S.C. §1201), and the jury was thus left with an all-or-nothing choice to convict or acquit at the guilt phase, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980).

### C. THE PENALTY PHASE JURY INSTRUCTIONS CONTAIN MULTIPLE ERRONEOUS STATEMENTS OF LAW IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION; LISA MONTGOMERY WAS PREJUDICED.[35]

In violation of the Fifth and Eighth Amendments, the jury was misinstructed on the meaning of "mitigate" as "to make less severe" or "to moderate," which thereby undermined the consideration of defendant's numerous mitigating circumstances, because there is a reasonable probability that one or more jurors refused to credit mitigating evidence because such juror(s) did not consider such evidence, though constitutionally mitigating under *Lockett v. Ohio*, 438 U.S. 586 (1978) to have "moderated" the offense or made the offense "less severe," thereby precluding full and fair consideration of all of defendant's mitigating evidence in violation of *Lockett* and its progeny (R. 356-3 & 21: Sentencing Instructions).

In violation of the Fifth and Eighth Amendments, the jury was allowed to find (and did find and weigh), as an aggravating circumstance, the substantive offense itself (interstate kidnaping resulting in death) which unconstitutionally double-counted the offense as an aggravating circumstance and did not constitutionally narrow the class of persons eligible for the death sentence, in violation of *Lowenfield v. Phelps*, 484 U.S. 231 (1988); *State v. Middlebrooks*, 840 S.W.2d 317 (Tenn. 1992), and which was then unconstitutionally weighed and placed on death's side of the scale in violation of the Eighth Amendment under *Stringer v. Black*, 503 U.S. 222 (1992)(R. 356-4, 5: Aggravating Circumstance 1 Instruction; R. 356-14: Sentencing Instruction 7; R. 354-3: Jury Verdict).

In violation of the Fifth and Eighth Amendments, the jury was allowed to find (and did find and weigh) as an aggravating circumstance, that the defendant endangered another person (Victoria Jo Stinnet) by cutting her from the womb of her mother with a knife, but as the Eighth

[35] Each claim of error is raised individually and cumulatively.

Circuit recognized (*United States v. Montgomery*, 635 F.3d 1074, 1086 (8th Cir. 2011)), Victoria was not a "person" within the meaning of federal law at the time, and thus the jury found and weighed an aggravating circumstance that was not applicable here and for which there was insufficient evidence, and then unconstitutionally weighed this non-existent aggravating circumstance when imposing the death sentence, in violation of in violation of the Eighth Amendment under *Stringer v. Black*, 503 U.S. 222 (1992)(R. 356-5: Aggravating Circumstance 2; R. 356-14: Sentencing Instruction 7; R. 354-3, 4: Jury Verdict)

In violation of the Fifth and Eighth Amendments, the jury weighed as an aggravating circumstance that the "defendant committed the offense after substantial planning and premeditation" but the jury never found this circumstance unanimously, as evidenced by the lack of the word "unanimously" as modifying this particular aggravating circumstance, whereas other aggravating circumstances were, in fact, stated as having been found "unanimously"(R. 354-4: Verdict Form). As a result, in violation of the Fifth and Eighth Amendments, this aggravating circumstance did not narrow the class of persons eligible for the death sentence  The jury's consideration and weighing of this non-unanimous aggravating circumstance also violated the requirements of the Federal Death Penalty Act and due process and the right to a fair and reliable determination of the death sentence by improperly placing on death's side of the scale an aggravating circumstance that was never properly found by a unanimous jury as required by law.

In violation of the Fifth and Eighth Amendments, the jury was allowed to find (and did find and weigh) as a separate aggravating circumstances a "grave risk" aggravating circumstance and a "heinous and depraved" aggravating circumstance that both relied on the identical fact, viz. that the defendant used a kitchen knife to cut the baby from the womb (R. 356-5 & 14-15: Instructions; R. 354-3 & 4: Verdict Form), which thereby double-counted this aggravating fact

more than once and unconstitutionally doubled the aggravating weight of this fact before the sentencing jury, thereby unconstitutionally skewing the sentencing verdict in favor of death. *See e.g., Stringer v. Black*, 503 U.S. 222 (1992).

In violation of the Fifth and Eighth Amendments, the jury was allowed to find (and did find) as separate aggravating circumstance that the offense caused injury, loss and harm because of the victim's personal characteristics as a human being and that death had an impact upon the victim's family, which applies to every homicide case, and thus did not constitutionally narrow the class of persons eligible for death sentence and was therefore unconstitutionally weighed in the sentencing calculus, leading to the arbitrary imposition of the death sentence (R. 356-5 & 18: Jury Instructions; R. 354-5: Verdict Form)

In violation of the Fifth and Eighth Amendments, the jury was instructed that it could only find as a mitigating circumstance the defendant's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law if that capacity was "significantly" impaired, which thereby interfered with the jury's full consideration of the defendant's mitigating evidence of mental illness and capacity, in violation of Lockett and its progeny, in fact leading only one juror to find this mitigating circumstance (R. 356-5 & 20: Jury Instructions; R. 354-6: Verdict Form).

In violation of the Fifth and Eighth Amendments, the jury was instructed that it could only find as a mitigating circumstance the defendant's "mental or emotional disturbance" if that disturbance was "severe," which thereby interfered with the jury's full consideration of the defendant's mitigating evidence of mental or emotional disturbance, in violation of *Locket*t and its progeny, in fact leading no juror to find this mitigating circumstance despite clear evidence

that defendant was emotionally or mentally disturbed (R. 356-5 & 6 & 20: Jury Instructions; R. 354-6: Verdict Form).

In violation of the Fifth and Eighth Amendments, the trial court's sentencing instruction on reasonable doubt limited the consideration of reasonable doubts about aggravating circumstances and the appropriate sentence, where the instruction required individual jurors to reject reasonable doubts that individual jurors held if such reasonable doubt(s) would not be supported by other jurors (i.e., doubts based upon "common sense") (R. 356-8: Sentencing Instruction 2).

In violation of the Fifth and Eighth Amendments, the trial court placed upon the defendant a burden of proving mitigating circumstances by a preponderance of the evidence where there is no such burden under the Eighth Amendment, and by doing so, the trial court limited the jury's full consideration of all of the defendant's mitigating evidence, in violation of *Lockett* and its progeny (R. 356-8: Sentencing Instruction 2).

In violation of the Fifth and Eighth Amendments, the trial court's sentencing instruction on consideration of testimony unconstitutionally limited the jury to consider only particular factors, requiring the jury to "consider" various considerations, which by definition precluded jurors from evaluating evidence using any other considerations not included in that list, such as witnesses' body language and use of words, and jurors' overall impression or intuition about the witness (whether fully articulable or not) in considering the truthfulness of witnesses' testimony (R. 356-9: Sentencing Instruction 3).

In violation of the Fifth and Eighth Amendments, the jury was instructed that it "may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death," (R. 356-23: Jury Instructions) which unfairly indicated to jurors that they  could do so and indicates that they did so, and this was highly prejudicial, as it

allowed the jurors to impose the death sentence by finding that any of the invalid aggravating circumstances noted supra was in and of itself sufficient to impose the death sentence, and where any or all of such invalid circumstances did not narrow the class of persons eligible for death but was sufficient to impose the death sentence by itself when weighed against mitigating circumstances, the jury instructions led to the arbitrary imposition of the death sentence, and given the general verdict of death, the error requires a new sentencing hearing, as we do not know which aggravating circumstance(s) were found by the jury to outweigh mitigating circumstances.

In violation of the Fifth and Eighth Amendments, the jury was instructed that it was to determine "whether or not the circumstances in this case justify a sentence of death" and was instructed that to impose a life sentence, the jurors had to conclude that the death sentence was not justified (R. 356-23 & 24: Jury Instructions), but the proper inquiry was a fair and balanced inquiry into what the appropriate sentence should be, rather than placing on the defendant a burden of showing that the death sentence was not "justified," for in any case of murder, a death sentence is "justified," but the constitutional and appropriate inquiry is what sentence should be imposed. These instructions were not evenhanded, tipped the scales in favor of death, prevented a fair consideration of all the evidence at sentencing, and led to the arbitrary and unfair imposition of the death sentence, in violation of the Fifth and Eighth Amendments.

In violation of the Fifth and Eighth Amendments, there was insufficient evidence to convict defendant of interstate kidnaping that resulted in death, where jury instructions (R. 339-25: Instruction 17) required the jury to find, beyond a reasonable doubt, that the defendant: (1) unlawfully kidnaped, abducted, carried away or held Victoria Jo Stinnet; (2) did so for the purpose of claiming her as her child; (3) "willfully, knowingly, and unlawfully transported"

Victoria in interstate commerce and (4) Bobbie Jo Stinnet died as a result of defendant's actions as described in One, Two and Three above. The government presented absolutely no proof that Bobbie Jo Stinnet died as a result of Victoria being "willfully, knowingly, and unlawfully transported . . . across the state line from Missouri to Kansas." In fact, the proof conclusively establishes that the victim's death occurred before any federal crime ever occurred by the crossing of any state line. Consequently, there was insufficient evidence to support the defendant's conviction for interstate kidnaping resulting in death, her conviction must be reversed, and retrial barred on the grounds of double jeopardy.

In addition, the trial court's instructions to the jury violated Mrs. Montgomery's rights under the Fifth, Sixth, and Eighth Amendments because the jury was not required to find that death was an appropriate punishment beyond a reasonable doubt.

Mrs. Montgomery's death sentence is unlawful and was obtained in violation of her rights under the Fifth, Sixth, and Eighth Amendments because the jury was not instructed that the reasonable doubt standard governed the ultimate penalty determination in this case. *See Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The district court failed to instruct the jury that it had to decide beyond a reasonable doubt that one or more aggravating factors outweighed the mitigating factors, or that death was ultimately the appropriate decision, instead instructing the jury members that they must simply determine that the aggravating circumstances sufficiently outweighed the mitigating ones. (Doc. #356, Penalty Phase Instruction No. 1, p. 2-3). This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors. *See* 18 U.S.C. §2593(e).

The district court's instruction failed to meet the requirements of the Constitution which mandate that jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that they substantially outweigh them. The *Apprendi* principle applies to fact-finding necessary to put a capital defendant to death. *Ring*, 536 U.S. at 609. A sentence greater than that authorized by a jury's simple verdict of guilt cannot be imposed unless the facts supporting an increased sentence are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 478. Therefore, the district court should have instructed the jury during the penalty phase that it had to find that the aggravating factors outweighed the mitigating ones beyond a reasonable doubt.

In *United States v. Gabrion*, the United States District Court for the Sixth Circuit ruled that failure to instruct the jury in a capital case that the ultimate decision had to be based upon proof beyond a reasonable doubt was reversible error and required a new sentencing hearing. 648 F.3d 307, 325 (6th Cir. 2011). The district court's failure to appropriately instruct the jury in Mrs. Montgomery's case requires reversal as it is a structural error.

**XVII. MRS. MONTGOMERY WAS DENIED DUE PROCESS OF LAW, EQUAL PROTECTION OF THE LAW, THE RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT, AND EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE THE FEDERAL DEATH PENALTY, AS ADMINISTERED, IS DISPROPORTIONATELY AND UNCONSTITUTIONALLY APPLIED ACCORDING TO THE RACE OF THE VICTIM, AND TRIAL AND APPELLATE COUNSEL MADE NO OBJECTION BASED ON THIS FACT.**

Since reintroduction, the federal death penalty has been used as a tool of federal law enforcement with escalating frequency, particularly in the Western District of Missouri. Statistics maintained by the Federal Death Penalty Resource Counsel as a part of its mandate to facilitate the effective defense of federal capital cases demonstrate that the authorization

process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the victim's race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

A significantly higher percentage of cases involving white victims are authorized for death than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995 and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level." Continuing the pattern, during the administration of Attorney General Ashcroft, 32% of cases involving white victims which were presented for authorization were authorized for death, while only 19% of cases involving nonwhite victims were so authorized. During the administration of Attorney General Gonzalez, which is the timeframe of Mrs. Montgomery's trial, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized. Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed,

the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases - a nine percentage-point difference."

Lauren Cohen Bell, Ph.D., has conducted a comprehensive statistical analysis of the relationship between victim race and sentencing outcomes in federal capital cases. This analysis was based on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008. Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403. She determined that a federal defendant charged with killing a white victim is three times more likely to be sentenced to death than a defendant who kills a non-white victim. Dr. Bell concluded that the race of the victim is "highly statistically significant" and that the likelihood that the discrepancy occurs by chance is "essentially zero."

Evidence of the developing pattern was available to trial counsel from the Federal Death Penalty Resource Counsel by or before the time of trial; that office has maintained this data since 1992. Trial counsel's failure to obtain the information and pursue a pre-trial challenge to the Government's racially discriminatory actions was deficient performance. Had counsel performed effectively, it is reasonably likely that the Government would have been precluded from seeking death. Alternatively, the statistics regarding the application of the federal death penalty since Mrs. Montgomery's trial constitute new evidence that warrants review of this ground for relief. Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the Government's authorization process and plea bargaining decisions.

The racial discrepancy present in the administration of the Federal Death Penalty Act, is the work of a single decision maker, i.e. the DOJ. This fact renders the above statistics all the more probative of discrimination. The Court should grant relief from Mrs. Montgomery's death sentence because the Government's charging and plea practices, as well as the sentencing patterns, are influenced by the race of the victims, in violation of the Fifth and Eighth Amendments.

## XVIII. INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

The Due Process Clause of the Fifth Amendment guarantees to a defendant in a criminal case the effective assistance of counsel on appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008). Where a petitioner challenges the outcome of an appeal the question of whether the result should be upheld is evaluated pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). The performance of Mrs. Montgomery's appellate counsel fell below prevailing professional norms in that counsel failed to recognize and raise meritorious issues. As a result, the outcome of Mrs. Montgomery's direct appeal to the United States Court of Appeals for the Eighth Circuit is unreliable. Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger*, 498 U.S. 308, 321 (1991).

## XIX. LISA MONTGOMERY SUFFERS FROM SEVERE MENTAL ILLNESS AND THE EIGHTH AMENDMENT PRECLUDES HER EXECUTION

As discussed above, Mrs. Montgomery suffers from severe mental defects. These mental defects prohibit the United States from executing her.

It is a fundamental "precept of justice that punishment for crime should be graduated and proportioned to the offense. *Atkins v. Virginia*, 563 U.S. 304, 311 (2002)(quoting *Weems v.*

*United States*, 217 U.S. 349, 367 (1910)). The Eighth Amendment to the Constitution prohibits the infliction of "cruel and unusual punishments." A capital sentence violates the Eighth Amendment when it is "grossly out of proportion to the severity of the crime," or "so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 173, 183 (1976). The twin goals of retribution and deterrence drive the Eighth Amendment proportionality analysis and "unless the death penalty when applied to *those* in [the defendant's] position measurably contributes" to these goals, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Edmund v. Florida*, 458 U.S. 782, 798 (1982).

In *Atkins*, the United States Supreme Court held that the execution of the mentally retarded is "cruel and unusual" for purposes of the Eighth Amendment. 536 U.S. 304. The Supreme Court concluded that capital punishment for mentally retarded defendants "is excessive" and therefore "the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." 536 U.S. at 321. Mrs. Montgomery submits that the Eighth Amendment also precludes the execution of persons suffering from severe mental illness. Although *Atkins* did not address a categorical exception for persons who are severely mentally ill, its reasoning makes necessary an expansion of the Eighth Amendment protection to such individuals. Individuals who suffer from mental illness, such as Mrs. Montgomery, share the characteristics that make the execution of a mentally retarded individual inconsistent with the retributive and deterrence functions of the death penalty, such as diminished capacity for understanding, poor impulse control, and a poor ability to engage in meaningful cost-benefit analysis of their actions. American Bar Association, *Special Feature: Recommendation and*

*Report on the Death Penalty and Persons With Mental Disabilities*, 30 Mental & Physical Disability Law Reporter 668, 670 (2006).

In addition, the execution of the mentally ill offends the "evolving standards of decency" protected by the Eighth Amendment. *See Atkins*, 536 U.S. at 312, 316 n. 21 (the Eighth Amendment analysis is "informed by objective factors," such as the use of professional "organizations with germane expertise").

Mrs. Montgomery's diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others compels the same conclusion reached in *Atkins* be applied to Mrs. Montgomery: her execution would violate the Eighth Amendment. As society's measure of justice continues to expand, the meaningless distinction drawn between the moral culpability of the intellectually disabled and seriously mental illness defendant will fall. Just as it is morally repugnant to execute an intellectually disabled defendant, so too is the Eighth Amendment offended by the execution of one, such as Mrs. Montgomery, who is impaired by mental illness, brain injury and the serious psychological aftereffects of trauma.

## XX. MRS. MONTGOMERY'S CAPITAL SENTENCE IS CONSTITUTIONALLY DISPROPORTIONATE; THE IMPOSITION OF THE DEATH SENTENCE UNDER THE CIRCUMSTANCES PRESENTED HERE IS ARBITRARY AND CAPRICIOUS IN VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION

Mrs. Montgomery incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. The facts in support of this claim, among others to be presented after further investigation, discovery, access to subpoena power, and an evidentiary hearing, include the following:

Mrs. Montgomery is the only woman sentenced to death under the Federal Death Penalty Act. Of fourteen reported fetal abduction cases nationwide since 1987, Mrs. Montgomery is the only person to be sentenced to death. Clearly, similarly situated women have not been subjected to a capital sentence. Mrs. Montgomery's sentence is disproportionate in violation of the principles of *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976); Zant v. Stephens, 462 U.S. 862 (1983).

It further appears from a review of these similar cases that the race of the victim played an impermissible role in the charging decision and selection of Mrs. Montgomery for the death penalty in violation of *Gregg*.

Mrs. Montgomery was not sentenced to death because of her crime, but because of the series of professional errors and mistakes made by her dysfunctional and unprepared trial team and the series of constitutional violations which plagued her trial.

Here in violation of the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(a) the sentence of death was influenced by passion, prejudice, and other arbitrary factors as described elsewhere in this motion.

**XXI. IN VIOLATION OF ARTICLE VI, CLAUSE 2 OF THE UNITED STATES CONSTITUTION, THE SUPREMACY CLAUSE WAS VIOLATED WHEN LISA MONTGOMERY'S RIGHTS UNDER TREATIES TO WHICH THE UNITED STATES IS BOUND AND CUSTOMARY INTERNATIONAL LAWS WERE DISREGARDED, INCLUDING HER RIGHTS UNDER TREATIES RATIFIED BY THE UNITED STATES; HER RIGHTS UNDER TREATIES ENTERED INTO AND SIGNED BY THE PRESIDENT OF THE UNITED STATES; AND HER RIGHTS UNDER CUSTOMARY INTERNATIONAL LAW. *SEE UNITED STATES V. BELMONT, 301 U.S. 324 (1937), THE PAQUETE HABANA, 175 U.S. 677, 700 (1900); BREARD V. GREENE, 188 S.CT. 1352, 1355 (1988).***

A. Mrs. Montgomery's death sentence violates the following treaties ratified by the United States:

1. The International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 entered into force Mar. 23, 1976 (ICCPR);
2. The International Convention on the Elimination of All Forms of Racial Discrimination **G.A. res. 2106 (XX), Annex, 20 U.N. GAOR Supp. (No. 14) at 47, U.N. Doc. A/6014 (1966), 660 U.N.T.S. 195, *entered into force* Jan. 4, 1969 ;** and
3. The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. G.A. res. 39/46, annex, 39 U.N. GAOR, 39th Sess., Supp. (No. 51), U.N. Doc. A/39/46 (1984), entered into force June 26, 1987 (Convention against Torture);

B. Mrs. Montgomery's death sentence violates the following treaties entered into and signed by the President of the United States:

1. The American Convention on Human Rights, Nov. 22, 1969;
2. The Convention on the Elimination of All Forms of Discrimination Against Women; and

3. The International Covenant on Economic, Social and Cultural Rights.

C. Mrs. Montgomery's death sentence violates the following customary international laws:

1. The American Declaration of the Rights and Duties of Man; and,

2. The Universal Declaration of Human Rights.

D. Mrs. Montgomery's death sentence violates those rights guaranteed to Mrs. Montgomery through treaties and customary international law that her death sentence violates, include, but are not limited to:

1. the right to life;
2. the right to be free from racial discrimination;
3. the right to be free from gender discrimination;
4. the right to be free from discrimination on the basis of economic status;
5. the right not to be sentenced to death for this crime because it was not sufficiently serious to warrant a sentence of death;
6. the right to not be executed by lethal injection, because death by lethal injection constitutes cruel, inhumane and degrading punishment;
7. the right to a fair and impartial trial;
8. the right to be presumed innocent until proven guilty according to law;
9. the right to detailed notice of the charges against her;
10. the right to adequate time and resources in which to prepare her defense;
11. the right to obtain the attendance of witnesses to testify in her defense;
12. the right to examine witnesses against him;
13. the right to be free of coercion to confess guilt;

14. the right to refrain from testifying against herself;

15. the right to be free from detention while awaiting trial;

16. the right to be tried without undue delay;

17. the right to be free from arbitrary searches;

18. the right to be free from arbitrary detention; and

19. the right to have her detention reviewed by a court without undue delay.

E. The conditions of Ms. Montgomery's confinement on death row, including the length of her confinement on death row, constitute torture, or cruel, inhuman or degrading treatment or punishment in violation of her rights under treaties or international compacts or agreements entered into by the United States; under customary international law; under general principles common to the major legal systems of the world, including peremptory norms or *jus cogens*; under the ICCPR; and/or under the Convention against Torture.

F. Execution of Ms. Montgomery would further violate each of the rights set forth above.

## XXII. MRS. MONTGOMERY'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICAL EFFECTS OF THE ERRORS IN THIS CASE

Mrs. Montgomery's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mrs. Montgomery's guilt and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, and a reliable determination of guilt and penalty, and fundamental fairness. Taylor v. Kentucky, 436 U.S. 478, 487, and n. 15 (1978).

Mrs. Montgomery incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Motion and the exhibits thereto. In addition, Mrs. Montgomery re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mrs. Montgomery of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against her, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Motion individually justifies reversal, when considered cumulatively, these errors denied Mrs. Montgomery her constitutional rights. These constitutional violations warrant the granting of this Motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson, supra*, 507 U.S. 619, 638 n. 9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mrs. Montgomery's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

## CONCLUSION

WHEREFORE, movant Lisa M. Montgomery asks that the Court provide her the following relief:

A. That the Court conduct a status conference and set a schedule for further proceedings related to this Motion, including Movant's Amended Petition to be submitted in accordance with Rule 15(a) of the Federal Rules of Civil Procedure and, thereafter, submission of the government's Answer pursuant to Rule 5 of the Rules Governing 28 U.S.C. §2255 Cases.

B. That the Court permit Mrs. Montgomery to amend this Motion to include further evidence in support of the claims currently pled.

C. That the Court permit Mrs. Montgomery to utilize the process of discovery as contemplated by Rule 6 of the Rules Governing 28 U.S.C. §2255 Cases.

D. That the Court permit Mrs. Montgomery to amend this Motion to include any additional allegations or claims not presently known to her or her counsel which may be identified or uncovered in the course of discovery, additional investigation, and litigation of this Motion, and to allow the amendments to relate back to the date of the filing of this Motion.

E. That Mrs. Montgomery be permitted to file a Traverse to Respondent's Answer, responding to any affirmative defenses raised by Respondent.

F. That Mrs. Montgomery be permitted to file a Memorandum of Law in Support of this Motion in accordance with a schedule established by the Court.

G. That the Court conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion or by Mrs. Montgomery's Traverse to be filed in response to any affirmative defenses raised by Respondent.

H. That the Court permit oral argument on this Motion.

I. That the Court vacate Mrs. Montgomery's conviction and sentence and order a re-trial and/or resentencing hearing be conducted.

J. That the Court grant such further and additional relief as may be just.

Respectfully submitted,

/s/ *Lisa G. Nouri*
LISA M. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

/s/ *Christine M. Blegen*
CHRISTINE M. BLEGEN, Mo. Bar No. 43758
BLEGEN LAW FIRM, LLC
230 SW Main Street, Suite 217
Lee's Summit, MO 64063
(816) 213-0384

/s/ *Kelley J. Henry*
KELLEY J. HENRY, Mo. Bar No. 38849
OFFICE OF THE FEDERAL PUBLIC DEFENDER
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

*Attorneys for Movant Lisa Montgomery*

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Lisa Nouri. I am an attorney licensed to practice in the State of Missouri. I was appointed to represent Lisa M. Montgomery in this post-conviction proceeding. Mrs. Montgomery has authorized me to file the foregoing pleading, a Motion to Vacate, Set Aside, or Correct Sentence, and for a new trial pursuant to 28 U.S.C. §2255 and Rule 33 of the Federal Rules of Criminal Procedure. I am filing this pleading on her behalf.

I declare that the content of the foregoing pleading is true and correct, except for those matters based upon information and belief, and I believe the latter matters to be true. The sources of my information include, but are not limited to, official court records, documents obtained or prepared during the investigation of this pleading, and items in the possession of other lawyers, investigators, or other experts connected with the preparation of this pleading. I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings because these matters are more within my knowledge than Mrs. Montgomery's knowledge.

I declare, under penalty of perjury, that the foregoing verification is true and correct.

/s/ *Lisa G Nouri*

Dated: March 18, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2013, the above-captioned document was served electronically on Roseann Ketchmark and Cynthia Cordes, Assistant United States Attorneys representing the government in this matter, through the Court's CM/ECF filing system.

/s/ *Lisa G. Nouri*