IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY | ) | |
| Movant | ) | |
| | ) | |
| v. | ) | Case Number 12-8001-CV-W-GAF |
| | ) | Criminal Case # 05-6002-CR-SJ-GAF |
| | ) | |
| UNITED STATES | ) | |
| Respondent | ) | |

***STATEMENT OF FREDERICK A. DUCHARDT, JR.***

Now on this 2nd day of September, 2014 comes Frederick A. Duchardt, Jr. and does make his statement, as directed by the Court, "addressing Movant's allegations of ineffective assistance of counsel raised in her Section 2255 Motion" (Doc. 71, 77, 80).

## I. *Introduction*

At the outset of their petition, Current Counsel for Mrs. Montgomery[1]

[1] ~~In this statement, I shall consistently attribute full responsibility for the contents of the amended petition to its authors, Current Counsel for Lisa Montgomery. I take pains to make this distinction because there are serious misrepresentations of fact and law made in the amended petition for which someone, in the future, might be held accountable. Because of my personal experience with Lisa Montgomery, and in light of the sorts of the misrepresentations made in the petition, I am completely confident that Lisa Montgomery IS NOT responsible for these misrepresentations; rather, I believe that her Current Counsel are fully responsible for those misrepresentations. Thus, I take the measures which I do to attribute to Current Counsel, and Current Counsel alone, responsibility for the words they have chosen.~~

put succinctly their indictments against me: that I chose the "exotic and misguided defense of pseudocyesis" rather than "delving more into Mrs. Montgomery's mental illness and brain damage" and that thereby I "failed to tell the true story of Lisa Montgomery's life, her history of abuse, and her mental illness and brain damage" (Doc. 71, p. 5). I respond, in similar summary fashion, that in light of the whole of the testimony actually presented at trial, I believe it is clear that the combined major diagnoses given Lisa by our experts, those being pseudocyesis, major depression, borderline personality disorder and post-traumatic stress disorder (Tr. 2190-92, 2291-92, 2405-07, 2420-23, 2989, 2993-94, 3027-29, 3160), were accurate and appropriate, and neither exotic nor misguided. As my time records reflect, I spent a tremendous amount of time with Lisa Montgomery, and with the lay and expert witnesses, in order to learn and tell "the true story" of Lisa Montgomery. In addition, in reviewing the record again, it seems to me that the true, non-speculative parts of Lisa's "story" were all told, with particular emphasis on the parts concerning Lisa's mental illness and brain damage. The only significant omission was the part of the brain damage story which would have been told by Dr. Ruben Gur, Ph.D. but for Court rulings which prevented that. ***United States v. Montgomery***, 635 F.3d 1074, 1088-1093 (8th Cir. 2011).

~~Over their next 8 pages, Current Counsel for Mrs. Montgomery offer a multifaceted narrative of the events of Mrs. Montgomery's life, without troubling~~

**Formatted:** Body Text, Indent: Left: 0.08", First line: 0.5", Line spacing: Exactly 14.85 pt

**Formatted:** Indent: Left: 0"

to attribute sources for any of the individual parts (Doc. 71, p. 5-13). I would note that most of the specifics of that narrative, and all specifics worthy of credit, can be found in the testimony offered in the defense of Lisa Montgomery at time of trial through a host of lay witnesses, as well as through experts Vilayanur Ramachandran, M.D., Bill Logan, M.D., and Ruth Kuncel Ph.D. Those other specifics of the narrative of Current Counsel for Mrs. Montgomery which were not contained in the presentation at trial were omitted because they were at best highly debatable distractions and at worst completely untrue, with most of the untrue parts vehemently denied by none other than Lisa Montgomery herself.

Formatted: Indent: Left: 0"

Current Counsel for Mrs. Montgomery conclude their introduction narrative by positing that "(a)ll of these stressors combined with centrifical (sic) force with Lisa's mental illness, brain dysfunction and disconnect from reality led to the underlying crime in this case" (Doc. 71, p. 13). Whatever is the point this sentence makes, Current Counsel for Mrs. Montgomery contend I did not make that point, and thereby rendered ineffective assistance of counsel (Doc. 71, p. 13). Current Counsel for Mrs. Montgomery then list "the injustices in this case" which they perceive occurred, to wit

1. "the removal of every woman who was appointed to represent Mrs. Montgomery" (Doc. 71, p. 13);

2. “los[s] as her counsel one of the country’s most successful capital defense lawyers” (Doc. 71, p. 14);
3. “betray[al] by the men who were appointed to represent [Mrs. Montgomery] (presumably including me) because they placed their own interests and egos over the best interests of [Mrs. Montgomery]” (Doc. 71, p. 14);
4. (t)he lawyer ultimately appointed to represent her (presumably me) “unabashedly told untruths to the Court…” and “…eschewed his professional obligations and responsibilities under the ABA Guidelines, ignored the rest of the defense team, adopted an implausible first phase theory without properly investigating it and then ignored the evidence that disputed it, and painted a completely false picture of Lisa Montgomery to the jury and the Court (Doc. 71, p. 14);
5. “Mrs. Montgomery was tried while incompetent” and “sat stoic and flat throughout the trial…creating the impression in the minds of the jury that she was cold and remorseless (Doc. 71, p. 14);
6. The government “overreached” via presentation of “inadmissible” evidence, including “bogus scientific evidence”, and engaged in “improper argument” in addition to making a “charging decision” which “was racially biased” (Doc. 71, p. 14);

7. The jury in the case, through my efforts, "was selected after an incompetent voir dire" with one juror supposedly being removed because of her race (Doc. 71, p. 15).

It is contended that I failed in all of these regards, either directly by what I did or indirectly by way of my failure to properly preserve and raise issues for direct appeal (Doc. 71, p. 14-15). My general response is that the facts and the law fully demonstrate that none of the issues raised has merit. I shall make more particular answer to each accusation in the order in which it is raised in the Petition of Current Counsel for Mrs. Montgomery.

## II. ***Issues related to the removal of Judy Clarke as counsel for Mrs. Montgomery***

### 1. Summary of the issues raised and the facts pertinent thereto, including facts not mentioned in the Petition

Current Counsel for Mrs. Montgomery urge that "the removal of Judy Clarke" was "perhaps the most egregious mistake made in this case" which "deprived Mrs. Montgomery of effective assistance of counsel" (Doc. 71, p. 15, 39). Current Counsel for Mrs. Montgomery also create a subtext theme regarding the "removal of every woman who was appointed to represent Mrs. Montgomery" (Doc. 71, p. 14).

Current Counsel for Mrs. Montgomery note, in support of their subtext, that Assistant Federal Defender Anita Burns and private practitioner Susan Hunt were the original defense team for Lisa, but that Anita withdrew and was replaced by her

immediate supervisor, Dave Owen "with "no thought or discussion…about losing a woman on the team or what impact the removal of one of her attorneys might have on Mrs. Montgomery" (Doc. 71, p. 16). It should be noted that, after making this point, Current Counsel for Mrs. Montgomery never link it to any allegation regarding violation of constitutional or statutory law.

Returning to their main theme, Current Counsel for Mrs. Montgomery explain the process by which Susan and Dave decided to involve Judy Clarke in the defense team, noting the basic need for Judy, a California attorney, to be sponsored by Dave in order to be allowed to practice *pro hac vice* before the Western District of Missouri Federal District Court (Doc. 71, p. 16-17).

Judy Clarke's entry into the Montgomery defense team is cast by Current Counsel for Mrs. Montgomery in glowing, even reverent, terms touting Judy's experience, her prior success complete with press clippings, her having at her disposal a cadre of experienced helpers, and her bringing with her all the right stuff to develop a good relationship with Mrs. Montgomery (Doc. 71, p. 17-18, 55). Without as much fanfare, there are also details given which lowlight the skills which Judy was lacking, those being tact, diplomacy and the ability to effect policy and solutions from a secondary position in a hierarchy (Doc. 71, p. 18-22). This part of the Petition is written in a fashion worthy of inclusion in any good tabloid

article, purporting[2] details of cruel words and actions passed between Dave and Judy (Doc. 71, p. 19-20), and Dave and Susan (Doc. 71, p. 20), and the investigators for Dave and Judy (Doc. 71, p. 20), and the estrangements and backbiting which followed (Doc. 71, p. 19-20, 31-34). Particularly revealing is the gender role reversal between Judy and Dave, with his feelings being hurt by her directness, and her making a ham handed apology to the effect that, even though she was absolutely right in dressing him down, in public no less, she was sorry he took offense at her directness (Doc. 71, p. 20) Then, the clearly self-serving accounts of the fouls by the three players are twisted together, and peppered with a goodly amount of innuendo and surmise, in an effort to lay blame, not upon the three players who committed childish fouls against one another, but rather upon the referees trying to sort the mess out, those being then Federal Public Defender Ray Conrad[3] and Judge Gary Fenner (Doc. 71, p. 20-21, 28-29).

It is correctly accounted that the ultimate arbiter, Judge Fenner, chose to terminate Judy because of his ongoing questions about whether expenditure of her time as a government employee was "necessary" in light of her being the third counsel appointed when only two counsel were called for by statute (Doc. 71, p. 23-24; 05-6002 Doc. 79). It is also correctly accounted that, because of failures by

[2] There is heavy reliance upon impressions of third parties about the combatants (20, 49)

[3] Mr. Conrad has since retired from that position.

~~Dave and Susan, Mrs. Montgomery was given no prior or concurrent notice about the termination of Judy Clarke, and learned about the matter only because Judge Fenner took it upon himself to have Mrs. Montgomery brought to Court the very next day so that he could himself, and in person, explain things to her (Doc. 71, p. 23-24)[4]. Account is made that, when given further time, Lisa Montgomery herself was better able to articulate her own objections to the Judy termination, and that those objections were entertained and considered by Judge Fenner (Doc. 71, p. 34-36). Account is given, as well, to the personal decision made by Susan Hunt to voluntarily withdraw from the case (Doc. 71, p. 36-38).~~

~~It is also claimed that, at the time that she was removed, Judy Clarke was in full swing fulfilling the role of preparing a mental health defense for the case in that she "had sent out two expert contracts" to, a neuropsychologist, Dean Delis, Ph.D., and a psychiatrist, Judith Herman, M.D. (Doc. 71, p. 26, fn. 3).~~ It is ~~purported by current Counsel for Mrs. Montgomery that these representations~~

[4] ~~Current Counsel for Mrs. Montgomery raise gratuitous and truly befuddling questions over Public Defender investigator Ron Ninemire's truthfulness regarding his representations that Mrs. Montgomery, when first informed about Judy Clarke's removal, expressed general, but not specific, upset over it (Doc. 71, p.~~

~~25). Current Counsel for Mrs. Montgomery brand Ron a liar with support~~

**Formatted:** Indent: Left: 0.08", First line: 0.5", Right: 0.15", Space Before: 1 pt, Line spacing: Double

~~only from Mrs. Montgomery's generalized perception that she had been lied to by someone (Doc. 71, p. 27, fn. 4). There is no explanation given about how Ron can be seen as anything more than unwitting in the machinations of the attorneys, something about which Ron expressed understandable anger at Dave Owen, Ron's coworker at the Federal Public Defender's Office, for Dave's role in the ordeal (Doc. 71, p. 31). Using pejorative language against Ron on such flimsy grounds seems to undercut the credibility of Current Counsel for Mrs. Montgomery.~~

about expert preparation are supported by the say-sos by Judy Clarke and me (Doc. 71, p. 26, fn. 3). Actually, my contrary recollections are correctly accounted in the affidavit of the investigator for Current Counsel for Mrs. Montgomery, that until I read Judy's 2013 affidavit, all information which I had received indicated was that in the six months Judy was on the case, there were no experts who had been identified, much less enlisted, by Judy (Ex. 19, p. 2). To be more specific, no one ever mentioned the names of Dean Delis or Judith Hermann to me. Even in her 2013 affidavit, Judy never mentions anything about "contracts", instead indicating that she had "contact" with Delis and Hermann (Ex. 3, p. 10).

Susan Hunt, for her part, has represented that "Judy Clarke had just hired trauma expert Judith Hermann and Neuropsych Delis before she was removed from the case" (Ex 1, p. 8). However, it seems that Susan's choice of wording that "Judy" had "hired" would be inapt since Susan also has made clear that Dave Owen, and not Judy, "controlled the purse strings" (Ex. 1, p. 6, 7). Susan also does not mention bringing Hermann and Delis to my attention (Ex. 1). Actually, Susan indicates that I did not ever call her to discuss the case (Ex. 1, p. 13). To the contrary, my time and phone records show that on the first day that I started work on the case, May 16, 2006, I had a phone conference with Susan lasting 0.4 hours. My records also reflect that, on July 11, 2006, I engaged in e-mail communication

with Susan. My records further reflect that, on July 13, 2006, Susan participated in

the phone conference between me and Judy, and that phone conference lasted 0.7 hours. What is more, my records reflect that, on August 30, 2006, I spoke with Susan over the phone about discovery issues. And, my file contains a letter from Susan, dated September 5, 2006, which describes Susan providing to me a copy of the database about the case which she had put together and which I had requested from her. Susan never mentioned Hermann or Delis in any of the communications I had with her about the case, and Hermann and Delis are not mentioned in Susan's database. ~~From all of this, I conclude that, in 2006, Susan knew little or nothing about Hermann and Delis and assumed that the person who actually had knowledge about these experts, Judy, would pass along to me herself whatever information about those two which she, Judy, deemed important.~~

~~I have once again searched the data base for the Montgomery case, and I have once again found no reference of any kind to either of Hermann or Delis. I have also asked that Laine Cardarella, current Federal Public Defender for the Western District of Missouri, search all of that office's financial records, which were not included in the database, in an effort to find any reference to a "contract" or anything else of a financial nature for Dean Delis or Judith Herman. On August 29, 2014, I was informed, for the first time, that a search of the Federal Public Defender Office's separate financial records for 2006 show that, in April of 2006, monies were allotted for Dean Delis and for Judith Herman. The records also~~

show that no money was spent on Delis and only about $400 was spent on Hermann .

Since Judy has given her word that she had "contact" with these two people prior to termination of her appointment (Ex. 3, p. 10-11), and in light of the financial records unearthed by the Federal Public Defender, I am comfortable trusting Judy's representation. However, I find strong reasons to believe that whatever "contact" there was accounted for very little in Judy's own estimation, and therefore mattered little to the Montgomery defense. I conclude so because there is no sign of Judy's contact with these experts in any of the materials related to the case, that is in the database. Moreover, Judy never brought these names to my attention in my phone conversations with her[5], and Judy has made no representation that she shared any work product with respect to these experts with Lisa, with me or with anyone else associated with the team who eventually would try Lisa's case (Ex. 3, p. 10).

Had Judy perceived information about Delis and Hermann to have any significance, Judy's failure to share such information would have been especially troubling for two reasons. First, Judy acknowledges that, at that time, her government job was "Capital Resource Counsel" and her job duties were to "provide assistance to appointed counsel, both CJA and federal defenders, and

[5] According to my phone records, these phone calls, occurring on May 16, 2006 and July 13, 2006, totaled some 1.3 hours.

~~defense teams in federal capital cases" (Ex. 3, p. 2). It would certainly seem that such assistance to Lisa's defense team, whoever might constitute that team, would necessarily include Judy sharing the names and contact information for experts she had identified for purposes of trial. Second, and even more importantly, Judy unequivocally represents that, at the time she generated this work on experts, she was acting as *pro hac vice* counsel for Lisa (Ex. 3, p. 10). Under any reasonable definition of the term, work product would be the proper description of Judy's identification of any significant experts, and Lisa Montgomery and her defense team were entitled to have that from Judy if it existed. Thus, my only explanation for Judy failing to provide information about Delis and Hermann to me and the rest of the Montgomery defense team is that she perceived whatever she had produced to that point to be unimportant.~~

Current Counsel for Mrs. Montgomery contend that I "incredibly…was unaware" of contracting of services with Hermann and Delis (Doc. 71, p. 70). Since I was led to believe there had been no experts enlisted, since there was nothing in the database referring to Hermann or Delis, and because Clarke and Hunt saw fit to not breathe a word about the two to Lisa Montgomery's trial defense team, my lack of contact with these folks would seem to be completely understandable. ~~More importantly, had current Counsel for Mrs. Montgomery believed that Dr. Hermann and Dr. Delis would have been worthwhile experts in~~

this case, they could have established the premise by choosing them to conduct evaluations and make reports for them. Since current Counsel for Mrs.

Montgomery saw fit to not enlist the services of these experts during their workup of their amended motion, and instead hired others, there is no way to know whether these experts would have been better than, worse than, or the same as the experts actually used by me in the case.

There are a couple of other critical facts from the record which are not brought out by Current Counsel for Mrs. Montgomery. For instance, even though Judy Clarke was part of the defense team for more than six months, from October of 2005 to April of 2006, she did not file one motion in the case, and did not leave behind any work product related to preparation of any motion. Moreover, though the members of Judy's defense team are described in glowing terms in the Petition, there is no sign in the database of any work produced by them in the six months that they and Judy were on the job. It is brought out by Current Counsel for Mrs. Montgomery that those who were brought into Mrs. Montgomery's defense team by Judy Clarke felt more loyalty to attorney Clarke than to client Montgomery, and therefore withdrew from service to Mrs. Montgomery once Clarke was no longer in the picture (Tr. 71, p. 25, 30). The obvious questions about the actual value of such fair weather workers to a Montgomery defense team are not noted by Current Counsel for Mrs. Montgomery.

Apparently not conceiving that the facts as they themselves accounted them were reason enough for Judge Fenner to have removed any or all of the three co-counsel, Current Counsel for Mrs. Montgomery, in somewhat afterthought fashion, speculate that Judge Fenner was somehow "eager" to remove Clarke from the case (Doc. 71, p. 46), and that Owen and Conrad perpetrated a "fraud" on the Court by advocating for removal of Clarke (Doc. 71, p. 47). As Current Counsel for Mrs. Montgomery speculate it, though they do not know what was said to Judge Fenner by Owen and Conrad at the time Clarke was removed, "whatever was said was apparently serious enough" (Doc. 71, p. 47-48). Selectively drawing from certain statements by Judge Fenner, Current Counsel for Mrs. Montgomery accuse Conrad and Owen of claiming that Clarke was only brought on the defense team to work out a plea agreement, and turned out to be obstructive, unproductive, and abusive (Doc. 71, p. 48, 53). Current Counsel for Mrs. Montgomery note that Judge Fenner himself has debunked such speculation about the words of Owen and Conrad, explaining that he understood that Clarke's anticipated role went beyond negotiation of a plea, that the choice of words about Clarke being unproductive "were my words" and "were not the words of Mr. Owen or Mr. Conrad" and that the impression of lack of productivity owed to "the conflict that existed between counsel, and I think that's rather obvious in the record" (Doc. 71, p. 51; Doc. 53, p. 3). Undaunted by a direct "no", Current Counsel for Mrs. Montgomery persist that

something "must have been said" (Doc. 71, p. 51-52). Current Counsel for Mrs. Montgomery mate this speculation with further speculation that Owen "did not want to take direction from a woman (Ms. Clarke) who he described as 'emasculating'" (Doc. 71, p. 52). These speculations lead Current Counsel to conclude that Owen must have had an actual, personal conflict of interest against Lisa Montgomery, and that that conflict can be imputed, in some unexplained fashion, to Conrad (Doc. 71, p. 52, 54).

This mess is then laid at my feet, as I am accused of ineffectiveness for my choices to not raise formal objection and appeal over what happened (Doc. 71, p. 52, 56).[6] It is correctly accounted that I researched the issues at the time I learned about them, that in light my research I concluded that the issue had no merit, and that I prepared a memo to the file in those regards (Doc. 71, p. 56-57; Ex. 10).

Though it is not mentioned in the Petition, I also developed, accounted in my memo, and shared with Judy Clarke, a strategy whereby Judy could actually return to the defense team in keeping with the prevailing law upon the subject; Judy could

[6] Current Counsel for Mrs. Montgomery perceive that "because the litigation was being funded by the FPD, the trial team (including John and me) had a "conflict of interest barring" development of a claim against Owen and Conrad (Doc. 71, p. 56), and that I could be held accountable for failure to raise this issue only after the Federal Public Defender Office left the defense team upon appeal (Doc. 71, p. 56, 58). While I think there is nothing in the law "barring" an attorney from addressing a conflict of interest whenever he finds one, I do not address this since there was never, at any point, a legitimate legal issue regarding conflict to raise.

~~become licensed to practice in the Western District of Missouri and then, in keeping with the just-announced teachings of ***United States v. Gonzalez-Lopez***, she could enter an appearance as Counsel for Lisa Montgomery, without the need for, and problems associated with, Court appointment of her (Ex. 10). In my memo, drafted a few days after my last phone conversation with Judy, I described my conversation with Judy along these lines, and her rejection of the proposal. In her 2013 affidavit, Judy claimed to have "no memory of Mr. Duchardt suggesting to me that I should become a member of the Western District of Missouri Bar and enter my appearance as volunteer counsel" and goes further to assert that "I do not believe that Mr. Duchardt ever made that suggestion." (Ex. 3, p. 9). Putting things simply in reply, I have not only my past recollection recorded of the matter, I also have an independent current recollection that things happened between Judy and me precisely as I described them in my memo.~~

Current Counsel for Mrs. Montgomery conclude by claiming that only Judy Clarke developed a trusting relationship with Lisa Montgomery, that Lisa's trust in Dave Owen and the Federal Public Defender Office was irretrievably broken by the removal of Judy, that I never developed a relationship of trust with Lisa, and that therefore Lisa's trial team "never learned critical details about Mrs. Montgomery's life history and mental illness" (Tr. 71, p. 59). Current Counsel support their lack-of-trust claims against me and the rest of the trial team only with

my representations, made at a pretrial conference some six months before trial, that developing trust with Lisa had been an uphill climb after the Clarke removal (Tr. 71, p. 59). What I also made clear at that pretrial conference, and what Current Counsel for Mrs. Montgomery note later in their petition, and what was certainly the case, was that despite the problems over the Judy Clarke matter, thanks to Lisa Montgomery's kind, generous and forgiving nature, John and I were able to gain Lisa's trust and confidence, and the Federal PD crew were able to regain the trust and confidence from Lisa which they previously enjoyed (Doc. 71, p. 157; 4/3/07 Pretrial Conf. Tr. 12-13). That Lisa favored me with her trust and confidence is confirmed in dozens of letters to me over the years that I represented her at trial and upon appeal. All of those letters are contained in the files which I provided to Current Counsel for Mrs. Montgomery, and stand in stark contrast to this accusation regarding lack of trust, but are not mentioned by Current Counsel for Mrs. Montgomery.

~~2. Current Counsel for Mrs. Montgomery cannot shoehorn this size 10 foot of an appointed counsel matter into the size 5 slipper of a retained counsel issue~~

2. Current Counsel for Mrs. Montgomery first claim that I erred in refusing to argue that the holding by the Supreme Court in ***United States v. Gonzalez-Lopez***, 548 U.S. 140, 144 (2006) prohibited removal of Judy Clarke since Clarke was the attorney wanted by Lisa Montgomery and because Clarke was, in the estimation of
Current Counsel for Mrs. Montgomery, an attorney of the sort, as meant by the

**Formatted:** Left, Indent: First line: 0", Right: 0.37", Space Before: 0.3 pt, Line spacing: single, Numbered + Level: 3 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0" + Indent at: 0.15", Tab stops: 0.23", Left

words of the ***Gonzalez-Lopez*** opinion, "willing to represent the defendant even though he is without funds" (Doc. 71, p. 42-43, 56). I researched this issue in 2006, and found it wanting (Ex. 10). ~~I have further researched it now, and still find it wanting.~~

~~In ***United States v. Gonzalez-Lopez***, 144-150, Justice Scalia, speaking for a five Justice majority, made clear that structural error, obviating the need to show prejudice, occurs when a defendant, "who does not require appointed counsel", is denied the right to "choose who will represent him". Current Counsel for Mrs. Montgomery see a loophole in the language chosen by Justice Scalia, that "the Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds (emphasis added)." ***United States v. Gonzalez-Lopez***, 144. As Current Counsel for Mrs. Montgomery and Judy Clarke see it, since Judy Clarke and her San Diego Public Defender Office were "willing to represent the defendant", removal of Clarke should qualify for treatment as a ***Gonzalez-Lopez*** choice of counsel matter (Doc. 71, p. 34, 56). The trouble is that such reasoning turns a blind eye to the obvious, that service by then Public Defender Judy Clarke and her Public Defender Office required Court appointment. Justice Scalia put in no uncertain terms that "the right to counsel of choice does not extend to defendants who require counsel to be~~

appointed for them." ***United States v. Gonzalez-Lopez***, 152. In the years since the ***Gonzalez-Lopez*** opinion was handed down, those Courts who have actually been called upon to address directly the very issue raised by Current Counsel for Mrs. Montgomery have found that appointed counsel situations do not implicate such choice of counsel issues. ***Whitney v. State***, 396 S.W.3d 696, 699 -701 (Tex.App.–Fort Worth,2013); ***State v. Sanchez***, 288 P.3d 351, 362 - 364 (Wash.App. Div. 3,2012); ***People v. Noriega***, 229 P.3d 1, 4-5, 108 Cal.Rptr.3d 74, 77 – 79 (Cal. 2010).

The only way ***Gonzalez-Lopez*** could have been made to apply in Lisa Montgomery's case was in the way I had suggested in July of 2006, with Judy Clarke actually being willing to become qualified for admission to the Bar of the Western District of Missouri and to then enter her appearance without invoking the appointment powers of the Court (Ex. 10). In her affidavit, Judy essentially reiterated what she told me over the telephone in July of 2006, that "there was simply no way for me to just enter my appearance in the District Court as volunteer counsel" (Ex. 3, p. 9). Since Judy was unwilling and/or unable to take the steps of becoming qualified and entering an appearance, ***Gonzalez-Lopez*** did not apply.

3. The removal process provided all that Lisa Montgomery was due under the law and the facts

In the alternative to their ***Gonzalez-Lopez*** argument, Current Counsel for Mrs. Montgomery claim that Judge Fenner exceeded his authority in removing Judy Clarke, and that I was ineffective in failing to raise that issue.

Current Counsel for Mrs. Montgomery start this portion of their argument by citing to the 18 U.S.C. 3005 requirement about capital case appointed counsel needing to be "learned in the law applicable to capital cases" (Doc. 71, p. 39). However, Current Counsel for Mrs. Montgomery do not take heed of two other provisions of that statute which strongly support Judge Fenner's actions in removing Clarke: the part calling for appointment of two counsel, not three, and the further admonition in the statute that "(i)n assigning counsel under this section, the court shall (emphasis added) consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts." Thus, Judge Fenner paring down the appointed counsel roster from three to two, and considering the local Public Defender's input in so doing, took steps in keeping with, not contrary to, the dictates of 18 U.S.C. 3005.

Current Counsel for Mrs. Montgomery go on that, once Judy Clarke was appointed to represent Lisa Montgomery pursuant to 18 U.S.C. 3599(e), that statute "became controlling" and "prohibited Judge Fenner from *sua sponte* removing Ms. Clarke" (Doc. 71, p. 40). The trouble with this argument is that

Judy Clarke was never appointed to represent Lisa Montgomery pursuant to 18 U.S.C. 3599(e). All attorneys of the Office of the Federal Public Defender, specifically including Ray Conrad and Dave Owen, were appointed (05-6002, Doc. 8). Susan Hunt was appointed as "additional counsel" (05-6002, Doc. 16). On the other hand, for Judy Clarke, Dave Owen filed a form petition for her admission, *pro hac vice*, to the bar of the Court (05-6002, Doc. 63), and that motion was granted upon docket entry by the Clerk of the Court without any action whatsoever on the part of Judge Fenner. There is no indication that Judy ever sought or obtained appointment by Judge Fenner pursuant to 3599. In fact, as already noted above, there appears not one filing in the case, ever, by Judy Clarke. Even if it could be argued, against the facts, that Judy somehow was "appointed", 3599(e) seems to apply only to the first two attorneys as appointed under 3599(b) and (d), as an apparent means to avoid reduction of the number of attorneys below the two required under 18 U.S.C. 3005. Therefore, if 18 U.S.C. 3599(e) controls, as argued by Current Counsel for Mrs. Montgomery, that aids their argument not one bit.

Current Counsel for Mrs. Montgomery go on "that once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." (Doc. 71, p. 40). ***Harling v.***

***United States***, 387 A.2d 1101, 1105 (D.C.App. 1978); ***Stearnes v. Clinton***, 780 S.W.2d 216, 221 (Tx.Ct.Crim.App.banc 1989). Assuming, for the sake of their argument that *pro hac vice* admission is akin to appointment, Current Counsel for Mrs. Montgomery wish to take the point of the ***Harling*** and ***Stearnes*** cases one step further (Doc. 71, p. 41-42), urging that should there be a revocation of *pro hac vice* status, there is an entitlement for both client Lisa Montgomery and attorney Judy Clarke to be heard on the matter. ***Johnson v. Trueblood***, 629 F.2d 302 (3rd Cir. 1980) (Doc. 71, p. 41). As the Third Circuit has put it, "…some type of notice and an opportunity to respond are necessary when a district court seeks to revoke an attorney's *pro hac vice* status" and at minimum "the attorney should be notified of two things: the conduct of the attorney that is the subject of the inquiry, and the specific reason this conduct may justify revocation." ***Johnson v. Trueblood***, 303-304. Two other Circuits have registered their agreement on the subject ***Belue v. Leventhal***, 640 F.3d 567, 576-577 (4th Cir. 2011); ***Kirkland v. National Mortgage Network, Inc.***, 885 F.2d 1367, 1371-72 (11th Cir. 1989).

The counterpoints to this argument are that Lisa Montgomery apparently received four different hearings on the matter from Judge Fenner on April 21, 2006, April 25, 2006, May 3, 2006 and May 6, 2006, and that those hearings would appear to have met the demands of due process for Mrs. Montgomery, especially since a "full scale" hearing on such a matter is not deemed to be necessary.

***Johnson v. Trueblood***, 304; ***United States v. Holland***, 66 F.3d 339, *3 (10th Cir. 1995); ***Lasar v. Ford Motor Co.***, 399 F.3d 1101, 1112-1113 (9th Cir. 2005). It is certainly true that Judy Clarke never received a hearing upon the matter. However, Judy did not seek such a hearing in the fashion in which counsel did in ***Johnson v. Trueblood***, 303. Consequently, it is likely that whatever rights which Judy had were waived by her failure to pursue her rights to hearing in the fashion which counsel did in ***Johnson v. Trueblood***, supra.

Relying on a what they purport is a valid Fifth Circuit holding, Current Counsel for Mrs. Montgomery claim that not only was a hearing required, but that a finding of "good cause" such as a "conflict of interest or a complete breakdown in communication" had to be made prior to a removal of Clarke (Doc. 71, p. 44). What Current Counsel for Mrs. Montgomery do not note is that the case they cite, ***United States v. Mason***, 668 F.3d 203, 213 (5th Cir. 2012), was later withdrawn by the Fifth Circuit and substituted with an opinion in which the term "good cause" appears nowhere in the text. ***United States v. Mason***, 480 Fed.Appx. 329, 330 (5th Cir. 2012). Current Counsel for Mrs. Montgomery also do not note that, even the withdrawn opinion which they cite was strictly limited by the facts that the opinion was addressed just to situations which would justify a defendant to request replacement of his counsel, and even at that was hounded by a vigorous dissent. ***United States v. Mason***, 668 F.3d 203, 217.

~~Even if there was a good cause requirement, as argued by Current Counsel for Mrs. Montgomery, the record in the case, especially as now amplified by the record made by Current Counsel this 2255 proceeding, fully supports the actions which Judge Fenner took. As noted already above, Judge Fenner would have had to look no further than his docket sheet to see that Judy Clarke had not one docket entry to show for her six months on the job. Judy could have argued, as financial records now confirm, that she had, literally just a few days before her removal, done some work of identifying two experts. However, it is likely at hearing that Judy would have had to admit, as she has now in her affidavit, her shortcomings in tact and in working in a secondary position in a hierarchy (Ex. 3). It would certainly seem that Judy Clarke's actions and inactions in this case more than justified her removal, her press clippings notwithstanding.~~

4.Any personal conflict between Owen and Clarke did not rise to the level of an actionable conflict between Owen and Montgomery

Current Counsel for Mrs. Montgomery further venture that Dave Owen "was acting under a conflict of interest which actually affected his representation of Mrs. Montgomery", ~~supporting that claim with only one supposedly untoward act by Owen, that he moved to have Clarke removed~~ (Doc. 71, p. 55). ~~On this basis, Current Counsel for Mrs. Montgomery proclaim that "the automatic reversal rule of **_Cronic_** applies" (Doc. 71, p. 55).~~



Case 4:12-cv-08001-GAF Document 131-1 Filed 09/26/14 Page 26 of 109

Current Counsel for Mrs. Montgomery obviously misperceive the teachings of the case they cite. In ***United States v. Cronic***, 466 U.S. 648, 660-667 (1984), a unanimous Supreme Court, confronted with obvious inferences of failures by a neophyte defense attorney in a terribly complex case, still refused to act on the obvious inferences of ineffectiveness inherent in such a situation, and remanded for necessary, specific findings of failures and prejudice warranting relief. It is impossible to see how the holding of the high Court in ***Cronic*** would in any way require "automatic reversal" upon the bare assertion, in this case, that Owen was instrumental in the removal of Clarke, especially since, as noted above, there was ample justification for Clarke's removal independent of anything Owen may have said or done.

Formatted: Indent: Left: 0.08", Right: 0.09", Space Before: 3.15 pt

Current Counsel for Mrs. Montgomery go on that "the rule" from Supreme Court holdings in "***Cuyler v. Sullivan***" and "***Mickens***, supra, applies and reversal of Mrs. Montgomery's conviction and sentence is required" (Doc. 71, p. 55).

Formatted: Left, Indent: Left: 0.08", Right: 0.09", Space Before: 3.15 pt

Current Counsel for Mrs. Montgomery also claim to have support for their arguments from "***Holloway v. Arkansas***" (Doc. 71, p. 52). However, once again, the cited cases do not stand for the propositions purported by Current Counsel for Mrs. Montgomery.

In the earliest of these cases, ***Holloway v. Arkansas***, 435 U.S. 475, 478-480, 488, 490 (1978), the Supreme Court confronted a situation dripping with potential

Formatted: Indent: Left: 0.08", Right: 0.09", Space Before: 3.15 pt

conflict, that is counsel representing all three of jointly tried codefendants; the Court reversed because the record made at time of trial established not only that counsel informed the Court regarding his perception of an actual conflict, but also that the perceived conflict actually played out when counsel was prevented from serving the interests of certain of his clients by being stopped by the trial court from impeaching the testimony of others of his clients.

In ***Cuyler v. Sullivan***, 446 U.S. 335, 337 (1980), the Supreme Court confronted yet another situation involving counsel representing all three of jointly tried codefendants. However, there was no ***Holloway*** type showing of actual prejudice; this led the Court to make clear that even representation of multiple codefendants is not, *per se*, an actual conflict impacting upon effective representation, and that inquiry must be made, and substantial proof must be provided to justify finding of an actual conflict. ***Cuyler v. Sullivan***, 349-350.

Finally, in ***Mickens v. Taylor***, 535 U.S.162, 164-165 (2002), one of Mickens' murder case trial counsel arguably had a conflict of interest because that counsel was actively engaged in representing the alleged victim on an unrelated matter at the time that the murder occurred. In that case, Mickens conceded that he could not prove prejudice from whatever conflict existed, but urged reversal because no inquiry about the conflict had been made as counseled for in ***Cuyler v. Sullivan*** and in ***Wood v. Georgia***, 450 U.S. 261, 272-273 (1981). ***Mickens v.***

Formatted: Right: 0.09", Space Before: 3.15 pt

Formatted: Indent: Left: 0.08", Right: 0.09", Space Before: 3.15 pt

***Taylor***, 169-172. The Supreme Court went on to make crystal clear that its previous rulings in ***Holloway*** and ***Sullivan*** should not be read as obviating the need for proof of prejudice in any and all cases of conflict. ***Mickens v. Taylor***, 176.

Though Current Counsel for Mrs. Montgomery do not cite to case law actually related to potential conflicts raised by the personal interest of an attorney, holdings in those particular regards make clear that, while personal interests of an attorney can, in some instances, rise to the level of an actionable conflict of interest with the client, it is incumbent upon client to show that the interests of the attorney actually conflicted with the interests of the client and that some sort of deficient performance by the attorney was attributable to the purported conflict. ***United States v. Hearst***, 638 F.2d 1190, 1193-1194 (9th Cir. 1980) (attorney's book deal about client's case not shown to impact decisions made at client's trial); ***Garcia v. Brunnell***, 33. F.3d 1193, 1198-1199 (9th Cir. 1994) (attorney's anticipated move to prosecutor's office not shown to impact decisions made at client's trial); ***United States v. Michaud***, 925 F.2d 37, 41-42 (1st Cir. 1991) (attorney teaching course to IRS agents not shown to conflict with duties to tax fraud client); ***United States v.***

***Sayan***, 958 F.2d 55, 64-65 (D.C.Cir. 1992) (claim that trial attorney failed to seek continuance only to curry favor with trial judge attorney not borne out by the record).

**Formatted:** Right: 0.09", Space Before: 3.15 pt, Line spacing: Double

**Formatted:** Indent: First line: 0.5", Right: 0.09", Space Before: 3.15 pt

Current Counsel for Mrs. Montgomery have an easy time proving that there was a big conflict between Dave Owen and Judy Clarke, and that Dave brought that conflict to the attention of Judge Fenner. However, under the law, that is not what needs be proven. Rather, the question is whether Dave's animosity toward Judy caused him to act in his own interests in a way contrary to the interests of Lisa Montgomery, his client. For this proposition, there is no proof, just rank speculation.

Because the problems between Dave and Judy were as monumental as they were, it would be impossible to legitimately argue that bringing the conflict to Judge Fenner's intention was anything but the right thing to do. Though there is no verbatim record regarding what was said to Judge Fenner by Dave Owen and Ray Conrad, Judge Fenner has made clear that the untoward points suspicioned by Current Counsel for Mrs. Montgomery were not said by Owen or Conrad, and that he (Judge Fenner) came to his negative conclusions about Clarke on his own.

Thus, the record makes clear that the complained-of result of Clarke's removal was caused by Judge Fenner's conclusions regarding the situation, and not through the efforts of Owen.

Even if the baseless speculation about Owen could be entertained despite Judge Fenner's contrary pronouncement, that still does not help Current Counsel for Mrs. Montgomery. Current Counsel for Mrs. Montgomery lavish starry-eyed,

Formatted: Right: 0.09", Space Before: 3.15 pt

Formatted: Indent: First line: 0.5", Right: 0.09", Space Before: 3.15 pt

Formatted: Right: 0.09", Space Before: 3.15 pt

hero worship for Judy Clarke's past accomplishments, and engage in speculation on how well Clarke might have done in this case if given more time. However, Counsel never come to grips with the record of events which confronted Owen and Conrad, and then Judge Fenner, that in Judy Clarke's first six months on the job, she was "unproductive" with really nothing in the record to show for her time on the job save for ruffling the feathers of her co-workers.

5.Conclusion

As noted above, in 2006 I researched these issues, and found them to lack factual and legal substance. Now that I have revisited these issues in light of the suggestions made by Current Counsel for Mrs. Montgomery, I believe that my original conclusions on the matter are supported and reinforced. It is because these issues lack substance, and indeed seem spurious, that I chose not to raise them while I was representing Lisa Montgomery.

## III. ***Miscellaneous allegations of ineffective assistance of counsel***

Beginning at page 59 of their amended petition, Current Counsel for Mrs. Montgomery set forth a stream-of-consciousness narrative regarding errors they perceive committed by me and others on the Montgomery defense trial and appeal teams. The scattergun style of organization and heavy doses of repetition of points to gain effect make it challenging to present a cogent response. I note that, in my

estimation, there are several matters raised which do not seem to contain claims of ineffectiveness of counsel. Those are allegations regarding

1. grand jury makeup gender and race problems (204)

2. racial bias in administration of death penalty process (225)

3. problems with Lisa Montgomery's execution on mental health grounds (228)

4. the unconstitutionality of the Federal Death Penalty Act (230)

5. international law violations wrought by the Federal Death Penalty Act (231). Because I do not detect claims of ineffectiveness of counsel in any of these points, and since I have been directed by the Court only to address allegations of ineffectiveness of counsel, I have not responded to any of these issues. As to the remaining issues raised, in order to assist any reader of this statement, I have organized what I was given into what I perceive to be the themes of ineffectiveness alleged in the petition, and I shall respond to those as follows.

Formatted: Indent: First line: 0.5", Right: 0.12", Space Before: 3.15 pt

Formatted: Indent: Left: 0.08", First line: 0.5", Right: 0.12", Space Before: 3.15 pt, Line spacing: Double, No bullets or numbering, Tab stops: Not at 0.58"

1.Failure to engender loyalty from certain of the Montgomery defense team

Current Counsel for Mrs. Montgomery note that, in the aftermath of our trial, certain members of our defense team have tried to distance themselves from responsibility for the work which we engaged at trial. Attorney Dave Owen apparently expressed during trial, to persons outside the defense team, the opinion that the penalty phase defense we offered at trial did not tell Lisa Montgomery's

"story" (Doc. 71, p. 91). Mitigation specialist Dani Waller has termed her experience on the team "frustrating" and allegations have been made on her behalf that she was somehow "iced out" of case preparation (Doc. 71, p. 71, 140, 150).

Psychiatrist Bill Logan has run the other direction from the pseudocyesis diagnosis relied upon at trial, calling it a product of my “sophomore’s disease”, and complaining that I somehow prevented him from addressing Lisa Montgomery’s characterological problems (Doc. 71, p. 74)

~~Confronted with all of this, I am reminded of the words of President John Kennedy in accepting responsibility for the failed Bay of Pigs invasion, that “victory has 100 fathers, but defeat is an orphan.” Current Counsel for Mrs. Montgomery rightly remind of what I told the jury in our penalty phase opening, that I take full, personal responsibility for not having been convincing enough regarding the defenses offered in Lisa Montgomery’s trial (Doc. 71, p. 91). I reaffirm that sentiment now.~~

However, it is well to remind all three of Dave, Dani and Bill of the parts they played in the defense which was presented. Whatever Dave may have expressed to others, he never voiced misgivings to John or me regarding our strategy, and I perceived that he worked hard in furtherance of that strategy. As for Dani~~, one needs look no farther than financial records to see how very much she was involved in Montgomery case preparation, to the tune of more than $85,000.00 in payments for what she described in her timesheets as extensive work on the case.~~ And Bill~~, for his part, surely is not saying under oath that a lawyer like me can dictate his opinions; besides, he~~ not only owned under oath the pseudocyesis

diagnosis, but also was afforded and took full opportunity in his testimony to describe that diagnosis along with other, concomitant mental health frailties which he found (Tr. 2405-07, 2420-23, 2989, 2993-2994). I am proud, even if these folks may no longer be, of the efforts which they mustered forth on Lisa Montgomery's behalf.

2.Allegations that our defense team did not function as well as the Clarke/Hunt team and did not investigate Lisa Montgomery's background in the thorough fashion in which we should have

According to Current Counsel for Mrs. Montgomery, there was "devolution in the quality of (Mrs. Montgomery's) representation after Ms. Clarke and Ms. Hunt were removed from the case" (Doc. 71, p. 60-61). ~~This point would seem indefensible in light of the meagre work product produced during the tenure of Clarke and Hunt.~~

~~Nevertheless, Current Counsel go on to paint in the broadest of strokes that~~ the defense team of which I was a part was "constitutionally deficient from start to finish" (Doc. 71, p. 61). Particularly, they term as "objectively deficient performance" for me to take on the role as the person developing mitigation themes for trial, indicating that in their estimation, the same person cannot serve both the role as attorney and the role as mitigation specialist on the same capital defense team (Doc. 71, p. 70-71). Also it is postulated that lawyers do not have the skill set to develop mitigation themes and conduct mitigation investigation (Doc.

71, p.64-65). Current Counsel for Mrs. Montgomery further claim that I excluded all other team members from the penalty phase preparation process and found "the idea of a mitigation specialist laughable" (Doc. 71, p. 70-71).

~~Starting with last things first, what I find laughable is that there are people, particularly those cited as experts by Current Counsel for Mrs. Montgomery, whose only real qualifications amount to having previously done capital case mitigation work, who think that they should be reverently referred to with the label of "mitigation specialist", that they should be able to command large per-hour fees because they tout the "mitigation specialist" label, and that they and they alone, without any sort of process, should be allowed, on their bare say-sos alone, to deign those who should be included in their "mitigation specialist" club and those who should be excluded. What gives me a belly laugh is Judy Clarke presuming to brand that Ron Ninemire, the Federal PD investigator who was a crucial member of the team from the beginning, who has a world of relevant experience and who conducted a tremendous amount of quality investigation related to both phases of the case for our team, was "not qualified as a mitigation specialist" (Doc. 71, p. 64, 69, fn 16). To put it simply, I heartily disagree with Judy's inaccurate assessment of Ron's worth.~~

~~For reasons unexplained, Dani Waller is considered by Current Counsel for Mrs. Montgomery to be a member in good standing of the "mitigation specialist"~~

~~club, but~~ Dani is claimed to not count as a working part of our team because she supposedly was "allowed to do only minimal work on the case (Doc. 71, p. 64). ~~As noted above, Dani's pay records tell a very different story.~~ In point of fact, Dani produced much work which was relied upon in our presentation at trial.

Also guffaw-worthy is any claim that I presumed I was able to do all of the work by myself (Doc. 71, p. 70-71). As demonstrated by the database produced by our team, a tremendous amount of work was done by all members of our team.

Current Counsel for Mrs. Montgomery accuse that no mitigation investigation or "biopsychosical (sic) history of Mrs. Montgomery" was conducted (Doc. 71, p. 61, 75, 136). ~~Contrary to the notion that our investigation was somehow lacking is that fact that Current Counsel for Mrs. Montgomery point to not one fact of substance about Lisa which was not contained in our database pertaining to the case. What is more, the database which we created for trial is the source for every important fact about Lisa Montgomery relied upon by the experts used by Current Counsel for Mrs. Montgomery. Putting things another way, Current Counsel for Mrs. Montgomery do not, because they cannot, point to one fact that they uncovered anew, and instead rely upon only those facts about Lisa which we uncovered and knew about. Our database work product best speaks of the effective teamwork that went into this case.~~

~~For all of the nasty insults hurled Dave Owen's way by Current Counsel for Mrs. Montgomery,~~ I perceived him to have worked as an effective member of the team. It is rightly observed by Current Counsel for Mrs. Montgomery that, among the tasks shouldered by Dave was searching the massive computer records of the case trying to find something of value we could use (Doc. 71, p. 90). Unfortunately for the defense in general, and for Dave's role at trial in particular, Dave was able to find no valuable needles after the long hours he spent searching through that haystack.

As for my being the choice as the leader of our team when it came to mitigation and mental health defense efforts, that had to do with an objective measure, experience. In response to the accusations by Current Counsel for Mrs. Montgomery about my supposed lack of expertise (Doc. 71, p. 64), I note that I have prepared and tried more than a dozen capital cases, and I have addressed complex mental health issues in many of those capital cases as well as in various non-capital cases. ~~My guess is that my credentials stack up well as against most any capital case attorney or "mitigation specialist "to be found. I know that my credentials are as good as or better than those who have been relied upon as experts by Current Counsel for Mrs. Montgomery.~~

3. Ventures that John O'Connor had difficulties accepting the appointment in this case and finding co-counsel, that John could not have been competent without billing the Court for more hours, that John should have lorded over things more as "lead counsel", and that John committed some tactical errors at trial[7]

In their amended petition, Current Counsel for Mrs. Montgomery have turned the concept of professionalism on its head, glorifying the untoward actions of certain learned counsel and "mitigation specialists" who previously served in this case; Current Counsel for Mrs. Montgomery see as badges of courage a lawyer's inabilities to work civilly with co-counsel and a mitigation specialist's abandonment of duties to a client because she was more loyal to a dismissed attorney[8] (Doc. 71, p. 18-22, 25, 30). Conceiving those learned in the capital case law as entitled to be spoiled, selfish, prima donnas, Current Counsel for Mrs. Montgomery and those of their mindset cannot imagine that anyone qualified to do so would have associated himself/herself with the Montgomery case in the aftermath of the departure of Judy Clarke (Doc. 71, p. 26, 61-62).

[7] While it could be myopically argued that I should not be answering accusations leveled at John O'Connor, I do make answers because many of the accusations against John are, at bottom, accusations against me. Even those complaints against John which do not involve me directly still involve me indirectly since John and I worked so closely as a team, and since I bore responsibility for work of all members of the team, even the team leader.

[8] If "mitigation specialist" was actually a title of substance, subject to some form of attorney-like licensure, the cavalier approaches taken in this case by some of those who call themselves by that title, particularly those who accepted compensation for services and left their work uncompleted, would certainly have amounted to strong bases for sanctions and removal from office for abandonment of a client,.

To those with the sort of *Through the Looking Glass* view of the professional world as held by Current Counsel for Mrs. Montgomery, a man like John O'Connor is an enigma. John is one of the most experienced criminal case practitioners in the United States who has handled many capital cases. Yet John is old school to the bone, quietly confident in his considerable abilities, not needing genuflection-like acknowledgment of his position and prowess, for whom being a capital case defense attorney means utmost loyalty to clients, particularly the indigent ones for whom the Courts must often rely upon his willingness for service. Thus, when John was called upon by Judge Fenner to pick up the pieces of the train wreck left behind by Judy Clarke and Susan Hunt, in the fashion of a true hero, John ran toward, and not away from the calamity. And contrary to the notions expressed that John would find it difficult to find ethical and competent counsel to assist him (Doc. 71, p. 61-62), John had to make only one phone call to find someone who is just as old school as he is, me.

Continuing with their theme of capital case attorneys as selfish, Current Counsel for Mrs. Montgomery use John's time records in an effort to argue that he could not have been effective as lead counsel in this capital case because he did not personally bill the Court enough (Doc. 71, p. 63). The first problem with this point is that it obviously comes from the perspectives that government resources for capital cases are limitless, and that capital case defense attorneys should be

~~expected to have billed the Court for every last dime of time and expense invested in the case.~~

~~Everyone knows, or at least should know, that capital cases, like no other kinds of cases, tax the minds, hearts and souls of the attorneys called upon to try them. The Congress and the Courts have expressed their clear understanding of this monumental commitment by those who defend indigent capital cases by allowing per-hour compensation at a considerably higher rate than the norm for other court-appointed cases, and by removing caps on per case compensation totals. Therefore, there can be no argument but that a capital case attorney will be well-paid for his/her considerable efforts even if he/she does not niggle for every last cent to which he/she might be entitled.~~

~~Experienced counsel like John understand these realities, and often do not bill for things they could, and maybe should. An instance in this case of John not asking for proper compensation is highlighted in a footnote by Current Counsel for Mrs. Montgomery (Doc. 71, p. 63, fn. 11). In the weeks leading up to trial, John visited Lisa at CCA accompanied by a group of women from his Church, and Current Counsel venture that "(t)his was not a professional visit" (Doc. 71, p. 63). Current Counsel for Mrs. Montgomery could not be further off base. This lengthy visit with Lisa by John was a classic example of an experienced attorney for an indigent client thinking outside the box to create unique and multifaceted ways to~~

advance the case. John taking his Church Ladies to CCA was a stroke of brilliance on many levels.

John knew that we needed to outfit Lisa with clothing for the trial because what clothing which Lisa owned was not only far from stylish, it was literally moldy from having been stored inappropriately during Lisa's lengthy incarceration. John believed that Lisa was a beautiful woman inside and out, and that her beauty could be showcased for a jury's ready observation if she was outfitted properly for trial. Knowing that women's style was not his forte, he enlisted a group of ladies from his Church, all of whom have impeccable fashion sense. Thanks to the help of these women, together with John providing them his credit card, Lisa was outfitted for trial so nicely that Lisa commented that she had never had clothes so nice and observers at trial regularly interjected how nice Lisa looked every day. John also knew, in talking with me about the approaches I had developed to put Lisa at ease, that Lisa was generally more comfortable talking with men if women were around. Thus, John was able to get Lisa more comfortable with him in a lengthy session in the context of a group dominated by women. Finally, John knew through review of all of the work product that Lisa's fragile mental and emotional state required that she receive as much personal affirmation as we could give her to build her up for what would be the ordeal of trial upcoming. John knew these Church Ladies personally, and knew they would

provide the sort of kindness and attention to Lisa which would make anyone, and particularly Lisa, thrive. John accomplished all of these vital case-related tasks without thinking to charge for any of it, not for the time, not for the costs of the wardrobe. To John, it is not how much he charges, it is how much he contributes to the case. The contribution to the case from these activities, and host of others for which John sometimes charged and sometimes did not charge, were strong.

Current Counsel try to leave the impression that John did not personally spend enough time with Lisa in advance of trial (Doc. 71, p. 63). However, Current Counsel do not trouble themselves to allege what John needed to do with Lisa which was not accomplished by the hours which John himself spent with Lisa, coupled with the hundreds of hours with Lisa spent by me and other members of the defense team. My personal impression was that Lisa was completely comfortable with John, and that John was completely familiar with Lisa based upon his personal interactions with Lisa coupled with his study of the information provided by me and other members of the team.

In despicably dishonest fashion, Current Counsel for Mrs. Montgomery endeavor to twist a compliment from me about John's humility into a cut against John's work ethic (Doc. 71, p. 64, fn. 12). Since Current Counsel for Mrs. Montgomery chose not to record their interview with me, let me accurately account what happened. At a point in her questioning of me, one of Current Counsel for

Mrs. Montgomery was inquiring about the role of a lead counsel in the context of how Judy Clarke, Dave Owen and Susan Hunt fought over it like children fighting over a prize. I resorted to crude vernacular to emphasize that John's style of management is to not find important such glorified trappings of leadership, and to state particularly that John's style would be to not interfere with my preparation for a particular witness' examination unless he saw something wrong.

Current Counsel for Mrs. Montgomery allege that "Mr. O'Connor's role in the case was minor" (Doc. 71, p. 63). No one reading the transcript, particularly from the first phase of trial, could legitimately reach such a conclusion. What is certainly the case is that John was comfortable that a team was at work on the case, and that it was not necessary for he himself to duplicate activities ably performed by other members of the team. Whereas Current Counsel for Mrs. Montgomery say "Mr. O'Connor abdicated his role as lead counsel to Mr. Duchardt", anyone with a lick of insight about effective management would instead say that Mr. O'Connor delegated particular tasks to others on the team, and then stayed out of their ways while they accomplished those tasks.

While John would probably accept that all of the claims of ineffectiveness lodged against the team could and should be lodged against him as lead counsel, the number of complains made about things John himself did and did not do are few and frivolous. In this regard, Current Counsel for Mrs. Montgomery globally

~~accuse that John was "often bringing out information damaging to Mrs. Montgomery" (Doc. 71, p. 90). However, when they come to specifics, Current Counsel for Mrs. Montgomery point only to testimony by experts and law enforcement officers about the crime scene and whether it could be concluded that Bobbie Jo Stinnett engaged in a struggle with her assailant marked by Bobbie Jo reviving after initial strangulation and after cutting of her abdomen began (Doc. 71, p.167-170 , 188-190). Current Counsel for Mrs. Montgomery essentially accuse John of mishandling the whole matter (Doc. 71, p. 167-170, 188-190). In point of fact, John masterfully made the best of a horrible situation.~~

~~We as a team knew that pathologist Mary Case was prepared to testify that the presence of blood on the bottoms of Bobbie Jo Stinnett's feet proved that Bobbie Jo somehow planted her own feet into her own blood at a point in time after the cutting of her abdomen spilled her blood. Though this seemed the only logical conclusion from the available facts,[9] John enlisted the services of another pathologist, who confirmed all of that for us. The best face which could be put on the ugly incident was the one John endeavored, for which he is criticized, that the blood on the bottoms of the feet could be explained by Bobbie Jo being revived from her strangulation by the cutting, and only retracting her legs, but not actually~~

[9] ~~The only other postulated possibility, that Bobbie Jo was picked up by her assailant, only to dip the bottoms of her feet into her own blood, and they lay her back down, would have been incredible.~~

engaging in a further, all-out, struggle. Current Counsel for Mrs. Montgomery, of course, criticize generally that this evidence should have been somehow blocked, or should have been watered down in some fashion (Doc. 71, p. 86), but cannot offer any legitimate alternative approach to the matter.

Being a smart lawyer, John did catch prosecutor Matt Whitworth failing to dot his I's and cross his T's on the foundation for Dr. Case's testimony. While Current Counsel for Mrs. Montgomery say that John should have gotten the Case testimony excluded on this technical basis, they present no case law supporting that claim, obviously determining, as we did, that there is no reported case finding error in permitting a prosecutor to correct his omission by supplying his foundation after proper objection brings the matter to the fore.

What John masterfully did, for which he is not credited by Current Counsel for Mrs. Montgomery, is that he navigated the expert pathology testimony keeping intact the factual foundation for our argument that Bobbie Jo Stinnett was dead before her child was removed from her body. This was critical support for our sufficiency of the evidence claim that, because the death came prior in time to the birth of the child, this could not have been a kidnapping resulting in death. ***United States v. Montgomery***, 1086-1087.

4.3. Supposed failures by me to maintain an appropriate caseload and spend adequate time with Lisa Montgomery

Current Counsel for Mrs. Montgomery accurately account that, during the six months after I accepted appointment to Lisa's Montgomery's case, I was called upon to try twice the capital case of ***United States v. John P. Street***, the first time to a hung jury, and the second time to a guilty verdict and a life sentence.[10] Because of the demands of the ***Street*** case in 2006, I did not devote full time to Lisa Montgomery's case during 2006. However, as my time records reflect, I devoted a substantial amount of time to Lisa's case in 2006, and devoted full time and more in 2007. As my time records also reflect, I met with Lisa herself a few times in 2006, and then made up for any lost time by meeting with Lisa for 120 plus hours in 2007.

Current Counsel for Mrs. Montgomery criticize that my approach to handling my obligations to Mr. Street and Mrs. Montgomery in the fashion I did amounted to "a violation of prevailing professional norms" (Doc. 71, p. 69, 162-163). Current Counsel for Mrs. Montgomery do not bother to support this claim, which is essentially that I should have handled only one case at a time, because such a claim is itself contrary to prevailing professional norms.

5.4. My decision to include my wife in my meetings with Lisa

[10] To finish the story, I was able to later earn reversal of Mr. Street's conviction and sentence. ***United States v. Street***, 548 F.3d 618 (8th Cir. 2008). Then, at the third trial, I earned an acquittal for Mr. Street.

For the first months at the beginning of my time representing Lisa Montgomery, I did my best to learn about all aspects of Lisa's background. Using this information, coupled with what I gleaned from my meetings with Lisa, I concluded that Lisa is a gentle person, quick to befriend anyone, man or woman, and kind almost to a fault to anyone, man or woman. However, because of ill treatment of Lisa by women and men alike, Lisa is naturally slow to truly trust anyone, woman or man. On top of that, because of the horrific sexual abuse which Lisa endured in childhood, and even into adulthood, at the hands of men who she should have been able to trust, Lisa has what has been diagnosed, even by government trial expert Park Dietz, as a post-traumatic-stress generalized fear of sexual attack when she is alone with any man, and therefore has a hard time trusting any man, even one in a position of trust, like an attorney. By early 2007, Lisa and I had already developed a very good relationship. However, in light of the reports in the file, I believed Lisa had never yet trusted ANY attorney, investigator, mitigation specialist, or mental health professional so completely as to delve with them deeply into all aspects of her background, including upon the facts of the case. I felt I needed to have more trust from Lisa than she had given to that point to anyone associated with the case. What I believed was that, as a man, in order to gain that level of trust from Lisa, I had to break her cycle of distrust by showing Lisa that a man in position of trust could be counted on to be with her and

never be a threat to her. My thought was that just taking a woman team member with me to meetings gave Lisa no reason to trust me or that team member. However, there was one person in my life whose presence could give Lisa the assurance that my intentions with her were completely honorable. That person was my wife, Laurie Ryland Duchardt.

Ryland has a BSW and a Master's Degree in Guidance and Counseling.[11] Before raising our children, Ryland had a career as a probation officer and a juvenile officer. While I have been in the private practice, Ryland has assisted me in a number of my cases in invaluable ways in mostly unpaid capacities.

Since I knew there were others on the team who technically could fill the role as interview assistant, I knew that the approach in using Ryland in this fashion which I was envisioning was somewhat experimental, and actually a luxury, and therefore it would be hard to justify paying her out of government funds. Consequently, Ryland and I decided we would not bill for the time which she would have to spend helping me with the interviews of Lisa. We started, and I led the interview processes, with Ryland ably assisting in an investigator-like background role. Lisa took to the situation completely, appearing far more at ease, and liking Ryland very much from the start. Lisa looked forward to seeing us both,

[11] There is reported a perception by Dave Owen that Ryland is "some kind of a psychologist or therapist" (Doc. 71, p. 148). I take it that Dave jumped to these conclusions from my description of Ryland's background in precisely these terms.

and opened up in ways she had not before. And, there came quickly the place that Lisa gave me her complete trust, and could be with me fear-free, even when Ryland was not present. There is no question in my mind that Ryland being present was instrumental in Lisa giving me the trust which she has.

The complaints by Current Counsel for Mrs. Montgomery about my using Ryland start with grousing about why I did not just use a woman member of the team.for my interviews (Doc. 71, p. 149). My reasoning is accounted above, and I believe that reasoning panned out. It is also mused that I had not shared with others my plan to use Ryland (Doc. 71, p. 148). As I noted in a memo, I had shared, in advance, my plan (Ex. 23, p. 1). Next, it is a quoted from Dave Owen, that he supposedly "felt that Mrs. Montgomery displayed a certain aversion to Ryland" (Doc. 71, p. 149). ~~As an aside, I note that Current Counsel for Mrs. Montgomery, throughout the rest of their Petition, have gone out of their way to disparage nearly every other legal and factual impression expressed by Dave Owen, but still express as gospel Dave's take on this one subject.~~ But more to the point, the many, many letters by Lisa to Ryland expressing loving appreciation for Ryland's efforts directly contradict Dave's singular, personal anecdote. The truth of the matter is that Ryland's generous donation of many, many hours of her time was unquestionably critical for Lisa and me developing the strong, trusting relationship which we had, and honestly still have.

Formatted: Indent: Left: 0.08", First line: 0.5"

The only thing which can be read as a criticism of substance is the accusation that Ryland and I, in our interviews with Lisa, "planted" the memory that Lisa's brother Tommy was with her when she went to Bobbie Jo Stinnett's home, and that Lisa thereafter just repeated the "script" we had given her (Doc. 71, p. 72-73, 82). This is absolutely wrong. To the contrary, it was Lisa who, for months, had been volunteering to others on the team about her memory that someone else was with her at Bobbie Jo's house. Lisa refused to say who that someone else was, reasoning that she needed to stay silent about that person for that person's protection. The entire team took great pains to make sure to never lead Lisa on any subject, and everyone, including Ryland and I, were extremely careful to not suggest anything, but just patiently listen until Lisa got to a point at which she wanted to share more. As I accounted in my memo, it was at an earlier meeting, one at which Ryland was not present, that Lisa revealed Tommy as the person who was with her (Ex. 23, p. 4). During the meetings with Lisa while Ryland was present, we let Lisa talk, without prompting, about her recollections those and all other regards (Ex. 23, p. 4).

6.5. Current Counsel for Mrs. Montgomery question the means through which our trial strategy was developed, question the validity of the strategy, and call me a liar to boot

Current Counsel for Mrs. Montgomery claim that our trial team "made the mistake of focusing solely on the crime, hastily zeroing in on the defense of

pseudocyesis, rather than their client and her complex biopscyhosocial (sic) history" (Doc. 71, p. 60). Counsel go on to say, in no uncertain terms, that I lied to this Court during the development of our trial defense and thereby created a conflict of interest between me and Lisa Montgomery (Doc. 71, p. 74, 152, 162).

As I noted beginning at page 24 of this statement, in discussing accusations made against Dave Owen, Current Counsel for Mrs. Montgomery have a fundamental misunderstanding of ***United States v. Cronic***, supra, and that fundamental misunderstanding leads Counsel to believe that all they need to do is pop off that an attorney is a "liar" and that entitles them to an "automatic reversal". They roll out the same cannon which they fired at Dave, and fire several rounds at me (Doc. 71, p. 74, 76, 152, 162). As I mentioned earlier, at pages 24-26, the legal reasoning in this regard employed by Current Counsel for Mrs. Montgomery is flat wrong. I shall not repeat that explanation here. I shall observe that the incentive of a possible "automatic reversal", though in fact illusory, provides to those situated like Current Counsel for Mrs. Montgomery powerful motivation to obfuscate in an effort to convert otherwise benign events into things sinister. Fortunately, a fair accounting of the facts readily sorts things out, and I shall endeavor to provide that fair accounting here.

As our original April 2007 trial date approached, all on the defense team, including Lisa Montgomery herself, could be satisfied that we had worked our

~~hardest over the ten months we were together~~. Thanks to that work, we had a good handle on the government's case and on Lisa's background, including her mental health state. Contrary to the accusation by Current Counsel for Mrs. Montgomery that we had not developed for Lisa a complete "biopschyhosocial (sic) history" (Doc. 71, p. 60-61), our database gave us a good handle on Lisa's complicated background. There is no question that, in April of 2007, we could have kept the scheduled trial date, and could have done a creditable job in advancing the very sort of penalty-phase-only defense which Current Counsel for Mrs. Montgomery and their experts appear to envision. We could have relied on lay witnesses and on experts who were then at the ready to tell about Lisa Montgomery's troubled background, and that is essentially what Current Counsel for Mrs. Montgomery would have had us do. The problem is that such an approach would have required us to ignore new developments in early 2007; Current Counsel for Mrs. Montgomery say flat out, we should have ignored those developments and should have pressed on ignoring what we learned through those developments. The problem with that approach is that it would not have told, in the word so often used by Current Counsel, the "story" of Lisa Montgomery. Moreover, in our opinion, that approach would not have given us the best chance of saving Lisa's life at trial.

In early 2007, new information came to us, in the form of revelations from Lisa, which made things not so simple, bringing to the fore considerations which

had previously been the stuff of mere speculation. Lisa provided intricate details about her strong beliefs that, despite having undergone a tubal fulgeration sterilization procedure many years previous, she had nevertheless experienced multiple pregnancies since then, and had even given birth on a number of occasions, including at some time during the week that Bobbie Jo Stinnett was killed. When one took all of these new details and coupled them with other information about which we were already aware, particularly the physical signs of pregnancy which Lisa demonstrated in the months leading up to the Stinnett killing, there seemed to be only one diagnosis for Lisa which made sense and told her "story", and that was pseudocyesis. Current Counsel for Mrs. Montgomery urge that pseudocyesis is "exotic" and "rare" (Doc. 71, p. 5, 74, 87). ~~However, it does not occur to Current Counsel for Mrs. Montgomery that the crime charged, the killing of a pregnant woman in order to steal her child, is also exotic and rare in the same mold as pseudocyesis.~~

In addition, Lisa was insisting that her brother Tommy was with her when she was at Bobbie Jo Stinnett's home, though Lisa could not or would not say that Tommy had actually done anything to Bobbie Jo. Current Counsel for Mrs. Montgomery say that we should have rejected Lisa's account about Tommy's presence out of hand because, according to them, "all the evidence pointed to the fact that Mrs. Montgomery did not have an accomplice" (Doc. 71, p. 73).

Actually, the opposite was true. In her statements to police, Bobbie Jo Stinnett's mother had accounted a phone conversation with Bobbie Jo, shortly before Bobbie Jo's body was discovered, during which conversation Bobbie Jo had said that "the people", i.e. more than just Lisa, were at her house looking at her dogs. An eye witness had also reported to police that she saw a car, with two people inside, leaving the scene of the crime. On top of that, it had always seemed to those of us who dealt with Lisa on a daily basis that she was herself too physically weak to have been able to subdue and kill Bobbie Jo by herself. Interestingly enough, during one of our interviews with Tommy, he himself made precisely this observation about Lisa's lack of physical prowess making it highly unlikely she could have committed the crime by herself.

Current Counsel for Mrs. Montgomery also say that we should have rejected all of Lisa's revelations because it seems to them that it would be inconsistent for Lisa to have suffered from pseudocyesis and for Tommy to have helped Lisa with a killing (Doc. 71, p. 158).[12] If one trusts the definition of pseudocyesis which government expert Park Dietz accounted at trial, Current Counsel might have a point. I, instead, came to trust the true expert on the subject, Vilayanur

[12] Demonstrating the unremarkable ability to snag low-hanging fruit, Current Counsel for Mrs. Montgomery endeavor to turn a piece of my self-deprecating humor in describing the matter into proof positive of my lack of intellectual skills (Doc. 71, p. 158).

Ramachandran, and his cogent explanation, accounted in his report and testimony, about how the Tommy revelations, true or untrue, were part and parcel of the pseudocyesis condition from which Lisa suffered (Tr. 2243).

Current Counsel for Mrs. Montgomery also claim that we set Lisa up for failure because we "encouraged Lisa to talk about …the Tommy defense in all the evaluations that occurred" even though we, as a team, eventually decided to concede Tommy's alibi and consequent lack of participation (Doc. 71, p. 85). Current Counsel for Mrs. Montgomery correctly point out that I strongly disagreed with conceding the Tommy alibi (Doc. 71, p. 85). John as the lead counsel, with strong support from Dave[13], made that call for strategy reasons which were understandable, but with which I disagreed. Regardless of how we decided to handle Lisa's insistence that Tommy was present, Current Counsel for Mrs. Montgomery criticize us for letting Lisa talk about that, though failing to explain how, short of either not using any mental defense whatsoever or telling Lisa to lie, we could have hidden Lisa's firm recollections about Tommy from thorough expert questioning. The truth of the matter was that Lisa's recollections meant that the Tommy story was in the case, and we just had to figure out the best way to handle the Tommy story.

---

[13] This is another example of Dave's active participation in the case, contrary to claims that Dave was frozen out.

So as to not get too far ahead of ourselves, it should be remembered that, in March of 2007, we did not have all the expert reports. Armed with the revelations from Lisa, we marshaled all of our resources to set about to full and fair investigation concerning all those revelations. I took on finding expertise in the field of pseudocyesis. John concentrated on investigation related to Tommy's possible involvement in the crime. At that point, we still had some six-plus weeks before trial was scheduled to begin, and so there was hope that we could accomplish much in the time left. ~~We also knew that Judge Fenner would be reluctant to continue the case again in light of how many continuances had been granted prior to John and I taking over.~~ Therefore, we resolved to do our best to complete all preparation, even the preparation regarding new issues, in time for the April trial date.

Current Counsel for Mrs. Montgomery criticize that we found ourselves in the position we did in March and April of 2007 because I personally was too busy in 2006 with the Street case to do more, in 2006, in connection with the Montgomery case (Doc. 71, p. 68-69, 147, 162-163). Particularly, Current Counsel for Mrs. Montgomery compare that I only conducted a handful of meetings with Lisa in 2006, while I devoted over 120 hours of time to meetings with Lisa in 2007 (Doc. 71, p. 68, 73). ~~Had I been by myself in defending Lisa, such criticisms would have more traction.~~ Since, instead, I was part of a devoted

team, my efforts in 2006 combined with all that everyone else on the team was doing. I was then able to supercharge the preparation process when I could, at the end of 2006 and into 2007, combine my full time and more with the efforts of the other members of the team. As to whether we gave Lisa the opportunities to make revelations earlier, while I was personally only able to conduct a handful of meetings with Lisa in 2006, others on the team were meeting regularly with Lisa throughout 2006. The revelations from Lisa which came in early 2007 came at that time, not because of lack of opportunities afforded to Lisa before, but because, in her mind and heart, Lisa became ready to make those revelations at the point that she did.

On the pseudocyesis investigation front, as my timesheets reflect, I spent many, many hours in March of 2007 researching all of the mental health issues confronting us, including pseudocyesis. I identified those in the mental health field touted as experts in the field of pseudocyesis. It became clear to me that Dr. Ramachandran was far and away the most accomplished on the subject. However, I learned that Dr. Ramachandran was out of the country, and I was led to believe that he was not reachable and would not return until late April. I then canvassed local mental health experts with whom I was familiar, including Dr. Bill Logan, to talk to them about the issues we faced. Dr. Logan seemed to me to be the best candidate to assist in evaluating the issues new to play since Dr. Logan had already

worked with Lisa and the previous case team. In my initial contact with Dr. Logan, I explained what issues we needed to evaluate in light of Lisa's recent revelations. I further explained that, because we had a trial date looming, if he was willing to assist us, Dr. Logan had to be willing to pull out all the stops to get finished, in a matter of just a couple of weeks, with a review of the records, an in- person evaluation of Lisa, and the writing of a report. Dr. Logan indicated understanding of what was needed, and verbally agreed to take on these tasks and accomplish those tasks on a short time frame if that was necessary. I got materials to Dr. Logan, and thereby got his process started.

At that same time, I was having to cajole tardy reports out of three experts already onboard the team, Rob Fucetola, Ruben Gur and Ruth Kuncel[14]. And, I was facing a deadline for notice of intent to rely upon mental defenses at both phases of trial. Of course, I had considerable input from Fucetola, Gur and Kuncel about what to expect from their reports. However, Dr. Logan was new to the case, with new issues to address. Therefore, when it came time to give our Rule 12.2 revelations, I chose the broadest possible language with the least specifics, and

[14] It is incorrectly postulated that I "brought" Dr. Kuncel "into the case in January of 2007" (Doc. 71, p. 71). Actually, it was Dani Waller, who was familiar with Dr. Kuncel from work in Chicago, who recommended to Dave Owen that Dr. Kuncel be hired. It was then Dave and Dani who brought Dr. Kuncel on board and who after that shepherded her review of reports and meetings with Lisa Montgomery. I took over when it came time to receive Dr. Kuncel's report and prepare Dr. Kuncel for trial.

gave notice that we would “rely upon defenses related to mental disease or defect during both possible phases of trial” and would “rely upon expert testimony to support said defenses” (05-6002 Doc. 193).

Then, on April 1, the unexpected happened. I got word that though Dr. Ramachandran had been in India, he was now expected back very soon, and I might be able to make contact with him right away. I was actually able to talk with Dr. Ramachandran for about 20 minutes on April 2. In that conversation, I explained the case in brief. While Dr. Ramachandran gave appropriate caveats to his opinion, Dr. Ramachandran confirmed that it sounded to him like pseudocyesis was in play in this case. I explained to Dr. Ramachandran that, if he was to agree to consult, we would likely be on a short time frame. Dr. Ramachandran verbally agreed to participate in the case and further agreed that, if necessary, he would pull out all of the stops necessary to have an evaluation and report completed as soon as I needed it, even within the next 2-3 weeks.

While I was doing all of this mental-health-related work, John was investigating the Tommy matter, getting interviews of related witnesses on the subject conducted. John also had the brainstorm that Lisa’s account about Tommy could be tested by having her submit to a polygraph examination regarding that account. John arranged for that examination, and Lisa took the test and passed it.

When we met with Judge Fenner on April 3, 2007, the facts detailed above were the facts as we knew them. ~~I believe that a fair reading of what I said to Judge Fenner on April 3 tracks perfectly with these facts (4/3/07 Tr. 11-16), and I believe that Current Counsel for Mrs. Montgomery contrive to posit differences where there are no differences.~~

Foremost, Current Counsel for Mrs. Montgomery assert that I "stood before the Court and announced that this diagnosis [pseudocyesis] would be used in the first phase of the trial as a defense on the ground of mental disease or defect" (Doc. 71, p. 154).~~ Since pseudocyesis was actually "used" in the first phase of our trial, it would seem impossible for Current Counsel to legitimately argue that such a representation was a lie~~.

Current Counsel for Mrs. Montgomery go on that, at the April 3, 2007 hearing, I tried to "save face with the Court by pretending that [I] was ready to try the case in April of 2007" (Doc. 71, p. 81). It is further accused that I was concerned with keeping the Judge "happy" (Doc. 71, p. 160). To the contrary, at the outset of the hearing, I exposed my face to buffets by making clear that I believed that a continuance was necessary because "it just doesn't seem like everything can get done in the kind of fashion it ought to be done" (4/3/07 Tr. 4). Judge Fenner expressed clear understanding of, and unhappiness with, that point (4/3/07 Tr. 7-8). Current Counsel for Mrs. Montgomery seem to understand this

latter counterpoint regarding Judge Fenner not being "happy" since they twice observe that the Judge was "irritated" with me (Doc. 71, p. 160, 162). Those observations about the Judge's irritation, I believe, are fair, though they do not reflect the kindness and respect which the Court still afforded me, despite the difficult situation.

Current Counsel for Mrs. Montgomery question how I could speak with Dr. Ramachandran and mail a massive packet of information to him on April 2 and yet represent to Judge Fenner on April 3 that Dr. Ramachandran was in the midst of reviewing information about the case (Doc. 71, p. 154). Of course, the explanation is simple: electronic transfer of certain critical documents on April 2, along with mailing that same day of a more voluminous packet, all put together with Dr. Ramachandran's assurance that he would get on review of things right away.

Current Counsel for Mrs. Montgomery also detail that, though I had, at the pretrial conference, professed the intention that experts would have reports completed in time for the April trial date, what actually happened was that contracting for services and actual report completion occurred on later timeframes (Doc. 71, p. 74-75, 155-156). Of course, these delays became possible because the Court did not force the case to trial in April and continued the matter (05-6002 Doc. 223), thereby allowing more time for us to get necessary work completed, time we naturally took.

Current Counsel for Mrs. Montgomery complain that I "did not bother to tell the Court" that Ramachandran and Logan completing their assigned tasks prior to April 20, 2007 "was unlikely" (Doc. 71, p. 160). I did not need to say that to the Court because I had secured assurances from both Ramachandran and Logan that they would do what needed to be done to get their processes completed in time for an April 2007 trial if that was necessary. As it turned out, I did not have to enforce those parts of my verbal agreements with the experts.

Current Counsel for Mrs. Montgomery claim that the government "saved" me by agreeing to a continuance (Doc. 71, p. 78, 160). ~~While who saved who is debatable,~~ it is certainly true that the continuance was what I told the Court that I wanted, and the continuance allowed for the team to prepare for the trial which we wanted, one which brought forth all of Lisa's mental health diagnoses, including pseudocyesis.

Then there is the argument by Current Counsel for Mrs. Montgomery that it would have been smart to just abandon the argument of pseudocyesis, and keep things simple, focusing strictly on penalty phase arguments related to Lisa's mental and emotional damage. As noted already above, that was considered. That brings us to why our team felt that telling Lisa's "story", including about pseudocyesis, gave us the best chance to save Lisa's life at trial. Had Lisa been accused of murdering her mother Judy, or her ex-husband Carl, or her husband Kevin, or one

of her children, or even some random stranger, a simple defense strategy, like that envisioned by Current Counsel for Mrs. Montgomery, would have made sense. Instead, Lisa was accused of having planned and carried out the murder of an innocent acquaintance for the sole purpose of stealing that woman's baby and using that baby as her own. It seemed to our team that those facts were so uniquely and horribly aggravating that they would overwhelmingly outweigh a standard mitigation defense, and that only with an explanation for such a "rare" and "exotic" offense could we hope to save Lisa's life.

~~7.~~6. Complaints that I botched the trial mental health presentation

Current Counsel for Mrs. Montgomery complain that I presented the first phase insanity defense while somehow ignoring Lisa Montgomery's other mental and emotional issues (Doc. 71, p. 60, 61, 73, 92, 178). Current Counsel for Mrs. Montgomery lament that I offered an insanity defense at trial without understanding the burden of proof I was shouldering and when I supposedly should have known that there was insufficient support for that defense (Doc. 71, p. 84, 163, 180). Current Counsel then litany that I chose experts without thinking the matter through (Doc. 71, p. 66-67), that the experts I chose were not competent (Doc. 71, p. 135), that I subjected Lisa Montgomery to a series of "harmful and irrelevant" evaluations at the hands of men (Doc. 71, p. 82, 136), and that I failed

to provide the experts what they needed to perform well (Doc. 71, p. 61, 79-80). On all counts, I disagree.

Contrary to the notion that our mental health defense was single-minded, the record of testimony and argument establishes that the jury was urged to find that Lisa Montgomery suffered from variegated mental diseases and defects, including pseudocyesis, major depression, post-traumatic stress disorder, bipolar disorder, borderline personality disorder as well as trauma-caused brain injuries (Tr. 2071, 2091, 2198-2200, 2205, 2213-2214, 2245-2248, 2405-07, 2420-23, 2989, 2993-94, 3021, 3027-3031, 3159-3180).

~~Current Counsel for Mrs. Montgomery attribute failure of our first phase defense to their belief that I felt that we did not bear a preponderance burden of proof on the subject, and would win if the evidence could go either way (Doc. 71, p. 84). Actually, what I tried to communicate Current Counsel for Mrs. Montgomery, which they fail to account, is that~~ I believed, going into trial, that it was 50-50 bet that the jury would find that we had met our preponderance burden of proving insanity. While my prowess as an oddsmaker might be questionable, my understanding of the law applicable to mental health defenses is not.

Current Counsel for Mrs. Montgomery can certainly claim, ~~in true Monday-morning-quarterback fashion~~, that our mental health defense at the first phase must have been wanting because the jury found Lisa Montgomery guilty. ~~However,~~

~~they cannot support what they go on to say, that "(t)he condition of pseudocyesis was not sufficient to support a defense of not guilty by reason of insanity" (Doc. 71, p. 163).~~ Dr. Ramachandran and Dr. Logan concluded that it was (Tr. 2191- 2198, 2420-2423). Even the government's expert, Dr. Park Dietz, never denied the severity of the sort of mental illness diagnosed by Dr. Ramachandran and Dr.

Logan, only registering his opinions that Lisa did not suffer from pseudocyesis and that the constellation of the mental problems he detected in Lisa did not constitute a severe mental illness (Tr. 2558-2561, 2584, 2614, 2618-2619). Current Counsel for Mrs. Montgomery baselessly claim that Dr. Ramachandran "was not well-prepared" and "came off poorly", ignoring the contrary record evinced in the trial transcript (Tr. 2165-2378).

The words "slapdash" and "blindly" are used to describe my enlisting of the services of Dr. Rob Fucetola, Ph.D. and Dr. Ruben Gur, Ph.D. in May of 2006 (Doc. 71, p. 66-67, 162). No personal or professional criticisms are leveled at these men, ~~likely because they are great guys,~~ preeminent in their respective fields of neuropsychology and neuroimaging. Therefore, I take the criticism as based on the fact that I pulled the trigger on hiring these men almost immediately after my appointment to represent Lisa Montgomery. My timing, and my eyes-wide-open approach, are easy to explain.

**Formatted:** Justified, Indent: Left: 0.08", First line: 0.5", Right: 0.08", Space Before: 0.6 pt

As already noted above, as accounted by my time records, when I came into the case, I contacted Susan Hunt and Judy Clarke to get their takes on the case. ~~Both Susan and Judy wanted to focus on the indignities which they believed they had suffered at the hands of the Kansas City Federal Public Defender's Office, and I certainly listened to all of that, and later researched those concerns. My purpose for the call was to get Susan's and Judy's perceptions about the critical issues in the case~~. Both Susan and Judy said that they believed they had identified in Lisa great physical-and-emotional-trauma-related brain injuries. What I gleaned from reading of case documents confirmed Susan's and Judy's takes on the need for brain-injury-related testing. Susan and Judy mentioned no experts they had identified and left me with the distinct impression that one of my major tasks would be finding of experts to do proper testing in anticipation of trial.

Fortunately, from my work in other cases, I knew that neuropsychological testing needed to initially be done in order to assess brain damage and determine whether brain imaging would be in order. Also, from my work in other cases, I was familiar with Dr. Fucetola and Dr. Gur and the high quality work they could perform. Plus, I knew that, because both Dr. Fucetola and Dr. Gur were busy men, we needed to get them contacted quickly in order fit into their busy schedules the work we needed them to do. And, I knew that the Street case was scheduled to begin trial just about a month and a half later, and so I needed to proactively get

things started on Lisa's case before I became buried in the Street case. Thus, I made the initial contacts with Fucetola and Gur, setting Fucetola's testing for just a few weeks later.

Shortly after jumping to the conclusion that I moved too fast in hiring Dr. Gur, Current Counsel for Mrs. Montgomery jump to the opposite conclusion, that Dr. Gur's actual testing occurred too late, in February of 2007, just a couple of months before the scheduled trial date at the end of April of 2007 (Doc. 71, p. 69, 71). It apparently does not occur to Current Counsel for Mrs. Montgomery that it was only because I made contact with a busy Dr. Gur as early as I did that we got the work by him scheduled and completed on our required time frame, two months prior to a late April trial date.

Current Counsel for Mrs. Montgomery nit pick that Dr. Gur did not diagnose Mrs. Montgomery as suffering with pseudocyesis (Doc. 71, p. 74), without further observing that Dr. Gur was not called upon to diagnose any mental health condition. Dr. Gur's function in this forensic setting was exactly what it would have been in his clinical setting, to produce imaging, and to relate the results of the imaging with the diagnoses reached by others.

Current Counsel for Mrs. Montgomery generally rail against the harms caused by "inappropriate" mental health testing, and call "irrelevant" the testing

which was conducted (Doc. 71, p. 67, 82, 136). However, they point to no testing which was conducted which could be labeled as "inappropriate" or "irrelevant".

Current Counsel for Mrs. Montgomery fault me for not being sensitive to the fact that most of the experts I was enlisting were men, and all of the experts who would examine Lisa on behalf of the government were men (Doc. 71, p. 68, 82). In leveling this criticism, Current Counsel for Mrs. Montgomery do not acknowledge that the medical doctors they enlisted to assist them were similarly gender challenged. I trust that Current Counsel, in choosing their medical doctors, believed, as I did in choosing my experts, that it was important to enlist the very best experts, male or female, and then work with Lisa, prior to the conduct of evaluations and testings, to get her as comfortable as possible with what she would then face.

Current Counsel also claim that I failed to elicit critically important conclusions from our experts regarding Lisa appearing sane when she was not sane, being able to deliberate while insane, and being unable to conform her conduct to the requirements of the law (Doc. 71, p. 135, 190). Actually, our experts covered all of that ground (Tr. 2085-2088, 2151, 2180, 2343-2345, 2411-2423).

Current Counsel for Mrs. Montgomery also tick off a list of supposed failures in preparing experts for testimony.

One is a complaint by Bill Logan that, supposedly, I did not prepare him for testimony by providing to him an accounting of Lisa's deletion of incriminatory e-mails (Doc. 71, p. 79-80, 88). However, Dr. Logan testified at trial that he was provided that information (Tr. 2426). My records and recollectiona support Dr. Logan's trial time account of the matter, and can be used to refresh Dr. Logan's current, faulty memories about events. In September of 2007, at the instance of Dr. Logan, I called upon computer expert Troy Schnack to prepare a summary of Lisa's deleted e-mail history. My records still contain that summary, provided by Troy on September 28, 2007. I recall providing copies of that summary to Dr. Logan and Dr. Ramachandran. My guess is that if Dr. Logan looks back through the voluminous materials he was provided related to this case, he will find that summary. In addition, it seemed to me at time of trial, and seems to me now having reviewed the transcript of Dr. Logan's trial testimony, that Dr. Logan addressed the untoward inferences from those e-mail deletions as well as anyone could.

Another was a criticism, again from Dr. Logan, with Logan expressing his from-the-bleachers impression that I did not prepare Dr. McCandless to address recordings, played during McCandless' cross-examination, in which recordings Lisa is heard to make jokes about Dr. McCandless and things she (Lisa) had told Dr. McCandless during therapy sessions (Doc. 71, p. 90). Since Dr. Logan was not

present when I prepared Dr. McCandless, it is difficult to know why he would presume to comment on the subject. Actually, in preparation with Dr. McCandless, I did address with her the matter of Lisa's attempts at humor with Dr. McCandless, and I even laid the foundation, in direct examination, for what of that ilk would come in cross (Tr. 2084-2085). In this situation, again, I believed that untoward inferences from something Lisa had done were addressed as well as they could have been.

Yet another criticism concerns the perception that Dr. Ruth Kuncel was "unprepared for the all-out assault" which she faced on cross-examination (Doc. 71, p. 91). In point of fact, and as my records reflect, I spent a goodly deal of time discussing Dr. Kuncel's testimony with her, and so preparation was not the problem. I believe that the record of direct examination reflects that Dr. Kuncel gave a good accounting about her strong opinions about Lisa (Tr. 3009-3053). In our trial preparation, I had urged Dr. Kuncel, in responding to cross-examination, to not get into pitched battles, and feel free to concede certain facts where that was necessary. I even took the additional step to prepare Dr. Kuncel for such necessary cross-examination concessions using a portion of direct examination to go, point by point, through certain problem areas in her testing. Despite all of my efforts at direction, when the heat of battle turned up, Dr. Kuncel, who was well-practiced in the state courts of Illinois, fell into habits of fencing with cross-examining counsel

which she learned in that venue. While the rather cantankerous tactics which Dr. Kuncel displayed are regularly allowed in Illinois state courts, there was no such leeway given by Judge Fenner. It is an unfortunate but fair reading of the record that Dr. Kuncel came off poorly in the exchange, and it is an unfortunate but fair inference that the power of Dr. Kuncel's other testimony was likely undercut, at least somewhat and perhaps greatly, as a result.

Current Counsel for Mrs. Montgomery call our team to task because Lisa Montgomery was moved in the middle of Dr. Kuncel's testing, noting that the move caused a non-standard interruption of Dr. Kuncel's testing for which Dr. Kuncel was dressed down during cross-examination (Doc. 71, p. 71). What happened was that, without warning, Marshals removed Lisa early from local detention at CCA for testing to be conducted by Dr. Gur in Philadelphia. Dave and Dani, who had arranged for Dr. Kuncel's meetings with Lisa, scheduled for Dr. Kuncel assuming that the Marshals would not move Lisa more than two weeks prior to her scheduled appointments in Philadelphia. In keeping with standard security protocols, the Marshals did not give any advance warning concerning the move. Current Counsel for Mrs. Montgomery do not suggest, short of omniscience or better luck, how we could have prevented this unfortunate snafu. The record at trial amply demonstrates how we tried to smooth over the problem.

Current Counsel for Mrs. Montgomery also criticize me for not having earlier discovered the opinions of Dr. McCandless which we presented at trial (Doc. 71, p. 81, 186). Actually, Dr. McCandless explained things completely in her testimony admitting that, prior to trial, she (McCandless) had kept her conversations with and findings about Lisa Montgomery superficial, whereas she (McCandless) decided, in the middle of trial, that treatment concerns required a deeper analysis, resulting in the new conclusions about which she was called upon to testify (Tr. 2091-2092).

Finally, Current Counsel for Mrs. Montgomery fault me for having supposedly failed in my discovery obligations to the government (Doc. 71, p. 84). Current Counsel for Mrs. Montgomery apparently have not taken note that the Eighth Circuit decided that I met all discovery obligations. ***United States v. Montgomery***, 1092, fn. 8.

~~8.~~7. Complaint that we did not present our "story" through a forensic social worker

At the very bottom of the complaints lodged by Current Counsel for Mrs. Montgomery is the criticism that I did not enlist the services of a forensic social worker, like Jan Vogelsang, MSW, to write our defense script for trial (Doc. 71, p. 59, 60, 61, 93-124, 164, 191). As to this point, it should be noted, in the way that Ms. Vogelsang intently insists when she testifies, that she IS NOT a mitigation specialist, but rather is a forensic social worker. As Ms. Vogelsang explains, while

the title of mitigation specialist is applied to an investigator who tracks down pieces of mitigation information, the forensic social worker label is given to a social worker who takes all of the pieces of mitigating information, and then organizes, draws conclusions from, and creates a narrative about that information. I have found that it has become part of the standard playbook for national capital punishment resource counsel to utilize Ms. Vogelsang to synthesize a defendant's background materials into a narrative, and to use that narrative as the master plan for the entire case.

Before going any further, I observe that neither Ms. Vogelsang in her report, nor Current Counsel for Mrs. Montgomery in their amended petition, explain how the testimony of Vogelsang would have been any less vulnerable to the sorts of attacks leveled by the prosecution against the lay and expert witnesses who we presented upon the same subjects. Put another way, it could have been expected that, had she testified, Ms. Vogelsang would have seen the same attacks coming her way, and neither she nor Current Counsel for Mrs. Montgomery explain how she could have better fended off those challenges. In fact, for many reasons which will be detailed below, Ms. Vogelsang would have been even more vulnerable to attack.

I also note that, as Current Counsel for Mrs. Montgomery account it, Ms. Vogelsang's narrative draws heavily from the say-sos of Judy Shaughnessy and

Carl Boman portraying Lisa as a bad mother, and even as a "prostitute" (Doc. 71, p. 143-144).[15] I believe that Judy's and Carl's accounts are at best skewed and at worst downright false. I know for sure that Lisa herself denied such portrayals of her as made by Judy and Carl. Because I distrusted these accounts by Carl and Judy, because Lisa denied those accounts, and because there were others who accounted the facts consistently with Lisa's accounts, I did not portray Lisa in the sorts of negative fashions as suggested by Ms. Vogelsang. Along these same lines, I have been criticized for not catering to Judy Shaughnessy in order to get her nuggets of information and for supposedly destroying the relationship between Judy's family and the defense team (Doc. 71, p. 77). It is certainly true that I never catered to Judy. That was in part because it was brought to my attention, by Lisa herself, how previous defense team members had catered to Judy's whims, and how Lisa felt betrayed by such conduct. I found no need to make Lisa feel betrayed in this way because I found no need to curry favor with Judy in the fashion that others had. I never had any problem getting Lisa's family members, including Judy, to meet and converse at length with me, and I had extensive meetings with all of those folks in advance of trial. Moreover, as alluded to above, I found that Judy's historical accounts were almost universally untrustworthy, with

[15] It is interesting to note how the affections of Current Counsel for Mrs. Montgomery for Judy and Carl flip flop in the course of their amended petition,, from supportive reliance in creating the Vogelsang narrative, to total rejection and disgust at other places (Doc. 71, p. 190-191).

Judy never missing an opportunity to twist a story to make Lisa look bad and to make Judy look good. To sum up, I decided as untrustworthy, and therefore not worthy of use, the Judy-Carl-engendered, pejorative descriptions of Lisa upon which Ms. Vogelsang relies.

~~I have been familiar with Ms. Vogelsang's work for many years, and over the years I have been made aware that, at least in some of the early cases in which Ms. Vogelsang was used, defendants achieved penalty phase success in having Ms. Vogelsang do in those cases what she has done for Current Counsel for Mrs. Montgomery this case, that is weave a poignant story from available information. The trouble is that the more Ms. Vogelsang has been used, the more that prosecutors have developed counterplans against her sort of plan. Prosecutors noticed that Ms. Vogelsang relies upon hearsay, often many times removed, and now prosecutors regularly interpose successful penalty phase challenges that the probative value of such hearsay is minimal, and that therefore such information is excludable under 18 U.S.C. 3593(c). Similarly, prosecutors noticed that Ms. Vogelsang relies upon great detailing of the troubled lives, including mental illnesses, of relations of a defendant, and even of those not related to the defendant, and now prosecutors regularly interpose successful penalty phase challenges that the probative value of such information about family members and others is minimal, and that therefore such information is excludable under 18 U.S.C.~~

~~3593(c). And Prosecutors noticed that Ms. Vogelsang, beyond her social worker expertise, repeatedly draws medical, psychiatric and psychological conclusions from the information she is provided, and now prosecutors regularly interpose successful penalty phase challenges against Ms. Vogelsang's beyond-her-expertise conclusions. Finally, Prosecutors noticed that, in Vogelsang cases, all of the experts used the Vogelsang narrative as a script, and that therefore the conclusions of other experts could be undermined through the undermining of the Vogelsang narrative.~~

~~Current Counsel for Mrs. Montgomery, while not addressing directly these peculiar vulnerabilities of Vogelsang, do raise a related issue~~. Current Counsel for Mrs. Montgomery generally criticize that we chose not to rely, in the fashion which Ms. Vogelsang would have, upon ~~dubiously admissible~~ hearsay about Lisa's family members' backgrounds, as well as the backgrounds of unrelated others, such as the backgrounds of the children of Lisa's stepfather, Jack Kleiner; more specifically Current Counsel for Mrs. Montgomery challenge that we should have preserved for appeal an instance in which Judge Fenner excluded, upon 18 U.S.C. 3593(c) grounds, precisely this sort of hearsay information about the mental health history of one of Lisa's cousins sought in the Dave Owen examination of another of Lisa's cousins, Wendy Treibs (Doc. 71, p. 214). Current Counsel for Mrs. Montgomery argue, ~~*sans* pertinent authority~~, the admissibility of such information

(Doc. 71, p. 215). We on the Montgomery trial and appellate teams did not press the matter further because we did not believe that the legal argument, as now articulated by Current Counsel for Mrs. Montgomery, was a solid one. As well, I believed that our expert opinions regarding Lisa's mental illnesses were well-premised upon solid evidence about Lisa's background, and that pressing marginally provable claims about mental illnesses of family members and non-family members left us exposed to attack from prosecutors that our expert conclusions drew upon hearsay regarding possible problems of family members and non family members rather than upon rock solid facts from Lisa's own background.

Because I was aware of the peculiar vulnerabilities ~~which Ms. Vogelsang or~~ a social worker like her would bring, I decided instead to provide the raw materials of our mitigation investigation to those associated with our case who were qualified to assess them, i.e. Dr. Ramachandran, Dr. Logan[16] and Dr. Kuncel. I believed that these folks could find the critical information in our mass of materials, and it would seem that their performances in these regards confirmed my trust in them to do this work.

[16] Dr. Logan has expressed that he is used to, and would have preferred, having someone like Vogelsang sift through and organize the materials for him rather than him having to do all of that hard work himself (Doc. 71, p. 79-80). For the reasons noted, I decided to put Dr. Logan to doing the review and organization of the raw materials himself.

~~9.~~8. Complaint that our trial team did not find, as postulated by experts enlisted by Current Counsel for Mrs. Montgomery, that Mrs. Montgomery was mentally incompetent to assist counsel and to stand trial and specifically suffered from cerebral frontal lobe damage

Current Counsel for Mrs. Montgomery, ~~based mostly upon conclusions offered by Dr. George Woods, M.D.,~~ claim that Lisa Montgomery was not mentally capable to assist us in preparing her defense and was so obviously mentally incompetent to proceed to trial that it was incumbent upon us to seek a finding to that effect from the Court (Doc. 71, p. 93, 132-135, 195). There is also insistence that the medications used by jail doctors to treat Lisa's mental illnesses "made her affect flat and made her appear remorseless" and gave her a "disengaged appearance, flat and absent affect, and inability to show emotion at trial" (Doc. 71, p. 93, 132).

~~The biggest problem with these Woods-inspired accusations are that they have no basis in fact.~~ The challenge I found at trial in persuading that Lisa has a mental illness is that Lisa was opposite to different from the claims by Dr. Woods. Lisa never appeared to have a mental illness in the manner postulated by Dr. Woods. Lisa was readily able to engage anyone and everyone in cogent conversation, even at her darkest times. Lisa never had problems understanding the proceedings against her. Lisa never had problems understanding the questions we were asking her about her background and the crime, and never had problems understanding why we were asking the questions which we were. Lisa's problems

in answering certain of our questions were not on the level of lack of understanding. Rather, Lisa had a complex protective shield, developed over years of abuse, which she had to be persuaded to let down, and which she ultimately did let down, in order for interchange to occur on matters of import. ~~The only matters which Lisa has suppressed completely, and about which I believe she still cannot account, concern the details about how Bobbie Jo Stinnett was killed. There is nothing I have seen attributed to Lisa in the materials of Current Counsel for Mrs. Montgomery which our team did not know about.~~

Certainly, different medication regimes were tried from 2005 to the present in treating Lisa's mental illness, and my personal perception is that the medications currently being used to treat Lisa seem to have more positive effect than some of the medications previously used for treatment. However, none of the medications used to treat Lisa ever made her appear to me as "flat" or "absent" or "disengaged" or "remorseless". Throughout preparation for trial, and at trial, Lisa was always full of questions and attentive to answers. As Current Counsel for Mrs. Montgomery is well-aware from review of my file, I have pages and pages of pretrial letters and trial time notes[17] written by Lisa raising intelligent issues of fact

[17] Actually, the mass of trial time notes I have preserved in my file are only a small fraction of the total of the notes which Lisa produced. I have only those notes which were produced while I was in close proximity to Lisa or which were given to me for review by others, and therefore got put into my trial file at the end of a

and law related to the case. However, I see no indication that Current Counsel for Mrs. Montgomery ever shared all of these items, which run counter to Dr. Woods' conclusions, with Dr. Woods. Lisa was completely and consistently engaged at trial, and always appeared so. There were a few times when Lisa got displeased looks on her face, especially when untoward testimony came from witnesses like ex-husband Carl Boman and mother Judy Shaughnessy. I kept a close watch for those instances, and I interacted with Lisa at those points to get her out of those funks, thereby improving her outer appearance at those difficult times.

Also, it must be noted that Dr. Woods is the only professional who has evaluated Lisa who has expressed an opinion that Lisa was not competent at the time that she stood trial. Dr. Woods has an unfortunate reputation that he finds incompetence to stand trial in persons who all other experts, including defense experts, have found competent.[18] Blecker, Robert, *The Death of Punishment, Searching for Justice among the Worst of the Worst* Palgrave Macmillan (2013), p.

---

trial day. I am unsure where a large bulk of additional notes which I saw at time of trial which were directed to Dave Owen and others got to.

[18] To the extent that it is being argued by Current Counsel for Mrs. Montgomery that I should have used Dr. Woods in lieu of one or more of the experts I used, I do not believe that would have been appropriate for the reasons cited above, and also because Dr. Woods' qualifications would have been subject to impeachment based upon a 1993 finding against him of malpractice for which his license to practice medicine was suspended for a time (See ***In re the matter of the accusation against George Washington Woods, Jr. M.D.***, California Medical Board Case Number D-5595.

~~135-137.~~ We did not seek a finding of incompetence to proceed because there was no basis in medicine, fact or law for such an effort.

Current Counsel for Mrs. Montgomery also advance certain opinions about damage to Lisa Montgomery's brain apparently held by Dr. Woods and another of their experts, Dr. Siddhartha Nadkarni (Doc. 71, p. 93, 121-128, 132). One problem is that the opinions by Dr. Nadkarni regarding midbrain issues are strikingly similar to, but not nearly as well-supported as, conclusions from Dr. Gur which were rejected as amounting to speculation beyond the reach of generally-agreed-upon medical science. ***United States v. Montgomery***, 1088-1093. ~~Neither Dr. Nadkarni nor Current Counsel for Mrs. Montgomery explain s how Dr. Nadkarni's opinions in these regards would have been received at trial whereas Dr. Gur's better supported positions on the same subjects were not.~~ It is also complained that Dr. Fucetola did not do more extensive neuropsychological testing which it is believed would have detected certain frontal lobe damage postulated by Dr. Nadkarni and Dr. Woods (Doc. 71, p. 132). ~~Unfortunately, these Doctors did not have extra neuropsych testing done themselves, and worse they do not address what would appear to be contrary PET and MRI testing results from Dr. Gur's University of Pennsylvania team.~~

Formatted: Indent: First line: 0.5", Right: 0.12"

~~10.~~9. Belief by Current Counsel for Mrs. Montgomery that Daubert challenge against Gur testimony could have been finessed away

Current Counsel for Mrs. Montgomery accuse that I missed a golden opportunity because, in their sense of things, Matt Whitworth was willing to essentially stipulate admission of the Gur imaging results at penalty phase so long as I was willing to abandon use of those results in support of a first-phase, pseudocyesis defense (Doc. 71, p. 83, 163). Current Counsel engage in wishful thinking.

Matt Whitworth did indeed say at the outset of our ***Daubert*** hearings, preceding testimony, that the Gur results might be admissible at the second phase of trial. I reminded Matt of those words on numerous occasions thereafter. However, once Matt actually heard Dr. Gur and the power of the testimony he could offer, Matt fought tooth and nail to keep the Gur testimony out of the case entirely. Therefore, even if we had abandoned our first phase defense, there was no room for an agreement regarding the second phase because Matt was resolved to seek exclusion of the Gur evidence for that phase as well.

~~11.~~10. Ignoring plea negotiations

Current Counsel for Mrs. Montgomery complain that we made an "anemic attempt at settlement" of the case despite their perception that Lisa Montgomery had expressed a willingness to plead guilty in order to avoid the death penalty (Doc. 71, p. 84, 150-151). There are misperceptions in these contentions which ignore critical facts.

Starting with last things first, I have never seen any indication in any materials related to the case that Lisa ever expressed a willingness to plead guilty for any reason. I personally never heard Lisa utter such words. To the contrary, Lisa never could come to grips that she had done something wrong and always wanted to find a way to go home. In making their contrary statement, Current Counsel for Mrs. Montgomery cite nothing in the record or our database to support the statement.

Whether or not Lisa was on-board with a negotiated settlement, we still believed it was our duty to look for such a way to save Lisa's life. However, as Current Counsel for Mrs. Montgomery seem to acknowledge, the climate for such negotiations in the Western District of Missouri in 2006 and 2007 was bad (Doc. 71, p. 198-200). At the time, Todd Graves, a strong death penalty proponent, was United States Attorney for the Western District of Missouri. We argued on appeal, particularly in our Petition for Certiorari, that Todd was so strongly pro death penalty that he stretched jurisdiction in order to bring Lisa's case, which could have been a perfectly good state court matter, as a Federal Death Penalty Act case. Though Current Counsel argue precisely the same points regarding Todd's death penalty predilections (Doc. 71, p. 198-200), they fail to get the obvious point that, because of Todd's zeal, Todd's ear was deaf when it came to negotiations on any death penalty case, particularly this one. Current Counsel for Mrs. Montgomery

also forget that, in 2006 and 2007, the Bush administration was in power in Washington. Justice Department policy for that time had been set by former Missouri Attorney General/Governor/Senator, John Ashcroft. It was often accused that the Justice Department, in those days, was taking nation a Missouri-style approach to capital cases. Equipped with this mindset, the Justice Department was rarely negotiating for life sentences, and more often was forcing reluctant US Attorney offices to seek capital punishment in Federal cases in jurisdictions where states had actually abolished the death penalty for state cases.

Current Counsel for Mrs. Montgomery accuse that John and I "failed to appreciate…that a thorough mitigation investigation is integral to an effective plea strategy (Doc. 71, p. 64, 150). To the contrary, we knew we needed to effectively investigate every aspect of the case to be properly prepared for negotiations. However, we also knew that we needed to find a receptive ear for that information. John and I always felt that our only real chance to find a settlement would be to try to convince the front line prosecutor, Matt Whitworth, to go to bat with us. We felt that we could convince Matt only by bringing forward to him, in advance of trial, what our defense was all about. This, of course, dovetailed with our duties under discovery rules. Thus, we made plain to Matt that we wished to be proactive with our discovery in order to try to persuade him that a disposition other than death was appropriate. In keeping with this strategy, when we developed the Tommy

and the pseudocyesis defenses, even though those like Current Counsel for Mrs. Montgomery might have had misgivings about the approach (Doc. 71, p. 152), we candidly and immediately laid all of that out for Matt, as well as for the Court. We continued, as trial preparations continued, to keep working on Matt. Unfortunately, none of our efforts persuaded Matt, who always favored the death penalty in the case, in no small measure because the family of the victim was in favor of the death penalty.

As trial loomed, since Todd was gung ho in favor of death for Lisa, and since we could never persuade Matt to urge to Todd a local recommendation for a life sentence, I figured an appeal to a death-penalty-inclined Washington, without a local recommendation, was going to be a waste of time. Still, on the eve of trial, I felt that nothing ventured meant nothing gained, and that no harm could possibly come from a request. Therefore, I made the request which I made, which of course was denied. ~~I see nothing from Current Counsel for Mrs. Montgomery, other than more wishful thinking, to support a notion that anyone could have found a different and better way toward negotiated settlement of this case.~~

~~12.~~11. Failure to request "appropriate continuances"

Current Counsel for Mrs. Montgomery criticize my purported lack of requests for continuance (Doc. 71, p. 84, 152). In making such charges, they apparently miss that I requested and was granted two continuances, in July of 2006

(05-6002 Doc. 91, 93) and in April of 2007 (05-6002 Doc. 210, 223). Current Counsel insist that I should have asked for another continuance, on the eve of the October 2007 trial, "to regroup" (Doc. 71, p. 84). Current Counsel do not, because they cannot, cite to authority that "to regroup" is an accepted ground for a last-minute continuance. More importantly, there was no regrouping which we needed to do. Though we persisted with making our record urging the admissibility of the Gur testimony, Judge Fenner had already given fair warning that it was unlikely that he would relent on his adverse ruling, and therefore we had ample time to prepare the substantial case we had left. We were ready to try the case our team wanted to try, and could try under Court rulings, when trial started. ~~When boiled down to gravy, the real complaint by Current Counsel is that we never were going to try the case the way they would have wanted us to, as Vogelsang and Woods would have directed, and we would not have done so for the reasons detailed above..~~

~~13.~~ Claim about "boilerplate motions"

Formatted: Indent: Left: 0.07", Right: 0.11", Space Before: 1.8 pt, Line spacing: Double, No bullets or numbering, Tab stops: Not at 0.31"

There are few cuts more unkind to an experienced attorney than to accuse him, as Current Counsel for Mrs. Montgomery accuse me, of having filed "a few boiler-plate form motions" (Doc. 71, p. 85). ~~However, in making the accusation Current Counsel do not give the Court any direction about what plate, other than mine, on which my motions were boiled.~~ All of my motions were so unique that I

challenge Current Counsel to find any instance, other than in the Montgomery case, in which these motions were filed.

My challenge regarding sufficiency of the evidence about death resulting from kidnapping was an issue of first impression ***United States v. Montgomery***, 1085-1087. My challenge to Eighth Circuit penalty phase instructions, based upon split between Circuits, is one I have originated, and cannot be found anywhere else. ***United States v. Montgomery***, 1098-1099. My challenge to exclusion of polygraph evidence is uniquely tailored to this case. ***United States v. Montgomery***, 1094. Likewise uniquely tailored to the facts of this case is my challenge to sufficiency of the evidence about the heinousness aggravating factor. ***United States v. Montgomery***, 1095-1096. The closest motions to "boiler-plate", but still all cooked up by me, were the now-generally-used constitutional challenges that the Federal Death Penalty Act risks execution of the actually innocent, is violative of the indictment clause, and unlawfully does away with the Federal Rules of Evidence (05-6002 Doc. 103, 104, 105). All three of these motions were originated by me and other attorneys trying Federal capital cases in the mid 1990's, and the issues raised in those original motions have been considered and rejected by the Circuits throughout the country. I have refined all of those motions, in unique ways, to take the issues the next logical steps past the Circuit decisions on the subjects, even going so far as to find contrary state

precedent to support new arguments (05-6002 Doc. 103, 104, 105). I did not carry any of these issues through to appeal because there were plenty of other, stronger issues to brief.

~~14.~~12. Challenges against the ways in which I conducted the jury selection process

According to Current Counsel for Mrs. Montgomery, I "failed to elicit basic information about jurors' views" on important topics so as to allow effective exercise of peremptory challenges, my voir dire of the venire was "insufficient and incompetently conducted", I "inexplicably allowed the Court to excuse for cause venire members whose views on the death penalty would not have prevented them from discharging their obligations under the law" and I engaged in and permitted "misstatements of the law" during the jury selection process (Doc. 71, p. 171, 178-179). Current Counsel for Mrs. Montgomery go on to cite to various portions of the trial transcript, and claim that on the pages they cite, there occurred instances in which I either failed to identify jurors who would automatically vote for the death penalty, or failed to identify jurors who could not or would not give effect to mitigation, or failed to oppose the removal of jurors whose views would not substantially impair their ability to serve, or failed to correct supposed misstatements of law, or failed to insure proper instruction and questioning about mental defenses, or failed to "challenge or correct the processing effect" (Doc. 71, p. 177-178). I disagree with all of these claims.

My jury selection method consisted of use of a questionnaire and conduct of group and individual voir dire examination. I note that no challenge is made against the questionnaire which I drafted and which was jointly submitted (05-6002 Doc. 109). I am satisfied that that questionnaire was comprehensive in its approach and provided considerable information about the venire upon which we relied greatly in exercising for cause and peremptory challenges. As to the voir dire examination itself, I would have liked for that process to have been much more extensive. ~~I have designed and implemented much more extensive questioning processes, lasting more than a week in each case, in **_State of Missouri_**~~

~~**_v. James Skinner_**, a Jackson County Missouri capital case tried before the Honorable Jack Gant using a jury we selected in St. Louis City, **_United States v. Dennis Moore_**, a capital case tried before the late District Judge D. Brook Bartlett in the Western District of Missouri, and **_United States v. Demetrius Hargrove_**, a capital case tried before District Judge Carlos Murguia in the District of Kansas. In **_United States v. German Sinisterra, Arboleda Ortiz and Plutarco Tello_**, I requested that Judge Fenner allow the same sort of process which we employed in **_Skinner_** and **_Moore_** (**_Hargrove_** was tried later); instead, Judge Fenner conducted a relatively abbreviated process, doing all of the questioning himself. That shortened, solely Court-conducted process was challenged by me on appeal, but was upheld by the Eighth Circuit. **_United States v. Ortiz_**, 315 F.3d 873, 888-897~~

Formatted: Body Text, Indent: First line: 0.5", Right: 0.13", Space Before: 1.8 pt

(8th Cir. 2002). In Lisa's case, through discussions with opposing counsel and with Judge Fenner, I was able to obtain a more extensive voir dire examination than allowed in ***Ortiz*** along with permission for attorneys to conduct most of the individual questioning of venirepersons. I then conducted the most extensive voir dire which I could within the process allowed. While I obviously would have preferred a better voir dire process, I developed a process better than the minimum process allowed under ***Ortiz***, and I used the process which was afforded to exercise for cause and peremptory challenges in the best ways possible.

I have reviewed all of the portions of the record cited by Current Counsel for Mrs. Montgomery, and I find that in none of those places did there occur any statement or exchange which would be improper or objectionable.

It is also claimed that I conspired in a ***Batson*** violation supposedly because I sought removal of Juror 129, Doralis Torres, on the basis that "she's Cuban" (Doc. 71, p. 170, 208). My words, "she's Cuban", were used to express the plain fact which Ms. Torres explained in her questionnaire, that she was born, raised, and lived most of her life in Cuba. After hearing her speak during voir dire, it seemed to me, to Matt Whitworth and to Judge Fenner that Ms. Torres had difficulty understanding questions and expressing herself in English. I attributed her difficulties in English to the fact that she grew up in a Spanish language country, and that was the point I was making when I used the words "she's Cuban". My

reference had nothing to do with her race; rather it was a shorthand to express that she spent most of her life in a country in which Spanish was her language. However, I was concerned about Ms. Torres because of other answers she gave on the questionnaire. Ms. Torres' answer to question 41 was very pro-death penalty, but was tempered by the phrase that "God is the only person who is charge of giving or taken (sic) a live (sic)." Matt Whitworth made voir dire inquiry of Ms. Torres about her meaning for that phrase, and she made clear that her faith would not stop her from giving a sentence of death if she thought that appropriate (Tr. 246-247). In my mind, those voir dire responses made her question 41 answer that much stronger. In addition, she indicated in question 46 of the questionnaire that she followed a child killing case in the news and could not understand how someone could commit such a crime. And, in questions 83, 84 and 85, she seemed to express misgivings about mental defenses. Because of her views on the death penalty, on cases involving children, and on mental defenses, I likely would have used a peremptory challenge to remove her had she remained on the panel to that point in the process, and so angling for her removal for cause saved that peremptory challenge.

~~15.~~13. Failure to act in response to Judy Shaughnessy attempt to intimidate witnesses

It is complained that I did not take any actions against Judy Shaughnessy when Dani Waller brought to my attention that Judy was saying mean things to

family members called to witness (Doc. 71, p. 92). When I heard about this, I had no doubt but that Judy was yammering in the way that she was for precisely the reason as feared by Dani, as an attempt to intimidate our witnesses. My reason for not acting was a simple one. Judy's bombast was ineffectual, and the witnesses attended and testified fully and truthfully despite Judy's efforts. I felt that was the best counterpunch against Judy.

~~16.~~14. Failure to properly prepare Lisa Montgomery's children for their testimony

Current Counsel for Mrs. Montgomery make the challenge that I "spent limited, if any, time preparing defense witnesses" and that therefore I was "often…unable to get testimony" which I "expected" (Doc. 71, p. 185). Having made this broad point, Current Counsel for Mrs. Montgomery cite only one specific, the perception that at trial the testimony of Lisa's children "went badly" and that I "was taken completely by surprise with what they said while testifying" (Doc. 71, p. 185).

My time records accurately reflect that I spent considerable time preparing all witnesses for trial. I believe that the record from trial accurately reflects that, for the most part, all witnesses, including Lisa's son C.J. and her daughter Chelsea, performed admirably, and as we had hoped they would. The one exception to the pattern of good performance was the first phase testimony by Desiree (Desi) Boman, Lisa's oldest daughter. Desi's first phase testimony was extremely

disappointing and damaging in certain particular respects. However, it was not something which took me "completely by surprise".

As my time records reflect, I made multiple trips to Oklahoma to visit Lisa's children, and I spent hours preparing them for testimony on those trips, polishing things off in Kansas City during lengthy sessions on the days leading up to trial. I used my early sessions to learn about these four young people, and I learned well about the mixed feelings all four of Lisa's children had concerning their mother. Their love for Lisa was strong and enduring. However, they were extremely confused and hurt by what happened to cause the charges being brought against Lisa. And, though they each had wonderful stories about growing up, they also had some stories of pain which came from Lisa's failings, at times, as a mother. In my sessions with the children, I covered all of this ground, letting them express their feelings about their mother, good and bad. I knew from the beginning that, because of these understandable mixed feelings which the children had, there would be some danger in using them as witnesses. However, I knew that there were certain critical facts that I wanted to get from them. Especially from Desi, we wanted to elicit about the symptoms of pregnancy, consistent with pseudocyesis, which Lisa displayed and which she, Desi, saw and otherwise experienced.

In my sessions with the four, I first listened. I then tried to give the perspective about how much Lisa suffered from her mental illnesses, and how hard

she had tried to overcome those mental illnesses in order to mother them. In all of the sessions, Desi was always the one who was very defensive in favor of her mother, always finding the good in Lisa, and always finding good explanations for any untoward behavior which Lisa had ever displayed. It was Lisa's youngest daughter, Kayla, who was always the least sympathetic to her mother, though even Kayla softened as time went along. As we approached trial, I went over all aspects of possible testimony in detail with each of the four. Desi, as usual, was a rock, prepared for everything I raised with her.

Unfortunately, when Desi testified at trial, many of her answers changed significantly from what we had repeatedly discussed. Desi had consistently told me that she had seen her mother without clothes and had then seen her mother's expanded abdomen, and had at other times felt her mother's expanded abdomen, and had believed from that seeing and feeling that Lisa was pregnant. However, at trial, Desi said that she did not recall seeing Lisa without clothes (Tr. 1936) or touching her stomach (Tr. 1938-1939). When Desi and I prepared her for trial, we had set up a question designed to bring out Desi's own words to me that her mother would threaten discipline far more than she would give it. However, when I posed that prepared question at trial, Desi reduced things, saying Lisa "sometimes" threatened discipline more than giving it out (Tr. 1939). And, after our practice testimony sessions had Desi giving answers that Lisa always took care

of her needs and the needs of her sibs and that Lisa always did her best, Desi testified that there were times when Desi's needs were not met, that Lisa sometimes was not doing her best, and that Lisa was lazy "occasionally, quite a bit at times" (Tr. 1939-1940,1945).

Desi did offer very helpful testimony in other portions of her first phase testimony. And, Desi performed admirably, and just as I expected, when she returned to testify during penalty phase (Tr. 2935-2950). However, it is completely fair to say that the portions of Desi's testimony, as cited above, "went badly".

~~17.~~15. Failure to seek exclusion of testimony by government imaging experts

Current Counsel for Mrs. Montgomery globally complain that I allowed advancement of "perjured and otherwise false testimony" (Doc. 71, p. 212-213). However, I locate only one group of matters which would arguably fit into this category, the general expression of contempt for government experts Helen Mayberg, M.D. and Alan Evans, Ph.D., peppered with specific accusations that these Doctors "offered junk science", gave "misleading, unreliable, unscientific and specious testimony" and topped off with an indictment that I should have questioned "the validity of their protocols" and their supposedly "shoddy techniques" (Doc. 71, p. 90, 213).



Case 4:12-cv-08001-GAF Document 131-1 Filed 09/26/14 Page 96 of 109

Consistent with their bombastic approach upon other issues, Current Counsel for Mrs. Montgomery are long on invective and short on support for their claims. Current Counsel for Mrs. Montgomery have not sought experts of their own to support their accusations against Mayberg and Evans. This is particularly problematic because these accusations of "junk science" and "shoddy techniques" and "unscientific" approaches are being leveled by a three lawyers against two of the world's most renowned scientists in the field of neuroimaging. I have no doubt that, had it been the Current Counsel for Mrs. Montgomery mismatched against these brilliant scientists in cross-examination about "techniques" and "protocols", at the end of that, the words "shoddy" and "misleading" and "unreliable" and "specious" would have been left hanging on the lawyers, not the scientists.

As the record makes clear, I took lots of exceptions to the testimony offered by Dr. Mayberg and Dr. Evans. ***United States v. Montgomery***, 1092-1093. However, it would have been preposterous to claim that these preeminent experts were somehow "unscientific" or purveying "junk science". Instead, the correct indictment was that, though the objections raised by these very adroit people were technically correct, it was still they who were venturing outside of prevailing professional norms because their correct objections were hypertechnical, and thereby non-standard. Relying upon detailed explanations by Dr. Ruben Gur,

Ph.D., we made precisely this point in fighting tooth and nail in this only way possible against these scientists. ***United States v. Montgomery***, 1088-1093.

~~18.~~16. Failure to impeach Park Dietz in the fashions deemed appropriate by Current Counsel for Mrs. Montgomery

Current Counsel for Mrs. Montgomery express total dissatisfaction with my handling of government experts Park Dietz, M.D. and Dan Martell, Ph.D., giving specifics that I let Dietz describe other high profile cases he handled for the government, that I failed to seek to exclude, as unreliable, Dietz's professional conclusions, that I allowed Dietz and his cohort Martell use what Counsel call "character testimony", that I highlighted certain of the questions on one of the tests administered to Lisa, that I allowed the government to argue that use of Dietz in this case "meant Lisa was the worst of the worst", and that I did not confront Dietz with what Counsel term "his perjury" (Doc. 71, p. 90, 191-192).

I believe that the record of my cross-examination of Dr. Dietz reflects that I was trying to paint Dietz as a gun for hire. My allowing Dietz to talk about certain of the notches on his gun handle was part of that approach.

As for the complaints about Dietz's conclusions and the information upon which he based those conclusions, I believe those are subjects for cross-examination, that we addressed those things on cross-examination, and that there is no legal basis for the sort of exclusion as argued by Current Counsel.

With respect to the contention about closing argument, I observe that the words "worst of the worst" were never uttered by prosecutors, and so I am at a loss to find any substance for this point as articulated by Current Counsel.

As to my going into detail with Dan Martell about one of his tests, the controversial psychopathy check list, I believe it is clear that I was trying to emphasize the parts of the test as a means to convince the jury about what an unscientific, unreliable sort of test that the PCL is.

~~And then Current Counsel for Mrs. Montgomery show again their penchant to willy nilly use the term liar against one who they feel opposes them. I have no love for Park Dietz, as my cross-examinations of him in three different cases make clear. However, unlike Current Counsel for Mrs. Montgomery, I am unwilling to cavalierly toss around baseless accusations of criminality against anyone. The word chosen by Current Counsel for Mrs. Montgomery, "perjury", has never been applied to Dietz's Yates debacle~~. In ***Yates v. Texas***, 171 S.W.3d 215 (Tx.App. 2005), it was found that Dietz had given "false testimony". ~~Even though the Eighth Circuit found that cross-examination upon the subject was proper, the Court made clear that the ***Yates*** case was not an instance of "perjury", but instead an example of a "mistake" demonstrating Dr. Dietz's "fallability". ***United States v. Purkey***, 428 F.3d 738, 759 (8th Cir. 2005).~~ I believe that my cross-examination of

Formatted: Right: 0.09", Space Before: 0.6 pt, Line spacing: Double

Dr. Dietz got all the impeachment mileage out of the truth of the ***Yates*** matter that could be properly gotten.

~~19.~~17. Failure to seek exclusion of 911 tape

Current Counsel for Mrs. Montgomery generally claim that I failed to object to a host of victim impact evidence; however, I only found one specific in this regard, the perceived failure in not securing exclusion of the 911 tape (Doc. 71, p. 92, 193, 194, 200). Without question, the tape was powerful, with Bobbie Jo Stinnett's mother sobbing her report to emergency response personnel about the horrific scene of Bobbie Jo's body looking like it had "exploded". If there could have been posed any academic question as to whether victim impact was the government's main reason for using the recording at penalty phase, Matt Whitworth removed all doubt about the matter in his closing argument (Tr. 3192-3193).

~~Had Matt gone further, as he mused he might have (Tr. 3192-3193), and attempted to play the tape a second time during his argument, I absolutely would have objected that such a second playing was unfairly prejudicial.~~ However, I did not seek exclusion of the tape in the first instance because I believed that the sort of 18 U.S.C. 3593(c) objection suggested by Current Counsel for Mrs. Montgomery was not well taken in that the recording was, in the words of the same subsection 3593(c), "relevant to the sentence" as it was direct evidence about the

Formatted: Right: 0.14", Space Before: 3.15 pt

crime itself, and specifically bore on aggravating factors regarding victim impact as well as the heinousness of the offense.

~~20.~~18. Complaints regarding first phase instructions

Current Counsel for Mrs. Montgomery make a series of arguments against instructions without any sort of authority supporting those arguments (Doc. 71, p. 216-218). Also Current Counsel claim that some sort of lesser included offense instruction should have been offered (Doc. 71, p. 218). I raised none of these issues because I did not believe any of them had merit.

~~21.~~19. Complaints regarding penalty phase instructions

Current Counsel for Mrs. Montgomery contend I should have but did not object to certain penalty phase instructions (Doc. 71, p. 218-223).

~~Some of the objections raised by Current Counsel actually reprise, in much less detail, the points which I raised at trial against the instructions, and carried forward upon appeal (Doc. 71, p. 222-223). ***United States v. Montgomery***, 1085-1087, 1098-1099. As to these matters, which were raised at trial and upon appeal, it would certainly seem that complaint that those issues were not raised would not be well taken.~~

I find that one of the criticisms of Current Counsel does have substance. Current Counsel rightly note that, as to the aggravating factor concerning substantial planning and premeditation, the word "unanimously" was not contained

in the jury's finding upon the matter (Doc. 71, p. 219-220; 05-6002 Doc. 354, p. 4). As to the rest, there is no substance.

Current Counsel fault the instructions definition of the term "mitigate" without providing direct authority for their contentions and without even posing, as required for a challenge to an instruction, an alternative definition from competent authority (Doc. 71, p. 218-219).

Current Counsel contend that the instructions allowed the jury to use the offense itself as an aggravating factor to be weighed in favor of death (Doc. 71, p. 219). To the contrary, at the places noted by Current Counsel, the jury was called upon to make so-called "gateway findngs". Current Counsel do not cite to other instructions on the actual subject of weighing of aggravating and mitigating factors which the Courts, including the Eighth Circuit, have found make clear that gateway findings are not to be weighed by the jury in determining whether to sentence to death.

Current Counsel contend that there was insufficient evidence to support the aggravating factor of endangerment of another person as applied to Victoria Jo Stinnett, Bobbie Jo's child; in this regard, Current Counsel draw upon my argument that, prior to her live birth, the child was not a person, and therefore Federal statutes which apply to persons cannot apply (Doc. 71, p. 219). The trouble with this argument is that Current Counsel do not perceive applicability of

~~the aggravating factor to the child after she was born, and thereby legally became a person, in light of the facts that she was taken from her mother a month prematurely and was not provided any sort of post-natal care in the process.~~

Current Counsel assert that there was unconstitutional double-counting of the endangerment factor and the heinousness factor because “both relied on the identical fact, that the defendant used a kitchen knife to cut the baby from the womb (Doc. 71, p. 220). ~~What Current Counsel fail to acknowledge is that, while this one element was common, the two were distinct because the other elements of the factors were distinct.~~

Current Counsel fault the use of victim impact as an aggravating factor (Doc. 71, p. 220-221~~), without noting the Supreme Court authority, which they themselves cite elsewhere in their petition (Doc. 71, p. 200, 202), permitting such an aggravating factor to be used. ***Payne v. Tennessee*****, 501 U.S. 808 (1991).**~~

Current Counsel contend, in two paragraphs, that there were proper mitigating factors concerning mental health, in addition to the statutory factors which I offered, which should have additionally or alternatively been presented for the jury’s consideration (Doc. 71, p. 221). ~~However, Current Counsel fail to pose to the Court any such proper factor which was omitted, or how such factors would have been preferable to the ones I proposed.~~



Case 4:12-cv-08001-GAF Document 131-1 Filed 09/26/14 Page 103 of 109

Current Counsel challenge the standard instruction regarding reasonable doubt (Doc. 71, p. 221) ~~without acknowledging the long line of cases upholding the language and without proposing any alternative language.~~

Current Counsel challenge giving a defendant the burden of proving mitigating factors by a preponderance of the evidence (Doc. 71, p. 221-222) ~~without acknowledging the long line of cases finding appropriate the placing of upon a defendant of precisely such a burden when it comes to other defenses and without explaining what burden less than preponderance they propose being used instead.~~

Current Counsel challenge that the jury should have been instructed, with more particularity, concerning the ways in which they could weigh witness testimony (Doc. 71, p. 222), ~~though they do not explain how the instruction in any way precluded the sorts of considerations they espouse, and do not point to any particular instances from witness testimony at trial for which such particularized instruction would have made a difference.~~

Current Counsel also contend that the instructions would have allowed the jury to give death based upon a determination that an invalid aggravating factor outweighed mitigating factors (Doc. 71, p. 222). ~~The problem for that argument is that, even if such a reading of the instruction was found to be a correct one, in this case the jury found all submitted aggravating factors, and therefore the problem~~

envisioned by Current Counsel with respect to finding of only one such factor did not occur.

Finally, in four separate paragraphs, Current Counsel contend that the jury's ultimate determination upon punishment should have been made beyond a reasonable doubt, that the jury should have been so instructed, and that a Panel of the Sixth Circuit has agreed with their contentions (Doc. 71, p. 223-224). Unfortunately, Current Counsel fail to note that the Panel opinion upon which they so critically rely was withdrawn by the Sixth Circuit, and was replaced by an *en banc* opinion finding contrary to the position espoused by Current Counsel. ***United States v. Gabrion***, 719 F.3d 511,531-533 (6th Cir. 2013). Compounding the problems for the argument of Current Counsel is that six other Circuits who have considered the issue, including the Eighth Circuit, have decided the matter against Current Counsel's position. ***United States v. Purkey***, 749; ***United States v. Sampson***, 486 F.3d 13, 31 (1st Cir. 2007); ***United States v. Runyon***, 707 F.3d 475, 516 (4th Cir. 2013); ***United States v. Fields***, 483 F.3d 313, 345-346 (5th Cir. 2007); ***United States v. Mitchell***, 502 F.3d 931, 993-994 (9th Cir. 2007); ***United States v. Fields***, 516 F.3d 923, 950 (10th Cir. 2008).

22.20. Complaints regarding penalty phase arguments

Current Counsel for Mrs. Montgomery fault me for not having objected to many, particular penalty phase arguments made by the government (Doc. 71, p. 92,

201-203). As to one of the arguments, concerning Lisa's failure to apologize (Doc. 71, p. 202), proper objection was made, the matter was raised on appeal, and a finding of error, albeit harmless error, was made by the Eighth Circuit. ***United States v. Montgomery***, 1096-1097).

~~None of the other complaints is well taken.~~

Current Counsel claim that Matt Whitworth posited that the jury must make unanimously findings with respect to mitigating factors (Doc. 71, p. 201-202). Actually, Matt's point was as follows:

> Now aggravating factors, as the judge has told you, must be proven by us beyond a reasonable doubt. Mitigating factors are only required to be proved by a preponderance of the evidence. (Tr. 2865)

This statement was not objectionable because it was a flawless recitation of the applicable law with no inference that unanimity is required regarding mitigating factors findings.

Current Counsel argue that prosecutors' use of John's first phase argument descriptors about the killing of Bobbie Jo Stinnett[19] amounted to a contention that we on the defense side conceded that "death was the only appropriate sentence"

~~[19] Current Counsel also argue that John's concessions about the obvious, terrible nature of the crime were so contrary to Lisa's best interests as to create yet another instance of a conflict of interest worthy of Current Counsel's form of ***Cronic*** treatment (Doc. 71, p. 202, fn. 29. As already mentioned twice above, Current Counsel misapprehend ***Cronic***. Besides, a far better argument of ineffective assistance could have been made against John had he not made the obviously correct concessions which he did about the nature of the crime.~~

(Doc. 71, p. 202). While the argument by prosecutors drew the completely correct conclusion that we had always conceded the terrible nature of the crime itself, nothing can be teased out of such an argument regarding any concession from us upon the issue of punishment. Moreover, all of the other arguments of prosecutors, debating against our multifaceted case in favor of life, left a clear, contrary impression about prosecutors' understanding regarding our position as to proper punishment.

Current Counsel for Mrs. Montgomery pose that certain arguments by prosecutors improperly interjected their personal feelings (Doc. 71, p. 202). I have reviewed again the pages of the record cited by Current Counsel and I find nothing there for which any proper legal objection, including the one they proposed, could have been sustained.

Current Counsel posit that argument about justice for Bobbie Jo Stinnett's family coming from a death sentence went too far under applicable Supreme Court precedent. I would note that those Courts who have directly addressed the issue raised by Current Counsel have found the matter contrary to the position espoused by Current Counsel . ***Thorson v. State***, 895 So.2d 85, 113-114 (Miss. 2004); ***State v. Prevatte***, 570 S.E.2d 440, 490 (N.C. 2002); ***Edwards v. State***, 737 So.2d 275, 290-291 (1999); ***Kuenzel v. State***, 577 So.2d 474, 498 (Ala.Cr.App. 1990).

Current Counsel accuse that government arguments about our mitigating factors were somehow improper (Doc. 71, p. 202-203). I have never seen a case which has so held.

Current Counsel argue that showing the jury exhibits received in the case constituted an improper appeal to "emotion, vengeance, caprice" (Doc. 71, p. 203). My perception is that all holdings along these lines are contrary to this position.

Current Counsel claim that Matt Whitworth "argued that life imprisonment wasn't punishment (Doc. 71, p. 203). Actually, in referring to a life sentence, Matt said just the opposite, that "it's a very serious penalty" (Tr. 3181).

Current Counsel contend that prosecutors argued that the jury "could not exercise mercy or sympathy, and that there was a societal obligation to impose death (Doc. 71, p. 203). Rather, at the portions of the argument cited by Counsel, the prosecutors at most urged that jurors should not show mercy and that society cannot tolerate such a crime, both arguments regularly found appropriate by the Courts.

Current Counsel also claim that certain arguments by prosecutors unlawfully urged "that the responsibility for the death sentence was not borne by the jury" (Doc. 71, p. 203). However, Counsel do not point to any such argument, and no such argument was ever made.

23.21. Complaints regarding issues raised on appeal

Current Counsel for Mrs. Montgomery say that we failed to raise meritorious issues on appeal, ~~but give not one example~~ (Doc. 71, p. 227-228). All I can say to that in reply is that John Gromosky and I raised 9 meritorious issues on appeal, and we found nothing else worth raising.

***Conclusion***

I believe that the foregoing answers the ineffective assistance of counsel allegations made in the amended petition submitted on Mrs. Montgomery's behalf by Current Counsel for her (Doc. 71). If the Court wishes any further information from me, I am, of course, available, so long as Mrs. Montgomery gives her permission for me to answer further. I do hereby swear that the foregoing is true and correct to the best of my knowledge and belief.

/s/Frederick A. Duchardt, Jr.
FREDERICK A. DUCHARDT, JR.