# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **LISA M. MONTGOMERY**, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No. 12-08001-CV-W-GAF |
| | ) | Crim. No. 05-06002-01-CR-W-GAF |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent. | ) | |

## GOVERNMENT'S SUGGESTIONS IN OPPOSITION TO MOVANT'S AMENDED MOTION UNDER 28 U.S.C. § 2255

The respondent, the United States of America, respectfully requests that this Court deny the amended motion under 28 U.S.C. § 2255 filed by the movant, Lisa M. Montgomery, attempting to vacate her judgment and sentence. The Government provides the following suggestions in opposition to Montgomery's amended motion:

## I. Summary

In October of 2007, following a jury trial in the United States District Court for the Western District of Missouri, Montgomery was found guilty of the kidnapping of Victoria Jo Stinnett and the murder of Bobbie Jo Stinnett and was sentenced to death. On appeal to the United States Court of Appeals for the Eighth Circuit, Montgomery's convictions and sentence of death were affirmed by the Eighth Circuit. *United States v. Montgomery,* 635 F.3d 1074 (8th Cir. 2011). The United States Supreme Court denied her petition for a writ of certiorari on March 19, 2012. *Montgomery v. United States*, 132 S.Ct. 1741 (2012).

Montgomery now has filed a motion under 28 U.S.C. § 2255, attacking her conviction and sentence for innumerable reasons, including multiple claims of ineffective assistance of counsel. None of her claims has merit, and many of them are not even cognizable in a § 2255 because they involve mere alleged trial errors that should have been raised on appeal.

The Government has attached to its response affidavits from two of Montgomery's trial attorneys, Fred Duchardt and John O'Connor, which refute, in elaborate and painstaking detail, the various allegations of ineffectiveness that have been levied against them. In view of these affidavits, and the frivolous nature of many of the claims raised in Montgomery's petition, the Government does not believe – at this point in time, anyway – that an evidentiary hearing is required. Nor is Montgomery entitled to a certificate of appealability.

Accordingly, for the reasons outlined below, the Government believes that Montgomery's motion, although unreasonably voluminous, should be denied without an evidentiary hearing or certificate of appealability.

## II. <u>Procedural History</u>

On December 17, 2004, following her arrest, a one-count complaint was filed in the United States District Court for the Western District of Missouri alleging that the movant, Lisa M. Montgomery, on December 16, 2004, kidnapped infant Victoria Jo Stinnett and transported her in interstate commerce from Skidmore, Missouri, to Melvern, Kansas, and that the actions of Montgomery resulted in the death of the infant's mother, Bobbie Jo Stinnett, in violation of 18 U.S.C. § 1201(a)(1). (D.E. 1.)

On January 12, 2005, a grand jury in the Western District of Missouri returned a one-count indictment charging that on December 16, 2004, Montgomery willfully and unlawfully kidnapped, abducted, carried away, and held Victoria Jo Stinnett, and willfully transported her in interstate commerce from Skidmore, Missouri, across the state line to Melvern, Kansas, and that the actions of Montgomery resulted in the death of Bobbie Jo Stinnett, in violation of 18 U.S.C. § 1201(a)(1).   (D.E. 15.)

On January 20, 2005, Montgomery made her initial appearance on the indictment and was arraigned before United States Magistrate Judge John T. Maughmer.   (D.E. 18.)

On January 31, 2005, the Government filed a motion to dismiss the criminal complaint against Montgomery, and the court entered an order dismissing the complaint. (D.E. 24.)

The Government filed its notice of intent to seek the death penalty, on November 16, 2005.   (D.E. 64.)

On March 13, 2007, a grand jury returned a superseding indictment against Montgomery charging a violation of 18 U.S.C. § 1201(a)(1).   (D.E. 154.)   The superseding indictment charged the same crime as outlined in the initial indictment but added an amended "Notice of Special Findings" section that included the intent factors and aggravating circumstances the grand jury found in support of the death penalty.

Montgomery filed a multitude of pretrial motions which were denied by this Court.

On August 28 and September 4, 2007, this Court held hearings pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), regarding the

admissibility of certain testimony from one of Montgomery's proposed expert witnesses, Dr. Ruben Gur. (Tr. 9/4/07 at 103-97.) Dr. Gur had generated a report indicating that he had conducted brain imaging on Montgomery and made relevant findings to her mental state based on that procedure.

The Government objected to this proposed testimony and presented counter testimony by Dr. Alan Evans and Dr. Helen Mayberg. Both government experts challenged the scientific reliability of Dr. Gur's methodology, findings, and conclusions. (Tr. 8/28/07 at 8-17, 29, 41-42; Tr. 9/4/07 at 16-30.) The court noted that the Government was unable to challenge Dr. Gur's findings directly because he had not yet produced the raw data that allegedly supported his claims. At a hearing on September 5, 2007, the court ordered Dr. Gur to produce the raw data to the Government's experts no later than September 12, 2007. (Tr. 9/5/07 at 2-17.)

The deadline came and passed and Dr. Gur failed to provide any raw data. After further challenge by the Government, on September 19, 2007, Dr. Gur finally turned over the raw data which he claimed he had relied upon in arriving at his opinions, and which was necessary to enable the Government's experts to recreate the tests performed by Dr. Gur.

Both government experts, Dr. Mayberg and Dr. Evans, conducted separate tests comparing Montgomery's PET scans with the 23 individuals Dr. Gur had used in the comparison group (normals) as part of his analysis. Both government experts found that Dr. Gur's comparison method was seriously flawed and that, when the comparisons were

done properly, Montgomery's brain was well within the normal limits of the comparison group. (Tr. 8/27/07 at 12; Tr. 9/4/07 at 19, 30-32.)

This Court found that the comparison method utilized by Dr. Gur was scientifically invalid, and that any conclusions drawn from such a contrast also were invalid. As a result, the court excluded Dr. Gur's testimony pertaining to the imaging of Montgomery's brain.

Montgomery, however, had an array of other experts testify to her mental illness at trial. These included Vilayanur Ramachandran, M.D., Dr. William Logan, M.D., Dr. Linda McCandless, M.D., and Dr. Ruth Kuncil, M.D. The Government presented the testimony of Dr. Park Dietz, M.D., and Dr. Daniel Martell, Ph.D.

A jury was empaneled and trial began on October 1, 2007, before this Court. On October 22, 2007, the jury found Montgomery guilty of the kidnapping of Victoria Jo Stinnett and the murder of Bobbie Jo Stinnett. (D.E. 341.)

The penalty phase of the trial began on October 23, 2007. On October 26, 2007, the jury unanimously found that the aggravating factors presented by the Government outweighed the mitigating factors submitted by Montgomery and found that Montgomery should be sentenced to death. (D.E. 353.)

On April 4, 2008, following a denial of Montgomery's motion for a new trial, the court sentenced Montgomery to death. (D.E. 402; Gov. Adden. A1.)

On April 5, 2008, Montgomery filed her notice of appeal with the United States Court of Appeals for the Eighth Circuit. (D.E. 403.) On June 22, 2011, the Eighth

Circuit issued an opinion affirming Montgomery's conviction and sentence in *United States v. Montgomery,* 635 F3d 1074 (8th Cir. 2011).

In her appeal to the Eighth Circuit, Montgomery raised the following nine issues: (1) the sufficiency of the evidence; (2, 3) the exclusion of the brain imaging evidence from Dr. Gur during the trial and during the penalty phase; (4) the admission of evidence regarding Montgomery's "mothering skills" and her failure to apologize to her children for her actions; (5, 6) the exclusion of Montgomery's proposed evidence, during the guilt and penalty phases of the trial, that her physical reactions during a defense-sponsored polygraph examination "were not indicative of deception"; (7) the sufficiency of the evidence, during the penalty phase of the trial, that Montgomery's murder of Bobbie Jo Stinnett was committed "in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim"; (8) whether this Court erred in submitting to the jury Penalty Phase Instruction No. 1, which instructed the jury "that the defendant must be sentenced to death" if the jury unanimously found that the aggravating factors sufficiently outweighed any mitigating factors; and (9) whether Montgomery was entitled to a new trial or a new sentencing hearing based upon the "cumulative effect" of any or all of these alleged errors.

After her conviction and sentence were affirmed by the Eighth Circuit, Montgomery filed a petition for a writ of certiorari with the United States Supreme Court, which was denied on March 19, 2012. *Montgomery v. United States*, 132 S.Ct. 1741 (2012).

On March 18, 2013, Montgomery filed her initial motion pursuant to 28 U.S.C. § 2255. On October 1, 2013, Montgomery filed an amended 28 U.S.C. § 2255 motion.

### III. Factual History

On the afternoon of December 16, 2004, the Nodaway County, Missouri, Sheriff's Department received a frantic 911 call from Becky Harper stating that her daughter, Bobbie Jo Stinnett, was injured. (Tr. 518-19, 525-27.) Mrs. Harper had arrived at her daughter's house in Skidmore, Missouri, to find her daughter lying in a pool of blood. (Tr. 518, 544.) Mrs. Harper informed the dispatcher that it appeared that her daughter's stomach had exploded. (Tr. 518-19, 526.) Mrs. Stinnett was eight months pregnant at the time, awaiting the birth of a baby girl. (Tr. 499, 502, 514, 518, 534.)

Emergency personnel and investigators immediately determined that Mrs. Stinnett's mid-section had been cut laterally, her fetus had been removed, and the umbilical cord had been cut. (Tr. 533-35, 573, 575.) Upon arrival at the emergency room, hair was found clenched in both of Stinnett's hands, and strangulation marks were observed on her neck. (Tr. 538, 549, 579, 584-85, 1632-33.) A subsequent medical examination of Mrs. Stinnett's body confirmed that she had been strangled. (Tr. 656-58.)

In addition to the incision wound to the lower abdomen, which had been made in order to remove the fetus, Mrs. Stinnett had suffered blows to the head and to the nose. (Tr. 655, 660-63, 814-15.) She also suffered cuts on her fingers and abrasions on both elbows. (Tr. 652-54.) Medical examinations later confirmed that Mrs. Stinnett was initially strangled to unconsciousness, and her abdomen was cut open; she then regained

consciousness and struggled against her attacker. (Tr. 657, 666, 810-11, 815.) At that point, she was then strangled to death, then her abdomen was cut open further and the baby was fully removed. (Tr. 810-811, 828-31.)

Given the circumstances of the crime, investigators from the Nodaway County Sheriff's Department, the St. Joseph, Missouri Police Department, Missouri Highway Patrol, the Maryville, Missouri Department of Public Safety, the Cameron, Missouri Police Department, the Kansas City Regional Computer Forensic Laboratory, and the Federal Bureau of Investigation (FBI), began an intensive investigation, which included an Amber Alert. (Tr. 536, 539, 556, 579, 588, 631, 636.)

Mrs. Stinnett's mother told investigators at the scene that her daughter was involved in the breeding of rat terrier dogs and someone had scheduled an appointment to come to her daughter's house to look at a dog just prior to the murder and abduction. (Tr. 506-07, 515, 538-39, 634.) Mrs. Stinnett frequently used the Internet in connection with her dog breeding business. (Tr. 500-01, 740-42.)

A computer forensic examiner was able to view Mrs. Stinnett's computer at the scene. (Tr. 539, 671-76.) A preliminary search of her computer revealed instant message communications with a person using the name "Darlene Fisher" from Fairfax, Missouri. (Tr. 635, 679-84.) Police were not able to locate anyone in Fairfax, Missouri, with the name Darlene Fischer. (Tr. 541, 557, 635-36.) However, the computer examiner determined that the message board postings contained an IP address. Law enforcement utilized the IP address to trace back the communication to a computer

in the home of Kevin Montgomery in Melvern, Kansas. (Tr. 639-40, 698.) Kevin Montgomery is Lisa Montgomery's husband.

Additionally, a dog breeder in Franklin, North Carolina, reviewed messages on a rat terrier message board and found a message from Darlene Fischer to Mrs. Stinnett the night before her murder. (Tr. 699-702, 1320-21.) The breeder provided the IP address of that message to the FBI. (Tr. 702, 1323.) Law enforcement determined that the subscriber associated with the IP address was also Kevin Montgomery with a physical address in Melvern, Kansas. (Tr. 1323-26.)

Further, a tip was also called in by a woman, Patsy Hughes, informing police that she had seen the Amber Alert, and that a friend of hers, Lisa Montgomery, had just reported having a child under circumstances that Ms. Hughes said concerned her. (Tr. 567-69, 638, 1202.) Ms. Hughes provided police with Lisa Montgomery's address in Melvern, Kansas. (Tr. 569, 1202.)

On December 17, 2004, law enforcement authorities began immediate surveillance of Montgomery's residence in Melvern, Kansas. (Tr. 1284, 1637, 1667.) A red vehicle matching the description of a vehicle seen at Mrs. Stinnett's residence at the time of the crime was at the Montgomery residence. (Tr. 620-21, 626-28, 633, 1637, 1667.) When law enforcement approached the home and knocked on the front door, Kevin Montgomery voluntarily allowed the officers and agents into the home. (Tr. 1006, 1284, 1638.) When they entered the home, officers saw Lisa Montgomery sitting on the sofa, holding the infant while watching the Amber Alert scroll across the bottom of the television screen. (Tr. 1289, 1639, 1668.) At the request of law enforcement officers,

Montgomery allowed an officer to hold the infant, and agreed to be questioned by police outside the home. (Tr. 1006-07, 1285, 1640-41.)

Montgomery told investigators that she delivered her baby on December 16, 2004, at the Birth & Women's Center in Topeka, Kansas. (Tr. 1640.) A subsequent check at the Birth & Women's Center revealed that there were no births at the center on December 16, 2004. (Tr. 1342.) She then admitted that this was a lie she had told her husband. (Tr. 1643.)

She then claimed to have actually delivered her baby in her home the day before in order to save money. (Tr. 1643.) She said two friends had been with her at the time of the birth. (Tr. 1643.) When asked the names of the friends, Montgomery stated that, in truth, her friends were not with her but they were just on stand-by in case there were problems. (Tr. 1643.)

When her in-laws arrived at the residence, Montgomery demanded to be taken from the scene. (Tr. 1644.) She was transported to a substation of the Osage County Sheriff's Department to continue the interview. (Tr. 1645.) Shortly after arrival, Montgomery stated to investigators, "You have Bobbie Jo's baby." (Tr. 1646.) Thereafter, Montgomery confessed to having strangled Mrs. Stinnett and to removing the fetus. (Tr. 1646, 1649.) She admitted the baby she had was Mrs. Stinnett's baby and that she had lied to her husband about giving birth to a child. (Tr. 1646.)

At the same time that Montgomery was being interviewed, FBI agents obtained consent to search from Kevin Montgomery for searches of the residence and the Montgomery's red car. (Tr. 1008-10.) In the trunk of the car, they found a trash bag

containing numerous items, including a bloody coat, a bloody towel, a bloody disposable pad and an umbilical cord clamp. (Tr. 1258-60.)   In the pockets of that coat, they found a knife with blood on it and a rope with blood and hair on it.   (Tr. 1258-59.)

DNA testing confirmed that Mrs. Stinnett was a contributor to the blood on the knife and the hair on the rope.   (Tr. 1305, 1309.)   DNA testing also indicated that fingernail scrapings obtained from Montgomery contained a mixture, the major component identified to Lisa Montgomery, the minor component being consistent with Mrs. Stinnett.   (Tr. 1313-14.)

Inside Montgomery's residence, law enforcement found a birthing kit (with a umbilical cord clamp and infant nasal suction bulb missing), a digital camera, a disposable camera, birth announcements, a motion for change of custody of Montgomery's children filed by her ex-husband, and a letter, purporting to be authored by Dr. Stephen Saylor, dated October 8, 2003, and referencing the loss of a baby and Montgomery's donation of that baby to science.   (Tr. 1241-48.)   Dr. Saylor later testified that he did not author the October 8, 2003, letter, and never treated Montgomery. (Tr. 1621-22.)

Investigators were able to piece together the events that led up to the crime and the events that followed.   Montgomery met Bobby Jo and Zeb Stinnett at a dog show in Abilene, Kansas, in April 2004.   (Tr. 501-02, 919.)   Shortly after this dog show, Mrs. Stinnett learned that she was pregnant and began telling other dog breeders on the Internet website message boards and in e-mails about her pregnancy.   (Tr. 738-39, 743-44, 1644.)   It was determined through computer evidence that Montgomery viewed

these same websites and posted to the same message boards on multiple occasions. (Tr. 760, 1676.)

During this time period, Montgomery began falsely claiming she was also pregnant. (Tr. 504, 894-97, 909, 1190.) However, this was not the first time that Montgomery falsely claimed she was pregnant.

In 1990, after the birth of her fourth child with her first husband, Carl Boman, Montgomery had a tubal fulguration, in which her fallopian tubes were occluded by cauterization. (Tr. 1064-67.) This sterilization procedure made it impossible for Montgomery to become pregnant. (Tr. 2061-62.) Yet, despite knowledge of her own procedure, Montgomery continued to fake pregnancies in front of individuals who were not aware of it.

In 1994, while still married to her Carl Boman, Montgomery had an extramarital affair. (Tr. 1068-69.) Montgomery claimed that she was pregnant by the man with whom she had the affair. (Tr. 1071-72, 1097, 1751.) Mr. Boman and Montgomery later reconciled and Montgomery ceased making the claim. (Tr. 1071-72, 1097-99.)

In 2000, prior to her marriage to her second husband, Kevin Montgomery, Montgomery claimed that she was pregnant and needed money from Kevin Montgomery to have an abortion. (Tr. 938, 962-63.) Kevin Montgomery gave her the money and the pregnancy was not mentioned again. (Tr. 963, 1038.)

In 2002, Montgomery told Kevin Montgomery, along with her friends in the area, that she was pregnant again. (Tr. 745-48, 882, 938, 965, 1138-39, 1755, 1936.) Montgomery claimed that she was receiving prenatal care from Dr. Robert Hutchinson, a

local physician, but would not allow Kevin Montgomery to attend any prenatal visit with her. (Tr. 965-66.) Dr. Hutchinson testified that he never provided prenatal care for Montgomery. (Tr. 1624.)

In 2004, Montgomery again claimed that she was pregnant. (Tr. 504, 754, 834, 849, 882, 892, 938, 971, 1121, 1166, 1182.) She again told Kevin Montgomery that she was monitoring her pregnancy with Dr. Hutchinson. (Tr. 972, 974.) Montgomery told her friends and immediate family that she was due in December 2004. (Tr. 981.) Montgomery put in for maternity leave with her employers. (Tr. 1124-25, 1182.)

In 2004, Carl Boman and Montgomery were in a custody dispute over their children. Mr. Boman heard that Montgomery was once again claiming to be pregnant. (Tr. 1075.) Mr. Boman knew that Montgomery could not become pregnant due to her sterilization. Mr. Boman and his second wife, Vanessa, sent e-mails to Montgomery telling her that they planned to expose her lies in court to use it against her in the custody proceedings. (Tr. 1077-81, 1107-08, 1469-72, 1491-98, 1504-06, 1526-27.)

On December 10, 2004, Mr. Boman filed a motion for change of custody of the two minor children, Chelsea and C. J., who still resided with Montgomery. (Tr. 1082-83.) Mr. Boman testified that Montgomery boasted to him on the telephone in both November and December 2004 that she would prove him wrong. (Tr. 1082-84.)

Computer forensic examiners later conducted a thorough search and examination of Montgomery's computer. (Tr. 1408-11, 1427-28, 1565-66.) The Internet history clearly established that Montgomery had been targeting Mrs. Stinnett and planning her crime for months. The Internet history extracted from 2004 showed numerous searches

to websites containing images and information pertaining to fetuses and neonates at varying ages of gestation. (Tr. 1443-1521.) An ultrasound photograph was also located, along with the website that was visited to obtain it. Both the original ultrasound and a cropped version of the ultrasound, where the real mother's name was edited out and replaced by Lisa Montgomery's name, was located on Montgomery's hard drive. (Tr. 1439-41.) Further forensics examinations showed that after the ultrasound photograph was edited, it was printed from Montgomery's computer. (Tr. 1442.) Witnesses testified that Montgomery showed them the ultrasound photograph in 2004 claiming that it was her baby. (Tr. 973-74, 1182, 1193-94.)

The Internet history also showed visits to websites about home birthing (Tr. 1474-76, 1482-84, 1531-33), water birthing (Tr. 1531-33), pitocin and oxytocin to induce birth (Tr. 1485-87), cesarean sections and emergency cesarean sections (Tr. 1501-03, 1511-17, 1531-33), the process of obtaining birth certificates (Tr. 1474-76, 1484-85), and the calculation of child support. (Tr. 1431, 1436-37, 1448.) Evidence also was located regarding the research and purchase of the home birthing kit. This was the same home birthing kit located inside the Montgomery house at the time of the search. (Tr. 1477-78.)

Further, there was computer activity directly related to Mrs. Stinnett, including online communications where Montgomery inquired about Mrs. Stinnett's location and residence. (Tr. 1425-26, 1487, 1498-1502, 1506-08.) The Internet history also revealed visits to Mrs. Stinnett's own webpage and photograph accounts, which included photographs of Mrs. Stinnett and her dogs and photographs of Mrs. Stinnett posing to

document her pregnant abdomen. (Tr. 1488-89, 1498.) There were also a series of Internet searches for the address and directions to Mrs. Stinnett's house which is in northwest Missouri. (Tr. 1488-89, 1508-09.)

Using credit card records, cell phone records, and computer records, investigators were able to determine that the day before the murder/abduction, Montgomery drove to northwest Missouri. (Tr. 1327-32.) Based upon e-mail search warrant results and the Internet history, investigators learned that upon returning to her residence later that day, Montgomery created and used the "Darlene Fischer" account, with the e-mail address fischer4kids@hotmail.com. (Tr. 1545-49.) Specifically, "Darlene Fischer" communicated by instant messenger with another rat terrier breeder, Jason Dawson, about obtaining a puppy that Montgomery already knew that Mrs. Stinnett was selling. (Tr. 759-61.) Dawson referred her to Mrs. Stinnett. (Tr. 760.)

Computer examiners located communications between "Darlene Fisher" and Mrs. Stinnett in which "Fischer" indicated that she wished to purchase one of Mrs. Stinnett's puppies and set up a meeting with Mrs. Stinnett at her residence the following day. (Tr. 1552-53, 1555-63.) Mrs. Stinnett e-mailed Montgomery MapQuest directions to her home in Skidmore, Missouri. (Tr. 713-16.) Additionally, computer analysis revealed that Montgomery, prior to the time she left her residence and traveled to Mrs. Stinnett's home, selectively deleted incriminating Internet history. (Tr. 1566-70.) Investigators still were able to retrieve the deleted Internet history from the hard drive of Montgomery's computer. (Tr. 1566-70.)

According to Montgomery, she drove to Mrs. Stinnett's home in Skidmore, Missouri, on the day of the crime. (Tr. 1649.) She and Mrs. Stinnett visited for approximately two hours and played with Mrs. Stinnett's dog. (Tr. 1650.) Around 2:30 p.m., after Mrs. Stinnett had received a telephone call from her mother, Becky Harper, Montgomery assaulted and eventually killed Mrs. Stinnett. (Tr. 516, 523, 1671.) Montgomery strangled Mrs. Stinnett with a rope that she had hidden in her coat pocket and used a kitchen knife, which was also hidden in her coat pocket, to cut Stinnett and remove the fetus. (Tr. 1650, 1665.) According to Montgomery, she then fled the Skidmore area in her vehicle, taking the baby with her. (Tr. 1650.)

Following the crimes, Montgomery drove to Topeka, Kansas. (Tr. 1330.) She telephoned her husband, Kevin, advising him that she had driven to Topeka to do some Christmas shopping when she went into labor and gave birth at the Women's Birthing Center. (Tr. 986, 1340.) Kevin Montgomery and two of the Montgomery's teenage children traveled to Topeka to meet Montgomery and the newborn baby. (Tr. 988-93.)

After traveling back to Melvern, Montgomery called her family and friends to announce the baby, whom she named Abigail. (Tr. 851-53, 941-42, 994-95.) Kevin Montgomery's parents and a friend of the family visited her. (Tr. 994-95, 1175.) Photographs were taken that evening of the Montgomerys and the baby. (Tr. 992.) The photographs later were seized as evidence. (Tr. 1243.) Birth announcements, found at the Montgomery residence, were filled in with the name "Abigail." (Tr. 1002.)

The following morning, December 17th, Montgomery, her husband, and the infant traveled to the nearby town of Melvern, Kansas. (Tr. 996.) The Montgomerys showed

off the baby to various people around town.    They stopped at the bank and ate breakfast at the Whistle Stop Café.    (Tr. 871, 884-85, 996-97.)    Then they traveled to Lyndon, Kansas, stopping at the Casey's General Store and the Osage County Courthouse. (Tr. 835-37, 878, 999-1000, 1128.)    After returning to their residence, investigators approached the home, contacted Montgomery, and she was subsequently arrested. (Tr. 1005-08.)    She repeatedly confessed to the crimes, on a number of occasions, shortly after her arrest.

The baby, Victoria Jo Stinnett, who is now with her father, Zeb Stinnett (Bobbie Jo Stinnett's widower), suffered only a cut above one eye.    (Tr. 991, 1286, 1669.)

## IV.    Montgomery's Guilt Phase Case-in-Chief

Montgomery's defense at trial was that she was not guilty by reason of insanity. Montgomery called 27 witnesses during the guilt phase.    Although the defense experts testified that Montgomery suffered from severe mental illnesses that prevented her from being able to appreciate the nature and quality or the wrongfulness of her acts at the time of the offense, the defense spent much of their case-in-chief humanizing Montgomery and explaining how her childhood was spent in a terror-ridden environment.    The witnesses testified how Montgomery was able to survive years of physical, emotional, verbal, and sexual abuse.

John Patterson testified that he is Lisa Montgomery's biological father.    Patterson met Montgomery's mother, Judy, in a bar, they married and had Montgomery. Patterson was an alcoholic, and Judy drank heavily while she was pregnant with Montgomery.    Patterson was an absent father the first year of Montgomery's life, while

Judy had affairs with multiple men in the family home. When Patterson finally came home from military duty in Korea, he had a volatile relationship with Judy. Patterson described how men would come to their home and fist fight over Judy upon his return from Korea. The home environment was so bad that Patterson abandoned the family and signed up for another tour of duty in Vietnam. Patterson testified that "I just couldn't deal with Judy anymore. I abandon[ed] them." (Tr. 1715.) Patterson also described how he witnessed Judy physically abusing his older daughter, Diane. Patterson testified that he has a history of mental illness and was placed in a psychiatric ward in the army for psychiatric treatment. Patterson explained how he still has post-traumatic stress disorder attacks to this day.

Judy Shaughnessy (Judy), Lisa Montgomery's mother, testified. Judy testified she has been married multiple times. She was previously married to John Hedberg Patterson, Jack Kleiner, Richard Boman, Hecter Oshoa, and Danny Shaughnessy. Judy testified she moved around frequently when Lisa Montgomery was a child. Montgomery was born in the state of Washington, as was Montgomery's younger sister, Patty. Judy moved with Montgomery and Patty to Larenfield, Kansas; then Rossville, Kansas; then back to the state of Washington; then Colorado Springs, Colorado; then Rossville, Kansas; then Ogden, Kansas; then Tulsa, Oklahoma; then Modesto, California; then San Antonio, Texas, then Sperry Oklahoma; then Cleveland Oklahoma. While in Oklahoma Judy met and married Jack Kleiner. Judy described Kleiner as a cruel man that drank a fifth of rum every night. Judy testified that Kleiner struck the children, and Judy's daughters told Judy that Kleiner made them go in the bathroom and take their

pants down to get whipped with a belt. Judy testified that she caught Kleiner having sex with Montgomery in February of 1984 when Montgomery was 14 years old. Montgomery disclosed to Judy that Kleiner had been molesting her for quite some time. Judy also testified that after Montgomery's 1990 sterilization procedure after the birth of Montgomery's fourth child, Montgomery claimed to be pregnant on multiple occasions. Judy testified that when Montgomery was grown, Judy thought something was wrong with Montgomery's mental health, but could not convince Montgomery to seek counseling or treatment.

Patty Baldwin (Patty), Montgomery's sister, testified that both she and Lisa Montgomery were repeatedly physically abused by Jack Kleiner over a period of years during their childhood. Patty also witnessed Kleiner sexually abusing Montgomery.

Jackie Moffett (Jackie), Montgomery's step sister, testified that Jack Kleiner is her father. Jackie testified that Kleiner is a very mean alcoholic who abused all of his children. Jackie testified about how terrifying it was to watch Kleiner abuse the younger children. Jackie specifically remembered how she and Montgomery sat at the kitchen table physically shaking as Kleiner abused Patty. Jackie also testified how Judy never hugged or showed her children affection. Jackie testified that Montgomery and Patty were singled out and received harsher treatment then the other children Kleiner and Judy later had together. Jackie also testified that she felt guilt and fear for Montgomery and Patty because she moved out of the house and left them unprotected at the abusive hands of Judy and Kleiner.

Becky Perkey (Becky), Montgomery's step-sister, testified that Jack Kleiner is her father. Becky testified that growing up in a house with Kleiner was constant terror because of the constant beatings the children received. She remembered Kleiner beating her with his fists, his knees, and chipping her tooth with a telephone receiver. Becky also remembered how terrified Montgomery was when Kleiner and Judy were beating Patty. Becky described seeing Montgomery with her head down, her lips quivering, and Montgomery was shaking all over. Becky also testified that she never saw Judy express any love towards Montgomery and never saw Judy protect Montgomery.

David Kidwell testified that Lisa Montgomery's mother, Judy, is his aunt. He testified that he is close in age with Judy and grew up around her. He testified that Judy grew up as a "wild" person. He further testified that Judy told him that she caught Jack Kleiner raping Montgomery when Montgomery was a child. Judy told Kidwell that she thought young Montgomery had brought the rape on, that Montgomery had led Jack Kleiner on, and Judy thought Montgomery had enticed Jack Kleiner.

Michael Boman (Michael) testified that Richard Boman is his father. He testified that when he was in the second grade Judy and her five children moved in with Richard and Michael. Michael described Judy as argumentative and verbally and physically abusive. Michael testified that Montgomery would try to stick up for him when Judy was abusive to Michael. Michael testified that when he was 16 years old he ran away from home because of Judy's abuse.

William Boomhower testified that he knew Montgomery when she lived in Deming, New Mexico. Boomhower testified that Montgomery and her husband Carl

Boman brought their children to events at the Moose Lodge where Boomhower served as governor of the lodge, such as weekly dinners, Halloween parties, Easter parties, and Christmas parties. Boomhower also testified that Judy and Richard lived in Deming, New Mexico, at the same time as Montgomery. Boomhower testified that Judy "used" people, and that it was common knowledge that Judy claimed Montgomery took Judy's husband (Jack Kleiner) away from Judy.

Phyllis Perdue testified that she knows Judy Shaughnessy (Judy) through Perdue's work as a child welfare specialist in Tulsa County, Oklahoma. Perdue testified that Judy was trying to get legal custody of Judy's grandson, Justin Kleiner, but that during the home study of Judy, she disappeared for seven to eight months and was denied legal custody.

Pat Brunton testified that she worked for three years in Shawnee County, Kansas, to find placement for foster children or reintegration with biological parents. Brunton testified she worked with Justin Kleiner's parents Bonnie and Teddy Kleiner. Brunton testified that Montgomery tried to assist Bonnie Kleiner with learning how to clean, cook, and launder clothes. Brunton described Montgomery as quiet and always very polite. Brunton told the jury how Montgomery raised goats and spun yarn by hand. Brunton testified Montgomery's children were well balanced and clean and that the children had their needs met. Brunton testified that Montgomery was a good mother with good mothering skills. Brunton testified how surprising this was since Montgomery had not been raised well herself. Brunton testified about reports that Montgomery's mother, Judy, had many husbands and Judy had sexual activity with men in front of the children.

Brunton described Judy as dishonest and as a manipulative woman who actually pits her children against one another. Brunton testified that she believes Montgomery was the family scapegoat, and that Montgomery was wrongly blamed for the family's problems. Brunton testified Montgomery was sexually raped and molested by Jack Kleiner, and that Judy told Brunton that Montgomery had seduced Jack Kleiner; that it was Montgomery's fault she was raped, and that Montgomery was trying to steal Jack Kleiner from Judy. Brunton testified that she has worked with at least 200 families, and that Judy Shaughnessey's family is "easily the second most dysfunctional family" she has ever worked with. (Tr. 1864.)

Teddy Kleiner (Teddy) testified that he is Montgomery's half-brother. Teddy testified that his father, Jack Kleiner, was a drunk when he and Montgomery were growing up. Teddy testified that Jack Kleiner was physically abusive to the children, and he witnessed Jack Kleiner raping Montgomery when they were growing up in the Kleiner home. Teddy described Montgomery as being a passive person that "any ten year old kid on the street could beat up." Teddy explained that Montgomery did not show her emotions very well.

Joy Montgomery (Joy) testified that she is Montgomery's mother-in-law. Joy testified that in 2004 Lisa Montgomery said she was pregnant, and Joy believed her. Joy further testified that one day in 2004, Montgomery's mother, Judy, and sister, Jerry, came to Joy's home, knocked on Joy's door and just walked in stating that Montgomery was not pregnant and could not get pregnant. Joy testified that she thought Judy and Jerry were just trying to stir up trouble.

Roger Montgomery (Roger) testified that he is Montgomery's father-in-law. Roger testified that in 2004 he thought Montgomery was pregnant. Roger testified that one day in 2004, Montgomery's mother and sister came to the door in a "hysterical type of atmosphere" and made accusations that Lisa Montgomery was not really pregnant. Roger testified that he did not believe Judy because he was aware of the problems Judy had caused Montgomery in the past.

Monica Guitterrez testified that she worked with Montgomery when Montgomery lived in Deming, New Mexico. Guitterrez testified that Montgomery would occasionally bring her children to work, and that Montgomery would interact with her children. Guitterrez testified that Montgomery was having marital problems and seemed sad. Guitterrez testified that Montgomery and her mother, Judy, did not have a loving mother-daughter relationship. Guitterrez also testified that Montgomery frequently talked non-stop in a rapid and repetitive manner.

Tamara Hand testified that Montgomery worked for her when Montgomery lived in Deming, New Mexico, at the newspaper office called the Deming Headlight. Hand testified that Montgomery was a good employee. Hand never had any trouble with Montgomery, and Montgomery was allowed to bring her children to work. Hand testified Montgomery interacted well with her children, Montgomery's children were well behaved, and Montgomery gave them instructions and helped them with their homework. Hand described Montgomery's job as stressful. Hand testified that Montgomery handled her assignments and duties responsibly.

Nancy Wallentini testified that in the 1980's she worked at Family and Children Services in Tulsa, Oklahoma. As part of Wallentini's job, in 1984 and 1985, she conducted counseling sessions with Montgomery because of allegations that Jack Kleiner had sexually abused Montgomery. Wallentini described Montgomery in 1984 as a "shy 16 year old" who was nervous during the counseling sessions and reluctant to talk about the abuse. Wallentini testified that in 1984 Montgomery was not involved in many school activities because Montgomery had the responsibility of caring for her younger siblings at home. (Tr. 1923.) Wallentini testified that Montgomery was sexually abused for approximately two years. Wallentini further described Montgomery as having difficulty expressing emotions and was blocking feelings. Wallentini testified that Jack Kleiner threatened Montgomery not to tell anyone of the sexual abuse or Kleiner would sexually abuse Montgomery's sister. Wallentini testified that she had five sessions with Montgomery where it was just one-on-one. Wallentini concluded her testimony by saying the length of time she spent counseling Montgomery was definitely not sufficient.

Desiree Boman (Desiree) testified that Montgomery is her mother. Desiree testified that at the time of the offense she believed her mother was pregnant. Montgomery wore maternity clothes and her stomach was larger. Montgomery took Desiree with her to shop for maternity clothes. Desiree testified that Montgomery disciplined all the children, but Desiree does not remember her sister, Chelsea, getting slapped by Montgomery over a yarn-spinning incident. Desiree testified that Montgomery worked a lot, and at times worked three jobs.

Carl Boman, Jr. (C.J.) testified that Montgomery is his mother. C.J. testified that at the time of the offense he believed his mother was pregnant. C.J. testified that Montgomery looked pregnant and she sometimes had morning sickness. C. J. also testified that Montgomery did not object to C. J. living with his father, but that Montgomery wanted C. J. to finish the school year before moving.

Rick Malone testified that he was assistant manager at Wendy's restaurant when Montgomery worked there in 2004. Malone testified that in 2004 Montgomery looked pregnant and he definitely believed that she was pregnant.

Stephanie Herrick testified that she is wheelchair-bound because of a disease called cytotaxia that attacks the muscles of the body. She testified that her husband worked with Montgomery at Casey's before the offense. Herrick described Montgomery as happy-go-lucky and generous. Herrick testified that Montgomery gave her a puppy for companionship because Herrick was at home all day by herself. Herrick testified that she and Montgomery went to a movie and dinner the weekend before the offense. Herrick testified that Montgomery looked pregnant because Montgomery had an enlarged stomach.

Becky Bodine testified that she fostered Montgomery's nephew, Justin. Bodine testified that Justin's parents are Bonnie and Teddy Kleiner. Bodine testified that Montgomery testified in support of Bodine adopting Justin.

Troy Schnack testified that he is a computer system administrator with the Federal Public Defender's Office. Schnack testified that he conducts forensic examinations of computers and uses the same tools as the government's expert used in the Montgomery

case.   Schnack further testified that he conducted a forensic examination of Montgomery's computer.   Schnack presented many of his computer findings to the jury including Montgomery extensive search for her half-sister, Diane Hedberg; her searching for baby care items as far back as 2002, and Montgomery crying over the placement of her nephew, Justin.   Schnack read a posting by Montgomery that said "[m]y nephew is a year and a half old and he was in foster care for over 14 months with wonderful foster parents who truly loved and adored him.   We won't be able to have visits with him. And here is why.   My mother is the type of person that if I had him for a weekend and he got a bruise would turn me in instantly for abuse and then try to have my children taken so she could get them, too.   She is on her sixth marriage and wants an instant family with her new younger husband and this is her way to do it.   When my little brother was arrested she immediately went to the state and tried to have my children removed from my home.   They didn't because I was able to prove she did it in retaliation but the threat is still there.   So I am not sure at this point what to do.   Lisa M."   (Tr. 1991.)   Schnack also explained to the jury that in April of 2004 Montgomery searched photos from many dog breeders accounts other than just Bobbie Jo Stinnett, such as Jason Dawson, Tracy Ramirez, and Patricia Hughes.

Eugene VandenBoom testified that he is a physician specializing in ObGyn. Dr. VandenBoom testified that he was involved in having Montgomery tested to determine if she remained sterile after her tubal fulguration surgery.   The test performed is called a hysterosalpingo gram.   The testing did in fact confirm that Montgomery

remained sterile, and she could not become pregnant after her original tubal fulguration procedure in 1990.

Linda McCandless testified that she is a psychiatrist who works mainly at Corrections Corporation of America (CCA). Dr. McCandless testified that she first evaluated Montgomery at CCA, four days after her December 17, 2004, arrest. During the evaluation she questioned Montgomery about her medical history, her family's medical history, and completed a mental status evaluation. Dr. McCandless diagnosed Montgomery with bi-polar disorder, rapid dysthymic disorder, possible alcohol dependency, possible brief psychotic episodes, and possible dissociate amnesia. Dr. McCandless' diagnosis of bi-polar was based largely on Montgomery's detailed history of mood swings since the age of 28 or 29 and Montgomery's long history of depression following highs. Dr. McCandless explained to the jury how the mental illness of bi-polar disorder can cause racing thoughts, inability to concentrate, increased energy, poor judgment, and impulsive decisions. Dr. McCanless' diagnosis of dysthymic disorder was based on Montgomery's depression for at least 21 of the past 24 months. Dr. McCandless testified that she questioned Montgomery about the offense. Montgomery told Dr. McCandless that she did not remember the incident of the murder, and that "I can't think that I would do something like that." Montgomery also was unsure if she felt suicidal at that time, and was later placed on suicide watch. Dr. McCandless described to the jury how inmates on suicide watch are stripped of their clothing and put in a paper gown so that no clothing can be used for self-harm. The inmates are not allowed eating utensils and are given only finger food. Inmates are

basically left in a cell with only a mattress. Montgomery was on suicide watch from December 21, 2004 until January 17, 2005. Once taken off suicide watch, Montgomery began to hoard sleeping pills and was placed on suicide watch again until March 18, 2005. Montgomery was then placed in an isolation setting because of the high profile nature of the criminal case.

Dr. McCandless testified that she had a total of 62 medical visits with Montgomery in the year 2005. Dr. McCandless continually monitored Montgomery's unstable moods, sleeping habits, and speech, which confirmed the bi-polar mental illness. In February of 2006, Dr. McCandless began Montgomery on an anti-depressant drug regime called Wellbutrin. In March of 2006, Dr. McCandless began Montgomery on a mood stabilizer drug regime called Depakote. Dr. McCandless also testified that because of Montgomery's history of persistent migraine headaches, she treated Montgomery with the drug Elavil. Dr. McCandless stated that since Montgomery has been on the anti-depressant and mood stabilizer drug regimes that Montgomery has less severe mood swings.

Dr. McCandless was unable to "rule out" the mental illnesses of psychosis or dissociative amnesia. In fact Dr. McCandless explained how Montgomery's repeated reports of being pregnant after being sterilized, and Montgomery's belief of having still-births, and Montgomery showing off the kidnapped baby as if it were her baby led Dr. McCandless to believe Montgomery suffered from delusions and psychosis, which Dr. McCandless called "delusional cycling psychosis."

Dr. McCandless ended her testimony by explaining how Montgomery eventually was able to be housed with the general population at CCA, and Montgomery was doing well with the other inmates.

Beverly Kemper testified that she is a registered nurse who specializes in mental health. Nurse Kemper explained how she was intake nurse at CCA when Montgomery came to the facility. Nurse Kemper testified that she has spent a great deal of time with Montgomery over the years. Nurse Kemper described Montgomery as initially appearing like any other young woman, "[h]owever, it didn't take long to understand that there were a lot of hidden things within her that she was not able to verbalize and give to you, that she was a very troubled young lady." Nurse Kemper explained that Montgomery's history of family issues and past abuse were "very hidden." (Tr. 2151-52.)

Dr. Vilayanur Ramachandran testified that he has been the Director of the Research Center for Brain and Cognition at the University of California, San Diego, for the past 25 years. He testified that he is a medical doctor and also obtained a Ph.D. in nuclear science in neurology from the University of Cambridge in England. He held post-doctoral research fellowships at Oxford University in England and also at the California Institute of Technology. He testified he has published approximately 150 papers related to brain damage and psychiatry in peer reviewed journals, and has written two books. He is also a professor of neuro-science and psychology, and has a visiting professorship at Harvard, Johns Hopkins, and Stanford. He has also received an award from the International Neuro-Psychiatry Association for outstanding contributions to

neuro-psychiatry, and was chosen in Newsweek Magazine as one of the top hundred most prominent people in the next century.   (Tr. 2172.)

Dr. Ramachandran testified about delusions.   He testified that delusions are when you have a false belief about yourself or a false belief about the world, and the belief becomes a dominant theme in your life to the point it dominates your life.   Those who suffer from delusions sincerely believe in the delusion.   Dr. Ramachandran explained that the deluded person will cling to the delusion and try to protect the delusion at all cost.   He also explained the psychological phenomenon of dissociation to the jury and discussed the concept of an amputees "phantom arm" and a woman having a "phantom pregnancy."   (Tr. 2176.)

Dr. Ramachandran testified that delusional states can progress to a point where the person becomes dissociative.   He explained that in a dissociative state, the person is in a trans-like state where you are outside yourself and watching yourself.   You no longer are a participant in what is going on.   Dr. Ramachandran testified that pseudocyesis could be an example of this delusional and dissociative condition.   A person who suffered from pseudocyesis can progress from a delusional state into a dissociate state in order to protect their delusion of being pregnant.   He explained that if a person with pseudocyesis feels threatened about their pregnancy delusion, "they will dissociate, they will go into what is called decompensate, going to a dissociate state and go into this trans-like state for an hour, a few hours and act out and then completely forget about what happened."   (Tr. 2179.)   Dr. Ramachandran testified that usually a person who is

in a dissociative state cannot appreciate the nature and quality or wrongfulness of their conduct.

Dr. Ramachandran continued to explain the disorder of pseudocyesis. A person with this disorder may actually have bodily changes that mimic that of someone who is really pregnant. He testified that pseudocyesis is a mental illness that is recognized in the Diagnostic and Statistical Manual Fourth Edition. It is a disorder that is not new to medicine, and Dr. Ramachandran has studied and written about it. Dr. Ramachandran testified that he has seen at least six cases of pseudocyesis in his practice. He testified that pseudocyesis is a somatoform disorder that causes hormonal changes in the body. (Tr. 2186) He further explained that the compulsive urge to have a child comes from the cortex of the brain, then comes to the anterior of the brain, and releases the pregnancy related hormones. The hormone production suppresses menstruation. Prolactin levels increase, which causes the uterus to enlarge, breasts to enlarge and become pigmented, abdomen to enlarge, and also causes cravings for strange food. (Tr. 2188.)

Dr. Ramachandran testified that in the gynecology publications in the United States you see that pseudocyesis is mentioned as a common consequence of childhood sexual abuse. Like Montgomery, those who suffer from post-traumatic stress disorder (P.T.S.D.) are pre-disposed to also suffer from pseudocyesis disorder. (Tr. 2191.) Additionally persons who suffer from P.T.S.D. are prone to developing a dissociative state. He testified that P.T.S.D. and dissociative state often co-exist in a person, and they feed off each other. In other words, you can have dissociative states causing P.T.S.D. and P.T.S.D. leading to a dissociate state. He testified that childhood sexual

abuse can lead to P.T.S.D. and can also lead to pseudocyesis. "[W]e know for sure childhood sexual abuse is a pre-disposition to pseudocyesis and can possibly act through the P.T.S.D. to produce pseudocyesis. That is clear." (Tr. 2192.)

Dr. Ramachandran testified that he reviewed large amounts of records including medical records of Montgomery, witness statements, police reports, and reports from all the mental experts who evaluated Montgomery. He also testified that he personally examined Montgomery for several hours. It was Dr. Ramachandran's expert opinion to a reasonable degree of medical certainty, after studying the records and examining Montgomery that she suffered from the severe mental illness of pseudocyesis. (Tr. 2198.)

Dr. Ramachandran explained to the jury that Montgomery's inability to remember and describe the killing of Bobbie Jo Stinnett is typical of someone in a dissociative state. (Tr. 2201.) Dr. Ramachandran again confirmed his opinion that to a reasonable degree of medical certainty, when Bobbie Jo Stinnett was killed, Montgomery was suffering from the severe mental disease of pseudocyesis. (Tr. 2205.) He explained that once Montgomery had the delusion that she was pregnant, she would do everything she could to sustain the delusion and that included fabricating evidence, which is common conduct for those with delusions. (Tr. 2206.) Additional Dr. Ramachandran testified that Montgomery's dysfunctional relationship with her mother, was a traumatic assault on Montgomery's ego, and could be a pre-disposition factor to a delusional state such as pseudocyesis. (Tr. 2215.) Once Montgomery was in a delusional state, she was obsessed and started web searches, talked to people about her pregnancy, created a nursery, and did everything that enhanced the delusion and sustained the delusion. (Tr.

2221.) When Montgomery's delusion that she was pregnant was challenged, her response was typical of someone who is deluded. Dr. Ramachandran explained that "as with all delusions, when they are challenged in a neuro-psychiatric setting the person does their very best to cling to the delusion by either manufacturing evidence or changing evidence, not deliberately, with the intent of deceit, but this is typical of the delusional state." (Tr. 2229.) Dr. Ramachandran said this is why Montgomery manufactured fake letters, manufactured fake ultrasounds, denied she was sterile, claimed she went to prenatal medical appointments, and claimed she delivered a baby at home. (Tr. 2229-44.)

Dr. Ramachandran ended his testimony by confirming his opinion to a reasonable degree of medical certainty, that at the time of the offense, Montgomery was suffering from the severe mental disease or defect of pseudocyesis with delusions and a dissociative state, and that at the time of the offense she was unable to appreciate the nature and quality or wrongfulness of her conduct. (Tr. 2250-51.)

The last witness called by the defense in the guilt phase of the trial was Dr. William Logan. Dr. Logan testified that he is a physician that specializes in psychiatry. He obtained undergraduate degrees in both biology and psychology, as well as a graduate degree in medicine with a sub-specialization in psychiatry. He is board certified in both psychiatry and forensic psychiatry. Dr. Logan testified that he served as the director of the law and psychiatry department at the Menninger Clinic for eight years before working in his private practice called Logan and Peterson. Dr. Logan then gave greater details about his specific experience in forensic work, courtroom experience,

-33-

professional memberships, publications and presentations, and professional consultation work for the Government.

Dr. Logan testified that in Montgomery's case he reviewed a large amount of information including police reports, witness statements, autopsy and crime scene materials, CCA records, school records, family history, mental health records, and expert evaluations and expert reports involved in the case. Dr. Logan also examined Montgomery on three different occasions for a total of approximately ten hours.

Dr. Logan testified that as part of his evaluation of Montgomery he looked at her history and her family's history. In particular he obtained information about the mental health of various family members because genetics could have an impact on Montgomery's mental health. Dr. Logan testified that he looked at Montgomery's development as a child. In particular looked at mother-child experience, whether her mother drank during pregnancy, whether her mother smoked. He looked to see if Montgomery crawled and walked on time, and any signs of abnormalities. He looked at Montgomery's family life to determine if both parents were there, if there was conflict in the home, whether somebody left, whether Montgomery witnessed violence in the home, whether she had any head injuries or other kinds of injuries, or whether she had significant illnesses. Dr. Logan explained how it is important to understand that other relatives can play a role in a child's development, and how experiences such as physical, sexual, and emotional abuse can affect someone for years. Dr. Logan testified he wants to know about a person's experiences in the formative years, such a substance abuse, that forms the foundation on which the child's later development will be built. Dr. Logan

explained that the more trauma and abuse there is, the more likely it is that a person will crumble when faced with life's struggles and tribulations instead of weathering them and essentially mastering life's problems.   (Tr. 2392.)

Dr. Logan found several factors and experiences in Montgomery's background that he felt were significant.   It was significant that her father was seldom around and left when Montgomery was about four years old.   Another significant factor was the negative effect on Montgomery when her step-sister, Diane, was taken from the home. Another factor was that Montgomery moved frequently growing up. Dr. Logan counted ten or eleven moves between the age of 4 and 18.   (Tr. 2393.)

Dr. Logan testified that a "major influence" in Montgomery's life was the "significant physical abuse" of her by her stepfather, Jack Kleiner.   In particular, Dr. Logan explained that Jack Kleiner would humiliate Montgomery by stripping her naked to get lashed with a belt and other things that were really excessive.   Dr. Logan found that Montgomery grew up with a lot of fear and intimidation.   He also told the jury about Montgomery's childhood involving years of sexual abuse by her stepfather that included sexual intercourse.   (Tr. 2394.)   Dr. Logan explained how incestual sexual abuse leaves the victim with a real sense of betrayal, and the betrayal usually involves the mother because at some level the mother knew and failed to protect the child.   Dr. Logan explained how Montgomery was thrust into a role inappropriate for her age, and she learned from her stepfather that her primary value from him was not to be nurtured or follow her own ambitions, but rather her value was to service his sexual

needs.   (Tr. 2395.)   He testified that it is not unusual to see an incest victim get married early or have a history of promiscuity or engage in premature sexual activity.

In reviewing the records, Dr. Logan found that Montgomery did not receive the therapy she needed after the sexual abuse was brought to the attention of authorities. Dr. Logan found that Montgomery's prognosis for recovery from the sexual abuse was especially bad because her mother viewed her as a competitor and blamed Montgomery for being a "home wrecker."   (Tr. 2397.)

Dr. Logan testified that the stepfather threatened Montgomery that if she did not submit he would sexually abuse her younger sister, Patty.   Dr. Logan also testified that the stepfather followed up on his physical threats against Montgomery and described Montgomery's household as "violent."   (Tr. 2398.)

Dr. Logan testified at length regarding the relationship between Montgomery and her mother.   He described it as a "love-hate" relationship in which on one hand she felt persecuted by her mother, but that she would strive for her mother's acceptance.   He told the jury how there was certainly a lot of anger in the relationship, and yet Montgomery was always striving for acceptance from her mother to "seal over the wounds of their family and try and create a family situation that didn't exist." (Tr. 2398.)

Dr. Logan discussed how there was a theme in Montgomery's life regarding her losing her children, and how her mother used children as weapons.   In Montgomery's life there was a constant battle around her keeping her children.   Once her mother took Desiree and Chelsea from Montgomery, when the girls were very small, and refused to

Case 4:12-cv-08001-GAF   Document 140   Filed 02/02/15   Page 36 of 163

give them back. Once her mother confronted her inside a church and pulled a couple of Montgomery's children out of her arms and kept the children from Montgomery until a court awarded her custody again. Montgomery's mother would complain to Social Services to have the children taken away. Dr. Logan described the conflict between Montgomery and her mother like the "Hatfields and McCoys." (Tr. 2401.)

Dr. Logan testified that because of who Montgomery was, and because of the trauma she sustained by her family, she failed to develop healthy ways of dealing with conflict. Dr. Logan gave examples of when Montgomery was in grade school, she was a shy, quiet girl who primarily liked to read and escaped into fantasy. As Montgomery grew, she dealt with conflict by literally escaping by running away or changing her environment. Dr. Logan explained that Montgomery's first marriage to Carl was a form of running away to get away from home. He gave another example of Montgomery's dysfunctional method of coping by drinking alcohol heavily when she lived in New Mexico. Dr. Logan explained that Montgomery would also cope with conflict by false pregnancies. Dr. Logan told the jury about the conflict and stress in Montgomery's life each time she had a false pregnancy. (Tr. 2402.)

Dr. Logan testified about Montgomery's sterilization and how that affected her. Dr. Logan explained that Montgomery felt pressured from Carl and her mother to have a tubal fulguration. She believed her mother would take her children away if she refused to have the sterilization. Dr. Logan explained that in light of Montgomery's history of sexual abuse, one of the areas Montgomery felt safe and secure was in having children, and that had been Montgomery's role growing up, to take care of younger siblings. He

explained that the sterilization and the loss of her ability to reproduce was emotionally traumatizing to Montgomery. Montgomery felt that Judy was forcing her into the sterilization as retaliation for Montgomery having sex with Judy's husband. Montgomery felt that Carl was forcing her into the sterilization as revenge for Montgomery having an affair with Brett. (Tr. 2403.)

Dr. Logan then testified about his finding that Montgomery suffered from post-traumatic stress disorder (P.T.S.D.). Dr. Logan explained that P.T.S.D. occurs when someone is exposed to a traumatic event that "floods their body's alarm system or brain alarm system." (Tr. 2404.) Dr. Logan testified that P.T.S.D. can be seen in children who have been sexually and physically abuse. P.T.S.D. occurs when someone is "extremely scared and feeling helpless to do anything about it." Dr. Logan described some of the symptoms of P.T.S.D. as the need to escape and avoidance. P.T.S.D. also causes difficulty sleeping, difficulty concentrating, and irritability. Dr. Logan testified that Montgomery's P.T.S.D. went untreated and formed shifts in mood, nightmares, difficulty sleeping, depression and anxiety. Dr. Logan also was of the opinion that Montgomery's multiple suicide attempts was a form of escape when she felt particularly overwhelmed. One of Montgomery's suicide attempts was when her mother and Carl took her children away from her and refused to give them back. (Tr. 2405.)

Dr. Logan was then questioned about pseudocyesis and delusions. He explained that delusions are a fixed belief in something that is not real. Once a person has a delusion, it may change somewhat in form and intensity over time, but "once the person believes in something they tend to latch on to it and want to hold on to it." (Tr. 2406.)

Dr. Logan testified that pseudocyesis is a mental illness that can be triggered by incest, and for Montgomery it could also be triggered by feeling her tubal fulguration was forced upon her.  Dr. Logan is of the opinion that the loss of Montgomery's ability to reproduce had a profound effect on her self-image.  Montgomery could not deal with reality in a healthy way, instead her ability to deal with reality is "somewhat plastic and changeable."  (Tr. 2406.)  Dr. Logan explained that if she gets an unpleasant truth, she does not check outside of herself to see whether something is true, but rather goes on what she feels inside as the truth.  "From what she feels inside she starts imagining scenarios which over time progress to become reality" for her.  (Tr. 2408.)  Dr. Logan explained that these false realities are delusions, and to protect the delusions, a person may try to hide them from someone who may interfere with the delusion.  Dr. Logan also explained that it is hard to successfully challenge a person's delusions.  "The harder you challenge with reality the harder they dig in."  (Tr. 2410)  Dr. Logan explained how Montgomery truly believed her delusion that she was pregnant.  "It was a fantasy in which she indulged herself and became delusional and her thinking is plastic enough if she imagines it can be true, if she imagines it long enough it becomes true in her mind."  (Tr. 2411.)

Dr. Logan was questioned about Montgomery's mental state at the time of the offense.  Dr. Logan's expert opinion was that at the time of the offense, "she dissociated, she had a feeling of unreality, she did not feel like herself."  (Tr. 2416.)  "At the time itself there appeared to be some episode of dissociation that is usually seen in a period of extreme stress."  Montgomery thought, at least in her delusion, she had

lost her baby earlier that week. At the time of the offense, Montgomery was in the midst of chaos. There were many traumatic things going on in her life such as wanting to leave her husband; Carl was threatening to take custody of her children; her husband was behind on his child support; she was having a lot of money problems, and financial pressures; one of her best friends died and she had not recovered from that loss. Dr. Logan explained that at the time of the offense, Montgomery's "world was really closing in on her." (Tr. 2418.)

Dr. Logan summarized his opinion by stating that Montgomery's "mental illness drove her to kill without really an adequate consideration of the reality of the wrongfulness of what she was doing and the gravity of what she was doing. I think after she drove away she realized what had happened to some degree but with the plastic she approaches life with she started to pretend the baby was hers and I think came to believe the baby almost was hers. But the police interviewed her at a critical time. For a brief period of time they were able to break through that delusion." (Tr. 2419.)

Dr. Logan ended his testimony by given his expert opinion to a reasonable degree of medical certainty, Montgomery suffered from pseudocyesis at the time of the offense, which is a severe mental illness. (Tr. 2420.) Dr. Logan further gave his expert opinion that in a delusional dissociate state caused by pseudocyesis Montgomery would not be able to appreciate the nature, quality and wrongfulness of her conduct." (Tr. 2423.)

By its verdict, the jury rejected Montgomery's defense during the guilt phase of the trial returning a verdict of guilty on October 25, 2007.

## V. **Montgomery's Penalty Phase Case in Chief**

The Government called four witnesses in its case-in-chief during the penalty phase. (Tr. 2881-2903) Montgomery called a large number of mitigation witnesses to testify during the penalty phase of her trial. Many of the witnesses testified about the difficult circumstances of Montgomery's childhood and her neglectful, alcoholic, and abusive parents. The witnesses also testified how Montgomery was a good person and a loving mother. These witnesses included a unit manager, a correctional officer, and a correctional counselor at the CCA holding facility in Leavenworth, Kansas; Montgomery's husband, two of her daughters, her biological father, a half-sister, a cousin, a forensic psychiatrist, and a clinical psychologist.

Cynthia Collins, a unit manager at CCA, testified that Montgomery was never a problem while she was incarcerated at CCA. Ms. Collins further testified that it was "rare" to have an inmate who caused no problems like Montgomery. Ms. Collins testified that Montgomery used her time productively while incarcerated and made remarkable crafts with her hands. Ms. Collins testified that Montgomery helped other inmates learn the art of tatting and assisting others in CCA's quilting program. Ms. Collins testified that Montgomery was an avid reader; was talented at drawing self-portraits; and served her time peaceably while incarcerated.

Teresa Taylor, a correctional officer at CCA, testified that Montgomery caused no problems and "was easy to deal with" at CCA. Montgomery was pleasant, very polite, and did what she was told to do while incarcerated at CCA.

Tracy Tinsley, a correctional counselor at CCA, testified that she spent time with Montgomery at CCA. Tracy Tinsley described Montgomery as not causing any problems; never being a disciplinary problem; reading often; attending religious services; and involved in crafts. Ms. Tinsley also testified that Montgomery "has taught a lot of other younger women who don't know anything about tatting how to tat and she has also taught them how to quilt." (Tr. 2919)

Kevin Montgomery, who is Montgomery's husband, testified that he and Lisa Montgomery married and enjoyed many family activities together with their children. Mr. Montgomery testified the family events included attending Lisa Montgomery's children's football games, high school choir concerts, basketball games, junior high band musicals and recitals, softball games, and volleyball games. The family also enjoyed going to community festivals, and Lisa Montgomery enjoyed projects with her children such as sewing. Mr. Montgomery testified that Lisa Montgomery loved her children, and that he and Lisa Montgomery were still very much in love.

Desiree Boman, who is Montgomery's oldest daughter, testified that she and her mother sewed dresses together, and that her mother encouraged Desiree to try new things. Desiree testified she and her sister, Chelsea, wanted to play football in school, and her mother talked to the school board to help Desiree and Chelsea become part of the team. Desiree also testified that her mother helped her with 4-H projects such as raising and showing animals and took the children on trips to different places. Desiree testified that she loves her mother very much, and she knows her mother loves her.

Chelsea Boman, who is Montgomery's middle daughter, testified that she is in the army reserves and that her mother helped her get through basic training with encouragement. Chelsea also testified that some of her best memories of her mother are times spent camping and doing things together with her. Chelsea testified about trips to Colorado and San Antonio with her mother and attending different festivals as a family. Chelsea testified that she loves her mother and continues to have a loving relationship with her mother even though Montgomery is incarcerated.

John Patterson, Montgomery's biological father, testified that when Montgomery was just a small child he abandoned her and his other daughter, Diane. Patterson testified he made the mistake of "leaving my two daughters with a crazy lady." (Tr. 2953) The crazy lady he was referring to was Montgomery's mother, Judy, who raised Montgomery. Patterson testified that he has reunited with Montgomery and will maintain a relationship with her even though she is incarcerated.

Diane Mattingly, Montgomery's half-sister, testified that she is about four years older than Montgomery. Mattingly testified that Montgomery's mother, Judy, raised her until Mattingly was taken away. Mattingly testified how difficult it was for Montgomery and her to live with and be raised by Judy. Mattingly described her childhood with Judy as "walking on egg shells." (Tr. 2956) Mattingly testified that she and Montgomery could never please Judy; that Judy would hit them if they did anything wrong; and they were told by Judy they were not good enough. Mattingly testified that Judy did not take care of her children. It was instead Mattingly who tried to take care of Montgomery and her little sister, Patty. Mattingly testified that she was the one that fed them, clothed them,

and protected them.   Mattingly testified that when she was taken away from the home, she was sick to her stomach because she knew Montgomery and Patty would no longer be cared for.

Wendy Treibs, Montgomery's cousin, described Montgomery as a sweet, kind and generous person.   Treibs testified that Montgomery frequently gave her gifts such as clothes, jams, and homemade blankets.   Treibs testified that Montgomery was a good mother.   Treibs described Montgomery as a patient and easy-going mother.   Treibs also testified how Montgomery's mother, Judy, was mean-spirited towards Montgomery. Treibs explained how Montgomery was raised by a controlling, dysfunctional, manipulative, and negative mother.   Treibs also testified about Montgomery's step-father, Jack Kleiner.   Treibs testified that Montgomery was raped by Jack Kleiner when Montgomery was a child, and that Treibs was always scared of Jack Kleiner.   Treibs testified how difficult Montgomery's childhood was to be raised by Judy and Jack Kleiner. Treibs described how Montgomery was not shown love growing up and was physically and verbally abused as a child.   Treibs also testified about some of the mental illnesses in her family.   Treibs testified that she suffers from depression with psychosis and has been diagnosed with a bi-polar disorder.   Treibs testified that her brother Kenny also suffers from mental illnesses.   Treibs went on to explain how her parents got her the mental health care that she needed, but Montgomery did not receive the mental health care she needed. Treibs explained how Montgomery's mother had a negative impact on Montgomery receiving care for her mental illness.

William Logan, a forensic psychiatrist who had testified in the guilty phase of the trial, testified that Montgomery was a victim of sexual abuse, and that she suffered from the mental diseases of post-traumatic stress disorder, pseudocyesis, dissociation, depression, and personality disorder.   Logan further testified that Montgomery's ability to appreciate the nature, quality and wrongfulness of her actions at the time of the offense was substantially impaired to a reasonable degree of medical certainty.   Logan also testified that at the time of the offense Montgomery was operating under a severe mental or emotional disturbance.   Logan also explained how Montgomery's mental illnesses stem in large part from the chronic childhood neglect, molestation, physical and emotional abuse that Montgomery suffered from throughout her life.   Logan testified that Montgomery had difficulty with "reality testing" and suffers from paranoia and delusions.   Logan explained how Montgomery had been in the midst of severe turmoil throughout her entire life.

Ruth Kuncel, a clinical psychologist, testified that she conducted a comprehensive mental evaluation of Montgomery.   Kuncel testified that Montgomery suffered from mental illnesses stemming from her difficult childhood.   Kuncel described how Montgomery was abandoned by her biological father and the trauma Montgomery sustained from being torn away from her sister Diane at a young age.   Kuncel describes the ramifications of Montgomery being abused sexually and physically as a child.   Kuncel testified that Montgomery did not feel safe, she grew up with a great deal of logical confusion, a great deal of fear, and over-whelming anxiety.   Kuncel explained when everything is confusing to Montgomery, there is not that sense of knowing what is real and what is not real.   Kuncel also testified that the psychiatric medication that Montgomery is

now taking has cut down on Montgomery's fear, overwhelming anxiety, and depressive symptoms.    Kuncel also diagnosed Montgomery with a substantial post-traumatic stress disorder as a result of her childhood physical and sexual abuse.    Kuncel further diagnosed Montgomery with major depression and general anxiety.    Kuncel testified that at the time of the offense Montgomery's capacity to appreciate the wrongfulness of her conduct, and to conform her conduct to the requirement of the law was very, very seriously impaired. Kuncel testified that Montgomery was suffering from a severe mental disturbance at the time of the offense.

On October 25, 2007, the jury heard the court's instruction of law, closing arguments of counsel, and retired to deliberate.    The jury was required to deliberate on five statutory and one non-statutory aggravating factors.    The defense submitted and the court instructed on 19 mitigating factors.    The jury returned with a verdict the same day. By its verdict, the jury rejected the brain damage and diminished mental capacity defense of Montgomery.    By unanimous vote, the jury determined that a sentence of death should be imposed.

Following the formal imposition of the death sentence, Montgomery filed a timely notice of appeal.    In her brief filed in the Eighth Circuit, Montgomery raised a total of nine issues.    On June 22, 2011, the Eighth Circuit affirmed the conviction and sentence in *United States v. Montgomery*, 635 F3d 1074 (8th Cir. 2011).    The United States Supreme Court denied Montgomery's writ of certiorari on March 19, 2012.    *Montgomery v. United States*, 132 S.Ct. 1741 (2012).

# VI.  Standard of Review

In her § amended 2255 motion, Montgomery has raised numerous claims of ineffectiveness directed against the attorneys who represented her at trial and on appeal, as well as several trial errors that were not litigated on direct appeal.

With respect to her ineffective-assistance-of-counsel issues, the Supreme Court set out a two-pronged test for constitutionally ineffective assistance of counsel in *Lockhart v. Fretwell*, 506 U.S. 364 (1993).   Counsel is constitutionally ineffective when: (1) counsel's representation falls below an objective standard of reasonableness; and (2) the efforts are so prejudicial that the adversarial balance between the defense and prosecution is upset. *Id*. at 369.   A court may examine the "prejudice" aspect of a claim without having to first determine whether the representation fell below the objective standard of reasonableness. *McCann v. Armontrout*, 973 F.2d 655, 660 (8th Cir. 1992) (citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984)).

It is Montgomery's burden to affirmatively prove the prejudice aspect of this claim. *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992).   The review of counsel's performance is deferential, and the presumption is that counsel is competent and effective. *Smith v. Lockhart*, 921 F.2d 154, 156 (8th Cir. 1990).   Finally, in order to demonstrate prejudice, Montgomery "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Most of Montgomery's claims of ineffectiveness are nothing more than an exercise in second-guessing the performance of trial counsel.   In evaluating an attorney's

performance, a court must begin with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because individual criminal defense attorneys might employ different trial strategies. *Strickland*, *id.* at 689. Courts should avoid "the distorting effects of hindsight" and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time. *Id.* at 689. The burden is on the petitioner to show that counsel's representation was not within the range of sound defense strategy. *Id.* at 690. To establish prejudice, Montgomery must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Here, Montgomery has clearly failed to make the required showing, and her motion should be denied.

Montgomery also has raised a number of claims that do not involve assertions of ineffective of counsel, or newly discovered evidence. These claims, in other words, could have been raised on direct appeal, but were not. Courts normally will not entertain such arguments in a § 2255 motion if a movant did not raise the claim prior to trial, at trial, or on direct appeal. *Hines v. United States*, 282 F.3d 1002, 1005 (8th Cir. 2002). In order to obtain § 2255 relief despite such procedural default, a movant must show both cause for her failure to assert the claim in earlier proceedings, and actual prejudice from the alleged error. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002). The showing of cause and prejudice, however, is not required if: (1) a movant seeks § 2255 relief based on facts not developed at trial that should be considered to avoid a fundamental miscarriage of justice as the conviction of an innocent person, *McCleskey v. Zant*, 499 U.S. 467, 494

(1991); (2) the Government fails to object to the consideration of newly raised issues, *West v. United States*, 994 F2d 510, 512 (8th Cir. 1993); or (3) the § 2255 motion raises certain constitutional claims that may be adequately addressed only on collateral review, *Massaro v. United States*, 538 U.S. 500, 509 (2003).

## VII.   <u>Claimed Grounds for Relief</u> *(Page 4)*

**A.   *Introductory Allegation:   Montgomery Claims Her "True Story" Was Not Told to the Jury***

Montgomery begins her amended § 2255 motion with a lengthy introduction that contends that "[t]he poor choices made by Lisa Montgomery's defense team at trial resulted in an imbalanced and unjust trial, and a sentence of death for Lisa Montgomery, because the trial defense team failed to tell the true story of Lisa Montgomery's life, her history of abuse, and her mental illness and brain damage."   (D.E. 71 at 5.)   The introduction continues for an additional nine pages, outlining Montgomery's "true story" that the defense allegedly failed to tell.   However, in reality, virtually everything outlined in these nine pages was presented by the defense trial team to the jury during Montgomery's four-week jury trial.[1]   As Fred Duchardt, one of Montgomery's trial attorneys, emphasized in his affidavit, all of "the true, non-speculative parts of Lisa's 'story' were all told, with particular emphasis on the parts concerning Lisa's mental illness

---

[1]The Government has attached to this response, Attachment A, which documents that virtually every detail of Montgomery's life – details that Montgomery claims were not presented to the jury – were, in fact, offered in evidence by Montgomery's defense team at trial.

and brain damage." (Duchardt Aff. 2-3.)[2]  As Mr. Duchardt goes on to note, "[t]he only significant omission was the part of the brain damage story which would have been told by Dr. Ruben Gur, Ph.D.[,] but for court rulings which prevented that." (Duchardt Aff. 2-3.)

Mr. Duchardt also correctly observes that parts of the "multifaceted narrative" in the amended § 2255 motion describing Montgomery's life, have no basis in the record, and some of the alleged facts were denied by Montgomery herself. (Duchardt Aff. 2-3.) However, to the extent these supposed "missing facts" are supported by the record, Mr. Duchardt correctly notes that these facts were, in fact, presented to the jury "through a host of lay witnesses, as well as through experts Vilayanur Ramachandran, M.D., Bill Logan, M.D., and Ruth Kuncel Ph.D." (Duchardt Aff. 2-3.)

**Claim I** *(Pages 15-47)*

**B.** ***Montgomery's Claims Regarding the Removal of Judy Clarke from the Trial Team***

Montgomery's first four specific claims involve the removal of Judy Clarke from Montgomery's trial team.  She asserts that (1) the removal of Ms. Clarke deprived her of effective assistance of counsel; (2) David Owen perpetrated a "fraud on the court" by leading the court to believe that Ms. Clarke was being obstructive to the defense team efforts; (3) she was deprived of counsel during a critical stage, or in the alternative, that Mr. Owen and Ray Conrad, the Federal Public Defender, had a conflict of interest that affected their performance when Ms. Clarke was removed; and (4) the defense trial team had a conflict of interest preventing them from raising or perfecting the denial-of-counsel

---

[2]The Government's has attached Fred Duchardt's affidavit as Attachment B.

claim, and were ineffective for not raising the Judy Clarke issues prior to trial and on direct appeal.

Only claim (4) is cognizable in a § 2255 because the first three claims were forfeited by Montgomery's failure to raise them at trial and on direct appeal. And while ineffective assistance can be "cause" for excusing this procedural default, it is clear from the record, including Mr. Duchardt's affidavit, that since there was no basis for challenging Ms. Clarke's removal from the defense team, Mr. Duchardt cannot be held to have been ineffective in failing to raise this issue at trial and on direct appeal.

      1.    *Case History of Appointed Counsel*

Montgomery was charged by complaint on December 17, 2004, in the United States District Court for the Western District of Missouri, and shortly thereafter the Office of the Federal Public Defender (FPD) for the Western District of Missouri was appointed to represent her. Three days after the complaint was filed, on December 30, 2004, Assistant FPD Anita Burns was assigned by the FPD to represent Montgomery on behalf of the FPD, with Assistant FPD David Owen serving as supervisor to Ms. Burns. The following month, on January 20, 2005, Susan Hunt was also appointed as attorney for Montgomery. Three months later, on April 14, 2005, Anita Burns was granted leave to withdraw, and Assistant FPD David Owen assumed Ms. Burns' role as primary co-counsel for Montgomery.

Mr. Owen and Ms. Hunt served together as primary co-counsel for Montgomery for six months from April 2005 until October of 2005. In October of 2005, David Owen moved this Court to appoint Judy Clarke *pro hac vice*, as a third attorney for Montgomery.

*2.* *This Court's Reluctance to Appoint Judy Clarke as Pro Hac Vice Counsel*

The record is uncontroverted that this Court was hesitant to appoint Judy Clarke as an additional third co-counsel for Montgomery from the outset. On April 25, 2006, this Court reaffirmed, on the record, its initial reluctance to appoint Judy Clarke as co-counsel in Montgomery's case. This Court made clear to David Owen, Susan Hunt, and Ray Conrad during a conference in chambers that he "was very hesitant to have Judy Clark[e] involved in it from the first place." The record in this case is devoid of any opinion or statement to the contrary. (Tr. 13, April 25, 2006)

*3.* *Information Relied Upon by this Court for Removing Judy Clarke*

Even though reluctant to allow Judy Clarke to participate in the Montgomery case, this Court granted David Owen's request on October 7, 2005. (D.E. 63.) Judy Clarke served as a third co-counsel for Montgomery for less than seven months before she was removed on April 20, 2006.

It is abundantly clear that Mr. Owen and Ms. Clarke did not have a healthy working relationship. The significant depth of their deteriorated relationship is uncontroverted.

*4.* *David Owen*

David Owen described his relationship with Judy Clarke as "drastically deteriorat[ing]" within one month of Judy Clarke's appointment by this Court. (Owen Declaration at 6; Montgomery Exh. 2) David Owen explained that problems with the Montgomery team arose shortly after the involvement of Judy Clarke on the case. (Owen Letter to Richard Burr at 2; Montgomery Exh. 7.)

The difficult working relationship between Judy Clarke and Mr. Owen continued to become worse over time. Mr. Owen once said he felt as though Judy Clarke "took a baseball bat to [Mr. Owen's] head" during a team meeting, and that "Judy just started lambasting that [he] did not have the experience to establish priority to anything. It was a very ugly scene." (Owen Letter to Richard Burr at 2; Montgomery Exh. 7.)

There is no doubt on April 20, 2006, David Owen and Ray Conrad spoke with this Court about the difficulties the Montgomery defense team was having amongst each other. Likewise, it is uncontroverted that during this conversation David Owen advised this Court that he felt Judy Clarke was causing problems for the Montgomery defense team, and Mr. Owen requested this Court to remove her as counsel from the case.

Mr. Owen was clear when he reiterated to this Court during a recorded in-chambers conversation that "I can't work with this person . . . [o]ur office cannot work with that woman. It is impossible. She is just abusive beyond reasonability. We just can't work with [Judy Clarke]." (Tr. at 23.)

Consistent with Mr. Owen's complaints to this Court about Judy Clarke, Mr. Owen advised the Capital Resource Counsel on May 2, 2006, in a letter that "I was not and still am not willing to continue to be abused [by Judy Clarke] and will not tolerate any employee of the Federal Public Defender being abused the way Ron Ninemire was abused [by Judy Clarke]." (Owen Letter to Richard Burr at 3; Montgomery Exh. 7.)

    5.    *Susan Hunt*

Susan Hunt observed that Mr. Owen was having difficulty working with Ms. Clarke as early as November of 2005. (Hunt Declaration at 6; Montgomery Exh. 1.) At one

point Judy Clarke called a meeting with Ms. Hunt and Mr. Owen at a restaurant.   "Mr. Owen was extremely angry after the meeting and felt he had been attacked unfairly.   He never got over this and continued to complain about Judy Clarke and her people."   (Hunt Declaration at 6; Montgomery Exh. 1.)

Ms. Hunt conceded that on April 19, 2006, she, Mr. Owen, and Judy Clarke discussed the possibility of Ms. Clarke being removed from the Montgomery case because of internal defense team problems.   (Hunt Declaration at 6; Montgomery Exh. 1.) Ms. Hunt concedes that she and Mr. Owen planned to speak to this Court the following day on April 20, 2006, about the team's problems and the potential of Judy Clarke leaving the Montgomery case.   (Hunt Declaration at 6; Montgomery Exh. 1.)   In a conference in the Court's chambers on April 25, 2006, Ms. Hunt described the team's problems as "team dynamics, personality [issues]" and claimed that "I don't know if we could have ever worked through them.   I don't know the answer to that."   (Tr. at 3.)   Ms. Hunt went on to reiterate and describe the team problems to this Court in a conference in chambers on May 3, 2006.   Ms. Hunt told this Court, "I think we came to you last week, I forget two weeks ago.   Basically I think what we told you there w[ere] some big problems with functioning, right, wrong, I think the blame lies with everyone.   I think the blame lies with me, the blame lies with the federal public defender, the blame lies with Judy.   There were problems working together and that is why we came to you."   (Tr. at 17.)

   *6.*    *Judy Clarke*

Judy Clarke conceded in her declaration dated March 14, 2013, that the Montgomery defense team was experiencing internal strife.   Judy Clarke recalled meeting

at a restaurant with Mr. Owen and Ms. Hunt to discuss the team problems. (Clarke Declaration at 7; Montgomery Exh. 3.) Judy Clarke admits that "Mr. Owen interpreted my comments and observations [during this restaurant meeting] as an all-out attack on him and his professional abilities." Judy Clarke went on to state in her declaration that "I explained that the team needed to function in a better way and that we had to change the way the team was functioning. I stated matter-of-factly that he [David Owen] did not know enough to be the leader of the team and that he needed to relinquish control, and take this experience as an opportunity to learn about capital investigation and litigation. I gave examples of how his actions were impeding the investigation, especially his insistence on participating in sensitive interviews." (Clarke Declaration at 7; Montgomery Exh. 3.)

Judy Clarke went on to opine that "I believe that some of the resentment and resistance that led to the need to have that conversation over dinner and the hurt feelings that remained after, worsened the divisions that were apparent on the team when I first became counsel on the case. I tried very hard to keep the various factions working together as a whole but failed. However, as much as I tried, I could never figure out how to fix what was wrong . . . [t]he drama that infected this team was definitely detrimental to the work that we were trying to accomplish for Lisa Montgomery." (Clarke Declaration at 7; Montgomery Exh. 3.)

Judy Clarke likewise echoed in her declaration, the critical aspects of Ms. Hunt's and Mr. Owen's memory of the April 19, 2006, meeting at Ms. Hunt's house. Judy Clarke agrees the meeting was a bit heated and was about whether Judy Clarke should continue as a part of the Montgomery defense team. (Clarke Declaration at 8; Montgomery Exh. 3.)

7.    *Fred Duchardt*

Beginning on page 5 of his affidavit, Mr. Duchardt explains:

Current Counsel for Mrs. Montgomery urge that "the removal of Judy Clarke" was "perhaps the most egregious mistake made in this case" which "deprived Mrs. Montgomery of effective assistance of counsel" (Doc. 71, p. 15, 39). Current Counsel for Mrs. Montgomery also create a subtext theme regarding the "removal of every woman who was appointed to represent Mrs. Montgomery" (Doc. 71, p. 14).

Current Counsel for Mrs. Montgomery note, in support of their subtext, that Assistant Federal Defender Anita Burns and private practitioner Susan Hunt were the original defense team for Lisa, but that Anita withdrew and was replaced by her immediate supervisor, Dave Owen "with "no thought or discussion . . . about losing a woman on the team or what impact the removal of one of her attorneys might have on Mrs. Montgomery" (Doc. 71, p. 16). It should be noted that, after making this point, Current Counsel for Mrs. Montgomery never link it to any allegation regarding violation of constitutional or statutory law.

Returning to their main theme, Current Counsel for Mrs. Montgomery explain[s] the process by which Susan and Dave decided to involve Judy Clarke in the defense team, noting the basic need for Judy, a California attorney, to be sponsored by Dave in order to be allowed to practice *pro hac vice* before the Western District of Missouri Federal District Court (Doc. 71, p. 16-17).

Judy Clarke's entry into the Montgomery defense team is cast by Current Counsel for Mrs. Montgomery in glowing, even reverent, terms touting Judy's experience, her prior success complete with press clippings, her having at her disposal a cadre of experienced helpers, and her bringing with her all the right stuff to develop a good relationship with Mrs. Montgomery (Doc. 71, p. 17-18, 55). Without as much fanfare, there are also details given which lowlight the skills which Judy was lacking, those being tact, diplomacy and the ability to effect policy and solutions from a secondary position in a hierarchy (Doc. 71, p. 18-22). This part of the Petition is written in a fashion worthy of inclusion in any good tabloid article, purporting details of cruel words and actions passed between Dave and Judy (Doc. 71, p. 19-20), and Dave and Susan (Doc. 71, p. 20), and the investigators for Dave and Judy (Doc. 71, p. 20), and the estrangements and backbiting which followed (Doc. 71, p. 19-20, 31-34). Particularly revealing is the gender role reversal between Judy and Dave, with his

feelings being hurt by her directness, and her making a ham handed apology to the effect that, even though she was absolutely right in dressing him down, in public no less, she was sorry he took offense at her directness (Doc. 71, p. 20). Then, the clearly self-serving accounts of the fouls by the three players are twisted together, and peppered with a goodly amount of innuendo and surmise, in an effort to lay blame, not upon the three players who committed childish fouls against one another, but rather upon the referees trying to sort the mess out, those being then Federal Public Defender Ray Conrad and Judge Gary Fenner (Doc. 71, p. 20-21, 28-29).

It is correctly accounted that the ultimate arbiter, Judge Fenner, chose to terminate Judy because of his ongoing questions about whether expenditure of her time as a government employee was "necessary" in light of her being the third counsel appointed when only two counsel were called for by statute (Doc. 71, p. 23-24; 05-6002 Doc. 79). It is also correctly accounted that, because of failures by Dave and Susan, Mrs. Montgomery was given no prior or concurrent notice about the termination of Judy Clarke, and learned about the matter only because Judge Fenner took it upon himself to have Mrs. Montgomery brought to Court the very next day so that he could himself, and in person, explain things to her (Doc. 71, p. 23-24). Account is made that, when given further time, Lisa Montgomery herself was better able to articulate her own objections to the Judy termination, and that those objections were entertained and considered by Judge Fenner (Doc. 71, p. 34-36). Account is given, as well, to the personal decision made by Susan Hunt to voluntarily withdraw from the case (Doc. 71, p. 36-38).

It is also claimed that, at the time that she was removed, Judy Clarke was in full swing fulfilling the role of preparing a mental health defense for the case in that she "had sent out two expert contracts" to, a neuropsychologist, Dean Delis, Ph.D., and a psychiatrist, Judith Herman, M.D. (Doc. 71, p. 26, fn. 3). It is purported by current Counsel for Mrs. Montgomery that these representations about expert preparation are supported by the say-sos by Judy Clarke and me (Doc. 71, p. 26, fn. 3). Actually, my contrary recollections are correctly accounted in the affidavit of the investigator for Current Counsel for Mrs. Montgomery, that until I read Judy's 2013 affidavit, all information which I had received indicated was that in the six months Judy was on the case, there were no experts who had been identified, much less enlisted, by Judy (Ex. 19, p. 2). To be more specific, no one ever mentioned the names of Dean Delis or Judith Hermann to me. Even in her 2013 affidavit, Judy never mentions anything about "contracts", instead indicating that she had "contact" with Delis and Hermann (Ex. 3, p. 10).

Susan Hunt, for her part, has represented that "Judy Clarke had just hired trauma expert Judith Hermann and Neuropsych Delis before she was removed from the case" (Ex 1, p. 8). However, it seems that Susan's choice of wording that "Judy" had "hired" would be inapt since Susan also has made clear that Dave Owen, and not Judy, "controlled the purse strings" (Ex. 1, p. 6, 7). Susan also does not mention bringing Hermann and Delis to my attention (Ex. 1). Actually, Susan indicates that I did not ever call her to discuss the case (Ex. 1, p. 13). To the contrary, my time and phone records show that on the first day that I started work on the case, May 16, 2006, I had a phone conference with Susan lasting 0.4 hours. My records also reflect that, on July 11, 2006, I engaged in e-mail communication with Susan. My records further reflect that, on July 13, 2006, Susan participated in the phone conference between me and Judy, and that phone conference lasted 0.7 hours. What is more, my records reflect that, on August 30, 2006, I spoke with Susan over the phone about discovery issues. And, my file contains a letter from Susan, dated September 5, 2006, which describes Susan providing to me a copy of the database about the case which she had put together and which I had requested from her. Susan never mentioned Hermann or Delis in any of the communications I had with her about the case, and Hermann and Delis are not mentioned in Susan's database. From all of this, I conclude that, in 2006, Susan knew little or nothing about Hermann and Delis and assumed that the person who actually had knowledge about these experts, Judy, would pass along to me herself whatever information about those two which she, Judy, deemed important.

I have once again searched the data base for the Montgomery case, and I have once again found no reference of any kind to either of Hermann or Delis. I have also asked that Laine Cardarella, current Federal Public Defender for the Western District of Missouri, search all of that office's financial records, which were not included in the database, in an effort to find any reference to a "contract" or anything else of a financial nature for Dean Delis or Judith Herman. On August 29, 2014, I was informed, for the first time, that a search of the Federal Public Defender Office's separate financial records for 2006 show that, in April of 2006, monies were allotted for Dean Delis and for Judith Herman. The records also show that no money was spent on Delis and only about $400 was spent on Hermann.

Since Judy has given her word that she had "contact" with these two people prior to termination of her appointment (Ex. 3, p. 10-11), and in light of the financial records unearthed by the Federal Public Defender, I am comfortable trusting Judy's representation. However, I find strong reasons to believe that whatever "contact" there was accounted for very little in Judy's own estimation, and therefore mattered little to the Montgomery

defense. I conclude so because there is no sign of Judy's contact with these experts in any of the materials related to the case, that is in the database. Moreover, Judy never brought these names to my attention in my phone conversations with her, and Judy has made no representation that she shared any work product with respect to these experts with Lisa, with me or with anyone else associated with the team who eventually would try Lisa's case (Ex. 3, p. 10).

Had Judy perceived information about Delis and Hermann to have any significance, Judy's failure to share such information would have been especially troubling for two reasons. First, Judy acknowledges that, at that time, her government job was "Capital Resource Counsel" and her job duties were to "provide assistance to appointed counsel, both CJA and federal defenders, and defense teams in federal capital cases" (Ex. 3, p. 2). It would certainly seem that such assistance to Lisa's defense team, whoever might constitute that team, would necessarily include Judy sharing the names and contact information for experts she had identified for purposes of trial Second, and even more importantly, Judy unequivocally represents that, at the time she generated this work on experts, she was acting as *pro hac vice* counsel for Lisa (Ex. 3, p. 10). Under any reasonable definition of the term, work product would be the proper description of Judy's identification of any significant experts, and Lisa Montgomery and her defense team were entitled to have that from Judy if it existed. Thus, my only explanation for Judy failing to provide information about Delis and Hermann to me and the rest of the Montgomery defense team is that she perceived whatever she had produced to that point to be unimportant.

Current Counsel for Mrs. Montgomery contend that I "incredibly…was unaware" of contracting of services with Hermann and Delis (Doc. 71, p. 70). Since I was led to believe there had been no experts enlisted, since there was nothing in the database referring to Hermann or Delis, and because Clarke and Hunt saw fit to not breathe a word about the two to Lisa Montgomery's trial defense team, my lack of contact with these folks would seem to be completely understandable. More importantly, had current Counsel for Mrs. Montgomery believed that Dr. Hermann and Dr. Delis would have been worthwhile experts in this case, they could have established the premise by choosing them to conduct evaluations and make reports for them. Since current Counsel for Mrs. Montgomery saw fit to not enlist the services of these experts during their workup of their amended motion, and instead hired others, there is no way to know whether these experts would have been better than, worse than, or the same as the experts actually used by me in the case.

There are a couple of other critical facts from the record which are not brought out by Current Counsel for Mrs. Montgomery. For instance, even though Judy Clarke was part of the defense team for more than six months, from October of 2005 to April of 2006, she did not file one motion in the case, and did not leave behind any work product related to preparation of any motion. Moreover, though the members of Judy's defense team are described in glowing terms in the Petition, there is no sign in the database of any work produced by them in the six months that they and Judy were on the job. It is brought out by Current Counsel for Mrs. Montgomery that those who were brought into Mrs. Montgomery's defense team by Judy Clarke felt more loyalty to attorney Clarke than to client Montgomery, and therefore withdrew from service to Mrs. Montgomery once Clarke was no longer in the picture (Tr. 71, p. 25, 30). The obvious questions about the actual value of such fair weather workers to a Montgomery defense team are not noted by Current Counsel for Mrs. Montgomery.

Apparently not conceiving that the facts as they themselves accounted them were reason enough for Judge Fenner to have removed any or all of the three co-counsel, Current Counsel for Mrs. Montgomery, in somewhat afterthought fashion, speculate that Judge Fenner was somehow "eager" to remove Clarke from the case (Doc. 71, p. 46), and that Owen and Conrad perpetrated a "fraud" on the Court by advocating for removal of Clarke (Doc. 71, p. 47). As Current Counsel for Mrs. Montgomery speculate it, though they do not know what was said to Judge Fenner by Owen and Conrad at the time Clarke was removed, "whatever was said was apparently serious enough" (Doc. 71, p. 47-48). Selectively drawing from certain statements by Judge Fenner, Current Counsel for Mrs. Montgomery accuse Conrad and Owen of claiming that Clarke was only brought on the defense team to work out a plea agreement, and turned out to be obstructive, unproductive, and abusive (Doc. 71, p. 48, 53). Current Counsel for Mrs. Montgomery note that Judge Fenner himself has debunked such speculation about the words of Owen and Conrad, explaining that he understood that Clarke's anticipated role went beyond negotiation of a plea, that the choice of words about Clarke being unproductive "were my words" and "were not the words of Mr. Owen or Mr. Conrad" and that the impression of lack of productivity owed to "the conflict that existed between counsel, and I think that's rather obvious in the record" (Doc. 71, p. 51; Doc. 53, p. 3). Undaunted by a direct "no", Current Counsel for Mrs. Montgomery persist that something "must have been said" (Doc. 71, p. 51-52). Current Counsel for Mrs. Montgomery mate this speculation with further speculation that Owen "did not want to take direction from a woman (Ms. Clarke) who he described as 'emasculating'" (Doc. 71, p. 52). These speculations lead Current Counsel to conclude that Owen must have had an actual, personal conflict of interest against Lisa

Montgomery, and that that conflict can be imputed, in some unexplained fashion, to Conrad (Doc. 71, p. 52, 54).

This mess is then laid at my feet, as I am accused of ineffectiveness for my choices to not raise formal objection and appeal over what happened (Doc. 71, p. 52, 56). It is correctly accounted that I researched the issues at the time I learned about them, that in light my research I concluded that the issue had no merit, and that I prepared a memo to the file in those regards (Doc. 71, p. 56-57; Ex. 10).

Though it is not mentioned in the Petition, I also developed, accounted in my memo, and shared with Judy Clarke, a strategy whereby Judy could actually return to the defense team in keeping with the prevailing law upon the subject; Judy could become licensed to practice in the Western District of Missouri and then, in keeping with the just-announced teachings of *United States v. Gonzalez-Lopez*, she could enter an appearance as Counsel for Lisa Montgomery, without the need for, and problems associated with, Court appointment of her (Ex. 10). In my memo, drafted a few days after my last phone conversation with Judy, I described my conversation with Judy along these lines, and her rejection of the proposal. In her 2013 affidavit, Judy claimed to have "no memory of Mr. Duchardt suggesting to me that I should become a member of the Western District of Missouri Bar and enter my appearance as volunteer counsel" and goes further to assert that "I do not believe that Mr. Duchardt ever made that suggestion." (Ex. 3, p. 9). Putting things simply in reply, I have not only my past recollection recorded of the matter, I also have an independent current recollection that things happened between Judy and me precisely as I described them in my memo.

Current Counsel for Mrs. Montgomery conclude by claiming that only Judy Clarke developed a trusting relationship with Lisa Montgomery, that Lisa's trust in Dave Owen and the Federal Public Defender Office was irretrievably broken by the removal of Judy, that I never developed a relationship of trust with Lisa, and that therefore Lisa's trial team "never learned critical details about Mrs. Montgomery's life history and mental illness" (Tr. 71, p. 59). Current Counsel support their lack-of-trust claims against me and the rest of the trial team only with my representations, made at a pretrial conference some six months before trial, that developing trust with Lisa had been an uphill climb after the Clarke removal (Tr. 71, p. 59). What I also made clear at that pretrial conference, and what Current Counsel for Mrs. Montgomery note later in their petition, and what was certainly the case, was that despite the problems over the Judy Clarke matter, thanks to Lisa Montgomery's kind, generous and forgiving nature, John and I were

able to gain Lisa's trust and confidence, and the Federal PD crew were able to regain the trust and confidence from Lisa which they previously enjoyed (Doc. 71, p. 157; 4/3/07 Pretrial Conf. Tr. 12-13). That Lisa favored me with her trust and confidence is confirmed in dozens of letters to me over the years that I represented her at trial and upon appeal. All of those letters are contained in the files which I provided to Current Counsel for Mrs. Montgomery, and stand in stark contrast to this accusation regarding lack of trust, but are not mentioned by Current Counsel for Mrs. Montgomery.

(Duchardt Aff. 5-17.)

8. *Montgomery Did Not Have a Sixth Amendment Right to Choose Court Appointed Counsel and Removal of Judy Clarke Did Not Deprive Her of Effective Assistance of Counsel.*

Montgomery did not have a Sixth Amendment right to choose court-appointed counsel; rather, a district court retains full and unfettered discretion to appoint, remove, and reassign counsel in court-appointed cases. Here, this Court properly consulted and relied upon the Federal Public Defender's Office pursuant to 18 U.S.C. §§ 3005 and 3599, and correctly removed *pro hac vice* attorney Judy Clarke after she lost the support of her local office and sponsoring attorney because she was negatively affecting the progress of Montgomery's defense team as a whole.

Although Montgomery relies on *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), in support of her claim that Ms. Clarke's removal deprived her of her Sixth Amendment right to counsel, *Gonzalez-Lopez* clearly states that the Sixth Amendment only guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant for free. *Id*. at 145. Unlike the *Gonzalez-Lopez* case, all of the attorneys in Montgomery's case were court-appointed and paid by government funds.

-62-

Montgomery attempts to blur the lines claiming that Judy Clarke, a government-funded, court-appointed attorney, was offering her services for "free," and therefore Montgomery had a Sixth Amendment right to her services. But, while Ms. Clarke was not going to bill Montgomery for her services, that does not mean that she was working for free. Ms. Clarke was an employee of the Federal Public Defender's Office in San Diego, California, and was paid for by the Administrative Office of the United States Courts with government funding. Pursuant to 18 U.S.C. § 3006A(g)(2)(A), attorneys employed by a Federal Public Defender are prohibited from working in separate legal work on their own in private practice. This was again confirmed by local Federal Public Defender Ray Conrad. (Conrad Depo. at 51.) As a FPD employee paid for by the Government, Ms. Clarke could not offer her services for "free," since she was a salaried employee under court appointment. Ms. Clarke's situation, therefore, was entirely different from a retained or *pro bono* attorney retained by the defendant in *Gonzalez-Lopez*.

Furthermore, unlike the defendant in *Gonzalez-Lopez*, Montgomery never made any efforts to either bring Ms. Clarke on board in the first place or have her return after she was removed.

While defendants have a Sixth Amendment right to choose their own counsel if the counsel selected are not court appointed, all of Montgomery's attorneys were appointed by the court. Thus, *Gonzalez-Lopez* is inapplicable in her case. Moreover, even if Montgomery had passionately sought the representation of Ms. Clarke after her removal,

because Ms. Clarke was both court appointed and *pro hac vice*, the court maintained complete discretion to choose Montgomery's representation.

Beginning on page 17 Mr. Duchardt states in his affidavit:

Current Counsel for Mrs. Montgomery first claim that I erred in refusing to argue that the holding by the Supreme Court in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) prohibited removal of Judy Clarke since Clarke was the attorney wanted by Lisa Montgomery and because Clarke was, in the estimation of Current Counsel for Mrs. Montgomery, an attorney of the sort, as meant by the words of the *Gonzalez-Lopez* opinion, "willing to represent the defendant even though he is without funds" (Doc. 71, p. 42-43, 56). I researched this issue in 2006, and found it wanting (Ex. 10). I have further researched it now, and still find it wanting.

In *United States v. Gonzalez-Lopez*, 144-150, Justice Scalia, speaking for a five Justice majority, made clear that structural error, obviating the need to show prejudice, occurs when a defendant, "who does not require appointed counsel", is denied the right to "choose who will represent him". Current Counsel for Mrs. Montgomery see a loophole in the language chosen by Justice Scalia, that "the Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds (emphasis added)." *United States v. Gonzalez-Lopez*, 144. As Current Counsel for Mrs. Montgomery and Judy Clarke see it, since Judy Clarke and her San Diego Public Defender Office were "willing to represent the defendant", removal of Clarke should qualify for treatment as a *Gonzalez-Lopez* choice of counsel matter (Doc. 71, p. 34, 56). The trouble is that such reasoning turns a blind eye to the obvious, that service by then Public Defender Judy Clarke and her Public Defender Office required Court appointment. Justice Scalia put in no uncertain terms that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 152. In the years since the *Gonzalez-Lopez* opinion was handed down, those Courts who have actually been called upon to address directly the very issue raised by Current Counsel for Mrs. Montgomery have found that appointed counsel situations do not implicate such choice of counsel issues. *Whitney v. State*, 396 S.W.3d 696, 699 -701 (Tex.App.– Fort Worth,2013); *State v. Sanchez*, 288 P.3d 351, 362 - 364 (Wash.App. Div. 3,2012); *People v. Noriega*, 229 P.3d 1, 4-5, 108 Cal.Rptr.3d 74, 77 - 79 (Cal. 2010).

The only way *Gonzalez-Lopez* could have been made to apply in Lisa Montgomery's case was in the way I had suggested in July of 2006, with Judy Clarke actually being willing to become qualified for admission to the Bar of the Western District of Missouri and to then enter her appearance without invoking the appointment powers of the Court (Ex. 10). In her affidavit, Judy essentially reiterated what she told me over the telephone in July of 2006, that "there was simply no way for me to just enter my appearance in the District Court as volunteer counsel" (Ex. 3, p. 9). Since Judy was unwilling and/or unable to take the steps of becoming qualified and entering an appearance, *Gonzalez-Lopez* did not apply.

In the alternative to their *Gonzalez-Lopez* argument, Current Counsel for Mrs. Montgomery claim that Judge Fenner exceeded his authority in removing Judy Clarke, and that I was ineffective in failing to raise that issue.

Current Counsel for Mrs. Montgomery start this portion of their argument by citing to the 18 U.S.C. 3005 requirement about capital case appointed counsel needing to be "learned in the law applicable to capital cases" (Doc. 71, p. 39). However, Current Counsel for Mrs. Montgomery do not take heed of two other provisions of that statute which strongly support Judge Fenner's actions in removing Clarke: the part calling for appointment of two counsel, not three, and the further admonition in the statute that "(i)n assigning counsel under this section, the court shall (emphasis added) consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts." Thus, Judge Fenner paring down the appointed counsel roster from three to two, and considering the local Public Defender's input in so doing, took steps in keeping with, not contrary to, the dictates of 18 U.S.C. 3005.

Current Counsel for Mrs. Montgomery go on that, once Judy Clarke was appointed to represent Lisa Montgomery pursuant to 18 U.S.C. 3599(e), that statute "became controlling" and "prohibited Judge Fenner from *sua sponte* removing Ms. Clarke" (Doc. 71, p. 40). The trouble with this argument is that Judy Clarke was never appointed to represent Lisa Montgomery pursuant to 18 U.S.C. 3599(e). All attorneys of the Office of the Federal Public Defender, specifically including Ray Conrad and Dave Owen, were appointed (05-6002, Doc. 8). Susan Hunt was appointed as "additional counsel" (05-6002, Doc. 16). On the other hand, for Judy Clarke, Dave Owen filed a form petition for her admission, *pro hac vice*, to the bar of the Court (05-6002, Doc. 63), and that motion was granted upon docket entry by the Clerk of the Court without any action whatsoever on the

part of Judge Fenner. There is no indication that Judy ever sought or obtained appointment by Judge Fenner pursuant to 3599. In fact, as already noted above, there appears not one filing in the case, ever, by Judy Clarke. Even if it could be argued, against the facts, that Judy somehow was "appointed", 3599(e) seems to apply only to the first two attorneys as appointed under 3599(b) and (d), as an apparent means to avoid reduction of the number of attorneys below the two required under 18 U.S.C. 3005. Therefore, if 18 U.S.C. 3599(e) controls, as argued by Current Counsel for Mrs. Montgomery, that aids their argument not one bit.

Current Counsel for Mrs. Montgomery go on "that once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." (Doc. 71, p. 40). *Harling v. United States*, 387 A.2d 1101, 1105 (D.C.App. 1978); *Stearnes v. Clinton*, 780 S.W.2d 216, 221 (Tx.Ct.Crim.App.banc 1989). Assuming, for the sake of their argument that *pro hac vice* admission is akin to appointment, Current Counsel for Mrs. Montgomery wish to take the point of the *Harling* and *Stearnes* cases one step further (Doc. 71, p. 41-42), urging that should there be a revocation of *pro hac vice* status, there is an entitlement for both client Lisa Montgomery and attorney Judy Clarke to be heard on the matter. *Johnson v. Trueblood*, 629 F.2d 302 (3rd. Cir. 1980) (Doc. 71, p. 41). As the Third Circuit has put it, "…some type of notice and an opportunity to respond are necessary when a district court seeks to revoke an attorney's *pro hac vice* status" and at minimum "the attorney should be notified of two things: the conduct of the attorney that is the subject of the inquiry, and the specific reason this conduct may justify revocation." *Johnson v. Trueblood*, 303-304. Two other Circuits have registered their agreement on the subject *Belue v. Leventhal*, 640 F.3d 567, 576-577 (4th Cir. 2011); *Kirkland v. National Mortgage Network, Inc.*, 885 F.2d 1367, 1371-72 (11th Cir. 1989).

The counterpoints to this argument are that Lisa Montgomery apparently received four different hearings on the matter from Judge Fenner on April 21, 2006, April 25, 2006, May 3, 2006 and May 6, 2006, and that those hearings would appear to have met the demands of due process for Mrs. Montgomery, especially since a "full scale" hearing on such a matter is not deemed to be necessary. *Johnson v. Trueblood*, 304; *United States v. Holland*, 66 F.3d 339, *3 (10th Cir. 1995); *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1112-1113 (9th Cir. 2005). It is certainly true that Judy Clarke never received a hearing upon the matter. However, Judy did not seek such a hearing in the fashion in which counsel did in *Johnson v. Trueblood*, 303. Consequently, it is likely that whatever rights which Judy had were waived

by her failure to pursue her rights to hearing in the fashion which counsel did in ***Johnson v. Trueblood***, supra.

Relying on a what they purport is a valid Fifth Circuit holding, Current Counsel for Mrs. Montgomery claim that not only was a hearing required, but that a finding of "good cause" such as a "conflict of interest or a complete breakdown in communication" had to be made prior to a removal of Clarke (Doc. 71, p. 44). What Current Counsel for Mrs. Montgomery do not note is that the case they cite, ***United States v. Mason***, 668 F.3d 203, 213 (5th Cir. 2012), was later withdrawn by the Fifth Circuit and substituted with an opinion in which the term "good cause" appears nowhere in the text. ***United States v. Mason***, 480 Fed.Appx. 329, 330 (5th Cir. 2012). Current Counsel for Mrs. Montgomery also do not note that, even the withdrawn opinion which they cite was strictly limited by the facts that the opinion was addressed just to situations which would justify a defendant to request replacement of his counsel, and even at that was hounded by a vigorous dissent. ***United States v. Mason***, 668 F.3d 203, 217.

Even if there was a good cause requirement, as argued by Current Counsel for Mrs. Montgomery, the record in the case, especially as now amplified by the record made by Current Counsel this 2255 proceeding, fully supports the actions which Judge Fenner took. As noted already above, Judge Fenner would have had to look no further than his docket sheet to see that Judy Clarke had not one docket entry to show for her six months on the job. Judy could have argued, as financial records now confirm, that she had, literally just a few days before her removal, done some work of identifying two experts. However, it is likely at hearing that Judy would have had to admit, as she has now in her affidavit, her shortcomings intact and in working in a secondary position in a hierarchy (Ex. 3). It would certainly seem that Judy Clarke's actions and inactions in this case more than justified her removal, her press clippings notwithstanding.

(Duchardt Aff. 17-24.)

## Claim II *(Pages 47-52)*

### C. *Montgomery Failed to Properly Allege That a Fraud Was Committed Upon the Court*

On March 19, 2013, Montgomery filed her initial motion under 28 U.S.C. § 2255 alleging fraud upon the court. (D.E. 32.) The allegation was that "Ray Conrad and

David Owen perpetrated a fraud on the court by leading Judge Fenner to believe that Judy Clarke was being "obstructive" to the defense team efforts."

Thereafter, on May 6, 2013, pursuant to a court order, the parties interviewed United States Magistrate Court Judge John T. Maughmer to question him about statements made in his presence by Mr. Conrad and Mr. Owen to this Court regarding complaints of Judy Clarke. (D.E. 49.) Later that day, on May 6, 2013, this Court held a hearing where current counsel for Montgomery made oral arguments and this Court made statements on the record regarding its removal of Judy Clarke. (D.E. 53.)

On May 20, 2013, Montgomery deposed Mr. Conrad pursuant to a court order, questioning him about complaints of Judy Clarke made to this Court. (D.E. 52.)

Despite this blatant fishing expedition, Montgomery failed to show that Ray Conrad or David Owen perpetrated a fraud upon this Court as Montgomery continues to allege, and, in fact, she has failed to properly allege such fraud with any degree of the required specificity.

Montgomery brashly makes accusations of "fraud" committed by the Federal Public Defender's Office without any supporting facts. Rather, Montgomery's pleadings include lengthy discussions and citations to affidavits about the defense team not getting along with *pro hac vice* counsel Judy Clarke. The pleadings further point to one meeting off the record with Judge Fenner, Judge Maughmer, Ray Conrad, and David Owen. Everyone present at this off-the-record meeting has since provided statements about the content of that meeting, which demonstrated, like all of the other meetings on the record, that Montgomery's court-appointed counsel was not getting along with Ms. Clarke.

Moreover, any time fraud is alleged, it should be done with care and consideration, and with, at a minimum, supporting evidence. In this case, no supporting evidence exists. Fed. R. Civ. P. Rule 9(b) notes that when alleging fraud, the party "must state *with particularity* the circumstances constituting fraud or mistake." (Emphasis added). Despite Montgomery's lengthy pleadings, numerous interviews, questioning of a United States District Court Judge, a United States Magistrate Judge, and deposing the Federal Public Defender, Montgomery has yet to obtain any evidence that supports an allegation of fraud committed upon this Court.

Rule 9(b) requires that fraud must be alleged with particularity. *Roberts v. Accenture, LLP*, 707 F.3d 1011, 1020 (8th Cir. 2012). As with fraud allegations in both criminal and civil matters, the protection is designed to prevent "frivolous accusations" and to facilitate the ability for the responding party to prepare an "appropriate response." *Id.* The heightened requirement requires great specificity. *Freitas v. Wells Fargo Home Mortgage, Inc.*, 703 F.3d 436, 439 (8th Cir. 2013) (citing *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2011). "To satisfy the particularity requirement of Rule 9(b), a claim of fraud must include such specific facts as the time, place, content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Raynor v. National Rural Utilities Cooperative Finance Corporation*, 690 F.3d 951, 955 (8th Cir. 2012) (citing *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). This applies also when the alleged acts are "acts of manipulation." The party making the allegation must "specify, with particularity, what

manipulative acts were performed, which persons performed them, when the manipulative acts were performed." *Public Pension Fund Group v. KV Pharmaceutical Company*, 679 F.3d 972, 986 (8th Cir. 2012).

Further, the claim must also "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Vigil v. Nelnet, Inc.,* 639 F.3d 791, 796 (8th Cir. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Montgomery, based on her own investigation and interviews, falsely asserts that the *only* reason Judge Fenner removed Ms. Clarke was because he believed incorrect information about her work ethic or her mental health investigation skills. However, every person interviewed, including Judge Maughmer and Judge Fenner, stated that the district court was on notice that Judy Clarke was not getting along with the defense team.

In fact, the statements obtained by Judge Fenner, Judge Maughmer, Mr. Conrad, Mr. Owen, and Ms. Hunt are *consistent* in the sense that everyone agreed that no one got along with Ms. Clarke, and as a result, the defense team was becoming unproductive and actually at risk of becoming ineffective due to her continued involvement. None of their statements support the claim that someone "defrauded" Judge Fenner into removing Judy Clarke based upon false reasons. An *ex parte* discussion or statements that suggest that memories have faded about discussions that happened years ago do not miraculously translate into proof that fraud was committed upon this Court.

1.  *Montgomery Failed to Show the Relevance of Alleged Fraud*

Assuming for the sake of argument that the alleged, albeit unspecified fraud, was true, even so, Montgomery has yet to explain why it is relevant to any remedy to be sought

in her amended § 2255 motion. Even if this Court believed incorrectly that Ms. Clarke was "not working" or "not productive," because of the lack of quality in her legal work, Montgomery did not have a Sixth Amendment right to select her attorney since all of her attorneys were court appointed. The court still retains the discretion to remove counsel for any basis if it is in "the interests of justice." 18 U.S.C. § 3006A(c). It was undisputed that Judy Clarke did not get along with anyone on Montgomery's defense team. The district and magistrate court retain full discretion to appoint and remove counsel that are government funded. Additionally, even if the court did not have such sweeping discretion in this area, Judy Clarke lost her support from her sponsoring local attorney, which is required as *pro hac vice* counsel.

> 2.    *Courts Retain Discretion for all CJA Appointed Counsel*

Pursuant to the Criminal Justice Act (CJA) the district court is provided discretion to appoint and replace counsel as the court sees fit, or "in the interests of justice." 18 U.S.C. § 3006A(c). This is a subjective standard left to the discretion of the court. The court retains discretion, under the provisions of § 3006A(c), to remove even the sole and primary counsel for a defendant and to replace him or her with new counsel if the court believes it will serve the interests of justice. In Montgomery's case, it was not even her primary counsel being removed, it was only secondary counsel brought in to assist lead counsel on a *pro hac vice* basis.

While Congress enacted 18 U.S.C. § 3599 to govern the appointment of counsel in capital cases, thus supplementing § 3006A for persons facing execution, the "interests of justice" standard still applies in death penalty cases. *Martel v. Clair*, 132 S.Ct. 1276, 1287

(2012). There is not a heightened standard in death penalty cases. A magistrate or district court's discretion to remove or appoint new counsel utilizing the "the interests of justice" standard also applies for persons facing execution. *Id*. Further, one of the factors that a court should consider when deciding whether the removal of counsel will aid in the "interests of justice," is the "need to thwart abusive delay." *Id*. (quoting *Hunter v. Delo*, 62 F.3d 271, 274 (8th Cir. 1995) (citing *United States v. White*, 451 F.2d 1225, 1226 (6th Cir. 1971))).

Regardless of whether Ms. Clarke was "doing work" on her own, because of her involvement in the case, the entire defense team had become conflict ridden and unproductive. All of the interviews, affidavits, and depositions given or taken in this case demonstrate that the defense team was not getting along subsequent to Ms. Clarke's participation. A district court not only has the discretion, but also an obligation, to intervene if information is obtained indicating that a defense team appointed on behalf of a defendant charged with a capital crime, for whatever reason, is not working productively together. Otherwise, the team is not serving the best interests of the defendant and is not properly utilizing the allocation of government funding.

Further, even if, hypothetically, Montgomery had retained Judy Clarke as private counsel, a defendant's Sixth Amendment right is not absolute and comes with limitations. A court still has the right to remove retained counsel if the court finds counsel to be disruptive.

> "[T]he right to retain counsel of one's choice is not absolute . . . The right of choice of counsel must not obstruct orderly judicial procedure or deprive courts of their inherent power to control the administration of justice. . . .

Therefore, courts must balance the defendant's right to counsel of his own choosing against the court's interest in the administration of justice."

*United States v. Edelmann*, 458 F.3d 791, 806 (8th Cir. 2006) (quoting *United States v. Gonzalez-Lopez*, 399 F.3d 924, 929 (8th Cir. 2005), *aff'd and remanded*, *Gonzalez-Lopez*, 548 U.S. at 140) (internal quotations and citations omitted)).

### 3. *Pro Hac Vice Counsel*

Ms. Clarke appeared as *pro hac vice* counsel. As such, she did not represent Montgomery at the discretion of Montgomery, but at the grace and discretion of the court and the sponsoring local Federal Public Defender's Office.

In order to appear in the Western District of Missouri, outside counsel must be sponsored as *pro hac vice*. Mr. Conrad and Mr. Owen served as Ms. Clarke's sponsors in the Western District of Missouri. Thus, regardless of other co-counsel's opinions or a defendant's opinions, if the sponsoring attorney no longer wants to sponsor outside counsel *pro hac vice*, then they can seek the court's release of their sponsorship and the appointment of outside counsel *pro hac vice*. The basis for local counsel's decision is subjective and requires no objective showing to the court.[3] Further, as an employee from another Federal Public Defender's Office, Judy Clarke's participation in a case with the Western District of Missouri's Federal Public Defender's Office required the approval and consent of the local FPD's office.

---

[3]Some circuits have even found that the *only* way to terminate the appointment of a public defender is if the federal magistrate judge or district judge determines that the defendant is no longer indigent and can afford to retain counsel. *United States v. Dangdee* 608 F.2d 807, 809 (9th Cir.1979).

Even when *pro hac vice* counsel are *retained* by a defendant, the district court still maintains the discretion to revoke his or her *pro hac vice* status and can do so without a hearing.  *Johnson v. Trueblood*, 629 F.2d 302, 304 (3d Cir. 1980).  Formal notice may even be inappropriate in some circumstances.  *Id.*  Of course, in Montgomery's case as previously discussed, Judy Clarke was not retained, but even if she had been, this Court had no requirement to even have a hearing or provide formal notice and maintained full discretion to remove her at will.

Pursuant to 18 U.S.C. § 3005, in death penalty cases with court-appointed counsel, the court is mandated to utilize the Federal Public Defender's Office as a resource, including seeking their advice and input regarding the appointment of counsel.  "In assigning counsel under this section, the court *shall* consider the recommendation of the Federal Public Defender organization, or if no such organization exists in the district, of the Administrative Office of the United States Courts."  18 U.S.C. § 3005 (emphasis added).  Thus, Judge Fenner properly sought the recommendation and input from the local Federal Public Defender's Office.

Further, pursuant to 18 U.S.C. § 3599, in death penalty cases, "if the appointment is made before judgment, at least one attorney so appointed must have been admitted to the practice in the court in which the prosecution is to be tried for not less than five years, and must have had not less than three years' experience in the actual trial of felony prosecutions in that court.  18 U.S.C. § 3599(b).  Even if this Court had preferred to select Ms. Clarke over counsel for the local Federal Public Defender's office, the court would have been

compelled to select the Federal Public Defender's Office since Ms. Clarke did not meet the required qualifications outlined in § 3599(b).

### 4. *Conclusion*

Montgomery has failed to present evidence that supports "fraud upon the court" and has further failed to properly allege fraud with any specificity. Further, Montgomery does not enjoy a Sixth Amendment right to choose court appointed counsel, and this Court retains broad discretion regarding the assignment of both court appointed counsel and counsel appearing *pro hac vice*. Finally, this Court properly consulted and relied upon the Federal Public Defender's Office pursuant to 18 U.S.C. §§ 3005 and 3599, and Ms. Clarke otherwise lost the support of her local Federal Public Defender's Office and sponsoring agency to appear *pro hac vice*.

## **Claim III** *(Pages 52-56)*

### D. *Judy Clarke's Removal Did Not Deprive Her of her Right to Counsel During a Critical Stage of the Proceedings, Nor Were Either David Owen or Ray Conrad Operating Under a Conflict of Interest When They Sought Her Removal*

The Sixth Amendment, of course, guarantees criminal defendants the right to effective assistance of counsel. *Sweeney v. United States*, 766 F.3d 857, 859 (8th Cir. 2014) (citing U.S. Const. amend. VI). "Normally, in order to succeed on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was 'deficient' and that the 'deficient performance prejudiced the defense.'" *Walking Eagle v. United States*, 742 F.3d 1079, 1082 (8th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). However, prejudice may be presumed when a defendant

experiences a "complete denial of counsel" at a critical stage of his trial. *United States v. Cronic*, 466 U.S. 648, 659 (1984).

Relying on *Cronic*, Montgomery asserts that Mr. Owen and Mr. Conrad were suffering from a "conflict of interest" when they sought Ms. Clarke's removal from the defense team, and that her removal constituted "structural error" that requires no showing of prejudice. But neither *Cronic*, nor any of the other cases they cite in support of their argument, support such a claim.

While it is clear that Mr. Owen had a "conflict" with Ms. Clarke that prevented them from functioning as an effective defense team, he had no "conflict of interest" that would have required his disqualification. And removing Ms. Clarke from the defense team obviously did not result in a complete denial of counsel for Montgomery at a critical stage of the proceedings.

As Mr. Duchardt notes in his affidavit (Duchardt Aff. 24), *Cronic* involved a case where a young, inexperienced lawyer, with limited experience in criminal matters, was given only 25 days to prepare for a trial which was both serious and complex, and which involved witnesses who were difficult to contact. Nevertheless, the Court held that ineffectiveness would not be presumed, and that the defendant still was required to show prejudice. *Cronic*, 466 U.S. at 666-67.

Likewise, none of the other cases cited by Montgomery in her motion, *Cuyler v. Sullivan*, 446 U.S. 335, 337 (1980); *Holloway v. Arkansas*, 435 U.S. 475 (1978), or *Mickens v. Taylor*, 535 U.S. 162 (2002), support her claim that Mr. Owen and Mr. Conrad were operating under an actual conflict of interest when they sought Ms. Clarke's removal

from the case. *Cuyler* and *Holloway* involved defense attorneys who were representing three joint defendants with potentially conflicting interests. *Cuyler*, 446 U.S. at 337; *Holloway*, 435 U.S. at 478-480, 488, 490. In *Mickens*, one of Mickens's attorneys arguably had a conflict of interest because he had been representing the alleged victim on an unrelated matter at the time that the murder occurred. *Mickens*, 535 U.S. at 164-65.

None of these cases, then, involved a situation involving multiple court-appointed attorneys where one of those attorneys was removed at the request of the others because of conflicts between those attorneys. And, although as Mr. Duchardt correctly observes in his affidavit (Duchardt Aff. 27), the personal interest of an attorney can, in some cases, create a conflict between counsel and his client, it is incumbent upon the client to show that the interests of the attorney actually conflicted with the interests of the client, and that some sort of deficient performance by the attorney was attributable to the purported conflict. *United States v. Hearst*, 638 F.2d 1190, 1193-94 (9th Cir. 1980) (attorney's book deal about client's case not shown to impact decisions made at client's trial); *Garcia v. Brunnell*, 33 F.3d 1193, 1198-99 (9th Cir. 1994) (attorney's anticipated move to prosecutor's office not shown to impact decisions made at client's trial); *United States v. Michaud*, 925 F.2d 37, 41-42 (1st Cir. 1991) (attorney teaching course to IRS agents not shown to conflict with duties to tax fraud client); *United States v. Sayan*, 958 F.2d 55, 64-65 (D.C. Cir. 1992) (claim that trial attorney failed to seek continuance only to curry favor with trial judge attorney not supported by the record).

Obviously, Montgomery cannot make such a showing in this case. At best, she merely can establish that there existed a clash in personalities between members of her

defense team, a conflict that was resolved by removing Ms. Clarke from the defense team at the request of the Federal Public Defender's Office – the same office that originally sought her participation in the case. Thus, despite what Montgomery argues in her motion, this Court's decision to remove Ms. Clarke from the case was not a result of fraud, deception or a "conflict of interest" on the part of the Federal Public Defender's office, but rather based upon clear and convincing evidence that Ms. Clarke's presence was corrosive and disruptive to the smooth and effective functioning of her defense.

**Claim IV** *(Pages 56-59)*

E.    ***Montgomery Claims That the Trial Team of Fred Duchardt, John O'Connor, and David Owen Did Not Have a Conflict of Interest That Prevented Them From Raising or Perfecting Ms. Montgomery's Claim Of Denial of Counsel by the Removal of Judy Clarke From The Defense Team, Nor Did Mr. Duchardt and John Gromowsky Provide Ineffective Assistance of Counsel in Failing to Raise the Issue of Ms. Clarke's Removal, Since the Attorneys Understood That Such a Claim Had No Merit.***

Finally – at least with respect to the Judy Clarke issue – Montgomery asserts that her trial attorneys were ineffective in failing to object to Ms. Clarke's removal prior to trial, and that her appellate attorneys were ineffective in failing to raise this issue on appeal.

In fact, the only issue cognizable in Montgomery's amended § 2255 motion regarding the removal of Judy Clarke is the question whether Montgomery's *appellate attorneys* were ineffective in failing to raise this issue on appeal. Since this issue was not raised on direct appeal, it was forfeited and may not be raised in a § 2255 motion unless a prisoner can show both cause for the procedural default, and prejudice resulting from the unraised error. While ineffective assistance of counsel can support both the "cause" and "prejudice" prongs of this test, scrutiny of appellate counsel is highly deferential.

When appellate counsel competently asserts some claims on a defendant's behalf, it is difficult to sustain an ineffective assistance claim based on allegations that counsel was deficient for failing to assert some other claims. *Winters v. United States*, 716 F.3d 1098, 1106 (8th Cir. 2013) (citing *Link v. Luebbers*, 469 F.3d 1197, 1205 (8th Cir. 2006)). As *Winters* goes on to note, because one of appellate counsel's important duties is to focus on those arguments that are most likely to succeed, counsel will not be held to be ineffective for failure to raise every conceivable issue. *Id.*

Here, Montgomery's appellate attorneys filed a 150-page brief on appeal, raising numerous issues that generated a lengthy opinion by the Eighth Circuit. As Mr. Duchardt indicates in his affidavit (Duchardt Aff. 29), he extensively researched these issues and "found them to lack factual and legal substance." He went on to say that they even "seem[ed] spurious," to him, which is why he declined to raise them on appeal. (Duchardt Aff. 29.)

Consequently, none of Montgomery's claims involving her "Judy Clarke" issues, regardless of how they are phrased or packaged, entitles her to relief in this proceeding.

**_Claim V_** *(Pages 59-195)*

**F.** **_There is No Merit to Montgomery's Claims the Fred Duchardt–led Trial Team Performed Deficiently and Unreasonably both Prior to, During, and After Trial which Denied Her Effective Assistance of Counsel_**

Under Section V of her motion, Montgomery provides a veritable laundry list of claims of ineffectiveness directed at the defense team led by Mr. Duchardt, including the claims that while the time between Montgomery's arrest (December of 2004) and her trial (October of 2007), the turnover of the defense team precluded the effective use of that time,

and resulted in "'chaos and dysfunction.'" (D.E. 71 at 83.)   Montgomery also contends

that neither Mr. O'Connor nor Mr. Duchardt spent adequate time preparing Montgomery's

defense.   (D.E. 71 at 62-82.)

In his affidavit, Mr. O'Connor refutes the notion that he did not spend sufficient

time on the case, or that the defense team was in "chaos and dysfunction."   He indicated

that Mr. Duchardt, and Mr. Owen, the First Assistant at the Federal Public Defender's

Office and he had the complete cooperation of Ray Conrad, the Federal Public Defender,

and that all of them "collaborated on the defense" of Montgomery.   (O'Connor Aff. 1.)[4]

He further stressed that his billing records did not reflect all of the hours he spent

working on the case, and that he "worked many more hours on [the] case than are indicated

in the records."   (O'Connor Aff. 1.)   He added that "[f]rom [his] 31 years of litigating

criminal cases, [he] was fully prepared to defend Mrs. Montgomery when her trial began in

October 200[7], as was the rest of the defense team."   (O'Connor Aff. 1.)

In Mr. Duchardt's affidavit, he confirmed that Mr. O'Connor performed many

hours of service on Montgomery's behalf that he did not bill for, and that he even visited

Montgomery at CCA accompanied by women from his church – a visit he did not bill for.

(Duchardt Aff. 38.)   Mr. Duchardt also dismissed Montgomery's claims that

Mr. O'Connor did not personally spend sufficient time visiting Montgomery, noting that

the entire defense team spent "hundreds of hours" with Montgomery.   (Duchardt Aff. 40.)

---

[4]The Government has attached John O'Connor's affidavit as Attachment C.

Mr. Duchardt also emphasized that it was clear to him that Montgomery was "completely comfortable" with Mr. O'Connor and that he was "completely familiar" with Montgomery.   (Duchardt Aff. 40.)

As for Montgomery's claim that Mr. O'Connor, in essence, abdicated his role as lead counsel in the case, Mr. Duchardt emphasized the Mr. O'Connor's management style was low-key, placed value on good teamwork, and was designed not to interfere with, or duplicate the work of others unless there was a need to intervene.   (Duchardt Aff. 41.)

1.   _Daubert Proceedings (p.83)_

Montgomery asserts that Mr. Duchardt was ineffective in insisting on attempting to use Dr. Gur's testimony at trial, instead of accepting the Government's supposed offer to allow him to use that testimony in the penalty phase of the trial.   (D.E. 71 at 83.)   He also asserts that Mr. Duchardt was ineffective in failing to request a continuance once the district court sustained the Government's objection to Dr. Gur's testimony in both phases of the trial.   (D.E. 71 at 83-84.)

Both claims involve informed, strategic decisions that are "virtually unchallengeable" in a § 2255 proceeding.   _Brooks v. United States_, — F.3d —, No. 13-3640, 2014 WL 6663319, at 1 (8th Cir. Nov. 24, 2014) (quoting _Strickland_, 466 U.S. at 690).

Although the Eighth Circuit ultimately upheld the district court's refusal to allow Dr. Gur to testify during the guilt phase, the court did hold that part of his proposed testimony was admissible during the penalty phase, but that its exclusion was harmless error.   _Montgomery_, 635 F.3d at 1092.

In his affidavit, Mr. Duchardt's clearly and unequivocally discredits Montgomery's claim that the Government was willing to allow the defense to introduce Dr. Gur's testimony during the penalty phase, if Montgomery's defense team was willing "to abandon [the] use of those results in support of a first-phase, pseudocyesis defense." (Duchardt Aff. 80.) Mr. Duchardt refers to this allegation as "wishful thinking," and states that once the Government had the opportunity to read Dr. Gur's reports, it fought "tooth and nail" to keep his testimony out of evidence, so that there was no opportunity to obtain the compromise that Montgomery suggests could have been reached. (Duchardt Aff. 80.)

With respect to Montgomery's claim that Mr. Duchardt should have requested a continuance "to regroup" once Dr. Gur's proposed testimony was excluded, Mr. Duchardt notes in his affidavit that he already had been granted two continuances, and this Court had made clear that it was unlikely to grant another postponement of the trial. (Duchardt Aff. 83.) He also indicates in his affidavit that, even absent Dr. Gur's testimony, he was ready to try the case. (Duchardt Aff. 83.) In any event, the Eighth Circuit, on direct appeal, emphasized that the admissible portion of Dr. Gur's testimony was essentially cumulative to evidence that was ultimately introduced by both sides. *Montgomery*, 635 F.3d at 1092 ("The jury heard extensive testimony from Drs. Ramachandran, Logan, and Kuncel, as well as from Montgomery's treating psychiatrist, about Montgomery's background and psychiatric diagnoses").

Finally, with respect to Montgomery's claim that he "failed to timely comply with the discovery requested by the Government" (D.E. 71 at 84), Mr. Duchardt correctly

observes that "the Eighth Circuit decided that [he had] met all [of his] discovery obligations" with respect to Dr. Gur's proposed testimony (Duchardt Aff. 70), and, indeed, the Eighth Circuit so ruled. *Montgomery*, 635 F.3d at 1092 n. 8 ("to the extent the district court based its decision to exclude the PET evidence on Montgomery's alleged discovery violation, the sanction was unwarranted").

### 2. *Plea Settlement Was Never An Option (p.84)*

As one of her claims of ineffectiveness, Montgomery asserts that Mr. Duchardt was ineffective in failing to aggressively convince the Department of Justice not to seek the death penalty. (D.E. 71 at 84.) But, in their affidavits, both attorneys agree that the Government was never amenable to such a compromise. Mr. Connor notes:

> Given the horrific nature of the crime, and the decision of the United States Attorney to seek the death penalty, the case was going to be decided by a jury. Certainly we tried to negotiate this case to something other than the death penalty but the Government was never interested in those negotiations.

(O'Connor Aff. 8.)

Mr. Duchardt's affidavit notes that, to begin with, Montgomery never indicated that she was prepared to plead guilty in exchange for the Government's agreement not to seek the death penalty. Nevertheless, he repeatedly tried to convince the United States Attorney, Matt Whitworth, not to seek the death penalty, and he even made a last-minute approach to the Department of Justice, figuring he had nothing to lose by doing so. (Duchardt Aff. 83.) Consequently, while a negotiated settlement might have been a better option than going to trial and risking a death sentence, that option was never made available to the defense. (Duchardt Aff. 83.)

In summary, then, neither Mr. Duchardt nor the defense team can be held to have been ineffective in failing to obtain a negotiated settlement when (1) Montgomery never indicated that she would be amenable to such a settlement, and (2) the possibility of such a settlement was never a viable option, since the Government was not open to such negotiations.

3.     _Tommy Defense is Abandoned (p. 84)_

Montgomery also complains that her trial team was ineffective in abandoning the so-called "Tommy Defense," which would have advanced the theory "that Tommy Kleiner was the actual killer." (D.E. 71 at 85.) According to Montgomery's motion, Mr. Duchardt wanted to proceed with this defense, but Mr. O'Connor chose not to pursue such a theory. (D.E. 71 at 85.)

Montgomery does not argue that there was any legitimate basis for pursuing such a defense, and the question of what witnesses or defenses to present are clearly matters of trial strategy that are "virtually unchallengeable." _Strickland_, 466 U.S. at 690. In Mr. O'Connor's affidavit, he explains why they decided to abandon any reliance upon the "Tommy Defense":

> In all criminal cases there becomes evidence or testimony that cannot be overcome, or, the belief that highlighting evidence only draws more attention to it. We took the position of not drawing attention to it. In my opinion, that was the best decision at the time in dealing with the issue of the Tommy Defense.

(O'Connor Aff. 5.)

4. *Pre-Trial Motions (p. 85)*

Montgomery asserts in her motion that, "[b]eyond a few boiler-plate motions, Mr. Duchardt failed to engage in pre-trial motion practice." (D.E. 71 at 85.) But, obviously, an attorney's effectiveness cannot be based on the number of pre-trial motions that the attorney chooses to file, regardless of their merit. In any event, as Mr. Duchardt points out in his affidavit, he *did* file a number of pretrial motions, and none of them were of the boilerplate variety:

> There are few cuts more unkind to an experienced attorney than to accuse him, as Current Counsel for Mrs. Montgomery accuse me, of having filed "a few boiler-plate form motions" (Doc. 71, p. 85). However, in making the accusation Current Counsel do not give the Court any direction about what plate, other than mine, on which my motions were boiled. All of my motions were so unique that I challenge Current Counsel to find any instance, other than in the Montgomery case, in which these motions were filed.

> My challenge regarding sufficiency of the evidence about death resulting from kidnapping was an issue of first impression *United States v. Montgomery*, 1085-1087. My challenge to Eighth Circuit penalty phase instructions, based upon split between Circuits, is one I have originated, and cannot be found anywhere else. *United States v. Montgomery*, 1098-1099. My challenge to exclusion of polygraph evidence is uniquely tailored to this case. *United States v. Montgomery*, 1094. Likewise uniquely tailored to the facts of this case is my challenge to sufficiency of the evidence about the heinousness aggravating factor. *United States v. Montgomery*, 1095-1096. The closest motions to "boiler-plate", but still all cooked up by me, were the now-generally-used constitutional challenges that the Federal Death Penalty Act risks execution of the actually innocent, is violative of the indictment clause, and unlawfully does away with the Federal Rules of Evidence (05-6002 Doc. 103, 104, 105). All three of these motions were originated by me and other attorneys trying Federal capital cases in the mid 1990's, and the issues raised in those original motions have been considered and rejected by the Circuits throughout the country. I have refined all of those motions, in unique ways, to take the issues the next logical steps past the Circuit decisions on the subjects, even going so far as to find contrary state precedent to support new arguments (05-6002 Doc. 103, 104, 105). I did not carry any

of these issues through to appeal because there were plenty of other, stronger issues to brief.

(Duchardt Aff. 84.)

The record, then, refutes Montgomery's contention that Mr. Duchardt did not engage in "pre-trial motion practice," but absent some showing that Mr. Duchardt failed to file some essential motion that would have changed the result of either the trial or the sentence imposed, such a claim, even if true, is insufficient to entitle Montgomery to relief.

5.     *Jury Selection (p. 86)*

Montgomery argues that Mr. Duchardt's "questioning of the jurors was abysmal," that he failed to make meritorious objections to statements by the court and the prosecution, and that his "questioning was novice and showed no skill in the area of capital defense jury selection." (D.E. 71 at 86.)

Again, these arguments are merely exercises in second-guessing, and fail to entitle Montgomery to relief.   As Mr. O'Connor's notes in his affidavit:

> The Court allowed a jury consultant in Mrs. Montgomery's case. Fred and I both had previous experience with Dr.  Steven Mandracchia, a psychologist at Western Missouri Mental Health**,** and chose him as our consultant**.**   Anyone who has worked in the court system in Jackson County or the surrounding areas is aware of Dr. Mandracchia's abilities and knowledge in dealing with human beings.   Dr. Mandracchia was present during the entire jury selection process.   He was provided the jury questionnaires and he was in court to listen to responses given to the defense and prosecution.   He was fully engaged with us during recesses and during the jury selection.

> Further, I have worked on other cases with Fred.   He does an outstanding and stellar job of selecting jurors, and he did so in this case.   To say otherwise I take great exception.

(O'Connor Aff. 8.)

Mr. Duchardt addresses these claim in considerable detail in his affidavit. (Duchardt Aff. 86.)   At this point in the Government's response, however, it suffices to say that Mr. Duchardt was an experienced, skilled trial attorney with many years of experience conducting *voir dire* examinations.   Absent some showing that a particular juror should have been struck for cause – a showing that Montgomery cannot make – claims concerning his performance during *voir dire* is simply a pointless exercise in Monday-morning quarterbacking.

6.      *The Trial (p. 87)*

Montgomery complains generally, under this subsection, "that all three trial attorneys failed to object to improper questioning and evidence from the Government witnesses" (D.E. 71 at 87), and then uses a scattergun approach to complain that the defense team was ineffective in (1) attempting to portray Montgomery as a "good" mother; (2) calling Dr. Ramachandran's to establish that Montgomery suffered from pseudocyesis; (3) calling the treating psychiatrist, Dr. Linda McCandless; and (4) failed to adequately cross-examine the Government's experts, "often bringing out information damaging to Mrs. Montgomery."   (D.E. 71 at 87-91.)

Again, Montgomery fails to identify any actual errors that adversely impacted either the guilt or penalty phases of the trial.   Asserting that defense counsel's cross-examination was ineffective, or noting that a particular defense (in this case, pseudocyesis) was not accepted by the jury both fall far short of meeting the *Strickland* requirements for establishing ineffective assistance of counsel.   Here, the evidence of Montgomery's guilt

was overwhelming, and pseudocyesis was the only possible defense Montgomery's defense team had to put forward. The fact that it was unsuccessful does not show that the defense team was ineffective in raising that defense.

7.     *Penalty Phase (p.91)*

Under a subsection entitled "penalty phase," Montgomery asserts that the defense team "fail[ed] to represent Lisa Montgomery" properly in the penalty phase." (D.E. 71 at 91.) Specifically, they claim that the defense team failed to properly prepare its witnesses, put on a "poor" mitigation defense, did not allow Dani Waller to meaningfully participate in the presentation of evidence, and failed to object when Judy Shaughnessy was seen talking to other family members, supposedly "attempting to intimidate" them. (D.E. 71 at 91.)

Obviously, claims that the defense failed to properly prepare their witnesses are too vague and nonspecific to even require a response. And Ms. Waller's role in the presentation of Montgomery's defense was obviously for her attorneys to decide. As for Mr. Duchardt's failure to object when he saw Judy talking to other family members, Mr. Duchardt decided, in an exercise of professional judgment, that Judy's comments were not likely to influence or intimidate other family members, and he was correct in that assumption. As he noted in his affidavit, "Judy's bombast was ineffectual, and the witnesses attended and testified fully and truthfully despite Judy's efforts. I felt that was the best counterpunch against Judy." (Duchardt Aff. 89-90.)

8.    _What the Jury Did Not Hear (p. 92)_

Montgomery expends over 40 pages of her motion setting out mitigation evidence that the jury supposedly did not hear during the penalty phase of the trial.  (D.E. 71 at 92-135.)  Remarkably, despite 43 pages of often single-spaced quotations from a wide variety of declarants, Montgomery is unable to cite a single relevant fact that was not part of Montgomery's mitigation defense.   As earlier noted, although Montgomery contends in her motion that her "true story" was never told, in fact, her "story" was told in minute, graphic detail during the penalty phase of the trial.   (_See_ Attachment C.)   Indeed, as noted in Mr. Duchardt's affidavit, the only alleged facts that the jury "failed to hear" are claims that are completely unsupported by the record and, in some instances, refuted by Montgomery herself.   (Duchardt Aff. 2-3.)

9.    _Montgomery's Trial Team Retained Competent Mental Health and Neurological Experts (p. 135)_

Beginning at page 135 of her amended motion, Montgomery raises 25 "specific" claims of ineffectiveness, beginning with the assertion that her defense team was ineffective in failing to retain "competent mental health and neurological experts."   (D.E. 71 at 135.)   However, as the Eighth Circuit noted on direct appeal, "[t]he jury heard extensive testimony from Drs. Ramachandran, Logan, and Kuncel, as well as from Montgomery's treating psychiatrist, about Montgomery's background and psychiatric diagnoses," and, but for the improper exclusion of part of his testimony, the jury, during the penalty phase, would have heard from Dr. Gur as well.   _Montgomery_, 635 F.3d at 1092.

The witnesses cannot be labeled as less than "competent" merely because the jury obviously rejected at least part of their testimony.

10. *Montgomery's Trial Team Conducted ABA Mitigation Investigation (p.136)*

Montgomery's second specific claim of ineffectiveness concerns her contention that her defense team did not conduct a sufficient mitigation investigation. (D.E. 71 at 136-44.) However, as earlier noted, although Montgomery's motion is replete with what she claims is new mitigation evidence that was not presented during the penalty phase of the trial, in fact, it is nothing more than a rehash of, or is cumulative to, the massive amounts of mitigation evidence that the defense team presented on Montgomery's behalf.

As Mr. Duchardt notes in his affidavit, the defense team compiled an extensive database of information and evidence that they used during the penalty phase of the trial in an effort to convince the jury not to impose the death penalty. (Duchardt Aff. 32-34.) Mr. Duchardt correctly observes that Montgomery's new attorneys cannot point to even "one fact of substance about [Montgomery] which was not contained" in their mitigation database. (Duchardt Aff. 34.) He also correctly points out that the database they "created for trial is the source for every important fact about . . . Montgomery relied upon by experts for [c]urrent [c]ounsel for . . . Montgomery." (Duchardt Aff. 34.) He goes on to emphasize that Montgomery's present attorneys "do not, because they cannot, point to one fact that was discovered anew, and instead rely upon only those facts about [Montgomery] which we uncovered and knew about." (Duchardt Aff. 34.)

*11.* *Montgomery Claims That Defense Team Was Not Cohesive (p.144)*

Montgomery's third "specific" claim of ineffective assistance of counsel is the vague contention that she was denied her Sixth Amendment right to counsel because the defense team was not "cohesive." (D.E. 71 at 144-45.) According to Montgomery, Mr. Duchardt was ineffective because he was poor at delegating responsibility, and his "decision to just handle everything himself deprived . . . Montgomery of competent, adequate, effective counsel." (D.E. 71 at 146.) In Montgomery's words, Mr. Duchardt was not a "team" player. (D.E. 71 at 146.)

But this claim is as unfounded as it is irrelevant. To prevail with such an argument, Montgomery must show more than a vague lack of "cohesiveness" – whatever that might entail – or that Mr. Duchardt might have been reluctant to delegate tasks to other members of the trial team. Rather, she is required to demonstrate the counsel's performance was deficient and that this deficiency created a reasonable probability that the result – at either stage of the proceedings – would have be different. *Strickland*, 466 U.S. at 694. Vague, non-specific allegations that Mr. Duchardt was not a "team player," even if true, state no viable claims for relief in a § 2255 action.

*12.* *Montgomery Claims That Mr. Duchardt's Wife Should Not Have Met With Montgomery (p. 146)*

Montgomery's fourth claim of ineffectiveness is that Mr. Duchardt should not have met with Montgomery in the presence of his wife, Ryland Duchardt, who, Mr. Duchardt's affidavit notes, "has a BSW and a Master's Degree in Guidance and Counseling," and had previously worked "as a probation officer and a juvenile officer." (Duchardt Aff. 45.)

Mr. Duchardt believed, based upon his interactions with Montgomery, that she had difficulty trusting men, and that she might be more cooperative and forthcoming, if his wife accompanied him during his interviews with Montgomery. (Duchardt Aff. 45.) This not only is a strategic decision that is within the purview of counsel's expertise, but it falls far short of establishing either ineffectiveness or prejudice under the *Strickland* test.

13. *Montgomery Claims That Defense Ignored Plea Negotiations (p. 150)*

In what is numbered as her fifth claim of ineffectiveness, Montgomery devotes more than two additional pages of her motion to the claim, previously discussed under Section 2 of this response, that the defense team was ineffective for supposedly "ignoring plea negotiations." (D.E. 71 at 150.) As previously emphasized, the simple answer to this question is that the Government was not willing to accept a guilty plea in exchange for agreeing not to seek the death penalty. Although Mr. Duchardt did his best to convince the Government to be satisfied with a life sentence, that option was never a realistic possibility. (*See* Section 2, *infra*, and Duchardt Aff. at 80-83.)

14. *Montgomery Claims That Fred Lied to Court About Having a Defense Prepared (p. 152)*

Montgomery's sixth claim of ineffectiveness states that Mr. Duchardt was ineffective in making numerous misrepresentations to the court, failed to request appropriate continuances rather than admit that he was not prepared for trial, and announced a possible defense to the court and the Government before it had been fully investigated. (D.E. 71 at 152-62.)

Mr. Duchardt's affidavit clearly and categorically refutes all of these claims. (Duchardt Aff. 48.)   In that affidavit, Mr. Duchardt emphasizes that he made no "misrepresentations" to the court, that he was, in fact, prepared for trial, and that he had determined to press forward with the defense of pseudocyesis at the time he announced his intention to do so to the court and the Government.   (Duchardt Aff. 48.)

Regardless, even if Mr. Duchardt had been ineffective in any or all of the respects alleged, Montgomery cannot show *Strickland* prejudice from any of these supposed failings.

16.     *Montgomery Claims That Mr. Duchardt's "Misrepresentations" Created a Conflict (p. 162)*

Montgomery's seventh claim of ineffectiveness asserts that Mr. Duchardt's "misrepresentations" in insisting that he was ready for trial put his own interests before his client's and created a conflict of interest so severe that he was no longer acting as her attorney under the Sixth Amendment.   (D.E. 71 at 162.)

The simple answer to this ridiculous assertion is that, as demonstrated above, there were no "misrepresentations" by Mr. Duchardt, much less such serious misrepresentations that they created a "conflict" between him and his client.

17.     *Montgomery Claims That Mr. Duchardt's Case Load Was Too Great (p. 162)*

Montgomery's eighth claim of ineffectiveness is that Mr. Duchardt's case load was too great to allow him to spend enough time on Montgomery's case.   But, obviously, the effectiveness of trial counsel cannot be measured in the time that an attorney or attorneys spend on a case, absent a showing that more time was needed.   In this case, it is clear that

Mr. Duchardt and his defense team spent thousands of hours preparing for trial; the record, in fact, speaks for itself on this issue. In any event, as Mr. Duchardt stresses in his affidavit, although he was handling other cases during the time he also was representing Montgomery, he was fully prepared to try her case by the time it actually went to trial:

> Current Counsel for Mrs. Montgomery accurately account that, during the six months after I accepted appointment to Lisa's Montgomery's case, I was called upon to try twice the capital case of **United States v. John P. Street**, the first time to a hung jury, and the second time to a guilty verdict and a life sentence. Because of the demands of the **Street** case in 2006, I did not devote full time to Lisa Montgomery's case during 2006. However, as my time records reflect, I devoted a substantial amount of time to Lisa's case in 2006, and devoted full time and more in 2007. As my time records also reflect, I met with Lisa herself a few times in 2006, and then made up for any lost time by meeting with Lisa for 120 plus hours in 2007.

> Current Counsel for Mrs. Montgomery criticize that my approach to handling my obligations to Mr. Street and Mrs. Montgomery in the fashion I did amounted to "a violation of prevailing professional norms" (Doc. 71, p. 69, 162-163). Current Counsel for Mrs. Montgomery do not bother to support this claim, which is essentially that I should have handled only one case at a time, because such a claim is itself contrary to prevailing professional norms.

(Duchardt Aff. 44.)

18. *NGRI Defense (p. 163)*

Montgomery's ninth claim of ineffectiveness involves Mr. Duchardt's decision to raise a defense of not guilty by reason of insanity (NGRI), asserting that he would have been better off without presenting a defense during the guilt phase of the trial. (D.E. 71 at 163.)

Again, this is a ludicrous assertion. Although this defense was ultimately unsuccessful, it was the only defense that Montgomery could possibly have raised during

the guilt phase of the trial, and Mr. Duchardt was able to support the defense through the testimony of several experts, including Drs. Ramachandran and Logan. And as Mr. Duchardt points out in his affidavit, he was able to present this defense while, at the same time, also focusing on Montgomery's other mental and emotional issues, notwithstanding Montgomery's current claims to the contrary:

> Current Counsel for Mrs. Montgomery complain that I presented the first phase insanity defense while somehow ignoring Lisa Montgomery's other mental and emotional issues (Doc. 71, p. 60, 61, 73, 92, 178). Current Counsel for Mrs. Montgomery lament that I offered an insanity defense at trial without understanding the burden of proof I was shouldering and when I supposedly should have known that there was insufficient support for that defense (Doc. 71, p. 84, 163, 180). Current Counsel then litany that I chose experts without thinking the matter through (Doc. 71, p. 66-67), that the experts I chose were not competent (Doc. 71, p. 135), that I subjected Lisa Montgomery to a series of "harmful and irrelevant" evaluations at the hands of men (Doc. 71, p. 82, 136), and that I failed to provide the experts what they needed to perform well (Doc. 71, p. 61, 79-80). On all counts, I disagree.

> Contrary to the notion that our mental health defense was single-minded, the record of testimony and argument establishes that the jury was urged to find that Lisa Montgomery suffered from variegated mental diseases and defects, including pseudocyesis, major depression, post-traumatic stress disorder, bipolar disorder, borderline personality disorder as well as trauma-caused brain injuries (Tr. 2071, 2091, 2198-2200, 2205, 2213-2214, 2245-2248, 2405-07, 2420-23, 2989, 2993-94, 3021, 3027-3031, 3159-3180).

> Current Counsel for Mrs. Montgomery attribute failure of our first phase defense to their belief that I felt that we did not bear a preponderance burden of proof on the subject, and would win if the evidence could go either way (Doc. 71, p. 84). Actually, what I tried to communicate Current Counsel for Mrs. Montgomery, which they fail to account, is that I believed, going into trial, that it was 50-50 bet that the jury would find that we had met our preponderance burden of proving insanity. While my prowess as an oddsmaker might be questionable, my understanding of the law applicable to mental health defenses is not.

Current Counsel for Mrs. Montgomery can certainly claim, in true Monday-morning-quarterback fashion, that our mental health defense at the first phase must have been wanting because the jury found Lisa Montgomery guilty. However, they cannot support what they go on to say, that "(t)he condition of pseudocyesis was not sufficient to support a defense of not guilty by reason of insanity" (Doc. 71, p. 163). Dr. Ramachandran and Dr. Logan concluded that it was (Tr. 2191-2198, 2420-2423). Even the government's expert, Dr. Park Dietz, never denied the severity of the sort of mental illness diagnosed by Dr. Ramachandran and Dr. Logan, only registering his opinions that Lisa did not suffer from pseudocyesis and that the constellation of the mental problems he detected in Lisa did not constitute a severe mental illness (Tr. 2558-2561, 2584, 2614, 2618-2619). Current Counsel for Mrs. Montgomery baselessly claim that Dr. Ramachandran "was not well-prepared" and "came off poorly", ignoring the contrary record evinced in the trial transcript (Tr. 2165-2378).

The words "slapdash" and "blindly" are used to describe my enlisting of the services of Dr. Rob Fucetola, Ph.D. and Dr. Ruben Gur, Ph.D. in May of 2006 (Doc. 71, p. 66-67, 162). No personal or professional criticisms are leveled at these men, likely because they are great guys, preeminent in their respective fields of neuropsychology and neuroimaging. Therefore, I take the criticism as based on the fact that I pulled the trigger on hiring these men almost immediately after my appointment to represent Lisa Montgomery. My timing, and my eyes-wide-open approach, are easy to explain.

As already noted above, as accounted by my time records, when I came into the case, I contacted Susan Hunt and Judy Clarke to get their takes on the case. Both Susan and Judy wanted to focus on the indignities which they believed they had suffered at the hands of the Kansas City Federal Public Defender's Office, and I certainly listened to all of that, and later researched those concerns. My purpose for the call was to get Susan's and Judy's perceptions about the critical issues in the case. Both Susan and Judy said that they believed they had identified in Lisa great physical-and-emotional-trauma-related brain injuries. What I gleaned from reading of case documents confirmed Susan's and Judy's takes on the need for brain-injury-related testing. Susan and Judy mentioned no experts they had identified and left me with the distinct impression that one of my major tasks would be finding of experts to do proper testing in anticipation of trial.

Fortunately, from my work in other cases, I knew that neuropsychological testing needed to initially be done in order to assess brain damage and determine whether brain imaging would be in order. Also, from my work in other cases, I was familiar with Dr. Fucetola and

Dr. Gur and the high quality work they could perform. Plus, I knew that, because both Dr. Fucetola and Dr. Gur were busy men, we needed to get them contacted quickly in order fit into their busy schedules the work we needed them to do. And, I knew that the Street case was scheduled to begin trial just about a month and a half later, and so I needed to proactively get things started on Lisa's case before I became buried in the Street case. Thus, I made the initial contacts with Fucetola and Gur, setting Fucetola's testing for just a few weeks later.

Shortly after jumping to the conclusion that I moved too fast in hiring Dr. Gur, Current Counsel for Mrs. Montgomery jump to the opposite conclusion, that Dr. Gur's actual testing occurred too late, in February of 2007, just a couple of months before the scheduled trial date at the end of April of 2007 (Doc. 71, p. 69, 71). It apparently does not occur to Current Counsel for Mrs. Montgomery that it was only because I made contact with a busy Dr. Gur as early as I did that we got the work by him scheduled and completed on our required time frame, two months prior to a late April trial date.

Current Counsel for Mrs. Montgomery nit pick that Dr. Gur did not diagnose Mrs. Montgomery as suffering with pseudocyesis (Doc. 71, p. 74), without further observing that Dr. Gur was not called upon to diagnose any mental health condition. Dr. Gur's function in this forensic setting was exactly what it would have been in his clinical setting, to produce imaging, and to relate the results of the imaging with the diagnoses reached by others.

Current Counsel for Mrs. Montgomery generally rail against the harms caused by "inappropriate" mental health testing, and call "irrelevant" the testing which was conducted (Doc. 71, p. 67, 82, 136). However, they point to no testing which was conducted which could be labeled as "inappropriate" or "irrelevant".

Current Counsel for Mrs. Montgomery fault me for not being sensitive to the fact that most of the experts I was enlisting were men, and all of the experts who would examine Lisa on behalf of the government were men (Doc. 71, p. 68, 82). In leveling this criticism, Current Counsel for Mrs. Montgomery do not acknowledge that the medical doctors they enlisted to assist them were similarly gender challenged. I trust that Current Counsel, in choosing their medical doctors, believed, as I did in choosing my experts, that it was important to enlist the very best experts, male or female, and then work with Lisa, prior to the conduct of evaluations and testings, to get her as comfortable as possible with what she would then face.

Current Counsel also claim that I failed to elicit critically important conclusions from our experts regarding Lisa appearing sane when she was not sane, being able to deliberate while insane, and being unable to conform her conduct to the requirements of the law (Doc. 71, p. 135, 190). Actually, our experts covered all of that ground (Tr. 2085-2088, 2151, 2180, 2343-2345, 2411-2423).

(Duchardt Aff. 61-66.)

20.    *Mr. Duchardt's Portrayal of Dr. Gur's Opinion to the Court (p. 163)*

Montgomery's tenth claim of ineffectiveness raises the curious claim that Mr. Duchardt essentially "oversold" the court on Dr. Gur's proposed testimony, and that this supposed "overreaching" led to the total exclusion of Dr. Gur's proposed testimony, including during the penalty phase of the trial.   (D.E. 71 at 163-67.)

In other words, Montgomery now faults Mr. Duchardt for attempting to portray Dr. Gur's testimony in the most positive light possible – obviously, precisely what a competent defense attorney would be expected to do – arguing that, by doing so, he somehow caused the district court to err by excluding *all* of Dr. Gur's testimony, even that portion of his proposed testimony that the court of appeals, on Montgomery's direct appeal, held was admissible. (D.E. 71 at 163-67.)

Montgomery might just as well be arguing that up is down, and black is white. Nevertheless, regardless of whether Mr. Duchardt's portrayal of Dr. Gur's proposed testimony caused the court to erroneously exclude it during the penalty phase of the trial, the court of appeals, on direct appeal, found that its exclusion was harmless. *Montgomery*, 635 F.3d at 1092.

21.    _Testimony of Dr. Mary Case (p. 170)_

Montgomery asserts in her eleventh claim of ineffectiveness that the testimony of the medical examiner, Mary Case, should have been excluded by her trial counsel.   (D.E. 71 at 167-170.)

As part of Montgomery's argument she contends that Dr. Case "presented false and exaggerated scientific evidence" when Dr. Case testified that the evidence suggested that Bobbie Jo Stinnett "was conscious at the time that her baby was removed from her uterus." (D.E. 71 at 167.)   From the outset, Montgomery's claim misstates the testimony of Dr. Case.   Dr. Case testified that to a reasonable degree of medical certainty Bobbie Jo Stinnett was conscious after Montgomery cut Bobbie Jo's abdomen, not "at the time her baby was _removed_ from her uterus." (Tr. 810-824.)   (Emphasis added.)

Even if Montgomery's misstatement were accurate, it would not advance her claim of ineffectiveness, since the objection to Dr. Case's conclusions is relevant only to the credibility of her testimony, not to its admissibility.   However, it is worth noting since Montgomery continues to argue in this same vein.

Montgomery argues that the testimony of Dr. Case should have been excluded because "[t]here was no evidence that Bobbie Jo was alive when the baby was removed . . . and any testimony about Mrs. Stinnett being alive during the removal of the baby was pure speculation."   (D.E. 71 at 168.)

Dr. Case testified definitively regarding two important facts.   First, the bottom soles of Bobbie Jo Stinnett's feet had been flat on the floor after Ms. Stinnett was bleeding profusely from her abdominal cuts.   The very large amount of blood found on

Ms. Stinnett's soles and between her toes is significant, since only the heels of her feet were touching the floor as she lay dead on the ground. (Tr. 810-13, 826-31.)   Second, Ms. Stinnett had multiple wounds to her body besides the large gaping cuts to her abdomen, including ligature marks on her neck, blunt-force-trauma injuries to her head and nose, abrasions to both elbows, and fresh cuts on her fingers, from defending herself from a sharp object, which in this case was a knife. (Tr. 813-15.)

Because of these two important facts, it was Dr. Case's testimony to a reasonable degree of certainty that Bobbie Jo Stinnett was strangled and "regained consciousness from the asphyxiation while the incision was being made into her abdomen, bleeding had begun and then she put up a struggle and then she was further restrained and strangulation was continued and she died as a result of that as well as blood loss from the incision made into her abdomen and uterus."   (Tr. 810-11, 824.)

Montgomery argues the testimony should have been excluded because Dr. Case qualified her opinions in her written report with the word "possibility" rather than explicitly stating her opinions were based on a reasonable degree of medical certainty. (D.E. 71 at 168-69.)   The written report of Dr. Case, however, was successfully excluded as an exhibit by Montgomery's trial team.   (Tr. 809.)

When Dr. Case testified at trial regarding her opinions, Montgomery's trial team did object because Dr. Case was not asked if her opinions were based on a reasonable degree of medical certainty.   Montgomery's trial team was, therefore, not ineffective.   After the objection was lodged, the Government made the proper foundational questions to elicit

Dr. Case's testimony that her opinions given to the jury were made within a reasonable

degree of medical certainty.   (Tr. 824.)

Mr. Duchardt points out the following trial strategy in his affidavit:

We as a team knew that pathologist Mary Case was prepared to testify that the presence of blood on the bottoms of Bobbie Jo Stinnett's feet proved that Bobbie Jo somehow planted her own feet into her own blood at a point in time after the cutting of her abdomen spilled her blood.   Though this seemed the only logical conclusion from the available facts, John enlisted the services of another pathologist, who confirmed all of that for us.   The best face which could be put on the ugly incident was the one John endeavored, for which he is criticized, that the blood on the bottoms of the feet could be explained by Bobbie Jo being revived from her strangulation by the cutting, and only retracting her legs, but not actually engaging in a further, all-out, struggle.   Current Counsel for Mrs. Montgomery, of course, criticize generally that this evidence should have been somehow blocked, or should have been watered down in some fashion (Doc. 71, p. 86), but cannot offer any legitimate alternative approach to the matter.

Being a smart lawyer, John did catch prosecutor Matt Whitworth failing to dot his I's and cross his T's on the foundation for Dr. Case's testimony.   While Current Counsel for Mrs. Montgomery say that John should have gotten the Case testimony excluded on this technical basis, they present no case law supporting that claim, obviously determining, as we did, that there is no reported case finding error in permitting a prosecutor to correct his omission by supplying his foundation after proper objection brings the matter to the fore.

What John masterfully did, for which he is not credited by Current Counsel for Mrs. Montgomery, is that he navigated the expert pathology testimony keeping intact the factual foundation for our argument that Bobbie Jo Stinnett was dead before her child was removed from her body.   This was critical support for our sufficiency of the evidence claim that, because the death came prior in time to the birth of the child, this could not have been a kidnapping resulting in death.   *United States v. Montgomery*, 1086-1087.

(Duchardt Aff. 42-43.)

Montgomery fails to show ineffectiveness by her trial team regarding the testimony

of Dr. Case.   Even if Montgomery could show that her trial attorneys were somehow

ineffective for not filing a *Daubert*-type exclusion motion, or for not objecting more during the testimony of Dr. Case, the admission of Dr. Case's testimony was proper, and Montgomery cannot show *Strickland* prejudice from any of these supposed failings.

22. *Montgomery's Claim of Ineffective Assistance During Jury Selection (p. 170)*

Montgomery's twelfth claim is that her trial counsel was ineffective during jury selection, and their performance was objectively unreasonable. (D.E. 71 at 170.) Montgomery makes seven specific complaints: (1) counsel failed to identify jurors who would automatically vote for the death penalty; (2) counsel failed to identify jurors who could not or would not consider and give effect to mitigation; (3) counsel failed to oppose the removal of jurors whose views on capital punishment would not substantially impair their ability to serve; (4) counsel failed to correct repeated misstatements of the law of mitigation; (5) counsel failed to insure proper instruction and questioning about the defense of mental disease or defect; (6) counsel was ineffective in injecting the issue of race of juror Torres and then failing to object when juror Torres was removed from the jury for cause; and (7) counsel failed to challenge or correct the processing effect.

None of these claims has merit. With respect to claim (1), the record refutes Montgomery's assertion that her attorneys failed to identify jurors who would automatically vote for the death penalty. Montgomery's trial counsel took part in preparing a 38-page questionnaire that all venire-persons completed. The questionnaire asked the following questions in a direct attempt to identify jurors who would automatically vote for the death penalty:

Question 39. Have you read any books or articles recently about the death penalty? If your answer is yes, please indicate the books or articles you have read. Please describe what impact this reading had on you.

Question 40. Have you seen any movies or television programs about the death penalty? If your answer is yes, please indicate the movies or programs you have watched. Please describe what impact this viewing had on you.

Question 41. Please describe your feelings about the death penalty in your own words. Please describe how strong are those feelings and how long have you had them?

Question 42. Which of the following best describes your feelings about the death penalty? Please read all of the statements carefully, take some time to think, and then mark all of the choices which you believe describe your feelings.

I am opposed to the death penalty, and I will never vote to impose the death penalty in any case, no matter what the facts.

a. I am opposed to the death penalty, and I would have a difficult time voting to impose the death penalty.

b. I am opposed to the death penalty, but could vote to impose the death penalty if I believed that the death penalty was called for in light of the facts and the law in the case.

c. I have no definite opinions for or against the death penalty. I could vote to impose the death penalty, or I could vote to impose a sentence of life imprisonment without possibility of parole, whichever I believed was called for in light of the facts and the law in the case.

d. I am in favor of the death penalty, but I could vote for a sentence of life imprisonment without possibility of parole if I believed that a sentence of life imprisonment without possibility of parole was called for in light of the facts and the law in the case.

e. I am strongly in favor of the death penalty, and I would have a difficult time voting for a sentence of life imprisonment without possibility of parole.

f.  I am strongly in favor of the death penalty, and I would vote for the death penalty in every case in which the person charged is eligible for a death sentence.

g.  None of the statements above correctly describes my feelings about the death penalty.

Based on the answers to the questions above, counsel for the Government and counsel for Montgomery identified 29 veniremen (Nos. 38, 61, 26,154, 156, 165, 168, 176, 193, 196, 205, 209, 221, 228, 263, 279, 298, 322, 328, 338, 358, 359, 392, 395, 417, 423, 437, and 439) who they believed should be struck for cause based on the possibility that they would automatically vote for the death penalty.  A joint motion to strike was filed under seal on April 11, 2007.  (D.E. 207.)  On April 12, 2007, this Court struck all 29 veniremen identified along with 96 other veniremen.

When jury selection began on October 1, 2007, additional and individual questions were asked of the remaining veniremen.  Venireman No. 32 was struck because "he would lean toward the death penalty regardless of the evidence."  (Tr. 127.)  Venireman No. 9 was struck because "she would lean toward the death penalty and don't know how that feeling would influence her ability to weigh the mitigating and aggravating factors."  (Tr. 162-163.)

Venireman No. 69 was struck because he answered "no" to the question of whether he could "vote for a sentence of life if you find the aggravating factors do not outweigh the mitigating factors."  (Tr. 185.)  Venireman No. 69 further explained that he "would vote for a death sentence in this case."  (Tr. 185.)  Venireman No. 50 was struck because he responded "yes" to Mr. Duchardt's question, "[i]n a deliberate killing would you start with

a bias in favor of the death penalty?"  (Tr. 204.)  Venireman No. 50 also responded, "[y]es, right" to Mr. Duchardt's follow-up question, "would it be very difficult for you to consider things like mitigating factors?"

Venireman No. 70 was struck because when Mr. Duchardt asked, "you had said I believe in the death penalty, I believe if you take a life in a cold-blooded act you need to die for your crime," Venireman No. 70 responded, "[y]es sir."  (Tr. 214.)  Mr. Duchardt asked the follow-up questions, "[t]hat strikes me that you pretty strongly are in favor of the death penalty for what we are talking about here which is a deliberate, premeditated killing, is that right, sir."  Venireman No. 70 responded, "[y]es sir.  (Tr. 214.)  Mr. Duchardt continued with the questioning, "[a]nd would it be a fair statement that if it was proven to you beyond a reasonable doubt that a person has committed a deliberate killing that you feel that really the death penalty is the only appropriate sentence for that person?"  Venireman No. 70 responded, "[y]es sir."  (Tr. 214.)  Mr. Duchardt ended his questioning with, "[a]nd you really wouldn't consider life imprisonment for that person?"  Venireman No. 70 then responded, "[p]robably not, sir."  (Tr. 214.)

Venireman No. 76 was struck because when Mr. Duchardt asked, "do you feel in the case of a deliberate killing would you pretty much automatically vote for the death penalty and really not consider life?" Venireman No. 70 responded, "I think I would."  (Tr. 216.)

Venireman No. 106 was struck because when Mr. Duchardt asked, "is it a fair statement to say that if you found a person guilty beyond a reasonable doubt of a deliberate killing that you would vote to impose the death penalty all the time," Venireman No. 106 responded, "[y]es."  (Tr. 264.)

Likewise, Venireman No. 108 was struck because when Mr. Duchardt asked, "[i]f you found a person guilty of a deliberate killing would you also feel that person gets the death penalty and you really wouldn't consider life?" Venireman No. 108 responded, "[i]f I felt they did it deliberately, yes. Mr. Duchardt went on to ask, "[y]ou wouldn't consider life in a case like that." Venireman No. 108 responded "[n]o." (Tr. 265.)

Jury selection continued on October 3, 2007. Venireman No. 130 was struck based on his response to the question, "could you also weigh and consider the defense mitigation evidence and if you find the aggravated evidence doesn't outweigh the mitigation evidence would you vote for a life sentence." Venireman No. 130 gave an equivocal response of, "I would like to think I could, yes." (Tr. 370.)

Venireman No. 139 was struck based on his response to the question, "[c]an you also follow the instructions if the aggravating factors don't outweigh the mitigating factors can you vote for a life sentence?" (Tr. 375.) Venireman No. 139 gave an equivocal response of, "[i]n this, I have a difficult time under these circumstances." (Tr. 375.) Venireman No. 139 went on to explain, "[i]t's awfully difficult for me to commit to that . . . I don't think I could." (Tr. 375-376.)

The record, then, shows that Mr. Duchardt systematically identified and removed all of the jurors whose answers suggested they would automatically vote for the death penalty. Montgomery's remaining claims regarding Mr. Duchardt's supposed ineffectiveness during the jury-selection process are equally lacking in merit. Indeed, Mr. Duchardt addresses these claims in considerable detail in his affidavit. (Duchardt Aff. 86.) At this point in the Government's response, however, it suffices to say that Mr.

Duchardt was an experienced, skilled trial attorney with many years of experience conducting *voir dire* examinations. Absent some showing that a particular juror should have been struck for cause – a showing that Montgomery cannot make – claims concerning his performance during *voir dire* is simply a pointless exercise in Monday-morning quarterbacking.

Beginning on page 86 of Mr. Duchardt's affidavit, he states:

According to Current Counsel for Mrs. Montgomery, I "failed to elicit basic information about jurors' views" on important topics so as to allow effective exercise of peremptory challenges, my voir dire of the venire was "insufficient and incompetently conducted", I "inexplicably allowed the Court to excuse for cause venire members whose views on the death penalty would not have prevented them from discharging their obligations under the law" and I engaged in and permitted "misstatements of the law" during the jury selection process (Doc. 71, p. 171, 178-179). Current Counsel for Mrs. Montgomery go on to cite to various portions of the trial transcript, and claim that on the pages they cite, there occurred instances in which I either failed to identify jurors who would automatically vote for the death penalty, or failed to identify jurors who could not or would not give effect to mitigation, or failed to oppose the removal of jurors whose views would not substantially impair their ability to serve, or failed to correct supposed misstatements of law, or failed to insure proper instruction and questioning about mental defenses, or failed to "challenge or correct the processing effect" (Doc. 7, p. 177-178). I disagree with all of these claims.

My jury selection method consisted of use of a questionnaire and conduct of group and individual voir dire examination. I note that no challenge is made against the questionnaire which I drafted and which was jointly submitted (05-6002 Doc. 109). I am satisfied that that questionnaire was comprehensive in its approach and provided considerable information about the venire upon which we relied greatly in exercising for cause and peremptory challenges. As to the voir dire examination itself, I would have liked for that process to have been much more extensive. I have designed and implemented much more extensive questioning processes, lasting more than a week in each case, in **State of Missouri v. James Skinner**, a Jackson County Missouri capital case tried before the Honorable Jack Gant using a jury we selected in St. Louis City, **United States v. Dennis Moore**, a capital case tried before the late District Judge D. Brook Bartlett in the Western

District of Missouri, and ***United States v. Demetrius Hargrove***, a capital case tried before District Judge Carlos Murguia in the District of Kansas. In ***United States v. German Sinisterra, Arboleda Ortiz and Plutarco Tello***, I requested that Judge Fenner allow the same sort of process which we employed in ***Skinner*** and ***Moore*** (***Hargrove*** was tried later); instead, Judge Fenner conducted a relatively abbreviated process, doing all of the questioning himself. That shortened, solely-Court-conducted process was challenged by me on appeal, but was upheld by the Eighth Circuit. ***United States v. Ortiz***, 315 F.3d 873, 888-897 (8th Cir. 2002). In Lisa's case, through discussions with opposing counsel and with Judge Fenner, I was able to obtain a more extensive voir dire examination than allowed in ***Ortiz*** along with permission for attorneys to conduct most of the individual questioning of venire persons. I then conducted the most extensive voir dire which I could within the process allowed. While I obviously would have preferred a better voir dire process, I developed a process better than the minimum process allowed under ***Ortiz***, and I used the process which was afforded to exercise for cause and peremptory challenges in the best ways possible.

I have reviewed all of the portions of the record cited by Current Counsel for Mrs. Montgomery, and I find that in none of those places did there occur any statement or exchange which would be improper or objectionable.

It is also claimed that I conspired in a ***Batson*** violation supposedly because I sought removal of Juror 129, Doralis Torres, on the basis that "she's Cuban" (Doc. 71, p. 170, 208). My words, "she's Cuban", were used to express the plain fact which Ms. Torres explained in her questionnaire, that she was born, raised, and lived most of her life in Cuba. After hearing her speak during voir dire, it seemed to me, to Matt Whitworth and to Judge Fenner that Ms. Torres had difficulty understanding questions and expressing herself in English. I attributed her difficulties in English to the fact that she grew up in a Spanish language country, and that was the point I was making when I used the words "she's Cuban". My reference had nothing to do with her race; rather it was a shorthand to express that she spent most of her life in a country in which Spanish was her language. However, I was concerned about Ms. Torres because of other answers she gave on the questionnaire. Ms. Torres' answer to question 41 was very pro-death penalty, but was tempered by the phrase that "God is the only person who is charge of giving or taken (sic) a live (sic)." Matt Whitworth made voir dire inquiry of Ms. Torres about her meaning for that phrase, and she made clear that her faith would not stop her from giving a sentence of death if she thought that appropriate (Tr. 246-247). In my mind, those voir dire

responses made her question 41 answer that much stronger. In addition, she indicated in question 46 of the questionnaire that she followed a child killing case in the news and could not understand how someone could commit such a crime. And, in questions 83, 84 and 85, she seemed to express misgivings about mental defenses. Because of her views on the death penalty, on cases involving children, and on mental defenses, I likely would have used a peremptory challenge to remove her had she remained on the panel to that point in the process, and so angling for her removal for cause saved that peremptory challenge.

(Duchardt Aff. 86-89.)

### 23. *Defense Theory (p. 178)*

Montgomery's thirteenth claim is that her trial counsel was ineffective because they failed to have a theme or theory of defense. (D.E. 71 at 179.) This claim is not a legal argument, but rather a general ranting. What current counsel for Montgomery purposefully ignores is that the evidence overwhelmingly established that Montgomery deliberately committed a horrific murder and kidnapping after much deliberation and planning, and her only relevant mental problem was that she was wicked and evil. That leaves even the best criminal defense attorneys in an extremely difficult and vulnerable defense posture.

This claim is another example of current counsel complaining about virtually everything that occurred surrounding the prosecution of this case without any legal basis. Ranting and second-guessing by current counsel fail to entitle Montgomery to relief.

### 24. *Pseudocyesis Defense (p. 180)*

Montgomery's fourteenth claim is that her trial counsel was ineffective because they relied on the defense of pseudocyesis. (D.E. 71 at 180.) Current counsel easily second-guesses the work of Montgomery's trial counsel, but suggest no viable alternative

defense. Unfounded second-guessing does not entitle Montgomery to relief. Montgomery was arrested within 24 hours of the crime with the kidnapped baby in her arms. Montgomery gave her defense team virtually nothing to work with.

On page 5 of John O'Connor's affidavit he states:

> It was my belief then, and it is my belief now in hindsight, that pseudocyesis was the best defense to put forth on Mrs. Montgomery's behalf.

(O'Connor Aff. 5.)

In Montgomery's case, it was not only the "best" defense, it was the defense team's *only* defense. While it proved unsuccessful, the failure of the pseudocyesis defense does not show that her trial attorneys were ineffective.

### 25. *Portrayal of Montgomery as a Good Mother and Hard Worker (p. 182)*

Montgomery's fifteenth claim is that her trial counsel was ineffective because they portrayed Montgomery as a hard worker and good mother, and should have presented a more persuasive mitigation story. (D.E. 71 at 182.) They specifically claim that trial counsel "completely and utterly failed to present certain evidence during the guilt phase of the trial that would have laid the groundwork for the penalty phase of the trial."

The "certain evidence" suggested by current counsel (Montgomery being "tortured" by her mother, first husband, and second husband) is actually refuted by the investigative reports and witness statements. (D.E. 71 at 183.) Current counsels' suggestion that Montgomery's trial attorneys were ineffective because they failed to present inaccurate or false testimony does not provide Montgomery with any basis for relief.

Moreover, even if their present claims were accurate, and even if Montgomery's defense team should have presented evidence that Montgomery had been "tortured" by her relatives, as opposed to merely being seriously abused, this additional evidence would not certainly have altered the jury's sentencing determination. The record in this case is replete with evidence that Montgomery had been seriously abused and, at least partially as a result, suffered from numerous mental deficits. Any additional evidence of this nature could only have been cumulative. *See Purkey v. United States*, 729 F.3d 860, 865-66 (8th Cir. 2003)

John O'Connor, one of Montgomery's trial attorneys, emphasized in his affidavit that the defense team presented all of the relevant and material evidence they could muster in support of her defense:

> It was our duty and responsibility to put on the evidence about Mrs. Montgomery that was relevant and material to her defense. With assistance from the various personnel on the staff including the investigators, IT support, and mitigation specialist, we put forth, in my opinion, the best testimony available for Mrs. Montgomery as it relates to the issues the motion raises on this point.

(O'Connor Aff. 5.)

### 26. *Impact of Montgomery's Medication During Trial (p. 184)*

Montgomery's sixteenth claim is that her trial counsel was ineffective because they failed to address Montgomery's "flat-affect" during trial, purportedly because of the medication she was taking. (D.E. 71 at 184.) But the record refutes this claim. Montgomery's trial attorneys were attentive to Montgomery's demeanor and presentation in the courtroom. Successful efforts were made by Montgomery's defense team to have

her dress, groom, and to portray herself during trial as a good, caring, and gentle woman. As this Court is well aware, and as the trial record reflects, Montgomery's behavior and/or demeanor raised no questions or concerns to the parties, jury, this Court, or courtroom personnel during the trial.

Montgomery did not testify at trial, but did consistently and actively communicate with her defense team throughout the month-long trial. Even if, for the sake of argument, she had a "flat-affect" in front of the jury, this does not provide any support for her argument that her attorneys were ineffective.

On page 5 of John O'Connor's affidavit he states:

> My recollection of Lisa at trial was that she was fully engaged. She often passed notes to Fred and others raising questions about what witnesses were saying. One instance in particular illustrates her level of engagement. Dr. Mary Case, a pathologist, testified about a mark that Dr. Case claimed was sustained during the offense. Lisa grew so emotional that we had to ask the Court for a recess. During the recess, Dr. Case went back to see the mark on Lisa, which caused her (Dr. Case) to recant her testimony about the mark after the recess. I believe this single instance – pleading with us to stop the trial in the middle of testimony – was a strong gauge on Lisa's involvement in her own trial. I did not see her to be cold or remorseless in front of the jury. Nothing about her demeanor in front of the jury raised concerns for me, other than her emotional state at the time of Dr. Case's testimony.

(O'Connor Aff. 5.)

### 27. _Preparation Defense Witnesses (p. 185)_

Montgomery's seventeenth claim is that her trial counsel was ineffective because they failed to properly prepare defense witnesses for trial. (D.E. 71 at 185.) Montgomery's one-paragraph complaint focuses on the testimony of Montgomery's

children. The affidavit of Fred Duchardt readily refutes this meritless claim. (Duchardt Aff. 90-93.)

It is unreasonable for current counsel to have an expectation that Montgomery's trial counsel should have coached or shaped the testimony of Montgomery's children. Montgomery's trial counsel only had control of the questions that were asked on direct examination, not questions that were asked of the children by the Government on cross-examination.

It was obviously important – in fact, essential – for the defense team to have those close to Montgomery testify that Montgomery looked pregnant at the time of the crime, and that they actually believed she was pregnant. The decision whether or not to have the children testify is classic trial strategy. Montgomery was a neglectful mother with many significant character flaws. As much as current counsel would like to ignore this fact, Montgomery's trial counsel had to strategically deal with Montgomery's failings as a parent at trial.

As the trial transcript reflects, Mr. Duchardt, in the guilt phase of trial, was effective in utilizing Desiree Boman and C. J. Boman in the most positive way possible, he also strategically took some of the sting out of what he knew was coming during cross-examination with Desiree Boman, and kept the testimony brief. (Tr. 1935-41, 1955-57.) Mr. Duchardt, rightfully, did not coerce Desiree Boman and C. J. Boman into testifying falsely on cross-examination.

As the trial transcript reflects, Mr. Duchardt, in the penalty phase of trial, was effective in utilizing Desiree Boman in the most positive way possible, and had a virtually

flawless direct examination of Desiree. (Tr. 2935-41.) Likewise, Mr. Duchardt was effective in utilizing Chelsea Boman during the penalty phase of trial. (Tr. 2944-48.) The direct examination of Chelsea Boman was flawless. (Tr. 2944-48.)

Beginning on page 90 or Mr. Duchardt's affidavit he states:

Current Counsel for Mrs. Montgomery make the challenge that I "spent limited, if any, time preparing defense witnesses" and that therefore I was "often…unable to get testimony" which I "expected" (Doc. 71, p. 185). Having made this broad point, Current Counsel for Mrs. Montgomery cite only one specific, the perception that at trial the testimony of Lisa's children "went badly" and that I "was taken completely by surprise with what they said while testifying" (Doc. 71, p. 185).

My time records accurately reflect that I spent considerable time preparing all witnesses for trial. I believe that the record from trial accurately reflects that, for the most part, all witnesses, including Lisa's son C.J. and her daughter Chelsea, performed admirably, and as we had hoped they would. The one exception to the pattern of good performance was the first phase testimony by Desiree (Desi) Boman, Lisa's oldest daughter. Desi's first phase testimony was extremely disappointing and damaging in certain particular respects. However, it was not something which took me "completely by surprise".

As my time records reflect, I made multiple trips to Oklahoma to visit Lisa's children, and I spent hours preparing them for testimony on those trips, polishing things off in Kansas City during lengthy sessions on the days leading up to trial. I used my early sessions to learn about these four young people, and I learned well about the mixed feelings all four of Lisa's children had concerning their mother. Their love for Lisa was strong and enduring. However, they were extremely confused and hurt by what happened to cause the charges being brought against Lisa. And, though they each had wonderful stories about growing up, they also had some stories of pain which came from Lisa's failings, at times, as a mother. In my sessions with the children, I covered all of this ground, letting them express their feelings about their mother, good and bad. I knew from the beginning that, because of these understandable mixed feelings which the children had, there would be some danger in using them as witnesses. However, I knew that there were certain critical facts that I wanted to get from them. Especially from Desi, we wanted to elicit about the symptoms of pregnancy, consistent with

pseudocyesis, which Lisa displayed and which she, Desi, saw and otherwise experienced.

In my sessions with the four, I first listened. I then tried to give the perspective about how much Lisa suffered from her mental illnesses, and how hard she had tried to overcome those mental illnesses in order to mother them. In all of the sessions, Desi was always the one who was very defensive in favor of her mother, always finding the good in Lisa, and always finding good explanations for any untoward behavior which Lisa had ever displayed. It was Lisa's youngest daughter, Kayla, who was always the least sympathetic to her mother, though even Kayla softened as time went along. As we approached trial, I went over all aspects of possible testimony in detail with each of the four. Desi, as usual, was a rock, prepared for everything I raised with her.

Unfortunately, when Desi testified at trial, many of her answers changed significantly from what we had repeatedly discussed. Desi had consistently told me that she had seen her mother without clothes and had then seen her mother's expanded abdomen, and had at other times felt her mother's expanded abdomen, and had believed from that seeing and feeling that Lisa was pregnant. However, at trial, Desi said that she did not recall seeing Lisa without clothes (Tr. 1936) or touching her stomach (Tr. 1938-1939). When Desi and I prepared her for trial, we had set up a question designed to bring out Desi's own words to me that her mother would threaten discipline far more than she would give it. However, when I posed that prepared question at trial, Desi reduced things, saying Lisa "sometimes" threatened discipline more than giving it out (Tr. 1939). And, after our practice testimony sessions had Desi giving answers that Lisa always took care of her needs and the needs of her sibs and that Lisa always did her best, Desi testified that there were times when Desi's needs were not met, that Lisa sometimes was not doing her best, and that Lisa was lazy "occasionally, quite a bit at times" (Tr. 1939-1940,1945).

Desi did offer very helpful testimony in other portions of her first phase testimony. And, Desi performed admirably, and just as I expected, when she returned to testify during penalty phase (Tr. 2935-2950). However, it is completely fair to say that the portions of Desi's testimony, as cited above, "went badly".

(Duchardt Aff. 90-93.)

As Mr. Duchardt's affidavit illustrates, no amount of preparation can prevent an attorney from being surprised by a witness's testimony, particularly on cross-examination. And, in the case of Desiree Boman, all of her testimony did not mirror the statements she had made to her attorneys prior to trial. But trial counsel cannot be convicted of ineffectiveness merely because a witness does not testify as favorably as the attorney might have wished or even expected.

28. _Tommy Defense (p. 186)_

Montgomery's eighteenth claim is that her trial counsel was ineffective for announcing and relying on the "Tommy Defense." (D.E. 71 at 186.) As previously noted, current counsel can easily second-guess the work of Montgomery's trial counsel, but suggests no viable alternative defense. Unfounded second-guessing does not entitle Montgomery to relief. Montgomery was arrested within 24 hours of the crime with the kidnapped baby in her arms. A search of her computer graphically illustrated how she had stalked her victim, premeditated the crime, and learned how to perform a Caesarian section. Montgomery gave her defense team virtually nothing to work with.

Because the defense team knew there was enough evidence to suggest that two people might have been involved in the killing of Bobbie Jo Stinnett and the kidnapping of her infant, it was reasonable for the defense team to offer this as another facet of their defense case. Just because reasonable trial strategy does not pan out in the long run, does not mean that trial counsel's efforts were ineffective.

Likewise, if a defense team reasonably and strategically abandons a defense on the eve of trial or during trial, due to newly discovered evidence, this does not amount to

ineffectiveness of counsel. Hindsight is always 20/20 in the post-conviction world. Montgomery is not entitled to relief because a proposed defense strategy was abandoned, once defense counsel determined that it was no longer viable.

Once Mr. O'Connor learned that the once potentially viable mitigation evidence that someone other than Montgomery might have committed the crime, the so-called "Tommy Defense," was refuted by newly discovered facts, it was strategically imperative not to move forward with this theory. Mr. O'Connor stated the following in his affidavit regarding his decision to abandon the "Tommy Defense":

> In all criminal cases there becomes evidence or testimony that cannot be overcome, or, the belief that highlighting evidence only draws more attention to it. We took the position of not drawing attention to it. In my opinion, that was the best decision at the time in dealing with the issue of the Tommy Defense.

(O'Connor Aff. 5.)

In other words, since the job of the defense team was to inject, if possible, reasonable doubt into the case, evidence that pointed to another suspect – in this case Tommy Kleiner – had to be explored by the defense team. However, once it became clear that Kleiner had an ironclad alibi for the time during which the crimes were committed, the defense wisely abandoned this potential avenue of defense. Such common-sense strategy cannot be equated with ineffectiveness.

29. *Testimony of Dr. McCandless (p. 186)*

Montgomery's nineteenth claim of ineffectiveness is that her trial counsel was ineffective for presenting the testimony of Dr. Linda McCandless during the first phase of trial. (D.E. 71 at 186.) Current counsel base this claim on their interview of another trial

witness, Dr. Logan. Dr. Logan was not present when Dr. McCandless testified at trial. (Duchardt Aff. 67.) Dr. Logan was not present when Dr. McCandless was preparing for her testimony with Mr. Duchardt. (Duchardt Aff. 67.) Yet Dr. Logan makes a sweeping conclusion that Mr. Duchardt did not prepare Dr. McCandless for her testimony and it went badly.

Over the Government's objection, the defense team was able to accomplish many points with Dr. McCandless on direct examination. Dr. McCandless made the following points: (1) Dr. McCandless interviewed Montgomery within four days of the crime; (2) Dr. McCandless diagnosed Montgomery immediately with bi-polar disorder; (3) Dr. McCandless, early on, suspected Montgomery might suffer from psychotic episodes; (4) Dr. McCandless, early on, suspected Montgomery might suffer from dissociate amnesia; (5) Montgomery did not remember the crime during her initial interview with Dr. McCandless; (6) Montgomery was placed on suicide watch for extended periods of time while incarcerated, which can be a humiliating environment; (7) Dr. McCandless had 62 visits with Montgomery during the first year Montgomery was incarcerated at CCA; (8) Dr. McCandless had treated Montgomery for approximately three years by the time of trial; (9) Montgomery eventually became more mentally stable since once she was incarcerated and placed on medications; (10) Dr. McCandless developed a strong rapport with Montgomery, and they are relaxed enough to joke about Montgomery's mental health symptoms; (11) Dr. McCandless testified to Montgomery's recitation of what had occurred leading up to kidnapping. (Tr. 2068-94.)

Mr. Duchardt confirms in his affidavit that he did prepare Dr. McCandless for trial, notwithstanding Montgomery's current claims to the contrary:

> Another was a criticism, again from Dr. Logan, with Logan expressing his from-the-bleachers impression that I did not prepare Dr. McCandless to address recordings, played during McCandless' cross-examination, in which recordings Lisa is heard to make jokes about Dr. McCandless and things she (Lisa) had told Dr. McCandless during therapy sessions (Doc. 71, p. 90). Since Dr. Logan was not present when I prepared Dr. McCandless, it is difficult to know why he would presume to comment on the subject. Actually, in preparation with Dr. McCandless, I did address with her the matter of Lisa's attempts at humor with Dr. McCandless, and I even laid the foundation, in direct examination, for what of that ilk would come in cross (Tr. 2084-2085). In this situation, again, I believed that untoward inferences from something Lisa had done were addressed as well as they could have been.

(Duchardt Aff. 67-68.)

The record, then, shows that Dr. McCandless was an essential witness who, like most witnesses, might be less effective on cross-examination. The fact that parts of their testimony might be less effective when subjected to cross-examination does not mean that they should not have been called as a witness to begin with, or that the attorney who called them did a poor job in preparing them for cross-examination.

30. *Cross-Examination of Government Witnesses (p. 188)*

Montgomery's twentieth claim of ineffectiveness is that her trial attorney was ineffective for eliciting harmful testimony during the cross-examination of Government witnesses Dr. Miguel Laboy, Sheriff Ben Espey, and Detective Paul Gatewood. (D.E. 71 at 188-190.)

Montgomery complains that Dr. Laboy testified on cross-examination that a person can be strangled to unconsciousness, not die, then regain consciousness, and then be

strangled again to unconsciousness and death. (D.E. 71 at 188-189.) Although Dr. Laboy is an expert, this opinion is fairly unenlightening. It arguably is common sense. It definitely was not a significant factor in the outcome of the verdicts.

Further the Government already had set the stage for the related point that was of significance. The significant point was that when Bobbie Jo died, she had many wounds on her body, and blood on the soles of her feet which Dr. Case was then able to infer that (1) Bobbie Jo and Montgomery were involved in a violent struggle before her death, and (2) Bobbie Jo was still alive when her baby was being cut from her abdomen. These significant inferences were brought out by the Government as early as opening statement. (Tr. 456-457.) Laboy's testimony that a person does not necessarily die immediately even if they are strangled to the point of unconsciousness was inconsequential, and could not have been a surprise to the jury.

Mr. O'Connor stated the following in his affidavit:

> One could argue that Miguel Laboy's testimony was bolstered. However, in light of the type of case that this was, the horrific nature of the crime, the photographs at the scene, the autopsy photo, and all of the forensic evidence surrounding the victim, Laboy's testimony was inconsequential. It is my opinion that the testimony ultimately had no effect on the jury's decision.

(O'Connor Aff. 5.)

Fred Duchardt stated the following in his affidavit:

> While John would probably accept that all of the claims of ineffectiveness lodged against the team could and should be lodged against him as lead counsel, the number of complains made about things John himself did and did not do are few and frivolous. In this regard, Current Counsel for Mrs. Montgomery globally accuse that John was "often bringing out information damaging to Mrs. Montgomery" (Doc. 71, p. 90).

However, when they come to specifics, Current Counsel for Mrs. Montgomery point only to testimony by experts and law enforcement officers about the crime scene and whether it could be concluded that Bobbie Jo Stinnett engaged in a struggle with her assailant marked by Bobbie Jo reviving after initial strangulation and after cutting of her abdomen began (Doc. 71, p.167-170 , 188-190). Current Counsel for Mrs. Montgomery essentially accuse John of mishandling the whole matter (Doc. 71, p. 167-170, 188-190). In point of fact, John masterfully made the best of a horrible situation.

(Duchardt Aff. 41-42.)

Montgomery additionally complains that Sheriff Espey was able to explain during cross-examination that because of the blood on the floor around Bobbie Jo Stinnett, his opinion that the victim and Montgomery struggled was valid, since he asked the paramedics to walk carefully around the crime scene to not disturb the blood on the floor. (D.E. 71 at 189.) In a similar vein, Montgomery complains that Detective Gatewood was able to give his opinion on cross-examination that the victim and Montgomery struggled because of the swiping patterns of blood on the crime scene floor. (D.E. 71 at 190.)

When examined closely, this fact was presented by the Government throughout trial, beginning with the Government's opening statement. In its opening statement, the Government advised the jury that Becky Harper would testify that when she found her daughter dead on the floor, "she saw a horrific sight, her daughter was lying on the floor, blood was everywhere in that room." (Tr. 453.) The 911 audiotape recorded Becky Harper describing "blood everywhere" as Becky Harper entered the room where her daughter was killed. (Tr. 2903.)

Montgomery's trial counsel effectively cross-examined Sheriff Espey and Detective Gatewood. (Tr. 541-550; 604-610.) Statements made by the witnesses during

cross-examination, which merely confirmed the testimony of an earlier witness, Becky Harper, did not constitute ineffective assistance of counsel.

31.     _Expert Opinions (p. 190)_

Montgomery's twenty-first allegation of ineffective assistance is her claim that her trial attorney "never presented proof from his experts that as a result of her pseudocyesis, Mrs. Montgomery was unable to conform her behavior to the law" and "failed to explain how her pseudocyesis was in any way related to the killing of Mrs. Stinnett."   (D.E. 71 at 190.)

Fred Duchardt presented the testimony of expert Dr. Valayanur Ramachandran. Mr. Duchardt's questioning was extensive.   The direct examination alone stretches over 86 pages of the transcript. (Tr. 2165-2251.)   The last few questions go directly to the defense theory that Montgomery suffered from the severe mental disease of pseudocyesis with delusions and a dissociative state at the time of the killing and kidnapping, and that in this mental state, Montgomery was unable to appreciate the nature and quality or wrongfulness of her conduct, and unable to make informed judgments or discriminate between right and wrong. (Tr. 2250-51.)

John O'Connor presented the testimony of expert Dr. William S. Logan.   Like Dr. Ramachandran, Dr. Logan's testimony was extensive, spanning over 46 pages of transcript.   (Tr. 2379-2425.)   Dr. Logan explained Montgomery's mental illness before and at the time of the offense, and how her mental illness caused her to commit the crime. Dr. Logan opined that Montgomery could not conform her behavior to the law, and that Montgomery's severe mental disease, drove her to kill and kidnap. (Tr. 2414-20).   Dr.

Logan testified that Montgomery's "delusional state of mind, and faced with all of her difficulties right there at that particular point in the interaction with Bobbie Jo, I think her mental illness drove her to kill without really an adequate consideration of the reality of the wrongfulness of what she was doing and the gravity of what she was doing." (Tr. 2418-19.)

The record, in other words, refutes Montgomery's arguments. The testimony of the defense team's experts, if believed by the jury, *did* establish a viable defense for Montgomery. The fact that the jury did not accept the defense, and acquit Montgomery, does not establish that her trial team was ineffective.

### 32. *Defense Cross-Examination of Government Expert (p. 190)*

Montgomery's twenty-second claim of ineffective assistance raises the claim that her trial attorneys were "ineffective in preparing for and cross examining the Government's mental health experts." (D.E. 71 at 190.)

Current counsel for Montgomery complain that a "proper social history investigation" of Montgomery was not done. They argue that if a "proper" investigation had been done, trial counsel could have then undermined the theories of the Government's experts.

In this claim, as in several others, current counsel somehow argue that if the jury had believed Montgomery's past included torture by her mother and ex-husband, the jury would not have sentenced Montgomery to death. This is an incredible leap by current counsel. There is no evidence, outside of what was already presented to the jury, that Montgomery was "tortured" by anyone. There was, however, extensive evidence that Montgomery had a history of being abused by others.

-123-

Current counsel claim that Montgomery was victimized by her ex-husband, Carl Boman, and suffered from "sadistically forced sexual violence and torture." (D.E. 71 at 191.) However, these post-trial claims by current counsel are controverted by Montgomery and Carl Boman's pretrial statements.

Interestingly, current counsel's source for these wild stories of Montgomery being tortured are from the declaration of Jan Vogelsang. Vogelsang is a social worker hired by current counsel. However, a review of Vogelsang's declaration regarding Montgomery's marriage to Boman fails to substantiate these wild claims. Vogelsang routinely cites sources for her claims, but this is not true in Vogelsang's section titled "Marriage to Carl Boman, Back to Where She Started."

On pages 93 and 94 of Jan Vogelsang's declaration, Vogelsang makes the following dramatic unsubstantiated claims:

> By the time of her fourth and final child's birth, Lisa was in the throes of major mental illness and so out of touch with reality that she did not know if she had, in reality, given birth to her fourth child, or if it was a dream. Marriage to Carl catapulted Lisa back to the days of violent sexual assault by Jack when she was powerless to protect herself. Carl's pre-marital behavior towards Lisa could have warned a normally functioning person to beware, but Lisa had no ability to recognize what was her due, what to expect, or what to prohibit based on her maltreatment as a child. In one notable incident before marriage, Carl shoved Lisa, who was naked getting out of a shower, against a wall heater that burned her flesh while he had sexual intercourse with her. His behavior became more aggressive and more violent during their marriage. He beat her, tied her in stress positions, poured hot wax on her, forcibly inserted glass bottles in her anus and vagina, held a knife to her throat, and sexually assaulted her. He bruised and hurt her. He recorded her screams and pleas for help on his video camera. Lisa, ashamed, humiliated, and fearful, told her mother about it. Judy went to Carl and told him Lisa confided in her. Lisa did not seek help again. She grew to expect the violence and lived in sickening anticipation of its reoccurrence."

Vogelsang's claims that Montgomery was subjected to sexual torture by Boman are refuted by the investigative reports and witness statements, so her defense team cannot be faulted for failing to present evidence that was simply untrue.

Additionally, current counsel argue that Montgomery's trial counsel should have objected to Dr. Dietz testimony regarding the high-profile case of Ted Bundy, Montgomery's motivations at the time of the crime, and character testimony. They also argue that trial counsel should have known more about Dr. Dietz's testimony in the Andrea Yates trial.

Beginning on page 95 of Mr. Duchardt's affidavit, he states:

> Current Counsel for Mrs. Montgomery express total dissatisfaction with my handling of government experts Park Dietz, M.D. and Dan Martell, Ph.D., giving specifics that I let Dietz describe other high profile cases he handled for the government, that I failed to seek to exclude, as unreliable, Dietz's professional conclusions, that I allowed Dietz and his cohort Martell use what Counsel call "character testimony", that I highlighted certain of the questions on one of the tests administered to Lisa, that I allowed the government to argue that use of Dietz in this case "meant Lisa was the worst of the worst", and that I did not confront Dietz with what Counsel term "his perjury" (Doc. 71, p. 90, 191-192).

> I believe that the record of my cross-examination of Dr. Dietz reflects that I was trying to paint Dietz as a gun for hire. My allowing Dietz to talk about certain of the notches on his gun handle was part of that approach. As for the complaints about Dietz's conclusions and the information upon which he based those conclusions, I believe those are subjects for crossexamination, that we addressed those things on cross-examination, and that there is no legal basis for the sort of exclusion as argued by Current Counsel.

> With respect to the contention about closing argument, I observe that the words "worst of the worst" were never uttered by prosecutors, and so I am at a loss to find any substance for this point as articulated by Current Counsel.

As to my going into detail with Dan Martell about one of his tests, the controversial psychopathy check list, I believe it is clear that I was trying to emphasize the parts of the test as a means to convince the jury about what an unscientific, unreliable sort of test that the PCL is.

And then Current Counsel for Mrs. Montgomery show again their penchant to willy nilly use the term liar against one who they feel opposes them. I have no love for Park Dietz, as my cross-examinations of him in three different cases make clear. However, unlike Current Counsel for Mrs. Montgomery, I am unwilling to cavalierly toss around baseless accusations of criminality against anyone. The word chosen by Current Counsel for Mrs. Montgomery, "perjury", has never been applied to Dietz's Yates debacle. In *Yates v. Texas*, 171 S.W.3d 215 (Tx.App. 2005), it was found that Dietz had given "false testimony". Even though the Eighth Circuit found that cross-examination upon the subject was proper, the Court made clear that the *Yates* case was not an instance of "perjury", but instead an example of a "mistake" demonstrating Dr. Dietz's "fallability". ***United States v. Purkey***, 428 F.3d 738, 759 (8th Cir. 2005). I believe that my cross-examination of Dr. Dietz got all the impeachment mileage out of the truth of the *Yates* matter that could be properly gotten.

(Duchardt Aff. 95-97.)

As these excerpts demonstrate, there is no basis for Montgomery's claims regarding Mr. Duchardt's reasoned, tactical decisions regarding Dr. Dietz's testimony, and the Government's closing arguments.

### 33. *Montgomery's Claim That Mitigation Story Was Not Told During Death Penalty Phase (p. 192)*

Montgomery's twenty-third claim of ineffective assistance asserts that her trial counsel "failed to conduct a culturally competent and thorough mitigation investigation." (D.E. 71 at 192.)

Current counsel broadly claim there was a "wealth of information" that the jury did not hear, that would have changed the outcome of the trial. (D.E. 71 at 192-93.)

However, current counsel fails to set forth any fact or combinations of facts that the jury did not hear that would have changed the outcome of the trial, because there are none.

Beginning on page 70 of Mr. Duchardt's affidavit, he states:

> At the very bottom of the complaints lodged by Current Counsel for Mrs. Montgomery is the criticism that I did not enlist the services of a forensic social worker, like Jan Vogelsang, MSW, to write our defense script for trial (Doc. 71, p. 59, 60, 61, 93-124, 164, 191). As to this point, it should be noted, in the way that Ms. Vogelsang intently insists when she testifies, that she IS NOT a mitigation specialist, but rather is a forensic social worker. As Ms. Vogelsang explains, while the title of mitigation specialist is applied to an investigator who tracks down pieces of mitigation information, the forensic social worker label is given to a social worker who takes all of the pieces of mitigating information, and then organizes, draws conclusions from, and creates a narrative about that information. I have found that it has become part of the standard playbook for national capital punishment resource counsel to utilize Ms. Vogelsang to synthesize a defendant's background materials into a narrative, and to use that narrative as the master plan for the entire case.

> Before going any further, I observe that neither Ms. Vogelsang in her report, nor Current Counsel for Mrs. Montgomery in their amended petition, explain how the testimony of Vogelsang would have been any less vulnerable to the sorts of attacks leveled by the prosecution against the lay and expert witnesses who we presented upon the same subjects. Put another way, it could have been expected that, had she testified, Ms. Vogelsang would have seen the same attacks coming her way, and neither she nor Current Counsel for Mrs. Montgomery explain how she could have better fended off those challenges. In fact, for many reasons which will be detailed below, Ms. Vogelsang would have been even more vulnerable to attack.

> I also note that, as Current Counsel for Mrs. Montgomery account it, Ms. Vogelsang's narrative draws heavily from the say-sos of Judy Shaughnessy and Carl Boman portraying Lisa as a bad mother, and even as a "prostitute" (Doc. 71, p. 143-144). I believe that Judy's and Carl's accounts are at best skewed and at worst downright false. I know for sure that Lisa herself denied such portrayals of her as made by Judy and Carl. Because I distrusted these accounts by Carl and Judy, because Lisa denied those accounts, and because there were others who accounted the facts consistently with Lisa's accounts, I did not portray Lisa in the sorts of negative fashions

as suggested by Ms. Vogelsang. Along these same lines, I have been criticized for not catering to Judy Shaughnessy in order to get her nuggets of information and for supposedly destroying the relationship between Judy's family and the defense team (Doc. 71, p. 77). It is certainly true that I never catered to Judy. That was in part because it was brought to my attention, by Lisa herself, how previous defense team members had catered to Judy's whims, and how Lisa felt betrayed by such conduct. I found no need to make Lisa feel betrayed in this way because I found no need to curry favor with Judy in the fashion that others had. I never had any problem getting Lisa's family members, including Judy, to meet and converse at length with me, and I had extensive meetings with all of those folks in advance of trial. Moreover, as alluded to above, I found that Judy's historical accounts were almost universally untrustworthy, with Judy never missing an opportunity to twist a story to make Lisa look bad and to make Judy look good. To sum up, I decided as untrustworthy, and therefore not worthy of use, the Judy-Carl-engendered, pejorative descriptions of Lisa upon which Ms. Vogelsang relies.

I have been familiar with Ms. Vogelsang's work for many years, and over the years I have been made aware that, at least in some of the early cases in which Ms. Vogelsang was used, defendants achieved penalty phase success in having Ms. Vogelsang do in those cases what she has done for Current Counsel for Mrs. Montgomery this case, that is weave a poignant story from available information. The trouble is that the more Ms. Vogelsang has been used, the more that prosecutors have developed counterplans against her sort of plan. Prosecutors noticed that Ms. Vogelsang relies upon hearsay, often many times removed, and now prosecutors regularly interpose successful penalty phase challenges that the probative value of such hearsay is minimal, and that therefore such information is excludable under 18 U.S.C. 3593(c). Similarly, prosecutors noticed that Ms. Vogelsang relies upon great detailing of the troubled lives, including mental illnesses, of relations of a defendant, and even of those not related to the defendant, and now prosecutors regularly interpose successful penalty phase challenges that the probative value of such information about family members and others is minimal, and that therefore such information is excludable under 18 U.S.C. 3593(c). And Prosecutors noticed that Ms. Vogelsang, beyond her social worker expertise, repeatedly draws medical, psychiatric and psychological conclusions from the information she is provided, and now prosecutors regularly interpose successful penalty phase challenges against Ms. Vogelsang's beyond-her-expertise conclusions. Finally, Prosecutors noticed that, in Vogelsang cases, all of the experts used the Vogelsang narrative as a script, and that therefore the conclusions of

other experts could be undermined through the undermining of the Vogelsang narrative.

Current Counsel for Mrs. Montgomery, while not addressing directly these peculiar vulnerabilities of Vogelsang, do raise a related issue. Current Counsel for Mrs. Montgomery generally criticize that we chose not to rely, in the fashion which Ms. Vogelsang would have, upon dubiously admissible hearsay about Lisa's family members' backgrounds, as well as the backgrounds of unrelated others, such as the backgrounds of the children of Lisa's stepfather, Jack Kleiner; more specifically Current Counsel for Mrs. Montgomery challenge that we should have preserved for appeal an instance in which Judge Fenner excluded, upon 18 U.S.C. 3593(c) grounds, precisely this sort of hearsay information about the mental health history of one of Lisa's cousins sought in the Dave Owen examination of another of Lisa's cousins, Wendy Treibs (Doc. 71, p. 214). Current Counsel for Mrs. Montgomery argue, *sans* pertinent authority, the admissibility of such information (Doc. 71, p. 215). We on the Montgomery trial and appellate teams did not press the matter further because we did not believe that the legal argument, as now articulated by Current Counsel for Mrs. Montgomery, was a solid one. As well, I believed that our expert opinions regarding Lisa's mental illnesses were well-premised upon solid evidence about Lisa's background, and that pressing marginally provable claims about mental illnesses of family members and non-family members left us exposed to attack from prosecutors that our expert conclusions drew upon hearsay regarding possible problems of family members and non-family members rather than upon rock solid facts from Lisa's own background.

Because I was aware of the peculiar vulnerabilities which Ms. Vogelsang or a social worker like her would bring, I decided instead to provide the raw materials of our mitigation investigation to those associated with our case who were qualified to assess them, i.e. Dr. Ramachandran, Dr. Logan and Dr. Kuncel. I believed that these folks could find the critical information in our mass of materials, and it would seem that their performances in these regards confirmed my trust in them to do this work.

(Duchardt Aff. 70-75.)

As the Government has emphasized in other parts of this response, although a central theme of Montgomery's § 2255 motion is that the "true story" or "whole story" of Montgomery's life was not presented to the jury, in fact, current counsel for Montgomery

are unable to identify a single, pertinent fact that was not presented to the jury at some point in the proceedings. Their real issue appears to be in the *manner* or *style* of that presentation, which is, obviously, a matter of trial strategy.

34. *911 Tape (p. 193)*

Montgomery's twenty-fourth claim of ineffective assistance asserts that the recording of the 911 call made by Bobbie Jo Stinnett's mother after the killing and kidnapping should have been excluded during the penalty phase of trial, and that the defense team was ineffective in failing to successfully obtain its exclusion. (D.E. 71 at 193.)

Current counsel provide no authority for their contention that it was improper to play the 911 audio recording at trial. As the record reflects, the 911 recording was not admitted during the guilt phase of the trial, but the initial portion of it was admitted in the penalty phase as part of the Government's victim impact evidence. The first part of the 911 recording was highly probative of the impact of Montgomery's crime on Bobbie Jo Stinnett's mother.

The United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), held that the Eighth Amendment permits consideration of "evidence about the victim and about the impact of the murder on the victim's family" in determining "whether or not the death penalty should be imposed." The Government "has a legitimate interest in counteracting the mitigating evidence that the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so to the victim is an individual whose death represents a unique loss to society and in particular to

his family." *Id.* (quoting Justice White's dissent in *Booth v. Maryland*, 482 U.S. 496, 617

(1987)).

Mr. O'Connor's explains that he did not object to the 911 call during the penalty

stage of the trial because it was clearly admissible:

> The 911 tape was not used in the guilt stage of litigation, when it clearly could have been. It was used in the penalty stage. Moreover, the tape was relevant and material under the law. *See* 18 U.S.C. 3593(c). The tape was prejudicial, but all evidence that is inculpatory to a defendant is prejudicial. That tape was coming in with or without objection.

(O'Connor Aff. 7.)

On page 97 of Fred Duchardt's affidavit he also points out why the 911 tape was

admissible during the penalty stage:

> Current Counsel for Mrs. Montgomery generally claim that I failed to object to a host of victim impact evidence; however, I only found one specific in this regard, the perceived failure in not securing exclusion of the 911 tape (Doc. 71, p. 92, 193, 194, 200). Without question, the tape was powerful, with Bobbie Jo Stinnett's mother sobbing her report to emergency response personnel about the horrific scene of Bobbie Jo's body looking like it had "exploded". If there could have been posed any academic question as to whether victim impact was the government's main reason for using the recording at penalty phase, Matt Whitworth removed all doubt about the matter in his closing argument (Tr. 3192-3193).
>
> Had Matt gone further, as he mused he might have (Tr. 3192-3193), and attempted to play the tape a second time during his argument, I absolutely would have objected that such a second playing was unfairly prejudicial. However, I did not seek exclusion of the tape in the first instance because I believed that the sort of 18 U.S.C. 3593(c) objection suggested by Current Counsel for Mrs. Montgomery was not well taken in that the recording was, in the words of the same subsection 3593(c), "relevant to the sentence" as it was direct evidence about the crime itself, and specifically bore on aggravating factors regarding victim impact as well as the heinousness of the offense.

(Duchardt Aff. 97-98.)

Both attorneys, in other words, made a conscious decision not to object to the 911 tape during the penalty phase because they recognized – as current counsel for Montgomery refuse to do – that the audiotape was clearly admissible, and that an objection would have been both baseless and fruitless.

35.   *Cumulative Effect of Alleged Errors (p. 194)*

Montgomery's twenty-fifth claim of ineffective assistance asserts that the "cumulative effect" of the previous twenty-four claims of ineffectiveness of counsel claims should provide Montgomery with relief. (D.E. 71 at 194.)  But it is well settled that, in determining the existence of *Strickland* prejudice, individual claims of ineffectiveness, none of which is sufficient to require relief under *Strickland*, cannot be cumulated into a viable claim of ineffectiveness.  *Kennedy v. Kemna*, 666 F.3d 472, 485 (8th Cir. 2012); *Middleton v. Roper*, 455 F.3d 838, 851 (8th Cir. 2006).

The Eighth Circuit repeatedly has recognized "[a] habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would be itself meet the prejudice test."  *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002); *see*, *i.e.*, *United States .v. Robinson*, 301 F.3d 923, 925 n. 3 ((8th Cir. 2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief, and noting the Eighth Circuit's rejection of cumulative error doctrine); *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation.").

Here, Montgomery has failed to demonstrate that any of the allegations of ineffective assistance described above were prejudicial. Assuming, *arguendo*, that Montgomery has established some minor deficiencies in the representation by her prior attorneys at trial or on appeal, whether considered individually or collectively, they were not outcome-determinative in the sense that they altered the outcome of either the guilt phase or the penalty phase of the trial.

**_Claim VI_** *(Pages 195-197)*

**G.**    **_Montgomery Claims She Was Tried While She Was Incompetent_**

Montgomery contends that her conviction and sentence should be vacated because she was tried while she was incompetent. But, again, the record fails to contain any evidence that Montgomery was incompetent during either the guilt or punishment phases of the trial.

Beginning on page 76 of his affidavit, Mr. Duchardt states:

> Current Counsel for Mrs. Montgomery, based mostly upon conclusions offered by Dr. George Woods, M.D., claim that Lisa Montgomery was not mentally capable to assist us in preparing her defense and was so obviously mentally incompetent to proceed to trial that it was incumbent upon us to seek a finding to that effect from the Court (Doc. 71, p. 93, 132-135, 195). There is also insistence that the medications used by jail doctors to treat Lisa's mental illnesses "made her affect flat and made her appear remorseless" and gave her a "disengaged appearance, flat and absent affect, and inability to show emotion at trial" (Doc. 71, p. 93, 132).

> The biggest problem with these Woods-inspired accusations are that they have no basis in fact. The challenge I found at trial in persuading that Lisa has a mental illness is that Lisa was opposite to different from the claims by Dr. Woods. Lisa never appeared to have a mental illness in the manner postulated by Dr. Woods. Lisa was readily able to engage anyone and everyone in cogent conversation, even at her darkest times. Lisa never had problems understanding the proceedings against her. Lisa never had

problems understanding the questions we were asking her about her background and the crime, and never had problems understanding why we were asking the questions which we were. Lisa's problems in answering certain of our questions were not on the level of lack of understanding. Rather, Lisa had a complex protective shield, developed over years of abuse, which she had to be persuaded to let down, and which she ultimately did let down, in order for interchange to occur on matters of import. The only matters which Lisa has suppressed completely, and about which I believe she still cannot account, concern the details about how Bobbie Jo Stinnett was killed. There is nothing I have seen attributed to Lisa in the materials of Current Counsel for Mrs. Montgomery which our team did not know about.

Certainly, different medication regimes were tried from 2005 to the present in treating Lisa's mental illness, and my personal perception is that the medications currently being used to treat Lisa seem to have more positive effect than some of the medications previously used for treatment. However, none of the medications used to treat Lisa ever made her appear to me as "flat" or "absent" or "disengaged" or "remorseless". Throughout preparation for trial, and at trial, Lisa was always full of questions and attentive to answers. As Current Counsel for Mrs. Montgomery is well-aware from review of my file, I have pages and pages of pretrial letters and trial time notes written by Lisa raising intelligent issues of fact and law related to the case. However, I see no indication that Current Counsel for Mrs. Montgomery ever shared all of these items, which run counter to Dr. Woods' conclusions, with Dr. Woods. Lisa was completely and consistently engaged at trial, and always appeared so. There were a few times when Lisa got displeased looks on her face, especially when untoward testimony came from witnesses like ex-husband Carl Boman and mother Judy Shaughnessy. I kept a close watch for those instances, and I interacted with Lisa at those points to get her out of those funks, thereby improving her outer appearance at those difficult times.

Also, it must be noted that Dr. Woods is the only professional who has evaluated Lisa who has expressed an opinion that Lisa was not competent at the time that she stood trial. Dr. Woods has an unfortunate reputation that he finds incompetence to stand trial in persons who all other experts, including defense experts, have found competent.[18] Blecker, Robert, *The Death of Punishment, Searching for Justice among the Worst of the Worst* Palgrave Macmillan (2013), p. 135-137. We did not seek a finding of incompetence to proceed because there was no basis in medicine, fact or law for such an effort.

(<sup>18</sup>To the extent that it is being argued by Current Counsel for Mrs. Montgomery that I should have used Dr. Woods in lieu of one or more of the experts I used, I do not believe that would have been appropriate for the reasons cited above, and also because Dr. Woods' qualifications would have been subject to impeachment based upon a 1993 finding against him of malpractice for which his license to practice medicine was suspended for a time (See *In re the matter of the accusation against George Washington Woods, Jr. M.D.*, California Medical Board Case Number D- 5595.)

Current Counsel for Mrs. Montgomery also advance certain opinions about damage to Lisa Montgomery's brain apparently held by Dr. Woods and another of their experts, Dr. Siddhartha Nadkarni (Doc. 71, p. 93, 121-128, 132). One problem is that the opinions by Dr. Nadkarni regarding midbrain issues are strikingly similar to, but not nearly as well-supported as, conclusions from Dr. Gur which were rejected as amounting to speculation beyond the reach of generally-agreed-upon medical science. *United States v. Montgomery*, 1088-1093. Neither Dr. Nadkarni nor Current Counsel for Mrs. Montgomery explains how Dr. Nadkarni's opinions in these regards would have been received at trial whereas Dr. Gur's better supported positions on the same subjects were not. It is also complained that Dr. Fucetola did not do more extensive neuropsychological testing which it is believed would have detected certain frontal lobe damage postulated by Dr. Nadkarni and Dr. Woods (Doc. 71, p. 132). Unfortunately, these Doctors did not have extra neuropsych testing done themselves, and worse they do not address what would appear to be contrary PET and MRI testing results from Dr. Gur's University of Pennsylvania team.

(Duchardt Aff. 76-79.)

As Mr. Duchardt's affidavit indicates, the defense team was convinced that Montgomery was not incompetent to stand trial and showed absolutely no signs of incompetency. Since this issue was not raised at trial, or on direct appeal – specifically because Montgomery's defense team knew that it was without merit, it may not be raised for the first time in a § 2255 motion.

_**Claim VII**_ _(Pages 197-198)_

**H.**    _**Montgomery Claims She Did Not Receive a Fair Trial Because the Jury Was Permitted to See Her Under the effects of Psychotropic**_

Montgomery asserts that she was denied a fair trial because the jury was permitted to see her "under the effects of psychotropic medications which only partially treated her complex mental illness.  (D.E. 71 at 197.)   As earlier noted, this claim is expressly refuted by the record, including Mr. Duchardt's affidavit, where he specifically rejects Montgomery's current claim that the medications used by jail doctors to treat Montgomery's mental illnesses "made her affect flat and made her appear remorseless" and gave her a "disengaged appearance, flat and absent affect, and inability to show emotion at trial."   (Duchardt Aff. 96.)

In any event, this is still another claim that should have been raised at trial and on direct appeal.   Montgomery cannot use a § 2255 motion to raise for the first time an issue that should have been raised on direct appeal.

_**Claim VIII**_ _(Pages 198-200)_

**I.**    _**Montgomery Claims the Government's Decision to Obtain a Death Sentence was Based on Improper and Inapplicable Factors**_

Montgomery contends that the Government's decision to request a sentence of death was based on "improper and inapplicable factors" in violation of any number of Montgomery's constitutional rights.   Again, this is an issue that should have been raised prior to trial and on direct appeal.   Having failed to do so, the argument is forfeited and cannot be raised for the first time in a § 2255 motion, since a post-conviction motion cannot be used as a substitute for an appeal.

In any event, Montgomery's claims are based solely upon speculation and have no support in the record. Indeed, in affirming the imposition of the death penalty on direct appeal, the Eighth Circuit found that "[o]verwhelming evidence supported the jury's verdict" finding that Montgomery had "'committed the offense in an especially heinous or depraved manner in that it involved serious physical abuse to the victim.'" *Montgomery*, 635 F.3d at 1095-96.

Quite simply, nothing in the record suggests, must less shows, that the Government's decision to seek the death penalty was based on anything *other* than the especially heinous and depraved manner in which Montgomery had committed her unspeakable acts. To suggest otherwise, flies in the face of the record, as well as common sense.

**<u>Claim IX</u>** *(Pages 200-201)*

**J.**     **<u>*Montgomery Claims the Playing of the 911 Tape Recording was Improper*</u>**

At page 200 of her amended motion, Montgomery again claims that the playing of the 911 tape during the penalty phase of her trial violated her constitutional rights. This issue previously has been addressed by the Government in responding to Montgomery's claim that counsel was ineffective in failing to object to the admission of this piece of evidence.

Raising it again as a stand-alone claim of trial error adds nothing to Montgomery's argument, since it has been procedurally defaulted unless she can show both cause and prejudice. *Walking Eagle v. United States*, 742 F.3d 1079, 1081-82 (8th Cir. 2014). Although ineffective assistance of counsel can satisfy both the cause and prejudice

standard, *id.*, as previously noted, since the 911 tape was clearly admissible in the penalty phase, defense counsel could not have been ineffective in failing to have objected to it.

Montgomery nevertheless claims that the playing of the 911 tape recording by the Government in the penalty phase was error because it was played "for one reason and one reason only," to inflame the jury. (D.E. 71 at 201.)   Montgomery specifically claims that "the Government played for the jury the entirety of the 911 tape of the phone call made by the victim's mother to the Sheriff's department upon discovering her daughter.   The recording, which is twelve minutes in length, records the mother's sobs at finding her daughter" (D.E. 71 at 200.)

As previously stated, the 911 recording was not admitted during the guilt phase of the trial, but was properly admitted in the penalty phase as part of the Government's victim impact evidence.   The recording was highly probative of the impact of Montgomery's crime on Bobbie Jo Stinnett's mother.

It is of interest that Montgomery's claim inaccurately states what the jury actually heard.   In the guilt phase the complete 911 recording, which lasts 14 minutes and 48 seconds, was marked as exhibit 3a.   Exhibit 3a was not admitted or played to the jury during the guilt phase of trial.

During the penalty phase only a redacted portion of the 911 recording was admitted and played to the jury.   The redacted waive file was marked and admitted as exhibit 54. The waive file marked exhibit 54 is only the beginning 6 minutes and 28 seconds of the 911 call.

The admission of a portion of the 911 recording was proper, and did not violate the Sixth and Eighth Amendment as asserted by Montgomery.

**_Claim X_** *(Pages 201-204)*

**K.**      **_Montgomery Claims the Prosecution Made Misstatements of the Law During the Trial_**

At page 201 of her amended motion, Montgomery complains about the prosecution's "multiple misstatements of law" that the Government made during the penalty phase of the trial, arguing that they violated multiple constitutional rights possessed by Montgomery.

But, again, these arguments should have been raised at trial and on direct appeal; to the extent that they were not, they have been forfeited unless Montgomery can show both "cause and prejudice" for the failure to have raised them at trial and on direct appeal. *Walking Eagle*, 742 F.3d at 1081-82.   Although ineffective assistance of counsel can supply the necessary cause and prejudice, Montgomery raises these claims of error not as ineffectiveness, but rather as mere trial error, notwithstanding her throwaway statement, which appears earlier in her amended motion, that counsel failed to object to "multiple instances of improper argument," without specifically identifying any instances of such failures.   (D.E. 71 at 92.)

However, even if this claim is construed as a claim of ineffective assistance of counsel, it lacks merit.   On direct appeal, Mr. Duchardt *did* contend that the prosecution improperly argued that Montgomery "never apologized for her actions" and that she "drag[ged] [her] kids into court" to testify on her behalf.   *Montgomery*, 635 F.3d at 1096.

On direct appeal, the Eighth Circuit held that the first remark was proper, but that the second was not. *Id.* at 1096-98. However, the court held that the remarks were not sufficiently prejudicial to warrant a new trial. *Id.* at 1098.

To the extent that Montgomery's claims are based on these arguments, this issue obviously may not be relitigated. However, to the extent that they might be based on other portions of the Government's closing argument, even viewed as ineffective assistance of counsel, they entitle Montgomery to no relief, as Mr. Duchardt explains in his affidavit:

> Current Counsel for Mrs. Montgomery fault me for not having objected to many, particular penalty phase arguments made by the government (Doc. 71, p. 92, 201-203). As to one of the arguments, concerning Lisa's failure to apologize (Doc. 71, p. 202), proper objection was made, the matter was raised on appeal, and a finding of error, albeit harmless error, was made by the Eighth Circuit. **United States v. Montgomery**, 1096-1097).

> None of the other complaints is well taken.

> Current Counsel claim that Matt Whitworth posited that the jury must make unanimously findings with respect to mitigating factors (Doc. 71, p. 201-202). Actually, Matt's point was as follows:

> "Now aggravating factors, as the judge has told you, must be proven by us beyond a reasonable doubt. Mitigating factors are only required to be proved by a preponderance of the evidence." (Tr. 2865) This statement was not objectionable because it was a flawless recitation of the applicable law with no inference that unanimity is required regarding mitigating factors findings.

> Current Counsel argue that prosecutors' use of John's first phase argument descriptors about the killing of Bobbie Jo Stinnett amounted to a contention that we on the defense side conceded that "death was the only appropriate sentence" (Doc. 71, p. 202). While the argument by prosecutors drew the completely correct conclusion that we had always conceded the terrible nature of the crime itself, nothing can be teased out of such an argument regarding any concession from us upon the issue of punishment. Moreover, all of the other arguments of prosecutors, debating against our

multifaceted case in favor of life, left a clear, contrary impression about prosecutors' understanding regarding our position as to proper punishment.

Current Counsel for Mrs. Montgomery pose that certain arguments by prosecutors improperly interjected their personal feelings (Doc. 71, p. 202). I have reviewed again the pages of the record cited by Current Counsel and I find nothing there for which any proper legal objection, including the one they proposed, could have been sustained.

Current Counsel posit that argument about justice for Bobbie Jo Stinnett's family coming from a death sentence went too far under applicable Supreme Court precedent. I would note that those Courts who have directly addressed the issue raised by Current Counsel have found the matter contrary to the position espoused by Current Counsel . *Thorson v. State*, 895 So.2d 85, 113-114 (Miss. 2004); *State v. Prevatte*, 570 S.E.2d 440, 490 (N.C. 2002); *Edwards v. State*, 737 So.2d 275, 290-291 (1999); *Kuenzel v. State*, 577 So.2d 474, 498 (Ala.Cr.App. 1990).

Current Counsel accuse that government arguments about our mitigating factors were somehow improper (Doc. 71, p. 202-203). I have never seen a case which has so held.

Current Counsel argue that showing the jury exhibits received in the case constituted an improper appeal to "emotion, vengeance, caprice" (Doc. 71, p. 203). My perception is that all holdings along these lines are contrary to this position.

Current Counsel claim that Matt Whitworth "argued that life imprisonment wasn't punishment (Doc. 71, p. 203). Actually, in referring to a life sentence, Matt said just the opposite, that "it's a very serious penalty" (Tr. 3181).

Current Counsel contend that prosecutors argued that the jury "could not exercise mercy or sympathy, and that there was a societal obligation to impose death (Doc. 71, p. 203). Rather, at the portions of the argument cited by Counsel, the prosecutors at most urged that jurors should not show mercy and that society cannot tolerate such a crime, both arguments regularly found appropriate by the Courts.

Current Counsel also claim that certain arguments by prosecutors unlawfully urged "that the responsibility for the death sentence was not borne by the jury" (Doc. 71, p. 203). However, Counsel do not point to any such argument, and no such argument was ever made.

(Duchardt Aff. 102-05.)

Since none of the complained-of remarks was improper in any way, and since Mr. Duchardt, in any event, had a reasonable basis for concluding that they were not improper, this issue entitles Montgomery to no relief.

**Claim XI** *(Pages 204-208)*

**L.** **_Montgomery Claims that Women and African Americans were Underrepresented on the Grand Jury Which Indicted Her_**

Montgomery claims for the first time, that "Women and African Americans were Underrepresented on the Grand Jury which Indicted Her." This is an issue that should have been raised prior to trial, and on direct appeal. Since it was not, it was forfeited. Montgomery makes no effort to show either cause or prejudice.

In any event, similar to *United States v. Deering*, 179 F.3d 592, 597 (8th Cir. 1999), there is nothing in the record indicating how [Montgomery's] grand jury was selected or what its racial and ethnic composition was." Although Montgomery had a constitutional right to a grand jury randomly drawn from a representative cross-section of the community, *see United States v. Artero*, 121 F.3d 1256, 1260 (9th Cir. 1997), based upon the lack of record, this Court must reject Montgomery's argument because she has failed to satisfy the elements of a *prima facie* case. *Deering, id.*; *see also Duren v. Missouri*, 439 U.S. 357, 364 (1979) (listing elements of prima facie case).

Nothing in the record suggests that women or minorities were systematically excluded from the venires or panels from which the grand jurors were chosen. Absent evidence that women and African-Americans were systematically excluded from the grand

jury by virtue of the nature of the selection process, the gender or ethnic composition of the actual grand jury that indicted her was constitutionally irrelevant. *See Duren*, *id.*

**Claim XII** *(Pages 208-211)*

M. ***Montgomery Claims that Juror Torres was Excused Simply on the Basis of Her Race***

This claim involves another attempt by Montgomery to present an argument that was forfeited by her failure to raise it at trial or on direct appeal. Montgomery falsely claims that Juror Torres was excused on the basis of her race, *i.e.*, because Mr. Duchardt identified her as Cuban.

As Mr. Duchardt explained in his affidavit, he did not object to her removal for cause because he believed that she might "very pro-death penalty," could "not understand how someone could commit such a crime," and "express[ed] misgivings about mental defenses." (Duchardt Aff. 89.) Under these circumstances, he "likely would have used a peremptory challenge to remove her had she remained on the panel." (Duchardt Aff. 89.)

This, obviously, was a matter of reasonable trial strategy that cannot be second-guessed in a § 2255 motion.

**Claim XIII** *(Pages 211-212)*

N. ***Montgomery Claims that the Government Engaged in Misconduct with Tommy Kleiner***

This "government misconduct" claim is still another supposed "trial error" that, notwithstanding its utter lack of merit, is still an issue that Montgomery should have raised at trial and on direct appeal. It has been forfeited and cannot be raised in a § 2255 motion

no matter how many constitutional provisions Montgomery relies upon in support of her claim.

In any event, the simple answer to this argument is that the defense team, once it realized that Tommy Kleiner had an ironclad alibi for the time frame in which the crimes were committed, wisely elected not to use him as a defense witness. Consequently, any supposed "tampering" with this witness could not have affected either the guilt portion of the trial, or the sentencing hearing.

**Claim XIV** *(Pages 212-213)*

O. ***Montgomery Claims the Government Suppressed Exculpatory Evidence, Knowingly Used Perjured Testimony, and Failed to Correct False Testimony***

Although, under this claim, Montgomery asserts that her conviction was based on "suppressed exculpatory evidence," and "perjured testimony," and that the government "failed to correct false testimony," there are no credible allegations of anything of such nature in the record, including Montgomery's motion. Indeed, this section of Montgomery's motion is complete boilerplate, and points to no exculpatory evidence that the Government suppressed, any "perjured testimony," or any false testimony that the Government failed to correct

**Claim XV** *(Pages 213-214)*

P. ***Montgomery Claims that Witnesses Mayberg and Evans Presented False, Misleading, Unreliable, Unscientific, and Specious Testimony***

As Mr. Duchardt notes in his affidavit, these allegations presumably are related to the testimony of Dr. Helen Mayberg and Dr. Alan Evans, who, Montgomery asserts, gave testimony that amounted to "junk science." But, as Mr. Duchardt points out in his

affidavit, that did not make their testimony "false" "misleading," or "unreliable," and, in fact, the Eighth Circuit relied on much of their testimony in concluding that the testimony of Dr. Gur was properly excluded:

> Current Counsel for Mrs. Montgomery globally complain that I allowed advancement of "perjured and otherwise false testimony" (Doc. 71, p. 212-213). However, I locate only one group of matters which would arguably fit into this category, the general expression of contempt for government experts Helen Mayberg, M.D. and Alan Evans, Ph.D., peppered with specific accusations that these Doctors "offered junk science", gave "misleading, unreliable, unscientific and specious testimony" and topped off with an indictment that I should have questioned "the validity of their protocols" and their supposedly "shoddy techniques" (Doc. 71, p. 90, 213).

> Consistent with their bombastic approach upon other issues, Current Counsel for Mrs. Montgomery are long on invective and short on support for their claims. Current Counsel for Mrs. Montgomery have not sought experts of their own to support their accusations against Mayberg and Evans. This is particularly problematic because these accusations of "junk science" and "shoddy techniques" and "unscientific" approaches are being leveled by a three lawyers against two of the world's most renowned scientists in the field of neuroimaging. I have no doubt that, had it been the Current Counsel for Mrs. Montgomery mismatched against these brilliant scientists in cross-examination about "techniques" and "protocols", at the end of that, the words "shoddy" and "misleading" and "unreliable" and "specious" would have been left hanging on the lawyers, not the scientists.

> As the record makes clear, I took lots of exceptions to the testimony offered by Dr. Mayberg and Dr. Evans. *United States v. Montgomery*, 1092-1093. However, it would have been preposterous to claim that these preeminent experts were somehow "unscientific" or purveying "junk science". Instead, the correct indictment was that, though the objections raised by these very adroit people were technically correct, it was still they who were venturing outside of prevailing professional norms because their correct objections were hypertechnical, and thereby non-standard. Relying upon detailed explanations by Dr. Ruben Gur, Ph.D., we made precisely this point in fighting tooth and nail in this only way possible against these scientists. *United States v. Montgomery*, 1088-1093.

(Duchardt Aff. 93-95.)

**Claim XVI** *(Pages 214-225)*

**Q.**     ***Trial Court Errors***

 *1. Testimony of Wendy Treibs*

Montgomery's Claim XVI attempts to raise even more unpreserved trial court errors, *i.e.*, the exclusion of hearsay testimony during the penalty phase of the trial, and errors in virtually all of the guilt- and penalty-phase instructions.   None of these claims has merit.

With respect to the exclusion of Wendy Treibs's proposed testimony during the penalty phase of the trial, where she was precluded from testifying that her brother Kenny Alexander (Montgomery's cousin) had told her that he had been diagnosed with bi-polar disorder, the evidence not only was hearsay, but also unreliable and nonprobative of any disputed issue in the case.   Montgomery's mental condition and mental history was the principal focus of the case; whether or not Montgomery's cousin might have been diagnosed with bi-polar disorder, even if true, essentially added nothing to the case.   Its exclusion did not create a reasonable probability that the jury, had it known of this supposed diagnosis, would not have assessed the death penalty against Montgomery.

 *2. The Guilt Phase Jury Instructions*

Since Montgomery did not challenge the instructions at trial or on direct appeal, she may not obtain collateral relief unless she shows both cause and actual prejudice.   *United States v. Frady*, 456 U.S. 152, 168 (1982).   A court need not determine whether cause has been established if a defendant has failed to demonstrate actual prejudice.   *Id.*

Actual prejudice can be shown if the challenged instruction "so infected the entire trial that the resulting conviction violates due process." *Id.* at 169. An instruction that is undesirable, erroneous, or even universally condemned is not sufficient reason for relief. *Id.* A defendant must show that the instructional error actually and substantially disadvantaged his entire trial, not merely that it created a possibility of prejudice. *Id. at* 170. The adequacy of the instructions must be evaluated as a whole. *Id.* at 169; *United States v. Butler*, 56 F.3d 941, 945 (8th Cir. 1995).

As Mr. Duchardt notes in his brief, although Montgomery spends several pages attacking guilt-phase Instructions Nos. 13, and 15 through 19, these faithfully followed the Eighth Circuit model criminal jury instructions and Montgomery's current attorneys essentially assert that these instructions contained errors, without identifying those errors, or citing any authority for their assertions that the instructions were in some way flawed. As Mr. Duchardt notes in his affidavit:

> Current Counsel for Mrs. Montgomery make a series of arguments against instructions without any sort of authority supporting those arguments (Doc. 71, p. 216-218). Also Current Counsel claim that some sort of lesser included offense instruction should have been offered (Doc. 71, p. 218). I raised none of these issues because I did not believe any of them had merit.

(Duchardt Aff. 98.)

Montgomery has not identified any errors in any of the instructions, nor was there any basis for submitting a lesser-included instruction. Montgomery can show neither "cause" nor "prejudice" regarding these instructions. Her claims were forfeited, and cannot be raised for the first time in an § 2255 motion.

3. *The Penalty Phase Jury Instructions*

Montgomery also argues, for the first time in her § 2255 motion, that the penalty phase instructions contained "multiple erroneous statements of law," but, again, this Court employed Eighth Circuit model criminal jury instructions, and Montgomery provides no authority or reasoned argument for any of her claims that the instructions contained any errors, with a single exception.   As Mr. Duchardt notes in his brief:

> I find that one of the criticisms of Current Counsel does have substance.  Current Counsel rightly note that, as to the aggravating factor concerning substantial planning and premeditation, the word "unanimously" was not contained in the jury's finding upon the matter (Doc. 71, p. 219-220; 05-6002 Doc. 354, p. 4).   As to the rest, there is no substance.

Mr. Duchardt's reference to the aggravating factor concerning substantial planning and premeditation refers to the fact that the instruction in question inadvertently failed to require the jury to find "unanimously" that this aggravating factor was present.   But the word "unanimously" preceded every other aggravating factor the jury was required to find, and, if the jury noticed this omission at all, it most certainly would have found, reading the instructions together, that this factor had to be found "unanimously."

Mr. Duchardt, during his closing argument in the penalty phase emphasized that the "aggravating factors . . . must [be] unanimously . . . proved beyond a reasonable doubt" (Tr. 3168), and the penalty phase instructions informed the jury in *eight* separate places that the aggravating factors must be unanimously proven beyond a reasonable doubt. (D.E. 179 at 30, 32, 44-47.)

In any event, the jury, to have imposed the death penalty, was required to find only *one* aggravating factor, and, the jury, in fact, found all five statutory, and the one

non-statutory aggravating factors that were submitted to it. Moreover, the evidence was overwhelming that the offense had involved extreme, extensive planning and premeditation.

The omission of "unanimously," then, from a single instruction relating to a single aggravating factor could not have had any significant effect on the jury's decision to impose the death penalty. Clearly, the omission did not so infect the entire sentencing hearing that it violated due process. *See Frady*, 456 U.S. at 169-70. Considered as a whole, the omission was clearly harmless. *Id.* at 170.

Montgomery's other objections to the penalty phase instructions require little comment, but since Mr. Duchardt extensively discusses those objections in his affidavit, and clearly and convincingly demonstrates why they lack merit, the Government has taken the liberty of rescripting his response below:

> Current Counsel for Mrs. Montgomery contend I should have but did not object to certain penalty phase instructions (Doc. 71, p. 218-223).

> Some of the objections raised by Current Counsel actually reprise, in much less detail, the points which I raised at trial against the instructions, and carried forward upon appeal (Doc. 71, p. 222-223.) *United States v. Montgomery*, 1085, 1087, 1098-1099. As to these matters, which were raised at trial and upon appeal, it would certainly seem that complaint that those issues were not raised would not be well taken.

>        * * *

> Current Counsel fault the instructions['] definition of the term "mitigate" without providing direct authority for their contentions and without even posing, as required for a challenge to an instruction an alternative definition from competent authority (Doc. 71. p. 218-219).

> Current Counsel contend that the instructions allowed the jury to use the offense itself as an aggravating factor to be weighted in favor of death

(Doc. 71, p. 219).   To the contrary, at the places noted by Current Counsel, the jury was called upon to make so-called "gateway find[i]ngs".   Current Counsel do not cite to other instructions on the actual subject of weighing of aggravating and mitigating factors which the Courts, including the Eighth Circuit, have found make clear that gateway findings are not to be weighed by the jury in determining whether to sentence to death.

Current Counsel contend that there was insufficient evidence to support the aggravating factor of endangerment of another person as applied to Victoria Jo Stinnett, Bobbie Jo's child; in this regard, Current Counsel draw upon my argument that, prior to her live birth, the child was not a person, and therefore Federal statutes which apply to persons cannot apply (Doc. 71, p. 219).   The trouble with this argument is that Current Counsel do not perceive applicability of the aggravating factor to the child after she was born, and thereby legally became a person, in light of the facts that she was taken from her mother a month prematurely and was not provided any sort of post-natal care in the process.

Current Counsel assert that there was unconstitutional double-counting of the endangerment factor and the heinousness factor because "both relied on the identical fact, that the defendant used a kitchen knife to cut the baby from the womb (Doc. 71, p. 220).   What Current Counsel fail to acknowledge is that, while this one element was common, the two were distinct because the other elements of the factors were distinct.

Current Counsel fault the use of victim impact as an aggravating factor (Doc. 71, p. 220-221), without noting the Supreme Court authority, which they themselves cite elsewhere in their petition (Doc. 71, p. 200, 202), permitting such an aggravating factor to be used.   ***Payne v. Tennessee***, 501 U.S. 808 (1991).

Current Counsel contend, in two paragraphs, that there were proper mitigating factors concerning mental health, in addition to the statutory factors which I offered, which should have additionally or alternatively been presented for the jury's consideration (Doc. 71, p. 221).   However, Current Counsel fail to pose to the Court any such proper factor which was omitted, or how such factors would have been preferable to the ones I proposed.

Current Counsel challenge the standard instruction regarding reasonable doubt (Doc. 71, p. 221) without acknowledging the long line of cases upholding the language and without proposing any alternative language.

Current Counsel challenge giving a defendant the burden of proving mitigating factors by a preponderance of the evidence (Doc. 71, p. 221-222) without acknowledging the long line of cases finding appropriate the placing of upon a defendant of precisely such a burden when it comes to other defenses and without explaining what burden less than preponderance they propose being used instead.

Current Counsel challenge that the jury should have been instructed, with more particularity, concerning the ways in which they could weigh witness testimony (Doc. 71, p. 222), though they do not explain how the instruction in any way precluded the sorts of considerations they espouse, and do not point to any particular instances from witness testimony at trial for which such particularized instruction would have made a difference.

Current Counsel also contend that the instructions would have allowed the jury to give death based upon a determination that an invalid aggravating factor outweighed mitigating factors (Doc. 71, p. 222). The problem for that argument is that, even if such a reading of the instruction was found to be a correct one, in this case the jury found all submitted aggravating factors, and therefore the problem envisioned by Current Counsel with respect to finding of only one such factor did not occur.

Finally, in four separate paragraphs, Current Counsel contend that the jury's ultimate determination upon punishment should have been made beyond a reasonable doubt, that the jury should have been so instructed, and that a Panel of the Sixth Circuit has agreed with their contentions (Doc. 71, p. 223-224). Unfortunately, Current Counsel fail to note that the Panel opinion upon which they so critically rely was withdrawn by the Sixth Circuit, and was replaced by an *en banc* opinion finding contrary to the position espoused by Current Counsel. ***United States v. Gabrion***, 719 F.3d 511, 531-533 (6th Cir. 2013). Compounding the problems for the argument of Current Counsel is that six other Circuits who have considered the issue, including the Eighth Circuit, have decided the matter against Current Counsel's position. ***United States v. Purkey***, [428 F.3d at] 749; ***United States v. Sampson***, 486 F.3d 13, 31 (1st Cir. 2007); ***United States v. Runyon***, 707 F.3d 475, 516 (4th Cir. 2013); ***United States v. Fields***, 483 F.3d 313, 345-346 (5th Cir. 2007); ***United States v. Mitchell***, 502 F.3d 931, 993-994 (9th Cir. 2007); ***United States v. Fields***, 516 F.3d 923, 950 (10th Cir. 2008).

(Duchardt Aff. 98-102.)

Little needs to be added to Duchardt's analysis. The Government would note, however, that with respect to Montgomery's claim regarding the "unconstitutional double-counting of the endangerment factor and the heinousness factor," this was an issue that was thoroughly litigated as set forth below. The Government has previously responded to Montgomery's argument. (D.E. 214). Magistrate Judge Maughmer prepared a report and recommendation recommending denial of Montgomery's motion (D.E. 268), and this Court entered an order denying the motion (D.E. 271).

In denying Montgomery's motion, this Court followed the majority of the courts in finding that although the jury must consider the circumstances of the underlying crime in both the guilt and sentencing phases, such is not duplicative, nor does such offend and violate a defendant's rights to due process and to be free from cruel and unusual punishment. *See United States v. Mayhew*, 350 F.Supp.2d 936 (S.D. Ohio 2005); *United States v. Henderson*, 461 F.Supp.2d 133 (S.D.N.Y. 2006); *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003); *Moore v. Kinny*, 320 F.3d 767 (8th Cir. 2003); *United States v. Rodriguez*, 389 F.Supp.2d 1135 (D. N.D. 2005); *United States v. Grande*, 353 F.Supp.2d 623 (E.D. Va. 2005).

Additionally, the Supreme Court in *Lowenfield v. Phelps*, 484 U.S. 231 (1988), found that a jury may perform the duty of finding an aggravating circumstance "at either the sentencing phase of the trial or the guilt phase." *Id*. at 245. The Court further found that "the fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and

so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Id.* at 246.

As the above authority demonstrates, the court properly denied Montgomery's motion to dismiss an aggravating factor due to duplication of an element of the offense.

With respect to Montgomery's claim that the jury was improperly instructed that it was required to return a sentence of death if the jurors found that the aggravating factors outweighed mitigating factors, such an instruction, which followed the Eighth Circuit applicable model instruction, was in accordance with well-established Eighth Circuit precedent.

In *United States v. Allen*, 247 F.3d 741, 780 (8th Cir. 2001), *vacated and remanded on other grounds*, 536 U.S. 953 (2002), the Eighth Circuit held that Instructions No. 12.01 and 12.11 (the weighing instruction) which the defendant had attacked as impermissibly mandatory in nature, "accurately explain[ed] the jury's role in sentencing under the FDPA." *Allen*, 247 F.3d at 780. The court also held that the district court did not abuse its discretion in refusing to give the defendant's "mercy" instruction, which closely followed the language in 21 U.S.C. § 848(k), to the effect that the jury, "regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence." *Allen*, *id.* The Eighth Circuit concluded:

> Under the FDPA, the jury exercises complete discretion in its determination of whether the aggravating factors outweigh the mitigating factors. The jury was informed that whether or not the circumstances justify a sentence of death was the decision left entirely to them. Mercy is not precluded from entering into the balance of whether the aggravating circumstances outweigh the mitigating circumstances. The FDPA merely Precludes the

jurors from arbitrarily disregarding its unanimous determination that a sentence of death is justified.

*Id*. at 781. The Eighth Circuit reaffirmed this holding in *United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002), and in *United States v. Nelson*, 347 F.3d 701, 712 (8th Cir. 2003).

Consequently, as Mr. Duchardt's affidavit clearly demonstrates, the only error in the penalty phase instructions (the omission of the word "unanimously") was clearly harmless and would not provide grounds for setting aside Montgomery's sentence of death.

 **Claim XVII** *(Pages 225-27)*

**R.** ***Montgomery Claims the Federal Death Penalty is Disproportionately Applied According to the Race of the Victim***

Montgomery's Claim XVII is still another assertion that was forfeited by her failure to raise it at trial or on direct appeal. Montgomery attempts to avoid the Government's forfeiture argument by asserting that her trial team was ineffective in failing to raise this claim at trial or on appeal.

However, Montgomery's attorneys were not ineffective in failing to raise an issue that has no merit and was doomed to failure. Not surprisingly, Montgomery cites no authority for this claim, and the few circuits that have addressed this claim have held to the contrary. *See United States v. Sampson*, 486 F.3d 13, 25-27 (1st Cir. 2007); *United States v. Jones*, 287 F.3d 325, 332-35 (5th Cir. 2002).

**Claim XVIII** *(Pages 227-228)*

**S.** ***Montgomery Claims She Received Ineffective Assistance of Appellate Counsel***

Under Claim XVIII of her motion, Montgomery states that she received the ineffective assistance of appellate counsel, because her defense team "failed to recognize

and raise meritorious issues." (D.E. 71 at 227-28.) But Montgomery's motion fails to discuss or identify a single issue, meritorious or otherwise, that Mr. Duchardt or Mr. Gromowsky failed to recognize or raise at trial or on direct appeal.

In Mr. Duchardt's affidavit, he categorically refutes the notion that either he or his co-counsel overlooked any viable issues on direct appeal:

> Current Counsel for Mrs. Montgomery say that we failed to raise meritorious issues on appeal, but give not one example (Doc. 71, p. 227-228). All I can say to that in reply is that John Gromosky and I raised 9 meritorious issues on appeal, and we found nothing else worth raising.

(Duchardt Aff. 106.)

To establish a claim of ineffective assistance of appellate counsel, a movant must show that (1) his appellate attorney's performance failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney; and (2) he was prejudiced by the attorney's poor performance on appeal. *Donnell v. United States*, 765 F.3d 817, 821 (8th Cir. 2014). In addition, in determining whether an appellate attorney performed effectively, an appellate court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and such a review is highly deferential. *King v. United States*, 595 F.3d 844, 853 (8th Cir. 2010). Even if this Court were to somehow conclude that Montgomery's attorneys on appeal failed to raise a meritorious issue, that does not necessarily mean that they were "incompetent for failing to pursue it." *King*, *id.* (citing *Anderson v. United States*, 393 F.3d 749, 754 (8th Cir. 2005)).

"While the Constitution guarantees criminal defendants a competent attorney, it 'does not insure that defense counsel will recognize and raise every conceivable constitutional claim.'" *Anderson*, 393 F.3d at 754.   As *Anderson* stressed, "The question here is not whether counsel's choice to omit an argument on appeal was an intelligent or effective decision, but rather whether his decision was an unreasonable one which only an incompetent attorney would adopt."   *Id.* (quoting *Garrett v. United States*, 78 F.3d 1296, 1305 (8th Cir. 1996)) (internal quotation marks omitted).

Counsel is not required to raise every potential issue on appeal.   *Anderson*, 393 F.3d at 754.   Indeed, the Supreme Court has recognized the "importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."   *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).   Absent contrary evidence, an appellate court will assume that appellate counsel's failure to assert an issue was an exercise of sound trial strategy.   *Anderson*, 393 F.3d at 754.

Here, the record shows that Mr. Duchardt and Mr. Gromowsky carefully selected their nine strongest issues for direct appeal, at least two of which – the exclusion of Dr. Gur's proposed testimony during the penalty phase, and a portion of the Government's penalty phase closing argument – were found to be meritorious, although insufficient to merit reversal.   *See Montgomery*, 635 F.3d at 1092, 1097-98.   Accordingly, they cannot justifiably be accused of ineffectiveness in failing to raise any number of weaker arguments on appeal, none of which has any merit.

As noted throughout this response, Montgomery's failure to prove ineffectiveness on the part of his appellate attorneys precludes review of *all* of the trial errors she now

attempts to raise in her § 2255 motion, because a showing of ineffectiveness is necessary to supply the "cause" for the failure to raise them on direct appeal. Otherwise, they are forfeited and cannot be raised for the first time in a § 2255 motion. *Frady*, 456 U.S. at 168.

**Claim XIX** *(Pages 228-230)*

### T. *Montgomery Claims She Currently Suffers from Severe Mental Illness and Brain Damage*

Montgomery's Claim XIX avers that she currently suffers from severe mental illness and brain damage and that the Eighth Amendment precludes her execution. This issue, however, is not properly raised in a § 2255 motion, because, even if true, it does not undermine the jury's finding of guilt, or the jury's *imposition* of the sentence of death. While it might provide grounds for *delaying* her execution, it obviously provides no grounds for *vacating* her death sentence.

**Claim XX** *(Page 230-32)*

### U. *Montgomery Claims the Death Sentence is Disproportionate, Arbitrary and Capricious*

Under Montgomery's Claim XX, she argues, for the first time in her § 2255 motion, that her sentence of death was "disproportionate[, and] . . . arbitrary and capricious" under the Eighth Amendment. (D.E. 71 at 230.) Montgomery argues, without any demonstrative basis, that she "is the only woman sentenced to death under the Federal Death Penalty Act," and that "[o]f the fourteen fetal abduction cases nationwide since 1987," she is "the only person sentenced to death." (D.E. 71 at 230.) She also argues that her race must have played a role in her receiving the death penalty. (D.E. 71 at 230.)

Montgomery, of course, should have raised this claim at trial and on direct appeal. Since she did not, the claim has been forfeited unless she can show "cause and prejudice" for failing to have raised it earlier. *Frady*, 456 U.S. at 168.

Here, the obvious reason that Montgomery's defense team failed to raise this claim was that it was doomed to failure. Since the Eighth Circuit upheld Montgomery's death sentence on direct appeal, it obviously determined that it was not disproportionate to the offense or arbitrarily or capriciously imposed in her case. Indeed, in view of the heinous, horrific, premeditated nature of Montgomery's offense, if the death sentence was not appropriate in her case, it would be difficult to conceive of a case where a death sentence could lawfully or constitutionally be imposed.

**Claim XXI** *(Pages 231- 233)*

**V.** ***Montgomery Claims her Death Sentence Violates Treaties Ratified by the United States***

Montgomery's Claim XXI asserts, for the first time in her § 2255 motion, that her death sentence was unconstitutional under the Supremacy Clause of the United States Constitution because it supposedly violates international law and treaties to which the Government is a party. (D.E. 71 at 231-33.)

This claim has been forfeited, and is frivolous, in any event. As already emphasized, the constitutionality of the Federal Death Penalty Act already has been clearly established. *Sampson*, 486 F.3d at 25-27; *Jones*, 287 F.3d at 332-35.

There also is considerable authority for the proposition that the imposition of the death penalty does not violate international law. *Coleman v. Mitchell*, 268 F.3d 417 (6th

Cir. 2001).   In *Coleman*, the court stressed that "the claim that 'international law completely bars this nation's use of the death penalty . . . is unsupportable since the United States is not party to any treaty that prohibits capital punishment *per se*, and since total abolishment of capital punishment has not yet risen to the level of customary international law.'"   *Id.* at 443 n. 12 (quoting *United States v. Bin Laden*, 126 F.Supp.2d 290, 294 (S.D. N.Y. 2001)).

As noted in *Madrigal v. Bagley*, 276 F.Supp.2d 744, 809-10 (N.D. Ohio 2003), "[a]lthough the U.S. Supreme Court has not directly addressed the issue, it has implicitly rejected an argument that international law should influence rulings under the federal constitution about the death penalty."   Indeed, in *Stanford v. Kentucky*, 492 U.S. 361 (1989), the Court held that imposing the death penalty on 16-year-olds does not violate the Eighth Amendment.   Although the Court did not expressly say so, it appeared to implicitly reject the dissent's reliance on international treaties that banned the death penalty.

Finally, at least one federal district court has held that the death penalty does not violate international law. *Jamison v. Collins*, 100 F.Supp.2d 647, 766-767 (S.D. Ohio 2000) (reviewing the Charter of the American States, customary international law, and other international human rights treaties and concluding "that international law does not preclude the State of Ohio from establishing and carrying out a capital punishment scheme.")

**Claim XXII** *(Pages 233-234)*

### W.   *Cumulative Effect of Alleged Errors*

Montgomery's final argument is that her conviction and sentence should be vacated because of the "cumulative prejudicial effects of the errors in the case."   (D.E. 71 at 233.) However, despite a § 2255 motion that spans more than 230 pages, Montgomery has been able to identify only a single error that was not raised and decided on direct appeal – the omission of the word "unanimously" in a single penalty-phase instruction, an omission that clearly was harmless.

As earlier noted, the "cumulative error" theory in post-conviction cases has been soundly rejected by the Eighth Circuit.   *Kennedy*, 666 F.3d at 485; *Middleton*, 455 F.3d at 851.   "A habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test."   *Hall*, 296 F.3d at 692.

The "numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," *Robinson*, 301 F.3d at 925 n. 3, and "[e]rrors that are not unconstitutional individually cannot be added together to create a constitutional violation." *Wainwright*, 80 F.3d at 1233.

Here, Montgomery cannot cumulate non-errors into constitutional error justifying her relief under § 2255.

### VII.   Need For Evidentiary Hearing Or Certificate Of Appealability

This Court should deny Montgomery's motion without an evidentiary hearing, because the record is clear that Montgomery is not entitled to relief.   "No evidentiary hearing is required where 'the motion and the files and records of the case conclusively

-160-

show that the prisoner is entitled to no relief.'" *Purkey*, 729 F.3d at 869 (quoting 28 U.S.C. § 2255(b)). Here, as in *Purkey*, the evidence Montgomery has presented along with her § 2255 motion, even taken as true, is insufficient to establish a violation of her Sixth Amendment right to effective assistance of counsel, and her stand-alone claims of trial and sentencing error were forfeited, and, in any event, are refuted by the record. Since the record conclusively shows that Montgomery "is unable to establish prejudice as required by *Strickland*," or any errors of a constitutional nature that have not been forfeited, no hearing should be held in this case. *Purkey*, 769 F.3d at 869.

Nor should this Court issue a certificate of appealability. In *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000), the Court articulated what a habeas corpus applicant must show in order to be granted a certificate of appealability under AEDPA. A certificate of appealability should not be issued if the claim is clearly procedurally defaulted, or even if the procedural default is not clear, there is no merit to the substantive constitutional claims. Rather, a certificate can only be issued if the procedural default is not clear and the substantive constitutional claims are "debatable among jurists of reason." *Langley v. Norris*, 465 F.3d 861, 862-63 (8th Cir. 2006).

Here, none of Montgomery's ineffective-assistance-of-counsel claims or her untimely allegations of trial and sentencing error are "debatable among jurists of reason," and her untimely claims involving trial and sentencing error were procedurally defaulted. Therefore, no certificate of appealability should issue in this case.

# VIII.  Conclusion

The United States respectfully requests this Court to enter an order denying Montgomery's amended motion under 28 U.S.C. § 2255 without an evidentiary hearing, and without issuing a certificate of appealability.

Respectfully submitted,

TAMMY DICKINSON
United States Attorney

By     /s/ *Roseann A. Ketchmark*

ROSEANN A. KETCHMARK
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Room 5510
Kansas City, Missouri   64106
Telephone:   (816) 426-3122

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on February 2, 2015, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

Lisa G. Nouri
2526 Holmes
Kansas City, Missouri   64108

Christine M. Blegen
Blegen Law Firm, LLC
230 SW Main Street, Suite 217
Lee's Summit, Missouri   64063

Kelley J. Henry
Office Of The Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee   37203

*Attorneys for Movant*

  /s/ *Roseann A. Ketchmark*  
Roseann A. Ketchmark
Assistant United States Attorney