**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **LISA M. MONTGOMERY,** | ) | |
| | ) | |
| ***Movant,*** | ) | |
| | ) | |
| | ) | **Case No. 4:12-cv-08001-GAF** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| ***Respondent.*** | ) | |

**TRAVERSE**

COMES NOW movant Lisa M. Montgomery, by and through undersigned counsel, pursuant to the Fifth, Sixth, and Eighth Amendments to the United States Constitution; 28 U.S. C. § 2255; and Rules 5, 6, 7, and 8 of the Rules Governing Section 2255 Proceedings for the United States District Courts, and respectfully submits this Traverse in further support of her Motion for Collateral Relief to Vacate, Set Aside, or Correct Her Sentence and for a New Trial (hereinafter "2255 Motion"). Movant notes that the Government's Suggestions in Opposition to her motion fail to rebut a number of her claims[1] thereby entitling her to collateral relief on those claims. As to her other claims, the Government's Suggestions in Opposition demonstrate the need for an evidentiary hearing because of numerous material factual disputes as to core issues in the case. In light of the pleadings and exhibits, the Court is required to permit discovery and schedule an evidentiary hearing.[2] *See* Rules 5, 6, 7, and 8 of the Rules Governing Section 2255 Proceedings for the United States District Courts. Further, the Court should also direct the

---

[1] And in some instances fail to respond at all.

[2] Movant maintains that such hearing should be before a different judge. She recognizes that the Court has already denied her motion to reassign and intends no disrespect by her continuing objection to this 2255 proceeding being handled by Judge Gary Fenner. Movant simply notes her request to preserve the issue for appellate review should such be necessary.

Government to file the record in this case in compliance with Rule 5 of the Rules Governing Section 2255 Proceedings for the United States District Courts.

As an initial matter, where the Suggestions in Opposition dispute a fact pled by Movant in her motion, Movant denies the facts as alleged by the Government. Movant specifically relies on, and incorporates by reference as if fully set forth herein, her 2255 Motion and all exhibits and attachments thereto. (D.E. 71 and Exhibits 1-35). Movant also incorporates by reference as if fully set forth herein the contents of her Motion to Reassign, Reply to Response to the Motion to Reassign, and proceedings thereon. (D.E. 41, 46, 50, 53, 59, 65).

## I. Introduction

At this summary stage of proceedings, the court is required to presume the facts pled by Movant (including the facts as stated in the declarations and exhibits) as true and to draw all reasonable inferences in her favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242 (1986). In this proceeding, 28 U.S.C. § 2255 (b) requires the Court to grant an evidentiary hearing to determine the issues and thereafter make findings of fact and conclusions of law unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. The case of *Machibroda v. United States*, 368 U.S. 487 (1962) is instructive. In *Machibroda*, the Movant alleged that his guilty plea was unconstitutional because it was procured through promises from the Assistant United States Attorney who, Movant alleged, had personally visited him at the jail and assured him that he would receive no more than twenty years imprisonment, that the district court judge had agreed to the deal, but that the Movant should not tell his lawyer about the secret deal. In response to the motion, the Assistant United States Attorney filed an affidavit denying the allegations. Though the United States Supreme Court characterized the factual allegations of

the Movant in *Machibroda* as "improbable" the Court found that the district judge was in error for failing to grant an evidentiary hearing. The Court held:

> We think the District Court did not proceed in conformity with the provisions of 28 U.S.C. s 2255, 28 U.S.C.A. s 2255, when it made findings on controverted issues of fact without notice to the petitioner and without a hearing. *United States v. Hayman*, 342 U.S. 205, 220, 72 S.Ct. 263, 96 L.Ed. 232. The statute requires a District Court to 'grant a prompt hearing' when such a motion is filed, and to 'determine the issues and make findings of fact and conclusions of law with respect thereto' unless 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' This was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court. The factual allegations contained in the petitioner's motion and affidavit, and put in issue by the affidavit filed with the Government's response, related primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light. Nor were the circumstances alleged of a kind that the District Judge could completely resolve by drawing upon his own personal knowledge or recollection.

*Machibroda v. United States*, 368 U.S. 487, 494-95 (1962). The Court held that even in a "marginal" case, where "specific and detailed" factual allegations have been made, the Court is required to hold an evidentiary hearing. *Id.*

This law has remained unchanged and in fact, Movant is not required under the law to file a Traverse where, as here, the pleadings establish a genuine factual controversy. The advisory committee notes to Rule 5 of the Rules Governing Section 2255 proceedings state:

> There is nothing in § 2255 which corresponds to the § 2248 requirement of a traverse to the answer. Numerous cases have held that the government's answer and affidavits are not conclusive against the movant, and **if they raise disputed issues of fact a hearing must be held.** *Machibroda v. United States*, 368 U.S. 487, 494, 495 (1962); *United States v. Salerno*, 290 F.2d 105, 106 (2d Cir.1961); *Romero v. United States*, 327 F.2d 711, 712 (5th Cir.1964); *Scott v. United States*, 349 F.2d 641, 642, 643 (6th Cir.1965); *Schiebelhut v. United States*, 357 F.2d 743, 745 (6th Cir.1966); and *Del Piano v. United States*, 362 F.2d 931, 932, 933 (3d Cir.1966). None of these cases make any mention of a traverse by the movant to the government's answer. As under Rule 5 of the § 2254 rules, there is no intention here that such a traverse be required, except under special circumstances. See advisory committee note to Rule 9.

*Id.* (emphasis added).

The Eighth Circuit has followed these legal principles and reversed two federal capital cases from Missouri where the district court failed to grant an evidentiary hearing. *See United States v. Nelson,* 347 F.3d 701 (8th Cir. 2008); *Sinistera v. United States*, 600 F.3d 900 (8th Cir. 2010).

Two weeks ago, the Tenth Circuit reversed the holding of a district court judge in the Eastern District of Oklahoma who denied a hearing in a federal capital 2255 case alleging constitutionally ineffective assistance of counsel at the penalty phase of the trial. *United States v. Barrett*, No. 12-7086, 2015 WL 4926800 (10th Cir. Aug. 19, 2015). In that case, the Court found that "[t]aking Defendant's proffered mitigation evidence as true, it is sufficient to require an evidentiary hearing." *Id*., at *19.

The record in this case is already voluminous. At this stage, it would not serve the Court for Movant to simply restate what has already been stated. The factual disputes are clear. Due process and the constitution require this Court to set this case for an evidentiary hearing where the evidence can be tested in court and the witnesses subjected to cross examination. Thereafter, the Court should set a schedule for post-hearing legal briefing.

## II. The Government's Suggestions in Opposition Are Not Responsive to the Claims as Pled in the Motion

### A. The Government's Suggestions in Opposition Mischaracterize, Misconstrue, and Misapprehend Most of Movant's claims.

Movant's 2255 Motion speaks for itself as to her legal theories and the facts which underlie her constitutional claims for relief. Throughout its suggestions, the Government misapprehends or recasts many of Movant's claims and then proceeds to answer their newly-framed claims. Movant cannot reply to claims she did not raise.

As but one example, pages 59-133 of the § 2255 Motion contains a summary of the facts which Movant relies on to support her claim that she received constitutionally ineffective assistance of counsel pre-trial, at trial, and at sentencing.[3] The facts are described in chronological fashion and provide the predicate necessary for understanding Movant's overarching claim of ineffective assistance of counsel. The Government's suggestions parse the individual pages and take the facts on those pages out of context. On p. 84 the Government alleges that Movant claims that trial counsel was ineffective for abandoning the "Tommy Defense." For that proposition, it cites to page 83 of the 2255 Motion. Page 83 of the Motion does indeed discuss how trial counsel abandoned the "Tommy Defense." But the 2255 Motion does not claim that trial counsel was ineffective for abandoning the defense. The Motion alleges that trial counsel was ineffective for announcing in open court –before he had evidence to support the claim -- that he had solved the case and that Tommy was in fact guilty of the murder, and ineffective for planting the notion in Movant's fragile psyche that her hallucination of someone else being present with her at the crime scene was in fact a reality and moreover that person was Tommy.[4]

This professional error was as cascading as it was catastrophic. The Government went to Movant's mother and Tommy and informed them that Lisa was trying to pin the murder on Tommy. The result was that Judy Shaughnessy was able to shut down access to crucial evidence of Lisa's torturous upbringing. Further, the fact that trial counsel continued on with this defense for so long further exacerbated Movant's already fragile mental state. Movant already had a tenuous hold on reality and part of her mental illness is an inability to separate reality from her delusions and hallucinations. So once the idea that it was Tommy who killed Bobby Jo Stinnett

---

[3] Pages 1-58 of the motion are also incorporated into the factual support for the IAC claims.
[4] Neither the Government nor Mr. Duchardt deny that Mr. Duchardt still believes that Tommy is the culprit.

was firmly planted in Movant's brain and the defense prematurely disclosed in open court, the Government was able to capitalize on this objectively unprofessional error by arguing that Movant was simply a manipulative liar and not mentally ill.[5]

So, it is clear that Movant did not allege that counsel was ineffective for failing to present the "Tommy Defense." Mischaracterizaions such as these permeate the Government's Suggestions making it impossible to meaningfully reply. Like Mr. Duchardt, the Government's Suggestions are filled with *ad hominem* attacks on habeas counsel and Movant along with pejorative characterizations of the claims in the motion. Movant will not respond in kind, nor can she reply to characterizations that serious claims of constitutional error are "ludicrous." Suggestions, at 94.

### B. The Government's Suggestions Misunderstand the Law Regarding Ineffective Assistance of Counsel

The Government suggests that the Court should use the test in *Lockhart v. Fretwell*, 506 U.S. 364 (1993) to assess Movant's claim of constitutionally ineffective counsel. The Government fails to mention that the *Fretwell* decision was limited by the Supreme Court in *Williams v. Taylor*, 529 U.S. 262 (2000). There the court wrote:

> Cases such as *Nix v. Whiteside*, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), and *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel does deprive the defendant of a substantive or procedural right to which the law entitles him. In the instant case, it is undisputed that Williams had a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence that his trial counsel either failed to discover **or failed to offer**.

*Williams*, 529 U.S. at 393 (emphasis added).

[5] Here, the Government says "wicked and evil." Suggestions at 109.

The test as described by the United States Supreme Court is:

> Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, 466 U.S., at 687, 104 S.Ct. 2052, with performance being measured against an "objective standard of reasonableness," *id*., at 688, 104 S.Ct. 2052, "under prevailing professional norms," *ibid*.; *Wiggins v. Smith*, *supra*, at 521, 123 S.Ct. 2527. This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation.

*Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005). Not unlike the case here, the lawyers in *Rompilla* conducted an investigation and presented a case in mitigation.

> This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase. None of the sources proved particularly helpful.

*Rompilla*, 545 U.S. at 381. Even though the family members of Rompilla had been less than forthcoming and Mr. Rompilla was unhelpful to his lawyers, the Court found that Rompilla had proven a claim of ineffective assistance of counsel and ordered his sentence set aside.

These principles were reaffirmed *Porter v. McCollum*, 130 S. Ct. 447, 455 (U.S. 2009). In *Porter,* trial counsel was found ineffective where "the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." *Porter*, 558 U.S. at 32.

The Court in *Porter* recognized that "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.' *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)." *Porter*, 558 U.S. at 40. The key word being "thorough." It is not enough that counsel conduct some investigation.

The following year, the Supreme Court once again reaffirmed the principles in *Williams* and *Rompilla*.

> We have never limited the prejudice inquiry under *Strickland* to cases in which there was only "little or no mitigation evidence" presented, App. to Pet. for Cert. 30B. [We have] found deficiency and prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase. *E.g., Williams, supra*, at 398, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (remorse and cooperation with police); *Rompilla v. Beard*, 545 U.S. 374, 378, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (residual doubt).

*Sears v. Upton*, 561 U.S. 945, 954 (2010). The *Sears* court further clarified that once the investigation is completed professional norms require the lawyer to read, assess, and integrate that evidence into a holistic theory of defense. *Id.*, at 951.

In *Martel v. Clair*, ___U.S.___, 132 S. Ct. 1276 (2012), the Supreme Court explained the heightened standard for counsel in capital cases that is guaranteed by federal statute. The Court observed:

> In 1988, Congress enacted the legislation now known as § 3599 to govern appointment of counsel in capital cases, thus displacing § 3006A for persons facing execution (but retaining that section for all others). See Anti–Drug Abuse Act, 102 Stat. 4393–4394, 21 U.S.C. §§ 848(q)(4)–(10) (1988 ed.) (recodified at 18 U.S.C. § 3599 (2006 ed. and Supp. IV)). The new statute grants federal capital defendants and capital habeas petitioners enhanced rights of representation, in light of what it calls "the seriousness of the possible penalty and ... the unique and complex nature of the litigation." § 3599(d) (2006 ed.). Habeas petitioners facing execution now receive counsel as a matter of right, not an exercise of the court's discretion. See § 3599(a)(2). And the statute aims in multiple ways to improve the quality of representation afforded to capital petitioners **and defendants** alike. Section 3599 requires lawyers in capital cases to have more legal experience than § 3006A demands. Compare §§ 3599(b)–(d) with § 3006A(b). Similarly, § 3599 authorizes higher rates of compensation, in part to attract better counsel. Compare § 3599(g)(1) with § 3006A(d) (2006 ed. and Supp. IV). And § 3599 provides more money for investigative and expert services. Compare §§ 3599(f) (2006 ed.), (g)(2) (2006 ed., Supp. IV), with § 3006A(e) (2006 ed. and Supp. IV). As we have previously noted, **those measures "reflec[t] a determination that quality legal representation is necessary" in all capital proceedings to foster "fundamental fairness in the imposition of the death penalty**." *McFarland*, 512 U.S., at 855, 859, 114 S.Ct. 2568.

*Martel*, 132 S.Ct. at 1284-85 (emphasis added). *Compare Christeson v. Roper*, ___U.S.___, 135 S. Ct. 891 (2015).

The constant theme that runs through the Supreme Court's jurisprudence is that in a capital case, the defendant is entitled to heightened due process and to an individualized sentencing determination that presents a true picture of the defendant's character and background. Troubled background and mental illness are routinely found by courts to be compelling mitigation. As the Tenth Circuit recently wrote, "evidence of mental impairments 'is exactly the sort of evidence that garners the most sympathy from jurors' … It enables counsel to 'explain to the jury [why] the defendant may have acted as he did[,] …connect[ing] the dots between, on the one hand [his] mental problems, life history and circumstances, and personal history and, on the other, his commission of the crime in question.'" *Barrett*, 2015 WL 4926800, at *21 (quoting *Smith v. Mullin*, 379 F.3d 919. 942 (10th Cir. 2004) and *Hooks v. Workman*, 689 F.3d , 1204 (10th Cir. 2012).

The *Strickland* prejudice inquiry requires the court to

> "[C]onsider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [§ 2255] proceeding—and reweigh it against the evidence in aggravation." *Porter*, 130 S.Ct. at 453–54 (brackets and internal quotation marks omitted). This is a "probing and fact-specific analysis," which "will necessarily require a court to 'speculate' as to the effect of the new evidence." *Sears*, 561 U.S. at 955–56. But **we need not be certain** that the omitted evidence **would have changed** the outcome of the proceeding: **it is sufficient if confidence in the outcome has been undermined**. *See Byrd*, 645 F.3d at 1168.

*Barrett*, 2015 WL 4926800, at *19 (emphasis added).

Here, the Government's does not engage with the evidence as produced in the motion and the exhibits attached to the motion. For the Government to prevail at this summary stage, it is not sufficient to simply disagree with the facts as pled. Moreover, it is not enough to argue, as the

Government does here, that the crime is simply too heinous and that "if the death sentence was not appropriate in her case, it would be difficult to conceive of a case where a death sentence could lawfully or constitutionally be imposed." As a matter of fact there are at least fourteen cases similar to Montgomery's all of which resulted in a sentence of less than death.[6] Movant is the only woman convicted of this type of crime who has been sentenced to death. Further, the recent life verdict in the James Holmes case in Colorado gives lie to the Government's position.

The Supreme Court has never held that trial counsel is excused from conducting a professionally reasonable pre-trial investigation or from presenting a professionally reasonable defense simply because the facts of the crime are difficult. For instance, in *Williams v. Taylor*, Mr. Williams committed a home invasion, ordered both victims to remove their clothes, held them captive while ransacking the home, raped one of his victims, and then forced them into a thicket where they were shot. *Williams v. Taylor*, 529 U.S. at 424-425. In *Wiggins v. Smith*, Mr. Wiggins beat, drowned, and drenched the 77 year old victim with lye or ammonia. *Wiggins v. State*, 352 Md. 580, 585-586 (Md. 1999). Mr. Rompilla, who had a prior conviction for rape, stabbed and set his victim on fire. *Commonwealth v. Rompilla*, 539 Pa. 499, 505-506 (Pa. 1995). Mr. Porter stalked his victim, shot her, and pointed his gun at her daughter, taunting "Boom, boom, you're going to die." *Porter v. State*, 564 So. 2d 1060, 1061-62 (Fla. 1990). In *Sears v. Upton*, Sears abducted the victim from a parking lot with brass knuckles, handcuffed her, drove her across state lines, raped her, and despite her pleas for her life, stabbed her repeatedly five hours later. *Sears v. State*, 270 Ga. 834 (Ga. 1999). Despite the heinousness of these facts, in each case the Supreme Court found that there was a reasonable probability that the mitigating

[6] *Report: Fetal Abduction Cases on the Rise*, AJC.com, March 20, 2015, available at http://www.ajc.com/news/news/national/report-fetal-abduction-cases-rise/nkbR7/ (last checked September 1, 2015).

evidence not presented – including evidence of mental illness – would have caused at least one juror to vote for life.

**C. The Government Misunderstands the Scope of Relief Available Under 28 U.S.C. §2255. Movant's claims are cognizable because they require the consideration of facts outside the record and/or Movant has cause to overcome any procedural default due to ineffective assistance of trial and/or appellate counsel.**

The United States Supreme Court has recognized that claims which require development outside the trial record are cognizable in post-conviction proceedings. While ineffective assistance of counsel and *Brady* claims are the most recognized of these claims, they are not the only claims that may be raised in a § 2255 proceeding. The Court has recognized that claims which involve extra-record evidence are best suited for § 2255. *See e.g. Massaro v. United States*, 538 U.S. 500, 504-06 (2003)(internal citation omitted).

Movant's claims regarding the removal of Judy Clarke, for example, require extra-judicial information that was not available at the time of trial. *See* Motion to Reassign, Reply to Response to the Motion to Reassign, and proceedings thereon. D.E. 41, 46, 50, 53, 59, 65.

Movant's claim that she is incompetent to be executed under *Ford v. Wainwright*, 499 U.S. 399 (1986) is cognizable in a § 2255 proceeding, contrary to the Government's allegation, though it may not be ripe for adjudication at this time. *See Stewart v. Martinez-Villareal,* 523 U.S. 637 (1998); *Compare Panetti v. Quarterman,* 551 U.S. 930 (2007).

Similarly, Movant's claims of structural error regarding the composition of the grand and petit juries require evidence outside the record and failure to address these claims would be error.

Furthermore, to the extent that any claim raised by Movant should have been raised on initial submission, Movant is entitled to an evidentiary hearing on the issue of whether trial and/or appellate counsel's ineffectiveness provides cause for the procedural default. *See*

*Coleman v. Thompson, 501 U.S. 722 (1991); see also McQuiggin v. Perkins,* ___ U.S.___, 133 S.Ct. 1924 (2013).

### III. Exhibits to Suggestions in Opposition Demonstrate the Existence of Material Factual Disputes

The Government supports its position with: a) a table summary that appears to be counsel's work product document which is incomplete, misunderstands and mischaracterizes Movant's factual and legal claims, is lacking in reliable support in many areas, and should be wholly discounted; b) a statement from appointed trial counsel Frederick Duchardt which is conclusory in nature and contradicted by other documents in the case;[7] and c) a statement from appointed trial counsel John P. O'Connor which is conclusory and, as is the case with Mr. Duchardt, also contradicted by other documents in the case. The statements of Duchardt and O'Connor were obtained over counsel's vigorous objection. Counsel Duchardt engaged in extraordinary lengths to conduct his own investigation and discovery before drafting his statement. Despite the inordinate amount of time that Mr. Duchardt represents he spent in preparation of his 106 page statement, he fails to offer specific facts to attempt to rebut the factual allegations in Movant's §2255 motion and exhibits. Mr. Duchardt's statement clearly details the personal affront he has experienced at being the subject of an ineffective assistance of counsel claim and he goes to great length to personally attack the credibility of habeas counsel for Movant. The tenor and tone of Mr. Duchardt's statement can and should be considered when assessing its credibility. Much of Mr. Duchardt's statement contains *ad hominem* attacks on "current counsel" for Movant. Mr. Durchardt goes to extreme and unusual lengths to argue the

[7] See e.g., Exhibit 1, Affidavit of Russell Stetler; Exhibit 2, Affidavit of David Owen; Exhibit 3, Dr. Dean Delis contract; Exhibit 4, Dr. Judith Hermann Contract; Exhibit 5, Email from Federal Defender Laine Cardarella to Frederick Duchardt; Exhibit 6, Declaration of Desiree Bowman Offutt; Exhibit 7, Juror #129 Jury Questionnaire; Exhibit 8, Deposition of Ray Conrad; Exhibit 9, May 2006 Duchardt Time Records; Exhibits 1-35 of the Movant's "Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence and for New Trial," D.E. 71; and documents filed in support of Motion to Reassign, D.E. 41, 46, 50, 53, 59, 65.

Government's case. His defensiveness should give this Court pause. Movant has already moved to strike portions of the affidavit, D.E. 131,[8] and is at the very least entitled to a hearing where Mr. Duchardt may be cross-examined about the contents of his statement.

Mr. Duchardt's conduct in the preparation of his statement, conduct where he represented to be acting on behalf of Mr. O'Connor as well, calls into question his credibility and/or his memory of certain issues relating to his representation of Movant. Though most of Mr. Duchardt's statement is conclusory and fails to engage with the evidence and arguments presented by Movant, several portions of the statement call into question his memory on certain core facts and/or his truthfulness and those portions support Movant's entitlement to a hearing on disputed facts.[9]

For example, Mr. Duchardt claims that Juror #129 "appeared to have difficulty understanding questions and expressing herself in English." Suggestions in Opposition at 108 (quoting Duchardt Statement). In fact, Juror #129's answers to the jury questionnaire contradicts this assertion in a number of ways. Exhibit 7, Juror 129 Questionnaire. First, the juror was able to read and provide answers to the 39 page questionnaire. *Id.* Further, in response to Question #11, Juror 129 stated that when asked to learn a new task her preferred method of educating herself was to "read any information I could get on the subject." *Id.* In response to Question #26, she indicated that her favorite authors include Giovani Boccaccio,[10] Dante Aligheieri,[11] Pablo Neruda,[12] Homero.[13] *Id.* The last book the juror had read was The Divine Comedy by Dante. *Id.* The juror was currently reading El Decameron by Giovanni Boccaccio. *Id.* In response to

[8] Movant incorporates the arguments made in this Motion as if fully set forth herein.
[9] This should not be read to mean that Movant suggests that Mr. Duchardt is willfully lying in his statement, but there are factual averments made by Mr. Duchardt that do not square with the facts and evidence.
[10] Author of The Decameron and On Famous Women.
[11] Author of the Inferno.
[12] Poet and winner of the 1971 Nobel Prize in Literature.
[13] Author of the Iliad and the Odyssey.

question #27, her three favorite books were *The Iliad*, *The Divine Comedy*, and *Dragon's Eye*.[14] *Id.*

Additionally, Mr. Duchardt alleges that the Juror's answer to question #41 was "very pro-death penalty, but was tempered by the phrase God in the only person who is charge of giving or taken (sic) a live (sic)" and that the juror "expressed misgivings about mental defenses." Suggestions in Opposition at 108-109. The questionnaire as a whole does not support these conclusions. Question #41 asked each veniremember to "describe your feelings about the death penalty in your own words. Please describe how strong are those feelings and how long you have had them." Exhibit 7. The juror's full response was "I think that the person who deserve that sentence is because it had committed a very serious crime. I believe that God is the only person who is in charge of giving or taken a live." *Id.* Question #42 asked the veniremembers to rate their feelings about the death penalty and provided 8 options in increasing levels of support for the death penalty. *Id.* Options a-c were against the death penalty and options e-h were in favor. *Id.* Juror 129 chose option d, which was neutral on the death penalty. *Id.* Elsewhere on the questionnaire, the juror indicated that she was politically "liberal," supported gun control, and that she received her written news from the Pitch magazine which is an alternative newspaper in Kansas City. *Id.* The juror's answers to questions about crime indicated that she believed that mental illness was a major contributor to the cause of crime and that the best way to address crime was to have more control over its causes. *Id.* Put simply, Juror #129's answers do not support the conclusion that she was "very pro-death penalty" or that she would be hostile to a

[14] By Stephen King.

mental disease or defect defense. This is but one example of Mr. Duchardt's assertions failing to align with demonstrable facts.[15]

Mr. O'Connor's affidavit is brief and conclusory offering little in the way of facts. Mr. O'Connor's affidavit fails to conclusively refute the factual and legal allegations in Movant's motion. Mr. O'Connor's affidavit is similarly refuted by Movant's evidence.

The dispute between Movant's proof and the facts as alleged by the Government entitle Movant to a hearing. *Machibroda*, 368 U.S. at 494-95. Though Movant has not pedantically outlined each material dispute between the facts as alleged in her Motion and the facts as Mr. Duchardt recalls them, even the example cited above is sufficient for this Court to determine Movant is entitled to a hearing on her ineffective assistance of trial counsel claims.

### A. Court-Ordered Affidavit of David Owen Contradicts the Statements Proffered by Duchardt and O'Connor

Though the Government sought and received an affidavit from trial counsel, David Owen, they chose not to file it. Exhibit 2, Affidavit of David L. Owen, Jr. While Movant does not endorse every fact in Mr. Owen's affidavit, his affidavit refutes many of the statements made by Mr. Duchardt and Mr. O'Connor and supports many of Mrs. Movant's claims. At a minimum, Mr. Owen's affidavit further establishes the existence of material fact disputes necessitating a hearing.

For example, Mr. Owen states in his court-ordered affidavit:

> Early on in the representation of Lisa Montgomery the issue of competency to stand trial was raised among the defense team. Prior to Judy Clarke's entry into the case, there was no medical and/or psychological testing done which would have supported a motion for a declaration of incompetence. Susan Hunt and I raised this issue with Judy Clarke and steps were being taken to obtain the

[15] Additional examples include, but are not limited to: disputes between Mr. Duchardt and Dr. Logan regarding Dr. Logan's testimony and Duchardt's failure to provide Dr. Logan with necessary information; Mr. Duchardt's general denial that he misled the court about Dr. Ramachandran's diagnosis of pseudocyesis but failure to explain away the evidence from his timesheets and the transcript of proceedings.

> appropriate information to present to an expert prior to an examination for mental competency. However, once Fred Duchardt took over the case and the issue was raised with him, he proclaimed he would be handling all mental health matters with **his experts**. When no discernible action was being taken and the issue was raised again about Lisa Montgomery's competency to stand trial, Fred Duchardt would claim it was being dealt with by the experts. All of the defense team believed she met the definition of incompetent as she was incapable of assisting in her defense due to her mental issues and inability to relate the events of the crime or her past childhood and upbringing. Furthermore, as Fred Duchardt was in effect lead counsel, no other defense team member was authorized to file any pretrial motions.

Exhibit 2 at 16-17 (emphasis added).

Mr. Owen went on to explain that "all decisions concerning Lisa Montgomery's mental health issues for the mitigation case were [Duchardt's] responsibility and **no assistance** from the other defense team was requested **or accepted**." *Id*. (emphasis added).[16] Mr. Owen further explains that "early on that Fred Duchardt was focusing solely on brain imaging and PET scans." *Id*. at 17-18. Mr. Owen is very critical of Dr. Gur and stated that "because Fred Duchardt did not spend any time in pretrial preparation with Dr. Gur his demeanor on the witness stand was atrocious and his testimony did more harm than good." *Id.*, at 18.

Mr. Owen details in his affidavit the fact that while pseudocyesis had been postulated as a theory prior to Mr. Duchardt's entry into the case[17] the theory had been discarded because Movant's computer usage "was not consistent with that theory" and "negat[ed] any real possibility this theory would be accepted by either the defense experts or the jury." *Id.*, at 14. Mr. Owen states in his affidavit that the trial team prior to Mr. Duchardt's entry into the case was pursuing evidence of fetal alcohol syndrome because of evidence that Movant's mother drank extensively during her pregnancy. Additionally, Mr. Owen states:

[16] Mr. Owen explains that John O'Connor's role was limited to investigation of the offense and presentation during the guilt phase of the trial and that Mr. O'Connor was largely uninvolved with the development of the mitigation/sentencing portion of the case. Exhibit 2 at 11.

[17] Mr. Duchardt claims to have come up with this defense on his own.

> Another theory concerned the symptoms exhibited and expressed by Lisa Montgomery of PTSD, severe headaches, bi-polar disorder, etc. Because these symptoms were supportive of a mental disease or defect, it was my opinion they needed to be presented to the jury in both the guilt and mitigation phases of the trial. In the guilt phase, I believed it would be beneficial [given] the fact Lisa claimed to have "vague memories" of someone else being with her at Bobby Jo Stinnent's house at the time of the offense, thus presenting evidence of either delusions or hallucinations. Had an expert been retained to address these issues it would have been evidence of a mental disease or defect. In the mitigation phase, I felt the more psychological issues we presented the better chance the jury would see just how damaged Lisa Montgomery was mentally and emotionally thus giving the jury sound reasons to avoid imposing the death penalty. Unfortunately, Fred Duchardt was solely focused on physical brain damage and abandoned these theories.

*Id.*, at 15.[18]

Mr. Owen confirms that, "Prior to Ms. Clarke's removal from the case, she had arranged for a couple of experts, Dr. Dean Delis and Judith Herman. I do not remember why, after Ms. Clarke's departure, they did not continue to serve as experts in the case." *Id.*, at 10.

Mr. Owen states that once Mr. Duchardt came on the team "[w]e had a few team meetings; however, they were not on a regular basis and John O'Connor did not attend most of them." *Id.*, at. 11.

Mr. Duchardt claims to have never been told that Dr. Delis and Dr. Herman had been contracted to work on the case. Mr. Duchardt is skeptical of the existence of such contracts because, he claims, they are not contained in the "database" of documents collected by the trial team. After being informed by Federal Public Defender Laine Carderella that her records reflect that money was set aside for these experts, see exhibit 5, Mr. Duchardt grudgingly admits that the experts must have been retained. However, Mr. Duchardt fails to explain why they experts were dismissed by Mr. Owen two days after Duchardt was appointed on the case. *Compare*

[18] Mr. Owen states in his affidavit "at no time did Lisa Montgomery ever directly acknowledge it was Tommy Kleiner who was with her[.]" *Id* at 15.

Exhibit 5, Email from Laine Cardarella (David Owen released the funds for Delis and Herman on 5/25/2006) and DE 89 in Case No. 5:05-cr-06002 (appointed Mr. Duchardt on 5/23/2006).

Mr. Duchardt's time records also cast doubt on the credibility of his current statement. Mr. Duchardt's records reflect that on 5/16/2006 he had a 12 minute conversation with Judge Maughmer's staff about being appointed on the case. Exhibit 9, Duchardt May, 2006 time records. He next had a 12 minute conversation with John O'Connor followed by an 18 minute conversation with Matt Whitworth. *Id.* He then had a 30 minute conversation with Judy Clarke and a 24 minute conversation with Susan Hunt. *Id.* He then spent 6 ½ hours reading the pleadings in the case and 72 minute researching the issue of Judy Clarke's removal from the case. *Id.* After spending 9.3 hours in the case, prior to appointment, prior to discussing the case with any of the investigators or mitigation specialists, prior to meeting the client, Mr. Duchardt contacted the office of Dr. Ruben Gur to consult with him on the case. *Id.* On May 19, Mr. Duchardt's records reflect that he conducted 90 minutes of "investigation to find a neuropsych testing expert." *Id.* According to the federal public defender records, Dr. Delis' contract was released on May 25, 2006.

Mr. Duchardt goes on at length to describe the massive database of trial documents that the Federal Public Defender's office maintained. However, it is unclear how much of the database Mr. Duchardt actually reviewed. Mr. Duchardt's lack of knowledge of these two expert witnesses, Dr. Herman being the foremost expert in the area of trauma, is troubling to say the least. His extensive effort to lay the blame for his lack of knowledge at the feet of Ms. Clarke who had been literally barred from representing Movant by this Court is not persuasive and undermines the credibility of Mr. Duchardt's statement. Further, the fact that Dr. Delis and Dr. Herman were released after Mr. Duchardt had met with Dave Owen, lends credibility to Dave

Owen's description of Mr. Duchardt simply taking over the case and focusing on brain imaging and PET Scans. Mr. Duchardt simply eschewed any person that Judy Clarke had worked with undermining six months of preparation.

This is just but one example of the disputed facts presented by Mr. Duchardt's statement when compared to other evidence. Further, Mr. Owen's Affidavit provides yet another version of the events that led to the removal of Judy Clarke and admits that Lisa Montgomery was not consulted about the removal of Ms. Clarke and objected to her removal. Mr. Owen's Affidavit affirms that Judy Shaughnessy instructed family members not to speak with counsel for the defense, and shows that Ron Ninemire and Owen concluded that Tommy Kleiner's alibi precluded his participation in the offense but that Ms. Montgomery's hallucinations should have been pursued through the lens of her mental illness. Mr. Owen also confirms that Mr. Duchardt involved his wife in the case without consulting the team; misrepresented her expertise as being "an expert therapist," and that when Mrs. Duchardt sat at counsel table, Movant "displayed a certain aversion to her." Mr. Owen states that the trial team had discussed the importance of effect of Movant's medication on her emotional affect and that Mr. Duchardt claimed such could be handled by explaining the situation to the jury. Mr. Owen stated that "During the trial, Lisa did present a very flat affect and the jury probably interpreted that as 'cold-bloodness.' At no time did Fred Duchardt bring to the jury's attention the effects these medications had on Lisa's body or personal appearance." *Id*., at 19.

Mr. Owen confirms that he was upset with the presentation of the evidence in the case and called Susan Hunt during the penalty phase to say, "Lisa's story is not being told." Mr. Owen states, "The mitigation presentation was weak and the mental health evidence lacked foundational support." *Id.*

Mr. Owen's affidavit contradicts the facts as presented by the Government and demonstrates the dispute as to material facts relating to Movant's claims of fraud on the court, interference with right to counsel, and ineffective assistance of counsel. Without more and certainly in light of the rest of the proof presented, Mr. Owen's affidavit entitles Movant to a hearing on these issues.

### B. Mitigation Expert Russell Stetler's Supplemental Declaration Explains That Mr. Duchardt's Views On Mitigation Evidence And Presentation Make Him An "Outlier."[19]

Denise LeBouef and Russell Stetler each provided declarations to the § 2255 Motion. D.E. 71, Exhibits 33 and 34. The Government does not address either declaration. By failing to even mention these declarations, the Government concedes that Ms. LeBouef and Mr. Stetler[20] are experts in the area of capital defense and correctly set forth the prevailing professional norms for capital defense counsel in a capital case. By the proof produced in Mr. Duchardt's admissions and the Affidavit of David Owen, the capital defense in this case fell below prevailing professional norms.

Mr. Stetler reviewed Mr. Duchardt's statement and provided a supplemental declaration. Exhibit 1. In his supplemental declaration, Mr. Stetler addresses Mr. Duchardt's statement that the "standard mitigation defense" that the use of capital defense counsel of an expert to "synthesize a defendants background materials into a narrative, and to use that narrative as the master plan for the entire case" is the "standard playbook for national capital punishment resource counsel." Exhibit 1 at 2, *quoting* Duchardt Statement at 61, 70, 71. Mr. Duchardt denigrates the use of mitigation specialists, describing them as a "club."

---

[19] Exhibit 1, Stetler Supplemental Declaration at.3.
[20] Mr. Stetler's expert standard of care testimony was relied on in the case of *Angela Johnson v. United States*, 860 F. Supp. 2d 663 (N.D. Iowa 2012) (experienced capital trial counsel Patrick Berrigan found constitutionally ineffective).

Mr. Stetler explains in detail how Mr. Duchardt's view of mitigation specialists is outside the prevailing professional norms and how Mr. Duchardt's statement fails to address core issues raised by the 2255 Motion. Mr. Stetler writes:

> There is no "standard mitigation defense," in the sense of a template for mitigation evidence. Every case is unique, and the challenge of the mitigation function is to discover the individual human frailties that will inspire empathy on the part of jurors (and judges) in spite of "horribly aggravating evidence." There is no "standard playbook" to utilize a particular individual (such as Ms. Vogelsang) to "synthesize a defendant's background material into a narrative." However, it has long been widely recognized that such a synthesis, commonly referred to as a social history, is the cornerstone of effective mitigation presentation.

Exhibit 1 at 2. Mr. Stetler goes on to say, "Similarly, the social history is a foundation for reliable mental health assessments in capital cases." *Id*., at 3. "What Mr. Duchardt denigrates as the 'standard playbook' of capital resource counsel is simply what has been recognized by courts and mental health practitioners as a core component of the mitigation function in capital cases." *Id.*

Mr. Stetler explains how Mr. Duchardt's assertion "that the trial team's failure to synthesize a social history was of no significance because 'our database gave us a good handle on Lisa's complicated background.'" falls below prevailing professional norms. *Id., quoting* Duchardt Statement at 50. Mr. Stetler observes how Mr. Duchardt

> does not discuss how the various mental health experts could have been expected to access all the facts that had been assembled in the database, except to say that he decided "to provide the raw materials of our mitigation investigation to those associated with our case who were qualified to assess them" and he "believed that these folks could find the critical information in our mass of materials."

*Id., quoting* Duchardt Statement at 75. Mr. Stetler observes that "[a]mong learned capital counsel in federal death penalty cases, Mr. Duchardt is an outlier in his cynical view of mitigation specialists." *Id.*, at 3-4.

Mr. Stetler goes on to explain that the Judicial Conference of the United States Courts has recognized the critical role that mitigation specialists play in capital cases. While Mr. Duchardt describes the idea of a mitigation specialist as "laughable" and a "mitigation specialist club," Duchardt statement at 30, Mr. Stetler explains that "the consensus in the capital defense community [is] not to designate a 'club' of pre-certified mitigation specialists because of the heterogeneity of backgrounds in the field, but instead to articulate performance guidelines for the mitigation function of defense teams in death penalty cases." Exhibit 1 at 5. The capital defense team here, as Mr. Stetler explains, did not comply with these performance guidelines.[21]

The Government focuses on the number of witnesses (D.E. 140 at 17) and the number of mental health experts (*id.* at 5) who testified at Movant's trial as if the number is somehow relevant to the quality of the defense representation that Movant received. One of the key issues raised by Movant in her Motion for Collateral Relief is that her trial team did not have a cohesive theory of defense. The overall defense theory was that Movant suffered from pseudocyesis, a theory contradicted by Movant's statement to law enforcement at the time of her arrest (Tr. 1646). During the trial, Movant's defense team elicited testimony as to *some* of the difficulties Movant experienced during her childhood while alternately trying to portray Movant as a good and loving mother. D.E. 140 at 21, 23, 41. The jury was presented with a disjointed defense that painted Lisa Montgomery as a "fragile creature" who had been abused by her step-father, but turned out to be a hard worker and a good mother.

As explained in Mrs. Movant's §2255 Motion, her conviction and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because she was denied effective assistance of counsel in numerous ways. The defense team that represented

[21] Mr. Stetler also explains how the removal of Judy Clarke and her team of qualified salaried mitigation specialists while at the same time adding Mr. Duchardt as a third, paid attorney whose hourly rate is twice the rate of private mitigation specialists, actually resulted in an increase in expenditures in this case. Exhibit 1 at 5-8.

her at trial was egregiously ineffective for failing to comprehend the value and importance of mitigation evidence, for failing to identify and present the full scope of mitigating evidence available to them due to their blind-sided focus on the theory of pseudocyesis, for ignoring the ABA Guidelines on the development of mitigation evidence, and for failing to understand the nature and causes of Lisa Montgomery's mental illness.

As Mr. Stetler points out in his supplemental declaration, the verdict forms themselves reveal the complete failure of Movant's trial defense team as well as Mr. Duchardt's lack of knowledge of key mitigating factors, such as the abuse of Movant by her husband. Exhibit 1 at 9-10. Mr. Duchardt's implausible and inconsistent defense theories constitute ineffective assistance of counsel that prejudiced Movant.

Because Mr. Duchardt's and Mr. O'Connor's statements materially conflict with the proof presented by Movant, including proof from Movant's expert witnesses Stetler and LeBouf, a genuine issue of material fact exists as to whether counsel performed deficiently as determined by reference to prevailing professional norms and Movant is entitled to a hearing.

### C. The Facts Regarding the Removal of Judy Clarke as Counsel for Movant Remain Hotly Contested and Movant Has Not Been Afforded Sufficient Opportunity to Develop all the Facts.

While the parties agree that on October 5, 2005, David Owen moved for the admission *pro hac vice* of Judy Clarke (D.E. 63) and that Judy Clarke was admitted *pro hac vice* on October 7, 2005 (*See* Docket Sheet entry for 10/07/05), the record is not "uncontroverted that this Court was hesitant to appoint Judy Clarke" as stated by the Government. D.E. 140 at 52. In April of 2006, this Court stated during a meeting for which there is a transcript that this Court had been reluctant to appoint Ms. Clarke. Again, counsel for Movant believe that this Court, specifically Judge Gary Fenner, is a material witness with regard to this claim and, therefore, Judge Fenner

should have been recused from this proceeding and allowed another District Court Judge to handle this habeas proceeding. There is no evidence to suggest that Judge Fenner expressed any reluctance on October 7, 2005 to allow Judy Clarke to be admitted *pro hac vice* or to her working on the defense team.

It is similarly unclear what happened on April 20, 2006. The Government takes the position that "David Owen and Ray Conrad spoke with this Court about the difficulties the Montgomery defense team was having amongst each other." D.E. 140 at 53. The actual evidence established to date is that David Owen denies asking Judge Fenner to remove Ms. Clarke, insisting that Mr. Conrad did all the talking. Meanwhile, Mr. Conrad has denied even being present at such a meeting. Exhibit 8, Ray Conrad Deposition. There is no direct evidence as to who, if anyone, made an actual request to have Ms. Clarke removed from the defense team. Mr. Owen's court-ordered affidavit alleges that Judge Fenner acted unilaterally in removing Ms. Clarke. Owen's affidavit says:

> If memory serves me correctly, Ray Conrad offered, as a solution to the problem, for the Office of the Federal Public Defender to withdraw from representing Lisa Montgomery as both Susan Hunt and Judy Clarke had death penalty experience. Judge Fenner summarily rejected that idea. Susan Hunt was not present during this meeting with Judge Fenner as she was still in the hearing in another courtroom. Then, without further comment or questions, Judge Fenner picked up the phone, called CCA (where Lisa Montgomery was being housed), and told them Judy Clarke no longer represented Lisa Montgomery and was therefore not authorized to visit her.

Exhibit 2 at 9. Owen's affidavit refutes the Government's assertion that Ms. Clarke would lose a local sponsor for her *pro hac vice* status. Moreover, it belies the contention that the only solution was to remove Ms. Clarke. Mr. Owen goes on to confirm that "Lisa Montgomery was not given any prior notice these events had happened." *Id.* Mr. Owen explained how both he and Susan Hunt came to the Court within a week of the removal of Ms. Clarke and told the Court that

neither were qualified to represent Ms. Montgomery given her significant mental health issues and once again Owen suggested that he withdraw and Judy Clarke be reinstated. *Id.* This again undermines the defense that Ms. Clarke would lose her *pro hac vice* sponsor as Ms. Hunt would presumably be willing to sponsor Ms. Clarke and Mr. Owen never said he would withdraw his sponsorship. Mr. Owen further recounts the difficulty in obtaining counsel qualified to handle a case involving mental health issues such as Movant's given the way that Ms. Clarke was treated. *Id.*, at 11.

Contrary to the Government's Suggestions, Movant has not been allowed to develop the record on these matters. *See* Motion to Reassign, Reply to Response to the Motion to Reassign, and proceedings thereon. D.E. 41, 46, 50, 53, 59, 65. Therefore, an evidentiary hearing is required on this claim.

The Government relies on Susan Hunt's affidavit to support its theory that Judy Clarke was the problem within the defense team. Yet, the Government quietly ignores the fact that David Owen pushed Anita Burns off the defense team and that Susan Hunt had her own issues in trying to work with David Owen. Ms. Hunt had been appointed as learned and lead counsel, but she felt her role was not respected by David Owen and his office was controlling the case because it controlled the funding of the defense. D.E. 71-1, Declaration of Susan Hunt at 7. While Ms. Hunt said the defense team had discussed the possibility of Judy Clarke leaving the defense team, she did not believe any final decision had been made at the time that David Owen and Ray Conrad allegedly went to speak to Judge Fenner. The end result of whatever conversation occurred was the removal of Judy Clarke from the case without any opportunity for Ms. Clarke, Ms. Hunt, or Movant to be heard on this issue.

The Government then inserts over six pages of single-spaced text taken directly from the

affidavit of trial counsel Fred Duchardt. Mr. Duchardt was not present for any of the conversations or meetings pertaining to Judy Clarke. Rather, Mr. Duchardt paraphrases and opines on Movant's claim without any factual knowledge that is relevant to the claim. Mr. Duchardt erroneously concludes that Judge Fenner had the option of choosing to remove Ms. Clarke from the defense team despite the fact that she had established an attorney-client relationship with Movant. Mr. Duchardt's legal analysis is erroneous. *See Martel*, 132 S.Ct. 1276; D.E. 41, 46, 50, 53, 59, 65.

With the removal of Judy Clarke, the defense team was basically starting over in May of 2006. In removing Judy Clarke from Movant's defense team, the district court deprived Movant of the effective assistance of counsel at the pretrial, guilt, and penalty phases of her trial in violation of 18 U.S.C. §§ 3005 and 3006A as well as the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Pursuant to 18 U.S.C. §3005, Lisa Montgomery was entitled to two attorneys, at least one of whom was required to be "learned in the law applicable to capital cases." Movant was eligible for appointed counsel in accordance with 18 U.S.C. §3006A. In *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006), the United States Supreme Court recognized that "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, *or who is willing to represent the defendant even though he is without funds.*" (*Emphasis added*) (Citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624- 625, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989)). The Supreme Court noted that the Sixth Amendment "commands, not that a trial be fair, but that a particular guarantee of fairness be provided – to wit, that the accused be defended by the counsel he believes to be best." *Id*., at 146. The Supreme Court held that the "right at stake here is the right to counsel of choice . . . ." *Id.*

Where a defendant is deprived of counsel of her choice, her Sixth Amendment rights are violated and no "additional showing of prejudice is required to make the violation complete." *Id.* The Court continued, "Deprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id*., at 148.

Movant was not asking that different counsel be appointed for her in April of 2006. Movant understands that the "right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Id.,* at 151 (Citing *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Caplin & Drysdale*, 491 U.S. at 626). Rather, Movant had counsel with whom she was satisfied. In fact, she was beyond satisfied with Judy Clarke – Ms. Clarke was the primary attorney she trusted. Yet, the District Court removed Ms. Clarke without hearing from Ms. Clarke and without affording Movant a meaningful opportunity to be heard on this matter. By the time the District Court spoke with Movant, an Order terminating Judy Clarke from the defense team had already been entered. Contrary to the Government's Suggestions, Ms. Montgomery did complain about the removal of Ms. Clarke from her team in a letter to the Court which was ignored. D.E. 71-8. The District Court took the additional step of barring telephone communication between Movant and Ms. Clarke so they could not discuss the District Court's action. Moreover, when Movant was taken before the District Court judge on Friday, April 21, 2006, it was to be informed of the judge's decision, not to be heard on this matter.

Because the evidence presented by Movant has established that a genuine issue exists as to material facts upon which this Court made the determination to remove Judge Clarke as counsel for Movant, Movant is entitled to further proceedings, including an evidentiary hearing on this issue.

## IV. CONCLUSION: The Government's Suggestions Do Nothing To Rebut The Evidence Presented By Movant In Support Of Her Motion Therefore Further Proceedings Are Warranted.

This Court should: 1) Order the Government to file the record in this case; 2) Grant Movant leave to conduct discovery; 3) Order an evidentiary hearing; and 4) Vacate Movant's unconstitutional conviction and sentence.

Respectfully submitted,

/s/ *Lisa G. Nouri*
LISA G. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

/s/ *Kelley J. Henry*
KELLEY J. HENRY, Mo. Bar No. 38849
OFFICE OF THE FEDERAL PUBLIC DEFENDER
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

*Attorneys for Movant Lisa Montgomery*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 1, 2015, the above-captioned document was served electronically on Roseann Ketchmark and Phil Koppe, Assistant United States Attorneys representing the government in this matter, through the Court's CM/ECF filing system.

/s/ *Lisa G. Nouri*