**SUPPLEMENTAL DECLARATION OF RUSSELL STETLER**

I, RUSSELL STETLER, declare as follows:

1. At the request of federal habeas corpus counsel for Lisa Montgomery in a case pending in the United States District Court, Western District of Missouri, *Montgomery v. United States*, Case N. 4:12-cv-08001-GAF, I provided a declaration on August 17, 2013. That declaration summarized the prevailing professional norms at the time of Ms. Montgomery's prosecution (2004 to 2007), including the standard of care in capital mental health evaluations; assessed the performance of her trial counsel in light of those norms; and addressed how the changes in Ms. Montgomery's pretrial representation and the composition of her defense team influenced the effectiveness of her ultimate representation at trial and sentencing.

2. Federal habeas corpus counsel have asked me to review two additional documents, statements by Ms. Montgomery's trial counsel, Frederick A. Duchardt, Jr., and John P. O'Connor. Both statements were prepared on September 2, 2014, and were filed on February 2, 2015, as Document 140-2 and 140-3 respectively. I will confine my comments to Mr. Duchardt's statement.

3. Mr. Duchardt insists that "the combined major diagnoses" of pseudocyesis, major depression, borderline personality disorder, and post-traumatic stress disorder were not "exotic." Duchardt Statement at 2. At the same time, he asserts, in essence, that a bizarre crime required a bizarre defense: "the crime charged, the killing of a pregnant woman in order to steal her child, is also exotic and rare in the same mold as pseudocyesis." *Id.* at 51. Mr. Duchardt explains that in early 2007,

> Lisa provided intricate details about her strong beliefs that, despite having undergone a tubal fulgeration sterilization procedure many years previous[ly], she

> nevertheless experienced multiple pregnancies since then, and had even given birth on a number of occasions, including at some time during the week that Bobbie Jo Stinnett was killed. When one took all of these new details and coupled them with other information about which we were already aware, particularly the physical signs of pregnancy which Lisa demonstrated in the months leading up to the Stinnett killing, there seemed to be only one diagnosis for Lisa which made sense and told her "story," and that was pseudocyesis.

*Id.* Mr. Duchardt later adds that the "facts were so uniquely and horribly aggravating that they would overwhelmingly outweigh a standard mitigation defense, and . . . only with an explanation for such a 'rare' and 'exotic' offense could we hope to save Lisa's life." *Id.* at 61. Mr. Duchardt does not explain what he means by "a standard mitigation defense," but he later states "that it has become part of the standard playbook for national capital punishment resource counsel to utilize Ms. Vogelsang to synthesize a defendant's background materials into a narrative, and to use that narrative as the master plan for the entire case." *Id.* at 71. He refers to the social history narrative as the forensic social worker's attempt to write the "defense script for trial." *Id.* at 70.

4. There is no "standard mitigation defense," in the sense of a template for mitigation evidence. Every case is unique, and the challenge of the mitigation function is to discover the individual human frailties that will inspire empathy on the part of jurors (and judges) in spite of "horribly aggravating" evidence. There is no "standard playbook" to utilize a particular individual (such as Ms. Vogelsang) to "synthesize a defendant's background materials into a narrative." However, it has long been widely recognized that such a synthesis, commonly referred to as a social history, is the cornerstone of an effective mitigation presentation. *See, e.g., Wiggins v. Smith*, 539 U.S. 510, 524 (2003). The *Wiggins* case was tried in 1989, and in April 1994, the state post-conviction judge "observed from the bench that he could not remember a capital case in which counsel had not compiled a social history of the defendant, explaining

'not to do a social history, at least to see what you have got, to me is absolute error.'" *Id.* at 517. Similarly, the social history is a foundation for reliable mental health assessments in capital cases. *See* Russell Stetler, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. Rev. 407, 417-422 (2014), citing Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FOR. PSYCHIATRY 43 (1994), Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting It Right: Life History as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); George W. Woods et al., *Neurobehavioral Assessment in Forensic Practice*, 35 INT'L J.L. & PSYCHIATRY 432 (2012). What Mr. Duchardt denigrates as the "standard playbook" of capital resource counsel is simply what has been recognized by courts and mental health practitioners as a core component of the mitigation function in capital cases.

5. Mr. Duchardt asserts that the trial team's failure to synthesize a social history was of no significance because "our database gave us a good handle on Lisa's complicated background." Duchardt Statement at 50. He adds, "Our database work product best speaks to the effective teamwork that went into this case." *Id.* at 34. However, he also explains that Assistant Federal Defender David Owens shouldered the task of "searching the massive computer records of the case trying to find something of value we could use," but unfortunately Mr. Owens "was able to find no valuable needles after the long hours he spent searching through that haystack." *Id.* at 35. He does not discuss how the various mental health experts could have been expected to access all the facts that had been assembled in the database, except to say that he decided "to provide the raw materials of our mitigation investigation to those associated with our case who were qualified to assess them" and he "believed that these folks could find the critical information in our mass of materials." *Id.* at 75.

6. Among learned capital counsel in federal death penalty cases, Mr. Duchardt is an outlier in his cynical view of mitigation specialists. In 1998, a three-judge subcommittee chaired by the Hon. James R. Spencer of the Eastern District of Virginia prepared a report entitled, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION. The report was presented to the Committee on Defender Services of the Judicial Conference of the United States in May, and its recommendations were adopted by the Conference itself on September 15, 1998. The subcommittee identified two important categories of expert services frequently used in federal death penalty cases, but not in non-capital federal criminal cases: mitigation specialists and jury consultants. The report emphasized not only the qualifications of mitigation specialists, in terms of training and experience, but also the associated cost savings:

> *Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase.* Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant. The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal. *Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys, the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.*

Emphasis added. The report also explained:

> Mitigation specialists typically have graduate degrees, such as a Ph.D. or master's degree in social work, and have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary materials for them to review.

7. By contrast, Mr. Duchardt finds it "laughable" that there are people

> whose only real qualifications amount to having previously done capital case mitigation work, who think that they should be reverently referred to with the label of 'mitigation specialist,' that they should be able to command large per-hour fees because they tout the 'mitigation specialist' label, and that they and they alone, without any sort of process, should be allowed, on their bare say-sos alone, to deign [sic] those who should be included in their 'mitigation specialist' club and those who should be excluded.

Duchardt Statement at 33.

8. In fact, the consensus in the capital defense community was not to designate a "club" of pre-certified mitigation specialists because of the heterogeneity of backgrounds in the field, but instead to articulate performance guidelines for the mitigation function of defense teams in death penalty cases. *See* Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, published in 36 HOFSTRA L. REV. 677 (2008); *see also* Sean D. O'Brien, *When Life Depends on It*, 36 HOFSTRA L. REV. 693 (2008) (explaining the survey of capital jurisdictions and the careful process of drafting and circulating the supplementary mitigation guidelines over a multi-year period in order to reflect a national consensus among capital defense practitioners). Professor O'Brien also noted the "wide variety of backgrounds, including highly trained and experienced anthropologists, attorneys, educators, journalists, social workers, sociologists, and others with education and training in human development and behavior." *Id.* at 699.

9. Regardless of the skills that individual attorneys like Mr. Duchardt may possess in relation to the mitigation function, someone on the core capital defense team needs to be exclusively dedicated to mitigation investigation – not writing motions, reviewing discovery, litigating legal claims, and performing the myriad tasks required of every lawyer in trial preparation. Similarly, there are traditional fact (or "guilt-innocence") investigators who have acquired expertise in mitigation. But they, too, like Mr. Ninemire, have more than enough to do

in their traditional role. I discussed these issues at length in an article several years ago:

> . . . the logic behind capital defense teamwork derives from the adage "two heads are better than one."[1] A true renaissance lawyer representing a client facing the death penalty will be brilliant on her feet in the courtroom, creative in crafting original motions, scholarly in her knowledge of Eighth Amendment jurisprudence, and empathic in her capacity to build a relationship of trust with a paranoid schizophrenic client who grew up in a foreign land. The Guidelines call for a second lawyer not because the true renaissance lawyer is perceived to be deficient in any area, but because no single lawyer can possibly find the time to do everything that is needed to provide high quality representation in a capital case. Of course, it is common for lawyers with complementary skills to be paired on capital cases. But regardless of the skills of any individual lawyer, a second lawyer strengthens the representation.
>
> In the area of fact development as well, two heads are better than one.[2] An uncommonly gifted individual with expertise ranging from DNA to the DSM should not attempt to handle simultaneously the two investigative tracks that are part of every capital case: the reinvestigation of the factual allegations which constitute the capital charges, and the biographical inquiry aimed at discovering mitigating evidence that may inspire mercy or compassion in the hearts of jurors. Putting aside whether there are any such renaissance investigators, we can see at the outset that the two different tracks require two very different skill sets.
>
> A capital defense investigator's task is to deconstruct the prosecution theory of the case and turn a solved crime into an unsolved mystery, challenging all factual predicates. Typically, the investigator reviews discovery meticulously and is a skilled reader of police reports, autopsy protocols, and a wide range of forensic analyses. She must be thoroughly familiar with the law and science relating to physical evidence, including the protocols for collection, preservation, laboratory analysis, and interpretation of scientific evidence. In the twenty-first century, a capital defense investigator also needs to understand the implications of the exonerations which have shaken the criminal justice system since the advent of DNA evidence in the late 1980s.
>
> The investigator needs to be well informed about the sources of wrongful convictions – including eyewitness errors, false confessions, the perjurious testimony of jailhouse informants, and unreliable scientific testimony (both junk science and forensic fraud).[3] Thus, skilled investigation of the facts of a capital

---

[1] *See* Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help But Can't Be Delegated*, THE CHAMPION (March 2007)(outlining the diverse set of skills needed to engage in fact investigation).

[2] *Id.*

[3] *See generally* Samuel R. Gross, Kristen Jacoby, Daniel J. Matheson, Nicholas Montgomery and Sujata Patil, *Exonerations in the United States, 1989 through 2003*, 95:2 J. CRIM. L. &

crime involves more than asking a percipient witness where she was, what she saw, and for how long. Equally important, the investigator needs to find out how the witness came to identify a particular suspect, and how that identification was influenced by police procedures before and after the witness attended a lineup. The investigator needs all the old skills as well: expertise at interviewing, and an ability to knock on a stranger's door and engage the stranger in conversation, without any authority to coerce cooperation. Finally, the twenty-first century investigator needs state-of-the-art databases for locating witnesses, familiarity with legal tools like open records acts, and a methodology for comprehensive background investigation of all witnesses, especially experts.

The mitigation specialist investigates a different factual universe and needs a wholly different set of skills. The Commentary to ABA Guideline 4.1 offered this summary:

> A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.
>
> Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well documented psycho-social history of the client based on an exhaustive investigation; analyzes the

CRIMINOLOGY 523 (2005) (examining patterns presented by 340 false convictions and what this information demonstrates about who is convicted and why and the overall risk of error); and Barry Scheck, Peter Neufeld & Jim Dwyer, *Actual Innocence: Five Days to Execution and Other Dispatches from the Wrongly Convicted* (2000) (presenting ten case studies of prisoners who have been wrongfully convicted to demonstrate a series of flaws within the criminal justice system and the role of DNA evidence in exonerating prisoners).

> significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation. (Citations omitted.)[4]

Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J.L. SOC. CHANGE 237, 251-53 (2007-2008).

10. Mr. Duchardt notes that when Judy Clarke was counsel of record in Ms. Montgomery's case she had "at her disposal a cadre of experienced helpers," but Judge Fenner "chose to terminate Judy because of his ongoing questions about whether expenditure of her time as a government employee was 'necessary' in light of her being the third counsel appointed when only two counsel were called for by statute." Duchardt Statement at 7. Mr. Duchardt fails to acknowledge two realities. First, using Ms. Clarke and the salaried "helpers" who were part of her Capital Resource Counsel project would have avoided the "large per-hour fees" that he believes are paid to private mitigation specialists, *supra* ¶ 7. Second, Judge Fenner appointed Mr. Duchardt himself as third counsel, who would receive "per-hour compensation at a considerably higher rate than the norm for other court-appointed cases," without "caps on per case compensation totals." *Id.* at 38. The hourly rate for learned counsel in federal capital cases is almost double what mitigation specialists are typically paid.

11. What Mr. Duchardt does not address in his lengthy Statement is the absence of true teamwork in the period when he was responsible for preparing the trial strategy. He does not

---

[4] 31 HOFSTRA L. REV. 913, 959 (2003).

claim that the team met regularly or even scheduled regular conference calls. He points to the extensive work that the mitigation specialist did and, predictably, to her "pay records," but offers no examples to support his claim that her work "was relied upon in our presentation at trial." *Id.* at 30-31, 34. He points to the "database" as evidence of the "tremendous amount of work" done by "all members of our team," but does not explain how entering information into a database takes the place of the human interaction that is at the heart of teamwork. *Id.* at 34.

12. Mr. Duchardt asserts that he believed "going into trial, that it was 50-50 bet that the jury would find that we had met our preponderance burden of proving insanity." *Id.* at 62. He concedes that his "prowess as an oddsmaker might be questionable," but insists that he understood the applicable legal burden. *Id.* The issue is not his "prowess as an oddsmaker," but his failure to recognize (a) that insanity defenses are extremely rare,[5] (b) that such defenses rarely succeed,[6] (c) that they are even less likely to succeed with death-qualified jurors,[7] and (d) that when jurors reject the mental health evidence as an affirmative defense, they are more likely to impose a death sentence.[8] I am aware of only one other federal death penalty prosecution

---

[5] *See* Grant H. Morris, *Placed in Purgatory: Conditional Release of Insanity Acquitees*, 39 ARIZ. L. REV. 1061, 1063 (1997) (for every 1000 felony cases, insanity is pleaded in approximately nine cases and successful in only two).

[6] *See* Ira Mickenberg, *A Pleasant Surprise: The Guilty But Mentally Ill Verdict Has Both Succeeded in Its Own Right and Successfully Preserved the Traditional Role of the Insanity Defense*, 55 CINCINNATI L. REV. 943, 945 (1987) (80 percent of those found not guilty by reason of insanity had been previously hospitalized for mental illness, and between 65 and 80 percent had been previously diagnosed as actively psychotic).

[7] *See* Brook Butler & Adina W. Wasserman, *The Role of Death Qualification in Venirepersons's Attitudes Toward the Insanity Defense*, 36 J. APPLIED SOC. PSYCHOLOGY 1744 (2006) (while the vast majority of people view insanity defense with great skepticism, research has found that death-qualified venirepersons are even less receptive).

[8] *See* Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557 (1998) (denial defense doubles risk of jurors imposing death penalty); *see also* Scott E. Sundby, *The Jury As Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109

where an insanity defense was proffered, and it, too, resulted in a death sentence. *See United States v. Battle*, 173 F.3d 1343 (11th Cir. 1999). The Special Verdict Form in Ms. Montgomery's case provides some insight into how the jurors viewed the mental health evidence. No jurors found that Ms. Montgomery "committed the offense under severe mental or emotional disturbance." Only one found that her "capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law was significantly impaired, regardless of whether her capacity was so impaired as to constitute a defense to the charge." None found that her "mental health has substantially improved since her incarceration because she is now receiving psychiatric treatment, including medication, to address her condition."

I declare under penalty of perjury pursuant to 28 U.S.C. §1746, and under the laws of the States of Missouri and California, that the foregoing is true and correct and was executed this 24 day of August 2015 at Oakland, California.

RUSSELL STETLER

(need to harmonize expert and lay testimony; two thirds of witnesses who "backfired" were defense experts).