**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI ST. JOSEPH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>vs.<br><br>LISA MONTGOMERY,<br><br>Defendant/Movant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 12.CV-8001-SJ-GAF |

**AFFIDAVIT OF DAVID L. OWEN, JR.**

I, David L. Owen, Jr., being duly sworn and of lawful age, affirms as follows:

First, I must state the following is solely from memory. I have not had any files to review. When I left the Federal Public Defender's office I left all the files there as they belonged to the office and not to me personally.

Sometime in February, 2005, I was assigned to represent Lisa Montgomery in her death penalty case. Prior to this I had never been directly involved in a death penalty case.

When Ms. Montgomery was first charged with Kidnaping Resulting in Death, Mr. Raymond Conrad was the Federal Public Defender for the Western District of Missouri and I was the First Assistant. Because this event took place in the Congressional District of Sam Graves and his brother, Todd Graves, was the United States Attorney for the Western District of Missouri, we were very confident the case would be charged as a death penalty case and our office, along with outside counsel experienced in death penalty defense, would be appointed to represent Lisa.

Our office had been appointed in one prior death penalty case which was assigned to AFPD Larry Pace. During the trial and penalty phase of that death penalty case Mr. Pace did not put on any mitigation evidence and the client was sentenced to death. With this in mind, Mr. Conrad and I had a fairly long discussion as to which Assistant would be assigned the case. I had no interest in doing a death penalty case at that point in time and did not want the assignment. Ultimately it was decided AFPD Anita Burns would be assigned and I was assigned to supervise and ensure that nothing like the mishandling of the first death penalty case by Mr. Pace was repeated. Ms. Burns resented the fact I had been assigned to supervise her involvement.

Federal Public Defender Chief Investigator Ron Ninemire, who made all investigative assignments in the office, had previously served as the investigator for Larry Pace in that death penalty case. When our office was appointed by the Court on Ms. Montgomery's case, Ron Ninemire determined he would serve as the investigator in her case as well.

Ms. Susan Hunt was appointed by the Court, as learned and lead counsel, to represent Ms. Montgomery. Ms. Hunt had death penalty experience and a fairly good working relationship with the Office of the Federal Public Defender.

Lisa Montgomery, pending the outcome of the trial in this matter, was housed at Corrections Corporation of America (CCA), a private jail facility located in Leavenworth, Kansas. In February, 2005, employees of CCA, searched Lisa's cell and seized a number of letters and notes. They then turned those materials over to the U.S. Marshal's who in turn provided them to the U.S. Attorney's Office. When

this issue came to the attention of Susan Hunt she called our office and, as Ms. Burns was on vacation, I accompanied Ms. Hunt to Magistrate Maughmer's chambers for a hearing on the seizure and release to the U.S. Attorney's of the documents which were considered attorney-client privileged material.

Upon Ms. Burns return from vacation she learned of what happened and my accompanying Susan Hunt to court. She then went to Mr. Conrad and demanded that either I be removed as the supervisor or she would not handle the case of Lisa Montgomery. Mr. Conrad then relieved Ms. Burns from the case and assigned it to me.

Very early on in the case, even prior to my entry of appearance, it was decided between Susan Hunt and Anita Burns the focus of the case would be primarily a mental health defense. In that vein, a mitigation specialist, Lisa Rickert, was hired. From the beginning there were personality clashes between Lisa Rickert and Susan Hunt. Lisa Rickert conducted several interviews but would not keep Susan Hunt informed of her progress. Additionally, Ms. Rickert was assigned the task of procuring records pertaining to Lisa Montgomery's life. Lisa Rickert was not interested in collecting those records and had not collected any by the time of my entry into the case. Once I was assigned the case, the clashes between Susan Hunt and Lisa Richert were fairly obvious and a conversation between Susan Hunt and myself resulted in the decision to fire Lisa Rickert and obtain a mitigation specialist who would work with Lisa Montgomery's attorneys and do the assigned tasks of conducting the interviews, collecting records and keeping the defense team fully informed of the mitigation investigation progress.

On August 16, 2005, mitigation specialist, Holly Jackson, was retained based upon her stated experience in mental health issues as they relate to mitigation in death penalty cases. . At this point in time, Ron Ninemire and Phil Thompson (Susan Hunt's investigator) were conducting the offense fact investigation. Additionally, due to the complexity of the case, it was determined a paralegal was needed to provide logistical support and Stephanie Elliott was hired and became part of Lisa Montgomery's defense team.

Susan Hunt and I knew we needed help from a death penalty lawyer with experience in mental health issues. Initially we received assistance from Mr. Dick Burr who was a capital resource counsel for the Administrative Office of the United States Courts. Mr. Burr suggested we come to Oklahoma to discuss the matter and when we arrived he introduced us to Judy Clarke. I was aware of Judy Clarke from her time as the Federal Public Defender in San Diego, California, and her involvement with the Unabomber case and the Susan Smith case. Both of those cases involved mental health issues. It was our desire to have Judy Clarke provide us with names of appropriate experts and assist in constructing the mitigation case in accordance with the ABA guidelines and what was determined by those experts. At no point was it ever believed Ms. Clarke would only assist in obtaining a favorable plea agreement. Susan Hunt and I were well aware the United States Attorney's Office for the Western District of Missouri was seeking the death penalty and would never agree to a plea bargain for life imprisonment without parole regardless of any pretrial mitigation evidence we presented.

There were a number of meetings with Judy Clarke, both at the FPD's offices

and Susan Hunt's home. At these meetings, Judy Clarke arrived with an entourage of people. One was Deb Garvey who was a mitigation investigator who worked closely with Judy Clarke. The other person was David Freedman. He was supposed to be an expert in mental health issues and also worked closely with Judy Clarke. Judy Clarke and Deb Garvey were employed by the Federal Public Defender's office in San Diego, California. To my understanding, David Freedman was contracted with the Administrative Office to provide services assisting the Capital Resource Counsel. Neither of the people were employees of the Federal Public Defenders for the Western District of Missouri.

At the initial meeting, Deb Garvey provided Stephanie Elliott with a listing of the desired records and the locations and addresses for obtaining those records. Stephanie Elliott immediately set about sending the appropriate requests for records and once those records were received she cataloged them into the files.

At a later meeting, held at Susan Hunt's home, Judy Clarke asked exactly what role we thought she would be playing in the defense of Lisa Montgomery. I responded "as much as possible." This question was presented before Susan Hunt and I had time to discuss it privately; however, we had always thought her role was simply to handle the mental health experts and present that portion of the mitigation case.

On October 5, 2005, I moved for the admission Pro Hac Vice of Judy Clarke. Prior to doing so, Susan Hunt and I had a meeting with Judge Fenner concerning Judy Clarke joining the defense team. We explained to him our desire of having Judy Clarke handle the mental health issues and experts at trial. The Judge did not

seem to have any real concerns but did express knowledge of Judy Clarke's aggressive manner.

During November, 2005, the relationship between Judy Clarke and myself drastically deteriorated. Susan Hunt and I had determined we needed a chart or spreadsheet form to organize and prioritize our work. As I, with the assistance of Troy Schnack (Computer Systems Administrator for the Federal Public Defender for the Western District of Missouri), was doing most of the computer work of analyzing the investigation into and forensic analysis of Lisa Montgomery's computer use I took it upon myself to design the form for use by all of Lisa Montgomery's defense team. In the process I input example data to illustrate how the form would work.

Judy Clarke then called a meeting with Susan Hunt and me. This meeting took place at a restaurant near Susan Hunt's home. At this meeting, Judy Clarke displayed the form and stated, in a voice loud enough other patrons could hear, "You are too stupid to set priorities and don't have enough trial experience to make any decisions." Of course, I was immensely embarrassed and deeply offended. A number of times during this meeting I tried to explain the data on the forms was just examples to show how the form would work. Each time she told me to "shut up, you're too stupid."

There were other problems with Judy Clarke's team. David Freedman was condescending and dismissive, refusing to listen or accept any input from the existing defense team. Deb Garvey, though extremely experienced, would "step on" Ron Ninemire's toes without any consideration of his professional experience or

personal feelings. It seemed like every time he would make an investigative decision, she would countermand it with something trivial and then later would institute the same decision originally put forth by Ron Ninemire.

At one point, Judy Clarke wanted to hire a law student she had become enamored with and wanted her to obtain experience in death penalty representation. She also wanted the Federal Public Defender for the Western District of Missouri to pay her stipend. I discussed this with Ray Conrad. At the beginning of the case, prior to Anita Burn's entry of appearance, Ray Conrad stated the Federal Public Defender's office would obtain the funding from the Administrative Office and ensure expenditure of all monies necessary for the defense of Lisa Montgomery. I believe Ray Conrad's exact words were "We will spend every nickle necessary." Providing a law student with experience in death penalty cases was not deemed necessary for the defense of Lisa Montgomery and would subtract from the funding needed for the obtaining of records, the hiring of experts and general expenses incumbent in the representation of a death penalty case.

At no point was Stephanie Elliott ever instructed to not order medical records concerning any individual involved in the case. It was determined early on, even prior to Judy Clarke's involvement, any and all information, medical or otherwise, related to Lisa Montgomery, her family, her friends and her life in general was necessary for the construction of a mitigation case. This included medical information concerning family members which might have led to genetic predisposition to medical/mental issues affecting Lisa Montgomery's mental and/or

physical health. The problem for us was the lack of knowledge on how to obtain and catalog this information as well as interpreting that information once obtained.

Prior to Judy Clarke's entrance into the case, Ron Ninemire had the closest and primary relationship with Lisa Montgomery and her family. Judy Clarke took exception to this stating that though all defense team members needed to visit with Lisa Montgomery, a woman should have the closest and primary relationship with her. This struck me as very sexist and inappropriate as Ron Ninemire had been doing a fantastic job with Lisa Montgomery and her children. He was considerate of potential issues relating to either fear or mistrust of men. Lisa's children seemed to rely on Ron Ninemire and looked to him for emotional support and guidance.

During an April 19, 2006, attorney meeting at Susan Hunt's home, Susan Hunt, Judy Clarke and I discussed the problems among the defense team and the potential of Judy Clarke leaving the team. Judy Clarke then left the meeting and Susan and I continued talking about what was best and if Judy Clarke should withdraw from representation. Susan said she wanted to sleep on it and give it careful consideration. We agreed to go visit Judge Fenner together the next morning after Susan was finished with a court hearing in another courtroom.

Ron Ninemire and I had been keeping Ray Conrad fully apprised of the progress of the defense case and the problems experienced with Judy Clarke, Deb Garvey and David Freedman. So the next morning I reported to Ray Conrad the discussion with Susan Hunt of the previous night. Mr. Conrad, without consulting me, called Judge Fenner to apprise him of the situation. Judge Fenner summoned both Ray Conrad and myself to chambers immediately.

Upon entering Judge Fenner's chambers he asked Ray Conrad about the situation with Judy Clarke. Mr. Conrad explained the friction being experienced between Judy Clarke, her team and the other members of Lisa Montgomery's defense team. No court reporter was present. If memory serves me correctly, Ray Conrad offered, as a solution to the problem, for the Office of the Federal Public Defender to withdraw from representing Lisa Montgomery as both Susan Hunt and Judy Clarke had death penalty experience. Judge Fenner summarily rejected that idea. Susan Hunt was not present during this meeting with Judge Fenner as she was still in the hearing in another courtroom. Then, without further comment or questions, Judge Fenner picked up the phone, called CCA (where Lisa Montgomery was being housed) and told them Judy Clarke no longer represented Lisa Montgomery and was therefore not authorized to visit with her. These events transpired very quickly and I had no time to consult with Susan Hunt. Additionally, Ron Ninemire and Judy Clarke were on their way to CCA at this time to visit with Lisa Montgomery. Ron Ninemire did not know about Ray Conrad contacting Judge Fenner nor the fact Judge Fenner summoned Ray Conrad and myself to chambers.

Susan Hunt was entering Judge Fenner's chambers just as this meeting ended. I explained what had happened and Susan Hunt was very upset as she had not yet made the final decision whether to seek Judy Clarke's removal from the case. She had the impression I made the decision to involve Judge Fenner and thereby not respecting her role as lead counsel. I had not made that decision. That was Ray Conrad's decision and he was my boss.

Lisa Montgomery was not given any prior notice these events had happened.

The next day, Lisa Montgomery was brought in front of Judge Fenner and he explained it was his decision to remove Judy Clarke from the case as her involvement was no longer necessary or helpful.

Prior to Ms. Clarke's removal from the case, she had arranged for a couple of experts, Dr. Dean Delis and Judith Herman. I do not remember why, after Ms. Clarke's departure, they did not continue to serve as experts in the case.

On April 25, 2006, Susan Hunt and I met with Judge Fenner in chambers to inform him Lisa Montgomery was mentally ill, taking psychotic medications and under constant psychiatric care. Susan Hunt told Judge Fenner she had no experience with clients who are mentally ill, that I had no death penalty experience and as such, we needed someone on the defense team with those qualifications. Susan told the Judge her personal preference was to have Judy Clarke reinstated. I strongly objected to that solution and the Judge stated that was never going to happen. I reiterated the option of the Federal Public Defender's office withdrawing from the case. He also rejected that idea. Finally, Susan Hunt told the Judge we would look for additional counsel experienced in mental health issues in federal capital cases to join the defense team. We told the Judge this would require a continuance of the trial setting and he did not seem to think this would be a problem.

We also told the Judge that the current mitigation specialist, Holly Jackson, would most likely terminate her association with the defense team because she felt unsure if she could ethically or professionally stay on the team because her mental health background was not as extensive as that of Judy Clarke's. However, it needs

to be remembered, when we hired her to conduct the mitigation investigation and assist in presenting the mitigation defense at trial she represented to us she had the requisite mental health experience. It became obvious to the defense team, Holly Jackson was quitting so she could ally herself with Judy Clarke in the hopes of future assignments.

On April 25, 2006, Susan Hunt, Ray Conrad and I met with Dick Burr in an attempt to try to locate an attorney experienced in death penalty defense with mental health issues. Mr. Burr stated this would be very difficult given what had transpired with the removal of Judy Clarke. Sometime after that Susan Hunt moved to withdraw from the case and the motion was granted.

After Susan Hunt's withdrawal, the Court appointed attorney John O'Connor as learned and lead counsel. John then sought the appointment of attorney Fred Duchardt to organize and manage the mitigation phase of Lisa Montgomery's trial. After a meeting between John O'Connor, Fred Duchardt and myself it was decided the division of labor would be John handling the offense investigation and presentation during the guilt phase of the case. Fred Duchardt was to seek out and work with mental health experts and present that aspect of the mitigation phase. I was to fill in where necessary as well as handle all the computer forensics for both the factual and mitigation phases. We had a few team meetings; however, they were not on a regular basis and John O'Connor did not attend most of them.

From the beginning of the representation of Lisa Montgomery, it was necessary to cultivate some kind of relationship with Lisa Montgomery's mother, Judy Shaughnessy. That responsibility fell to me. Mrs. Shaughnessy, from the

moment Lisa Montgomery was arrested, took every opportunity to publically discredit and demean Lisa. The consensus of the defense team was to try and neutralize her impact on Lisa by forming a relationship with her and learn as much as possible about Lisa's childhood and upbringing, as well as the hope of mending the rift between mother and daughter so that maybe she would either testify on Lisa's behalf or at a minimum not be so vitriolic towards Lisa at trial. This assignment continued after John O'Connor and Fred Duchardt were appointed.

In total, I probably sat down and spoke with Judy Shaughnessy 20 -25 times, in excess of 100 hours. She was very hard to deal with due to her own mental health issues. I attempted to convince Ms. Shaughnessy to allow the defense team to acquire all of her medical records. She declined to cooperate in any fashion. She was very narcissistic and did not want Lisa to get any mental health treatment because that would make her look like a bad mother. Numerous attempts were made to speak with Lisa's extended family - aunts, uncles and cousins. The defense team felt it was necessary to learn about the family dynamics, Lisa's childhood and any family medical or mental issues which would be important to a mitigation case. However, no one would talk with the defense team. Ron Ninemire and all the mitigation specialists made several attempts at cold calls on Lisa's sisters, but they would not speak with any of Lisa's defense team. Many times a family member would say Judy Shaughnessy had directed no one was to talk with Lisa's defense team.

During the course of gathering medical records of Lisa and her family members the amount of records became voluminous. I cannot recall which records

I personally reviewed.

I located and spoke with Wendy Tribe, Lisa's cousin, concerning their childhood times together. Ms. Tribe also indicated word had come to her through her parents, that Judy Shaughnessy had directed no family member was to cooperate with the defense attorneys for Lisa Montgomery. Wendy Tribe, not bothered by Judy Shaughnessy's directive, did provide some helpful background concerning the childhood abuse Lisa suffered at the hands of Judy Shaughnessy. She also related the mental issues experienced by her brother Kenny Alexander.

Judy Shaughnessy blamed Lisa Montgomery for everything that went wrong in her life. She gave birth to Lisa while she herself was very young. Judy Shaughnessy was what one would call a "camp follower." She preyed on the soldiers at Fort Riley, trading sex for alcohol and money. At times she brought abusive men to her home and Lisa Montgomery, at the age of six, was having to protect herself and her sister from these men. Judy Shaughnessy did admit to drinking heavily during her pregnancy with Lisa.

The defense team had heard rumors Judy Shaughnessy was raised by her sister Ann and that her sister was actually her birth mother, after being impregnated by Ann's father. During one conversation with Judy Shaughnessy at her home, she confirmed the rumor. She was told Ann, while being her sister was actually her mother. Ann had been a victim of father/daughter incest. Judy Shaughnessy also claimed to have been a victim of sexual abuse perpetuated by Ann's father.

After the second mitigation specialist, Holly Jackson, left the team, Ron Ninemire found Dani Waller around early June, 2006. Ms. Waller inherited a lot of

work from prior mitigation specialists but also did a considerable amount of new work. She was very knowledgeable, personable and worked easily with the rest of the defense team, with the exception of Fred Duchardt. Their relationship was not good and I have no understanding as to why. Personally, I think it was a turf war over the mitigation case and relationship with Lisa Montgomery's children. Fred wanted to do everything himself and insisted he was the only member of the team to visit and speak with Lisa's children. During trial, the government called Lisa's children as witnesses and the testimony went badly. Fred Duchardt, after supposedly developing the "closest" relationship with the children, was unable to rehabilitate their testimony. That testimony was very damaging and Fred was taken completely by surprise with what they said while testifying.

There were a number of defense/mitigation theories which were discussed. One of the first theories considered was Fetal Alcohol Syndrome. In light of our knowledge about Judy Shaughnessy's drinking habits and confirmation about her heavy drinking during the pregnancy with Lisa, the defense team, during the time of Judy Clarke, believed this might be a viable mitigation factor. However, once Fred Duchardt took over the case he decided that theory should be abandoned.

One of the major theories postulated prior to Fred Duchardt's entry into the case was Pseudocyesis. However, Lisa Montgomery's computer usage was not consistent with that theory. She had a tremendous amount of online research into how to perform cesarean sections, Pseudocyesis, home birthing techniques, Skidmore, Missouri, and Bobby Jo Stinnent, thus negating any real possibility this theory would be accepted by either the defense experts or the jury.

Another theory concerned the symptoms exhibited and expressed by Lisa Montgomery of PTSD, severe headaches, bi-polar disorder, etc. Because these symptoms were supportive of a mental disease or defect, it was my opinion they needed to be presented to the jury in both the guilt and mitigation phases of the trial. In the guilt phase, I believed it would be beneficial due given the fact Lisa claimed to have "vague memories" of someone else being with her at Bobby Jo Stinnent's house at the time of the offense, thus presenting evidence of either delusions or hallucinations. Had an expert been retained to address these issues it would have been evidence of a mental disease or defect. In the mitigation phase, I felt the more psychological issues we presented the better chance the jury would see just how damaged Lisa Montgomery was mentally and emotionally thus giving the jury sound reasons to avoid imposing the death penalty. Unfortunately, Fred Duchardt was solely focused on physical brain damage and abandoned these theories.

Because Lisa Montgomery had alluded many times to vague memories of someone else being with her at the Stinnent residence, Ron Ninemire and I developed a theory that possibly Lisa's brother, Tommy Kleiner, might possibly have been the person Lisa vaguely remembered. This issue was raised with the other defense team members and while not wholeheartedly adopted it was determined to be the best course of action to at least explore the possibility, if for no other reason than additional evidence of Lisa's mental heath issues.

At no time did Lisa ever directly acknowledge it was Tommy Kleiner who was with her, but Ron Ninemire and I did try to independently investigate this possibility.

Based upon Lisa's relative lack of strength, the crime scene photos and other logistical factors we thought it was possible and felt Lisa might not have been the person who actually killed Bobby Jo Stinnent. In fact, there was one resident in Skidmore, Missouri, who had witnessed Lisa's car leaving town at a high rate of speed. This person claimed to have gotten a good look at the driver of the car and the driver's description did not fit Lisa Montgomery. Additionally, the witness believed, in addition to the driver, she saw someone in the backseat of the vehicle hunched over a bundle.

Ron Ninemire and I felt it was our duty to explore every possible angle of a defense to the charges and leave no stone unturned, even knowing Lisa Montgomery suffered from mental issues as she presented this vague notion she was not alone while at Bobby Stinnett's home. At some point in time, I do not remember exactly how, we learned Tommy Kleiner was reporting to his probation officer at the time of the offense. At that point we discontinued this avenue of investigation as a defense to the crime. However, we believed it should still have been an issue to be dealt with by a mental health expert who would be able to relate these events (vague memories) to a recognized psychotic disorder and present this mitigation evidence to the jury.

Early on in the representation of Lisa Montgomery the issue of competency to stand trial was raised among the defense team. Prior to Judy Clark's entry into the case, there was no medical and/or psychological testing done which would have supported a motion for a declaration of incompetence. Susan Hunt and I raised this issue with Judy Clark and steps were being taken to obtain the appropriate

information to present to an expert prior to an examination for mental competency. However, once Fred Duchardt took over the case and the issue was raised with him, he proclaimed he would be handling all mental health matters with his experts. When no discernable action was being taken and the issue was raised again about Lisa Montgomery's competency to stand trial, Fred Duchardt would claim it was being dealt with by the experts. All of the defense team believed she met the definition of incompetent as she was incapable of assisting in her defense due to her mental issues and inability to relate the events of the crime or her past childhood and upbringing. Furthermore, as Fred Duchardt was in effect lead counsel, no other defense team member was authorized to file any pretrial motions.

Fred Duchardt was purported to be extensively experienced in death penalty defense with the requisite expertise in recognizing mental health issues and obtaining the appropriate mental health experts for the preparation of a mitigation case. Therefore, all decisions concerning Lisa Montgomery's mental health issues for the mitigation case were his responsibility and no assistance from the other defense team was requested or accepted.

My role in the mitigation investigation was limited to dealing with the computer forensics of Lisa Montgomery's computer use and talking with family members Judy Shaughnessy, Wendy Tribe and Jack Kleiner to learn of Lisa Montgomery's childhood and other family issues in an attempt to obtain any information which would have provided the defense with evidence of abuse, mental or physical abnormalities or unusual behavior to provide to the mental health experts.

It appeared early on Fred Duchardt was focusing solely on brain imagining

and PET scans. He retained Dr. Ruben Gur from Philadelphia, Pennsylvania. Dr. Gur was perhaps the poorest excuse for an expert I have ever come across. He damaged the defense case by not providing the appropriate reports in time for disclosure to the government. Additionally, he was not able to support his expert opinion with the evidence he developed. Because Fred Duchardt did not spend any time in pretrial preparation with Dr. Gur his demeanor on the witness stand was atrocious and his testimony did more harm than good.

During Fred Duchardt's trips to Philadelphia to monitor the brain imaging of Lisa, he was accompanied by his wife, Ryland. Only after Fred had written a memo concerning this trip did the defense team learn Ryland not only accompanied Fred, she also interacted with Lisa. When asked why Ryland, who was not a member of the defense team and thus not covered by any attorney-client privilege, or to our knowledge a mental health expert, was meeting with Lisa Montgomery, Fred stated she was an expert therapist. Ultimately we learned she had no training as a therapist. This situation was brought to the attention of John O'Connor (lead attorney in the case) and he deferred to Fred Duchardt. Mr. Duchardt also claimed Ryland had developed a special bond with Lisa. The rest of the defense team saw no evidence of this, and in fact, when Ryland was permitted to sit at counsel table during trial, Lisa seemed to display a certain aversion to Ryland.

There were many aspects of the trial I felt went badly that should not have. Prior to trial, a jury questionnaire was submitted to potential jurors in an effort to ascertain potential bias and adamant adherence to imposing the death penalty regardless of any mitigation evidence introduced during the trial or penalty phase.

My only involvement in the voir dire process was to review the completed questionnaires and make suggestions to Mr. Duchardt on which potential jurors I felt were unacceptable. He insisted on conducting the voir dire process by himself.

During Voir Dire, Fred Duchardt did not make any attempt to rehabilitate any of the jurors who were leaning toward imposition of the death penalty only as an extreme measure. The government was able to strike those jurors for cause and Fred did not put forth any resistence in spite of objections from the rest of the defense team.

Lisa Montgomery was being medicated from the beginning of her incarceration all the way through trial. Prior to trial, the defense team had a discussion concerning Lisa's affect while on these medications and how she would be perceived by the jury. To the best of my memory, Fred Duchardt felt her flat affect would be explained to the jury by the description of the medications Lisa Montgomery was taking and the effect on her body and personal appearance. During the trial, Lisa did present a very flat affect and the jury probably interpreted that as "cold-bloodedness." At no time did Fred Duchardt bring to the jury's attention the effects these medications had on Lisa's body or personal appearance..

At one point during the trial, I called Susan Hunt upset at what was happening in the presentation of the defense. I said to her "Lisa's story is not being told." The mitigation presentation was weak and the mental health evidence lacked foundational support. There was considerable evidence concerning the very abnormal childhood Lisa experienced and I felt the jury needed to know all about the abuse she suffered from her mother Judy Shaughnessy. There was also evidence of the alcohol consumption by Judy Shaughnessy during her pregnancy with Lisa and this very likely resulted in Fetal Alcohol Syndrome. This

avenue of mitigation was being developed during Judy Clarke's tenure on the defense team but was summarily dismissed once Fred Duchardt became the "mitigation attorney."

Other examples of mitigation evidence which did not get presented to the jury was the extensive mental health issues of Lisa's extended family. During the mitigation investigation evidence was gathered showing a number of examples of mental health issues in various family members. Though attempts to obtain medical records from these family members was met with resistance, subpoenaing the family members to testify and explain in detail their struggle with mental health issues would have given the jury a more thorough understanding of Lisa Montgomery's life and struggle with mental heath issues.

One of the witnesses concerning Lisa's childhood was her father John Patterson. It was my responsibility to present his testimony during trial. Prior to calling Mr. Patterson to the stand I had spent a considerable amount of time with him reviewing the questions I would ask and his responses. During his testimony I was able to elicit anecdotal evidence of Judy Shaughnessy's behavior towards him and the two girls Diane and Lisa.

After the jury returned the verdict, counsel was permitted to speak with the jurors in the jury deliberation room. Upon my entry into the room, I noticed on the dry-erase board the word "PREMEDITATION" written across the top of the board. It became obvious to me I had failed to dispel the concept. A number of the experts we had interaction with related to us that insane people can premeditate, they just start from a perspective disconnected with reality. However, many times prior to the beginning of the trial, the defense team, myself included, stressed to Fred Duchardt the need to get one of the experts to testify how insane people can premeditate. He did not do that. In my opinion, had Fred presented that testimony there would have been a high probability of a different outcome.

I declare, under penalty of perjury and the laws of the United States of America, that the foregoing affidavit is true and correct to the best of my memory, information and belief.

Signed on this 8th day of January, 2014.

David L. Owen, Jr.

State of Colorado, )
) SS:
County of Douglas, )

The foregoing Affidavit was subscribed and sworn to before me on January 8, 2014, by David L. Owen, Jr..

Witness my hand and official seal.

My commission expires: 05/01/2017.

HEATHER PIERCE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134027842
MY COMMISSION EXPIRES 5/1/2017

Notary Public