IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

ORIGINAL

LISA M. MONTGOMERY,

Movant,

vs. CASE NO. 12-8001-CV-W-GAF

UNITED STATES OF AMERICA,

Respondent.

THE DEPOSITION OF RAY CONRAD, produced, sworn and examined on Monday, the 20th day of May, 2013, at the law offices of Lisa G. Nouri, 2526 Holmes, in the City of Kansas City, in the County of Jackson, and the State of Missouri, before me,

MARIE A. McCRACKEN, CSR,CCR, RPR
of
McCRACKEN REPORTING

a Certified Court Reporter within and for the States of Missouri and Kansas.

Taken on behalf of Movant pursuant to Court Order.

A P P E A R A N C E S

For the Movant:

Ms. Kelley J. Henry
Supervisory AFPD - Capital Habeas
810 Broadway, Suite 200
Nashville, TN 37203
kelley_henry@fd.org
and
Ms. Lisa G. Nouri
Attorney at Law
2526 Holmes
Kansas City, MO 64108
lisanouri_atty@hotmail.com

For the Respondent:

United States Department of Justice
United States Attorney's Office
400 E. 9th Street, Room 5510
Kansas City, MO 64106
Ms. Roseann Ketchmark
Ms. Cynthia L. Cordes
roseann.ketchmark@usdoj.gov
cynthia.cordes@usdoj.gov

For the Witness:

Federal Public Defender's Office
818 Grand, Suite 300
Kansas City, MO 64106
Mr. Robert Glen Kuchar
bob_kuchar@fd.org

INDEX


| WITNESS: RAY CONRAD | PAGE |
|---|---|
| Examination by Ms. Henry | 4 |
| Examination by Ms. Nouri | 40 |
| Examination by Ms. Henry | 41 |
| Examination by Ms. Ketchmark | 43 |
| Examination by Ms. Cordes | 47 |
| Examination by Ms. Henry | 52 |
| Signature | 55 |
| Certificate | 57 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | May 6, 2013 Order | 4 |
| 2 | April 20, 2006 Order | 18 |
| 3 | April 25 and May 3, 2006 Conferences in Chambers | 19 |

STIPULATIONS

It is hereby stipulated and agreed by the parties hereto through their respective counsel that submission of this deposition to the witness for examination and reading to him or by him as provided in Rule 30(e), Federal Rules of Civil Procedure, is hereby expressly waived.

It is further stipulated by the parties hereto through their respective counsel that the deposition may be signed by the witness at any time before or at the time of trial before any notary public.

(WHEREUPON, DEPOSITION EXHIBIT NOS. 1 THROUGH 3, INCLUSIVE, WERE MARKED FOR IDENTIFICATION.)

RAY CONRAD,

of lawful age, after having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MS. HENRY:

Q. Good morning. Could you state your name for the record.
A. Ray Conrad.
Q. That's spelled the normal way?
A. Yes, C-O-N-R-A-D.
Q. Mr. Conrad, you are here pursuant to an Order issued by Judge Fenner on May 6, is that correct?
A. That's true.
Q. Have you had an opportunity to see that Order?
A. I have.
Q. I'm going to show you what's been marked as Deposition Exhibit No. 1 and ask you if that's the order that you have reviewed.
A. This looks like the Order I've seen,

yes.

Q. You've reviewed that prior to today?

A. I did.

Q. Do you need any additional time to review the Order before we proceed?

A. I don't think so.

Q. Just for purposes of the record, could you state your position.

A. Yes. Federal Public Defender for the Western District of Missouri.

Q. Thank you. And since you are a federal public defender and a lawyer we are going to dispense with a lot of those introductory questions we might ask in a deposition and just go straight to the heart of the matter, especially since the Court has put me on the clock. I would note for the record that I started the clock as soon as you were sworn in and we will follow the timelines back and forth and we may well end earlier than that.

A. Thank you.

Q. So the reason, of course, that we are here today is to ask some questions about conversations that you had with Judge Fenner and others in chambers regarding representation of

Lisa Montgomery and so to that end before we get started with the specifics of that meeting, I'd like to know if you have spoken to anybody about this deposition prior to coming in today other than Ms. Nouri when she spoke with you on the phone?

A. I think I asked Cynthia for a copy of that Order, Cynthia Cordes, I think I asked for a copy of that Order. I think Roseann called me and told me this was set for today and that she and Cynthia were going to be here, but they were not my representatives, they were representing the government.

Q. What else did you discuss other than that?

A. I think Roseann told me that you were going to question me about my -- whatever I had to say about Judy Clarke.

Q. Okay. And has anyone from Judge Fenner's chambers contacted you about the deposition?

A. No.

Q. Has anyone from Judge Maughmer's chambers?

A. No.

Q. Has anyone other than Ms. Cordes and Ms. Ketchmark from the government's office contacted you?

A. No.

Q. Did you do anything to prepare for answering these questions today?

A. I looked over that Order and I looked over -- looked over David's declaration I think. I read your petition a long time ago, whenever it came out, but I really didn't read it again to prepare for this, I just -- yeah, that's -- I'm trying -- is there anything else in --

Q. I'm just wondering what you did in order to prepare for the deposition. So you reviewed the motion that we filed. Did you review the redacted version or the unredacted version?

A. I don't know. I don't know. Whatever one was given to our office I read.

Q. So did you just download -- when you say given to your office, you didn't download it from ECF?

A. Probably my paralegal did download it.

Q. Okay. So did you also review Susan Hunt's declaration?

A. I'm sure I read it.

Q. Okay.
A. I don't think I read it in preparation for this meeting, but I'm sure I read it.
Q. Okay. Have you read the motion to reassign the case?
A. No.
Q. Have you read any of the government's pleadings in the case?
A. No.
Q. I want to direct your attention to the morning of April 20th of 2006.
A. Okay.
Q. That morning did David Owen come into your office to discuss the Lisa Montgomery case?
A. Yes, he did.
Q. Can you tell me what he told you in that meeting.
A. Yes. David, according to my recollection, came in and he said, Judy Clarke has now gone after -- I'm not sure that's the right -- she has attacked Susan Hunt and Susan Hunt is now prepared to have Judy off the case, have her removed from the case, we are in agreement with that.
Q. Was this the first inclination that you

had that there were difficulties on the Lisa Montgomery team?

A. Oh, no.

Q. Can you tell us about what other indications that you had had that there were difficulties on the team.

A. Well, almost from the first Judy would be extremely rude to my secretaries. Instead of coming in and saying, Hi, I'm Judy Clarke, I've got a meeting or conference, she would say, What's the combination, started off that way; just rude to my secretaries to start with.

There was a time when -- Judy is a fairly tall person. My paralegal is maybe five feet tall. She stood over her like a school teacher yelling at her, You better get that to me, get that -- it was -- I want it immediately or within days, some documents or something, you know, just yelling at her. That I thought was very rude.

Q. Can I stop you right there. I would like to indicate for the record, you stated that Ms. Clarke stood over your paralegal and you indicated that she was pointing her finger?

A. Yes.

Q. Since that won't show up on the record I wanted to put that on there. When you refer to your paralegal, is that Stephanie Elliott?

A. Yes.

Q. You used the word "yelling" and so if you could tell me, do you mean in a raised voice?

A. Yes.

Q. Go ahead.

A. Almost from the first meeting that my office had with Judy, Ron would come in very discouraged and say he had been insulted. Almost from the first meeting David would come in separately, say the same thing, he had been insulted.

Q. Did they tell you what the insult was?

A. I can't remember all of them, but one was David said he called Judy and said, Stop treating me like a country bumpkin and she said, Stop acting like a country bumpkin, that's one.

I remember him -- sometimes she called him stupid in public. There was another time Ron had a suggestion and she said -- how did she put that -- you don't know enough to have an opinion or something like that.

Seems like at some point told me in a

memo or gave me a copy of a memo that said that Deb Garvey, who was the mitigation expert -- Judy Clarke said that Deb Garvey is a ball-buster, meaning Ron better do what she said when he was -- when they were here in town.

Q. So it's your memory that Judy Clarke described Deb Garvey as a, quote, ball-buster?

A. That's what David said in some -- all these things I've told you are what I would read or hear from them.

Q. You didn't personally observe any of it?

A. I probably saw Judy one time after she got on the case.

Q. Did you ever address any of the difficulties on the team with Judy personally?

A. No.

Q. Did Susan Hunt ever come to you and express that she was having difficulties with Judy on the team?

A. No.

Q. When Dave came into your office on the morning of the 20th and said that Judy had attacked Susan, did he describe what the attack was?

A. No.

Q. "Attack" can mean a lot of things. What did you take it to mean?

A. I took it to mean that she started insulting, it becoming personal with Susan, as she had with Ron and David.

Q. And when Dave told you this, did he ask you to do anything?

A. He said -- let me think about this. He said -- he said, Susan is now in agreement that we need Judy off the case and I said, Tell the judge.

I must say this, too, almost from the first when these men would come in and explain to me, particularly David, I would say, Do you want to keep her on the case? So at this point after six or seven months I just said, Tell the judge, okay.

Q. So they would tell you about it along the way and you would ask them, Do you want her to stay on the case?

A. Uh-huh. That was my recollection, yes. I don't know whether I said that to Ron, but I'm pretty sure I said that to David on a fairly regular basis.

Q. What would David respond when you would

tell him?

A. No, no, he said, I'll try to work with her.

Q. Do you recall whether or not Judge Fenner ever expressed any reluctance to you or anyone else about Judy Clarke being appointed on the case initially?

A. No, I wasn't involved in any of those meetings.

Q. Were you aware that Dave and Susan were going to ask Judy Clarke to become a member of the team?

A. Yes, David did ask me if he could ask Judy Clarke to be on the team because he thought she had special knowledge of mental health issues in defense.

Q. Did you agree with that decision?

A. Yes, yes.

Q. Did you communicate that agreement to Judge Fenner?

A. No. Let me say this. I knew that Judy was a Special Resource Counsel paid by the Administrative Office. At that time I think she was associated with the LA office. Later, I'm not sure, she may have moved to another office,

but I think she was -- she is paid by them to help people around the country, as are a few other people that are Special Resource people. So, you know, that's part of what I thought they were supposed to do and she had that reputation and he wanted her, that was fine with me, but I didn't recommend her to the judge at all.

Q. You've known Judy Clarke through the years from meetings and such, is that correct, when she was the defender in Washington State?

A. I was never -- I don't know how to describe this, know her. I was -- I knew of Judy when she was a defender in San Diego. She left San Diego, went into private practice I think and then went to Washington and I really don't think I had any contact with her. I knew who she was, but, you know, yes, I would see her in a meeting, but that -- I can't say that I knew her.

Q. Just were aware of her?

A. I was aware of her, yes.

Q. There were a lot of federal defenders who go to those meetings?

A. Sure, absolutely.

Q. Getting back to the morning of the 20th when David Owen was in your office, did you know

at that time that he had spoken to Judge Maughmer three days earlier about the possibility of Judy Clarke leaving the Lisa Montgomery team?

A. Who had?

Q. That David Owen had.

A. I don't recall that at all.

Q. He didn't tell you that?

A. I don't recall.

Q. So when he came to you and said, Okay, Susan is ready, we've agreed we want Judy off the case and you responded, Well, tell the judge, what's the next thing that happened?

A. He said, I think she is going to the prison, and I said, Tell the judge, he can cancel the visitation if he wants to.

Q. And that conversation is still in your office?

A. That's in my office.

Q. Was there anyone else present?

A. No.

Q. Ron Ninemire and Stephanie Elliott weren't there?

A. I don't believe so.

Q. Did he tell you at that point whether or not Ron and Stephanie were on board for this

decision?

A. Well, no, they wouldn't be in a decision-making position, but if you want my opinion now, I can tell you. I can assure you.

Q. I'm more interested in what David Owen said to you at that time.

A. They weren't there.

Q. Did David tell you anything about whether or not Lisa Montgomery had been informed --

A. No.

Q. -- about this?

A. No.

Q. Did you ask him how the client would feel about it?

A. No.

Q. After you said, Well, tell the judge, what's the next thing that happened?

A. All right. I believe that my -- my memory varies from David's. I think he went to the judge, talked to the judge and I remained in my office. I simply do not recall going to the judge's office on the 20th.

Q. You don't remember being in chambers with Judge Fenner at all on April 20th?


Case 4:12-cv-08001-GAF Document 149-8 Filed 09/01/15 Page 16 of 95

A. I sure don't.

Q. Do you have any memory of picking up the phone and calling the judge?

A. I have racked my brain over that. It would not be -- it would not be typical for me to do something like that, but this was such an unusual case. I thought maybe I did call and say, Judge, David is coming over to talk to you about asking you to remove Judy from the case, I may have done that, but I honestly -- that's -- I'm telling you that's the best I can say. I can't say for certain but that's possible.

Q. But you don't have any specific memory of the phone call, so --

A. No. If somebody had a recording of it and said, This is you, okay, that's me, but I honestly -- my -- my recollection is that I was not over there. And I'm not trying to somehow excuse something, because certainly I'm for David to go. This has gone on for six, seven months, it's almost intolerable. While I did not personally go there, he had my okay to go there, there is no doubt on that.

Q. And when you say it was intolerable, was there any discussion between you and David about

other options such as your office getting off the case?

A. I don't think we talked about it.

Q. And I am going to ask some questions about that again in just a minute, but --

A. Okay.

Q. I want to ask you if you had ever seen -- show you Deposition Exhibit No. 2, which is an Order dated April 20th of 2006 blocking all phone calls from Lisa Montgomery to phone numbers of Judy Clarke, have you ever seen that?

A. No, I sure haven't.

Q. Did you know about the order being issued to block all phone calls?

A. If I did, I learned it within the last few days from some declaration that you obtained from somebody.

Q. You didn't know about it at the time?

A. No.

Q. Okay.

A. In fact, I thought she was continuing to communicate with her to tell you the truth.

Q. Okay.

A. Maybe it was by letters, I don't know, but I did think there were communications.

Q. Okay. Did you talk to Judge Fenner about the removal of Judy Clarke after he issued the order?

A. After he issued the order, oh, I was there on the 3rd of May and, you know, I don't have a recollection of the 3rd of May, but I know from reading the declaration it was the 3rd of May because I was incensed with Susan Hunt. I was not -- I was beyond -- Judy was gone, I was beyond that, but I was so mad at Susan Hunt that day as is reflected in somebody's statement.

Q. I'm going to show you now Deposition Exhibit No. 3, which is a transcript of the April 25th and May 3rd, 2006, proceedings. You see that in front of you. You'll notice on the appearances it has your name listed first and it says May 3rd?

A. Right, right.

Q. And so that transcript seems to indicate that you were not present for the in-chambers conference on April the 25th, is that also your memory?

A. That would be -- my memory is of my discussion about Susan and that was on the 3rd.

Q. And there was a court reporter there so

we have a --

A. And I didn't realize that.

Q. So if you weren't there on April 25th you can't tell us anything about what happened when Susan and the judge and Dave went off the record?

A. No, no, I -- let me say this, just -- I don't know this really is pertinent to anything, but I read that and I've racked my brain for two or three days trying to think about an in camera or under seal meeting, and then I went back and with great relief saw I wasn't even at that meeting. No wonder I have no recollection of that. So -- so I don't know what was said there.

Q. Okay. And also to be clear now, the meeting that we are talking about when I'm asking about the in-chambers discussion on April 20th is not transcribed.

A. That's true, that's true.

Q. And that's -- you don't remember being at that one either?

A. I don't either. I do not, but as I said, I did tell David, Go talk to the judge, you know, so I'm not -- I'm not trying to withdraw anything at all. I was -- that's what he wanted

to do, I simply don't think I was present. I don't know.

Q. And between April 20th and May the 3rd, do you have any memory of having any contact with Judge Fenner regarding the Lisa Montgomery case?

A. No.

Q. Between April 20th and May the 3rd, do you recall having any conversation with Judge Maughmer or someone in his chambers --

A. No.

Q. -- regarding the Lisa Montgomery case?

A. No.

Q. I'm sure you might have talked to him.

A. Actually I don't think I did. I moved over to administrative matters, so I'm not seeing them on a regular basis like I was a couple years ago -- no, five years ago.

Q. So on May the 3rd when -- let me back up. The transcript on May the 3rd, and let's just refer to that so that you know what I'm talking about, starts out on the very first line with the Court saying, "Susan, I suppose that David and/or Ray told you they visited with me earlier this week."

A. Uh-huh.

Q. And we have -- sort of putting it through the calendar, it's later referred to "when they were here on Monday," so we are assuming that that's May the 1st. Do you have any memory of going with David to see Judge Fenner on May the 1st?

A. No.

Q. Judge Fenner describes that you and David had gone to him to say that there was difficulties with Susan Hunt on the case. Do you have any memory of that at all?

A. No.

Q. You recall being pretty angry with Susan Hunt?

A. I was, yes, yes.

Q. Did Susan Hunt tell you at that time that the San Diego Federal Defender's Office was willing to assume representation of Lisa Montgomery and all of the funding for the case?

A. Is that in the transcript?

Q. It's referred to in the transcript, but it's sort of referred to vaguely, that's why I'm wondering if you were aware that the San Diego office was willing to assume responsibility for the case?

A. I don't think at that time I was. I was -- I was willing to have my office withdraw and have Judy and Susan handle it. I didn't think we could work with Judy and I was so dang mad at Susan at that point, I would have -- I would have hated for us to work with her, but -- but if the judge wanted to let Susan and Judy and/or whomever or -- frankly, I thought Judy might enter her appearance on her own. I didn't know what she was going to do, I just knew that it had gotten to the point of just impossible for my staff to work with her.

Q. Do you know or did you know Ruben Cahn, who was the defender in San Diego at the time?

A. I know of him. I really don't know him.

Q. Had Ruben contacted you?

A. No.

Q. Are you aware of other federal defender offices going in other districts and providing representation at the invitation of the Court or the local defender?

A. No. I'm aware of the resource counselor going to other places to assist defenders in a particular case but not a particular defender. May have happened, but I'm not aware of that.

Q. Would you have allowed the San Diego office to come into your district and appear on the Lisa Montgomery case and to replace your office?

A. I -- I never even thought about that to tell you the truth. Like I say, I thought Judy might enter an appearance, so I guess it would be whomever she had -- if she had her team, I -- I just really don't -- I wasn't approached about that, I just really hadn't had a thought about anyone else other than her.

Q. Okay. Now, you know that federal defender employees are not allowed to just enter their appearance, correct?

A. Well, Judy entered Pro Hac Vice in this case. As a sentencing resource counselor I'm not sure what her authority might be to tell you the truth, I really don't know.

Q. You know that, for example, any assistant federal defender is not allowed to engage in the private practice of law?

A. I do know that.

Q. We have to have actual court appointments in order to appear in a case?

A. Right.

Q. Did you know that Judy Clarke was actually an employee of the Federal Public Defender's Office, though she had a special position, she was a salaried employee?

A. I thought she was an employee, but -- and I believe she was paid by the Administrative Office, but I did not think she was like an assistant federal public defender in an office. I thought she maybe got her check through a particular office, but worked independently maybe of that office.

Q. Has your office hosted any of these special projects that exist in the federal defender system?

A. Special projects.

Q. Capital resource counsels, there is a mitigation counsel, there is sentencing guideline specialists, so these little projects that the AO funds but they place them within federal defender offices, have you ever had any of those?

A. We've had some. People from the AO came, I don't know, couple years, several years ago. Some people from the sentencing commission are coming this summer.

Q. But they are not hosted as employees of

your office?

A. They are not, they are not employees of my office, no.

Q. So you are not aware that there are actually some offices that hire employees to do these specific projects, that's not something you are familiar with?

A. Well, I would have thought it was like in my office is what I thought. I didn't pay for her or any of her team to come in, they were paid by the Administrative Office, but they were not hired by me, if that helps you at all.

Q. And are you familiar with the requirements for being a member of the Western District of the Missouri Bar?

A. Well, you have to be a member of the Missouri Bar. You have to have graduated from law school. You have to have taken the bar, got to be a member in good standing, that sort of thing, apply and become a member of the --

Q. Do you know whether or not the Missouri Bar has reciprocity with the California Bar?

A. I didn't know -- to tell you the truth, I don't know, I just really don't know.

Q. Do you know whose idea it was -- I take

that back. You've already answered that question, I'm sorry. Let me go on.

I had a lot of questions to ask about the May 1st meeting, so I'm just looking over things. Since you don't remember it, then you don't know how the meeting came about?

A. I know how it came about, I told you. David -- wait a minute.

Q. The May 1st?

A. No, I don't. Sorry. I was thinking the April.

Q. Can you tell us why you were so angry with Susan Hunt at the May 3rd meeting?

A. Yes, I can.

Q. Okay.

A. David came in and told me that Susan was on board or in agreement she had been -- finally she had been attacked and she was sick of it. She had seen it happen to her own investigator, to my investigator, to David, but now it happened to her and she was on board and it was time to do something, so I say, Tell the judge. Well, then we appear before the judge.

Q. On May 3rd?

A. May 3rd. And I feel like she is blaming

me for something that they have agreed to, she is trying to back out of her agreement and put the blame on me and my office, and while we had difficult dealings that had gotten just very difficult with Judy, I didn't want this to be reflected nationally with a sentencing resource counsel and have her take another side in this thing because I thought she was in agreement that this is what we are going to do. And so I told the judge my opinion on that, you know, that's what I said, I just don't think this is fair, so I was unhappy with Susan. It felt like she had gone back on what she agreed to.

Q. And that's a real clear memory for you, and I want to be sure that I understand the source of your knowledge about Susan's agreement, that came from David Owen telling you that Susan had agreed, correct?

A. That's correct.

Q. Did David Owen ever tell you that Susan Hunt had told him, I want to think about it and I want to call Judy before we do anything?

A. No, but I've read that in either -- in somebody's declaration, I guess Susan Hunt's declaration, have read that since. I didn't know


Case 4:12-cv-08001-GAF Document 149-8 Filed 09/01/15 Page 28 of 95

that at the time.

Q. And did you know at the time that Judy Clarke had reached out to Dick Burr for purposes of trying to put the team back together?

A. No, I didn't.

Q. Do you know Dick Burr?

A. I think we had met with him.

Q. Okay.

A. And he said -- he said -- I think they were -- Susan and David were trying to find somebody else that they could work with and he came to Kansas City and he said, I really can't find anybody else and I said, Well, I'm not going to put my staff through this again, I'm not going to have them subjected to this, one; and, two, Judge Fenner would think I was crazy if I asked for somebody to be reinstated after all of this. So that's -- but I didn't know Judy did that, had anything to do with it, I had no idea, he was just there.

Q. So when you are referring to this meeting with Dick Burr, this was after Judy had been removed but before John O'Connor had been -- John O'Connor had been appointed?

A. I don't know when John was appointed,

but it was -- yeah, because she left on the 20th of April, didn't she?

Q. Judy left on the 20th of April and Susan withdrew on May 8th.

A. Well, you know when Dick Burr was here?

Q. I don't. I don't. Let me ask you this, after the May 3rd meeting, we know from Susan Hunt that the judge called her and asked her to file a motion to withdraw because he had decided that he was going to go with your office instead of Susan. Had you had any conversation with Judge Fenner about his choice with respect to Susan Hunt staying on the case?

A. I -- I personally don't -- I don't recall that. I didn't care as long as -- as long as we were not in with Judy, I didn't care, but I don't think he -- he asked me who he should have and who he shouldn't.

Q. When you and Dave were discussing the change of counsel issue, was there any discussion about the need to have somebody on this team who understood how capital cases are supposed to be investigated?

A. You know, if you go back to the first, I mean, when he was first looking for somebody, I'm

sure that he told me that's why he wanted her on it, because he wanted somebody with knowledge of mental health defenses, I'm confident that Dave mentioned that, talked to me about that.

Q. I was just wanting to check the time to make sure -- sometimes I lose track.

Was there a discussion on the morning of April the 20th about the damage it would do to the case and to Lisa Montgomery's defense for Judy Clarke and the people who worked with her to be removed from the case?

A. No, not between me and David that I remember.

Q. Did you have any conversation with anybody else about the damage it was going to do to the case to remove Judy Clarke and her team?

A. No.

Q. When you were hearing about the difficulties on the team, did you reach out to another defender or somebody in the criminal defense community or the capital defense community to find out whether or not any of the criticisms that Judy had of Ron Ninemire and David Owen were legitimate concerns?

A. No.

Q. Did you do anything to determine whether or not, in fact, Ron Ninemire wasn't qualified to do the work that he was being asked to do?

A. No, because Judy had her own team do it anyway, so, no.

Q. I guess the question I'm trying to get at is sometimes hearing things can be hurtful even if they are true and so I'm trying to ascertain whether or not you did anything to determine if any of the criticisms of your staff were, in fact, true?

A. When somebody is called stupid in public, I don't think I have to investigate that. Somebody says one of their team is a ball-buster, I don't think I got to check into that. If somebody calls one of my people -- he says, Stop treating me like a country bumpkin and she says, Well, stop acting like one, I don't think I need to check into things like that. That's just beyond toleration and yet the guys tried for six or seven months, they tried to hang in there and it was just beyond their -- beyond their toleration and it had been beyond mine from very early on, but I let them make that call that they wanted to try.

Q. How do you know that Judy Clarke called some member of your staff stupid?
A. David said that.
Q. And what did David tell you about that?
A. I just -- I don't know. Just, you know -- I really don't know.
Q. You said that she called him stupid in public?
A. Yeah.
Q. Who else was around?
A. I don't remember.
Q. And do you know where it was?
A. No.
Q. Do you know if he was referring to a meeting at a restaurant with Susan Hunt and Judy Clarke in the case, that Susan had asked him to have a conversation with David Owen?
A. That sounds like somebody's declaration, either Susan's or David's.
Q. But you don't have any knowledge of that?
A. I just -- where they were or what they were doing and, no, I don't know whether they were in a restaurant or who all was present, any more than I know about him coming in and telling

me that he had called her and she called me and said, Don't act like a country bumpkin and those sort of things.

Q. You were relying on David being truthful to you?

A. Yes, I was.

Q. Did you ever personally observe Judy Clarke using any profanities?

A. I only saw Judy one time that I recall in my office -- not in my office, I mean in the general offices. She was down the hall, but I never -- I never met her, never attended their meetings, never -- much of this I think happened at Susan's house. My guys got together -- I think mainly my paralegal, Stephanie Elliott, got all this material in boxes and took it to her house, I think they had most of their meetings out there anyway, but I would not have attended anyway. If they had been in my office, I wouldn't attend their meetings.

Q. So it's your testimony that Judy did not stop into your office to say hello to you whenever she was in your office?

A. No.

Q. Did --

A. But she was -- she wasn't in my office very much. This was pretty much transferred to Susan's place of business.

Q. Did Stephanie Elliott ever make any complaints about Judy Clarke or any member of her team?

A. She told me about the time Judy was standing over her and she said, You know, here I am five feet or whatever and she is standing over me yelling at me, You better get that done and shaking her finger at me like an angry school teacher or something, but -- are you asking for other instances? I'm -- they are not coming to mind now.

Q. That's the only one you recall?

A. With Stephanie, yeah, I think so, yeah.

Q. And you mentioned earlier on that your secretaries complained that she would ask what the code was in a rude tone of voice?

A. Yes.

Q. Did you observe that?

A. No.

Q. How many lawyers do you have on staff there?

A. Fifteen counting me.

Q. Are they --

A. They are not all in Kansas City, though, but, yeah, 15.

Q. Do attorneys in your office ever raise their voices at staff?

A. Not at staff.

Q. Have you heard them raise their voices at each other?

MR. KUCHAR: I'm going to enter an objection. The judge's order was pretty clear.

MS. HENRY: You are absolutely right. I'm sorry. I was sort of following up on what made this behavior on behalf of Ms. Clarke so different from what he observed on a regular basis. I don't need to go there.

I apologize and withdraw the question.

Q. (BY MS. HENRY) Did you review the letters between Susan Hunt and Dick Burr that were written after Judy Clarke's removal?

A. I read one dated April 30th, I did read that one.

Q. And did you read the letter that Dave Owen wrote back to Dick Burr in response?

A. No.

Q. You were, as you said, pretty angry on

April 3rd at Susan, had you had any contact -- I'm sorry, May 3rd. Had you had any contact with Steve Asin with the Administrative Office of the Courts prior to that time?

A. I don't think I had any contact with Steve Asin.

Q. Do you recall Steve Asin placing a phone call to you after Judy Clarke had been removed and leaving you a voicemail?

A. I know David wrote a memo kind of lining out a lot of things that Judy had done that he thought Steve Asin should know about. I can't recall getting any positive response at all from anybody. I thought -- I thought -- I didn't -- I didn't go begging for help. I didn't ask anybody for assistance, but after -- after David said that, I thought well, this is just business as usual I guess, whatever -- whatever happens happens and it's not going to make anything happen, no change, so that's all I know.

Q. Okay. And you and I know who Steve Asin is but probably nobody else in this room does, so for the record, can you tell us who Steve Asin is.

A. I think he's called the Chief of the

Program Branch of the Office of Defender Services in the Administrative Office. As chief he's like the No. 2 man under the assistant director, who many years was Ted Lidz and now it's a lady named Caite Clarke, C-A-I-T-E, Clarke. He's been long time as the -- what they call the chief and more or less in charge of the day-to-day operations I believe of the office. Although they have a lot of different branches in that office, I think he would be looked to by most of the people there as their first person under -- under the assistant director.

Q. And I want to make sure I'm understanding this memo that you are referring to that Dave Owen wrote to Steve Asin. Is it your memory that David Owen was writing to Steve Asin to enlist his help in trying to curb Judy Clarke's behavior?

A. No, I think it was just a complaint.

Q. Okay.

A. Just felt like he had been treated unfairly and the office had been treated unfairly.

Q. You said the response was business as usual. I don't want to put my own inferences on

that. Can you tell me what you mean by "business as usual."

A. I just don't recall getting any kind of a response, you know.

Q. From Steve Asin?

A. Or anyone.

Q. Okay. Who is the anyone you would have expected a response from?

A. Well, I suppose I would think that the Administrative Office through the Office of the Defender Services would reach out to people in the resource -- sentencing resource people and say, Hey, this is overboard, you know. You'll need to -- you all need to talk about how you handle things and curb yourselves in some fashion, you know, I don't know. But I never -- I didn't get any report or expect one, but I -- I didn't get a thing that I recall.

Q. But it's your memory this occurred before Judy was removed?

A. No, no.

Q. It was after Judy?

A. Oh, yeah, yeah. It was just sort of after-the-fact thing telling Steve Asin.

Q. That's what I wasn't understanding.

A. Yeah.
Q. We have ten minutes of our time left. Is there any question that I've asked you here today that you would like to go back and modify?
A. No, I don't think so.
Q. Is there any answer that you have given that you would like to change?
A. I don't think so.
Q. Is there anything else that you feel like counsel for Lisa Montgomery or the government needs to know about your conversations or any conversation that you had with Judge Fenner that resulted in Judy Clarke's removal?
A. You know, I just -- I just think that I've already said it pretty much. It was just really what I viewed as terrible behavior to my staff, just reached the point we need to either get off or let her have the case or whatever.
Q. Thank you, sir.

EXAMINATION

BY MS. NOURI:
Q. So the source of the what I would call complaints about Judy Clarke were predominantly from David Owen?
A. They were on a regular basis after

almost every meeting by David and Ron.

Q. And then we have one time with Stephanie Elliott, correct, that she told you the standing-over-her story?

A. I don't know. She may have been telling me how the guys were being treated, I honestly can't remember, that just sticks in my mind, that one thing about her.

Q. It wasn't any of your personal observations?

A. Oh, no, no, no.

EXAMINATION

BY MS. HENRY:

Q. I'm sorry, I forgot to ask you, did David Owen come back from court on April the 20th of 2006 and tell you what he told the judge?

A. Well, you might think that's likely. I don't remember him telling me that.

Q. Would you have taken -- and I'll just tell you, I'm not trying to be coy. Judge Maughmer remembers you being in chambers on April the 20th. We know of two people remember you being there and I believe Judge Fenner remembers you being there, it's a little unclear, but I think he does from reading the transcript. So if

you were in a chambers meeting with the Court, would you typically take notes or --

A. No.

Q. -- would there be something --

A. No.

Q. There would be no notes for you to review?

A. Interestingly enough, I don't see his name on there, but I thought Judge Maughmer was there on the 3rd and I was complaining about Susan. I don't -- I don't know whether -- unless they have got notes, I wonder if maybe the judge thought my phone call was -- I don't know. I just -- frankly, if they have got something that says I was there, I -- I'm fine with it because whatever was said I told David to say, Tell the judge, you know. I just -- frankly, I do not remember being there, though.

Q. And we are just trying to recreate that record ourselves. We appreciate your time today. And the government has an opportunity to ask you. And I would say for the record, there are six minutes and 19 seconds left on my time.

EXAMINATION

BY MS. KETCHMARK:

Q. Mr. Conrad, at the beginning of the deposition you were asked if you -- in preparation for the deposition if you spoke with folks in our office and you mentioned you had spoken with both Cynthia and me and just so the record is clear, we didn't discuss what your testimony should be or --

A. No, no.

Q. -- anything of that nature.

A. In fact, one of you said, We don't represent you in this case. I don't remember which one it was, but --

Q. It wasn't me, so I think --

MS. CORDES: It was me.

Q. (BY MS. KETCHMARK) And just so we are clear, David Owen was not complaining that Judy Clarke did anything improper in her legal work, is that correct?

A. He never complained about -- that I can think of about legal work. It was the complaint that how she treated our staff and if they had an idea of how to do something -- for example, Ron, I think, had an idea of how to do something and

she said, You are not qualified to give an opinion on how to do this and, David, you are too stupid to have an opinion or something like that, you know.

Q. So it was more her manner or her approach?

A. Word, yes.

Q. Her personality problems?

A. Right. Yeah, they didn't come to me and say, Hey, she is -- she doesn't know how to handle a mental health case, that's the reason they wanted her in it, and for that matter, my recollection is that David asked that she be allowed to stay in at some point and let us out. I thought he said that. I thought he told me that or maybe I read it in a declaration, but --

Q. Lisa Montgomery's current defense team is claiming that you and David committed a fraud on the Court because you went to the judge and said she was doing defective legal work or negative legal work.

MS. HENRY: I'm going to object at the way you are characterizing our claim. It's under seal so Mr. Conrad doesn't have the benefit of being able to read it. What we have claimed

is based on what Judge Fenner said on the record on April 25th, so I'm going to object to the form of your question and your characterization of our claim. You may go ahead and ask Mr. Conrad your question.

Q. (BY MS. KETCHMARK) Do you have -- was there any -- just to be clear, was there any complaints regarding her representation of Lisa Montgomery, her legal work?

A. Not that I can recall. Not that I'm aware of. That just wasn't the problem, just -- that just simply wasn't the problem. It was the approach she took and the fact that my people were insulted and they couldn't even have an opinion or suggest something or a way to do something, you know. It was just constant insults and things were taken personally. I mean, she treated people with personal insults I thought.

Q. Your office is funded by the federal government and your employees are all funded by the federal government?

A. That's true.

Q. And the Administrative Office, are those employees all funded by the federal government?


Case 4:12-cv-08001-GAF Document 149-3 Filed 09/01/15 Page 45 of 95

A. That's true.

Q. How did you think that Judy Clarke was receiving a salary, was that somehow through the federal government?

A. Yes, I think funding comes through -- how to put this. The Administrative Office provides administrative support for all of our offices and for the groups associated with us such as Special Resource Counsel and Criminal Justice Act Panel Attorneys, so they provide funds at the direction of the judges that oversee the Administrative Office and it was my understanding that Sentencing Resource counsel receive their funds from the Administrative Office. They may be tied to a particular defender office, they might even have an office in that office, but I don't think they are subject to the defender. They are not like one of his assistant defenders, they are -- and their check may well come through with other checks. I've never had somebody like that in my office. But their checks, their government checks, come to them just like mine does, it's just I'm not sure whether it would go through a defender office or directly to them.

Q. Okay. But bottom line, she is funded by the federal government in some form?
A. That's right.
Q. She was not in the private sector at the time of this representation of Lisa Montgomery?
A. No.
Q. She was on the case, as you said, Pro Hac?
A. Pro Hac Vice for the case.
Q. It was David Owen and your office supporting her with that?
A. David I think moved for her admission.
MS. KETCHMARK: I think that's all of the questions I have.

EXAMINATION

BY MS. CORDES:

Q. Just briefly. When you first began, you mentioned the telephone conversation that you and I had. Just want to make clear that in that conversation I didn't interview you in any way for your testimony here today?
A. No, you did not.
Q. I didn't prep you before meeting here today?
A. No, you did not.

Q. As you indicated, I informed you that I didn't represent you and I represented the government?
A. That's true, that's true.
Q. Any other conversations that Roseann had with you prior to today's meeting, it didn't involve the substance of your testimony?
A. That's true, that's true.
Q. We just informed you of the Court Order?
A. That's true.
Q. I just wanted to follow up on a couple of things. When Judy Clarke was involved in the case, do you have any recollection of positive contributions that she made to move the case forward? Let me ask it this way, she was hired to assist with mental health issues?
A. Uh-huh.
Q. Do you have any recollection of work that she contributed to during her brief time on the case on those topics?
A. At the time I thought they were doing a lot of investigation. I thought they were doing a lot of sending people out to investigate the offense, but also a lot of people were being sent out to do mitigation work, so I think they were

in a preparatory stage I guess I would say at this stage.

Q. When you say that was taking place, was that Judy Clarke doing that work or is that the resources of your office doing that work?

A. Well, I think it was maybe a combination of the two, because she had a team of at least three people, two or three people with her, and I think she would direct them to do things related to mitigation and I think sometimes they may have done things with Ron and maybe -- maybe they were with David at some point, too, you know. We interviewed people, but they were doing a good deal of investigation as I recall and --

Q. When you described their relationship and the later stages of it, it sounds like it was becoming very conflict ridden and volatile. At that point in the relationship was the case moving forward?

A. I don't think the case was -- I -- I didn't hear anything about it being stopped or at a dead end or anything like that, but I frankly thought it was volatile from almost the first. They just continued on trying to do their jobs.

Q. Can you describe in a little bit more

detail about how the funding works for Judy Clarke, I guess, to the best of your knowledge.

A. Well, I really can't -- I can only say that the Judicial Conference of the United States has an executive committee of judges who determine how much money will be applied for CJA funds for the panel attorneys and how much will be applied for defender offices, what portion of that can go to Sentencing Resource people and what portion might go to these capital habeas units, which are units usually, maybe always, assigned to a particular defender office that are involved in 20 to 55-type work.

So they get an appropriation from Congress of a set amount for defender services and that has to be used as Congress has set. So that money is -- after it's been appropriated, they divide it up, decide who will get what portion, and of that I will get a specific budget, or an allotment. It's supposed to be a budget but it comes in portions, to see my particular small office through a year. Okay.

Now then, LA has the same thing, San Diego has the same thing, Wichita has the same thing.

There are associated with these offices a Special Resource Counsel. I don't know that that person is considered subordinate to the defender at all. I think they are independent, but I think they are paid -- they are paid government employees to do their work as Special Resource Counsel. They are supposed to provide assistance, for example, if you need motions or briefs or just want to discuss a case or if they have time and are interested, if you want their assistance in a case, you can ask for that, but in all those cases they are paid and I don't know whether their check actually comes through the defender office -- see, we get paid by direct deposit, so while they might have an office in that defender's office, I'm not -- I don't think they are subject to that defender. I think they are sort of an independent person that can go around the country and take care of a case as it comes along.

Q. But whether you are Special Resource Counsel or an assistant FPD you are paid for through government funding, correct?

A. Yes.

Q. And if you hold one of those two

positions, at no time can you also work in the private sector?

A. No. No, that's been -- that's been under the statute we are all operating under, which is 18 USC § 3006A, it provides that we cannot do private practice, that's in the statute.

MS. HENRY: I need to follow up on just two things.

MS. CORDES: I'm not sure if the Court Order is clear, I thought it was supposed to be our time and your time.

MS. KETCHMARK: If she needs six minutes, she can have six minutes.

MS. HENRY: Actually I just want to ask one question in particular that came in as a result of your questioning and this will be it.

EXAMINATION

BY MS. HENRY:

Q. You described the various complaints that your staff members had. Do you recall anyone ever telling you that one of the complaints that Judy Clarke had about the team that was discussed and that was the source of friction was an alleged special relationship

between Ron Ninemire and Lisa Montgomery?

A. I can tell you only from reading the declarations, I didn't know it at the time. You want me to tell you what I read in the declaration?

Q. No, I'm interested in what you knew at the time. That wouldn't have been one of the things you discussed with Dave about, go to the judge and tell him about that?

A. No, huh-uh. I could say that David and Stephanie were very worried about Lisa committing suicide and they went out there a lot, a lot, to kind of keep her on track I guess you could say and keep -- hopefully keep her in a situation where the staff would not put her in a more difficult situation of a suicide watch and whatever that entails at CCA. They were very, very concerned about that and spent a lot of time with her, that's all I know, but I didn't hear any complaints about it until I read one of your declarations. I didn't -- I had never known somebody complained about that.

Q. So basically your opinions that you have drawn and that you shared with us today were based completely on whatever you were told by

David Owen, Ron Ninemire and Stephanie Elliott?

A. Yeah, yeah -- and -- well, and my secretaries, yeah.

Q. So you have to rely on that to be truthful?

A. That's true.

Q. That's why you've drawn the opinions that you have drawn?

A. That is quite true.

Q. Thank you very much. I appreciate your time.

THE REPORTER: What about signature?

MS. HENRY: Yes, please.

THE REPORTER: Do you want a copy?

MS. CORDES: Send it to either one of us.

MS. HENRY: Can we waive formal presentment and she can send it to you?

MR. KUCHAR: That's fine.

MS. HENRY: I would like both PDF and an ASCII format.

MS. KETCHMARK: E-Tran.

(Witness excused.)

* * *

# ERRATA SHEET

RE: LISA M. MONTGOMERY v. UNITED STATES OF AMERICA

DEPOSITION OF: RAY CONRAD

| PG/LN NO. | CORRECTION | REASON FOR CHANGE |
|---|---|---|
| | | |
| 15/13 | 2255 | This is a statute |
| 53/10 | Ron | I referred to Ron not David |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_______ I certify that I have read my deposition in the above case and I request that no changes be made.

__X__ I certify that I have read my deposition in the above case and I request that the above changes be made.

SIGNATURE OF DEPONENT: Ray Conrad

DATED: 5/28/13



Case 4:12-cv-08001-GAF Document 149-8 Filed 09/01/15 Page 53 of 95

RAY CONRAD

STATE OF MISSOURI )

) SS:

COUNTY OF JACKSON )

Subscribed and sworn to before me this 28th day of May, 2013.

BELINDA K. BYE
Notary Public - Notary Seal
State of Missouri
Commissioned for Platte County
My Commission Expires: Apr[illegible] 2015
Commission Number [illegible]

NOTARY PUBLIC

My Commission Expires: 4-16-2015

In re: LISA M. MONTGOMERY vs. UNITED STATES OF AMERICA

C E R T I F I C A T E

I, MARIE A. McCRACKEN, a Certified Court Reporter within and for the States of Missouri and Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition by said witness was given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision, and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office in said County and State, this 28th, day of May, 2013.




Marie A. McCracken
MARIE A. McCRACKEN, CSR, CCR, RPR
Certified Court Reporter
Missouri #874
Kansas #0680

May 28, 2013

Mr. Ray Conrad
c/o Mr. Robert Glen Kuchar
Federal Public Defender's Office
818 Grand, Suite 300
Kansas City, MO 64106

In Re: LISA M. MONTGOMERY vs. UNITED STATES OF AMERICA

Dear Mr. Conrad:

Enclosed is your deposition taken in the above matter, along with the original signature page and correction sheet.

Please review your testimony and make any necessary corrections on the correction sheet provided. You will need to sign both the original signature page and the correction sheet in front of a notary public and return both in the envelope provided.

We would request that you return these completed items within 30 days of the date of this letter. If we have not received these items within 30 days or by the time of trial, an unsigned copy will be filed.

Thank you for your assistance in this matter.

Sincerely,

McCRACKEN REPORTING

BY: MARIE A. McCRACKEN
Certified Court Reporter

Enclosures

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. 12-8001-CV-W-GAF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

**ORDER**

Now on this 6th day of May, 2013, comes the Court herein and having heard from counsel on Movant's Motion to Reassign Case Pursuant to 28 U.S.C. § 455(b)(5)(iv) (Doc. #41), hereby authorizes the attorneys for Movant and the Government to depose Mr. Raymond C. Conrad, Jr., Federal Public Defender for the Western District of Missouri.

Said deposition is limited to any discussion between Mr. Conrad and the Court relating to the conflicts between the Office of the Federal Public Defender for the Western District of Missouri and Ms. Judy Clarke in the handling of the underlying case herein, specifically, but not limited to, the meeting in question on April 20, 2006.

Mr. Conrad is under no obligation to discuss in general the operation of his office or personalities or conflicts within his office or any matters not taken up and discussed with the Court. The deposition is to be scheduled as soon as possible, but no later than three (3) weeks from the date of this Order. The deposition shall not exceed one (1) hour for Movant's questions and shall not exceed thirty (30) minutes for questions from the Government.

Counsel for Movant is given ten (10) days from receipt of the transcript of the deposition to file any additional suggestions in support of Movant's Motion to Reassign Case, and the

PENGAD 800-631-6989 EXHIBIT 1 km 5-20-13

Government is given seven (7) days from the date of the filing of any such suggestions to respond. Any reply will be filed within five (5) days of the Government's response.

s/ Gary A. Fenner
GARY A. FENNER, JUDGE
UNITED STATES DISTRICT COURT

DATED: May 6, 2013

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-6002-CR-SJ-GAF |
| | ) | |
| LISA M. MONTGOMERY, | ) | UNDER SEAL |
| | ) | |
| Defendant. | ) | |

**ORDER**

It is hereby ordered that telephone communication between defendant Lisa M. Montgomery and her previous attorney, Judy Clarke, is to be prohibited while defendant remains in custody. The Corrections Corporation of America (CCA) is to take all steps necessary to prohibit telephonic communication, including blocking incoming and outgoing telephone calls, to or from the following telephone numbers: 619-279-3804; 213-894-3936; 213-364-3938; 501-412-2784.

/s/ Gary A. Fenner
GARY A. FENNER, JUDGE
United States District Court

DATED: April 20, 2006

EXHIBIT
PENGAD 800-631-6989
2
mm 5-20-13

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 05-06002 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | April 25 and |
| | ) | May 3, 2006 |
| | ) | Criminal |
| LISA MONTGOMERY, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF CONFERENCES IN CHAMBERS

BEFORE THE HONORABLE GARY A. FENNER

UNITED STATES DISTRICT JUDGE.

A P P E A R A N C E S:

For the Defendant:

Mr. Ray Conrad(5-3 meeting)
Federal Public Defender
Mr. Dave Owen
Assistant Federal Public Defender
818 Grand Blvd.
Kansas City, Mo. 64106

Ms. Susan Hunt
819 Walnut Street
Kansas City, Mo. 64106

ELIZABETH SHINN, BA, RPR
U. S. COURT REPORTER
400 EAST 9TH STREET, ROOM 8435
KANSAS CITY, MO. 64106

EXHIBIT
3
Dm 5-20-13
PENGAD 800-631-6989

APRIL 25, 2006

THE COURT: Susan, what is going on.

MS. HUNT: I just wanted to kind of revisit what happened last week and I have got to give you a little bit of background with the client so you understand where we are coming from.

This is probably one of the hardest cases I have ever had, not because the client is hard to deal with, that is not the issue but she has some serious, serious mental problems which I think don't come as a shock to anybody. She has been diagnosed with melanoma at C. C. A. She's under a psychiatrist's care. She's on medication. She has been seeing Dr. McCandless since Day One. It was like every day. Now it's down to once or twice a week. They're some serious, serious problems.

I think by what transpired last week we unintentionally, and perhaps because we didn't think it through, and don't have the mental health background maybe we should we have created more problems than we ever thought would happen.

You saw her in court Friday. She's a mess. I think she feels devastated by this. Her husband, we have a litigation specialist and her husband talked to her on Saturday and we got an e-mail from her basically relaying that conversation and it wasn't good. Lisa called him

Friday night and was crying, very upset. Feels she can't trust us anymore. She didn't know about this. She feels devastated, betrayed, lied to, everything. I called him yesterday just to verify is that what she really said. I mean I think we have, not we can't repair the damage with the client, I don't think it's gone forever but I think we have taken some steps back. And I think you would agree with that.

MR. OWEN: I would agree with that.

MS. HUNT: Frankly, I was kind of taken by surprise a little bit the way this thing transpired on Thursday. It's nobody's fault but Dave said he talked to Ray and he said the visit was cancelled. I was planning on calling Judy.

There were a lot of issues not to do with the client and I told you that. And there were just team dynamics, personality, whatever. I don't know if we could have ever worked through them. I don't know the answer to that. I kind of wished we would have prepared the client more or something. It was so fast nobody had a chance to really talk to her.

I talked to her last night. She told me she feels like -- all she would say, over crying, is Ron lied, I feel like Ron lied, Ron Ninemire. She thinks we all lied to her. She was going to say I think you lied to me. I don't

think she's the kind of person, based on her background, that has the ability to come out and say that to you. She wanted to see the psychiatrist all weekend. They wouldn't let her. There was a suicide up there and I think the psychiatrist has been busy with that which is one of the reasons we have lost, we have not only done that kind of damage and very unintentionally, we certainly wouldn't have intended to do that to her.

She also told me she feels like -- and this unfortunately when you stop, take a look back objectively at it, this is how things have happened her whole life, made her re-live some parts of her life unintentionally. She feels like this decision was made for her without consulting her and she has no say. To her it was a very serious decision that affects her life and she feels like we didn't consult her, it was made for her and she is told after-the-fact which is exactly what happened.

When it is all said and done that is what happened.

THE COURT: Maybe to some extent. Don't be too hard on yourself because from my perspective Ms. Clark was a third attorney who was only appointed in an effort to see if she could assist in getting a plea worked out and that was what the situation was from the very beginning. And if she was being obstructive toward the case being handled properly

and there being good communication among all the attorneys and if she was presenting difficulty with the two of you who are the ones who are going to have to try the case, I don't really have any reservation about the judgment call that needs to be made in that kind of a circumstance. You can always look back in hindsight things should have gone differently and if you were going to do it over again you might do it this way. I wouldn't be too critical of what happened in that regard.

We made the effort to discuss it with the defendant as soon as we possibly could. I can understand she's not a person that understood all of that.

MS. HUNT: There is a lot of that, a lot of things intertwined in there. You are right, that is one of the goals when we brought Judy on board was the plea, that is exactly right. Also what she brought to this case is a tremendous experience in mental health issues which the court is aware of is one of the guidelines for representation. You have to have somebody on your team with a mental health background, experience and ferreting those issues out and handling them and presenting them. I have never had a serious mental health case and I don't think Dave has.

MR. OWEN: Not a serious mental health --

MS. HUNT: Not Lisa --

MR. OWEN: The guy had delusions. Lisa's is a different mental health problem.

MS. HUNT: Did you present --

MR. OWEN: Yes, we had a psychiatrst. But I don't have the level of experience necessary to handle Lisa, I will say that.

MS. HUNT: I don't either. That is one of the things we lost, we have to rebuild is what I am trying to tell you. And to be real honest, with Judy we gained another mental health person and we gained a mitigation investigator specialist we also lost. I believe the mitigation specialist we hired, she wasn't tied to Judy at all. I don't believe she is going to stay. That is my assessment. That is your assessment, too.

MR. OWEN: She's withdrawn from the case, I believe.

MS. HUNT: So that is a serious setback for us. These are all kind of unintended consequences that just happened. David and I have had some serious conversations where do we go from here, what damage did we do, how can we rebuild it.

One thing we talked about briefly this morning was trying to put this team back together, but that is not going to work in the state it is. It's just not. We have come up with basically two options I guess and that is we haven't

made a decision, I guess, is the bottom line but we kind of wanted to keep you informed and ask your opinion as we work through this. And our goal is to work through this fairly quickly because we have to get this case back on track and try to rebuild the relationships and get people in place we need.

One option, and this is probably never going to happen, but I am throwing it out for whatever it's worth. One option is to bring Judy Clark and the resources she brings back on board in place of the public defender's office and the public defender's office out here. I can work with her and we can be back on track like something has happened but it would be very close to being back on track and on schedule for trial.

The other option is not do that and we would have to hire a mitigation specialist.

MR. OWEN: Have to find a mental health expert to assist us.

MS. HUNT: That person is probably going to potentially be a lawyer that can assist us in the preparation for trial and working with the experts, right.

MR. OWEN: Right.

MS. HUNT: We need that and we need a mitigation specialist to replace the one we have lost. We may need another investigator. We don't know. That is up in the

air.

THE COURT: What is the problem with the mitigation specialist.

MR. OWEN: Judge, she was star struck by Judy Clark. She lives in L.A. Judy Clark lives in San Diego.

MS. HUNT: They didn't know each other prior to this.

MS. OWEN: Prior to this and she has aligned herself with Judy Clark quite honestly. When we talk about her in Kansas City we figured she's constantly interviewing for a job with Judy. And when Susan and I called her Thursday night we told her what had happened and we asked for her commitment to stay on the case and all that, she gave us her commitment. The next day she calls Susan --

MS. HUNT: That next evening.

MR. OWEN: With a totally different approach, just like our phone call the night before had never happened.

MS. HUNT: She claims she misunderstood what I said. There is no way. We made it very clear.

MR. OWEN: She had talked to Judy Clark in the meantime and we have found out she has absolutely no confidence in Kansas City lawyers; me specifically, my office in general and no respect for Susan. She thinks that we have done an absolute devastating damage to Lisa's case and essentially she has withdrawn.

MS. HUNT: And David hasn't talked to her and I have. She called me Friday night and I talked to her over the weekend. Really when she is all settled down what it comes down to a lot she does have some mental health background, experience as a mitigation investigator, talking to her. She does not have, and that is what she told me, she does not have the background and experience to go and look for experts. And she said, my God, now you are going to look to me to try to find experts to help you with that and I am not at all qualified for this and I am not sure ethically, professionally I can stay on that case. That is really what she told me on Sunday after she called down.

So it's a combination of what he said, what I said all rolled in one. But the bottom line, I don't think she will be there at the end of the day. She hasn't said that. And I don't think David wants her to stay, to be real honest.

MR. OWEN: After the things she said, no.

MS. HUNT: That's a deal breaker there.

THE COURT: I understand.

MS. HUNT: Now you don't know this, this is our third mitigation person. We look like a bunch of idiots to these witnesses. We went, through nobody's fault, but she wasn't really doing a good job. That was early on. Holly is this woman's name, Holly Jackson, and she has established

relationships with a lot of core people involved that need to be established in this case and frankly I think that is a huge problem. Now we have to start over. It's unintended consequences, it really is.

THE COURT: I am not saying it's possible but I would much rather see you try to make up with her than trying to make up with Miss Clark.

MS. HUNT: I understand that.

THE COURT: What you have told me, I am not saying you couldn't convince me otherwise but it probably would be a pretty hard sell to get me to feel that would be the right thing to do.

MR. OWEN: Judge, I will throw this out on that line. My office will not work with Judy Clark ever again. We just are not going to take that abuse.

MS. HUNT: The first option, their office maybe frankly was and that is -- David and I, we still get along, nothing personal here -- but the first option their office withdraw and that office be added and the opportunity remains and you have two lawyers and all the mitigation people we need, that is the first option.

THE COURT: What's your other option. I am not inclined to do that.

MS. HUNT: The other option, like he said we have to find a mental health person, we have to rebuild. And

that option is going to take time. I guess that is one of the reasons we are coming to you now, is because of this situation. We have to do this quickly for the client and everybody's sake.

THE COURT: What do you want me to do.

MR. OWEN: I am not asking to get off this case. You appointed our office to do this case.

MS. HUNT: We know that is option B, that is not going to happen. I just wanted you to know where we are coming from. I think you would want to be advised.

THE COURT: I appreciate that and I am not inclined to want Miss Clark to be involved in it. For whatever that is worth to you, that tells you what you need to try and do. It may be your mitigation person, maybe she thinks about it and you talk to her again.

MS. HUNT: I think you have decided you don't want her back.

MR. OWEN: I am the one that pays her paycheck. And her attitude toward our office has to change.

MS. HUNT: That is a real problem. Problems are solvable, I understand that.

THE COURT: I am not telling how you have got to solve it, but we all get upset with people from time to time and are able to work past it and go on with it. And I know you all are keeping your perspective on giving your client

the best representation you can and that is what you have got to do. And not that it is going to help you much but I would be happy for you to tell your mitigation person you have talked with me and I want her to stay on the case, if that is something you are comfortable with doing. And I am more than happy for you to use my position with her to help you in that effort if you decide that is the best route to go.

I guess to some extent I think it's somewhat unprofessional for a person to take on a job and a task and responsibility, particularly one of this nature and then --

MS. HUNT: Things don't go your way.

THE COURT: You know, particularly if it's at least for the most part based on her personal relationship with an attorney who I have made a decision is no longer involved in the case. That is not a very professional approach. That would be like, you know, if for some reason I decided that one of you was going to be replaced and the other one said I am giving up on my client then, I am walking, too.

MS. HUNT: We wouldn't do that. I guess part of our message is if we do option B. or plan B, whatever, I don't see how this case can go in October.

THE COURT: I understand what your message is on that.

MS. HUNT: It's not we didn't want to do that. Seriously we did want to.

MR. OWEN: Judge, we were literally running nine miles an hour to make the October trial even after this came down, but it's not working.

THE COURT: You all make an assessment of it and if it's something that we need to talk about then we will get the government up here and we can sit down and talk about it.

MS. HUNT: We can't give you a time how long we need. We have reached out to other people to try to get suggestions and names and we are going to try to get that put together but until we do --

THE COURT: I can tell you all that I think, as you know, I was very hesitant to have Judy Clark involved in it from the first place. But that is just the way it goes and I can see why you all at that time thought that would be helpful. I don't have any reservation about the fact that she needed to be taken off the case because her involvement was obstructive in getting a defense for Miss Montgomery put together.

MS. HUNT: It was being put together but it was tense.

THE COURT: Somebody has to be in charge and in this case it's you.

MS. HUNT: I think we would have been ready in October had this not happened. We just kind of wanted to keep you up-to-date.

THE COURT: I appreciate that and you all talk about what you need to do with the mitigation thing and decide how you want to approach it. Even if you decide you want to try to keep this lady I can't force her to stay on. I am not going to try. If she isn't staying she isn't staying.

MS. HUNT: If you force somebody she wouldn't do a good job.

THE COURT: You don't want that. Think about it and if you get to a point you want to talk about something else I am more than happy to talk with you about where you are and what you are thinking you might need to do or not do.

MR. OWEN: We appreciate it.

THE COURT: And we will go from there.

MS. HUNT: We just have a lot of re-building. I just don't think we thought it through. So the consequence is enough.

MR. OWEN: You can't think of all the consequences.

MS. HUNT: No, but things happen.

THE COURT: I tried to make your client understand

it was my decision and she might have been willing to accept that and apparently she hasn't accepted that and who knows different.

MS. HUNT: She had a different relationship with Judy Clark that was good, but that is what happened. She was expecting her that day and then all of a sudden she was told her visit was cancelled.

(Discussion off the record.)

MR. OWEN: We do need to have this under seal. I am being serious about that.

THE COURT: We will continue it.

MAY 3, 2006

THE COURT: Susan, I suppose that David and/or Ray told you they visited with me earlier this week.

MS. HUNT: Right.

THE COURT: And they expressed concerns about the defense of Lisa Montgomery proceeding and you all being able to work things out. And I told them I wanted to talk to all three of you at the same time to see what the situation was and what, if anything, can be done to facilitate, if there is a problem, getting that resolved and getting things going.

So I would like to hear your position on where things stand and what, if any, problems you have and what, if anything, you think can be done.

MS. HUNT: Okay. First, I don't know if the court has seen it. I filed a letter from the client this morning under seal. You got it.

MR. OWEN: Yes.

THE COURT: I have not seen it.

MS. HUNT: Here is the original if you want to read it.

THE COURT: Just tell me what she says right now.

MS. HUNT: She's not blaming anybody. She just is expressing basically her concern about the removal of Judy and the fact, you have read it, too, she feels she wasn't

frankly notified about it and it wasn't discussed with her. And I think that frankly is a problem that I think we should have talked to her about it prior to it being done. The fact she has had trouble trusting lawyers in the past, that she has gone through other team members being removed without her knowledge or understanding, Anita Burns who was initially on this; another Lisa Rickart, a mitigation investigator we hired. Frankly the reason she was removed she resigned. She would have been fired if she hadn't. She just wasn't doing the job is the bottom line but she expressed some concerns about that. Are decisions going to continue to be made without my knowledge or consent. Is that what I expect in the future. It's a nice letter. It's well written.

MR. OWEN: It's well written. She's not bashing. She extolled Judy's virtues. That is basically it.

THE COURT: That is the bottom line.

MS. HUNT: That is the bottom line. I think we came to you last week, I forget two weeks ago. Basically I think what we told you there was some big problems with functioning, right, wrong, I think the blame lies with everyone. I think the blame lies with me, the blame lies with the federal public defender, the blame lies with Judy. There were problems working together and that is why we came to you.

Quite frankly, I didn't anticipate the depth of the devastation on Lisa Montgomery by the removal of Judy. I knew there was a good relationship between the two and I knew that. She had gotten Lisa to open up more and there was some changes. I think it was wrong, I think it really was. And I think David and I, this is our fault. I think we should have discussed it with her and tried to assess that before it just happened. I think they're fundamental problems. And I think they're fundamental problems with our continuing on.

THE COURT: "With us continuing on", what do you mean by that.

MS. HUNT: With David Owen and I. I think there is a lot of water under the bridge, nothing personal against David Owen. I still consider him a friend. That is not this issue obviously.

THE COURT: One thing about it, Lisa Montgomery doesn't get to pick who her attorneys are. She's entitled to have effective counsel and that is my responsibility to see to it that is accomplished. And it's also your responsibility as her counsel to see to it that takes place. So it's unfortunate Lisa Montgomery is upset and if she doesn't like what is going on, I have told Lisa Montgomery it was my decision and it was my decision alone. And, you know, I am very, very surprised by everything that

has taken place in this case over the last couple of weeks. First the two of you come and say Judy Clark is a non productive member of the team, causing problems, we need to have her removed from the defense. And based upon your explanation of the situation I did that.

And then a few days later the two of you came back and you wanted to think about reconsidering that and maybe bringing Judy Clark back in. And then a few days later we have a situation where the two of you say that you are not able to work together and get along. And as I told David and remember when they came in and talked that, knowing both of you I find it hard to believe you would have some kind of an issue you couldn't sit down and talk about and get it resolved and get it behind you. And as I told you at one of our meetings over the course of the last couple of weeks I considered you the lead attorney in the case (talking to Susan). And certainly in any relationship I expect the attorneys to talk things through and work with each other and be receptive to each other's input and opinion on how things ought to be handled. But when it comes right down to if there is a difference of opinion where a decision has to be made then somebody has to be in a position to make that decision.

MS. HUNT: I think that is the problem.

THE COURT: I am not going to change attorneys on

Lisa Montgomery every week.

MS. HUNT: I agree.

THE COURT: If there are specific circumstances that you all want to talk about with me, issues that you feel you are not going to be able to work through or resolve, I am happy to listen to you but I am really not inclined to take anybody off the case because somebody is having a difficult time getting along. Just on a broad proposition that you can't work together my reaction to that is then you need to work it out and you need to resolve it and you need to get past it. If there is something that happened, somebody feels that there are specific things that have taken place that have destroyed the ability to have a working relationship to provide effective counsel to Lisa Montgomery then tell me what they are.

MS. HUNT: Judge, there has been a lot of, as I think we told you the other day, we consulted Dick Burr, the National Resource Counsel, David and I met with him last Tuesday and Ray was in that meeting as well. And we all agreed because of Lisa Montgomery's mental health and because of the information in this case we had to have somebody on this team and the A. B. A. Guidelines and Supreme Court requires on mental health background. And Dick's job, he was going to try to find somebody. Dick hasn't been able to find anybody. He says basically there

is nobody that can do this.

And I really am going to resist, I don't want to get into he said-she said, I don't think that is productive at this point. I have a strong feeling that while the court considers me lead counsel and David says I am lead counsel, in reality I am not. And decisions are made I am not consulted on and things are ignored we all agreed to. And that situation cannot occur and I can effectively represent Lisa. And I personally can't be involved and be effective and I think it's a bad situation.

This case definitely requires a federal public defender's office because it's going to require a lot of resources frankly and I think we all know there is a problem sometimes getting sufficient money out of Judge Logan to accomplish things that need to be done. I would be the first one to say the public defender needs to be in this case. It requires a lot of resources. It requires a lot of investigators, like Thomas Smith does not. That is not a problem. Two C. J. lawyers, it's not been a problem. That being said, if anybody should go it should probably be me because they have the resources I don't have and I can't get. I don't know. I don't know what was said to you on Monday. I wasn't a party to that conversation at all.

THE COURT: Really not much more than what I have said, David and Ray represented that you and David were at a

point you weren't able to work together anymore and David did not feel that he would be able to at this point represent Miss Montgomery in the case. Basically my sense was that David and Ray were saying when we met on Monday that they needed out and now you are saying you need out.

MS. HUNT: And I am saying it because of the resources I can't muster and I just cannot do. One of the major disagreements -- and I think maybe the court is aware of this -- is I was supposed to call Judy that day and discuss this with her. Unbeknownst to me she had already contacted Dick Burr. He said why don't I sit down with you people and see if we can't work out these differences and get this case rolling.

David, he told you, he did not tell me this, call and cancel the visit. That is what happened. I was stunned. I never was allowed to make the phone call. I tried to resurrect with Dick Burr, that is one of the topics we talked on Tuesday, let's try to put this back together for the sake of the client. We had the resources, mental health people we needed, we had all this in place. That was lead counsel, that was my opinion the best way to go. Put aside our personal differences. Always been personal differences, not about the client. That was my opinion as lead counsel what should happen. He said absolutely not and that is where we are at. That is just, I don't want to go

into all the other details. I don't think it's productive, but that is just an example of how my ability to actually make decisions and be responsible is not respected. I don't have it, I just don't have it.

THE COURT: David, do you think there is a basis for Susan to feel you don't respect her judgment or decisions in the case, things happen that draw that into question.

MR. OWEN: Speaking to that particular issue, Judy Clark being in the case, she can assume that is her decision or not her decision. I have overruled this by saying I can't work with this person. I don't know how you want to view it. Our office cannot work with that woman. It is impossible. She is just abusive beyond reasonability. We just can't work with her.

THE COURT: I accepted that.

MR. OWEN: I appreciate Susan's position. She thinks it's best for Lisa Montgomery's defense to have that team put back together. I have no objection if they want to put that team back together, but our office can't work with them.

The other issue I think bothers Susan greatly is the money. And I appreciate her position as lead counsel she ought to be able to do, what money is spent where and how. I have never denied anybody any money, never. But

no-one outside the federal public defender's office has control over the federal public defender's budget and how it is spent. I cannot give that duty to Susan just because she's the lead counsel.

MS. HUNT: I understand.

MR. OWEN: They're those fundamental differences. Additionally, again I don't want to get into the he says-she says, this is not the place for that. All of a sudden it appears that all of the problems with this case are sitting in my lap, it's all my fault because I, quote, feel the need to control this case, unquote. Well, I don't. But that's the perception and I cannot be the whipping boy and the scape goat.

THE COURT: I do sense there is some surprising second guessing on the decision to remove Judy Clark. And I am surprised by that because it was a joint request from the two of you and it seemed that there was no consideration for anything other than the fact that Judy Clark had to go.

Then a couple days later I was surprised to hear you suggest, well, maybe we ought to bring Judy Clark back in. And it's like in anything else you have got to, in this business you make your decisions and you go with it. And you make things work from that point on. And when we met the following Monday after Judy Clark was removed and that was suggested to me I told you pretty clearly as far as I

was concerned that wasn't an option, Judy Clark was not coming back in. And I mean I still don't hear anything that I think is of such a significant or serious nature that the two of you shouldn't be able to work together.

I guess you are basically saying, Susan, that if the public defender's office stays in this case that you want out.

MS. HUNT: Quite frankly, I wasn't the one that came to you Monday and said I couldn't work. This meeting is because David Owen and he feels obviously strongly about that.

THE COURT: But this meeting is because I wanted to talk to everybody about it.

MS. HUNT: I understand but because he came and told you he couldn't work with me. I never did that. Maybe that was a good thing for David to do. Maybe it was a bad thing for him to do. But obviously there were issues that at a minimum needed to be aired, resolved and moved past or at the other extreme something else needs to be done.

MR. OWEN: Judge, if I may, Dick Burr is the resource counsel, he sent an e-mail to me yesterday of which Susan received a copy and in which he squarely puts the blame in my lap for the inability to even obtain additional resources; in other words, somebody that is expertise in handling that will help the case. And it is obvious to me

that we are the federal public defender's office to stay on this case. Dick Burr would not be able to assist in the defense of Lisa Montgomery in obtaining additional resources. I think, quite honestly, he is ready to wash his hands of the whole thing as well.

It is my viewpoint that in the best interest of the client, best interest of proceeding in this case through to trial in a timely fashion that it would be best for our office to get off. That way Susan could continue because not only have we got the problem between Susan and me we have the mitigation specialist who, quite frankly, was hired by our office, is paid by our office but will not deal with our office. She wouldn't even return my calls.

MS. HUNT: I don't think she is staying.

MR. OWEN: She would if I wasn't. My point being is I believe she would continue on the case. if I am still on the case, if the federal public defender's office is still on the case, and Holly leaves, the mitigation specialist leaves, this case goes back to square one with mitigation investigators and things like that. All that has been done. This person has developed a relationship with the various witnesses that need to be developed. And Susan can, and I am sure with the court's assistance, obtain whatever funds are necessary from Judge Logan. It is just my opinion for the good of the defense and to keep this case

on track and moving smoothly, it's just best we get off.

MS. HUNT: He has had more contact with the witnesses than I have and you know the witnesses and so does Ron Ninemire, just like the mitigation specialist. I haven't had contact.

THE COURT: My main concern is whether the two of you can work together. You are always going to have problems with experts and I can't predict who is going to do what, what expert is going to have a problem or get sick or what is going to happen. I am concerned with having capable attorneys who can do an effective job for the client. And in my judgment you are both of that caliber, but you are telling me you can't work with her and you are telling me that you all have had issues you think it's best you not continue in the case.

MS. HUNT: Yes, based on obviously, like I said, he is the one that came up here and said he couldn't work with me. He is saying that now.

THE COURT: I understand. That is a little bit petty in the sense, I mean --

MS. HUNT: I understand.

THE COURT: That is like one brother tattling on another one and then everybody getting mad and not being able -- I mean I am confident you could move past that.

MS. HUNT: That is not what caused me to say that,

correct.

THE COURT: I am not saying it wouldn't be upsetting to anybody. I am sure David would be sensitive about it if things had transpired the other way. But I guess if they're differences that need some input then probably better they come out or the sooner they come out the better, maybe the two of you agreeing let's go talk. But we have already discharged two of Lisa Montgomery's attorneys, Anita and Judy Clark. And if one or other or both of you go it's pretty much my opinion we are going to be starting over regardless. Maybe we wouldn't. Maybe there would be a way to put something together and have one of you off of the case and be able to pick up maybe along the lines of what David is suggesting. But I still, I just can't believe that the two of you are in here telling me you can't work together.

MS. HUNT: Well, frankly, that may not be the answer you want to hear. One of the reasons I say their office needs to stay they have a paralegal. I don't have a paralegal. They're experts that have already signed contracts with their office ready to come in here and do some work. If they were off the case and I was on it, appoint somebody else, I would have to file a motion. That work right now would be at a standstill where right now under their office it would continue to go as far as getting

this case back on track. I may not get the money from Judge Logan. I had some problems with the Thomas Smith case. He denied an expert once and he wrote another letter and he granted it. You probably don't know but that expert came in and didn't charge for travel time, didn't charge for meals. Submitted a very conservative bill and Judge Logan cut it by three thousand dollars. It's very difficult to get people to work with you under those scenarios and I could not be effective under that. Really a lot what this boils down to is the expert money and the resources. They have a big office. They have a paralegal. They have that staff. They can do that and the paralegal they have has been busy, 40 hours a week on this case.

THE COURT: Are you saying you can't work with them.

MS. HUNT: I am not saying that is the reason. I am saying that because he came in here to talk to you. No, that brings more of an issue for me. That is not the sole reason. I am saying that I think they're fundamental differences. He can say I am lead counsel but there have been decisions made in my opinion I am just ignored and I don't think in this case, it's my third death penalty case. I am no expert and I know David doesn't like hearing that but he doesn't have that background and experience to make those decisions. Frankly, that was part of the problem why

the team fell apart in the beginning in the first place. I can't see it's going to change much. That will be a problem.

THE COURT: We have some difficulties in the Smith case too with attorneys.

MS. HUNT: Right, that was the client though.

THE COURT: The codefendant and with the client, but the attorneys need to work together to try to head off, resolve those kinds of issues. And here we are well into this case and I have got two veteran, experienced, capable attorneys in here, both of them telling me we just can't work together. And these are long hard, difficult cases.

MS. HUNT: Very much so.

THE COURT: It would be extremely unusual if people didn't have differences and even serious differences and disagreements about how things ought to go. You just ought to be able to work through them. I know that I keep saying that and I guess that if you tell me, if you are both telling me that is not going to happen then I have got to decide what I am going to do. But that certainly would be what I would expect and anticipate from both of you. But I can't make it happen and if that is not possible or highly unlikely then I will decide what I am going to do. But really it seems to me like you ought to put these things aside and do your job of representing Lisa Montgomery. And

I know you are both capable people and it's a hard case. It's a difficult case. All of these cases are. They take a long time. It's not something that is over in a short period of time and it's just an awful lot you have to deal with and that makes it a rough road.

Ray, is there anything you want to comment on.

MR. CONRAD: Judge, Susan sent out a six-page letter that basically attacks me and David fairly consistently in the case. One of the problems, we are under-cutting her authority as lead counsel because of money and the only way that you can get around that is to have Susan as lead counsel and the C. J. A. panel attorney and have her own budget she works with. We have never denied her anything. But nevertheless I am the subject of the attacks on the fact we are controlling the budget and not letting her have the money she needs and in fact making a statement we refused to use money on a particular subject which is not correct. We have not denied that money. I am pretty bitter about that. I am pretty upset that would happen.

I am upset these two people come to you saying they can't work with Judy Clark. Three days later we meet with defense counsel and much to my surprise Susan says I have changed my mind. This is a big hole in this case and I have made a mistake, I can accept that. After all we are

talking about somebody that is facing the potential death penalty and if she has had time to think about it and think she made a mistake, that is her choice. But then to suggest that it is my fault and David's fault and we decided we would prevent Judy Clark from entering the prison and talking to the client is totally untrue. I did not make that decision. But that is the gist and that is suggested nationally to other people she had no opportunity to even object, she was so stunned she was unable to object to this court. And yet she is lead counsel, asked that Judy be removed from the case and I have to sit here and have that kind of thing said against me and David. And nationally that is known, that people are aware of that including The National Resource Counsel, if not others, that supposedly we are controlling the budget and preventing her from acting as lead counsel. We have given her the opportunity she requires to control the budget as lead counsel. If that is the case then she certainly would have every opportunity to seek a budget through this court. But, no, day-to-day she comes here with another proposition and that is I can't handle this case with this budget, we have got to have the federal public defender in here to take care of the budget. So that is a new position. And yet just three or four days ago she wanted us off the case. When we come to you and tell you we can't work with Susan, today she says they

should have the case and I should be off of it.

MS. HUNT: I disagree with about everything he says what my letter was. But obviously they're some deep-seeded feelings and I am going to renew my motion to withdraw from this case. I think, based on what he has said, it's obvious they do not want to work with me and I cannot be effective.

Having said that I do believe they do have the budget, they do have the experience, they do have the background in this case. They have the file and I think that would be in the best interest of the client at this point.

THE COURT: Well, needless to say, I am extremely disappointed in the circumstance that presents itself and as equally surprised by the situation that presents itself. I don't know too much more what I can say to anybody and I guess that I am going to have to think about it and if I want to talk to anybody any further about it I will call you back. If not, I will make a decision what we are going to do. Okay.

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Elizabeth Shinn
U.S. Court Reporter