IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

| | | |
|---|---|---|
| LISA M. MONTGOMERY,<br><br>*Defendant/Movant,*<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>*Plaintiff/Respondent.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 12-CV-8001-SJ-GAF |

**PETITIONER'S INITIAL MOTION TO AUTHORIZE DISCOVERY**

COMES NOW, Movant Lisa Montgomery, by counsel, and respectfully moves this Honorable Court pursuant to Rule 6 of the Rules Governing §2255 Proceedings and *Bracy v. Gramley*, 520 U.S. 899 (1997), for leave of the Court to conduct discovery relevant to Mrs. Montgomery's claims for relief. Specifically, Mrs. Montgomery requests to depose the following:

1) Dr. Linda McCandless *(Phoenix, Arizona, former staff physician for Corrections Corporation of America at Leavenworth);*

2) Attorney Fred Duchardt *(Kansas City, trial counsel*);

*3)* Attorney John O'Connor *(Kansas City, trial counsel);*

4) Ron Ninemire *(Kansas City, retired investigator, Office of the Federal Public Defender, Western District of Missouri);*

5) Stephanie Elliot (*paralegal, Office of the Federal Public Defender, Western District of Missouri).*

Further, Mrs. Montgomery requests production of the following:

1) Mrs. Montgomery requests this Court to order a subpoena *duces tecum* for the rest of Mr. Duchardt's file.

In support of her requests for discovery, Mrs. Montgomery submits the following Suggestions in Support:

**A. Standard for Discovery.**

> In appropriate circumstances, a district court, confronted by a petition for habeas corpus which establishes a prima facie case for relief, may use or authorize the use of suitable discovery procedures, including interrogatories, reasonably fashioned to elicit facts necessary to help the court "to dispose of the matter as law and justice require."

*Harris v. Nelson*, 394 U.S. 286, 290 (1969). In response to *Harris*, Congress enacted Rule 6 of the Rules Governing §2255 proceedings, permitting discovery upon a showing of good cause:

> A party may invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

"Good cause" is established where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).

*Bracy* sets out a clear, straightforward framework for the determination of a habeas petitioner's discovery requests: a court must 1) determine whether the petitioner has alleged the elements of the claim to be proven and 2) determine whether the petitioner has made any specific allegations that support the particular discovery request. If the petitioner has alleged the claim and asked for probative evidence, she has shown good cause for discovery and the court has the duty to permit it. *Id*.

This Court has previously granted discovery, albeit to the Government, in a case with similar issues regarding the ineffectiveness of trial counsel. Order, *Nelson v. United*

*States*, W.D. Mo. No. 04-8005-CV-W-FJG (Doc. 205, July 25, 2012) ("Nelson Order"). Relying on precedent from the Eastern District of Missouri from *Allen v. United States*, No. 4:07-CV-00027, 2011 WL 4729819, E.D. Mo. (Oct. 7, 2011), this Court ordered depositions of trial counsel and others.[1]

### B. Mrs. Montgomery meets the *Bracy* requirements as to the depositions and production of documents in support of her claims.

As was the case in *Allen* and *Nelson*, the depositions here are relevant to the question of whether Mrs. Montgomery's trial counsel performed deficiently in the investigation and presentation of her defense and mitigation evidence.

1) **Dr. Linda McCandless** *(Phoenix, Arizona, former staff physician for Corrections Corporation of America at Levenworth).*[2]

Deposition of Dr. McCandless is necessary for support of Mrs. Montgomery's claim of ineffective assistance of counsel Claim V: "In Violation of the 5th, 6th, and 8th Amendments, the Fred Duchardt-led Trial Team Denied Lisa Montgomery the Effective Assistance of Counsel in That Her Attorneys Performed Deficiently and Unreasonably Both Prior to, During and After Trial In Light of Prevailing Professional Norms Under *Strickland v. Washington*, 466 U.S. 668 (1984) and Mrs. Montgomery Was Prejudiced as There Is A Reasonable Probability That But For Counsel's Error's, The Outcome Of Her Trial Would Have Been Different," including subpart 19 ("Trial Counsel Was Ineffective for Reaching Out to Dr. Linda McCandless in the Middle of Trial and Presenting Her as a First Phase Defense Witness").[3] D.E. 71, at p. 186. As Mrs. Montgomery has previously

[1] In *Allen*, the District Court ordered depositions of trial counsel, counsel's paralegal, and a mitigation specialist. *Allen, supra* at *4.

[2] Movant has attempted to interview Dr. McCandless to develop the proof outlined herein, however Dr. McCandless has declined to be interviewed.

[3] Deposition of Dr. McCandless is also merited as to Claim VII :"Mrs. Montgomery Did Not Receive a Fair Trial Because the Jury Was Permitted to See Her Under the Effects of Psychotropic Medications Which Only Partially Treated her Complex Mental Illness in Violation of *Riggins v. Nevada,* 504 U.S.

pled, during trial it became clear that things were not going well and Mr. Duchardt decided that he had a new witness to support his defense: the treating psychiatrist from Corrections Corporation of America where Mrs. Montgomery was held pre-trial, Dr. Linda McCandless.

Two genuine issues of fact before this Court in determining Mrs. Montgomery's claims are (1) when Mr. Duchardt developed Dr. McCandless' testimony and (2) whether he was forthright with the Court and the Government at the time of trial regarding the timing of the development of that testimony. While Mr. Duchardt has claimed that Dr. Linda McCandless' testimony "sort of fell into our lap," (D.E. 72-19, Dec. of Chris Armstrong, p. 4) available records suggest otherwise.[4] On October 12, 2007, a Friday, in the midst of the trial, Mr. Duchardt billed .10 of an hour (6 minutes) for a telephone call to Dr. McCandless at CCA. Exhibit 1, Excerpt of Duchardt CJA Voucher. On October 13th, a Saturday, Mr. Duchardt billed .6 (36 minutes) for a telephone call with

---

127 (1992) where Dr. McCandless was a direct witness to the effects of psychotropic medication on Mrs. Montgomery, having treated Mrs. Montgomery prior to the medication and observed her after Mrs. Montgomery began the medication and throughout the trial.

[4] In his statement, Mr. Duchardt's only response to the claim he failed to discover Dr. McCandless' important information or properly prepare her to testify is to refer to Dr. McCandless' testimony that she kept her interviews with Mrs. Montgomery superficial until mid-trial:

> Current Counsel for Mrs. Montgomery also criticize me for not having earlier discovered the opinions of Dr. McCandless which we presented at trial. (Doc. 71, p.81, 186). Actually, Dr. McCandless explained things completely in her testimony admitting that, prior to trial, she (McCandless) had kept her conversations with and findings about Lisa Montgomery superficial, whereas she (McCandless) decided, **in** the middle of trial, that treatment concerns required a deeper analysis, resulting in the new conclusions about which she was called upon to testify (Tr. 2091-2092).

D.E. 129, Statement of Fred Duchardt at p. 70 (emphasis in the original). Such a response begs many questions, among them why Mr. Duchardt did not request Dr. McCandless to more thoroughly assess Mrs. Montgomery until mid-trial. Further, given Mr. Duchardt's time records, which reflect a phone call with Dr. McCandless on October 12 just a day prior to Dr. McCandless' more in-depth interview with Mrs. Montgomery on October 13, 2007, Mr. Duchardt's careful articulation that Dr. McCandless decided in the middle of trial to do an in-depth interview, begs the question of whether he asked her to do so before she "decided."

Dr. McCandless. *Id*. Dr. McCandless' treatment notes reveal that she questioned Lisa about the offense for the first time on Saturday, October 13, after she had spoken with Mr. Duchardt. On Sunday, October 14th, Mr. Duchardt had yet another .2 (12 minutes) telephone call with Dr. McCandless. *Id*.

Then on Monday, October 15, Mr. Duchardt announced he had a new witness for the first phase of the trial. At 6:16 a.m, Mr. Duchardt emailed the Courtroom Deputy to Judge Fenner, the Government attorneys, David Owen, Ron Ninemire, and Stephanie Elliott, letting them all know that Dr. McCandless would be testifying. D.E. 71-28, Fred Duchardt email to court dated 10/15/2007. According to the email, Mr. Duchardt had called Mr. Whitworth the night before to notify him that Dr. McCandless would be testifying. *Id*. The Government objected both to the late disclosure and that the addition was a violation of the Court's discovery rules on mental health evidence. *Id.* Mr. Duchardt claimed that Dr. McCandless "reported to [him] that she had met with Lisa on Saturday . . . because she ha[d] been concerned about Lisa's mental health during the trial." *Id*. Mr. Duchardt claimed that Dr. McCandless had "decided she needs to change her diagnosis of Lisa to include psychosis." *Id*. Duchardt presented this issue as if he had only just learned from Dr. McCandless herself that Dr. McCandless would support a first phase defense. The veracity of that statement is questionable. When asked how he obtained Dr. McCandless' treatment records over a weekend, Mr. Duchardt's response was that he kept a "free flow of that stuff coming to [him]." D.E.71- 19, Dec. of Chris Armstrong, p. 4. Dr. McCandless' deposition is needed to develop Movant's claim that Mr. Duchardt's handling of Dr. McCandless was ineffective assistance of counsel.

In addition to determining whether Mr. Duchardt's development of Dr. McCandless

as a witness in the middle of trial was deficient performance, the Court must also determine whether Duchardt's failure to adequately prepare Dr. McCandless to testify was constitutionally adequate. As Mrs. Montgomery has pled, and Dr. Logan's declaration attests:

> Mr. Duchardt's failure to prepare his witnesses also compromised the testimony of Dr. McCandless, who was totally blindsided by the recordings of Ms. Montgomery's phone calls from CCA. Dr. McCandless was not a forensic expert, but Mr. Duchardt left Dr. McCandless vulnerable to cross examination regarding those calls by not providing her information regarding those calls prior to her testimony. I believe that had Dr. McCandless been prepared, she could have explained that in fact Ms. Montgomery was presenting herself falsely in those phone calls, in other words she was trying to present herself as more competent than she was in order to mask her deficits and impairments.

D.E. 71- 17, Dec. of Dr. Logan; D.E. 71, p. 88-90; 186-88.

To this claim, Mr. Duchardt has made minimal response:

> Actually, in preparation with Dr. McCandless, I did address with her the matter of Lisa's attempts at humor with Dr. McCandless, and I even laid the foundation, in direct examination, for what of that ilk would come in on cross (Tr. 2084-2085). In this situation, again, I believed that untoward inferences from something Lisa had done were addressed as well as they could have been.

D.E.129, Statement of Fred Duchardt, p.68. Mr. Duchardt's response does not answer whether he played the tapes subsequently used to impeach Dr. McCandless for her prior to her trial testimony, nor does he answer how he "address[ed]" the issue with her. Further, assuming the veracity of Duchardt's statements in court, Mr. Duchardt only spoke with Dr. McCandless for .5 (30 minutes) total after her interview of Mrs. Montgomery before he put her on the stand. (.2 hours, 12 minute phone call on Sunday when she called to tell him of the results of her interview and .3, 18 minute, phone call on Monday the 15th).

Deposition of Dr. McCandless is necessary for further factual development of Mrs. Montgomery's claims that Mr. Duchardt performed deficiently 1) by failing to contact Dr. McCandless prior to trial, 2) by failing to have any actual "free flow" of information with Dr. McCandless prior to making the decision to use her as a defense witness in the midst of a death penalty trial,[5] 3) by then contacting her mid-trial to ask her to develop additional 11th hour proof of his defense, and 4) failing to play the tapes of Mrs. Montgomery's phone calls for Dr. McCandless (or to fully inform the doctor of the substance of the recorded conversations) such that she could revise her opinion or prepare a response to the implication that Mrs. Montgomery was lying to her, and 5) by failing to sufficiently prepare Dr. McCandless to testify as a defense witness. As Mr. Duchardt has not directly answered the question of whether he attempted to develop Dr. McCandless as a defense witness prior to trial, whether he, in fact, as Mrs. Montgomery believes, contacted Dr. McCandless on October 12 to ask her to interview Mrs. Montgomery to confirm his theory of pseudocyesis rather than maintaining a "free flow" of information as he now represents, and whether/to what extent he "discuss[ed]" the taped phone calls later used to cross examine Dr. McCandless with her prior to her testimony or otherwise prepared her to testify, deposition of Dr. McCandless is necessary for development of the record as to those questions.

2) **Attorney Fred Duchardt** *(Kansas City, trial counsel)*

Deposition of Mr. Duchardt is necessary for support of Mrs. Montgomery's claim ineffective assistance of counsel Claim V: "In Violation of the 5th, 6th, and 8th Amendments, the Fred Duchardt-led Trial Team Denied Lisa Montgomery the Effective

[5] Query why, if Mr. Duchardt had a "free flow" of information with Dr. McCandless, her testimony was not developed prior to trial. The late date of their discussion, in and of itself, indicates that there was no "free flow" of communication.

Assistance of Counsel in That Her Attorneys Performed Deficiently and Unreasonably Both Prior to, During and After Trial In Light of Prevailing Professional Norms Under *Strickland v. Washington*, 466 U.S. 668(1984) and Mrs. Montgomery Was Prejudiced as There Is A Reasonable Probability That But For Counsel's Error's, The Outcome Of Her Trial Would Have Been Different," including all subparts.

As this Court has noted, Mrs. Montgomery has pled twenty-five distinct bases for her claim of deficient performance by the trial team.[6] D.E. 71. Though Mr. Duchardt filed a lengthy "statement" with this Court ostensibly in response to Mrs. Montgomery's claims (D.E.129), Mr. Duchardt failed to address many of the issues raised by Mrs. Montgomery or respond to many of the questions proposed by the Government when requesting that Mr. Duchardt be required to prepare an affidavit.

Though Mr. Duchardt scathingly dismisses Mrs. Montgomery's claim of interference with the right to counsel, he failed to provide critical information regarding his decision to not pursue development of that claim for appeal. While Mr. Duchardt boasts of his "strategy" whereby Judy Clarke could have returned to the Montgomery team and posits that her "rejection of the proposal" was the reason the issue was not pursued (D.E. 129 at 15-16) he fails to address whether he knew (as he surely would have if he had done the research or had the conversation with Ms. Clarke that he claims to have had) that his "strategy" was untenable in that Ms. Clarke as a federal defender in California was not eligible to become a member of the Missouri Bar which was, at that time, a pre-requisite for admission to the bar for the Western District of Missouri. Given that his putative reason for not pursuing the issue is illusory, deposition of Mr. Duchardt is necessary for determination of: 1) what he knew and when and 2) what Ms. Clarke actually discussed

[6] Mrs. Montgomery pled twenty-four separate grounds and also a claim of cumulative error. D.E. 71.

with him in the conversation Mr. Duchardt has cited. In his haste to dismiss Mrs. Montgomery's claims regarding the interference with counsel, Mr. Duchardt failed to address a number of the Government's well taken questions regarding this issue, specifically: What information were you given about Judy Clarke when you were first appointed to represent Mrs. Montgomery? Did Mrs. Montgomery ever speak with you about Judy Clarke? What documents/materials did you review that Judy Clarke was involved with? Why did you not meet with Lisa Rickerts, Holly Jackson, Debra Garvey, David Freeman, or Judith Herman? D.E. 79-1, Questions from Roseann Ketchmark at #1, 3, 5, 14.[7]

Avoiding the central issue in Mrs. Montgomery's claim of ineffective assistance of counsel for failure to retain competent mental health experts (D.E. 71 at p. 135), Mr. Duchardt also fails to answer the Government's penetrating question: Did Fred persuade Dr. Logan to agree with Ramachandran's somatoform disorder? D.E.79-1, Questions from Roseann Ketchmark at #30. Mr. Duchardt also posits that "from my work in other cases, I was familiar with Dr. Fucetola and Dr. Gur and the high quality work they could perform;" however, he does not provide any specifics as to what he knew about Drs. Fucetola or Gur prior to hiring them. D.E. 129. Mr. Duchardt has stated that he relied on the expertise of Judy Clarke and Susan Hunt in identifying "Lisa's great physical-and-emotional-trauma-related brain injuries" (D.E. 129 at 64); but he neglected to address Mrs. Montgomery's claim that the trial team failed to engage an expert to explain to the jury how Mrs. Montgomery's dissociative states could cause her to appear to be engaging in deliberate behavior that was nevertheless beyond her capacity to control. D.E. 71 at p.135.

[7] The Government's submission of the questions in D.E. 79 demonstrate the materiality of Movant's claims. If the matters set forth in D.E. 79 were not material, the Government would not have sought to have Mr. Duchardt (and Mr. O'Connor) address them by affidavit.

Mr. Duchardt seems to believe that his assertion that "Current Counsel for Mrs. Montgomery point to not one fact of substance about Lisa which was not contained in our database pertaining to the case . . . putting things another way, Current Counsel for Mrs. Montgomery do not, because they cannot, point to one fact that they uncovered anew, and instead rely upon only those facts about Lisa which we uncovered and knew about.[8] Our database work product best speaks of the effective teamwork that went into this case" (D.E. 129 at 34) is a sufficient response to Mrs. Montgomery's claims of ineffective assistance of counsel for failure to conduct a mitigation investigation that complied with the ABA guidelines and prevailing professional norms. It is not.

As the Government has articulated, compelling questions regarding the trial team need to be answered, e.g.: How did the defense insure they conducted a mitigation investigation that complied with the ABA guidelines and prevailing professional norms? Did the defense team understand the importance of a mitigation investigation? If so, how did they insure their mitigation investigation was complete? Were Fred, John O'Connor, or David Owens familiar with the ABA guidelines, basic principles of penalty phase investigation, and how to analyze mitigation information? Did Fred insist that he be the only one to visit with Mrs. Montgomery's children? If so, why? *See* D.E. 74-1, Questions from Roseann Ketchmark at #41-44. Mr. Duhardt failed to address any of these questions in his affidavit. *See* D.E. 129.

Similarly, Mr. Duchardt failed to respond to Mrs. Montgomery's claim that the defense team never functioned as a cohesive team other than to say, "I am proud, even if [Logan, Owens and Waller] may no longer be, of the efforts which they mustered forth on Lisa Montgomery's behalf." D.E. 129 at 32. Mr. Duchardt failed to answer basic questions

[8] Movant does not concede this point.

such as: Why did John, Fred, and David have very few team meetings? Why didn't John O'Connor meet with Mrs. Montgomery more often given that he was appointed as lead counsel? Did Mrs. Montgomery have problems communicating with men? If so, what did Fred's team do, besides having Ryland attend meetings with Mrs. Montgomery to remedy the problem? *See* D.E. 79-1, Questions by Roseann Ketchmark at #10, 11, 44, 48. Deposition of Mr. Duchardt is necessary given his failure to respond to these critical questions.

Though Mr. Duchardt goes on at some length regarding his reasoning for inducting his wife into the defense team, Mr. Duchardt's statement fails to address the central element of Mrs. Montgomery's claim regarding the impropriety of Ryland Duchardt's involvement in the case. Specifically, Mr. Duchardt, while saying, "My thought was that just taking a woman team member with me to meetings gave Lisa no reason to trust me or that team member," (D.E. 129 at 46) begs the question of why he did not seek to develop Ms. Waller's (the actual mitigation specialist) role or add a female team member who Mrs. Montgomery could trust rather than take his wife along for confidential attorney-client meetings. The Government's question regarding this claim likewise remains unanswered. *See* D.E. 79-1, Questions by Roseann Ketchmark at #48 (what did Fred's team do, besides having Ryland Duchardt attend meetings with Mrs. Montgomery to remedy the problem). Mr. Duchardt also failed to address whether he discussed his decision to involve his wife in the case with the other attorneys or any member of the defense team before taking such actions.

Mr. Duchardt's statement fails to address Mrs. Montgomery's claim that he overstated Dr. Gur's opinion to the Court, thereby causing this Court to exclude Dr. Gur's

testimony. Both Mrs. Montgomery and the Government wish for Mr. Duchardt to answer questions regarding his mischaracterization of Dr. Gur's testimony. *See* D.E. 79-1, Questions by Roseann Ketchmark at #55, 62 (asking Mr. Duchardt's response to the allegation "that he was overreaching with Dr. Gur's neuroimaging opinion" and his response to the allegation that he should have presented Mrs. Montgomery's brain damage without trying to have Dr. Gur fit it within the theory of pseudocyesis).

Mr. Duchardt has failed to respond to Mrs. Montgomery's inter-related claims that the trial team lacked a cohesive theory of defense for trial and that the defense of pseudocyesis was factually unsustainable. On the surface, Mr. Duchardt's theory that Mrs. Montgomery's brother was involved in the murder is inconsistent with Mrs. Montgomery taking action due to pseudocyesis. Moreover, while Mr. Duchardt has said both that everything pointed to Tommy Kleiner having been with Mrs. Montgomery at the time of the killing (D.E. 129 at 52) and that "Vilayanur Ramachandran, and his cogent explanation accounted in his report and testimony, about how the Tommy revelations, true or untrue, were part and parcel of the pseudocyesis condition from which Lisa suffered" (*Id.* at 51), he has not explained how pseudocyesis would have provided an insanity defense to the killing of Bobbie Jo Stinnett. Included within the matters needing explanation are the questions posed by the Government: Did Mr. Duchardt ignore the fact that Mrs. Montgomery never told anyone that she believed that the baby was hers? Did Mr. Duchardt minimize Mrs. Montgomery's confession? D.E. 79-1, Questions by Roseann Ketchmark at #31, 32. It is necessary to take Mr. Duchardt's deposition to discover his position on how it is that pseudocyesis could possibly have caused Mrs. Montgomery to be

unable to appreciate the nature and quality or the wrongfulness of her acts under 18 U.S.C. §17.

In his statement, Mr. Duchardt repeatedly invokes the word "strategy" in response to his mistakes, reasoning that as Mrs. Montgomery related that she believed she had given birth in the week before the killing, the defense team was bound to assert an insanity defense rather than using the mitigating evidence of her serious mental illness and mental defects to support a verdict less than death. (D.E. 129 at 50) ("when one took all of these new details and coupled them with other information about which we were already aware . . . there seemed to be only one diagnosis for Lisa which made sense and told her 'story' and that was pseudocyesis"). In so doing, Mr. Duchardt fails to answer the claim at all: while pseudocyesis may or may not have appeared to be the correct diagnosis, it was up to the defense team to determine how best to present that diagnosis to the jury with the most credibility. Depositions of the trial team members are necessary to determine how the decision to proceed with the NGRI defense was made and what factors were considered in making that "strategy" decision so that the unreasonableness of that decision may be further supported.

While not responding at all to Mrs. Montgomery's claim that he failed to properly prepare Dr. Ramachandran for testimony, Mr. Duchardt responds to other claims of inadequate preparation by asserting that he spent plenty of time with Desi Boman (D.E. 129 at 91-92), Dr. Kuncel (*id*. at 68), and Dr. McCandless (*id*.). He also contradicts Dr. Logan's claim that Dr. Logan was not provided materials he requested prior to testimony. *Id*. at 67, 68, 90. Deposition is needed to determine what Mr. Duchardt did to prepare these witnesses as his statement does not set out any information regarding how his "preparation" time was

spent. *Id*. Similarly, a deposition is needed to question Mr. Duchardt about the materials he claims to have provided to Dr. Logan and when such materials were supposedly provided.

With regard to Mrs. Montgomery's claims that the trial team was ineffective for announcing and relying on the "Tommy Defense," Mr. Duchardt has been uncharacteristically coy: Mr. Duchardt claims that Lisa "insisted" that her brother was with her at Bobbie Joe Stinnett's house without discussing the timing of that revelation, to whom the revelation was made, or under what conditions the revelation was made. *Id*. at 53. Most particularly, Mr. Duchardt's statement avoids the questions posed by the Government: Did Mr. Duchardt press Mrs. Montgomery over and over until she finally said Tommy was the culprit? Did Mr. Duchardt ever consider the Tommy story as a planted memory? Did Mr. Duchardt ignore all the evidence that pointed to the fact that Tommy wasn't there? D.E. 79-1, Questions by Roseann Ketchmark at #19-21. None of these questions are answered in Mr. Duchardt's prepared statement. *See* D.E. 129. Perhaps most critically, Mr. Duchardt has not answered the questions of when and how the defense discovered that Tommy Kleiner was at his probation officer's office during the crime. *Id.* at 81 (discussing team dispute regarding concession of alibi, but not providing information as to when team learned of alibi).

Mr. Duchardt's statement submitted in this matter failed to address why he did not develop Dr. McCandless as a witness prior to trial and how it was that he came to develop her as a witness mid-trial. Invoking Dr. McCandless' testimony that she kept her examinations of Mrs. Montgomery superficial until mid-trial as his sole response to Mrs. Montgomery's claim, (D.E. 129 at 70), Duchardt's response raises more questions than it answers. Duchardt fails to answer why he did not develop McCandless as a potential

witness pre-trial, fails to address why he contacted Dr. McCandless mid-trial, and fails to address the substance of their conversation. Notably, Duchardt failed to even answer the question posed by the government in relation to Mrs. Montgomery's claim: What is Mr. Duchardt's response to the allegation that he should not have reached out to McCandless during trial? D.E.79-1, Questions from Roseann Ketchmark at #67. Discovery of Mr. Duchardt's deposition is necessary for the factual development of Mrs. Montgomery's claim of ineffective assistance of counsel with regard to the handling of Dr. McCandless' testimony.

Mr. Duchardt failed to address Mrs. Montgomery's claims that his cross-examination of the Government's experts was inadequate, failing to establish that the Government's experts' reliance on Carl Bowman and Judy Shaughnessey undermined the experts' conclusions. D.E. 71 at 190. Instead, in summary fashion, Mr. Duchardt intones that, "There is nothing I have seen **attributed to Lisa** in the materials of Current Counsel for Mrs. Montgomery which our team did not know about." D.E. 129 at 77. As the biopsychosocial does not attribute Mrs. Montgomery as a source, Mr. Duchardt's statement is a non-answer. Mr. Duchardt reframes Mrs. Montgomery's claim as a complaint "that I did not enlist the services of a forensic social worker, like Jan Vogelsang, MSW, to write our defense script for trial." D.E. 129 at 70. Mr. Duchardt goes on to provide his current opinion of Ms. Vogelsang without any discussion of what he knew about the discipline of forensic social worker at the time he was investigating Mrs. Montgomery's social history. Because Mr. Duchardt does not relate what he thought during the relevant time period – ie. during the time in which he was making the decisions about expert assistance in Mrs. Montgomery's case – a deposition is needed to determine

how Mr. Duchardt attempted to gather information, how he attempted to form that information into a narrative, and precisely what of the information contained in the biopsychosocial prepared by Ms. Vogelsang he knew about at the time of trial and what he did not.[9]

Further, Mr. Duchardt does not directly address Mrs. Montgomery's allegation that he failed to present evidence that Mrs. Montgomery was sexually abused by her husbands, Carl Bowman and Kevin Montgomery, and that she was abused and tortured by her mother, Judy Shaughnessay. *See also* D.E. 79-1, Questions by Roseann Ketchmark at #61. From Mr. Duchardt's declaration it is impossible to discern whether he is saying he knew of that abuse, but decided not to present it (D.E. 129 at 77, "There is nothing I have seen attributed to Lisa in the materials of Current Counsel for Mrs. Montgomery which our team did not know about") or whether he did not know of the abuse. *Id*. at 72 ("I believe that Judy and Carl's accounts are at best skewed and at worst downright false. I know for sure that Lisa herself denied such portrayals of her as made by Judy and Carl. Because I distrusted these accounts by Carl and Judy, because Lisa denied those accounts, and because there were others who accounted the facts consistently with Lisa's accounts, I did not portray Lisa in the sorts of negative fashions as suggested by Ms. Vogelsang"). A deposition is necessary to determine what exactly Mr. Duchardt knew at the time of the trial before a decision can be made as to whether he made a valid strategic decision not to utilize such information.

[9] For instance, Current Counsel located documents from the Oklahoma Department of Family Services (D.E. 71-16 at Attachment 148 cited in the biopsychosocial at p.109) which indicate that Mrs. Montgomery was repeatedly investigated due to the deplorable conditions in which she and her children were living. These documents fly in the face of Mr. Duchardt's "Good Wife and Good Mother" defense and prove the falsity of his statement that "our data base gave us a good handle on Lisa's complicated background."

Mr. Duchardt responded to Mrs. Montgomery's claim regarding motion practice with a challenge to Current Counsel to "find any instance other than in the Montgomery case in which these motions were filed." D.E. 129 at 85. Depositions are necessary to ask Mr. Duchardt specifically why he did not file motions which should have been filed.

To Mrs. Montgomery's claim that she was incompetent to proceed at trial, Mr. Duchardt retorts that "Lisa never appeared to have a mental illness in the manner postulated by Dr. Woods" (D.E. 129 at 76), asserting his personal belief that she was competent because "Lisa was readily able to engage anyone and everyone in cogent conversation, even at her darkest times." *Id.*[10] Mr. Duchardt is not a mental health expert. Deposition of Mr. Duchardt is necessary to ask Mr. Duchardt about the behaviors/symptoms he observed (and which support Dr. Woods' diagnosis) to determine whether Mr. Duchardt observed those particular symptoms but failed to appreciate their significance. As Mr. Duchardt proffered a defense at trial based upon Mrs. Montgomery's propensity to dissociate without those around her being aware, his assertion that she "never had problems understanding the questions asked and never had problems understanding why we were asking the questions" (*id.*) does not meaningfully answer the questions about Mrs. Montgomery's competency. Further, though Mr. Duchardt has purported to give Current Counsel his entire case file (D.E. 129 at 17), Current Counsel does not have "pages and pages of pretrial letters and trial time notes written by Lisa raising intelligent issues of fact and law related to the case" as Mr. Duchardt's statement reflects should be contained in the file. *Id.* A subpoena *duces tecum* for the rest of Mr. Duchardt's file is

[10] David Owen's affidavit contradicts Mr. Duchardt on this point. D.E. 149-2 at 17("All the defense team believed she met the definition of incompetent[.]")

necessary for the production of those documents upon which he relies as showing Mrs. Montgomery's pre-trial competency.

3) **Attorney John O'Connor** *(Kansas City, trial counsel)*

Deposition of Mr. O'Connor is necessary for support of Mrs. Montgomery's claim ineffective assistance of counsel Claim V: In Violation of the 5th, 6th, and 8th Amendments, the Fred Duchard-led Trial Team Denied Lisa Montgomery the Effective Assistance of Counsel in That Her Attorneys Performed Deficiently and Unreasonably Both Prior to, During and After Trial In Light of Prevailing Professional Norms Under *Strickland v. Washington*, 466 U.S. 668(1984) and Mrs. Montgomery Was Prejudiced as There Is A Reasonable Probability That But For Counsel's Error's, The Outcome Of Her Trial Would Have Been Different," including all subparts.

Though Mr. O'Connor has submitted at "Statement" in this matter (D.E. 130, Statement of John O'Connor), his statement consists primarily of conclusory, self-serving opinions without supporting facts. *See* D.E. 130 at 5 ("It was my belief then, and it is my belief now in hindsight that pseudocyesis was the best defense to put forth on Mrs. Montgomery's behalf;" "We put forth, in my opinion, the best testimony available for Mrs. Montgomery as it relates to the issues the motion raises;" "in my opinion that was the best decision at the time . . ."). Deposition of Mr. O'Connor is necessary for development of the claims as fully discussed above in the section regarding Mr. Duchardt, as Mr. O'Connor was lead counsel and "takes full responsibility for the tactics employed and decisions made with regard to the defense of Mrs. Montgomery." *Id*. at 2. Though his statement is unclear as to his personal knowledge of many of the averments in Mr. Duchardt's statement, development of the discovery outlined above is necessary through a

deposition of Mr. O'Connor in further support of Mrs. Montgomery's claim of ineffective assistance of counsel.

Beyond that which is outlined above, Mrs. Montgomery submits that deposition of Mr. O'Connor is necessary as Mr. O'Conner has stated in response to Mrs. Montgomery's claims that, "I worked many more hours on Mrs. Montgomery's case than are indicated in the records." *Id*. at p. 2. A deposition is needed to discover how many more hours and what recollection Mr. O'Connor has of what work he completed that is not recorded in his time sheets. Mr. O'Connor also states that he "took measures to build rapport" with Mrs. Montgomery, though he does not specify what "measures" he took nor how each "measure" worked or any further accounting of Mrs. Montgomery's response to him given the limited number of times he met with Mrs. Montgomery. *Id.* at p.3. The Government's stated interest in this inquiry demonstrates further "good cause" for discovery of these matters. D.E. 79-1, Questions by Roseann Ketchmark at #11 (Why didn't Mr. O'Connor meet with Mrs. Montgomery more often?); at #48 ("Did Mrs. Montgomery have problems communicating with men? If so, what did Mr. Duchardt's team do, besides having Ryland attend meetings with Mrs. Montgomery to remedy the problem?").

Mr. O'Connor's statement failed to address Mrs. Montgomery's claim of ineffective assistance of counsel for failure to object to the lay witness opinion testimony by Sherriff Espey regarding his opinion that the crime scene showed evidence of a "struggle." The Government has already indicated that the Government, too, wishes to ask Mr. O'Connor about that failure. *See* D.E. 79-1, Questions by Roseann Ketchmark at #70 (asking what is Mr. O'Conner's response to the allegation that he should have objected to question posed to Ben Espey?). In the same vein, Mr. O'Connor also failed to address

Mrs. Montgomery's claim regarding his eliciting of harmful testimony through Office Gatewood (*see also*, *Id.* at #71). Mrs. Montgomery has good cause for discovery of this information.

Finally, despite Mr. Duchardt's statement's designation of Mr. O'Connor as the person who decided to abandon the Tommy defense – against Mr. Duchardt's wishes – Mr. O'Connor devotes not quite 4 lines to the entire issue of how 1) he failed to rein in the "Tommy defense" before trial and 2) how/when he came to abandon the "Tommy defense." *See* D.E. 130 at 5. As the Government has made clear through their submitted questions, good cause exists for discovery of the pertinent facts underlying Mr. O'Connor's decision, including but not limited to: 1) did the team ever consider/research/investigate the possibility that the Tommy story was a planted memory? (*see* D.E. 97-1 at #20); 2) Did the team ignore all the evidence that pointed to the fact that Tommy was not there? (*Id*. at #21); 3) Did the team weigh the cost of using the "Tommy defense" versus the hypothetical benefit prior to announcing it? (*Id*. at #27); 4) How did the team consider the Tommy defense to be consistent with pseudocyesis defense? (*Id*. at #28); 5) Who first mentioned the possibility that Tommy was present? (*Id*. at #36); 6) Did Mr. Duchardt and Mr. O'Connor discuss Mr. Duchardt's announcement of the "Tommy defense" prior to the April court date? (*Id*. at #52); 7) What was the defense strategy to deal with Mrs. Montgomery's report to each expert that Tommy had been present? (*Id.* at#35); and, critically, 8) When and how did the defense team learn of Tommy's alibi? (*Id*. at #81). For all of these reasons, Mrs. Montgomery has shown good cause for the discovery of Mr. O'Connor's deposition.

4) **Ron Ninemire** *(Kansas City, retired investigator, Office of the Federal Public Defender, Western District of Missouri)*

Mr. Ninemire has stated that over time, as Mrs. Montgomery was medicated, her affect grew more and more flat. *See* D.E.71-21. David Owen confirms this statement. DE 149-2 at 19. Mr. Ninemire, then, is a witness to the changes in Mrs. Montgomery's affect as a result of medication and good cause exists for the discovery of his observations of her affect during trial in front of the jury in support of Movant's ineffective assistance of counsel for failure to protect her rights pursuant to *Riggins* claim. *See* D.E. 71 at 175.

Deposition of Mr. Ninemire is also necessary in relation to Mrs. Montgomery's claim of interference with counsel. Mr. Ninemire, alone, is in a position to know 1) what he knew about Dave Owen and Ray Conrad's intentions with regard to their meeting with Judge Fenner on April 20, 2006 and 2) what exactly he conveyed to Mrs. Montgomery regarding why Judy Clarke was not admitted into the CCA facility on that day. Mr. Ninemire has given conflicting statements regarding this conversation with Mrs. Montgomery on that day, contending both that he was as in the dark as she was (D.E. 71-21) and that he advised and counseled her regarding the removal of Mrs. Clarke (Tr. April 21, 2006, p.3). Mr. Ninemire is also a witness as to what Ms. Hunt told Mrs. Montgomery on April 21, 2006 about the removal of Judy Clarke and Mrs. Montgomery's response.

Finally, Mr. Ninemire witnessed Mr. Duchardt's relationship with and handling of Dani Waller, the trial team's putative mitigation expert. As Movant has alleged that Mr. Duchardt failed to effectively utilize Ms. Waller's services and, to the contrary, crowded Ms. Waller out of the case, Mr. Ninemire's deposition is necessary to further develop this claim. See D.E. 71 at 60 (alleging that Ms. Waller's work was minimal); 63 (alleging that Mr. Duchardt had minimal interaction with Ms. Waller); 64 (alleging Ms. Waller was informed that Mr. Duchardt did not have "any use for mitigation specialists"); 85 (alleging

that Ms. Waller was "iced out" of the case); 132 (alleging that Mr. Duchardt kept Ms. Waller so out of the loop that she had to email Mr. Ninemire to find out when to show up for trial); *see also* D.E. 71-45, Declaration of Dani Waller.

For all of these reasons, Mrs. Montgomery has shown good cause for the discovery of Mr. Ninemire's deposition.

5) **Stephanie Elliot (paraglegal, Office of the Federal Public Defender, Western District of Missouri)**

Ms. Elliot was the paralegal assigned to Mrs. Montgomery's case and worked with the various trial teams as they were configured and re-configured. She has familiarity with the files and records in the case, the relationships between the various team members, and knowledge of which records were provided to the various expert witnesses. Given the arguments as set forth above, in her §2255 motion, and the Traverse, Ms. Elliot is an important fact witness as to Movant's ineffective assistance of counsel and Judy Clarke-related claims.

**C. Conclusion**

WHEREFORE, for all the reasons articulated above the motion should be granted, this Court should allow Mrs. Montgomery to depose the people above and order production of the requested evidence and documents.[11]

[11] Movant notes that this Court has previously granted limited discovery in this case in the form of a deposition of Ray Conrad (*see*, D.E. 149 – 8), and an off-the-record interview of Judge Maughmer by the parties. This Court has previously denied Movant's request for Judge Fenner to recuse himself so to allow deposition of Judge Fenner regarding Movant's Judy Clarke related-claims. *See* D.E. 41, 46, 50, 53, 59, 65, incorporated by reference as if fully set forth herein. Though Movant does not waive any issues regarding her request to depose Judge Fenner, she acknowledges that this Court has already denied such and re-raising the issue now would be futile. Movant does not wish to anger or annoy the court, but is compelled to point out that the newly available Court-ordered Affidavit of David Owen, D.E. 149-2) raises additional factual issues regarding the in-chambers conference where Judy Clarke was removed. Mr. Owen's affidavit supports Movant's claims.

Respectfully submitted,

/s/ *Lisa G. Nouri*
LISA M. NOURI, Mo. Bar No. 32800
2526 Holmes
Kansas City, MO 64108
(816) 471-1000

/s/ *Kelley J. Henry*
KELLEY J. HENRY, Mo. Bar No.
OFFICE OF THE FEDERAL PUBLIC
DEFENDER
810 Broadway Street, Suite 200
Nashville, TN 37203
(615) 736-5047

*Attorneys for Movant Lisa Montgomery*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2015, the above-captioned document was served electronically on Roseann Ketchmark, Assistant United States Attorney representing the government in this matter, through the Court's CM/ECF filing system.

/s/ *Lisa G. Nouri*