DECLARATION OF COUNSEL SUSAN HUNT:

I, Susan Hunt, being duly sworn and of lawful age, state as follows:

I began my legal career in Kansas City, Missouri, at the Wyrsch law firm providing legal representation to individuals charged with violating criminal laws from misdemeanors to felonies, in state and federal courts. I clerked for Jim Wyrsch and Charlie Atwell during school then worked for them upon graduation in 1986 and stayed there until I went solo in 1989. Prior to becoming an attorney, I was a forensic chemist for the Kansas City Missouri Police Department's Regional Crime Lab from 1980-1984. I also spent time as an independent contractor writing appellate briefs for John O'Connor. I am now a sole practitioner and have been since 1989 and I specialize in federal criminal defense. I have defended individuals charged with all types of crimes, including high profile cases involving white collar crime, drugs, computer crimes, weapons offenses, conspiracy and death penalty defense. I was co-counsel on Richard Zeitvogel on a capital habeas state conviction. I was counsel for Keith Nelson, although not designated lead counsel. I was lead counsel in the U.S. v. Thomas Smith capital trial in Springfield, Missouri. The Smith case ended in a nondeath sentence. I was appointed as lead counsel to represent Lisa Montgomery while still representing Thomas Smith.

I have been asked by Mrs. Montgomery's current counsel, representing her in her proceedings under §2255, to provide information as to certain events that occurred pretrial in Mrs. Montgomery's case. I have no firsthand knowledge about the trial phase.

I was appointed as learned counsel to represent Mrs. Montgomery on January 20, 2005 although I began work on the almost immediately since it was anticipated to be a capital case. The Federal Public Defender had already been appointed. Ray Conrad was the Federal Public Defender for the Western District of Missouri. When Lisa Montgomery was first charged, Ray Conrad assigned the case to Anita Burns, one of the Assistant Federal Defenders in the office. Their office had handled one prior death case which had been assigned to staff attorney Larry Pace and that case is now set for hearing on a 2255 motion.Mr. Pace also represented Keith Nelson for about 6 months in another capital case and I ultimately became co-counsel for Mr. Nelson after Mr. Pace. Ray Conrad assigned David Owen to supervise Anita Burns on the Lisa Montgomery case as this was Ms. Burns' first capital case in state or federal court.

Initially the case was staffed with Anita Burns and the Federal Public Defender Chief Investigator Ron Ninemire. David Owen was supervising. Since it was known that the case may be a capital case, the Court reached out to me as potential lead counsel. The only experience Ron Ninemire had as a capital investigator was the case he worked on with Larry Pace. He did some mitigation investigation on the Keith Nelson case until Mr. Pace withdrew. He believes he is a mitigation investigator and does have some experience but it is limited. ~~Mr. Ninemire had no experience as a mitigation investigator.~~ I began to utilize my investigator, Phil Thompson. Ms. Burns and I wanted a mitigation specialist to be retained for the Lisa Montgomery case. It was pretty obvious early on that the defense focus would be mitigation and mental health. Ms. Burns, Mr. Ninemire and I all met with Ms. Rickert before retaining her. Every time I wanted to do something, Anita would ask, "Do you think we're making a mistake?"

During February, 2005, CCA had seized some documents from the cell of Lisa Montgomery. Ms. Burns was on vacation and David Owen stepped in to assist during this time period. Upon Ms. Burns return, she did not like the interference and supervision from Mr. Owen and she complained to Ray Conrad. Ms. Burns was off the case after her conversation with Ray Conrad which was before she filed a motion to withdraw with the Court on April 29, 2005.

No thought or discussion was had about losing Ms. Burns from the team or what impact that might have on Mrs. Montgomery. I did not visit with Mrs. Montgomery before Ray Conrad removed Ms. Burns from the case.

Mr. Owen and I had problems with Ms. Rickert. Ms. Rickert engaged in several interviews and would not keep us apprised of her activities. We also had personality problems with her. She did not want to collect records and I thought that should be part of her tasks. Ron Ninemire and Lisa Rickert had put together a binder for the capital presentation that Mr. Owen and I had before the Department of Justice in Washington, D.C. We did not use the binder. I presented and Mr. Owen supplemented. We mostly talked about Mrs. Montgomery's background. We did hold back some information as we knew that DOJ was not going to change their minds. DOJ did tell us we could come back once we obtained our experts. No further attempts were made to get a plea while I was on the case because we just weren't ready yet. On August 8, 2005, Lisa Rickert resigned from the case at Mr. Owen's request.

Lisa Rickert was replaced as the mitigation specialist by Holly Jackson on August 16, 2005. In addition to these mitigation specialists, Ron Ninemire, the FPD Chief Investigator and

Phil Thompson, a private investigator, were being utilized to investigate the circumstances surrounding Mrs. Montgomery's case. Mr. Ninemire and Mr. Thompson were fact investigators but they also did some limited mitigation investigation.There really wasn't much fact investigation to do; it was all tied into mitigation . Mr. Ninemire never liked Holly Jackson and he did not want to do mitigation interviews with her since he didn't believe in the way she conducted the investigation. Mr. Thompson made two or three trips with Ms. Jackson to Melvern, Kansas for interviews. Mr. Ninemire told me, "I just won't have a woman tell me what to do."

Because of the complexity of the case, we needed to hire a paralegal to assist with support. Stephanie Elliott was hired as a paralegal by the Federal Public Defender in October, 2005 and became a part of the Lisa Montgomery defense team.

Initially, Anita Burns and I were dealing with Dick Burr, a capital resource counsel for the Administrative Office of the U.S. Courts. Subsequently, Mr. Owen and I continued to receive support and guidance from Mr. Burr. Mr. Owen and I knew we needed an attorney to help with the mental health aspect of the case. We were at a loss as to how to defend Mrs. Montgomery. I wanted to handle the guilt aspect portion of the case and Mr. Owen wanted to handle the computer aspect of the case. Mr. Owen and I went toTulsa, Oklahoma and met with Dick Burr and Judy Clarke. Dave Owen had no death penalty experience and I had no significant mental health capital experience. We wanted Judy Clarke in the case to help with the mitigation and mental health aspects. She was not brought in solely to secure a plea but to have full intention of participating in a trial of Mrs. Montgomery.

I remember a conversation Mr. Owen and I had with Judge Fenner and telling the Judge we wanted to bring Judy Clarke in and the Judge was not resistant. On October 5, 2005, Mr. Owen moved for the admission *pro hac vice* of Judy Clarke. Judy Clarke is a nationally-recognized criminal defense attorney who specializes in difficult cases, often involving mental health issues. Judy Clarke was admitted *pro hac vice* on October 7, 2005.

At a meeting at my home early on, Ms. Clarke asked us what role did we want her to have. We said as much as possible. We thought she would handle the experts meaning she would obtain the mental health experts and have the necessary testing done on Mrs. Montgomery. We knew early on that this case would be for trial.

When Ms. Clarke came in the case, she brought Deb Garvey and David Freedman with her. Deb Garvey was a mitigation investigator that worked closely with Ms. Clarke and David Freedman was an expert on mental health issues that had a contract with the Administrative Office (AO) of the U.S. Courts and had also been referred by Dick Burr.

The Federal Public Defender Office did not pay Judy Clarke, Deb Garvey, or David Freedman.

Deb Garvey provided Stephanie Elliott with a list of records to obtain and Ms. Elliott proceeded with requesting records identified by Ms. Garvey. Ms. Elliott also managed the filing of all the records our office received. Ms. Elliott had no prior capital experience or records management experience in a capital case.

During November, 2005, Mr. Owen began to have difficulty working with Ms. Clarke. Mr. Owen controlled the purse strings and did not like being led by Ms. Clarke. Ron Ninemire had extreme problems with Deb Garvey. Mr. Ninemire didn't think that the interviews and records requests that Ms. Garvey wanted done were necessary. Ms. Garvey knew what she was doing but Mr. Ninemire did not like taking orders from Ms. Garvey. Mr. Ninemire didn't like Deb Garvey and he never bought into the mitigation aspect of the case. Mr. Owen didn't like mitigation people, didn't like Ms. Clarke or Ms. Garvey. He believed in mitigation but did not understand what they considered to be mitigation.

Judy Clarke then called a meeting with me and Mr. Owen at a restaurant. Mr. Owen had prepared a priorities form as a sample. At the meeting, Ms. Clark told Mr. Owen that he should not be setting priorities and didn't have enough experience to make decisions about priorities. I had asked Ms. Clarke to confront or counsel Mr. Owen on his shortcomings so that she could continue to make crucial decisions about the mental health and mitigation defense for the team. Mr. Owen was extremely angry after the meeting and felt he had been attacked unfairly. He never got over this and continued to complain about Judy Clarke and her people.

Ron Ninemire wanted to have the primary relationship with Mrs. Montgomery and her family. Ms. Clarke took exception to that. When Ms. Clarke came in, she didn't like the relationship Mr. Ninemire had with Mrs. Montgomery or her children. Ms. Clarke didn't like Mr. Ninemire having so much contact with the client to the exclusion of others on the defense

team. She said we should all be seeing her and that no one person should have a special relationship with Mrs. Montgomery.

Mr. Owen controlled the purse strings on the case even though I was lead counsel. I had no authority to make decisions. Stephanie Elliott told me that one set of preliminary medical records for Mary Coleman, the sister of Mrs. Montgomery's father, had been obtained. From the preliminary records the defense team learned that she had adult-onset epilepsy, occasional seizures, migraine headaches, AVM (arterio venous malformations), and an aneurism resulting in a slight stroke. Ms. Elliott said that Mr. Owen told her not to order additional medical records because he had not decided whether he wants to spend the money. I recognized the value of this medical evidence for possible mitigation on behalf of Mrs. Montgomery and was upset that Mr. Owen had again not consulted me about whether or not to order the medical records. Mr. Owen wanted to be in charge of everything.

Mr. Owen refused to accept team decisions. The team had assigned Holly Jackson to Mrs. Montgomery's mother, Judy Shaughnessy, but Mr. Owen repeatedly emailed her without the teams' knowledge. Mr. Owen had participated in an interview of Mrs. Montgomery's cousin, Wendy Treibs, along with Ms. Jackson. Prior to Ms. Jackson finishing her questioning of this key witness, Mr. Owen became restless and wanted to end the interview. Mr. Owen had no training in mitigation and should have deferred to Ms. Jackson.

Ms. Clarke was in Kansas City on April 19, 2006 and participated in a defense team meeting that evening. During the meeting, Mr. Owen, Judy Clarke, and I discussed problems and the potential of Ms. Clarke leaving the case. Ms. Clarke left the meeting and I wanted to

sleep on the question of whether or not Ms. Clarke should withdraw from the case and to give it careful consideration. At the end of the meeting, it was agreed that I would think about the issue and call Ms. Clarke the following day. Mr. Owen and I had agreed to meet at Judge Fenner's courtroom some time the next morning after I had gotten out of another courtroom to discuss this issue with Judge Fenner. I was unaware that Mr. Owen had gone to see Judge Maughmer on April 17th, two days before the night meeting at my house. After the meeting I felt like I was being pulled apart. Mr. Owen was urging me to get rid of Ms. Clarkeand she was urging me to get him under control. I knew getting rid of Ms. Clarke was not a good idea and the next morning I intended to tell Mr. Owen I changed my mind and was not asking her to leave. I never got that chance.

Mr. Owen and I never took a vote with any team members about having Judy Clarke removed from the case. Judy Clarke had just hired trauma expert Judith Hermann and Neuropsych Delis before she was removed from the case. Ms. Clarke never gave a prohibition about talking about the offense with Mrs. Montgomery. I had never considered using the CCA psychiatrist, Dr. Linda McCandless. We were collecting her information through records request but we had left strict instructions that she was not to discuss the facts of the case with Mrs. Montgomery. We had done some preliminary research on the pseudocyesis path and similar fetal abduction cases. No plea offers were extended while I was on the defense team.

The next morning, April 20, 2006, before Mr. Owen heard back from me, he went with Ray Conrad, the Federal Public Defender for the Western District of Missouri, to Judge Fenner's chambers. I was not consulted or advised of this in chambers conference. Neither was Ms. Clarke, or our client, Lisa Montgomery.

Judy Clarke was to have a legal visit with Mrs. Montgomery that same afternoon. Without hearing from Judy Clarke or Lisa Montgomery, Judge Fenner had called CCA where Lisa Montgomery was being detained and informed CCA that Judy Clarke was not to be permitted to see Lisa Montgomery that afternoon. An Order was entered that same day prohibiting telephone contact between Lisa Montgomery and Judy Clarke.

When I left a court proceeding on the morning of April 20th, I was met by Mr. Owen and he told me it was done and Judy Clarke had been removed from the case. I was upset as a final decision had not been made to seek the removal of Ms. Clarke from the case. I was learned and lead counsel on the case and I felt that David Owen and Ray Conrad had acted without my knowledge or consent in moving forward and asking Judge Fenner to remove Judy Clarke from the case.

Judy Clarke went to CCA on the afternoon of April 20th intending to meet with Mrs. Montgomery. She was accompanied by Ron Ninemire of the Federal Public Defender's Office. While Ms. Clarke was not allowed to see Lisa Montgomery on the afternoon of April 20th, Mr. Ninemire proceeded to meet with Mrs. Montgomery for an hour and a half. I do not know if Mr. Ninemire discussed the removal of Judy Clarke from the defense team with Mrs. Montgomery that afternoon. I do know that Mrs. Montgomery felt that Mr. Ninemire had lied to her about the removal of Judy Clarke and she lost all faith in her attorneys. I know that I did not contact her prior to the removal of Ms. Clarke.

Due to the telephone restriction imposed by Judge Fenner, not only was Ms. Clarke not permitted to see Mrs. Montgomery, she was denied the ability to explain to Mrs. Montgomery what had transpired on the morning of April 20th. Mrs. Montgomery had not been given any

prior notice by any member of the defense team that Ms. Clarke might be removed from the case. I personally did not see Mrs. Montgomery on April 20th.

The following day, on Friday, April 21st, Mrs. Montgomery was taken to the federal courthouse for an 11:00 a.m. hearing before Judge Fenner that lasted about ten minutes. Mr. Owen, Ron Ninemire and I were present at this hearing. Judy Clarke was not informed of this hearing or afforded an opportunity to be heard. Judge Fenner told Mrs. Montgomery that it was his decision to remove Ms. Clarke and that Ms. Clarke's involvement was no longer necessary or helpful. I remember Lisa sitting there not saying a word.

On April 25, 2006, Mr. Owen, Ray Conrad and I met with resource counsel Dick Burr in an attempt to try and put the defense team back together. Mr. Burr informed us that it would be very difficult to get an experienced capital attorney with mental health experience to take on the case given what had transpired with the removal of Ms. Clarke.

Mr. Owen and I then met with Judge Fenner in chambers on April 25th. I was having second thoughts about the removal of Judy Clarke from the Montgomery defense team. I told the Judge that Lisa is mentally ill, that she is being medicated, and under constant psychiatric care. I told the Judge that I had no experience with clients with mental illness and had no experience in investigating and presenting a mental health mitigation case. I said neither Mr. Owen nor I had the experience to do a mental health capital case. We both agreed that we needed someone on our team that had that background and experience.

I told the Judge that the removal of Judy Clarke was devastating to the client and that Mrs. Montgomery felt betrayed and lied to by the defense team. I also told the Judge that the loss of Ms. Clarke and her people put a big hole in our case, since Ms. Clarke was very

experienced in mental illness issues in capital cases. I told the Judge that we needed to fill that hole and we had come up with some potential solutions.

My preference was to put the team back together with Ms. Clarke. Mr. Owen strongly objected and the Court denied that option. Another option was to remove the local Federal Public Defender Office and have the San Diego Federal Public Defender Office take over the case with Ms. Clarke and me as the co-counsel. Mr. Owen again told the Court that he was strongly opposed to that option as well and that his office had no intention of asking to withdraw. The Court denied that option as well.

Finally, I told the Judge that we would look for additional counsel experienced in mental health issues in federal capital cases to join the team. We explained that this is a mental health case and the guidelines required such a person being on the defense team. We told the Judge this would require a continuance and the Judge did not seem to have a problem with a continuance.

We also advised the Judge that our mitigation specialist Holly Jackson may quit the team. Ms. Jackson was unsure if she could ethically or professionally stay on the team because her mental health background was not as extensive as that of Ms. Clarke. We did not encourage Ms. Jackson to get off the case.

I sent a letter to Dick Burr on April 30, 2006 detailing the problems in the defense team and what had transpired leading to Judge Fenner removing Judy Clarke from the case. By that time, Holly Jackson had already resigned so we were without a mitigation specialist. Mr. Owen responded to Dick Burr with a letter of his own on May 2, 2006. He told Mr. Burr that he and

Ray Conrad had met with Judge Fenner on Monday, May 1, and requested that their office be relieved from the representation of Mrs. Montgomery.

On Monday, May 1, when Ray Conrad and Mr. Owen met with Judge Fenner without my knowledge or input, there was no court reporter present. Mrs. Montgomery was not advised of the meeting with the Judge. Mr. Conrad and Mr. Owen told Judge Fenner that Mr. Owen and I were unable to work together and get along.

Judge Fenner advised he wanted to see all the attorneys on Wednesday, May 3. Mr. Owen, Mr. Conrad and I met with the Judge in chambers on May 3. I filed a letter under seal from Mrs. Montgomery, provided a copy to Dave Owen, and gave the original to the Judge to review.

I took issue with the May 2nd letter of David Owen to Dick Burr and responded. I knew that Mr. Owen and I had acted contrary to our ethical obligations and the Sixth Amendment rights of Mrs. Montgomery when Judy Clarke was terminated without consulting Mrs. Montgomery. I tried to remedy this grievous error by asking the Court to restore Ms. Clarke to the team or to allow me to handle the case with Ms. Clarke as the team that Mrs. Montgomery would feel most comfortable with. The Federal Public Defender's Office in San Diego advised me that it would accept an appointment in the case and provide funding for the cost of the defense. The FPD in San Diego would assign Ms. Clarke to the case to serve as co-counsel with me.

On May 10, 2006, I filed a motion to withdraw at the Court's direction and I was removed from the case on May 12, 2006. The primary reason given to me was the money issue

and how to fund the defense of Mrs. Montgomery. I was unaware that Ray Conrad had been so involved in the Montgomery case.

Mr. Owen contacted me at least twice during the trial. He told me that he didn't like the way they were presenting the case and said they were "not telling her story." He was upset. Neither John O'Connor nor Fred Duchardt ever called me to discuss the case.

Mr. Owen left the Federal Public Defender Office the day after the Lisa Montgomery penalty phase verdict. He had already been demoted from his title of First Assistant and he told me that they treated him horribly in the office.

I now know that the perception in Kansas City is if you cross Ray Conrad, then he holds a grudge but I did not know that at the time. Mr. Owen knew that he could not remain in Kansas City and make a living as a criminal defense attorney because Ray Conrad would make it very hard for him to get CJA work. Mr. Owen contacted me later and asked me to sign his Colorado Bar application and I did. I still consider Dave a friend.

I have had no contact with Mrs. Montgomery since I I withdrew from representation of her in May, 2006.

I declare under penalty of perjury and the laws of the United States of America that the foregoing is true and correct to the best of my information and belief. Signed the 8th day of March, 2013.

Susan Hunt