DECLARATION OF JUDY CLARKE

1. I am an attorney licensed to practice law in the State of California. I graduated from the University of South Carolina School of Law in May 1977, took and passed the July 1977 California Bar, and was admitted to practice in California in December 1977. I have been a member in good standing since admission, and remain so today. I am also admitted to practice before the Ninth Circuit Court of Appeals, and the United States Supreme Court. Shortly after being admitted to practice, I accepted a job as a trial attorney with the Federal Defenders of San Diego, and in the fall of 1983 became the Executive Director of that program. I left that position in the fall of 1991 and became a special partner in the San Diego office of McKenna & Cuneo. Within a year, I rejoined the Federal Defender Program, becoming the Executive Director of Federal Defenders of Eastern Washington, based in Spokane, Washington. I served as that organization's Executive Director until the summer of 2002, when I returned to San Diego, and became one of two full time salaried Capital Resource Counsel with the Federal Defender Program, consulting and assisting defense counsel in federal capital cases around the country.

2. The majority of my practice has been in the federal courts, where I have been both trial and appellate counsel. I have also argued twice before the United States Supreme Court. I am a Fellow in the American College of Trial Lawyers (inducted in 1997), and served as the President of the National Association of Criminal Defense Lawyers (1996-1997). In 1998, I was selected by the National Law Journal as one of the "Fifty Most Influential Women Lawyers in America", and in 2001 as one of the "Top 50 Women Litigators." In 2011 and again in 2012, I was selected as one of the Top 100 Lawyers in California.

3. I have been counsel in several cases in which the state or federal government sought the death penalty, including *South Carolina v. Susan Smith* (1995)(tried before a jury to a life verdict); *United States v. Theodore Kaczynski* (EDCA, 1996-1998)(pled to life after jury selection); *United States v. Tahn Lam* (EDCA, 1999)(pled to life); *United States v. Buford Furrow* (CDCA, 1999-2001)(pled to life); *United States v. Jay Lentz* (EDVA, 2003)(tried before a jury to a life verdict); *United States v. Zacarias Moussaoui* (EDVA, 2002-2003)(I assisted only pretrial, and not with the trial); *United States v. Eric Rudolph* (NDAL, 2003-2005)(pled to life); *United States v. Roy Green* (CDCA, 2003-2011)(found

incompetent and ultimately civilly committed); and *United States v. Joseph Duncan* (D.Id., 2007-2008)(client was *pro se* during penalty phase, and I was one of 3 standby counsel). I have also represented a number of individuals who faced capital charges, but against whom the government chose not to seek the death penalty. I was most recently lead counsel for Jared Loughner, charged in federal court in Tucson, Arizona with the shooting of Congresswoman Giffords, and the deaths of 6 others (pled to life).

4. I have been in private practice in San Diego, California since the fall of 2009. I am also on the adjunct faculty at Washington & Lee University School of Law, currently teaching a criminal practice practicum course, as well as Professional Responsibility. During the time I was counsel for Lisa Montgomery, I was a full time salaried attorney with the Federal Defender Program (as one of two "Capital Resource Counsel"). I left that position when I entered private practice; however, I continue to serve as one of several lawyers who comprise the Federal Death Penalty Resource Counsel Project, on a contract through the Administrative Office of the U.S. Courts, to consult with and provide assistance to appointed counsel, both CJA and federal defenders, and defense teams in federal capital cases.

5. I first became involved in the Lisa Montgomery case at the request of Richard ("Dick") Burr who had been assigned as the federal death penalty resource counsel to assist the defense team. Dick asked me to come to a meeting with the local Assistant Federal Public Defender David Owen, and Susan Hunt, who was appointed pursuant to 18 U.S.C. §3005 as the counsel "learned in the law applicable to capital cases." I believe this meeting was in the summer of 2005. Given the way in which the two lawyers described their interactions with Lisa, it was apparent that they had limited experience working with a client with Lisa's likely history or investigating the background of someone with complex mental health issues. Ms. Hunt acknowledged as much, and as the capital or learned counsel in the case, expressed the need for assistance in both investigating and understanding Lisa's life, mental health, and very likely history of serious abuse and trauma. I did not know Ms. Hunt before this meeting. Mr. Owen believed that we had met before this meeting, because of our mutual connection to the federal defender program, but I did not remember him or know anything about his practice or skills. I did know Ray Conrad, the Federal Public Defender for the WDMO, from our mutual tenures as chief federal defenders. At this first meeting, the lawyers appeared open to assistance from both Dick Burr and me.

6. At some point, I believe in the fall of 2005, the attorneys asked me to join the team as co-counsel. We had a meeting where I asked them to be clear about what role they wanted me to take in the case. They told me that they wanted me to do as much as I could on the case. They described some team dysfunction issues, the specifics of which I do not remember; my recollection is that the issues were related to the work of Ron Ninemire and the mitigation specialist, Lisa Rickert. I was vaguely aware, either from Dick Burr, or from this conversation that one of the assistant federal defenders originally assigned to the case had been removed from the case, and replaced by Mr. Owen. Both lawyers continued to indicate a lack of conceptual or practical knowledge of how to undertake representation of a seriously mentally ill client, the investigation of life history, or a clear idea of how to go about learning about such issues.

7. It was my job to assist federal defender offices with capital cases, and upon their request, I agreed to join the team. It was my understanding that Susan Hunt was the learned counsel, and that the Federal Public Defenders (FPD) office was co-counsel, with David Owen, as an assistant federal defender, assigned the case within the office. With the exception of Ms. Hunt's attorney's fees, which I believe were paid under the Criminal Justice Act, the FPD provided the funding for the case. As a result, the FPD had contracts with the mitigation specialist, as well as an additional investigator with whom Ms. Hunt had worked on other cases. Within a short time after I joined the team, mitigation specialist Lisa Rickert left the team, and Holly Jackson was hired to replace her. I do not recall participating in either of those staffing decisions, nor did I raise an objection to either decision. I had never worked with Holly Jackson, but she came highly recommended. Also within a short time after I joined the team, we discussed the need for someone to organize and distribute documents, and assist with record collection. The FPD office hired Stephanie Elliott, a lawyer who was either a neighbor or friend, or both, of David Owen, as a paralegal. I did not know Stephanie Elliott, but had no reason to question her hiring and did not.

8. After consulting with both Ms. Hunt and Mr. Owen, I sought and obtained the assistance of two experienced capital investigators, both of whom had substantial experience in working with clients with mental illness, and in investigating mental health issues in capital cases: Debra Garvey, a capital case investigator/ mitigation specialist with the Federal Public Defender in Los Angeles; and David Freedman, an experienced mitigation investigator who worked fulltime with me as part of the Capital Resource Counsel project. Neither Debra Garvey nor David Freedman required contracts for their services as they, like me, were salaried employees of Federal Defender Organizations.

9. Ms. Garvey, Mr. Freedman, and I had worked together on other federal capital cases. I had the highest regard for their skill, experience, and work ethic. I trusted their insights, and they had worked very well with other capital defense teams. I believed that bringing them into the case would be a great benefit to the Montgomery defense team, particularly given the lack of mental health experience on the team, and would be a win-win – helping make sure Lisa's case was well investigated and prepared, and at the same time helping another FPD office and local CJA lawyer learn and improve their skills. Holly Jackson was very open to their input and worked very well with Ms. Garvey, Mr. Freedman, and me.

10. Once I joined the team as counsel, I learned that the assigned FPD investigator, Ron Ninemire, believed he had a "special relationship" with the client, Lisa Montgomery; it also appeared that Mr. Ninemire was the primary team member visiting with Lisa. I knew from experience that it is not healthy for the client or their case for any member of the capital team to have a "special" relationship with the client, exclusive of other team members. This is particularly true in a capital case with a client who has an extensive history of sexual abuse. It can be damaging to investigative efforts, trust building with the client, and simply unhealthy for the client to permit or encourage "special" relationships, those relationships that are independent of the rest of the team. In my experience, these divided relationships can have negative consequences in working on mitigation, working with experts, and in working toward settlement of a case. I encouraged the team to broaden the number of team members who visited with Lisa, to have regular visits with Lisa by as many members of the team as possible, and to share the content of each visit with the team in a consistent and purposeful manner. Whether reluctantly or not, the team as a whole discussed this, and agreed to this approach; however, it quickly became clear that Mr. Ninemire resisted this approach and friction developed within the team as a result.

11. In addition to encouraging a team approach to visiting and working with Ms. Montgomery, I talked with Mr. Owen and Ms. Hunt about permitting Ms. Garvey to take a lead role in helping set investigative priorities, and providing hands on direction to the investigators in the field. My discussions about Ms. Garvey's role and concerns about Mr. Ninemire's apparent "special" relationship with Ms. Montgomery provoked an odd response from Mr. Owen who essentially said that I should be careful in doing anything against Mr. Ninemire's wishes. Though I never got a clear picture of what Mr. Owen was suggesting, it was as if he was somehow afraid of Ron Ninemire and unwilling to supervise him as part of a team, or to impose limits on Mr. Ninemire's role. I did not understand this

reluctance as I routinely delegate, supervise, monitor, and assess work product of investigators as part of my responsibility as capital counsel.

12. I kept my focus on the team's interactions with Ms. Montgomery, learning about the work already done in the case, planning the work ahead, and assessing how individual team members could best serve case needs. Mr. Ninemire did not have the experience or skill to serve as the lead investigator or mitigation specialist on the case. My understanding was that he had worked on only one federal capital case through sentencing (where the client received a death sentence) and he did not appear to understand the role and function of a mitigation specialist, the protocol for investigating mental health and cognitive issues, or how to screen for psychiatric and cognitive impairments. He also did not understand the relationship between chronic and extreme trauma and subsequent behavior and symptoms. Given the likely extensive nature and severity of the trauma Ms. Montgomery suffered, it was imperative that the investigation be conducted by an experienced and well trained mitigation specialist. Ms. Garvey and Mr. Freedman had the requisite training, experience, and knowledge about trauma, psychiatric issues, and cognitive impairments and how to organize and implement an investigation plan around mental health hypotheses. I hoped that Mr. Ninemire would be open to learning from Ms. Garvey and Mr. Freedman, both of whom had extensive experience in training and supervising mitigation investigation, and to following the direction of Ms. Garvey as the lead mitigation investigator. That was not the case, and Mr. Ninemire did not take direction from Ms. Garvey. He was instead resistant and reluctant to accept her supervision, perform tasks assigned him, or work collaboratively with her.

13. At the time I joined the team, the previous mitigation specialist had conducted a number of preliminary interviews, but substantial work remained to be done. Few life history records for Ms. Montgomery and her family had been identified, collected, and analyzed. Identifying, collecting, organizing, and analyzing life history documents and records are critical to mitigation investigation and developing a social history. It is the first step in identifying potential mitigation themes and mental health issues that require follow up investigation. It is laborious and time consuming work. Ms. Garvey immediately set out to provide lists of records that needed to be collected and a system for tracking the progress of record collection and analysis. Record collection is a standard part of any mitigation investigation and cannot be delegated to clerical workers without ongoing supervision.

14. In addition to the records collection, we needed to identify, locate and interview family and lay witnesses who had opportunities to observe Ms. Montgomery and her family over time. We routinely build a potential witness list by identifying first degree family members, persons who lived in the home, extended family members, teachers, neighbors, co-workers, and peers and prioritize interviews with these potential witnesses as the investigation unfolds. Interviews with these witnesses require the interviewer to have core skills in mitigation investigation, in overcoming barriers to disclosure about trauma and other sensitive issues, and in recognizing signs and symptoms of mental disorders. Witness interviews are time consuming and laborious. They must be conducted one on one in face to face settings that are safe and confidential. They cannot be conducted in group settings, over the telephone, or in the presence of others, especially when the subject matter involves shameful events such as sexual and physical abuse by family members.

15. Ms. Jackson and Ms. Garvey worked closely and collaboratively to identify potential witnesses and to prioritize the investigation tasks and interviews of those witnesses. Interviews about trauma are particularly sensitive and require careful, strategic consideration so as not to alert perpetrators or those who colluded in the trauma. When conducted properly, these interviews bear fruit, and the information obtained is invaluable in building the case for a life verdict by documenting the nature, extent, and consequences of trauma, and in identifying other witnesses with relevant information. When improperly conducted, witnesses fail to disclose important information, withdraw cooperation, or even alert other witnesses not to cooperate.

16. Ms. Hunt and Mr. Owen did not have experience in addressing the complexity of the mental health issues found in this case. Ms. Hunt understood this and expressed gratitude that she had an opportunity to learn about these issues. Over time, Ms. Hunt began to tell me that she had been having problems with Mr. Owen not respecting her role as learned counsel since the beginning of the case. She said she felt like Mr. Owen wanted to control the case, and in essence did so by controlling the funding for investigation, travel and experts. Mr. Owen also wanted to take multiple trips to meet with witnesses, with little appreciation for some of the sensitive topics that needed to be addressed. Ms. Hunt asked me to discuss these concerns with Mr. Owen and to help him understand that he needed to allow her to carry out her role in leading the team, and accept help in developing the mental health case. Ms. Hunt told me that it would be very hard for her to have this conversation with Mr. Owen and raise these issues, and asked me to raise the concerns with Mr. Owen.

17. Ms. Hunt and I both thought that raising these issues and having this conversation with Mr. Owen would best be done in a more relaxed setting, and agreed that a discussion over dinner at a local restaurant would work best. I anticipated an informal discussion about our various roles and how we could better work as a team with less conflict. I was direct and forthcoming about my concerns. My sole objective in addressing the topic was to assist Ms. Hunt and the team in moving forward in the investigation and preparation of the case. Ms. Hunt expressed support for the message during this meeting.

18. Mr. Owen interpreted my comments and observations as an all-out attack on him and his professional abilities. I explained that the team needed to function in a better way and that we had to change the way the team was functioning. I stated matter-of-factly that he did not know enough to be the leader of the team and that he needed to relinquish control, and take this experience as an opportunity to learn about capital investigation and litigation. I gave examples of how his actions were impeding the investigation, especially his insistence on participating in sensitive interviews. I explained that the attorney on the team with the least experience should not be in control of the case. Mr. Owen did not say much during this dinner, but it was clear he was angry and hurt. I do not believe he ever got over it, though I did try to smooth things over and apologized for hurting his feelings. It was never my intention to hurt his feelings. However, I believe that the points I was trying to get across were valid. My motive, and Ms. Hunt's, was to help provide Ms. Montgomery with representation by a team that could meet the prevailing standard of care; and both of us believed that our obligations to Ms. Montgomery had to be paramount to the risk of hurting Mr. Owen's feelings.

19. I believe that some of the resentment and resistance that led to the need to have that conversation over dinner and the hurt feelings that remained after, worsened the divisions that were apparent on the team when I first became counsel on the case. I tried very hard to keep the various factions working together as a whole but failed. However, as much as I tried, I could never figure out how to fix what was wrong, and I deeply regret this failure. Capital cases are always difficult, but I have managed to work with a number of teams through the tense and exhausting disputes that inevitably arise when the consequences are life and death, the pace of work is overwhelming, and the issues complex and multi-dimensional. The drama that infected this team was definitely detrimental to the work that we were trying to accomplish for Lisa Montgomery.

20. Things came to a head in mid-April, 2006. On April 19, I flew into Kansas City for a team meeting, to meet a potential witness and visit with Ms. Montgomery. The meeting was at Ms. Hunt's house, where Ms. Hunt, Mr. Owen, and I believe others from the team who lived in the Kansas City area were present. The meeting was a bit heated, and when I left, Ms. Hunt told me that we would talk again the next day about whether I could continue with the team. I called Dick Burr on my cell phone to ask for his help in patching up the situation and helping us all see a way forward. He agreed to help.

21. The next morning, April 20, 2006, and as planned, Mr. Ninemire and I met with one of Ms. Montgomery's brothers in a prison facility. I believe we then ate lunch together after that meeting and then went to CCA for what was also a previously arranged visit with Ms. Montgomery. When I attempted to sign in at the front desk, I was refused entry into CCA to meet with Lisa. The person at the front desk informed me that the judge had called and then faxed an order directing that the jail refuse to let me visit with Ms. Montgomery. I was stunned and asked to see a copy of the fax. Mr. Ninemire acted surprised, as if he had no idea what was going on and said he would go see Ms. Montgomery. The person at the front desk handed me a faxed copy of the Court's order. Mr. Ninemire was allowed entry to visit with Ms. Montgomery, but I was not, and I left the jail facility.

22. I was concerned about the impact of my departure from the team, and particularly the impact such an abrupt departure would have on Ms. Montgomery. We were working toward building a relationship of trust with her, where we focused on consistency, predictability, and uniformity. I had not told her about any intra-team disputes or difficulties and did not want to alarm her about team conflicts. Like many trauma victims and capital clients with cognitive impairments, Ms. Montgomery was extremely sensitive to conflict. She was anxious, paranoid, and fearful, and she desperately wanted to please others. It was clear to me that she was unstable and was often out of contact with reality. I did not know how she would respond to abrupt, unpredictable developments such as my removal and her inability to contact me. I had worked hard to demonstrate to Ms. Montgomery that she could count on her team and all its members to act in her best interests, to respect and protect her rights, and that it was safe to trust our team effort. We were proceeding slowly and cautiously to build a safe and trusting relationship with her so that she could reveal her perceptions and experiences, to the extent she was able. Our observations and interactions with her revealed that her mental state was very fragile. I wanted the team to avoid any disruptive, dramatic, or unsettling interactions with her and thought other team members understood the importance of being cautious and predictable.

23. I do not know what was said to Judge Fenner to cause him to remove me from the case. I was told by Ms. Hunt that Mr. Owen and Ray Conrad talked with the Judge asking for my removal from the case, and did so without her agreement or permission. Ms. Hunt told me that she had wanted to talk with me again after the meeting at her house on April 19, and had not made up her mind about asking me to leave the team. I have since been told that I was accused of not liking men, being abusive to FPD office staff, and allegedly becoming so angry that I spit on Stephanie Elliott. None of this is true. I was never abusive to staff. I never spit on anyone. I did express anger once in front of Stephanie Elliott and Ms. Hunt when I was told that Mr. Owen continued to delay approving an expert contract after the team, including Mr. Owen, had agreed on the expert. My response was not personal. I felt like Mr. Owen's continued delay and refusal to retain the expert could have a negative impact on the work of the case.

24. Over the course of the next several days after the April 20 Court order terminating my role as counsel for Ms. Montgomery, I talked with Susan Hunt and Dick Burr in an effort to repair the damage and put the team back together. Almost immediately, and particularly after she spoke with Ms. Montgomery, Ms. Hunt realized that a serious mistake had been made. She told me that Ms. Montgomery was devastated and felt like she could no longer trust the Kansas City team. Ms. Hunt wanted to put the team back together. We talked about different ways to make that work, and ultimately proposed that the Federal Defender office I was hosted by (the Federal Defenders of San Diego) would agree to accept an appointment in the case and provide the necessary funding. I believe the Executive Director of Federal Defenders of San Diego provided a letter agreeing to accept appointment, to fund the case, and to work with Ms. Hunt as local counsel. For reasons unknown to me, this option was refused; thereafter Ms. Hunt believed she was unable to work with Mr. Owen's office, and withdrew from the case.

25. Fred Duchardt was appointed to the case, and my memory is that we spoke once or twice by telephone. I encouraged Mr. Duchardt to ask the Court to reconsider its action removing me from the case. To my knowledge he did not do so. I have no memory of Mr. Duchardt suggesting to me that I should become a member of the Western District of Missouri Bar and enter my appearance as volunteer counsel; and, I do not believe that Mr. Duchardt ever made that suggestion. Given that the district court judge had removed me from the case and revoked my *pro hac vice* status, apparently at the request of the local Federal Public Defender, there was simply no way for me to just enter my appearance in the District Court as volunteer counsel. If there had been such an option, or had

replacement counsel requested or suggested a solution, I would have made all attempts to do it, and to again become counsel for Ms. Montgomery.

26. Shortly before I was removed from the case, I had contact with two experts who agreed to consult on the case: a neuropsychologist, Dr. Dean Delis; and, a renowned expert in trauma, Dr. Judith Herman. Dr. Delis had agreed to do a neuropsychological evaluation, and I believe we had either scheduled his initial visit with Ms. Montgomery, or were at least very close to scheduling it. Dr. Herman had agreed to review materials and consult with the team, and in fact I had sent materials to Dr. Herman to review only a couple of days before I was removed from the case. At that point, we still did not know the extent of Lisa's illness, or the severity of the trauma she had experienced. We knew that Lisa had a complex presentation of multiple symptoms. We suspected neurological impairment. We believed that Lisa had a hard time knowing what was real or not real, and was at times psychotic. We believed that she had mania and depression, and probably suffered from delusions. We also suspected that she had experienced hallucinations.

27. I believe that Lisa Montgomery would have accepted a plea to life in prison without parole and know that I would have encouraged the team to pursue settlement discussions (a plea to life) in this case. In my experience settlement discussions require substantial thought, knowledge of the strength of the government's case and a compelling understanding of the client's life. It was my opinion that, if we investigated the case properly, and conducted a competent mental health evaluation that was well supported by a documented and thorough social history, we may have been able to resolve the case. Certainly that was my goal. When I was removed from the case, we were making progress toward that goal, but we were not yet in a position to seriously discuss settlement with the Government.

28. At the time I was removed from the case, I was aware that some of the team believed that someone other than Ms. Montgomery was present at the scene. I did not see this as a reasonable theory or a defense given other facts in the case, but I did not discourage investigation into the offense. At the same time, I believed that we would have to evaluate the strength of any such "defense" in light of the government's potential rebuttal and at a time when we had conducted enough investigation to understand what the options for defenses and mitigation might be. The guilt and penalty phases of a capital case are connected, and the evidence for both phases ultimately presented as a consistent and integrated whole.

I declare under penalty of perjury and the laws of the United States, that the foregoing is true and correct to the best of my information and belief.

Dated this 14th day of March, 2013.

J Clarke

Judy Clarke