# **DECLARATION OF GEORGE W. WOODS, JR., M.D.**

I, George W. Woods, Jr., M.D., hereby declare the following:

## **Qualifications**

I am a physician licensed to practice in California, with a specialty in neuropsychiatric consultations. My clinical practice consists of treating persons with cognitive impairments, ethno-psychopharmacology, and psychotherapy. For the last twenty-nine years, I have treated clients with developmental disabilities, acquired brain injuries, and cognitive impairments secondary to neuropsychiatric disorders.

I am currently an Adjunct Professor on faculty at Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry and Introduction to Geriatric Psychiatry to third and fourth year residents. I teach a Continuing Legal Education program for Thomson Reuters, "Where Mental Health Meets the Law." I am also a lecturer at Boalt Hall, the University of California-Berkeley, School of Law. I teach Introduction to Mental Health and the Law. I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, and the Black Psychiatrists of America. I am a member of the American Association for the Intellectually and Developmentally Disabled (AAIDD), and serve on the Executive Committee of the Challenging Behaviors Special Interest Research Group for the International Association for the Specialized Study of Developmental Disorders (IASSID). I currently serve as Secretary General for the

International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees.

I have been qualified and have testified as an expert in numerous civil and criminal cases in state and federal courts. A copy of my *curriculum vitae* is attached hereto.

**Referral Questions**

At the request of counsel for Lisa Montgomery, I conducted a neuropsychiatric evaluation of Ms. Montgomery, taking into account the complex historical, developmental, psycho-social, and psychiatric data accumulated during the course of Ms. Montgomery's case. I was also asked to address the following questions.

- Was Ms. Montgomery's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?
- Was Ms. Montgomery under severe mental or emotional disturbance at the time of the offense?
- Is Ms. Montgomery's neurobehavioral history an important component of her social history?
- Did prior assessments of Ms. Montgomery by trial defense and government experts accurately reflect Ms. Montgomery's neurobehavioral history?
- Must a reliable psychiatric assessment of Ms. Montgomery include consideration of her neurological deficits?
- Did Ms. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?
- Did her impairments and medications inform her demeanor at trial?

**Interviews and Summary of Materials Reviewed**

I met with Ms. Montgomery in a private interview room at the BOP Carswell Medical Facility in Fort Worth on January 17, 2013 and February 8, 2012. My evaluation included clinical interviews, an assessment of her neurological status, and review of her biopsychosocial history and case related materials.

I reviewed extensive documents relating to Ms. Montgomery's childhood, adolescence, and adulthood. These documents included diagnostic data in medical and psychiatric records, the biopsychosocial history prepared by Jan Vogelsang, M.S.W., and which I incorporate into my findings in this declaration, excerpts of prior legal proceedings, prior psychiatric, psychological, and neuropsychological assessments, including video recordings and raw data, and other relevant material. I reviewed documents chronicling the lives of Ms. Montgomery's family members, including vital records, medical, school, employment, military, social service, law enforcement, correctional, and civil and criminal records. I reviewed sworn declarations submitted by relatives and other individuals who observed Ms. Montgomery and family members over the course of their lives.

These are the kinds of materials routinely relied upon by members of my profession in reaching an accurate assessment and providing answers to referral questions.

**Clinical Formulation**

A mosaic of mental impairments affects every domain of Ms. Montgomery's life, behavior, and mental functioning. She has significant neurologic deficits, including but not limited to cerebellar dysfunction that is likely the result of exposure to high levels of alcohol in utero. She also has mild atrophic changes in her brain, an unusual finding, given her relatively young age. She has symptoms of motor dysfunction.

Ms. Montgomery suffers from a significant affective mood disorder with psychosis that severely compromises her ability to function without careful medication titration and monitoring. She demonstrates pervasive and enduring consequences of surviving intentional trauma so severe that it meets the definition of torture, and she meets criteria for complex posttraumatic stress disorder and disorders of extreme stress (Briere & Spinazzola, 2005; van der Kolk, Roth, Pelcovitz, Sunday, & Spinazzola, 2005). These disorders interact synergistically and account for Ms. Montgomery's mood lability; loss of contact with reality categorized as a perceptual disorder which in its mildest form is dissociation and in its most extreme form is psychosis; impaired working memory; judgment and insight; affective dysregulaton; defective goal formation; and confusion.

The day to day expression of these multiple impairments reduced Ms. Montgomery's functioning to child like dependence and was present long before she was arrested for the current offense. She was unable to effectively or consistently care for herself, her children, her pets, and her husband; could not effectively perform activities of daily living such as bathing and showering, dressing, grooming, shopping, and homemaking; and could not accurately perceive events and circumstances in her life.[1] She had no control of her unpredictable mood shifts, severe bouts of irritability, and ever present mental confusion. She was mentally absent – out of contact with reality – for most of her waking hours. She often had no memory of her daily activities, like shopping for groceries, and depended on hurriedly scribbled notes on day calendars to tell her what she had done in the past. She developed a restricted and isolated

---

[1] Lisa Montgomery, Department of Human Services, State of Oklahoma. Child protective services investigated Ms. Montgomery following complaints that she and her children were homeless, squatted in an abandoned house that was unsafe for habitation, were hungry, and unclean. One neighbor reported she was drunk and begged him to take her children so her husband would not gain custody of them. The social service agency did not find child abuse but found child neglect

routine to minimize being overwhelmed by day to day responsibilities, but even a restricted routine overwhelmed her.

**<u>Cerebellar and other Brain Impairments</u>**

Ms. Montgomery has cerebellar dysfunction, along with other brain impairments. The cerebellum is a region of the brain that plays an important role in motor control and some cognitive functions such as attention and language and in regulating fear and pleasure. Ms. Montgomery demonstrates behaviors and symptoms associated with functional impairment of the cerebellum, including distractibility, hyperactivity, impulsiveness, disinhibition, anxiety, irritability, ruminative and obsessive behaviors, dysphoria, and depression, tactile defensiveness and sensory overload, apathy, and childlike behavior.[2] Impaired cerebellar function is well recognized as a consequence of exposure to alcohol during fetal development. By all accounts, Ms. Montgomery's mother drank excessively and frequently during her pregnancy.

Robert Fucetola, Ph.D., ABPP-CN, administered neuropsychological testing to Ms. Montgomery on July 26 and 27, 2006. Ms. Montgomery reported to Dr. Fucetola that she did not get a job after high school because "She did not know how." (Fucetola report, page 3). Dr. Fucetola documented her "spur of the moment" behaviors and noted she had a history of multiple low grade concussions. He reported Ms. Montgomery had three motor vehicle accidents in June 1993, January 1998, and September 1998 in which she hit her head. In June 1993, she was involved in an MVA as an unrestrained front seat passenger of a car that struck two others. Her head struck the windshield and rearview mirror, breaking the latter. She subsequently sought treatment for headache and neck pain. In January 1998, she sustained head trauma as the

---

[2] Schmahmann, J. D. (2010). The role of the cerebellum in cognition and emotion: Personal reflections since 1982 on the dysmetria of thought hypothesis, and its historical evolution from theory to therapy. *Neuropsychological Review, 20,* 236-260.

unrestrained driver of a car that went under a truck on the front driver's side. Her head struck the windshield and cracked the windshield. She was not sure if there was a loss of consciousness, but her fist recollections were of noticing blood coming from her head while still in the car and her oldest daughter holding her youngest daughter outside the car. She had persistent headache after the accident. In September 1998, she was in another MVA when she was struck head-on by another vehicle; she struck her head on the windshield. Although she did not recall losing consciousness after the September 1998 motor vehicle accident, she does not recall some of the treatment she received. She subsequently hit her head on a trampoline in 1999. Her husband described her as "confused," after the trampoline incident. Fucetola also documented a history of headaches, although he did not discuss the quality of her headaches.

At least three additional, early sources of head injuries were not included in Dr. Fucetola's report. First, Ms. Montgomery sustained repeated head injuries during her step father's frequent sexual assaults of her during her teenage years. The step father routinely grabbed fistfuls of Ms. Montgomery's hair and banged her head on the concrete floor, where the assaults often occurred. She saw stars and was nauseated. Second, Ms. Montgomery's half brother reported that he threw a size D battery at her that struck her "square in the back of the head. She went down like a crushed rag doll."[3] She was taken to the emergency room for treatment. Third, Ms. Montgomery's mother and step father subjected her to repeated blows on her head with their bare hands, fists, and objects during her childhood.

Dr. Fucetola reported that Ms. Montgomery "almost felt safer in CCA" because there was a locked door. She also reported other evidence of trauma, including nightmares, isolation, and a fear of being touched while she was sleeping.

---

[3] Declaration of Ann Walker-King.

Dr. Fucetola's limited battery did not evaluate those areas of brain function that impaired Ms. Montgomery's day to day functioning. His test of executive function was limited to two tests, the Trails Making Test and the Wisconsin Card Sorting Test. Both of these tests are limited by poor ecological validity, i.e., the translation of testing to actual behavior in the real world (Barkley, 2012).

Dr. Fucetola's limited executive functioning battery and limited investigation into right parietal lobe function precludes a thorough understanding of Ms. Montgomery's brain function through his neuropsychological testing. Right parietal lobe function can be impaired in extreme stress, particularly when the trauma occurs early in life (De Ridder, Van Laere, Dupont, Menovsky, & Van de Heyning, 2007).

Ms. Montgomery's scores on IQ testing reveal a startling twenty-nine point spread between her verbal and performance scores, which is statistically significant. Dr. Fucetola reported that this level of discrepancy occurs in only 1.7% of the persons with IQs over 120. This discrepancy indicates possible brain dysfunction. It is important that her scores were higher in performance than verbal, which is unusual for women. Ironically, her highest score was in visual attention. This is consistent with her hypervigilance, secondary to her profound trauma and anticipatory anxiety. Her lowest scores were in processing speed, impaired for someone with her potential brain functioning. Dr. Fucetola noted,

> Attentional working memory as measured by overall indices on the WAIS-III (but not WMS-III) was below expectation given Ms. Montgomery's nonverbal (but not verbal) intellectual function.

Fucetola report at page 7.

Dr. Fucetola recommended further consideration of the significant verbal IQ/non verbal IQ, and believed it to be neurodevelopmental in origin. He recommended neuroimaging as one

way to better understand the implications of the unusual neurological finding. However, a more comprehensive neuropsychological battery may point to the clear neurobehavioral problems documented by family members and others historically.

Ms. Montgomery's ability to discriminate facial affect is impaired and indicates right prefrontal, anterior temporal, limbic, and amygdala dysfunction. Ms. Montgomery's memory is also discrepant to her IQ scores. These deficits offer insight into her problems with impulse control, judgment, and inhibition. However, a comprehensive neuropsychological battery may illuminate the obvious cognitive deficits found in my neurological examination.

The emotional damage and neurological effects of chronic physical and psychological trauma suffered by Ms. Montgomery are profound. She was born into a family of multi-generational mental illness that was largely undiagnosed and untreated (Deborah A. Perlick et al., 2004; Thomas G. Schulze, Donald Hedeker, Peter Zandi, Marcella Rietschel, & Francis J. McMahon, 2006). Multiple members of her family, as described in Jan Vogelsang's biopsychosocial history, appear to have suffered from neurocognitive and psychiatric impairments. Medical, pediatric, psychiatric, and education records and descriptions by first degree and extended family members document a lengthy history of familial genetic vulnerability to psychiatric and neurologic impairment.

Ms. Montgomery's biological father, his half brother and half brother's daughter (who also has cognitive impairments), his sister and her daughter, and his half sister and her daughter all report histories of mood disorder. Ms. Montgomery's father has posttraumatic stress disorder from military service in Vietnam during combat. Her paternal grandmother had intense emotionality, outbursts of anger and irritability, and died from end stage dementia and failure to thrive. Her paternal aunt has adult onset epilepsy and surgery for an arteriovenous malformation

(AVM). Her paternal half sister has been diagnosed with bipolar mood disorder and posttraumatic stress disorder.

There is also a significant history of genetic vulnerability to psychiatric and neurologic disease in Ms. Montgomery's maternal family reaching as far back as a great aunt who died in a mental institution and an uncle with mental retardation. Two of her cousins and two of their children have been diagnosed and hospitalized for treatment of bipolar mood disorder. Her half brother has been treated with antipsychotic medication and is currently imprisoned. Drug and alcohol use is prevalent among her half siblings, mother, and father. Two of Ms. Montgomery's grandchildren have been diagnosed with autism and pervasive developmental disorder.

Widespread and untreated mental health problems, coupled with substance abuse, have contributed to familial patterns of behavior that are pathological (Thomas G. Schulze et al., 2006). Both paternal and maternal families kidnap children within the family for significant periods of time. They engage in ongoing custody battles in court over grandchildren and threaten judicial civil and criminal action frequently. Alcohol and drug use is pervasive, and the family appears to have an extensive history of physical and sexual assault by family members against family members.

The degree of Ms. Montgomery's neurological impairment in and of itself would have severe enough impact on her development. Taken together the cumulative impact of the other psychiatric and psychosocial dysfunction she suffered, it has had a profound and debilitating impact on her social, cognitive, emotional, and behavioral development and functioning (Kim, Miklowitz, Biuckians, & Mullen, 2007). Neurological deficits are apparent independent of neuroimaging and the neuropsychological testing conducted pretrial, as that neuropsychological testing was so limited. The cognitive impairments are ecologically valid, meaning they are found

in real life circumstances (Barkley, 2012). Neurological deficits are found in her neurobehavioral history. Prior to trial, mental health experts were not provided with a complete neurobehavioral history, did not identify her neurobehavioral deficits and therefore were unable to relate her behavior to those deficits and psychosocial outcomes.

Ms. Montgomery described not being able to perform simple tasks. The disabilities she described have neurological and psychiatric bases and indications. Ms. Montgomery began projects but was not able to finish them. She could not figure out how to take stock and determine what groceries were needed, keep track of groceries, and shop for needed groceries. She was unable to figure out how to dress her children appropriately and became confused when attempting to lay out clothes. Similarly, she could not braid or figure out how to brush and comb their hair, plan enough in advance to prepare breakfast before school, or plan for extracurricular activities. She attempted to keep a day journal of tasks but could not figure out what to write as tasks.

Lack of impulse control and poor judgment is evidenced by her several short lived relationships with men and her unplanned and frequent moves from one home to the next – frequently to substandard homes from safer and healthier structures. She moved to isolated and rural locations in an attempt to live a simpler life with fewer demands for scheduling activities and interacting with others. She did not seek more challenging employment or positions with better pay and benefits, because she recognized her limitations and feared failing the training for a new position.

**Complex Post Traumatic Stress Disorder**

Ms. Montgomery was subjected to chronic and extreme sexual violence, emotional cruelty, and life threatening physical assault as a child at the hands of those who should have

protected and buffered her from harm. She exhibits the behaviors and symptoms, including psychosis, of those who have been exposed to severe sexual and emotional abuse in childhood and subsequently develop complex post traumatic stress disorder. Impairments in her adaptive functioning are most likely related to the presence of psychotic and traumatic symptoms as well as cognitive deficits. The relationship between psychosis, trauma, and adaptive functioning is explained by Gapen et al.:

> . . .[T]here is robust evidence that trauma, and early childhood trauma particularly, heightens the risk of developing psychotic symptoms. Read et al.[4] proposed a traumagenic neurodevelopmental model which integrates the findings of PTSD research with those of psychosis research and highlights the role of psychosocial factors in the genesis of psychosis. . . .The traumagenic neurodevelopmental model postulates that childhood stressful events activate the HPA axis, which in turn releases glucocorticoids. In the long-term, this may damage the regulation of the HPA axis and increase vulnerability to psychosis.[5]

Ms. Montgomery survived extreme and intentional trauma like that recognized as torture by the United Nations.[6] The following methods of torture were used against her by her mother and step father beginning in early childhood and continuing into adolescence:

- forced silence by duct taped mouth;
- blunt trauma of punches, kicks, slaps, whipping;
- positional torture of prolonged constraint of movement;
- asphyxiation by smothering and choking;
- sexual violence;
- exposure to extreme cold water and cold temperature;

---

[4] Read, J., et al. Child Maltreatment and Psychosis. A Return to a Genuinely integrated bio-psycho-social model. Clinical Schizophrenia and Related Psychoses, 2(3), 235-254.

[5] Gapen, Mark, et al., PTSD, Psychosis and Adaptive Functioning in a Highly Traumatized Urban Community Sample.The Trauma Center at JRI, Psychiatry and Behavioral Sciences, Emory University.

[6] United Nations (1999). Istanbul Protocol, Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Review of Torture Methods, section 144 – 145, page 29.

- humiliation by verbal abuse and forced wearing of urine soaked underwear of others;
- threats of sexual assault of other family members;
- psychological techniques to break down will, including forced betrayals;
- accentuating feelings of helplessness:
- exposure to contradictory messages;
- behavioral coercion;
- forced to harm her sister;
- forced to witness atrocities being inflicted on her sister;
- and threats to kill (mock execution).

Additional categories of torture were inflicted on Ms. Montgomery by her first and/or second husbands, including: positional torture, using suspension, stretching limbs apart, and forced positioning; burns with hot wax; sexual violence and sexual violence by instrumentation (glass bottles); coerced sterilization; blunt trauma; whipping; and threats to kill (knife at throat).

Ms. Montgomery's half siblings and step siblings witnessed extreme acts of cruelty by her mother against Ms. Montgomery and, to a lesser extent, against other children in the home. As a small child, Ms. Montgomery's mouth was duct taped shut to prevent her from talking and in punishment for talking. She was forced to stand without moving for hours in a corner of the room, could not scratch her nose, and could not sit or lean against the wall. She was not allowed to talk, cry or make noise. She was stripped naked, beaten, and forced to stand under a cold shower for lengthy periods of time. She was forced to take a board and hit her younger sister until she bled. Her mother gave custody of Ms. Montgomery's older half sister upon whom Ms. Montgomery depended for protection and care to the state. Her mother choked and beat Ms. Montgomery and encouraged a step father to beat her for insignificant or fabricated wrong

doings. She was forced to confess falsely to protect her younger siblings. Her step father frequently sexually assaulted her in a room he built for that purpose, pounded her head against the concrete floor, and whipped her naked with a belt. He often held a pillow over her face when he sexually assaulted her. A younger half brother described a time when Ms. Montgomery's mother "held a knife to Jerri Jo's tongue [a half sister] and said she was going to cut Jerri Jo's tongue out."[7] He prayed that his parents "wouldn't kill my sisters."[8] A friend of his father's (Ms. Montgomery's step father) sexually molested the half brother and Ms. Montgomery.

As the United Nations Istanbul Protocol points out "torture is an extraordinary life experience capable of causing a wide range of physical and psychological suffering."[9] It is important to understand that Ms. Montgomery experienced torture frequently and routinely at the hands of her mother and others who were charged with caring and protecting her in her early childhood. The effects of torture on a child are not the same as the effects of torture on an adult. Torture and chronic trauma affect the developing brain of children, the child's psychological make-up, and the child's ability to recover. The sequelae to torture "occur in the context of personal attribution of meaning, personality development and social, political and cultural factors. For this reason, it cannot be assumed that all forms of torture have the same outcome."[10] However, some forms of torture and maltreatment in childhood are more likely to contribute to psychosis than others.

Studies indicate childhood sexual trauma may be an important contributing factor in development of psychosis for some individuals who are at high risk for psychotic disorders. It also appears that previous experiences of sexual trauma are related to the severity of psychotic

---

[7] Declaration of Teddy J. Kleiner, January 30, 2013
[8] Id.
[9] Istanbul Protocol, paragraph 234.
[10] Istanbul Protocol, paragraph 234.

symptoms and have a negative impact on outcome and course of psychotic disorders. There are a number of theories for why trauma may cause psychosis:

> Biological modes of how trauma might impact on psychosis include heightened sensitivity to stress through aberrant activation of the Hypothalamic-Pituitary Adrenal (HPA) axis stress-diathesis model. Dysregulation of the HPA axis may contribute to or interact with the dopaminergic abnormalities that are thought to be important in psychotic disorders. [11]

Whatever the relationship between psychosis and sexual abuse, Ms. Montgomery has experienced discreet episodes of psychotic symptomatology such as visual, tactile, and auditory hallucinations. She has also experienced sustained, chronic loss of contact with reality that is more severe than dissociation associated with post-traumatic stress disorder and is more aligned with the severe impediment associated with psychosis. She has extreme perceptual distortions wherein she is unable to determine if she is experiencing "real" events and situations or if her experiences are unreal and not occurring. This inability to recognize reality affects her judgment and insight and denies her a rational understanding of the world in which she lives.

The severity, chronic nature, and young age at which torture and maltreatment occurred have profound significance on Ms. Montgomery's neurologic and psychiatric diseases, as does the quality of the relationship between Ms. Montgomery and her mother. Her mother inflicted extreme acts of torture that broke Ms. Montgomery's will and ability to function independently. She encouraged others to harm the child, kept tally of alleged wrongdoing to increase punishment, and participated directly in life threatening physical assaults:

> Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD

[11] Sexual Trauma Increases the Risk of Developing Psychosis in an Ultra High-Risk "Prodromal" Population. Schizophrenia Bulletin, 10.1093/schbul/sbt032.

> secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. In addition, interpersonal traumas are likely to have more profound effects than personal ones . . . Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing, feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal... In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage.[12]

The cumulative impact of mother-imposed and sanctioned torture and maltreatment starting at such an early age caused long term damage to Ms. Montgomery's brain:

> The organization and functional capacity of the human brain depends upon an extraordinary set and sequence of developmental and environmental experiences that influence the expression of the genome . . . Unfortunately, this elegant sequence is vulnerable to extreme, repetitive, or abnormal patterns of stress during critical or circumscribed periods of childhood brain development that can impair, often permanently, the activity of major neuroregulatory systems, with profound and lasting neurobehavioral consequences . . . Now, converging evidence from neurobiology and epidemiology suggests that early life stress such as abuse and related adverse experiences cause enduring brain dysfunction that, in turn, affects health and quality of life throughout the lifespan. An expanding body of evidence from rodent, primate, and human research suggests that early stressors cause long term changes in multiple brain circuits and systems.[13]

Ms. Montgomery experienced complex psychological trauma resulting from exposure to severe stressors that (1) were repetitive and prolonged, (2) involved harm and abandonment by caregivers and other ostensibly responsible adults, and (3) occurred at developmentally vulnerable times in her life during critical periods of rapid brain development. Long term

---

[12] Bessel Van Der Kolk, Traumatic Stress: The Effects of Overwhelming Experience on Mind, Body, and Society, Guilford Press, New York, London, 1996, page 184-184.
[13] Anda, R., V. Felitti, et al. (2006) "The enduring effects of abuse and related adverse experiences in childhood." European Archives of Psychiatry and Clinical Neuroscience 256:174-186.

consequences are evident in changes in Ms. Montgomery's mind, emotions, body, and relationships.[14]

Ms. Montgomery also experiences common psychological responses to trauma, including re-experiencing the trauma, avoidance and emotional numbing, and hyper-arousal. She has flashbacks and intrusive memories in which traumatic events are happening all over again, even when she is awake. She re-experiences physical sensations associated with maltreatment such as choking and being unable to breathe or cry. She becomes distressed when she is exposed to cues that symbolize the trauma, such as her fear of men and emotions associated with the trauma like lack of trust. She consciously and unconsciously avoids any thoughts, conversations, and activities that arouse recollections of the trauma. She is socially withdrawn and detached from events around her. She compulsively relies on hand crafts such as tatting to ward off intrusive thoughts. She is unable to recall important aspects of trauma she survived.

Ms. Montgomery experiences hyperarousal due to chronic and severe trauma. Medication has relieved many of her most troubling symptoms, but prior to an appropriate medication regimen first initiated at the Federal Medical Center at Carswell (run by the Bureau of Prisons) after her trial, she was irritable and experienced outbursts of anger, she was unable to concentrate, she was hypervigilant, she suffered generalized anxiety, and she demonstrated physiological signs of distress (shortness of breath, sweating, dry mouth, dizziness, and gastrointestinal distress). Ms. Montgomery has done well while taking antipsychotic medications. She describes the effect of this potent medication as organizing, allowing her to complete tasks and to recall more effectively. She is better able to maintain a reality base. This

[14] Ford, et al., Treating Complex Traumatic Stress Disorders; an evidence-based guide; Guiliford Press, 2009, p. 13.

pharmacologic response is a good indication of antipsychotic response, rendering her more constantly in touch with reality.

The hallmark of the extreme trauma Ms. Montgomery survived is her loss of contact with reality that is greater than brief, mild dissociative episodes that only manifest slight changes in perception or out of body experiences alone. She experiences dissociation, which is "a disruption in the integration of consciousness, self-perception, memory, and actions,"[15] Dissociation is also defined as "The exclusion from consciousness and the inaccessibility of voluntary recall of mental events, singly, or in clusters, of varying degrees of complexity, such as memories, sensation, feelings or attitudes."[16]

In addition to disassociation, Ms. Montgomery also suffered from psychosis until placed on antipsychotic medication. She suffered delusions; auditory and visual hallucinations; perceptual distortions; paranoia and delusions of persecution; and mood disorders with psychotic features. The persuasive evidence that Ms. Montgomery has psychotic symptoms is contained in the psychiatric and medication records from her pretrial incarceration at CCA and her post trial commitment to FMC Carswell, a BOP facility.

Ms. Montgomery was diagnosed with depression and bipolar mood disorder with psychotic features by psychiatric staff at CCA and was treated with a regimen of mood stabilizers and anti depressants. The medication tamped down some symptoms but was unsuccessful in controlling her delusions, hallucinations, and loss of contact with reality. Staff attempted to titrate the regimen to control some symptoms but was unsuccessful. Upon arrival at Carswell, a BOP facility, psychiatric staff reviewed and changed Ms. Montgomery's medication

---

[15] Istanbul Protocol, paragraph 244.
[16] Spiegel et al, Dissociation: Culture, Mind, Body; American Psychiatric Press, 1994, page 60.

regimen from a commonly used combination of mood stabilizer and anti depressant to Risperdal, a medication used for its antipsychotic properties. Ms. Montgomery responded favorably and has been receiving Risperdal continuously since her arrival. Her psychotic symptoms have diminished considerably and she reported a remarkable change in her ability to recognize what is real and what is not real, to plan, organize and carry out activities, to read and remember what she has read, and to focus, pay attention, and concentrate. She is also better able to disclose some details of the traumatic and shameful treatment she received as a child, but still has considerable cognitive and psychiatric symptoms that compromise her ability to recall past traumatic events.

Family members and friends uniformly report that from childhood until her arrest Ms. Montgomery was frequently mentally absent, in her own world, and out of contact with events around her. Her first husband, Carl Bomen, reported she "was not emotionally present. She was in her own world and distant from everything . . . Lisa went somewhere else mentally. She just wasn't present . . . She shut down and went in her own world . . . She was spaced out a lot of the time and getting worse."[17] Her son noticed that his mother "was much more detached" and "was in another world."[18] Ms. Montgomery's youngest daughter believes that her "strongest memory about growing up, as well as one of the saddest parts of my life is the fact that my mom was not present." Ms. Montgomery "wasn't able to be either mentally or emotionally present in my life."[19] One of Lisa's four step fathers observed that "Lisa seemed to be in a world of her own" and "just stared off and wasn't engaged with the conversation around her."[20] Her husband at the time of the offense remembered that she "got a blank look on her face and didn't respond" when

---

[17] Declaration of Carl James Boman, February 13, 2013.
[18] Declaration of Carl James Boman, II, February 13, 2013.
[19] Declaration of Kayla Deanne Boman, February 21, 2013.
[20] Declaration of Richard Leroy Boman, January 8, 2013.

he tried to talk with her about difficult subjects . . . [I]t was like she wasn't even there . . . She was in her own world that we couldn't see."[21]

Ms. Montgomery's loss of contact with reality was long standing. One of her step sisters who babysat her as a small child reported that Ms. Montgomery "got lost in her books or stared into space so that she was not really with it. You had to yell to get her attention. She'd eventually come back to and respond."[22] One of her half brothers recollected that she "went into her own little world a lot. She often spaced out, stared into space or lost herself in a book."[23] A classmate from high school described it as "daydreaming a lot in class."[24]

During puberty Ms. Montgomery began to drink alcohol in response to repeated rapes by her step father. Her designated room in the trailer was a partially finished add-on to the trailer that had no lock, a concrete floor, and no heat. Her mother and step father used the room to store homemade liquor and wine. In junior high and high school Ms. Montgomery drank the wine to quell her fear and dread of the oral, vaginal, and anal rapes she endured more than weekly. As a young mother, Ms. Montgomery drank to excess and "started each day with a cup of coffee laced with Jack Daniels." The high prevalence of the comorbidity of substance use disorders and post traumatic stress disorder (PTSD) has been reported in a number of studies. In civilian populations with PTSD, estimates of lifetime prevalence of substance use disorder range from 22% to 43%, far higher than estimates for substance abuse disorders in the general population.

**<u>Affective Mood Disorder</u>**

The course of Ms. Montgomery's behavior and symptomology meets criteria for Bipolar I Disorder, Most Recent Episode Depressed, Severe with Psychotic Features, but additional

---

[21] Declaration of Kevin Montgomery, February 5, 2013.
[22] Declaration of Penny Craig, February 27, 2013.
[23] Declaration of Teddy J. Kleiner, January 30, 2013.
[24] Declaration of Susan Barrow Swartz, March 1, 2013.

information may be forthcoming from BOP medical, psychiatric, and medication records. Analysis of these records, in conjunction with appropriate diagnostic tests, is necessary to determine if the diagnosis of Bipolar I is the core diagnosis for her severe illness. She demonstrates mood lability, impulsive judgment, disinhibition, depressive episodes, persecutory delusions, irritability, agitation, euphoria during manic and hypo manic episodes, and visual and auditory hallucinations. She has a propensity for dissociation.

Rapid, unpredictable mood changes were a prominent feature commented on by Ms. Montgomery's husbands and children. Her ex husband recollected that she "was sad or unhappy for days at a time and then she suddenly had a plan or an idea and nothing could stop her . . . Lisa could not stay in one place for any length of time . . . and moved from house to trailer to apartment and back again in the same town or different towns and states without any plan."[25] He also noticed that "her personality changed from quiet and passive to being exuberant at times" when she reached her twenties."[26] Ms. Montgomery's youngest daughter has learned to recognize symptoms of bipolar when "moods go from very high to low," and thinks one of her sisters "is most like our mom" with mood swings.[27]

Episodes of depression kept her in bed for days. She "spent a lot of time in bed," according to her half brother who didn't know "if it was because of her headaches or what the cause was. She would spend days in bed and just lay there in silence."[28] Her first husband compared times when "she got bursts of energy" to "[o]ther times, she stayed in bed for days . . . .Between all her mood changes, moves to and from places, and separations and reunions, it wore

---

[25] Declaration of Carl James Boman, February 13, 2013.
[26] Id.
[27] Declaration of Kayla Boman, February 21, 2013.
[28] Id.

me out."[29] In contrast to depressive episodes, her husband found it "almost impossible to keep up with her at times."[30] Her irritation and agitation presented terrible problems for her children as "[h]er fuse got shorter and shorter; she was really quick to go off yelling . . . Her outbursts were over nothing really."[31]

Ms. Montgomery's social interactions were often inappropriate, and co workers and family commented on them. This impaired understanding of social context is both a feature of frontal lobe dysfunction and bipolar disorder (Zubieta, Huguelet, O'Neil, & Giordani, 2001). Her first husband said she "went from not talking to talking non-stop even to strangers . . . [S]he even approached people she did not know and started talking to them. It was a total change. She didn't notice if you talked to her or asked her any questions. Once she started talking she kept talking."[32] A co-worker reported that Ms. Montgomery "was constantly talking" and "told the same stories over and over again."[33] Another co-worker's husband opined he "did not like her after they met because he thought she talked too much."[34] One of her half brothers advised that "[t]he best thing to do is ignore it because it [talking] will drive you crazy . . . She can talk for hours and hours."[35]

Ms. Montgomery's hygiene deteriorated significantly as an adult. She "generally smelled of body odor and rarely bathed. She wore dirty clothes a lot of the time."[36] Her home and cars

---

[29] Declaration of Carl James Boman, February 13, 2013.
[30] Declaration of Kevin Montgomery, February5, 2013.
[31] Declaration of Chelsea Boman Veal, February 10, 2013.
[32] Id.
[33] Declaration of Jenny Hays, February 12, 2003.
[34] Declaration of Cheryl Fine, February 10, 2013.
[35] Declaration of Tommy Kleiner, February 8, 2013.
[36] Id.

were filthy. In her twenties, "she quit bathing and being clean" and "smelled bad."[37] She "smelled so bad that people commented on it" when she worked at Wendy's.[38]

Ms. Montgomery's behavior embarrassed her children. She acted on impulse, started projects, and didn't complete them. Her half brother reported "she would get really interested in something and spend a lot of time on it and then she wouldn't be interested anymore."[39] She disappeared for days with "no notice or warning."[40] At times in public, she "acted like a young child. She twirled around in the Wendy's and sang out loud. She swung her arms like a child does when they are skipping along . . . [N]ot only was it bizarre behavior, but it was very embarrassing for me as her daughter."[41]

**Migraine Headaches**

Ms. Montgomery suffered migraine headaches that incapacitated her for days. The headaches were "so painful that she would cry."[42] Her husband described them as so severe "[t]hey knocked her to the floor. She could not do anything – anything at all. She could not get out of bed, talk, eat, or read. . .She was almost paralyzed by them and stayed in bed for days."[43] Migraine headaches occur in a high percentage of persons with bipolar disorder and are a well-recognized symptom of brain dysfunction. (Arnold, 2003; Will Boggs, 2006). Other types of headaches may rise from structural defects like cluster headaches or tension headaches. Migraines are impairments in brain function, a sign of cognitive disarray (Arnold, 2003).

---

[37] Declaration of Carl James Boman, February 13, 2013.
[38] Declaration of Chelsea Veal, February 10, 2013
[39] Id.
[40] Id.
[41] Declaration of Chelsea Boman Veal, February 10, 2013.
[42] Id.
[43] Declaration of Kevin Montgmery, February 5, 2013.

**Mental Status Examination**

Lisa Montgomery is a white female who looks older than her chronological age of 45. She has asymmetric facial features with pull to the right, wide set eyes, and recessed chin. She was dressed appropriately, in prison issued attire. She is positive for a thyroidectomy and is treated for hypothyroidism. Thyroid dysfunction is well known to co-exist with mood disorders (Kilzieh & Akiskal, 1999). Her contact with reality during the interview was interrupted by perceptual distortions and extreme dissociation, particularly when pressed on details of trauma.[44] Her mood was euphoric. She expressed paranoid ideation. She was anxious. She consistently wrung her hands, cast her eyes down, spoke in a soft, barely audible voice, and looked confused. She had moments when she was able to answer my questions, but the more common response was a mumbled answer that she did not know. She was unable to answer many of my questions because she has no recollection of significant events. She is unable to tell if an event happened, "if it was real," or if "was not real" and had not happened. She could not remember her children's developmental milestones. She described a post partum period after her fourth and last child was born when she did not know if the birth had occurred, if it "was real," or if it was "not real." This does not appear to be a retrieval of memory problem, rather it is a sustained loss of contact with reality and severe perceptual distortion. Her speech was tangential. She perseverated on how her childrearing practices were different from her mothers, that she loves her children, and that she was a good mother.

Cognition was significantly impaired by her dissociative experiences. Much of her inability to answer questions was secondary to her impaired working memory. As her memory

---

[44] Even though Risperdal has been effective in reducing some of the psychotic symptomology, Ms. Montgomery continues to experience significant episodes of dissociation and loss of contact with reality.

had not firmly recorded the event or her traumatic response, it was difficult for her to bring forth the memory.

Affective range was restricted, although she could laugh occasionally. She was most often anxious, and her anticipatory anxiety, which she acknowledged, was palpable. Constructional ability was impaired. She was asked to draw the face of a clock. She drew a circle and placed the numbers outside the circle. The clock drawing is a screening instrument for right parietal functioning.

She showed significant evidence of compromised cerebellum dysfunction. She cannot walk in tandem with heel toe. She was unsteady, almost fell, and required assistance to regain her balance when asked to perform tandem gait. She was unable to skip and reported that she had never been able to skip as a child.

**Conclusions**

Ms. Montgomery has a long standing history of serious brain impairments, exposure to extreme trauma, affective mood disorder, and psychosis. These disorders interact synergistically and account for Ms. Montgomery's mood lability; loss of contact with reality, which in its mildest form is dissociation and in its most extreme form is psychosis; and impaired memory, judgment, insight, and cognition. The interplay and severity of these multiple impairments resulted in her inability to perform basic activities of daily life, to care for herself or her family, and to act rationally and logically. She has dysfunction in her neurological systems, including her motor functioning, significant attentional problems, limbic dysfunction, memory, and visual dysfunction.

These symptoms affect her behavior at all times, disrupting her ability to function normally.

My answers to the referral questions are provided below:

- Was Ms. Montgomery's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Lisa Montgomery suffered from a complex mosaic of medical and neurobehavioral disorders that interacted with the effects of lifelong trauma that produced both brain damage and psychiatric disorders. These disorders substantially impaired her capacity to conform her conduct to the requirements of the law.

- Was Ms. Montgomery under severe mental or emotional disturbance at the time of the offense?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, she was under severe mental and emotional disturbance at the time of the offense.

- Is Ms. Montgomery's neurobehavioral history an important component of her social history?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Ms. Montgomery's neurobehavioral history contained in the biopsychosocial evaluation documents the manner in which her brain damage adversely affected her life course. It is a critical component of any social history that purports to describe the factors that shaped and influenced her functioning.

- Did prior assessments of Ms. Montgomery by trial defense and government experts accurately reflect Ms. Montgomery's neurobehavioral history?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, there was limited neuropsychological testing of those parts of the brain that are most relevant. Dr. Fucetola recognized the limitations of his battery, especially given the extreme discrepancy between performance and verbal IQ. He administered only neuropsychological testing, and it lacked a comprehensive frontal lobe and parietal lobe examination. In spite of a rich familial/genetic history that warranted further examination, neither the government experts nor defense experts investigated the relationship between her significantly impaired every day functioning, which cannot be explained by bipolar disorder and complex trauma alone, and her behavior surrounding the offense.

- Must a reliable psychiatric assessment of Ms. Montgomery include consideration of her neurological deficits?

  In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, a reliable psychiatric or psychological assessment of Ms. Montgomery must include consideration of her neurological deficits; Ms. Montgomery manifests symptoms of frontal lobe dysfunction, including poor social understanding and context, difficulty weighing and deliberating, poor sequencing ability, irritability, and asocial behavior. She was often unable to organize herself, her children, and her home in any meaningful way, while believing she was a good mother.

Ms. Montgomery has a discrepancy between her verbal and nonverbal IQ that captures her strengths, language usage, and her weaknesses, day to day organizing and daily functioning.

It is important to understand the weight of each of her impairments-her complex trauma, her mood disorder, and her cognitive deficits-in order to adequately understand her level of impairment.

- Did Ms. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial?

In my professional opinion, which I hold to a reasonable degree of psychiatric certainty, Ms. Montgomery's ability to rationally aid and assist her counsel was severely compromised due to two factors: 1) she did not receive appropriate medication for her symptom complex, and 2) she was unable to disclose to counsel the details of the extreme abuse due to predictable trauma sequelae.

- Did her impairments and medications inform her demeanor at trial?

It is my professional opinion, which I hold to a reasonable degree of psychiatric certainty, that the combination of Ms. Montgomery's cognitive and psychiatric impairments and medications caused and explained her disengaged appearance, flat and absent affect, and inability to show emotion at trial.

I declare under penalty of perjury that the above is true and correct this __17th_____ day of March, 2013.

______________________________

George W. Woods, Jr., M.D.

**References**

Arnold, L. M. (2003). Gender differences in bipolar disorder. *The Psychiatric clinics of North America, 26*(3), 595-620.

Barkley. (2012). *Executive Functions: What They Are, How They Work, and Why They Evolved*. New York: The Guilford Press.

Briere, J., & Spinazzola, J. (2005). Phenomenology and psychological assessment of complex posttraumatic states. *Journal of traumatic stress, 18*(5), 401-412. doi: 10.1002/jts.20048

De Ridder, D., Van Laere, K., Dupont, P., Menovsky, T., & Van de Heyning, P. (2007). Visualizing out-of-body experience in the brain. *The New England Journal of Medicine, 357*(18), 1829-1833. doi: 10.1056/NEJMoa070010

Deborah A. Perlick, P. D., Robert A. Rosenheck, M. D., John F. Clarkin, P. D., Paul K. Maciejewski, P. D., JoAnne Sirey, P. D., Elmer Struening, P. D., & Bruce G. Link, P. D. (2004). Impact of Family Burden and Affective Response on Clinical Outcome Among Patients With Bipolar Disorder. *Psychiatric services, 55*(9).

Kilzieh, N., & Akiskal, H. S. (1999). Rapid-cycling bipolar disorder. An overview of research and clinical experience. *The Psychiatric clinics of North America, 22*(3), 585-607.

Kim, E. Y., Miklowitz, D. J., Biuckians, A., & Mullen, K. (2007). Life stress and the course of early-onset bipolar disorder. *Journal of affective disorders, 99*(1-3), 37-44. doi: 10.1016/j.jad.2006.08.022

Thomas G. Schulze, M., Donald Hedeker, P., Peter Zandi, P., Marcella Rietschel, M., & Francis J. McMahon, M. (2006). What Is Familial About Familial Bipolar Disorder? *ARCH GEN PSYCHIATRY, 63*.

van der Kolk, B. A., Roth, S., Pelcovitz, D., Sunday, S., & Spinazzola, J. (2005). Disorders of extreme stress: The empirical foundation of a complex adaptation to trauma. *Journal of traumatic stress, 18*(5), 389-399. doi: 10.1002/jts.20047

Will Boggs, M. (2006). Migraine Headache Commonly Complicates Bipolar Disorder. *Reuters Health*.

Zubieta, J. K., Huguelet, P., O'Neil, R. L., & Giordani, B. J. (2001). Cognitive function in euthymic bipolar I disorder. *Psychiatry research, 102*(1), 9-20.