DECLARATION OF LISA RICKERT, MSSW, CSW

I, Lisa Rickert, an adult resident of Dane County, Wisconsin, of lawful age declare as follows:

**BACKGROUND AND EXPERIENCE**

1. I am a mitigation specialist in private practice in Madison, Wisconsin. I have been in private practice since September 1997. My work initially involved the preparation of sentencing reports in criminal cases and the preparation of dispositional reports in juvenile cases. Since January 2000, after extensive training and mentoring from the Death Penalty Institute, my work has become exclusively death penalty mitigation investigations.

2. I received a Bachelor of Science Degree in Social Work from the University of Wisconsin-LaCrosse in 1993, and a Master of Science in Social Work from the University of Wisconsin-Madison in 1996. I am a Certified Social Worker in the State of Wisconsin, Certification Number 2212-120. I am a member and former President of the Governing Board for the National Alliance of Sentencing Advocates and Mitigation Specialists formerly known as the National Association of Sentencing Advocates.

3. I have worked professionally in the Juvenile Justice and Criminal Justice Systems for over 25 years and I have prepared over 200 sentencing reports.

4. Since January 2000, I have worked on 23 capital murder cases. I have worked on federal death penalty cases in Wisconsin, Iowa, Missouri, Kentucky, and Michigan and state cases in Illinois, Missouri, Florida, Kansas, Arkansas, Washington, and Connecticut. I have worked on one military case out of Ft. Bragg and one terrorism case out of Guantanamo Bay, Cuba.

5. The responsibility of lead counsel and the role of a mitigation specialist in a potential death penalty case, is best addressed in the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003 Revision) and the Supplemental Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (2008). The Supplemental Guidelines were developed by the American Bar Association Death Penalty Representation Project and endorsed in December 2008 by the National Alliance of Sentencing Advocates and Mitigation Specialists. The guidelines are meant to provide guidance to the defense team and judges on selecting, funding, and working with mitigation specialists. I conduct my work in accordance with the ABA Guidelines.

6. The role of the mitigation specialist in a death penalty case is to assist counsel by conducting an on-going and exhaustive social history of every aspect of the client's life and any other factor that provides a basis for a sentence less than death.

7. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

8. A mitigation specialist must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews are necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation.

9. A mitigation specialist must interview lay witnesses, or witnesses who are familiar with the defendant or his family, including but not limited to:

a. The client's family, extending at least three generations back, and those familiar with the client;

b. The client's friends, teachers, classmates, co-workers, employers, and those who served in the military with the client, as well as others who are familiar with the client's early and current development and functioning, medical history, environmental history, mental health history, educational history, employment and training history, military experience and religious, racial, and cultural experiences and influences upon the client or the client's family;

c. Social service and treatment providers to the client and the client's family members, including doctors, nurses, other medical staff, social workers, and housing or welfare officials;

d. Witnesses familiar with the client's prior juvenile and criminal justice and correctional experiences;

e. Former and current neighbors of the client and the client's family, community members, and others familiar with the neighborhoods in which the client lived, including the type of housing, the economic status of the community, the availability of employment and the prevalence of violence; f. Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served; e.g. Witnesses who can testify about the adverse impact of the client's execution on the client's family and loved ones.

10. A mitigation specialist must provide counsel with documentary evidence of the investigation through the use of such methods as genealogies, social history reports, chronologies and reports on relevant subjects including, but not limited to, cultural, socioeconomic, environmental, racial, and religious issues in the client's life. The manner in which information is provided to counsel is determined on a case by case basis, in consultation with counsel, considering jurisdictional practices, discovery rules and policies.

11. It is the duty of the mitigation specialist to gather documentation to support the testimony of expert and lay witnesses, including, but not limited to, school, medical, employment, military, and social service records, in order to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state, intellectual capacity, and life history that may explain or diminish the client's culpability for his conduct, demonstrate the absence of aggressive patterns in the client's behavior, show the client's capacity for empathy, depict the client's remorse, illustrate the client's desire to function in the world, give a favorable opinion as to the client's capacity for rehabilitation or adaptation to prison, explain possible treatment programs, rebut or explain evidence presented by the prosecutor, or otherwise support a sentence less than death.

12. It is the duty of the mitigation specialist to aid counsel in preparing and gathering demonstrative evidence, such as photographs, videotapes and physical objects (e.g., trophies, artwork, military medals), and documents that humanize the client or portray him positively, such as certificates of earned awards, favorable press accounts and letters of praise or reference.

**LISA MONTGOMERY CASE**

13. I was hired to be the mitigation specialist for the Lisa Montgomery team by the Office of the Federal Public Defender, Western District of Missouri in the early winter months of 2005. I was initially contacted by Assistant Federal Public Defender Anita Burns and the Chief Investigator, Ron Ninemire. I traveled to Missouri for an interview. I recall

my meeting with Anita Burns as being a good one and I looked forward to working with her on the case. Ms. Burns was only on the case a short while. By the time I made my first trip to Kansas City, Ms. Burns was no longer on the case. She had been replaced by David Owen. I was not made privy to the reason that Ms. Burns was no longer on the case.

14. From the very beginning of my working relationship with Mr. Owen, there was a difference of opinion on how to conduct a mitigation investigation. It seemed as if Mr. Owen had some sort of paranoia about my meeting with any of the witnesses one-on-one. He insisted that I always be accompanied by another person. Most of the time the other person was Ron Ninemire, but, on a few occasions, one of the attorneys would insist on coming along on my interviews.

15. As I stated above, the ABA Guidelines require one-on-one interviews with witnesses. In my experience, this requirement is essential, particularly in cases like Mrs. Montgomery's where it was clear that there was a multi-generational, familial pattern of physical, sexual and emotional trauma. In such sensitive interviews, it is critical to build a rapport and a relationship of trust with the witnesses. It takes multiple, careful, sensitive interviews before the victims and witnesses to such trauma will feel comfortable enough to share the crucial details that are so essential to a biopyschosocial history. I have learned that my posture, eye contact, tone of voice, and choice of questioning all play a part in building trust. I have also learned the importance of being in the moment with the witness, allowing the witness silence, and also allowing the witness to talk without interruption or suggestion. The atmosphere and questioning in an interview is beyond my control with more than one team member in the interview.

16. At team meetings, I expressed my concerns about not being permitted to interview mitigation witnesses by myself. My concerns were overridden by the attorneys. For most of the interviews, Ron Ninemire accompanied me.

17. I found the presence of the attorneys during my initial visits for interviews to be an impediment to my work. When I plan a trip to see witnesses, I always plan a full itinerary so as to maximize my time on the road which is beneficial to the case and is also the most cost-effective for the court. I will work from early in the morning to late at night in order to get the most work done and to accommodate the schedule of my witnesses. I recall one trip in which co-counsel, Susan Hunt, insisted that she accompany me. In that instance, I had already planned my itinerary but was forced to change it to accommodate her schedule. During the interviews with the witnesses, Ms. Hunt interrupted the flow of the interview by getting up and leaving the room to take smoke breaks. When she returned, she interrupted again by saying, "Wait, I missed that." The witness had to stop and recap for Ms. Hunt. She did not turn her cell phone off during the interviews and it rang in the middle of the

interview. I found this very distracting to both myself and the witness, and I believe it hindered my interviews. Although I had to change my itinerary to accommodate Ms. Hunt coming along she did not accompany me on interviews later than 5 o 6 pm which was her happy hour.

18. I found David Owen's presence during interviews even more distracting. Mr. Owen was not a quiet observer and he repeatedly interrupted. He basically shared the interview with me. I am having difficulty pulling out exactly what he said or did, but I remember that he was inappropriate regarding questions surrounding some of the sexual abuse issues.

19. I never knew exactly why, but it became clear to me that David Owen and Susan Hunt developed a mistrust of my work. I learned from Federal Resource Counsel, Dick Burr, that David and Susan had sent some of my work product to another mitigation specialist, Scharlette Holdman, for critique. I would not have been bothered or offended if the team had been up front with me and told me that they were sending my work product to Ms. Holdman. Ms. Holdman is excellent at what she does, and I would have welcomed the collaboration. I was bothered because this was done behind my back. When I asked the attorneys if they sent Ms. Holdman all of my work product and asked them specifically about each document they acted like they didn't know or that they weren't sure they had a particular document. The attorneys received updates of all work product every team meeting. I felt like the lawyers had not sent all of my work product to Ms. Holdman and as a result, they were not going to get the full benefit of her input and at the same time were undermining and disrespecting me.

20. During the entire time I was on the case, the team was extremely dysfunctional. It was clear to me that neither Ms. Hunt or Mr. Owen had any training or experience with how to investigate and prepare a mitigation case such as Mrs. Montgomery's- one that involves multiple, co-morbid mental illnesses, issues of severe trauma, and genetic and neurological disorders which appeared to go back several generations.

21. Increasingly over time, I felt like my work on the case was compromised. It is my practice to leave no stone unturned, meaning interview all possible witnesses. I remember one instance where I had some extra time in my schedule and wanted to interview someone, a second cousin maybe, who was known to be the family historian. The attorneys didn't talk to me directly but instead complained to Resource Counsel, Dick Burr who talked to me about why I would interview a second cousin. Another time, Ron and I had what I believed was a really productive interview with Carl and Vanessa Boman and Lisa's children. Approximately one week later Susan and David told us "what ever happened, you are never to see them again." They mandated that "from now on out" only David or Susan were to be permitted to see or talk to them. I was ordered to have no further contact with these

witnesses. I was never told what the complaint was and it was most certainly not handled professionally.

22. I reached the end of my rope after an interview that David Owen insisted on being present for. I can't remember the details now. I do recall that after the interview, I went into Ron's office to express my frustration. I told Ron that I didn't see how he could work in that office. Ron said to me, "Lisa, you don't know the half of it." Then he went on to tell me that the day before, David was in his office and implied that Ron and I were having an affair. I was horrified. It should go without saying that David Owen's accusation was utterly baseless. But, it became clear to me that I could no longer work for this team. The paranoia, mistrust, disrespect and behind-the-back dysfunction that existed on the team was simply too much for me to be able to fulfill what I believed my ethical obligation was to Mrs. Montgomery.

23. I found Ron Ninemire to be a very nice person who genuinely cared about Mrs. Montgomery and her family. However, after my resignation letter was submitted I heard that the attorneys wanted Ron to be in charge of the mitigation case. Ron knew that this was not a good idea, but he did not believe that he was free to speak his mind. Throughout our time working together Ron told me that he had no choice but to do what he was told to do by David Owen. He stressed to me that he was an "at-will" employee. He felt like he was always at risk for being fired. David Owen required him to call each and every evening that we were out investigating and report in on all of the details of the day's interviews. It did not matter how late at night the interviews went, Ron had to call Dave. I often said to him, why can't this wait until tomorrow and Ron explained that he had no choice.

24. I was sickened that I felt forced to resign from the case. I did not put David Owen's baseless accusation into my resignation letter, because Ron swore me to secrecy, saying "please, I have to work here" or words to that effect.

25. I felt like it was important that I have a closing interview with Lisa Montgomery. I had met with Lisa on many occasions and had established a good relationship with her. She had disclosed important, sensitive information to me. I knew that we had not yet uncovered all that there was to uncover with Lisa, but I was aware of her trust issues and how important it was for me to have a good closing meeting with her so that she not feel as if I had abandoned her. I was also aware of her suicidal tendencies. I felt obligated to help her transition to the person who would replace me, whoever that might be. I expressed my desire to Susan Hunt and David Owen, but they flatly refused to allow it. Even after I assured them that I would not undermine any member of the team and that it was only my goal to help Lisa through the transition, they still refused.

26. During the time that I was on the case, I memorialized my interviews in memos that I distributed to the team. As a social worker, I am trained to document what I hear and observe. I also know that the attorney and any experts who they hire rely on the truthfulness of my interview memos. The contents of my memos are a true and accurate recording of what I was told by the witnesses and my observations of them.

27. The themes that were emerging in the case, when I resigned, centered around Mrs. Montgomery's multiple severe mental illnesses and the lifelong trauma she suffered. We were just beginning to investigate the issue of brain impairment. I certainly would have wanted to follow up on symptoms of fetal alcohol spectrum disorder or fetal alcohol effect given that we knew Judy Shaughnessy drank heavily during her pregnancy with Lisa. The team, to my knowledge, was not pursuing a theory that there was a second person involved. It was understood that Mrs. Montgomery was alone.

28. I was never contacted by attorneys Fred Duchardt or John O'Connor about my work on Mrs. Montgomery's case. Dani Waller, the mitigation specialist who was working on the case at the time of trial, did reach out to me and ask for my file. I sent her everything I had. Later, Ms. Waller and I ran into each other at a seminar. She expressed to me that the dysfunction that I experienced with the team continued during her time on the case.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Date this 14 day of March, 2013.

Lisa Rickert

Lisa Rickert, MSSW, CSW