Office COPY

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY

STATE OF OKLAHOMA

JUDY KAREN KLEINER, )
Plaintiff, )
-vs- ) CASE NO. JFD-84-3025
JACK GLEN KLEINER, )
Defendant. )

DISTRICT COURT
FILED
OCT 15 1985
DON E. AUSTIN, COURT CLERK
STATE OF OKLA. TULSA, COUNTY

TRANSCRIPT OF TRIAL ON MERITS

Proceedings had and testimony taken in the above entitled cause before the Honorable Hugh V. Rineer, Judge of the District Court, heard on March 4, and March 7, 1985.

A P P E A R A N C E S

FOR THE PLAINTIFF: Mr. Richard D. White, Jr.
Attorney at Law
Tulsa, Oklahoma

FOR THE DEFENDANT: Mr. Edward E. Glass
Attorney at Law
Tulsa, Oklahoma

SHANNON RUTH WAGGNOR
CERTIFIED SHORTHAND REPORTER
TULSA COUNTY COURTHOUSE
TULSA, OKLAHOMA

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 1 of 318

# I N D E X


| PROCEEDINGS March 4, 1985 | PAGE |
| --- | --- |
| Stipulations of Counsel | 3 |
| **WITNESSES** | |
| **MRS. JUDY KAREN KLEINER** | |
| Direct Examination by Mr. White | 4 |
| Cross Examination by Mr. Glass | 36 |
| Redirect Examination by Mr. White | 82 |
| Recross Examination by Mr. Glass | 85 |
| Examination by the Court | 88 |
| Further Recross Examination by Mr. Glass | 90 |
| Further Examination by the Court | 91 |
| **MISS LISA RAE HEADBURG** | |
| Direct Examination by Mr. White | 91 |
| Cross Examination by Mr. Glass | 104 |
| **MS. NANCY WALENTINY** | |
| Direct Examination by Mr. White | 106 |
| Cross Examination by Mr. Glass | 118 |
| Redirect Examination by Mr. White | 122 |
| Examination by the Court | 123 |
| **MISS PATTI HEADBURG** | |
| Direct Examination by Mr. White | 125 |
| Cross Examination by Mr. Glass | 133 |

I N D E X C O N T.

PROCEEDINGS March 7, 1985 PAGE

MR. JACK GLEN KLEINER

Direct Examination by Mr. Glass 137

Cross Examination by Mr. White 230

Redirect Examination by Mr. Glass 262

Recross Examination by Mr. White 266

MISS PENNY KLEINER

Direct Examination by Mr. Glass 267

Cross Examination by Mr. White 274

MR. TEDDY KLEINER

Examination by The Court 282

Examination by Mr. White 285

Further Examination by The Court 292

JERRI JO KLEINER

Examination by The Court 294

Examination by Mr. White 298

EXHIBITS

PLAINTIFF'S

Number One (admitted) 10

Number Two (admitted) 34

DEFENDANT'S

Number One (admitted) 167

Number Two (admitted) 167

Number Three (admitted) 73

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 3 of 318

INDEX CONT.

DEFENDANT'S EXHIBIT CONTINUED — PAGE

Number Four (admitted) 151

Number Five (admitted) 167

Number Six (admitted) 229

CERTIFICATE OF THE REPORTER 301

P R O C E E D I N G S

THE COURT: This is case number JFD-84-3025, Judy Karen Kleiner, Plaintiff versus Jack Glen Kleiner, Defendant. Case comes on today for trial. Show the presence of both parties and their attorneys; Plaintiff represented by Richard White; the Defendant by Ed Glass.

Care to make an opening statement, Mr. White?

MR. WHITE: I will waive the opening statement.

THE COURT: Mr. Glass?

MR. GLASS: Your Honor, we'll also waive opening statement. May we approach the bench, please, for stipulation?

THE COURT: Yes, you may.

MR. GLASS: Comes now the Defendant, Jack Glen Kleiner, through his attorney of record, Edward E. Glass, and herewith enters the following stipulation: That his regular take home pay per month varies between the sum of $1,800 and $2,000 each month. That all right?

MR. WHITE: That's it.

MR. GLASS: Okay.

THE COURT: Thank you. Back on open court. May call your first witness, Mr. White.

MR. WHITE: Plaintiff calls Judy Kleiner to the stand.

MR. GLASS: Your Honor, we'd like to invoke the rule of sequestration any of the witnesses here be excluded

until their testimony is needed.

THE COURT: Mr. White do you have any witnesses here?

MR. WHITE: I don't believe I call any of these people. In fact, I don't know who that woman is.

THE COURT: Mr. Glass, are they your witnesses?

MR. GLASS: Other than Mr. Kleiner and one person who's in the courthouse, but just not here, no.

THE COURT: The two people in the courtroom you are not gonna call them?

MR. WHITE: No.

THE COURT: All right.

MR. WHITE: Ms. Kleiner.

THE COURT: Raise your right hand, ma'am.

You solemnly swear the testimony you give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

MRS. KLEINER: I do.

THE COURT: You may be seated.

MRS. JUDY KAREN KLEINER

After having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q Please state your full name for the record.

A Judy Karen Kleiner.

Q Judy, where do you currently reside?

A At 9917 North Garrison, Sperry, Oklahoma.
Q How long have you lived there, Miss Kleiner?
A Since July 1984.
Q Miss Kleiner, you are currently married to the Defendant, Jack Glen Kleiner, is that correct?
A Yes, I am.
Q When were the two of you married?
A Um -- October 24, 1974.
Q You've been residing as husband and wife up until your last separation preceding the filing of this petition?
A Yes.
Q You currently employed, ma'am?
A Yes, I am.
Q And where are you employed?
A I work for A.R.A. Services in Tulsa, Oklahoma on 23rd Southwest Boulevard.
Q What is your occupation?
A I work in the book department, distributor.
Q What do you do?
A I fill orders that send out to the store for paperback books.
Q What is your wage at this employment?
A I make four seventy-five an hour; which on a 40 hour week it's a $190 a week.
Q What is your monthly take home?

A Around 644.
Q Okay, you have any children of this marriage, Miss Kleiner?
A Yes, I do. I have three.
Q And their names and birthdates?
A Teddy's is [redacted]; Jerri Jo's is [redacted]; and Tommy's is [redacted].
Q Do you have any other children of any other marriages?
A Yes, I do. Have two daughters.
Q Their names for the Judge?
A Lisa Maria --

MR. GLASS: Objection, Your Honor, they're not children of this marriage. Court has no jurisdiction over them. Not germane.

THE COURT: Overruled.

Q You may answer.

MR. GLASS: Wait a minute, Richard. Your Honor, this is one of our witnesses. Since I was the one requested the rule, I'm obligated to identify.

THE COURT: What's your name, ma'am?

A WITNESS: Penny Kleiner.

THE COURT: The rule of sequestration of witnesses has been invoked; which means that you will not be able to sit in the courtroom during the testimony. You will have to wait in the hall. You'll have to also keep in mind that throughout this trial you will not be able to discuss your

testimony, or anyone else's testimony with anyone except the attorneys. And that rule will remain in effect until you are released or until the trial's over.

MISS KLEINER: Okay.

THE COURT: Thank you.

BY MR. WHITE:

Q Okay, Judy, I'll repeat the question. I want you to give the names and birthdates of your other children not of this marriage?

A I have two daughters. Lisa Marie Headburg (phonetics), which is 17 years old, she was born [redacted]; Patty Renee Headburg (phonetics), which is born [redacted].

Q Do these children reside with you?

A Yes, they do.

Q And your three natural children from this marriage reside with you?

A Yes, they do.

Q So you have five children currently residing with you?

A Yes.

Q All right, prior to your separation from Mr. Kleiner, though, all five children reside with the two of you?

A Yes.

Q Okay, during the entire term of your marriage of Mr. Kleiner they resided with you?

A Yes.

Q Is that some odd ten years?
A Yes. We was married ten years.
Q Okay, you filled out a pretrial financial declaration that you signed, is that right?
A Yes, I did.
Q I'm gonna review it with you briefly, to make sure the information is correct. You state in here that your monthly take home pay is $644, is that correct?

THE COURT: You don't need to do that, Mr. White. She's filled it out and sworn to it, or you can get her to swear to it. But, you don't need to review it. Something you want to highlight, fine. Otherwise, Mr. Glass can cross examine.

Q Okay, I want you to review that. If there's any debts that you didn't list or any assets, or if there are any monthly obligations on here you didn't list, at this time -- you did omit your signature, so I want you to look at that, and if that's correct go ahead and sign it. Be able to do that.
A Since I filled this out I have had more medical bills.
Q Okay, and what sort of medical bills?
A Um -- Tommy had to go back and forth to the doctor, and I also was to the doctor.
Q So, these are for one of your children?
A Yes. And myself.
Q How much did you incur in medical bills for Tommy?

A Um -- his is probably over $600 right now.
Q Okay, that's 600 that is not listed on there?
A On this sheet?
Q Yes.
A Is this monthly?
Q Yes, those are monthly.
A I don't know how to answer that.
Q Let me see this sheet. Okay, you didn't list on here any of your installment debt payments, so it would not have been on there. On your debts you've got Hillcrest, and Tulsa X-ray a balance of $500, are there any other medical bills, at this time?
A Yes.
Q And who are they to?
A Dr. Miller, he's a urinologist (phonetics), he's at Hillcrest Physician's Building. And also with Dr. Griffin, I take Tommy back to therapy.
Q And these were all incurred since you gave me this information?
A Uh-huh.
Q And how much do you owe Dr. Griffin?
A It's over $600.
MR. GLASS: That was for what again?
A For Tommy, he broke his elbow.
Q And what was the other one?

A For me.
Q And what is that for?
A I had a bladder infection.
Q And who were you owed -- who do you owe money to for that?
A Dr. Miller, a urinologist at Hillcrest Physician's Building.
Q How much do you owe him?
A On his it's just about over a hundred.
Q Are there any other debts or expenses not listed in here?
A Not that I am aware of.
Q Okay, would you please sign this.
MR. WHITE: At this time, we move to enter into evidence pretrial financial declaration.
MR. GLASS: No objection, subject to cross examination, Your Honor.
THE COURT: Plaintiff's Number One will be admitted.
BY MR. WHITE:
Q Judy, when did you and Mr. Kleiner separate?
A The actual time?
Q Yes.
A February the 25th.
Q 1984?
A Yes.
Q Have you been having marital problems prior to that?

A Yes.
Q For how long a period of time?
A Off and on for quite a few years.
Q Was there any particular source of these problems?
A Yes.
Q What was that?
A Alcohol.
Q Would you be more specific?
A He would -- um -- drink every night. He would not take me and the kids anywhere socially anywhere. Um -- it was always I had to do this, for the kids. When Christmas time came he would not go anywhere. He had to drink and watch football all the time. He went to work during the day, he came home and never left until he went to work again.
Q Mr. Kleiner spend much time with the children during these years?
A In the evenings only.

MR. GLASS: Your Honor, gonna object unless he establishes a time.

THE COURT: Sustained.

Q Okay. Let's take the year immediately before you two separated, what did Mr. Kleiner do with the children?
A In 1983?
Q From February '83 to February '84.
A One time he took us to Woolaroc.

Q What's that?
A It's a park that has animals and that -- we's gone approximately two and a half hours. He wanted to hurry up and get back because football was on.
Q Did he do anything else with the children in that year?
A He might've went to get water or something, that was it. No recreation. No nothin'.
Q Did you spend time with the children during this period of time?
A Yes.
Q Um -- did you work during this period of time?
A No.
Q Did you work during any other period of time in your marriage?
A In 1978 and part of '79.
Q What did you do?
A I worked for A.R.A. Services, where I'm employed now.
Q Okay, so you worked during your ten year marriage for a year?
A Yeah. And I left -- where I worked --
Q What activity did you partake with the children during the year February '83 to February '84?
A I went to their school programs. I went -- took'em to parks. Um -- we went on picnics. We went to the zoo.
Q Were any of these activities, at that time, where Mr.

Kleiner could go with you?

A Yes.

Q Was he invited to go?

A Yes.

Q Did he ever accept an invitation to go?

A No.

Q Did he state to you why he wouldn't go?

A He just didn't want to go.

Q You stated that Mr. Kleiner would drink at night, is that correct?

A Yes.

Q Do you know how much he would drink at night?

MR. GLASS: Objection, Your Honor, unless established where we're going here. Incompatible divorce basically seems to me, at this point. He's certainly carried his burden for incompatibility.

MR. WHITE: Your Honor, we're engaged in a custody dispute here. I think it's highly relevant.

THE COURT: Overruled.

MR. GLASS: May I -- My problem here is if we're gonna talk about drinking, and so forth, we're talking about February '83 through February '84. Seems to me that the Court ought to be interested in what these parties are doing now, what their current problem is. If that's what we're interested in, it's the activities right now, that Your Honor

should be concerned with in terms of which party is proper party to be awarded the care, custody, and control of these children. Don't see what his drinking has to do --

THE COURT: I'll listen to what she's got to say for '83 and '84 first.

BY MR. WHITE:

Q Let me ask a question. Approximately how much did Mr. Kleiner drink in the evenings?

A I can't tell you on ounces, I can tell you he had and I can't tell you the size, it was big bottle of rum.

Q Would you show the Court?

A It's one of the big ones with the handle on them. He would buy three cases of Coke and bring'em home on Mondays, and they would go and the kids didn't drink that many. They knew it was their father's, you know. Um -- if you ran out of rum he would drink wine, beer, whatever was there.

Q Did he drink every night?

A In '83?

Q Between February '83 and February '84.

A He might've missed two or three nights.

Q In a year's time?

A Yeah.

Q Did he get drunk when he drank, or visibly intoxicated to you?

A Yes.

Q How do you know that?
A There's time that he would drink and he would get -- create argument, and next morning he will not remember'em.
Q Did he have any certain traits he would exhibit when he was under the influence of alcohol?
A Anger if it didn't go his way.
Q If what didn't go his?
A Anything. If you disagreed.

MR. GLASS: I make the same objection. I think we need to establish time periods here and get a little more definite.

THE COURT: Sustained.

Q Okay, let's limit your answer to, if you could, to a specific example, if you have a specific example to give to the Court of a time and place that Mr. Kleiner under the influence of alcohol exhibited any anger, violence, or anything of that nature; need to be specific. So, if I say between February 1983 and February 1984, try to place it particular circum-stances, if you could.
A About what the anger was about?
Q Or what happened?
A We had some neighbors that lived next door to us --

MR. GLASS: Your Honor, make the same objection. I'd like to have this nailed down as when it was?

MR. WHITE: Haven't had a chance to get there.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 17 of 318

BY MR. WHITE:

Q If you could tell the Court when it was to the best of your recollection.

A September, October, November until they moved out.

Q Are you saying it's repeated instances?

A Yes.

Q Let's just give the Court one example of these repeated instances in September?

A September I had two sisters down from Kansas, and Wesley Gann (phonetics), they lived next door, and his family and Jack was agitated at them anyway, and he was also claimed to be a preacher man. Jack --

MR. GLASS: Objection, Your Honor. We have a referenced to a "he". I don't know who we are talking about.

A The next door man, Wesley Gann.

Q Okay.

A Jack drank very heavily that night. During the evening I called Osage County Sheriff to come, and I's afraid somebody going to get killed. They do have it on record. Osage did finally come out. Jack took off up this road in the red pickup truck and he came, and he knocked the mailbox down, and denied it. He also went up to Skiatook to the Osage County and lied on tape recording.

Q About -- what happened out there that you're referring to?

A He didn't like the man.
Q He argued with them?
A Yes.
Q Anything else happen?
A Probably in August when they first moved out, he took a two by four after Wesley Gann, because Wesley Gann was on our property.
Q Any other incidences which under the influence of alcohol he exhibited violence, say after that in October 1983?
A He exhibited violence with my daughters.
Q Okay, could you please tell the Court when that was, and what he did?
A I can't say the days. It was almost an every time occurrence when -- it -- you know, if he tell'em to do something and they didn't hop to it right then he would take his fist to'em.

MR. GLASS: Your Honor, I've got to object to this, we need to have time stated much more specific.

THE COURT: Sustained.

Q Okay, you are gonna have to be a little more specific, Judy, as to when this may have occurred. If it occurred many times, then just pick out several of the many times that it occurred and tell the Judge.
A Rick, it happened many times --

MR. GLASS: Judge --

A -- over the years.

MR. GLASS: Excuse me. I'm not trying to be difficult, but now client is trying to tell us -- attorney is trying to tell his client how to testify. If someone should be asking for a break for a conference, that would seem to be proper. I just got to make these objections.

THE COURT: Well, Mr. Glass, I think we need to give a little bit of latitude here. I mean she says that he took a fist to'em or whatever it was she said, let Mr. White ask her when this happened, and then we'll --

Q Ma'am --

THE COURT: Mr. White knows what he needs to get from her.

Q Again we're in the time period the year immediately before your separation. Was it the summertime? Was it the fall?

THE COURT: Just ask when, Mr. White. She knows the seasons of the year.

Q Okay.

A Every season.

Q Well, --

THE COURT: Ma'am, listen to me. You heard Mr. Glass object four times on this. What we want to know is, your gonna have to say that the man took a fist to her you tell us when he did it.

A I don't know the exact date.

THE COURT: We don't want an exact date. A month; when the last time happened. Okay? When was the last incident? Let's start that way.

Q Was it November, September, if it happened all these months, just pick out one --

THE COURT: Mr. White, I asked her when the last incidence was.

A The last incident?

THE COURT: Yes. When the man was drunk and he did something to one of the children.

A On May 27, 1984, he took his fist after my daughter Patti.

Q This was after you were separated?

A Yes. That was the day I walked off and left the farm.

Q Please tell the Court in detail what happened?

A That day.

Q That incident where he took his fist to Patti.

A Jack had returned to the home after we were separated, and I had to go in town and get some pop, and when I came back my daughter came and told me. She said, "Mother --

MR. GLASS: Objection, Your Honor, it's hearsay.

A My daughter is here.

MR. GLASS: Objection, Your Honor, it's hearsay.

THE COURT: Ma'am, you let me rule before you say anything else. She's here, I'm gonna let her -- if she's here

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 21 of 318

she can testify to what happened.

Q Okay, what you know, not what Patti told you. Patti can come down and testify, if necessary. What happened?

A My daughter was frightened --

MR. GLASS: Objection, Your Honor. Assumes a fact not in evidence.

THE COURT: She can say if her daughter was frightened.

MR. GLASS: Show our objection, please.

Q Okay, but you didn't actually witness the beating that he gave?

A No.

Q Have you ever witnessed Jack take his fist to one of your children?

A Yes.

MR. GLASS: Ask her --

Q Okay --

MR. GLASS: Excuse me.

Q -- give me a chance. Okay when, if you can, when did --

A I just don't know how to answer it.

MR. GLASS: Your Honor, seems to me it's asked and answered. She's been given many opportunities.

THE COURT: Overruled.

A Monthly. Weekly.

Q When was the last time you saw Mr. Kleiner take his fist at the children -- one of the children?

sleep; and about an hour later he got up and never slept with anything on. He got up, and he went down the hallway, and I couldn't figure out why he didn't use the bathroom in our bedroom, and he still didn't have nothin' on. He come back out of the hallway -- we have a trailer and we always had a light on for the kids. He went out into the new living room we had built and didn't come back. And I laid there, and I couldn't sleep, thought well maybe he heard a sound, you know. I thought it was kinda odd still didn't have any clothes on. I heard some bottles hit. So, I got up and I went through there and we had carpet, nobody could hear me. I went out there and I got to the one doorway and the light switch was to my right and I turned it on. And at my feet, my daughter, Lisa Rae, was on the floor, and Jack sexually molesting her.

MR. GLASS: Objection, Your Honor. Move to strike. We have no basis for say whether this man was sexually molesting someone.

MR. WHITE: I have witness, Your Honor.

THE COURT: Well, --

MR. GLASS: I'd like to ask a little more specificity as to what a sexual molestation is, and whether she's competent to declare what it is.

THE COURT: Fine, she can testify as to what she saw. She won't characterize it that way. That sexual molesting will be stricken. She can tell us what she saw.

Q Judy, you say Mr. Kleiner was nude -- nude and on top of your daughter?
A Yes, he was.
Q How old was your daughter, at this time?
A 15.
Q Did she have any clothes on?
A She had a gown pulled up to her neck.
Q Was he having intercourse with her?
A Yes.
MR. GLASS: Objection, Your Honor.
THE COURT: Mr. White, let her testify as to what happened.
MR. GLASS: I move to strike that, please.
Q Tell the Court exactly what you saw?
A When I turned the light on he was sexually with her.
Q When you say sexually with her tell the Court what you mean specifically?
A He was in her. He was pumping her. When I hit the light and I seen it, I liked to froze. I asked him, you know, my first words, "Oh, my god, what are you doing?" And he got up and just walked off.
Q And what happened then?
A He went into bed and went to sleep. I stayed up all night afraid he would come after Lisa, as bad as he threatened her.

Q What did he say?
A Told her to keep her mouth shut.
Q He say that in your presence?
A Yes.
Q Did he say anything to you?
A Said he didn't know what he was doing.
Q Did you say anything to him?
A I had a lot to say.
Q What did you say?
A I told him I wanted him out of the home, away from me. And it was just verbal talk, because he was drunk.
Q Anything else said that night?
A No.
Q Anything transpire the next day?
A When the kids got up. I got them up early, took my daughter to a doctor, Dr. Barnes (phonetics).
Q Okay, what did Mr. Kleiner do the next morning?
A I don't know. He was there all day. I called and told him to be off the place by six o'clock in the evening.
Q When you returned from the doctor, was he there?
A Yes. One of the vehicles didn't run, so I took him into Tülsa and got him a motel room.
Q Um -- did he come back that night to stay?
A No.
Q When did he come back?

A In May. He would come back off and on, because we have to haul water out there where we live.
Q And he assisted you, is that what you are saying?
A Hauling water, yes.
Q Did he reside in the house after that February incident?
A Not until May, he come back.
Q And why did he come back in May?
A We had a talk, and I knew that alcohol -- and I been trying to understand it, I know alcohol is it makes a person sick. We had talked and he agreed that he would go to counsel-ling. He would go to a treatment center. He would do anything so long as I wouldn't prosecute him for doing that to Lisa. He did go to two A.A. meetings. But, he wouldn't go again, because he wanted me to attend them, and I can't do that for him he has to do it for himself. And I would not go.

MR. GLASS: Objection, Your Honor, as to --

THE COURT: Sustained.

I have got a protective order. I'm afraid I have got to take a recess until 1:30.

(After recess, the following proceedings were had:)

THE COURT: You are still under oath, ma'am.

MR. WHITE: I'd like the reporter, if she would, to read back the --

THE COURT: You were discussing him coming back in May; going to two A.A. meetings, and that your client refused

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 26 of 318

to go to any.

BY MR. WHITE:

Q Ms. Kleiner, when did Mr. Kleiner leave for the second time?

A He didn't. I did.

Q You did?

A Yes.

Q And when was that?

A May 27.

Q And how long had -- um -- he been with you before you left -- I don't recall when he came back the first time.

A I don't remember the date. I remember the day I left it was Memorial Day.

Q Okay, and where did you go?

A I went into Sperry.

Q Where in Sperry?

A I went to Jeany Lipkey (phonetics) and Richard Bowman's house.

Q Who are Ginny (phonetics) --

A Richard Bowman was the Chief of Police and Ginny was his sister.

Q Okay, you stayed with them?

A Yes, I did.

Q How long did you stay with them?

A I stayed in that house a month.

Q Okay, and where did you go from there?

A To 9917 North Garrison.

Q Okay, and how did you happen to move to 9917 North

Garrison?

A It was a bigger house.

Q Okay, I mean did you rent the house or was someone living there; please tell the Court the circumstances surrounding that?

A The house was a bigger house. I have the five children. Um -- I moved over there the first of July.

Q Okay, who all resided there, at that time?

A Myself, my five children, Mr. Bowman and his son.

Q All right, was the house rented by Mr. Richard Bowman from the landlord -- from the owner of the house?

A For July, yes.

Q Okay, did you have any means of income at that time?

A I was on County.

Q On Welfare?

A Yes.

Q And how much are you receiving at that time?

A I was receiving I think $400. It was a little over 400 -- 469, or something like that. And 284 in food stamps.

Q So, you are receiving $752 a month?

A Uh-huh.

Q You and your five child -- children. How long did you know Mr. Bowman up to this time?

A I had met him when he was Chief of Police when I hauled water. Um -- also when I did help Mary at the snackbar, him and his sister would come in.

THE COURT: Ms. Kleiner, I don't want to interrupt you, but the question was how long did you know Mr. Bowman.

How long? I don't want a history of it.
A Probably seven months.
Q Okay, how long did you and you children reside there with Mr. Bowman?
A At where?
Q At this house on North Garrison?
A He moved out in December.
Q Of 1984?
A Yes, sir.
Q So, about from July to December?
A Yes.
Q Okay, did you receive child support from Mr. Kleiner during this period of time?
A I received --

MR. GLASS: Objection, Your Honor. Witness has already testified she was on -- receiving AFDC. No circumstances she couldn't be -- matter of law, she can't be receiving support from Mr. Kleiner.

THE COURT: Overruled.

A What?
Q You may answer the question.
A No, I did not receive any.
Q When was last time you received any money from AFDC?
A I went off County in November. And I just received -- um -- a check in February for $234.
Q Do you know what month that was for?
A For the month of December.
Q Okay, have you received any child support from Mr.

Kleiner for the months of January, February, or March?
A No, sir.
Q Do you, at the present time, your kids involved in any activities?
A My daughter -- younger daughter, Jerri Jo, just finished basketball. I do have four of my children enrolled for baseball, they're starting their practise season now.
Q Okay, how long has the daughter been in basketball?
A Um -- probably since the last of November.
MR. GLASS: We're gonna raise an objection unless this is a child of this marriage, please.
THE COURT: Yeah. Let's just refer to the three children of this marriage.
Q Which child are we talking?
A Jerri Jo.
MR. WHITE: I believe that is a daughter of this marriage, Your Honor.
BY MR. WHITE:
Q Jerri Jo's a daughter of this marriage?
A Yes, sir.
Q And she's been in basketball since November?
A End of November.
Q How many games has she had?
A Oh, probably 15.
Q When were those games played?
A Some are played Saturday afternoon. Some of basketball practise after five. Some of their games start at 5:30.
Q Have you been to most of the games?

A I went to two of'em.
Q Okay. Now, the two boys of this marriage, are they involved in any sports?
A I enrolled them in baseball.
Q Okay, is that just beginning?
A Um -- yeah.
Q So, there haven't been any games, yet?
A No games.
Q You planning on going to their games?
A Yes.
MR. GLASS: Objection, Your Honor, speculation.
THE COURT: Overruled.
Q Ms. Kleiner, you are working fulltime, isn't that correct; you testified?
A Yes, I am.
Q So, have you had occasion to use any of the daycare facilities in Sperry?
A Yes.
Q And which facility is that?
A It was called Carol's Daycare Center. And then a new owner has bought in which their name is Sandy, I don't know her last name.
Q Okay, do you plan on using this daycare center if you receive enough funds to do so?
A Yes.
Q Do you know what the daycare center charges to watch their kids?
A To watch Tommy -- um -- because he's kindergarten they

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 31 of 318

were charging me thirty-seven fifty a week.

Q How about the other kids?

A My oldest daughters were watching them.

Q So, Tommy's only one that needs daycare?

A Yes.

Q Okay, you and Mr. Kleiner have accumulated, I assume, some property during the marriage, haven't you? Some personal property?

A Yes, we have.

Q And do you have an idea of -- you listed on your pre-trial financial declaration that's -- that it's worth $4,000?

MR. GLASS: Objection, Your Honor, what is it.

MR. WHITE: Household furnishings and property.

MR. GLASS: Again raise an objection the lawyer testifying not the client.

THE COURT: Sustained.

BY MR. WHITE:

Q Okay, I am gonna hand you what's on the face of it says Plaintiff's Exhibit Number Two, could you please identify that for the Court?

A This was contents stuff that was in the barn.

Q When you left?

A Yes.

Q Okay, and -- um -- you've got values next to the contents, is that correct?

A Uh-huh.

Q Where did you come up with those values?

A I don't understand.

Q How do you come to use those values?
A For the -- if I had to replace it, that's what it would cost me to replace these things.
Q Okay, and -- um -- I -- save the Court the time of reading these, and move to introduce these when you've identified them all. Hand you the second page, please, identify that for the Court?
A This was on vacuum cleaner that I did take.
Q You have possession of the vacuum cleaner?
A Yes, I do.
Q Okay, and I'm handing you now the third page, would you identify that?
A These are contents that was listed outside.
Q Okay.
A On the property. Well, it was like trailers that we had; riding lawnmowers that we had, you know; the push-mower; our animals.
Q Do you have any of that property now?
A None.
Q Okay, hand you the fourth page.
A These are items that were in my oldest daughter's bedroom.
Q Okay, did you take any of these items with you?
A Yes, I did.
Q What items were those?
A I did get her jewelry box. I got a dresser with mirror and chest of drawer.
Q Would you place a check mark by anything you took?

A There is --

Q Just put a check mark in black ink. Okay, and the fifth page, any item you've taken I want you to check with a check mark.

THE COURT: Identify it, Mr. White.

A This is one of the bedrooms for Patti and Jerri Jo, the other daughters.

Q Handing you the sixth page, if you'd identify that for the Court, and check in black ink any items you've taken.

A This was on the boy's bedroom.

Q Handing you the seventh page, please identify these items and check in black ink any items you've taken.

A This was on Jack's and my room.

Q Handing you the eighth page, please identify this sheet and check any items you've taken.

A These were items in the bathroom.

Q Handing you the ninth page, please identify these items and check in black any items that you've taken.

A Okay, these items were in the kitchen, except the freezer, it was outside.

Q Okay.

A But, it was appliance.

Q Handing you the 10th page, please identify this for the Court. and check off any items you've taken.

A This was stuff in your dining room..

Q This is final page and 11th page, and could you explain that -- what that contains, and check any items that you've taken.

A Okay, these items were in the living room.

MR. WHITE: At this time, move to enter into evidence Plaintiff's Exhibit Number Two.

MR. GLASS: No objection subject to cross examination.

THE COURT: Plaintiff's Number Two will be admitted.

BY MR. WHITE:

Q Judy, the court record shows that a temporary order was entered in this case in which Mr. Kleiner was granted certain visitation rights. Um -- have you always given Mr. Kleiner the visitation set forth in this order?

A No.

Q Okay, and could you please tell the Court when you refused to give him visitation, and reason you chose not to allow that?

A His visitation rights was January of 1985. I did not let him take the kids.

Q When you say January --

A January 11.

Q Okay, had you given him his last weekend that he was entitled under the temporary order?

A He had gotten them all along, even over the Christmas holiday one day.

Q Okay, and why did you refuse him visitation January 11?

A My son came home --

MR. GLASS: Objection, going to hearsay.

A He's here to testify, Your Honor.

MR. GLASS: Objection. This witness can't testify.

It's gonna be hearsay.

MR. WHITE: He's here.

THE COURT: Well, don't testify as to what your son said, ma'am. Just testify as to why you stopped the visitation.

A Because, I believed that Jack Kleiner and Penny Kleiner was going to kidnap the kids and take them out of state; and that I also know that drinking alcohol was involved out there.

MR. GLASS: Objection, Your Honor, interjecting an opinion.

THE COURT: Sustained.

Q Judy, I take it you're asking this Court to grant you custody of the three minor children, is that correct?

A Yes, I am.

Q Um -- could you please tell the Court of any hard reasons you have, based upon your life objective you feel you'd be a better parent than Mr. Kleiner?

A I feel I'd be a better parent because I don't drink alcohol, for one. I know the common knowledge that I'm doing. I work hard every day for the kids. I want the kids happy and I want them to go to school. And I want them to enjoy their life.

Q Why don't you feel that they will receive these benefits from Mr. Kleiner?

A Because I think alcohol is number one in his life. I've lived through it.

Q Any other reasons?

A I cannot buy my kids love. My love is there for them.

I can't buy'em, and I won't compete.

MR. WHITE: I don't believe I have any further questions at this time, Your Honor.

THE COURT: Mr. Glass.

CROSS EXAMINATION

BY MR. GLASS:

Q Mrs. Kleiner, I noticed over the noon break, when I was reviewing your pretrial financial declaration, you put no value in for the real estate, can you tell us why, please?

A I'm not exactly sure what it is valued at.

Q Okay, Ms. Kleiner, I hand you what's been marked as Defendant's Exhibit Number One, would you look at that please, and tell the Court if you know what it is? Do you recognize that document, ma'am?

A No, I don't.

Q You've never seen that, then?

A No.

Q You've never been sent a copy of that?

A No, sir.

Q Okay, that's fine. Hand you what's been marked as Defendant's Exhibit Number Two, have you ever seen that document?

A Yes, I have.

Q Will you tell the Court, please, what it is?

A I would assume it's record of payments.

Q What sort of record of payments?

A Of child support sent to the County.
Q Sent to the County or sent to you?
A Be sent to the County.
Q Okay, do you know what period of time that covers? If you know?
A Do you mean when it started?
Q Do you know what period of time?
A I seen something similar to this today, only.
Q All right, is it possible that you don't know the time period that this document covers?
A No.
Q All right, you testified that you were receiving State aid, is that correct?
A Yes, sir.
Q What period of time were you receiving the aid?
A I applied first part of March of 1984, through November of 1984.
Q Do you know when Mr. Kleiner was released from having to pay any additional support to the State?
A No, sir.
Q Okay. Now, the temporary order that was entered in this cause requires the payment of $100 a month, I believe, to you, doesn't it?
A I don't know.
Q You don't? All right. Now, during the marriage you

said that you were employed for a short period of time with A.R.A. Services, is that correct?

A Yes, sir.

Q And what did you do when you were working for them in 1978; 1979?

A I worked on the production line.

Q Doing what?

A Sending magazines to stores.

Q Okay, is A.R.A. a magazine distributor?

A Magazine and paperback books.

Q Okay, and you are still doing about the same work, is that right?

A Yes, sir.

Q Okay, did you make 400 and -- $4.75 an hour prior to this?

A I do now. I just got it in January.

Q What did you make in 1978 and '79?

A Two dollars and something an hour.

Q Okay. Now, you testified as to medical bills for Tommy, I believe you said it was about -- was it $600 you testified to?

A Yeah. It's total.

Q I wasn't quite sure, when I was listening to you -- that testimony. What was wrong with Tommy for that $600 bill?

A He fell and broke his elbow.

Q Okay, have you ever taken the boy to any other doctors?
A Um -- Tommy?
Q Yes.
A I took him to Hillcrest Medical Center.
Q For the same thing?
A For the elbow. And he cut his arm in July.
Q And where did you take him, then?
A Hillcrest.
Q Is that all that you've taken Tommy for?
A Um -- in his lifetime, or --
Q Well, let's go back say two years?
A I had a wart removed from his toe.

MR. WHITE: Objection, Your Honor, I don't see relevancy of two years ago having child treated for medical --

MR. GLASS: He's right. I'm looking for that year period of time, I guess.

THE COURT: Thank you.

BY MR. GLASS:

Q From February '83 through say February '84.
A It might've been the time I had his wart taken off his toe.
Q When was that?
A I'm not sure.
Q Who did that?
A Dr. Barnes.

Q Okay, and what kind of a doctor is Dr. Barnes?
A Osteopath.
Q Okay, is he a what they call a general practitioner type doctor?
A Yes, sir.
Q Okay, have you taken Jerri Jo to any doctors during the same period of time?
A No.
Q Why not?
A She never been sick or got hurt.
Q Okay, how about Teddy? Same period of time.
A No problems.
Q Okay, do you have health insurance where you're currently employed?
A Yes, I do.
Q Did Mr. Kleiner have health insurance where he's employed?
A No, sir.
Q Okay, who had generally carried the health insurance and during the marriage?
A No one.
Q Didn't have it?
A No
Q Isn't it true, Mrs. Kleiner, that -- um -- over the past few years during your marriage that you have had as much to drink from time to time as Mr. Kleiner has had?

A No, sir.
Q Is it your testimony that you have never been an alcoholic consumer?
A I have drank.
Q Yes. Okay, is it your testimony --
MR. WHITE: Unless he refers to last year, Your Honor, I'm going to object.
THE COURT: Overruled.
Q Is it your testimony that you do not consume alcoholic beverage, or you never have during the marriage?
A No. Or I don't know how to answer that.
Q When is last time you took a drink?
A Probably back in January of 1984.
Q And what was occasion?
A New Years Eve.
Q Who were you with?
A Jack was there; my children were there; um -- Paul and Ruth Solt (phonetics) was there; Jeff Badson (phonetics) was there.
Q Where were you?
A Huh?
Q Where were you?
A In the living room.
Q Okay, how much did you have to drink that night?
A Probably two drinks.

Q Okay, wasn't it common during your marriage for you to have one or two drinks most evenings with your husband?
A No, sir.
Q It was not?
A No.
Q Did you ever have drinks with your husband during your marriage?
A Yes.
Q Evenings when he come home?
A Yes.
Q Have you ever been drunk?
A Long time ago.
Q When is last time you were drunk?
A Real drunk?
Q I'm just asking you when was last time you were drunk?
A 1976.
Q Okay. Now, isnt' it true Mrs. Kleiner, that during this period of time that you complained of Mr. Kleiner's drinking that you bought alcohol and brought it into the house?
A Yes.
Q Okay, if you were complaining about Mr. Kleiner's consumption of alcohol, why did you buy it?
A Because he told me to.
Q Did everything your husband told you, is that right?
A Yes.

Q Everything?

A Most everything.

Q Okay, why is that you left the house in May? Why didn't you put him out of the house?

A I tried. He said he would not leave because he didn't have any money, he just got paid on a Friday night, he said he didn't have any money and he wasn't going.

Q Eventually you went to a lawyer, did you not?

A In the month of June, yes.

Q Okay, had you ever talked to a lawyer prior to the time you went to a lawyer in June about a divorce?

A No.

Q Okay, do you know of any criminal charges ever being filed against Mr. Kleiner?

A I don't understand.

Q Yes, or no. Do you know of any criminal charges ever being filed against Mr. Kleiner?

A I don't know how to answer it.

MR. WHITE: Depends what criminal means.

Q According to your opinion, do you know of any criminal charges ever being filed against Mr. Kleiner?

A I know he was arrested.

Q For what?

A Assault and battery on police officer and assault on me.

Q And when was that?

A April 27, 1979.
Q And what was the outcome of that charge?
A He got off.
Q Why?
A I don't know. He did have to work down on Peoria cleaning up the streets on Sunday like a probation.
Q Was that a city charge or State charge?
A I don't know.
Q Were you one of the complaining witnesses?
A I was at the time.
Q And you were living with him?
A Yes.
Q Still as wife?
A I am.
Q Were still his wife at that time?
A Yes.
Q So, you took him back into the house after that, is that right?
A Yes.
Q Thank you. You went into great detail about an incident, I believe it was, in September -- um -- where Sheriff was called and there were certain allegations concerning your neighbor, Mr. Gann, or Gant?
A Gann.
Q And did you see who actually knocked down the mailbox?

A No.
Q Okay, so you don't know who did, do you?
A No.
Q Okay, have you in your married life when you were living with Mr. Kleiner, ever made any comments about Mr. Gann and his wife and their children?
A I had problems with them, too.
Q So, you must not thought they were too good?
A I didn't think they were that bad.
Q I see. Isn't it true that you used to ridicule and laugh at the way Mrs. Gann wandered out in front of her house and she was dressed?
A No, sir.
Q Okay, do you know of -- if Mr. Gann was ever arrested for doing any damage to any property of Mr. Kleiner's?
A He was arrested.
Q For what?
A He was arrested for that incident that -- um -- Jack claimed that he took a pipe and beat on the truck the night the mailbox was tore down.
Q Did you see any of that?
A I seen him be arrested, yes.
Q All right, so you mean taken away, right?
A Yes.
Q And after that, Mr. Kleiner went up to Osage County to

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 46 of 318

sign papers, or whatever?
A Yes.
Q Were you with him?
A Yes.
Q Do you know if the charges were against Mr. Gann, if you know?
A No.
Q Do you recall an incident where Mr. Gann apparently offered to put some -- bring in water down to your property; do you recall that incident?
A Yes, sir.
Q Do you ever see any of the paper work on that incident?
A No, sir.
Q Do you ever hear how much money they wanted?
A It was different amounts different times.
Q Is there water, yet, at the property?
A No. Not that I am aware of now.
Q Isn't it true that the Gant -- Gann --
A Gann.
Q G-A-N-N?
A Yes.
Q Isn't it true that the Gann children were kind of a problem to you with your children?
A Yes.
Q Okay, in fact, both you and Mr. Kleiner would probably

have been happier had they just not lived there, wouldn't you?

A They actually didn't bother me that much.

Q I see. Okay, you testified that in May of 1984, you saw Jack Kleiner, I believe your remarks were, take a fist against Patti, is that correct? Is that a fair statement of your testimony?

A I said that's what Patti told me.

Q Oh, excuse me. You did not see that?

A No.

Q Did you see any marks on her?

A No.

Q Okay, who generally, during your marriage, did the correction or the disciplinary role in your family?

A The most?

Q Did you -- well, yes.

A I did.

Q Okay, so then, anything that you testified that Mr. Kleiner did it was of a disciplinary nature you were doing that if not more, is that right?

A I didn't use my fist.

Q What did you do?

A They got swatted on the rear end or tapped.

Q How?

A With my hand.

Q I see. Is there much difference between your hand and

your fist? We're talking about little kids here, Mrs. Kleiner?
A I don't whip --
Q -- is that right --
A I don't whip the little kids hard.
Q How long had Mr. Jeff Bates lived in your mobile home with you and your daughters and Mr. Kleiner, and your Kleiner children?
A From September to February. Or the first part of March.
Q What year?
A '83, '84.
Q '83, '84, what was his relationship to Lisa?
A While he was there?
Q Yes.
A I don't know how to answer that. They were friends. They were close. They talked.
Q Were they boyfriend/girlfriend?
A Before he moved over. But, he felt like part of the family, like a son.
Q Okay, did you ever see him crawling along the hallway?
A No, sir.
Q Okay, Mr. Kleiner never got up and asked you if you saw it?
A No.
Q Did Mr. Kleiner ever tell you that he saw it?
A No.

Q You -- um -- never filed any charges against Mr. Kleiner did you, for this alleged sexual molestation?
A No, sir.
Q Why not?
A Humiliation. Afraid.
Q I see. You have testified that you took her to -- Lisa to see Dr. Barnes, is that correct?
A Yes, sir.
Q The G.P.?
A Yes, sir.
Q Did Dr. Barnes make any, if you know, any reference to any legal authorities about your daughter's physical condition?
A He thought I should advise 'em.
Q All right, do you know if he did?
A I don't know.
Q He did not tell you, then, if he did?
A No.
Q All right, you've testified that you were living -- um -- in the Bowman house, I believe, and I'm sorry I neglected to get that address, but that's where you left when you apparently left the homestead in May of 1985, am I correct?
A When I left?
Q Uh-huh.
A I don't understand what you are saying. Did I go?

Q Maybe I wrote the wrong date down. Maybe it was May of 1984. Um -- I believe you testified that you left the mobile home, paraphrasing, that you left the mobile home and you moved in with Jean Lipkey and Richard Bowman?

A Yes, sir.

Q That right? And who moved in that house with you?

A My children.

Q Okay, what's your relationship to Mr. Bowman?

A We're very close friends.

Q How long have you known Mr. Bowman, at this time?

A Over a year. Year and three months, something like that.

Q How large a house did you move into with Mrs. Lipkey and Mr. Bowman?

A It was a three bedroom.

Q And Mrs. Lipkey and Mr. Bowman are brother and sister, is that correct?

A Yes, sir.

Q Okay, will you describe the sleeping arrangements in that house that you first moved into with Mrs. Lipkey and Mr. Bowman?

A Okay, there was a back porch, which in the summertime it was warm we put the boys out there. The girls had a room. And Jeany Lipkey had a room. And Richard Bowman had a bedroom.

Q Where you sleep?

A Most of the time on the couch.
Q Do you ever sleep with Richard Bowman?
A In that house?
Q Yeah. That's where we are right now.
A No.
Q Okay. Now, you, if I followed your testimony correctly you stayed there for about a month and then moved to where you're living now, is that right?
A Yes, sir.
Q Isn't it true that Richard Bowman and his son moved there, as well?
A Yes, sir.
Q How big a house was the second house, North Garrison house?
A It's three rooms, plus.
Q Pardon me?
A It's three bedroom, plus.
Q What are the sleeping arrangements there?
A The boys had a bedroom. The girls had a bedroom and I had a bedroom.
Q Where did Richard Bowman and his son sleep?
A His son slept in with my boys.
Q And where did Richard Bowman sleep?
A With me.
Q Okay, ever had sexual intercourse with Richard Bowman?

A Yes, sir.
Q How many times?
A I didn't keep count.
Q So, while you were living with the minor children of this marriage, you were having sexual relations with another man?
A Not regularly, no.
Q I see. Do you know what adultery is, ma'am?
A Yes, I do.
Q Do you consider yourself and adulteress?
A No.
Q Why not?

MR. WHITE: Objection, Your Honor, absolutely no relevance to the fact that she does or does not consider herself an adulteress.

THE COURT: Overruled.

Q Why not?
A Because when I caught Jack doing what he did to my daughter, I consumed my marriage was over. The day even I walked out it was over.
Q Uh-huh. Didn't bother get a divorce, though, did you?
A Oh, I was trying.
Q Yeah, I can tell that.

THE COURT: Mr. Glass.

MR. GLASS: Judge, I apologize.

BY MR. GLASS:

Q Well, if you were so worried about what you say you saw Mr. Kleiner doing, why didn't you pursue it?

A Because I told you --

MR. WHITE: Objection, Your Honor. That's been asked and answered.

THE COURT: Overruled.

Q Why not?

A Because of the humiliation for the three little kids because all five of the children go to Sperry School.

Q Uh-huh. So, is your boyfriend he is Chief of Police there, isn't he?

A No, he is not now.

Q But he was then?

A Yes.

Q So, it wouldn't have taken much to get that man put in jail, would it?

A He was Tulsa County.

Q Yes, or no. It wouldn't have taken much to get --

MR. WHITE: Objection. He is asking a legal question.

THE COURT: Sustained.

Q I believe you testified that you have Jerri Jo involved in basketball, how old is Jerri Jo?

A She's nine.

Q Testified she had 15 games last year?
A Approximately.
Q How come you only went to two of them?
A Because I worked and sometimes I don't get home until 5:30, six o'clock.
Q What are the games?
A When?
Q Uh-huh.
A On Tuesdays and Thursdays. They have different days, and on Saturdays.
Q Were they afternoon or night?
A Some in the afternoons.
Q Okay, did you go to all the night games?
A No.
Q Now, you say you have the boys enrolled in baseball?
A Yes, sir.
Q Have they started there season, yet?
A No.
Q Have you bought any of the equipment, yet?
A They have ball gloves -- one does.
Q Have you bought any uniforms, yet?
A The team gets'em.
Q Have you bought any?
A No.
Q All right, have you bought them baseball shoes, yet?

A No.
Q Not too uncommon for little boys to have baseball mitts, is it?
A No.
Q Bats -- their own bats?
A They don't have any.
Q How about baseballs?
A They do have baseballs.
Q Okay, you testified during your direct as to the charge, I believe, of $37 a week to take care of Tommy, is that right?
A $37.50.
Q Sorry. $37.50, I stand corrected. I didn't read it right, excuse me. $37.50. Was there a reason that the paying of child care was left off your pretrial financial declaration?
A I do not have Tommy enrolled in daycare right now.
Q Okay, who's taking care of Tommy right now?
A Carl.
Q Who's Carl?
A Carl Bowman.
Q Carl Bowman?
A Yes, sir.
Q Richard Bowman's son?
A Oldest son.
Q I see. Well, how old is he?
A 23.

Q You pay him?

A No, sir.

Q What qualifications does he have to take care of your children?

A He's good with kids.

Q Uh-huh, what qualifications -- excuse me. Isn't it true that you first met Richard Bowman -- Richy Bowman now for the purposes of obtaining counselling?

A When I first met him?

Q Uh-huh.

A No.

Q Now, his son who takes care of your children what sort of a schedule does he keep with them?

A Carl Bowman comes up to my house probably at a quarter to eight so the other kids can catch the school bus and he stays at my house with Tommy, and then he takes Tommy to school at noon.

Q Okay, and what happens then?

A Tommy's in school.

Q Okay, and what happens after that?

A I don't know. I'm at work.

Q Okay, who picks up Tommy?

A He rides a school bus home with the rest of the children.

Q Okay, so then it's just the morning that this fellow keeps track of him?

A Yes, sir.
Q Okay, does he have any other work?
A No, not at this time.
Q Okay, who gets your children their breakfast most mornings?
A My children eat at school.
Q So, you don't cook breakfast for them?
A No. I have to leave for work.
Q What time -- what're your work hours?
A My work hours is 7:30 to 4:30 unless I have to make up time or hours missed.
Q Okay, and what sort of a lunch do the kids have?
A They eat lunch at school.
Q Who cooks dinner for them?
A Um -- supper, in the evenings?
Q The evening meal, yeah. Excuse me.
A Um -- usually Carl comes up and puts it on for me, or oldest daughter, or I do.
Q Okay, can you tell us, please, what sort of an evening meal they normally have?
A They have a hot meal.
Q Would you tell us, please, what sort of an evening meal they normally have?
A They have chicken, mashed potatoes and gravy. They will have biscuits and gravy with vegetables. They have meatloaf.

They have roast. They have hot dogs. I fix casseroles.
Q You make them?
A Some of them.
Q Chicken, roast, hot dogs. Most of those things would take a period of time to cook, wouldn't you agree?
A Some of them. I do have a crock pot.
Q Yeah. But, you apparently don't cook or prepare those type of meals for them on a regular basis, do you?
A Not regularly.
Q You yourself?
A Not regularly.
Q Okay. Now, the property that you have with Mr. Kleiner is three and a quarter acres, is it not?
A Yes.
Q Has a mobile home on it?
A Yes.
Q And some outbuildings for animals?
A Yes.
Q Okay, would it be fair to say that it's a farm?
A I called it that.
Q Okay. All right, did you ever take care of the pigs?
A Yes, sir.
Q Ever take care of the cows?
A Yes, sir.
Q You value the -- I have part of what is admitted as your

Plaintiff's Exhibit Two, and I'm sorry, Mrs. Kleiner, I'm not trying to trick you on this at all. Now, I don't know what order they are marked, pages two, three, four, five, but when you talk about the outside items?

A Uh-huh.

Q Are you familiar basically what was on that sheet?

A If it was trailer and stuff?

Q Yeah. Yeah. You say Jerri's cow, $500, for example, how would you be in a position to value the cow at $500; I recognize you may have been one of the owners and you have the right, but can you tell us if you have any special knowledge?

A We paid $600 for her.

Q Okay.

A With the calf.

Q With the calf. And you've valued the black and white calf at $200?

A Yes, sir.

Q Okay, now are those personal opinions, or are those -- well, let's start there; are those personal opinions?

A Somewhat, but I also went to livestock sales.

Q Okay, when did you do that?

A When I lived out there.

Q Okay, so you think that's kind of an educated guess, then?

A Yes.

Q Hogs, $600. How many hogs were there, or are there?
A Are there, now?
Q How many hogs did you value at $600?
A We had quite a few out there. I had some that I prize very highly because I raised them from babies. And they were huge, and they were ready to have babies.
Q And hog feeder at a $100, these are the --
A Big tanks.
Q Big tanks. Now, when you left in, I think it was May 27?
A Yes.
Q Um -- when you left then, did you take -- there are several things that the Court has asked you to mark with an -X-, did you take all those things with you?
A That day?
Q That day.
A No.
Q Did you come back then to the house?
A Yes. About two weeks later.
Q Who came back with you?
A My daughter and me.
Q Which daughter?
A Um -- Patti.
Q Okay.
A I do think Lisa came with me one time when she wasn't

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 61 of 318

in college.

Q How many times did you go back there to get things?

A Twice.

Q Okay, and all of these check marks are the accumulation of the two times you were there?

A Yes.

Q Okay, speaking of bedroom, it says bedroom three Lisa?

A Yes.

Q Are you aware of those items?

A Yes.

Q You say here jewelry box and contents a $100 and you say twin bed at 50, and I think -- sorry that's apparently still there. Dresser mirror at 35, chest of drawers at 25, and a clock radio at 25. Are these items Lisa's personal property or were they your personal property and Jack's personal property?

A The bedroom furniture was given actually to her by one of the neighbors.

Q Now, is this the dresser mirror, and chest of drawers?

A Yes. Yes. The clock was a birthday present from a year before.

Q Okay. And jewelry box?

A It was a gift at Christmas time.

Q So, then none of this is really jointly acquired property of you and Mr. Kleiner's, is that right?

A No.
Q All right. Now, you say clothing of $400 and so forth, but there's no check mark, does Lisa not have all of her clothes?
A We did not acquire their clothes. They weren't there.
Q I see. Shoes, a $100. Does she not have her shoes?
A She did not get any of them.
Q Why not?
A They weren't there.
Q Okay, do you know where they are?
A From what people told me.
Q Do you know where they are?
A Probably burnt.
Q Ever filed any criminal charges against anybody or reported them stolen, or reported them destroyed?
A No.
Q You had a typewriter, $75, where is that?
A It is in my home now.
Q So, should we put a check mark?
A I did not take it out of my home. I bought it at auction. It was taken to the auction by some friends of Jack's and we bought it back.
Q I see. So, it should have a check mark beside it, should it?
A I did not take it out of the home.

Q But, you have possession of it, now?
A I bought it.
Q Yeah. Why?
A Because, Lisa needed a typewriter and I was at the auction and it came up for sale and at the time I bought it, I didn't know it was hers.
Q What kind of typewriter is this?
A One of the big heavy ones.
Q You didn't see it before you began to bid on it?
A I seen the typewriter.
Q You didn't recognize it as Lisa's before you began to bid on it?
A No.
Q What about a weaving loom for $30, where is that?
A I don't know.
Q In bedroom two, you show check marks besides jewelry box and clock radio and two pairs of -- is it --
A Band shoes.
Q Marching band shoes?
A Yes.
Q And a -- okay, is that all that you have in your possession of Patti's?
A That I am aware of.
Q There are several other items still on the list that you do not admit to having, where are they?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 64 of 318

A Like what?
Q Eye glasses a $100.
A I don't believe the girls got'em. They -- I don't know. They don't wear'em.
Q Are they prescription eye glasses?
A Yes, sir.
Q Okay, a pocket radio for $10 where is that?
A I don't know.
Q Okay, these times that you came back into the house after you left in May of last year -- this year, May 27, 1984, could you tell us when those were?
A It was approximately two weeks after I had left and then a week after that.
Q Okay.
A Or might've been two weeks.
Q Do you mind if I ask what took you so long to come back and get your property?
A Truthfully, I was afraid he was out there.
Q Well, weren't you living with the Chief of Police of Sperry?
A He has no jurisdiction in Osage County.
Q Not bad. Weren't you living with someone who could have made it very easy for you to get in your own house and get your own property and that of your children?
A I did not ask him. He did not tell me what to do.

Q Out of the master bedroom, you say you took -- I can't tell if it's one coat, or your clothes?
A I got one coat.
Q Okay, and when did you get that one coat?
A The first trip I went out, it was hanging up behind the door.
Q Uh-huh. Wedding rings, you don't even have those?
A I have one. The band.
Q When you came out on those two occasions, did you bring a large truck or trailer, or anything to move pieces of your furniture?
A On one occasion.
Q Why would you have not moved more furniture?
A Well, because I do know, when I was down at the house the phone rang, and I did answer it, and one of my neighbors told me that if any, you know, they were told that Jack had mentioned if I was down for them to -- for them to call him.
Q Okay, who was that?
A Norma and Keith Hollingsworth.
Q Hollingsworth?
A Yes.
Q Are they the people that called you and told you that?
A Yes.
Q I see. So, you apparently just left and didn't take anything else, is that right?

A On the second trip, and Jack knew of this, he let me have the deep freeze.
Q And what was in the deep freeze?
A There was some strawberries that I had put in, and vegetables and stuff. And there was some meat.
Q And you ate it?
A You bet.
Q How many places did you attempt to find a job? Other than the job that you got?
A I was working at T.G.and Y. part-time.
Q When was this?
A September.
Q '84?
A Yes, sir.
Q What sort of education background do you have?
A I finished the 11th grade.
Q Okay, do you possess any particular skills, such as typing, or office skills, things of this nature?
A No, sir.
Q Do you know anything about computers?
A No.
Q You were on -- receiving AFDC and food stamps, did the State ever -- scratch that. You stated that you did not give Mr. Kleiner visitation after I believe it was January 11, at least the date I wrote down, because you believed

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 67 of 318

Jack and Penny were going to kidnap the kids and take them out of state, is that right?

A Yes, sir.

Q What do you base that belief on?

A My son told me.

Q Okay. Now, where do you think he would have taken them?

A I don't know. I know that my son told me --

Q Okay. Well, your son's gonna have the opportunity to testify apparently later. Isn't it true that your lawyer told you not to give Mr. Kleiner visitation?

A When I told him what I feared, he advised me.

Q Okay, are you aware, Mrs. Kleiner that I have filed an application for citation for contempt -- Judge I have the original here, I don't know why. Um -- excuse me. Um -- for your failure to permit the visitation with your -- the child's natural father?

A I'm aware of it.

Q Okay, are you aware that on each and every attempt when Mr. Kleiner should have had visitation with his children a witness came along with him?

A Not at all times. I wasn't aware of it.

Q But, you knew for the most part that when you refused that there was gonna be somebody that could testify that you refused, didn't you; or state that you refused?

A No, I wasn't aware of it.

Q Okay, have you ever made the remarks to anybody that you plan to take the children out of the State of Oklahoma?
A I was planning on moving to my sister's house.
Q Where is that?
A I have a sister up in Kansas; also one in Texas.
Q Which sister are we talking about?
A Different occasions, I was planning on moving to Texas.
Q Okay, and also to Kansas I take it?
A Then, yes. Because, my sister -- one of my sister is alone up there, and I's gonna go up and stay with her.
Q Where would the children have stayed?
A With us.
Q Okay, excuse me I mislead you. Did you plan to take the children with you to either Texas or Kansas?
A Yes, sir.
Q Okay, what sort of visitation rights would Mr. Kleiner have been able to have under those circumstances?
A I would have come to Court to have it arranged. I would not have just left.
Q Okay, but while you were here you did refuse him visitation, is that correct?
A Yes.
Q Yes. And during that period of time, you were receiving child support, weren't you, from the State, albeit, but you were receiving child support?

A When?

Q Well, all during this time that you denied Mr. Kleiner visitation?

A No, I have not received any since I denied him. I denied him on January the 11th, I have not received any child support January, February, or this month.

Q Did I not just hear you say that you got a check for 200 and some odd dollars in February?

A That was for the month of December. He sent it to the State. That was December's payment.

Q You -- you may not be aware of this, but are you aware that he was ordered to pay State of Oklahoma support for you and could not pay you until he was released from that payment to the State?

A I'm aware of some parts of it.

Q When you left the care of AFDC and food stamps, what caused that?

A I had fulltime job and was receiving child support. I figured if I got off County and would get the child support that the Court had ordered, I could make it on my own with me and the children.

Q Okay, and again do you recall what the Court had ordered he pay you -- Mr. Kleiner pay you?

A We were here August the 13th.

Q Do you remember what the Court ordered Mr. Kleiner to

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 70 of 318

pay you?

A $375 a month.

Q And I take it then, that you are not aware of, I take it, that you are not aware that the State of Oklahoma for a long period of time did not release Mr. Kleiner from paying them?

A I wasn't aware of that.

Q Did you ever ask anyone to attempt to get child support for you from Mr. Kleiner?

A Yes. I talked to my attorney. I went to the County Welfare Office, and they used computer --

Q Okay, and it comes up that you are no longer receiving benefits, is that correct?

A That's right.

Q When you were, do you recall when you began receiving benefits?

A From the County?

Q Well, I'm talking about AFDC, I think we're talking about the same thing.

A March of 1984.

Q No. Not the day. Do you recall the paper work that you signed, or the papers that you signed at that time?

A I signed a lot of'em.

Q Do you recall what they said?

A Some of them was that I would look for job, and if I

found one I would not quit; that I would try to go independently to support my children.

Q Uh-huh. Okay, you testified briefly of -- towards Defendant's Exhibit Number Two -- well, I put -- hand you what's been marked as Defendant's Exhibit Number Three, would you tell us what that is, please?

A This is a letter I left there.

Q Left there?

A At the property.

Q When?

A When I walked out. It was right after that.

Q Was it in -- was it in May of 1984, or one of the two times that you came back?

A Would have to be one of times I came back. Because, I talked to Bill Ladd about our divorce.

Q Okay. All right, that's fine. What's the purpose of that letter or -- first of all, is that letter in your own handwriting?

A Yes, sir.

Q All of it in your own handwriting?

A It seems to be.

Q Is that the letter that you left at the house that you just testified about?

A Yes, sir.

Q What is purpose of that letter?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 72 of 318

A At the time I didn't want nothin'. I wanted my freedom and I wanted the kids. I wanted to be rid of him, because I couldn't take anymore. But, after I had talked to Bill Ladd, and I more or less came to my senses, why I should be giving up what I worked hard many years for what we had. And I couldn't let him have it. Why should he deserve it. It wasn't my fault. But, I wrote this before I really thought things through.

Q But, that's fair statement of your true feelings when you wrote that letter, isn't it?

A Yes, at the time.

Q Yeah. And you were involved with Richard Bowman at that time, weren't you?

A I was not involved with him.

Q But, you knew him?

A Yes.

Q Living with him, weren't you?

A I was staying at his house.

MR. GLASS: Your Honor, we're gonna move to admit Defendant's Exhibit Number Three.

MR. WHITE: Your Honor, I'm gonna object. I have no idea what's in here. I don't know --

MR. GLASS: Read it.

MR. WHITE: -- relevancy is. I still see no relevancy in it after reading it. Mr. Glass can enlighten

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 73 of 318

the Court as to what possible relevancy he can establish.

THE COURT: Mr. Glass?

MR. GLASS: Your Honor, this is a letter in the Defendant's (sic) own handwriting. And it at least prior to some alleged conversation which we don't know whether they took place or not. That letter, according to her, fairly states her position. In that letter she takes the position that she wants nothing other than what she has. All in her own handwriting. I do think it's germane. I think that it's worthwhile for the Court to consider for whatever proof it tends to make.

MR. WHITE: I know that it's been testified it was written while she was very distraught emotional state. She had not had legal counsel at the time the letter was written. I don't think this Court really would gain anything by reading the letter.

THE COURT: Defendant's Number Three will be admitted for what it's worth.

MR. GLASS: Thank you. Judge, I don't believe we have any other -- well, wait a minute.

BY MR. GLASS:

Q The bill to Dr. Miller, is your bill, is that correct?

A Yes, sir.

Q Okay, is that not paid at this time?

A It is not paid. No.

Q Was it a doctor bill for both you and for Tommy occurring during a period of time that you were on the Welfare benefit?
A No, sir.
Q Okay, is the 1977 Chevrolet that you refer to the same vehicle as 1978 Chevrolet pickup; or are they separate?
A Separate.
Q Separate, okay. And where is the 1977 Chevrolet, at this time?
A In Sperry.
Q Are you driving it?
A No. Not today.
Q Have you sold it?
A No, sir.
Q Okay, so you still use it?
A The '77, I do.
Q Yeah. Yeah, all right. Do you own any other cars, at this time?
A I own half ownership in a Honda.
Q And where is that?
A It's in the parking lot.
Q Is there a reason that that's not on your pretrial financial declaration?
A It -- actually I can't say I'm half owner, my name is on the title.
Q Who is the owner, then?
A Richard Bowman.
Q Mr. Bowman has thought enough of you to put his name on

your car title. You just happen to be on Mr. Bowman's bank accounts, as well?
A No, sir.
Q I see. Isn't it true that you have commented to certain people that in fact you and Mr. Bowman are gonna get married?
A We have talked about it.
Q Isn't it true that you have commented to certain people that in fact you and Mr. Bowman are going to get married?
A Yes, sir.
Q Thank you. Well, do you have an interest in the Honda or not?
A I actually don't have no interest in it except my name is on the title.
Q That means you do have, I think. Did you -- or don't you have a financial interest in that Honda?
A Yes.
Q How much would you say your financial interest is in that Honda?
A Probably $350, half of it.
Q Half of $350?
A No. Probably worth about 700.
Q Okay, so you say that you have another asset worth $350?
A Yes, sir.
Q You say that you have a bank account at the Exchange Bank of Skiatook?
A Yes, sir.
Q With $12 in it?

A That's about what is in it.
Q How much does it normally -- does that bank account normally have in it?
A When I get paid on Tuesday, I deposit the -- my check and pay bills and comes back down again. Weekly.
Q I understand. Um -- do you have any savings accounts any place else or anything like that?
A No, sir.
Q How much of your income is supplemented by Richard Bowman, or anybody else? You testified that -- excuse me -- how much of your income is supplemented by Mr. Bowman or other people?
A I have had to borrow $300 every month to pay my rent.
Q From who?
A From Richard Bowman.
Q You say that your living expenses are $1348? I'm going from -- excuse me. Sorry. I should have told you.
A Right now it's to flat nothing.
Q But, I am going from your pretrial financial declaration.
A Yes.
Q You say that it cost $1348 for you to live. Now, is that the expenses for you, and what we're gonna call the Kleiner children, and Patti and Lisa?
A For me and my five children. Yes.
Q All right. Okay. Well, how much of those expenses would you say are attributable to you and the Kleiner children, not for -- is it Pat or Patti?
A Patti.

Q And Patti and Lisa.
A I don't understand what you're --
Q Well, do you consider Mr. Kleiner's responsible to support Patti and Lisa?
A No, sir.
Q All right. Well, for example, says here mortgage payment $300, I guess?
A I pay $300 rent.
Q That your rent?
A Yes.
Q Well, how much of your rent would you say is attributable to Patti and Lisa; I guess that's what I am saying?
A Be $50 a piece.
Q Do they pay you $50 a piece?
A They're minor children.
Q Okay, do they work?
A No.
Q Okay, so they're your dependents, is that right?
A Yes.
Q Are you paying all of their school expenses?
A What I can.
Q I notice that there was some band shoes?
A Yes.
Q Is that mean one of them plays marching band, I assume?
A Patti does.
Q What instrument?
A Bass Clarinet.
Q Does she own them?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 78 of 318

A The bass clarinet?
Q Does she -- is that free and clear?
A Yes, sir.
Q What kind of an instrument is it?
A It's clarinet.
Q What brand is it?
A I don't know the brand.
Q Did you purchase it?
A Yes, sir.
Q How long ago?
A I think this is her second season with it.
Q She take private lessons?
A No, sir.
Q You say that you spend $350 a month on food and household supplies; how much of that is attributable to Lisa and Patti?
A I divide into six. Take six into it and that's what each one equals out to be.
Q Okay, and would you take the same position on the utilities?
A Yes, sir.
Q Well, just for purposes of saving time would you take the same position on all the way through; so if we were to divide $1348 by six and take off two-sixths, the other four-sixths are the cost for you and the Kleiner children?
A Well, some of it, I think, would vary. Because --
Q Okay. All right, then we'll go through it. How about -- um -- $60 for telephone?

A For the telephone?
Q Uh-huh.
A That is all on my part. The kids use it all the time. All of them.
Q How much more for Lisa and Patti is what I am trying to get at?
A I will divide that in six.
Q Okay, and laundry and cleaning?
A Into six.
Q Clothing?
A Into six.
Q Okay, when is last time you bought clothing for these kids?
A In Christmas time.
Q Okay, did you actually pay for the clothing yourself?
A Yes, sir.
Q Did anybody else provide them any clothing?
A The church.
Q Okay, they are providing you clothing now?
A The church did give the kids some clothes.
Q Was it money, or were they clothes?
A Clothes.
Q So you are not spending $50 a month on clothing right now?
A I haven't had it.
Q Did I not hear you say that you were receiving some $700 a month for the support and maintenance of your minor children up through, I guess what you believe January, isn't


TULSA COUNTY
OFFICIAL TRANSCRIPT

that correct?

A Yeah. I did at the time buy'em stuff, but last three months I have not.

Q Been working?

A Yes, and paying bills what I can.

Q Show $50 -- I'm sorry, $20 a month for entertainment; is this for activities for you, or for you and the children?

A For the children.

Q Is that for all -- all for the kids?

A Basically it will be four of'em.

Q Okay, how would you divide that off? Take Lisa and Patti out?

A I would probably take Lisa off and take four of the children into it.

Q $50 a month for grooming, tobacco, alcohol, gifts and donations; do you smoke cigarettes?

A Yes, sir.

Q Make donations?

A No, sir.

Q You are not a regular church goer?

A Oh, at church I don't regularly. No.

Q And how much of that $50 would you say is for incidentals -- I'm sorry, that is what they call it, incidentals, grooming, tobacco, alcohol, gifts, and donations?

A I didn't understand the question.

Q Now, take Patti and Lisa out of there how much would you take out?

A Probably $10.

Q Okay, auto expense a $180, that is for going back and forth from Sperry?

A (Whereupon witness nods head in up and down fashion.)

Q Does that include your automobile insurance?

A I think it does.

Q And for what are you paying $73 a month?

A Car payment.

Q For which car?

A '77 Chevrolet.

Q Well, in your pretrial financial declaration you don't show an indebtedness for 1977 Chevrolet. How much do you owe on the 1977 Chevrolet?

A Probably $1600

Q And it's $77 a month?

A 73.

Q Excuse me. And to whom do you make that payment?

A F. and M. Bank and Trust.

Q When did you get that car loan?

A In December of 1984.

Q You still living at home with Mr. Kleiner at that time?

A No, sir.

Q Why -- what was your source of income in December of 1984?

A I'm working in 1984, December.

Q Okay, on the strength of your job you were given a $1600 loan by F. and M. Bank on your car?

A That and because I thought I would be getting child support.

Q Anybody cosign that loan for you?
A No, sir.
Q Who's name on the title of the 1977 Chevrolet?
A My name is.

MR. GLASS: Subject to recall, Your Honor, that will be all the cross examination at this time.

THE COURT: Mr. White?

MR. WHITE: Just briefly.

REDIRECT EXAMINATION

BY MR. WHITE:
Q Miss Kleiner, I want to make sure that your financial statement accurately reflects the assets of the marriage. What automobile did you and Mr. Kleiner purchase during your marriage? (No audible answer) What automobiles did you two own at the time you split up?
A At the time we split up a '78 Ford pickup, a '74 Chevy Suburban.
Q And are they still in possession of one of the two of you?
A I do not have the '74 Suburban.
Q Do you know what the Suburban's worth?
A No.
Q '74 --
A It wasn't runnin'.
Q $800?
A I have no idea.
Q What was the other automobile?
A '78 pickup.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 83 of 318

Q Who has that now?
A Jack does.
Q What kind of pickup? Chevrolet?
A I think it's Ford.
Q Ford pickup. Do you have any idea what's that worth? What was paid for it?
A I think he paid $850 for it.
Q And you have possession of neither of those vehicles?
A No, sir.
Q And this '77 Chevrolet that Mr. Glass inquired into, that was purchased after you two were separated, is that right?
A Yes, sir.
Q Ms. Kleiner, if you were living with your three natural children without Lisa or Patti would you still have a phone?
A Yes.
Q Would you still keep your utilities hooked up?
A Yes, sir.
Q Would you still live in the same house and pay the same rent?
A Yes, sir.
Q Ms. Kleiner, Mr. Glass had asked you some questions about Mr. Bowman and you had acknowledged for a period of time you did reside with him, and that you did engage in sexual intercourse with him, and you were honest and you testified that that was true, is that right?
A Yes, sir.
Q When -- and -- and you said -- and when was it that you

two split up residences?
A The first of December.
Q Okay, could you tell the Court why?
A I felt that for my children's sake it wasn't right. I did need help, because I couldn't afford them, 700 does not take care of kids when you have five of them, and he did help me. And when December came I thought I could make it on my own with what I could get paid and with child support.
Q If this Court grants you custody of those children would you reside with Mr. Bowman or anyone else in a sexual relationship outside of marriage?
A No, sir.
Q Or any circumstances, even if you needed the money?
A No, sir.
Q Are you in love with Mr. Bowman?
A I do have strong feelings for him.
Q Okay, Miss Kleiner, have you ever discussed with the kids, especially the oldest, the circumstances about the divorce; what is actually happening?
A To the oldest children?
Q Yes. Or all three of them.
Q I have told them what is going on, that we were -- their father -- or well, I was getting a divorce, that he had filed for custody of the kids.
Q Did you ever tell them that Mr. Kleiner was not a good father?
A I have told my kids to love and respect him.
Q Have you ever told the kids that Richard Bowman was

their father, or should be treated as their father?
A No, sir.
Q If you were granted custody of these kids would you ever tell them that anybody, but Mr. Kleiner, was their father or should be treated as their father?
A No, sir.
Q Do you want Mr. Kleiner to have a sufficient access with the children, so that they understand that he is their father?
A I don't mind him seeing'em if it's under strict supervision where I don't fear him taking the kids away.
Q Okay, do you want them to grow up being able to see him, though?
A If that's their choosing, yes.
MR. WHITE: I have no further questions.
THE COURT: Mr. Glass.

RECROSS EXAMINATION

BY MR. GLASS:
Q Mrs. Kleiner, you testified that you had a 1974 Suburban automobile; is that a Plymouth or Chevrolet?
A Chevy Suburban.
Q What happened to that truck?
A The truck sit in the drive. It didn't run. The mufflers or whatever was all rusted out. It -- um -- when I couldn't --
Q Can you tell us what happened to the truck?
A I traded it for the station wagon so I would have as much room, in that car, to Richard Bowman plus $1200.
Q Actually got $1200 for it?
A I borrowed $1200 plus the pay off on the Suburban because

it just sat there idle, and I was making payments on it and I didn't even use it.

Q Is the 1977 Chevrolet automobile which you have testified to owning prior to this time, is that a station wagon?

A Yes, sir.

Q So, then you owe, I believe your statement was $1600 to F. and M. Bank plus $1200 to Richard Bowman?

A I borrowed $1200 from the bank plus the pay off and then the interest came to $1600.

Q Okay. Did I misunderstand you? Didn't you just say that Mr. Richard Bowman gave you $1200?

A No.

Q Would you clear it up, then?

A I gave him $1200 for the car.

Q Okay, which car?

A The '77 station wagon.

Q For which you owe $1600 to the F. and M. Bank?

A Yes, sir.

Q Was the pay off of the F. and M. Bank for Richard Bowman?

A Richard Bowman didn't have nothin' to do with any pay offs or anything. I owed on the Suburban.

Q Okay. So, you -- did the $1200 that you give Mr. Bowman then cover all the final payment on the Suburban?

A I don't understand. All I can tell you is how I did it at the bank.

Q $1200 floating around, I don't know where it went, that's what I'm getting at.

A $1200 -- he wanted $1200. He had his car up for sale.

THE COURT: Ma'am, say who he is.

A Richard Bowman wanted $1200 for his car.

Q Okay.

A Okay. The Suburban wasn't running, so I was making a $100 and -- I think it was a $113 payment on the Suburban.

THE COURT: To who?

A To the bank.

THE COURT: What bank?

A F. and M.

THE COURT: Thank you.

A I went to the bank, I borrowed $1200 to buy the station wagon plus the rest of the pay off for the Suburban.

Q That's the $1600?

A Yes.

Q Got it. Okay, excuse me. Have you ever told -- have you ever told anyone that Mr. Kleiner is not a good father to the children?

A No.

Q Okay, if the Court were to see fit to grant Mr. Kleiner the custody of these children, what visitation would you want with your minor children?

A Whatever the Court would decide.

Q Would you want it to be as equally strict for the same reasons that you fear?

A I don't plan on running with the children.

Q Well, your own testimony, you have said that at various times you planned to leave the State of Oklahoma and either

go to Texas or Kansas?
A I was going to with the Court's permission.
Q And you previously told people that you were planning to leave the State of Oklahoma, haven't you?
A With the Court's permission, I would leave.
Q You would want the most liberal visitation you could possibly have, wouldn't you?
A It depends on how liberal means.
MR. GLASS: No further questions, Judge.
THE COURT: Mr. White?
MR. WHITE: I have nothing further, Your Honor.

EXAMINATION BY THE COURT

Q Where is the Chevy Suburban, ma'am?
A I do not know.
Q When you -- where is last place you saw it?
A At -- um Don Davidson's (phonetics) house, or funeral home. I don't know if he owns it now, or if he sold it, or what.
Q How did you give it to someone?
A I -- in the transaction with the '77 Chevy of doing it, Mr. Bowman took the car that is why my name is on the title is because I tried to sell it and I couldn't sell it. Nobody would buy it because we was having trouble keeping it runnin'.
Q All right, that is good enough. When was this transaction?
A December.
Q Of 1984?
A Yes, sir.

Q All right, you get any AFDC for Patti and Lisa?
A Now?
Q Yes.
A No, sir.
Q You get any child support for them?
A No, sir.
Q Why not?
A I don't know where their father is.
Q Why don't you get AFDC for them?
A I just went off County completely.
Q When did you get this Honda?
A I think got it sometime December.
Q Of '84?
A Yes, sir.
Q When did you start your employment at A.R.A.?
A Um -- it was in the middle part of October of '84; might have been around the 19th, or --
Q You testified that the -- your attorney hasn't supplied the Court with any of those lists. These eye glasses you said that the girls don't have their glasses?
A I'm not aware if they do, or if they don't.
Q How old are these girls?
A The oldest one just turned 17, and the other one is 14.
Q Both of them wear glasses?
A They're supposed to.
Q Have you asked them why they're not wearing their glasses?
A No. They had --
Q Do they need their glasses?

A Yes.
Q They've been without their eye glasses since May?
A Yes, sir.
Q And you were on AFDC and you never got them eye glasses?
A They don't get eye glasses.
Q Have you ever made any effort to get them any glasses?
A I haven't made any effort. I did ask Jack if I can have the eye glasses, and for the remark he said, I never got them.
Q He said? What'd he say?
A He told me to go have my boyfriend buy'em.
Q Other children wear glasses?
A No.

THE COURT: Any cross to my questions, Mr. White?

MR. WHITE: No, Your Honor.

THE COURT: Mr. Glass?

MR. GLASS: Very briefly, Judge.

FURTHER RECROSS EXAMINATION

BY MR. GLASS:

Q Aren't these children, Mrs. Kleiner, that you are referring to who don't have -- um -- eye glasses Patti and Lisa?
A Yes, sir.
Q Okay. So, they're not Mr. Kleiner's natural children are they?
A No, sir.
Q Um -- during this period of time that you were taking the AFDC and the food stamps benefits, did you take any trips?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 91 of 318

MR. WHITE: Objection, Your Honor, that was not covered on your direct examination.

MR. GLASS: I agree. I'll back off.

THE COURT: Thank you. Anything further, Mr. Glass?

MR. GLASS: No.

THE COURT: Okay, one final question, ma'am.

FURTHER EXAMINATION BY THE COURT

Q I understood you to say that the values you have on Plaintiff's Exhibit Number Two are replacement values? The dollar figures are what it would cost you to replace these items?

A If I had to probably go out and repurchase them, yes.

THE COURT: Okay, be in a recess until -- for about ten minutes.

(After recess, the following proceedings were had:)

THE COURT: Raise your right hand.

You solemnly swear the testimony you give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

MISS HEADBURG: Yes.

THE COURT: Pull that microphone over to you, please.

MISS LISA RAE HEADBURG

After having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q Lisa, please state your full name for the record.

A Lisa Rae Headburg.

THE COURT: Help her pull that -- speak right into

that.

Q And Lisa, are you the daughter of the Plaintiff, Judy Kleiner?

A Yes.

Q And you recognize the Defendant?

A Yes.

Q And who is that?

A My stepdad.

Q Jack Kleiner, is that right?

A Yeah.

Q Now, you currently go to what school, Lisa?

A Sperry High School.

Q Sperry High School. And what grade are you in?

A 11th.

Q And have you -- how long have you been going to the high school? Since ninth grade, eighth grade?

A Eighth grade.

Q Okay, how old are you today?

A 17.

Q When is your birthday?

A [redacted].

Q Okay, do you have any sisters?

A Yeah.

Q Speak up. Who is that?

A Patti and Jerri Jo.

Q Patti and Jerry Jo. Are they both natural sisters?

A Uh-huh. Just Patti.

Q Okay, is Jerri what, a stepsister?

A Halfsister.

Q Halfsister. And how long have you lived with, up to your mother's separation, how long have you lived with her and Mr. Kleiner, do you know?

A Since I was about four or five.

Q Since you were about four or five. Okay, so you're well acquainted with Mr. KLeiner?

A Yes.

Q What do you think about Mr. Kleiner? Do you like him?

A He scares me.

MR. GLASS: Your Honor, I'm gonna enter an objection I don't see the relevancy of this testimony. If it goes the direction I think it is, next thing we're gonna see in here is the District Attorney. I think if he's gonna be allowed to ask these questions the courtroom should be closed, and ought to done in a private way.

MR. WHITE: Any way he would like to do it, Your Honor. Necessarily --

MR. GLASS: Also point out, Your Honor, that you have not -- this child is a minor and you have not declared her to be a sufficient witness to testify.

THE COURT: Well, I don't think I need to do that, unless you object to her competency, Mr. Glass.

MR. GLASS: Well, the one thing I need to tell Your Honor, on the record, I intend to rigorously cross examine this witness without regard to her age, based on what I believe she will testify to, until you tell me to stop. Because it will be my job to represent Mr. Kleiner to the very

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 94 of 318

best --

MR. WHITE: It's his privilege, Your Honor, he wishes to do it here or close the door. I don't see the necessity to do that, we're prepared to proceed.

THE COURT: Does the witness understand that?

MR. WHITE: Yes.

A (Whereupon witness nods head in up and down fashion.)

MR. WHITE: I'll ask you do you understand?

A Yeah.

THE COURT: Who is person in the courtroom?

MR. WHITE: I believe this is her aunt.

MRS. KLEINER: My sister.

THE COURT: Well, back to the original question of what do you think of Mr. Kleiner, I'll sustain that objection. I think as to any other additional testimony we'll take those objections as they come.

BY MR. WHITE:

Q Lisa, are you afraid of Mr. Kleiner?

A Yes.

MR. GLASS: Objection, Your Honor. No foundation set for the question.

THE COURT: Sustained.

Q Is Mr. Kleiner disciplined you in the past, Lisa?

A Yes.

Q How does Mr. Kleiner normally discipline you?

A He will hit us with his fist.

MR. GLASS: Objection again. Your Honor, I'm gonna object unless a time, date is set instead of general answers

to be specific.

THE COURT: Pull the microphone a little closer to you, Lisa. I will allow the general question provided Mr. White you make it more specific. I prefer that you go from specific to generalities.

MR. WHITE: Well, I need to generalize to get into the specific.

BY MR. WHITE:

Q You testified, or you stated, Lisa, that Mr. Kleiner has hit you with his fist.

A (Whereupon witness nods head in up and down fashion.)

MR. GLASS: Objection, Your Honor. Your Honor, that is not what he --

THE COURT: She did not say that.

Q Would you -- I'll retract the question, my mistake. Did you testify that Mr. Kleiner has hit you in the past?

A Yes.

Q Where did Mr. Kleiner hit you?

THE COURT: Let's say when first.

Q Okay, when did Mr. Kleiner hit you?

A When he got mad at us.

Q Okay, do you remember the last time that was?

A In May.

Q What did Mr. Kleiner do in May?

A He got mad at us, or something, and hit my sister, Patti, and pushed me up against the refrigerator.

Q Did you see where he hit Patti?

A She was holding her face, so --

Q Okay, has Mr. Kleiner ever touched you any other way?
A Yes.
Q Could you please tell the Court; I know this is difficult, Lisa; when and where from the first time?
A I was just out of eighth grade, it was during the summer he would come in late at night when we was -- when everybody else was asleep. He'd wake me up and he just touch me on my body.
Q Where on your body did he touch you?
A My breast and stuff.
Q Where else? Did he touch you anywhere else besides your breasts?
A Yes.
Q Where?
(No audible answer)
THE COURT: Can you answer the question?
A (Whereupon witness nods head in up and down fashion.)
THE COURT: Answer the question.
A On my vagina.
Q This was in June of 1982, is that --
A It was during the summer.
Q That was the summer of your eighth grade year and did he do it any other times?
A Yes.
Q How long after that first time did he do it?

A More like once or twice a week.
Q Why didn't you tell your mother?
A He told me not to tell her.
Q Is that the only reason you didn't tell her?
A He said he'd hurt us.
Q Us, as in who?
A Me and my mom and probably Patti.
Q Did any incidents occur in the fall of 1982?
A Yeah.
Q Could you please tell the Court what happened?
A During the day my mom was gone. She'd take all the kids with her and just us two. And he took me in the bedroom and made me take off all my clothes.
Q And then what happened?
A Then he took his clothes off and laid on me.
Q Then what happened?
(No audible answer)
THE COURT: Can you answer the question?
A Yeah.
Q What did he do then, Lisa?
(No audible answer)
Q Answer the question.
A He made me have intercourse with him.
Q This was in fall of 1982?
A Yeah.

Q How old were you then?
A About 14.
Q Did he come in after that?
A Yeah.
Q How soon after that?
A About two weeks.
Q Did he do the same thing?
A Sometimes.
MR. GLASS: Your Honor, I have to object.
MR. WHITE: I'll strike the question.
MR. GLASS: As lurid as it seems --
THE COURT: Sustained.
MR. GLASS: -- it should be made.
THE COURT: Sustained.
BY MR. WHITE:
Q When he came in the second time, what did he do?
A He'd do the same thing.
Q Tell the Court what that is, as hard as it is, tell the Court?
A He'd make me have intercourse with him.
Q Did you ever try to stop him?
A (Whereupon Reporter could not understand the answer.)
THE COURT: I didn't hear your answer.
A Yes.
Q What happened?

A He said he'd hurt Patti.
Q Did he come in after that second time?
A Yeah.
Q How long after the second time did he come in?
A I don't remember.
Q What did he do on the third time?
A About the same thing.
Q Which was what?
A Touching, and make me do the same.
Q Lisa, after your ninth grade year in school where was your bedroom?
A They built it on outside the house.
Q And who all lived in that bedroom?
A Just me.
Q After you moved in that bedroom, did Mr. Kleiner ever come in?
A Yes.
Q He come in in the summer of 1983?
A Yes.
Q Would you please tell the Court what happened on that occasion?
A I had a friend spend the night with me, and he come out and told me to leave the door open because he wanted her to.
Q Did you --

MR. GLASS: Object, Your Honor, unless she can

give us some facts. He wanted her --

THE COURT: Sustained.

A That's what he said. He wanted her.

Q What did you say?

A I didn't say anything.

Q Did you leave the door unlocked?

A No. We locked it.

Q How did you do that?

A With a board. 'Cause, I think the lock was broke.

Q Do you know whether or not he tried to come in that night?

A Yeah. He knocked on the door.

Q Did he do anything else?

A And went around to the window and tried to get us to open it.

Q Did you let him in or --

A No.

Q Did you speak to him about this the next day?

A No.

Q Did you ever speak to him about what happened?

A He told me not to do it again, though.

Q What did you say?

A Nothin'.

Q Patti (sic), has he had sexual intercourse with you -- with Lisa -- I'm sorry, has Mr. Kleiner had sexual intercourse with you on any other occasions?

A He come out there.
Q When?
A Once a week, or every other week.
Q And why didn't you tell your mother?
A He said he'd hurt us.
Q Did you tell your sister?
A Yeah.
Q Which sister was that?
A Patti.
Q What did you tell Patti? Do you remember?
A I talked to her about. I don't think she believed me for a while.
Q Okay, I'm gonna take you now to February 1984, did you ever have any physical contact with Mr. Kleiner -- um -- in February 1984?
A Yes.
Q Would you please tell the Court what happened on that occasion, approximately February 20, 1984?
A He come out there and made me go in the hallway and lay down, and was laying on top of me when mom come in.
Q Did he have any clothes on?
A He had a shirt on.
Q Did he have anything else on?
A I don't remember.
Q Did you have anything on?

A I had a nightgown on.
Q Were you having sexual intercourse?
A No.
Q Okay, and then what happened?
A He told me to go back to bed.
Q Why?
A I don't know.
Q I'm gonna start back, I don't know if I'm following you. I'm to the point where he's laying on top of you and you are both -- or you described what clothing was on; and then what happened?
A My mom walked in.
Q And what happened then?
A He told me to go to bed.
Q And did you go to bed?
A Yeah.
Q Do you know what happened between Mr. Kleiner and Mrs. Kleiner at that point?
A I heard them arguing.
Q Do you know what was said at all?
A No.
Q Okay, what happened next day?
A Mom took me to the doctor.
Q Do you remember what doctor that was?
A Dr. Barnes.

Q Okay, did you see your father -- or your stepfather, Mr. Kleiner, that day?
A No.
Q Did you see him that night?
A Huh-uh.
Q Do you know when he left after that incident?
A It was that night.
Q He moved out?
A Uh-huh.
Q And -- um -- he did move back in later on, didn't he?
A Yes.
Q Do you remember when that was?
A It was April or May.
Q And did he ever make any sexual advances towards you after he returned?
A No.
Q Have you spoken with him about that since that time?
A No.
Q I know this may be hard to calculate, Lisa, but how many times did he approach you wanting sexual intercourse over the period of time from June 1982 until he left in February of 1984?
A I don't know.
Q Know approximately?
A (Whereupon witness nods head in side to side fashion.)

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 104 of 318

Q Would it be more than 20?
A Probably.
MR. WHITE: I have no further questions, at this time.
THE COURT: Mr. Glass.
MR. GLASS: Your Honor, I'm gonna move to strike the testimony of Lisa Rae Headburg on the basis that it has no relevancy at all to the proceedings before the Court.
THE COURT: Motion will be overruled.

CROSS EXAMINATION

BY MR. GLASS:
Q Lisa, are you aware of the effect of your testimony today, and what could be potentially done with it?
A Not really.
Q Lisa, you testified to several acts, but I want to concentrate, please, on your trip to Dr. Barnes office: Will you please tell the Court what the doctor did?
A He took pregnancy tests.
Q Tell us what those were?
A He examined me, and then he took some blood for some kind of test.
Q Did he have a what they commonly call a female examination where they put your feet up in stirrups?
A Yes.
Q Can you tell us, please, what the doctor did?

A I don't remember.
Q Do you know?
A I didn't understand what it was at the time.
Q All right. Now, Lisa, when did you begin having your menstrual cycle?
A A year ago December.
Q All right, and would you tell me, please, during the period of time you have your menstrual cycle what sort of device do you use? A tampoon (phonetics), or do you use a pad?
A Pad.
Q Okay, did the doctor make any -- please don't tell me what they were because it's hearsay, but did the doctor make any statements to you about what he thought your physical condition was when you were there for your examination?
A No.
Q Were you present when he make any statements to your mother?
A No.
Q Okay, how much has your mother talked to you about your testimony here today?
A Not very much.
Q But, she asked you to come and make this testimony, didn't she?
A Yeah.

Q Did you talk to Mr. White before you came here?
A Yes.

MR. GLASS: Nothing else, Judge.

THE COURT: Mr. White?

MR. WHITE: I have no further questions, Your Honor.

THE COURT: You may step down. Thank you.

Raise your right hand, please.

Do you solemnly swear the testimony you give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. WALENTINY: Yes, I do.

MS. NANCY WALENTINY

After having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Q Please state your full name for the record.
A My name is Nancy Walentiny.
Q Would you spell that.
A W-A-L-E-N-T-I-N-Y.
Q Nancy, what is your current occupation?
A I am a counsellor.
Q Where are you counselling?
A Family and Children Services here in Tulsa.
Q And what type of counselling do you do?
A I work in what's known as the family sexual abuse treat-

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 107 of 318

ment program at Family and Children Services.

Q How long have you been doing this type of counselling?

A Approximately two years.

Q Do you have any education? Do you have a bachelor's degree?

A I have a bachelor's degree from the University of Texas, and a master's degree from the School of Social Work at the University of Oklahoma.

Q How long have you been with this Department of Children Services?

A I've been there for two years. The entire time I've been in the sexual abuse project.

Q When did you receive a masters degree?

A I got my masters in '82. And had some further training after that, with -- um -- specifically in the field of child abuse at Masters and Johnson in St. Louis. And also at Medgars, and various conferences that are held here yearly.

Q Prior to your work with the Department of Children Services, were you employed in any other counselling capacity?

A I was employed at Youth Services of Tulsa County.

Q For how long?

A Oh, approximately a year.

Q What did you do for them?

A I was a counsellor there working with families that had conflict with adolescents.

Q Okay, Nancy, are you acquainted with the Plaintiff, Judy Kleiner?
A Yes, I am.
Q When did you first become acquainted with Miss Kleiner?
A On December the 20th, of 1984.
Q And what was the occasion of your meeting?
A Um -- she came into our agency with her daughter, Lisa.
Q And what was the stated purpose?
A The purpose was for Lisa to enter our family sexual abuse treatment program.
Q Did you -- was Lisa with her, at that time?
A Um -- I'm trying to recall. Sometimes I will see a parent, individually before I see the young person. We'll set up an appointment for the young person, and I don't recall whether Lisa was with her on that first visit or not.
Q What did Ms. Kleiner tell you the situation was?
A She told me that she was concerned about Lisa. And would like Lisa to participate in our program due to some sexual abuse that she had suffered.
Q Did you go into any detail on what had happened?
A Um -- yes.
Q What did she tell you happened?
A She basically told me that Lisa had been sexually abused by her stepfather; and I questioned her about that; and asked her how she knew that; and she stated to me that she had

gotten up one evening during the night and had observed the sexual abuse in the hallway of their, I believe, it was a trailer home.

Q Did you have any other questions for Miss Kleiner concerning her knowledge of the sexual abuse?

A Um -- I'm sure I asked her some general questions. Um -- I did not get more specific with her, I don't recall, at the time.

Q Did you meet with Miss Kleiner on any other occasions outside of this initial conference with her?

A Yes, I have.

Q And when were those occasions?

A I can't give you the dates, but I would say there've been two or three occasions since that time.

Q And what -- was she alone or was she with Lisa at these conferences?

A She -- I -- um -- I did not have she and Lisa together in the counselling session, but they were together at the agency.

Q You speak to them separately?

A Yes.

Q When did you first speak with Lisa about the sexual molestation?

A Would've been most like the visit after the December 20th visit. Would've been a week later. I usually see clients

especially in the beginning on weekly basis.

Q Did you discuss the incident with her, at that time?

A With Lisa?

Q Yes.

A No, I did not.

Q What did you discuss?

A Um -- we spent the first session discussing why Lisa was there from my perspective. Lisa is very anxious about -- um -- the sexual abuse --

MR. GLASS: Your Honor, I would object on the grounds of hearsay.

MR. WHITE: She's expert giving her expert opinion to her observations.

MR. GLASS: Your Honor, this witness has not been declared to be an expert witness by this Court, nor hasn't been requested that she has; but, nonetheless, it's still hearsay.

THE COURT: What is the purpose of this testimony?

MR. WHITE: Your Honor, I believe that it's necessary. We've had allegations, and she's been examined by an expert. I think it's highly relevant to hear the opinions as to what the girl has suffered, whether it was valid, or whether it was true or not, and whether any damage has been done. I don't know if damage is significant but, basically to validate the allegations.

THE COURT: Mr. Glass?

MR. GLASS: I'm not sure. I presume that he was gonna link it up somehow. I don't see the relevancy at this point. This is not a child of Mr. and Mrs. Kleiner. It's not a child that Mr. Kleiner has adopted. And whether or not the little girl spoke the truth or not is up to you to determine. But, in terms of what work is going on to help her, I don't see what -- I mean I know you're interested as a professional and Domestic Relations Judge. But, in terms of these proceedings I see no sense or validity to them.

MR. WHITE: Your Honor, in response; Mr. Kleiner's character is in issue as he's seeking custody of the children. I would limit my questions, if so requested, to the actual -- or actual observations as to whether or not these things did happen.

MR. GLASS: Your Honor, Mr. Kleiner has never spoken to this woman. As far as I know she's never attempted to get Mr. Kleiner to come in to see her. One would think that if they were that concerned that they would be talking to the alleged perpetrator of the act. And also point out that the witness has previously testified that the act, if whatever was involved, happened in February of 1984. This lady first saw this young girl in December of 1984. One would wonder why this concerned mother took so long to get her daughter to something like that.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 112 of 318

THE COURT: Well, let's address the qualifications of this witness as expert, first, before we allow her to give any expert testimony, Mr. White.

MR. WHITE: Well, Your Honor, she has stated her educational qualifications.

THE COURT: Let's hear if Mr. Glass objects to qualifying her as an expert.

MR. GLASS: After those kind of testimony? I wouldn't object to the lady. I mean she's done everything one would think would have to do. She's working for the probably finest agency in the City that deals with this. I do a good deal of work in this area, Your Honor, over in the Juvenile Court. I know of this agency's work. I'm sure she's an expert. But, I mean I would assume she's an expert. But, I would still say, even though an expert what earthly good does it do this Court in these proceedings. I don't see it does a thing.

MR. WHITE: Your Honor, again I will limit my question if so requested, to her impression as to whether or not upon examination and upon her expertise whether these things actually happened; and whether Lisa's speaking the truth.

MR. GLASS: Well, Your Honor, I object if that's his purpose. Because in February of 1984 this young -- this mother took that young girl to a doctor, who under the law is

obligated to turn in to the law enforcement authorities the names and addresses of any person who he has reasonable knowledge of and has reason to believe has violated the law. Now, this -- that kid has accused her stepfather of statutory rape, and God knows what else. But, as yet this woman hasn't filed any charges against him. The doctor that examined her hasn't done anything about it. Now, I don't see that this has any relevancy at all.

MR. WHITE: Your Honor, if he wants to put the doctor on, that's his privilege --

MR. GLASS: He is not my witness.

MR. WHITE: He's not my witness. If he wants to put on Miss Kleiner on, he can put her on. That's his privilege. As to why charges were not pressed, I believe he did ask about that, or why the doctor did not make a report.

THE COURT: I'm gonna go ahead and let her answer. I'm gonna take your objection under advisement. I'm not convinced that this is really valid testimony. I'll rule on that later.

MR. GLASS: All right.

BY MR. WHITE:

Q Mrs. Walentiny, do you have a screening process for the people that come see you for sexual abuse problems?

A Could you be more specific? I'm not sure I understand what you mean by screening process.

Q Well, when a girl, or parent, comes in with an allegation of sexual abuse, you automatically believe them?
A Do I automatically believe?
Q Believe that it's happened; or do you check into these things?
A I check into that, certainly.
Q Okay, tell me how this is normally done?
A Well, I will interview the parent, or parents. Often when parents come to our agency with their children, of course, it's after the fact and they come for treatment because we are treatment oriented, that's our focus. I do interview the parent that brings the child in, individually; and then I have the child come in, either the first session I will have mother and child and I will interview them individually. Or sometimes I will have just the mother come in. The next session I will have the daughter come in. That way I get to hear from each of them, individually, what has happened.
Q And did you do that in this case?
A Yes, I did.
Q Do you have any standards of behavior that you attribute to a person that's telling the truth or person that's not telling the truth?
A Well, yes. I look, for instance, the mother and the child -- um -- young people, children will generally word things differently as will an adult. Is the child using the

same words mom used or dad used; are they using their own words; do they appear to be telling their own story. When I ask questions, do they appear to be consistent. Those are the kinds of things that I look for, when I'm interviewing a child about what is happened to them. I do not as a rule in the first session go into a lot -- having the child give me a lot of details, because they're generally very anxious; their trust level is very low. And I try to make them comfortable the first couple of sessions, depending on the child. Some children that's not necessary, but most it is.

Q Ms. Walentiny, how many interviews have you had with Lisa?

A I can't tell you exactly numberwise, but since December the 20th, it's been -- um -- approximately every week.

Q And based upon your experience and these norms of behavior you've described; in your expert opinion, is she telling you the truth, or is there a possibility she's fabricating?

MR. GLASS: Your Honor, before the witness answers have you declared her as an expert witness?

THE COURT: Yeah, I find that she's an expert.

Q You may answer the question; if you remember it.

A Would you reask it again, please?

Q Based upon your expertise, Ms. Walentiny, and these norms of behavior attributed to a girl who may be lying, or maybe

telling the truth; what is your opinion as to the truthfulness of Lisa's allegations?
A My opinion is that Lisa's telling the truth.
Q And why is that?
A Well, there are -- um -- quite a few indicators there that we look for in sexual abuse -- um -- that are present with Lisa.
Q And would you please give those to the Court?
A Well -- um -- she's -- appears to be somewhat depressed; and was more so, than when she initially came in. Um -- there appears to have been some role reversal in the family, which is very common in families in which sexual abuse occurs. Um -- Lisa tends to have a blocking of affect which is -- um -- more easily understood as repression of anger. She exhibits quite a bit of anxiety when talking about sex, sexual matters, and of the sexual abuse itself.
MR. WHITE: Okay, I don't believe I have any further questions, at this time.
THE COURT: Mr. Glass?
MR. GLASS: Your Honor, I'm gonna move to strike. I don't see any relevancy to the testimony at all in this case.
MR. WHITE: Your Honor, her truthfulness is certainly an issue in the case, and I think her testimony has qualified her to give an opinion as to truthfulness of

her testimony or truthfulness of her allegations.

MR. GLASS: The problem I have got, at this point is, Judge, is that they went through what they do to determine whether or not they believe her, and I assume they're talking about Lisa as well as the mother -- um -- make certain statements, then the witness is asked for an opinion. She says she thinks Lisa is telling the truth. Well, we don't know what she's telling the truth about. Then, she says that she repressing anger, that there's role reversal, and she appears depressed, that she doesn't like talking about sex. Well, albeit, we hear to this point we don't know what the witness is saying that in her opinion Lisa is telling the truth about. And for that reason I would move to, and respectfully move to strike the witness' testimony as having no relevance to this particular lawsuit.

MR. WHITE: Your Honor, if I might ask several more questions, if then the Court is not satisfied, then -- um -- I will have nothing further to say on it.

MR. GLASS: Your Honor, he ended his direct examination.

MR. WHITE: I haven't rested my case yet.

MR. GLASS: He rested his direct examination and submitted the witness to cross examination.

MR. WHITE: You know, if necessary I could recall her again to go over matters again, but I think that will be

a big waste of time.

THE COURT: I'm gonna overrule your objection, Mr. Glass.

MR. GLASS: Okay.

THE COURT: You may cross examine.

CROSS EXAMINATION

BY MR. GLASS:

Q All right, Mrs. Walentiny, you've indicated you spoken to both Lisa and Mrs. Kleiner?

A Uh-huh.

Q Am I correct? Why would you not have attempted to speak with Mr. Jack Kleiner?

A Well, our focus is on treatment and -- um -- we offer treatment to those individuals who want treatment and seek treatment.

Q Uh-huh.

A It's not an investigative activity.

Q No, I'm not implying that. Wouldn't one assume if you were treating a mother and child, you would also need to treat the stepfather?

A If the perpetrator is going to remain in the home, then, yes we would. Because our focus is on the family, we would want to treat that individual.

Q On what basis are you satisfied in your own mind that Jack Kleiner sexually abused his stepdaughter, Lisa? Get right on

it.
A Okay, can you --
Q So, I want you to answer that question, on what --
A On what basis? On the basis that the mother has told me that she observed the sexual activity.
Q Are you aware that the daughter just testified that in that same instance Mr. Kleiner was not having sexual inter-course with her? This is instance that this woman has testified under oath that she saw Jack Kleiner's penis entering her daughter's vagina, are you aware of that?
A Am I aware that the mother --
Q Are you aware of her testimony?
A No. I was not in here when the mother made her testimony.
Q Would that change your opinion of Jack Kleiner, if you found that testimony was made, and that your own witness said that?
MR. WHITE: Your Honor, I'm gonna object. If Mr. Glass gonna tell her what the witness didn't say, he ought to tell her what the witness did say.
THE COURT: Overruled.
A Would you mind repeating that?
Q Yes. I would.
THE COURT: Mr. Glass. Slow down, and simplify your question, Mr. Glass.
MR. GLASS: Well, got a pretty serious --

THE COURT: Your question is far too compound for the witness to answer.

MR. GLASS: All right.

BY MR. GLASS:

Q I take it that you believe Mrs. Kleiner is telling the truth?

A Yes.

Q And you believe that Lisa is telling the truth?

A Yes.

Q Based strictly on what they have told you; yes or not?

A Based on what they have told me, plus some of the indicators that we're aware of --

Q Okay. And you have never bothered to talk to, or attempt to talk to reach Jack Kleiner, have you?

A No.

Q All right. Have you seen the results of Dr. Barnes physical examination of Lisa?

A No, I have not.

Q Have you ever attempted to talk to him?

A No, I have not.

Q Do you know if Lisa is what they commonly called a sexually active child?

A You'd have to define sexually active for me.

Q Okay, fair statement. Has she ever had sexual intercourse with anyone other than Jack Kleiner, in your opinion?

A Yes.
Q Who?
A I am not aware of the individual's name.
Q How many people?
A How many am I aware of?
Q How many are you aware of?
A Uh -- one.
Q In fact, that was a teenage boy that lived in their house wasn't it?
A I believe that's correct.
Q And at the same time Mr. Kleiner and Mrs. Kleiner lived in that house, isn't it?
A I believe that's correct.
Q And those acts took place at night, when everyone else was asleep, didn't they?
A Um -- which acts?
Q With the young boy whose name you can't remember?
A I'm not sure when those acts took place.

MR. GLASS: Okay, nothing else, Judge. We're gonna move to strike this witness' testimony. We now find that the witness has admitted to her having sexual relations with other people, and it seems to me has bearing at all on this case.

MR. WHITE: Your Honor, I'd like to redirect, if I could.

THE COURT: You may redirect.

REDIRECT EXAMINATION

BY MR. WHITE:

Q Nancy, you've testified that you talked to Lisa about the alleged sexual abuse?

A Uh-huh.

Q Could you tell the Court what Lisa told you actually happened; what type of sexual abuse did she tell you she suffered?

MR. GLASS: I have to object, Your Honor, it's hearsay. Lisa's been here --

THE COURT: Also outside the scope of cross. I'll sustain the objection.

Q Mr. Glass had told you, or asked you if you would change your opinion if -- if Ms. Kleiner had testified that a sexual act took place in her presence and Lisa testified that it did not; did Mr. Glass ask you that; do you recall?

A I believe that's what he asked.

Q Okay, is it common that -- um -- an observed sexual act might be observed one way by the person observing, and another way by the person engaging in it? For example, would it be uncommon for a mother who observed this act to testify that she saw them having intercourse when in fact the father lay naked on top of the girl without actually having put his penis in her vagina; and excuse me for being so blunt?

MR. GLASS: Move to -- object to the question is

compound, unclear. I'm not exactly sure what he is asking.

THE COURT: I'll sustain the objection.

Q Okay, we'll try it again.

THE COURT: I think I'd sustain it in any case, Mr. White.

MR. WHITE: Well, Your Honor, I would ask that the leeway that Mr. Glass was given, given the circumstances, facts, that he gave the witness.

THE COURT: This witness can't testify as to expert as to your question, anybody in this room can answer that question. You want to ask her as an expert, come up with a proper question.

MR. WHITE: Okay, I will have no further questions.

MR. GLASS: Your Honor, at this time, I move to strike the witness' testimony, for the reasons aforesaid.

MR. WHITE: I believe the witness' testimony is highly relevant.

THE COURT: I'm not gonna strike her testimony.

MR. GLASS: Please show our respectful objection.

THE COURT: It will be noted.

EXAMINATION BY THE COURT

Q Ma'am, what was your statement about role reversal in the family?

A That that was present.

Q What specifically are you talking about?

A Okay, when we speak of role reversal, it's instances in which a child or adolescent is performing some or many of the child care and household tasks that an adult might usually perform.

Q What are the specifics in this case?

A Um -- it's my belief from talking with Lisa that she does quite a bit of child care, taking care of the children in the family. When she comes home from school she is responsible for seeing that the household runs smoothly. That -- um -- some of the money that she has she would use to buy for -- things for other members of the family. And she also takes a psychological responsibility -- feels responsibility that an adult might feel.

Q Did you administer any tests or anyone under your direction administer any test, psychological tests to either Mrs. Kleiner or Lisa?

A No.

THE COURT: Any cross to my questions, Mr. White?

MR. WHITE: No, Your Honor.

THE COURT: Mr. Glass?

MR. GLASS: Mrs. Walentiny, are you aware of -- no. No, Judge. No.

THE COURT: Thank you very much, ma'am. You may step down.

Mr. White, before you call your next witness; as to -- um

-- Mr. Glass's continuous objections, I find that they are well founded, and not in any way unsubstantiated in this case. Um -- and I would state now that the testimony of the previous witness, although, qualified as an expert, I don't think that her testimony will get any more weight than anyone else's testimony in this case.

You may call your next witness.

MR. WHITE: Note my exception. Your Honor, I expect to take about five minutes, she's waiting in the witness area. She is our last witness, I expect her testimony will be no longer than 15 minutes.

THE COURT: Let me know when she gets here.

(After a brief recess, the following proceedings were had:)

THE COURT: Raise your right hand.

Do you solemnly swear that the testimony you are about to give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

MISS HEADBURG: Yes.

THE COURT: Would you help her out, Mr. White?

MR. WHITE: You are not gonna hurt it. Speak right into there.

MISS PATTI HEADBURG

After having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WHITE:

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 126 of 318

Q Tell the Court your name.
A Patti.
Q Okay, Patti, your full name?
A Headburg.
Q Speak into the microphone; it's too loud for you, but not for us.
A Patti Headburg.
Q Up.
A Patti Headburg.
Q Speak up for the Judge. Patti, how old are you?
A 14.
Q What grade are you in?
A Ninth.
Q Ninth grade. And this your mother, right?
A (Whereupon witness nods head in up and down fashion.)
Q You have -- or Defendant is stepfather, is that right?
A (Whereupon witness nods head in up and down fashion.)
Q Answer the question.
A Yes.
Q Okay, Patti, how many sisters do you have?
A Two.
Q Two. And who are they?
A Lisa and Jerri.
Q Lisa and Jerri. How old is Lisa?
A 17.

Q And how old is Jerri?
A Nine.
Q And Lisa is your full sister, and Jerri's your halfsister, is that right?
A Yes.
Q And you have two stepbrothers?
A Halfbrothers.
Q Halfbrothers?
A Yes.
Q And they are?
A Teddy and Tommy.
Q Teddy and Tommy. Okay, Patti, how old are you when -- do you remember how old you were when your mother and Mr. Kleiner got married?
A No.
Q You real small?
A (Whereupon witness nods head in up and down fashion.)
Q Has Mr. Kleiner been your stepfather now for the past 10 years?
A Yeah.
Q And during that period of time, has he seen fit to a -- to give you discipline from time to time?
A Yes.
Q And I am going to be specific -- um -- on any occasions, if you can, the most recent, has Mr. Kleiner ever hit you

with his fist?
A Yes.
MR. GLASS: Ask that the witness be specific in time.
Q Okay, and again, could you please tell the Judge when that was, and how come he did that, to the best you can remember?
A The last time?
Q Yes.
A The day we left out from the house.
Q Okay, how did it happen?
A I was in the hallway, and he was mad or something, and I don't know what happened.
Q Well, what did happen?
A He started yelling at me and he hit me.
Q Where did he hit you?
A In the face.
Q Was hand open, or was his hand closed?
A Closed.
Q And what did you do, at that time?
A Screamed.
Q Has he hit you on any other occasions in the same way, with his fist?
A Yes.
Q About how many times?

(No audible answer)
Q Ten, five, twenty. Do you have any idea, at all?
A I don't know.
MR. GLASS: I'm gonna ask that identify the date and time, if he can, please.
THE COURT: Already, testified she doesn't know how many times.
Q But, he has hit you more than one time; that is, this one time?
A Yes.
Q Have you ever had occasion to see your dad in the evenings?
A Yes.
Q Your stepdad -- did I say dad? I'm talking about Mr. Kleiner, do you know whether or not Mr. Kleiner drinks?
A Yes.
Q Okay, do you know what he drinks?
A Yeah.
Q What did he drink?
A Um -- Bacardi and Coke.
Q During the time that you were living with Mr. Kleiner, how often in a given week, would he drink?
A Probably about six days out of a week.
Q Did Mr. Kleiner ever get drunk when you were there?
A Yeah.
Q Okay, Patti, how -- to you, how does a drunk person act?

A Different than they are when their sober.
Q And when they're not drinking?
A (Whereupon witness nods head in up and down fashion.)
Q And how did Mr. Kleiner act different when he was drunk?
A He yelled a lot and --
Q Did he ever do anything else when he was drunk, besides yell?
A He used to hit me and Lisa.
Q Patti, do you have any idea how many drinks Mr. Kleiner would take in a normal night, or is there a normal amount?
MR. GLASS: Your Honor, I'm gonna ogject. I don't know --
MR. WHITE: I'll strike the --
MR. GLASS: -- how the child can answer that.
MR. WHITE: I'll strike that question.
BY MR. WHITE:
Q Patti, did Mr. Kleiner ever drive after he'd been drinking?
MR. GLASS: Objection, Your Honor, unless he can state a definite time.
THE COURT: Well, unless he can state that it was with kids in the car.
Q Okay, did he ever drive with you, when he had been drinking?
A No.

Q Not that you remember. Okay. Patti, do you know whether or not Mr. Kleiner has ever touched your sister, Lisa, or where he should not touch her?

MR. GLASS: Objection, Your Honor.

THE COURT: Unless she knows of her own knowledge.

Q That is what I'm asking, of your own knowledge?

A Yes.

MR. GLASS: Objection. That means that she's actually seen it. Unless she's actually seen it.

THE COURT: Unless she's actually seen it.

Q Have you ever seen it, Patti?

A No.

Q Has Lisa ever told you about it?

A Yes.

MR. GLASS: Going to move to strike this line of testimony, Your Honor, that she obviously cannot testify --

THE COURT: Sustained.

Q Have you ever overheard Lisa talking to Mr. Kleiner about it?

A Yes.

Q Please tell the Court when that was?

A What?

Q Please tell the Judge when you heard this and what was said and where you were?

A We were at Lisa's room one time when Lisa had her friend

come over spend the night from Tulsa. And it was late, I guess, and he came out to the door, and he was talking to Lisa and I was standing in the room, and he said keep your door unlocked tonight, and said something about we were just goofing off, and he said something about liked Janet and Lisa looked good, and everything.

Q Okay, did you ever hear anything besides that?

A Like what?

Q Did you ever hear any other time when Mr. Kleiner talked to Lisa?

A One day -- one night when we had a bunch of people over, he wanted somebody help him unload the tractor; and Lisa didn't want to go out there. I said I would, but he told Lisa to go out there and help him and they're out there for a long time. I went out to see what was going on, and they didn't see me or anything, but I heard him to leave her door unlocked because, you know, her door was -- you had to go out the house to get to hers, and leave your door unlocked tonight I want to come in, and then started telling her how pretty she was and that she had a nice body.

Q And that was -- you heard that yourself?

A Uh-huh.

Q Where was this?

A Outside by the -- um -- out -- it was -- it wasn't a totally finished barn, but it was like a barn.

Q Now, would you please tell me what Lisa said about --
A She was tellin' him --
Q I don't want you to tell me what Lisa said, but did you ask Lisa about these things?
A Yes.
Q Okay, did you ask Mr. Kleiner about these things?
A No.
Q Did you mention to your mother?
A No.
Q Why didn't you?
A Because I didn't want to be the cause of their marriage breaking up.

MR. WHITE: I don't have any further questions, Your Honor.

THE COURT: Mr. Glass?

CROSS EXAMINATION

BY MR. GLASS:
Q Patti, I'm Ed Glass. I'm your stepfather's lawyer. As I understand your testimony, you have never actually seen anything wrong between Jack Kleiner and Lisa, is that correct?
A Yes.
Q You testified to an event in the barn, I believe, is what you referred to; do you remember when that was?
A Um -- it was probably around late July, early August of eight -- '83, I think.

Q All right, was Mr. Bates living at the house at that time?

MR. WHITE: Objection, Your Honor, Mr. Bates never mentioned in direct.

MR. GLASS: That's all. That's all.

THE COURT: You can ask it as far as I'm concerned.

MR. GLASS: Well, it is outside the direct.

MR. WHITE: I don't even know who he is.

MR. GLASS: She knows for sure.

MR. WHITE: Your Honor, I object --

MR. GLASS: Was there --

MR. WHITE: -- outside the scope of --

THE COURT: As to who is living in the house at the time of these instances, you can ask her if you want to what was going on in the house.

BY MR. GLASS:

Q Jeff Bates living in the house at the time of the incident where you're talking about hearing the voices in the barn?

A Um -- I think.

Q Okay. Um -- Jeff -- it is Jeff Bates, isn't it?

A Uh-huh.

Q Jeff Bates and Lisa had a boyfriend/girlfriend relationship, didn't they?

A Yes.

Q Now, you've testified that you can't -- didn't see --

pardon me. Did you see who was talking to Lisa?
A Yes.
Q And who was that person?
A It was him.
Q You did actually see Jack?
A Uh-huh.
Q All right, I thought you said you didn't. Have you ever seen your mother act differently after she's been drinking than when she has not been drinking?
A My mom very seldom even took a drink.
Q Would you answer the question for me, please; have you ever seen your mother act differently than when she's been drinking, than the way she acts when she isn't drinking?
A No.
Q Okay. Have you had any difficulties with Mr. Jack Kleiner?
A As like what?
Q Well, you tell me. Have you had any difficulties with him?
A Well, he used to hit me a lot, but that's all.
Q Okay --
A I mean --
Q Under what circumstances would he hit you?
A Sometimes under none.
Q Okay, was he ever disciplining you for things that you had done wrong in his opinion?

A Yeah.
Q Okay, if I were to ask you if you really liked Jack Kleiner, would you say yes or no?
A Yes.
Q You really like him?
A Well, what do you mean?
Q Do you like your stepfather or not?
A I don't know.

MR. GLASS: Judge, I'm not gonna cross anymore.

THE COURT: Mr. White?

MR. WHITE: Nothing further, Your Honor.

THE COURT: Thank you. You may step down. We'll recess until 9:30 Thursday the 7th.

(WHEREUPON, proceedings were recessed.)

(Proceedings had March 7, 1985.)

THE COURT: We're back on JFD-84-3025, Judy Kleiner, Plaintiff, versus Jack Kleiner, Defendant. Both parties are present and represented by their attorneys.

Mr. White, you may call your next witness.

MR. WHITE: Your Honor, pursuant to the discussions in chambers, we will reserve call of the two children which are our only witnesses remaining, until after the Defendant presents his case.

THE COURT: Okay, very well. Mr. Glass.

MR. GLASS: At this time we will call Mr. Jack

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 137 of 318

Kleiner.

THE COURT: Raise your right hand, sir.

Do you solemnly swear the testimony you're about to give before the Court, will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. KLEINER: I do, Your Honor.

THE COURT: You may be seated.

MR. JACK GLEN KLEINER

After having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GLASS:

Q Will you state your name for the Court, please?

A Jack Glen Kleiner.

Q And are you the Defendant in the matter of Judy Kleiner versus Jack Glen Kleiner, case number JFD-84-3025?

A Yes, sir.

Q Tell us where you live, Jack?

A Route two, Northwest, Sperry, Oklahoma.

Q And is that a -- how big a piece of real property is it?

A Three and a quarter acres.

Q And how do you hold that property?

A You mean buying it by mortgage?

Q Is there a mortgage against it?

A Well, through the man we bought it from. Yes, sir.

Q In whose name is the property held?

A Ted Salsbury, or Nadine, one.
Q Is their name on the deed?
A It's on the paper which -- um -- well, yes. Yes, sir.
Q Is that real property not held in your name and that of your wife's?
A Well, we don't have the abstract. I mean we're buyin' it. Yes.
Q Do you have a deed that says your name on it?
A Yes.
Q All right, does it have your wife's name on it, as well?
A I said deed -- or -- abstract piece of paper. Yes, it had mine and my wife's name on it. Yes, sir.
Q Was this piece of real property acquired during the marriage?
A Yes, sir.
Q So, it's jointly acquired property, is that right?
A Yes, sir.
Q All right, do you own any other real property?
A No, sir.
Q I handed you a document -- I'm sorry. When were you married to Mrs. Kleiner?
A I don't have the date. 12, 13 years ago, sir. I'm not much on keeping up on dates.
Q All right, and since the time of your marriage to Ms. Kleiner, have you always been married to her?

A Yes, sir.
Q Never been a prior divorce completed?
A No, sir.
Q All right. How long have resided at Route Two, Northwest Sperry?
A Other than a month or month and a half, that's been three and a half years. Somewhere in there.
Q Okay, where did you live prior to that?
A Well, we moved -- well, let's see. We lived on Admiral Place. Uh --
Q All right, how long did you live on Admiral Place?
A Two years. Two and a half, something like that.
Q Okay, where'd you live before that?
A We came back from San Antonio.
Q All right. Now, Jack, there are children born of this marriage?
A Yes, sir.
Q And what are the children's names?
A Jerri Jo; Tommy; Teddy.
Q And how old is Jerri?
A Jerri's nine.
Q How old's Tommy?
A Six.
Q How old's Teddy?
A Ten.

Q Do you remember Jerri's birthdate?
A [redacted], just guessin'. I'm not much on dates. I'm sorry I don't. I thought I had a wife took care of them things, but I didn't.
Q All right, let's not add details, just answer the questions I try to ask.
A Thank you.
Q Now part of this lawsuit is that you desire to have the care, custody, and control of those children?
A Yes, sir.
Q All right. Now, I handed you a document that I marked as Defendant's Exhibit -- that's marked Defendant's Exhibit Four, will you look at that please, and tell us what it is?
A That's tellin' what I make, what I owe, more or less how I spend my money, what I need and what I don't need. Gas, lights.
Q All right. Now, we have stipulated that your income is between $1800 and $2,000 per month, is that correct?
A Yes, sir.
Q On your pretrial financial declaration --
A Did you say thousand or hundred?
Q $1800 --
A Oh, okay. Okay. Yes, sir. Yes, sir.
Q On your pretrial financial declaration it shows a 1978 Chevrolet pickup?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 141 of 318

A Yes, sir.
Q Now, is there another vehicle in the family?
A Used to be.
Q What other vehicles are you referring to?
A '74 Suburban.
Q Do you know what happened to that car?
A Not really, no.
Q All right, do you know if that car is still running in you wife's possession today?
A I say not.
Q All right. Now, on your checking account in the pretrial financial declaration on Page Two, you show an account where, please?
A On Page Two, what?
Q Where you show your bank account?
A F. and M. Bank.
Q All right. Now, what is the purpose of that bank account?
A More or less for paying bills.
Q Do you have any other bank accounts?
A No, sir.
Q Will you explain to the Court, please, how you use the F. and M. account?
A I deposit my check each week and pay the bills each week, so I can get them paid.
Q All right, do you normally not write checks for things;

pay cash for things?
A Mostly, yes.
Q All right, under the life insurance -- um -- will you explain to the Court, please, your life insurance?
A I had it on all the children until like I say this thing happen. Then, I got it off the ones which basically weren't mine for sometime. And I have it on my three children and myself.
Q All right, is that insurance through your employment?
A No.
Q All right, from -- who's the insurance agent?
A Duke Waters (phonetics).
Q And what type of a policy is it?
A I'm guessin' it's 50,000 on me, something like. 10,000 a piece on them, something to that.
Q Now, let's try to be a little more clear.
A It's strictly --
Q How much on your life do you believe you have?
A I'm guessin' 50,000.
Q All right, is it whole life?
A To the best of my knowledge.
Q All right, do you know the difference between term and whole life insurance?
A Not really, Ed.
Q All right, and you think that each of your three children

are insured for $10,000 a piece?
A Yes, sir.
Q All right, do you know if your wife has any insurance on any of the children?
A No idea. No, sir.
Q All right, sir. And can you tell us what you pay per month for that insurance policy?
A $66, Ed.
Q Is that payment current?
A To the best of my knowledge.
Q All right.
A Ed, I do --
Q Now, you have no other insurance, or do you have health insurance through your --
A No, sir. No other insurance, no health.
Q You do not have health insurance?
A No, sir.
Q Does your employment provide health insurance?
A No, sir.
Q All right, how long -- where do you work, please?
A Square Deal Auto Parts.
Q How long have you been there?
A Off and on 13 years.
Q Do you have a specialty there?
A I'm just one of the fixtures. I'm there, and I sell parts,

sir.

Q You're not a Ford expert; or a Chevy expert?

A No. No. No.

Q Any particular type of part expert?

A No, sir.

Q General sales person?

A No, sir.

Q Now, does that have any -- does that employment have any profit sharing, or retirement --

A No, sir.

Q -- or associated --

A No, sir.

Q Do you have any private retirements accounts?

A No, sir. No, sir.

Q No IRA's --

A No, sir.

Q All right. Do you have any money anyplace other than what you have testified to at this point?

A No, sir.

Q What is the current balance in your checking account?

A I deposited a $127 just yesterday.

Q All right, how much money are you carrying with you today? Just guess?

A $6.

Q All right. Now, concerning your real property, what do you

feel that that property is worth right now?
A If a person could get a buyer right quick it'd be $20,000. It might be worth more, but like I say there again there's no buyers out on real estate, I don't believe.
Q All right. Why would you -- how much did you pay for the real property?
A $20,000.
Q All right, and you paid that when?
A Oh, we paid $5,000 of it -- we made payments up until, now.
Q All right, when you paid $20,000, when did you buy the property, Jack?
A Three years ago.
Q All right, why would you be of the opinion that it had not raised in value in three years?
A Strictly on the account of the real estate, the way it sellin', Ed.
Q All right, have you made changes in that --
A We did add on. We did not finish. We added a living room on during one week I was off on vacation.
Q Will you explain to the Court, please, what is on the three and a quarter acres?
A A trailer house -- um -- with a room added; a water room; and a living room added on to that. There's also two tin barns, which are one of them half way finished. The other one

is finished. And a cement block building, real small. That would be it.
Q Do you have any animals on the farm, now?
A I have two pigs; five or six chickens; two ducks which belong to my daughter; I have two dogs.
Q Five or six chickens, and what other animals?
A Two ducks which belong to my daughter.
Q Okay, what do you use the finished tin barn for?
A More or less just storage, is it.
Q Okay, you testified that one tin barn was one half finished?
A Uh-huh.
Q Is it usable?
A Um -- I park stuff in there which I know's gonna get wet, you know, things like that. But, it's -- I would say it's usable, no. I mean it's just a tin roof and two walls.
Q All right, what do you put in the cement block building?
A Nothing.
Q What is it for?
A It used to be a well-house.
Q Is there a well in it?
A There was a well there -- um -- which was no good.
Q You can't use the water for any purpose?
A No. It's dry you might say.
Q How do you get water to the property?

A I haul water.
Q Can you explain that to the Court, please?
A I have a barrel on my three quarter ton truck. I haul it from Skiatook to the house; drain it into the house; then we got a big -- big cement water under the house there that pumps just like you got runnin' water.
Q All right. How often do you have to haul water to your property?
A Depends on how many children, how much washin' you doin', two, three barrels a week at the most.
Q How much is that?
A A 1,000 gallons.
Q A 1,000 gallons a week, or 1,000 each haul?
A 500 each haul.
Q What probability of getting water to that property?
A $1,000.
Q That would be all it would take, and then you can hook up to a water system?
A I mean just the tap, five something, and then the pipe and diggin' --
Q Do you have any plans to hook into the water system there?
A If I'm lucky enough to get the place and the children, yes. Otherwise no.
Q All right, if the water were hooked up would it increase the value of the property?

A No. Not really. The right person, yes. The right person it's no big chore to get water, other than you might --

Q What's the condition of the -- is it a mobile home or a house?

A It's still a mobile home. However, once I get a roof over the trailer it will not be classed as a --

Q All right. What's the condition of the -- of that property, at this time?

A It needs finished. I mean, it needs work, but it's not all that tough. Right man knew where he's goin' he can do it in a short while.

Q Okay, is there a reason that you haven't finished the work there?

A The divorce situation, yes.

Q How long has the mobile home been in the condition that it's in now?

A As long as it's been there, probably ten, twelve I don't know how many years it's been sitting. Any number of years.

Q What is the basis of the $20,000 value that you place on that property?

A Well, mainly on account of the way real estate sellin' if it's good time, and it was cleaned up like I say, finished, like I say 25, 30,000 at the most.

Q All right. What is the basis for that value?

A     Well, my -- with that Skiatook dam out there and the fishin', like I say, that'd be the basis, you know, like if it's fenced up and the right person seen it they can surely want it for --
Q     Is it your personal opinion, Jack?
A     Yes, sir.
Q     Is what you're saying?
A     Uh-huh.
Q     Now, on your pretrial financial declaration you show a debt to a Mr. Ted Salsbury?
A     Yes, sir.
Q     Is that -- explain, if you will, the debt to Mr. Salsbury and the debt to the F. and M. Bank for the trailer?
A     The payment to Ted Salsbury, 250 every month, is the agreed amount we would pay each month for the house and the property.  The F. and M. Bank -- um -- don't know exactly, possibly the lumber to build on the living room and things like that.
Q     Uh-huh.
A     For the F. and M. I could be wrong.  It might've been for some other need around the house.
Q     All right.  So, the indebtedness to Mr. Salsbury is for the mobile home?
A     No.
Q     Improvement?

A Well -- yeah. It's for everything complete.
Q For the mobile home, the improvements to the property, the real estate, and everything is on it? That is purchase -- that's the balance of the purchase loan, is that right?
A Yes, sir.
Q Okay, would the bank loan to F. and M. Bank then be a home improvement type loan?
A Yes, sir.
Q All right. You show another debt to Farmers and Merchants Bank -- or F. and M. Bank, what's that for?
A That's for my pickup.
Q Okay, and are you current -- I'm sorry. You show an indebtedness to Sears -- um -- what is that indebtedness for?
A Bills in the past that were there which I'm payin' for.
Q All right. General merchandise?
A Yeah.
Q Are you current in all of these debts?
A To the best of my knowledge, yes.
Q Do you know of any other debts?
A No.
Q All right. Draw your attention to items six, the monthly expenses, without testifying in detail --
A Item six?
Q The last page. Without testifying in detail, do those expenses fairly represent your monthly living expenses?

A Yes, sir.
Q All right.
A Yes, sir.
Q Now, you show in the utilities -- um -- a figure and then plus propane?
A Well, that's an approximate filling. You usually -- through the fall you'll probably fill that I'm guessin' maybe four times, maybe five, depending on length of winter at that amount of money.
Q Okay. What does it cost to fill the propane tank, do you know?
A Well, last one I put a $120 in it. I don't know how much they can fill it, but it was pretty full.
Q Okay, and does the company -- do you have a regular company that comes out --
A Yes, sir.
Q -- and they check it? They keep it full for you?
A Yes, sir. Uh-huh.
MR. GLASS: Okay, Judge, at this time, we'd like to move to admit Defendant's Exhibit Number Four.
THE COURT: It'll be admitted subject to cross.
MR. GLASS: For purpose -- for which it is offered.
BY MR. GLASS:
Q Now, Mr. Kleiner, the -- um -- did you direct me to prepare a citation for contempt in this matter?

A     Beg pardon, Ed?
Q     You direct me to prepare a citation for contempt in this matter?
A     Yes, sir. More than one.
Q     And what the purpose of your wanting me to prepare the application for citation for contempt?
A     I've not seen my children since after I's seein' 'em, that was it. I've not had my children at like at my regular visitation since after Christmas.
Q     Okay.
A     Shortly after Christmas.
Q     Prior to Christmas, what type of visitation did you enjoy?
A     Through the last year very little when she was out vacation, you know --
Q     Now, just a minute. I'm not gonna go for that. You testify, and you testify directly.
A     Okay.
Q     How much time -- how much visitation did you have with those children prior to Christmas?
A     On my two weeks -- or two days each week ever other week I probably seen 'em eight times at the most.
Q     All right. Now, when, is it your testimony, that you people separated?
A     May 24 whenever she said.

Q What year, Jack?
A '84.
Q All right. So, it is your testimony that you have had eight visitations since the May separation and Christmas, is that right?
A Yes, sir. Eight, ten at the most. Yes, sir.
Q Okay. Why would you not have had more?
A She was out of state. She was here, there, and hiding you might say.
Q Do you know that of your own knowledge?
A Yes.
Q Would you tell us, please, if you can, what you know of your wife's activities between the date of the separation and Christmas concerning visitation?
A She is introduced Judy and Richard Bowman been introduced to every member of her family. Her sisters, Topeka, Kansas --
MR. WHITE: Objection, Your Honor. I'd like him to specify time and place. I'm not sure if he's --
A I'm not capable of doin' that. I do know that --
MR. WHITE: -- talking about things that he personally has heard.
A Uh-huh. I know.
THE COURT: Mr. Kleiner, be quiet. The -- um -- answer, if you're gonna answer this question is got to be your direct knowledge that you were there, or that your wife told

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 154 of 318

you these things. Or I'll let you tell -- I'll let you testify, too, if your children told you.

A Beg your pardon?

THE COURT: I'll let you testify also if your children told you.

Q Might be able to slow this -- speed this up, Your Honor. Mr. Kleiner, did you have a prior attorney representing you before I was hired?

A Yes, sir.

Q Who was that?

A Bill Ladd.

Q And did Mr. Ladd prepare a series of interrogatory questions?

A Best of my knowledge. Yes, sir.

Q I hand you what is a legal pleading, can you identify what that pleading is?

A Yes, sir.

Q Can you tell us, please, what that is?

A It's an intogerary (phonetics) report sayin' where, when and what she wanted us to've been doin'.

Q In those answers to interrogatories, Mr. Kleiner, is there answer -- are there answers, pardon me, dealing with your wife's travels, and what she was doing this period of time?

A Yes, sir.

MR. GLASS: Your Honor, since that has been filed of record, we would commend those questions and answers to you for --

THE COURT: Very well.

MR. GLASS: I think that's probably the fastest way to handle that issue.

THE COURT: Okay.

BY MR. GLASS:

Q Now, you testified that you have not seen your children since Christmas, is that correct?

A Just after, yes.

Q All right. When did you have Christmas visitation 1984?

A I got my Christmas supposedly the next morning after Christmas Eve at eight o'clock in the morning. I was called says you can pick'em up now.

Q And did you go get the children?

A Yes, sir. Yes, sir.

Q Where did you pick the children up?

A [redacted].

Q Who was there at eight o'clock in the morning on Christmas morning?

A The children, of course; Richard Bowman; and Judy Kleiner.

Q Okay. Now, did you take the children from the house --

A Yes.

Q -- from that address?

A Yes.
Q Where did you take the children to?
A Right to the farmhouse. Yes, sir.
Q And when did you return the children?
A I did not. I held'em for two days until they got me for intogerary somethin' -- they wrote up -- summoned me with a deal.
Q Came down or a writ of habeas corpus --
A Yeah. Habeas corpus.
Q All right. Why did you not return the children prior to the issuance of that habeas corpus?
A I felt in black and white and I say on paper that I was supposed to have 'em Christmas, which I did not get'em Christmas. Um -- she had'em Thanksgivin'. I did not involved things on time that she was supposed to have 'em I would not create into a --
Q Did the children miss any school while you had'em for those two days?
A No, sir. No, sir.
Q Did your wife ever try to contact you directly to return the children?
A One time. Yes, sir.
Q When was that?
A She made a call, it was Sunday about five o'clock, I'm ready for the children.

Q Now, what -- was Christmas on Sunday?

A Well, the time, you know, when Christmas is up. I'm sorry about that, I don't know that it was Sunday. No. No. No. But, the time that I was, you know, like I was supposed to have 'em Christmas then she was supposed to get'em back, she called me that evening.

Q How long was your schedule visitation for Christmas visitation, Mr. Kleiner?

A No certain time. But, I figured through Christmas. Christmas was a Christmas they don't go to school I shoulda' had'em 'til probably the first of the year. Something like that. They're not -- Christmas is Christmas, like I say, I shoulda' had'em -- actually I shouldn't even gotten the habeas corpus or whatever. I don't even feel that. I didn't argue.

Q How long was your visitation, Jack?

A Visitation was -- I kept'em I think two or three days longer than I should've.

Q Okay, what did you tell your wife when she talked to you about returning the children?

A Don't actually remember. I might've just said see ya' or something like that.

Q Okay. Now, since Christmas, have you -- when -- when was the next time you saw the children?

A It's supposed to've been ever two weeks, Ed. I don't

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 158 of 318

have dates or anything like that. But, it's -- it's supposed to've been on the court deals.

Q When was the next time you saw your children after you gave them back to her after the Christmas visitation was over?

A That was it. Other than just seein' 'em, you know, just like I would here. But, like I say that'd be it. I never got 'em period.

Q All right. You never had any visitation since that time?

A No, sir.

Q Now, what was -- did you -- have you requested the visitation every time you received --

A Damn near ever time, with a witness. Yeah.

Q Now, I'm gonna hand you a copy of the filed application for citation for contempt so that you can refresh your memory as to dates.

A All righty.

Q When was the first date that you should have had visitation after the Christmas holiday visitation was over?

A February the 8th.

Q Were you supposed to have them in January, Jack?

A Oh, that's right. Okay.

Q What was the first date, please?

A Um --

Q Weren't you supposed to have the kids on January 25th?

MR. WHITE: Your Honor, I object. That's leading.

He asked and answered that question.

THE COURT: Overruled.

A I see these dates, but I shoulda' had'em two weeks before then.

Q That's fine.

A Okay, January the 25th.

Q What's the next date?

A February the 8th.

Q When's the next date?

A 22nd.

Q All right, now, should you have had them prior to January the 25th, as well?

A Yes, sir.

Q Two weeks prior to that?

A Yes, sir.

Q Okay. Now, in each of these instances, did you request visitation?

A Yes, sir.

Q Who was with you on the visitation prior to January 25th?

A Penny Kleiner.

Q Who was with you on the January 25th visitation?

A Penny Kleiner.

Q Who was with you on the February 8th visitation?

A Penny Kleiner.

Q And who was with you on the February 22nd request?

A Penny Kleiner.
Q On the very first visitation prior to the January 25th date, will you explain to the Court, please, what you did and what happened?
A I knocked on the door. She finally answered the door. I asked --
Q Which door?
A Her front door. 9917 North Garrison Place.
Q Okay.
A I says I'd like to pick up the children. She says you're not gettin' 'em, my attorney said that you don't pay no child support you don't get no children. Yes, you did.
Q Well, all right. Then-what happened?
A I left.
Q All right, on January 25th where did you go to pick up the children?
A 9917 North Garrison Place.
Q Now, let me go back on the first visitation, what time did you arrive as far as you know?
A 6:30.
Q On the January 25th date what time did you arrive?
A 6:30.
Q And tell the Court, please, what happened?
A The same thing happened this time.
Q Did Mrs. Kleiner tell you that her attorney had told --

A She said her attorney had said not to pay -- or not to let you pick up the children on accounta' she said that we had not received any child support from you. Which was paid.
Q All right, when did you go again on that day?
A February the 8th.
Q Okay, what time did you arrive?
A 6:30.
Q And where did you go to pick up the children?
A 9917 North Garrison Place.
Q And what happened?
A This time there were no lights on in the house. I knocked on the door, see no one wanted to answer the door. But, I did, comin' into Sperry, see their car down at Mrs. Davis downtown -- or down on the main street which you come in on, that yellow wagon she drives.
Q Now, who is Mrs. Davis?
A She's the ex-mayor.
Q All right. So, what did you do?
A I drove back down there with witness, knocked on the door. Richard Bowman sittin' in there, Judy was hidin' there. I asked --
Q How do you know that Judy was hiding there?
A You could see her dash -- when the minute the door opened she dashed back in the back there. I did see her.
Q Did you see your children?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 162 of 318

A No, sir. Not then, but I asked Ms. Davis I need to talk to Judy Kleiner.
Q Uh-huh.
A She did not. She said get off my property. Says this is my property. And that is what Mrs. Davis told me. I drove back up to the house, but I did come in a different way. I put a flashlight in my hand. There's a couch sittin' to the right of her door. I put my foot up there, shined the flashlight on my ex-daughter, Patti Kleiner -- Headburg, and Charles Bowman or whatever his name is, young kid of his, one of'em, and there was on the couch -- I knocked on the door, and says you better open this door with a flashlight they had a little windows up above, you gotta'-get up high. I says you better open this door -- open the door they would not let us in. I did see Teddy at the back.
Q The children were at --
A They were at that address.
Q -- [redacted]?
A Uh-huh.
Q So, on that particular occasion you did not actually have any confrontation with your wife?
A Other than she knew I was --
Q Yes or no.
A -- waitin' on my children. No, I did not.
Q When's the next visitation?

A February 22nd.
Q And where did you go for that visitation?
A I knocked on the door and asked if I could see my children -- 9917 North Garrison Place.
Q At what time?
A 6:30.
Q What happened?
A She refused me. Said my attorney says still no child support you don't get the children.
Q Okay. Now, Mr. Kleiner, to whom are -- were you paying child support, at that time?
A Osage County.
Q Wait a minute, that's a long questions, Judge. I apologize. Um -- when is the last time you paid child support to Mrs. Kleiner?
A I'm not 30 days behind. I don't know the last date that I did send it.
Q To her directly?
A To her directly, no.
Q When is the last time you paid child support to her directly? If you can remember.
A I paid it to the Osage -- I didn't pay it to her directly. I paid it to the Osage --
Q Have you ever paid child support directly to her?
A No. Not to my knowledge.

Q Okay. All right, gonna hand you what's been marked as Defendant's Exhibit Number Two, will you look at that, please, and tell me what that is?
A It's showin' that I paid child support. Records of payment. Judy Kleiner.
Q To whom did you pay child support does that allege?
A Judy Kleiner.
Q All right, where did you pay the money that that money represents?
A Courthouse in Pawhuska.
Q Okay, do you know if Mrs. Kleiner received that money, or do you know if she was on a Welfare benefit?
A I think she's been on all of'em. I do not know if she got the money, no. That's between -- I paid my bills.
Q All right. Now, what's the date of that document, Jack, do you know?
A The last payment looks like here 12-7- of '84.
Q All right, did you actually receive that document?
A I just here recently did. Yes, sir.
Q Okay. Now, gonna hand you Defendant's Exhibit Number Five.
A Yes, sir.
Q Would you tell us what that is, please?
A This is a drawing, where you go to draw Welfare, I guess, that you been on Welfare. AFDC and food stamps.

Q Is that -- did you receive that?
A I guess I did. It's here in my hand.
Q Did you receive that in the mail?
A Best of my knowledge.
Q Do you remember when you received it in the mail?
A No, sir.
Q All right. Now, what does that document say? What does it proport to tell you?
A Says to be terminated effective December 1st of '84.
Q Okay, what is to be terminated effective December 1st, 1984?
A Your AFD and C and food stamps.
Q Okay. Now, what is the address that that was sent to?
A [redacted].
Q Where?
A [redacted].
Q And so you got that?
A I guess I do.
Q What did you do when you got that, do you remember? Did we have a conversation, Jack, about that document?
(No audible answer)
Q Do you remember?
A No, sir.
Q Okay. Gonna hand you Defendant's Exhibit Number One.
A Yes, sir.

Q Will you tell us what that is, please?
A Does hereby acknowledge receipt of such and such money which said sum is received and accepting in full payment and satisfaction of said judgment with interest and lien, Jack Glen Kleiner, dated this date, 20th February, '85.
Q All right. Is that bear a court filing stamp?
A Court filing from the Department of --
Q -- what is the date of the filing?
A -- Human Services. Date is February the 20th of '85.
Q All right, when did you get that document as far as you can tell?
A Just here recently in the mail.
Q All right. Now, Mr. Kleiner, calling your attention to Defendant's Exhibit Number Two.
A Uh-huh.
Q They -- there's an allegation there that you owe some -- some support to the Department?
A Which was paid. And I --
Q When was that paid?
A Um -- that's the reason they told me if I'd mail this here everything -- I was up-to-date a 100 percent just here recently. Last two weeks.
Q Okay. Now, prior to receiving the Defendant's Exhibit Number One, had you been under an order to pay the Department of Human Services support?

A I would say so. I have been payin' it, yes, sir. And I figured it's right.
Q Do you know how long you've been paying it to them?
A Eight months. Six months. Somewhere in there. May be longer.
MR. GLASS: Your Honor, at this time we'll move to admit Defendant's Exhibit Number One, Defendant's Exhibit Number Two, and Defendant's Exhibit Number Five.
THE COURT: Mr. White?
MR. WHITE: I have no objection.
THE COURT: Defendant's One, Two, and Five will be admitted.
BY MR. GLASS:
Q Now, do you recall, Mr. Kleiner, the requirement of the temporary order that was entered originally in this case; insofar as child support?
A To my knowledge this is way it was supposed to've been done. This is way it was supposed to've been handled.
Q At this time, do you -- what is your understanding as to who you are to pay child support to?
A Up until this time, I was to pay it to the Osage County.
Q Who do you pay it to now?
A Judy Kleiner.
Q All right.
A Uh-huh.

Q And do you understand how much is that obligation?
A Yes, sir.
Q How much is that obligation?
A $234.
Q All right, and have you paid that for the month of March, yet?
A No.
Q All right. When do you plan to pay it?
A Well, dependin' on where we sit so I can get records straight. I was told once by her lawyer and you just told not to pay.
Q If this Court orders you to pay it, you'll pay it?
A You bet. Yes, sir.
Q All right.
A I will need a day or two. But, like I said it will be paid.
Q All right. Now, considering the property that you have in and about the three and a quarter acres, is it your -- what is your understanding of your wife's desire for any of the property which she has in her possession?
A Sorry. Restate that, Ed.
Q What is your understanding of what your wife desires by way of property settlement?
MR. WHITE: Your Honor, I'm going to object unless he again specifies a time when she made statements to him.

Q All right, we'll go it another way. Hand you what's --

THE COURT: Go ahead.

Q Hand you Defendant's Exhibit Number Three.

A Yes, sir.

Q Will you tell the Court what that is, please?

A This is a letter that she left me after she hauled two trailer loads of stuff away from the house there. One of'em down there at Warren Applegates --

MR. WHITE: Objection, Your Honor. He asked him to identify the document.

Q Just identify it.

A Okay.

Q Do you know when you got that?

A Yes, sir.

Q When was it?

A Yes, sir. It was two, three weeks after she left on May 24th, whatever the date is she said she left.

Q All right. Now, at that time, what did that letter purport to represent about what she wanted by way of property settlement?

A This states it all in her writing. And like I say it is in --

Q What does it purport to represent?

A She had got everything she wanted, and to sell the property and give whatever goes to the kids, and that's it.

Just half of --
Q Does that letter say anything about the property that was left in the trailer?
A Said she doesn't want a bit of it no way, shape, or form. She got everything out that she wanted. And I was to dispose of the rest, to get rid of it in any way, shape, or form that I knew.
Q All right. Now, did you talk to her about that letter after you got it?
A She called on the phone and said you got a letter there sayin' exactly way it is, and that's what I meant, and that's it.
Q Do you remember when that conversation took place?
A Um -- day or two after I picked up the letter at the house.
Q Okay. Now, do you know at this time if your wife desires any of the property in the mobile home?
A The greed has changed. I'm sure she'd love to have it all.
Q All right. Have you had any contacts from her as to what she wants in the property?
A The last -- the divorce papers, like I said, she wanted half the property, and she wanted alimony, so on so forth, plus everything of half of what's there.
Q Okay.

A After she done got more than half of it.
Q Let me hand you Plaintiff -- Plaintiff's Exhibit Two is several documents; Plaintiff's Exhibit Two, the first page.
A Okay.
Q Do you have any of that property at this time?
A Fruit jars sitting in the corner which she's got written here $200 --
Q Do you have any of that property?
A Yes, sir. I have the jars. And I don't know what tools she's talking about, my tools more or less. Christmas, I guess she's talking about decorations, which you can go --
Q Do you have them?
A I have my tools. I have the jars. I have the Christmas decorations.
Q What about automatic --
A These were two old pig feeders she hauled which is nothin' but junk.
Q Do you have them?
A I do not have 'em.
Q What about cow equipment?
A The ropes are there, yeah. Chain saw was stolen, I believe, by her, but that's beside the point, chain saw is gone. Two incubators gone. I did get $25 a piece for the incubators. Wood stove is in the house and I always figured -- there's one in the shed, too, they're both there.

Q All right. Now, considering the fact that she has valued those items.
A Uh-huh.
Q Would differ at all in any of the values of that property?
A Yes. All of it.
Q Okay, will you tell us, please, which of those items you disagree with?
A I can give you a disagreement on each and ever one of'em.
Q Just the items that you have.
A Okay. The jars, $200, canning jars what's supposed to be.
Q Uh-huh.
A Um --
Q What do you say they're worth?
A $20.
Q How many jars are there?
A Half a pickup load if you wanna' go in that respect.
Q The tools?
A My grinder, my vise, I would say all in all there might be a $100, and wrenches, and that's cleaning me out tool box and all.
Q What about Christmas decorations?
A Christmas decorations, $20.
Q The -- um --
A Pig feeders?

Q Pig feeders.

A They were junk. Threw them in the iron -- or out in the trash dump where I dump my --

Q All right, so you don't have them?

A To my -- they're in the dump out there, I do not have 'em, no. They was junk anyhow.

Q So, you would value them at zero?

A Zero. Cow equipment, ropes and that, which ain't worth five, $10 at the most. She's got $50 written down here.

Q Chain saw?

A Chain saw. Which might've been worth brand new $89 real short, small one brand new. You could probably pick one up for 25, $35 anywhere.

Q How many chain saws are there there?

A Well, there used to be two. In the meantime one of'em did disappear. Both of'em did disappeared now, like I say --

Q How much do you think, if you had them, they would be worth?

A $100.

Q And the incubators?

A You can go buy'em probably 20, 25 bucks anywhere each. There are two of'em.

Q You say 25 for a total of $50?

A Yeah. Uh-huh. Uh-huh. Uh-huh. Wood stove, I guess she's talkin' about one in the shed, which wouldn't be the

one in the house which more or less part of the house -- um -- wood stove maybe 20, $25. Paid $69 for it new and it's just sittin' in the old shed.

Q All right, hand you another page which purports to value a vacuum. What -- would you agree with that value?

A No. Worth a lot more, but like I say I'm not -- let her have her way on it.

Q $150?

A I've done it before. Guess I'll do it again.

Q Come on. Come on.

A $150.

Q Pardon me, Judge. Now, hand you a document that says outside on it. Now, are those -- all of those items still there?

A Some of'em.

Q Okay, do you generally agree with the values --

A No. No, sir.

Q Can you tell us, please --

A Horse trailer which are in here sold by Jack, not long ago, I did get $400 out of the trailer. And you might spend $500 get you another one just as good if not better. Okay, these other two trailers which I would value this pickup bed trailer -- now that more or less goes to the house on account of the water barrel hundred and a quarter, probably worth 150 or more. The flat bed trailer she got 75, which might be worth

$50, I'd sell it for that or guarantee. Ridin' lawnmower for $800 here, might be worth and hundred and half, $200.

Q Is it a new one?

A No. By far it's --

Q How old is it?

A It's gotta least be six, seven years old. Eight or nine something like that.

Q So you maintain it?

A I haven't lately kept up, no, sir.

Q Okay.

A It's might even be stuck up -- froze up. Pushmower $30, which -- um -- you know, how long they last about a half a year and they're gone and it is not there.

Q It is not there?

A No, it's not. The pushmower --

Q Where is it?

A Through it in the iron pile, or give it to somebody 'cause it's junk. They wanted it for wheels or whatever. That's all.

Q All right.

A Chain hoist which I bought for 50 or 100 and I turned around and I sold it for $40. She's got a $100 written here. Two water coolers $50 -- um -- I sold one of'em for $20, the other one I give away. They're worth 20, $25 at the most. She's got $50.

Q Why would you have given one of'em away?

A I'm not needin' it. Why should I -- when I can make someone else comfortable, I try. One air conditioner which she's got here 50 bucks. Some you're gonna spend a $100, but yeah, that's probably worth the value of it, 50 bucks. A Jersey cow here which we paid $300 -- 289, she sold it and got 289 July. Yeah that's --
Q What do you think --
A -- she might've found out --
Q Well --
A 280. When the cow sells then that's what it's worth.
Q What about the calf?
A Now, that's one. This is a Jersey cow here which I did turn around and sell $300. I sold it.
Q And you got $300 for it?
A I don't know where you get a nine -- thousand --
Q Jack.
A I sold it for $300. Yes, sir. For the black and white calf I got a $100 for. For two big hogs I got a hundred a piece. I might've got 50 bucks for some of the hogs I didn't give away.
Q So how much did you get for the hogs? Total?
A Um -- 250. Hog feeders which I think Ernie (phonetics) give her one, and probably Ernie give 'em both, but 20, 30 bucks a piece at the most. I do still have one of'em left. She's got a $100. Ducks and geese, she's got here a $100, sold

must all them, too, gotta be her writing. Um -- there was not that many after she left and the dogs -- the dogs -- um -- loved'em, you know, with no one there watchin' the house. Um -- cement blocks there she said I got a $100 for 'em I think I might've got 20 bucks, and I did sell'em.

Q All right.

A She even got a value on the kids bikes, which them's them kids bikes. I ain't steal them bikes from nobody.

Q What do you think the bikes are worth?

A Pick'em up --

THE COURT: Let's say the bikes belong to the kids and not set a value. Mr. White, next time you try a case in front of me would you make some copies? It makes it rather difficult for the Court to follow this and for you to follow this.

MR. WHITE: I'd be happy to make copies first recess.

MR. GLASS: Would you like me to go on to something else, and then come back to this?

THE COURT: If we can, yes.

MR. GLASS: All right, let's do that.

BY MR. GLASS:

Q Now, Jack, you heard some testimony concerning your relationship with Mrs. Kleiner. Can you characterize that relationship, please?

A What might this be pertainin' to, Ed? Relation with her --
Q What sort of a relationship have you had with Mrs. Kleiner over the years?
A Over the years? Enough that I put my check, or whatever the house, I say you do it, here's the checkbook each week. And like I say when she come home she got the money, she got the whole ball of wax. I say run this place like she was supposed to do. But, she got mad at the water barrel, by the cop.
Q All right.
A Truth.
Q What -- um -- when did you begin having trouble with Mrs. Kleiner?
A It's been now a year and a half.
Q And do you know what the cause of those problems were?
A She did had the trailer or the water barrel, she'd go get the water, right there was Richard Bowman at the water barrel. He was a policeman in Sperry at the time. They had good conversations. Right then's when I started gettin' affliction back at the house.
Q All right. Now, you heard some allegations, Jack, that you're a drinker?
A Yes, sir.
Q Are you a drinker?

A I do drink. Yes, sir.
Q Can you tell the Court, please, how much you drink?
A At the most, and this includes my friends that do come out, maybe half gallon shade more a week. And that's it.
Q Half gallon of what?
A She got me to be a rummy. I used to be a Canadian Club like Bacardi.
Q What do you drink with it?
A Coke.
Q Okay. Now, you heard your wife testify that you brought home, or she brought home, some numbers of cases of Coke; do you remember --
A I used to through the summer, like I say, drink three cases of two liter bottles home each and ever week. It was more than devoured by mainly her two older children which loved Coke and drank it thoroughly and a hundred percent. You betcha'.
Q Okay, but you used a little bit with --
A Oh, yeah.
Q -- light Bacardi, right?
A Oh, yeah. And she drank, too.
Q Now, did your wife drink, or does she drink, as far as you know?
A Yes, sir.
Q Okay. When -- what kind of a drinker was she?
A When it's party time she'll be there.

Q Okay. Okay. Now, would you say that your wife drinks as much as you?
A I'm a little older. I drink a little more. Not that much, but I do drink a little more.
Q Ever seen your wife inebriated, or drunk?
A I feel like I have. She gets tee-hee, and probably comes a lot closer to passin' out than the next man that she wants to talk about.
Q Okay, did you feel that alcohol was a problem in your marriage?
A I thought if she said I went along, I did try to help straighten it out. That was not the problem in the house.
Q Did you buy all the alcohol that was consumed at the house?
A To the best of my knowledge, yes, sir. She did make wine, which I don't even drink, been sittin' around there which I've give to this friend and that friend. She had three, five gallons of wine that at all times. She made beer. She made it, her and Ernie.
Q Okay. Now, you heard a young girl accuse you of sexually molesting her yesterday, is that correct?
A Yes, sir.
Q Or the day before?
A Yes, sir.
Q Have you ever had sexual intercourse --

A No way, shape or form, sir. No, sir.
Q You ever had sexual intercourse with the young girl that testified here?
A Lisa you're talkin' about? No, sir.
Q Yes.
A No, sir.
Q All right. You heard her say that you asked her on one occasion to leave your door unlocked, did you do that?
A I heard that. I did not. I don't even recall bein' there no way, shape or form. I was, say -- like I say, when I go to bed, I go to bed, and I don't go to bed to fool around I guess like other people did in the house.
Q Um -- now during -- what period of time are we talking about here, do you recall?
A She said been goin' on for sometime, I guess. Even before I had the livin' room added on.
Q Jack, did you ever go into her bed -- Lisa's bedroom late at night, get into bed with her, and fondle her breasts --
A No, sir. No, sir. No, sir.
Q -- or touch her vagina?
A No, sir.
Q What sort of a sexual relationship did you have with you wife?
A I thought pretty good one through life. But, like I say there towards the end she was, I guess, gettin' bored with

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 182 of 318

me, or I wasn't enough man for her. By the way she did say I was.

Q During the period of time that Lisa alleged that you were taking advantage of her, suppose is the right word, during that period of time were you having a satisfactory sexual relationship with your wife?

A Best of my knowledge, yes, sir.

Q All right. What is your normal work day, Jack?

A Eight till six Monday through Friday.

Q All right. Okay, do you always go right home after work?

A Yes, sir. I never stopped any honky-tonks or nowhere's.

Q Okay, you heard Miss Lisa say that you knocked on the door of the outside room, do you recall that testimony?

A Yes, sir.

Q Did you do that?

A No, sir.

Q Now, do you believe of -- do you have any of your own direct knowledge of any relationship that Lisa had with anyone else?

A Yes. A Jeff Bates and there was a Carl that she talked about. Like I say, her mother knew about that they was havin' things goin' on. Carl from Sperry there.

Q Did any of these boys live in the house?

A Jeff Bates. Yes. Which she --

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 183 of 318

Q -- idea was it that Jeff Bates live in the house?
A Judy Kleiner.
Q All right.
A She drug him home.
Q What was the reason for Jeff Bates living in the house?
A Well, he's supposed to've been a helpin' hand, which he was no helpin' hand --
Q All right.
A -- at the house.
Q How long did he stay in the house?
A Four months. Five months.
Q And during that four or five month period what was his relationship with Lisa?
A Pretty close, say.
Q Can you be a little more direct, please? What --
A Never actually seen'em in intercourse, but I knew it was happenin' and their mother did, too, because --

MR. WHITE: Objection, Your Honor. He stated he did not know. If he's going to state that he does, I believe he needs to state why and how he would know such a thing.

THE COURT: Sustained.

A Okay.
Q Did you ever have any discussions with your wife about Lisa's relationship with Mr. Bates?
A I think one in the backyard where -- um -- like I say,

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 184 of 318

it seemed like my drink was more important and bad than his and her carryin' on. That was out --

Q What did that conversation -- when did that conversation take place?

A Oh, two months before she left. A month before she left.

Q Okay. And can you tell us about the conversation concerning Mr. Bates and Lisa, please?

A Well, she was asking me what to do. And I says she's your daughter, you handle her the way, 'cause like I say --

Q What was she asking you what to do about?

A Well, what shall we do about it.

Q About what?

A About Jeff Bates and problems that happened.

Q All right. What problems was she referring to?

A The intercourse goin' on. Jeff Bates and Lisa.

Q All right. Did you ever see Lisa having intercourse --

A No.

Q -- with Jeff Bates?

A I did not.

Q All right, on what do you believe that she was having intercourse with Mr. Bates?

A The times that he was caught crawlin' past Judy and my bed goin' to Lisa's room.

Q All right --

A And it happened more than once. Judy knows about.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 185 of 318

Q How many times has he been caught going past your bed-room door?
A At least three times.
Q Can you tell us about when that was?
A Um -- the end of '83 goin' into -- yeah, end of '83. November, December, January, something like. Just guessin'.
Q All right, and the first event, can you tell us what occurred?
A Well, I woke up and like I say --
Q About what time, do you know?
A Midnight. One o'clock. Um -- the walkway from our bedroom door is not two or three foot right past to go on out the living room and to Lisa's house. And heard something there and I got up and I put the light on and there was Jeff.
Q Where was he?
A On the floor crawlin'. I says where you goin' Jeff.
Q You can't say what he told you. All right, the second event -- I'm sorry. How was Jeff Bates dressed when you found him down there?
A Um -- normal jeans and T-shirt. Something like that.
Q Okay, and the second event?
A Same way.
Q Third way?
A Same way.
Q How do you know he was crawling to Lisa's bedroom?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 186 of 318

A Crawlin' to the livin' room for what reason, I don't know.
Q All right. But, he wasn't walking?
A Wasn't walkin'. And they were terribly drunk.
Q Was he drunk?
A He might've been drinkin', I can't say he was drunk.
Q Have there ever been any criminal charges filed against you for any sexual related crime?
A To my knowledge, none whatsoever, Ed. No, sir.
Q Has any police officer or representative of any district attorney's office or any other law enforcement, ever talk to you --
A No, sir.
Q -- concerning these things?
A No, sir.
Q You heard the testimony of a Nancy Walentiny, I believe, is how she pronounces her name?
A Yes, sir. Uh-huh.
Q Had you ever seen Mrs. Walentiny prior to her testimony here?
A Never seen her before in my life, to my knowledge.
Q Have you ever talked to her?
A Never personally talked to her. No, sir.
Q Okay, ever talk to her on the telephone?
A Only words I heard from her is she called me an old S.O.B.

out here, from talkin' to Lisa right out here in this courtroom.

MR. WHITE: Objection, Your Honor.

Q Did you --

THE COURT: Overruled.

MR. GLASS: Well, Judge, I think it's very relevant if one of their witnesses --

THE COURT: I said overruled.

MR. GLASS: Oh, I'm sorry. Pardon me. Excuse me.

BY MR. GLASS:

Q Did you actually hear it, or did Lisa?

A Lisa -- I mean not Lisa, Penny.

Q Penny. She actually heard that?

A Yes, sir.

Q You were in here, weren't you?

A I was in here.

Q And it is -- you're sure you've never had any contact with that woman?

A To my knowledge I've never seen her.

Q All right. Would you tell the Court, please, what sort of relationship you had with Patti Headburg and Lisa Headburg?

A I tried, but it was to no avail. 'Cause when I did try to get'em to do the housework, like I say I was an S.O.B.--

MR. WHITE: Objection, Your Honor. Again being over general and he's not referring to specifics.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 188 of 318

THE COURT: Sustained.

Q Can you tell us, please, first, with regard to Patti what sort of a relationship did you have with her?

A I don't think I've had one with either one of'em growin' up the whole time Judy and I've been together. Never. Not really.

Q All right, you heard Patti say that you hit her?

A Yes, sir.

Q On May 29th, 1984.

A Uh-huh.

Q Did you?

A Yes. I hit her.

Q Did you hit her with your fist in the face?

A No, sir.

Q Where did you hit her?

A I might've bopped her on the back or arm, or the butt. And the butt's where they normally got it and that is true. I'm strict, but I'm not a cruel man I'll guarantee you. I am strict, I'll guarantee you that.

Q Okay. Did you ever hit Patti Headburg with a belt?

A No. But, I believe Judy has.

Q Did you ever hit Patti Headburg with a stick?

A No, sir.

Q Okay. On May 29th, 1984, what was going on in your house when the incident between you and Patti Headburg occurred?

A When they left?
Q Uh-huh. Did Mrs. Head -- Patti Headburg say anything to you?
A I can't even remember. But, it was a lot milder than what they're puttin' it here, I'll guarantee you that.
Q Were you sober --
MR. WHITE: Objection.
THE COURT: Overruled.
Q Were you sober, or were you drunk when that occurred?
A Sober.
Q Remember what time of day it was?
A Noon or somewhere around there.
Q Had anything to drink at all?
A No, sir.
Q Okay. During the time that you have had Patti Headburg in your house, how long a time has that been?
A Ever since Judy and I have been married. And Judy had'em when we took --
Q Okay. Do you feel that you developed a good relationship with her at any time, during that time?
A There were times there were spotty. I thought it could've been, but --
Q What about Lisa Headburg?
A Same way.
Q Now, Mr. Kleiner, did Lisa Headburg or Patti Headburg

ever make sexual overtures to you?

A No. I don't know that either one of'em has.

Q Okay. Now, if you would, tell the Court -- no, no, we can't go -- concerning the custody issue here, Jack --

THE COURT: Let's take a ten minute recess.

MR. GLASS: Okay.

(After a brief recess, the following proceedings were had:)

MR. GLASS: We can complete the property testimony now.

BY MR. GLASS:

Q I hand you -- I'm sorry. State your name for the Court, please.

A Jack Glen Kleiner.

Q And are you the same Mr. Kleiner that has been previously testifying in this matter before our break?

A Yes, sir.

Q Mr. Kleiner, going back to the property, I hand you another document which is part of Plaintiff's Exhibit Two, are you -- would you tell the Court, please what page you're looking at?

A Bedroom three, I guess.

Q And how much of that property do you still have -- first off, who's bedroom was that?

A I guess bed three is Lisa, I guess the way she --

Q Is any of that property still remaining in the bedroom?

A No. None of it, no.
Q All right, where is the typewriter?
A Typewriter I told her give it to a friend. I guess he took it to sale and got $5 out of it.
Q Okay, other than the property -- I'm sorry.
A These clothes and everything was gone. There was no clothes in that room whatsoever.
Q All right. The property -- first off that has a check mark by it?
A Yeah. I guess that --
Q That is the property that is allegedly removed by your wife, is that correct?
A Best of my knowledge. Yes.
Q Was anything else gone after she left that day, up to the two occasions?
A None of it. None of it was left. There might be one old camera layin' around there which is junk. It's on the desk, like I say there's one old junk camera. None of this stuff.
Q Did she take it all?
A Other than -- well, fact is I think she took a bed, or so of one of'em. I know she did, yes, uh-huh.
Q She took all that property?
A Uh huh. Uh-huh. Uh-huh.
Q So --
A There were two or three trailer --
Q Is any of the -- I'm sorry. Is this all really Lisa's property?

A Best of my knowledge. I never kept track of her property.

Q And would you want the Court -- I mean, you would have no claim on Lisa's property?

A None whatsoever, no.

Q Hand you another document, would you tell the Court, please, what that is?

A Bedroom two.

Q Whose bedroom was that?

A Got here Patti's.

Q All right, would you look at that and just tell us, is all of that property Patti's?

A Best of my knowledge.

Q And was it all removed by your wife?

A Before, yes.

Q All right.

A All of it.

Q Okay.

A Ever bit.

Q And you would have no claim?

A I have no use no way, shape or form. No, sir. There's also silverware --

MR. WHITE: Objection, Your Honor.

THE COURT: Sustained.

Q Okay, bedroom one.

A Okay.

Q Now, what is bedroom one?

A Um -- Tom and Ted's I guess.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 193 of 318

Q Okay. Now, what -- Tom and Ted are your children?
A Yeah.
Q Okay, what property on that list is still there?
A Which she's got written here, none of this up above. None whatsoever, other than a twin beds, yeah. Stereo which she gave to my daughter which worth $50. I give my daughter still have, is worth two or three dollars. Never did play. And --
Q Okay, what about the clothes and shoes and toys?
A They were gone by her taking also.
Q And chest of drawers and two twin beds. Are they --
A No. I think I got -- I might have the two chest of drawers yeah no problem there. I got the two chest of drawers I probably got the twin beds.
Q So beds and drawers are all that remain in that bedroom?
A Yeah. Uh-huh.
Q Was that --
A She cleaned it out.
Q Was that jointly acquired property?
A No. No. What children owned was their, you say, acquired property. I don't understand.
Q Did you acquire it during the time you were married?
A Oh, yes. Uh-huh. Uh-huh.
Q Hand you another document and would you tell the Court, please, what that's for?
A Twin beds still there. Chest of drawers.
Q What room is it?
A Master bed, which I guess is mine.

Q All right, what is that? The bedroom that you and Mrs. Kleiner slept in?
A To the best of my knowledge.
Q All right. First off there are some check marks there, showing property that, I believe, your wife has previously testified that she removed. Is there anything else gone from that list that is not there?
A All I've got, the queen bed; chest of drawers; the night stand's still there. And -- um -- clothing, no, shoes no yarn, no craft stems. I have a clock which I, you know, I have a clock. There's a clock there. Jewelry box I don't keep. Diamond ring, I hand you out of my pocket if the Court wants it. No problem. She gave it back in that letter that was with the letter I got.
Q Now, is the diamond ring --
A Okay.
Q The diamond ring is part of the wedding set?
A Uh-huh.
Q And she gave it --
A Gave it back in that letter. Yes, sir.
Q All right. Uh-huh. And you still have it?
A Yeah. Got it right in my pocket.
Q Says it's worth $200, is that a fair value?
A I don't know what all to do with it, now, I guess, yeah.
Q Is that a fair value?
A I guess. I paid four.
Q Did she take the items from the master bedroom that you say are no longer there?

A Yes, sir.
Q What is there?
A Queen bed, chest of drawers, night stand, and clock.
Q All right, of those items that remain do you agree with her values?
A She doesn't have a value on the clock. You can buy this bed for a hundred bucks or so, 50, hundred bucks. Chest of drawers 30, 40 bucks. Night stand $10. Cut all of it in half or more.
Q Okay, was the -- were these items purchased during your marriage?
A Yes, sir. Yes, sir.
Q How old is the queen size bed?
A Four years. Five years.
Q All right.
A We buy no new furniture at our house it's all used. Old fashioned.

MR. WHITE: Objection.

THE COURT: Sustained.

Q Well, was that -- was this furniture in the master bedroom bought new?
A No. None of it was.
Q You bought used furniture?
A It's all used in the house, Ed. We never bought a bit of new furniture.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 196 of 318

MR. WHITE: Objection.

MR. GLASS: I move to strike that, it's not responsive.

THE COURT: Thank you.

BY MR. GLASS:

Q Hand you another document, please, tell us what that is? What room is it?

A Bathroom.

Q Now, how many bathrooms are there in the house?

A One and a half.

Q Okay, which bathroom does that refer to, can you tell?

A I imagine this is would be the master bathroom or the main one, full one.

Q All right, is any of the property on that list still there?

A I've got a few sheets in the house which she might've left. Other than that I ain't even give or sold any of them. They was all taken. That was about it. She -- I did even have to get me another blanket this winter 'cause it did get kinda' cool. None of this stuff was there.

Q Did she take it all?

A Yes, sir. Yes, sir.

Q All right, would you generally believe that there was as much property there and that the values are proper?

A Maybe $100 in all.

Q The whole thing?
A Uh-huh.
Q $100?
A Uh-huh. Uh-huh.
Q Hand you another document, first off would you tell us what room that refers to?
A I presumin' the kitchen.
Q Okay. Now, hand you -- can you give the Court an idea what is there that is on that list?
A Frigidaire's there. I like to sell some of these at these prices. Washer and dryer's there. Freezer's which she's got. And Frigidaire, an old one, I gave away is out in the shed, yes.
Q You still have any of the other items?
A I got pots and pans. I got dishes. Shredder I don't know if it's there or not. Toaster's there.
Q Okay. Now --
A Pressure cooker these are --
Q Would you agree with the value of shown for the refriger-ator?
A Frigidaire might be worth $300. She's got $600.
Q What about the --
A Washer and dryer, man went out to buy'em, yeah that will be a reasonable price.
Q All right, and the refrigerator for $25, do you agree

it's worth that?
A I give it to you if you haul it away.
Q Now, concerning the freezer, wife testified that she had that freezer, and she had the food in it, is that correct?
A Yeah. She's -- I give her that another load she took out of there with -- it was full of -- um --
MR. WHITE: Objection, please.
THE COURT: Mr. Kleiner, just answer the question.
A Okay. Sir, I'm sorry.
Q Would you tell the Court, please, what was -- first off, when you gave that to your wife?
A Two or three weeks after she left. A Monday, maybe.
Q And can you tell us what was in the freezer to the best of you knowledge?
A Filled with meat from our pigs that we had out there. And also vegetables, and strawberries.
Q Okay, about how many pigs had you had slaughtered?
A At least two.
Q Okay, were they good size pigs?
A Yes.
Q Any idea of what the meat dressed out at?
A 200 pounds a piece, something like that.
Q Okay, was there any beef in the freezer?
A If we just bought it at the store, you know, at that time we didn't have nothin'.

Q Was the -- how large a freezer was it?
A Um -- pretty long one. From me to that wall and pretty good size one.
Q Okay, and what -- was it full all the way to the top?
A Yes, sir. It was all the way full.
Q All right. Now, of the kitchen items that you still have left?
A Uh-huh.
Q Could you lump all of that together, please, and tell us about the value that you have left?
A I been -- not this. Not this.
Q This stuff.
A And this?
Q Just this stuff.
A Okay. Okay -- um -- 150 bucks.
Q Okay. Now, the check mark is by a crock pot and silver, did she take any dishes and pots and pans with her?
A Yes.
Q Okay. Now, she says she took silver, there's value of $50 on --
A She took silverware which valued probably four or $500.
Q Okay. Now when you say silverware, do you mean sterling silver, sterling flatware, or are you talking about stainless steel, and --
A I'm talkin' about good stuff, Ed.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 200 of 318

Q All right. Okay, what about any crystal or china, or good china, or anything like that?
A I'm sure there was, but I'm not that -- I'm sure there was.
Q Would you disagree then with the value of the silver?
A You bet.
Q How much was there?
A Full, you know, it was in a box, you know, full to the, you know, so many what eight settings or for each one it was full. Real nice.
Q When did you use that silver?
A Strictly on occasion. Once in a great while.
Q How much do you think it was worth?
A Four or $500.
Q Okay. Now, do you still have the pasteurizer and the buckets and the strainers, and all that?
A Don't have the bucket and drainers in that, no. But, you can probably pick that stuff up for 40 or 50 bucks at the most.
Q Okay.
A Brand new.
Q Do you still have the pressure cooker?
A Yes, sir. To the best of my knowledge.
Q Okay, and would you agree with the value of pressure cooker?
A I think you can get a new one for that, but I haven't

checked into'em lately.

Q How old is the pressure cooker that you have?

A Four years.

Q What would you value?

A $50.

Q Do you know if your -- or you are of the belief that your wife has removed everything from the kitchen that she wishes?

A No. I still think she's greed, she wants more. I'm sure of that.

Q Do you have any sufficient kitchen items to get along if you had the children?

A Yes, sir.

Q All right, hand you another document, what room does this refer to?

A Dining room.

Q And is there anything there that she has removed on that list?

A Two piece sectional I gave, yeah, she's moved the television. Sorry about that.

Q All right, anything else that she removed?

A No.

Q Is it all there in the mobile --

A Best of my knowledge. I don't know where this other stereo came from, though.

Q Is there a stereo in the mobile, at this time?
A One I paid $30.
Q Okay, would you agree that -- that all the property is there that -- that is alleged to be there, and would you agree as to the values?
A Stuff that she got written here, you can buy for half or less anywhere, and probably a third of that honestly $315 you probably pick it up all for $100 and probably better stuff than what we've had at all.
Q Okay, there's reference to a sectional there, is that in your wife's handwriting by the way?
A I don't know, really. It's printed there.
Q What does it say?
A It says I gave a piece to Penny. I don't know I gave her any parts of sectional. Now, I did give my big couch which they didn't like that was what I laid on in the evenings that I watched T.V. from. Um -- and, of course, taking a drink. That I did give to Paul and Ruth. I don't know that I gave Penny any part of a sectional except for Bill give me a sectional after she left and I did give part of that sectional to Penny, but nothin' here.
Q Do you have a sectional sofa in the mobile dining room, at this time?
A No. I've got a third of one, if you know what I mean.
Q All right. Okay, you testified to -- I hand you what I

believe is the last page and what is the heading of that page?
A Living room.
Q All right. Now, first off what are -- what is not there at this time? What has been removed?
A Been removed two table lamps and .22 rifle which I will double her money and buy it back if I can. It was mine a hundred percent. A shotgun is gone. Um --
Q Do you know where the shotgun is?
A She says here Lewis Priest sold it. But, to my knowledge he didn't unless she delivered it to him.
Q Did you ever authorize --
A No.
Q -- her to sell --
A No.
Q -- a shotgun of yours?
A No.
Q Who bought the shotgun?
A I bought it.
Q Okay.
A Hundred percent.
Q Is anything else there -- what's there now?
A Couch and love seat, like I say. Black recliner, which she found got value at $50, found and give to me and found it in a dump. Library table, I guess, end tables. The wood stove

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 204 of 318

which is part of the house. Utensils, clock, television's there. Worth maybe a hundred and a half. Gun rack still there.
Q Is there anything else in the living room that is not listed on that list?
A Yeah. I have other stuff in the living room not on that list.
Q Okay, what?
A Like I say, the console I paid $30 for it. It's console stereo. Um -- there's two more easy chairs that I purchased later. Um -- that's about it.
Q Okay.
A Uh-huh.
Q Now, is there adequate furniture in the mobile home at this time, if to handle you and the children if the Court sees fit to give you the custody?
A A hundred percent. Yes, sir.
Q So, your -- if you were to be granted what was left in the mobile, and around the place, would you want anything more?
A No. The children. That's -- I would make it.
Q All right. Now, Mr. Kleiner, can you please tell us about your relationship with the three children? Take the oldest one first.
A Teddy. Yes, sir.
Q Uh-huh. Tell me about your relationship with Teddy?
A We --

MR. WHITE: Your Honor, I'm gonna object unless he be a little more specific. I think that opens the door for a long narrative, and he limit his questions --

THE COURT: Overruled.

A Um -- go -- do I go ahead?

Q Answer the question. Let's do this up to the point and time that you and your wife separated in May of 1984. Tell us about the relationship you had with Teddy.

A My weekend is only time I had off, like I say, of the evenings includes vacations like she had me building a living room on --

THE COURT: Mr. Kleiner --

A Okay.

THE COURT: Answer the question.

A Okay.

Q Your relationship with Teddy, please.

A Relationship with Teddy. Okay, I was there when I was not busy doing something and that was not all the time that I was doing something, him and I were close, like I say, they've got their B.B. guns, they've got their animals, they've got bicycles. And I will guarantee you we were there and we were together. I guarantee you.

Q What is the middle boy's name?

A Little boy's name is Tom.

Q Tommy.

A Tommy.

Q What relationship did you have with Tommy say up to the separation?

A Same way. And him and I got a long good. I'm not the kind of guy that goes out and plays, though, you know, and I -- our time together play when there's not work to be done, I -- in helpin' and playin' with the children.

Q Okay, did you spend personal time, what I would say, one on one time with Teddy and Tommy?

A When they did need me I was there at all times.

Q Okay. Now, the youngest child, what's that child's name?

A Youngest child would be Tommy.

Q The middle child.

A Jerri Jo.

Q Yeah.

A Yes, sir.

Q What sort of relationship do you have with Jerri Jo?

A Like a father should. And I was close to her, real close. I do love her.

Q Okay. Now, did you spend any time with Jerri Jo alone?

A In the past I have not. In the future I would, yes. I' not --

Q Why have you not spent time alone with Jerri Jo?

A She is a little girl. I did work from eight to six Monday through Friday. I kinda guess left up to mother like

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 207 of 318

I did the other girls.

Q Okay, now tell the Court when you have had the children for visitation what did you do with the children?

A We went skatin' -- um -- more than one time. Um -- we shot their B.B. guns. They had their bike rides. We were together and I guarantee you we were. Their minds today I guarantee you are -- whoops.

Q What I want you to characterize, what you did during the visitation?

A Play with them. Love them. And hopefully make them comfortable and enjoy being with me, also.

Q Now, when you had the children prior to the separation in May, did your wife -- sorry, Judge, that's misleading. Who cooked the meals in your house?

A At our house?

Q Uh-huh. Prior to your separation?

A Prior to the separation?

Q Uh-huh.

A Supposedly Judy.

Q Okay.

A Cooked the meals in our house, supposedly.

Q During the time that you have the visitation, the eight to ten times that you testified to.

A Uh-huh.

Q Who cooked the meals while you had them over every other

weekend?
A While I had'em Teddy and I.
Q Okay. Now, did anybody else help you with any of the cooking?
A To my knowledge there wasn't. Jerri kinda pitched in a little, but we enjoyed ourselves and we et good.
Q All right. What was the typical breakfast, if you don't mind, that you would give your children when you had them?
A I guarantee you they got their --
Q What was typical breakfast?
A Okay, eggs, sausage and bacon. If they wanted, or toasties.
Q Okay.
A Milk.
Q What about lunch? What sort of a lunch did you see they have?
A If they preferred hamburgers, or sandwiches that's what they had. We preferred something, whatever we have that, if they preferred a meal we would cook a meal. Teddy's pretty good cook.
Q Well, did you do the cooking or did Teddy?
A Teddy, I both --
Q Okay.
A Together.
Q What kind of a supper, or dinner, did you have?

A Well, we were smart enough, we could fry potatoes. We knew how to cook meat one way or the other. We'd have a regular meal along with radishes, celeries, and things like that. The little ones like them, too.
Q What normally was the beverage at night?
A Anything they wanted, but like I say, mostly preferred Coke.
Q Did you have them drink milk because --
A You bet. They got their share of milk. There's milk in the house at all times.
Q Okay. Now, you have other children, do you not, Jack?
A Five.
Q And have any of your other children been involved in the -- with your -- with Teddy, Tommy, and Jerri Jo during the visitation?
A None whatsoever. My soon to be ex ran them all away, all of'em.
MR. WHITE: Objection, Your Honor, beyond the scope of the question.
THE COURT: Sustained.
Q During the visitation, did you ever attempt to include your children -- your prior marriage children?
A Yes, sir.
Q And what occurred, can you tell us, just generally, please the activities with Teddy, Tommy, and Jerri Jo and your prior

children?

A Penny was out to the house a time or so. And like I say she was more or less run off by Judy. Sayin' that she done this and done that, and she did not.

Q Was there any one of the other children, other than Penny, involved with the kids?

A Penny was only one that close at the time. Two of'em just moved down here.

Q All right, what about your -- during your period of visitation is Penny around then?

A Yes. Uh-huh.

Q All right, and did she help?

A Yeah. She helped. You bet.

Q Did she ever cook any of the meals?

A You bet. Quite a number of'em. They're gettin' a little bit better.

Q Did you teach the children how to handle the animals?

A They probably more or less learnt on their own, 'cause like I say I found out that she wasn't there at all times, like I say there again they probably did a lot more bein' at home by theirselves than I knew how.

Q Okay, do the children play any sports, or anything like that?

A Well, I heard that she entered'em in baseball, I guess this summer. Ted played football last. I did go to one of

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 211 of 318

Jerri Jo's basketball games -- um -- on one weekend, or some- think here just while back.

Q Okay, have they ever been involved with sports activities prior to that -- to this time?

A They have ball gloves at the house. They have balls at the house. We play ball.

Q You played ball with them?

A Yes, sir.

Q Who would generally put Teddy, Tommy, and Jerri Jo to bed?

A I will say, at the house, me as much as her.

Q Now, does this mean prior to the separation?

A Yes, sir.

Q Okay, prior to the separation were you giving them -- did they get a bath every night or how was that handled?

A They more than had -- if they needed a bath, they got a bath. Yes, sir.

Q In the morning who got them up?

A I say the alarm went off they kinda all got up.

Q Okay. Now, during the visitation times that you had with them --

THE COURT: Mr. Glass, let's take our noon recess now. We'll be in recess until 1:30.

(After noon recess, the following proceedings were had:)

THE COURT: Mr. Kleiner, you are still under oath

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 212 of 318

in this matter.
A Yes, sir.
THE COURT: Mr. Glass.
BY MR. GLASS:
Q Will you state your name for the record, please?
A Jack Glen Kleiner.
Q Are you the same Jack Glen Kleiner who has previously testified in this matter?
A Yes, sir.
Q Mr. Kleiner, up to, since the separation -- I'm sorry, yes, since in your visitation -- um -- when you have had the children -- um -- since your separation and on May 29, can you tell me about the bedtime activities, for example, what time did the youngest child go to bed?
A Youngest child there wasn't no set time. We never had. If there was a T.V. program or something like that on, I let'em stay a little longer, but there was no set bedtime, at all. By ten for sure ever night. But, like I say, they -- it wasn't any exactly -- I didn't have nothin' to hide or that from'em like has been in the last year. They had their normal activity they get plenty of rest right at the house, and they had no certain bedtime, but yet they still got plenty of sleep and able to get picked up the bus bright and early for the morning or be ready to go, and healthy and rested.
Q Okay, and did you -- concerning all the children, did you

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 213 of 318

see to it that they -- have you seen to it that they have regular baths and things of that nature?

A Yes, sir. There was no problem there, as far as their cleanliness, or even we'd tell'em, like I say, to be clean and try, like I say.

Q Okay. Now, do you -- or how do you handle washing their clothes?

A Washer and dryer right in the house.

Q Okay, do you wash clothes for them while they're with you for visitation?

A Yes, sir. Yes, sir.

Q All right. Okay. Now, have you noticed any changes in the children, in their, I suppose relationship to you -- um -- since you last saw them over your Christmas visitation? Can you speak to that?

A Extremely. Yes. There's -- just like they're here in body only today, they're not here in soul. I guarantee you their minds is else where. It's been twisted, I guarantee you. I seen them out front for the first time, we both threw arms around Jerri Jo and Teddy, but it's just I seen -- said would you care to come over and talk to Penny and I, the reason for they've been cut down and stuck in back for some reason --

MR. WHITE: Objection, Your Honor. Again, I'd like to specify how they been cut down.

A Somehow their minds --

THE COURT: Wait a minute. Wait a minute, Mr. Kleiner, just stop your answer. And you can get it on cross. Mr. Glass.

Q Now, why -- how have -- has their actions changed toward you?

A Um -- get away, dad, you've done somethin' wrong.

Q All right, what -- why do you feel that way?

A You can even see it in their eyes, Ed. They're scared. They're scared. When I walked -- when they had their arms around me they was scared of what their mother or whoever back there might do.

Q Did you -- have you noticed any changes in the children since the children have been around your wife and Mr. Bowman and his family?

A This is extremely what I'm talkin' about, yes. And they even come out there and taken a day or so to get them back in the graces of the place, it's their home they're welcome to use the phone anything at the house. And like I say they cannot do or call or --

Q Do the children ever phone you at all from --

A No. No. And they do want to.

Q How do you know that?

A They've told me many times in the past that her and him have said get off phone, there's their phone they got three or four of'em at the house.

Q All right, do you feel that your wife has influenced your children against you?
A Yes, I do.
Q Why would your wife influence your children against you?
A The hatred and love for -- her love for Richard Bowman, that she thinks she has. Thinkin' he is a big man which he's nobody in another year when Ms. Davis throws him out on his ears.
Q Are you of the opinion that your wife would do almost anything to defeat your custody request?
MR. WHITE: Objection, Your Honor, that's leading.
THE COURT: Sustained.
A I can answer?
Q No. When you've had the children have they said anything to you about what goes on between your wife and the Bowman family, or particularly Richard Bowman?
A There are noises in the house --
MR. WHITE: Your Honor, I'm gonna object and ask him to be more specific if a child spoke to him, which child, and when that was.
Q Okay, I will do that. Can you tell me, first off, which child has talking to you, if any of them are.
A Yes, sir. Hopefully they're protected by the Lord, and I know their --
Q Please just answer the --

A Teddy, Tommy, and Jerri all three have told me.
Q When?
A November 25. I don't even know that was the date back there, one of their visitin' days ever other week supposedly.
Q Why particularly on that visitation, do you know?
A It's things that's happened periodically in the past or things that they've seen and heard.
Q Okay, what do they tell you on that visitation?
A About noises in the bedroom about them two on the couch out in the living room when they was supposed to be in bed, comin' out and bein' sick and wantin' help and they were refused help; about his shorts -- his shorts hangin' in her closet, the clothes; and the filth; and their not eating; and things like that; noodles for breakfast and things like that. The whole household and isn't big enough for our children, let alone his two and him and her together. It's still a little old three bedroom house where she said bigger house it wasn't a bigger house. They booted out on East Second because of the creation of its problem.
Q Who told you that they refused -- that they were refused help?
A What help?
Q Which child told you that they were refused?
A Teddy, Tommy, and Jerri, all three.
Q What sort of help were they looking for?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 217 of 318

A They was either sick at their stomach or needed some love that evening. And nine o'clock or before, because like I say they made 'em go to bed ever night and nine o'clock sharp and be there.

Q Okay, when they -- this love or attention was refused what did the children tell you your wife and Mr. Bowman were doing?

A Makin' love, you know, not intercourse, but like I say patsy-patsy handsy-handsy and arm around the necky. And --

Q Okay. Have any of your children ever said anything to you during your visitation about -- um -- the correction or the discipline that they received from Bowman's?

A Yes, sir.

Q I'm talking about from your -- not from your wife, but from Mr. Bowman?

A Yes, sir.

Q Can you tell me about when this has occurred, if you can?

MR. WHITE: Your Honor, before he answers I'd like to object to the continuing hearsay testimony. I -- um -- my client, I believe, was refused to relate items children have told her in her testimony and I'd ask that the Court deny the questions as to what the children have told Mr. Kleiner. The children are the best people to testify as to that.

MR. GLASS: Your Honor, in response of this, of course, Mr. White certainly have the opportunity to cross

examine the witness. But, it's our impression and we're trying to show you that Mrs. Kleiner and this fellow, Bowman, have so influenced these children that they're not going to say anything at all about what's really going on. We know that the children -- I'm sorry, Mr. Kleiner can testify as to what the children have said to him, and we feel it's very relevant for you to hear this. But, of course, whatever your ruling is we will abide by it.

MR. WHITE: Your Honor, there's absolutely no way for us to -- um -- outside from calling the children in there to prove or disprove of Mr. Kleiner saying on the stand as to what they've told him. And it's hearsay.

MR. GLASS: Your Honor, some of it may have been in front of other people. I don't know. I can find out.

THE COURT: I'm gonna let him testify. I'm pretty close to referring this case to Juvenile Authorities. I'm gonna let him testify.

BY MR. GLASS:

Q Okay, Jack, can you tell us about the feeling -- I'm sorry, what any of the children, and which child has talked about discipline by the -- by Mr. Bowman?

A The main one is the chokin' deal between Teddy and Richard Bowman.

Q When did that occur?

A It happened back in November, December or even before

that one. I wasn't even, like I say, I wish I could've been there. And it was a good chokin' incidence. Teddy, I think at the time did see have a time from the neck chokin' incidence. It was not only my boy and Richard Bowman doin' any chokin' to my boy, too. Another time made my little Tom wet his pants right in the vehicle just 'cause of his prerogative. You just wait there right in the car. You just wait in that car and shut your mouth. Where made him wet his pants and boy six years old still got a right to stop a car and open the door and wet outside the door anyhow.

Q Okay, have any of your children during the time of your visitation ever -- well, strike that. Was there ever anyone in your presence when the children had talked about these things you've just testified to?

A I sure they was, Ed. But, no one to stand by me, no.

Q None of your daughters were present?

A Um -- sure. If you ask Penny she remember. She tell the truth, I tell you that.

Q All right. Now, in the event that the Court would see fit to grant you the care, custody, and control of these children, what sort of plan do you have for taking care of them?

A Depended on the house or they have to sell or not. They would get on the bus same way. Like if I had'em in the morning they would get on bus to go to school first thing in the

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 220 of 318

morning. Guarantee you be someone protective custody like phone call. They have to at school, whoever needs phone, I guarantee I'll be there. If not, my daughter would also be there.

Q Okay, who would take care of the children in the day during the day after school?

A Penny Kleiner.

Q Now, have you talked to Penny about this?

A Yes, sir.

Q All right, does she now live with you at the trailer?

A No. She has her own home.

Q How would the children get home from school?

A The bus picks'em up right at our driveway, which is half a block from the house, and same way, leaves'em in the evening.

Q All right. Now, are there any other children that get off at the same stop?

A Not at that, right up on half quarter of mile up right at the top of the hill and Keith and Norma's boy.

Q Are the children used to boarding and getting off the bus at this point?

A Yes, sir.

Q Okay. Have you discussed with Mrs. Kleiner -- I'm sorry, Miss Kleiner, Penny Kleiner, who would prepare their meals and so forth for them for the evening meal?

A I haven't put that many dreams on it, which I do want, Ed.

But, there will be no problem there. I'll guarantee you things would really work. I guarantee you they would work hundred percent.

Q Okay. Um -- now, if Mrs. -- if Penny Kleiner were ill or couldn't be there, is there anybody else that can pick them up or be there with them in the afternoon?

A I have Jackie Kleiner (phonetics), which is my daughter. I always have Penny Kleiner which could make it. They live in Owasso, make it in a moment, or be there before. I guarantee.

Q Okay, so -- all right, would there be a need for baby-sitters -- um -- after school if the Court would see fit to give you custody?

A No need for babysitter no way, shape, or form I guarantee you.

Q All right. Do your children know your daughters that you've referred to?

A They do know'em.

Q Jack, do you know if we identified these children -- I'm sorry, I can't remember. What are the names of your other children?

A Jackie is my younger daughter, and Penny is my older daughter.

Q Okay, and how old is Penny?

A Age, I -- dates, Ed, I'm serious, I just neglected to keep any. I'm sorry, I don't.

Q All right, they're adults?
A You bet.
Q All right. Um -- Jack, have you given any thought to the responsibility that you would have if this Court were to grant you the custody of these kids?
A I guarantee you the responsibility, I guarantee I wouldn't need Welfare or anythin' like that, or food stamps or nothin' like that. I guarantee you I man enough that I can work and handle 'em. I guarantee and take good care of'em.
Q Okay, do you feel that you are qualified?
A Yes, sir.
Q Suppose during the day the school were to call and say Mr. Kleiner,Tommy has got the flu, and must go home.
A Uh-huh.
Q What would be your proposed solution?
A This happened here while back which the school wasn't even supposed to have my phone number, but the school burnt here at Sperry here just a while back, and Richard Bowman and everybody number, but Jack Kleiners, this one gal of Tommy's the teacher, Marth someone I have her number, at the school called me and I says she says where does Judy work and I said --
Q You can't testify to what she said.
A But, anyway she says --
MR. WHITE: Objection.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 223 of 318

Q You can't testify.
A Someone has to pick the children up.
Q Okay, and who did?
A I picked'em up. I picked'em up.
Q Okay.
A And took to the house.
Q In an emergency you could leave your --
A You bet.
Q All right. If -- if it were -- is it possible that Penny, or your other daughter could pick up the children if it were necessary?
A Yes. Yes.
Q Do you have any plans for anyone to live in the mobile -- I'm sorry, assuming the Court gave you the mobile as well.
A If I keep them children, I talked to Penny in a moment, like I say, I would be more than glad to have Penny and her, you know, children move in with, I guarantee we make it.
Q All right. Now, I'm catching something here, so let's go right to the point. Um -- you have any sexual desires for your daughter?
A No. No. No. No, sir. Those are my daughters. I don't have any for any of my daughters no way.
Q That is fine. That is fine. I have a little glint there I thought you ought to answer that question. You feel that -- do you need to have anybody live there in the mobile with you,

as matter of fact, and take care of those children well?

A No. No. They can be taken care of good without. But, like I say there again if Penny would be willin', and like I say there is no problem there either. It'd be a helpin' hand to her, too.

Q Okay. How are the children doing in school, do you know?

A I don't, Ed. I seen a report card, that's been months ago. And no I don't.

Q Has your wife volunteered any information to you?

A No.

Q Have you ever helped any of your children with their school work?

A Yes, I have. Yes, I have.

Q Okay. Jack, how far did you go in school?

A Eleventh grade.

Q How far did your wife go in school, do you know?

A I think the same way.

Q Okay. Are you a high school graduate through a test or anything?

A No. No. No.

Q What sort of personal relaxing would you propose to be involved in, or have you given it any thought if the Court would grant you these children -- um -- how would you get away from it all?

A Um -- from my own personal or with the children?

Q You yourself.

Q Me myself it'd be joy just to watch'em out there. I guarantee you you wouldn't -- them kids and me and them animals get along good. I think.

Q Okay, are you -- do you feel that your children have a strong feeling for that farm?

A I believe at one time, yes. I believe at one time, I hope it's still there.

Q Okay, Jack, why would you think that this Court should grant you the custody of these children and not your wife?

A I feel I'm more capable moneywise, workwise, and still protective and takin' care of'em. I'm not too good to hide my name and number and come and get'em or be there in a moment and just like I say, turn around and wouldn't -- like the last year if my children for need her they'll be taken to her. Same way phonewise, or whatever, they'll have her.

Q Okay.

A Even livin' with me in full custody.

Q What sort of visitation would you want the children to have with Mrs. Kleiner?

A I'd let'em kinda pick'em out between'em, you know. I would want'em kinda let'em kinda work that out.

Q What if the Court were to say gonna give Mrs. Kleiner every other weekend and a month in the summertime, every other holiday, standard visitation time, wish that she see

as much of her, do you have any problem with something like that?
A No. No.
Q Do you have any problem with a long period of time in the summertime with the mother?
A I'd miss'em. But, I could survive.
Q Okay, you are not seeking any child support from her, are you?
A No.
Q Now, concerning the mobile home, in the event the Court would grant you the children, would you want the Court to grant you the mobile home and the property?
A Ed, I tell you I get them children it wouldn't matter. I'd sell that place and be on another little three acre ponderosa, and make them children be -- there's guarantee you in full, and I guarantee you they'd be happy. Ask Teddy about a duck chasin' 'em and that should turn --
Q If you were to have the homestead and the grounds, and say the Court would order you to pay your wife half of the equity which is considerable; your testimony, my friend, is that there's $3,000 or less left on the loan and it's worth $20,000, we're talking about a lot of money.
A True.
Q You willing to pay her half?
A If I can't get the children. You bet.

Q Now, do you need that property if the Court were to grant you the children, and say in its wisdom grant to your wife the property, do you feel you need that property to successfully raise your children?
A No. No, sir.
Q You love your kids?
A You betcha.
Q What's it feel like when you come in from a hard day at work? Describe to me your feelings when you see those little kids running up the hallway, dad I'm glad your home?
A It was a tremendous hug I got from out here I feel the same way there, too. I guarantee ya' precious, I guarantee you.
Q Okay. Now, has there ever been a prior divorce action in this case between you and your wife?
A Yeah. Bill Ladd.
Q No. Isn't this a continuation of same?
A Well, whatever.
Q Okay.
A It's different written, or whatever.
Q Now, in the event the Court would find in making its decision in this case, that you owe some arrearage in child support, are you willing to pay that arrearage in child support to Mrs. Kleiner?
A If that's what --

Q Do you know what I mean?
A If they can prove I'm in the back, and well I --
Q That's what I'm getting --
A What about my children? I been out of those for a time, she held'em out on account of her lawyer.
Q Well, that's up the Court. Excuse me, Judge, I'm --
A I gave you that, Ed. That is deed and tract on the house, isn't it?
THE COURT: Mr. Kleiner.
A I'm sorry.
Q Hand you Defendant's Exhibit Number Six, will you take a look at that and tell me if you can, what it is?
A This is our home, three and a quarter acres, on Route Two, Northwest of Sperry, home and mobile home. This is our -- the deed that Ted and Nadene that we pay them for the house on.
Q What is title of the document?
A Contract for deed.
Q And do you recognize the signatures on it?
A Yes, sir.
Q Well, who are the signatures?
A Nadene Salsbury, Jack Kleiner, and Judy Kleiner.
Q Okay, is that the document that you have previously referred to?
A Yeah.

Q That sets the debt to Mr. -- well, you said to Ted?
A Salsbury. Nadene also.
MR. GLASS: All right, Your Honor, to aid the Court, we move to admit this contract for deed.
MR. WHITE: No objection.
THE COURT: Defendant's Exhibit Number Six will be admitted.
BY MR. GLASS:
Q Okay, Mr. Kleiner, who lives currently at the homestead besides yourself?
A My other boy from Kansas. But, he's with Becky (phonetics) over in Owasso right now for a few days. Timmy Kleiner my oldest boy from Kansas has been there.
Q If the Court were to grant you the custody would he still remain?
A If there's any problem he wouldn't, but he would. He's tryin' to look for a job and get hisself position.
Q How old is he?
A 29.
Q Has there been anything that has lead you to believe that your children are not eating properly when they're with their mother and Mr. Bowman?
MR. WHITE: Your Honor, I'm gonna object question, as leading.
THE COURT; Overruled.

A More than once they -- Ted and Tom they've come out to the place like they're -- and Jerri, and like I say, immediately headed for the food on account, and like I say, they mentioned in the past they was fixin' -- welcome in my house to go over to the house to fix what they want to eat. Especially when I bring'em home like that they're hungry, and extremely hungry. They've noodles they've had for breakfast and things like that made by Richard Bowman and Lisa Headburg. Many a times.

MR. GLASS: I think that's all the direct.

THE COURT: Mr. White, cross examine?

CROSS EXAMINATION

BY MR. WHITE:

Q Mr. Kleiner, I'm gonna change gears a little bit, and let's go back to the beginning of your testimony which dealt primarily with finances. You've answered several of my questions so, I'll be brief as possible. You owe approximately $3,000 against your property, is that correct?

A Yeah.

Q Wasn't that property listed for sale with a real estate agent?

A Uh-huh.

Q Who was that listed with?

A Two of'em. Last one was -- oh -- Ted Salsbury's sister out of Skiatook.

Q Judy Marrs (phonetics) have been one of them?

A Julie Marrs?

Q Judy Marrs in Skiatook.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 231 of 318

A That might've been her name. I don't really know. There was a Skiatook place, yes.

Q Do you remember what it was listed for?

A 30. 35.

Q So, apparently at that point and time, anyway, you felt it was possible to get 30, 35,000 for this property?

A If we're interested in raisin' a value of the place put 35. I'm not depreciatin' the place, sir. I mean real estate, they couldn't sell it.

THE COURT: Mr. Kleiner, now, I gave you a lot of leeway when you're answering your attorney. I'm not gonna give you that leeway now. You answer the question and that is it.

A All right.

Q Did you at one time feel the property was worth 30 to $35,000?

A Yes.

Q Okay, and if this Court saw fit to award you title to this property you will be willing and able to pay Mrs. Kleiner her share of the equity, is that correct?

THE COURT: Doesn't matter if he's willing or able to or not, Mr. White. If that's what I order, that's what he does.

Q Mr. Kleiner, you testified on direct examination that your income is $1800 to $2,000 a month, is that correct?

A Yes.

Q And that is take home, isn't it?

MR. GLASS: I believe that was the stipulation.

THE COURT: That is the stipulation.

Q Okay, I just wanted to clear that up. You testified that there are a life insurance policy on your life and on the children's lives?

A My three children, yes.

Q You weren't sure if it was whole life insurance or term life insurance?

A I got the policy at home, I bring'em show you.

Q Okay, and you have no health insurance?

A No.

Q On yourself or the kids?

A No.

Q Or no retirement benefits for your employment?

A No.

Q Mr. Kleiner, you stated during your direct examination that you sold -- sold a number of items of property?

A Yes.

Q And took place since you and your wife have been separated?

A Yes.

Q Um -- and I like again to review that so we can attempt to total up the value -- that the dollars obtained from selling items.

A All righty.

Q I think I've got them. I'll review them, if I miss something, please advise me of such an omission. You sold -- um -- a jersey cow for $300?

A Uh-huh.

Q You sold a calf for $100?

A Yes, sir.
Q You sold two hogs for $250?
A Two hogs and some little pigs.
Q Okay. And you sold -- um -- a metal chain saw, did I understand you?
A No. Those were stolen or taken away by two trailer loads or three.
Q Okay, you sold a trailer for $400?
A Yes, sir.
Q And you still have the lawnmower or did you sell that?
A I have the ridin' lawnmower.
Q Okay --
A Froze stuck. I sell it for a $100 or be worth a $100.
Q Did you sell anything else for -- you sold a typewriter or you gave it away?
A I gave a typewriter away.
Q Did you sell anything else?
A To my knowledge that's it.
Q And you've also given away a number of items since you been separated?
A You betchas.
Q And I will try to inventory those items. If I miss something please let me know.
A Sure.
Q You gave away the typewriter?
A Yes.
Q You gave away some hogs, did you testify?
A Yeah. I gave a few hogs away to my friends.

Q What are those hogs worth, sir?
A Baby pigs worth 20 bucks a piece.
Q And hog?
A Five.
Q You gave away a $100 worth of --
A Yeah. Uh-huh.
Q And did I understand you to say that you gave some hog feeders?
A One.
Q A hog feeder and what's that hog feeder worth?
A $20.
Q Okay, and cement blocks?
A Cement blocks.
Q What are the cement blocks for?
A They were given to us and like I say, I think the -- got a nickel a piece for'em. Told a man to get'em out of there, they was around the house there.
Q They didn't have any value to your --
A I might've somewhere on the farm used'em if I had a farm.
Q Okay, did you give anything else away, sir?
A Like what?
Q Um -- I don't know. Any property of any sort to anyone that has any value?
A I just told'em to get in there, like I say, whatever get it out of there.
Q Okay. I'm going to review with you your pretrial financial statement. Um -- you -- I'm referring to the last page. Now, you state that your total monthly expenses are

$1600?

A Uh-huh.

Q Okay, as part of those expenses you list food and household supplies at $240 a month?

A Uh-huh.

Q What does that include, sir?

A Soap, water -- soap, washing and kitchen and hand soap. Groceries. And that means food like hamburger. Um -- got some in the freezer right now I plan to eat this weekend. Um -- I probably spend 50, 60 bucks ever week I go to the grocery store, guarantee you it gets that.

Q On this $240 a month, how many people are you feeding?

A Myself and if I got a friend comes out on the weekend. My daughter or anything like that, like I say they're welcome they normally help cook the meals and then like that, yes. Uh-huh.

Q So, you are well stocked with food I take it?

A I don't think anyone ever been to my house and went hungry.

Q Okay you list also $300 a month for payment of child support from a prior marriage I assume, is that right?

A No. I better look at that one myself. I think this is pertainin' to what I've been payin'. 234, sorry about that. I guess that's what it pertainin' to, my children I'm payin' for right now. In '84.

Q This $300 figure is inaccurate then, isn't it?

A Yeah. 234 in the past.

Q You mean children were primarily where it was --

A These right here, yes.
Q Okay, you listed a 1978 Chevrolet pickup truck?
A Uh-huh.
Q And you list -- stated here that there's $972 owed against it?
A Yes, sir. Uh-huh.
Q And that's owed to F. and M. Bank?
A Uh-huh. Yeah.
Q Was any of this money borrowed after you and Mrs. Kleiner separated?
A Yeah. There was -- I had to get my truck overhauled.
Q And how much did you borrow?
A I think 900 and something like that.
Q So, most, if not all of this $900 is money you borrowed since you been separated?
A Yeah. Uh-huh.
Q Okay, Mr. Kleiner, do you recall coming to court last August with Mr. Ladd on a hearing in this matter?
A Yeah. I sure do.
Q Temporary order. And you recall Mr. Ladd meeting with me and agreement being made as to temporary order for the status quo of the finances?
A Didn't get fulfilled, like I say I remember being there.
THE COURT: Mr. Kleiner, just answer the question.
Q Did Mr. -- I don't want to breach attorney/client, but were you aware of the contents of that order?
A Like what are you referring to?
Q Do you know what the order said?

A No. I guess I don't.
Q Did you ever read it?
A I don't know that I ever do.
Q Did Mr. Ladd give you a copy of it?
A I don't know that I have or not. Do you have a copy I can read?
Q I'm sure there was one in the court file. I'm sure Mr. Glass has one.
THE COURT: Let's not banter, gentlemen. Let's just --
Q Mr. Kleiner -- um -- are you aware that child support in that temporary order, and I understand the impression you had to pay the Department, but did you understand that order stated that you were to pay $375 a month in child support?
A The right hand --
Q Do you understand that's what the order said, all I'm asking.
A Like I say --
Q That's all I'm --
THE COURT: Yes or no, Mr. Kleiner.
A No. I didn't understand.
Q Mr. Kleiner, did you understand the visitation priviledge you were given pursuant to that order?
A No. They weren't fulfilled, no.
Q Did you understand the visitation priviledges as set forth in that order?
A No, I didn't.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 238 of 318

Q You didn't what?
A No. Because none of'em were fulfilled.
THE COURT: Mr. Kleiner.
Q Did you understand it? I'm not asking if they were fulfilled; did you understand what the order said in regard to visitation?
A I guess that I was supposed to get them ever other week.
Q Okay, and you testified -- um -- when your attorney was asking you questions, that on Christmas you were given the children, weren't you?
A Uh-huh.
Q Christmas morning at eight o'clock?
A I didn't get'em at Christmas.
Q What day was it at eight o'clock?
A The next day.
Q The day after Christmas?
A Yeah. Uh-huh.
Q What day of the week was that?
A I don't know.
Q And you kept the children that day, and then the day after that?
A Couple of other days.
Q Couple of other days?
A Sure.
Q When did you plan on bringing them back?
A Well, I's lucky enough, I hope for never.
Q That was your intent, was it?
A No. No. No, that wasn't.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 239 of 318

Q Okay, when did you intend to bring them back?
A I'd hoped -- hearing comin' up --
Q When were you going to bring the children back? Answer my question.
A I might've brought'em back the next week. I guarantee you been in school.
Q Wasn't this during the holiday?
A Yeah. Uh-huh.
Q Did you ever tell Mrs. Kleiner that you were gonna keep the children for a week?
A Uh-huh. No.
Q Did you tell her how long you were gonna keep the children?
A No.
Q Why not?
A Because she was too busy with Richard Bowman, that's why.
Q That is your only reason?
A Well, that and part of others.
Q Temporary order say you can keep the children for a week during the Christmas time?
A Christmas, yes. That's Christmas.
Q You keep the children for a week?
A It said Christmas.
Q Okay, did you have any discussions with Mrs. Kleiner regarding --
A No. She was too busy.
THE COURT: Mr. Kleiner, let him finish the question.

A Okay.
Q Just answer my questions. I don't want your interpretations. Did you have any discussion with Mrs. Kleiner --
A None.
Q -- the return.
A No.
Q You never -- if you were gonna bring the children back?
A No.
Q Never?
A No.
Q The first time you talked to her before you got the children was here in the courtroom?
A Yeah. Uh-huh.
Q And you stated that -- um -- your next visitation was sometime in early part of January, is that right?
A Supposed to've been January the 12 somewhere. 11th or 12th somewhere in there.
Q And Mr. Kleiner, did you ever make any statement to anyone in the presence of any of your children that you were strongly considering taking the children to Kansas --
A No, I did not.
THE COURT: Mr. Kleiner, let him finish the question.
Q -- Oklahoma City -- Kansas, or Oklahoma City to keep them away from their mother?
A No, I did not.
Q You never said that?
A No, I did not.
Q And if one of your children told the Judge that, he'd be

lying?

A If you say so. I did not.

Q Mr. Kleiner, I'm gonna go back to our child support order. You were paying $234 a month to the Department of Human Services, weren't you?

A Yes.

Q And your payment went from time this divorce was filed up through December, didn't they? December of 1984?

A What are you askin' me?

Q Is that how long you make payments on this?

A I -- um -- yes.

Q You paid $234?

A You bet.

Q And you understand, don't you, that Mrs. Kleiner was off any financial aid from the County of any sort December 1st, 1984, don't you?

A No, I don't.

Q Didn't your attorney show you a letter?

A You said any aid, did you not. You said any aid, did you not?

Q Okay.

A Richard Bowman.

Q That's County I'm talking about.

A Oh, just County. No, I guess she was.

Q Did you make a child support payment for the month of January to anybody?

A No. Not to my knowledge. I don't know.

Q Okay, did you make a child support payment for the month of February?

A No.
Q To anybody. Did you make a child support payment for the month of March to anybody?
A No. I haven't seen my children.
Q That's why you haven't paid?
A That's right.
Q Thank you.
A A hundred percent.
Q Let's talk about the children for a minute. You testified that while you and Mrs. Kleiner lived together that you spent time with the boys, but you really never spent any time with Jerri Jo?
A I spent time with Jerri Jo. You said I didn't. You misinterpreted that I don't have time. The farm there I guarantee Jerri's been around.
Q But, you haven't spent as much time with Jerri Jo as you have with the boys?
A No. You're right.
Q And you're not as close to Jerri Jo as you are with the boys?
A Yeah, I say I'm just as close if not closer. We're three peas in a pod. Fact, our team the -K- team, you know the -A- team, but the -K- team. Jerri Jo, she drummed that one up. That's bein' time spent with playin' around the house.
Q Answer the question.
A I did answer it.
Q That's what I say, you haven't answered the question. Mr. Kleiner, you testified that you normally drink a half

gallon a week of rum?

A Uh-huh.

Q Buy a half gallon?

A I buy a half gallon of rum ever week.

Q How many drinks does that translate into an average normal evening?

A I drink two, maybe ever week evening, one or whatever. And go to bet if there's friend on the weekend comes out it will be drank up, probably.

Q You don't drink more than one or two drinks in any normal average evening?

A I don't know if you're drinkin' man, can you judge your drinkin' durin' the night. I say approximately that's what I drink a night. Maybe one or two a night. It isn't ever night either.

Q Did you drink more alcohol on the weekends than on -- or during the week?

A Be hard to say, because weekends I haven't even had a drop.

Q Do you drink any other type of alcohol besides rum?

A No.

Q You don't drink beer, or you don't drink wine, or anything else?

A No.

Q Just rum. Do you drink in front of the children most of the time?

A Oh, yeah. Yeah.

Q Have you ever given the children any alcohol?

A My wife has. And I have, too.

THE COURT: Sir. Did you ever?

A Yes, sir.

Q And when was this?

A Ever now and then if they come up and want a sniff or whatever. That was all.

Q You given them alcohol on their weekend visit out to the trailer?

A No, sir.

Q Never?

A Well, if you -- I never have, like I say. No, sir.

Q Has your daughter, Penny?

A Oh, now I don't know. You'll have to ask her. She'll be here shortly.

Q You don't know if Penny could have given them alcohol while they were out there on the weekend?

A I don't know. No.

Q Mr. Kleiner, have you ever driven in your automobile after drinking?

A I might've had a drink and given'em a ride, but I was not drunk no way, shape, or form.

Q Have you ever driven them around after drinking for several hours?

A No. Never.

Q Do you recall an incident where Penny's car failed and you had to go out and get the car, and you took the children with you?

A No. I don't.

Q You don't recall that incident. Okay. Mr. Kleiner, you said that if you were granted custody that Penny would be your primary babysitter, if I understood you correctly, that she babysit during the day?

A Yeah. Uh-huh.

Q Okay, and you feel Penny would be a good influence on the children, is that correct?

A I'm sure, if not her, Jackie, one of'em somehow would work into the situation. Um --

Q Which Jackie are you talking about?

A My other daughter.

Q Where's Penny live right now?

A Penny's Sand Springs.

Q She live by herself?

A She got her two children.

Q How about the father?

A I think he's around there.

Q Does he live there?

A I don't really know.

Q You don't know.

A His dad lives right over at the --

Q Is she married to the father of those two children?

A Sir, that's her business. I don't keep track of my --

THE COURT: If you know.

A I don't know.

Q You don't know if your daughter is married?

A I say I don't know.

Q And you don't know that he lives there? You don't know

whether or not he lives with your daughter?

A Yeah. I know he is there.

Q He is there. And is that Jackie Smith?

A I guess, yeah.

Q Jackie Smith often come out and visit you at the trailer with Penny?

A He comes ever now and then. He doesn't come all the time.

Q Has he come out in the past when the children were visiting?

A Yeah.

Q Is Jackie Smith have a drinking problem?

A He might have a drinkin' problem. I haven't noticed it out there on my premises, though.

Q Did he drink alcohol out on the weekends with you?

A He's a beer drinker. I'm sure he take a drink now.

Q He ever get intoxicated while he was out there?

A Not to my knowledge.

Q Do you know whether or not Jackie Smith has ever driven the children around in his car?

A If so, it'd be over Ernie's or some place like that. But, not to my knowledge, no.

Q Not to your knowledge, they never been in his car when he was driving?

A I can't think of a reason, maybe so.

Q Jackie Smith, to your knowledge ever driven his vehicle after becoming intoxicated?

A Oh, I'm sure he has.

MR. GLASS: Your Honor, I'm gonna object to the relevancy here. It seems to me whether Jackie Smith drives after drinking is, unless it's tied to the children, is absolutely irrelevant.

THE COURT: Overruled. Been sufficient connection.

Q How old is Penny?
A 26, somewhere like that.
Q 26, and where did Penny grow up?
A Manhattan and here.
Q Did she spend most of her childhood with your former wife?
A Yes.

THE COURT: Let's not get carried away, Mr. White.

MR. WHITE: I've got a connection, Your Honor.

BY MR. WHITE:

Q Um -- did Penny ever spend any time in a girl's home?
A I'm sure she did, yeah.
Q For fighting, is that right?
A Yeah. Uh-huh.
Q And do you know the circumstances surrounding that, Mr. Kleiner?
A No, I don't.
Q Do you know how long she was in the girl's home for fighting?
A No. That was -- Judy had run her off before then, so I don't know.
Q I'm just asking the question, do you know, sir?
A I don't know.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 248 of 318

Q You don't know the circumstances?
A Huh-uh.
Q You don't know how long she was in the girl's home?
A Huh-uh.
Q Has Penny ever been in jail?
A Once again, Penny be here shortly, I don't know her life, like I say.
Q You don't know whether your daughter's ever been in jail?
A Not been, I guess.
Q Just answer my question.
A I don't know. I don't know.
Q You are not aware of an incident in Owasso where she was put in jail?
A No.
MR. GLASS: Your Honor, seems to me it was asked and answered.
THE COURT: Sustained.
Q Have you ever known Penny to take drugs?
A I known my wife and Penny to take drugs.
Q Penny taking drugs?
A My wife and Penny, yes, sir.
THE COURT: Mr. Kleiner --
MR. WHITE: Admonish the witness --
THE COURT: -- he is not asking about your wife, he's asking about Penny.
BY MR. WHITE:
Q What type of drugs has Penny taken?
A I think they was smokin'.

Q Penny was smoking marijuana, is that correct?
A Penny and Judy, yes.
Q How often does Penny smoke marijuana?
A I never seen her since she been out to see me once.
Q She ever smoke marijuana on your property?
A None whatsoever. I don't allow it into my house.
Q Okay, do you know an individual that goes by the name of T.J.?
A T.J. No, I don't.
Q Friend of Penny's?
A Penny had a friend, yeah. A gal, yeah.
Q Could her name have been T.J.?
A Possible, yeah.
Q And did she spend some time living at your trailer?
A She came out there one evening, cleaned the house through the day. Yeah, uh-huh.
Q She sleep at your trailer?
A Yeah. Yeah.
Q And stayed overnight at your trailer when the kids were there?
A Yeah.
Q And stayed overnight at the trailer when you were there, didn't she?
A Yeah.
Q Do you know --
A Slept in her own room.
Q Do you know how old T.J. is?
A 40.


TULSA COUNTY
OFFICIAL TRANSCRIPT

Q 40. And she's a friend of Penny's?
A Used to be.
Q Why was T.J. there?
A She cleaned the house.
Q Is normal for someone to come out and clean the house spend the night?
A If my children are there, and I ask'em, yeah.
Q And why did you ask her to spend the night?
A Maybe help cook a meal, or clean further into the evening or whatever.
Q How long have you known T.J.?
A I haven't.
Q You haven't?
A Huh-uh.
Q You don't know. You know her, don't you? Have you met her?
A One time.
Q And the one time you met her spent the night?
A Yeah. 'Cause I wanted my house clean.
Q Know anything about her at all?
A No, I didn't.
Q Do you know whether or not T.J. takes drugs?
A I don't know a thing about it, sir. I don't keep track another person's life on that.
Q Mr. Kleiner, you testified about an individual by the name of Jeff Bates?
A Yeah. The man with Lisa. You bet.
Q That's right. The man with Lisa, and you testified that


TULSA COUNTY
OFFICIAL TRANSCRIPT

you know that Mr. Bates has had sexual intercourse with Lisa?
A I never seen'em done it, but it was done. And supposed --
THE COURT: Mr. Kleiner, let him finish his question.
A Okay.
Q You testified that you caught Mr. Bates, I believe that is name he is been going by, and I refer to in this courtroom you caught Mr. Bates crawling down the hall with his jeans and his T-shirt on?
A More than once.
Q More than once. And because you caught him crawling down the hall you assumed that he was on his way to have sexual intercourse with your stepdaughter, is that right?
A Uh-huh.
Q And that is only evidence that you have of that, isn't it?
A No. Do you want the evidence?
Q That is only evidence?
A I'll tell you the --
THE COURT: Mr. Kleiner, I don't want to tell you, again.
A I'm sorry, Your Honor.
Q Mr. Kleiner, you testified that on at least one occasion you hit Patti, your stepdaughter, with your open hand?
A Uh-huh.
Q Have you ever hit Lisa with your open hand, or your closed fist?
A Yes. No, not with closed fist. Open hand.

Q In the face?
A Not to my knowledge. Shoulder or whatever.
Q And on how many occasions have you hit Lisa that you can recall, or approximately how many?
A Seven. Eight.
Q And how long -- how many times have you hit Patti?
A Probably as many.
Q Seven or eight times?
A Uh-huh.
Q Were you drinking at these times?
A I'm sure I was at one time or another, yeah.
Q Okay, Mr. Kleiner, have you been intoxicated in the last six months?
A I drank. I don't know that I have been passed out or anything like that to my knowledge.
Q Well, have you been intoxicated -- you been under the influence of alcohol?
A Oh, yeah I drink.
Q And approximately the last six months how many times have you been under the influence of alcohol?
A Well, ever time you take a drink, so I understand it. So, I guess half the time maybe.
Q Half of you waking hours, or half --
A Oh, no. No. No.
Q Half the evenings? Half the days, is that what you're saying?
A From when I get home at night, ten o'clock at night. 10:30.
Q What do your children think about alcohol? Have

they ever talked to you about it?
A My little one have never said a thing in the past.
Q Do you think it's good for your children to see you drinking day in and day out?
A Sir, if I have to quit right now for my children, I'll quit drinkin' I guarantee you. Ain't no problem there. Ain't no problem there. I don't need it like some people do.
Q Please just answer my question.
A I did.
Q Mr. Kleiner, you testified that your children have made comments to you about things that have gone on at Mrs. Kleiner's home?
A Miss Bowman's home, yeah.
Q If you could, sir, repeat for me these allegations and how made them?
A What allegations?
Q The ones that your children made to you about what went on at your wife's home?
A Um -- about the shorts and is that what you're talkin' about? The shorts hung in the closet, his shorts? Teddy, Jerri, and Tommy. They better not get a spankin' for that, either.
Q Mr. Kleiner, what did Teddy tell you?
A Just what I told you.
Q About -- tell me again.
A Um -- about them, like I say, wakin' up on account of noise in a bedroom which Judy and Richard's in. Richard Bowman and Judy supposedly Kleiner.

Q And when did Teddy tell you this?
A Once again, back November.
Q Back in November?
A When it was cool, to keep warm, you know.
Q And you believe if Teddy went back, without you or Mrs. Kleiner, and the Judge's chambers, that you --
A Today, he --
Q -- tellin' you?
A -- he would not. No, he wouldn't.
Q Did Teddy tell you anything else that you think he might remember if he went back --
A Today, no. They're wiped out. Guarantee you they're brainwashed. It's pitiful.
Q And you feel the children are brainwashed based upon your observations of them out there?
A You bet. You can look and tell.
Q Just answer my question.
A Yes, I do.
Q Now, outside of seeing them out there these last several days, do you have any other evidence that they've been brain-washed?
A In the past when they've come out there to see me, yes I have.
Q Tell me what is this evidence you have that they've been brainwashed?
A You can look in the way to get them back to you -- longer than that, even when they're at their own place out there which is their place, look in their eyes, you can tell by the look

in their eyes.
Q You can tell by the look in their eyes?
A That's right. The way they look and way they feel.
Q And what do they say?
A They don't have to say, you can look and tell, guarantee.
Q By looking in their eyes and look on the face?
A That's right.
Q Is there any other evidence besides the look on their face?
A Evidence from their past future, yes. You're askin' me a question evidence from her past future guarantee ya'.
Q And is that it? Anything else? Any other evidence?
A I'm sure there is. Go ahead.
Q You tell me, is there any other evidence that you have that they have been brainwashed outside of your assumptions about Mrs. Kleiner?
A Do what?
Q Is there any other evidence that you have that they've been brainwashed?
A I guess not. I guess not.
Q You testified, sir, that on one occasion you went out to the building owned by Martha Davis to pick up the children?
A Uh-huh.
Q And that she ordered you off the property?
A That's right.
Q And did you make any threats to her?
A None whatsoever. I says may I see Judy Kleiner, she says

get off my property, this is mine and you don't belong on it.

Q Okay Mr. Kleiner, have you ever talked to the children about the divorce proceedings, and --

A No.

Q And means to them and why you and Mrs. Kleiner are separated?

A No.

Q Have you ever made any comments to the children about the character of Mrs. Kleiner?

A No. I don't know that I have.

Q You never called her any names in front of the children?

A Oh, I'm sure from some -- I guarantee be sure I called her some names, you bet.

Q Tell me what?

A I don't remember or on the date, I don't remember that. I know I did. I don't remember the names.

Q Okay, you're absolutely certain you cannot remember the names you called her in front of your children?

A No, I can't remember.

Q Prostitute, possibly?

A Good possibility.

MR. GLASS: Seems to me he is stuck with his answer.

THE COURT: Overruled.

Q Could you have called her a prostitute?

A Good possibility.

Q A bitch?

A Good possibility.

Q A whore?
A Adulteress, a good possibility.
Q You want the children to love Mrs. Kleiner, or to hate Mrs. Kleiner?
A That there's their prerogative love her and help in that respect toward her no problem whatsoever.
Q Mr. Kleiner, if you thought your wife was going to take the children and to leave the state to avoid your getting custody what would you do?
MR. GLASS: Your Honor, outside the scope of direct merely supposition.
THE COURT: Overruled.
Q You may answer the question, sir.
A Beg your pardon?
Q If you felt Mrs. Kleiner was gonna leave the state and hide the children from you, so you couldn't see them and you had the children with you, what would you do? Would you let her see them?
A Yeah. 'Cause I want my day after I get it, too.
Q You would not attempt to protect the children?
A Oh. Yeah. I protect'em. That's one reason here while back we filed a deal so won't go out state. Which she planned on through this like plan on here in the courtroom.
Q Teddy told you that mommy as soon as you gave him back to her was gonna take him where you couldn't find him, would you give him back to mommy so she could do that?
A Yeah. And put my -- right on her tail, too.
Q Okay. Mr. Kleiner, how many times have you bought

clothes for the children?

A Like I say, once again, I come home handed her the check. She went and not only that --

Q Just answer my question.

A Last --

THE COURT: Mr. Kleiner.

A Yes. I --

THE COURT: The question is a little broad, Mr. White. How many times you bought clothes for the child.

Q Have you ever?

THE COURT: Let's pin it down a little bit.

Q Have you ever purchased clothes yourself, gone out and bought some clothes for the kids?

A I left in the house and children and I certainly they been with me, have been --

THE COURT: Mr. Kleiner, just say yes or no.

A Yes. Many a times here just in the late future they've got a three closets out there clothes.

THE COURT: Mr. Kleiner, you said yes. Leave it at that.

Q How many times since you've been separated or before you were separated, when you two were together did you buy clothes for Mrs. Kleiner?

A I handed --

Q Not Mrs. Kleiner, but the kids?

A I handed the money to her, she bought. That is one reason, sir, is like it is, I guess --

THE COURT: Mr. Kleiner.

A She bought all the clothes.
THE COURT: Fine just say --
A I paid for'em.
Q Mr. Kleiner, do you consider yourself a violent man when you were upset?
A No. I can handle myself, though, I feel. I'm a little man.
Q We all know that you have been upset about Richard Bowman?
A True.
Q That is true?
A Uh-huh.
Q Since the separation, have you and -- Mr. Kleiner, did you ever try to run Mr. Bowman off the road in your vehicle?
A Yes, I did. On the road when they was tryin' to put the tail on me and she was bowin' underneath deal there, I could've drove clean through, but I didn't. I stopped the vehicle so they can go through, while that yellow belly run back to Sperry.
Q Mr. Kleiner, have you been drinking?
A None whatsoever. I just came from work, sir.
Q Mr. Kleiner, you heard Lisa get up yesterday, or excuse me Monday, testify about sexual advances that you purportedly made upon her?
A I heard Lisa.
Q And did it appear to you that she was having a very difficult time sitting up there and talking about this?
A It appeard to me that her mother had brainwashed her,

just like -- and you're right, I'd have a hard time tellin' a thing like I was told right here. I guarantee ya' she's been prepped for a year and three months by Judy Kleiner.

Q And, sir, you believe --

A And Richard Bowman.

Q You believe that she was not telling the truth?

A No, I do not.

Q Sitting up there and -- um -- okay. Mr. Kleiner, have you ever talked to Lisa about her appearance, told her she was cute?

A No.

Q Attractive?

A Nope.

Q Did you hear Patti, your stepdaughter, testify about conversation you had with Lisa out by the tractor?

A I heard this also.

Q And your testimony that she was lying or not?

A Yes. She was lyin'. Yes.

Q Mr. Kleiner, I'm gonna go back to Penny for a moment, she's spent the night out there on occasions when the children have been out at your house for visitations?

A I believe so.

Q Has her boyfriend Jack -- Jackie, spent the night with her out there?

A Yeah. Yeah.

Q And they're not married are they?

A No.

Q Have they slept -- were they asleep?

A Oh, I'm sure they do, yeah.

Q Possibly they had sexual intercourse while they were there?

A No guarantee.

Q How many daughters you have, sir?

A By my previous marriage, three daughters, two boys.

Q And -- um -- who are the daughters? Penny and who?

A Penny, Jackie, and Becky.

Q Did I understand you to say that Penny was the youngest?

A Once again age, like I say, I'm guessin' no. Maybe youngest. I can be wrong. My wife kept on behind --

Q Is your testimony you don't even know which child was born first; Penny, Jackie?

A No, I do not. I don't keep track of dates. And they've been run away from me fully for 12 years. 13 years. Now, if that makes a bad man -- whoops.

Q Mr. Kleiner, do you believe that both you and your wife are fit parents and that the Court needs to just make a determination as to which parent is more fit?

A I don't believe she is fit by far. No.

Q Okay.

A No, I don't.

Q Have you ever told the children that?

MR. GLASS: Asked and answered, Your Honor.

THE COURT: Overruled.

Q Have you ever told the children that?

A To my knowledge, no. But, I probably have, yeah.

MR. WHITE: Your Honor, I don't believe I have

any further questions at this time.

THE COURT: Mr. Glass.

REDIRECT EXAMINATION

BY MR. GLASS:

Q Mr. Kleiner, what do you feel is different about the value of your property today, versus when the property was listed for between 30 to $35,000?

A The difference would be on the account of real estate isn't sellin' period.

Q When was listing that was -- you were questioned to?

A Last summer. Last fall. Last summer more or less.

Q Did you have any bites, at all?

A None whatsoever.

Q Did the agent, pardon me. You made a reference to your wife smoking marijuana, you tell the Court about that, first off when was it?

A This was when we lived on Admiral -- not Admiral but Archer Place.

MR. WHITE: Your Honor, I'm gonna object as to remote in time to have a bearing on this.

MR. GLASS: Your Honor, he brought it up.

THE COURT: Overruled.

BY MR. GLASS:

Q Do you remember when it was?

A My daughter and her --

THE COURT: Do you remember when it was?

A '78.

Q How much did you see your wife smoke?

A I didn't see her smoke any of it, Penny did.
Q All right. All right, now, you on cross examination were examined about Mr. Bates, and you said Judy told me, when you were asked about how you know he had sexual intercourse with Lisa; what did Judy tell you?
A She asked what was we gonna do. I said it's your daughter you handle it in full. She knew a hundred percent who, when, and where, this was way a year ago.
Q All right, will you explain to the gas station incident, please to the Court?
A Just 'cause when they got me for haneus corpus (phonetics) I had the children after Christmas. I was drivin' home, don't normally pay visual attention to things like this, but this blue Mercury which belong to Richard Bowman and Judy was sitting besides him was stopped at 41st and Peoria. And I stop, stop sign. Car with park lights over there I stop go on through I notice this turn lights on start followin' me. I get almost to dead stop there is gas station about six blocks, I do that flip flop middle of the gas station on a highway which Peoria which is four lane there. I stop I seen his car pull into the gas station, knowin' who it was seein' through my rear view mirror, I swung around into the station pulled around, they seen they had no place to go except the outside drive, which they headed for. I guarantee I could drilled their door when she sittin' right there. I said no, she's still their mother. I could've gotten both, but swung around and run, and yellow --
Q Okay. Were they chasing you?

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 264 of 318

A You might say they were harassin' me or whatever, but it turned, you know --

Q You don't have much use for Mr. Bowman?

A You steal a man's wife and that's just what was done.

Q Is Lisa normally a happy outgoing child?

A She's a brain -- no I can't say she's happy. She -- um --

Q Is she quiet?

A Yeah. Quiet, yeah.

Q You said that -- um -- your wife ran your children off, I assume you're talking about the five kids?

A That's right.

Q Twelve, 13 years ago?

A Yeah.

Q Do you know why she ran them off?

A Scared that they might get a buck of the old man's pocket some day.

Q Did she ever tell you that she didn't want the kids around?

A Yeah.

Q Can you remember when that was?

A Through the whole 12 years, you might say.

Q Why did she have a disliking for your children?

A Jealousy. And thinkin' that the'd get a buck out of if I ever amounted to anything. Never got anythin' of my own.

Q Mr. White asked you about what -- why you felt that the children have been brainwashed by their mother. When they saw you when you came in today did they run up and say hello to you?



TULSA COUNTY
OFFICIAL TRANSCRIPT

A No.

Q When they saw you the last time you were here on I think it was Monday, did they run up and say hello to you?

A They were actually with me, but I guarantee they'd have run up.

Q Yes or no?

A Yes.

Q How much time have you been able to spend with them while you been here, or while they've been here at the courthouse?

A That hug was it.

Q Okay. So, even during the trial your wife has denied you the right --

A That's correct.

MR. WHITE: Objection, Your Honor. That is leading question.

THE COURT: Sustained.

Q Well, has your wife offered to let you see the kids during these proceedings while --

A None whatsoever. No.

Q I didn't think so. Now, as to this child support payment situation, Mr. Kleiner, I believe -- wouldn't it be fair to say that both Mr. Ladd and myself have told you that once the Department has received an order directing you to pay them you had to pay them or be received -- the pleading which you finally did in February?

A Yeah.

Q All right.

A And it says when I was paid up, too.
Q Once again if this Court makes a finding that you owe Mrs. Kleiner arrearage child support, will you pay it?
THE COURT: Doesn't matter if he paid or not, Mr. Glass.
MR. GLASS: Nothing else, Judge.
THE COURT: Mr. White.

RECROSS EXAMINATION

BY MR. WHITE:
Q Mr. Kleiner, have you asked Mrs. Kleiner during these proceedings these last two days to see the children?
A She heard me ask'em over there.
Q Ask --
A No, I haven't personally. I don't want to talk her to no way, shape, or form guarantee.
MR. WHITE: Okay, I have nothing further, Your Honor.
MR. GLASS: Nothing else, Judge.
THE COURT: How old are you, Mr. Kleiner?
A 52.
THE COURT: You may step down.
A Thank you.
MR. GLASS: Only one more witness, Your Honor.
THE COURT: Let's take a recess.
(After a brief recess, the following proceedings were had:)
THE COURT: Call your next witness, Mr. Glass
MR. GLASS: Yes. Miss Penny Kleiner.
THE COURT: Raise your right hand, ma'am.

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 267 of 318

You solemnly swear the testimony you're about to give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

MISS KLEINER: Yes, I do.

THE COURT: Mr. Glass.

MISS PENNY KLEINER

After having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. GLASS:

Q Will you state your name to the Court, please.
A Penny Lee Kleiner.
Q And Miss Kleiner, are you married at this time?
A Common law.
Q All right, and to whom are you married by the common law?
A Jackie Jackson Smith.
Q And with Mr. Smith how many children do you have?
A Two.
Q And what are their names?
A Tonysha Kleiner (phonetics) and Ginseng Kleiner (phonetics).
Q Now, Miss Kleiner, is it Mrs. Kleiner or Mrs. Smith?
A I go by Kleiner.
Q All right Miss Kleiner, has your dad discussed with you his request to have this Court to grant him -- pardon me. Pardon me. Pardon me. Are you aware of the three Kleiner children?
A Yes.
Q And how -- what are their names?

A Teddy, Tommy, and Jerri Jo.

Q And while since the separation of Mr. and Mrs. Kleiner, this Mr. and Mrs. Kleiner, have you spent much time with those children?

A As much as possible, yes.

Q Okay, and do you recall seeing the children with Jack and how they got along with him?

A Yes. Yes, I do.

Q During the time how many times have you been with Jack and the children?

A Oh, gosh, probably 15.

Q Okay, and during those times can you relate the absolute total worst, just the worst thing that you ever seen?

A The worse?

Q Yeah.

A Hurt knee, wart on Tommy's knee.

Q How do they get along?

A Get along great.

Q Okay, you never seen him take off and walk --

MR. WHITE: Objection, Your Honor.

A No

MR. WHITE: Overruled.

Q What's this wart business?

A Um -- he had a wart on his knee.

Q Who? Who?

A Tommy, the littlest. He had a wart on his knee that bothered him really badly.

Q Okay, and --

A He complained about it.
Q What did you do about it, do you know?
A We took him to the doctor.
Q Okay. All right, when did you first meet Judy Kleiner?
A Um -- probably about fifth grade.
Q Okay, and -- um -- when you first met her did she -- did the two of you get along?
A At first, yeah.
Q Did you eventually have some problems with Judy Kleiner?
A Yes.
Q And could you tell us what your problems with Judy Kleiner, please?
A Well, she lied. Twisted up stories.
Q What was effect of your difficulties with Mrs. Kleiner?
A Could you explain that in a different way?
Q Did -- um -- did you -- did this cause an end of your relationship with the Kleiner family for a while?
A Yes. With my father, yes.
Q Okay.
A My -- my other brothers and sister, too. Each of one at a time.
Q How many brothers and sister, do you have?
A I have got two older sisters, another older brother, and younger brother.
Q How often do you see these people?
A Um -- sometimes twice a month. They live over in Owasso now. My younger brother is in Kansas now.
Q Okay, do you feel that if this Court were to grant to

your father the custody of the children, that he is capable of caring for them?

A Oh, yes.

Q Do you - can your father cook?

A Yes. He has for me this time, yeah.

Q Um -- it's my understanding that you are going to help him and care for the children, is that right?

A Uh-huh. Yes, I do anything for them.

Q Do you know, can you explain to the Court, what your father has asked you to do in the aiding with the kids?

A He really didn't have to ask me nothin' because I'd be there for my family anyway. Because they're my blood I'd do anything for my family.

Q Um -- have you discussed with your father being there during the day with -- come back from school?

A Uh-huh.

Q What about -- how would you care for your other children if you were there taking care of --

A Same way. They will be right there with me.

Q All right, how old are your other children?

A One's probably six weeks, and other one three years old.

Q Okay, so they're not in school, yet?

A No.

Q Now, are you comfortable enough with the Kleiner children to discipline them and do what's necessary to take care of them?

A Yes, I am.

Q Can you briefly describe your relationship with the

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 271 of 318

Kleiner children? Just briefly.
A Like brother and sisters.
Q Okay, do they mind you?
A Yes. Yes, they do.
Q Now, the -- um -- it's -- did you have any problems with Kansas when you were a minor?
A Yes.
Q Okay, now at this point and time do you have any what we would call record?
A At this time, no.
Q Uh-huh. Even though you were a minor, do you mind relating to this Court that event?
A No, I don't.
Q All right, would you please tell the Court first off how old you were?
A I was 14 years old.
Q And with whom were you living?
A My mother.
Q Were your mother and Mr. Kleiner then divorced?
A Yes. They were divorced.
Q All right, and what sort of trouble did you get into?
A Fighting.
Q Okay, and what -- were you in high school?
A Junior high.
Q Junior high school. And what happened to you because of this?
A I was sent up to a rehabilitation center for 90 days.
Q And what happened to you at the rehab center?

A I just went to school and talked with counsellors twice and they said I was well enough to go. And they let me go.
Q Did you return to the home of your mother?
A Yes, at first.
Q And then where did you move?
A I went to Owasso with my sister. My oldest sister, Becky.
Q And was this by agreement with your mother?
A Yes.
Q Did your father have anything to do with that situation?
A No.
Q Now, other than a possible traffic ticket, or whatever, have you had -- have you been in any trouble since that time with the law?
A No. None whatsoever.
Q All right, were you present before and expert witness testified in this case a Mrs. -- Judge, I left this legal pad out there.
A Walentiny?
Q Mrs. Walentiny. Were you present in the court area before Mrs. Walentiny testified?
A Was that the curly-haired lady standin' --
Q Yes.
A Yes.
Q All right, and did you see her talking on last time we were here, did you see her talking to Mrs. Kleiner?
A Out here, no. To Lisa.
Q It was Lisa. Okay, and did you relate to the -- please the conversation that you heard?

MR. WHITE: Your Honor, I'm gonna object to what Mrs. Walentiny made out there, that's hearsay, inadmissible.

THE COURT: Overruled.

Q Would you relate just what you heard, please? And first off what you saw.

A She walked up and she glanced at my dad, and she glanced through the courtroom, then she turned around and walked back over to Lisa said, "Is that the nasty old man."

Q Okay, is that all that she said?

A That is all that I could hear.

Q Did she use any other words when she referred to your father?

A No.

Q Are you willing to aid in the care of the Kleiner children?

A Yes.

Q Do you feel that you are qualified?

A Yes, I do.

Q Have you talked with your common law husband about this?

A He doesn't have no say so. But, yes I have talked with him.

Q In the event you were to aid Jack with the care of the children, would you and your husband move into that mobile home?

A Yes. If it comes to that, yes.

Q Okay, but, do you plan to do so now?

A Not right now.

Q Okay, are your other sisters available to your knowledge

to help with the children in the event that their help was necessary?

A My older sister, yes. Jackie.

Q Have you ever prepared any meals for these children?

A Yes.

Q And have you been present when meals have been consumed with Jack and the children?

A Yes.

Q Um -- can you tell us, please, generally what type of meals are prepared by Mr. Kleiner for the children?

A Well, he's got his own meat, which is butcher a pig. And he had -- has ham, and -- um -- pork chops, pork steaks, stuff like that. Sausage.

Q Do the children spend a good deal of time out doors when they were with him?

A Oh, yes.

MR. GLASS: Judge, I think that's all.

THE COURT: Mr. White.

CROSS EXAMINATION

BY MR. WHITE:

Q Miss Kleiner, it is Miss Kleiner?

A Uh huh.

Q You stated that you're common law married to Jackie Smith?

A Yes. I've been with him almost six years.

Q Six years. How old are your two children?

A One's two and one's six weeks. I mean one's three and other one six weeks.

Q When did you determine that you were married to Mr. Smith?
A Well, common law is two years. And well, I thought about it after the first two years. I just never used his name or nothin'.
Q Why is that?
A Well, I'm on Welfare. I can't, you know, I can't -- you know, don't turn to him for money for children, because I can't rely on that. And I know I can't.
Q Why can't you rely on that?
A Well, he is not responsible worker. And I feel if I'm gonna do it, I'm gonna get it myself.
Q Mr. Smith is not responsible worker?
A No. Not as far as going out and having a job all through the week, stuff like that. He is a good worker, yes.
Q You are on Welfare, is that what I understand?
A Yes.
Q Do the Welfare authorities know about Mr. Smith?
A No.
Q They don't know that you are common law married to Mr. Smith?
A No.
Q Do you have any idea that they might do if they knew that?
A They run him off.
Q Why would they run him off?
A Because he's scared of high class things like this. He's had trouble with his family and everything. He's working up

a little bit and actually he's doing better, now. I feel that he is, you know, the better in the future. I'm gonna stick with that. He is a good father. I don't want him to --

Q Do you have to fill out papers to the -- receive the Welfare?

A Yes.

Q Was there a question whether or not you are married?

A No.

Q Do they ask?

A Yes.

Q And what do you answer?

A I'm single, because then --

THE COURT: Miss Kleiner, let me interrupt you and advise you that there may have been a crime committed, and that you probably should consult with an attorney before you testify further in this, as to whether or not there has been some kind of Welfare fraud. You have the right to take the Fifth Amendment and not answer those questions if you think it'll incriminate you.

Let me also mention while we're talking about crimes, that we have also got possibility of income tax fraud in this case. We've got the situation where there has been an allegation of a rape, or at least statutory rape, where those crimes were not reported to the authorities. I have thought about this since Monday, determine what my responsibility is in this case. And now I hear that there's third possibility of a crime.

I just want to advise all of you that the possibility

exists that criminal charges may be filed against various individuals involved in this case.

Mr. White.

Q Does Jackie Smith normally live with you?

A No.

Q Why not?

A Because he's not supposed to. He comes and see the children and works, you know, when he does.

Q Why is he --

THE COURT: Let's move on Mr. White. Your point's been made.

Q You testified, Miss Kleiner, that there's good possibility that you and Mr. Smith and your two children -- or there's a possibility anyway that you would move into the trailer with Mr. Kleiner, is that what I understood?

A Uh-huh.

Q Do you feel that Mr. Smith would be a good example for the children?

A Oh, yes.

Q Does Mr. Smith drink? Does he have a drinking problem?

A No.

Q Does he drink?

A Occasionally.

Q How many days a week?

A Twice, if he has the money, and it's not likeable.

Q Did he normally get drunk when he drinks; intoxicated?

A No.

Q Do you drink?

A No.
Q You don't drink at all?
A Occasionally. Not as much as he does.
Q Mr. Smith take drugs?
A No.
Q Has he ever taken drugs?
A Not to my knowledge.
Q Is Mr. Smith ever been arrested and put in jail?
A Yes.
Q You tell me when?
A That's been before I even met him.
Q Since you --
A And I put him in one time.
Q Why did you put him in?
A Because he locked me out of the house. We were arguing and he locked me out of the house. I just called the police and told them I didn't want to argue, take him away, and so they did.
Q When was that?
A Two, almost three years ago.
Q Do you know if charges were filed against Mr. Smith?
A No, they weren't.
Q Do you know of any other incident in which Mr. Smith has been placed in jail?
A It was before I met him. But, I don't know.
Q You and Mr. Smith quarrel very often?
A We have our spats, but --
Q Mr. Smith ever hit you?

A No.
Q You ever hit him?
A Yes.
Q And when was that?
A Um -- plenty --
Q With your fist, or with --
A No. No. No. Huh-uh, not mean hit, no.
Q Do you recall an occasion in the last several months when Mrs. Kleiner allowed you and Mr. Smith to visit the children, before we had a problem with visitation?
A At their house.
Q Where you -- she let you take the children to your house?
A Oh, yes.
Q And is it true that you took the children over to Mr. Kleiner's?
A No. We went roller skating.
Q After roller skating did you take the children to Mr. Kleiner's?
A We ate pizza.
Q Did you ever go, that weekend, to Mr. Kleiner's?
A No.
Q You never saw Mr. Kleiner that weekend when you are with the children?
A He came in.
Q At your house in Sand Springs?
A Yeah.
Q Was there any drinking going on that night?
A No.

Q Do you recall an incident where Mr. Smith after drinking quite heavily, took the kids out in the car and did donuts in the car?

A No.

Q Mr. Smith married before he met you?

A Yes.

THE COURT: Let's leave Mr. Smith alone. Okay?

MR. WHITE: I don't believe I have any further questions, Your Honor.

THE COURT: Mr. Glass.

MR. GLASS: I have nothing else.

THE COURT: You may step down, ma'am. Mr. Glass?

MR. GLASS: Your Honor, I don't feel it's -- that we have anything else. Anything else would be surplusage.

THE COURT: Mr. White?

MR. WHITE: We just have meeting in chambers testimony. We will be finished.

THE COURT: Who's making the request that I talk with the children?

MR. WHITE: The Plaintiff is, Your Honor. It's -- um -- specifically regarding the refusal of visitation, and -- um -- several allegations of -- of -- Plaintiff that Mr. Kleiner has driven them around after drinking. That will be limited, I believe, to those instances.

THE COURT: Have you talked to the children about this?

MR. WHITE: Yes, Your Honor.

THE COURT: Do they expect to talk to me today?

MR. WHITE: Yes.

THE COURT: Which ones?

MR. WHITE: The two oldest.

THE COURT: You understand that when we go into chambers I will simply make some introductions, and any questioning will be your responsibility?

MR. WHITE: I understand.

THE COURT: I will also reserve the right to determine, after my brief questions, that any testimony they could give will not be beneficial and I may not let them testify.

MR. WHITE: I understand.

THE COURT: I want to tell both of you, Mr. and Mrs. Kleiner, that whatever those children say in chambers will be confidential. Both attorneys will be in there, and the Court Reporter will be there, and I'm going to tell the children that what they tell me will stay in that room and neither one of you are to ask them what was said. I want them to be able to speak as honestly as they can without any kind of fear that there will be a problem later on, with parents.

You understand that Mr. Kleiner?

MR. KLEINER: I understand.

THE COURT: Mrs. Kleiner?

MRS. KLEINER: Yes, sir.

THE COURT: I'm very serious about this. I don't want you asking them what happened in there, or what they said. And the attorneys are not to discuss with you what

was said.

I don't know if we'll come back in court after I hear the children, and I would again state that very concerned for safety and welfare of these kids. Been some rather unpleasant testimony in this case from both of you. There are clearly have been things done that are not in the best interest of these children. I have some questions in my mind as to whether or not either one of you should have custody of these children.

After I hear from the children, I just may make a determination that this case should be referred to the Juvenile authorities. There is so much hatred and animosity in this case, that I'm not sure that I can give custody to one of you and feel that the children are gonna be safe with the other whichever one of you I gave custody to, the children will be safe at all.

I simply want both of you to know that that's way I'm thinking on this case.

You can bring the children around. We'll take them in about five minutes.

(Whereupon, the following proceedings were had in chambers:)

MR. TEDDY KLEINER

After having been brought into chambers, gave the following answers:

EXAMINATION BY THE COURT

Q Teddy, do you understand what's going on?

A Uh-huh.

Q What's going on?
A Mom and dad gonna get a divorce.
Q Okay, and my name is Judge Rineer. Now, I'm the person who is gonna decide whether or not they're gonna get a divorce and then who is gonna have custody of the kids, and what kind of visitation is gonna be. You understand that? Have you talked to your mother or your father about it?
A (Whereupon witness nods head in side to side fashion.)
Q Okay, do you know Mr. Glass?
A Uh-huh.
Q He represents your father, he is a lawyer. And Mr. White, he is a lawyer who represents your mother. You talked to either one of the lawyers?
A Uh-huh.
Q Who have you talked to?
MR. GLASS: I talked to him, I think. Haven't I met you before?
A Yeah.
MR. GLASS: Yeah.
Q Okay, and this is Shannon. She's the Court Reporter. That little machine she has there, she is taking down everything that we say.
A All right.
Q If I ask you a question, you have to speak up so she can hear what you say and she'll write it down with her machine. Okay?
A Okay.
Q How old are you?

A 10.
Q What grade are you in?
A Fifth.
Q Where do you go to school?
A Sperry.
Q How do you do in school?
A Okay.
Q Okay?
A Uh-huh.
Q Have you always gone to Sperry?
A Huh-uh.
Q Where else have you gone?
A California and Texas and Tulsa.
Q You lived in California?
A Uh-huh.
Q When did you live in California?
A About six years ago.
Q Okay, when did you live in Texas?
A About seven years ago.
Q Okay, you have a brother and sister?
A Uh-huh.
Q What is your brother's name?
A Tommy.
Q How old's he?
A Six.
Q What's your sister's name?
A Jerri.
Q How old is she?

A Nine.
Q You call her Jerri or Jerri Jo?
A Jerri Jo.
Q Okay, and she's nine?
A Uh-huh.
Q Okay, what grade is she in?
A Fourth.
Q Okay, I'm gonna let Mr. White and Mr. Glass ask you some questions. Okay? And if you don't understand the question, you tell them you don't understand.
A Okay.
Q All right, and if you don't know the answer, you say you don't know the answer.
A Okay.
Q Do you know what the -- do you understand what the difference between the truth and a lie?
A Uh-huh.
Q What is the difference?
A A lie is when you say stuff that is made up. And truth is what's right.
Q Okay, you gonna tell the truth here?
A Uh-huh.
Q Okay, has anybody talked to you about what you're gonna say in here?
A Huh-uh.

THE COURT: Okay, Mr. White.

EXAMINATION BY MR. WHITE

Q Teddy, you understand that both your father and mother love you very much?

A Uh-huh.
Q And that they both want the best for you, you understand that?
A Yeah.
Q Okay, no matter what happens in here they both gonna still love you very much.
A Uh-huh.
THE COURT: Oh, Teddy, I forgot to tell you something. Whatever -- I have told your mother and father that what you say in here stays in here. It's gonna be our secret. Okay. And I told them that they're not to ask you what you told me.
A Okay.
THE COURT: So, that I want you to feel that you can be honest with me. Okay, that you can tell the truth and not be afraid that your mother or your father will find out what you said. Okay? And the lawyers aren't gonna tell your mother and father what you said, and I'm not gonna tell them, and you're not gonna tell them, and they're not gonna ask. Okay?
A Okay.
THE COURT: All right. So, what you say in here they'll never know what you said.
A All right.
THE COURT: Mr. White.
BY MR. WHITE:
Q Teddy, you in the past had times when you were, after your mother and father split up, when you stayed with your

mother during the week and visited with your father on the weekends, do you remember?

A Uh-huh.

Q And where would you usually stay when you are visiting with your father on the weekends?

A At his house.

Q Is that the trailer out in the country?

A Uh-huh.

Q And who was usually out there when you visited?

A Dad.

Q Is anybody else out there?

A Uh-huh. T.J., one of dad's Penny's friends.

Q How many times was she out there?

A About three weekends when we was out there.

Q She stay during the day or stay all night?

A All night and all day.

Q Who else was there?

A Penny and Jackie.

Q Okay, is that Jackie the man Penny's husband or boyfriend?

A Yeah.

Q Okay, how about Penny's kids?

A He -- and her new little baby.

Q Now, did Jackie and Penny spend the night, too?

A Uh-huh. Sometimes.

Q Okay, do you know what alcohol is, Teddy?

A Uh-huh.

Q Would you tell the Judge?

A Beer and whiskey and all that.

Q Do you know what alcohol does?
A Uh-huh. It ruins your brain and makes you funny.
Q Have you ever seen your father and mother drink alcohol?
A Uh-huh. Dad.
Q How often do you see your dad drink?
A Every night.
Q What does he drink?
A Whiskey and Coke. Rum and wine.
Q How about your mother?
A Very often she drinks wine. Now, she doesn't drink nothin', though.
Q Do you know what drunk means?
A Uh-huh.
Q What does that mean?
A They drink too much and they get sick and they crazy.
Q Have you ever seen your father or your mother drink too much and get drunk?
A Huh-uh. Dad, yeah.
Q What does your dad do when drinks too much?
A He get mad and start sendin' us to bed, and start hollerin' and one time he beat up momma in Tulsa.
Q Okay, when you would go out to visit on weekends, would he drink alcohol?
A Uh-huh.
Q When were -- would he usually drink?

A At night.
Q Do you know how much? How many glasses?
A About four big -- no, about six or seven big glasses like that (indicating).
Q Did your dad, after drinking like that, has he ever taken you out in the car?
A Uh-huh.
Q Can you tell the Judge when that happened?
A Oh, it was around in December. Penny and Jackie was out there, and they -- um -- flooded their car out and -- um -- they walked back and -- um -- we went and me and dad and Jackie went and fixed the car and then we come back.
Q Okay, where was the car?
A Oh, about eight miles away.
Q Who drove out to the car?
A Dad.
Q Okay, have you ever road in the car with Jackie, when he was driving?
A Uh-huh. It was around in November and we was -- um -- going back from dad's when Penny had us, and she wasn't supposed to take us out at dad's. He starts speeding through Owasso and almost wreck into a fence and starts slidin' everywhere.
Q Do you know if Jackie had been drinking alcohol?
A He was, a bunch.

Q Did he have what he's drinking in the car, or before he drove?

A He was drinking beer in the car.

Q Is you dad ever drove you in the car when he drinking in the car?

A Yeah. One night it was around October, he was watching Penny go home, and we was -- um -- in Owasso and -- um -- dad was drinking, and we stopped at a gas station for Penny to get gas and T.J. was around then. And then that night she didn't want pop, see, threw her pop down and went in and got a beer and come back out and then we went home.

Q Did they drink the beer in the car, or wait until they got home?

A They drank the beer in the truck.

Q Has your dad ever given you or any of your brother --

A Once. Me and Tommy.

Q Did he -- how much did he give you?

A Um -- oh, glass about that big full.

Q Was this on the weekend when you were visiting?

A Uh-huh.

Q Teddy, do you remember hearing your dad talk about possibility of taking you to --

A Yeah.

Q -- another state or something?

A Uh-huh. January 11. Before that, though, two weekends

before January 11. He was talking about that. I overheard him at night time and then I went back to sleep and then January 11, that's when we have to go out there, then, but we was supposed to.

Q Okay, what he say about taking you somewhere else?

A He said he was gonna take us to Kansas City to his ex-wife's. Or he's gonna take us to Oklahoma City.

Q Did he tell you if he was gonna tell your mom where you were?

A He said he wasn't gonna tell her.

Q And you come back and tell your mom what you heard?

A Uh-huh.

Q Have you ever heard your dad talk about your mom when you were out there on the weekend?

A Yeah. One time he said he was gonna shoot her and kill her with a shotgun and one time he tried to run over her in the car.

Q Have you ever heard your mom talk about your dad?

A Huh-uh.

Q Even though you've said these things, you understand you dad still loves you?

A Uh-huh.

Q You still love your dad?

A Uh-huh.

MR. WHITE: I don't believe I have any further

questions.

THE COURT: Mr. Glass?

MR. GLASS: I don't think I have any questions, Your Honor.

FURTHER EXAMINATION BY THE COURT

Q Teddy, tell me about the house that you live in?
A Which house?
Q One you live in now?
A It's nice.
Q How big is it?
A Um -- three bedroom.
Q Who lives there?
A Momma and us kids.
Q Do you have a room of your own?
A Huh-uh. Me and Tommy share it.
Q Do you have a bed?
A Uh-huh.
Q Mr. Bowman live there?
A Huh-uh. Not now.
Q When did he live there? When did he leave?
A About three, four months ago.
Q Do you have any problems when you went to visit with your father?
A Huh-uh.
Q When is last time that you talked with Mr. White?

A This morning.
Q How long did you talk?
A Five minutes.
Q If you had your choice, who would you choose to live with; your mother or your father?
A Mom.
Q Why is that?
A Because she gives the love we need. And when dad's trying to buy us.
Q Who told you that?
A Nobody. I know it, because he's always buying us everything we want.
Q What'd he buy you?
A He bought Jerri a bike. He bought a toys, clothes. And everything.
Q Where you get your hair cut?
A In Owasso.
Q Barber shop?
A Uh-huh.
Q When you get that shirt you have on?
A Um -- Christmas.
Q Who bought it for you?
A Momma.
Q What do you have on your hands?
A Marker.

Q Pretty bored today?
A Uh-huh.
THE COURT: Anything further, Mr. White?
MR. WHITE: No, Your Honor.
THE COURT: Mr. Glass?
MR. GLASS: No, Judge.
THE COURT: Thanks a lot. You can go ahead and sit down.

JERRI JO KLEINER

After having been brought into chambers, gave the following answers:

EXAMINATION BY THE COURT

Q You Jerri Jo?
A Uh-huh.
Q How you doing?
A Fine.
Q Been here all day?
A Uh-huh.
Q Have you been bored?
A (Whereupon witness nods head in up and down fashion.)
Q Have you been expecting to talk to me sometime today?
A (Whereupon witness lifts both shoulders.)
Q You don't know?
A (Whereupon witness nods head in side to side fashion.)
Q How old are you, Jerri Jo?

A Nine.
Q When is your birthday?
A [redacted].
Q What grade are you in?
A Fourth.
Q You go to school in Sperry?
A Uh-huh.
Q Do you know what's going on here today?
A Court.
Q Why are we in court?
A (Whereupon witness lifts both shoulders.)
Q For a divorce?
A Uh-huh.
Q You talk to your mother or your father about a divorce?
A (Whereupon witness lifts both shoulders.)
Q You don't know. I'm Judge Rineer, and it's gonna be my job to decide if there should be a divorce; and also to decide who the kids should live with; do you understand that?
A (Whereupon witness nods head in up and down fashion.)
Q Have you met Mr. Glass?
A Uh-huh.
Q He's your father's lawyer. Have you met Mr. White?
A (Whereupon witness nods head in up and down fashion.)
Q He's your mother's lawyer, okay. And that's Shannon. She's the Court Reporter, and she's using that machine to write

down everything that we say, so that when you say something you have to speak up.
A Okay.
Q So she can hear you and write it down. Okay?
A Okay.
Q I told your mom and dad before we came in here that whatever you've told me would be a secret, and I won't tell your mother and father what you said.
A Okay.
Q And the lawyers won't tell your mother and father what you said, okay, and your mother and father will not ask you what you said. So, when you talk to us I want you to feel that you can be honest. Okay? Because your mom and dad will never know what you told me. Okay? Okay?
A Okay.
Q Do you know what the difference is between the truth and a lie?
A Yeah.
Q What is the difference?
A When you lie it doesn't mean -- um -- truth.
Q Okay. And will you tell us the truth?
A Yes.
Q Okay, where do you live now?
A 9917 North Garrison.
Q 9917. Okay, who do you live there with?

A Mom and my -- my mom and my brothers and sisters.
Q Who are your sisters?
A Lisa and Patti.
Q Okay, how long have you lived there?
A I'm not for sure.
Q Okay, when is last time you visited with your father on a weekend?
A I don't know.
Q Has it been awhile?
A Uh-huh.
Q Okay, if you had your choice as to which you want to live with; your mother and father; who would you choose?
A My mom.
Q Why would you choose her?
A Because my dad drinks and he acts funny after he does. And talks about my mom after he does.
Q You still want to visit with your father if you lived with your mother?
A Yeah.
Q You like to spend weekends with him?
A (Whereupon witness nods head in up and down fashion.)
Q Speak up.
A Yes.
Q Okay, I'm gonna let Mr. White ask you some questions, if he wants to, and I want you to be -- tell him the truth and

if there's question you don't understand, you tell him you don't understand.

A Okay.

THE COURT: Okay.

EXAMINATION BY MR. WHITE

Q I was gonna ask you about two questions, Jerri Jo. Do you know what alcohol is? You said -- talked about drinking what do you think it is?

A Booze, and whiskey, and beer.

Q Dc you know when go to visit your dad did he ever drink any of that stuff?

A Yes.

Q Okay, after -- have you ever known of any time when you visited when he drank that stuff and drove the car?

A A lot of times.

Q Did he ever do that and drive the car with you or your brothers and sisters?

A Uh-huh.

Q Very many times?

A (Whereupon witness nods head in up and down fashion.)

Q Okay, are you saying yes?

A Yes.

MR. WHITE: Judge, I don't have any further questions.

THE COURT: Mr. Glass?

MR. GLASS: No questions of this young lady, Your Honor.

THE COURT: Thank you very much.

(Whereupon, the following proceedings were had in open court:)

THE COURT: Mr. and Mrs. Kleiner, I've talked with the two oldest children. And again let me say that I told them that what they had to say was in chambers was to remain confidential and neither one of you would be asking them what they had to say or what went on in there.

I'm going to pass the case for decision until March 21st, 1985 at nine o'clock. In the interim I will order the Defendant to pay child support in the amount of $150 by March 11, 1985. And I will further award visitation to the Defendant on the weekend of March the 8th, which is tomorrow, from six p.m. to Friday until six p.m. Sunday, and we make a civil transfer of children.

I want to impress upon both of you that neither one of you are to discuss this divorce, discuss the other person with these children. I don't want you Mr. Kleiner to say one bad thing about Mrs. Kleiner.

MR. KLEINER: No problem.

THE COURT: Mrs. Kleiner, I don't want you to say one bad thing about Mr. Kleiner. Mr. Kleiner, I'm not making a finding that this is true or not true, but I do not want

the children in the car if you've been drinking.

MR. KLEINER: Sir, there hasn't been --

THE COURT: I'm not saying there has been. I'm just telling I don't want it to happen.

MR. KLEINER: No problem.

THE COURT: Okay, other than that we will be in recess until the 21st.

(Whereupon, Proceedings are concluded.)

C E R T I F I C A T E

STATE OF OKLAHOMA )
) ss.
COUNTY OF TULSA )

I, SHANNON RUTH WAGGNOR, a Certified Shorthand Reporter in and for the State of Oklahoma do hereby certify that the foregoing is a true and correct record of my notes taken in Case No. JFD-84-3025, heard on March 4, and March 7, 1985.

I further certify that I am not related to either of said parties, nor interested in said action.

WITNESSED MY HAND AND SEAL this 15th day of October, 1985.

Shannon Ruth Waggnor
Shannon Ruth Waggnor
Certified Shorthand Reporter

Office COPY

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY
STATE OF OKLAHOMA

JUDY KAREN KLEINER, )
Plaintiff, )
-vs- ) CASE NO. JFD-84-3025
JACK GLEN KLEINER, )
Defendant. )

DISTRICT COURT
FILED
OCT 15 1985
DON E. AUSTIN, COURT CLERK
STATE OF OKLA. TULSA, COUNTY

TRANSCRIPT OF COURT'S DECISION

Proceedings had in the above entitled cause before the Honorable Hugh V. Rineer, Judge of the District Court, heard on March 21, 1985.

A P P E A R A N C E S

FOR THE PLAINTIFF: Mr. Richard D. White, Jr.
Attorney at Law
Tulsa, Oklahoma

FOR THE DEFENDANT: Mr. Edward E. Glass
Attorney at Law
Tulsa, Oklahoma

SHANNON RUTH WAGGNOR
CERTIFIED SHORTHAND REPORTER
TULSA COUNTY COURTHOUSE
TULSA, OKLAHOMA

P R O C E E D I N G S

COURT'S DECISION

BY THE COURT:

This is case number JFD-84-3025, Judy Kleiner, Plaintiff versus Jack Kleiner, Defendant. Case comes on today for decision following trial on the merits heard on March 4, 1985. Show that both parties are present and represented by their attorneys.

I received a letter yesterday -- um -- hand delivered, that said copies were sent to the two attorneys, from Wallentiny, the lady with the Family and Children Services.

MR. GLASS: I didn't receive any letter from her.

THE COURT: Did you, Richard?

MR. WHITE: I wasn't in the office yesterday. I could've.

THE COURT: I think she hand delivered, I'm sure it was late yesterday, probably. It says copies were sent to you. And -- um -- I don't know if she got any advice from anyone for sending this letter, but in effect, it denied making the statements that some of the witnesses testified that she made in the hallway. It has not had any effect on my decision. But I did want two of you to know that I did receive that from her.

MR. GLASS: Will that be part of the evidence in this case? If it is, I think we should have the opportunity to examine her on it.

THE COURT: It's not as far as not part of the evidence. And my decision was finished and not changed my

decision any.

MR. GLASS: I haven't had any contact from her. The people made the testimony about her language.

THE COURT: In any event, I did not take her letter into consideration.

As to the decision in this case: The Court finds it has jurisdiction over the subject matter and the parties to the action. Parties have been married since October 24, 1974. Court finds that three children have been married -- have been married -- have been born to the marriage. Those children are now 11, 9, and 6 years old. Court finds it has jurisdiction over the children pursuant to the Uniform Child Custody Jurisdiction Act. Court finds that a state of irreconcilable incompatibility exists, such that the aims of the marriage have been destroyed, therefore grants a divorce to each from the other.

The majority of the trial was spent on issue of custody of the three minor children. In addition to those three children, the Plaintiff is the mother of two teenager girls, who resided with this family since the parties marriage 10 years ago. In addition to testimony regarding the divorce issue, both parties testified regarding contempt citation over the issue of visitation.

On more than one occasion during this trial, I stated that a referral to the Juvenile Court was a good possibility. I have decided not to refer the case to Juvenile, but I'm not totally content in my decision not to do that.

I cannot, at this time, say that either party is unfit.

Although, clearly both of you could be a lot better parent. Plaintiff presented evidence from her teenage daughters regarding certain alleged sexual activity, all of which was denied by the Defendant. During that testimony, and as a matter of fact, during the entire trial, the Plaintiff, mother, remained emotionless. Lisa, the Plaintiff's daughter who testified regarding the sexual activity, did not go to Family and Children Services until some 10 months after the fact, although she was seen by a doctor who apparently did not report the incident.

The Court is not making a finding one way or the other as to whether any sexual activity occurred. But, whether there was sexual activity or not, the mother had an obligation to report it to the proper authorities, and immediately obtain counselling for the child. This was not done. The Court finds this inexcusable, whether it happened or not.

As for the Defendant, Court can find no valid reason to strike a teenage girl, either with a fist or an open hand. There is some concern on my part that the Defendant will strike with excessive force the three children of this marriage. It's clear that the Defendant drinks too much, which causes additional concern for the safety of these children, especially while they're being transported.

The Plaintiff, soon after the separation, was sleeping with another man in the presence of the children. Although, that apparently has stopped. I want you all to note that Judge Brightmire feels that that alone is sufficient to award custody to the other parent. In addition to that, the

Plaintiff has gone to -- has not really spent the time that I think she could have, or should have, with these children; in that she only went to two basketball games. And as I stated during the trial, disturbed me that the girls, not children of this marriage, have not had their glasses replaced. I just -- just makes me wonder how much concern the two of you have for these kids.

All things considered, I think it is in the best interest of the children, that the custody be placed with the mother with visitation to the father. The Plaintiff has stated she fears the Defendant will remove the Defendant -- the kids from Oklahoma. The Court finds her fears to be unfounded. But, I will, of course, admonish the Defendant and the Plaintiff, particularly the Defendant that should you remove the children from the State of Oklahoma, or should you remove the children from their mother, that you face the possibility of felony charges being brought against you.

Court finds the Defendant not guilty of wilful indirect contempt of Court. Likewise, the Court finds the Plaintiff not guilty of wilful indirect contempt of Court.

I have no doubt that both of you love these children and care about the children, for the children, and possibly were just in a period of time where you're caring more about yourselves than you are about the kids; and I -- hopefully that will change. I think it's important that the Defendant be granted fairly liberal visitation. I don't like to sit up here and tell parents when they can and cannot see their children. There is a point in your lives when the children

are more important; that the two of you have to get along for the benefit of the kids. The visitation that I now award is a minimum, and more that can be arranged, I think should be arranged.

Defendant will be granted every weekend from Friday at six p.m. through Sunday at six p.m. to begin March 22, 1985. Defendant will be granted Spring Break from six p.m. the Friday of Spring Break -- the Friday school ends until the conclusion of Spring Break.

Has Sperry had their Spring Break, yet?

MRS. KLEINER: No, sir.

THE COURT: That will begin this year 1985.

Memorial Day each odd year; Fourth of July each even year; Labor Day each odd year; Thanksgiving each odd year from Wednesday at six p.m. through Sunday at six p.m. Christmas during each odd year from six p.m. the day school recesses until two o'clock p.m. Christmas Day. Christmas during even years from two o'clock Christmas Day to six o'clock December 30. Six o'clock p.m., December 30.

The Plaintiff will have visitation on Mother's Day if that should be one of the father's weekends, the mother will have that Mother's Day. The Defendant will have visitation on Father's Day, if that's not one of his regular weekends, he will have Father's Day. The Defendant will have summer visitation for a period of four weeks each summer on 30 days written notice to the Plaintiff.

As to the child support: Testimony was that Defendant earned -- has income of some 1800 to $2,000 per month;

Plaintiff's net is $644 per month. Child support will be in the amount of $200 per child per month to begin April 1st, 1985. Plaintiff testified she has health insurance on the children. Therefore, the parents will be responsible to pay additional medical or dental expenses fifty-fifty, anything that's not covered by insurance.

As to the real property: The parties have a contract for deed on their real property, which is a mobile home on three and a quarter acres, which the parties referred to as the farm. The Defendant testified that fair market value is $20,000. Plaintiff had no opinion as to the fair market value. Purchase price on August 20, 1981, was $20,000. Court will find that the fair market value is $20,000.

Plaintiff testified she did not want the property. Therefore, it will be awarded to the Defendant subject to a lien in the Plaintiff's favor. Defendant will be responsible for the contract payments and will hold the Plaintiff harmless therefrom. Court finds there is equity in the approximate amount of $17,000.

As to the household goods and furnishings: Each party is awarded his or her personal belongings and all household goods and furnishings in his or her possession. Court finds that total value of household goods and furnishings to be $4,000. Court further finds that the Defendant received $1,600 for items he has sold since the separation. Court further finds the Plaintiff received $1,000 worth of household goods and furnishings. To equalize the personal property division, the Plaintiff will be awarded judgment in the amount

of $2,300.

The Defendant is awarded his 1978 Ford pickup. The Plaintiff is awarded her 1977 Chevrolet, which is her separate property and separate debt. The Defendant is ordered to pay the F. and M. Bank for the add-on; the F. and M. Bank for the pickup; the Sears; and he is to hold the Plaintiff harmless on those debts.

In order to equalize the property division and award Plaintiff her portion of the equity in the home, Plaintiff will be granted judgment in the amount of $11,000. That includes the $2,300 from above. That's a total of $11,000. That judgment will be a lien on the real property. Judgment will be due and payable March 31st, 1986. It will bear no interest prior to that time. Judgment will be due earlier on Defendant's ceasing to use the home as his principle residence. If that judgment is not paid when due, interest will be at the rate of 15 percent per annum.

This is an appropriate case for the award of an attorney fee for the benefit of the Plaintiff.

I don't think the parties are prepared to argue the attorney fees this morning. I would suggest that the two of you get together and see if you can agree. If you cannot agree, I ask that one of you prepare an order setting it for hearing and we'll have a hearing on those fees.

Court will be in recess.

(WHEREUPON, Proceedings are concluded.)

C E R T I F I C A T E

STATE OF OKLAHOMA )
) ss.
COUNTY OF TULSA )

I, SHANNON RUTH WAGGNOR, a Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that the foregoing is a true and correct record of my notes taken in Case No. JFD-84-3025, heard on March 21, 1985.

I further certify that I am not related to either of said parties, nor interested in said action.

WITNESSED MY HAND AND SEAL this 15th day of October, 1985.

Shannon Ruth Waggnor
Shannon Ruth Waggnor
Certified Shorthand Reporter

Case 4:12-cv-08001-GAF Document 154-32 Filed 09/03/15 Page 311 of 318

Office COPY

IN THE DISTRICT COURT IN AND FOR TULSA COUNTY

STATE OF OKLAHOMA

JUDY KAREN KLEINER, )
Plaintiff, )
-vs- ) CASE NO. JFD-84-3025
JACK GLEN KLEINER, )
Defendant. )

DISTRICT COURT
FILED
OCT 15 1985
DON E. AUSTIN, COURT CLERK
STATE OF OKLA. TULSA, COUNTY

TRANSCRIPT OF HEARING ON PLAINTIFF'S

MOTION FOR CONTEMPT CITATION

Proceedings had and testimony taken in the above entitled cause before the Honorable Hugh V. Rineer, Judge of the District Court, heard on June 11, 1985.

A P P E A R A N C E S

FOR THE PLAINTIFF: Mr. Richard D. White, Jr.
Attorney at Law
Tulsa, Oklahoma

FOR THE DEFENDANT: Mr. Edward E. Glass
Attorney at Law
Tulsa, Oklahoma

SHANNON RUTH WAGGNOR
CERTIFIED SHORTHAND REPORTER
TULSA COUNTY COURTHOUSE
TULSA, OKLAHOMA


TULSA COUNTY
OFFICIAL TRANSCRIPT

P R O C E E D I N G S

THE COURT: This is Case Number JFD-84-3025, Judy Karen Kleiner, Plaintiff versus Jack Glen Kleiner, Defendant. Case comes on today on the Plaintiff's application for contempt citation. Both parties are present and represented by their attorneys; Plaintiff by Richard White; the Defendant by Ed Glass. My understanding that -- uh -- the Defendant is prepared to plead guilty to wilful indirect contempt of Court at this time. Is that right, Mr. Glass?

MR. GLASS: Your Honor, I have advised my client of both options. That of his right to jury trial, and also his right to plead or to declare today that he is in contempt and seek permission of this Court to pay the balance due by Friday. He's elected to waive his right to jury, this morning, enter a plea of guilty of wilful indirect contempt and ask Your Honor to set the pay time, if you will, or whatever you choose to call it, Friday at 1:30.

THE COURT: Mr. Kleiner, raise your right hand, please.

Do you solemnly swear the testimony you give before the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. KLEINER: Yes, sir.

THE COURT: Mr. Kleiner, you understand that you have a right to a jury trial in this matter?

MR. KLEINER: I do.

THE COURT: You can have a six person jury to determine whether or not you have wilfully violated the

court's order.

MR. KLEINER: I understand.

THE COURT: If you are found guilty by a jury or by myself, you can be sentenced to the Tulsa County Jail for up to a period of six months.

MR. KLEINER: Yes, sir.

THE COURT: You understand that the Plaintiff would have to prove that you -- that we have a valid court order. I think we have a valid court order; that orders you to pay child support. And they have to prove that you didn't pay a portion of it, or all of it, and you didn't -- you didn't pay it even though you could have paid it even though you had a job and were making money refused to pay. That is the burden that they would have. And you understand that you can have jury decide whether or not you wilfully violated the order. You can have the Court decide that. You understand that?

MR. KLEINER: I understand that.

THE COURT: You telling me you are giving up your right to a jury trial?

MR. KLEINER: That's right.

THE COURT: You are giving up your right to try the case to me; and you are going to plead guilty that you've wilfully failed to pay your child support?

MR. KLEINER: That's right.

THE COURT: Okay. Mr. White, how much is the arrearage?

MR. WHITE: Your Honor, the arrearage at this time

is $1800, which represents the month of April, May and June at $600 per month.

THE COURT: When was the June payment due?

MR. WHITE: June 1st.

THE COURT: Mr. Kleiner, is that your understanding that there's --

MR. KLEINER: My understanding you ordered it. Yes, sir.

THE COURT: Okay, I will find you guilty of wilful indirect contempt of court, I will find that there's an ar-rearage of $1,800 through the month of June, 1985. And I will pass sentencing until 1:30 on Friday, June 14, 1985. At that time, Mr. Kleiner, you are to pay the entire balance. If you do not pay the entire balance, then we'll have a brief hearing to determine what your sentence should be. You understand that?

MR. KLEINER: I understand that.

THE COURT: Okay, I will recognize you back to this Court on Friday June 14, 1985, at 1:30. If you -- if you pay the money prior to that time, then you won't need to be here, and your contempt will be purged. If you do not pay the money by that time you will need to be here. And if you are not here a bench warrant will be issued for your arrest.

Mr. White?

MR. WHITE: Your Honor, at this time could we also be granted judgment in sum of the arrearage?

THE COURT: Yeah. There is no problem. Judgment

will be entered in the amount of $1,800.

MR. WHITE: Thank you.

MR. GLASS: May I make a comment?

THE COURT: Sir?

MR. GLASS: May I make a comment?

THE COURT: Yes.

MR. GLASS: My understanding that two garnishments have been run by Mr. White on behalf of his client. It's my understanding that for some reason Mr. White has not either received the money, or that his garnishor has not been fully notified. Mr. Kleiner may have some credit for monies that are paid, or may have some monies coming to the courthouse, and so forth. At any rate, we need to verify that. There is also an allegation by Mr. Kleiner that he paid amount of $150 in the next visitation directly after the divorce was granted. I understand now there is a question of whether that was to be paid for the month of April or for -- it was for month of March. And I need to speak with Mr. White about this in terms of what Mr. Kleiner's of the belief that it was for the month of June. And I think that -- I'm sorry for the month of April. And I believe Mr. White and his client are of the opinion that it's for the month of March. At any rate, we need to resolve these three matters, and will do so by Friday.

THE COURT: I will withhold entering a judgment for any amount at this time. And I will enter the judgment on Friday, if it's not paid.

MR. GLASS: That is fine.

THE COURT: There is no dispute that at least $1,650 is not been paid. There may be a $150 that was paid?

MR. GLASS: That's right. I don't have any dispute about that at all.

THE COURT: Then, we'll reserve the entering a judgment until Friday. If the two of you can agree on that we will take it up then.

MR. GLASS: I will reach Mr. White on that this afternoon.

THE COURT: All right, Court will be in recess.

MR. GLASS: Thank you.

(WHEREUPON, Proceedings are concluded.)

# C E R T I F I C A T E

STATE OF OKLAHOMA )
) ss.
COUNTY OF TULSA )

I, SHANNON RUTH WAGGNOR, a Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that the foregoing is a true and correct record of my notes taken in case no. JFD-84-3025, heard on June 11, 1985.

I further certify that I am not related to either of said parties, nor interested in said action.

WITNESSED MY HAND AND SEAL this 15th day of October, 1985.

Shannon Ruth Waggnor
Shannon Ruth Waggnor
Certified Shorthand Reporter