DECLARATION OF DANI WALLER, MSW

I, Dani Waller, an adult resident of the State of Illinois, declare the following:

1. I am a Mitigation Specialist in private practice in Springfield, Illinois. I am the owner of Mitigation and Sentencing Services. I have been in private practice for the past eight years. Prior to entering private practice, I was employed as a Mitigation Specialist for the Office of the State Appellate Defender's Capital Trial Assistance unit. I held that position for five years. I received a Bachelor of Arts degree from Millikin University in Political Science in 1990. I received a Master of Societal Politics from the University of Illinois Springfield in 1995. I received a Master's of Social Work degree from the University of Illinois, Champaign-Urbana in 1999. Over the course of my career, I have worked on close to 60 capital cases in some capacity in the States of Illinois, Kentucky, South Carolina, Oklahoma, Florida, Nevada, California and at the federal level.

2. I was hired by David Owen of the Federal Public Defender's Office for the Western District of Missouri to provide mitigation services in the case of the United States v. Lisa Montgomery. During the time I worked on the case, I reported to David Owen. I worked at Mr. Owen's direction. It is my general recollection that Mr. Owen had various tasks he wanted me to complete.. I understood my role on this case as one in which I was to interview witnesses who had previously been interviewed and attempt to locate others.

3. My experience working on the Montgomery defense team was frustrating. I knew that there had been problems with the two previous teams, but I did not know the details. I tried to stay out of all of the drama that was going on in the office. During the course of my time on the case, you could feel the tension in the office pertaining to David Owen.

4. I do not recall ever having a conversation with John O'Connor about my work on the case. I recall John O'Connor attending one team meeting at which I was present.

5. I do recall Fred Duchardt attending a few of the meetings where I was present. It was clear to me that Mr. Duchardt did not have any use for mitigation specialists. I was informed that he did not believe in using mitigation specialists.

At one point I provided Mr. Duchardt with a genogram and when I tried to discuss it and the implications, he said he couldn't make heads or tails of it and walked out of the room. I do not recall him ever asking for my opinion about the mental health or mitigation themes in the case. I do not recall him asking me my opinion about the pseudocyesis defense. To my knowledge, Mr. Duchardt did not ask or seek input from the team about the advisability of involving his wife, Ryland, in the case. I was led to believe that Ryland was a therapist. I thought it was odd that she was sitting at counsel table. During a break in the trial, I was making small talk with Ryland and asked her where she had gone to school for her training in therapy. She seemed surprised that I was under the impression that she was a therapist and told me she was not. She did some sort of work with developmentally disabled children and horses, but I do not now recall exactly what that entailed. I just recall that she was not a therapist.

6. During the time I was on the case, David Owen made it clear that he wanted someone with me when I went out on interviews. Usually it was Ron Ninemire.

7. By the time I was meeting with the witnesses, it was clear to me that some had witness fatigue. Some witnesses had been interviewed by so many different people that they were tired of telling their story.

8. There were instances when having David Owen present on interviews was distracting. It appeared at times he was not engaged and was disinterested in the interview. One incident I distinctly recall happened during an interview in which Mr. Owen was present. He picked up a newspaper (or some sort of reading material) and read it during my interview while sitting at the table with myself and the witness.

9. I remember Lisa's mother, Judy Shaughnessy, sitting outside the courtroom at one point. She would make comments loudly as some witness walked by so that they could hear. In some instances she said awful things directly to the witness. The witnesses seemed intimidated by Judy. I discussed this with Ron Ninemier as we were concerned. My general recollection was that he advised me he discussed this with an attorney and was advised there was nothing to be done about the situation.



RW

10. I do not recall Mr. Duchardt asking me to prepare the mitigation witnesses, nor consulting with me about the mitigation themes or how the mitigation themes could be brought out during the witnesses' testimony.

11. After interviewing a witness, it was my general practice to write memos to the team to share what I learned and my observations. To my recollection I gave memo's of interviews to the Federal Public Defender's Office. The contents of my memos are a true and accurate recording of what the witnesses said to me at the time of their interviews.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Dated this 17 day of March, 2013.

Dani Waller, MSW