# **Declaration of Holly Jackson**

I, Holly Jackson, declare as follows:

I am a mitigation specialist in private practice in Los Angeles, California, and I am also an attorney licensed to practice law in California. I have been in private practice as a mitigation specialist and attorney since 1999. My work has involved investigating and preparing mitigation evidence, including social histories, in state and federal capital cases.

Since January 2000, I have worked on 40 capital murder trials and post conviction proceedings. I have worked on federal death penalty cases in California, New Mexico, Missouri, and Tennessee, and on state death penalty cases in California, Montana, and Mississippi. I regularly attend CLE accredited federal and state training seminars for capital cases, consult with experts in the field, and stay abreast of capital case law as it relates to mitigation and mental health issues.

I was hired to be the mitigation specialist for the Lisa Montgomery team by the Office of the Federal Public Defender, Western District of Missouri in late summer of 2005. I was told at the time I was hired that Judy Clarke, an experienced capital defender, was joining the team, and I looked forward to the opportunity to work with her and the rest of the team.

I recognized early on that counsel from the office of the federal defender in Kansas City did not recognize, know, and understand how to conduct a mitigation investigation and how to prepare a reliable social history of the client. Although I did not know with certainty what their prior capital experience was, it was clear they were unfamiliar with ABA Guidelines on the Performance of Counsel in Capital Cases, basic principles of penalty phase investigation, the relationship between trauma and mental health, symptoms of major mental disease, and how to obtain and analyze information to determine its relevance to mitigation and Ms. Montgomery's

social history. Part of my role as a mitigation specialist is to help counsel learn about relevant mental health issues and the protocol for investigation for the penalty phase. I attempted to assist counsel in getting up to speed on mitigation investigation and mental health issues in Ms. Montgomery's case.

At team meetings and in conversations with individual team members, I attempted to discuss these preliminary findings and the need for additional follow up to learn specific behaviors at various developmental and critical stages in Lisa's life. I described mental health symptoms I observed in Lisa that suggested the presence of several possible major mental disorders, including bipolar mood disorder and post-traumatic stress disorder, but emphasized that it was imperative to show the course of these symptoms and behaviors over time through multiple interviews and relevant life history documents. I tried to present my suggestions in an unthreatening and supportive manner because dynamics in the federal defender office seemed very bizarre. They were very paranoid about any hint of criticism and paid excessive attention to gossip and rumors.

Counsel dismissed my suggestions and recommendations as if I were an alien from Mars. Counsel were hostile and uninterested in learning my observations and findings in my investigation. They belittled and ridiculed well established consequences of severe trauma on individuals, even when it was apparent that Ms. Montgomery had survived extreme trauma in childhood at the hands of her parents. They rejected out of hand possible relationships between Ms. Montgomery's behavior over the course of her adult life and the presence of mental illness, in spite of growing evidence that her behavior was inextricably linked to significant impairments.

I quickly came to rely on Judy Clarke to guide the investigation and to educate the team about the protocol and objectives of mitigation investigation in a complex case such as Ms.

Montgomery's. I hoped her standing, stature, and experience in capital trials could overcome the federal defenders' skepticism and disregard for mitigation and mental health related investigation. The federal defender team members, however, resisted her efforts to meet the standard of care demanded in capital cases and ridiculed her as much as they did me. It was not simply a personnel dispute or personality conflict. Attorneys on the team other than Ms. Clarke consistently rejected and dismissed mitigation evidence as unimportant and irrelevant.

At the time I resigned from Ms. Montgomery's case, I was beginning to suspect the severity of her multiple mental impairments and that they likely disrupted her day to day functioning in every domain. The evidence we uncovered strongly suggested that we had a great deal more investigation to conduct to identify the nature and severity of her illness, especially in light of her lack of contact with reality and her limited ability to describe significant events in her life. She seemed incapable of providing detailed and realistic accounts of terrifying and stressful situations. Her memory deficits and distortions in her perceptions were red flags that we had a long way to go before we would be ready for trial.

I knew the case needed capital counsel who were steeped in complex mental health related issues, how to analyze extensive data, and how to present the case to all the decision makers, from the U.S. Attorneys, to the Court, and to the jury if need be. Although I had extensive experience in mitigation investigation and commonly seen mental illnesses, the emerging picture in Ms. Montgomery's case required more than I could provide. No mitigation specialist can replace competent counsel; we can only supplement their work. In Ms. Montgomery's case, however, Ms. Clark's removal from the case left the team bereft of any team member competent to guide the investigation and develop the mental health aspects of the case.

It was critical to the case that we document the manner in which her day to day functioning was impaired and that we determine the etiology of the impairments. I suspected fetal alcohol spectrum disorder, bipolar mood disorder, disorders of extreme stress, and neurologic impairments were at work in Lisa's life for a long time, not just the year leading up to the offense. I heard hints and suggestions from witnesses that required follow up that Ms. Montgomery was unable to attend to the needs of her children, despite her considerable love for them; her hygiene was terrible; she could not keep a safe and sanitary home; she worked in extremely low level positions but had performed well academically; she was unable to focus and sustain attention; and she initiated and failed to complete project after project. I also suspected that the severe child abuse she survived contributed to much of the chaos and confusion in her life.

Mitigation for Ms. Montgomery required more than a list of diagnoses, tests, and criteria. It required the story of her life in rich detail and narrative so that ordinary jurors could see and believe the interplay of mental illness and her day to day life. It is especially important in mental health cases, such as Lisa Montgomery's, to provide the jury and the Court with a credible and reliable, empathy provoking narrative that puts human context around otherwise off putting labels. The narrative must be detailed, documented, and persuasive. Simply presenting disconnected facts, summary descriptions, and historical data is not sufficient.

///

///

///

///

///

After interviewing a witness, it was my practice to write memos to the team to share what I learned and my observations. Everything I had, I gave to the Federal Public Defender's Office. The contents of my memos are a true and accurate recording of what the witnesses said to me at the time of their interviews.

I declare under penalty of perjury the foregoing is true and correct to the best of my ability this 10th day of March, 2013.

Holly Jackson

Holly Jackson