Confidential Memo

To: David Owen, John O'Connor, Fred Duchardt, Ron Ninemire
From: Dani Waller

Date: August 6, 2007

RE: **Allen Baldwin** [redacted]

[redacted]

---

**Allen** is the ex-husband of **Patty** (Lisa's ½ maternal sister). Patty moved to Clarington, Ohio with a boyfriend who was in the military [Bob Marling]. Patty met her military boyfriend in San Diego, CA and when he returned to Ohio, Patty went with him. She and her boyfriend both worked a local gas station. Allen knew Patty from the gas station. They eventually began dating and Allen married Patty 9/24/95. They divorced 8/2002.

Allen met **Lisa** Montgomery one time. Allen and Patty returned to Topeka, Kansas for a family reunion in 1996. All of the siblings (**Tommy, Teddy, Jerri Jo**, Patty and Lisa) stayed at their aunt's house. All of the siblings were "extremely rude" to Lisa during the family reunion. They made fun of her hair and her clothes. That evening Allen took Patty aside and told her she should be ashamed of herself for treating her sister that she hadn't seen for a long time so harshly.

Patty got upset that Allen was "taking her side." She said "you don't know her." Allen said it didn't matter what Lisa had done in her past, she had done nothing that day to warrant such treatment. He didn't feel like he knew Patty's siblings well enough to say anything to them.

Patty tried to make her case by telling him about the stuff Lisa had done in the past but, "most of it seemed petty to me." Two things stick out in his mind. First, Patty told him that Lisa had married her brother. Allen didn't find out until much later that it was actually a step-brother Lisa had not been raised with-Allen believes Patty left those details out in order to present Lisa in the worst light possible. Secondly, Patty told Allen that Lisa had an affair with her mother's husband.

Allen said their treatment of Lisa at the family reunion reminded him of school children. There's usually one kid who is picked on. When the next school year arrives, it doesn't matter that it's a brand new school year, the kids still pick on the identified one and don't give them a fresh start. He felt sorry for Lisa.

Allen brought his video camera to the reunion. Patty and her siblings each got to make their own tape. Teddy made fun of Lisa throughout his tape. He would say how ugly she was and how ugly her clothes were. Then that night, they were going to watch their videos. Teddy showed his and they were all laughing at Teddy's video which made fun of Lisa. Lisa then got up and went to bed. She refused to let them watch the video she made. They snuck in her room that night and took it. The next morning they were making comments to her that let her know they had watched it. Lisa said, "I know what you did" and left with her children. Allen did not see Lisa's video, but Patty said Lisa had basically only filmed

him. Allen did not know what to think. Lisa was not sexual or inappropriate in any way. She was nothing but polite to him.

Patty called Allen the day after Lisa was arrested for the current charges she faces. Patty said "see I told you all along she was crazy."

Allen knew Patty from the gas station, but he actually talked to her at a club. He used to help music disc jockeys set up their equipment at clubs in the area. One night he saw Patty out and she asked him to sit at her table to keep another patron from bothering her. When he asked where her boyfriend was, she told him they broke up. He sat with her for a couple hours. She began calling him regularly and they dated. Allen later found out (once his relationship with Patty was over) through friends that Patty had not broken up with her boyfriend and was also seeing him at that time.

Patty tried to stay away from her family. She told Allen that the further away from them she was, they better off she was as they couldn't get along. She went to visit her family in December of 2001. It was then that she met another man through her sister Jerri Jo. Patty then began going back to Kansas on a monthly basis. She would tell Allen right before she left so he wouldn't have enough time to take off work and go with her. She and Allen eventually separated and Patty moved back to Kansas in the summer of 2002. They were divorced in August of 2002. Patty had taken many things that belonged to Allen such as his personal photo albums. She agreed to send them and his stuff back. She never did.

Patty's oldest daughter **Karen** [redacted] was young when he first began seeing Patty. She was like a daughter to Allen. He and Patty went on to have a daughter **Kaylee** [redacted]. After Patty and Allen divorced, he continued to help with Karen and got her for vacations too.

Allen met Patty's mom **Judy** when she came to visit them in Ohio. Judy said she was coming to find an apartment and job. She wanted to move to Ohio. They were going to let Judy stay with them until she found a job. However, after 3 days Judy went back to Kansas. She told Patty that she was a "sloppy pig" whom she had "raised better than that." She told Patty she couldn't take it in Ohio with her and thus needed to return to Kansas.

Patty was very hurt by Judy's comments. Patty realized that Judy had used her. Judy was involved with a guy and had left him. She moved to Ohio so he would beg her back. Then, she didn't want to feel guilty about leaving and returning to him, so she blamed it on Patty; "she used Patty as her excuse."

Judy treated Allen like a "king." She told Patty that he was the best thing she could get and she should hold on to him. Patty didn't work much. She didn't cook or clean either. She didn't do anything to make life better for Allen "she was the most unorganized woman." When Patty left him, she told him that she couldn't live up to what she was "supposed" to be and that she needed to be herself. She was tired of everyone telling her how lucky she was to have him.

Allen's last conversation with Judy was one in which she lied to him. Allen and Patty were separated in July of 2002. He had Kaylee at the zoo when he got a call that Patty needed her back right away. He thought it was odd, but returned her. Patty assured him she was not leaving Ohio only moving to another apartment, but after a few days of not being able to locate Patty, he called Judy. Judy had just been there visiting Patty. He dug through old address books of Patty's until he found Judy's number. Judy told Allen she had no idea where Patty was living. She admitted to driving Patty back to Kansas, but knew nothing beyond that. Allen later found out from his step-daughter Karen that Judy was lying to him. It had been Judy's idea all along and they stayed at Judy's house. Patty took off with his daughter

and step-daughter without letting them say good-bye. Karen also told him that Patty's boyfriend was living with them at Judy's as well.

Allen's step-daughter Karen is now 18 years old. She calls Allen on a regular basis. She moved out from Patty's home when she was 18 years old. She moved in with a male friend. She told Allen she moved out as soon as she had the chance to get away from her mother and the drama of her mother's family. She finally dropped out of school because Patty was going to the school and making scenes. Patty would also follow her from school to try and figure out where she was living. Patty called Allen. He told her Karen was an adult and didn't have to tell where she was living. He also pointed out to Patty that if she had a better relationship with Karen, Karen would want her to know her address. Karen is now hoping to go back and finish school.

Patty has another daughter **Jessica** who is 16 years old. Jessica lives with her father in Florida. Jessica and Karen communicate through email. Patty left Jessica with her mother Judy for a couple months when Jessica was little. Jessica's father **Troy** then flew to Judy's and took Jessica back home with him. Patty claimed they dropped off the face of the earth.

Allen would urge Patty to locate Jessica, but she claimed to not know where she was or how to find her. Finally, they contacted Jessica's father Troy. Allen drove half way to meet Troy and bring back Jessica for a visit.

Not long into the visit Patty said "I'm ready to send her home. She's a brat." Allen told her it was a horrible thing to say about her daughter. He thought she should partially blame herself for Jessica's acting out behavior as she hadn't been there for her at all. After Jessica returned to Florida, Allen would encourage Patty to send Jessica cards and birthday gifts. He gave her money for this and Patty assured him she was doing so. However, once Patty left Allen, Jessica's father told Allen that Patty never got back in touch with Jessica nor did she ever send cards/gifts.

Allen believes that Patty didn't want to have to pay child support. He also believes Patty is the type that once it's over, she's ready to move on. Allen believes that Patty only has contact with Jesscia now because the other two girls (Karen and Kaylee) keep up the contact.

Allen continued to give Patty money for anything Karen or Kaylee needed. He gave her money through Western Union a number of times because Patty would call and say someone was running a high fever and needed to go to the Emergency Room. He would demand that she send him a receipt, but she never did. He figured she was lying "but that was my kid, I wanted to make sure she was okay." Later, Karen told Allen that Patty had been lying in order to get more money out of him. Karen said Patty would threaten her-make her call Allen and tell him she needed money for a school dance dress. Patty would tell Karen if she didn't do it, she couldn't go anywhere.

Allen wants custody of his 11 year old daughter Kaylee-every summer when she visits she tells him she wants to stay with him, but then backs out at the last minute. She said her mother Patty makes her promise she'll return. Kaylee said if she breaks her promise her mother will be mad at her forever.

Allen met Jerri Jo a few times. His impression of her was that she was wild and wanted to go out and party often. He knows Patty and Jerri Jo had a falling out and weren't speaking for a while. One time Patty called him for money. He told her to get it from her family. She told him they weren't speaking anymore. She had different reasons for not speaking to her different siblings.

Allen knew Tommy from the time Patty convinced Allen to take Tommy in while they lived in Ohio. She thought if they could get him away from his family and friends, he would be better. Tommy was alright for a while, but he and Patty would often bicker and argue. Finally, Tommy was yelling at her in the kitchen. He then pushed her in front of the kids and Allen and left.

Allen took off after him and found him drinking at a creek he liked. He explained to Tommy why that behavior wasn't allowed (kids) and that they needed to talk if they were having a problem. Tommy apologized but showed up later, drunk. Finally, after having been kicked out of their home, Tommy told Allen that he was going to leave Ohio because he couldn't change and control his temper. He didn't see any point in sticking around and causing problems for Allen and Patty.

Allen worked as a commercial roofer for 13 years. He currently works for a heating/air conditioning company. Allen will contact Karen (in Kansas) to see if she'd be willing to talk to me. He advised he would be willing to answer more questions as well.

# UNITED STATES

# VS

# LISA MONTGOMERY

*05-06002-01-CR-W-GAF*

# CARL BOMAN

OMB No. 3095-0029 Expires 9/30/2005

# REQUEST PERTAINING TO MILITARY RECORDS

To ensure the best possible service, please thoroughly review the accompanying instructions before filling out this form. Please print clearly or type. If you need more space, use plain paper.

## SECTION 1 - INFORMATION NEEDED TO LOCATE RECORDS (Furnish as much as possible.)

1. NAME USED DURING SERVICE (last, first, and middle) | 2. SOCIAL SECURITY NO. | 3. DATE OF BIRTH | 4. PLACE OF BIRTH

5. SERVICE, PAST AND

BRA

Need Section 1 Info
Completed

ERVICE NUMBER
RING THIS PERIOD
nown, write "unknown")

a. ACTIVE SERVICE

b. RESERVE SERVICE

c. NATIONAL GUARD

6. IS THIS PERSON DECE

☐ NO ☐

TARY SERVICE?

1. REPORT OF SEPAR... (DD Form 214 or equivalent). This contains information normally needed to verify military service. A copy may be sent to the veteran, the deceased veteran's next of kin, or other persons or organizations if authorized in Section III, below. NOTE: If more than one period of service was performed, even in the same branch, there may be more than one Report of Separation. Be sure to show EACH year that a Report of Separation was issued, for which you need a copy.

☐ An **UNDELETED** Report of Separation is requested for the year(s) ______

This normally will be a copy of the full separation document including such sensitive items as the character of separation, authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and dates of time lost. An undeleted version is ordinarily required to determine eligibility for benefits.

☐ A **DELETED** Report of Separation is requested for the year(s) ______

The following information will be deleted from the copy sent: authority for separation, reason for separation, reenlistment eligibility code, separation(SPD/SPN) code, and for separations after June 30, 1979, character of separation and dates of time lost.

**2. OTHER INFORMATION AND/OR DOCUMENTS REQUESTED** ______

**3. PURPOSE** (Optional – An explanation of the purpose of the request is strictly voluntary. Such information may help the agency answering this request to provide the best possible response and will in no way be used to make a decision to deny the request.) ______

## SECTION III - RETURN ADDRESS AND SIGNATURE

**1. REQUESTER IS:**

☐ Military service member or veteran identified in Section I, above

☐ Next of kin of deceased veteran ______ (relation)

☐ Legal guardian (must submit copy of court appointment)

☐ Other (specify) ______

**2. SEND INFORMATION/DOCUMENTS TO:**
*(Please print or type. See item 3 on accompanying instructions.)*

Name

Street | Apt.

City | State | Zip Code

**3. AUTHORIZATION SIGNATURE REQUIRED** *(See item 2 on accompanying instructions.)* I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the information in this Section III is true and correct.

[signature]

Signature of requester (Please do not print.)

03/03/06 [redacted]

Date of this request | Daytime phone

Email address

# INSTRUCTION AND INFORMATION SHEET FOR SF 180, REQUEST PERTAINING TO MILITARY RECORDS

**1. Information needed to locate records.** Certain identifying information is necessary to determine the location of an individual's record of military service. Please try to answer each item on the SF 180. If you do not have and cannot obtain the information for an item, show "NA," meaning the information is "not available." Include as much of the requested information as you can.

**2. Restrictions on release of information.** Release of information is subject to restrictions imposed by the military services consistent with Department of Defense regulations and the provisions of the Freedom of Information Act (FOIA) and the Privacy Act of 1974. The service member (either past or present) or the member's legal guardian has access to almost any information contained in that member's own record. Others requesting information from military personnel/health records must have the release authorization in Section III of the SF 180 signed by the member or legal guardian, but if the appropriate signature cannot be obtained, only limited types of information can be provided. If the former member is deceased, surviving next of kin may, under certain circumstances, be entitled to greater access to a deceased veteran's records than a member of the public. The next of kin may be any of the following: unremarried surviving spouse, father, mother, son, daughter, sister, or brother. Employers and others needing proof of military service are expected to accept the information shown on documents issued by the military service departments at the time a service member is separated.

**3. Where reply may be sent.** The reply may be sent to the member or any other address designated by the member or other authorized requester.

**4. Charges for service.** There is no charge for most services provided to members or their surviving next of kin. A nominal fee is charged for certain types of service. In most instances service fees cannot be determined in advance. If your request involves a service fee, you will be notified as soon as that determination is made.

**5. Health and personnel records.** Health records of persons on active duty are generally kept at the local servicing clinic, and usually are available from the Department of Veterans Affairs a week or two after the last day of active duty. (See page 2 of SF180 for record locations/addresses.)

**6. Records at the National Personnel Records Center.** Note that it takes at least three months, and often up to seven, for the file to reach the National Personnel Records Center in St. Louis after the military obligation has ended (such as by discharge). If only a short time has passed, please send the inquiry to the address shown for active or current reserve members. Also, if the person has only been released from active duty but is still in a reserve status, the personnel record will stay at the location specified for reservists. A person can retain a reserve obligation for several years, even without attending meetings or receiving annual training. (See page 2 of SF180 for record locations/addresses.)

**7. Definitions and abbreviations.** DISCHARGED -- the individual has no current military status; HEALTH -- Records of physical examinations, dental treatment, and outpatient medical treatment received while in a duty status (does not include records of treatment while hospitalized); TDRL – Temporary Disability Retired List.

**8. Service completed before World War I.** National Archives Trust Fund (NATF) forms must be used to request these records. Obtain the forms by e-mail from *inquire@nara.gov* or write to the Code 6 address on page 2 of the SF 180.

## PRIVACY ACT OF 1974 COMPLIANCE INFORMATION

The following information is provided in accordance with 5 U.S.C. 552a(e)(3) and applies to this form. Authority for collection of the information is 44 U.S.C. 2907, 3101, and 3103, and E.O. 9397 of November 22, 1943. Disclosure of the information is voluntary. If the requested information is not provided, it may delay servicing your inquiry because the facility servicing the service member's record may not have all of the information needed to locate it. The purpose of the information on this form is to assist the facility servicing the records (see the address list) in locating the correct military service record(s) or information to answer your inquiry. This form is then filed in the requested military service record as a record of disclosure. The form may also be disclosed to Department of Defense components, the Department of Veterans Affairs, the Department of Transportation (Coast Guard), or the National Archives and Records Administration when the original custodian of the military health and personnel records transfers all or part of those records to that agency. If the service member was a member of the National Guard, the form may also be disclosed to the Adjutant General of the appropriate state, District of Columbia, or Puerto Rico, where he or she served.

## PAPERWORK REDUCTION ACT PUBLIC BURDEN STATEMENT

Public burden reporting for this collection of information is estimated to be five minutes per response, including time for reviewing instructions and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of the collection of information, including suggestions for reducing this burden, to National Archives and Records Administration (NHP), 8601 Adelphi Road, College Park, MD 20740-6001. DO NOT SEND COMPLETED FORMS TO THIS ADDRESS. SEND COMPLETED FORMS AS INDICATED IN THE ADDRESS LIST ON PAGE 2 OF THE SF 180.

Standard Form 180 (Rev. 02-02) (Page 1)
Prescribed by NARA (36 CFR 1228.168(b))

Authorized for local reproduction
Previous edition unusable

OMB No. 3095-0029 Expires 9/30/2005

# REQUEST PERTAINING TO MILITARY RECORDS

To ensure the best possible service, please thoroughly review the accompanying instructions before filling out this form. Please print clearly or type. If you need more space, use plain paper.

## SECTION I - INFORMATION NEEDED TO LOCATE RECORDS (Furnish as much as possible.)

| 1. NAME USED DURING SERVICE (last, first, and middle) | 2. SOCIAL SECURITY NO. | 3. DATE OF BIRTH | 4. PLACE OF BIRTH |
|---|---|---|---|
| | | | |

5. SERVICE, PAST AND PRESENT (For an effective records search, it is important that all service be shown below.)

| | BRANCH OF SERVICE | DATES OF SERVICE | | CHECK ONE | | SERVICE NUMBER DURING THIS PERIOD (If unknown, write "unknown") |
|---|---|---|---|---|---|---|
| | | DATE ENTERED | DATE RELEASED | OFFICER | ENLISTED | |
| **a. ACTIVE SERVICE** | | | | | | |
| | | | | | | |
| | | | | | | |
| **b. RESERVE SERVICE** | | | | | | |
| | | | | | | |
| **c. NATIONAL GUARD** | | | | | | |
| | | | | | | |

6. IS THIS PERSON DECEASED? If "YES" enter the date of death.
☐ NO ☐ YES ____________

7. IS (WAS) THIS PERSON RETIRED FROM MILITARY SERVICE?
☐ NO ☐ YES

## SECTION II – INFORMATION AND/OR DOCUMENTS REQUESTED

1. **REPORT OF SEPARATION** (DD Form 214 or equivalent). This contains information normally needed to verify military service. A copy may be sent to the veteran, the deceased veteran's next of kin, or other persons or organizations if authorized in Section III, below. NOTE: If more than one period of service was performed, even in the same branch, there may be more than one Report of Separation. Be sure to show EACH year that a Report of Separation was issued, for which you need a copy.

☐ An **UNDELETED** Report of Separation is requested for the year(s) ____________

This normally will be a copy of the full separation document including such sensitive items as the character of separation, authority for separation, reason for separation, reenlistment eligibility code, separation (SPD/SPN) code, and dates of time lost. An undeleted version is ordinarily required to determine eligibility for benefits.

☐ A **DELETED** Report of Separation is requested for the year(s) ____________

The following information will be deleted from the copy sent: authority for separation, reason for separation, reenlistment eligibility code, separation(SPD/SPN) code, and for separations after June 30, 1979, character of separation and dates of time lost.

2. **OTHER INFORMATION AND/OR DOCUMENTS REQUESTED** ____________

3. **PURPOSE** (Optional – An explanation of the purpose of the request is strictly voluntary. Such information may help the agency answering this request to provide the best possible response and will in no way be used to make a decision to deny the request.) ____________

## SECTION III - RETURN ADDRESS AND SIGNATURE

1. **REQUESTER IS:**

☐ Military service member or veteran identified in Section I, above
☐ Next of kin of deceased veteran ____________ (relation)
☐ Legal guardian (must submit copy of court appointment)
☐ Other (specify) ____________

2. **SEND INFORMATION/DOCUMENTS TO:**
*(Please print or type. See item 3 on accompanying instructions.)*

Name ____________

Street ____________ Apt. ____

City ____________ State ____ Zip Code ____

3. **AUTHORIZATION SIGNATURE REQUIRED** *(See item 2 on accompanying instructions.)* I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the information in this Section III is true and correct.

Signature of requester (Please do not print.)

03/03/06 [redacted]
Date of this request Daytime phone

Email address ____________

## Dewey, Oklal , United States




Copyright © 1988-2004 Microsoft Corp. and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
© Copyright 2003 by Geographic Data Technology, Inc. All rights reserved. © 2004 NAVTEQ. All rights reserved. This data includes information taken with permission from Canadian authorities © Her Majesty the Queen in Right of C

Carl Boman
<[redacted]>
08/10/2006 10:46 PM

To Ron Ninemire [redacted]
cc
bcc
Subject Re: Hello Carl

I hate to hear that about Phil, it breaks my heart, man he has been hit hard. Ron you guys are always welcome, just let us know when. The FBI is coming next thursday. Our new address

[redacted]

the new number is [redacted]. The summer has been going good, not enough free time or money, but Desi has been down all summer and that has been really nice. Look forward to seeing you again. Carl

--- Ron Ninemire <[redacted]> wrote:

> Carl,
> I hope your summer is going well. It has
> been sometime since I
> have talked to you. There has been a lot of activity
> (non-case related)
> this summer. I did not know if you all heard that
> Phil Thompson's wife
> passed away last month from cancer. Phil has really
> been hit hard this
> year with his daughter and wife passing away.
> Next week David, Dani(our new mitigation
> specialist) and I will be
> in the Tulsa area. We wondered if we could visit you
> and the children.
> Also I need your new address. Please let me know at
> your earliest
> convenience.
>
>
> Thanks,
> Ron Ninemire
>

Do You Yahoo!?
Tired of spam? Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

The following four places were sent work records requests: Zinc Corp, Del Monte Pet Foods in Topeka, Unlimited Concrete in Dewey and Dayco Auto Parts in Springdale. A guy from Dayco left a message on Ron's email that the records for Carl were more than ten years old and had been destroyed.

Connors Correction – 1985 - 90 need subpeona

Wells Fargo - San Diego 1990 - 92

Wells Fargo Tulsa 1992 - 93

Zinc - 1993 - 95 2000 - 2003

Unlimited - 1995 - 2000

Del Monte - April to May 2005

Day Co. - May to August 1989

1st married - 8-21-86
divorced - 10-1-93

2nd married 12-11-94
divorce 8-98

FEDERAL PUBLIC DEFENDER
[redacted]

[redacted]

RAYMOND C. CONRAD, JR.
FEDERAL PUBLIC DEFENDER

April 13, 2006

Carl Boman
[redacted]

RE: CJ's and Kayla's social security cards

Dear Carl:

Enclosed please find the originals of both CJ's

We made copies and are keeping them on file.

Thank you. I look forward to seeing you soon.

Sincerely,

Ron Ninemire
Chief Investig

RKN
Enclosures

P 893 212 649

**Certified Mail Receipt**
No Insurance Coverage Provided
Do not use for International Mail
(See Reverse)

UNITED STATES POSTAL SERVICE

| | |
|---|---|
| Sent to Carl Boman | |
| Street & No. 119 S Bucey | |
| P.O., State & ZIP Code Bartlesville OK 74003 | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Address of Delivery | |
| TOTAL Postage & Fees | $ 4.98 |

10, June 1990

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CARL BOMAN
[redacted]

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Carl B ☐ Agent ☐ Addressee

B. Received by (Printed Name) Carl Boman

C. Date of Delivery 4-21-06

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

BARTLESVILLE OK 74003 APR 21 2006

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? (Extra Fee) ☐ Yes

2. Article Number
(Transfer from service label)

PS Form 3811, August 2001 Domestic Return Receipt 102595-02-M-1540

March 20, 2003

Carl,

Here is new copy of medical which you still owe me for. It is not updated to reflect all medical bills you owe me for.

I have also included a copy of the Kansas Child Support Calculator showing what the new child support should be. This is based on both of us either working 60 hours a week (overtime or second jobs). Vanessa wanted my income from Greyhound included even though I no longer work there, so feel it only fair to include yours. This is based on your stated wages of $8.50 an hour, and could be more if your current wages per hour is more. This is not reflecting the medical or arrearage nor does it reflect the credit you will receive for me being able to claim all 4 children on my taxes. I do not wish for that to change.

On the adjustments: I have not previously charged you for the babysitting costs, and will not do so now. You do not carry health insurance even though you are court ordered, so you do not receive credit for that. The long distance visitation costs are if you have to pick up and bring the kids back on a regular basis which you do not. You will receive the income tax consideration, so I can continue to claim all 4. You may receive the overall financial condition, however it is doubtful you can say that you cannot afford any more due to the fact that your wife does not work.

I don't know if you are going to want a court order for visitation or not. I will fight if you try to enforce a regular visitation due to the fact you have never tried to have a regular schedule set up, and when we do set up a visit, half the time you fail to show up, and cancel at the last minute. I asked you about spring break in advance, so that I could make plans with the kids and you canceled that the day you were to show up and get them.

Chelsea, Carl, and Kayla will be playing summer ball, and have swimming lessons planned for right after. We can try to work out a week in between if that is agreeable to you. I will object to any longer of a visit due to you having inadequate transportation and housing, and interference in the regular summer plans of the kids.

I would also appreciate if you were the one to write to your children. I will not object to Vanessa writing to them as long as letters from you are equal in amounts. That means for every letter Vanessa writes, I will expect one for the kids from you. After all, you are their parent and she is not.

As for your plans to move up here, I will not stop you. I would ask for a number of short visits with the kids before any long ones so that they have time to get to know you again.

I do not wish to attend the same church as you. I do not feel that Vanessa's type of Christianity is what I want my children to learn. She is very judgemental of people, and seems to believe the worst and I don't

really want the kids to think that is what church is about. I am sure she can put on a good show, but they would know better.

I have to go now. I have other things to do. I would appreciate payment on the medical bills as soon as possible, and will get you an updated current bill soon.

Lisa