MR. HELVEY: Your Honor, I have one more witness.

THE COURT: Okay.

MR. HELVEY: Lisa Montgomery.

LISA MONTGOMERY,

called as a witness in behalf of Interested Parties, Jeff and Becky Bodine, having been first duly sworn, testified as follows:

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. HELVEY:

Q. Please state your name for the Court.
A. Lisa Montgomery.
Q. And how are you related to Justin Kleiner?
A. He's my brother Teddy's son.
Q. Now this summer you filed some charges in Franklin County against Tommy, correct?
A. Yes, I did.
Q. Can you tell us what led to that?
A. After Teddy and Bonnie were arrested, me and my sister Patty went to their trailer in Ottawa to retrieve their personal belongings to put up in case they got out. We were there several hours, had left to go get gloves and trash bags, and when we came back Tommy showed up there. He was trying to rip the

walls out looking for Teddy's hidden stash.

When we got ready to leave he was blocking my car, we were trying to jump start my car because it wouldn't start. He got into an argument with us when I asked him if he was involved in it. He took a knife and started threatening me and Patty.

Q. Involved in what?

A. In Teddy's meth lab. I asked him if he knew what was going on there. He started calling me names. Patty told him he couldn't talk to me like that. And he was holding a knife and he started threatening to cut our throats. He slammed Patty's hand in the car door.

Q. How did you get away?

A. We backed up and went through the neighbor's yard in my car.

Q. Before you filed charges, did you talk -- and who is Judy Shaughnessy?

A. She's my mother.

Q. Before you filed charges, did you talk to Judy?

A. Yes. We first went to her house. She was at work, but Patty wanted to take a shower. We talked to Danny. Then we went to my mom's work and told her what happened.

Q. What did she say?

A. She told us she would take care of it, she would deal with Tommy later, to keep our mouths shut or she would not get custody of Justin.
Q. And since -- and you went ahead and filed the charges?
A. I went ahead and talked to my husband and, yes, filed charges.
Q. And then you haven't been allowed at Judy's house since then?
A. I have not gone out there, no.
Q. Now are you familiar with the Hope Kleiner case in Oklahoma?
A. I went with my mother -- I never got to go into the hearings, but I went with my mother several times to Oklahoma to those hearings.
Q. And did she end up with visitation?
A. She told me she had visitation with Hope on a monthly basis.
Q. But is she visiting Hope now?
A. I don't believe so, no.
Q. Has she ever said anything about visits with Hope?
A. I heard of one visit but that was over a year ago, I believe.
Q. Have you stayed in touch with Teddy in prison?
A. I did not initiate contact. He wrote me a letter and

I received it the end of January.

MR. HELVEY: Your Honor, if I could have this marked as Exhibit -- Interested Party Exhibit 15.

THE COURT: All right. Have the other people seen this?

MR. HELVEY: I've given everybody a copy of it, I believe.

THE COURT: All right. The court reporter will mark it.

MR. HELVEY: Your Honor, if I may approach the witness?

THE COURT: You may.

Q. (By Mr. Helvey) Is this the letter you received from Teddy?

A. Yes.

Q. Can you read the sentence on the fourth line that starts: I didn't appreciate.

A. I didn't appreciate Bonnie and Tommy acting like they were just so innocent. Everyone knows all three of us was guilty and I took the rap for all of us. I am really upset that now I am doing the time for all our stupidity. But Tommy and Bonnie both are not returning my letters.

Q. That's fine.

Now did you testify in Tommy's probation revocation hearing?

A. Yes, I did.

Q. And are you afraid of Tommy?

A. Yes, I am.

Q. Why?

A. In November, my sister came in -- Patty came into my work and said that Tommy could come in my work anytime he wanted and there would be nothing I could do about it. And when he did come in my work a couple of days later and I called the police, and there was a no contact order, they seemed unwilling to do anything about it.

We saw him the next night. By then, I had already filed for protective order and saw him the next night at middle school. And he's just like, I can go anywhere I want and you can't do nothing about it. He can go right up to my kids and I can't stop it. I think if he gets angry he will hurt somebody.

Q. Are you afraid that he's going to retaliate against you?

A. I do believe so, for the jail sentence he's in.

MR. HELVEY: Nothing further, Your Honor, for this witness from me right now.

THE COURT: Okay. Any questions, Mr.

McDaniels?

MR. McDANIELS: No.

CROSS EXAMINATION

BY MR. COFFMAN:

Q. The criminal case that you've described relating to Tommy, Patty tells a strikingly different story about that, does she not?

A. Yes, she does at this time.

Q. And this case never went to trial, did it?

A. I was not present at the first hearing in Ottawa. I received a letter saying he had plead guilty.

Q. To misdemeanors to avoid the felony; is that correct, do you know?

A. I do not know.

Q. All right.

Patty never made a statement to the -- they never took her statement, did they?

A. No.

Q. They proceeded only on your statement?

A. Right.

Q. Patty denies that these events happened, doesn't she?

A. Yes.

Q. And Tommy also denies that they happened the way you say it in your report, doesn't he?

A. Right.

Q. That's all I have.

CROSS EXAMINATION

BY MR. HASTERT:

Q. Ma'am, were you pregnant last year?

A. Yes.

Q. And it was my understanding from speaking with your brother that you've had your tubes tied at some point in time; is that correct?

A. Yes, we had surgery a year and a half ago or, well, it's been longer than that, almost two years ago.

Q. When was that?

A. Two years ago April.

Q. And where did you have that surgery?

A. In Topeka.

Q. Do you have any idea what the doctors said your success rate could possibly be or what you could expect?

A. No guarantees. Took us a year, a little over a year.

Q. And what happened to that child?

A. Stillborn, May 30th of last year.

Q. Okay. Thank you.

CROSS EXAMINATION

BY MR. CAMPBELL:

Q. Ma'am, when was the last time you had any contact with your mother?

A. September or October, it's been quite awhile.
Q. So you've had a rather difficult relationship with her since that time?
A. We've had -- since this began a year ago, we've had a very difficult relationship.
Q. You say this, this being the child in need of care case concerning Justin?
A. With Teddy and Bonnie, yes.
Q. Now this case was filed in February of 2003; do you recall that?
A. Yes.
Q. You recall coming in for the original hearings?
A. Right.
Q. Since that date, February 2003, how many times have you been at your mom's house?
A. Four or five times during the summer.
Q. And you haven't been there since?
A. I don't think I've been there since the day Tommy was arrested.
Q. And what day was that?
A. It was in July, right after Teddy and Bonnie.
Q. So you haven't been to your mom's house since July?
A. Right.
Q. Have your children been out there?
A. My children have been out there.

Q. How often?
A. They have been out there once.
Q. One time?
A. Maybe twice. Desiree will drive, so. I know they went Thanksgiving.
Q. You don't recall any other day?
A. I keep thinking there was one other time but it wouldn't have been for very long.
Q. Do you ever go out to your mom's to work or do anything?
A. Now, last year?
Q. In the last year.
A. Not in the last year.
Q. In the last year were you ever at your mom's when Justin was there?
A. Yes.
Q. How many times?
A. Twice, maybe.
Q. In the last -- the most recent being in July?
A. June, May or June.
Q. But you know you haven't been there since July?
A. Yeah.

MR. CAMPBELL: I have no further questions, Your Honor.

THE COURT: Okay. Court's trying to figure

out exactly what your motivation is for being here today. Are you here because you want to set -- you want to tell the truth about facts?

MS. MONTGOMERY: Yes. I got involved with this when Teddy and Bonnie came to my house asking for help. Teddy wanted to go to rehab. Bonnie needed a place to stay with Justin. They had nothing for him. I spent a whole day getting a playpen, diapers, everything that baby needed. And when Laurie Dunn called and said she needed to check on him, I said come out. And they took him and put him in foster care. I was okay with that so Teddy and Bonnie could get their lives back on track. I did everything I could for almost two months to help Teddy and Bonnie.

THE COURT: Are you mad at Teddy and Bonnie, or mad at your mother?

MS. MONTGOMERY: I'm not mad at Teddy and Bonnie. I was disappointed in what they did, but I'm not mad at them, no.

THE COURT: How would you describe your relationship with your mother?

MS. MONTGOMERY: It's been -- we were getting along, trying to get along up til Justin was born. And things that she said and did make me, you

know, wonder.

When Teddy and Bonnie left Justin as a newborn with my mom, my mom had every intention of taking custody of him, that's what she wanted, it was her goal, not to try and help Teddy and Bonnie get their lives back on track, but to take Justin. She did not get custody of Hope and she thought she could get custody of Justin.

When Teddy and Bonnie took Justin to Oklahoma, she did nothing during that whole time. If she said anything to anybody about where they were at and Justin was taken, she would not have the opportunity to get him until he was back here in Kansas. I called Laurie Dunn the day they arrived so they could look at it and nothing was done until they came to my house and it was done in retaliation for them coming to my house. I do believe that. They came to my house on a Monday night -- they arrived on a Friday, they came to my house on a Monday night. Nothing was filed until Tuesday morning. Why wasn't something done over the weekend or Monday morning? My mom had every opportunity to do that. She waited until they were at my house. She did not want Justin taken from my sister's house or her house because then she would not be able to get him.

I've heard people say, your mom says you're trying to get custody. I have never asked for custody of Justin. I have never tried taking custody of Justin.

THE COURT: Well, I guess the problem I'm having here, I'm trying to understand your motivation for testifying. And, you know, it's one thing to be subpoenaed. And apparently you felt you had some information that SRS should know about so you contacted them?

MS. MONTGOMERY: I did not contact SRS.

THE COURT: Huh?

MS. MONTGOMERY: I did not contact SRS about this. I have stayed out of it.

I was here at the first hearing. I helped Teddy and Bonnie with their visits getting transportation. My in-laws even gave them a car so they could do that on their own. But I have stayed out of it until the last hearing last month when I was called and asked how I felt about my mother getting custody of Justin. I felt that that's not a good idea when she was willing to let my brother terrorize us and then cover for him so that she would be able to get custody of Justin.

You don't know what it's like to go to your mom

and say your little brother's taking a knife and threatening to kill you, and she's saying don't say nothing, let it go or I won't get that baby.

THE COURT: All right. Anyone else want to follow up on any of that?

MS. MONTGOMERY: And then they covered for each other. They have.

THE COURT: Anyone?

All right. I guess you can step down.

(The witness stepped down.)

THE COURT: Other witnesses?

MR. HELVEY: None here, Your Honor.

THE COURT: All right. Do you have any rebuttal?

MR. COFFMAN: I do. If nobody else has witnesses, I have two rebuttal witnesses.

THE COURT: Do any other counsel wish to call anyone?

MR. CAMPBELL: I don't think so, Judge. Could we take just a quick break?

THE COURT: Short break?

MR. CAMPBELL: Yeah, I just need to get up and move.

THE COURT: All right. We'll take a break. Let's make it about ten minutes. And then we'll come