DECLARATION OF WILLIAM S. LOGAN, M.D.

I, WILLIAM S. LOGAN, declare as follows:

In March 2005 Susan Hunt and Dave Owen contacted me to conduct an assessment of Lisa Montgomery's immediate clinical needs. This assessment was needed due to Ms. Montgomery's recent suicide attempt. My involvement at that time was for that limited purpose and my work was accomplished in less than ten hours. At the time I evaluated Ms. Montgomery, I provided my thoughts and impressions to defense counsel by letter. My involvement in the case in 2005 was strictly clinical crisis intervention. At no time did I continue to serve as Ms. Montgomery's clinician.

My next involvement in the case was over two years later when I was contacted on March 22, 2007 by attorney Fred Duchardt who asked me to review my earlier report and conduct a further assessment of Ms. Montgomery. I signed a contract for my forensic psychiatric services on March 28, 2007. I examined Ms. Montgomery on April 10, 2007 and again on May 11, 2007. I examined Ms. Montgomery for just under nine hours total in 2007.

When I look back at the trial of Ms. Montgomery, there are a few points that stand out in my memory: first, I specifically and repeatedly asked Mr. Duchardt to provide me with copies of, or information regarding, Ms. Montgomery's computer use. I specifically requested information regarding deletions in her internet history. Mr. Duchardt informed me that that information was not available. Ultimately, my testimony was significantly undermined by cross examination regarding the deleted emails as I was unprepared for those questions. In my view, Mr. Duchardt's failure to provide me with this critical information such that I could take this information into my clinical evaluation and be prepared to respond appropriately on cross examination was catastrophic.

Mr. Duchardt's failure to prepare his witnesses also compromised the testimony of Dr. McCandless, who was totally blindsided by the recordings of Ms. Montgomery's phone calls from CCA. Dr. McCandless was not a forensic expert, but Mr. Duchardt left Dr. McCandless vulnerable to cross examination regarding those calls by not providing her information regarding those calls prior to her testimony. I believe that had Dr. McCandless been prepared, she could have explained that in fact Ms. Montgomery was presenting herself falsely in those phone calls, in other words she was trying to present herself as more competent than she was in order to mask her deficits and impairments.

At the time Mr. Duchardt contacted me, he had already zeroed in on pseudocyesis as the cornerstone of Ms. Montgomery's defense. Mr. Duchardt had run across Dr. Ramachandran and was quite taken with his scientific theories. Dr. Ramachandran, it appeared, had little to no forensic experience, and the extent of his expertise was questionable in my view. He had personally seen ten pseudocyesis cases. While I do not dispute that pseudocyesis is an acknowledged somatoform disorder, it does not take into account Ms. Montgomery's other long standing and significant disabilities. There were more diagnostically accurate and clinically appropriate diagnoses to explain her symptoms of psychosis, symptoms that were grounded in her medical, family, psychiatric, and social history.

The defense did not allocate resources to the development of a social history, because of the focus on pseudocyesis. An adequate social history would have permitted a more complete discussion of Ms. Montgomery's psychotic symptomatology in the context of her complete life history and her behaviors both related and unrelated to the offense. It was necessary for me to have had a full social history that included more collateral sources rather than being forced to rely almost exclusively on the information Ms. Montgomery was able to disclose to me. While a full social history is always desirable, such was especially critical in this case in light of the evidence that Ms. Montgomery was actively psychotic. A social history would have provided patterns of behavior related to trauma, neurologic deficits, and psychiatric disease. It also would have offered examples of how severely impaired Ms. Montgomery was in her day to day functioning.

Mr. Duchardt's primary focus of pseudocyesis was clinically incomplete, myopic and misguided. I liken it to what we used to call in medical school "sophomore's disease" -- which is when medical students become entranced with rare and interesting diseases and begin to look for unusual and or exciting medical explanations for common symptoms.

Understanding Ms. Montgomery's behavior and symptomology in context of her major psychiatric disorders would have made much more sense rather than focusing solely on the possibility of her having such a rare, specific diagnosis. Had I been asked, I would have suggested that the focus of the mitigation be placed on Ms. Montgomery's symptomology – explaining to the jury that Ms. Montgomery was out of touch with reality (psychotic), a condition seen in the context of a major mood disorder. Though she was able to form a plan, Ms. Montgomery's frame of reference was not rational; she was psychotic and her actions resulted from that psychosis and lack of contact with reality. It would have been more consistent with the evidence if the defense had presented a complete picture of the interaction of major depression with psychotic features, severe bipolar disorder, complex trauma, and neurologic

impairments. Pseudocyesis is a rare symptom presentation that can occur as part of major depression with psychotic features or severe bipolar disorder.

Mr. Duchardt did not want any testimony that did not directly support the diagnosis of pseudocyesis. I thought it was important that Ms. Montgomery's actions at the time of the offense be understood in the context of her psychiatric and neurological history, which showed she was gravely disabled as a result of long standing and multiple mental impairments, not simply one rare and obscure delusional disorder. Even if the impairments did not provide a defense to the charges, they explained the intensity of her desperate acts and the irrationality of her thought process, all of which was relevant to mitigation of sentence.

By the time I got involved in 2007, it was full speed ahead on pseudocyesis. Mr. Duchardt was completely focused on guilt innocence phase of the trial and little preparation was done for the penalty phase.

Because of her severe abuse history, delusions, and psychosis, Ms. Montgomery often dissociated, was perceptually disrupted, and suffered from memory impairment so often seen in severely traumatized, psychotic patients. At the time, Ms. Montgomery was unable to disclose the information necessary for a reliable social history. The inability to accurately and effectively disclose details about the nature of trauma and its sequelae is often not volitional but is a direct result of the trauma, and special care must be given to avoid exacerbating symptoms of trauma and producing unreliable information. Trauma assessments and interviews must be conducted in a safe environment by trustworthy and trained persons who are provided adequate time to build a trusting relationship and sufficient information to recognize the interplay of trauma with other disorders such as cognitive impairments. That is why it is essential that interviews with severely traumatized clients be conducted by mitigation specialists, team members, or other experts with training and experience in interviewing trauma survivors and overcoming predictable barriers to disclosure.

Another problem in this case was that Mr. Duchardt did not appear to be working with a qualified mitigation expert. I have known Ron Ninemire, who is an investigator employed by the Office of the Federal Defender, for years and I respect his work, but he is not a mitigation investigator. That is simply not his role. When I consulted on this case initially in 2005, Lisa Rickert was the mitigation expert. When I began consulting on the case in 2007, I did not work with any mitigation investigator or expert over the duration of the defense investigation. It is unusual for a mitigation expert to not have contact with the client and with forensic experts such as myself. In my experience working cases in which the death penalty

has been sought, the way this case was handled is the exception rather than the rule. Most often I work with mitigation investigators, identifying red flags I see in the social history or in the client interviews and request the investigator and defense team to provide me additional information on that aspect or area of a client's life so that I can better assess how that event, symptom, or relationship fits with the client's behavior or symptomatology and affects the diagnosis.

I would have been interested in knowing much more information about Ms. Montgomery's social history. A complete history of the abuse she suffered as a child and as an adult, the temporal relationship between violence she experienced and her report of false pregnancies, and observations of her behavior before the crime would have informed my analysis. My assessment of Ms. Montgomery established that she was clearly psychotic, that is to say out of touch with reality; in March of 2005 she was experiencing both auditory and visual hallucinations. Without a detailed and thorough social history, I was unable to discern how longstanding this psychosis was or whether it permeated all aspects of her functioning prior to incarceration or was confined to solely matters relating to pregnancy.

Mr. Duchardt did not ask me to explain to the jury the effect of Ms. Montgomery's medication on her affect. During the course of the trial the jury had opportunity to view video clips of Dr. Dietz's interview with Ms. Montgomery. Had I been asked, I could have explained that the medications Ms. Montgomery was taking pursuant to her psychiatrist's prescription flattened her affect, diminishing her ability to react emotionally to Dr. Dietz. The medication also affected her presentation in the courtroom. In addition to the effect of her medication, Lisa has trust and paranoia issues which affected her presentation when she was interviewed by Dr. Dietz who was a stranger to her –someone unknown to her and who admittedly worked for the prosecution.

My initial impression of Ms. Montgomery as psychotic with a mood disorder reflected my observations and the information provided me at that time, and she continued to demonstrate symptoms of psychosis, major depression, and bipolar mood disorder. Mr. Duchardt did not ask me to conduct a screening for neurological impairments, and I did not conduct one, although a 2006 neuropsychological evaluation by Robert Fucetola, Ph.D., and brain imaging studies by Rubin Gur, Ph.D., were provided later. Absent a reliable social history and appropriate diagnostic tests – including neuropsychological and neurological assessments – it is not possible to say with certainty what psychiatric and neurological diseases affected Ms. Montgomery's behaviors and actions.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

William S. Logan, M.D.

William S. Logan, M.D.
Signed this 14 day of March 2013.