# DECLARATION OF CHRIS ARMSTRONG

I, CHRIS ARMSTRONG, declare as follows:

I am an investigator in the Office of the Federal Public Defender for the Middle District of Tennessee in Nashville. As part of my employment, I traveled to Kansas City, Missouri and witnessed the interview of Fred Duchardt by attorneys for Lisa Montgomery on the morning of March 12, 2013. The following is what Mr. Duchardt related to counsel regarding his representation of Lisa Montgomery.

Mr. Duchardt explained that he came to be involved in the Lisa Montgomery case when he was contacted by attorney John O'Connor on May 16, 2005. Mr. O'Connor specified that he was soliciting Mr. Duchardt's involvement in the case, because of his "familiarity with dealing with mental health issues." Mr. Duchardt clarified that Mr. O'Connor was uncomfortable with the mental health aspect of Ms. Montgomery's case and specifically wanted Mr. Duchardt to handle that aspect of the case. At the time of his initial involvement, Mr. O'Connor made Mr. Duchardt aware that the Office of the Federal Public Defender for the Western District of Missouri (hereafter FPD) was reluctant to work with him. Mr. Duchardt honestly does not know why that was the case. He had never before worked directly with that office, but laughingly speculated, "I guess my reputation precedes me."

Mr. Duchardt and Mr. O'Connor had previously worked together on the Demetrius Hargrove case, but they had also known each other for years before that. Their acquaintanceship dated back to Mr. O'Connor's days as a prosecutor in Jackson County. Mr. Duchardt characterized their partnership as having an "approach" which was "to roll up our sleeves and get to work." When asked who took the lead counsel role, Mr. Duchardt explained, "for the most part, no one is a chief or an indian."

At the time Mr. Duchardt first met Ms. Montgomery, she was "devastated" by the loss of Ms. Clarke as her counsel. Ms. Montgomery was suffering the after-effects of having lost confidence in her trial team and was "very guarded" with him initially. As he explained, Ms. Montgomery has to deal with what he called "her demons" constantly, but she was dealing with a lot more back then than she is now. Mr. Duchardt "worked like hell to get her say what the hell she meant," because expressing herself was very difficult for Ms. Montgomery. Ms. Montgomery had been "in no way in the loop" about the events which led to the loss of Ms. Clarke as her counsel and had had no interaction with Ms. Clarke since Ms. Clarke's dismissal. As Mr. Duchardt worked with Ms. Montgomery it became clear to him what a nice relationship Ms. Clarke had developed with Ms. Montgomery.

On May 16, 2007, Mr. Duchardt called former counsel Judy Clarke. As he explained, at that point he was trying to piece together what had happened. He likened the situation to his having walked into a bomb scene: the case had exploded and he was trying to figure out what triggered the entire problem. He was trying to get everybody's side. Ms. Clarke explained that

Ms. Montgomery was being denied her right to counsel. Mr. Duchardt felt that as Ms. Clarke had been admitted *pro hac vice*, she did not have a leg to stand on, legally. He told Ms. Clark to get herself admitted to practice in the Western District of Missouri and they could talk further. Mr. Duchardt characterized Ms. Clarke as "a delight and smart as all get-out."

Mr. Duchardt related that he also talked with his co-counsel, FPD David Owen, regarding what had happened to cause the breakup of the first defense team. Mr. Owen told Mr. Duchardt that Ms. Clarke was "condescending" and "emasculating." Mr. Duchardt felt that Mr. Owen, "had issues along those lines, because he voiced them. It struck [Mr. Duchardt] that that said volumes more about [Mr. Owen] than it did Judy [Clarke]." Mr. Duchardt explained further that Mr. Owen is not the easiest person to get along with "as Judy learned." But Mr. Duchardt made the best of the situation, because Mr. Owen was willing to work and it was, in Mr. Duchardt's opinion, better for the case to be funded by the FPD than to have to seek funding from the court.

When asked whether he perceived that there was some sort of gender war going on at the FPD at the time of the Montgomery case, Mr. Duchardt responded "Dave's issues were not just gender. Dave is very proud of Dave's capabilities and can be very abrasive." Mr. Duchardt defended Mr. Owen saying that Mr. Owen had a right to "be at least grumpy" about the fact that Ms. Clarke had not hired any experts at the time she was taken off the case. Mr. Duchardt said he was unaware of the two contracts Ms. Clarke had sent to experts before she was removed from the case and expressed that he "essentially started from scratch" upon entering his appearance.

At the time he entered the case, Mr. Duchardt knew that he wanted to get Dr. Ruben Gur involved. He had "wanted to use Ruben in a previous case and the opportunity just did not work out." Though Mr. Duchardt did not have a social history or any specific concern or symptom that indicated that Ms. Montgomery had a brain injury which needed investigation, he "figured that if anybody was going to find an issue here, it was Ruben." Mr. Duchardt further explained, "Basically where we were with Lisa is that we were making it up as we went along, because there was nothing obvious wrong with her except her suicide [attempts]."

Though other experts examined Ms. Montgomery prior to Dr. Ramachandran's entrance into the case, Mr. Duchardt explained that Drs. Logan and Gur "had none of that pseudocyesis stuff 'till we got Ramachandran." Mr. Duchardt knew that Dr. Logan would be an expert for the defense based on his 2005 evaluation of Ms. Montgomery: "I knew that we had Bill [Logan] kinda in good shape, because of his competency to proceed evaluation." Mr. Duchardt said that he looked into other experts, because "quite frankly we had the money to spend and I was looking for additional ideas."

Mr. Duchardt recalled that Mr. Owen was the team member who found Dr. Ruth Kuncel. Mr. Duchardt was not pleased with Dr. Kuncel's work on the case, saying "in hindsight, Ruth did not do a very good job." Mr. Duchardt indicated that perhaps what Dr. Kuncel finds works in Chicago state courts just does not play well in Federal Court. Mr. Duchardt said that though Dr.

Kuncel "talked a good game" she did not do well on the witness stand. As Mr. Duchardt said, "I mean, in juvenile court, she'd probably do just fine, but she was in the big leagues."

Mr. Duchardt said that Dave Owen was the originator of the theory of pseudocyesis. "Dave never could pronounce that word to save his life, but he came up with that thought from day one." Mr. Duchardt took Mr. Owen's idea and "chased it down." Addressing how he located Dr. Ramachandran, Mr. Duchardt said, "If you look up pseudocyesis, you find Ramachandran." Mr. Duchardt found Dr. Ramachandran to be "just a delight." Mr. Duchardt was unaware of where Mr. Owen might have learned about pseudocyesis, but thinks that it was the best diagnosis, "That got us as close to having a finger on the pulse as anything."

Mr. Duchardt used an electronic copy of the FPD file provided to him on a hard drive. As he explained, "everything I needed was there electronically." Mr. Duchardt was the person on the team in charge of determining what materials were provided to experts, but his memory (of which he admitted he is not completely certain) is that the copies of the materials were made at the FPD and sent out from that office.

In 2006, Mr. Duchardt had two capital jury trials for Phil Street. As he said, "there were a lot of eighty hour weeks in those times." His work load for that year was, "primarily it was Lisa [Montgomery] and Phil [Street]."

With regard to how the defense team functioned, Mr. Duchardt explained that he was "not a big meetings guy." If he needed something from someone on the team, he would email or call that person rather than consult the whole team. "If I thought of something I thought needed to be done, I would call Ron [Ninemire, investigator with the FPD] and he would be on it." He was unaware whether there was a chain of command at the FPD; he indicated that there may have been some process by which Mr. Ninemire sought approval before doing the tasks Mr. Duchardt requested, but that the process always seemed seamless to Mr. Duchardt. Though Mr. Duchardt acknowledged that he would have been the person in charge of the mental health investigation, including the work by the mitigation specialist, he remembered, "Dani [Waller, the investigation specialist,] did not come on 'till later."

"Someone calling themselves a mitigation expert is almost laughable," said Mr. Duchardt. He feels that death qualified attorneys are the mitigation specialists. In this case, he was the death qualified attorney, "so, yeah, I would have been the mitigation specialist." The FPD hired Dani Waller as a mitigation specialist, and Mr. Duchardt was ok with that, though he unequivocally states that he was the person in charge of mitigation. Mr. Duchardt explained that he "did not really have a lot of a relationship with Dani Waller," though he characterized her as a "good gal." He said Ms. Waller did what she was asked to do. He recalled that Dave Owen was the person who primarily assigned tasks to Ms. Waller; Mr. Duchardt did not recall asking Ms. Waller to do very much. He recalled that Ms. Waller "had a nice rapport she developed with

Lisa," but went on to say that Ms. Waller's "role in terms of what I was doing was not a whole lot."

Mr. Duchardt recognized that Ms. Montgomery had serious issues in even being in a room with a man. As he said, "God bless Park Dietz, he finally figured one thing out:" Lisa had post-traumatic stress disorder at being in the room with one man by herself much less two men. Mr. Duchardt said, "Literally what Lisa always felt is that every guy always wanted something from her. I had to figure out a way that wasn't an issue." Mr. Duchardt worked hard at getting Ms. Montgomery to "not think of me as a guy." He said that it took a long time to accomplish that – indicating that one should "look at the time sheets" to see how much work he invested visiting with her. One of the ways he attempted to alleviate Ms. Montgomery's stress was that when they had long sessions together, he would bring his wife, Ryland Duchardt. He said Ms. Duchardt has a masters in counseling and a social work type background, and Ms. Montgomery "took to her like a second mom type thing." Despite his perception that Ms. Montgomery was comfortable with him when Ms. Duchardt was in the room, he admitted, "It was only after trial that Lisa began to open up about things related to the case."

Mr. Duchardt explained it was a great effort to explain to Ms. Montgomery the process of a trial and what she was facing, "so much of [our effort] was us being able to communicate to her; we could only get so far before she shut down." Mr. Duchardt explained that the way Ms. Montgomery learned to cope with bad stuff was to put it in a room inside herself and shut the door and never open that door again. He spent a lot of time telling her that they had to open the door and have a look at what was inside. Because Ms. Montgomery could not disclose the extent of her trauma, he did not have much information to provide to the experts, "there wasn't a hell of a lot to share." Mr. Duchardt said that he got social history information from Ms. Montgomery during a long interview with her while she was in Pennsylvania for testing "and really that was the script."

Mr. Duchardt "absolutely" agreed that Ms. Montgomery functions much better since her transfer to the Bureau of Prisons where she was placed on new psychotropic medication. He said she got some better while at Corrections Corporation of America (CCA) when the psychiatrist there got "on board that there are more issues [with Ms. Montgomery] than meets the eye."

Regarding whose idea it was to have the CCA psychiatrist testify at trial, Mr. Duchardt said that, "basically Dr. McCandless presented herself with those ideas." Her testimony sort of "fell into our lap." Dr. McCandless made notes to her file and Duchardt read them "and that's literally in the middle of trial." When asked how it was that he got Dr. McCandless' notes over a weekend during the trial, Mr. Duchardt said he kept a "free flow of that stuff coming to [him]" from CCA.

Dr. Logan told Mr. Duchardt that he [ Logan] could only provide the team mitigating evidence, as Mr. Duchardt put it, Dr. Logan said he couldn't give the team a "first phase"

defense. Based on Logan's inability to find a psychiatric disorder which would support insanity, Mr. Duchardt provided Dr. Logan Dr. Ramachandran's report, and Dr. Logan was able to support Dr. Ramachandran's analysis.

Duchardt clarified that the theory presented at trial was that Lisa believed that Bobbie Jo Stinnett's baby was, in Lisa's delusional mind, Lisa's baby. Of this theory Mr. Duchardt said, "Frankly I think it was every bit as good as the government's theory."

Regarding the presentation of the defense, Mr. Duchardt explained that Mr. O'Connor "exercised discretion as lead counsel" in only a few instances. One of those decisions was to not go with what has come to be known as "the Tommy defense." Mr. Duchardt expressed that he, himself, has "no doubt" that Ms. Montgomery's brother Tommy Kleiner was present during the killing of Ms. Stinnett. He "absolutely believe[s]" that Mr. Kleiner's probation officer fudged her records, thereby providing Mr. Kleiner's alibi. Mr. Duchardt explained that Mr. Kleiner told John O'Connor that Mr. Kleiner left court and returned a week later to visit his probation officer; Mr. Duchardt does not believe the probation officer made contemporaneous notations as she was supposed to do and later entered the date wrong when she went back to do her computer records. He does not believe she doctored the records to deliberately affect this case. Mr. Duchardt was disappointed in Mr. O'Connor's decision to not present this defense to the jury. As he put it, had it been Mr. Duchardt's decision, he would still be arguing that Tommy Kleiner was there.

When questioned, about how 'the Tommy defense' could have fit with the not guilty by reason of insanity/pseudocyesis defense, Mr. Duchardt said that "I've no doubt Lisa [Montgomery] got into the situation, had the baby dropped into her lap and carried on." Mr. Duchardt continued, explaining that pseudocyesis works as a defense no matter who did the killing, "in Lisa's own mind the way she envisions the situation, she was Florence Nightingale who saved the baby."As to what his theory was as to why Tommy Kleiner (against whom Ms. Montgomery had a restraining order) would have gone to Bobbie Jo Stinnett's house with Ms. Montgomery, Mr. Duchardt suggested that we should "sit down and talk to Tommy for awhile; he did not need a lot of reason to do bad shit." He pointed out that both of Ms. Montgomery's brothers, Teddy and Tommy, are a piece of work; "those guys are just louses."

When asked about how the defense team thought it could keep 'the Tommy defense' out of the trial, given that the experts had been provided information about Tommy being there, Mr. Duchardt referred us to Mr. O'Connor as the best source of an explanation for how that could possibly have worked. Mr. Duchardt characterized Mr. O'Connor's position as being that Ms. Montgomery is crazy and her belief that her brother may have been present was yet another manifestation of her mental illness. Mr. Duchardt disagreed with Mr. O'Connor's strategy and wanted to take it on the chin and battle it out – presenting the theory to the jury that Tommy Kleiner was the actual killer.

Mr. Duchardt had one fairly long meeting with Ms. Montgomery's mother, Judy Shaughnessy, to size her up. He related that Mr. Owen had spent a lot of time with Ms. Shaughnessy, trying to butter her up, but Mr. Duchardt took a more direct approach with Ms. Shaughnessy: "She did not like that." Mr. Duchardt was left with the impression "she's only interested in Judy and had no problem having Lisa sold down the river." When asked how the decision was made as to who would do Ms. Shaughnessy's direct examination, Mr. Duchardt said he would not have let anyone else cross Judy, besides "John did not give a shit."

Mr. Duchardt pointed to two other decisions that Mr. O'Connor made as lead counsel with which he, Mr. Duchardt, disagreed. Mr. Duchardt disagreed with Mr. O'Connor's decision to abandon the pursuit of the information from Ms. Shaughnessy's divorce attorney. He also disagreed with Mr. O'Connor's decision regarding not cross-examining the government's expert psychiatrist, Park Dietz, regarding his failure to look at any of the physical manifestations Ms. Montgomery exhibited of pregnancy. Mr. O'Connor thought Dr. Dietz's failures were better exploited through arguing them to the jury in closing argument; Mr. Duchardt thought that he needed to have at Dr. Dietz right there.

Mr. Duchardt did not recall knowing of any disturbance caused by Ms. Shaughnessy in the hallway of the courthouse. Having met her, he could imagine that such a thing happened, but did not specifically recall anyone telling him she was intimidating witnesses.

Mr. Duchardt expressed his belief that Dr. Ramachandran's testimony went very well. As Mr. Duchardt explained, "the good thing about Dr. Ramachandran is that he is not afraid to embrace the frailties of the entire defense." According to Duchardt, Dr. Ramachandran saw the frailties of the case as facts that could go either way. Mr. Duchardt believes that the key issue that was always in Dr. Ramachandran's favor was that Ms. Montgomery had physical manifestations of pregnancy; Mr. Duchardt said that Dr. Dietz never addressed that in any way.

Mr. Duchardt did not see his guilt/innocence phase defense as compromised by the loss of Dr. Gur's proffered testimony. "To me he was not as important to the pseudocyesis defense as he would've been to a general penalty phase defense." Mr. Duchardt felt that Dr. Gur's testimony certainly would have given physiological credence to pseudocyesis and for that reason, he argued vigorously for its admission. Mr. Duchardt mostly wanted Dr. Gur's "pretty pictures" of Ms. Montgomery's brain damage admitted. Mr. Duchardt recalls that "we won the motion [to exclude based on *Daubert*] on the merits" conditional upon Dr. Gur getting get raw raw data to the prosecution. He said they spent several weeks with Dr. Gur providing data and the government protesting that the data was insufficient. On the eve of trial, the court decided not to allow Dr. Gur's testimony. Mr. Duchardt did not feel he needed a continuance to make things better, because "it wasn't that any time was going to change that." The Judge was going to allow the PET so Mr. Duchardt's argument was going to be that not only the PET should be admissible, but that under the lesser standard of admissibility at the penalty phase, the other

evidence should be admitted as well. The judge's decision to not admit any of Dr. Gur's testimony thwarted Mr. Duchardt's plan.

When Ms. Montgomery was first tested at Dr. Gur's lab in Philadelphia, pseudocyesis was not yet a working theory. Mr. Duchardt clarified that Dr. Gur was "brought along" on pseudocyesis just as Dr. Logan was. Mr. Duchardt explained that when Dave Owen introduced the idea of pseudocyesis, "It was like a light bulb came on."

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Chris Armstrong

Signed this 15th day of March, 2013.