**DECLARATION OF JANET SANTANA**

I, JANET SANTANA, declare as follows:

I am a paralegal in the Office of the Federal Public Defender for the Middle District of Tennessee in Nashville. As part of my employment, I traveled to Kansas City, Missouri and witnessed the interview of Ron Ninemire by attorneys for Lisa Montgomery on January 23rd, 2013. Mr. Ninemire's boss, Ray Conrad, the Federal Public Defender for the Western District of Missouri, was present for the entirety of the interview with Mr. Ninemire, though he did not interrupt or contradict Mr. Ninemire's version of events.

In the course of the interview, Mr. Ninemire explained that he is the chief investigator for the Office of the Federal Public Defender in Kansas City, Missouri. He has been an investigator in that office since 1989. Before coming to the Federal Defender, he had his own private investigation firm for two years, and before that he was a probation and pretrial officer for the United States Probation and Pretrial Services Department.

Before working on the Lisa Montgomery case, Mr. Ninemire had experience working as a mitigation investigator on three potential death penalty cases for the Federal Public Defender. He worked on the Keith Nelson case for approximately eight months before a conflict arose which required the Office of the Federal Defender to be removed from the case. He worked on the Arboleda Ortiz case which went to trial in April 2000 and resulted in a death verdict. He also worked on a case involving the killing of a government witness in Maryville, Missouri that could have been a capital case. In the end, the government did not seek authorization in that case.

Mr. Ninemire explained that death penalty mitigation investigation is distinct from other types of fact investigation. He has received training in how to do mitigation investigation by attending at least five Life in the Balance seminars sponsored by the National Legal Aid and Defender Association. He recalled that the first of those seminars he attended was in Washington, D.C. He also attended the mitigation training put on by the Administrative Office of the Courts. The first of those trainers he attended was in Salt Lake City in May 2005. In the course of his training in capital case mitigation investigation, he has attended sessions taught by Judy Clarke, Russ Stetler, and Scharlette Holdman; he did not recall ever disagreeing with the approach of any of those experts to mitigation investigation.

Mr. Ninemire stressed that as Ms. Montgomery's case is a western district of Missouri case, Ray Conrad, the Federal Defender in that district, was appointed to handle the case. It seemed significant to Mr. Ninemire that Mr. Conrad was in charge of the case rather than the attorneys to whom the case was ultimately assigned. According to Mr. Ninemire, Ray Conrad put Mr. Ninemire in charge of the case investigation so it was his intention to handle the case the way he thought best. As he said, "Ray put me in charge so that's the way I'm going to operate."

He explained that the way in which Deb Garvey was brought into the case put him in conflict with her; according to Mr. Ninemire, Ms. Garvey seemed to have believed that she was brought in to take over the mitigation investigation. Mr. Ninemire did not think that was appropriate and was not going to allow that to happen.

Mr. Ninemire first met Lisa Montgomery in the Kansas District Court. He also met her family at that same time. His initial impression was that Ms. Montgomery was devastated and traumatized, though in that first meeting he did not have much time with her. His primary job early in the case was to talk to the family and help them navigate the court system; he said it was apparent that the Montgomery family had never had experience with federal court and was reeling from the events.

For the first couple of years of representation by the FPD, Ms. Montgomery was very depressed and on suicide watch. Mr. Ninemire said, "I took it upon myself that I was going to be there for her;" he saw himself as a "conduit to her family." According to Mr. Ninemire, when Ms. Montgomery was first incarcerated she believed unlikely things: Mr. Ninemire gave as an example that Ms. Montgomery told him that Bobbie Jo Stinnett had come to her cell and said that she forgave Ms. Montgomery. It was his impression that over time as she was medicated, Ms. Montgomery became more emotionally stable. He also said that over time as she was more medicated, Ms. Montgomery's affect became more and more flat.

Mr. Ninemire stated that the defense team had weekly meetings at Susan Hunt's house in Kansas. He attended those meetings. It was at one of those meetings that he learned that Judy Clarke had been invited into the case. Mr. Ninemire characterized Ms. Clarke saying she was "not a timid person," that she "did her business and wanted everyone to fall in line." Mr. Ninemire was not present at any meeting involving a decision to seek to have the court remove Ms. Clarke from the case. He did not vote to remove Ms. Clarke from the case.

Mr. Ninemire recalled the day that Judy Clarke was removed from the case. Ms. Clarke had come to Missouri, he picked her up to go to see Ms. Montgomery's brother, another witness, and to visit Ms. Montgomery. They went to see the brother who was incarcerated and then the other witness; they then went to CCA where Ms. Montgomery was being held. When they got to CCA, Ms. Clarke and Mr. Ninemire presented their credentials. The CCA employee at the desk said that Ms. Clarke was not to be admitted pursuant to a court order. Mr. Ninemire was emphatic that he had no idea what was happening or why Ms. Clarke was denied entrance. As he said, "If I would've known that was going to happen, I guarantee I wouldn't have been standing at CCA with her." He recalled that he argued with the CCA employee that Ms. Clarke was an attorney who was appointed on the case and had been allowed to visit Ms. Montgomery in the past. The officer said that he could not allow Ms. Clarke in to visit. Mr. Ninemire went on in to visit Ms. Montgomery and had to explain that he did not know why Ms. Clarke had not been allowed to visit. Mr. Ninemire said that he later confronted Mr. Owen about having put him in such a difficult position: to Mr. Ninemire's eye, the lawyers clearly had known that Ms. Clarke

was being removed from the case, but they had him go out investigating with her and to visit the client with her without any idea that she was going to be removed. Mr. Ninemire objected to having been put in such an awkward situation. He was adamant that had he known Ms. Clarke was going to be removed, he would not have taken her investigating with him or to visit Ms. Montgomery. Mr. Ninemire did not recall Susan Hunt or David Owen informing Ms. Montgomery of Ms. Clarke being removed from the case. According to Mr. Ninemire, he was not present when either attorney discussed Ms. Clarke's removal with Ms. Montgomery.

Mr. Ninemire remained part of Ms. Montgomery's legal team through the time of trial, working with the trial team: David Owen, Fred Duchardt, and John O'Connor. He recalled that the trial team was conflicted about whether to present the theory that Ms. Montgomery's brother, Tommy, was with her at the time of the crime. According to Mr. Ninemire, the team did not discuss the possibility that Ms. Montgomery's statements about Tommy's presence were a possible delusion or hallucination. Mr. Ninemire expressed that he thought – and continues to think – that there was real merit to the Tommy defense. He, as a former probation officer, felt like there were holes in Tommy's alibi. He expressed that as having been a "gut feeling" that he had. Mr. Ninemire said that the decision about whether to present "the Tommy defense" was not made until a week before the trial.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Janet Santana

Signed this 15th day of March, 2013.