UNITED STATES OF AMERICA

vs.

LISA MONTGOMERY

SWORN STATEMENT

OF

LEONA HAYES

was taken on April 3, 2007, at 4:33 p.m. at 305 South Orchard, Skidmore, Missouri, before Elaine M. Wilson, CCR.

A P P E A R A N C E S

For the Defendant:

MR. JOHN P. O'CONNOR, ESQ.
WAGSTAFF & CARTMELL, LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112

Also present:

Mr. Ronald K. Ninemire
Mr. Thomas Moss
Ms. Crystal Hayes

ORIGINAL



Case 4:12-cv-08001-GAF Document 166-11 Filed 09/03/15 Page 1 of 29

# I N D E X


WITNESS: LEONA HAYES PAGE NO.

Direct Examination by Mr. O'Connor 4


## E X H I B I T S


PAGE NO.

Defendant's Exhibit 1 20

(Exhibit retained by Mr. Ninemire.)

P R O C E E D I N G S

(Statement commenced at 4:33 p.m.)

LEONA HAYES,

called as a witness herein, being first duly sworn by the Reporter, testified on her oath as follows:

DIRECT EXAMINATION BY MR. O'CONNOR:

Q. Would you state your name for the record, please?
A. My name is Leona Arlena Hayes.
Q. And where do you live, Ms. Hayes?
A. 606 East Cherry Street, Skidmore, Missouri, ZIP 64487.
Q. Do you mind if we have your phone number?
A. No, I don't.
Q. Would you give that to her?
A. 1-660-928-3438.
Q. Did I introduce myself to you as John O'Connor?
A. Yes.
Q. I'm the attorney for Ms. Montgomery.
A. Okay.
Q. You understand that?
A. Yes.
Q. And we're appointed by the Federal Court to represent Ms. Montgomery in her case. Do you understand that?
A. Yes, I do.
Q. You understand that I'm not a prosecutor?
A. Yes. You're an attorney.

Q. But I'm not a law enforcement person?
A. Yes.
Q. And that no one here has told you that they were law enforcement people, have they?
A. No. Investigators.
Q. For the defendant?
A. Yes.
Q. And I want to ask you some questions today if that was okay with you?
A. Yes.
Q. It's my understanding you were home on December 16, 2004?
A. No, I was not at home at that time. I was over here. This is my son's place.
Q. Tell me when you got to your son's place.
A. Approximately -- let's get this straight. Because of the roast in the oven, approximately a little before 3:00.
Q. Is there a reason you remember December 16, 2004?
A. My reason -- for one reason is because of the murder of Bobbie Jo's baby (Sic). December the 16th -- it was two years ago. It's been two years. It'll be two years and four months the 16th of April. I think I'm correct. And yes, because she's relatives to my son-in-law.
Q. Okay. And tell me what you were doing that day before you got to your son's house.
A. My son was living with me and we had been cleaning on the

house because his other wife had left him. And we had put a roast in the oven, and I had told my son we wouldn't stay over here too long because I didn't want the roast to burn. And that's the reason we were over here in the neighborhood.

And he drove up -- when my son drove up to the deck approximately just a few minutes before 3:00, this is when I seen what I seen.

Q. Hope that these are questions okay for me to ask, but can you give me a little bit of background or history of you?

A. Of me?

Q. Yeah. Where you grew up, where you went to school?

A. I went to school around Grant City. I was born in Grant -- well, out in the country in Grant City, Missouri. I moved to my folks' farm to farm; farm girl. Then in 1950 I married Leland Hayes at Reverend Day's house in Maryville, and we were married 47 years before he died in '97. And I have seven children.

I worked for probably seven and a half years, maybe eight, as a nurse -- nurse's aide, and a little bit of everything at the rest home. Most at Nodaway Rest Home. Then I was at Parkdale. Plus I've helped take care of my mother and dad before they deceased. And I helped take care of two neighbor ladies besides raising my children, and helped with grandchildren.

And basically, I guess you'd say my education came through -- because we were married very young; my husband was 19 and I was 16. We wore out two sets of encyclopedias; one Bible; one Bible pretty ruffled at home right now; and all the education from the time my children started 'til they finished school was 30 years. And I guess a housewife and that about sums it up.
Q. Wonderful life. Tell me how -- are you on any medications for anything?
A. I'm on high blood pressure medication.
Q. And I see that you wear glasses?
A. Yes, sir.
Q. What do you wear glasses for?
A. Because my eyesight got where I couldn't see, like, close here. I could see far away, but I couldn't see close.
Q. And do the glasses correct that problem?
A. Yes.
Q. And would you have been wearing glasses on December the 16th, 2004?
A. Yes, I was.
Q. You always wear your glasses?
A. No, not in bed.
Q. Okay.
A. But otherwise.
Q. But otherwise, yes. So why don't you tell me in your own

words what you saw when you got here at your son's house that caught your attention on December 16, 2004?

A. Okay. What caught my attention was the vehicle coming from the -- coming from the north. We heard the noise -- I heard the noise when I stepped out of my son's pickup which is parked right here at the deck.

And when I first seen the vehicle, was up here by this big tree on the west side of the road. Up there by -- I think it's close to Lininger's. And when I seen this vehicle coming I actually said these words to my son, because there was a girl here in town that -- the Jones girls and Terry Howard and some of them, they would drive pretty fast. And I said, "Is that little" -- I don't want to say the word 'b' -- "is she crazy?" And that's just what I said. And I said, "I'm -- look", you know. Of course -- from where the barrels -- right down over in there -- I said, "Kean, that's not the Jones girl. I don't know who that is."

That's when I observed the window rolled down about this much (indicating) and the person's head was small, like, driving down like this (indicating). And in the backseat there was someone -- I pert near certain she was down on one knee -- the hair was longer -- a doing something. What, I don't know.

Q. Give me the best description of the vehicle that you

could give.

A. Oh, my goodness, I went blank. Was it a Toyota or the other one? It's a red one. Small one. It was sort of -- not real clean -- some -- dirty. And the windows was a little tinted. I can't remember the name of that vehicle. Please, Lord. Reminds you of a Toyota, I will say that. Small car.

Q. Two door, four door, or do you know?

A. That I didn't observe.

Q. And there were definitely, in your opinion, two people in the vehicle?

A. Yes, sir.

Q. A person driving?

A. Yes, sir. I seen 'em.

Q. And a person in the backseat?

A. Yes, sir.

Q. Was your view unobstructed?

A. No. I had a good view right down -- straight down.

Q. That's probably a bad lawyer question. Was there anything in your view that kept you from seeing what you saw?

A. No. No.

Q. So your view was clear?

A. My view was very clear.

Q. How far up the street did you see that vehicle coming?

A. When I heard the noise up there by the tree on the west

side of the road.
Q. How far up would that be?
A. I'm not sure how far; a block, two blocks, something like that. Block and a half.
Q. And did -- that's what drew your attention to the vehicle?
A. Yes.
Q. And then you watched the vehicle?
A. Yes.
Q. And I can see right here at the corner, it'd be a pretty sharp left-hand turn?
A. Most certainly.
Q. The vehicle had to slow down?
A. It almost wrecked. When it went around the corner it went (making sound) and brought it -- he brought it back.
Q. Now you used the word he.
A. I say he or she when it -- really thinks about a he or she. Women cut their hair off. Men cut their hair off. And the person was little. That's what throws me, whether it was a he or a she 'cause they were little and they were crunched down in the seat like this (indicating) and their hands were little.
Q. Give me the best description you can of the person driving the vehicle as far as hair, face -- give me your best description.
A. Okay. Sitting this way (indicating). The face is small

and crunched down, and the hands is small. And as far as the hair -- this is what I'm wondering. I know there was blonde there, but it looked like it might have streaks -- still you could see. It might of had the hair streaked, but I know there was blonde there 'cause I seen it. I seen that. And that was all I could see because it was gone.

Q. Okay. And your son was with you?

A. My son? I was with my son.

Q. Okay. Where were you in relation to each other outside?

A. He pulled up by the deck, and of course it takes him a while to get out. So when I jumped out is when I heard this vehicle. And Kean made the remark, "It's probably one of the Jones girls." And I said, "That's not one of the Jones girls."

So then after seeing it go around, I proceeded to run around the truck because, I mean, I've never seen any driving like that in this town. Well, maybe young kids, you know, once in a while. So when I did I could see the stop sign real plain where they turned and went south.

Right now there's a bush that's bushed out, that if you look when the bush is not bushed out you can even see it plainer. And that day was a good day; 59 degrees, I remember so plain. And I was thinking, helping with Kean and my daughter -- we just got in the house just about

3:00. My daughter -- the phone rung and she says, "Mom, there's something wrong with Bobbie Jo. She's either having her baby or something. Could Kean bring you back over here at my house to take care of the" -- my great-grandchildren, the two -- "while I go over and see about Bobbie Jo?" I said yes.

That's when we discovered -- my daughter went in -- I think it was the Law man, woman, and I think it was Becky, and then my daughter, and I believe Debbie come in next. Because my son sat in the vehicle, he observed it, 'cause I was over there with the two little ones. So hard to talk about.

Q. Sure.

A. And the time -- it's just exactly. Becky had spoken to little Bobbie Jo. Said, "Come and get me." Something about her truck wasn't working. And Bobbie Jo was usually on time; she liked to be. And it was about 3:00. And by the time momma talked to 'em about -- Becky at 2:30 -- in between is when they had to do it. Because little Bobbie Jo had said to her mother, "They're here now, Mom, to get the dogs."

Q. Who told you that?

A. Becky. She's relation to my son-in-law.

Q. What was your relation to Bobbie? You said earlier.

A. She's my son-in-law's niece or great-niece. It's

Becky -- okay -- the mother of Bobbie Jo is a sister to my son-in-law.
Q. Okay.
A. And we helped raise Bobbie Jo when Becky was working.
Q. And when did the police interview you, do you remember?
A. Oh, I'm not real sure except -- the first one I'm real sure. It happened on December the 16th. It was two years ago, December the 16th around 3:00. And they came -- that was -- seemed to be on a Thursday, if I can remember right.
Q. So December 16th would have been the day Bobbie Jo -- this happened. Would that have been the next day?
A. Then the next day they came because I cried half the night. And my son said, "Mom, don't get involved because this town -- they might kill you."
And I prayed to God and I said so help me if they do. It's to help Bobbie Jo. So I called Maryville law officers and I said, "I don't want to talk to anyone but Mr. Houston." So I talked to Mr. Houston and he said okay. Then the FBI, they called, and they said, "Would you mind if we come and talk to you?" And I said, "No, I don't." I said I've got to do this.
So then they came out -- what my mind can remember -- I'd say between 9:00, maybe 10:30, somewhere along in there. Because by evening, around 5:00 or 5:30, I

think it was, they had little Victoria.
Q. Okay. Now obviously, your son has never talked to the police?
A. This is the first time he's talked to anyone because he didn't want to.
Q. Tell me about that.
A. About Kean?
Q. Why didn't he?
A. Because he didn't want involved because they kill people in this town.
Q. Is there a reason now that he's willing to be involved?
A. Yes. He says that it's time for him to speak up. He understands what his mother means. And I think he understands more.
Q. And just wants to be truthful about what he saw?
A. Right.
Q. And I'm assuming you two discussed what you saw that day? You have discussed it?
A. Oh, we -- we both know what happened that day 'cause we know what we seen.
Q. And you both commented to each other as you were seeing it?
A. Yes. And he didn't want me to say nothing 'cause he's afraid something would happen to me. And as I said, I didn't care; it was the truth if I could help Bobbie Jo.

Q. Now I want you to understand something so you -- this in some way may help Lisa Montgomery in the sense that she's saying that her brother was with her when this happened. Okay? So I want you to understand that what you may be saying --

A. Who's brother? Now what do you mean by that?

Q. Let me back up first. Let me say this. You're saying that you want to help Bobbie Jo?

A. Yes.

Q. And I think the truth helps everyone. Do you agree with that?

A. Yes, I do.

Q. Whatever it is. Do you agree with that?

A. I agree with that. I even said this to these gentlemen. My brother works in the prison at Cameron, Missouri. Has for a few years; Virgil Carroll. And the Bible says I shalt not kill and I'd rather see her get life in prison. It would be worse than the death penalty. Because when they find out what's happened, my brother says you ought to hear the chantin' they do to these people and these women when they find it out. You suffer. Death penalty would be easier.

Q. Well, my only concern is that someone may come to you and say, hey, you're helping the defense because you're giving them information that may help her.

A. I've heard that.
Q. Okay. And so is that going to change what you say? That it may help her?
A. I don't see how it can help her. I'll ask you back a question. How can the truth help what she has actually done?
Q. I don't see it either, but someone may say that to you. That's what I'm saying.
A. Now there'll be, like, judges there. Besides, you're just a lawyer, right? You're not a judge.
Q. Yeah. I'm not a judge, for sure.
A. Okay.
Q. But what happens is, at a trial there's two sides; the defense and the prosecution. And they'll ask you questions and we'll ask you questions, okay? But when you say that I'm doing this to help Bobbie Jo, someone could say to you, well, really, you may be helping the defendant in some respects.
A. In some respects, I can see where you're coming from, but in other respects -- maybe I shouldn't say this to you folks, but this is what my dad always told me. Wise old man. The truth will be the lie right through hell. The truth will be the one that will be there. Never a lie.
Q. And I think that's what I'm trying to get to is I want you -- I don't want someone to say, well, you talked to those

defense lawyers and now you've kind of helped her. We don't know what you're going to say. We're here just to get the truth, whatever that is. I don't know what it was. I wasn't here. That's why we're talking to you. And so --

A. And their side's welcome to come.

Q. Exactly.

A. I'll tell them the same if they want to be here.

Q. That's all -- that's all I'm saying. I'm sure they're going to want to talk to you and I'm hoping that you will talk to them. But I'm just saying, I guess maybe to hear myself say it, but whatever you saw that day and what you've told us today, that's the truth?

A. That's the whole truth, so help me God.

Q. Now I understand that when you talked to Ron and to Tom yesterday that they showed you a couple of photographs. And to be fair, they didn't bring you a bunch of different photographs --

A. No.

Q. -- they brought you the same photograph.

A. One.

Q. And let me tell you why that happened, because I think it's important for you to understand why that happened. When we read your report it didn't look like you could identify the person. It says you gave a general

description. So all we were really trying to do is say, does this person match the general description?
A. Yeah, I understand.
Q. We had no idea you were going to say this is, or looks like, the individual. So we didn't come up here with the idea --
A. That it might be.
Q. No. We didn't come up here with the idea of tricking you or trying to get you to pick a picture. We had no thought that you'd pick a picture.
A. Well, it's like I told them. I said, "I don't think I'm sure and I might be sure." What I can remember is -- and when I face that face this way -- I still say the hands was little, was scrunched down like this (indicating) and it was most certainly a driver. Because the window was rolled down and the person, Lisa Montgomery, was in the back. She was on one knee a doing something.
Q. Okay. Now you said Lisa Montgomery. You didn't actually see Lisa Montgomery. You saw a woman in the back who you believe is Lisa Montgomery?
A. That's correct. That's how I should have said it.
Q. That's fine. One second.

(Marking Defendant's Exhibit 1.)

Q. (Mr. O'Connor) Let me hand you what's been marked as Defendant's Exhibit 1 for purposes of this

statement under oath. Was that shown to you yesterday?
A. Yes, it was.
Q. And when you look at that photograph, look at it anyway you want to. Tell me what that photograph means to you?
A. What it mostly means, the person's little. It's like I keep telling, the person's little and the person had blonde-colored hair. But I've told them this before, yesterday, the nose may not have been the same. The nose is what throws me.
Q. All right. Tell me in terms of -- does that look like the person that was driving; doesn't look like the person, what's your opinion?
A. (Looking at exhibit) This is hard to say for sure. Because the most that I seen, and I will say it again, the person's head was little, and the hair -- whether that hair was pulled back to a ponytail, or had something around its head, I'm not sure. But I do know the person was little, and that's why I said the hands were small. It's awful hard to say, for sure. Real sure.
Q. And I don't know if we're asking you to say for sure, but I'm asking you in terms of if you were to give it, on a scale of one to ten, what would you put the scale on that that's the person you saw driving the vehicle?
A. The vehicle? Still say the head's small. If I could just see the hands. But the head -- but the hair was

different. It was blonde but it was different, I'm almost sure. It might have been -- I mean, it's like I say, it was going so fast. I remember mostly the head little, and the hair was light-colored, and the hands were small.

Q. On a scale of one to ten on this photograph, what would you say?

A. A possibility? A possibility of eight if the nose -- the nose has got me throwed. Of course I didn't see the nose real good of the person, either.

Q. And so when you talked to Ron and Tom yesterday, at one point they wrote down that you said --

A. I was pert near sure.

Q. -- "I think I'm sure that's him."

A. Did you ever have a feeling that, yes, it looks like him, but yet there's something, like, when he's sitting down there, with little hands, that you can't actually really say? And yet the head is little, the hair is blonde, and the head was little.

Q. Do you think if you saw the person in a lineup that that may help you?

A. Yes, I think so.

Q. Okay.

A. And the hands. I could see those little -- the hands were -- they weren't big. They were clampsed over the steering wheel. They were small. That's what I noticed most of

all. See the window was down (indicating). The window was barely -- much of it up at all. And I have a feeling that was because she was working with that baby. It had to have air.

Q. Obviously if you're called as a witness in this case you'd be in front of a jury, and we would be asking you questions or the prosecution may be asking you about this photograph. Okay. And the one thing none of us want to happen, underscore, is for us to put words in your mouth as to what you saw or what you can say. I want that to be clear.

And so if we were in court right now and you were asked the question, "I hand you this photograph, Defendant's Exhibit 1," and said, "Does that look like the person that was driving the vehicle?" What would your answer be?

A. My answer would be it -- possibility, could be. But the most that I can remember is, squatted down in the vehicle and the hands was small on the wheel because there most certainly was a driver. And that does represent a lot what I seen.

Q. Now what some people would say is anything is possible. Possibilities are -- we don't deal usually in possibilities. We deal in probabilities. Is it possible it's him or is it probable that it's him, in your

opinion? Because yours is the only one that counts.
A. Possible.
Q. And you believe if you saw the person in person and could see their hands, you can maybe be positive?
A. I think so.
Q. And would you go as far as to say that this looks like the person who was driving the vehicle, Exhibit Number 1?
A. I could not tell from the front face 'cause I didn't see the front face. I just seen the side view.
Q. And when you open up the -- the side view does it look like the person -- Exhibit 1?
A. This is what is giving me the view (indicating).
Q. All right. And when you say this, so I can describe it for the record, there's a photograph of him facing forward, correct?
A. Uh-huh, here (indicating).
Q. And then there's a photograph of him facing sideways?
A. Now this I couldn't say because I didn't see him that direction.
Q. Okay. But this record can't say what we're trying to say. Let me try to help. It's not your fault. There's two pictures on this Defendant's Exhibit 1, okay? You agree?
A. You mean this is Exhibit 1 --
Q. Yes.
A. -- and this is Exhibit 2?

Q. No. It's all Exhibit 1. There's two pictures. Do you agree with that?
A. Yeah. There's two pictures.
Q. The top picture is a person looking straight ahead at the camera or looking forward -- the top one. Do you agree with that?
A. I don't -- I didn't see anything like that, no. It's -- it's the one looking --
Q. Okay. Listen to my question, please.
A. Okay.
Q. There are two pictures in this Exhibit 1, is that correct?
A. Yes.
Q. Picture number one, just this picture, shows a person looking forward?
A. Yes.
Q. Picture number two is a person looking sideways?
A. Yes.
Q. If I understand what you're saying here, picture number two, the person looking sideways, is the view that you saw?
A. Yes.
Q. And does that person --
A. Right here?
Q. Right. And the one that you're looking -- the second one there -- looking sideways, I understand you're saying

looks like the person that you saw driving the vehicle?
A. Yes.
Q. You're not positive?
A. I'm not positive.
Q. Okay. But you believe if you saw this person again, and maybe even saw his hands, you may be able to make a positive identification?
A. Yes, I think I could.
Q. Now was Sheriff Espey at Bobbie Jo's house before your daughter, Reba?
A. There was an older man there. I'll ask my son if you don't mind. He'll know what one it was. 'Cause see it was Becky and the Sheriff, or whichever one that was. It wasn't Houston, I know.
Q. This just has to be if you know or you don't know. I'll probably have to --
A. No, I don't know which Sheriff was there.
Q. Do you remember ever talking to Special Agent Stark of the FBI?
A. Stark of the FBI? First one that came to my house.
Q. Did you remember talking to him?
A. Yes.
Q. Did you tell Stark basically what you've told us here today?
A. Oh, man. Yes. I've told them each time that it wasn't

just her.

Q. Do you remember on what day you talked to Stark? Would it have been the next day?

A. It was on a Friday 'cause this was on Thursday when it happened.

Q. Okay.

A. On a Friday because that's the day when they came -- my house -- and then that evening it came on the news they had Victoria.

Q. All right. Since that time has the FBI or U.S. Attorney's office, or anyone connected to them, come and talked to you or your son?

A. Yes. I have three cards here. The second one, right here. Now they didn't talk to my son.

Q. All right. Now he worked with us back at that time; Mr. Thompson.

A. This one.

Q. So that's the --

A. Susan.

Q. -- card that you showed me. And Susan Hunt. So no one's come -- no one in law enforcement has come back to speak with you since Stark was here?

A. No. Not that I can remember. Only just these. Now that was --

Q. Okay. So I understand, someone from the Highway Patrol

has talked with you?

A. Yes. They were number one.

Q. In the last year --

A. They were number one.

Q. In the last year --

A. Number two (indicating), number three (indicating).

Q. In the last year has anyone talked to you law enforcement-wise?

A. In the last year? Let me get my mind straight now 'cause this is two-oh-seven. I'd say no. I don't believe -- let me check this one here (indicating). Had it been a year?

Q. That's not law enforcement. That's Mr. Thompson.

A. Okay. No.

Q. I've got to ask a question I'm not supposed to ask a lady. How old are you?

A. Be 73 in December.

Q. Have you ever had any problems with memory or ever been treated medically for any issues regarding your memory?

A. No. My children told me I'm too alert. I can remember things, some they don't know. I get the pictures out, then they know. I like to take pictures. I showed them.

Q. Have all of your answers been truthful?

A. So help me God they have. The best to my knowledge.

Q. And has anyone told you what to say here or put words in your mouth?

A. No, sir.
Q. And has anyone made you any promises of any kind for you to say what you're saying?
A. No, sir. Just like I've said, this person is small and I definitely know until my dying day, I will not say nothing else because I know what I seen, so help me God. There was a driver, she was in the back. I don't care which side it is. Your side, Becky's, on their side or what. They're not going to make me change my testimony; anybody. Because so help me God, I know what I seen.
Q. How far were you from the vehicle when you saw it as far as feet?
A. I don't know how many feet. These gentlemen's measured it. I was standing there by the truck just right down there close to the road where you -- where the vehicles are parked.
Q. So you've shown Mr. Ninemire where you were standing?
A. Yes, sir.
Q. And he did some measurements?
A. Yes, sir.
Q. And the view that you had from that spot you could see clearly up the street a couple of blocks?
A. Oh, I could see up the street a long ways.
Q. Okay. And you saw the cars, as I understand it, coming for at least a couple of blocks?

A. At least a block and a half, where the tree is is when I first noticed them on the west side. Because you could hear the noise (making sound) and that's when I said to my son, "Well, that little Jones" -- mmm -- I'm not going to say it -- "must be crazy the way she's driving today." And then when it got down here I said, "That's not the Jones girl."
Q. Is there anything else besides what we've asked you that you want to add to your statement?
A. The best to my knowledge I have given you folks -- I'll do to the other side, too, to either statement is what -- that this is the truth, so help me God. Because I believe in my heart that if one can get by with helping this lady -- and what's this person going to do if they don't find who, her, he, whichever could help do that. And also, how can this lady strangle Bobbie Jo and cut the baby out at the same time for this baby to have oxygen and breathe? It's not possible.
Q. Now is that something you've thought on your own knowing this?
A. I worked as a nurse.
Q. Okay. But no one -- none of us have put that in your head?
A. No.
Q. Okay. 'Cause that's one of the theories we have talked

about, but I don't want someone to say, well, we put that in your head.

A. No.

Q. You're saying this to me. I've never talked to you before today, is that right?

A. That's right.

Q. And we can rely on your statements under oath here today?

A. Pardon?

Q. We can rely on your statements under oath here today?

A. Yes, sir.

MR. O'Connor: That's all I have. Thank you, ma'am.

A. Thank you very much.

(Statement concluded at 5:10 p.m.)

C E R T I F I C A T E

STATE OF MISSOURI )
COUNTY OF NODAWAY )

I, Elaine M. Wilson, a Certified Court Reporter in and for the State of Missouri, do hereby certify that prior to being examined, the witness in the forgoing proceedings was duly sworn to testify the truth, the whole truth and nothing but the truth; that said proceedings were taken before me and thereafter transcribed under my direction and supervision; and I hereby certify that the foregoing transcript of proceedings is a full, true and correct transcript of my voicewriter notes.

I further certify that I am neither a relative nor employee nor attorney nor counsel of any of the parties, nor a relative nor employee of such attorney or counsel, nor financially interested in the action.

Witness my hand at Maryville, Nodaway County, Missouri, this 7th day of April, 2007

Elaine M. Wilson CCR 1202

Only a hard copy with the reporter's original signature constitutes a certified record.