# DECLARATION OF DEBRA GARVEY

I, Debra Garvey, being duly sworn and of lawful age, declare as follows:

1. I have been asked by Ms. Montgomery's current counsel, representing her in proceedings pursuant to 28 U.S.C. §2255, to provide information relating to my participation in the pre-trial legal team for Mrs. Montgomery in 2005-2006.

2. I am currently the Capital Case Coordinator at the Office of the Federal Public Defender for the Central District of California. I am a graduate of the University of California Davis Law School, and have worked on both state and federal death penalty cases. I have worked at the Office of the Federal Public Defender since 1996, when I was hired as part of the newly formed capital habeas unit. I became the chief investigator in 1997 and remained in that position until 2009. I began working on capital trials in 1998 and have worked on approximately twelve federal capital trials in various jurisdictions, in addition to the Central District of California.

3. Prior to working with the Federal Defender, I was an attorney with the Legal Aid Foundation of Los Angeles, as well as the Inner City Law Center. Both settings were free legal clinics where I worked with tenants living in slum buildings, as well as those who qualified for government benefits but had been unable to access the benefits. Previously I was the director of a small program for mentally ill homeless women, the Downtown Women's Center in Los Angeles, a long-term substitute teacher for seriously developmentally disabled students in the East Whittier City School District, and a staff member for a children's resource program in Tijuana, Mexico.

4. My participation in Mrs. Montgomery's defense began in the fall of 2005 at the request of Judy Clarke. Ms. Clarke and I had worked together previously on other capital trials prior to her entrance of appearance in Mrs. Montgomery's case. As a staff member of the Federal Public Defender in Los Angeles, I was loaned to another Federal Public Defender program, in this instance in Kansas City, Missouri, to supplement the defense team being assembled because of the experience I had working on capital trial teams.

5. I believe the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereafter* ABA Guidelines) are the touchstone of capital representation. I know that it is critical for the defense team function as a team, both sharing information and duties and also brainstorming to develop themes and theories. Capital defense teams should be committed to a client centered investigation, where the work begins with the client and radiates outward. The goal is a social history, a biography of an individual client in the context of the world in which she grew up; it is

an ecological perspective on human development, paying attention to the package of risk factors which shaped the individual. This work can be cyclical, requiring multiple interviews of the same person as information about the client begins to unfold, and it is multigenerational. In addition, a team looks at the forensic issues presented in each case and the fact patterns that emerge from a careful examination of the evidence. Throughout this work, the team's relationship with the client is of paramount importance because not only is our investigation centered on the client and predicated on the client's trust, we have to understand our client's nuanced and complex history, often including mental illness, physical disease and trauma.

6. After Ms. Clarke accepted appointment in Ms. Montgomery's case, she talked with the other Montgomery team members about asking David Freedman and I to also join the defense team. The team agreed that they were interested in us becoming part of the defense team and David and I began attending team meetings. David Freedman has a wealth of expertise in all aspects of capital investigation and mitigation. His experience in working with mentally ill clients, identifying appropriate experts in a case and helping lawyers prepare and present an expert are unparalleled. Though it varies from case-to-case, my role when I am loaned to another Federal Defender office to work on a capital trial case is generally to assist the team in organization, brainstorming, document synthesis, and integration of information into theory and theme. Because I am on loan from another jurisdiction, I generally attend team meetings and visit the client locally, but often only interview a handful of witnesses or take on a particular segment of interviews.

7. At the time Ms. Clarke, Mr. Freedman and I joined the Montgomery team, the team consisted of Susan Hunt, David Owen, Ron Ninemire (investigator), Phil Thompson (investigator), and Holly Jackson (mitigation specialist). A short time after we joined the defense team, the Federal Defender hired Stephanie Elliot as a paralegal through social connections of David Owen.

8. Upon our becoming part of the Montgomery team, it became clear that the investigation had not yet gotten off the ground. Though Ms. Rickert (prior mitigation specialist) and then Ms. Jackson had begun collecting historical records and documents on Mrs. Montgomery, the team seemed to be at a standstill as to what to do with the information they were acquiring. There was no system in place for a careful and thoughtful analysis of the documents coming in - it wasn't clear who would review the documents, extract the relevant information and then share it with the team in a meaningful way. Information contained in records is only helpful if read and synthesized into an overall developing picture of the client and her family, then cross-referenced, and recorded in some accessible way.

9. Many teams with whom I have worked have found themselves similarly stuck: they know that document collection is critical, but are flummoxed as to how to glean the important information from the overwhelming amount of paper and, equally importantly, how to publish that information to all the team members, how to catalogue that information in a systematic and helpful way, and, most importantly, now to begin to build a theory of mitigation from the information.

10. Records collection is critical, for it, along with information from the client, provides the information upon which initial investigative priorities are established. Witness interviews are informed by the team's understanding of who the prospective witness is in relation to the client and the client's history. The preparation that takes place before a witness interview necessarily includes a review of the documents that touch the witness, a thoughtful analysis of what more information the witness may be able to provide or elaborate on from what is in a document and how the witness may fit into the overall theory of the case being developed.

11. Upon our joining the defense team, I set about identifying categories of records which would need to be collected and establishing a system by which the records collection and analysis could be documented and shared with other team members. Though the actual requests for records may be carried out by a paralegal, that process requires oversight and cannot simply be delegated to someone without mental health training or experience in developing a theory of the case.

12. Ms. Clarke suggested that I could be of assistance to the team by taking a lead role in proposing investigative priorities. Because of my experience in many capital trial and capital habeas investigations, I had perspective on which avenues could be most safely and expeditiously explored while we were completing document collection and synthesis of the information from those records.

13. Generally, capital trial teams establish a hierarchy of witness interviews, determining the order of those interviews as information is available. While it is the goal of the team to obtain as much information as possible as quickly as possible, it is important to avoid conducting an interview without as much preparation and information as possible. In capital cases, particularly where the client has been traumatized, it is critical to be savvy as to the order of the interviews to maximize the amount of information obtained before a witness becomes hostile or avoidant particularly when you are working to uncover abuse or collusion against your client. Ms. Jackson and I worked well together in developing investigative priorities which we proposed to the team for their review. The goal was to have the team collaborate and agree on an overall plan of investigation.

14. Almost immediately, Mr. Ninemire was reluctant to acknowledge my ideas or input. Despite his lack of any significant experience in mental health investigations or capital mitigation in general, Mr. Ninemire was insistent that he was the lead investigator and should be the person determining the investigative direction and priorities. He didn't seem to understand or accept the team process nor the collaborative nature of capital defense, and –in particular – he didn't accept my experience or knowledge of capital work as valid.

15. A team approach to capital representation requires every team member to be invested in all stages of the litigation – everyone must be aware of all that is going on and working together so that the entire case presentation is harmonious. A team approach, as required by the ABA Guidelines, also includes a team approach to the client.

16. In well-functioning capital defense teams, the team's practice is for the team to establish a schedule for regular visits with the client that follow predictable patterns. The predictability of the visits help the client to trust the team; the fact that we visit in pairs prevents team-splitting by the client or territorialism by any team member.

17. Despite an explanation of why exclusive relationships between a capital client and any one team member are detrimental to capital defense teams, both Mr. Ninemire and Mr. Owen persisted in their individualized approach to Ms. Montgomery and her family. Mr. Ninemire insisted that he had a special bond with Ms. Montgomery. He was territorial and protective of that relationship. He and Mr. Owen believed Lisa had some additional information about the crime itself and thought that Mr. Ninemire was in a position to pressure her, through his personal relationship with her, to reveal that information. Mr. Ninemire believed facts about Lisa's relationship with her family would only be revealed to him through his conversations with her and Lisa's belief that she was telling him these details in confidence. Mr. Owen believed he had a special relationship with Ms. Montgomery's mother, Judy Shaughnessy. In team meetings it was agreed that Mrs. Shaughnessy had to be approached carefully as she was a witness to the rape of Mrs. Montgomery by her step-father, a possible colluder in his continual abuse of Mrs. Montgomery, and presented as mentally ill herself. In contravention of the team decision, Mr. Owen repeatedly emailed with Mrs. Shaughnessy and -on at least two occasions – Mr. Owen went to interview Mrs. Shaughnessy without notice to the rest of the team and without direction from any of the team trained in mental health investigation.

18. I am aware of the deposition of Ray Conrad in the on-going 2255 litigation for Mrs. Montgomery. His description of the complaints reported to him regarding Ms.

Clarke are inconsistent with Ms. Clarke as I know her and inconsistent with the efforts I observed her make to form a cohesive and effective defense team for Mrs. Montgomery.

19. Further, I am aware that Judge Fenner has stated on the record that he removed Ms. Clarke from the case because she was not being productive. Judge Fenner was mis-informed or otherwise mistaken. Though the team was floundering when Ms. Clarke, Mr. Freedman and I joined, under Ms. Clarke's direction, the mitigation investigation began and was progressing. During the relatively short time we were on the case, we established a protocol for team visits with the client, developed meaningful relationships with her, gaining her trust, collected voluminous records relating to her life and mental health, digested that information, and began interviewing witnesses with a tentative understanding that Mrs. Montgomery's mental health symptomology reflected not only familial, genetically linked mental illness but also a history of extreme and prolonged trauma. Right before we were removed from the case, Ms. Clarke made contact with Dr. Dean Delis, a neuropsychologist, who agreed to conduct an assessment of Mrs. Montgomery. We also met with Dr. Judith Herman, a national expert in the effects of trauma, who had agreed to review materials and consult on the case.

20. Capital defense work requires team work. There is simply no successful way around that as a foundation. The team must be in constant communication and collaboration. There must be trust among team members, without territoriality or self-promotion. In successful capital defense teams, everyone is working hard toward a common goal, without ego or pretense or self-indulgence. I have been on capital defense teams that understood what it takes to resolve a case for something less than the client's execution date and were committed to that work. Ms. Montgomery's defense team not only did not commit to that work, many of its members were far more concerned about their own goals and egos than with achieving a good outcome for Mrs. Montgomery.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Debra Garvey
Signed this 25th day of September, 2013.