IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

LISA M. MONTGOMERY,

Movant,

vs. CASE NO. 12-8001-CV-W-GAF

UNITED STATES OF AMERICA,

Respondent.

THE DEPOSITION OF RAY CONRAD, produced, sworn and examined on Monday, the 20th day of May, 2013, at the law offices of Lisa G. Nouri, 2526 Holmes, in the City of Kansas City, in the County of Jackson, and the State of Missouri, before me,

MARIE A. McCRACKEN, CSR,CCR, RPR
of
McCRACKEN REPORTING

a Certified Court Reporter within and for the States of Missouri and Kansas.

Taken on behalf of Movant pursuant to Court Order.

A P P E A R A N C E S

For the Movant:

Ms. Kelley J. Henry
Supervisory AFPD - Capital Habeas
810 Broadway, Suite 200
Nashville, TN 37203
kelley_henry@fd.org
and
Ms. Lisa G. Nouri
Attorney at Law
2526 Holmes
Kansas City, MO 64108
lisanouri_atty@hotmail.com

For the Respondent:

United States Department of Justice
United States Attorney's Office
400 E. 9th Street, Room 5510
Kansas City, MO 64106
Ms. Roseann Ketchmark
Ms. Cynthia L. Cordes
roseann.ketchmark@usdoj.gov
cynthia.cordes@usdoj.gov

For the Witness:

Federal Public Defender's Office
818 Grand, Suite 300
Kansas City, MO 64106
Mr. Robert Glen Kuchar
bob_kuchar@fd.org

INDEX


| WITNESS: RAY CONRAD | PAGE |
|---|---|
| Examination by Ms. Henry | 4 |
| Examination by Ms. Nouri | 40 |
| Examination by Ms. Henry | 41 |
| Examination by Ms. Ketchmark | 43 |
| Examination by Ms. Cordes | 47 |
| Examination by Ms. Henry | 52 |
| Signature | 55 |
| Certificate | 57 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 - | May 6, 2013 Order | 4 |
| 2 - | April 20, 2006 Order | 18 |
| 3 - | April 25 and May 3, 2006 Conferences in Chambers | 19 |

STIPULATIONS

It is hereby stipulated and agreed by the parties hereto through their respective counsel that submission of this deposition to the witness for examination and reading to him or by him as provided in Rule 30(e), Federal Rules of Civil Procedure, is hereby expressly waived.

It is further stipulated by the parties hereto through their respective counsel that the deposition may be signed by the witness at any time before or at the time of trial before any notary public.


Case 4:12-cv-08001-GAF Document 166-16 Filed 09/03/15 Page 3 of 58

(WHEREUPON, DEPOSITION EXHIBIT NOS. 1 THROUGH 3, INCLUSIVE, WERE MARKED FOR IDENTIFICATION.)

RAY CONRAD,

of lawful age, after having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MS. HENRY:

Q. Good morning. Could you state your name for the record.

A. Ray Conrad.

Q. That's spelled the normal way?

A. Yes, C-O-N-R-A-D.

Q. Mr. Conrad, you are here pursuant to an Order issued by Judge Fenner on May 6, is that correct?

A. That's true.

Q. Have you had an opportunity to see that Order?

A. I have.

Q. I'm going to show you what's been marked as Deposition Exhibit No. 1 and ask you if that's the order that you have reviewed.

A. This looks like the Order I've seen,

yes.

Q. You've reviewed that prior to today?

A. I did.

Q. Do you need any additional time to review the Order before we proceed?

A. I don't think so.

Q. Just for purposes of the record, could you state your position.

A. Yes. Federal Public Defender for the Western District of Missouri.

Q. Thank you. And since you are a federal public defender and a lawyer we are going to dispense with a lot of those introductory questions we might ask in a deposition and just go straight to the heart of the matter, especially since the Court has put me on the clock. I would note for the record that I started the clock as soon as you were sworn in and we will follow the timelines back and forth and we may well end earlier than that.

A. Thank you.

Q. So the reason, of course, that we are here today is to ask some questions about conversations that you had with Judge Fenner and others in chambers regarding representation of

Lisa Montgomery and so to that end before we get started with the specifics of that meeting, I'd like to know if you have spoken to anybody about this deposition prior to coming in today other than Ms. Nouri when she spoke with you on the phone?

A. I think I asked Cynthia for a copy of that Order, Cynthia Cordes, I think I asked for a copy of that Order. I think Roseann called me and told me this was set for today and that she and Cynthia were going to be here, but they were not my representatives, they were representing the government.

Q. What else did you discuss other than that?

A. I think Roseann told me that you were going to question me about my -- whatever I had to say about Judy Clarke.

Q. Okay. And has anyone from Judge Fenner's chambers contacted you about the deposition?

A. No.

Q. Has anyone from Judge Maughmer's chambers?

A. No.

Q. Has anyone other than Ms. Cordes and Ms. Ketchmark from the government's office contacted you?

A. No.

Q. Did you do anything to prepare for answering these questions today?

A. I looked over that Order and I looked over -- looked over David's declaration I think. I read your petition a long time ago, whenever it came out, but I really didn't read it again to prepare for this, I just -- yeah, that's -- I'm trying -- is there anything else in --

Q. I'm just wondering what you did in order to prepare for the deposition. So you reviewed the motion that we filed. Did you review the redacted version or the unredacted version?

A. I don't know. I don't know. Whatever one was given to our office I read.

Q. So did you just download -- when you say given to your office, you didn't download it from ECF?

A. Probably my paralegal did download it.

Q. Okay. So did you also review Susan Hunt's declaration?

A. I'm sure I read it.

Q. Okay.
A. I don't think I read it in preparation for this meeting, but I'm sure I read it.
Q. Okay. Have you read the motion to reassign the case?
A. No.
Q. Have you read any of the government's pleadings in the case?
A. No.
Q. I want to direct your attention to the morning of April 20th of 2006.
A. Okay.
Q. That morning did David Owen come into your office to discuss the Lisa Montgomery case?
A. Yes, he did.
Q. Can you tell me what he told you in that meeting.
A. Yes. David, according to my recollection, came in and he said, Judy Clarke has now gone after -- I'm not sure that's the right -- she has attacked Susan Hunt and Susan Hunt is now prepared to have Judy off the case, have her removed from the case, we are in agreement with that.
Q. Was this the first inclination that you

had that there were difficulties on the Lisa Montgomery team?

A. Oh, no.

Q. Can you tell us about what other indications that you had had that there were difficulties on the team.

A. Well, almost from the first Judy would be extremely rude to my secretaries. Instead of coming in and saying, Hi, I'm Judy Clarke, I've got a meeting or conference, she would say, What's the combination, started off that way; just rude to my secretaries to start with.

There was a time when -- Judy is a fairly tall person. My paralegal is maybe five feet tall. She stood over her like a school teacher yelling at her, You better get that to me, get that -- it was -- I want it immediately or within days, some documents or something, you know, just yelling at her. That I thought was very rude.

Q. Can I stop you right there. I would like to indicate for the record, you stated that Ms. Clarke stood over your paralegal and you indicated that she was pointing her finger?

A. Yes.

Q. Since that won't show up on the record I wanted to put that on there. When you refer to your paralegal, is that Stephanie Elliott?
A. Yes.
Q. You used the word "yelling" and so if you could tell me, do you mean in a raised voice?
A. Yes.
Q. Go ahead.
A. Almost from the first meeting that my office had with Judy, Ron would come in very discouraged and say he had been insulted. Almost from the first meeting David would come in separately, say the same thing, he had been insulted.
Q. Did they tell you what the insult was?
A. I can't remember all of them, but one was David said he called Judy and said, Stop treating me like a country bumpkin and she said, Stop acting like a country bumpkin, that's one.
I remember him -- sometimes she called him stupid in public. There was another time Ron had a suggestion and she said -- how did she put that -- you don't know enough to have an opinion or something like that.
Seems like at some point told me in a


Case 4:12-cv-08001-GAF Document 166-16 Filed 09/03/15 Page 10 of 58

memo or gave me a copy of a memo that said that Deb Garvey, who was the mitigation expert -- Judy Clarke said that Deb Garvey is a ball-buster, meaning Ron better do what she said when he was -- when they were here in town.

Q. So it's your memory that Judy Clarke described Deb Garvey as a, quote, ball-buster?

A. That's what David said in some -- all these things I've told you are what I would read or hear from them.

Q. You didn't personally observe any of it?

A. I probably saw Judy one time after she got on the case.

Q. Did you ever address any of the difficulties on the team with Judy personally?

A. No.

Q. Did Susan Hunt ever come to you and express that she was having difficulties with Judy on the team?

A. No.

Q. When Dave came into your office on the morning of the 20th and said that Judy had attacked Susan, did he describe what the attack was?

A. No.

Q. "Attack" can mean a lot of things. What did you take it to mean?
A. I took it to mean that she started insulting, it becoming personal with Susan, as she had with Ron and David.
Q. And when Dave told you this, did he ask you to do anything?
A. He said -- let me think about this. He said -- he said, Susan is now in agreement that we need Judy off the case and I said, Tell the judge.
I must say this, too, almost from the first when these men would come in and explain to me, particularly David, I would say, Do you want to keep her on the case? So at this point after six or seven months I just said, Tell the judge, okay.
Q. So they would tell you about it along the way and you would ask them, Do you want her to stay on the case?
A. Uh-huh. That was my recollection, yes. I don't know whether I said that to Ron, but I'm pretty sure I said that to David on a fairly regular basis.
Q. What would David respond when you would

tell him?
A. No, no, he said, I'll try to work with her.
Q. Do you recall whether or not Judge Fenner ever expressed any reluctance to you or anyone else about Judy Clarke being appointed on the case initially?
A. No, I wasn't involved in any of those meetings.
Q. Were you aware that Dave and Susan were going to ask Judy Clarke to become a member of the team?
A. Yes, David did ask me if he could ask Judy Clarke to be on the team because he thought she had special knowledge of mental health issues in defense.
Q. Did you agree with that decision?
A. Yes, yes.
Q. Did you communicate that agreement to Judge Fenner?
A. No. Let me say this. I knew that Judy was a Special Resource Counsel paid by the Administrative Office. At that time I think she was associated with the LA office. Later, I'm not sure, she may have moved to another office,

but I think she was -- she is paid by them to help people around the country, as are a few other people that are Special Resource people. So, you know, that's part of what I thought they were supposed to do and she had that reputation and he wanted her, that was fine with me, but I didn't recommend her to the judge at all.

Q. You've known Judy Clarke through the years from meetings and such, is that correct, when she was the defender in Washington State?

A. I was never -- I don't know how to describe this, know her. I was -- I knew of Judy when she was a defender in San Diego. She left San Diego, went into private practice I think and then went to Washington and I really don't think I had any contact with her. I knew who she was, but, you know, yes, I would see her in a meeting, but that -- I can't say that I knew her.

Q. Just were aware of her?

A. I was aware of her, yes.

Q. There were a lot of federal defenders who go to those meetings?

A. Sure, absolutely.

Q. Getting back to the morning of the 20th when David Owen was in your office, did you know

at that time that he had spoken to Judge Maughmer three days earlier about the possibility of Judy Clarke leaving the Lisa Montgomery team?

A. Who had?

Q. That David Owen had.

A. I don't recall that at all.

Q. He didn't tell you that?

A. I don't recall.

Q. So when he came to you and said, Okay, Susan is ready, we've agreed we want Judy off the case and you responded, Well, tell the judge, what's the next thing that happened?

A. He said, I think she is going to the prison, and I said, Tell the judge, he can cancel the visitation if he wants to.

Q. And that conversation is still in your office?

A. That's in my office.

Q. Was there anyone else present?

A. No.

Q. Ron Ninemire and Stephanie Elliott weren't there?

A. I don't believe so.

Q. Did he tell you at that point whether or not Ron and Stephanie were on board for this

decision?

A. Well, no, they wouldn't be in a decision-making position, but if you want my opinion now, I can tell you. I can assure you.

Q. I'm more interested in what David Owen said to you at that time.

A. They weren't there.

Q. Did David tell you anything about whether or not Lisa Montgomery had been informed --

A. No.

Q. -- about this?

A. No.

Q. Did you ask him how the client would feel about it?

A. No.

Q. After you said, Well, tell the judge, what's the next thing that happened?

A. All right. I believe that my -- my memory varies from David's. I think he went to the judge, talked to the judge and I remained in my office. I simply do not recall going to the judge's office on the 20th.

Q. You don't remember being in chambers with Judge Fenner at all on April 20th?

A. I sure don't.
Q. Do you have any memory of picking up the phone and calling the judge?
A. I have racked my brain over that. It would not be -- it would not be typical for me to do something like that, but this was such an unusual case. I thought maybe I did call and say, Judge, David is coming over to talk to you about asking you to remove Judy from the case, I may have done that, but I honestly -- that's -- I'm telling you that's the best I can say. I can't say for certain but that's possible.
Q. But you don't have any specific memory of the phone call, so --
A. No. If somebody had a recording of it and said, This is you, okay, that's me, but I honestly -- my -- my recollection is that I was not over there. And I'm not trying to somehow excuse something, because certainly I'm for David to go. This has gone on for six, seven months, it's almost intolerable. While I did not personally go there, he had my okay to go there, there is no doubt on that.
Q. And when you say it was intolerable, was there any discussion between you and David about

other options such as your office getting off the case?

A. I don't think we talked about it.

Q. And I am going to ask some questions about that again in just a minute, but --

A. Okay.

Q. I want to ask you if you had ever seen -- show you Deposition Exhibit No. 2, which is an Order dated April 20th of 2006 blocking all phone calls from Lisa Montgomery to phone numbers of Judy Clarke, have you ever seen that?

A. No, I sure haven't.

Q. Did you know about the order being issued to block all phone calls?

A. If I did, I learned it within the last few days from some declaration that you obtained from somebody.

Q. You didn't know about it at the time?

A. No.

Q. Okay.

A. In fact, I thought she was continuing to communicate with her to tell you the truth.

Q. Okay.

A. Maybe it was by letters, I don't know, but I did think there were communications.

Q. Okay. Did you talk to Judge Fenner about the removal of Judy Clarke after he issued the order?
A. After he issued the order, oh, I was there on the 3rd of May and, you know, I don't have a recollection of the 3rd of May, but I know from reading the declaration it was the 3rd of May because I was incensed with Susan Hunt. I was not -- I was beyond -- Judy was gone, I was beyond that, but I was so mad at Susan Hunt that day as is reflected in somebody's statement.
Q. I'm going to show you now Deposition Exhibit No. 3, which is a transcript of the April 25th and May 3rd, 2006, proceedings. You see that in front of you. You'll notice on the appearances it has your name listed first and it says May 3rd?
A. Right, right.
Q. And so that transcript seems to indicate that you were not present for the in-chambers conference on April the 25th, is that also your memory?
A. That would be -- my memory is of my discussion about Susan and that was on the 3rd.
Q. And there was a court reporter there so

we have a --

A. And I didn't realize that.

Q. So if you weren't there on April 25th you can't tell us anything about what happened when Susan and the judge and Dave went off the record?

A. No, no, I -- let me say this, just -- I don't know this really is pertinent to anything, but I read that and I've racked my brain for two or three days trying to think about an in camera or under seal meeting, and then I went back and with great relief saw I wasn't even at that meeting. No wonder I have no recollection of that. So -- so I don't know what was said there.

Q. Okay. And also to be clear now, the meeting that we are talking about when I'm asking about the in-chambers discussion on April 20th is not transcribed.

A. That's true, that's true.

Q. And that's -- you don't remember being at that one either?

A. I don't either. I do not, but as I said, I did tell David, Go talk to the judge, you know, so I'm not -- I'm not trying to withdraw anything at all. I was -- that's what he wanted

to do, I simply don't think I was present. I don't know.

Q. And between April 20th and May the 3rd, do you have any memory of having any contact with Judge Fenner regarding the Lisa Montgomery case?

A. No.

Q. Between April 20th and May the 3rd, do you recall having any conversation with Judge Maughmer or someone in his chambers --

A. No.

Q. -- regarding the Lisa Montgomery case?

A. No.

Q. I'm sure you might have talked to him.

A. Actually I don't think I did. I moved over to administrative matters, so I'm not seeing them on a regular basis like I was a couple years ago -- no, five years ago.

Q. So on May the 3rd when -- let me back up. The transcript on May the 3rd, and let's just refer to that so that you know what I'm talking about, starts out on the very first line with the Court saying, "Susan, I suppose that David and/or Ray told you they visited with me earlier this week."

A. Uh-huh.

Q. And we have -- sort of putting it through the calendar, it's later referred to "when they were here on Monday," so we are assuming that that's May the 1st. Do you have any memory of going with David to see Judge Fenner on May the 1st?
A. No.
Q. Judge Fenner describes that you and David had gone to him to say that there was difficulties with Susan Hunt on the case. Do you have any memory of that at all?
A. No.
Q. You recall being pretty angry with Susan Hunt?
A. I was, yes, yes.
Q. Did Susan Hunt tell you at that time that the San Diego Federal Defender's Office was willing to assume representation of Lisa Montgomery and all of the funding for the case?
A. Is that in the transcript?
Q. It's referred to in the transcript, but it's sort of referred to vaguely, that's why I'm wondering if you were aware that the San Diego office was willing to assume responsibility for the case?

A. I don't think at that time I was. I was -- I was willing to have my office withdraw and have Judy and Susan handle it. I didn't think we could work with Judy and I was so dang mad at Susan at that point, I would have -- I would have hated for us to work with her, but -- but if the judge wanted to let Susan and Judy and/or whomever or -- frankly, I thought Judy might enter her appearance on her own. I didn't know what she was going to do, I just knew that it had gotten to the point of just impossible for my staff to work with her.

Q. Do you know or did you know Ruben Cahn, who was the defender in San Diego at the time?

A. I know of him. I really don't know him.

Q. Had Ruben contacted you?

A. No.

Q. Are you aware of other federal defender offices going in other districts and providing representation at the invitation of the Court or the local defender?

A. No. I'm aware of the resource counselor going to other places to assist defenders in a particular case but not a particular defender. May have happened, but I'm not aware of that.

Q. Would you have allowed the San Diego office to come into your district and appear on the Lisa Montgomery case and to replace your office?

A. I -- I never even thought about that to tell you the truth. Like I say, I thought Judy might enter an appearance, so I guess it would be whomever she had -- if she had her team, I -- I just really don't -- I wasn't approached about that, I just really hadn't had a thought about anyone else other than her.

Q. Okay. Now, you know that federal defender employees are not allowed to just enter their appearance, correct?

A. Well, Judy entered Pro Hac Vice in this case. As a sentencing resource counselor I'm not sure what her authority might be to tell you the truth, I really don't know.

Q. You know that, for example, any assistant federal defender is not allowed to engage in the private practice of law?

A. I do know that.

Q. We have to have actual court appointments in order to appear in a case?

A. Right.

Q. Did you know that Judy Clarke was actually an employee of the Federal Public Defender's Office, though she had a special position, she was a salaried employee?

A. I thought she was an employee, but -- and I believe she was paid by the Administrative Office, but I did not think she was like an assistant federal public defender in an office. I thought she maybe got her check through a particular office, but worked independently maybe of that office.

Q. Has your office hosted any of these special projects that exist in the federal defender system?

A. Special projects.

Q. Capital resource counsels, there is a mitigation counsel, there is sentencing guideline specialists, so these little projects that the AO funds but they place them within federal defender offices, have you ever had any of those?

A. We've had some. People from the AO came, I don't know, couple years, several years ago. Some people from the sentencing commission are coming this summer.

Q. But they are not hosted as employees of

your office?

A. They are not, they are not employees of my office, no.

Q. So you are not aware that there are actually some offices that hire employees to do these specific projects, that's not something you are familiar with?

A. Well, I would have thought it was like in my office is what I thought. I didn't pay for her or any of her team to come in, they were paid by the Administrative Office, but they were not hired by me, if that helps you at all.

Q. And are you familiar with the requirements for being a member of the Western District of the Missouri Bar?

A. Well, you have to be a member of the Missouri Bar. You have to have graduated from law school. You have to have taken the bar, got to be a member in good standing, that sort of thing, apply and become a member of the --

Q. Do you know whether or not the Missouri Bar has reciprocity with the California Bar?

A. I didn't know -- to tell you the truth, I don't know, I just really don't know.

Q. Do you know whose idea it was -- I take

that back. You've already answered that question, I'm sorry. Let me go on.

I had a lot of questions to ask about the May 1st meeting, so I'm just looking over things. Since you don't remember it, then you don't know how the meeting came about?

A. I know how it came about, I told you. David -- wait a minute.

Q. The May 1st?

A. No, I don't. Sorry. I was thinking the April.

Q. Can you tell us why you were so angry with Susan Hunt at the May 3rd meeting?

A. Yes, I can.

Q. Okay.

A. David came in and told me that Susan was on board or in agreement she had been -- finally she had been attacked and she was sick of it. She had seen it happen to her own investigator, to my investigator, to David, but now it happened to her and she was on board and it was time to do something, so I say, Tell the judge. Well, then we appear before the judge.

Q. On May 3rd?

A. May 3rd. And I feel like she is blaming

me for something that they have agreed to, she is trying to back out of her agreement and put the blame on me and my office, and while we had difficult dealings that had gotten just very difficult with Judy, I didn't want this to be reflected nationally with a sentencing resource counsel and have her take another side in this thing because I thought she was in agreement that this is what we are going to do. And so I told the judge my opinion on that, you know, that's what I said, I just don't think this is fair, so I was unhappy with Susan. It felt like she had gone back on what she agreed to.

Q. And that's a real clear memory for you, and I want to be sure that I understand the source of your knowledge about Susan's agreement, that came from David Owen telling you that Susan had agreed, correct?

A. That's correct.

Q. Did David Owen ever tell you that Susan Hunt had told him, I want to think about it and I want to call Judy before we do anything?

A. No, but I've read that in either -- in somebody's declaration, I guess Susan Hunt's declaration, have read that since. I didn't know

that at the time.

Q. And did you know at the time that Judy Clarke had reached out to Dick Burr for purposes of trying to put the team back together?

A. No, I didn't.

Q. Do you know Dick Burr?

A. I think we had met with him.

Q. Okay.

A. And he said -- he said -- I think they were -- Susan and David were trying to find somebody else that they could work with and he came to Kansas City and he said, I really can't find anybody else and I said, Well, I'm not going to put my staff through this again, I'm not going to have them subjected to this, one; and, two, Judge Fenner would think I was crazy if I asked for somebody to be reinstated after all of this. So that's -- but I didn't know Judy did that, had anything to do with it, I had no idea, he was just there.

Q. So when you are referring to this meeting with Dick Burr, this was after Judy had been removed but before John O'Connor had been -- John O'Connor had been appointed?

A. I don't know when John was appointed,

but it was -- yeah, because she left on the 20th of April, didn't she?

Q. Judy left on the 20th of April and Susan withdrew on May 8th.

A. Well, you know when Dick Burr was here?

Q. I don't. I don't. Let me ask you this, after the May 3rd meeting, we know from Susan Hunt that the judge called her and asked her to file a motion to withdraw because he had decided that he was going to go with your office instead of Susan. Had you had any conversation with Judge Fenner about his choice with respect to Susan Hunt staying on the case?

A. I -- I personally don't -- I don't recall that. I didn't care as long as -- as long as we were not in with Judy, I didn't care, but I don't think he -- he asked me who he should have and who he shouldn't.

Q. When you and Dave were discussing the change of counsel issue, was there any discussion about the need to have somebody on this team who understood how capital cases are supposed to be investigated?

A. You know, if you go back to the first, I mean, when he was first looking for somebody, I'm

sure that he told me that's why he wanted her on it, because he wanted somebody with knowledge of mental health defenses, I'm confident that Dave mentioned that, talked to me about that.

Q. I was just wanting to check the time to make sure -- sometimes I lose track.

Was there a discussion on the morning of April the 20th about the damage it would do to the case and to Lisa Montgomery's defense for Judy Clarke and the people who worked with her to be removed from the case?

A. No, not between me and David that I remember.

Q. Did you have any conversation with anybody else about the damage it was going to do to the case to remove Judy Clarke and her team?

A. No.

Q. When you were hearing about the difficulties on the team, did you reach out to another defender or somebody in the criminal defense community or the capital defense community to find out whether or not any of the criticisms that Judy had of Ron Ninemire and David Owen were legitimate concerns?

A. No.

Q. Did you do anything to determine whether or not, in fact, Ron Ninemire wasn't qualified to do the work that he was being asked to do?

A. No, because Judy had her own team do it anyway, so, no.

Q. I guess the question I'm trying to get at is sometimes hearing things can be hurtful even if they are true and so I'm trying to ascertain whether or not you did anything to determine if any of the criticisms of your staff were, in fact, true?

A. When somebody is called stupid in public, I don't think I have to investigate that. Somebody says one of their team is a ball-buster, I don't think I got to check into that. If somebody calls one of my people -- he says, Stop treating me like a country bumpkin and she says, Well, stop acting like one, I don't think I need to check into things like that. That's just beyond toleration and yet the guys tried for six or seven months, they tried to hang in there and it was just beyond their -- beyond their toleration and it had been beyond mine from very early on, but I let them make that call that they wanted to try.

Q. How do you know that Judy Clarke called some member of your staff stupid?
A. David said that.
Q. And what did David tell you about that?
A. I just -- I don't know. Just, you know -- I really don't know.
Q. You said that she called him stupid in public?
A. Yeah.
Q. Who else was around?
A. I don't remember.
Q. And do you know where it was?
A. No.
Q. Do you know if he was referring to a meeting at a restaurant with Susan Hunt and Judy Clarke in the case, that Susan had asked him to have a conversation with David Owen?
A. That sounds like somebody's declaration, either Susan's or David's.
Q. But you don't have any knowledge of that?
A. I just -- where they were or what they were doing and, no, I don't know whether they were in a restaurant or who all was present, any more than I know about him coming in and telling

me that he had called her and she called me and said, Don't act like a country bumpkin and those sort of things.

Q. You were relying on David being truthful to you?

A. Yes, I was.

Q. Did you ever personally observe Judy Clarke using any profanities?

A. I only saw Judy one time that I recall in my office -- not in my office, I mean in the general offices. She was down the hall, but I never -- I never met her, never attended their meetings, never -- much of this I think happened at Susan's house. My guys got together -- I think mainly my paralegal, Stephanie Elliott, got all this material in boxes and took it to her house, I think they had most of their meetings out there anyway, but I would not have attended anyway. If they had been in my office, I wouldn't attend their meetings.

Q. So it's your testimony that Judy did not stop into your office to say hello to you whenever she was in your office?

A. No.

Q. Did --

A. But she was -- she wasn't in my office very much. This was pretty much transferred to Susan's place of business.

Q. Did Stephanie Elliott ever make any complaints about Judy Clarke or any member of her team?

A. She told me about the time Judy was standing over her and she said, You know, here I am five feet or whatever and she is standing over me yelling at me, You better get that done and shaking her finger at me like an angry school teacher or something, but -- are you asking for other instances? I'm -- they are not coming to mind now.

Q. That's the only one you recall?

A. With Stephanie, yeah, I think so, yeah.

Q. And you mentioned earlier on that your secretaries complained that she would ask what the code was in a rude tone of voice?

A. Yes.

Q. Did you observe that?

A. No.

Q. How many lawyers do you have on staff there?

A. Fifteen counting me.

Q. Are they --
A. They are not all in Kansas City, though, but, yeah, 15.
Q. Do attorneys in your office ever raise their voices at staff?
A. Not at staff.
Q. Have you heard them raise their voices at each other?
MR. KUCHAR: I'm going to enter an objection. The judge's order was pretty clear.
MS. HENRY: You are absolutely right. I'm sorry. I was sort of following up on what made this behavior on behalf of Ms. Clarke so different from what he observed on a regular basis. I don't need to go there.
I apologize and withdraw the question.
Q. (BY MS. HENRY) Did you review the letters between Susan Hunt and Dick Burr that were written after Judy Clarke's removal?
A. I read one dated April 30th, I did read that one.
Q. And did you read the letter that Dave Owen wrote back to Dick Burr in response?
A. No.
Q. You were, as you said, pretty angry on

April 3rd at Susan, had you had any contact -- I'm sorry, May 3rd. Had you had any contact with Steve Asin with the Administrative Office of the Courts prior to that time?

A. I don't think I had any contact with Steve Asin.

Q. Do you recall Steve Asin placing a phone call to you after Judy Clarke had been removed and leaving you a voicemail?

A. I know David wrote a memo kind of lining out a lot of things that Judy had done that he thought Steve Asin should know about. I can't recall getting any positive response at all from anybody. I thought -- I thought -- I didn't -- I didn't go begging for help. I didn't ask anybody for assistance, but after -- after David said that, I thought well, this is just business as usual I guess, whatever -- whatever happens happens and it's not going to make anything happen, no change, so that's all I know.

Q. Okay. And you and I know who Steve Asin is but probably nobody else in this room does, so for the record, can you tell us who Steve Asin is.

A. I think he's called the Chief of the

Program Branch of the Office of Defender Services in the Administrative Office. As chief he's like the No. 2 man under the assistant director, who many years was Ted Lidz and now it's a lady named Caite Clarke, C-A-I-T-E, Clarke. He's been long time as the -- what they call the chief and more or less in charge of the day-to-day operations I believe of the office. Although they have a lot of different branches in that office, I think he would be looked to by most of the people there as their first person under -- under the assistant director.

Q. And I want to make sure I'm understanding this memo that you are referring to that Dave Owen wrote to Steve Asin. Is it your memory that David Owen was writing to Steve Asin to enlist his help in trying to curb Judy Clarke's behavior?

A. No, I think it was just a complaint.

Q. Okay.

A. Just felt like he had been treated unfairly and the office had been treated unfairly.

Q. You said the response was business as usual. I don't want to put my own inferences on

that. Can you tell me what you mean by "business as usual."

A. I just don't recall getting any kind of a response, you know.

Q. From Steve Asin?

A. Or anyone.

Q. Okay. Who is the anyone you would have expected a response from?

A. Well, I suppose I would think that the Administrative Office through the Office of the Defender Services would reach out to people in the resource -- sentencing resource people and say, Hey, this is overboard, you know. You'll need to -- you all need to talk about how you handle things and curb yourselves in some fashion, you know, I don't know. But I never -- I didn't get any report or expect one, but I -- I didn't get a thing that I recall.

Q. But it's your memory this occurred before Judy was removed?

A. No, no.

Q. It was after Judy?

A. Oh, yeah, yeah. It was just sort of after-the-fact thing telling Steve Asin.

Q. That's what I wasn't understanding.

A. Yeah.

Q. We have ten minutes of our time left. Is there any question that I've asked you here today that you would like to go back and modify?

A. No, I don't think so.

Q. Is there any answer that you have given that you would like to change?

A. I don't think so.

Q. Is there anything else that you feel like counsel for Lisa Montgomery or the government needs to know about your conversations or any conversation that you had with Judge Fenner that resulted in Judy Clarke's removal?

A. You know, I just -- I just think that I've already said it pretty much. It was just really what I viewed as terrible behavior to my staff, just reached the point we need to either get off or let her have the case or whatever.

Q. Thank you, sir.

EXAMINATION

BY MS. NOURI:

Q. So the source of the what I would call complaints about Judy Clarke were predominantly from David Owen?

A. They were on a regular basis after

almost every meeting by David and Ron.

Q. And then we have one time with Stephanie Elliott, correct, that she told you the standing-over-her story?

A. I don't know. She may have been telling me how the guys were being treated, I honestly can't remember, that just sticks in my mind, that one thing about her.

Q. It wasn't any of your personal observations?

A. Oh, no, no, no.

EXAMINATION

BY MS. HENRY:

Q. I'm sorry, I forgot to ask you, did David Owen come back from court on April the 20th of 2006 and tell you what he told the judge?

A. Well, you might think that's likely. I don't remember him telling me that.

Q. Would you have taken -- and I'll just tell you, I'm not trying to be coy. Judge Maughmer remembers you being in chambers on April the 20th. We know of two people remember you being there and I believe Judge Fenner remembers you being there, it's a little unclear, but I think he does from reading the transcript. So if

you were in a chambers meeting with the Court, would you typically take notes or --

A. No.

Q. -- would there be something --

A. No.

Q. There would be no notes for you to review?

A. Interestingly enough, I don't see his name on there, but I thought Judge Maughmer was there on the 3rd and I was complaining about Susan. I don't -- I don't know whether -- unless they have got notes, I wonder if maybe the judge thought my phone call was -- I don't know. I just -- frankly, if they have got something that says I was there, I -- I'm fine with it because whatever was said I told David to say, Tell the judge, you know. I just -- frankly, I do not remember being there, though.

Q. And we are just trying to recreate that record ourselves. We appreciate your time today. And the government has an opportunity to ask you. And I would say for the record, there are six minutes and 19 seconds left on my time.

EXAMINATION

BY MS. KETCHMARK:

Q. Mr. Conrad, at the beginning of the deposition you were asked if you -- in preparation for the deposition if you spoke with folks in our office and you mentioned you had spoken with both Cynthia and me and just so the record is clear, we didn't discuss what your testimony should be or --

A. No, no.

Q. -- anything of that nature.

A. In fact, one of you said, We don't represent you in this case. I don't remember which one it was, but --

Q. It wasn't me, so I think --

MS. CORDES: It was me.

Q. (BY MS. KETCHMARK) And just so we are clear, David Owen was not complaining that Judy Clarke did anything improper in her legal work, is that correct?

A. He never complained about -- that I can think of about legal work. It was the complaint that how she treated our staff and if they had an idea of how to do something -- for example, Ron, I think, had an idea of how to do something and

she said, You are not qualified to give an opinion on how to do this and, David, you are too stupid to have an opinion or something like that, you know.

Q. So it was more her manner or her approach?

A. Word, yes.

Q. Her personality problems?

A. Right. Yeah, they didn't come to me and say, Hey, she is -- she doesn't know how to handle a mental health case, that's the reason they wanted her in it, and for that matter, my recollection is that David asked that she be allowed to stay in at some point and let us out. I thought he said that. I thought he told me that or maybe I read it in a declaration, but --

Q. Lisa Montgomery's current defense team is claiming that you and David committed a fraud on the Court because you went to the judge and said she was doing defective legal work or negative legal work.

MS. HENRY: I'm going to object at the way you are characterizing our claim. It's under seal so Mr. Conrad doesn't have the benefit of being able to read it. What we have claimed

is based on what Judge Fenner said on the record on April 25th, so I'm going to object to the form of your question and your characterization of our claim. You may go ahead and ask Mr. Conrad your question.

Q. (BY MS. KETCHMARK) Do you have -- was there any -- just to be clear, was there any complaints regarding her representation of Lisa Montgomery, her legal work?

A. Not that I can recall. Not that I'm aware of. That just wasn't the problem, just -- that just simply wasn't the problem. It was the approach she took and the fact that my people were insulted and they couldn't even have an opinion or suggest something or a way to do something, you know. It was just constant insults and things were taken personally. I mean, she treated people with personal insults I thought.

Q. Your office is funded by the federal government and your employees are all funded by the federal government?

A. That's true.

Q. And the Administrative Office, are those employees all funded by the federal government?

A. That's true.
Q. How did you think that Judy Clarke was receiving a salary, was that somehow through the federal government?
A. Yes, I think funding comes through -- how to put this. The Administrative Office provides administrative support for all of our offices and for the groups associated with us such as Special Resource Counsel and Criminal Justice Act Panel Attorneys, so they provide funds at the direction of the judges that oversee the Administrative Office and it was my understanding that Sentencing Resource counsel receive their funds from the Administrative Office. They may be tied to a particular defender office, they might even have an office in that office, but I don't think they are subject to the defender. They are not like one of his assistant defenders, they are -- and their check may well come through with other checks. I've never had somebody like that in my office. But their checks, their government checks, come to them just like mine does, it's just I'm not sure whether it would go through a defender office or directly to them.

Q. Okay. But bottom line, she is funded by the federal government in some form?
A. That's right.
Q. She was not in the private sector at the time of this representation of Lisa Montgomery?
A. No.
Q. She was on the case, as you said, Pro Hac?
A. Pro Hac Vice for the case.
Q. It was David Owen and your office supporting her with that?
A. David I think moved for her admission.
MS. KETCHMARK: I think that's all of the questions I have.

EXAMINATION

BY MS. CORDES:
Q. Just briefly. When you first began, you mentioned the telephone conversation that you and I had. Just want to make clear that in that conversation I didn't interview you in any way for your testimony here today?
A. No, you did not.
Q. I didn't prep you before meeting here today?
A. No, you did not.

Q. As you indicated, I informed you that I didn't represent you and I represented the government?

A. That's true, that's true.

Q. Any other conversations that Roseann had with you prior to today's meeting, it didn't involve the substance of your testimony?

A. That's true, that's true.

Q. We just informed you of the Court Order?

A. That's true.

Q. I just wanted to follow up on a couple of things. When Judy Clarke was involved in the case, do you have any recollection of positive contributions that she made to move the case forward? Let me ask it this way, she was hired to assist with mental health issues?

A. Uh-huh.

Q. Do you have any recollection of work that she contributed to during her brief time on the case on those topics?

A. At the time I thought they were doing a lot of investigation. I thought they were doing a lot of sending people out to investigate the offense, but also a lot of people were being sent out to do mitigation work, so I think they were

in a preparatory stage I guess I would say at this stage.

Q. When you say that was taking place, was that Judy Clarke doing that work or is that the resources of your office doing that work?

A. Well, I think it was maybe a combination of the two, because she had a team of at least three people, two or three people with her, and I think she would direct them to do things related to mitigation and I think sometimes they may have done things with Ron and maybe -- maybe they were with David at some point, too, you know. We interviewed people, but they were doing a good deal of investigation as I recall and --

Q. When you described their relationship and the later stages of it, it sounds like it was becoming very conflict ridden and volatile. At that point in the relationship was the case moving forward?

A. I don't think the case was -- I -- I didn't hear anything about it being stopped or at a dead end or anything like that, but I frankly thought it was volatile from almost the first. They just continued on trying to do their jobs.

Q. Can you describe in a little bit more

detail about how the funding works for Judy Clarke, I guess, to the best of your knowledge.

A. Well, I really can't -- I can only say that the Judicial Conference of the United States has an executive committee of judges who determine how much money will be applied for CJA funds for the panel attorneys and how much will be applied for defender offices, what portion of that can go to Sentencing Resource people and what portion might go to these capital habeas units, which are units usually, maybe always, assigned to a particular defender office that are involved in 20 to 55-type work.

So they get an appropriation from Congress of a set amount for defender services and that has to be used as Congress has set. So that money is -- after it's been appropriated, they divide it up, decide who will get what portion, and of that I will get a specific budget, or an allotment. It's supposed to be a budget but it comes in portions, to see my particular small office through a year. Okay.

Now then, LA has the same thing, San Diego has the same thing, Wichita has the same thing.

There are associated with these offices a Special Resource Counsel. I don't know that that person is considered subordinate to the defender at all. I think they are independent, but I think they are paid -- they are paid government employees to do their work as Special Resource Counsel. They are supposed to provide assistance, for example, if you need motions or briefs or just want to discuss a case or if they have time and are interested, if you want their assistance in a case, you can ask for that, but in all those cases they are paid and I don't know whether their check actually comes through the defender office -- see, we get paid by direct deposit, so while they might have an office in that defender's office, I'm not -- I don't think they are subject to that defender. I think they are sort of an independent person that can go around the country and take care of a case as it comes along.

Q. But whether you are Special Resource Counsel or an assistant FPD you are paid for through government funding, correct?

A. Yes.

Q. And if you hold one of those two

positions, at no time can you also work in the private sector?

A. No. No, that's been -- that's been under the statute we are all operating under, which is 18 USC § 3006A, it provides that we cannot do private practice, that's in the statute.

MS. HENRY: I need to follow up on just two things.

MS. CORDES: I'm not sure if the Court Order is clear, I thought it was supposed to be our time and your time.

MS. KETCHMARK: If she needs six minutes, she can have six minutes.

MS. HENRY: Actually I just want to ask one question in particular that came in as a result of your questioning and this will be it.

EXAMINATION

BY MS. HENRY:

Q. You described the various complaints that your staff members had. Do you recall anyone ever telling you that one of the complaints that Judy Clarke had about the team that was discussed and that was the source of friction was an alleged special relationship

between Ron Ninemire and Lisa Montgomery?

A. I can tell you only from reading the declarations, I didn't know it at the time. You want me to tell you what I read in the declaration?

Q. No, I'm interested in what you knew at the time. That wouldn't have been one of the things you discussed with Dave about, go to the judge and tell him about that?

A. No, huh-uh. I could say that David and Stephanie were very worried about Lisa committing suicide and they went out there a lot, a lot, to kind of keep her on track I guess you could say and keep -- hopefully keep her in a situation where the staff would not put her in a more difficult situation of a suicide watch and whatever that entails at CCA. They were very, very concerned about that and spent a lot of time with her, that's all I know, but I didn't hear any complaints about it until I read one of your declarations. I didn't -- I had never known somebody complained about that.

Q. So basically your opinions that you have drawn and that you shared with us today were based completely on whatever you were told by

David Owen, Ron Ninemire and Stephanie Elliott?
A. Yeah, yeah -- and -- well, and my secretaries, yeah.
Q. So you have to rely on that to be truthful?
A. That's true.
Q. That's why you've drawn the opinions that you have drawn?
A. That is quite true.
Q. Thank you very much. I appreciate your time.
THE REPORTER: What about signature?
MS. HENRY: Yes, please.
THE REPORTER: Do you want a copy?
MS. CORDES: Send it to either one of us.
MS. HENRY: Can we waive formal presentment and she can send it to you?
MR. KUCHAR: That's fine.
MS. HENRY: I would like both PDF and an ASCII format.
MS. KETCHMARK: E-Tran.
(Witness excused.)
* * *

______________________________
RAY CONRAD

STATE OF____________________ )

) SS:

COUNTY OF___________________ )

Subscribed and sworn to before me this ________day of_____________, 2013.

_______________________________
NOTARY PUBLIC

My Commission Expires:_________________________

In re: LISA M. MONTGOMERY vs. UNITED STATES OF AMERICA

**E R R A T A   S H E E T**

**RE: LISA M. MONTGOMERY v. UNITED STATES OF AMERICA**

DEPOSITION OF: **RAY CONRAD**

PG/LN NO. CORRECTION REASON FOR CHANGE

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

:_________:___________________:______________________

_______ I certify that I have read my deposition in the above case and I request that no changes be made.

_______ I certify that I have read my deposition in the above case and I request that the above changes be made.

SIGNATURE OF DEPONENT:_______________________

DATED:_______________________

C E R T I F I C A T E

I, MARIE A. McCRACKEN, a Certified Court Reporter within and for the States of Missouri and Kansas, hereby certify that the within-named witness was first duly sworn to testify the truth, and that the deposition by said witness was given in response to the questions propounded, as herein set forth, was first taken in machine shorthand by me and afterwards reduced to writing under my direction and supervision, and is a true and correct record of the testimony given by the witness.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or relative or employee of such attorneys or counsel, or financially interested in the action.

WITNESS my hand and official seal at my office in said County and State, this ______, day of _________________, 2013.

___________________________________
MARIE A. McCRACKEN, CSR, CCR, RPR
Certified Court Reporter
Missouri #874
Kansas #0680

May 28, 2013

Mr. Ray Conrad
c/o Mr. Robert Glen Kuchar
Federal Public Defender's Office
818 Grand, Suite 300
Kansas City, MO 64106

In Re: LISA M. MONTGOMERY vs. UNITED STATES OF AMERICA

Dear Mr. Conrad:

Enclosed is your deposition taken in the above matter, along with the original signature page and correction sheet.

Please review your testimony and make any necessary corrections on the correction sheet provided. You will need to sign both the original signature page and the correction sheet in front of a notary public and return both in the envelope provided.

We would request that you return these completed items within 30 days of the date of this letter. If we have not received these items within 30 days or by the time of trial, an unsigned copy will be filed.

Thank you for your assistance in this matter.

Sincerely,

McCRACKEN REPORTING

BY: MARIE A. McCRACKEN
Certified Court Reporter

Enclosures