# DECLARATION OF DENISE LeBOEUF

I, Denise LeBoeuf, being duly sworn and of lawful age, declare as follows:

1. I am an attorney licensed by and in good standing with the Louisiana State Bar. I have also been admitted to practice in the Eastern, Middle and Western Districts of the United States District Courts in Louisiana, the Northern District of Florida, the Fifth Circuit Court of Appeals, and have been admitted *pro hac vice* in other states and federal courts. I am also a member of the United States Supreme Court bar.

## I. Qualifications

2. I am an experienced capital defense lawyer. I have been counsel of record in a number of cases in both state and federal courts, including the United States Supreme Court. I have served as lead counsel in capital trials, authored briefs on direct appeal, and represented clients in post-conviction proceedings from state district court through federal habeas and clemency applications. I have been appointed "learned counsel" pursuant to 18 U.S.C. § 3005 in several federal capital cases since 1998, when the federal government resumed capital prosecutions; I have been offered but declined federal appointment in a capital case a number of times since then as well. I have been accepted as a member of the Office of Military Commissions Defense qualified to serve as learned capital counsel in the military commissions on Guantánamo. I have been qualified by a number of state and federal courts to testify as an expert on the defense function in capital cases.

3. Since 1989 I have represented clients in capital cases at trial, first as a state public defender and thereafter in private practice or with various non-profit law firms. From 1992-1999 I was an attorney at the Loyola Death Penalty Resource Center, a federal Community Defender Organization, providing assistance to other counsel and direct representation to death-sentenced

clients in state and federal habeas proceedings. During this time I also continued to defend clients in capital cases at trial in Louisiana. In 1999 I co-founded the Center for Equal Justice in New Orleans, a not-for-profit law office, exclusively representing persons facing a death sentence at trial, on appeal, or in post-conviction. I was appointed to capital cases at all levels by both state and federal courts, primarily in Louisiana but also in Florida. I was the co-Editor of the Louisiana Capital Post-Conviction Manual, and authored the chapters on litigation overview and mental health litigation.

4. In 1999 the Louisiana legislature granted death-sentenced inmates a right to counsel; the following year I received the first grant for a state-financed office to represent capital inmates in post-conviction. I founded the Capital Post-Conviction Project of Louisiana (CPCPL) and served as the Executive Director from 2000 to 2006, establishing and supervising a statewide office with over a dozen permanent and six temporary employees. The office was charged with representing or finding representation for all Louisiana condemned prisoners after their death sentence was affirmed on direct appeal. While the Director of CPCPL I authored the chapter on post-conviction procedure for the Louisiana Judges Capital Case Bench Book.

5. In 2005 the offices of the Post-Conviction Project had to be relocated due to flooding following Hurricane Katrina. I supervised the restoration effort and established new offices and additional staff. I continued serving as Director until 2006.

6. I was appointed by the judges of Orleans Parish to serve on the Board of the Orleans Public Defenders, and elected Chair of that Board. I served in that position for a year, from April 2006 through 2007, assisting in the effort to re-establish and reform indigent defense in post-Katrina New Orleans. The entire 2006 Board received the Camille Gravel Award from the Federal Bar Association for distinguished *pro bono* service.

7. From 1992 to the present, I have frequently worked with capital trial and post-conviction defenders in a number of roles. I consult on an individual team basis, as well as train, not only with lawyers, but also with investigators, mitigation specialists, and experts. I advise litigation teams on trial preparation, especially in the development and understanding of mental health mitigation. Although I have consulted on cases in many capital jurisdictions, I have worked as resource counsel and as a consultant primarily in the Southern states, including Texas, Mississippi, Virginia, Georgia, Tennessee, Florida, Alabama, Arkansas, North Carolina, Missouri, and Louisiana.

8. From 2006 to 2008, I was in private practice, exclusively defending clients in capital cases. The Administrative Office of the Federal Courts, Defender Services Division, contracted with me to provide resource assistance to lawyers and defense teams in federal habeas, primarily in underserved states. I was also of counsel to the American Civil Liberties Union's Capital Punishment Project in Durham, North Carolina, and assisted that project's Executive Director with start-up as well as case-specific duties.

9. In April 2008, I accepted a position with the American Civil Liberties Union as Director of the John Adams Project, coordinating the ACLU's participation in a coalition of civilian attorneys and detailed military counsel defending the Guantanamo "High Value Detainees." One of the cases was *United States v Mohammed et al,* a capital prosecution in the Military Commissions of five detainees co-accused for their responsibility in the 9/11 attacks. On behalf of the ACLU's John Adams Project I helped to establish civilian defense teams for the capital defendants in the military commissions, to assemble cultural and mental health experts as consultants, and to coordinate with civilian and military legal team members and with the non-governmental organizations working for accountability for torture and exposure of the conditions

affecting the clients. On behalf of this Project I prepared a written submission and testified in Congress about the inadequacy of resources for capital cases in the commissions.

10. On May 1, 2011 I became the Director of the ACLU's Capital Punishment Office, with responsibilities that include oversight of all ACLU capital litigation and advocacy, and coordination with all state affiliates working toward reform or repeal of the death penalty. In that capacity I have supervised staff counsel in capital cases (trials, appeals, and post-conviction) in North Carolina, Tennessee, Alabama, Mississippi and Georgia. I participated in substantial team consults in Arizona, Florida and the U.S. military. I also continue to work with the Mohammad team defending Mr. Mohammad in his capital case in the Military Commission at Guantanamo Bay.

11. For many years I have been a guest lecturer at law schools and universities in seminars and law school or undergraduate pre-law courses on the law and practice of capital defense, teaching various aspects of the American death penalty and capital procedure. These universities include Fordham University School of Law, Yale Law School, Tulane Law School, Columbia University and Columbia Law School, Southern University Law School, Harvard Law School, University of California at Irvine, University of California, Berkeley School of Law, Xavier University, University of North Carolina School of Law, University of Mississippi School of Law, Hofstra Law School, St. John's University School of Law, University Of Texas School of Law, and Cornell Law School.

12. From 2000 to 2008, I was a guest lecturer at Louisiana State University Law School annually; from 1994 to 2001, I was a guest lecturer at Loyola University School of Law annually. In the spring of 2009, I was the keynote speaker for a symposium on the death penalty at University of Missouri Kansas City Law School. I have authored two law review articles and

a number of papers on capital defense, particularly mental health litigation, as well as blogs and opinion pieces on the death penalty in American jurisprudence and public life.

13. I have an interest in international human rights law and the death penalty. In December 2001, at the request of Amnesty International, I travelled to Moscow, Russia, with Sister Helen Prejean – international activist and speaker – and Bud Welch, who lost his daughter in the Oklahoma City bombing and became an advocate for abolition of the death penalty. I spoke to the Russian Duma on two occasions, and to Russian judges, courts, and clemency board members.

14. In 2010, 2011 and 2012 I taught International Law and the Death Penalty for Tulane Law School's International Criminal Law Summer session in Amsterdam. I presented a short paper on torture and the death row phenomenon at the Congress of the International Association of Law and Mental Health in Berlin in July 2011.

15. In February 2010 I participated in the first-ever capital defense training in Lahore, Pakistan, speaking to Pakistani lawyers, investigators, inmate counselors and mental health professionals at the request of Reprieve UK. I travelled to Pakistan again in 2011 to lecture at several universities and capital law conferences, and to consult with the Justice Project Pakistan, a group of human rights lawyers defending capital cases.

16. I have spoken at national events concerned with capital defense and the criminal justice system for a number of years. These talks include the National Center for American Progress panel member, speaking on "Race and Prosecutorial Discretion"; Faces of the Wrongfully Convicted, UCLA, Los Angeles, California; "Race and the Criminal Justice System," University of Dayton School of Law, Gilvary Symposium on Law, Religion & Social Justice; First (1998)

and Second (2002) National Conferences of the Wrongly Convicted, Northwestern Law School, Chicago, November 1998 and December 2002.

17. In addition to teaching at universities as a guest lecturer, I also speak extensively at national conferences and short courses devoted to training lawyers and investigators in the special practice of capital defense. Since 1993, I have lectured extensively on capital case defense, primarily in the areas of mitigation development and integration, mental health litigation, particularly the effects of trauma on development and behavior, false confessions, and standards of practice for capital attorneys. I have lectured on these and other subjects in many death-penalty jurisdictions, including Alabama, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Montana, Illinois, Indiana, Ohio, Kentucky, Louisiana, Maryland, Missouri, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, North Carolina, Tennessee, Texas, and Virginia. I have lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts, in connection with federal death penalty cases and habeas corpus litigation. I have also been asked to speak about the death penalty in non-capital jurisdictions, such as Alaska, Massachusetts and Minnesota.

18. I have lectured at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund, the National Legal Aid and Defender Association ("Life in the Balance"), the California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). A number of times I served on the planning committees for these national conferences. For over a decade, I served on the planning committee for the capital case certification required of Louisiana capital defense attorneys. I

have also taught a number of times at the death penalty colleges sponsored by the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois.

19. When New York became a capital jurisdiction in 1995, I was asked to join the faculty of experienced capital defenders who participated in rigorous seminars to teach New York lawyers capital practice. I also serve as a faculty member for the National Consortium for Capital Defense Training, which received federal funding for capital defense training conducted in a number of high-need venues nationally from 2005 to the present.

20. In 2002 I served on the Committee that revised the 1989 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"). The Guidelines were extensively rewritten to reflect current consensus on the national standard of care applicable to capital cases. After passage of the 2003 Guidelines by an overwhelming majority of the American Bar Association, the United States Supreme Court re-affirmed the role the Guidelines play in providing "well-defined norms" for capital practice. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

21. In the past twenty years I have worked in some capacity in hundreds of capital cases. I have provided direct representation or substantial assistance in capital cases at trial, on appeal or in post-conviction; have coordinated or supervised the representation of indigent capital defendants; have assisted counsel of record in drafting pleadings, preparing experts, conducting investigation, and developing litigation plans; and I have trained capital teams or consulted with team members at various litigation stages in capital cases in virtually every capital jurisdiction in the United States.

22. I am stepping down as the director of the ACLU's Capital Punishment Project to return to practice in New Orleans, Louisiana in October, 2013. I will continue to serve as the director of

the John Adams Project for the ACLU, and will be able to devote most of my time to work on the capital case against the alleged 9/11 conspirators in Guantanamo. I will continue to teach and consult on capital cases. On September 26, 2013 I became the second recipient of the John Paul Stevens "Guiding Hand of Counsel" award, given by the American Bar Association.

## II. Standard of Care in Capital Cases

23. There is a standard of practice applicable to all capital cases, in all United States jurisdictions. This has been true since the so-called "modern era" of the death penalty began in 1976, when the United States Supreme Court permitted some states to resume death sentencing and executions. *Gregg v. Georgia,* 428 U.S. 153 (1976). Such standards are expressed by written guidelines and jurisprudence, but exist independently and pre-date such written expression. By far the most comprehensive, accepted, and well-vetted set of standards is to be found in the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Capital Cases (February 2003), the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, as well as the earlier 1989 ABA Guidelines, and applicable case law.

24. From the beginning of my work in capital defense to this day, I have endeavored to learn, live up to, and improve the standard of practice applicable to capital cases. I learned the standards of care by apprenticing myself to senior capital defenders. In my first two capital cases, in 1990 and 1992, I was a very junior lawyer with two different lawyers who were rightly highly regarded in the defender community. They each embodied the standard of practice for a low-volume, high-quality criminal defense practice, and they taught me a great deal. Despite their expertise, one of the things I came to realize is that there are many ways in which a good –

even a great – grounding in criminal defense is simply not enough to meet the need for high quality legal representation in a capital case.

25. In my early capital forays, I was lucky, and lead counsel was very good. In the 1990 trial case, we secured a unanimous life verdict not through my skill or preparedness, but likely through the unique circumstances of the case (an HIV positive client with no previous history of violence with a very reasonable theory of self-defense or manslaughter for the two homicides). The client was eventually released through the efforts of lead counsel on appeal and died of his illness in his home. In 1990, I briefed and argued a small part of a capital direct appeal; we achieved a remand for the client, with whose case I still assist, in state post-conviction.

26. In 1989 I began a capital post-conviction case without the security of experienced co-counsel and quickly realized that I needed the assistance of full time capital defenders. I consulted with attorneys at the Loyola Death Penalty Resource Center and began learning that a capital case is more than just a very difficult homicide trial. Defense of a capital trial requires a thorough preparation for two cases: the defense to the crime and the presentation of a case for life at sentencing. Moreover, it requires that those two phases of the bifurcated trial be integrated, not inconsistent, and that together they fairly capture and present all the many reasons why the client in this case should not receive a death sentence. In the decades since those early cases, I have concentrated my practice exclusively in capital defense. I have spent that time trying to improve myself and my community in the standard of practice required for these cases.

27. The Guidelines capture the heightened need for preparation, and the uniquely demanding nature of capital defense.

> [D]eath penalty cases have become so specialized that defense counsel have duties and functions definably different from those of counsel in ordinary criminal cases. The quality of counsel's "guiding hand" in modern capital cases is crucial to

> ensuring a reliable determination of guilt and the imposition of an appropriate sentence. Today, it is universally accepted that the responsibilities of defense counsel in a death penalty case are uniquely demanding, both in the knowledge that counsel must possess and in the skills he or she must master. At every stage of a capital case, counsel must be aware of specialized and frequently changing legal principles, scientific developments, and psychological concerns. Counsel must be able to develop and implement advocacy strategies applying existing rules in the pressure-filled environment of high-stakes, complex litigation, as well as anticipate changes in the law that might eventually result in the appellate reversal of an unfavorable judgment.

Eric M. Freedman, Add Resources and Apply Them Systematically: Governments' Responsibility Under the Revised ABA Capital Defense Representation Guidelines, 31 HOFSTRA L. REV. 1097 (2003)(footnotes omitted).

28. The Guidelines were not created in a vacuum, and the problems addressed by the Guidelines were not unknown before 2003. The Guidelines cite to a number of important articles, cases and studies concerning representation in death penalty cases, and provide a review of the predecessor guidelines (the "related standards" section). The seminal article is Gary Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U. L. REV. 299, 303-04 (1983). Also illuminating is Stephen B. Bright, Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer, 103 YALE L.J. 1835 (1994). *See also* Andrea D. Lyon, Defending the Death Penalty Case: What Makes Death Different? 42 MERCER L. REV. 695 (1990); Welsh S. White, Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care, 1993 U. ILL. L. REV. 323 (1993); Jeffrey L. Kirchmeier, Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the Strickland Prejudice Requirement, 75 NEB. L. REV. 425, 428-34 (1996); Spec. Comm. on Capital Representation & Comm. on Civ. Rts., Ass'n of the Bar of the City of N.Y., The Crisis in Capital Representation, 51 REC. OF ASS'N OF THE BAR OF CITY OF N.Y.

169, 185-87 (1996); James S. Liebman, The Overproduction of Death, 100 COLUM. L. REV. 2030, 2102- 10 (2000).

29. The directive to conduct a thorough multi-factor investigation is an unassailable general principle. There is literally no capital case in which it does not obtain. Guideline 10.7 gives the black letter law, and the commentary illuminates the scope of the need. The Guideline reads in part:

> GUIDELINE 10.7—INVESTIGATION
>
> Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.
>
> The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

30. The comments to this guideline explore the scope of the investigation into both guilt/innocence and potential death penalty.

> Penalty
>
> Counsel's duty to investigate and present mitigating evidence is now well established. The duty to investigate exists regardless of the expressed desires of a client. Nor may counsel "sit idly by, thinking that investigation would be futile." Counsel cannot responsibly advise a client about the merits of different courses of action, the client cannot make informed decisions, and counsel cannot be sure of the client's competency to make such decisions, unless counsel has first conducted a thorough investigation with respect to both phases of the case.
>
> Because the sentencer in a capital case must consider in mitigation, "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant," "penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history." At least in the case of the client, this begins with the moment of conception. Counsel needs to

explore:

(1) Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage);

(2) Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, the loss of a loved one, or a natural disaster; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (e.g., failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities);

(3) Educational history (including achievement, performance, behavior, and activities), special educational needs (including cognitive limitations and learning disabilities) and opportunity or lack thereof, and activities;

(4) Military service, (including length and type of service, conduct, special training, combat exposure, health and mental health services);

(5) Employment and training history (including skills and performance, and barriers to employability);

(6) Prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services);

The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

Accordingly, immediately upon counsel's entry into the case appropriate member(s) of the defense team should meet with the client to:

1. discuss the alleged offense or events giving rise to the charge(s), and any improper police investigative practice or prosecutorial conduct which affects the client's rights;

2. explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating factors under the applicable death penalty statute and

any mitigating factors; and

3. obtain necessary releases for securing confidential records relating to any of the relevant histories.

Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for the client to discuss. Topics like childhood sexual abuse should therefore not be broached in an initial interview. Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer. As noted supra in the text accompanying note 103, a mitigation specialist who is trained to recognize and overcome these barriers, and who has the skills to help the client cope with the emotional impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional, probation, or parole officers, and others. Records — from courts, government agencies, the military, employers, etc. — can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections. Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. A multi-generational investigation extending as far as possible vertically and horizontally frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment. The collection of corroborating information from multiple sources — a time-consuming task — is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence.

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information pertaining to the client, his or her siblings and parents, and other family members, including but not limited to:

a. school records
b. social service and welfare records
c. juvenile dependency or family court records
d. medical records
e. military records
f. employment records
g. criminal and correctional records
h. family birth, marriage, and death records
i. alcohol and drug abuse assessment or treatment records

j. INS records

> If the client was incarcerated, institutionalized or placed outside of the home, as either a juvenile or an adult, the defense team should investigate the possible effect of the facility's conditions on the client's contemporaneous and later conduct. The investigation should also explore the adequacy of institutional responses to childhood trauma, mental illness, or disability to determine whether the client's problems were ever accurately identified or properly addressed. Even if the institution that responded to the client was not grossly abusive or neglectful, it may have been incompetent in a number of ways. For example, IQ testing or other psychological evaluations may have been performed by untrained personnel or using inappropriate instruments— flaws that might not appear on the face of the institutional records.
>
> The circumstances of a particular case will often require specialized research and expert consultation. For example, if a client grew up in a migrant farm worker community, counsel should investigate what pesticides the client may have been exposed to and their possible effect on a child's developing brain. If a client is a relatively recent immigrant, counsel must learn about the client's culture, about the circumstances of his upbringing in his country of origin, and about the difficulties the client's immigrant community faces in this country. Counsel should also be particularly sensitive in these circumstances to language or translation difficulties that may unwittingly have led to misunderstandings between the client and others, including government officials and members of the community at large, with whom he may have come into contact.

31 HOFSTRA, 1021 – 1026 (footnotes omitted).

31. This duty to investigate is underlies everything else the defense team does to prepare a capital case. "Of course, no mitigation case is better than the facts in support of it, which is why the ABA Guidelines, the Supplementary Guidelines, and the decided cases place such heavy emphasis on counsel's duty to investigate." Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases , 36 HOFSTRA L. REV. 663, 671 (2008) (hereinafter "Supplementary Guidelines, 36 HOFSTRA")

32. Investigation, the necessary cornerstone, is conducted by a team. The notion that all capital cases require a team goes back to the earliest days of the modern era of the death penalty. Indeed, Millard Farmer's capital defender organization was named "The Team Defense Project,"

because the team concept is so central. The Guidelines address the core concept of a team in the Commentary to Guideline 4.1, "The Defense Team and Supporting Services".

> The Team Approach to Capital Defense
>
> National standards on defense services have consistently recognized that quality representation cannot be rendered unless assigned counsel have access to adequate "supporting services [including] secretaries[,] investigators[, and] . . . expert witnesses, as well as personnel skilled in social work and related disciplines to provide assistance at pretrial release hearings and at sentencings."
>
> This need is particularly acute in death penalty cases. The prosecution commits vast resources to its effort to prove the defendant guilty of capital murder. The defense must both subject the prosecution's evidence to searching scrutiny and build an affirmative case of its own. Yet investigating a homicide is uniquely complex and often involves evidence of many different types. Analyzing and interpreting such evidence is impossible without consulting experts—whether pathologists, serologists, microanalysts, DNA analysts, ballistics specialists, translators, or others.
>
> In particular, mental health experts are essential to defending capital cases. Neurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses on death row. Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various junctures during the proceedings, including competency to stand trial, sanity at the time of the offense, capacity to intend or premeditate death, ability to comprehend Miranda warnings, and competency to waive constitutional rights. The Constitution forbids the execution of persons with mental retardation, making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase. Creating a competent and reliable mental health evaluation consistent with prevailing standards of practice is a time-consuming and expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary.
>
> Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team

> or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.

Guidelines, 36 HOFSTRA at 955-57, (footnotes omitted).

33. Under the Guidelines, lead counsel is responsible for assembling the defense team, choosing not only competent co-counsel, but also at least one investigator and one mitigation specialist. Guideline 10.4. Once the team is assembled, lead counsel is responsible for the coordination of the team's investigation into the client's life history, which necessarily involves the assistance of a mitigation specialist.

> The fundamental duty of a mitigation specialist is to conduct a comprehensive life history investigation of the client and identify all relevant mitigation issues, including facts and circumstances to rebut the prosecution's case in aggravation. [The process of gathering, organizing, and analyzing life history data often leads to the identification of mental health issues requiring assessments by mental health experts who potentially will testify regarding their findings. When this occurs, and often it does, the mitigation specialist gathers extensive information about the mental health issue at hand, works with the defense team to identify and select a qualified expert, assists counsel in preparing the client and his family for the assessment process, and provides any additional information the mental health expert needs to conduct a reliable mental health assessment. The first step in this process is to conduct a life history investigation.

Dudley & Leonard, 36 HOFSTRA L. REV. 963, 966 (2008).

34. Though the team works together to investigate and develop the themes and theories regarding the client's life, "[i]t remains the role of the core defense team, in the person of counsel, to integrate all the facts and circumstances of the defendant's life and the crime and present a persuasive narrative of the events that encourages values of accountability over retribution, grace over vengeance, and life over death." Dudley & Leonard, 36 HOFSTRA L. REV. 963, 966 (2008).

## III. The Standard of Care in Practice: Implementing the Guidelines

35. The Guidelines are not aspirational: they embody a standard of practice that is critically important and is followed by lawyers and investigators in capital trials in all U.S. capital jurisdictions. The Guideline-based approach gives lead counsel assurance that he or she is proceeding in a fashion that makes use of the years of experience and data that are expressed in the standard of care. Further, counsel can take comfort in knowing that such a careful, step-wise process – which includes open and full communication among team members that is client-centered and client-based and goal-directed toward resolution of the case before trial – offers the best likelihood of avoiding a death sentence. This is true even in a case where the client's responsibility for the homicide is unquestionable. Nevertheless, and importantly, the guidelines do not offer a formula for success. There is no "one-size-fits-all" checklist that guarantees victory, because each case is different, and each human life is different. The reasons why that life should be spared are, therefore, unique and the investigation that uncovers those facts will be one of a kind. This is the reality of capital defense: there are guidelines but no map.

36. I was privileged to be a member of the Advisory Committee when the ABA undertook an update of the Guidelines. Although there were many discussions and exchanges in the meetings and colloquies that shaped the finished revisions, one I remember quite clearly was that we shifted our thinking toward a functional definition of qualified capital counsel. Steve Bright offered persuasive leadership on this point. For years, those of us who had been reading records where counsel failed to prepare, to investigate, to develop the story for life had been aware of the importance of the systemic practice that became the Guidelines mandates. But many efforts by state bars or non-profits to evaluate attorneys in death penalty cases focused solely on quantifying the attorney's capital experience. The Guidelines changed that, looking rather to

what counsel *did* in a particular capital case. The definition of qualified capital counsel changed, from someone who had handled so many capital cases to someone who followed the standard of care: who assembled a team, investigated mitigation, formed a relationship with the client – someone who, in short, followed the guidelines.

37. In my practice I have found that I rely on the truth and applicability of the guidelines in every case, and have come to see that the principles that the standards reflect are essential. What follows is a discursive and anecdotal commentary on a few of the practical effects of this guideline-compliant approach to capital defense.

***Team Defense***

38. Every decision of any real significance is a team decision. That may sound easy, but it reflects a complex paradigm. I have found it to be a very comforting maxim: when faced with the second team meeting in a busy week and wondering if we should spend more time writing motions, researching law, interviewing witnesses, preparing materials for experts, or even making entries in the chronology or the document log, the answer is that all those tasks need doing, as well as all the myriad other tasks listed in the outlines above and to be found in the articles in the Supplementary Guidelines publication. But none of those tasks will prevent the dangers that are associated with too little communication on the team.

39. The best experiences on capital teams I have been associated with were different in some respects, based on the personalities, experience, and capacities of the team members, but all had some aspects in common. All were considerably larger than the four-person minimum team (2 lawyers, 1 fact investigator, 1 mitigation specialist). All were client-based and client-centered. All took as a basic assumption the notion that the mental health issues would inform all litigation decisions and strategies, not just the penalty phase preparation. And all the good teams

communicate, frequently. Frequent team meetings are essential, even if there is daily email check-ins.

40. Once my late sister, Marie LeBoeuf Campbell, a highly regarded mitigation specialist, was telephoned by the lead counsel in a post-conviction case. He was excited to tell her about a motion the lawyers had filed. "We had a team meeting," he began, to which she replied "No, you didn't." Team meetings are inclusive of all team members, including paralegals, lawyers, fact and mitigation investigators and specialists. Team meetings do not include experts, however, unless the team has decided to retain a consulting expert (see the section below on preparing for experts) who will not testify and will never be subject to discovery requests from the prosecution.

41. On the best teams I have found the tasks assignments are not dictated by roles but evolve from the circumstances of the case. This runs the spectrum from fairly mundane ("Who keeps the "to do" list?" "Who facilitates the next meeting?") to significant ("Who interviews the client's mother next?"). I am not suggesting that the social work intern should draft pleadings, but an inclusive and non-elitist approach to the work ensures that differing views get heard.

42. Team communication is essential to a full understanding of the client. The best teams have a schedule for seeing the client, and the visits are very frequent. There is no magic number, but trial clients often require visits at least two or three times a week, with variations depending on logistics and case exigencies. Some clients at some times will require daily visits. That is a team decision. If the holding facility does not cooperate, the team should decide whether or not to litigate conditions and frequency of visits. The team decides how to rotate visits among team members, how to communicate by telephone or mail when not visiting, and when and how to change focus or messages to the client in the upcoming visits. Most critically, the team as a

whole must assess the information as it is gathered by the mitigation investigation, and observe and record observations and assessments of the client.

43. Nothing the client does or says is trivial or unimportant or, if repetitive, unworthy of documentation. Every meeting, conversation in court, phone call should be documented with the team member's observations ("voice was low, spoke more slowly than usual"). Critically important symptomatic expressions – change of mood, sleeping patterns, grooming, etc. – can only be informative if they are noticed, and noted.

44. Having full team meetings, run with regard for the entire team is the best way to safeguard against what has been called "team-splitting." Team-splitting occurs when the client establishes a "special relationship" with one team member or, conversely, demonizes a team member. The client may refuse to speak with a demonized team member, make inappropriate comments to another, or make unworkable demands upon the team. I have come to distrust the phrase "team-splitting" as it wrongly implies that the behavior is volitional (although I have not found a more appropriate synonym, and so use it throughout). In my experience, this has never, not once, been volitional or deliberate behavior on the part of the client, and I have experienced some form of team-splitting behavior in virtually every case.

45. In one case, a client became convinced that I was only interested in penalty phase issues and was not working on trying to have him released from prison. He demanded that I stop visiting him, that I not sit at counsel table in court, that I not sign pleadings, and that I be fired from the team and the case. He threatened to drop his post-conviction petition if these requests – one might well say "needs" – were not met. Because we had a strong team with several years of experience with this client, and because we had a substantially completed bio-psycho-social history, we were able to understand his fears and talk with him. We had a number of people,

including my co-counsel, the mitigation specialist, a third lawyer in my office, and a volunteer intern who could visit him frequently. We made a team decision that I would drop off the visiting roster for a time, and they would step up their visits. We never confronted him, but over time we negotiated away a number of the demands he'd made to accommodate his deep anxieties without harming his case. We ultimately did not agree to anything he asked except that I not visit; it was a team decision that the other "demands" would have damaged him and his case. He accepted that resolution. We accomplished this without ever diminishing the number of total visits he got, without opening him to attack from the court or prosecution, and without losing the tremendous value of the information we had obtained and the deep knowledge the team had. This client is no longer on death row, and I am once again welcome when I visit him.

46. This instance of team-splitting was entirely understandable; the client was severely traumatized, as is true in the majority of capital cases. "Splitting" behaviors are adaptive for youngsters in abusive environments: a child who is being beaten by a drunken stepfather learns to try to gain the favor of the abusive parent or the protection of another adult or older sibling. These "shifting alliances" become the only way the child can feel safe, even temporarily, and even when the behaviors no longer work or are no longer needed, the child does not learn another way to interact with people. It is simply not possible for a client with a history of severe and untreated trauma to interact "normally" with a group of people. This is all the more true when the trauma occurred during the developmental period.

47. The traumatized client, very often the victim of abandonment or gross neglect as an infant or child, is "splitting" the team to try to make sure he is not abandoned again. To stave off this primal fear, the client tries to bind one or more team members very closely, often expressing dependence, and insisting that a "special" team member spend more time with him. Demonizing

other team members is a corollary of this: the traumatized client learns to identify "perpetrators" and 'rescuers", learns to make fast, black-and-white decisions about potential harm, and has no experience with a group of people who can all care about and for him.

48. There is another form of team-splitting to which many capital defenders are susceptible, and which is, if anything, even more dangerous for the client and more destructive to the case. Sometimes the team-splitting comes from within the team itself, not from the client. More often it is a combination: capital team members react naively to the client's expressions of appreciation and trust and begin to adopt the mentally ill and traumatized client's view of other team members. Or conversely a team member will react defensively to being demonized and react by negative expressions against the client or against the "favorite" team member. This is always inappropriate. It will usually not go unchecked if there is frequent communication within the team, but it can be very harmful. There are some grim examples of teams going off the rails entirely by failing to see and respond appropriately to a team member who has bought into a "favorite" position, including legal team members who were persuaded to contravene team decisions with the client, or even break jail rules in order to maintain the unhealthy alliance.

49. But the harm need not be that dramatic to be very damaging to the case. It bears repeating here that most capital defendants have a severe trauma history. Those trauma histories are established by documentary evidence and through interviews with others, but interviewing the client is a critical component of any capital case and those interviews become part of the trauma history. There is a wide variety of responses that traumatized persons display in such interviews. Most are reluctant to talk about some aspect or every aspect of sexual violation. Some traumatized persons cannot stop talking about the events or a portion of them. Some people have significant memory lapses or distortions around traumatic events; some know this to

be true, some do not. Only team members who are skilled in taking trauma histories – usually, but not always, learned counsel and the mitigation specialist – should conduct the initial trauma interviews. But when team-splitting goes unchecked, the client may shut down talking about trauma with the interviewer who is most skilled, because that is one way of dealing with the pain of untreated trauma and its sequelae. Or the client may start editing his memories, trying to make himself appear in a better light to the favored team member. Either way, the team is losing valuable information and ultimately destroying the rapport that must be established for client-based representation to move forward.

50. The Guidelines require that the defense presented be culturally competent. ABA Guidelines 10.5, commentary, 31 HOFSTRA at 1005. A robust and diverse team with good communication is necessary for the fulfillment of this mandate. Just as lead counsel cannot simply retain a mitigation specialist and delegate the work of "obtaining mitigation" to the specialist alone, but must steep herself in investigation she coordinates, so too the task of reaching cultural competence must be shared. Again, this can range from the need to have current slang explained to the aging counsel to a team decision to seek specific information or assistance raised by the client's cultural background. This is often not as straightforward as trying to ensure that there is a Black team member on the team if the client is African-American or realizing that community outreach and inquiries will require a Spanish speaker.

51. In one case the team became puzzled by the discrepancy between accounts of the client's childhood delivered to my co–counsel, who, like the client, was an African-American man, and the stories he was telling me, a white middle-aged woman. Co-counsel, an able and empathetic lawyer, was highly successful at getting useful and accurate information from the client about many aspects of his life, and had established a solid rapport with him. But the version he

received of our client's childhood was highly sanitized. The client told him repeatedly that nothing was wrong: he'd been poor but happy; his mom was the greatest. With time and with the help of others, I was there when the client was able to share the reality with co-counsel: his mother had been a neglectful alcoholic, rarely at home and only occasionally loving or caring toward him and his brothers. It became clear that the client had felt constrained about disparaging his mother to another Black man. Such a disclosure violated a cultural norm for him, one that took him (and us) a long time to get past. This was all important information – the stories of his friends in the projects he told co-counsel, the truth about his mother he told me, and the realization about the culture-based inhibition – that only emerged as a result of a varied and communicative team.

52. Lead counsel's responsibility to develop the team does not end when she has successfully chosen a team a comprised of members with these goals or even when tasks are assigned. Lead counsel must direct the team, through team meetings, encouraging true group participation in decision making. The group cannot make a team decision without robust exchanges of opinion, near-constant updating of information, and thoughtful re-evaluation of tasks as they are completed.

53. In one case the mitigation specialist and I had assigned ourselves to visit the client's mother, a critical mitigation witness, at least twice a month, preferably once a week. However, a few months after this arrangement, it became clear that the discovery process was going to absorb an inordinate amount of my time, both in court and in negotiations with the prosecutor's office. The question of how to accommodate my inability to fill the role we had assigned to me presented an important decision for the team, one with several, far-reaching ramifications. If we went to trial, I would be the one to examine the mother on the stand, and so had to build a

relationship of trust with her. We also still had a considerable amount of information to obtain from her in interviews. We had to decide if a third person should begin to visit the witness or if the mitigation specialist could adjust her schedule to make more meetings. This was one of those decisions that wasn't a matter of a right or wrong way to handle this – we simply had to come up with a plan that would work well to serve the interest of the litigation. Our decision that had to be re-evaluated and reconsidered periodically and it had to be made as a team.

54. This is why team meetings are so critical. The team is not a collection of solipists who are united only by the case they are working on; it is a team only if the individual members share information and opinions frequently. Typical team meetings include individuals reporting back on progress on a task; other team members weighing in whether or not they agree with any characterizations or tentative opinions; and a discussion of priorities and timing. While the learned counsel ultimately has to guide and coordinate this process, he or she should not be making all or even most of the decisions.

***Working with Experts***

55. I think perhaps one of the most serious mistakes that a capital defense team can make is in calling on experts before the bio-psycho-social history is substantially completed. Just as counsel cannot tell the mitigation specialist to "go obtain the mitigation," neither can the team ask an expert "what is this client's problem?" The Supplementary Guidelines issue of the Hofstra Law Review have an entire article on this: "GETTING IT RIGHT: Life History Investigation as the Foundation for a Reliable Mental Health Assessment," 36 HOFSTRA L. REV. 963. The authors are clinical and forensic psychiatrist Dr. Richard Dudley, and mitigation specialist Pamela Blume Leonard.

> As in all criminal proceedings, decisions about whether and when to engage a mental health expert are in the hands of counsel, who must consider the client's mental state at every stage of the criminal proceedings. **As a general rule, it is never appropriate to expect a mental health expert to deliver a comprehensive mental health assessment of the client until the life history investigation is complete.**

36 HOFSTRA L. REV. 963, 974 -975 (2008)(footnote omitted, emphasis supplied).

56. The title says it, and experience demonstrates the truth of this maxim in every case: life history **is** the foundation for a reliable mental health assessment. There are a few reasons why this is so. For one, experts cannot competently evaluate a client without accurate history. This is true for medical conditions – the first thing a doctor does is take a history, but is all the more true for an assessment of neuro-psychological, emotional, cognitive or psychiatric impairments. For reasons that range from maltreatment as an infant to misconceptions about mitigating evidence or shame about past sexual or physical abuse, many capital defendants are poor historians and may be unwilling or unable to give accurate answers to the mental health professional. The life history must be complied and corroborated by the team. Clients in capital cases present more complex features than many mental health experts see regularly, and they often have received previous misdiagnoses and inadequate or inappropriate treatment. The danger of perpetuating such a misdiagnosis is increased if the evaluating expert is under-informed. In addition, the goal of mitigation preparation is different from the goals for most mental health professionals, even those with substantial non-capital forensic experience.

57. Calling in an expert prematurely, before the life investigation is substantially conducted, makes it more likely that the expert will attempt to diagnose the client rather than understand and explain her unique symptoms in the context of her life story. Cases where the penalty phase

strategy came down to a battle of competing experts, each of whom are attempting to "prove" which diagnosis is "right", have often ended badly. The jurors who see experts as "bought and paid for" are likely to identify the entire mitigation phase with the expert, leaving no reason to vote for a sentence less than death if they feel the prosecution expert "won" the battle.

58. Another reason to focus on symptoms rather than diagnosis is that diagnoses are not, in and of themselves, mitigating. Without a contextualized explanation, they are merely labels, and labels are not humanizing. Further they permit opposing experts to talk about "bi-polars" as a generic group, glossing over the differences in clinical presentation or the problems of multiple co-morbidities that afflict so many capital defendants. Experienced capital defenders know the dangers of a disagreement between experts, even – or perhaps, especially – if they are on the same 'side." For these reasons, highly qualified capital defense teams routinely ask mental health experts to comment on symptoms, to explain the client's paranoia or anxiety or depression as this particular unique individual experiences it, in the context of a whole life. The expert simply cannot do this without a history.

59. One simple but extremely important reason why an expert should not be retained without a substantially completed life investigation is that the team cannot know which sort of expert to call. Psychiatrist? Trauma expert? Forensic or clinical or research psychologist? Expert in learning disabilities, toxic exposure, intrauterine insults? Often teams or individual counsel choose experts based on past experience in other cases; they like a particular psychiatrist, for example, and know that she is empathetic, diligent, and reliable. Those are important qualities, but they do not mean that she is right for this case. In fact, sometimes retaining an expert prematurely is all about lead counsel's comfort, not what is right for the client or the case.

60. In many cases even a very early acquaintance with the client can lead the team to assume that there will be mental health issues in the case. Sometimes the facts of the homicide or arrest are a strong indication of mental illness. But it is not until substantial progress has been made on the life history investigation, and a significant number of client visits conducted, before the team is ready to decide which expert, and what his referral question should be.

61. The referral question is the formal request of the expert: what is the expert being asked to do? Assess the client for cognitive impairments? Evaluate her current psychological functioning? Do a longitudinal assessment to determine if she had PTSD when she was 18 years old? The question focuses the expert on the issues the team has decided are relevant to the presentation of mitigating evidence.

> All too often, defense teams permit premature and inappropriate mental health evaluations to take place. Sometimes this includes needless and potentially harmful psychological testing. For example, unless the client has, or may have, a mental condition that relies on intelligence test scores, it is unnecessary to engage an expert to conduct such testing. Counsel should never allow a mental health assessment to take the place of a comprehensive life history investigation. Like brain imaging, psychological testing of any kind must always be approached with caution--never unless needed, always with full knowledge of its limitations, and in any event only after the mental health professional who has been carefully selected by counsel to do the testing has been thoroughly prepared with the background information necessary to make the testing meaningful.

36 HOFSTRA L. REV. 963, 975 (2008).

62. In one post-conviction case, the client's history of sexual abuse at the age of 12 by a neighbor was well-documented and had been presented at trial. However, the expert retained at trial did not have the biopsychosocial history and so did not know that the client had a pre-existing condition, likely a form of autism, that magnified the harm he suffered and depleted his ability to cope with the abuse. Further the mental health expert did not understand the cultural context of the sexual abuse: the client's parents were religious, uneducated, rural, and isolated.

They were deeply ashamed of the abuse and did not understand the need for counseling or treatment, further exacerbating the client's PTSD. Moreover the psychologist conducted personality testing which was unhelpful and did not account for the delusional nature of the client's subsequent beliefs about his tormentor, facts which were very relevant to the crime and the statements made to the police. Because the expert was so poorly prepared by the team, he missed the opportunity to tell the jury that the client in this case was deeply remorseful for the homicide, even though all capital team members recognize that remorse is potentially the most important of any mitigating facts. In contrast, the post-conviction team retained a psychologist with a clinical practice in severe trauma with psychotic features and facilitated consultation with an expert in autism spectrum disorders, who was able to present a fully contextualized picture of the client's disabling symptoms.

63. As Dudley and Leonard indicate, it may be important to have an expert observe very unusual or psychotic episodes in a client before the life investigation is completed.

> [I]t is often valuable for a mental health expert to assess a client who is clearly exhibiting signs and symptoms of psychosis. Psychotic episodes are just that – episodic – and the severity of symptoms therefore wax and wane. The mental health expert's direct observation of a client in the throes of a florid psychotic episode or other acute deteriorated mental state can be invaluable in establishing mental health conditions. But such an assessment would only represent a part of the data to be gathered for mitigation. Addressing an acute circumstance and formulating a mitigation narrative are different endeavors

36 HOFSTRA L. REV. 963, 975 (2008) (footnote omitted)

64. But even when there is clear historical and observational data that leads the team to suspect intellectual disability, testing can be premature. In one such case the team failed to do adequate investigation of the client's adaptive deficits before asking an expert to test his educational functioning. Many intellectually disabled clients who are poor and were educated in

disadvantaged communities, as was this man, have such deficits – but not all. An intellectually disabled person can be educated to about a sixth-grade level, which is how this client tested. Although he was intellectually disabled (mentally retarded) and thus should be ineligible for a death penalty, the testing not only failed to show his real deficits, in self-care and communication, but actually created evidence that could have been harmful.

65. The importance of the focus on symptoms rather than diagnoses is particularly relevant to the timing of retaining experts. With rare exceptions, mentioned above, bringing in an expert too soon may miss the interplay of symptoms, how they affect the client, and how they make him feel. Many clients have multiple problems: they were neglected or abused as children; they have severe stress disorders that went untreated or actually elicited punishment for the consequent behaviors. They may often have a cognitive impairment as well, intellectual disability or learning disorder. Children with cognitive or developmental disorders are more vulnerable to abuse in stressed and fractured families. Or they may have a psychotic disorder or a delusional one. The goal, again, is not to decide eventually "which" diagnosis to present at trial. The diagnosis is not the goal. If a client is exhibiting symptoms such as lack of apparent emotion, social withdrawal, and loss of interest in everyday activities, it may be impossible to determine whether or not the clinician is seeing negative symptoms of schizophrenia, or depression or avoidance as a symptom of Post-Traumatic Stress Disorder.

66. Here is where the guiding hand of experienced counsel can really make a difference for the team. It is a common mistake to assume that the team should seek to understand what is 'wrong' with the client as soon as possible. This in turn leads to calling in experts before the materials the expert will need – the documents, interviews, and months of client observations – are assembled. But experienced capital counsel recognize the danger of channeling the

investigation too early, rejecting evidence that doesn't fit with one hypothesis or developing tunnel vision about another. Experienced capital counsel, who have followed the guidelines and avoided settling on a diagnosis or an expert too soon, know that the investigation into the client's life will prove far more complex, nuanced, and rich in mitigating detail if it is not channeled too early into one realm. They know to avoid this cascade of errors by recording client observations of multiple symptoms and behaviors over time, by getting the history from witnesses over many talks and by waiting to consult with experts until the biopsychosocial history is substantially completed.

67. What matters to the jurors is a holistic, contextualized, and detailed description of a life: the way the client feels and why they should care. This picture will always include symptoms in a case with mental illness and often will include a history of misdiagnoses or inadequate treatment, compounded by adverse life events and system failure. In many cases, a full explanation can only be given by one or more expert witnesses – empathic teaching experts – who either testify or consult with the team and other testifying experts. When those experts are properly prepared, and when experienced defenders have waited to engage with experts until a full picture of the client has begun to emerge, the result is truly mitigating evidence that is robust, documented, established by the best science, and verified by multiple sources.

I declare under penalty of perjury and the laws of the United States that the foregoing is true and correct to the best of my information and belief.

Denisé LeBoeuf

Signed this 1st day of October, 2013.