# DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

***Summary of Opinions***

1. I was asked by federal habeas corpus counsel for Lisa Montgomery to summarize the prevailing professional norms regarding the investigation and presentation of mitigation evidence in capital cases at the time of Ms. Montgomery's prosecution (2004 to 2007), and then to review the performance of her trial counsel in light of those norms. In addition, I was asked to address the standard of care in capital mental health evaluations, with particular attention to the importance of the social history investigation. I was also asked to review the history of Ms. Montgomery's pretrial representation and to address how the changes in her representation and the composition of her defense team influenced the effectiveness of her ultimate representation at trial and sentencing.

2. These questions are addressed in detail in this declaration, but the critical points can be summed up succinctly. Counsel's duty to conduct thorough mitigation investigation was well established at the time of Ms. Montgomery's prosecution. The U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), had underscored counsel's duty to conduct thorough mitigation investigation. In that decision, the High Court acknowledged the critical role of the nonlawyer whose postconviction mitigation investigation provided the proof of how Mr. Wiggins had been prejudiced by the deficient performance of his trial counsel. The High Court also cited the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (1989) as "well-defined norms." 539 U.S. at 524. The ABA Guidelines were revised in 2003 and published that summer in 31 HOFSTRA L. REV. 913 (2003).

That widely read symposium edition of the law review contained additional articles stressing the importance of the mitigation specialist in the defense team. *See* Jill Miller, *The Defense Team in Capital Cases*, 31 HOFSTRA L. REV. 1117 (2003), and Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143 (2003). The U.S. Supreme Court's decision in *Rompilla v. Beard*, 545 U.S. 374 (2005), reiterated the importance of thorough mitigation investigation, finding trial counsel ineffective in a case where they had engaged the services of three mental health experts but had failed to conduct the thorough investigation that is essential to reliable assessments and effective mitigation.

3. The Eighth Amendment jurisprudence of the United States Supreme Court has mandated individualized sentencing in death penalty cases since 1976. *See Gregg v. Georgia*, 428 U.S. 153 (1976) (finding Georgia's death penalty statute Constitutional in part because it allowed for mercy based on individualized consideration), and *Woodson v. North Carolina*, 428 U.S. 280 (1976) (finding mandatory statute unconstitutional because it would allow the blind infliction of the death penalty on members of a faceless undifferentiated mass). Effective capital defense throughout the post-*Furman* era has required counsel to conduct a thorough investigation of the client's life. This investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused. Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face interviews. The purpose of this thorough investigation is to develop evidence that will humanize the defendant, help jurors to understand why he or she may have committed the capital offense, and to evoke compassion and empathy by

identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just. Based on the materials that I have reviewed (summarized *infra* at ¶ 36), it is my considered professional opinion that Ms. Montgomery's trial counsel failed to conduct the thorough mitigation investigation required by the prevailing professional norms of 2004 to 2007.

4. Without the social history that results from a thorough mitigation investigation, trial counsel cannot make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of a client's possible mental disorders or impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. In Ms. Montgomery's case, the mental health evidence presented at trial was fatally flawed because of trial counsel's failure to investigate thoroughly, to respond to the many "red flags" that were disclosed in the mitigation investigation, and to appreciate the contribution and advice of the various experienced mitigation specialists who were serially engaged. Changes in the defense team's composition thwarted the mitigation investigation and prevented a mental health assessment that conformed to prevailing norms.

***Background and Qualifications***

5. I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, www.capdefnet.org. This national position was created

in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

6. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

7. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco which coordinated appellate and postconviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

8. I have investigated all aspects of death-penalty cases since 1980, first working in a

private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in postconviction. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

9. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases are prosecuted. I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over more than two decades, I have lectured at over three hundred fifty continuing legal education programs around the country, including eight in the state of Missouri.

10. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers

("Making the Case for Life"). At various times over the past two decades, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand practitioners. I was a co-chair of the planning committee for this seminar in 2009, 2011, 2012, and 2013, and currently serve as a co-chair for the 2014 seminar. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois. I have taught at a dozen capital defense seminars throughout the country under the auspices of the National Institute of Trial Advocacy and a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the National Consortium for Capital Defense Training.

11. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (Summer 2003), available at www.ambar.org/2003guidelines. At the request of HOFSTRA LAW REVIEW, I wrote an article for

their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA L. REV. 1157 (Summer 2003). At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (Spring 2008). At the request of UMKC LAW REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories," 77 UMKC L. REV. 947 (Summer 2009). I have recently written two additional articles on prevailing norms in the development of mitigation and mental health evidence that were accepted for publication this year. One, written in collaboration with Professor W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, has just been published in 41 HOFSTRA LAW REVIEW 635 (2013). The other, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, will be published in UMKC LAW REVIEW.

12. I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press). I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008).

13. I have qualified as an expert witness in multiple state and federal courts and have

provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by testimony or affidavit over a hundred times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, New York, North Carolina, Oklahoma, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert witness seventeen times, including testimony in capital habeas corpus cases in the District of Arizona, the Eastern District of California, the Northern District of Iowa, the Western District of Missouri, and the District of Wyoming, as well as in state capital postconviction proceedings in Alabama, Arkansas, California, Colorado, and Wyoming. I have also testified as an expert witness on mitigation standards in state and federal trial courts.

14. Over the years, I have been directly involved in hundreds of capital cases in California and New York, including scores of trials and postconviction hearings. I have also been consulted in various capacities on capital cases in numerous other jurisdictions around the country, including Missouri. I have consulted extensively on federal capital cases from the time I assumed my present position in 2005.

***Prevailing Norms in the Development of Mitigating Evidence in Capital Cases, 2004 to 2007***

15. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a

capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. Investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association published the second edition of its STANDARDS FOR CRIMINAL JUSTICE (2nd edition 1980), Standard 4.4-1 of the Defenses Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" (Emphasis added.) *Id.* at 4:53. The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id.* at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55.[1] These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, 529 U.S. at 396 (2000).

16. These ABA Standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (an effective capital litigator then practicing in the South) emphasized, "Importantly, the life story must be complete." Dennis N. Balske, *New Strategies for the Defense of Capital Cases*, 13 AKRON L. REV. 331, 358 (1979). In 1983, Professor Gary

---

[1]*See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, CHAMPION (Jan.-Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983). Writing in 1984, Mr. Balske advised capital defense counsel that they "must conduct the most extensive background investigation imaginable. You should look at every aspect of your client's life from birth to present. Talk to everyone that you can find who has ever had any contact with the defendant." Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE CHAMPION (March 1984), at 40, 42. *See also* David C. Stebbins and Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION (August 1986) at 14, 18 ("capital defense attorneys must recognize that the profession demands a higher standard of practice in capital cases"); and Robert R. Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION (August 1988) at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

17. At the beginning of the 1980s, a capital defense lawyer in California hired a former *New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey Fosburgh, had previously written a best-selling book about a murder case she had covered for the newspaper, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977). After her

successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here – namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.
>
> Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience. (Emphasis added.)[2]

18. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity. *See*, for example, John Hill and Mike Healy, *The Death Penalty and the*

---

[2]Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7 (July 1982). This article also appeared in the magazine of the California defense bar, FORUM (Sept.-Oct. 1982). *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM (May-June 1978), and Michael G. Millman, *Interview: Millard Farmer*, FORUM, 31-33 (Nov.-Dec. 1984).

*Handicapped*, FORUM, 18-20 (May-June 1986) (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); and David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

19. Over the past thirteen years, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), *Porter v. McCollum*, 558 U.S. 30, 130 S. Ct. 447 (2009), and *Sears v. Upton*, 561 U.S. ____, 130 S. Ct. 3259 (2010). Every case but *Sears* was tried in the 1980s, and all were tried more than a decade prior to Ms. Montgomery's case. In *Williams*, the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health

experts. Similarly, in *Porter*, also tried in 1988, counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" (Citation omitted.) Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." 558 U.S. at 36. In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 130 S. Ct. at 3266. Postconviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. 130 S. Ct. at 3261. Four of these five individuals subsequently received sentences of less than death, and the case of Demarcus Sears is pending as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[3] On October 15, 2004, the State of Maryland agreed to a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole immediately based on time already served.[6] On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for

[3]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH, Apr. 9, 2001, at A1, *available at* http://truthinjustice.org/va-dpreview.htm.

[6]*See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), http://www.jenner.com/news/news_item.asp?id=12759624.

Ronald Rompilla.[7] On July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be resentenced to life because of his age (seventy-eight), stating "if we were to seek and obtain [the death penalty], it would never be executed."[8] All five cases involved brain damage and/or cognitive impairments.

20. In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Competent capital counsel have long retained a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted in 1998 that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." The subcommittee report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." The Commentary also stated that the work of mitigation specialists "is part of the existing 'standard of care' in a federal death penalty case." *Id.*,

---

[7] *See* Associated Press, *Death Row Inmate Gets New Life Term*, USA TODAY, http://www.usatoday.com/news/topstories/2007-08-13-477084247_x.htm (last visited Apr. 8, 2008).

[8] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY, July 21, 2010.

Commentary to 7. Experts, Sec. II, Recommendations and Commentary. FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference (May 1998), *available at* http://www.americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/National/federal_judicial_conference_recommendations.authcheckdam.pdf (commonly known as "the Spencer Report").

21. As revised in 2003, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, ABA Guidelines (rev. 2003) , *available at* www.ambar.org/2003guidelines) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (*available at* www.ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.C.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.D.(7).) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." (1989 Guideline 11.4.1.C.)

22. The 1989 edition of the ABA Guidelines reflected a national consensus among capital

defense practitioners based on their practices in the 1980s. These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop standards to reflect the prevailing norms in indigent capital defense. NLADA published its Standards for the Appointment of Defense Counsel in Death Penalty Cases (available at www.americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocuments/NLADA_Counsel_Standards_1985.authcheckdam.pdf) in 1985. With initial support from the ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in Death Penalty Cases (emphasis added) over the course of several years. In February 1988, NLADA referred the Standards to SCLAID, which reviewed them and circulated them to appropriate ABA sections and committees. SCLAID incorporated the only substantive concerns expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more appropriate than "Standards." Each black-letter guideline is explained by a commentary, with references to supporting authorities. (*See* Introduction to ABA Guidelines, 1989 ed.)

23. Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, ___, 130 S. Ct. 1473, 1482 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'" Justice Stevens cited *Strickland*, 466 U.S. 668, 688 (1984), *Bobby v. Van Hook*, 558 U.S. 4, 130 S. Ct. 13 (2009) (*per curiam*) (slip op., at 3); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*,

529 U.S. 362, 396 (2000). Justice Stevens concluded: "Although they are 'only guides,' *Strickland*, 466 U.S., at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8 (slip op., at 5), these standards may be valuable measures of the prevailing norms of effective representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association in particular) as guides to prevailing professional norms.

24. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for a juror to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert & David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994). *See also* George W. Woods, David Freedman, & Stephen Greenspan, *Neurobehavioral assessment in forensic practice*, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012).

25. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to

remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

26. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in initial interviews with clients and their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

27. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical

nature of the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION, 43-45 (May 1992).

28. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[9] Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. Cultural issues may involve not only race and ethnicity, but gender, sexual orientation, socio-economic status, or any other characteristics that define social identity.

29. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

30. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted her judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same setting turn out differently. It is an objective scientific fact. It does not reflect a bad choice made by the client.

---

[9]*See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008).

31. Over the years, I have been involved in hundreds of capital cases, including scores of trials and postconviction hearings, throughout the country. I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in scores of cases around the country. *See supra* ¶ 13. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness). *See also* John H. Blume, Sheri Lynn Johnson & Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, at 1038 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors. Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death."). *Id.* at 1051 ("[E]vidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors. Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating.").

***Standard of Care in Capital Mental Health Evaluations***

32. Both anecdotal reports from capital defense practitioners and social science research

indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[10] *See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts. Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of her life and to be able to offer an

---

[10]During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81). People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999). In another case, a different school psychologist explained the impact of learning disabilities (at age 11, reading just above a second grade level; at 14, just above fourth grade; and at 17, just above fifth grade). People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000). In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine – 30 years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking. From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001). *See* Russell Stetler, *The Mystery of Mitigation : What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n.92) (2007-08).

empathic framework for understanding the resultant disorders and disabilities.[11] Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

33. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

34. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have

[11]It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact. As one capital defense lawyer pointed out in 1988, "[T]estimony about the psycho-social development of the defendant explains the psychological diagnosis in human terms that the jury can understand." He continued, "Typical psychological testimony on sanity, competency, or diminished capacity sounds like it comes out of a textbook. Despite the best efforts of the mental health professional and the attorneys, most of this type of testimony is incomprehensible to a lay juror. There is also an unfortunate tendency to get caught up in technical terms that bore the jurors and do nothing to humanize the client. It makes little sense to spend several days putting on the testimony of relatives and friends of the defendant about the human characteristics of the defendant, and then put on a psychologist or psychiatrist who immediately turns this around by making the person sound like a casebook study out of some obscure and arcane psychology textbook." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, CHAMPION (Apr. 1988), at 34, 38.

been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including neuropsychology, addiction medicine, psychopharmacology, and the disciplines which study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to elicit, or assess the credibility of, client disclosures; and testifying witnesses, to name but a few. To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

35. The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis." (H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985). ) The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members." (Kaplan & Sadock at 488.) Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware." *Id.* This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent

> information in the clinical and criminological literature. To verify what the defendant tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.

Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427 (1980). Capital defense lawyers also appreciated this need: "A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological make-up and of how the crime occurred." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 37.

***Review of the Case of Lisa Montgomery***

36. At the request of Ms. Montgomery's federal habeas corpus counsel I have reviewed the opinion of the United States Court of Appeals for the Eighth Circuit affirming the conviction and death sentence (*United States v. Lisa M. Montgomery*, 635 F.3d. 1074 (8th Cir. 2011)); excerpts from the transcripts of the testimony and argument in the penalty phase of Ms. Montgomery's trial; the Special Verdict Form outlining aggravating and mitigating factors, filed October 26, 2007; the Motion for Collateral Relief to Vacate, Set Aside, or Correct Sentence and for a New Trial, filed in the United States District Court for the Western District of Missouri on March 18, 2013 and attached exhibits, including the expert declarations of George W. Woods, Jr., M.D., and Jan Vogelsang, M.S.W. (including attachments); declarations documenting the recollections of various members of the defense team at trial, including Judy Clarke, Susan Hunt, David L. Owen, Jr., Lisa Rickert, M.S.W., Holly Jackson, and Dani Waller, M.S.W.; the declarations of Chris Armstrong (memorializing an interview with trial counsel Fred Duchardt) and Janet Santana

(memorializing interviews with Stephanie Elliott and Ron Ninemire); and the report and appendix of the government's mental health expert, Park Dietz, M.D. I have also been briefed by habeas counsel on other details of the procedural history of the case.

*Pretrial chaos and dysfunction*

37. The pretrial history of this case is a story of chaos and dysfunction. While there is the appearance of ample time to prepare Ms. Montgomery's defense (from her arrest in December 2004 until commencement of trial in 2007), the turnover in the defense team precluded effective use of that time. Similarly, although the Federal Public Defender's Office of the Western District of Missouri provided funding for multiple mental health experts and three different mitigation specialists, the team failed to conduct the thorough mitigation investigation that is necessary to provide the social history on which a reliable mental health assessment depends. In addition, the failure to conduct a thorough mitigation investigation deprived the defense of the vivid, detailed lay testimony needed to corroborate testimony about Ms. Montgomery's mental disorders and impairments. In both phases of the trial, defense counsel ignored decades of research documenting the danger of relying on mental health expert testimony in isolation in capital cases. Relying on piecemeal mitigation investigation, trial counsel had only factual fragments of Ms. Montgomery's life story, rather than a coherent, well corroborated narrative. The Special Verdict Form demonstrates how the jurors utterly rejected what trial counsel proffered as mitigation.

38. The capital offense occurred on December 16, 2004. Lisa Montgomery was arrested the following day. The Federal Public Defender's office was appointed to represent her, and Assistant Federal Public Defender Anita Burns was assigned to the case. David Owen, then the

First Assistant Federal Public Defender, was responsible for supervising Ms. Burns. Neither had experience in capital cases. The FPD's chief investigator, Ron Ninemire, was also assigned to the case. (Declaration of David Owen, March 7, 2013, at 1-2.) Ms. Burns retained an experienced mitigation specialist from Wisconsin, Lisa Rickert, M.S.W. (Declaration of Lisa Rickert, M.S.W., March 14, 2013, at 1-3.) Susan Hunt was appointed as learned counsel on January 20, 2005. She hired investigator Phil Thompson to assist her. (Declaration of Susan Hunt, March 8, 2013, at 2.) The lawyers immediately brought in a local psychologist, Marilyn Hutchinson, Ph.D., as well. Concern about Ms. Montgomery's depression and potential for suicide prompted the lawyers to have her examined confidentially by a local psychiatrist, William S. Logan, M.D. (Exhibit 11: Dr. Logan's letter of March 7, 2005, at 1.)

39. Dr. Logan saw Ms. Montgomery for one hour on March 6, 2005, and did not hesitate to recommend hospitalization. In his letter of March 7, 2005, Dr. Logan noted Ms. Montgomery's "chronic suicidal thoughts," disturbed sleep, "intrusive recollections of a traumatic event," and "auditory and visual hallucinations." He reported that a room search on March 3 had "revealed a suicide (will) letter" and six Trazadone pills apparently "hoarded for an overdose." *Id.* Dr. Logan noted how Ms. Montgomery's isolation status made things worse, not better, because it caused "increased depressive rumination." *Id.* at 2. Dr. Logan's recommendation was blunt:

> It is my recommendation that Ms. Montgomery be hospitalized for the treatment of her depression. Her psychotic thoughts (derogatory auditory hallucinations) increase her risk for suicide. Hospitalization is indicated, and is the usual and customary treatment for those with a Major Depressive Disorder with psychotic features and those who are at a significant risk for suicidal behavior.

*Id.*

40. Meanwhile, when Anita Burns was on vacation in February 2005, David Owen

involved himself in the case. Ms. Burns complained to the head of the office, Federal Defender Ray Conrad, upon her return. Ms. Burns was removed from the case. (Hunt Dec. at 3.) Mr. Owen substituted for her in April 2005 and remained on the case through trial. When mitigation specialist Lisa Rickert made her first trip to Kansas City, she found that Ms. Burns had already been replaced by Mr. Owen. (Rickert Dec. at 4.) There was apparently never an effective working relationship between Ms. Rickert and Mr. Owen. She resigned from the case on August 8, 2005. Her declaration enumerates numerous difficulties from her perspective: "a difference of opinion [with Mr. Owen] about how to conduct a mitigation investigation," "paranoia about my meeting with any of the witnesses one-on-one," problems when Ms. Hunt or Mr. Owen participated in interviews (including Mr. Owen's being "inappropriate regarding questions surrounding some of the sexual abuse issues"), and a general "mistrust" of her work. (Rickert Dec. at 2-3.) Mr. Owen attributed the problems to "personality clashes between Lisa Rickert and Susan Hunt." (Owen Dec. at 3.) He said that he and Ms. Hunt made a decision to fire Ms. Rickert and find a mitigation specialist who would "work with the attorneys and do the assigned tasks." *Id.* at 3-4. Ms. Hunt reported that she and Mr. Owen "had problems with Ms. Rickert," including "personality problems" and a failure "to keep us apprised of her work." (Hunt Dec. at 3.)

41. According to Ms. Hunt, Ms. Rickert and Mr. Ninemire did "put together a binder for the capital presentation that Mr. Owen and I had before the Department of Justice in Washington, D.C. We did not use the binder. I presented and Mr. Owen supplemented. We mostly talked about Mrs. Montgomery's background." *Id.* They held back some information "as we knew that DOJ was not going to change their minds. DOJ did tell us to come back once we obtained our

experts. No further attempts were made to get a plea while I was on the case . . ." *Id.*

42. Neither Ms. Hunt nor Mr. Owen had expertise in the complex mental health issues that were apparent from Dr. Logan's early report. They hired another experienced mitigation specialist, Holly Jackson, a week after Ms. Rickert withdrew, but they also needed a more experienced attorney. According to Ms. Hunt, "Mr. Owen and I knew that we needed an attorney to help with the mental health aspect of the case. We were at a loss as to how to defend Mrs. Montgomery. I wanted to handle the guilt aspect portion of the case and Mr. Owen wanted to handle the computer aspect of the case." (Hunt Dec. at 4.) They consulted with Federal Death Penalty Resource Counsel Richard Burr about their need for mental health expertise, and he introduced them to Judy Clarke.

43. Ms. Clarke was at that time a fulltime salaried Capital Resource Counsel, funded through the Federal Defenders of San Diego, so she did not require any funding from the trial court or the Federal Public Defender of Western Missouri. She not only had a distinguished record as a capital defense lawyer, but she had particular expertise in complex mental health issues, which she had extensively litigated in the so-called Unabomber case (*United States v. Theodore Kaczynski*) before the case ended in a negotiated disposition just prior to trial.[12] Ms. Clarke was also firmly committed to effective teamwork in capital cases and brought with her (at no further cost to the court or the local federal defender) two more salaried staff from the federal

---

[12]*See* Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, CHAMPION, Jan.-Feb. 1999, 33, 40, n.1 ("Kaczynski's guilty plea to avoid a death sentence was as dependent on tireless mitigation investigation as the life verdicts in the [Susan] Smith and [Terry] Nichols sentencing proceedings. The Unabomber case is an important reminder that the development of mitigation evidence may be as critical to resolving cases through successful dispositions as to winning life sentences before juries.").

defender system with extensive capital experience in investigation, mitigation, and mental health issues, Debra Garvey and David Freedman. (*See* Hunt Dec. at 5 and Declaration of Judy Clarke, March 14, 2013, at 3.)

44. On October 5, 2005, Mr. Owen moved for Ms. Clarke's admission in the Western District of Missouri *pro hac vice*. She met with Ms. Montgomery the next day and was admitted on October 7. She remained on the case until April 2006. During that time, she met with Ms. Montgomery on a regular basis and attempted to structure the team's contact with Ms. Montgomery in a way that would maximize the effectiveness of their relationship with the client. She was concerned that Chief Investigator Ron Ninemire from the local federal defender office had been the primary team member visiting with Ms. Montgomery even though he was not qualified by training and experience to serve as a mitigation specialist or to monitor the signs and symptoms of mental disorders and impairments. Ms. Clarke was also alert to the risk of "team splitting," which occurs when a client develops a "special relationship" with one member to the exclusion of the others. According to Ms. Clarke:

> I knew from experience that it is not healthy for the client or their case for any member of the capital team to have a "special" relationship with the client, exclusive of other team members. This is particularly true in a capital case with a client who has an extensive history of sexual abuse. It can be damaging to investigative efforts, trust building with the client, and simply unhealthy for the client to permit or encourage "special" relationships, those relationships that are independent of the rest of the team. In my experience, these divided relationships can have negative consequences in working on mitigation, working with experts, and in working toward settlement of a case. I encouraged the team to broaden the number of team members who visited with Lisa, to have regular visits by as many members of the team as possible, and to share the content of each visit with the team in a consistent and purposeful manner.

(Clarke Dec. at 4.)

45. Ms. Clarke observed that the prior mitigation investigation (by Ms. Rickert) had

involved "preliminary interviews, but substantial work remained to be done." *Id.* at 5. "Few life history records for Ms. Montgomery and her family had been identified, collected, and analyzed." *Id.* She correctly notes in her declaration, "Identifying, collecting, organizing, and analyzing life history documents and records are critical to mitigation investigation and developing a social history. It is the first step in identifying potential mitigation themes and mental health issues that require follow-up investigation." *Id.* A local lawyer, Stephanie Elliott, was added to the team as a paralegal, and Ms. Garvey "set out to provide lists of records that needed to be collected and a system for tracking the progress of record collection and analysis." *Id.* at 2, 5. I agree with Ms. Clarke's observation that "[r]ecord collection is a standard part of any mitigation investigation and cannot be delegated to clerical workers without ongoing supervision." *Id.* at 5. *See also* Russell Stetler, *Mitigation Investigation in Death Penalty Cases*, THE CHAMPION, January-February 1999, at 33, 38 (discussing records as "key element" in social history investigation).

46. Ms. Clarke also described an effective plan for the interviews that are equally critical to mitigation investigation:

> Ms. Jackson and Ms. Garvey worked closely and collaboratively to identify potential witnesses and to prioritize the investigation tasks and interviews of those witnesses. Interviews about trauma are particularly sensitive and require careful, strategic consideration so as not to alert perpetrators or those who colluded in the trauma. When conducted properly, these interviews bear fruit, and the information obtained is invaluable in building the case for a life verdict by documenting the nature, extent, and consequences of trauma, and in identifying other witnesses with relevant information. When improperly conducted, witnesses fail to disclose information, withdraw cooperation, or even alert other witnesses not to cooperate.

(Clarke Dec. at 6. *See also* Stetler, *Mitigation Investigation*, at 37 (abuse and trauma histories "virtually universal" in capital cases).)

47. The disputes that arose within the team are discussed in the declarations of Mr. Owen,

Ms. Hunt, and Ms. Clarke from their various perspectives. Ms. Clarke notes that divisions were already apparent when she first joined the team, and they worsened over time. (Clarke Dec. at 7.) She continues, "Capital cases are always difficult, but I have managed to work with a number of teams through the tense and exhausting disputes that inevitably arise when the consequences are life and death, the pace of work is overwhelming, and the issues complex and multi-dimensional. The drama that infected this team was definitely detrimental to the work that we were trying to accomplish for Lisa Montgomery." *Id.* This observation is consistent with my own experience of "tense and exhausting disputes" as inevitable, but generally resolvable because of mutual respect and a shared commitment to high-quality representation. I would also note that the point of adding experienced capital defenders like Ms. Clarke is not to make anyone else's job easier. Rather, the point of teamwork is not to function as isolated individuals performing delegated chores, but to maximize the effectiveness of every member of the team by working harder collectively. Team sports are analogous: the addition of a talented new team member is expected to change team chemistry and draw the most out of every player, rather than allowing others to relax while the newcomer shoulders more of the burden.

48. I will not comment on the details of how Ms. Clarke was removed from the case, except to note that the abrupt and unexplained removal of Ms. Clarke (like the prior removal of Ms. Rickert and Ms. Burns) could only have confused Ms. Montgomery, destroyed whatever fragile trust and rapport had been established, and left an already despairing client feeling more powerless than ever. The removal of Ms. Clarke also prompted mitigation specialist Holly Jackson to withdraw from the case. (Declaration of Holly Jackson, March 10, 2013, at 3 ("Attorneys on the team other than Ms. Clarke consistently rejected and dismissed mitigation

evidence as unimportant and irrelevant.").) *See also* Hunt Dec. at 11: "We also advised the judge that our mitigation specialist Holly Jackson might quit the team. Ms. Jackson was unsure if she could ethically or professionally stay on the team because her mental health background was not as extensive as that of Ms. Clarke. We did not encourage Ms. Jackson to get off the case." After Ms. Jackson withdrew, Ms. Hunt told the court as they were seeking their third mitigation specialist, "We look like a bunch of idiots to these witnesses." (Tr. of Conferences in Chambers, April 25 and May 3, 2006, at 9.) Within a few weeks, Ms. Hunt herself also withdrew from the case, leaving only male attorneys and a male investigator. *Id.* at 12. The disruption was not only catastrophic in terms of the relationship between Ms. Montgomery and her remaining team (*see* Exhibit 8, handwritten letter from Lisa Montgomery, transmitted to the trial court on May 3, 2006), but it added to the considerable barriers to disclosure between the team and the wider universe of potential mitigation witnesses.

49. Mr. Owen was the only lawyer who remained. Two new lawyers, John O'Connor and Fred Duchardt, were appointed in May 2006. They divided responsibilities mechanically. Mr. O'Connor would handle guilt/innocence, and Mr. Duchardt would be responsible for mitigation and sentencing.[13] The federal defender's office engaged the services of a new mitigation specialist, Dani Waller, in June. Mr. Duchardt never contacted Lisa Rickert, Holly Jackson, Debra Garvey, or David Freedman to solicit their insights into the mental health and mitigation issues. Before she was removed, Ms. Clarke had consulted one of the country's foremost

[13]At the time of his appointment, Mr. Duchardt was busy with another federal case to be tried that year, *United States v. John P. Street*, #4:04-cr-00298-GAF-1; *see also* 548 F.3d 618 (2008) (first trial ended in mistrial; second trial ended with conviction and life sentence on December 14, 2006).

authorities on complex trauma, Dr. Judith Herman, and sent her materials to review a few days before Ms. Clarke was removed from the case. (Clarke Dec. at 10.) Dr. Herman is on the clinical faculty at Harvard Medical School and is the author of TRAUMA AND RECOVERY: THE AFTERMATH OF VIOLENCE FROM DOMESTIC ABUSE TO POLITICAL TERROR (1992), as well as FATHER-DAUGHTER INCEST (1981). Mr. Duchardt's team appears to have had no contact with Dr. Herman.

50. The trial preparation under the direction of Mr. Duchardt was costly in every sense. The Federal Public Defender's Office was paying all the expert bills, and Mr. Duchardt spared no expense. His team engaged the services of multiple mental health experts, Ruben Gur, Ph.D., a neuropsychologist from the University of Pennsylvania; V. S. Ramachandran, M.D., Ph.D., a neuroscientist from the University of California, San Diego; and therapist Ruth Kuncel, Ph.D. Dr. Logan, who was ignored in 2005 when he found Ms. Montgomery psychotic and in need of hospitalization (*see supra*, ¶ 39), was brought back into the case in 2007. The social history investigation, however, was truncated. Dani Waller, M.S.W., the final mitigation specialist, was kept on a tight leash. According to her declaration, "During the time I worked on the case, I reported to David Owen. I worked at Mr. Owen's direction. It is my general recollection that Mr. Owen had various tasks that he wanted me to complete. I understood my role on this case as one in which I was to interview witnesses who had previously been interviewed and attempt to locate others." (Declaration of Dani Waller, March 17, 2013, at 1.) She added that Mr. Owen made it clear to her "that he wanted someone with me when I went out on interviews." *Id.* at 2. She also confirmed what Ms. Hunt had predicted: "By the time I was meeting with the witnesses it was clear to me that some had witness fatigue. Some witnesses had been interviewed by so many

people that they were tired of telling their story." *Id.*

51. Trust and rapport are not transferable. Even when there is continuity of team members, the trust established by one member with a client or witness cannot simply be handed off to another member of the team. Both Lisa Rickert and Judy Clarke were specifically prohibited from having further contact with Ms. Montgomery after they were removed from the team. (Rickert Dec. at 6 and Clarke Dec. at 8.) When Ms. Waller encountered witnesses, she was not starting from a neutral beginning point, but instead trying to overcome the negative impressions that arise when multiple strangers have attempted to establish rapport and begin to ask invasive questions into the most sensitive areas of their lives. *See* Stetler, *Mitigation Evidence*, at 38: "Interviews are sensitive because of cultural, psychological and other barriers that must be overcome to ensure that family secrets are disclosed. . . . Regardless of culture, life-history investigation is invasive of privacy – seeking the darkest, most shameful and intimate secrets of the client's family."

52. The final collection of lawyers, experts, and investigators was a team in name only. According to the mitigation specialist, "I do not recall ever having a conversation with John O'Connor about my work on the case. I recall John O'Connor attending one team meeting at which I was present." (Waller Dec. at 1.) She continued, "I do recall Fred Duchardt attending a few of the meetings where I was present. It was clear to me that Mr. Duchardt did not have any use for mitigation specialists. I was informed that he did not believe in using mitigation specialists." *Id.* Ms. Waller's account is consistent with what Mr. Duchardt reportedly told habeas counsel – that he was "not a big meetings guy." He delegated tasks by phone or e-mail. (Declaration of Chris Armstrong, March 15, 2013, at 3.) According to the summary of the

interview with Mr. Duchardt:

> "Someone calling themselves a mitigation expert is almost laughable," said Mr. Duchardt. He feels that death qualified attorneys are the mitigation specialists. In this case, he was the death qualified attorney, "so, yeah, I would have been the mitigation specialist." The FPD hired Dani Waller as a mitigation specialist, and Mr. Duchardt was ok with that, though he unequivocally states that he was the person in charge of mitigation. Mr. Duchardt explained that he "did not really have a lot of relationship with Dani Waller," though he characterized her as a "good gal." He said Ms. Waller did what she was asked to do. He recalled that Dave Owen was the person who primarily assigned tasks to Ms. Waller; Mr. Duchardt did not recall asking Ms. Waller to do very much.

*Id.*

53. In a deposition in another habeas corpus case where Mr. Duchardt's client was sentenced to the federal death row, he espoused similar views:

> [E]ssentially, it has always seemed to me kind of funny that people have elevated the notion of a, quote, unquote, mitigation specialist, beyond what it actually is. There's no school that gives degrees in mitigation specialist training. There is no actual specifics for anyone.
>
> Frankly, the notion of the mitigation specialist, when it first came up in capital cases, came up because most lawyers had never tried a capital case before. And so they needed someone who had understanding of what sorts of things that would be mitigating factors. Those lawyers needed some help in being able to develop some of those things.
>
> If you look at some of the early motions for – asking for appointment of mitigation specialists, the motions basically indicate that you need a mitigation specialist because the lawyers don't know what mitigation is.

(Deposition of Frederick A. Duchardt, Jr., December 3, 2012, *German Sinisterra v. United States of America*, No. 04-08003-CV-W-GAF, at 18-19.)

54. Mr. Duchardt seems to have been oblivious to the evolution of capital defense practice, as recounted *supra* ¶¶ 19-20. He saw no need to develop social history evidence as the underpinning of reliable mental health assessments. He did not appreciate the importance of corroborating expert testimony with credible lay witnesses. *See supra* ¶¶ 31-32. He did not value the ideas and input of the mitigation specialist who was nominally on his team, or of any of her

predecessors, despite their decades of combined experience in capital cases. He seems to have had no insight into the limitations of his own knowledge in the areas of mitigation and mental health evidence, or the sheer amount of time required for thorough mitigation investigation. *See supra* ¶ 27.

*Failure to pursue negotiated disposition*

55. Counsel's Duty to Seek an Agreed-Upon Disposition in capital cases is fully elaborated in ABA Guideline 10.9.1, 31 HOFSTRA L. REV. at 1035 (2003). *See also* Russell Stetler, *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA L. REV. 1157 (2003). A survey of federal death penalty cases identified 2,975 "death-eligible" federal capital defendants from 1989 through 2009. (JON B. GOULD & LISA GREENMAN, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES (September 2010) at 5, Figure 1: "Death Eligible" Federal Defendants, 1989-2009, by Calendar Year of Indictment.) According to this report, the Attorney General authorized notices of intent to seek the death penalty in 463 of those cases. *Id.* at 8, Figure 2: U.S. Department of Justice Capital Authorizations, 1989-2009, by Year of Authorization. By the end of 2009, 262 authorized defendants had been tried, and 68 had been sentenced to death. *Id.* at 8-10. Many others avoided the death penalty through plea bargains, even after an original authorization.

56. It appears that the original presentation to the Department of Justice in Ms. Montgomery's case was perfunctory. *See supra* ¶ 41. Ms. Hunt and Mr. Owen presented some

background information about Ms. Montgomery, held back some information in the belief that authorization was inevitable, but left with an invitation to return "once we obtained our experts." (Hunt Dec. at 3.) When Judy Clarke was dismissed, Judge Gary A. Fenner stated that the Court believed that "Ms. Clarke was a third attorney who was only appointed in an effort to see if she could assist in getting a plea worked out and that was what the situation was from the very beginning." (Tr. of Conferences in Chambers, April 25 and May 3, 2006, at 4.) Ms. Hunt disagreed with the Court's characterization: "We wanted Judy Clarke in the case to help with the mitigation and mental health aspects. She was not brought in solely to secure a plea but to have full intention of participating in a trial of Mrs. Montgomery." (Hunt Dec. at 4.) *Accord*, David Owen: "[W]e had always thought her role was simply to handle the mental health experts and present the portion of the mitigation case." (Owen Dec. at 5.)

57. Ms. Clarke herself recognized the importance of pursuing an agreed-upon disposition, and she felt that the team was making progress before she was removed:

> I believe that Lisa Montgomery would have accepted a plea to life in prison without parole and know that I would have encouraged the team to pursue settlement discussions (a plea to life) in this case. In my experience settlement discussions require substantial thought, knowledge of the strength of the government's case and a compelling understanding of the client's life. It was my opinion that, if we investigated the case properly, and conducted a competent mental health evaluation that was well supported by a documented and thorough social history, we may have been able to resolve the case. Certainly that was my goal. When I was removed from the case, we were making progress toward that goal, but we were not yet in a position to seriously discuss settlement with the Government.

(Clarke Dec. at 10.)

58. A thorough mitigation investigation is integral to an effective plea strategy. It identifies the family and friends who care about whether a capital defendant lives or dies. It identifies the individuals who will visit the client in prison, put money in her commissary account,

and accept her collect telephone calls long into the future, when the capital defense team is out of the picture. It identifies the jail visitors who may be positive or negative influences on the client's decision. It identifies all the people in her life who may be allies in persuading a reluctant or disordered client that a plea to life without release is the most prudent and rational course. The mitigation investigation also provides evidence of changed circumstances that may persuade the Government to reevaluate its original authorization decision. Evidence of severe mental illness (such as the psychosis discussed by Dr. Logan in 2005, *supra* ¶ 39) may simply raise the specter of endless future litigation over competency to proceed or to be executed, thereby reminding the Government of the finality available through a plea.

59. There is no evidence that the final defense team took any steps toward settling Ms. Montgomery's case until the eve of trial. In fact, even though Mr. Owen remained on the case, it appears that Mr. Duchardt was unaware of the invitation extended by the Department of Justice to Ms. Hunt and Mr. Owen until trial was about to commence. In his letter to the Department of Justice on September 29, 2007, Mr. Duchardt wrote, "It has recently come to my attention that, when previous counsel had met with your committee early on in the case, you had invited them to provide to you any mental health evidence that might develop in the case so that the committee might consider that, and possibly reconsider its recommendation to the Attorney General regarding seeking of the death penalty against Mrs. Montgomery." (Exhibit 28, Duchardt letter to Margaret Griffey and Gwynn-Charlie Kinsey, September 29, 2007, at 1.) In his letter, Mr. Duchardt relied exclusively on his controversial mental health theory that Ms. Montgomery "was suffering from the severe mental disease or defects of pseudocyesis and post-traumatic stress disorder (PTSD) which caused her to not be able to appreciate the nature and quality or

wrongfulness of her conduct." *Id.* The local U.S. Attorney's office did not support the request for reconsideration based on their experts' views that Ms. Montgomery was malingering mental illness. The Department of Justice denied the request on October 9, 2007, while the trial was under way. (Exhibit 28, E-mail from Gwynn-Charlie Kinsey to Matt Whitworth, October 9, 2007, 9:58 A.M.)

*Sparse mitigation evidence, failure to pursue "red flags"*

60. The defense presentation at the penalty phase of Ms. Montgomery's trial was sparse and overly reliant on experts unsupported by lay testimony. It began with three staff from the private jail where Ms. Montgomery was housed pretrial to establish that she had been well behaved. Six family members testified: Ms. Montgomery's husband, Kevin Montgomery; her daughters, Desiree Boman and Chelsea Boman; her biological father, John Patterson (who had abandoned her as a toddler and had not had any contact with her until she was incarcerated in connection with this case); her half-sister, Diane Mattingly (who had also not seen Ms. Montgomery since they were small children until her arrest in the capital case); and her cousin, Wendy Treib. The final witnesses were psychiatrist William Logan and psychologist Ruth Kuncel. Neither expert testified to Ms. Montgomery's social history. They were aggressively challenged on cross-examination about the diagnosis of pseudocyesis, discussed *infra* at ¶¶ 68 to 71, malingering, the interpretation of Dr. Kuncel's psychological tests, and the reliability and truthfulness of Ms. Montgomery's statements. The horrific trauma that Lisa Montgomery experienced in childhood – rape perpetrated by her own stepfather – was reduced to an abstract battle of the experts instead of a vivid, life-defining victimization.

61. The singular impact of rape on children was noted in both the majority and dissenting opinions in *Kennedy v. Louisiana*, 554 U.S. 407 (2008). Writing for the majority, Justice Kennedy noted, "Rape has a permanent psychological, emotional and sometimes physical impact on the child. *See* C. BAGLEY & K. KING, CHILD SEXUAL ABUSE: THE SEARCH FOR HEALING 2-24, 111-112 (1990); FINKELHOR & BROWNE, ASSESSING THE LONG-TERM IMPACT OF CHILD SEXUAL ABUSE: A REVIEW AND CONCEPTUALIZATION in HANDBOOK ON SEXUAL ABUSE OF CHILDREN 55-60 (L. Walker ed. 1988). We cannot dismiss the years of long anguish that must be endured by the victim of child rape." 554 U.S. at 435. Justice Alito, in dissent, added, "Long-term studies show that sexual abuse is 'grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate.' C. BAGLEY & K. KING, CHILD SEXUAL ABUSE: THE SEARCH FOR HEALING 2 (1990). . . . Psychological problems include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. Meister,[14] *supra*, at 209; Broughton,[15] *supra*, at 38; Glazer, *Child Rapists Beware! The Death Penalty and Louisiana's Amended Aggravated Rape Statute*, 25 AM. J. CRIM. L. 79, 88 (1997). The deep problems that afflict child-rape victims often become society's problems as well. Commentators have noted correlations between childhood sexual abuse and later problems such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal

---

[14]Melissa Meister, *Murdering Innocence: The Constitutionality of Capital Child Rape Statutes*, 45 ARIZ. L. REV. 197 (2003).

[15]J. Richard Broughton, *On Horror's Head Horrors Accumulate: A Reflective Comment on Capital Child Rape Legislation*, 39 DUQUESNE L. REV. 1 (2000).

level, and psychiatric illness. Broughton, *supra*, at 38; Glazer, *supra*, at 89; HANDBOOK ON SEXUAL ABUSE OF CHILDREN 7 (L. Walker ed. 1988). *Victims of child rape are nearly 5 times more likely than nonvictims to be arrested for sex crimes* and nearly 30 times more likely to be arrested for prostitution. *Ibid.*" 554 U.S. at 468-69, 128 S. Ct. at 2676-77. (Emphasis added.)

62. The Government's main expert, Dr. Park Dietz, speculated that the sexual contact with Ms. Montgomery's stepfather may not have occurred, or may have been consensual:

> It is beyond the scope of this evaluation to determine the validity of the disputed sexual abuse claim, which apparently was never prosecuted, or to determine whether any sexual contact that may have occurred was willing or not. If, however, it is true that the defendant was sexually abused by her stepfather against her will, such abuse could cause the development of PTSD.

(Report of Park Dietz, M.D., September 17, 2007, at 7.) He then offered his familiar hypothesis that a killer's symptoms of exposure to trauma may be the sequelae of the very homicide that she is accused of perpetrating:

> The most obvious possible cause of PTSD, however, is not one reported by the defendant. If the finder of fact determines that the defendant intentionally attacked Bobbie Jo Stinnett to cut the fetus from her uterus and that the defendant witnessed the results of her handiwork, this violent and bloody event could certainly cause her to suffer PTSD thereafter. Most killers who experience PTSD as a result of the homicides they commit have either committed particularly gruesome killings or had an emotional attachment to the victim or both. This killing was certainly gruesome, and the defendant referred to the victim as her "friend."

*Id.* Dr. Dietz was dismissive of PTSD as the basis of an insanity defense and asserted that Ms. Montgomery had neither psychotic illness nor a mental defect arising from brain damage at the time of the charged offenses: "She may have PTSD as a result of the crime and/or abuse during her childhood, but neither would constitute a serious mental disease or defect at the time of the charged offenses." *Id.* at 32.

63. The pretrial mitigation specialists understood the importance of investigating Ms.

Montgomery's traumatic childhood and its developmental impact on her moods, cognition, behavior, and emotions. They had begun appropriately by looking for objective, credible witnesses and records that could corroborate the sexual trauma and its developmental effects. Lisa Rickert, for example, had a working "Chronological History" that identified numerous teachers and other professionals who might have provided insight into Ms. Montgomery's cognitive, emotional, and social functioning before and after she was raped by her stepfather. (Attachment 2 to Vogelsang Dec. at 23-55.) The chronology was last updated July 20, 2005, and it is flawed to the extent that it relies heavily on interviews rather than records. However, it was a work in progress. Had a meaningful mitigation investigation proceeded throughout the life of the case, the chronology would have expanded in detail and filled in documentary sources for many of the events described. Ms. Rickert tracked down the physician in Tulsa who had examined Ms. Montgomery in February 1984 after her mother told him that Ms. Montgomery had been sexually abused by her stepfather. (Interview Notes, Interview of Dr. William Barnes, July 14, 2005; *id.* at 11-12.) According to the notes,

> Dr. Barnes said he remembered that Lisa came in with her mother. I was able to show him a picture of Lisa and he confirmed that it was her. He said the mother requested an examination of her daughter because she had been sexually abused by her stepfather. Dr. Barnes said Lisa's hymen was ruptured and he ordered a pregnancy test, which meant taking blood. He said he would not have recommended the pregnancy test if her hymen had not been ruptured. Dr. Barnes said the tests were negative and he sent the results to Lisa's mother.
>
> Dr. Barnes said Lisa's mother stayed in the room the entire time during the pelvic examination. He cannot recall anything about the mother other than to say she seemed more upset than Lisa. He recalled Lisa showed little emotion and had a flat affect. Dr. Barnes never talked to Lisa alone about what happened to her.
>
> Dr. Barnes never saw Lisa or her mother again.
>
> Dr. Barnes thought that the sexual abuse was more than a one-time occurrence. . . .

*Id.* Dr. Barnes also told Ms. Rickert that his normal practice was to call the police, "but the mother said she was going to call the police." *Id.* at 2.

64. Readily available records from the Central Family and Children's Service in Tulsa, Oklahoma, documented the counseling that Ms. Montgomery received following the sexual abuse. The counselor's handwritten notes on February 5, 1985, described a session with Ms. Montgomery:

> Discussed particulars of sexual abuse:
> – Began when Lisa was 8th or 9th grade. Continued for approximately 2 yrs. L. had difficulty remembering details and needed prompting. Appeared pensive. Abuse began [with] fondling. Jack told her if she told her mother she would regret it.
> – Told her if she did not submit he would do it [with] [NAME REDACTED]. (L. appears to resent [NAME REDACTED] and this could have a relationship [with] that.
> – First time intercourse took place was while mom was at store. Boys were at a friends house.

(Attachment 102 to Vogelsang Dec.) Holly Jackson and Ron Ninemire interviewed Lewis Priest, a friend of Ms. Montgomery's mother and stepfather who had worked with the stepfather at a couple of salvage yards. Mr. Priest reported that when the mother and stepfather were separating, the mother told him that she had caught Jack Kleiner in bed with one of her daughters. Mr. Priest told them he had "asked Jack [Kleiner] if he had sex with his daughter and Jack admitted he had." (Attachment 92 to Vogelsang Dec.: Interview with Lewis Priest, January 20, 2006.)

65. The comprehensive social history provided to habeas counsel by Jan Vogelsang in her declaration (Exhibit 16) illustrates many other important pieces of information unearthed by the pretrial mitigation specialists but never developed into a full social history or even a thorough and complete chronology. Ms. Vogelsang's declaration contains hundreds of footnotes citing the work of the pretrial mitigation specialists. Until they were utilized by Ms. Vogelsang, the pretrial reports simply constituted a collection of isolated facts whose significance was undetermined.

The richness of the additional documentary evidence and follow-up interviews on which Ms. Vogelsang relies also demonstrates that the pretrial reports contained merely the tip of the proverbial iceberg. The pretrial reports are best understood as discovering the "red flags" that should have prompted further investigation.

66. Ms. Rickert, for example, had begun to explore the multigenerational family histories with her interview of the paternal grandmother (which shed light on the great-grandmother, who suffered from Lupus late in life). The grandmother, Marie Stelma, was "easily stressed and upset" herself. *See* Vogelsang Dec., notes 2 and 5. Ms. Rickert's interviews with maternal aunts, Alice Derry and Ellen Linderman, also had insights about Ms. Montgomery's biological father, John Patterson. *See* Vogelsang Dec., note 16. John's mother told Ms. Rickert about the impact of his being kidnapped by his own father. *See* Vogelsang Dec., note 40. Ms. Rickert had also interviewed John's half-brother, Thomas Hedberg, about John's condition when returned to the family. *See* Vogelsang Dec., note 73. Ms. Rickert's interviews about the maternal lineage are also cited by Ms. Vogelsang (in notes 173-181, 191-194, 199, 203, 205, 211, 219-222, 227 243, 251, 263, 268, 282-283, and 293). Ms. Vogelsang also incorporated an interview by Dani Waller at notes 255, 272, 289, and 302-303. Holly Jackson's interviews of Ms. Montgomery's younger brother and school friends are also cited (for example, at notes 441 and 584) There are numerous additional citations to the pretrial interviews, highlighting the importance of assimilating all the disparate sources of information into an overall contextual framework for understanding the world in which Lisa Montgomery grew up.

67. In addition to its repeated guidance about counsel's duty to conduct a thorough mitigation investigation, the U.S. Supreme Court has also stressed the importance of responding

to "red flags" that require further investigation. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court noted that nothing uncovered by trial counsel suggested that investigation would be fruitless. "To the contrary, the many red flags . . . would have prompted a reasonable attorney to conduct additional investigation." 539 U.S. at 525. Similarly, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court noted that counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected." 539 U.S. at 391. Elsewhere, the Court has characterized those cases as ones where "defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009).

*The deadly diagnosis of pseudocyesis: frontloading or backfiring?*

68. There is an adage in medical education that warns students to "think horses, not zebras" when they hear hoofbeats. In other words, look for the common disorders and diseases with which we are all familiar, as opposed to the rare and exotic ones seen in arcane research journals. This common-sense advice applies in the realm of mental disorders as well – particularly when the diagnostician has the burden of convincing skeptical jurors and adversarial experts that the rare and exotic condition is real. In Ms. Montgomery's case, trial counsel decided to make the diagnosis of pseudocyesis the centerpiece of the defense theory. The results were predictably catastrophic.

69. As I discussed at length, *supra* ¶¶ 32-35, mental health experts need an accurate and independently corroborated multigenerational social history as the foundation for their assessments. To the extent that testifying experts instead rely on a capital defendant's self-report,

they will be effectively and devastatingly cross-examined. It appears that Mr. Duchardt chose the rare and exotic diagnosis, and then located an expert who might endorse it (Dr. Ramachandran). Mr. Duchardt seemed determined to offer a defense of not guilty by reason of insanity. According to the report of his interview by habeas counsel:

> Dr. Logan told Mr. Duchardt that he [Logan] could only provide the team mitigating evidence, as Mr. Duchardt put it, Dr. Logan said he couldn't give the team a "first phase" defense. Based on Logan's inability to find a psychiatric disorder which would support insanity, Mr. Duchardt provided Dr. Logan Dr. Ramachandran's report, and Dr. Logan was able to support Dr. Ramachandran's analysis.

(Armstrong Dec. at 4-5.) This far-fetched psychiatric theory, propounded by an academic neuroscientist, was of course substantially undermined by Mr. Duchardt's additional theory that Ms. Montgomery's brother, Tommy Kleiner was the actual killer. Mr. Duchardt reportedly told habeas counsel that he was "disappointed in Mr. O'Connor's decision not to present this defense to the jury. As he put it, had it been Mr. Duchardt's decision, he would still be arguing that Tommy Kleiner was there." *Id.* at 5.

70. ABA Guideline 10.10.1 (Trial Preparation Overall) states, "Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." 31 HOFSTRA L. REV. at 1047. While there is superficial consistency between an insanity defense and mitigation that relies on psychiatric evidence, there is in fact a grave danger of undermining powerful mitigating evidence by the confusion that inevitably arises in jurors' minds when one first tells them the evidence *is* a legal excuse for the crime, and then later that the same evidence, viewed as mitigation, is *not* an excuse. Worse, when jurors simply do not believe the evidence of insanity, the defense has no credibility when offering more of the same in the penalty phase. The verdict sheet in Ms. Montgomery's case bears out this

point. A single juror found that Ms. Montgomery's capacity was impaired "regardless of whether her capacity was so impaired as to constitute a defense to the charge." None of the jurors found that she committed the offense "under severe mental or emotional disturbance."

71. Insanity defenses are rare, and successful insanity defenses extremely rare. As one study noted, "Contrary to popular belief, insanity is pleaded in less than one percent of all felony cases and is successful in only one-quarter of the cases in which it is pleaded. Thus, for every 1000 felony cases, insanity is pleaded in approximately nine cases and is successful in only two." (Grant H. Morris, *Placed in Purgatory: Conditional Release of Insanity Acquittees*, 39 ARIZ. L. REV. 1061, 1063 (1997) Citations omitted.) Another cited studies indicating "that eighty percent of those defendants found NGRI had been previously hospitalized for mental illness, and that between sixty-five and eighty percent had been previously diagnosed as not just mentally ill but actively psychotic." (Ira Mickenberg, *A Pleasant Surprise: The Guilty But Mentally Ill Verdict Has Both Succeeded in Its Own Right and Successfully Preserved the Traditional Role of the Insanity Defense*, 55 CINCINNATI L. REV. 943, 945 (1987).) A timely study released the year before Ms. Montgomery's trial noted that jurors in death penalty cases are particularly likely to reject insanity defenses:

> While the vast majority of people view the insanity defense with great skepticism, research has found that death-qualified venirepersons are even less receptive to it than are their excludable counterparts. Consequently, the aforementioned research concluded that capital defendants who plead NGRI face a particularly difficult challenge: attempting to prove their innocence to a jury [biased] toward conviction and in favor of the death sentence before their trial even begins.

(Brooke Butler & Adina W. Wasserman, *The Role of Death Qualification in Venirepersons' Attitudes Toward the Insanity Defense*, 36 J. APPLIED SOC. PSYCHOLOGY 1744 (2006). Citations omitted.) These researchers conducted an empirical study of three hundred venirepersons from

the 12th Judicial Circuit in Florida and found that death-qualified venirepersons, when compared to excludables, were more likely to endorse certain insanity myths, find the defendant guilty, and sentence the defendant to death. *Id.* at 1744.

*Verdict sheet deficiencies*

72. The crucial importance of clear, simple, well-drafted verdict sheets was discussed in the District Court's Memorandum Opinion and Order in *Angela Johnson v. United States of America*, No. 3:09-cv-3064-MWB, United States District Court for the Northern District of Iowa, Central Division, Document 377, filed March 22, 2012. The case was tried in 2005. The Court in *Johnson* found "the mitigating factors were remarkably poorly drafted, considering how important they are in a capital case." *Id.* at 356. The *Johnson* Court quoted a U.S. Supreme Court decision at length to make the point that "'sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.' *Abdul-Kabir v. Quarterman*, 550 U.S. 33, 246 (2007). As the Court also explained in *Abdul-Kabir*, '[T]he jury must be permitted to "consider fully" such mitigating evidence and . . . such consideration "would be meaningless" unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the death sentence.' 550 U. S. at 260 (quoting *Penry I*, 492 U.S. at 321)." *Id.* at 358.

73. The *Johnson* Court concluded from its analysis of *Abdul-Kabir* that "it follows that counsel in a capital case performs deficiently, even if counsel presents mitigating evidence, if

counsel fails to formulate mitigating factors in a way that allows jurors to give meaningful consideration and effect to that mitigating evidence . . ., and that a petitioner may be prejudiced by that deficiency, if there is a reasonable probability that, had counsel properly formulated mitigating factors, jurors would have been able to give meaningful consideration and effect to all mitigating evidence." *Id.* at 358- 59. After citing to *Strickland*, 466 U.S. at 688, 691-92, the *Johnson* Court, quoted from the ABA Guidelines (rev. 2003), Guideline 10.11.K (The Defense Case Concerning Penalty), "Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions. Post-conviction counsel should pursue these issues through factual investigation and legal argument." *Id.* at 359.

74. The *Johnson* Court used one particular mitigating factor from the verdict sheet to illustrate the problem of multifaceted ("group"), overly complicated factors that "resulted in" additional conditions, rather than simple, straightforward facts. Mitigating factor (9) in *Johnson* stated, "Angela Johnson was raised in a single-parent household by an emotionally unstable mother who subjected her children to unusual fasting procedures, long periods of abandonment and physical detachment, and occasional physical abuse, resulting in Angela Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem." *Id.* at 359. In the Court's analysis, "this single mitigating factor included many facts (at least eight) that jurors were asked to consider as a group . . . Furthermore, it required the jurors to reach the specific conclusion that the first five of these facts actually caused (that is, 'resulted in') the remaining three, thereby restricting the

jurors' ability to give each fact its full mitigating effect. At a minimum, this mitigating factor, as formulated by Johnson's trial counsel, would have confused jurors as to their ability to consider the potential mitigating effect of any particular fact, standing alone, or in conjunction with all the other facts with which it appeared." *Id.* at 360. The Court found that this convoluted mitigating factor "precluded jurors from finding that the occasional physical abuse suffered by Johnson was mitigating, standing alone, because it resulted in Johnson being far more susceptible to escape through illicit drug use, a series of unhealthy relationships with men, and chronic feelings of abandonment and poor self-esteem, or resulted in any one of those things, *or* had some other result not listed, such as inuring her to physical violence against others, even children, which reasonable jurors might find mitigating." *Id.* at 362.

75. Drafting mitigating factors for the verdict sheet should be a team effort, and it will often benefit from consultation with the Federal Death Penalty Resource Counsel Project, which maintains a library of the mitigating factors proffered in past federal death penalty cases. There is no evidence that the remaining mitigation specialist was even consulted in the drafting of the mitigating factors in Ms. Montgomery's case. As in the *Johnson* case, the verdict sheet in Ms. Montgomery's case was full of compound, multifaceted conditions that purportedly also produced certain results. Unless a juror found that all of the conditions were present *and* that they produced the specified result, the factor had to be rejected. Factors 4, 5, 6, and 10 are examples of both problems. Several other factors are just verbose and unnecessarily convoluted. Factor 4 stated, "Lisa Montgomery was the victim of childhood physical and sexual abuse at the hands of her stepfather, Jack Kleiner, and was psychologically and emotionally damaged as a result of that abuse." A simple declarative statement ("Lisa Montgomery was raped by her stepfather") might

have been more effective. Factor 10 was even more complex: "In the time that she has been incarcerated, Lisa Montgomery has assisted other inmates, particularly those who were younger than her, and those with disabilities, teaching other inmates crafts and other things, and Lisa Montgomery would continue to do so if sentenced to life imprisonment without possibility of release." A single juror endorsed that factor. There might have been more support if the factor simply stated, "Lisa Montgomery has been helpful to other inmates while incarcerated pretrial." The jurors overwhelmingly rejected factors that predicted how Ms. Montgomery would behave in the future (factors 10, 12, 14, and 17). No juror found that she will serve her time peaceably if sentenced to life without release (factor 12).

***Conclusions***

76. It is my considered professional opinion that Ms. Montgomery's trial team performed deficiently in failing to conduct the thorough mitigation investigation required under the prevailing norms of 2004 to 2007. By the time of trial, the team existed in name only, and the mitigation specialist had been reduced to a minor role of performing only specific delegated tasks. Despite all the experts who were consulted, the basic social history investigation was never completed, and there was no coherent trial strategy. There is also no evidence that trial counsel developed a strategy for resolving the case, in spite of an invitation from the Department of Justice to return when expert evidence was available. The capital offense in itself suggested extreme mental disturbance, and the readily available information about Ms. Montgomery's life history announced a narrative of complex trauma of extraordinary dimension.

77. In the 2003 edition of the ABA Guidelines, Guideline 5.1 (Qualifications of Defense

Counsel) was carefully revised to eliminate quantitative measures of experience and to stress instead commitment to high-quality representation and special skills and knowledge relevant to capital cases, including, in particular, "skill in the investigation, preparation, and presentation of mitigating evidence" and "skill in the investigation, preparation, and presentation of evidence bearing upon mental status." These skills were sorely lacking in Ms. Montgomery's case. The Guidelines likewise stress the importance of a team. As I have written elsewhere, the Guidelines call for more than one lawyer not because of the deficiencies and limitations of any individual lawyer, but because the complexity of capital cases means that "no single lawyer can possibly find the time to do everything that is needed to provide high quality representation in a capital case." (Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help But Can't Be Delegated*, THE CHAMPION (March 2007) at 61, 62.) The preparation of mental health and mitigation evidence is an enormous undertaking, requiring special skills and a methodical approach. In Ms. Montgomery's case, the approach was haphazard, the team was dysfunctional, and the result was a presentation that was incoherent and incredible.

78. As the Supreme Court of the United States noted last year, "The right to the effective assistance of counsel at trial is a bedrock principle in our justice system. It is deemed as an 'obvious truth' the idea that 'any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.'" Citation omitted. *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012). The harm in this case is not just to Ms. Montgomery, whose life is in jeopardy, but to the jurors who rendered a life-and-death decision without the evidence needed to produce a morally reliable result and to the justice system itself, which holds the public's trust

only to the extent that its proceedings are fair and "appear fair to all who observe them."[16]

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, and under the laws of the States of California and Missouri, that the foregoing is true and correct and that this declaration was executed this 17 day of August 2013 in Oakland, California.

RUSSELL STETLER

[16]This is Chief Justice Rehnquist's language in a case where he noted "the institutional interest in the rendition of just verdicts" as being just as important as the rights of the criminally accused. *Wheat v. United States*, 486 U.S. 153, 160 (1988).