UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA M. MONTGOMERY, Movant, | ) | |
| vs. | ) | Case No. 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS - VOLUME I
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
OCTOBER 31, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:
MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:
MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

I N D E X

Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

INDEX (continued) — Page

NOVEMBER 1, 2016

VOLUME II


RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

## I N D E X
(continued)

Page

NOVEMBER 2, 2016

VOLUME III

RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . . 761

I N D E X
(continued)

Page

NOVEMBER 3, 2016

VOLUME IV

DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

I N D E X
(continued)

Page

NOVEMBER 4, 2016

VOLUME V


CHRISTOS DAVATZIKOS
Direct examination by Ms. Henry. . . . . . . . . . . . 1120
Cross-examination by Mr. Valenti . . . . . . . . . . . 1165
Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG
Direct examination by Ms. Henry. . . . . . . . . . . . 1182
Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE
Direct examination by Ms. Henry. . . . . . . . . . . . 1245
Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL
Direct examination by Ms. Henry. . . . . . . . . . . . 1255
Cross-examination by Mr. Valenti . . . . . . . . . . . 1290
Redirect examination by Ms. Henry. . . . . . . . . . . 1302

I N D E X
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

## I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864

I N D E X
(continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

I N D E X
(continued)

Page

NOVEMBER 10, 2016

VOLUME IX

FRED DUCHARDT
Direct examination by Ms. Harwell (cont'd.). . . . . 2263
Cross-examination by Mr. Ketchmark . . . . . . . . . . 2273

BEN LEONARD
Direct examination by Ms. Henry. . . . . . . . . . . . 2324
Cross-examination by Mr. Valenti . . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . . . . 2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

## INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Dianne Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Lebouef | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |

FOR THE RESPONDENT:

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

OCTOBER 31, 2016

MORNING SESSION

(Court in session at 9:05.)

THE COURT: Good morning. Thank you. You can all be seated.

Ms. Henry, are you ready?

MS. HENRY: We are, Your Honor. We have a few housekeeping matters, if it please the Court.

THE COURT: All right.

MS. HENRY: What I would like to do is introduce you to members of the Lisa Montgomery defense team for which the Court may not be familiar. So if people are coming in and out of the courtroom, you know who they are.

THE COURT: All right.

MS. HENRY: Seated at the counsel table, of course, you know Ms. Nouri and Ms. Harwell. We also have David Paschal who is an investigator in the Office of the Federal Public Defender in Nashville. Janet Santana over here is my paralegal who's been with me for 17 years. And Megan Wartner who's the legal assistant in my office. They will be assisting us with the exhibits as we move through the hearing today.

Also in the courtroom in the front row we have Ms. Kayla Brandt in the green. She's an investigator in my office. And Mr. Ben Leonard who's also an investigator in my office.

THE COURT: All right.

MS. HENRY: And, Your Honor, we would at this time request to invoke the rule with the exception of Mr. Leonard. By agreement the government and I have agreed that Mr. Leonard and Mr. Lipanovich, Special Agent Lipanovich, excuse me, would be allowed to be in the courtroom.

THE COURT: Do you care to speak to that any, Mr. Valenti?

MR. VALENTI: No, Your Honor.

THE COURT: All right. The request is granted. The rule will be enforced with the exceptions noted.

MS. HENRY: Your Honor, other exceptions to that will be next week when we present testimony of Jan Vogelsang. We have an expert witness, Kate Porterfield, that Mr. Valenti has been kind enough to agree could sit in because that will help expedite Dr. Porter's testimony.

THE COURT: All right.

MS. HENRY: In addition to those matters, Your Honor, we have a stipulation with respect to the unavailability of witness Ron Ninemire which we didn't commit to writing. I apologize. Mr. Ninemire has had some medical difficulties which has resulted in him having a condition called temporary global amnesia as well as he has a cardiac aneurysm, and so testimony could present a life-threatening event for him. So the government and we have agreed he is an unavailable witness for purposes of this hearing, and we would request that he be

considered as such.

THE COURT: All right. Granted.

MS. HENRY: We also have had a few witnesses, Your Honor, who have passed since filing their declarations. I believe the Court is aware that Ms. Hunt's investigator, Phil Thompson, has passed away and so he is an unavailable witness. We also have a witness by the name of Dr. DiAnne Bradford. She was the witness who had provided the declaration regarding the psychotropic medications that Mrs. Montgomery was on during the hearing and gave a declaration regarding the impact of those medications on affect and that sort of thing.

Dr. Bradford sadly passed away from breast cancer in September of this year and so is unavailable to testify. The government has been kind enough to agree to her declaration coming in in lieu of her testimony so that we didn't need to request the opportunity to get a new expert, and Dr. Woods will also be referring to her declaration in his testimony.

THE COURT: All right.

MS. HENRY: We have a few other stipulations, Your Honor.

Your Honor, we have prepared notebooks and I apologize. We literally were adding exhibits at six o'clock this morning. I apologize for being a little disorganized.

I would like to read into the record, if I may, Your Honor, the stipulations which the government was kind enough to

agree to and signed off on this morning.

And the first is Movant's Exhibit No. 78, and I should state for the record that copies of our exhibit notebooks have been provided to the government as well as a copy for the Court and there will be a copy available for the witness.

"Stipulation regarding the testimony of Denise Riley Baker. Denise Riley Baker was the social worker assigned to investigate the allegations of sexual abuse of Lisa Montgomery by Jack Kleiner. Ms. Baker would testify that the allegations were reported to DHS by attorney Rick White. Ms. Baker conducted an investigation of the allegations of abuse. She concluded that Lisa was telling the truth about Jack Kleiner. As a result of her investigation, she recommended the case be pursued criminally and sent the appropriate paperwork to the Tulsa County District Attorney's office.

"Ms. Baker would testify that parts of Sperry, Oklahoma, are in Tulsa County and parts are in Osage County. Ms. Baker did not realize that the location of the sexual abuse was in Osage County. Ms. Baker would testify that in the 1980s the department had a hard time getting the authorities in Osage County to follow up on allegations of sexual abuse. The fact that the recommendation for prosecution is not signed by any prosecutor indicates to Ms. Riley that the case was never evaluated by any prosecutor and no decision was made by anyone

as to whether or not to pursue charges against Jack Kleiner and that is likely the case just fell through the cracks. Denise Riley Baker is now in private practice after retiring from federal probation.

"Stipulated this 31st day of October, 2006 [sic]."

Signed Jeffrey Valenti and Kelley Henry, counsel for the government and Ms. Montgomery.

The next stipulation we entered into, Your Honor, is with respect to Movant's Exhibit No. 79, stipulation regarding the testimony of Hugh Rineer. The stipulation states as follows: "Judge Hugh Rineer presided over the contested custody and divorce proceedings between Judy Kleiner and Jack Kleiner. Judge Rineer heard testimony from Lisa Montgomery regarding being sexually abused by Jack Kleiner. By the time Judge Rineer heard these allegations, the Oklahoma DHS had already been contacted and the case had been referred for prosecution. Judge Rineer would testify that he has recently read the transcript of the divorce proceedings in Kleiner v. Kleiner and that it would not be fair to conclude that he did not find Lisa's testimony regarding sexual abuse credible. Instead, he believed that no further action was necessary on his part because of the involvement of DHS.

"Stipulated this 31st day of October, 2016."

Signed by Jeffrey Valenti, counsel for the United States and Kelley Henry, counsel for Lisa Montgomery.

If I could check my notes one minute, Your Honor. I believe that's all the stipulations we have.

The next matter to bring to the Court's attention in terms of housekeeping, Judge, is with respect to a request for a protective order that I received late Friday afternoon orally by the -- Ms. Martha Coffman who is counsel for the Kansas Supreme Court. We had -- as Your Honor knows, there is a claim in this case that there was misconduct as well as ineffective assistance of counsel with respect to the Tommy Kleiner defense and Tommy Kleiner issue and matters relating from the allegation that Tommy Kleiner was involved in the case.

Trial counsel has subpoenaed on the part of the probation officer's file -- the probation officer's name is Ms. Erin Garman. She will testify tomorrow afternoon. However, Ms. Garman has requested an opportunity to review her file, which is in the custody of the Kansas probation office. Recently -- I'm a Missouri lawyer but not a Kansas lawyer. The Kansas Supreme Court has recently passed a rule that prohibits the probation and parole files from release without a protective order from a court. Ms. Coffman had unfortunately sent an email to an email address that was incorrect. She sent it to Kelly, K-e-l-l-y, underscore Henry at fd.org. Sadly, because of the way the government email system works, that went to likely a pro se writ clerk in Texas who shares my name and gets a lot of my emails and rarely forwards it to me.

Ms. Coffman called my office Friday afternoon and they reached me and I called her back. She sent me a proposed protective order which she indicated if this court signed, that they would provide the probation files via email today which, of course, we would provide the government as well. So I'm requesting that the Court -- orally requesting that the Court enter that protective order as requested by Ms. Coffman.

THE COURT: Do you care to speak to that, Mr. Valenti?

MR. VALENTI: No, Your Honor. I have no objection.

THE COURT: Your request is granted. We'll issue the protective order.

MS. HENRY: Thank you, Your Honor. We'll provide that to -- we'll provide that after lunch at the break to be signed.

THE COURT: Very well.

MS. HENRY: Next thing we have, Your Honor, the government has been very kind in agreeing to stipulate to many of the exhibits coming in, and we felt like at this juncture it would be a good idea to just do that in order to save time as we move along.

I wanted to make sure that I understood Mr. Valenti this morning that you're agreeable to our moving admission of these exhibits, but you are going to want each of our live witnesses to testify regarding their declarations? Is that --

MR. VALENTI: Correct. I don't want the declarations to serve in lieu of the live witness as planned, like David Owen who prepared a declaration but intends to be a live witness. I mean, obviously, I'd like to talk to them live. I have no problem with the declaration coming in with that understanding.

MS. HENRY: So at this point, Your Honor, I do want to explain witnesses a little bit because it is idiosyncratic, one of my colleagues would say of me. The first exhibit has a number of attachments, and rather than change their numbers, because they relate to the biopsychosocial history declaration and there are a number of attachments, we thought it would be very confusing to the Court and parties if we were to change exhibit attachment 1 to the biopsychosocial to 1-A. So what we have done is we have just given the exhibit number and then dash 1 all the way through so that we're keeping consistent with the declaration itself, if that makes sense.

THE COURT: I'm sure we'll figure it out.

MS. HENRY: Thank you, Your Honor.

So with that provision, we at this time move admission of Movant's Exhibits 1 through 139.

MR. VALENTI: No objection.

THE COURT: Those exhibits are received.

MS. HENRY: Then, finally, Your Honor, I know the Court does not wish to hear an opening statement. There is one

development, however, that everyone in the room except Your Honor is aware of that I think is important for the Court to know.

As you hear the evidence as we proceed today, development that came -- factual development that came in our case in the last few months. We are hoping that each witness is going to build on each other, and that by the end there will be a complete narrative story. Again, I won't give you an opening statement. However, just as a factual matter, the Court should be aware that there has been a supplemental declaration from Kate Porterfield as a result of investigation that led to our discovery that when she was 16 years old, Mrs. Montgomery disclosed to her cousin, Mr. David Kidwell, that not only had she been sexually abused by Jack Kleiner but that actually she had been sexually abused by three or four of Jack Kleiner's friends. Sometimes all at once.

That sexual abuse occurred over a number of years. It included brutal sexual abuse. Without being too graphic, it was oral, anal, as well as vaginal. Sometimes all at once. There would be beatings and that when they were finished, they would urinate on her. She made that disclosure contemporaneously to her cousin and that person kept her secret because she was afraid of being -- that her family would be killed by Jack Kleiner.

He provided that declaration. He was then

interviewed by Kate Porterfield. Dr. Porterfield went to interview Lisa Montgomery regarding these allegations. Upon that interview, Ms. Montgomery was able to disclose to Dr. Porterfield for the first time that not only had that occurred but that her mother and stepfather had actually trafficked her and had caused her to pay for items around the house, including the addition by providing sexual favors to the plumber, the roofer, the gas man, and others.

Mrs. Montgomery has been able to provide names of some of those men. She could not know that those names actually appeared in our file that Mrs. Judy Shaughnessy had provided in her divorce proceedings in response to interrogatories, names of men who she was in the company of, and two of those men who Mrs. Montgomery disclosed were in those interrogatories.

One of those men was the plumber, Gerald Shipley. Gerald Shipley's obituary indicates that his nickname was Shorty. Mrs. Montgomery had described Shorty, the plumber. And his obituary also states he is a plumber. That information was provided to Dr. Porterfield, and she reached conclusions as well as other experts based on those revelations.

And with that, Your Honor, I believe that concludes all of our housekeeping matters.

THE COURT: All right. Thank you.

Your Honor, Ms. Harwell will have our first witness.

THE COURT: All right. Do you have any housekeeping matters, Mr. Valenti?

MR. VALENTI: No, Your Honor.

THE COURT: Are you ready to proceed?

MS. HARWELL: We are, Your Honor. Movant would call Russ Stetler.

MOVANT'S EVIDENCE

THE COURT: Mr. Stetler, come right up over here to the witness stand, and before you take a seat my clerk here will swear you in.

THE WITNESS: Thank you.

RUSSELL STETLER, being sworn by the courtroom deputy, testified:

THE WITNESS: Good morning Your Honor.

THE COURT: Good morning.

DIRECT EXAMINATION BY MS. HARWELL:

Q Would you state and spell your name for the court reporter, please.

A Russell Stetler, R-u-s-s-e-l-l, S-t-e-t-l-e-r.

Q Mr. Stetler, how are you employed?

A I'm employed as the National Mitigation Coordinator for the federal death penalty projects, and I'm hosted based in a Federal Public Defender Office in Oakland, California.

Q What are the federal death penalty projects?

A They're projects which provide assistance to assistant

public defenders, Federal Public Defenders, and appointed counsel handling death penalty cases in federal court at any level. That is to say, cases that are being prosecuted under the Federal Death Penalty Act or cases in federal court on habeas corpus.

Q And what are your duties as the National Mitigation Coordinator?

A Well, to assist in consulting with those lawyers on mitigation-related issues. I do a lot of training. There are multiple federal death penalty projects. There's the Trial Project. There's the Habeas Assistance Project. There's ones specific to cases like this for 2255 motions, and all of them have national training programs that I help to plan those programs and serve as faculty.

Q How long have you held this position?

A Since 2005.

Q I believe your current position was described in the September 2010 update to that which is commonly known as the Spencer Report. Would you explain to the Court what the Spencer Report is?

A Yes. The Defender Services Committee which oversees the entire Criminal Justice Act implementation appointed a subcommittee chaired by Judge James Spencer from the Eastern District of Virginia to do a report on cost and quality of defense representation in federal death penalty cases back in

the '90s, and it was published in 1998 after approval by the Judicial Conference of the United States. So its official title is Report on the Cost and Quality of Defense Representation in Federal Death Penalty Cases, but it's commonly referred to by the name of Judge Spencer.

Q And your position came from that report; am I right?

A In a sense. One of the recommendations in that 1998 report was that there needed to be more mitigation capacity and to do it most cost effectively. The recommendation was to employ mitigation specialists as staff in Federal Defender organizations, and so eventually the Defender Services Committee recommended my position in 2004, and I was hired in 2005.

Q And I believe in your notebook you have Exhibit 122, which is the 2010 update; is that correct?

A Yes.

Q If you could review pages 111 to 112 of that report and just read into the record how that report describes your position, please.

A "In 2004 the Defender Services Committee authorized a position for a National Mitigation Coordinator in a Federal Defender office to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts. In addition to leveraging his own significant knowledge and skills through case consultations, the National

Mitigation Coordinator has enhanced defense representation and contributed to cost containment efforts by recruiting more mitigation specialists to work on federal capital cases, matching mitigation specialists with counsel, and providing expanded training opportunities both for defender staff and for private mitigation specialists who are authorized to work on federal cases. This training enhances the skills and availability of such professionals."

Q You didn't write that report, but does it reflect what you think you do professionally?

A Yes.

Q Before taking your current position, have you held other positions that relate exclusively to death penalty cases?

A Yes.

Q And what were those?

A For the ten years before I assumed this position I was the Director of Investigation & Mitigation at the New York State Capital Defender Office. That was a statewide office created when the death penalty was reinstated in New York. It had a mandate to see that defendants facing the death penalty under the New York statute received effective representation, and we essentially had first refusal rights on all cases; and if we didn't take a case for any reason, we still became involved in the case by recommending counsel for appointment to the Court and providing resource assistance.

Q And what was your duty specifically there?
A Actually similar to what I do now. I was consulting on mitigation issues, helping lawyers find mitigation specialists to work on their cases, brainstorming the mitigation and mental health issues and, again, we also did a lot of training.
Q After New York, what was your next position?
A After New York, it was this position.
Q I'm sorry. Before New York.
A Before New York, from 1990 to 1995, I was at the California Appellate Project in San Francisco.
Q And when did you first begin working on capital cases?
A 1980.
Q And in what position?
A That was in a private capacity.
Q And you were an investigator in a private capacity?
A Yes.
Q At the time of Ms. Montgomery's prosecution from late 2004 until the time of the trial in 2007, where were you working then?
A Well, initially I was still with the trial office in New York, the New York Capital Defender Office, and then in the fall of 2005 I assumed my present position.
Q You mentioned that you helped to set up the capital defender office. Please tell us how that staffing happened.
A Yes. You know, New York had not had a death penalty

for decades; and so when the office was created, they hired as the capital defender the head of the office, a New York lawyer who had had death penalty experience in Alabama, and he very consciously wanted to bring in people with death penalty experience as well as recruiting strong local lawyers. So we hired people who had worked in Alabama, Florida, Georgia. I came from California. Other people from North Carolina, South Carolina, and Texas. And that was important in sort of establishing staffing ratios and, you know, how we organized case teams. We hired as many nonlawyers as lawyers for this trial work.

So, in other words, for every potential case we wanted to be sure we had a team of two lawyers, a mitigation specialist, and a fact investigator; and that was just the consensus of the people who had capital experience, you know, wherever they were.

Q When you say "wherever they were," you mean the lawyers that came from all these different parts of the country all agreed that was the right staffing ratio?

A Yes. We didn't look at a book. We talked among ourselves and there was consensus that was what was required.

Q During the period of the prosecution of Ms. Montgomery and during her trial, whether you were in New York or in Oakland, were lawyers across the country reaching out to you asking questions about mitigation investigation?

A Yes.

Q During that time, did you have any contact with Missouri practitioners regarding mitigation investigation?

A Yes, certainly.

Q What about the concept of defense teams? Did people reach out to you when they were forming their team for advice on that?

A Yes.

Q Have you attended continuing legal education programs dedicated to topics related to the death penalty?

A Yes, since I began working with death penalty cases in 1980.

Q Have you also served as faculty in those kind of programs?

A Yes.

Q Do you have any idea how many times you've been faculty --

A It's in excess of 350 times.

Q Were those trainings national, regional, at the state level?

A I guess all of the above. There are a number of national programs in which I regularly served as faculty. The NAACP Legal Defense Fund had an annual program that invites people from all the death penalty jurisdictions to try to bring them up to date on current developments. I've helped in the

planning of that program for many years and served on the faculty there.

And then the sort of national organization of public defenders known as the National Legal Aid and Defender Association has had a program called Life in the Balance. It takes place in different locations from one year to the next. But I participated as faculty there for many years.

The organization of the private defense bar, the National Association of Criminal Defense Lawyers, for the past 15 years or so has had a program called Making the Case for Life, which is very focused on mitigation issues, and I've participated in that program as well.

In California from the time that I started working on death penalty cases I attended an annual program called the Capital Case Defense Seminar, which started out as just a statewide program but has really expanded because of its reputation to actually attract national attendees, and that program is now attended by over a thousand up to 1,200 practitioners every year, and for six years I was a co-chair of the planning committee of that seminar.

Q I know from our conversations that to ask you in what states you've participated in CLE is virtually to invite an alphabet song. Is it just fair to say that you have participated in being faculty and CLE in virtually every death jurisdiction in the country?

A Yes, with a couple of exceptions.
Q What about training programs related specifically to the federal death penalty?
A Yes. I participate regularly in all the programs organized by the federal death penalty projects, so there is an annual strategy session for federal death penalty prosecutions. There's also what's called an authorized case training which is more of a bring-your-own-case brainstorming session.

And then the habeas assistance and training counsel project has an annual national habeas corpus conference, an annual conference on mitigation evidence. So it covers substantive developments in the areas of mitigation.

We also have a mitigation skills program which I helped to design, and that's designed kind of in keeping with the Spencer Report to increase the capacity. So we invite, first of all, the staff from Federal Defender offices to participate in that program, and that's an interactive program where people have simulated interviews around a case hypothetical. They review records collectively to extract information that should be followed up on in an actual case. The Habeas Assistance Program has also just a general postconviction skills seminar. I serve on that faculty as well.
Q Thinking more about the state of Missouri, have you done any training here?

A Yes.
Q How often?
A I don't recall the exact number, but I counted it up at the time I did my declaration. It's been a few since then. I think it's about ten times.
Q What about trainings related to the federal death penalty cases but here in Missouri? Have you done trainings here in Missouri related to federal death penalty cases?
A We've done the mitigation skills program in Missouri and have people who are working on federal death penalty cases. We've had the federal strategy session here.
Q I think you mentioned that often you're one of the hosts of these different skill seminars. Have you helped plan CLE trainings?
A Yes, absolutely.
Q Can you give the Court some examples? We don't need to go through them all.
A Well, again, I was the co-chair for six years of the California program, which is, you know, a half dozen plenary sessions for the thousands of attendees, and then kind of a smorgasbord of workshops. I think we have about 80 simultaneous workshops, everything from forensics to jury selection and mitigation, mental health issues.
Q Turning to publications, have you published articles related to mitigation investigation?

A Yes, I have.
Q I know that we're going to discuss some of them in some detail, but if you would just give the Court a few examples, maybe some of the older ones.
A Yeah. In the 1990s I wrote a few articles for the publication of the National Association of Criminal Defense Lawyers, The Champion. One was just kind of generally mitigation evidence in death penalty cases. It was followed by a piece on mental disabilities and mitigation.

I also wrote something for the National Legal Aid and Defender Association publication, Indigent Defense, called Why Death Penalty Cases Require Mitigation Specialists.

MS. HARWELL: If I could just drop a footnote for the Court. Mr. Stetler's just referenced Exhibit 106, Exhibit 107, and Exhibit 123.
Q (By Ms. Harwell) Have you published anything -- you mentioned the article on mental disabilities. Anything else specifically related to mental health in capital cases?
A Yes. I published something in the UMKC Law Review on capital mental health assessments and prevailing norms. That was published in 2014.
Q I think we'll discuss that in a moment.

When you mentioned prevailing norms, have you published on the prevailing norms in capital mitigation investigation?

A Yes. I had two articles in the Hofstra Law Review. One is on the ABA Guidelines and prevailing norms. I wrote that with Professor Bradley Wendel from Cornell Law School, and the other is -- that was published in 2013. And in 2015 a shorter piece called the ABA Guidelines: A Historical Perspective, which kind of traced the origins of the ABA Guidelines, and that was written with Aurelie Tabuteau, T-a-b-u-t-e-a-u.

MS. HARWELL: And I'm not totally tracking and keeping up, but, Your Honor, that last one references Exhibit 112.

Q (By Ms. Harwell) Have you published on counsel's duty to seek agreed upon disposition?

A Yes. In 2003 when the ABA Guidelines were revised, there was an issue of Hofstra Law Review where they were published, and I was invited to do an article on the specific issue of counsel's duty to pursue negotiated dispositions for that issue.

Q That's the 2003 edition?

A That's correct.

MS. HARWELL: And, Your Honor, I would note that's Exhibit 108.

Q (By Ms. Harwell) Have you had a role in drafting any death penalty defense manuals?

A Yes.

Q And just to clarify, did you work on any of those manuals prior to 2004?

A Yes. I worked on a California death penalty defense manual in the '90s. It's a multivolume publication. In the early '90s we began including one volume entirely dedicated to medication, and I helped shape that volume. And then when I went on to New York in 1995, I helped to prepare the New York Capital Defender Trial Manual.

Q Can you estimate at this point how many capital cases you've been involved with?

A It's hard to put a number on it. You know, at the beginning when I was working privately and working directly on cases, I worked on a hundred homicide cases from 1980 to 1990 and somewhere between a quarter to a third of those were death penalty cases.

At the California Appellate Project, that was a nonprofit which coordinated the postconviction representation of all the prisoners on the sentence of death in California, and at that time there were already a few hundred. And so I worked on a large number of cases to varying degrees. Some were briefer consultations and others were much heavier direct involvement.

In New York we had over 800 death eligible cases in the time the statute was operative. It required prosecutors to advise our office of any case that was death eligible under the

statute, and so we were involved in those cases until death was taken off the table, and I had a role in hundreds of those cases. Very few of them actually went to trial, but I had a role in a large number of cases there.

Q Fair to say that in addition to the cases that you worked on personally, you supervised investigative efforts in a far greater number?

A Yes. That was true, of course, both in the California Appellate Project and the New York Capital Defender Office.

Q Have you been qualified as an expert in any courts regarding standard of process and prevailing norms in investigations in death penalty cases?

A Yes.

Q Have you testified about these standards of prevailing norms prior to the prosecution of Ms. Montgomery?

A Yes.

Q When and where?

A Actually, I testified in the District Court for the Middle District of Tennessee in 2001. It was a pretrial proceeding. I don't have the dates of all my testimony in any sort of chronological order, but I also testified in Pennsylvania in 2003 where there were issues about the adequacy of funding of death penalty representation. They were only paying $1,000 to the lawyer who was responsible for investigation of the penalty phase. So that was when I was

still working in New York, but I came to Pennsylvania to testify.

Q Have you testified as an expert in capital habeas proceedings such as this one?

A Yes.

Q Under both 2254 and 2255?

A Yes. That's correct.

Q Have you previously testified in this district?

A Yes, I have.

Q In fact, in this court?

A Yes, I have.

Q Were you permitted to testify as an expert witness in each of those courts?

A Yes.

Q In testifying in this type of proceeding is death the main thing you do as a professional?

A No.

Q Has any Court ever found you not to be qualified as an expert in mitigation investigation?

A No.

Q If you would turn in your notebook to the original declaration you filed in this case back in August of 2016. I believe it's Exhibit 47.

A Yes.

Q Is that your declaration?

A Yes, it is.
Q Signed August 17th?
A Yes.
MS. HARWELL: And, Your Honor, subject to the government, I would ask that be formally made an exhibit.
MR. VALENTI: No objection.
Q (By Ms. Harwell) Does that declaration accurately summarize your background, your qualifications, as well as the standards of practice in mitigation investigation?
A Yes.
Q And if you'll look at Exhibit 48. I believe that's a supplemental declaration. And tell the Court when you signed that, please.
A Yes. That was signed two years later, August 24th, 2015.
Q And that also reflects further opinions that you've held in this case; is that correct?
A Yes.
Q If you would look at Exhibit 49. I believe it to be your CV -- or did you provide us your CV?
A Yes. That I don't have in front of me, but I did.
Q But we reviewed it?
A Yes.
Q And it accurately reflects your qualifications?
A Yes.

MS. HARWELL: And, Your Honor, I would ask all those be moved formally as exhibits at this point. And I would tender Mr. Stetler as an expert in investigation and mitigation expert in death penalty cases.

MR. VALENTI: No objection.

THE COURT: Well, all exhibits have been received so I'm not sure you have to formally move to have them admitted, but I guess there is no harm in that other than they're already in evidence.

Mr. Stetler, his experience and knowledge in the field of mitigation is certainly something that I take into consideration.

MS. HARWELL: Thank you, Your Honor.

Q (By Ms. Harwell) Let's discuss the prevailing norms and the development of mitigation evidence in capital cases in the relevant time period from 2004 to 2007. You previously identified Exhibit 47 as a copy of your declaration. I just want to be clear that everything that we address is addressed to that relevant time period, from the time of Ms. Montgomery's arrest in 2004 through her trial in 2007.

A Yes. That's correct.

Q You state in your declaration that the importance of investigating mitigation cases thoroughly in capital cases was stressed at defense seminars you attended going all the way back to the 1980s; is that correct?

A Yes.

Q In paragraph 16 of your original declaration you mentioned law review articles going back as far as 1979?

A That's correct.

Q I believe that's Exhibit 113. Stressing the importance of investigating a client's childhood and traumatic experiences. As you review the literature, was that an isolated article back that far or were there other articles around that time?

A There is a steady progression of articles I think beginning with that one. The article I refer to was written by Dennis Balske, B-a-l-s-k-e, who was practicing in the south at that time and it was published in Akron Law Review. He wrote a follow-up article that was published in The Champion magazine five years later. The Champion magazine publication of the National Association of Criminal Defense Lawyers had a whole series of articles in the '80s and early '90s discussing mitigation.

There was another significant law review article that gave kind of a grand overview of the importance of mitigation evidence, and that was written by Professor Gary Goodpaster, G-o-o-d-p-a-s-t-e-r, and published in NYU Law Review. I think that was published in 1983. So there was an emerging literature in that period.

And I should add that, you know, we communicate

better today because of the advantages of email and the instant communication that is available to us through list servers, and so forth, but these magazines were important in developing a national consensus on these issues and bringing ideas to the attention of people in multiple jurisdictions.

But what you also saw was the emergence in multiple places of the same idea that was important to have someone dedicated to the life history investigation of the client. There were people who were pioneering this in the South very early. There was a whole group called Team Defense in Georgia, and then we had articles about that program in California published in the California defense bar magazine in the early '80s.

There's a very interesting article published in, again, the California defense bar magazine in 1982, by Lacey, L-a-c-e-y, Fosburgh, F-o-s-b-u-r-g-h, about her work on the first death penalty case that she worked on, and what was interesting is that the lawyer in that case had read a book that she had written about a murder case. She had been a reporter for the New York Times, and he read her book about this murder case and thought she had really done an outstanding job kind of understanding the perpetrator.

So by then she was teaching at the journalism school in Berkeley, and so he went and asked if she would consult on his death penalty case, and it was a very successful

collaboration that she wrote about when the case was over. And, again, that was written in 1982 and gave a summary of the value of having somebody in this unique role of working on mitigation evidence.

Q And I believe that's Exhibit 116. I'm going to ask you to turn to that.

MS. HARWELL: And while you're doing that, I'll let the Court know that the other articles Mr. Stetler mentioned from The Champion are Exhibit 113, 114, and 115.

Q (By Ms. Harwell) And, Mr. Stetler, while you're turning, just to clarify, the articles in The Champion -- The Champion isn't solely a death penalty publication, is it?

A No. It's a publication of the National Association of Criminal Defense Lawyers, the largest defense bar organization in the country.

Q Are you at 116 now?

A Yes, I am.

Q If you would just read into the record the portion you found most significant from that publication regarding the Nelson case?

A Yeah. There are a couple of paragraphs. The first one says, "Just as in a book or a movie, the difference between a portrayal that is flat and bereft of human detail of emotion, and one that is not, spells success or failure, so too an attorney's ability to imbue a whole trial with the emotional

figure of his client may be the difference between life and death.

"Lawyers, however, are sometimes not very good at understanding people, or knowing what drives them or makes them appealing to others, so it may be helpful to call in someone else to fill that function."

She goes on, "Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech, things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. This person should have nothing else to do but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience."

And, again, this is published September, October 1982.

Q And, Mr. Stetler, from your highlighting that article in your declaration, I take it that that article resonates for

you in terms of the task of a mitigation specialist?

A Yes.

Q That article highlighted that there should be one person whose sole job on the team, I think the word was used, to really focus on mitigation. How early was the concept of a multidisciplinary team introduced into capital litigation?

A Well, it was really there from the beginning in some locations, and partly that was simply a response to the Supreme Court's decisions in 1976 that upheld statutes that gave jurors an opportunity to consider mitigating evidence. The cases talked about the need for individualized sentencing in capital cases as not just in like policy but actually a constitutional requirement.

So I mentioned in Georgia there was an organization called Team Defense that sprang up already in the late 1970s that talked about the importance of having multiple people part of the defense in any individual case.

You know, my experience in California sort of mirrored what was talked about here. Lawyers were discovering on their own that it was important to have somebody with the skill sets that were good for life history investigation. They came from a variety of backgrounds; Ms. Fosburgh in journalism, many people who were social workers or people with background in psychology or anthropology.

And, again, people responded around the country in a

similar way. In the state of Ohio they actually had a mitigation department in the public defender's office, and another one of the articles that we've included as an exhibit was written by people from that Ohio office. In 1987 it talked about mitigation specialists as absolutely critical in death penalty cases.

Q I believe that's attached as Exhibit 117. If you would turn there. You said that was published in 1987. If you could read what that article had to say about the team approach.

A Yeah. It's published June 1987. I'll just read the last couple sentences in conclusion. It says, "The mitigation specialist is a professional who, as attorneys across the nation are recognizing, should be included and will be primary to the defense team. Obviously, there are no guarantees for a sentence less than death, but proper utilization of the team approach and the mitigation specialist will greatly increase the likelihood of a successful mitigation and a life sentence."

And, again, the authors were at least all originally from the Ohio Public Defender Office. One of them was the head of what they called the mitigation specialist department, so it's already in the parlance at that time.

Q And in paragraph 19 of your declaration you discuss sort of in detail five different cases from the United States Supreme Court where trial counsel were found to be ineffective for failing to investigate potential mitigation evidence. I

believe those were Williams, Wiggins, Rompilla, Porter, and Sears. I think some of those cases were decided after Ms. Montgomery's trial, but do you know when those crimes or prosecutions occurred?

A Yes. The Terry Williams case decided in 2000 by the Supreme Court was tried in Virginia in 1986. The Kevin Wiggins, W-i-g-g-i-n-s, case was decided in 2003 but tried in Maryland 1989. The Rompilla case, R-o-m-p-i-l-l-a, was decided in 2005 but the trial was in Allentown, Pennsylvania, I believe in 1988. And then there were two cases that were decided by the Supreme Court after the Montgomery prosecution. Porter v. McCollum case in Florida decided in, I believe, 2009 but that was tried also in 1988. And the fifth was the case of DeMarcus Sears in Georgia and decided in 2010 but the case was tried in 1993.

Q After directing you that we were going to focus on things relevant to from 2004 to 2007, we've taken a bit of a step back for historical perspective. Fair to say that all of the things you've just discussed, the publications and the Supreme Court cases, reflect that it was known in the nation that mitigation was important well before 2004?

A Yes, absolutely. And you mentioned early in this discussion the Spencer Report that was published in 1998, and in that original report Spencer had a very interesting discussion of that issue specifically in relation to the

federal death penalty.

Q I believe that we've attached that report as Exhibit 120. If you don't mind to turn to that. What did that report say with regard to mitigation specialists?

THE WITNESS: Your Honor, I apologize. This is a little difficult to follow because it was never published with page numbers, but there is an initial section called Roman Numeral I, Analysis and Findings, and under Section B, Factors Affecting the Scope and Cost of Defense Representation, Arabic Numeral 7, Importance of Experts and Their Costs, there's a discussion of mitigation specialists.

A It says, "Mitigation specialists typically have graduate degrees, such as a Ph.D. or master's degree in social work, and have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary materials for them to review. Although most often they assist counsel in assembling and interpreting the information needed in the penalty phase of a capital case, in some cases mitigation specialists are also called to testify about their findings.

"Without exception, the lawyers interviewed by the subcommittee stressed the importance of a mitigation specialist

to high quality investigation and preparation of the penalty phase."

Q (By Ms. Harwell) Did that committee also form some recommendations and make commentary with regard to those recommendations?

A Yes. The second session -- section of the report, Roman Numeral II, Recommendations and Commentary, returns to the area of experts under Arabic Numeral 7, and they recommended creating salaried positions for mitigation specialists in Federal Defender offices.

The commentary says, "Penalty phase investigators, or, quote, mitigation specialists, unquote, as they have come to be called, are individuals trained and experienced in the development and presentation of evidence for the penalty phase of a capital case. Their work is part of the existing, quote, standard of care, unquote, in a federal death penalty case." And then it refers back to the section that I read a moment ago. "Because the hourly rates charged by mitigation specialists are lower than those authorized for appointed counsel, employment of a mitigation specialist is likely to be a cost-effective approach to developing the penalty phase defense.

"Mitigation specialists are, however, in short supply. In most of the federal death penalty cases the subcommittee examined, penalty phase investigators were not

available locally. Courts thus were required to pay for the costs of travel and related expenses in addition to paying the mitigation specialist's hourly rates." So then it goes on to say that their recommendation is that development capacity is within Federal Public Defender offices.

Q And you said that the Spencer Report was written by a subcommittee of the Defender Services Committee?

A That's correct.

Q And then made these recommendations to whom?

A To -- well, first, to the Defender Services Committee which oversees the implementation of the Criminal Justice Act or oversees the whole Federal Public Defender program and the system of appointment of counsel, but then it was ultimately referred by that committee to the Judicial Conference of the United States, and the Defender Services Committee approved it in May 1998, and the recommendations in the report were adopted by the Judicial Conference of the United States on September 15th, 1998.

Q In paragraph 21 of your declaration you discuss what we've labeled as Exhibit 86, the 1989 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Will you discuss with the Court how those guidelines came into existence and what they are intended to reflect?

A Yes. The American Bar Association has historically had an interest in standards, not just for the defense function but

for the prosecution function, and obviously criminal justice is just one area that the American Bar Association sometimes considers. Its members are much more diverse than people just working in criminal justice.

But beginning around 1980 they had standards for criminal justice, the prosecution function and the defense function, and these standards were meant to apply to all cases, not just death penalty cases, but any kind of prosecution. In fact, these standards were cited by the U.S. Supreme Court in one of the death penalty cases that I mentioned, Williams v. Taylor, the case from Virginia decided in 2000. It was cited also in Strickland v. Washington when Justice O'Connor was trying to look at what were appropriate norms at that time. But those standards just related to ordinary, all varieties of criminal defense.

There was an early recognition that death penalty defense was particularly complex and the famous language of the Supreme Court itself, "death is different." So working with the public defenders around the country, the American Bar Association has a committee on legal aid and indigent defense, and they encouraged the national association -- the National Legal Aid & Defender Association to develop standards in death penalty cases. Again, that's the organization of all the public defenders around the country, and they in turn wanted standards to recommend to their memberships in all different

states who is qualified to handle a case.

So initially they focused on appointment standards, then they published those in the mid '80s. They revised them somewhat and called them Appointment and Performance Standards, then transmitted them to the American Bar Association to the standing committee on legal aid and indigent defense. They then ran the draft by various other ABA sections, section on individual rights, so forth, and so the ABA committees that were part of the review process made their own revisions; and, most importantly, they changed the nomenclature from standards to guidelines, and so the Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases was published by the ABA in 1989.

Q You highlight that change from standards to guidelines. What was the significance of the different nomenclature?

A Well, they wanted to say that these were really to be followed and they were not aspirational. They were a reflection of the practices of that time.

Q Your declaration also references the 2003 revision to these guidelines, which is Exhibit 103. What was -- what happened between '89 and 2003? How were those guidelines modified?

A Well, the capital defense work is dynamic. In other words, it isn't one set of practices that people learned in 1980 or '85 or 1990 that entitles them forever to be

appropriately qualified for handling death penalty cases.

There have been tremendous advances in our knowledge of mental health issues, for example. Tremendous advances in what we've learned about how jurors make decisions, how they process mitigating evidence, and how they, you know, struggle with these issues in the penalty phase deliberations.

So the practice has continued to evolve, and the American Bar Association put together a committee to update the standards between 1989 and 2003, and the 2003 Guidelines did not deviate from anything that was expressed in 1989, but they discussed the issues in more detail in the black letter guidelines. And then there is a very extensive, I would say, encyclopedic commentary that accompanies the guidelines that just cites to the cases that have been decided that are relevant to the guidelines, the social science empirical literature which influenced the changes that are reflected in the 2003 Guidelines.

Q Were there changes in the 2003 Guidelines with regard to the staffing of a case?

A Yes. I would say -- and we can get back to all of these, but I would say there are perhaps four significant changes between 1989 and 2003. One is about staffing the defense team in death penalty cases. Another is about workload. A third is the duty to seek dispositions in death penalty cases. And the fourth is, you know, in the area of

investigation. They just say a lot more about the importance of investigation.

On staffing there are two different sections. One addresses staffing from the point of view of whatever governing authority is responsible for indigent defense, because all these cases involve people who don't have the money to hire lawyers, and so from the point of view from the governing authority they say the governing authority should appoint a full team of two lawyers, a fact investigator, and a mitigation specialist, and then it adds someone on the team should be qualified by training and experience to screen for mental disorders and impairments, either one of these four people or someone in addition.

The same language is repeated from the perspective of the individual lawyers assigned to a case. So it's not just some abstract authority that's responsible for staffing, but individual lawyers are supposed to consider that their team has all of those members.

Q And you said that the 2003 Guidelines address workload limits. What was the distinction from '89 to 2003 in that regard?

A Well, I think it was just a recognition that in addition to having a full team, you wanted to have people who could devote the amount of time required; and, again, the workload provision is in there twice, once to remind the

governing authority, you know, don't have the same lawyer handling all the cases because if they've got too many cases, they're not going to be able to do the appropriate job.

And then also from the point of view of the lawyer. When you look at yourself in the mirror in the morning, you should understand that you have to be able to devote adequate time to each individual death penalty case because of the seriousness of the stakes, and they use workload rather than caseload because you can't -- there's no cookie-cutter approach to these cases. Every case is different. Some are much more complex than others. So they avoided saying how many cases were appropriate to handle, because one case may be all that a lawyer could handle in a given time frame because of its complexity.

Q You also indicated that the 2003 Guidelines addressed the standard of seeking an agreed-upon resolution to the case?

A Yes.

Q What did they say about that?

A Well, it's an extensive discussion of the importance of seeking a resolution and, you know, commentary discusses how many cases have actually been resolved, and the major change between 1989 and 2003, I believe, was to make the point that you didn't need to wait for a capital client to say, Please seek a negotiated plea for me. It was counsel's duty to explore that; and if the client was initially uninterested or

even opposed, if that was the lawyer's best advice, that was the best route to a successful outcome, then counsel should try to continue persuading the client to see that was appropriate.

And, similarly, if the prosecution was initially saying, No deal is available, the guidelines encourage lawyers not to give up but to continue to seek an agreed-upon disposition.

Q In the same vein in terms of the duty on counsel under the prevailing norms at the time of the publication in 2003, was there a duty on counsel to investigate regardless of the client's wishes?

A Yes. That's exactly what the guideline on investigation says, both as to guilt phase and as to penalty.

Q Have you written anything on the topic of the 2003 Guidelines?

A Yes. I did that article on the plea issue, and that was in part because we had been very successful in that area at the New York office that I was part of. Of the hundreds of cases that were death eligible, many were resolved by plea, probably overwhelming majority. We made repeated approaches to prosecutors to try to persuade them to de-authorize the case, not to seek the death penalty. We had great success in that area. It was not something that was specific to the statute, but we just adopted a practice of talking to people, sharing information.

We -- you know, the federal death penalty has a more formal procedure for authorization because it ultimately needs approval from main Justice in Washington. We didn't have that centralized decision making in New York, but we met with local prosecutors, whether it's the district attorney himself -- because they were almost all men at that point -- or sometimes it was with a team of senior prosecutors, but we shared information about why death might not be appropriate in the case. And prosecutors under the New York statute had a 120-day decision-making period to decide whether they were going to go forward, and in a large number of cases we persuaded them that death was not required.

Q I believe you indicated that's your 2003 Hofstra Law Review article?

A That's correct.

MS. HARWELL: And I believe that's Exhibit 108, Your Honor.

Q (By Ms. Harwell) Were there other articles in that same law review that were relevant to the guidelines?

A Yes. Jill Miller, who was a mitigation specialist from Madison, Wisconsin, did an article on the defense team; and, again, this was one of those provisions of the guidelines that were particularly important in the 2003 revision. She's a very experienced mitigation specialist who had actually worked on a number of federal death penalty cases from the very beginning,

and before that she had worked in state court cases in Illinois and multiple other jurisdictions.

And then the third article, besides hers and mine, was just about mitigation specialists, and that was written by Pamela Blume Leonard who was then the director of mitigation at the Georgia Capital Defender Office, and hers was, I think, called, "A New Name For an Old Profession" or something. I'm garbling the name, but it was just about the importance of mitigation specialists.

MS. HARWELL: And for the Court, I would note that those are Exhibits 104 and 105.

Q (By Ms. Harwell) Did you write any articles that were actually cited in the commentary to the 2003 Guidelines?

A Yes. I think the articles I mentioned earlier that I wrote for The Champion and also for the NLADA publication, Indigent Defense, were in the footnotes.

MS. HARWELL: That's Exhibits 106, 107, and 123.

Q (By Ms. Harwell) I believe you were subsequently involved in developing the supplemental guidelines for the mitigation function of the defense teams in death penalty cases that was published in 2008; is that correct?

A That's correct.

MS. HARWELL: We've attached that as Exhibit 87.

Q (By Ms. Harwell) Could you discuss the lag time between the development of the practice reflected in

supplementary guidelines and their publication?

A Yes. The drafting process was about 40 years.

Q Why is that?

A Well, after the 2003 revision of the ABA Guidelines and the 2003 United States Supreme Court decision in Wiggins v. Smith, which was actually the first Supreme Court decision to refer directly to the ABA Guidelines and which also recognized the importance of the nonlawyer who had gathered the information that was persuasive on the prejudice issue in postconviction, after that decision and after the revision of the ABA Guidelines, there was a lot of interest in more detail about what the mitigation function involved. So an informal committee was established to work on supplementary guidelines for the mitigation function.

We first extracted from the ABA Guidelines which were the relevant sections that should be further developed and enhanced, and there was a very modest staff that polled death penalty practitioners in every jurisdiction and asked them, How do you do mitigation in Arkansas, Tennessee, California, wherever? So they gathered that information. And then as we put together a draft, and I was part of the original drafting committee, you know, we pulled things out of the ABA Guidelines and then added to it based on the input we were getting from around the country. We then circulated the drafts at training programs.

So, again, I've done a lot of capital defense training programs. I indicated earlier some of these national programs, one sponsored by the NAACP Legal Defense Fund, the NLADA, and the NADCL programs, and all those programs we had discussions on standards, and we circulated these drafts and got feedback, and there were clear consensus on some issues, occasional disagreements on others, but we ironed those out to produce a satisfactory document that really did reflect the best practices of people involved in the mitigation function, and that was mitigation specialists and lawyers from all over the country.

And then when we finally had a satisfactory draft and we were not getting suggestions for changes any longer, then it was ready and was provided to Hofstra Law Review for publication in 2008.

Q You've already mentioned that the Supreme Court in Wiggins discussed the ABA Guidelines. Were there other instances of the Supreme Court referring to the guidelines?

A Yes. Interestingly, the Wiggins case, as I mentioned earlier, concerned a trial which occurred in 1989 and the Supreme Court used the ABA death penalty guidelines that were published in 1989 to critique what had not been done in that case, and I think that's an important observation because the guidelines as published in 1989 were not aspirational. They were not saying, From now on this is what lawyers should do.

They were really meant to reflect what the prevailing norms were at that time, and the Supreme Court used those 1989 Guidelines to assess the performance of the public defenders in Baltimore in Mr. Wiggins' case.

In 2005 -- the 2003 Guidelines were published the same year. The Wiggins case came out a couple months later, but they were really not appropriate to apply retrospectively to a case that had been tried in 1989.

But in 2005 in the Rompilla case the Supreme Court did acknowledge the various editions of the criminal justice standards, the 1989 Guidelines, and the 2003 Guidelines. So there's one footnote that kind of talks about all the different iterations of the ABA Guidelines, but all reiterating the central point that there is a duty to conduct thorough investigation.

Q Has the Supreme Court ever criticized the way lower courts have used the ABA Guidelines?

A Yes. The Supreme Court in the Bobby v. Van Hook case in 2009 chastised the Sixth Circuit for applying the 2003 Guidelines without pausing to see whether they really were the standards at the time of Mr. Van Hook's trial, and they also criticized the Sixth Circuit for treating the guidelines as inexorable commands. They're not ten commandments. They are guidelines.

Q So what's the bottom line? What value do the ABA

Guidelines have in assessing trial courts' performance?

A That's an important question, and I think Justice Stevens in a non-capital case gave the best template for answering. In the case of Padilla v. Kentucky, which was about the collateral consequences in immigration for criminal pleas, he said -- he sort of outlined all the things the Court should look to in deciding what prevailing norms were in the criminal defense area, and he said, We've always looked to ABA standards and the like because there's really nothing comparable. There's no alternative to these ABA standards and guidelines. They really are probably the best articulation of what the consensus is that's developed in these areas.

And then Justice Stevens went on to say, We looked at law review articles, criminal defense manuals, training conference materials, the publications of the criminal defense bar. He specifically cited an article from The Champion. But it's a very thorough list.

And then subsequently in the capital case of Hinton v. Alabama the Supreme Court quoted Justice Stevens' analysis and actually quoted the first couple sentences verbatim. So I think that's the bottom line.

Q And is that the model you try to use when you're asked to be an expert in these sort of cases to look at all those sources of information --

A Yes.

Q -- in terms of the standards?

Incidentally, you mentioned both in your declaration and then here today these five cases; Wiggins, Williams, Rompilla, Porter, and Sears. Do you know what the resolutions were in any of those cases?

A I believe the Sears case is still pending, still being litigated in Georgia. The other four cases were all resolved for sentences less than death.

Q Was there any common denominator in those cases of why those cases were reversed?

A Yes. They all had important mental health evidence that was missed at the time of trial.

Q And in any of those cases did lawyers consult with mental health experts?

A Yes. Three of those cases there had been mental health experts consulted at trial. In the Wiggins case there was a forensic psychologist who had done IQ testing. In the Rompilla case there were three different local mental health experts who had interviewed Mr. Rompilla. I think some of them may have also interviewed his family members. And in Mr. Porter's case I think there was a tape recording of an expert's clinical interview or mental status examination that was played at trial.

So the experts had been involved. But in all of those cases it was the depth of the mental health inquiry that

was ultimately at issue and the fact that the experts had not been provided all of the relevant data for a more accurate and reliable determination.

Q Turning back again to the ABA Guidelines a little bit more. Has the federal judiciary adopted or addressed the ABA Guidelines in any way?

A Yes. Actually just at the beginning of this month the Judicial Conference of the United States in the model CJA plan that was just adopted has a reference to the ABA Guidelines.

Q We provided that to the Court as Exhibit 88?

A Yes. This is the Guide to Judiciary Policy, Appendix 2A, the Model Plan for Implementation and Administration of the Criminal Justice Act, last revised October 3rd, 2016. So this was approved by the Judicial Conference of the United States just the beginning of this month.

On page 28, paragraph 9, it says, "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guidelines 1.1 and 10.2 et seq., and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases."

Q And which version of the ABA Guidelines were in circulation at the time of Ms. Montgomery's trial?

A The 2003.
Q In paragraph 24 of your declaration you discuss the relationship between the mitigation investigation and reliable mental health evaluations, and we were sort of getting into that talking about the Supreme Court opinions. What, in your expert opinion, is the relationship between the investigation and the reliability of the evidence that comes from mental health experts?
A Well, mental health issues have always been important in death penalty cases, and I think what we have learned over the years is that the mitigation investigation is really a critical foundation for consultation with experts. It helps you figure out what kinds of experts, not just random experts, but what sort of specific experts are appropriate to the needs of your case in terms of what you have learned about your client in the social history investigation; and, in turn, the expert's opinion is only going to be as reliable as that underlying investigation. In other words, an expert who simply comes in, meets the client, and relies on the client as the principal source of information is going to be very effectively cross-examined.

So the more you can provide an expert with hard data from convergent sources; from interviews, from documentary evidence, contemporaneous evidence that was created during the life of the -- or the developmental years of the client, that's

going to make for more credible and more reliable mental health opinions.

Q Did you cite the Court to any articles that support your opinion in that regard?

A Well, yes. I believe the one that's relevant in this time frame was the one by Liebert and Foster, L-i-e-b-e-r-t. They are two mental health professionals in California who did an article for the American Journal for Forensic Psychiatry on standards in death penalty cases, and that was published in 1994. One of the authors is a psychiatrist and the other a psychologist.

MS. HARWELL: That's Exhibit 118.

Q (By Ms. Harwell) Have you also published on this topic?

A Yes, I have.

Q What did you write about?

A I wrote about this for the University of Missouri-Kansas City Law Review in 2014, really summarizing what some of these cases had said but what multiple authors have said on this issue. There's another article published along with the supplementary guidelines on the defense function in 2008 Hofstra Law Review by Dr. Richard Dudley and Pamela Blume Leonard called "Getting it Right," and it stresses the importance of the social history investigation as the foundation of reliable mental health assessments.

That article also is very good in its discussion of referral questions. In other words, the lawyer's ability to frame what question is appropriate for the mental health expert to address. In other words, it's not the traditional narrow forensic questions of competency and insanity. Mitigation is as broad as can be. So there is no need for a mental health expert testifying in a penalty phase to force a diagnosis, to kind of categorize the client in terms of particular, you know, insurance categories. We're not talking about, How would I build this if I were treating the patient? It's a very, very broad opportunity to say, How does this person function? What are the things which influence the individual's development? What are the multigenerational influences? What was encoded in the DNA on both sides of the family? As well as, What were the learned behaviors from the patterns of behavior that occurred on both sides of the family?

MS. HARWELL: I believe that's Exhibit 97, the article that Mr. Stetler was just referencing.

Q (By Ms. Harwell) Mr. Stetler, what scholarship is there on how jurors look at expert testimony?

A Well, there's a robust empirical literature on that issue. There's a social science study called the Capital Jury Project. It began in 1991. It was initially funded by the National Science Foundation and they interview real jurors who have sat in death penalty cases. Some that turned out to be

death sentence cases, other jurors came back with a sentence of life without parole.

They used structured interviews so every juror in all these multiple jurisdictions is asked the same questions. Some of them are forced-choice questions where you are going to just have to say A, B, C, or D or yes or no, and others gives jurors an opportunity to say in their own words how they were processing information, and they've now interviewed over 1,200 jurors from multiple cases around the country, and the State University of New York at Albany is the repository for their research. If you go to their website, they have all of their publications that have been summarized in mainly law review articles, but occasionally books and dissertations.

And one of the significant findings is that there's an article written by Professor Scott Sundby, S-u-n-d-b-y, who teaches at the University of Miami, and based on his interview he concluded that it's very dangerous for capital defense lawyers to rely on isolated experts that, you know, jurors will reduce things to the battle of the experts and they canceled out -- it's not going to work for you in mitigation, and what Professor Sundby is saying does not reject the use of expert testimony but simply says it has to be very, very well corroborated by lay witnesses, historical experts, people who knew the client in the pre-offense years who can talk about how particular events affected the individual's functioning and

shaped their adult life. So that's one.

Another, you know, I think equally relevant article also by Professor Sundby talks about how there's a need to integrate the two phases of a capital trial and how a first phase defense that denies responsibility doubles the likelihood of a death sentence; and, again, that's just based on the empirical feedback from jurors.

Q Let's talk a little bit about the corroborative data that Professor Sundby found so important. In paragraph 25 you discuss the importance of records collection. Have any of the Supreme Court decisions that you mentioned also referenced the importance of records?

A Yes. Two of them in particular. In Williams v. Taylor, case from Virginia that was decided in 2000, one of the social service records was so powerful that the Supreme Court dropped it into a footnote, Footnote 19, in that opinion, and what's powerful is here's an outsider, someone working for the Department of Social Services comes to the house and observes what's going on and just writes it up in a DSS report, and I can't quote it absolutely word for word but something like, The home was a complete wreck. There were places on the floor where someone had a bowel movement, puddles of urine, dirty dishes in the kitchen. The children were unclothed and the parents were too drunk to find the clothes and too drunk to put the clothes on the children. And in the end the children,

including Terry Williams, a later capital defendant, had to be taken to the hospital because they were under the influence of whiskey.

So it's a vivid example of the importance of records. And it also to me illustrates a story that you couldn't get just from interviewing the defendant and the family members. Here's a child that was under the influence of whiskey. He's not going to have a very good recollection of what happened, and the parents were totally intoxicated. All they're going to be able to tell you about that incident is, The neighbors called the police on us and we were in jail for the weekend. But that vivid outside report was absolutely critical.

In the Rompilla case from Pennsylvania, the public defenders spent time with the client. They visited Mr. Rompilla repeatedly. They brought in those three experts. So there were a lot of interviews and there were interviews with family members, and the Supreme Court documents Mr. Rompilla wasn't very interested in mitigation. Everybody said things were normal in the family, and the experts sort of accepted that because they had nothing else.

In that case there was a prior conviction that was going to be used in aggravation that the public defenders didn't bother to collect from the courthouse; and when the postconviction lawyers pulled that file, they found presentence

reports that gave a completely different picture of that family and of Mr. Rompilla. He had a third grade level of cognition after nine years of schooling. There was schizophrenia running in the family, possible intellectual impairment, domestic violence. One parent had stabbed the other. So a whole rich picture that came only from those records that the trial lawyers had failed to collect.

Q You mentioned that Mr. Rompilla's family wasn't forthcoming with this information. I believe in your declaration in paragraph 26 you talk about barriers to disclosure. Can you tell the Court what you mean by that term and how you overcome those barriers?

A Yes. Actually, it is sort of a two-part answer. There is some sensitive subjects that we all are reluctant to discuss with strangers. We meet somebody for the first time and they want to talk about our first sexual experiences. You know, we're not likely to open up on those subjects or the things that we're just ashamed of in our background, how poor the family was, or the marital problems of parents or grandparents or whoever else it might be. So some of that is kind of normal psychological mechanisms that we all share. But then, in addition, all the things that define who we are socially; our religion, politics, education, age, gender, class, we don't share those with most of the people that we represent. Of course, race and language, culture can be, you know, the most

important additional barriers.

And so it's a two-step process to overcome those barriers. One is to -- that we can't change who we are. I'm always going to be an old white man; but if I've got a client from another race, another gender, another culture, I'm going to recommend that we include in their team diversity so that we'll have personnel who will help bridge those human connections.

But bottom line also is that as Ms. Fosburgh said in that article that I read much earlier, it takes a lot of time and patience. It means having a skilled listener as the person who spends the most time with the client, who listens non-judgmentally and begins to develop the rapport and trust needed to elicit sensitive information, and that's why the supplementary guidelines talk repeatedly of the need for multiple in-person, face-to-face, one-on-one meetings, not just with the client but the mitigation witnesses that were interviewed.

MS. HARWELL: Your Honor, I'm unfamiliar with the Court's procedures. Does the Court normally take a morning break at all?

THE COURT: Yes.

MS. HARWELL: We're about to turn to new subject matter, and I thought it might be the most natural place for me to take a break.

THE COURT: We'll take a recess for 15 minutes. And, you know, I'm somewhat flexible on it, but I'd kind of like to go to 12:30 before we break for lunch if it works with the witnesses. So that's what we'll shoot for.

MS. HARWELL: Thank you for letting us know.

(Recess taken at 10:40 a.m.)

THE COURT: Ms. Harwell, you can proceed.

RUSSELL STETLER resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MS. HARWELL:

Q Mr. Stetler, turning now to your review of Ms. Montgomery's case with some particularly. When were you first contacted about Ms. Montgomery's case?

A I don't recall the exact date, but it was a few months before I wrote the declaration that was signed in August of 2013.

Q And what did you review prior to signing your declaration in 2013? Please refer to the declaration if you need to.

A I reviewed the Eighth Circuit opinion, which kind of gave me an overview of what the case was about. I reviewed the penalty phase testimony. I reviewed the declarations of the members of the initial trial team who had provided them, as well as the declarations of the people from your office who were witnesses to the interviews with Mr. Duchardt and Mr. Ninemire.

So I think the interviews -- declarations from the three mitigation specialists; Lisa Rickert, R-i-c-k-e-r-t, Holly Jackson, and Dani, D-a-n-i, Waller, W-a-l-l-e-r, Judy Clarke, C-l-a-r-k-e, Susan Hunt, David Owen, and then the lengthy declaration of Jan Vogelsang, V-o-g-e-l-s-a-n-g, with multiple attachments which were, in some cases, original interviews from the pretrial period and, other cases, subsequent declarations.

Q Mr. Stetler, as you sit here, you say you read through Ms. Vogelsang's report and attachment. Are you purporting to be conversant in all the attachments --

A Not at all.

Q -- to the report? Did you also review the report of the government's expert, Park Dietz?

A Yes, I did.

Q Are you now prepared to give your expert opinions regarding the performance of Ms. Montgomery's trial counsel?

A Yes, I am.

Q In your opinion, did the mitigation investigation performed in Ms. Montgomery's case comply with the prevailing professional norms that existed in 2004 to 2007?

A No, it did not.

Q Let's get into the particulars of why you hold that opinion.

You indicated in your 2013 declaration that the

defense team had ample time and ample resources for investigation of the penalty phase, but you pointed to several problems that you felt compromised their functioning as a team. Would you tell the Court what problems you identified and the effects that you saw on the work performed?

A Yes. This is an unusual case in the number of people who were involved. There was a lot of turnover at the beginning and, you know, within that pattern of turnover some very significant women involved in the case left, and I think that relates back to what I was talking about earlier in terms of barriers to disclosure and things that make it hard to establish the trust and rapport that you need to elicit information.

There's also in the specific area of the mitigation specialist's work, you know, we talk about multiple interviews but we contemplate multiple interviews by the same person. In other words, if I wanted to develop rapport with a witness, I'm going to see that witness repeatedly until we have sufficient trust established and I can see the witness at a time when no one else is home or we can go down to the corner diner and sit quietly so that it really is a one-on-one interview. I want to do that multiple times until we have absolute real ability to share with one another.

In this case the turnover meant that you had what is often referred to as witness fatigue, a brand-new mitigation

specialist asking the same questions about the same issues. I've already told somebody else about this. I'm uncomfortable getting back into those discussions.

Q Let me stop you right there. In your experience, is it actually worse for a witness to encounter a new mitigation person after they've already disclosed something to one person, or does the second person come in in the same position as the first person?

A It can be worse and it certainly is awkward when all of a sudden, you know, you pour things out to one person and another stranger appears and you don't know what happened to that first person. They're gone.

You had Ms. Rickert in the case for seven, eight months, and then Ms. Jackson came into the case afterward. You had Anita Burns from the Federal Public Defender Office involved initially. I should back up and say that in fact this case already started with jurisdictional issues, and the first lawyer that the client met was from Kansas, from the Kansas Federal Defender Office; and then it was obvious to that lawyer that there were mental health issues that needed, you know, some quick observation, not diagnosis, not something sophisticated, but brought in a local social worker, Mr. Dillingham, who saw Ms. Montgomery a few times and memorialized his own observations and some starting hypotheses both about what needed to be explored.

Then we go from the Kansas team to a Missouri team. Ms. Burns is involved in the case, and then she goes away for a brief time and returns and is essentially replaced by her supervisor, Mr. Owen. They've been working with Ms. Rickert, but by the time Ms. Rickert gets down here to work with the lawyers, things have changed.

It's now Mr. Owen and not Ms. Burns, and Susan Hunt had been brought in. And then there's concern about the need for somebody on the team with more mental health experience than they had, and at that point Judy Clarke is brought in for a period of time, and then along with her she has people who are working with her. And then they leave the case. Not long after that Ms. Hunt leaves the case. Then Mr. O'Connor and Mr. Duchardt are finally appointed for, you know, the last, whatever, 18 months or so.

So there's a lot of turnover and that creates potential issues and problems, and I don't know how much communication there was between the final team and all the predecessor members. I mean, you really wanted to absorb all the knowledge that all these other people had, but I didn't see that that really had been accomplished in this case. There were a couple, you know, phone calls and, of course, they did have the reports that had been written, but that's not the same as really absorbing the collective wisdom, the institutional knowledge.

Q You're pointing to turnover in a team as a problem as somewhat in an abstract sense. Is there a particular problem in dealing with a client with a serious mental illness?

A Yes, absolutely.

Q And how is that different or --

A Well, it's a client who's got difficulties sorting out, Who can I trust? Who can I believe? What's real here? With who's got issues of abandonment from past relationships and uncertainties about whether anybody out there in the world is trustworthy. So I think it's particularly hard given those issues.

Q You brought up in an abstract sense before our break barriers to disclosure. Would the sort of team turnover that you've discussed actually create an additional barrier to disclosure?

A Yes, because it's another reason to be unsure of whether the person I'm talking to is even going to be here the next time. So why should I agonize and pour out all these things they want to discuss when I'm really not certain who's going to be around.

Q At the time when the ultimate trial team was sort of assembled in 2006, did that team constitute the team contemplated by the prevailing norms at that time?

A Well, that's an interesting question, because on paper it looked as though it had the appropriate staffing. It had in

fact three lawyers because it had the Federal Defender and had Mr. O'Connor and Mr. Duchardt, it had a fact investigator from the Federal Defender office, and it had a mitigation specialist, but I think what was missing was teamwork itself.

So, in other words, the team existed on paper. You had lawyers, you had a fact investigator, you had a mitigation specialist, but they were not functioning as a team and instead were kind of functioning as independent energy -- entities, and there's sort of a mechanical division of responsibilities so that Mr. O'Connor was dealing with guilt/innocence issues, Mr. Duchardt was dealing with penalty and mitigation issues, and there was apparently not very good communication between all of those people, and Ms. Waller who was the ultimate mitigation specialist.

Q What did you observe about that team in terms of its cultural competence?

A Again, I think gender is a big issue. Whenever you've got women clients, and I think because of the loss of the previous women on the team, two women lawyers and two women mitigation specialists, that's another sort of block there. Ms. Waller was not nearby so she was not characteristically the primary person who was visiting on a regular basis. I understand that Stephanie Elliott, the lawyer who was employed as a paralegal in this case, did spend time with the client, but she was not somebody who was trained in capital defense

work, was not experienced in the area of mitigation certainly. So there was not somebody in the core team who was seeing the client and observing on a regular basis.

I mean, one of the things that's important in meetings with clients is just observing week by week how they are composing themselves. Are they unraveling or are they under medication? What is their speech like from one week to the next? There ought to be, you know, regular team meetings where whoever has last seen the client is reporting back on all those observations. So the meetings are not just to convey information to the client or to ask a few questions, but they're to provide that insight into how the client is maintaining over the long life of the case, because that is something which is important to be able to convey to the experts who ultimately are selected.

Q Didn't this team gather rather a lot of records?

A Yes.

Q You pointed earlier to the importance of record collection. With all these records, were you able to observe things that the team failed to do with those records?

A Yes. I have a sense that they understood that it was important to gather the records, but I'm not sure they understood what to do with them. I think they ended up being, you know, filed away but never integrated into the kind of comprehensive life story that you want to put together as

you're then selecting your experts for potential testimony and defining the referral questions that the experts should address.

Q I know that you don't pretend to have mastery of all the documents contained in Ms. Vogelsang's report, but did you select a record that demonstrated how the team could have used records more ably?

A Yes. I think you're referring to the one with the GAF source.

Q I am. I'm going to get oriented. And if you could just highlight for the Court, both introduce the Court to what this record is and your understanding and how you as an expert mitigation -- an expert in mitigation investigation would have used this record.

A This is from Dr. Sallye Wilkinson, S-a-l-l-y-e, Wilkinson, who was doing marriage counseling.

MS. HARWELL: For the record, I believe that to be Exhibit 1-199.

A And this was -- this was a couple of years before the capital offense. Couple dates here. First seen this year April of 2002, continuation start date June of 2002. And this has got diagnoses. And, you know, again, I referred to how a lot of the diagnoses in the Diagnostic and Statistical Manual are there to give us insurance billing categories, but the diagnosis on Axis I you would look up and you look it up and

you find it's major depression or I think it's depression not otherwise specified, so it's a sign two years before the offense she's got these symptoms of depression.

On Axis II she's deferring. But then two interesting numbers. She's got last year's Axis V and a current Axis V and it's been a big change.

Q (By Ms. Harwell) Can I stop you right there? What is Axis V?

A Well, Axis V doesn't exist anymore, but in the Diagnostic and Statistical Manual that was in use at that time, which was the 4th revision, they had a multiaxial diagnostic system, and Axis V designated what they called Global Assessment of Functioning, abbreviated GAF, and her score last year in the opinion of this psychologist was 59, which was -- again, you would just go to the DSM and look up, What does that mean? And that means, you know, mild interference with her ability to function in the world. And then you look at the current GAF score and it's dropped to 48. And, in fact, if you go on to the last page of this record, I think you'll see that there's even a handwritten notation which gives a slightly lower score; and when you get those scores down to the 40s, under the system that the DSM was using at that time, that's serious interference with everyday functioning.

So that's a snapshot of what was going on with her life at that time. It's a sort of benchmark, if you will. So

if it was -- if her score was 59 one year and it dropped to 48 the next, where was it by the time of the capital defense? And what were behind these numbers? You would want to go back to Dr. Wilkinson and say, How did you choose these numbers? What were the symptoms that you were seeing that led you to the two different equivalent of assessment functioning scores?

MS. HARWELL: And just for ease of the Court, I refer the Court to the declaration filed by Dr. Sallye Wilkinson and that's 1-289. I don't think Mr. Stetler is necessarily familiar with that document, but that is the work that this team did in going back as Mr. Stetler had indicated.

Q (By Ms. Harwell) Mr. Stetler, you sort of sound like a psychiatrist reading all of that and it causes me to wonder, is that sort of knowledge the kind of thing that the guidelines contemplate by insisting that someone on the team have mental health knowledge?

A Well, what the guidelines talk about is someone who is qualified by training and experience to screen for mental disorders. So, you know, not to be a psychiatrist, not to be a psychologist, but to be able to have enough familiarity with records like this that you'll know roughly what it means -- what a Global Assessment of Functioning is supposed to be reporting and just to have the ability to go look up the numbers and translate this so that you can come back to the team and say something about, What's the significance of this

record? Because you don't expect everybody on the team to read it closely or to understand what the numbers mean on the diagnostic impressions.

So, you know, you don't have to have highly specialized training in psychiatry, but you have to know which book to look in. Just as if an expert is talking about doing testing, you may not know much about the test, but you know which book is going to give you the answers to those things because Google isn't the answer to everything.

Q Or at least you have to have the curiosity to think to go look up such numbers?

A Yes.

Q I'd like to talk now about some of the other failures that you've highlighted from the team. I'd like to show you a few documents and see, as we did with this one, whether there are any red flags which you've identified regarding the trial team's failure to mitigate. I'm going to refer you to Exhibit 1-283. It is an investigative report by Dani Waller regarding an interview of a man named David Kidwell. Have you reviewed that document before today?

A Yes, I have.

Q All right. Did you identify any red flags that merited further investigation in that document?

A Yes, I certainly did. I think we want to go to the -- let's start at the bottom paragraph. This is a cousin who got

along with Lisa but felt that her mother was keeping her isolated and telling him to stay away because Lisa would try to seduce him.

And let's go to the next page. Well, then, Mr. Kidwell is a primary important witness to the molestation. He's reporting that she was very depressed after the incident, and in the second paragraph is a bombshell. He's advising Lisa to go talk to someone or he's reporting that he advised her to go talk to someone about what had happened, and she tells him, "Sometimes Jack would come home drunk with his friends and make her perform sexually with them." She didn't have anyone she could tell or trust then while it was going on. So to me that's just a huge breakthrough in the case when you're finding a credible witness. He's an adult. He happens to be a cousin but he's an adult when he is having these conversations with Lisa, and she is reporting to him not only was she molested by her stepfather but he would come home drunk with other men and make her perform sexually with them.

Q And these conversations Mr. Kidwell was having were with Lisa when she was a child. Is that your understanding of this document?

A Yes. That's my understanding.

Q As a mitigation investigator if you -- or mitigation specialist, if you were to receive a report like this from an investigator, what action would that prompt on your part?

A Well, it's -- it changes the trauma-triggering event from a single perpetrator to serial rape by multiple men. So it's a whole area that needs to be investigated, developed. You are going to need to bring in somebody who can -- you are going to need to bring in a specialist in trauma who is going to be able to elicit more information than any of us can get from a client, somebody who's got the experience to elicit that information and to assess its credibility, to make behavioral observations about how the client experiences the reports that she will ultimately give on this area.

I mean, Mr. Kidwell is not a trained professional, but he understands enough to say she's depressed after this, and she has confided in him. So he's a very critical witness. But then you want to go find out who were these other men? What were the circumstances? What was the mother doing? How long did this go on? So there's a whole area of investigation that is absolutely critical.

It's been obvious from the beginning that trauma was a huge issue in this case, but rather than think of trauma as an isolated event as somebody who might infer from some of the initial reports, well, the mother caught Jack in the act of having sex with her daughter, you know, what we need to understand is really much more complex. It's not a single incident. It's not a single perpetrator. It's multiple inappropriate sexual assaults, and we don't know from this

brief report how long it was, how many men, what exact acts were performed, but those are all areas of critical investigation.

Q Would you assume from what you just called this brief report that there's no more information to obtain from Mr. Kidwell?

A No. I would want to spend more time with him.

Q Is it true that even for witnesses such as Mr. Kidwell who, as far as we know or from this report, don't indicate any sort of trauma to him, but there could still be barriers for disclosure in terms of all that he knows?

A Yes, absolutely. And he may also have been very reluctant to discuss this because he's a member of the family. He's got connections to everybody, and there are family dynamics that are making it difficult for him to open up and share all of this, and most witnesses are not eager to be in the center of a judicial proceeding like this one. So there are a lot of inhibiting factors for him. So you have to assume that you haven't gotten the whole story from the first time you have talked to him.

Q In your practice as a mitigation investigator, have you found the witnesses who failed to protect a traumatized relative or friend often have barriers to disclosure because of their own sense of guilt or shame?

A Yes. It's survivor's guilt. It's classic.

Q Let me show you Exhibit 130 and see if you recognize this document. I'm sorry. I think I've got the wrong one. That's not 130. I'll show you -- no. Despite the lack of a sticker, we are at 130. Do you recognize this document?
A Yes.
Q And what is that?
A That's a memo summarizing a September 12th interview by Dani Waller and Ron Ninemire with all of Ms. Montgomery's children.
Q And did you note sort of a red flag in this memo as well?
A Yes. I think if you go to the last page of the memo, Ms. Waller raises in the final paragraph under Strategies/Points to consider, she says very bluntly, "It's going to come out that Lisa was 'mean' to these kids at certain points. Chelsea felt Lisa was mean to them all, but especially to her." Two paragraphs down she says, "We believe the government will present Lisa as a bad mother, producing a horrible family life and possibly present her as an abusive mother too."

So that's the kind of a classic example of what's sometimes called double-edged information. On the one hand the children know their mother and they have important feelings for her that you want to potentially convey to a jury or other decision-makers, but it's not a simple world where everything

is black or white. There are shades of gray. And you have to then unpack and say, We want to learn more about whatever these children will say about the negatives in the home.

It's not surprising that a person with this background is not a perfect mother, and, you know, you need to find out exactly what was going on, what's the context, see who else was in the household at the time, at what period the negative events occurred. It's all part of the story, and you can't make snap decisions about whether this is a good witness or a bad witness without knowing everything that the witness has to convey.

Q In your career as a mitigation specialist, have you found such facts in other cases that are on the surface unpleasant or things you didn't want to find out about your client?

A I don't want to exaggerate to say always, but it is extremely common.

Q And in the teams that you've worked with, I mean are those things swept under the rug or are they --

A No. I think you have to -- that's why it's written up by Ms. Waller as a strategic issue for discussion. That's why you needed a team that talked about these things and say, How are we going to handle it? What else do we need to find out? What do we know about negative incidents? Who else was in the home at the time? How was Lisa functioning at the time? And

you have to put it all together chronologically. She had presumably some good years and some bad years, but you need to put together the whole story if you're going to have a full and complete picture.

Q I'm hearing you say that a full, complete picture isn't just positive information; is that correct?

A No. Again, I think when the Supreme Court says you have to conduct a thorough investigation, my dictionary tells me that thorough means complete and meticulous. So it isn't a question of quantity, how many witnesses did we call at the penalty proceeding, how many did we talk to, but what's the quality of the investigation? Did we get all the relevant facts? Did we follow up when we had that paragraph from Mr. Kidwell that said, you know, sexual rape by multiple men? Did we follow up when she may be portrayed as a bad mother because Chelsea is saying she was mean? Well, what does that mean? We need all those things to be unearthed so that we can make decisions about how best to present the mitigation in a way that it's fully accurate.

Q I'd like to show you Exhibit 1 dash -- I believe it's 1-291, ask you if you saw -- have you seen this document before that purports to be a beginning genogram?

A Yeah. Actually, this is interesting. This is Mr. Dillingham's genogram, and it shows you in fact the way every mitigation specialist starts out. We want to get a picture of

who are all the players here. And so this isn't unique to capital defense work. He was trained as a social worker, and he wants to get just an image from his first conversations with the client about who else is in the family.

Q Mr. Stetler, let me stop you there. Do you know who Mr. Dillingham is in the constellation of people who saw Ms. Montgomery?

A Yes. He was the person from Kansas who was contacted by the Federal Public Defender Office in Kansas and sent in for some preliminary impressions of Ms. Montgomery.

Q So to be clear, he wasn't actually on the trial team?

A No. No.

Q But do you have any understanding whether his notes were given to trial counsel?

A I assume that they were, but I don't know.

Q If Mr. Dillingham says he did, but that was your working assumption?

A I'm acquainted with Mr. Dillingham and if he said he gave them, I'm sure he did.

Q Okay. And Mr. Dillingham saw Ms. Montgomery shortly after her arrest?

A Yes. A small number of times; but, as you can see, he's gotten down to the basics at the beginning. He starts identifying, okay, who's in this family? What do we need to learn about family dynamics? And he's got some notes. I think

it's the second genogram that's gotten more detail and some of his preliminary observations about, you know, custody battles as a recurring theme or family script.

Q This one here says, "Custody fight over children are repeating intense family pattern."

A Yeah.

Q What would that mean?

A I didn't have my glasses on. Excuse me.

Q What would that cause you to do as a mitigation specialist?

A Well, I mean, I think that's a very insightful observation that, you know, children, custody are huge issues in this family that we want to know as much as possible about. What prompted him to make that observation? Who else in the family has had issues with child custody? You want to elicit all of that in the course of your investigation.

And we know that when he refers to family patterns, we know that there are patterns of behavior, sometimes called family scripts, that are learned and repeated because other family members are models; and so just as we have some things that are encoded in our DNA, we have other things that we have learned from our parents and other family members and they learn from earlier generations. So you want to develop what are those family patterns and how did that affect Lisa Montgomery.

MS. HARWELL: If I might have Exhibit 1-45.

Q (By Ms. Harwell) While that's coming, Mr. Stetler, by highlighting these sort of examples of red flags that you saw in the file, you're not testifying that these are every problem you saw in the file?

A No.

Q These are just examples of things that would have triggered further investigation?

A Right.

Q I'm going to show you an attachment to the declaration of Dani Waller, which has been marked as 1-45, and see if you recognize this interview memo.

A Yes, I do.

Q And do you recall reviewing that memo before today?

A Yes.

Q And did you find a red flag that merited follow-up in that memo?

A Yes. This is a rather extraordinary interview. This is the half sister, the child of Ms. Montgomery's biological father. So she's tracked down and Ms. Waller and Mr. Ninemire go to interview her in Kentucky, and she had just gotten married. She's been married six weeks, and her new husband is present for this interview of very sensitive subjects, assuming that she's probably talking about some things that her husband of six weeks has never heard about before. I think on the next

page it's --

Q Do you recall the substance of --

A Yeah. In the middle of the page she's talking about when she's gone to live with Judy and Lisa and Patty how Judy often brought strange men home from the bars. She drank a lot as she frequented the bar near their house. She was at the bar more nights than not. Diane recalls one particular time when she was trying to shove a man out the front door. Diane put Lisa behind her and had Patty clinging on her hip.

The next paragraph goes on, "Some of these men would take an interest in the girls and try to talk to them. One night, near the time Diane was taken away, a strange man whom Judy had left in charge of the girls, came into Diane and Lisa's bedroom. He molested Diane.

"Lisa and Diane shared a room and if each stretched their arm out from their beds, they would touch. Lisa was in her bed while Diane was being sexually abused. Diane believes this may not have been the first time it happened. This is primarily due to the fact that when the man entered their bedroom, she recalls telling herself that she needed to remain very quiet. In reflection, she believes this may have been a reaction to previous abusers. After the man made her perform sexual acts, her memory goes blank. She does not know if Lisa was asleep or not. Diane feels guilty," et cetera.

So, yeah, this is another bombshell interview

because it suggests that -- again, it kind of connects back to that interview with David Kidwell suggesting that there are multiple men being brought into this unsafe environment where these young girls are subjected to sexual assault.

And, again, I stress that this interview took place in the presence of Diane's brand-new husband. They'd been married six weeks and she's pouring out this very, very difficult stuff, and she's saying at some point she goes blank. She doesn't remember. Well, there's more there. You are going to need to explore it in detail. You're going to need to build up that trust that will enable her to share more with you.

And there are multiple strategies for that. Dani Waller might have said, How about if I take you to breakfast tomorrow morning? Actually leaving for a little while. How about if we, you know, just one-on-one, just the two of us woman-to-woman, or just check in with her the next day and say, That was very, very painful and difficult to talk about those subjects, but I'd like to come back and talk about them in more detail, maybe come back in a month, but certainly something that should have been followed up.

Q And, again, this was a memo performed by Dani Waller who you know to be -- what was her role in the case?

A She was the final mitigation specialist. But I think what was different by the time she was involved is that she was -- she lives in Illinois. She was not geographically

proximate. She was not regularly consulted. They were not meeting on a regular basis or even telephonically.

So my sense from her declaration is that she viewed her work much more as performing the specific assignments that she received from the Federal Public Defender Office. She wasn't getting much direction or no direction from Mr. Duchardt and she barely knew that Mr. O'Connor was in the case. So this is just an example of how this team is not really functioning in the way that's contemplated when we talk about teamwork.

Q Mr. Stetler, I asked you to identify those sort of examples of red flags so we could discuss with the Court what you as a mitigation investigator would have done with the information that was in the defense files. I think I understand, though, that in your declaration that's not the main -- each of those things is not the main critique you have of the mitigation that was put together in this case.

They had a lot of information, and I believe in your declaration you stress that the actual problem is the way in which that information was synthesized and put together. Would you tell the Court your expert opinion on the way the team related the pieces of information they did have?

A Well, we're not seeing the basic tools. I mean, things like the genogram that Mr. Dillingham scratched out in her earlier visit should have been updated constantly. We saw that Ms. Rickert attempted to put together a chronology of

information during the time that she had been involved in the case. Well, that should have kept expanding. So we should have had these basic tools updated month by month by month so that by the time we were close to trial and bringing in experts we had a very, very detailed chronological distillation of all the information that we had collected rather than, you know -- I'm sure thousands of pages of information but not digested in any way that could be -- could be effectively presented to a jury.

And you needed somebody to be able to provide that framework to the jury, somebody -- you needed both lay witnesses like Mr. Kidwell, like Diane to come and tell those vivid stories in detail, but then you also needed somebody to put together all the pieces in some sort of framework that would help the jury understand what had happened in Ms. Montgomery's life.

Q You spoke of the need to distill information from the experts. In your experience why is that necessary?

A Well, you know, it's very, very difficult to turn to an expert and say, Here are 10,000 pages, 20,000 pages. It's a needle in the haystack. Good luck. Experts need some sense of why particular records may be important, and so the more you can organize things, the easier their job is going to be. And they may see a record and say, Well, this reminds me of there are probably four or five records that relate in the same area.

Can you help me get them? Do you have all the records from this marriage counseling, for example, or have you gone back and explored this in more detail with the half sister, Diane?

You don't want to just have a data dump of raw material. You want to select the information that is going to be -- you think is going to be most useful to help the expert understand the hypothesis that you generated.

Q And not to put a too fine of point on it, I assume it's actually cheaper because the experts aren't fishing through --

A Yes, absolutely.

Q You also prepared a supplementary declaration in 2015 after reviewing Mr. Duchardt's statement; isn't that correct?

A Yes.

Q And that was filed on September 2nd after Mr. Duchardt's statement was filed on September 2nd. Did Mr. Duchardt's statement change any of the opinions that you had expressed in your initial declaration?

A No.

Q Did it strengthen any of your opinions?

A Yes.

Q How so?

A Well, this declaration from Mr. Duchardt in his own words was explaining why he thought mitigation specialists were unnecessary, why he thought they were -- I mean, he's very dismissive of the whole idea of mitigation specialists. He

seems to think they are a club that's making money off these cases. He's not respectful of the professionalism of people doing mitigation work. And I think having it in his own words just made it, to me, much, much clearer.

Q In terms of Mr. Duchardt's feelings about mitigation?

A Yes. He talks very sarcastically about the mitigation specialists' club.

Q Well, let's break that apart. Is there a club? Is there a list of certified mitigation specialists?

A No. In fact, it's interesting. One of the discussions that arose in the period after the revision of the ABA Guidelines is whether there should be a certification process, and the consensus that emerged was that it was more important to establish performance standards, which ultimately became the supplementary guidelines rather than certifying certain individuals and saying they are qualified and, therefore, the work that they do is good work.

What matters ultimately is how the work was done, how thoroughly it was done, so the performance standards were deemed more important than, you know, certifying particular people.

The consensus was also that you wanted to give lawyers the maximum flexibility to select the individual to do the mitigation investigation who was most appropriate to the needs of the case rather than restricting the choices to a

pre-selected group. You know, sometimes because of issues of language or culture or who knows what else, there may be a graduate student in sociology or anthropology or some other area that is the best person to investigate in a particular case, and thought it was important to give lawyers the ability to make that choice as long as the lawyers themselves were in a position to provide all the appropriate guidance to ensure that they were complying with the standards.

Q I believe in your supplementary declaration you were critical of Mr. Duchardt's reference to a standard mitigation defense. Why were you critical of that?

A Well, it makes no sense. There is no such thing because every case is different. The Supreme Court language comes back to me. We're talking about the diverse frailties of human kind. You can't push each case into some kind of cookie-cutter approach and you don't know until you've conducted that thorough investigation what the mitigation teams are going to be in your individual case. You can't run the same set of mitigating factors on the verdict sheet that you used last time. Everything has to be tailored to what you have discovered in the course of the investigation.

Q I believe you were also critical of Mr. Duchardt saying it's become part of the standard playbook for national capital punishment resource counsel to utilize Ms. Vogelsang to synthesize the defendant's background into a narrative. Is

there a standard playbook? Does everybody use Ms. Vogelsang?

A No. Ms. Vogelsang is a very experienced social worker. She's testified in a number of cases, but the choice who provides that framework is, again, determined by the details of the case.

I can think of cases where an urban geographer was used to tell the story of a client who grew up in south central Los Angeles, and he had a very, very rich understanding of what it meant to grow up as a young African-American male in that setting, and a very creative choice. The urban geographer teaches in a business school in North Carolina. So you choose the person to narrate the story and provide that framework based on the facts of your individual case.

Q You used the phrase "provide that framework." Is the social history sort of the cornerstone of that framework?

A Yes.

Q You also earlier talked about the social history being necessary for reliable mental health assessments. Both of those things are true at the same time?

A Yes, absolutely.

Q Can unsynthesized documents, just historical records, take the place of a social history narrative?

A No. I mean, it's a question of quantity. You can't give anyone, whether it's an expert or a juror, a data dump of tens of thousands of pages of material. You've got to put that

material into a framework that makes sense.

Q And why is it necessary that the person who does that sort of synthesizing of the documents be a mitigation specialist as opposed to say a lawyer doing it?

A Well, it's a big job and there are some lawyers who can do that work well, but they don't do that work and try to be a lawyer on the case at the same time. There are people --

Q Why not?

A Well, it's just too much to do. They've got motions to write. They've got jurors to select. They've got discovery to review, all the myriad of tasks of capital defense lawyers that are very substantially outlined in the ABA Guidelines.

Q So what I hear you saying is it doesn't matter as much what kind of person who does the task rather than the task gets done?

A Right.

Q I'd like you to elaborate on a few statements in your supplementary declaration. In your supplementary declaration you discuss how rare insanity defenses are?

A Yes.

Q And why is that relevant?

A Well, Mr. Duchardt says in his declaration he thought there were about 50/50 odds of success. In my experience and in the studies that I've been able to find in the year of the modern death penalty following the attempted assassination of

President Reagan by John Hinckley, there's a tremendous hostility to insanity defenses; and, if anything, more hostility on the part of death-qualified jurors. I cited one of those studies that made that point. So they're very rare. There was an article in the New York Times not long ago that looked at 6,000 murder cases in a ten-year period with seven insanity defenses offered.

So there are really two points. One is that the defenses are extremely rare and the likelihood of success is, on top of that, very rare unless you have a client who has an extensive, well-documented record of previous hospitalizations and diagnoses and recognizable mental illness; schizophrenia, bipolar disorder, things that jurors and judges have heard of, not some more exotic one.

Q When jurors reject mental health evidence as an affirmative defense, are they more likely to then reject mental health evidence in mitigation?

A If they feel that the evidence is just rubbish, then it doesn't work for any purpose, and it's very difficult to sort of turn on a dime and say in the first phase it's a complete defense. It's an affirmative defense. Not guilty by reason of insanity. Then to say in the second phase, okay, it isn't a defense. It's just an explanation. It's just something else that's a reason to spare their life.

So it's a very difficult and awkward transition and,

you know, in my experience when a jury rejects mental health evidence for all purposes, then it's not going to give you a very warm reception in the second phase.

Q We've been talking about your expertise in mitigation investigation, but I think it's clear that you understand who has the ultimate responsibility for assuring that a complete mental health -- complete mitigation investigation has been conducted?

A The lawyer.

Q And in your expert opinion did trial counsel in Ms. Montgomery's case fulfill that responsibility in light of the prevailing norms from 2004 to 20007?

A No, he did not.

MS. HARWELL: Might I have just one moment, Your Honor?

THE COURT: Yes.

MS. HARWELL: I think that's all I have of this witness.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Good morning, Mr. Stetler. How are you, sir?

A Almost afternoon, Mr. Valenti.

Q Not yet.

As I understand it, so the Court is clear, you work

for a resource group, correct?

A Yes.

Q And your job description as you laid it out was consultation, brainstorming, and assistance to trial counsel as it relates to selection of experts and preparation on a mitigation case, correct?

A Well, not just trial counsel. Trial counsel and habeas counsel.

Q Counsel representing a capitally charged defendant?

A In federal court.

Q In federal court. Right. So you are a resource?

A Yes.

Q A resource that is intended to be used?

A Yes.

Q But there's no statutory obligation for trial counsel to call you?

A That's correct.

Q It's a volitional choice that's made, correct?

A Yes, absolutely.

Q I would assume, then, that those people who represent or are employed by the Federal Public Defender system tend to call you more than others because you are in the same system as them?

A Not necessarily. I can see why you suspect that, but it's not necessarily true.

Q Well, break down for me the percentage of cases that are referred to you by those employed by the Federal Defender system versus those that are hired under the CJA.
A You know, I don't have statistics in mind, but I just finished a long consultation on a case in Oregon with a CJA lawyer and the capital habeas units exist in -- I think there are 18 capital habeas units at this point that cover, I don't know, 14 or 15 jurisdictions. So there's a lot of places that there just aren't capital habeas units.
Q Regardless, you were not consulted by trial counsel in this case, correct?
A No. That's correct.
Q You have, however, been consulted and applied to postconviction counsel when they took over representation of Ms. Montgomery?
A Yes. That's correct.
Q And it's not just this case that you have been consulted in cases in the Western District of Missouri. There have been other capitally charged defendants for whom your group was contacted as a resource?
A That's correct.
Q And off the top of my head I can think of German Sinisterra being one; is that correct?
A Yes.
Q In that case you were contacted as a resource in the

postconviction proceeding?
A Yes.
Q Then you were also contacted as a resource in the prosecution of Keith Nelson?
A Yes. Both in 2255 proceedings.
Q Thank you. Both of those cases 2255s.
Any other cases in the Western District of Missouri where you or your group were contacted as a resource?
A I don't think so.
Q Okay.
A Excuse me. Didn't mean to interrupt you.
Q That's all right.
A I think in both those cases I was originally contacted by CJA counsel. Mr. Jenab in Sinisterra and Mr. Ruhnke, R-u-h-n-k-e, in the Nelson case, and then both of those cases capital habeas units were later involved.
Q For purposes of the conversation --
A It's just to clarify the answer to your previous question.
Q And for purposes of the conversation that I want to talk about now, the three cases in the Western District of Missouri that you or your group were contacted as a resource were all in the postconviction phase?
A Yes. Yes.
Q And you were called to testify now in each of those

three cases, correct?

A Yes.

Q And in the first case, the case of United States v. German Sinisterra, that actually occurred in this very courtroom before Judge Fenner, correct?

A Yes. That's correct.

Q In that case Mr. Duchardt was one of trial counsel and you were critical of him and his team approach then, were you not?

A Yes.

Q In the case of United States v. Keith Nelson you testified before Judge Gaitan, I believe one floor down, I think in 2014, and in that case you were critical of Pat Berrigan and Susan Hunt and the trial team in that case?

A Yes.

Q Where you have said in this case, Ms. Montgomery's case, you said that on paper they had a team but they didn't function as a team; is that correct?

A Yes.

Q That's very similar to the testimony you provided in both Mr. Sinisterra and Mr. Nelson, is it not?

A But more similar to Nelson than Sinisterra.

Q In Mr. Sinisterra's case you were specifically critical of Mr. Duchardt and his thoughts on mitigation; is that correct?

A Yes.
Q When you testified earlier about Mr. Duchardt's, for lack of a better word, skepticism, he doesn't exercise skepticism about mitigation. He exercises skepticism about the hiring of someone labeled a mitigation specialist; is that fair?
A Yes.
Q He understands as a practicing lawyer in this district what mitigation is, correct?
A Well, that's his presentation, yes.
Q All right. But he is critical of going out and hiring someone to do the work he thinks he himself is able to do and manage; is that correct?
A And has the time to do.
Q But he has testified before this court and in the declaration that he knows how to prepare a case for mitigation purposes and supervises that work?
A Yes, that's his testimony.
Q And you disagree with the manner in which he does that work, correct?
A Yes, absolutely.
Q Despite the fact that there were two attorneys, really three attorneys in this case, and numerous investigators assigned and they conducted these interviews, you don't like the way the team functioned?

A Well, I think it did not function as a team.

Q And you mentioned in the course of your presentation the ABA Guidelines talking about the standard of care, and you ultimately got to what I think is the important part where you agree that in 2009 the Sixth Circuit determined that the ABA Guidelines are not inexorable commands but instead guidelines, correct?

A No. It was the Supreme Court --

Q I'm sorry. I misspoke.

A -- overruling the Sixth Circuit.

Q So the Supreme Court, the supreme law of the land, said they're not inexorable guidelines -- commands, but instead guidelines?

A Correct.

Q So the things that you would like to see done but aren't necessarily the mandated standard of care?

A That's correct.

Q And you then testified that in this year, 2016, the CJA has tried to kind of adopt into the ABA Guidelines as a standard of care in cases that they're appointed, that CJA counsel is appointed on, correct?

A Yes, the Judicial Conference of the United States.

Q That just became a rule now but would not have applied in 2007 when this case was tried?

A It was not in the model plan in 2007, that's correct.

I pointed to using that document simply to show that this is not just a consensus of me and my friends, but it's something that's recognized at this point in time by the Judicial Conference of the United States which is, you know, presided over by the Chief Justice and includes the chief judges of every circuit.

Q And, Mr. Stetler, I think that you said rather than making the use of mitigation specialist, it would be a certified position, there instead has been a tendency to create a performance standard, correct?

A Yes.

Q As we're talking about performance standards, it's very similar to what's being done here in this courtroom over the next week or two and that is whether the Court who is the final arbiter in this matter determines whether or not sufficient performance by counsel was done, correct?

A Absolutely.

Q And you would agree with me, then, that regardless of your opinion on the matter, that ultimately it is the court system, starting with Judge Fenner and potentially higher up, for them to decide whether or not Ms. Montgomery received efficient or deficient performance in the course of her representation, correct?

A Yes, that's why the hearing was ordered for that.

Q Because you've been around doing this for several

years, since 1980, I believe, you're aware of who Mr. Duchardt is, correct?

A Yes.

Q And you know Mr. Duchardt was -- started out as a public defender and received his education in the state of Missouri as it relates to practicing in defending these cases?

A Yes.

Q All right. When you were asked to review this case to determine whether the team did or did not function appropriately, were you made aware of a case that Mr. Duchardt and Mr. O'Connor defended in the State -- excuse me -- federal court in Kansas, U.S. v. Demetrius Hargrove?

A Yes.

Q And you're aware that was a capitally charged case in Kansas, tried, I believe, in 2006 in which they achieved a life verdict?

A Yes.

Q All right. So they had worked previously together, Mr. Duchardt and Mr. O'Connor, successfully as it relates to getting a verdict not involving death?

A Yes.

Q And that immediately preceded their appointment in this case, correct?

A I don't recall the dates, but I'll accept that.

Q If I would submit to you that it did precede this,

would you agree with me?
A Yes. And there were two other cases handled by Mr. Duchardt in federal court with life sentences, one of which was overturned on appeal and on retrial led to an acquittal.
Q Correct. United States v. Phil Street and I think the other one is United States v. Carl Haskell. Does that sound right?
A Yes.
Q Okay. Cases that he was capitally appointed on in this district and achieved less than death verdict, one acquittal, one a life verdict?
A Yes.
Q Now, during your -- or in your initial declaration August of 2013, the first 20-odd pages or so were kind of laying out the standards involved and kind of what it is that you do to form the background of your opinion, correct?
A Yes.
Q And, as you get in, then, sir, to the opinions that you offer, one of the significant complaints you have was about the trial team's efforts to resolve this to some kind of disposition other than death, correct?
A Yes.
Q I believe that starts on page 36 of your 53-page declaration. Were you aware that in April, specifically on April 3rd of 2007, the trial team; Fred Duchardt, John

O'Connor, David Owen, met with government counsel at the time and tried to negotiate a resolution short of a death verdict or short of death; in other words, I would call it taking death off the table? Were you aware they had that meeting?
A I was not aware of that meeting at the time.
Q Okay. At the time you wrote the declaration in 2013 you were not aware that trial counsel in Ms. Montgomery's case met with government counsel and attempted to use the Tommy defense as a leveraging tactic to get the government to agree to remove death?
A Yes.
Q Knowing that now, would that change your opinion in your declaration about that part being deficiently performed?
A No. I think the Tommy defense was not likely to have changed the government's position.
Q Okay. Now, when you look at that, do you look at it from trial counsel's knowledge at the time in 2007? When they knew that, they had been told by their client, Lisa Montgomery, that she was not alone when this murder took place. Were you aware of that?
A Yes.
Q And were you also aware then that they had found witnesses in and around the Skidmore, Missouri, area who had said they saw not one but two people in the car that was described as the getaway car in this case?

A Yes.
Q Okay. So there were facts in the possession, not just from their client's admission, but from other third-party independent, unbiased witnesses that there was another participant in this murder?
A Yes, and I believe there was originally a 302.
Q Correct. And so you say that using that as a conversation piece for the government to try to get Ms. Montgomery to become a cooperating witness against that unknown participant in the murder was deficient on their part?
A Well, I think it needed more investigation because it certainly didn't turn out to be the defense that was presented.
Q I would tell you that post that meeting, certainly more investigation did occur, and it did turn out that was not the greatest defense, but at the time on April 3rd, 2007, there was an April trial date looming just around the corner, wasn't there?
A Yes.
Q And subsequent to the client's disclosure of another person being present and because of the needs of the mental health examinations that had not yet been completed, ultimately Judge Fenner continued the case from April of 2007 to October of 2007?
A Yes.
Q And that then gave the government more time to go look

into whether or not there was another person that was at that murder, didn't it?
A Yes.
Q Okay. But when they made that disclosure, they were up against a trial deadline, were they not?
A Yes.
Q Okay. And that's important, isn't it, at the time?
A Yes, but it's a rather belated time to be seeking resolution.
Q Correct. But as you've said, getting some of these admissions can take time, can they not? In other words, witnesses don't disclose upon first interviews?
A That's correct.
Q Or sometimes second interviews?
A Yes, absolutely.
Q And according to Mr. Duchardt and Mr. O'Connor, Ms. Montgomery didn't disclose that there was another person with her until January of 2007, did she? Did you know that?
A Yes. That's in his declaration.
Q All right. And then the investigation they conducted would have occurred from January 2007 to April of 2007 when they met with government counsel to try to persuade the government to take death off the table, and that was against a looming trial deadline?
A Yes.

Q As we mentioned, as we said, time is important; because if you have more time, it's reasonable to expect if you're working diligently, you have more you can get done, correct?
A Yes.
Q But whether the government agrees or defense agrees, ultimately the courts set the calendars on these matters; isn't that correct?
A Yes, of course.
Q And when a deadline is set, unless you can get a continuance, order for some reason you can show good cause on, you're going to be prepared when they say to be prepared, right?
A Yes.
Q And when Mr. Duchardt and Mr. O'Connor came to government counsel, then, in April 2007, Ms. Montgomery had a trial date looming later that month and it had not yet been continued?
A Yes. And I think they presented it -- something that was not adequately investigated at the time.
Q So your thinking is that it was not adequately investigated at the time they made the disclosure. You know, and I think it's in your declaration, that subsequently, I believe from memory, September 29th of 2007, Mr. Duchardt authored an email exchange or thread, that I would call, to the Department of Justice using reference material from the mental

health evaluation and expert opinion to try to talk the department into what I would call decertifying the case as a capital case?

A Yes.

Q And you're aware that in federal cases when the death penalty is sought, it requires consultation with the Capital Crime Section of the Department of Justice?

A Yes.

Q And a referral to the Attorney General on whether we will or will not seek death?

A Yes.

Q And so they on eve of the then looming October trial, they again went to the government through various agencies to attempt to get death off the table in the case?

A Yes.

Q Okay. It wasn't successful?

A No.

Q Obviously.

Are you familiar with any cases or how many cases that once they've been certified as death cases by the Attorney General have been decertified prior to trial?

A Oh, yes.

Q How many cases has that happened?

A You know, I don't have the numbers in front of me, but you can infer some of the numbers from the Spencer update

report.

Q Okay. And do you know those off the top of your head? I don't. I don't have them at my fingertips either.

A No. Part of the decertification/deauthorization strategy is not waiting until the eve of trial, but whenever you've got changed circumstances, and that can be, you know, something related to guilt/innocence or something in your mitigation case because the government is always the main justice and I assume the local U.S. Attorney's Office as well is looking for something new which causes to reevaluate.

Q Finally, as we're talking about the mental health defense, you indicated that since John Hinckley's time, the jurors in general had, I guess, a healthy skepticism as it relates to mental health defenses, specifically as it relates to NGRI, not guilty by reason of insanity, allegations -- or complaints, correct?

A Yes.

Q But just because they are not favored doesn't mean if you're an attorney and that's the case you have before you, you should still present it despite the rarity of insanity defense, shouldn't you?

A Well, if it's -- if it is a well-documented, credible presentation, something you have to think about very carefully, particularly in a death penalty case.

Q And when you're dealing with a case like we're dealing

with in the Ms. Montgomery case --

A Yes.

Q -- that is a factually horrific case, mental health is pretty obviously going to be an important part of the defense or the mitigation or both in this case from the get-go, right?

A Yes.

Q And most everyone would agree that they're going to have to find something to give a jury to hang its hat on to come up with a verdict even less than death or even not guilty by reason of insanity, correct?

A Yes.

Q And what the defense team in this case thought was their best avenue was the defense of pseudocyesis, correct?

A Yes.

Q And I believe you refer to that as kind of an exotic diagnosis; is that correct?

A Yes.

Q But Dr. Ramachandran -- I won't attempt to spell it or say his first name -- it's R-a-m-a-c-h-a-n -- I'll give it to you later.

A D-r-a-n.

Q Thank you. D-r-a-n.

A And initials V.S.

Q Yes. I think Vilayanur is his first name. Dr. Ramachandran, a psychologist for the University of California

at San Diego opined about pseudocyesis, did he not?
A Yes, he did.
Q And indicated that it was his opinion, based upon the facts and circumstances of the case and his examination of Ms. Montgomery, that she was in a delusional state at or near the time of this offense and would not have been, in his opinion, in her right mind to be able to appreciate the wrongfulness of her conduct or comport herself to legal standards, correct?
A Correct.
Q So he was a pedigreed psychologist that came in with an opinion that ultimately the jury obviously did not accept but it was an opinion from a clinical or licensed psychologist?
A Well, mainly an academic neuroscientist.
Q Neuroscience meaning involving the brain?
A Yes. He's well known in that area.
Q And as that decision was made, would you agree with me, then, that Mr. Duchardt and Mr. O'Connor as a team made a tactical decision on what defense they thought best to present in light of the horrifying facts and circumstances underlying the offense under trial?
A Well, I think they made a decision without having put together all of the mitigation information and assess the impact of the trauma in Ms. Montgomery's life just in terms of the couple of things that I pointed to earlier today, and then instead of developing trauma, instead of developing the

multigenerational mental illness in the family, reached out for an exotic diagnosis that I would be surprised if any juror ever heard of. So it was very, very -- I won't say unlikely to succeed.

Q You're saying exotic, but it's a diagnosis that's acknowledged, correct?

A I don't know that I've ever met a psychiatrist who has seen it.

Q And are you aware of a report called Caesarean Abductions chronicled in the 20-odd Caesarean abductions that have occurred in this country since hospitals locked down their emergency rooms?

A No.

Q So you're not aware that there is still not a lot of these cases nationwide but they are on an increasing basis as women have societally been given more status by being pregnant or by being the mother of a newborn child? Are you familiar with that -- the studies on those at all?

A No.

Q Some of the criticism I believe you had is you referred to the trial team's failures in this case was some of the exploitation or lack thereof of the sexual abuse allegations that Ms. Montgomery endured as a child, correct?

A Yes.

Q Did you ever read or were you ever made privy to the

special verdict form in this case?
A Yes.
Q You know what a special verdict form is, of course?
A Yes.
Q And that details the mitigating and aggravating circumstances that usually the government or the defense alleges should be proven?
A Yes.
Q In particular, mitigation element -- or Mitigation Finding 4 and Mitigation Finding 8 talk about significant sexual and physical abuse that Ms. Montgomery endured. You're aware that was put to the jury, and that for the significant sexual abuse endured by Ms. Montgomery at the hands of Jack Kleiner, I believe eight of the jurors found that to have been present, correct? Do you recall that?
A I don't recall the exact number, but I'll accept your representation.
Q For purposes of the significant physical and sexual abuse that she endured, nine jurors found that despite those things in her life, she still was able to provide good mothering for her children?
A Yes.
Q So there clearly was evidence before the jury about physical and sexual abuse deemed significant by and at the hands of Jack Kleiner, correct?

A Yes.

Q And there was more discussion about that abuse as it related to what impact it would have on Ms. Montgomery herself as a parent, correct?

A Yes.

Q And so despite your complaints about the exploitation of that information, there was enough evidence to the jury's satisfaction for eight or nine of them to find that she had suffered significant sexual and physical abuse?

A Yes.

MR. VALENTI: Just a moment, Your Honor.

THE COURT: All right.

Q (By Mr. Valenti) Just real quick follow-up. As it related to the Tommy Kleiner information, you indicated that you didn't think that was a useful negotiation tactic on their part; is that right?

A I think it was not fully investigated.

Q Okay. As it relates to both the plea negotiations that would have happened April 3rd, 2007, or the request of the department in September of 2007 to have the case decertified, one of the statutory mitigating factors that's present in the federal death penalty is an equally culpable person either not charged or not being held accountable for the offense, correct?

A Yes.

Q And so by bringing that information to the government's

attention in April or September, it was yet one more negotiating tactic on the part of the team to try to get death off the table for their client?

A Yes.

MR. VALENTI: Thank you. That's all I have.

THE COURT: Ms. Harwell.

MS. HARWELL: Very, very briefly, Your Honor.

REDIRECT EXAMINATION BY MS. HARWELL:

Q Mr. Stetler, you indicated that you were aware that several of the jurors found Ms. Montgomery had been sexually abused?

A Yes.

Q And by that special verdict form, does that give you any indication of the weight the jurors placed on that finding?

A No. In fact, we have some verdict sheets where 12 jurors find everything on the verdict sheet and still return a death verdict. So it doesn't say anything necessarily about weight.

Q And here certainly the eight jurors who found that factor still returned a death verdict?

A Yes. And I think -- I would say about that that it's as though that box had been checked, yes, the fact of some kind of sexual abuse was established but not the vivid story that is apparent when you look at some of these reports.

Q And that doesn't tell us anything at all about what

either of those eight jurors or any of the other jurors might have felt with regards to the history of Ms. Montgomery being trafficked by her mother?

A Yes.

Q Mr. Stetler, they also asked you about agreements to plead guilty. Are you aware that when DOJ authorizes a plea, that takes death off the table?

A Yes. I mean -- yes.

Q And are you aware of cases, recent cases in the news where the department has agreed to take death off the table by plea?

A Yes.

Q Even after certification?

A Yes.

Q Finally, they also asked you -- Mr. Valenti asked you about your awareness of Mr. Duchardt's track record of the Street trial and Hargrove trial.

A Yes.

Q Are you also aware that Mr. Duchardt, no one in the country has more people on federal death row than Mr. Duchardt?

A That's correct.

MS. HARWELL: I don't have any further questions.

RECROSS-EXAMINATION BY MR. VALENTI:

Q As it relates to application of the federal death penalty in federal court, the Western District of Missouri

rightly, wrongly, or indifferently has had more cases than most everybody else too, haven't they?

A Western Missouri and Texas probably have the most.

Q From the federal standpoint?

A Yes.

Q Now, you talked about whether or not or what implication jurors find in a particular mitigating circumstance would have as it relates to weighing. Quite frankly, we're never going to know that, are we, unless we interview the jury?

A Right.

Q Because the verdict form doesn't provide for them to quantify the weighing process?

A That's correct.

Q In fact, the instructions on the weighing process in the federal death penalty tell the juror any one factor can outweigh any other factor found, whether it's a mitigating factor or an aggravating factor, and so we simply don't know?

A That's correct.

Q So we cannot presume anything from the numbers other than we know that jurors found the fact that she had been severely physically and sexually abused, they found it to have been satisfied by at least a preponderance of the evidence?

A Yes.

MR. VALENTI: That's all I have, Your Honor.

THE COURT: All right. Thank you, Mr. Stetler.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: We'll take a break for lunch now. Be back in one hour. We'll go by the clock at the back of the room. That will be 1:25.

(The noon recess was taken at 12:25 p.m. until 1:25 p.m.)

AFTERNOON SESSION

THE COURT: Thank you. You can be seated.

Ms. Harwell, are you ready? Ms. Henry.

MS. HARWELL: I'll defer to Ms. Henry.

MS. HENRY: While coming to the witness stand, Your Honor, I forgot this morning to request the Court to take judicial notice of the transcripts and file in the underlying criminal case matter as well as all the exhibits.

MR. VALENTI: No objection.

THE COURT: Your request is granted.

MS. HENRY: Thank you, Your Honor.

MARC BOOKMAN, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Sir, would you introduce yourself to the Court and spell your first and last name for the court reporter.

A Yes. My name is Marc Bookman, M-a-r-c, B-o-o-k-m-a-n.

THE WITNESS: Good afternoon, Your Honor.

Q (By Ms. Henry) Mr. Bookman, how are you employed?

A I'm the director of the Atlantic Center for Capital Representation in Philadelphia.
Q What is the Atlantic Center for Capital Representation?
A We're a nonprofit that does a number of things regarding the death penalty. We consult with cases mostly in Pennsylvania, some in Delaware, and then a couple other scattered states as well.
We put on trainings, various trainings for death penalty practitioners. We engage in some systemic litigation, some specific litigation for specific capital cases, and we engage with the legislature regarding reforms, and so forth.
Q Is that a nonprofit organization?
A It is. We are actually a project of the Texas defender service, but that's just because we're small and can't -- we're not really a full nonprofit ourselves. We are a project of a nonprofit in specificity.
Q And so you are an attorney licensed to practice law?
A I am.
Q How long have you been a licensed attorney?
A I passed the bar in 1982.
Q And you are licensed in Pennsylvania?
A Pennsylvania and I'm also -- I also passed it in North Carolina, but I'm on inactive status there for maybe the last 33 years or so.
Q Is that because you went to law school in North

Carolina?

A Yes.

Q Where did you go to law school?

A I went to the University of North Carolina at Chapel Hill.

Q Prior to your work with -- well, let me ask you this: Are you the founder of the Atlantic Center for Capital Representation?

A I am.

Q And prior to founding the Atlantic Center for Capital Representation, how were you employed?

A I was an attorney in the Defender Association of Philadelphia from 1983 to 2010.

Q So most of your legal career you were with the Philadelphia Defender Association?

A That's correct.

Q And Philadelphia Defender Association has a unique structure. So could you sort of explain to the Court how Philadelphia Defender Association staffs its cases?

A Well, I'm assuming you want to know the initiation basically of the homicide unit in the defender association or is there something else?

Q We'll get there in a minute. The Philadelphia Defender Association, is that an umbrella organization?

A It is an umbrella organization. So the Defender

Association is a Community Defender and so we have a State office. We have a federal office. The federal office is divided into a trial office and habeas unit, a capital habeas unit. I was never in the federal office. I was always in the State office.

Q And you don't generally do capital habeas work; is that correct?

A I don't -- I missed what you said.

Q You don't do capital habeas work?

A I do a little bit of it, but that's not -- that's never been my primary focus.

Q Has most of your career been as a trial attorney?

A Yes.

Q And at some point, Mr. Bookman, we're going to talk about the homicide unit at Philadelphia Defender Association you helped found, but before we get there, I would like to talk with you about some of your experiences -- well, no, let's just go there. Why don't you tell me about the formation of the Philadelphia homicide unit?

A So I was a defender in the association from 1983 to, well, right through to 1993. The unit formed in April of 1993 but some things had happened previous to that that caused the formation. For many, many years in Philadelphia the Defender Association did not handle homicides.

In the early '90s a series of articles came out by a

reporter named Rick Tulsky who ultimately won a Pulitzer for revealing bad lawyering, for lack of a better word, in capital cases in Philadelphia, caused sort of a national scandal, and that prompted the court administration to change its previous policy. They decided that the Defender Association take 20 percent of the homicides that emerged from April 1993 on. So that was the initiation of the homicide unit.

Q And did you help form that homicide unit?

A I did. I was one of the initial members in the unit. I'd already been a defender for ten years at that point.

Q And did that unit take capital cases?

A It did. We took 20 percent of all homicides randomly from Philadelphia.

Q Can you estimate for the Court how many capital cases you handled at the trial level while you were at the Philadelphia Defender Association?

A I can. I actually handled -- I actually handled one before I entered the homicide unit. While I was in the homicide unit, dozens. There was a pretty regular stream of capital prosecutions of one form or another.

Q With respect to the Philadelphia homicide unit, how did you determine how to staff that unit?

A Well, we -- as I said, we came in brand new, and we made a determination that we were going to follow the ABA Guidelines. They were from 1989. The guidelines called for

two attorneys, a mitigation specialist, and fact investigator on every capital case, and so that's what the unit -- that's what the unit did.

We initially began our training by bringing in a man named Kevin McNally who is still to this day practicing. He now runs the Federal Resource Center, I guess. I'm not sure exactly what it's called, but he's in charge of the federal trial office resource counsel that goes around the country helping various lawyers, and Mr. McNally came to our office and spoke for a few days just to give us a sense of what kind of work we were entering into, and then we all went to our first national conference maybe three or four months after that.

Q And prior to the formation of the unit when you knew that was coming down the pike, did you do some things to get yourself prepared to handle capital cases?

A I did. I had been interested in death penalty work for some time, and I anticipated that our unit was going to be formed. I think a number of us did. So I was recruited by a Temple law professor to handle a postconviction case in Pennsylvania, was not in Philadelphia; and so I did the postconviction capital issues in that case. That led to the first postconviction grant of a new trial in Pennsylvania history, in modern Pennsylvania history, and then I stayed with that case. He eventually got a life sentence after a re-sentencing phase, and so I kind of cut my teeth on that. So

that's why I answered your question I occasionally do habeas work. This was State habeas work essentially that led to the reversal. That was my first introduction to the work.
Q Those of us in the Midwest and South tend to think of Texas as a very active death penalty jurisdiction. Can you describe for the Court the climate for death penalty litigation in Pennsylvania?
A Well, Pennsylvania for a long time had the fourth biggest death row in the country. I think our high might have been 240 people on the row. It's always been a very active death penalty state. The district attorneys in Philadelphia have always pretty actively sought it.
Lynne Abraham was the DA for 16 years. She was on the front page of the New York Times Sunday magazine saying that she was the deadliest DA in the country. So it's always been a pretty active state. We've had only three executions but obviously a large death row.
Q And during your time in the homicide division of the Philadelphia Defender Association from 1993 until 2010, did you ever have a client sentenced to death?
A No. The unit has never had a client sentenced to death I should point out.
Q And how many people were in that unit?
A Well, it started as -- I think it started as ten. Four units of two lawyers each. We would rotate the lawyers. And

then there were two supervisors. Of course, there were others. We had staff mitigation specialists and fact investigators. I'm not sure the entire number but might have been 15, 20. It varied from time to time.

Q In addition to your work as the -- in the Federal Defender Death Penalty Association --

A The state defender.

Q -- the State Defender Association as well as your work with the Atlantic Center for Capital Representation, have you attended training in the area of death penalty litigation?

A Yes, many.

Q Can you estimate how many?

A Oh, boy. I've attended -- I mean, probably -- I mean, well over a hundred, probably over 150, I'm guessing.

Q Have you attended training, national trainings?

A Yes, many of them -- many of them are national. The ones that are not national are regional; and if they're not regional, they're at least statewide.

Q Have you participated as a faculty -- invited faculty member to trainings with respect to death penalty litigation?

A Yes, many.

Q Can you highlight for the Court some of the significant faculty appointments you've received?

A Well, I've been teaching for some time. I've taught almost every year at the NAACP Legal Defense Fund training,

conferences called Life in the Balance and Making the Case For Life. Those are national conferences initiated by the NACDL, the National Association of Criminal Defense Lawyers; NLADA National Legal Association -- I can't remember for definite -- and the Defender Association Organization. A number of others as well. There's a national mitigation training that I came to and spoke at. I've spoken at a lot of conferences.

Q Do you also often speak at the conference in Monterey, California?

A I do.

Q What is that conference?

A That's a California-based conference but it's really national. A lot of people come to that conference. I mean, it's a very, very large conference with many, many speakers offering different insights into different, you know, areas of litigation. So even though it's based in California, it's really a national conference.

Q Have you participated in what they call Bring Your Own Case Training sponsored by the Federal Death Penalty Resource Counsel?

A I have. I've taught at many of those; and since we formed the Atlantic Center for Capital Representation, I've also organized maybe ten of them at this point.

Q Could you describe what these conferences are?

A Sure. Bring Your Own Case trainings developed I think

because a number of us felt that so-called talking head trainings or trainings where someone like myself even would get up and speak about an issue, we felt that was not -- we thought, you know, reasonably effective training. We thought what would be more effective would be capital teams bringing their cases to a training and having speakers and then breakout sessions where the teams could meet with faculty and discuss their specific issues in their cases as opposed to generic capital training.

Q And you are one of those individuals who was on faculty that would meet with these federal capital teams and help them come up with themes and theories and brainstorm their cases?

A Federal teams and mostly State teams, frankly. So teams from all over. Bring Your Own Case trainings have now become pretty prominent.

Q And is one of the benefits or advantages of attending a Bring Your Own Case training the ability to network and make connections with more experienced litigators in the death penalty community?

A Yeah. I think there's a lot of advantages. I mean, that's certainly one of them. You know, it gives you a chance to meet national faculty. When I do one of our Bring Your Own Case trainings and we have it outside Philadelphia, we always bring in a national team of faculty. So I think that's one of the big advantages.

But also I think it's very important. I think lawyers learn techniques better when they're dealing with their own cases and the cases are all very, very different; and so, you know, for me to speak about, you know, mitigation or pretrial motions, that's a generic thing. But when we go into small groups, we can deal with the specifics of the case. You know, every case is different and that gives us a chance to really talk about that specific case and learn kind of on the ground.

Q So when you get into these Bring Your Own Case trainings and you're working with teams, do you have a stock mitigation case that you suggest each and every team follow?

A A stack?

Q A stock.

A A stock mitigation case. No. That's exactly the point of Bring Your Own Case trainings, that the cases, you know, obviously are all very different from one another; and so, you know, the team of lawyers -- and it's just not lawyers. It's mitigators and investigators as well. We encourage the team to come to a Bring Your Own Case training. Oftentimes we don't even let one lawyer come. We really encourage the entire team to come, and so there is no such thing as a stock mitigation training. I mean, this is specific to your own cases. I don't think I've ever seen a stock mitigation training.

Q And you have also been invited faculty at seminars that

are sponsored by -- you mentioned Kevin McNally who is the director of the Federal Death Penalty Resource Counsel Project, which is a project of the Administrative Office of the United States Courts. Has that project invited you to serve as faculty at their seminars?

A Yeah. I mean, there's a number of different federal offices, federal units. There's the habeas unit. There's the habeas assistance and training unit. There's the federal resource counsel. I think I've probably been at all of them at this point at least once.

Q In what areas are you invited to teach on at these seminars?

A Well, I've taught on a lot of different things; pretrial motions, plea negotiations, jury selection, structure of a closing, almost, you know, virtually -- preparation of mitigation, investigation, working with teams, pretty much everything.

Q So every aspect -- essentially you have been faculty at national seminars teaching on every facet of capital representation?

A Just about every one anyway, yeah.

Q In addition to serving as faculty at these national seminars, have you testified as an expert on the standard of care with respect to capital representation in death penalty cases before?

A I have. I've taught a few times. I didn't do it when I was public defender; but since 2010 I've done it several times, and one of our briefs on standard of care was relatively recently cited in a federal capital case affirmatively.
Q So one of your briefs was accepted by a district court in an opinion as establishing expertise in the standard of care?
A Yes. It was an amicus brief, yes.
Q And what was that case?
A I think it's Dennis v. Wetzel, I'm thinking. James Dennis was the defendant.
Q United States District Court case?
A Yes.
Q Has any Court ever found you not to be an expert on the standard of care in capital defense work?
A No.
Q Mr. Bookman, I'm going to show you -- put up here on the Elmo what has previously been admitted as Movant's Exhibit No. 51. Do you recognize that document?
A Yep. It's my resume, for lack of a better word, CV.
Q You're not much one for CVs and that sort of thing?
A No. I haven't kept careful track of all the places I've spoken at or written and things. I'm just not very good at that, but I think this summarizes it fairly.
Q And in addition to your extensive experience as a trial

lawyer, your trainings both as a student and as a faculty member and teaching, have you also had articles published in the area of death penalty?

A I have. I've published -- I'm not quite sure how many but a number of essays in The Atlantic and Mother Jones and recent one in Vice. One at the UMKC Law Review actually, University of Missouri-Kansas City Law Review.

Q And was that published in a symposium, on the UMKC symposium on the death penalty mitigation?

A Yes.

MS. HENRY: Your Honor, at this point I would tender Mr. Bookman as an expert, as an attorney expert on the standard of care in capital cases.

MR. VALENTI: No objection.

THE COURT: All right.

MS. HENRY: Thank you, Your Honor.

Q (By Ms. Henry) Mr. Bookman, you were contacted by me earlier this year and asked to review a declaration previously provided in this case by an attorney named Denise Lebouef?

A Yes.

Q And are you familiar with Denise Lebouef?

A Yes.

Q How is it that you know her?

A I've known Ms. Lebouef for some years. I met her at a training. It probably was in 1993. I think it was the first

national training that I ever attended, and I found her, you know, incredibly insightful and informative, and so we've seen each other over the years at different trainings. I've invited her to Philadelphia trainings. A number of times she's come. And she's one of the many people that I've reached out to over the years for help in my cases to kind of consult with.

Q You've mentioned a couple of times about reaching out to people in your career. Has there been a death penalty community that has formed over the years?

A There's no question. There's a very, very strong death penalty community. That's, you know, some resources have been allotted for this. Frankly, if there were no resources, I think it would still be a very small community.

I have, you know, always reached out to others for help. It's a very dynamic community. I can remember early in my career calling David Bruck who was, you know, already very kind of an important attorney in our community. He had argued a number of times in front of the United States Supreme Court. He was just about ready to try the Susan Smith case, only a week away, and he still took an hour to answer my questions. This was in the kind of early to mid '90s. So the community is very, very forthcoming, and I've never really been turned away when asking for help.

Q In his declaration provided to the Court -- or actually it's not a declaration, it's a statement which I guess was

later notarized -- Mr. Duchardt described the death penalty community as a clique. Is that your experience?

A It is not my experience. I have -- like I said, I don't think I've ever been turned away from help when I've asked for help; and, frankly, I get calls constantly myself for help, and I've never turned anybody away. I think it's a very, very forthcoming, welcoming community that is anxious to help, and I think a lot of people would say that.

Q So when I contacted you to ask you to look at Ms. Lebouef's declaration provided in this case, did I let you know that Ms. Lebouef, given the trial date, would not be able to testify?

A Yes.

Q Did I ask you to review her declaration as well as a number of other documents to see if your professional opinions and views were in concordance with Ms. Lebouef's?

A Yes.

Q I'm going to place on the overhead or -- you can tell I'm old. I still call them overheads -- the Elmo here. Do you recognize Movant's Exhibit No. 50 as the declaration that you reviewed?

A I do.

Q And that is a 31-page declaration signed by Ms. Lebouef?

A Yes.

Q On September 1st of October 2013 [sic]; is that correct?
A Well, the first day of October.
Q The first day of October, yes. And after you reviewed the materials -- let's go through the materials you reviewed first, then I'll ask you a question about the declaration. Is that okay?
A Sure.
Q Did we provide you with a number of background materials to review?
A Yes.
Q And I'm just going to highlight some of those for you.
A All right.
Q I know you don't have them committed to memory; is that correct?
A That is correct.
Q And you're not going to suggest to the Court that you are conversant with everything that's in those notebooks back there?
A No.
Q But you did review the documents that I sent you?
A Yes.
Q And we sent you, for example, the 2255 motion that had been filed on behalf of Mrs. Montgomery?
A Yes.

MS. HENRY: And I'm going to slow down, Ms. Calvert. I'm sorry.

Q (By Ms. Henry) And we also provided you with a number of declarations; is that correct?

A That is correct.

Q Did we provide you a declaration from a woman named Jan Vogelsang?

A Yes.

Q As well as Kate Porterfield?

A Yes.

Q George Woods?

A Yes.

Q Siddhartha Nadkarni. I will spell that name. S-i-d-d-h-a-r-t-h-a, Nadkarni, N-a-d-k-a-r-n-i?

A Yes.

Q Two declarations from Russell Stetler?

A Yes.

Q A declaration from Dr. William Logan?

A Yes.

Q A declaration from Judy Clarke?

A Yes.

Q Susan Hunt?

A Yes.

Q David Owen?

A Yes.

Q John O'Connor?
A Yes.
Q Fred Duchardt?
A Yes. I mean, there's a declaration by him. There's an interview. Some of these people there's some duplicates. They're not duplicates but one is a declaration and one might be a statement but, yes, I reviewed.
Q So there was a declaration from Chris Armstrong regarding an interview of Fred Duchardt?
A That's what I'm talking about, yes.
Q As well as a statement of Mr. Duchardt?
A Yes.
Q Then there is a declaration from a man named Bret, with one T, Dillingham?
A Yes.
Q Dani Waller?
A Yes.
Q Lisa Rickert?
A Yes.
Q Holly Jackson?
A Yes.
Q Sallye, S-a-l-l-y-e, Wilkinson?
A Yes. I can't quite grasp that one.
Q She's a counselor?
A Yes.

Q David Kidwell?
A Yes.
Q And did we also provide you with an interview of David Kidwell?
A Yes. In other words, there was a statement from Dani Waller, I think it was, first. Then there was another interview with Mr. Kidwell later, if that's what you are referring to, yes.
Q Did we provide you with a copy of the trial transcript?
A Yes.
Q And a copy of a transcript summary for your use in reviewing the transcript?
A Yes.
Q And there may be other items, but those were the most significant items that you reviewed; is that correct?
A I think so.
Q After reviewing the documents that we have obtained in this case on behalf of Mrs. Montgomery and reviewing Ms. Lebouef's declaration, do you adopt the opinions that Ms. Lebouef provided in her declaration to the Court?
A I do.
Q And does Ms. Lebouef's declaration accurately reflect what is the prevailing professional norms in the death penalty community?
A I believe so, yes.

Q I want to move on to another topic now with you, Mr. Bookman. I'd like to discuss with you this whole idea of attorney standard of care, which is really synonymous with prevailing professional norms. Would you agree?
A I do.
Q And the prevailing professional norms, would you also agree with me, are expressed in a number of ways, both through the ABA Guidelines as well as practice articles, case law, and publications from the Administrative Office of the Courts?
A I agree. I agree with that and I'd probably throw in national conference presentations as well.
Q So I'd like to break that apart and take it -- we've heard Mr. Stetler's testimony about these items from the perspective of a mitigation expert, but a mitigation expert and attorney are different things in capital cases; is that fair to say?
A Yes, it is.
Q So I'd like for you to discuss those things with me and the Court this afternoon from the perspective of an experienced expert capital attorney.
In order to come up with the prevailing professional norms in a capital case, I think it's important for us to share with the Court this concept of what makes a capital case different. We've heard that Woodson v. North Carolina sort of set out the standard of death is different. What is it about

death cases that makes them different?

A Woodson, and I guess Roberts v. Louisiana may have been the accompanying case, that really was the starting point. You know, I mean, I don't want to be too much of a historian here, but what happened was that the courts were finding that there was no way to discern the worst of the worst from not the worst of the worst. So when Furman was found unconstitutional, it was a lack of guidance provided to juries. The statutes weren't providing guidance.

So the states, a number of the states then took a better look at this or they changed their statutes, and what Woodson said was that we can't solve this problem of lack of discretion by simply giving everybody the death penalty because that would not -- that would mean that we're not doing an individualized analysis of each person to see whether he or she merited a death sentence.

So Woodson eliminated the possibility for mandatory sentencing, and what it said was that, you know, death is different because of the qualitative difference involved and that we don't want to make any mistake so we want to provide guidance, but we want to have something called heightened reliability; that is, we want to take special care to try to make sure that the discretion that these statutes are providing is being, you know, properly applied, essentially.

So that's what started the concept of death being

different, that it's death not only because of the possibility of execution, but also we don't want to be making -- we don't want to be making mistakes, so we want to have even more reliability than the ordinary case.

So ultimately that led -- you know, there's a number of cases that followed that; Eddings and Ake v. Oklahoma, and so forth. Ultimately in 1989 it was recognized that we need special -- we need to take special care in these cases.

So in 1989 the ABA passed guidelines, and what those guidelines talk about essentially is making sure that we're -- we, as a legal community, are doing the best job we can possibly do to ensure that this discretion -- you know, I like to picture kind of a funnel that cases go into and then only the ones that really merit the death penalty come out, and so the guidelines were designed to make sure that we were doing the best we could, as a legal community, with resources, with time, with defense teams to ensure that we were doing as good a job as we could.

So like I said earlier, when we came around to starting our unit in 1993, we followed those 1989 guidelines and applied them to every capital case that we had.

Q And as a result of the case law that grew; Lockett, Eddings, Woodson, did there come with that some principles on whether or not it was appropriate to limit mitigating evidence?

A Right. The principles -- ultimately -- and Lockett, of

course, was the first case to do this, but it really springs from the individualized sentencing that was mandated in Woodson. So what the cases say now and what, of course, Lockett started out by saying that, you know, we can't limit mitigation. Not everybody's mitigation is going to be the same and we can't limit it.

Then seven years later Skipper v. South Carolina came along, and what Skipper said was not only are we not going to limit it, but we're also going to make sure that some mitigation -- mitigation does not necessarily have to be connected to the crime. It doesn't have to explain the crime. It can be something totally separate from the crime. In that case it was, you know, institutional adjustment, but that Skipper stands for much broader than that.

Then, of course, years later Tennard v. Dretke came along citing Skipper articulated clearly that mitigation does not have to commit -- does not have to connect to the crime. It doesn't have to explain the crime. It can be any mitigation concerns for a reason for a sentence less than life -- less than death.

Q Now, I want to pause here for a moment, and that's to spell Tennard and Dretke for Ms. Calvert.

A I hope I can do it. It's T-e-n-n-a-r-d, D-r-e-t-k-e.

Q And that case from the United States Supreme Court was very clear that the decision maker cannot be limited from

considering evidence just simply because there was no nexus between the evidence and the crime itself?

A Yes. I'm not sure about this but it may have been Justice Kennedy. At some point Justice Kennedy said that mitigation is potentially infinite. It may have been in that case.

Q And there are other principles that have flowed from those cases. For example, does -- as a result of those decisions, was there a case, Green v. Georgia, I guess is what I'm getting at?

A Yes.

Q With respect to the ability of evidentiary rules to limit what a decision maker can and can't consider. Can you talk about that?

A Yes. It's kind of the -- that was the seminal case for what I guess what we would call relaxed evidentiary standards, which is that the Courts said in Green and said since that, you know, you can't -- we can't let evidentiary rules, strict evidentiary rules prevent the introduction of mitigation. You know, I had a very good example of it. In one of my own cases we introduced a videotape of young children --

MR. VALENTI: Your Honor, I think I'm going to object. I feel like we're getting far afield. I'm not sure of how the history lesson on how we got the rules we have is necessary to the rules we do have. Let's talk about that.

THE COURT: I don't need a history lesson on it.

MS. HENRY: Your Honor, just one more question, if I might.

THE COURT: All right. If you don't get a direct answer, then ask it again.

MS. HENRY: Okay.

Q (By Ms. Henry) Mr. Bookman, is it also true that as a result of the Eighth Amendment cases that unanimity is not required on behalf of a jury in order to consider mitigation evidence?

A Yes, very specifically not required.

Q And we've already sort of gone through with Mr. Stetler, so I'm just going to ask some leading questions because I want to get the concordance between both the attorney and mitigation specialist with the acceptance of what are these prevailing professional norms that Mr. Duchardt takes issue with them, and that is the ABA Guidelines you've already discussed from 1989 as well as the ABA Guidelines in 2003. Do the ABA Guidelines in 2003 reflect the prevailing professional norms as they exist in capital cases?

A Yes. I mean, I haven't mentioned them yet but, yes, they do.

Q And with respect to the supplementary guidelines for the mitigation function, it was published in 2008, but do those guidelines reflect the prevailing professional norms for the

presentation of mitigation in capital cases during the relevant time frame here, 2004 to 2007?

A Yes, they do. In fact, if you look at the footnotes for those mitigation guidelines and for the 2003 Guidelines, they're clearly citing lots of material from way before those publication dates.

Q And you knew that experience in your practice as an attorney prior to the publication of those particular reports; is that correct?

A Yes.

Q And so those reports were simply a reflection of the practice -- the best practices of folks in the death penalty community?

A I would say that's right.

Q And I'd like to now move on to a different topic with you, Mr. Bookman, and that has to do with -- I keep looking at my note from Ms. Calvert that says slow down -- that has to do with what it means to be a qualified death penalty attorney, if we can turn to that topic now. Has there been a debate in the death penalty community about what it means to be qualified?

A Well, you know, I think that the community or at least the decision makers for cases initially started with a thinking about experience, and I think we moved away from that, and I think Ms. Lebouef talks about this a little bit, a movement away from, you know, trying a hundred cases to what did you

do -- what was -- did you perform with some merit in those cases? So it was kind of a concept of, you know, if you go -- and I don't want to be too --

Q Let me stop you there and ask you a question. So does it matter how many notches an attorney has on their belt, if they've tried ten capital cases but half of those clients have gotten the death penalty? Does that necessarily make them a qualified capital attorney?

A No. This is what I was about to say. You know, if you went to the track and you saw a horse that ran 30 times and he always lost, you wouldn't bet on that horse. So the community moved away from -- the community moved away from just how much experience do you have to a closer analysis of what exactly was that experience and how was that used. So the guidelines talk about kind of a merit-based system where the appointing system looks at the job you've done, not just how many cases you have and how many you've tried.

Q And has the United States Supreme Court and Congress recognized the importance of attracting qualified counsel in federal capital cases?

A Yes. The original Spencer Report was from 1998. That was Judge Spencer's report. And that was kind of a clear recognition that federal cases were -- there was a decent number of them, and the Spencer Report talks about the quality control, making sure we get the best lawyers, raising the fees,

you know, talking about a lot of the standards that, frankly, can be found from the 1989 guidelines and sort of took them to look at the federal cases and applied them for quality control, basically.

And, of course, in 2010 the Spencer Report revised it but didn't change it in any significant way, just an acknowledgment that quality was crucially important in these cases. Then, of course, there's a case, Martel v. Clair. I don't know if you want me to discuss that very briefly.

Q First let's spell Martel. M-a-r-t-e-l v. Clair, C-l-a-i-r?

A Yes.

Q And that's a case in the U.S. Supreme Court. And did it discuss the Congressional history with respect to appointment of counsel in capital cases?

A It did and it basically talked about -- it talked about the standards, and it talked about the intent of that statute. I think it's 3599. That talked about, you know, seeking the best lawyers and the highest quality attorneys to handle these cases.

Q Turning now to the ABA Guidelines, Mr. Bookman, I want to focus with you on three areas with respect to the guidelines, then I'm going to cut you loose for the day and get to our other two witnesses. So let's go to Guideline 4.1, the defense team and support services.

When you were reviewing the record in this case as well as Ms. Lebouef's declaration and Mr. Duchardt's sworn statement provided to the Court, did you see anything in his statement that gave you pause with respect to this particular guideline?

A Well, okay, I have to apologize. I haven't committed 4.1. Is that structure of the team?

Q Defense team and support services, right.

A So, you know, this team suffered from any number of problems and so, you know, you have to make a decision -- I mean, you can either -- you can either define a team as a number of people or you can define it as a working team.

Here they lost, you know, mitigator after mitigator after mitigator. I think there was four of them at some point. They lost lawyer after lawyer after lawyer. So I think about it like kind of like an orchestra. What a team should be doing is there's an orchestra leader and he sends out everybody to learn a piece of music, and everybody -- you don't have five clarinetists. If you have a small orchestra, everybody is playing a different instrument.

And so everybody gets delegated a job, and then that team, they do its job and they come back and each -- and regularly they go over the job they're doing, and they have meetings to discuss it. It's kind of like an orchestra rehearsal. So you'll learn your task. You do your task. You

come back. You practice with the orchestra. And you come back again. You do more. You practice more. You come back and you meet again, and at some point the orchestra's prepared to play its piece. Here you've got -- there's no -- I mean, there's no institutional --
Q Let me stop you there for a minute.
A All right.
Q Because one of the things we heard about earlier today and I think you are alluding to is this sense of turnover and disruption in the legal team, and so I would like to put up on the screen here what's previously been admitted as Movant's Exhibit 133, which is the trial team timeline. Have you seen that trial team timeline?
A I have.
Q And does that accurately reflect from your review of the record the number of different defense teams that were involved in Mrs. Montgomery's case and the dates in which they started and stopped?
A Yes.
Q And does the disruption of the attorney-client relationship in this case, at least four major times, have any impact on the quality of the ultimate trial attorneys to be able to represent the client?
A You know, disruption is never going to be a good thing, but -- you know, you always want to minimize disruption on a

capital team, but here you've got an exceedingly traumatized, you know, mentally ill, very, very sensitive to any kind of -- any kind of disruption and trauma, so you have to be particularly careful about it when you have a client like this.

What happened here the constant disruptions, you know, took away any stability that she might have in her team, but also there was a sense of -- there was such a sense of lack of continuity. I think it was best articulated by her when she wrote that letter pointing out, you know, she doesn't know what's coming next, and so --

Q Let me stop you there a minute. You said "that letter." That's the first time the letter's been discussed this time in court. When you refer to "that letter," you are referring to the letter which Ms. Montgomery wrote to Judge Fenner in May of 2006 regarding Ms. Clarke's departure from her legal team. Is that the letter you are referring to?

A Yes.

Q And we'll get back to that in just a moment, but we're talking about the importance of team continuity on the team, and I skipped over an important predicate question in my desire to rush, which is to ask you, we see problems with this team but what does a functional death penalty team look like?

A Right. I'm hesitant to call this a team, and I'll tell you why. You know, a team, as I said, I mean, an orchestra, a sports team, whatever, they get together and they practice, and

this is a -- a team has -- well, for one thing the ABA Guidelines give you a floor; two attorneys, a mitigation specialist and a fact --

THE COURT: Mr. Bookman, could you just tell me what they didn't do, in your opinion. I mean, I understand your analogy and I understand how the concept of a team is supposed to function.

THE WITNESS: I'll try and cut right to the chase then, Judge.

A This team didn't -- they didn't meet. They didn't exchange -- they didn't exchange ideas. They didn't -- you know, when tasks were delegated, they didn't synthesize those tasks into a whole. So, you know, there's a lot of puzzle pieces to a death penalty case and you have to put them together. So in this case the tasks were delegated but they were never synthesized into a whole, and one of the main reasons was that the team never met on any kind of a regular basis. You can't have -- it's not a dictatorship.

Q (By Ms. Henry) Mr. Bookman, let me ask you this: We talk about the importance of meetings and Ms. Lebouef talks about that in her dec about how team meetings are the most important thing; and so when you read in Mr. Duchardt's declaration that he rejected the concept of meetings because he just wasn't a meetings guy, does that reflect the standard of care in federal death penalty cases?

A No. It's very contrary to the standard of care, obviously.

Q And if the billing records of Mr. Duchardt and Mr. O'Connor are to reflect that in fact they met as an entire team less than ten hours over the course of 16 months, in your expert opinion is that a sufficient amount of time for a team to get together and make these important decisions that they're required to make?

A No.

Q Is it sufficient for a capital team to do such as what this team did, which is to assign individual team members a task and then not get back together and discuss those tasks?

A Delegation is important. If you don't delegate tasks, then there's just too much to do. There's a huge amount to do. But it can't just end at delegation because everybody has -- everybody has their insights about what they've done. If you don't bring those insights together and discuss them as a team, it's wasted.

I'm hesitant -- I don't want to put a limit on it. It's not like a team can't -- they didn't meet for ten hours, and ten hours I can say is not enough, but 20, 40, 60. This team never really met. They never discussed things.

There was a case in Philadelphia where the second lawyer got up and spoke about -- he gave a Bible interpretation saying that an eye for an eye only applied when you killed a

pregnant woman. He didn't realize that in fact that was the crime his client had been convicted of. So, in other words, I mean, it's a harsh example, but teams that don't meet, don't synthesize their presentation, and they don't -- and they also -- you know, the idea of a team is bringing different people with different skill sets together.

Q An example of that case, I'd like to draw your attention to what happened here. We heard about, to some extent, the report from Dani Waller, the mitigation specialist, and you're aware that Dani Waller's declaration states that she felt like she was cast aside by this team and that she didn't really have much of an opportunity to share what she had learned of in these meetings. You are aware of that?

A Yes.

Q And you read Mr. Kidwell's declaration, correct?

A Yes.

Q And you've also read the statements that Ms. Waller prepared with respect to her interview?

A Yes.

Q And having read that, did you as a trial attorney see a number of red flags?

A I did.

Q Including, for example, did you see in that report that Ms. Waller indicated that Mr. Kidwell had been cautioned by the family to not cooperate with the defense?

A Yes.

Q You saw that?

A It's really the second or third line of the statement, and that already alerts an effective capital lawyer to huge problems, you know, in the family dynamic.

Q And when you see huge problems in the family dynamics, do you, as an experienced trial capital lawyer, begin to think that perhaps this is a case where there is a significant trauma history and a lot of family secrets?

A I think that's exactly right. There are any number of different explanations for it, but you have to do a thorough investigation to know. I mean, reading that -- once you're aware of that and then, of course, there are many others that feed right into that where the mother is suggesting that the daughter, Ms. Montgomery, was at fault, and so forth. So, you know, there are a lot of things that need a very, very full investigation just from this one relatively short statement.

Q And does this report also indicate that the witness, though he is a cousin of Mrs. Montgomery, is also a law enforcement officer?

A Yes.

Q And so does that, in your experience, give him a little bit more credibility from a normal witness?

A Well, I think it does. I guess it would almost have to. But there's a lot of reasons to believe this anyway even

without that.

There are -- let me just start out by saying whether you believe it or not, a full investigation is absolutely necessary. I mean -- I don't know why anybody would read that and not believe it; but even if you did read it and didn't believe it, you would certainly do a full investigation that merits that. There are many reasons to believe that it's true, and then he is a law enforcement officer. So for all those reasons, this would require a full investigation.

And, frankly, for anybody that's done a number of these cases, this is -- it's not a recurring pattern but it's a pattern that we've seen occasionally.

Q If you're experienced in these cases?

A That's right. That parents who don't necessarily want things brought out in the public will call family members and say, Don't talk to them or don't cooperate. That's something we've seen before.

Q But an experienced team can get past those barriers?

A Absolutely.

Q And with respect to Mr. Kidwell's disclosure that Lisa Montgomery had told him contemporaneously when she was a child about these multiple gang rapes that she had been subjected to, is that something a capital defense lawyer who is experienced would follow up on?

A Well, I mean -- yes, of course. But it's not just -- I

mean, that's a huge issue when he talks about her saying that -- I'm not good with these names. It's Jack Kleiner and his friends were together and did this. You're talking about, you know, you're talking about real systemic abuse there.

Q And this report is dated March 1st, 2007; is that correct?

A Yes.

Q And that's happening really at a critical time in the case since there's an April 30th, 2007, trial date looming?

A Yes.

Q And from your review of the record and your review of Mr. Kidwell's declaration, does it appear that anyone followed up on the red flags that were in Mr. Kidwell's report?

A Well, I didn't read the whole transcript. It's a long transcript. So I'm not going to claim I read it. But I took special notice to look at Mr. Kidwell's testimony because having read that, I wanted to see how it played out in an actual courtroom, and I was shocked to see, you know, two pages or whatever it was that Mr. Kidwell testified. He could have testified for half a day on just his observations of Lisa and the interactions between Lisa and her mother and Lisa and her stepfather. That statement alone, I mean, once you did a full investigation of it, you know, that's not a two-page bit of testimony. That's a significant trauma.

Q And we're just picking out a few of the red flags in

the case that will be developed through the course of this hearing, Mr. Bookman, but I want to talk to you about this concept that we talked about in the trial community -- I don't think it's really even unique to capital defense lawyers -- about the need of the defense to come to grips with what are considered bad facts or bad facts being unchanged, and specifically we've already heard testimony this morning that there was -- the trial team was alerted to the fact that Mrs. Montgomery's children would provide damaging testimony with respect to Lisa's abuse and neglect. As a trial attorney, is that something that you would want to investigate and figure out if there was a way for you to mitigate?

A You have to investigate it and then you have to -- you have to -- for lack of a better word, use it in your case. If it's in the case, then you've got to confront it. There's a fantastic United States Supreme Court case that really discusses this, Sears v. Upton, which is the lawyers tried to portray Mr. Sears as a, you know, a decent guy with a decent middle class upbringing. His family was shocked to hear what he had done, and so forth.

MR. VALENTI: Your Honor, again, I object. We're getting well beyond the questions being asked.

THE WITNESS: Judge, I'm going to get -- let me just finish this point because I think it's relevant.

Q (By Ms. Henry) I'll ask you a question.

A Okay.
Q So the point of Sears v. Upton, is it not, that it violates the Eighth Amendment to present a false picture to the jury of who your client is?
A Yes.
Q Is that a problem that you saw here in Lisa's case?
A No question about it.
Q Where Lisa's trial attorney presented her to the jury as a good mother when in fact there was plenty of evidence that was going to rebut that?
A That's exactly what Sears said. They made an attempt -- you know, the truth would make her less likable in front of the jury but more understandable. That's what Sears said. The lawyers tried to make Sears more likable and, consequently, he was less understandable. So they said that was a violation of the standard of care, basically. And that's happened here in a number of circumstances, not only just with her children but with the diagnosis.
Q And so I'd like to move on to the issue of diagnosis and working with experts, because ultimately at the end of the day whose responsibility is it to elicit -- to choose the expert witnesses in the case?
A It's the lawyer's responsibility.
Q And whose responsibility is it to provide the appropriate background and history to the experts?

A It's the lawyer's responsibility to do all those things, ultimately.

Q And in providing information to an expert, isn't the standard of care in the capital death penalty community that the attorney first conducts the biopsychosocial history before retaining expert witnesses?

A The standard of care is that you should be almost complete with your biopsychosocial history. I mean, that's standard of care. It's also common sense.

Q And why is that common sense?

A Well, you wouldn't go to a doctor and say, you know, diagnose me. The doctor asks you a couple of questions. Doesn't ask you about your family, doesn't look into your medical records, doesn't ask what medications you're taking, and then gives you a diagnosis. That's not a diagnosis that you would rely on.

You would want a doctor to ask you about your health, your parents' health, maybe your grandparents' health, look all over your records, ask you a lot of questions about your behavioral patterns or whatever your problem is and before he -- he would select specific tests that might apply to your complaints, and only then would you expect, you know, a fair assessment of your physical health. With mental health it's even worse.

Q And let me ask you this, Mr. Bookman, because the first

expert that was retained in this case by Mr. Duchardt before he even met Mrs. Montgomery was an expert who does functional instructional imaging, MRIs and PET scans. In the capital defense community what is the teaching with respect to when such very expensive imaging should be considered in a case?

A I think that for a long time now there has been extreme -- let's just say you do that with extreme caution. You don't do that until you finished your biopsychosocial history, until you have real concrete reason to believe that an MRI or CAT scan or PET scan would show results. You generally would do something preliminarily like a neuropsychological evaluation. So you would have reason to think that one of those tests would be fruitful for financial reasons, and also because you'd have to know what tests to take and whether it would show anything.

Q With respect to the decision in this case to plead Ms. Montgomery not guilty by reason of insanity, I would like to talk to you about that, although Mr. Stetler was able to speak to that and he is not a lawyer as you are.

There are some special considerations, are there not, that an attorney must have in mind before he or she chooses to enter a plea of not guilty by reason of insanity on behalf of their client? And is one of those considerations the fact that you are essentially waiving your client's Fifth Amendment right?

A You certainly are opening your client up to examinations, examinations and the government's, you know, taking a very careful look at your mental health problems. You are certainly doing that to a far greater extent if you seek a defense of not guilty by reason of insanity, yes.

Q And so before you plead your client not guilty by reason of insanity, is it incumbent upon the lawyer to make sure that he has an expert witness who is qualified and capable of rendering a diagnosis that's consistent with the definition of insanity in a particular jurisdiction?

A Yes. I mean, no question. I totally agree with that. There's also -- there's a lot of other reasons that you would be extraordinarily cautious before you went down the path of insanity under these facts.

Q What does -- what's the impact of pleading a not guilty by reason of insanity defense on mitigation when that defense is ill-conceived?

A So, you know, there's a lot of research on this topic. The Capital Jury Project -- I don't know if Mr. Stetler discussed the Capital Jury Project. So there's a lot of -- there's a lot of data that suggests -- you know, we know that capital jurors are more prone to conviction, at least there's a decent amount of research on that topic, but we also know they're much more skeptical about insanity. Of course, the public generally is more skeptical about insanity.

We also know from the Capital Jury Project data that a failed innocence defense is a very likely death sentence, because it gives the appearance that a defendant has tried to fool the jury, has tried to get over it and is not willing to accept responsibility for what he or she has done. So you have to be extraordinarily cautious before you go down the path of what I'm calling an innocence defense, and not guilty by reason of insanity is the equivalent of an innocence defense in the sense it does not accept responsibility and, you know, says basically, I didn't know what I was doing, I didn't know the wrongfulness of my act, or whatever.

Q So you are aware that the not guilty by reason of insanity defense in this case was based on a diagnosis of a condition called pseudocyesis?

A I am aware of that.

Q And that's spelled --

MS. HENRY: You got it. Okay. Good, because I might have failed that spelling.

THE COURT: I think Kathy knows how to spell that.

MS. HENRY: My spell check even has it now.

Q (By Ms. Henry) And Dr. Ramachandran who was the seminal expert presented at trial has since provided a declaration wherein he has stated that not only is he not an expert in pseudocyesis, that he's also not a licensed psychologist or psychiatrist and that he did not understand,

because he was educated at Oxford, that the federal insanity statute was anything other than the McNaughton Rule which he had been taught in Cambridge. Accepting those things as true, the deposition is already in the record and the Court will read it. If all those things are true, is it your opinion that a qualified capital defense lawyer would base an insanity defense around such an expert?

A You would not. I mean, picking an -- first of all, it seemed -- it looks to me as if they came up with their theory then picked an expert. That's not exactly -- you know, you have some insights into your case, but you don't settle concretely on your decision and then go get an expert that will say that. But I have many other problems with that defense as well.

Q And so could you share some of those problems with us briefly?

A Sure, briefly. You know, there are -- there are prosecutors in your courtroom, and they're here today as well. I'm not sure if they are the same ones. But when you're proceeding with caution, you have to recognize that there is -- there is evidence that hurts your defense and you're going to lose credibility if you go with a defense where it is so provable.

So when we're talking about insanity and we're talking about wrongfulness of your act or appreciating the

nature and quality of your act, the federal statute's very short, when you have such concrete evidence that it's not true, that pseudocyesis was not true, and I'm talking about the leading emails and creating a false Hotmail address, and there's, at least, the research into C-sections. When you're an experienced litigator and you've dealt with insanity cases before, you know what to look for and you know what is going to be a big problem.

And so those three facts -- and there may be many more. I didn't read the entire transcript. Those three facts alone would alert any effective trial lawyer to say, This isn't going to work and I'm going to lose my credibility in front of this jury. And as far as I can tell, that's what happened.

Q So, Mr. Bookman, I want to move on to our last area of discussion with you today, and that's the area that's really in your wheelhouse which is the duty of trial counsel to pursue plea negotiations. Okay?

A Yes.

Q And the ABA Guidelines speak to this, but the United States Supreme Court has also spoken to the duty of trial counsel to pursue plea negotiations; is that correct?

A Yes.

Q And that's something that you've had quite a bit of success with; is that correct?

A Yes.

Q And it's something that you have lectured on quite frequently with trial lawyers; is that also correct?
A Yes.
Q In your experience, have you had situations where you had a prosecutor tell you, No way, no how, this case is so bad we're never going to offer you a plea?
A Yes, just a year and a half ago.
Q And in those cases were you able to ultimately plead those?
A Yes. Not only me. There are many, many attorneys across the country that have pled cases that were seemingly unpleadable, you know, in the media or whatever and those cases have resolved themselves.
Q Now, one of the things that we've learned just last week because the government was kind enough to provide notes of one of their trial attorneys is that this team -- well, a couple of the lawyers assigned to represent Mrs. Montgomery approached the government on April the 3rd of 2007 to have discussions. It really wasn't a plea offer. It was discussions. I recently made you aware of that; is that correct?
A Yes.
Q And we discussed the notes that were provided to us?
A Yes.
Q And so those notes have previously been admitted as

Movant's Exhibit 138, and I'd like to put the first page of those notes up there for you to see. And you see there where it says Tuesday, 4/3/07, 9 a.m.?

A Yes.

Q And I'll represent to you that later in the day counsel appeared before his Honor to have some discussions about the upcoming trial date, but do you see the first entry there where it says, "D continuance"?

A Yes.

Q And do you see where it says, "Judy Clarke believed shouldn't talk to defendant. Fred disagree and talked to defendant"?

A Yes.

Q Do you see that?

Have you had an experience where as a capital trial lawyer you tell your -- the team, You know what, it's not a good idea. Our client is pretty mentally ill. She's fragile. Let's not question her about the offense because we want to not have an impact on her memory?

A Yes. I haven't had a female traumatized like that. I mean, I haven't had that specific situation; but, yes, we've had very profoundly mentally ill clients, clients that would say to us, I don't remember it or I don't know nothing. And so oftentimes we might be very, very careful in making sure that we don't suggest what happened to somebody that, you know,

doesn't have a clear memory or has memory impairments or is traumatized.

There are many, many different examples of it. It doesn't happen all that often, but it does periodically happen that is someone who is really -- of course, Mr. Dillingham's notes sort of suggest that initially she was in that sort of state. So you want to be careful not to make suggestions.

Q I want to ask you a little bit more about the circumstances of that April 3rd, 2007, meeting where the defense is making it clear to the government that they need a continuance because they're not ready for trial, and they make a suggestion to the government that Mrs. Montgomery would proffer to testify against her brother as an alternate suspect?

A Yeah.

Q Is that correct?

And see if I can find in the notes -- let me ask you this: Is it ever a good idea when you're having these sorts of plea discussions with the prosecuting authorities to tell them things that aren't true?

A Well, it's -- I mean, this is a problem I have not only with what's called the Tommy defense but also pseudocyesis. I have a lot of problems --

Q I'll get there but I want to ask you a specific question.

A Yes. It's not good to lie to the prosecution.

Q Okay. And specifically the prosecution, it appears from their notes, that the defendants told them that they had a witness who had a positive I.D. of Tommy as being in the car driving away from the scene; and if I tell you that in fact that was an untrue statement, do you consider that to be professionally reasonable behavior to represent you have an I.D. witness when in fact you don't?
A Obviously it's never good to do that, and certainly it isn't good under those circumstances for any number of reasons. You're going to, you know -- not only is it below professional standards but you're going to lose all your credibility as well in a situation where your credibility is crucial.
Q And so there were, as you said, as we discussed, a number of problems with this ill-conceived plea discussions, but can you share with the Court very briefly what those concerns that you had were?
A Sure. I mean, you know, the No. 1 rule of plea negotiation is you don't underestimate your opponents. You know -- and I think -- I'm not -- you know, I wasn't there so I can't anticipate it; but I know that if I had a case like this and I had -- you know, you have to be able to think, What's the government going to think about this? So I put myself in place of the government and I say, What are you giving us? A mentally ill, traumatized woman who gave contrary statements initially.

You know, from a government perspective and, of course, they can -- they're obviously going to speak for themselves, but I think good defense lawyers have to put themselves in the place of the government. You're not giving them a case that can be prosecuted. They have no evidence that Tommy did it. They in fact have evidence that Tommy didn't do it. They have no case that they can base a prosecution on because it's just a woman trying to, you know, say someone else did it without any other evidence at all. That's not a case, you know, any competent prosecutor is going to arrest somebody else on, especially when they have evidence that she said something contrary and that he had an alibi.

Q So would a competent capital defense lawyer fully investigate their client's statement that there was this alternate suspect before presenting that to the government?

A Yes. You would never, you would never come to the government with a theory that someone else did this or someone else was involved or you should seek to prosecute someone else unless you did a full investigation and had real evidence to support it. I mean, unless I'm missing something, there was no real evidence to support this that the government could base a case on. If they had evidence, they would have acted on it.

Q I would like to now direct your attention to the second situation where Mr. Duchardt -- I wouldn't even call this a plea offer, but where he sent a letter to the Department of

Justice in Washington, D.C. It's previously been admitted as Movant's Exhibit 139. You see the date on there as September 29th, 2007, two days before the start of the trial?

A Yes.

Q And when you reviewed that letter, there was a particular sentence that really struck you. Can you tell us what that sentence was?

A Yes, the second sentence. "It has recently come to my attention that, when previous counsel had met your committee early on in the case, you had invited them to provide to you any mental health evidence that might develop in the case so that the committee might consider that, and possibly reconsider its recommendation." It goes on from there. It's a long sentence.

Q And the particular word that caused you concern was the phrase "recently come to your attention." Is that correct?

A Yes.

Q Because Mr. Duchardt had been appointed May 19th of -- I believe it's May 19th -- of 2006, and this letter is written September 28th, 2007, what does that tell you about the loss of institutional memory on this team?

A I mean, it tells me that there really was no institutional memory, but it tells me something beyond that as well, which is -- I mean, these are serious cases, and so capital -- experienced capital defense lawyers start out by

doing two things. They start out with a full investigation of the trial -- of the factual allegations, and they start out with a full investigation of the sentencing phase, and at some point those two investigations proceed to a point where the team gets together and decides, What's the best way to resolve this case? Should we go to trial or should we try to resolve it to something less than a death sentence? And often, often, very often the answer is let's try to resolve this to something less than a full-blown trial. And so that --

Q I'll ask you some more questions about that in a minute. But with respect to Mrs. Montgomery's case, if it were true that Mrs. Montgomery had in fact told initial counsel that she was interested in accepting a plea of guilty and sentence of life without parole prior to Mr. Duchardt even coming on to the case, is that something that should have added to his efforts to pursue plea negotiations?

A No doubt about it.

Q And have you had an opportunity to review dispositions in cases similar to Mrs. Montgomery's?

A Yes.

Q And I'm going to show you what has been previously admitted into evidence as Movant's Exhibit No. 131, if I can figure out how to get it on the screen here. I feel like I'm having a neuropsych test now. Does that chart accurately reflect research conducted into other cases where women killed

pregnant women and took their babies?
A I'm assuming, yes.
Q And other than Mrs. Montgomery, is there anyone in the United States who has received a death sentence for this crime?
A No.
Q In fact, everyone who has committed this crime except for Mrs. Montgomery has ultimately received a life sentence; is that correct?
A That's what the chart indicates.
Q And so a capital defense attorney conducting this sort of research would competently pursue plea negotiations; is that correct?
A Well, sure. I mean, it tells you that this is the sort of case that can result in a life sentence, the community can be satisfied with this. So it doesn't mean that it's going to be necessarily resolved, but it's a very, very important path to follow. That's what I was sort of getting at, the third path. Once you decided, there's got to be a full third path and that is plea negotiation, and plea negotiation doesn't take place two days before trial by sending a letter that you just recently heard about it. That should have been one of the very primary, first questions he should have asked.
I mean, again you've got this pseudocyesis defense, it's sitting out there, but having been able to see the problems with that defense, competent and effective capital

lawyers pursue a plea negotiation even if the client didn't say that. Even if Ms. Montgomery said she didn't want to do that, you'd be obligated under the guidelines to pursue it and discuss it with her.

So when he said, She didn't tell me she wanted to plead guilty, that's a meaningless thing. In fact, it's contrary to the guidelines and it's contrary to my experience. I've only had a few people in my, you know, decades that have said they want to plead guilty. Generally the lawyer initiates the discussion and, you know, you bring all the facts to bare in a discussion. So for Ms. Montgomery to say she was interested in that is yet one more reason why you would strongly pursue it.

What I think irritated -- it didn't irritate me. What struck me about the letter was that he said he had recently come to realize that. Having the case for that long, plea negotiations should have been one of the very primary topics of every team meeting from after May on. That should have been a very, very prominent point of discussion. How can we resolve this case? What can we resolve it with? And, again, presenting a Tommy defense is not good plea negotiation, and presenting a mental health defense that the government profoundly won't believe because of their own evidence is also ineffective plea negotiation.

Q And, finally, Mr. Bookman, there are -- lawyers make

decisions, people have to make choices and make decisions, but there's a difference between making a decision and a difference between -- and making a reasonable strategic decision?

A Yes.

Q In a capital case how are reasonable strategic decisions made under the prevailing professional norms?

A Again, this is more common sense than anything. But capital -- any decision made in a capital case can only be strategic if the team has all of the available information at its disposal. So I'm not somebody that gets on the stand and says, If you had done this, you'd get that result. I am someone that says that we have prevailing norms and we follow those prevailing norms because those prevailing norms have uniformly worked most of the time. That's why they're prevailing norms.

And so to make a strategic decision you have to have all the information and have discussed it. So if you decide on pseudocyesis without a full discussion of the negative evidence that was going to hurt it or the negative ramifications of Dr. Ramachandran's -- I can't pronounce it -- background or the negative experiences of opening a client up to examination by Dr. Dietz and Dr. Martel or understanding what the statute is, understanding the ramifications in a capital case, if the jury disbelieves the insanity defense, if you haven't contemplated all of those decisions, then you haven't made a strategic

decision.

Q Thank you, Mr. Bookman. Just one moment. Thank you.

MS. HENRY: Let me get this stuff out of your way.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Mr. Bookman, good afternoon.

A Good afternoon, sir.

Q Let's go through several things, if we may. First, I want to talk to you about the exhibit you were shown that had the defense timeline that showed the attorneys coming in and out of the case.

A PowerPoint slide?

Q Yes.

A Yes.

Q Now, there's a lot of focus on Anita Burns and the Kansas lawyers and Judy Clarke and all; but, quite frankly, what we're here to talk about today is the team that ultimately tried this case, that being Mr. Duchardt, Mr. Owen, Mr. O'Connor, and the investigators they had around them, correct?

A Yes.

Q Because what we're worried about is not what others who could have been in the case, might have been in the case, or what they might have done in the case, we want to know what actually happened in the case by the people that took the case

to trial, right?

A Well, I'm assuming that you're right. I'm willing to agree with you.

Q Well, we're in a postconviction setting. We're talking about whether or not Ms. Montgomery received effective representation of counsel during the course of her trial, because ultimately we're here because she was convicted and sentenced to death, correct?

A Well, that's why we're here. I mean, I'm not sure what you're asking me. You may not be asking me anything controversial, but I wouldn't just separate out the last 16 months. I mean, I would talk about from the time she was arrested; and, frankly, it goes way before that. So I can't -- I'm not sure what you're asking me about. I can't just isolate out 16 months of her representation. If you're asking me specifically about something that happened during those 16 months, I can talk about that.

Q We don't have to ground on my opinion about why we're here. We're to talk about the team that took her case to trial.

A I mean, I'll accept your question for what it is.

Q Well, you talk about, then, one of the things you acquired as an important team component was you call them team meetings, correct?

A Yes.

Q And what we're really talking about, though, isn't it, communication?
A That communication, yes. Team meetings, I would say, yeah, boil it down to that.
Q And meeting can mean any number of things, but do they have to be face-to-face meetings?
A They don't have to be. I mean, you know, there are resource problems and sometimes federal teams are more scattered than state teams and city teams. I think that teams should meet face to face on a regular basis. I don't think every meeting has to be that way.
Q And whether they use modern technology, as long as they're communicating, they're accomplishing a goal, aren't they?
A Well, you know, I mean, I think Ms. Lebouef pointed this out. You know, you can have daily email check-ins, and so forth. You know, it's better than nothing, but email, there's no give and take. So there's no -- there's no, you know, here's what I found, then the investigator chimes in and says, you know, that's interesting because I found something along those lines too.
I had a very good example of this. I don't know if there's time for me to say, but, you know, on a team -- I was investigating a team with two mitigators. You bring different skills to the table. You have to sometimes meet face to face.

My mitigator came up to me and said, We all visited the mother, a number of times, of the client. They came up to me and said, Did you notice that the rug was neatly vacuumed? Well, I had gone to this mother's house a number of times but that's not one of my skill sets. So it dawned on me when they asked me and I said yes. It turns out it was always neatly vacuumed every time I went there. It turned out that one of our themes was an obsessive-compulsive disorder on the mother. I would not have picked that up. That's outside of my wheelhouse. If we had not had those meetings, I would not have known that. I would not have known to pursue it, and we did pursue it. So the synthesis of all the different team meetings led us to a very important theory in that case. So emails are okay, daily check-ins, but at some point teams have to meet and have a back and forth, a give and take.

Q Well, you acknowledge phone calls, emails, use of modern technology, Facetime, things like that, can serve the purpose of getting a team together so they communicate with one another?

A It certainly will help, yes.

Q Now, you talked at some length about plea negotiations and what should have been done or should not have been done, and we talked about the fact that the team that took the case to trial met with representatives of our office on April 3rd, 2007, to accomplish what I think is fair to say one of the more

important goals in a capital representation. That is to get death off the table, correct?

A That's a very important goal.

Q If you can do that, it's going to be a goal of you or other trial counsel when you're representing a capitally charged defendant, correct?

A It's a No. 1 goal I think.

Q Okay. And when they came in that meeting of April 3rd, were you aware that there was a looming trial date that had not yet been continued on April 30th of 2007, so some four weeks from the date of the meeting?

A Yes.

Q Okay. So time was precious because they were on the loom of a trial date, correct?

A Yes.

Q And they came to our office and engaged in plea negotiations where they identified that Lisa had -- Lisa Montgomery had disclosed to them that there was another person present with her at the murder, correct?

A Yes.

Q You're aware that was disclosed to Mr. Duchardt, Mr. O'Connor, and Mr. Owen?

A Well, I know -- I mean, I'm not sure what the genesis of that statement was. I know that they said that she said that.

Q I'm not asking you of the veracity of what it was, just that it will be testified to that they learned in January of 2007 that she had opened up to them, in their words, and disclosed there was another person present with her at the murder?

A Yes. That's what they told.

Q And so from that January time frame, which is inexact, to the April 3rd, 2007, time frame, which is pretty exact, they told our office that they had done an investigation and found a witness who had seen another person in the car that they thought was the getaway car with a female. Okay?

A Yes.

Q All right. So in their mind they had a third-party nonbiased witness who thought there was at least two people leaving the scene of Bobbie Jo Stinnett's murder?

A Yes.

Q Okay. So they were attempting to do what you had described as one of the more important goals of a representation, that is to get our office convinced to take death off the table in the prosecution, correct?

A I assume that's what they were trying to do, yes.

Q And ultimately they were unsuccessful, correct?

A Clearly.

Q And you've talked about the failure of that negotiation. Let me ask you this: Have you ever negotiated a

less-than-death result with the Western District of Missouri?

A No, sir.

Q Okay. Are you familiar with how many cases have been death certified and tried by the Western District of Missouri subsequent to the passage of the Federal Death Penalty Act in 1994?

A I am not.

Q Are you aware of how many cases that were once certified as death ever negotiated down to life results?

A I'm not aware.

Q Okay. If I submit to you that the answer is none, would that surprise you?

A You know, I mean, would it surprise me? I don't know. But there are cases in very, very bad jurisdictions that have resolved themselves. Arizona, you know, Philadelphia was no picnic either. I'm just saying that, you know, whether or not the answer is none, the attempt was ineffective. You, as a prosecutor, must know that when they came to you with nothing, they would leave with nothing.

Q Well, it wasn't me.

A Okay.

Q I've inherited the case from two people who have gone on to be judges.

The fact of the matter is, you've not negotiated a less-than-death result and you are not aware of what our

office's practice is once a case has been death certified, are you?

A You're correct.

Q And so they made the attempt and they were not successful. We know that as a fact, correct?

A I agree with that.

Q And so though you claimed that it was an ineffective attempt, having not yourself negotiated with our office in that capacity, you are making that opinion in a backward looking fashion by saying, I've seen other cases where this has worked so it should work here?

A Well, here's what I'm saying. I'm saying what they tried to do has not worked anywhere. There's no prosecutor in the world that would say, Oh, great, we're going to go arrest Tommy because there is another person in the car. They have no evidence of it whatsoever. No prosecutor on earth that would say, That's great. Thank you. We're going to de-death this case and we're going to de-authorize this case and we're going to go arrest Tommy.

Q Well, sir, that's not all they've done. They've offered to make her a cooperator, to put her before a grand jury, to put her in front of a polygraph. They've offered to do things that we would ask a cooperator to do, correct? Were you aware that we --

A I know they did the polygraph examination.

Q They offered to make her a witness because, granted, we're not just taking it on someone's word. We're going to go out and do something.

A Of course. But you are -- again, you are a prosecutor, sir. Are you going to take Lisa Montgomery after giving her a deal and have her testify against her brother who there is a stay-away order from and who there's an alibi for? No, you're not.

Q But, see, that's why I say you're backward looking. You're assuming facts that didn't exist on April 3rd, 2007. No one knew that Tommy had an alibi at that point. That wasn't done until much later in the investigation to figure out whether Tommy could have been there or not because there is a third party who claims they saw a person there. Certainly as we sit here now, we know that the evidence that they offered to them on April 3rd, 2007, wasn't going to be good, but they didn't know that, nor did we know that.

THE COURT: Just a minute. Don't interrupt. Neither one of you don't talk over each other, and you both need to slow down a little bit.

Q (By Mr. Valenti) On April 3rd, 2007, no one knew that Tommy had an alibi and it wasn't determined until much later, correct?

A Yes, and you're making my point.

Q Sir, I asked you a question. I didn't ask you to make

a point. Did they know on April 3rd, 2007, that Tommy had an alibi based on the investigation conducted at that point?
A I'll take your word that they didn't. I don't know the chronology enough to say, so I'm going to assume you're right.
Q And what's important as I'm talking about this negotiation part is that the different regions of this country respond to capital litigation differently; is that fair?
A That's not my experience. I mean, I got yelled at by a district attorney in Kentucky. That's the case we just pled a year ago. He told me no, no, no. And, I mean, that's Kentucky. So I don't know every jurisdiction in the country, but I'm not willing to accept every jurisdiction is different.
Q I'm not saying every jurisdiction is different, but do you see a lot of capitally prosecuted cases in Minnesota?
A They don't have the death penalty in Minnesota.
Q How about federally, where they do have it?
A Honestly I don't know.
Q You never have. Okay. Certainly places like Texas, Missouri, Virginia have been more aggressive over the years, Florida, in the pursuit of the death penalty, whether it be at the State level or federal level, correct?
A I think that's fair to say.
Q And because the federal death penalty is a newer statute than the State death penalty in the states that do have them, there is an environment in certain states that the death

penalty is an appropriate punishment because it's been on the books for some time. Would you agree with me on that?

A You would have to ask me the question again, sir. I'm sorry. I'm not sure I followed you.

Q In a state where they've never had a death penalty but then the Federal Death Penalty Act comes along, it's not unsurprising to see that they don't really pursue the death penalty federally, is it?

A Well, I'm not sure that is right. They pursued it several times in Massachusetts. There's one going on now, and obviously the Boston bombing took place in Massachusetts. I don't think they've ever had a death penalty.

Q And that throws things in the air a little bit because I think most people would say that Dzhokhar Tsamaev, if I've said it right, was a surprising case to many. Everyone thought it was going to be negotiated away. Ultimately it was not. It was tried and ultimately he was given a sentence of death, correct?

A Well, I agree with the last thing you said. I'm not sure what everybody thought. I'm not going to sign on to what everybody thought, but I agree as to your ultimate result.

Q It was kind of a case of first impression in the Boston area to seek a death penalty in a case?

A I'll be honest with you, sir, I don't know.

Q Let's go to the NGRI. You indicated that to decide to

go with an insanity defense is a dangerous endeavor, correct?

A It's something that has to be proceeded with very cautiously.

Q And the reason for that is when someone goes with such a defense, it makes the client available to government counsel for a mental health evaluation, correct?

A That's one reason.

Q Similarly, in any death penalty case federally, if mental health is going to be amongst the mitigating circumstances that the defense team will rely upon, the client is then opened up at some point for examination by the government expert, correct?

A I believe that's so. I've never tried a federal death penalty case.

Q If I submit to you that is so --

A I think twelve two, I think.

Q And that there has been litigation, not in this case, but in a lot of cases when they proceeded through the federal court on when the government would get access to a defendant claiming mental health mitigators?

A All right.

Q So though it is a risk to take an insanity defense because of the reason that the client will be available to government counsel for mental health evaluation, they are similarly available for evaluation to the government counsel --

to doctors of their choice when they're going to present mental health mitigators, correct?

A Yes, but you're opening up your client to a different, very different scope of examination. For instance, if you're putting on -- if you're putting on evidence just of, you know, background of trauma or posttraumatic stress, there is different instruments that are going to measure that, not an NGRI is going to open you up to all sorts of instruments that wouldn't be opened up with a more limited presentation, if that makes sense.

Q And from the facts of this case if you were just cold called on a case that involved what I would call a Caesarean abduction, it would be fairly obvious, you would think from the get-go, that some type of mental health is going to be necessary in the formation of a defense in the case, whether it be on the guilt side or penalty side?

A I certainly agree that this case cries out for a mental -- it's evidence of some mental health issues for sure.

Q Correct. And whether that be on the mitigation side or the guilt side, certainly on the mitigation side as it's related to trying to get beyond the horrific facts of the crime itself, in order to get a jury to come up with a less-than-death verdict, you would need some kind of compelling evidence to give the jury something to hang its hat on, correct?

A Well, I mean, you would put together a full mitigation presentation, and that would have, you know, all kinds of human frailties, you know, pro and con; and, yes -- I mean, I don't know about a jury needing to hang its hat on something. You know, in my opinion pseudocyesis was, you know, shooting yourself in the foot, because I think they lost all their credibility with a theory that could not prevail.

Q And, again, that's your opinion because you weren't part of the jury deliberations?

A It's my opinion, but I think it's based on concrete -- I mean, you are a prosecutor. You have to know that, you know, research on the Internet and making up a fake Hotmail address and deleting emails is evidence -- it's consciousness that you knew you were doing something wrong, and so that's going to defeat an insanity defense every time.

I've tried insanity defenses, and I've also walked away from a lot of them, and I'm suggesting that this one the government had to know they were holding a full house on the evidence with that defense.

Q During the course of your testimony, Mr. Bookman, they asked you a couple times about some of the reports, whether it be to Mr. Kidwell or otherwise, and it's not important about sexual and/or physical abuse, correct?

A Yes.

Q Were you ever made privy or did you ever review the

verdict form in this case or the special verdict form?

A I did not.

Q If I suggest to you that the jury in this case returned two mitigators, one by eight jurors, one by nine jurors, where they found that significant physical and sexual abuse by Jack Kleiner and physical abuse by the mother were found, would that surprise you?

A It doesn't surprise me. I'm assuming it's a fact or you wouldn't have asked me, but I don't think that that, you know, ends the inquiry. I mean, there was a battle of experts, you know, in the penalty phase and everybody's talking about that and, of course, some -- you know, some of the jurors did not find it. So I guess they must have accepted Dr. Dietz' perspective that maybe it didn't happen. I don't know. But I know that when you read Mr. Kidwell's two pages in transcript, they didn't cover this in a persuasive way that would move jurors. So whether they found it or not, you can't read from a verdict form what weight they gave it, and apparently they didn't give it much weight because of the death verdict.

Q And you're never going to know the weight because of the way the federal weighing goes. It's unfortunate that's unknowable, correct?

A I do agree with that. Well, except the verdict tells you generally.

Q Well, ultimately you know that they didn't weigh it

sufficiently, but you don't how much weight that one factor would or would not have gotten?

A That's fair.

MR. VALENTI: Just a second.

THE COURT: Ms. Henry, anything further?

MS. HENRY: I wasn't sure if he was finished.

THE COURT: I'm sorry.

MR. VALENTI: That's all I have, Your Honor.

MS. HENRY: Nothing further, Your Honor. Thank you.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: I think we'll take a recess now until 3:25.

MS. HENRY: Your Honor, we have two more witnesses, just to let you know.

THE COURT: Two more? Okay.

(Recess taken at 3:10 p.m.)

THE COURT: Ms. Henry.

MS. HENRY: Your Honor, as Ms. Moore knows, Ms. Nouri's brother has been very, very ill with Huntington's disease, and over the break she just learned he has passed away.

THE COURT: I'm sorry to hear that.

MS. HENRY: She was -- I haven't been able to speak with her. But I think it would be respectful if we could --

our witnesses are here, but I request that we be able to break for the day. Ms. Nouri, she's been trying to hold it together. She hasn't wanted us to ask for a continuance. Our witnesses are here. I'm ready to go but --

THE COURT: I'm not going to make you proceed today under those circumstances. And I realize you'd like to show your support for Ms. Nouri, but if Ms. Nouri -- I mean, obviously if she has to be gone tomorrow or whatever her circumstance is, I fully understand that, but I would expect you to be prepared to proceed --

MS. HENRY: Yes, sir.

THE COURT: -- from this point forward.

MS. HENRY: Yes, sir.

THE COURT: Did you want to speak to that any, Mr. Valenti?

MR. VALENTI: No, Your Honor.

THE COURT: All right. We will adjourn for the day, and we'll resume again at nine o'clock tomorrow morning.

And, Ms. Henry, please convey my condolences to Ms. Nouri.

MS. HENRY: Yes.

THE COURT: Thank you.

(Court adjourned at 3:15 p.m. until 9 a.m., Tuesday, November 1, 2016.)