UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS - VOLUME II
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 1, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:
MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:

MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

I N D E X

Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

I N D E X
(continued)

Page

NOVEMBER 1, 2016

VOLUME II


RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

# I N D E X
(continued)

Page

NOVEMBER 2, 2016

VOLUME III


RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . 761

I N D E X
(continued)

Page

NOVEMBER 3, 2016

VOLUME IV

DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

I N D E X
(continued)

Page

NOVEMBER 4, 2016

VOLUME V

CHRISTOS DAVATZIKOS
Direct examination by Ms. Henry. . . . . . . . . . . . 1120
Cross-examination by Mr. Valenti . . . . . . . . . . . 1165
Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG
Direct examination by Ms. Henry. . . . . . . . . . . . 1182
Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE
Direct examination by Ms. Henry. . . . . . . . . . . . 1245
Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL
Direct examination by Ms. Henry. . . . . . . . . . . . 1255
Cross-examination by Mr. Valenti . . . . . . . . . . . 1290
Redirect examination by Ms. Henry. . . . . . . . . . . 1302

I N D E X
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864

I N D E X
(continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

I N D E X
(continued)

Page

NOVEMBER 10, 2016

VOLUME IX

FRED DUCHARDT
Direct examination by Ms. Harwell (cont'd.). . . . . 2263
Cross-examination by Mr. Ketchmark . . . . . . . . . . 2273

BEN LEONARD
Direct examination by Ms. Henry. . . . . . . . . . . . 2324
Cross-examination by Mr. Valenti . . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . . 2374

## INDEX OF EXHIBITS



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Bret Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Diane Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

## INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |
| FOR THE RESPONDENT: | | | |
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

NOVEMBER 1, 2016

MORNING SESSION

THE COURT: Good morning.

Well, Ms. Nouri, I'm very sorry to hear about the loss of your brother, and I know it comes at a particularly difficult time for you. We will certainly take into consideration whatever you need.

Ms. Henry, are you ready with your next witness for today?

MS. HENRY: We are, Your Honor. Movant calls Ron Wurtz.

THE COURT: Thank you.

RONALD E. WURTZ, being sworn by the law clerk, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning.

A Good morning.

Q Mr. Wurtz, could you state your name for the record and please spell your first and last name.

A My full name is Ronald E. Wurtz. R-o-n-a-l-d. Wurtz, W-u-r-t-z.

Q Thank you, sir.

Can you tell the judge what your occupation is?

A I'm an attorney.

Q And are you a retired Federal Public Defender?

A Yes, I am. I retired in March of 19 -- or March of

2013.

Q But you still retain your law license?

A Yes.

Q What states are you licensed in?

A I'm licensed in the state of Kansas in the U.S. District Court and Tenth Circuit.

Q And how long were you employed by the Federal Public Defender's Office?

A About 15 years.

Q And in what district were you employed?

A Kansas.

Q And prior to your employment -- well, when you retired from the District of Kansas, Federal Public Defender's Office what was your position?

A I was first assistant.

Q Prior to your employment with the Federal Public Defender's Office in the District of Kansas, how were you employed?

A Immediately prior to going to the Federal Defender's Office I was the chief of the Kansas Death Penalty Defense Unit.

Q In fact, did you start the Kansas Death Penalty Defense Unit?

A Yes. When Kansas passed the death penalty in 1994, I had been with the State Public Defender's Office for a number

of years and was the senior. Had the most gray hair as I tell people. And so I was asked to start up the Death Penalty Defense Unit in Kansas.

Q So you were in charge of that unit for nine years?

A Only about four years.

Q Four years. I'm sorry. My math is really bad.

Had you had capital experience before starting the unit?

A No.

Q When you started that unit, what was the paradigm on which you modeled the unit?

A Well, we tried as much as we could to follow the ideal ABA Guidelines. In fact, we actually convinced the Board of Indigents' Defense Services, which is our supervisory board, to pass some regulations that required the following of the ABA Guidelines.

Q So, in your opinion, as an attorney, were the ABA Guidelines the professional standard of care in the state of Kansas for capital cases?

A They were and they are.

Q Were there other members of your office, the capital office in the state of Kansas, who ultimately came over to the Kansas City, Kansas Federal Public Defender's Office?

A From the death penalty unit Melody Evans, now known -- I think she goes by Melody Brannon now, came to work with me in

the State Death Penalty Defense Unit. She's now the defender for the State of Kansas.

Q So she's in charge of the office in the District of Kansas now?

A Yes.

Q I want to direct your attention, Mr. Wurtz, to your involvement with the Lisa Montgomery case, if we may. I understand that you may not have all those dates committed to memory, so I'd like to show you on the screen here what's previously been admitted as Movant's Exhibit 136, which is the docket sheet from the case over in Kansas. Do you recognize that, sir?

A Yes.

Q And do you recall how you came to be involved in Lisa Montgomery's case?

A Well, as I recall, Charles Dedmon, who was the first assistant at the time of the Kansas Federal Defender, gave me a call and asked me to join him in one of our first interviews, if not the first interview, of Lisa.

Q And so that docket shows both you and Mr. Dedmon were counsel of record; is that correct?

A Yes.

Q If I move it up a little bit or if I change the page, you see there that the U.S. Attorney was a woman by the name of Terra Morehead?

A Yes.

Q And then does it show you there the date in which the case was filed?

A Yes.

Q What date was that?

A December 20th, 2004.

Q Would you have seen Mrs. Montgomery before December 20th, 2004?

A I don't recall. We would have seen her before the Rule 5, and my first recollection is that I talked to her at the U.S. Marshal's Office with Charles prior to going in on the first appearance.

Q So if this offense occurred on December the 16th, 2004, and Mrs. Montgomery was taken into custody on December the 17th of 2004, is it fair to say that you and Mr. Dedmon encountered Mrs. Montgomery within a week of the crime?

A Yes.

Q And can you explain to the Court your impressions of Mrs. Montgomery when you encountered her?

A My recollection of her was that she was just totally wrung out. I've described it as like she's been drug through a keyhole. She looked like she had been constantly crying. She seemed disoriented. She was difficult to communicate with.

Q And those were your experiences with Mrs. Montgomery. Between you and Mr. Dedmon, who had the most contact with Mrs.

Montgomery?

A Mr. Dedmon did.

Q How did you and he split up responsibilities for the case?

A Well, my office was in Topeka. His was in Kansas City. He primarily had the personal contact with Ms. Montgomery. I went back to Topeka to organize any possible investigation that might need to be done immediately in preparation either for the removal hearing or simply to establish a baseline to pass on in case the case went to the Missouri side, which we understood from the beginning it was a possibility. I did the legal work. Charles did the personal work with our client.

Q And you mentioned that there was a possibility from the beginning that the case could be removed to the Missouri side. Were you handling the case as if there was also a possibility it was going to stay on the Kansas side?

A Absolutely. We handled it as if the case would stay in Kansas.

Q And in keeping with the possibility that the case would stay in Kansas, did you reach out to any professionals in the death penalty community for assistance and consultation?

A Well, I have some recollection that -- of course, we talked to the chief defender to see if we would keep the case or if he was going to authorize us to keep the case or get ahold of resource counsel.

I'm sure we contacted resource counsel, and I remember talking about having Cyndy Short as potential counsel, whether it stayed in Kansas or in Missouri, to have her assigned as learned counsel.

Q And for purposes of the record, could you -- I think everyone is probably familiar with who Cyndy Short is, but others who may read the transcript may not know. Can you tell us who Cyndy Short is?

A She's an attorney licensed in Missouri. She has done a lot of death penalty work I think at the Missouri level as well as in the federal courts. She has a great reputation, and I had her make presentations at death penalty CLE programs. So I knew of her. I think some other people in our office may have known her personally. I did not. I only knew her by reputation.

Q And was she in fact the director of the Western Missouri Capital Trial Unit for the Missouri State Public Defender System for a number of years?

A I remember she worked for the death penalty for the state system. I don't remember her title.

Q Don't know all the ins and outs of the bureaucracy?

A I don't.

Q In addition to considering Ms. Short as learned counsel in the case, it's interesting to me that you would consider her learned counsel given your death penalty experience and

having -- was Ms. Brannon in your office as well at the time?

A Yes.

Q So even though there are two experienced capital litigators in your office, you were also looking outside for counsel in the case?

A That seemed to be the pattern in the office. We would -- not too long before that I had a Hobbs Act case that started as a death in Wichita, and we went to resource counsel and had learned counsel come in to help. It didn't get authorized but -- thank goodness, but then I took the case over. But we have a practice of going to the resource counsel in order to evaluate whether to bring somebody in or whether our office could handle the case.

Q Has the resource counsel ever turned you down when you asked for help?

A No.

Q And do you find them to be a useful resource?

A Absolutely. Yes.

Q Now, you mentioned that Mr. Dedmon had most of the contact with Mrs. Montgomery, the personal contact with Mrs. Montgomery early on in the case. Can you -- what was Mr. Dedmon's title at the time?

A He was the first assistant Federal Defender.

Q Did you become first assistant when Mr. Dedmon retired?

A Charles was unfortunately on a vacation in the

Appalachians and he was struck with lightning. He recovered pretty well physically, but he continued to have some cognitive problems for a while, and he eventually retired with medical retirement, and I took over as first assistant.

Q And he's now an author; is that correct?

A Pardon me?

Q He's now an author? He writes books? Or did you know that?

A I don't know.

Q In any event, could you explain to the Court your knowledge of Mr. Dedmon's practices with respect to taking notes while interviewing clients?

A Charles was a copious note-taker. Very detailed person. He was wonderful to take along on an interview with somebody because I don't take notes very well. I watch people and do the interview without taking notes, or I prefer to. Charles could get everything almost like a stenographer.

Q So that's an incredible valuable resource for you?

A Yes.

Q Did Charles share with you or Mr. Dedmon -- excuse me -- share with you that he was taking similar notes to document Mrs. Montgomery's mental health and state of remorse?

A Well, he and I would talk during that time frame. I don't know that he told me he was taking notes, but I've known him since the early '80s and we worked in the State office

together. He's a note-taker.

Q And did he share with you his observations of Mrs. Montgomery's mental status at the time or as he observed it as an attorney?

A It seemed obvious to the both of us and with what his ongoing attempts to talk to her was that we needed to get a psychiatric evaluation as soon as possible or psychological evaluation for a baseline and to start making decisions.

Q Were you concerned that she was suicidal?

A Charles was. I didn't notice it. I mean, in a situation like this -- I've handled dozens of murder cases and it's something I would have worried about -- I worried about with her, but Charles was concerned.

Q And as a result of having reached out to both Cyndy Short and a concern about Mrs. Montgomery's mental functioning, did your office retain the services of a gentleman by the name of Bret Dillingham?

A Bret came in and worked on the case, I think at the recommendation, I'm not sure, of Cyndy Short. I think this was the first time Bret had worked with our office, but he did come in I think while we were still on the case.

Q And you all were only on the case, the docket sheet would show -- I can get to the next page.

A Until the removal hearing is what I remember.

Q And that's the Rule 5 hearing; is that correct?

A Well, I think she may have appeared one time before that, but around December 23rd, shortly before Christmas, as I recall.

Q So between December the 20th and December the -- it looks like --

A 23rd.

Q 23rd?

A Is when the Rule 5 removal hearing was.

Q So in that short period of time you had contacted resource counsel, considered learned counsel, and engaged the services of someone to help you identify mitigation needs?

A Yes. I believe we also sent investigators out to contact her family.

Q Having known Mr. Dedmon for a number of years, I want to show you what's been previously admitted into evidence as Movant's Exhibit No. 75, and that's the declaration of Charles Dedmon, and I don't know if you're able to recognize this. Does that look like Charles' signature there on the last page?

A I think so, yes.

Q Mr. Wurtz, I've shared with you, I think, and you know that Melody Brannon has signed a declaration with the Court that is Exhibit 76, that Mr. Dedmon's file has since been shredded and destroyed and there appears to be no copy available to anyone in the case. So I want to ask you whether or not anyone from the Missouri Public Defender's Office, the

Western District of Missouri Public Defender's Office ever came to you and asked you any questions about Mrs. Montgomery's case?
A No.
Q Did anyone on Mrs. Montgomery's successor trial teams ever come and talk to you about Ms. Montgomery's case?
A Judy Clarke did.
Q Was that shortly before Mrs. Clarke exited the case?
A As I recall, yes.
Q About a week?
A It was not long. I remember being very surprised when I read that happened.
Q And did you share with Mrs. Clarke your observations of Mrs. Montgomery when she was arrested and during the time that you represented her?
A Yes. We talked for some period of time.
Q Would you have been willing to share those observations and experiences with Mr. Duchardt and Mr. O'Connor had they asked?
A Yes.
Q And since between the time that you spoke with Mrs. Clarke about your observations of Mrs. Montgomery, when is the next time anyone representing Mrs. Montgomery spoke to you?
A When you called me.
Q And that was this summer?

A Yes.
Q In between that time you had not been contacted?
A No.
MS. HENRY: Thank you, Your Honor. That's all I have.
MR. VALENTI: No questions, Your Honor.
THE COURT: Thank you, Mr. Wurtz.
THE WITNESS: Thank you, Judge.
THE COURT: Have a good day.
(Witness excused.)
MS. HENRY: Your Honor, we would call Bret Dillingham.

BRET DILLINGHAM, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning, Mr. Dillingham.
A Hi.
Q Would you introduce yourself to the Court and spell your first and last name for the court reporter, please.
A Yes. Do I need to get closer to the microphone or is this good?
Q I think you're good.
A Okay. Bret, B-r-e-t, and then Dillingham, with a D, as in David, i-l-l-i-n-g-h-a-m.
Q You might want to pull it up a little bit.

A Okay.
Q You have kind of a soft voice.
A Not usually.
Q Mr. Dillingham, could you share with the Court what your occupation is?
A Well, I work as a jury consultant, solo practice, and I've done work in mitigation in the past and I'm now in a limited degree.
Q And could you share with us your educational experience?
A Yes. I have a master's in social work, in clinical social work from the University of Kansas, and then did sort of postgraduate supervised practice for two years to get my clinical social work license, which in Kansas is called LSCSW.
Q I'm going to say LSCSW because I will never get that right. So can you explain to the Court what an LSCSW is?
A Well, that is somebody who is licensed in the state of Kansas to diagnose and treat mental disorders with a DSM, provides, like, therapy services and hold themselves out as a clinical social worker, and then you can work in an institutional setting with that license. You could be in a private practice as well.
Q And where did you do your postgraduate internship? Is that the right word?
A Right. Well, my second year of graduate school and

then for two years following I did my training at the Menninger Clinic in Topeka at what was then called the Community Service Office.

Q Can you share with the Court and the record what the Menninger Clinic is?

A Well, it was a pretty renowned psychiatric hospital in Topeka, the Menninger Foundation, then the Menninger Clinic where the clinical services were. They had a number of inpatient and outpatient programs, and I worked in a community -- what they called the Community Service Office. It was off of the main Menninger campus in Topeka downtown and served outpatient psychotherapy clients.

Q So have you actually engaged in psychotherapy as a profession?

A Oh, yes.

Q And you are licensed by the state of Kansas to actually diagnose?

A Yes.

Q But has your primary work for the last 15 years, or is it 20 now, been as a trial consultant?

A Well, I sort of wrapped up my clinical practice really about the same year as I first met the client here, about 2004. So 12 years.

Q As a trial consultant, do you do more than -- I know that you help lawyers pick juries, but is it more than that?

A Right. I mean, it's a lot of things. I do help with jury selection, and I'll help in civil cases. I often do focus groups or mock trials.

About half of my work is in capital defense. So there it's assisting with jury selection but also with overall trial strategy and then sometimes with mitigation as in this particular case.

There's one attorney I worked with where I do mitigation triage, we call it, where it's going in as soon as possible to start developing ideas about where the mitigation might lie.

Q When you speak about that one particular attorney, who is that?

A That's Cyndy Short.

Q And how long have you and Ms. Short had a professional working relationship?

A Well, she's the first attorney I ever worked with in this whole field, and that would have been -- I'm going to have to cheat and look at my CV. I think you have a copy of it. Wow, so 1997. So I worked with her on a case. It was a capital case where it ended up being an acquittal.

Q So since 2004 when you became involved in Lisa Montgomery's case, you had been working with Ms. Short for -- is that seven years?

A Yes.

Q And you would do what you called a mitigation triage. Can you explain what that is to the Court?
A Right. Well, I mean, so I would come in with a clinical background. She always wants to have somebody kind of help walk her through, you know, psychological issues, things like that. So I would go in to meet with the client, ideally as soon as possible.

Part of that is just to help get the client, make sure they're okay, get them settled in and joined in with the team, and then begin to sort of look at the family issues that might be there, the DSM-type issues that might be there, and other social things, and in that particular role with an eye on what would be most effective at trial ultimately for a jury. So sort of half clinical hat and half jury research hat to kind of think about where the most effective mitigation might be.
Q And you call that a triage. So you're not actually making a diagnosis in the first few visits with the client?
A Well, even in a clinical practice you would not make a final certain diagnosis most often in the first few visits, but you make a differential diagnosis where it's really things to rule in and rule out, and I would begin thinking about those, and with the idea that ultimately it would be turned over to -- the reason why I call it triage is there would be a mitigation specialist on the team ultimately as well, and then I would continue working with the team for the trial strategy for both

phases.

Q So you're not a mitigation specialist?

A Well, I don't think so. I've not -- I have functioned as a mitigation specialist on a couple cases that thankfully didn't end up having to go to trial, and I no longer hold myself out as such.

Q Because that's a specialized field?

A Right. Yeah.

Q But, Mr. Dillingham, I would like to now turn your attention to your involvement in Mrs. Montgomery's case in 2004 and the very beginning of 2005.

A Okay.

Q Who were you first retained by?

A Well, I was first contacted by Cyndy Short who was not who ultimately retained me. And it's my understanding she would be considered to come in as learned counsel.

MR. VALENTI: Your Honor, I'm going to object. We're getting into speculative material about what Cyndy did or didn't do. More importantly, we're getting into what other lawyers might have done, could have done; and the relevancy as it relates to the representation that Ms. Montgomery did receive, I think evokes the question. Mr. Dillingham has provided an affidavit in this case about what he did do, and the speculative things going on behind the scenes really aren't relevant for purposes of this hearing, and I don't think we

need to get into it. We don't need to develop that record.

THE COURT: Do you want to respond to that, Ms. Henry?

MS. HENRY: Two ways, Your Honor. First is that we are establishing a baseline of deficient performance in this case, which means following professional norms. Other witnesses that will testify this week will talk about what the professional norms are. The fact that Ms. Short was learned counsel or qualified as learned counsel will ultimately become -- but honestly questioning that Mr. Dedmon contacted him --

THE COURT: Did anybody question Ms. Short's qualifications as counsel?

MR. VALENTI: No. But she was never in the case. So whether she's qualified or whether --

THE COURT: I understand that but, I mean, my point is nobody's challenging Ms. Short?

MS. HENRY: No, sir.

Q (By Ms. Henry) The next question is, did Mr. Dedmon ultimately hire you?

A Yes. I was retained and actually hired by Charles Dedmon.

Q Okay. And so, Mr. Dillingham, were you kind enough to bring with you this morning a copy of your billing records?

A I was.

Q Is that going to be the most accurate representation of the dates that you actually saw Mrs. Montgomery?
A Yes. I just noticed one typo where the year changed from '04 to '05 on page 2. The date says 1/4/04.
Q Okay. Let me show some exhibits and get them moved into evidence, then you can correct them.
A Very well.
Q I will first put on the Elmo here what previously has been marked as Movant's Exhibit No. 140 and has not yet been received. Can you identify that document, please?
A Yes. That's the first bill that I sent for my work in this case.
Q And who was that addressed to?
A Charles Dedmon.
Q All right. And is that a bill that you prepared contemporaneous with your work on Mrs. Montgomery's case?
A Yes.
Q Is that a fair and accurate representation of the dates and times you worked for Mrs. Montgomery during the time in which you were retained by Mr. Dedmon?
A Yes.

MS. HENRY: Your Honor, I would move into evidence now Movant's Exhibit 140.

MR. VALENTI: Your Honor, for the reason previously stated I would object because I don't think Mr. Dedmon or Mr.

Wurtz or Mr. Dillingham's work on the case is really the issue at bar here.

THE COURT: I don't think that it is either other than as, you know, professional norms go, and we've had a lot of testimony about that, and I think you've established that the ABA Guidelines are a barometer to be used to determine professional norms.

MS. HENRY: Actually what we're going to get into now are the red flags of mental illness that were in the file as a result of Mr. Dillingham's work that were not followed up on by Mr. Duchardt and Mr. O'Connor. I'm trying to establish when Mr. Dillingham saw her.

THE COURT: All right. The exhibit is received.

MS. HENRY: Thank you, Your Honor.

Q (By Ms. Henry) Then after you were observed -- I'm sorry. Let me back up. You were next retained by Anita Burns; is that correct?

A Correct. That's reflected on the second billing statement.

Q So I'm going to put up on the Elmo now what has been moved into evidence -- what I will move into evidence as Movant's Exhibit 141. Is that a copy of your billing records with respect to the time you spent with Mrs. Montgomery at the behest of Anita Burns?

A Correct.

Q And is that a fair and accurate representation of the amount of time you spent with Mrs. Montgomery on Mrs. Montgomery's case at the request of Anita Burns?
A Yes.
Q And is that going to be the best representation of your memory of the time you spent with Mrs. Montgomery?
A Absolutely.
MS. HENRY: Your Honor, at this time I move into evidence Movant's Exhibit 141.
MR. VALENTI: Same objection, Your Honor.
THE COURT: Received.
Q (By Ms. Henry) Mr. Dillingham, I want to ask you now about your meetings with Mrs. Montgomery, if I can.
A Okay.
Q Can you describe for -- well, let me back up. Did you provide a declaration in this case?
A I'm sorry. A what?
Q A declaration in this case.
A Yes, I did.
Q And you provided that at my request; is that correct?
A Right.
Q And it was signed on April the 18th of 2016?
A Yes.
MS. HENRY: And that has previously been moved into evidence as and accepted into evidence as Movant's

Exhibit 1-291 for purposes of the record.

Q (By Ms. Henry) And when you prepared that declaration for us, Mr. Dillingham, did you review the memo that you prepared in this case?

A I did.

Q Was this a memo that you prepared to provide to counsel and anyone else who might possibly represent Mrs. Montgomery on down the road so they would know your observations?

A Exactly.

Q And that was attached to your declaration as attachment No. 2; is that correct?

A I don't know, but I'll take your word for it.

Q You'll take my word for it.

A I don't know exactly what number it was given, yes, but I believe it was provided along with my declaration.

Q I'm going to show you that memo and have you read into the record just that first paragraph there.

A Well, it says, "Mitigation Themes/Issues To Explore. 12/26/04. This is a rough brainstorming memo, aimed at recording information, ideas, and strategies emerging from my one meeting with Lisa on 12/22/04, as well as my brief conversations with Charles Dedmon concerning his meetings with Lisa."

Q So you wrote this memo after visiting Lisa only one time; is that correct?

A That's right.
Q And then you visited Lisa three more times according to your billing record?
A That's correct.
Q And so your ideas about Lisa's mental health and functioning evolved over time?
A Yes.
Q And you came to have a deeper understanding of what was going on with her?
A I think so, yes.
Q Now, I want to ask you a few questions now about some specific observations that you made of Mrs. Montgomery at the time that you shared with the team. You shared with her -- with the team that down the road they might want to consider brain scans or possible neurological problems; is that correct?
A Correct.
Q And you also explained to the team that Lisa was very conflicted, had an extremely conflicted relationship with her brother, Tommy; is that also correct?
A Yes.
Q Did Mrs. Montgomery ever tell you that Tommy was involved in the murder?
A No.
Q And in fact did she tell you that she believed he was incarcerated in Lansing?

A That was my understanding. I believed he was based on what she had said.
Q So she believed he was incarcerated when you were meeting with her?
A Exactly.
Q In prison?
A Right.
Q Not at the crime scene?
A Not at the crime scene, no.
Q Did she also share with you a sexual abuse history?
A She did.
Q Did she share with you -- did you in fact make a note that clearly many stories of neglect, abuse, and trauma will emerge as family history is drawn out?
A Right.
Q On page 3 of your report?
A Thank you. Yes.
Q Did you know that?
A Yes. I'm sorry. Yes.
Q And have you worked with individuals who have been sexually and physically traumatized?
A Yes.
Q Is it your experience that even if they share some extremely traumatic events in the first interview, that there's still more to uncover?

A Almost always.
Q Did you also note -- I'm going to show you on page 4 of your memorandum -- let me find it here -- that Mr. Dedmon experienced -- or shared with you that Mrs. Montgomery appeared to have no memory of the offense?
A She shared that with me directly, I believe.
Q Okay.
A I don't remember that being coming from Mr. Dedmon.
Q Do you recall observing that Mrs. Montgomery believed that her memories of the event were likely in a dream?
A Yes. If you could point me to the page. I do remember writing pretty much what she had told me. Here it is. It's on page -- it's identified on my copy as page 3, and it states, "Client reports no memory of incidents around alleged crime, says she feels as though living in a dream." Then I do see where Mr. Dedmon had told me when he engaged her on those topics she became shut down and silent whenever asked questions about pregnancy, miscarriages, babies.
So as far as the crime itself, what she reported to me is she had no memory, but she said, and I put it in quotes, meaning that's a verbatim quote from her, "Says she 'must have done' and 'probably did' what they accuse her of."
Q So she was telling you that she was responsible for the crime?
A She felt that she must be.

Q And that description there as someone who is a licensed LSCSW in the state of Kansas, what did that indicate for you as a possible diagnosis that should be considered?
A Well, the memory lapse -- I mean, she had no memory of it, and combined with the sexual abuse history and just some general feelings about her affect, which was not steady, made me wonder if there wasn't some possible dissociative disorder.
Q You say her affect was not steady. Is that something that you experienced over time in your rapport with her?
A Right.
Q And describe what you mean by that.
A Well, I mean, at times maybe her affect was sort of incongruently liked, you know, and at times she seemed very depressed; and then there were times when she would get quite worked up and her speech would become pressured and she'd be talking with great urgency about some things, but testimony wasn't always matching. It didn't match up. And, of course, we all do that when we talk and as topics change, but it wasn't really matching the content.
Q And so did you form some preliminary differential diagnoses or things you thought needed to be considered and ruled out?
A Yes.
Q And what were those?
A Well, I came to believe after the first visit as I

talked with her more, that there was a delusional disorder possibility that needed to be strongly explored, and I think I -- and certainly depression. I thought a dissociative disorder maybe not otherwise specified or more specifically should be explored. I think I also mentioned I thought there could be some neurological issues related to some head injuries.

Q Did you also note at the bottom of the page, what is your page 3 of your report -- it's not in your report but we're calling it a report. It's actually just your rough brainstorming memo, correct?

A That's right.

Q That you should also include the possibility of psychosis?

A Right, which is -- and I spoke kind of a delusional disorder as a specific psychotic disorder. I noted also posttraumatic stress disorder. There's -- there was obsessive-compulsive disorder, which I recall that was something I was concerned about. Now thinking back, I'm not going to have a great memory of what symptoms were associated with that. There's a whole paragraph here. I can read it or it speaks for itself.

Q It will speak for itself. I want to ask you just a few more questions, Mr. Dillingham.

A Yes.

Q During the time that you spoke with Mrs. Montgomery over the course of your forming, did you begin to fill in what we call a genogram?
A Right.
Q And is that a pretty common tool that's used in clinical practice as well as in death penalty cases?
A That's right.
Q It's a tool social workers use?
A That's right. Especially at the Menninger Foundation. The family assistance, where your genograms come from had a lot of proponents and how to go about to work.
Q I want to show you what is attached to the back of your brainstorming memo. Is that the first genogram that you worked on with Mrs. Montgomery?
A Yes.
Q And is that something that you filled in in order to provide some structure to your interview? In other words, was she that linear?
A Well, I don't know -- I can't say that I used that tool with her specifically. It was a common tool I would use within the -- it was an initial way to start getting history and giving us both tasks to work on together.
Q And can you read for the Court what you noted here at the top?
A "Custody fights over children are repeating and intense

family pattern."

Q So that's something that you saw as an important mitigation theme even in the early stages?

A It was something that became really clear in that very first meeting, yes.

Q Then as time went on, did you begin to fill in a second more detailed genogram?

A Yes.

Q And that's what I'm putting up on the screen now; is that correct?

A Right.

Q And for the purposes of the record, that does appear to be cut off at the top and on the side; is that correct?

A Right.

Q Somewhere there may be a clearer copy, but this is the best one that you've seen; is that correct?

A That's right. Because I no longer have the original copy of that. I'm sure I sent it along with my --

Q Do you have a copy of the genogram up there with you? There's two things I want to show you, point out.

A You know, I can look at the one you have here on the screen. I don't appear to have one with me.

Q On the screen do you see where I'm pointing? Do you notice a name David Kidwell?

A Yes.

Q And do you also notice over in the next line there's also another mention of Kidwell next to another family member?
A I think so.
Q You've made various notes on this genogram of things that you thought were important for the team to know and consider; is that correct?
A That's right.
Q And you wrote those contemporaneous with your interviews with Mrs. Montgomery?
A Yes, I did. Possibly some of it was written, you know, right immediately following the visit when she was taken back to her cell, but that would be notes that I'm taking at the time.
Q And this genogram also mentions the multi -- or the custody disputes amongst family members?
A Right.
Q Now, after your four visits with Mrs. Montgomery, did you have a meeting with Susan Hunt?
A Yes.
Q Who was successor counsel to Mr. Dedmon?
A That was my understanding.
Q And worked with Ms. Burns at the time; is that correct?
A Right. Well, I went to their office when they were assigned the case and I did meet with Anita Burns, but then she was not in the meeting with Susan Hunt and the other team when

I was sort of passing along what I had. I think she had a court appearance or something like that.

Q So did you present your opinions to the team after they had formed over four visits with Mrs. Montgomery?

A Yes. I believe that's correct.

Q Do you want to check your billing records?

A Yes.

Q What day do your billing records reflect you had that attorney meeting?

A Yes. You were correct. That was after my -- all four meetings that I had.

Q So is that January 14th, 2004?

A Yes. Well, I should -- that's the correction I was saying needed to be made. That last client meeting was 1/4/05, and that meeting that I had with Ms. Hunt and the team was on 1/14/05. I just didn't get the year changed on that.

Q Can you describe for the Court, to the best of your memory, who was present at that meeting?

A To the best of -- the person I remember being there is Susan Hunt. There were other people there, and I could possibly have my memory refreshed, but I don't remember their names right now.

Q Ms. Hunt -- Anita was not there?

A Anita was not at the meeting. I met with her on my way into the meeting at their office.

Q Could you describe to the Court that meeting?
A Well, I felt a little unwelcomed honestly. I mean, they didn't seem terribly -- they didn't ask me very many questions or seem too interested in what I was trying to convey to them.
Q And were you -- did you have any further contact with Mrs. Montgomery's case?
A No. I left that meeting. It was sort of don't call us, I'll call you, and they didn't call.
Q Did you mail your notes and memorandum to Ms. Burns?
A I did.
Q Thank you, Mr. Dillingham. That's all I have.
MR. VALENTI: May it please the Court.
THE COURT: Mr. Valenti.
CROSS-EXAMINATION BY MR. VALENTI:
Q Mr. Dillingham, you said that you were made uncomfortable at that meeting. Who was it that made you uncomfortable at the meeting?
A Well, I didn't say I was uncomfortable.
Q I'm sorry. My apologies.
A I think I felt unwelcomed. And the only person I really remember at the meeting was Susan Hunt, and she seemed in general not very interested in sort of the work that had been done before she came onto the case.
Q And Ms. Burns you indicated that you met on the way

into the meeting but she was going to court you thought?

A Right.

Q Okay. Did you have any conversation with her about the case in a meaningful way or just exchanged pleasantries?

A We probably did in the little time we had. I mean, I'm usually right down to business. I'm sure we talked about things, but I couldn't tell you the exact things we spoke about.

Q Post that meeting on January 14th, 2005, you indicated you sent the materials we're talking about today, other than the declaration, of course, to Ms. Burns, correct?

A That's right.

Q Now, you, as I understand it, authored this -- the report attached to your declaration on January 26th [sic], the day after Christmas, 2004; is that right? Or did I say that wrong?

A I don't know. I have to look. I don't doubt you. 12/26/04. So, yes, it appears that is the day I wrote this memo.

Q It's based upon --

A It's also in my billing records. I see where the memorandum is indicated in my billing records for that date.

Q So you wrote it December 26th, 2004, based primarily upon a few conversations you had with Charles Dedmon and from a client meeting you had with Ms. Montgomery on 12/22/2004,

correct?

A That's right.

Q And you knew that the events in question that gave rise to the prosecution in this case happened on December 16th, 2004?

A I probably did know that at the time.

Q If I propound that to you, you wouldn't disagree with me?

A No.

Q Okay. So you met with her then within a week or six days after the event that led to Ms. Montgomery being charged, correct?

A That's right.

Q When you met with her and kind of took the social history and began the genograms, were you the only person in the room?

A Well, you know, I've been trying to recall that. I'm certain that at that first meeting Charles Dedmon probably came in at least to make introductions. I don't remember if he stayed the entire time, and I don't -- I cannot recall right now whether or not there was an attorney present with me at the next three meetings for any or part of those. Both would be common for me to meet with or without an attorney present.

Q So on the December 22nd meeting, the first meeting you had that was the subject of the memorandum, either you met with

her by yourself or possibly for some time with Charles Dedmon with you?

A Yes.

Q Any females with you at that time?

A I don't believe so. I mean, if you have something in the record that indicates that somebody else was at that meeting, I don't recall.

Q I'm asking. I don't know.

A Okay. I don't recall. Like I said, I don't know for sure. I know that he must have been there to introduce me at least.

Q So in that meeting, though, she was fairly open with you, wasn't she?

A Yes.

Q You learned that she had been sexually abused by her father, Jack Kleiner, from the time that she was approximately 12 years of age, I believe?

A Yes.

Q And you were able to report that in your memorandum and also you were able to learn that on your first meeting with Ms. Montgomery, correct?

A It appears so, yes, in this memo.

MR. VALENTI: Nothing further. Thank you, sir.

THE WITNESS: Thank you.

THE COURT: Ms. Henry.

REDIRECT EXAMINATION BY MS. HENRY:

Q Mrs. Montgomery didn't share with you that she had been gang raped by her stepfather and three or four of his friends for a number of years, did she?

A No, not at that meeting or in subsequent meetings.

Q You never learned that?

A No. I mean, really I don't -- the only things that I heard are reflected in this memo or additional information on that second genogram, but nothing that detailed her --

Q She didn't share with you she had been trafficked by her mother?

A No.

Q Thank you.

MS. HENRY: No further questions.

MR. VALENTI: Nothing further, Your Honor.

THE COURT: All right. Thank you, Mr. Dillingham. You're excused.

(Witness excused.)

MS. HENRY: Your Honor, if I could step outside and see if our next witness is here.

Your Honor, I'm sorry.

MS. NOURI: I'm going to have to go to the restroom, Your Honor, and the next witness is mine.

THE COURT: We'll take a 15-minute break. We'll be back at five minutes after ten.

(Recess taken at 9:50 a.m.)

THE COURT: Ms. Nouri.

MS. NOURI: Your Honor, we call Anita Burns.

THE COURT: I think you know where the witness stand is, don't you?

THE WITNESS: Yes, Your Honor.

ANITA BURNS, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. NOURI:

Q Good morning.

A Good morning.

Q Happy birthday.

A Thank you.

Q Please state your name for the record.

A Anita Burns.

Q And, Ms. Burns, where are you employed?

A At the Federal Public Defender Office.

Q And how long have you been employed there?

A Eighteen years.

Q And prior to that where were you employed?

A Prior to that I was at the Clay County State Public Defender Office for ten years, and prior to that I worked about seven months in Linn County, Missouri, at the prosecuting attorney's office.

Q And in your experience as an attorney, have you had capital experience?

A No, I have not.
Q You didn't have any in the State system?
A No. I had tried some murder cases but none of them were death penalty.
Q So you hadn't had any training with regard to how to put together a capital case file or had you?
A No. I had been to a seminar back when I was still at the State defender office, the Life in the Balance seminar down in New Orleans; but other than that, no, I had not.
Q And have you had training in dealing with I would call it severely mentally ill clients?
A I haven't had any specialized training other than, you know, training that we would get at our yearly CLE seminars. There's often a session on how to effectively represent or interact with persons with mental illness; but as it relates to capital, nothing specific, no.
Q But as your experience as a Federal Public Defender, I take it you've dealt with mentally ill clients?
A Several.
Q So you have some on-the-job training in handling those types of clients?
A Yes, I do.
Q What about -- you're familiar with the term "mitigation"?
A Yes.

Q What is that?
A Sentencing mitigation would be anything you can do to try to bring in the client's background, their personal situation to gain a lower sentence, either in a regular case or in a capital case to try to get a life sentence instead of the death penalty.
Q So because of your experience, you're familiar with mitigation because of the analysis of sentencing factors now?
A Yes. Sentencing mitigation, I mean, that's been a big area of concentration at the last several CLEs. In fact, the one we were at just last week there was a session on sentencing mitigation.
Q But with regard to capital mitigation, you hadn't had any prior training with that, or had you?
A No, none specific to capital.
Q How was it that you came about to find out you were going to be appointed to represent Ms. Montgomery?
A Ray Conrad was my supervisor at that time, and he told me the case was being assigned to me.
Q And did he tell you why?
A No.
Q But you had no capital experience?
A I did not.
Q Had anyone else in the office had capital experience?
A Besides Larry Pace, no. I was trying to think -- I

know Laine Cardarella had tried homicide cases at the State, and I don't know about Steve Moss. I'm not sure if he did. I believe he did but I'm not positive.

Q Now, when Mr. Conrad assigned you the case, did he tell you that it was your case?

A Yes.

Q I know at some point, and I've seen the minute sheets and I'm going to tell you it was December 23rd, 2004, you went to a hearing in the District of Kansas; is that correct?

A Correct.

Q And why did you go to that hearing?

A Because at that time I knew I was going to be representing Ms. Montgomery so I went over to watch the proceedings in Kansas.

Q Did you have any conversations with anyone?

A I talked to the Kansas defender that was representing her at that time.

Q And did you try and solicit some advice from him?

A Yes. I wanted to talk to him about what he had done in the case up to that point and for him to give me his opinions and insight into the case at that time.

Q And did he tell you that he had already reached out to some people?

A Yes.

Q And who was that?

A Mr. Dillingham.
Q Yes.
A Yes.
Q And what did he explain to you the purpose of that?
A That he had retained him to meet with Ms. Montgomery up at CCA just to, you know, kind of help with the case, to help with the mental health aspect of the case.
Q Because Mr. Dedmon perceived there to be a mental health aspect of the case?
A Yes.
Q And he shared that information with you?
A Yes.
Q Did you subsequently contact Mr. Dillingham?
A Yes, I did.
Q And you spoke with him about his meetings with the client?
A Yes.
Q Can you tell me a little bit about what -- whether that was helpful or your thoughts about Mr. Dillingham?
A I thought it was because he had some experience with the mental health aspect, and he had formed a trust with Ms. Montgomery. So I thought that was a good thing for her and for the case.
Q Did you make other phone calls to other people?
A I did. I reached out to -- I know I talked to Jennifer

Herndon. I think I talked to Pat Berrigan. I talked to Dick Burr, who was resource counsel for the Federal Defender for capital cases, to get some guidance.

Q So can you explain to me more about the purpose of these calls?

A Yes. I wanted to talk to Mr. Burr just because I wanted to make sure I was doing the right things in the case early on. So I was asking him about a mitigation specialist, just how I should proceed with that aspect, and that was pretty much the focus at that time, because I felt that we needed a mitigation specialist on the case early on, so that was what I was working on.

Q And so you started visiting with Ms. Montgomery, correct?

A Yes, I did.

Q And how many times would you speculate you visited with her?

A I don't know how many times. You'd have to look at the CJA -- or CCA log when we sign in when we go, but I met with her a few times.

Q And are you a note-taker?

A Yes.

Q Are you a copious note-taker?

A Yes.

Q And did you take notes when you went over to the

District of Kansas?
A I did.
Q And also every time you met with Ms. Montgomery?
A Yes.
Q What did you do with those notes?
A The notes were kept in the file. I mean, I did handwritten notes so they were all in the file. I may have done something -- I may have typed a few of them up. I'm not good at keeping up with that, but I would have kept all the handwritten notes with the file.
Q And you have told me before that you take shorthand; is that correct?
A Yes.
Q So if someone else were to interpret your notes, would they be able to do that?
A No. I mean, I would have to -- I would have to write out the words that I used shorthand. I don't take them all in shorthand. I do some of them just for speed.
Q Early on you found out that Susan Hunt was going to be appointed on the case; is that correct?
A Yes.
Q And she was going to come in as lead counsel?
A Yes.
Q And why is that?
A Because she had capital experience.

Q And I know that she was appointed January 20th of 2005. Would you agree with that?
A Yes.
Q But you had been talking with her during the month of January, correct?
A Yes. I don't remember -- as soon as I knew Susan was going to be appointed, we began talking because I wanted her to know everything that was going on and get her advice and her input as well.
Q So you shared with her about Mr. Dillingham?
A I believe I did.
Q And about your meetings with the client and your observations?
A Yes. Yes.
Q Did you have any problem interacting with Ms. Hunt?
A No. No. We would often speak in the evenings just because we had -- either of us would be in court. I know we talked a lot after work in the evenings.
Q When you saw Ms. Montgomery, did you see her alone or with any other persons?
A I don't know. I know that Ron Ninemire would have gone with me a few of those times; but if he did every time, I'm not certain. Again, you can check the CCA logs to see who signed in. If I had my notes, I could tell you because I would have notated a conference with client and who was with me.

Q But you don't have your notes?
A I don't.
Q The thought to -- what to do with Mr. Dillingham, what were your thoughts on that?
A My thoughts were to keep him on because he had -- he and Ms. Montgomery had a rapport and they were -- she seemed comfortable communicating with him. I thought it was more important at that point to have somebody who had some mental health experience to interact with Ms. Montgomery and to give Ms. Montgomery somebody other than, you know, an attorney or investigator to talk with.
Q And you know he had training in mental health, in dealing with mentally ill clients?
A Yes.
Q Were you going to hire him as a mitigation specialist?
A Not as a mitigation specialist but more in a role of advising us on maybe how to proceed and to maintain that relationship with Lisa Montgomery.
Q I guess we might call him a consultant?
A Yes.
Q So you made the decision that you wanted to keep Mr. Dillingham on?
A Yes.
Q For the interim to make positive decisions about who to hire after that?

A Correct.

Q And what happened with that decision you made?

A Well, at some point -- I don't remember the exact date I was taken off the case, but at some point I was taken off the case, and Mr. Owen and I had had some disagreements about the case, and he was not going to keep Mr. Dillingham on the case.

Q Well, sometime in March of 2005 there were some letters seized from Ms. Montgomery or from her cell at CCA; is that correct?

A Correct.

Q And there was a hearing about those letters March 17th of 2005?

A I don't know the date, but I believe that that would be the date if you're getting it off the docket sheet, yes.

Q And where were you at?

A I was on vacation.

Q So you didn't attend the hearing?

A I did not.

Q But you were aware Ms. Hunt and Mr. Owen attended the hearing?

A Yes. Well, I didn't know -- I didn't know that Susan Hunt did. I knew David Owen did from our own office. But if that's reflected on the docket sheet, I don't dispute it.

Q So what happened when you came back from vacation?

A Well, when I came back from vacation, I didn't agree

with the way that Mr. Owen had handled the letters that were seized from Ms. Montgomery, and really that was just kind of the final straw in the problems between he and I. It really had started over hiring a mitigation specialist and other things and the fact that I was told that he was going to be making the decisions in the case and that I was to report to him but he was not going to be trying the case with me, and it finally -- that was just kind of the final straw.

Q So I'm going to backtrack just a minute just to show you what is Exhibit 91, and when does that show the FPD on the Missouri side was appointed?

A December 28th, 2004.

Q And then showing you Exhibit 92, that's a motion to withdraw, correct?

A Yes.

Q And that's your motion to withdraw?

A Yes.

Q And that is filed on what date?

A April 14th of 2005.

Q And the Court entered the order and you withdrew from the case?

A Right.

Q So what did you do with the file, including your notes?

A I don't remember if I hand delivered it to David or gave it to Ron. I don't know who I gave it to, but every note

I would have taken -- I kept everything together in the file so it would have gone to him.

Q Can you illustrate a little bit more of the source of conflicts you were having with Mr. Owen on this case?

A Well, it really started with the mitigation specialist. I had intended to hire Cyndy Short, and I was -- at least -- I don't know if I was positive at that point, but she was definitely someone I was very interested in because she had a lot of experience in the area. I knew her when she was here locally.

So really the conflicts started, I was called into Mr. Conrad's office and he and Mr. Owen told me that I was not going to hire Ms. Short as a mitigation specialist.

Q Were you given a reason?

A I was not.

Q Did you ultimately hire a different mitigation specialist?

A I did. Lisa Rickert.

Q And did you go with someone to meet and interview Ms. Rickert?

A Yes. Susan Hunt and Ron Ninemire and I went to meet with her.

Q And she doesn't live locally?

A No. I believe it was Wisconsin.

Q And after that meeting, did you take it back to the

team?

A We talked that day when we were meeting her. We talked about it amongst ourselves and, yes, we made a decision at that point that we wanted to hire her, and then -- I don't remember if we came back and we finalized it, but I knew at that point that we were going to hire her.

Q And so she ultimately got hired?

A She did.

Q And you hired her and you said Mr. Ninemire was with you. Is he a mitigation specialist?

A In my opinion?

Q Yes.

A In my opinion, no.

Q Why?

A Because I don't think he had enough experience at that point to be a mitigation specialist. I know he had worked on capital cases, but I wanted somebody on this case that had a lot of experience in this area.

Q And you had been working with Ms. Hunt while you were on the case about trying to put a budget together so the office would know what was going on in the case and the funds necessary to do that?

A We were starting to work on that, and I was really seeking help from Susan -- Susan Hunt on that because I had not done that before.

Q And you knew she had?
A I knew she had and I wasn't certain at that point how much things would cost.
Q After you were -- can you tell me how it is again that you were removed from the case of Ms. Montgomery?
A Yes. I went in to Mr. Conrad and just told him that I was not going to be able to continue working with Mr. Owen on the case.
Q Because?
A Because we were having conflicts, mainly because I was uncomfortable with him making the decisions on the case and then me carrying them out. I felt like I should make at least -- I'm not opposed to compromising or talking with other attorneys, but I feel like if I'm going to be responsible, I should at least be comfortable with the decision that's made, and that was not happening. I mean, I expressed that to Mr. Conrad, and at that point he took me off the case.
Q Had you asked to be removed?
A No.
Q Did you inform Ms. Montgomery?
A I did not.
Q Do you know if anyone else did?
A I don't know how they handled that.
Q After a period of time, did you -- what was David Owen's title when you were appointed on the case?

A He may have been senior litigation specialist at that time. I'm not sure when he got that position so I can't say for sure if he was then or not. But he was -- wasn't first assistant. We had a first assistant in Springfield, but it was apparent that Mr. Conrad relied heavily on Mr. Owen.
Q Was the perception that he was the heir apparent to Mr. Conrad's job?
A Yes.
Q And so how did Mr. Owen deal with people in the office?
A Well, I mean, with me specifically or just --
Q You specifically, then we can expand.
A With me specifically, I mean, we were on cordial terms. I would not say that we were friends by any stretch. I don't think David Owen was particularly good at working with women.
Q Why do you say that?
A Just -- it's hard for me to put that in words, but just being around him that was instantly apparent to me after a short time. So, you know, I just don't think he was going to be able to work with a woman on equal footing.
Q Did he treat women in the office different than the men?
A I mean, I don't think I would say he treated them differently. I think it was just more the way he interacted with women. I mean, he didn't single somebody out to go do an activity with. I think it was just more his personal

interaction.

Q And that was apparent to you?

A Yes.

Q After a period of time, did you come to learn that Mr. Owen had been demoted?

A Yes.

Q And how did that happen or how did that come about?

A I don't remember if Ray sent an email out about that, Mr. Ray Conrad, or if I just heard through the office, you know, through other people at the office, but I became aware of that, yes.

Q After you were removed from the case, did you have any further contact with David Owen?

A As far as having conversations, no. I mean, he was not speaking to me at that point. If we saw each other in the hallway, I would say hi because I wanted to be professional; but, no, we did not have much contact at all after that.

Q And you're aware that at some point Mr. Duchardt and Mr. O'Connor were appointed on this case, correct?

A Yes.

Q And did Mr. O'Connor ever come and talk to you or solicit information about your early presence on the case?

A No.

Q Did Mr. Duchardt ever come to you?

A Mr. Duchardt did. He came in the office, and I don't

know if he was there to pick up the file from somebody else. He came into my office and talked to me. I mean, I had worked for Fred Duchardt at the State Defender Office so we knew each other well.

Q So you had a long history with Mr. Duchardt?

A Yes.

Q Did he ask you a specific question?

A Yes. I mean, we talked in general about Ms. Montgomery, and then he asked me why we had not talked to her about the facts of the case yet at that point.

Q And what did you tell him?

A I told him I didn't think she was in a mental state at that time that we should talk with her about the facts. I mean, I knew that this case was going to be lengthy and that we were going to need to focus on mitigation; that we were going to have plenty of time to talk with her about the facts. I felt it was more important early on to establish a rapport with her so that we could get into those facts later on when the time was appropriate.

MS. NOURI: One moment, Your Honor.

That's it, Your Honor.

MR. VALENTI: No questions, Your Honor.

THE COURT: Thank you, Ms. Burns.

THE WITNESS: Thank you, Judge.

(Witness excused.)

THE COURT: Ma'am, would you come right up here to the witness stand, please.

STEPHANIE ELLIOTT, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. NOURI:

Q Will you please state and spell your name.

A Stephanie Elliott, S-t-e-p-h-a-n-i-e, E-l-l-i-o-t-t.

Q And what is your occupation?

A I'm a paralegal at the Federal Public Defender's Office.

Q And how long have you been a paralegal there?

A I started October 1st of 2005.

Q Prior to your life as a paralegal, what was your occupation?

A I'm a licensed attorney in Johnson County, Kansas, and I was in private practice with my husband.

Q And what type of work did you do in private practice?

A Civil. I did primarily divorce and child support enforcement. I did some work comp defense for the Kansas Workers' Comp Fund.

Q And when did you get out of law school?

A December of 1987.

Q I'm sorry. Did you say --

A December of 1987.

Q And so you had attorney experience from '87 to

approximately 2004?
A Yes. I worked for the Department of Revenue in Topeka from when I graduated to when we moved here in March of 1991.
Q And you knew Mr. Owen, I guess I would call it, socially?
A Yes.
Q Could you explain to the Court how you knew Mr. Owen?
A My neighbor is his cousin and we were in, like, a ladies book club with Dave's wife. So I probably knew her better but I knew him.
Q And did you see Mr. Owen at a party in the fall of 2005?
A Yes, in September.
Q And was he talking about a big case that he had?
A Yes.
Q Can you describe the conversation?
A Well, he was talking about that they, you know, had been assigned the Montgomery case and were looking for someone to help, you know, with the organization of all the documents.
Q And what did you say or what did you --
A Well, he asked me, he said if I knew of anybody or would I be interested. So we kind of talked about it some, then I kind of talked about it with my husband at that time. Dave said it would maybe be three to six months.
Q Had you had prior experience on a capital case?

A No.

Q Had you done any criminal work?

A Just traffic tickets.

Q And had you had any experience in dealing with what I would call a complex or a big file?

A Yes.

Q What was that experience?

A I worked as an attorney with Reid Holbrook over in Kansas City, Kansas. Holbrook, Evans and Faye (ph) was the law firm at that time, and the big case I worked on was Wyandotte County was our client and they were suing the people that built the jail and contractors and all that and it was in arbitration and also in the district court.

Q So you told Mr. Owen that you had some experience in dealing with a big document case?

A Yes.

Q And that's what led to him thinking about offering you that opportunity?

A Yes.

Q Did you have any capital training prior to the Montgomery case?

A No.

Q Did you have any mental health training prior to the Montgomery case?

A Well, CLEs that I took, you know, through the state of

Kansas, you know, some of the divorce and child support enforcement.

Q Nothing specialized with regard to a capital criminal defendant?

A Correct.

Q And the same thing with regard to -- strike that.

So you decide after speaking with your husband that you're going to take this opportunity. So when did you first start with the Montgomery case?

A It was the first part of October of 2005.

Q And did you go into the office and meet with anyone?

A Yes. I met with Dave and Ray Conrad and Susan Hunt.

Q They retained you? They retained you; is that correct?

A Yes.

Q And originally it was sort of a contract basis?

A Correct.

Q And how long did that last?

A I think until the first of December.

Q And then they offered you a full-time job?

A Right. It was just -- it was hard for the office manager to do the paperwork and it was just easier to do it that way.

Q What did they explain to you -- when you had that initial meeting at the FPD office, what did they explain to you your role would be?

A They had a lot of documents and records that had been requested and received and had come in. I think the secretaries had started to scan some of them, but it was at least to start primarily to organize those and, you know, get them scanned into the proper electronic folders as well as, you know, the hard copy folders.
Q Who was doing your role, then, before you came in?
A There wasn't a paralegal. The two legal secretaries I think had started to do some of the scanning.
Q And when you started October 2005, there was already a voluminous amount of records?
A Yes.
Q What kind of records? Can you give me an idea?
A Well, there were some school records. Like birth and death certificates. There were some court records, you know, regarding like Lisa and her divorce and the Justin Kleiner matter, some of the court records, divorce records from Lisa's mother, Judy, and then also some of the criminal records were kind of coming in regarding her two brothers.
Q And when you came into the case, did you start attending what I would call team meetings?
A Well, not right away. Do you mean that first day?
Q No, no, no. I mean in the first month or two.
A Oh. Well, right. Like David and Ron and I would meet when I first started to try to show me where everything was and

then, you know, kind of to get organized. It was just the three of us for a while.

Q And then it became apparent to you that there were other team members involved in the case?

A Like when Judy Clarke came on board?

Q Yes.

A Yes. That wasn't right when I started. That was maybe a month or so after.

Q And who were those people you started dealing with also?

A It was Judy Clarke, Deb Garvey, David Freedman, and Holly Jackson.

Q And there was also Susan Hunt?

A Yes.

Q And did she have an investigator also that she dealt with primarily?

A Yes, Phil.

Q Phil Thompson?

A Thompson, yes.

Q Who has passed away?

A Yes.

Q And then Mr. Owen, yourself, and Mr. Ninemire?

A Yes.

Q And did you guys have regular team meetings, the whole big group of you?

A Yes.
Q What was the purpose of those team meetings?
A Well, just, I think, to -- for the attorneys to decide, you know, which direction, you know, and who was going to perform what tasks.
Q Like, was there an agenda for these meetings?
A Yes.
Q Were they organized?
A Yes.
Q Was there a free flow exchange of information?
A Yes.
Q Were you instructed on what records you are going to be getting or letters to send out or things like that?
A Yes. You know, partly at the meetings then afterwards, you know, I would talk with Deb Garvey, you know, about kind of where to start, doing like they called it the medical records blast where we got records for the kids and Carl and Lisa.
Q And so you received information from Deb Garvey and you acted on that information?
A Correct.
Q Did you have any issue taking instruction or orders from Ms. Garvey?
A No.
Q Did she seem to have experience in a case of this nature, capital case?

A Yes.

Q After the period of time where Mr. O'Connor and Mr. Duchardt came on to the case, did you have team meetings after that?

A Well, when they first came on, maybe a couple where it was like all of us together.

Q Yes.

A At the Federal Defender's Office.

Q A couple?

A Uh-huh.

Q How many times would you say you saw Mr. O'Connor at your office?

A Two or three maybe.

Q So the team meetings you had -- I'm going to call it the Mr. Duchardt era -- were different than the team meetings you had in the what I'm going to call the Judy Clarke era?

A Yes.

Q Can you tell me a couple reasons why they were different?

A Well, from my perspective maybe the attorneys thought most of the records had been gathered so I wasn't really asked to do that as much, and I think they were just asking me for copies of things. And, you know, for example, they'd bring over a hard drive and so we could copy the information we had on that and also made paper copies of like discovery or

whatever they wanted.

Q So the records collection, just to move into that, when you first started, whose direction was it? Were you unilaterally deciding what records to get?

A No.

Q How were you doing that?

A Well, between Ron and then Deb Garvey.

Q And when the records came in, can you explain the process of what you did with records?

A Well, I would scan them and then, you know, would be put in the electronic folders and then we also kept track of the hard copies in, like, big notebooks, for example, with the person's name and then we do tabs like whatever the medical provider was.

Q So at that point there was Susan Clarke and -- I mean Susan Hunt and Judy Clarke, then the other respective people; Deb Garvey, Holly Jackson, Ron Ninemire, Dave Owen, Phil Thompson. When you scanned those documents in, did you give that information to the other players on the team?

A Yeah. At that time we just would make CD discs with that information.

Q And would Susan periodically come by and pick up her disc?

A Yes.

Q And you got the information to the Judy Clarke team?

A Yeah. You know, if they were in town, we'd have them ready or, you know, maybe mail them sometimes. For each time I don't really remember how we did that.
Q But every member of the team was given the information as it was coming in?
A Yes.
Q And you saw to that?
A Yes.
Q That was your task.
Who decided how to set up the folders or whatever you just called it when the information came in?
A I guess me.
Q So let's say, for example, a medical record of Carl Boman came in, which is Lisa Montgomery's first husband, what would you do with that?
A We had notebooks set up for him, so I would do whatever the medical providers, you know, would have been. Like I said, do a tab in the notebook, then we'd just put the records -- after I scanned them, put them in the notebook.
Q And everyone got an electronic version of that also?
A Yes.
Q When Mr. O'Connor and Mr. Duchardt came into the case, were they provided all these documents that had come into the case prior to their entry?
A Yes. They brought hard drives over that we copied

everything that we had onto hard drives for them.

Q And besides the hard drives, did you give them anything else?

A They each wanted paper copies of the discovery.

Q And did you do that?

A Uh-huh. Yes.

Q Since you were involved in records collection and organization since about October of 2005 up through the trial, when were the bulk of the records obtained on the case?

A You know, probably, like I said, when I started there in '05, maybe for the next year or so.

Q And so just to be very clear, so after Mr. Duchardt and Mr. O'Connor came into the case with Mr. Owen, were there very many records coming in after that?

A No.

Q Did you ever meet Ms. Montgomery prior to court? Did you ever meet Mrs. Montgomery prior to court?

A No.

Q You never had any visits with her at CCA?

A Oh, I thought you meant prior to when the case started. Okay. I misunderstood your question.

Q Did you ever visit her at CCA?

A Yes. Yes, I did.

Q Many times?

A Correct.

Q If I told you over 40, would you accept that?
A Yes.
Q And those were all pretrial?
A Correct.
Q Those visits. And you actually visited her almost another half dozen times after the verdict?
A Yes.
Q When you visited her, did you go alone or did you go with others?
A Both.
Q And when you visited her, what did you see your task was or what were you trying to do?
A My main task was to allow her to go through the discovery, because we had it in paper copy at that time. We couldn't take electronic devices into CCA. So it was all, you know, printed out and in notebooks and just to allow her -- we'd do about a two-hour stint at a time to look at all the 302s.
Q And isn't that correct that you started that discovery review with her about November 2006?
A Yes.
Q And you had numerous visits in November, December with binders?
A Yes.
Q But you had many, many visits before November of 2006

with her; is that correct?

A I don't know about many, many; but several, yes.

Q When you had these team meetings in the Judy Clarke era, would you describe your interaction with Lisa? Was someone with you? Was there a memo made of simultaneous interaction?

A Yes.

Q And so everyone on the team was informed about what Ms. Montgomery's -- any observation about her was reported to the team?

A Yes.

Q You didn't keep that to yourself?

A Correct.

Q Did you -- did there come a point when you went on an interview of Ms. Judy Shaughnessy and Patty Baldwin?

A Yes.

Q I'm going to show you what's been marked as Exhibit 124. Can you see the date of that?

A Yes.

Q What's that date?

A February 1st, 2007.

Q And how was it that you came about having to go to this interview?

A Mrs. Shaughnessy called Dave Owen and said that the FBI had contacted her, that they wanted to meet with her, and I

think the meeting was going to be like the next day and she wanted him to come along, and then Dave and Ron Ninemire were in Oklahoma tracking down people, you know, tracking down witnesses. So he asked me to go. And I don't remember where Susan was. She must not have been available either.
Q Well, I'm going to point out to you February 1 of 2007, that was approximately eight months before the trial. So during that time period, would you agree with me that the attorneys were David Owen, John O'Connor, and Fred Duchardt?
A Yes.
Q So that's probably why --
A I couldn't remember how long ago.
Q But your recollection is that it wasn't Mr. O'Connor or Mr. Duchardt. It was Mr. Owen telling you to go do this meeting?
A Yes.
Q Okay. And I just would like you to explain, what does this highlighted portion say?
A "The household was in its usual chaotic state when I arrived."
Q What does that mean?
A Well, there were people in and out.
Q Well, let's point out. Whose household was it?
A It was Judy Shaughnessy's.
Q And had you been to that house before that day?

A Yes.
Q So what was the usual chaotic state?
A The house was just in disarray. There just were people in and out. She was, you know, kind of hollering at people. It was just chaotic.
Q And that was typical?
A Yes.
Q And I'm going to ask you to read the top where it's highlighted there.
A "Matt then started to question Patty. Roseann was upset that since they didn't know she was coming, they did not have her 302."
Q And what does that mean? Can you explain to the Court why they would be upset?
A Well, they didn't know Patty was going to be there. They had asked to talk to Judy, and I don't know if they couldn't get ahold of Patty. I don't know. But she showed up with Judy.
Q And what did Judy tell you when Patty was there when you presented to her home?
A Well, I was supposed to go to Judy's house to go with her to make sure she actually went to the meeting, and, like, Okay, we need to go, I said to her. She said, Well, we need to wait, and I said, Well, what for? She said, You'll see. Then ten or so minutes Patty showed up. And I never met her.

Q So that was sort of Judy Shaughnessy's kind of trickery or playing games?
A Correct.
Q Was that a typical thing she would do?
A Yes.
Q I would like you to read into the record the point where it says Patty, and I'm going to have you go all the way down to the end of that, then ask you to describe the observations of the people.
A To the end of the page?
Q Yes, ma'am.
A "Patty didn't want any part of the reputation Lisa had for herself. Matt asked her about that. Patty said Lisa had a reputation for being promiscuous, but that was all talk, she really wasn't. Judy chimed in that Carl was the manipulator in Lisa's life. Patty and Judy were talking over each other at this point. Judy said her relationship with Lisa started to go bad when she caught her with Jack. Patty said she was aware of it because she saw it. Patty said that Jack left, then came back, then Judy left with the kids. Matt asked Patty if she believed the relationship between Lisa and Jack was consensual. Patty said at the time she thought Jack was forcing her, now she believes Lisa was scared to death to refuse. Patty started crying and said that Jack had beat the crap out of them for years and that no, it was not consensual. I noted that Judy

had a strange affect during Patty's recitation. She had a blank look on her face and she was looking across the table at me, not consoling Patty, who was very visibly upset."

Q So there's two things I want to ask you about that. You're aware of the Jack Kleiner and Lisa Montgomery sexual abuse?

A Yes.

Q And was Lisa Montgomery a minor during that time period?

A Yes.

Q In fact, she was under 16?

A Correct.

Q Because we know Mr. Kleiner wasn't even kicked out until after her 16th birthday?

A Yes.

Q And your observations that you described pretty vividly about Ms. Shaughnessy and her lack of affect or I guess I would call it sympathy with regard to Patty who is kind of spilling her guts to the government, can you describe that a little bit more?

A Well, she just was kind of staring because I was sitting across the table just kind of staring at me and she was sitting beside Patty and not patting her hand or arm around her.

Q No effort at consoling?

A No.

Q Did she appear to be miffed or mad that Patty even told that?

A She just had, like, no expression on her face.

Q Now, I want to cut to the trial of Ms. Montgomery. Did you attend the trial?

A Yes.

Q And can you describe the seating arrangement of the Montgomery defense team during the trial?

A The back table Troy and I sat back there with the computer. We also had some boxes with hard copies of, you know, exhibits if we needed them. And then at the -- kind of the back corner Lisa was in between --

Q Now, you're talking about the counsel table now?

A Yes. So Lisa -- let's see. Dave was at the very end and then it was Fred, Lisa, and then Fred's wife. Maybe Fred's wife was down by Dave. And then John O'Connor sat up at the top corner, then Ron Ninemire was on the other side.

Q Now, were you aware -- had you ever -- were you aware that Mrs. Duchardt was going to be at the trial?

A No.

Q When you entered, did you know who the woman was at the counsel table?

A No. Because I had been back with Lisa in the marshal's lock, then came out and saw her, and then Fred said that Troy

and I were going to sit at, as he called it, the kids' table.

Q And so you were responsible for changing out or helping Mrs. Montgomery change every morning and every evening?

A Yes.

Q And when you came out, did you and Troy wonder who that lady was?

A I think Troy was probably already seated; and, yeah, I didn't know who she was, and I really can't remember if Fred introduced her. I kind of became aware it was his wife.

Q And what did Mr. O'Connor do?

A At that point nothing that I recall. I kind of had been back in the back.

Q What was Mr. Owen's reaction?

A At that time, I mean, we're getting ready to start voir dire so he didn't say anything, you know, then.

Q Did you walk back to your office every day after changing Mrs. Montgomery out?

A Yes.

Q And did your coworkers accompany you?

A Yes.

Q Who would that be?

A Well, Troy and Ron and Dave and myself.

Q Did Mr. Duchardt ever accompany you back to the office?

A Not that I remember.

Q Or his wife?

A No.

Q Or Mr. O'Connor?

A No.

Q The first day after you left, was there some discussion about why Fred's wife was at the counsel table?

A Well, yeah, because we're just like, you know, kind of who is she and what is she doing there, and Dave was like I don't know. He didn't seem -- he didn't know about it before we got there either.

Q So none of you understood the purpose of that?

A Correct.

Q It was not explained to you ahead of time?

A No.

Q How did Ms. Montgomery seem to interact with Mrs. Duchardt during the course of about a three- or four-week trial?

A I thought she interacted with her all right.

Q Was there an incident with Mrs. Duchardt and a U.S. Marshal during the trial?

A Yes.

Q What happened?

A Mrs. Duchardt was -- oh, there were some mints like those Life Savers. I think she was passing one to Lisa and the U.S. Marshal Deputy came behind and said, You can't do that. And so then Mrs. Duchardt, Well, yes, I can and why not? She

was, like, angry and told her to stand down.
Q So was it unnerving?
A Yes.
Q Awkward?
A Then I think the marshal's deputy talked to Judge Fenner about it.
Q And did the judge come out and say something when he came on the bench?
A I don't recall it in open court. He probably had the attorneys come up to the bench and said something.
Q And the jury wasn't present for any of that?
A No. No.
Q What was your role in helping prepare the attorneys for trial with regard to exhibits?
A Well, to make sure we had enough copies, that they were given to the judge, of course, and U.S. Attorneys.
Q And did Mr. O'Connor ask you to do anything specifically for him?
A I don't think so.
Q Did Mr. Duchardt?
A No.
Q I'm sorry?
A No.
Q Did Mr. Owen?
A Yes.

Q What did he ask you to do?
A Well, for the witnesses that he was going to examine or cross-examine they had them divided up, you know, whatever reports, you know, paper reports or memos that would pertain to that person, for Dave anyway, we had them in folders with the witnesses' names on them.
Q And you would have been happy to do that for Mr. O'Connor or Mr. Duchardt?
A Sure.
Q What did you do during the three to four weeks you were sitting at the kids' table, as you call it?
A When we were actually in court in session?
Q Yes, ma'am.
A Well, I took notes. I did help get some witnesses back and forth, if somebody maybe needed to go down to get their vouchers from the marshal.
Q You're aware, because you're an attorney, there's an exhibit list kept like a master exhibit list of all the exhibits in a trial?
A Yes.
Q Were you assigned to keep track of the exhibit list?
A No.
Q So you didn't do that?
A No.
Q Are you aware of who did that?

A I think Ron did.
Q And you mean Mr. Ninemire?
A Mr. Ninemire. Sorry.
Q During the trial, at some point one of Lisa's children, Desiree Boman, testified; is that correct?
A Yes.
Q Can you tell me what the reaction was or the discussion as you all left court after that day's testimony?
A Well, she gave testimony that in all the times that, you know, Ron and even the mitigation specialist they interviewed her that she had never told any of them before, you know, I think that Lisa would hit them with hangers, just some physical abuse that, you know, that, of course, that Desiree was asked about that and she, you know, said that there wasn't, then she had said that in court. So when we were walking back, you know, Dave and Ron were just very upset, like she had plenty of opportunity to tell us and is she lying? Why would she lie to us? They were pretty upset about it.
Q And so they felt blindsided?
A Yes.
Q Did there come a point in the trial where you learned that Judy Shaughnessy, Lisa Montgomery's mother, Judy Shaughnessy was intimidating witnesses in the hallway?
A Yes.
Q What can you say about that?

A Well, what I remember is I think Dani Waller, the mitigation specialist, had kind of heard her out there and brought it to the attorneys' attention so that, you know, we needed to get everyone separated, you know, in the rooms in the back out of her reach.

Q During the trial, there came a point where Mr. Duchardt was cross-examining Dr. Martell. Do you recall that?

A Yes.

Q And can you tell me what Mr. O'Connor did during that time period?

A Well, as I said, he was sitting kind of at that front corner of the table, and he just kind of scooted his chair backwards where Troy and I were sitting and, you know, had written some notes on like a kind of larger Post-it notepad.

Q And what did the note say?

A I think at first it was -- he said something like Fred has said pathological liar seven times now and Martell never has. Then he needs to stop, something like that.

Q So he was frustrated and upset with the cross-examination --

A Yes.

Q -- of Dr. Martell; is that a fair statement?

A Yes.

Q And were there other witnesses during the trial where Mr. O'Connor would scoot back to your guys' table and express,

I guess, frustration?

A I don't remember it as much as I do remember it with Martell, Dr. Martell.

Q And after you left court that day and you walked back with your coworkers; Dave Owen, Ron Ninemire, and Troy Schnack, was there further discussion about that testimony and cross-examination of Dr. Martell?

A Yes. Dave had said it was a disaster.

Q Now, since you were going to regular team meetings during the Judy Clarke era, you were privy to what was being discussed at the team meetings, correct?

A Yes.

Q And were you at a team meeting where there was a discussion of a Dr. Ramachandran and pseudocyesis?

A Yes.

Q And was that ultimately rejected or ruled out and was he ruled out as a witness?

A I don't recall him being ruled out, but I think they thought maybe they had some better people to contact first.

Q But they had already -- you had heard that name significantly ahead of when Mr. Duchardt came into the scene?

A Yes.

Q When Mr. Duchardt came on the scene, is it fair to say that he dealt with most of the experts?

A Yes.

Q And did he discuss your knowledge of collection of information that was passed on to prior experts?
A Do you mean like what I had sent to them to review?
Q Yes.
A Yes. It would have been in the information. We had it in folders, you know, electronic folders.
Q But that was very clear of what work product had already been done to that point?
A Yes.
Q And that was not hidden from Mr. Duchardt?
A Correct.
Q Did Mr. Duchardt request you to put together any information to provide to experts?
A I don't -- I don't really remember if he did or not.
Q So you don't know if he asked you to send a packet of information to experts that he retained?
A I don't remember that he did. It makes sense that he would, but I don't really remember doing it.
Q And if you did that, you would have attached a letter that you would have sent to an expert?
A Yes.
Q I mean, would that be your practice?
A Right.
Q You wouldn't just mail somebody a bunch of documents without a cover letter?

A Correct.
Q Now, the final mitigation specialist on this Mr. Duchardt/Mr. O'Connor/Mr. Owen team was who?
A Dani Waller.
Q And was Ms. Waller at the trial?
A Yes. I'm not sure she was there, you know, every day but she was there, you know, kind of in and out quite a bit.
Q And you were familiar with her before from being in your office?
A Yes.
Q And anything that she had produced you would distribute out also?
A Yes.
Q Now, during the trial on a lunch break, let's say, what did the legal team do?
A Well, we could keep the jury room, you know, it was dedicated, I guess, to us for that whole month, and, you know, a lot of times we brought our own lunch or maybe we'd go down to the cafeteria to eat.
Q And in this room, jury room, were there discussions about what had happened in the morning or what was going to happen in the afternoon or things like that?
A Well, somewhat but Lisa's husband was allowed in so they'd kind of have to get him kicked out so they could talk about things.

Q And were other family members coming in and out of the room?
A At times there were.
Q So it was kind of disruptive, I guess, to trying to get something productive done; is that a fair statement?
A Yes.
Q Did that seem to perplex or annoy Mr. Owen?
A Yes.
Q So when you would walk back on these daily walks back, was that another source of things that were discussed?
A Yes.
Q Now, just to be clear, at the end of every day you helped Ms. Montgomery change out?
A Correct.
Q So about how long would that take?
A Oh, 15 minutes or so and I'd usually stay with her until the deputy marshal would say they were ready to transport her.
Q So you didn't leave her sitting there alone. You stayed there until the marshals come and got her?
A Yes.
Q And after that, was there like a team meeting between all the attorneys of what had happened that day or what was coming up? Anything of that nature?
A I wouldn't say after that because I was, you know, back

there by myself with her. If they talked about things in the courtroom, you know, while I was back there, I don't know. But then on the way back down we sometimes would talk with Dave and Ron and I about what kind of had gone on.

Q So after you walked back after 15 minutes, you, Dave, and Ron might have a meeting about what had transpired that day?

A Yes.

Q But you didn't have any such meetings with Mr. O'Connor or Mr. Duchardt?

A Not with me.

Q But you don't know what happened that 15 minutes when you were helping her change?

A Correct, I do not.

Q At some point are you aware that Mr. Owen was demoted in February of 2007?

A Yes.

Q And he was demoted from what?

A From what?

Q Yes. What was his position?

A He was first assistant to, I guess, regular assistant.

Q That was pulled?

A Yes.

Q And that was pulled by Mr. Conrad?

A Yes.

Q And how did you become aware of that?
A Well, I was gone the day it happened. I think just office talk. And then he had told me himself, you know, maybe that next day or so.
Q And what did he tell you?
A He just said, Well, you probably heard I've been demoted. I'm still going to stay on Lisa's case.
Q And did you come to learn or did he tell you that he was going to leave after the case was over?
A He didn't that day.
Q Did he ever tell you that?
A Yeah, I mean, probably at some point.
Q So it was common knowledge that he was going to leave after the trial?
A Yes.
Q And have you had any contact with Mr. Owen since he's left town?
A His cousin that is my friend, her daughter got married, like, three years ago, and I just saw him at the wedding. I talked to his wife, Peggy, but I just kind of waved at him. I didn't talk to him about any of this going on. That's the only time I've seen him.
Q I understand that. Now, after the verdict was read and Ms. Montgomery was convicted, can you tell me what happened or what her reaction was as she was going back to the lockup area

to change clothes?
A Well, I didn't go back with her right away. John and Fred and Dave did. I don't remember if Ron did or not. You know, that she was upset and said she was kind of ready to help us.
Q After?
A After.
Q After the fact?
A Yes.
Q Ms. Elliott, you never used a program called Case Map; is that correct?
A Barely. I know they were trying to make it work and I never really did.
Q So you didn't understand it?
A No.
Q And you didn't put anything into it?
A No.
Q And that was not provided to anyone in the final team?
A They were trying to do updates through that program, and I didn't -- I didn't really understand it.
Q Everything that was in the file when Mr. O'Connor and Mr. Duchardt came in was turned over to them?
A Correct.
MS. NOURI: I don't have anything further, Your Honor.

MR. VALENTI: No questions, Your Honor.
THE COURT: Thank you, Ms. Elliott.
(Witness excused.)
THE COURT: Come on up to the witness stand. Thank you.
TROY SCHNACK, being sworn by the courtroom deputy, testified:
DIRECT EXAMINATION BY MS. NOURI:
Q Good morning.
A Good morning.
Q Please state your name.
A Troy Schnack.
Q And can you spell Schnack?
A S-c-h-n-a-c-k.
Q Where are you employed, Mr. Schnack?
A With the Federal Public Defender, Western District of Missouri.
Q What is your job there?
A I'm the computer system administrator.
Q And can you describe your educational background?
A I have attained a GED when I was 16, went to college, studied computer science. Left college to go into the workforce. And then I have extensive continuing ed in both network systems security and multiple forensic certifications for analysis.
Q And how long have you been at the FPD?

A Eleven years, I think.

Q And all of your experience at the Federal Public Defender is in the computer field?

A Yes, it is.

Q So you're the computer nerd of the office?

A I am absolutely.

Q And you also have some familiarity with computer forensics?

A Yes.

Q What is that?

A What is my experience?

Q Well, what is your experience?

A About 2001 we understood that computer forensics was needed in a lot of our cases. Hiring experts was expensive, and so I showed an interest in that, and they began sending me to training around the country, obtaining certifications so that I could perform forensics. So I have a certificate in computer forensics from the University of Oregon, and then I have multiple forensic certifications which require both written and hands-on testing.

Q And you were, I don't know if you still are, on something called DAWG?

A I was at one time, correct.

Q What is DAWG?

A That is an acronym. It's actually D-A-W-G. It's the

Defender Automation Working Group, and it's a part of a defender services committee that basically would meet in Washington, D.C. to -- it was a panel of attorneys, investigators, paralegals, and people who did what I did, computer system administrators, and we would help formulate ideas and progress and planning for any kind of automation that would help the offices or client, defendant.
Q You have a reputation nationally in the Federal Defender system regarding your computer skills or expertise; is that a fair statement?
A Yes.
Q Not trying to make you brag about yourself, but you were aware of Ms. Henry before this case; is that correct?
A Yes.
Q Because you served on that DAWG committee together?
A Correct.
Q When there is a big -- you have experience with big document cases in your office?
A Yes, I do.
Q And you also have, I guess I would call it, a mutual respect, admiration for some of the FBI computer forensic people that you've dealt with on these big cases too?
A Yes, I do.
Q So when there's a big document case, that's not going to affect you or that's not new to you. You know how to handle

getting everything produced for the attorneys?
A Yes.
Q Do you have any specific capital case training?
A I do not.
Q When did you start working on the Lisa Montgomery case?
A I can't give you an exact date. I began working on it when the forensics, the computer forensics side of the case was brought to me by David Owen is when I was brought into the case.
Q And there was some computer forensics pretty early on in this case, correct?
A I would say yes. However, I knew that the case was in our office for quite awhile before that particular evidence was brought to me to work on.
Q Back in that time period of 2004 to 2007 or I guess I'm going to say 2005 to 2007, what kind of witness locators system was your office using?
A Witness -- I don't know if I understand the question.
Q Well, did you have access to, say, like a driver's license database?
A I think we used -- I don't know that we had our national system that we have now. I know that we used Westlaw people search database. I don't think we had a national license that we do today that offers the ability to do a lot of that searching online.

Q Is that something that the office has to pay for, that license?
A Well, now we are provided that through Defender Services, so there is a national license that all offices can use.
Q So on the Montgomery case were you in charge of file management?
A No, not really.
Q What were you tasked with doing regarding to maintaining a file?
A The part that I had to take care of is just like any other case where I maintain the servers and the networks to make sure data was backed up and secured, but I wasn't put in charge of managing how it was stored or indexing it or anything like that.
Q So the era when Susan Hunt and David Owen were the attorneys, you're aware of that, correct?
A Yes.
Q And then Judy Clarke came into the case?
A Correct.
Q And she brought a number of people with her to assist?
A That's my understanding, yes.
Q Then you were also involved in the case with Fred Duchardt, John O'Connor, David Owen era?
A Yes. I would say that last era is where I had my

involvement.

Q You did not attend team meetings in the Judy Clarke era?

A No.

Q And you were aware there were regular team meetings going on?

A Many.

Q But no one sought your need with regard to computer forensics in that era?

A No.

Q But during the Fred Duchardt and John O'Connor and David Owen era when it became important to analyze the computer information, that's when your role stepped up; is that fair to say?

A That's correct.

Q And who did you primarily work with on the case?

A David Owen.

Q And you -- what did you do for David Owen?

A I would extract the millions of Internet history records which were pertinent in this case and break them down into small databases so that he could then analyze them and go through and look at them and see what was there and what was important to him.

Q Did you have many, many meetings with Mr. Owen?

A Many.

Q And he kind of fancied himself a computer geek also; is that correct?
A Yes.
Q So that was of interest to him?
A Yes.
Q Did Mr. -- did Mr. O'Connor ask you to do anything for him with regard to preparing for trial?
A Not that I remember.
Q And did you attend the trial?
A Yes.
Q And can you describe where you sat during the trial?
A I basically sat at a table behind the main defense team's table. Is that what you're asking?
Q Yes. Who did you sit with?
A Stephanie Elliott.
Q Who was at the main defense table?
A Lisa, of course, David Owen, Fred, John, and Fred's girlfriend/wife.
Q So there was another lady at that table?
A Correct.
Q Had you ever met that woman before?
A No.
Q And when you came in and were seated, did you ask Mr. O'Connor who that was?
A Not verbally. It was more of a -- when John turned

around and looked at me, I kind of gave a hand signal of who is that, and he kind of replied back, shook his head with the same hand signal I don't know.

Q It appeared to you he didn't know who it was either?

A Correct. It appeared that he didn't know or didn't know why she was there, one of the two.

Q Did any other team members during the course of the day or that evening, did you get the sense that they knew that Mrs. Duchardt was going to be seated at counsel table?

A It appeared from everyone I talked with that it was a big surprise.

Q So you guys were the last to know?

A Correct.

Q What did you think Mrs. Duchardt's role was?

A I thought she was there to talk with Lisa, I guess. It was just a guess. I don't know what her role was there.

Q Now, did she help Mrs. Montgomery change in and out of clothes every day?

A Not that I know of.

Q Was there a point in the trial where there was an incident between Mrs. Duchardt and a U.S. Marshal?

A Yes.

Q What happened?

A Because of my role of making sure exhibits were ready for electronic display, anytime we had a break, I was usually

pretty involved mentally into that. So I didn't really hear what the conversation developed that caused this, but at some point the female marshal yelled in a very commanding loud voice that startled me, Step down or step off, and at that point it shook me so I looked up to kind of see what was going on and realized it was with Fred's wife.

Q Did everyone appear unnerved by that raised voice?

A Pretty shocked.

Q Have you ever seen that happen in a trial before?

A I haven't.

Q And what happened after that?

A It kind of calmed down a little bit, and then I believe Fred or one of the other attorneys came back in and tried to kind of dissolve the situation, and then at some point there was a conference about it with the judge.

Q So you said during the trial you were in charge of exhibits. Does that mean you were keeping like the master exhibit list of what's admitted or objected to or things like that?

A No.

Q That wasn't your role?

A Correct. I was just to make sure that they were rendered electronically then to be presented to the screen for witnesses or whatever occurred during the trial.

Q What was your understanding of the, I guess I would

call it, the allotment of the attorneys' roles with regard to the case? What was Mr. Owen doing?
A His main focus was on the computer evidence.
Q And what was Mr. Duchardt's main focus?
A Just about everything else.
Q What was Mr. O'Connor's role?
A Lead defense attorney.
Q I'm going to show you what's been marked as Exhibit 89. Can you see that?
A Yes.
Q Can you tell me what that is?
A That's a memo I created back in September '07.
Q What was the actual date of that?
A September 28th, 2007.
Q And if I represent to you that trial started October 1st, 2007, you wouldn't disagree with that?
A No. That sounds right.
Q This memo -- can you read what the request is there again?
A Yes. Fred asked that I create a summary of deleted Internet files that were found on the Mac computer.
Q Now, did he ask you to do that months before?
A If I created the memo on this date, more than likely the request was that day or the day before.
Q You didn't sit on a request?

A I hate sitting on requests.
Q Was that issued during the trial where an attorney would say, Hey, can you do this? Can you do that? Can you make this ready?
A That's pretty common, yes.
Q So that's not unusual?
A No.
Q But who was the attorney who would request you to do most of the things during the trial?
A Almost all the last-minute stuff was with Fred.
Q And just to open this up, what is that? Can you explain a little bit of that to me?
A Well, I look at the page on the right, the December 14th.
Q Okay.
A I made a note that this shows that these were Internet history records that had been deleted related to the Rat Terrier board. So basically just a quick computer forensic blurb. When you use the Internet on a computer system or at least Internet history and you also have the ability to clear that history. So that page -- I didn't see the bottom of it.
Q I'm sorry.
A That's all right.
Q Goodness gracious.
A So what I had done is retrieved all of the Internet

history from each day, and then it was requested, and that's why I made these smaller reports that showed here's what was deleted on this specific day by a user, and then I'd made a note there at the bottom that websites related to things other than the Rat Terrier board like Apple and Microsoft were removed -- I mean -- I'll read the sentence real quick. Yeah, showing that other websites like for Mac software or Apple or other searches were removed along with these Rat Terrier posts.

Q So Mr. Duchardt asked you to prepare this memo and you did that?

A Correct.

Q And you didn't have any problem doing that?

A No.

Q And you also prepared a -- I'm going to call it a chaos map.

A Okay.

Q And what is the chaos map?

A I'm not sure.

Q Did you prepare something showing that Mrs. Montgomery had lived at numerous addresses?

A Oh, yes. Yes. Using different information that I had gotten from the mitigation people, I guess, I created an animated map that showed the multiple places that Lisa had lived in her life and how she had moved from place to place around the country.

Q And who actually prepared that?
A The map itself?
Q Uh-huh.
A I did.
Q You did it because you thought it would look better?
A Yes. When they initially asked me for something, I didn't like the idea that they had, so I created it in an animated way so it would show all this hopping and bouncing.
Q And did you also receive what I will call a genogram from Dani Waller?
A I did.
Q And what did you do with the genogram?
A I, again -- I like things to look very professional, so I took what she had made and then I reformatted it in a different program so that things were easier to read. The lines and all the different symbols that are on a genogram were a little bit more clear.
Q And were you doing this because Mr. Owen thought or was preparing to do the opening statement in the trial?
A I'm not 100 percent sure on that, but I'm -- my recollection is that David was really into that jumping arrow thing and that he was going to give an opening about that constant moving in her past.
Q But did he give that opening?
A He did not.

Q Now, during the trial, you said Mr. Owen was seated at counsel table?
A Correct.
Q Were there points in the trial where Mr. Owen would scoot back to the table that you and Ms. Elliott were seated at?
A There were a few times but not very often. Usually if he needed something from me, I would walk over and kneel next to him.
Q Can you recall an event during the testimony of Dr. Martell?
A Can you remind me of what Dr. Martell talked about?
Q Do you recall the testimony of Dr. Martell when Fred Duchardt was cross-examining him?
A Yes. Actually it was -- I believe it was John who did most of the rolling back and talking.
Q I thought that's what I said. If I said something else, I completely apologize.
A I understood you to say David.
Q If I said that, I misspoke. So apparently I did because everyone is shaking their head in agreement with you.
So there were points in the trial where Mr. O'Connor scooted back to your table?
A Many times.
Q Many times. And can you -- do you have vivid memories

of any occasions?

A I think specifically that the cross that you were referring to that this witness seemed to go -- to give some basic information, but the feeling of myself and Stephanie and other people at the table were kind of like, hey, that went very well for us. He didn't really say anything. And then Mr. Duchardt began to do a cross-examination, and as that went, John got -- it was physically obvious that he was upset and would roll back and ask when he was going to stop. It was just not good.

Q Did he write a note?

A Yes.

Q What did the note say?

A How do we get him to stop, or something like that.

Q And you said there were other times during the trial when Mr. O'Connor, you said numerous times, when he would push back?

A Yes.

Q He wasn't pushing back to have a social chat with you and Stephanie?

A No.

Q He was frustrated with what was happening?

A Yes.

Q And was that during cross-examinations that Mr. Duchardt was doing?

A Most of the time, yes.
Q Was there a point in the trial where you had to leave during one of Mr. Duchardt's cross-examinations?
A Yes.
Q What happened?
A It was just evident that -- I was obviously -- obviously I'm not an attorney but it was evident to me that as Mr. Duchardt would press certain issues, it wasn't helping us, and I do my best to maintain, I guess, a poker face while I'm at the table as to not influence the jurors if they're looking at me, and I couldn't just sit there anymore, so I got up as if I needed to go to the restroom and left the courtroom.
Q Now, you testified in trial, correct?
A I did.
Q And when you started working in that office, was Mr. Owen already employed there?
A Yes.
Q So what was your relationship like with Mr. Owen?
A Initially it was very good. He was excited to have a computer person that could get things fixed and done around the office.
Q Why do you say initially?
A Because it didn't stay that way.
Q Why? What happened?
A Mr. Owen was a very -- I guess I would say he was very

demeaning to the people that worked for him. Rarely smiled but was always quick to point out anything that he felt you did wrong or did something that he didn't instruct you to do.

Q So was he trying to educate in a constructive or instructive manner?

A No. He just wanted you to feel like you weren't as important as he was.

Q So he was an egomaniac?

A That I would say, yes.

MR. VALENTI: Your Honor, I object to the speculation.

THE COURT: Sustained.

Q (By Ms. Nouri) Now, Mr. Owen and you prepared for your testimony?

A Many hours, yes.

Q And he practiced questions with you?

A A few.

Q Did he ask you what you thought would be the pitfalls of your testimony?

A Yes.

Q Did you cover that with him?

A I did. I even suggested things that -- in the evidence to point out to him to make sure that he understood that's what those things could mean.

Q Because if you knew you were cross-examined on those

things, you would have to answer the bad information?

A Absolutely.

Q And there was a lot of bad computer forensics information?

A Yes, there was.

Q So you practiced extensively with him and all of your insight was imparted on to Mr. Owen?

A Correct.

Q Do you know if he passed that on to Mr. O'Connor or Mr. Duchardt?

A I have no idea.

Q Were you in any team meetings with Mr. Owen or -- I mean Mr. Owen, Mr. Duchardt, or Mr. O'Connor to share information with them?

A Never.

Q You have worked with Mr. Ninemire in the past too?

A Yes.

Q Is Mr. Ninemire a mitigation specialist?

A He told me that he was, but I can't say yes or no.

Q Was there a mitigation specialist on the team?

A Yes.

Q Who was that?

A Dani Waller I think was her name.

Q And that genogram that you put together for someone was based on information she had provided to you?

A Correct.
Q In February of 2007 was Mr. Owen demoted?
A I'm not sure about the date but, yes, he was demoted.
Q It was several months before the trial of the Montgomery case?
A Yes, it was.
Q And how did you become aware he was demoted?
A Initially through office gossip and then through an email from the defender to the staff.
Q And did you have any discussions with Mr. Owen about that?
A One or two, not many.
Q Did you become aware that Mr. Owen was going to leave after the trial?
A Yes.
Q That was common knowledge in the office?
A Everyone knew that, yes.
Q And did he, in fact, leave the day after the trial ended?
A Yes.
Q And one of the important parts of the trial was a Daubert hearing regarding a Dr. Gur. You're familiar with Dr. Gur?
A I recognize the name, yes.
Q What was the defense's thoughts when the testimony of

Dr. Gur was lost?
A They weren't happy. They were not happy.
Q Did Mr. Duchardt tell you anything?
A Not initially. I think I heard about it from Mr. Owen.
Q During the course of the trial during the lunch, the defense team met in a jury room, correct?
A Correct.
Q And was the purpose to try and discuss what was happening in the morning and then proceed with what was going to be happening the rest of the day?
A Correct.
Q Was it productive to have those meetings at lunch?
A No.
Q Why not?
A Because the room was filled with a whole bunch of other people that weren't part of the team.
Q Like who?
A Lisa's husband, her kids, and multiple other people that I still don't know who they are.
Q After the verdict was read and Mrs. Montgomery was convicted, were you present when she -- well, let me ask you this: During the course of the trial, you sat behind Mrs. Montgomery, correct?
A Yes. At a separate table, correct.
Q Did you have an opportunity to observe her over the

four weeks?
A Yes.
Q What were your observations?
A She was, I guess I would say, sullen, always head kind of down, not much activity. There would be -- I mean, there would be interactions once in a while with David and her or someone else but a lot of no movement.
Q No movement. And did you have occasion sometimes to go around to the other side of the table when you were passing off exhibits to Mr. Owen?
A Correct. A lot of times I would go to give him a note for a suggestion on cross or something like that.
Q So you observed her face also?
A Yes.
Q Would you describe her as animated during the trial?
A No.
Q What happened after the verdict was read with Mrs. Montgomery?
A As we got up to leave the table, her eyes kind of got wider and she turned to, I think it was David or Fred, I can't remember which one, but she kind of came to life and said, Okay, what can I do to help now? And I only remember it because I was kind of shocked by that.
Q You're aware of a program called CaseMap?
A I am.

Q And what do you think of CaseMap?
A Now I like it better than I did back then. Back then I didn't like it.
Q And what happened with the idea of trying to use CaseMap in this case?
A It was suggested by one of the co-counsel to David that we use CaseMap as a database program for all the evidence and witnesses in the case, and I tried to convince them not to use it because of the time. It had a poor way of keeping desperate people that weren't in the same office in sync. That was ignored. And so David took it upon himself to purchase licenses for the software and to distribute it to all of the people that were on the defense team at the time and to try to keep all that data synchronized.
Q And did there -- did the CaseMap use ever get off the ground, I guess?
A It was used for a while, but it was abandoned fairly early on.
Q So it wasn't -- there's no, like, CaseMap database sitting out there that has everything in it?
A No.
Q Is that correct? And if there was, you would know it?
A Yes.
Q And whatever you had was given to Mr. O'Connor and Mr. Duchardt when they entered the case?

A Yes.
Q And during the trial, did Mr. Duchardt on different breaks or different times come back to this recurring theme how damaging it was to lose Dr. Gur's testimony?
A Not directly to me, but there would be continual conversation about, "I can't believe we can't get that in there" or even before the trial, "We're going to reraise this because we need to get that evidence in."
Q And reraise it how?
A I'm guessing by offering another motion to allow it.
Q Was there discussion that issue would have to be appealed?
A Yes.
Q Because it was so damning to the case to lose?
A Yes.

MS. NOURI: I don't have any further questions, Your Honor.

CROSS-EXAMINATION BY MR. VALENTI:

Q Mr. Schnack, over the last 11 years, as I recall your testimony, you've been a member of the Federal Public Defender Office?
A Yes.
Q During that time, was the Montgomery case the first time you were ever asked to sit at counsel table during the presentation of the jury trial?

A No.

Q So you have sat at counsel table before?

A Yeah.

Q And in the role, are you, then, assisting with the presentation of electronic evidence when the exhibits are published to the jury or Court?

A Correct.

Q Okay. Have you sat through, then, meetings, in general, not talking about the Montgomery case, about clients' or defendants' demeanor in front of a jury?

A Yes.

Q And then it would be important to a defense team to have a client have an appropriate demeanor before a jury, correct?

A Correct.

Q A client who's too jovial can look like they don't care to a jury, correct?

A Correct.

Q A client who seems smiley or happy may seem demented? I mean, there are concerns that a trial team will have about a defendant's demeanor; is that true, correct?

A Yes.

Q Have you been present any of those times when counsel has instructed and educated a defendant how they should dress and how they should appear in front of a jury?

A I have not.
Q Okay. Would you be surprised to know that Mr. O'Connor or Mr. Duchardt might have instructed Ms. Montgomery to how to sit in the courtroom and interact before a jury so that they could present her in a certain way?
A I wasn't privy to that so I wouldn't be surprised.
Q So you did not observe any instruction to Ms. Montgomery about that?
A Correct.
Q Were you present when Ryland Duchardt was in Ms. Montgomery's ear talking to her during the course of the trial?
A I was present but not close enough to hear.
Q If there were any instructions from either Mr. O'Connor, Mr. Duchardt, Mr. Owen, or Ryland Duchardt about demeanor, you were not privy to those conversations?
A That's correct.

MR. VALENTI: Thank you, sir.

MS. NOURI: No, Your Honor. Thank you.

THE COURT: Thank you, Mr. Schnack.

(Witness excused.)

MS. NOURI: Next one might take about an hour, Your Honor.

THE COURT: Okay.

MS. NOURI: Susan Hunt.

SUSAN HUNT, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. NOURI:

Q Would you please state your name.

A Susan Hunt.

Q And your occupation?

A I'm an attorney.

Q And what is your educational background?

A I have a Bachelor of Science in Education from KU, and I've got a master's from Wichita State and law degree from KU.

Q And what was your work experience after law school?

A When I was in law school, I worked for Jim Wyrsch and Charlie Atwell at that firm. It's changed names so many times I can't remember the name of it now. He hired me when I graduated, and I worked for them for probably three years, and then I went on my own, solo practitioner.

Q So you went on your own in what year?

A Oh, gosh. I graduated from law school in 1986, so I probably worked for Jim Wyrsch until '89 or '90, so it was right in that time.

Q And you've been on your own ever since?

A Yes.

Q And what is your primary caseload?

A I do nothing but criminal, primarily federal. I do State appeals. I really don't do any State trial work.

Q And do you also do some federal appeals?

A Yes.

Q And at some point you became what is called a CJA panel rep. What is a CJA panel rep?
A You represent -- there's a CJA panel -- gosh, I don't know. I'd say it's two or three hundred lawyers at this point on the panel that are appointed by the Court for court-appointed cases. There's a CJA panel rep for every district that is supposed to, you know, meet with the judges, whatever, kind of coordinate things. If members of the panel have questions, they contact you. You're like their go-to resource. There's a meeting every year in which you get together with other panel reps across the country and talk about problems, things in the panel, that kind of thing.
Q And who appointed you panel rep?
A I was appointed -- actually Linda Franklin was the panel rep at the time. She became a judge in municipal court, so she recommended me to Ray Conrad, because I think Ray Conrad does the appointments, to fill the rest of her tenure, or whatever. I forget how long the appointment is for. So, anyway, he did and I was appointed at that time. I'm not sure when she took the bench. It's been quite awhile ago.
Q You were her successor?
A Right.
Q What has been your experience from the time you would say you were in law school working for the Wyrsch firm in chronological order in dealing with capital cases?

A When I left Jim Wyrsch, Charlie Atwell hired me on a contract basis to the appeal of Ray Copeland who was a State case. I worked on that. I got the brief almost done and he died of natural causes, so we never went any further on that.

Then there was a period of time I worked really closely with Elena Franco, and I got appointed to Richard Zeitvogel, which was a State death penalty case that was on federal habeas at the time. So we did that case through the federal habeas process, through the appellate process, and then the clemency, everything you do before the execution. I did that.

Then I was hired by John O'Connor to do the appeal of George Baby Harris, which was a State capital prosecution that he defended. I did that appeal.

Then I was -- I was called by Judge Hays who wanted me to join the team that represented Keith Nelson, so I did. We ended up pleading guilty and did a penalty phase. That went through some lawyer changes but it ended up being Pat Berrigan and myself.

Then I was appointed to represent Thomas Smith down in Springfield, Missouri. It was a capital case. That went to trial in February of 2007 and got a not guilty -- well, we got guilty on the trial phase but a life sentence. Anyway, before I went to trial on that I was appointed on Lisa Montgomery. I was already representing Thomas Smith, but I then was appointed

on Lisa Montgomery.

Q And have you been appointed any capital case subsequent to Lisa Montgomery?

A No. But I forgot one. I was also co-counsel with Elizabeth Carlyle on Cecil Clayton, which was another federal habeas case, but that went on past Thomas Smith and Lisa Montgomery. In fact, it was just concluded. His execution was about, I don't know, nine months ago, something like that, ten maybe.

Q And a substantial portion of your law practice is from federal appointments; is that correct?

A Yes.

Q What we call CJA appointments?

A It is today, yes.

Q Including the capital cases?

A Right. I haven't had one since a long time ago, but yes.

Q During your experience in capital cases, have you had to deal with mentally ill clients?

A Cecil Clayton was one. He had actual brain damage. Keith Nelson was brain damaged. We didn't find it. Lisa Montgomery was really -- Thomas Smith wasn't really either. I mean, there was some trauma, childhood things, but it wasn't really mental illness. Like Cecil Clayton had a two-by-four go in his head and destroyed part of his frontal lobe. So that

was kind of physical organic brain damage.

Q And did you have experience doing mitigation or knowledge about mitigation in capital cases?

A Yes.

Q And what is your knowledge about that?

A Well, not anywhere near a mitigation specialist or investigator, but I'm aware that that's -- actually that's probably the most important part of the capital case, because most of these people are guilty and most of these people -- I mean, they have -- the government has the evidence, and so it's mostly a mitigation case to try to get a life sentence. So it really becomes the most important part.

And it's the life history. It's the background. It's the mental illness if there is one. It's the sexual abuse if there is. I mean, we had that in Keith Nelson's case. That kind of stuff, activity. I understand it, but I'm not an expert.

Q I understand. So the point of these cases is a lot -- they're not who done it?

A No, not at all.

Q I'm going to show you what's been marked as Exhibit 93. Can you see that okay?

A Yes.

Q And is that an order appointing you?

A Yes.

Q What is the date on that?
A January 20th, 2005.
Q So you were appointed by Judge Maughmer?
A Correct.
Q And did you receive a call prior to that from someone that you were going to be appointed on the case?
A I think I was actually called by Judge Maughmer to see if I would take it, for one. I think I was contacted by the Federal Public Defender. I can't remember who. It was probably Anita Burns who was on the case to tell me that's what they were going to do.
Q So just because that's dated January 20th, you would have had conversations before that date?
A Yes, but not a lot of substantive conversations, correct.
Q And when you were appointed to the case, was it your understanding that you were appointed as lead counsel?
A Yes.
Q And who told you that?
A I believe Judge Maughmer. It was well known that Anita Burns had no capital experience.
Q And so that's why they put you on the case?
A Right. Under the statute they have to have somebody with experience.
Q And you accepted the appointment?

A Correct.
Q Did you have any contacts with Charles Dedmon out of the District of Kansas FPD's office?
A I know he initially represented her, but I don't know that I ever talked to him.
Q Did you have any contact with a Bret Dillingham?
A I don't believe I ever spoke with him. I may have. But I did see the reports. When I was appointed, they were out of the case. It was already transferred over here. So I saw reports that he wrote or summaries. I don't know that I ever talked to him.
Q And you read those reports?
A Correct.
Q When you were appointed to the case, who did you start contacting? Did you contact a Dick Burr?
A Oh, yes.
Q Why did you do that?
A He was resource counsel. I worked with him before on Thomas Smith and some other issues, and he was our resource counsel, and he's extremely knowledgeable and extremely helpful in cases like this, so I think Anita and I both contacted him.
Q And is that a standard practice that you would have done?
A Yes.
Q Did you contact him on the Thomas Smith case?

A Yes.

Q I mean, why do you contact resource counsel?

A For resources basically, for their knowledge, and they know experts they can point you to. That's their job basically is to help point you where you need to go and just brainstorm with you on issues.

Q So initially you were working on this case with Anita Burns; is that correct?

A Yes.

Q And did you have -- I'm going to show you what's been marked as Exhibit No. 95. What's the date of that letter?

A January 27th, 2005.

Q And what's the gist of that letter?

A It's a letter written to the warden of CCA, the warden at the time.

Q Let me direct your attention to the last sentence of the first paragraph.

A Dr. McCandless was the psychiatrist at CCA, and she -- because Lisa was on suicide watch, that's part of her job is to meet with her and assess her mental health, but in the process of doing that, she was having discussions with Lisa trying to get her to tell her what happened in this case and discuss it with her, and I wanted that to stop.

Q And so you sent the letter to the warden?

A Correct.

Q Now, you mentioned she was on suicide watch. What does that mean?
A That means she either attempted or they believed she was going to attempt to commit suicide.
Q And was she like in a paper gown?
A I think so.
Q Twenty-four hours a day?
A Right. Well, I think her entire time, at least when I was representing her, I think she was held in the medical unit in solitary basically, not in solitary confinement but in a room by herself.
Now, they did, as time went on, let her go to a room with more women for recreation. They read and they sew and do things like that, but she always slept and spent a lot of time in this room by herself.
Q Did you, you and Ms. Burns, eventually hire Mr. Dillingham?
A No, we never did.
Q Did you seek to find a mitigation specialist?
A Yes.
Q And why is that?
A Because this case required it. They all require it and we wanted to get one from the beginning.
Q Well, didn't you have Ron Ninemire in the Federal Defender Office?

A He was helping us. We needed additional help. We had to get a handle on this client and her background.

Q Is Mr. Ninemire a mitigation specialist?

A In my mind he is not.

Q Why not?

A The only case that I'm aware of he did any mitigation work on was Ortiz that I believe was tried in this court prior to Lisa Montgomery, and there was no mitigation presented at all. And I take that back. He did do a little bit of work on Keith Nelson before Larry Pace was dismissed from the case. And, you know, I had many discussions with him during that time. The mitigation work that he did on that case were collecting records, school records, that kind of thing, and he really -- he flat out told me he didn't really believe in mitigation.

Q He didn't believe in it?

A No.

Q Did you also bring into the case a man by the name of Phil Thompson?

A Oh, yeah.

Q Who is Mr. Thompson?

A Phil Thompson worked for Bob Duncan for years, then he worked for Jim Wyrsch for probably 30 years as his investigator. I worked with Phil when I worked for Jim Wyrsch. We've always been close friends. And he retired. And when he

retired, he began working for me. In fact, he was one of the investigators on the Thomas Smith case, went through the whole case with me. So I hired him to get involved in Lisa Montgomery. He didn't do a lot but he did work on it.

Q And Mr. Thompson is more of what you would call a fact investigator; is that a fair statement?

A Oh, absolutely.

Q So you and Anita Burns decide you need a mitigation specialist?

A Right.

Q Did you seek input from resource counsel with regard to that decision?

A I'm sure we did. I don't remember an actual discussion, but I'm sure we did.

Q And did you eventually land on a mitigation specialist to hire?

A We hired Lisa Rickert out of Wisconsin who was fairly new in that field, but she had some good recommendations by the resource counsel, so we hired her.

Q And what was Mr. Owen's involvement initially in those first few months of the case?

A Not much. He was -- from what I was told he was told by Ray Conrad -- well, he was first assistant and he was supposedly going to take Ray's job when he retired, and so from what I was told Ray Conrad wanted him to supervise Anita Burns

and basically look at the budget so he would understand how much these cases cost, that kind of arrangement, is what I understand, and nobody ever discussed it with me. I didn't work there.

Q And did you have meetings with Mrs. Montgomery early on?

A Yes.

Q And what was Mrs. Montgomery's condition or state based on your observations?

A Initially she really didn't talk much. She was very much -- she was very quiet. She wouldn't volunteer any information. She would answer yes or no on a question. We really didn't discuss the facts of the case at all with her. We were just trying to get a handle -- I mean, she was -- she is the most different client I've ever represented in my life. I mean, there is nobody I can even equate to Lisa Montgomery. We knew there was some real mental health issues going on. We didn't understand what they were or how to even deal with it.

Q Well, with that in mind did you consult with a Marilyn Hutchinson regarding Lisa's mental state and her suicidal situation?

A We did. And I forget. I used Marilyn before in a case, probably not a big-deal case, so I knew her. So we hired her just to go out to CCA to do a quick evaluation. She was never anybody we ever intended to use as an expert at trial or

anything else. We just needed somebody with a lot more experience and background and dollars than we did to go out and assess, kind of give us an idea where we needed to go, where we needed to look, what we needed to do.
Q And I'm going to show you what's been marked as Exhibit 132. What's the date of that letter?
A March 5th, 2005.
Q What's the gist of that letter?
A Apparently that was written to Chief Johnson who was Chief of Security at CCA, and it come to our attention that officers at CCA had seized a bunch of documents out of -- I think there were letters and some addressed to us -- out of Lisa's cell in the medical unit at CCA, and those documents were given to the U.S. Marshals and eventually given to the government, and we wanted those documents back, especially the ones addressed to us because they were privileged.
Q So you sent a letter to the warden?
A Correct.
Q And if I represent to you that there was a hearing March 17th, 2005, about those documents, you wouldn't disagree with me on that?
A No.
Q Just to backtrack a little bit, did you also, after those letters were, I guess, discovered, seized, found, did you also consult with another expert by the name of Dr. Logan?

A Yes.
Q What was the purpose of consulting with Dr. Logan?
A I believe when those letters were seized, it was the result or in conjunction with a suicide attempt by Ms. Montgomery, and that's why we hired Dr. Logan to go out and, once again, see what we were dealing with with her.
Q And Dr. Logan saw her on March 6th, 2005, the day after you sent that letter?
A Yes. It was a Sunday, I think.
Q That was the day after?
A Right.
Q And to clarify again, were you going to use Mr. Logan as an expert ultimately in the trial?
A No.
Q Dr. Logan.
So there is a hearing in front of Judge Maughmer about these letters later in the month, correct?
A Yes.
Q Was Ms. Burns there?
A No.
Q Why not?
A She was out of town. I'm not sure why, but she was gone.
Q And what happened about a month later on the case with regard to Ms. Burns?

A She was -- again, I can tell you what I was told. I wasn't there, but she always -- I can tell you she always resented Dave Owen being her supervisor, so to speak, always resented that from day one, and she griped about it a lot, and I don't know exactly what precipitated this particular incident. I know this was part of it, this hearing where he came with me because she was out of town. Anyway, from what I was told, she went to Ray Conrad and told him it's either she represent Lisa Montgomery or Dave Owen. So Mr. Conrad told her to get off the case and appointed Dave.
Q Now, during the course that Anita Burns was on the case with you, were you having almost nightly phone calls or keeping each other abreast of what you were doing separately on the case?
A Oh, absolutely.
Q So you spoke with her a lot?
A Yes, and met with her a lot. My office at that time was in the same building as theirs so it was very convenient.
Q So you had a lot of meetings with Ms. Burns?
A Yes.
Q That's why get consulting experts, things like that, this was a discussion the two of you had together?
A Yes.
Q Did you tell Ms. Montgomery beforehand that Anita Burns was going to withdraw?

A No, because I didn't even know this was going to happen. No.
Q Did you explain to her afterwards? Did you ever explain to Ms. Montgomery what happened?
A I think Anita did. I wasn't involved in that decision at all. I had nothing to do with it. And so if anybody -- I mean, I might have answered questions if she asked them. I don't remember. If anybody was going to talk to her, it would be Anita's place.
Q But you didn't do that?
A No, I didn't.
Q And so then Mr. Owen and you are on the case, correct?
A Correct.
Q And so you're coming to realize the severity of Ms. Montgomery's mental health issues?
A Right.
Q So what are you doing? What is your thought process during that time period?
A We needed somebody that really understood mental health much better than we did and somebody who could really, you know, find out what we're dealing with, what experts we needed, how we needed to present this case in the mitigation phase because there was no guilt-and-innocent phase in our mind.
Q And are you talking with resource counsel about that?
A Yes.

Q Now, wait a minute. You just said there was no -- what did you just say, the sentence before?

A There was no guilt-and-innocence phase in this case. I mean, nothing to contest in that part of the case that we could see. We read a lot of discovery by then. We'd been out to her house. There was just nothing.

Q Sort of a done deal?

A Right. Right.

Q So -- and Mr. Owen was in agreement with that?

A Right. Phil Thompson talked to some people about the guilt-and-innocence part.

Q That was going nowhere?

A Right.

Q So you are talking with resource counsel?

A Right.

Q Which is?

A Dick Burr.

Q And so how does Dick Burr assist you in trying to get people with knowledge of mental health in the case?

A He wanted us to come down to Tulsa, Oklahoma, and I think there was something else we were going to do down there in addition to meeting with him, but I know we met with him in, I think, David's hotel room and he brought Judy Clarke to the meeting because he thought she would be someone that could really assist us in this case, and the four of us sat down and

discussed Judy Clarke and discussed, you know, Lisa Montgomery, discussed the case, where we were at, what we needed.

Q And did there come a time in July 2005 where you and Mr. Owen met with Judy Clarke, Deb Garvey, and David Freedman?

A Yeah. We met with her -- we never met Deb Garvey I don't think. I know we never met David Freedman until then. We may have met -- Judy Clarke before her appointment worked with us and talked with us, that kind of stuff. So it wasn't like we met her in Tulsa, then several months later she was appointed. We had ongoing conversations.

Q You were working with resource counsel. You were working with Ms. Clarke, working with some of her people that she had experience with in trying to work through issues regarding Lisa Montgomery's case?

A Right.

Q Did there come a point in September where Ms. Clarke -- September of 2005 where Ms. Clarke came in pro hac vice?

A Yes.

Q That was filed by whom?

A David Owen.

Q But you had been having experience with her the few months prior to that?

A Yeah.

Q You hadn't just met her one time?

A Right.

Q And what did you and Mr. Owen tell her you wanted her to do?
A We wanted her to basically take over the mitigation part of this case and help us -- we were all going to work together and lead us in the right direction. She could bring in, as she told us, Debra Garvey who was chief investigator for the Federal PD's Office in Los Angeles who had extensive experience in mitigation investigation. David Freedman, I don't think we meet him until after Judy was appointed, but he was a mitigation person. He didn't go out and investigate but he read records and he did life histories and he combed through the records to find themes or issues to explore. So those are the people she brought with us and we wanted to utilize those sources to put this case together. We wanted her to take the lead on it.
Q So when they came in, what was going on with Lisa Rickert, the mitigation specialist that you and Ms. Burns hired?
A She interviewed some witnesses. She was very adverse for some reason to collecting records. I don't really know why, but I knew -- and Judy kept telling us, We got to get these records, these records and look at these sources, and she was adverse -- I got a lot of the records that were obtained during that period of time personally. She really didn't want to do it.

Q So before the Judy Clarke team came in, you were getting these records yourself?
A Right.
Q And did you have any complaints about Ms. Rickert's memos or interviewing process of the things that she was doing?
A She didn't keep us informed at all of what she was doing. She was just -- I mean, she lived in Wisconsin and she was just kind of doing her own thing and not telling us even, so that wasn't good.
Q So you were wanting a free flow exchange of information in what was happening?
A Right.
Q And after Deb Garvey started getting involved in the case, what happened with records collection?
A It skyrocketed. We got a lot more.
Q Who was in charge of that?
A Deb was directing it. I was doing some work on it. Holly Jackson, who we hired to replace Lisa Rickert, was also actively getting records. So we all were. Deb was really in charge of what -- knowing what sources to go to. Deb Garvey's office had access to a lot more databases in their public defender's office than the local one here.
Q What do you mean by database?
A Well, the only records that Ron Ninemire could pull up, at least that's what he told us at the time, were driver's

license records which you can get addresses from, some information, but not much. Deb Garvey's office had access to a lot of different databases. They could pull up criminal histories. They could pull up all kinds of criminal records. Ron told me those were all paid -- you had to pay for those databases and the local office wouldn't pay for it. So she had that resource that was very helpful in identifying things and identifying locations of people and addresses and that kind of thing.

Q So the period of time that you were on the case Mr. Ninemire didn't have the ability to do those kinds of database searches because they didn't have the funds to pay for that in the local office?

A Or they just wouldn't authorize it. The office did not have that access. And he was the first one to say she's got a lot more access than we do.

Q So that was a good source?

A Oh, absolutely.

Q Did Mr. Ninemire have problems working with Ms. Garvey?

A Absolutely.

Q Why?

A She was a woman.

Q What do you mean by that?

A He resented that. I heard him say -- and if I heard it once, I heard it ten times, "I am not going to take any orders

from any damn woman."

Q When Ms. Clarke came into the case, did you guys start having regular team meetings?

A We did.

Q Who was at the team meetings?

A Everybody that could make it; Dave Owen, myself, Phil Thompson, Ron Ninemire, usually Deb Garvey, and David Freedman, Holly Jackson. Unless they had something else they really had to do, they were all there.

Q And Judy Clarke?

A Right.

Q So everybody came?

A Right.

Q And were the meetings lengthy?

A Usually all day.

Q Was there agendas for the meeting?

A There wasn't like a written agenda, but there was kind of. I mean, I think at the beginning I think Judy is the one who said, Okay, we need to go over these items.

Q So they were goal oriented?

A Right. Yeah. They weren't just get together and chitchat.

Q There were discussions about what records had came in the prior week or two and what was still to be sought, things like that?

A Things like that and what information we gleaned out of those records and where that might lead us in the investigation or witnesses, that kind of discussion was had, yes.
Q And was their insight helpful in that regard?
A Yes, very helpful.
Q And was there also constant updates regarding the client's mental health, mental status based on meetings with her?
A When Judy got in the case, she, I guess for lack of a better word, instituted this policy. Up until that time everybody was going to see Lisa on their own, and Ron Ninemire, he wanted to do the majority of that. He wanted to have the relationship with the client. Well, Judy said absolutely not. That is not healthy for anybody. Everybody needs to have that relationship.

I think Judy's goal, obviously, it's her case, is get this to a point where the government will accept a life sentence. We never got there with her in the time frame. That was her goal. And as she explained to us, to reach that to have the client -- if we ever got to that, to have the client accept a life sentence, they had to trust everybody on the team, not just one member, i.e., Ron Ninemire.

So we started going in pairs. Nobody ever went alone. And one person that went in that group, that pair, would then write a short memo about the meeting and anything

of importance really that was gleaned from the meeting, and that was sent out to everybody in the team. So there were constant -- I mean, we went to see -- somebody went to see Lisa at least once a week and sometimes twice.

Q And all the records, all the information, all the meetings with the client, everything that was coming in was distributed to every party?

A Everybody.

Q Nothing was held back?

A No.

Q At some point Ms. Elliott was hired in October of 2005?

A Right.

Q And that was because the records were just so voluminous already?

A Yes.

Q And did she even attend team meetings?

A She did. She did.

Q Now, did there come a time in early November where you had asked Ms. Clarke's assistance for you to deal with Mr. Owen?

A Yes.

Q What was that about?

A Ron, as I already said, was very resentful of Deb Garvey and to some extent with Judy Clarke, although he didn't work directly with her as much. David became very resentful of

Judy Clarke because she was controlling the case, which is what I wanted her to do, but David wanted to control the case. It was David's ego was the problem that got in the way, and he wanted to be in charge and he wanted to be the leader of this team, and so --

MR. VALENTI: Your Honor, I need to object again. The issue of Ms. Clarke's representation is no longer before the Court. That's been ruled by you. We're here to talk about the representation the trial team got, not the interaction and relationships between -- I believe we're getting far afield and we're getting cumulative because we're going to hear from a number of witnesses based on their order of proof for the next day and a half, and I think for them -- for this witness, rather, to speculate on the relationships of others is inappropriate.

THE COURT: All right. Where are you going with this, Ms. Nouri?

MS. NOURI: Well, Your Honor, one of the issues is sort of what we heard about, the institutional memory of the various teams, and Mr. Owen should be conveying to the ultimate team of Mr. Duchardt and Mr. O'Connor all of the issues that were discovered, all the problems, decisions that were made with experts, whether retained or not retained, theories, all of these things are important, because Mr. Owen is the common denominator and should have relayed all of the prior

information to the final team.

THE COURT: What's that have to do with his relationship with Judy Clarke?

MS. NOURI: I'm getting very close to that, Your Honor.

THE COURT: What's it have to do with it?

MS. NOURI: It has to do with the performance of the final team, because Mr. Owen, again, is part of that final team, and the prejudice may lie part ways in the lack of Mr. Owen conveying all the prior information that he was privy to.

THE COURT: Okay. But we're getting into the Clarke/Owen personality conflict.

MS. NOURI: Right.

THE COURT: And so I -- I mean, they didn't get along.

MS. NOURI: Okay.

THE COURT: So do we need to go into that further?

MS. NOURI: I think it's important, Your Honor, and I don't think it will take more than a few minutes to illustrate an example of why Mr. Owen's trying to run the team became a problem.

MR. VALENTI: Your Honor, the records will reflect what the defense team that took the case to trial had. Mr. Owen will be here. Mr. O'Connor will be here. Mr. Duchardt will be here. They can confront them with what they had or

didn't have.

THE COURT: Well, I'm not tracking with you on it, but if you've got another question or two on it, go ahead.

Q (By Ms. Nouri) So you had a meeting on November 2nd of 2005 with you and Mr. Owen and Ms. Clarke?

A Correct.

Q Did not go well?

A No.

Q And after that, I think we just heard there was serious team dysfunction?

A Just real briefly. David was constantly yelling at me to get rid of Judy Clarke. Judy Clarke was constantly talking to me about getting David Owen under control so this team will function. So I was put in the middle and it was a nightmare situation. Yes, very dysfunctional.

Q So between November of 2005 to April of 2006 did you have team meetings?

A Yes, we did.

Q Things continued to work on the case?

A We did.

Q Records were coming in?

A They were.

Q They were being distributed?

A Yes.

Q Client meetings went on?

A Yes.
Q Were team members looking for signs and symptoms of mental illness in meetings with the client?
A Yes.
Q What's the purpose of that?
A Of looking for signs?
Q Uh-huh.
A To determine what experts we were going to need at the mitigation phase, and we were at the point when Judy was dismissed from the case of hiring some of those experts.
Q So the purpose of all of these things is not just to meet but to determine what experts to bring into the case?
A Correct.
Q And you began to make decisions on experts to retain?
A Right.
Q And had contracts been sent to a few experts?
A I believe so. I mean, that was -- you know, I didn't control the money or budget. That was the public defender's office. And Judy Clarke, one of the things she brought to the team is she knew all these national -- all these people. They worked with her. For instance, one of them, and I can't remember her name, that never was hired --
THE COURT: You know, I think we're getting beyond what's relevant here.
Q (By Ms. Nouri) I'm going to show you what's been

marked Exhibit 66.
A Okay.
Q That's a transcript of a hearing April 21st; is that correct?
A Uh-huh.
Q Of 2006?
A Correct.
Q And the day before what had happened?
A I'm not sure of the date. I'm assuming that's the day before Judy Clarke was dismissed from the case and told at CCA she could not visit.
Q So Judy Clarke was dismissed from the case?
A Correct.
Q And was Ms. Montgomery aware of that?
A Prior?
Q Yes.
A No.
Q I'm going to show you what has been marked as Exhibit 60. Can you see that?
A Yes.
Q What is that?
A I believe that's my declaration in this case that was -- I was asked to write.
Q And that was signed and dated by you?
A Yeah, the 8th day of March, 2013.

Q And that sort of reflects your recollection of events?
A Yes.
Q As you knew it at that time?
A Right.
Q And you were lead counsel all this time; is that correct?
A In theory.
Q In theory. I want to draw your attention to just one sentence in this document. Can you see the highlighted portion?
A Yes.
Q So what does that say?
A "I was unaware that Mr. Owen had gone to see Judge Maughmer on April 17th, two days before the night meeting at my house." And I wasn't unaware of it.
Q And I'm going to show you what's been marked Exhibit 67 and it's 68. It's combined in two documents here but they're technically two of our exhibits. What's the dates of those?
A April 25th and May 3rd.
Q Of what year?
A I'm sorry. 2006.
Q And that also relates to the dismissal of Judy Clarke and ultimately your dismissal; is that correct?
A Yes. Yes.

Q I'm going to show you what's been marked as Exhibit 65. What's this letter?

A That's a letter I wrote to Dick Burr, the resource counsel, on April 30th. We were trying to get him -- with the loss of Judy Clarke we were trying to get him to get us somebody else with her experience in mental health background to work with this case. So I wanted to kind of lay out to him what had gone on, kind of where we were at, the whole landscape. I sent the letter to him. I think I emailed it to him. I also emailed this to David Owen and said, you know, If you disagree with anything I say, David, chime in. I believe he did and trashed everything I said.

Q And you were trying to preserve a record for all of this?

A Well, not -- I wasn't thinking about a record as much as I was thinking about getting this case back on track. I was very concerned with Judy being gone.

Q Because there was a trial date looming?

A Right. Right. And we had experts that -- I don't know if the contracts had actually been sent, but David was supposed to get them. They never did get hired. We had mental health experts lined up. There were records that he refused to pay for which we needed and I told him to get. I don't know if he ever did. I mean, there were things --

THE COURT: Ms. Hunt, I think you've responded to

the question. We're not here to rehash all of that.

MS. NOURI: Okay, Your Honor.

Q (By Ms. Nouri) This is a letter marked -- it's Exhibit 99?

A Yes.

Q That's a letter from whom?

A Federal Defender of San Diego to me in 2006.

Q And they were willing to take over the case with you; is that correct?

A Yes.

Q One of the last things I want to show you is Exhibit 71. What is that?

A That's the letter that Lisa Montgomery wrote basically outlining or stating what her concerns about the dismissal of Judy Clarke.

Q And just to talk about the letter, not the dismissal or anything like that, but that letter was produced May 3rd to the Court, I believe; is that correct?

A I think so, yes.

Q But she was in court on April 21st, a few weeks before that, correct?

A Correct.

Q So what was it like trying to deal with Ms. Montgomery to get her to write a letter?

A Lisa Montgomery didn't trust anybody and she really

didn't trust lawyers. She'd been let down by lawyers her whole life. She had been abused both sexually, mentally, physically by men her whole life. She had very huge trust issues with anybody.

She had gotten to the point where she had trusted Judy Clarke and she was beginning to trust me as far as her legal representation. When Judy was dismissed, she lost all hope. She told me that. She called me crying. I had many, many phone conversations with her between the time that Judy left the case and the time that she wrote that letter. She felt she was lied to by Ron Ninemire. She felt he knew that day when Judy was not allowed into CCA, she felt he knew exactly what was going on but refused to tell her.

So she was having huge issues, and I said, You have got to tell somebody how you feel. You've got -- if nothing else, for yourself to get it out.

Q Was it difficult to get her to write that letter?

A Extremely difficult. It was not something -- she didn't confront people. She kept it all inside. She had her whole life. That's the way she dealt with it or didn't deal with painful subjects. She didn't put it out in writing. She didn't say it.

Finally she wrote that letter and I think it took her -- I think she wrote it three times, and it took her several days to write it. And in the letter she expressed, I

think, kind of what I've told you about how she felt.

Q And the letter will speak for itself.

A Correct.

Q The task to get her to do it was painstaking on your part?

A Yes. And I told her when I got that letter, that we were having this -- because I knew we were going to have this hearing or meeting with Judge Fenner in his chambers, and I said, I believe one of us is going to be gone. I don't know if it's going to be me or Dave Owen. She didn't want me to be gone. I said, You call me on Monday and I can tell you what the decision is.

Q Were you ultimately removed from the case?

A I was.

Q I'm sorry. How were you removed?

A I was told to withdraw, so I did.

Q That's what you did?

A I did. I filed a motion to withdraw.

Q And you let Ms. Montgomery know what had happened?

A That day. She called me that Monday and I told her that Monday afternoon.

Q And what was her reaction?

A She was upset.

Q And did there come a point where you found out that you were removed as CJA panel rep?

A Oh, yes.

Q What happened?

A Shortly after that, it wasn't too long after that --

THE COURT: Wait a minute. What's that got to do with anything?

MS. NOURI: Your Honor, it sort of relates to the dysfunction in the Federal Public Defender Office.

THE COURT: To the what?

MS. NOURI: The dysfunction in the Federal Public Defender Office, who ultimately remained on the case.

THE COURT: She suggested that she withdraw and the public defender's office stay on the case. What does the fact -- I mean, I don't know whether she continued to be CJA rep or not, and apparently she didn't, and I don't know what the genesis of that was or why, but why does it matter here?

MS. NOURI: Well, I think when she gives the explanation of why it happened or the genesis, it will illustrate what was going on.

THE COURT: All right. Let's do it after lunch. We'll be back at 1:35, according to that clock.

(The noon recess was taken at 12:35 p.m. until 1:35 p.m.)

AFTERNOON SESSION

THE COURT: Ms. Nouri, you can continue.

MS. NOURI: Yes, sir.

Susan Hunt resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MS. NOURI:

Q So, Ms. Hunt, did you ever attend part of the Lisa Montgomery trial?

A I had something in federal court one day, I don't remember what it was, and I stopped in and watched maybe 45 minutes of it one day. That was it.

Q And how did Ms. Montgomery appear to you?

A She had a flat affect. She showed absolutely no emotion. She just sat in the chair and stared straight ahead. She looked like, you know, her body was just stuffed sitting in the chair. It was obvious to me she was medicated.

Q And did you receive a call from Mr. Owen during the trial?

A Yes. It was a Sunday afternoon and it was towards the very end of the trial, as I remember. I didn't really follow the case but I knew it was going on.

Q So what happened?

A He called, and I hadn't talked to him, I don't think, since that last meeting in the judge's chambers in May of 2006 or '7, whatever it was. I was kind of surprised he called me. He was very upset, and he just kept saying, They're not telling Lisa's story. They're not doing it. They're not putting in the stuff we found. He goes, I'm just scared to death what's going to happen. I said, David, you have to deal with it. You

know the story. I just talked to him. He was extremely upset the way the trial was going. He thought they were losing and, of course, they did.

Q Did he mention anything to you about Dr. Gur's testimony or the exclusion of Dr. Gur's testimony?

A He said it was devastating, but he said they shouldn't have relied on that completely is what his feeling was.

Q When you were instructed to withdraw from the case -- and you're aware that Mr. Duchardt and Mr. O'Connor came into the case?

A Right.

Q Did you have any contact with Mr. O'Connor?

A No.

Q Did you have any contact with Mr. Duchardt?

A Yes. Two, maybe three conference calls with me, Judy Clarke, and Fred. I don't know who initiated the call. It wasn't me. It was one of them that initiated the conference calls.

Q And did you express to Mr. Duchardt your concerns regarding Ms. Montgomery's competency and her ability to assist her -- any defense attorneys?

A Yes, we both did.

Q What did you tell him?

A Just that she was devastated by this; that she'd lost all hope; that she didn't trust men; that she felt like the

people that she did trust were, once again, ripped out of her life. That's kind of the way she describes it. We both talked to him about her mental state as we saw it.

Q And you also discussed with him about raising the removal of Judy Clarke issue?

A We both did, correct.

MS. NOURI: I don't have any further questions, Your Honor.

THE COURT: Mr. Valenti.

MR. VALENTI: Thank you, Your Honor.

CROSS-EXAMINATION BY MR. VALENTI:

Q Good afternoon, Ms. Hunt. How are you?

A Good.

Q There's been some testimony and I want to make clear a couple of things in the record, if I may. One about when Lisa Montgomery was first arrested and brought into federal court. Initially the case, or at least she, was taken in custody in Kansas, correct?

A Correct.

Q And under federal rule then, she made her first appearance in that case under Rule 5 over there before she was ultimately transported to Missouri where the charges were ultimately filed, correct?

A That's correct.

Q And Rule 5 is kind of the law in federal court when

someone gets arrested, they make an appearance in the jurisdiction wherein the arrest occurred?

A Correct. She was arrested in Kansas, yes.

Q And when that happens, if the person is not represented, generally the public defender will be appointed and have sometimes minimal or sometimes more type of representation before the case is passed to where it's going to go?

A My understanding is it's a removal hearing, right.

Q In other words, is this the person charged? Do they admit that they're the right identity? And are they ready to go face charges where they're at?

A Correct.

Q Now, in the capital case as well, the division of labor is not an unusual thing in your experience, is it?

A No.

Q For example, when the case was being handled by you and Mr. Owen, when you were first made aware through Dick Burr of Judy Clarke, it was both you and Mr. Owen's position you would like someone to come in and take a leadership role in the mitigation side of the case, correct?

A That's correct.

Q In other words, that was Judy Clarke's role when she was initially brought into the case because you were appointed as lead counsel but you wanted to defer to her because of her

working expertise?

A Right. It was the majority of the case, correct.

Q You've done that in other cases you've handled, correct?

A Yes.

Q Keith Nelson, that was a capital case that was charged in the Western District of Missouri, ultimately tried before Judge Gaitan and you went to trial in that case with Pat Berrigan, correct?

A That's correct.

Q And you and Pat had different roles or division of labor in that representation?

A That's correct.

Q Then once Mr. Nelson in that case was convicted, you continued with different roles. I believe you took on an appellate role in that case, correct?

A Well, he pled guilty and we had the penalty phase. In that phase I did the cross-examination. The government put in, you know, guilt-and-innocence witnesses to kind of get the jury aware of how we got here, so I handled that part of it and he handled the mitigation, so that was the division. And then, yes, I was involved in the appeal after the case was concluded, yes.

Q I think during your testimony about your background you started out handling appellate cases for other lawyers,

including one for John O'Connor earlier in his career -- or earlier in your career as it related to a State death penalty case, correct?

A I did have one with John O'Connor when I worked with Jim Wyrsch, yeah, and I did handle one case, yes.

Q The point I'm trying to make is that in these cases, because of the volume of work, people get different roles?

A That's correct.

Q And you are not aware necessarily of the roles that Mr. O'Connor and Mr. Duchardt or Mr. Owen had other than maybe anecdotally; is that fair?

A Yes. I didn't follow the case. I wasn't part of it, right.

Q In addition, in these capital prosecutions, they tend to be complex; is that fair?

A Yes.

Q And in your experience, then, it's not unusual to have a lot of turnover in the trial team, at least in the cases you've had federally; is that true?

A I don't know if it's true as overall, but in my experience it has been.

Q Your experience really from the kind of soup-to-nuts aspect would be the Nelson to Montgomery case, there was a lot of trial team turnover in both those two cases in federal court, correct?

A There was turnover in both Keith Nelson and in Thomas Smith. Those were at the instigation of the client, not through the team members fighting. This was the only case that was not the client's instigation but actual dysfunction of the team.
Q Okay. Didn't you testify before Judge Gaitan in the 2255 proceedings, however, in Mr. Nelson's case that team dysfunction was one of the primary causes of why you think Mr. Nelson didn't receive competent representation?
A I don't recall that. I mean, the reason -- Larry Pace removed himself and withdrew from the case and so did Bill Shull. They both did this at Keith Nelson's request, not mine. I had nothing to do with those. So I don't remember that testimony.
Q A better question is, did you testify in the Nelson case about team dysfunction, about Pat Berrigan being dysfunctional in his representation of Mr. Nelson?
A I don't think I drew that conclusion. I testified about the things that he didn't do. Now, if you want to call that dysfunction, I guess you can.
Q Did you further testify about Jennifer Herndon, also known as Jennifer Brewer, related to her dysfunction in her assistance with you in the appeal of Mr. Nelson's case, on the direct appeal?
A I testified that she said it was my fault certain

issues weren't raised, and my testimony was she had the responsibility to do that. She's the one that filed the brief. She's the one that finished it. If they weren't, that was her job. I didn't say she was dysfunctional. That's a conclusion I never reached.

MR. VALENTI: Thank you, ma'am. I appreciate your time.

THE COURT: Ms. Nouri.

MS. NOURI: Nothing further, Your Honor.

THE COURT: All right. Thank you, Ms. Hunt.

THE WITNESS: Thank you.

(Witness excused.)

MS. HARWELL: Your Honor, the movant will call Lisa Rickert.

THE COURT: Ms. Rickert, come up right over here to the witness stand, please. Go ahead.

LISA RICKERT, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARWELL:

Q If you'll state your name for the record, please.

A My name is Lisa Rickert.

Q And spell your last name, please, for the court reporter.

A R-i-c-k-e-r-t.

Q And, Ms. Rickert, what is your profession?

A I'm a mitigation specialist.

Q And, Ms. Rickert, in the past have you prepared an affidavit setting forth the standards in the job you believe represents being a mitigation specialist?
A I have.
Q I'm going to show you a document. It's Movant's Exhibit 126 already admitted into evidence and see if you recognize this affidavit.
A I do.
Q Is that an affidavit you prepared some time ago?
A Yes.
Q And at the time you prepared it did it reflect what you thought the job of a mitigation specialist was?
A Yes.
Q In not three pages of single space but could you just tell us very briefly what a mitigation specialist is, in your opinion?
A Sure. A mitigation specialist assists the defense counsel in investigating the life of a defendant. So it is my job to do kind of, in technical terms, a biopsychosocial cultural history of the defendant, and you do that by interviewing everybody and everyone who's ever known the person in various ways and at different times in their life, and you also do a lot of document gathering, pretty much every piece of paper that exists on the defendant, and then you prepare a social history for the defense.

Q In the matter regarding Ms. Montgomery that we're here about today, did you prepare a declaration back in 2013?
A I did.
Q Let me show you what's been marked Exhibit 1-2 and see if you recognize that.
A Yes.
Q Does that appear to be the declaration you signed in 2013?
A Yes, that's it.
Q Now, Ms. Rickert, you worked with the Montgomery team from February 14th of 2005 to about August the 8th of 2005. Does that sound right with your memory?
A Yes.
Q I'm going to ask you some about your history with that team. Who hired you initially?
A I was hired by an attorney by the name of Anita Burns.
Q And who did you understand Ms. Burns to be? What office did she work for?
A She worked for the Federal Public Defender's Office, and I had flown in and done an interview with her and was hired by her.
Q You were hired by Ms. Burns. Then by the time you began working on the case and came to Kansas City the first time, did you again meet with Ms. Burns?
A No, I did not. I was told that she was no longer on

the case.

Q And who did you meet with when you began work on the case?

A Well, I was -- I met with Susan Hunt and David Owen. David apparently replaced Anita Burns and Ron Ninemire who was the investigator.

Q At the time you came in to begin work and meeting with Ms. Hunt and David Owen and Ron Ninemire, did you review sort of your idea what a mitigation specialist would do or did you all just jump right in?

A No. It was actually quite nice. I actually had a meeting with them, and we discussed, you know, the professional standards and how I do my work. Then we have kind of an agreement in what way you would like the communications to happen, you know, by email, by phone. I always do written work product. So that kind of -- those kind of things were discussed at that meeting.

Q When you were at that meeting, did you see Ms. Burns at all?

A Well, that was the meeting with -- yeah, that was the meeting with Anita Burns, then after that, I did not see her at all.

Q Okay. So to clarify just for the record, since I got confused, you said initially you met with Ms. Burns and talked about how things would be communicated, told her you would

write memos, all that description you gave was in your meeting with Ms. Burns?

A Correct.

Q Let me ask my question again and better. When you came to begin work and met David Owen, Ron Ninemire, and Susan Hunt, did you go back through your method of working on a case or did you all just pick up and start working?

A I did not go back and restate those things. We just started work.

Q When you first came to Kansas City to begin work with that team, did you see Anita Burns at all?

A No. I thought it was strange that there was no communication. She never told me why she wasn't on the case anymore, and it even seemed like I wasn't supposed to go say hello to her or have any communication with her. I wasn't told what the reason was for her not being on the team. I left it at that and had no communication with her.

Q Let's talk about working with the team you did work with; Mr. Owen, Ms. Hunt, and Mr. Ninemire. Did that team have meetings?

A Yes.

Q And did you come in for those meetings? Were they here in Kansas City?

A Yes. Typically there would be a team meeting every time I did come into town.

Q And what drove when you came into town?
A Generally it was that I had interviews to do, particularly with the client and others.
Q When you had these meetings, what was their purpose? What did you all accomplish in a meeting?
A Well, a typical team meeting would be, you know, discussing who saw the client last, what interviews had been done, what records had been gathered, then what needs to be done and who needs to be interviewed yet. So it's kind of a constant running of what had happened last time we spoke and what needs to be done in the future.
Q Did that -- did you receive a lot of feedback in those meetings?
A Well, I don't remember receiving a lot of feedback. I worked at such a short period of the preliminary part of the investigation, and so I can't say there was a lot of feedback necessarily. It was me really reporting information.
Q You say sort of a preliminary part of the investigation. You interviewed a lot of people; is that fair?
A Yes, I did.
Q Do you have an estimate how many people you talked to?
A I probably interviewed about anywhere between 25 and 30 people, and a few people I had interviewed more than once, particularly the client.
Q The people you interviewed more than once, was that

primarily the client's nuclear family?
A Yes.
Q Her husband and her children?
A Yes, and her mother.
Q I think at one point you had to do an estimate of how many witnesses you thought you would need to see in the case?
A Yes.
Q Why did you do that?
A Well, there's a point where, you know, we pay attention to our budget that's given us, and so I would need to -- I needed to write up what had been done and what needed to still happen to justify further funding authorization for the case.
Q At the point where you did that estimate, obviously before August of 2005, what was your estimate of how many more witnesses you had yet to even make contact with?
A It was large. This was -- they were large families all around, and there was divorces, that kind of thing. There was also frequent moves, and so there was a lot of people in different locations. So I remember estimating, you know, close to a hundred people that may need to be investigated or interviewed.
Q As you worked on a case and with this team, did problems arise?
A Yes.
Q And could you describe from your perspective what those

problems were?

A Yeah. You know, very early on I would say there was conflicts arising between the way that I typically work and what the attorneys felt was my function on the team, and so it became pretty clear that they were not very familiar with how the mitigation investigation would run or work in a death penalty case.

One of the things was they would make kind of hypotheses about the mitigation themes and expect the investigation to sort of be tailored to supporting those themes versus conducting an investigation and having the themes emerge from the facts that you gather. And the other conflict right off the bat would be that they expected somebody to accompany me at every interview.

Q And why was that a problem for you?

A Well, that's a problem for me in that, you know, the professional standards state that interviews should be one-on-one, face-to-face. We are oftentimes listening to very sensitive information. It's crucial to building a rapport and trust with the witness who you're expecting to share very sensitive information, and so the best way to do that is to sit with someone one-on-one and conduct an interview.

Q Who was the person who primarily went with you?

A Primarily it was the investigator, Ron Ninemire.

Q And so Mr. Ninemire was present for most of your work?

A Yes.
Q Is that fair to say?
A Yes.
Q Was Mr. Ninemire -- did he obstruct your work?
A No, he really didn't. Ron was very good. If I had to have someone with me, Ron would be the person. You know, he was not intrusive. He allowed the interview to take place, almost as if it was one-on-one so that I was able to build a rapport just on a one-on-one basis. I didn't have someone intruding in, and he would go sit in the back and observe things. So he was not obtrusive and we worked well together.
Q Was he -- you seemed to imply he was preferable to other members of the team. Why is that?
A The other two would have been Susan or David who would accompany me on interviews and that did not go well.
Q Can you give us a for-instance?
A Well, with Susan -- one of the things is I would travel to a location and I typically had most of my interviews set. Sometimes they weren't. But I had to make sure that her schedule would accommodate it instead of mine and the witnesses and our availability. I had to include another person, and her schedule was not very accommodating. So that was one thing.

We also had a time where she sat in on an interview and the man was sharing a lot of sensitive information. He became very emotional and Susan got up a couple of times to

take a cigarette break.

Q Why was that a problem?

A Well, it interrupted our meeting. And so she would leave and then she would come back but she wasn't caught up on what we were talking about. She said, Wait a minute, wait a minute. Back up. Can you fill me in? And we would have to repeat what was said. It was awful. It was very intrusive. She had her cell phone on and it would go off during the interview. We also would have to stop work at a particular time, typically by five because that was happy hour.

Q Is that how you normally work?

A Absolutely not.

Q Why is that not how you work? How do you prefer to do a week of interviews?

A If I were to travel to a location, I'm going to fill my time and I'm going to be accommodating to the witnesses that I have to interview. That could mean an early morning interview. It could mean a later at night interview. So oftentimes when I am traveling, my days are very long and you get the work done.

Q Why are you so attentive to trying to get the work done in the shortest amount of time?

A It's the most efficient way to work. There's a lot of work to be done in a certain amount of time; and so when a mitigation specialist travels to a particular location, you work as long as you need to and as much as you need to to get

the work done in that location.

Q Also prevents the expensive repeat visits?

A Absolutely, yes.

Q You mentioned the biopsychosocial history. Does that involve only the people who are currently alive?

A No. Mitigation specialists do multigenerational investigations, so we go back at least three generations.

Q And why is that?

A Well, there are histories of family violence, criminality, trauma history, genetic difficulties, that, you know, follow people and follow family members. So it's very important to go back and trace those patterns of behaviors and medical conditions and mental health conditions.

Q And were you doing that work in this case?

A Yes.

Q How was that received by your team?

A Well, it was almost as if they didn't understand that's, again, how a mitigation specialist works or how a mitigation investigation should work.

There was a location where I was doing interviews with a number of different family members, and each time you do interviews your interview list expands because of the people that they may recommend. You should talk to this person. You should talk to that person. So there was a family member who was recommended to me who may have been a second or third

cousin, but she was also the genealogist of the family, and so I met with her.

It was apparently a problem for Susan and David in that they didn't come to me with it, but they -- it's like they went behind my back and almost told on me to a resource counsel who then confronted me and said, Why would you interview a second or third cousin? And I had to explain to him why I did that.

Q Was this the only problem the team had with your work?

A No. It always seemed as if there was a mistrust with my work or me personally. There was a time when Ron and I conducted an interview. It was very long. It involved a number of people. This was Lisa Montgomery's ex-husband who currently had custody of their children. He was remarried and so it was also with his current wife.

And we had sat with them as a group first, and then we did individual interviews with them, and the interviews went very well. But a day or so later Susan or David received a call from, I believe it was Vanessa, the wife, and she was very angry and she said that we misrepresented ourselves and we never would have talked to them had we known they weren't with the prosecution and that kind of thing. And I think there was grievances as well, but I don't know what they were. They were not shared with me.

And that is not an unusual occurrence in our work.

You know, I can't tell you the number of times that you sit down and the very first thing I do is explain who I am, the purpose for my visit, here's my card, you know, all of that kind of thing; and we're dealing with people in crisis, in their own trauma, and they don't hear it. They don't receive it. And so there's so many times they said, I thought you were the probation agent. I thought you were with the prosecuting -- you know, it happens. You always have to take time to tell them again that kind of thing.

So this wasn't unusual to me and yet it seemed to be unusual to David and Susan, and they treated it as if Ron and I did something wrong instead of it being an occurrence that we needed to work through to make sure that Vanessa and Carl were again comfortable, and so we were forbidden to have any contact with them. Only David and Susan would have contact. And it was kind of that we never discussed it as a team as how to best resolve this particular conflict.

Q Was Mr. Ninemire -- did Mr. Ninemire seem to be secure in his position with the team and with his job?

A Not at all. Ron frequently talked about how if he had a particular -- he certainly witnessed my conflicts with Susan and David and if we -- and he would see how, you know, if I brought something up, it wasn't that I follow what Susan and David wanted, but I certainly would bring something up, and Ron never felt like he could bring something up if he felt like it

was not the best standards. And he would say, You know, hey, I'll lose my job. I'm an at-will employee. I do what they say. And he would say that repeatedly.

And even when he would accompany me to interviews, the minute we got in the car, he'd hop on the phone with David Owen, and that was fine the first few times, but one time we got done I think after ten o'clock, and he still hopped on the phone with David Owen. I said, Why wouldn't you wait until the morning? And he said, He wants me to call after every interview. And so -- and he said, I do what he says. So it was just, you know, this kind of strange control over Ron and he never felt secure in his job.

Q And this calling after interviews, did you actually memorialize your interviews?

A All the time I would do interview notes.

Q And how were those notes distributed, then, to the team and in the case file?

A Well, the interview notes would be typed up very soon after the interview and they would be distributed to the team, and then relevant information would be placed in a chronological history as well.

Q So you were conducting not only -- or creating not only interview notes, but also creating sort of a chronology of the things the team learned; is that fair to say?

A Yes.

Q Were you the person who was primarily responsible for synthesizing the information you learned in your witness interviews into this chronology?
A Yes.
Q But that chronology was available to everyone?
A Yes.
Q Was it discussed at your team meetings?
A Yes. And it was constantly being updated so there was always interview notes, chronology that would always be updated. There was interview lists and documents lists that would be constantly updated because we'd add more people on or records we gathered.
Q You said you had just began to scratch the surface of this 20ish interviews or 20ish people that you had contacted. Was there any question of you being provided adequate funding?
A Yes. And that's always the case in death penalty work that, you know, you have to go back for more funding. There was an issue where it always seemed that David was portraying to me that funds were limited and so in a way that I would have to change my work, and I was aware that that wasn't necessarily the case. Ron Ninemire and I had a conversation, I think it was with Dick Burr at a conference, who indicated that there was adequate resources for this particular case, and yet David was always portraying that there was not adequate resources or funding for my position.

Q As your work progressed, did you find that the relationship deteriorated further?
A Yes.
Q And why was that?
A Well, there was interviews still happening. There were times when interviews had to be done in Washington and California, and I was told that I would not be doing them, that David and Ron would do them, yet I had to prepare the questions for them.
Q Why was that a problem?
A Well, it was absolutely a problem in that I was doing all the interviews the best way I could with these people who were joining me, and yet for me to prepare questions for someone else to do them, it really broke the continuity of the information I was gathering.
I could prepare questions but I can't prepare or anticipate the follow-up or how these three people over here told me something that might be relevant to ask this person, you know. So I knew it wasn't going to be the best way to do that interview.
Q How was it determined that Mr. Ninemire and Mr. Owen would go to Washington and do those interviews instead of you?
A David Owen just told me that they were going to do it instead of me.
Q That did not come out of a team process is what I hear

you saying?

A No.

Q Did you seek any guidance or recourse with Mr. Owen's boss?

A I did. So as the -- as our relationship continued to deteriorate, I thought I should talk to David's boss, Ray Conrad, and I told him my concerns and he listened but he didn't do anything about it.

I also sought assistance from Dick Burr, the resource counsel, and through that conversation, Dick let me know that Susan and David had sent my work to one of the top people in our mitigation field behind my back, that I was not aware of it, and they sent it to be reviewed as if I had -- again, they wanted to see what I was doing wrong.

Q I assume that took you aback?

A Yes.

Q Ms. Rickert, were you collecting records through this whole process?

A Sure. There's -- you have to have releases of information to get many records, and so Lisa Montgomery signed releases. So those would have been sent down and then it takes time for records to come back. We needed releases of information signed by many of the members of the family, including the mother, Lisa's mother. Eventually we got those signed and then they would be sent out, but certainly not all

the records were coming back by the time I had left.

Q Did you regard the record collection to be at a reasonable point given that you were six months into the case?

A Oh, sure.

Q Did you regard yourself as having collected the majority of the records?

A Oh, I don't think so by any means.

Q You were only on the case for about six months?

A Yes.

Q And you resigned?

A I did.

Q I'm going to show you Exhibit 54, see if you recognize that.

A Yes. That's the resignation letter I wrote.

Q Ms. Rickert, you in the second paragraph write, "You shared with me that your training has taught you to fear the mitigation specialist, and to make sure that the mitigation specialist doesn't control your case." What did David Owen and Ms. Hunt say in regards of that to you?

A There was a point at which I sat with them to say, you know, What is happening? Why is it that you mistrust my work? And if you sent my work to this person to be reviewed, did you send it all? Did you send every work product that I have? And they said, Well, I don't know. And I said, But if they're going to review it, you have to send it, and they didn't even

know some of the things I was referring to, and so there was that.

And then they said, you know, Look, we're told, we're trained to mistrust you, that don't let the mitigation specialist control your work, and we talked about, What do you think I'm doing? So we tried to have a heart-to-heart with it but it didn't get better.

Q Clearly the relationship deteriorated for some time. Was there an incident that caused this resignation letter?

A There was.

Q Will you tell the Court what happened?

A There was a day that I had to fly into Kansas to do work. I had walked in Ron Ninemire's office and I was sharing with him, you know, kind of venting of something that had gone on. It might have been that my work had been sent to someone else for review. I can't remember exactly what it was. And he said, You don't even know the half of it, and I said, What? And he said because Ron and I had a good working relationship, probably the only two on the team who worked well together, David Owen insinuated that we were having an affair.

Q And I assumed from how you say that, that was not in fact true?

A Absolutely not.

Q The fact that Ron Ninemire told you that Mr. Owen had made this insinuation, was that the reason you resigned from

the team?

A It is. I wanted to go directly to them and confront them and I was angry and I thought this is now getting very strange. I'm not going to be on this team anymore. Ron was so anxious and concerned that I would reveal what he said because he would lose his job. So I resigned without putting it in the letter.

Q When you sent this letter to Mr. Owen and Ms. Hunt, did you go speak with Ms. Montgomery?

A No. I was not allowed to close in any way with Lisa Montgomery or any other witnesses that I had built a rapport with.

Q When you say "close in any way," what would have been -- obviously it's not ideal to resign in the middle of a case, but how would you have wanted to handle that?

A Yeah. This was very unusual. It was unusual for me as well, and certainly I'm not even sure I expected to go face-to-face and talk with her, but I did want to at least write a letter that gave her some explanation of why I would leave. And also, you know, kind of reinforce support for the defense team and that kind of thing and end it in a good or reasonable way.

I had no faith that it would have -- I had no idea what would have been told to her, and so I asked if I could write a letter and they certainly would have seen it, but I was

not allowed to do that.

Q So instead you just faded from Ms. Montgomery's life?

A I did. I also offered to help with the new person to make sure that they received all of my things and that I told them whatever they needed to know, and I was never taken up on that offer.

Q You say you offered to make sure the new person received everything. Did you have any reason to think that you had any materials the team did not also have?

A No. I certainly -- they had it all and there was a few things that had straggled in that I forwarded to Ron Ninemire, but certainly it was not also like they had a conversation with me about various witnesses and different things that I had uncovered.

Q You would have been willing to do that with whatever mitigation specialist followed you?

A Oh, absolutely.

Q Would you have also been willing to talk with any other lawyers who came on the case? I realized at that point you weren't anticipating that.

A Yes.

Q We sort of jumped ahead to the close of your relationship with Ms. Montgomery, and that assumed you had one. I apologize. Did you actually meet with Ms. Montgomery?

A Yes. Probably five or six times.

Q And those times being a singular visit or sometimes more than one day in that visit?
A Initially I spent three days with her at various times in those days, and then there was a couple of visits that were later on.
Q When you say "at various times in those days," that sounded planned. Why would you do it that way?
A Well, I tend to start that way to get -- not only spend a lot of rapport building, you know, but to -- because typically I'm flying in, and so I want to make sure that if I have a conversation with someone on one day, that I can actually follow it up the next day and the next day. And also get a sense of their -- any mental health issues, you know. We are the ones who look for signs and symptoms, and so I wanted to see her at various times during the day. I also wanted to make sure there's enough time that if she was not able to keep talking or get to rest or whatever, that I still had time to come back and see her. So for all sorts of reasons I allowed that amount of time.
Q You said you met with Ms. Montgomery both several times initially and then additional times throughout the six months you were on the team?
A Yes.
Q So you observed her intently in the beginning and then also longitudinally through your involvement in the case?

A Yes.
Q As you observed her as a mitigation specialist, did you become concerned about her competency?
A I became concerned about her mental health. I don't evaluate for competency, but I certainly saw some pretty serious signs and symptoms of deteriorating mental health while I would be with her.
Q Would you tell us what you saw?
A Yeah. Lisa would -- her moods would change throughout our interview. Her speech would change throughout our interview. Sometimes she would be talking very conversationally and other times it was so rapid that I couldn't even keep up with what she was saying.

There were times that she at the mention of a name would dissociate. She would -- let me explain. She would pause and just stare as if she wasn't in the room with me any longer.

Her memory was very impaired I could tell. With all social history questions she had blocks of time that she couldn't remember, particularly her early years.

She also talked about talking with angels. So I would see her on one day and the next day she would say that angels came to visit her. They taught her these songs. Other spirits would come to talk to her. So there was some pretty serious things going on.

Q Did you memorialize those observations in your reports?
A Yes.
Q And you gave those reports to the attorneys?
A Yes.
Q Did you use conclusory terms or did you, like today, sort of break apart and describe what you saw?
A My hope is that I would always describe what I saw.
Q Did Ms. Montgomery discuss her sexual abuse history with you?
A In little bits and pieces. So she did admit to having a history of sexual abuse. She was not specific. I knew who one of her betrayers was. I was aware of a suicide attempt at the age of 14 because of a room that had been built on her family's home specifically for her. So there was -- she would give me glimpses of her sexual abuse history, but certainly we were just touching the surface.
She also indicated that she would never tell people throughout her life. There were times when she had to get a pregnancy test because of the sexual abuse. She wouldn't tell the doctor. There were times when she had counseling. She would not tell the counselor. There was a divorce proceeding and she said only what her mother and the attorney told her to say. So she would never reveal what was happening to her. She really kept her secrets.
Q What did that indicate to you in terms of the quantity

or depth of the interviews?

A Lisa had a very significant trauma history, and so I knew that there were secrets that I was just beginning to understand.

Q You did not in any way think you had the whole story contained in the chronology you provided to the lawyers?

A No, not at all.

Q Were you clear about that with them that the work was just beginning?

A Oh, I think repeatedly, yes.

Q During the time you were on the case, was the team at all pursuing the theory that someone else did the crime?

A I don't -- I feel like I've heard that before, but I don't think that was something that anybody was pushing, that that was a valid strategy.

Q Did you have information that Lisa's mother had consumed alcohol when Lisa was in utero?

A Yes.

Q And looking into the issues relating to that alcohol consumption, was that part of your plan going forward with the investigation?

A Yes. That was one of many mitigation themes emerging as I was doing my investigation.

MS. HARWELL: If I could have one moment, Your Honor.

THE COURT: All right.
Q (By Ms. Harwell) And, Ms. Rickert, in the memos that you provided to defense counsel in this case, those were your best attempts to accurately portray the information that was given to you; is that correct?
A Yes.
Q And you reviewed those in attaching them to your declaration; is that correct?
A Yes.
Q Did Mr. O'Connor or a Fred Duchardt ever contact you about your work on your case?
A No.
MS. HARWELL: I don't have any further questions.
THE COURT: Mr. Ketchmark.
MR. KETCHMARK: Thank you, Your Honor.
CROSS-EXAMINATION BY MR. KETCHMARK:
Q Good afternoon, ma'am.
A Good afternoon.
Q So kind of picking up there to the answer to the last question, you did not have contact with Fred Duchardt or John O'Connor in connection with the work that you did on this case; is that a fair statement?
A That's correct.
Q You also talked about these issues that you had, and it sounds like, and correct me if I'm wrong, but the issues that

you illustrated were primarily with Susan and with David Owen and there was the intention that you had to do your work with them because they were the attorneys primarily handling her representation when you were involved in the case; is that a fair statement?

A Yes.

Q And just so I'm clear, I wrote down that your involvement -- you were retained in February of 2005 and you were on the case for approximately -- until your resignation letter on August 5th of 2005?

A I think it was August 8th, but yes.

Q August 8th. Correct.

When you talked about initially being contacted by Ms. Burns about getting involved in the representation, you said that your initial meeting was to kind of come with her -- or come to Kansas City and speak with her. Do you recall that line of questioning?

A Yes.

Q And I think you testified that when you meet with the attorney, you want to talk to them about not only what you can bring to the case but also about how you could provide information; is that a fair summary of that?

A Sure. It's basically an interview and getting an understanding of how I work and what I would produce and that kind of thing.

Q So it's like a job interview. You're basically saying this is how I work, and they're saying, okay, is that going to comport with my style or am I better suited with somebody else?
A Correct.
Q And would you agree with me the reason for that is because in your line of work you've worked with a bunch of different attorneys, I would assume?
A Yes.
Q And attorneys have different styles?
A Yes.
Q And some attorneys would rather have stuff in hard copy and some attorneys would rather have stuff in email, some attorneys would rather you verbally give them the information. It just depends on the attorney, correct?
A Yes.
Q But it's not a one-size-fits-all because of how attorneys approach their job; is that a fair statement?
A Well, in death penalty work the attorneys certainly have their own style, but there is a function of mitigation that is spelled out in the ABA Guidelines that we follow.
Q And just so we're clear, and so you don't misunderstand what I'm trying to suggest, I'm not trying to understand the mitigation. The mitigation work is separate than how the information is being provided. Would you agree with me some attorneys might want that in a different fashion?

A It's always in writing. I will say it's always in writing.
Q To document?
A Yes. Yes.
Q But the end result is the goal of your job, as you said, is to provide information in the person's biosocial history and background that mitigate or justify something less than a death sentence?
A Yes.
Q And that's ultimately the goal of what you're doing, what you're trying to tell the attorney you can provide, right?
A Yes.
Q You also indicated, ma'am, that you were frustrated with Susan and David in that they always wanted somebody to be present when you were doing interviews. You recall that line of questioning?
A Yes.
Q And I think you indicated that Mr. Ninemire was present with you in a lot of these interviews?
A Yes.
Q And that you said -- you described him as being the least intrusive, and I think you said that he was okay to work with. He oftentimes let you function as if you were on your own. Is that an accurate summary of what you testified to?
A Yes.

Q So the times that you interviewed Lisa, Mr. Ninemire would have been present with some or all of those; is that a fair statement?
A Not every one but some.
Q And do you recall, ma'am, when you did an interview with Lisa on March 8th and you did a memo to the defense team talking about an interview that you had conducted with Ms. Montgomery that lasted for eight-and-a-quarter hours on March 1st and you talked about Mr. Ninemire being present during that interview? Do you recall that memo?
A I think so.
Q Let me show you for the record. It's marked as an underlying document in the case. It's Document 151-12. It's a 28-page document. I would just direct your attention to the caption as well as the highlight of the second paragraph.
A Yes.
Q And is this document that's been in the case, as I referenced, a memo you would have done in connection with that interview?
A Yes.
Q And does this refresh your recollection that you had written that Mr. Ninemire appears to have a very good working relationship with Lisa and that she responded nicely and was friendly and smiled when he was around?
A Yes.

Q So there wasn't problems that Lisa had with Ron, at least when you were present?
A That's correct. And we certainly wanted to be aware of that because of her relationship with men. So we thought that was a very good -- it was a positive that Ron had a good relationship with her.
Q Would it be an accurate statement, ma'am, that the times that you were around Ms. Montgomery and Mr. Ninemire you never saw a problem between the two of them?
A No.
Q They seemed to work well and she seemed to respond to him; is that a fair and accurate statement?
A Yes.
Q You also talked, ma'am, when you were questioned by Ms. Harwell about competency issues, she asked you if you ever saw anything that concerned competency, and my recollection of your testimony is that you're not a lawyer and competency is not an area that you delve into but what you deal with is mental deficiencies or concerns about their mental well-being; is that fair and accurate?
A Well, I'm not a psychologist so it is not my job to do an evaluation; but as a mitigation specialist gathering social history information, it is my job to recognize signs and symptoms that would be reported then to the attorneys and that's, you know, for all sorts of purposes for mitigation and

also to get an understanding of who the best experts we need on the case.

Q And I guess what I'm trying to get at, ma'am, at any point in time did you get to the point where you told Susan or David or anybody on the defense team that you thought that there was competency issues that precluded Ms. Montgomery from understanding what was going on and that they needed to entertain filing something with the Court to ask she be evaluated?

A I don't think I would have ever said that.

Q If you did, that would have been memorialized in the file in some way, shape, or form?

A Yes. Yeah.

Q So if that's not present in the file, can we assume that's not something you would have done?

A Correct.

Q You also indicated that you provided all of your materials and that you had nothing left and when you exited the case, that all of that would have been passed on to whoever came in your stead or whoever was representing Ms. Montgomery forward through in the litigation; is that a fair statement?

A Yes.

MR. KETCHMARK: One moment, Your Honor.

That's all I have.

MS. HARWELL: No further questions.

THE COURT: All right. Thank you. You're excused.

(Witness excused.)

MS. HARWELL: Your Honor, movant would call Agent Lipanovich.

KURT LIPANOVICH, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARWELL:

Q If you would state your name and spell it for the court reporter.

A My name is Kurt, K-u-r-t, Lipanovich, L-i-p, as in Paul, a-n-o-v, as in Victor, i-c-h.

Q And you are an agent with the FBI?

A That's correct.

Q What's your role in Ms. Montgomery's case? Are you the case agent?

A I'm sorry. Yes, I was case agent.

Q How long have you been with the FBI?

A March 5th, 1990.

Q How did you come to be involved in the Montgomery case?

A It happened in one of the counties that I cover up in St. Joseph, Missouri. We cover the 17 counties in northwest Missouri. The case occurred in Skidmore, Missouri. That's in my territory, and I typically handle the violent crime cases, and my partner typically handled at that time the white collar cases.

Q Fair to say that your testimony at the trial covered much of your involvement with the case?
A That's correct.
Q And is any of that testimony -- do you know any of it to be false or inaccurate as you sit here today?
A I do not.
Q I'm going to try to ask you about things other than what was asked at the trial. Through the course of your investigation, you met with several members of Ms. Montgomery's family?
A Yes.
Q Let's first talk about your meetings with Ms. Montgomery's mother.
A Okay.
Q Do you remember her name?
A Judy Shaughnessy.
Q Exactly. And what do you remember about Ms. Shaughnessy?
A As I told you I think once before, that she struck me as sort of a hard woman.
Q And what do you mean by a hard woman? That's a colloquial expression that we use.
A Hard life. Definitely two of her sons -- one of her sons, I think, had extensive time in prison, was in prison at the time, Teddy. Tommy had been in and out of prison. And her

other daughter, one of her daughters, Lisa Montgomery, was facing capital murder. So she had a tough life, Judy did, and just struck me as not a real emotional, not real -- not exactly nurturing type of mother. Just a hard woman is the best way to describe her.

Q You had several meetings with Ms. Shaughnessy?

A If you say so. I don't recall all of them.

Q But you had ample time to observe her?

A Several times, yes.

Q You never saw her being warm and fuzzy in any way?

A No.

Q She also discussed with you her former husband, Jack Kleiner's sexual abuse of Ms. Montgomery?

A As I recall, yes.

Q And based on your conversations with Ms. Shaughnessy, you made representations later to Judy Clarke, among others, that the sex between Mr. Kleiner and Ms. Montgomery was consensual?

A I don't think I ever talked to Judy Clarke about that that I recall.

Q Did you make representations that you believed the sex between Ms. Montgomery and Mr. Kleiner was consensual?

A I never made a representation as to my opinion as to whether or not it was consensual. As I recall, one of the people I interviewed said it was of a consensual nature. I

never characterized it that way.

Q A person other than Ms. Shaughnessy?

A I believe it was one of the sisters.

Q Was Ms. Shaughnessy present for that interview?

A I don't recall that.

Q You also spoke with Ms. Montgomery's husband, Kevin?

A Yes.

Q And if you would just tell the Court your interactions with Kevin Montgomery and what you observed.

A I always described him as not the sharpest knife in the drawer in kind of a colloquialism. I remember after this was all said and done, he called me and asked me, Where's my baby? And I couldn't figure out what he was talking about until I realized that he actually had apparently thought Lisa was pregnant and the baby that they were holding on December 17th, 2004, that was actually Bobbie Jo Stinnett's baby that was cut from her was not his child and I explained that to him, and he still said that he thought that Lisa was pregnant.

Q Have you read the motion in the 2255 action before the Court today?

A I skimmed over part of it. I haven't read all from start to finish, no.

Q You read the parts pertaining to you?

A I believe so.

Q Let's talk about those parts now where clearly we're

interested in your interactions with Lisa Montgomery's brother, Tommy Kleiner. When did you first meet Tommy Kleiner?

A As I recall, I interviewed Tommy on March 29th of 2007.

Q And where did you meet Tommy Kleiner?

A I think it was at his sister's residence, as I recall.

Q How was that meeting set up? Did he call the meeting or did you call the meeting?

A I did.

Q Why did you do that?

A I was asked by Matt Whitworth to try to talk to Tommy to find out where he was December 16th, 2004.

Q You were also told to obtain a buccal swab from Mr. Kleiner; is that correct?

A That's correct.

Q So from that conversation you gathered that Mr. Whitworth was wondering whether Tommy Kleiner was at the scene of the crime?

A That would be my guess, yes.

Q Tell us about that conversation. How did that go with Mr. Kleiner?

A Mr. Kleiner's not a real bright person. Again, colloquialism, he's kind of squirrelly. He's just all over the place emotionally. He doesn't have exactly a good track record with employment. So we were trying to pin down where he was. Of course, this is almost two-and-a-half -- well, it's

two-and-a-quarter years after the fact. Again, he doesn't really hold a nine-to-five type of job. He's been in and out of prison, doesn't hold a job down either. So we were trying to pin down where he was working, if he was in fact working, on December 16th, 2004.

Q I believe when you and I spoke before, you indicated that it was apparent to you that Mr. Kleiner had some mental or emotional problems?

A I would say so, yes.

Q That he also had perhaps been using drugs, but that it was also obvious that he had some underlying psychiatric issues?

A I think that's a fair assumption, yes.

Q Was Mr. Kleiner able to tell you at all where he was?

A His best guess was that he was working for a concrete company, which was confirmed by one of his sisters and also by his then girlfriend, Nina Green, that he was working at a concrete company.

Q Did Mr. Kleiner provide you any other information about his activities during December of 2004?

A I think that's all that he could provide.

Q Did his sister provide you any other information?

A I think the sister and then also Nina Green confirmed that at the time I believe Nina was going to beauty school and Tommy was her ride, and she would have remembered if she had

been dropped off early because she would have to stay outside in the cold because the beauty school didn't open up early. If Tommy had been late, she would also remember that. And I believe Tommy was also helping one of his sisters maybe clean an apartment during December.

Q Did Mr. Kleiner catch on that you were inquiring about whether he was involved in the murder?

A I don't think so. I'm not sure if he really caught on to that. I certainly didn't tell him why I was asking that. Again, he's not real bright. I don't think -- he didn't ask me if that's what I was asking and I never offered that.

Q You asked him, however, about his whereabouts on the day of the murder that his sister committed?

A That's correct.

Q And you asked him to provide a DNA sample?

A If he would, yes.

Q Did you give him any justification for that request, an untrue justification that would be separate and apart from checking his whereabouts on the day of the crime?

A I think I probably would have told him we were trying to pin down where everyone was on that day, but I didn't specifically tell him that we think you were there or someone thinks you were there and he didn't ask, as I recall.

Q Did you take a buccal sample from his sister?

A No.

Q Who was also Ms. Montgomery's sister?
A That's correct. I did not take one from her.
Q And she was sitting right there beside him?
A That's correct.
Q So it would be clear you had someone of compromised intelligence and you kind of focused on him?
A He didn't ask and I didn't offer.
Q Okay. What did you do to investigate Mr. Kleiner's whereabouts besides ask him and take a buccal swab?
A Again, talked to his sister, talked to Nina Green, and then I ran a criminal history to see where he -- what charges he was under; and, frankly, I found out that he was on probation, and so I thought I would contact his probation officer and that maybe she could tell me where he was working on December 16th, 2004, if in fact he was working.
Q And did you contact the probation officer?
A Yes, I did.
Q And what day did you do that?
A It would have been, I believe it was April 5th, 2007.
Q And did she respond to your questions when you spoke with her?
A She said that she would need a subpoena, and so we obtained a subpoena, but she was able to tell me that she had evidence as to where he would have been that day; but, as I recall, we needed a subpoena before she could provide us the

court documents.

Q Did you pull his criminal file from the courthouse?

A From the courthouse? No.

Q Did you talk with anyone else besides his probation officer?

A After I talked to her and I got the subpoena for the records, I didn't feel there was a need to, no.

Q Did you discuss with Ms. Garman, the probation officer, the possibility that Mr. Kleiner was sleeping with Ms. Garman?

A Now, that's the first time I heard that when you asked me the other day.

Q So you certainly didn't mention it to Ms. Garman?

A No, I certainly did not.

Q Did you instruct Ms. Garman not to alert Mr. Kleiner to the fact that you were investigating him?

A I don't think I would have done that, no. Let me go back. The most I would have said is, You're not under the obligation to tell him; but if someone were to ask you, certainly don't lie.

Q Did you discuss Mr. Kleiner's criminal record with him at any point?

A I don't think I did, no.

Q Did he discuss with you the fact that his sister had taken out a lot of charges on him?

A That part he did mention to me, yes.

Q That's discussing his criminal record?
A You're right.
Q Did you agree with Mr. Kleiner that some of those charges seemed to be false or trumped up?
A My recollection was that Lisa from time to time would throw him under the bus. She would file charges. According to Tommy, she would do that just because. For whatever reason Tommy was kind of her whipping boy and she would do things just to get him in trouble. She seemed to enjoy that. So I think I commiserated with Tommy, It certainly seems that Lisa likes to get you in trouble.
Q I was going to ask you that word. Did you commiserate with him?
A Certainly.
MS. HARWELL: Your Honor, if I could have just one moment.
Q (By Ms. Harwell) After the date at the sister's home on March 29th, did you ever talk to Tommy again?
A Several times. Actually he would call me from time to time, typically from jail, and ask for help with the State charges, and I would tell him every time, There's nothing I or the FBI is going to do to help you with your State charges and you should probably stop committing crimes.
And then there was a trial prep meeting when he had to come into the U.S. Attorney's Office and meet with myself

and the attorneys on the case, and that would have been in probably, as I recall, sometime in September of '07.
Q And Matt Whitworth was present for that meeting?
A That's correct.
Q And that was actually in this federal building; is that correct?
A In the U.S. Attorney's Office. That's correct.
Q Did you set that meeting up with Tommy?
A I can't remember if I set it up. I probably did. I think I was the one who was trying to schedule most of the witness meetings, pretrial meetings.
Q Would you have Tommy's direct number or did you, again, contact his sister?
A I think I went through his sister. People's phones kept getting disconnected. I'm not sure if he had a working phone. As I recall, he did not. I think I went through a sister. I couldn't even tell you which one.
MS. HARWELL: I think that's all, Your Honor.
THE COURT: Mr. Valenti.
MR. VALENTI: Thank you, Your Honor.
CROSS-EXAMINATION BY MR. VALENTI:
Q Agent Lipanovich, during the course of your investigation relative to Tommy Kleiner's location on December 16th, 2004, you determined that he was currently -- he was on probation, is that right, at that time?

A That's correct.
Q And that based on the records that you received that he was in fact visiting with his probation officer, Erin Garman, in Kansas at the time or very near the time of the murder?
A From about 1:20 to sometime after that 2:17 on December 16th, 2006, yes.
Q That was based upon records in Osage County. And that's records based upon Kansas state records that had him clocked in seeing a court in the probation system?
A He was seeing his probation officer, Erin Garman.
Q The paperwork indicates that that meeting ended sometime around 2:17 p.m.; is that right?
A That's correct.
Q Approximately what time was Bobbie Jo Stinnett murdered by Lisa Montgomery?
A It was between 2:30 and 3:30 p.m.
Q How far away was the court in Kansas that Tommy was at and the location in Skidmore, Missouri, that Bobbie Jo Stinnett was murdered?
A It was my recollection it was about 175 miles.
Q Did you learn what charge Mr. Kleiner was on probation for in Kansas?
A Yes, I believe I do.
Q What charge was it; do you recall?
A My recollection is it's one of the protection order

violations that Lisa had filed against him. He had pled guilty to it in fact, so he was seeing Erin Garman, his probation officer, on a charge that had arisen from Lisa Montgomery calling the police and saying he was violating a protection order.

Q So ironically for purposes of this murder he had an alibi as a consequence of Lisa's earlier actions?

A That's correct.

Q All right. When you talk to a witness and when you're done with them, do you ever give them any advice on who they can or cannot speak to in a case?

A If they ask or if I feel it's necessary, I will give them my standard spiel.

Q That is?

A Tell them you have three choices. One is if you decide to talk to them, that's fine. Two, you cannot talk to them, that's fine. Or the third choice is you can talk to them but you can ask a representative of the U.S. Attorney's Office or an FBI agent can be present.

Q Did you ever give that spiel to Tommy Kleiner?

A Yes.

Q Did you ever promise to give Tommy Kleiner any assistance for talking to you?

A No. In fact, we didn't need to. He couldn't provide me anything. He was not any use at all in telling me where he

was on December 16th, 2004.

Q You ultimately found out but by your own investigation?

A That's correct.

Q Did you ever tell Tommy Kleiner not to cooperate with defense investigators or defense counsel in the defense of Lisa Montgomery for the case that she was standing trial?

A Never.

MR. VALENTI: Thank you, sir. That's all I have.

MS. HARWELL: Nothing further, Your Honor.

THE COURT: All right. Thank you, Special Agent.

(Witness excused.)

MS. HARWELL: Your Honor, at this point in the proof the movant would have called Tommy Kleiner. However, the parties agree to have a testimonial deposition of Mr. Kleiner that at this point I will move be admitted as an exhibit in this case. I would ask that it be Exhibit 142.

I know that the Court will want to review that in full; however, to fill the Court in, I prepared a very short statement as to what we -- what the Court will read in that deposition.

The parties deposed Mr. Kleiner on October 14th. He testified to many things. He stated that he's currently under the medication Risperdal for anger and mood disorder. On cross-examination he added that he had been previously medicated with both Depakote and Lithium.

Mr. Kleiner testified he was contacted by his sister, Patty Baldwin; that he was told to come to her house to meet with the FBI. Mr. Kleiner was unable to indicate exactly when that meeting occurred, just that it was prior to his sister Lisa's trial.

Mr. Kleiner met with Agent Lipanovich at his sister's house, and Mr. Kleiner indicated that Agent Lipanovich asked what Mr. Kleiner termed his whereabouts at the time of the crime. Mr. Kleiner said that he was unable to provide Agent Lipanovich his whereabouts, and that in an attempt to provide the FBI assistance in determining that he was not with his sister at the time of the crime, he provided the FBI with his casino cards which he obtained as part of his involvement in a check cashing scheme.

Mr. Kleiner testified that he was worried about revealing his involvement in a crime but that Agent Lipanovich assured him that Agent Lipanovich would help him on those charges if that case were to go federal.

He also testified that he reviewed the charges Ms. Montgomery had taken out on him with Agent Lipanovich and that the agent reflected that he recognized that those charges were likely false or unfair. Agent Lipanovich promised to assist Mr. Kleiner in getting out of what Mr. Kleiner termed out of the A box, which he explained is an enhancement under Kansas law due to his prior criminal convictions.

Mr. Kleiner testified that Agent Lipanovich instructed him not to tell the defense team that the FBI knew about Mr. Kleiner's whereabouts. Again, his term. Mr. Kleiner also testified that he felt paranoid after Agent Lipanovich told him that the defense had covertly acquired his DNA.

Mr. Kleiner and his family feared that he would face federal prosecution for murder if he did not cooperate with the FBI and follow Agent Lipanovich's instructions.

Mr. Kleiner testified that Agent Lipanovich told him that the defense was claiming that he, Mr. Kleiner, was sexually involved with his probation officer, Erin Garman.

Mr. Kleiner testified that he called both Agent Lipanovich and AUSA Matt Whitworth repeatedly after his involvement in the case.

He further stated that he has been traumatized by all the above events. On cross-examination Mr. Kleiner became very agitated and angry, often raising his voice in response to Mr. Valenti's questions thereby demonstrating his mood instability.

We'd ask the Court to accept Exhibit 142.

MR. VALENTI: I don't have any objection, Your Honor. It needs to be read in its entirety.

THE COURT: All right. Thank you.

Is that an exhibit I already received or do I need to receive it?

MS. HARWELL: You need to receive it. It wasn't on our initial list.

THE COURT: It's received.

MS. HARWELL: Thank you, sir.

MS. HENRY: Your Honor, at this time I have to apologize to the Court. I mis -- I mistimed today. Erin Garman, who was our next witness, who was a witness who was going to have to travel eight hours round trip today for what we anticipated to be testimony at the end of the day. Given the way things moved and what I thought was going to be a longer day, I told her to come on Thursday.

All of our next witnesses, which are very lengthy tomorrow, and we may go longer tomorrow, are flying in. We don't have any local witnesses available, and I very much apologize to the Court. It's 100 percent my responsibility.

THE COURT: That it is. And there was some discussion of this, and I think there was recognition on your part that when you gave notice that movant might need some additional time, that you did realize that oftentimes things move faster in this court, and I do try to keep things on track.

MS. HENRY: Your Honor, the subject matter of our witnesses got cut today in ways that I didn't anticipate, so their testimony would have been much longer. So I apologize for that.

THE COURT: Well, I mean, you know, there's no point arguing things with you, but I don't know much of anything was cut today.

MS. HENRY: We edited based on objections.

THE COURT: All right. Well, I don't like it and I don't want it to happen again. You know, you get people here. I don't care how long they've got to travel. I don't care if you've got to put them up overnight. Things oftentimes, more often than not, move faster than counsel anticipate and, you never know what the extent of cross-examination of your witnesses are going to be, but it has not been extensive to this point, and so you need to take that into consideration as well.

MS. HENRY: Yes.

THE COURT: And you need to be prepared if there is not extensive cooperation to have your witnesses ready to go.

MS. HENRY: I do apologize and it is 100 percent my fault, Your Honor, and I apologize.

MR. VALENTI: Your Honor, if I may, for purposes of planning, I'll tell you it would be my intention even tomorrow -- it would be my intention for tomorrow's lineup, as I say, it's Judy Clarke, Deb Garvey, Holly Jackson, David Freedman, Dick Burr, to make many of the same objections that I've done today that relates to the propriety or relevance of some of the testimony. To the extent that they qualify in the

case the facts of what red flags they identified, I think it's appropriate when we get into it whether they would, could, or should of what they planned to do is speculative. It's not, from my mind, relevant. It's testimony we currently had with Ms. Hunt and all and so --

MS. HENRY: I can certainly provide the Court with some more extensive legal argument on that topic if you'd like to hear it today or if you like to take those objections as they come with respect to the testimony. I don't intend -- those are my witnesses tomorrow with the exception of Holly Jackson.

THE COURT: I'll take them as they come.

MS. HENRY: Okay.

THE COURT: Well, I still intend to get this finished in two weeks.

MS. HENRY: Yes, sir.

THE COURT: All right. I don't like it but we're going to adjourn for the day and everybody be back at nine o'clock in the morning. Don't run out of witnesses again, either side.

(Court adjourned at 2:55 p.m. until 9 a.m. Wednesday, November 2, 2016.)