UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS - VOLUME III
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 2, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:
MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:

MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

I N D E X Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE


RUSSELL STETLER

Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN

Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

## I N D E X
(continued)

Page

NOVEMBER 1, 2016

VOLUME II

RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

I N D E X (continued) Page

NOVEMBER 2, 2016

VOLUME III


RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . . 761

I N D E X
(continued)

Page

NOVEMBER 3, 2016

VOLUME IV

DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

I N D E X
(continued)

Page

NOVEMBER 4, 2016

VOLUME V


CHRISTOS DAVATZIKOS
Direct examination by Ms. Henry. . . . . . . . . . . . 1120
Cross-examination by Mr. Valenti . . . . . . . . . . . 1165
Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG
Direct examination by Ms. Henry. . . . . . . . . . . . 1182
Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE
Direct examination by Ms. Henry. . . . . . . . . . . . 1245
Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL
Direct examination by Ms. Henry. . . . . . . . . . . . 1255
Cross-examination by Mr. Valenti . . . . . . . . . . . 1290
Redirect examination by Ms. Henry. . . . . . . . . . . 1302

## I N D E X
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI


CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864

# I N D E X
(continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

I N D E X (continued) Page

NOVEMBER 10, 2016

VOLUME IX


FRED DUCHARDT

Direct examination by Ms. Harwell (cont'd.). . . . . 2263

Cross-examination by Mr. Ketchmark . . . . . . . . . 2273

BEN LEONARD

Direct examination by Ms. Henry. . . . . . . . . . . 2324

Cross-examination by Mr. Valenti . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . 2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

# INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Diane Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Lebouef | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |
| FOR THE RESPONDENT: | | | |
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

NOVEMBER 2, 2016

MORNING SESSION

(Court in session at 9:05.)

THE COURT: Good morning.

Ms. Henry, you have a witness this morning?

MS. HENRY: I do, Your Honor.

THE COURT: Good. We can proceed then.

MS. HENRY: Thank you.

Your Honor, the movant calls Richard Burr.

THE COURT: Mr. Burr, would you come right up over here to the witness stand, please.

RICHARD BURR, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning, Mr. Burr.

A Good morning.

Q If I could have you state your name for the record and spell your first and last name for the court reporter.

A I'm Richard, R-i-c-h-a-r-d, Burr, B-u-r-r.

Q And you have a nickname?

A Nickname, yes. I'm Dick, D-i-c-k.

Q So if we've heard other witnesses before or after your testimony refer to Dick Burr, that would be you?

A That's the same person, yes.

Q For the record, Mr. Burr, could you please tell us what your occupation is?

A I'm an attorney.
Q And are you licensed to practice law?
A I am. I'm licensed in Texas. I was licensed in other states, but I'm not leaving Texas so I dropped -- resigned from the bar in other states.
Q Could you share with us for the record your educational background?
A I graduated from college, Vanderbilt University in Nashville, Tennessee, in 1971; and from law school, the University of Kentucky in 1976.
Q And after your graduation from law school in 1976, for purposes of the historical record, was that the same year that Gregg v. Georgia was decided?
A It was.
Q And did you immediately enter the field of capital defense at that time?
A Actually I worked for three years in a small firm in Rochester, New York, where my wife was in graduate school. The firm did Title VII employment discrimination plaintiff's work. So I did that for three years, then I started death penalty work after that.
Q And how did you begin your career in death penalty work?
A I moved back to Nashville and took a job with a nonprofit legal organization called the Southern Prisoners'

Defense Committee. I was hired originally to do prisoners' rights litigation because I had some civil rights class action practice experience, but immediately I started doing death penalty defense work. I still did some prisoners' rights work until 1981 when I left that office, but I did about equal -- between '79 and '81 about equal death penalty defense work, habeas work, and prisoners' rights litigation.

Q In 1981 you left that position to go where?

A I went to the public defender's office in West Palm Beach, Florida, where I was an assistant public defender until 1986.

Q And in '86 --

A I'm sorry. Yeah, late '86.

Q In 1986 where did you go?

A I went to New York to the NAACP Legal Defense Fund where I was the director of the Death Penalty Defense Project there from late '86 until April, I think it was, of 1994.

Q And for the record could you explain what the NAACP Legal Defense Fund is?

A Yes. It's a legal services organization started by the NAACP with Thurgood Marshall as the original director. At some point in time -- I used to remember this but I can't be sure when it was -- I think it was in the mid '70s, the legal defense fund became its own organization, separate from the NAACP, still very collaborative with the NAACP, but it is a

freestanding legal organization now.

Q And your successor was George Kendall?

A Yes.

Q When you left the NAACP Legal Defense Fund, where did you go?

A I moved to Texas and became a part of what was then called the Texas Resource Center. There were, oh, close to 20 resource centers funded by the federal government as Community Defender organizations, and I think those started in about, oh, probably 1988 or '89.

The Texas Resource Center started about that time. I came in 1994 as the litigation director. The mission of those offices was to represent people in federal habeas -- capital federal habeas proceedings, death sentence people, and to provide some consulting assistance to panel attorneys who had cases as well.

Q During the time that you were with the Texas Resource Center, did there come a time when you were appointed to represent an individual, a rather notorious individual in a capital federal prosecution?

A Yes. In May of 1995 I was appointed as the learned counsel in the prosecution of Timothy McVeigh for the Oklahoma City bombing.

Q And what were your responsibilities in that case?

A My primary responsibility was to develop the case in

mitigation and opposing aggravation for the penalty phase of the trial. I also participated in jury selection and certainly in the strategy development for the entire trial.

Q Following your work with the Texas Resource Center and the McVeigh trial, did there come a time when you took a position, a contract position, with the Administrative Office of the Courts?

A Yes. There was something called the Federal Death Penalty Resource Counsel. It was a project started by the Defender Services Committee with the AO doing administrative work in connection with it.

I think it started in about 1991 or '2 with two lawyers. Their mission was to provide consulting assistance to counsel -- defense counsel appointed in federal capital prosecutions. I became the third lawyer as a part of that project in 1987.

Q You mentioned the Defender Services Committee, and just for purposes of the record, there's a lot of red tape and hierarchy and bureaucracy in Washington, could you explain what the Defender Services Committee is?

A Sure. The Defender Services Committee is a committee within the Judicial Conference of the United States. It's composed of federal district judges and court of appeals judges, and that committee is the judicial administrative source for all capital -- or all indigent defense in the

federal system. They establish and approve the budgets for Federal Defender offices, for capital habeas units within Federal Defender offices, for Community Defenders, the Administrative Office of the Courts. The Defender Services Office is the administrative arm of that committee but that committee has the authority.

Q And so the Federal Death Penalty Resource Counsel Project has the implementer or the authority that flows from the Defender Services Committee?

A Yes. All of us in the project were contractors. Each of us came from pretty extensive capital defense experience and had our own private capital defense practices, but we were hired for a certain number of hours. It's usually 1,000 to 1,500 hours a year to do the contract work for the project.

Q Was there a recognition on the part of the Defender Services Committee that the individuals who staffed the Federal Death Penalty Resource Council Project were in fact experts in the area of death penalty defense?

A Yes. There was a report done by the Defender Services Committee. Let's see. I think the report was published in 1998, if I'm remembering correctly. It came to be called the Spencer Report because the committee was chaired by Judge Spencer from Virginia. It studied the capital -- the indigent defense system in federal capital prosecutions and determined that our project was critical to the provision of effective

assistance of counsel because of the experience and quality of the people in our project.

Q Was the goal to increase the quality of representation while at the same time maintain costs?

A Yes. Yes. What we tried to do in every capital case that was indicted was to -- if we knew about the case early enough, we recommended through the Federal Defender counsel to be appointed learned counsel, and we tried very much to establish a relationship of assistance and consultation with those lawyers and work as extensively with them as they needed and wanted.

We didn't appear as counsel, but we did a lot of work behind the scenes. We helped develop strategy, helped find resources, helped draft pleadings on occasion, met with the defense teams pretty frequently and were, you know, sort of the -- there were learned counsel appointed in every team, but we were sort of backup for the learned counsel, I guess you'd say.

Q In addition to your contract with the Federal Death Penalty Resource Counsel Project, did you also maintain a private practice of law where you accepted appointments for representation?

A I did. Since -- oh, since the time I went to the Legal Defense Fund in late '86, I've always represented somebody in Texas, on death row in Texas in State or federal habeas

proceedings.

During the time that I was a federal death penalty resource counsel, the number of clients I had varied, but I always had at least three or four Texas habeas clients.

I also in the early years of my practice with the Federal Death Penalty Resource Counsel I took appointments in federal cases. None of them was authorized and when they were not authorized, I dropped out. But I did have a number of appointments, oh, between 1997 and 2001 or '2. I quit taking appointments at that point because I took on more Texas habeas cases.

Q We'll get back to the project in a little bit, but staying now with your career. Have you ever argued any cases in the United States Supreme Court?

MR. KETCHMARK: Your Honor, if I might, I have no problem stipulating to the qualifications of Mr. Burr. I think we all know what his role is in this matter. I think we all know what his qualifications are. I don't know that we need to make a record.

THE COURT: I agree. I believe Mr. Burr is well qualified to render opinions on matters in death penalty cases.

MS. HENRY: Thank you, Your Honor.

Q (By Ms. Henry) With respect to the Federal Death Penalty Resource Counsel Project, did you also provide training for lawyers?

A Yes. From the time I joined the project in 1997 we always had one major annual training, which we called the strategy session, because when it started out, it was very small. It has grown now to be a full-fledged seminar. It lasts two-and-a-half, three days. We have it at various courts in the country from year to year, and it's a full federal capital defense seminar.

Q Are you familiar with a gentleman by the name of Frederick Duchardt?

A Yes.

Q Does Mr. Duchardt attend those strategy sessions?

A I remember seeing Fred at some of them. I'm not sure whether he came to all of them when I was a resource counsel or not, but I remember at least at one or two of them. I can't remember what years it was.

I should say we also -- at some point I left the Federal Death Penalty Resource Counsel Project in 2014 to focus all my work on Texas, but at some point along the way, I think probably in about 2004 or '5, maybe a little later, we started having something called an authorized case training separate and apart from the national seminars. We invited counsel who had authorized federal capital cases to come to those, to bring their whole team. It was a bring-your-own-case training. We had very short lectures but a lot of breakout time with the teams who had cases, working through a number of issues in

those cases. At first we had one of those a year. Now I think there are two in addition to the annual strategy session.

Q And we'll return to Mr. Duchardt a little bit later in your testimony, but with respect to just those strategy sessions and bring-your-own-case sessions, let me ask you, Mr. Duchardt never attended any of the premiere case sessions?

A I don't remember Fred attending any of the authorized case trainings.

Q Do you know a gentleman by the name of John O'Connor?

A I don't know him personally. I don't think I've ever met him, but I had some email correspondence with him and probably a phone call or two in connection with this case.

Q Other than that, you don't recall Mr. O'Connor attending federal death penalty strategy sessions?

A I don't recall that. That's no guarantee that he wasn't there.

Q And you obviously are familiar with Dave Owen?

A Yes.

Q Did Mr. Owen ever attend a federal death penalty strategy session?

A Not that I remember.

Q So I jumped ahead just a little bit. Now I'm back up to where we're going to go with your testimony today, Mr. Burr. Give us some general discussions about the Federal Death Penalty Resource Counsel Project, and I think you said you were

the third person assigned to that project?

A Yes.

Q And the other two were Kevin McNally and David Brock; is that correct?

A That's correct.

Q Did you and Mr. McNally and Mr. Brock have a division of labor?

A We did. We roughly divided the country. There were three of us then. The number of federal prosecutions were a lot fewer then than they are now. They've grown over the years. I tended to focus on cases in the Fifth Circuit -- or covered by the states in the Fifth Circuit, Eighth Circuit, and the Tenth Circuit. The Ninth Circuit was sort of a place where all three of us would take, you know, consult on cases every now and then. The primary circuits I focused on were the Fifth, Eighth, and Tenth.

Q And would that include the Western District of Missouri?

A Yes.

Q You mentioned I think very briefly but I would like to go back and have you explain for the record the policies of the Office of Defender Services as it relates to Federal Public Defenders and their consultation with resource counsel in potentially capital cases. Let me first ask you, is there a statutory component to that issue?

A The only statutory component is 18 U.S.C. 3005 which calls for -- when a federal capital case is indicted, it calls for the local Federal Defender to make a recommendation of counsel, appointment of counsel, learned counsel for that case. Learned counsel meaning people who have had experience in capital death trials.

Q A corollary requirement on behalf of Congress and the statute that the Court consult with a Federal Public Defender's Office, did the Administrative Office of the Courts, Office of Defender Services as they were then known, have a policy with respect to Federal Defender offices and what their obligations were vis-à-vis these appointments in your project?

A Their obligation was to consult with us, with the Federal Death Penalty Resource Counsel Project, because we were hired because we were experienced capital defense lawyers and we knew a lot of people who did capital defense work; and, you know, because of our experience and work with a lot of people over the years, we had a pretty good sense of who did good work and who did not do such good work. And so we -- they were required -- the Federal Defender was required to consult with us by the Defender Services Office, and they in turn made recommendations to the judges, the district judges for appointment.

Q And was that policy in fact endorsed by the Defender Services Committee?

A Yes, it was. At least in the Spencer Report that I mentioned earlier, the 1998 study of capital indigent defense in the federal system, they found that that was a critical first step in the process of getting the best qualified, experienced counsel into these cases from the beginning.
Q And the Spencer Report was adopted by the Judicial Conference?
A It was.
Q And is actually available on their website for anyone to see?
A Yes. That's correct. There's an update I think in 2004.
Q Did the update in any way back away from the requirement that Federal Public Defenders must consult with resource counsel?
A No.
Q And, in fact, has that requirement gotten even stronger through the years?
A It has. It took awhile for Federal Defenders to realize they had that responsibility not only to recommend counsel but to consult with us from the outset, and there were some areas where Federal Defenders just rarely talked with us. We learned about cases through a variety of means; through press accounts, through just local contacts, through Federal Defenders. But as soon as we learned about the case, we

contacted the Federal Defender who started a dialogue about who to recommend, and some defenders didn't realize it was their responsibility to recommend counsel. And, you know, the Federal Defenders, to varying degrees, were responsive to us.

Q And were there some Federal Defenders who even though they recognized their responsibilities under the policy did not follow the policy?

A Yes.

Q There's been questions and suggestions on behalf of the government to the effect that the Western District of Missouri is recognized as being one of the harshest jurisdictions in the country with respect to the federal death penalty. Is that your experience?

A Yes, it is.

Q Is there in fact geographical disparity in the application of the federal death penalty across the country?

A There is. I'm out of that work now, have been for two or three years, but there were certain districts within the country that where the U.S. Attorney often sought authorization for a potentially federal capital case; and once authorized, rarely, if ever, agreed to the authorization or supported the authorization or was willing to entertain a plea.

In the majority of federal districts that was not the case. The U.S. Attorney's Office, you know, would consider de-authorization when new facts developed that made it appear

that authorization was no longer needed or appropriate, but in some districts, and this was one of them, that didn't happen. I'm not sure ever happened, but it certainly didn't happen very often, if it did.

Q Can you explain, again for the record, what the authorization process encompasses?

A Yeah. The authorization process is something developed as a protocol by the Attorney General of the United States. It was first developed by Janet Reno set out in the U.S. Attorney's Manual, and it sets up a whole process by which the Attorney General will determine whether or not in a particular case death is sought by the government.

It starts and it includes defense counsel. Defense counsel has the right to confer with the U.S. Attorney about their authorization and recommendation. U.S. Attorney makes a recommendation to the Department of Justice. Thereafter, there is a committee within the Department of Justice that considers the recommendation of the U.S. Attorney at which defense counsel is entitled to appear in person or by teleconference.

And then the third step is that committee makes the recommendation to the Attorney General. The Attorney General decides whether to authorize any particular case or not. Defense has no role in addressing the Attorney General.

Q So with respect to that final decision, the ultimate decision-making authority does not reside in the local U.S.

Attorney's Office but in fact with that committee in D.C.; is that correct?

A Well, it's actually the Attorney General. The committee in D.C. and the Department of Justice can recommend -- you can recommend against authorization or for authorization at odds with whatever the U.S. Attorney has recommended.

Q Certainly they take into consideration, probably heavily, the recommendation of the local?

A Yes. The committee tended to recommend authorization if the U.S. Attorney did. The Attorney General, depending on who the Attorney General has been, you know, rejected that authorization far more often than the committee did, but still there's a pretty high coincidence between a U.S. Attorney's recommendation to seek death and the actual authorization by the Attorney General.

Q And there certainly have been situations where the local U.S. Attorney General recommended authorization and authorization was not granted?

A Yes.

Q For those individuals who practice federal death penalty law in jurisdictions where they know that their chances of de-authorization once granted is going to be very, very difficult, does that place on them an even higher burden to make a competent presentation at the authorization stage?

A Yeah. I mean, the -- it's true in every case, no matter which the district, that the best chance to protect your client's life is to have the case not authorized, and probably the statistical chances of having that result for your client are greatest with the U.S. Attorney and through the authorization process.

Once authorization has been granted or decided on by the Attorney General, it's harder. You can seek de-authorization thereafter based on new evidence or new facts, new developments -- mostly factual, sometimes legal -- but that's much harder. And then, of course, you know, if the case goes to trial as an authorized case, the chances go -- are diminishing from that point forward.

So we always encourage people to do a considerable amount of work. I mean, there's not a huge amount of time usually from the time counsel is appointed to an authorization decision, but it can be a year. It can be a year. But to get resources early, to put those resources immediately to work in investigating the case of guilt/innocence and the mitigation phase so that you have -- you are not just making arguments to the U.S. Attorney but you are presenting real information as to why they should not recommend authorization in that particular client's case.

So the work -- there is considerable work we encourage lawyers to do from the beginning to try to avoid authorization

because that's the best chance to save your client's life.

Q And even though that's true and the chances of getting a life imprisonment without possibility of parole plea becomes all the more difficult, there has still been situations where attorneys have been able to successfully engage in plea negotiations and in negotiating for sentences less than death post-authorization but pretrial; is that correct?

A Yes. That has happened -- it's not a rare event. It's not common but it's -- you know, in the universe of cases that have been authorized, I would think de-authorization occurs in at least 10 percent, maybe up to 20 percent of the cases. Twenty is probably a little high, but at least 10 percent of the cases.

Q And sometimes over the objections of the local U.S. Attorney?

A Occasionally. I mean, your chances of de-authorization are better if the U.S. Attorney supports it.

Q And is this information that you provide to the local attorneys appointed in federal capital cases from the beginning, these various steps in the plea negotiation process?

A Yes. We would make contact with -- I mean, if we've been part of recommending somebody, we've been in contact with those people already. If we were not, then we make contact with whoever's been appointed immediately and offer to come meet with them to start talking about how to work on the case.

I mean, they're not novices, most of them. They have their own ideas, but we bring a whole body of experience to their benefit.

We send materials right away. We maintain a pleadings bank and do a lot of memos about every aspect of the representation. So we have, you know, full litigation guides for every aspect of a capital case. We provide those materials and offer to meet with people.

From that point on hopefully we engage with the defense team and we become, you know, kind of a regular part of the -- regular members of the defense team. We're copied on emails. We're part of the ongoing situation about the case and what's being learned from the investigation and the experts that may be needed, where there may be holes in the government's case, all of that stuff that defense teams focus on.

Q So you have never suggested to a capital defense team that that pre-authorization stage is merely preliminary and not something to be taken very seriously?

A Oh, no. Just the opposite. We tell people this is your best chance to succeed with your client, to save your client's life. You've got to give this utmost and primary importance. Make room for it in your practice because this is where you can do your most effective work, effective in terms of result.

Q Now, with respect to your project, I know you said it started with just three of you. At that time were you working with Federal Public Defender organizations as well as CJA panel lawyers?

A Yes. Our project started with just -- it was the three of us that you've mentioned; David Brock, Kevin McNally, and myself. Somewhere along the way, and I can't remember exactly when it was, probably around 2000, '99 or 2000, 2001, we added a fourth lawyer who was Judy Clarke, and Judy was not -- she was not an attorney in private practice. She wanted to be an assistant federal defender, and we then conceived of having a part of the project be based in Federal Defender offices called capital resource counsel.

So with Judy Clarke the capital resource counsel aspect of the Federal Death Penalty Resource Counsel Project was born. She was an assistant federal defender in San Diego, and that part of the project has always -- since Judy -- has had a second and sometimes a third lawyer as an assistant federal defender. All of the rest of the members of the federal resource counsel have been in private practice.

Q The project Ms. Clarke founded was dedicated -- was sort of a subset?

A It was a subset and her position was a hundred percent devoted to federal capital defense. The project was started because Federal Defender offices in general did not have people

with capital defense experience in them, and there was a need for Federal Defender offices to take cases, and so the idea was if we had a few --

MR. KETCHMARK: Your Honor, if I might, I'm going to object. I don't understand the relevance of any of this. We all know who Judy Clark is. We all know what role that she played in this matter. I don't see why this is relevant to the issues that the Court granted the evidentiary hearing.

If they want to talk to Mr. Burr about what his role was in this particular case in consultation with the counsel and all of the events that preceded to this and led to the red flags and problems that we saw upon her exiting from the case, that's fine. I don't think we need to get into this whole side show with respect to the project and Ms. Clarke and the creation of what her -- I mean, this is clearly an attempt to try to get into the issues the Court had ruled it doesn't want to hear any evidence on in this evidentiary hearing.

THE COURT: Ms. Henry.

MS. HENRY: It is not. I'm establishing for Your Honor at this point the resources that were available to the Federal Defender organization both pre-authorization and after Ms. Clarke exited as her role --

THE COURT: I think you've pretty well established that, haven't you?

MS. HENRY: Actually I don't think I have yet, and I

don't have a whole lot more questions about Ms. Clarke at this point. I just wanted to be able -- I will be able to show --

THE COURT: She was available as a resource as was Mr. Burr and the other two individuals in the resource counsel office.

MS. HENRY: I don't believe that the record yet reflects that Ms. Clarke would have been available to Mr. Duchardt after she exited the case. Mr. Duchardt --

THE COURT: Mr. Duchardt said he talked to her.

MS. HENRY: Mr. Duchardt, the testimony will be, talked to her twice and not about issues about representation. I'm sorry. I don't want to give an opening statement.

THE COURT: I understand she was available as a resource and the record should reflect that. All right.

MS. HENRY: Thank you, Your Honor.

THE COURT: Thank you.

Q (By Ms. Henry) Returning now to the Western District of Missouri, Mr. Burr.

A Sure.

Q If I might, as I said, the Attorney General has indicated that they intend to defend on some of our claims with respect to the particular harshness of the Western District of Missouri. Did you have experience working with the local Federal Public Defender, Ray Conrad, and are you familiar with his practices and procedures with respect to consultation and

following the policy that is required to consult with resource counsel in the appointment of learned counsel?

A Mr. Conrad rarely consulted with us about recommendations for counsel. I don't even know whether he made the recommendations to the judges in the Western District or the judges simply appointed people, but Mr. Conrad rarely consulted with us, if ever. I believe he did consult with us on this case. Maybe I'm mistaken about that. I'm not sure. But he was one of the few Federal Defenders in the country who simply, you know, didn't return phone calls, didn't respond to emails when we reached out.

Q Did you make attempts to offer recommendations for learned counsel in Mrs. Montgomery's case immediately?

A Yes, we did. Now, I don't remember whether that was gratuitous on my part. Sometimes I would just, you know, send an email to Mr. Conrad saying, Here are the people we recommend. I don't remember if that's what happened here or whether he was responsive to my saying, We'd like to make recommendations, but I did make some recommendations.

MR. KETCHMARK: And, again, Your Honor, I don't mean to continue to object, but I'm going to object on the relevance of this. Obviously he's indicating that Mr. Conrad rarely consulted with him.

As this court knows, we have a history of capital cases that have been upheld in a 2255 context where the

appointment of counsel, the question here -- and has always been -- whether or not the trial counsel provided effective representation or whether they were ineffective.

I think we're going down the line of the Cyndy Short and the whole issue of whether or not she should have been, could have been -- we are not working in an altered reality here. We have to examine what happened as it related to trial counsel. So I'm going to object on the relevance.

It's clear that there is policies and criminal procedures where it's clear -- now he's saying that Ray didn't consult, but that doesn't alter the impact of the dispositive questions before the Court.

THE COURT: Well, I think overall that's a valid and strong argument to make. I think you probably established that Mr. Conrad rarely consulted with the resource counsel. He may or may not have in this case.

MS. HENRY: If I could respond to the objection. If I hear the Court saying that you're going to make a finding that Mr. Conrad didn't follow the policy of the Office of Defender Services --

THE COURT: I'm not making that finding. I mean -- unless there's contrary evidence, the evidence is, and I believe what Mr. Burr says, that Mr. Conrad rarely consulted with them, but he may or may not have in this case, but there likely was some communication between the counsel and Mr.

Conrad. I think that is what the record establishes. That's what Mr. Burr's testimony establishes, and at this point I have no reason to disbelieve that.

MS. HENRY: Yes, sir. If I could please respond to Mr. Ketchmark's argument with respect to his saying these issues have been upheld in 2255s before.

THE COURT: That doesn't matter right now. I mean, that's an argument overall as to what weight to give to the matters that are before me potentially.

MS. HENRY: I just don't want to waive anything, Your Honor.

THE COURT: You don't want to what?

MS. HENRY: I don't want to waive anything. I'm a habeas lawyer. I know if I don't speak, I waive an argument, and I can't let what Mr. Ketchmark's saying without responding that the arguments we're raising with respect to the pattern and practice of the Western District of Missouri, just that Mr. Duchardt's affidavit says he doesn't follow the guidelines, that the Western District of Missouri didn't follow the guidelines that they were required to follow, that did result in deficient performance at the critical plea negotiation stage as Mr. Burr's testimony has suggested. Mr. Conrad's failure then is a part of that. We cannot say --

THE COURT: Okay. You've established that Mr. Conrad rarely, if ever, followed the policy recommendation of

the Defender Service Committee as adopted by the Judicial Conference.

MS. HENRY: I'm fine with that, Your Honor. Thank you. If I've established that, I've done more than I thought.

Q (By Ms. Henry) You're familiar with the learned counsel who was eventually appointed by the Court initially; is that correct?

A Yes.

Q I only have one question about Susan Hunt. You had worked with her previously -- I have two questions. You worked with her previously?

A I had on at least one other case, maybe two.

Q And you agreed to -- actually, I have a whole section. But with respect to Susan in particular, was she regarded by the project as qualified learned counsel?

A No.

Q Nonetheless, she did reach out to you for guidance; is that correct?

A Yes, she did. I would characterize Susan as learning counsel rather than learned counsel.

Q And at this point, Mr. Burr, I would like to now focus with you on the period of time in the Montgomery case that relates to that period during the very critical pre-authorization stage where Mrs. Montgomery was represented by Susan Hunt and David Owen. If we could focus on that time

frame right now in your testimony. Thank you.

With respect to that time frame, did you make suggestions to the local team as to potential resources that they could tap into and ways in which they could represent Mrs. Montgomery?

A Yes. I met with the team relatively early, I think after they were appointed. I think it may have even -- I may have the dates mixed up, but I think it was in January 2005.

Q I think that's right.

A I met in the Federal Defender's Office with David and an assistant defender named Anita Burns who was then involved in the case and Susan Hunt, and I believe Mr. Ninemire was there, perhaps Phil Thompson, who was an investigator who worked with Susan fairly regularly. I'm not sure the very first meeting he was there but a fellow named David Freedman was there either the first or second meeting. David was associated with the Federal Death Penalty Resource Counsel Project. That's F-r-i-e-d-m-a-n or is it e-e?

Q I think it's e-e.

A F-r-e-e-d-m-a-n. Sorry. David was not a lawyer but was a mitigation specialist and a really good mitigation specialist, and we contract -- he had a contract with us to provide expert mitigation assistance to defense teams, and this was a case that was all about mitigation from the very beginning, at least in my perspective, and David had more

expertise than I, and I thought he ought to be part of the consultation early on.

Q When you were consulting with this team early on, you mentioned a lawyer by the name of Anita Burns. Did Anita Burns seem to be open to accepting your counsel and resources?

A She did. I remember very distinctly in that first meeting, meeting or two, that she was just sort of absorbing everything, asking good questions in contrast to David who was making judgments about everything we were talking about and not very open to the process of representation that we were trying to impress was so important.

Q You mentioned that it was obvious, at least to you, from the beginning that this was a case about mitigation. Why do you say that?

A Well, I can't remember the specifics but the evidence of guilt, even from the early stages, I think was pretty strong, all the circumstantial evidence. At that point there certainly wasn't -- there wasn't scientific evidence that connected her to the crime that I know of, but it looked like a very strong case of guilt.

Often federal death cases are that way. There are some where there are issues of guilt, but very often the government seeks death only in cases where guilt is almost a foregone conclusion, and so the work -- the real defense work in the case is all about mitigation and how you relate that

work to the first phase of the case, the guilt/innocence phase of the case. This case certainly seemed to be that.

By the time I met with the defense team they had met with their client I'm sure more than once, and they were learning some things about her that, you know, gave me information on which to react and to respond and raise questions and to make suggestions.

She appeared from the outset to me to be quite mentally ill from how they were describing her, and the meeting focused very much on getting a mitigation specialist into the case as quickly as possible and how the mitigation work could unfold. David Freedman was very helpful in that respect as well. So that's what it looked like from the very beginning.

Q You had consulted on cases, previous cases from the Western District of Missouri where Mr. Ninemire had played a role; is that correct? The Ortiz case and Sinisterra?

A There was a little bit of consultation I did in Ortiz and Sinisterra. I don't remember meeting Mr. Ninemire before that, but I do -- I talked with Larry Pace I think was in Ortiz. At one point I think Fred was in Sinisterra and Jennifer Herndon. I don't know what her name was back then.

THE COURT: Jennifer Herndon.

A Yes. Was co-counsel with Fred in Sinisterra. I think I talked more with -- Jennifer was somebody I had a prior consulting relationship with in an Eastern District case. So I

knew Jennifer and she consulted regularly with me on Sinisterra. Didn't have any contact with Fred. And I had a little bit of contact with Larry Pace on Mr. Ortiz' case. Not very much.

Q (By Ms. Henry) Were you aware through your role as federal death penalty resource counsel that Mr. Ninemire had served the role of mitigation specialist in the Ortiz case?

A I think -- he probably said that in this first meeting that we had on Ms. Montgomery's case.

Q Were you aware that in the Ortiz case no mitigation had actually been presented at the trial?

A Yes.

Q So when you had this first conversation with the Federal Public Defender's Office and they brought in these individuals; Anita Burns, David Owen, Ron Ninemire, Susan Hunt, Phil Thompson, was there anyone on that team that was qualified to screen for mental health symptoms?

A No, not at all.

Q And is that why the focus was to get a mitigation specialist in right away?

A Yes. Yes. It was quite apparent really from the very early contacts with Ms. Montgomery that this was a mental health case in terms of just everything about it that would require extensive investigation by somebody who was experienced and could do effective work in talking with witnesses and

gathering records to learn about Ms. Montgomery's life history and the emergence of and manifestations of any kind of mental illness she might suffer.

Q Did you make recommendations to the team as to who might be a qualified mental health -- or mitigation specialist?

A I think -- I don't know whether -- I'm sure I did. I mean, David Freedman and I would have done that. I know Lisa Rickert became the mitigation specialist. I don't know if Lisa's a person we recommended or whether we recommended somebody else and Lisa came into the case. We probably recommended Lisa. I don't remember that.

Q As the case progressed through the pre-authorization stage, that authorization stage which you said is so critical to resolving the case to life without parole, did the team, mostly through Susan Hunt, continue to -- let me back up. Did there come a time when you learned that Anita Burns had dropped out of the case?

A I did learn. I think Susan told me about that. I was not directly knowledgeable about it, but I believe Susan informed me about that.

Q So if I represent to you somewhere -- just sort of moving through the timeline, the authorization meeting was September 28th of 2000 -- September 26th or 28th of 2005. Go with me on that?

A That sounds right to me.

Q So about almost ten months from the defense. In about March, late March, April, Mr. Owen comes in for Ms. Burns. Does that sound about right for the timeline?
A I think that's right.
Q Did Ms. Hunt continue to reach out to --
A Let me back up a little bit. David was a part of the team from the very beginning as sort of a supervisory person in the Federal Defender's Office, and from the very beginning asserted himself as a sort of controlling figure in the case.
Q And what impact did that have on the progression of the case as they prepared for authorization?
A It was very problematic because David had never been involved in a capital case. He did not -- I mean, mitigation seems like a simple thing to understand from just the surface. Developing mitigation is extremely complex. It requires interview -- people to interview -- first of all, to identify, find, and interview life history witnesses, some of whom come from the client herself or himself, many of whom come from other people, from looking at records. You know, you find people through a variety of means who had some substantial window into the life of this person.

You then begin interviewing them, and sequencing the interviews is important because there are some people who may know more than others, but you may want to know more before you start talking with those people. So sequencing of the

interviews is important.

The interviews themselves are very important. You can't just sit down with somebody and say, Tell me what you know. You have to know something about the person's relationship with the client, what that might reveal, and you have to ask a lot of very specific questions to help evoke people's memories, because we don't -- none of us think in terms of mitigation, you know. We know people and we know them sort of in a -- in a Gestalt we have about each other but that's not detailed, but that Gestalt has come from a myriad of experiences and observations and feelings that arose during experiences.

And so the mitigation investigator's job is to get to those details, that whole mountain of incidents, as it were, that create the Gestalt that person has about the person we're looking at.

Q Did Mr. Owen ever seem to grasp those concepts during the time that you --

A I'm sorry.

Q I'm sorry. Did Mr. Owen ever seem to grasp those concepts?

A No. No. And it's not a discredit to Dave because he'd never done this work. Interviewing people for mitigation is incredibly different from interviewing people for facts. In fact investigation you are trying to pull information out of

people that's very specific, very concrete based on observations, you know, based on things you have perceived or heard, and it's not an accumulation of hundreds and thousands of little experiences that give you an impression about somebody. That's what mitigation is.

Fact investigation is quite different. It's very discrete, very limited, very concrete, looking at very limited amount of material. I'm sure Dave knew a lot about that, most lawyers do. Although we rely on investigators to do that with us and for us because they're better at it than we are for the most part.

But, you know, Dave did not understand mitigation. He understood the concept that there are things in people's lives that can provide a reason for not putting somebody to death. That's the simple thing to understand. But how you develop those reasons is something he had no understanding about and not much openness to learning about.

Q Now, because he was the representative and the first assistant at the Federal Public Defender's Office, did Mr. Owen control the purse strings on the Montgomery budget?

A He did. That was sort of his leverage within the team is for any investigator or mitigation specialist or expert the Federal Defender budget would pay for those folks, and so David was -- you know, David sort of played the role of Judge Fenner in a nonfederal defender case who has to decide whether

something is reasonably necessary, are the resources reasonably necessary. So Dave Owen kind of played the Judge Fenner role in this case in that respect.

THE WITNESS: Not in any other respect, Judge.

Q (By Ms. Henry) Did that become a problem?

A It was cumbersome and it was problematic because Dave didn't have the basis of experience to understand why something was necessary. He also kind of micromanaged the mitigation specialist when they were in. Whenever a mitigator was going to interview somebody, it had to be cleared with Dave; and if it was somebody Dave already had some contact with, he didn't see any need for the mitigation specialist to go see them, because he didn't understand that he did not have the skill to interview a mitigation witness. He thought he did.

So he did a lot of micromanaging that slowed things down, required the mitigation specialist to justify why it was necessary to go see people and see them in a particular order and go back to see them another time, because oftentimes you don't get what you need in one visit. You get what you need if you develop a relationship with a mitigation witness and give them time to start remembering things. So you have to come back again and sometimes again and again before people begin to remember those little details that create their impressions about people.

Q And you observed this during, again, this critical time

frame in the case, this pre-authorization time?

A Yes.

Q Did there come a time when Susan Hunt and David Owen sent to you the mitigation reports of the mitigation specialist, Lisa Rickert?

A Yes.

Q What did they ask you to do with it?

A They asked me to look at it. As I remember, there were about 200 pages of memos written about interviews with witnesses, and there were -- it sort of confirmed, as I suspected, that Ms. Montgomery had serious mental illness issues. It wasn't clear at that point what they were, but just in my own experience over the years I developed -- I've done a lot of work around mental health in these cases, and it looked to me like there were some aspects of bipolar disorder and maybe even some brain impairment, some temporal lobe impairment because of behaviors that I seen associated with those afflictions. That wasn't a diagnosis by any means, but it was an indication that there were some very, very serious mental illness and brain dysfunction issues that were afflicting Ms. Montgomery.

Q So in habeas parlance we would call that that you saw some red flags for some pretty serious and severe mental illnesses in the work product from Lisa Rickert?

A Yes. There was a whole field of red flags. Just about

everybody she talked with a red flag came up for me. Red flags simply mean this is something we've got to look at more deeply and more broadly. We got to get records.

Mitigation rests on two foundations, records associated with somebody's life, every kind of record possible, and interviews with people. At that point Ms. Rickert, I think, did not have any records. She just had interviewed a fair number of people. I don't remember how many but maybe 15 or so people. And the themes among those people were so similar in their observations and memories about Ms. Montgomery that I began creating some impressions about what might be afflicting her, and that certainly called for gathering records, and that was not something Ms. Rickert had done.

Q Did you share your observations and the information that you gleaned from viewing Ms. Rickert's records with the entire Montgomery team as it was constituted at that time?

A I did. I recall a meeting after reviewing Ms. Rickert's interview memos. I believe it was at the Federal Defender's Office where we discussed that, and I gave more of my impressions and more effort to suggest directions for investigation in that meeting.

Q And then did there come a time -- and just let me anticipate the objection. I want to ask you about, again, work that was engaged in between July of '05 and October of '05 or up to the authorization stage. So I'm not asking you about

Judy Clarke and her folks' work on the case during the time she was appointed, but I just really want to focus on the work that was done by this team between July of '05 and the authorization stage. Okay? Does that make sense?

A Sure.

Q Did there come a time when you formed an opinion that the team was sort of floundering?

A Yes.

Q And was that about July of 2005?

A I think it was about that time. It was not too long after the meeting where I had reviewed Lisa Rickert's memos. The team -- despite my suggestions and guidance, the team seemed not to get it. They seemed to be stuck on what I think were sort of silly issues of guilt/innocence, that somebody else actually did this.

Q Let me stop you there for just a second. I would like to explore that. That is a theme that's repeated in the case. They were stuck on this idea that somebody else had actually done it and they were interested in investigating that; is that correct?

A Yes.

Q And at that point had they told you that Mrs. Montgomery had named an accomplice?

A Had what?

Q Had named -- in other words, had she told anyone that

Tommy did it?

A Yes. I don't remember who but there was some suggestion by her of someone else.

Q Was it not that Tommy did it but that she felt like there was someone else in the room with her?

A Yes.

Q So she hadn't given a name. It was just this sense that someone else was with her?

A I don't mean that you don't ignore stuff like that. You look at every potential way of defending your client; but as that was happening, they were getting more discovery from the government, as I recall, and there just -- at that point there seemed to be almost no doubt that there was nobody else involved, at least not in a primary way.

Q Let me ask you about that. You've had clients who have severe trauma histories; is that correct?

A Yes.

Q Are you familiar with individuals who dissociate?

A Yes.

Q And if you have a client where it's clear to you from the facts there's only one perpetrator but they feel as if there's someone else, some unnamed person in the room, is that a red flag for you of some dissociative disorder?

A Yeah. It's much more pointing towards an aspect or feature of mental illness than it is about actual witnesses or

actual co-perpetrator status, and that's how I saw this and yet they couldn't see it that way, you know.

I think -- my sense was that they just -- and Susan Hunt said this expressly to me, that they just didn't understand mental illness and could not understand why digging deeper and deeper into records and talking with mitigation witnesses was so important. So they kind of latched on something they were more comfortable with which was somebody else being involved that perhaps might have some responsibility or some degree of responsibility.

Q So were they reaching out to -- letting you know that they wanted to ask Lisa about the offense and did you caution them to wait, hold back, don't be doing that?

A Yeah. I said, Look, if you do that with her, you will simply be stepping into what could be a delusion that she has about what went on, and you don't want to promote that with her. You know, you can ask some questions about it, but think of it as likely a delusional process for her and begin to understand that at least in the context of the information you're gathering about her mental illness or mental illnesses and about the traumatic events that defined her life.

They didn't know that much about trauma at that point, but there was enough that Lisa Rickert found that suggested she had some serious trauma, and we know that trauma produces various kinds of mental illness and can produce brain

damage. So I tried to steer him in that direction and away from treating the possibility of someone else's involvement as real.

Q Did you caution them to avoid contaminating Mrs. Montgomery's memory because someone with her particular symptom presentation may be very susceptible to having their memory altered unintentionally?

A Yeah. It appeared that whatever had taken -- that whatever memory she had of this incident was pretty spotty, and depending on the way our brains function -- people can, who have temporal lobe epilepsy, which is not the kind of thing we think about as epilepsy of people having seizures where they fall down and have contractions and that sort of thing. Temporal lobe epilepsy can appear to be nothing to the observer, but it can also lead to -- can produce very violent behaviors for which the person has little or no memory.

So if she did have temporal lobe impairments, she might have no memory for what actually happened, and our minds cannot stand to have no memory of something. It's one of those vacuums that nature tries to fill. And so when we don't have a memory of something, we are quite vulnerable to suggestion as to what actually happened and we embrace that suggestion and it becomes a memory and we don't even know that's happened. That happens to all of us, not just folks who are like Ms. Montgomery. If we don't remember something and somebody

suggests something, that can become a memory. So that was a potential danger.

Q So here we are it's July with three months from the authorization meeting and the team is telling you, We're floundering. We just don't get it.

A Well, they weren't telling me that. I was observing that.

Q I apologize. Thank you for correcting me.

Did you do something? Did you try to bring somebody in as a consultant on the case?

A Yeah, I did. Susan Hunt, to her credit, reached out to a mitigation specialist named Scharlette Holdman. That's S-c-h-a-r-l-e-t-t-e, Holdman, H-o-l-d-m-a-n. This is a person I'd known since the late -- gosh, since 1979 or 1980 and worked with extensively over the years.

Scharlette was the pioneer of mitigation investigation. She was -- at the time we started working together she was in Florida. At that point I think she was in California. And Susan Hunt called Scharlette. I didn't recommend she call her. Someone else did. She called Scharlette. Scharlette then contacted Judy Clarke and me saying, It looks like these folks need some help. Judy and I then started a dialogue about whether she could come in and be at least co-consulting with me, and so that's how Judy was introduced into the case.

Q And do you recall about when that was? Was it early July?
A I think it was about mid July, maybe July the 10th or 11th rings a bell, but it was the first half of July of 2005.
Q Was there an in-person meeting?
A There was. There was a meeting in, I think, Tulsa, Oklahoma. I'm not quite sure why we were there. But there was a meeting then and Susan was there, David Owen was there, Judy was there. I think Lisa Rickert was there. I can't remember if David Freedman was there or not. He may have been. And I was there.
Q And what was the purpose of that meeting?
A Really the purpose was to bring Judy, you know, into consulting with the team and, you know, see if there was any way she could help. I wasn't able to and that was -- it wasn't an agenda to bring her in as co-counsel or anything like that.
Q And did Ms. Clarke make some offers of assistance in terms of consultation and resources?
A She did. Judy was in the Federal Defender system and had access to really good death penalty folks within the Federal Defender system at that point.

She brought in a person named Debra Garvey who was a master at collecting records and also mitigation specialist. She brought David Freedman in in a more robust way because David worked very closely with Judy through the Federal

Defender system. I think those were the two people that she brought in in a more robust way. Well, Deb Garvey for the first time because it was very apparent at that point and still there had been no serious record collection and that needed to happen and so that started happening.

And Judy had by that time done a number of federal death penalty trials that had gone to trial actually, but she'd been learned counsel in a number of federal death cases that were authorized and ended up with a plea, and she knew how to organize records, how to sequence the work in cases better than I did, and she led that expertise of sort of organizing and starting to manage the case in a way that nobody had done before.

Q Was the goal of that team at that time in the summer of 2005, three months away from authorization, was there a goal to achieve a sentence less than death, to either plead the case or not have it authorized?

A I'm sure that that was a part -- I mean, they certainly wouldn't reject that, but I think their goal at that point still was to find some way of finding -- getting to a conviction of less than capital murder.

I don't think they had at that point realized that the only way they could help Lisa Montgomery was to do the kind of in-depth mitigation investigation that at that point had not been done.

Q Now, this critical deadline, this authorization deadline, has there been times when defense counsel has been able to go to the Department of Justice and say, "Can you please put that date off? We need more time to give you an adequate presentation."
A Yes. I mean, there are efforts like that that are routinely made. They're not always successful. The Department of Justice sort of has its own agenda, but it can happen. Particularly, again, if the U.S. Attorney doesn't oppose that.

It can certainly -- you can get more time, and my experience is that a lot of U.S. Attorney offices are sympathetic to people just getting the resources they need or getting the resources to work or doing the kind of investigation to get to some core facts in the case that are actually appreciated in the authorization process.

The thing that is -- I don't know if it's unique but what's valuable about the federal authorization process is that the prosecution truly values the input of the defense. It values the input of the defense on matters that it cannot reach and mitigation is the primary matter. Because, you know, from a strategic perspective if the mitigation is such in a case that they think they may not be able to get a death sentence even just on that concrete level, they may begin to back off seeking death.

And, you know, in a more robust sense they may be

moved by the mitigation. I mean, mitigation moves people. And so they value that and the valuing of that is built into the authorization process.

Q Nevertheless, in this case no request was made to push back that deadline?

A Not to my knowledge.

Q And at the time that you were meeting with the defense team and these additional resources were brought to bear, was there, in your opinion, enough time to put together a sufficient mitigation package to present to DOJ?

A No. No. I mean, again, the mitigation investigation that had been done at that point was interviews by Lisa Rickert that raised red flags but the red flags hadn't been penetrated. Record collection was just started after that meeting in July with Deb Garvey's and Judy's help, and it takes awhile to get records in. You just don't sort of snap your fingers and give a release to an agency and they say, Here are the records. Oftentimes they have to dig or you have to persuade them to go dig or you have to dig in their records to get them. So it is usually a several-month process to get records in. Records are critical because they --

MR. KETCHMARK: I object to asked and answered. I'm giving him latitude with the narrative nature, but it's just going on and on and on.

THE COURT: I agree. Just respond to the question

and if you have another question, you can follow up.

MS. HENRY: Sure.

Q (By Ms. Henry) Is one of the things that you suggest to defense counsel, Mr. Burr, that they not simply rely on the word of their client when they're making these representations to the Department of Justice -- I think this was the point I would like you to summarize -- that they need to be able to support their claims of mental illness with more than just the word of the client but with these documented records?

A Yeah.

Q That was really the point I'm trying to make.

A That is the point, yes.

Q Thank you. I appreciate that.

Once this meeting took place in July of 2005, did the work of collecting records start right away?

A It did start.

Q And did it increase dramatically?

A It did.

Q And after a period of time, were you aware that a presentation was made to the Department of Justice?

A I was generally aware of that. I don't think I saw the memo that was presented to the Department of Justice by the defense team. I don't recall seeing one.

Q Me either. Do you know if there was one created?

A I don't know.

Q Is it possible that they -- well, we know it was by telephone. Is it possible that there was simply an oral presentation by telephone?

A Yes.

Q Is an oral presentation by telephone to the Department of Justice without the presentation of supporting materials a very effective attempt to defeat authorization?

A No, it's not. I suppose it could be in a particular case, but generally it is not.

Q After the meeting with the Department of Justice -- I'm going to focus with you now on -- again, this is a period of time that involves the Judy Clarke team but it's not related to claims regarding her removal, but I want to talk with you about what you learned through your continued -- well, let me ask you this question. I guess I haven't laid the foundation.

After authorization Ms. Clarke came in to the team. Did you continue to consult with the Montgomery team in Kansas City?

A Yes. Once Ms. Clarke was appointed as co-counsel, my role changed because she was -- she was in the team and her folks that she brought in like Deb Garvey and David Freedman were actually team members at that point, and a mitigation specialist named Holly Jackson was brought in through Judy.

My role changed because I then mostly talked with Mrs. Clarke. My primary point of contact before that was Susan

Hunt, and I still talked with Susan and occasionally with David. I don't remember if I -- and I probably attended team meetings occasionally, but my role was less at that point.

Q But you did attend some team meetings?

A I think so, yeah.

Q And Mrs. Clarke kept you apprised of how the case was proceeding?

A Yes. I still -- there was a time I dropped off their email list but I got back on it, and I started seeing, you know, the flow of communication through emails.

Q And did you come to draw -- did you attend team meetings in person?

A I don't remember for sure.

Q Maybe some in person, some on the phone?

A I know I was on the phone with some conference calls. I don't remember if I attended any more meetings in person.

Q Just by way of orienting and time-wise, that next summer is when you tried the Daryl Atkins retrial, so was that a time period where Ms. Clarke became more active with the Montgomery team and you became involved with more -- involved with other cases?

A Yeah. I was very engaged in that case as well as my continuing Texas cases, and so I had less contact with the team over -- let's see, we're still post-authorization.

Q Yes.

A Up until about April of 2006.
Q Yes. That's the time frame I want to talk about right now.
So during that time frame, you were monitoring the case but Ms. Clarke was more involved?
A Yes.
Q Did you draw any -- did you glean any impressions for the information that you were receiving about concerns the team had about Mrs. Montgomery's competency and mental health?
A Yeah. Ms. Montgomery was -- the best characterization I think that I can remember is fragile. She ebbed and flowed between suicide and something more stable than that, but suicide was always haunting her. She was -- I don't remember if the detention facility was medicating -- providing any medication to her at all. I think maybe they were but I'm not sure. But she was -- she was very fragile.
What I perceived was that Judy Clarke developed a relationship with her that was much more stabilizing for her than any relationship she had with anybody else on the defense team, but she was fragile.
Q And when you have a client who presents as a suicide risk, who you know has a severe trauma history, does that present particular problems for the attorney working with that client in terms of their ability to rationally assist the lawyer getting into that trauma and that serious trauma

history? And that was a really poorly worded question. Do you know where I'm going?

A I understand. People who have complex trauma histories, as Ms. Montgomery did, often cannot remember incidents. Some incidents will stand out but many will not, because all of us experience this to some degree. If we've been through something that felt traumatic, the memory for that event dissipates or gets suppressed because it's painful, and so -- and yet it can emerge without our knowing it, without our appreciating it. It can come out as something volatile or it could come out as profound paranoia about something or it can come out as suicide. It's almost just an impulsive thing, you know, not consciously happening. The deeper the trauma someone has experienced, the more those sort of time bombs, as they were, are in that person's life and they can explode.

With a person with this sort of history you can't trust what you learned from them totally. You certainly can't believe that you're getting the whole story, and you can't be confident that that person is going to be there with you in the sense of being mentally and emotionally present and connected to what's going on, either in working up the case or appearing in court, and so those sort of problems were there.

In the time I was involved in the case I don't think that they emerged as a sort of fully recognized incompetence to stand trial issue, because there was so much information coming

in about her and about all the manifestations of her illness that legal issues had not even crystallized from that, but there were all of those seeds that would lead lawyers to raise a competence question there and beginning to bloom.

Q Thank you.

I would like to move now to a discussion -- a theme that has developed through our investigation in the case and our presentation here in court with respect to the role of gender as it relates to cultural competence and dealing with someone such as Mrs. Montgomery who has, at least it appeared at the time and we've since learned even more deeply, a serious sexual abuse history. In your experience can gender play a role in a female client's ability to reveal the depths of her sexual traumatization?

A Yes.

Q Why is that?

A When the trauma is sexual and perpetrated by males, which it usually is, not always but usually, then the mere presence of a male can trigger some of those time bombs that I mentioned earlier. Trauma plants time bombs in us. And there are various triggers that can make those things go off, and it triggers a re-experience of the trauma.

And, again, that experience is not a conscious thing. It's not something you can call forth or suppress. It's just there. And the mere presence of a male can do that.

There's usually greater comfort with females than with males for that reason in a female client.

Oftentimes, as well, there can be some trust developed between a woman client and a woman lawyer or mitigation specialist in a way that just can't be developed with a man.

Q Did you have discussions with the Montgomery team and -- now I'll just broaden that time frame from January of '05 through April of '06. Were there discussions that you were aware in the Montgomery team regarding this issue of gender and that role it played with respect to interviewing Lisa about her trauma?

A Yes.

Q And can you share with us those discussions and how they were received?

A I don't remember particular conversations, but I do remember an ongoing issue for discussion was the different experiences that David Owen and Ron Ninemire and Phil Thompson had in meeting with Ms. Montgomery different from the experiences that Susan Hunt or Lisa Rickert or Holly Jackson or Judy Clarke had in meeting with Ms. Montgomery. They were just different. They were different experiences in which, you know, at times Ms. Montgomery sort of acted in a stereotypical way that women sometimes do towards men.

Q Explain that.

A Wanting to appear nice, wanting to appear attractive, wanting to appear enticing, sort of a sexual dynamic --

MR. KETCHMARK: Your Honor, I'm going to object. I don't believe that he was present during any of these. I think he's basing it strictly off of records. I mean, I think we're getting far afield. He can testify that he saw red flags. There was an issue of gender, I think, that's been established. I think having him testify about how she was appearing, how she was dressing, he wasn't there.

MS. HENRY: I don't think we've discussed how she was dressed because she was in a paper gown.

THE COURT: Would you clarify if he ever met Lisa Montgomery or was present during any of the interviews that took place with her?

MS. HENRY: Let me back up and lay further foundation for the question I'm asking, Your Honor. I think Mr. Ketchmark -- and perhaps I have not been clear with the question I asked.

Q (By Ms. Henry) Yesterday, Mr. Burr, Mr. Ketchmark showed one of our witnesses what is docket entry No. 151-12 where he pointed out that Mrs. Montgomery seemed to get along with investigator Ron Ninemire. Were you present at meetings or on the phone at meetings where there were discussions related to concerns about Ron Ninemire wanting to have a special relationship with Lisa Montgomery?

A Yes.

Q And what was the reason -- so let me ask you this: In your experience dealing with women who have these severe sexual trauma histories, is it your experience that those women will appear to get along with the men on the team?

A Yes. I've had clients just like Ms. Montgomery with that kind of history who love to see me, love to have me come visit them, not because -- well, that's -- yes.

Q But you weren't the person who was going to do the complex trauma history?

A No.

Q Was there, at these meetings, a discussion about the fact that Mr. Ninemire wanted to play that role and a feeling that he was not the appropriate person to play that role?

A Yes. There was discussion, an ongoing discussion, about that. It was not just Mr. Ninemire -- it was particularly with him -- but with all the male members of the team. They had a different experience, as they described it. I did not see any of it. But as they described it in meetings, they had a different experience from the meetings the women on the team had with Ms. Montgomery.

Q Certainly possible that their perceptions of Mrs. Montgomery trying to entice them were way off base. We're not saying that's a fact she did it, right?

A I have no idea. But they had a sense from her that she

really liked talking with them.

Q And liking talking with them isn't the same as being the person who should do the trauma?

A That's right.

THE COURT: Ms. Kelley [sic], is this a good time to take a break?

MS. HENRY: Yes, sir. I'm sorry.

THE COURT: We can go on if you'd like.

MS. HENRY: This would be a great time to take a break.

THE COURT: All right. We're going to take a recess for 15 minutes by the clock at the back of the room. So we'll reconvene at ten minutes till eleven.

(Recess taken at 10:35 a.m.)

THE COURT: Thank you. You can all be seated.

Ms. Henry, are you ready to continue?

MS. HENRY: Yes, Your Honor. Thank you.

RICHARD BURR resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MS. HENRY:

Q Mr. Burr, thank you.

I'd like to now move a little bit forward in time in the Montgomery case from where we were when we took our break, and I want to ask a couple of specific questions. I'm going to skip over most of the time frame from April the 20th through about May 16th. Okay?

A Of 2006?

Q Of 2006. We're going to skip that part for now, but I do want to ask just a couple of questions that are relevant to some other issues.

At the time -- in April of 2006 were you aware of the fact that the Montgomery team of Ms. Clarke, Ms. Hunt, and Mr. Owen had engaged a woman by the name of Judith Herman as an expert to assist in the Montgomery case?

A Yes.

Q And who is Judith Herman?

A Judith Herman is a trauma expert. She's researched and written extensively about trauma. Her books are sort of the guidepost in the field, at least they were as of that time. She's very difficult to get involved in cases, and I know there had been some outreach to her and Ms. Clarke was hoping to entice her into the case. She had said no but was willing to talk with Ms. Clarke, and Ms. Clarke can be pretty persuasive in person, so she was trying to get her involved.

Q Was the team also pursuing a neuropsychological evaluation of Mrs. Montgomery?

A Yes.

Q And did the team ask you -- do you know the individual that they had retained was a man by the name of Dean Delis?

A I know that from refreshing my recollection recently, yes, and I knew it at the time.

Q And are you aware that they were also reaching out to a forensic pathologist by the name of Werner Spitz, W-e-r-n-e-r, Spitz?
A Yes.
Q And were you aware that at least preliminarily Dr. Spitz had reported to the team that, yes, this was a crime that a single person could commit?
A I think I was aware of that, yes.
Q And also at this time frame I know that they were looking at 12.2 deadlines and trial deadline. There was also a motions deadline looming, wasn't there?
A Yes.
Q Had you agreed to draft some motions on behalf of the team that they could file to meet that motions deadline?
A I did. Yes, I did. The reason was that Judy Clarke was the only learned counsel in the case, from my perspective, and her hands were full, so I offered to do the death penalty motion-related practice.
Q And those would include what sorts of motions?
A Generally there's an overarching motion to challenge the death penalty as a constitutional matter, as a statutory matter, and as applied in the case. So it goes to all three levels. Some of the arguments are general, you know, the constitutionality of it, but most are tailored to the particulars of the case.

There's also generally a motion to strike the death penalty notice or to strike particular aggravating circumstances. Again, there can be sort of general challenges to those but also more specific cases, challenges to the aggravating factors that the government put in their death notice.

Q Were you ever called into service to provide those motions to the successor team, to Ms. Clarke and Ms. Hunt?

A No.

Q Skipping over from April 20th -- and for purposes of the record, that was the day that the order was entered directing that Ms. Clarke no longer serve as counsel for Mrs. Montgomery?

A Yes, I remember that.

Q From that time frame until early May, we're going to skip that time frame and go to the time in which you became aware that John O'Connor was going to be appointed as counsel in this case. Do you recall when that happened?

A I do recall that.

Q And how did you learn that John O'Connor was appointed in the case?

A I think Susan Hunt told me, and I probably looked at PACER at the same time.

Q Did Mr. O'Connor contact you or did you contact him?

A I don't remember who initiated the contact. I know we

communicated. I think I initiated the contact once I learned he was coming into the case, probably by email. I usually start with email, but I do think we had at least one telephone conversation as well.

Q And did Mr. Conrad consult with you about who should come in as learned counsel once Susan Hunt was -- withdrew from the case?

A No.

Q So Mr. O'Connor's presence as learned counsel came as a surprise. But did he then ask you for suggestions of additional counsel?

A Yes. Mr. O'Connor did ask me for suggestions.

Q And can you share with the Court and with the record the substance of those conversations?

A I agreed to try to help. And as I tried to do that, I realized that the lawyers that I would contact who would be, you know, somewhat equivalent to Judy Clarke -- no one is equivalent to Judy -- were very experienced, quality learned counsel. I would have to tell them what had gone on in the case in terms of counsel, and it became a real stumbling block to me to believe that I could persuade somebody to come into the case against the context of what had happened.

That said, I tried. I did reach out to some lawyers. I made some recommendations. I think I made some recommendations to Mr. O'Connor.

Q And did those recommendations include a woman by the name of Denise Lebouef?
A Yes.
Q Do you know how to spell Ms. Lebouef's last name?
A D-e-n-i-s-e. And Lebouef is capital L, lower case E. Actually all lower case the rest of it, b-o-u-e-f. Capital L, lower case E, B, like boy, o-u-e-f.
Q Did you also have discussions with Mr. O'Connor about the availability of the Federal Public Defender's Office in San Diego --
A Yes.
Q -- to accept an out-of-district appointment to assist Mr. O'Connor in his representation of Ms. Montgomery?
A Yes, I did. There was a discussion about bringing Judy Clarke back into the case as a Federal Defender based in San Diego and for that office to assume the role of Federal Defender in the case in place of the Western District of Missouri Federal Defender Office, and he seemed open to that, at least in the -- in our email communication.
Q Mr. O'Connor seemed like he was interested in pursuing that possibility?
A Yes. He thought it would make sense to have that kind of continuity, and he appreciated the skill and knowledge of Judy Clarke.
Q And the Federal Defender in San Diego at the time, was

that a man by the name of Reuben Cahn?

A Yes. C-a-h-n.

Q And if he had accepted an out-of-district appointment, would he have been in a position to provide the same amount of funding and resources as the local Federal Public Defender's Office?

A Yes. That's true with every Federal Defender who is counsel or co-counsel in a federal death penalty case, budgets the case, out of their own budget.

Q Does the Office of Defender Services, now the Defender Services Office, sanction such out-of-district appointments?

A Yes. There's a protocol for getting it done that requires chief judges of the two circuits communicating with each other, but yes.

Q And that protocol is approved by the Defender Services Committee?

MR. KETCHMARK: Again, Your Honor, I don't see the relevance of any of this.

THE COURT: What's the relevance? I mean, there are a lot of people who could have been brought in but weren't. We're not going to talk about all of them, are we?

MS. HENRY: The relevance is that it will impeach the testimony later of Mr. O'Connor about the fact he said the only person -- I've interviewed him so I know what the testimony is going to be. This is simply impeachment of a

later witness rather than call Mr. Burr back. I know what the testimony is going to be. It is going to be inconsistent.

THE COURT: You've established that Mr. Burr says --

MS. HENRY: I'm done.

THE COURT: Thank you.

Q (By Ms. Henry) After those communications with Mr. O'Connor, you learned that Mr. Duchardt had actually been appointed in the case?

A I did.

Q And did you have a track record of communications with Mr. Duchardt?

A Yes.

Q And what was that track record?

A There were none.

Q Did you have any communications with Mr. Duchardt about this case?

A I don't think so. I don't recall any. And going back through my notes and emails, I don't recall. I don't think so. That was typical for Mr. Duchardt with respect to our project. He rarely consulted with us.

Q Was there a decision made in the project to change personnel assigned to the Montgomery case in the hopes of maybe if somebody else was resource counsel, Mr. Duchardt would be willing to accept the assistance?

A Yes.

Q Who was the person who was assigned that task?
A A person in the Federal Death Penalty Resource Counsel Project named Richard Ney -- that's N, like Nancy, e-y -- who lived in Wichita, I think, Wichita, Kansas, was assigned to be the resource counsel.
Q And was the hope that perhaps somebody more locally, midwestern, a new face might draw Mr. Duchardt in to accepting some assistance?
A Yeah. The sense within the project was over the years that none of us had been successful in engaging Mr. Duchardt to consult with us, and we thought that maybe a new face and somebody more local might have been successful.

MR. KETCHMARK: Again, Your Honor, I'm going to object to this line of questioning. I don't know that it's relevant. I think he established that Mr. Duchardt did not reach out to them. That's part of the record. What steps they took to try to entice him to come to -- have contact with him, I don't know why this is relevant to what we're ultimately trying to determine why the Court set an evidentiary hearing.

MS. HENRY: We're going to get into Mr. Duchardt's sworn statement filed with this court.

THE COURT: In what regard?

MS. HENRY: In his regard that these resource counsel folks are clubby and cliquish and unwilling to assist him.

THE COURT: Unwilling to assist him?

MS. HENRY: Yes. That's the representations that he's made to me and I believe in his statement. Mr. Duchardt will testify again --

THE COURT: Okay. All right. So there is a new resource counsel that was named.

Objection's overruled.

MR. KETCHMARK: And, again, Your Honor, I hate the fact that we're sitting here -- and the line she's going down now is to impeach Mr. Duchardt when he hasn't even testified. It seems a little -- I understand from the convenience standpoint that she doesn't want to subject Mr. Burr to being recalled, but maybe she could preface that this is what she's trying to establish and we can figure out the function of her questioning and this particular line of inquiry would be helpful.

MS. HENRY: That was my last question.

THE COURT: All right. In order to avoid recalling Mr. Burr for his testimony, I will allow it.

MS. HENRY: Thank you, Your Honor.

Your Honor, if I could now take a break from my direct examination to address Your Honor about my next line of questioning. As you're aware from the way I was trying to structure this, I intentionally skipped the period from April 20th until Mr. O'Connor's testimony.

At this point, anticipating Mr. Ketchmark's and Mr. Valenti's objections, I would like to inform the Court about another area that I would like to go into with Mr. Burr, but I don't want to draw the Court's ire by doing it in light of all the objections. I'd like to explain our position and make a record as to why we feel like Mr. Burr's testimony on this issue is relevant, not to claims to the Court 1, 2, and 3 of the motion that the Court has already ruled on but to other claims in the case. If I may be heard.

THE COURT: Let's hear your position on this.

MS. HENRY: My position on this, Your Honor, is several fold, and I apologize for the inconvenience this may cause.

It is certainly true that much of the evidence relating to Ms. Hunt and Ms. Clarke's exiting from the case is relevant to the claims on which the Court has already ruled; however, it is equally relevant to other claims on which the Court has granted an evidentiary hearing. Those claims are several fold.

This Court was gracious to grant us a hearing on almost 50 issues, 23 issues of ineffective assistance of counsel, all of which the Court will need to consider under Supreme Court precedent under the totality of the circumstances and cumulatively. The Supreme Court's been clear they're not to be dealt with bit by bit.

I think that we have established the standard of care, and we have established the baseline for deficient performance. We are now going into an area of the impact of the exiting and the disruption of the trial team, that it would have had on the subsequent trial team and their ability to competently represent Mrs. Montgomery, which we believe both goes to their deficient performance, Mr. Owen's continued representation in the case, his failures apparently, as will be clear throughout the day, to communicate the institutional knowledge that had been gained through these lawyers to Mr. Duchardt and to Mr. O'Connor. It will establish the prejudice from that claim.

It will further establish Claims 1, 2, and 3 of the motion, which the Court's ruled on and we respect that ruling. It did not deal with Mr. Owen's ineffectiveness in handling that situation, nor that of Mr. Conrad's. Their ineffectiveness is very much a part of what led to the ultimate ineffectiveness and dysfunction in the final trial team in this case.

We seek to present the testimony to show that Mr. Owen was ineffective in representing Lisa Montgomery during this time frame as was for some time, a brief period of time --

THE COURT: During what time frame are you talking about?

MS. HENRY: I'm now talking specifically about

April 20th through the appointment of Mr. Duchardt or Mr. O'Connor. I believe the record will show that Ms. Hunt withdrew on May the 10th. Mr. O'Connor was appointed on May the 12th, but Mr. O'Connor began working on the case or at least his time records show that he met with Your Honor and Judge Maughmer on May the 9th. So he had some involvement with the case beginning May the 9th.

I'm referencing that time frame and the activities that occurred during that time frame as they relate to Mr. Owen being ineffective, acting deficiently in a way that prejudiced Mrs. Montgomery with her relationships with subsequent legal counsel, and I believe that that evidence is relevant to our ineffective assistance claim -- counsel claim.

It is also relevant, Your Honor, to our claims regarding Mrs. Montgomery's incompetence to assist counsel; and to be very clear with respect to our theory about why she was incompetent, we are not claiming that Mrs. Montgomery did not understand the role of the Court, the jury, and the prosecutor or her own counsel. Instead, we are maintaining that she was incompetent to rationally assist her lawyers because of her despondency that resulted in the removal of these two women lawyers from her case, just as the removal of Anita Burns had been a rupture in her attorney-client relationship, as well as that effective turnover that resulted in additional prejudice to Mrs. Montgomery.

And, finally, Your Honor, I would note for the record that on page 7 of his Honor's order which granted this evidentiary hearing, his Honor granted an evidentiary hearing on the claim of ineffective assistance of appellate counsel for failure to raise claims -- many of the claims that are raised in our motion.

The government has defended on the, for lack of a better word, to use our shorthand in the case, the Judy Clarke issues. They have defended on the grounds that Mrs. Clarke should have done something, filed a motion with the Court, filed a motion with the Court of Appeals that Mrs. Montgomery herself had waived the claim by failing to independently file a motion or file some complaint in the Court of Appeals.

An evidentiary hearing was granted on the effectiveness of counsel for defaulting claims; and as the Court well knows, in order to establish ineffective assistance of counsel under those circumstances, we have to show cause and prejudice, and so we would wish -- if I'm misreading the Court's order, then I'm misreading the Court's order. Again, as stated as a habeas lawyer -- trial lawyer by training but habeas lawyer by profession.

THE COURT: Okay. I can tell you we're not getting back into the issue of the legitimacy or propriety of the removal of Judy Clarke. That's been decided.

MS. HENRY: Yes, sir. And I do not want to get into

the legitimacy or propriety of it. I would like to present evidence -- I understand you've ruled on that. I would like to present evidence on the decision to come to you in the first place being ineffective assistance on the part of David Owen. That's different, I believe, from claims 1, 2 and 3. 1, 2, and 3 had to do with Your Honor's decision.

THE COURT: Well, I think the record is clear that team was dysfunctional. Do you disagree? The Susan Hunt, David Owen, Judy Clarke team was dysfunctional.

MS. HENRY: I think we would be able to show evidence that team could have been put back together and have worked much more productively for Mrs. Montgomery.

THE COURT: But we're not getting into that.

MS. HENRY: I'm not trying to argue that with Your Honor. Please, I'm not. I'm suggesting to you that we would be able to present evidence that Mr. Owen -- Mr. Owen, not Your Honor's decision -- Mr. Owen's decision, Mr. Conrad's decision to act as they did as opposed to take alternate remedies. That was ineffective assistance of counsel, and that is a claim on which we wish to present evidence, and you are in control of the --

THE COURT: Okay. I don't understand -- I mean -- are you saying that O'Connor and Duchardt were ineffective because they allowed David Owen to continue to participate?

MS. HENRY: I will be saying that, but that's not

the point of this evidence.

THE COURT: Okay. Then what's the point you're making now?

MS. HENRY: The point I'm making now is that Mr. Owen's reckless actions resulted in real harm to Mrs. Montgomery and her ability to assist counsel, and Mr. Duchardt and Mr. O'Connor will tell you that. They had a very difficult time engaging with Mrs. Montgomery. That goes to her competency and it goes to their ability to represent her.

THE COURT: Okay. And is that because of some interaction that David Owen had with her?

MS. HENRY: Because of David Owen's actions which resulted in the disruption in the trial team. That disruption impacted Mrs. Montgomery.

THE COURT: I've decided what happened with that team, and I've decided that team could not function and I dealt with that. And that's been decided and that's not going to be re-litigated here. So maybe I just really don't understand what you're getting at. I mean, I accept that that team did not operate in Lisa Montgomery's best interest.

MS. HENRY: I do understand Your Honor's ruling. I really do. And I don't want to argue with you. I promise you that, and I am trying to make sure I preserve a record. So I would request that our objection be noted under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution and preserve our record.

THE COURT: Okay.

MS. HENRY: Thank you, Your Honor.

THE COURT: Mr. Ketchmark, Mr. Valenti, either of you want to speak any further to any of that?

MR. KETCHMARK: I think the record is sufficient, Your Honor.

THE COURT: All right. Thank you.

Is that all of Mr. Burr?

MS. HENRY: Yes.

MR. KETCHMARK: May it please the Court.

THE COURT: Mr. Ketchmark.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Mr. Burr, kind of picking up on the theme -- you were present in the courtroom during that exchange, and I think you would agree with me, would you not, that the trial team as it existed with Ms. Hunt, Mr. Owen, and Ms. Clarke was dysfunctional?

MS. HENRY: Your Honor, I'm going to object. I apologize. But I was prevented from getting into this area so if we're not going to discuss this time --

MR. KETCHMARK: I can rephrase my question.

THE COURT: All right.

Q (By Mr. Ketchmark) Let me ask you this: You were involved -- and it sounds like through your testimony in

direct -- rather intimately in the team concept and team makeup of Ms. Montgomery's defense prior to April of 2006, correct?

A Yes, I was.

Q In fact, I think your testimony was that your first meeting was at the public defender's office here in Kansas City as early as January of 2005; is that correct?

A Yes.

Q So your involvement begins literally almost within less than a month of Ms. Montgomery being charged in this case, correct?

A I think that's accurate.

Q If I were to represent that the crime happened on December the 16th of 2004, roughly a month you are already involved in this?

A Yes.

Q And I think you indicated, did you not, Mr. Burr, that you had a problem with this particular public defender's office in terms of reaching out and talking to you as it related to consultation on decisions of learned counsel? Am I correct in summarizing your testimony that happened a couple hours ago?

A Yes, there was a history of that.

Q Okay. But ultimately while you didn't have input in the decision on Ms. Hunt, you did immediately jump in and start to get involved and come out and have meetings with these individuals who ultimately were representing Ms. Montgomery at

that time; is that correct?

A Sure. That was not atypical. Whenever somebody was appointed, whoever they were, whoever recommended them, however they came to be appointed, once they were appointed, we reached out to them.

Q And the other thing, and just so I'm clear and I have an understanding, you are not suggesting that there's any statute or regulation that requires private counsel who might be appointed under CJA as learned counsel that they have a duty and an obligation to reach out to you?

A No. There's no statutory obligation for appointed counsel to reach out to my project.

Q So with respect to Mr. Duchardt and the testimony that you ended with, there is nothing that is required; you are a resource that Mr. Duchardt or others can reach out if they believe that that would assist them in doing their obligations and duties, correct?

A That's correct in part. For counsel who are familiar with the Spencer Report, the report I mentioned, they would certainly after reading that report would think it was in their client's best interest to reach out to us.

Q And we understand what the ABA Guidelines are and we've heard testimony with respect to the Spencer Report, but my point is other than that being a suggestion and a recommendation, there's not a requirement that private counsel

reach out to you; is that a fair statement?

A That's correct.

Q With respect to the discussion that Ms. Henry had with you on this notion of reaching out to the department and this important time frame that exists prior to a presentation of mitigation when the initial decision is being made on whether or not to authorize or not authorize. Do you recall that discussion and that line of questions?

A Yes.

Q And Ms. Henry suggested that's an important time frame in the case because that's an opportunity when the defense can put together not only a mitigation argument but if they have evidence, they can put that together and that can be very important and a very important step, correct?

A I think I testified to that.

Q Right. So that's your testimony and I think everybody here would agree that's what she was talking about with you in that regard?

A Yes.

Q And I believe if I'm correct, sir, that your testimony was that this team was not functioning and they hadn't done what they needed to do at the time that stage arose in September of 2005. Is that consistent with your recollection?

A I'm sorry. Was not function --

Q They hadn't done what they needed to do, in your

opinion, at the time that this opportunity to present mitigation to the department?

A They were starting to do it. I think that -- I mean, it's a process.

Q I understand.

A And the process started with Lisa Rickert's work. Her work was valuable.

Q Did you bring Ms. Rickert into the case? Was it your suggestion; do you recall?

A I don't remember. I suspect it was because I -- I don't know how they would have known how to reach out to Lisa Rickert. She lived in Wisconsin.

Q Okay. But so the process began with Ms. Rickert and you talked about the process is getting records and doing interviews, correct? And you're basically creating the picture however it plays out of what the mitigation would be, correct?

A That's correct.

Q And Ms. Clarke is obviously, by your own testimony, consulting and meeting with the team I think you said in July of '05 when you met in Tulsa, correct?

A That was her initial contact with the team.

Q Before she actually got appointed and came into the case as pro hac vice, correct?

A Yes.

Q At any point, sir, prior to this meeting with the

department in September, did you tell anybody on this team that you're going too fast, that you need to ask for an additional time before you do this presentation because you're not ready?
A I don't remember whether I said that or not.
Q Let me ask you this, though. Obviously that's something that if you thought that, that would be important to communicate, correct?
A Yes. That's why I say I don't remember a specific --
Q Conversation?
A -- conversation. But it was quite apparent that from the time Judy Clarke and Deb Garvey and David Freedman actually became involved in the case, it was a fairly short time between them and September.
Q Let me ask you this: Would you agree with me that in these cases -- because now we sit here some, what is it, ten years removed now, eleven years removed now -- that documentation, documentation, documentation is going to be important because memories fade?
A Absolutely.
Q And that's why we have been provided and we have copies that have been admitted into the court as exhibits, copies of emails and exchange and correspondence between yourself and the trial team that was existing at that time?
A I'm not aware of that, but there were emails.
Q Let me show you, if I could, sir, what's a document in

the court, and I will show you -- it is Document No. 151-6. It is a two-page document, and I ask you to just take a look at that as an example.

MS. HENRY: Excuse me, Your Honor. If we're going to show the witness a document, can I be provided with a copy?

MR. KETCHMARK: I only have one copy. This is a court document. I will be happy to show it to you after I show it to him before I ask questions.

A This relates to after Judy Clarke was out of the case.

Q (By Mr. Ketchmark) I understand. But there's correspondence and documentation that's going on?

A Oh, yeah. No, there were lots of emails back and forth.

Q And letters back and forth?

A I'm sorry?

Q As well as letters?

A Yes.

Q You received letters from Ms. Hunt; you received letters from Mr. Owen?

A Mostly emails but I remember at least one letter from David Owen, and there may have been letters from Susan Hunt as well.

Q In fairness, there might have been letters that were attached to emails?

A Yes.

Q But there is correspondence going back and forth?
A There is written communication going back and forth.
Q Do you have, sir, as you sit here today, any written communication where you sent to members of the team that they were making a mistake and that they needed to ask for additional time before they made their presentation in mitigation to the Department of Justice?
A No.
Q You would agree with me too, would you not, sir, that based on your experience extensively in this area, that the department, once the decision is made, you can always go back if circumstances change or additional information comes to light?
A Yes.
Q So that would have been something that any of the iterations of Ms. Montgomery's trial team could have done, correct?
A Yes, with the appropriate change in circumstances or information.
Q So Ms. Clarke, if she would have been in the case and would have seen things, she could have gone back to the department and said, Hey, here's additional information. We didn't have this when the first presentation was done. We want you to consider this now.
A Yes.

Q And similarly when Mr. Duchardt or Mr. O'Connor get in the case, if they start to see things developing and changing, they could go back to the department and say, Circumstances have changed. Would you consider taking and de-authorizing this case?
A Yes.
Q Are you aware whether or not Mr. Duchardt or Mr. O'Connor ever did that?
A I'm not because I was not resource counsel to them. I wasn't assigned as resource counsel, and I have no idea. I did not keep up with the case after Richard Ney took over as the resource counsel, except, you know, from a great distance.
Q Just generally?
A I mean, I knew when the trial started. I knew the outcome, all of that, but I didn't know any of the particulars of what was going on.
Q You talked about the trial team, and my understanding when we're using that term here, sir, I'm referring to Susan Hunt, David Owen as the two. This is that time frame. Okay? I want to frame that so you understand what I'm asking this question.
A Okay.
Q I believe, and correct me if I'm wrong, but I heard you testifying about your belief that they were focused on guilt and innocence and whether or not somebody else potentially

could have been involved and that they didn't really understand the concept of mitigation so they were defaulting more to what they were comfortable with, which was the guilt and innocence investigation; is that an accurate statement?

A That is an accurate statement.

Q Similar question with respect to documentation, sir. Do you have any emails or letters or memos that you gave to them as resource counsel suggesting, Guys, you're making a mistake. This is not where you want to be putting your focus. Don't look at that, look at this.

A I don't know if there's one particular email that said that in those terms, but my whole effort to bring Judy Clarke in to work with them was premised on that, and they understood that. Susan Hunt in particular who is who I communicated more with when just she and David Owen were counsel.

Q And I understand and I appreciate, sir, that your focus in bringing Ms. Clarke in was the focus you thought mitigation was not being addressed and that they needed somebody with that level of expertise to focus on mitigation, am I correct, and that's what your meeting was with respect to?

A Yes. And I know I communicated in some fashion with them, whether it was orally or by email, that that's why Judy Clarke needed to come in.

Q But that, I don't believe, is responsive. What I'm asking, sir, is the focus of their making a mistake by focusing

on guilt and innocence and whether somebody else could have been responsible. Did you ever tell them in writing in a memo, in an email, Don't focus on guilt and innocence, only focus on mitigation?
A I don't remember whether I did or not. I certainly communicated that to them at least orally.
Q And I assume, sir, that you are familiar with the statutory aggravating and mitigating circumstances in the federal death penalty statutes and sections?
A Yes.
Q And you're aware that one of the statutory mitigating factors is whether or not there is somebody else who is basically more culpable in the punishment than they ultimately receive, paraphrasing?
A Yes.
Q So obviously if there's information to suggest that maybe somebody else was involved, that could be very significant factual information because that would support a mitigating argument that, hey, there's somebody else who could have done this and they're not even charged, and that could mitigate punishment?
A It certainly could if it was based in reality.
Q But that's something that if you received that information, you would counsel them that that's something, and I think as you indicated, you're not going to ignore it and you

have to caution as to the source of that information, correct?
A Exactly. Yes.
Q While you were involved in this case, would you agree with my characterization that the trial team, as it existed, was dysfunctional?

MS. HENRY: Your Honor, same objection as I had earlier. If Mr. Ketchmark wants to explore this area, I will be afforded the same on redirect.

MR. KETCHMARK: And I think, Your Honor, the basis of my question is I think it goes directly to -- he has an interest in this matter. It goes to his credibility. It goes to weight that the Court can determine.

He was involved in the bringing in of Lisa Rickert. The Court has heard testimony with respect to how she functioned and the impact she had on the trial team.

He was responsible in part for bringing in Ms. Clarke. We know how that evolved into a situation of chaos, and so I think that it's relevant, not as it relates to what would have and could have happened had Ms. Clarke stayed on, but would have and could have happened if they would have developed a functionality by going into this altered reality. It goes to what was the status of the case while Mr. Burr was involved as a consultant.

THE COURT: Objection's overruled.
A I would agree with you that the team was dysfunctional,

but I would have to explain how I thought it was dysfunctional.

Q (By Mr. Ketchmark) There was problems and you were concerned and I think your testimony is they were floundering. They weren't focusing on the right things and there were problems going on and issues and combating between personalities. Is that a fair and accurate representation?

A As to the combating between personalities, I didn't see it as mutual combat. I saw it as increasingly uncomfortable with trying to work with Judy Clarke, with Judy Clarke making efforts to overcome this uncomfortableness and with me trying to help facilitate that as well. I did not see Judy Clarke objectively engaging in any behavior that a rational person in a defense team would react negatively to.

Q And let me ask you this, sir: Other than the meetings that you had here in Kansas City on occasion, is it a fair and accurate statement that there were things happening with this defense team, whether it be meetings or interviews or discussions that you were not a part of or privy to?

A Certainly.

Q In fact, a substantial number of them because you weren't here?

A I was not here. I was not privy to all the interactions between the team, not at all. I was -- I saw what was reflected in the emails in the extent I was copied, and generally I was. I heard from -- at least from Susan Hunt and

Judy Clarke about problems within the team. So I heard it from their perspectives. I may have heard from David on his own or at least in response to my asking him questions, I heard David's perspective.

Q And David in fact sent you a letter outlining kind of what his position was with respect to all of this dated May 2nd of 2006. Does that sound correct?

A Yes. I think that was in response to something I had sent out, yes.

MR. KETCHMARK: That's all I have.

THE COURT: Ms. Henry.

REDIRECT EXAMINATION BY MS. HENRY:

Q Mr. Burr, this document is not an exhibit in this evidentiary hearing, but it was attached to our reply, and I'm asking some questions about it. But the record should reflect I placed what is docket entry No. 151-6 up on the Elmo for you to look at. I'm going to ask you some questions about it in just a minute. But I want to ask you just sort of generally about the idea of emails.

Would you agree with me that oftentimes miscommunications can come about through email exchanges because there's a loss of tone in context; is that fair to say?

A I'm sorry. I didn't understand what you were saying.

Q Would you agree with me that a lot of times if you wanted to -- I'll rephrase the question. It was a really bad

question so we'll strike it.

Will you agree with me, sir, as just a means of communication if you want to deliver information that's not necessarily going to be well received, it's better to do that on the phone or in an in-person meeting rather than an email? And I'm not referring to this.

A It depends on the circumstances. You know, emails can loosen restraints that we should have, which we would have in face-to-face communications or telephone communications. So when communicating about a difficult subject, I try to choose the mode of communication that I think will allow most reflection on the part of the person I'm trying to communicate with, and it varies depending on the situation.

Q By the time that you're sending -- or you're receiving and sending emails, this email which is 151-6 in the record, May 1st of 2006, the record should reflect by this time Mrs. Clarke was out of the case on the 20th and Ms. Hunt and Mr. Owen had subsequently gone to the Court with their own problems in working together on the case. Had they come to you or had Susan come to you for help in trying to put the case back together?

A I think Susan had, yes.

Q And she had sent you a letter sort of just to outline the problems that had evolved?

A Yes. That's correct.

Q And you sent this email response to Mr. Owen because by this point the communication with Mr. Owen was basically shut down?
A Yeah. I can see from the bottom of this email Susan Hunt had sent me a letter trying to explain from her perspective what the problems were between her and David, and I probably had had a telephone communication with her as well, and so this email today that was triggered by that and by the events that were going on.
MS. HENRY: And just so the record is complete on this particular issue, which was addressed by Mr. Ketchmark in his cross-examination, that letter has already been introduced -- Ms. Hunt's letter has already been introduced into evidence, and I'm not going to waste the Court's time trying to figure that out, but I represent to the Court that Mr. Hunt's letter is in evidence as well as Mr. Owen's letter is in evidence.
Q (By Ms. Henry) With respect to this email that Mr. Ketchmark was asking you about, did you address with him what you addressed with me on direct examination about the difficult time you were having recruiting additional counsel to help him on the case?
A Yes.
Q And had Mr. Owen and Ms. Hunt actually asked you to help them find a replacement for Mr. Owen or Ms. Clarke so they

could continue on the case together?

A I do believe they did. I think that was actually on a conference call with the two of them.

Q And so they realized that they, the two of them, were in the same situation that they had been back in October of 2005, two individuals who were not capable of representing Mrs. Montgomery on their own?

A Yes.

Q And you were telling them at that point you were having a difficult time recruiting anyone who was willing to come into the case?

A Yes.

Q And you were quite blunt in this email. Can you share with the Court what it was you were communicating to Mr. Owen?

A I was as blunt as I can be.

Q And you're not a very blunt person?

A Well, I try to be kind to people. Maybe that interferes with bluntness at times.

Q But your memory at the time in May of 2005 was that David had a need to have control over the case and that that was having a detrimental effect on the case?

A Yes.

Q And Mr. Owen continued to be counsel for Mrs. Montgomery through the trial of the case?

A To my knowledge, that's correct. Yes. I was not

personally involved in that piece of the case, but yes.

MS. HENRY: Just one moment, please.

Thank you. That's all I have.

RECROSS-EXAMINATION BY MR. KETCHMARK:

Q Just so we're clear, you had worked with Ms. Clarke or you knew who she was before and you were responsible for bringing her into this case; is that a fair statement?

A Yes and yes.

Q And so you had a vested interest in seeing this work with her?

A I had a vested interest in seeing Ms. Montgomery effectively represented, and I believed that having Judy Clarke in the case provided the most likely possibility of that.

MR. KETCHMARK: That's all I have, Judge.

MS. HENRY: Thank you.

THE COURT: All right. Thank you, Mr. Burr. You're excused.

THE WITNESS: I just want to let you know that I'm not the Richard Burr from North Carolina. I get mixed up with him all the time.

THE COURT: The record will duly note that.

(Witness excused.)

MS. HENRY: Your Honor, we would call Judy Clarke.

THE COURT: Ms. Clarke, would you come right up here to the witness stand, please.

JUDY CLARKE, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning, Ms. Clarke.

A Good morning.

Q Would you please state your name and spell your last name for the record.

A I'm Judy Clarke, C-l-a-r-k-e.

Q And that's Judy with a Y?

A That's Judy with a Y, yes.

Q And can you please describe for us what your profession is?

A I'm a lawyer.

Q And how long have you been licensed to practice law?

A I was admitted to the bar in 1977, December 1977.

Q Where did you go to law school?

A I went to the University of South Carolina Law School for two-and-a-half years, transferred out to San Diego. I went to the University of San Diego Law School for a semester and transferred back to South Carolina, and I graduated from South Carolina in '77.

Q And where is your undergraduate?

A Furman University in Greenville, South Carolina.

Q And after you graduated from law school, did you pass the bar in any states?

A California.

Q And do you have a bar license in any state other than California?
A No.
Q Besides being a California bar lawyer, are you admitted to practice law in any other jurisdictions?
A Well, I was the Federal Defender in Spokane, Washington, for ten years and was authorized to practice in the Eastern District of Washington and the District of Idaho but they did not -- the Court did not require me to take the bar exams for either of those states.
Q Are there several district courts that will allow Federal Public Defenders to appear without requiring them to be members of the state bar?
A I think that there are. My experience was in San Diego. They had at the time -- I haven't looked into it recently, but they had at the time if you were hired by the Federal Defenders, you had to take and pass the first available California bar if you were an out-of-state lawyer. Spokane, Washington, obviously allowed me to practice without being a Washington lawyer. They did in Idaho as well.
Q So was your first job outside of law school as a public defender?
A Well, yes. My first job as a lawyer was with the Federal Defenders of San Diego.
Q And how long did you hold that position?

A Well, I worked -- I started work in 1978, about February 1978 in San Diego. I was a trial attorney at that office until -- well, I was promoted to a trial attorney, senior trial attorney, chief trial attorney. I became a director of that organization in November or December of 1983.

Q Is that organization a Community Defender organization?

A It is. As the judge probably knows, there are two types, Federal Public Defenders and Community Defenders, and it's just a different sort of structure, but governed by the same administrative office and the same funding regulations, just that the difference was that the Community Defender director was hired by a board of directors which were typically community lawyers, and the Federal Public Defenders were hired by the circuit, I think with the recommendation of the district court or the input of the district court.

Q So if we were to look at an organizational chart, when you became the director of the Federal Defender Services of San Diego, you were basically at the same level as what Laine Cardarella is now in the Western District of Missouri?

A Correct. That's correct.

Q Was that a rather large office?

A Well, when I was the director of the organization, I thought it was large. It's comparatively very small now. I mean, we had -- we went from, you know, six to eight to ten to 12 to maybe 14 lawyers while I was there. It's really large

now.

Q And then you left your position as the director of that office at some point and where did you go?

A I left the San Diego Federal Defenders in --

MR. VALENTI: Your Honor, I believe much of her biographical data is within her declaration. It's an admitted exhibit already. We don't take exception with that if Ms. Henry wants to move on.

THE COURT: Does that suffice, Ms. Henry?

MS. HENRY: Your Honor, if I could just ask a few other questions, then we'll move on.

THE COURT: All right.

Q (By Ms. Henry) I think the point I'm hoping to make, Ms. Clarke, have you spent -- you spent a goodly portion of your career as a -- what we would call a normal regular trial attorney; is that fair to say?

A If you're talking about when did I begin to do death penalty cases, I was a lawyer, a real lawyer, and my first capital case was in 1995, '96.

Q And you've been --

A But I practiced -- if you're trying to point out, I practiced in the federal courts as a Federal Defender for most of my legal career up to that point, yes.

Q And you're also familiar, are you not, as the director of both the Federal Defender Services in San Diego as well as

Federal Defender --
A Federal Defenders in eastern Washington and Idaho.
Q -- of the budgetary constraints and concerns and organization structures of Federal Defender offices?
A Sure.
Q And your office in Washington actually had a Capital Habeas Unit within it; is that correct?
A That's correct. It started while I was there.
Q But it had its own director, Joan Fisher?
A That's correct.
Q Ms. Clarke, you have -- I apologize. You provided a declaration in this case; is that correct?
A Yes.
Q And that declaration was signed by you in March of 2013; is that correct?
A If that's the date. I don't recall the date.
Q I apologize. I don't have that exhibit number handy.
MR. VALENTI: 63.
MS. HENRY: 63. Could I have 63?
Q (By Ms. Henry) Ms. Clarke, showing you on the Elmo screen there --
A Yes.
Q -- what's previously admitted as Movant's Exhibit No. 63. Is that a copy of your declaration?
A It appears to be, yes.

Q And that was signed by you on the 14th day of March, 2013?
A Right.
Q And Mr. Valenti and Mr. Ketchmark is correct that you have detailed your -- highlights of your federal experience in that declaration; is that correct?
A I'm sure I did some biographical information, yes.
Q Thank you.
Let's move on. Ms. Clarke, have you participated in -- let me direct your attention to the point in which you became a member of what's called the CRC. What is the CRC?
A Capital Resource Counsel Project. The death penalty came back to the federal courts in the -- well, really mid '90s to late '90s and began to become an issue for the Federal Defenders. So there were -- there was a resource counsel project that did consulting to private practitioners who were on contract to the Administrative Office to consult in capital cases, but it became apparent that it would be very helpful to have salary staff Federal Defenders who could be loaned to Federal Defender offices to assist with their capital cases. So that's how that project arose, and there were two Capital Resource Counsel positions funded by the Administrative Office and I was hired into the first one.
Q And did you have staff with you in that project?
A Well, the lawyer's position was supposed to come with a

paralegal position attached to it, and my so-called paralegal position very quickly converted to be filled by a guy named David Freedman who had substantial capital mitigation experience and a wealth of knowledge of mental health issues. So in conversation with the oversight committee, the group of Federal Defenders that oversaw my work, we decided to hire David Freedman into that position rather than a paralegal because of the wealth of knowledge that he could bring to the program.

Q And so were you available to any Federal Public Defender organization who was appointed in a federal capital case to work with them as resource counsel?

A Not only available but expected to assist.

Q And did Mr. Freedman also provide that assistance?

A Correct.

Q Was it necessary for you to be appointed counsel in order to provide that assistance?

A Well, you could go into a case in a couple of ways. Either as a member of their staff essentially assisting on the case or as counsel of record appointed by the district court.

Q Were there protocols that were adopted that allowed you to engage in that role of more consulting as opposed to direct representation?

A Sure.

Q And in addition to providing training to Federal

Defender organizations in federal capital cases in that role, did you also participate in training as faculty at various seminars?

A Throughout my career?

Q Yes.

A Yes.

Q Can you estimate how many seminars you have presented in?

A Oh, gosh, you know, I really cut back on that probably 20 years ago as my capital work became all-consuming, but I think I counted at one time. I had done seminars in about 40 states. I was very active in the Federal Defender Training Program and then through the National Association of Criminal Defense Lawyers with the Administrative Office and national training.

Q In fact, you've been the president of the National Association of Criminal Defense Lawyers?

A I was, yes.

Q Have you produced textbooks?

A Well, San Diego produced a Defending the Federal Criminal Case Manual and I was active in keeping that book alive. And I went -- and I published just a guideline grapevine when the sentencing guidelines sort of took over our lives. I went to Spokane and I created the My Little Red Rules Book which was sort of a handy little reference for courtroom

evidence issues. We produced my other book, we called it, which was a compilation of motions for lawyers to have and to use in various cases.

I think when the Bail Reform Act came out in the mid '80s or so, I wrote the Bail Reform Act Reporter for the ABA. I think the ABA published it. So, yeah, I was active in producing materials.

Q Did your project also produce a guide for lawyers, little assistant guide for lawyers in the federal capital cases?

A Yes. We kind of took My Little Red Rules Book concept and brought it to the Federal Death Penalty Act. I think we started doing that in about 2009.

Q And you update it every year?

A Pretty much. And just produced a new one.

Q And the record should reflect I'm holding a copy of the 2015 rule book, and there's a 2016 rule book now?

A Correct.

Q And that's handed out at the federal death penalty strategy sessions?

A It is. And made available to all of the capital teams.

Q Can you describe for the Court your approach to working with federal death penalty -- not federal death penalty -- Federal Defender offices who find themselves -- strike that.

When you were CRC counsel, can you describe what

your approach was in working with Federal Defender organizations when they were appointed to federal capital cases?

A Well, I think my -- I think my first case was in the Eastern District of Virginia, and I went in as counsel and as a member of the team there, and I picked up another Eastern District of Virginia case fairly quickly on the heels of that and actually tried that case. So I'm not exactly sure what you mean. I became a member of the team and would participate in developing the investigative plan, you know, identifying records to be collected, talking about how to work with the client. I would be part of that.

Q Describe your concept of the team approach.

A Well, the capital cases are very, very draining, time-consuming efforts. Often with clients that suffer from a variety of impairments. So you have to think about the whole. So one of the things that a team -- a team needs to consist of -- the ABA Guidelines lays this out. The team needs to consist of at least two lawyers, one of whom is so-called learned in the law of capital cases. That's the federal rule. A mitigation specialist who is trained in, you know, meeting with the witnesses, to elicit sensitive matters. I mean, I could go on and on about the mitigation specialist. But then a fact investigator typically. There can be a paralegal. There can be a number of people participating in a team effort.

So the team needs to think about how to work with a client, how the interactions will go with a client, how many people and how often the team members will meet with the client, how that will be reported back to the other members of the team.

My belief is that the more members of the team that can interact with the client in a general way is healthy because it can help the client develop trust in the team's efforts, and everybody sort of gets a little different relationship with the client, and you learn a little bit about how the client interacts with the world by watching them interact with team members.

So that's, you know, one huge component is figuring out how to work best with the client and keeping the team engaged and a conversation with the client.

Q Let me ask you -- I'll stop you there. I want to ask you a question about this team approach that you have. When you're appointed on a case to work with a Federal Defender organization and you bring all these members of the team together, do you impose a rigid hierarchy on the team members?

A I sure hope not. When you say "your team approach," I mean the team approach is one adopted by the American Bar Association in the guidelines for representation in capital cases. So I can't claim the credit for this team approach. And I also had the incredible opportunity to work with some

really fine mitigation people and lawyers to learn a lot about team work, but imposing a hierarchy would not be the team concept.

Q And so I'm using the phrase "your," but what you're saying is it's not unique to you. It's the practice. That's the professional norm?

A Right.

Q And when you are on these teams working together without a rigid hierarchy, is collaboration key?

A It is absolutely key. Absolutely. I mean, that's how -- sometimes it's agonizing to have such collaboration because everybody has so many different ideas but ultimately the product is better.

Q And do you -- in your practice with the teams you've worked on, is it your experience that the teams meet often?

A Sure.

Q And can you describe what sort -- what you mean by having a meeting? Is that just a quick phone call or something else?

A Well, it could be any number of ways. I've worked with teams where there's a weekly telephone call because people are spread out too far, and maybe, you know, just periodically they get together in person. I worked on teams where there is a weekly in-person meeting. It depends on the needs of the case and what's going on in the case and where in the stage of the

prosecution it is, but it's very important to keep communication going and to meet and to know each other so that you can develop some kind of trust with each other.

Q You used the word "weekly" instead of "monthly." Why is that?

A Well, just to keep everybody on the same page and watching what's going forward. Now, I mean there are cases right now not yet in the federal courts. They involve typically murders at BOP facilities and there hasn't been an indictment and the team is moving at a much more glacial pace and they may not meet weekly; but if you -- there's been an arrest and someone's in custody and there's a likelihood of authorization coming, you're going to meet regularly.

Q And frequent meetings are important in your experience?

A Yes.

Q And when you have these meetings, do you exclude members of the team?

A Well, that wouldn't be -- no. That wouldn't be teamwork.

Q Why is that?

A Because you want everybody engaged in the work of the case. If somebody's collecting records and they hear a conversation at the team meeting about the importance of a particular symptom that they're seeing in the client and the person could say, Oh, we've got -- this record just came in and

maybe we better follow up with this other record. So everybody at different skill levels brings something to the team.

Q Is it fair to say that folks who work on these cases there's a lot to do?

A Yes.

Q And it's impossible to memorialize every conversation and every observation and insight that a member of the team might have?

A Right.

Q And so do these team meetings become crucial for individuals to have that interaction and turn the different pieces of evidence over and look at it from different perspectives?

A Sure.

Q And has it been your experience that teams that meet in ways such as this end up with a better end product?

A Well, it's more effective. It's a much more competent, effective representation; and if you don't have this kind of interaction, you could have a team member going off on a tangent that becomes a distraction and is not good for the client.

Q Is there also a danger -- let me ask you this: Are you aware of a concept that we refer to in the death penalty community as team splitting?

A Oh, yes.

Q Can you describe for the record what team splitting is?
A Well, that would be where -- I mean, it happens -- you think of it typically with a client doing team splitting because oftentimes their lives have been -- they survive by splitting people off, by having a special relationship with a family member and a different relationship with another one, but teams can do it too. They can become so divided and backed by, whatever, of other team members. It's just not a healthy way to go.
If there's a problem in the team, and there always are, the healthy team will talk about it as a team and deal with it, and that's why it's important to spend a lot of time together so that you can feel comfortable dealing with problems. I don't know whether I'm answering.
Q That's exactly what I was asking you about.
And you mentioned that team splitting results from individuals sometimes wanting to have a special relationship with the client. Can you expand on that, why that's a bad idea?
A Why it's a bad idea?
Q Yes.
A Well, it's bad for the client because the client, you know, has one relationship; and if you're going to shepherd a case ultimately maybe to a plea or maybe to surviving a trial or maybe to any kind of point, the client has to have

confidence in the whole team; and if the client gets frustrated with one person and that's the person with the special relationship, they're gone.

There's a case, I believe it's been reversed on 2255 where the paralegal in the case had this special relationship with the client and got so involved with believing the client's version of the events, that it became a real bar ultimately to offering a plea. So those kinds of special relationships just can be unhealthy. You also don't learn about the client when one person has the relationship.

Q You mentioned a little bit earlier an approach that involves sending different members of the team to meet and observe the client and to maybe even mix and match those members. Can you explain the reasoning behind that approach?

A Well, I found that very effective because people have different relationships with different people, and it's often very interesting to and informative to see a client interact with one team member with you present and with a different team member with you present because you're seeing a different person sometimes and they're different with you depending on who else is in the room. So it's great insight.

I mean, as a member of a capital team, we're stepping into that client's world. They're not stepping into our world. And for us to have the opportunity to learn who they are and see them interact with different people; and how

they interact with different people, it not only informs the team members but it informs the client essentially on how they interact with the world.

Q And have you found this valuable in terms of being able to identify mental health symptoms as well as other areas of mitigation?

A Sure.

Q Is it possible -- strike that. I'll get back to that a little later.

Ms. Clarke, I would like to direct your attention now to the time frame in which you became involved with the Lisa Montgomery case, if we may.

A Okay.

Q And I would like to direct your attention to what's been testified to as a meeting in Tulsa, Oklahoma, in July, I believe July 10th of 2005. Do you recall that meeting?

A I do recall that meeting.

Q And how is it that you came to be at that meeting?

A I think that I came to be at that meeting because it was a Federal Defender case and one of the lawyers had reached out to Scharlette Holdman, who I had worked with on cases, asking for help essentially; and Scharlette knew that I was part of the resource counsel project and told me about this, and I found out who was the resource counsel. It was Dick Burr. And said to Dick, Here's a question coming up from one

of the lawyers and if I could be of any help, let me know. And Dick said, Come to Tulsa. I think he had to clear it with the lawyers first, but I think that's sort of how I got there.

Q And once you got to Tulsa, do you recall who was present for the meeting?

A You know, I recall Dick Burr, Susan Hunt, and David Owen. I don't -- I have been asked whether or not Lisa Rickert was there, and I just don't recall whether she was or not.

Q Do you remember the specifics of the conversation that took place on July 10th, 2005?

A My memory of that meeting was being concerned that the lawyers had a feeling for the government's case but not for Lisa Montgomery, that there was a -- they talked about her in relatively hostile terms which -- and not the warmth that you would like to think that your legal team would think of the client. So I remember that and thinking, well, there's got to be some work turning that. The team has to start to feel Lisa Montgomery, not the crime.

So I had that and I left -- and we also talked about the need to collect records, that it was not being done, and I offered some assistance in record collection through Debra Garvey in LA.

Q I want to ask you about Debra Garvey in LA, but listening to the answer you have given has reminded me of a topic I meant to ask you about and didn't, and that's the topic

of an approach to capital litigation, probably criminal defense litigation overall, that's often referred to in our field as client-centered representation. Can you explain for the record the concept of client-centered representation?

A Well, being focused on the client, being focused on the issues that have affected the client's life, figuring how it is to walk in that client's shoes, and understand where that client is coming from.

Q Is it, in fact, the professional norm in the capital defense community that the approach of the team is to be client centered?

A Yes.

Q What are the pitfalls of a team that isn't client centered?

A Well, they're going to miss -- they're going to miss the client. They're going to miss the narrative of the client's life. They're going to miss understanding who that client is and what brought that client to their doorsteps.

Q Ma'am, you've mentioned that you offered assistance by way of Debra Garvey assisting them in collecting records.

A Right.

Q Why is it you were able to offer the assistance of Debra Garvey?

A I had worked with Deb Garvey on a couple of capital cases by then, I think. Her office had invited me before I was

Capital Resource Counsel, when I was still director in the Spokane office, her office had invited me to defend a fellow charged in Los Angeles, and I got to know her office really well and I got to know her really well.

After that, I think I actually took another case with her office and so worked a lot with her. But her boss, who I believe was then Maria Stratton, made her available to other defender offices because Deb came with a lot of capital investigation experience, and her boss, who I knew very well, also realized how much help the Federal Defender program nationally could use, and she would agree to make Deb available periodically to help. So I thought that I could offer her services. She would have to ask her director, her Federal Public Defender, but I thought she might be available to help.

Q And you and Ms. Stratton had known each other for a long time through the defender program?

A Oh, yes.

Q And did Ms. Garvey offer help with records collection?

A Yes, she did, and she did it from Los Angeles is my memory. She did, you know, releases to hospitals in the area. You just blanket a lot of things. I think she probably got all the vitals, birth, death certificates. And then I believe she began to review records as well and recommend other records to get. I think we -- we meaning Debra Garvey, David Freedman, and I -- came into that team pretty soon thereafter and started

actually actively helping them.

Q And so I want to move you from July 10th of 2005 now to the end of July, the beginning of August. Is that the time frame in which you started to become more actively involved with the team?

A I think so. I think it wasn't long after that Tulsa meeting that we were invited to join a team meeting and to talk about how we might be of assistance.

Q And at that next meeting when you were invited to join the team meeting, who all was present?

A Oh, gosh, I don't remember. I'm guessing it was David Owen and Susan Hunt and Ron Ninemire and maybe Phil Thompson but I don't -- I don't remember.

Q By the time you were becoming involved in the case, had Lisa Rickert already resigned from the case?

A You know, I think Lisa Rickert was on her way out. I don't recall -- I just don't recall meeting with Lisa Rickert. When I started to get involved and work with them, they were looking for a replacement, them meaning David Owen and Susan Hunt. They were looking for a replacement and got a recommendation for Holly Jackson, who I did not know but I knew the referring source and so I thought that probably was a positive one, but I was also looking around for recommendations to fill that position.

Q And do you know who the referral source was on Holly

Jackson?

A I think it was Scharlette Holdman.

Q We've heard Scharlette's name a few times today. Who is Scharlette Holdman?

A Scharlette Holdman, I always tease her about being the grandmother of mitigation investigation. She's been involved in capital litigation as a mitigation specialist before we called them mitigation specialists. Scharlette was active through the ACLU, I think, many, many years ago in Florida. She's trained many, many, many investigation specialists and lawyers. She's just -- she's quite a force in her own right and very, very smart with mental health, very, very thoughtful with witnesses. She's just quite a presence.

Q So even though you didn't know or have a previous relationship with Holly Jackson and you didn't recommend her, you had no problem with that choice?

A Oh, no. Huh-uh.

Q You didn't become appointed counsel until sometime in the fall of 2005; is that correct?

A Right. After -- I think we had met with the team after Tulsa and offered to help in any way that we could, and the primary help was record collection and talking about how to pull important information out of records and get a chronology going. I think David Freedman may have started a chronology of the records so he could sort of help the team look at mental

health symptoms. I think I began looking at interview memos to see what kind of mental health issues even I could understand, but I don't believe I was invited to actually join as counsel of record for a few more weeks. So it was probably September -- sometime in the fall.

Q And when you were invited to join the team as counsel of record, what was your role to be?

A Well, I actually had a specific conversation because I had seen confusion over what does a consultant do? Are you counsel of record for a specific part of the case or what is it you're looking at? I didn't -- I've never thought that somebody could go in for a specific part of the case because of the team concept, but I did sit down with David Owen and Susan Hunt and say, What would you like from me? What is it you expect me to do? They said we want you to be as involved in all parts of the case as you can be.

Q By the time you became involved as counsel of record in Mrs. Montgomery's case, had the presentation to the DOJ authorization committee already occurred?

A I think it was coming up.

Q So --

A I don't actually remember the exact timing, but I didn't participate in that.

Q So if I tell you that the authorization meeting with DOJ was late September of 2005 and you were admitted pro hac

vice in October of 2005?

A Then I wasn't there. I know I wasn't there. I just didn't know the exact timing.

Q So from July to October of 2005 you were not counsel of record but you were beginning to consult with the team?

A Yes.

Q In your opinion -- and there's been a lot of discussion and testimony already in the case about the importance of the initial authorization meeting to try to convince DOJ not to seek death.

A Right.

Q In your opinion from reviewing the case and talking with the lawyers, were they prepared for that authorization meeting? Had they done enough investigation to make an effective presentation to DOJ?

A No. You often don't have control over that because DOJ will have that. They're in a timeline and oftentimes teams can go and say, We're not ready. Will you give us more time? And the committee will say, Give us what you got now and you can always come back to us later. Typically you try to get as much time as you can get so you can have as much of your case within your grasp as you can so that you can make decisions about what to provide to DOJ. I mean, in a serious mental health case, which I viewed this case as, you're not going to be ready to make that mental health presentation that early.

Q And tell us why you believed this was a serious mental health case.

A Well, just listening to a little bit of Lisa's history as I heard it and then meeting Lisa Montgomery and looking at the crime itself, you know, there were just a variety of things to say there were problems here. I don't know whether you want me to describe what I remember about her or not, but it was clear to me it was a mental health case.

Q I want to focus right now, and we'll move on to later, but right now during that initial three months before you were counsel of record, were you beginning to see signs and symptoms of what we call red flags of the mental illness, mental health symptoms with Mrs. Montgomery?

A Well, sure, because I was going through the interview reports and trying to pull out and talk to Deb, David, everybody on the team about what it looked like people were seeing. I mean, there was I think -- I can't tell if I conflated my own impressions when I went in and met with Lisa or what I knew before then so it's hard to distinguish it out, but she had, you know -- she talked a lot. She talked fast. She was periodically teary. She talked of suicide. She was a mess and you could just feel it in the interview memos. The team, when I came into the case, was very concerned about having her discuss the crime, and I think she was unable to do that, and there's something going on when that is happening.

Q So I want to break some of those symptoms down because they may seem very obvious to you what they mean but they may not for the reader of the record. So when you say, for example, a symptom of she talked a lot and she talked very fast, for you -- I didn't ask all the background questions because they stipulated to your background, but it's fair to say you represented a number of individuals who have had some severe and serious mental health?

A Yes. It's fair to say that I've learned a lot about mental health, you know, that a layperson can do over the years.

Q So when you encounter a client who is speaking a lot and speaking fast, was that something that's a red flag for you?

A Sure. The profession, the doctors would call that pressured speech. When someone is talking so fast, not only fast but from topic to topic with no logical connection, at least logical connection for the listener, that is a symptom of something going on. There's probably some mood disorder in there that could be the reflection of some kind of psychotic thinking. You know, you don't know. Something is happening when somebody cannot -- you couldn't redirect her conversation often, even as much as you might try on the days where she was that pressured in relating to you.

Q And you said she would go from topic to topic?

A Yes.

Q And, again, what would that be a symptom of for you?

A Well, that's part of this potential mood disorder. And then the suicidality, the depression, not wanting to go on could be part of bipolar. That could be part of depression. There would be times where she would sit in the chair she would be in in the visiting room with her knees up and her arms around her knees and she would rock, and I didn't know what that was a symptom of, but it's not just sort of normal behavior of someone normal.

Q After you observed her sitting -- and I think you're describing her with her knees to her chest almost in a seated fetal position?

A Right.

Q -- did you share that observation with other members of the team and say, Hey, I noticed this about Lisa. We need to look into what that might be a symptom of.

A Well, sure, but the starting point would be, This is what I'm seeing. What's everybody else seeing? So we encouraged a report of -- this would be called symptoms. We didn't know what it is a symptom of, but it is a symptom of something going on. So we would encourage everybody to recognize it and observe it and report it.

Q Were there times in which when you met with Lisa, she appeared to stare out into space or go away?

A Sure. I can remember a couple of times, and I have no good, clear memory of what the conversation or the context was, but that she would go off; and by going off, I mean stare out into space in the middle of a conversation and then come back.

Q And, I'm sorry, you said --

A And then come back.

Q And for you as somebody who has been trained in capital cases for a number of years by that point, when a client -- and have mentally ill clients as a public defender, when they exhibited that sort of a symptom, what is that telling you?

A Well, I don't know exactly what's going on, but you know something is going on, and some of the Ph.D.'s and M.D.'s would call it dissociation. I don't know whether she was hearing something that was talking to her. She was never able to say where she went, and it wouldn't be long periods of time. It wasn't like catatonia or something, but there was a going off into space somewhere.

Q And you're describing these symptoms in a very open and nonjudgmental way. Is that what you encouraged the team to do?

A Right. The ABA Guidelines talk about team members as being observational caretakers and that's really one of the best things that we can bring to a case is to observe without judgment and to observe as objectively as we can so that we can figure out the right experts to hire and know the right story to tell.

Q Do you go into these client meetings with a preconceived notion of what it is you're going to find?
A No. I guess I go in with a bent that I'm going to be open to there being impairments. It's oftentimes, and I don't know if you've experienced it, but oftentimes it's easy to normalize behaviors and you try to talk to yourself about not normalizing behaviors. So you try to be as open as you can and not judge what the behavior means.
Q Did you observe a situation -- other members of the team engaging in this process of normalizing?
A That was an issue that we talked a lot about as a team and we talked about, you know, let's observe. Let's see what we have here. Let's not draw conclusions about what's happening. Let's observe.
Q And normalizing is a fairly common pitfall a lot of lawyers fall into?
A Oh, my gosh, I still have to talk to myself about that.
Q And is part of that because when you're going to visit your client, of course, you want to develop a relationship of trust but you are there as a professional, not to be their friend?
A Correct.
Q You may come to be quite fond of your client, sometimes not, but your role is to be there as a professional and, as you say, to observe?

A Right. The fondness for a client grows as you begin to understand their place in life.

Q And as you were making these observations of a client and their symptoms, what else was going on in Lisa Montgomery's case as far as moving it forward to prepare the case?

A Well, we had a tremendous focus on record collection.

Q And why is that?

A Well, records speak volumes. On a death certificate you could learn that the grandmother -- it didn't happen in this case -- but the grandmother committed suicide or died at a mental health facility. Records speak volumes that family members either are reluctant to reveal or have forgotten, and they're just a wonderful way to develop the narrative of a person's life and to put it in context.

Q And do you find it important to be able to have records to corroborate the stories of your collateral witnesses as well as your client?

A Of course. I mean, witnesses -- they're subject to memory issues and records can help them remember things. Maybe we should define what records are.

Q Yes. Please do. Please do.

A Because it's really important to get a multigenerational collection of records, and many times that will require getting releases signed by family members. So it requires a fairly early development of a relationship with

critical family members to get releases signed and releases -- you're going to go after birth, death, school, military, employment, all medical obviously, any hospitalizations, Social Security earnings, Social Security disability. I mean, there are just a variety of records in all of our lives that help tell the story about us.

Q And you and Deb Garvey and David Freedman attempted to educate the local team with respect to the need to collect records in this case?

A We talked a lot about the need to collect records. I remember that Susan Hunt was pretty good about realizing the importance of it, even if she had some capital case experience, but it was an ongoing conversation. I don't think anybody really resisted collecting records. There were divorces in this family too, I think, and different marriages, and those records were really important to go after.

Q Did there come a time -- there's another attorney on the case by the name of David Owen; is that correct?

A Yes.

Q Besides Susan Hunt. And did Mr. Owen control the purse strings in the case?

A He did. I think the Federal Defender's Office funded everything in the case except for Susan Hunt's fees.

Q Did Mr. Owen present some particular obstacles with getting some of the records in the case?

A Well, there were obstacles, yes. It was primarily purse strings, as I recall, and lack of desire to get records, although he did at some point, and I can't remember the timing, hire a paralegal to come and help with record collection.

Q And you mentioned that the paralegal -- we haven't discussed her yet. Her name is Stephanie Elliott?

A That's correct.

Q Did you have a role in selecting Stephanie Elliott as a paralegal for the case?

A I didn't. I met her. I didn't. I had been the one in a team meeting to suggest that we could really use the help of somebody to do sort of record central; and once they come in, scan them and make them available however they were made available, and I had suggested a young woman that I had worked with on a case that I think was in law school or getting out of law school. I couldn't remember now. And David said he could find somebody and hired Stephanie Elliott.

Q You didn't have any particular problems with Stephanie Elliott?

A No.

Q She seemed to work well with Deb Garvey and David Freedman?

A Yes.

Q Over time did you begin to have more and more in-person team meetings with the local team here in Kansas City?

A Well, after I got actually in the case as counsel of record, I think we did have pretty regular meetings. I couldn't tell you the schedule now, but I remember pretty regular meetings. We met at Susan Hunt's house. We met at the Federal Defender's Office. There were pretty regular meetings.
Q And while I'm sure there was some social component in terms of chitchat and that sort of thing before the meeting, were these meetings fairly structured?
A Well, they had an agenda. Typically we knew what we would be talking about.
Q So you weren't just getting around to having a gab session is, I guess, what I'm getting at?
A Oh, no. No, no. We were trying to do a to-do list and following up on a to-do list and what people agreed during a team meeting to do, you know, we would follow up with afterwards. Oftentimes, probably in this case, as I do in a lot, follow up with a memo or email saying, Now, so-and-so's doing this and so-and-so's doing that.
Q Did you attempt to reach consensus at these meetings as to how the team would split up the tasks?
A Well, that was the goal to meet about what the state of the case was, what the next steps were, what the last piece of investigation had led us to, how the investigative plan should be modified. We talked about hiring experts. We talked about what motions might be filed. And, yes, that was the whole goal

was to come to a consensus about what to do in the case. That's what drove the machine.

Q Was anyone excluded from these team meetings?

A No.

Q And was everyone in the team meeting given tasks?

A Yes. Yeah.

Q Everyone -- was there a task list that was kept and updated?

A Yeah. I don't know how we kept that, but I had my own notes of to-dos following the meetings.

Q And did Deb Garvey keep an overarching chart?

A I'm sorry. Deb Garvey did keep a to-do list, a chart. I think it was a Word document, table.

Q And she would do her best to keep it updated?

A Right.

Q But things change.

THE COURT: Ms. Henry, when you get to a good point to stop, we'll break for lunch.

MS. HENRY: Yes, sir.

THE COURT: Is that now?

MS. HENRY: Yes, sir.

THE COURT: All right. We'll recess for lunch until 1:30.

(The noon recess was taken at 12:30 p.m. until 1:30 p.m.)

AFTERNOON SESSION

THE COURT: Thank you. You can all be seated.

Ready, Ms. Clarke?

THE WITNESS: Yes.

THE COURT: Ms. Henry?

MS. HENRY: Thank you, Your Honor.

JUDY CLARKE resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MS. HENRY:

Q Good afternoon, Ms. Clarke.

A Good afternoon.

Q Where we left off I believe -- I'd like to go back to just a few observations of Mrs. Montgomery's mental health symptoms, and I want to ask you if you ever observed situations where Lisa had a difficult time understanding what was real or not real?

A I think so. Big picture, of course -- this is pretty much a big picture memory for me -- is that she described at one point either seeing shadows or figures sitting on her bed in her cell, which would not have been real. She described interactions with her children that were more magical than real, you know, going on trips to have fun and you figure out the trips really weren't all that fun. So, yes, I thought Lisa was psychotic and unable to distinguish sometimes reality from nonreality.

Q So she would share with you her perception of reality,

particularly as it related to her children, you have a memory of that where she would describe herself as being a really particularly good mother and then the investigation would reveal that perhaps her perception of that reality wasn't accurate?

A Right.

Q Now, Ms. Clarke, you had described for us -- oh, sorry, there's one other thing from the records I want to ask you about, and we'll probably be a less narrative and get to some specific facts that we're interested in.

Another factor I'm wondering if the team was considering is Lisa's mother, Judy Shaughnessy, drinking while she was pregnant?

A Sure. I remember a team meaning, yes, fetal alcohol syndrome was on the table to be investigated and considered.

Q And why is that?

A Well, when you have a parent who is drinking during a pregnancy, that can affect the baby.

Q And did certain members of the team; Ms. Garvey, Mr. Freedman, did they happen to note midline defects in Mrs. Montgomery that seemed indicative of fetal alcohol affecting her?

A There was discussion of the facial features and whether or not Lisa met those, and I think she was in the ballpark, and so it required an investigation.

Q Thank you for that.

Now, when you discussed earlier in your direct testimony this idea of no one on the team having a particularly special relationship with any other member of the team, did that become a bone of contention, this special relationship, in the representation of Lisa Montgomery?

A Well, I don't know if it was a bone of contention. It was an issue that surfaced very early on in my relationship with the team that an investigator in the Federal Defender's Office was the one who saw the client, was the one who reported on the interactions with the client. I mean, other people did, but that he had this sort of special relationship with the client. It was described as that. And very early on I began to talk about the dangers of this sort of isolated or special relationship.

Q And to be clear, Mrs. Montgomery didn't ever complain -- we're talking about Ron Ninemire; is that correct?

A That's correct.

Q She didn't say she didn't like Ron Ninemire, to your knowledge, did she?

A No.

Q She, in fact, superficially appeared to like him?

A Correct.

Q But what were the dangers of the special relationship that the team was concerned about and that was expressed to Mr.

Ninemire?

A Well, what I tried to say earlier is that you have a relation -- a one-on-one relationship that's not shared with the rest of the team, if that person loses the confidence or trust with the client, then you've really stepped backwards. You don't learn as much about the client or you don't learn really anything about the client because you don't have other people having those interactions with the client.

Q Was there also a situation where Mr. Owen wanted to have a special relationship with one of the witnesses in the case?

A The mother, yes.

Q Who was that?

A The mother, Judy Shaughnessy, I think was her last name.

Q S-h-a-u-g-h-n-e-s-s-y.

And what was the concern about Mr. Owen having this special relationship with Judy Shaughnessy?

A Well, there were a number -- this case brought up another layer of complexity because I think the records were showing and our interactions with Lisa showed that she was a victim of sexual abuse, that her stepdad had had sex with her and then her half brother who became her husband -- how that relationship went I'm really vague how it was. It was an unusual relationship -- had sex with her before they got

married. He had sort of a power relationship over her. But, at any rate, there was a real atmosphere of sexual abuse and Lisa sexualizing relationships with men, so that was something to be concerned about with interactions with Lisa and concerned about getting information from her mom, if her mom had the same kind of history, you know, discussing those kind of very sensitive issues with somebody who's really not trained to sort of listen and get them could, you know, hide the facts.

Q Is it your experience dealing with -- and I'm told I need to stand a little closer to the microphone. I apologize. Is it your experience dealing with women who have this sort of sexual abuse trauma that often there is a multigenerational pattern of sexual abuse and trauma?

A Well, incest, yes; and yes.

Q So is that something that the team wanted to investigate with respect to Judy Shaughnessy and her background, upbringing and see if there was incest or sexual abuse in her background?

A Most definitely.

Q Was there some evidence of incest or sexual abuse in Judy's background?

A My memory is yes, but I don't have a clear memory of what I knew.

Q And you have not actually read the -- you're aware Jan Vogelsang was retained by postconviction counsel and performed

a biopsychosocial history on Lisa?
A Right. You told me that.
Q But you haven't actually read the biopsychosocial history?
A No.
Q But your memory is that you knew at the time that there was some red flag that there was incest on Judy Shaughnessy's side of the family?
A Oh, yes.
Q Was there also a red flag on the mother's side of the family of this pattern of people trying to get custody of each other's children?
A There was a very unusual sort of who had the kids? Who owned the kids? Who took care of the kids? Who had custody of the kids? It was a very unusual pattern, to me anyway.
Q That is not something you are accustomed to seeing in your cases?
A No.
Q Is that something that had you continued to work on the case even in a consulting role, that you would have invited successor counsel that they want to look into?
A Oh, most definitely. My recollection of what had involved into our working hypothesis was trying to understand the relationship between a psychotic disorder, bipolar disorder, and severe trauma, sexually-based trauma. We were

trying to head down that path.

Q And is that the path that you were beginning to head down in April of 2006?

A Well, we were headed down that before then, but yes.

Q Before I get to the experts that you had sought to retain on behalf of Lisa Montgomery's case, I want to ask about a couple of other specific situations. I want to focus now on the area of plea negotiations and settlement discussions. Okay?

A Sure.

Q Earlier in your testimony this morning you mentioned that the Department of Justice committee headed up by Peggy -- I don't remember Peggy's last name.

A Peggy Griffey.

Q Griffey, right. They would tell folks if they've authorized the case that you can come back to us with more information?

A Right.

Q Is that something that you have had an experience with in your career going back to that committee with additional information after authorization?

A Yes.

Q And has that sometimes been successful?

A Yes.

Q Was that something that you were considering on behalf

of Mrs. Montgomery?

A Absolutely. You always keep that as an option, as a-hope-for option to settle the case. And that's part of the development of a relationship with the client so if that moment comes, you can bring the client to a plea. Those are very difficult things for people to envision the rest of their lives in a small box essentially. So you work with the client and you develop your case to the point where you can have that conversation with the government.

Q And having that conversation with the government, is it in your experience important that that presentation be thoroughly investigated and well vetted?

A Absolutely.

Q What are the risks of going to the Department of Justice with half-baked theories that are demonstrably --

A Well, you're going to have no audience.

Q And would you lose credibility with that committee?

A Sure. And you can't keep going back as you learn more. You have to figure out the right time to get back. I've actually been involved in a couple of cases where the mental health case got developed to the point that the Department of Justice changed its mind, the Attorney General.

Q And that's not an experience that's unique to you?

A No.

Q Have you worked with other attorneys and counseled

other attorneys who have been in similar situations?
A Sure.
Q And assisted them and guided them in successfully negotiating a de-authorization?
A Right.
Q In fact, isn't it true that most cases, most cases that are considered initially to be federal capital cases result in a sentence less than death?
A Oh, sure.
Q At the time that you left Mrs. Montgomery's case as counsel of record, was it your opinion and belief that Lisa Montgomery would have accepted a plea offer?
A Absolutely.
Q For life in prison without the possibility of parole?
A Yes.
Q Ms. Clarke, you mentioned having experience with clients who have severe mental disorders, mental disabilities, and I'd like to focus with you now on the particularities of mental health defenses in federal court and the rules that are unique to federal court with respect to those mental defenses. Is that okay?
A Okay.
Q And I would like to first talk with you about the federal standard for not guilty by reason of insanity. Are you familiar with that standard?

A Generally, yes.
Q And is it generally accepted, to be colloquial, whether or not the defendant knows right from wrong?
A Well, can appreciate the wrongfulness of the conduct, yes.
Q So it's not -- there's no volitional component?
A Right. The statute was changed post Hinckley, yes.
Q In your experience is that an extraordinarily high burden?
A Virtually impossible if you have, you know, somebody who can talk. I mean, if you're comatose and out of it, maybe that would be the time, but it's a virtually impossible standard, I think, to meet.
Q What are the dangers of going in front of a jury with an NGRI defense that isn't supported with competent evidence?
A Complete loss of credibility. I mean, the important thing in a capital case, I guess this is where you're headed, is integrating the first phase with the second phase. Some lawyers before they really think about what it takes to prove an insanity case will say, Well, that's front loading mental health, but what it's doing is giving the jury an opportunity to reject your mental health presentation because it's an insanity defense that's planning or preparation, those kinds of things, just sort of intuitively juries say, I'm not going insanity. You've lost your credibility in the penalty phase.

Q With respect to Rule 12.2 of the Federal Rules of Criminal Procedure, are you familiar with that rule?
A Yes. I have to always read it, but yes.
Q In fact, that's in that little orange book?
A It is.
Q Are there some extra protections that are provided to federal criminal defendants in capital cases with respect to mental health exams when mental health defenses are considered?
A Well, an insanity defense essentially opens the client up to a government evaluation and discussion of the crime. A penalty phase mental health presentation without an insanity defense there are certain protections built in in terms of the defense being able to poll the defense after they see what the government's rebuttal would be essentially.
Q And does the rule also provide -- let's back up for just a second.
A It also allows the lawyers to litigate the parameters around the government's evaluation. Because it's a rebuttal right, the lawyers typically will raise with the trial judge, okay, we're putting on a mental health defense and so far as we're putting on neuropsych testimony and it's these 15 tests, and the government says, Well, we want to put on -- we want to evaluate for personality disorders, and so the argument to the judge would be that's not rebuttal to the neuropsych testing. So there are limitations that Courts can impose and that

lawyers should be asking for in a mental health presentation for penalty phase.

Q So there is a vast difference in terms of what you're opening your client up to in an evaluation when you plead not guilty by reason of insanity versus giving notice of a mental health defense in penalty?

A Oh, sure, and a Fifth Amendment issue that is essentially waived with an insanity defense.

Q Explain to me what the lawyer's responsibility is when you have a client who is known to be mentally ill, severely mentally ill, and you're having to enter a plea for them of not guilty by reason of insanity, which will essentially waive their Fifth Amendment rights, how does the lawyer navigate that law?

A I mean, how does the lawyer explain that to the client?

Q Right. And make sure that you're waiving your Fifth Amendment right competently?

A Well, that's a difficult call. I mean, I think you'd have to talk to the client about it because you're essentially saying it's a plea. Actually it's not -- in federal court we have a not guilty plea and a guilty plea and a defense is not guilty by reason of insanity, but certainly you'd want to have a conversation with the client about what he or she is giving up.

Q And in Lisa Montgomery's case she had confessed to the

crime right away; isn't that correct?

A Yes.

Q And the confession that she gave was actually quite brief?

A That I don't remember the entirety of it, but, yes, there was a confession.

Q And the FBI hadn't actually videotaped her confession to them or anything like that, correct?

A I'm sure they didn't. I think they've changed their protocols on videotaping in recent years, but I can't imagine they did back then.

Q And so this case we had a confession from Lisa Montgomery accepting responsibility for her actions pretty close in time to the offense?

A Right.

Q Would you agree with that? By pleading not guilty by reason of insanity, does that have any negative consequences on any potential mitigating factors you could argue to the jury in terms of acceptance of responsibility and showing of remorse?

A Well, sure. It's in conflict, right. I have remorse but I was crazy at the time I did it. It's in conflict. You have to really be -- yeah. I don't know that's water that can be navigated well at all. I would not advise the attempt to present an insanity defense.

Q And that's true in all cases?

A It would be an extraordinarily rare case. I haven't seen one. I haven't seen one.

Q And with respect to 12.2 when a defendant is raising a mental health defense under the penalty -- just for the penalty phase, is it also true that the government is prevented from even seeing those evaluations until there is a verdict of guilty?

A Yes. The rule lays out a process by which reports are submitted and not exchanged until after the guilty verdict comes and defendant says, I'm going to put on a mental health presentation, then the government gets it and you get the government's reports and you still have an opportunity, I think after that, I think to poll it. So there are a layer of protections.

Q So I've discussed with you just now briefly the idea of plea negotiations, approaching the government, and the subject of 12.2. And I'd like to direct your attention to a meeting that you had with FBI Agent Kurt Lipanovich and Matt Whitworth. Yes, Kurt Lipanovich is sitting right here at counsel table.

A I thought I recognized him during the break.

Q You had a meeting with Susan Hunt, Kurt Lipanovich, and Matt Whitworth at the FBI offices to review and copy the 1-A files. Do you recall that?

A I do recall we went to review evidence, yes, and I'm sure the case agent would have been the one there.

Q And was that within -- if I tell you it was in January of 2006, would you have any reason to disagree with that?
A No.
Q And do you recall at that meeting having a discussion with Matt Whitworth about the fact that the government had retained Park Dietz in the case?
A My memory is that Park Dietz was going to be involved in the case unless he wanted to refer the case out, but he was looming large in the case.
Q And when you use the word "looming large," what does that mean?
A Well, Park Dietz has, you know, been involved in a number of cases and has a reputation for testifying for the government for huge sums of money and being very artful at refuting mental health presentations.
Q Is he someone that you encountered in your practice in the past?
A I've never had him on the witness stand. He has been in the background in a couple of cases that I have worked on.
Q And during that conversation with Mr. Whitworth, did he bring up the concept of pseudocyesis with you?
A I think that was the -- if it was going to be a pseudocyesis defense, which as I remember thinking to myself, Matt is teaching me this because he thinks I don't have any idea what pseudocyesis is. I probably couldn't spell it but I

had done some looking into it. I think maybe that was when they were going to refer it out. I don't really remember the details of the conversation. The thing that stuck to me was Matt asking if the mentals had been done.

Q And at that time did he discuss with you the idea of a taint team?

A Actually I think probably he did, and he had been the firewall counsel in the case. Is that correct? I'm not mixing cases up here? Yeah.

Q And what did you think of the concept of taint teams?

A That was kind of evolving at the time whether a firewall or taint team was an appropriate vehicle. It gave the government some advantages, and I think people were thinking at the time whether it was a good way to go out. The rule does not envision it. The rule says no attorney for the government shall have access to certain information if you do a penalty phase, mental health presentation, I mean until you give your final notice. So the rule doesn't really envision it but some courts have done it.

Q And I would like to just jump ahead of myself. Maybe everybody in the courtroom understands what a taint team is. But for purposes of the record, could you explain what a taint team is and how it works?

A Sure. I think it's more called firewall team now, but it's the same idea, taint team, a firewall team. It's a

prosecution team that gets information from the defense and is responsible for litigating the issues pretrial about what the limits on the examination would be, and it keeps the information from the trial prosecutors who are still going to try the guilt phase of the case, such that they're not supposed to have access to, you know, information from the defense.

Q Has there been quite a bit of motion practice that has evolved around this Rule 12.2 notice and the types of evaluations that can be conducted?

A Oh, absolutely. From what notice has to be given, how much information has to be provided, who can get it, will there be a taint team, what is -- assuming the Court's going to allow a government rebuttal exam, what's the parameter of the government rebuttal examination? There's a lot of litigation that should go on around a 12.2 notice.

Q And is that some type of motion practice and litigation that you were considering on behalf of Mrs. Montgomery prior to your exiting the case?

A Well, we would have. I mean, we were just beginning our expert evaluations. So certainly we would have been thinking about 12.2, but we hadn't gotten that far. I think we were probably negotiating 12.2 deadlines with government counsel.

Q Also during that meeting, did you have a discussion with Matt -- you and Susan have a discussion with Matt

Whitworth -- I should say now Judge Whitworth, he was Matt at the time -- and Agent Lipanovich regarding the dysfunction in Lisa Montgomery's family? In other words, did they express to you knowledge of the fact that there was dysfunction in her family?

A You know, I just don't remember.

Q And did you write the memo of that meeting?

A I'm sure I did. I tried to document.

Q And if I was able to show you a copy of a memo of that meeting, would that help to refresh your memory?

A Sure. Let's hope.

Q Placing up on the Elmo here a document titled FBI/AUSA meeting 1/26/06. Can you see that?

A Yes.

Q And it's in small type. Is that the memo that you typed memorializing the meeting you had with the government and Agent Lipanovich?

A It is. And it's Susan, Stephanie, and I and it's my language, yes.

Q So the "I" in the first sentence there --

A That's me. The "I" is me.

Q And Susan is Susan Hunt?

A Yes.

Q And Stephanie would be who?

A Stephanie Elliott, the paralegal we talked about

earlier.

Q I want to direct your attention to page 2, and I will note for the record that there were attorney impressions in this memo that I have redacted quite unskillfully with a black marker. The paragraph there, if you could read that to yourself and see if that refreshes your memory.

A Yes. I actually do remember coming away from that a bit surprised that the case agent had thought that the sex that Lisa had with her stepfather was consensual sex.

Q After that meeting with the AUSA in January of 2006, did the work on the case continue? Your work on the case, did you continue working?

A Sure.

Q Were you continuing to gather records and update the team? Continuing to gather records?

A Yes.

Q Conduct interviews?

A Yes.

Q And update the chronology?

A Yes.

Q And, Ms. Clarke, at this particular moment we're not going to discuss any particular tensions on the team that were going on at that point. My question to you is more broadly. There's already been basically a stipulation about there being problems with the team. But between January of 2006 and

April 20th of 2006, was the team making progress towards conducting appropriate mental health exams on Lisa Montgomery's behalf?

A Yes. Yes. I mean, record collection had gone on. David Freedman, I think, and maybe even Deb Garvey were doing a chronology. We were discussing mental health symptoms. I think Holly Jackson may have done a chart or two or three of symptoms and how to think about trauma. We were talking about them at team meetings. We had discussed hiring a neuropsychologist at one team meeting, then right after the team meeting was over, one of the lawyers, I guess maybe David Owen, called and said, We can't hire that guy. Do you got anybody else? We did locate a neuropsych, retained him, had him scheduled to come in.

Q Who was the neuropsychologist that you wanted to hire and why did David Owen say you couldn't?

A You know, I can't remember his name but there was a discussion at the team meeting. He is of Asian background -- was of Asian background. I never worked with him. He'd been identified as an appropriate neuropsych, and the question was whether that will be a good presentation with a Kansas City, Missouri, jury and we sort of had worked through that and I thought decided to make that hire, and then there were changed minds afterwards and we went and found -- David Freedman actually went and found a very qualified neuropsych to replace

the guy we never hired.

Q And was that Dean Delis?

A Yes, Dean Delis.

Q And had contracts actually gone out from the Federal Public Defender's Office to retain Dean Delis' services?

A Yes. Yes. We'd also -- I had actually gone and met with one of the country's leading trauma experts.

Q I wanted to ask you about that next.

A Okay.

Q So did you identify a trauma expert to consult with?

A We did. I mean, she's well known in the field of trauma, Judith Herman, and I had a connection to somebody that knew her and made that connection and got through to her and actually arranged to go and meet with her. Debra Garvey and I went to meet with Judith Herman. She was very interested in the case and the symptom picture we presented, but was not able, physically able to travel and testify and was not going to engage in the case at that level, but she agreed to be a consultant, which I thought was fantastic, because of her knowledge of trauma, and she would also help us find an appropriate trauma expert.

Q And for purposes of the record I know you said that she's a renowned trauma expert. Has she authored any treatises on the issue of trauma?

A Yes.

Q And can you share with the Court some of those?
A I can't remember the name of the major book.
Q Trauma and Recovery?
A Trauma and Recovery. I mean, that's really where she made her name. That's where I began to learn about trauma was from her book, Trauma and Recovery.
Q And had she actually been retained as a consultant on behalf of Lisa Montgomery?
A Yes. And I had sent her records for review.
Q And had she agreed to also help you -- I think you said that she had a physical condition that prevented her from being able to travel and be a witness in the case?
A Right. And whether that prevented her or whether that was just her decision to be prevented from it, she was not willing to be a witness, but she was willing to consult with us.
Q And was she also willing to assist you in identifying an appropriate expert who had expertise with women who have been subject to chronic, severe trauma?
A Yes. And I think that she gave me a name, and I'm pretty sure I contacted that person. That was right towards the end of my relationship with the team.
Q But you were following up on that lead?
A Oh, yes.
Q Had you also retained experts with respect to the jury

venue and the jury pool?
A Yes. We had actually done that earlier, probably by December or early January. We met with a man -- I think Susan Hunt may have worked with him before -- to talk about venue issues. I was reaching out to people about being a jury consultant to actually help with development of a questionnaire, you know, doing the voir dire practice and the voir dire work, maybe a focus group or two. We had not retained that person yet, though, but we did, I'm pretty sure, retain -- I'd like to say his name was Bisecker. Is that right?
Q Do you know how to spell that?
A No. B-i-s-e-c-k-e-r, something like that.
Q I think that's right. And had you also been in contact with a woman by the name of Lisa Dahl, D-a-h-l?
A I don't remember.
Q A jury consultant in Lawrence, Kansas?
A I doubt that would have been me because I don't know her. I had reached out to a woman in Atlanta and a woman in New Jersey, but I may have talked to Lisa Dahl, but that name is not real familiar to me.
Q You were looking for a jury consultant?
A Yes.
Q In addition to looking at an expert in trauma, experts in juries, experts in neuropsychology, was it your -- did you

also consult with a neuropsychiatrist about the case?

A I consulted with George Woods, I believe, to talk to him about medication and how the testing might be affected by medication and whether Lisa should remain on medication, what we should know about her state of being medicated when she was going to be tested. He was not retained. I just consulted with him.

Q So no money changed hands. It was simply a matter of you asking him some questions?

A Right.

Q And he had not been brought into the case as a member of the multidisciplinary team at that point?

A No.

Q If the case had moved forward, is a neuropsychiatrist, such as George Woods, someone you would have considered bringing onto the team?

A Certainly. I mean, it's one step at a time. The life history developments such that you know enough to retain a neuropsychologist to do the neuropsych testing and then that testing will lead you in other directions, and we certainly would have been hiring -- finding and hiring the right experts for that. We hired -- I don't think you asked about him, but we hired Dr. Spitz, Werner Spitz, to look at the autopsy.

Q And Werner is W-e-r-n-e-r?

A Yes.

Q Who is Werner Spitz?
A A well-known pathologist.
Q And is he, in fact, one of the authors on the treatise on forensic pathology?
A I'm sure he is. He's a very well-known guy.
Q Medicolegal Investigation of Death?
A Yes.
Q Spitz and Fisher I think it's referred to.
Did you have a preliminary conversation with Dr. Spitz about the autopsy results in this case?
A Yes, with a focus on cause of death, time of death, and whether or not more than one person had to have been present.
Q And what did Dr. Spitz tell you about whether or not one person was capable of committing this?
A He was pretty clear that one person very easily could have done this.
Q Did he give you an opinion as to whether or not Dr. Case's opinion regarding the way in which Bobbie Jo Stinnett died was subject to challenge? In other words, whether or not she had been strangled twice or whether there was rope slippage?
A Right. There was -- I don't really remember Dr. Case's findings right now, but it had to do with what -- was there a strangulation, then a cut, then a fight, then a strangulation, then a cut. And I hate to be that deliberate about it, but it

was a question of what order things had happened in. Was she conscious when the cut occurred? You know, there were issues around her death that we wanted him to look at and tell us whether or not a pathologist could render the opinion that Dr. Case had rendered.

Q Were you considering a Daubert challenge to Dr. Case's testimony at that time?

A Sure.

Q And that wasn't for a guilt/innocence purpose but rather a penalty phase purpose; is that fair to say?

A Yes.

Q Because as horrible as the death was, the more aggravating it was presented to the jury, the harder it is to get the jury to consider mitigation?

A Right.

Q Now, I want to ask you now, Ms. Clarke, about your last meeting with Lisa Montgomery as her counsel of record, if I may. Would you agree with me that occurred on April the 13th of 2006?

A Oh, gosh, I wouldn't know the date.

Q Was it about a week before you were no longer counsel of record?

A That would sound about right.

Q Can you describe for the Court Mrs. Montgomery's mental state during that particular meeting?

A Well, without some refreshing of my recollection, probably not. I mean Lisa -- I've described her as being this rapid pace talker, sometimes being teary eyed, sometimes being suicidal.
Q So I'm going to refresh your memory then.
A Thank you.
Q Unfortunately I didn't choose this font. You did. I'm going to show you a memo you wrote memorializing a number of things, but I want to direct your attention to the second item there.
A I visited --
Q Oh, my goodness, Mr. Ketchmark is helping us out here.
"I visited LM at CCA on Thursday."
A Move it out a little bit so I can see the full sentence. That would be right. That would be right. Obviously ten years later I can't place the date and all of that.
Q Sure.
A That would be right. I would have been very worried about her.
Q Do you recall that she was in pretty bad shape that day?
A Yes.
Q And how did you describe her?
A Ragged, withdrawn, intermittently teary and quiet, then

would talk fast, licking her lips.

Q And then did you further describe some physical symptoms? She rocked in the chair?

A Yeah. Yes. I saw that over time, not every visit, but yes.

Q As a result of your concerns about Mrs. Montgomery's -- how she was doing at that particular visit, did you suggest to the team that someone else get out there to visit her fairly soon?

A Yes. Yes.

Q There was a concern at that point that perhaps Claritin was causing her some additional problems. Do you recall that?

A I recall we were worried about the interaction of different medications. I think Dr. McCandless was sort of watching the medications.

Q Then you never saw Mrs. Montgomery again as her appointed counsel?

A No. Well, not during that time frame, no.

Q In fact, you didn't see Mrs. Montgomery again until after her conviction and sentence of death; is that correct?

A I didn't see her until just right near the absolute end of her direct appeal.

Q Mr. Duchardt took you down to the BOP to visit with her?

A Yes.

Q We haven't asked you to go down to visit Mrs. Montgomery, the 2255 team has not taken --
A No.
Q After April the 20th of 2006. I'm going to skip over a time frame until about approximately April -- of May sometime, May 16th, May 17th, May 18th of 2006, the point in which Fred Duchardt became counsel of record in the case. Between that time frame, April 20th and whenever Mr. Duchardt was appointed in the case, did you have any conversation with an attorney by the name of John O'Connor?
A I don't think -- I don't remember ever having a conversation with John O'Connor.
Q So John O'Connor never called you about the case?
A No. Fred Duchardt did call me after he was appointed.
Q Do you recall how many conversations you had with Mr. Duchardt?
A I think two.
Q And did Mr. Duchardt -- who initiated the calls? Do you know if it was him or you?
A He -- I think he emailed me the first call and said that he was counsel on the case and would like to -- I think it was actually to Susan Hunt and to me, he would like to talk with us about the case.
Q And were you willing to talk with Mr. Duchardt about the case?

A Oh, absolutely.
Q And did you share with Mr. Duchardt the experts that you had retained in the case?
A Right. The conversation was not all that long but probably 30 minutes, and Fred wanted to know, you know, how the case had landed up in his lap. I gave a brief description to him of what I thought the problems had been. I gave him the names of the -- of Debra Garvey and David Freedman. I don't know whether I gave him Holly's name or not. I think Holly -- I don't know whether she was still on the case or not, and their telephone numbers. I gave him the names of the experts that we had retained; Spitz, Herman, and Delis. And I think he even said at that time he was thinking about hiring Ruben Gur. So there was a little bit of discussion about the experts.
Q And there was a second conversation with Mr. Duchardt a little bit later?
A Right.
Q Do you recall that conversation?
A Well, I recall it now, I think, because I'd gotten a letter from Lisa, and maybe I reached out to Fred, I'm not exactly sure how that happened, to talk to him about her and was there some way that he wanted to raise the issue of trying to get me back into the case.
Q And did Mr. Duchardt ask you to refrain from taking any action with respect to that issue?

A Refrain from taking action?

Q In other words, did he tell you he was going to look into it and he wanted you to stand back?

A Well, yes. I mean, he was counsel and he would make the decision about what to do about that. I think I encouraged him to take steps on the client's behalf to get me back engaged in the case.

Q And you, again, made contact with him because Ms. Montgomery had written to you?

A That's correct.

Q She had not telephoned you because she was unable to telephone you; is that correct?

A I was told that her telephone privileges to me were cut off.

Q And did you make any attempt to reach out to Mrs. Montgomery on your own, or did you feel constrained to do so?

A Oh, I felt like I was ordered to not have contact. I was barred from the jail, and I simply did not have -- I did not reach out to her, no.

Q Mr. Duchardt has filed a sworn statement with the Court indicating that in that conversation with you he suggested a possible alternative was for you to become a member of the Missouri bar and enter your appearance on behalf of Mrs. Montgomery as a pro bono attorney.

A I don't think that he -- I don't think he made that

recommendation to me. It would have been impossible to do. I was a California bar member. I would have to take and pass the Missouri bar. You know, get scheduled, get in, study for the bar, and take the bar, and the case would be over by the time that happened. I don't -- I mean, I think if he said anything to me, that would have stuck in my mind. No, he didn't suggest I do that. That would have been crazy to suggest I do that.

Q Ms. Clarke, even though you were no longer counsel of record for Ms. Montgomery after April 20th of 2006, had successor counsel reached out to you, would you have offered them your consulting services?

A Oh, absolutely, and I sort of expected that that would happen, but it didn't.

Q And what about Mr. Freedman and Ms. Garvey, had they been available to the successor team to continue to provide services on a consulting basis?

A Sure. Sure. Absolutely.

Q Isn't that, in fact, part of the mandate of the CRC project that you provide consulting to Federal Defender offices?

A That's correct. But even stepping back from that, we would have gone over our institutional knowledge of the case with Mr. Duchardt and the other lawyer that came on new. I mean, we would have helped in any way that we could have.

Q And did you communicate to Mr. Duchardt that you were

open to that sort of communication and assistance?

A Sure. Yes.

Q Did Mr. Duchardt ever take you up on those requests?

A Beyond those two telephone calls, I don't believe he did -- I don't think we had contact at all.

Q Did Mr. Duchardt ever ask you about whether or not you all had considered this pseudocyesis defense and what you thought about the pseudocyesis defense?

A No.

Q And did he ever ask you your opinion about the feasibility of there being an additional suspect or a co-conspirator with Mrs. Montgomery in the case?

A No.

Q And if he had asked you those questions, if he'd ask you, for example, Do you think Tommy was with Lisa on the day of the homicide, what would you have told him?

A Well, I would have told him that we were investigating that. We knew that Tommy had been arrested around that time. I don't -- I don't have a memory of having excluded Tommy as a viable suspect. I did not think that it was a viable approach. But I certainly wasn't stopping the investigation of it. But I don't have a memory of having firmly excluded Tommy at that point in time, but it was headed that way.

Q Other than those conversations with Mr. Duchardt, were you ever contacted by Dave Owen again?

A No. No.
Q Did you take steps with respect to your own Federal Defender -- you were hosted by the Federal Defender; is that correct?
A Federal Defenders of San Diego, yes.
Q And who was your boss at the Federal Defenders of San Diego?
A Reuben Cahn.
Q And when you explained to Mr. Cahn what had happened in the case, did he make any offers to assist the local Federal Public Defender's Office here in Kansas City?
A Yes. I mean, he offered to have his office come into the case, fund the case, and assign me to the case. He made that offer, I believe, to Susan Hunt and I think it's in writing.
Q Is that something that, in your experience, has happened in a lot of these cases?
A Sure. I mean Federal Defender offices can take out-of-district cases. There's even protocol now as to how that happens. So it would not have been unheard of by any means.
MS. HENRY: May I have just one moment, please.
Q (By Ms. Henry) Few more questions. I'm sorry, Ms. Clarke. My team had some good ideas.
During that last visit that you had with Lisa

Montgomery, did she express to you that she was, in fact, having thoughts of suicide?

A Yeah, that's my notes and that's my memory. She had that periodically.

Q At the end of -- when you went to visit with Lisa Montgomery in BOP custody down in Fort Worth, Mr. Duchardt brought you along with him because the case was about to be turned over to successor counsel; is that correct?

A I don't believe he went with me. I think I went by myself.

Q Okay.

A At his request. And it was -- yes. It was his concern that Lisa would give up and not proceed on postconviction.

Q And he believed that your assistance would assist him in relating to Mrs. Montgomery?

A Yes.

Q During the time that you represented Mrs. Montgomery, I think we discussed this a little bit, there were issues about wanting to make sure that a woman was involved in Lisa's team to assist her; is that correct? Am I remembering that correctly?

A Well, I guess there was actual conversation about it. She was a highly sexually abused, traumatized, probably bipolar young woman, and her relationships with men had been skewed by her history with men, so it was healthy to have a female or two

or three surrounding her, I thought.

Q And I want to ask you one last question. Mr. Duchardt has expressed disagreement with what he called previous counsel's direction that no one ask Lisa Montgomery any questions about the offense, and so I'm wondering if you could share with the Court the reasons why prior counsel, yourself included, thought it inadvisable to question Lisa Montgomery directly about the offense?

A Well, prior counsel before me didn't necessarily think that. We had a lot of discussions about that because we probably would be confronting -- we would either be planting memories in this very traumatized woman or confronting a delusional belief system which wasn't going to be healthy for developing a relationship of trust. So if she wanted to talk about anything, it was fine to listen to it, but to go in and query her about the offense was not going to further the relationship with her or the development of an understanding of the mental health issues in her case. So we did talk about and I thought came to a conclusion that we should wait for the appropriate expert or the appropriate time that she wanted to talk.

Q And that was to avoid planting memories in Lisa's mind?

A We did not want to plant memories.

Q And that was something you knew was a possibility?

A Oh, yes.

MS. HENRY: Your Honor, at this point that would conclude the direct that I would make with the exception of, as with Mr. Burr, as the Court I'm sure is aware, I avoided any questioning of Ms. Clarke with respect to the circumstances surrounding the time frame that caused her to be removed as counsel of record on the case as well as the November dinner with Ms. Hunt and Mr. Owen because I knew that was a subject of ongoing objection.

I would, if allowed, go into those areas with Ms. Clarke to, again, not relitigate issues 1, 2, and 3 but rather to litigate whether or not Mr. Owen's -- Mr. Owen, apostrophe S, actions were ineffective and resulted in a critical disruption of the trial team particularly where we now have evidence that at this time Ms. Montgomery was actually suicidal and in a bad state psychologically, whether that impacted her ability to be competent and assist her subsequent counsel.

THE COURT: Do you want to speak to that, government?

MR. VALENTI: Your Honor, I think we made our point fairly abundantly. It's of a cumulative nature. It's already been ruled on by the Court as it related to that dynamic of the team, and I, quite frankly, do not think it needs to be gone over again.

THE COURT: All right. Your request to inquire on those matters is denied.

MS. HENRY: Your Honor, may I also state that I would incorporate the argument that I made earlier today that I went on quite some time. The Court doesn't need to hear it from me again.

THE COURT: All right.

MS. HENRY: And that it's made under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Thank you, Your Honor. I appreciate it.

No more questions, Ms. Clarke. Mr. Valenti has some.

MR. VALENTI: Your Honor, I have no questions.

THE COURT: All right. Thank you, Ms. Clarke.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused.

(Witness excused.)

THE COURT: Ms. Nouri.

MS. NOURI: I think we're calling Laine Cardarella.

LAINE CARDARELLA, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. NOURI:

Q Please state your name.

A My name is Laine Cardarella.

Q Where are you employed, Ms. Cardarella?

A I'm with the Federal Public Defender's Office in the Western District of Missouri.

Q And you are the public defender?
A I am.
Q And how long have you been the top dog in the office?
A I was appointed in April of 2014.
Q When did you start working in the FPD here in Kansas City?
A I was hired as an Assistant Federal Public Defender in June of 1998.
Q And before that you were a state public defender?
A I was for seven years.
Q And so have you always been a criminal defense attorney in the defender system?
A I have. Since I graduated from law school, yes.
Q Can you tell me -- I'm familiar with something called the Cardone Committee.
A Yes.
Q Can you tell me a little bit about the Cardone Committee?
A Yes. About almost 30 years ago the Supreme Court appointed a committee of judges to review the implementation of the efficacy of the Criminal Justice Act. That was the Prado Committee so named because the chair of the committee was Judge Prado.

When they created their report about the Criminal Justice Act, they recommended that this sort of review be done

periodically, and I think they recommended more frequently than every 27 years, but they did another one. Chief Justice Roberts appointed judges, I think in 2014, maybe early 2015, and Judge Cardone from Texas is the chair of the committee. So that's why it's call the Cardone Committee. And they are reviewing the implementation of the Criminal Justice Act nationwide.

Q And were you one of the Federal Defenders asked to speak to the Cardone Committee?

A I did testify, yes.

Q What was the reasoning that you were selected being a new defender?

A They don't tell us why we're invited to come testify, just that we are invited. I was invited to the public hearing in Birmingham, Alabama, which was specifically about the death penalty. So most of the other defenders and witnesses were more death penalty advocates, the death penalty in the capital system. I don't know if that's why I was invited. I did speak to that a little bit, but any topic was available to anyone.

Q I'm sorry to interrupt you. That was sort of the purpose of the meeting that you were attending?

A That was the focus of the meeting in Birmingham, yes.

Q I'm going to show you what's been already admitted called Exhibit 88.

A Yes.

Q What is that?
A I know that as the Model Plan. It's part of the guide from the judiciary.
Q And can you tell me a little bit about the Model Plan?
A Yeah. So each district is encouraged to have their own plan under the Criminal Justice Act sort of laying out how the Criminal Justice Act will be implemented in that district. The judiciary has this document, the Model Plan, and the district courts are encouraged to use the Model Plan as, of course, a model for their own plans.
Q And so with regard to this particular plan, is that sort of what you're saying?
A Yes.
Q And I also want to point out to you this paragraph 9.
A Yes.
Q So what does that mean to you?
A So the American Bar Association has guidelines. They're just lots of guidelines to help lawyers who are doing particularly capital work to guide them on the type of work they should be doing, the efforts they should be making, and the Model Plan incorporates those guidelines into the plan encouraging districts to then incorporate those guidelines into their district plans.
Q So you have the judiciary policy or plan headed by Chief Justice Roberts, the ABA Guidelines, and you keep

referencing local. So I'm going to show you what's been marked as Exhibit 90.

A Yes.

Q What is that?

A That is the Western District of Missouri's plan for implementing the Criminal Justice Act.

Q Let's see if I can follow along here closely. So what does that instruct you to do?

A Well, the first thing that the plan does when it comes to public defenders is it creates us. So each district's plan decides are you going to have a Federal Public Defender? Are you going to have a Community Defender organization? Or are you not going to have an institutional defender? Here in the Western District of Missouri obviously we have a Federal Defender Office. So that's the first thing the plan does, then it tells us a little bit more about what we should be doing and what you've highlighted in subsection 2B is that we have to operate pursuant to the provisions of that Model Plan that you showed us earlier.

Q And just to hammer it home, just to highlight one more portion of the local plan.

A Yes.

Q What does that say?

A So this says -- I'm in subsection 8A, and it basically says the same thing to the Court and the Clerk of the Court and

it reiterates my office and the private attorneys that we should be adhering to the guidance of the Model Plan.

Q This is in effect now, correct?

A That was the Western District of Missouri plan, yes. The current plan, yes.

Q And has these guidelines always been applicable to the Federal Defender in the Western District of Missouri?

A Yes. So it's always directed us to the Model Plan. The Model Plan was recently amended, like, in September, October 1st, really recently amended. I was part of the committee that amended that, that made those proposed changes.

So some of the things that we did was we made it more black letter in the Model Plan itself. The things that had already been policy within the Defender Services Office organization. We're DSO now. We were -- before that we were ODS, but basically the Defender Services Organization.

Q So this isn't new to you or to your office?

A No. No.

Q When you were hired in -- what year did you tell me that was? '87?

A Oh, gosh no. Hello. I'm not that old.

Q I'm sorry. That hurts me inside.

A 1998 is when I came into the system.

Q Okay. Was Mr. Owen there when you were hired in?

A He was.

Q What was his job title?
A At that point he was just an AFPD.
Q At some point did he become the first assistant?
A He did. He became a senior trial attorney which is a non-supervisory. It's just a pay raise. And then when Steve Brown in Springfield retired, he became -- David became our first assistant.
Q What's the first assistant even mean?
A Well, I can tell you what it means to me. My first assistant is David Mercer in Springfield. He is primarily responsible for the supervision of our attorneys and staff in both Springfield and Jefferson City. So he does not have the authority to hire or fire, but he tries to put out fires since I can't be everywhere at once. So he's my primary supervisor in those locations. He's expected to be on top of the law so that people can go to him to brainstorm their cases and he knows what he's talking about. He, more than anyone else, should be representing me in conferences or meetings with judges, U.S. Attorneys, probation officers.
Q And were there problems with Mr. Owen in the office after he became first assistant?
A There were problems with Mr. Owen in the office before he became the first assistant.
Q What were some of the problems?
A He was very, very -- he was very hard to work with. He

was belligerent. He was misogynistic. He was a bully in every sense of the word.

Oh, my gosh, the examples. My office was near the door that led out to the hallway to the restroom, and one day I was on the phone and he popped his head in, as people did, because I was on the way to the bathroom. A lot of times they'd say, Hey, Laine. He popped his head in. I was on the phone and we just sort of waved at each other. A few minutes later he called me to his office and just screamed at me. When I stop by your office and you're not available, you come see me as soon as you become available. And I had no idea he even wanted to see me. It's just any opportunity he had to scream and yell at us he did. He was very, very authoritative.

Q Did his anger or outburst of violence escalate as the years went on?

A I would be cautious -- I will say -- I would be cautious to say violent. He was an angry, angry person. Yes, the more authority he had the more he tended to lord it over us. He would often ask, especially when we first got hired, he asked Anita and me, You're not one of those militant female lawyer types, are you? We found that he would ask that after we had done something that he clearly thought was militant female lawyer type behavior.

To be honest, I was -- I needed my job. We had just started our family, and I was making twice as much money as I

did at the State. So I sort of swallowed it and said, You know, I better not act that way again. The writing was on the wall that David was going to be around and be in charge.

Q So there was a lot of tiptoeing around the office for several people?

A Certainly by me, yes.

Q And Mr. Conrad, was he known to go to court?

A At the beginning a little bit. At the beginning of my 18 years. But I would say maybe in the last seven to ten years -- it's hard for me to remember when he stopped going to court -- but he didn't really handle cases.

Q Did there come an occasion on February 20th, 2007, when you went to court with Mr. Conrad and appeared in front of Judge Maughmer?

A I went with him and we watched a hearing, yes.

Q And what happened at that hearing?

A The client was complaining about his attorney, and in particular about some things that David, who was not the attorney of record, but had been at a meeting with the client, some things David Owen said during an attorney-client meeting, and it was pretty bad. So after the hearing, Judge Maughmer told Ray, This is unacceptable and if you don't do something about this, I will. And after that, David was demoted.

Q And did Mr. Conrad explain further to you about the situation?

A Yes.
Q What did he say?
A Well, I did know something about the issue because the record -- the attorney of record had contacted me right after David had made these really horrible remarks to the client, and so I knew something about that history. That's why I wanted to go to the hearing with Ray to see what happened, and Ray thought that I would be upset. I guess I did a really good job of hiding my feelings about Mr. Owen, and Ray thought I would be upset about David's demotion. So he contacted me, you know, to try to explain what had happened, and he said that, you know, he had initially thought he would kind of handle this in house and he would talk to David, but that Judge Maughmer had told him, You got to do something about this.
Q So just to get the timing right, if I represent to you that hearing was February 20th, 2007, he was demoted or removed from first assistant right after that or the next day?
A I would say pretty quickly after that. He was in Los Angeles and Ray called him in Los Angeles, and I think by the weekend it was done. It was over.
Q And after that point, did it become common knowledge that Mr. Owen was going to leave the office after the Lisa Montgomery trial?
A Yes.
Q Did you have any additional incidents with Mr. Owen

after that demotion?

A No. I think it was a little bit humbling for him. Although I would say he lacks humility in all respects, but he did not -- no, he didn't make himself as present in the office as he had been.

Q So did he sort of disengage from the office after the February 20th date?

A Yes, he did. We didn't see much of him after that.

MS. NOURI: I told you it would be fast, Your Honor.

THE COURT: So far.

MR. VALENTI: No questions, Your Honor.

THE COURT: All right. Thank you, Ms. Cardarella.

THE WITNESS: Thank you, Judge.

(Witness excused.)

MS. HARWELL: We would call Holly Jackson.

Good afternoon.

THE COURT: Good afternoon.

Ms. Jackson, come up right over here to the witness stand, please.

HOLLY JACKSON, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARWELL:

Q Good afternoon, Ms. Jackson. If you would state and spell your name for the court reporter.

A Good afternoon. Holly Jackson, H-o-l-l-y, J-a-c-k-s-o-n.

Q And, Ms. Jackson, what is your profession?
A I'm a mitigation specialist.
Q And how long have you been a mitigation specialist?
A About 16 years.
Q What was your background and training to become a mitigation specialist?
A I have a degree in sociology from UCLA, and I have a law degree from California and I'm licensed to practice law in California.
Q How did you get from law school to being a mitigation specialist?
A Actually back in college I was interning for lawyers who were working on capital cases, and then in law school I was specifically a law clerk working on capital cases and being trained as a mitigation specialist at the same time.
Q So you mentioned being trained as a mitigation specialist on a case. Has most of your training been on-the-job training?
A Yes. At the beginning I was exclusively training as a mitigation specialist but also doing lots of education, specifically in mitigation.
Q Where have you worked death penalty cases?
A All over the country. Primarily in California, which is my home base, but in Tennessee, in Kansas, Mississippi, Arizona, New Mexico, and different places.

Q Have you worked solely State cases or also federal cases?
A Both.
Q At the time you were hired in this case back in 2005, about how many cases had you worked on as a mitigation specialist?
A About 15.
Q I'm going to show you what's been marked as Exhibit 1-57. Do you recognize that document?
A Yes.
Q Is that the declaration you signed back in March of 2013?
A Yes.
Q And does that document reflect not only your credentials but also your work in this case?
A Yes.
Q So let's talk some about your involvement in the case. Who hired you to work on Lisa Montgomery's case?
A Technically the Federal Defender's Office here in Kansas City. Specifically David Owen of that office.
Q How did you come to be contacted by Mr. Owen, if you know?
A I received a telephone call from Mr. Owen indicating that he was looking for a mitigation specialist to replace an existing or one that was no longer with this case, and

indicated that he and someone else on his team wanted to come to California to meet with me, which I thought was interesting, and I offered to come to Kansas City, but they ended up coming to California to meet with me.

Q You said you thought that was interesting. Have you ever had a team to come to you to interview you before?

A No.

Q Are such meetings to interview to see if you were a good fit for the team, is that customary?

A Well, certainly we have phone conferences when we're out of state. I mean, I've worked on many cases out of state. No one's ever come that distance to meet with me.

Q And you said that Mr. Owen indicated that he and someone else would be coming to see you. Who was that?

A His investigator, Mr. Ninemire.

Q Did they in fact come to California?

A They did.

Q And how did that meeting go?

A They came to my office and they visited me in Los Angeles. They had traveled there. And we met for a short time and we kind of discussed the case and the client.

Q Let me ask you specifically. Do you remember any terminology that Mr. Ninemire and Mr. Owen used about Ms. Montgomery while speaking with you at that first meeting?

A Yes. I'm trying to gauge their knowledge of the client

and their knowledge of mental health issues, and I was -- just had concerns that their descriptions of the client were just lacking in knowledge of mental health issues. So what I mean by that is they would describe her in terms as like pain in the ass, nympho, difficult, just kind of descriptions maybe an older brother would use or something that were very simple terms to describe pretty serious mental health issues.

Q At that point you had not met Ms. Montgomery?

A No.

Q So you didn't actually know if she was mentally ill or not, but did you have experience with how people describe mentally ill people?

A Yeah. Those are very common kind of buzz words for some fairly serious -- I mean, generally serious mental health issues.

Q Let's talk -- turning from that sort of initial meeting with Mr. Ninemire and Mr. Owen -- they did hire you?

A Yeah.

Q And you agreed to work with them despite this use of buzz words?

A Yes. Yes. And they were very nice gentlemen. They were nice gentlemen.

Q Did you ultimately come to Kansas City and meet with the whole team?

A I did.

Q Do you remember -- we won't go into a lot of details. But where was the first meeting you attended?
A At Susan Hunt's lovely home in Overland Park.
Q If I were to tell you that your billing records reflect that the first time you came to Kansas City on the Montgomery case was in September of 2005, would that seem about right?
A Yes.
Q As you progress sort of -- we won't get into the nitty-gritty of each meeting; but as you began working with this team, what was that experience like?
A Everybody was -- they were all kind and nice people. I enjoyed their company and I thought everybody was very nice.
Q Let me stop you right there and ask: Did you know -- other than having met Mr. Owen and Mr. Ninemire, when you came to Kansas City, did you know anybody else?
A No. I had never met anybody before, even though one of the people was from Los Angeles, but I had never met anyone before. I come to know that they -- some of them had a lot of experience, and that was great for the team, but I didn't know anybody.

But the experience for me was great because I, you know, soon learned that they were very experienced people on the team, Ms. Clarke in particular and Ms. Garvey. So we were, you know, really setting out the logistics for running a team which I thought was nice.

It was clear that Mr. Owen and some of the folks from Kansas City didn't quite know as much, but I was hopeful that we would all learn and it would be fine.

Q And so you've described sort of Ms. Clarke and Ms. Garvey, people that were from California, even though you didn't know them, and then Mr. Ninemire and Mr. Owen. Was there anyone else from Kansas City that you remember meeting initially?

A Susan Hunt. It was at her home.

Q Was your relationship to all of these team members equal or was one person supervising your work?

A David Owen was my supervisor. He was supervising my work, in particular because I was out of state. Anything that I did or travel need, I would have to have authorized by him.

Q We've heard here in the courtroom -- I know you've been outside and you don't know all the proof that's already been admitted and I want us to not rehash too much, but we've heard a lot of proof about a lot of team meetings and the way in which the team was trying to come to consensus and work together about objectives and things to do. Was that -- does that resonate with your experience that that's how the team meetings were going?

A Yes.

Q Did you have any problem accomplishing the goals that were set out for you to do after everyone had agreed in a team

meeting as to what you would do?
A Yes. At times I would have difficulty getting approval for travel. Over time I would have more and more resistance with accomplishing the goals set out at the meetings.
Q And that was from Mr. Owen?
A Yes.
Q Was Mr. Owen part of the team meetings where the goals and priorities were set out?
A Usually.
Q And yet you still encountered resistance when you went to get your travel approved?
A Yes.
Q I just want to make sure I'm understanding.
A Yes.
Q Were you able to track or discern sort of a pattern to what that resistance was about? Did it center around your need to do certain kinds of interviews or what was that about?
A It's generally about multiple interviews. I think there was some lack of understanding as to why people needed to be seen more than once and some understanding about that. I think that sort of started and stopped there from my understanding.
Q Let me ask you specifically about Ms. Montgomery's mother. It's been mentioned that Mr. Owen had some interactions with her. Was that your experience as well?

A Yes. Yes.
Q And did the -- did there come a time where the team asked you to begin to interact with Ms. Shaughnessy?
A Yes.
Q Tell us what the team wanted you to do.
A The team wanted me to begin to engage with her and begin to interview and really kind of start that sort of sensitive process of beginning to engage with somebody that we believed had signs of real significant trauma and kind of a history of violence and probably alcoholism and just a serious history of mental health issues and trauma, and so that's a delicate and a very sensitive issue and we approached it as a team. It is a witness you have to take carefully and sensitively.
Q And why did the team want you to be the person to be in contact with Ms. Shaughnessy?
A I had many years of training in that issue, and that was one of my -- trauma and bipolar were two of my two big, main issues and my training and education and background.
Q Once the team had sort of identified this priority with your work, was Mr. Owen -- did Mr. Owen continue to be resistant to your contact with Ms. Shaughnessy?
A He did. He did because he felt that he had -- my understanding was that because he had had contact with her himself that he just automatically somehow was a better suited

person, but I tried to explain that without that training and sensitivity, it just wasn't an automatic thing, and it was a difficult process because just knowing the witness doesn't make you the best person to try to elicit very difficult and sensitive information.

Q Did you encounter any problems gaining approval for your visits with Ms. Montgomery?

A There were times I did. It was more difficult to see her and get into the facility.

Q As you began working both with the team and seeing Ms. Montgomery and then talking with witnesses, I think maybe you realized from the beginning even that you were not the first mitigation specialist on the team?

A That's right.

Q Did anyone ever tell you what happened with Ms. Rickert?

A I received very vague information, and the one thing that I recall was that I was -- Mr. Owen mentioned to me that people didn't get along with Ms. Rickert or didn't like her style or something, but that was all I remember hearing.

Q Did the fact that you were the second mitigation specialist coming on after some witnesses had been seen, did that cause problems for you?

A Yes.

Q And --

A But I knew that going in. That's always a problem.
Q Why is that a problem?
A Being the first mitigation person on a case is difficult because of the nature of the work is just all about -- is a very sensitive task. You're asking people to divulge parts of their life that are very sensitive and people don't want to talk about it, and each witness requires some level of rapport and trust, and in some cases you're asking them to give you their Social Security record, ask them to delve into their lives; and when a person comes on and starts that process, to pull that person and to have another person come on just really creates such a -- people just wonder, okay, who's the next person and why should I trust this person? There's just -- just for all the reasons that you would think that a person might just be pulled out of nowhere, that's just a problem and people -- and witnesses and family members it's in the back of their mind and it seems to always be a concern.
Q Do people get tired of repeating the same information to new people?
A They do. They do. And they tell you that they do and they -- many tell you that they don't want to talk about it again or they say, Why should I? You know, you're just going to leave. Or just shut down altogether. Or they say, I told the other person. There's some difficulties with that.
Q One of the themes developed by the ultimate trial team

in this case had to do with Ms. Montgomery's brother, Tommy. What do you recall knowing about Tommy during the time that you were on the case?

A I just -- I have a vivid memory about Tommy because I remember exploring the possibility that Tommy was involved in the crime itself, and so I just have a vivid memory of hearing at a meeting with David Owen in Kansas City that Tommy was absolutely, impossibly not involved because he was definitely at a meeting with a probation or parole officer for sure at the time of the crimes, and I just kind of remember feeling kind of personally disappointed that somebody -- the person that we were thinking might be involved had an alibi.

Q Do you remember who related this information to the team?

A David Owen.

Q As the work progressed and you did interviews and you reviewed the work that Ms. Rickert had done on the case, what did you begin to learn about Ms. Montgomery's life? Were you seeing signs and symptoms of things?

A I was seeing many, many different areas to explore. I mean, there were quite a number of things that were -- that we were seeing just glimpses to start to investigate in terms of her potential symptoms and things.

Q As you saw signs and symptoms, how did you memorialize what you saw and convey that information to the team?

A I tended to make charts. I would make a symptoms list. I would make -- I tended to create charts that would give the whole team things to just be thinking about so that we could all collaborate so if one person was seeing somebody, they might think about some of these ideas and factors to just be thinking about to rule in or rule out.
Q Ms. Jackson, I put up on the screen Exhibit 56. Do you recognize this chart?
A Yes.
Q Is that the kind of chart you were just describing?
A Yes. Yes. This is a very, very preliminary chart but I really like to just kind of start getting stream of conscious out because in a team anything you want to hear you just want your other members to know because -- so that they understand that you're hearing things from people and we need to rule things in and rule things out and they become important over time, but they're just sort of scratching the surface of possible risk factors. Certainly these are all sort of risk factors for mental health issues.
Q I think I heard three things in your answer that were interesting to me. I think I heard you saying this document was intended to be essentially collaborative, that this was you giving information to the team in hopes that they would reflect back information to you?
A Yes. I'm in the field a lot and I always -- anything I

can hear I want to make sure the entire team gets ideas of just glimpses and things that I'm hearing in the field.

Q I also heard you say that this is a very preliminary document. This was not by any means what you thought should be presented in a penalty phase?

A Definitely.

Q I've forgotten the third thing I heard.

A Risk factors for bigger issues?

Q So the things you were conveying with all of this chart was things that needed further investigation; is that fair to say?

A Yes.

Q I'm going to show you another document that's been introduced as Exhibit 128. Is this also your work product?

A Yes.

Q And that's titled Hallmarks of Bipolar Disorder chart; is that correct?

A Yes.

Q Why did you create this chart?

A Well, part of my job under the ABA Guidelines and the way that I assist counsel is I create as many aids for counsel as I can, and this was an area that I thought was very important in terms of our case because I thought our client was constantly exhibiting these symptoms, and so this was a chart -- it was kind of an interesting educational tool that I

was using for Mr. Owen. In particular, because I had the closest relationship with him, and this is something where I wanted him to sort of understand the hallmarks of this issue to be -- for us all to be mindful of, but him in particular to know what I'm thinking about and what he might be looking for and things that we're seeing, I'm seeing in the field, and what maybe -- I think what family members were describing in this particular chart. We were noting them just for him to know that they're cropping up, the signs and symptoms were being identified by other people, and it's just, again, that aid.

Q Now, Ms. Jackson, there's been a lot of talk in the courtroom about red flags and about noticing red flags. We've now displayed for the Court both your very preliminary, as you said, themes and theories chart, bipolar chart. Is your only role as a mitigation specialist to note red flags or is it ultimately your goal to integrate those things?

A Definitely to integrate and to create narratives and kind of a tapestry of all that material.

Q Do you investigate only for -- to achieve a diagnosis or are you trying to investigate how those things that are in these charts might have affected Ms. Montgomery's functioning?

A The latter and to provide all that information for an expert to actually make that diagnosis.

Q I'm going to show you Exhibit 56 and see if you know what this is. Do you recognize that document?

A Yes.
Q I don't expect you to know exactly how many pages, but fair to say it is a lengthy document?
A Yes. I always call that the master to-do list.
Q And this master to-do list reflected what for your team?
A Our ongoing sort of exhaustive list of constant updated lists of people or records or ideas that needed to be investigated.
Q I think the Court understands that you didn't stay in the case but about six months; but if you had stayed in the case longer, would that list have grown or shrunk?
A Definitely grown. Because every record we would see, if a name was identified that we thought would be useful, it would be added to that list.
Q Though you were only in the case about six months, had you begun to develop some sort of working hypotheses, things you were looking at in terms of Ms. Montgomery's mental health and functioning?
A Yes.
Q And what were those?
A Preliminarily they were bipolar disorder, trauma, severe trauma, I would say, in this -- relatively as cases go, severe and sexual, which isn't always present. Fetal alcohol spectrum, that was present and neurological deficits and

disorders.

Q You mentioned the sexual trauma. Let's talk for a minute about what you had -- what had keyed you into those issues. Do you recall -- was all you knew about that issue just what Ms. Montgomery told you?

A No. There was several levels, sadly, in this case. We had learned from physical documents that there had been a case involving sexual abuse perpetrated on her by a stepfather and there was documentary evidence of that. Then later in life there was anecdotal evidence and the potential for video graphic evidence of, you know -- I'm forgetting the word -- but sexually explicit actions perpetrated on her.

Q Are you talking about bondage?

A I am. Yes. That's the word. Graphic sexual material. And just we heard about things in between. So at different stages of her life, which is very rare to have -- to have the childhood sexual abuse documented all the way through later in life, to have this idea that there was the potential that we would be looking and possibly find videos of bondage and different things. So the sexual component of this was very serious and profound.

Q I'm hearing you say that this team did not believe that the abuse Ms. Montgomery suffered at the hands of her stepfather was the whole story?

A No.

Q Did the team have any questions or were you poised to investigate what Ms. Montgomery's mother's role would have been in relation to the sexual trauma on Ms. Montgomery?
A Well, she was clearly somehow involved in the childhood incident and, in my opinion, it was harmful the way it was described. It was a mother who was downplaying it in documents and not protecting the child.
Q So that raised questions for you?
A It did.
Q Is that fair to say?
A It did. And it was part of many areas that I felt would be necessary to explore with her and why I found her to be such an important witness on the scale of traumas and those types of things to be elicited and to be dealt -- you know, delved into with her as a witness.
Q With Ms. Shaughnessy?
A That's right.
Q What other sort of red flags or I'm not even talking about specific things you saw, but what other areas were you concerned about? Did you see red flags with regards to Lisa's treatment of her children, for instance?
A I did. Some of these I really felt were red flags in relation to her bipolar disorder, but I would say that I gleaned information from interviews and saw a whole spectrum of things, including in relation to her home, for instance, that

her home was filthy, that it smelled, that it was disorderly, that her children were unkempt, and her children were neglected at times.

With respect to her personal body, there was a lot of information about herself being unkempt. She smelled. She didn't take care of herself, that she didn't sleep properly. She would be up for days. And then she would start things, then she would stop. Start many projects then not continue them. All of these were -- they are very symptomatic of case law and DSMs and psychological books. These were very common themes for someone who suffers from a major mental illness, and more than one person was describing these events, and the sexual component people were describing also, and there were others.

Q You mentioned that more than one person was describing those litany you just went through. Was it also true that those observations had occurred over the course of Ms. Montgomery's lifetime? That is to say they didn't suddenly come about the year before the crime?

A Yes.

Q Let's talk about your personal interactions with Ms. Montgomery. Did you observe any symptoms that concerned you when you were interacting with her personally?

A I did. I observed similar interpersonal ones that I just described, some of the ones with her own body just being

unkempt at times.

In the low phases -- I saw the phases of what I would consider a bipolar disorder in terms of low depression, being unkempt, low, almost sometimes kind of catatonic, not really being able to speak but being appreciative that you were there. Just unable to muster energy and knowing that you've come a long way but still not really being able to be there.

Then just the real highs of not having been able to sleep for days and working on little projects that they allow her to do there but working on them incessantly and just nonstop for days at a time. Her makeup, just the patterns that you see. So I do feel that I saw those symptoms over the course of time.

Q And, I'm sorry, I kind of forgot to lay the foundation for that question. Did you visit with Ms. Montgomery regularly?

A I did.

Q In the six months you were in the case, once a month-ish or more?

A Well, I tended to try to come to the state for long periods of time to save resources and just really kind of do as much as I could at a time. So I tended to always be here more than a week if I could. So when I would come, I would come a couple of times a week during the trip, and then I would come back a couple weeks later and do the same thing.

Q So fair to say you interacted with her enough to observe these symptoms you've been describing?
A I thought so.
Q Did seeing such symptoms give you pause -- wait. Let me ask something first. Did you convey to the team these symptoms that you were seeing?
A Always.
Q And was that just verbally at team meetings or did you include that sort of information in your charts and in written documents to the team?
A All of those ways.
Q Did seeing Ms. Montgomery in the ways you're describing give you any concern or pause about her competency?
A Yes.
Q And what did it cause you to think or relate to the team?
A Well, both. That she was truly suffering from a major mental illness and that she really couldn't assist rationally with her defense.
Q Let's talk about the end of the time that you worked on the case, centering on the time period from April 20th of 2006 through May 2006 after Ms. Clarke was removed as counsel. Did you see Ms. Montgomery in that time frame?
A I did.
Q Do you have any idea of how much time you spent with

her after Ms. Clarke was removed?
A I was allowed -- Mr. Owen allowed me to come here and over -- it was about a two-day period. I remember coming twice in one day. I was pretty concerned.
Q So what did you observe in Ms. Montgomery in that visit right after Ms. Clarke was removed?
A Something like I had never really seen before. I mean, she was just inconsolable. She was pretty devastated by Ms. Clarke being removed from the case. She absolutely somehow blamed herself. She felt that she had done something wrong. She was sobbing. She was sort of incoherent. She was sort of inconsolable. Really all I could kind of do is sort of hug and just sort of be there as just, you know, a source of support, but she was -- she was just in complete distress really.
Q I want to kind of ask a two-part question. One, did you know an explanation to give Ms. Montgomery for the loss of Ms. Clarke from her team that you thought would be appropriate to give her?
A No. But I certainly -- I didn't know anything but I certainly didn't give her any -- I gave her no reason to be alarmed and tried to assure her.
Q But had you known an eloquent even, you know, explanation, would Ms. Montgomery have been able to receive that information in the state she was in?
A No. No.

Q Were you able to discern how the loss of Ms. Clarke affected Ms. Montgomery's feelings about the remainder of her team, and that's to say Ms. Hunt and Mr. Owen?
A I just didn't think that she could trust. Again, just the -- well, I just personally felt that she -- that trust and breaking of trust and abandonment and things were part of her history and this, you know, was just one of those -- the next tragic one for her. It was one of those kind of terrible events.
And I was only there to console, and this is just sort of a personal opinion, but she was -- she was in great distress, and I felt her ability to trust, particularly because she felt that she had done something wrong, that it was so tied into her past or something that she had done something again and that this was just, you know, this was just another --
Q I may be about to use buzz words that lawyers shouldn't use. Are you saying that you felt like this event triggered Ms. Montgomery's trauma?
A Yes.
Q Let's talk about why you left the Montgomery team. After Ms. Clarke left in May of 2006, did you receive an email from David Owen?
A Yes.
Q While they're looking for that -- do you recall this email?

A Yes.
Q It's dated May the 9th, 2006?
A Yes.
Q What does that email reflect?
A I was let go. I was fired.
Q And was that your decision or Mr. Owen's?
A Mr. Owen's.
Q What was your response to that email? I don't mean emotionally. But what did you do?
A Well, I honored it. Obviously -- it's fine to be fired, but the idea of having no contact with the client to me was, you know, just kind of showed disregard, again, for the feelings of Ms. Montgomery because, you know, this is a client that needed, you know, help during a very difficult process and she was, again, sort of disconnected from people that were trying to help her, but it is what it is. I thought it was -- at a human level I thought it was, you know, something that didn't help the client.
Q So you've indicated, as the email reflects, that David Owen instructed you not to have contact with Ms. Montgomery?
A Right.
Q Obviously no one likes to be let go or fired from something. If you had ever chosen in any way to leave a team, would you ever leave a client without explaining your leaving by choice?

A No.

MS. HARWELL: If I might have just one moment, Your Honor.

THE COURT: All right.

MS. HARWELL: I don't have any further questions.

MR. KETCHMARK: No cross, Your Honor.

THE COURT: All right. Thank you, Ms. Jackson. You're excused.

(Witness excused.)

THE COURT: We'll take a recess now. We'll take a recess until 20 minutes till four by the clock in the back.

MS. HENRY: Your Honor, may I ask one housekeeping issue?

THE COURT: All right.

MS. HENRY: We have two more witnesses, one of which, I believe, will be 30 minutes and the other, I believe, will be one hour. I have a very lengthy expert witness who will be in the courthouse in about 30 minutes. She's local. The other two are flying out tonight. This notebook is her direct. I don't think I'm going to be finished before five o'clock. I'll make her stay. I just wanted some guidance from you.

THE COURT: Well, I guess somebody's not flying out tonight if we're not finished by five o'clock.

MS. HENRY: These two are going to be finished. I

didn't know whether or not the expert witness needed to stay around. I don't think we're going to get to her.

THE COURT: I thought you said an hour and a half with these next two witnesses.

MS. HENRY: That's my estimate.

THE COURT: So if we start at 20 till 4, that's an hour and 20 minutes.

MS. HENRY: I'm telling you that's my belief.

THE COURT: And we've got to do cross, which there may not be.

MS. HENRY: My belief is that we will not get to my expert and I would like to let her go, but I don't want to do that -- I think these are going to be long.

THE COURT: Well, I mean, we're right close to five o'clock or a little bit after. That's fine with me.

MS. HENRY: Thank you.

THE COURT: If you're going to take an hour and 20 minutes, then you can let your expert go.

MS. HENRY: Thank you, sir.

(Recess taken at 3:23 p.m.)

THE COURT: Thank you. You can all be seated.

Ms. Henry.

MS. HENRY: Your Honor, movant calls Deb Garvey.

THE COURT: Ms. Garvey, would you come up over here to the witness stand for us, please.

DEBRA GARVEY, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good afternoon, Ms. Garvey. May I ask you to state your name for the record and spell your first and last name for the court reporter.

A Sure. It's Debra, D-e-b-r-a, Garvey, G-a-r-v, as in Victor, e-y.

Q And, Ms. Garvey, what is your profession?

A I'm a mitigation specialist.

Q Are you also a licensed attorney?

A I am.

Q How long have you been a licensed attorney?

A 1985. How many years is that?

Q I'm not going to do math.

A Thank you.

Q It's late in the afternoon.

You've been licensed since 1985 in California?

A Yes.

Q And where are you currently employed?

A The Federal Public Defender in Los Angeles, the Central District of California.

Q How long have you been employed with the Federal Public Defender's Office in the Central District of California?

A A little over 20 years.

Q And have you always been a mitigation specialist in

that office?

A No. I was the -- I was initially hired when the office was obligated to fund the Capital Habeas Unit and the mitigation investigator, and I became the supervising investigator, chief investigator essentially, for a while and then began working on capital trials.

Q So the record is clear, what is a Capital Habeas Unit?

A When people who are sentenced to death in State court exhaust their State court remedies, they have the option to proceed into federal court, at which time new work is done on their case or renewed work is done on their case.

Q So were you one of the -- the Capital Habeas Units sprung up in around 1995, 1996; is that correct?

A Yes.

Q And were you one of the first mitigation investigators in your unit?

A I was one of the first -- there were three of us hired and I started on the first day the unit started.

Q Prior to your work for the Federal Public Defender's Office for the Central District of California, had you had experience working on capital cases?

A No. I'm sorry. I apologize. I did. In law school. As an assistant, reviewed some tapes and materials for an attorney.

Q Where did you graduate from law school?

A UC Davis.

Q So the entirety of your experience working as a mitigation investigator or later mitigation specialist, has that all been within the Federal Public Defender's Office?

A Yes. Within the Federal Public Defender system, yes.

Q And that role has changed and you moved from doing the habeas cases and the CHU, as we call them, to doing federal trials, right?

A Right.

Q When did you make that transition?

A I believe in 2008, 2009. I worked on federal capital trial cases before that time but was still engaged in the capital habeas work as well.

Q Who was your defender at the time, at the Lisa Montgomery trial?

A Sean Kennedy.

Q And prior to Mr. Kennedy, who was the defender?

A I could be wrong about that. It might have been Maria Stratton. I was first employed with Maria Stratton, then Sean Kennedy. Now we have a new defender.

Q Did both Ms. Stratton and Mr. Kennedy have an attitude about loaning their staff out to other Federal Defender offices?

A Definitely.

Q What was their approach to that?

A I think the LA office is a big office by comparison to many other Federal Defender offices with a lot of case experience, sadly, of capital trial cases and capital habeas cases. So when smaller offices or offices with less experience were looking for help, it was common for both those defenders, Maria Stratton and Sean Kennedy, to loan staff to those offices to support their work.
Q And so were both Ms. Stratton and Mr. Kennedy very supportive of you offering your services to other public defender offices?
A Extremely supportive.
Q And was that essentially free help?
A Definitely. And frequently our office also paid for me, paid my expenses, so it was very free help.
Q Did you have staff who worked with you in the LA office that would help you complete tasks on behalf of other Federal Defender offices?
A I did.
Q And how many people on staff would help you out?
A You know, it depended on the task that we were working through. I had an assistant that was half time probably working with me, sometimes more than that depending on the demand of the work. And then additionally, depending on short-term projects, I would have as many as four or five other people assist on things.

Q And were those individuals that you had trained?
A Or who trained with me along -- you know, alongside. We grew up together, so to speak.
Q Okay. So they also were experienced?
A Yes.
Q Ms. Garvey, over the years, have you developed a working relationship with an attorney by the name of Judy Clarke?
A Yes.
Q Did you and Judy Clarke frequently work on federal capital trial cases together?
A Definitely. A number of times. I don't know if I would say frequently, but yes.
Q And that is a professional relationship that continues to this day?
A It does.
Q Have you over the years -- was there another individual who typically -- well, typically -- who often worked with you and Ms. Clarke on these federal capital trials?
A David Freedman.
Q And who is David Freedman?
A David Freedman is a Ph.D. in -- I'm sorry. I couldn't tell you the exact field his Ph.D. is in, but he's a mental health expert in terms of being able to help evaluate what kind of mental health expertise we need in a case, and does a really

nice job of sort of translating lawyers to mental health experts and vice versa so that it's a smooth presentation when we're able to go forward in the case.

Q So when the three of you work together as a nucleus, do each of you bring something different to the table?

A I would say so. And we overlap, but yeah. We each have a different gift, skill, whatever you want to call it we bring.

Q And what is it that is your particular strength in the area of capital mitigation?

A Well, it depends on what day you ask me. I'm pretty organized. I would say that is one thing I spend a lot of time at. So in developing the foundational documents that are needed, the records, in organizing interview sequences that makes sense, and I'm good with clients. I'm a good observer of clients. Depending on what the case needs are, I interview. It really depends. But basically I'm a really -- I'm absurdly organized.

Q I think you've been described as someone who is really good at getting records. You would agree with that?

A Sometimes that's true, yes.

Q And do you have an assistant with you who helps you gather those records?

A In the past I have, yes.

Q And let me ask you some specific questions about the

Lisa Montgomery case now, if I can.

A Sure.

Q Did there come a time, Ms. Garvey, that you became aware that the Federal Public Defender's Office in the Western District of Missouri here in Kansas City had been appointed to represent a woman by the name of Lisa Montgomery?

A Yes.

Q And did it come to your attention that the attorneys appointed to represent Lisa Montgomery were needing assistance with gathering records in the case?

A Yes.

Q How did that come to your attention?

A Judy Clarke called me in the spring or summer of 2008, I believe it was, to ask if I could help them because they needed to begin document collection and had not begun it and really didn't have a good idea about how to go about it.

Q And did this involvement on your -- well, did you agree to accept that task?

A Yeah. I had to ask the Federal Defender locally if it was okay for us to do that, but, yes, once we had that agreement I did.

Q And did you begin to work almost immediately, then, on assisting gathering of records?

A I did. We did it from afar. I was in California doing it initially, but we did quite a bit of work quickly.

Q And that was -- you agree with me that that initial records collection on your behalf and your assistant's in California predated the time in which Ms. Clarke became counsel of record in the case?
A Yes.
Q And you said that record collection happened from afar. Is that because the Federal Public Defender for the Western District of Missouri did not have a paralegal on staff?
A I believe that is correct.
Q And there was no paralegal assigned to the Lisa Montgomery case at that point?
A That's my understanding, yes.
Q At some later date a woman by the name of Stephanie Elliott was hired?
A I do remember that, yes.
Q And did you work with Ms. Elliott to train her as to the process of collecting records in a capital case?
A Yes.
Q Can you describe for the Court -- the judge has heard a lot so I don't want you to go on at length, but could you describe for the Court the importance of -- well, just how vast the record collection can be in a capital case?
A Well, the obligation of a capital team is to gather every document they can that touched the client's life in any way in a multigenerational process because it's hard to tell

without looking at all those papers that you can collect what might be important and what might be critical even to the understanding of the client in the presentation to the Court or in trying to resolve the case.

Q And did you bring your skills to bear in terms of looking at some of the initial work that had been done in Mrs. Montgomery's case and make some preliminary decisions about records requests that needed to go out right away?

A I think initially we did what we would call a hospital sweep because we knew Lisa Montgomery presented a lot of mental health -- potential mental health issues, and so we wanted to see if we could find documents that would support that or help us understand that and her.

Q When you became involved in the case, what was the state of the records collection up to the point that you took over, started taking over things?

A I don't believe they had much of any record at all. They may have had one or two documents but really nothing. And even more critically had almost no releases signed from any relevant immediate family members that would need to authorize our collection of records that touched their lives.

Q The case at that point had been pending since, I believe the date is December the 20th of 2004 and your involvement was August of 2005.

A Sorry. I had the date wrong.

Q Did that seem to be a -- was it behind the curve in terms of records collection in your experience?
A Oh, definitely. They're almost a year in and that is, you know -- a case is built on what you find out from witnesses, but you can't really effectively talk to witnesses until you've seen the documents that are relevant to them, that might form your inquiry with them, how important you might find them to be ultimately as witnesses. So to have proceeded to represent the client for that period of time and not systematically begin a record collection is really outside the curve of the standard practice.
Q And, Ms. Garvey, you were involved in assisting the local Federal Public Defender's Office in the process of records collection from the time that you started work preappointment for Ms. Clarke up until the point that Ms. Clarke exited the case; is that correct?
A That's right.
Q So would you agree with me that that would roughly be from August of '05 until April of '06?
A Yes.
Q And I'd like to show you, Ms. Garvey, what has previously been introduced into evidence as Movant's Exhibit 101, and that is a chart of records that were collected, starting over here, upon appointment from the various trial teams that had been representing Mrs. Montgomery.

This time frame is when your records requests started going out all the way to this time frame. This is when Stephanie Elliott became involved in the case. Do you recall working -- a significant number of records requests went out when Stephanie Elliott became involved in the case?

A I'm sure that's true. I know that I had a list of common records that should be sought and then specific records to Lisa that we knew existed from the bit of record collection that we had begun to do. So when Stephanie was hired and began working, I had I think almost immediately a list of things that I wanted her to send out requests for.

Q And did you work closely with Ms. Elliott in getting those records requests out?

A I did.

Q And then just to complete the chart, this red band, the end of it which is when Ms. Clarke exited the case as counsel of record and we see that really not a lot of records were gathered during the rest of Mrs. Montgomery's representation at the criminal trial level, and so I want to ask you, at the point when you -- when Ms. Clarke exited the case, had you completed the document collection in the case?

A No.

Q Did you feel like you had anywhere close to completing the document collection?

A No. The work of document collection is really layered,

and so one document often will tip you off to the existence, it's a clue or cue that there are more documents to be sought that are relevant to the client, client's life story, and that comes in that constant flow of information that's coming in. You have to follow up on what you see and what you become aware of in the documents themselves as well as when you begin to talk to witnesses, you're aware of new information that should be collected in order to complete the picture as best you can.

Q And, in fact, document collection is an ongoing process that continues up until trial and often, as the case here, in postconviction?

A Yes.

Q What happens to those documents that -- you send the releases out, the records come in. Do they just get stuck in a file folder somewhere or what happens to them?

A Well, the best teams, the functioning teams get their documents in. They're carefully read and analyzed by a few people. Certainly not just a clerk or a paralegal but usually by the mitigation folks that are working on the case. Often one or more of the attorneys are also reviewing them or at least reviewing documents that the mitigation people have flagged as particularly significant.

They're often ordered chronologically into a summary that's of some team-based document that everybody can review and be aware of the sequence of events that the documents tell

the story of. And then finally often put into some kind of database so they're functionally available when you have to have them later.

Q And did you serve the role as far as trying to cull out those documents that were going to be helpful and relevant to experts who ultimately come on the case?

A Yes. In conjunction with the team that decision would be made to say these are relevant documents for this particular expert in this particular area of expertise, yes.

Q I want to ask you now about the process of culling together the documents for an expert to review. Do you give the expert every single thing you collect and say, Good luck to you, find out what's relevant, or do you organize them in some way?

A Generally the team has some kind of conversations about the expertise the expert will be offering and then what is relevant to that expertise. In parts -- you know, the person is not overwhelmed with the massive amount of information you've gleaned about the client or the particular area of expertise you're asking the person to testify about.

So, no, you generally would choose the particularly relevant documents and organize them in a manner that is effective for the expert to review. You may decide that some things are not relevant or not helpful or not even -- you know, might be suspect documents for some reason that don't really

help the overall picture because they're not as rigidly produced, you know, by whatever underlying institution produced them, that kind of thing.

Q Have you served the role in -- well, in this case there were documents that were gathered together and about to be sent to experts who had been retained in the case. Did you assist in gathering those documents?

A I'm sorry. Are you asking did I --

Q Or identifying the documents to be sent?

A Along with other people, yes.

Q Is it important for the team when they're sending documents out to an expert to make sure that they're not sending confidential attorney-client work product to the expert?

A Absolutely. And it is a standard that people are pretty careful about because you, of course, don't want to have to turn over ultimately something that may just be an internal memo, a summary of something, or otherwise not meant to be a court-available document.

Q Because once you've turned that over to the expert, then it ultimately becomes available to --

A To the government, absolutely.

Q Have you participated yourself in actually physically going through the documents that are being sent out?

A In some cases, yes.

Q Is there always someone on the team who needs to be responsible, to make sure that attorney work product isn't sent to experts?
A Absolutely. Usually more than one person. It's usually not just one set of eyes in capital cases that's making that -- that may be certain of that.
Q Now, Ms. Garvey, in addition to your helping to gather documents on behalf of Mrs. Montgomery's defense, did you also have an opportunity to meet Mrs. Montgomery and interact with her?
A I did.
Q And did you also take part in team meetings?
A I did.
Q And who was typically present at these team meetings?
A Usually it was Susan Hunt, David Owen, Ron Ninemire, Phil Thompson, Holly Jackson, Judy Clarke, most of the time David Freedman, but not always, and myself and Stephanie Elliott.
Q Did these meetings take place in Kansas City?
A Sometimes we met at Susan Hunt's house, which is not in the city.
Q In the area?
A But in the area, yes.
Q So you all would fly in to the local team and meet with them in their homes?

A Yes.
Q When you did that, did you also take the opportunity to go visit Ms. Montgomery or do some other work?
A Definitely, yes.
Q How long did these team meetings typically last?
A Gosh, I think probably the three- to four-hour range.
Q And during those three to four hours, was there an agenda?
A Yes.
Q Did you often take part in that agenda as far as leading a topic item?
A Sometimes, yes.
Q In addition to the team meetings that involved everyone on the team, were there also investigator meetings?
A Yes.
Q Can you describe who would attend the investigator meetings?
A Well, generally it was Ron Ninemire, Phil Thompson, myself, and Holly Jackson some of the time. Holly, you know, was also involved in developing mitigation themes and theories; and so when she was in town, we all met together. Sometimes it was by phone. But the idea would be to prioritize what we had, what we were learning, what we had, what we still needed to do, developing some themes around what we could see was evolving, and what we had collected, or who we had talked to, and

certainly some of it was about -- talking about Lisa herself.

Q And you shared with each other your observations of Lisa and the symptoms that she was presenting?

A Yes.

Q From your personal observations of Ms. Montgomery as well as the information you gleaned from the team meetings and the investigator meetings, did you begin to -- as well as your review of the documents that were collected, did you, as an experienced mitigation specialist, begin to identify certain symptoms that you thought were worthy of noting and follow up on?

A Oh, definitely.

Q Can you share with the Court some of those?

A Lisa was clearly very traumatized. Some sources of that trauma were apparent to us pretty quickly. Some we weren't clear about for a while. She often, in my experience in talking with her, would what I thought might be dissociated during the meeting with her, perhaps have, you know, moments or more of lapse of not being present when you tried to talk to her.

Q Can you describe that in a little bit more detail?

A If you talked to Lisa about a topic and it wasn't always clear, you couldn't always anticipate what topic would cause her to not be able to stay in the room, so to speak. You could talk about something, touch a topic and she would

literally physically change her body. She would sometimes sit with her legs held up with her arms around her legs and just not be responsive when you spoke to her. She would rock occasionally in the chair. I know she told me and others but myself that she believed people were visiting her in her cell and singing to her. She had other kinds of what seemed to be hallucinations, both auditory and visual that she talked about.

Q And having observed these symptoms, did you and the team begin to form some opinions about some mental health disorders that may be at play with Mrs. Montgomery?

A Yes.

Q And what would those be?

A You know, we were not at a conclusion certainly because the process would be we were recording symptomatic observations and eventually there would be experts who would help us sort through what we were seeing, but I would say that certainly some working theories, so to speak, would be that she was bipolar. She was tremendously -- the sexual abuse she had endured was tremendously painful and impactful for her. We wondered about epilepsy at one point. Certainly PTSD that was trauma related.

Q When you say epilepsy, do you mean temporal lobe epilepsy or some other kind?

A Yeah, a petit mal kind of thing where she's not having a seizure that is visible, but the absence that she experienced

when you were talking to her certainly crossed our minds that it was possible it was some kind of neurological episode.

Q And are these symptoms that you have been trained through the years to be able to recognize?

A Yes.

Q Have you experienced situations in the past or even maybe since Mrs. Montgomery's case working with legal teams who don't have that training who tend to either miss these symptoms or normalize these symptoms?

A I've seen both and it's, you know, unfortunately somewhat frequent because there's just not that much life experience that is similar to what our capital clients have experienced, so people are just not -- not only not trained but sometimes not even very sympathetic to what they perceive somebody not being cooperative or otherwise being -- telling lies, not telling truths, not appreciating that the client is not able to retrieve a memory because of the trauma that was present when the memory was instilled in them, that kind of thing.

Q Did you experience that those sorts of issues with the team involved in Mrs. Montgomery's case, that tendency to normalize?

A Definitely. And, you know, I would say normalize and also somewhat demonize. The language sometimes some of the people on the team locally were using about Ms. Montgomery was

not something you would normally hear someone talk about their client, describe their client as being.

Q Was that something that you tried to address with the team at team meetings and to provide education?

A We did as a team. I mean, I certainly -- my focus was really much more, I would say, with Ron Ninemire and Phil Thompson. Holly has the same experiences, same training, so, you know, she also was doing that as were other people on the team, primarily Judy and David as well as Holly and I. But it was distressing at first, I have to say, because you want to feel like people are committed to the work that the client needs done; and when you are not compassionate or sympathetic to the perspectives of the client independent of what they're charged with, that's distressing to see, and so you do try to work with people in hopes that you are going to be able to fill out the vision of what the case will be about and how we want to present the client.

Q And as you've testified in your role as a mitigation specialist on the Lisa Montgomery team, you tended to work more closely with Mr. Ninemire and Mr. Thompson; is that fair?

A That's true.

Q Did there -- did you notice any particular difficulties in terms of being able to work with Mr. Ninemire and get him to accept the concept of mitigation?

A You know, Mr. Ninemire had been an investigator in the

local office, I think a long time at that point, as I recall, and he had a certain type of practice and a certain experience that he felt really confident about, and it wasn't the standard of practice for capital trial cases, and it was really hard for him to adjust what he was doing.

The specific thing I can remember talking to him about at some length was he had spent a lot of time visiting Lisa just by himself, and I remember having the conversation with him saying, You know, Ron, if I supervised you, this would not be an acceptable practice. People just don't do this with sexually abused clients. Single men don't go in and see women who have experienced just extraordinary sexual trauma.

But even further than that, the capital teams the standard practice generally is you visit in twos, and there's lots of reasons why we do that, and then you record. There's a written memo about the client visit so the team can understand what's going on with the client that particular day or week, and none of that practice was in place when we came to begin working here.

Q And the response back, I would guess, Well, if she likes Mr. Ninemire, what's the harm?

A Right. Well, one part, you know, a client who only knows how to relate to men or to the world in certain ways, if you only tap into that experience of theirs, you're getting not a complete picture of the client. She's going to sexualize

things that -- or he are going to sexualize things that aren't the actual presentation that you're looking for. You're looking for, you know, what was the fullness of what was going on for them rather than that lens that they have that's pretty skewed, and so to tap into that not only is inappropriate for the client, not very professional, you really don't get good information always that way.

Q Were you initially hopeful that you were going to be able to provide training to assist Mr. Ninemire in being able to further himself as a capital investigator?

A I think, you know, initially he wanted to have that experience and learn from, I would say, Holly and I, Judy and David, David Freedman, initially.

Q And, Ms. Garvey, I think you've testified that Mr. Freedman was the individual on the team who was the most experienced in terms of identifying mental health symptoms and identifying experts; is that fair to say?

A That would be true.

Q Was there a point when you were involved in the case that the team was investigating a mental disorder which is known as pseudocyesis?

A Yes.

Q And did the team begin to gather documents such as prior testimony of a man by the name of Dr. Ramachandran?

A Yes.

Q And was that something that the team had been discussing?

A Yes.

Q At the point that you exited the case in April of 2006, is it fair to say that the idea of going down that pseudocyesis path had pretty much fallen away?

A Yeah. I think we were pretty clear that pseudocyesis is a symptom of psychosis. It's not a -- there's something else there. That is just one symptom in a package of things that we still needed to unpack.

Q So more of a footnote as opposed to a chapter heading?

A Yes. That's right.

Q Was Mr. Freedman -- excuse me -- Dr. Freedman charged with the task of investigating Dr. Ramachandran in that particular diagnosis?

A I believe so.

Q And he's here today so we'll ask him about that a little bit later.

A Thank you.

Q What I would like to do now is turn to a to-do list in the Montgomery case.

A Okay.

Q Did the team keep a running to-do list?

A I believe we did, yes.

Q What was the purpose of the running to-do list?

A It's just a record to keep everybody focused and to revisit and review, renew at all times, every time the team met about what the team priorities were, who we still hoped to talk to. In some instances what were the topics that the person would potentially be able to speak to, what records were we still looking for, that kind of thing.
Q And I'd like to show you what's previously been introduced into evidence as Movant's Exhibit No. 57 and ask you if that appears to be the last updated Montgomery to-do list prior to your exiting the case March 30th, 2006?
A I believe so. I haven't seen it in a long time, but I believe so.
Q Is this your work product?
A I'm sure it is, I'm sorry to say. It definitely looks like mine.
Q And in this particular to-do list it has columns. Can you explain what those columns are?
A Yeah. The first -- so on the left side, the first column on the left is the relevant witness. The middle -- the second column going right is who's going to do what related to that task or that person. The third column heading right is what's been accomplished on the task. And the final column is what did we know or what work has been done toward it if we haven't actually concluded it. You know, it's the miscellaneous category of what might be helpful to know in

accomplishing this task.

Q And this memo, which is quite lengthy, and we're not going to go page by page, but is it broken up into sections? This first section being interviews?

A Yes.

Q Then is it followed by, for example -- I should have tagged this, I apologize -- records and then experts? Is that basically the way it was broken down?

A Maybe some research, but yes.

Q And so if I were to tell you that Exhibit No. 57, for example, suggests that a woman by the name of Leona Hayes had been interviewed on February of 2006 by Susan Hunt and Phil Thompson, would that indicate that Ms. Hayes had actually been interviewed?

A Yes.

Q Do you know who Ms. Hayes is?

A Is she the neighbor that lived near the victim?

Q Yes, ma'am.

A Yeah.

Q And do you know the purpose of interviewing Ms. Hayes by Ms. Hunt and Mr. Thompson?

A I believe there was a 302 from the FBI suggesting that Leona Hayes thought she might have seen someone in the car that may have been the getaway car after the victim was killed.

Q And do you recall that in that interview of Leona Hayes

that she indicated to Ms. Hunt and to Mr. Thompson that not only was she opposed to the death penalty but that the victim's mother in this case was also opposed to the death penalty?

A I'm sorry. I don't remember that.

Q In addition to the Leona Hayes interview in February of '06, there is on page 13 -- well, let me ask you this: Were you aware of the fact that -- obviously you were aware that Mrs. Montgomery was a victim of sexual abuse at the hands of her stepfather?

A Yes.

Q Did the team recognize or know at that point the depth of the sexual abuse, did you feel?

A Oh, no, I'm sure we didn't. In part because we didn't -- we hadn't done all the record collection we needed to do to be able to figure out what else might be out there, but I don't think we had the kind of team education yet where the team had been able to really work that through.

We certainly knew Lisa had been abused many times. We knew that her stepfather had constructed a separate bedroom for her that had to be entered only from the outside rather than walk through the house. We suspected for the purpose of being able to periodically, occasionally, frequently, however often, go out and abuse her without necessarily tipping off the whole family. We knew that her mother had witnessed him raping her, raping Lisa, the stepfather raping Lisa once and blamed Lisa

for it. We knew there were many very serious and significant failures to protect Lisa, but I'm sure we didn't know all of it.

Q And were you wanting to continue to delve into the depths of the trauma that Lisa experienced?

A Definitely.

Q And did you become aware during the course of your time representing Lisa Montgomery that the government, at least Agent Lipanovich, had suggested to Ms. Clarke and Ms. Hunt in a meeting at the FBI office that perhaps the sexual behavior between Lisa Montgomery and Jack Kleiner was consensual on behalf of Lisa?

A I do remember hearing about that, yes.

Q So was it incumbent upon the team knowing that the idea of consensual sex between Ms. Montgomery who was under the age of 16 and her much older stepfather might be consensual that the team was going to need to prove lack of consent?

A Absolutely.

Q And you anticipated that would potentially be an issue if the case went to trial?

A Absolutely.

Q And would you have wanted to gather all the records that you could to nail down the truth of the allegation as well as the extent of the abuse?

A I do. And I can say definitely it would have been so

critical for us to do that because I really believe that's the kernel of the story for Lisa's life. That explains many things that happened later.

Q Now, some of the records you would want to get, for example, DHS records from social service agencies that may have investigated such events?

A Yes.

Q And you knew, of course, during the time that you represented Mrs. Montgomery that Mr. Kleiner had not been prosecuted for his criminal acts?

A Yes. And I knew that her mother had been certainly less than supportive and even blameful of Lisa.

Q And so that issue of systemic failure, was that something that you would have wanted to consider as a mitigation theme?

A Definitely. It would have been a presentation we would have spent a good amount of time on.

Q You knew, for example, that Ms. Montgomery had actually testified at the divorce proceeding as to at least part of the sexual abuse she experienced?

A We did. And it was one of the reasons we knew that there likely would be more documents we could pursue that would help substantiate that part of the case.

Q Had you obtained all those documents?

A Oh, no. No. We definitely had not.

Q And with the documents that you did have, did you identify, for example, certain workers who were on your to-do list to go interview?
A Yes.
Q And I'll show you page 13 of Exhibit 57, and I want to draw your attention to the name at the top. Do you see the name there?
A Yes, I do.
Q Could you read that into the record for me, please?
A "Denise Riley at DHS/CPS worker contacted by Walentiny." Second column says, "Steph requested records from CPS. Phil asking Walentiny about Riley." And final column says, "Ask for file/notes."
Q So that task had not been accomplished by the time you got --
A That's correct.
Q Now, I would like to refer you to -- social service records are really often the gold in capital cases, are they not?
A Definitely.
Q And I want to refer you to now page 16 of Exhibit 57. Like I said, I'm not going to go through every task left undone. But do you see there on page 16 where you all were going to get ADC records in Deming?
A Yes.

Q Deming, was that New Mexico?
A Yes, in New Mexico.
Q And was the team aware that was a particularly volatile time in Mrs. Montgomery's life?
A We were, yes.
Q And were you wanting to fully investigate everything that happened to Ms. Montgomery in Deming?
A Yes.
Q And that included interviewing a gentleman by the name of Ken Flynn; is that correct?
A Yes.
Q That was the district attorney who had a relationship with Lisa?
A Yes.
Q You also -- on page 17 there's a note about wanting to follow up on the autopsy report. Can you see what that says there, and read that into the record?
A "Autopsy report for timing of death, cause of death and consideration regarding pathologist." The next column over, this gets assigned to David Freedman.
Q And why would that have been assigned to David Freedman?
A For his expertise in looking at what -- not only what the autopsy meant and said medically but then helping us consider what the right expert would be.

Q Was there consideration on behalf of that trial team that was assembled at the time that folks were looking into a Daubert challenge as far as the medical examiner was concerned?
A I believe so.
Q And then I want to draw your attention to halfway down the page of page 18 of Exhibit 57 where I'm pointing here right now. Can you read that?
A Sure. "Central Family Services, get new releases to them for more complete records. Get those more complete records to Walentiny." And other notation is, "Ron got new set of records January 2006."
Q So is that telling you an example of a situation where oftentimes social service agencies don't give you all the records the first time?
A Definitely that happens. Yes.
Q And sometimes even when you check done, you find out later on there's even more records to get?
A So true, yes.
Q Oftentimes does that happen when you read the records and realize, Wait a minute, there's more records?
A Not only that. You not only see it in the context of the singular records but sometimes a record from a completely other different agency, other institution highlights, Well, wait a minute, this is referring to something we don't have that should have come from this agency so we need to go back to

them with this and point out, you know, what we suspect is missing.

Q And sometimes does it happen that you will go and speak to someone who's named in those reports like a Denise Riley, for example, that will then -- she will then lead you to even more records?

A Yes.

Q Does that happen all the time?

A Not all the time but frequently enough that you can't not pursue it because it often does bring more information.

Q And there's also a mention here of master chronology. Do you see that?

A Yes.

Q Who was assigned that task?

A It looked like David Freedman was.

Q And that was something that was ongoing?

A Yes. Yes.

Q Why was David Freedman doing that?

A I believe it would have been for his expertise in recognizing symptoms of mental illness that were present in the records.

Q Next I'd like to show you page 20 of Movant's Exhibit 57. Do you see a notation there about Tommy Kleiner's criminal cases?

A I do.

Q And can you tell me what that references?
A We would have been looking to see when Tommy Kleiner was in custody and -- well, let me back up. What was he charged with, what was the outcome of those cases, and when was he in custody.
Q Would you also be looking for things like his employment records?
A Definitely. Probation records, school records, if they were available, any diagnostic medical records that might have been present.
Q Do probation officers sometimes have in their files -- or I'm sorry. Do court records sometimes have in their files indications like presentence report and things like that you can get even more social history?
A Yes.
Q And that's oftentimes prepared by probation officers and social workers?
A Yes.
Q And so was it the goal of the team to amass all of Tommy Kleiner's pretty extensive criminal history?
A Yes.
Q And that was a task assigned to Stephanie, David, Phil, and Susan?
A Yes.
Q And many records had, in fact, been collected?

A I believe so. You can see we were looking in several counties I can see here so we were working on it.
Q Was the team also working on a -- on page 22 of Exhibit 57, a chart of Mrs. Montgomery's pregnancies, false pregnancies, and sexual relationships?
A Yes.
Q And why was that?
A You know, to get a sense of the arc over time of what had gone on with her related to those issues, because it was clearly going to be present in her case, and so to understand what happened when and how that fit within the timeline of her life, what else was going on.
Q And who was assigned that?
A David Freedman.
Q And is that because the false pregnancies appeared to be a symptom of some sort of mental health symptom?
A Yes. I think most of us were approaching the false pregnancies as a sign of some kind of psychosis, so we were trying to figure it out.
Q Then on page 23 we start looking at experts that the team was looking at, and do you see the first expert there?
A Xavier Amador.
Q And who is Xavier Amador?
A He's a psychologist in Arizona who is particularly -- or at the time he was in Arizona, I believe. He may be

somewhere else now. He was particularly good on issues of Axis I diagnosis of mental illness.

Q Is it possible you're confusing Xavier with Pablo Stewart?

A Oh, I might have been. I'm so sorry.

Q Is Xavier Amador the fellow who wrote "I'm Not Sick"?

A Yes, he is. You're right. I'm sorry. Yes.

Q Okay. Now that I've refreshed your memory as to who Xavier Amador is -- and that's, I'm sorry, spelled X-a-v-i-e-r, M-a -- A-m-a-d-o-r. He had written this "I'm Not Sick." What was Xavier Amador's specialty?

A Xavier Amador had a brother, so his experience started out of having a brother who was quite mentally ill and who frequently refused services or treatment that, of course, would have made him safer and healthier. And so Xavier's expertise was in helping thread through how to help a client, a family member, a mentally ill person to have some insight into what was going on with them and help them accept treatment, a plan, be safer, be healthier kind of thing.

Q And was he particularly good at helping folks who had -- I can't say it. Where you refuse to accept you're mentally ill?

A Yes. Definitely.

Q Anosognosia?

A Yes.

Q And so was that something that you all were interested in because of the lack of insight in folks in Lisa Montgomery's family to recognize just how sick she was?

A Yes. I can tell you from personal experience it's a great book. He's very helpful in helping you figure out how to work through something with a loved one or someone you're close to that you wish would choose treatment, have insight, be able to be safer. It's a great resource.

Q And then you have on this next page, there's still more experts on page 24. There's a number of experts there who were being considered; is that correct?

A Yes.

Q And we won't go through all of them, but Lisa Dahl who is a mitigation -- or a jury selection expert or possibly on trauma?

A I don't remember her. I'm sorry. I don't remember what she was about.

Q Judith Herman?

A I met with Judith. Judy Clarke and I met with Judith Herman in Boston. She is the preeminent expert on trauma, probably wrote the bible on trauma, and she was physically not well herself and so unable to work on the case, not able to do the travel or other, you know, physical work necessary but was interested in -- was willing to review documents and advise us as a consultant, which we thought was a fabulous opportunity

for us to have that kind of expertise available to us.
Q Then we see there a Dr. McCandless. Is that Dr. Linda McCandless who was at CCA?
A Yes. Who was medicating Lisa. And so that's a large part why David Freedman would have been assigned to her to talk the same talk about the medication and its efficacies and effects.
Q Was the team considering using Dr. Linda McCandless as an expert witness for a first based offense on behalf of Lisa Montgomery?
A I don't remember. I'm sorry.
Q Dr. Ramachandran is listed there at the end?
A Yes.
Q It's noted that he is a Ph.D.?
A Right.
Q Not an M.D.?
A Right.
Q And in the column there it says he's a neuroscientist on phantom limbs?
A Yes.
Q He's not seen there as an expert on pseudocyesis?
A I think pseudocyesis is one subset of what he does as phantom limbs. I can't tell you why I put phantom limbs in there instead of pseudocyesis. He's written a book. I remember at least one book we read, some members of the team

read that included chapters on various kinds of phantom experiences that were psychosis borne.

Q Would you be surprised to learn that that one book that he wrote has one chapter that has five pages on pseudocyesis?

A I would not be surprised at all.

Q And David Freedman was assigned the Dr. Ramachandran contact?

A Yes.

Q And then you have other things like, "Always read and respond to Susan's emails"?

A That might have been more tongue-in-cheek than anything.

Q Okay. Also on the to-do list was a list of legal research to be done?

A Yes.

Q So the team was talking about and considering different legal motions that they could file?

A Yes.

Q And that included motions such as challenging the 911 call?

A Yes.

Q During the time that you were working on the Lisa Montgomery case, were you aware of the fact that a doctor named Park Dietz had been retained on behalf of the government?

A I believe I was.

Q And was it during this time that Dr. Dietz got himself into some trouble down in Texas?
A Yes.
Q And was the team considering conducting an independent investigation into what were then allegations of perjury against Dr. Dietz in Houston involving the Andrea Yates case?
A I believe so, yes.
Q Is that something if you had stayed on the case, you would have followed up on?
A Oh, definitely.
Q There was also a man by the name of Bret Dillingham. He also was on your list of individuals to follow up with. Do you recall that?
A I don't. I'm sorry.
Q Sure. He was the gentleman who conducted the very first sort of mitigation triage in Ms. Montgomery's case.
During the time that you and your team were involved in the Montgomery case, did it ever come to your attention that Mrs. Montgomery had been sexually abused not only by her stepfather but also by acquaintances or friends of her stepfather?
A Yes.
Q And how did you know that?
A I imagine we must have known that -- you know, I only can say I think we probably heard some of it from family

members but perhaps from Lisa herself.

Q Were you aware during the time of your representation of Lisa Montgomery that her mother had actually trafficked her or sold her body in order to pay for home repairs?

A We knew -- I remember that we suspected it. I couldn't tell you if we had nailed down that.

Q Is that the sort of information that you would have wanted to be able to establish and present as mitigation?

A Definitely.

Q Is that something you would have followed up on?

A Oh, yes, definitely. The layers of trauma that Lisa suffered would have -- including all the sexual abuse that we were aware of would have been something we would want to document and then potentially talk to witnesses about.

Q And then finally I'm going to show you Movant's Exhibit No. 64. It's already been introduced into evidence. Do you recognize that as the declaration that you prepared in this case?

A Yes.

Q And does that declaration, which appears to be five pages in length, bear your signature on the fifth page?

A Yes.

Q Just one moment, please.

A Sure.

Q That's all I have, Ms. Garvey.

MS. HENRY: Your Honor, I won't make my same spiel again. I think you know what I'm about to say. I would at this point now turn to the particular problems between Ms. Garvey and the situation involving the removal of Ms. Clarke from this case. I understand the Court's previous ruling. I'd like to renew my request to present that testimony for all the reasons previously stated under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

THE COURT: Well, I believe that there is some criticism of Ms. Garvey's withdrawing from the case. I don't know if you're talking about that or exactly what you're talking about.

MS. HENRY: You know, I need to be clear because I think I have confused the Court. Ms. Garvey was not the individual who was removed from the case.

I need to ask you a few more questions.

Thank you for pointing that out to me.

Q (By Ms. Henry) Ms. Garvey, when Ms. Clarke exited the case, you were still a member of the Federal Public Defender's Office in Los Angeles; is that correct?

A Yes.

Q And as a member of the Federal Public Defender's Office in Los Angeles, would you have still been willing to continue to work with the local Federal Public Defender's Office on this case?

A Yes.

Q Would you have continued to be a resource to them free of charge if they had requested?

A Yes.

Q Did you ever tell the local Federal Public Defender's Office that you were refusing to work on the case?

A No.

Q Did they ever reach out to you and request your help after Ms. Clarke was exited from the case?

A No.

Q Did Mr. Duchardt ever call you and ask you for your assistance with the case?

A No.

Q Did Mr. Duchardt ever call you at all?

A I've never spoken to Mr. Duchardt. I know who he is but I've never met him.

Q Did Mr. John O'Connor ever reach out to you and ask for your help?

A No.

Q Did David Owen ever call you again?

A No.

Q Did Ron Ninemire ever call you again?

A No.

Q Did Stephanie Elliott?

A No.

Q Did any of those individuals reach out to you and ask for copies of your file?
A No.
MS. HENRY: Thank you.
Again, Your Honor, I renew my request to pursue questions on the lines of what I discussed earlier with respect to Ms. Clarke's removal from the case for all the reasons stated previously under the Fifth, Sixth, Eighth, and Fourteenth Amendments.
THE COURT: The issues relating to Ms. Clarke's removal that have been ruled are not going to be revisited.
MS. HENRY: Thank you, sir.
That's all the questions I have, Ms. Garvey.
MR. VALENTI: May it please the Court.
THE COURT: Mr. Valenti.
CROSS-EXAMINATION BY MR. VALENTI:
Q Ms. Garvey, I believe during your testimony you indicated that you became aware -- I think you said that Special Agent Lipanovich said in a meeting with Judy Clarke that the sex between Lisa Montgomery and Jack Kleiner was consensual; is that correct?
A I did not say it was consensual.
Q No. No. You didn't say that. You said you were aware -- you've testified that you were aware that Kurt Lipanovich said that the sex between Lisa Montgomery and Jack

Kleiner was consensual?
A I had been told that, yes.
Q That's what I'm getting to, when you say you've been told that, you weren't for the meeting. You don't know what took place?
A Right.
Q Someone told you that and that person would have been Judy Clarke, someone you worked with for a long while, correct?
A I think both Judy and Susan Hunt.
Q Did you document a report about that at that time? Did you take notes? Did you credit the file in any way of that activity?
A I think the only indication about it would be whatever's on the to-do list about how we would have pursued the follow-up to that.
Q You mentioned also, ma'am, that you were aware generally that Lisa Montgomery had been sexually abused by not just Jack Kleiner but by other people associated with Mr. Kleiner, correct?
A Yes. Uh-huh.
Q And you indicated that you were also generally aware, and I don't think you knew exactly how, but you were generally aware that she'd also been trafficked sexually, correct?
A We thought it was a possibility, yes.
Q Okay. Did you document that awareness in any manner?

A I believe it's in the files.
Q Did you pass that on to anyone?
A It was a team discussion so I'm not sure what you mean by pass it on.
Q The reason why I ask is when you're out of the case, we're then led to believe that Dr. Porterfield only within the last few weeks has uncovered the fact that Lisa Montgomery was sexually trafficked and/or sexually abused by people other than Jack Kleiner. So you knew about this in 2005 and 2006 and yet we're led to believe that that information just came to light in 2016?
A I don't think you've correctly characterized my testimony. I think what I said was we had thought it was possible.
Q I think you said you were generally aware that she had been abused, then you said you were generally aware it was possible she was sexually trafficked. I think that's what you testified to, correct?
A I can't say that. I mean, you could have it read back. But what I would say to you to clarify is we thought it was possible that her mother had trafficked her, so to speak, but had not documented, had not talked to anybody about it as far as I can remember.
Q What about the sexual abuse by people other than Jack Kleiner? You said you were generally aware of that, I believe,

during your testimony. You're telling me now that the more consistent or more accurate way to say that is that you thought it was possible she was sexually abused by others?

A No. I would say as to Jack Kleiner sharing her with friends, we had heard that, yes.

Q And so that would be --

A The sexual trafficking was just a possibility.

Q All right. But because that only really came to light some ten years later, that wasn't clearly documented in any meaningful way that could be used, was it?

A I can't answer that. I'm sorry.

Q You indicated that the collection of records is an ongoing responsibility, right?

A Definitely.

Q It's an ongoing duty, correct?

A To the defense team, yes.

Q Something that doesn't stop?

A Right.

Q Is it fair to say that you've worked in cases both on what I would call the guilt/innocence or mitigation phase and you've also worked in postconviction phases?

A Yes.

Q When cases are before a trial court to be resolved on either a -- some disposition on the guilt/innocence side, whether that be plea or whether that be a trial, deadlines tend

to be more stringent; is that fair to say?
A What kind of deadlines are you talking about?
Q Trial deadlines. When a trial date is set, those are less flexible to be moved than postconviction deadlines?
A It really depends on the case. I don't think I can say certainly that that's true.
Q And is it fair to say, then, in general when cases go into postconviction, they tend to go much slower and that more time is afforded to you when you're working on a case in a postconviction context?
A It depends on the jurisdiction.
Q Okay. Do you say that some cases in postconviction are moving father than the actual trial itself?
A Yes.
Q Okay. Are you familiar with the postconviction process in the Western District of Missouri about the time?
A Not really.
Q If that time was considerably longer than was allowed for a case to get to resolution, would you agree that in the postconviction context if you have more time, you can get more records?
A Sure.
MR. VALENTI: That's all I have, Your Honor.
THE COURT: Ms. Henry?
MS. HENRY: Nothing further, Your Honor.

THE COURT: All right. Thank you, Ms. Garvey.

(Witness excused.)

MS. HENRY: Your Honor, we have an additional witness. We could go ahead and put him on. We could go to about six if that's what the Court would like.

THE COURT: Go to six?

MS. HENRY: Go to about six.

THE COURT: No. We'll quit now.

All right. We're going to adjourn for the day and everyone be back at nine o'clock in the morning.

(Court adjourned at 4:45 p.m. until 9 a.m. Thursday, November 3, 2016.)