UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA M. MONTGOMERY, Movant, | ) | |
| vs. | ) | Case No. 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS - VOLUME IV
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 3, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:
MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:

MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

## I N D E X

Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

I N D E X
(continued)

Page

NOVEMBER 1, 2016

VOLUME II

RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

I N D E X
(continued)

Page

NOVEMBER 2, 2016

VOLUME III

RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . . 761

INDEX (continued)

Page

NOVEMBER 3, 2016

VOLUME IV

DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

I N D E X
(continued)

Page

NOVEMBER 4, 2016

VOLUME V

CHRISTOS DAVATZIKOS
Direct examination by Ms. Henry. . . . . . . . . . . . 1120
Cross-examination by Mr. Valenti . . . . . . . . . . . 1165
Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG
Direct examination by Ms. Henry. . . . . . . . . . . . 1182
Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE
Direct examination by Ms. Henry. . . . . . . . . . . . 1245
Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL
Direct examination by Ms. Henry. . . . . . . . . . . . 1255
Cross-examination by Mr. Valenti . . . . . . . . . . . 1290
Redirect examination by Ms. Henry. . . . . . . . . . . 1302

I N D E X
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

# I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864



Case 4:12-cv-08001-GAF Document 220 Filed 05/04/17 Page 9 of 306

INDEX (continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

I N D E X
(continued)

Page

NOVEMBER 10, 2016

VOLUME IX

FRED DUCHARDT
Direct examination by Ms. Harwell (cont'd.). . . . . 2263
Cross-examination by Mr. Ketchmark . . . . . . . . . 2273

BEN LEONARD
Direct examination by Ms. Henry. . . . . . . . . . . 2324
Cross-examination by Mr. Valenti . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . 2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Diane Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |
| FOR THE RESPONDENT: | | | |
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

NOVEMBER 3, 2016

MORNING SESSION

(Court in session at 9:05 a.m.)

THE COURT: Are you ready, Ms. Henry?

MS. HENRY: Yes, Your Honor, we are.

Movant calls David Freedman.

Your Honor, while Mr. Freedman is making his way to the witness stand, I'll let you know that Sheriff Espey is present in the courtroom today, and we have agreed that is fine; that even though the rule is invoked, that he's welcome to sit in on these proceedings.

THE COURT: All right. Good morning.

DAVID FREEDMAN, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning, Mr. Freedman.

A Good morning.

Q Would you state your name for the record and spell your last name for the court reporter.

A David Freedman, F-r-e-e-d-m-a-n.

Q Mr. Freedman, how are you employed?

A I'm a post doc at the University of California, Los Angeles at the Semel Institute.

Q And how do you spell Semel?

A S-e-m-e-l.

Q What is the Semel Institute?

A It's -- it houses the Department of Psychiatry and Behavioral Medicine at UCLA.

Q You said you're a post doc. What does that mean?

A It's a position that you take in my field soon after finishing a doctorate, and so it's part of the continuing training that we do.

Q And so you are -- we're going to get into your professional background, but currently you are doing research; is that correct?

A That's right. I work on neurodevelopmental disorders. I have a second job -- well, two others actually. I'm currently teaching at Columbia Law School, a class on criminal defense and mental illness, and I continue to consult on capital cases.

Q So let's get into your educational history, if we can. Okay? Can you share with the Court what degrees you hold and from where?

A Sure. I'll do them backwards because it's easier. I have a Ph.D. from Columbia University in psychiatric epidemiology, I have a master's from the Harvard School of Public Health, and I have a B.S. from the University of Wisconsin in Madison.

Q And what was that degree?

A From Madison?

Q Yes.

A It was from the School of Education. So it's a training degree in curriculum design and instruction.
Q In addition -- when you -- let me ask you this question: How was it that you came to be involved in capital work?
A I started in 1991 at the California Appellate Project as an intern investigator. So they had a small group of us that they were training to do investigation on capital cases.
Q What is the California Appellate Project?
A CAP, I'll refer to it as, was a state resource center that provided assistance to appointed counsel in all of the habeas cases in California. So all of the people sentenced to death in California were appointed lawyers, and CAP provided -- was a resource center for those attorneys and did a little bit of direct representation as well.
Q And who were your supervisors at CAP?
A I was hired and trained by Scharlette Holdman and Russ Stetler.
Q And during the time that you worked at CAP, did you also come to know a woman named Kathy Wayland?
A Yes. Kathy came to -- Kathy worked as an expert on a case that we had at CAP and then came to work at CAP.
Q And what is Kathy known for in the capital defense community?
A Kathy's research and training before she came into the

death penalty world was in trauma, and what she's known for really is her research and work on trauma exposure and the consequences of exposure to trauma.

Q And does she actually present at CLEs quite regularly for capital defense practitioners?

A Presents, publishes, yes. I mean, she's a resource for the community.

Q Is she a close collaborative colleague of yours?

A Yes. I mean -- yes. We've presented together. We talk frequently. We help each other write.

Q You've published together?

A We have not published together. We edit each other's work, but we've presented together at conferences.

Q On topics such as trauma and mental illness?

A Yes.

Q So your experience at CAP, how long were you there?

A '91 to '95, I believe.

Q You were an investigator at CAP?

A Right.

Q Through the years at CAP, did you develop a particular affinity for a certain aspect of capital representation?

A Yeah. I was trained initially to do all sorts of investigation and mitigation. I got licensed in California as an investigator, but my work very quickly focused on mental illness issues; and so while I was trained to do a broader sort

of investigator job, I quickly specialized in clients who had mental illness.

Q And did that work cause you to then seek to further your education?

A Yeah. That was why I went back and did my master's was to look at -- to look at how mental illness affects behavior in a way that brings people into the criminal justice system. So I went to do my master's to look at prevention work and focused on how policy deals with people with mental illness in particular.

Q And that was what your public health master's is in?

A That's right.

Q And then you furthered your education, I think you said, psychiatric epidemiology. What is that?

A Right. So my degree is, I suppose, technically in epidemiology. I was funded by the National Institute of Mental Health for five years and specialized in psychiatric epidemiology, and the field looks at the distribution and causes of mental illness. So it's a population-based research rather than a clinical field. So we don't look at how individuals become sick. We look at a population of what are their exposures and consequences and life course effects of mental illness.

Q After getting your master's degree, where did you work?

A During it?

Q Yes. During, while you were pursuing it.
A I did two jobs at different points. So one was at the Harvard Injury Research Control Center. I may have those words in the wrong order, but it was a position that was looking at intentional and unintentional injury, including violence but also falls and we were studying, you know, all sorts of injuries that happen.
And the other was at the Cambridge Hospital through a grant from the city of Cambridge and the Harvard Department of Psychiatry on the two wards, psychiatric wards at the Cambridge Hospital, and I was doing a study on violence exposure on people on the locked wards prior to their discharge and release back into the community.
Q And what was the purpose of that study?
A The study was set up by the assistant chair, co-chair of the Department of Psychiatry because he thought that the staff was missing trauma exposure in the people who were in those wards.
So they wanted to look at a comparison of doing -- of interviewing the patients before discharge to ask them about perpetration and victimization regarding violence, and then compare their reports right prior to discharge with the medical records on the wards to see what had been known by the treating staff before, and the idea was to figure out whether they needed better training, whether they needed to do

a better job training staff.

These wards were both permanent psychiatrists and social workers, and so forth, but also it was a training unit for the Department of Psychiatry. So people who had just finished their medical degrees and then were specializing in psychiatry rotated through these wards. So it was to figure out whether they needed better training in understanding trauma and trauma in lives with people on these wards.

Q Did you develop an instrument to be used in that study?

A Yes. We used a structured instrument, semi-structured instrument to ask about perpetration and victimization to walk people through a set of exposures, violence exposures. So from being slapped to -- well, starting from being yelled at to having a gun pulled on them and to ask them about their experiences in the last 30 days, the last year, and across their lifetime.

So we were looking to see whether there were violence exposures that led to their being detained. So these are locked wards. They're involuntary commitments so people couldn't check themselves in and out, but they're also not exactly in prison. So at the point they were no longer a danger to self or others, they would be released and a determination had to be made on the wards, and we were looking to see where in their life span the exposures to violence happened.

Q And did you -- what were the results of the study? What did you learn about whether or not these staff members who were treating people in locked facilities were missing trauma?

A I mean, that is what we found. The records, medical records were significantly underreporting the amount of exposure to violence that the people on these wards had experienced, and that the task of asking them very specifically what their exposure had been was uncovering a lot more exposure to violence than what's reflected in the records.

Q You said that was a study that was funded by who?

A Funded by the city of Cambridge and the Department of Psychiatry.

Q From Harvard?

A Yeah.

Q And then can you share with the Court what your next work was?

A I went back to capital defense consulting after my master's.

Q Describe for the Court the nature of your consulting.

A So I pretty much only -- I get referred cases. Most of the cases I get referred are where people suspect that there is a question of mental illness, but I work on any set of cases. I did that briefly in private practice, and then I completed my master's in '99. In 2002 I think I started working with Judy Clarke as part of the Capital Resource Counsel Project.

Q So you came to work directly for Judy in 2002?
A That's correct. So in that little window of me finishing my master's and working with Judy, I was in private, sort of, practice.
Q And did you know Ms. Clarke from your previous work?
A We had worked one postconviction case together before that. I knew her as a -- I had gone to a training that she hosted in Idaho and presented, but I didn't really know her at that point. I was just invited to speak. So I didn't know her well.
Q And as part of the Capital Resource Counsel Project, were you actually a salaried employee with the Federal Defender system?
A I was.
Q And where were you housed?
A I was initially housed in San Francisco where I lived, and then housed in the San Diego Federal Defender Office because I was moving to Arkansas; and for whatever bureaucratic reasons, it was easier for them to have me paid out of the San Diego Federal Defender than anything else.
Q So you lived in Little Rock but you were assigned to San Diego?
A That's right.
Q And that was -- that's become a fairly standard practice in the Federal Defender system for people to be housed

in one defender office but maybe live someplace else?
A Right. Especially people who are working in the -- I wasn't working on San Diego cases in particular. I mean, I was working as a national resource person so it didn't really matter where I was because I was traveling to cases.
Q So in 2004 when the Lisa Montgomery case came into the Federal Defender system, you were in Little Rock?
A Yes. I moved there in 2004.
Q Okay. So this was December the 16th, so you were a new resident in Little Rock?
A Right. Yeah. I don't remember exactly the month I moved; but, yeah, I would have moved in 2004.
Q And even though you had an office in Little Rock, you were there?
A Right.
Q And how long did you hold the position with the Capital Resource Counsel Project?
A Until 2009 when I went to do my doctorate.
Q And what research did you complete while doing your doctorate?
A I worked primarily on psychotic disorders, so schizophrenia and bipolar. My initial research was on schizophrenia and developmental risks for schizophrenia and then cognitive functioning of people with schizophrenia.
My dissertation was on bipolar and whether bipolar

disorder is a neurodevelopmental disorder, and I used a birth cohort that was developed in northern California in the '60s and has been followed since, and for both of those sets of studies there's a group of people who have become diagnosed with schizophrenia and a group that's been diagnosed with bipolar, and we looked at things that were risk factors for the development of those illnesses.

Q You've used the phrase "neurodevelopmental" a couple of times. Can you explain for the record what you mean by neurodevelopmental?

A Yeah. So there's not a great definition. Neurodevelopmental is essentially what it means. There's a traditional neurodevelopmental pathway, so everybody's brains form and develop over time, and what we look at in illness is what takes somebody off that trajectory. So neurodevelopmental research tends to start in the period in utero, perinatal times and then follow people across the development of their life.

So the neurodevelopmental part is just how the brain develops and functions and its structure, its both physical structure and its functional nature.

Q And so do we know from research that the brain tends to continue on the developmental trajectory into the 20s now, right?

A Yeah. So I would phrase that slightly differently. The brain changes across life span, and we see there's a period

where the brain is developing and sprouting. Neurons are connecting. There's a huge increase in that in early years and it begins to prune back in adolescence. So you see a reduction in certain kinds of connections that aren't being used. So the brain becomes more efficient and begins to myelinate during that period of adolescence into the 20s.

Myelination is just a -- it's like insulation around the neurons to make them operate more efficiently, and myelination happens back to front. Myelination finishes in the 20s. In the age 20s full development probably lasts until 25 to 28, and then the cognitive functions sort of plateaus in the late 20s, 30s. And for most of us who are slightly older than that, it starts to decline at a point somewhere around the 40s. So for many of us we're in that sort of declining period, which hopefully is long and slow.

Q Hopefully so.

A At least to get us through today.

Q Mr. Freedman, I want to focus now on some of your publications, if I might. Let me ask you this: In your work as a post doc, do you also continue to work as a consultant on capital cases?

A I do.

Q And have you continued a professional working relationship with Judy Clarke through the years?

A Yeah.

Q While you were at the Capital Resource Counsel Project, did you consult with Federal Defender offices throughout the country?

A Yeah. So our charge, so to speak, at the Capital Resource Counsel was to assist any Federal Defender office that got a capital-eligible case. So hopefully we were able to consult with people when the indictments came prior to the Department of Justice deciding whether it would be capital or not so we could work with teams to develop evidence to present to the Department of Justice before that decision was made. That obviously didn't always happen, but we tried.

Q And your position was attached to Ms. Clarke's position; is that correct?

A That's right.

Q Did you only work on cases where Ms. Clarke was providing direct representation as counsel of record?

A No. So we also did a lot of consulting, more consulting than her direct representation, and I also worked with the other side of the resource counsel, which was -- which is the wing of it that provides assistance to CJA counsel eligible cases. So I was attached to her. I mostly worked with her, but I also worked with other people in their resource counsel project on the CJA.

Q And then some people might just call you up on their own and ask for help and you would help them?

A Right. I still do get calls from State counsel as well. So the CRC project was just federal capital, but I would also get calls from State practitioners with State-eligible death cases.

Q And have you always been open to offering your assistance to lawyers even if you weren't going to get paid?

A Yeah. I mean, unfortunately, but yeah.

Q When people reach out for help, you don't turn them down?

A That's right.

Q Now turning to some of your publications, and there are several in your CV, which is already in the record, but I want to ask you if you could highlight for the Court some of your publications and peer-reviewed articles that are particularly relevant to your testimony today.

First if you can, for the record, explain what it means to have an article be peer reviewed.

A Yeah. I mean peer review is that -- so you as a group usually -- only rarely do we write as individuals, but as a group, you write what you think is a finished perfect thing. You submit it to a journal. They blindly -- in a blinded process they send your paper out to experts in the field, and you get comments back, then you make revisions based on those comments, which can be anywhere from grammatical changes to you've used the wrong analytic model and you need to change --

you haven't taken this into account and you need to change the way in which you approached the data itself.

Then they can -- so the peer reviewers recommend whether the paper should be accepted, rejected, or revised and resubmitted and some combination of that. So the peer review process is a pretty rigorous one.

Q So what are some of those articles you published in peer review journals?

A I'm going to have a handful from my dissertation on bipolar and exposures related to early childhood and bipolar disorder. I mean, I don't know how much detail you want me to get into.

Q You published on bipolar disorder?

A Published on bipolar and schizophrenia. I've published on capital defense issues, competence to stand trial.

Q Have you published also in the area of competence?

A I did, yes.

Q And I'm going to put something up here on the Elmo and ask you if you can identify what this is. Do you recognize that?

A I do.

Q What's that?

A I published a paper in 2009 on what was required --

MR. KETCHMARK: Your Honor, if I might, at this point I would just interject. They didn't notice him up as an

expert. I think they noticed him up as a fact witness. His involvement would have been over in 2009. They're trying to get into areas of his expertise after he was involved in this case.

MS. HENRY: I'm not offering him as an expert. I'm offering him to show the Court what was available to Mr. Owen, and we're going to be able to develop through testimony how dismissive Mr. Owen was of Dr. Freedman's opinions. So I'm simply establishing his qualifications and credibility and why the trial team should have been listening to him.

THE COURT: He sounds pretty well qualified to me.

Q (By Ms. Henry) So have you published in the area of -- in the International Journal of Law and Psychiatry on how to determine if someone is competent to stand trial?

A Yeah. I mean, this paper is how to determine it but also what's required of a defendant. So a lot of the -- like the ABA Guidelines are about what lawyers have to do in order to assess whether somebody's competent to stand trial, and I was taking -- I reviewed some of that. I was taking the approach of what's required cognitively of a defendant to engage in the process of a trial in a way that is competent and meets the standards. So a way for people to understand what the person sitting as a defendant has to be able to do.

Q Mr. Freedman, I was going to ask you this later but just to make sure that we're clear in the record and Mr.

Ketchmark's objection, did you become aware on the defense -- you remember the Lisa Montgomery capital defense team, correct?

A Yes.

Q And the team that you were a part of was the team that involved Susan Hunt and David Owen; is that correct?

A That's correct.

Q Did you become aware from the team how Mr. Owen viewed your assistance to the team?

A Yes.

Q Could you share that with the Court, please?

A He had trouble understanding that I wasn't a nurse. His view of public health was I assume -- he never actually said this to me, but was sort of the public health service where they send nurses out to provide assistance to --

MR. KETCHMARK: Your Honor, I'm going to object. If he said this wasn't a conversation he had with Mr. Owen, I don't know where he's basing this information. I think he can talk about his discussion or what Mr. Owen told him directly. We're kind of roundabout getting in this dynamic of everybody is picking on David Owen.

He's talking about -- I don't know the source of this information. I don't know the reliability of this information. They're calling all these team members. If they want to talk about what David Owen told Judy Clarke, they could have done that as it relates to this particular individual. I

think he can testify about what Owen told him directly or conversations or emails that he got from David Owen, but to suggest in a roundabout fashion this rumor and gossip that's happening at these team meetings I think is inappropriate.

THE COURT: Well, David Owen remained on the case, and if Mr. Freedman had observations of his competency or effectiveness in the course of his representation -- and I understand all that changed when the team changed and the dynamics of who may or may not have been in control may have very well have changed as well, but I'm going to listen to Mr. Freedman's experience in his interaction with David Owen. And I think it's already been established, has it not, that Mr. Freedman was part of the team meetings to some extent, at any rate, while the Susan Hunt, Judy Clarke, David Owen team was still in existence?

MR. KETCHMARK: And the only thing I would add, Your Honor, if he could be instructed that if he has personal knowledge in terms of things that Mr. Owen directly told him or emails that he referenced in his testimony. If not, he basically say how his source of information back to Mr. Owen for clarification of the record.

THE COURT: I presume that if there are records that establish anything that need to be pointed out, you will do that, but let's qualify what the source of Mr. Freedman's opinions is or are.

MS. HENRY: I certainly will, Your Honor. I should also say we will be calling David Owen.

THE COURT: I understand he's on your witness list, just as about everybody is.

MS. HENRY: Yes, sir.

Q (By Ms. Henry) So, Mr. Freedman, how did you become aware of the fact that Mr. Owen had a difficult time not seeing you as a nurse?

A Other people on the team told me he made these references when I wasn't in the room. My experience of it was very much that he was dismissive and would not pay any attention to anything I said. So it was not a surprise to me to hear people say that's how he referred to me because that was what my experience was with him in the room.

Q Thank you.

I brought a copy of your CV with me to the lectern, but I apologize. I don't know what the exhibit number is. 98. I'm going to put it up on the Elmo, Movant's Exhibit 98, and ask if you can identify that document.

A It looks like the beginning of my CV.

Q Okay. And your CV appears to be, or this one anyway -- doesn't have page numbers on it -- it includes all your professional work; is that correct?

A That is right.

Q And is this the last page?

A Yes.

Q Do you continually update your CV?

A Yeah. One of the things is they require you submit this thing constantly, and it has to be up to date every time.

Q So this was up to date at the time you emailed it to me? You may have added some additional publications?

A It's possible.

Q And I'm not going to -- we would be here all morning if I went through your entire CV and all of your qualifications, so we'll just move on and your CV will speak for itself. And we'll talk about your work experience and publications you had prior to your involvement; is that correct?

A Yes.

Q In addition to your work in consulting with Federal Public Defender offices who had capital cases assigned to them, did you also participate as a trainer at various seminars around the country?

A Yes. Starting back -- I think 1999 I started doing training.

Q What sorts of seminars have you been -- have you trained at?

A So the Federal Resource Counsel at least two a year. I've been at the -- California has a very large capital training seminar every year, and I presented at that a number of times. There's sort of yearly trainings at a number of

organizations NSCDL runs. I've been to some of those to present.

Q I know you're kind of a humble guy and I'm asking you to brag, but you've trained at Monterey; is that correct?

MR. KETCHMARK: Your Honor, if I might, I think Ms. Henry indicated, and we didn't object to his CV, Exhibit 98, being admitted. I would note for the record there's an entire section on where he's presented, where he's lectured. I don't know that we need to get into this. I think it's cumulative of the CV. I'm not contesting his qualifications. We're not contesting the CV. I think what's more important is what did he do in this particular case, and I don't know that we need to go into belaboring his testimony or his presentation.

THE COURT: Can the CV suffice?

MS. HENRY: What I really want to establish, Your Honor, is he taught at seminars that Mr. Duchardt attended.

THE COURT: Well, ask him that.

MS. HENRY: Yes, sir.

Q (By Ms. Henry) Are some of the seminars Mr. Duchardt attended such as the Federal Death Penalty Strategy Session?

A Yes.

Q And let me add, Life in the Balance?

A Yes.

Q And at the Monterey seminar in California?

A Yes.

Q Thank you.

So, Mr. Freedman, I'd like to now ask you some specific questions about your involvement in the Lisa Montgomery case. I direct your attention to January of 2005, which was within a month of the offense and Mrs. Montgomery being charged. Did you have a consultation with the Federal Public Defender's Office in Kansas City with Dick Burr?

A Maybe. I have a vague -- I don't remember the first contact so I'm not sure when exactly it was, but I did have a consultation, and I don't exactly know the date, so I don't know that it was exactly in January, but yes.

Q So if Dick Burr testified that he brought you in to consult on the case early on, would you have any reason to disagree with him?

A No. No. I'm fine with the Dick-brought-me-in-early part. It's the dating of it I'm not sure of.

Q And what was the purpose of Dick asking you to help out in the case at that point?

A Dick was part of the resource counsel project. He would have asked me to become involved because he thought there was some possibility that there was a mental health question for the defendant because that's what I would -- why he would have called me as opposed to somebody else. So he likely wanted to have me in the room so that we could hear descriptions of symptoms and behaviors and get a sense of what

was being seen at that point so we could provide some guidance.

Q Do the ABA Guidelines require each team to have a member who is capable of identifying mental health symptoms?

A They do.

Q And so was Mr. Burr bringing you in at that early stage, not to serve that role ultimately on the team, but to at least guide them in the right direction?

A Yeah. Right. So I didn't have to be that person for the team. They could have hired somebody to do that, but they needed somebody who had skills and training in working with somebody with mental illness as part of their team, and so part of the consultation project role is to sort of help them figure out who they might want to get or guide them towards certain kinds of resources that they could go forward with or become that person potentially.

Q And since you were in Little Rock, it wasn't that difficult for you to get up to Kansas City?

A Right. I was regionally close and so it was sort of within our territory and Dick was in Oklahoma or Texas at the time.

Q And traveling is not something that bothers you. You are available --

THE COURT: Nobody's -- that's not even an issue. I mean, nobody is saying he wouldn't do whatever he had to do.

MS. HENRY: Okay. If that's stipulated to, we don't

need to go there.

THE COURT: I don't know if it is a stipulation. I think it's just obvious, as a lot of this is.

MR. KETCHMARK: Your Honor, Ms. Henry indicated she didn't know about leading. I have no problem with her leading if it will expedite this process. If she wants to get in and make her points with him, that's perfectly acceptable with this particular witness.

THE COURT: Well, I think the record reflects that you don't object to leading questions.

MR. KETCHMARK: Thank you.

Q (By Ms. Henry) Mr. Freedman, you were involved early on in the case in that limited consultation role, and then do you recall that the next time you became involved in the case was when Ms. Clarke contacted you in July of 2005 and asked you to, again, assist the team in identifying mental health symptoms with Mrs. Montgomery?

A That's right.

Q And did you do that?

A I tried.

Q And did you begin to then receive records from Ms. Garvey?

A Yeah. Yes. Ms. Garvey came in slightly after me, and so I think I started -- I think we may have had a meeting with the team that was in Kansas City before records started coming

in.

Q And during that process, were you the person who started to put together the mental health chronology?

A Yes. I was chron'ing records and documents as they came in to try and capture mental health symptoms.

Q And did you share your chronology with the team?

A Yeah, regularly as it was updated.

Q I want to ask you -- you attended the team meetings; is that correct?

A Yes.

Q There were a lot of them?

A Yes.

Q Did you -- and I'm going to ask this question for a specific purpose, not related to the dysfunction with the team. But did you notice or did it become apparent that there was a problem with David Owen having a special relationship with Lisa Montgomery's mother, Judy Shaughnessy?

A Yes.

Q Can you explain what that problem was, please?

A Yeah. So Lisa's mother was a potentially very important historian of Lisa's upbringing and development, so all of the things that would have affected her during her life. We became aware of sexual abuse that was occurring, and the scope of that sexual abuse was we were investigating and looking at.

It was certainly my view, and I think shared by most of the team, that David Owen was not going to be able to elicit information that was important to the development of those kinds of facts, and so we didn't want to have him maintain this special relationship with Judy that would keep us from doing the investigation that had to get done.

So he was -- he was hindering the investigation by maintaining this relationship and doing it at times when as a team we had agreed he would stop, then he would later disclose that he had continued to have contact without telling anybody and continued to tell her things or not tell her things, all of which was interfering with us getting a mitigation specialist to begin the process of establishing a rapport with her to elicit information that was critical to understanding Lisa's history.

Q And so did the team at that point based on -- I'm going to refer to the team as did you, Ms. Clarke, and Ms. Garvey based on your experience and training with Scharlette Holdman, Kathy Wayland, CAP, your education, did you suspect that Judy Shaughnessy may be a part of -- a perpetrator of trauma among Lisa Montgomery beyond just being a passive witness?

A Yes. I mean, we knew that she was a part of it, but the question was what the scope of that participation was. I mean, the simple fact of abuse -- I mean, going to court and saying our client was abused doesn't really do anything, right?

I mean, nobody cares anymore. I mean, since Dershowitz wrote the Abuse Excuse article, whenever that was. I mean, it's the details of what happened and the consequences that that creates that matter for mitigation.

So the pursuit of the scope of what it was and how it happened and how often and whether people whose responsibility it is to protect a child are participating in the perpetration of the offense against that child changes the context in which that child develops. And so you have to find that, right? It's not enough to just be able to say, Oh, well, there was a court case and in that court case it says the person was abused. That's good. That's a red flag. That's the kind of thing that helps you, guide you to continue to pursue the investigation.

But it's the details of what happened and the consequences and how people have to adapt -- the abused person has to adapt to kind of keep themself safe and alive, and so we knew that things had happened, but we didn't yet know the scope of what that was or what it meant.

Q And when you say you knew, you knew it intuitively but you didn't have actual knowledge, right?

A We had --

Q You knew some things but you didn't know other things?

A That's right. We knew some things from some records that were obtained from the divorce that occurred and from -- I

think from a CPS file, if I remember right, but we had -- it was so clearly the surface of what there was to find, and we did not have time or make it to find all of that, but we were on that path, I believe.

Q So specifically at the time that you exited the case, you all did not have -- you had an intuition that perhaps there were more than just Jack Kleiner as a perpetrator, but you didn't have any information that there was more than Jack Kleiner; is that correct?

A That's right. I mean, I would say more than intuition. We had signs and symptoms that were consistent with a level of trauma that was greater than that which we knew to have happened, and we were not yet able to prove or document the scope of what had happened, but we had the red flags that would indicate that more had happened than we knew about at the time.

Q And so did the team decide to reach out to Judith Herman to assist the team in identifying the depths of the trauma?

A Yes.

MS. HENRY: If you would give me a moment, Your Honor.

THE COURT: All right.

Q (By Ms. Henry) A component of the team meetings that we haven't heard about before involved the training that would occur at the team meetings. Did each team meeting include a

training component where some member of the team would attempt to train the local Federal Public Defender on issues relevant to the case?

A Yes. I mean, we did training -- we always do training, and we had particular issues in this case that were important that everybody have a baseline of knowledge on. I mean, so from investigators to lawyers and paralegals, everybody on the team needed some basic understanding of how mental illness works and how trauma works; and because people were seeing Lisa and the visits are important opportunities to observe symptoms, we needed people to know what they were seeing. So, as in all teams, we did training every chance we got.

Q Was there a problem with members of this team normalizing symptoms of mental illness?

A Yes. I mean, not just this team. I mean, to put this in perspective, we all normalize, right? When we have family members or friends who are ill and we adapt ourselves to those symptoms because we care for them, right? I mean, it's a human thing that you want to make normal things that you see in somebody that you like or want to take care of. There's nothing wrong with that.

But it's not helpful for a defense team to do, right? I mean, our task is to figure out what those symptoms are, how it affects the functioning of the person, how it has in the past and how it currently is, how it's affecting

interactions with the team itself, how it's going to affect their ability to go to trial, all of those things, right? So normalizing in that context makes symptoms that are important to defense go away. So you're downplaying them.

I think with this team there was an added problem of hostility towards some of the behaviors that came from mental illness were viewed negatively by members of the team, and they felt personally offended by things that were done or said. So it wasn't entirely normalizing. Some of it was also creating a negative and hostile view of Lisa that we needed to work past, and teams need to understand which things are somebody being a jerk and which things are somebody expressing or demonstrating symptoms that relate to a mental illness, right? I mean, both those things can happen but you have to be able to differentiate them so that we can look at what the symptoms are versus what the behaviors are.

With Lisa there were very few things with her being a jerk. I don't remember any, honestly. There were a lot of symptoms that were interfering with the relationships and that were difficult for this team to get their heads around, and they wanted to either normalize, say, Oh, that's not really a symptom of anything. I didn't see anything. Or say, That's just her being difficult and we don't like her for that.

Q Was the fact that Lisa had memory impairments one of those things that the team found -- the local team didn't

understand?

A Yes. Yeah. So the view of her memory issues and having to work with her around sort of the normal process by which people try in their own heads to make stories make sense. So where a story that's somebody remembering and trying to tell has gaps or doesn't quite fit together or they remember it like a dream as opposed to the way most of us remember things, you have to fill in those details in some way in your own head, the person's head, and this can be difficult for the team because they may not be understanding that process.

So lots of defense teams, including this one, feel like they're being lied to by a client where a client is trying best to recover the details that they remember, and those details are shaped by trauma and by mental illness, and so they don't come out in a way that is easiest for the rest of us to understand. So you need a way to hear those stories and evaluate them that's not just taking the client at their word.

Q In your experience, did Lisa Montgomery have a difficult time understanding what was real and not real?

A Yes.

Q Can you explain that to the Court?

A I mean, she had a variety of symptoms, including what appeared to be sort of hallucinations and experiences that nobody else in the room was having and dissociative periods which may have been trauma related or neurologically driven,

conditions that -- she had experiences that you could be sitting with her and not also experience but she would experience them, and so, yeah, I mean, she had symptoms of a psychotic disorder.

Q Did she also have symptoms of a mood disorder?

A Yes.

MR. KETCHMARK: Again, Your Honor, I'm going to object to borderline expert testimony. He didn't provide any reports with respect to that. He didn't do any type of evaluation, any type of testing with her. He was endorsed as a fact witness with respect to his activities. He can talk about his observation, but now to start suggesting that she had symptoms of a mood disorder, that she had all these -- this is getting into borderline expert testimony, and that was not the purpose, my understanding, as to why they endorsed him. It's what he did, what the team did, what they observed, and what was basically left undone when the Judy Clarke ensemble and team moves out of the case.

MS. HENRY: Your Honor, this is the member of the team who was --

THE COURT: It sounds an awful lot like expert testimony with diagnoses as opposed to factual information. I think you established that, you know, there were all of these symptoms of mental illness, at least that's what your witnesses testified to. I don't think anybody disputes ultimately that

Lisa Montgomery had serious mental health issues.

MS. HENRY: I guess the way to respond to that, Your Honor, is in a couple different ways. The government's expert does dispute that, actually. At trial the government's expert said she was a manipulator and antisocial liar. Actually, he didn't say antisocial. I apologize. He did not give antisocial as a diagnosis.

But at trial it was heavily disputed as to whether Ms. Montgomery had a mental illness or not, and that's the ineffective assistance of counsel claim that we are establishing here.

The red flags that were in this file -- Mr. Duchardt in his declaration to this court under oath has sworn that this team had done nothing in the case when he picked it up, and so we're trying to impeach Mr. Duchardt's declaration in anticipated testimony. We're also going to show that --

THE COURT: Okay. Well, can you move on with what you got?

MS. HENRY: Yes, sir.

THE COURT: All right. And so he's given his opinion. Now let's move on to something else.

MS. HENRY: Okay.

Q (By Ms. Henry) I want to now ask you about whether or not the legal team in this case was investigating the possibility of there being a second perpetrator at the crime

scene. Okay?
A Sure.
Q Was the team investigating whether there was a second perpetrator at the crime scene?
A There was a question as to whether there was or not and -- yes. We were investigating it. It was at issue for at least some portion of the time that I worked on this case.
Q And during the time that you worked on this case, did you learn that certain members of the team -- and I understand you didn't share this view -- but certain members of the team were working under the hypothesis that perhaps Lisa Montgomery's brother, Tommy, was involved?
A Yes.
Q And did the team ultimately rule out Tommy because they realized that he was with his probation officer and had an alibi at the time of the crime?
A Yes.
Q Did every member of the team know this information at that time?
A Yes.
Q Was it shared openly in a meeting?
A Yeah. I mean, I think some people were disappointed that Tommy had an alibi, but that's the kind of thing you do investigation to figure out, right? It's not that hard to find. So of the things that you would explore, that was one of

the things that we explored and it was not a viable option, and so we moved on to continue the investigation on things that were going to be relevant.

Q Did you also investigate a theory of pseudocyesis?

A Yes.

Q And were you the individual on the team tasked with investigating pseudocyesis?

A Yes. I mean, it had come up before I joined the team as an idea, but I think it was assigned to me to figure out whether it was a viable defense or, you know, mitigation presentation.

Q So I understand that if you punch pseudocyesis into Google, Dr. Ramachandran's name is going to pop up?

A I would imagine so, yes. I haven't tried, but yes.

Q Did you investigate Dr. Ramachandran as a potential expert in the case?

A Yes.

Q And what conclusions did you draw about the viability of Dr. Ramachandran as an expert?

A I would -- had we remained on the case, I don't think we would have used him as an expert. I don't think his expertise is right for capital case presentation. He's an interesting man but, I mean, his goal is to write popular descriptions of case experiences that he's had or heard of and to bring them to popular life so people see how we understand

the brain but in a popular way, and pseudocyesis was part of that. It's a chapter -- or section of a chapter in one of his first books.

But it's not -- it's not a condition that is terribly helpful. I mean, you know, it's not a -- it's a symptom description. It's not a diagnosis. It's not a life course sort of thing. It's the kind of symptom that comes about in the context of a mental illness.

But what we cared about was the mental illness that would have given rise to those symptoms, those symptomatic set of symptoms. The way in which mental illness gets embodied is what we would have cared about, not the name of pseudocyesis. And so he's not really an expert in the underlying broader piece of that, and so I probably would not have wanted to work with him.

Q Did you share your views with the team at the team meetings?

A I'm sure I did.

Q And David Owen would have been present for that?

A Yes.

Q As well as Ron Ninemire?

A Yes.

Q Now, Mr. Freedman, your work product in the case tends to be -- or is, frankly, all of your work product is in the form of chronologies and to-do lists; is that fair to say?

A Usually. I mean, I don't remember if I wrote a memo on something but I probably did not. I usually do not. My work is usually chronologies and tasks lists of some sort, maybe witness list, depending on if that is assigned to somebody else or not.

Q And at these team meetings you had there were no court reporters present, correct?

A Correct.

Q So you all would share information orally; is that fair to say?

A Yes.

Q And you would rely on each other's institutional memory to recall what happened at the team meetings?

A Yes. I mean, part of the point of the team meeting is exactly that, right? You want everybody in the room together so you can talk through issues and make decisions together and so you don't really need a record of that. We don't need a court reporter for that. And we're going to have another team meeting and evaluate whether we've done the things that got assigned out to people and what we've learned and where we're going next, and that's why you have team meetings.

Q And were you the member of -- a person on the team who would have been intimately involved in putting together materials that would go to the ultimate mental health experts who would testify in the case?

A Yes.
Q Is it important in your experience that the team carefully review materials that are sent out to potential testifying experts?
A Yes, of course.
Q And would you personally review each document before it got sent out of the office to an expert?
A Yeah. I would know everything that's going, and we would have chron'd -- I would have chron'd those records so I would know the details of those records, and I would be able to say, You know, these 600 pages are completely irrelevant for this kind of expert. Let's not pay them to look at them, and things like that. You don't just send your case file off to an expert and say, Tell me what you see. I mean, you have to help guide them a little bit.
Q And would you recommend to a team that they ever send confidential attorney work product to the government's expert?
A No.
Q And why is that?
A Well, I mean, you risk -- I mean, you're opening the door to all work product potentially, right? I mean, you're essentially giving it to the prosecution if you give it to your expert and you're giving it to the prosecution's expert, and so you are -- in some sense you risk that you have waived the work product privilege at that point. So why wouldn't the

government come and ask for your entire file and want to see everything else that's in there if you have disclosed part of it and waived part of that privilege?

Q I want to ask you a final area of questions. Let me just make sure I have appropriately edited myself. Just a minute.

I'm sorry. Were you the individual who identified Dr. Dean Delis as a potential neuropsych in this case?

A Yes. I had worked with Dean on a previous case and I know his research and publications. He's the author of two of the most highly used neuropsychological instrument batteries in the world.

Q And what are those batteries?

A One is the California Verbal Learning Test, which is now Version 2, and the other is the Delis-Kaplan Executive Function System, I believe. The S is either scale or system and Delis is the Delis, so Delis-Kaplan.

Q Are you familiar with use of personality testing in capital cases?

A I am.

Q And do you recommend to legal teams that they subject their clients to personality testing?

A No.

Q Why not?

A So personality is different than mental illness, and

it's typically considered fixed, immutable characteristics, and the characteristics of a person are typically not mitigating. It's pejorative language that we use to label people who we don't really like their negatives or ways and their gender diagnoses and the way that DSM works for personality disorders don't become separate very well. They're all kind of a mess. So the science of them is not very good. And personality testing doesn't answer any of the questions that are useful to whether somebody has a mental illness or not.

So in terms of training teams, right, it's part of that work, then, around personality disorders is also helping people pick good experts who know the difference between personality disorders and what used to be Axis I psychiatric disorders, and finding experts can be difficult, right, but you need somebody who you've chosen because they have some knowledge of the kind of symptoms that you're seeing in your client.

So that's part of the work that we were doing with the team was to identify the symptoms that would help lead us to the right kind of experts who knew something about what Lisa had as opposed to just a generalist who might go in and do anything.

Q There came a time in the case where Ms. Clarke exited her role as direct -- of direct representation as counsel of record. Do you recall that? I'm not going to ask you about

it. Do you recall she left the case?
A Yes.
Q Do you know a fellow by the name of John O'Connor?
A No.
Q Did John O'Connor -- did anyone identifying themselves as John O'Connor call you on the phone and ask you about your work in the case?
A On the Montgomery case?
Q On the Montgomery case.
A Nobody ever called me or emailed me about the case after Judy was off the case.
Q So that would include Ron Ninemire, David Owen, and Fred Duchardt, they never contacted you?
A That's right.
Q And Stephanie Elliott never contacted you?
A That's right, never.
Q So the next time you had contact with anyone representing Lisa Montgomery was when I contacted you?
A Yes.
Q If they had contacted you and asked for -- well, asked for your help or asked for your knowledge of the case, asked you questions about the case, would you have been willing to help them?
A Sure. I mean, I have an ongoing obligation to the client throughout the trial process. I had a job that was

resource counsel related, right? I mean, sure.

Q Did you -- the one question that Mr. Duchardt has asked that we've heard, and I think that's the only evidence, is that he asked whether or not the -- why the team, why Judy had asked the team not to question Lisa Montgomery about the offense. Do you know why Judy didn't want the team to ask Lisa Montgomery about the offense?

A Yeah. I mean, it's a hard -- there's not a short answer to that question but I'll try.

MR. KETCHMARK: Then, Your Honor, I would object. Judy already testified. She's already explained what her rationale was. This is cumulative of her testimony. It would be better coming from her. I don't know that he can add anything to that.

THE COURT: I would agree. She's already stated what her thought process was in that regard.

MS. HENRY: If I could be clear, Your Honor, the government is not going to challenge the truth or veracity of Ms. Clarke's testimony.

THE COURT: I think -- I mean, you asked him does he know why Judy Clarke did this. Now, the separate question is his opinion about whether she should have been asked about the circumstances of the crime or not.

MS. HENRY: Thank you, Your Honor. I'll ask that question.

Q (By Ms. Henry) Do you believe that Mrs. Montgomery should have been asked about the facts and circumstances of the crime?

A No, not at the time we were working on it for sure. It's not so informative. I mean, it doesn't really matter to a large degree, at least in the development of a case, and so there was every risk of re-traumatizing her and having her dissociate or re-experience symptoms and her description of it -- you know, it's not like there wasn't an investigation here. I mean, there was an entire law enforcement investigation. We knew the facts of what happened. We saw the evidence that was photographed and documented and obtained. We didn't have questions about the job that was done by law enforcement in documenting that at the time.

So what is it that she would have added? Nothing. And the risk of doing that and alienating her from the team and provoking symptoms or making her symptoms more severe with no upside, there's no benefit from asking her those questions. It was pointlessly cruel.

Q Did you caution the team they needed to be careful to not provide details of the offenses to Mrs. Montgomery?

A Yeah. I mean, so the other piece of the trauma -- I mean, this is true in all mental illnesses, not just trauma, but especially in trauma which is a disorder of memory, you have to worry that you're filling things in that the person

doesn't actually remember so the next time they get asked a question, what they remember is something you've told them, not their original memory.

In conditions like posttraumatic stress disorder, people lose track of where those memories come from and how they fit together. She also had some cognitive processing problems which would have made that worse, and so you wouldn't want to feed her anything because it would get incorporated perhaps wrongly into what she thought was her own memory versus what she had been told by somebody else or read.

So you really have to guard against the filling out the picture; and when you challenge clients on what happened at an offense, you almost always are providing them details. And so you then lose sight of what they knew or what they remembered, and that's true for all clients, but especially somebody with these sorts of symptoms that she had.

Q Though you were only in the case for six months, when you left the case, did you have concerns that Lisa Montgomery might not be able to rationally assist counsel in the case?

A Yeah. I mean, we had a real question as to her competence. We had not tested it yet. We hadn't pushed to see whether there were things we could do that would keep her competent through a trial process, but there were -- we had real question as to whether she was competent to proceed. It wasn't sufficient yet to raise it, and we didn't have expert

consultation yet to sort of guide us on that, but absolutely it was a concern with her.

MS. HENRY: If I could have just one moment.

Thank you, Mr. Freedman -- or Dr. Freedman, excuse me. I don't have any further questions.

THE COURT: Mr. Ketchmark.

MR. KETCHMARK: Thank you, Your Honor.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Just a few questions, sir.

Ms. Henry ended with the fact that you indicated that you were only in the case for about six months. I think that's what your testimony was; is that correct?

A I didn't say but it seems about right. I mean, from January to -- I don't know the date that we last -- that I last had contact when Ms. Clarke left.

Q Just so I understand, correct me if I'm wrong, your initial involvement would have been in January of '05 when Dick Burr brought you in but that was just in a consultation role, correct?

A That's right.

Q And then you were more hands on when you became, quote-unquote, a member of the team that would have been after Judy Clarke starts to get involved in the case and she brings you in; is that a fair statement?

A That's right.

Q So the time you were involved in this team and actually working in the case more than a consultation role would have been tied to the time Ms. Clarke was involved as trial counsel?
A That's right.
Q You talked about going through and doing chronology of records and that that's a very important step in the process and that records are very important in mitigation in death penalty work; is that a fair statement?
A Yes.
Q Would you agree with me, sir, not only records that come in about the social history of the defendant are important because that's what mitigation is based on, correct, in large part? It's the foundation of mitigation?
A Yeah. If you take out the client part of that, I'm fine with it. It's multigenerational.
Q Multigenerational. It's the social history multigenerational?
A Yes.
Q Would you also agree with me, sir, that another important component in capital litigation is documentation of what the attorneys are doing, because oftentimes we are years removed, as we are in this case, in trying to go back and create an understanding of what attorneys did and what trial team members did in the defense when we're looking at it from a postconviction standpoint?

A No. I wouldn't agree with that. I mean, when you're preparing a trial, you're not preparing for a 2255. I mean, maybe we should be but we're not. We're preparing for trial. So the documentation of what we're doing so that somebody later can look back it, honestly is a far --

Q Well, let me ask you this, then: It's not uncommon that counsel can change in the course of litigation? These cases can go on for an extended period of time. This isn't the first time that you've seen where initial counsel's different from trial counsel; is that a fair statement?

A Yes.

Q And it's important to do transition. I think Ms. Henry even talked to you about whether or not the new attorneys were reaching out to you to see what you had done and to provide guidance, and you said, I think your testimony was that you would have done that if you were asked, correct?

A Yes.

Q And would you agree with me that another way to do that is to do some documentation, especially when you rule things out and say, This is not viable, this is not something that should be pursued, simply documenting that in the memo and leaving it in your file would be another way in which to do that; fair statement?

A No, not fair. I think that there are many things that happen in a defense team that can't be written down into a memo

like that. Some things could. You could easily say, Here's the reason why we're not going to pursue this line of mitigation, or something like that. You can write all of that down. But, you know, we're not working as a team in the thought that the team's going to change. I mean, so we're having team meetings. We're having those discussions --

Q Let me ask you this, sir: With respect to Tommy Kleiner, let's talk about Mr. Kleiner. You indicated that there was discussion amongst the team as to whether or not there could have been another perpetrator. Do you recall that line of questions?

A Yes.

Q And I think you specifically mentioned Tommy Kleiner by name as a potential suspect in that investigation; is that correct?

A I did not, but he was.

Q Well, Ms. Henry mentioned Tommy by name?

A Right.

Q So it was her question. It wasn't your recollection that it was Tommy?

A I remember it was Tommy. Sorry. I misunderstood what you were asking.

Q You do remember it was Tommy?

A Yes. He was the potential other suspect that came from a police report where a neighbor said that they had seen two

people in a car driving away from the scene, and that led to Tommy Kleiner as a potential co-participant in the offense.

Q And would you agree with me there's an important mitigator out there if you have somebody who is equally culpable, depending on the punishment and whether they're charged, that's something that you would absolutely want to explore and that's why the team was looking at that in the mitigation phase?

A You would look at whether there was an alternative suspect. I mean, a co-participant whether there's sort of joint planning doesn't get you out of the question of whether you face a death penalty. So I don't have an easy answer to that. It would depend on the facts, if you find them, what the roles were.

Q Let me ask you a question that I hope you have an easy answer to. If there are records that are available to document the whereabouts of somebody that you are investigating, those records would be obtained, correct?

A Yes.

Q And those records would be obtained, they would be noted in the to-do list, after those were obtained, they were noted they were recovered, correct?

A If those records are recovered, yes, they would be in the file.

Q And you stated definitively that Tommy could not have

done this and that's based on the fact that you all had obtained those records and those records ruled Tommy out, correct?

A I don't know if we obtained the records or somebody talked to probation and was told that he was there and we were in the process of getting the records. I don't remember where in that process that happened.

Q And there would be a request with probation documenting that those records were wanting to be obtained?

A Or somebody who knew probation would have gone over and talked to them personally and asked for them.

Q Let me ask you this: What about a memo suggesting specifically, Hey, I am team member X and I talked with probation and Tommy could not have done this because they told me that the records showed this?

A There wouldn't be a memo about that. That's the kind of thing you discuss as a team. I mean, you would spend all of your time writing memos about things that aren't happening if you did that.

Q So these are all things that are happening in the team meetings, similar to the discussion about David Owen and his inappropriate relationship with Judy Shaughnessy, correct?

A Yeah. I mean, that was happening -- yes.

Q And what I want to make certain because I didn't quite understand you, sir, is my recollection when we were talking

earlier and you heard me object, I want to make certain, did you recall specifically being present when Mr. Owen was given directions about how he was not to interact with Judy Shaughnessy? Were you present when he was given that admonishment?
A He wasn't given an admonishment. We had a team discussion about what's the best approach to Judy in order to elicit information that we needed to elicit from her, and David Owen's continued private contact with her was decided among the team was not the best way to do that.
Q And so you were present when that discussion was had with Mr. Owen?
A I believe so, yeah.
Q Were you also present when Mr. Owen later, as you said, repeatedly indicated he wasn't following that team directive and that he was continuing to have the contact?
A Yeah, he would say things at other team meetings that indicated he was continuing to have private conversations with Judy and to see her after the time we had agreed as a group that that was not the way in which we were going to go about this.
Q And Mr. O'Connor and Mr. Duchardt, I think you indicated that you don't know who those -- you hadn't had contact with those individuals in connection with this case?
A Right. I do know who Mr. Duchardt is. I don't know

who Mr. O'Connor is. But I had no contact with either of them in relation to their representation of Lisa Montgomery.

MR. KETCHMARK: That's all I have, Your Honor.

MS. HENRY: Nothing further, Your Honor.

THE COURT: Is it Dr. Freedman?

THE WITNESS: It is.

THE COURT: I thought you were working on your doctorate, but that's a different doctorate.

THE WITNESS: Yeah. I'm done with it.

THE COURT: Well, thank you very much.

THE WITNESS: Thank you.

THE COURT: You're excused.

(Witness excused.)

MS. HENRY: Your Honor, the movant calls Dr. Fucetola.

THE COURT: All right. Come right up over here, please, to the witness stand.

ROBERT PETER FUCETOLA, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning, Dr. Fucetola.

A Good morning.

Q Can you state your name for the record and spell your last name.

A Sure. It's Robert Peter Fucetola, F, as in Frank,

u-c-e-t-o-l-a.

Q And, Dr. Fucetola, how are you employed?

A I'm a professor of neurology and clinical neuropsychologist at Washington University School of Medicine in St. Louis.

Q Dr. Fucetola, how long -- where did you get your degree?

A Well, I went to college and earned my Ph.D. in clinical psychology at Washington University where I'm now employed. As is required by everyone in my field, I completed a one-year internship at Tulsa University School of Medicine in Boston, and then a fellowship in the Department of Psychiatry at Harvard Medical School also in Boston before essentially returning to St. Louis for the job that I still hold today.

Q How long have you been a neuropsychologist?

A Since 1998.

MS. HENRY: And, Ms. Santana, I apologize I didn't ask for this earlier. Can I have Exhibit 46 and 45, please.

Q (By Ms. Henry) Dr. Fucetola, I'm going to place up on the screen here what has previously been admitted into evidence as Movant's Exhibit No. 46. Is that a copy of your curriculum vitae?

A Yes, it is.

Q And does your curriculum vitae set out your qualifications as a neuropsychologist?

A Yes.
Q And is it -- was it accurate and up to date at least at the time you emailed it to me this summer?
A Yes.
Q And do you have any board certifications, sir?
A Yes. I'm board certified in my field, which is clinical neuropsychology.
Q And what's your title at Wash U?
A Professor of Neurology and Chief of Clinical Neuropsychology.
MS. HENRY: I was just going to ask, are you willing to stipulate? Do you want me to go through all the qualifications?
MR. VALENTI: No.
MS. HENRY: Can we stipulate that Dr. Fucetola is an expert in neuropsychology?
MR. VALENTI: We can.
MS. HENRY: Your Honor, I would offer Dr. Fucetola as an expert in neuropsychology.
THE COURT: All right.
Q (By Ms. Henry) That was easy.
Dr. Fucetola, I'd like to now direct your attention to your involvement in the Lisa Montgomery case, if I may. Did there come a time when a man by the name of Fred Duchardt asked you to become involved in Lisa Montgomery's case as a

neuropsychologist?

A Yes.

Q What is it that you were asked to do?

A Well, I was asked to complete an independent neuropsychological evaluation of Ms. Montgomery. I understood that to mean a detailed cognitive and intellectual assessment of her capacities.

Q Doctor, did Mr. Duchardt indicate to you that he wished for you to provide the raw data of your neuropsychological testing to a gentleman by the name of Dr. Ruben Gur?

A Yes.

Q Had you worked with Dr. Gur before?

A No.

Q Did Mr. Duchardt tell you that the reason that he wanted the raw data from your neuropsychological testing sent to Dr. Gur was because he wanted it to be used to create what is referred to as a behavioral image?

A Yes.

Q Are you familiar with Dr. Gur's behavioral image?

A Yes.

Q Is that an instrument that he has in fact a patent on?

A That's my understanding, yes.

Q And so did you have a conversation with Dr. Gur to discuss the neuropsychological battery that you would administer to Mrs. Montgomery for purposes of that behavioral

image?

A Yes.

Q And did you have any problems with the request that Dr. Gur made of you in terms of the testing that he wanted?

A No.

Q And did you also administer some additional tests you thought were indicated?

A I did.

Q Do you recall the date that you saw Mrs. Montgomery?

A Well, it was in July of 2006 on -- over two days, the 26th and the 27th.

Q And did you conduct that at CCA in Leavenworth?

A Yes.

Q As a result of the neuropsychological battery you administered to Mrs. Montgomery, did you complete your report?

A Yes.

Q And I'm going to show you what's previously been admitted into evidence as Movant's Exhibit No. 45. Is that a copy or at least the top part of the first page of the report that you completed in the Montgomery case?

A Yes, it is.

Q And is that information that you also passed on to Ruben Gur?

A Yes.

Q Did you also pass on to Ruben Gur the raw data of the

neuropsychological testing?

A Yes.

Q And are you aware of the fact that a behavioral image was actually created as a result of Dr. Gur taking your data and placing it into his algorithm?

A I am.

Q Dr. Gur --

THE COURT: Ms. Henry, is this a good time for a break?

MS. HENRY: I was just going to ask if we could do that.

THE COURT: We'll take a break until a quarter till eleven.

MS. HENRY: Thank you.

(Recess taken at 10:30 a.m.)

THE COURT: Ms. Henry.

MS. HENRY: Thank you, Your Honor.

ROBERT PETER FUCETOLA resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MS. HENRY:

Q So, Dr. Fucetola, over the break I have placed on the projection screen that's on the screen in front of you a portion of Movant's Exhibit No. 28. Do you recognize that as the behavioral image which Dr. Gur generated using your raw data?

A Yes.

MS. HENRY: For the record, Your Honor, I would state that this particular aspect of Dr. Gur's report was not excluded by Your Honor and was in fact available as evidence that could have been presented at trial, just to orient the parties, because the other parts of Dr. Gur's report were eliminated.

Q (By Ms. Henry) Dr. Fucetola, do you have any professional qualms or criticisms of Dr. Gur's behavioral image?

A No.

Q Do you find it to be a useful tool?

A Yes.

Q Now, as a result of the neuropsychological battery that you administered to Lisa Montgomery, did you write a report of your findings?

A I did.

Q And that was a report that you provided to counsel; is that correct?

A Yes.

Q I'm going to place now on the overhead a document that has previously been admitted into evidence as Movant's Exhibit No. 45. Do you recognize that as a copy of your report?

A Yes.

Q And what is the date of that report?

A July 26th and 27th of 2006.

Q I'll flip to the last page. That appear to be a complete copy of your report?
A Yes, it does.
Q And do you have a copy of your report with you in front of you?
A I do.
Q I see you brought a number of materials with you today?
A Yes.
Q You brought your file?
A Yes, I did.
Q That was the file that was provided to us under a protective order; is that correct?
A Correct.
Q If you need to refer to any portion of your file, which is subject to a protective order -- which I believe would be actually putting up the actual test instruments; is that correct?
A Yes.
Q Would you please alert me and the Court so that we can make sure and honor the protective order in the case?
A Yes.
Q I don't think we're going to need to. I just want to give that provision since you and I didn't have a chance to talk since you flew right in from St. Louis this morning.
A Yes.

Q Thank you.

Now, your report reflects that the Federal Public Defender's Office and Mr. Duchardt provided you with a number of materials to assist you in your neuropsychological demonstration; is that correct?

A Yes.

Q And you list those items on pages 1 and 2 of your report?

A Correct.

Q In addition to the items listed on pages 1 and 2 of your report, you were also provided by a paralegal in the Federal Public Defender's Office and Ms. Stephanie Elliott a copy of Marilyn Hutchinson's raw data in this case; is that correct?

A Yes.

Q And that raw data that was provided by Stephanie Elliott also included confidential attorney-client work product, did it not?

A I believe so.

Q And when the government ultimately retained the services of Dr. Daniel Martell, you provided a copy of Dr. Hutchinson's raw data as well as your own to Dr. Martell; is that correct?

A Yes.

Q Now, turning now to your specific evaluation of Lisa

Montgomery, is it fair to say that the majority of the instruments Lisa Montgomery scored within the normal range?

A Yes.

Q Also she -- you also in your report provided the raw data numbers; is that correct?

A Correct.

Q And so Mrs. Montgomery on her neuropsych profile, though she scored within the normal range in most instances, that normal range would be anywhere from the 34th -- or the 27th percentile up to 99th percentile; is that correct?

A Well, actually I would say it's even broader than that. Really she had scores clustering around the 16th percentile at the low end and, yes, beyond the 99th percentile.

Q So her numbers were in various places for different parts of the brain that were being tested?

A Correct.

Q You did find a specific -- there was an indicator on the -- I'm trying to lead you and I'm not an expert. I'm not doing a good job of it. What were her results on the I.Q. testing?

A Well, Ms. Montgomery earned a very high I.Q. score on the Wechsler Adult Intelligence Scale that I personally administered to her. Her I.Q. score was 124, which corresponds to the 95th percentile.

However, one of the striking things I noticed right

away in Ms. Montgomery's data was the dramatic disparity between her verbal intelligence, which was at the high end of the average range, and her nonverbal intelligence, which was very superior and measured at above the 99th percentile. The former was 111, the latter was 140. So there was a 29-point difference between her verbal I.Q. and her nonverbal or performance I.Q.

Q Why, in your expert opinion, is that a significant finding?

A Well, it's -- at the time that I saw Ms. Montgomery it struck me as potentially significant because it's quite rare to have a difference that large. We know from these tests what the base rate or how common in the healthy population differences are between a person's verbal I.Q. and nonverbal I.Q., and we know that a 29-point difference is very rare.

In and of itself as an isolated finding it's difficult to know exactly what it means about Ms. Montgomery's brain but, again, it's something that's highly uncommon. When I say "highly uncommon," what I really mean is that a difference of that size or larger between a person's verbal and nonverbal I.Q. is seen in only around 1 to 2 percent of people with I.Q.'s above 120. So we're talking about a select group to begin with, very, very -- individuals with high I.Q.'s, among that group one only sees in healthy Americans a difference that size or larger, again, in only 1 to 2 percent

of those people. So it's quite rare.

Q And is that rarity something that you reported to trial counsel in this case?

A Yes.

Q And did you in fact do some additional scholarly research into this issue of this massive split in between the verbal and performance I.Q.?

A I did. Again, I think -- you know part of what I -- I thought was important for me to understand in analyzing Ms. Montgomery's data was how common these findings are in healthy brains or how uncommon they are in this case. And so I reviewed some scientific literature that provided precise information about exactly how common this kind of difference is in both healthy brains and also the brains of people who have major mental illnesses like bipolar disease or schizophrenia, for example.

Q Thank you.

I'm going to place up here on the screen an article. Can you tell us what that article is?

A Yes. This is a peer-reviewed scientific publication from a journal called the Journal of Clinical Psychology, and it's from a Grant Iverson who, it looks like, was at the University of British Columbia at the time and now at Harvard Medical School and provides base rate information. That is, it provides information about how common verbal/nonverbal I.Q.

differences are in psychiatric patients.

So the sample here are not healthy adults but rather people with major mental illnesses that require inpatient hospitalization, again, like bipolar disorder or schizophrenia.

This study shows what I said was true about healthy people as well, that differences of the magnitude we see in Ms. Montgomery are quite rare even in individuals with major mental illness.

Q Is this article an article that you were looking at at the time that you had been retained by the trial team in Mrs. Montgomery's case?

A Yes.

Q In fact, does it show where you have actually made some underlines and circles around different charts and things? An example here.

A Yes. So this is my handwriting, my circles that I would have made around the time shortly -- while I was analyzing the data shortly after I saw Ms. Montgomery in July of 2007, and this is a table, this is Table 1, shows how common, again, it is to see differences like Ms. Montgomery shows. For example, she showed a 29-point difference. That's seen in less than -- a difference that size favoring nonverbal I.Q. is seen in less than 1 percent of the psychiatric inpatient population.

Q So I want to ask you now, if you could, for purposes of

the record, explain the difference between verbal I.Q. and performance I.Q. and why that's significant? What's the verbal test and what is the performance test?

A Well, intelligence is a broad multifactorial construct. It involves intelligent behavior. It involves verbal skills, like being able to read verbally and express oneself with a good vocabulary, and it involves nonverbal or visual intellectual abilities, like spacial navigation or visual attention to detail, and so the most widely used intelligence test in the United States measure both nonverbal intellectual abilities and verbal intellectual abilities. Most tests, including the one that Ms. Montgomery was given, those are summed and then comprised an overall I.Q. score.

We also know that the two hemispheres of the brain are specialized for different kinds of intelligence. So in most people the left hemisphere or verbal side of the brain subserves and supports verbal I.Q.; and, conversely, the right hemisphere in most individuals subserves the performance I.Q. or the nonverbal intellectual abilities.

Q So is it fair -- and I could be summarizing this wrong so correct me if I'm wrong. Is it fair to say that when you have someone such as Mrs. Montgomery with this extremely rare split between verbal I.Q. and performance I.Q., that could be an indicator that there is something cognitively wrong, some brain damage in one side of the brain versus the other?

A Correct.

MS. HENRY: Your Honor, I would like to, with your permission, mark the article that Dr. Fucetola's been referencing as Movant's Exhibit 143 and ask it be accepted into evidence.

MR. VALENTI: No objection.

THE COURT: Received.

Q (By Ms. Henry) In addition to the I.Q. testing that you performed on Mrs. Montgomery, did she also have a -- let me back up.

I'm going to move on. That's where I'm going. Did you see a potential source of cognitive dysfunction with Mrs. Montgomery as a result of her performance on the Faces Test?

A Yes. What alerted me actually to the highly unusual finding was a stark difference between her visual memory abilities and her nonverbal I.Q. Again, the base rate of the size of the difference that she showed in that, which was in the 30- to 40-point range, was highly unusual. The fact that her visual memory score was so much lower than you would expect given her performance I.Q. was a function of poor per -- relatively poor performance on a facial memory test in which Ms. Montgomery had to learn and then reliably remember a set of new faces of people she had never seen before.

Q So I want to show you what I will mark as Movant's Exhibit 144. Is that a chart that was in your file that

compared Mrs. Montgomery's I.Q. scores with her scores on that Faces Test?

A Yes. It is a comparison of her -- I would say actually no. I think that this is a table that shows something important as well, which we covered, which is the frequency of the I.Q. differences. There is a table that I found in my original chart that does portray how common the differences are between visual memory, and this is it.

Q Okay. I'm sorry. On the second page is what I'm going to have -- this was in your file, correct?

A Correct.

Q And it's something that you relied upon and shared with Mr. Duchardt?

A It is. It is something I thought about critically. Again, part of the process in my thinking here was that small differences between a person's verbal and visual abilities are common. Large differences are not as common, as these tables show. So, for example, if you look at C6 and you compare the size of the difference between Ms. Montgomery's performance I.Q. and her visual immediate and visual delayed index scores, the difference there for her is 43 and 46 points. Well, you can see from looking at the chart that that is seen in less than 2 percent. It's actually cut off a bit, but it's less than 1 percent of the healthy population. So, again, the difference between her memory abilities and her visual

intelligence is quite rare.

Q And that was important to you, important enough for you to do the research and do the calculations; is that correct?

A Well, yes. I mean, I think, first of all, it's important to see is it rare or not; and if so, how rare is it? And that it is so rare begs the question of why. What is going on in Ms. Montgomery in her brain to explain such a stark difference?

Q And did you pause at some possible etiologies for this stark difference?

A I did.

Q And what were those possible etiologies?

A Well, my recollection from reviewing my notes that I'd prepared in anticipation of a conversation with Mr. Duchardt was that at the time I was thinking about a few different things.

First of all, I considered whether these differences had a developmental basis, meaning there is a reasonable chance that Ms. Montgomery's brain, the trajectory of her brain development was abnormal resulting in these kind of stark differences.

And in that -- along those lines, I thought about a few different factors which might affect the trajectory of her brain development, things I was aware of at the time of my involvement in the case. So, for example, the psychology

maltreatment that was present in the family of origin, the potential for prenatal alcohol exposure.

And I also considered, though, a number of explanations brain related. For example, I thought about the multiple head injuries that Ms. Montgomery had sustained according to medical records and her report to me over the course of her life.

And so -- I also obviously considered whether a major mental illness like, for example, bipolar disorder might account for some of the findings. So at that point those were potential explanations in my mind that might account for these differences and in my view merited further investigation.

Q And was that your recommendation to Mr. Duchardt?

A Yes. I believe I tried to make that explicit in my report.

Q And recently I shared with you that Dr. Martell testified that he re-administered the Faces Test and got a somewhat higher result that bumped Mrs. Montgomery into the low range of normal; is that correct?

A Yes.

Q And is there a practice effect between -- on the Faces?

A There is. One thing about humans is that there is a practice effect on almost all tests.

Q Besides there being a practice effect, did you recalculate this rarity between the differences in performance

I.Q. and visual and immediate and performance I.Q. and visual delay using his scores?

A I did.

Q And was there a substantial difference in the rarity in which you would find that incongruent result?

A There was not. And part of that is simply because although Dr. Martell found slightly higher scores when he re-administered the test about a year later, the magnitude of that difference, the size of that practice effect was still pretty small. It was a standard deviation on one of the Faces Tests and a third standard deviation on the other. From a neuropsychological, from a metric standpoint, that's very small.

Q Mrs. Montgomery also had -- I don't want to call it abnormal -- a significant result on the Finger-Tapping Test; do you recall that?

A I do.

Q I'm using the wrong word because I'm trying to lead you and make this go faster. How would you characterize her results on the Finger-Tapping Test?

A Well, this is a test that simply measures the patient's fine motor speed in their hands, and so neuropsychologists and neurologists typically measure both hands separately. Of course, the right hand depends on the left side of the brain and the left hand depends on the right side of the brain. So

we're measuring -- potentially measuring brain differences.

I did see a difference on the test, so Ms. Montgomery's right hand, which is her dominant hand, was lower than her left hand which is not what you would expect in a normal person. For those of us who are right handed, you would expect about a 10 percent advantage. She showed the opposite.

Now, at the time I attributed that or wrote that off sort of in my mind to a peripheral injury to her hand that Ms. Montgomery described to me when I was procuring a medical history. She had told me about an incident involving a fence post and I think an injury to her right wrist -- or right hand.

Q Did Mr. Duchardt share with you the medical records from that wrist injury when she hit her wrist on the fence post?

A Well, I can only say I did not see those until a decade later.

Q When I emailed them to you?

A Yes.

Q So I'm going to show you what's previously been admitted into evidence as Movant's Exhibit 1-206. Do you recognize those records?

A I do.

Q Those are the records I emailed to you?

A Yes.

Q And they are the records regarding Ms. Montgomery's

wrist injury; is that correct?
A True.
Q And on the last page of the report -- I'm going to try and zoom in for you since Mr. Ketchmark taught me how to do that. What are the post treatment instructions for Ms. Montgomery's wrist injury?
A Well, that she apply ice, that she should elevate the right arm and follow up as needed. She was diagnosed with right arm pain.
Q So is that the sort of injury that you would expect to cause the abnormality you saw on the Finger-Tapping Test?
A I would say no at this point, and part of that also hinges on something in those records that you didn't just put up, which is the fact that an X ray of that right wrist ruled out any actual injury.
Q So you read the entire file?
A I did.
Q And the X ray itself showed there was no significant injury?
A Correct.
Q And so with that information, was your finding on the Finger-Tapping Test then relevant from a neuropsychological standpoint?
A Well, I think in my mind it moves from irrelevant to potentially relevant; because, again, if we can rule out, which

I think we have now, that an old peripheral years ago can explain that finding, then there's obviously a strong possibility that it reflects a brain-based difference.

Q And is that something that you would have been able to share with Mr. Duchardt back in 2007?

A Well, yes, of course, I shared the results of my report.

Q Did Dr. Martell ever call you and ask you about the results of your report?

A I don't believe so.

Q How about Dr. Park Dietz?

A No.

Q When Mrs. Montgomery performed -- completed the tasks you asked her to complete, the neuropsychological battery, did you draw any conclusions about whether or not she was malingering?

A That is something I considered, yes, and formed an opinion on.

Q And what was your opinion?

A Well, I ruled out any evidence of the exaggeration or fabrication of cognitive and intellectual impairment, and I did that in the standardized way that people in my profession do, which is through the administration of what we call performance validity tests, tests that are embedded in the exam that the patient doesn't know they're taking or the individual doesn't

know they're taking but serve as a check on the credibility of effort.

Q And you concluded that Ms. Montgomery was giving sufficient effort and not malingering?

A She passed all of those tests, and to be precise, what that means is her performance was in the range on the test that is considered valid. It's important to distinguish between my gut feeling here and what the test tells us. The test says she passed.

Q The test says she passed. What about your personal observations of Ms. Montgomery?

A Well, again, my experience with her over those two days is she worked hard and, as I think we covered in my earlier testimony, did well in most tests.

Q Dr. Martell characterized the results of your neuropsychological examination of Mrs. Montgomery in the trial of this case before the jury as being completely clean. Would you agree with that?

A I wouldn't -- I guess without knowing exactly what he means by "completely clean," I would say that if by completely clean he means no hint of a highly unusual pattern of difference between verbal and nonverbal abilities, then I would disagree with him because we do have that here.

Q As a result of your neuropsychological battery and your opinions, did you recommend to Mr. Duchardt that he pursue

further investigation of Mrs. Montgomery's brain functioning by doing further imaging?

A I did. I mentioned a few specific neurodiagnostic techniques in my report.

Q That you felt were indicated as a result of your testing?

A Exactly. To investigate these, again, just highly unexpected differences.

MS. HENRY: Just one moment, please.

Thank you, Dr. Fucetola. That's all I have.

Your Honor, may I move into evidence Movant's Exhibit 144, which is that chart?

MR. VALENTI: No objection.

THE COURT: Received.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Fucetola, if by clean Dr. Martell meant that you gave a complete battery of neuropsychological tests and you were qualified to do so and did appropriately, that would have been a fair statement of him, right?

A I agree.

Q Okay. Now, when you're going through and doing your neuropsychological evaluation, Ms. Montgomery knows that you've been retained by her attorney representing her in capital

court, correct?
A True.
Q You introduced yourself to her and explained what your purpose was?
A Yes.
Q You explained that you've been hired by Mr. Duchardt to do this neuropsychological battery potentially for use in the court case currently pending in the Western District of Missouri?
A Yes.
Q There was no allusion on her part that what you were doing and who you were doing it for?
A I don't believe so.
Q When you did your neuropsychological evaluation, you came back with basic findings indicating that she had normal cognitive function; is that fair?
A Yes.
Q And then you were particularly taken, I believe, by this I.Q. split, and what we're talking about here is that she had a verbal I.Q. of, I think, 140?
A Yes.
Q And she had a performance I.Q. of 111?
A I'm sorry. The verbal I.Q. was 111. The performance I.Q. was 140. And the overall was 124.
Q My apologies. I wrote those backwards.

Either way, the full scale I.Q., which is the number 124 you came up with, is essentially kind of an average or the ultimate conclusion of what her I.Q. is. Is that kind of how it's used?

A It is. A lot of psychologists would argue based on information provided by the test developer that someone like Ms. Montgomery, the full scale I.Q. isn't a good reflection, isn't a good reflection of her overall abilities because of the difference, but in the interest of providing as much data to everyone as possible, I did calculate it.

Q And as it relates to I.Q., the average I.Q. essentially is 100; is that correct?

A That is correct.

Q The statistical measure anyway, correct?

A Yes.

Q And Ms. Montgomery's full scale I.Q. at least a standard deviation above that; is that true?

A Yes.

Q So however we look at it, whether it be a verbal of 111 or performance of 140, both of those are above average I.Q. levels?

A Well, to be precise, 111 is at the 77th percentile. I called that high average before, and the 140 would be above the 99th percentile.

Q When you're going through and you're analyzing this

split between the two, the verbal and the performance, you referred to an article that I'll say was written by Iverson; is that fair?

A Yes.

Q Okay. Is it Dr. Iverson, I assume?

A It is.

Q It doesn't say that here but I assume he wouldn't be published in the psychiatric journal if he were not.

Dr. Iverson indicates in this article from 2001 that there is the notion that I.Q. detriments -- I assume that means splits, correct -- are associated with lateralized brain dysfunction has remained a common clinical lore to the present day?

A I agree.

Q And he said despite the fact that the predictive validity of what that split means has been called into question over the recent years; is that fair?

A It is.

Q This article was authored in 2001. Has there been more recent articles that you would have relied upon from 2001 that talk about this split differential and I.Q. and what impact or predicted validity it may have?

A Possibly. I would say not with regard to healthy adults because we'd have to use the data that Ms. Henry put up from the manual of the test itself. That wouldn't change. I'm

certain there have been more studies of how common these I.Q. differences are since the Iverson article, since, let's say, 2006 or 2007; but my understanding of that literature is that it confirms, again, that I.Q. differences of certain magnitudes have different base rates in the population, have different frequencies or commonalities.

Q But regardless of the literature, it still says it is a rare occurrence for that big a split?

A Correct.

Q So it's going to be more correct. In his article Iverson indicates that one of the causes or likelihoods or possibilities perhaps, I guess would be a better word, of these I.Q. splits could be depression?

A I would -- I think that would depend on a few things. I can elaborate. So, for example, a verbal I.Q., verbal I.Q. would be insensitive to depression. That's been shown in the studies. Certain subtests that go into the performance I.Q. which include those that measure processing speed or working memory could be affected by a situational factor such as depression. But as a rule, I.Q. is relatively insensitive to psychiatric illnesses like major depression.

Q In the conclusion of his article on, I would say, Conclusion C, when discussing the possibility of why a split might occur, isn't one of the conclusions that the split more likely because the patient is higher functioning, in other

words, a full scale I.Q. of greater than 109?
A Well, and that's why I would direct us to the chart. It only looks at people like Ms. Montgomery who have I.Q.'s over 109, and even though -- and what he's saying is that differences are even more common in people with high I.Q., and the same is true at the other end of the tail. People with very low I.Q., and that's something I had to consider, but even in people with high I.Q. like Ms. Montgomery, a difference this size is very rare.
Q With her full scale I.Q. of 124 what percentile does that reside in?
A The 95th.
Q 95th. So her full scale I.Q. is -- in and of itself is a statistical -- I don't want to say rarity, but it's in the 95th percentile, correct?
A Yes.
Q During your testimony, sir, they showed you an image that Dr. Gur had done and was referred to as the behavioral image; do you recall that?
A I do.
Q And you indicated, I believe, you did not -- or did you not that it was in your mind a reliable tool?
A Yes.
Q In what way?
A Well, insofar as it portrays the relationship between

results on a behavioral test, let's say, a test of memory or attention or vocabulary and the specific anatomical region of the brain that subserves that ability.

Q Have you taken or undergone some study into the science behind the algorithm that Dr. Gur patented as the behavioral image?

A No.

Q Would you be surprised that in an examination under oath Dr. Gur has admitted that the citations to the reliability of the science are to himself and to his associate with whom he patented that technology?

A Again, that's not something I looked into so it's hard to say.

Q Would you be surprised that Dr. Gur has admitted that the scale that he produces and the image, the unitless scale and that he would acknowledge the colors were chosen at random and they have no comparative value?

A I'm not sure if it would surprise me. The colors on our PET scans that we use in the hospital also are chosen. They're arbitrary.

Q Generally, you have looked at a topographical map before, correct?

A Sure.

Q And intense colors in areas indicate something, correct?

A Well, depends on the test.
Q And I'm talking about -- I'm not talking about PET topographical. I'm not qualified to talk about that. I want to talk about just a general topographical map when you're going out to look at a hill you want to climb. As the lines get closer and the colors become more intense, that's an indication of a rise in slope?
A Right.
Q Right. And it's a comparative value. It's scaled, in other words, so that you can look from Point A to Point B and make an inferential reference of what is going to happen to you when you move from Point A to Point B, correct?
A Yes.
Q In his behavioral image, because it is a unitless scale looking at one versus another, you cannot compare regions and have any reliability in the unitless scale, can you?
A Well, my understanding -- and I'm not an expert in this technique, but my understanding is that the colors portray relative strengths and weaknesses in certain abilities that are subserved by different brain areas relative within that individual's brain.
Q Are you aware that Dr. Gur has admitted that he and his associate opined on what areas the brain should have impacts on certain behaviors trying to link behavior to neurodeficits and that they --

MS. HENRY: I apologize, Mr. Valenti. I think at this point I --

THE COURT: You need to speak into the microphone for me. You can talk there at the table.

MS. HENRY: I'm sorry. I apologize, Your Honor.

I do want to interject an objection. I think this line of questioning is somewhat inappropriate. There's no evidence that Dr. Gur has ever testified in this matter. Maybe we'll cross-examine Dr. Gur about his -- he will be here next week, but I don't think it's appropriate to be asking and making representations about a record that's not in evidence and I haven't seen.

THE COURT: Overruled.

Q (By Mr. Valenti) I believe I was asking if you recall that Dr. Gur and his associate arbitrarily decided on what areas of the brain they thought should be linked to certain behaviors rather that empirically study that fact.

A I guess what I would say is I'm certainly not aware of anything that Dr. Gur has testified about, but the relationship, the known relationship between specific test performance and specific regions of the brain that are involved has existed for decades before Dr. Gur and has been shown by many other scientists.

Q I agree with you on that. The brain, however, is plastic, is it not, and by plastic meaning -- it's your

terminology, not mine. What does the term "brain plasticity" mean?

A Well, I think most people would intend it to mean the adaptability or the capacity to change as a result of, let's say, an environmental or toxic or metabolic change.

Q And there are certainly people who have had some type of brain injury or insult in an area of the brain that has been linked empirically to certain behaviors that the brain elsewhere has picked up the ability to assist, right?

A True.

Q So the brain can overcome injury?

A Well, I guess what I would say is the brain has a mechanism to physiologically adapt to injury. I don't know if I would use the term "overcome."

Q You said it better than I did. The brain can physiologically adapt to insult or injury, not on a blanket scale but it can happen?

A It has the potential. Again, a lot of it can depend on the age of the brain at the time and the magnitude of the insult.

Q Are you aware that Dr. Gur's behavioral image and his testimony -- well, maybe not behavioral -- but his testimony regarding Lisa Montgomery was not allowed into court because it did not pass general scientific admission in a Daubert hearing before this court?

MS. HENRY: Your Honor, I'm going to object to that. That was not this court's ruling. The Court excluded the MRI at the Daubert hearing. The Court excluded the PET scan later as a result of a discovery dispute. The Court did not exclude the behavioral image.

THE COURT: Well, I would have to look back at that to make certain exactly what the ruling was. Do you want to speak to that?

MR. VALENTI: Let me rephrase.

Q (By Mr. Valenti) In this case Dr. Gur didn't testify because of issues that he was not able to get satisfied by this court as it relates to the raw data supporting what he had done. Did you know that?

A Well, all I can say is I learned from -- years later or more recently from Ms. Henry that Dr. Gur did not wind up testifying. I have no idea why.

Q Do you know a doctor named Geoffrey Aguirre, A-g-u-i-r-r-e, with the Perelman School of Medicine at the University of Pennsylvania?

A I do not.

Q He's a neurologist and a neuropsychologist at the same university as Dr. Gur. You're not aware of any of the work that Mr. -- excuse me -- Dr. Aguirre has performed or his criticisms of Dr. Gur's?

A I'm not. In fact, I'm intrigued to hear you describe

someone as both a neurologist and neuropsychologist.
Q I need to look it up. I want to make sure I say it correct. He has a medical doctor degree and Ph.D. and he works in the neurology department at the medical school at the Perelman School of Medicine at the University of Pennsylvania.
A No, I'm not aware of him.
Q You would agree as professor, though, sir, would you not, that you're an educator primarily, correct?
A Yes.
Q Okay. And that educators will engage in what we call neuroethics. Have you heard that term before?
A I have.
Q Does your university provide neuroethical lectures?
A I don't think they would -- I've never heard of a lecture entitled neuroethics, but certainly medical students, Ph.D. students receive adaptive training in ethical behavior.
Q Have you ever witnessed neuroethical lectures put on by the University of Pennsylvania as it relates to the Perelman School of Medicine?
A No.
Q So you've never heard Dr. Gur refer to those lectures as a neurohuckster?
A I'm sorry. Neuro --
Q Huckster.
A No. You're introducing me to a completely new

vocabulary.

MR. VALENTI: That's all I have, Your Honor.

MS. HENRY: Nothing further, Your Honor.

THE COURT: All right. Thank you, Doctor. You're excused.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

MS. HENRY: Your Honor, movant will call Erin Garman.

ERIN GARMAN, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning, Ms. Garman. Thank you for your patience this morning.

Could you state your name for the record and spell your first and last name, please.

A Erin Garman, E-r-i-n, G-a-r-m-a-n.

Q And, Ms. Garman, how are you employed?

A I am a probation officer with the 12th Judicial District in the Community Corrections Program in Kansas.

Q Where is the 12th Judicial District?

A North central Kansas.

Q Was there a time in your career where you supervised on probation a man by the name of Tommy Kleiner?

A Yes.

Q Do you still supervise Mr. Kleiner?

A No, I do not.
Q Was he a memorable client?
A Yes.
Q Was he somebody who was pretty emotionally volatile?
A Yes.
Q And I want to ask you specifically about a time in which you became aware that Mr. Kleiner's whereabouts on December 16th, 2004, were in question. Okay?
A Okay.
Q Did you become aware at some point that the FBI was interested in knowing whether -- where Mr. Kleiner was?
A Yes.
Q How did you become aware of that fact?
A FBI Agent Kurt Lipanovich contacted me. He was interested in who Tommy was working for at the time. They were trying to figure out where he was.
Q And did he ask you to look through your file to see if you knew who his employer was?
A Yes.
Q And in the process of looking through your file, did you determine that in fact Mr. Kleiner was not at work that day but was in fact visiting you?
A Yes. That's correct.
Q And that he was in your office at the time of the homicide and there was no way he could have been involved in

the death of Bobbie Jo Stinnett?
A That was my understanding, yes.
Q And did you relate that information to Mr. Lipanovich?
A Eventually I did, yes.
Q Did you tell them that he needed to get a subpoena?
A Yes.
Q And he did so?
A Yes, he did.
Q Now, I want to -- have you had an opportunity before testifying today to look at what's call your chrono?
A Just briefly.
Q For the record, what is that?
A It's my contact notes that are in the file, any phone calls I make, any contact with defendants. My contact notes are entered into the Full Court Program which was our case management program at the time.
Q And is the Full Court Program a different program from that which Mr. -- let me back up. One of the ways that you knew that Mr. Kleiner was with you at the time of the homicide is that he signed in on the computer screen; is that correct? There's some computer time stamp that shows exactly --
A That would be when I entered my notes.
Q Was that a different program than this chrono?
A No. Full Court produces the report that prints out the chronos.

Q So I'm going to show you what has -- what I've just marked as Movant's Exhibit 145. And do you recognize that document?
A Yes.
Q Is that a printout of your chronos?
A Yes.
Q And it ends on July 3rd, 2007. Is this a document that was in your file originally because it was produced for court proceedings in this case?
A I believe it must have been, yes.
Q So that's why it drops off at July 3rd, 2007?
A Yes.
Q And you worked with Ms. Kauffman to see to it that those documents were emailed to us earlier this week; is that correct?
A Yes.
Q In referring to Movant's Exhibit No. 145, there are some entries in the file dating back to July -- I'm sorry -- April the 4th of 2007. I'd like to direct your attention to that first entry there.
A Okay.
Q On July 4th -- why do I keep saying July? I'm sorry. April 4th. What's the time noted there?
A That is 3:45 a.m.
Q Does the computer put in the a.m. or p.m. or did you

put in the a.m. or p.m.?

A I believe I did.

Q Do you believe that to be accurate or do you believe that to be an error?

A I believe that should 3:45 p.m.

Q What did it say there?

A What did the contact note say?

Q What does the contact note say?

A "Spoke with CCSO Wheeler. She will check with MJ or OJA to see what we can forward to the FBI. Told her that D was in my office for COP on December 16th around 1:30 to 2:00. I have a report form and the COP plus my chrono dated 12/16/04 at 2:17 p.m."

Q Who is CCSO Wheeler?

A Chief Court Service Officer Wheeler was my boss at the time.

Q And who is MJ?

A MJ. I believe that's Willowby (ph). She was the staff attorney at the Office of Judicial Administration.

Q So OJA is the Office of Judicial Administration?

A Yes.

Q And COP is what?

A Conditions of Probation.

Q And conditions of probation, those include things such as this document that was introduced into evidence during the

trial of this case; is that correct?
A That is a report form that any defender that was reporting to me in my office, they had to fill out a report form when they arrived at my office. This is a report form that Tommy Kleiner filled out that day on December 16th, 2004.
Q Then there were also conditions of probation, like firearms restrictions and drug testing and that sort of thing?
A Yes. The day that I met with him, that day when I met with him, we did an intake for his new probation case. So we went through all the intake paperwork that included the conditions of probation, expungement forms, firearms forms, all of those forms.
Q And are those forms that you then file with the Clerk of the Court to be placed in Tommy Kleiner's court file?
A I believe at the time back then we did conditions of probation. They were filed with the Court. And firearms restrictions.
Q And the court files are public documents?
A Yes, unless it's noted to be confidential.
Q Now, you had additional contacts that day. Your contact notes reflect that you did speak with Kurt Lipanovich on -- well, let me ask you this: There is a notation -- I don't think that you're referring to Kurt Lipanovich but let me ask to be sure. I don't want to make any assumptions. On March 30th you say, "Sent email to Kurt at CC." That's not

Kurt Lipanovich, is it?

A No. That's Kurt Layton with Community Corrections.

Q You did speak with Kurt Lipanovich on April the 4th; is that correct?

A Yes.

Q And Mr. Lipanovich did get a subpoena for your records which was served on you on April the 5th; is that correct?

A I'd have to look at my notes, but yes.

Q And you recall that I came out to your home and visited with you about your contact in this case; is that correct?

A That's correct.

Q And I brought my investigator, Ben Leonard, with me?

A Yes.

Q You were kind enough to sit down at the kitchen table with us and answer my questions?

A Yes.

Q And you told me that you had talked to Agent Lipanovich and told him that you did have the alibi information for Tommy Kleiner but that he would need to get a subpoena?

A Yes.

Q Which he later did?

A Yes.

Q Now, Ms. Garman, I want to also ask you about your interview with Kurt Lipanovich. Do you recall telling Mr. Leonard and myself that when you talked to Kurt Lipanovich and

provided Tommy's alibi to him, that he told you if the defense contacted you, you didn't need to talk to them?

A I don't recall the exact conversation. I think it was stated that if anybody else contacted me in regards to the case, to let him know.

Q Do you recall telling Mr. Leonard and I that he told you not to contact -- if the defense contacted you, that you didn't need to talk to them, then your response was, And so when they contacted me, I didn't?

A I was told that I didn't have to speak with anybody in regards to the case unless I spoke with MJ, which is the staff attorney. So any time either Kurt or any of the other attorneys contacted me, before I said anything or did anything, I ran it by MJ.

Q And the last question I want to ask, Ms. Garman, is the first time we spoke, you provided me with information that was quite surprising to me. Did you in fact tell us that during the course of working with Special Agent Lipanovich on the case, he informed you that defense counsel was going to suggest that you and Tommy Kleiner were engaged in a romantic relationship?

A There was a phone call from Agent Lipanovich stating that Lisa's attorneys had gone to visit Tommy Kleiner to interview him; and during the interview, they had asked him if he and I had had some sort of an affair or had been involved.

Q And you found that ludicrous?
A I did, yes.
Q Did Mr. Kleiner become quite unstable and angry when he learned that there were accusations being made that he might be involved in the murder? Did he start calling people and threatening them?
A I don't recall.
Q Let me find that specific place in your contact notes. Just give me a moment.
Let me show you a contact note on April the 4th at 11 a.m.
MS. HENRY: I'm sorry. I have not admitted these yet.
Your Honor, may I move to admit Movant's Exhibit 145?
MR. KETCHMARK: No objection.
THE COURT: Received.
Q (By Ms. Henry) Do you see the contact note there at 11 a.m.?
A Yes.
Q If I can figure out -- it's like an I.Q. test itself to use this machine.
Do you see that contact there?
A Yes.
Q What happened then?

A It says, D, the defendant, Tommy Kleiner, called. He said that FBI contacted him and wants to meet with him at one o'clock today. He said that his sister, Lisa Montgomery, told law enforcement that he was involved in the murder of Bobbie Stinnett. Tommy wanted to know who he listed as his employer at the time of the murder. I told Tommy he'd have to call me back at a later date when I was in my office in Lyndon because at the time he called me I was in another county.
Q And that contact note is dated 4/4/2007 at 11 a.m. Would you agree with me on that?
A Yes.
Q And did you enter that contact note on April 4th, 2007, at 11 a.m.?
A I don't know.
Q Does the contact note indicate when that event happened? So if you entered it later, is that date accurate?
A The eleven o'clock a.m. is the time -- April 4th, 2007, at 11 a.m. is the date and time that I entered. In our actual Full Court Program it is time stamped and dated as to when that contact note was entered. So it's possible that I entered that contact on the 5th. That would be noted in the Full Court Program.
Q In other words -- I'm not trying to -- this isn't a trick question. This is a contemporaneous note?
A Yes.

Q That's all I was trying to get at. I'm sorry. I promise. I'm not trying to trick you.

Then did you receive information on April the 10th from Doug Garman?

A Yes.

Q Regarding Tommy?

A Yes.

Q Any relation?

A He's my husband.

Q And what did he inform you about Tommy on April the 10th?

A I had received an email from him from the Topeka Police Department. It was sent out to all officers at the Topeka Police Department. Tommy had called WIBW, local TV station in Topeka, and tried to get an interview. He told them that Lisa's attorney is saying that he cut the baby from the victim. The police department went to WIBW and took a phone harassment report, and Tommy told WIBW that he would shoot at them if he tried to arrest him.

Q And then on April the 12th -- on April 12th there's a pretty long contact note there with Mr. Kleiner?

A Uh-huh.

Q What does it say there?

A I went to see Tommy at the jail. He had been arrested at 1220 North Van Buren, Apartment 5. He was living with

Rhonna Blackwell again. She still had a PFA against him. They've got court later this month. She tried to get it dismissed. Tommy said that he was dealing drugs over the weekend. He said that he was going to be locked and loaded when law enforcement came for him, but they got to him sooner than he thought they would. I told him to behave himself while in custody and that he needed to keep his mouth shut so that he didn't get into any more trouble. He mentioned that he might want to withdraw his plea and go to trial on the Agg Battery. I told Tommy about the new county attorney and that he would have to talk with his attorney about it.

Q Thank you.

MS. HENRY: Just one moment, please, Your Honor.

No further questions. Thank you.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Good morning, Ms. Garman. With respect to what's been offered and received as the Exhibit 145, would you agree with me this is a complete rather lengthy log of your contact with respect to both the defendant as well as individuals who call in connection with this case?

A Yes.

Q Is this a complete log? And what I mean by that is would you log all contact that you would receive in connection with Mr. Kleiner's case that would have resulted in the generation of this document?

A I would log anything that I had. I don't know that that report -- there's dates -- beginning date and end date. I'm sure there are probably previous entries and entries after that date. That is just a report that was ran by myself on the date at the top of the report.
Q So if I were to report or suggest to you that the latest entry in terms of the most recent is the July 3rd of 2007 and the earliest entry is December 16th of 2004, if I'm understanding what you're telling me is those are the dates that you entered to produce this document?
A Yes.
Q So there might have been stuff that preceded December 16th because you were representing him back in 2003?
A Yes.
Q With respect to that caveat, though, from December 16th of 2004 up to July 3rd of 2007, we can assume that this is a complete log?
A Yes.
Q So this is complete?
A As long as all the pages are in it.
Q And, again, obviously you haven't reviewed it. What I'm getting at, I guess, Ms. Garman, is you noted contact with the FBI agent regarding Tommy's supervision, correct?
A Yes.
Q And I know Ms. Henry didn't discuss it, but is there

also documentation about contact that you received from a Ron Ninemire from the Federal Public Defender's Office in June of 2007? Do you recall those conversations?

A The exact conversations, no, but I do -- was contacted by them, yes.

Q But that would have resulted in you creating those log entries?

A Correct.

Q So, ma'am, can I assume if there had been contact by somebody else on behalf of the Federal Public Defender or anybody in connection with the FBI or Lisa Montgomery's case, those would have been important enough that you would have created log entries and those would be encompassed and documented in Exhibit 145?

A Yes.

MR. KETCHMARK: One moment, Your Honor.

That's all I have.

MS. HENRY: Nothing further, Your Honor.

THE COURT: Thank you, Ms. Garman. You are free to go.

(Witness excused.)

MS. HENRY: Your Honor, I have one very short witness that I have just hanging out in case I needed somebody at the end of the day, and then I have two very long witnesses. With the Court's indulgence, may I call my short witness now,

and then we can break for lunch and do the two expert witnesses this afternoon?

THE COURT: All right.

MS. HENRY: Thank you, Your Honor.

THE COURT: Good morning. Would you come right up here to the witness stand for me, please.

CHRIS ARMSTRONG, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning, Mr. Armstrong.

A Good morning.

Q Can you state your name for the record and spell your first and last name, please.

A Chris Armstrong, C-h-r-i-s, A-r-m-s-t-r-o-n-g.

Q And, Mr. Armstrong, are you currently retired from the Federal Public Defender system?

A I am.

Q Have you previously been employed by the Office of the Federal Public Defender for the Middle District of Tennessee?

A I was, yes.

Q How long were you -- your last employment with the office, how long were you employed there?

A Eight years, I think. It may be a little longer.

Q And were you in fact an investigator in the Capital Habeas Unit?

A Yes.

Q And was I your supervisor?

A Yes.

Q And prior to my being your supervisor at the Federal Public Defender's Office in Nashville were you also in private practice?

A I was.

Q And did we work on a case together, the Tommy King case, while you were in private practice?

A We did.

Q You've known me for how long? Almost 16 years?

A Yes, sounds right.

Q You were not assigned a lot of duties on the Lisa Montgomery case; is that fair to say? You weren't a main investigator?

A That's true.

Q But I did ask you to be present to witness an interview that I conducted with a gentleman by the name of Fred Duchardt; is that correct?

A Yes.

Q And I asked you to be present to take detailed notes of that interview; is that correct?

A Yes.

Q And you knew that when you were taking those notes, that I was wanting you to commit those notes to a declaration;

is that also correct?

A Yes.

Q And you were not the only one in the room taking notes. Ms. Harwell was also in the room taking notes; is that correct?

A Yes.

Q And I know you don't -- as you sit here today having blessedly retired, don't have an independent memory of the conversation that occurred, but do you recall just as a general sense whether the interview was hostile in any way?

A No, it was not. It was friendly, cordial.

Q Knowing my patterns and practices and having -- we worked on a lot of cases together; is that fair to say?

A Yes.

Q And we've been in the field together for many interviews; is that correct?

A Yes.

Q And you're familiar that I have a philosophy against audiotaping interviews. Are you familiar with that?

A That's true.

Q And that in fact I instructed you on my cases I never wanted you to surreptitiously record or not surreptitiously record any witnesses; is that correct?

A That's correct.

Q So if Mr. Duchardt had filed a document with this court subject to Rule 11 stating that I had requested his permission

to audiotape our meeting, that would be in conflict with my pattern and practice and behavior; is that correct?
A Yes.
Q Now, at the conclusion of the interview with Mr. Duchardt, did you take your notes, compare them with Ms. Harwell's notes and commit that interview to a declaration?
A Yes.
Q If there was something in Ms. Harwell's notes that was not in your memory, did you include it in your declaration?
A No.
Q So this declaration, which was signed contemporaneously or very close in time to the interview of Mr. Duchardt, is the best recollection of what your notes said about what Mr. Duchardt said in our interview; is that fair?
A Yes.
Q I'm going to show you now, sir, what's been previously admitted into evidence as Movant's Exhibit No. 83. I show you the top of it. Does that appear to be your declaration, sir?
A It does.
Q And on the last page, is that your signature?
A It is.
Q I want to direct your attention to the fourth paragraph of this declaration. Let me ask you, Mr. Armstrong, would it be easier for you if I handed you a copy?
A I have a copy but you can hand me yours. What page are

we on? Page 2?

Q Page 1, fourth paragraph.

A "At the time Mr. Duchardt" --

Q Yes. Can you read that paragraph into the record?

A I will. "At the time Mr. Duchardt first met Ms. Montgomery, she was 'devastated' by the loss of Ms. Clarke as her counsel. Ms. Montgomery was suffering the aftereffects of having lost confidence in her trial team and was 'very guarded' with him initially. As he explained, Ms. Montgomery has to deal with what he called 'her demons' constantly, but she was dealing with a lot more back then than she is now. Mr. Duchardt 'worked like hell to get her to say what the hell she meant,' because expressing herself was very difficult for Ms. Montgomery. Ms. Montgomery had been 'in no way in the loop' about the events which led to the loss of Ms. Clarke as her counsel and had had no interaction with Ms. Clarke since Ms. Clarke's dismissal."

Q Thank you.

I'm going to direct your attention now, sir, to page 3. I'm not going to go through every single one of these, but page 3, the fourth full paragraph on the page.

MR. VALENTI: Your Honor, I object. If he says he can't recall and the declaration is already in, I think this is cumulative and unnecessary.

MS. HENRY: That's fine.

THE COURT: Okay.

MS. HENRY: Thank you, Mr. Armstrong. I don't have any further questions.

MR. VALENTI: No questions.

THE COURT: All right. Thank you, Mr. Armstrong.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: It's going to be a particularly long afternoon if we break now, but if that's where you're at.

MS. HENRY: I am. I think we'll be good starting at one. We'll be done at five.

THE COURT: You think what?

MS. HENRY: We'll definitely be able to be done by five.

THE COURT: That's not exactly my point.

MS. HENRY: I'm sorry, sir. If the Court wishes to start with Dr. Logan, I believe he's here. I haven't checked in the hallway. I told him to be here at eleven.

THE COURT: I'll go ahead and break for lunch, but I just -- I don't know exactly -- well, let's talk about that. Where are you in your schedule?

MS. HENRY: Today we have Dr. Logan and --

THE COURT: That's not what I want to know. I want to know how much longer are you going to take to put your evidence on?

MS. HENRY: Right now as it stands, it looks like we're going through next Friday -- I'm sorry -- Thursday. I keep forgetting -- I think we all forgot that Friday was a holiday. We're willing to work on that Friday.

THE COURT: What kind of holiday is next Friday?

MS. HENRY: Veteran's Day.

THE COURT: Veteran's Day. Okay. You got plenty of witnesses to stay here as long today as we elect to stay, right?

MS. HENRY: Yes, sir. When we had our discussion the other day, we went back to the hotel and changed a bunch of people's flights.

THE COURT: Okay. I'll be back at one o'clock.

(The noon recess was taken at 12 p.m. until 1 p.m.)

AFTERNOON SESSION

THE COURT: Ms. Harwell.

MS. HARWELL: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. HARWELL: At this point in the proof, the movant would call V.S. Ramachandran, R-a-m-a-c-h-a-n-d-r-a-n. And, I'm sorry, I'm not going to attempt to spell his first two names because they elude me.

If I might acquaint Your Honor, I know you will read the full deposition. It's a testimonial deposition that we took on October the 10th, but if I might give the Court a short

summary.

Dr. Ramachandran testified that he suffered a seizure a few years ago, and that the effects of the medication make it difficult for him to travel.

He recalls that he was in India during his first contact with Fred Duchardt, though he did not recall the specific date.

Dr. Ramachandran testified using the word "inconceivable" to describe the idea that he would in an initial call with an attorney provide any sort of diagnosis. He clarified that he would have to see a patient prior to making such a diagnosis.

He testified that he did not do any tests or other tools of diagnosis, but relied on his interview with Ms. Montgomery to determine whether or not she had pseudocyesis. He also relied on information provided to him by Mr. Duchardt regarding observations by Ms. Montgomery's family of her symptoms. Dr. Ramachandran did not himself interview any of the family members.

Dr. Ramachandran testified that he has published extensively on brain science. His CV is appended to his testimony, but that his scholarship on pseudocyesis is limited entirely to five pages in Chapter 11 of his first book, Phantoms in the Brain, and consisted merely of a recitation of a case study which had been published in the 1930s.

Dr. Ramachandran testified that in that book, Phantoms in the Brain, he provided end notes to each chapter, and that those end notes he discussed in his preface were an attempt to alert the reader to actual scholarship on the subject covered in the book.

Dr. Ramachandran testified that he does not and did not at the time of our trial hold himself out as an expert in pseudocyesis; that in fact there's no such thing as an expert in pseudocyesis because it is so rare.

In fact, the only other time Dr. Ramachandran has seen what he believed to be pseudocyesis in this country was a case where the client had been observed by gynecological professionals and blood work demonstrating her minimal changes was documented.

Dr. Ramachandran testified that because he trained at Oxford and learned the English law system regarding insanity, at the time of his testimony in this matter he erroneously understood that the test of insanity was the McNaughton Rule including the test of whether defendant's conduct was volitional.

Dr. Ramachandran understood that the sole referral question in this matter from Mr. Duchardt was just for him to determine whether Ms. Montgomery had pseudocyesis.

He further testified that a determination of whether a person is able to appreciate the wrongfulness of her conduct

was and is beyond his expertise.

Finally, he testified that he trained as a medical doctor in India and is not licensed to practice medicine in the United States.

And with that, Your Honor, we would tender Exhibit 36. I believe it's been agreed to that's the factual testimony of Dr. Ramachandran.

THE COURT: All right. It's already been received?

MS. HARWELL: Yes.

THE COURT: All right. Ms. Henry.

MS. HENRY: Thank you, Your Honor.

Movant calls Dr. William Logan.

WILLIAM LOGAN, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good afternoon, Dr. Logan. Would you state your name for the record and spell your first and last name for the court reporter, please.

A The name is William Logan. William is spelled W-i-l-l-i-a-m. Logan is spelled L-o-g-a-n.

Q I guess that's pretty obvious but just in case.

Dr. Logan, can you tell us how you are employed?

A Pardon?

Q How are you employed?

A I'm in a practice with another psychiatrist, Dr. Peterson. We operate as a partnership.

Q Are you a psychiatrist?
A Yes.
Q Are you a licensed psychiatrist?
A Yes. Although actually psychiatrists are not licensed. They're licensed as medical doctors. The designation of psychiatry is through a different mechanism. You're licensed as a medical doctor to practice medicine and surgery, and I'm licensed in Texas, Missouri, Nebraska, and Kansas.
Q Dr. Logan, do you have a curriculum vitae?
A Yes.
Q Did I ask you to send that to me?
A I believe so.
Q So I'm going to place up here on the monitor what has previously been admitted into evidence as Movant's Exhibit No. 42. Do you recognize that to be an accurate copy of your curriculum vitae, at least as of July 2016?
A Yes.
Q Does that vitae accurately summarize your professional accomplishments?
A Yes.
Q And details your publications, your seminars, where you taught, your educational activity, consultations, et cetera?
A Yes.
MS. HENRY: Your Honor, I would move that Dr. Logan --

Q (By Ms. Henry) Well, let me ask you this: Dr. Logan do you practice forensic psychiatry?
A Yes.
Q What is forensic psychiatry?
A Forensic psychiatry is the application of psychiatry to answer some questions before a Court.
Q How long have you been a forensic psychiatrist?
A Since 1981.
Q And has your work been only in Missouri or have you practiced elsewhere?
A No. For a long time I was with The Menninger Clinic, which was located in Kansas, but part of the time I was located in Menninger -- they moved their office containing our department to downtown Kansas City, Missouri. So it's been both Missouri and Kansas.
For a while, before I went to Menninger, I was at the Medical Center for Federal Prisoners in Springfield, Missouri, on their forensic unit there.
Q I will ask you to slow down just a little bit because the court reporter is trying to do realtime reporting.
Have you testified in court as a forensic psychiatrist?
A I have.
Q How many times?
A I've never made an absolute count. First three years I

did this probably around 50 times, but then from 1984 to the present on average around 30 times a year.

Q Do you testify in federal and State court?

A Yes.

Q And in Missouri, Kansas, and other surrounding states?

A Yes. Sometimes states that are not surrounding.

Q What other states have you testified in?

A Oh, my goodness. Well, the furthest west I've been is California. The furthest east I've been is Long Island. Furthest south I've been is Puerto Rico. Furthest north is Minnesota. Not with great frequency but various states.

For a number of years I testified out west a lot in Wyoming, Utah, Arizona on a couple of occasions.

Q So coast to coast and top to bottom?

A Yeah.

Q Have you ever had your testimony not accepted as an expert witness in forensic psychiatry?

A Not that I'm aware of, no.

Q Have you testified on behalf of both the prosecution and the defense in these cases?

A Yes.

Q Have you testified for the prosecution and the defense in capital cases?

A Yes.

Q Have you also had the experience of being appointed by

the Court to conduct competency evaluations?
A On occasion, yes.
Q As an independent court witness?
A Right.
MS. HENRY: Your Honor, at this time I would tender Dr. Logan as an expert in psychiatry.
MR. VALENTI: No objection.
THE COURT: His expertise is recognized.
MS. HENRY: Thank you, Your Honor.
Q (By Ms. Henry) Dr. Logan, I want to turn your attention to the Lisa Montgomery case, the matter we're here to discuss this afternoon. How did you first become involved in the Lisa Montgomery case?
A I received a phone call from her attorneys that she was in considerable distress up at Corrections Corporation of America up in Leavenworth. I believe Susan Hunt was one of the attorneys. I forgot the other one but there were two at the time. And they basically wanted me to go up and see her and do what I would call a clinical consultation.
Q What is a clinical consultation?
A Basically it's when you evaluate a patient as you would in a clinical setting, then recommend treatment.
Q At that time -- well, can you share with the Court and the record the difference between a consulting expert and a testifying expert?

A Well, when you do a clinical consultation, you basically are advising whoever the treater might be. You're not the one actually going to be doing the treatment. Someone else is. But your opinion has been requested to basically inform the person that's treating them.

Q If an attorney contacts you and enters -- retains you, say a defense attorney retains you to be a consultant on the case but says, You're not going to actually testify in the case, what's the difference between that role and a testifying expert's role? I guess what I'm getting at, is that covered by the attorney-client privilege?

A Oh, interesting question. I'm not very often asked to do what I was asked to do initially in this case. I would suppose it is. I mean, if you don't produce a report, it stays there between you and the attorney.

On rare occasions I've been asked to consult on things like jury selection or to review another report and give the attorney my opinion about the validity of it or what else could have been done, but that's not a real typical role. If you don't prepare a report, then the relationship stays between you and the attorney. However, in this case they did ask me to do a consultation report.

Q And we'll be talking about that in just a moment.

With respect to the consultation report that you provided to the Montgomery team as it was at the time, I'll

represent to you now March of 2005 it was Anita Burns and Susan Hunt.

A Right.

Q And you know both of those attorneys?

A Right.

Q And have worked with both of them?

A Almost all the attorneys mentioned in this case I've worked with at some point.

Q And if I represent to you that it was March of 2005 that you became involved in the case, you would accept that?

A Yes.

Q What was the presenting problem with Mrs. Montgomery in March of 2005?

A They were concerned about her depression. I think a room search they had found her hoarding some pills or trazodone, not a great many of them, but I had been aware of some successful overdoses when tricyclic antidepressant -- when you're on a particular medication. She had written a letter to a friend of hers that could be interpreted as suicidal.

So they wanted a clinical consultation about what I would recommend in regards to treatment, and I think specifically they were inquiring about whether she might be suited for inpatient treatment or whether she could be treated as an outpatient; and if so, if she was treated outpatient, what I would recommend.

Q I'll stop you there for just a second. You mentioned that she had been hoarding -- what was the drug?
A Trazodone, t-r-a-z-o-d-o-n-e. It's a tricyclic antidepressant often used for sleep due to its sedative side effect.
Q What is a tricyclic antidepressant?
A It's the first group of antidepressants that came on the market closely related to amitriptyline or Elavil. Tricyclic refers to the chemical structure of those medications, and primarily they are drugs that promote the increase of norepinephrine. Norepinephrine is a neurotransmitter in the brain that's been shown to be deficient in some cases of depression.
Q Are there specific concerns or cautions that should be used with the prescription of trazodone?
A Not particularly. You can get some dry mouth. You can get some constipation. As I mentioned, sedation can be a problem. Some of that is dose dependent. So it's not the quality of the medicine itself totally but also the medicine's initial side effects and dosage range in which you prescribe.
Q Because of the sedative effects, are there concerns that an individual who is suicidal could use trazodone to actually successfully commit suicide?
A Yes, but not because of the sedative side effects. As it turns out, that class of medication is prone to cause fatal

cardiac arrhythmias up to two weeks after an overdose. So they really have to be very closely monitored after an overdose. Also the sedation is a problem as well. They may simply stop breathing, but it takes many more than 50 milligram tablets to get that job done. I know of at least one other case up in Platte County where she took many more than that and successfully killed herself.

Q That's Nila Wacaser?

A Yes, as a matter of fact.

Q So Ms. Montgomery had been hoarding trazodone, she'd written a suicide letter, and had there been another incident involving her wrists that had occurred?

A Just that she was depressed. Oh, she had been banging her head against the wall. Nothing that would kill her but certainly self-destructive behavior.

Q And were there episodes of dissociation that had been described to you?

A Yes. Other people had thought that she was dissociating at times where she appeared not to be in good contact with others around her.

Q And so when you evaluated Mrs. Montgomery in March of 2005, did you reach any conclusions about her acute state at that time?

A Yes. That was really all I was called to do was to give her a clinical evaluation, render diagnosis, then make

some recommendations. My diagnosis at the time was that she was in the midst of a major depressive disorder and g930 24.

That she had some psychotic features that she described.

Q And did you write that in a report to the lawyers?

A Yes.

Q And did you prepare that report shortly after having seen Mrs. Montgomery?

A Yes.

Q And would you describe your role at that time as almost a crisis intervention? In other words, Mrs. Montgomery was in crisis and they wanted to do something very quickly.

A I assume they were trying to look for an opinion that she might be transferred someplace like an inpatient unit. That ultimately didn't happen. But I really can't speak totally to what their motivation was for calling me in.

Q You got there very quickly after the pills and the letter?

A Yes. It was represented as a crisis and I think I went up and saw her but on a Sunday, which I don't normally do.

Q So I have placed on the projector there a copy of Movant's Exhibit No. 39. Is that the letter that you wrote to counsel regarding your findings with respect to Mrs. Montgomery in March of 2005?

A Yes.

Q And does that letter accurately summarize your opinions as you saw Mrs. Montgomery in March of 2005?
A Yes, it does.
Q Can you describe the symptoms that you observed -- well, let me ask you this question first: Because you were called in to do a clinical consult, were you provided with any background materials, biopsychosocial history, anything of that sort?
A No.
Q So it was just you go up to CCA, evaluate the client, and tell us what you see?
A Right. Simply the same as you would do with any clinical case that you saw.
Q And wasn't it -- they didn't ask you was she insane at the time of the offense; is that correct?
A No, there was no pending forensic question at all.
Q And when you rendered your opinion, you based it on your observations of Mrs. Montgomery, correct?
A Well, yes, but there also had been observations of her behavior by CCA staff. Certainly there had been incidents, certainly the letter had been intercepted and read. The pills -- the cell would have been searched and the pills found, so it wasn't all just what I saw in front of me.
Q Were you in fact also aware of a diagnosis that she had been -- she being Mrs. Montgomery, had been given by a Dr.

Linda McCandless? That's M-c-C-a-n-d-l-e-s-s.
A I knew Dr. McCandless. I'm not sure I was aware of what Dr. McCandless had diagnosed her at the time. I think she was the only treating psychiatrist there. So I assume whatever pills she was hoarding had been prescribed by Dr. McCandless.
Q You knew eventually that Dr. McCandless had diagnosed Lisa Montgomery with bipolar disorder; but as you sit there today, you don't know if you knew it at the time?
A I didn't know it in March of 2005.
Q But you did know that someone was giving her medication that was an antidepressant?
A Nothing for bipolar disorder though.
Q That wasn't a treatment for bipolar disorder?
A Well, they would have treated it when she was in a depressed state so it would have been helpful. But if you had already diagnosed bipolar disorder, you would expect to see either a mood stabilizing medication of some kind, either Lithium or sometimes antiseizure agents are used for that purpose or sometimes some of the antipsychotic treatments are used for that as well.
Q How did Mrs. Montgomery present to you when you observed her in March of 2005?
A She appeared depressed and despondent, anxious.
Q And that resulted in your preliminary opinion and your diagnosis of what?

A I called her at major depressive disorder with psychotic features, but there were other symptoms in addition to just her presenting mood. She also complained of the typical symptoms of a major depressive disorder, which is persistent sadness, lack of motivation or interest in her surroundings, feeling withdrawn, tearful, tired, difficulty concentrating, suicidal thoughts, and something you only see usually in severe cases of depression, which is seeing or hearing things that aren't there. She mentioned hearing the voices of her children that wasn't much comforting and a mother who was often critical, which is not something you would expect to hear even in someone who was depressed but did not have psychotic features, but some depressions do come with some psychotic features, so it is not unexpected.
Q But it was something you noted?
A Yes. Some of the history. Of course, nobody can see whether somebody is actually hallucinating or not, but you do elicit that history.
Q And did you make some specific treatment recommendations at that time?
A Yes, I did, quite a long list of them actually.
Q Do you recall what they were?
A Well, she was being kept in solitary confinement. That's been shown to aggravate depression. Her attorneys had instructed her not to talk to the clinicians in this case -- I

guess it would have been McCandless -- about anything about her events at all; but without some ability to go into that, you would not be aware of certain developments in her case which she could be responding, you know, certain motions that were filed.

In one case, I believe, she had recently had a visit from family members, and her kids appeared on the Montel Williams show, and so there were certainly things swimming around that. If you didn't get into the case a bit with her, you were not going to be aware of it all and you could be blindsided by it if you were the clinician.

Q Let's talk for a second. You said it was her attorneys. Are you aware that it was actually Dr. McCandless that instructed that Ms. Montgomery was to receive no access to any news articles about the case and that the paper actually had any of those articles cut out of them?

A I was not aware of that, but given her activity, the things early on around the time I saw her, I'm not surprised by that intervention. I'm certainly not going to tell her attorneys not to inform her of the developments in her case.

Q And, Dr. Logan, did you recommend that Lisa actually be transferred to a psychiatric facility?

A I recommended that she either do that or if they were not able to accomplish that -- because I know that the facilities for women in the bureau at that time, at least, were

much more limited than they are today. There was no Carswell, I don't believe.

Q Let me stop you there. I think your voice dropped. There was no Carswell?

A Right.

Q And what's Carswell?

A Where they house a lot of the women with psychiatric difficulties that are in custody at the Bureau of Prisons. I recommended some medications they might try for -- including a couple of antipsychotics that had been used as mood stabilizers.

Q And did you reach an opinion that, at least at that time, Lisa Montgomery lacked decisional competence?

A I don't believe that was the focus at the time, but certainly if that had been a question on the table, I would have said that; but since there was no decision pending before her, it was a moot point.

Q So it was your professional opinion that you held at that time that it was not part of the referral question that she lacked decisional competence?

A Right.

Q In March of 2005?

A Yes.

Q Was that your only involvement in Lisa Montgomery's case until we fast forward to March of 2007?

A Yes.

Q And when you were contacted on March 22nd of 2007, who contacted you?

A I believe it was Fred Duchardt.

Q And was that surprising?

A No. I mean, I worked with Fred Duchardt before.

Q That was a poorly worded question. Were you surprised that you were contacted again about the Lisa Montgomery case?

A No, not particularly. I thought -- they were facing a trial date late April, early May. I thought they were kind of 11th hour.

Q And how did you feel -- when we talked before you took the stand, I think you told me that the other night in your office that you hate those sort of 11th-hour requests?

A I do but certainly they're not unknown to me.

Q Okay. You have a lot of lawyers who wait to the last minute?

A Yes.

Q At the time that Mr. Duchardt contacted you on March 22nd of 2007, had you reached a conclusion that Lisa Montgomery suffered from a condition known as pseudocyesis?

A No.

Q Had you told Mr. Duchardt that you could provide a diagnosis of pseudocyesis?

A No, not at that point for sure.

Q Between March 3rd, 2007, and March 22nd of 2007 had you been provided with any background materials, something we call a biopsychosocial history by anyone on behalf of Mrs. Montgomery?

A Mr. Duchardt did send me a memo that contained some of that in it, I believe, but certainly not anything extensive.

Q Did he do that after the phone call on March 22nd, 2007?

A Right. I think he actually called me on the 21st and I got back to him on the 22nd. I think he faxed over something that kind of caught me up to speed.

Q So would you have been in a position -- even though you had seen Mrs. Montgomery just one time in March of 2005, would you have been in a position to diagnose Mrs. Montgomery on March 22nd of 2007 with pseudocyesis?

A No. That would have required -- some of these cases went back in time. It would have been nice to have some contemporaneous reports of outside observers or medical records or things of that nature that really weren't available at that time. I think I was told about Dr. Ramachandran that either had or would be seeing her in the near future.

Q So if I was to tell you that Dr. Ramachandran was contacted for the first time by Mr. Duchardt, his time records will reflect that was April the 2nd of 2007, he probably didn't talk to you about him on March 22nd, 2007, or did he?

A I think he was aware of him.
Q Okay. Did he tell you on March 22nd of 2007 that Dr. Ramachandran had diagnosed Lisa Montgomery with pseudocyesis?
A No. I think he presented he was an expert in pseudocyesis and would be part of the evaluation in a group that would be seeing her.
Q I'm sorry. I didn't understand this before. You're telling me that on March 22nd of 2007 Mr. Duchardt represented to you that Dr. Ramachandran was going to be part of the case?
A Yes.
Q Okay. I'm sorry. I didn't know that.
When did you evaluate Lisa Montgomery?
A I would have to look back on my record to tell you the exact dates, but it was a couple of times in April -- no, one time in April and another time in early May, I believe.
Q So let me ask you this question, Dr. Logan: Did you prepare a report in this case?
A Yes, I did.
Q And I'm going to show you what has been previously introduced into evidence as Movant's Exhibit No. 40. Is that a copy of the report you prepared in this case?
A Yes. I just pulled it out of my pile.
Q Okay. So you have it in front of you as well?
A I do.
Q And does that report reflect that you saw Mrs.

Montgomery on April the 10th of 2007 and May 11th of 2007?
A Yes.
Q That report also indicates being contacted by Mr. Duchardt on March 24th, 2007, but have you since looked at your billing records and determined that it was three days earlier?
A Well, it was actually -- the initial phone call came in on the 21st, but I didn't speak to him that day. I called him back the next day, which would have been March 22nd, and that's what my notes reflect.
Q So we'll give him the benefit of those extra two days.
A Okay.
Q And then that day he faxed over a summary of the case to you; is that correct?
A Yes.
Q That wasn't actually physical documents. It was the lawyer's summary of what the case involved; is that --
A Yes, Mr. Duchardt's overview of the case.
Q And at that point Mr. Duchardt was interested in whether or not pseudocyesis was a possible explanation for what the government was calling prior bad acts, that is, the fact that Mrs. Montgomery had claimed to be pregnant on a number of occasions when she was not pregnant; is that correct? He had a question about insanity, but he had a separate question about whether pseudocyesis would rebut the prior bad acts?
A Yeah, I believe he did mention pseudocyesis, but the

bottom line was that he wanted an opinion about whether she was insane at the time or was under extreme emotional duress -- or distress, rather. And he further in his criteria, which I think is relevant in the State of Missouri. It wasn't actually a federal standard but that's a moot point.

Q So prior to seeing Ms. Montgomery on April the 10th of 2007, would you have been in a position to give a diagnosis of pseudocyesis to Mr. Duchardt?

A Well, I don't think so, but I don't want to narrow this down too much. I was asked to do a diagnostic evaluation which might include pseudocyesis but certainly wasn't limited to pseudocyesis. Okay? I mean, I was sort of asked basically to do an amended version of what I had done several years early, which was to give a complete clinical diagnosis and then review a number of ancillary materials, including a number of legal materials that had been prepared; and then considering all those sources of information, arrive at a diagnosis, and I arrived at several. Pseudocyesis was one but not the only one.

Q That's absolutely right. We'll want to get in some detail about that but for right now my more narrow question is probably an obvious one, but you're not accustomed to have lawyers tell you what your diagnosis is going to be, right? I mean, they'll try but you're not going to let that happen?

A Not unless I agree with them, then that's fine. I do appreciate their input and their observations and their

rationale, and certainly it was good to know she had reported a number of pregnancies that other people doubted and had not actually come to pass. She had some rather unusual stories to tell about those.

Q Again, I don't want to belabor the point. What I would like to do is direct your attention to a transcript that's already been introduced into evidence as Movant's Exhibit No. 58. I'm going to read -- and this transcript, sir, for purposes of the chronology is dated April the 3rd of 2007, so seven days before you had your first meeting with Mrs. Montgomery.

A And the source?

Q I'm sorry.

A The source?

Q It's a court transcript.

A Okay.

Q And so this is Mr. Duchardt and the Court. I'm going to read this to you, then I'm going to have a question. Okay? And I'm going to pick up on page 3 of the transcript where Mr. Duchardt has informed the Court that he has two experts who need to write reports and he says, quote, And that is the reason I came forward with this whole situation to you and Judge Maughmer to try to tell you that as much as we wanted to make sure that the court date was going to work it just doesn't seem like everything can get done in the kind of fashion it

ought to be done in order for everybody to get all this information.

"THE COURT: What were the two experts that were due last week?

"MR. DUCHARDT: That was Dr. Ruben Gur from the University of Pennsylvania and Dr. Ruth Kuncel. In fairness to Dr. Kuncel, Dr. Kuncel needs the report information from Dr. Gur. She's gotten general information about that but some of the specific information she needs on some of her conclusions comes from some of the information that will be in Dr. Gur's report.

"Psychiatric experts," the Court asks.

"MR. DUCHARDT: Both of these are psychologists. They are M.D.s who have actually been involved in conducting the MRI testing but Dr. Gur is the one that pulls all the information together. One of them has been on the team for some period of time but we have brought him back to the fore. That is Bill Logan. The other is," it says, "B.S. and I will pronounce it and spell it for you, Ramachandran, and he is at the University of California, San Diego, brain institute there.

"And the issue that has come to the fore because of everything is a diagnosis called pseudocyesis, and that will be a diagnosis that will impact upon the first phase defense in terms of mental disease or defect.

"THE COURT: Who is it that is giving you a

preliminary diagnosis?

"MR. DUCHARDT: That is Dr. Ramachandran and also Dr. Logan."

Was that an accurate representation of what you had told Mr. Duchardt at that time?

A No.

Q Moving on to your next work in the case. You testified that Dr. -- that Mr. Duchardt had provided you with a great deal of background information in this case; is that fair to say?

A Right. I think I prepared an appendix to the report that you flashed earlier. Many of them were actually documents that were given to him by the prosecution.

Q The FBI 302s and things of that nature?

A Exactly.

Q Did Mr. Duchardt provide you with what is known as a biopsychosocial history or a social history?

A I thought Dr. Kuncel was the one kind of working that up. I typically do somewhat of a social history as part of my own evaluation and provide that in my report, but I didn't have anything very extensive, largely because those take considerable time to prepare, and we were not working with very much time.

Q Had you worked on other capital cases where attorneys have provided you with a social history, biopsychosocial

history?

A Yes.

Q Let me ask another question. Have I provided you a copy of the biopsychosocial history that was produced by a woman by the name of Jan Vogelsang, V-o-g-e-l-s-a-n-g?

A Yes, you have.

Q And is that the sort of social history that you have seen in other capital cases?

A More extensive than some but certainly more along the lines of what you see if they have considerable time to work the case up.

The real difference is that since the defendant's credibility is always at issue, and hers perhaps for more legitimate reasons, the more things you can verify from other sources, the more source documents you have, the more credible or stronger foundation you have for your opinions and diagnosis.

Q And I understand you're saying that you were working under a very short time frame between March and an April 30th trial date, but when you say considerable amount of time, a year and a half would be considered a considerable amount of time; would you agree?

A One-and-a-half to two years is within the range.

Q So if you have one-and-a-half to two years, even if you are starting from scratch, that's enough time to do a

biopsychosocial history?
A Well, if the documents are available, but some of these things are more easily accessed than others, and then certainly every case varies in terms of what you're able to access. I know on this particular case there were some witnesses that came forth many years later about some of the sexual abuse issues.
Q I provided you with the report of Dr. Kate Porterfield and the declaration of David Kidwell and we'll get to those in just a minute.
Is it fair to say, sir, you've worked with a number of capital lawyers in Kansas City; is that correct?
A Yes, and elsewhere.
Q And elsewhere?
A Yes.
Q Including Arizona?
A Yes.
Q And with other capital teams you find it the norm that they try to have somebody on the team put together some sort of social history for the mental health expert assigned to the case?
A Yeah, usually. I worked with Mary Goody who originally came from Missouri and winded up marrying an attorney and moving out west. She did quite a bit of mitigation work in capital cases in the western states, and she would send me box

loads of materials and all the records as they came in.

Q And do you find that helpful in reaching your ultimate diagnostic impressions?

A Sure. It helps you sort things out in terms of, you know, everybody's memories suffer some distortion in the passage of time; and certainly if you go back to the source records, it helps you put things in perspective about when events occurred, whether the person had some distortion about those events, and how those events may have related to other things occurring at the time.

Q When you visited with Ms. Montgomery in March of 2007 -- before I get to that. You mentioned Dr. Ramachandran. I'd like to talk about Dr. Ramachandran for a moment. And I made a mistake. Did you testify that Mr. Duchardt had represented to you that Dr. Ramachandran was one of the foremost experts on pseudocyesis in the country?

A Well, I don't know about this country. He's from India. Several of the cases he's seen has been in India, but he was one of the few experts in pseudocyesis, and that he had likely seen half a dozen cases of this which is far more than anyone else since this was an exceedingly rare condition.

Q And are you used to in context of working capital cases working with what's called a multidisciplinary team of experts?

A Yes.

Q What is a multidisciplinary team of experts?

A Basically you have a group of mental health experts that all have a slightly different focus. You have child developmental experts if the child has been exposed to a lot of trauma. You have some experts who may be specialists in the whole area of child sexual abuse and its adult ramifications. You have sometimes neuropsychologists if somebody's been brain damaged, a neurologist, a neuroradiologist who may supervise the MRIs and PET scans if you need to do them. So basically different specialties approach the person from different directions.

And one of the experts can be a social worker or mitigation expert who prepares what they call a biopsychosocial history. We used to just call it a social history. They basically go through the person's life and collect as much information as they can about their functioning and interactions with others, and sometimes they even go back several generations in that some mental illnesses may have a genetic vulnerability. So they typically are kind of expert biographers, if you will.

Q So when you work with these other experts who come from different disciplines, is it your practice to not let them tell you what your opinion is but at least talk with them and discuss with them what they're seeing from their education and background and work together to figure out what's going on with a particular patient or client?

A Yes. Almost always it's a collaborative approach. Medicine is a collaborative field. Certainly even with physical diagnoses, you offer consultations from various doctors and related subspecialties and tests that you consider in arriving at your conclusions and course of treatment.
Q And so in this case you didn't pick Dr. Ramachandran to be one of the mental health experts; but because he was, did you listen to him and his opinions and take those into account?
A Oh, of course.
Q Let's get to your visit with Lisa Montgomery. Can you tell me what you noted about her thinking?
A Basically that she tended to be somewhat disjointed and rambled a bit. She would skip from one topic to another.
THE COURT: At what point in time?
MS. HENRY: I'm sorry.
Q (By Ms. Henry) On April 10th and then in 2007. We're in the 2007 era now.
A Right.
MS. HENRY: I apologize for not making that clear, Your Honor.
Q (By Ms. Henry) So when you saw Lisa Montgomery in April and May of 2007, your observations were that her thinking was tangential. She went from one topic to another. I'm sorry. I missed the rest of that.
A Sure. Basically it's included under behavioral

observations in my report, but she was much less guarded and suspicious than when I had seen her in March. She had told me that hallucinations were no longer present, that those had resolved. Her suicide risk seemed much less. She had a good working relationship with her psychiatrist, Dr. McCandless.

Q Was she medicated at this time?

A Yes.

Q And what was she being medicated for?

A From my recollection it was bipolar disorder depressed.

Q And I'd like to direct your attention, sir, to page 28 of your report -- I'm sorry -- 29 of your report. And did you write there at the end of that second -- maybe actually first full paragraph, "What emerged is that Mrs. Montgomery had little grasp of how to check out her perceptions with external events. Instead her perceptions and beliefs are determined more by internal emotional status"?

A Yes.

Q And is that what you observed in Mrs. Montgomery at that time?

A Well, to put it in context, this was discussed in that paragraph but challenged her belief that she could have had pregnancies. She had had a tubal ligation in 1990, and all of her reported pregnancies had occurred after that date. She had entertained the idea that the -- in fact, I think she had actually lied and told others the tubal ligation had been

reversed which was not true, at least not surgically, but she thought that the cords had -- the fallopian tubes had reattached, and they were going to do a test, salpingo-oophorectomy, to see if the fallopian tubes were still viable.

Q So her defense team actually subjected her to an examination?

A I wouldn't use subjected but --

Q They had her go through a pretty invasive procedure to see if the tubal ligation --

A Right. Basically when you're confronting a fixed idea, usually it's not permeable to facts, but at least in light of everything that she said, to go the extra mile to go check things out and that's something that's verifiable, and I had mentioned that to her and she really seemed to become overwhelmed and said if her pregnancies had been false, that she wouldn't know what to believe about other events in her life, which had she been in treatment might have been a good statement, then you could actually proceed to talk about what was real and wasn't real, because I think those blurred for her.

Q What was real and wasn't real was blurred for Mrs. Montgomery?

A Yes.

Q Did you reach any diagnostic conclusions with respect

to Mrs. Montgomery at the conclusion of your evaluation now being 2007?

A Yes. I gave several diagnoses.

Q What were those diagnoses?

A Well, one was posttraumatic stress disorder, chronic, that began back in her adolescence with sexual abuse and physical abuse by her stepfather. I think what now carries the name in some circles of complex PTSD.

The second one was major depressive disorder, recurrent. I noted it was without psychotic features at that time but without full interepisode recovery. In other words, she always remained somewhat depressed and there wasn't a complete recovery from the major depression that I had seen before. And I did mention that at times it had included psychotic features like hallucinations.

And then I also got -- noted a rule-out diagnosis, which is a term of art. It actually means to continue to consider it but not eliminate it yet, a bipolar disorder.

And then finally a somatoform disorder, not otherwise specified, which I labeled pseudocyesis. It's rare enough that it's not -- doesn't really have a category in the DSM all by itself.

Q And what is a somatoform disorder?

A A somatoform disorder is where somebody develops an idea that they are ill from some condition or a distortion of

their body image such that they don't have a realistic perception of what's happening with them physically. An example that's much more common might be an anorexic that believes even though she is an emaciated, 95-pound person, that she's actually overweight and needs to fast. When they see themselves, they don't see what everybody else sees. So sometimes people with these somatic disorders actually develop physical symptoms because their belief in having a condition is so strong that it influences them physically.

Q And are somatic disorders often seen with individuals who have complex posttraumatic stress disorder?

A Those can track together, yes.

Q Then you also gave, just for completeness, an Axis II diagnosis; is that correct?

A Yes. Basically it was a borderline personality disorder, not -- NOS stands for Not Otherwise Specified with borderline and dependent features. That had been given by other experts as well. Sometimes they would say dependent personality with borderline features, but those are the main things that seem to be prominent. And predisposed to her -- refers to some of the difficulties she was having.

Q And is that also likely the result of complex posttraumatic stress disorder or physical abuse?

A Borderline personality particularly is often seen in people who have a long history of child sexual abuse.

Q So it's not so much a volitional thing as a result of a traumatic event that's happened to them?
A Looking back you don't know what she would have been but for these events. Certainly you can have people who have borderline personality that have not been sexually abused, and there has been some thinking that those with borderline personalities might actually be a variant of a bipolar disorder. So there's a tendency nowadays to talk about different emotional conditions that are spectrum diseases. They fall along a spectrum of a disability and certainly borderlines have quite a difficulty with mood regulation as well as bipolar disorder patients do.
Q And we've now gone through a litany of things that are just labels.
A Well, I think they have more meaning to me perhaps than they would somebody on the outside who hasn't studied them or have actual experience with them.
Q Fair to say that a lot of times people in your profession will use these labels as a way of quickly communicating to one another about what they're seeing, what their impressions are?
A Right. They're not hard and fast or set in stone. They change. They're flexible. They're kind of a shorthand to say, Well, this is where we need to go with treatment. I mean, that's our goal for using the slang is to set out a treatment

course.

Q And would you agree with me that such labels and diagnoses aren't really very helpful to understanding exactly -- for the layperson to understand exactly what the symptoms are and the effects on an individual's behavior in a capital case?

A Yes. That's one of the reasons to have a fairly rich biopsychosocial history so you can understand who the person is apart from the diagnostic label.

Q After you wrote this report, I assume you provided it to Mr. Duchardt and discussed it with Mr. Duchardt; is that correct?

A I'm sure I did.

Q And Mr. Duchardt was the individual on the defense team, the attorney on the defense team with whom you spent the majority of your time preparing for your testimony that would later come in October of 2007; is that correct?

A Yes. He was the one that really communicated with me. Now, he had a co-counsel, Mr. O'Connor, and I certainly have done cases with Mr. O'Connor as well, but attorneys divide responsibility sometimes, and Mr. Duchardt was the one who was pursuing the mental health aspects of this.

Q So you worked with Mr. Duchardt because he was the one pursuing the mental health aspects?

A Right.

Q And then at some point, really the weekend before your testimony in the middle of trial, your first phase testimony responsibilities were shifted to Mr. O'Connor; is that correct?
A Yes. Actually I think both attorneys were present at the meeting and kind of at the end they were kind of deciding who would do the direct and O'Connor said he would, and then I think the morning I testified he showed me briefly kind of a list of prospective questions.
Q The morning that you testified?
A Well, the day I testified, yes, same date.
Q I believe that -- let me ask you a question. Dr. Logan, I first came to talk with you about your experiences working with the Montgomery trial team some time ago; is that correct?
A Yes.
Q Back in 2013?
A '13, right.
Q But we had known each other before from my work back at the capital unit here in Kansas City years ago; is that correct?
A That's correct too.
Q And I want to show you what has been previously admitted into evidence as Movant's Exhibit No. 41. Do you recognize that?
A Yes. This is the declaration.

Q Is that the declaration that you provided at my request on behalf of Mrs. Montgomery?
A Yes.
Q And is that declaration signed on March 14th of 2003?
A Yes.
Q Or 2013, excuse me.
A '13, yes.
Q In that declaration you described Mr. Duchardt as experiencing what you refer to colloquially as sophomore's disease. Can you explain what that is?
A When you go through your sophomore year of medical school, your main course is one in pathology and you learn about all kinds of diseases, many of them quite rare, and it's sometimes -- well, it's fairly frequent that at some Point A number of the medical students will come down with an extremely rare fatal disease, and the professors always laugh and say, you know, all these diseases here have some common symptoms but common things happen commonly and rare things happen rarely. But it is -- you know, when you get an unusual diagnosis, some people become overly fascinated with that diagnosis to the extent of blocking out other things that may be wrong with the individual, and I think that is what I was referring to at that point.
Q Did that happen here in this case?
A I thought they were focused on pseudocyesis.

Q Why is that?
A Because that was just one symptom in a person who was really quite mentally ill with a number of different and varying diagnoses, including a mood disorder and PTSD that also shaped her behavior, and to isolate out one among several diagnoses and try to make that the lead to the exclusion of other things really was not the most accurate picture one could obtain.
Q And did you caution Mr. Duchardt that taking pseudocyesis that was really maybe a footnote instead of a chapter heading and making it the full focus of a first phase NGRI defense was problematic?
A I think I did mention that. I think you can kind of see that if you read the comparison between my report and my testimony. My report is much more evenly distributed in terms of discussing the overall picture of her problems where the testimony tended to kind of narrowly focus on the pseudocyesis.
Q And you don't control your -- the questions you're asked in court, right?
A Not completely, no. Hopefully, you know, we meet and they take some information from me in developing the questions, but they actually control what's synthesized and what's asked.
Q So you provide your opinion to the attorney surely, but it's up to them to decide --
A They have to make the presentation and direct the

testimony.

Q In your opinion, did Ms. Montgomery have other Axis I diagnoses that could have been stressed in the penalty phase of the case?

A Certainly.

Q And what would have been a more compelling presentation in the penalty phase of the case?

A I think, once again, if you had to do a very complete biopsychosocial history with a lot of collateral evidence and one of the challenges of the case was her credibility and whether she was a fabricator or liar or something in between, it shows some of these things actually had occurred to her, the diagnoses had resulted from that and have impacted her life going forward, and that would have been most in terms of symptoms of PTSD and ability to trust others, mood regulation, depressive episodes, and could have blended in some of the underlying drive to have these pregnancies, even after she knew -- should have known under rational terms that was physiologically not possible.

Q And it's fair to say that you did share with Mr. Duchardt the concern or the risks of separating out pseudocyesis into the first phase and divorcing it from the other major mental illnesses that would have been -- in other words, divorcing your diagnoses between the first phase and the second phase defense?

A I thought it would have been much more practical to present it in the second phase, because he also did something very unusual. I don't know if you want me to go into it, but there was a whole issue of her brother being there.
Q Let's talk about Tommy Kleiner. Was Tommy Kleiner mentioned by Mrs. Montgomery in 2005 when you evaluated her for the clinical consult?
A No. Again, remember I wasn't there to talk to her about the events of that day. But by the time I did talk to her in 2007, I had certainly read her confessions, the police reports. There was no credible evidence that Tommy was there, and to present that as a legitimate defense along with a mental illness defense I thought really detracted from the mental illness defense. If anything, the mental illness might have been better able to explain why Tommy -- she thought Tommy was there.
Q Why she thought Tommy was there. That brings up the issue of dissociation and PTSD.
A Right.
Q Tell us what you think the better explanation of why Tommy was there in her head.
A I don't think she could accept what she did. You know, she had to stare kind of full in the face the extent of what she had done to another person, and she wanted to distance herself from it, both at the time she could remember events of

what occurred and accept the critical event of her strangling Bobbie Jo Stinnett. And then she clung to fragments of -- I think there was some witness that maybe had seen two people leave to concoct the whole story that Tommy was actually there.

Q Let me stop you there, Dr. Logan. Were you aware at the time you saw Ms. Montgomery in April of 2007 that by that time she had been shown all of the discovery in the case? Were you aware of that?

A Yes.

Q And were you aware of the fact that the attorneys had been working on her pretty hard to get her to tell them who the other person was who was with her at the crime scene?

A I knew they seemed unusually fascinated by this, and I couldn't tell who the driving force was behind that, but I think I was reading a report that I mentioned there was a couple of discrepancies and said it will be left to the trier of fact, which is another way of saying the jury can make the determination but I'm not buying it. I don't want to come out and say that flat out.

Q But you were telling the lawyers --

A In shorthand, this is not very credible.

Q It's not a good defense to go down?

A I don't think you want to present a defense that obviously can be proved to be either a lie or fabrication along with the mental illness defense.

Q If a patient describes to you an event and feeling as if someone is there as opposed to telling you that someone is actually there, could that be a sign of dissociation?
A It might be a sign of dissociation. I mean, the other person -- sometimes in a dissociative state a person can get a reaction where they feel like they're observing what they do, but you have to be careful at that point because you don't want to induce a false memory and that's very easy to do with people who dissociate.
Q Can you explain that?
A Well, basically since their perception is actually kind of hazy at that point, they may be overly eager to grasp somebody else's explanation or add facts or actually fill in the blanks in confabulation to concoct a story that may be more palatable to them.
Q So you have to be cautious and the people asking the questions need to be skilled?
A Yes. In fact, where else this comes up legally sometimes is you'll have people who have amnesia and they want to put them under hypnosis to recall memories, and there's a requirement that they get a videotaped recording of what they remember beforehand and they videotape the hypnosis process including the examiner's questions to make sure in fact memories aren't implanted and what's coming from them is actually coming from their memory as opposed to confabulation

or re-creation.

Q And that was a concern with Mrs. Montgomery?

A Certainly I didn't think there was strong evidence to present that. In fact, I thought in light of the false pregnancies and her ability to kind of construct life events based on her emotional needs, that that might be a better explanation for Tommy than the fact that he was actually there.

Q But the defense team seemed unusually attached to this idea that Tommy --

A They were not open to that.

Q I want to ask you, sir, about this issue of Mrs. Montgomery's email deletions. With respect to Ms. Montgomery's email deletions, was that something that you had told Mr. Duchardt that you needed information about whether Mrs. Montgomery had deleted emails?

A Yes. There was an initial thing that was sent to me that had listed some of her Internet searches, and you will see in the body of my questions where I asked her about some of those, particularly Caesarean sections and she said, Well, that was for delivering dogs and she wasn't a dog breeder. I kept asking about, Well, I was aware there were deletions. I said, What were the specifics of that, and was repeatedly told that this wasn't available, this wasn't available, then finally a couple days before I testified --

Q Let me stop you there before we get to the couple days

before because I've got some questions. You were aware there were some email deletions and you asked for those from Mr. Duchardt?

A Yes.

Q And Mr. Duchardt told you that the information about the specific emails that Mrs. Montgomery had deleted was not available to you; is that correct?

A That's right. Well, not available meaning not available to him. He didn't say they were available and he was withholding them from me. He didn't say that.

Q He said he didn't have them?

A He didn't have them.

Q Okay. And there came a meeting in the middle of trial around October 14th. It was at your office?

A It was a couple days before I testified.

Q So we're into the defense case. And at that meeting Mr. Duchardt did show you a document that I'm going to put on the screen here, which is Movant's Exhibit No. 89. I emailed that document to you a few months back and you didn't even recognize it at that point; is that correct?

A Well, not initially, then as I thought about it, I did recall seeing something similar to it at that meeting.

Q And at that meeting do you recall that Mr. Duchardt provided this to you and you looked at it and handed it back and said this isn't very useful to me?

A Yes. The primary reason is there's nothing about the content included in that memo.

Q And if we can go through a couple of pages of the memo. We see that it's handed to you -- it was handed to you in a paper format, correct?

A Right.

Q And what's listed appears to be Internet addresses, URLs, I believe my --

A Well, you would have had to go through and look up every URL, but even if you looked up the URL, you couldn't tell what was deleted.

Q Because it was deleted?

A The whole URL was, which information is more specific.

Q And a URL isn't an email, is it? It's a website?

A Right. It's a website.

Q And you are asking for deleted emails?

A There was something on the latter page of that that did come up, I think, in my testimony.

Q On this page?

A No. It's on the last page.

Q The very last page?

A I think on the last page. There was a notation in there somewhere that she had left a message with Bobbie Jo Stinnett and Darlene Fischer on the computer, which I was later informed -- it probably wasn't there. She actually deleted all

of them. At any rate, it was a small point but there was really no opportunity for me to look up all of those two days before trial and certainly not be able to talk to Lisa Montgomery about that.

Q In fact, you testified at page 2421 and 2422 of the criminal trial, and I'm just helping you along here, you testified that you believed that Mrs. Montgomery had not deleted a -- on direct that there was an email between Darlene Fischer and Bobbie Jo Stinnett that had not been deleted?

A That's what I was referring to.

Q And on cross-examination you were corrected by Matt Whitworth; is that correct?

A Yes.

Q And on cross-examination you learned that all of the emails had in fact been deleted?

A Not only that, they had a lot of specifics about what had been deleted, particularly about Caesarean sections and things of that nature, and it showed significantly that there obviously had been some degree of premeditation that morning before she went up to Skidmore in terms of her deliberately erasing things from the computer.

Q And last question on cross-examination by Mr. Whitworth on page 2438 of the criminal court transcript -- criminal trial transcript Mr. Whitworth asks you, "Is it a fair statement if the defendant here was selectively deleting incriminating

evidence before the murder we talked about earlier, is that an indication she knows what she was about to do was wrong?" And your answer was, "It could be interpreted that way"?

A Correct.

Q And that was, of course, a truthful answer?

A Yes.

Q And one that if you had been provided the information that you were requesting pretrial, you could have shared that answer with Mr. Duchardt before he decided whether to put you on the stand or not?

A I could have, although there was other things that obviously indicated there was planning. I mean, the rope and the knife that were used in the murder were from her car and they were actually used and they were hers. So I mean it didn't arrive there by accident. And if you go back to my report, I talked about her being kind of in an emotional crisis and being overwhelmed to the extent she couldn't recognize that before the nature and wrongfulness of her actions. That didn't mean she couldn't plan or didn't have a legal recognition of the wrongfulness, but certainly for someone who could get so wrapped up in getting a baby that they'll take a newborn's mother's life away and steal her baby out of the womb really is somebody who is pretty distorted in their thinking.

Q And I understand that -- I mean, it was your opinion then and it's your opinion now that Mrs. Montgomery suffers

from several severe mental illnesses?

A Correct.

Q But from somebody who is an expert such as yourself who has testified a lot in criminal trials, you certainly realized at the time you were asked that question on cross-examination by Mr. Whitworth that was a concession by the defense expert that the not guilty by reason of insanity defense was not supported by the defense evidence?

A Certainly not a strict interpretation of it wasn't supported by the evidence. In fact, I thought the whole thing would have been much better left for the mitigation stage, the full presentation.

Q In fact, you told me, shared with me before that they were surprised that the jury reached the conclusion that it did, but you weren't surprised given the way the evidence was presented?

A Not at all.

Q Now, Dr. Logan, as we've alluded to a few times, since you signed your declaration in March of -- let me ask you this question. I apologize. You did testify again in the penalty phase of the case, correct?

A Yes. Mr. Duchardt was the one who asked the questions at that point.

Q At that point -- if I represent to you that your testimony in the penalty phase was a total of 22 pages

including cross-examination, would you have any reason to disagree with me on that?

A No. I reviewed it. It was short.

Q And in your testimony in the penalty phase you testified at page 2986 of the transcript that the sexual abuse was certainly less prominent at the time of the crime than it was at the time in which it was perpetrated on Mrs. Montgomery?

A I'm not sure that's being read in the right context.

Q Would you agree with me that testimony such as that would tend to some extent minimize the importance of the sexual abuse if that's how you testified at trial?

A Well, certainly it wouldn't need to. I wasn't intending to do that. I would have to see the question and what context it was written. Certainly I think what I may have been saying is someone with PTSD related to the sexual abuse was not as overwhelming to her currently as it might have been back in her adolescence, but I don't think that means that it was somehow diminished or any less bothersome or prominent or that it would not affect her in her relationships currently.

Q Again, because you don't control the questions that are asked, if you give an answer that needs further explanation, it's incumbent on the lawyer to ask the question?

A Right.

Q And at the time that you testified for Lisa Montgomery, you were certainly aware of the sexual abuse at the hands of

her stepfather, which was pretty bad. Were you aware at the time of trial that the government's expert, Park Dietz, was questioning whether that abuse even occurred or if it did occur, whether it was consensual?

A I know it was questioned generally, the validity of many things that she said. Basically I think the premise was she was a chronic liar. I thought that certainly it was feasible that she had been a victim of incest because I had actually worked with an incest group at Menninger that tried to reintegrate families where that had occurred and worked with victims and perpetrators.

What I didn't know at the time, which comes out later, was she had told me it was just fondling and just by her stepfather, and it turned out that was only a fraction of what occurred, but that is not that unusual given that you're doing a forensic evaluation. They don't know you that well. You're a man. You know, they don't have rapport built up with you like they would if you were their treating psychiatrist for a couple of years where that kind of thing could have come out.

And certainly if you're in the role of a doctor in a correctional setting, which I've also done, you don't have a lot of time to get into that. You're mostly interested in the major symptoms and side effects and how to adjust the medication. You don't have time to do psychotherapy.

Q And you alluded to the information you learned since

you testified in this case. In addition to Dr. Vogelsang's biopsychosocial history and her supplement to the biopsychosocial history, have you also reviewed the report of Dr. Kate Porterfield?

A Yes.

Q Dr. Kate Porterfield, as her name might suggest, is a woman?

A Yes.

Q And is an expert in complex trauma. You saw that from her report?

A Right.

Q Those two documents in particular -- you've also seen the declaration of David Kidwell?

A Yes.

Q You saw the declaration of the neighbor, Wesley Gann, who discussed how Mr. Kleiner would stand out in his yard staring at Mr. Gann's two-year-old daughter while openly masturbating? You saw that?

A Right.

Q The declaration of the neighbor who testified that Lisa was traumatized when she came to live with her after Mr. Kleiner had finally been kicked out?

A Right.

Q And how isolated that trailer was?

A Yes.

Q And that's information that you did not have at the time that you testified in Mrs. Montgomery's trial; is that correct?
A That's correct.
Q And if you had testified at Mrs. Montgomery's trial armed with the additional information that you now received, would you have been able to give a much more detailed -- much more detailed testimony regarding Mrs. Montgomery's complex trauma?
A Well, certainly I would have still diagnosed her with PTSD and would have talked about those. She would have been less acceptable to someone asking credibility concerns about that particular issue anyway and would have been able to talk about the ongoing impact of that and how an individual adapts to stress, particularly through episodes of dissociation, which she learned to do during periods of fairly intense sexual abuse not only by Mr. Kleiner but three of his friends.
Q I believe you told me when we spoke earlier that by the time you got up to testify, you felt almost like you were more of a summary witness?
A Well, I think I came at the very end.
Q And had you been more accustomed to being what's referred to as a lead-off witness, particularly when you're presenting an insanity defense?
A No. Actually I've done both. But what I was aware of

is if you're the lead-off witness, you're going to get questioned in a lot greater depth than if you're the guy that comes at the end.

Q As someone who has testified quite a bit, did you think it was an unusual choice for Dr. Linda McCandless to be the lead-off witness to present the insanity defense in this case?

A I did but I thought that she was just going to be a fact witness, and later I did have a chance to review her testimony, and that role got rather blurred. I think she started off to be just a fact witness. I was just a treating psychiatrist. I'm not giving a forensic opinion. I think by them introducing her, it kind of put her in a forensic role where that had not been the intent.

MS. HENRY: If I could have just one moment, Your Honor.

THE COURT: All right.

MS. HENRY: That's all the questions I have, Your Honor.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Good afternoon, Dr. Logan.

A Good afternoon.

Q Sir, I want to start with one of the things you were talking about about some of the materials that you've been

exposed to recently from the postconviction investigation, but let's talk about your own experience, sir. You saw Ms. Montgomery on two different time frames; is that correct?

A Yes.

Q That would be initially in March of 2005 because of the distress and suicidal ideation, then again in '07 when you were actually hired to be an expert witness in the case by Mr. Duchardt?

A Correct.

Q I believe you testified, did you not, sir, that you saw some changes in her psychiatric profile from '05 to '07. In other words, the complex depressive state wasn't quite so bad, the PTSD might not have been as bad for her in '07 when you saw her as she was in '05; is that fair?

A Yes. Another thing, she was not talking about any hallucinations in '07 like she did '05.

Q So in '07 -- say that again. I'm sorry.

A She was saying she did not have any hallucinations. Remember back in '05 she had told me about some hallucinations. That was another change.

Q Her mental state was -- I guess this is subjective, but I'll say worse in '05 when you saw her in a kind of a crisis intervention mode; is that fair?

A Yeah. Certainly in terms of the depression, that's correct.

Q That was, of course, only about four months after the Bobbie Jo Stinnett murder; isn't that right?
A Yes.
Q For clarity purposes, I want to refer back to your declaration. In your declaration you indicate that you were hired March of 2005 by Susan Hunt and Dave Owen. Does that ring a bell?
A I think that's who I addressed my letter to, so I assume that's who it was.
Q All right. And similarly in your report that you did as a result of that intervention, you indicated and wrote that to Ms. Hunt and Mr. Owen; is that right?
A Yes. I believe that's right.
Q I think in your testimony you said or you thought you might have been hired by Anita Burns; do you recall?
A I was familiar with her. She may have been part of the team, but that's what I wrote down at the time.
Q So if the declaration from '13, then the report from 2007 referenced Dave Owen, you would agree he's probably the person involved in hiring you along with Ms. Hunt?
A I would since I put his name on the letter. Usually I do that to the attorneys that are most directly in charge of the case at least.
Q When you wrote your report in 2007, you went through a fairly good history with Ms. Montgomery as it relates to the

Tommy stuff; is that right?
A I did.
Q And there were several pages during that testimony that talked very specifically about Tommy's involvement in the murder of Bobbie Jo Stinnett and his availability at the crime scene with her, correct?
A Her perception, yes.
Q Something like she actually picked him up that day from his girlfriend, Nina's, house and they were going to go Christmas shopping?
A Right.
Q That's terrible when your own handwriting is so bad you have to take a second to read it.
There was a conversation about the fact that they were going to go look at Bobbie Jo Stinnett's house for Rat Terriers and a specific demarcation about whether the puppy was going to be show quality versus pet quality, correct?
A Right.
Q So there was some pretty specific facts in the interaction between you and Ms. Montgomery about Tommy's involvement that day?
A Yes, there was. Nothing that could be verified but she was specific.
Q I understand. And so much so that she recalled Tommy being offered a glass of water while at Bobbie Jo Stinnett's

house?

A Yes.

Q And then when she gets into talking about the details of the murder, she's foggy and not quite so accurate and can't provide you the same detail she provided up to that point, correct?

A Right. Her lapse in memory really involves pretty specifically around the killing of Bobbie Jo Stinnett itself and the cutting open of the womb. Then when her memory picks up again, there's a rope around Bobbie Jo Stinnett's neck and she can't seem to get free and the baby's lying out by Bobbie Jo Stinnett's side.

Q Do you recall her talking to you about driving away from that crime scene with the baby and both her and Tommy telling each other, I'll tell for you and I'll take the bullet for you, and she said she'd do the same for him?

A Right. I remember that dialogue.

Q Okay. You indicated, I believe in your direct testimony, if I understand it correctly, that that interaction or the information might have been a coping mechanism. That's my word. I don't think you used it. But for her to not be able to appreciate what she'd done, so she was putting someone else at the scene. Is that how you characterized it?

A No, not quite. Close. It was her not being able to accept what she had done, and it started off as a feeling that

somebody else might have been present, and then I think she just took off to the races and I thought the rest of it was just made up.

Q And rather than --

A Because there was no physical evidence of Tommy being there. I think he actually had an alibi.

Q I understand, sir. What I'm getting at, though, is your explanation for that is she couldn't cope with the fact that this crime had happened and she did it, right?

A Right. I mean, it's really a pretty horrible thing to do.

Q Couldn't it also be that she's just a pathological liar?

A Yeah. If you look at my report, I even acknowledge that's a possibility. I think that's one of the reasons that biopsychosocial history is so important because it's really tough for this lady to separate out what's a lie, what's imagination, what's delusion, and sometimes they blend together. She admitted that to me in the report that she had lied about certain things to her relatives.

Q Were you aware that by 2004 Ms. Montgomery had a history of placing false accusations against her brother, Tommy, so much so that he was actually in custody around the date of this crime because she falsely accused him of a crime?

A Yeah. I was aware of bad blood between the two of

them.

Q And you indicated that you were aware ultimately, certainly you weren't in 2007, but aware ultimately Tommy had an alibi for actually having been present at that murder, correct?

A Correct. I wasn't surprised. I just didn't -- I didn't think it was credible. There was nothing in -- I did read the investigative materials. There wasn't any indication of the second person, no fingerprints, no nothing to bolster that.

Q To be fair, there was a witness who had --

A The witness was the only thing that might have seen it, but eyewitness testimony is, you know, not the best on a scale of things.

Q Now, in your declaration you make the statement that by the time you got back in the case in 2007 that the defense team was full speed ahead on pseudocyesis, correct?

A Yes.

Q Okay. You had been doing this for a long time, correct?

A Yes.

Q Do lawyers tell you what to diagnose?

A Sometimes they suggest.

Q If they suggest and you disagree, what do you do?

A They can go find somebody else.

Q You're not going to force a diagnosis to make a lawyer happy that's hiring you, are you?
A No.
Q Okay. So if they were focused on that, your job as hired was to evaluate her and you could talk to them about getting them on another topic, couldn't you?
A I could. I didn't necessarily, however, disagree with the pseudocyesis, but I didn't see it as the end all and be all of the question whether it was or wasn't but the degree in which they focused on it.
Q And I understand. And I'm not quibbling with you about the end all be all, but you diagnosed it as one of her Axis I conditions, didn't you?
A Right. I called it a somatoform disorder. It's right there. And I still think that's potentially true.
Q Somatoform disorder, not otherwise specified, then kind of in parenthesis pseudocyesis or what we would call false pregnancy?
A Exactly.
Q So when you authored your report in 2007, I believe you signed it May 15th of '07, that was one of your three significant Axis I diagnoses, correct?
A It was.
Q I believe when you came to that conclusion, you looked at the materials other doctors had done in the case, correct?

A Yes, including a couple that ultimately were not allowed in testimony.

Q You had the ability to expose yourself to even more information before you form your opinion than the information that was ultimately presented to the jury?

A Correct.

Q Including you consulted with Dr. Ramachandran, didn't you?

A Yes. He came into town and I met him at the restaurant at the airport along with Mr. Duchardt and we discussed the case.

Q When you were done meeting with Mr. Duchardt and meeting with Dr. Ramachandran, you obviously still were convinced based upon your own examination of Mrs. Montgomery that consultation that pseudocyesis was a viable diagnostic Axis I ailment?

A Right. I might even say today that I've not changed my mind about that.

Q I understand. But you did say that they were full steam ahead, and it's fair to say that you as one of the hired experts did diagnose what they were going full speed ahead with?

A Let me clarify something. I did not advocate using pseudocyesis as the foundation for an insanity defense. Therein lies the distinction. You can have a diagnosis but the

degree that may have influenced her actions at the time of the crime, I did make that causal connection. In fact, I thought the evidence weighed fairly strongly that she was not under delusion that she was pregnant; otherwise, why would she need somebody's baby?

Q Okay. Did you tell that to the jury?

A I wasn't asked to.

Q By anyone. You were, however, asked was she suffering from pseudocyesis and you said?

A I did say that.

Q You were also asked is that a severe mental illness and you responded?

A Correct, it is.

Q And then on page 2424 you were asked one final question by John O'Connor as summation of your testimony, "Dr. Logan, would a person in a delusional dissociative state caused by pseudocyesis be able to appreciate the nature, quality, and wrongfulness of her conduct?" Do you recall your answer?

A I said yes, but I did not say that she was in that state when she killed Bobbie Jo Stinnett.

Q But you had diagnosed her with pseudocyesis?

A Right, but I didn't say it was operational when she killed Bobbie Jo Stinnett.

Q How many angels can you dance on the head of a pin, Dr. Logan? You diagnosed her with a condition?

A Right.

Q And you were asked about the condition?

A Right.

Q And you asked if it was a severe mental defect or disease?

A Which it is.

Q And you were asked if a person in that case who was on trial for her life in front of a jury --

A Right.

Q -- had experienced that situation of dissociative state would it be a severe mental disease and defect, and you opined?

A That it was.

Q It would be my opinion that they would not be able to appreciate the wrongfulness of their conduct?

A I did say that.

Q And that was the end of your testimony, at least on direct examination, before you were crossed, wasn't it?

A Right.

Q You were then asked again during the penalty phase of the case whether you thought she could appreciate the wrongfulness of her conduct, and you opined what?

A I opined again that I did not think that, the same and consistent with my report. I did not think, at least from a moral standpoint, she could appreciate the full gravity and extent of the wrongfulness of her conduct.

Q Which is the hallmark of an insanity defense, correct?
A Yes.
Q And you testified in front of a jury under oath understanding, since you've done this for a long time, what that meant?
A Yes.

MR. VALENTI: May I have just a moment, Your Honor?

THE COURT: Yes.

MR. VALENTI: That's all I have, Your Honor.

MS. HENRY: I have nothing further, Your Honor.

THE COURT: Thank you, Dr. Logan. You're free to go now.

(Witness excused.)

MS. HENRY: Your Honor, I notice by the clock it's 2:35. My next witness will be about as long as Dr. Logan.

THE COURT: Go ahead and present your witness.

MS. HENRY: I didn't know if you'd want to take a break since we'd been going an hour and a half.

Movant calls Marilyn Hutchinson.

MARILYN ANN HUTCHINSON, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good afternoon, Dr. Hutchinson. I know you've been running from courthouse to courthouse today. I appreciate you being here.

A Thank you.
Q Can you state your name for the record, please, and spell your first and last name for the court reporter.
A Yes. My name is Marilyn Ann Hutchinson, and it's M-a-r-i-l-y-n, and Hutchinson is H-u-t-c-h-i-n-s-o-n.
Q And can you tell the Court what your occupation is?
A Yes. I'm a psychologist.
Q And how long have you been a psychologist?
A Oh, 42 years.
Q Are you in private practice?
A Yes, I am.
Q And what is the nature of your private practice?
A I have a dual-fold practice. I have a clinical practice called Hutchinson & Associates. I have ten associates in the office. That is a therapy-based practice. I'm the only one out of that office that also does forensic work, and I spend about half of my time doing forensic evaluations and half of the time I see 18 clinical clients a week.
Q So with respect to your forensic practice, have you ever worked on capital cases?
A I have.
Q How many capital cases have you worked on?
A Well, I was trying to count. Somewhere between six and ten, I think, but I wasn't quite sure.
Q Over the course of your career?

A Yeah. Most of those more recently. I didn't do them initially.

Q You worked on the case of a woman named Nila Wacaser; is that correct?

A I did.

Q A long, long time ago?

A Yes.

Q But most of your work has been more recent?

A Yes.

Q Do you have any particular areas of specialty?

A Yes, I do.

Q What is your area of specialty?

A Trauma and its aftermath.

Q Can you tell us a little bit about your teaching responsibilities?

A My teaching?

Q Yes.

A I initially was hired as an associate professor -- or assistant professor and promoted to associate professor in the University of Wisconsin system. I had that position directly after graduate school in 1975, and I was there until 1983.

When I moved to Kansas City, I had a half-time position at the counseling center where I supervised master's and doctoral students, and I also taught a couple of classes at the UMKC counseling program.

Q How many forensic evaluations do you think you've done over the years?
A Somewhere over 600 but I haven't counted for a while.
Q Have you worked for the prosecution as well as the defense?
A I have.
Q Are there times that you worked for the defense where the defense ends up deciding that they don't need a report from you?
A They certainly do, yes.
Q About how much of the time do you think that happens?
A The last time I figured that it was about 30 percent that the findings that I had were not favorable and they chose not to call me.
Q When you -- do you know the difference between -- I'm sure you do -- the difference between a consulting expert and a testifying expert?
A Sometimes I might be called in as a consulting expert to kind of advise at the very beginning of a case what this involves. What might we be looking at? Who do you know that might be helpful? What kind of issues do you think are involved here? And in those cases I often don't testify at all.

And then as a testifying or expert witness, then I'm called in and I go in as a neutral evaluator to evaluate the

defendant and reach some kind of conclusion about whatever the issues of the case.

Q And so when you serve in a consulting role and you go in and visit the client, you're actually part of the attorney-client privilege at that point, correct?

A Yes.

Q And your work product would be considered confidential and covered under the attorney-client privilege?

A That was my understanding, yes.

Q And so when you do a forensic evaluation, do you often at the beginning of a forensic evaluation provide the client with certain information about what their legal rights are, their Fifth Amendment rights?

A Right. I always tell them you don't have to answer any question that I ask. I may ask you why you don't want to answer it, but you don't have to answer that question either, and that I take notes contemporaneous with the interviews, and I say all the things that I'm writing down here could end up in court.

Q And when you're serving as a consulting expert, there aren't those same concerns when you are meeting with a client, correct?

A Correct.

Q Because you don't anticipate your notes being shown in court or to experts on the other side?

A Correct.

Q Now, I'd like to talk with you -- you said you worked about six to 12 capital cases. What has your role in those cases typically been?

A As an expert witness.

THE COURT: I think she said six to ten.

THE WITNESS: I think I said six to ten.

MS. HENRY: Sorry. I apologize.

Q (By Ms. Henry) About six to ten cases?

A I think so, yeah.

Q Have you also had the experience when you work on those teams, typically of coordinating with other multidisciplinary experts?

A Usually, yes.

Q And what sorts of multidisciplinary experts are you used to working with?

A Well, often I will be asked to suggest what do you think needs to be done? Do we need a neuropsych? Do we need brain imaging? Do we need to bring in a medical person? Do we need to bring in a drug person? Do we need to bring in some kind of psychiatrist or medical interactions? And I'm often the one that tries to spearhead that.

Q Is that a helpful experience to work as a part of the multidisciplinary team?

A Oh, sure. Because -- well, trauma is my expertise. I

don't claim expertise in a whole variety of things. So like if it's a case that involves street drugs, I know almost nothing about those beyond common knowledge, and so I usually say, you need a pharmacist or a street drug person.

Q Have you had the experience of working with a social historian in the case?

A Yes. Yes, often.

Q Do you find working with a social historian to benefit you in your analysis?

A Yes. When I'm in the role of an expert witness, then what I typically do is meet with the client and they give me what is their social history. People's memories, dates, so forth are often fallible, and so the social histories provide the documentation of either those details or correct the dates or correct the people, but they provide a validation or a correction on what I've been told.

Q And in capital cases, not the Montgomery case, but in the other capital cases in which you've worked, have you found it to be the norm that there's someone on the team who puts together that sort of social history?

A Yes.

Q When you are assigned to work on these cases, capital cases, there's normally a voluminous amount of records; is that fair to say?

A Almost always.

Q And do you read all those records?
A I do.
Q So you get the social history which provides some context but you also read the records independently?
A Yes, I do.
Q I want to ask you --
MS. HENRY: I need a comfort break.
THE COURT: You need what?
MS. HENRY: I need a comfort break.
THE COURT: All right.
MS. HENRY: I apologize.
THE COURT: We'll be back at three o'clock.
(Recess taken at 2:45 p.m.)
THE COURT: All right. Ms. Henry, you can continue.
MS. HENRY: Thank you, Your Honor, for allowing me that break.
MARILYN ANN HUTCHINSON resumed the stand and testified:
DIRECT EXAMINATION (continued) BY MS. HENRY:
Q We'll take up where we left off.
I'd like to speak with you now about your role in the Lisa Montgomery case, if I may.
A Yes.
Q Do you recall being contacted by members of the Federal Public Defender's Office in January of 2005 to become involved in -- I didn't get your CV in or get you qualified. I'm sorry.

It's the end of the day.

MR. VALENTI: I'll stipulate to it.

MS. HENRY: So just for purposes of the record, Dr. Hutchinson's curriculum vitae is 38, and I believe the government is stipulating so I would move Dr. Hutchinson be accepted as an expert in the area of psychology, particularly the area of trauma.

MR. VALENTI: Agreed.

THE COURT: All right.

MS. HENRY: Thank you.

Q (By Ms. Henry) Now, let me ask you about your role in Mrs. Montgomery's case. Were you contacted by attorneys in the Federal Public Defender's Office in January of 2005 to become a part of the defense team?

A Yes.

Q And what was your role -- I said part of the defense team so I guess I gave the answer, but what was your role at the time?

A I think at that point they were really confused about what might be involved in this case, and they asked me to see if I would meet with her and provide them with some direction about what might be possible and what might be going on.

Q And were you a consultant?

A Yes. At that point, yes.

Q And so did you understand that your role was to be able

to brainstorm with the defense team different possible things that might be going on with Mrs. Montgomery?

A Yes.

Q And did you actually attend team meetings?

A Yes, I did.

Q And engage in brainstorming with members of the team?

A Yes.

Q And did you take notes at those team meetings?

A I did.

Q In fact, are you a copious note-taker?

A I am. I take -- I type notes. So I have just about what everybody says.

Q And is that for your personal use, sort of your work product?

A Yes. I get cases confused if I don't.

Q And it's something you can go back to and refer to when you ultimately come up with a report; is that correct?

A Correct.

Q And those notes may contain thoughts and impressions of other members of the defense team?

A Definitely, yeah.

Q And you don't always give attribution to who it is that may be saying certain things at those team meetings?

A Correct.

Q And so it was important for you to attend those team

meetings in order to see what was going on with Lisa from other members of the team so that you could help the team figure out what they had with Mrs. Montgomery, correct?
A Yes.
Q And in that role was it expressed to you that you were not going to be a testifying expert but that you were fulfilling the role of a consulting expert?
A Yes.
Q Which I think, as you testified before the break, that's not your normal role but it was the role that you took on here?
A Yes.
Q Did you ever write a report in Lisa Montgomery's case?
A No.
Q Did you ever come to any final conclusions in Lisa Montgomery's case?
A No.
Q And why not?
A Well, I wasn't done. I met with her a couple of times and had some psychological testing done by one of my associates and attended a couple of team meetings, and then was called in, I think it was on a Sunday morning one time, when they were concerned about her suicide, and then I went away.
Q So your role in Mrs. Montgomery's case as the consulting expert was very brief?

A Very brief.
Q And after you ultimately wrote a letter in March of 2007, which we'll get to in a minute, after that your services were no longer utilized by the Federal Public Defender's Office?
A Correct, and I think it was '06, though, that letter.
Q I'll show it to you in a minute.
A Okay.
Q 2005. The attorneys on the case, I think the record will reflect, from January of 2005 until April of 2005 were Susan Hunt and Anita Burns with a man by the name of David Owen in a supervisory role over Anita Burns. Does that comport with your memory?
A Yes, it does.
Q Did you know Anita Burns from previous work?
A No.
Q Did you work with Anita Burns on this case?
A Only at the team meetings.
Q So at the team meetings there would be Anita Burns and was Susan Hunt there as well?
A That's my recollection, but it's a long time ago.
Q Did they have a mitigation specialist at the meeting as well?
A Yes, they did.
Q And do you recall her name?

A It was a woman from Madison, but I don't remember her name.
Q And would the investigator, Ron Ninemire, also be present?
A I think he was.
Q And at times would an investigator by the name of Phil Thompson, a private investigator who worked with Susan Hunt, would he be at these meetings?
A I don't recall.
Q Nonetheless, there were a lot of folks assembled in a room. And would these meetings be sort of brainstorming sessions?
A Yeah. People would report what ideas they had, what they might have learned since the last -- I think I went to two team meetings. So it was just kind of trying to keep everybody on the same page.
Q And was there great concern that Mrs. Montgomery was suicidal?
A That developed, yes, for sure.
Q What is your process for writing the report and reaching a conclusion?
A Well, I have to have a conclusion first before I would write a report, but were I to write a report, I would want to read all the records. I would want to assemble all the different kinds of data that was available from the mitigation

people, from the investigators who went out and met with other witnesses.

On capital cases I usually meet with family members myself. I would have spent a lot of time developing rapport with the defendant, and then I have to reach some kind of idea I get how this worked, I understand with a reasonable degree of certainty what went on in this to make this particular scenario make psychological sense. If I can't make it make sense, then I can't write a report.

Q I want -- in this case during the brief period of time that you were involved with Mrs. Montgomery, how many times did you meet with her?

A Three times.

Q Were there concerns expressed at the team meetings about the mitigation specialist wanting to question Mrs. Montgomery about her traumatic events?

A I expressed concern about that.

Q And why did you express that concern?

A A couple of reasons. One is I thought that she was not psychologically stable enough to begin that intense investigation. I didn't know the particular mitigation specialist. I was concerned. I think she planned to spend multiple days in a row with her. I thought that it was just too early to do all of that work.

Q And, in fact, the government alluded yesterday to a

document which is in the record, in the filings in this case, a document, I believe 151-16, which is the mitigation specialist's report of having spent three days in a row with Mrs. Montgomery from March 1st through March 3rd of 2005 where she spent over 15-and-a-half hours with Mrs. Montgomery. Is that something that caused you concern, an intense meeting like that?
A I said two things. One is I thought that was too much time; and, two, anything that was discussing the crime, I thought it best that I do those discussions before she did, and she didn't agree.
Q And did you later learn the day after that last visit with Ms. Rickert, Ms. Montgomery actually had a dissociative event and the department of -- CCA was concerned she was attempting to commit suicide?
A Yes. That's when I was called in then in, I believe, on the 8th.
Q To do a subsequent evaluation?
A Yes.
Q And at that point they did ask you to write a letter that they could give to the warden to see if they could do something about her living conditions?
A Yes.
Q And that was because she was acutely suicidal?
A Correct.

Q Now, with respect to your evaluation of -- I'm sorry. It wasn't an evaluation. With respect to the time you spent with Ms. Montgomery in January of 2005, was there an associate in your firm who also visited with Ms. Montgomery in 2005?
A Yes.
Q Who is that person?
A Her name is Dr. Karen Willing. She is a Ph.D. psychologist who at that time was an associate in my office and was -- is a specialist in psychological testing.
Q And how did you use Dr. Willing collaboratively in this case?
A When a case was local, and this was local enough, I would ask her to do the psychological testing. If it was someplace that was out of town, then I would do the testing myself. It helped me in terms of workload. It also gave us a second set of observations, because sometimes people would behave very differently to her than they would behave to me because they thought I was the expert and she was, you know, somehow less; and then depending on how they behaved to her, it was another piece of behavioral information. And then she would write up notes about that testing, and then I would use that as I moved forward.
Q And did you follow that process with Ms. Montgomery?
A Yes.
Q And did you in fact go see Ms. Montgomery on one day

and Dr. Willing see Ms. Montgomery on the second day?
A Yes.
Q Did you administer certain psychological instruments to Ms. Montgomery?
A Yes. She did the pure psychological testing. I did the competency and the malingering instruments.
Q Can you tell us which instruments you administered?
A Yes. I did the Evaluation of Competency to Stand Trial, which is the ECST. And I think it's the -- I don't remember whether it was the SIRS or the SIMS. The SIRS, which is the Structured Interview of Reported Symptoms. I also had her complete what's known as the DES or Dissociative Experience Survey. After we had -- after the initial testing, it showed profound dissociative experiences or tendencies. So I took that back on another date and had her do that.
Q Let me stop you there for just a moment, Dr. Hutchinson. The record should reflect that you have a folder in front of you that you're referring to. Is that the raw data from your evaluation -- or the testing of Ms. Montgomery?
A Yes, it is.
Q And you need to use that to refresh your memory?
A Yes. I was just checking for sure. I gave the SIRS. That's in my handwriting. The MacArthur Competence Assessment Tool is in my handwriting, and the Evaluation of Competency to Stand Trial, which I already mentioned, the ECST, is in my

handwriting.

Q And is there -- was there other testing that was administered that was in the handwriting of Dr. Willing?

A Yes.

Q And what are those instruments?

A She did the WAIS, the Wechsler Adult Intelligence Scale. She was with her while Lisa filled out the Sentence Completion Inventory. She also administered the Rorschach and the Thematic Apperception Test or the TAT.

Q And was there another personality instrument?

A The Minnesota Multiphasic Personality Inventory and the Millon Clinical Multiaxial Inventory.

Q And those inventories were administered under -- or by Dr. Willing?

A Yes.

Q You were not present for those?

A Correct.

Q And I believe you -- on the Wechsler test, there's raw data that's been provided under protective order in this case. Is there a place on the Wechsler for the test administrator to list their name?

A Yes.

Q Did Dr. Willing actually write her name on the Wechsler form?

A Yes.

Q So a trained psychologist would know that the Wechsler had a space for the test administrator's name; is that correct?
A That's correct.
Q And you would know that by looking at whose name is written on that test who the administrator is?
A Correct.
Q Other than seeing Dr. Willing's name on the Wechsler, is there any other indication to anyone besides yourself that Dr. Willing was involved in the testing?
A Well, on the two competency tests I have my name. I don't think the others have a place for naming. I'm just checking. But I don't think that there's any other name places on them.
Q It is obvious, however, that this handwriting is different?
A Yes.
Q You recognized Dr. Willing's handwriting from years working with her?
A Of course.
Q And I'm sure that the lawyers at the Federal Public Defender's Office, Ms. Hunt and Ms. Burns, probably knew that you had used Dr. Willing as a psychometrist to assist you in your work?
A Yes.
Q But it would -- after they left the case, it would

require someone to actually ask you those questions to find out if you had any assistance?

A Or to look at the papers.

Q Or to look at Dr. Willing's name?

A Yes.

Q And ask some more questions about that?

A Yes.

Q That didn't happen here, did it?

A It did not.

Q You mentioned that Dr. Willing after she administered the personality test would type up notes from the personality test. Can you describe that process for me?

A Yes. She would go through and score the Rorschach, make notes from the Thematic Apperception Test, go through the narrative reports that comes from the computer scoring of the MMPI and the MCMI, and she would type up, I don't know, three or four pages that are in the font which she uses, which is different from the font I use, and would write essentially just straight possible interpretations of that data.

Q So would her notes be sort of an overview of interpretive results that you get from the computer as well as a mix of brainstorming ideas?

A No. She wouldn't have been in the place to do any brainstorming about it.

Q Okay.

A Her job was just to report what there was, because she didn't interview the defendant. She didn't have conversations with her. She didn't read any records. She was not in a position to make any interpretations beyond kind of just what the facts of those tests said, and then it was my job to make the interpretations of putting them all together.
Q So you mentioned the facts of those tests, and when you say facts of those tests, you basically mean this is what a computer says the results of this test might mean?
A Correct. Yeah. Computer scoring always says it's likely this or this or this and that it should always be used in conjunction with historical data, with evaluations and that diagnoses can never be made from testing results.
Q So you don't just spit the MMPI into the computer and have it spit out a diagnosis?
A Correct.
Q It requires somebody like you to bring to bear the interviews, the social history, the records, and your own professional evaluation to determine what the meaning of the test is?
A Yes.
Q So is it fair to say that the psychological testing that you use in your practice is really a piece of the puzzle but it's not the whole picture?
A Oh, never.

Q Did you commit to paper your initial impressions of Lisa Montgomery?
A I think I had a two-and-a-half-page report that said, "Brief overview of testing," which was sort of a summary of those summaries, so it wasn't at that point an interpretation or conclusion but was, This is what -- I mean, the question that I was asked was, What in the world is going on with this woman and can you help us figure this out?
So I was -- at that point I hadn't met with her enough to know what I thought was going on, but I said this is what the testing has said so far. So it really was sort of like page 1 of how many, fifty-something, of what I might subsequently say, but this is what I've got so far.
In fact, I think Karen wrote at the bottom of one of the reports, Not much here to help, or something on that order, which is I don't know what happened -- I don't know how this happened. The testing doesn't explain what might have caused this event.
Q And you've become aware, have you not, that that quote that Dr. Willing wrote, "Nothing in the testing is of much help," got picked up by government's experts and has been -- that that quote, A, has been attributed to you? You've become aware of that?
A I have.
Q You have become aware of the fact that quote was used

to suggest that the testing itself was invalid and not useful?
A I heard that that was a conclusion, yes.
Q Was that your conclusion?
A No.
Q Did anyone ever ask you until Ms. Harwell and I asked you those questions?
A No.
Q Can you describe for the Court what writings about -- from March of 2005 we have the brief testing overview?
A Yes.
Q Which is dated February 5th, 2005, and it says, "Montgomery Work Product Summary," and it's three pages in length?
A Yes.
Q Is that your document?
A Yes.
Q And then we have -- these are all pieces of information that were turned over to the government's expert. At the time that you wrote that brief testing overview work product summary, did you have any intent for that work product summary to ever go to a government expert?
A I thought I was just providing it in writing for the team meeting because there was a lot of stuff to try to incorporate pretty quickly.
Q So that was a document that you prepared in order to

have a productive meeting with the team?
A Yes.
Q And then there is a summary of the first team meeting, which is your note-taking from that first team meeting; is that correct?
A That's correct.
Q And that's just straight up this is what was said by the team?
A Correct.
Q And then in early March there's a summary of your interview with Ms. Montgomery; is that correct?
A That's correct.
Q And there is a summary of the March team meeting?
A Again, notes from that meeting.
Q There's a summary of information from the mitigation specialist reported at that team meeting; is that correct?
A That's correct.
Q There's three-and-a-half pages of summary of content from two interviews?
A Correct.
Q There is a letter to Susan Hunt in March of 2005; is that correct?
A Yes.
Q And the rest of the writing in your file regarding the 2005 interaction in the case is from Dr. Willing; is that

correct?
A That's correct.
Q I'm going to ask you some more detailed questions of your letter of March of 2005.
A Okay.
Q I want to quickly cover your recollection of when Mr. Duchardt contacted you, if I may.
A Yes.
Q Did Mr. Duchardt contact you sometime in 2007 and indicate that he wanted to go forward at trial with Mrs. Montgomery with a not guilty by reason of insanity based on pseudocyesis?
A He did.
Q And what was your response to him?
A My response at that time was that I thought that was an unlikely diagnosis given how uncommon it was. I didn't have anything that supported it but that I certainly hadn't finished, but that I thought that there might be other explanations.
Q And as a result, did you and Mr. Duchardt part ways?
A Yes.
Q And he never contacted you again to ask you to explain any of your testing?
A Correct.
Q Did Dr. Martell ever call you and ask you to explain

any of your testing?

A No.

Q Did Dr. Park Dietz ever contact you to ask you about your testing?

A No.

Q Did a fellow by the fame of Ronald Walker, who I'll represent to you is an FBI profiler who performs the task of summarizing the records for Dr. Dietz and Dr. Martell, did a Mr. Ronald Walker ever contact you to ask you about your testing?

A No.

Q Have you ever had the experience of attorneys trying to tell you the diagnosis that they want you to reach?

A No.

Q And would you accept an attorney directing you to come up with a particular diagnosis?

A I do not.

Q Have you worked with Mr. Duchardt before or since the Montgomery case?

A I did one case with him previously. He wasn't the first chair. I think he was a supervisor on the Faye Copeland case, so I had some contact with him. And I believe that I did one civil case with him, and I'm not sure whether it was before or after this, but I've never worked with him again.

Q Is that your preference?

A Yes.
Q And before we get back into your individual -- the test data and how it was represented or misrepresented at trial, I want to clarify your role currently. Were you contacted by me in the summer of this year to ask you about your testing?
A Yes.
Q And what is it that I asked you to do?
A You asked me to look at all of the new records that had been produced, which I have done, and to comment about if that would have been useful in understanding the situation with Lisa, and you asked me to look at the interpretations that were done in my testing and to comment on those.
Q And have you done that?
A I have.
Q Now, you mentioned earlier that your specialty is in trauma?
A Yes.
Q What does that mean?
A Well, trauma is a whole lot of different things. Trauma can be a car wreck. It can be the crash of the Hyatt that people endured here in Kansas City. It can be sexual assault. And trauma can be different for different people, and essentially it's that it is psychologically a trauma if the person's ego or their self is overwhelmed to the point that at the time of it they are overcome with a feeling of helplessness

and hopelessness, and that they don't have the psychological resources to be able to incorporate what they're experiencing in that moment.

So like at the Hyatt crash some people came out with terrible PTSD and people who were standing 6 inches from them didn't. That's just the differences in personality, the differences in what they witnessed and what their ego tolerated. So people who have different egos experience things differently in trauma.

Q And do you have substantial -- we've already stipulated to your credentials. What kind of trauma do you find to be the most prevalent?

A Well, there's all kinds. If I was working at the VA, the most common would be battle fatigue kinds of trauma. The kind that I end up seeing the most often in my forensic cases has been women who have been abused and have fought back. So I've done about 350 battered women cases and a couple battered men cases.

The other kind of trauma that I have worked with substantially is people who had substantial and significant childhood trauma that led them to behave in ways in adulthood that was a direct manifestation of that childhood trauma.

Q As a result of your experiences as a clinician as well as a forensic examiner, are you trained to recognize physical signs and symptoms of trauma in patients who you evaluate?

A Yes.
Q And what sorts of physical signs and symptoms do you look for?
A Well, I mean, I often -- if you think about a normal curve that most of us are in the middle, so if you think about height, then most women are five-four to about five-six, then we have a few out here on the one table that are 6 foot. We have a few on the left-hand table that are 5 foot.

Well, most human characteristics people kind of fall in the middle in terms of any psychological attribute, whether it's their friendliness, their emotionality, their ability to laugh at themself, whatever, any psychological trait. But people who have had significant childhood trauma are going to be out at one end or the other. So you look at people who fall at the extremes, one end or the other, depending on how they psychologically handle the trauma that they had, what age they were at the trauma that had happened, how violent it was, how close the perpetrator was, they will come up with different ways that's congruent with their biology and their system.
Q And when you see your patients in a clinical setting, I would suspect that you don't do a whole lot of going out and gathering the types of social history records that you see in a capital case; is that fair to say?
A I never do.
Q But, nonetheless, you're able to conduct a clinical

interview with the client and make a decision whether or not that client is suffering from trauma and come up with a treatment plan based on your clinical interview?

A Yeah, but I don't do that in the first couple hours.

Q Why not?

A Because you overwhelm them. It's with some humility that I remember when we first started really doing sexual abuse trauma treatment, like 30 years ago, the sort of prevailing thought was you just need to dig up all that stuff and dump it out in the room, then sweep it away and people will be fine, and it wasn't.

At that time there were three private-standing psych hospitals devoted to sexual abuse victims in Kansas City because --

THE COURT: Ms. Henry, do we need the entire history of treatment of sexually abused individuals?

MS. HENRY: It's relevant, Your Honor, to our claim that the defense team in this case did not recognize how to conduct a proper --

THE COURT: Well, I understand that she says that wasn't proper, and she's an expert in treating trauma victims. I just think we're getting --

MS. HENRY: I'll move on.

THE COURT: -- getting off track.

Q (By Ms. Henry) Is it fair to say what you saw in your

experience before is what you saw when Ms. Rickert interviewed Ms. Montgomery for three days in a row causing her to have a suicide attempt?

A Yes.

Q However, you do know in a forensic practice when you're going to have to go to court and testify, that if you were to base your opinions solely on the clinical interview or forensic interview in that circumstance with a client, that your opinion is going to be subject to challenge?

A Correct.

Q And so when you work on forensic cases, is it your practice to request the lawyers provide you with corroborating data?

A Always.

Q And is it your experience that when you are conducting these forensic evaluations with clients who have extreme sexual abuse, just like your clients in a clinical setting, it's going to take many, many interviews before you're going to reach the depths of the trauma to which they have experienced?

A Correct.

Q And even after they provide that information to you, you're still going to want to look at the biopsychosocial history and the documents in order to get corroboration for what the client is able to tell you?

A Yes.

Q And is it also your experience that at times the client doesn't have a good memory of the event?
A That's often true, yes.
Q Is trauma in fact -- I've heard it referred to as a disease of memory. That may not be exactly right. I'm being colloquial. What is the relationship between trauma and memory?
A Well, if a trauma is overwhelming, whether that's a car crash or a sexual assault or a murder, that memory will often not be consciously available to the person because the emotion associated with it is too large. So that's what happens when we call repressed memories, and they may not surface forever or they may surface as screen memories which is --
Q What do you mean by screen memories?
A A screen memory is a memory that fits some kind of category, so there's not all the details of maybe ten that were sort of alike but there was one that is sort of a summary of them, and so it will be sort of a placeholder for that category of assault or abuse.
Q In this case we have contended that the story of the sexual abuse of Lisa Montgomery by her stepfather, Jack Kleiner, is a story that she had told in court when she was 17 years old, so it was out in the open and public knowledge. We've maintained that it's sort of the equivalent of we didn't have the screen memory but it was her placeholder and that

there was much deeper trauma that needed to be investigated. Is that consistent with your experience working with trauma survivors?

A Yes. Certainly.

Q Is that something that's actually very common?

A Yes, it is.

Q I want to talk with you about the particular problems that are associated with trauma and memory as it relates to traumatic events that happen to children.

A Okay.

Q Is it even more difficult to get to trauma that has happened to children when they get older?

A It can be. Depending on the level of fragmentation that was done within the self at the time of that trauma, the trauma memory may be held in a dissociated place within the memory and so it's not really accessible. Sometimes it's remembered with certainly the emotion of the child. And if I can give an example. A patient of mine reported a memory where she said she was in a well with rats. As time passed, it actually was that she was locked in a stone basement and there were mice, but as a four-year-old, it felt like a well and rats. As time passed, that became more clear. But the first report was what it had felt like to her when she was four.

So sometimes it takes time to work through what might be more of the visuals as opposed to the emotion.

Because when there is trauma, the hippocampus is the one that records it first, and it gets transferred and mediated through the amygdala; and if the prefrontal cortex is not able to sort through that, then it's just stored predominantly as emotion and it will get generalized, and so many trauma victims go through life with this sort of generalization of fear that 24/7 they feel like they're in danger.

Q And do you think that would have been a problem with Lisa Montgomery where we now know there was significant trauma and abuse that occurred even before Jack Kleiner came into the picture?

A I'm sure there was.

Q When you have individuals who have been traumatized, such as someone like Mrs. Montgomery, do you have to be careful to not suggest or implant facts into their memory?

A Extremely careful.

Q And in fact with children there's actually a protocol about how to ask questions so that you don't create a false memory in a child?

A Correct.

Q And with impaired people such as Mrs. Montgomery, you have to be very careful?

A Yes. The reason for that is that attribution or where did you learn something is the first part of the memory to go, and all of us experience that when we say, you know, I heard or

read the other day about blah, blah, blah, but I can't remember where I learned it, and that's a very common human thing. So if someone says to a child, was your daddy present, and so they made a picture in their mind of their daddy being present at this event. Then when they're subsequently asked, they're not going to be able to sort between the picture that they made in their mind when they were asked that question or the picture in their mind that that was actually when they were there because that attribution is going to be lost.

So you have to ask questions in any criminal defendant in extremely open-ended ways, like what happened next? What happened next? And never put any content in it because then you are very at risk of implanting that and them not knowing where it came from.

Q And was that in fact something that was discussed amongst the Montgomery team with Anita Burns and Susan Hunt where they were concerned about not questioning Mrs. Montgomery about the crime because they didn't know what they were dealing with yet and didn't want to implant memories?

A Correct.

Q You mentioned earlier that part of the reason that you hadn't come to any conclusions -- there were many reasons you hadn't come to conclusions in the Montgomery case, but one of them was that you hadn't yet developed rapport with Mrs. Montgomery even though you'd seen her three times?

A Correct.
Q Why is it so important in a forensic evaluation of someone like Mrs. Montgomery where you know that there is or you suspect there's serious trauma history to develop that sort of rapport?
A A couple of reasons. One is they obviously have to trust you. With that trust comes a psychological holding, if you will, so that people can talk about an emotion that is bigger than what they can do by themselves, but in the context of a relationship they sort of give some of that to you and the person's listening can hold part of those feelings. Like a child who cries and then as soon as they're done crying and they gave part of it to mom or dad, then they run back outside because they're all fine because they gave away those tears, and that psychological holding is what happens in a therapy process and is analogous to what has to happen when you have a very intense kind of trauma victim in a forensic case.
Q And with a trauma victim such as Mrs. Montgomery, what can be the impact of the sudden loss of a person who they came to trust once they open up to them and then that person goes away?
A Well, there is no trust. Then the next person would have to try even harder, but at some point people give up trusting.
Q And it makes it very difficult, then, for that team to

uncover the trauma?

A Correct.

Q If you had been asked to do an evaluation in this case, what more would you have needed to do?

A Well, I probably would have needed to meet with her for another ten to 20 hours. I certainly would have wanted a neurological evaluation, just because it was an unusual enough situation that it sort of pointed to there might be something more significant. I certainly needed a complete social history documented after I had done some interviewing. I would have wanted to meet with family members, but those interviews could not have been conducted with her until she was stable on medication and stable in a different kind of housing.

Q So when you saw her in March of 2000 -- between January and March of 2005, what were her living conditions?

A She was in a medical unit where she was the only person that was under 24/7 observation. She was allowed one hour of television at nine o'clock in the morning, and she was allowed to take showers at midnight. So she had no contact with any other inmates. She was essentially not allowed any kind of contact with anybody except professional staff. She couldn't have any books. She couldn't have newspapers. She couldn't have television. She couldn't have news. She was left in a six-by-eight room with just her crazy thoughts.

Q And was she under 15-minute checks or not?

A I think it was at least 15-minute checks.
Q And was there a time she was on full suicide watch where she was under constant observation?
A I thought it was full suicide for a number of months. I don't remember the exact details on that.
Q At the time that she was -- that you were involved in the case, was she properly medicated?
A She was not.
Q Was she being medicated at all?
A She was given a low dose of trazodone. Trazodone is one of the first generation antidepressants which is extremely sedating. It's often now used just as a sleeping med. It has very little antidepressant effect at that level.
Q Was she being appropriately treated for the bipolar disorder to which she had already been diagnosed?
A No.
Q Is the fact she was not being properly treated relevant to interpretation of the psychometric testing that was administered by Dr. Willing and the competency eval you administered?
A Yes. I think her psychological distress and her lack of trust and her apprehension, all of those played significant roles in what she was able to do testing-wise. Certainly we were -- we were scrambling to try to see what, if anything, we could learn from the testing. So it was done to say where is

she now without necessarily making lots of implications about that's where she would have been three months ago or that's where she would be three months from now.

Q When someone is on suicide watch, how are they dressed?

A Paper gown.

Q So when she was having to complete these instruments, she was in a paper gown?

A That's my recollection, yes.

Q And do you recall if it was particularly cold at CCA?

A I don't remember what it was at that time but it certainly has been every time since.

Q What were the concerns that you had about Lisa being kept in these housing conditions?

A Well, I thought that -- I had a lot of concerns. One was that I thought that she was certainly at risk of decompensating further without any information about her children, about her husband, or about her case. She was left to imagine the worst for all of those.

She was having thought disturbances. There certainly was some evidence of bipolar reactivity. She was not being medicated for her depression or for her thought disorders. She was being regularly interviewed by the treating doctor there who was quizzing her about the crime. So she was being told don't really talk about the crime and yet this doctor that was, you know, allegedly trying to treat her kept

talking to her about the crime and I think she felt very conflicted about what to do about that.

I think the isolation led to a lot of catastrophizing on her part. She was pretty hopeless at that point. She had come to believe that she had in fact committed this crime. Initially she didn't know that she had and was really pretty overcome with guilt and remorse about that. She was dissociating with some regularity. Dissociation that probably was learned in childhood since that's really the only time when we're emotionally immature enough to learn that level of dissociation.

Q Let me ask you about that. You say that dissociation is not something -- it's something that must come from childhood. Why do you say that?

A All of us can space out, but that's not really what dissociation is. Dissociation is a blending of reality and fantasy, and children don't have those two realities quite as firmly entrenched as we hope most adults do. So when children are traumatized, then they are lying between fantasy and reality and they dissociate to a fantasy place. So when someone is doing a lot of dissociation as an adult, it is a common inference that they learned that in childhood.

Q And that's something you know from your training and specialty?

A Oh, sure.

Q That's not something an attorney might know?
A No. You do now.
Q Yes. But you would have shared that with the team?
A Yes.
Q And you mentioned -- maybe I mentioned and you agreed with me. You did ultimately write a letter because of your concerns about Ms. Montgomery's housing. And you have that in front of you, but I placed on the overhead Movant's Exhibit 37, which has already been received into evidence. Is that a copy of the letter you wrote to Ms. Hunt on March the 14th of 2005?
A Yes, it is.
Q And did that bear your signature on that last page, page 3?
A My copy doesn't but, yes, that is.
Q Okay. And was it your recommendation that Mrs. Montgomery was so bad off that she needed to be transferred to a psychiatric facility?
A Yes, it was.
Q Did you -- this wasn't a psychological report. We've established that because you hadn't yet come to any conclusions?
A Right. This was a recommendation for the health of the defendant. I was concerned about her decompensation to the point she would not be able to assist counsel.
Q So you felt her competency was at issue at this time?

A Correct.
Q And that steps needed to be taken in order to help her and keep her from killing herself?
A Yes.
MS. HENRY: Your Honor, I should state for the record that we've prepared a proposed exhibit list, which we filed with the Court, and we made a typographical error with respect to our description of Exhibit 37. We will correct that from -- we made the same mistake, I think, trial counsel made and called it a report and it is not. It is a letter. And so we will correct that, and I wanted to apologize for that typographical error and clear that up. We'll file a new exhibit list.
THE COURT: Is it something Terri can do right now and be done with it?
THE COURTROOM DEPUTY: I've corrected it.
MS. HENRY: Thank you.
Q (By Ms. Henry) Besides having Ms. Montgomery transferred to a psychiatric hospital, what other recommendations did you make? For example, did you recommend she had better medication?
A Yes. I said a change in medication was immediately necessary; that she needed reduced housing restrictions; that the particular person who was her treating physician there, because of her -- that woman's particular interest in talking

about the crime, I thought was a conflict of interest given that doctor's role, and I thought that if she was going to have someone who's going to be a confidante on a more regular basis, it needed somebody different from that physician. She had fears that if she reported how she was actually feeling to that doctor, she would get more punished. So it was a real double bind for her as to how to use that person.

Q Was she also being harassed or did she report being harassed by other inmates at the jail? That they would come to her room and say things to her?

A Yeah. I don't remember any details about that, but that image is clear, yes.

Q You did make a recommendation that perhaps if she was transferred to a different facility, she might be subject to less inmate harassment?

A Yeah. I thought if she were transferred to a hospital outside of the Kansas City area where people knew the crime because it had a lot of press coverage, that there would be less reactivity. Women in prison in particular are pretty mean to other women who hurt children.

Q Did Ms. Montgomery also express some paranoid ideas or thoughts during the time that you evaluated her in March?

A Yes.

Q And what were some of those?

A She believed that she was being tape-recorded and that

her conversations with her attorneys were being tape-recorded. Obviously I couldn't validate whether that was true or not, but I suspected it was paranoia.

Q And you mentioned that she also had, you say, thought disturbances or thought -- what was the phrase?

A Thought disturbances, yes. The testing showed that she viewed the world in some pretty idiosyncratic ways, that she just had very unusual ideas about people in relationships in particular.

Q Did Ms. Montgomery -- she wasn't actively psychotic at the time you saw her; is that correct?

A It's hard to say. I mean, she may have been and that wasn't my intent to try and push those. I mean, people who are psychotic sometimes know that those are the things you're not supposed to say out loud, and I didn't want to put her in the position to try to hide that or lie so I wasn't pushing on that.

Q You didn't reach any ultimate conclusions about whether or not she was psychotic or not?

A Correct.

Q But did note that there was a possibility of thought disturbances which could be a psychosis?

A Yes.

MS. HENRY: Just one moment, please, Your Honor.

Q (By Ms. Henry) You mentioned, Dr. Hutchinson, that you

did administer a few competency measures to Ms. Montgomery; is that correct?

A I did.

Q And what did the -- we'll start with the MacArthur, if we can. What does the MacArthur test measure?

A Let me get to it so I can be complete. The MacArthur is a fill-in-the-blank kind of question and answer. The person is described a number of scenarios where they're asked, What's the thing that should be done here? What should you tell your attorney? It also has questions about understanding what's the role of the judge, what's the role of the jury, pretty concrete, formal competency questions.

Q Does the MacArthur test tell you anything about whether or not a traumatized client is able to rationally assist their lawyer in developing evidence in mitigation?

A No.

Q It's just do they know who the judge is, who the jury is, who the prosecutor is, and who the defense attorney is?

A Right. And some reasoning. There's a section on reasoning. So, like, they're described a scenario of a bar fight and they -- so, like, one question I just opened up there. "So if there were two facts at the bar, there was a country western band playing or Fred called the ambulance after he had heard Reggie, which fact should be told to the attorney?" And so obviously if somebody chooses that there was

a country western band, then they're not thinking very clearly. So there are some of those reasoning kind of questions.

Then the third section is known as appreciation. So they're asked, "In comparison to other defendants, does your lawyer treat you -- are you as likely, less likely, or just the same likely to be treated fairly or just as likely to get a fair sentence," and those kinds of things. So it covers three different kinds of things that are important in competency.

Q And besides measuring competency, if a criminal defendant wants to malinger mental illness, is this measure a good opportunity for them to try to appear crazier than they are?

A Yes. On the appreciation section they certainly could.

Q And on the appreciation section under Appreciation Item No. 18, what was the question there? Is that the question that you just said?

A That's the one about, "Do your lawyers care about you and will they help you as much as other people?"

Q And what did she circle as her answer there?

A She said she thought she would get good help. "They care about me. They haven't done interviews with the news. They seem more concerned about me than themselves. They don't understand but they're trying," kind of idea.

Q And then on Appreciation Item No. 18, what was the question there?

A "Some lawyers expect their client to tell them everything about how they got in trouble with the law compared to other people facing charges like yours. Are you more or less likely, just as likely to tell everything to your lawyer?" And she put, "I am just as likely. I don't know. I can't remember some things and some things -- some things I don't want to tell."

Q I should note that on this particular instrument there's just three items to circle; but then if the patient provides you with additional information when they're answering the question, do you hand write their response?

A Yeah. And you always say, "Why is that?"

Q Okay.

A So they have to give a more or less or just as likely and then why.

Q So she said she would try to cooperate. She's just as likely as anybody else, but then made the comment --

A That "There are some things that I can't remember and some things that I don't want to tell."

Q Now, as a clinical psychologist and forensic psychologist who specializes in trauma, when you get an answer like that, what does that tell you?

A That -- well, it could be two things. One is they might have something that they want to hide, but that's unlikely that they would say, "I don't want to tell you," but

that it was most likely to be an indication of an emotional issue that they couldn't yet talk about.

Q And would that be an indicator of trauma?

A Yeah. And she went back -- and she followed up with that as, "Everybody has doubts and fears."

Q Appreciation Item No. 20.

A "Compared to other people who were charged with the same offense as you, do you think you are more likely, less likely, or just as likely to be found guilty?" And she answered, "I will be just as likely." She said, "I will be. I don't know about others because I am. It's not what they say. I finally read the indictment. This crime they have to have a reason to believe it, like, if I was caught with drugs but they have proof. They have proof I did this."

Q So she was acknowledging her responsibility and acknowledging that she was likely to be found guilty?

A Yes, and that she was more likely, just as likely to be found guilty, yes.

Q And Appreciation Item No. 21, what was that?

A "Compared to other people found guilty of this crime, do you think you will get more punishment, less punishment, or about the same if you are found guilty?" She said she would get more punishment because -- my writing is bad -- "because mine has been way more public. It's just what people hear, sigh. Other people may not face the death penalty like even

the guy in Wichita is not facing the death penalty. Some other people aren't facing the death penalty."

Q But she at that time believed she was going to receive the death penalty?

A Yes.

Q And on Appreciation Item No. 22, can you read that question for me?

A "Prosecutors sometimes recommend less punishment if defendants agree to plead guilty. Let's say that the prosecutor makes an offer like that in your case compared to other people facing charges like yours, would you more likely, less likely, or just as likely plead guilty?" And she said, "More likely. Heck, yeah. Because I am guilty. What punishment whether it's life or death, anything less would be good. Any number of years would be less as a possible ending."

Q So Mrs. Montgomery was indicating there that, yes, she would -- heck, yes, she would plead guilty?

A Yes.

Q I'd like to, if I can find it, get to the ECST-R record form.

A Okay.

Q And do you have that in front of you?

A I do.

Q And that's the other evaluation of competency test that you administered to Ms. Montgomery?

A It is.
Q And does that test ask similar questions?
A It does some. It goes at it a little different, it has some of the same kind of questions about what's the job of people, but it also gets to a little more about their relationship with the attorney, and then has some questions that just -- kind of a little bit of -- different take on it.
Q I'd like to direct your attention to page 3 of the raw data and Item No. 4, which is titled Agreements and Disagreements.
A Okay. So the question --
Q What is that question?
A The question that I would have in my book would have said, "Have you ever had any agreements or disagreements with your lawyer?" And her response was, "Yes, on the plea. They want to do not guilty. I don't feel that's right." She said, "If they asked me, I would not have agreed. The judge never asked me." And then I say, "Was that wrong," question mark. "I did it. I don't remember because if I" -- "if doing it I deserve to be punished. They kept saying that they would agree but it wouldn't mean anything. I'm wasting the Court's time dragging through this guilty" --
Q So she was accepting responsibility and actually indicated that she wanted to plead guilty to the crime but that her attorney entered a not guilty plea without asking her?

A Yes.

Q I'd like to also direct your attention to the Sentence Completion Test. What is the Sentence Completion Test?

A The Sentence Completion Test is a sort of a fishing expedition where you just have stimulus phrases like, When the odds are against me, When I was a child, so you're just asking for people to fill in a first sort of free association answer that sometimes will give you something that you'll want to talk about that you wouldn't have ever thought to talk about.

Q And I should say these forms that were being filled in, the ones that you did, the two competency instruments, that was on January 21st of 2005, and then the Sentence Completion Test that was when Karen Willing was with her, so that's dated January 22nd, 2005; is that correct?

A Yes.

Q And I would like to direct your attention to the last page of the Sentence Completion Test. This is in Lisa Montgomery's handwriting; is that correct?

A That's correct.

Q Item No. 54, what's the prompt there?

A The prompt is, "My most vivid childhood memory."

Q And what did she respond?

A "I cannot talk about it."

Q As a trauma clinician, is that an indication to you of there being a significant trauma history?

A Yes.
Q And by this point she'd already told you about being sexually abused by her stepfather, Jack Kleiner; is that correct?
A I knew some about it, yes, not the full extent.
Q So there's something else that she cannot talk about that has not yet been revealed?
A Correct.
Q Item No. 60, what's the prompt?
A "The worst thing I ever did."
Q What's her answer?
A "Is the reason I am here."
Q So in those three instruments as well as in your interactions with Ms. Montgomery, is it fair to describe those as demonstrating the fact that she was accepting responsibility for the crime and expressing remorse?
A Yes.
Q At any time that you interviewed Mrs. Montgomery, did she ever try to tell you that her brother, Tommy, was with her on the day of the offense?
A No.
Q If she had noted an alternate suspect or a co-conspirator or somebody else that might be involved in the crime, is that something that you would have shared with the team?

A You bet.
Q I'm sorry. I asked that question just as you took a drink of water.
A Of course. I mean, that would be a big deal.
Q And that would be something that you would remember?
A Yes. And it would be in my notes.
Q Okay. Now, Dr. Hutchinson, you've been made aware of the fact that three tests that you gave the government's expert noted in his summary of reports that there was no summary of your three tests, although he didn't know the difference. He just said there's three tests given. There's no summary. Why is that?
A Well, they were the ones I did and the notes were done by Dr. Willing, so those were the notes of her tests that she provided to me. I didn't write a summary of my own. For one it wasn't the subject of the team meeting that I was presenting at; and, two, I knew what they said.
Q So you didn't need a summary for yourself?
A Correct.
Q The government's expert when he reported on the documentation that was provided to him and represented to him as being your report noted the possibility of extreme narcissistic injury was typed out on one of these pages?
A Yes.
Q And that got interpreted to mean that she was a

narcissist. Was that what was meant to be communicated?
A No. Again, those were Dr. Willing's notes. A narcissistic injury is something that all of us can have and would be an indication of a stressor. So if -- so if my identity as an expert witness, for example, if my ego is all wrapped up in this, this is who I am and I came in here and you said, Marilyn, we decided you really aren't any good at this and so we don't want you to testify, I would probably have a narcissistic injury about that depending on how involved my ego was with that definition of myself.
I think what Dr. Willing was communicating was -- in her TAT stories, she had disclosed a fair amount of significant information, like that her daughter had left, and I think Dr. Willing surmised that perhaps that had been a significant narcissistic injury to her because her definition of herself was very entangled in being a mother and being a good mother, and so having her daughter leave would have been a narcissistic injury which would have been a significant stressor.
Q And so that term is really just a psychological term, but what it means to you is there was some stressors in her life?
A Correct.
Q And, again, Dr. Willing was just giving you some ideas but she hadn't conducted the interview?
A Correct.

Q And she was just purely looking at the testing itself?
A Correct.
Q So representing that those were your conclusions and that was your report was inaccurate?
A Completely.
Q Now, the experts for the government also gave a summary of your -- the results of the testing that was conducted. Did they provide an accurate summary of your summary?
A No.
Q And why not?
A They took individual sentences -- I mean, what they seemed to quote were some of the lines out of Dr. Willing's report but would take part of a line and not all of the line or that -- for example, on one of them I remember it was, "Profile is exaggerated but she is still extremely distressed," and they just put profile exaggerated. Another one was -- I wrote, "Exaggerated but still quite disturbed." They left off that part.

I had emphasized that I thought that PTSD was a likely diagnosis. They completely left that off of their summary of my summary. The sentence was something about an "Exaggerated profile and not likely an indicator of her personality," and the rest of the sentence was, "could be deliberate or could be extreme vulnerability," and they just put in the first phrase.

Q So they left in deliberate but left off extreme vulnerability?
A It seemed as if it was deliberate.
Q If a person on -- well, there was a lot of testimony at the trial with respect to the results of the MMPI test. You've been made aware of that; is that correct?
A Yes, I have.
Q You did not attend Mrs. Montgomery's trial; is that accurate?
A I did not.
Q But you since have been provided with a transcript of Dr. Martell's testimony; is that fair to say?
A I have been.
MS. HENRY: Just one moment, Your Honor.
Q (By Ms. Henry) Would it surprise you to learn that in an 11-page direct examination Dr. Martell mentioned your name almost ten times?
A I've been told that so it doesn't surprise me now.
Q I'm going to read to you some passages from the trial transcript and ask you to comment on them.
MS. HENRY: I should note first I see Dr. Hutchinson's name on page 256, again on page 257, on page 259 a couple of times, on page 2460. That conversation continues on 2461 without her name. And again on 2463. And for purposes of the record, the direct examination of Dr. Martell begins on

2452 and ends on 2463.

Q (By Ms. Henry) So, Dr. Hutchinson, Dr. Martell testifies on page 2456, "I reviewed the psychological evaluations that were conducted on Ms. Montgomery by Dr. Kuncel, by Dr. Marilyn Hutchinson, by Dr. Ramachandran, and by Dr. Logan." Is it possible for Dr. Martell to have reviewed a psychological evaluation by you?

A No.

Q And that's because there wasn't one?

A Correct.

Q On page 2457 you're asked -- Dr. Martell was asked, "Now, Dr. Hutchinson and Dr. Kuncel previously administered psychological tests you reviewed?" The answer was, "That's correct." And so you're invoked there, but the psychological tests were not administered by you but in fact were administered by Dr. Willing; is that correct?

A That's correct.

Q On page 2459 Dr. Martell testifies or is asked, "And before we get to your conclusions, did you review Dr. Kuncel's and Dr. Hutchinson's conclusions and detect anything related to malingering that caught your attention?" And he answered, "I did." And, again, would that be accurate to say that Dr. Martell was able to review your conclusions?

A Couldn't have.

Q Further down on the page you're referred to again in an

answer on page 2459 from Dr. Martell where he says, the question was, "What did you find in Dr. Kuncel," then there's an end dash so I guess the question wasn't finished, and Dr. Martell volunteers, "Dr. Hutchinson and Dr. Kuncel found evidence she was malingering.  Historically Dr. Hutchinson saw her first about a month after the instant offense in January of 2005.  She gave the MMPI.  Also gave the" -- transcript says MCPMI -- "I also gave, and she," referring to you, "noted evidence on both of these tests Ms. Montgomery was exaggerating her symptoms or malingering."  Did you find evidence of malingering?
A I did not.  That's never listed in anything I have, nor is it listed on any of the test narratives from the computer scoring.
Q On page 2460 Dr. Martell notes your testing -- what he refers to is your testing.  2460 beginning with -- we'll start with the top to make sure that we put it in context.  "Dr. Kuncel gave something during her exam.  This was two years later in January.  Then she saw her again in March of 2007. She gave something called the Structured Inventory of Malingered or SIMS.  The SIMS have various scales that measure -- that measured different kinds of faking and Ms. Montgomery was selective.  She didn't fake everything.  For example, there's a scale for faking low intelligence.  She did not fake low intelligence.  In fact, she has a superior I.Q.

Dr. Hutchinson tested it at 120, which is in the superior range, and actually noted she probably would have scored higher but she didn't give her best effort at the time of the Dr. Hutchinson's testing." First of all, you didn't give her the WAIS. Dr. Willing did, right?
A Correct.
Q When Dr. Willing noted a question about, Well, did she conclude or you conclude that Ms. Montgomery wasn't giving her best effort?
A She concluded that because of some inattention issues which probably were related to depression and anxiety.
Q So someone who is depressed may have some inattention issues when they're taking the WAIS?
A Correct.
Q And so she scored a 120, but did Ms. Montgomery on that WAIS also have a significant split between her verbal I.Q. and her performance I.Q.?
A Yes. It was significant on the one we did, and it was even more significant later when she was able to perform, I think, at a better reflection of her capacities.
Q You've been able to review the WAIS score that Dr. Fucetola received?
A Yes.
Q And is it your opinion that the fact that by the time Dr. Fucetola gave her the WAIS that she was then being

medicated for her bipolar disorder, that that likely made her more able to attend and perform on the test that he gave?
A Of course.
Q And so in fact it was the performance I.Q. that went up?
A Yes.
Q For Dr. Fucetola?
A Yes.
Q And that her verbal I.Q. was relatively the same on both measures?
A Correct.
Q So then Dr. Martell concludes on the end of the page on 2460, "So she is selective. Some days she seems to malinger other tests, at other times she doesn't. It's a little bit like the boy who cried wolf; never quite sure when you are getting the truth and when you are getting what she wants you to hear or when you are being manipulated.

You since reviewed that testimony. What's your opinion about your testing being used to suggest that Dr. Willing's testing that was done at your instigation being used to suggest that Ms. Montgomery selectively malingered?
A Well, those actually were my tests. Those were the two competency instruments that measured different things -- or the two malingering instruments, and that he reached the conclusion that she was malingering a mood disorder and she was

malingering a bad memory. Well, in fact, she has both of those problems. So if you come up with -- I mean, she's been diagnosed with bipolar disorder, and she had a lot of times when she talked about memory issues, so the fact that those two came up high wouldn't be indicative of malingering. The other instrument which is about consistency of reporting of symptoms she didn't have any significant scores, which meant that she was being truthful, I think, on both of them.

Q So that was a mischaracterization of the testing?

A Oh, of course.

Q And then on page 2463 as the direct examination is closing out, the question from Mr. Whitworth is, "Dr. Marilyn Hutchinson was a psychologist retained by the defendant in this case; is that correct?

"ANSWER: That's correct.

"As was Dr. Kuncel?

"Yes, both defense retained experts."

And that was the end of the direct examination. In your experience mentioning your name that many -- well, did you testify at the trial?

A No.

Q Mentioning your name that many times and suggesting that you had reached conclusions that Ms. Montgomery was manipulative and that she had malingered, would that leave the impression that you would have supported the government's case?

A It certainly lends credence to that possibility.
Q And would that have been accurate?
A No.
Q You certainly hadn't reached conclusions because you hadn't been given enough additional information?
A Right.
Q Then we go to cross-examination. Mr. Duchardt begins to make representations in his questions to Dr. Martell or asked questions, then Dr. Martell states, "Well, there's tests that Dr. Hutchinson identified as being exaggerated that have built-in scales" -- and this is 2485 of the transcript -- "has built-in scales to catch people either faking bad or exaggerating." And then he goes on to 2486 and states, "I'm relying on her characterizations, Dr. Hutchinson's." Again, you didn't characterize --
A No. Those were, again, partial quotes out of the computer-generated information that did not represent even what the computer was saying.
Q And then on page 2499 the redirect at line 2 Dr. Martell testifies, "And her history of malingering for Dr. Hutchinson." Again, an untrue statement, correct?
A Correct.
Q So, Dr. Hutchinson, let's talk now, if we may, about the MMPI that you gave in this case, and I shared with you my open hostility of the MMPI, right, but we're going to talk

about it now.

A I have my copy.

Q All right. And when you give someone an MMPI, the computer will spit out some -- what's called an interpretive report. What is an interpretive report?

A It is a collection of actuarial or statistical ideas about who this person might be. Sometimes there are actually contradictory statements within the same report because they're picking up different configurations within a report. So that's why it's incumbent to look at the whole thing, to not ever report just this test says that and that test says this, because that doesn't make you one's expertise as a psychologist.

Q And does it also -- does this report also give you a list of -- let me back up. I'm assuming everyone in the room knows what an MMPI is but the reader of the transcript on down the road may not know. What is an MMPI?

A Minnesota Multiphasic Personality Inventory. And at that time it was the 2 and now it's been updated again, but then it was the 2.

Q And how is that test administered?

A It is a series of true/false questions. At that point there were 567 of them that people answered on a bubble fill in the true/false to a list of 567 questions.

Q That's a lot of questions.

A That is a lot of questions.
Q Is it completed all at one time?
A It is.
Q About how long does it take on average to complete?
A Some people do it in 40 minutes and some people do it in two hours.
Q Okay. It takes a long time?
A Yes.
Q And then when you get these interpretive reports, do they spit out also some significant answers that they call critical items?
A They do.
Q And what are the critical items?
A They're ones that may indicate some serious issue or serious concern, and they are presented so that you can go back and you can ask the client, On this question you answered true or you answered false. Can you explain that to me? Sometimes you find that they had an idiosyncratic reading of it. Sometimes they say, Oh, that was a mistake. I didn't mean to say that, or they explain something that is pretty significant.
Q Can you give me an example of an idiosyncratic interpretation of a question on the MMPI?
A "People can read my mind," which comes up on the paranoid scale. And so when I say, When you said that people could read your mind. Yeah. My mom says she can always tell

what I'm feeling just by looking at my face. Well, that's idiosyncratic for that test item, but it seemed true to the person who took the test.

Q But it's going to cause that paranoid scale to go up?

A Correct.

Q And so that's what we're talking about in terms of not allowing the computer to dictate diagnosis?

A Right.

Q Sometimes when people score very, very high on some of these scales, it's because they really are in that much distress?

A They are, yes.

Q Mrs. Montgomery scored -- had some -- let's look at the acute anxiety state, and there were 17 possible items and Ms. Montgomery endorsed nine of them?

A Yes.

Q And that would indicate what?

A She had pretty high anxiety. If I look back at the actual profile -- let me get to that page. Her anxiety was at a T score of 80, which is a pretty significant score, yes.

Q And some of the items -- the items that she endorsed, the first one, "I wake up fresh and rested most mornings." She answered that false?

A Correct.

Q And if there was information in the social history that

would support the idea that Ms. Montgomery had sleeping problems and was working multiple jobs, answering that question false would seem to be a true, lack of a better word, expression of what she experienced?
A Correct. Yeah. When I -- I go over these usually after the end of the interview, and the ones they've already told me about I don't say, Don't do those. It's the only ones that I don't understand, that I go over.
Q But someone -- since you ended up leaving the case and this MMPI report was passed on to several different people apparently with all of your work product, they could have gone to the critical items list and looked at the items that were endorsed and determined that in fact each one of these nine items that she endorsed on the anxiety scale appeared to bear out in her social history; fair to say?
A They all look pretty true, yes.
Q And so we don't need to go through all nine of them?
A No.
Q You had an opportunity to read the biopsychosocial history in this case?
A I have.
Q And you had an opportunity to read Dr. Kate Porterfield's report in this case?
A I have.
Q And you've had an opportunity to read the declaration

of a man named David Kidwell?
A Yes.
Q A man by the name of Wesley Gann?
A Yes.
Q You've had an opportunity to read the declaration of Carl Boman where he corroborated David Kidwell as well as Lisa Montgomery's most recent revelations?
A Yes.
Q And so that's the sort of history I'm talking about that you could take and look at and compare to these critical items and determine whether or not Ms. Montgomery was being truthful in her responses?
A Correct.
Q The same goes with depressed suicidal ideations. Of 22 possible items in this section, 18 were endorsed in the -- but she was pretty suicidal in her responses?
A Yes.
Q And she was on suicide watch?
A Yes.
Q And this was within a month of her incarceration?
A Yes.
Q So it's not surprising that she's suicidal?
A Correct.
Q But the computer doesn't know that she's on suicide watch?

A No.

Q And so they're asking these questions, the normative population or the norms are not normed on people who are on suicide watch facing the death penalty?

A Correct. If you'll see at the top of the page, it says Correctional Interpretive Report, so she's being compared to other pretrial defendants.

Q And they could be charged with anything from theft to capital murder?

A Correct.

Q So if somebody who was in jail for theft might be depressed if they got caught and they might be doing some jail time, but it's not the same level of distress as Lisa Montgomery was facing?

A Correct.

Q And there are no norms for people who are on suicide watch?

A No.

Q On the threatened assault critical items she endorsed two. "At times I feel like smashing things," and "I get mad easily and get over it soon"?

A Sure.

Q Those are pretty innocuous, right?

A Well, I would have to ask her about them. It says, "At times I feel like smashing things." My follow-up question

would be, Do you? Or what makes you feel like smashing things and how often does that happen? And if they go, Well, you know, the other day when I bumped my car when I was backing up, I felt like just hitting the windshield or something, and I go, Okay. I get that. But if they go, I felt like smashing down the door, then that would mean something different.

Q On the situational stress, she endorsed three of seven possible items?

A Yes.

Q Including "I have used alcohol excessively," she said true?

A Yes.

Q And you now know from reading the biopsychosocial history that Ms. Montgomery had a pretty serious alcohol problem?

A A couple of different occasions, yes.

Q "I believe that my home life is as pleasant as most of the people I know." She answered that false?

A Correct.

Q And that seems consistent with her biopsychosocial history?

A Correct.

Q "I have made lots of bad mistakes in my life." And she answered that true?

A Yes, which is pretty self-revealing.

Q I mean, we can go on and on, but basically having reviewed these critical items, if you had to compare them with her social history, fair to say you could conclude that what's being reported as -- well, you couldn't conclude because you haven't done the full evaluation, but a person could conclude that this was a valid profile and that Ms. Montgomery was in severe distress?

A Yeah, and it would have changed the way I looked at that -- the statement that they quoted about an exaggerated profile because they gave several other alternatives. So I would have been able to validate those other alternatives.

Q But you didn't have the opportunity to do that?

A Correct.

Q We've been talking about Dr. Willing's notes on the testing that she administered to Ms. Montgomery. If we just took Hutchinson out of Dr. Martell's transcript and replaced it with Willing, would it still be a valid testimony that there were conclusions about malingering?

A No, because, A, I never -- she or I ever used the word "malingering." What was listed were quotes out of the psychological report narrative which is not a conclusion. Those are all hypotheses. So like on the MMPI where it was one of the things they quoted, "The client responded in exaggerated manner. These results may stem from a number of factors that include falsely claiming psychological problems, a low reading

level, a plea for help, acute difficulty adjusting to incarceration, or a confused state." So when you look at the critical items about confusion and you interview her and when she's talking about I don't know what's real and what's not and you know -- I knew how difficult her incarceration was, then it lends credence to those interpretations of the hypothesis, that it was exaggerated. I don't even know for sure that it was exaggerated given how distressed she was, but compared to other correctional inmates, it had the possibility of being exaggerated.

Q Thank you. You explained that very well.

You did note that Mrs. Montgomery was psychologically a complex person?

A Yeah. Again, that was a note from Dr. Willing at the bottom.

Q I apologize.

A That was a summary of the Rorschach and the TAT saying that this is a very psychologically complex person and what you see is going to be in layers; that what you get one day will not be exactly what you get another day, will not be exactly what you get another day because of the depth of pathology, the diversity of mental health diagnoses, that this is just going to take awhile.

Q And so that's something you may have shared with the team?

A Yes. In fact, I did put that on my overview notes.
Q Did you share with the team that Ms. Montgomery had a difficult time knowing what was real and not real?
A Yes, I did.
Q And what can that possibly be a symptom of?
A Well, it's most often found in trauma or in psychosis. So if a person is dissociated, then at the time of the event then that memory is not encoded in the way that a memory is encoded when they're present. So those memories have a dream-like quality to them usually, and then people who have gone through that dissociative experience don't know whether they dreamed it, whether they made it up, whether it was real, did somebody tell it to them, because they don't have the usual markers for what's real.

So like if I say, I want you to make a picture of an elephant and I want you to see that chair and then I ask you which one's real, your picture of an elephant doesn't have the same quality of the picture in your mind of the chair, and so you go, Well, that one's not and that one is, but when a memory is learned in a dissociated way, then it doesn't have those same characteristics to know intrinsically that was real.
Q Is there anything in Mrs. Montgomery's history that you've now had an opportunity to review that would suggest that there's something in her childhood that impacted her ability to know what is real or not real?

A Yeah. Her reality was denied on a regular basis. She was sexually assaulted. She was told it was her fault. Her mother held her at gunpoint and said, "Why did you do this?" Someone whose reality is frequently negated begins to distrust, maybe I don't know what's real.

Q And if you have a client, a forensic patient such as this who has a difficult time knowing what's real and what's not real, do you stress to the lawyers that you're working with the importance of going out and getting records and getting data and getting corroborating witnesses?

A Right. Otherwise, I can say I don't know what's true; and if I don't know what's true, I certainly won't testify that it is or isn't.

Q There was also testimony from Dr. Martell suggesting that Ms. Montgomery, quote, pretended to have memory problems and a mood disorder. Did you see that testimony?

A Yes. That was his interpretation of one of the malingering instruments because she had high scores on those two items, but she did have both of those. So that can't be malingering. I mean -- so it measures a level of affect. So if somebody really does have a mood disorder, you would expect them to come up high on the affect scale. If they really do have memory problems, then they're going to come up high on the memory section.

As he mentions, she didn't seem to malinger on her

intellect, and there's a variety level, I think there's six or seven scales on that particular instrument, and he said she malingered on the two that she was high on, but she'd already been diagnosed with both of those.

Q There was another instrument, another personality test that was involved?

A The MCMI?

Q The MCMI.

A Yes.

Q Is it fair to conclude from the testing alone that Ms. Montgomery malingered on the MCMI?

A No. It has the same kind of proviso on the top of it.

Q What is its proviso?

A "On the other hand, the response style may convey feelings of extreme vulnerability that are associated with a current episode of acute turmoil."

Q Does that seem accurate?

A It certainly did.

Q What were the possible diagnoses suggested by the MCMI?

A The suggested clinical syndromes or Axis I were major depression, recurrent severe; posttraumatic stress disorder or adjustment disorder with anxiety. And the Axis II disorders were depressive, schizoid, dependent, or self-defeating.

Q And then does it give on page 7 of the interpretive report possible DSM multiaxial diagnoses?

A I'm sorry. What?

Q I'm sorry. I was looking down. On page 7 of the report does it give possible DSM-IV multiaxial diagnoses?

A Yes. The one that I read, major depression, posttraumatic stress disorder, adjustment disorder, is the Axis I. Axis II were the depressive personality disorder, schizoid, dependent, or self-defeating. And psychosocial environmental problems it lists loneliness.

Q On page 6 of the report does it note noteworthy responses?

A Yes, which would be the same as the MMPI critical items, just different wording.

Q And is it the same sort of situation here where if you get these particular responses, you're going to want to go back and ask more questions?

A Correct.

Q And so under the first section there of health preoccupation where it says things like the first, she endorsed four items. The fourth item listed is Item 149. "I feel shaky and have difficulty falling asleep because painful memories of a past event keep running through my mind," and she answered that as true. Would that seem to be accurate given the social history?

A Yes.

Q "I can't" -- No. 74. "I can't seem to sleep and wake

up just as tired as when I went to bed."
A True.
Q And that's consistent with the history?
A Yes.
Q "In recent weeks I feel worn out for no special reason."
A She answered true and that seemed consistent.
Q "And lately my strength seems to be draining out of me even in the morning."
A True. Yes.
Q And also at the time when she's talking about her strength draining out of her and being worn out, besides being depressed, which she obviously was, she was also taking an extremely sedative medication, correct?
A Yes.
Q That could also account for her responses there?
A Yes.
Q On page 7 under childhood abuse she endorsed two items. "I'm ashamed of some of the abuses I suffered when I was young," and "I hate to think about some of the ways I was abused as a child."
A She answered true to both of those.
Q And, again, that appears to be truthful responses on her part?
A I believe so, yes.

Q Under self-destructive potential --

THE COURT: Ms. Henry, do we have to go through every answer on every test that was administered by Dr. Hutchinson? Maybe you can help me but tell me where you're going with this.

MS. HENRY: This is an item that's not in the record. We're not going to be able to place it in the record because it's raw data from a report, these particular items. So I was trying to read them into the record so that it would be there.

THE COURT: Well -- and what are you seeking to establish in support of your motion by that?

MS. HENRY: I'm seeking to establish that trial counsel who ultimately tried the case was ineffective because they allowed Dr. Martell to come in and testify to the jury that Dr. Hutchinson's testing concluded that Ms. Montgomery was malingering which meant she was a liar.

THE COURT: I get that you're making that point here for the presentation; but, again, Dr. Hutchinson says that her reports -- first of all, there are no conclusions in her reports; and, secondly, her reports are not reflective of the things that Dr. Martell testified to.

MS. HENRY: If there's not --

THE COURT: You know, I mean, I don't know what the government's going to present. I don't know what the

government's cross is going to be. But I don't know that we need to listen to an hour and a half of supporting anecdotal evidence on what Dr. Hutchinson has clearly testified to.

MS. HENRY: I understand. I don't mean to annoy the Court.

THE COURT: I appreciate, you know, the fact you need to make a record, but at some point your record has been established.

MS. HENRY: All right.

Q (By Ms. Henry) Let me summarize -- well, let me ask you this, Dr. Hutchinson. If I were to -- the material that I'm reading from and received is subject to protective order but you also provided this to -- we got this from Dr. Fucetola, but it was also provided to Dr. Martell and to others not under our protective order. So if I were to mark the MMPI-2 and the MCMI results that came out of the testing Dr. Willing gave, does that cause any particular ethical problems?

A The ethical code for the American Psychological Association is that they can be produced in the context of a judicial proceeding. So it can be introduced.

THE COURT: I'd like for you to mark those and enter them in the record.

MS. HENRY: Thank you, Your Honor.

Your Honor, given it's five minutes until five can I -- we need to get stickers. Can we stipulate that I'll have

those marked as the next two numbered exhibits and they'll be entered in evidence?

MR. KETCHMARK: No objection.

THE COURT: All right. You can enter them in the morning.

MR. VALENTI: I don't think I will be long.

MS. HENRY: That will conclude my direct examination of Dr. Hutchinson, Your Honor.

THE COURT: All right. Thank you. If you get them marked, we'll do it before we leave or we can do it in the morning.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Hutchinson, how are you?

A I'm well. Getting tired.

Q I understand. Let me make sure I understand where we're at. Based upon the role you were hired in, you really didn't conclude much but you had a lot of running hypotheses?

A I had a lot of what?

Q Running hypotheses or theories or ideas, things to explore?

A Well, we were just beginning that.

Q Well, for example, in the malingering or the exaggeration of symptom issues that came out from, I guess, the

computer --

A Yes.

Q -- response to the testing instruments, it would be unfair I think in your testimony to say that you or Dr. Willing under your supervision or with your assistance concluded she malingered, but there was a hypothesis from the testing instrument anyway that malingering might be present, correct?

A No.

Q There was a hypothesis, then, that was written in your hand or in your report about exaggeration of symptoms?

A Yes. An exaggeration and malingering are not the same thing despite the testimony by Dr. Martell.

Q Okay. Malingering is something I would say lawyers unfortunately use more than medical professionals. Would you call it a response bias be a better use of terminology?

A No. I use malingering. And I believe that malingering is when there is a conscious or an unconscious attempt to portray something for which there is secondary gain and that it is not based in fact; whereas, an exaggeration is making something slightly larger than it is. So if I say I have a stomachache that's like a four on a scale of one to ten and I say, Oh, it hurts so bad I can hardly stand it, that's an exaggeration. I still have a stomachache. But if I say, I have a stomachache and I don't have one, then that's malingering.

Q Well, we can play with the adjectives, but exaggeration, embellishment is not based in truth or some truth but additional little extra put on it, right? Isn't that what exaggeration means?

A Yes.

Q Okay. You were asked whether or not she knew real from unreal. Was that a conclusion you gave the Court today that she didn't know real from unreal?

A She stated she often didn't.

Q Okay. Did you conclude or did you simply report to your team that she had said that she didn't know real from unreal?

A That's what she reported and that's what I reported.

Q So you reported it to the team but you didn't conclude that?

A I didn't know yet.

Q Okay. Did you write it in the report that you wrote to them in March of 2005?

A I think I wrote down "doesn't know."

Q Okay. But it was on your letterhead with your signature. It surely looks like something that you endorsed because you put it in a letter, right?

A Can I see what you're referring to? Is it the letter to Ms. Hunt?

Q It is the letter to Ms. Hunt.

A Let me make sure I understand it in context. For ease, can you tell me what page it's on?

Q I'm sorry. I'm having contact issues. Doctor, I don't see it as I sit here. I guess I was asking more about the general principle. Did you report to your team in some way that she was experiencing difficulty knowing the real from the unreal?

A I did but I don't know that I included it in that letter.

Q You don't think it's in the letter. Would it have been in the accompanying notes that you took by your hand?

A I'm sorry. What?

Q Would they be in the notes that would have been in your file?

A Yes. There might have been notes in the summary of the interviews.

Q Thank you. I might have misspoke.

Timing-wise you were in this case from January of '05, shortly after the crime, until sometime in March of '05; is that correct?

A That's correct.

Q Do you know exactly when you got taken off the case or you were no longer on the case?

A I know that letter was the last thing that I did. I don't remember the date of Fred Duchardt's phone call to me.

Q If that letter was dated March 14th, 2005, it would be your recollection that would be about the end of your services in this case until we got to the postconviction side of it?
A That would be the last thing I did, yes.
Q During that time you indicated that you provided some competency measures and one of those was the MacArthur?
A Yes.
Q And that's basically the legal standard of competency for someone to appear in court and have a prosecution continue against them, correct?
A It's one of them.
Q It's one of them. And at the conclusion of that, did you have a conclusion whether she was competent at the time you tested her?
A Well, as I said, she was competent on the measures that that measures. The ability to assist counsel I was concerned about.
Q Okay. I believe in the notes that were provided it said that she was competent on all measures that she's been tested on at that point, correct?
A That's correct.
Q To be fair, when we get into March, what precipitated your letter on March 14th was I think you said you were fearful that she may be decompensating in a way in the future she might not be able to assist counsel?

A Correct.
Q And that was why you issued the letter to Ms. Hunt to try to seek some medication changes and housing changes and things like that, correct?
A Correct.
Q Okay. You indicated during your testimony and I think from some of the testing instruments that were given by either you or Dr. Willing, that at least in 2005, shortly after this crime occurred and when you were on the case, Ms. Montgomery in a number of different occasions indicated a willingness to accept responsibility to plead guilty, correct?
A Yes.
Q Again, we've made it clear that you were out of the case in March, or so, of 2005. You don't know what her state of mind was in 2006 or ultimately in 2007 when the case was tried?
A I do not.
Q You also indicated during your examination, Doctor, that Ms. Montgomery did not reveal to you or, I assume, Dr. Willing that Tommy Kleiner was present at or near the crime scene when Ms. Bobbie Jo Stinnett was murdered, correct?
A That's correct.
Q And had that been reported to you, you would have reported it to the team in some fashion?
A Correct.

Q Now, you also indicated, however, though, that you and Dr. Willing and the team had a conscious decision in place not to confront Ms. Montgomery about the facts of the case and the crime as it related to the interaction of Bobbie Jo Stinnett, correct?
A I think that there was the very -- I did some brief kind of overview stuff just establishing sort of baby steps towards there. I think I had had some brief discussion with her about it, but not extensive for sure.
Q Well, did you know that the team had -- that the team's position in early 2005 when you were there that they didn't want Lisa Montgomery questioned about the facts of the case? Did you know that?
A I don't remember an admonition about that.
Q Do you remember any of the team meetings that you participated in the discussion to send a letter to CCA, specifically to Dr. McCandless instructing her to stop asking questions about the sum and substance of the offense that's being charged?
A I certainly remember that and supported it highly. She was an inappropriate interviewer of that.
Q So though Ms. Montgomery did not report that Tommy Kleiner was present at the murder scene, to you it's not surprising that really wasn't an area that, A, you'd have delved into very deeply or, B, the team didn't want other

people to delve into at that time?
A Well, I think having Dr. McCandless not delve into it was a different issue than what the team was talking about.
Q Okay. So do you have a different recollection that the team wanted to confront Ms. Montgomery about the facts of the case at the crime scene?
A I don't have a clear recollection in either direction.
Q But it hadn't happened, to your knowledge, at that point? From your perspective you hadn't gotten into it very deeply yet?
A Correct.
Q Okay. You were asked to look at some of the neuropsychological testing and testimony as it relates to Dr. Martell; do you recall that?
A Yes. Well, I'd have to clarify for sure what you're talking about.
Q Okay. Well, you were asked specifically about some of Dr. Martell's testimony. Did you look at the work Dr. Martell did related to the neuropsychological testing that he did of Ms. Montgomery?
A I did not.
Q Okay. So you did not look at whether some of the validity scales that he employed while doing that testing showed symptom -- well, he showed malingering. You don't know because you didn't look at it?

A It isn't coming to mind what testing was that. I'd have to -- what particular test might help me reconcile.
Q It was the MMPI and came back invalid based upon the testing that he did.
A I may have seen that. I can't recall.
Q Okay. So though he testified, in your opinion, inappropriately about your test and conclusions, his own opinion about malingering can very well have been influenced by his own testing; would you agree with that?
A I would have to see his testing to know whether or not I concur with his interpretations.
Q And you haven't seen it to that degree to have an opinion?
A That's correct.
Q Were you ever asked to look at Dr. Kuncel's neuropsychological testing or evaluation?
A Yes, I did see hers.
Q When someone gives the MMPI, should they take -- do the test all at once?
A Obviously.
Q Okay.
A And I know Dr. Kuncel didn't.
Q And that's not the way it should be done, is it?
A It is not.
Q So if Dr. Kuncel gave part of the test here in Kansas

City and then waited another six or eight weeks and then gave the other half of the test while she was in Philadelphia?
A Completely a violation of the way it should be done.
Q Okay. Similarly, not just doing it half here and half in Philadelphia but the time frame is a problem, correct?
A Both of them are.
Q When you give the test Dr. Kuncel did, would you also ever tell someone to try to put themselves in a different frame of mind while answering the questions?
A No.
Q And isn't it true that Dr. Kuncel informed Ms. Montgomery to try to place herself at a moment in time different from when she was taking the test?
A Yes. That doesn't work.
MR. VALENTI: One moment, Your Honor.
THE COURT: Okay.
MR. VALENTI: That's all I have, Your Honor. Thank you.
MS. HENRY: No further questions.
THE COURT: All right. Thank you, Dr. Hutchinson. You can go home now or wherever you're going.
THE WITNESS: Good.
MS. HENRY: Your Honor, I would now note for the record that we have marked --
THE COURT REPORTER: Ms. Henry, I can't hear you.

MS. HENRY: I'm sorry. I apologize. I'm not usually so soft spoken.

We've marked the correctional interpretive report for the MMPI-2 as Movant's Exhibit 146 and the raw data for the Millon Clinical Multiaxial Inventory-III as Movant's Exhibit 147.

MR. VALENTI: No objection, Your Honor.

THE COURT: Received.

All right. Is that all for today?

MS. HENRY: Yes, sir.

THE COURT: Well, let's talk about tomorrow. I know Ms. Nouri needs to leave.

It's been conveyed to me through my courtroom deputy, Ms. Nouri, because of your brother's passing, you need to leave tomorrow at 3:30 or 3:45 at the latest.

MS. NOURI: Yes, Your Honor. I haven't been able to see my parents at all.

THE COURT: I totally understand that and I don't have any problem with you leaving whenever you need to. You know, I mean, we've had to stop a little early a couple of times this week; and, you know, I'm not -- I don't mean to be at all insensitive to your situation, but there are three attorneys representing the movant in this case, and I wonder if you could arrange your evidence tomorrow so that we could go until about four o'clock to try to minimize the amount of time

that Ms. Nouri might need to miss and also maybe arrange your witnesses so that does not present any more of a problem with Ms. Nouri being able to be apprised of the testimony or being brought up to date as to what took place.

MS. NOURI: Your Honor, I have a couple different thoughts about that, and I understand your point, but since I was appointed on this case, I don't want to put myself in the position where later it's interpreted that I wasn't present for something. I don't want to get myself in a problem later. I feel like I should be present. I can push it to 3:45 and maybe we could just skip the afternoon break somehow.

THE COURT: We'll probably all collapse if we tried to do that.

MS. NOURI: I just want to do what I think is right, Your Honor, and I don't want to get myself in trouble either, and I don't want anyone else to get in trouble.

THE COURT: I can't imagine how you could possibly get in trouble in that scenario. The difficulty is maybe we've got a witness on the stand and it's 3:45 and we've got 15 more minutes to go. Nobody wants that witness to have to come back.

MS. NOURI: I agree with you.

THE COURT: And so I'm trying to -- if we've got a witness and we're finished at 3:45 or you can see we're going to be finished then and you're comfortable with that --

MS. NOURI: Then I'll play that by ear.

THE COURT: -- then we'll stop. We won't go past four o'clock unless you all request that we do that for the sake of a witness.

MS. NOURI: Okay. I appreciate that.

THE COURT: And we'll try -- you all can, you know, try to conduct your examination and conclude your witnesses in a fashion that can accommodate your needs as best as we can.

MS. NOURI: I understand that. Thank you, Your Honor.

THE COURT: All right. Do you all want to weigh in on that at all?

MR. VALENTI: We're flexible. Whatever you need, Your Honor.

THE COURT: All right. So don't run out of witnesses at three o'clock.

MS. HENRY: No, sir.

THE COURT: You get people here and, you know, we'll get as much done as we can.

And, Ms. Nouri, I know it has to have been difficult for you to be here under this kind of pressure this week given that circumstance, and I appreciate your sticking in and seeing that we can get through this.

Nine o'clock tomorrow morning.

(Court adjourned at 5:10 p.m. until 9 a.m. Friday, November 4, 2016.)