UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

# TRANSCRIPT OF PROCEEDINGS - VOLUME V

BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 4, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:

MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:

MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

## I N D E X

Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

## I N D E X (continued)

Page

NOVEMBER 1, 2016

VOLUME II


RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

# I N D E X
(continued)

Page

NOVEMBER 2, 2016

VOLUME III


RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . . 761

## I N D E X
(continued)

Page

NOVEMBER 3, 2016

VOLUME IV


DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

## I N D E X
(continued)

Page

NOVEMBER 4, 2016

VOLUME V

CHRISTOS DAVATZIKOS
Direct examination by Ms. Henry. . . . . . . . . . . . 1120
Cross-examination by Mr. Valenti . . . . . . . . . . . 1165
Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG
Direct examination by Ms. Henry. . . . . . . . . . . . 1182
Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE
Direct examination by Ms. Henry. . . . . . . . . . . . 1245
Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL
Direct examination by Ms. Henry. . . . . . . . . . . . 1255
Cross-examination by Mr. Valenti . . . . . . . . . . . 1290
Redirect examination by Ms. Henry. . . . . . . . . . . 1302

## I N D E X
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

# I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864

I N D E X
(continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

I N D E X
(continued)

Page

NOVEMBER 10, 2016

VOLUME IX

FRED DUCHARDT
Direct examination by Ms. Harwell (cont'd.). . . . . 2263
Cross-examination by Mr. Ketchmark . . . . . . . . . 2273

BEN LEONARD
Direct examination by Ms. Henry. . . . . . . . . . . 2324
Cross-examination by Mr. Valenti . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . 2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Diane Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

# INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |
| FOR THE RESPONDENT: | | | |
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

NOVEMBER 4, 2016

MORNING SESSION

(Court in session at 9 a.m.)

THE COURT: Ready, Ms. Kelley?

MS. HENRY: Yes, Your Honor.

THE COURT: I mean Ms. Henry. I'm sorry.

MS. HENRY: That's okay. I'll answer anyway.

MR. VALENTI: Your Honor, in general, I'd like to put one objection on the record, if I may. If I understand Dr. Davatzikos' -- if I said that correctly -- and about Dr. Newberg's testimony --

THE COURT: Okay. Could you pull the microphone over.

MR. VALENTI: Your Honor, as I understand Dr. Newberg and Dr. Davatzikos' -- if I said the name properly -- testimony, they essentially are PET scan and MRI experts that provided raw data to Dr. Gur, and I guess there's an allegation about Dr. Evans and Dr. Mayberg. What Dr. Evans and Dr. Mayberg may have testified to in a Daubert hearing, quite frankly, I don't think is relevant at this point given that ultimately Dr. Gur was unable to provide the raw data that led our experts to recreate what he did, and that evidence was ultimately ruled as not admissible and he did not testify in the case. So I don't believe that this is in any way germane to the issues before the Court, and I don't believe that Dr.

Newberg or Dr. Davatzikos need to testify.

THE COURT: Ms. Henry.

MS. HENRY: Your Honor, you've specifically granted an evidentiary hearing -- I'm sorry -- Your Honor has specifically granted us an evidentiary hearing regarding whether or not counsel -- trial counsel was ineffective in their presentation of evidence at that Daubert hearing.

In addition, Your Honor has given us an evidentiary hearing regarding whether or not Drs. Mayberg and Evans presented false testimony and false information to counsel in the underlying criminal case.

Dr. Davatzikos and Dr. Newberg were not just individuals who provided raw data, they also provided analysis upon which Dr. Gur relied.

We believe once the Court hears their testimony, they will understand why trial counsel were ineffective in failing to present their testimony and their expertise at the Daubert hearing in order to more fully inform the Court about the relevance of the MRI data and the PET data.

I would also note that the Eighth Circuit Court of Appeals in the case of U.S. v. Montgomery found that this court erred in excluding the PET analysis at the trial; but, nevertheless, found that error to be harmless.

Because we have been granted a hearing on ineffective assistance of counsel with respect to that PET

data, we will be able to establish that had counsel been effective in presenting the evidence to the Court, had counsel presented to the Court accurately the nature of the discovery dispute, had counsel explained to the Court the difficulty in obtaining what I believe Mr. Duchardt referred to as the sushi data, the Court would not have ruled the same.

Moreover, we have argued that trial counsel was ineffective in attempting to use the MRI analysis and the PET analysis in the first phase of the trial, and had they limited their request to admit the PET data and the MRI data to the penalty phase, there wouldn't have been the need to begin with.

Further, I would note that we had a trial conference on October 14th. I requested a pretrial conference be set back in January for the purpose of being able to brief and argue any legal issues that may be raised by the government.

THE COURT: Okay. Well, I'm not going down that road. It doesn't matter that someone brought it up in the pretrial conference. It's brought up now. I mean, if the objection's made and it's legitimate, I'm supposed to ignore it because it wasn't made earlier?

MS. HENRY: No. I'm simply saying that if there's some issue later should the Court rule this evidence is inadmissible or find my argument not to be sufficient. I'm just merely letting the Court know I am responding orally on my feet to an argument made the morning of this witness'

testimony.

If the Court needs further briefing, analysis, and legal research in order to take the evidence, I will certainly request to do it.

THE COURT: I'm going to let you present the testimony, and I'll take it pursuant to the government's objection.

MS. HENRY: Thank you, Your Honor.

Movant calls Christos Davatzikos.

CHRISTOS DAVATZIKOS, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good morning.

A Good morning.

Q Dr. Davatzikos, if I'm pronouncing your name correctly.

A Yes.

Q Could you please introduce yourself to the Court, and please spell your first and last name for the court reporter.

A I'm Christos Davatzikos, C-h-r-i-s-t-o-s. Last name, D-a-v-a-t-z-i-k-o-s.

Q Dr. Davatzikos, what is your occupation?

A I'm a professional radiologist at the University of Pennsylvania, and I direct a research center for brain imaging analytics. I also hold a dual chair. I have joint dual appointments in other departments.

Q May I ask you, Dr. Davatzikos, if we could explore your educational history, please. Where did you receive your bachelor of science?
A I got my bachelor's at the National Technical University of Athens, Greece. And I got my master's at Johns Hopkins University, my Ph.D. at Johns Hopkins University, and then my postdoctoral fellowship at the Johns Hopkins School of Medicine.
Q And do you currently hold a number of faculty appointments?
A Yes.
Q All at the University of Pennsylvania?
A Yes.
Q Can you, for the record, set out what your faculty appointments are?
A My primary appointment is in the Department of Radiology at the School of Medicine, and my secondary appointments are in engineering departments; biomedical engineering, electrical engineering, and also applied math at the University of Pennsylvania.
Q Do you work in the Penn Neurodegeneration Genomics Center?
A No. I don't work in that center actually.
Q Your CV --
A Yes. Actually I do collaborate with the Center of

Neurodegenerative Diseases.

Q I apologize. And you're affiliated faculty; is that correct?

A Yes, in the Center of Neurodegenerative Diseases.

Q Okay. Thank you.

And I think we talked before that if I'm going to misstate something in a question, I absolutely want you to correct me. I'm glad you did that and we'll continue to do that.

A Sure.

Q Can you describe -- are you the director of any lab at the University of Pennsylvania?

A Yes. I direct the section of the Biomedical Image Analysis. Also I direct the center which is an overarching entity of bridges across many departments, the Center for Biomedical Image Computing and Analytics.

Q What is the Center for Biomedical Image Computing and Analytics?

A So it is a research center that was created a few years ago to integrate a number of activities at the University of Pennsylvania that revolve around the topic of quantitative and rigorous analysis of medical scans. Primary emphasis is MRI scans of the brain, and that came out of a need to come up with more rigorous and quantitative ways of interpreting brain MRI scans beyond looking at the scan and saying it looks like X or

Y. So a number of diverse scientists and clinicians work together to apply modern, sophisticated, advance, quantitative analysis methods for MRI scans primarily.

Q And you are the director of that department?

A Right.

Q Has that department received any awards or special recognitions?

A We receive different types of awards, a number of research funding awards from NIH. Yes, invited lectures.

Q So what does NIH stand for?

A NIH is the National Institutes of Health. It's the center that essentially oversees and administers the majority of research funding in the biomedical field, including, of course, our field.

NIH is a component of a number of institutes, such as the National Institute on Aging, National Institute on Drug Abuse, and so forth, Mental Health, which specializes in different diseases and disorders, and they fund respective research projects.

Q So the United States government -- an arm of the United States government provides funding to your center?

A Right.

Q And you have to apply for that?

A Yes. It's a competitive application. Usually about 10 percent of the grants are funded. There are applications three

times a year, and we apply and essentially are peer reviewed and eventually decisions are made at NIH.

Q And you stated you were also and have been since 2002 the director of the section of Biomedical Image Analysis?

A Right.

Q What is Biomedical Image Analysis?

A That's a -- that's one of the bigger labs that's a part of the center, and that now is the section -- is the section in radiology that, again, deals with the use -- the development and the use of advanced quantitative image analysis methods that will interpret MRI scans, including brain MRI scans.

Effectively, we're looking to convert the visual interpretation of MRI scans to a quantitative panel, if you will. Pretty much as you go and you have your blood work, you have your -- a number of other tests to come up with numbers.

Besides numbers we do the same thing with MRI scans. You can now apply this computer-assisted quantitative methods that give you a set of numbers that capture your brain anatomy or your brain function; and, therefore, you can do more rigorous analysis that is compared with normative data, and so forth. So this is the purpose of this section.

Q And you've been the director of that section since 2002?

A Exactly.

Q But you've also been engaged in that research for a

number of years; is that fair to say?

A Yes. My postdoctoral training was in 1994. After that, I've been faculty appointment in each of the -- initially as assistant associate professor at Johns Hopkins Medicine, then I was recruited to head this section.

Q And University of Pennsylvania, as the name might suggest, is a teaching hospital; is that correct?

A Yes. It's an academic institution that has teaching, clinical practice, and research.

Q So do you actually have students who you teach?

A Yes.

Q Where does the University of Pennsylvania's MRI center rank in terms of world recognition? Is it a world-renowned institution, in other words?

A Yeah. Well, we want to think so. According to the rankings, we are No. 2 or 3. So it's a Harvard standard and Penn is the leading institution in imaging. Penn is an ivy league university, obviously.

Q In addition to your work as the director of these different labs and your various faculty appointments that are current and have been ongoing, have you received any awards or honors in your field?

A Yes, a number of them. I mean, I --

Q Could you share with his Honor the awards that would be the most relevant to what we're talking about here today, the

quantitative analysis of an MRI?

A Yes. Perhaps most relevant is that I was elected fellow with the American Institute for Medical and Biological Engineering, which is an honor given to only 1 or 2 percent of people in the field. Also I've been elected fellow which, again, is a similar honor for people with electrical engineering, computer science background.

Q Have you published in the area of quantitative analysis?

A Yes.

Q I have in front of me your curriculum vitae, which is Movant's Exhibit 35, which has already been introduced into evidence. I believe it's 65 pages long. Most of it is your writing; is that fair to say?

A Uh-huh.

Q I'm sorry. You have to say yes or no.

A Yes.

Q So you're a prolific writer in your area?

A Yes. I have approximately, if I remember correctly, approximately 350 publications and 21,000 citations. So people in the field refer to my work in their own applications.

Q You've been cited 21,000 times?

A Right.

Q And have these articles that you've published been published -- maybe not all of them or maybe all of them have --

in peer-reviewed journals?

A They are -- yeah, all the journal publications are in peer-reviewed journals.

Q And have you received a number of grants from NIH and other institutions?

A Yes. Our center now has approximately $5 million a year of awards from NIH.

Q And are you a member of any professional societies?

A Yes. The ACRIN Society, the Human Brain Mapping Society, different institutes related to different aspects of my work.

Q What is the brain mapping?

A The Organization for Human Brain Mapping is one of the professional organizations. Perhaps it's most related to this that bridge together a diverse group of scientists and clinicians who are interested in the brain structure and function. Some are people like me. Some are neuroscientists and neuroanatomists, neuropsychologists, and so forth, and that's the society that is aiming to better understand the structure and function of the brain and link the alterations of changes and structure function to different diseases and disorders and to behavior.

Q In addition to your professional work for the University of Pennsylvania and your work on these various committees, do you also have a small independent consulting

practice?

A Right.

Q What is the nature of that practice?

A That is like cases like this. Sometimes I'm called in. Most of the time just people -- or some of the times it's cases like this or some of the times it's cases of traumatic brain injury and people obtain MRI scans. People will have behavioral problems or develop behavioral problems or cognitive problems after an accident. They have MRI scans taken. Sometimes they come to me and they ask for a detailed evaluation of the MRI scan.

Once I perform analysis similar to the one I performed herein, I report basically whether or not the MRI scan is normal or abnormal or in what way it is abnormal.

Q And you also have done some medicolegal work in criminal cases; is that correct?

A Yes.

Q And has that always been in conjunction with Dr. Gur?

A The criminal cases for the most part have been with Dr. Gur. The traumatic brain injury cases are separate.

Q The traumatic brain injury cases tend to be with the civil bar, civil cases?

A Yes.

Q That distinction probably doesn't mean a whole lot to you, but people suing for money. Is that usually the

circumstance?

A Yes.

Q When you work with Dr. Gur on these medicolegal cases, how much of your professional time does that take up?

A It usually takes, you know, several hours to look at the MRI, to look at the documents, analyze and provide a report, and sometimes I have to report to court to explain what I did.

Q Would you estimate that's a fairly small amount of your professional work?

A Yes. That's certainly a small amount. The University of Pennsylvania has a rule that allows faculty to consult one day a week, basically, roughly. That's certainly less than one day a week for me.

Q You're allowed up to a day a week but you do much less than a day?

A Yes. These cases do not appear every week.

Q How often have you testified in court?

A Probably ten times, 12.

Q So that's not a frequent occurrence for you?

A No. Most of my reports go in as reports; and then if I need to testify, I report in.

Q Oftentimes is it true that your reports go to another member of the multidisciplinary team and that person ends up presenting your work?

A Exactly. Dr. Gur has presented, for example, most of the criminal cases with the data.
Q So you work collaboratively with him, provide him the data based on your expertise, then he uses his expertise to interpret it?
A Exactly. Exactly. The brain is a very complex organ and behavior is very complex, and you need to look at it from different aspects, and different people are experts in different aspects of the brain and its workings.
So I'm an expert on computation of neuroanatomy. So I can tell you very well how the brain is structured, if it's abnormal. Someone else might look at function using PET images or MRI. Someone else might look at the cognitive tests; and someone, like Dr. Gur, who has the biggest picture of the psychology perspective and clinical neuropsychology perspective can tie them all together to interpret the findings. Pretty much like you go to your PCP, you know, they can request a lab test from lab X and another lab test from lab Y or with a specialist to do analysis, then they tie it all together to make a diagnosis to interpret the findings.
Q When you say PCP, as a criminal defense lawyer, I think drug. You mean primary care physician?
A Yes. Sorry.
Q I want to make the record clear.
Dr. Davatzikos, in the relatively small amount of

times you've testified in court, have those jurisdictions been in federal and State court? Do you know which jurisdictions?

A Both. It's been in both, yeah.

Q Have you ever had your testimony not accepted? In other words, any Court found you not to be an expert?

A No. There have been discussions about it being accepted or not, but it's all been accepted.

MS. HENRY: Your Honor, at this time --

Q (By Ms. Henry) I should ask you, Dr. Davatzikos, does Movant's -- I'll put it on the Elmo so you can see what I'm talking about -- Movant's Exhibit 35, does that appear to be an accurate copy of your curriculum vitae as it existed in October of 2016?

A Yeah.

Q And that is 65 pages in length?

A Yes.

MS. HENRY: Your Honor, at this time I would move Dr. Davatzikos to be accepted as an expert in the area of -- let me get the right word.

MR. VALENTI: Computational neuroanatomy.

MS. HENRY: Correct. That one, yes.

MR. VALENTI: I would accept it on that but I have one question, Your Honor. Has he authored a report in any way?

Q (By Ms. Henry) Dr. Davatzikos, have you independently authored a report or did you provide your data to Dr. Gur? In

other words, have you written any report in this case?

A Both. I provided the data and I wrote him an explanation. I'm not sure how much of that he incorporated in the report or he rephrased it.

Q So you gave it to Dr. Gur and this was the final report, Movant's Exhibit 29?

A Yes.

Q Then you also provided the data that Dr. Gur used at the original trial in this case --

A Yes.

Q -- regarding the MRI?

A Yes.

Q And when you say "provide a report," this item here, Figure 2, this was your original report to Dr. Gur?

A Right.

Q And then you have subsequently performed a re-analysis of the MRI data; is that correct?

A Yes. Exactly.

Q And that's on page 1 --

A Yes.

Q -- of Movant's Exhibit 29; is that correct?

A Yes.

Q So you provided that data to Dr. Gur and discussed it with him; is that correct?

A Yes. Correct.

MS. HENRY: Your Honor, I move Dr. Davatzikos be accepted as an expert in computational neuroanatomy.

MR. VALENTI: No objection.

THE COURT: I'll consider his opinions.

Q (By Ms. Henry) Dr. Davatzikos, I think we have established that you provided the quantitative analysis of the MRI in Lisa Montgomery's case to Dr. Gur upon which he relied on in his reports in August, September, October of 2007 and later January of 2008, all of which are contained as a collective exhibit, Movant's Exhibit 28.

Though you provided that information to Dr. Gur on behalf of Lisa Montgomery, were you ever contacted by an attorney for Lisa Montgomery at the time? His name was Fred Duchardt. Do you know that name?

A I do not recall that name.

Q Did a gentleman by the name of John O'Connor ever contact you on behalf of Lisa Montgomery?

A Back in 2007, you mean?

Q Yes.

A The name doesn't ring a bell. I don't remember.

Q In fact, isn't it true that the only attorney acting on behalf of Lisa Montgomery who's contacted you has been myself, Ms. Harwell, and Ms. Nouri?

A Yes. Back then from what I recall I gave Dr. Gur my report and numbers, and he continued on everything else. I

didn't have any -- I didn't appear in court or have any other contact.

Q No one asked you questions to explain how you performed your analysis or reached the conclusions that you reached; is that correct?

A Correct.

Q And no one questioned you about your methodology?

A Correct. I mean, Dr. Gur might have asked me.

Q No attorney?

A Yes.

Q Dr. Gur might have consulted with you about your methodology once it came into question?

A Exactly.

Q Have you subsequently had -- and when I say "subsequently," I mean this year, had an opportunity to read the reports of Dr. Mayberg and Dr. Evans that criticized your methodology and your quantitative analysis and interpretation of the MRI in this case?

A Yes.

Q And so now I would like to back up a little bit. For purposes of the record, we've been using the phrase "quantitative analysis" and "MRI" and a lot of technical terms. If you could, for the record, sir, please explain exactly what -- I think we know what an MRI is. We all have seen an MRI, but what is a quantitative analysis in relationship to an

MRI?

A Okay. So the MRI scans are obviously complex and some of the things -- some of the diseases can be seen very easily, and this is what is done in the majority of the radiology practice. For example, if you have a stroke, your MRI scans shows a black spot in the middle, which is dead tissue, because after a stroke, you have a tumor, you have something that has different characteristics, if it has -- it's pretty obvious. It's essentially an abnormality that sits in the middle of a normal brain. If you have a multiple sclerosis lesion or lesions, then you see that as well. That constitutes the majority of the clinical practice of radiology.

Over the past 20 years -- and I was one of the lucky people to enter that field back in the early '90s -- people realized there's a lot more that can be seen in the MRI. In particular, many brain diseases, such as Alzheimer's disease, such as neurodevelopmental disorders, neuropsychiatric disorders, such as schizophrenia, bipolar disorder, ADHD, a number of other brain disorders and diseases would effectively constitute the majority of what you might be interested in in the neurology and psychiatry practice.

They are not -- they're not manifested by obvious lesions in the brain. So there is a need for more accurate, more precise and quantitative analysis, meaning that instead of looking at your blood, then saying is it normal or not normal

or does it have high cholesterol. No. You have to run it through some lab tests. Same with an MRI. You have to make precise measurements and see if something is slightly abnormal in the brain and that would actually affect your behavior, your cognition, so forth.

So this is what these quantitative analysis methods do. They take an MRI and they perform extensive, precise and reproducible measurements and come up with a set of numbers, a panel that tell you that this part of your brain has volume X and activity Y and whatever you want, and then that part of the brain is in sections. That part of the brain looks like that. And then that's how it compares with, for example, normative range. Just pretty much like the brain growth charts. You go to the doctor. They measure some very basic things. But we measure a lot of things about the brain.

Q I want to ask you about this concept of normative group. Am I understanding your testimony correctly that you use this state-of-the-art quantitative analysis in order to compare a patient's brain, the numbers that you get, with a normative sample?

A Yes.

Q And how are these normative samples obtained?

A So the normative samples -- and this is something that has changed since 2007. The normative samples are obtained via a number of research studies that typically enroll patients and

healthy controls. What you want to study is how a disease affects your brain. You want to enroll patients with that disease but you also want to enroll healthy controls who don't have disease and have been screened for basically an abnormality.

So we pull together all these healthy controls, and I have collected the database of about 700 people over the years. Our group is one of the best-known groups in the field internationally, so we receive a lot of these. We are the central imaging analytics center for a number of multi-sites that take place in different parts of the country, over the world, actually. We get the MRI scans. We analyze them. We send them back numbers. So out of all of these controls we have collected a database of 700 of these cases now. We have thousands of normal controls that have been used in different studies. And they are different ages. And, of course, both males and females.

And so I was able to pull from that normative database people who are around the age of Ms. Montgomery in this case and compare her MRI scans with the respective normative relation. So it is very important to have these normal controls and to have an appropriate range of them, because if I tell you that your cholesterol is 300, unless I tell you something else, you won't know what that means. If I tell you the majority of people who are healthy have a

cholesterol less than 200, whatever the category is, then you know that it's an abnormal cholesterol level; but if the normative range was from zero to 1,200, then you're fine. So you have to have this comparison measure.

Q Is that normative group, as you've described it, did you use the state of -- the most up-to-date normative group -- I'm using the wrong words. Is the normative group that you used in your analysis of Mrs. Montgomery in 2007, was that state-of-the-art at the time?

A At the time, yes. At the time we had a much more limited database of normative controls. As I said, a lot of this field has evolved over the past 15, 20 years. So at the time we had a more limited set. Now we have a much broader set.

Q But in 2007 when you were using the best data available, was your practice generally accepted in your field of MRI analysis, quantitative analysis, and neuroanatomy?

A Yes. Yes.

Q Did you feel comfortable in 2007 that you were able to produce reliable and scientifically acceptable results in your quantitative analysis and interpretation of Mrs. Montgomery's MRI?

A Yes, I did.

Q Now, I want to ask you, before we get into what you actually found with Ms. Montgomery's MRI in 2007 and

foreshadow -- I know there's been a re-analysis in 2016 with the more robust group, but sticking just with 2007 for right now, have you become aware of the criticisms of your methodology that were levied against your methodology by Drs. Mayberg and Evans with respect to your interpretation of the MRI data in this case?

A I have read the -- yeah, I've read the discussions from the court proceedings. I'm not sure if it was a criticism to my methodology or criticism using one standard deviation or something different.

Q I want to talk about standard deviations for a little bit, if we can. There are some concepts in math and statistics that I've been learning a lot about. They're not intuitive. So can you explain for the Court in ways that someone with an English major like me can understand what a standard deviation is?

A Yes. Let me see how best to explain that. So the average height of men in the U.S. is about five-ten. If all men in the U.S. were exactly five-ten, the average would be five-ten and the standard deviation would be zero. So there would be no deviation from that mean. But if men's heights varied from, say, 5 feet to, you know, 7 feet or to 6-something, then there is a large standard deviation, which basically means the average is five-ten but people can have variable heights, and the standard deviation is one measure of

how much variability exists in people's height in the population, in the main population in the U.S. So that's an example of what it means, basically.

Q So once you start to see variability in the standard deviations as a scientist, do you start to, in a clinical sense -- we're going to talk about the difference between clinical significance and statistical significance in a minute. But as a scientist, if you begin to see variability in the standard deviations in the data that you are able to produce, does that start to raise questions in your mind about whether or not there's some abnormality present or the data might be suggesting there is an abnormality?

A Well, you have to understand the variability of the population in order to be able to judge whether or not the specific measurement from a specific person is abnormal. So if you're given a number that your cholesterol is 240 and the average cholesterol in the population is 200 and the standard deviation is maybe 20, then you know that 240 is very abnormal; but if the standard deviation is 100, then you have 200 plus a hundred is 300, so 240 is well within this range. So it's not abnormal. So that's how you use it, basically. You have to take into account both the average and the standard deviation to be able to tell whether or not a given measurement from a given person is normal or abnormal.

Q When you performed a quantitative analysis, which you

performed in an MRI, and provide that data to Dr. Gur, I take it from our discussions that you would agree that volumetric analysis of an MRI in and of itself that suggests an abnormality is not going to be diagnostic, but it's going to be a piece of information that an ultimate diagnostician could use to either rule out or rule in the possibility of an abnormality?

A Yes. Brain diseases and disorders are complex. As you correctly said, brain volumes or volumes with specific structures of the brain are part of the picture that you want to put together. For example, people with Alzheimer's disease have very pronounced loss, shrinkage of one part of the brain, which is called the hippocampus, which is responsible for memory.

You also have other changes in different parts of the brain as well. They also have functional changes. They have cognitive changes that match the profile of an Alzheimer's patient. So memory, loss of spacial, temporal, spacial abilities and all these things. So loss of volume of this part of the brain is one very pronounce feature, but it's not the only one. You have to put it together with other parts, both functional and behavioral or cognitive to be able to create a bigger picture.

And then, of course, in the cases where there is a diagnosis, for example, in Alzheimer's there is a diagnostic

criteria, then you come up with a diagnosis. In other areas of brain injury there is no diagnosis right now, but there's still -- there's a consensus that there is a number of brain changes that are associated with some brain injury; therefore, people take those into consideration when they consider the clinical picture of a patient.

Q So, for example, with football players who get concussions, if they get a concussion and you get a clinically significant finding on an MRI and their behavior has changed and they do a PET scan and there's some functional changes, you can be pretty sure that those things wouldn't all be occurring at the same time. It wouldn't be statistically probable they would be happening but for that concussion?

A Right. Exactly. I mean, it could be that your brain volumes are in the bottom 10 percent, but if your brain function is also compromised and if you are a football player and you have a history of concussion and if you have cognitive decline, then it is an extremely unlikely event to happen other than the TBI, traumatic brain injury.

Q I'd like to turn our attention now to the volumetric analysis that you performed on Lisa Montgomery's MRI data in 2007. Let me ask you this: The computer that is spitting out the numbers that you're using, it doesn't know who the patient is, right?

A Yes. It doesn't.

Q The numbers are what the numbers are?
A Exactly.
Q It doesn't matter whether the patient is charged with capital murder or they're a housewife?
A Exactly.
Q I placed on the screen -- what have I placed on the screen?
A These are -- statistical measure called a Z-score, and I'll explain that, but essentially it's a measure of how normal or abnormal the brain structure is of different parts of the brain. Let me first actually -- because we've been talking about brain structures and parts of the brain, let me explain -- could I explain --
Q Please do.
A -- as a background because people might not be familiar. So the brain is pretty much analogous to our body. It has many small organs. It's a single organ but it has many structures, like the heart, the stomach. They each perform a different function. So there's a part of the brain that controls -- literally controls this finger, another part controls that finger, another part controls my tongue, and another part that understands -- that interprets someone speaking, another part that controls my heart rate, and so forth. So it's a very complex organ that has suborgans, if you want, which we call structures.

It's important not to look at the whole brain as a whole because if you look at the whole body, you don't get -- it could be only your heart has a problem. You have to specifically look at different parts of it. That's what we do with the brain. We measure different brain regions, each of which has a different functional meaning.

As I said before, here we use some broad, very widely accepted partitions discovered 150 years ago by neuroanatomists. The frontal, the temporal, the parietal, so forth, these are different parts of the brain. Roughly speaking, the frontal is where the executive functions take place. Temporal is where a lot of the memory and language take place. The parietal is an area which is related to synthesis of different signals from our environment. It integrates, synthesizes -- it's a complex brain region. The medial area, which you see there, is -- it controls emotions and fear and other aspects of our behavior. It's a very important area of the brain as well, and so forth.

The ventricles are the converse of the brain. It's the lack of brain, if you want. Ventricles are a cavity in the brain which is filled by fluid; and whenever we lose brain, the ventricles get bigger. They fill up the space. So big ventricles are not good in general. So this is what I'm showing here.

As I said earlier, measuring the volume of a brain

structure doesn't tell us much. We have to compare it to normal population, and we do that by creating what we call Z-scores. If a Z-score, which is plotted here in the graph, if it's positive, it means that particular brain structure is above average. If it's negative, it's below average. So what you see here is that the parietal and the medial part of the brain are below average.

Q And can you tell anything about the ventricles from this particular graph?

A The ventricles are above, way above average. So they are large. That indicates there has been loss of brain, and that loss has been substituted by fluid, basically, by a cavity.

Q And at the time in 2007 when -- there are -- there's a red line and a blue line. What do those represent on the chart?

A Oh, this is the left and right hemisphere of the brain. The brain is generally symmetric, but we like to look at them sometimes separately because they're slightly asymmetrous. Some parts of the -- some functions are asymmetric such as language, which resides on the left part of the brain.

Q So you have indicated here this is the volumetric analysis with respect to Lisa Montgomery's brain structure in 2007, and you found significant findings in the parietal lobes?

A And medial and ventricles.

Q The parietal, the medial, and the ventricles?
A Exactly.
Q And you found those -- what's a Z-score? And what's a Z-score in relationship to a standard deviation?
A A Z-score minus one would be one standard deviation below normal. A Z-score above would be one deviation above normal. So the ventricles here are about one standard deviation above average.
Q In 2007 when you were performing your volumetric analysis on Lisa Montgomery's MRI data, did you and Dr. Gur note that Mrs. Montgomery's brain had an unusual structure?
A Yes.
Q And what did you mean by that?
A So the unusual structure -- again, let me give a little bit of background information. Different parts of the brain -- some brains are larger and some brains are smaller, and usually when a brain is larger, all of its substructures tend to be larger. When it's smaller, all the substructures tend to be smaller.

What you see here in Ms. Montgomery's brain some areas are way above average, so the temporal, the frontal, and the occipital areas. Some areas like the parietal and medial are well below average. So that's actually -- it's not only the actual numbers but the contrast between some parts of the brain seemingly intact and some other parts of the brain

seemingly affected. This contrast makes it a lot more abnormal than the actual numbers indicate.

In our analysis this year in 2016 I performed a ratio analysis where I divided each of the total brain volume and you can see a lot more significant, which is essentially a way to amplify what you see here in the graph where some of the regions are up and some are down.

Q And so it's not only Mrs. Montgomery compared to a normative sample but you're also very interested in seeing the variability in the brain structure itself?

A Exactly. Let me give you an example that sometimes people understand easy. If I measure someone's length and it is 1 meter, that's well within normal range. That's the left leg and I conclude that's normal. Then I measure the right leg and it's 1.2 meters. That's also within normal range. But if you contrast the two, you say this is not normal. This is very unusual to have such an asymmetry in the length of your legs. This is something analogous here that each of these measurements could be within normal range but the contrast between them is really not.

Q And the ventricles, for example, you found to be clinically very large?

A Right.

Q Which you said is not good?

A Right.

Q Indicating that either there's been brain loss or there was never a brain there to begin with; is that correct?
A Yes.
Q And although not diagnostic in and of itself, does quantitative analysis like this, the unusual brain structure that you saw with Ms. Montgomery in 2007, at least raise questions that require further investigation in terms of whether or not this variability or contrast in the results could be the result of a neurodevelopmental disorder or a psychiatric illness or some sort of a traumatic brain injury?
A Correct. It's like if you go to the doctor and they do an EKG and they find something that looks unusual. That's a test that tells you that something is abnormal in your heart rhythm, then you have to put it together with other measurements. Is a person getting out of breath frequently? Are there other signs? Lightheadedness, stroke, whatever. There could be a number of other things that could be associated that put together might make a more complete picture. So this is like an EKG. It's sort of an abnormality in your heart rhythm. You have to put it together with other pieces of information.
Q And the putting it together is something that other people do. You give them this piece of scientific data and then they put their expertise together with that data?
A Exactly. Exactly.

Q Is the analysis that you performed that is expressed in Movant's Exhibit 28, as we see up here on the screen, I believe it was Figure 2 in the April 3rd, 2007, report of Dr. Gur, was that generally accepted science?
A Yes.
Q I want to ask you, before we move to the 2016 re-analysis, which I want to talk about for sure, I want to ask you about the difference between what is clinically significant and what is statistically significant. Am I correct in understanding that statistical significance is the type of significance that is required in order to make scientific conclusions that end up in textbooks, things like that?
A Yes.
Q I didn't explain that very well.
A Yes. When you establish, say, a scientific truth, for example, the earth revolves around the sun, you have to take measurements, you have to put them together, and you are 99.99 percent sure that it's proven, and then it goes through the textbook. You said and everybody knows that the earth revolves around the sun. You heard there's no objection there.
Obviously the level of certainty there has to be extremely high, basically a hundred percent. In the clinic when you run a test like this or other tests, you can never be a hundred percent sure. You examine different tests and you get different hints and you have to put it together into what

is the most likely interpretation and what's the most likely cause of whatever symptoms are there.

So that's why, of course, in a clinical environment you're not expecting to reach a 99.99 percent certainty but, again, like I said, to come up with a more plausible explanation, and that's, I think, what the difference between clinical significance is and statistical significance in the concept of scientific discovery is.

Q So if you were a mental health professional and you received your quantitative analysis on Ms. Montgomery and the report said possible nerve developmental problem, possible brain injury, possible psychiatric illness, then that mental health clinician would want to check the history and see --

A Exactly.

Q -- has there been a concussion? Was there in utero alcohol exposure? Was this person subject to head injuries? Showed symptoms of psychiatric illness? All those things?

A Exactly.

Q And then that would -- we begin to narrow down the probabilities by adding that additional data?

A Exactly.

Q And you'd follow the person's behavior?

A Yes.

Q To see if --

A To see if the behavior matches, to see the measurements

that you have to higher certainty that these two are related.

Q So it's a step-by-step process?

A Exactly.

Q Dr. Davatzikos, I'd like to turn your attention now to the re-analysis, which is reflected -- let me ask you about 2007, then we'll move to 2016. With respect to 2007 the report -- Dr. Gur wrote a report that was submitted to his Honor and to opposing counsel where he expressed opinions with respect to the neuroanatomic findings, in other words, the MRI and the quantitative analysis that you performed. Have you read those reports?

A Yes.

Q And do you agree with Dr. Gur's opinion with respect to your portion of that analysis, your quantitative analysis of Mrs. Montgomery's MRI?

A I do agree, yes.

Q Did you agree at the time?

A Yes.

Q And if you had been called to testify before his Honor in 2007, would you have been able to give the same testimony that you have given us here this morning?

A Yes.

Q Now, I'd like to move on to 2016. Is there a concept in your profession known as a pipeline?

A Yes.

Q What is the pipeline?
A Well, I don't know if it's formal or an informal way but people -- because of all of these analyses, methods have become complex and multifaceted, we put together a more complex analysis, which is called a pipeline, basically. So it's a number of steps that are applied to analyze an MRI scan, and this together informs each other and they reach a conclusion. They give some output. This is what a pipeline is basically.
Q And I think you mentioned earlier in your testimony that now in 2016 -- in 2007 your database had some 700, I think you said, and now --
A In 2007 we had a limited database, a broader age range. It was -- I don't remember exactly -- on the order of 50 people, but the important thing was that it was from ages 18 to 50-something. So we just didn't have healthy controls at the time to -- so we used a broad range. In 2016 I used a more specific range from 25 to 50, and I think Ms. Montgomery was 39 at the time of this.
Q So I jumped about five steps ahead of myself and I apologize.
A All right. Maybe I did.
Q I did that. It's my fault. Except you're a scientist and I'm an English major.
When you performed the analysis in 2007, out of the

database that you had, you wanted to pull out a normative sample that matched Mrs. Montgomery's demographics as closely as you possibly could?

A Yes. But you also want to have enough of them to be able to do statistics; because if we just had ten people around her age, that wouldn't be sufficient for us to draw conclusions.

Q So scientifically you needed a sufficient enough sample?

A Exactly.

Q And in order to do that you had to have a broader age range?

A Exactly.

Q Which was 18 to 50?

A 50 -- I believe, if I remember, actually 59 or something like that.

Q Ms. Montgomery was 39?

A Yes.

Q Now you have a more robust database; is that fair?

A Yes.

Q And so were you able to narrow the age range of the normative group with Ms. Montgomery?

A So I picked up women -- it was 49 women ages 25 to 50 and evenly distributed, so it's a -- we have the larger -- or the ability to do that because we have a lot of people now, and

that gave us a much more precise measurement of normative range for her gender and age.

Q And the sample -- I think we've used the word "normative." I just want to be clear. The normative sample is of normal people who have normal brain functioning?

A Exactly.

Q And did you --

A Normal brain function. Also have been screened for traumatic brain jury, other disorders, or things that could place them in the category of possibly of normal people.

Q So what we traditionally think of from our sixth grade science class is a control group?

A Exactly.

Q Okay. And I'm going to place on the overhead projector now the first page of Movant's Exhibit 29, which has already been accepted into evidence, focus just there on Figure 1. Can you see that?

A Yes.

Q Can you explain what Figure 1 is?

A It's analogous to what we showed before. It shows the Z-score of different brain regions again, and on the left is exactly analogous to the previous graph that we had which shows the different lobes, the different big partitions of the brain; frontal, temporal, parietal, and so forth, and that is extremely consistent with the -- with the analysis of 2007.

Q Were you able to obtain -- let me ask you this: Mrs. Montgomery didn't get a new MRI; is that correct?
A Yes. Well, it's the same MRI.
Q Yes. You used the same MRI data that you had on file for Mrs. Montgomery to perform this analysis?
A Exactly.
Q Were you able to obtain more granular and detailed information about Mrs. Montgomery's brain using this new pipeline?
A Yes, exactly. The methods -- I don't think I mentioned the methods of the past decades also improved tremendously. So we're now able to get even more accurate measurements than we were before, and because we also are using a more appropriate normative -- or more suitable normative population to obtain more accurate measurements, more precise measurements.

The left is almost exactly identical to the curve that you had before; frontal, temporal, parietal goes down, occipital is up, limbic is down. They're extremely similar but the significant values are higher.

What I also did this time relates to what I was telling you before that you have to contrast the areas that seem to be normal, such as the frontal lobe, with those that seem to be abnormal, left and right leg concept. So I compared the parietal lobe to the total brain volume and the limbic lobe to the total brain volume. That's what you see in the middle

column.

THE COURT: Doctor, could you slow down a little bit.

THE WITNESS: Sorry.

THE COURT: Thank you.

A So in order to evaluate this contrast between brain regions that are apparently affected of normal and brain ranges that are not abnormal, I form various ratios. So in this case the middle column I show the parietal over the total brain volume and the limbic over the total brain volume, and that shows you that now the parietal lobe and the limbic lobe are even more abnormal. So, again, they are more abnormal -- these measurements amplify the fact that the parietal lobe is not only abnormal but it's much slower than the frontal lobe and other parts of the brain. So this contrast makes it look even more -- again, the concept of 1 meter is not an abnormal length of a leg but if your other leg is 1.2, then something is not right.

So now as you see here, the parietal is divided by total which is extremely abnormal of minus 3.5 or minus 1.5, and so for the ventricles, which are extremely abnormal, the third ventricle is five standard deviations above normal. This is -- I don't know what the response is, one in a million or something. It's extremely unlikely that event to happen.

Q (By Ms. Henry) So does this -- first of all, this

re-analysis confirms the legitimacy of the analysis that was performed in 2007; is that your opinion?
A Yes, exactly.
Q Do you hold that opinion to a reasonable degree of scientific certainty?
A Yes.
Q But in addition to confirming the validity of the prior analysis, this new analysis suggests that Ms. Montgomery's brain is actually much more abnormal than what was known in 2007?
A Exactly.
Q It's not that she got worse because it's the same --
A It's the same MRI, yeah. In 2007 if you asked me my opinion, I would probably have had the same opinion as Dr. Gur. It seems abnormal. It seems abnormal. I can sort of see what I think Dr. Evans and Mayberg are saying. They were trying to think of a different interpretation. That wouldn't be my interpretation. I would agree with Dr. Gur. But now the measurements completely confirm that Dr. Gur was right.
Q And did I hear you correctly that the ventricles are more than five standard deviations above the mean?
A Right.
Q And you said that's like a one-in-a-million chance?
A I don't know what the exact number is but it's extremely unlikely. It's probably more than one in a million.

Q And when we say "extremely unlikely," just to be precise because we are making a record, it's unlikely that to occur in a normal individual?
A Exactly. So the ventricles are getting bigger, in particular the third ventricle, which is deep in the brain and it neighbors a lot of the deep structures of the brain. For this region to get larger you have to lose brain for some reason; and, again, there are many courses that cause -- that lead to brain loss. If you lose brain, then whatever is gone is replaced by a cavity which is then filled by CSF which is fluid, basically, and this is what we measure.
Q And what is CSF? I know that's an acronym.
A Cerebral spinal fluid.
Q Cerebral spinal fluid?
A It's almost like water that runs -- surrounds your brain and -- yeah.
Q So there's a phrase called gray matter that we see in Dr. Gur's report. Is gray matter healthy brain tissue?
A So yeah. The brain has neurons and the neurons have -- then neurons -- the main part of the neuron which performs function and the cables that are connected to each other are called -- essentially form the white matter because they're covered by fatty tissue that appears white or bright in the MRI. So you have the gray matter, which is the main processing units of the brain; the white matter, which is the cables, the

connection; and the CSF, which is fluid that surrounds the brain.

Q So when we have these different ventricles and they get larger because they're filled with CSF, that means that the gray matter in the partitions of the brain that are closest to the ventricle has either died away or was never there to begin with?

A Yes.

Q And do you know the brain structures that surround the third ventricle?

A Well -- okay. I didn't want to go into that level of detail.

Q Sorry.

A I don't want to confuse people here. But the ventricular volume is not as specific as the direct measurements of brain partitions like parietal lobe. What happens if you lose brain tissue, the brain shrinks, or if it doesn't shrink, it leaves a cavity or both.

So you could, in principle, have brain loss that is all over the place and cause this ventricular expansion. It doesn't necessarily have to be in the areas that are very close to the ventricles. That's probably less likely to happen in the third ventricle which is deep in the brain but it's possible.

So the fact that the ventricles are big doesn't

necessarily tell us that only the parts of the brain that neighbor the ventricles are abnormal, but it could be other parts of the brain as well.

Q Thank you. You corrected my understanding. I appreciate that.

And if you can explain to me this section of the graph.

A Yes. So this is -- I obtained a lot of measurements. We do it in what's called the hierarchical way. You start with total brain volume, break it down to lobes, which are the major partitions, which I have on the left, then we break it down even more, even smaller structures. Like I said, there's a small part of the brain that controls my right index finger. You could measure that, although not with this level of accuracy, because it's very small.

So, anyway, I looked at the small parts of the brain to see if maybe the abnormality can be further localized. You see here different parts of the parietal lobe that came out as abnormal, but I think that part of the graph is not as important because it shows a number of different brain regions of the parietal lobe are abnormal. That is better seen on the total than you see in the middle column.

Q But does that at least corroborate the finding in the middle column?

A Of course. The middle column is essentially a sum of

all these other small measurements.

Q And you have explained previously the concept that the brain is an organ that has suborgans that you refer to as partitions. These labels across the bottom of this graph, would those correspond with those partitions?

A Exactly.

Q And each of those partitions forms a -- or has a different function in terms of the way the brain operates?

A Exactly.

Q And then ultimately affects behavior?

A Yes.

Q And is it your opinion to a reasonable degree of scientific certainty that this 2016 re-analysis with a more robust and -- you know, more robust data demonstrates that Mrs. Montgomery does in fact have abnormal brain structure?

A Yes, it does.

Q And do you have an opinion to a reasonable degree of scientific certainty that this data corroborates the data from 2007?

A I think it does corroborate it, yes.

Q It strengthens it; is that fair to say?

A Yes. It strengthens it. I mean, sort of like now we know that I think Dr. Gur's opinion was right for sure because we have confirmed it with even more detailed measurements.

Q Can you explain for us, Dr. Davatzikos, the concept of

brain plasticity?
A Brain plasticity, yes. So when there's damage in the brain, some parts of the brain are lost or they lose their function and that -- for example, in traumatic brain injury or a stroke, you can -- right after the event you can lose -- completely lose function that was subserved by that part of the brain that was damaged.
Progressively the brain luckily finds ways to compensate for that loss, and by forming -- either forming new connections or by rewiring old connections, re-utilizing old existing and unaffected parts of the brain, it manages to perform the loss function as well as it can. That's why you see in stroke patients immediately after the stroke, you have a huge loss of function, then gradually the function comes back or part of the function comes back. This is essentially brain plasticity.
Q And so, for example, taking the stroke example, somebody who has a stroke and has some loss in brain function, in order to regain that brain function, they require some sort of supportive medical intervention, rehabilitation; is that fair to say?
A Yes.
Q And they get that rehabilitation from trained medical and mental health professionals who have rigorously studied how it is we can help stroke patients regain their function?

A Yes. There's a whole entire field, of course, and it depends on where the damage is. If your stroke is in the area that affects motion, your motor cortex, then you go do physical therapy and you try to rebuild your muscles, and so forth. If the stroke is in the area that controls cognitive functions, you go to cognitive therapy, and so forth. So the professionals who see a patient after a stroke, for example, depends on what the function or loss is.

Q But there's no way -- once the brain tissue dies, there's no way to get that brain tissue back?

A No.

Q And once -- if the brain tissue never develops because of some sort of neurodevelopmental problem such as in their fetal alcohol or concussion as a child or something that keeps that brain from developing, you're not going to get that brain back?

A Yes. You're not.

Q And if there's a psychiatric illness that is corresponding to some of the findings that you're finding with the structure of the brain, that psychiatric illness is going to require professional intervention from mental health experts who can help that person learn how to function despite their brain abnormalities; is that fair to say?

A Exactly. We do a lot of work with schizophrenia, which has its own pattern of brain abnormality, and you can see that

the brain hasn't developed well; but, of course, being able to identify this pattern early in brain development and intervene with cognitive behavioral therapy or potential drugs down the road is very important, yeah. It could potentially change the function, but it's not going to bring back what didn't develop or what was lost.

Q Dr. Davatzikos, you mentioned your work with schizophrenic patients. Is Pennsylvania -- the University of Pennsylvania and I guess the medical school, Department of Neurology, which you are a part, are you all considered one of the leaders in the study of brain structure as it relates to psychiatric illness such as schizophrenia?

A I think so. Yeah. I mean, obviously Dr. Gur is perhaps the world's expert in the field of neuropsychiatry, especially schizophrenia but neuropsychiatry more generally. We collaborate closely because my lab is well known for these type of measurements. Yeah, I would want to think that we are among the top people in the field.

Back in 2005 we published one of the first seminal papers using these types of measures in schizophrenia. It was in JAMA Psychiatry and many other groups followed similar measures.

Q That publication in 2005, which obviously predates the trial in Ms. Montgomery's case, was published -- you used another acronym, the JAMA?

A JAMA is the Journal of the American Medical Association. It's either the top or one or two top journals in the medical field. Back then it was called Archives.

Q You along with Dr. Gur and others at Penn published the seminal paper in the area?

A The seminal paper was More Modern Quantitative Analysis Methods. There's been a number of other measurements in the '90s, papers in the '90s. Dr. Gur has published maybe half of them in the field or a third and a number of people who published using such volumetric measurement. But, of course, then the technology was much more limited.

Q And even though the technology was much more limited, they were helpful?

A Yes. Abnormalities and neuropsychiatric disorders reduce brain volumes. Neuropsychiatric disorders have been published since the early '90s. It's been very, very well established. Yes.

MS. HENRY: If I can have just one moment.

No further questions, Dr. Davatzikos. Mr. Valenti will have some questions for you.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Davatzikos, how are you, sir?

A Very good. How are you?

Q Good. Sir, as we get started, to make sure that I'm communicating in the right language, as we talked earlier, you are a computational neuroanatomy expert, correct?
A Correct.
Q And for the lawyers in the room, that means that you study the brain?
A Yes.
Q And the anatomical structures of the brain?
A Yes.
Q One of the, if not the chief investigative tool you use, I believe, is the MRI; is that correct?
A Exactly.
Q And the MRI standing for Magnetic Resonance Imaging machine?
A Yes.
Q I really don't want to go into what that does, but, in general, can you tell me what an MRI does on your behalf when you're investigating brain anatomy?
A What it does is it gives us a fairly clear picture of the brain inside. Of course, we cannot see the brain from outside, but it's a very advanced technique that allows us using magnetic fields to look inside the brain; and, therefore, get pictures that we then use to analyze and to understand brain anatomy.
Q And you indicated that one of the primary methods

that you then use or quantitate -- maybe I'm using that term wrong -- the information that you get from an MRI is a volumetric analysis of what the results are?
A Yes.
Q Okay. You've indicated, I believe in your direct testimony, that volumetric analysis alone is not diagnostic but is a piece of the puzzle you would look at, correct?
A It's a lab test, yeah.
Q If I understand what we're talking about here, the information that Dr. Gur wanted to and was willing to testify in 2007 was about the behavioral image that he put together from various data points; is that correct?
A Yes. You would have to ask Dr. Gur about that. He put together a behavioral image. I could go into more detail from what I know if you want.
Q Well, if you need to, feel free. I'm not trying to cut you off, but what I'm getting at is you had a piece of a puzzle that was provided to Dr. Gur, correct?
A Yes.
Q And there were other pieces to that puzzle provided to Dr. Gur; is that right?
A Yes.
Q I believe Dr. Newberg provided PET scan results and analysis, correct?
A Exactly.

Q And Dr. Gur, for lack of a bad metaphor, was kind of the quarterback that pulled those pieces together and then gave an overall diagnostic opinion?
A Yes. I'm not sure if I would call it diagnostic. It gave a picture of all the pieces falling together.
Q Okay. And that -- the pieces falling together was what he was advancing, as you know and I have heard, called the behavioral image; is that fair?
A Yes. Behavioral image is part of what he used. So by -- neuropsychologists before MRI became so abundant and precise or available, they were measuring the behavior of -- different aspects of the behavior of a person trying to guess what is inside the brain. Of course, you couldn't see the brain. Because we know -- for 150 years people have studied the brain from people with stroke, from cadavers, and so forth, we have a basic understanding of how the brain works, and we know that the specific function is compromised. We know that part of the brain that facilitates must be compromised.

So by putting together all these different aspects of behavior, neuropsychologists are able to create these images which are, one, possible of looking at the brain. Now with the MRI, of course, we can have a direct measurement inside the brain. Of course, if these two images agree -- and they agreed very well, actually -- remember, even for us scientists it was remarkable how well they agreed, then you have higher

confidence that what you see in the MRI and what you see in behavior are linked together

Q Did you review the report that Dr. Gur initially authored on April 3rd, 2007, provided to Ms. Montgomery's counsel, Mr. Duchardt?

A Yes.

Q All right. And I'll put it on the screen. I've marked it 28(a) because there are several date ranges. Just why it might look a little bit different. This is the report that Dr. Gur created; is that correct?

A Yes.

Q Have you had occasion to review that before coming into court today?

A I did review it, yes.

Q And when I'd asked you earlier if you had written any reports, you hadn't authored a report like this under your signature, did you, in this case?

A I did give Dr. Gur a report like this with all the numbers, and he takes -- you know, he condenses it and puts it together in respect with everything else.

Q Do you still have that from 2007?

A Not with me.

Q I've never seen it. I've seen Dr. Gur's report, but I've never seen anything authored by you. Do you know if that was provided to government counsel ever?

A I gave Dr. Gur all these numbers. I tell him exactly what I used as normative population. I will give him text that explains my numbers. He usually takes part of my text and incorporates -- and my graphs and incorporates them into these reports. So these effectively are my graphs.

Q However, the report is signed by Ruben Gur, Ph.D., professor of neuropsychology?

A Yes.

Q So he's the author of the report?

A Exactly.

Q There is originally in that report four pages total with one additional page of what I would call the definition page with the report. Do you agree with me on that?

A Yes.

Q And there's one footnote in there, Footnote 2, where it refers to a semi-automated template warping, w-a-r-p-i-n-g, warping algorithm being used as it relates to the MRI analysis, and it quotes a paper or source of you and a Dr. Shen from 2002?

A Yes.

Q So the only time that you're in any way mentioned is in an attribution to an algorithm that was used in the MRI. Would you agree with me on that?

A No. I think I was mentioned in there as Dr. Davatzikos provided me with these numbers. Essentially he says the graph

is my graph, as far as I remember it, but maybe you can put up the report.

Q I'm happy to provide it to you.

MR. VALENTI: Your Honor, may I approach?

THE COURT: Yes.

A This is one of the reports. There were --

Q (By Mr. Valenti) I agree there were a bunch of reports. I'm going to go through them.

A There's a bunch of reports. Essentially whenever you see, you know, Dr. Davatzikos provided me with these numbers and these measurements, that essentially is stuff I gave him, including the Figure 2 plot that you have here.

Q I understand, sir, that what you're telling me is the MRI stuff in there came from you, but the report is written and signed by Dr. Gur and you're a footnote to the algorithm that was used in this report from April 3rd, 2007?

A Footnote and a graph.

Q The graph is yours, correct?

A Yes. Yes.

Q But it doesn't say who authored the graph, does it?

A I did.

Q I know you did, but the reader of the report doesn't know that.

A And I would leave it up to the Court to interpret that. I'm not sure I follow what you are asking me. You go to the

primary care physician and he says, Okay, your cholesterol test is back. It says X. Well, he could say or she could say the cholesterol test was performed by Dr. X or could not say, but the test is the test.

Q I understand that. I'm not trying to argue with anything you've done. What I'm trying to suggest to you is that in 2007 when these materials were provided to the United States Attorney's Office and to Ms. Montgomery's attorney, the only signature as an author of the data in here is Dr. Gur. You tell me and I agree that you did the MRI.

MS. HENRY: Excuse me, Your Honor, if I could interject an objection. If Mr. Valenti would direct his attention to the first page of the report and just allow Dr. Davatzikos to see that section, though he's not named, I do believe the postdoctoral fellows are named.

Q (By Mr. Valenti) Dr. Fucetola's named, correct?

A Sorry?

Q You're not named. She wants you to look at this paragraph here. It talks about who he referred to. Are you named in that paragraph?

A No. What he names in that paragraph is the people who acquired the images. So the people who took Ms. Montgomery to the MRI scanner or directed the technicians to run a specific protocol as I specified actually because I need a specific MRI protocol for them to run and specific protocol in

order to be able to perform the volumetric measurements.

Q Okay. So you're not named?

A Not in that paragraph, no.

Q And then Dr. Gur supplemented his report in April of 2007, I believe with some typos. Essentially it's the same report. I'll show that to you. It's similar. Are you named in the report other than as a footnote for the algorithm that was employed?

A The footnote is called a citation. It essentially tells you if you want to learn the details of the method that was applied here, you have to go to that paper. It's not a footnote. It's a reference. I don't see my name, but I cannot read that fast.

Q If you need time. I'm not trying to force anything on you. If you need more time, sir, take it.

A I'm not sure what exactly you're asking, actually.

MS. HENRY: Your Honor, we'll stipulate that in the April and August reports, other than the fact that Dr. Gur told the reader of the report that, Under my supervision with help from faculty and postdoc fellows at our center, I have analyzed and verified -- we'll stipulate that's what the report says.

THE COURT: Do you accept that?

MR. VALENTI: I do.

A The magnetic resonance images of Ms. Montgomery were examined via delineation of 92 regions of interest. It doesn't

mention my name but "were examined." He refers to my examination. Which was assisted by a semi-automated template-warping algorithm. This analysis revealed -- whatever then the results. So this the part which he refers to me but not by my name only.

Q (By Mr. Valenti) Refers to work done by you but not credited to you. I understand you take exception to that. We have a stipulation on it. We're fine.

A I don't have any problem with that. He refers to the publication and that's exactly the procedures that were applied. It doesn't need my name.

Q And you'll agree that in the 2007 reports, Dr. Gur has as one of the figures in it his behavioral image. It's actually Figure 1 in those reports. Do you recall that?

A That's his image.

Q Are you familiar with how the behavioral image works and the science behind it?

A This is what I was trying to describe before. The different measures from different cognitive domains if you want to try to build a picture. But, again, Dr. Gur, he's the world expert in this.

Q Are you aware of Dr. Geoffrey Aguirre on the faculty at your school of medicine?

A Dr. Aguirre, yes, I've heard of him.

Q He's in the Department of Neurology?

A Yes.
Q Are you familiar with his criticisms of Dr. Gur's methodology as it relates specifically to the behavioral image?
A No.
Q After you provided information to Dr. Gur and he wrote his reports in 2007, there developed a discovery controversy in the Western District of Missouri about Dr. Gur's reports, specifically about -- in the information below. You're aware of that now, correct?
A Yes. You're talking about Dr. Mayberg and Dr. Evans?
Q Yes. I think in your direct exam you said you can kind of see where Dr. Mayberg and Evans were coming from but based upon what you looked at, you interpreted it differently, correct?
A I would agree with Dr. Gur's opinion at the time, and now certainly there's proof of that.
Q And when you say "proof of that," you're looking at this in 2016, nine years later, based upon the new analysis that's been done, correct?
A Same MRI.
Q I understand. Same MRI. But more robust tools because technology has grown over the last nine years; fair?
A You're looking at the photograph when you're trying to see something in it. You see something and you're not a hundred percent sure this is your interpretation. Now you have

a magnifying glass that is a lot better and you look and say, Aha, definitely that is an abnormality.

Q As a consequence of the dispute that was going back and forth in the Gur and the Mayberg/Evans situation, there were a number -- I don't know if I call them reports or letters to Mr. Duchardt from Mr. Gur -- or from Dr. Gur, excuse me. Have you seen those?

MS. HENRY: I'm sorry, Mr. Valenti. If I could just interject an objection. The discovery dispute was regarding the PET data, not the MRI data. Dr. Newberg is here to discuss that, but I don't believe that Dr. Davatzikos has offered an opinion about the discovery dispute with respect to the MRI.

MR. VALENTI: Correct.

Q (By Mr. Valenti) You indicated, however, that you did do the re-analysis in 2016 and it just came in fairly recently using the old MRI but with new tools, correct?

A New tools, new normative data.

Q That was what was marked as Exhibit 29. I show it to you now, correct?

A Yes.

Q 29. That's my handwritten number. But you recall having seen that in the report?

A Yes.

Q In the report just recently submitted there is your area on the MRI that we talked at during your direct

examination with more conclusions able to be drawn because of the new technology, correct?
A Yes.
Q And it has a reference to the 2007 volumetric MRI result that you published back then?
A Yes.
Q There's also what would be Dr. Newberg's information about the PET scan. We won't talk about that because that's not your expertise, correct?
A Yes.
Q Have you reviewed this report and noticed that there's no mention of the behavioral image anywhere in it at this time?
A I reviewed it. I don't recall. Again, the behavioral image is Dr. Gur's expertise. I'm not sure if this report would exactly -- if it was meant to discuss everything or specific topics of things.
Q It's entitled "Neurobehavioral Assessment of Ms. Montgomery," correct?
A Uh-huh. Yes.
Q And that was -- let me make sure I have that right -- what was being done for her in 2007, Neurobehavioral Assessment, correct?
A Yes. Maybe there's something new there. Maybe the assessment is the same. I guess unless she was -- I assume because -- so I assume that Dr. Gur didn't talk about it

because it hasn't changed. The neurobehavioral image was the same as before because that's when he performed the measurements. We analyzed the MRI so we have new interpretation of the MRI scan. That's what he updates. I'm assuming -- you will have to ask him.

Q I will. But your 2007 graph is still there and it didn't change because you didn't do work, right? So it's in there even though it's the same as it was nine years ago?

A Yes.

Q And the behavioral image, whether it was there or not, it's a fact it's not in the report in 2016 but you don't know why?

A I'm assuming it's because there's no --

Q Doctor, I'm not asking what you are assuming. Do you know why?

A No.

MR. VALENTI: May I have one moment, Your Honor?

Q (By Mr. Valenti) And you answered part of this. I guess I need to ask one more question. You indicated that you would have provided some type of notation, report to Dr. Gur when he assimilated that piece of the puzzle into his overall report, correct?

A Yes.

Q And I've indicated to you that I've still never seen it. Have you ever provided that to Ms. Henry, Ms. Harwell, Ms.

Nouri?

A I don't think so.

Q So that portion of what you've done either does not exist or your testimony has been subsumed into the original report but not provided as what I would call the raw data?

A It has been integrated into the report.

Q Integrated in the report. All right.

MR. VALENTI: That's all I have, Your Honor.

MS. HENRY: Just two, maybe three questions.

REDIRECT EXAMINATION BY MS. HENRY:

Q Dr. Davatzikos, Dr. Gur brought you in to discuss the MRI but you were not privy to the questions that I asked him to address in an updated report?

A Say that again.

Q You're not privy to the questions that I asked Dr. Gur to address in his updated report, correct?

A I'm not.

Q Privy, you don't know what I asked him?

A No.

Q Whatever the notes are that you provided to Dr. Gur, which I will represent are not in the file and I haven't seen it, is it likely that's because that's scientific information that I wouldn't be able to interpret?

A Yes. It's scientific jargon. That's why Dr. Gur, as I said earlier, someone has to integrate and synthesize



Case 4:12-cv-08001-GAF Document 221 Filed 05/04/17 Page 107 of 237

everything into a picture, and Dr. Gur and I obviously talk a different language and a lot of jargon.  I assume that's why he integrated his plots.  The plots are my plots.
Q	And you don't have -- Dr. Gur doesn't hide your existence, does he?
A	Not at all.
Q	And when he says in the report that he worked with faculty at Penn, are you faculty at Penn?
A	Yes.
Q	So when he says on the first page of his report in April of 2007 that he worked with faculty and postdocs at Penn to put together both a structural and functional analysis of the brain, that means he tapped into you and Dr. Newberg --
A	Right.
Q	-- for your expertise?
A	Exactly.
Q	And folks who worked for you?
A	Exactly.
Q	Did I hear you say on cross-examination that you actually defined the protocol for the MRI that was used with Mrs. Montgomery?
A	Yes.
Q	And that's because you're the person who's skilled at that?
A	Yes.  We have certain requirements of -- essentially,

an MRI has to be very detailed with high resolution so we can measure things we want to measure.

Q And Mr. Valenti asked a question on cross-examination that was a little bit confusing, and it's probably my fault. I probably wasn't very clear with my arguments with Mr. Valenti. So I want to be perfectly clear. The behavioral image that Dr. Gur produced is based solely on raw data from neuropsychological testing; is that correct?

A Yes.

Q And neuropsychological -- Dr. Gur is a neuropsychologist; is that correct?

A Yes.

Q He has additional expertise that he will share with the Court when he comes in next week, but fair to say he doesn't need your input or help on the neuroimage, on the behavioral image?

A Yes.

Q And if the behavioral image in this case was not actually excluded by his Honor and it wasn't presented so it hasn't really been challenged, there would be no need to update information regarding the behavioral image?

A That's precisely what my assumption was, but I think I was interrupted and I was told if I know. That's what I would assume, but he didn't precisely tell me why. I didn't ask. It didn't come up.

Q Your raw data has nothing to do with the behavioral image?
A Exactly.
Q Dr. Gur didn't use your MRI data to produce the behavioral image?
A Correct.
Q Those are separate things?
A Correct.
MS. HENRY: Thank you, Dr. Davatzikos.
MR. VALENTI: Nothing further, Your Honor.
THE COURT: Thank you, Doctor. You're excused.
(Witness excused.)
THE COURT: And we'll take a recess now until five minutes until 11.
(Recess taken at 10:40 a.m.)
THE COURT: Ms. Henry.
MS. HENRY: May it please the Court. The movant calls Andrew Newberg.
ANDREW NEWBERG, being sworn by the courtroom deputy, testified:
DIRECT EXAMINATION BY MS. HENRY:
Q Good morning. I think it's still morning.
A Yes, it's morning.
Q If you could state your name for the record and spell your last name for the court reporter.
A It's Andrew Newberg, N-e-w-b-e-r-g.

Q Dr. Newberg, what is your occupation?
A My occupation is I'm a physician. I'm a professor in emergency medicine and radiology at Thomas Jefferson University Hospital in Philadelphia. My primary specialties are nuclear medicine, which is a variety of imaging studies that we use to look at different body areas, including the brain and internal medicine.
Q Where did you receive your education?
A I received my education at -- my medical education at the University of Pennsylvania in Philadelphia, and I did my internal medicine residency at Graduate Hospital in Philadelphia. I did my nuclear medicine training and fellowship at the University of Pennsylvania, and that was -- and then I took my position at the University of Pennsylvania.
Q Can you describe for the Court the nature of your postdoctoral education?
A So the postdoctoral education primarily consist of residency programs we do. The field of nuclear medicine, which is the main imaging modality that I use in my career, is something that has, at least at the time, had several avenues, including internal medicine, which is the path that I took, so I took a full three-year residency in internal medicine, which helps you really pretty much learn all the different areas of the body. Then I did a fellowship for two years in nuclear medicine at the University of Pennsylvania.

So the nuclear medicine fellowship and residency includes basically spending your entire time learning about imaging, learning about how to do imaging, how to interact with the patients, help take care of the patients getting the imaging studies, and ultimately how to interpret those imaging studies in a clinical contest.

During that time period, I also was continuing to develop an entire research program that became a very significant part of my career, which is primarily to focus on neuroimaging, on brain imaging. So I was involved in doing a number of research projects at the time in terms of looking at a variety of different neurological and psychiatric conditions, conditions ranging from Parkinson's disease, Alzheimer's disease, to depression, to eating disorders, anxiety, just really the full gamut of all the different neurological and psychiatric disorders.

So the combination of both the clinical and the research piece was the main part of my postdoctoral training, which could then be utilized as I developed my career.

Q And did your postdoctoral training lead to a faculty appointment at the University of Pennsylvania?

A Yes. I was actually -- for about one year I had a position at the Philadelphia Veterans Administration Hospital, which was affiliated with Penn, so it was a professorship appointment there.

In about the end of 1999 I took a professorship position at the University of Pennsylvania. I started out as assistant professor, then moved up the ranks to associate professor, and then ultimately to full professor.

Q And that was at the University of Pennsylvania?

A Up to associate professor at the University of Pennsylvania, then about six years ago I moved my position to Thomas Jefferson University Hospital in Philadelphia, and at that point I was promoted to full professor.

Q So you are an academic as well as a medical doctor?

A Correct.

Q And do you teach other medical doctors?

A Absolutely. So my life consists of clinical work with patients, reading scans for patients, doing research, which is primarily focused on brain imaging, and also a lot of teaching responsibilities. So throughout my career I have taught undergraduate students. I continue to teach a course actually in what's called the Biological Basis of Behavior Program at the University of Pennsylvania. That's usually undergraduates. That's a course called Human Brain Imaging.

I teach medical students about internal medicine and about nuclear medicine, about imaging. I teach radiology residents, nuclear medicine residents and fellows, and have continued to do that in varying ways throughout my entire career.

Q You've used the word "nuclear medicine," and you say "nuclear" and I think of Three Mile Island. What do you mean by nuclear medicine?

A Sure. So nuclear medicine is an entire field. It is primarily an imaging field, and it essentially involves anytime that we administer some type of radioactive material, hence the name nuclear, that follows some part of the body's physiology so we can see where it goes and whether that particular body part is functioning normally or not. And so we can use nuclear medicine to look at pretty much every organ of the body. We can look at the heart. We can look at the gastrointestinal systems, the bones, the joints and, of course, we can look at the brain.

When it comes to the brain, we're primarily talking about using these radioactive tracers that follow some part of the brain's physiology. The most commonly used tracers generally look at kind of basic activity. So that's usually based upon either blood flow changes in the brain or metabolism changes in the brain. What's generally nice about the brain is that the more a particular area is working, the more blood flow it gets and more metabolism it has. It's a little bit like the car engine. The faster you go the more gasoline goes to the engine. The brain works the same way.

So we can look at disorders where there might be higher levels of activity, lower levels of activity. We can

also look at just what's happening in the brain when people are using different parts of their brain. If they wiggle their finger, then we can see activity going in the motor areas of the brain.

We can also look at a variety of other physiological processes, including neurotransmitters and many other aspects of diseases as well, but that's what nuclear medicine is ultimately about.

Q So you studied in this area, you've researched in this area, and you've taught in this area?

A Yes.

Q And you continue to treat patients using this technology?

A Absolutely.

Q Now, with respect to your faculty appointments, I think we've gone through those. I'd like to ask you now about any hospital or administrative appointments that you have.

A Well, my primary appointment where I am currently is Thomas Jefferson University. I'm a professor in radiology and emergency medicine. I'm actually the director of research at what's called the Myrna Brind Center of Integrated Medicine, which actually combines all the different tools that we have in the medical field to help take care of patients in a very visualized way.

It includes the diagnostic imaging tools that we

have, including a new PET scanner that we have in our center to help diagnose people with head injury, cognitive disorders, emotional disorders, and so forth, then how we can actually use that information to help treat people.

So my primary appointments, at least from that academic as well as clinical perspective, is director of research at our integrated medicine center and professor of emergency medicine and radiology at Thomas Jefferson.

Q Do you have any specialty certification?

A My specialty certifications are both in nuclear medicine and internal medicine. I have my boards in both of those.

Q You're board certified in both of those?

A I'm board certified in both of these, yes.

Q And you are a licensed physician in Pennsylvania?

A Yes.

Q And have you received any honors or awards that are particularly relevant to your testimony that you are going to provide today?

A Most recently I was pleased to see I was noted as one of the top 50 most influential neuroscientists in neuroscience alive today by an online psychology website. That's very nice.

Q I have, as I mentioned, Movant's Exhibit 31, which has already been introduced into evidence, which is -- would you recognize that as a copy of your curriculum vitae?

A Yes.
Q Dated October 1st, 2016?
A Uh-huh. Yes.
Q I'm sorry. You have to say yes or no.
A Yes, it is.
Q And your curriculum vitae in October of 2016 is 59 pages long?
A Yes. It includes both the academic appointments, teaching responsibilities. I have -- a lot of the length has to do with the publications that I have been involved in over the years. I've published about 150 peer-reviewed articles, chapters, books, about 150 abstracts all pertaining -- or almost all pertaining to nuclear medicine and imaging and particularly brain imaging.
Q Dr. Newberg, in addition to your faculty appointments and your work as a physician treating patients and the research work that you do, have you also engaged in a small, independent consulting practice? Practice might be the wrong word. Do you do some independent consulting?
A I do, yes. Yes. So I've been involved in helping a variety of individuals analyze brain scans primarily for a variety of purposes, including helping other physicians outside of our institution to better diagnose patients, and then I've also been working with a number of individuals for medicolegal purposes, whether they're criminal or injury type of cases, to

help, again, evaluate brain scans and to try to bring a little bit more information to helping people understand what's going on within somebody's brain who is dealing with some particular issue.

I've worked with Dr. Ruben Gur from the University of Pennsylvania since my time there, and he and I have worked on a number of cases together where he asked me to evaluate a brain scan done either at the University of Pennsylvania or outside and to perform some type of evaluation, a quantitative evaluation and to help to describe it so that information can be useful in the context of the particular case.

Q So you and Dr. Gur have collaborated professionally for -- since you were at Penn. Is that almost 20 years?

A Yes. Yeah. Yeah. He was actually one of the first people who I met when I was looking to do my research. I was sort of debating about working with Dr. Gur or with this other doctor, Dr. Alavi, in nuclear medicine. I worked with Dr. Alavi and Dr. Gur and he also collaborated quite often so it's been a long-standing relationship.

Q Is it pretty typical in your field of nuclear medicine to collaborate with other individuals outside of your particular discipline?

A You almost have to because as an imaging person, we don't have access to the patients. So almost all of my studies, whether I was at Penn or here at Jefferson, I almost

always had to work with people in psychiatry, in neurology. Those are the two primary areas for the brain imaging piece where I would work with those individuals, and I would work with Dr. Gur's lab in the context of the types of patient that he would see.

For example, they deal a lot with schizophrenia. I would work with other people in the depression research unit where we do studies on depressed patients, in the eating disorder clinic on patients with eating disorders, movement disorders for Parkinson's patients, the memory disorder group for people with Alzheimer's disease.

So they're the ones that help to send the patients to me, and then we do the scans. We do the analysis and refer back to the -- or I would contact back with the referring physician to go over what the results are and to see how that information can be helpful. Again, it would often be -- it could be clinical, it could be research, or often some combination of the two.

Q So when you work with Dr. Gur on medicolegal cases, your role is to do the nuclear medicine piece?

A Correct.

Q And Dr. Gur then relies on your expertise and his expertise and that of others on the team to reach the full picture?

A Exactly. So -- and that's to me -- I'm sure this

will come up a couple of times, but to me it's always the critical -- of critical importance when we think about what these imaging studies do. They're not viewed in a black box. It's so important to put the information that we get with our scans with other types of scans, with the clinical picture, with the clinical testing, and that does put together a very full picture as to what's going on for a patient in a legal context or a clinical context. Putting all of that information together is very critical.

Q And so you're a piece of the puzzle but you're not the whole puzzle?

A Exactly.

Q Well, with respect to -- I want to move in to start asking specific questions about PET imaging and Mrs. Montgomery.

MS. HENRY: Before I do that, I need to ask the Court to accept Dr. Newberg's testimony as an expert in the field of nuclear medicine and PET imaging.

THE COURT: I'll consider his opinions.

MS. HENRY: Thank you, Your Honor.

Q (By Ms. Henry) Dr. Newberg, in 2007 did you become involved in a PET imaging study on the patient of Lisa Montgomery?

A Yes. Yes, I did.

Q Did you design the protocol for the PET imaging study?

A Well, I'm part of the group that does that. As a faculty member, we're constantly developing our protocols; and as the primary neuroimaging person -- I mean, it's probably not purely myself, but it was myself with my colleague that we developed what is our standard of care practice for all imaging studies.
Q And were you in fact physically present when Ms. Montgomery was put in the PET scanner?
A Yes. Yes, I was.
Q And that was actually at the University of Pennsylvania?
A Yes.
Q Do you recall her attorney, Fred Duchardt, actually being present at the University of Pennsylvania at that same time?
A I don't remember but I see a lot of people. I'm pretty usually focused on the process of what's going on. So I don't remember. Sorry.
Q Were you hidden? Was your existence or involvement in the case hidden in any way from the defense counsel?
A I don't believe so. I mean, not purposefully, no.
Q Dr. Gur authored several reports in 2007 spanning from April 3rd of 2007 all the way through January of 2008. Have you read and reviewed those reports?
A Yes, I have.

Q And there's an issue that's been brought up that your name does not appear on the April 3rd report or the August report, but instead Dr. Gur refers to working with faculty and postdocs at the University of Pennsylvania in conducting his whole analysis.

A Right.

Q Would you be one of those faculty members --

A Yes.

Q -- that would be referred to in that report?

A Yes.

Q Were you ever contacted by counsel for Lisa Montgomery to ask you questions about the PET scanning before I reached out to you this year?

A No.

Q So Ms. Harwell, Ms. Nouri, myself, we're the first ones to ask you questions about the PET -- or the nuclear medicine piece of this case?

A Correct.

Q If counsel in 2007 had wanted to ask you questions about the protocols, methodologies, or raw data regarding the PET imaging studies, would you have been willing to answer their questions?

A Of course. Absolutely.

Q If experts working on behalf of the government had reached out to ask you questions about the raw data and

neuroimaging that you performed on behalf of Mrs. Montgomery in this case, would you have been willing to answer their questions?

A Sure. Absolutely.

Q Now, when I was asking you qualifying questions, Dr. Newberg, I neglected to ask you whether or not as part of your consulting practice, do you testify a lot?

A I testify a moderate amount. Often the cases -- usually the way the cases run is that I usually provide the imaging results and the report for that to Dr. Gur or to whoever the person is who's involved in the case, and then there have been a number of circumstances where I've been asked to testify either in court or as part of a deposition where people come to my office.

Q When they have specific questions about the nuclear medicine piece?

A Exactly. Yes.

Q Which Dr. Gur can't answer, they'll come to you?

A That's right. And mostly focusing on the methodology, what we did, how I did it, and any questions about how the analysis was developed or interpreted, or anything like that.

Q Now, I want to ask you, Dr. Newberg, about the methodology that you utilized in conducting the PET imaging in Ms. Montgomery's case and the ultimate results which you were able to report, because, as you're aware, there was some

controversy raised about that. I want to ask some very specific questions about that to paint that full picture for the Court.

A Sure.

Q Okay?

A Yes.

Q And first I realize we've been saying PET, which is an acronym, but for the record we haven't actually said what PET means. Can you tell us what PET means?

A PET stands for Positron Emission Tomography. As I mentioned earlier, when we talked about nuclear medicine, we're administering some type of radioactive material. So for PET imaging the radioactive material is what is called a positron emitter. So there's a small amount of radioactive isotope that's attached to a molecule that when that gets into the person, as that radioactive molecule breaks down, it decays, it releases the positron; hence, Positron Emission Tomography.

What happens actually is that positron, which is actually antimatter, travels a very short distance in your body and it meets up with one of your body's electrons. When it hits one of your body's electrons, it's a little bit like Star Trek. They annihilate each other, explode on a very, very small level and they send off radioactive photons in opposite directions picked up by the PET scanner, by the detector; and then by using a variety of different mathematical approaches,

we can figure out where that came from. And the reason that's relevant is that the more of the material -- the more that the material goes to a particular area, the more radioactivity we see coming from that area; and, hence, we can infer how much activity is going on in that particular area as the result of doing the scan.

In the specific case of Ms. Montgomery and certainly far and away virtually all clinical scans done using a radioactive tracer called fludeoxyglucose or FDG. So it is the sugar analog like the sugar we get in table sugar that our brain uses for energy and it has a little bit of a radioactive tag on it so that we inject it into the person. We allow it to circulate in the person. The brain takes it up like it's taking up regular sugar; and if certain areas of the brain need more sugar, then it takes up more of that radioactive tracer, and then we can see that on the scanner.

Q And is that something you're used to doing every day in your practice?

A Pretty much, yes. I mean, I've done thousands and thousands of these kinds of scans, both in my clinical practice as well as research. It is the approved and the most common scan that is used in PET imaging for a variety of neurological and psychiatric purposes.

Q So in legal terms is that process considered generally accepted in the scientific community?

A Oh, absolutely. It's a very common study for anybody who has -- who needs to look at their brain activity, their brain metabolism, this would be the kind of scan you would do. It is an approved scan. It is reimbursed by, obviously depending on the specific indication, Medicare and approved by the FDA, and it is the type of scan that we do in the clinical setting as well as for many research purposes.

Q And is the protocol that you followed in Mrs. Montgomery's case in terms of obtaining the PET scan images and the underlying data the same protocol that you follow in your lab on a regular basis?

A Yes, it's the standard protocol. In fact, almost all protocols around the country now are fairly standardized. There may be a few minor variations in terms of how long you allow the tracer to circulate in a person's body, but typically you are waiting at least about 30 minutes.

So we do the injection. I mean, our specific protocol -- jumping ahead a little bit -- is that we inject the person. We allow them to remain in kind of a dimly lit, low environmental stimulus room because we don't want the brain to be doing anything in particular. We're really trying to get what the brain is doing at rest. We allow that to happen for about 30 minutes, which is primarily the uptake time for the FDG tracer, and then we proceed to put them into the scanner. The scanning time usually takes about 20 minutes, and then we

analyze the scan from there.

But that's the way we do all of our scans, both clinical and research, and certainly for Ms. Montgomery the scan was done exactly according to the typical standard of care approach that we use.

Q And, again, you supervise it?

A Right. Right.

Q And no one asked you to make any alterations to your approach?

A No. No.

Q So you used the generally accepted approach for Mrs. Montgomery?

A That's correct.

Q And then once you -- well, let me ask you this: What was the role of the University of Pennsylvania in the development of PET technology?

A Actually, it's quite a rich history. In fact --

THE COURT: Excuse me, Doctor. I don't think the reliability of PET scans is in question, is it?

MR. VALENTI: No.

MS. HENRY: Actually in the discovery dispute below, which is what we're trying to rebut and establish the ineffective assistance of Mr. Duchardt, it was called into question by Drs. Mayberg and Evans. That's my understanding. We're attempting to show that their representations about the

reliability of the PET scans was an issue.

Further, yesterday and, again, with Dr. Davatzikos the government is introducing the suggestion that Dr. Gur and the PET imaging, MRI imaging is, I think he used the word "neurohuckster."

THE COURT: The MRI imaging and PET imaging are two different things. The Eighth Circuit said the PET scan is reliable scientifically.

MS. HENRY: They did. And it's our contention that if trial counsel had provided this court with reliable information about the data, that this court would have actually allowed the information in and that wouldn't have been an issue on appeal and had instead been presented to Mrs. Montgomery's jury in the mitigation. We think it should have been presented in mitigation. That's part of the ineffectiveness claim.

THE COURT: And you can get into all of that, but it seems to me that you're laying foundation for the reliability of PET scanning.

MS. HENRY: You're right. But the other thing I'm doing, Your Honor, is that the scanner itself was called into question by Dr. Mayberg. She was questioning -- and Dr. Evans. She was questioning whether or not it was appropriate to use the scans -- the normative data from the scans at Penn in the comparative analysis that Dr. Newberg is going to complain why she's wrong.

THE COURT: I mean, you know, I just wonder if you can get to that as opposed to spending all this time on the reliability of PET scanning.

MS. HENRY: Sure, Your Honor. Can I just ask him -- the point I wanted to make is that Penn originated PET scanning. The first PET was at Penn. That was --

THE COURT: Is that true?

THE WITNESS: It is true.

THE COURT: Okay.

MS. HENRY: So we'll move on.

THE WITNESS: My boss did the first injection in 1976.

Q (By Ms. Henry) After you conducted the PET, the actual imaging study took place, what did you do next?

A After the imaging was performed?

Q Yes.

A Once we get the scans, we -- or I analyze the data using what I used back then was a standard approach that we use something called a region of interest analysis. So what we do is we put a variety of individual regions on all the different parts of the brain or many different parts of the brain, and from that, we determine how much radioactivity is coming from each part, and then we use that -- we do something called normalizing, which is that we compare each region to a whole brain value, and that takes into consideration each person's

individual variability, because obviously somebody with a very large brain it's a little hard to compare somebody with a very small brain, so somebody's baseline may have more activity than somebody else.

So we need to -- this is standard practice that we normalize the brain to some reference region or to whole brain in this particular case, which is what I have always done.

And then what we do is we calculate what is essentially an activity ratio for each region, then we can look at what each region's activity is for that individual, and then we can compare that to a group of controls, and then we can determine whether or not those values for the individual that we're looking at are high or low or normal and make an assessment as to what their overall brain function is based on all of those different individual structures.

Q And did you do that in this case?

A Yes, I did.

Q I'm going to show you just a couple of different images so that we can make sure that we're all talking about the same thing.

A Sure.

Q And this is part of Movant's Exhibit 28. Do you recognize that?

A Yes.

Q What is that?

A That's the FDG PET scan for Mrs. Montgomery. These are what are called axial slices, so they're sliced from the top of the head from the, I guess, the left upper corner down to about -- most of the way down in the brain. These just represent individual slices as you go down to the different structures of the brain, and I mean the way you interpret it visually is that the colors represent activity. So the red areas are the most activity followed by the yellow, the blue, and the black.

As a clinician, I look at these and I can say, Okay, these are the areas that look to be elevated or increased or decreased compared to a control. If I'm looking at it visually in my -- if it's what I have based on my experience, but obviously we need to do it quantitatively. That usually supersedes that and we can get the specific information on given structures.

Q So this is a gross picture of what the PET studies show but you're more interested in the underlying analytical data?

A Correct. Correct.

Q Did I say that right?

A Yeah. This is the true sort of raw data. This is the scan data.

Q Okay. So this is the image?

A That is the image.

Q And what is the underlying data?

A So the underlying data is ultimately the amount of radioactivity, the radioactivity counts that come out of the brain, and we can look at the individual counts from any given region to determine how much activity -- how much of that tracer went to that particular part of the brain.

So just as an example if one part of the brain has a hundred counts and another has 50 counts, then the area that has a hundred counts is more active and it's getting more of that tracer to it and we can calculate that using our quantitative analysis.

Q And so there's something called cpp?

A Counts per pixel, yes. So basically what I was saying it's how much radioactivity is occurring within -- when you divide the image up, they're actually -- like our television, there are pixels. So it's how many radioactive counts are coming out of each pixel.

Any given structure is usually comprised of some number of pixels. So if it's a small structure, it could be 20 or 30 pixels. If it's a larger structure, it could be a hundred pixels or more. So what we do is we calculate a count per pixel value, and that is relevant because you want to get a sense of what the overall activity is in a particular structure; and if I just look at the highest pixel or the lowest pixel, that doesn't give me quite as good information as when I get this, and I saw in a couple of reports the punch

biopsy, so to speak. You say I'm looking at the thalamus and I'm going to put a region in the thalamus and get the average counts per pixel that represents the activity in that structure.

Q And we're getting into stuff that's highly technical and likely a lawyer wouldn't actually present in that great of detail in front of a jury, but you are aware that there was a discovery dispute in this case with respect to production of the cpp data which came to be called the raw-raw data?

A Right.

Q Is there a difference between raw data and this count per-pixel data?

A Well, to me -- I mean, the raw data is truly the image that you're seeing, and then from there the raw data that we calculate is the quantitation, is the numbers that come out that wind up being in the tables that we generate, and then we use that to determine how many counts per pixel are in each region. We create -- as I mentioned before, we create a ratio. We normalize each structure so when we actually get to a ratio, that's just relative to the whole brain, and then we can use that to develop some type of evaluation compared to the normal data. To some degree it's all raw data but it's different levels of processing of that data.

Q Is it fair to say that a lawyer's understanding of raw data with respect to PET scanning and a medical doctor's

understanding -- nuclear medicine doctor's understanding of raw data may not always match?

A That sounds reasonable unless they have some specific medical training.

Q If a lawyer says, I want to see the raw data --

A It probably wouldn't mean very much.

Q And you're probably going to show them this?

A Exactly.

Q And would you also perhaps show them something like this, which is also part of Exhibit 28?

A Yes. At least this can show what the numbers, what the values actually are.

Q This is identified as Table 1. Can you tell us what that document is?

A You want me to sort of describe what we're seeing?

Q Can you describe what we're seeing? Yes.

A Sure. So on the left-hand side are the gradations of the individual regions. So, for example, SF would be like superior frontal, and I believe the key is at the bottom there. Then you have what the ratio of counts are for each region for Ms. Montgomery, what the average counts in that same region would be in a group of healthy controls, healthy women that we're comparing Ms. Montgomery to. The standard deviation has a reflection of how much there's normal variability in the population. Typically, as you can see, a lot of these are in

the sort of .08 to .1, which usually is if you kind of calculate it is about a 10 percent variation. So that means that some people -- if the average counts are a hundred, some people have 96, some people have a 105. Between 90 and 110 with the average being a hundred, that would be your value.

And that is important, because when you then ultimately are evaluating a given individual, there is this natural variability. So we usually -- for me, as a clinician or as a researcher, I like to make sure that we are at least outside of the range of the standard deviation. So for me usually if you're beyond about a 10 percent difference or more specifically one standard deviation, depending on the structure, that's what I use as saying this is something that's meaningful to the patient. So the Z-score is basically a more calculated value that has to do with how much her score is above or below the normal score.

And then the next value is more of a statistical value, and what -- the second to the last two columns are columns that were generated by the statistician, not myself. This is basically trying to show how likely it is that her particular values would be in the range that they are. So if you go down to the OM category, basically what the result is showing is that only -- in a normal population only one out of 3 million people would theoretically have that result.

And, again, as we talked about before, putting all

of the information together, part of what's important with a brain scan is you just don't look at one structure. You are looking at all of the structures. So if I had a normal person and one single structure was substantially out of the norm, I would have difficulty really saying an awful lot about that because everything is normal. That could just be an anomaly. But when you have what literally are about a third to a half of the regions being out of the normal range, then that tells you something about what's going on with that particular person's brain. So that's what this whole table was ultimately showing.
Q And so this table is showing the raw numbers --
A Uh-huh.
Q -- of each of the structures and the statistical analysis that was performed?
A Yes.
Q To reach the conclusion, then give us a level of probability that Mrs. Montgomery would have this level of variability or that she would get the results in those particular structures if she was normal. So the higher -- one in 3 million sounds like maybe there is a risk, there's something going on here?
A Exactly. Especially, again, when you look at all of the structures.
Q And were you able to, then, plot those structures on a graph that was provided back in 2007?

A Yes. So this is also -- this is not something that I created. This is something that Dr. Gur takes my data and basically transforms it into a graph just to make it easier to see visually. It's not altering the data but it's just putting it into a different non-numerical kind of look. So it's basically presenting the same data where you're looking at the Z-score, you're looking at whether or not her particular -- each point represents a structure, whether or not it is above or below the normal value, and to what extent it is above or below the normal value. So it gives you, again, kind of this -- a little bit more of a visual picture of are many values abnormal or just a few? Are they high or are they low? And it helps us to understand the data a little bit better.
Q Could that image we placed up on the overhead, which is contained in many of Dr. Gur's reports that are collected in Exhibit 28, could that be considered raw data?
A Which image?
Q The graph.
A This graph? It's a representation of the raw data. I mean, it's not the data itself per se. Although it's basically reflecting the data, yeah.
Q Is it an attempt to make this highly complicated data more understandable to the reader?
A Yes. Yes.
Q How many structures of abnormality were found on the

PET scan of Mrs. Montgomery?

A You know, I don't know the exact number. I would say about a third to a half of them were abnormal. I was looking at my most recent re-analysis, which I know we'll talk about, and I calculated about half of them were abnormal.

Q So on this particular graph is every place where there is a star an indication that that structure showed some area of possible abnormality?

A Well, each box represents what the value is for the structure.

Q Okay.

A So when they are substantially higher, then that means that it's above the norm; and if they're substantially below that line, then it's below the norm. So I'm not sure that exactly answers your question, but it's reflecting what's normal and what's not normal and you can see where those areas are.

Q All right. Now, with respect to getting this cpp data, count-per-pixel data, how is that data captured on an individual PET scan?

A So in order -- what I do for every scan and certainly what I had done with Ms. Montgomery's scan is we take the images. We have a standardized template of regions. So it's called region-of-interest analysis. These regions are placed -- they're based on a large brain atlas, and this was

all something that was published way back in the early 1990s in a number of articles out of the University of Pennsylvania. We place these regions of interest onto the brain, and then from that a table is calculated that shows you how many counts per pixel are coming out of each of those regions. So I ultimately am able to produce from that information a spreadsheet, much like the one we were just looking at, that shows each region, how many counts per pixel there are, the size of the region, and also what the whole brain region is. So I can calculate what the regional value is for each structure, and it's a pretty straightforward process.

The main issue is placing the regions onto the individual's structures. Some structures -- when we're looking at the scan, there are multiple slices and some structures go over several slices, so there's two regions on multiple slices for a given structure, but basically what we're doing is we're just trying to figure out how much radioactivity -- on a very simplistic level what the radioactivity counts that are coming out of each area of the brain and then we create a spreadsheet, and the standard to normalize is that patient's whole brain value. I know that was one of the concerns that I had looked at that was raised about what was our normalization to, and we always normalize it to the whole brain score for each patient.

Q So let's -- since you brought up the concept of normalization and that was a huge bone of contention, and

you're aware of the fact that Dr. Evans and Dr. Mayberg contended that they were able to prove that you didn't actually follow your standardized, scientifically accepted methodology in calculating Mrs. Montgomery's PET results? You're aware of that?

A Yes.

Q I think that what you told me is I do what I do and I did what I do in this case?

A Right. Exactly.

Q You would dispute that?

A Yes. And basically I process every scan I do the same exact way. It's what I've said. We look at each region. We normalize to the patient's whole brain. I was actually somewhat surprised when they said, Well, I must have normalized, if I understood their contention, to some larger sample of other people's brains, and that's just not what gets done.

So basically once we normalize to that person's brain, we then compare to the group of normals, and that's how we decide whether or not her brain is abnormal or not, but that particular process is the same for everybody. Like you said, I do what I do. It's like you're baking a cake and you put in a teaspoon of salt and somebody said you didn't put it in. If you put it in, you put it in. It may or may not taste salty but it's in there.

Q Okay. Well, that's a lot of normals in one sentence. So there's a normalization process?
A Yes.
Q And then there's a comparison to a normative group?
A Right.
Q Which is composed of people who are normal?
A Who are healthy, yeah.
Q So let's talk about normalization first.
A Okay.
Q That process is unique to the individual patient; am I understanding that correct?
A Yes.
Q And how do you do that?
A How do I do it?
Q Yes.
A Well, basically we calculate -- we have a region that goes around the entire brain for that individual, and that provides the whole brain value for that particular person. We then compare each region to that whole brain value. So each person is normalized to their basic scan, and the reason that's important is that, as I mentioned earlier, part of it is that everybody's brain operates a little bit differently. So if your brain normally uses up to 4 milligrams of glucose per minute and mine uses 5, I need to take that into account. I need to know that there's a little bit of a difference between

just how our brains work at baseline so when I'm now comparing our brains, I can look at what individual regions are doing relative to the rest of the brain. That's how we ultimately make our determination about what parts of the brain are normal or not.

Q Now, there is this concept of normative group?

A Control group.

Q Which was a control group and that was the discovery dispute in this case with respect to getting their count-per-pixel data --

A Right.

Q -- on the normal group? Is that your understanding of the discovery dispute?

A Certainly one of them, yes.

Q And there was another discovery -- or another dispute regarding the scanners. We're going to do that after we talk about getting the cpp data from the normative sample.

A Okay.

Q There was a normative sample -- or Mrs. Montgomery's brain was compared to a normative sample of healthy individuals; is that correct?

A Yes. That's correct.

Q Was that normative sample a sample that was published in peer-reviewed journals?

A It has been published in peer-reviewed journals.

Q Was the process of comparing Mrs. Montgomery's -- the results of her imaging study to that normative sample, did you follow generally accepted scientific practices in doing so?
A Yes. And the same practices that we've done for other studies. So as I mentioned with some of the studies where we would look at patients with a neurological disorder and we want to decide whether or not their brain patterns look normal or not, we compare them to the normal control group; and so there were a number of different conditions that we've looked at and we say, Well, here's an Alzheimer's group cohort and we look at their brains and say, How does their brain compare to a normal control group and where are the differences? And that helps differentiate or establish what is associated with a particular problem, particular disorder.
Q So I'll represent to you, Dr. Newberg, that the record will reflect that on August 23rd of 2007 the government's experts, after testifying in court, requested through the government's attorney that Dr. Gur produce the cpp data for each individual that was in that normative sample. You're familiar with that?
A Yes, I am.
Q And at that time there was a trial date of October the 1st, 2007, and I know I'm an English major but I can figure out that's about five weeks before trial and they're requesting that data. Are you aware of the difficulties that the PET

Center encountered in trying to gather that data?
A Yes.
Q And what were those difficulties?
A Well, the main issue was that some of the scans from the control group were on different computers that had been changed, had been -- as we update things, had been changed and was in a different location and some -- we also archive our scans over time. They get put on different hard drives. They get put on different CDs at the time. So part of the issue was trying to go back and make sure we had who were the controls, where they were, where they were coming from, when the date of their scans were. So we had to go back and take a little bit of time to figure out which ones they were and get all of that information together.
Q So it's not like the -- all the controls were scanned on the same day and all of their data was stored on the same computer and archived on the same media; is that fair to say?
A That's correct.
Q That these control groups were built over time so their images may have been taken at different points in time, so their data could be on different computers and on different pieces of archived data?
A Exactly, yes.
Q And so the head of the PET Center for the University of Pennsylvania had to in his or her spare time when they weren't

conducting research and overseeing the PET Center go to each individual PET, each individual subject, find the media, find somebody who could run the computer because it was an older computer, pull up the data, re-analyze the data. Something have to happen to that data to make it usable?

A So we had to go back and basically get that data back from the scans themselves, from the count files that are generated; and so, yes, I mean, there's physicists who help us with our computer-related issues involved in helping to run the clinical center. She helps us with running all of our research projects; and so, yes, when she had a few moments, she could go back and identify where those patients were, gather up the data, load it up onto the common computer so we could get that information for everybody.

Q And did she do that as quickly as she could, in your opinion?

A Yes. Yes. I mean, she certainly wasn't purposefully not doing it, but she's a very busy person. So she would have to spend an hour or so getting everything organized, then gets called away to take care of a whole bunch of things and then get back to it a few days later. Since there were a number of them, it took her a little while to get everything organized.

Q And there's also patient care that has to be prioritized?

A Absolutely.

Q And research projects that are time sensitive that have to be attended to?
A That's correct.
Q And those are government-funded research projects?
A Many of them are, yes.
Q So if producing that data within about a five-week span of time, does that seem unreasonable to you as somebody who works at the University of Pennsylvania and works in nuclear medicine?
A It certainly could be a little tight, yes, absolutely.
Q Now, with respect to the other issue that was addressed by Drs. Mayberg and Evans -- we're good on time -- Dr. Mayberg and Evans had a criticism of the use of the normative sample in this case based on the different generations of scanners; is that your understanding?
A That was one of the arguments they made, yes.
Q Can you explain the nature of that criticism?
A Well, I think the basic criticism was that we had performed her scan on a particular type of scanner, on a specific scanner and whether or not the numbers and the values that are generated on that scanner would be the same if you're not comparing it to somebody who has been scanned on a different scanner.

So I think part of what we originally had done was to use our standard control group. I believe that when we were

asked to sort of look at the data again, we were asked to look at data only from that scanner.

So the bottom line is is that on a more technical level these scanners are very comparable. There are multi-site trials done throughout the country. Obviously some are being done on one type of scanner, some are being done on a large scanner, a smaller scanner, brain scanner, different brands, and so forth, and people have come to realize that for the most part it is still within that same kind of range of variability we were talking about. That's kind of what that standard deviation is all about which is that for the most part the scanners are comparable.

So even though I know we tried to get it so that the data that we were comparing to was as closely matched and on the same scanner as Ms. Montgomery's scan, even if you were to look at scans from a lot of different scenarios or from a lot of different scanners, I should say, the difference -- your values for the most part would hold. Whether or not it would be, you know, instead of two-and-a-half standard deviations, it might be two or it might be three. The numbers might vary a little bit but somebody who has an area that is very overactive is not suddenly going to look very underactive compared to normative data from a different scanner.

In fact, I know we'll talk about it, but in rerunning this data using a different kind of software program,

their whole basis is here is a normative group of subjects who have been scanned and people around the country can, again, use this software to determine if the scan on their scanner looks normal or not. So it's become a fairly common practice to recognize that while there is some variability on scanners, that it is typically not sufficient to trump over whatever abnormalities a person may see. If there's something very subtle, maybe; but when you're talking about large and substantial abnormalities, the different types of scanners are really not going to be very relevant.

Q And because the University of Pennsylvania really started as the pioneer in the field of PET studies, did other institutions and hospitals rely on your normative groups when they conducted their PET analysis?

A I don't know if other people specifically used our particular group. I know that they certainly have used our scanners and people have looked at the data. I can't say whether there's published data that's based on our normative database.

Usually just because of how studies get designed, there's almost always a control group that each site will use. So for the most part people will usually rely on their own data so that they can analyze it exactly the same way. There are a variety of different variations on how to analyze scans.

Q And Mrs. Montgomery's case she was actually analyzed on

a University of Pennsylvania scanner?
A Correct.
Q And you have been able to in other medicolegal contexts be able to come to reliable interpretations of PET data using the database that you have but the person was scanned on a different PET scan?
A That's correct.
Q For example, Vanderbilt?
A Correct.
Q And as long as the PET scanner was itself state-of-the-art, you don't have a problem with that?
A Right. I mean, there are always checks that I make as well. So we look at the image. That to me is always a very important piece of this. I'm looking at it. I've seen thousands of pictures, thousands of scans. So I can say, Well, gee, you know, that frontal lobe looks overactive. Now I'm looking at a number. Okay. It's shows it's consistent. If something is inconsistent with what I can see on the scan or if the numbers just seem completely inappropriate, then I can think about, Well, is there something wrong? Is there something about how the data was processed or how the scan was put together or how we calculated those values?
So there are these internal checks that we keep doing to make sure that the values that we're getting seem appropriate, are consistent with what we're seeing visually,

makes sense in the overall context of just how we understand the brain and brain function and the numerical values we can get from that.

And looking at Ms. Montgomery's -- and people move on the scan so the scan doesn't look good. But, you know, again, her first scan looked very good. It looked -- the quality of it looked excellent. It seemed very reasonable to be able to analyze the data and get good results from it.

Q So having reviewed Dr. Gur's reports that are Movant's collective 28 from April the 3rd of 2007 to January of 2008, based on what you knew at the time, were Dr. Gur's -- let me ask you this: Dr. Gur has a section in those reports that gives interpretations of the PET imaging data; is that correct?

A Correct.

Q And did you contribute to that part of the report?

A I contributed by providing him the information, by providing the data he then used to describe it, and I have seen them and I think his descriptions are exactly accurate. I didn't see anything in there that was different than what I had provided for him.

Q And is that how your reports typically work, that you all work together collaboratively; that Dr. Gur produces the ultimate report under his signature?

A Yes.

Q And that's your standard practice?

A Yes.
Q And you may have conversations with Dr. Gur that somebody might consider work product or brainstorming, but you have not in this case submitted a report that has your signature on it? You've given me a paragraph and we're going to talk about that.
A Right. Right. When I provide him with these scan results, there is usually kind of a brief email that I send that includes the information, the file that represents the patient's data, and a relatively brief description of what the data shows.
Q And would it be fair to say that all of that information that you conveyed to Dr. Gur is contained within the ultimate written report?
A Yes. Yes. And part of the reason that we do it that way is that he knows the patient. He knows the psychological pieces of the patient. So it's important for him to be able to look at that data and to be able to understand more how -- what it means in that context without me having access to the neuropsychological evaluations and things like that. That's why I provide him primarily the values, the numbers, then he utilizes that information.
Q In this particular case, which was unusual, you actually met Mrs. Montgomery but you didn't do a clinical interview?

A Correct.

Q And you didn't read any of the records or any of that?

A I mean, nothing substantial, no. I usually like to be somewhat unbiased in how I read the scans. I actually like to not know much about what's going on other than maybe some very basics of the case. I can go ahead and do the analysis and say, Okay, this is the results. Here you go, Dr. Gur. Now, you know, you put this information together with other data, the MRI data, other laboratory data that might exist, then, of course, the neuropsychological data.

Q In 2007 or actually today you wouldn't represent that PET data or a PET scan in and of itself is diagnostic for a mood disorder?

A Correct.

Q It's not diagnostic for PTSD?

A Correct.

Q Or a somatoform disorder?

A Correct.

Q It can be diagnostic for certain disorders?

A It's diagnostic -- again, it's part of the clinical diagnostic picture. So if you have somebody -- and we see a lot of patients -- as I said, up to this day we take care of a lot of patients. Maybe somebody has a concussion and their emotions have started to run wild. The question is what's going on? We can do a brain scan and we can look at the

emotional areas of the brain or areas that control our emotions and see whether or not they look normal or not and try to better understand what's going on with the patient, but it always has to be put together as part of the overall clinical piece of information, and to some degree this is true in all of medicine. I mean, we always talk about not treating a number because somebody's hemoglobin is a little high or their liver function is a little low. We don't necessarily treat that unless we're looking at them in the context of the bigger picture. That's what we ultimately try to put together like Dr. Gur's whole report, what we do with our clinical patients as well.

Q So it's important to -- as we start with this, you know, funnel of what people are expected to be normal and we get behavioral information in terms of a social history?

A Yes.

Q And that's a huge part of the clinical piece?

A Yes.

Q And then we get neuropsychological data which tells us something about how the brain is working?

A Correct.

Q And then we get structural data in the MRI and that gives us some information, right?

A Correct.

Q Then we get this nuclear medicine piece from the PET

scan and that tells us how the brain is functioning?

A Correct.

Q And then we have experts, such as Dr. Gur and others, who can then look at the client's actual behavior and make an assessment as to, well, when you have a problem on some neuropsych tests and you have a problem on the MRI and there's a problem on the PET scan and this person's engaging in some pretty crazy behavior, the probability of that person having a normal brain is pretty low?

A Correct.

Q But you're just a piece of that?

A Correct.

Q Now, having become aware of the criticism of your methodology, which was quite surprising to you; is that fair to say?

A The way they presented it, yes, absolutely.

Q Having read the reports of Dr. Mayberg and Dr. Evans, what is it they claim that you did with the --

A My understanding of what they claimed in my discussions with several different people and in looking at what they wrote is it looks like they're saying that when I analyzed Ms. Montgomery's scan, that when I did the normalization process itself, that I was somehow normalizing her scan to the data from the normal control scan, the whole brain values of the normal control scan. So -- and that's just -- I mean, I

appreciate that if someone were to do that, it would be the wrong thing to do, but that's why -- I don't do that. So each person's scan, hers as well, gets normalized to their own brain, and then from there you can compare it to other groups.

But just sort of plain and simple is it didn't make sense to say that, again, if I'm interpreting what their criticism was, that they thought and they tried to prove this by averaging these other values and looking at these other brains that they were saying that I somehow was using as the normalization process, that's just not the way it's done.

Q Did Dr. Mayberg or Dr. Evans reach out to you and ask you any questions about how you performed the analysis?

A No.

Q If they had, would you have answered their questions?

A Oh, sure.

Q And Dr. Mayberg and Dr. Evans, you know who they are?

A I know them. I don't know them well.

Q Being experts or people who practice in this field, they could read Dr. Gur's report and figure out that Dr. Gur is not the person who conducted the normalization process?

A Right. He would not have done the normalization process.

Q They would know that somebody -- a nuclear medicine specialist had been involved?

A Yes.

Q And they could have asked Dr. Gur, Hey, can we talk to the nuclear medicine specialist you worked with?
A Absolutely.
Q They would have been happy to let them know that?
A I would assume so.
Q There's also a complaint that only data on 35 of the regions of interest were provided instead of the 36 that were reported. Did you in the PET Center provide all of the regions of interest to Dr. Mayberg and Dr. Evans?
A Yes. Yes. I mean, it's basically a standard spreadsheet so it kind of comes as it is. I certainly didn't alter it in any way.
Q Now, because you became aware of these criticisms and they were quite shocking to you -- it's never happened to you in any other case?
A Not for that particular criticism, no.
Q Not to your knowledge?
A Not to my knowledge.
Q Mine either. Did you take it upon yourself, then, to rerun Mrs. Montgomery's PET data?
A Yes. So, you know, these are my methods so it's always a little concerning to me if somebody feels like I'm not doing something right. As a scientist, one of the best ways of trying to prove what data you have is right is to do it a different way, and over the last several years there's a number

of new software programs that are available. We actually use one at Thomas Jefferson University. It's called MIMneuro.

Q Can you spell that for the court reporter?

A Sure. I think it's all capital, M-I-M, then neuro, and it's a commercially available software program. It was an FDA-approved program for analyzing PET scans, basically. So I ran her original data, her original scan through that analysis to see whether or not I would get results that seemed comparable in terms of the basic areas that were -- that we found to be either high or low, and I was actually pleased, but you know, I thought it was very nice to see that the data for the most part was remarkably similar in terms of the limbic structures, which I know were one of the key areas that Dr. Gur had pointed out that we had found was abnormally elevated in Ms. Montgomery's scan, and they were all substantially elevated on the basis of this analysis as well.

This analysis, I should say, is in many ways -- it's hard to say whether one approach is better or worse, but one of the things that's nice about this as a comparison is that this is a very fully automated program. So the way it works is that I load the scan into the software. I basically click a button to say run the analysis. The software takes care of the rest. It normalizes the brain. It fixes everything. It applies the regions, and then it compares it to its own normative database, which, again, is an approved process. So to have that kind

of -- even taking myself out of the equation in terms of how I analyzed the data and being able to do it in a different kind of way, to get very, very similar results with the limbic system, the parts of the frontal lobe, temporal lobe, the areas that seemed to be high were generally high, the areas that were low seemed to be low. I thought that -- it was very helpful for me to see that the original data seemed to hold up extremely well, and here we are, whatever, nine, ten years down the road and with a much more updated software at least to come up with the similar kind of result was -- I thought it was very satisfying for me to see.

Q And you mentioned that this software program was approved. Approved by who?

A Well, it's FDA approved. It's approved by the FDA so that people can use it in a clinical context.

THE COURT: Do we need to hear more about today's technology?

MS. HENRY: It's to corroborate the data since this gentleman's information has been --

THE COURT: He's already testified to that extensively.

MS. HENRY: I just wanted to clear up who it was approved by. That's all. He said it was approved and that could be others.

I'll move on.

THE COURT: All right.

Q (By Ms. Henry) Showing you what has been marked as Movant's Exhibit 148. Can you identify what that is?

A Yes. So this is the printout that you get from the MIMneuro software. It is done a little bit differently, so some of the regions are not exactly the same. There are a couple of regions which are not part of the way they designed this software, so there's a little bit of a limitation in terms of exactly how carefully you compare everything.

You have the structure, then you have the Z-score which is comparable to what Dr. Gur had reported in terms of the Z-scores that we got from the original analysis. So this refers to the standard deviations above or below the normal database, and then Z-score -- the first column is the total Z-score for left and right, and then it's broken down into the left and the right side. There are a few structures, I think maybe down a little bit lower, which don't actually include a left and a right because they're just very general structures. They don't actually have a left or right. And that's what those mean.

So the cerebellar vermis, for example, is right at the midline, so we don't talk about it as having a left and right; but other than that, these values were -- actually, if you go to the next page, particularly towards the bottom of the results there, yeah, right there. So, I mean, you can see some

of these structures at the bottom; the parahippocampus, the midbrain, brainstem, the temporal lobe, the hippocampus, the amygdala, those were all critical areas that were elevated prior on the initial analysis, and these are all being picked up as elevated. In fact, actually I believe Dr. Gur also pointed out that there is even a little bit of asymmetries, that the right side tended to be a little bit more active than the left; and, again, we see a number of the -- you can just look at the very first -- the very one at the bottom, the parahippocampus, 6.36 on the right, 5.47 on the left. So, again, not only are we seeing the areas were elevated but we're even seeing kind of a left-right differentiation. So to me it's very supportive of what we had originally evaluated or proposed.

Q Thank you.

Would you consider this to be sort of the raw data of the analysis --

A Yes.

Q -- you just performed?

A Uh-huh.

MS. HENRY: Your Honor, I would now move admission of Movant's Exhibit 148.

MR. VALENTI: When was that created, Doctor?

THE WITNESS: This was done this past week.

MR. VALENTI: So October 2016?

THE WITNESS: Yes.

MR. VALENTI: Thank you. No objection.

THE COURT: Received.

Q (By Ms. Henry) And when you created this document, like I said, you took it upon yourself, then let me know you had done it?

A Yes.

Q You did provide a paragraph, a summary at that point?

A Yes.

Q And so that's something I'll represent to you I've provided to the government.

A Sure.

Q That's the only original written documentation that you have produced in this case?

A That's correct.

Q You mentioned the limbic system. This is the last area I want to talk about with you.

A Sure.

Q You mentioned that there were abnormalities shown in the PET scan in the limbic system. Can you explain what the limbic system is?

A So the limbic system is one of the main areas -- I basically refer to it as the emotional center of the brain. It's not the only area of the brain that's involved in emotions but it's very, very crucial to generate our emotional responses

and how we react to different things.

There's been a number of studies that have looked at people with posttraumatic stress disorder who have emotional dysregulation. There's been studies looking at violent criminals, many of which have pointed to the limbic system as being abnormal either in terms of its activity, its structure, or how it responds to various stimuli; and so when you talk about a person who may have experienced or have issues with emotional processing, emotional responses, then the limbic system seems to be one of the key areas that seems to be involved with that.

Part of the way that I tend to look at it, and maybe a little bit of an oversimplification, but especially when you talk about people who tend towards violence and violent criminals, what some of the data from my take on the literature shows is that often they either have a very hyperactive limbic system because their emotions are sort of too strong to be able to control properly, or another part of the brain, the frontal lobe, which normally helps to balance their emotions isn't working well enough, and we actually kind of see evidence of both of those in Ms. Montgomery that parts of the frontal lobe are not particularly -- are actually reduced in their activity. The limbic system seems to be increased. The implication for that would be that there are going to be times where the emotions are not controllable.

Q And is the literature and the science well established that individuals who are subjected to chronic sexual and physical abuse actually have changes in their brain function?

A Yes. I mean, there's a reasonable number of studies that have looked at people suffering a variety of different abuses; emotional abuse, physical abuse, sexual abuse. Again, people with posttraumatic stress disorder have become a very large area of study. Concussion, again, which is more a physical aspect of the trauma. All of these have shown and reflected a variety of changes going on in different areas of the brain, particularly emotional centers of the brain as well as some of the areas that help to regulate those emotional responses.

Q Did the PET analysis of Mrs. Montgomery also in 2007, corroborated in 2016, but in 2007 did it show abnormalities in Mrs. Montgomery's behavioral brain functioning -- I'm probably mixing my words there -- relative to memory?

A Relative to?

Q Memory.

A Memory? I'm not sure I understand.

Q I'm messing up my brain structures.

A Do you mean did it have something to do with her memory?

Q It has something to do with my memory right now.

Was there an abnormality with respect to the

parietal lobes?

A Yes. And also, I mean, if you're talking about memory, some of these structures, the hippocampus in particular, is very prominent with regard to our memory. In general, that makes sense because our brains want to remember things that are very emotionally important to us. So we remember important events because of their emotional aspect, and that's how we write things into your brain. So when people have abnormal functioning or structure of their hippocampus as well as in parts of their parietal and temporal lobe, then it's certainly very possible that memories will not function properly, will not be remembered, will be altered, a variety of different circumstances depending on what the situation is.

Q Thank you. Give me just one moment, please.

A Sure.

Q Thank you, Dr. Newberg. That's all the questions I have. I think Mr. Valenti will have some.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Newberg, before we get into this very long -- I won't be long -- as I understand it, with the brain no one particular area does one particular task. There's areas of responsibility, correct?

A Yes.

Q And other areas of the brain can assist and sometimes if an insult or injury occurs to the brain, other areas can try to assist or help?
A Correct, or could be affected by it.
Q I'm sorry?
A Or could be affected by it.
Q Or could be affected by it?
A Correct.
Q But it's a little bit like when people talk about the genes in the human body. No one gene says blue eyes. It's kind of a mix of several. So it's kind of hard to put your thumb exactly on this does this?
A Correct.
Q When you were talking about your analysis in this case, if I understand correctly, and I think I do, you provided a piece of the diagnostic puzzle through your scanning, correct?
A Yes.
Q Then the results that you got were provided to Dr. Gur who took other data that he received from other forms and then compiled the report that we know was authored on April 3rd of 2007; is that correct?
A Right.
Q I believe he then amended that report in August of 2007, but essentially the same. I think he cleaned up some typos and maybe moved some graphs around. Does that sound

about right?

A Yes.

Q Okay. Obviously you said this. You didn't author a report, and until recently as of a few weeks ago, when you reran the data, then you provided Ms. Henry with an explanation of the data you rerun and what it meant and she kind of provided that to me upon receipt. But you didn't write a report back in 2007?

A I mean, again, other than usually a very brief paragraph that just says we ran the scan. The scan looks good. Here's the general results.

Q And that would have been provided to Dr. Gur, correct?

A Yes.

Q That wasn't provided to Ms. Montgomery or her counsel at that time, was it, your email?

A I didn't send it to them.

Q You don't know if Dr. Gur did or did not?

A I don't know. I would assume he did.

Q You said that one of the reasons kind of -- I want to call this a bad analogy that I used with Dr. Davatzikos but kind of the quarterback analogy. Dr. Gur is kind of acting as the quarterback to kind of pull it all together, correct?

A Yes.

Q And you said the reason for that is because he knew the patient, correct?

A Right.

Q What do you mean "he knew the patient"?

A Well, he has access to all of the data on the patient. So, in other words, he has the ability to interview the patient, talk to the patient, look at the history of the patient, their history, the family history, whether they have laboratory studies, and other evaluations, the MRI data. So like Dr. Davatzikos, I mean, I don't see his MRI scan per se. So he's the one that has -- the quarterback analogy is good. He's sort of putting that all together; and, hence, I argue knows the patient better than any of us know the person as to what's going on.

Q As the permutation of knowing the patient, you mean having access to the patient as part of the diagnostic or clinical interview?

A It certainly could be, yes.

Q In your own practice because you have kind of divergent specialties, that being internal medicine and in your scanning -- or nuclear medicine role, nuclear medicine you're a little more removed than you would be than an internal medicine specialist?

A Correct. For the patient.

Q For the patient. As it relates to the patient. That's what I'm trying to say.

A Right. So if somebody sends me a patient, they know

the patient. They know everything that's going on. I come in and discuss that with them based on the scan results, but it's not my patient.

Q Understood. You were asked about whether Dr. Mayberg or Dr. Evans ever called you. How many criminal cases have you been involved in over the years; do you recall?

A Probably about 30 or 40, or so, something like that.

Q Do you recall approximately when you started doing that?

A It was probably early 2000.

Q So maybe for the last 15 or 16 years?

A Uh-huh.

Q During that time, have you always been hired on behalf of the criminal defendant?

A I mean, many of those times. I suppose there have been -- I know there have been some times it's been more of an injury type of case.

Q So some of the cases are criminal and some of them have been civil?

A Civil, yeah.

Q And I want to refer to the criminal cases. Of the handful, the 30 or so you said you've done, how many of those do you think would have been criminal in nature?

A I'm sorry. Say that again.

Q How many of the cases that you worked on in court where

you've been asked as an expert are criminal cases?

A I would say 80 percent or 90 percent.

Q In those cases whether you're an expert for the government or the State, if it may be in Pennsylvania or for the defense, have you been told prior to court to speak with the other side's experts?

A Have I been told to speak? I haven't been told to speak to them.

Q You realize that if I propound to you that in criminal matters, especially when the death penalty is alleged, government experts and defense experts kind of want to keep those to ourself because generally we're on opposite sides of the issues; do you understand?

A Yes.

Q Does that make sense?

A Yes.

Q And so Dr. Evans and Dr. Mayberg did not call you, but you didn't call them either?

A No.

Q When did you become aware of the complaint they had about your methodology?

A I don't know the exact time or date. Usually it's after the case has been involved or tried and sometimes that will be usually from Dr. Gur or from the counsel.

Q Did you learn about it prior to this case being tried

in October of 2007?

A Prior to the trial?

Q Correct.

A Honestly, I don't think so but I don't know.

Q During the time that there was a dispute about the admissibility of Dr. Gur's testimony, Dr. Gur authored a number of reports that supplemented the reports he prepared on April 3rd of 2007 and then August of 2007. In the original reports he wrote your raw data as it was identified was not provided, was it? I think you said a graphical representation of the data was there.

A You mean as part of Dr. Gur's report?

Q Correct.

A Yeah. So the raw data is presented as the graph, yes.

Q And then on October 22nd of 2007, three weeks after the trial of Ms. Montgomery commenced, for the first time he attached the raw data to a report that -- or really a letter that he wrote to defense counsel, Fred Duchardt. Have you had occasion to look at that report or that letter?

A If you show it to me, I can let you know if I did, but I think I did.

Q The exhibits are marked collectively as 28. I've marked them down by date, 28(e), a letter authored October 22nd, 2007. Have you seen that before?

A I have, yes.

Q And I believe at the tail end of that report what you were shown earlier on the Elmo was the raw data as it relates to the testing you would have done on Ms. Montgomery, correct?
A Yes. Correct.
Q Then after the trial of Ms. Montgomery on January 8th, 2008, Dr. Gur kind of laid out his exceptions with Dr. Mayberg and Evans more completely or more fully; and, again, if you would look at 28(f) and tell me if you've seen that?
A Yes. I have read that.
Q And you would agree that your raw data is again attached to that report as essentially just a duplicative copy of what was provided, I think, three weeks earlier on October 22nd?
A I assume it was the same. The numbers are -- this -- I think this may have been --
Q There might be another page to it.
A I was just trying to see if there was -- again, I know that part of the question that had come up at one point had to do with what was the control group. So I'm not sure -- because it looks like the healthy control group numbers are just a little bit different. It could have been -- I know that when we were originally asked to get the old data, that there may have been some differences because of which control group we specifically use. This gets back to what I was saying about to some degree, you know, whether or not it's done exactly on the

same scanner or not so you have a value for the healthy woman of .95 instead of a .94. But other than that, the values will probably be fairly comparable.

Q For me to clear the record, I might have said it's duplicative of what was provided on October 22nd. Instead there's additional raw data that might have been run in a slightly different way but it's essentially raw data provided on February 8, 2008?

A Correct.

MR. VALENTI: Just one moment, Your Honor.

That's all I have, Your Honor. Thank you.

THE COURT: Ms. Henry.

MS. HENRY: Nothing further, Your Honor.

THE COURT: All right. Thank you, Doctor. You're excused.

(Witness excused.)

THE COURT: All right. We'll take a break for lunch now until 1:30. Also we briefly discussed earlier the possibility of convening the trial on Friday next week, the holiday. That's not possible because of security issues with the building. It involves too many people and too many resources and too much expense. We would have to have volunteers to secure the building, and I'm not going to ask people to do that. So just so you know, we're not going to be in court on Friday of next week.

I'll be back at 1:30.

(The noon recess was taken at 12:30 p.m. to 1:30 p.m.)

AFTERNOON SESSION

THE COURT: Ready, Ms. Henry?

MS. HENRY: Good afternoon, Your Honor. Movant calls Camille Kempke.

THE COURT: Right up here, ma'am, please. And before you're seated, she'll swear you in.

CAMILLE ELIZABETH KEMPKE, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Dr. Kempke, could you please have a seat. And you have a quiet voice so I'm going to ask you to make sure you speak into the microphone and I'll try to do the same thing. Okay?

A Okay.

Q If you can please state your name for the record and please spell your first and last name for the court reporter.

A Camille Elizabeth Kempke, C-a-m-i-l-l-e, K-e-m, as in mother, p, as in Peter, k-e.

Q And, Dr. Kempke, what is your profession?

A I'm a physician in the specialty of psychiatry.

Q Have you recently retired from federal service?

A One week ago today.

Q And I'd like to ask you about your federal service as

it relates to Mrs. Montgomery. I'll do that in a moment. But I'd like for you to share with the Court your professional education, if you could, please.

A Bachelor's degree in science from the Michigan Technological University, 1975. M.D. 1978 from the University of Michigan. Residency in internal medicine -- or partial residency in Reading, Pennsylvania. Then I did a general practice doing both emergency medicine and primary care, returning to do a psychiatry residency at Johns Hopkins, 1993 to 1996. First boarded in psychiatry in 1998. Reboarded in 2008.

Q You reboarded in psychiatry?

A Yeah. We now have to reboard every -- what used to be every ten years. Now we get to do it every three.

Q So you were an actual practicing physician, I believe in emergency rooms, for a period of time before you went back and got your additional degree in psychiatry; is that correct?

A Thirteen years.

Q And then as a psychiatrist, are you licensed in any states?

A I'm licensed currently in Michigan. I carried licenses in other states.

Q And you've recently retired from the Veterans Administration; is that correct?

A Correct.

Q And you worked with the Veterans Administration for how long?
A Six years.
Q Immediately prior to your employment with the Veterans Administration did you work for the Federal Bureau of Prisons?
A I worked at the Federal Bureau of Prisons at FMC Carswell February 2008 through September 2010.
Q And FMC stands for what?
A I think it's --
Q Is it Federal Medical Center?
A That sounds good, yeah.
Q Okay. And is that the facility that houses -- well, who's housed at the facility?
A All women. They have the max unit there which is the admin unit, the medical unit for all women as well as they have a low and a medium -- or they have a low and a -- I don't know. One of those places where you walk in and out, really low security.
Q And were you a psychiatrist on staff at the FMC Carswell Bureau of Prisons in 2008 to 2010 when Lisa Montgomery came into custody there?
A Yes, ma'am.
Q What was your role at the FMC Carswell during that time frame?
A I was the treating psychiatrist on several different of

the units, starting off on the lockdown mental health unit and eventually moving over to the admin unit as well as carrying various duties amongst other people as needed to the units. There was an outpatient mental health unit that I also cared for. I saw people on the M-3, more secured lockdown unit as well.

Q So for purposes of your testimony today, I want to focus on the M unit and the admin unit, just for you to describe how they work so the Court will understand how you came in contact with Mrs. Montgomery. What is the M unit?

A I assume it stood for mental health but probably just mental. I believe M-1 was the lock unit where people had to have permission to go off the unit. The M-2 unit was in between that unit and the M-3 unit. M-2 was the more standard outpatient unit. Really just so the mental health nurses kept an eye on some of the people that were mental health problems, and then the M-3 unit was the equivalent of a SHU for mentally ill special housing.

Q Special housing unit?

A Right.

Q And if someone had made suicide attempts, would they go over to one of the M units?

A M-3 is the one that had the solo rooms, and the facilities were barren enough to minimize the risk of suicide in a couple of the different rooms there.

Q And the admin unit, is that the unit where Mrs. Montgomery was ultimately assigned to live?
A Yeah. That was the maximum security unit, and that was a separate building in a different part of the campus.
Q And was she assigned to live in that unit because of the nature of her sentence?
A Yes.
Q There's not -- there's Terre Haute, which is the death row for men, but there's really not an equivalent of that for women; is that correct?
A That's correct.
Q Mrs. Montgomery and another woman by the name of Angela Johnson made up federal death row for women?
A Correct.
Q And they both lived in that admin unit?
A Correct.
Q And Ms. Johnson is no longer there. She's out in general population?
A That's my understanding.
Q Did you see Ms. Montgomery in both the M-3 unit and the admin unit?
A Yes, ma'am.
Q As her treating psychiatrist?
A Yes, ma'am.
Q Were you the treating psychiatrist who saw Mrs.

Montgomery when she was received at Carswell?

A Yes.

Q And when she first got to Carswell, did she stay in the M unit for a period of time?

A Yes.

Q And when she left -- why was she there for a period of time?

A First of all, she carried a mental health diagnosis, bipolar disorder. Secondly, she was not doing particularly well psychiatrically. And, thirdly, they didn't really know what they were going to be able to do with her as far as housing, whatever the special corrections requirements were. So she was a transfer from another facility.

Q When you say she wasn't doing well psychiatrically, can you please describe for the Court your personal observations of Mrs. Montgomery that caused you to come to that conclusion?

A She was disheveled, not taking care of her hygiene. She was difficult to get to respond to questions or come to the door and talk.

Q Did you at that time decide that was probably related to her sentence?

A Yes.

Q Over the course of knowing Mrs. Montgomery for two years, did you later come to a different conclusion?

A Yes. That was not her standard presentation. She's

had that presentation a couple of times while I was there. The first time when she came in and later on she had another depressive episode and she looked the same at that time. Most of the time, though, she was happy to talk and chatter away.

Q Was Ms. Montgomery medicated the entire time that you interacted with her at Carswell?

A Yes.

Q And what was she being medicated for?

A She was being medicated for bipolar disorder.

Q And is that a type of mood disorder?

A Yes, ma'am.

Q Does it have psychotic features?

A Yes, ma'am.

Q Did you observe Mrs. Montgomery ever in an acute psychotic state?

A Yes. Particularly the second time she was depressed is when I recognized what was happening the first time. She was in a solo room in the admin unit, wouldn't come to the door, wouldn't talk to me, except she had to because otherwise she would be disciplined correctionally, and was very just dirty, slovenly, which was not her standard, and reported having difficulties with no longer being able to hear the radio properly.

Q When you saw her on the second time, how did she present? What caused you to see her the second episode of

psychosis that you observed? What brought that to your attention?

A The guards called me that there was problems going on, and then when I got to the unit, some of the other inmates on that unit told me I needed to check her.

Q And what did you observe when you checked her?

A That was when I received that symptom that I gave, the symptoms. She was staying back in the room, not getting out of bed, not doing any of her tatting, not able to listen to the radio, one- and two-word sentences were extraordinarily difficult to extract from her.

Q And there was some issue about the radio. Can you explain that?

A We had talked about what some of the symptoms might be for her psychosis; and because she had apparently had a previous experience with an antipsychotic, and the difficulty was that she would not be able to understand what was -- what the words of her favorite songs were when they were playing on her radio, and my interpretation of that was that was a form of psychosis.

Q And had you had a lot of contact with Mrs. Montgomery so you were able to see her in and out of different states?

A Yes, ma'am.

Q Had you developed a relationship of trust with Mrs. Montgomery?

A Yes, ma'am.

Q Because she had been on a previous antipsychotic, did you determine that it was appropriate to try an antipsychotic with Mrs. Montgomery at this time?

A Anyone with a bipolar disorder who is psychotic is deserving of one. She was already on a mood stabilizer, Depakene, and that was not holding her. So in that situation anybody with a mood disorder gets an antipsychotic, who gets psychotic.

Q And what antipsychotic did you choose to use with Mrs. Montgomery?

A I think at first tried some Abilify, which is a newer one of the atypicals, but she did not tolerate it, so eventually returned to Risperidone.

Q Could you spell Risperidone for the court reporter?

A R-i-s-p-e-r-i-d-o-n-e.

Q And what is Risperidone?

A Risperidone has another name, which is Risperdal, which is R-i-s-p-e-r-d-a-l, which is the brand name but working in the VA I now use all generic names. It was the first of the atypical antipsychotics, called atypical because they don't cause as much movement disorder as some of the other older style, Haldol, Prolixin style of old generation antipsychotics.

Q How did Mrs. Montgomery respond to the prescription for the antipsychotic of Risperidone?

A The depression resolved and she went back to being herself.
Q And the psychosis resolved?
A Yes, ma'am.
Q Did she make any representations to you that she could, for example, now listen to the radio and the words on the radio made sense?
A Yes.
MS. HENRY: Just one moment, please, Dr. Kempke.
Thank you very much. That's all I have.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Kempke, my understanding is you were at FMC Carswell from February 2008, did you say?
A Yes.
Q Until 2010? And you saw Ms. Montgomery in April, May, that timeframe of 2008?
A Yes.
MR. VALENTI: That's all I have.
MS. HENRY: That's all, Your Honor.
THE COURT: Thank you, Doctor. You're excused.
(Witness excused.)
MS. HENRY: May it please the Court. Movant calls Dr. Ruth Kuncel.
THE COURT: Good afternoon. Doctor, would you come up over here to the witness stand, please. Thank you.

RUTH BOUTIN KUNCEL, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good afternoon, Dr. Kuncel. Could you please state your name for the record, and please spell your last name for the court reporter.
A My name is Ruth Boutin Kuncel, K-u-n-c-e-l.
Q And how about that middle name?
A B-o-u-t-i-n.
Q Thank you.
Dr. Kuncel, are you recently retired from forensic psychiatry?
A Yes, I am.
Q What is your professional background?
A By original training I was an academic psychologist specializing in test design. The bachelor's, master's, and Ph.D. in psychology from the University of Chicago. I later went back for another three years and specialized in clinical psychology.
Q So I'd like to talk with you now about your experience as an academic. When you got involved with psychology, were you initially quite interested in becoming an academic and studying the development of testing instruments?
A Yes, I was. That was my original training and intent. In fact, I was on the faculty at the University of Chicago for

five years doing research around test design, issues of reliability, validity, test construction.

Q We're going to return to your work with test design, validity, and test construction in just a moment. But after you received your three years of additional training, did you become licensed as a psychologist?

A I was licensed before I returned to school.

Q And where are you licensed?

A State of Illinois.

Q And your entire career you've been licensed in the state of Illinois; is that fair to say?

A Yes.

Q Did you engage in a clinical practice?

A Yes.

Q What was that clinical practice?

A It was broad based. I saw children, adolescents, adults, families. I was also involved in a lot of child custody evaluations which bridges the gap between clinical and forensic work.

Q As a result of your work in child custody evaluations, were you appointed to any specific boards or anything like that?

A I was appointed by the presiding judge of the domestic relations division to be on the committee that oversaw the child custody evaluation and help create a new program. So I

sat for weeks with a group of judges to arrive at a new design for a new program.
Q What county was that?
A I'm sorry?
Q What county was that?
A That was DuPage County, Illinois, west of Chicago.
Q Is that a fairly large suburban county?
A Yes.
Q I believe you said that all of your training has been at the University of Chicago; is that correct?
A Except for the respecialization. That was the Illinois School of Professional Psychology.
Q And the University of Chicago, is that a well-respected, well-ranked department of psychology?
A Yes. If you want to believe U.S. News & World Report, it's ranked one of the top three universities in the country and the psychology department at the time I was there, especially around psychometrics, was considered one of the best available.
Q In addition to your -- well, in your clinical practice you treated patients; is that fair to say?
A Yes.
Q And you also did work in the child custody arena. Have you also been involved in forensic work?
A Yes.

Q And what was the nature of your involvement with forensic psychological work?
A It's been quite broad. I've been involved in roughly 40 capital murder cases, a number of sexual assault cases. I have done -- I've worked as a therapist with people who have been abused or neglected or some way mistreated where there's a trial subsequent to it. Those are some examples.
Q So, as an example, you have worked with rape survivors to help them face an upcoming trial and how to get through it?
A Yes.
Q And is that because of your specialization in treating individuals with trauma?
A Yes. I have a background working with PTSD patients. One of the advantages I've had is I've had a number of variety of experiences, which I would like to think allows me to pull that together around any particular case that I happen to have.
Q In addition to the work that we have described, have you engaged in any teaching positions?
A Yes. I taught briefly down at Roosevelt University in Chicago.
Q Have you also participated in research in the area of psychology and testing in particular?
A Yes. I conducted research around how to go about taking personality tests. Was heavily involved with Don Fiske who is one of the people who helped construct and design the

whole idea around reliability and validity of tests, so trying to help design quality tests that will allow good measurement and to set up standards for those tests has been central to the kind of research I did.

Q And when you first began practicing as a psychologist, was it your intent to become an academic?

A Yes.

Q And were you specifically interested in becoming an academic in the area of psychometric testing?

A Yes.

Q And do you feel that is an area of expertise that sets you aside from any other forensic psychologist?

A Yes.

Q How long have you been -- had experiences working in the field in the area of test design?

A I started working in the area of test design when I was a senior in college.

Q So many years?

A Yes.

Q Have you received any special fellowships, honors, or awards that is relevant to the testimony that you are going to be presenting here today?

A I received various academic awards over the years, scholarships, fellowships. I think this addresses your issue.

Q For example, you were the U.S. Public Health Service

Predoctoral Fellow with the National Institute of Mental Health?

A Yes.

Q National Institute of Mental Health, is that a government agency?

A I believe so, yes.

Q Have you authored any peer-reviewed articles?

A Yes.

Q And do those peer-reviewed articles deal with the issue of psychometric testing?

A Yes.

Q And have you also published some non peer-reviewed original articles?

A Peer-reviewed or book chapters in journals or publications that have to do with psychological testing, psychometric testing.

Q So you've written a couple of chapters in books on psychological testing?

A Yes.

Q Have they been published?

A Yes.

Q For example, in the subject of reducing diversity in subject interpretation of items published in conjunction with Dr. D.W. Fiske?

A Yes.

Q And who is Dr. Fiske? I'm sorry.
A Donald Fiske was the chairman of the psychology department at the University of Chicago when I was there. He's best known for helping to develop methodology around reliability and validity of tests. He came out of Harvard originally and was quite well known in the field at the time.
Q And you worked quite closely with him?
A I worked with him starting as a senior in college. I stayed on through -- he was my dissertation advisor. I worked in conjunction with him for five years afterwards when I was on the faculty.
Q Then in 1995 did you also author a book chapter on response process models; toward an integration of cognitive processing models, psychometric models, latent trait theory, and self-schema?
A Yes.
Q You also list on your CV, which has been admitted as Movant's Exhibit 44, a number of abstracts?
A I'm sorry?
Q A number of abstracts?
A Yes. They were published as various abstracts, yes.
Q What's an abstract?
A It's a summary that appears in a publication that reviews publications, articles, and other journals.
Q And have you been an invited lecturer on matters

relating to --

THE COURT: Excuse me. Is the CV in evidence, Exhibit 44?

MS. HENRY: It is, Your Honor.

THE COURT: Okay.

MS. HENRY: The reason I'm going through this, Your Honor, is because Dr. Kuncel's credentials were challenged quite a bit at trial with respect to her ability to administer and interpret psychometric testing. So I felt like it was important for the record to reflect --

THE COURT: What was the ultimate result of that, though?

MS. HENRY: The ultimate result of that would be that the -- we would argue and Dr. Kuncel is going to testify she felt like her testimony was completely undermined and not understood in front of the jury.

THE COURT: It was allowed, right?

MS. HENRY: It was allowed. We have alleged that it was handled ineffectively by trial counsel.

THE COURT: Can you just enter her CV in evidence and we won't have to go through all of that?

MS. HENRY: Certainly, Your Honor.

Your Honor, may I just approach the witness?

THE COURT: Sure.

Q (By Ms. Henry) Dr. Kuncel, I'm going to hand you

Movant's Exhibit 44. Is that your curriculum vitae?
A Yes. It was at the time that I --
Q That you provided it?
A -- provided it, yes.
Q And since you provided it, you've retired?
A Yes.
Q From forensic psychology anyway?
A From forensic psychology, yes.
MS. HENRY: Your Honor, I would offer Dr. Kuncel as an expert in psychometric testing as well as in clinical psychology.
THE COURT: All right. I will consider her testimony.
MS. HENRY: Thank you.
Q (By Ms. Henry) Dr. Kuncel, did there come a time -- you said that you have worked with almost 40 capital defense teams; is that correct?
A Forty capital murder cases, yes.
Q And in those 40 capital murder cases one of them was the Lisa Montgomery case; is that correct?
A Yes.
Q Is it also correct that you were -- you were initially recruited in this case because you worked with a mitigation specialist named Dani Waller; is that accurate?
A Yes. My understanding is she recommended me to Mr.

Owen.
Q To Mr. David Owen?
A Yes.
Q And Dani Waller is someone who you were familiar with at the time?
A Yes. I've worked heavily with her in various murder, capital murder cases in Illinois primarily.
Q And most of that work that you did was prior to Illinois doing away with their death penalty; is that correct?
A Yes.
Q And is it fair -- we should make clear, Dr. Kuncel, you wanted me to make clear to the Court that you were much fresher with the current state of psychology back in 2007 than you are today?
A Absolutely.
Q And you have chosen to really scale back your forensic work some time ago?
A I quit doing forensic work about three years ago and focused on other things in my life since then.
Q So we don't want to overstate your testimony today, but we want to focus in on your work with the Lisa Montgomery team as it compared to your experiences in other cases.
A Yes.
Q Fair enough? Having worked with Ms. Waller and other mitigation specialists and other capital trial teams, what was

your normal role on a capital trial team?
A My normal role was to be approached by the attorney who seemed wide open to, Ruth, what do you think? Take a look at this individual, come back and tell me how you see this person, what arguments seem appropriate, and I did that. I would go take a look, I would come back to the attorney and it varied. Sometimes, depending upon the perspective of the attorney, either there's nothing I have to say that is likely to help you given your argument, all the way down to I think she's psychotic or whatever it is that I thought.
Frequently the defense, if I'm testifying for the defense, was built around my take on what it was. That, of course, I respect the attorney, whatever the attorney wants to do, but often I was very integral to the process of formulating the case.
Q And how did your typical experience compare to your experience working on the Montgomery team?
A I perceived myself as quite peripheral in this case; that the focus of the defense was elsewhere; that they had a diagnosis that they wanted to use, which I -- pseudocyesis is not an expertise that I have. I didn't think it would be ethical to be directly supportive of something about which I'm not knowledgeable, and so I felt marginalized in the case that they were off doing with other people what it is that they felt was appropriate to their version of the case, and I respect

that.

Q So, Dr. Kuncel, I would like to break your experience with the Montgomery case up into basically three different sections. Okay? So right now I want to talk about that first section, which would be your initial involvement in the case in January of 2007 through your evaluation of Lisa Montgomery which occurred -- started in January but ended up concluding in March and culminated in a report. Okay? Can we focus in on that time?

A Okay.

Q From about January of 2007 until the beginning of March 2007, is it fair to say that your primary contact with the defense team was with an attorney, David Owen?

A To the extent I had any contact, yes.

Q And there wasn't much contact with him either?

A Correct.

Q And then after March of 2007 through the trial, the attorney who contacted you about anything substantive related to the case, that was Fred Duchardt; is that correct?

A For the most part, yes, with rare exceptions.

Q And then logistical issues about paying the bills, that sort of thing, Mr. Owen was in charge of making sure that the invoices got paid?

A That's my recollection. All of this is based upon my best recollection.

Q We should be clear about this. This was nine years ago?

A Yes.

Q And you're just testifying today from what you remember?

A Yes.

Q But you do have some strong memories that we'll get into?

A Yes.

Q Do you recall, Dr. Kuncel, when you first came to evaluate Ms. Montgomery at the CCA in Leavenworth?

A Yes.

Q Did something happen during that evaluation that you believed compromised your ability to make an effective presentation of your opinions to Ms. Montgomery at trial?

A Yes, very much so.

Q What happened?

A Well, I arrived. I conducted my first day. My understanding as to what time I could leave that evening was truncated. And then I returned the second day to continue with testing, and they had removed her overnight to Philadelphia. So, therefore, I was left right in the middle of a number of processes, testing, et cetera, that really I think compromised from then on the quality of my work and what I should say.

Q Did it surprise you that the attorneys had not

communicated with the authorities at CCA to ensure that Mrs. Montgomery would remain at CCA during the course of your evaluation of her?

A I don't know how it is, the inner workings of this are, but it really surprised me that it had not been arranged, having transported myself from Chicago to Kansas City, that there was not some kind of arrangements that would guarantee me a second day with her.

Q There did come a time when you visited Ms. Montgomery again to complete your evaluation; is that correct?

A Yes.

Q And where did that take place?

A In Philadelphia.

Q Were the conditions of your evaluation of Ms. Montgomery in Philadelphia obstructive to your process there?

A Yes, quite.

Q Can you please describe for the Court what those obstacles were?

A First, they didn't seem to anticipate me. They did not know where to put me with her to interview her and test her, and I was ultimately assigned to a room with a glass wall that looked out on the area where visitors congregated before they were allowed admission to see whoever it was they had come to see. So we were sitting there interviewing looking out at 30, 40, 50, 70 people milling around, including there was one

toddler who came up, put his mouth on the glass watching us while we worked.

Q And why is that a problem?

A Well, one, it's a distraction for me and for the person I'm interviewing. Two, there are standards for administering tests and they do not include giving tests to people with a glass wall, milling around, people watching us, babies, and so on. That was the first complication there.

Q Were there others?

A Yes. Then there was an additional problem that it started to snow, I gather. In other words, the staff that was supposed to come in to -- was late and so I was asked to leave prior, again, to when I had rounded things up for the day.

Q So is it fair to say that in your evaluation of Ms. Montgomery you faced a number of obstacles that you felt compromised your data?

A Yes. To the point I could still remember thinking walking out of the -- here in Kansas City that I know I'm going to end up on a stand being quizzed about the quality of my work because it has in fact been compromised.

Q And you're referring specifically to the fact that you had begun to administer the MMPI to Ms. Montgomery and had intended to complete that with her the next day; is that correct?

A Well, I had intended to complete it on the first day.

Given my understanding, I had time to complete it. It would have been in one piece. But given that, okay, I would come back the next day and finish it, but she was gone. So now I faced having half of it done and it's six weeks later in Philadelphia.

Q And you were aware, because you were here, that became a major issue in your testimony?

A Yes, it did.

Q And you're also aware because you now read Dr. Martell's testimony that even before you got on the witness stand the jury had been told that your data was in fact invalid and worthless?

A Yes.

Q Did you -- what was your feeling and why did you make the decision that you made to continue with the MMPI in the way that you did?

A No matter what I did I was going to be subject to questioning and challenge. There is no out given what happened to doing it that's not going to be addressed by the opposing psychologist and criticized.

My decision to use the first part after much careful consideration was that she was sufficient -- it was already two years after the original incident. I had -- when I saw her in Kansas City, her mental state was much poorer than it was when I saw her later in Philadelphia, and I wanted to hold on to the

first part of the testing.

The way the MMPI is put together, most of the more important scales are in the first half of the testing. So I decided to retain those and use -- and go ahead and finish testing her. If I had been unethical, I could, frankly, had finished it and said it came from one point and not, but that's not who I am. So I clearly marked for Dr. Martell where I had left off and where I continued.

So the data was compromised in that sense? Yes, it was. I thoroughly agree. To start over, though, there are problems psychometrically with test retests generally. She'd already been given the test previous to me. My version was already a test. So what do I do? Then I end up facing two and a half -- if I start over, but she's been given the first half of this test three times now but only two for the second. There was no good out given that the defense had not -- or if they could, provided me with an assurance that I could give it in one piece in one location.

Q Why not just throw it out altogether and just not use the MMPI?

A I'm sorry?

Q Why not just throw out the MMPI altogether and just not use it?

A I could have but I'd already given half of it. So I was going to have to deal with the fact that I had already

given half of it. Plus, the MMPI -- psychometric testing is very complicated and takes, frankly, a fair amount of expertise in ethics to handle it effectively and to throw it out. One of the -- it's one of the better psychometric tests available. So my decision was if I make clear, very crystal clear what I had done with it and use my own psychometric judgment, professional judgment around what the use of that test is, had one that compared to it before, that that was of the available choices the best one available to me.

Q Understanding that none of them were ideal?

A None of them were going to work very well.

Q And is it fair to say, Dr. Kuncel, that even though you have this additional psychometric academic experience, you don't diagnose on the basis of an MMPI?

A No. It's one -- it's one piece of data. The process of diagnosis requires a lot of pieces of information. Similar to a medical exam. Blood test shows this, physical exam shows that. You put the pieces together and you do it as best you can in a method that's going to integrate the information to the best diagnosis you can offer.

Q And so that was one way in which your ultimate testimony was undermined but there were others; is that fair to say?

A Yes.

Q And can you describe one such example for the Court?

A Well, one way that it was undermined was -- I testified in mitigation that my test data was proven at trial by Dr. Martell with his criticisms of it, and then the jury, without hearing from me about my test data, arrives at a verdict, and so now they're looking at me testifying in mitigation where they already have -- I would think in many cases -- an entrenched opinion based upon their own decision and verdict around the quality of my information and data.
Q So let me back up for a minute because there's this whole first phase/second phase dichotomy here. The referral question that your report addressed was actually a first-phase defense of not guilty by reason of insanity; is that correct?
A That was my understanding, yes.
Q So that was the question you were answering in the report, but you were not offered as an expert in the first phase of the case?
A That's correct. I did not -- I don't have a medical background. I don't have an expertise in pseudocyesis. It did not feel appropriate to offer an opinion about pseudocyesis in my evaluation, and that created another kind of quandary for me. I didn't have anything, to my knowledge, of pseudocyesis that negated it, but then exactly how you handle what you do have -- what I did have to say, that was another kind of difficulty.
Q And we've been talking a whole lot now about testing

and test data which, as you and I have discussed, is really when you're in front of the jury not one of the things you really want to focus on a lot, but in your trial testimony, because of these obstacles you faced with the psychometric testing, did you end up spending the majority of your time on the witness stand defending your test protocol and very little time discussing Mrs. Montgomery's social history background?

A Yes.

Q In fact, is it fair to say if I've represented to you that in the entire course of direct examination and a very lengthy cross-examination, I think your direct was 22 pages and Ms. Cordes went on at some length on cross, there was only nine pages of social history data?

A Something like that.

Q And was it your understanding that your role in the penalty phase of Mrs. Montgomery's trial was really to serve a role similar to that of what Jan Vogelsang has provided in the 2255 proceedings?

A My understanding of my role to some extent was that, but in a basic kind of way, what exactly what my role was. The defense team and I -- I was not integrated into the process of how they were handling the case sufficiently. Then when I stepped up to the witness stand, I was really, to any extent, clear, What is my role in all of this?

Q So I was presuming you knew your role but you didn't

really --

A I was adrift in a number of ways. My typical procedure is to offer an attorney, Look, let me outline some possible questions to give you an idea what I think is important for me to convey. Obviously that's up to the attorney. But Mr. Duchardt did not want me to bother doing that. He was all focused on other things. Fair enough. That was his call.

Then when it came to discussing with him what I was going to do or how I was going to do it from my point of view, it was totally inadequate. I didn't know where I stood on that. I did not know with clarity how to deal with the pseudocyesis issue. That had not been worked out.

I also -- by background, I had also been qualified in court as a neuropsychologist, so the whole biological aspect of her situation was something else I could have addressed, but I had been told that there were certain kinds of -- certain testimony was not to be included in my testimony. So that left me uncertain and confused. Last thing I wanted to do would be responsible for a mistrial because I offered something that was inappropriate. There was a lack of clarity there about what to do.

So when you put it all together, I was really adrift, especially given the lack -- to me it's important when I testify on direct and have a chance to speak without the usual issues that are confronted in cross-exam to lay out

certain more complicated topics so that I can then under cross make reference back to those topics, things like malingering, that there are topics that can be addressed, laid out. This is what I think, here's how I think about it, then under cross I can make reference back. Because the defense and I had not coordinated, that had not been something that had been a priority. I was left also trying to testify where I'm trying to dodge all of these issues, tell the truth, respond appropriately to the attorney cross-examining me, don't mention biology in ways that are inappropriate, deal with the pseudocyesis issue. All of this left me very unable to respond in a way that likely was considered appropriate to the Court.

Q Having read Dr. Martell's testimony, you are aware that Dr. Martell represented to the jury that your testing showed -- though you didn't conclude that Mrs. Montgomery was malingering, but your testing showed Ms. Montgomery was malingering?

A Yes. I have since just recently read his report.

Q And if you had been called to testify at Mrs. Montgomery's trial regarding the issue of Dr. Martell's opinion of your report, if you'd been asked those questions, what would your responses have been?

A My response would have been first to point out that quality psychometric work requires a lot of expertise and a lot of ethical judgment around what is appropriate to conclude and

what is not; that within psychometrics it is very easy to cherry pick a couple things rather than looking at the nuances, which are invariably there, to say, Ah, here's evidence of X, therefore, X is true and go ahead and pursue an argument, which solves a lot of problems when you're dealing with a jury because it's simple, easy to grasp and it raises a traditional problem. It's a whole lot easier to argue this is true than to put together the data that says, no, it's not.

I objected to how he represented malingering, for instance, how he dealt with the two instances that he referred to in my test data around malingering and that they were stated as, at least as I understood his report, and my opinion is they were stated as this is evidence of malingering, topic over. We can now proceed because we know she's a malingerer and she's shrewd enough to go and malinger sometimes and not others when, as far as I'm concerned, each of these are cherry picked. Each of these are evidence of possible malingering. But let's look at them separately and let's look at all the tests that did not show instances of malingering. Rather, these are pieces of evidence of malingering -- no malingering rather than something where she knew enough about malingering to go fake successful testimony -- or responses otherwise.

Q So is it fair to summarize, then, that you think -- it was your professional opinion then and now that Dr. Martell's conclusions before the jury that Mrs. Montgomery was capable of

selectively malingering, you would disagree with that conclusion?
A I would disagree with them.
Q To a reasonable degree of psychological certainty?
A Yes.
Q Now, because of your -- not only do you have this specialized academic experience in psychometry but you also went back and got three additional years of training that you were not required to do?
A That's correct. I already had a state license and I could have practiced without those three years.
Q But furthering your education and as someone who has experience with psychometric testing, you and I share a belief about those tests and whether they should be given at all, but be that as it may, they were and you testified about them. So is it also your experience that when psychometric tests are given, the test administrator, the psychologist, the professional who's going to interpret what they mean needs to take that test data and compare it with social history and records?
A Yes. It's one piece of data very much like a blood test. You use that data, you have a background to interpret that data in and of itself, and then you insert it within the background of your knowledge of other testing related to that particular test, how it compares and combines with other tests,

and then put it within the context of the social developmental history and biological characteristics of the person.

Q Did the trial team in this case ever provide you with a biopsychosocial history similar to that which -- let me back up and lay foundation to ask this question.

Since you've been contacted by myself and Ms. Harwell and Ms. Nouri regarding this case, have you been provided with a number of documents that were filed in support of Mrs. Montgomery's postconviction motion?

A Yes.

Q And did that include the report or the declaration which is actually a biopsychosocial history completed by a woman named Jan Vogelsang?

A Yes.

Q Did the trial team provide you with any sort of biopsychosocial history similar to that of Ms. Vogelsang's?

A Not that I recall.

Q Instead, did the trial team just hand you a bunch of records and tell you good luck?

A That's one way of saying it, yes. I had a bunch of records, bunch of bits and pieces, and it was up to me to integrate them, which I attempted to do, and put in my report.

Q So you worked a lot of hours in this case; is that fair to say?

A That's correct.

Q Almost all of it independently?
A Yes.
Q So you took your job very seriously, got the records that were provided, and attempted to put together a social history and story of trauma in the report that you provided to counsel?
A Yes.
Q But that was under the overarching referral question of whether or not Mrs. Montgomery was not guilty by reason of insanity under the federal statute?
A Yes, with the lack of clarity about where I fit in the process.
Q You talked a lot about integrating with the rest of the mental health team and the presentation that's going to be made at trial. Is that something you talked about being a part of another capital trial team?
A That is what I do regularly. By the time we're doing what you and I are doing now I have some idea that we are on the same page, you know what I think, that there's clarity. So I'm not busy trying to figure out what your question means, that I can focus on trying to explain myself succinctly.
Q And you said that didn't happen here?
A That's correct.
Q Did Mr. Duchardt ever ask you to participate in meetings with, for example, Dr. Logan who ultimately testified

at trial?

A I don't remember being included in any meeting of that variety.

Q You never met with Dr. Ramachandran, the purported pseudocyesis expert at trial?

A Not to my recollection.

Q In fact, you didn't come in to testify until after the guilty verdict had come in and you were presented in penalty?

A Correct.

Q Knowing -- do you know who these experts are, Dr. Logan and Dr. Ramachandran? Are you familiar with them? Have you read their reports?

A I don't remember what I read when. I know who Dr. Ramachandran is from -- because of his reputation elsewhere. What reports I read when, I don't recall as we sit here.

Q Would you argue -- or would you think I was incorrect if I told you that of all the individuals who ended up testifying on behalf of Mrs. Montgomery, if anyone was going to testify about her trauma history, you would have been that person? Would you disagree with that?

A Have I ever heard that?

Q They didn't tell you that?

A No.

Q You didn't know that?

A I did not know that.

Q You do have a history, experience and training in individuals who have suffered from trauma?
A Yes.
Q And have worked quite a bit with children?
A Yes. I am a child psychologist, among other things.
Q Once you got to Kansas City and the trial was underway and the case was in between guilt, innocence, and penalty, you did have some interaction with Mr. Duchardt in preparation for your testimony on the eve of your testimony. Can you describe what that interaction was like?
A I have very minimal recollection of it. My recollection is leaving with kind of -- seems to me he was in and out. I don't even have a clear recollection. We sat down and this is what we're going to do. That's not part of my memory. I simply remember going into court with the feeling -- it had more the feeling of being about to be cross-examined where an attorney is going to stand up and ask you things and you have some general idea what it's going to be about but you don't have any degree of clarity. In fact, the very first question that he asked me after I spelled my name was -- we weren't on the same page.
Q Can you -- it seems like an innocuous enough example but we should talk about it. So the first question he asked you -- have you and Mr. Duchardt actually had a discussion about the possibility that a Kansas City jury might perceive

somebody from Chicago as not like them? Had you had that discussion?

A We had had a discussion down that road with the -- I have family -- she once lived in Coffeyville, Kansas. My father once lived in Coffeyville, Kansas. I have a background of small town Missouri communities. So I think what he was trying to get at is are you familiar with the social/cultural background associated with her history, and there was something to be said for that, but instead he asked me something like where I was originally from. That's an entirely different question. So I was stuck trying from the beginning to answer his question but deal with the reality of what I thought he was asking. And there's also the fact that not everybody's thrilled about me being from Chicago.

Q But you were actually -- the truthful answer to the question is you were born in Chicago?

A The truthful answer is I was born in Chicago. I moved to the St. Louis area and grew up in the St. Louis suburbs and went back to college at the University of Chicago at 18 and have been in the Chicago area ever since. So that was the literal answer to the question.

Q And yet it's a small point but you offer it to illustrate that you and Mr. Duchardt really were not communicating or connecting during your testimony?

A Correct.

Q And do you attribute that to his lack of preparation of you for your testimony?
A As I saw it, as best I recall at the time, his focus was on other people and other things, which is his right. I didn't argue that. I was peripheral to what he was doing. I was an afterthought. He did not want my efforts at trying to guide what I thought I had to say. So we weren't on the same page. His mind appeared to me to be elsewhere.
Q And when he met with you on the eve of trial for preparation, did he appear rushed or hurried?
A Throughout I had the feeling of someone who just had a whole lot to do that was important; and, again, that's -- he has to figure out what's important, but I wasn't there.
Q And you weren't part of what was --
A I wasn't a part of what was important.
Q Are there any particular areas in the Montgomery case based on your evaluation of Mrs. Montgomery and reviewing the records that you felt you could have presented on direct but were not able to present because you weren't asked the questions?
A Yes.
Q And could you provide some examples of those?
A One thing I could have done was lay a framework around a number of issues that went off the rails during cross-exam having to do with premeditation, malingering, that there is a

framework that I could lay out and explain that then would have allowed me during cross-exam to make reference back to those, things that take some effort in explaining without interruption in order to explain and to put forth.

But then when you try to -- when you're asked a yes-or-no question, have you quit beating your wife type of question during cross, when you're trying to be truthful, be responsive, respect the Court, and juggle all the issues I've already described and having no framework to refer back to, I was adrift.

MR. VALENTI: Your Honor, I want to object. The narrative answers are getting awfully long.

THE COURT: I'll sustain that. It's my practice to always let a witness explain their answer. I never limit people to a yes-or-no answer. I don't know if she's saying that particularly happened here.

MS. HENRY: No. We're about to move to why she felt that cross-examination went so poorly. There's no blame on the Court here.

THE COURT: I'm not assuming any blame. I'm just saying that I can't imagine that that happened if she was limited to a yes-or-no answer.

Q (By Ms. Henry) Let me direct your attention, Dr. Kuncel, to what happened on cross-examination. How did you feel the --

THE COURT: She's already told us how she felt. Let's not go back into that. She's testified numerous times how she felt.

Q (By Ms. Henry) Dr. Kuncel, did there come a time when his Honor cleared the courtroom to admonish you in answering your questions on cross-examination?

A Yes.

Q And did you feel -- when you went off the witness stand, how did you feel cross-examination went for you?

A Very badly.

Q There came a point in cross-examination when the Assistant United States Attorney, Ms. Phillips, now Ms. Cordes, was asking you questions about the topic of your report where the heading was premeditation, and it appears now from reading the transcript objectively without a lot of emotion, that you and Ms. Cordes were talking at cross-purposes and it got pretty ugly pretty quick; is that fair to say?

A Yes.

Q And at that point Ms. Cordes approached the Court and asked the Court to direct you to give more succinct answers, and you didn't feel like you could answer the questions that were being asked; is that fair to say?

A I could understand for sure why the Court felt that way and drew that conclusion and I respected that, but I also felt absolutely at a loss because I was being asked yes-or-no

questions when the answer was not yes or no as far as I was concerned.

Q And do you feel that if you had sufficient preparation and been asked appropriate questions on direct examination, you could have avoided getting into that argument with the Assistant United States Attorney on cross-examination?

A Yes.

Q And you would agree with me that the way that cross-examination went tended to undermine your credibility in front of the jury?

A That was certainly my impression.

Q Dr. Kuncel, I neglected to ask you about your -- or did I? I may have dissociated. Have I already asked you to identify your CV?

A Yes.

Q Okay. Sorry. It's late in the afternoon. If you would give me one moment, please.

Dr. Kuncel, in your report, which is Exhibit No. 43, Movant's Exhibit 43, which has already been entered into evidence, it's a pretty lengthy report; is it fair to say?

A Yes.

Q Fifty-five pages in length?

A Yes.

Q Single spaced?

A I'm sorry?

Q Single spaced?
A Yes.
Q And the majority of the report has to do with Ms. Montgomery's background and social history; is that fair?
A Yes.
Q And you attempted to, as best you could, express the information that you had at the time that you testified in trial in that report; is that fair?
A Yes.
Q You've mentioned that you've also -- that you've read Ms. Vogelsang's declaration. Have you also read the declaration of a Dr. Kate Porterfield?
A I would need my memory refreshed.
Q I may not have provided -- did I provide you Dr. Porterfield's declaration?
A You probably did but I had an awful lot to cover.
Q Okay. I provided you with a lot of information; is that fair?
A Yes, 260, I don't know, 70, or so, pieces.
Q Is it fair to say that there's a lot of, without going through -- because I don't think his Honor wants me to go through each fact that's new. There are a lot of new facts in the biopsychosocial history of Jan Vogelsang as well as the declaration from our current trauma expert?
A There is a great deal of information that's been newly

provided to me that, to my recollection, was not available to me at the time of trial.

Q For example, at the time of trial you did not have information that Mrs. Montgomery's mother had actually sold her body to the plumber, the propane man, the roofer, and other men for services in the home?

A I don't recall that I saw that back originally, no.

Q And you were not aware of the information regarding Mrs. Montgomery's stepfather's seriously abhorrent sexual behavior?

A I was aware at the time that there were a great number of people who seemed to have sexual access to her and whose behavior was not traditionally sexual, but often it seemed sadomasochistic in nature too.

Q Such as her stepfather?

A Yes.

Q And all the information you had you put in your report?

A I did my best to summarize what I had at the time.

Q Do you believe that your opinions and testimony at trial could have been much stronger if you had received this additional data?

A Absolutely, yes.

Q And do you believe that it would have been much stronger to have focused your direct examination on this trauma history as opposed to discussing psychometric testing?

A My opinion is if I presented the trauma history -- the biopsychosocial development of the person with the test data as part of that and drawn, I would hope, a coherent conclusion based upon the entirety of what I had available to me.
Q Thank you, Dr. Kuncel.
MS. HENRY: That's all I have.
MR. VALENTI: May it please the Court.
THE COURT: Mr. Valenti.
CROSS-EXAMINATION BY MR. VALENTI:
Q Dr. Kuncel, it's not my intention to go through the lengthy cross that happened at trial. That's part of the record, but I do have several things I want to talk to you about. First, you indicated that there was a lack of clarity on your role. You, of course, were a forensic psychologist employed in this case, and in your report on page 1 you indicate that you were employed by David Owen to do an analysis of Lisa Montgomery?
A Yes.
Q You understood that?
A Yes.
Q Okay. And you did it, right?
A Yes.
Q And you looked at a lot of materials in this case, and you documented those materials in your 55-page report, didn't you?

A Yes.

Q And rather than go through the length of that report, we have it as an exhibit, look at it at its leisure, but included in that you talked to several people in addition to your interview of Lisa Montgomery, didn't you?

A In terms of interviewing, no. There were several other people that I reference in here as having talked to, but I have no personal, at this point, recollection of having talked to them.

Q So if in your report on page 3 when it talks about the interview of Lisa Montgomery, then refers to that you spoke with attorney Fred Duchardt, David Owen, and Stephanie Elliott of the trial team, would that be accurate?

A On page 3?

Q Page 3 at the bottom under Interviews.

A Yes.

Q And then you also spoke with mitigation specialist, Dani Waller, and you spell her name out, Investigator Ron Ninemire, Dr. Ruben Gur, and Dr. Robert Fucetola, correct?

A That's what my report says. As we sit here, I remember talking to Dani Waller. I have no -- it's been ten years. I do not recall those other discussions.

Q So if you can't recall it here with me today, your report would be the best indication of who you spoke to then?

A Yes.

Q And then preceding that interview section there are a number of document sources that you looked at, including Dr. Logan's report, Dr. Ramachandran's report, several other doctors, correct?
A Yes.
Q Okay. So you knew that you were to conduct an evaluation of Ms. Montgomery, not as a lawyer but as a forensic psychologist, correct?
A Yes.
Q And you did it. So you weren't lacking clarity there?
A Within the role of being a forensic psychologist, what you're doing, how you're doing it, and how you're going to present it in court are two different issues.
Q Well, the lack of clarity that I saw, ma'am -- and I believe that Ms. Henry talked about it -- was that during cross-examination when you were asked questions, you would go off on answers that were nonresponsive. Do you remember that?
A I remember they were described as nonresponsive. What I was trying to do is get in the data that, in my opinion, should have been presented in direct which would have allowed me to be responsive during cross.
Q But it was to the point and it got so argumentative that the judge, Judge Fenner, had to clear the courtroom and admonish you to respond to the question asked and not provide the testimony you chose to put on at the time, correct?

A Yes.
Q You understand the process. Ms. Henry asked questions. You answer them, right?
A Yes.
Q I ask questions and you answer them?
A But when you were asked questions such as, Have you quit beating your wife types of questions, that was the situation I found myself in during cross back then.
Q Okay. Trials have been going on in this country for hundreds of years, ma'am. You know that. Do you know that?
A The trials have been going on --
Q Trials in the criminal justice system have been happening for hundreds of years in this country.
A Yes.
Q Use of leading questions in cross-examination is appropriate and encouraged. So it's an allowed practice?
A I'm not objecting to the nature of the question. I'm objecting to the preparation that I had to answer it in a responsive manner.
Q Let's talk about that. You say that you were on a different page with your attorney. After you were asked your name, the first question to you on page 3010 of the transcript is, "Where are you from originally?"
A Yes.
Q Not a hard question?

A Yes.
Q And you're telling us now that the answer you provided actually in testimony isn't true because you answered, "Well, from the Midwest. I am from little towns in Missouri and Kansas. My family is from variously Harper and Coffeyville, Kansas, and Clinton, Missouri. So I am not unfamiliar with the kinds of settings." You just told us that that's not true?
A It depends on how you interpret the original question. What I was doing at the time was attempting to both say the truth. "Where are you from originally?" can be interpreted as where your family's from and "Where are you from?" can be interpreted where you were born. So I was doing my best to achieve both what I had every reason -- because we had talked about these things in prior discussion, his question and the truth.
Q I think you're making my point for me. You're trying to interpret the question rather than answering it. I'm not asking for you to invent the Rosetta Stone, ma'am. I'm not asking for you to define the word "is" like Bill Clinton was asked to do. You were asked, "Where are you from originally?" Let me ask it now. Where are you from originally?
A It depends on what you mean by your question.
Q I don't think I need you to answer. I think the point has been made.
So the lack of clarity seems to be, in my mind, when

I see it, you're unable to interpret the question or answer questions asked of you?

A I had no trouble answering questions when it's clear to me where the person is coming from and I've had the foundation laid in order to answer it.

Q So you have admitted now that the data that you produced in your psychometric testing was flawed, correct?

A Absolutely, yes.

Q Okay. And as you were questioned about that in examination during the trial of this matter, that's when you began to get defensive about the reasons you did it, right?

A Yes.

Q And it strikes me as odd that given your early life work on test design and research and how to take tests, that you were a particularly poor administrator of tests in this case, weren't you?

A No, I was not.

Q Did you give the MMPI in a manner that would be considered the way it should be?

A Because I did not have access to her as I should have, no.

Q Because part of the test being given in Kansas City in January of '07 and the rest of it being given in Philadelphia in March is not the way it should be done?

A There is no way that is appropriate given my

circumstances where she disappeared in the middle of the test. I would have been subject to problems associated with giving it two and a half times or it having been given two and a half times is another problem. There was no way given that the defense did not provide me with the opportunity to test her in her entirety --

Q And you realize, of course, that the defense, the defense attorneys do not control the prison system?

A I have no idea who is responsible for it, but certainly it did not manage to come about in the defense. If they had any control of it, they didn't do it.

Q In addition, though, to giving the test at different times temporally, you also when giving her the test in 2007, asked her to imagine herself at a different time in her life, didn't you?

A On other -- not on the MMPI, but on other tests, yes.

Q Which is also not the way those tests are designed, are they?

A Some of them are designed that way that you can give it that way and use clinical judgment around how you give it. Yes, you can, because we needed to find out something about that period in between and it was the best available option, and it was very clear about how I administered it and why. I was not in any way attempting to deceive anybody about my procedure.

Q Regardless of what your intent was, it's not an ideal way to give the test, nor is it a recommended way to give it, is it?
A A lot of things weren't ideal or recommended, including a glass wall where people are watching the testing.
Q Do you know who Dr. Marilyn Hutchinson is?
A I know generally who she is.
Q I asked her on the stand just the other day about whether the way you gave the test was proper, not just because of the two different cities but because of asking the client to imagine a different time in her life and she said, No, you shouldn't do that.
A Well, I disagree.
Q Okay. So beyond the fact you said that you were concerned in your examination that the jury, given how your testimony went, would be concerned about your data being flawed, you would admit yourself that your data was flawed?
A In some ways, yes, and other ways, no, given that I had given standardized testing as a baseline in the situations you're describing, which I can then use as a clinical comparison to other forms of data collection to solve the problems that were presented in this case.
Q But given the fact that you said the testimony -- moments ago that you were concerned the jury might invalidate your testimony because of the data flaws, when we know the data

is in fact flawed, that's a reasonable conclusion a jury can reach, couldn't they?

A The premise of your statement just now is not my understanding of what was said before.

Q But you admit your data was flawed?

A Yes.

Q And you were concerned that the jury discounted your data?

A Because of the way that Dr. Martell presented it to them, which, in my opinion, was not appropriate.

Q Based upon your admission today that your data was flawed, is it unreasonable for a jury to question your data?

A In certain ways, yes, and certain ways, no.

Q Based on your interpretation, of course.

Beyond having issues with how the test was administered, let's talk about some of the tests you did administer, one of those being the SIMS test, which is the Structured Inventory of Malingered Symptomatology. Have I said that correct?

A Uh-huh.

Q For future purposes I'm going to say SIMS. It's a lot easier. You gave that, correct?

A Yes.

Q And that's a test designed to give several scales and validity exams to determine if someone is faking or

malingering, correct?

A Yes.

Q And I believe, again, if I'm correct, that the test proposed that when someone scores greater than 14 on the subscales for that, you need to consider malingering as a possible result based upon that screening exam, correct?

A Correct.

Q And in Ms. Montgomery's case she scored greater than 14. She scored a 16?

A Yes.

Q And despite getting a validity scale or taking a screening exam for malingering that said above this amount indicates malingering, you concluded otherwise, correct?

A For reasons that I've explained before and would be glad to explain again.

Q Now, you said during your testimony that you were concerned about what you did and didn't have, but you did make several diagnoses in this case, correct?

A Yes.

Q Included in that is you made a diagnosis by history of both physical abuse and sexual abuse of a child, correct?

A Yes.

Q All right. And on the last page of your report, page 55, you also stated, "I have also observed psychological symptoms consistent with 300.82 somatoform disorder, not

otherwise specified," in parenthesis, "pseudocyesis," correct?
A Yes.
Q So you saw psychological conditions consistent with the diagnosis of pseudocyesis but your concern at that time was that it's more -- or better left to a medical professional to make the ultimate conclusion; is that correct?
A Yes. I did not want to go from -- there are certain symptoms that are, I think, there from a psychological perspective to a diagnosis that seemed ethically outside my realm of expertise.
Q But you believed it enough to list it as a somatoform disorder, not otherwise specified under the DSM, correct?
A I said consistent with. That's different.
Q Okay. Everything you saw was consistent with that diagnosis?
A I've also observed psychological symptoms consistent with, but there were other symptoms that were captured in other diagnoses, and I also go on to say that she is really hard to diagnose because there seemed to be now neurological/neuropsychological issues that were not captured and not caught, that she had many, many sources of problems, psychological/psychiatric problems.
Q Of course, at the time that you wrote this report, as earlier referenced, on page 3, I believe, you'd seen Dr. Ramachandran's report, correct?

A If I said I did, I had.

Q So you knew that there was someone else out there talking about pseudocyesis?

A I knew that the defense planned to offer pseudocyesis as a diagnosis.

Q And, of course, because you know what you're doing, if you didn't think that pseudocyesis was appropriate based upon your psychological observations, you would have said so, wouldn't you have?

A To say I don't think it's an appropriate diagnosis implies that I could diagnose it if I saw it. So there is a circumscribed area where this is not for me to say. What I did was offer diagnoses that I thought I could offer on my own; and to the extent that there were symptoms that were consistent with pseudocyesis, offered them, but not go beyond that.

Q All right. You've told the Court today that you believe that the lack of effectiveness of your testimony was a product of not being prepared properly by defense, but we've agreed today, haven't we, that your data was compromised, correct?

A For reasons beyond my control.

Q Understand. You said that. Was your data compromised, ma'am, yes or no?

A Parts of it were, yes.

Q And you gave a malingering scale that gave you a result

indicative of malingering but concluded otherwise?

A The screening test as opposed to a whole list of other tests which were not purposefully explored, in my opinion, by Dr. Martell. So there was plenty to suggest she was not malingering, and the screening test -- there were explanations for the screening test, and it is, after all, a screening test where false positives are purposefully incorporated into the test.

Q In addition to that, similar to what we just experienced in that answer, you were admonished before the jury because of nonresponsiveness to questions. Do you recall that happening?

A Yes.

MR. VALENTI: Just a moment, Your Honor.

Nothing further.

MS. HENRY: Just one question, Your Honor. I need to clarify the record, if I might.

REDIRECT EXAMINATION BY MS. HENRY:

Q I'm sure Mr. Valenti didn't mean to suggest that you had actually read Dr. Ramachandran's --

THE COURT: Okay. You need to wait until you get up to the microphone.

MS. HENRY: I'm sorry.

Q (By Ms. Henry) I'm sure that it wasn't meant to suggest to you that you had actually read Dr. Ramachandran's

report in this case, but I do think the record needs to be clear, Dr. Kuncel. So your report in this case was dated April the 9th of 2007, correct?

A Yes.

Q And you listed on your report the sources of data that you had reviewed prior to submitting the written report, correct?

A Yes. That's correct.

Q I'm going to show you the page 3 that Mr. Valenti was referring to, and you see there where I highlighted affidavit and testimony of Dr. V.S. Ramachandran, M.D., and in parenthesis it says Wiggett. Would you agree with me that you reviewed his affidavit and testimony from the Wiggett case?

A I would agree. These are the things that I reviewed at the time. Ten years later exactly what I reviewed -- all I can tell you is what's listed here. That's as much as I remember.

Q So if it's true that Dr. Ramachandran did not even meet Mrs. Montgomery until May of 2007 and your report is written in April of 2007, it wasn't possible for you to have reviewed Dr. Ramachandran's report before signing off on this?

A That would certainly appear to be the case.

Q Thank you, Dr. Kuncel.

MS. HENRY: I don't have anything further.

MR. VALENTI: Nothing further, Your Honor.

THE COURT: Thank you, Dr. Kuncel. You're excused.

(Witness excused.)

THE COURT: Ms. Kelley, do you want to take a ten-minute break or do you want to keep going?

MS. HENRY: Ten-minute break would be good.

THE COURT: All right. We'll be back in ten minutes.

(Recess taken at 3 p.m.)

MR. KETCHMARK: Your Honor, my understanding is their next witness is going to be a gentleman by the name of Lawrence Fox, and I want to lodge an objection. I want to object to Mr. Fox' testimony. He has two documents that are included in their exhibit list. There's a document to the declaration, Exhibit 52, and then Exhibit 53 is his CV.

Mr. Fox is a law professor, an attorney. He's with the Yale School of Law. They basically asked him to opine on ethical issues, specifically three areas they wanted him to inquire and he does so in his declaration. The first is whether two attorneys for Ms. Montgomery, Owen and Conrad, violated their duties of candor to the tribunal --

THE COURT REPORTER: Mr. Ketchmark, could you speak into the microphone?

MR. KETCHMARK: I'm sorry. The first area that they wanted to inquire was whether or not Owen and Conrad violated their duties of candor to the tribunal when they instituted ex parte proceedings with the Court regarding the dismissal of Ms.

Hunt and Ms. Clarke.

The second is whether these same lawyers violated their duty to notify and consult with their client and seek her participation in proceedings related to personnel changes amongst the lawyers.

And the final is whether Mr. Duchardt violated the duty of candor and created a non-waivable conflict when he lied to the Court about his preparations regarding the defense of pseudocyesis to protect his own reputation.

THE COURT: Do you want to speak to that?

MS. HARWELL: Yes, Your Honor.

THE COURT: Briefly.

MS. HARWELL: I'll try.

I know the Court knows Rule 702 far better than I, but we believe that we have brought to the Court an expert in legal ethics. He will not be testifying to the Court in regards to black letter law. Obviously the Court knows that. But we are trying to provide the Court with expert opinion regarding the rules of professional responsibility and the ethics governing the conduct of lawyers, specifically as to the issue that the Court listed on page 2 of your memorandum to us regarding the things we were to address at this hearing.

Issue No. 7, the Court granted us a hearing on whether Mr. Duchardt's announcement at that April 3rd hearing of the pseudocyesis defense and the Tommy defense created a

disqualifying conflict of interest.

THE COURT: I think judging the ethics of an attorney is kind of like determining attorney's fees. I don't think I need an expert to tell me what is ethical behavior by an attorney and what isn't. So I'm not inclined to allow that testimony.

MS. HARWELL: We would like to make an offer of proof. I don't think -- there's not a jury here. It's not as if there would be any harm to the Court to hear --

THE COURT: I'm not going to have an offer of proof by way of testimony. If you want to tell me what your witness will testify to if he was allowed to testify, I'll allow you to do that.

MR. KETCHMARK: Your Honor, if I might, the exhibit is the declaration, which is Exhibit 52. I'm of the belief that document would satisfy as an offer of proof. I think it sets forth exactly what his testimony would be with regard to these matters, so I would ask the Court entertain that as the offer of proof versus going through and regurgitating Exhibit 52.

MS. HARWELL: I agree with the government in that regard.

THE COURT: I will accept Exhibit 52 as Mr. Fox' -- the testimony that Mr. Fox would give if he was allowed to be called as a witness.

MS. HARWELL: Thank you, Your Honor.

I do then have the unenviable task of telling the Court that we anticipated about an hour testimony from Professor Fox who we had fly here from Philly last night to be prepared to fill the Court's time until the time the Court had told us. This leaves us short witnesses at this point. We have a lot of people flying in on Sunday to be prepared for all of next week, but at this moment --

THE COURT: So you're telling me that once again you're out of witnesses?

MS. HARWELL: We have Professor Fox but other than Professor Fox, we are out of witnesses.

THE COURT: Well, this is becoming an intolerable habit. I mean, I don't know how -- what I can do to impress upon you the importance for us to be able to move this. I mean, I know it's not the only case you've got, it's not the only case they've got, it's not the only case I've got.

MS. HARWELL: Certainly. And we had a witness here prepared to work for the Court this afternoon. I did not anticipate the government's motion. They did not notify us of any problem with Professor Fox' report prior to testimony starting this afternoon.

THE COURT: I understand that. But I would have hoped that given the difficulties that we've already had this week with the scheduling of witnesses, that you would err on

the side of having more testimony available than less testimony available.

MS. HARWELL: And we thought we had. I apologize to the Court.

THE COURT: So that's it for the day? You've got no more witnesses?

MS. HENRY: Your Honor, I can tell you that every witness we have to be present next week will be in Kansas City and available this weekend.

May I make a further record with respect to the government's motion to exclude Professor Fox?

THE COURT: Well, Ms. Harwell already spoke to it. I mean, I'm not going to let you all play tag team getting up and one attorney arguing after another on the same point.

MS. HENRY: I understand that, Your Honor. I was asking for permission. You said no. I respect that.

I will let the Court know that we did attempt to obtain one additional witness to be present today. He is in a capital murder trial and received his verdict last night and has arranged his schedule to be here.

THE COURT: The last thing I said to you yesterday was don't run out of witnesses at three o'clock, and here we are at 3:15 after I just came back. We took a break. And you're out of witnesses again.

MS. HENRY: And if we had been provided with the

government's motion to exclude our witness, Your Honor, we would have been aware.

THE COURT: I understand we could have taken it up earlier, but I would think that a person might anticipate that there would be a challenge to that kind of testimony.

MS. HENRY: He's been accepted in 12 other courts.

THE COURT: Pardon?

MS. HENRY: He's been accepted in 12 other courts. We did not anticipate the objection.

THE COURT: Okay. Well --

MS. HENRY: And our objection to the exclusion is under the Fifth, Sixth, Eighth, and Fourteenth amendments.

THE COURT: See you Monday morning at nine o'clock.

(Court adjourned at 3:20 p.m. until 9 a.m. Monday, November 7, 2016.)