UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS - VOLUME VII
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 8, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:

MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:
MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

I N D E X Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

## I N D E X
(continued)



NOVEMBER 1, 2016

VOLUME II


RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

## I N D E X
(continued)

Page

NOVEMBER 2, 2016

VOLUME III

RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . . 761

INDEX (continued) Page

NOVEMBER 3, 2016

VOLUME IV


DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

I N D E X
(continued)

Page

NOVEMBER 4, 2016

VOLUME V

CHRISTOS DAVATZIKOS
Direct examination by Ms. Henry. . . . . . . . . . . . 1120
Cross-examination by Mr. Valenti . . . . . . . . . . . 1165
Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG
Direct examination by Ms. Henry. . . . . . . . . . . . 1182
Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE
Direct examination by Ms. Henry. . . . . . . . . . . . 1245
Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL
Direct examination by Ms. Henry. . . . . . . . . . . . 1255
Cross-examination by Mr. Valenti . . . . . . . . . . . 1290
Redirect examination by Ms. Henry. . . . . . . . . . . 1302



Case 4:12-cv-08001-GAF Document 223 Filed 05/04/17 Page 7 of 315

INDEX
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

# I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864

I N D E X
(continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.) . . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

## I N D E X
(continued)

Page

NOVEMBER 10, 2016

VOLUME IX

FRED DUCHARDT
Direct examination by Ms. Harwell (cont'd.). . . . . 2263
Cross-examination by Mr. Ketchmark . . . . . . . . . 2273

BEN LEONARD
Direct examination by Ms. Henry. . . . . . . . . . . 2324
Cross-examination by Mr. Valenti . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . . 2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Purkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

# INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |


Case 4:12-cv-08001-GAF Document 223 Filed 05/04/17 Page 33 of 315

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of DiAnne Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

# INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |

FOR THE RESPONDENT:

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

NOVEMBER 8, 2016

MORNING SESSION

(Court in session at 9 a.m.)

THE COURT: Good morning.

Ready, Ms. Henry?

MS. HENRY: Yes, Your Honor.

THE COURT: All right.

MS. HENRY: Movant recalls Dr. Kate Porterfield.

THE COURT: Doctor, I'll have you sworn again since it's a new day.

KATHERINE PORTERFIELD, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION (continued) BY MS. HENRY:

Q Dr. Porterfield, yesterday afternoon I was asking you about the difference between clinical work and forensic work, and I'd like to revisit that because I forgot to ask you one question there and that is with respect to the nature of clinical work. Do clinical psychologists only treat patients?

A No. Clinical psychologists can perform a range of tasks and functions based on their training, but treatment, caring for people, providing therapy is one of the tasks, one of the skills that you receive training, but it's not the only context in which you're trained as a psychologist.

Q In fact, you testified yesterday about your work in immigration courts. What are those evaluations that you

conduct?

A So, for instance, another aspect of the training of becoming a clinical psychologist is you learn to perform assessments, evaluation of mental disorders. You learn to perform treatment, therapy, and you are able to formulate diagnoses and treatment plans.

So for my work at the Bellevue NYU program, Survivors of Torture, I spoke about yesterday, much of our work is -- much of my work is evaluation. So I will evaluate a potential new client of the program. I will assess their history, determine if the individual meets criteria to be accepted into our program. That has nothing to do with providing treatment.

Additionally, for many of my clients who I do end up treating, I will sometimes perform an evaluation, then testify in immigration court about their mental disorder coming out of torture.

Q And, in fact, most of your testimony -- in fact, almost all of the testimonial work that you've done in courts has been in the context of immigration; is that correct?

A The bulk of it, yes.

Q You testified it's really -- it's two or three times in criminal cases before today?

A That would be -- this is the third.

Q And one of the times that you testified, was that for

the prosecution in a child murder case?

A Correct.

Q Thank you. I appreciate you helping me go back through that.

A Excuse me. This is the fourth.

Q Okay. So two times with defense and once with the prosecution in the child murder case?

A Correct.

Q Now, Dr. Porterfield, you spoke yesterday about the fact that you conducted an evaluation of Mrs. Montgomery for the referral question, which we won't go back and repeat because that's already in the record. Did you prepare a PowerPoint slide that would help us get through your testimony as quickly as possible?

A I did.

Q And would it assist the Court and the parties in understanding your conclusions for us to go through those slides?

A I believe so, yes.

Q And the first of those slides is up on the screen today, and we're not going to read verbatim everything on the slides, but could you begin with a summary of your conclusions with respect to Lisa Montgomery?

A Sure. My conclusions essentially as they appear there is that Ms. Montgomery, that her childhood and adolescent

experiences of trauma, victimization, and neglect had a massively deleterious effect on her development and her functioning and capacities, and that these impairments are well studied and well researched in the literature as impairments that come from developmental alterations that happen to abused children.

I then summarized, as you see on the slide, that her difficulties fall in the realm of what we call chronic or complex posttraumatic stress from ongoing trauma as well as bipolar disorder and very severe dissociative symptomatology.

Q And, Dr. Porterfield, is there a methodology that you follow which is generally accepted in your field?

A Yes. So the --

Q Can you describe that methodology?

A Yes. So the methodology involves how you collect data and what data you collect when you are trying to make conclusions about an individual's mental functioning, and so for -- the standard is to conduct a clinical interview and as much record review and what you would think of as sort of collateral information as possible.

For this case that was really my two sort of prongs of data. The first prong would be information regarding Ms. Montgomery's history of her life and her development, and that came from everything from records to witnesses to her life, whether those be professional people who encountered her or

family members or other people who knew her. Of course, Ms. Montgomery's history of her own life, so her own report as well as any other expert testimony that had been done around her and her life. And then I also interviewed another witness, Mr. Kidwell, regarding her history.

That second prong, then, is the clinical condition and any data that will -- so that first is history. The second is what about her functioning? What was she like? How did she act? How does she act now? And that data you get from that clinical interview that I mentioned. You also get it from any records that describe her functioning. How was she? What did she act like as a young person? As well as witnesses' testimony about what was Ms. Montgomery like. So that's sort of the two prongs I'm looking at.

Q Is there a scientific basis for that methodology?

A Absolutely. When you conduct an evaluation, you have the data; but as a medical professional, you need to interpret that data and analyze it, and you want to do that through literature and the foundation scientifically in your field that undergirds what you're looking at. So for me that's a set of data that comes out of, first of all, normal childhood development. Very important to understand what is a normal, good enough childhood. How do you develop in that?

I looked at some data, which I can briefly summarize, from something call the ACE Study, the Adverse

Childhood Experiences Study. The neurobiological research that underpins our understanding of what happens to kids who get abused was very important to me in understanding Ms. Montgomery's functioning, my own clinical knowledge from working for the past 18 years with traumatized people, and, of course, the clinical literature about the diagnoses such as posttraumatic stress, complex trauma; in other words, the literature that talks about what do people who have abuse backgrounds struggle with then.

Q Is it generally accepted in your field to use these sources of science in order to interpret the data you discussed in the slide previously?

A Yes. You need to take that data you've amassed and understand it through a lens of the field, you know, my field being psychology.

Q And is it important for the Court to understand what a normal childhood development, what you called good enough child development is in order to understand your interpretations of Ms. Montgomery?

A I believe there's a few points that are important to understanding about how a child grows that then will be illustrative of what happens when a child's development is derailed by science.

Q So what is the primary task of normal childhood development?

A Well, so when I think about a growing child, one of the things that's very basic, and our field has really demonstrated this, is that child infancy, from being a baby up until growing into adulthood, has this sort of overwhelming task as an organism, a human organism. We call that biopsychosocial regulation.

I can be fairly brief on this. But what the idea of biopsychosocial regulation is that baby from infancy to adult is learning to control and recognize his or her self, his body functions, her senses, her perceptions of the world, her feelings, her interactions, meaning the child is growing to learn how to manage being an organism in the world.

So a quick example would be an infant lying in a crib who experiences discomfort from a wet diaper. That child at four or five months old has no other capacity except one, which is to cry, right? So what that child does is they exert the one regulatory process they can do, vocalization, to express body doesn't feel good. What you hope in normal childhood, again, good enough childhood is that environment will respond to that child. So that baby's going to lie there and a warm face is going to appear that picks the baby up, holds the baby, comforts the baby and says, Oh, we've got to change that diaper, and changes that diaper.

All of that description I just gave is just one little moment, right, in the life of that organism that's

growing to learn how to regulate himself or herself, and that is the foundation of what are these actually literally trillions, trillions of neurochemical connections that start to get made for that child about what it means to cry, what it means to be lying there feeling cold.

And so -- and I can wrap this up, but what you're learning about when you learn about the regulation capacities of children is the way the child's own needs of their body interact with the environment, and does that environment teach them cry equals comfort or cry equals a number of bad things that can happen to abused children; fear, violence, hurt. That's what regulation is.

The reason I said there's trillions of moments because there's actually in the neurochemical wiring of the baby's brain this incredible opportunity that happens over the course of the child's life to make connections, and each of those connections happens as the child interacts with the environment.

Q And I know we're going to talk a little bit more about the neurobiological aspects of trauma, but is that experience that you described, the baby in the crib seeing the warm face, we know that's relevant to Lisa Montgomery because that warm face just wasn't there?

A Correct.

Q But is that seeing the warm face, is that what helps to

create what -- I think you've taught me are called mirror neurons?

A Are called what?

Q Is that the mirror neurons?

A Well, I think we talked about just mirroring, right? So this idea that a baby, their first development comes from being seen. So as they see a face and then they are seeing back, they begin that process of the neurochemical connections that have to do with interpersonal connectivity.

Q And there's a scientific basis for this?

A Oh, absolutely, yes.

Q That science was available in 2007?

A Yes. I included in your references, as needed, but I do have a bibliography in both my report and in this slide show just about the kind of basis of this scientific work.

Q And so what does the science tell us, then, about how the child learns to regulate?

A I will say -- I'll be brief here. Just simply that the child regulates the body through the interaction of the environment. It's not just that it naturally happens that we learn to control ourself.

Another quick example, a child grabs -- a three-year-old child grabs a toy from their brother or sister, the environment needs to respond to that. Again, a good enough response is, Oh, no, we don't grab toys. Take this back and

you go sit. You grabbed a toy from your brother. That wasn't nice. Good enough, right? A response with the environment says, This is a limit on you, and that teaches the child. Again, another moment of regulation. I can't grab. I can't hit. When I do these things, the environment will respond. That's why it's an interaction and why each thing the child learns from that environment will shape not only the child's behavior but what we now know, it will shape the child's brain development.

Q So now relevant to Lisa Montgomery's case. What happens to the child when their environment isn't that good enough environment?

A So my clinical evaluation of Ms. Montgomery really yielded a conclusion that her environment was throughout her childhood one of coercion, violence, humiliation, degradation, exploitation. I mean, it was a very horrible childhood. That's going to lead to an adaptation that children make that is often called in our field survival coping, and it's kind of what it sounds like. Survival coping -- if you'd like me to continue?

Q Please.

A It's basically a description that the child is going to adapt. That's the thing about the human organism. We adapt. So when a child's environment is frightening, the child will adapt to managing fear by having physiological fear protection

mechanisms that take place. Let me give an example.

Q What do you mean by that?

A Yes. Sorry. So survival -- I'm going to actually use an example because Ms. Montgomery did one inadvertently, I think, in our interview which is that she was describing at one point being a little girl and having spoken and her mother saying, You don't speak to me, or some way that her mother was angry she had spoken so the mother duct-taped her mouth and made her stand.

Frankly, Ms. Montgomery was describing this very offhandedly, and she talked about what I learned. It's funny. You learn you better not cry too hard because when you cry real hard with duct tape, you can start to get your nose stuffed up, and so I had to learn don't cry too hard because I don't want that nose to get stuffed and I won't be able to breathe.

That's an unbelievably disturbing formulation for a child to have to make, right, about how to not suffocate oneself with duct tape?

In fact, when she said it, the offhanded thing she then said was, Well, I will just daydream during that. That is clinically a very important phrase "daydream."

Q Why so?

A Because Ms. Montgomery was not daydreaming at that point. Daydreaming is the kid sitting in math class and he puts his pencil down and starts looking outside and thinking

they want to go play. What Ms. Montgomery was describing was the beginning of what I'm going to talk about which is of a dissociative style of dealing with stress, fear, and pain, meaning she detached and disconnected.

Again, something we now know about scientifically she detached from the fear, from the overwhelming experience. So what she calls daydreams is, in my opinion, the beginning of her learning to dissociate.

Q And how does this survival coping affect the brain? Does it cause brain changes?

A Yes. This has been really an exploding part of our field for the last 30 years which is that the things that children do under traumatic stress have been shown now to be adaptations that make lasting, permanent changes in the brain.

There's three -- I'm really not going to do a big deep dig on the science here but if I could just briefly sort of frame. There's three major areas the research has looked at what we call the neurochemical aspect of brain development. That's the brain messengers that send signals to us. The neuroendocrine system, which is the hormonal system which regulates much of the bodily functioning, including response to stress; and the neuroanatomical, meaning simply that brain structure, that actual mass that is the brain.

Again, I'm not going to summarize them all here, but I did provide a very lengthy bibliography. There's extensive

literature on what those changes have been shown to be in maltreated children.

Q Let me ask you for just a moment about that. Was this information, this science available to clinicians such as yourself in 2007 when Mrs. Montgomery's case was tried?

A It was.

Q Can you just explain, again, briefly. I know you prepared a slide about the neurotransmitters and the like. Can you briefly summarize --

A Sure.

Q -- these brain changes?

A Again, I'll do it by the categories. So neurotransmitters are the brain chemicals that connect the synapses of our neurons, those little spaces between the nerves and our brain. The reason it's interesting -- I said trillion before. We believe that children have trillions of synapse connectivity moments, meaning moments when things are firing as they are developing, which is kind of an incredible idea, and those -- what we've shown is that the chemicals that go across the synapses that create the connectivity between our nerves and our brains have shown alteration, if you study stressed, traumatized kids, and the alterations are that they have overactivation of some.

It depends -- now, I'm not going to break down all these neurotransmitters. There's overactivation of some of

them, there's underactivation of others. You see impairments, frankly, in the quantity of the chemicals that are in the child's brain and how they're interacting.

Sorry. Do you want me to just say about the neuroendocrine system?

Q Yes. Sorry. You're the scientist. I'm not. So can you tell us about the neuroendocrine system?

A I can do this quickly. The neuroendocrine system is our hormonal system that manages stress, the part of our body that handles -- sorry -- the system in our body that handles digestion, alertness, appetite, and it is a deeply sensitive system because it has to handle all of the ways we are as a person.

When children are put under severe stress and strain and fear, their neuroendocrine system has now been shown scientifically to have alteration. I'll give one quick example. There's something called cortisol that gets released in the body after you've been through something very, very stressful. So if I were hit by a car and then they took me to the hospital and I was awake, very frightened and then afterwards they quickly took a sample of my saliva, what they'd probably find is that the cortisol in my saliva would be at a very high rate, and that's because that cortisol is what goes kind of pouring into the human body to calm it down after a trauma; and so what we see in traumatized children is they have

excessive and under -- they have too much and too little cortisol, depending on -- it's a deeper analysis than I'll do here, but the point is their stress response system is not activating itself in a normal way. It's activating itself in an overly stressed way. That's an example of a neuroendocrine.

Q And that can actually affect the changes in the brain as a child?

A Absolutely, yes. The cortisol particularly has been shown -- there is a direct link between the function -- the structure of the brain, which is the next part of the slide, which is something called the corpus callosum -- and I have one thing for a moment, if I could, because it does relate to findings of Ms. Montgomery.

Corpus callosum is an anatomical part of the brain. It's literally down the middle and it connects the right and left hemispheres. What we have found recently in robust studies is that too much of that cortisol stress response shrinks that corpus callosum, which is kind of incredible because what we're now seeing is that abused children as they grow have a smaller corpus callosum which means they have less connectivity between left and right parts of their brain, and that connectivity is everything for people. That's how we put things into words because our left hemisphere is language broadly, connects with our right, which has to do with our perceptions.

So to have that proof that abused children have less connectivity, I'm thinking now about Ms. Montgomery's IQ test that shows this very large discrepancy between her verbal capacity and performance capacity. That is a really important finding now about what happens to children under stress.

Q And does it matter at what point in the child's development that they experience this chronic severe stress?

A Yeah. I mean, one of the things that's really amazing about the brain also is how much of it develops what we call postnatally. You're not born with a functioning brain that we now have as adults. It develops over the course of the child's life.

There are critical periods in children's lives where there's real explosions of brain development. One of them at adolescence. Another one tends to be in that preschool area, sort of three to -- sorry -- two to four, and one of those things that sometimes gets used in my field is what fires together wires together.

The idea there is if a child's brain is required to be in a certain state, let's say, a state of fear and threat detection, I have to protect myself, I'm under threat, the parts of the brain that handle fear and threat detection are firing, right? That's trillions of connections. And then they become wired. They become permanently connected. So that child's brain is now what we think of as a survival brain.

It's a brain ready for fear. It's ready for threat. It's not a brain really ready to do sort of the normal things that kids have to do. That's how it becomes problematic.

There's also functional parts of the brain, the frontal lobe up here and the limbic system, which handles our emotions that are not even formed until really late adolescence -- not completely formed until late adolescence.

Q So how is the frontal lobe impacted -- let me ask you this question: When Mrs. Montgomery -- there's been testimony about the fact that really she experienced physical trauma from birth on and it was constant throughout childhood, and then the sexual trauma began probably around eight or nine and continued on and continued to get worse and worse and worse. So when you're experiencing this physical, emotional, sexual trauma throughout the course of her development from birth to --

A Yes.

Q -- 18, is it -- do we know something about the way the frontal lobe and the limbic system would be affected?

A Well, what's sad about it, frankly, in this case is that the critical periods of development for, let's say, the limbic system. That limbic system, by the way, again is the emotional responses of the child. One of the critical developmental periods of the limbic development is early childhood.

So what we found is that if children are abused,

maltreated, frightened during their younger years, sometimes they're going to demonstrate later what we call affective problems, problems with their feelings, handling them, what we call emotional dysregulation. So we've got Mrs. Montgomery certainly experienced in early childhood -- while that limbic system was formulating itself and growing, she experienced great abuse, fear, abandonment, neglect.

I was going to say the frontal lobe gets shaped much more in those and really solidified in the adolescence and later adolescence. What we find with teenagers who are abused is that they suffer more of those cognitive impairments that come from frontal lobe damage. So trouble planning, trouble thinking things through, trouble with their reasoning capacity and handling emotion and reasoning together, you know. Making a good decision, essentially.

So then we've got Ms. Montgomery abused severely as an adolescent, and we see in Mrs. Montgomery's clinical condition the detrimental effect of that, which is terrible, terrible functioning in planning, impulse control, and reasoning.

So sadly you see the critical periods for her because the abuse took place across her childhood, in her adolescence many of the critical periods where times she was under severe traumatic stress and, therefore, her functioning became impaired.

Q And so we've gotten into the next slide a little bit, let's move on to -- is there a scientific basis or studies and research about the way that these brain changes affect functioning?

A Yes. So, again, if I just quickly frame that we are talking about -- we've talked about normal child development, then we've talked about, well, what about the brain changes that come when the child is under stress, fear, pain? Well, how do we know that does anything to kids? How do we know these brain changes do anything?

Well, what's been, again, very, very powerful and exciting in our field is that we have studied the effects of childhood stress through a lot of studies. I'm just going to, again, briefly focus on this one that's quite important, which is called the Adverse Childhood Experiences Study.

Q Before you describe the Adverse Childhood Experiences Study, let me ask you, was the data from the Adverse Child Experiences Study available to trial counsel in this case in 2007?

A It was.

Q And what was the ACE Study?

A So just broadly what the ACE Study did was examine, well, what about when people have bad life events, hard life events? So what do we know about that? How do they turn out? And what the study did -- it was an HMO study, believe it or

not, so meaning it came out of a large healthcare plan, and they looked at 17,337 people, which is an astonishingly large sample for my field. We don't usually have such large samples. What that does is it gives you the ability to really have robust conclusions because you have such a large sample.

Q And what did they conclude?

A So what they did was they looked at people in this HMO and asked them, Did you have these experiences in your life? This is a childhood retrospective study. They asked about ten things, as you can see there on the slide. They asked about abuse. They asked about household function as defined by a number of things; parental, mentally ill parent, substance abuse parent, mother treated violently, family member in prison, and then parental separation or divorce. Then they about asked neglect. Importantly, they looked at emotional abuse, physical abuse, sexual abuse separately and they also looked at neglect, physical and emotional. They took these ten variables and they said, Did you have these occur in your childhood?

Q And what was the outcome of that study?

A Well, what was remarkable is that they found that the -- there was a graded effect, a dose-related effect of trauma and traumatic stress, and that was the more adversity that a person had in their childhood, the worse off they were doing, the more poorly they were functioning; and by poorly

functioning, I mean on a number of measures; medical health, sort of physical health, psychological health, anxiety, depression, substance abuse, interpersonal health, you know, marriages, divorces. They looked at how are people doing. What they found is the more adversity, the worse off people were doing.

And what's really fascinating about the ACE Study is that much of the literature talks about a person with four ACE events you are going to have a massively increased likelihood of suicide. A person with four ACE events has a massively increased likelihood of alcoholism. So they really looked at those ACE events and even at the rates of three and four ACE events, they found very, very poor outcomes.

Q And you're aware, Dr. Porterfield, are you not, that at the trial of this case on cross-examination Dr. Kuncel was asked the question about, and I don't remember the number, but something to the fact that studies show that, you know, hundreds of thousands of children in a year experience some sort of abuse? Is this finding from the ACE Study about the dose response to stressors relevant to answering some of those questions about why sometimes children with maybe a single instance of abuse differ in their capacity to function versus those people who have a number of these stressors?

A Absolutely. Because what it shows is that the dose matters. If you are talking about multiple, six, seven, eight

adverse childhood events, again, we're not even talking about looking at the length of these events in the child's life; but if you are talking at that level of adversity, you're going to be looking at worse and worse functioning afterwards.

And so with Ms. Montgomery, for instance, if we just do a broad-base look at her as a subject of the ACE evaluation, you see that she has nine out of ten ACE events in her childhood. That is an astonishing load of adversity.

Q And just to briefly go through Mrs. Montgomery's clinical condition, can you describe for the Court what your findings were with respect to her clinical condition?

A Yes. So I think to do that it would be helpful if I could talk about posttraumatic stress disorder for a few minutes and describe how that happens to people.

Q First of all, let me ask you, did you give Mrs. Montgomery -- did you believe that posttraumatic stress disorder is part of her overall --

A Yes. Mrs. Montgomery has posttraumatic stress disorder. In fact, she has what I would call complex posttraumatic stress disorder which has to do with pervasive, long-standing traumatic events as opposed to sort of one or two exposures.

Q So we're going to break that down. In order to understand complex trauma and complex PTSD, we first need to understand PTSD. So could you explain PTSD to the Court?

A Sure. I mean, just to use this slide as a frame, what you're talking about when you're talking about posttraumatic stress disorder is the human response to fear and the human response to terror.

What's amazing about posttraumatic stress actually is that we used to sort of think of it as an anxiety disorder, people are scared, they're nervous after they've had something bad happen. But what we've actually learned in the last 30 years or so is that really posttraumatic stress disorder is a disorder coming out of our memory functioning in the brain and our arousal system or what I will call our fear network, and what we find is that people who have posttraumatic stress has a dysfunctional linkage between their memory of the event and their fear reaction in their body and that makes people really suffer, because what they do is that fear -- let me describe the fear network for a moment.

Fear network is the part of our body that activates when we're in danger. Sometimes it's called fight or flight, and it is a physiological human response that is nonverbal and involuntary. Again, if a car were coming towards me, I would not think, Do I jump out of the way? I would dive out of the way. Because my body would have activated a set of physiological responses to fear. Those physiological responses are incredibly useful in that moment. When a child is being hurt, the physiological fear response is helpful to them

because it helps the child either get away, fight the person off, or what we later see is shut down and freeze. So that fear response is useful.

However, after the trauma is over, it's not so useful to have the fear response continuing to fire, and people who have posttraumatic stress have that. The way we understand it is that when the trauma occurs, the brain is laying down a memory of what happened, okay? As that brain is laying down that memory, let's say, again, the car is coming and I'm going to remember this moment of this car coming towards me. As that's happening, I'm in a state of fear, and the dysfunction of PTSD is that we understand now that the part of the brain that encodes memory is the hippocampus, the larger system than that but the hippocampus is the main structure. If laying down that memory as the amygdala, the part of the brain we talked about the limbic system, is sending fear.

So later the memory of the trauma activates the fear, and so the terrible thing about posttraumatic stress is that for people who have been traumatized, remembering is actually being afraid. In other words, when they remember, they feel fear in their body, and my patients and many people I've worked with describe this. It's not, Oh, it's a bad memory, it makes me upset. That's, of course, true. It's that if you make me remember, I am going to feel those physiological feelings of fear again.

And that's why that little circle I have there has to do with if you start with the perception, so the moment of the trauma. So for a rape survivor, right, as you're being raped, those perceptions, your sensory reaction to being raped is being laid down in your body while you are unbelievably frightened. In Ms. Montgomery's case that would be as a child. Then you follow that circle later, that network of reactions can get triggered again and just all of a sudden and then that person has extreme discomfort because they're afraid again.

Q Let me ask you a question, Dr. Porterfield. So what you're describing about that re-experiencing of the trauma when an individual remembers what happened to them is one of the reasons why it's very difficult for individuals such as Mrs. Montgomery to be able to access the memory of her trauma and express it in an interview with a mental health professional?

A Absolutely. I mean, all survivors of trauma, especially if they haven't been treated, I mean received mental health treatment or medical treatment, they have great difficulty returning to the traumatic memory. That's kind of the classic characteristic problem of a posttraumatic experience is if I return to that memory, I'm going to feel unbelievably afraid. Soldiers tell us this. Firemen tell us this. Kidnapped survivors tell us this. And Mrs. Montgomery's history is certainly a story of this. Because what happens is the individual does everything they can to not have that state

return. They will really, really try to stop it from coming, and that means they will try to push away reminders. They will try to push away anything that takes them to that place. With Mrs. Montgomery --

Q Is that what you call avoidance?

A It is called avoidance, yes. Mrs. Montgomery became so pathological as a child that it turned to what I mentioned earlier dissociation, which is a severe form of avoidance.

Q And so we have the DSM criteria for PTSD up here on the slide and you described some of those. Very quickly could you tell us the criteria?

A Just very briefly, yes. So this is the criteria for the diagnosis of posttraumatic stress. The first criteria is that you have to have the stressor, an exposure of some kind. It could be that they heard about something, suffered it yourself, witnessed it.

Criterion B is what is called that intrusive re-experiencing, which means the memories and feelings of the trauma come back to you and, again, it's called re-experiencing for a reason. It's not just remembering. The body feels that fear again, and that's what our survivors tell us. And it's intrusive because it comes out of the blue sometimes or it can come from a trigger and the person feels the feelings again of fear and of the trauma. Sometimes they might picture things. They might smell things.

Criterion C is what we call avoidance, and that is people work very hard to not go back to that memory. They'll try to put it out of their mind, say, Please don't talk to me about it. They'll avoid things that remind them, and that's very often a conscious process of avoiding.

And then Criterion D is sort of a complex set of symptoms that I can also talk about a little later, in fact, when I talk about complex posttraumatic stress. Negative changes in thought or mood. That's just what it sounds like. The survivor of violence, the survivor of trauma often struggles afterwards with what we call sometimes meaning making. Who am I in this world if this happened to me? Who are people if this happened to me? These negative changes are very powerful for survivors. And when the trauma is what we call manmade, so human trauma as opposed to, you know, hurricane, a car accident, you know, some other difficult environmental trauma, when the trauma comes from people, especially loved ones or people who should protect, then you see really, really severe Criterion D problems. Those negative changes become much more impairing in terms of sense of self, sense of the world, and I can talk a little more about that later.

Finally, that last criterion is alterations in arousal/reactivity. That is when I talked about that fear reaction, that posttraumatic patient who suddenly has a heart

racing, suddenly feels their stomach is contracting, like they have a nervous stomach. Suddenly they feel startled, a phrase called exaggerated startle response, which is the person jumps. You know, a door slams, they come out of their skin. So those alterations in arousal is the final set of criteria for posttraumatic stress.

Q And when you reviewed the records in this case, the data as well as your clinical interview of Mrs. Montgomery and your interview of David Kidwell, which we'll get to a little bit later, but as a summary, did you -- were you able to document each of these criteria with respect to Mrs. Montgomery?

A Yes. My evaluation of Mrs. Montgomery demonstrated many of these symptoms in the present and there was also a retrospective reporting of them and observation of them of others who had seen them in her, so, yes, they were consistent.

Q So now let's get into what happens when the trauma is, I think as we say, ongoing, pervasive, and inescapable. What is that called?

A Well, what our field has learned is that someone who experiences trauma in a circumscribed manner, one trauma, two, couple different events in their life, they really struggle often with PTSD. It can be severe.

So there's a different sort of presentation and set of problems that emerges in people who have had to have a

lifelong or chronic condition of fear, trauma, and being overwhelmed; and the sort of model of that is called complex posttraumatic stress, and that -- we've learned this through war survivors, kids growing up in war zones, kidnap survivors, children who have been chronically abused. These are the populations who have a posttraumatic condition, but we look at it as having more impairments, more pervasive problems in the functioning, and it's sort of best understood, I think, as a captivity condition, meaning the person's trauma came out of a situation they could not get out of, sometimes called learned helplessness, meaning -- excuse me -- the captivity sometimes is described as leading to learned helplessness which is a condition in which the person realizes there is nothing they can do to escape. I've seen that in several kidnap survivors.

Q Let's discuss this concept of learned helplessness a little bit because you're aware that at the trial in this case, as we suggested -- as we talked about yesterday, there was a question as to whether or not Mrs. Montgomery's complex PTSD was not diagnosed, and there was a question about whether or not Ms. Montgomery's PTSD was simply from the crime itself, and there were also many questions raised as to whether or not Mrs. Montgomery was a, quote, willing participant in the sexual trauma that they knew about at least at the time of the trial. Can you describe this concept of learned helplessness, because I think it's very important to understand that?

A Well, absolutely. The idea that a child would be living in a home in which the main -- one of two caregivers is going to have complete access to her in a room that he has built off the side of the house, that entire structure is a structure that I would say is a recipe for learned helplessness. What I mean by that is an experience in the human body and human mind that this stress I'm under, this threat that's attacking me, I can't get away no matter what I do. So the individual begins to enact an almost passive and what we call immobile response because there's nothing I can do.

The research on this came out of dogs, actually, and sort of disturbing which was that they shocked dogs over and over again and created a condition where the cage door was open for the dogs to actually get out of the shock and the dog stopped trying, and it was really a horrible metaphor about the mammalian, meaning mammal, response to too much harm and fear, which is that you start to believe physiologically and mentally that there's nothing you can do, and I do believe that's quite relevant to Mrs. Montgomery's childhood in that this was happening in the home. She was the victim of caregivers, her stepfather and what was shown to be true is her mother as well colluding. And so this experience for her was not escapable.

Q And you mentioned this mammalian study. Is the limbic system often referred to as the mammalian brain?

A Yes. That's that part of the brain that carries our fear, and one of the reasons people think about is mammals. You do think of animals, right, you think of that monkey responding to something by grabbing onto the momma monkey or you think about a dog, you know, running away from something frightening; that that flight-or-fight mechanism comes through the limbic system, and the limbic system is where we process fear and negative emotion.

Q So how is it that multiple traumatized children develop complex PTSD?

A Well, I mean, essentially the thing you need to understand about complex posttraumatic stress is that it's just not that fear that I'm going to talk about for a few minutes. This child is having a prolonged state of fear. And what's really critical is that prolonged state of fear is coming at the hands of someone they trust or supposed to trust. It's coming at the hands of people who are supposed to protect them.

So that's the sort of critical piece that you have to understand about a chronic child sexual abuse survivor is that they not only get that disordered arousal system that we talked about, right, their fear and threat detection is quite off-kilter, but they also develop a disordered sense of self and a disordered sense of other people and detachment, and that's from the perpetrator being trusted adults or people who are supposed to trust them. It's really critical to

understanding the difficulties that Mrs. Montgomery had.

Q So can you explain to the Court what are the symptoms of complex posttraumatic stress?

A Right. We don't need to review the first because we've already talked about those symptoms of posttraumatic stress, the re-experiencing, avoidance, and overwhelming sense of threat.

Where complex traumatized children develop problems are in these very broad-based areas of functioning, and I can do this -- I'll try to do this kind of quickly and clearly. The first is what we call affective dysregulation. That's just big words that has to do with how the child learns to handle themself, handle their feelings. If you remember going all the way back to the beginning of my conversation today, biopsychosocial regulation. Affective dysregulation is that child does not learn to deal with their body, control their feelings, understand their body. Second --

Q Can you also talk to us about the negative self-concept?

A Yes. So the second component, that part of complex posttraumatic stress is what we call negative self-concept. That's pretty straightforward. People who are chronically abused over a long period of time, especially by caregivers, develop deeply disturbed senses of their self in the world; damaged, destroyed, as throwaway, garbage. This is the kind of

language people will use who have been badly abused, and I can talk later about Mrs. Montgomery in this regard.

Q And what about interpersonal disturbances? What do you mean by that?

A Again, it's pretty straightforward, but people who are chronically abused in a situation in which they couldn't escape develop great difficulty managing interpersonal relationships, dealing with other people. When you think about it, of course, it makes sense, right? The child is growing and learning what are people. If the child grows and learns that what people are is they are a source of physical pain, they're a source of terror, they're a source of I will be getting raped, then their capacity to deal with people gets impaired because people are sources of pain and danger.

Q And so while this is common sense to some extent it's also based on substantial clinical or scientific and empirical research?

A Oh, absolutely. The research on child abuse, child maltreatment can be poor outcomes that I've laid out as well as the complex problems is a very, very well-studied aspect of our field.

Q And so in Lisa Montgomery's case, turning to your evaluation of Lisa Montgomery based on the scientific, empirical research, and your experience, did you identify risk factors in Lisa's childhood that confirmed your diagnosis of

complex posttraumatic stress?

A Yes. So if we think back again to those risk factors we talked about with the ACE Study and there's been other -- ACE is not the only study to look at risk factors. In fact, the Department of Justice looked at risk factors in children and says that if kids have these problems, they're going to go on to have trouble with delinquent and -- delinquent behavior.

The risk factors I'm identifying here you see on the slide are basic things that Lisa experienced in her childhood; and, frankly, they are over a long period of time that I believe are critical to understanding her very poor outcome as an adult.

Q So it's important for us to talk about all of these risk factors. We talked a lot about sexual abuse. That's been a lot of the focus over the last week and a day, but the sexual abuse is there but there's also other types of abuse; is that correct?

A Yes. So Ms. Montgomery's --

Q Let's start first with the sexual abuse and move through that quickly, then we'll get into the risk factors.

A I mean, so just broadly there is just such extensive sexual abuse in this woman's childhood that is well documented, well reported, including reported before the events of the crime and documented by experts and professionals, not simply family members. There is her -- actually, I realize I do not

have up there that she was sexually assaulted by a relative, Kenny, I believe his name is.

Q Her cousin, Kenny Alexander, when she was a small child?

A Yes. But then really the first two points --

Q The gang rapes and the trafficking, you're aware that that's something that the jury didn't know about; is that fair to say?

A Did not know about?

Q Right.

A Correct.

Q That was new information that you learned from your interview of David Kidwell and your interview of Lisa Montgomery?

A Correct. So I was just pausing because Diane's rape I have there with Lisa Montgomery present predates the other events because Lisa was herself a small child at that point. I believe Ms. Mattingly estimates Lisa was about three or four when she was lying in bed while Diane, seven or eight, was being raped by an adult male. So we're going to start with that -- a starting point of sexual abuse because for a four-year-old child to be lying in that situation would be unbelievably frightening and would be a condition of sexual abuse.

Sorry. To then return to your question. Lisa

Montgomery's experience of being groomed by Jack Kleiner starting at approximately age 11, if not earlier, with fondling, nudity, physical punishment being coupled with the nudity, being forced to bend over a bathtub with her bare bottom exposed and growing into at age 13 an experience of frank rape by him is just an astonishing amount of abuse for a child to absorb. It is very, very severe.

When you then add that what has emerged is that she also was trafficked by her mother, other caretaker, who is supposed to protect, traffics to other adult men who multiply raped her, beat her, and urinated on her, it is almost incomprehensible the kind of stress this child's body and mind suffered; and, frankly, her disordered behavior shows the cost in terms of how severely disturbed she is.

Q So we've talked about the sexual abuse. What about the physical abuse?

A Again, these are well documented, multiple witnesses talking about just an extensive and very just sadistic sort of tone in this child's home by her mother and stepfather in terms of being, you know, put in a shower when she had wet her bed, in a cold shower, just cruel physical treatment. Being whipped with multiple objects; belts, cords, wire hangers.

A story told by someone else of Judy hitting Lisa with a hairbrush over the head, having a broom broken over her back by her adult stepfather and also being hit and beaten

during the rape to the point where she said she would have bruises sometimes on her legs after the rape by these men. When you talk about dose, we're talking about just an enormous dose of physical violence in this child.

Q And did Mrs. Montgomery tell you that sometimes she would have to wear long dresses in order to cover up the beatings on her legs?

A Yes, she did.

Q And told you that the beatings were allowed?

A Yes.

Q During the gang rapes?

A That's correct.

Q Did Mrs. Montgomery also tell you that some of these men would leave her money because they knew that Judy wasn't sharing all the proceeds with her?

A Yes. She talked about a man who would open the drawer of her dresser and sort of slip this money in; which, again, if you try to think about a child developing in the world and conceiving of what people are and what adults are, it's so perverse to think of a child having just been raped by an adult male as he slips money into her dresser and the mother is in the other room.

Q Let's talk about the next factor, emotional abuse, and I know there is a lot of emotional abuse when we get back to talk about that dose of stress. What were some of the

instances of emotional abuse that you were able to document in the records?

A Again, there is a staggering amount of abuse enacted on Lisa Montgomery as a child and adolescent that I would call emotional. By emotional abuse, that is cruelty towards her, verbal, psychological manipulation, things designed to really make her feel terrible.

You know, there is just a tone across this family of disparagement and sort of vicious language being used towards children. There is -- the experience of Ms. Mattingly as a child being told, You are going to be removed from the home because you're bad, you're not ours. Again, this is now -- that's an emotionally abusive situation for Ms. Montgomery as well because she's a little child watching her big sister, beloved, being threatened with abandonment. This is so frightening for children. Watching Diane Mattingly being put on the porch naked. This is emotionally abusive to Lisa Montgomery, of course, as well as to Ms. Mattingly.

Q What about Jack's threats?

A Well, you know, Mr. Kleiner by all accounts was just an unbelievably frightening man, and he threatened Lisa that he would rape her sister if she told. So Lisa now has the double bind, I have to submit to the rape because if I don't, my sister gets it. He also threatened, though, to kill the family if she told. This was a very important point to me because it

led to a real feeling of, I believe, learned helplessness that I talked about earlier in Lisa. He's saying, I will kill your family.

If you want to sort of think about part of my questioning was evaluating her, what was the believability of that threat? What I found in the records was that Judy Kleiner herself in her divorce proceeding says, Part of why I didn't want to leave or kick him out, rather, was I believed he was going to kill us. So there you've got a grown woman saying this man is capable of hurting, slash, killing his family. So when a little child, 11, 12, 13, 14 feels it, that to me is quite credible.

Other abuse --

Q And what abuse, emotional abuse did you see, for example, with Judy with respect to Lisa?

A Well, again, I believe Mrs. Kleiner was very mentally ill because her -- the things she was capable of doing to her children are really astonishing in their cruelty. Cutting Lisa's hair as a symbol of you're bad and dirty. That's a very disturbing concept for a child that you are physically now going to be changed by me into less attractive -- whatever the meaning of the short hair is -- because you're bad and dirty. That's a very, very disturbing message for a child.

It really leads to the most powerful emotional abuse that I believe happened to Lisa Montgomery by her mother, which

was that after this extensive years of sexual abuse was discovered, Mrs. Kleiner blamed Lisa for the abuse, said that she had done it, she had stolen her husband, said she had broken up the family. She said she had made it so we don't have money now. It's very difficult to try to capture how damaging that message is to a child who suffered sexual abuse.

When kids suffer sexual abuse, one of the biggest predictors of improvement in their functioning, helping them is does the system respond in a way to protect them, to prosecute the perpetrator and do they get loving family support from those who care for them.

Q And what you have just described, would that have been relevant to rebut the prosecution's argument at trial that hundreds of thousands of children are sexually abused but their outcomes are fine?

A Oh, absolutely, because the variables that matter are all in the details, right? What was the extent of the abuse and what happened after? What are those protective factors? I can talk about that later, if you like. But this idea of Mrs. Kleiner saying to Lisa, This is your fault, is really just a staggering kind of damage to do to a child.

Q And the other instances that you have here on this slide, such as allowing Jack back into the home, sending Lisa away, and publicly humiliating Lisa, are those all examples of Mrs. Kleiner doing what to Lisa?

A Well, again, not to be too fine of a point on it but it's not simply Mrs. Kleiner says, It's your fault, you did this, you stole my husband, you chose this, she also then tells people this publicly, and there's multiple witnesses who say she said that all the time. So now you've got this other layer for this child. It's not just, Hey, this is your fault, coming from the mother -- who, by the way, knew about it clearly and was bringing it about herself -- it's that she's telling people. So when you think of an adolescent, this is a time of deep sort of self-consciousness and awareness of who am I in the world, how do people think of me, and you have this woman saying to people all around, This child did this on purpose, she brought it on herself, she was having sex with my husband, that is deeply, deeply disturbed behavior by Kleiner -- Mrs. Kleiner and very damaging as you see in Lisa, or as I saw, frankly, in my evaluation.

Q And you are aware that at trial, the government's experts, Dr. Dietz and Dr. Martell, relied on Judy Kleiner's reports that Lisa had brought the sex on herself when they were making conclusions about Lisa being a willing participant or consenting to the sexual abuse?

A Yes. I'm aware that Dr. Martell and Dr. Dietz both raised the specter of Lisa as, quote, a willing participant and someone who possibly consented to sexual abuse when she was starting at 11 years old.

Q And there also have been instances of Judy actually killing the family dog in front of the children; is that correct?
A Yes. So this is just further emotional abuse. I mean, again, this is not the child being physically hurt but imagine the child watching your mother kill a beloved, treasured pet, the coercion and the control that's part of that.
Other examples of abuse would be forcing the kids to fight one another, something that's strangely and bizarrely Mrs. Kleiner chose to do having her children have to hit each other with wooden boards.
Q In fact, told them that they had to go out and hit each other with two-by-fours and don't come back until someone's bleeding?
A Correct.
Q And that was confirmed by multiple sources?
A That's right.
Q And then she would also continue to leave Lisa at home?
A Well, in fact, the leaving Lisa alone at home sounds almost passive and, in fact, what emerged is that Mrs. Kleiner appeared to actively participate in the handing over, what we call trafficking, frankly, of Lisa to adult men for sex.
Q Beyond those instances of abuse, which we can all agree is quite disturbing, there was also emotional and physical neglect, another one of these ACE factors that adds to the

dose?

A Yes. The neglect, emotional and physical -- I mean, again, I think as lay people, we probably have a conception of these two concepts, but the emotional neglect has to do with the lack of love, nurturing, tenderness that's essential to a growing child.

Physical neglect is more the absence of needed environmental sources of, you know, of health for the child. So dirty home, poor home, child not getting enough food, nutrition, clothing, leaving the child. No toys has actually been identified as a source of -- as a variable of neglect, not letting that child grow and have something to play with. So those are both two different factors, again, present in Lisa Montgomery's life.

Q And what about the risk factor with respect to parental loss?

A Parental loss and abandonment is shown as a severe risk factor for many, many years in the literature, and we know Lisa Montgomery, it's quite clear her father both takes her away from the mother for this sort of bizarre period of time that's unclear what that was but appears to abscond with her, but then he really just disappears and abandons her, and that's a risk factor for kids to lose a parent.

Q And that's scientifically known?

A Yes. Again, when I say risk, I apologize because --

what I'm saying is risk factors are events in one's life that increase the likelihood that you're going to have problems, psychological, emotional outcomes.

Q And the violence in the home?

A Well, again, this is a very, very robustly and rigorously studied aspect of child development, which is are they suffering violence in the home and/or witnessing domestic violence? Huge factor that predicts problems in kids to witness violence in their home, and we have this in spades during Lisa Montgomery's childhood.

Q You saw that in the records and you have them listed here some of the instances of violence you were able to glean from reliable documents and data in your review?

A Absolutely. I mean, stories of -- as we heard, Diane Mattingly protecting Lisa from witnessing a massive fight between adults in the middle of her living room. Mr. Patterson, the first -- sorry -- Lisa's father and Judy were flagrantly violent with each other and fought.

Mr. Kleiner was apparently brutal towards Judy. She had a broken nose, black eyes, physical, you know, manifestations of the amount of violence and severity of violence.

There were a number of people coming in and out of the house. These supposed boyfriends or men who were coming to see Judy, and there would be violence with them at times.

Q Then, of course, we have evidence from, for example, James Miller, a cousin of Lisa, who came to live with them that described Jack's assaulting of Lisa and the children and multiple witnesses talking about Jack's physical abuse?
A Yes, extensive.
Q And the risk factors regarding substance abuse in the home?
A Just simply there's a high correlation of children who grow up in homes with substance-abusing adults as having their own risk to not just substance abuse but other mental disorders and other problems. We see this extensively in the history of Lisa Montgomery in terms of those adults who on that side reported to be substance abusing.
Q These risk factors seem to be quite astonishing and unique in Lisa Montgomery's history with respect to child objectification, abduction, and abandonment. Why is that important and relevant to you in your analysis of Lisa Montgomery?
A Well, I called this risk factor. It's not in the ACE Study, of course, because it is so -- frankly, I think it's sort of rare the amount of child objectification that is present in this family multigenerationally, but I have flagged it because it is so pronounced in terms of a pattern that existed in this family of seeing children as objects to be used in battles with one another, literally people take threatening

to get rid of kids, getting rid of kids, threatening to steal kids; and you see I've listed it here, but from Lisa's childhood she saw this disturbing pattern that children were objects and it, I believe, was absorbed into her very disturbed sense of self.

Q And then the risk factor of her mentally unstable parents. What evidence did you see in Lisa's history that her parents were mentally unstable?

A Again, there's robust and rigorous literature on this. When kids have a mentally ill parent, especially untreated, that the children have much greater likelihood of mental illness.

You've got Mr. Patterson who supposedly has posttraumatic stress disorder and depression and he himself didn't think he could be around his children, and Mrs. Kleiner is clearly a very disturbed woman. I don't know what her diagnosis would have been, but her completely out-of-control behavior, her vicious sadism, her lability, meaning the mood sort of instability, and her assaultiveness suggests she was very mentally ill.

And then Mr. Kleiner, again, just a profoundly disturbed man in terms of not just his behavior in the home as violent but also pronounced alcohol use and, of course, most of all a predatory sexual abuser.

Q What was the psychological effects of Mrs. Montgomery

of all of this on her childhood and adolescence?

A As I said, there's just massive, pervasive, severe, negative impact on Mrs. Montgomery in almost all aspects of her functioning due to this traumatic stress and this highly disturbed childhood.

Q Let's break that down a little bit, if we can. Let's talk first about the effects of Mrs. Montgomery with respect to her emotional dysregulation.

A So if you just think back a minute to -- we talked about complex posttraumatic stress and that category falls under there. It is, again, emotional dysregulation, inability to recognize, deal with, handle one's feelings and experiences.

Okay. So there is extensive evidence that Mrs. Montgomery was a profoundly dysregulated young woman. So starting -- I think, it really, really began to emerge in her teen years when she was being raped and then going into her very disturbed adulthood. This would be -- you know, examples of this are her incredible volatility, her inability to handle emotions, retreating in her bed for days, sort of losing it on her kids, I think mistreating her children, excessively drinking, being engaged in promiscuous behavior. These are all signs of a person who is not able to manage or regulate the emotions and the experiences that are going on in their body.

Q I'd like to stop you right there for second. You're aware of the fact at the trial of this case trial counsel

attempted to portray Mrs. Montgomery as a, quote-unquote, good mother and good wife and didn't really deal with the plain fact that Mrs. Montgomery had, in fact, abused her children and had these bouts of emotional volatility, anger --

A Yes.

Q -- those sorts of things?

If you had been or someone like you had been contacted by trial counsel, would you have been able to put that behavior within the context of this emotional dysregulation that came out of Mrs. Montgomery's complex posttraumatic stress?

A You would have looked at the data. I mean, what do we do when we do an analysis and an evaluation? You look at the data, then you analyze the data, and the data is everywhere that Mrs. Montgomery was an incredibly dysfunctional parent and who could not run a home much less raise children.

Q Now, with respect to this distorted -- well, let me ask you this: Did you -- because it's important to look at pre-crime descriptors of Mrs. Montgomery. When you talked to Mr. Kidwell, did he describe for you his personal observations that you found consistent with emotional dysregulation?

A Yes. He talked about Ms. Montgomery both as a teenager, which for me was really important because it was contemporaneous with the abuse. Now, of course, it's the retrospective report because Mr. Kidwell looking back, but he's

talking about Lisa Montgomery as a teenager as he's seeing her, and he's talked about her being retreated into herself, looking incredibly frightened, shaking, trembling, showing a startled response. These are the signs of a traumatized child, and he's seeing them in his teenage years -- sorry -- in her teenage years.

He then also says that as she grew, she became this strange member of the family who everyone says she's impossible to deal with. She flies off the handle. She's irritable. You never know what she's going to do. So then you watch that dysregulation now at a different point in time and it's morphed into more of what we see as this chronically undercontrolled woman due to who used to be that frightened, withdrawn teenager.

Q Now, with respect to distorted damage to self, I know that's going to become very important as we discuss dissociation and psychosis. Could you please describe for the Court what it is that you mean here with respect to distorted damaged sense of self?

A Yes. Ms. Montgomery has such an unbelievably troubled split and damaged sense of herself. Again, consistent with what has happened to her and what her childhood was but it is so pronounced, and what I mean by that is her ability to be herself is almost not -- she's almost incapable of feeling a sense of self; and what I mean by that is when she feels a

sense of self, she's confused by that. When she has a feeling, she doesn't really know if the feeling is coming from within her or outside of her. That's very, very disturbing.

When she does describe herself, she talks about herself as being damaged, broken, only good as a body to create babies, brought about by Jack's abuse. She has these very denigrating conceptions of herself. But what's even more disturbed is that there isn't really for her a sense of self that is steady or consistent, and it's almost like quicksand, her sense of herself in the world.

Q Now, up here on the slide you mentioned, "Must have wanted it if I wanted a room." Do you recall in your clinical interview of Mrs. Montgomery when you began to ask her about the abuse by all of these other men, her telling you about what her mother's -- her mother blaming her? What did her mother say?

A Well, her mother said, first of all, Hey, you wanted a room so we need to pay for those renovations. I'm putting it in quotes. And, therefore, sort of like if you wanted this room, you have to take it. And also she herself internalized it. That's where we're getting into sense of self. She said, I must have wanted it if I wanted to have a room, right? She asked that of me almost as if it was possibly true.

Q Do children do this when they're subjected to abuse?

A Absolutely.

Q Do you see in your research and science that they start to try to -- that they take on this sort of strange almost weird justification for their parents' actions?
A Yes. That is why complex posttraumatic stress is a little different than posttraumatic stress because that sense of self and interpersonal distortion, they are so pronounced and so difficult to -- well, frankly, they're very hard to treat if the child doesn't get really good treatment, because when a child's being abused, they have to make sense of it, okay? They have to make sense of what's happening. What we know clinically if that child is being abused by a loved figure; mom, dad, a beloved person in their life, they then have to make sense why is this happening. It must be that I'm making it happen. I am bringing this on. That then leads to an entire cascade of beliefs about oneself as dirty, disgusting, you know, warped, did it to myself, and that's where that really toxic self-blame happens in sexual abuse survivors, and Mrs. Montgomery is deeply disturbed with that.
Q What about Mrs. Montgomery's body confusion?
A Yes. So we're going to talk about dissociation a little later, but, you know, Mrs. Montgomery's perception of herself is not just her internal feelings and thoughts. It's also her physical body. She has a very -- in my clinical opinion, a very split, fragmented, and troubled relationship to her own body. She literally does not perceive her body

accurately in some cases and has trouble remembering, for instance, states of her body with any accuracy.

So pregnancy has been discussed with her many times, sex, her body during sex, what was happening to it. These are perceptions that for her are split. They're fragmented. I can talk about dissociation but it might be easier later but I will explain that.

Q Sure. We'll wait. We're going to get there very, very quickly. What about her distorted perception in her interpersonal relationships?

A This is that third piece of the complex posttraumatic stress. We've got that emotional dysregulation. We've got that sense of self being distorted. Then we have a very, very troubled part of Mrs. Montgomery which is her perception of other people; and what I mean by this -- and this happens to severe abuse survivors -- Mrs. Montgomery grew in a context of experiencing people as a source of physical pain, emotional pain and neglect. She then internalized that that is what human interaction is. People are going to hurt you. They're going to violate you. And what emerged as she grew into an adult was a difficulty perceiving people as anything except a threat or an object, because people to her were the source of such deep, disturbing violence as a kid.

So for her people were not like you or I might experience, you know, a full person with a range of

capabilities and relationships. You know, to me maybe you're a lawyer, I'm an expert here on the stand. We have a whole set of meanings about that. Lisa Montgomery when she sees people, she experiences people as highly frightening and threatening and sources of destruction, basically.

Q And now we're going to move into a discussion of dissociation, which is such an important finding with Mrs. Montgomery. Can you explain to the Court why children dissociate?

A Yes. So this is really, I think, a very, very important aspect of Mrs. Montgomery's mental disturbance. She is a very, very severe example of a person who uses dissociation; and what I mean by dissociation, just for a minute take it back to kids, if a child is experiencing something that is physically hurting them or just horrifying them, it's overwhelming them, one of the things that happens physiologically is that the brain actually releases into the body chemicals that are -- we call them endogenous opioids. It's just like it sounds. Endogenous from within, coming from within us. Opioids like you might think of with -- that you need during surgery or during, you know, pain relief people take opiates.

We have a set of those in our body that get released during physical pain and they're incredibly protective. I mean, if a soldier -- and we hear these stories all the time

from veterans. If a soldier hits an IED and his leg is wounded severely and he's lying there talking to his buddy saying, Okay, radio this and do that, you know, move this way, and the buddy is thinking, How is he talking to me? How is he functioning? His leg is very, very injured. What's happening is his system has kicked into opiate secretions that are decreasing and detaching the pain.

Q How does that work with children in a sexual abuse case?

A So a child who is being raped, the child -- let's say, if we're going to use Mrs. Montgomery, that's obviously why we're here, a young child 13, physically not developed, who's being raped by an adult male is going to have a whole cascade of physical discomfort, pain, and horror from that. So they're going to have smells and sounds of an adult male having sex. They're going to have the physical pain in their genital area of an adult male penetrating them, and all of that is going to lead that body to need to, as we talked earlier, survive, cope. What's going to happen is the body releases chemicals that will anesthetize. That decreases the pain the child feels. It decreases the sensory experiences, I'm not really feeling it. It decreases the consciousness. Rape survivors will tell you it was like I left my body and looking down and so -- sorry.

Q No. That's a really, really important point with respect to Lisa Montgomery and that consciousness issue in the

looking down. What examples do you have from Lisa Montgomery?

A So one of the things, again, sort of came out organically in a description she was giving, she was talking about Jack Kleiner's fondling her and what, again, I'm calling grooming, preparing the child to be the object of my sexual abuse. She was talking about what he would do, taking off her clothes and starting to touch her body and she just offhandedly said, Things were still real then. And I said, Well, what does that mean? And we began to talk about her memories, and what was clear was that her memories were -- are different as she gets older because they are more fragmented, and what I'm positing is that they are memories that have been degraded and fragmented by her dissociation. Sorry. That's a long explanation. But if I could have just another minute on it.

Those endogenous opiates I talked about, those things that make you not feel the pain, the good thing is they make you not feel the pain, but the other side of it is they also disconnect us then as that memory of the event is being laid down. That's why after a trauma we often don't have great fragmented -- sorry -- great linear memories. We have fragmented memories. So as that opiate is decreasing pain and decreasing consciousness, it's also decreasing memory and connection.

So when Lisa Montgomery says to me, Things were still real then, what she was saying is she has a memory of

that that is different from the memory of the later rapes, because when the rapes started happening, when the multiple men were raping her, she says it is much less able to be accessed as a memory. It's a much foggier fragmented image in her memory.

Q And is that consistent with what you see in rape survivors?

A Yes, because what dissociation -- I've seen dissociation in survivors of severe sexual assault quite a bit, and what you're talking about is they have an altered consciousness. They have -- if you see this slide, the kind of technical word for dissociation is a disruption of what we call our normally integrated functions.

Integrated functions are that I'm sitting here in this courtroom and I'm perceiving it. I know I'm in a courtroom. My thoughts are matching what my senses are telling me and also matching my feelings, which I'm on the stand talking. That's an integrated experience.

People who dissociate, they're not integrated. So their thoughts are cut off. Their memories -- sorry -- their emotions are disconnected. Their memory of what happened to them is often choppy, fragmented, or nonexistent. Sometimes they would call it dissociate amnesia. Their perceptions, their senses are not always in tune and their sense of self is often cut off from their experience. That is the classic

clinical presentation of a severely dissociated person, and Mrs. Montgomery has a very severe dissociative symptomatology.

Q And you've used the word "severe," and we know that you have, because of your work at Bellevue with Survivors of Torture and your work with journalists who have been kidnapped in third world countries and tortured, you've seen a lot of people who have been traumatized. Where would you place Mrs. Montgomery's level of dissociation in the population of individuals that you have treated which is quite unique?

A Oh, it is one of the most severe cases of dissociation I've ever seen. What I mean by that is it's so pervasively part of who she is. I've seen survivors of very severe rape and torture who had an okay enough childhood that, yes, they have severe dissociation. When you start reminding them about the kidnapping, for instance, they dissociate. They disconnect. I'm not feeling myself anymore. I can't do this. I'm not in my body. The world's not real but they have a fundamental sense of self that is intact.

Mrs. Montgomery doesn't have that. Mrs. Montgomery's entire development took place in a context of stress, humiliation, degradation, and so her dissociation is woven deeply into her personality. There is no ground for her to stand on. So her dissociation is not the sort of episodic blips. Her dissociation is a completely pervasive part of who she is. She lives in a dissociated state much of the time.

Q And so that makes it particularly difficult, then, for someone who doesn't consult with someone of your experience and expertise -- and you're not the only one with this experience and expertise; is that fair to say?

A Absolutely. Psychologists learn what posttraumatic stress is and what complex posttraumatic stress is and what dissociation is. These are not -- you know, these are not esoteric concepts in psychology.

Q And it was known in 2007?

A Absolutely.

Q And a lawyer could have consulted with you to learn about how to interview Mrs. Montgomery and what to do with information that she provides?

A Me or many other qualified people.

Q And you describe the situation of altered consciousness and how when these folks are not -- who experience trauma they're not integrated and sometimes they feel outside their bodies?

A Yes.

Q Is that often reported to you as saying, I feel like there's someone else there or I feel like I was in this other place looking down in the situation?

A There's two really important concepts I can explain fairly briefly. Depersonalization and derealization and these are the real challenges of a dissociated person because what

depersonalization means is I don't feel like a person. I'm not in my body. I'm not real. And derealization is the world is not real. The world feels like a movie or a fog or a dream, and it's really incredible because people who dissociate, they talk about this as just a very frightening, disturbing experience to feel that way.

Mrs. Montgomery has very severe derealization and depersonalization, and that means she is very vulnerable to not knowing if she's real, if her environment's real, if the interaction is real. It all, like I said, becomes sort of like quicksand for her, and I believe that is because her neurobiological response to early stress was such a heavy load of anesthetizing, altering neurochemicals that she now just daily functionally lives in that kind of -- in that kind of operating stance, which is the world does not feel real to her.

Q And so we talked, I think --

A I think we talked about that.

Q We talked about this. We'll go past that. And we've talked a good deal about --

A Yes.

Q -- Dr. Martell and Dr. Dietz so we don't need to go back there. But you did -- there is one important point about the way that a mental health professional approaches Mrs. Montgomery's history and experience because is it fair to say that if you -- if your construct of Mrs. Montgomery is that she

is perhaps as she was described at trial as almost as though she brought this sexual abuse on herself, does that impact the way in which you're going to review the data and skew your ultimate results?

A Well, absolutely. I mean, just to speak about it a little more scientifically. If you take a factor that's incredibly toxic and what I call disease inducing, which is child rape, that is a very disease-inducing process for a child, they're going to have multiple impairments coming out of being raped. If you take that and say, Well, I'm going to take that out, I'm going to take it out as a factor, I'm going to say, No, that was not rape, that was a choice made by a child, well, then, what you're doing is you're essentially taking out the toxic factor and saying, I don't need to weigh that anymore. Now let's look at the functioning. It makes no sense. It's spurious. It's not a way to examine to take out one of the most important factors in their development and say, We're going to say that doesn't matter.

Q I want to ask you now, Dr. Porterfield, about some examples of specific physiological responses that you observed -- I'm sorry. I need to talk about protective factors first. I got ahead of myself.

Again, we talked about how at trial there was this discussion from the prosecution about hundreds of thousands of kids being abused every year. There is a concept in psychology

that looks at protective factors and what makes certain children resilient and others not; is that fair to say?

A Correct. Those are the factors that can mitigate the effect of adversity. So we say if a kid has a rough situation, what distinguishes the kids to do okay coming up with those variables of adversity versus the kids who don't? We're able to break that down in the field into what we call protective factors.

Q And is this scientifically based and research based?

A Yes. A lot of research on what we call risk --

Q And this information regarding the protective factors was the science and literature available in 2007?

A Absolutely.

Q So can you describe for the Court some of the protective factors that can assist --

A Sure.

Q -- a child and whether those were present for Mrs. Montgomery?

A This is not an exhaustive list but one of the biggest protective factors is what we call social support. I'm taking that a little farther here and calling it a nurturing, loving response to the traumatic event in a child's life, because one of the things we know is that social support is greatly important; friends, a good school system, adults, parents who care about you, take care of you. But what we also know

clinically is that a traumatized child also needs nurturing. They need a response that's therapeutic from loved ones as well as from therapeutic providers. All of that is a protective factor for an abused child. It will help the child do better after being sexually abused.

Q So instead of having these protective factors, did Mrs. Montgomery actually have the opposite?

A Absolutely. Mrs. Montgomery not only did not have a nurturing, loving response from her family, she had the exact opposite, which she was directly and patently blamed for what was done to her. So incredibly disturbing to do to a child.

She also did not have the support of any other adult around her as her mother went around telling people it was her fault. For instance, could an aunt or uncle or neighbor have said, you know, you wonder, Well, gosh, it wasn't her fault. Let me help Lisa. No one. She tells Mr. Kidwell, an older cousin at the time, a law enforcement representative --

Q Let's pause there for just a moment. Mr. Kidwell was in fact in law enforcement when Lisa Montgomery --

A I believe so, yes.

Q And one of the things Lisa Montgomery told you when you -- in fact, wasn't the first words out of her mouth when you started to ask her about the gang rapes and later we learned about the trafficking, was the first word out of her mouth, Whenever I told, nobody did anything?

A Yes. I found that to be a really poignant and important point, Whenever I told, no one did anything, because what you're thinking about is, What's 360 degrees around the child? The child's been abused. When they turn around, what do they see in 360 degrees? No matter where Ms. Montgomery turned, there was no one who responded appropriately with therapeutic or legal systemic responses to having been a rape survivor.

There were a few sessions of therapy with a therapist who recognized that she was a rape survivor but astonishingly does not inform child protective services. That makes no sense. There is Mr. Kidwell, a relative who is a law enforcement agent, who does not inform other law enforcement or child protection this child's being raped. There are -- there's divorce court in which the rape is described, and there is not any legal or therapeutic mandate afterwards that this child be assisted.

So when I say 360, wherever this child turned, there was not a response that said, You were hurt. The environment is going to respond to you. And that is a deeply important part of Mrs. Montgomery's disturbance is that the world around her is a world that she experiences as threatening, frightening, and not seeing her as a valuable human.

Q Now, with respect to Nancy Walentiny, the counselor, you're aware of the fact that the way that Mrs. Montgomery got

into counseling was because it was Judy Shaughnessy's lawyer who reported --

A Yes.

Q -- to the CPS and got her some counseling, but those counseling sessions were in fact quite brief and they were not court mandated. Is that what you meant?

A Yes.

Q And did you know something specific about Mrs. Shaughnessy -- well, first of all, did you notice that Dr. Walentiny actually shared the content of Lisa Montgomery's counseling sessions with Judy Shaughnessy?

A Correct. Which is a very tricky and sort of complicated issue whether you would share information with a sexual abuse survivor who is under age with a parent.

Q And did, in fact, Judy Shaughnessy tell Lisa Montgomery, I'll know everything you tell her so watch what you say?

A Yes. She told Lisa that, I will know the content of what you say. She also directed her to not tell about the men who were coming to the home. She directly said, Don't tell that because I'll get in trouble.

Q And did Nancy Walentiny actually make observations about Judy Shaughnessy in the records themselves that you found to be important?

A There were two points that I thought were really

salient from Mrs. Walentiny. First was describing Judy as unempathic towards Lisa; and, again, the quick example is I believe Ms. Kleiner is in the room with Lisa, her daughter, who has now been exposed to having been a survivor of at least four years of sexual assault and Mrs. Kleiner begins to say to the therapist, Oh, they're always asking for money. They don't appreciate me. Ms. Kleiner, in other words, in a therapy session for her sexually abused child begins to explain about the child, and Ms. Walentiny rightly identifies this as sort of a shocking level of nonempathy for her abused child.

The second observation Ms. Walentiny makes that is quite relevant is that Judy, quote, talked over Lisa. That's a really important dynamic in that room because literally she's talking over her. What we also, I think, know is that she was controlling Lisa's ability to actually share the truth in that therapy session, and essentially Lisa didn't go to any more therapy, right? It was stopped. That was also just a hugely problematic decision on the part of Judy.

Q So now that we've talked a little bit about the therapy sessions, I want to close out our time here this morning talking with you a little bit about the importance of someone who is skilled in trauma, conducting an appropriate interview with a trauma survivor in order to help them disclose the extent of their trauma.

We've heard a little bit, again, about this

distinction between clinical and forensic; but in terms of asking questions in order to get to the truth of the trauma, it doesn't really matter whether it's a clinical setting or a forensic setting; is that fair to say?

A Sure. You can conduct a competent and effective trauma interview in a number of contexts. It doesn't have to be clinical or forensic.

Q But can there be barriers in that environment that you can't control, in fact, it's happening in a jail cell?

A Sure.

Q You have to work around that. But are there other barriers that are avoidable that could be employed in order to assist the client in being able to be -- to be able to disclose?

A First of all, whenever you're conducting an interview as a psychologist, whatever the context, you need to be aware of the barriers that exist, whether those are barriers because of the client's potential mental state. Maybe they're psychotic. Maybe they're paranoid. Or barriers -- and/or barriers of the environment. You're in a prison. You're in a room where the patient knows they're being watched, whatever. You need to be aware of those barriers and be factoring them into how you conduct your interview and how you observe the patient.

With trauma that's a particular set of things you

need to think about. What is this person's trauma history that I do know about? Is there any, you know, sort of verifiable aspect to it? And also what's happening to them as I begin to examine them regarding the trauma? You want to be doing that in a particular way to be careful but also to be getting effective information, and so you need to be thinking about a lot of variables around you in the environment including your style of interviewing in order to get effective information.

Q So I'm going to ask you about a couple of different situations and ask you to comment on them. I don't think that you know this but there's been testimony from Dr. Kuncel who was the person who the trial team picked to present testimony about Lisa Montgomery's trauma, testimony from her when she was interviewing Lisa in Philadelphia at CCA, she was placed in a room with a glass wall --

A Uh-huh.

Q -- where there were 50 to 60 people outside the room waiting to go into visitation who could look in and observe --

A Yes.

Q -- that clinical interview. Would that be a situation which would impede an individual from being --

A It, of course, would not be optimal, especially with a vulnerable person that they're being watched and that there's people going back and forth. I would try to prevent that.

Q And also does the gender of the interviewer, can that

make a difference?

A It can. It's important to consider it.

Q And does it matter if you have an individual such as Mrs. Montgomery who talks about having a difficult time with more than one man in the room, would that be a barrier to disclosure?

A Sure. I think that's where gender becomes an issue. I don't think gender is a black-and-white issue. You can never have a male interview a female or never have a female interview a male. That's not realistic. I think where gender becomes an issue is where a person's sexual abuse is at the hands of multiple men and the individual maybe signals that way, I'm uncomfortable, I'm getting uncomfortable, I'm feeling -- you know, I'm having reactions, but then the interviewer needs to be adjusting to that, needs to be dealing with that. Would that have better been done by women? Possibly. Even if done by men, it needs to be done in a clinically sensitive way so you don't what's called decompensate the patient, meaning dissolve them into their symptoms, which can happen.

Q When you interviewed -- let me ask you this: Because individuals who have been serially raped and trafficked, they often have shame and blame themselves and so it's embarrassing, is humiliating, would that be fair to say, to share those details?

A Very much so.

Q And so would having a video camera trained on you and microphone clipped to your lapel so that you are constantly aware of the fact that everything you say is being recorded and will be played back to people you don't even know who, would that also be a barrier --
A I think that would be very obstructive to a person handling an interview well.
Q And, Dr. Porterfield, getting back to your clinical interview of Mrs. Montgomery, you have seen her a total of three times; is that right?
A Yes. That's correct.
Q Two days in March of 2016 and once in September?
A Yes. Correct.
Q And those were both lengthy visits. Did you -- do you know about how long you spent with Mrs. Montgomery?
A Yeah. I think I spent about 11 hours, you know, about 18 hours, 19 hours.
Q During the time that you spent with Mrs. Montgomery, did you observe physical, involuntary physiological reactions from her when you were discussing --
A Absolutely.
Q Can you describe those?
A Sure. Ms. Montgomery became very anxious and agitated at times, shifting in her seat, crying, getting hot, and having to sort of, you know, shake her clothing to release air. She

became -- she gagged several times, literally had sort of a physical gag reflex when talking about sexual abuse. I think that's most of what I remember.

Q If I could have just one moment, please.

Thank you, Dr. Porterfield, that's all I have. The government may have some questions.

THE COURT: We'll take a break now. I'll be back at five minutes till eleven.

(Recess taken at 10:40 a.m.)

MS. HENRY: I forgot one thing, Your Honor. May it please the Court. I apologize.

THE COURT: Okay.

MS. HENRY: Thank you. I had forgotten to move into evidence Movant's Exhibit No. 155, which is a hard copy of Dr. Porterfield's PowerPoint which was displayed in court today. A copy has been provided to opposing counsel. We would move that it be accepted into evidence.

MR. KETCHMARK: And I have no objection to that, Your Honor.

THE COURT: Received.

MS. HENRY: Thank you, Your Honor. No further questions.

THE COURT: All right. Mr. Ketchmark.

MR. KETCHMARK: Thank you, Your Honor.

KATHERINE PORTERFIELD resumed the stand and testified:

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Good morning, ma'am.

A Good morning.

Q How are you?

A I'm good. Thank you.

Q Dr. Porterfield, if I understand correctly, there are two reports, obviously in addition to the PowerPoint, there's your original report, which has been marked as Movant's Exhibit No. 7. I believe that's dated April 22nd of 2016. Is that your original report?

A Yes.

Q And then you have a supplemental report, I believe, ma'am, that is Movant's Exhibit No. 8, and I believe that is a supplemental report that was dated October 10th of 2016; is that correct?

A Correct.

Q I'm curious, ma'am, you talk about meeting with Ms. Montgomery and the meetings occurred in March of this year and I think that was for a total of 11 hours?

A That's right.

Q Do you remember when you were first approached by this defense team and retained as an expert in this matter?

A I believe it was February of this year.

Q So it would have been sometime in 2016?

A I believe so. There is a chance it was late '15, but I

believe it was January or February of this year.

Q Would it be accurate to state, though, ma'am, that the majority of your work, regardless of when you would have been retained, would have been basically in 2016?

A Correct.

Q And just so the Court is clear, and the Court obviously will have copies of the reports, but the difference between what's contained in your supplemental report and what's contained in the original report is additional information and investigation of interviews that you did with David Kidwell as well as Ms. Montgomery with respect to additional abuse that she might have suffered at the hands of multiple men; is that correct?

A That's correct.

Q So, ma'am, is it a fair characterization that was not information that you had either explored or fully developed because had you done that prior to your initial report, that would have been included in the initial report and there would have been no need for a supplemental?

A Correct.

Q With respect to this concept, ma'am, that you testified to about complex PTSD, you recall that line of testimony which was extensive?

A Yes.

Q And you would agree with me, would you not -- I'm

calling you ma'am. I apologize -- Doctor, that the concept of PTSD is something that's been recognized in the DSM and has been recognized for quite some time since the 1980s; is that a fair statement?
A Yes.
Q The concept of complex PTSD is a concept that has been proposed but it's recognized in the DSM as it stands today in the current version of the DSM; is that correct?
A Correct.
Q In fact, it's been proposed several times but it hasn't been adopted; is that a fair statement?
A Well, I don't think it's accurate to say several times, but there was a conversation about including it a few years ago and a further study was ordered on it, so it was not put in when the recent restructuring occurred that was called DSM-5.
Q And you're aware and you reviewed obviously the testimony of the -- and the reports of the various experts here with respect to the concept that Ms. Montgomery suffers from PTSD and that wasn't disputed in the trial. Would you agree with that characterization?
A Correct.
Q So the concept of complex PTSD is a concept that talks about chronic or exposures to PTSD over an extended period of time chronically that results in this concept of complex PTSD that you're talking about?

A Well, sorry. I just want to break that down a little bit. So it's not exposure to PTSD. It's an exposure to traumatic stressors over the extended period of time that results in a clinical presentation that is widely known in the clinical literature as well as in the ICD-11 that's coming as complex posttraumatic stress disorder.

MR. KETCHMARK: One moment, Your Honor.

That's all I have.

REDIRECT EXAMINATION BY MS. HENRY:

Q Dr. Porterfield, you are aware that though the diagnosis of posttraumatic stress disorder was given at trial, there was a dispute at trial as to whether or not Mrs. Montgomery's posttraumatic stress disorder was as a result of the crime alone or as a result of the crime as well as the extended sexual abuse; is that correct?

A Yes.

Q And part of that dispute was because of Dr. Dietz and Dr. Martell saying they didn't have enough information and that perhaps Mrs. Montgomery had been a willing consensual participant in the sexual abuse and rapes that she suffered at the hands of her stepfather for a period of years?

A Yes, because the diagnosis of posttraumatic stress is necessarily linked to what the stressors were; and so if you diagnose it and are not properly identifying, recognizing, and elaborating the stressors, you're going to really misunderstand

the clinical presentation that comes from posttraumatic stress.

Q And, of course, if Dr. Dietz and Dr. Martell had been provided the extensive biopsychosocial history that you have been provided, perhaps they wouldn't have had those questions; fair to say?

A I don't necessarily agree with that because they were provided that she was extensively raped for two years and they said it was consensual. So I don't know what further information might have shifted them to not see a 14-year-old having sex with their stepfather as rape.

Q Good point.

The concept of complex posttraumatic stress disorder has been around since about 1993 or even earlier than that; is that correct?

A Oh, yes.

Q And, in fact, I'm holding in front of me a book, Treating Complex Traumatic Stress Disorder by a --

A Dr. Courtois and Julian Ford, two leaders in the field of traumatology.

Q And, as you say, the concept of posttraumatic stress disorder will be in the ICD-11. What is the ICD?

A The ICD is the International Classification of Diseases 11th edition, which is coming out. It is the internationally recognized diagnostic formula, framework rather, that is used in the United States for all medical disorders and almost all

insurance, and it is actually -- sorry to drill down for a moment, but the complex posttraumatic stress disorder is present in ICD-10, the current formulation. It's called enduring personality change due to catastrophic stress. The coming edition has simplified and classified it as complex posttraumatic stress disorder. So it is in existence.

Q And, in fact, the concept of complex posttraumatic stress disorder was a generally accepted clinical diagnosis at the time of Mrs. Montgomery's trial?

A Widely used.

Q Thank you.

MS. HENRY: No further questions.

MR. KETCHMARK: No additional questions.

THE COURT: All right. Thank you, Dr. Porterfield.

THE WITNESS: Thank you.

THE COURT: You're excused.

(Witness excused.)

MS. HARWELL: Good morning, Your Honor. Movant would call Siddhartha Nadkarni.

THE COURT: Right up here, please.

SIDDHARTHA NADKARNI, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARWELL:

Q Dr. Nadkarni, if you will state your full name and spell it for our court reporter, please.

A My name is Siddhartha Nadkarni. The first name is spelled S, as in Sam, i-d, as in dog, d, as in dog, h-a-r-t-h-a, and my last name is spelled N, as in Nancy, a-d, as in dog, k-a-r-n-i.
Q And, Dr. Nadkarni, what is your employment?
A I work at NYU Medical Center.
Q In what field?
A I do neurology and psychiatry and I work in the epilepsy division there.
Q If we could review briefly what your qualifications are for that position.
A Sure. So I went to medical school at the University of Miami and then matriculated into a combined neurology and psychiatry residency program. That was six years in duration at NYU Medical Center.

After that, I did a fellowship in neurophysiology specializing in epilepsy. That was one year in duration.

Then I've been board certified in multiple boards including neurology, psychiatry, behavioral neurology, epilepsy, and clinical neurophysiology.
Q That's five separate board certifications?
A Right.
Q If I might show you what's been marked as Exhibit 125. Do you recognize this document?
A Sure. This is my CV.

Q Make sure it accurately reflects your qualifications.
A Yes.
Q Dr. Nadkarni, you said that you work with epilepsy. Can you explain sort of in laymen's terms that I might understand exactly what your clinical practice is like?
A Sure. So my days are divided between seeing patients. The patients that I see have seizure disorders or other neurobehavioral or neuropsychiatric illnesses. So I would say it's a mix of neuropsychiatry and epilepsy, people who have seizures coming from different parts of their brain.
And then a lot of what I do is also administrative, so I'm a program director for multiple residencies and fellowships. So one of them is the epilepsy research fellowship at NYU, another one in the combined residency in neurology and psychiatry, and then I've been also the program director of the clinical neurophysiology fellowship and the regular epilepsy fellowship, and I'm the training director for the neuroscience curriculum for the psychiatry residency training program.
Q It was perhaps implied in your answer to that question but you teach as part of your duties?
A Correct.
Q To med students?
A From medical students to residents to fellows, all the way across the board.

Q Have you been published, Dr. Nadkarni?
A I have.
Q Can you tell us about your publications?
A My publications are generally in the areas of epilepsy and psychiatry and also in the area of brain injury as well.
Q Are those peer-reviewed articles, book chapters? Just give the Court a feel.
A Correct. So there are peer-reviewed articles in there. There's book chapters in different book publications. One recent book chapter is a chapter in the book of Traumatic Brain Injury where it's a chapter talking about epilepsy and psychiatric illness and epilepsy and traumatic brain injury.
Q And those publications are reflected in the CV; is that correct?
A Yes, they are.
Q Have you testified as an expert witness before?
A I have.
Q Do you know whether it was a State or a federal case?
A I've done both.
Q And your expertise was accepted in that time?
A Yes.

MS. HARWELL: I would ask the Court to declare Dr. Nadkarni an expert in the field of epilepsy, neurology, and neuropsychiatry and traumatic brain injury while I'm at it.

MR. VALENTI: No objection.

THE COURT: I will consider his opinions.

Q (By Ms. Harwell) Dr. Nadkarni, when you became involved in the case of Ms. Montgomery, what did we ask you to do in this case?

A You asked me to evaluate her neurologically.

Q And in very general terms -- we're going to go through and talk about all of your findings specifically, but as a general overview, what did you find?

A So it involved taking a history from her and performing a neurological examination of her as well as record review. I found she has deficits that came out in her neurological examination that lead me to think that she has both epilepsy and a significant frontal lobe syndrome, as well as parietal lobe and temporal lobe dysfunction.

Q Okay. Well, let's start with your methodology. You said that you reviewed records, took some history. If you'd tell us, just sort of walk us through, when you as a clinician do an evaluation, what all is involved in that?

A It involves taking a history of the patient, which is an interview of the patient where the patient gives you information regarding the history of the present illness, what is currently bothering the patient, what is the history of that complaint in all sort of dimensions.

That includes following -- that includes a past medical history, a developmental and social history, a past

psychiatric history, past surgical history, medication, allergy history, and what medications the patient's been taking and then a neurological examination.

Q Just with regard to the history, you asked those questions of Ms. Montgomery but her team also provided you with a fair amount of documentation --

A Correct.

Q -- and records; is that right?

A That's correct.

Q And those are listed in your report, which we've marked as Exhibit 23?

A Yes.

Q And you have that in front of you, I think?

A Yes.

Q So you reviewed not only what Ms. Montgomery related about her medical history but also documentation from hospitalizations and medical records; is that fair to say?

A Correct.

Q Then you were going to talk about what else you do in your assessment.

A Right. So it usually involves the examination, the neurological examination, which looks at different parts of the nervous system as they manifest in somebody's comportment and neurological exam, how they function sensory-wise, coordination-wise, mental status wise, all of those things.

Q When you say a "neurological examination," is that something that someone sitting there watching, like me, would realize this is a doctor examining a patient?
A Yes. It involves touching the patient and having them do things and assessing how they do them.
Q And are those the sorts of clinical evaluations you do in your practice all the time?
A Yes, exactly.
Q So what you did in our case for Ms. Montgomery is what you do at NYU on a regular basis?
A Right, with any patient.
Q Did you also use any instruments?
A I used a -- well, I use instruments to examine her, including reflex hammer and tuning fork and other instruments like that, but I use a cognitive assessment instrument as well.
Q Okay. Tell us about that. What is that?
A That's called the Montreal Cognitive Assessment. It's a bedside instrument that's a screening tool for cognitive impairment.
Q And why do you use that?
A It's a good way to measure certain functions that are seen in the way the brain works in terms of cognition. So it involves things like language assessment, side shifting, organization, memory. Very specific cognitive functions are screened on that test.

Q And I believe you wrote a report. I think your report reflects it was written in September 2013?

A That's correct. Right.

Q Since that time our team provided you the data from Dr. Ruben Gur; is that right?

A Yes. I did not have that before.

Q It's fair to say you did not rely on Dr. Gur's data in writing your report?

A I didn't have that information when I wrote my report.

Q But you've now been able to review it and to determine whether it contradicts or confirms what you were looking at?

A Right.

Q And, I mean, we won't bury the lead. What's the outcome?

A So, yeah, I think it confirms very nicely what I saw just on my examination, history, and record review of Ms. Montgomery.

Q And when you say you looked at Dr. Gur's data, by that you mean you looked at the PET results and the MRI results?

A Correct.

Q And those are the sorts of diagnostic testing you are very familiar with in your work?

A Yes, routinely. So after the history and examination to confirm your diagnosis, you often do testing including neuroimaging testing, functional and structural neuroimaging

testing.

Q So while you read all of Dr. Gur's synthesis of it, you yourself are qualified to look at those instruments and sort of know what's going on there?

A Yes. Yes.

Q Did you prepare slides to help us talk about your findings?

A I did.

Q And if we might turn to those now. Let's talk -- you said a bunch of things in the beginning in terms of your summary of the findings. I'm going to let you tell us where we want to start in terms of breaking apart each of your findings.

A Sure. So we can actually start with the first slide, which is sort of an overview slide of the cerebral hemispheres. I think what I'll do is as I talk about the functions of these structures, maybe mention how Lisa's case is impacted by these parts of the brain.

Q Please.

A The entire colored portion of this slide has to do with what we call the neocortex. That's n-e-o-c-o-r-t-e-x. And that's the cortex that is evolved really late in human development, and it is responsible for very higher-level functions that human beings have basically in their daily lives.

So in the front there in the light pistachio green

is the frontal lobe, which we'll talk about more in Lisa's case. Right behind that is the parietal lobe, and right behind that in pink is the occipital lobe. Then in light blue or purple is the temporal lobe.

Each of these has functions that are very basic functions, and then they have functions that are much higher-level functions. So the frontal lobe is where motor function is. That's a very basic function and helps us move, initiates movements, and helps us move our limbs and our tongues and our bodies.

The parietal lobe is a lobe that takes in sensory information and then sort of assesses the nature of that, whether it's taste, smell, touch. Those are all involved in parietal lobe functioning.

Then the occipital lobe is involving vision, visual assessments. And the temporal lobe has some function in auditory functioning. These are sort of the basic functional elements of some of these lobes.

The temporal lobe also is involved in emotional regulation, short-term memory and functions along those lines, and then the higher-level functions involved in these structures are also important. So the frontal lobe is important for comportment, which is sort of the way people assess the world and interact with the world and stimuli that they get from the world involving decision-making, judgment,

insight, social awareness, social adaptation, self-awareness, empathy. These are all things that are involved in specific circuits in the frontal lobe, and many of those areas Lisa Montgomery has a lot of problems with functionally based on her -- based on frontal lobe injury.

The parietal lobe has a big function in self-awareness and awareness of the world. Specifically in terms of half of the space or left hemispace, which is right hemispace, but also in terms of overall awareness of situations and one's own self in those situations.

Then the temporal lobe houses the limbic structures, a lot of limbic structures, which are called the limbic because they are on the edge, on the medial, middle edge of the brain and are connected in various ways between the frontal and temporal lobes, and they're sort of on a limb, and they are very important in emotional processing, processing of emotional information, generating emotional experiences that are internal emotional experiences, and those structures are also involved in Lisa Montgomery's case.

Q May I stop you right there. You used a phrase "internal emotional experiences," and I don't really know what that is. Can you distinguish that from an external emotional experience?

A Right. So what I mean is there are representations of states that other people are in and a state that you're in

yourself, right? So if I see somebody that has an angry face, I should be able to say, Oh, that person has an angry face and let me model that in myself, let's say, What would it be like if I had an angry face? When I sort of model that in myself, I can tag that angry face with feeling angry, and that's sort of an emotional tag to that external representation, and that internal representation lets me say, Oh, that person must be feeling angry because when I internalize that and I see that, I feel angry.

I think Lisa Montgomery can't do that. I think she can't assess other people's states and internally represent them and talk about them in any significant way. I think that's the broken part of her brain.

Q Where do we go from here?

A Okay. So we can go to the next.

Q I think you want to talk about the parietal lobe?

A We can talk about the parietal lobe. That's next. This is a scheme of the same thing. So the parietal lobe is very important in integrating experiences and stimuli from the world. So when something comes into the brain, whether it's auditory or it's visual, it goes to these primary cortices like the temporal lobe which we're getting just bits of data. It's almost like O's and Y's, little bits of data, binary data that says, Oh, this is a sound. And then this is a sight. And then those basic bits of data are sort of attached to each other in

secondary association cortex. Primary association cortex first and then secondary association cortex, which is usually within the lobes that are involved.

The parietal lobe is a very important function in taking those bits from the secondary association cortex and putting them together. So sights and sounds or smells and sounds or sounds or sights with smells, and then sort of making an assessment about what those things might mean and what the valence is for a given person.

Q Let me stop you there. What is valence?

A Valence means the importance of that given object, right? So if you see -- if somebody sees something on a table, for some people a box of cigarettes or an iPad or whatever it might be, there might be some valence to those objects, and the parietal lobe helps you say, Oh, this is something that's important to me.

That information that's packaged in the parietal lobe then gets sent to the frontal lobe to make higher-level judgments of, Should I approach that thing? Should I walk away from that thing? How should I behave in relationship to that thing? I think this is also -- this process of synthesizing information and tagging it with the appropriate valence of whether it's important or not is also a problem for Lisa Montgomery because of her parietal lobe dysfunction.

Q You put in the slide regarding the Brodmann Map. What

is the significance of the Brodmann Map?

A This is just to point out that, you know, there are -- this is a very famous map that was made when they stimulated different parts of the brain, often during epilepsy surgery actually, and they saw what happened. So they'd give electrical impulses to different parts and one would make the hand move and one would make somebody speak and one might make somebody cry or see something.

So this is a map to show what different areas generally -- you know, in the population basis what functions they subserve, and I put this up here because, you know, like I said before, there are lower-level functions of all of these lobes and there are higher-level functions of all of these lobes.

The lower-level functions are really nicely mapped out in this Brodmann Map, but the higher-level functions really involve networks of different parts of the brain that go together and those you can't map out so easily locally structurally, and the importance is that in neuropsychological testing you can measure those fundamental functions that are listed in the Brodmann Map, but it's very, very hard or I would say it's almost impossible in neuropsychological testing as we know it to map out higher-level functioning, which is a big problem in Lisa's case.

Q So if I understand what you're saying, you're saying

the Brodmann Map is part of the basis for your testimony in the sense that it gives us the understanding of what different parts of the brain do?

A Right.

Q But at the same time it is also descriptive of limitations for neuropsychological testing?

A Yes, very much so.

Q Because there are ways in which the parts of the brain work together which can't be just shown by part by part?

A Correct. Right.

Q Did you also find problems with other parts of Ms. Montgomery's brain?

A Yes. So I think the three main areas that are affected in Ms. Montgomery are the frontal lobe, the parietal lobe, and the temporal or, slash, limbic lobe, and the right hemisphere I think is more affected than the left hemisphere.

So this picture that's up right now gives a little bit of a sense of the limbic structures. So as you see the picture on the top right, it says cingulate gyrus. And if you just follow that down to the left and around the parahippocampal structures in the temporal lobe below, that's all part of the limbic lobe.

So in Ms. Montgomery's case these limbic structures, parietal structures, and inferior frontal structures are all -- have all been shown to be abnormal with her, and actually

follows kind of a classic pattern, very classic pattern for comportment difficulties.

Q What do you mean by "classic pattern"?

A So in patients who have trouble with -- comportment is comprised by several things that help us enact behaviors in the world, right? So it involves insight, judgment, self-awareness, social adaptation, and empathy, and it lets us behave appropriately in the world we live in and assess when something will have negative consequences or positive consequences and helps us make judgments, basically.

And with Lisa I think there's a comportment -- there's a comportment difficulty in these structures. So the classic pattern that's seen in people who have comportment problems is relatively lower metabolism in the left hemisphere compared to the right hemisphere and relative atrophy in the right hemisphere compared to the left hemisphere. This is neuroimaging -- this is a classic neuroimaging pattern for comportment difficulties.

Q And I think that's a good place for me to stop you. I sort of neglected to do it until now. You are talking about a lot of things that are undergirded by scientific research?

A Yes.

Q The concepts you're discussing and the knowledge about the brain that you're discussing, is this brand new stuff or was it around in 2007?

A It was definitely around in 2007. It's been around probably for 50 or 60 years at least. There's been an explosion of neuroscience now that we've learned a lot more but these concepts we've known about, these networks.
Q So the things that you're describing to the Court, while it sounds pretty exciting to those of us who are English majors, are really pretty basic concepts, things that's been known about the brain for a long time?
A Right. This is sort of a behavioral neurology 101.
Q So a neurologist in 2007 could have certainly testified to the things you are testifying to?
A Absolutely.
Q And I'm sorry. I interrupted as you were talking about systems that affect comportment.
A Right. So comportment is the way you enact behaviors and behave in the world. These systems -- you can imagine why these systems would be important. So this parietal lobe function of synthesizing information, stimuli from the world, and tagging it appropriately would be crucial to making a decision about what's important, what's not important, what would be bad for me, what would be good for me. She has significant abnormalities in that area, as well as her limbic lobes.

So the limbic lobe is very important for generating emotional -- those emotional tags and the physical experiences

that go along with emotional states, and that also is abnormal in her imaging.

And last, the area of the frontal lobe. Lots of different parts of the frontal lobe are involved in comportment, but the main parts are the orbital frontal cortex. If you'd just go back a slide.

Q Sorry.

A No problem. So the orbital frontal cortex is the -- if you look at the top picture on the right, the tip of the brain, that's the frontal pole. If you'd just go down below that, sort of the surface, that just rounds out the frontal lobe on the bottom, that's called the orbital frontal cortex, and that has connections in various ways to other parts of the brain that have to do with social adaptation, social awareness, making judgments about when to say something, when not to say something, right? So we all have -- I shouldn't say we all, but a lot of people have had frontal lobe syndrome in their lives temporarily, and it's basically like if you're drunk, right? When you're drunk, alcohol basically temporarily removes your frontal cortex functioning.

Q Kind of shuts it down?

A Shuts it down. Right. Exactly. So that, you know, your judgment is off. You might think you're funnier than you are, right? That's a classic actual frontal lobe sign. You can't assess the world correctly and you're disinhibited. So

you make judgments and you say things that are inappropriate and hurtful or otherwise inappropriate socially. And that's something that's very, very hard to get around people who have frontal lobe syndrome. It's very closely linked to this notion of comportment and how you behave in the world.

Q You've talked about what frontal lobe syndrome is. I want to back up a little bit since you're a specialist in epilepsy. What is epilepsy?

A Okay. Epilepsy is a disease where people have seizures, and seizures are any kind of behavioral change or experience that somebody can have that's related to abnormal firing of certain parts of the brain.

So if you think of the brain as a peach kind of, the lining is where all the neurons live, the cell bodies live, and they send down on these cables, these axons that are sort of the meat of the fruit, of the peach, but those neurons in that cortex if they get together and start firing when they shouldn't and they get enough of their neighbors involved, people can have seizures. Seizures that are pleomorphic. It's all different kinds of seizures people can have.

Q You said pleomorphic?

A Right. Different presentations, different symptoms that people have during seizures.

Q So I think most of us have some idea what we think seizures look like. You as a specialist, tell us about the

range of what a seizure activity can look like.

A So what people conventionally think of as I'm shaking, shaking, shaking, I'm making noise, I'm frothing at the mouth, that's called a convulsion, a generalized convulsion. But there's a lot at the final common pathway sort of. There's a lot of seizures that happen before you end up convulsing. And they can be -- any psychic experience actually people can have during a seizure.

So in a frontal temporal epilepsy, which is I think what Lisa Montgomery suffers from, people can have -- the five most common symptoms are auras, which you retain awareness but you might smell something strange, and the trick is that it's stereotyped. So the smell is the same every time because the same part of the brain is firing so you get the same kind of sensation. That's a very important historical point for epilepsy that people have stereotyped experiences.

So abnormal smell, out-of-body experiences or dissociative experiences in general is a common feature of temporal lobe epilepsy. People can lose time very commonly. So all of a sudden they find themselves doing something and they can't account for the last few minutes, five minutes, ten minutes.

And if those symptoms progress enough, you have alteration in your awareness and you might blank out, you might stare, you might have what we call behavioral arrest where you

just stop doing what you're doing. You might have automatic movements on one side of your body, hand rubbing or rubbing your face or moving your legs in certain ways; and then if that progresses and involves more cortex, if those neurons get more friends involved, eventually if both sides get involved, you have a big convulsion, which is what people generally think of as seizure.

Q I hear you saying, though, that there are seizure activities in the brain that doesn't involve external manifestations?

A Absolutely. You would never know by looking at somebody.

Q Okay. And do you have any sense of how common that is or uncommon that is?

A It's very common. It's probably -- it's more common than convulsions in temporal lobe epilepsy.

Q How does this kind of misfiring in the brain actually affect the rest of the brain activity?

A So if it's very local, it won't -- so people can go through their lives and do whatever they're doing. They might just have an intense deja vu or an intense smell, or something, and they can just work through it and nobody else would know.

If it spreads more, you might have problems speaking. You might be unaware of what's going on around you. You might not be able to understand what people are saying.

You might not be able to move as easily. There's all these things that can happen once the seizure spreads.

Q Can seizure activity in the brain affect someone's memory or ability to remember things?

A Absolutely. So temporal lobe seizures especially. The place where they start is usually in the structure called the hippocampus, which is at the tip of the temporal lobe. In that upper right-hand picture again in the very front of the bottom is the temporal lobe and that's where the hippocampus is, and often seizures start in the hippocampus or right next to the hippocampus in a structure called the amygdala; and once those areas get involved -- the hippocampus is responsible for memory. So once it's seizing or its neighbor is seizing, it's not going to be able to put down new memories.

Q So the seizure activity itself can affect someone's ability to remember something?

A Absolutely.

Q Let's talk about your findings in Ms. Montgomery's case specifically. As you were doing your neurological examination, if you could tell us about the findings that led you to your conclusions?

A Sure. So in the -- first of all, in the history Ms. Montgomery gives a classic history for symptoms of temporal lobe epilepsy over many, many, many, many years, going back to even her childhood she's had experiences that go along with

temporal lobe epilepsy. In fact, to such an extent that, you know, that I was unable to get further EEG testing on her; but even without that electroencephalogram testing to look at her brain waves, her history points to a temporal lobe epilepsy in a way that I would treat her just based on her history just as a clinician.

Q When you say "I would treat her," that implies that would take some judgment?

A Correct.

Q Why is that?

A Well, the diagnosis of temporal lobe epilepsy is made by a lot of -- it is made by history, then a little bit is helped by the examination, and then you can do confirmatory tests.

Q I guess what I'm getting at is what would be the downside of treating it?

A Oh, yes. Right. So if you -- no, these medications have lots of side effects, chronic side effects and acute side effects. So it can affect your thinking. They can give you double vision and tremor and sleep problems and mood problems. So it's a big deal to put somebody on seizure medicine. So you don't do it unless you're convinced that somebody has epilepsy, then the benefits outweigh the risk of taking the medication.

Q And just to be clear for the Court, I mean, you said you're a clinician. Do you have any ballpark figure of how

many people you have diagnosed with temporal lobe epilepsy in your practice?

A Oh, my goodness. Probably 5-, 6,000 maybe, something like that.

Q Fair to say you're fairly familiar with the symptoms?

A Yeah. It happens every day just about, yeah.

Q So when you say "I examined Ms. Montgomery and I saw these signs and symptoms, I see it in her history," you're somebody who knows?

A Yes. And typical, right? So typical signs. This isn't like an atypical presentation of epilepsy.

Q And let's break that apart a little bit. What were the typical signs you saw?

A So the episodes of lost time and the episodes of -- she had olfactory hallucinations but they were very stereotyped. She had several episodes of lost time where she lost time even if it was a few minutes long. There's a question, you know, she might have dissociation in other ways, but there were discrete episodes that were brief in duration where she would be doing something and all of a sudden she didn't know how she was doing it. That's very suspicious for seizures.

Then on the neurologic examination when I examined her physically, she has weakness in her left hand, weakness in coordination in her left hand. That points to sort of brain abnormalities in both the frontal lobe and temporal lobe

circuits.

Q Let me ask you, Dr. Nadkarni, having watched you do this exam, when you say "weakness in the left hand," it's not something where someone has to -- they could sort of fake how hard you're trying. You were doing objective testing that demonstrated to you the weakness?

A Oh, yeah. Right. So she doesn't -- it's not like she can't move her arm and anybody can see it; but if you dive in and do subtle testing, the testing might be subtle but the findings are sort of not subtle for somebody who knows what they're looking for.

Q Let's talk a little bit about the data you reviewed from Dr. Gur, the MRI and the PET. Are your findings and Dr. Gur's consistent or inconsistent with each other?

A They're consistent with each other.

Q Is there -- do you have a slide we need to look at to talk about that?

A I don't think so.

Q Could you tell us how they -- how they're congruent?

A Right. So my findings in the neurologic examination portion of my assessment of her pointed to frontal lobe dysfunction, and the PET scan and the MRI also point to those areas as being abnormal along with limbic dysfunction, which is temporal lobe dysfunction, which maps perfectly onto her history of probable epilepsy and the seizures.

She also had some element of incoordination in her left hand, which might just be from the weakness, but that could point to like a global difficulty in her right hemisphere. The right side of the brain controls the left side of the body so it's a fact that she was weak but she had some incoordination that spoke to sort of a right hemisphere problem. These are all findings that came out in the neuroimaging studies.

Q Did you also review the neuropsychological testing conducted by Dr. Fucetola?

A I did.

Q Were his findings consistent or inconsistent with your findings?

A I think they were consistent with my findings.

Q I was just going to ask, did he not also give the MoCA, the Montreal Cognitive Inventory?

A He did a much more extensive version of the same thing.

Q But I believe it's true that on one of the subscales of that involving the words starting with F, you ended up with almost exactly the same results?

A Yeah, which is important. So that's another finding on the neurologic examination that was striking is that if I asked somebody to give me as many words as they can in one minute that started with the letter F, you should -- somebody who has sort of a basic level of education should be able to hit, you

know, 15, 20, 25 words in a minute that start with letter F, and Lisa could only produce 12 words for me which is shocking given what her other neuropsych testing showed, like her IQ was very high. There's no explanation for why she couldn't give those -- more than 12 words.

And really she was trying and the -- what it shows is that the frontal circuits -- these same frontal circuits are involved in generating thoughts and words and those frontal circuits, the medial frontal circuits don't work as well with her and that was a focal finding in that neuropsych testing too.

Q It seems to a layperson, Dr. Nadkarni, that you sort of mentioned so many different parts of the brain and so many different circuitries that it sounds like you're saying, you know, her brain is just completely falling apart. I think I know from your conversations that you're alluding to activity because of there being systems within the brain that affect more than one region?

A That's exactly right. So it's not she has a tumor or a stroke in one place and now she can't move her hand. It's that these are networks that have been severely damaged, I think.

Q Is it fair to say that though there are a lot of different names of locations that you've talked about, you're actually talking about systems within the brain that work together and you're saying this system has a problem and this

system has a problem?
A Right. Those systems absolutely -- those systems absolutely work together. And, you know, the problem is that it's very hard to assess those networks when we examine patients. So if I look for somebody the way they move, that's one thing or if you do neuropsych testing, all of the things that you test in neuropsych testing that were on that Brodmann Map, like language and attention and set shifting, each one of those discretely could be okay in somebody's brain, but their connections between the emotional circuitry and the salient circuitry and the judgment circuitry can be completely dysfunctional and you would never know from just neuropsych testing or even not necessarily from neuroimaging all the time. Somebody could have a normal MRI scan, which we don't have in this case, and they can have severe problems in the frontal lobe and comportment, comportment syndrome.
Q You indicated that despite all of these subparts you've named as sort of generally problems in the frontal, parietal, and limbic systems?
A Yes.
Q Would a problem with any one of those be fairly crippling to someone's functioning in the world?
A Yes, absolutely.
Q But here we have sort of an interplay of different problems?

A Right. So this is especially disabling. In a very sort of verified kind of -- in the highest levels of human interaction and functioning, this is like -- it's almost as if these areas are completely nonfunctional sometimes, these networks I mean.
Q Is it true that an injury to one of those areas would affect the functioning of other areas?
A It's possible, sure.
Q I think at some point when we were speaking, you said it's sort of like if a bomb went off in one part of the city, it might affect the sewer in another part of the city?
A Exactly right. This woman hasn't been injured but she's sustained multiple head injuries; and if you bomb a city, you can -- if you bomb one part, you affect another part. If you bomb multiple parts, which is what's I think happened in her case, then the ramifications can be significant.
Q All of the opinions that you've testified to here today and your diagnosis of these problems in Ms. Montgomery's brain, do you hold those opinions to a reasonable degree of medical certainty?
A Yes.
MS. HARWELL: If I might have just one moment, Your Honor?
THE COURT: All right.
MS. HARWELL: I don't have any more questions. The

government may have some more.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Nadkarni, is that pronounced correctly?

A Yes.

Q Thank you.

Did I understand, sir, you're a medical doctor, correct?

A Yes.

Q And you study the neurological systems most focusing on epilepsy; is that right?

A Epilepsy and neuropsychiatry.

Q And neuropsychiatry. And I believe that I understood this and read in your report that you believe that some of the periods of dissociation that Ms. Montgomery had been attributed to and other findings were, in your opinion, more likely a result of postictal situations that she found herself in after seizure; is that correct?

A Right, ictal and postictal.

Q Ictal meaning, i-c-t-a-l, kind of the scientific term for in a seizure?

A Right.

Q And postictal meaning just that, after the seizure?

A Right.

Q And postictal, as I understand your report, would mean that the brain having had experienced some type of traumatic event has a period of recovery post-seizures, correct?
A Right.
Q And during that period of seizure or post-seizure, during that recovery period, a person's not got their full mental faculties at their disposal, correct?
A Right.
Q I believe you described that there were a number of circumstances that can be found kind of in the -- commonly aware, as most people think of, the actual physical convulsions but for someone in your field, you see things like lost time, inability to have attention, or something like, I think you said, smells?
A Abnormal smells. Lots of symptoms that are like that that go with temporal lobe epilepsy.
Q The conclusions you drew about some of these periods of time loss for Ms. Montgomery was a result of the neurological examination you did as well as the examination of her history; is that correct?
A Yes.
Q Okay. We didn't really talk about it in much detail, but can you talk to us about the neurological examination you did conduct? How did you go about doing that?
A How did I do the neurological examination?

Q Correct.
A So I was sitting in the room with her and I checked her cranial nerves, checked eye movements, and I checked the symmetry of her facial movements, her hearing, the different nerves of her head and face; and then you do a motor examination which involves testing muscle tone and bulk and strength, sensory examination testing basic sensory modalities, coordination examination, and a cognitive assessment as well.
Q I think you mentioned EEG; is that correct?
A I mentioned -- in my impression I said that it would be helpful to get an EEG.
Q Was one done?
A I don't believe so.
Q Okay. An EEG, for purposes of the record, stands for electroencephalogram?
A Right.
Q That does what?
A That shows you abnormalities of brain waves that might be associated with various different illnesses. So one being epilepsy. It can show you how active those brain waves are in terms of epileptic spikes. So you can see spikes on an EEG when people aren't having seizures. It tells you where seizures can come from. It can tell you that somebody has abnormal brain functioning having had lots of seizures as well.
Q For purposes of your courtroom discussion, as I'm not

an expert in the field, is a seizure from epilepsy kind of like an electrical overload in the brain? Is that a decent analogy?

A Yeah.

Q Okay. Well, with an EEG if you happen to be doing it at the time of a seizure, is it fair to say you're trying to track those electrical impulses and put them in graphs and you can see some evidence that that's going on?

A That would be ideal if you can get it during a seizure. That's very rare to catch it during a seizure.

Q When someone experiences a seizure, is there evidence left beyond the surface?

A Yeah. So oftentimes in people who have epilepsy if they have seizures for a long time, they can have changes that happen in their psychiatric symptoms and cognitive functions and even motor functions that are subtle but are remnants of having seizures in the past.

Q Anything along the lines of a hormonal or an enzyme or something that you -- terrible. I'm not an expert.

Can you draw blood? Is there anything you can do like that to show there's been past indications of seizure activity in the brain?

A No.

Q So if the test was all about the modality, the strengths, the grips, the symptomatology that we've discussed is the best post-seizure way to determine if someone has had

those in the past?

A And the EEG and MRI if it happens right afterwards.

MR. VALENTI: Just a moment, Your Honor.

Nothing further. Thank you.

REDIRECT EXAMINATION BY MS. HARWELL:

Q Dr. Nadkarni, I believe you just testified that it would be very rare to actually catch a seizure during an EEG?

A Correct. We try to make that happen. It's very hard.

Q I just want to ask you one more question. If in Ms. Montgomery's social history there was evidence that during systematic and repeated and very brutal rapes that occurred over several years, her head was banged into a concrete floor repeatedly, could that cause the kind of injury that you have been describing here today?

A Right. So I think -- I missed that. I don't think I said that. But I think all of her -- mostly, 99 percent of her problems that are involving the frontal lobe and her temporal and parietal lobe are from repeated traumatic injury. She also had a prenatal toxic history also so that probably didn't help.

But developmentally and then postbirth, severe traumatic head injuries she's had repeatedly will give you this kind of a picture, and classically those patients present with comportment problems, these frontal lobe syndrome kind of issues. And epilepsy -- you have posttraumatic epilepsy also, which I think is what happened with her. She had posttraumatic

epilepsy from that too.

Q Thank you.

MS. HARWELL: No further questions.

MR. VALENTI: Nothing further, Your Honor.

THE COURT: Thank you. Doctor, you're excused.

THE WITNESS: Thank you very much.

(Witness excused.)

MS. HARWELL: Your Honor, movant would call Dr. George Woods.

Your Honor, if we might have a brief recess. The government needs to review Dr. Woods' PowerPoint.

THE COURT: All right.

MR. VALENTI: I've not seen his PowerPoint before.

THE COURT: How long do you want?

MR. VALENTI: I'm told it's a hundred slides.

THE COURT: A hundred slides?

MS. HARWELL: It's all information that they have seen before.

MR. VALENTI: It's probably from his report, which I've read, but I've not seen his PowerPoint.

THE COURT: It's pretty early to break for lunch but we could do that.

MR. VALENTI: I could probably -- if we could take ten minutes. I need to see it to make sure that I'm comfortable with the material in it.

THE COURT: I'll check with you in about ten minutes.

MS. HARWELL: Thank you, Your Honor.

(Recess taken at 11:53 a.m.)

(The noon recess was taken at 12:05 p.m.)

AFTERNOON SESSION

THE COURT: Thank you. You can be seated.

MS. HARWELL: Thank you, Your Honor. I think we were in the process of calling Dr. George Woods.

THE COURT: Dr. Woods, would you come up to the witness stand, please.

THE WITNESS: Thank you, Your Honor.

GEORGE WASHINGTON WOODS, JR., being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HARWELL:

Q If you would state your name full name.

A George Washington Woods, Jr.

Q And are George and Woods spelled in the customary way?

A Yes.

Q If you would tell us about your professional background. What is your vocation?

A Sure. I'm a physician. I specialize in psychiatry and a subspecialty of neuropsychiatry.

Q And where are you licensed to practice?

A I'm licensed in California.

Q And what is neuropsychiatry?
A Neuropsychiatry is the -- really the evolution of psychiatric practice. It's really understanding that the brain is a very, very important instrument in understanding how people behave, and so neuropsychiatry is really moving from the early psychiatry when we really just looked at, say, medications or we looked at mental health. We didn't really have a sense of the ways in which the brain impacted behavior and other medical diseases. If I could give you a quick example?
Q Sure.
A When we first started using psychiatric medications, particularly antipsychotic medications, they were really aimed at what we call positive symptoms of psychosis and positive symptoms are hallucinations and delusions primarily, and to some degree psychiatric medications were useful for that.
As time went by, though, we found out that there are other types of symptoms. There are negative symptoms; withdrawal, isolation, lack of motivation. And there are cognitive symptoms. There are symptoms that work that are brain based that impact a person's ability to weigh and deliberate, to sequence their behavior, to really understand the big picture, and psychiatric meds are not really aimed towards those cognitive symptoms.
So neuropsychiatrists are really -- really look at

those cognitive symptoms. We certainly take into consideration the positive symptoms and negative symptoms, but we want to look and see the ways in which the brain doesn't work and how does that translate into behavior.

Q Are you also trained in psychopharmacology?

A Yes.

Q What is psychopharmacology?

A Psychopharmacology is the relationship between medications and their impact on the organism. What I mean is that medications affect not only the brain but all parts of the body. So after my psychiatric residency, I did a fellowship in geriatric psychopharmacology, which was a two-year program at the National Institute of Mental Health and the American Psychiatric Association.

MS. HARWELL: Your Honor, though that's not the primary focus of Dr. Woods' testimony, I would note for the Court that by agreement with the government, Dr. Woods is going to be testifying to information that is included in the report of Dr. DiAnne Bradford who was the psychopharmacologist retained by the Montgomery team but who passed away as we were preparing for this hearing. She and Dr. Woods have worked together for years, and he is both trained to recognize, to understand, and discuss her findings and will be relating those to the Court.

Q (By Ms. Harwell) Dr. Woods, do you have a clinical

practice where you actually treat patients?

A Yes, I do.

Q And where is that?

A It's in Oakland, California, 401 Grand Avenue, Suite 380.

Q And how much of your time do you spend treating patients?

A About 40 percent of my time is spent treating patients and about 60 percent of my time -- say about 50 percent of my time is doing consultations both civil and criminal forensic, and 10 percent of my time -- I'm trying not to get over a hundred, but about 10 percent of my time is spent doing clinical research.

Q And how -- you mentioned your forensic practice. How does your clinical practice inform your forensic practice?

A When you see patients, you see the range of pathology. When you see patients, you see people that may work every day, may raise children, may become educated, may function and yet still have cognitive and psychiatric problems. So much different perspective than only looking at forensic patients. The other real advantage, in my opinion, in seeing patients is that you work patients up.

Q Sorry?

A What we call work patients up. So when someone comes in -- for example, last Sunday, Sunday a week ago, I saw a

patient. In seeing her, I developed a differential diagnosis. Is this a minimal brain problem? Is it minimal cognitive impairment? Is this early onset dementia? Is this depression? Is this her thyroid medicine? And then you figure out what testing needs to be done in order to determine exactly what's going on with that person. So that's not necessarily what occurs in a forensic setting.

Q I hear you making a distinction between the clinical setting and the forensic setting in terms of the longitudinal nature of the clinical practice?

A That's correct.

Q Is that what you're saying?

A That's correct.

Q So you develop hypotheses and then are able to sort of test them out over time?

A That's correct.

Q And that informs your ability to what you're seeing in the other contexts?

A That's correct. The clinical picture is what counts even in a forensic setting.

Q Why is that? What do you mean?

A Because you have to know what's wrong with the person before you can answer forensic questions; and if you are hamstrung in having a good understanding of what's going on with the person clinically, then it hampers your ability to

answer the forensic question.

If you look at the statutes, you know, the statutes -- really many of the statutes that relate to mental illness or mental disorder say you have to have a mental disease or defect. Well, if you don't have a clear understanding of what that mental disease or defect is -- is there a mental disease or defect? If there is one, what is it? What are the range of possibilities? You can't answer a forensic question until you're clear about the clinical question.

Q You mentioned that you're trained forensically?

A Yes.

Q And I'm sorry. We kind of skipped over some steps in terms of your training. Perhaps we can back up and do some of that in terms of what are your qualifications to treat people clinically and to offer forensic opinions.

A Sure. Clinically I finished a medical -- a rotating medical internship in Alameda County Hospital in Oakland, California. I then did a psychiatric residency that was focused on neuropsychiatry at the Pacific Medical Center in San Francisco, and during that residency, we took extended neurological courses as well as externships. So we studied movement disorders. We did neurological examinations. We studied epilepsy. We studied a number of things at Kaiser, Kaiser Center in San Francisco, California. I was chief

resident by the last year, and at that point I did a fellowship in geriatric psychopharmacology, as I mentioned.

The reason why I did that particular residency is because geriatric medicine, as we now know, the average person over 65 is on about eight or nine different medicines. So you not only want to know the medication itself, but you want to know what interactions of the medication may be. Does this medicine interact with another medicine? In this case we'll see where certain medicines would increase the blood level of other medications. So that was really my training from a clinical perspective.

In terms of forensics, I first started teaching at the University of California, Davis in their Department of Forensic Psychiatry. I taught there from about 1990 to 1994. From 2000 to 2012 I taught a course for second- and third-year residents -- or third- and fourth-year residents in Atlanta at Morehouse School of Medicine in the Department of Psychiatry, and that course is called Clinical Aspects of Forensic Psychiatry. Once again, capturing that clinical piece that is really felt to be important.

I currently teach at the University of California Berkeley at Boalt Hall in the law school. I teach a course on law and mental health. And I also have a webinar of Westlaw called Where Mental Health Meets the Law, and these are courses that are really designed to put together an understanding of

the neurobehavioral aspect of psychiatry and the law.

Currently I'm taking a sabbatical from Morehouse School of Medicine because currently I am president of the International Academy of Law and Mental Health. So that's the forensic side.

But on the clinical side much of my work is really aimed at looking at what we call neurodevelopmental disorders; fetal alcohol, Fragile X, and in that sense I'm associate editor of the Journal of Policy and Practice in Intellectual Disabilities. I'm also the co-chairman of the special interest research group for the International Association for the Specialized Study of Intellectual and Developmental Disabilities.

I've worked for the World Health Organization in Kenya and Italy and Zanzibar, and I'm currently working in Malawi where I am working with local doctors learning about their knowledge and their expertise in neurology and neuropsychiatry and also teaching as well.

Q Have you been recognized as an expert in the field of neuropsychiatry?

A Yes.

Q State court? Federal court?

A State and federal court.

Q And military court, I think?

A That's correct.

Q Have you seen Exhibit -- Movant's Exhibit 22, a copy of your CV?
A Yes, I have.
Q You actually provided it to us?
A Yes.
Q And does it accurately reflect your background, accomplishments, teaching appointments, and publications?
A Yes.
MS. HARWELL: Your Honor, I believe Exhibit 22 is already in evidence.
Q (By Ms. Harwell) I think, Dr. Woods, you were talking about how clinical practice informs forensic practice and I sort of backed up to get your qualifications to do that.
A Sure.
Q In Ms. Montgomery's treatment, did you see any interplay of sort of clinical practice and how that works with forensic practice? I'm referring to sort of the treatment, the longitudinal treatment of Ms. Montgomery that you've reviewed.
A Yes. I'm sorry. I paused there for a minute because I think the difficulty was there was not an interplay that perhaps you would have liked.
Q Okay.
A What we really see -- if I may just summarize?
Q Sure.
A What we really see with Ms. Montgomery is that there

was a significant period of clinical treatment where Ms. Montgomery was actually diagnosed with bipolar disorder and actually diagnosed with several subsets of bipolar disorder that are very important.

She was diagnosed, for example, with a mixed phase, a rapid cycling, what we call a rapid cycling of bipolar disorder. Rapid cycling bipolar disorder means that someone can have both elevations and depression at the same time.

Rapid cycling is a type of bipolar disorder that is commonly found -- more commonly found in women. It is a type of bipolar disorder that is most commonly found with the type of cognitive impairments that we discussed quickly and I'll talk more about this.

So early on she was -- the diagnosis of bipolar disorder was made, and she was treated from 2005 actually until today. What we see in that ongoing treatment is, No. 1, her clinicians actually treat her for mood disorder. They treat her with mood-stabilizing drugs. They treat her with antidepressant medications. They do not treat her completely because Ms. Montgomery also has a psychosis. And -- I'm sorry.

Q I was going to say, we're going to go more thoroughly into your findings, but I wanted you to give sort of a brief summary upfront.

MS. HARWELL: Your Honor, I neglected to ask if the Court would consider Dr. Woods' opinions as based on his

expertise in the field of neuropsychiatry.

MR. VALENTI: No objection.

THE COURT: I will do so.

Q (By Ms. Harwell) Dr. Woods, did we provide you referral questions as you began to look at the Lisa Montgomery case?

A Yes.

Q Did you prepare slides to help us walk quickly as possible through all of the information that you reviewed and considered?

A Yes.

Q And the slides that we're going to go through for Your Honor, for the Court, would you -- are they directed towards that which was important to you in your assessment of Ms. Montgomery?

A That's correct.

Q If we could talk, then, about your referral questions. I believe we gave you seven referral questions.

A I believe that's correct, yes.

Q And if you could just succinctly -- I mean, the judge is going to see them flash up on the screen, but if you could tell him what you were looking at.

A Sure. First, the capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of law significantly impaired, regardless of

whether the capacity was so impaired as to constitute a defense to the charge. That was first.

To determine whether she was suffering under a severe mental or emotional disturbance at the time of the offense, and also to determine whether Ms. Montgomery's neurobehavioral history was an important component of her social history.

To review prior assessments of Ms. Montgomery by both trial defense and government experts and to really look at whether they accurately reflected Ms. Montgomery's neurobehavioral history and also to discuss whether the reliable psychiatric assessment of Ms. Montgomery should include, must include consideration of her neuropsychological deficits.

Did Ms. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial? And did her impairments and medications inform her demeanor at trial?

Q Did you prepare a report of your findings as to those seven referral questions?

A I did.

Q And if I were to tell you that report has been marked as Exhibit 20 -- let me hand it to you. I'll ask you if that's a copy of your report that you prepared?

A Yes.

Q And then did you further prepare an addendum to that report earlier this year?
A Yes, I did. I think it was 2013. I just want to look. Yes. Thank you. Yes.
Q Is that a copy of the addendum you prepared in this case?
A That's correct.
Q And if you read into the record which exhibit number that is.
A The addendum is Exhibit No. 21 and the initial report is Exhibit No. 20.
Q Do you need those to be able to testify?
A I would appreciate it.
Q I will leave them with you.
A Thank you.
Q And do those reports, both the one filed in 2013 and then the supplement filed earlier this year, accurately reflect your findings?
A Yes.
MS. HARWELL: And, Your Honor, I believe those are already in evidence.
Q (By Ms. Harwell) Dr. Woods, I would like us to talk now about the methodology you used in arriving at those conclusions in your report.
A Yes. The methodology that I use is really to review

the data as the slide shows. I reviewed the data of the biopsychosocial history. I must start out by saying that the biopsychosocial history is the most scientific component of any medical examination.

Q Why do you say that?

A Because testing is without context. It's important that when you do neuropsychological testing, when you do neuroimaging, when you do psychometric like the MMPI-2, that you understand the context in which that testing was done and you have a much better sense of who that person is if you have some history.

We now know that genetics are very, very important. Genetics are part of your biopsychosocial history because in this case we know that family members share genetic disorders, family members share mood disorders, and that's important to know. So that's really where you should start with a thorough, comprehensive biopsychosocial history and your science is added to that.

Q Do you feel that you have a full comprehensive biopsychosocial history in this matter?

A Yes. It was evolving over time, but that's certainly why I wrote the addendum, but yes.

Q In addition to reviewing the biopsychosocial history, what else do you do in your methodology?

A You really want to look at a clinical assessment. You

want to be able to do a thorough enough examination, not just an interview, but certainly like in this case where I did a neurological examination. I also noted that Dr. Nadkarni did a neurological examination as well as a psychiatric examination.

You want to be able to look at documents across the life span, educational records, social service records. You certainly want to take into consideration other mental health evaluators.

Q I want to ask you about that. In this case did you work as part of that interdisciplinary team?

A Yes.

Q And were you working in consultation, then, with Dr. Porterfield, Dr. Nadkarni, and Ms. Vogelsang?

A Yes.

Q And your work informed each other; is that fair to say?

A Yes. If I can just quickly?

Q Sure.

A When you go see a doctor and they make certain decisions, they then send you to the lab to get lab work. They'll send you to get a neuroimaging or an X ray. That's the kind of interplay, collaborative work that gives you a much more informed understanding of what's going on.

So the reports of other mental health evaluators are very important. The clinical interviews are very important. The neurological, neuropsychological, and neuroimaging are very

important in understanding the evolution of the science of trauma and neurobiology is very important.

Q Can you tell the Court how you then weigh all this information? It seems like you take a lot of data from a lot of different sources. How do you begin to synthesize that information?

A You look for internal consistencies. You look for information that's outside of the forensic setting as well as within the forensic setting. For example, the social services records from 2003 that notes that maybe delusional, bipolar 2003 was before the offense.

When you look at the medical records of Dr. McCandless and Dr. Kempke, Dr. McCandless treated Ms. Montgomery for years; and when you look at the consistent treatment, Dr. McCandless' attempts to change medications and to add medications, to really try to gain some control over these symptoms, that's very, very important because it's outside of the forensic setting. It's someone that is really being a treater. Those can be very, very helpful to your forensic conclusion.

Q Was all of the data you reviewed equally relevant?

A It's difficult to -- it's difficult to weigh. What you want to be able to do is to see if there are lines of thinking. Are there lines of thought that are more important than others? For example, in this case one of the lines of thought is that

there is a family history of mood disorders, family history of bipolar disorders, so that becomes increasingly important. There's a family history of psychotic disorders. There's a family history of sexual abuse. Those become the lines you want to begin to start to follow more carefully.

Q Was some of the data you reviewed relevant to more than one of your referral questions?

A Yes.

Q After weighing the data, then what sort of guides you in formulating your forensic assessment?

A The question is, No. 1, are these mental diseases and defects? No. 2, of what significance are they? Are they like Tom Brokaw? Nobody knows who Tom Brokaw is. One of the television news persons that had depression but still was able to get up every day and come to work. Or are these of such great significance that they actually impaired someone's ability to function?

So once you gather the data, you look at functioning. You gather the data, you determine the significance of the data, and then you turn and you look and say, How did that person function? Does this data -- is this data consistent with how this person was able to function? And that's where the forensic component becomes more relevant.

Q As you're talking about the data, I have to ask, was the data provided to you here, including the biopsychosocial

history, did it give you an adequate basis to formulate conclusions within a reasonable degree of medical certainty?

A Yes.

Q By way of summary, can you provide a preview of your clinical findings first, then we'll move to the forensic findings?

A Yes. First of all, Ms. Montgomery has brain impairment and this impairment is lifelong. Her brain impairment is merely what we call multifocal. It's in multiple areas. Certainly it's in the back of the brain, the cerebellum. It's certainly in the right side of the brain, the right parietal lobe, the right temporal -- frontal lobe, and we can talk more about that.

There are early brain structures that are also impaired, what we call the limbic system. Now, the reason why these early brain structures are important is because these are the -- when a child is born, their brain is about 40 percent formed. A cat's brain is about 65 percent formed. An ant's brain is about 90 percent formed. And it's thought that the reason why a child's brain is only 40 percent formed is because the environment plays such an important role in the development of that child, much more so than in other species. Those early brain structures are what are there when that child is born; the amygdala, the hippocampus. These parts of the brain that we call the limbic system. Those are what a child is born

with, and they are tremendously impacted with those early childhood experiences. That's why we know now that those experiences, if they're traumatic, can change the brain.

Q Did you also see that there were behaviors present that indicated brain impairment?

A Yes. Behaviors are symptoms. It's important to keep that in mind that behaviors are symptoms.

Q I'm sorry. I was going to say let's talk about Ms. Montgomery's brain impairments.

A Sure. Her academic functioning made her look better than she was. She was a good student, relatively good student. We sort of saw a drop-off in high school. However, day-to-day life requires more than reading and writing. You see these little clues not being able to sequence her thinking. She treated lice on her children but did not treat lice on her own body. So, consequently, her children continued to get lice. She could add but she couldn't go to the store and shop. So we're talking about that transition from mathematics to functional academics. What could she do with this academic information? She could read but she had difficulty remembering. She could not help her children with homework and she had difficulty making a menu.

Q Did you see other behaviors that you saw as symptoms of brain impairment?

A Yes. She talked about when she first got -- when she

finally got to prison at Carswell that it took her a month to learn to make her bed that specific way that was required in Carswell.

We know that she hit her children. They have described that in their declaration. But at the same time when she wanted to be a good mother and put her children in that conflictual situation where they recognized her love but also didn't know what to do with her behavior.

She would start a project and would be unable to complete it. And at times would actually just wipe the project off. She talked about knitting or tatting and just wipe it all off. She bought new tools each time she started a project. Could I stop for a moment here?

Q Sure.

A Because the next point is a very important point. These are sequencing issues. These are not just someone who gets frustrated and just throws things away. These are problems with the way that her brain works in terms of if I do this, then I should do that and then I should do that. When we talked about making a menu, many of my clients that have frontal lobe injuries cannot follow menus because menus are sequencing. You add these ingredients. You put that on the stove. Then you add these ingredients. Those are brain problems. And when you see someone who can't do those, your first thought is what is going on with the way their brain is

processing this information.

Q So these were clinical clues or symptoms that you saw sort of in reviewing Ms. Montgomery's biopsychosocial history?

A Exactly. And that family and friends were completely aware of -- as her sister said, I knew there was something wrong with her but I didn't know -- I didn't think she was schizophrenic.

These are -- these next two; bathing, changing clothes, and cleaning houses are, again, the kinds of behaviors one sees with people that are significantly impaired. We are comparing this to someone who theoretically has a 120 IQ; and even though we know there are problems with IQ and what that really means, this is someone that in a situation -- in a testing situation they could do very, very well, but they can't translate that, what we call ecological validity. They couldn't take it to the streets. So she could have a 120 IQ on tests, but the things that should reflect on the streets she couldn't do.

Q You indicated there that she had a certain obsessive quality. What do you mean by that?

A People that are obsessive can be obsessive in a number of interesting ways. That show on TV, Hoarders. Right. And hoarding is now in the DSM-5. Hoarding has become a subset of obsessiveness. Obsessive qualities doesn't mean you're obsessively neat. What it means is you can't stop the way you

are because your anxiety overwhelms you, and she talks about not being able to clean, not being able to bathe because of this overwhelming anxiety that just kind of stopped her from that kind of behavior, and that's what we're talking about.

Q In addition to brain impairments, did you see clinical symptoms of other disabilities?

A Yes.

Q If you could outline those briefly.

A I think most of the prominent clinical symptoms were the symptoms of her PTSD. She had significant avoidance, and this isn't an avoidance in that, I don't want to talk about this or I don't want -- she was not able to talk about the trauma that she had experienced to the degree that she had experienced it, and that really speaks to not the Type 1 PTSD that Dr. Dietz was talking about, the single act, but the complex PTSD, the repetitive acts, the repetitive breaking of spirit. So it's my professional opinion, and I think Dr. Dietz agreed, she had PTSD but it's much more severe PTSD.

Again, bipolar disorder. Bipolar disorder is a mood disorder. It's a disorder of mood swings. We normally think of -- historically think of bipolar disorder as people that have mania. They think they're the king of England, then they become depressed. But that's not really true.

We know now that bipolar disorder most commonly presents as irritability. It presents as agitation. Women sit

in the depressed phase of bipolar disorder much more so than men. They stay and they can't stay in that depressed phase.

As I mentioned earlier, bipolar disorder can be mixed. So that you have -- I don't know if you remember the two masks, the laughing mask and the crying mask and bipolar disorder, those two masks are mixed. So a person may be experiencing both the depression as well as the agitation or irritability at the same time. It's clearly what Dr. McCandless struggled with three or four years ago.

It's difficult to determine to really -- and there's no reason to, to determine which of these symptoms are mood based, bipolar based, and which are trauma based because they're comorbidly interreactive and they're bipolar and PTSD. When we talk about comorbid, I'd like for you to think about mixing colors. When you talk about a comorbid disorder, we're talking about disorders that mix and become something that often is even greater and more severe.

These brain impairments don't go away when we talk about comorbidity. The traumatic experiences undermine her perception of the reality consistently, even more so than the bipolar disorder, and we see that in her treatment. Her sisters described her as going away, spacing out, as well as other family members, other people in the community.

Her bipolar disorder was not clinically controlled until she received antipsychotic medication, and she describes

this. She describes while at CCA having some of her symptoms controlled with the valproic acid and some of the symptoms controlled with the other psychiatric medication, but really her thought process remained impaired, and it really didn't become better until she was tested with -- until she was started with Risperdal. There's a type of -- in statistics there is a type of experiment that's called ipsative study.

Q And what's an ipsative study?

A It's i-p-s-a-t-i-v-e. An ipsative study is a one-person study where you -- we do the clinical studies often where you may start someone on a medicine or start someone on a mode of treatment and you then take them off of it and then you start it back to see if it's really having the effect that it did.

We see that happening with Ms. Montgomery in March of 2009 when she has started for a very short time on Risperdal. She talks about being better. I might say Risperidone or Risperdal. These are all the same medications. She talks about clearing up. She talks about her thoughts being improved. But she's taken off the medication in 2009 and really struggles through the end of 2009 and 2010 until she is put back on the antipsychotic. She does very well and is on it to today.

Q Has Risperidone completely resolved all of Ms. Montgomery's problems?

A She is certainly more organized. She is able to compensate in ways that she was not able to compensate before.
Q Let's talk about what ways she's able to compensate now.
A Sure. She can take notes. She can write things down and follow through. In fact, every day she writes down what she wants to do for the next day. She can use a calendar effectively, and she describes these antipsychotics as making her able to take advantage of these compensatory mechanisms.
Q How are these clinical findings relevant for your forensic conclusions?
A Well, Dr. McCandless treated Ms. Montgomery pretrial, during the trial, and posttrial. The CCA records are replete with symptoms of bipolar disorder, one which may -- one period of time she may not -- she gets two hours of sleep in an eight-hour period. The next day she sleeps for 20 hours. She's described as irritable. She's described as confused. She's described as not being able to focus. She's described with having impaired concentration.
And, most importantly, you see Dr. McCandless for -- from 2007 through 2009 -- 2006, actually, through 2009 treating Ms. Montgomery with medications for bipolar disorder. Now -- and changing those medicines. Not just treating but she gives her Elavil because Elavil -- because she was having some pain. So she puts in Elavil which is a tricyclic

antidepressant we'll talk more about later. Ms. Montgomery has significant sedation problems with that Elavil. She cuts it back. Ms. Montgomery is a little better. She cuts it back. Ms. Montgomery is a little better. So you see a real clinical picture with Dr. McCandless during this period.

Q And how does that clinical picture that you saw beginning to emerge from Dr. McCandless' treatment of Ms. Montgomery, which I think we're going to sort of walk through here in a minute, how is that relevant, then, to the questions we asked of you?

A Well, they're relevant in that the clinical treatment was not -- the depth of the clinical treatment was not taken into consideration by many of the mental health providers both on the defense side as well as on the prosecution side.

Q So when you say they weren't adequately taken into account, what do you mean by that?

A Well, first of all, there was a limited social history about the extent of mood disorders in the family. If you knew that, as we know now, that several of her brothers are on the same medications that she's on; that people on both the maternal side of the family as well as the paternal side of the family carries diagnoses of mood disorders and specific diagnoses of bipolar disorder; if you knew that there were other family members that actually carry the same diagnosis, it would inform your clinical opinion as to whether when in 2003

the social worker said, Wow, Ms. Montgomery she has a little bipolar in here. You would say, Wow, that makes sense.

We also know that genetically mood disorders -- the incidents of mood disorders is about 4 percent of the population in the United States and about 3.8 percent of the population internationally. If you have one nuclear family member that has a mood disorder or a bipolar disorder, that increases your potential of being bipolar twofold. It doesn't mean that you may have all the symptoms but you may have some. That's exactly what we see in her situation.

Dr. Fucetola's testing was not followed -- although he recommended it, was not followed with the neurological assessment and that isn't just the neuroimaging but also a neurological examination that Dr. Nadkarni and I did perform.

Q I think you've already addressed the fact that the clinician in the jail provided a lot of information that was not really looked at in a forensic setting; is that right?

A That's right. And the clinical presentation undermined her ability to rationally assist her counsel, in my opinion.

Q We've heard -- his Honor's heard last week and I think you've been made aware of Ms. Montgomery's statement at the end of trial after the verdict had been returned and after the death verdict had been returned that she would now -- what can she do to help now. Did you take that into consideration in any way?

A Yes.
Q What did that signify to you?
A It was -- it was consistent with impaired sequencing of the frontal lobes.
Q Can you say more of what you mean by that?
A I purposefully said that more technically than I should have. One of the real things that the frontal lobes do is sort of what we call executive functioning and executive functioning helps you sequence. It helps you put things in proper sequence so they work. This is too late. She had been on trial for weeks. She had been in pretrial for years. And so to make this statement at this point, again, really reflects her inability to rationally assist because of her brain impairment.
Q What indicates to you that wasn't just withholding on Ms. Montgomery's part?
A Well, again, if you look at the clinical records, you'll see that Ms. Montgomery had difficulty even before that. If you look to Dr. Kuncel's records, Patricia Kuncel, she even -- Dr. Kuncel in 2007 is wondering whether Ms. Montgomery can really keep it together during a trial. She sees her as delusional. She sees her as fragile. She's concerned about her decompensating. This is before the trial even starts.
If you look at Dr. McCandless' records during the trial, Ms. Montgomery describes having difficulty reading

discovery because she can't concentrate. She's having difficulty focusing. And then you have this statement which, again, is an indication of very poor sequencing.

Q Is there any significance to the fact that Ms. Montgomery had no reason to not help her counsel or did she have a reason, in your opinion?

A No. No. I don't think that there's any significance to that. You know, this is real. The whole issue of normalization comes up and we'll talk about that. Our tendency, particularly with people who have brain impairment, is to try to normalize their behavior. Couldn't it be this? Couldn't it be that? And if Ms. Montgomery did not have the clear brain impairments that we see, certainly that could be taken into consideration, but she does.

Q What effect did medication have on Ms. Montgomery's appearance in the courtroom around the time that she made that statement?

A The medications and particularly the Elavil, but the others as well, impaired her presentation to the jury. They created both sedation and somnolence. These are two different phenomenon.

Q And I think we're going to delve more into that deeply in a little bit. I just wanted to sort of get to your answer -- a summary of your answers to the referral questions before we begin walking through all the data.

A I'm sorry. I apologize.
Q That's okay.
A My summary is that, yes, she was under severe mental and emotional disturbance at the time of the offense and her capacity to appreciate and the ability to conform was impaired, that neurological and neuropsychological history is important. It was either not considered or erroneously presented. It was incomplete and because it was incomplete, it was unreliable.
It's my opinion that the medications affected both her demeanor and her affect and it -- later I'll describe what affect is. It masked her symptoms and their severity and, in my opinion, it impaired her ability to be competent to aid and assist counsel.
Q And do you hold all of those opinions to a reasonable degree of medical certainty?
A I do.
Q Let's talk about your clinical and neurological assessment of Ms. Montgomery, if we could.
A Sure.
Q When did you conduct clinical interviews and assessment with Ms. Montgomery?
A My first interview was January 17th, 2013. My second was February 8th, 2013.
Q And then did you go two times again this year?
A That's correct.

Q So fair to say the first two visits were before your initial report, the second two before the supplement?
A That's correct.
Q Let's just start basically with what do you mean by clinical interview?
A Well, a clinical interview is an ability to gain some understanding of this person's social history, of their medical history, of their neurological history, of the way they present to the world.

In my case the clinical interview or assessment also includes a neurological examination, if at all possible. So that's what we did here. I sat and I took her social history, her family history, her medication history, her educational history. I talked to her about her various children, her relationships. I talked with her to some degree about her sexual history and abuse, and I think it was on the second interview that I did a neurological examination.
Q And, Dr. Woods, we'll go more into detail in a moment in terms of all of the information you had already reviewed when you did those things, but fair to say you didn't walk in and ask Ms. Montgomery those questions without any context or sense of what was known and documented in her social history?
A That's correct. That's very different than -- that's the difference between a clinical examination and a forensic examination.

Q So what is a differential diagnosis?
A A differential diagnosis is the range of possible diagnoses that one finds based upon the symptoms, presentation, testing. If I can give you an example?
Q Sure.
A You go into the doctor's office or you go into the emergency room and you say, I'm having chest pain, left-sided chest pain. It's radiating to the arm and it's radiating to the back. If your doctor only does an EKG and only looks for enzymes that relate to a heart attack, they may have made a mistake. There are 52 different causes for left-sided chest pain. So a differential diagnosis takes into consideration all the possible causes that one may have with the symptoms you see.
Q And is that your approach to arriving at ultimately a diagnosis?
A Yes.
Q How many times do you tend to assess a patient?
A I try to assess a patient a number of times, if possible. That's not always possible in the forensic setting, but in this particular case I saw her four times over the course of three years.
Q And why is it fortunate to see someone multiple times?
A Because people present differently at different times. That's particularly true if you have someone that you think has

a mood disorder like a bipolar disorder. You might see them one time when they are depressed. You might see them another time they may be more irritable or elevated. You may see them another time and they look good. So rather than an extended one-day or two-day examination, I try to catch people over the course of several weeks or several months, if possible.

Q And I'm going to ask a layperson question. Would it not do the same thing to stay longer one time?

A No.

Q And why not?

A Because if you catch that person on that day, if you catch them on that day, there's no indication that you will see those other symptoms on that day. Let me give you an example. If you have someone that is traumatized, that you know has a history of trauma and you sit there and you go for eight or ten hours and you ask them about all of these symptoms of trauma and did this happen to you and did that happen to you and how did they do this and when did they do that, you are in fact retraumatizing that person. Because keep in mind that one of the things that's most important about trauma is not having them relive the trauma. They try to avoid that. So if you do that over the course of time, you have an excellent chance of creating symptoms, creating cognitive impairment that wasn't there in the first place. So I try to do it in bites over a period of time to not create new symptoms.

Q Dr. Woods, I don't know if the Court knows but I went with you for your clinical assessment of Ms. Montgomery. Would you tell the Court why that was important?
A Yes. Ms. Montgomery is very -- afraid of men isn't quite the question. She's in fear in a different way, in an avoidant way, in a traumatic way, and I felt it would be important for you as her counsel to be there.
Q When I went, did I interfere in any way?
A No. No. You sat away. You sat away. There was no interaction at all.
Q Did I do anything that indicated I was cueing her or inserting myself?
A No.
Q Let's talk about when a traumatized person tries to tell their story. The Court's heard a lot about the difficulties a traumatized person has in telling that story. From a neuropsychiatric perspective, is that person's inability to tell their story intentional or unintentional?
A Well, it's hard for me to put it in terms of intent.
Q Maybe I'm asking the wrong question. Is it something the person deliberately does?
A Well, certainly what we see with people that are traumatized is that it impairs their memory. There are three -- there are multiple types of memory, probably 15 types of memory, but there are three main types of components of

memory; registration, retention, and recall. Registration is do you see it? Do you get it in? Retention is can you hold it? And recall is can you pull it out when you need it?

Trauma really impacts registration, whether it comes in or not, and that's exactly what happens in trauma. A good example would be the literature on eyewitness situations. For many, many years we thought this eyewitness testimony would be the best testimony because they were right there. They saw it. That's exactly how it happened. But when you are facing something that's going on, you're not thinking, okay, he's got a plaid shirt on. It's got five buttons on it. They've got blue eyes. It's the rare person that can do that. And that's why eyewitness testimony went out the window. That's what happens in trauma.

Q What role -- or does Ms. Montgomery's mood disorder and her cognitive impairments also play a role in her ability to recount things separate and apart from the trauma?

A Yes.

Q And how so?

A Ms. Montgomery has two particular neurological deficits that impact her ability to recall. The first one is she has significant right brain -- I didn't bring my brain. I can't believe that. I'm sorry. I usually carry a brain. Not usually, but when I'm in court, I carry a brain where I can kind of show these things.

But the right parietal lobe is right here, right here on the right side of the brain and it's the part of the brain that allows you to get the big picture, right? To put all the pieces together to really kind of figure out what it is that we're looking at and what we see not only from the neuroimaging but from the neuropsychological testing. And from Dr. Nadkarni as well as by neurological exam, she has impairments of her right brain. Her right frontal lobe doesn't allow her to pick up things as easily. Her right motor strip is reflected in poor -- she has some weakness on her left side. So her ability to kind of get the big picture, to really hold everything in place is impaired.

The other part is her cerebellum, the back of the brain, again, cannot be tested through neuropsychological testing; but, again, Dr. Nadkarni and my testing through really physical examination showed that she has cerebellum injuries. Again, the cerebellum is the fine tuning of executive functioning. The cerebellum is the part of the brain that allows you to really fine tune that sequencing, et cetera.

Q And I'm trying to translate what you said so I can ask an intelligent question. Does that mean Ms. Montgomery does have or doesn't have complete memories of things that happened to her?

A It's not either/or.

Q Okay. Tell me.

A I apologize. But it's not. There may be things that she has complete memory. We call it patchy memory. Depending upon the degree of stress that she's under, the degree of chaos that's going on around her, she may catch less. If she is in a testing situation, where none of that is going on and she's in a quiet room, she may get more. So it depends upon what we call ecological validity. What's going on in the environment around her?

Q And how can we assess her memory?

A We can only tell about memories by trying to get the information. The biopsychosocial history really that's what it does, it allows us to inform our interviews, and obviously that was so terribly important in this case because David Kidwell's declaration allowed us to move the ball further in terms of understanding what really had occurred to her.

Q When you reference David Kidwell's information, what do you understand or what do you know about that? Let's just establish your baseline.

A Sure. David Kidwell knew Ms. -- knew Ms. Montgomery when she was around 15 or 16 years old. He would visit the home. She described to him the sexual abuse that was going on in the home with the multiple persons, et cetera.

Q Is it fair to say we provided you Mr. Kidwell's declaration?

A That's correct.

Q So you have those facts?
A That's correct.
Q Do you also have the facts of the declaration from Ms. Montgomery's ex-husband, Carl Boman?
A Yes.
Q And what do you understand to have happened, I mean the nature of the trauma? We don't have to go into everything about it but what's salient for your opinions?
A What is salient is that Mr. Boman met Ms. Montgomery around this same time, around the time she was 16. He was a bit older. He was 21, I believe. And she told him similar stories of being abused by -- they called it the family secret. Of being abused by multiple men, being raped by her stepdad, by other associates of her stepdad in multiple different ways, being physically abused. So I won't go into it but I think you've heard that.
Q What did the fact that Ms. Montgomery's mother was involved with this abuse signify to you? How is that significant in your psychiatric evaluation?
A Well, her mother betrayed her. Parents are there to train their children and children will be trained regardless. Particularly young children will run to slaps as well as hugs, and what we see -- when we really talk about trafficking, we're talking about Judy Shaughnessy, I believe.
Q Shaughnessy, yes.

A Shaughnessy. Who trafficked her child out to the plumber, to the electrician who told her it was necessary for her to do this in order to get the services. So she developed a mindset of coping mechanisms that had already been groomed by her stepdad who had been bathing her naked, disciplining her naked as early as eight or nine years old.

Q You mentioned the role of parents and I think you talked about parents teaching coping mechanisms. So we'll skip over this slide. In your opinion, did Ms. Montgomery ever become a complete integrated person?

A She is better now than she's ever been. She is with the antipsychotic medication with the addition of Risperidone and with the addition of that treatment for years now, not just for months. It takes years to train a brain. She's better now. And then even now she says there are certain thoughts that she can't entertain. There are certain behaviors. But she's much better in functioning in the world.

Q The way you discuss the role of parents and the way in which parents are to teach coping mechanisms, does the absence of those sort of coping mechanisms in Ms. Montgomery's history explain why she followed her mother around for years and years?

A Well, Ms. Harwell, you don't have an absence of coping mechanisms. You have a substitution of coping mechanisms.

Q Help me understand the difference.

A Right. Children are going to cope. Children are going

to compensate. And so the fact that she was not given appropriate coping mechanisms meant that was given inappropriate coping mechanisms. She was given sexuality, for example. She was given prostitution. She was given, you know, being able to utilize her body in multiple different ways; and, frankly, there are times when she may have been sexual and it was in fact consensual. She may have been hypersexual, but what we see really are the substitution of appropriate coping mechanisms for inappropriate coping mechanisms.

Q I want to pause a moment there in the discussion of sort of sexuality and ask you if in your -- both your opinion as a clinician and then your opinion forensically, could Ms. Montgomery as a 12-, 13-, 14-year-old girl consent to the sexual abuse by her stepfather and his friends?

A I thought about this a lot and I don't want to get semantic about it, but there's a difference between agree and consent.

Q Say more.

A Consent has a certain legal understanding. Consent implies that you are able to weigh and deliberate. You're able to think about your decision and you agree. When you just agree to something, that's what we see children do. That doesn't necessarily mean that they understand all of the implications. So the idea that a -- I'm just talking about that 11 to 12 -- 11- to 16-year-old period that somehow her

going along with something was the same as her consenting. We have laws against that.

Q Is there a distinction between sort of compliance or acquiescence agreement or using agreement to sort of mean acquiescence?

A The term for the trauma in respect is this learned helplessness.

Q What does that mean?

A It means that over time you give up yourself and you acquiesce to what's been done and what you know that is coming. You know, one of the things we haven't talked about a lot is that anticipatory anxiety. Now we know that Ms. Montgomery could anticipate being raped because it happened so many times. She could anticipate these things that were going to -- so that anticipatory anxiety was every bit as overwhelming in the long run as the act itself.

Q How can that be?

A Because anticipatory anxiety erodes your ability to concentrate. It erodes your ability to function. The anticipatory anxiety is what is described by family members when they talk about, well, she was always kind of ditzy. She was always out to lunch. She really couldn't quite pick things. It occurred at an early age and it occurred so frequently that it became a part of her, and you certainly see that when you try to interview her.

Q Dr. Woods, I'd like to turn for a little bit to that which you found relevant in the biopsychosocial history.
A Sure.
Q How that factored into your assessment. And the Court heard quite a bit of our biopsychosocial assessment, and I think I've made you aware that the government stipulated to the fact that Ms. Vogelsang's report was well sourced and authoritative in many regards. So I don't want to get into too much detail here but if we could look at that which was important to you specifically in making your determination. If you could highlight for Court the things you saw in the biopsychosocial history that most informed your opinions.
A Well, if you could go with the first bullet point, the third bullet point, and the fifth bullet point. The first bullet point, maternal and paternal history of neglect, abandonment, and sexual dysfunction. That should be -- for any clinician that should be a clue in your differential as to whether there is a mood disorder in the family. Mood disorders manifest themselves with these kinds of behaviors. People that have severe mood disorders have these kinds of behaviors. That doesn't mean that you say, Well, I'm not saying they're bad people, but you want to look and see.
No. 3, the maternal and paternal history of mood disorders. This is what's call an affectively latent family.
Q What do you mean by that?

A In fact, I'll give you an example. Psychiatric disorders -- and this is not totally genetically accurate, but psychiatric disorders are distributed in very much the same way that diabetes is distributed. These are heterogeneous illnesses and what that means is if it's in a family, you've got a higher chance of getting it. It may not show up the same in every family member. Some people may get -- like myself, you get late onset diabetes. You may get early onset diabetes.

So it's the same thing with mood disorders. When you see mood disorders early in life, there's a greater chance of those mood disorders have a strong genetic component, but what we do know is that mood disorders run in families.

What we have here is something that is really rare in my experience, and that is a family history where you have not only diagnosed mood disorders, diagnosed bipolar disorders, but family members that at this point in history are actually using the same medicines, that are on Risperidone, that are on Depakote. They're actually using the same medicines that has made Ms. Montgomery so much more better. So much more better? So much better.

Q You also indicated that the fifth of those bullet points regarding cognitive impairments throughout the generations was important to you?

A Right. Again, this is what really kind of threw me at first is we see cognitive impairments, intellectual disability,

other autism, other types of brain-based impairments not only before Ms. Montgomery, but we're now seeing these impairments in the children as well and the children of her children.
Q And, Dr. Woods, I think you talked some about the physical trauma and sexual trauma, but what else did you think was important in the biopsychosocial history for arriving at your conclusions?
A The multigenerational history of alcoholism, the severe sexual and physical trauma that clearly is power oriented, sexual trauma issues. Power oriented, not sexually oriented. Exposure to alcohol in utero. We know that her mother acknowledged heavy drinking. We also -- other family members acknowledged -- acknowledged her mother drinking during her pregnancy. We know there are multiple head traumas. And obviously the sex trafficking by her mother and stepfather.
Q Did the biopsychosocial history provide you with symptoms that were consistent across Ms. Montgomery's life?
A Yes.
Q And what were some of those? I mean, the Court can read our slide but just to highlight the ones that were most significant to you.
A Well, I think the ones most significant were the loss of contact with reality.
Q That sounds a little bit like a term of art. I mean, it is and it isn't. Tell us what you mean by that.

A It's someone who can't maintain good contact with what's occurring around them. It doesn't mean they go off into their own world necessarily, but it means that they -- it's like hearing something far away and not being able to quite catch it. You can barely hear. Sometimes it's closer and sometimes it's further away, and that's exactly how people describe Ms. Montgomery outside of the forensic setting, growing up, in marriage, as a parent, as a sister. They consistently describe her as not being able to stay connected, not being able to -- I think it was her sister who said sometimes we would have to yell at her in order to kind of bring her back.

I think the other part that I think is important is the psychosis. Her sister said, you know, She's crazy but I don't think she's crazy like schizophrenia. The social worker in 2003 said, Wow, I'm wondering if she may be somewhat delusional. Dr. Kuncel said, you know, again, She sounds delusional. Dr. Hutchinson says, I think you need to look at her thought disorder. You know, Dr. Vogelsang says, Wow, she's psychotic. And then what do we see? We see the antipsychotic being the treatment that makes the most difference. So those are the two that I think are really the most important.

Q Did you assess Ms. Montgomery's neurological history?

A Yes.

Q And what did you find out about her activities of daily

living?

A That she had difficulty performing simple tasks. She had difficulty finishing tasks. She had real difficulty, as I talk about, sequencing, being able to really take stock and say, okay, I need a loaf of bread. I need some milk. I've got four kids. I got to do this, that, and the other. She had difficulty budgeting. She had problems braiding and brushing her hair. I put that there specifically because braiding and brushing is a sequential phenomenon.

You have to -- there's a neurological test that Dr. Nadkarni did that is consistent with her problems in braiding and brushing, and I'll talk about that. She had difficulty planning meals. These are all cognitive tasks that we tend to do fairly easily, but with someone that has the trauma history and the brain impairments that she has would be problematic.

Q And the information outlined in this slide, is this what you mean by ecological validity?

A Yes.

Q And that's to say these are signs of the impairments in terms of functioning in real life?

A That's correct.

Q Can you tell us what your actual findings in a clinical sense were from your neurological assessment?

A Yes. I did a neurological examination and I think the most -- most significant part of my neurological examination

were three tests. One of them is skipping. Skipping may not sound like a test.

Q It really doesn't.

A But skipping is actually a neurological function. It requires the cerebellum in order to -- even if you work with children, you know that early on in preschool they look to see if kids can skip. And what they're doing is looking to see how their cerebellum is functioning.

The second test -- she could not skip. The second test is a test of what we call tandem walking, and most of you may be familiar with tandem walking in terms of a field sobriety test. With people below 60, you don't allow them to put their hands out. You have them put their hands at their side and you have them walk heel toe, heel toe, heel toe. That, again, is a test of cerebellar functioning. She could not do that.

I also did what's called the Luria test, which is a similar test that Dr. Nadkarni did, and this is a test where you have someone hit their palm, the side of their hand, and their fist. Palm, side, fist. Palm, side, fist. And you have them do this rapidly. This is actually a test of brain functioning and primarily a test of frontal lobe functioning. And she could not do this.

So what we really see are neurological functions that are impaired. Impaired motor control, impaired cognitive

functions. She had problems with attention and language, and she had problems regulating fears as well as pleasure.

Q Let me ask you, does cerebellar function show up on neurological testing?

A No.

Q What are the effects of cerebellar dysfunction? I mean, what is the ecological significance?

A Cerebellar -- if I can take a moment. Up until 1998 when Dr. Jeremy Schmahmann started doing really pioneering work -- he started in 1984, but he published it in 1998 -- on the cerebellum, we just thought the cerebellum was a part of the brain that just controlled motor functioning; standing, walking, et cetera. Dr. Schmahmann, a neurologist at Harvard, really began to pull out what he called the cerebellar affective syndrome, and these are the symptoms that one sees; distractibility, when one becomes distracted, hyperactivity, impulsivity, disinhibition, not able to control one's anxiety, irritability, rumination, thinking things over and over and over, not being able to let go, over and over, obsessive behaviors, dysphoria.

Q What is dysphoria?

A It's a sad mood. Depression, again, tactical defensiveness. You can't stand being touched. You have problems being touched. Sensory overload, which is also called the gating mechanism, too much overwhelms you. She talked

consistently about having to be away from her kids because -- although any of us who have kids think this, but sometimes you just can't be there. You just can't be with them. But that's not the same as not being able to take care of their lives, et cetera, apathy and childlike behavior. These are all examples of cerebellar dysfunction.

We now know that the cerebellum has connections to the frontal lobe, and the frontal lobe is kind of the gross executive functioning, but the cerebellum is kind of the fine tuning of that executive functioning. And clearly she has difficulty. And these are the kinds of dysfunctions that one would see in someone with a history of drinking, their mother drinking.

Q You also conducted -- we referenced briefly earlier a third and fourth interview this year with Ms. Montgomery?

A Yes.

Q What was the purpose of those interviews?

A The purpose of the third and fourth interview was to do two things, to talk with Ms. Montgomery about Mr. Kidwell's revelations, but also I did a Barkley Deficits in Executive Functioning Scale. The Barkley is an interview. It's actually not a test. It's an interview that Russell Barkley at the University of South Carolina developed that looks at real life executive functioning, this kind of functioning in the real world.

Q I want us to focus for a moment on your attempts to interview Ms. Montgomery around the issues of trauma. I think you've already sort of set out most of the things in this slide in terms that which you knew about the trauma before you began interviewing her about it. I do want to ask you since this slide talks about the trauma moving Ms. Montgomery to dissociative states, I want to ask you for clarification. Is dissociation volitional?

A Dissociation is purposeful but it's not volitional in the sense of you weigh it, you think about it. There's purposeful behavior, then there's intentional behavior. Purposeful behavior is like driving a car. When you're driving a car, you do about 10,000 -- you do about 10,000 things in a four-block area. You turn on the radio. You see if there's a person standing there. You turn the corner. Hopefully you don't text. That's purposeful behavior. You're not weighing each and every one of those situations. That's purposeful behavior. But it's not intentional behavior. That's what you really see with dissociation is that it's purposeful. It serves a purpose, but not every time someone dissociates is in fact intentional.

Q Let's talk about Ms. Montgomery's clinical presentation before you began introducing the subject of the sexual trauma.

A Sure.

Q Just briefly, succinctly, how was the interviewing

going before you brought that up?

A She was guarded. She was pleasant. She appeared to be cognitively attached. She could hold a conversation. She likes to read. I like to read. So we talked about that. We spent some time talking about her daily activities. We spent some time talking about the projects. These are primarily crafts that she's involved in, and yet -- and this goes back to mood and affect. Her mood, the feeling that she imparted to the environment was one of fragility and anticipation.

Q What did you observe clinically about Ms. Montgomery when she confirmed the things that Mr. Kidwell told about the trafficking?

A She physically flushed. Her cheeks became red. Her answers became delayed, and as we go, we'll talk about delayed reaction time. I saw delayed reaction time. She was unable to elaborate. This is one of the things that Dr. Nadkarni talks about when he talks about her finding it difficult to initiate abulia, a-b-u-l-i-a, difficulty to initiate a conversation, and she became dissociative. In fact, she would not talk about it. If you don't mind me continuing?

Q No. Go on.

A She would not talk about it, and I was like, What would happen if we talked about it? And she said, I just can't. I just can't. I don't know. I don't know.

Q Were you able to talk around it a bit?

A I was able to ask her if what Mr. Kidwell said was accurate. She said that it was.

Q During your third meeting with Ms. Montgomery, you talked quite a bit with her about her medication regimen?

A Yes.

Q What was she able to tell you or reflect to you about the way her medication affects her functioning?

A Well, first of all, Ms. Montgomery was started in 2010, so I guess it's been six years now she's been -- was started on Risperdal or Risperidone. She's been treated with it once before briefly in 2009 and did well but was taken off of it. Then she was placed on it again in 2010. She's done extremely well. There never has been a question by her treating psychiatrist or treating people at Carswell about taking her off of it. They have monitored her dose. They actually have taken her off other psychiatric medications, and she says that it allows -- it helps her recognize what is real and what is not real. She says it allows her to plan, organize, and carry out activities.

I might add she doesn't say that she's at the top of her game. She says it's better than she used to be but she does it with compensatory mechanisms. She's able to read and remember what she has read, which was a real problem for her before. She can focus, pay attention, and concentrate much better, and she was able to disclose certain details of trauma

as it relates to perhaps her husband or her stepfather to some degree but not to the complete degree.

Q And you were aware that ultimately she was able to disclose more than she could to you to Dr. Porterfield?

A That's correct.

Q I think you've already covered to some extent the difference in the medication during trial and after trial. Fair to say the main difference is the introduction of the Risperidone?

A Yes.

Q Is it important to know, I think you mentioned earlier, about other family members being on the medications that Ms. Montgomery is on?

A Yes. I'd like to go through this quickly if I could?

Q Let's do.

A Because I think it's so relevant. These are the family members and medications, and what we see -- and this is part of why the biopsychosocial history is so important. What we see is that certain medications were given to this family across generations. So at this point her brother, Tommy, has been on Paxil, an antidepressant; Lithium, whose only indication is bipolar disorder; Depakote, which is a primary medicine for bipolar disorder, which she was on and completely; and Risperidone. He's now on Risperidone.

Her brother, Teddy, took Geodon -- I'm sorry.

That's misspelled. And Zyprexa, again medication, antipsychotics that are used in bipolar disorder.

Her cousin, Kenny, took Haldol, an antipsychotic; Lithium, again, for mood disorder; and Depakote, again, for mood disorder. Again, we're seeing in this family the significant psychiatric history.

Q You mentioned earlier that in your fourth visit with Ms. Montgomery you administered the Barkley test regarding deficits?

A Yes.

Q Could you discuss very succinctly what that showed you?

A Sure. The Barkley is a test of measured executive functioning deficits over time. You ask a person at a certain period of time, not currently, but six months ago or a year ago. So obviously my reference was before you came into the correctional system, and it's arranged in five different sections; self-organization, self-restraint, self-motivation, self-regulation of emotion, self-management to time.

Q And what does this -- the Barkley measure?

A The Barkley really looks at attention. You can't remember if you can't attend. I think that's what her problem was with reading was because she couldn't attend. She could read the words but she couldn't hold them. She couldn't hold on to them; alertness; visual-spatial functions. What I mean by visual-spatial functions is being able to look at all of the

situations, being able to see the big picture, a right parietal lobe function, being able to see the big picture. Autonomic emotional function, being able to cry. Her blushing was an autonomic function. Memory; sensory/perceptual functioning. That's like being able to -- when she talks about not like being touched; problems with language; motor functions; cognition, being able to think; and self-awareness.

Q Let's talk very in a sort of summary manner about her scores on the Barkley. Fair to say from this slide that Ms. Montgomery was markedly deficient in several areas?

A Yes. She was markedly deficient in her time organization, time management. She was markedly deficient in her organization. She was markedly deficient in her ability to restrain. She was markedly deficient in her motivation. She told actually a story about leaving jobs without even picking up a check.

Q And so what do these scores tell us about Ms. Montgomery's functioning in the world?

A That before she was -- that before she was adequately treated she had impaired functioning in being able to be independent, in being purposive and organized, and her own self-serving behavior. We note stories of her being very, very dirty, smelling terribly even at the Wendy's where they would have to put her in a separate area so that the customers would not have to smell her.

Q I want to talk now about some of the other sources of data that you considered in forming your opinions, if I could.
A Sure.
Q In addition to your interview and assessment of Ms. Montgomery, did you take into consideration observations of lay witnesses, people like attorneys, paralegals, mitigation specialists in reaching your opinion?
A Sure.
Q How do you weigh those reports of people who are lay witnesses?
A Well, you just try to gather the data. You try to get some understanding of what their expertise is. That can often be problematic with someone to say -- I had attorneys that say I have a family member who is mentally ill so I know this about mental illness, but you just try to gather that data. Yet it's very, very important if they don't normalize.
Q What do you mean by normalize?
A Normalizing is when someone attributes certain behavior to, oh, well, everybody does that or she always did that or it didn't really mean -- they didn't really mean it that way without really having an understanding of what that behavior means. Sometimes, as I said earlier today, behaviors are symptoms; and if you don't look at those behaviors as symptoms, you may miss important telltale signs.
Q Are you saying that there are no behaviors that are

ever just normal?

A No. Most behaviors are absolutely normal, but you really want to make sure that you don't overread something either culturally or neurologically.

Q So what causes people to normalize symptoms?

A Wow. Most times we don't have a range of understanding of what a symptom means and, therefore, we just think of it as a behavior. And I'm sorry. If I could give you another example?

Q Sure.

A This is really not normalizing but it's what tends to happen. One of the things you see so commonly in the United States particularly is eye contact, right, where a mental health professional will say, This person did not make eye contact with me. Okay. And they will read that as something being wrong with that person; paranoid, they're avoiding them, you know. But you don't really know the culture that person came from. You can't really know the context of that eye contact.

Here we're talking about a very impaired family where multiple sexual behaviors are going on and the mother says, Well, I think that she was trying to take my husband, right? I think she was trying to have -- that's kind of a normalization. This is very, very bizarre, you know, behavior. So that's normalization where they're trying to attach it and

that's an example.

Q Do you see even professionals normalizing symptomatic behavior? I think you've worked a lot with legal teams. Do you see lawyers do it?

A Oh, absolutely, and mental health providers and myself.

Q And did our team provide you with a copy of Fred Duchardt's declaration in this case?

A Yes.

Q Did you find examples of Mr. Duchardt normalizing behaviors that he saw in Ms. Montgomery?

A In my opinion, yes.

Q If we could look at the things you pulled out of Mr. Duchardt's declaration. What did you see as Mr. Duchardt's inadvertent -- let's give him the benefit and call them inadvertent normalization.

A Mr. Duchardt noted that she never appeared mentally ill as postulating in my report; that she was able to engage in conversation; that she never had trouble understanding proceedings; she never had problems asking questions; she never had problems understanding why attorneys were asking her the questions they were asking her; and she let down her protective shield and was able to answer questions.

Q Why do you call those sorts of conclusions by Mr. Duchardt normalizing?

A Well, because at the same time, at the very same time

that Mr. Duchardt was observing this, she was being treated with multiple medications for her bipolar disorder. She was having symptoms where they were describing her as irritable, mood disorders, depressed, impaired concentration. I'm not sure whether Mr. Duchardt had the opportunity to review the medical records of Dr. McCandless, but she was being treated for psychiatric disorders during this entire period from 2006 through 2009. And there was -- and this was unusual. There was never a period in there where she was not being treated. So you'll often see someone come in and they'll go, Well, is she malingering? They'll take her off the medications or it's situational. It's because she's gotten in trouble and, therefore, now we can take -- she was treated with very strong multiple mood stabilizers specific for bipolar disorder from 2006 through 2009. So at the time that he's describing these, she's being treated for a significant psychiatric disorder.

Q What consideration did you give to Mr. Duchardt's observations?

A Well, Mr. Duchardt is not a psychiatrist, and so I can't anticipate that he would be able to look at her or anyone else be able to look at her and say, Oh, that's just a bipolar symptom. He certainly did not take into consideration the mental illness as it was described by Dr. McCandless in her records over the course of years. He certainly didn't take into consideration that she was being treated with Depakote,

she was being treated with valproic acid, she was being treated with Wellbutrin, an antidepressant. An antidepressant that in fact was developed for bipolar depression.

Q Fair to say, then, that Mr. Duchardt's conclusions or the way he expressed himself about his observations of Ms. Montgomery conflicted with your observation?

A Well, no, no. They conflicted with the treatment she was getting. It wasn't my observations. I did not observe this. I read the records, and in the records you see that she's being treated daily with mood stabilizers and medications.

Q And let me ask the question another way. Do they also conflict with your conclusions both clinically and forensically?

A That's correct.

Q Let's pause for a moment here, Dr. Woods. I've made you aware of some criticism of you by Mr. Duchardt in his declaration. If we might talk for a moment about Mr. Duchardt's claim that you've developed an unfortunate reputation. I believe Mr. Duchardt cited a book written by a man named Blecker. Have you had a chance to review that book?

A I have had the opportunity to review the chapters that relate to me. It's a very small part of the book.

Q If you could just orient the Court, what do you understand from the blurb on the back of the book who is Mr.

Blecker?

A Mr. Blecker is a professor at New York University. He's a strong advocate for the death penalty.

Q Is he a mental health professional?

A Huh?

Q Is he a mental health professional?

A No, he's not.

Q What does he teach?

A He teaches law.

Q And what was Mr. Blecker's beef with you?

A Well, I'm not sure he has a beef with me. In kind of looking through his research, it's a little bit unclear. First of all, he says I'm a psychologist. I'm not a psychologist. I've never been a psychologist. So that -- it's pretty easy to find out I am a psychiatrist.

Secondly, he describes my examination in this one particular case, and it appears as though he's saying that because this person committed a horrific offense, which in fact he did, that he couldn't have been incompetent; but, I mean, my understanding is that's not the standard. The quality of the offense is not the standard as to whether someone is incompetent or not.

Q Well, and to just sort of track back to those little clumps we just traipsed you over, Mr. Duchardt cited Mr. Blecker's book for the proposition you have an unfortunate

reputation?

A Right.

Q But Mr. Blecker cited your opinion in one case?

A That's correct.

Q And, in fact, I think you and I checked the footnotes there and he actually cited to the state's expert?

A Dr. Sedler (ph) right.

Q So really Mr. Duchardt is through many modalities almost citing to an opposing expert in one case?

A That's correct.

Q So not a fair representation, I think, to say that you have this reputation across the country?

A Well, certainly not in that situation, that's correct.

Q And Mr. Duchardt also dropped a footnote regarding he said a sanction that you received from the medical board. If you could just clear that up for us.

A Sure. Mr. Duchardt said that my license had been suspended.

Q Is that true?

A No. My license has never been suspended. In 1990 -- between 1990 and 1993 I was involved in a medical board action. The findings were that I had not written a discharge diagnosis of alcoholism on a client and that I had prescribed her three refills. There was no action taken on my license. There has never been an action taken on my license. The judge

actually -- administrative law judge in that case also said that there was no action taken on my license. So I've never had my license impacted in any way.

Q Thank you for clearing that up for us.

Let's move now from your clinical assessment and review of the records and then move more into your understanding of and how you considered the reports of other professionals who looked at Ms. Montgomery.

A Sure.

Q You talked some about how you strongly considered the fact that Ms. Montgomery was medicated for a long period of time, but let's kind of move in chronological order through the various assessments, if we can.

A Sure.

Q Let's start with Marilyn Hutchinson. Do you recall that Marilyn Hutchinson saw Ms. Montgomery on three different dates early in 2005 shortly after Ms. Montgomery's arrest?

A That's correct.

Q What about Marilyn Hutchinson's findings did you find most significant? And, again, his Honor can read the whole slide, but if you will sort of highlight for us that which was important to you.

A Dr. Hutchinson is a very good psychologist here in town. She picked up when you look at her --

MR. VALENTI: Your Honor, at this time as we get

into this PowerPoint, I was just given this, as you know, right before lunch. This gets into a fairly summary testimony of every witness you've heard the last seven days, and I don't think we need to hear it again what Dr. Hutchinson had to say as she testified or the other doctors that have testified. Certainly as it relates to Dr. Bradford, we agreed we could go into that, and I think there's some 24 slides related to Dr. Bradford and since she's passed. But to go over testimony that is already before the Court on numerous occasions seems cumulative and unnecessary, in my opinion.

THE COURT: I've heard these witnesses and so if you can just --

MS. HARWELL: I was trying to direct Dr. Woods towards that which was significant to his findings.

THE COURT: Doctor, you understand I've heard the testimony of these experts, so if you can just kind of skip over specifically what was said and have the slides up and the slides are before me and Dr. Woods can give his conclusions from that.

MS. HARWELL: And that's what I was trying to do. We do have the data here for the Court. At some point I'll ask to make that an exhibit. I'm going to ask -- try to focus Dr. Woods' testimony on that which was important for his opinions.

Q (By Ms. Harwell) So if we could talk about Dr. Hutchinson, who, I believe you worked with in the past?

A Yes.
Q If we could focus on that which she saw that was of clinical and forensic significance in your opinions.
A Dr. Hutchinson saw symptoms consistent with a bipolar disorder and consistent with trauma. That's elevated mood, the mood changes, and the dissociation.
Q If we could then talk about Dr. Logan, who I believe --
A One thing on Dr. Hutchinson. Dr. Hutchinson also suggested that she be looked at for a thought disorder, psychosis. That's really all I wanted to add.
Q And Dr. Hutchinson's indication of psychosis was important to you why?
A Because we now know that her psychosis is being treated and she's doing much, much better.
Q Let's talk, then, briefly about Dr. Logan. What was important to you about Dr. Logan's observations of Ms. Montgomery?
A Dr. Logan noted symptoms of psychosis. Dr. Logan did not have a biopsychosocial history.
Q Then turning to Dr. Fucetola.
A Dr. Fucetola recommended neuroimaging. He realized the difficulty that the 29-point difference between performance IQ and verbal IQ was important and the conclusions. He recommended neuroimaging because he recognized the limitations of neuropsychological testing.

Q What about Linda McCandless, the doctor who prescribed -- you referred many times, I think, essentially to her work in talking about the medications at CCA. Is there something you would like to add in terms of what Dr. McCandless gave to you in performing your assessment?
A Well, Dr. McCandless has what I rarely see and that's a long-term treatment of someone that's in this particular situation within the setting of the trial; pretrial, trial, and posttrial. She diagnosed her with bipolar disorder. She called it rapid cycling. She saw symptoms of psychosis and diagnosed her with a brief reactive psychosis. She treated her with mood stabilizers, valproic acid, Depakote. She treated her with Elavil for actually pain but realized that the Elavil made her sedated and documented that she was sedated. More importantly, she documented that as the Elavil was decreased, Ms. Montgomery said she felt better. So there was kinds of --
Q Why would a decrease in a medication be significant to you?
A Because the symptoms that Ms. Montgomery was manifesting in court; the flat face, the flat affect, are symptoms of medication.
Q Did you also take into account information from Ruben Gur?
A Yes.
Q Could you tell the Court -- the Court actually hasn't

heard from Dr. Gur yet, but what about the reports that we provided to you from Dr. Gur was of significance to you?
A Overall the importance of Dr. Gur's testing is that Dr. Gur was able to give us information about parts of the brain that cannot be tested from a neuroimaging point of view -- I mean from a neuropsychological point of view. So he's giving us information about that new brain -- I'm sorry -- moving too fast. About that old brain, about that brain, limbic system, the amygdala. He's able to give us information about parts of the brain the neuropsychological testing doesn't get to.
He's also able to give us information about changes in the brain. When he talks about in the first two sentences enlarged ventricles, loss of tissue around midline or tissue never present, the reason your ventricles are enlarged is because your brain is shrinking. It's really just like a shore. If you look at a shore at a lake and over time as that shore recedes, the lake gets bigger. That's exactly what Dr. Gur's describing here. These are aspects of neuropsychological and neurological functioning that cannot be picked up in a neuropsychological test.
Q Just for clarity for the record, did you also review the reports of Dr. Daviztikos and Dr. Newberg who worked with Ruben Gur?
A Yes, I did.
Q Let's talk now about Ruth Kuncel who I believe saw Ms.

Montgomery in April of 2007. What was significant to you about Dr. Kuncel's work?

A Dr. Kuncel picked up significant head injuries, the multiple head injuries, I believe there were three, with the automobiles as well as the trampoline in 1993 and 1992. One in 1993, two in 1998. I think the trampoline was 1999. The fact that her mother drank heavily during pregnancy, and the fact that she does have signs putting her somewhere on the fetal alcohol spectrum; wide-set eyes, slight rotation and deformity of the spine. These are all what we call midline features. These are features that develop in the middle of the body and are all consistent with prenatal alcohol use.

Q I believe that Dr. Kuncel's materials also reflected the work of a social worker, Rhonda Gales. Do you remember reviewing --

A Yes, 2003.

Q And what was significant to you about Rhonda Gales?

A Ms. Gales -- this is 2003, two years before the occurrence, found Ms. Montgomery to be mentally unstable, very moody, a little delusional, maybe bipolar. She noted that two cousins had been psychiatrically hospitalized. She documented the stepfather physically and sexually abusing Ms. Montgomery from 11 to 12 to 16. So what we really see here is a mental health provider seeing the instability, seeing the mood disorder, seeing the psychosis, the delusion, seeing the

family, and seeing the bipolar disorder.

Q All before the crime?

A All before the crime.

Q Turning back then to Dr. Kuncel -- and like the Court said, we shouldn't summarize everything Dr. Kuncel saw, but why was it significant to you that Dr. Kuncel noted the midline defects? Did that correspond with your observations?

A Yes. It certainly corresponded with the cerebellar problem that you see. If we could just hold this up for a minute with Dr. Kuncel really quickly. Again, we're seeing symptoms of bipolar, sleep disturbance, eat too much, eat too little, what are called neurovegetative signs, tangential thinking, pressured speech. Pressured speech is a type of speech that is specific to bipolar disorder. It's a rapid type of speech, not just rapid speech, but a special type of repetitive. It's a term of art.

Q And certainly Dr. Kuncel was qualified to recognize that symptom?

A That's correct.

Q In a way that a layperson wouldn't necessarily?

A That's correct.

Q What else was -- I don't want to cut you off from anything else that you thought was really significant about Dr. Kuncel's observations that was important for your evaluation.

A No. No.

Q We have, as it's noted actually on the slide before you, many sources talking about Ms. Montgomery saying she's not sure what's real or not real?

A Correct.

Q In a neuropsychiatric sense, what does than signify?

A It signifies cognitive dissociation, this inability to really perceive the world accurately. It's not constantly there but in Ms. Montgomery's case because of the tremendous overwhelming trauma that she experienced, you would see -- it would be a state that she could slip into fairly quickly.

Q Do you recall whether Dr. Kuncel noted that Ms. Montgomery experienced auditory hallucinations?

A Yes.

Q I'm going to ask you now about the government's expert, Dr. Dietz. Was there anything of significance to you, not outlining Dr. Dietz' testimony, but anything that was significant to you in terms of either your clinical or forensic conclusions in this case?

A Certainly. Well, certainly Ms. Montgomery denied to Dr. Dietz the observations of her behavior by family and others.

Q I'm not sure what you mean by that.

A Ms. Montgomery described herself as a good mother. That's one example, right? Where family members, her children, her husbands all described her as a loving mother but not a

good mother. So that certainly was inconsistent.

Dr. Dietz said there was no evidence of psychosis and yet in the records in 2003 the social worker who was not involved in the forensic case who described her as being slightly somewhat delusional. Certainly we see Dr. McCandless describing her as having a brief reactive psychosis as well, and we see other people describing her with auditory hallucinations, et cetera.

Dr. Dietz notes that she does not have bipolar because he did not see mania. But, again, when you go through the medical records, you see irritability. You see agitation. Dr. Hutchinson described this elevated mood and this unreasonably elevated mood, which is what mania is. And the really difficult part, of course, is that she's being treated for bipolar during this entire time.

Q So when you are -- I'm hearing some criticism of these things you're talking about with Dr. Dietz; fair to say?

A I'm concerned just because I think there are -- there's information in the records that are inconsistent with his findings.

Q That's what I was going to ask. Is this just a matter of a battle of experts or you just have different opinions?

A Well, we obviously have different opinions. I also think if you look at the medical records, if you look at the current medical records, if you look at Dr. Kuncel, if you look

at the social history, there's an internal inconsistency that is hard to ignore.

Q You addressed briefly earlier Dr. Dietz' treatment of disputed sexual claims?

A Yes.

Q And that you found that inappropriate?

A Yes.

Q Wouldn't you agree, Dr. Woods, there are cultures in which children that young engage in sexual conduct?

A Well, not this culture. We, in fact, have laws that say a 12- to 16-year-old cannot have sex with a 56-year-old whether they choose to have sex or not and it goes back to your question of what is consensual versus what may be agreeing. I'm not even sure there's agreement. But the whole idea to debate whether this was willing or not, whether this sexual contact is willing or not is really a red herring. This is inappropriate sexual behavior. This is a child. This is someone that is a teenager, in their early teens. That type of behavior cannot be justified. And it certainly cannot be justified clinically. My big concern is that to be able to debate this is to ignore all we know about developmental psychology and how children develop, how sexuality develops.

Q Is it fair to say that as a forensic expert, it matters to you that the behavior that Dr. Dietz was sort of willing to equivocate on is illegal behavior?

A That's correct.
Q Let's talk briefly about Dr. Martell. What did you find significant in Dr. Martell's findings?
A Dr. Martell did capture again these terms of art "emotionally labile." He talked about the MMPI being invalid due to symptom exaggeration. However, Dr. Martell did not talk about the differential diagnosis of an elevated MMPI, that a person may not be able to read very well or that a person may be crying for help, and what is not reported, if I recall correctly in Dr. Martell's report, is that there is no discussion of the fact that at the time she took this MMPI she was actually being treated for bipolar disorder. She was on medications for bipolar disorder.
Q And you find that omission to be very significant?
A It's very significant because she was also being incompletely treated. It wasn't as though those symptoms were completely under control.
Q Let's talk very briefly about --
A One more thing about Dr. Martell.
Q Sure.
A And this really goes back to something I said in my report in terms of Dr. Fucetola. When you do a neuropsychological examination, it's important to also do a neurological examination because we know that the -- that neuropsychological testing really only tests 2 to 5 percent

of the brain. So if you are able to do a neurological examination -- so when Dr. Martell says there's no -- or conditionally he's relying completely on his neuropsychological testing. He didn't do any neurological testing, which may have given him other findings.

Q Let's speak briefly about Dr. Ramachandran. You're aware that Dr. Ramachandran diagnosed Ms. Montgomery with pseudocyesis?

A Yes.

Q And we've provided you with a copy of Dr. Ramachandran's 2016 deposition?

A Yes.

Q Was one of the things striking about the deposition is that Dr. Ramachandran admitted he doesn't have a medical license to practice in the United States?

A That's correct.

Q Why is that important to you?

A Well, he does not diagnose. He does not treat. And so, consequently, he doesn't have the methodology that one would normally expect either clinically or forensically.

Q Is it not also true that in that deposition he admitted that he didn't know the legal standard for NGRI?

A That's correct.

Q That was important to you as well?

A That's correct.

Q Let's talk just a little bit about the mental health evaluations that occurred after trial and what was -- I think you've -- I'm sorry. Let's talk about Dr. Nadkarni for a moment. What did you find of importance in Dr. Nadkarni's report?

A Dr. Nadkarni did some neurological testing I didn't do. He did a smell test. Olfactory -- the first cranial nerve is the olfactory nerve. It comes out of the nose into the bottom of the frontal lobe; and when people have olfactory hallucinations of being a bad smell or et cetera, that's evidence of a frontal lobe dysfunction.

So at this point we've got frontal lobe dysfunction because of the cerebellum. We've got it from motor perspective, the Nebraska-Luria test. We've got it from functional perspective, bad smells. We've got it from executive perspective, not being able to sequence. We know she's got a bad frontal lobe. Okay.

We have episodes of lost time, memory experiences that she is not really -- she's not sure what occurred. Word finding problems. Word finding problems, again, is a right parietal functioning. So we, again, shall see where other evidence that the right -- that's consistent with Dr. Gur that the right side of her brain does not work very well.

Q I'm hearing you say that you considered Dr. Nadkarni's findings to be not just consistent with yours but further

confirmation of your opinions?
A And further social history.
Q I apparently passed over a slide. Let me -- let's talk about Camille Kempke very briefly. I think you have pretty much talked about her in terms of the Risperdal that was prescribed in the BOP?
A Yes. Just quickly. Dr. Kempke, after experimenting with other medications, tried Risperdal. Again, Ms. -- I might add that these are extremely powerful medications. When I was in medical school at the University of Utah, Louis Goodman required that we take antipsychotic medications, that we actually wanted to have any specialization, he would give us just a small -- these are extraordinarily powerful medications. If you're not psychotic, you're not going to be taking Risperdal. You're not going to be taking Haldol.

Dr. Kempke noted that Ms. Montgomery did extremely well almost immediately on the Risperdal, put her on a regimen of Risperdal, took other medications off. Took the Depakote off, and now I think she's also on Prozac, but it's now been six years that Ms. Montgomery has been on Risperdal. She's done extremely well.
Q And by your repeated references back to that, I'm hearing you say that is, again, confirmatory information?
A That's exactly right.
Q Let's talk briefly about Dr. Porterfield. What was of

significance to the formation of your opinions or confirmatory of your opinions contained in the reports of Dr. Porterfield?

A Dr. Porterfield is well known, well respected in the field of trauma and complex trauma, torture. She recognized -- she said massive and pervasive impairments that come with the type of trauma, ongoing trauma and made the diagnosis of complex PTSD.

Q Let's talk then about Charles Sanislow.

THE COURT: Ms. Harwell, I was hoping to get to the point where you were finished with Dr. Woods before we take a break, but I think we'll go ahead and take a break now.

MS. HARWELL: I'm glad to sit down.

THE WITNESS: I'm glad too.

THE COURT: That makes it unanimous then. I'll be back at 3:20.

THE WITNESS: Thank you, Your Honor.

(Recess taken at 3:05 p.m.)

THE COURT: Thank you. You can all be seated.

Ms. Harwell.

MS. HARWELL: Yes, Your Honor. Thank you.

GEORGE WASHINGTON WOODS, JR. resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MS. HARWELL:

Q Dr. Woods, I think in our speed round of final Jeopardy here we were approaching a discussion of what you found important in the report of Dr. Sanislow, and I would remind you

the Court heard from Dr. Sanislow at some length yesterday. So if you'd just tell us what was important to you as you were looking at Ms. Montgomery's clinical and forensic picture.

A Bullet point 4 and 5, "Comorbid disorders create atypical symptoms." We've got complex PTSD. We've got bipolar disorder. We've got brain impairment. When you mix those together, they create more severe and more atypical symptoms, and those comorbid disorders show up as multiple profiles on the MMPI-2.

Q If we might now kind of take a step back from our rapid march through all those experts, I believe you said that you knew Dr. DiAnne Bradford; is that correct?

A Yes.

Q And you heard me make representations to the Court earlier that Dr. Bradford died just last month?

A I think that's correct.

Q How did you know Dr. Bradford?

A Dr. Bradford was a professor at Morehouse School of Medicine when I first started teaching there in 2002.

Q Is that how you came into contact with her?

A Yes. She had been teaching there for about five years at that time.

Q Are you familiar both with Dr. Bradford's qualifications and then also with her opinions in this case?

A Yes.

Q I'm going to ask you some fairly extensive questions about that.

MS. HARWELL: If someone might pull Dr. Bradford's CV for me.

Q (By Ms. Harwell) While we're pulling that CV, and I apologize for not having it ready, if you might just explain, Dr. Woods, what you know about Dr. Bradford's professional career, hit the highlights.

A Dr. Bradford spent her entire professional career until she came back teaching -- well, that's not true. She started teaching at Johns Hopkins. She then went to Europe and developed -- was the director of a large pharmaceutical company, Solvay, S-o-l-v-a-y, where the next 20 to 25 years she developed psychiatric medications.

She was the principal researcher for about 72 research projects over time and was a brilliant, brilliant psychopharmacologist.

She also had -- at the end of her career she was a principal investigator for research also here with National Institutes of Health.

MS. HARWELL: I'm going to ask to approach the witness, Your Honor, and show him what's been marked as Exhibit 25

Q (By Ms. Harwell) Dr. Woods, I'll ask if you're familiar with this document as the CV of DiAnne Bradford?

A Yes.

Q And I'm going to ask you if you would look at Exhibit 24 and see if you recognize that as the report of Dr. DiAnne Bradford that you previously reviewed?

A That's correct.

MS. HARWELL: Your Honor, again, just to remind the Court that the parties have stipulated that Dr. Woods will testify essentially in Dr. Bradford's stead.

Q (By Ms. Harwell) Dr. Woods, if we could review quickly the referral questions our team posed to Dr. Bradford, please.

A Yes. "Did Ms. Montgomery's medication regimen at the time of the trial affect her outward behavior, manner, appearance, interfere with her ability to respond appropriately to her external environment?

"How can genetics and stressful life events have played a role in her disorders?

"Based on her consensus diagnosis, Dr. McCandless, Dr. Woods, Dr. Kempke, was she receiving appropriate medications for her diagnosis and presenting symptoms at the time of the trial?"

Q Does Dr. Bradford in her report set out the list of materials that she reviewed in order to arrive at her conclusions?

A Yes, she does.

Q And what medications did Dr. Bradford report that Ms.

Montgomery took -- I'm sorry. Just briefly. The Court can see there Dr. Bradford reviewed CCA medical records, BOP medical records, and then the reports of all the experts that we've proffered in this case; is that right?

A That's correct.

Q Did she also review the social history documentation?

A Yes.

Q What medications did Dr. Bradford report Ms. Montgomery took during her trial?

A She took valproic acid. She took bupropion. She took amitriptyline. She took ranitidine. Ranitidine is a medication that is used for -- to help with the stomach, help control your stomach because valproic acid can upset your stomach.

Q What can you tell us in Dr. Bradford's stead about the medications in that chart?

A Well, the valproic acid is an antiseizure medicine. It started out as an antiseizure medicine in the 1980s. It was found to be very, very helpful in bipolar disorder.

Q Do we need to get you some water?

THE COURT: Do you have some water?

THE WITNESS: I do have some water but I don't want to drink too much of it.

THE COURT: We never know when Ms. Harwell is going to be done.

MS. HARWELL: Well, Judge Fenner, I have to point out this is the first time I've ever in my experience had a witness, especially an expert witness, take the stand and admit he forgot his brain. That sort of took me aback as we were getting kind of started here that the witness forgot his brain.

THE COURT: Maybe it was a good thing there was no jury here.

Q (By Ms. Harwell) Okay. I'm sorry.

A Bupropion is a second-generation antidepressant. As I mentioned earlier, bupropion was actually developed for bipolar disorder because most antidepressants are -- they cause problems with bipolar disorder. They flip people into what's called -- they flip people into mania, called the manic switch. So bupropion was actually developed for bipolar disorder, depression and bipolar disorder.

Elavil is an older tricyclic antidepressant used for pain, and some of you may be familiar with Elavil being used for diabetic pain, which is neuropathic pain, pains of the nerve. And ranitidine, as I said, is for the stomach, an acid reducer.

Q And I realized that we went ahead and qualified you earlier as a specialist in this field as well, but what were Dr. Bradford's findings in regards to the side effects created by these drugs?

A Each of these -- each of the drugs that we just

described have sedation and somnolence as side effects. They also have motor sedation because you can have cognitive sedation. Your brain kind of slows down. You get kind of foggy. We can have motor sedation where you don't respond so quickly. You have problems driving. You know, how many medicines will say, Don't drive until you figure this out. That's motor sedation.

So a combination of these drugs goes back to exactly what we talked about in terms of comorbid diseases. When diseases are comorbid, they have greater effects. When drugs are comorbid, they interact and they create greater effects. Now, as it turns out, there is a relationship between amitriptyline, which is the Elavil, and valproic acid. If I can explain that quickly.

Q Yes, please.

A Both of these drugs compete for sites in the liver. Usually valproic acid wins. When valproic acid wins, greater amounts of Elavil get backed up. So you get higher amounts of Elavil in your blood system than you normally would.

Q What's the behavioral effect or the physiological symptoms of that?

A You have much greater somnolence. You have much greater sedation than you would without the valproic acid. So, as I said -- and also with head trauma sedation and somnolence are side effects. They're often exaggerated when people suffer

from head trauma.

Q What does Dr. Bradford's chart reflected here in our slide indicate for you? I know this was included in her report.

A This slide separates out sedation and somnolence.

Q And what are the distinctions between the two?

A Sedation actually affects how your brain works. Sedation affects cognitive functioning. It affects your attention. I think you may recall that one of the things that we saw in the medical records was that Ms. McCandless would be trying to read discovery -- I mean Ms. Montgomery would be trying to read the discovery and she couldn't stay focused. She couldn't concentrate. It affects your coordination, your physical coordination. It affects your psychomotor activities like driving, et cetera.

Somnolence, on the other hand, makes you sleepy, makes you drowsy. It doesn't necessarily affect your thinking as much. So when you have sedation and somnolence, they can be very problematic.

Q Then let's talk about the other chart that appeared in Dr. Bradford's report. What does this chart represent?

A This chart is a chart that we normally use, and these are all first-generation antidepressant medications, and what you really want to look at here is how much sedation do they have. Now, you see anticholinergic, the second. That also

causes sedation and cardiac effects. So you really see the Elavil, very sedative, very anticholinergic. It causes bad heart effects.

Q What other negative effects are there with amitriptyline?

A I'm just going to read No. 1. I can do No. 2 and 3 if you'd like me to or the judge would like me to. I'm more than willing to. The ones that are most relevant here are the moderately severe sedation. So we're talking about brain impairment. And the somnolence, we're talking about sleepiness.

Q Do we know if 25 milligrams of Elavil is sufficient to produce this effect of sedation or somnolence the next day?

A These amitriptyline, particularly Elavil, is not dose related. So the sedation of Elavil is not a dose-related phenomenon. It doesn't matter, the dose. It matters how the person responds to it. There are others. Trazodone is another one that's dose related.

So regardless of the dose, depending upon the person, you would look at these kinds of symptoms, and what you see even at this dose, it can create -- decreases -- it increases reaction time, meaning it takes it longer for you to respond. It diminishes accuracy. Driving is not relevant here.

Q Dr. Bradford in her report, as reflected in the slide,

talks about tolerance?
A Yes.
Q What does that concept have to do with amitriptyline in this setting?
A Okay. Tolerance works like this. Your liver is the organ that breaks down, what we call metabolizes, most drugs and it has these enzymes in the liver. If you think of these little enzymes like Pacman, you know that Pacman, chop, chop, chop, chop, chop. So what really happens is when you give a drug, those enzymes come and they break that drug down. Now, if you give that drug again, those enzymes say, Oh, here it is again. We need more support. We need more reinforcements. So the second or third time you take that drug, it may not last as long. By the fourth time it may not be as effective. So you end up having to take more of the drug. On the streets when people are using drugs, it's called going on a mission. You can't get back to that same high. That's what tolerance is.
Q Does Dr. Bradford in her report and then as reflected in the slide indicate that actually with amitriptyline there isn't a tolerance?
A That's right.
Q That is to say it's still just as potent even after taking it a long time?
A You can take it for years, the same dose and you would not have the same -- and you would have the same effects.

Q And Dr. Bradford concluded that even at the 25 milligram dose the amitriptyline was sufficient to produce both sedation and somnolence during the day?
A That's correct.
Q Does that correspond with your opinion, since you're trained in psychopharmacology?
A Well, it corresponds with my opinion clinically, but I think more relevant it corresponds to the records, and what we see in the records -- and perhaps I'm jumping ahead. What we see in the records is that Dr. McCandless has to decrease the amitriptyline because Ms. Montgomery is becoming so sedated. Dr. McCandless actually uses the word "sedated." She's becoming sedated at 50 milligrams of the Elavil. She drops that to 25 milligrams and Ms. Montgomery feels better. And so, again, you see these kind of ipsative steps. She eventually eliminates the Elavil and Ms. Montgomery is doing better.
Q What do we know about the -- and I'm probably going to get the drug wrong -- the valproic tablets that are extended release --
A Right.
Q -- that Ms. Montgomery was taking during and after trial?
A Valproic is an acid. Extended release means that it lasts longer in the body. The same dose lasts longer because it's constructed -- the actual molecule is constructed

differently so it breaks down differently; and because they were having difficulty getting control of Ms. Montgomery's symptoms, they decided to go with an extended-release drug. They couldn't use -- they just couldn't increase her medications because she was having such bad stomach problems on the medication.  So they wanted to go with the same dose but give an extended release which is an artificial way of elevating the dose.

Q       And what does this chart show about the effects of the valproic acid in terms of the way it affects someone, how they feel?

A       When you elevate the dose, you have more problems, right?  And that's what we see here.  It's d-y-s-p-e-p-s-i-a, dyspepsia; and if you, again, go through the records, you'll see that all the time that Ms. Montgomery was being treated, she was also on some medicine to try to control her stomach problems secondary to the treatment.

Q       But more important for sort of the forensic evaluation here in terms of Ms. Montgomery's competency at trial and her appearance in front of the jury, would you agree that this table shows also the high degree of somnolence?

A       Absolutely.

Q       What effect does valproic acids have on amitriptyline?

A       Valproic acid, as I said, increases the amount of amitriptyline in the system.

Q And what are the sedative effects with ranitidine?
A Right. Ranitidine.
Q I'm sorry.
A It really is another sedating medication. It is an antihistamine. It's the kind of thing that if you were to separate out, the kind of thing that you would use if you got poison ivy, right, or if you got the hives. They would give you this antihistamine to kind of sedate you to kind of make that go away.
So during most of her treatment -- I mean during most of her trial, pretrial, trial, posttrial, she was treated with one type or another. Before this she was treated with Phenylgesic. Then she was treated with ranitidine. She was on valproic acid. She was also on Elavil. So she was on multiple drugs that cause sedation.
Q So at the time of the trial I'm hearing you that at least three drugs on board that cause sedation?
A At least.
Q Is there information in Dr. Bradford's report about the genetic history of Ms. Montgomery's family and how that interplayed with the drugs, psychopharmacology?
A Again, you see that Dr. Bradford had documented bipolar disorder, bipolar disorder with psychotic features being both maternal and paternal family, a half sibling, her brothers with the same problem. There's a question about her grandmother and

other family members; but we certainly know that there are, again, older family members and then there are younger family members that suffer from these mood disorders and other cognitive impairments.

Q Did Dr. Bradford consider and then analyze in her report the symptoms of psychosis that were reported in Ms. Montgomery's records?

A She noted, again, gross impairment in reality testing, delusions and hallucinations. We talked today about the olfactory hallucinations, lack of insight, grossly disorganized behavior, the flat affect, and difficulty in initiating important activities.

Q And then in Dr. Bradford's opinion and in yours were these psychotic symptoms being treated effectively at the time of trial?

A I'm glad you said that. I actually kind of not thought about that point for a moment. Even though Ms. Montgomery was being treated continuously, Dr. McCandless was struggling because she was still symptomatic. Even though Ms. Montgomery was being treated during the entire three years, Dr. McCandless could not get control over her delusions, could not get control over her agitation, could not get control over her anxiety, could not get control over her organization, and she tried -- she actually added another medicine. I think it was Tegretol to the regimen. So at one point she was on Elavil, Wellbutrin,

and two mood stabilizers trying to control her symptoms.

Dr. McCandless never backed off of trying to control her symptoms but was not totally successful, and so she was symptomatic through the pretrial, trial, and posttrial until the Risperidone.

Q Does Elavil impair facial muscle movement?

A Any sedation but certainly Elavil impairs facial movement because it has a motor function. If you recall where it said there was a motor sedation as well as a cognitive sedation. A motor sedation is a relaxing of a smooth muscle. That's why you give it when someone -- so that relaxing of the smooth muscle is what's called masked facies, f-a-c-i-e-s, and that masked facies can often look like someone is not interested or has no facial expression.

Q If the Court heard last week descriptions from people who were at counsel table talking about Ms. Montgomery just sitting slumped and looking flat, looking not present, would that jive, for lack of a better word, with the descriptions you're talking about the effects of the Elavil?

A That would be consistent, yes.

Q Were Dr. Bradford's conclusion that -- did Dr. Bradford, like you, conclude that Ms. Montgomery's history of psychosis and her mental illness was not adequately treated at the time of trial?

A That's correct.

Q Were Dr. Bradford's conclusions -- and let's see if I can ask it a better way. You are also a psychopharmacologist. Why was it important to you to also have Dr. Bradford's input?

A Say that again.

Q Why was it important to you to have Dr. Bradford's expertise and input?

A Dr. Bradford was probably one of the top five psychopharmacologists in the world. She had practiced internationally. She knows more about medications than -- she knew more about medications than anybody, and there's little subtle differences like between motor sedation and cognitive sedation that has to be made.

Q Do you know if Dr. Bradford has been declared to be an expert witness in other courts of law?

A Yes, she has.

MS. HARWELL: And, Your Honor, were Dr. Bradford here, I would, of course, ask you to consider her expert opinions, and I believe the government didn't have any objection to that.

MR. VALENTI: Do not.

Q (By Ms. Harwell) Let's talk, Dr. Woods, then about Dr. Bradford's conclusions. What did Dr. Bradford conclude and then I'll ask you to say whether you agree or disagree?

A Sure. Dr. Bradford concluded that the combination of these drugs had cumulative effects that affected her outward

appearance and that it reduced her ability to react to appropriate external cues.

Q And was that across all of the time period of pretrial and trial?

A Yes.

Q I'm sorry. I interrupted.

A That the medications caused a dulling of the senses, caused increased reaction time, which meant -- that's kind of an oxymoron. It takes longer to react. Decreased accuracy and unresponsiveness to external stimuli, caused flat affect, which is undistinguishable from the flat affect that is also seen in psychosis.

Q And, Dr. Woods, just very briefly, affect?

A Affect is the external expression that one presents to the world, smile, frown, when someone tells a joke, you laugh. Affect is measured by range. There's ranges of affect. Depression, blunted affect; psychosis, flattened affect.

Q What's the difference in blunted affect and a flattened affect?

A Blunted affect means someone tells a joke, everybody else is just guffawing and that person is just kind of smiling a little bit. Flat affect means your face looks frozen. You literally have difficult moving. It's like Botox. Your face is literally frozen.

Q Thank you for that clarification.

Dr. Bradford, as you were reading, concluded that there was flat affect from the medication?

A That's correct.

Q You seem to be suggesting that it could also be present from psychosis?

A That's correct. As she said -- it's, again, what we have here, Ms. Harwell, are multiple cumulative effects. Cumulative effects from the medication. Cumulative effects from the disorders themselves. We have multiple cumulative effects.

Q Did Dr. Bradford offer an opinion about the role of genetics and the stressful traumatic life events in Ms. Montgomery's disorders?

A Yes.

Q And what did she say?

A That she had a moderately high risk genetically for bipolar disorder; that the childhood maltreatment contributed to her mental illness, as I talked about earlier; that the severe trauma contributed to her psychotic symptoms. In DSM-5, 2013 it was acknowledged that trauma can create psychosis, and that her genetic makeup plus traumatic childhood contributed to bipolar disorder with psychotic features.

Q What was Dr. Bradford's conclusion about Ms. Montgomery's medications at trial?

A No. 1, that she had no treatment for psychotic

symptoms; that she had therapeutic levels of valproic acid and Wellbutrin. And I can explain that. Basically it means they were as high as they should be. This is an important one, that some bipolar symptoms were reduced. If you talk to Ms. Montgomery, she said, Yeah, I mean, my mood was kind of stabilized a bit but my concentration was still impaired, my ability to focus was still impaired. She still reported frequent bouts of depression and manic and the negative symptoms, as I talked about, flat affect, were present in the courtroom.

Q Dr. Woods, when you now sort of related what Ms. Montgomery said, I just want to be clear. Those aren't the words she uses to express those things. That's your sort of psychiatric translation of that which she described?

A That's correct.

Q She doesn't speak to you in terms of my cognition is impaired?

A That's correct.

Q I wanted to make sure that was clear on the record.

And is it also true that when you've had the conversations with Ms. Montgomery that you were talking about just there, that the way she's able to reflect with you the differences that you're describing is because she now knows what it is for her thinking to be clearer?

A That's correct.

Q Let's talk about your opinions and conclusions. And I'd like to make clear, Dr. Woods, that I think I know that all of your opinions and conclusions are based on science and learning and evidence that was available in 2007; is that correct?

A Absolutely.

Q Okay. Was Ms. Montgomery's capacity to appreciate the wrongfulness of her conduct or to conform her conduct to the requirements of the law significantly impaired at the time of her offense?

A In my professional opinion, yes.

Q And why is that?

A Ms. Montgomery was suffering from lifelong impairments. The impairment of concentration, the impairment of being able to think effectively through a problem, the impairment of being able to effectively weigh and deliberate situations had been problematic for most of her life, and certainly things like her brain injury are things that do not go away. Her bipolar disorder at times, it can wax and wane, but what we see is that shortly after her coming into the jail facility, she was starting to get treated with medication. Someone picked that up. That even -- and even beforehand they picked that up that she had significant and multiple problems. Those problems existed at the time of the offense as well.

Q Was Ms. Montgomery under a severe mental or emotional

disturbance at the time of the offense?

A Yes.

Q And why do you say that?

A Again, the symptoms that Ms. Montgomery was suffering from were not acute. The environment in which she was in was a stressful environment so that certainly added to it, but we see the symptoms that we are now describing as being there with Ms. Montgomery for much of her life.

This was a woman who was homeless, whose children were homeless at times, who was fighting with the family consistently, who others in her family considered to be, quote, crazy in that nontechnical sense, who had real difficulty managing her day-to-day life. That was not any less at the time of the offense.

Q I'm sorry. It may just be that you were going one direction in your sentence, then changed. Did you say her symptoms were not acute at the time of the crime?

A What I said was that -- when I used "acute," I meant in the terms they didn't just start.

Q Oh, okay.

A That they had been there for a significant period of time. They just hadn't started a week before or two weeks before.

Q I'm sorry. You taught me a new meaning of acute.

A I apologize. Poor choice of words.

Q Was Ms. Montgomery's neurobehavioral history an important component of her social history?
A Her neurobehavioral history puts it all together.
Q What do you mean by that?
A When you understand that her brain does not function properly, it takes these behaviors and it translates them into symptoms. When you understand that the part of the brain, the right side of the brain, does not work accurately and there are motor findings of that as well as emotional findings, but if you don't have that, then your differential diagnosis, your ability to really understand where her symptoms come from is limited. So her neurological status is very, very important.
Q Did the prior assessments of Ms. Montgomery by the trial defense and government experts accurately reflect Ms. Montgomery's neurobehavioral history?
A No.
Q And what were the limitations that you saw?
A The limitations were that there was no neurological testing done, there was no psychological testing, and it gave us some clues, but there was no neurological testing done to get at her difficulty in other ways.

The understanding of the role of neuroimaging was limited, and the fact that the amygdala and hippocampus and other parts of her brain that really do impact trauma and behavior was not well understood. Certainly the role of her

being treated was not understood.

Q And when you say "was not understood," is that because the knowledge was not available in the period between 2005 to 2007 or is it because the experts didn't delve in?

A The knowledge was not available.

Q Must a reliable psychiatric assessment of Ms. Montgomery include the consideration of these neurological deficits that you've been discussing?

A Yes.

Q And why do you say that?

A Because we now know and we certainly knew in 2005 and we actually knew in 1995 that the brain counts; that the things -- that the behaviors that come from the brain, that are driven by the brain make a difference. Our understanding about how vulnerable the brain is was not really clear until the mid, I would say, 1984, 1985. But now we've had 30 years and at that time we had 20 years of looking at it. So this brain behavior is very, very important and it allows us to look at the difference of diagnosis much more accurately.

Q Did Ms. Montgomery's impairments and medications affect her ability to rationally assist her counsel prior to and during the trial in your opinion?

A In my opinion, yes.

Q And, again, why do you say that?

A Sure. Well, first of all, she did not receive

appropriate medication for her symptom complex. She received appropriate medication for parts of it but not for that part that allowed her to think, to concentrate, to read; and without that medication, she was unable to disclose the nature and extent of her trauma.

But we see this vulnerability, Ms. Harwell, back as early as 2003 where at that point the social worker is describing her thinking as being impaired, and in 2007 with Dr. Kuncel she doesn't speak to competency but she talks to being very concerned about how she's going to be able to handle a trial and how she's going to be able to function. Nothing changed between Dr. Kuncel's observation or that 2003 observation and the time that she was in trial.

If I might say one more thing. Again, if you look at the medical records of Dr. McCandless, she talks about her trying to read and not being able to read, looking at discovery and not being able to read discovery, not being able to focus, not being able to concentrate. All of that is within the CCA medical records.

Q And what effect does medication have on the ability to disclose complex trauma?

A It provides a foundation for your thoughts and your emotions. It provides a safety net that allows -- it's like building a building. Medications, when they work, really allows one to organize your mind, to think in much more

effective ways. Now Ms. Montgomery has been on medications for six years, and she continues to describe appropriately improvement in her thinking over those six years.

Q Did Ms. Montgomery, in your expert opinion, did her impairments and medication affect her demeanor at the trial?

A Yes. We talked about the motor sedation. Again, we can look at the records to see that she was feeling sedated during this period of time. It certainly is reflected in people's description of her as having flat affect, of being apparently uninvolved and difficulty showing emotion.

Q And, Dr. Woods, I didn't ask you in the formal legal magic language each time, but all of those opinions you just expressed you hold to a reasonable degree of neuropsychiatric certainty; is that correct?

A Yes, I do.

Q And, Dr. Woods, I want to ask you one more question about how all of these pieces you've described fit together. That is to say you sort of described many different component problems and I think you've indicated that some of them compound each other?

A Yes.

Q The problems that you've seen and that you've described in neuropsychiatric terms, were those borne out in Ms. Montgomery's functioning in the real world?

A Yes.

Q And what makes you say that?

A We see a young woman who, according to lay witnesses, was never able to function effectively, who had children she could not take care of, who had marriages that she could not be a part of, who moved from place to place often from a better home to a less effective home, and that's clear, who traveled at a whim without shoes. She talked about going to the Grand Canyon in the middle of the winter with just shorts on, just taking her children, and we see this in her workplace and we see it in multiple other places.

We see a family history of bipolar disorder and other disorders that can lead to psychosis, and we see in the long run treatment that has been effective, and that's a sad comment but it's true.

MS. HARWELL: Let me have just one moment, Your Honor.

I don't have any further questions. I believe the government may have some.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Woods, before we get too deep into this, I want to make sure I understand a couple pieces of your testimony clearly. I think during your examination you indicated that the use of valproic acid in conjunction with amitriptyline

increased the amount of amitriptyline in her blood; is that correct?

A That's correct.

Q But didn't you tell me -- or didn't you tell us, rather, that the valproic acid and amitriptyline compete for sites in the liver; is that fair?

A That's correct.

Q So if they're both given in the diagnostic way at a similar time, the valproic acids tends to exert dominance and go and take up the liver absorption spots, correct?

A That's correct.

Q So rather than valproic acid actually increasing the amount of amitriptyline in the blood, it simply prevents the amitriptyline from being readily absorbed and it prolongs the time the amitriptyline would be absorbed; is that correct?

A That's not correct.

Q You're saying that it makes more amitriptyline in the blood?

A It doesn't make more amitriptyline. The goal of the liver is to break down, to metabolize, these drugs. So if you've got the valproic acid taking up the sites, there's no place for the amitriptyline to be metabolized.

Q I agree. I thought that's what I said. Rather than increasing the amitriptyline in the blood, the amitriptyline is simply in the blood without an exit point?

A Right. That lack of -- that being in the blood means that it's exerting its effects on the rest of the body.
Q But it's not increasing the quantity of amitriptyline in there. When you say it "increased it," it prolongs its presence in the bloodstream, correct?
A It actually does both because it prolongs it but it also increases it because it's getting backed up. It's like if you think of the valproic acid as closing down that tunnel, okay, it does prolong the time that the amitriptyline can get in, but it also backs up the amount of amitriptyline in the body. So it does increase the blood level.
Q I think we're saying the same thing. We're saying it in different ways.
A Okay.
Q Let me get some timeline questions now. You got involved in this case in 2013; is that correct?
A That's correct.
Q So you would have gotten on the case some four years or so after Ms. Montgomery was prescribed Risperdal in July of 2009?
A That's correct.
Q And I believe, if I understand your testimony correctly, the Risperdal starting in 2009 July has been the most effective medication for clearing her thoughts?
A Yes. I think actually she was started shortly in 2009

and then was taken off and started again in 2010.

Q Okay. Regardless, she got it in 2009, then got it more full-time in 2010, correct?

A I think taken off, then put back on, yes.

Q But that's been the drug that's been the most effective in clearing up her thinking?

A That's correct.

Q And you've seen her subsequent to her being prescribed that medication on an ongoing basis from sometime in 2010 or thereabouts?

A Yes, sir. And I apologize. I don't know your last name.

Q Valenti.

A Mr. Valenti, I apologize.

Q Yes. When you were going through your credentials, sir, you indicated that you are a licensed medical doctor practicing psychiatry and neuropsychiatry in California, correct?

A Yes, sir.

Q Are you board certified in your specialty?

A In psychiatry, yes.

Q What about neuropsychiatry?

A I'm not board certified in neuropsychiatry.

Q Is there a board certification available in neuropsychiatry?

A About three years ago there became a board certification in neuropsychiatry.
Q And you've not sat for that board?
A I have not.
Q Can you tell the Court what it means to be board certified in a particular specialty, please?
A Sure. It depends upon the specialty, but board certification means that you have taken -- at this point in history you've taken an examination, it's a written examination, in order to pass your certification.
Q Is the board certification you hold in psychiatry for clinical psychiatry?
A It's general psychiatry.
Q Okay. Thank you.
Do you hold board certification in forensic psychiatry?
A No, I don't.
Q During the course of your testimony, you were asked about withholding in the context of Ms. Montgomery's discussion with various clinicians about her symptomatology. Can you tell the Court what a definition in psychiatry would be of the term "withholding"?
A Sure. A person that is withholding is someone that may not be willing to provide certain information.
Q In the legal system we have used and the Court has

heard testimony and the jury would have when this case was tried in 2007 about malingering. Are you familiar with that term?

A Yes.

Q And withholding and malingering are certainly different terms but do they have similar meanings? Someone not being completely truthful about their symptomatology?

A It could be.

Q You indicated through the course of your testimony the reliance upon several different experts and the conclusions they drew from the results of their individual analysis of Ms. Montgomery?

A Yes.

Q One of the people you talked about was Dr. Hutchinson, correct?

A Yes.

Q Were you made aware of the testing that she did in the neuropsychological setting regarding her psychometric testing?

A Well, she did not do psychological testing. She did psychometric testing.

Q Better answer than my question. You were aware that technically she didn't do it. A doctor working for her named Dr. Willing did psychometric testing on Ms. Montgomery?

A That's correct.

Q You were made aware of that?

A Yes.
Q Were you made aware of the computer profile indication that symptom exaggeration was going on when that psychometric testing was done on Ms. Montgomery?
A Yes.
Q Were you made aware when you talked with Dr. Kuncel -- I'm not sure I'm saying her name right.
A You're probably right.
Q Were you aware that Dr. Kuncel did psychometric testing on Ms. Montgomery?
A Yes.
Q Were you aware that she also had similar indications that Ms. Montgomery was involved in malingering, specifically in her instance while giving her the SIMS test? Are you familiar with that test?
A I am familiar with the SIMS. I don't recall it being malingering in either case, but it was certainly one of the differentials would be symptom exaggeration.
Q And to be clear so that I'm not asking you an unfair question, the SIMS, Structured Inventory of Malingering Scales test, you're familiar with that?
A Yes.
Q And in that scale it indicates that if someone scores greater than 14 on that particular scale, malingering is suggested but obviously more needs to be done, correct? Does

that sound familiar to you?
A Yes. It's actually a little bit -- if I can just, if you don't mind?
Q Sure.
A The SIMS was developed by Richard Rogers along with the SIRS. Both of these tests really -- and Richard Rogers, I think as late as 2001, acknowledged that neither of these tests were utilized or normed with people with any type of cognitive impairment, and so the difficulty with the SIMS, if you will note is not used anymore, is that it was not normed on a population that had brain injury or brain impairment of any type. So that makes it much more difficult to read in terms of malingering when the normative sample was not accurate.
Q Were you aware that Ms. Montgomery scored 16 on that scale?
A Yes.
Q Were you aware, and I believe you were, that Dr. Martell did psychometric testing?
A Yes.
Q And ultimately that Dr. Martell invalidated the MMPI because in his mind she had symptom exaggeration or malingered the results?
A Yes.
Q You took all of that into account when you testified today?

A Yes, sir.

Q You were aware of it. All right.

You also talked, I believe, Doctor, about affect, and I believe you broke it down into blunt versus flat affect; is that correct?

A Yes, sir.

Q You would agree that's probably a term for an expert in your field, blunt versus flat, correct?

A Yes, sir.

Q What I mean by that is that laymen probably don't use it in such a discerning manner?

A That's correct.

Q All right. If somebody or the average person understands intoxicated affect, jovial affect?

A Right.

Q And maybe something's not right, but blunt versus flat might be a bit too technical?

A That's correct.

Q All right. You indicated that in your testimony that her affect as it was testified to by some people could be a result of the drug interaction that you described, correct?

A That's correct.

Q You also indicated that it could be a symptom of psychosis that she was experiencing?

A Yes, sir.

Q Let me ask you this, Doctor, could it also be a reflection of the grave situation in which she found herself?

A No. And that's a very interesting question because we always assume that that's true. The grave situation that she found herself is an emotionally latent situation. Blunt affect and particularly flat affect are really cognitive findings. So we're talking about the flat affect of psychosis is cognitively developed. The flat affect of drugs is pharmacologically developed. So those are different. If you were saying she had another type of affect, yes, but not in that particular case.

Q Well, the reason I asked you earlier about the technical way you're using the term versus what a layman, because all the reports about her affect are all layman reports?

A Right.

Q So we're not -- technical people didn't describe her affect so we're stuck with flat?

A Actually Dr. McCandless did describe her affect as flat.

Q But not in trial?

A Not in trial, during trial.

Q The reason I ask you that is, sir, have you witnessed many defendants while they stand trial?

A Yes.

Q You've seen them in court?

A Yes.

Q You've seen many defendants in court while they're facing death penalty allegations?

A Yes.

Q Okay. And their affect can change greatly based upon the situation they're in, can't it?

A Yes.

Q Okay. And you treat patients, correct?

A Yes.

Q And you give those patients advice and treatment and regimens to try to improve their situation; is that correct?

A That's correct.

Q You would agree with me that lawyers who represent a criminal defendant are similarly, not in the mental health capacity, but provide a service to their client?

A Yes, sir.

Q And if the lawyer is suggesting to a client to maintain a certain affect, that would be important to your calculation, right?

A Yes, sir.

Q Okay. Because you can't appear too happy in front of a criminal jury?

A Yes.

Q You can't appear overly excited or jovial?

A Yes.

Q There's kind of a narrow window you would expect that a criminal defendant needs to, for appearances sake, need to maintain, correct?
A I can't really answer that. I understand -- but I understand the question that you're asking.
Q Okay. I think lastly, sir, I want to talk about some of your testimony in -- I believe you were talking about the brain impairment section of Ms. Montgomery, and in that you were indicating that a very important piece to you was sequencing, correct?
A Yes, sir.
Q And I believe the example you gave about sequencing issues was inability to create a menu; and as I understood your explanation, it actually sounded like your ability to follow a recipe. Is that what you meant?
A By and large, yes.
Q Okay. In other words, if you're going to make cookies, you know, when you put the flour in, the sugar, the eggs?
A Yes, sir.
Q Doing things in a logically progressive way?
A Yes.
Q Now, in December of 2014 there are some pretty sequenced events in Lisa Montgomery's life, weren't there?
A 2004?
Q December of 2004. I said '14. December of 2004.

Excuse me.
A Yes.
Q By that I mean you were aware that she did research --
A Yes.
Q -- on the victim in this case, Bobbie Jo Stinnett, right?
A Yes.
Q Not only did she do research on her, she did research on dogs, specifically Rat Terrier dogs?
A Yes.
Q Not only did she do that, she did research on how to conduct C-sections?
A Yes.
Q Not only that, she was able to create a false persona or fake person by the name of Darlene Fisher to engage in email communications with Bobbie Jo Stinnett?
A Yes.
Q Not only that, she was able to delete her criminal history in indication of trying to cover up what she was doing, correct?
A Yes.
Q In that sequencing she was able to bring a rope with her?
A That's my understanding, yes.
Q She was able to bring a knife with her?

A Yes.

Q She was able to bring a home birthing kit with her, and she was able to manage her way from where she lived in Kansas to Skidmore, Missouri, to Bobbie Jo Stinnett's house?

A Yes.

Q And with scant minutes of training on the Internet, able to successfully perform a Caesarean section on a live human?

A Yes, she did. She did cut her open, yes.

Q You're a medical doctor?

A Yes.

Q Learned how to do a C-section. It's not something you just do as in the Easy Bake Oven over night, is it?

A Yeah. I wouldn't hardly call it an effective C-section, but I do understand what you're saying.

Q Well, an effective C-section for you is where the mother and the child both live?

A Yes.

Q An effective C-section for a Caesarean abductor means getting the baby, and she got that done, didn't she?

A Yes, she did.

Q And that's a pretty well -- good sequence of events that she was able to accomplish in December of 2004 before she was being treated for any mental health issues and before she was on Risperdal?

A It's difficult to look at the sequences. Those are all the things she did. It's much, much different to say these were a function of a sequence, but she did do each of those things.

MR. VALENTI: That's all I have, Your Honor.

MS. HARWELL: If I might have a moment, Your Honor?

THE COURT: All right.

MS. HARWELL: Very few questions, Your Honor. Just a tiny bit of cleanup.

REDIRECT EXAMINATION BY MS. HARWELL:

Q Dr. Woods, I know you reviewed at some length our referral questions to you. We did not ask you to opine as to whether Ms. Montgomery was NGRI or not?

A That's correct.

Q You talked about a differential diagnosis being a part of the things indicated, I think, on the SIMS?

A Yes.

Q And that one of the things that should be considered according to the report generated was symptom exaggeration. Fair to say there were other things to be considered as well?

A Yes. Malingering is not a diagnosis. Malingering is a lack of a diagnosis. Malingering is not part of DSM-5. It's in the -- in terms of system, it's really what we call the V codes. So when you look at each one of the tests that Mr. Valenti described, symptom exaggeration is what was found.

The cause of this symptom exaggeration is really much, much different. Symptom exaggeration usually looks at three areas; can this person read effectively for the MMPI? It's a fourth grade level. MMPI-1 is sixth level.

Can the person -- does the person have significant psychiatric pathology, and is this in fact a cry for help? So what we see is that at each time that she was given the MMPI, she was -- at least with Dr. Hutchinson, with Dr. Martell, she was actually -- and with Dr. Kuncel now that I think about it, maybe she was being treated for a significant psychiatric disorder. In many ways she was really in an inpatient setting being treated with psychiatric medications at the time that she was taking these tests. So it makes sense that one would look at that symptom exaggeration, and I might also add symptoms that were not completely under control.

Q And, Dr. Woods, the Court heard yesterday a long -- you've read Dr. Sanislow's report -- discussion of sort of the subscales of the MMPI?

A Yes.

Q You're familiar with a lot of that data and how those scales are weighed and what they indicate?

A Yes.

Q I'm not going to ask you to go into any of those subscales. I just want to ask you if in your review of some of that underlying data, you found actually a lot of the things

indicated were things borne out in the biopsychosocial history?

A When you look at the overall question of symptom exaggeration on those tests, particularly Dr. Martell's testing, you have to go into the details. If you look at the detail of the subscales, you'll find that in fact there is not evidence of willful exaggeration. There is evidence of symptom descriptions that are -- that are severe. So if she talks about family alienation, well, that makes perfect sense given her social history. She talks about personal alienation. That makes perfect sense given her social history. So these extremes are extremes in the very area that the biopsychosocial history reinforces.

Q Mr. Valenti made the point that Dr. McCandless wasn't observing Ms. Montgomery's affect during the trial. Dr. McCandless was not actually in the courtroom observing Ms. Montgomery in the courtroom?

A Sure.

Q But she was observing her during the time period which encompassed the trial?

A That's correct.

Q And she was taking notes and making reflections?

A That's correct.

Q All throughout the trial; is that fair to say?

A That's correct.

Q When we talk about -- when Mr. Valenti talked about

attorney instructions, you admitted, of course, you don't know what counsel told Ms. Montgomery to attempt to do with her face as she sat at counsel table?

A That's correct.

Q Fair to say with these drugs on board, those drugs would overwhelm many of her abilities to appear in any particular way?

A Yes. These affect directly the motor functioning of those muscles. So no matter what they may have told her the drugs were No. 1.

Q Thank you.

MS. HARWELL: No further questions.

MR. VALENTI: Nothing further, Your Honor.

THE COURT: Thank you, Doctor. You're excused.

THE WITNESS: Thank you very much.

(Witness excused.)

MS. HENRY: Your Honor, movant calls John O'Connor.

JOHN O'CONNOR, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Good afternoon, Mr. O'Connor.

A Good afternoon.

Q If you would state your name for the record, and I think the court reporter probably knows how to spell it.

A John O'Connor.

Q Mr. O'Connor, thank you so much for your willingness to

wait for us for a few hours this afternoon. We do appreciate that.

MS. HENRY: Your Honor, before we start with Mr. O'Connor's testimony, I'm sorry, I neglected to inform the Court and should at this point that movant will now withdraw claims -- three claims in our motion, and I would like to state for you what those claims are and where they are found in the motion, with the Court's indulgence.

Those are all under what is subheading 5, ineffective assistance of counsel, and we are withdrawing subclaim 11 as it is referred to in the Court's memo, which would be page 2 of the Court's memo regarding matters for hearing that would be found on page 167 of the motion, and that relates to ineffective assistance of counsel and the handling of the Mary Case testimony. That's the first claim.

Secondly, we are withdrawing subclaim 20 of claim Roman V, which is found at page 3 of the Court's memo and page 188 of the movant's 2255 motion that relates to ineffective assistance of counsel with respect to the handling of the Laboy, Espey, and Gatewood testimony

And, finally, we are now withdrawing subclaim, I believe that's 24, of Roman V, page 3 of the Court's memo and page 193 of movant's motion, and that relates to ineffective assistance of counsel with respect to seeking to exclude the 911 tape.

Can we be in agreement with that, Mr. Valenti?

MR. VALENTI: I'm okay with it.

THE COURT: All right.

MS. HENRY: Thank you, Your Honor. We'll move forward from there. If I can have a minute to get my exhibits in order.

Q (By Ms. Henry) So that should shorten things up a bit, Mr. O'Connor.

A Thank you.

Q Mr. O'Connor, I'd like to -- that's a predicate question. You were appointed counsel on behalf of Mrs. Montgomery in May of 2006; is that fair to say?

A That's correct.

Q And you were contacted by Magistrate Maughmer shortly, three or four days, before you were actually formally appointed and he inquired of you whether or not you would accept appointment in the matter; is that correct?

A I believe it was Judge Maughmer. It could have been Judge Fenner. I honestly don't have a recollection of that, but it was one or the other.

Q And when you were approached about your willingness to accept the Montgomery case, you reached out to resource counsel, a man by the name of Dick Burr, and inquired of him whether or not he might suggest co-counsel for you in the Montgomery matter; isn't that true?

A Again, I don't have a recollection of that. If Mr. Burr does, I would go by his word. I don't remember doing that; but if you say I did and he says I did, I don't say I didn't.

Q So if Mr. Burr testified before his Honor last week that you had asked him for a list of qualified capital lawyers who might come in and assist you, you have no reason to dispute his testimony?

A I don't but I -- honestly, when you asked me that last week, I do not have a recollection of doing that. I don't. But it's been nine years so I would have to say I don't know for sure.

Q Sure. So last week when I asked you about it, you didn't remember it; but if he's testified to it and you're not disagreeing, we're not going to get into a big fight about that, right?

A Again, I don't have a recollection of it, and I don't know Mr. Burr. So if he said that he did talk to me and maybe there will be some long distance call or something, I would not say -- but I honestly do not remember doing that and somewhat believe I wouldn't have; but, again, I don't -- I don't have a recollection. I apologize.

Q At some point Fred Duchardt came in as your co-counsel in this matter; is that correct?

A That is correct.

Q And when you agreed to accept appointment on behalf of Mrs. Montgomery, you recognized even before you were appointed that this case was going to involve issues of Mrs. Montgomery's mental or psychiatric illness?

A And, again, I read about the case in the paper. I wasn't following it in terms of who the lawyers were involved until I found out later. Obviously first thought about that kind of a case was mental -- it would be a mental defense. So I think, then, once getting here and hearing about the case, it seemed very apparent to me that would be the case.

Q And I want to be very clear, Mr. O'Connor, I'm not going to ask you any questions about issues relating to the removal of previous counsel, because that has already been ruled on. His Honor has made it clear he doesn't want us to delve into those areas.

A Okay.

Q So I think you've answered my question. You recognize this was a case involving psychiatric illness and you -- I think you shared with us when you sat down with us in the United States Attorney's Office, that that wasn't particularly your strong suit. You needed some help?

A Well, basically when you're in private practice, you get very few murder cases where you're hired. Most of the cases that I've had are of those type. Although I have had and we've had mental defenses.

As you know, the public defender handles the lion's share of the murder cases and cases where mental disease or defect is the defense. I've had it as a defense but not as often as someone like Mr. Duchardt or yourself or others who have done this for a longer period of time.

So if given the choice of having another counsel, and I'm not saying I was given a choice, but I did make a request, but that was certainly up to the Court to make an independent decision on that, I preferred to have someone who had that experience.

I had just gotten off a capital case that Fred and I did together over in Kansas City, Kansas, and we got to talking and I knew about the Purkey case and I just knew anecdotally about Fred's career of handling cases involving cases of mental disease or defect; and so I thought, you know, where someone's facing the death penalty, you want to bring to bear as much as you can their experience if it's allowed.

Q So the answer to my question is yes?

A I guess maybe that's a long way of saying yes.

Q And recognizing that you wanted someone else to come in and help you, you did know that David Owen for the Federal Public Defender's Office was already assigned to the case?

A I was aware of that, yes.

Q And David Owen was very clear and candid with you that he did not have the type of experience necessary to be able to

shoulder the psychiatric illness mitigation aspect of this case?

A Again, I had not talked to David at the point I was appointed. I only figured that out in terms of the fact that others were also involved. I don't think they would have been involved just kind of knowing other capital cases because in other capital cases when the attorneys are appointed, there are normally two; and if the public defender could be appointed, they would be because of their resources, and they haven't been, meaning they didn't have someone there with the experience of capital cases. So I just assumed that. It turned out to be true, but I did not know that for sure.

Q Now, you've mentioned -- well, let me ask you this: I'm going to pull apart that question about Mr. Duchardt and his reputation. But let's talk about David Owen. Were you aware at the time that Mr. Duchardt was appointed as second chair counsel, learned counsel, I should say, in this case that Mr. Owen and Mr. Duchardt -- or actually -- well, let's just leave it with Mr. Owen. Mr. Owen and Mr. Duchardt preferred not to work with one another?

A I don't believe I knew that, no.

Q Let me ask you, sir, about the case that you and Mr. Duchardt worked on together over in Kansas City, Kansas. I believe when I asked you about that case -- well, back up. That case involved a gentleman by the name of Demetrius

Hargrove; is that correct?
A That's correct.
Q And I believe when I asked you about Mr. Hargrove's case, again, when we sat down in the United States Attorney's Office, you told me that that case wasn't so much a mental health case as it was one of factual guilt or innocence?
A I think that's a fair statement.
Q And Mr. Hargrove was actually convicted of first-degree murder?
A That is correct.
Q And you would agree with me that residual doubt is a very strong mitigating circumstance?
A Sure.
Q And Mr. Hargrove was sentenced to life without parole?
A That is correct.
Q You mentioned Mr. Duchardt's work on the Purkey case. You said you were aware of that?
A Just in conversations with Fred during when -- we were together for, like, two years so we got to talk a lot about our cases, and so that's how I learned about the Purkey case.
Q Told war stories like lawyers do?
A Exactly.
Q And you were aware that Mr. Purkey received a death sentence?
A That's correct.

Q And were you aware of the fact -- well, let's talk for a moment about his State work. You said you were aware of his work in State court?
A Just anecdotally over the years. And then, again, we talked about different cases over the years, as you have said.
Q So you were aware that he represented a very mentally ill young man, 16-year-old young man, Keith Wilkins, in Clay County, Missouri, correct?
A I don't know names and I don't remember.
Q Mr. Wilkins was the subject of a United States Supreme Court opinion, Wilkins v. Missouri, that upheld the death penalty for 16-year-olds. You knew that?
A I may have heard about that back at the time; but, again, I don't -- I kind of remember you saying it, but do I remember it or did Mr. Duchardt mention that case? I can't say he did or he didn't.
Q So were you aware with Mr. Duchardt's vast experience with capital cases in the state of Missouri that he allowed a mentally ill 16-year-old to waive counsel, plead guilty, and ask to be sentenced to death?
A I was not aware of that.
Q And were you aware of the fact that conviction was ultimately overturned prior to Roper v. Simmons and that Mr. Wilkins is now in prison?
A I was not. I may have been aware of it, like maybe I

read about it, but I did not put the two together.
Q And were you aware of the fact that Mr. Duchardt has the distinction of having the most people on federal death row?
THE COURT: Now or then?
MS. HENRY: Then and now.
A I was not aware of that.
Q (By Ms. Henry) Now, with respect to the work that began on Mrs. Montgomery's case after Mr. Duchardt came into the case, you were appointed lead counsel; is that correct?
A That's correct.
Q And Mr. Duchardt was appointed learned counsel; is that correct?
A That was my understanding.
Q And you and Mr. Duchardt agreed to split responsibilities, wherein, you would be responsibility for the guilt/innocence aspect of the case; and when I say that, I mean factual guilt/innocence; is that correct?
A In essence of dividing the work, yes; but as to his responsibility as to the whole case, I think we were both responsible. I guess me being lead counsel you want to say more responsible, but I never gave up that responsibility other than the idea of Mr. Duchardt would handle a certain part of the case and I would handle a certain part and in discussions with Dave Owen he was going to handle a certain aspect of the case.

Q Certainly. And to be clear, I mean, you've made it clear in your statement that you filed with the Court that you accept full responsibility for all of the decisions that were made as lead counsel but in capital cases you do have to delegate; is that fair to say?
A That's fair.
Q And you delegated the mental health and mitigation aspects of the case to Mr. Duchardt based on your understanding of his expertise with mental health issues?
A I would say to a great extent, yes, but not to a full extent, if that makes sense.
Q Sure. And we'll be talking later about the work you ultimately did in October of 2007 with Dr. Logan; but backing up to the beginning stages when you're preparing the case to move forward, temporally we are in the summer of 2006. Mr. Duchardt was at that point charged with beginning to put together the mental health aspect of the case?
A I would say that's probably fair.
Q And Mr. Owen ultimately was charged with handling the computer forensic aspect of the case because that was his particular skill set?
A I think that's a fair statement.
Q Now, almost immediately upon accepting appointment in the Montgomery case, Mr. Duchardt made it clear to you that he was not going to be able to develop -- devote much time to Mrs.

Montgomery's case because of his responsibilities in another capital case; isn't that true?

A I'm not aware of that, no.

Q He didn't tell you that he was going to have to work on the Street case that was tried in 2006 and that he couldn't really turn his attention to Mrs. Montgomery until after the Street case?

A I do not have a recollection of that conversation.

Q If Mr. Duchardt recalls that in his sworn statement, would you have any reason to disagree with him?

A If he said it in the way you're saying it, I think -- and I don't know how you're saying it. If you're telling me he doesn't have time to do the work, then I would hope and believe he would not have accepted appointment; but if he said, I may need to devote more time to the Street case for a period of time before I can devote time to this case but I can devote the time, then I'm not saying that didn't happen, but I don't have a recollection, no.

MS. HENRY: Your Honor, we would ask the Court to take judicial notice of the docket entry in the case of United States v. Phil Street, which is 4-04-CR-00298-GAF.

THE COURT: Notice is taken.

MS. HENRY: Thank you.

Q (By Ms. Henry) Now, as the case moved forward during the summer of 2006, Mr. O'Connor, you were aware, were you not,

from Mr. Owen that there had been another mitigation specialist in the case that Mr. Owen had fired from the case, a woman by the name of Holly Jackson?

A I think -- again, my recollection is there was some discussion about that, yes.

Q And Mr. Owen then hired another mitigation specialist from the Federal Public Defender's Office named Dani Waller?

A I think that's correct.

Q If Ms. Waller has testified before the Court that she doesn't have much of a recollection of ever meeting with you, would you dispute her memory?

A I would dispute her memory because I remember talking with her.

Q When do you remember talking with her?

A Again, we're going back nine years. We had discussions at some point in time, I'm confident, but to tell you, as I sit here right now, an exact time and exact conversation, I cannot.

Q Nothing really sticks out?

A No, ma'am.

Q And this team that was put together, this final team that was put together for Mrs. Montgomery's capital murder trial was one that did not have very many lengthy team meetings; is that fair to say?

A I would say that's fair, yeah.

Q And when we're talking about trying to put things in

time, Mr. O'Connor, your time sheets, your time records in this case have already been moved into evidence as Movant's Exhibit 84, and you've talked about your time records and I asked you about them before.

A Sure.

Q And is it what you told us that in your statement, your sworn statement before the Court that your time records do not accurately reflect the time you spent in this case?

A Let me make sure that we're saying that right. The records -- the time that I did put in the records are accurate. In terms of the amount of time that was spent that was not in the records would be, I guess, inaccurate to that extent; and I think, as I think I told you, I'm not trying to be self-aggrandizing to myself, but about every federal case I've ever done I don't bill for all my time, and I'm just -- so I know that there's a lot of time, especially in this case, and others, that I just don't -- I'm not good at doing that probably, and I don't do a lot of it because, again, I have another practice, and so with people who do this all the time and every hour that they spend they write down. I just don't.

Q And let's talk about it. You told us very candidly that you're not a really good guy, not really good about keeping track of your time and every month when you're trying to put together your vouchers, you're having to go back and try to recreate what you did and how long you spent. And no one is

suggesting an overbill. Let's be very clear. But what you told us is that you're trying to recreate your billing and you do it to the best of your memory at the end of the month; is that fair to say?

A Yeah.

Q And if you -- you might let a two-minute phone call go; fair to say?

A I could let a 30-minute, 40-minute, hour, two hours. I mean -- and, again, I'm just trying to be candid without being self-aggrandizing. I think there could be as many as 80 hours that are not in there. I mean, I honestly do because I just don't keep track in that terms, and I don't sit and write every time I move as to what I'm doing, which is probably not a good practice; but in the criminal practice I've had over my career, you normally set fees because people are not used to paying by the hour; and, of course, if they're not happy with the outcome, chances are you won't get paid at the end. So you kind of set your fees accordingly. So an hourly way in terms of other than appointments, I would bet you I've had hourly clients, maybe a dozen over the years, because if you're not representing corporations, you're representing people in that regard. So that's something that I never got kind of accustomed to or used to.

Q Sure. And I'm not trying to be quarrelsome. I'm just trying to figure out how to be accurate. And so you were

appointed in May of 2016 and you served until January of 2008. So that is, by my count, 12 plus nine is 21, 21 months and about 80 hours short on the time. We can accept that.
A Again, I don't even want to say 80 hours. It could be more. It could be less. I mean, I'm just telling you that it could be that big of a number is, I guess, what I'm trying to tell you.
Q And so you would, for example, agree with me that one of the things we talked about, you said Mr. Duchardt does do these capital cases for a living so he does bill all of his time. So any time that he's billed as far as meeting with you or having a team meeting, you would accept his time records as accurately reflecting the time the team met?
A I would assume he would be a better bill keeper than me; and if he had in his records that he met with me or had times he met with me, I would accept those to be true.
Q And so if the time records that Mr. Duchardt kept showed that the team did not meet as a full team more than about ten hours between May of 2006 and January of 2007, you would have no reason to dispute that?
A As it relates to his records on whether we met. I don't know there would be records where I met where he wasn't there. I don't know. I know that that happened but I don't know to the extent of it.
Q So we'll have to rely on whatever records we have?

A I guess so.
Q Fair to say?
A I guess that's fair to say.
Q And also fair to say you do cases on retainer, you do cases appointed under CJA. When you get appointed on cases that are capital cases, that's the highest paying case you're going to get as somebody who takes appointments; fair to say?
A Because of the hourly rates, I guess that's correct.
Q So -- and you're a businessman. You have overhead?
A Yes.
Q You have a secretary to pay?
A Yes.
Q And you have office overhead to pay for?
A Yes.
Q And you're a pretty successful businessman so you must have made sure that you didn't go broke?
A I haven't yet.
Q Okay. And also with respect to the time that you met with Mrs. Montgomery, if we can't rely on your time records, we'll have to rely on the CCA visitation records; fair to say?
A I think that -- and you asked me that question the other day. The only other time -- obviously we had court hearings and we also had court hearings regarding the expert testimony when Ms. Montgomery was here where we would meet with her and talk with her during those periods of time. So after I

left your office, I'd forgotten about that, and that would be obvious, I think, from that. So as it relates to that, that would be -- those records at CCA plus anytime we were in court with her, recesses, lunch hour, whatever where we had discussions with her about her case.
Q So sure, of course, during the trial you talk with her at lockup, maybe over lunch break, something like that?
A I'm talking about the motion hearings.
Q So there was a motion hearing in August of 2007 shortly before the trial. So you would have met her at lockup then?
A Again, I don't have an independent recollection but I would assume we would have since she was here.
Q Well, the only pretrial motions I'm aware of, sir, are the motion for continuance in April of 2007. You remember that one?
A I have no memory of it, but I'm sure -- I'll take your word for it if you have the dates.
Q Then there was an untranscribed hearing on May the 9th regarding problems that Mrs. Montgomery had with this government's evaluation. You recall that?
A I don't recall it, but I don't -- again, when we talked, I'm not casting anything to you, but I'm just saying if you had something you wanted me to look at before I came, but I turned over all my records to the defense counsel, not you but Ms. Nouri when she requested, I don't know, three years ago. I

have no records. I have nothing to go back to to refresh my recollection. So I'm just trying to do the best I can from memory. So all I can do is that. I'm sorry.

Q So whatever the records reflect, the pretrial motions; motion for continuance, motion regarding mental health exam, and Daubert hearing, you would have met with Mrs. Montgomery all of those occasions?

A I would have assumed we would have, yes.

Q But you have no independent memory of meeting with her?

A I don't, but I mean every defendant I've represented during recesses, and so on, we're up talking to the defendant or interacting or out here interacting. So I would have assumed that we would have, but to tell you right now I have an independent recollection of that, I'm sorry, I can't.

Q If the CCA visitation records show that between May of 2006 when you were appointed and January 11th of 2007 you spent approximately four hours with Mrs. Montgomery at CCA, would you have any reason to dispute those records?

A If that's what the records say.

Q If the records indicate that you did not meet again with Mrs. Montgomery from January 11th, 2007, until you were in court on April the 3rd, 2007, you would have no reason to dispute that?

A Again, I've not seen the records; but if that's what you say the records say, that's what the records say.

Q And we're going to discuss the April 3rd, 2007, motion in some detail, but let me check my notes to see if we can back up a little bit in terms of our chronology here because I want to be able to keep us in order.

So going back to that summer of 2006, I want to ask you some questions about individuals who you may or may not have reached out to.

MS. HENRY: And to be clear for the United States, for the government and for Court, I'm asking these questions about information gathering, not about questions on claims 1, 2, and 3 in the motion.

Q (By Ms. Henry) Did you have a conversation with an attorney by the name of Judy Clarke regarding information that she obtained during her representation of Lisa Montgomery?

A I did not.

Q Did you have a conversation with a mitigation specialist by the name of Debra Garvey regarding her work that she had conducted and the information she had gathered on behalf of Mrs. Montgomery while she represented her?

A Again, I'm pretty confident I did not, but I can't sit here and say absolute that I'm pretty confident. I don't remember having a conversation with anyone outside.

Q And so then that would mean that you also did not have a conversation with a man by the name of David Freedman who was the person charged with identifying the mental health themes of

Mrs. Montgomery's case prior to your taking over the representation?
A I do not believe I did.
Q And you did not have a conversation -- you didn't even know who these people were at that time; is that correct?
A Again, I don't have a recollection one way or the other to be honest with you.
Q Let's talk a little bit about your training in capital cases, Mr. O'Connor. I believe you told us when we met with you at the United States Attorney's Office that you have not attended any federal death penalty strategy sessions that are sponsored by the Federal Death Penalty Resource Counsel Project; is that correct?
A I had not.
Q And you have not attended any seminars specializing in death penalty litigation by the National Legal Aid Defender Association, specifically Life in the Balance?
A Had not.
Q You have not attended the annual capital case seminar sponsored by the California Association for Criminal Justice held in Monterey, California, every February?
A Had not.
Q And, in fact, you have not attended any capital specific seminars outside the state of Missouri?
A I think that's a fair statement.

Q The extent of your training on capital representation involves attendance at seminars sponsored by the Missouri Association of Criminal Defense Lawyers; is that fair to say?
A Again, that's my best recollection.
Q Now, when you --
MS. HENRY: Your Honor, I note that it is five till five. I'm about to get into another area, and I don't think I'm going to be able to complete my direct examination of Mr. O'Connor at this time, and I was wondering if it would be an appropriate time to recess?
THE COURT: How long do you have with Mr. O'Connor?
MS. HENRY: I probably have about another 45 minutes.
THE COURT: Is the government going to have a fair amount of cross?
MR. VALENTI: I will take 15 minutes, Your Honor, in respect to the schedule. If you want to keep going, I'll keep going.
THE COURT: Do you have a preference?
THE WITNESS: Judge, I'd rather keep going only because I'm supposed to be in Jeff City in the morning for sentencing, for federal sentencing at 11 and 1, but I'm willing to come back. I've let the other Court know of the potential problem.
THE COURT: Well, let's go a little bit longer and

we'll see where we're at at 5:15. If we can finish up today, that would be good. If not, we'll get as far as we can.

THE WITNESS: Thank you, sir.

MS. HENRY: I would also let Your Honor know that we do intend to complete our proof tomorrow.

THE COURT: Pardon?

MS. HENRY: We intend to complete all of our proof tomorrow, just for your scheduling purposes.

THE COURT: All right. Not to delay Mr. O'Connor, but are you going to take all day tomorrow? Just so the government knows about their witnesses.

MS. HENRY: Depending on their cross-examination, I think it's likely we will take all day, at least until about three o'clock.

THE COURT: All right. We'll talk about that more.

MS. HENRY: Thank you, sir. I apologize for the interruption.

Q (By Ms. Henry) I want to ask you, sir, about your -- I'm going to jump out of chronological order and I'll skip back to the chronology in a minute. But I want to talk with you a little bit about David Owen.

A Okay.

Q Okay. Did there come a time in your representation of Lisa Montgomery that you became aware that David Owen had been demoted as First Assistant Federal Public Defender?

A You asked me that the other day and I might have. I don't have a recollection of that. I don't. But it seemed like something -- like I told you, there was something that happened that I was made aware of by Mr. Conrad, but the specifics of it I couldn't tell you. I absolutely didn't know.
Q And just to get our chronology straight, you know who Laine Cardarella is?
A Yes, I do.
Q And she's testified before the Court that Mr. Owen was demoted after the public defender's office was ordered to withdraw from the Elbert case, United States v. Elbert case. You wouldn't dispute her testimony?
A I wouldn't dispute anyone's testimony that I'm not aware of. I'm assuming she testified truthfully, so I guess no.
MS. HENRY: Your Honor, I'd like the Court to take judicial notice of the docket in United States v. Elbert, Case No. 06-00257-01, docket entry on February 20th, 2007, which was the date on which the public defender's office was ordered to withdraw.
THE COURT: Granted.
Q (By Ms. Henry) We'll get back to February 20th, 2007, as a tipping point in this case, Mr. O'Connor.
A Okay.
Q Having not had an opportunity to reach out to and talk

with the previous members of Mrs. Montgomery's trial team, did you rely on Mr. Owen to inform you of any significant event or discoveries that had been made previous to your representation?

A I don't know that I understand your question. I'm sorry.

Q Would you have wanted Mr. Owen to tell you any significant discoveries that had been made by the previous team?

A I would assume. You know, he's an attorney. If he had information he thought that we should be aware of, hopefully he would have told us, yes.

Q And did you count on him to volunteer that information on his own?

A Again, I would hope if he had information that he thought was helpful to the defense of any client and we were not involved as a team together, that he would provide whatever information he had and for us to all decide whether or not that was important or not.

Q Do you think that it would be fair for the previous counsel who had been removed from the case to assume that Mr. Owen would share with you the discoveries that had been made in the case?

A I don't know if that's for me to answer.

Q Let me ask you this: If previous counsel had already investigated the Tommy defense and determined that Mr. Kleiner

had an alibi, is that something you would have wanted to know?
A Well, in light of what later happened, absolutely.
Q And if the previous counsel had investigated Dr. Ramachandran and already decided that they weren't going to use him as an expert in the case because they didn't feel he was qualified, is that something you would have wanted to know?
A It would be something you would want to consider.
Q If the previous team had already decided that pseudocyesis as a basis for a not guilty by reason of insanity defense was not going to be a credible defense on behalf of Mrs. Montgomery, is that something you would have wanted to know?
A Again, you want all information that you can get in any case to make independent decisions. Now, whether your decisions would be different or you may disagree with their analysis of what may or may not be appropriate, that's another question. But in terms of if you can have as much information as you can have, information is good.
Q Sure. So if you knew that, for example, a man by the name of David Freedman had said, You know what, I've looked at this, it doesn't work with the facts and the evidence, would you have wanted to have a conversation with him and say, Well, why did you think that and let's talk about it?
A I'm assuming you probably want to talk about it, yes.
Q But because you weren't present at those previous team

meetings, you would need Mr. Owen to share that information with you to know what had happened?

A I think that's a good assumption.

Q Or to call David Freedman yourself?

A Again, if you don't know that information, I wouldn't have called Mr. Freedman.

Q Or Mr. Duchardt to call Mr. Freedman?

A Again, that would have been -- I don't know what knowledge Mr. Duchardt had, whether or not Mr. Owen shared information with Mr. Duchardt that he didn't share with me. I only know what I know.

Q Now, we spoke about Mr. Duchardt and his representations to you and your conversations with him during the Hargrove case about his knowledge of mental health. Were you aware of Mr. Duchardt's disregard for experts who are called mitigation specialists?

A I don't think we had any conversation along those lines. If we did, I don't remember them.

Q Were you aware of the fact when you were working with Mr. Duchardt that he has expressed, openly expressed disdain for the use of mitigation specialists in capital cases?

A Again, I don't remember that in discussions between him and I.

Q Do you believe in the use of mitigation specialists?

A I do.

Q Do you believe the mitigation specialist can be an important part of a capital team?
A I do.
Q And do you believe it's important to read all of the reports that a mitigation specialist provides to counsel in the case?
A Assuming the reports -- the information they're gathering is -- that's the purpose of getting the information is for it to be reviewed and used.
Q And you've been a trial lawyer for a really long time so -- I don't mean to date you. I've been a trial lawyer -- I wasn't a trial lawyer for a long. We may be about the same generation. Anyway, you've been a trial lawyer so you're aware of the fact that sometimes when you're working on a team, folks don't write things down, they just call each other up?
A That's probably fair.
Q And so if there were conversations that the previous trial team had where they maybe ruled things out so they didn't take the time to say, Hey, you know, let's write a memo about the fact that we're not going to follow up with this pipe dream, that's not going to surprise you that they wouldn't write something like that down?
A I mean, what I don't have I don't have. What they didn't write down they didn't write down. I don't know one way or the other.

Q And so sometimes those breakdowns in communication, turnover happens and information gets lost in the turnover, right?

A I assume that can happen, sure.

Q Now, you knew that Mrs. Montgomery -- you were aware of the fact that in the summer of 2006 when you and Mr. Duchardt began your representation of Mrs. Montgomery that she had some serious trust issues with the Office of the Federal Public Defender, the local office here? You were aware of that?

A I don't know if we were made aware of it once we got together with Ray Conrad and with Stephanie and everyone, but there was clearly -- it came up that she had issues with men. Now, whether specifically with the public defender's office, I don't have an independent recollection of that, but I do remember distinctly that there were issues about that for sure.

Q So you recall that Mrs. Montgomery did have trust issues with men and you attributed that to her -- let me ask that. That was a compound question. That's a bad thing to do. Let's back up. You were aware of her trust problems with men?

A Of what I was told, yes.

Q You were told that was because of her trauma history?

A Her what?

Q Her sexual abuse history?

A I don't know that I was told the reason, but I think eventually I learned the reason, but at the time when we first

got in the case, there were just -- there were trust issues with men is kind of what I was told as a generalized statement.

Q And yet to be clear, because it may not be clear from the record, the mitigation specialist's name is Dani Waller and Ms. Waller is in fact female; is that correct?

A Yes.

Q So the members -- female members of the defense team from 2000 -- May 2006 through January 2008 were Ms. Waller and Ms. Elliott?

A Correct.

Q The mitigation specialist and the paralegal?

A Right.

Q But Ms. Elliott, though she's a lawyer, had no previous capital experience and no mental health experience?

A That's correct. But it was my understanding, I believe, that she had developed or had developed some relationship with Lisa and was visiting Lisa either with Ron Ninemire or at least Stephanie herself and had built up a rapport that we wanted to continue with until Fred and I could try to build that relationship that we needed.

Q Sure. So Ms. Elliott continued to visit with Ms. Montgomery but in doing so, she didn't have training and background or experience to identify mental health symptoms?

A Again, I didn't know much about Ms. Elliott's experience other than what you've said, so I didn't have

information that she had that expertise or not other than just someone that, as I understood it, felt comfortable with, talked with, trusted. So as long as we had someone in that communication role, we kind of felt -- or at least I felt we needed to ease into it, for lack of a better word.

Q So Ms. Elliott would have social visits with Ms. Montgomery?

A That was my understanding.

Q So the only female member of the team who had any sort of training in mitigation was Ms. Waller?

A Female member you're saying?

Q Yes.

A I think that's true.

Q And Ms. Waller visited with Mrs. Montgomery only a handful of times?

A And, again, whatever she said she did, I don't have a recollection of that.

Q And Ms. Waller, because she was employed by the Office of the Federal Public Defender, took her direction from Mr. Owen?

A Well, again, I'm assuming that either Mr. Owen or Ray Conrad had talked with her about that. I don't know. But I'm assuming that that probably happened.

Q And is it also fair to say that the Office of the Federal Public Defender, Ray Conrad and through him Dave Owen,

controlled the purse strings for the experts in the case?

A I don't know if that's a true statement or not in this regard. I mean, I always felt in that case or any other case if there was a need for some other expert, that we always resort back to the Court for that kind of a situation. So I guess to some extent they were able to provide funding, but I don't think they were the sole -- in my opinion, wouldn't have been the sole funder unless the Court rejected our request for funding.

Q You never made any request for funding to the Court, correct?

A I don't believe we did.

Q Now, I want to get into this issue of women on the case because there came a time, you later learned after the fact, that Mr. Duchardt brought his wife in to visit with Mrs. Montgomery; is that correct?

A I think that's when they were out in Pennsylvania doing the testing.

Q And you were aware only after the fact that Ryland Duchardt had accompanied her husband, Fred Duchardt, to visit with Mrs. Montgomery?

A Again, could Fred have told me that before he went? Yes. Could he have told me afterwards? Yes. I don't know for sure. I can't say that definitively.

Q Two weeks ago in the United States Attorney's Office

you told me in front of Ms. Nouri, Ms. Harwell, Mr. Pascal, and Mr. Leonard that you learned of Ms. Duchardt's presence in Philadelphia only after she had gone there.

A And, again, I'm not saying that wasn't when I learned it, okay? But did he call me when he was there because we communicated -- and I don't know that he did. I'm not saying that he did. So I would be more inclined of what you just said was probably what happened after I got to thinking about it, but could he have called me before when he was there? I guess so. Do I have an independent recollection of that? No.

Q And you didn't take your wife to meet Mrs. Duchardt -- to meet Ms. Montgomery?

A I did not.

Q Taking your wife to meet with a capital client who's facing the death penalty is sort of an odd move, don't you think?

A Well, I would defer to Mr. Duchardt on that in this regard. Some things that happen in defending criminal cases can be unorthodox, may not fit with someone's right or wrong. If Fred had the belief that his wife was of some help in terms of Lisa's mental state while she was there in dealing with maybe men that were going to be dealing with her, I would trust his judgment on that. So I don't think that's for me to say.

Q Were you aware of the fact that Mr. Duchardt represented to the officials in Philadelphia that his wife was

an expert?

A I was not.

Q And Mr. Duchardt didn't discuss his decision to bring his wife in on confidential attorney-client conversations with you before he did it?

A Again, my recollection is no, but could he have? Yes.

Q And the reason for asking his wife to be present for these confidential attorney-client conversations is because Mr. Duchardt sensed that even after he had been appointed for nearly ten months and was approximately two months away from trial, he still didn't have a relationship of trust that he felt was necessary to be able to defend Mrs. Montgomery?

A I think that's a fair answer.

Q I want to talk with you now about Dr. Ramachandran.

A Okay.

Q Mr. Duchardt is the one who, on this team at least, brought Dr. Ramachandran into the case; is that fair to say?

A Yes.

Q And Mr. Duchardt represented to you that Dr. Ramachandran was a psychiatrist, did he not?

A Again, I don't have a recollection as to what degrees he told me he had or didn't have but -- so I can't answer that. I'm sorry.

Q Mr. Duchardt represented to you that Dr. Ramachandran was the world's foremost expert on pseudocyesis; isn't that

correct?

A I think he represented to me that he was the only person who had actually dealt with patients who manifest those physical symptoms and that he had dealt with, I think, a half dozen patients or more and so he had an expertise that others did not have.

Q You did not independently research Dr. Ramachandran?

A I don't believe I did, no.

Q So you did not know that all Dr. Ramachandran had done is publish a book that had one chapter that had five pages about pseudocyesis?

A If you are telling me that's true, I'll accept it.

Q And you did not know that Dr. Ramachandran was not a licensed psychiatrist in the United States?

A Again, I'm not saying -- I don't remember one way or the other what I knew or didn't know.

Q And you did meet with Dr. Ramachandran, correct?

A Yes.

Q But you didn't know that his understanding of the insanity defense was based on his training at Cambridge and that he thought it was the McNaughton rule?

A Again, if you're telling me that's what he has said or someone has said, I was not aware of it, no.

Q If he said that in his sworn deposition testimony that's in evidence in this court, you wouldn't dispute it?

A Again, what I knew is what I told you is I did not know.
Q So if Dr. Ramachandran has testified under oath in his deposition in this court that he was not the world's foremost expert on pseudocyesis but that his book cited to who those experts were, you would have no reason to dispute that?
A I don't think it's right for me to comment on someone else's testimony.
Q Now, I want to talk with you now about efforts -- well, actually I want to ask you one more question before we get into the Leona Hayes issue.
With respect to the defense that was presented at trial, you are aware of the fact that Mr. Duchardt was planning to and did try to represent to the jury that Mrs. Montgomery was a good and loving mother? You're aware of that?
A I think that happened during the trial is my recollection.
Q And you recall that the trial team was devastated when the children testified about the abuse and neglect that they suffered while they were living with Mrs. Montgomery?
A I don't have a recollection of that, no.
Q You don't recall the trial team walking out of the courtroom saying they're so surprised, that the kids have never said anything like that to them before?
A I think there was some discussion about the fact that

they -- what they had said and what they'd told Fred were two different things, yes.

Q And so what has been already introduced into evidence, Movant's Exhibit 130, wherein Mrs. Waller pointed out to the defense team, It's going to come out that Lisa was mean to these kids at certain points and that was a strategic consideration that counsel needed to consider prior to the trial, you weren't aware of that?

A She didn't tell me that, I don't believe.

Q And do you recall during I believe it was Desiree's testimony that Assistant United States Attorney Roseann Ketchmark was questioning Mrs. Montgomery's daughter about her interview that she had had the night before wherein Mr. Duchardt was sitting right there when the child discussed the physical abuse that she had experienced while living with her mother? Do you recall that testimony?

A I'm sorry, I don't.

Q I want to talk with you now, sir, about an issue related to efforts to seek de-authorization in this case. I'm sorry. I need to back up. Let's talk some more about the trial, then we'll talk about the de-authorization.

Ms. Waller has testified before the Court that during the trial, Lisa Montgomery's mother was intimidating witnesses in the hall and that she came to -- she gave that information to Ron Ninemire and assumed that Ron Ninemire had

provided that information to counsel. Do you recall ever learning that Judy Shaughnessy was intimidating witnesses in the hall?

A I don't.

Q Do you know who Judy Shaughnessy is?

A Lisa's mother, I believe.

Q And during the May 16th, 2007, era to the time of the trial, David Owen had been the person who was the primary contact between the trial team and Judy Shaughnessy?

A Again, I don't recall that but if you say that, I don't dispute it.

Q If David Owen testified to that, you wouldn't dispute it?

A Correct.

Q And you don't -- you didn't know that the previous trial team had some real problems with David Owen being the primary point of contact with Judy Shaughnessy?

A I was not aware, no.

Q Let's turn now to the effort to de-authorize the case such that it was. So we have already introduced into evidence a letter dated September 29th, 2007, which is addressed to Margaret Griffey and a Gwynn-Charlie Kinsey with the United States Department of Justice and it's signed by Frederick Duchardt and copied to Matt Whitworth. The letter does not show that you were copied. Were you aware of the request for

de-authorization that Mr. Duchardt filed on the eve of trial?
A I'm confident I was but I don't have an independent recollection as I sit here.
Q Would you have taken any role in crafting this two-page letter?
A I'm sure Mr. Duchardt and I would have talked about it but as far as writing it, probably not.
Q In his letter dated September 29th, 2007, Mr. Duchardt states, "It has recently come to my attention that, when previous counsel had met with your committee early on in the case, you had invited them to provide to you any mental health evidence that might develop in the case so that the committee might consider that, and possibly reconsider its recommendation to the Attorney General regarding seeking of the death penalty against Mrs. Montgomery." I'm particularly interested in the phrase, "it has recently come to my attention." If I represent to you, sir, the de-authorization meeting was September the 26th of 2005, this letter is almost two years to the day later. Did Mr. Owen not share with you all that the committee had said they were open to hearing additional information?
A I don't have -- I do not have an independent recollection of that, and I think you have to ask Fred what he meant by "recently," so I don't know what that meant to him.
Q I mean, you would agree with me, sir, that it's proper

to characterize a letter sent two days before jury selection as eve of trial?

A That's probably a fair statement.

Q And later there's -- attached to Movant's Exhibit 139 is an email chain between Mr. Duchardt and DOJ counsel as well as Matt Whitworth and you're copied on the email where Mr. Duchardt notes at 10:42 p.m. in the evening on September 29th that his attachments did not go through. So now we're getting this information to the government really on September 30th, the day before jury selection; fair to say?

A If that's what that says, I agree with you.

Q And that same email exchange indicates that the government's theory of the case is that Mrs. Montgomery has no mental illness whatsoever and instead simply malingering mental illness. Was that your understanding of the government's position at trial?

A I think if that's what that says, I don't dispute it.

Q And, of course, it goes without saying that the government ten days later denied their request for de-authorization?

A Correct. I mean, I think it would be -- in this case I would have never thought that they would not seek the death penalty based on the facts of this particular case. So the de-authorization, although obviously you're going to ask for it, and even though in this case when the so-called Tommy

defense came up, that we went back to try to get life without parole, which was the goal line here, that this, in their mind, was a death penalty case.  I don't think I thought differently or anybody else thought differently.  So any less effort to try to keep that from happening, of course, I would applaud, but at the same time I don't think a realistic attempt was ever going to have any hope, absent some other evidence.

Q      You would agree with me the two-page letter sent on the eve of trial setting forth the fact that the government's experts think that she's a malingerer and our experts think she's crazy didn't have much of a hope?

A      Not because it was sent two days later; because it didn't have much hope ten days before, a month before, or two months before, in my opinion.

Q      And, of course, you weren't part of the case during the critical pre-authorization stage when it would have been very important for that trial team to make a presentation to the Department of Justice regarding the sort of evidence I know you haven't heard but the Court has heard regarding Mrs. Montgomery's severe, serious, and debilitating mental illness?

A      All efforts at the pre-authorization that can be made on behalf of a client should be made, and I agree with that 100 percent.

Q      And you mentioned the April 3rd attempt at a plea offer and I want to get into that important detail, but before we do

that I want to talk about a hearing that was held on May the 9th of 2007 before his Honor regarding problems that developed with respect to the government's mental health evaluation of Mrs. Montgomery. And backing up from that because you --

THE COURT: Ms. Henry, before we get into that.

MS. HENRY: Yes, sir.

THE COURT: How much longer do you have?

MS. HENRY: Well, the April 3rd, Leona Hayes chapter is probably a good 15 minutes.

THE COURT: Okay. I think we better adjourn for the day and come back tomorrow morning. We can start before nine o'clock. We'll be done with Mr. O'Connor by ten o'clock tomorrow if we start at nine?

MS. HENRY: Yes, sir.

THE COURT: Would you agree, Mr. Valenti?

MR. VALENTI: Yes, Your Honor.

THE COURT: Does that work with you, Mr. O'Connor?

THE WITNESS: I have the case at one, but they moved the other cases. I could be in Jeff City in two hours for those, so that's fine.

THE COURT: Okay. Sorry for the inconvenience.

THE WITNESS: No problem.

THE COURT: We're going to adjourn for the day and we'll reconvene at 9 a.m. tomorrow morning.

What are you projecting is the earliest you may be

finished tomorrow?

MS. HENRY: The earliest is three depending on how long the cross-examination of Dr. Gur goes. And, I mean, well, Mr. Duchardt, that's a wild card.

THE COURT: Can you have some witnesses ready tomorrow afternoon?

MR. VALENTI: I can have some people here by three. If we get Dr. Dietz and Dr. Martell, if I can't get them here tomorrow, we have to arrange for them for Thursday.

THE COURT: Can you get them here Thursday?

MR. VALENTI: I don't know the answer to that, but I'll give you the answer tomorrow morning.

THE COURT: And what's your estimate on how long your evidence is going to take?

MR. VALENTI: No more than a day.

THE COURT: No more than a day. Okay.

MR. VALENTI: If that -- quite frankly, Judge, we might not call anyone. We have not yet made that decision. We want to look at a couple things.

THE COURT: Okay. All right. Well, we'll see you at nine o'clock tomorrow morning.

MS. HENRY: Thank you.

MR. VALENTI: Thank you.

(Court adjourned at 5:25 p.m. until 9 a.m. Wednesday, November 9, 2016.)