UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| LISA M. MONTGOMERY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 12-CV-08001-GAF |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

TRANSCRIPT OF PROCEEDINGS - VOLUME VIII
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 9, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:
MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:
MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

I N D E X Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE

RUSSELL STETLER
Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

INDEX (continued) — Page

NOVEMBER 1, 2016

VOLUME II


RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

I N D E X
(continued)

Page

NOVEMBER 2, 2016

VOLUME III

RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . . 761

# I N D E X
(continued)

Page

NOVEMBER 3, 2016

VOLUME IV

DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

INDEX (continued) — Page

NOVEMBER 4, 2016

VOLUME V


CHRISTOS DAVATZIKOS

Direct examination by Ms. Henry. . . . . . . . . . . . 1120

Cross-examination by Mr. Valenti . . . . . . . . . . . 1165

Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG

Direct examination by Ms. Henry. . . . . . . . . . . . 1182

Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE

Direct examination by Ms. Henry. . . . . . . . . . . . 1245

Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL

Direct examination by Ms. Henry. . . . . . . . . . . . 1255

Cross-examination by Mr. Valenti . . . . . . . . . . . 1290

Redirect examination by Ms. Henry. . . . . . . . . . . 1302

## I N D E X
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

## I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864



Case 4:12-cv-08001-GAF Document 224 Filed 05/04/17 Page 9 of 312

I N D E X
(continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

I N D E X
(continued)

Page

NOVEMBER 10, 2016

VOLUME IX

FRED DUCHARDT
Direct examination by Ms. Harwell (cont'd.). . . . . 2263
Cross-examination by Mr. Ketchmark . . . . . . . . . . 2273

BEN LEONARD
Direct examination by Ms. Henry. . . . . . . . . . . . 2324
Cross-examination by Mr. Valenti . . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . . 2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Diane Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |
| FOR THE RESPONDENT: | | | |
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

NOVEMBER 9, 2016

MORNING SESSION

(Court in session at 9 a.m.)

THE COURT: Good morning.

Ready, Mr. O'Connor?

THE WITNESS: Yes, Your Honor. Thank you.

THE COURT: Ms. Henry?

MS. HENRY: Thank you, Your Honor.

THE COURT: Thank you.

MS. HENRY: Your Honor, before we continue with Mr. O'Connor's examination, I need to correct the record of something I said yesterday.

THE COURT: All right.

MS. HENRY: Your Honor asked me a question regarding Mr. Duchardt's track record, and you asked me then or now and I said both. In the middle of the night I woke up and I remembered Jennifer Herndon. So I was inaccurate. Mr. Duchardt was at that point tied with Ms. Herndon and a month later tied with Mr. Berrigan. I apologize for that and I wanted to correct that record.

THE COURT: Thank you.

JOHN O'CONNOR resumed the stand and testified:

DIRECT EXAMINATION(continued) BY MS. HENRY:

Q Now, Mr. O'Connor, yesterday afternoon I was about to ask you about a hearing that was held on May the 9th of 2007,

and to provide some background for that, do you recall that once --

THE COURT: I want to swear Mr. O'Connor in again today. My fault.

JOHN O'CONNOR, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION (continued) BY MS. HENRY:

Q Thank you.

So to provide context to my question, you do recall that in April of 2007 the defense in this case gave notice of an intent to rely on the defense of not guilty by reason of insanity?

A Again, I don't have a recollection but I'll take your word for it.

Q Okay. And you do know that the government's experts, Park Dietz and Dan Martell, came to Kansas City and performed the beginnings of their evaluation at the end of which Mrs. Montgomery became emotionally overwhelmed and the examination had to stop. Do you recall that happening?

A I have a general understanding of that. I believe that did happen.

Q And there was, then, a hearing before Judge Fenner with respect to the fact that Mrs. Montgomery had been unable to complete the government's exam; do you recall that?

A Again, I have a vague recollection but I would not dispute that.

Q Sure. And fair to say that you would rely on the Court's docket sheet to tell you what those dates are and those dockets show what the docket sheet shows, right?
A Absolutely.
Q And would you agree with me, Mr. O'Connor, that in a capital case whenever there is a hearing -- actually any case, but in a capital case particularly, if there's a hearing in front of the Court, it's the defense counsel's responsibility to make sure that a court reporter is present and actually transcribes the hearing in any adversary judicial proceeding?
A I assume that to be true, yes.
Q And I will represent to you, sir, that efforts had been made to obtain a copy of the transcript of the May 9th, 2007, hearing, and we have been informed that none exists, but you are familiar with Assistant United States -- now Judge Roseann Ketchmark, but at the time she was an Assistant United States Attorney. You're familiar with her?
A Yes, I am.
Q And she is a pretty good note taker, would you agree with that? Have you seen her notes in other cases?
A Without being -- trying to say very nice things, she's a very good lawyer, very well prepared.
Q And the government has been kind enough to provide us with a copy of Ms. Ketchmark's -- Judge Ketchmark's, excuse me, notes from that May 9th, 2007, hearing, and I would like to

suggest --

MS. HENRY: We've had that marked as Movant's Exhibit 137, and I would like to ask counsel for the government if we can agree these notes are the best evidence of what happened at that May 9th, 2007 hearing?

MR. VALENTI: To my knowledge, that's correct.

MS. HENRY: Your Honor, I would move now for admission of Movant's Exhibit 137, the notes of the May 9th, 2007 hearing.

THE COURT: Any objection?

MR. VALENTI: No objection.

THE COURT: Received.

MS. HENRY: Your Honor, may I approach the witness?

THE COURT: Yes.

Q (By Ms. Henry) Mr. O'Connor, I placed in front of you Movant's Exhibit 137, which are the notes of Ms. Ketchmark regarding the 5/9/07 hearing. Do you see at the top here where it mentions that the hearing began at 1:30 in the afternoon?

A I do.

Q And do you see there the notes that Judge Fenner, colon, take up the issue of defendant becoming upset during mental exam?

A I do.

Q And exam was postponed?

A I do.

Q I'd like to direct your attention now to the third paragraph where it states, "Court directs defendant to fully cooperate to see that exams are complete. Must to present defense. Do not expect there to be any more difficulty with exams. Defendant, through Fred, apologizes to Court and will do her best." Do you see that there?
A I do.
Q There does not appear to be any notation that there was any colloquy with Mrs. Montgomery regarding her Fifth Amendment rights with respect to participating in these examinations with Dr. Dietz and Dr. Martell, does there?
A Not from what you've shown me, no.
Q And that would be defense counsel's responsibility when presenting a not guilty by reason of insanity defense; wouldn't you agree?
A Yes.
Q That Mrs. Montgomery should be fully informed and would need to understand the difference in the scope of an evaluation under not guilty by reason of insanity standards versus an evaluation for presenting mental health mitigation; fair to say?
A Fair to say.
Q And that if trial counsel in this case had decided that instead of presenting a not guilty by reason of insanity defense but to rather present a mental health defense under

Rule 12.2, such exams would not have been open to counsel for the government prior to a guilt verdict; you understand that, correct?

A I do.

Q And that's something that would be very important for someone like Mrs. Montgomery to understand; fair to say?

A I think that's fair.

Q And you're aware of Dr. Dietz' reputation in the community as a very skilled interrogator, are you not?

A I believe I became aware of that when I started looking him up and the government said that they were going to use him.

Q And so by pleading not guilty by reason of insanity, Mrs. Montgomery was exposed to three full days of videotaped interrogation by Dr. Park Dietz; fair to say?

A I think that's what happened.

Q Because once you plead not guilty by reason of insanity, all bets are off and the government has complete access; fair to say?

A Fair to say.

Q Now, I'd like to back up now and talk about the timeline regarding the April the 3rd, 2007, meeting with the government and later court hearing. Okay?

A Yes, ma'am.

Q All right. So we have discussed sort of the timeline of the trial team, and I'll show you, just to orient you, Mr.

O'Connor, Movant's Exhibit 133. Are you able to see that on your monitor there, sir?
A I'll move up a little bit. That's better. Yes. Thank you.
Q Okay. And I really just need to zero in there on the end of that timeline. I'll represent to you, sir, that Movant's Exhibit 133, having already been accepted into evidence, shows that you were appointed on May the 12th of 2006 and Mr. Duchardt was appointed on May the 16th of 2006. So that's where we started with our timeline; fair to say?
A That's what this says, yes.
Q And I believe you testified yesterday that the goal with Mrs. Montgomery was always to achieve a sentence of life without parole?
A I think that's a fair statement, yes.
Q And the team was in agreement that that was the best outcome for Mrs. Montgomery?
A I think that's a fair statement.
Q And Mrs. Montgomery was a very cooperative client?
A Yes.
Q She didn't put any limits on the work that you could do for her?
A No.
Q Also you testified yesterday with respect to the possibility of the death sentence in this case, and I'll show

you Movant's Exhibit 131, which is a chart accepted into evidence already demonstrating that in fact though there have been over a dozen similar homicides, some in fact even worse than Mrs. Montgomery's, Mrs. Montgomery is the only person to ever have been sentenced to death. Had you done similar research for Mrs. Montgomery when you represented her?
A Ask that question again. I'm sorry.
Q Sure. Had you done the research into similar cases and their dispositions when you represented Mrs. Montgomery?
A I don't believe I did.
Q Do you agree with me, sir, that when you're making an argument to the other side or even to a court, the decision-maker, about an appropriate sentence in the case, it's important to look at issues of proportionality?
A That's fair.
Q And so when you're looking at issues of proportionality, you would go to evidence of other crimes and see the dispositions in those crimes?
A That could be a way of doing it I guess, yes.
Q Do you agree with me that it would be a powerful argument to make that others similarly situated to Mrs. Montgomery did not receive a capital sentence?
A Again, that's kind of a generalization. I think that -- hope to believe that every case is looked at individually by whose making these decisions, and the

individual facts and circumstances of that particular case would probably dictate more than whether it was proportional; but, again, as a statement, that's not a generalization. I guess you could do that, but I don't know that it would be necessary.

Q Okay. And it's not research that you performed in this case?

A I did not.

Q Nonetheless, you were pursuing lines of investigation that you thought would be fruitful for producing a plea offer in the case?

A Yes, ma'am.

Q And that line of investigation had to do with an alternative co-participant in the crime?

A That is correct.

Q And you and the defense team pursued that line of investigation during the winter and early spring of 2007?

A Again, if that's the timetable, I'll agree with that.

Q And that was focused around the fact that there had been an eyewitness who had given a report that she had seen two people in the car matching Mrs. Montgomery's description, the car that she was driving?

A I believe there were two eyewitnesses, a mother and a son.

Q And the substance -- let's identify them. The mother

was Leona Hayes?
A I believe that's the right name.
Q Her son was Kean Hayes?
A Yes.
Q K-e-a-n?
A Again, I don't remember. The names sound familiar. They lived in the house basically down the street when you come out of where the victim lived, and the boy was in a wheelchair and would sit out in the yard from time to time, then the mother was in the house and would be outside from time to time.
Q And it became the defense's theories -- the theory of the defense that that second person in the car was Mrs. Montgomery's brother, Tommy Kleiner?
A That was obviously a strong potential in trying to figure out who was in the car. I personally talked to both of the witnesses separately. I took a court reporter with me and got their statements, and I found them to be highly credible.
Q We're going to talk about the court reporter and the credibility of their statements.
A Okay.
Q I want to focus for a moment -- the culmination of your investigation resulted in you having a meeting with the United States Attorney's Office on April the 3rd, 2007, prior to a pretrial conference with the Court?
A I've understood now that was the date, and I agree with

that, yes.

Q Okay. So you met with the government first in hopes to reach a plea settlement and following that you came to court?

A In other words, our thought process was that if there was another individual with her and that individual was one who actually strangled her, for lack of a better word, to cause her death, that the government would be as interested in the actual perpetrator and that Lisa then would be a co-conspirator. Just like, as you know, in bank robbery cases they're more interested in the person who went in the bank with the gun than the getaway driver. So from a culpability standpoint and maybe taking someone off the street who actually had committed the act, we thought we could make an argument that life without parole would be a good disposition and Lisa could be a witness against that individual.

Q And I understand that was the theory behind the plea settlement. And to be fair, sir, to this day you still believe there was another person who committed the crime?

A I've always believed that.

Q Nonetheless, let's talk about April 3rd and what happened that day in a chronological order.

A Okay.

Q So I'm going to show to you now, sir --

MS. HENRY: If I may approach the witness?

THE COURT: Yes.

Q (By Ms. Henry) -- Movant's Exhibit 138, which the government produced to us two weeks ago, and those are Roseann Ketchmark's notes from the events of 4/3/2007 starting from the meeting through court.

MS. HENRY: And I would move for admission of Movant's Exhibit 138 at this time.

MR. VALENTI: No objection.

THE COURT: Received.

Q (By Ms. Henry) Showing you on the Elmo here, sir, we see that --

A You want me to look at that instead of on this?

Q Either way. Whichever way is easier for you to see.

A I'll do this.

Q Ms. Ketchmark notes there the meeting begins at 4/3/2007 and the first thing she notes is defendant needs a continuance.

A Okay.

Q Is that correct? Do you agree that you needed a continuance at that time?

A I believe there was some discussion about that because we needed further time to potentially investigate what we believed was this new claim. Obviously we knew the government was going to want to investigate it if they were going to take this seriously, and we didn't know what their position was or whether they were going to believe it, not believe it, because

that witness had already been interviewed by the FBI, at least one, if not both, and they didn't make those statements to the FBI that they made to me.

Q So we're going to talk about that timeline again. We'll talk about the FBI.

A Okay.

Q And we'll go through it piece by piece. But you'll agree with me, sir, that, at least at that point, you informed the Court -- or you informed the government that you may need a continuance. Now, that meeting wasn't just a drop-by meeting. You had actually arranged that about a week or so earlier with Mr. Whitworth. Is that what you told me?

A I think that sounds about right, for whenever we got the information and talked about it and was wanting to meet and whether that was the first time he could meet or something, but it was before -- we didn't just show up, I guess to answer your question.

Q It was a prearranged meeting and you knew Mr. Whitworth?

A Yes.

Q And had a pretty collegial working relationship with Mr. Whitworth?

A Yes.

Q I should say now Judge Whitworth also on this bench. So you'd agreed to meet and you were going to make a formal

presentation, correct?

A Yes.

Q And we see here on page 2 highlighted, Matt says it's difficult to believe someone else was involved, and then on down it's represented to the government that Leona made a positive I.D. of Tommy Kleiner?

A Okay.

Q And that's what you just told me, right?

A Pardon me?

Q And that's what you just testified to that Leona had made a positive I.D. of Tommy Kleiner?

A I didn't testify to that.

Q I'm sorry. I misunderstand your earlier testimony.

A She identified a person that could match the description of who we believed could be Tommy Kleiner.

Q Okay. That was what you believed, but the government's notes say it was represented that Leona Hayes had made a positive I.D. So that wasn't true?

A Again, I can't speak for Mr. Whitworth and what he wrote down or what he took from the conversation, but I don't believe -- I mean, you've got the court reporter's statements. I don't believe that she made an identification of Tommy; but, again, I'm going from memory here. So I've not looked at that transcript in eight years, and I haven't had it for three. But if you want to tell me that it's not in there.

Q We'll look through it together.
A Okay.
Q So let's go back and let's look at the first time Leona Hayes is questioned.
MS. HENRY: And for the purposes of the record, Your Honor, we have marked the entire file of Leona Hayes, including all of her interviews, as Movant's Exhibit 158, and we would move admission at this time of Movant's Exhibit 158.
MR. VALENTI: No objection.
THE COURT: Received.
Q (By Ms. Henry) So you mentioned --
MS. HENRY: Your Honor, may I approach the flip chart?
Q (By Ms. Henry) You mentioned, Mr. O'Connor, that Leona Hayes had previously been questioned by the FBI; is that correct?
A That was my recollection.
Q So showing you on the Elmo the FBI report, which is dated 12/17/04. Would you agree with me?
A Yes.
Q And at that point on 12/17/04 Ms. Hayes stated that there was one person in the car with long hair; fair to say?
A You're talking about this report?
Q Yes, sir, that report to FBI Agent Gary Stark.
A That's what that says.

Q Ms. Hayes said one person, long hair, driving at a high rate of speed, correct?
A Yes.
Q Then you're also aware that Nodaway County Sheriff -- or State Highway Patrolman Sergeant Merrill interviewed Leona Hayes on, I believe the report date is 1/10 of '05?
A Okay.
Q Now, would you agree with me, sir, that on 12/17/04 that was the date that Mrs. Montgomery was arrested later in the day?
A Again, I don't remember the dates but I'll agree with you.
Q If I tell you the homicide was on 12/16, you know she was arrested the next day?
A Yes. And I'm not trying to push and pull with you. I'm just trying to let you know when you say those dates, they don't mean anything to me in terms of dates; but if you tell me that's the date, I'll agree that's the date.
Q And here Ms. Hayes states that she believes that there were two people in the car?
A Again, if that's what that says, I'll take your word for it.
Q So if Sergeant Merrill takes a report from Ms. Hayes where she says that the driver side window was down. She couldn't tell -- paragraph 4 -- if the driver was male or

female and that there was a female subject in the back seat of the red car. You would agree with me that Ms. Hayes' statement was available to defense counsel since 1/10 of '05?

A Yes.

Q And on 1/10 of '05 Ms. Hayes couldn't tell whether the driver was male or female, correct?

A That's correct.

Q And continued to maintain that the car was driving at a high rate of speed?

A I think that's a fair statement.

Q And then on Valentine's Day of 2006, Susan Hunt and Phil Thompson also interviewed Leona Hayes, and Ms. Hunt -- you knew who Mr. Thompson was, correct?

A Yes, I did.

Q And he was the investigator that Ms. Hunt used on a regular basis?

A Yes.

Q And there Ms. Hayes repeats that the car was driving at a high rate of speed. She couldn't tell if it was a man or woman in the front seat, but she thought there was a woman in the back seat. You were aware of that information in the file that previous counsel had interviewed Ms. Hayes?

A Again, I'm assuming I would have been.

Q And Ms. Hayes also told Mr. Hunt -- Ms. Hunt and Mr. Thompson that she believed the driver of the car was Kayla

Boman, Lisa's daughter; do you recall that?
A I don't recall that, but if that's in her report, I don't disagree with it.
Q Well, let's look at her report. Starting right here, "Ms. Hayes then went to her living room and came back with a picture that had been in the paper around the time of the incident. It was a picture taken of Lisa Montgomery, Kayla, and other subjects at the dog show in Abilene, Kansas. She stated that the person driving the car appeared to be similar to the picture of Kayla standing next to Lisa."
A Okay.
Q So on 2/14/06 Ms. Hayes identifies Kayla as the driver of the car?
A Okay.
Q Of course, the defense knew that Kayla was in Alabama so there was no way she was the driver of the car, correct?
A Again, if you're telling me that, I'll agree with it if that's in the report.
Q If there was testimony at the trial that Kayla was living with Patsy Hughes in Alabama at the time of the crime?
A I don't disagree with that.
Q And Ms. Hayes also told Ms. Hunt and Mr. Thompson that she was opposed to the death penalty; do you recall that?
A If that's in the report, I probably would have read it at the time.

Q And she also advised that Bobbie Jo Stinnett's mother, Becky Harper, was also against the death penalty in this case?
A Again, if that's in the report, I don't disagree.
Q That would be important information if the victim's mother would support a sentence of less than death?
A I guess it could be.
Q And then Ms. Hayes was not contacted again until the day before this meeting with the government, correct?
A Again, if that's the timeline, I don't disagree.
Q You stated that there was a sworn statement taken of Ms. Hayes?
A I believe so.
Q And it was taken at her home?
A It was.
Q And it was taken at 4:33 in the afternoon on April the 3rd of 2007?
A Whatever the transcript shows would be the date.
Q I'll show you the transcript.
A I'm not disagreeing with you.
Q I want to be clear.
A I trust you.
Q The transcript here, can you read it what time it says it was taken?
A April 3rd at 4:33.
Q So you had not spoken to Ms. Hayes earlier in the day

at 9 a.m.?
A Well, I think I'm pretty confident I talked to both of them without a court reporter. When they told me what they told me, I think that I got a court reporter and went back is my recollection as I sit here.
Q Let's look at this sworn statement. And the government was not present for the sworn statement, correct?
A They were not.
Q And you would agree with me that 4:33 in the afternoon is after 9 a.m. in the morning?
A I agree.
Q And after the hearing that you had with his Honor that same day?
A Again, if that was the date, I'll take your word.
Q And during that sworn statement, you showed Ms. Hayes a mugshot of Tommy Kleiner?
A I think now that you're saying that, again, if that's what the transcript says. I haven't seen it. I don't have a recollection of it, but I'm not doubting you. And maybe that's why I would have said she made a positive I.D. if that's in the transcript.
Q Let's back up to page 17 of the transcript starting at line 24.
A Okay.
Q Mr. O'Connor marking Defendant's Exhibit 1. "Let me

hand you what's been marked as Defendant's Exhibit 1." And then we go to page 18. "Was that shown to you yesterday?

"Yes, it was."

A Okay. So that would help refresh my recollection. I think I was there the day before probably. She made that identification. I wanted to come back to get it on the record before I was going to approach anybody with discussing it, would be my guess of how I've operated in the past.

Q Sure. And so if that's there -- and, again, we're just refreshing your recollection.

A I appreciate that.

Q "And when you look at that photograph, look at it any way you want to. Tell me what that photograph means to you.

"What it mostly means," she answers, "the person's little. It's like I keep telling, the person's little and the person had blonde-colored hair. But I've told them this before, yesterday, the nose may not have been the same. The nose is what throws me."

When I read "them," I'm assuming from context that she's referring to Tom Moss and Ron Ninemire. Who is Tom Moss?

A Tom Moss was an investigator that worked for me on just different matters. I would call him to do work for me. He didn't work for me as a full-time person but an investigator I used from time to time on cases. Ron, of course, was the investigator at the public defender's office.

Q And then on page 19 Ms. Hayes says, "Well, it's a possibility." We won't read the whole transcript because it's in evidence, but you continue to press her and asked her if it was probable or possible. She ends up saying on page 21, "I could not tell from the front face 'cause I didn't see the front face. I just seen the side-view." And there's a photograph of him facing sideways. It goes on and on, and ultimately she tells you, "It's possible but not probable." And on page 23 states on line 4, "I'm not positive."
A Again -- I don't mean to interrupt, but I don't know what she said or didn't say because we're not going through it line by line so it's hard for me to answer your questions.
Q Sure. You can take time to read it. Why don't you take some time to read pages 18 to 23 to yourself.
A Okay. I appreciate that. I don't think I have anything.
Q I'm sorry.
A Thank you. Thank you.
Q Thank you. I appreciate you taking the time to read that.
Would you agree with me, sir, that Ms. Hayes did not make a positive identification of Tommy Kleiner on April 3rd in her sworn statement?
A I think I somewhat disagree with you, because we went back and forth as to whether or not -- I don't think she made a

positive I.D. that day, but we went back and forth on the point that the side-view she believed could be him. If she saw him in person, she believed that she could make -- potentially make a positive identification, and she kept talking about his hands as well. So in coming away, the possibility of her still being able to identify the person driving the car, whether that was Tommy Kleiner or whoever, I still believed was in play.

Q In play but not a positive identification?

A I don't think she made a positive identification as it said she did not see the front of his face. She saw the side. We had some side-view pictures. She couldn't eliminate them. I think one of the questions there on 23, I kept going back -- or 22 where she said if she could see him in person, that may make a difference.

Q And, Mr. O'Connor, we discussed your experience as a trial attorney, and you are aware -- in fact, in the past you filed motions to suppress show-up identifications, have you not?

A Of course.

Q Because you know that a person's memory can be very suggestible if you just show them one picture?

A Sure.

Q And when you went to Ms. Hayes, she had already identified somebody else positively as the driver of the car to previous defense counsel?

A And, again, if you follow that logic, then she should have been able to immediately eliminate this picture of saying, Hey, I've already identified the right person. She did not do that.

Q So a skillful cross-examiner like Mr. Whitworth would have had plenty to use to impeach Ms. Hayes had she come and testified?

A There's always that impeachment but the -- I'm not the government so I don't have to follow the rules in terms of whether I show one picture or five pictures.

Q When you're proffering Tommy Kleiner as the co-participant in the murder with Mrs. Montgomery to the government and suggesting a positive I.D. has been made, that was not in fact the case on April the 3rd of 2007 given this sworn statement?

A Again, I've not seen the statement of the son. Are you telling me the son did not make an identification either?

Q I'm telling you that the son said he couldn't identify anybody.

A Okay. So, again --

Q And we'll get that marked and put it into evidence.

A You'll have to ask Matt what he was writing down, whether he was writing down to himself we need a positive I.D. or -- I said positive I.D. I can't imagine I said that because we would have given him the very statements to support what we

were arguing. We have to give them in discovery. So I can't imagine they're telling him I had a positive I.D. when I was at the beginning and a court reporter statement, which I want to believe we would have given it to him then to try to bolster our case. So, again, I don't know what he wrote down. You'd have to ask him, but I wouldn't have told him something that wasn't true because he could immediately diffuse it by looking at this statement.

Q Well, you didn't have this statement when you talked to him in the morning, right?

A I probably didn't.

Q I mean, if it was transcribed at 4:30 in the afternoon, you didn't have it?

A I didn't.

Q And what the transcript says is that she's referring to "them," so I'm assuming when she says "them," you weren't present on 4/2?

A That's correct. Okay. So having read that now, it looks like Ron and Tom had talked to the folks up there, told me of what they had said, then I went up there to take the court reported statement.

I would say this: And, again, they were scared. You know, I mean, they both were scared. They did not want to be involved in this case, you know, when I talked to them. So I recognized that trepidation, as with most witnesses, but them

probably more than most because of what happened.

Q And because of their knowledge of Skidmore and the previous murder not involving Mrs. Montgomery, that was --

A Yeah, I think they may have mentioned that now that you said that.

Q They mentioned that to you?

A Yes.

Q Let's continue on with our timeline here. So 4/2, '07, Tom Moss -- I'm going to use initials -- and Ron Ninemire interview Ms. Hayes. And we don't have a report from that. I will just represent to you, I don't have a report to show you. I've never seen one.

A Okay.

Q And then on 4/3 we have settlement discussions and we have court and then we have sworn statement. So we're filling this in.

A The sworn statements being the statements of the two witnesses?

Q Yes, of Ms. Hayes -- we'll put L. Hayes, LH, and KH for Kean Hayes.

A All right.

Q And the offer to the government in that settlement was that you would proffer Lisa to testify against Tommy, correct?

A That would be part of the deal to try to get her out of the death penalty that she'd be a witness.

Q And you were looking into hypnotizing Mrs. Montgomery at that time?
A You know, I don't have a memory of that. I'm not saying it didn't happen, but I don't.
Q Okay. Well, we'll get to that in a minute because I've got another document that might refresh your recollection on that.
A Okay.
Q Also in that meeting you did share with the government that Becky Harper was opposed to the death penalty in this situation causing Ms. Ketchmark to make a note, to make sure to file motion in limine regarding that, correct?
A Again, I have a vague recollection of that, but I'll take your word. If that's in her notes, probably we said that.
Q Ultimately -- well, we'll get to September in a minute.
Let's back up for a moment now. Let's go on with Tommy for a second. Let's go on with what happened after April the 3rd filling in the timeline here. I show you, sir, what's previously been introduced into evidence as Movant's Exhibit 145, which are the chronological notes of Tommy Kleiner's probation officer, Erin Garman, where she notes on April the 4th that the FBI has contacted her and contacted Tommy and wants him to come in for an interview. So can we agree the chronology establishes that the next day Tommy Kleiner is meeting with the FBI?

A If that's what that says, I agree with it.
Q But that wasn't the first time that Tommy Kleiner had met with the FBI about this case because Kurt Lipanovich here today -- you recognize Mr. Lipanovich?
A Yes.
Q -- has testified that he met with Mr. Kleiner on March, I believe, 29th, and you became aware that Mr. Lipanovich -- not at that time but later you became aware that Mr. Lipanovich immediately went out to investigate the Tommy Kleiner alibi as soon as you had the call with Matt Whitworth, right?
A I would assume. I may be wrong but Mr. Lipanovich may have been there when we talked with Matt. I'm not positive. But I kind of have a recollection that he was there.
Q And you recall, sir, that the individual who was in charge of having contact on this case with Judy Shaughnessy -- we discussed this yesterday -- was David Owen; fair to say?
A I think that's correct.
Q And David Owen had cautioned the defense team that if you all were to go forward against Tommy Kleiner, you risked alienating the entire family because Tommy was Judy's favorite?
A I somewhat recall a conversation along those lines that there was some issues that could cause problems, I think.
Q And that would be important to lose the cooperation of Lisa Montgomery's family as you went forward to investigate evidence of mitigation and mental health?

A Yeah. I mean, again, you've got to weigh these competing interests. You know, if the goal there is trying to get her out of the death penalty, and if there is another person with her, whether it's Tommy or whoever -- so, you know, it's somewhat of a Catch 22. You've got to make some of those decisions. And, again, if it turns out that it's not him, hopefully you can go back and rebuild those bridges. But, you know, you can't kind of do that in hindsight.
Q And, in fact, I think you told us when we met in the government's office that you didn't think twice about going forward with the Tommy Kleiner defense in April of 2007?
A Are you talking about at the time we were -- before we found out about the alibi?
Q Right.
A Yeah. I mean -- I think potentially -- he was potentially a viable defense at that time of both in mitigation and potentially for the trial both.
Q And, in fact, prior to going to the government with this settlement offer, Mr. Duchardt had expressed to the team that we better find out whether Tommy Kleiner has an alibi and somebody better go to talk to him?
A I think there was some discussion along that line.
Q And one way -- you knew Tommy Kleiner had a lot of contact with the law?
A I believe we had some knowledge of that, yes.

Q And you had gathered his -- or not you but previous counsel had gathered a lot of information about Tommy Kleiner's court cases and previous contacts with the law?
A I think that's a fair statement.
Q And there's been testimony before his Honor that that previous trial team was aware that Tommy Kleiner had an ironclad alibi for December 16th of 2004 but you didn't know that?
A I was never made aware of it if that's the case because one of the things that came down near the end in discussing, one, going forward and, two, talking about mitigation and, three, as a potential defense, that was talked about among all of us. That was never told to me or I believe, obviously, that would stop us in our tracks.
Q You would not have let Lisa Montgomery be interviewed on video telling the Tommy Kleiner story if someone had told you that the previous team knew that Mr. Kleiner had an ironclad alibi for December 16th of 2004?
A Well, obviously we would have discouraged her from doing that probably; but when she decides to tell us someone and when what she was telling us that it wasn't, he was in fact with her. And, again, we could talk about the psychology of all of that or whether that was -- but she was saying that.
Q And we'll get to when she started that and how that came about.

A Okay.
Q Fair to say that Mrs. Montgomery giving the Tommy story to Park Dietz on videotape was devastating to the trial?
A I don't know if the word "devastating" -- devastating in what context?
Q Devastating in the fact that the government was able to successfully show Mrs. Montgomery as simply a liar?
A Well, I mean, I think they'd done that in other aspects of the case, so whether that by itself was devastating -- obviously it wouldn't be good, but to use the word "devastating" in light of the other evidence in the case, I think you have to give perspective to all of that, but it wasn't good. I would readily admit to that.
Q In fact, you were so concerned about it that you made a last-ditch effort the week before trial suggesting to Matt Whitworth that you would agree to not present the theory of a co-participant in the murder if the government would agree to not present Mrs. Montgomery's statements with respect to Tommy Kleiner's involvement?
A I think we tried to make some effort at that. I have a recollection of that, yes.
Q Ultimately it was your decision to not present Tommy Kleiner as a co-participant in the crime?
A Ultimately we discussed it as a team. I made the final call.

Q Now, let's get back in our timeline here.

THE COURT: Ms. Henry, before you go on, I just want to -- since I told Mr. O'Connor we'd be finished with him by ten o'clock, and obviously we're not going to, I want to see if your schedule allows you to stay beyond that.

THE WITNESS: Judge, it does. What we did was PJ went down there this morning because I anticipated this maybe could take longer. So we're covered. So we're good. Thank you for asking.

THE COURT: Ms. Henry.

Q (By Ms. Henry) Again, the common denominator between all the trial teams in this case is David Owen; is that fair to say? He was on all of the trial teams?

A I believe that's a fair statement.

Q And the record will reflect that it's been established that a year after Ms. Hayes identified Kayla as the driver of the car on 2/20/07, Mr. Owen was demoted as the first assistant in the office?

A Again, I'll take your word for that.

Q And then we have on March the 1st of 2007 an important discovery, not related to Tommy Kleiner but related to mitigation, and I'll represent to you that already Dani Waller has testified and in evidence is her report of an interview of a man named David Kidwell, which is Movant's Exhibit 1-283. And I'll direct your attention on the Elmo here, sir, to the

second paragraph of Ms. Waller's memo where she reports that David Kidwell advised, "Lisa told him sometimes Jack would come home drunk with his friends" --

A Start over, please. I'm not following you.

Q Starting right here.

A Okay. Thank you.

Q "Lisa told him that sometimes Jack would come home drunk with his friends and make her perform sexually with them. She didn't have anyone she could tell or trust then while it was going on. David asked Judy one time where she was at while this was happening to Lisa. Judy's reply was that she couldn't be home 24 hours, seven days a week."

Do you agree with me, Mr. O'Connor, that mitigation information that Ms. Montgomery may have been subjected to gang rape would have been important information to present to the jury?

A I would.

Q And so we have that discovery in Ms. Waller's memo on 3/1, and Ms. Waller's testified that she provided that memo to the trial team. Do you have any reason to disagree you didn't receive that?

A I don't.

Q But then we have Mr. Duchardt going to visit Lisa in Philadelphia. You recall there was a time when Lisa Montgomery left CCA in Leavenworth and was transported to Philadelphia for

purposes of imaging scans. You recall that?
A I do.
Q And you recall now learning that Mr. Duchardt brought his wife with him for those meetings. We discussed that yesterday?
A Yes, ma'am.
Q And we did that because Mr. Duchardt felt like Mrs. Montgomery didn't have a level of trust and he needed to break through her defenses?
A And, again, you'd have to ask him that; but if that was the reason or there was more reason to it at that time, I don't know what his reasons absolutely were.
Q And do you recall, sir, that one of the issues in the case had been that previous counsel had not questioned Mrs. Montgomery about what had happened at the crime?
A Again, I don't have a recollection of that; but if that's what they have said, I have no reason to dispute what they've said.
Q And if Mr. Duchardt told Judge Fenner on April the 3rd, 2007, that one of the problems your team faced was that prior defense counsel had instructed Mrs. Montgomery not be questioned about the crime and you were standing right there and you didn't correct him, that would probably be the case?
A Say that again. I'm sorry.
Q Sure. You were present in court on April 3rd, 2007?

A Again, if the record shows I was, I was.
Q If Mr. Duchardt represented to the Court that previous counsel had forbidden anyone from talking to Mrs. Montgomery about the crime; would you disagree with that?
A Assuming that Fred had that conversation and reported to the judge and that's on the record, I don't disagree with it.
Q You'd rely on Mr. Duchardt to make those representations to the Court and to do so truthfully?
A Sure.
Q And you recall that Mrs. Montgomery describes symptoms of feeling like there was someone else in the room with her during the murder but never named -- did not name who that person was until Mr. Duchardt sent a memo to counsel?
A I think there was a belief that she did not want to say who it was, which I think there was some discussion about the fact that maybe it was a family member and that's why she would not -- did not want to talk about it. I have a recollection of something like that happening.
Q Right. The team got together and said she's describing this feeling like someone else was there and you were trying to figure out what's going on, but you were taking her literally that she felt like someone else was actually there?
A I think that would be fair.
Q And, again, you were relying on Mr. Duchardt to be the

expert on psychiatric illness and psychiatric symptoms?

A I don't know that I was relying on him to be an expert on psychiatric symptoms or illness. He was taking the mental illness part of the case. We both worked on it together. But he probably would have the more key role. But whether I was relying on that, I can't say that I was or wasn't.

Q You would agree with me, sir, that a person who suffers from posttraumatic stress disorder and is dissociative, one of the symptoms that they describe is feeling as if they are out of their body?

A Again, I think that may be one of the symptoms. I've not looked at that in a while; but if that's what is in the DSM, I'd be happy to agree to it.

Q You would defer to the expert in trauma testimony about what the symptoms of posttraumatic stress and dissociative disorder are?

A I would.

Q And you're aware, sir, that prior to you and Mr. Duchardt taking over the case, Mrs. Montgomery had not been shown any of the discovery in the case by any other lawyer?

A Again, I don't know that I knew that; but after we got involved, I think I learned that.

Q And prior to Mrs. Montgomery having access to the discovery and up until this memo, which we're going to talk about in some detail, Mrs. Montgomery had not named Tommy

Kleiner as a co-participant?
A You know, I don't remember the timeline of when she did. I know she didn't initially for a long period of time.
Q And, in fact, there was a discussion amongst the defense team that Mrs. Montgomery, even after she'd made these revelations in March of 2007 to Mr. Duchardt, did not want to proffer against her brother, Tommy Kleiner, and Mr. Duchardt encouraged her to do so?
A Again, you would have to ask him if he had that discussion with her.
Q Let's talk now about Mr. Duchardt's March 7th, 2007, memo.
MS. HENRY: Your Honor, may I approach?
THE COURT: Yes.
Q (By Ms. Henry) Showing you, Mr. O'Connor, what's previously been marked as Movant's 157, which is entitled "Memorandum," and it's addressed to you, Dave Owen, Stephanie Elliott, Ron Ninemire, and Dani Waller from Fred Duchardt. Do you see that there?
A I do.
Q It's dated March 7th, 2007?
A It is.
Q And do you have any reason to believe that you never received this memo?
A I'm sure I did.

MS. HENRY: Your Honor, we would move admission of Movant's Exhibit 157.

MR. VALENTI: No objection.

THE COURT: Received.

Q (By Ms. Henry) This memo itself is eight pages in length, so pretty lengthy, correct?

A Yes.

Q And it states at the beginning, "As you know, I was with Lisa in Philadelphia on Monday and Tuesday, March 5th and 6th." Do you see that there?

A I do.

Q So three days after the Kidwell interview on March -- did I read that right? Is it 5th and 6th? 5th and 6th. Okay. March 5th, 6th, '07, Ryland and Fred with Lisa, and 3/7 is the memo?

A Yes.

Q And he says that we worked pretty hard in those sessions, and at the end of that first paragraph, "My purpose in the meetings was to work on two main issues: what Lisa would tell about what she remembered about the death of Bobbi Jo" --

A What page are you on?

Q Page 1, first paragraph.

A Thank you.

Q -- "And Lisa's belief about her pregnancies she reports

after the 1990 procedure when her tubes were tied." So he sets the stage.

A Okay.

Q I don't want to read eight pages into the record. On page 2, first full paragraph -- or second full paragraph beginning with the word "I." "I particularly describe all of this to everyone because I think all of this was good, direct talk over our process for finding out information from her, and her reasoning behind being reticent." Do you agree with me that the use of the word "reticent" meant reluctant? Is that a synonym?

A I was on page 2 and that was on page 3. So I'm trying to catch up.

Q I apologize. Page 3.

A That's fine.

Q "I explained to Lisa that we have tried to be understanding of that reticence."

A Again, you would have to ask Fred what he meant by the word. What you said, I would agree that would be a definition of that word.

Q On page 4 under the heading, "Memories about the day Bobbie Jo was killed.

"During our discussions on what happened the day Bobbie Jo was killed, Lisa became firm on Tommy's involvement." Is that what is written there?

A It is.

Q So is it fair to assume that prior to that time Lisa had not been firm on Lisa's -- on Tommy's involvement?

A Again, you would have to ask Fred what he meant by that. You could take that from him saying that.

Q And on page 6, fourth full paragraph, "Lisa made clear she believes that Judy Shaughnessy is involved, and put Tommy up to this." Do you see that there?

A I do.

Q And you are also aware, are you not, sir, that Lisa Montgomery had an extremely conflicted relationship with her mother?

A Yes.

Q And one way of interpreting Lisa -- if Lisa has to become firm on Tommy's involvement, one could also assume her posttraumatic stress disorder meant that she didn't have memories of the day of the homicide?

A Again, I think that's in the eye of the beholder in terms of how someone interprets that. That's an interpretation that you could give, sure.

Q And it's also an interpretation that Mrs. Montgomery may have paranoid thoughts regarding her mother and her mother's role in the situation Lisa found herself in life?

A That could be an interpretation.

Q And paranoia and psychosis and dissociation were all

matters that you all were exploring with Mrs. Montgomery?

A I think that's fair.

Q And you would agree with me, sir, that someone who has dissociative and psychotic disorder is particularly susceptible to having their memory influenced?

A I guess from those issues you've raised someone could be, yes.

Q And that's why it's so important that when an individual with a fragile mental state who has comorbid mental illnesses is being interviewed, they should be interviewed by someone who is skilled and who would not suggest certain possibilities?

A And, again, in all fairness, I wasn't there. I don't know if things were suggested. I don't know if they were leading questions or open-ended questions. Again, I really honestly would defer to Mr. Duchardt. He'll have to tell you whether or not they were open-ended or he asked leading questions and inferred those things. I don't know.

Q He'll have an opportunity to answer those questions shortly.

Is it true, sir, that the defense team actually had on March the 30th subjected Mrs. Montgomery to a polygraph? Do you recall the polygraph?

A I don't remember the date, but I think there was a polygraph.

Q And do you recall that the government later moved to exclude that polygraph because the questions that were asked -- well, in penalty phase. Obviously it wasn't going to come in in guilt phase, but in penalty phase they moved to exclude it because the questions asked were not reliable; do you recall that?
A I don't recall that, but if that was in the record, I don't dispute it.
Q That the questions that Ms. Montgomery were asked, the question was, Was Tommy Kleiner in the house that day? She passed that polygraph, right?
A I believe that's true.
Q And so the polygraph examiner believed that she showed no deception so she had come to believe it?
A Well, I don't know what she came to believe or didn't believe. He ran the test and she wasn't deceptive on that question and that was his finding.
Q But you did have the polygraph before April the 3rd?
A Whatever the date it was is when it was.
Q And on March the 21st Ron Ninemire and Dave Owen interviewed Tommy and surreptitiously got his DNA?
A I recall something along that line.
Q When Tommy went up to use the bathroom, they snuck his cigarette and subjected it to DNA analysis, right?
A I have a recollection of that but not a good one; but

if you're telling me that's what they did, I don't disagree.

Q And then did you later learn that after all that information had been provided to the government and Mr. Lipanovich, Mr. Lipanovich informed Mr. Kleiner that the defense had gotten his DNA surreptitiously?

A I don't recall that, but if it's in a report where that happened, I don't dispute it.

Q Do you agree with me, sir, that a witness finding out that someone had snuck his DNA for testing might then shut down and become uncooperative with the defense?

A I guess that could happen.

Q Especially if they find out they're being accused of murder?

A I assume that could happen, yes.

Q And, again, if you had known that the previous trial team had ruled out Tommy Kleiner, you would not have pursued this line of defense?

A I think it would be unlikely assuming that we, one, believed that and, two, they had some record or evidence to support it, but I think that's a fair statement.

Q It's not a fair statement?

A It is a fair statement.

Q If I can have one moment, please.

Mr. O'Connor, I very much appreciate your time and you rearranging your schedule for us this morning. I believe

the government will have some questions.

A Thank you.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Mr. O'Connor, several things I want to talk about. First I want to go through the packet of information that was described as Exhibit 158. Do you recall that packet entails your statement from Leona Hayes in addition to the various reports created by investigators in the case?

A Yes.

Q Do you have a copy of that in front of you?

A I don't.

MR. VALENTI: Your Honor, may I approach?

THE COURT: Yes.

Q (By Mr. Valenti) You were asked about Ms. Hayes having positively identified Kayla. I want to show you page 2 of the interview that was conducted by Ron Ninemire and Susan Hunt -- not Ron Ninemire -- Phil Thompson and Susan Hunt and ask you to look at the paragraph here and read about the idea of Kayla.

A The whole paragraph?

Q So you can get it in context, yes.

A Thank you. Okay.

Q Now, I believe it was represented to you in direct examination that Ms. Hayes made a positive identification of

Kayla; is that right?
A Yes.
Q In that paragraph actually what she says is the person that was driving the car was similar in appearance but the picture they actually have Kayla is blocked out?
A I think that's what I just read.
Q That's not really a positive identification, is it?
A I did not take it as a positive identification.
Q You've been dealing with criminal cases for a long time in your career, correct?
A Yes.
Q How long have you been an attorney, sir?
A Thirty-three years.
Q During that time what has been your primary practice?
A Criminal.
Q Both as a prosecutor earlier in your career and later as a criminal defense attorney?
A That's correct.
Q How long have you been a criminal defense attorney?
A Twenty-seven years.
Q During that time have you dealt with eyewitness identifications?
A A number of them.
Q Have you dealt with police reporting?
A Yes.

Q So when you look at, review the report that was written, do you believe that Leona Hayes made a positive identification of Kayla Boman being the driver of the car seen leaving Bobbie Jo Stinnett's house?
A I would not have. As I've said -- hopefully not making an excuse -- I just have not seen any of those documents or even reviewed them before testifying, so I was testifying from recollection when I was being asked. So now that I've seen that better, I would not have believed there would have been a positive I.D. at the time.
Q Okay. And later in that report -- you may not have reviewed it. You're welcome to. I would propose to you that when the report was written by Mr. Thompson, he espoused in the report that both he and Susan were quite sure Ms. Hayes was correct in what she saw, and what we're talking about is two people being in that car, correct?
A Correct.
Q You were also asked in regards to the interview of Ms. Hayes about her giving the opinion that Becky Harper was against the death penalty, whether that would be important to you as an attorney?
A Correct.
Q I'm going to show you page 3 of that memorandum, the third paragraph and ask you to read that paragraph in its entirety, please.

A Okay.

Q Now, does that paragraph say that Becky Harper is against the death penalty or Leona Hayes is against the death penalty?

A It would say Leona Hayes. She was the only person that was against it the way that reads.

Q Correct. In this report Leona Hayes is reported to have said that she is the only person in Skidmore, Missouri, against the death penalty for Lisa Montgomery; whereas, every other citizen thinks she should get death for what had happened?

A That's what that says.

Q Including Becky Harper?

A That's what that says.

Q Now, as it relates to the statement that you took, let's kind of talk about this in context to make sure we understand what's going on. You, sir, in the spring of 19 -- or 2007, excuse me, January, March up to April. Okay. You're coming up against a trial deadline, aren't you?

A Yes.

Q Case is going to be tried at the end of April in 2007 as things stood at that time, correct?

A That's correct.

Q All right. So some of the scientific testing and analysis that Mr. Duchardt is getting done is happening in

March of 2007 when he goes to Philadelphia, correct?
A Correct.
Q And I believe that was Ms. Montgomery going through PET scan analysis and MRI analysis, kind of under the Ruben Gur protocol, correct?
A That's my understanding.
Q That's when you get a memorandum from Mr. Duchardt about him having gone with her to Philadelphia, correct?
A Correct.
Q Okay. At that time, certainly if you didn't know before, you knew after receiving the memorandum that his wife, Ryland, went with him, correct?
A Correct.
Q Did you have a problem with Ryland's involvement in the case?
A No.
Q Why?
A Again, she seemed to get along with Lisa. She was here for the trial for a few days and they seemed to interact in a very good way. Fred had advised me that he thought that they had interacted in a good way, and so as lawyers we kind of defer to each other's judgment. I trusted his judgment and I deferred to his judgment.
Q By your own observations did you see that they appeared to get along well?

A I did.

Q Did it appear that you were able to communicate with your client in a productive manner while Ryland was in the case?

A Yes.

Q As a defense attorney representing a criminal defendant charged in a capital murder, was it important for you to try to communicate with your client as well as you could?

A Yes.

Q Did you believe that having Ryland involved at any time in the case assisted you in that goal?

A Yes.

Q You were asked whether you had your wife meet Ms. Montgomery. Of course, you didn't, did you?

A I did not.

Q I believe you have told us, however, that you did ask members of your church group to meet Ms. Montgomery, didn't you?

A I did.

Q Tell us about that. What was the goal behind that?

A Basically just to have some interaction from the outside. Lisa had kind of -- we talked about some religious beliefs, belief in God. I had some women in our parish that's -- they have a justice committee and they were most anxious to go and talk with her and meet with her and give her

some support, that she wasn't isolated in terms of this crime.

And then also she didn't have any clothes, so they helped go with me and they picked everything out for the trial that she wore so she could have some self-esteem, feel good about herself. And I think from that standpoint, that goal was accomplished, but they certainly weren't being called in to discuss the case with her. The case was never discussed. It was all in just discussions in prayer and those kind of things.

Q Trying to create a good environment for her?

A Yes.

Q A supporting environment?

A Yes.

Q Trying to put people in her life that might have a better sense of fashion for women's clothes than you yourself might have, correct?

A Anybody would.

Q Okay. So it was important to try to make Lisa feel good, right?

A Yes.

Q Your goal as a defense attorney is to defend her to the best of your ability in a constitutionally -- in a constitutionally efficient way, correct?

A Yes.

Q This is kind of outside the realm of that. In order for you to do your job, you need her to have a positive, good

environment?
A Right. And I wanted her to have a good appearance before the jury.
Q When you talk about appearance in front of the jury, do you ever instruct your clients about how they should demean themselves while in court?
A That's a great question. And I still don't know the answer to that question because clients ask you, What do I do? Do I sit? Do I -- if they smile, then the jury thinks they don't care. If they laugh during a recess -- I mean, I think it's the hardest thing to do in a trial other than kind of sit there. If you look over at the jury, don't stare at anybody, kind of look through folks. I mean, it's just so difficult being on trial and being accused of any crime. I still don't know to this day what the correct demeanor is, and so other than just pay attention to what's going on, ask us questions if you need to, pass us notes if you need to, be engaged with us in assisting in defending you. I would tell that to every client.
Q Did you give that kind of advice to Ms. Montgomery?
A We did.
Q Did she follow your advice?
A She did.
Q Did you have the ability to communicate with her during the course of the trial?

A In terms of when the trial was going on from the seating arrangement, I was not near Lisa. I was at the front. She was at the back next to Fred. I think Ryland was there and I think Stephanie. So we would communicate during the trial. Not a lot because she would pass notes. If the note needed to get to me if I was questioning a witness, it got to me. If it was just a note to someone there that could be taken up at a recess or whatever -- but she was -- to me she was engaged. She did ask questions. She asked questions during recesses. And I kind of felt at that point in time she was engaged.
Q And she passed you notes during the course of the trial?
A I don't know that she passed me a note, but she passed notes for sure I think to Fred, to Dave, to whoever was sitting near her, and some of those notes got to me I know, but she didn't pass me directly a note, I do not believe.
Q She passed communications within the trial team?
A I think that's a fair statement.
Q All right. So you believe ultimately, however, that she was engaged in the defensive process and that she had taken your advice about how her demeanor, you thought, should best be portrayed?
A I do.
Q Okay. When we go back to the March 7th memorandum from Mr. Duchardt, in addition to indicating to you that he had

Ryland with him, you talked about kind of the fact of Tommy Kleiner's presence at the Bobbie Jo Stinnett murder being more firm. Do you remember that?

A Yes.

Q He also explained that he was telling the team what was going on because further meetings were going to be had with Ms. Montgomery on March 14th and 15th of 2007; is that correct?

A Yes.

Q If the memorandum says that, would you agree with me?

A I would agree with you that's what it says.

Q Okay. And that he explained to Ms. Montgomery and was reporting to you, the trial team, that if you all were going to go down the mental disease, NGRI path, that this was all going to have to come out at some point. In other words, you will have to show your cards. Do you recall Mr. Duchardt telling you that in that letter?

A Something along that line, yes.

Q And showing your cards is my poor analogy. He didn't say that. But basically he said if we're going to go down this path, we're going to have to let it be known soon, correct?

A I agree.

Q Because in March you're six to eight weeks away from a trial date, right?

A Correct.

Q Now, in addition to the reports attached to the

statement you took in 158, there's also the statement you actually took with the court reporter; do you recall that?
A Yes.
Q Before you went and took that statement, which I would propose to you happened on April 3rd, 2007, at 4:33 p.m., the reports clearly indicate that someone in your team, specifically Ron and Tom, had spoken to Ms. Hayes the day before on April 2nd. Would you agree with that?
A That made more sense after I looked at the stuff that was shown to me, yes.
Q And that meeting on April 2nd that your investigators did preceded the meeting you had with our office on April 3rd of 2007, didn't it?
A Again, if the records -- I'll agree with what the records show.
Q And I'll propose the records show you met with our office on April 3rd, 2007, at 9 a.m. Okay?
A Okay.
Q Then later that day you had a meeting before Judge Fenner -- well, it might not have been Judge Fenner. It might have been the magistrate. You had a court meeting to discuss the case. Would you agree with that?
A Yes. Is that from Roseann's notes of that --
Q The meeting occurred on April 3rd of 2007. I think it was from Roseann's notes.

A Okay.
Q The docket entry will show that you had a court appearance later that day.
A Okay.
Q When you -- after your investigators went and spoke to Ms. Hayes and her son on April 2nd, they believed that she made a positive identification of Tommy Kleiner, didn't they?
A That was my belief.
Q And that's why you went back up there later that day to take the court reporter and get a statement, correct?
A Again, I think that's a fair statement.
Q Why would you take a court reporter with you to take a statement? Tell the Court.
A Well, I mean, I think -- again, when you talk to someone and what you write in the report, someone could say maybe that you were trying to make something more than what it was. A court reported statement is a question and answer. There's no question what the question was. There's no question what the witness said. And it alleviates any doubt in terms of, you know, manipulation or thoughts that somebody's doing something untoward.
Q So you wanted to nail it down a little more usefully for you, correct?
A That's kind of what I've done my whole career.
Q And when you were asking her by showing her photographs

about Tommy Kleiner, when she was looking at the direct view of Mr. Kleiner, then the side-view of Mr. Kleiner, she said she struggled because she only saw him only from one view; is that correct?

A That's correct.

Q All right. And you mentioned to her in the question on line 10 on page 19, "And so when you talked to Ron and Tom yesterday, at one point they wrote down that you said --" She interceded an answer, "I was pert near sure." You finished the question saying, quote, I think I'm sure that's him.

Okay. Is that where you believe you got the identification by Ms. Hayes of Mr. Kleiner on April 2nd of 2007?

A Again, I can't say for sure, but it would make sense; but to say that for sure, I cannot.

Q When you met with our office on April 3rd of 2007, that was in the morning before you had gone back with the court reporter. Would you agree with that?

A Yes.

Q And when you came to our office, the goal in that meeting was significantly to try to get death off the table, if possible, correct?

A Yes.

Q All right. Because I think you said in your direct examination that the goal line was always to try to get a

less-than-death verdict, if possible?
A Yes.
Q And that was because the nature of the underlying crime was pretty aggravated, let's say, correct?
A Yes.
Q Okay. So when you met with our office, you were doing so at a time very near your trial deadline of April, late April 2007, right?
A Yes.
Q And you disclosed what you knew about the Tommy defense at that time, correct?
A Yes.
Q Would you have disclosed to us that Ms. Montgomery had told you now that there was another person present? Does that sound familiar?
A Yes.
Q And that person that was present with her during the Bobbie Jo Stinnett murder was in fact her brother, Tommy Kleiner?
A Yes.
Q Would you agree, then, that you had sent your investigators to kind of interview Leona Hayes, then it was your goal later to go back with a court reporter to nail that testimony down?
A That makes sense to me on that timeline.

Q In addition to simply advising the government about that and trying to get death off the table, you were trying to put your client in the best position possible to make her a cooperating witness, weren't you?
A Yes.
Q You had experience doing that in cases with either State or federal prosecution authorities before?
A Yes.
Q And one of the things you would need to do to try to nail that down is to try to verify your story as best you could, correct?
A Correct.
Q And that would be the reason to take a court reporter with you to Skidmore, Missouri, to speak with Ms. Hayes?
A Correct.
Q That would also be the reason that Tommy Kleiner would have been interviewed by Dave Owen and Ron Ninemire on the team on March 29th, correct?
A Yes.
Q And that would have been the reason on March 30th that a polygraph exam was given to Ms. Montgomery so that you could use the fact she passed that exam as a persuasive argument with my office to try to convince us to take death off the table?
A Yes.
Q And you did all those things?

A Yes.
Q Ultimately that was not successful, was it?
A It was not.
Q Now, you were asked about the previous trial teams and them having decided or discarded the Tommy defense. Were you aware of -- you may not be aware of this, but Government's Exhibit -- excuse me -- not Government's. Exhibit 145 is a series of notes from Erin Garman. Do you know who Erin Garman is?
A That doesn't strike me right now.
Q If I propose to you that she's a probation officer in Osage, Kansas, that was in charge of supervising Tommy Kleiner, does that ring a bell?
A It still doesn't, but I assume she was if you tell me she was.
Q I'll leave that line alone if you don't recall it.
Let me ask you this, then. When you came into the case, you were aware that there had been previous trial teams representing Ms. Montgomery?
A I was.
Q And you were aware, without getting into the details of the matter, that there had been some level of dysfunction that necessitated the Court removing previous counsel and appointing you in the case?
A To some degree I believe I knew that.

Q Did you reach out to that previous counsel to try to talk to them and figure out what their theories of the case were?
A I did not.
Q How come?
A I'm now assigned to do the case. I did not not do it. In other words, I didn't think, okay, I know better than everybody else so I don't need to talk to anybody. I just did not do it because we were now assigned to do the case. I felt comfortable handling the case, and so I didn't think about it one way or another. So it wasn't like I thought through and said, You know, I'm not going to do that. I just didn't do that.
Q Do you recall that one of the previous trial teams with Deb Garvey and David Freedman's input created what I call a to-do list of things they were doing, to explore, and things like that; do you recall that?
A I don't.
Q Okay. I'll ask Mr. Duchardt about that then.
When you were appointed in the case, Mr. O'Connor, I believe you indicated you asked the Court's indulgence to allow a mental health -- another attorney who specialized in mental health defenses, correct?
A Yes.
Q In fact, that's Mr. Duchardt; is that fair?

A That's fair.

Q All right. And did you tell the Court that if you took the case, you'd be willing to do it gratis if you could get another lawyer to help you in this matter?

A I think there was some discussion because obviously there had been previous lawyers, CJA funds had been used. I knew that the public defender was involved. I didn't know the extent of whether or not there was going to be the ability for a second counsel.

There were discussions, I think, with Judge Fenner and Judge Maughmer. I just felt that I wanted someone, if I could have the choice -- and I still didn't know if I had the choice, okay, to this minute other than I gave my opinion; and that if that meant getting someone involved to that degree and that I would not be paid -- because I did cases over the years in State court when Judge Randall was there and we didn't get paid because the money wasn't available. So I think I made that proffer.

It wasn't asked of me or discussed with me, but I thought it enough that I should try to persuade the Court that I'm willing to -- I believed that someone with Mr. Duchardt's ability in that area and this was a mental health would better -- make us a better team, so to speak, and better in representing Ms. Montgomery. That's my recollection of that conversation.

Q Based upon that, Mr. Duchardt was in fact appointed, correct?
A He was.
Q And you didn't have to work gratis. You did actually bill in this case?
A I did.
Q You've indicated during your examination that your billing records are probably not accurate, and I believe you said that's because you're not a billable-hours attorney; is that fair?
A I think that's fair.
Q When you'd take a case in the last 27 years as a criminal defense attorney, you said you negotiate flat fees; is that right?
A Ninety-five percent of the time.
Q And that generally is a soup-to-nuts kind of, this is what it costs for me to be in the case for however long it takes?
A Correct, with some exceptions, but that's fair.
Q If the exceptions are important to talk about, feel free to do so. I'm not trying to pigeonhole you on it. I just want to make sure that generally speaking you are a flat-fee lawyer?
A Yes.
Q You have indicated, though, you sometimes take

appointments; is that fair?

A I have.

Q You don't take many CJA appointments in federal court, do you?

A I've taken quite a few over the years. Now that PJ's with me, he normally now gets most of the appointments and I get less, but I've done several over the years.

Q So for the record to be clear, PJ is your son?

A Yes.

Q And he's also a partner of yours in your firm, correct?

A Yes.

Q And actually your son, PJ O'Connor, is on the CJA appointment list board; is that right?

A He's the CJA panel attorney for the district, then he also takes CJA cases.

Q You indicated that you have been taking appointed cases in State court for the better part of your career, right?

A I wouldn't say that. I would just say back at the time I first left the prosecutor's office there was a lot of cases. Judge Randall was the presiding judge. He called several lawyers over. He asked if we could create a list of maybe 30 lawyers that would agree to take cases to take the burden off the public defender's office. There was a number of them. I was one of many. But we took, you know, six, seven appointments apiece to try to ease the load knowing there was

no money to be paid and it was pro bono in that regard.
Q It was a service to the bar?
A Yes.
Q So if it's represented that your time sheets are an accurate reflection of the work you did in this case, you wouldn't take exception with that notion, correct?
A Yeah, I would.
Q When you were appointed to this case in 2006 to the time it ultimately went to trial in October of 2007, did you feel like you were given enough time by the courts to prepare your case for trial?
A Yes.
Q Ultimately we talked about the case is scheduled to go to trial in April of 2007 but that date was continued, correct?
A I think that's correct.
Q It went to October of 2007?
A Yes.
Q If you felt that you needed more time to prepare your defense either on the guilt or penalty phase, would you have been comfortable asking the Court for a continuance?
A Absolutely.
Q Did you feel the need to do so?
A No.
Q During the time that you were involved in the case, did your team have meetings or exchange information?

A We did.
Q How did you exchange information?
A Sometimes by email, sometimes by phone call, sometimes by in-person meetings. You name the form of communication we probably had it. Probably texting as well.
Q We've even seen, I believe in Exhibit -- I don't remember the number, but the letter of March 7th, 2007, Mr. Duchardt's letter to you indicating what had happened in Philadelphia, correct?
A The one I was just shown?
Q Yes.
A Yes.
Q The eight-page letter from Mr. Duchardt?
A Yes.
Q You exchanged memorandums too when necessary, correct?
A Yes.
Q Though you were not successful in getting the government to take death off the table in Ms. Montgomery's case, you were made aware that in September 2007 Mr. Duchardt made one last attempt to contact the Department of Justice through Ms. Margaret Griffey -- she went by Peggy Griffey -- to attempt to get her to decertify or de-authorize the case; do you recall that?
A Yes.
Q And I believe you were shown that letter and it was

referenced. It was a two- or three-page letter or email, not particularly long. Would you agree with me it, however, did reference all the inclusions and attachments and that was essentially the expert reports in this case?

A Yes.

Q Dr. Logan, Dr. Ramachandran, Dr. Gur, Dr. Kuncel, and several others. I would say eight different attachments. Does that sound about right?

A Yes.

Q Okay. That wasn't successful either, was it?

A It was not.

Q Have you had many other death penalty cases in the Western District of Missouri?

A I have.

Q Okay. Have you also had some -- I believe you said the District of Kansas; is that right?

A Yes.

Q That was the Demetrius Hargrove case?

A Yes.

Q Although Mr. Hargrove was convicted, he was sentenced to less than death, correct?

A Correct.

Q During any capital representation, is it fair to say that if you can find your client innocent, of course, that's great if you can do it, but most likely your goal is to take

death off the table?
A Again, depending on the facts of the case, but I would say that's always the goal in any capital case is to get death off the table, if you can.
Q In those cases that you had an experience with the Western District of Missouri, have you been successful in getting the Western District of Missouri to agree to plea bargain to less than death?
A Yes.
Q With our office?
A I believe so.
Q Which cases were those?
A I'd have to go back. I'd have to think about that one. I'm happy to come back, but I believe there was either one or two.
Q Okay. If you can recall, I'd appreciate it. I'm not aware of one.
A Okay.
Q Did you ever get a case decertified by the department?
A No. Let me correct that. I think the cases I'm referring to were in State court, not federal court.
Q To be fair, you did have a case that was indicted as a death penalty case against John Robinson federally?
A That's correct.
Q Okay. And that case was charged in both the state of

Kansas and the state of Missouri?
A Correct.
Q Wherein he got the death penalty in the state of Kansas?
A Correct.
Q And do you recall that there was a time when the Supreme Court, the United States invalidated the Kansas death penalty statute?
A Correct.
Q Then Mr. Robinson was indicted federally?
A Correct.
Q However, they reversed themselves, the Supreme Court did, and ultimately made Mr. Robinson's Kansas death case functional under the law and the case was dismissed over here?
A That's correct.
Q So when you were thinking about a case that you got less than death, would that be the one you were thinking of perhaps?
A That may be one. The other one I was thinking, now that I'm sitting here, was Steven Vest that there was some discussion about that with Mr. Becker, but I wouldn't want to swear to it.
Q Okay. As it relates to what I would call the Tommy defense, whether he was there or not, Dr. Ramachandran, if you recall, used the fact that he might not have even been there as

a supporting basis to suggest that Ms. Montgomery was in a delusional dissociative state at the time of this murder; do you recall that?

A Yes.

Q So he used that as a diagnostic criterion to support her mental health issues when he suggested that she was under severe mental disease or defect in the guilt phase of the case, didn't he?

A Again, I have a recollection of that.

Q And I think that an important question, Mr. O'Connor, is why did the defense team choose to pursue an insanity defense or what was commonly referred to in our line of business as pursuing an NGRI? You did that in this case, right?

A Yes.

Q Tell the judge, why did you do that?

A We believed that was the best defense to put forward to the jury in light of the facts and circumstances of the case and try to convince the jury just on the face alone without experts, it looks like someone wouldn't be in their right mind to commit this. You have some evidence to support that. I think that goes a long way in trying to get that theme home to the jury to save Lisa's life.

Q You were the lead counsel in the case?

A Yes.

Q There were other attorneys on the case as well, correct?
A Yes.
Q Did your team talk about pursuing the NGRI defense?
A Yes.
Q Did you agree with that decision?
A Yes.
Q Did you think it was tactically the best thing to do on Ms. Montgomery's behalf?
A Yes, we did.
Q You did that based upon your 27-some years of criminal defense work, right?
A Yes.
Q You knew that it would expose her to government experts earlier in the case than otherwise would be likely if she just pursued mental health evidence in the mitigation phase?
A Yes.
Q But you thought the risk was worth it in the hopes that you would be able to present that evidence to the jury in the guilt phase, correct?
A Again, knowing that those -- it's all a risk. Trying to weigh those risks against someone's life, those are tough decisions. They're not made easily. And, again, looking back, you could say it should have happened the other way.
Q Sure.

A But I was comfortable at the time that I made that decision and we made it, but -- I guess ultimately I made it. And as much of that evidence we could get before the jury on those issues, I thought we had a chance of saving her life.
Q And not just as much as you could get before the jury. When you go with an NGRI, you do have the advantage of being able to let the jury hear it twice, correct?
A Again, I'm big on taking the theme from start to finish.
Q So by doing the NGRI, you have a consistent defense approach to the case, correct?
A Yes.
Q In my words, the jury gets two bites at the apple. Either, A, they can believe the evidence sufficient to find her not guilty by reason of insanity in the guilt phase; or if not, they can say, Well, she might be guilty but, gosh, darn it, she just wasn't quite right. We could give her a mitigated sentence; is that fair?
A I think that's fair.
MR. VALENTI: Just a moment, Your Honor.
Q (By Mr. Valenti) Last thing I want to do, Mr. O'Connor, is you prepared a declaration that is, I would say, a summary of some of the things you talked about today; is that correct?
A The affidavit?

Q The affidavit.
A Okay. Yes.
Q It was dated September 2nd of 2014; is that correct?
A Yes.
Q I'm going to show you what's been marked as Government's Exhibit 41. Do you recognize that?
A I do.
Q I'm going to take you to the last page. It's electronically signed but would you have any reason to disagree that's your declaration prepared in this case?
A It is mine.
Q Is it a fair and accurate representation of your memories when you prepared it at the time in September of 2014 and what you remembered about the case?
A Yes.

MR. VALENTI: Your Honor, I move to admit Government's Exhibit 41.

MS. HENRY: No objection.

THE COURT: Received.

MR. VALENTI: That's all I have.

MS. HENRY: I can be very brief.

THE COURT: All right.

REDIRECT EXAMINATION BY MS. HENRY:

Q Mr. O'Connor, taking you to Exhibit 158, can you see that there or do I need to blow it up?

A I can see it. Thank you.
Q On page 18, not to belabor the point too much, question at line 3, "And when you look at that photograph, look at it any way you want to. Tell me what that photograph means to you.

"ANSWER: What it mostly means, the person's little. It's like I keep telling, the person's little and the person had blonde-colored hair. But I've told them this before, yesterday, the nose may not have been the same. The nose is what throws me."

That's what Ms. Hayes says she told Mr. Moss and Mr. Ninemire?
A Again, assuming what she told people before was those two, then that would be correct.
Q And you would agree with me, Mr. O'Connor, that when the team made the decision to present a not guilty by reason of insanity defense, there was a certain level of trust that you placed in Mr. Duchardt that he had worked with the mental health specialists in a way that they would be able to support a not guilty by reason of insanity defense with their testimony?
A I think that's a fair statement.
Q And that even if it's a good idea to present psychiatric evidence in the first phase, if that testimony doesn't on its face establish that Mrs. Montgomery meets the

federal standard for not guilty by reason of insanity, then it's not a good idea to present that defense, assuming that hypothetical?

A Okay. Assuming that hypothetical, I guess that could be true in this case. That evidence was allowed to be used for the jury to determine those issues.

Q Sure. And you don't have a memory of exactly the transcript. It's 3,000 pages and the Court will read it. But you would accept my hypothetical?

A As the hypothetical as stated, I would.

Q Would you also agree with me, Mr. O'Connor, that the decisions that you made at the time of trial were only as good as the information you had available to you at the time of trial?

A That's always the case.

Q And would you also -- you haven't read the biopsychosocial history. You offered to read whatever I wanted, but you haven't read the biopsychosocial history presented to his Honor in this case; is that fair?

A I have not.

Q And so if you had known at the time of trial that Lisa Montgomery's mother had trafficked her to multiple men from a young age, is that information that you think would have been important for a jury to consider in penalty?

A Yes, because it would go along with the theme -- one of

the themes we had that Lisa was sexually abused since she was a child by Jack and that it went on on multiple occasions, and that would just be further evidence of what her mother subjected her to, how that would look to a child, and hopefully the jury could see that Lisa wasn't the normal child, obviously.

Q And if Mr. Kidwell had been followed up on and you had learned that Lisa Montgomery's mother and father subjected her to oral, anal, and vaginal intercourse with men who were much older than her, sometimes three and four at a time, who would urinate on her when they were done, is that information you would have wanted the jury to know?

A Again, yes.

Q Thank you.

MS. HENRY: I don't have any further questions.

MR. VALENTI: Briefly. May it please the Court.

RECROSS-EXAMINATION BY MR. VALENTI:

Q Mr. O'Connor, you're aware of the special verdict form in this case, correct?

A Yes.

Q It's been awhile since you reviewed it, but if I submitted to you that the jury, at least eight or nine, depending on the way the question was tendered to them in mitigation, found that Lisa had been the victim of significant physical and sexual abuse, would that sound consistent with the

findings that you recall?

A Yeah, because there was pretty significant evidence of that.

MR. VALENTI: That's all I have, Your Honor.

THE COURT: All right. Thank you, Mr. O'Connor. You're excused.

THE WITNESS: Thank you, Your Honor.

(Witness excused.)

THE COURT: I'm going to take a recess now until five minutes after eleven.

(Recess taken at 10:47 a.m.)

THE COURT: Ready, Ms. Henry.

MS. HENRY: Yes, Your Honor. May it please the Court. Movant calls Dr. Ruben Gur.

THE COURT: Good morning, Doctor. Would you come on up to the witness stand for us. Thank you.

RUBEN GUR, being sworn by the courtroom deputy, testified:

MS. HENRY: Dr. Gur, you'll have to hold off for just one second, because Mr. Valenti was kind enough to remind me that I wanted to raise an issue before Dr. Gur's testimony, and that is Mr. Valenti had last week referred to a gentleman by the name of Geoff Aguirre who is a -- I believe he's an M.D. at the University of Pennsylvania. I don't know all of his credentials. He is not an endorsed expert witness in this case. He is a controversial figure surrounding this question

of neuroimaging and its use in the courtroom.

I believe that what limited research I've been able to do, if Mr. Aguirre is introduced into this case, it could create a serious side and collateral issue that I would be required to investigate and to present testimony regarding the credibility of Mr. Aguirre and his source of funding for some of the articles and lectures that he has given, and so I'm moving that the government not be permitted to cross-examine Dr. Gur regarding Dr. Aguirre and his opinions.

MR. VALENTI: Your Honor, Dr. Aguirre, A-g-u-i-r-r-e, and it's Geoffrey with the G-e-o-f-f-r-e-y version, is a medical doctor with a Ph.D. at the Perelman School of Medicine, the same school that Dr. Gur is on the faculty at. He is a member of the Department of Neurology. And he's critical of the neuroimage aspect of Dr. Gur's reports, his reporting as PET scans, MRIs. He can talk about those. But during the defense presentation of the evidence, they talk about the Court's ruling in this case essentially being that Dr. Gur was not going to be allowed to testify as it relates to the PET scans because of the discovery controversy related therein, but they then argue that the neuroimage that's produced by Dr. Gur could have been admitted. So I believe that Dr. Gur's awareness of the people in his own school's criticisms of the neuroimage and being able to talk about those principles and the criticisms is appropriate cross-examination.

THE COURT: All right. I will allow the government to cross on those lines if they choose to.

MS. HENRY: Just to be clear, Mr. Valenti, you're referring strictly to the criticism of the behavioral image?

MR. VALENTI: Yes, behavioral image.

MS. HENRY: That's all --

MR. VALENTI: My reference to Dr. Aguirre will be that, to the behavioral image. The first two reports Dr. Gur created he actually talks highly of Dr. Gur.

MS. HENRY: Thank you. I appreciate that clarification.

DIRECT EXAMINATION BY MS. HENRY:

Q Now, Dr. Gur, if you could state your name for the record and spell your first and last name, please.

A My name is Ruben Gur, R-u-b-e-n, G-u-r.

Q And, Dr. Gur, how are you employed?

A Sorry?

Q How are you employed? What's your job?

A Sorry. I'm a professor with tenure at the University of Pennsylvania at the Perelman School of Medicine. My primary appointment is in the Department of Psychiatry. My secondary appointments are in neurology and radiology, and I am a member of the graduate group in neuroscience that awards Ph.D.s in neuroscience.

Q Explain what that group is.

A Explain --
Q What does that group do? I'm sorry.
A So in order to get a Ph.D. you have to go to a graduate school, and the graduate department that awards Ph.D.s in neuroscience is called the neuroscience graduate group, and I am a member of that group. So if people want to get a Ph.D. in neuroscience, they can work under my supervision.
Q Thank you.
And I think we talked a little bit before court that you're a little bit hard of hearing and I need to make sure to speak into the microphone.
A Yeah. I'm sorry. Working on it.
Q Sure. If you don't understand -- if you don't hear me, you let me know and I'll try to speak louder.
A Okay.
Q Okay. Thank you.
Doctor, I notice on your CV that your office address is the Brain Behavior Laboratory at the Department of Psychiatry at the University of Pennsylvania. Can you tell the Court what the Brain Behavior Laboratory is?
A The Brain Behavior Laboratory is a laboratory that I established around 1982, and it's dedicated to using neuroimaging in order to understand brain and behavior.
Q You founded that laboratory?
A Yes.

Q And how -- what is your professional occupation? What kind of a mental health expert are you?
A I am an expert in neuropsychology and neuroimaging.
Q So let's go back through your educational degree and we'll come forward to your current occupation. What is your -- what are your degrees in?
A I received a Bachelor's Degree in Psychology and Philosophy from the Hebrew University in Jerusalem in 1970. I then came to the United States, obtained my Master's Degree in Clinical Psychology in 1971 at Michigan State University, my Ph.D. also in Clinical Psychology in 1973 from Michigan State University, and I did postdoctoral training in neuroscience at the Stanford University, 1973, '74, and clinical postdoctoral training in clinical psychology and neuropsychology at the University of Pennsylvania '74 and '76, concurrent with my appointment there as an assistant professor in the Department of Psychology.
Q Have you been at the University of Pennsylvania ever since?
A I've been at the University of Pennsylvania since 1974.
Q And in what capacity did you first begin to serve at the University of Pennsylvania?
A First I came as an assistant professor in the Department of Psychology. Then I moved to the medical school where I was promoted to associate professor, then got tenure

and then promoted to full professor, I believe, in 1989 or thereabouts. So since then I've been full professor with tenure at the University of Pennsylvania School of Medicine.

Q And what courses do you teach at the University of Pennsylvania School of Medicine?

A I used to teach courses in psychology, abnormal psychology, brain and behavior. Since moving to the medical school, my teaching is much more -- much more a part of my work. So I teach primarily medical students, graduate students, postdoctoral fellows, and I participate in classes. I've taught a couple of undergraduate seminars since I joined medical school. In the medical school I participated in teaching brain and behavior, human neurobiology, and neuroimaging.

Q So by profession would you describe yourself as a neuropsychologist?

A Yes.

Q And are you board certified?

A Yes. I'm board certified by the American Board of Professional Psychology with a subspecialty of clinical neuropsychology.

Q Are you also a diplomat in clinical neuropsychology?

A Yes.

Q What does that mean?

A It means that you pass a higher level of qualification

that is needed for just practicing in the field.

Q Do you also conduct research?

A Yes. That's what I do most of my time.

Q And what areas of research -- what's your research focus?

A My research focus is on neuropsychology and neuroimaging both in healthy populations looking at the effects of age and sex differences and the specific brain disorders. Most of my work has been done on psychosis, but I've done neuroimaging and neuropsychology work in a variety of other brain disorders ranging from seizure disorders, epilepsy, Alzheimer's disease, Parkinson's disease, stroke, cerebral vascular disease, and several other disorders.

Q And when you conduct your research, do you do that with a multidisciplinary team?

A Yes. Most of my work requires a multidisciplinary team.

Q And what sorts of mental health professionals are involved in your multidisciplinary team?

A In a typical study that involves neuroimaging and neuropsychology, there will be a neurologist, psychiatrist, nuclear medicine experts, physicists, radiologists, chemists, statisticians. Most papers will have at least one of each.

Q And do you often use students as well as those other multidisciplinary experts?

A Students?

Q To assist you in data collection and that sort of thing?

A Yes. There are students at all levels that work in the laboratory. And depending on the level, they will collect data, analyze data; and when there are graduate students and postdoctoral fellows, they will conduct some independent research and deal with a larger range of responsibilities; and if they make substantial contributions to the work, then they coauthor the paper that will report the results.

Q And you're the director of this laboratory, so essentially you're the boss of all these people who are working under you?

A Yes.

Q Okay. That may be an oversimplification but you're the figurehead at the top?

A Yes. It doesn't quite work like in a military setup. It is more like herding cats. But I'm responsible for what the lab is doing, and I have supervisory responsibility to the students and more junior faculty. We have several faculty also in the laboratory.

Q You work collaboratively; is that fair to say?

A Yes.

Q And when you reach conclusions with respect to -- well, I'm going to get back to individual clients in a minute.

Do you have any hospital or administrative appointments?
A Yes.
Q Where at?
A My main hospital appointment is at the Veterans Administration Hospital, the Philadelphia VA. Until recently I was a quarter of my time there. Now I've cut it to half of that because of the bigger involvement I have in the research, and my job at the VA is to help develop clinical research and consult on especially complicated cases where the staff may have a patient who has more than one problem. For example, they may have traumatic brain injury and they may suffer from posttraumatic stress disorder and they may have other psychiatric complications.
Q So the veterans who are being treated at the VA if they present with a particularly difficult comorbid diagnosis, you're brought in to consult on the case?
A Yes.
Q To assist in patient care for that veteran?
A Correct.
Q Are you licensed?
A Yes.
Q Where are you licensed?
A In the Commonwealth of Pennsylvania.
Q Have you received any -- I know you've received a lot

of honors and awards. Are there any ones in particular that stand out and are relevant for your testimony today?
A Report?
Q Awards.
A Awards?
Q Yes.
A Yes. I think probably the most significant awards were the Lieber Prize from the Brain & Behavior Research Foundation that I received together with my wife, Raquel, and the George Miller Prize from the American Psychological Association for distinguished contribution in a specific article.
Q What was that article?
A That was an article that looks at sex differences in brain and behavior.
Q In addition to those professional credentials that you possess, do you serve on any editorial or advisory boards?
A Yes. I'm on several editorial boards of brain behavior journals. I'm actually editor, meaning that an editor who makes the final decision about accepting manuscripts for the journal, Brain and Cognition.
I also served over the years in what is called Study Sections, which are groups of experts -- and the National Institutes of Health constitute in order to review grant applications from around the country, and currently I'm chairing a committee called APDA, A-P-D-A, which stands for the

committee that decides on grants in the area of Adult Psychopathology and Disorders of Aging.

Q So if someone wants to apply to the National Institutes of Health for a grant in that particular area, you have been vested with authority to help decide whether or not that grant will be given?

A The decision about grants funding depends on the deliberations of the committee such as the one I chair, and so all the grants in this area will come to my committee, and the committee meets three times a year and goes over all these grants and assigns scientific merit ratings; and based on the scientific merit, the institute director decides which grants to fund.

Q And the National Institutes of Health is a government organization; is that correct?

A Yes.

Q And so the United States government has seen fit to put you as chairman of that committee?

A Yes.

Q And you serve as the editor for the journal of Brain and Cognition?

A It's a journal called Brain and Cognition.

Q Is it a peer-reviewed journal?

A I'm sorry?

Q Is it a peer-reviewed journal?

A Oh, yes. This is a peer-reviewed journal.
Q Do you also -- have you also received grants from the National Institutes of Health?
A Yes. I've been -- I've received grants from the NIH since around the time when I came to Penn. I would say probably since around 1976.
Q So you routinely and regularly receive grants to do your research?
A Yes.
Q And does that research include the use of neuroimaging?
A Yes.
Q And that would include MRI scans and PET scans which are the subject here?
A Yes. Yes.
Q You also are an expert in other areas of neuroimaging such as FMRI; is that correct?
A Yes. I've been among the first to publish in this area, and there are several other MR methodologies that I use routinely in my work.
Q But FMRI was not used in Mrs. Montgomery's case?
A No.
Q Can you tell the Court about your grant applications with NASA?
A Well, I have several grants from NASA and I participate in other grants and they include neuropsychology and

neuroimaging. The methods we have developed have been adapted now by NASA for use in astronauts, and they are used in study of astronaut analog conditions.

So NASA funds research on earth in conditions that resemble space flight and so you can learn from those conditions about effects of space flight. So one of our grants from NASA is to look at people who spend the winter in Antarctica and we do imaging and neurocognitive measurement in those people before they leave; and then when they get back from winter over in Antarctica, we do those studies immediately and then follow up those individuals.

I also have a grant to look at neurocognitive performance of high-performing individuals who are at the level of astronauts and also the astronaut candidates and ground control people.

Q In addition to those grants, are there any other grant funding -- or I guess I should say your CV is 50 pages in length?

A It is exactly -- all the information here is what the school requires us to put there. So it's in the format of the -- required by the University of Pennsylvania.

Q And your assistant was kind enough to send us the most-up-to-date CV yesterday afternoon and I've marked that as Movant's Exhibit 156. Do you have a copy of that in front of you?

A Yes.
Q And is that curriculum vitae, which at the top is dated August 2016, an accurate representation of your professional accomplishments, including articles, presentations, commentaries, editorial boards, grant application, committees, all these things?
A Yes. I just noticed there was one piece of information in that CV that was not updated.
Q What is that?
A And that is my h-index. That has not been updated.
Q Can you tell the Court what an h-index is?
A H-index is a single number that is now increasingly considered as reflecting scientific stature of an individual. That number indicates the number of papers that an individual published in peer-reviewed journals that were cited that number of times. So an h-index of ten means that an individual published ten papers that were cited at least ten times each, and that is considered to be the best index right now for gauging a scientist's stature in the field.
Q What is your h-index now?
A So in this CV it still is an h-index of 109.
Q I'm sorry, Dr. Gur. What page?
A On page 6.
Q On page 6. Okay. Thank you.
A So that's two indices. One is the h-index and the

other is the i10-index, which means how many manuscripts have you published that were cited at least ten times. If a manuscript is cited ten times, it's considered sort of an ace in the sense that an Air Force pilot who downs ten enemy planes would be called an ace. So that's an index that reflects whether your work is being cited by other scientists.

Q So from August of 2016 to today your h-index went from 109 to what?

A 120.

Q And the other index?

A The h10-index [sic].

Q Okay.

A It was 349. I believe it's now over 400.

Q Okay. And where does that place you -- we've talked about the fact that you're kind of a humble guy, but where does that place you in terms of scientific stature for perspective for the Court?

A Well, there is an annual release of the list of scientists who have a 100 or higher h-index, and in the whole world there are about 1,500 scientists with an h-index of 100 or higher.

Q So you are in the top 1,500 analysts internationally?

A According to that index.

Q Now, Dr. Gur, I note that you had a publication in -- let's talk first about your behavioral image. Can you tell the

Court what the -- you know what? I'm going to get you qualified before we talk about behavioral image.

MS. HENRY: Your Honor, I would move to accept Dr. Gur as an expert in the field of neuropsychology and neuroimaging.

MR. VALENTI: I don't have any problem with that, Your Honor, with the exception of behavioral imaging. I need to cross at some length.

THE COURT: I will consider his opinions.

MS. HENRY: Thank you, Your Honor.

Q (By Ms. Henry) Let's talk, Dr. Gur, about the behavioral image and let's break it apart. First of all, could you describe for the Court succinctly what the behavioral image is intended to be?

A Well, because there are -- there was a proliferation in the field of neuropsychology, the National Institutes of Mental Health were concerned that neuropsychologists will interpret results of neuropsychological testing in relation to brain functioning.

With their funding we led a project where we invited the top four neuropsychologists in the country at the time who had the most experience in clinical neuropsychology, and with them we asked them to rate each neuropsychological test result with regard to the brain regions that are implicated by these results. So they put numbers.

So, for example, if there is a test of verbal fluency, we know that verbal fluency is affected by lesions in the left frontal region. So a deficit in verbal fluency would get a high number in the left frontal region and all other regions will get numbers depending on the probability that the lesion in those areas would produce a deficit in verbal fluency.

So the four experts went over each one of the tests that were available at the time and produced a table of weights that indicated which brain regions would be implicated if there is a deficit in that particular measure.

Q So I want to ask you some more about that, but, first of all, I'd like to talk about these four top experts. Did you just go pick your four buddies to do this?

A The four --

Q Four buddies. Were these just four pals of yours who you chose to assist you in this study?

A No. No. These were -- these are quite intimidating people and I was still junior at the time. I was hoping to enlist their collaboration on that project and I'm delighted that they agreed.

One of them was from Penn so he -- I knew him well before that project. The others were from other universities. It was Arthur Benton from the University of Iowa, Edith Kaplan who was from the Boston VA and Harvard, Harvey Levin who was

from the University of Texas, and the one who was from Penn was Andrew Saykin. But they were selected because they were recognized leaders in this area, not because of any personal relation or knowledge I had of them.

Q So were these top experts in neuropsychology at the time?

A How?

Q Were they top experts in neuropsychology?

A Yes. Yes. I think everybody would agree that these are to this day considered among the big giants of the field.

Q And was the concern that -- we know with neuropsychological tests that there's a gross result -- and that's my word -- that's reported but there's also subscale results?

A Correct.

Q Were you trying to get the granularity of the information that could be obtained from these subscale results?

A So, yes, but with a specific notion that we need to have reliable ways of relating cognitive performance to brain regions, to the functioning of brain systems.

Q Is it fair to say that the behavioral image is itself designed to be simply a graphic representation of the information that you're able to glean from the neuropsychological testing?

A Yes, absolutely. The behavioral image is not designed

to replace clinical judgment or standard clinical interpretation of the test results. It is just designed to help standardize the way we -- the way we relate to brain regions to a particular pattern of performance.

Q And did you get a patent on the behavioral image?

A Well, first -- I mean -- yes, I got a patent for the behavioral image.

Q Before you got a patent for the behavioral image, did you have to subject it to peer review and have it published?

A So it's a little complicated. In fact, if you publish something, then you automatically lose the right for patent. You can still get the U.S. patent if you apply within a year of the publication. I didn't know that. So we published the paper, and then the university told us we should go through to get a patent because they thought it was a patentable idea.

So we went ahead and got the patent. That is a U.S. patent. But in order to get a patent, you have to demonstrate to the Patent Office that your method is valid and reliable.

Q Where did you publish your results of the behavioral image?

A The first paper and then some subsequent papers were published in a journal called Neuropsychiatry, Neuropsychology, and Behavioral Neurology.

Q And are those peer-reviewed journals?

A Yes.

Q And so prior to publishing your research regarding the behavioral image, it was subject to peer review and accepted?
A Yes.
Q And then you went the next step, which maybe if you had been more savvy, you would have got a patent first, but you went the step of getting a patent which meant you had to show the reliability to the U.S. Patent Office?
A Yes.
Q And that was done?
A Yes.
Q And do you hold that patent to this day?
A Well, a patent is only valid for 17 years, so it expired a while back.
Q When did you get this patent?
A In 1990, I believe. Yes.
Q Have you ever represented in any court that you could diagnosis someone with a specific mental illness simply on the basis of the behavioral image?
A Oh, no, never.
Q And what role does the behavioral image play in your clinical interpretation of neuropsychological data?
A The main use I have for it is that after I reach my own conclusion, I want to make sure that this is about what -- this is commensurate or consistent with the conclusion that four experts would have reached had they seen that test, and this is

basically what the behavioral image tells me.

So in most cases, really the vast majority, I look at the behavioral image and I say, Yes, that's what I see from the data. But occasionally the behavioral image will show an additional area that could be -- that could show a deficit, and that can happen because I may not have noticed a particular pattern in the data, and then I go back and look at the results of the neuropsychological testing to verify that indeed that there are deficits consistent with an abnormality in a region that I didn't consider but the behavioral image would show me.

Q In addition to the behavioral image, do you also look at the neuroimaging data if it's available to you?

A Yes.

Q And does that include, for example, the MRI and the PET scan?

A Yes. The MRI gives me the data on brain structure and the PET data on brain function.

Q So are you looking at consistency across data from the neuropsychological to the neuroanatomical to the neurophysiological data?

A That's exactly what I do, yes.

Q And in medicolegal cases, such as the one we're dealing here with Mrs. Montgomery, is it common practice for you to work with other mental health professionals to share your opinions about what you see from the brain behavior

perspective, we'll say, for example, a psychiatrist, a neurologist, perhaps a trauma expert?

A That's usually how it works in medicolegal cases, yes.

Q You, Dr. Gur, are not a forensic expert; is that fair to say?

A That's fair. I'm not.

Q And you are not someone who educates yourself on the niceties between what the burden of proof is for a not guilty by reason of insanity defense versus a mental health defense that might be presented in the second phase or the penalty phase of a death penalty trial?

A No. No, I don't. I mean, I do medicolegal consultation under the one-day-and-seven rule at the University of Pennsylvania which allows faculty, full-time faculty to engage in outside consultations, including medicolegal consultations, one day in seven, which is roughly about 50 days in a year.

Q So you're only allowed to do this work 50 days a year?

A Yes.

Q And typically what happens is your data is given to a forensic expert who then is able to tie it all together and answer some of the legal questions?

A Yes.

Q And when you work on these medicolegal cases, has it become a practice of yours to work with a gentleman by the name

of Christos Daviztikos?
A Yes. Each one of the components that I use in my evaluation is a technical -- requires some technical skills, and the people who have those skills would be involved in various stages of the work. Professor Daviztikos is a world-renowned expert in image analysis, especially magnetic resonance images. So when I get an MRI of any case research, clinical or medicolegal, I ask Professor Daviztikos to process the case and give me the results of his quantitative analysis.
Q And Dr. Daviztikos is the expert in performing the quantitative analysis, and he uses a state-of-the-art method called -- in 2007 he used deformation-based morphology; is that correct?
A That's correct.
Q That's something he was skilled at doing?
A Yes.
Q And he would provide the results to you and then you would interpret those results as they related to the other data?
A Exactly.
Q So he had a piece of the puzzle?
A Correct.
Q And you also worked with a gentleman by the name of Dr. Andrew Newberg; is that correct?
A Yes.

Q And did Dr. Newberg provide the PET data in the case?
A Correct. Dr. Newberg is a nuclear medicine physician, and he has directed the clinical work of our PET Center at Penn and has been a colleague and very probably the most skilled person I know in reading PET scans.
He also can apply -- with the help of physicists he can apply a standard region of interest approach to the data so that he can get quantitative measurements from the PET scan; and so whenever I get a PET scan for any purpose, I ask Professor Newberg to analyze the data and give me his clinical reading and the quantitative analysis of the PET scan.
Q So the person who performs the quantitative analysis of the PET scan is Dr. Newberg?
A Yes. He gets -- the actual mechanics is done by Dr. Redding but sometimes Dr. Newberg does it himself. Usually there is a special person in the PET Center who does the quantitative measurements.
Q So the person who does the math --
A Yes.
Q -- is Dr. Newberg?
A Yes.
Q And then when you get the data from Dr. Newberg, you plot it on a graph?
A Correct.
Q And that graph ends up in your report?

A Yes.
Q And then you consult with Dr. Newberg as to what his findings are; and, again, you look at his findings in conjunction with Dr. Daviztikos as well as the neuropsychological data?
A Exactly, yes.
Q And so because you are the director of the Brain Behavior Laboratory, is it fair to say because of your neuropsychological experience, you're the guy who can sort of put all of this together and explain what the structural, functional data means as far as the person's behavior?
A Yes. That's the role of the neuropsychologist. Neither Dr. Daviztikos, nor Dr. Newberg have any training in behavioral science.
Q And you also work with your wife, Dr. Raquel Gur, who is a psychiatrist; is that correct?
A She's a neurologist and a psychiatrist, so she did dual training.
Q Okay. Is it fair to say that you rely on Dr. Daviztikos' and Dr. Newberg's expertise and input when you write your reports in the medicolegal context?
A Yes.
Q Now, I want to turn your attention, Dr. Gur, to your role in the Lisa Montgomery case. Okay?
A Okay.

Q And in the Lisa Montgomery case you were contacted initially and requested to perform an analysis of the neuroimaging and neuropsychological data on behalf of Mrs. Montgomery by an attorney by the name of Fred Duchardt; is that correct?
A Yes.
Q And Mr. Duchardt was your primary source of contact with the Lisa Montgomery team; is that fair to say?
A Yes.
Q And when you work on medicolegal cases, is it also fair to say that the schedule or timeline for when the analysis is to be performed is often dictated by the schedule of the lawyer?
A Yes. Schedules of other people as well.
Q You don't have any control over when the client is granted a transport order and brought in for the neuroimaging?
A No, definitely not in medicolegal cases.
Q And so you agreed to take on the case, I believe the record will show when Mr. Duchardt testifies, in May of 2006, but Mrs. Montgomery was not brought to Penn until February of 2007. You didn't have anything to do with that delay; is that fair to say?
A No. We were ready to study as soon as she was brought over.
Q Now, there is a question you know that was ultimately

raised about the production of raw data as it relates to the PET scan, and we're going to talk a little bit more about the PET scan, not in great detail because Dr. Newberg has been here before, but was the -- initially when you provided your report, did you provide what you believed was the relevant raw data in the case in a timely manner?

A Yes. I provided it the same day I received it from the PET Center and it is our standard and routine.

Q And then it later -- there later became an issue that arose with respect to government experts wanting even more granular data; is that correct?

A Yes.

Q And was that an unusual request in your experience?

A It never happened before. It never happened since.

Q And so --

A So I would think it's unusual.

Q So it wasn't something that you anticipated or expected that you were going to need to dig up and turn over?

A No.

Q I want to talk now -- we'll get back to that in a minute, but I want to talk about the work that you did on behalf of Mrs. Montgomery. You did receive the raw data of neuropsychological testing that was provided by Dr. Robert Fucetola from the University of -- or Washington University in St. Louis; is that right?

A Yes.
Q And did you take the results of that data and input it into your brain imaging algorithm; is that correct?
A Behavioral image?
Q Yes. Does that involve an algorithm?
A Yes. It's an algorithm. I didn't finish explaining the behavioral image.
Q I'm sorry. Please do.
A Essentially those weights that the expert gave were validated. We asked that those same experts -- they gave their weights independently. We then asked them to come back a year later and provide those weights again. So we established what is the inter-rater and intra-rater reliability of the ratings, and these ratings are the guts of the algorithm that we invented and developed which allow inputting the neuropsychological test results in getting an image of the brain is an output which reflects the brain regions that seem compromised, most compromised, based on the neuropsychological test results, and that's an algorithm in the sense that if you put in the same number, you get out the same image.
Q Thank you. And thank you for bringing up the issue of reliability and inter-rater reliability.
What was the point of asking them to come back a year later?
A Because we wanted to find out if they remained

consistent within themselves, and we considered a year to be an adequate interval for them to not remember out of the hundreds of numbers that they entered which numbers they were, and we wanted them to start the whole process from scratch and see if they came up with the same ratings.

Q And I believe you used the phrase "inter-rater" and "intra-rater." Can you please just -- I think I know what that means but can you please explain for the record.

A Yes. We wanted to establish whether the four experts agreed with each other, and that's the inter-rater reliability, and we wanted to find out if each of them agrees with themselves a year later, and that's the intra-rater reliability.

Q And so with Mrs. Montgomery you used this patented behavioral image that had this established reliability and input her numbers into the algorithm and were able to produce a behavioral image; is that correct?

A Yes.

Q Now, there's been, I know, some discussion about the fact -- well, let me back up.

Can you describe the scale that you use when you produce a behavioral image? What's the scale?

A So the behavioral image produces these numbers. These numbers are what is called unitless. In general, they are -- they track with Z-scores which indicate overall ability, but

within that they indicate the range of variability within an individual and that's the emphasis.

Q Why is the emphasis on the variability within the individual with respect to your behavioral image?

A Looking at variability within the individual is the way to find out if there is brain dysfunction.

Q Why is that?

A Because somebody who is very smart can get into a car accident and have a head injury. When they are tested, they will still score higher than most people in the population, and what you are asking yourself is -- everyone has a certain level of functioning and there is very little variability. So you may be better at math than you might be in language comprehension, but it's not that you will be a genius in language comprehension and a total -- intellectually disabled in math. The abilities are even and there is knowledge about how much variability you can expect within an individual.

The way you know that somebody has brain dysfunction is if one of those abilities deviates from the others. So, for example, if you wonder whether you are getting old and you begin to -- your memory doesn't seem to you as good as it used to be and you wonder whether it's normal for your age or whether you might be facing a dementing illness and you go to a neuropsychologist. The neuropsychologist will give you a neuropsychological battery. And according to guidance in the

field, if any one of your abilities is more than one standard deviation worse than your average ability, that will put you in a category called -- in a diagnostic category called mild cognitive impairment or MCI.

That's important because it turns out that about 20 percent of people with mild cognitive impairment will have Alzheimer's disease within a year of the evaluation; and, again, a certain percentage will have it within two years, and it's called conversion to dementia. This is the tool that is used in the field in order to find out whether you just have regular normal-for-age deficits in memory or whether your memory deficits indicate something worse.

Q So just to be very clear, because this is some highly technical stuff we're talking about, and I want to make sure I understand. With respect to the behavioral image, you're comparing Mrs. Montgomery's brain with other parts of Mrs. Montgomery's brain. You're not comparing her brain to a normative group on the test?

A That's the emphasis, although I do get the gauge from looking at the output of the algorithm, where she stands roughly relative to the rest of the population as well.

Q And with respect -- is that why it's unitless because you're comparing the brain of -- one part of the brain with another part of the same brain?

A Yes. We discussed that a lot among the experts, and we

initially thought we should try to quantify that unit further and decided essentially that any further attempts to modify these numbers will only confuse and be an obstacle, and since we already -- we're only using the behavioral image in order to ask where and not how severe but just where is the most likely damage, then there was no need to work more of those numbers.

Q And is that because that image then tells you, okay, we need to look more closely at that particular area of the brain?

A Exactly. And then if you go back to the test that you use -- and you may find that you didn't use a good test for that particular brain region, and so -- and the reason that the behavioral image shows deficit is because there are tests that are similar enough to that test and they converge to show that there is a problem with that region and then you can go and do some more testing with a patient that are focused on that region, and you may find that the deficit is greater or not as big as you thought.

Q The Court has heard testimony from Dr. Robert Fucetola that Mrs. Montgomery's IQ score had a significant difference between verbal IQ and performance IQ -- and the record will reflect what he testified to -- but I believe there was a 29-point spread with the verbal IQ being 111 and the performance IQ being 140. Is that the type of variability that neuropsychologists like you are going to want to explore further?

A That's exactly the variability I'm talking about. As you know, the average IQ is 100 and the standard deviation is 15. In general, if there is -- if there is a whole standard deviation difference between verbal and performance IQ, that's considered clinically significant and it suggests some brain dysfunction. And in her case there's almost two standard deviations difference. It's 29. It's close to 30. So two standard deviations definitely is very significant, because -- for example, since the average IQ is 100, so values between 85 and 115 are within normal limits; but if somebody scores 80, that already puts them in an intellectually impaired range. If it's 75, that's already considered moderate intellectual disability. And if it's 70, which is two standard deviations lower than the average, then that individual is diagnosed with intellectual deficits. They're called intellectual disability. So two standard deviations is already a disability. It's already a clinically severe condition.

Q And Dr. Fucetola also testified that when comparing Mrs. Montgomery's performance IQ with her performance on tests of visual immediate and visual delay, that the data placed Mrs. Montgomery in the less than bottom 2 percent of the population with respect to those scores. Would that also be an indication of the sort of variability within her neuropsychological testing that warrants further consideration?

A Exactly. The behavioral image is not designed to

replace any of those conclusions by Dr. Fucetola. He is a very accomplished and highly respected neuropsychologist. I did not question any of his conclusions. They seemed very reasonable. The only thing that the behavioral image contributed was a pictorial depiction of what are the brain systems most likely involved in the deficits shown on the neuropsychological testing of Ms. Montgomery.

Q Now, the government has raised a question with Dr. Fucetola about the color scheme that's used on your scale. How was the color scheme arrived at; the yellow, red to purple to blue?

A Well, it's an old DOS program. It only has eight real colors. It could have been much prettier with a Mac or newer Windows machine. So that was our limitation. And within that we just made a range where deep blue means low up to bright yellow means the highest.

Q So as we move down the scale, yellow would be areas that aren't necessarily concerning and dark blue would be the areas of the most concern?

A Exactly. Relative to that individual.

Q Does it really matter whether the area of concern is colored dark blue or red so long as the person reading the image understands what the scale means?

A Well, you usually focus first on the dark blue. These seem to be the -- the colors reflect the probability that that

region is involved basically.

Q Could you have decided to make red the color that indicated the most damage and come up with a different color scheme? I guess what I'm getting at is it doesn't really matter what color it is as long as you get it?

A No. I mean, that's arbitrary, but this is pretty much the scheme that is used in the imaging field. Across imaging modalities when you use a color scale, then the blue will indicate low and the bright yellow will indicate high.

Q Dr. Gur, did you create this behavioral image as a slick trick where you can basically take anyone's neuropsychological testing data and come up with a picture that shows they have brain damage?

A No.

Q Was this in fact scientifically validated, peer-reviewed, and published?

A Yes.

Q And have you testified about the behavioral image in other courts and contexts?

A Yes.

Q It's been considered by decision-makers in death penalty cases?

A Yes.

Q Now, with respect to the results of your review of the neuropsychological test data, including the information you

gleaned from the behavioral image, were you able to come to any conclusions with respect to areas of Mrs. Montgomery's brain that showed possibilities of dysfunction?

A Yes.

Q And what areas were they?

A From the behavioral image it looks like the area of damage is in the parietal lobe, which is roughly in the middle of your brain toward the back. Although there are indications of deficits that implicate deep gray matter. Notably the neuropsychological tests do not look at deep gray matter. They're blind to damage there. But when you see -- when you see damage in surrounding areas, then very often when you do the imaging, there will be damage in those regions that a neuropsychological test do not measure.

So the main finding you see in this image is that it is parietal. I thought it was more severe on the right than on the left. As you can see, the right side is somewhat darker but it's quite -- it shows on both parietal lobes.

Q And did you, Dr. Gur -- you published -- you produced a report in this case; is that right?

A Yes.

Q And when you produced your report in this case, it was a summary of not only the information gleaned from the neuropsychological testing and the behavioral image but it was also a summary of information that was gleaned from the MRI

study and the PET study; is that fair?

A Yes.

Q And in compiling your report, the initial one was dated 4/3/2007 and is in evidence as part of collective Exhibit 28, and the government and I have agreed to subparts to Exhibit 28, so the original report is 28(a). Did you put all that data together and provide it to counsel for Mrs. Montgomery with your best opinion as what the data revealed?

A Yes.

Q Did you take into account the opinions of Dr. Daviztikos and Dr. Newberg in compiling that report?

A I took into account their data, and Dr. Newberg also wrote a clinical reading of the PET scan.

Q You and I have discussed the fact that Dr. Newberg and Dr. Daviztikos' name does not appear in this particular report, have we not?

A Right.

Q But you did note on the cover in the background that you worked with -- that, "Studies were performed at the University of Pennsylvania Medical Center, under my supervision. With help from faculty and postdoctoral fellows at our center, I have analyzed and verified the results of the neuropsychological testing, the structural imaging study, MRI, and the imaging" -- "functional imaging study, PET."

When you refer in your report to faculty and

postdoctoral fellows at your center, did that include Dr. Daviztikos and Dr. Newberg?

A Yes. Dr. Newberg was still a part of our group at the time. He since moved to Thomas Jefferson University.

Q And you do cite to Dr. Daviztikos on page 3 of the report in terms of referencing the validity of the deformation-based morphology algorithm that you used?

A Morphometry, yes.

Q Morphometry. Thank you.

Were you trying to hide the fact that Dr. Daviztikos or Dr. Newberg were involved in the analysis of the imaging studies?

A No. Why would I want to?

Q And if Mr. Duchardt had asked to speak with Dr. Daviztikos or Dr. Newberg, would you have made them available to him?

A Of course.

Q If the government's experts had wanted to talk to Dr. Daviztikos or Dr. Newberg, would you have made them available?

A Yes.

Q And, in fact, later on in this case you were involved in some fairly extensive email discussions directly with the government's experts where the United States Attorney and defense counsel were also copied; is that fair to say?

A Yes.

Q That's pretty unusual in a forensic context. We can agree to that, right?
A Yes.
Q But because you were speaking a certain language, the lawyers agreed for you all to just have that discussion in a sort of free-flowing way to get that information as quickly as possible, correct?
A Yes.
Q And Dr. Evans and Dr. Newberg would recognize that you as a neuropsychologist probably were not the individual that actually conducted the quantitative analysis on the MRI; is that fair to say?
A Yes. Of course.
Q And they would have recognized that you would not have been the individual who personally did the quantitative analysis on the PET data; is that also fair to say?
A Yes.
Q Just one moment. In fact, Dr. Gur, your contract in this case would have been with the Federal Public Defender's Office, not Mr. Duchardt, correct?
A Right.
Q The Federal Public Defender is who actually paid the bills?
A Yes.
Q And so if the Federal Public Defender actually had --

let me ask you this: When you all bill your services to the Federal Public Defender's Office, Dr. Daviztikos and Dr. Newberg actually submit bills under separate cover; is that also correct?

A Yes.

Q And so one bill goes to one entity. I believe for awhile that was called CPUP?

A Yes.

Q And then Dr. Dr. Newberg and Dr. Daviztikos also had their own contracts?

A Yes. Just to explain, CPUP stands for the Clinical Practices of the University of Pennsylvania, and all the work that I did at Penn was done through that entity. So all the billing and invoicing and all the money came to the university and was credited to my program but did not go to my pocket. The only time that I charge myself is when I leave Penn and go give testimony outside of Penn.

Q So the Office of the Federal Public Defender probably knew about the involvement of Dr. Daviztikos and Dr. Newberg through having contracts with them?

A Yes, because they submit the bill themselves. I didn't submit their bills.

Q Thank you.

Dr. Newberg testified last week that he often gives you a blurb that you -- with respect to his quantitative

analysis of the PET and that you typically include that in your report. Is that your normal practice?

A Yes. He does that for all clinical or medicolegal cases. He sends me the paragraph describing his clinical reading of the PET scan and then attaches to it an Excel file that has the numbers that's generated.

Q And then you're able to use that Excel file to create the graphs?

A Correct. Exactly.

Q And you've -- having reviewed your initial report in this case of 4/3/2007, Movant's Exhibit 28(a), do you believe that it's likely that you included that blurb in the report itself?

A Yes.

Q But because you were the supervisor of this particular multidisciplinary team and this was a summary report, you adopted Dr. Newberg's analysis?

A Correct.

Q And you agreed with Dr. Newberg's analysis?

A Yes.

Q And found that -- or did you find that the neuropsychological data, the neuroanatomical data, and the neurophysiological data was all consistent with each other?

A Yes.

Q And did you conclude, then, that there was an

indication from those studies that Mrs. Montgomery did in fact -- did in fact appear that there was some brain dysfunction?

A Correct. Yes.

Q What is it that you concluded? And if you need to refer to your reports, they're in front of you.

A What was I --

Q What was your conclusion from your review of all the data?

A That she suffers from brain dysfunction that affects areas that are important for behavior, and that people with that sort of brain dysfunction would have difficulty in certain aspects of their behavioral functioning.

Q And did you conclude that those particular areas of dysfunction, their etiology could be from a number of sources, including the possibility of being exposed to trauma as a child?

A Yes.

Q Posttraumatic stress?

A Correct.

Q And that was something that was known at the time that posttraumatic stress, childhood exposure to severe trauma could actually cause brain changes?

A Yes. It was already known at the time. The evidence wasn't quite as overwhelming as it is today.

Q But it was generally accepted in the field that children exposed to trauma had brain changes?
A Yes.
Q You also noted that there was a possibility that some of the areas of dysfunction that showed up on the studies could be the result of Mrs. Montgomery's mother's alcohol abuse during her pregnancy with Lisa Montgomery; is that correct?
A Yes.
Q And your information about Mrs. Montgomery's alcohol abuse came from history that was provided to you by Mr. Duchardt; is that fair to say?
A Yes.
Q Mrs. Montgomery couldn't testify that her mother drank while she was pregnant?
A Right.
Q And the information about the fact that Mrs. Montgomery had been exposed to childhood and sexual abuse also came from history provided to you by Mr. Duchardt?
A Yes.
Q Is it fair to say that you relied on Mr. Duchardt's representations to you about what the social history data showed when you were reaching the conclusions that you reached in this case?
A I believe I received the summary from him.
Q And also a number of records relating --

A There was some records as well, and I interviewed her myself and she related some incidents of head injury.
Q The incidents of head injury that Mrs. Montgomery reported to you, were those corroborated with medical records that showed that she had actually, for example, had a car wreck where she was an unrestrained driver and her head went through the windshield?
A Yes.
Q And that she had a trampoline accident where she received a blow to the head and had a concussion?
A Yes.
Q And a few other car accidents?
A Correct. Not all of them were but most of them were.
Q And that was information that was important to you in terms of evaluating the data?
A Yes. Of course.
Q Would it also have been important to you to know that Mrs. Montgomery's head during her repeated rapes was sometimes smashed onto a concrete floor?
A Yes.
Q Now, your report of April 3rd, 2007, does mention that one area of brain dysfunction that you noted in your studies and the studies of Dr. Daviztikos and Dr. Newberg showed a vulnerability to pseudocyesis, so I want to ask you about pseudocyesis. Is it true, Dr. Gur, that the notion of

pseudocyesis was brought up by Mr. Duchardt?
A Yes.
Q And Mr. Duchardt wanted to know if you could make any determination about whether or not Mrs. Montgomery's brain could be susceptible to such a psychiatric illness?
A Yes. He asked me specifically whether the abnormalities could be consistent or related to pseudocyesis.
Q Did you ever represent to Mr. Duchardt that any of your data could be conclusively diagnostic for pseudocyesis?
A No.
Q And why is that?
A Pseudocyesis is diagnosed by -- diagnosed clinically. You don't need a PET scan to diagnose it, and there is no indication that the particular PET abnormalities were associated with pseudocyesis.
Q Did you in fact see there was some damage in the somat --
A Somatomotor.
Q Tell us what that is.
A There was abnormally high activity in the hypothalamus, and that happens to be the same region that shows hyperactivity in mice who have pseudocyesis. So that's the extent of what I could say in terms of whether what she has is compatible or congruent with the possibility of pseudocyesis.
Q So you were answering a question asked of you by the

lawyer with the only available data that you had?
A Yeah.
Q Pseudocyesis is an extremely rare psychiatric illness and certainly one that would not be possible to study?
A Right.
Q I want to talk with you, sir, now about the controversy regarding -- we're going to first talk about the MRI controversy, then we're going to talk about the PET scan controversy. Okay?
A Okay.
Q So let's turn to the MRI. What conclusions were you and Dr. Daviztikos able to come to with respect to the MRI in 2007? And then in a minute we'll talk about 2016. Sticking straight with 2007, what conclusions were you able to draw?
A One conclusion was clear which is that the ventricles were large.
Q What's the significance of large ventricles?
A I'm sorry?
Q What's the significance of large ventricles?
A Large ventricles it means that there is more fluid in the middle of the brain than there should be. The fluid in the middle of the brain -- the brain is surrounded by fluid in the middle and around it and that fluid provides nourishment to the brain but also protects it from injuries by hitting the skull. So the brain essentially floats in that fluid. And if there is


Case 4:12-cv-08001-GAF Document 224 Filed 05/04/17 Page 165 of 312

tissue loss in the so-called limbic structures, the structures that surround that fluid inside the brain, then every time a nerve cell dies its place is taken up by fluid.

So increased ventricles indicate that there was either damage to the brain, either -- what we call atrophy. Namely, there was tissue and the tissue died and that's why the fluid is larger, or dystrophy which is that the tissue failed to develop and that's why we have larger ventricles. Just the fact you have larger ventricles doesn't tell you whether it's atrophy or dystrophy, but it does tell you that there is some tissue loss in those limbic structures.

Q And what's the significance of the limbic structures?

A The limbic structures are the so-called emotional brain. These are all the structures that relate to the interpretation, experience, and expression of emotional behavior.

Q And what are some of the limbic structures?

A The main limbic structures are hippocampus and amygdala, and the other structures that are -- there is a whole cycle -- circle around the ventricles. They include insular and cingulate gyrus.

Q And so that was the first finding --

A And basal forebrain would also be a part of that.

Q What was your finding with respect to the enlargement of -- this first finding -- we'll stick with

that -- the enlargement of the ventricles? What was the abnormality that was shown by Dr. Daviztikos' quantitative analysis?

A In addition to the large ventricle or -- one that was shown was the large ventricles. The other one was that the parietal lobe seemed to be much smaller than it ought to be relative to the rest of the brain. So the volume of Ms. Montgomery's brain was definitely in the average range. In fact, as I recall, in high average; but against that the parietal lobe in particular, and more so seen on the right, showed reduced volume that actually was more than the standard deviation difference and probably -- well, as I recall, between the rest of the brain and the parietal lobe.

Q And so, again, we're talking about that variability in respect to Mrs. Montgomery's brain?

A Exactly. Because, again, brain damage is not going to shrink your whole brain. It will affect certain regions rather than others and that's how you find out that it's there.

Q All right. And that damage with respect to the parietal lobes, was that consistent with your findings and evaluation of the neuropsychological data?

A Yes.

Q So those two seem to work congruent with each other?

A Congruent with each other, yes.

Q And were there any other findings of significance on

the volumetric analysis?

A No.

Q With respect to --

MS. HENRY: Your Honor, I note it's 12:30. I think I can be done by one if you want me to keep going.

THE COURT: No. We'll stop. Is this a good place to stop?

MS. HENRY: Yes, sir.

THE COURT: We'll take a recess for lunch until 1:30.

Thank you, Doctor. 1:30.

(The noon recess taken at 12:30 p.m. until 1:30 p.m.)

AFTERNOON SESSION

THE COURT: Ready, Ms. Henry?

MS. HENRY: Yes, Your Honor. May it please the Court.

THE COURT: All right.

RUBEN GUR resumed the stand and testified:

DIRECT EXAMINATION (continued) BY MS. HENRY:

Q Dr. Gur, I want to go back to something I forgot to ask you before the break with respect to the behavioral image, and it actually has to do with a gentleman by the name of Geoffrey Aguirre. Do you know who that is, Professor Aguirre?

A Yes.

Q And who is that?
A Aguirre?
Q Yes, Aguirre. I'm sorry.
A Geoff Aguirre is a colleague from neurology in our neurology department.
Q Is Geoff Aguirre a neuropsychologist?
A No.
Q Is Geoff Aguirre qualified to comment on your behavioral image?
A I don't think so.
Q Are you aware of the fact that Geoff Aguirre was paid sums of money by the Department of Justice to review your testimony in capital cases and has presented videos that he's posted on the web as a result of that funding through the Department of Justice?
A I've seen the video that he posted, and my recollection of what he explained there was that the Department of Justice was concerned that my testimony is accepted in courts and told him -- asked him to find out why and whether there are any holes in my procedures or testimony.
Q And is it your understanding that Mr. Aguirre's videos that have been posted on the web after he was paid by the Department of Justice deal with the area of neuroimaging solely?
A Yes. Most of his comments, as I recall, relate to

imaging, not the behavioral imaging algorithm.

Q The behavioral imaging algorithm is a graphical representation of neuropsychological data, correct?

A Yes.

Q Is not in fact what we refer to as neuroimaging?

A No.

Q Those are separate things?

A Correct.

Q Professor Aguirre in one particular video online claims that you have found, quote, a neuroidentification for murderers. Is there such a thing as a neuroidentification for murderers?

A Well, I don't think so. And if there is one, I don't know of it.

Q Is there a generally accepted term of art called neuroidentification?

A No, not to my knowledge. I don't think a term like that exists.

Q Mr. Aguirre also says that this -- that neuroidentification for murderers is an easily identifiable finding on a brain scan which identifies folks who are predisposed to commit murder. Have you found such a marker?

A No.

Q Have you ever testified that you found such a marker?

A No.

Q He testified -- or he states in this video that he posted on the web after being hired by the Department of Justice that it's a system for generating arbitrary neuroscience claims. It works. It's infallible. It will always produce the result that you desire and this is a three-step process that can be found in just about every case I cited earlier; and in fact if one of you want to get in the scanner and get a brain scan and give it to me, I can follow this procedure and produce a result that identifies for you a mitigating brain injury that accounts for your behavior. Do you have such a foolproof process?
A No, and I haven't heard of any such process. I certainly have never used anything -- any process that resembles what he's talking about.
Q And, in fact, the same video where Mr. Aguirre posted on the web after being paid by the DOJ, Mr. Aguirre is quite complimentary of Dr. Daviztikos and his methodology; isn't that correct?
A As I recall, yes.
Q Now, returning to your work in Mrs. Montgomery's case and talking about Dr. Daviztikos' MRI data, I believe your -- and I'm going to try to speed this up as quickly as I can. We promised the Court we would be done today, so bear with me.

You noted that the MRI study showed reduced brain volume in the right parietal and medial gray matter and

abnormally high ventricular volume consistent with loss of tissue in medial brain structures.

I'm not sure we talked about medial gray matter and medial brain structures before the break. Could you share with us what those are?

A It's the same term that's used for what I described -- referred to as the limbic regions.

Q Okay. So those are synonymous with one other?

A Yes.

Q I'm sorry. I'm an English major. I wanted to make sure we covered it.

As I understand it, the controversy in 2007 in Mrs. Montgomery's case regarding the MRI data centered around the concept of standard deviations and whether or not the findings in the volumetric analysis needed to be more than two standard deviations above or below the mean in order to be significant, and is that your understanding of what the controversy was about?

A My understanding is that was the reason that they argued that the MRI does not show any abnormality.

Q And so I want -- we spoke earlier about IQ tests, and in the concept of IQ in order to have someone found to be intellectually disabled, there is that two-standard deviation below the mean requirement. We're all familiar with that. This is something different, is it not?

A Well, not exactly. Two standard deviations below average IQ is not impairment. It's disability. These are -- if you are two standard deviations below the average IQ; namely, if your IQ is 70 or below, this is not a mild, not even a moderate impairment. This is disability.

The term that we used to use was mentally retarded, but the correct term, more precise term is intellectual disability, which means the individuals with that sort of an IQ are literally incapable of intellectual functioning.

Q Thank you so much. Once again, English major, science major. So I appreciate you correcting me.

I want to talk about one standard deviation versus two standard deviations and the concept of clinical significance versus statistical significance as it relates to the MRI. Does that make sense?

A Yes.

Q Can you explain to the Court why it is that in your professional opinion and that of Dr. Daviztikos', who the Court heard from last week, that findings that are not two standard deviations from the mean but instead one standard deviation from the mean are still clinically significant?

A This is the definition acceptable not just in psychology but throughout medicine. Indeed, if your blood pressure is what is called high normal, which is not even one standard deviation above the average, you will be placed on

medication to reduce your blood pressure, and there is evidence, and I believe I cited that, and that evidence is even stronger that people who have blood pressure that is high normal have about a two-and-a-half-fold risk of having a cardiac event within a year of taking that measurement.

So throughout medicine any value that is more than one standard deviation away from average is considered of clinical significance and your doctor will be paying attention to it. If it's more than one and a half standard deviation, it's considered moderately impaired. In psychology you would be classified as moderately impaired in that particular domain. Two standard deviations is really definitely defective, and in fact many, many studies would remove all the subjects who are more than two standard deviations away from the mean. We'll remove them from the sample if they claim this is a normal sample. So one standard deviation is the place where a finding becomes clinically significant. Between one and a half and two it's moderate to severe.

Q And is that a concept that is taught really in first-year med school?

A That's what you learn when you learn how to do psychological assessment. These are the standards in the field. I just mentioned, this is how you diagnosis mild cognitive impairment in elderly individuals who think that their cognitive capacities are reduced compared to when they

were younger.
Q And so that was the concept you were trying to express back in 2007. Let me ask you, Dr. Gur, again, you don't have any control over which phase of the trial that testimony is offered. That's the attorney's decision; is that correct?
A Yes.
Q Now, sticking with the MRI and moving to 2016, and I'll show you -- put up on the Elmo here what is Movant's Exhibit No. 29. Is that the results of the new analysis of the same MRI data obtained from Mrs. Montgomery?
A This is the result of the analysis of her updated programming to do volumetric analysis.
Q So this is the same data from Mrs. Montgomery's MRI but placed through a state-of-the-art normative database?
A Yes.
Q And did that new analysis confirm your findings?
A Yes.
Q In fact, amplify your findings?
A Yes.
Q How so?
A First of all, the ratio of parietal lobe volume to the total volume is almost three-and-a-half standard deviations below what it is in the normal sample. So the parietal lobe is significantly smaller in volume than expected based on the whole brain. And that is important.

Again, you always have to talk about relative to that individual. So it is normal to be 6 foot tall. It is normal to wear a size 8 shoe, but it is not normal to be 6 feet tall and wear a size 8 shoe. This is exactly what we're looking for. Given her -- the brain she was born with, is there any region that is significantly smaller than it ought to be.

Q And is this analysis that you performed in 2016 -- or Dr. Daviztikos performed and that you interpreted in 2016 generally accepted in the field of neuropsychology?

A Yes.

Q And, again, it confirms your opinions from 2007, but were your opinions in 2007 stated to a reasonable degree of scientific certainty at the time?

A Yes.

Q Now, I'd like to move, if we can, to the discussion with respect to the PET data in this case.

A Yes.

Q And that -- Dr. Newberg has testified about some, and I'm going to try to not repeat testimony that the Court has already accepted and that really wasn't challenged and instead ask you some facts about the way that PET was compared with the normative sample.

The Court 's already heard some of the history of the fact that Pennsylvania was really the pioneer in PET

imaging. What version of the PET scan -- of the Penn PET scan was Mrs. Montgomery scanned on?

A Are you asking which PET scan was used with Ms. Montgomery or which one was used with the normative --

Q First of all, with Ms. Montgomery, then we'll talk about the various normative samples. So Ms. Montgomery's was the --

A The current generation PET scanner.

Q You don't remember if it was PET 5 or PET 4?

A Oh, they stopped counting them after PET 6. After that, it became a commercial product and each company gave it its own name.

Q So she was scanned on the one you had that was most current at your university at the time?

A Yes.

Q And you originally wanted to compare Mrs. Montgomery's results with a normative database that you had from others who had been scanned on that same scanner; is that correct?

A Yes. That's what I usually do.

Q But Mr. Duchardt asked you to use a different normative group; is that fair to say?

A Yes.

Q And what normative group did he want you to use?

A He felt that the normative group that the PET Center had for this was -- would seem too small to the Court, and we

did publish a paper that's in a very high-level journal called Science where we did really the first normative PET scans in healthy men and women, and he thought that would be a better normative group because the size was much bigger.

Q So the size of the normative group that was with the PET scan that Mrs. Montgomery had been scanned on, was that seven individuals?

A As I recall, there were 14 people.

Q Fourteen. Okay. I'm sorry. I misunderstood.

Was that a sufficient sample size, in your opinion, from a scientific standpoint?

A That was the sample size that the PET Center was allowed to study with healthy people because PET scanning involves ionizing radiation. We're not allowed to do a PET scan on a healthy person. The ethics board that's called IRB would allow investigators to study a small number of healthy people because they need it in order to proceed with the research, but the PET Center has to justify how many people they want to study, and the -- there is a statistical branch called power calculations and statisticians will tell you what is the sample size you need in order to get -- in order to establish the mean of a particular measure, and the rule of thumb is that it's about 12. So they were allowed to study, as I recall, up to 16. At that time they had 14. Now they have 16.

Q So the normative group that you had available to you from the same scanner as what Mrs. Montgomery was scanned on was scientifically acceptable for purposes of conducting the analysis --
A Yes.
Q -- that was required?
A Correct.
Q But Mr. Duchardt wanted you to use the normative sample from the Science paper that you had published?
A Correct.
Q And that paper was published in what year?
A 1995.
Q For purposes of the record what is Science?
A What is Science?
Q The journal of Science?
A The journal of Science is probably the most prestigious scientific journal. It rejects -- it proudly rejects 99 percent of papers that it receives for consideration, and it has a high impact factor, among the highest in the field -- in all of science.
Impact factor in the same way that you measure the stature of the scientists by looking at the h-index we discussed before, journals are measured by impact factor. Impact factor is the number of citations that an average manuscript receives when it is published in that journal.

Most journals have an impact factor between 0.5 and 2. This is considered acceptable. Less than 0.5 is considered low. Over 2 is considered moderate. And the Science has an impact factor, as I recall, of around 40. So papers that are published in Science tend to be widely cited because of the high level of scrutiny that these papers undergo.

Q And that sample size, the sample size that was published in Science in 1993, over what years was that normative sample developed?

A Between 1990 and 1993.

Q Now, I take it because you agreed to use that sample, that you felt that you could obtain valued results comparing Mrs. Montgomery's PET scan with the normative group from the Science paper?

A Yes. The profiles that we obtained in that sample is nearly identical to what we got from the smaller control. That's why I didn't think it will make a difference.

Q So you agreed to Mr. Duchardt's request because from a scientific standpoint, you didn't see a problem with what he was asking you to do?

A That's right.

Q But if you had used the normative group from the same scanner that you had with Mrs. Montgomery, that would have avoided one of the arguments that the government's experts had in terms of comparing Mrs. Montgomery's images obtained from

one scanner with normative groups from an older generation?

A It would have avoided that, and perhaps even more importantly we had and supplied the so-called raw-raw data that were available on the new scanner; whereas, those data were no longer available on operating computers at the time of the trial. So all the computers that were used to collect and store those data were decommissioned several years before the trial. So they were just not available.

Q You anticipated my next question. You would have also been able to respond much more quickly to the government's request for the raw-raw data or what Mr. Duchardt called the sushi data because you would have had that readily available to you?

A Yes. I would have been able to respond right away.

Q But there became -- because you used, at Mr. Duchardt's request, the older sample -- now how many people were in that older sample?

A Sixty-nine total.

Q And did you pull out a certain number to match by gender and age group?

A Yes. With that size of a sample you can just -- we just took out the females. There were, I believe, 26 females. Although unlike MRI where there is a big difference between males and females in volume, the PET metabolic rate for glucose are identical in males and females. There are about 3.56

milliliter of glucose per 100 gram of tissue per minute for both males and females. So there are differences within regions, but there is significance statistically with a large sample, but they're not -- they're very subtle.

Q But with respect to this discovery dispute that developed, you've testified previously that you weren't used to being requested to provide the, quote-unquote, raw-raw -- that's r-a-w as opposed to r-a-h?

A Yes.

Q -- data and it was not ready available to you; is that correct?

A Correct.

Q And it was on computers that you said had been decommissioned?

A Yes.

Q And I think we've established that the normative samples had been developed more than a decade before this trial and they were -- I believe Dr. Newberg testified they were on various media that had to be pulled and each one analyzed?

A Yes. As I recall, one of them had to be -- we had to go to literally to a museum to find a unit that could read some of those tapes.

Q You mean literally?

A Literally. We went to the Medical Society of Philadelphia who happens to have a very nice museum that

included that piece. That was the only place we could find it.

Q It was clear to you that the Court wanted this information to be produced very quickly. Did you drag your feet?

A I did not. As soon as I understood that that's what the Court wants, I immediately went to the head of the PET Center and explained the situation, to the physicist. The physicist said, Oh, come on, that's impossible. Let's call Alan Evans and I'll explain to him. I said, That's not how things work. They want it so it has to be done.

Well, I don't control the PET Center and the PET Center does routine work, both clinical work and research. They don't have extra staff. So they just couldn't place a request like that at the top of their priority, but I pushed as hard as I could.

Q And did you keep Mr. Duchardt informed of the difficulties that you encountered attempting to obtain this data?

A Oh, yes.

Q And all of these efforts were occurring between September the 5th of 2007 and the beginning of the trial; is that fair to say?

A Yes.

Q In fact, you did provide as much information as you could to Dr. Evans and Dr. Mayberg that caused them to file a

report with the Court dated September 20th, 2007; do you recall that?

A Yes. I gave them everything I had.

Q And do you recall that Dr. Evans and Dr. Mayberg claimed that you did not provide information for all 36 regions of interest but instead only provided information for 35 regions of interest?

A Yes. That turned out to be an error in their reading of the file.

Q Because you did in fact provide all 36?

A Yes. Of course.

Q Did you have any reason to hold back a region of interest?

A No.

Q And when you saw the results of their analysis, did you see what they had claimed -- actually, as it turns out, Dr. Newberg had done with his quantitative analysis of the PET scan?

A Yes.

Q What was it that they claimed had occurred?

A They claimed that the values for the normative sample that we published were based on dividing each region by the sum -- by the average of all the other regions, regions of interest that were included in the analysis, and that would have been an error. It would have been a mistake. It would

not have passed the reviewers, because these are -- these regions are of different sizes. You can just average them. If you want to average them, you have to multiply each region by its volume and then average all those, then divide by the total volume, which would have been a very complicated way of calculating and unnecessary and incorrect.

What we use in order to divide the value of each region is the total value number of coincidental hits or the total value for the whole brain, and that is obtained routinely for the whole brain. That includes these regions and all the rest of the brain. It includes gray matter and white matter and everything. And they erroneously claimed that it should have been only gray matter, but that's not what is done. Nobody does that.

Q So the error that they accused you of -- and I confess that I don't have the foggiest idea about math statistics. Two times two is about as much as it gets for me. The error that they claimed you had made would have been an error that you would know not to make; is that fair to say?

A Yes. It's more complicated than what I did, and it would have been wrong. So why do something more complicated? There's nothing to be gained from using that method. It just wouldn't have occurred to me to use a method like that.

Q And, in fact, if I understood your testimony correctly, they were not only claiming that the quantitative analysis in

Mrs. Montgomery's case followed this unscientific and unacceptable manner, but they were claiming that was the method that you used in the paper that was published in Science?

A It's even worse. They claimed that I used the correct method for her but that in the paper, in Science I used the incorrect method.

Q How likely is it that if you had used the incorrect method, the peer-reviewed journal that rejects -- proudly rejects 99 percent of its submissions would have published your data?

A All I can say is that if I received a paper, a PET paper that described using this method, I would not have accepted it.

Q And these allegations levied against you and really Dr. Newberg, who I think testified quite simply, I do what I do and I did what I do, those were levied against you after the Court's Daubert hearing; is that correct?

A I believe so.

Q And you never had an opportunity to come back to his Honor and defend the analysis that was provided in an open court subject to cross-examination under oath, correct?

A I only appeared once.

Q And, instead, you attempted to explain yourself and the analysis in a series of follow-up reports; is that correct?

A Yes. That's correct.

Q But you have no idea how those were presented to the Court or what interpretation was made or representations about those reports were made for his Honor?
A I don't.
Q You only know what you wrote?
A Yes.
Q Is everything that you wrote in those reports, does that constitute your opinions to a reasonable degree of scientific certainty?
A Yes.

MS. HENRY: And for the record I would note that those reports are compiled in Movant's Exhibit 28, and they are variously listed, and I'll just list their dates and the subnumbering. I'm sorry. I'm really tired. 4/3/2007 is 28(a). 4/3/2007, which was revised on 8/23/2007 is 28(b). September 28th, 2007, which is titled "Response to Mayberg and Evans Report" is 28(c). October 2nd, 2007, "Response to the Mayberg and Evans, quote, Reanalysis" is 28(d). October 22nd, 2007, "Results of comparing Ms. Montgomery's PET values to New and Old Scanners where raw data are available" is 28(e). And then "Summary of Neurobehavioral Findings on Lisa Montgomery and the Debate with Drs. Mayberg and Evans," dated January 8th, 2008, is 28(f).

Q (By Ms. Henry) With respect to this January 8th document, Dr. Gur, was that your -- was that provided to Mr.

Duchardt at his request so that he would have all of your opinions in one place for purposes of the appeal on behalf of Mrs. Montgomery?

A Yes.

Q And does that document fairly summarize your opinions and the debate between yourself and Dr. Evans and Dr. Mayberg?

A Yes. I read it again yesterday and it's a true and good report. It's exactly right.

Q All right. And you followed the generally accepted scientific methodologies in your evaluation of Mrs. Montgomery in 2007?

A Yes.

Q And then has it come to your -- let me ask you about the October 11th, 2016, report, Movant's Exhibit 29. Did you offer further opinions or replot the PET data --

A Yes.

Q -- in this report? Now, the data in this report, the October 11th, 2016, report, Movant's 29, that's just a new graph, correct?

A Yes.

Q That's not new data and that's not a new normative group?

A No. It's exactly the same data except instead of showing it in two graphs, over the years I came up with a way of showing the laterality effect and the main effect in one

graph. It's simpler.

Q And that was to make it easier for the reader to understand graphically what it was you were trying to convey?

A Exactly.

Q And did you in 2007 and again in 2016 confirm that Mrs. Montgomery's PET imaging demonstrated abnormal brain function?

A Yes. In exactly the same region.

Q And you have recently been aware that Dr. Newberg took it upon himself, having these -- his scientific method questioned, to rerun the original PET data that had been received from Mrs. Montgomery with commercially available software?

A Yes. Today we have commercially available software, and he asked me what I thought about him running it on a commercial. I thought it was a good idea and he did that.

Q And he shared those results with you; is that correct?

A Yes.

Q And you are aware that his new analysis with the commercially available database basically taking Penn's database out of the equation, his findings are consistent with the findings that you and he had in 2007?

A Yes.

Q And to summarize those findings, your findings really haven't changed since April of 2007; is that correct?

A No.

Q And to summarize on page 4 of that original report you found with respect to the PET, that the, "PET results showed abnormally increased metabolic activity in nearly all temporolimbic structures as well as in some frontal and motor regions and thalamus. The abnormally increased activity in the hippocampus and parahippocampal regions, as well as the amygdala, is more pronounced on the right. This pattern indicates increased vulnerability to impulsive behavior. The increased hypothalamic and related activation is potentially a source of vulnerability for pseudocyesis," parenthesis, "by history. The combination of reduced volume and increased glucose metabolism in the right suggests compensatory processes. Right hemisphere compensatory activation has been related to dissociative states." Was that your opinion in 2007?
A Yes.
Q Is that your opinion today?
A Yes.
Q Is that an opinion that you could have provided to psychiatric professionals who were assisting defense counsel at the time of Mrs. Montgomery's trial that they could have used in order to explain her psychiatric illness to the jury?
A Yes.
Q With respect to when you wrote "vulnerability to pseudocyesis" and then you put in parenthesis "by history," by

history, do you mean that Mr. Duchardt told you that there was evidence in the data that suggests Mrs. Montgomery actually exhibited the physical signs and symptoms of pregnancy when she was not in fact pregnant?

A Yes. Correct.

Q And so you relied on those representations when you were including that in your report?

A Yes. It was in the sense that if she had pseudocyesis, then I had to choose any brain region that could have been associated with it, it would be the hypothalamus since that's where the evidence from animal studies suggest.

Q But you were not suggesting that you could diagnose Mrs. Montgomery?

A No, of course not.

Q But that was information you thought could be helpful to Dr. Ramachandran who had been, at least represented to be, an expert in the field of pseudocyesis?

A Exactly.

Q You were not an expert in pseudocyesis?

A No.

Q And Dr. Evans and Dr. Mayberg, neither of them are neuropsychologists, are they?

A No.

Q Just one moment, please.

Thank you, Dr. Gur. I appreciate your patience.

That's all the questions I have. Mr. Valenti may have some.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q As we get started, Dr. Gur, let me first say good afternoon.

A Good afternoon.

Q You mentioned in your direct testimony something called the h-index. Candidly, that's new to me. And you referenced it as being something that is kind of a statistical analysis of an author's prodigious production and citation; is that fair?

A On which topic?

Q The h-index.

A Yes.

Q An indication of whether you've authored a number of articles and whether those articles themselves have been cited?

A Correct.

Q I'm unclear whether the citation that affects the h-scale is positive or negative or both?

A Is what?

Q If someone cites your article negatively, does that get reflected in the h-scale?

A Yeah, any citation counts.

Q Good or bad it's going to inflate the h-scale?

A Yes.

Q Not saying you did this but if some doctor wrote some highly controversial thing that people didn't believe in and there were a number of criticisms of that article, it's going to up their h-scale, right?
A Yes.
Q As you got started, you indicated, sir, that you are a board-certified psychologist, correct?
A Yes.
Q And I believe you indicated you were a diplomat in that field, true?
A Yes.
Q Are you a board-certified forensic psychologist?
A No.
Q And you know the difference between being board certified as a forensic psychologist and not being, correct?
A Yes.
Q And you are not?
A Correct.
Q I want to go, as we start, sir, to the discovery controversy that Ms. Henry spoke to you about. You were hired in this case to assist Mr. Duchardt as it relates to brain and neuroimaging of Ms. Montgomery, correct?
A Yes.
Q You then had Ms. Montgomery, or Ms. Montgomery, however it was, came out to Philadelphia to get her brain scanned under

both the PET and MRI technologies?
A Correct.
Q That happened in March of 2007; is that right?
A Yes.
Q And Dr. Daviztikos would have been kind of in charge of the MRI portion of the testing; is that fair?
A No. He only analyzed the results.
Q So someone else actually performed the examination?
A Yes.
Q Then Dr. Daviztikos' role would be, then, to read it, correct?
A Yes.
Q Because he is a nuclear medicine -- or he's a radiologist, correct?
A No, he's not.
Q What is he?
A He's an image analysis expert.
Q It takes certain people to read and analyze MRIs; is that correct?
A Yes.
Q What type of scientist does it take to read an MRI?
A Well, to read -- a clinical reading of an MRI is done usually by a radiologist. If it's an MRI of the brain, it's usually done by a neuroradiologist.
Q Are you either of those things?

A Yes.
Q You are?
A I'm sorry?
Q Are you either of those?
A No, no.
Q Are you qualified to read in the clinical setting an MRI?
A No.
Q As it relates to the performance of the PET scan, that was done by someone and that was read by Dr. Newberg, correct?
A Correct.
Q Does it take someone with certain skill and training to read a PET scan?
A Yes, much more so than an MRI.
Q That's called a nuclear scientist?
A Nuclear medicine physician.
Q Thank you.
And Dr. Newberg is one of those, isn't he?
A Yes.
Q Are you one of those yourself?
A No.
Q So you're not qualified to read the PET scan?
A Correct.
Q As -- after, rather, Ms. Montgomery was examined, you took the analysis of the MRI, you took the analysis of the PET,

and you combined that with other neuropsychological or psychometric testing to come up with your report, correct?

A Yes.

Q All right. And so before we -- I'll get back to that but first I want to talk about what you did. You wrote a report on April 3rd of 2007 with your findings in it, correct?

A Yes.

Q I'll try to stay by the microphone. Sorry. I tend to walk.

And when you did that, you described the findings from the MRI in your report in April of 2007, correct?

A Yes.

Q You described the PET results in that report, correct?

A Yes.

Q You also provided what we'll refer to as behavioral image in that report, correct?

A Yes.

Q And the report as it was written was signed by you under your signature?

A Yes.

Q Under your title?

A Correct.

Q Dr. Daviztikos was not mentioned as being the person that analyzed the MRI, was he?

A I'm sorry. What's --

Q Dr. Daviztikos was not named by name as the reader of the MRI, was he --
A Right.
Q -- in your report? Neither was Dr. Newberg as it relates to the PET scan?
A Correct.
Q Okay. You did say in the preamble that you work with other people at the hospital, and as we now know, those people were Dr. Daviztikos and Dr. Newberg, correct?
A And others as well.
Q And others as well. After you submitted your report before this case went to trial -- let me say this: When you submitted your report in April of 2007, this case was slated to be tried in late April 2007; do you remember that?
A Yes.
Q Ultimately, however, it was continued to October of 2007?
A Right.
Q Before that trial came, a discovery dispute arose over the admissibility of the opinions authored in your April 3rd report; do you remember that?
A That's my understanding of what happened.
Q And there was then a scheduled Daubert hearing to take place in August of 2007. I think it was ultimately continued to September of 2007. Does that sound about right to you, sir?

A I think that's about right.
Q And, Doctor, then, as that Daubert hearing came upon us, you revised your April 3rd, 2007, report with the revision dated August 23rd, 2007?
A Yes.
Q Is that correct? What was the point of that revision? In other words, did you change any of your analysis or were you just kind of cleaning up some typos and things like that?
A Very minor changes, as I recall.
Q Nothing substantive?
A No.
Q Okay. You were just trying to clean it up before you went to court for the hearing; is that right?
A Yes. I don't recall exactly the -- there may have been some points that Mr. Duchardt wanted me to clarify further.
Q Okay.
A But everything in my first report is in the second one.
Q Okay. The point I have is this: Again, in that August 23rd, 2007, report Dr. Daviztikos and Dr. Newberg are not named in the report by name, are they?
A Correct.
Q And you come and testify in probably early September 2007; is that right?
A Yes.
Q And Dr. Mayberg and Dr. Evans testified on behalf of

the government, and they argue contrary to your position. Is that a fair summary of what happened?

A Yes.

Q Okay. Subsequent to that hearing as we approach the trial in October, you're being asked to provide raw data, correct?

A Correct.

Q And raw data specifically and most importantly as relates to the PET scan?

A Yes.

Q And --

A Only those.

Q Correct. And sometimes it might be called the raw-raw data. I'm just going to call it the raw data, if that's okay. If I confuse you with a question, please ask me to clarify it. Okay? So your first report you write is Exhibit 28(c) dated September 28th, 2007, and it is a letter to Mr. Duchardt entitled, "Response to the Mayberg and Evans Report." Do you recall that?

A Yes.

Q In that report when you're talking about the PET scans, you still haven't identified Dr. Newberg as being the person that did the analysis that's within your original report, have you?

A Probably not, yeah.

Q Subsequent to that Exhibit 28(d) on October 2nd, 2007, you again write to Mr. Duchardt and this time your letter is entitled, "Response to the Mayberg and Evans," and then in quotes, "Reanalysis." Do you remember that report you wrote?
A Yes.
Q And in that report do you name Dr. Newberg or Dr. Daviztikos by name then?
A Okay.
Q You do or you don't?
A Yeah.
Q You do?
A I don't remember but it's quite possible.
Q I don't believe you have. I have the report here if you'd like to look at it.
A Okay. I wouldn't -- I'm not -- I don't remember. It's quite possible that I have or haven't.
Q Would you agree with me that this two-page report the raw data has still not been provided to Mr. Duchardt?
A Correct.
Q And the trial has commenced with jury selection by the time you write that on October 2nd, 2007?
A Yes.
Q Then the next letter you write to Mr. Duchardt is on October 22nd, 2007, and it says -- entitled, "Results of comparing Ms. Montgomery's PET values to New and Old Scanners

where raw data are available." Do you remember that letter?
A Yes.
Q If I suggest to you that letter is three weeks after the trial of Ms. Montgomery started, would that sound right to you?
A Yes.
Q And for the first time in that report you have provided some raw data, and I think based upon the title it means where it was available, correct?
A Yes.
Q And I'm going to show you the back page of Exhibit 28(e) and ask if you recognize the attachment that you've given Mr. Duchardt on October 22nd?
A Yes.
Q Okay. As we look at that, that's raw data as it relates to a PET scan, right?
A No. These are not the raw data.
Q Okay. What is this?
A These are the summary data. The thing that was added here was I consulted with a biostatistician, Professor Bilker, and he calculated these P-values that you see here on the sixth column.
Q Dr. Newberg thought that was considered raw data in his field. So you don't think it is?
A That's not the raw data that they were asking for.

Q But at least it's some data, right? It's statistical data?
A It's no different from the data that I supplied in my first report. It's just in the form of a table and it adds the probabilities of any of these regions being abnormally different from normal.
Q So we still don't really have the raw or the raw-raw data at this point even three weeks into trial, correct?
A I don't recall whether at that point I sent them. I did send them the raw data from the sample that was done on the same scanner, but I don't believe I had at that point yet the raw data that they were asking for, which was -- I mean, raw data means about a million observations per patient.
Q Okay. I will tell you that Dr. Newberg identified that as raw data to him in his field.
A Well, this is as raw as usually -- this is as raw as you get in every single other trial I was involved with.
Q Okay. In relation to the next report that you wrote, we've talked about that in your direct examination, that was January 8th, 2008, which was kind of the summary of your position, correct?
A Yes.
Q In that at the end of 28(f), you, again, provided a couple statistical tables that Dr. Newberg referenced as being raw data to him. I want to show you that and see if you

recognize it.
A Yes.
Q It goes on for about three pages. Do you recognize that?
A Yes.
Q I think that you testified, if I understand correctly, sir, that the raw data was in a decommissioned computer and, therefore, not readily available to you; is that right?
A Yes.
Q This is in September of 2007, right?
A Yes.
Q You screened her brain or did the brain scans in March of that year, right?
A Yes.
Q And you normalized it at some point after March but before September of 2007, right?
A Yes.
Q And by normalize I think a scientific way, at least in my mind, of saying you compared her brain to another batch of brains to make comparative value, correct?
A Yes.
Q Okay. So when I say normalization in this capacity, it's equivalent to comparative?
A Yes.
Q Okay. So sometime between March and September of 2007

you lost access to this raw data?
A These were not raw data. What I use to normalize were the average, the averages. This is how you do it. You have the average of the normative sample. You have the standard deviation. That's how you normalize. You take the new patient, you subtract the average of the normative sample, and you divide by the standard deviation, and that's how you get the Z-score for a patient.
Q So you scientifically normalized a certain batch of data in summary fashion against Ms. Montgomery's brain but you didn't have access to the raw data itself?
A I didn't need the raw data to do that.
Q In court when there's a Daubert hearing, you very well might. In fact, in this case you were ordered by the Court to produce it and couldn't, correct?
A Well, the first time I heard the raw data was requested was in September or October.
Q For purposes of coming to testify today, you authored yet another report, which has been marked as Exhibit 29. That was a report dated October 11th, 2016; is that correct?
A Yes.
Q And in that report you undertake to take Dr. Daviztikos' scan information before and kind of run it through more modern technology; is that fair?
A Correct.

Q Similarly, you take Dr. Newberg's scans from 2007 and do the same thing using commercial software and you kind of run it through an updated technology?
A Okay. So these data are the same on -- the same data on this analysis. The commercial software is something that Dr. Newberg did later on. It was not in my report.
Q That's fair. I misspoke. For Dr. Daviztikos and Dr. Newberg you plotted, then, the old data in a new way --
A Yes.
Q -- is that fair? Because your field, like most scientific endeavors, is advancing, correct?
A Yes.
Q And advancements have been made. We'll get back to that in a minute.
I want to talk about your background now, sir -- well, let me ask you this: In the 2016 re-report your behavioral image is no longer there. How come?
A There was nothing new about -- to do. It's the same. It would have been the same. There are no additional procedures.
Q Well, we'll talk about that. The behavioral image is based upon a quantitation process, correct?
A Yes.
Q From neuropsychological data you receive?
A Yes.

Q You yourself are trained to give psychometric testing, aren't you?
A Yes.
Q But you didn't do that here?
A No.
Q You took psychometric testing from Dr. Fucetola, correct?
A Correct.
Q You did indicate that you did some interview with Ms. Montgomery and took a history from her, correct?
A Yes.
Q How long did you meet with her?
A About three hours.
Q During that time, what did you do?
A Mainly took history, focused on past history of head injuries. Usually in those interviews I try to find out if there was any reason to suspect that at some point in her life her brain might have been exposed to damage.
Q If you were doing a clinical interview of Ms. Montgomery, would you have spent more than three hours with her?
A Yes. Well, I mean, a clinical interview would be about three hours. The testing will be about a day.
Q But you didn't do the testing here?
A No.

Q Instead you took Dr. Fucetola's data, Dr. Daviztikos' data, and Dr. Newberg's data, correct?
A Exactly.
Q And the quantitation that you used to come up with the behavioral image is based on an algorithm that you and a partner developed in the 1980s?
A Yes.
Q You patented it?
A Yes.
Q That patent was ultimately turned over by your university to a company called Bio-Logic; is that right?
A Correct.
Q And I think when you see the behavioral image, there's a little brand of Bio-Logic in the corner, correct?
A Yes.
Q When you described how you got to where you were, you said that you convened a panel of four experts, correct?
A Yes.
Q And they exercise judgment about how a brain should be impaired if certain behaviors were seen, correct?
A They specifically put a number on each brain region for each test, for each score that you get from each test indicating the probability that that region is involved if there is an impairment on that particular test.
Q Okay. But it's based on their judgment?

A Yes.
Q They were a committee?
A Yes. Except they did it separately. They weren't discussing it with each other. They sat in separate rooms.
Q And as a neuropsychologist, one of the goals of your profession, sir, is it not, to try to link behavior to brain function?
A Yes.
Q And that's what this committee was doing, trying to come up with a numerical value on what tests should mean regarding brain function and behavior?
A Exactly. Yes.
Q And then you had that group come back about a year later to redo it?
A Correct.
Q Okay. Again, though, they're not doing empirical analysis or evidence based. They're coming up with their best judgment?
A Based on their entire understanding of the literature and the lifetime of clinical experience.
Q When did they meet for the first time?
A Are you asking for the exact day?
Q The year.
A I think it's probably around 1988.
Q All right. So in 1988, or ballpark, they meet for the

first time to come up with this table of values or weights, I think you called it, correct?

A Yes.

Q Then a year later, say 1989, they came back in and did it again?

A Yes.

Q All right. Have you written about your methodology and the algorithm that supports your type of quantitation in the behavioral image?

A Yes. That study was published.

Q Yes. I believe you and I have talked about this before. You've written maybe four articles on this topic over the years; is that right?

A About that, yeah.

Q And you've indicated through your h-index that you're a prolific writer, correct?

A Yes.

Q The last time you wrote an article about the behavioral image, I think you've told me was in 1992 or 1993. Does that sound about right?

A There is a more recent article. I would think it's around 2012 maybe.

Q Would you agree with me that you testified in this courthouse in 2014 in the Keith Nelson case before Judge Gaitan and you indicated on the record under oath the last article you

wrote was in the 1990s on this?
A I think that after that, we wrote another article where we used behavioral image, but that technology was done. I put it on the shelf and I didn't do any more work on it.
Q Since the experts that convened the weight table happened in '88 to '89 and you wrote most significantly last about it some 20 years ago, has that technology laid stagnant on the shelf as you just described it?
A Yes.
Q Okay. Where in the 2016 report you're going back and using new technology to demonstrate the PET scan and MRI scan your behavioral image is an artifact of the past, correct?
A It's -- there was no other development. It could be developed further but I did not work on it. I moved on to other things.
Q And you would agree with me, sir, that technology in the neuropsychological field has advanced?
A Not in neuropsychology. Remarkably all the tests that we went over then are the same tests that are being used to this day.
Q Some of the diagnostic instruments that you use to inform a neurologist's examination like the PET scan and the MRI are getting better and better all the time, correct?
A Yes. These are very rapidly revolving technologies; whereas, neuropsychology moves much more slowly.

Q When Lisa Montgomery's brain was normalized against other brains, I think you said originally you would have used a sample of 14 normal brains, correct?
A Yes.
Q You didn't use that or did you use that?
A I didn't, not in the first report.
Q Okay. Say that again. I'm sorry.
A I did not use that in the first report.
Q You used it at some point?
A Later on as part of the discussion, I used those data as well.
Q Well, let's focus on what you did do --
A For the raw-raw data.
Q For purposes of our discussion, let's focus on what you did do. I think you said that you utilized a brain sample from 69 patients from your Science article; is that correct?
A Yes.
Q And you pulled out 26 of those that were female brains?
A Correct.
Q All right. Of those 26 brains, how many of those patients were diagnosed with mood disorders like Lisa Montgomery?
A All these are healthy controls. None of these individuals had any major psychiatric disorder.
Q So is there any way in your analysis or quantitation to

analyze Lisa Montgomery's brain against the brain of someone suffering psychological or psychiatric diagnoses?
A That's the right way of doing it.
Q I didn't ask you that. You've compared her brain to brains of people who are not sick, correct?
A Correct.
Q Can you poll the population, the psychiatric population and compare her brain to a psychiatric population to see if her brain is similar to theirs?
A Why would I want to do that?
Q I'm asking you, did you do it?
A I wouldn't do that, no.
Q Okay. But you didn't do it?
A No.
Q So you don't know none of the people that were in the normative group that you compared her to had diagnosed mood disorders?
A That's correct.
Q Did any of the people in the normative group have diagnosed PTSD?
A No.
Q Did any of the people in the normative group have diagnosed issues of depression?
A As I mentioned, all these are healthy individuals that were thoroughly screened.

Q Isn't it true, though, that depression affects metabolic rate?
A Subtle effects, yes.
Q The PET scan specifically is looking at glucose metabolism in the brain and that's one of the ways in which it's making a comparative value or a map of the brain. So if something that affects brain metabolism would be important to look at, wouldn't it?
A Well, we know what is the pattern of metabolic activity in people with depression, and that usually shows reduced metabolism in the frontal lobe, which she did not have.
Q When I was talking about the behavioral image, we agreed that you had a panel of people that came in and looked at it and came up with a weight table, correct?
A Yes.
Q All right. Are you familiar with a paper written by Ronald Yeo and Eric Turkheimer as it relates to Neuropsychological Methods of Localizing Brain Dysfunction: Clinical Versus Empirical Approaches? Are you familiar with that?
A Can you repeat the name of the first author?
Q Ronald Yeo. It's Y-e-o.
A Oh, yes, of course. Yes.
Q And he in the paper is somewhat critical of your table of experts making clinical judgment on what weight to give,

isn't he?
A He criticized the approach and suggested that the much more valid approach would be to use what is now called meta-analysis of available data, and we responded to that criticism. I believe that that's where the thing was settled because they did not re-rebut our rebuttal, which they would have, had they disagreed.
Q Well, in that article they specifically encourage empirical basis of applying brain function to behavior, don't they?
A Yes. Unfortunately the ability to do that is just around the corner but was not available at the time.
Q Okay. In addition to that, we've talked briefly about Dr. Aguirre, if I said his name correctly, and his criticism of your methodology, correct?
A Yes.
Q Dr. Aguirre is in the neurology department at the same institution you are currently employed; is that right?
A Yes.
Q He carries both a Ph.D. and M.D. in the Department of Neurology?
A Yes.
Q And he believes that your system is flawed science. I believe he referred to it as neurohuckster, hasn't he?
A Well, he never published any peer-reviewed papers that

challenged any of my writings. In fact, when he does cite my work, he always cited it in the context of replicating my findings. What he says in some lecture does not hold any scientific water, and definitely his statement that you just quoted is just flatly wrong.

Q His statement was provided in an online lecture for neuroethics. Would you agree with me on that?

A Yes.

Q Would you agree with me that you were invited to speak at that and you were not able to do so?

A What?

Q That you were invited, at least according to Dr. Aguirre, to speak in rebuttal to what he said and you were not able to appear?

A That's not correct. I was never invited to rebuttal. I was invited to attend this lecture and I couldn't because I was flying out of town to a conference that day. He never asked -- he never suggested that I would get an opportunity to rebut it.

Q Okay. You were invited to attend?

A I was invited to attend, yes. He invited me.

Q And you indicated and you were aware that he was paid by the Department of Justice; is that correct?

A That's what he says in that lecture.

Q He was approached by the Department of Justice because

you show up in postconviction hearings in death penalty cases federally around the country with very similar testimony. Do you know that to be the case? Do you know why the Department of Justice came to Dr. Aguirre?

A I don't know who came to him.

Q I said do you know why the department came to him?

A According to his explanation, they were puzzled that my testimony is accepted in multiple courts and individuals get off the death penalty for it, and what they told him was how is it possible that every person who gets charged with a capital offense happens to have brain damage, which is, of course, a caricature of what I do.

It's not -- I only -- I would only testify in cases where I examined the patient or I have data on the patient and the data indicates brain damage. If the data doesn't indicate brain damage, then I tell that to the attorney and in most cases then the attorney doesn't invite me to testify.

Q Similar to how in this case you wrote in your original report that the -- what you saw was consistent with a diagnosis of pseudocyesis, correct?

A Yes.

Q Okay. Because, though, Mr. Duchardt may have asked you about it, if you saw something not consistent with pseudocyesis, you would have been happily able to stand there and say, No, Mr. Duchardt, that is not indicated by my

analysis, correct?

A Absolutely.

Q Okay. Now, you talked about this on direct examination, but I think it's important that we talk about this a little bit more because you told me that normative is fair to call to compare, an equivalent word in the field for comparison, correct?

A Yes.

Q However, as it relates to your behavioral image, that picture is a unitless scale, right?

A Yes.

Q Units imply comparison, right?

A Unitless scale is a technical term. It just means that it's a number that behaves in a certain way. It follows certain laws, but you cannot apply a particular -- a particular label to different values.

Q Well, just by unitless and scales -- let's break it down. The word "scale" means put something in perspective, correct?

A Yes.

Q And a unit means if one is one, two is twice as big as one, right?

A That's one type of scale.

Q Well, a unit scale, if you have a unit of hedge apples, if you have a bigger hedge apple, you can say, That hedge apple

is bigger than this one; or if there's two, you can compare it to one, right?

A If you define size as volume, then that will behave that way but some scales are ordinal. All they mean is that if one number is bigger than the other, it means it follows. It doesn't necessarily -- it's not proportionate. So there are different types of scales being used. Some are called ordinals. Some are called proportional. But, in general, all you know about the scale is that it includes numbers and, of course, the higher the number the higher the value, but it doesn't -- in many scales that you can think of it's not totally proportionate. So four is not necessarily twice as much as two.

Q Well, you've heard the old saying about comparing apples to apples and oranges to oranges, right?

A Yes. Of course.

Q When you compare an apple to an orange, they're going to look different, aren't they? Right? An apple and an orange, different fruits?

A Yes.

Q Okay. Do you have an ordinal scale in your behavioral image?

A I believe that the scale in the behavioral image is more than ordinal but not quite proportionate.

Q Okay. You said in direct testimony it was a unitless

scale. You said before Judge Gaitan it was a unitless scale. My question then and my question to you now is based upon the way the behavioral image was depicted in 2007, it has no comparative value to when someone looks at it. It's just a pretty picture, right?

A No. No.

Q So you're taking exception with your testimony in 2014? I can provide it to you if you'd like to look at it.

A I'm not saying that it's not a unitless scale. It is a unitless scale. But the scale, the way you reach it, is by entering performance numbers and these are translated to Z-scores. So each number that enters into the algorithm has already compared that particular individual to the average. What comes out of the algorithm are the numbers that are unitless.

Q The numbers are unitless. And I would tell you that means noncomparative, correct?

A I wouldn't draw that equivalence.

Q You want to stick with unitless?

A Yes.

Q Okay. The algorithm that you created, the data going in was based upon the weight and judgments of these professionals from almost 30 years ago now, right?

A The weights. The numbers that go into the algorithm are the Z-scores of the tests that Ms. Montgomery took.

Q Okay. And what comes out is a unitless scale, as you told us; is that correct?
A Yes.
Q The algorithm you created, right?
A Yes.
Q And the citation in your paper we talked about, you basically cite to yourself on that algorithm, don't you?
A Yes. I created it.
Q Have you ever had anybody else get exposed to it so they could determine whether that algorithm had any value?
A It was fully vetted by the Patent Office as well as by the reviewers, the four or five papers.
Q So a lawyer at the Patent Office looked at it and thought it looked great and gave you a patent in the 1980s, right?
A I wouldn't want to testify about the quality of the evaluation of the U.S. Patent Office but, in general, in my field it's considered to be very rigorous.
Q To get a patent?
A Yes.
Q Okay. By a lawyer?
A It's not easy to get a patent, no.
Q Anybody else using your algorithm anymore?
A What?
Q Anyone else using your algorithm?

A I don't know.
Q If you knew -- because you have a patent on it, you would get paid for it?
A What?
Q If you had a patent on it and people were using it, you would get paid, wouldn't you?
A Yeah. No. I didn't ask to be paid for it. It was -- I went to the university. Usually the university takes a big chunk of what comes in and they gave it to a company called Bio-Logic, and that company manufactures EEG machines; and shortly after they got the patent, there was a change in the leadership of the company and they just basically never developed it or never tried to market it.
Q So, to your knowledge, no one else but you is using this algorithm?
A Correct.
Q You've not made any money off of it?
A No.
Q Bio-Logic, to your knowledge, has not been producing it, using it in any meaningful way?
A Not to my knowledge.
MR. VALENTI: Judge, I don't have anything else.
MS. HENRY: I can finish very briefly, Judge.
THE COURT: All right.
REDIRECT EXAMINATION BY MS. HENRY:

Q Dr. Gur, you didn't write anything about the behavioral image in your newest report because when I came to you to ask you about your analysis in 2007, I informed you that it had actually not been challenged and it was not in fact excluded by his Honor; is that correct?
A That's correct.
Q And so because there was no new information and because it was available for trial counsel to use at the time of trial, I informed you that in this postconviction matter it was not the subject for which I was concerned, correct?
A Correct.
Q And with respect to the old versus the new scanner, you did prepare a report, which is 28(e), where you compared the results of the PET values with the new and the old scanners where raw data was available, correct?
A Yes.
Q And the confusion, of course, is in this raw versus raw-raw. The CPP values, the count-per-pixel values?
A Yes.
Q That was the information that Dr. Evans and Dr. Mayberg was looking for; is that correct?
A Right.
Q You didn't need the CPP values from that old media to be available to you in order to do the quantitative analysis?
A Correct.

Q But they wanted the CPP values and that's what you learned they wanted for the first time on September 5th, 2007?
A Exactly.
Q And if Mr. Duchardt didn't request a continuance in order to allow you sufficient time to get the CPP values, that's outside your control?
A Yeah. Eventually we got them.
Q And the criticism from Dr. Mayberg and Evans where they claim Dr. Newberg did what he didn't do was September 20th of 2017 [sic] and that's Movant's 34; is that correct?
A Yes.
Q And, again, when Professor Aguirre goes on his video tours to criticize your methodology, he's not talking about the behavioral image?
A No, not to my knowledge.
Q He's not qualified to talk about the behavioral image?
A He's not.
Q And Dr. Aguirre uses neuroimaging in his research?
A Yes.

MS. HENRY: That's all I have. Thank you.

RECROSS-EXAMINATION BY MR. VALENTI:

Q Dr. Aguirre specifically mentions the fact that your testimony in Lisa Montgomery was kept out of the Daubert hearing and he approved of that decision, didn't he?
A States what?

Q Dr. Aguirre specifically in the lecture mentions with favor that your testimony in Lisa Montgomery was excluded by the Court performing its gatekeeping function in the Daubert hearing and he did so favorably?

MS. HENRY: Excuse me. If I could just interject an objection on clarification for the record, because Mr. Valenti stated he's only talking about Dr. Aguirre with respect to the behavioral image. To just clarify, the Lisa Montgomery ruling he was referring to had to do with PET and MRI.

THE COURT: Do you accept that?

MR. VALENTI: Yes.

THE COURT: Thank you.

A I don't think he -- I don't know -- I don't know what he's referring to. My testimony was on the behavioral image. Whenever I offered it, it was accepted. So he maybe misunderstood something. I'm not sure.

Q (By Mr. Valenti) Did you understand that Dr. -- excuse me -- did you understand, Doctor, that Judge Gaitan discredited your testimony in the Nelson case after hearing your testimony in that postconviction proceeding?

A I don't know about that. I didn't know that.

Q I can provide the records to the Court, but in his order he discounted your testimony?

A Okay. I'm ready to believe it.

THE COURT: Anything on that?

MS. HENRY: No, sir.

THE COURT: Thank you, Doctor. You're excused.

(Witness excused.)

THE COURT: Let's take a break now.

MS. HENRY: We could probably do George Parnham very quickly or take a break as the Court wishes.

THE COURT: We'll do Parnham, then we'll take a break. Ten minutes, right?

MS. HENRY: I'll try to get it under five.

Good afternoon, Mr. Parnham. If I could ask you to stand up to the witness stand.

THE COURT: Good afternoon.

THE WITNESS: Good afternoon, sir.

THE COURT: Come on up, and before you're seated my clerk will swear you in.

GEORGE PARNHAM, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Thank you, Mr. Parnham. If you could have a seat for us.

A Sure. Thank you.

Q And I promised the judge that I was going to make this quick. So if you could state your name and spell your last name for the court reporter, please.

A Yes. It's George Parnham. That's P, as in Paul, a-r-n-h-a-m.

Q Thank you.

Mr. Parnham, you are fresh off the plane; is that correct?

A Well, I'm not sure fresh is the correct word, but, yes, I just flew up today.

Q Okay. Thank you, sir.

If you could tell the Court, you are employed as an attorney in the state of Texas; is that correct?

A That is correct.

Q And for purposes of our hearing today, were you trial counsel in the case of State of Texas v. Andrea Yates?

A Correct, on two occasions.

Q You represented her on the first occasion and then on retrial; is that correct?

A That's correct.

Q And the reason for the retrial was because during the course of the first trial it was discovered that Dr. Park Dietz had provided some testimony on cross-examination that turned out not to be true; is that correct?

A That's correct.

Q And the court -- is it the Texas Court of Criminal Appeals that reversed the case?

A No. It was the First Court of Appeals that reversed that case.

Q And between the reversal of that case and the second

trial, was there a grand jury investigation into Mr. Dietz -- Dr. Dietz?

A Yes.

Q And was the -- let me ask you this: Did you instigate the grand jury investigation into Dr. Dietz?

A I don't know if I instigated the grand jury investigation. When I obtained the transcript of the first trial for the purposes of appeal, I saw the testimony of Dr. Dietz in a proper context and contacted the grand jury in Harris County to determine whether or not they saw fit to investigate.

Q Are you familiar with a gentleman by the name of Jim Brooks?

A I am.

Q Was Jim Brooks the foreperson of the grand jury?

A Yes, he was.

Q Did you know Mr. Brooks prior to the grand jury's investigation into Dr. Dietz?

A No, I did not.

Q And did you later learn that the reason the grand jury started looking into Dr. Dietz was because they came across an email from the District Attorney General's Office in the course of their investigation of the crime lab in Houston, Texas?

A I found out about the email that you have made reference to, but I don't recall the specific time during or

after the grand jury investigation whether that was revealed to me.

Q Did you, in fact, end up testifying in front of the grand jury?

A I did testify in front of the grand jury.

Q Was it a lawless grand jury?

A I'm sorry?

Q Was it lawless?

A Lawless?

Q Yes.

A No. I would not say that it was lawless at all.

Q Between Mrs. -- between the first trial and the second trial, did the prosecuting attorney in the case provide you with a copy of Dr. Dietz' testimony before the grand jury?

A Yes. I think that he did, and the reason I say that is I have no independent recollection, but I know that we did have a hearing relative to prosecutorial misconduct in light of the second trial about ready to take place.

Q And I'm placing on the monitor here Movant's Exhibit 81. Is that a copy of the Dr. Dietz' grand jury testimony?

A That purports to be a, I guess, first page of the reporter's record entitled "Testimony of Park Dietz."

Q I'm going to --

MS. HENRY: May I approach the witness, Your Honor?

THE COURT: Yes.

Q (By Ms. Henry) Is this a copy of the grand jury testimony that you provided to me and my investigator?

A I'm sure that it is if you represent that this is what you received from my office.

Q And did I come and interview you and ask you about your involvement in Ms. Yates' case?

A I'm sorry?

Q Did I come interview you and ask you about your involvement in Ms. Yates' case? Did I come down to your office and meet you?

A Yes, I believe you did.

Q And you gave me a copy of your file?

A That's correct.

Q And so this -- if another attorney representing Mrs. Montgomery had requested a copy of Dr. Dietz' testimony from that grand jury investigation into his false testimony in the Andrea Yates case, would you have similarly provided him a copy of that transcript?

A Yes. I would not see any reason not to.

Q And so by the time you received that grand jury transcript, it was a public record?

A Yes, I believe that it became public. That's correct.

Q Thank you. Just one moment.

MS. HENRY: Nothing further. Thank you.

MR. VALENTI: No questions, Your Honor.
THE COURT: All right. Thank you, Mr. Parnham.
THE WITNESS: Thank you, Your Honor.
THE COURT: You can go catch a plane back.
THE WITNESS: Yes, I shall.
(Witness excused.)
THE COURT: All right. We'll take a recess until 3:15.
(Recess taken at 2:55 p.m.)
THE COURT: Ms. Henry.
MS. HENRY: May it please the Court. The movant calls David Owen.
THE COURT: Mr. Owen, would you come up to the witness stand, please. Good afternoon.
DAVID OWEN, being sworn by the courtroom deputy, testified:
DIRECT EXAMINATION BY MS. HENRY:
Q Good afternoon. Mr. Owen, could you state your name for the record, please.
A David Owen.
Q And that is spelled O-w-e-n with no S?
A Correct.
Q Mr. Owen, you were trial counsel for Lisa Montgomery; is that correct?
A One of them, yes.
Q And before we go through what I hope will be a very

brief examination, just to be clear, any questions that I ask you we're not going into -- because his Honor already ruled on the issues with respect to Ms. Clarke's exiting from the case. So I will not be asking you any questions about that area or exploring that with you in any way today. Okay?

A Okay.

Q So, instead, what I would like to do is pick up in time -- I may refer back to information you got at that time, but right now we're going to pick up in May of 2006 after Ms. Clarke was out of the case and Mr. O'Connor was appointed. Okay?

A Okay.

Q At that point in time you did not consider yourself a capital-qualified attorney; is that fair to say?

A Correct.

Q And you also did not consider yourself to have expertise or background in mental health cases; is that correct?

A No expertise, no.

Q And because this was a capital case that involved mental health issues that you felt were beyond your level of expertise, you wanted co-counsel who could teach you but also shoulder that burden?

A Correct.

Q And when Mr. O'Connor was appointed by the Court, you

and he discussed the fact that he was probably not the person who was going to fill that role on the team; is that correct?
A Restate that, please.
Q Did you and Mr. O'Connor believe that Mr. O'Connor also was not the person who could fill the role of mental health specialist on the team?
A I don't specifically remember our conversation about that, but I knew that he wasn't.
Q Okay. And so Mr. Duchardt became appointed as learned counsel in the case; you recall that?
A Yes.
Q And you recall that it was the preference of the Federal Public Defender's Office here to not work on cases with Mr. Duchardt; is that fair to say?
A Yes.
Q And do you believe that was known?
A I'm sorry?
Q Was that known, the preference to not work with Mr. Duchardt, known?
A Known or no?
Q Known.
A I know I've discussed it with Magistrate Hays.
Q So Magistrate Hays knew that you preferred not to work with Mr. Duchardt?
A Yes. That was a discussion at one point in time that

we'd had.

Q Now, prior to Mr. Duchardt coming into the case as learned counsel, your office had actually retained the services of two mental health experts, a Dr. Dean Delis and Dr. Judith Herman; do you recall that?

A Yes.

Q You and I know the bureaucracy of a Federal Public Defender Office and how those contracts work, but his Honor may not know and the record may not know. So when a contract is entered into with an expert, that's a document that goes to the administrative officer in the Office of the Federal Public Defender; is that correct?

A That's correct.

Q And that contract is kept there for purposes of accounting and audit, correct?

A Yeah.

Q And when the bill comes in, the administrative officer is going to pay the bill and she's going to compare it to the contract?

A Correct.

Q And the person who served in that role in the Federal Public Defender Office at the time was a woman by the name of Kristin Kertz?

A Correct.

Q So those contracts might not necessarily make their way

into the case file that the paralegal is keeping; is that fair to say?
A Probably not, yes.
Q And that sort of bureaucratic red tape is not the sort of thing you would bother CJA counsel with?
A No.
Q If Mr. Duchardt wanted to know about Dean Delis or Judith Herman having been brought in the case, you would have shared that with him, wouldn't you?
A Yeah. I'm sure we told him when he took on the case.
Q Do you believe that you told him everything that you had learned up to that point in May of 2006?
A I believe we did, yes.
Q Did you hold anything back?
A Not to my knowledge.
Q Is it fair to say that prior to Mr. Duchardt's coming on the case, the defense team held regular and lengthy team meetings?
A Very frequently, yes.
Q And in those frequent lengthy team meetings a lot of information was shared verbally; is that fair to say?
A Yes.
Q And not all of it was written down?
A Probably not.
Q And so Mr. Duchardt would have needed to rely on your

institutional memory or he would have to call the members of the team who were no longer serving as members of the team; is that fair to say?
A It would have been myself, Mr. Ninemire, Ms. Elliott, the mitigation specialist at the time. We all -- when Fred came on, we all met and told him everything we knew.
Q And then after that time, Mr. Duchardt did not hold frequent team meetings; is that fair to say?
A That's fair, yes.
Q And Mr. Duchardt asked you to handle the computer forensics aspect of the case because that was your particular specialty?
A Yes.
Q And he announced to the team that he would be taking over the mental health and mitigation aspects of the case?
A Him and John both said that, yes.
Q John agreed that Fred would take over the mental health aspect?
A Yes.
Q And that John was going to handle the crime fact aspect of the case?
A Yes. John was the lead trial attorney. He's the one that made those decisions.
Q And that gets a little confusing in capital cases. You have a lead counsel and learned counsel, right?

A Right.
Q So John made the ultimate decision about the division of labor, but that was the way things basically proceeded from May of 2006 up until the trial in October 2007; is that fair?
A Yes.
Q And Mr. Duchardt also made it clear to the other members of the team that during the summer and fall of 2006 he was otherwise occupied with the Phil Street trial?
A I remember him being occupied with that case, yes.
Q And in the meantime you had hired a mitigation specialist by the name of Dani Waller; is that correct?
A Correct.
Q And she was hired by the Office of the Federal Public Defender and so served basically under you because you were the person who would have to approve her bills?
A That's not a real accurate way of stating it but --
Q Okay.
A Yes, I would approve her bills. She didn't work directly under me. She worked for the team.
Q And since Mr. Duchardt was in charge of the mental health mitigation, did you expect Mr. Duchardt to make assignments to Ms. Waller with respect to mitigation investigation tasks?
A Having to deal with the mental health issues, yes.
Q Now, you did maintain a relationship with Judy

Shaughnessy; is that correct?
A Yes.
Q That was the other aspect of your representation of Lisa Montgomery is that you were the point person between Judy and the team?
A Yes.
Q And you estimated in your affidavit that you probably met with Ms. Shaughnessy over a hundred hours during the course of your representation?
A That's correct.
Q And, again, I don't want to go into the details about Ms. Clarke being removed from the case, but you are aware of the fact that one of the concerns the previous team had was whether or not you were the appropriate person to have that relationship with Ms. Shaughnessy; is that correct?
A I assume so, yes.
Q That was communicated to you at the team meetings?
A I don't remember specifically that being communicated, but it would fall in line with the rest of the attitude.
Q Okay. During your conversations with Ms. Shaughnessy, she told you she was in fact the product of incest; is that correct?
A Yes.
Q She told you that her father had raped her sister, Ann, and that her sister, Ann, was actually her mother?

A Yes.
Q And Ms. Shaughnessy told you that her father also raped her, that is, Niles raped Judy?
A Yes.
Q And you thought that was important mitigation that should be explored?
A I thought it should be, yes.
Q Given your relationship with Judy Shaughnessy, you cautioned the trial team of Mr. Duchardt and Mr. O'Connor about proceeding with the Tommy defense; is that fair to say? In other words, you told them that accusing Tommy would cause Judy to shut down and circle the wagons and cut the family off?
A That part is true, but Ron Ninemire and I also did investigate that avenue. We just did it quietly where hopefully Ms. Shaughnessy didn't learn about it.
Q So you and Mr. Ninemire had previously been investigating the Tommy defense, correct?
A Yes.
Q And you wanted to keep it quiet because you were afraid that if Ms. Shaughnessy got wind of it, mitigation would be shut down?
A Yes.
Q And it's true, isn't it, Mr. Owen, that Lisa Montgomery never told you that Tommy Kleiner was the person who was involved in the crime? You and Mr. Ninemire had developed that

theory on your own?

A She never directly said that Tommy was the person that was with her. The things that she told us led us to believe that.

Q She told you she felt like there was someone else in the room?

A Yes.

Q And then you came to understand that that possibly was a symptom of a mental health disorder known as dissociative disorder?

A Yes.

Q But at first you took that literally and sought to find the other participant?

A Yes.

Q And the best candidate for the people that Mrs. Montgomery knew was her brother, Tommy Kleiner?

A Yeah. That's true. She had given us an avenue that we felt we had to explore. It was the defense duty to do so and we did so.

Q And ultimately, then, you ruled out Mr. Kleiner because he had an alibi?

A Correct.

Q The prior team that was involved in the case -- well, let me ask you this: The idea of pseudocyesis was an idea that was kicked around from the defense team almost from the very

beginning, correct?

A Correct.

Q By the time Mr. Duchardt came in the case the defense team had all but abandoned the defense of pseudocyesis as not workable as a first-phase defense?

A Correct. We figured it would be an additional factor that could be explored.

Q In other words, you thought that it was a better defense to the prior bad acts possibly to be used in mitigation rather than a first-phase defense of not guilty by reason of insanity?

A Exactly. We figured it was a mitigation situation, not a factual situation.

Q You also felt like it was important to present the fact that -- let me talk to you about Mrs. Montgomery's mental state during the time that you represented her.

Prior to Mr. Duchardt becoming involved in the case, the previous legal team, including yourself, had serious concerns about Mrs. Montgomery's competence to stand trial; is that correct?

A That's correct.

Q And you, in fact, believed that Mrs. Montgomery was not competent to stand trial; is that correct?

A That's correct.

Q But you were not allowed to file any pretrial motions

because Mr. Duchardt was in charge of all pretrial motions?
A Correct.
Q And you deferred to him?
A Well, I wouldn't have had on my own anyway. It's a team thing. I would not have taken that upon myself.
Q The team also discussed the fact that Mrs. Montgomery was under the -- under a doctor's care at CCA and receiving psychotropic medications; is that correct?
A Correct.
Q And you are aware of the case of Riggins v. Nevada that requires a defense team to advise a jury of the fact that a client is under the influence of psychotropic drugs and the effect those drugs might have on their behavior? You're aware of that?
A Yes. The defendant's demeanor and everything, yes.
Q Because if the jury doesn't know about the effect of those drugs, they can be perceived as cold-blooded and remorseless?
A Yes.
Q And that's something you recall discussing with the Duchardt/O'Connor team prior to trial?
A Yes.
Q And you also had discussed that it was going to be explained through one of the doctors that Mrs. Montgomery not only that she was on psychotropic medications but also the

effects of those psychotropic medications on her affect?
A Yes.
Q But that did not happen?
A No.
Q At some point you learned that Mr. Duchardt had brought his wife, Ryland, in to visit with Mrs. Montgomery; is that correct?
A Yes.
Q You learned that after the fact, correct?
A Correct.
Q You did not know that Mr. Duchardt had represented to officials at CCA that Ryland Duchardt was an expert witness; is that correct?
A That's correct.
Q Ryland Duchardt was not an expert witness; is that also correct?
A Yes.
Q She was not made a member of the defense team; is that correct?
A I think Fred made her a member of the team on his own. The rest of the team had no prior knowledge or say in the matter.
Q And, in fact, when you showed up for trial and Mrs. Duchardt was seated at counsel table, you were surprised?
A Yes.

Q You did not expect her to be there?
A No.
Q And I believe you stated in your affidavit that you felt that Mrs. Montgomery displayed a certain aversion to Ryland during the trial?
A Yes.
Q I want to talk with you now about Mr. Duchardt's relationship with Mrs. Montgomery's children. Did Mr. Duchardt make it clear that he wanted to be the person who had the contact with Mrs. Montgomery's children?
A Yes.
Q And was it believed that Mrs. Montgomery's relationship with her children was going to be a powerful mitigating circumstance?
A Yes.
Q And did Mr. Duchardt ever share with the rest of the defense team any concerns he had about the fact the children would be called to testify about their mother's abuse and neglect of them?
A I don't specifically remember that particular topic.
Q Do you remember being surprised after Desiree testified about her mother's abuse and neglect in the family?
A Yes. We were very surprised that the children, No. 1, were called by the government; but, No. 2, what they said and what they did testify.

Q So Mr. Duchardt had not prepared you for that testimony that was quite damaging?
A No.
Q At some point during the trial you became convinced that things were not going well; is that fair to say?
A Yeah, very fair.
Q And you called Susan Hunt who had been your previous co-counsel on the case to express your concerns?
A Yes.
Q What did you say to Ms. Hunt?
A Well, I don't remember verbatim, but basically that we were not getting the mitigation evidence to the jury that we thought was important. Her story wasn't being told.
Q And did you feel that Mr. Duchardt was not following through on promises that he had made to the defense team about the type of evidence he intended to present at trial?
A You want to restate that?
Q Sure. In your affidavit you state that Mr. Duchardt had represented to you that individuals who were mentally ill could actually premeditate and that you expected that testimony to be presented but it didn't happen?
A Let me correct the way you've put the question.
Q Please do. Please do.
A Because I was aware independently that mentally ill individuals can premeditate and that I felt that particular

evidence needed to be given to the jury. It never was.

Q Thank you. That's a much better way of stating it. I appreciate that.

Did you also feel that there was important mitigation about Mrs. Montgomery's paternal family that was not presented to the jury?

A I don't remember that.

Q You prepared an affidavit in this case; is that correct?

A Uh-huh. Yes.

Q And you did that at the behest -- first you provided a declaration for movant's counsel; is that correct?

A Correct.

Q That we attached to our motion?

A Correct.

Q And then the government sought and received a court order directing you to file an affidavit in response to the motion filed; is that correct?

A Correct.

Q Is it fair to say that you then read the 2255 motion prior to completing your affidavit that you had been ordered to produce?

A No.

Q Okay.

A I've never read the 2255 motion.

Q Okay. So the affidavit that you filed was based on your memory of what happened at the trial and what your concerns were?
A Correct.
Q From your memory?
A From my memory only. I had no notes, no files, nothing to refer to.
Q And, in fact, it had been your intention to leave the Office of the Federal Public Defender upon the verdict in Mrs. Montgomery's case; is that correct?
A That's correct.
Q And that's because on February 20th of 2007 there came a time when you were no longer the first assistant at the Federal Public Defender's Office?
A I don't know when it was, but true.
Q Around the winter of 2007. You don't remember the date?
A No.
Q And then after that time, your caseload became smaller and you worked on the Montgomery case pretty much exclusively; is that fair to say?
A Yeah, it is. There was no correlation with that. When I was assigned the case, I finished up the cases that I had and did not take any others. I was the one that did the case assignments in the office. I did not take any other cases so I

could concentrate solely on Lisa's case.

Q And there was also about a two-month period there in May, June when you were out of the office for back surgery?

A Correct.

MS. HENRY: Just one moment, please. Mr. Owen, thank you so much for your patience being around all day.

That's all I have.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

CROSS-EXAMINATION BY MR. VALENTI:

Q Good afternoon, Mr. Owen. How are you?

A Good afternoon.

Q I want to go through several things, if I may, and some of these you may not have heard before but I want to ask you about them. First, when you were -- got into the case, the first mitigation expert that your team had was Lisa Rickert; do you recall that?

A Yes.

Q Lisa Rickert was a mitigation expert who had come recommended to you by Dick Burr?

A I don't remember who recommended her. I was not on the case at the time she was employed.

Q Okay. That would have been the time when Anita Burns was on the case but you were her supervisor, correct?

A Yes.

Q If Mr. Burr testified earlier during this proceeding and indicated that he had made that recommendation as resource counsel, would you have any reason to quibble with that?
A No.
Q So Lisa Rickert, though, was the mitigation specialist on the case when you took over representation from Ms. Burns sometime in about March or thereabouts of 2005?
A Yes.
Q She obviously didn't work out; is that right?
A Correct.
Q She was ultimately let go. And can you tell the Court why?
A She would not communicate with the defense team. This was after I had gotten onto the team, had been assigned the case. Prior to that, Susan and I, Susan Hunt and I, had had a lot of discussions about Ms. Rickert. She was very concerned because Ms. Rickert would not communicate any progress or any information that she had gathered. Ms. Hunt was very concerned with that. Then when I got onto the case, I observed that firsthand what was happening. Susan and I had a discussion about it and it was decided to replace her.
Q And she was replaced with a woman named Holly Jackson; is that correct?
A Yes.
Q And Holly Jackson was on the case for some time really

until shortly after Judy Clarke and her group were let go, correct?
A Correct.
Q You were able to work with Holly Jackson fine?
A Yeah, more or less.
Q Is it fair for me to say that when I read your declaration, I get the impression that you thought she was star struck with Judy Clarke and wanted to leave the case because Judy was no longer in the case?
A Absolutely.
Q Okay. Judy, when she was brought into the case -- we won't talk about it much but I want to ask you this: She was a person who was recommended to you by the same Dick Burr we were talking about earlier, correct?
A Yes.
Q Now, as resource counsel, Ms. Hunt and you went to see Mr. Burr in Tulsa, Oklahoma, I believe; does that sound right?
A Yes.
Q And that's when you met Judy Clarke for the first time?
A No, I met Judy many years before that.
Q Bad question on my part. In relation to her working or providing guidance in this case, that was the first time you met her?
A Yes.
Q My apologies.

Needless to say that relationship doesn't work out in the end. The trial team consisted of you, Mr. O'Connor, and Mr. Duchardt; is that right?

A Right.

Q You told Judge Fenner in your testimony you had a preference not to work with Fred Duchardt. Can you tell him why?

A Throughout the course of the time our office had observed Fred and how he did death penalty cases in this courthouse, and we felt that -- I really don't want to talk bad about anybody, but at the time we felt that he was real Milquetoast in his defense.

Q You know, this is the time to have this conversation. You also -- he was one of the counsel in United States v. German Sinisterra, correct?

A Correct.

Q And one of the co-defendants in that case was a man named Arboleda Ortiz, correct?

A Yes.

Q And Arboleda Ortiz was represented by a member of your office, Larry Pace?

A Correct.

Q And I believe in your affidavit you mentioned that you and your boss at the time, Ray Conrad, did not think that Larry handled that case well?

A He didn't put on any mitigation at all.
Q Okay. And Judge Fenner's heard testimony in that case before, but you didn't like the way Larry handled the case?
A No.
Q And Larry and --
A Let me back that up. You said you didn't like that case. I will rephrase that. Mr. Conrad and I were not happy with his performance.
Q Okay. Nonetheless, when you get on the case, from the first time mental health is clearly going to be a component in this prosecution from an early stage, correct?
A Yes.
Q Given the underlying facts of the case, that was a fairly obvious conclusion, right?
A Yes.
Q All right. And like it or not, you were aware of the experience of the defense bar in practicing in the Western District of Missouri as it relates to cases that were capital, right?
A Yes.
Q Those are tough cases, correct?
A Yes.
Q And, generally speaking, negotiation with the Western District of Missouri, whoever the lawyer may be on the case, ultimately has to go through the Department of Justice,

correct?
A Correct.
Q Had you -- were you aware of much success in negotiating cases with this office down from death once it was death certified?
A No.
Q Were you aware of cases being decertified?
A No.
Q So you were under the impression that if this got certified, it was going to be an all-out litigation tussle until the end, correct?
A Yes.
Q Okay. My words, not yours, but does that sound fair?
A Yeah, that's fair.
Q Okay. When you got into the case and started working on it, it became clear, I think, that a lot of evidence and information was coming in in the form of records, correct?
A Yes.
Q Did you suggest that a paralegal be hired?
A Yes.
Q That person was Stephanie Elliott, correct?
A Correct.
Q And, as I understand things, you and her knew each other through, like, spouses or something like that; does that sound fair?

A No. My cousin. They lived next door to my cousin.
Q Thank you.
And though she's a lawyer, she didn't function as a lawyer in this case?
A No.
Q She was hired on a contract basis as a paralegal?
A For this case, yes. Subsequently she was hired full-time.
Q And she stays with that office to this day, correct?
A Yes.
Q All right. Did you have any trouble working with Stephanie?
A No.
Q At some point you've indicated that Holly Jackson ended up leaving the trial team, correct?
A Yes.
Q And that she was ultimately replaced by another mitigation specialist?
A Dani Waller.
Q Do you recall how Dani Waller was recommended to you and the trial team?
A Ron Ninemire -- if I remember correctly, Ron Ninemire took it upon himself to investigate, find out who mitigation specialists were and investigated them on his own without any other referring from Dick Burr or anybody.

Q You'd gone through resource counsel on numerous occasions; isn't that right?
A Yes.
Q And the two recommendations to you, at least your office, were Lisa Rickert and Judy Clarke. Is it fair to say those recommendations didn't work out well?
A That's fair, yes.
Q So Ron Ninemire went out to find a mitigation specialist he thought you could work with, right?
A That the team could work with, yes.
Q When I mean "you," I mean the team to be fair. And Ron Ninemire, so the record is clear, was the head investigator in the public defender's office back in 2005 to 2007, the period we're talking about, right?
A Correct.
Q Your office had other investigators, correct?
A Yes.
Q Was Ron the supervisor of the investigators?
A Yes.
Q How many investigators did your office have back then?
A I think up here there were four. There were two or three in Springfield. I don't think we had any in Jeff City.
Q Did Mr. Ninemire supervise all five or six of them?
A He was the ultimate supervisor, yes.
Q How many of those are men and how many are women?

A There was only one female at the time.
Q There was only one?
A Yes.
Q Who was that?
A I don't remember her name.
Q Eimee Edington?
A I forgot. There was two women, Eimee and then the other lady. I can't remember her name.
Q I can't either as I sit here. But there were at least two female investigators under Ron's supervision?
A Yeah, I'd forgotten about Eimee.
Q Did you ever observe Ron to have difficulty working with the women he supervised?
A No.
Q Did you have any trouble working with women in this case?
A No.
Q Did you have any trouble working with women in cases that you were assigned as co-counsel?
A No.
Q It's been referenced through questioning in this case that you, Mr. Owen, were misogynistic, bullying, and downright mean to the women in the case. Do you believe that to be true?
A No.
Q Your role in the ultimate trial team was that you were

going to be in charge of the computer side of the case, correct?

A Yes.

Q And so the record is clear, that meant that Mr. O'Connor was going to take what we would traditionally call the guilt side of the case?

A Correct.

Q Mr. Duchardt would take the penalty side of the case?

A Yes.

Q Or the punishment. And you would be in charge of the computers wherever that would come in, either guilt or penalty?

A Correct.

Q And you had that role and understood that to be your role?

A Yes.

Q You worked with Troy Schnack, a computer systems analyst. He's also got forensic skills in your office?

A Correct.

Q As a member of the old team who's been represented that several things were considered and discarded -- and by that I want to say this: Before Mr. O'Connor and Mr. Duchardt came in the case, Dr. Ramachandran had been someone who had been talked about in the team meetings, correct?

A Yes. The name is familiar.

Q And Tommy Kleiner and whether he was available or a

possible co-defendant was talked about, correct?
A Correct.
Q And pseudocyesis, I think you've already testified to, was talked about, right?
A Correct.
Q And you indicated that the team, then, had some fairly regular and lengthy meetings; is that right?
A Yes.
Q We've heard some testimony that those meetings were purpose driven with agendas, that kind of thing?
A Yes.
Q And I also believe that Ms. Garvey in assistance with -- with assistance from David Freedman kept what I would call a to-do list or a master to-do list, right?
A I believe so, yes.
Q Okay. And this master list would indicate kind of the things the team was working on. Somewhat similar to what a doctor would do with a differential diagnoses, correct?
A Yes.
Q Now, have you seen the list, I assume, in this case that she maintained? It's fairly lengthy. It's been some time because you don't have the file, but you saw it when you were a member of the team, right?
A I assume so, yes.
Q Would you agree with me that there was kind of a

completed column on that list? In other words, when something got done --

A It got checked off.

Q -- it got checked off. Would you agree with me -- or do you recall that Dr. Ramachandran, Tommy Kleiner, and pseudocyesis, though they were on the to-do list, they were never on what I call the to-done side?

A That specifically I do not remember.

Q Okay. As it respects Tommy Kleiner, because of the role you had with Judy Shaughnessy, you were trying to keep her on board. As I understand the reason for that was you really wanted to make her happy so that she wouldn't obstruct your ability to investigate the case; is that fair?

A Yes.

Q It's been described that Ms. Shaughnessy was kind of a hard woman. Is that a fair description of her?

A Woefully inadequate description, yes.

Q It may be a politically correct way to say that she was a ball-buster?

A No.

Q What was the issue with her?

A She was just woefully narcissistic. If anything that she might perceive would bring her into a bad light of any kind whatsoever, she would do whatever she could to bulldoze that out of the way.

Q So she was very concerned, if I hear you right, about appearances?
A Her appearances, yes.
Q Her appearances?
A Yes.
Q Okay. And so you wanted to try to placate her so you could do your job as it relates to defending your client, Lisa Montgomery?
A Yeah. And you need to understand the dynamic between her and Lisa.
Q Okay.
A Lisa had just -- she would shut down. She would close up anytime she thought about her mother. Her mother had abused her all her life and all Lisa wanted was her love and approval and Judy Shaughnessy withheld it and would dibble it out whenever, you know, one of her children did something miraculously wonderful as far as she was concerned.
So part of what I felt was my job was try to at least break that chain that kept them separate, you know, maybe get to where they could make up and, you know, become somewhat of a family so Lisa would at least feel a little bit better about herself.
Q You were trying to help the environment around your client?
A I'm sorry?

Q You were trying to improve the environment around your client?
A Yes.
Q You were trying to make Ms. Shaughnessy, Ms. Montgomery's mother, an ally, if you could?
A If I could, yes.
Q And because it was possible that looking at another of her children, Tommy Kleiner, as a possible co-suspect would alienate her and you didn't want her to know what you were doing?
A That's true.
Q And if I understand things correctly, based on other testimony, Ms. Montgomery started disclosing to you, the trial team with Fred and John and yourself, that another person was with her and specifically that Tommy was with her in the early parts of 2007; is that correct?
A Did you say specifically Tommy was with her?
Q Yes.
A She never specifically told us it was Tommy.
Q Okay. Do you remember a letter from Mr. Duchardt written to the trial team on March 7th, 2007?
A No.
Q I'm going to show you this. I'm going to mark it as Exhibit 157. It's an eight-page letter from Fred Duchardt purported to be to you, to John O'Connor, Stephanie Elliott,

Ron Ninemire, and Dani Waller. I'm going to show this to you. Take your time.

A You want me to read the whole thing?

Q No. You're welcome to. But I was going to ask you, would you agree with me that on March 7th, 2007, Mr. Duchardt wrote that letter to the team?

A That's the date on the letter, yes.

Q It indicates that he had met with Lisa on March 5th and 6th of 2007. He was specifically referencing the brain scans that were taking place in Philadelphia relative to the PET and the MRI, correct?

A Correct.

Q Is it in that letter that you learned for the first time that Ryland, Mr. Duchardt's wife, was in any way involved in the case?

A Yes.

Q The point of the letter beyond that was that in the letter would you agree that one of the issues Fred talks about is he indicates that she's telling him that Tommy Kleiner was there at Bobbie Jo Stinnett's murder? Do you recall that from that letter?

A I didn't read that particular thing, but, yeah. If you relate to me it's in there, I'll accept it.

Q No reason to disagree in 157 Mr. Duchardt's reporting that Tommy Kleiner was there and that he's quizzing her on the

strength and weakness of that?
A Right.
Q Okay. The reason that I ask you that is you're coming up on a trial deadline in March of 2007; isn't that right? I think you had a trial deadline at the end of April 2007?
A Yes.
Q In fact, I think there was a court appearance scheduled for April 3rd of 2007. Does that sound about right to you?
A I have no reason to quibble with that.
Q Before going to that meeting with the Court, do you recall coming to the United States Attorney's Office, yourself, Mr. O'Connor, Mr. Ninemire, Mr. Duchardt to meet with Mr. Whitworth -- Judge Whitworth, Judge Ketchmark, and Kurt Lipanovich, and Cynthia Cordes to discuss plea negotiations?
A Okay.
Q Does that sound familiar?
A Vaguely, yes.
Q Okay. And the reason for that was, is it fair to say, that in a capital case attempting to get death off the table, to negotiate something less than death would be a victory, correct?
A We had tried doing that from day one, yes.
Q And so if I represent to you based upon the notes of that meeting from Roseann, now Judge Ketchmark, that you all made a presentation to the government about Tommy Kleiner, do

you have any reason to disregard -- to not think that's true?
A No.
Q Okay. The way it's been represented to me is that the trial team represented to the United States, A, she's disclosed that not only was there someone there, she's given us the name. It's Tommy Kleiner, correct?
A Okay.
Q There was some investigative steps that you took as a team before coming to that meeting. Do you recall going to interview Tommy Kleiner with Ron Ninemire on March 29th, 2007?
A Yes.
Q And at that meeting somehow surreptitiously did you get like a cigarette butt of his so you could have a DNA profile of Mr. Kleiner run?
A Correct.
Q Okay. And the reason for that was you're still investigating whether your client's statement about Tommy Kleiner being there is true, correct?
A Yeah.
Q And because if you can make a sufficient presentation to the United States Attorney's Office, you might be able to get death negotiated away, correct?
A Correct.
Q It's also been represented that at that meeting in addition to saying that Mr. Kleiner was there, Ms. Montgomery

offered to be a cooperating witness against her brother so that the government could figure out who the real killer was; do you recall that?
A I don't recall that particular specifically, no.
Q Do you recall after you interviewed Tommy Kleiner on March 29th, 2007, the trial team had Ms. Montgomery take a polygraph examination on March 30th of 2007?
A I don't remember that.
Q If I submit to you that the records have indicated that did in fact occur, would you disagree?
A No.
Q Do you recall that there was a question that ultimately the government objected to on that polygraph examination that was attempted to be admitted in the penalty phase of the case that she passed as it relates to whether or not Tommy was with her at the crime scene; do you remember that?
A No. Don't doubt it.
Q From a negotiation standpoint, though, you'd want to know if Tommy was there, right?
A Correct.
Q You'd want to know if you could find some physical evidence to help firm up that theory so that you can be in a stronger position with our office, correct?
A Correct.
Q Because you know that you've had cases where defendants

have cooperated, right?
A Yes.
Q And when that happens, generally we want to make sure we can demonstrate it to be factually true before we're willing to give someone a benefit of the bargain, right?
A Correct. We also had a witness from Skidmore who believed she saw the car, Lisa in the back, and somebody else driving.
Q That woman's name was Leona Hayes, correct?
A That sounds about right.
Q And though Ms. Hayes had been interviewed by law enforcement early on in the case, no real follow-up had been done until Susan Hunt went out with her investigator; do you recall that?
A Okay.
Q Do you recall that on April 2nd, 2007, Ron Ninemire and Tom Moss went and interviewed Ms. Hayes and her son in an effort to determine more fully whether they could identify Tommy Kleiner?
A Correct.
Q Do you recall that they came back thinking that she had made an identification of Tommy Kleiner being the driver of the car that Ms. Montgomery was the backseat passenger of?
A Correct. And Ron and I went back up there so that I could ask her questions as well.

Q And I believe on April 3rd after meeting with our office and after coming to court, John O'Connor, based upon his deposition -- not a deposition but a transcript that was taken, did take Leona Hayes' statement with a court reporter there; do you recall that?
A Yes.
Q And, similarly, though, I wouldn't say it was an identification, but she said it looks similar from the side to the picture that you guys showed her of Tommy Kleiner; is that about right?
A Sounds about right.
Q So the point I'm making is as you're coming up on a trial date in April of 2007, you as the investigative team, you're still doing a lot of investigation as it relates to whether or not this other person at the crime scene is real, right?
A Yes.
Q So you clearly hadn't discarded that like the earlier team is alleged to have done or you wouldn't be spending your time doing that, would you?
A Probably not.
Q All right. As it relates to pseudocyesis, you had indicated earlier the team talked about pseudocyesis, but to be fair when Mr. Duchardt gets in the case, he really, as these folks with the mitigation investigation thinks, that the

pseudocyesis diagnosis is a significant one, correct?
A You would have to ask him how significant he thought of it.
Q From your perspective he focused on it?
A It was back on the table, yes.
Q So pseudocyesis was back on the table. And the expert that he was using in that capacity was a Dr. V.S. Ramachandran. Does that sound right?
A Yes.
Q Ultimately Dr. Ramachandran did testify during Ms. Montgomery's trial, didn't he?
A Yes.
Q And he opined that she did suffer from pseudocyesis. Does that sound right?
A Yes.
Q And that she was in a delusional state and to support delusional state she dissociated and would not have known right from wrong at the time of the murder, in other words, not guilty by reason of insanity. Does that sound about right?
A Yes.
Q But not just Dr. Ramachandran, Dr. Logan also testified in the guilt phase of the case, didn't he? Do you recall that?
A No. I don't remember when he testified.
Q If I suggest to you that he testified in the guilt phase as he's indicated that he did and that Mr. O'Connor --

MS. HENRY: It was Mr. O'Connor in the first phase.

MR. VALENTI: Thank you. I wanted to make sure I had it right.

Q (By Mr. Valenti) Mr. O'Connor took his testimony during the guilt phase, first phase of the trial, and that Dr. Logan similarly said that all of the psychiatric indications he saw were consistent with pseudocyesis. Does that sound about right?

A Yes.

Q And he was asked whether that was a major mental disease or defect and he said yes. Does that sound right?

A Okay.

Q And that similarly Ms. Montgomery was suffering from the ability to know right from wrong at the time of the offense in December of 2004. Okay?

A Correct.

Q So two different experts, Dr. Ramachandran and Dr. Logan, talked about that in the first phase of the case. Would you agree with me on that?

A If the record supports that, yes.

Q Okay. As it relates to mitigation, I believe that you said you were concerned that Lisa's story wasn't being told. Did you talk to the trial team about what was not happening you thought should be happening?

A Yeah, I believe I did.

Q What happened?
A Nothing.
Q Okay. Did you go to court and say, Hey, this isn't right that's not -- her story is not being told at that time?
A No.
Q Okay. You would agree that her story was one of physical abuse?
A One aspect of it, yes.
Q That she was a victim of sexual abuse?
A One -- another aspect, yes.
Q Do you recall the mitigation -- the verdict form in this case or the special verdict form as it relates to all the various mitigators that were pled and they asked the jury to review?
A Yes, I remember.
Q Do you recall that eight or nine jurors, depending on how the question was asked, found that Ms. Montgomery had been the victim of significant sexual and physical abuse?
A I don't remember the breakdown.
Q If I tell you that's on the special verdict form, would you have any reason to disagree with me?
A No.
Q Earlier you said that, whether it was you or the office, you didn't want to work with Fred because you thought he was Milquetoast in his defense cases?

A Correct.
Q Do you mean ineffective or you just don't like his style?
A Probably a little of both.
Q Well, if you thought he was ineffective, wouldn't you as an officer of the court have a duty to tell the Court?
A At that point we had no choice.
Q What do you mean you had no choice?
A Because the messy way the case had developed throughout the time, we needed somebody on the case that could handle, you know, supposedly as learned counsel, handle the case.
Q Which he was doing?
A Yes.
Q He handled the experts. He took her to get screened for the PET scan and the MRI, right?
A Yeah.
Q He found Dr. Ramachandran?
A Okay.
Q He found Dr. Logan?
A No.
Q Dr. Logan was in the case and testified?
A Dr. Logan was in the case but Fred Duchardt did not find him.
Q Well, that's -- he was in the case but he continued to use him?

A Okay.
Q Okay. And Dr. Kuncel as well. Do you remember her, the neuropsychologist out of Chicago or out of Illinois?
A Yes. Yes.
Q And she ended up testifying in the second half of the case, correct?
A Yes.
Q All right.
MR. VALENTI: Just a moment, Your Honor.
Q (By Mr. Valenti) In addition to the doctors I mentioned, of course, Dr. Fucetola, who was the neuropsychologist who would have done the psychometric testing who was in the case during Mr. Duchardt's time?
A I don't remember that specifically.
Q Do you remember a neuropsychologist being involved who would have done psychometric testing?
A I don't remember specifically, no.
Q Okay. Or a Dr. Gur, do you remember him?
A I remember him.
MR. VALENTI: Your Honor, I think that's all I have.
THE COURT: Ms. Henry.
MS. HENRY: Thank you, Your Honor.
REDIRECT EXAMINATION BY MS. HENRY:
Q Mr. Valenti brought up a good point about the experts I forgot to ask you about so I'm glad he did so I can go back to

ask you.

One of the things that you've told us both in our interviews and in your affidavit is that Mr. Duchardt was rather obsessed with the testimony from Dr. Gur; is that correct?

A I don't know if I characterized it that way, but yes.

Q He was very focused on --

A Focused on Dr. Gur's testimony, yes.

Q From the beginning really?

A Yes.

Q And he expressed to the trial team on more than one occasion that the defense had essentially been eviscerated once Dr. Gur was excluded?

A Say that again.

Q Did Mr. Duchardt express several times that once Dr. Gur's testimony had been excluded that the defense had been eviscerated?

A Yes.

Q And he talked several times during the trial about how he was going to have to get that ruling reversed on appeal?

A Okay.

Q Is that what you told us when we interviewed you in Denver?

A I don't remember specifically but if you took notes on it, I'm sure it's there.

Q Dr. Fucetola who performed the neuropsychological evaluation that found a significant abnormality in his testing with respect to Mrs. Montgomery's IQ and her verbal memory did not testify in the trial, correct?
A I don't remember if he or she testified or not.
Q If he didn't testify, that would have been Mr. Duchardt's decision?
A Correct.
Q And do you recall Dr. Kuncel's testimony in the penalty phase?
A Not specifically. I remember I was impressed with her, but I don't remember what her specific testimony was.
Q Do you recall her being so nonresponsive on cross-examination that the Court had to clear the courtroom and admonish Dr. Kuncel?
A No.
Q Do you recall that on cross-examination in the first phase Dr. Logan was forced to admit that the email deletions meant that Lisa Montgomery knew right from wrong?
A I don't remember that.
Q Would you agree with me that that testimony would essentially be an admission that he could not support not guilty by reason of insanity under the federal standard?
A I would agree with that.
Q Dr. Logan, as you mentioned, was not found by Mr.

Duchardt but in fact had been hired as a consulting expert by yourself and Ms. Burns; is that correct?

A Yes, because of Lisa's problems up there at CCA.

Q And when he was hired as a consulting expert by you and Ms. Burns, you had no intention of using him at the trial of the case?

A Correct.

Q There was another consulting expert hired shortly before that time, a Dr. Marilyn Hutchinson; is that correct?

A Correct.

Q And Dr. Hutchinson had also been hired just to be a consultant?

A Correct.

Q And her raw data and raw notes were never intended to be turned over to the government; isn't that correct?

A That's correct. She was not to be used as a testifying witness. There would be no reason to turn those notes over specifically by the office.

Q And then at some point Mr. Duchardt allowed those notes to be turned over inadvertently to Dr. Fucetola?

A Okay. I don't know.

Q And once those notes were turned over, then they had to go to the government if Dr. Gur was to be used?

A Okay.

Q And that wasn't your decision?

A No. I had very little to do with the experts.
Q And Dr. Ramachandran was represented to you by Mr. Duchardt to be an expert in pseudocyesis, correct?
A One of two or three, yes.
Q And you didn't do any independent research yourself into Dr. Ramachandran though you knew David Freedman had?
A I don't know what David Freedman knew or didn't know. I know that I didn't do any independent investigation.
Q And you left that -- I mean Mr. O'Connor left that to Mr. Duchardt?
A Yes.
Q Would you agree with me, sir, that if the special verdict form -- we'll just accept that the number's either eight or nine, I don't know which. I think it might be eight. It could be nine, jurors found that you all had proven Mrs. Montgomery had been sexually abused under the evidentiary standard that applies in the penalty phase, and that necessarily means that three to four jurors did not believe that Mrs. Montgomery had been the victim of sexual abuse?
A That would be correct.
Q And that's even though there was testimony presented that Judy Shaughnessy found Lisa's stepfather, Jack Kleiner, on top of her engaged in sexual intercourse when Mrs. Montgomery was a minor?
A Yes. He had built a special room off the trailer house

just for Lisa and for that purpose.
Q And yet four -- three or four jurors didn't even believe that fact had been proven?
A Okay.
Q Would that be fair to say?
A Yes, if that's the numbers.
Q You testified that from day one the goal was to achieve a plea of life without parole. That was what you all were working for. So you knew from day one that Mrs. Montgomery was amenable to a plea in this case?
A Yeah, I believe so.
Q Mr. Valenti asked you about Ron Ninemire. Ron Ninemire was never supervised by a woman in the Office of the Federal Public Defender, correct?
A No. He was the senior investigator.
Q So the women who worked under him -- the investigators worked under him?
A Yes.
Q And Ron Ninemire who took it upon himself to find Dani Waller in this case had been the investigator on the Ortiz case, correct?
A Dani Waller?
Q I'm sorry. Ron Ninemire had been the investigator on --
A Yes.

Q -- the Ortiz case?
A Yes.
Q And you and Mr. Conrad were not pleased with the fact that in the Ortiz case Mr. Pace and Mr. Ninemire had developed no -- that was a double negative. I am so tired.
You were not pleased with the fact that no mitigation was presented in the Ortiz case?
A Correct.
Q And you did not feel that Ron Ninemire was qualified to be a mitigation specialist?
A No. He wasn't qualified to be a mitigation specialist. He's qualified to be the chief investigator.
Q Okay. And you would agree with me that 99.9 percent of the cases that the Office of the Federal Public Defender deals with are not capital cases?
A Correct.
Q Mr. Valenti asked you about Lisa Rickert, and just so the record is clear, he led you into saying that you had fired Ms. Rickert, but in fact Movant's Exhibit 54 is Ms. Rickert's resignation letter from the team. You received that, correct?
A Yes. That was received after Susan and I told her that we did not want her services anymore.
Q So she resigned and you didn't want her; fair to say?
A It would be more fair to say we didn't want her and she resigned.

Q Okay. Ms. Jackson, on the other hand, was fired by you, Movant's Exhibit 55. You want me to blow that up?
A A little bit. My eyes are getting old.
Q Yeah, mine too.
A There you go. Thank you. Move it back the other direction. Thank you. Okay.
Q You'd agree with me that's an email to Ms. Jackson dismissing her from her services?
A Yes, after she told us she couldn't work with us anymore.
Q I want to go to one of the things that you mentioned about Judy Shaughnessy on cross-examination. You mentioned that whenever Lisa would talk about Judy Shaughnessy or when the subject of Judy Shaughnessy came up, I wrote that you said she would shut down, close up whenever she talked about her mother. Was that your experience with Lisa?
A Yes.
Q And so you were aware, were you not, sir, Judy Shaughnessy was a great source of pain for Lisa Montgomery in her life?
A Yes.
Q And would you agree with me, Mr. Owen, that at the time you represented Lisa Montgomery, you did not know that her mother had actually been trafficking her in that special room?
A No. This is the first I heard of that.

Q And you did not know that Lisa Montgomery's mother allowed sometimes three and four men to rape her anally, orally, and vaginally? You didn't know that, did you?
A Did not know that.
Q And you didn't know that when those men finished with her, they would urinate on her?
A No, didn't know that either.
Q And that would be something you would think a jury would want to consider in mitigation?
A Yeah.
Q And it might convince those other three or four jurors that that was a mitigating circumstance?
A It might. I'm sure it would. We searched everywhere we could find and followed up every lead that we could find and have never heard of that before.
Q Well, let me ask you about Dani Waller then. I'm going to show you on the Elmo here a memo from Dani Waller that's dated -- wrong date. I need March 1st.
This is Movant's 1-283, a March 1st, 2007, interview with a gentleman by the name of David Kidwell, and it's a memo from Dani Waller addressed to, among others, yourself. Do you see that there, sir?
A Yes.
Q And on the second page can you read the highlighted portion there, sir? "Jack would come home drunk with his

friends and make her perform sexually with them."

A Okay.

Q But the other men were not investigated; isn't that fair to say?

A Could never find out who they were.

Q So that wasn't followed up on?

A It was followed up the best we could. We went and talked to Jack Kleiner about it, and he denied it ever happened, wouldn't give us any names.

Q And that was the extent of the follow-up?

A As far as I know.

MS. HENRY: Just one moment, please.

Nothing further. Thank you.

RECROSS-EXAMINATION BY MR. VALENTI:

Q Mr. Owen, in your office, though, Mr. Ninemire is the chief investigator. There are a number of women attorneys in the office, correct?

A I'm sorry?

Q There were a number of women attorneys in the Federal Public Defender's Office when you worked there in 2005 to '7?

A Yes.

Q And when a case is assigned, does the attorney have supervisory authority over the investigator?

A Yes.

Q So the attorney's decisions on the cases is final,

right?

A Yes.

Q Did Mr. Ninemire ever get assigned cases to work with women attorneys in the Federal Public Defender's Office?

A He assigned himself cases that way, yes.

Q Did you ever see any difficulty between Mr. Ninemire and him taking direction from female attorneys?

A No.

Q You mentioned the work done by Mr. Ninemire and sometimes Mr. Pace in the Ortiz case. You realize that the work that was done by Mr. Pace was a subject of an ineffective assistance of counsel claim?

A Yes.

Q That was fully litigated in district court?

A Yes.

Q It was found not to be deficient performance?

A Yes.

Q The Eighth Circuit looked at it and similarly found it not to be deficient based on the circumstances of that case. Did you know that?

A Yes.

Q Okay.

MR. VALENTI: That's all I have.

THE COURT: All right. Thank you, Mr. Owen. You're excused.

(Witness excused.)

THE COURT: Is Mr. Duchardt going to be your next witness?

MS. HARWELL: Yes, sir, he is.

THE COURT: And how long are you going to take with him?

MS. HARWELL: Well, I think I've demonstrated to the Court that I know how to hurry.

THE COURT: That you what?

MS. HARWELL: I said I think I've demonstrated to the Court this week that I know how to hurry. You've had me speed up all of my witnesses. I don't have a PowerPoint this time so I don't really know how to judge it.

THE COURT: It's probably going to be longer than Mr. Owen, right?

MS. HARWELL: I don't know. It would depend on cross. If he agreed to everything I said just like Mr. Owen did, with whatever her name is over there, the lady that's been talking all day, then it would go about that fast.

MR. KETCHMARK: My guess it will probably be similar in length, if not a little bit longer than Mr. Owen.

THE COURT: I think -- I thought maybe I'd give Mr. Duchardt the option of starting today, seeing how much farther we've got at five o'clock and come back tomorrow, or we can just have him come back tomorrow. I mean, he's been waiting

around all day.

MS. HARWELL: He has been waiting around all day.

THE COURT: All right. Go talk to him and see if he wants to start or if he just wants to come back in the morning and do it then.

MS. HARWELL: I'll be glad to do that. I'll try to do it quickly.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Good afternoon, Mr. Duchardt. Would you come up to the witness stand for us, please.

THE WITNESS: Yes, sir.

FRED DUCHARDT, being sworn by the courtroom deputy, testified:

THE COURT: Ms. Harwell.

DIRECT EXAMINATION BY MS. HARWELL:

Q If you'd state your name for the Court, please.

A Fred Duchardt.

Q And, Mr. Duchardt, we only met one time briefly back in March of 2013 at Ms. Nouri's office. I'm Amy Harwell. Wasn't sure if you would even remember my name.

A Sure.

Q If we could just orient who you were in the Lisa Montgomery case.

A When you say who I was, I guess I'm the same person. I'm her attorney.

Q And you were appointed to represent Ms. Montgomery,

fair to say, in May of 2006?
A Trying to remember the exact date but that sounds right, yes.
Q And you handled the case all the way through the direct appeal?
A Yes.
Q After the 2255 motion in this court was filed, you entered an appearance as an interested party?
A Yes.
Q And you moved for and were granted some discovery?
A Discovery. I think I asked for my file back from you all. Is that what you mean?
Q And you asked for and then conducted some interviews with witnesses?
A I don't recall any interviews of witnesses particularly. I think that --
Q You don't recall meeting with the members of the Federal Public Defender's Office.
A Oh, sure.
Q With a court reporter present?
A Yes.
Q That's what I'm speaking of.
A I'm understanding.
Q And you did those things before filing ultimately a declaration in this matter?

A Well, the Court directed me to file a statement in response to the very extensive petition that was filed, and I gathered the information that I felt like I needed in order to be able to comply with that court order. I resisted that court order. I think you all resisted that court order as well.
Q And you resisted out of a sense of your ongoing duty of loyalty to Ms. Montgomery?
A Well, I think I said all of my reasons in my motion and that's what I would rely on now. I don't recall all the reasons off the top of my head that I put into it. Certainly I had an ongoing duty and still do, as far as I'm concerned.
Q And you understood then, as you do now, that unless an answer is responsive to a question asked in this court, the attorney-client confidences remain protected?
A Counsel, I don't know -- your question implies an awful lot and so I'm not sure I can go quite that broadly. What I can tell you is that when I have been asked for information about Lisa's case for a lot of different reasons, I've resisted that persistently in connection with the case for, as I said, a bunch of different reasons.
Q Well, let's go back to May of 2006 and talk about sort of the condition in which you found your new client when you accepted the appointment. Fair to say that when you met Ms. Montgomery, you had sort of a hard row to hoe in terms of building rapport?

A No. Actually, Lisa is a very sweet person and always in every instance in which I met with her she always tried her best. I found out a lot of information as time went along about how hard she had to work at that process. So I would not say that there was a hard row to hoe. That's not the way I would describe it.
Q Well, in fact, you did describe it when you met with Ms. Henry and myself and our investigator back in March of 2013 that when you met Ms. Montgomery, she was devastated by the loss of her prior counsel, Judy Clarke?
A I don't recall using those words, that particular word. What I -- the way I would describe it, certainly Lisa's had any -- well, innumerable assaults to her integrity as a person over the years, and she had developed a very nice relationship with Judy, and the circumstances under which she lost that relationship with Judy had a major impact on her, sure.
Q And fair to say that at the point you met Ms. Montgomery, she didn't understand all of those circumstances?
A Circumstances of what, ma'am?
Q In which she lost Ms. Clarke.
A I think by the time that I got there that a lot of explanations had been made to Lisa. I didn't have the impression at that point that Lisa didn't understand what had happened. I mean, as well as anybody could understand the niceties and legalities of what was going on. I didn't have

the impression that she didn't -- that the things hadn't been explained to her. Just the opposite. I had the impression that the things had been explained to her.

Q However, when you met with Ms. Henry, Mr. Armstrong, and myself, you explained to us it was your impression that Ms. Montgomery had not been kept in the loop about the events regarding the removal of Judy Clarke?

A Well, let me take a quick issue with you. I've had some problems with you all's characterizations already in this case about what you felt that I said and what I did say to you all. So when you say that I said a particular thing, I don't recall characterizing things the way that you are characterizing them when I discussed them with you.

Q So the answer was, no, you don't recall saying it that way?

A Why don't you repeat your question and let's see if I -- because I certainly am not comfortable the way -- with the way you put it, but maybe if you put it again, I'll understand better.

Q My question was do you recall that when Ms. Henry, Mr. Chris Armstrong, who was an investigator, and myself in March of -- actually March the 12th of 2013 at Ms. Nouri's office, do you recall expressing that it was your opinion that Ms. Montgomery had not been kept in the loop with regards to the removal of Ms. Clarke?

A I don't know that I used "kept in the loop." The problem I've got with your terminology -- do you want me to describe what my impression was?
Q Sure.
A Okay. What my impression was is that when the consternation happened between Judy and Dave and Susan, nobody informed Lisa about any of that, and I think that my impression was certainly that nobody shared the backbiting, bickering, stuff like that that was going on. So all of that when it blew up and was told to Lisa, came to her as a surprise. So if you call that her not being in that loop, I'd agree with you.
Q You expressed to us on that day that you realized that Ms. Montgomery had some issues dealing with males?
A That day? No.
Q Well, that day you met with us you expressed --
A I'm sorry.
Q I'm not saying you knew when you first met her.
A I'm sorry. What I thought you were asking me was the first day that I met Lisa --
Q No, sir.
A -- that I knew that. So your question is did I tell you when I met with you all that Lisa had difficulties with men?
Q Yes.
A Generally.

Q Yes.
A Yeah. I told you guys that. I told Lisa Nouri that before that, yes.
Q And that, since you are male, affected your ability to build a rapport with her to some extent?
A I certainly felt that Lisa -- I mean, she never said that to me directly, but in light of the way that she felt and other things that she said, I think that -- and because of her situation dealing with men in almost every relationship she had been in, that it always seemed to her that a man was looking for sex from her, and that it was very difficult for her to be trusting in those kinds of -- in any kind of interaction with men.
Q And when I said in the beginning that you had some -- more difficult row to hoe than some, I was alluding to some of these impediments.
A I was gender challenged in my dealings with Lisa.
Q You had some other challenges in that when you first met Ms. Montgomery, she was not as well medicated as you observed her to be later on appeal when she was in the BOP?
A I felt that the medication regimes with Lisa over the time that I represented her were -- they continued to vary. The doctors, I felt, were trying their best as any psychiatrist might do with a condition that they really didn't have a good handle on, that they were trying different medications at

different times. Sometimes those medications even while Lisa was during the pretrial proceedings seemed to work better than at other times.

What I certainly felt was that once Lisa got to Carswell, that they seemed to have continued that work and, in my opinion, that even though she kept having problems, that it seemed to me like the medications they were using when she got to Carswell seemed to me to be the best that had been tried.

Q And you actually in your sworn statement reflected that?

A That's my recollection, yes, ma'am.

Q At some point in your representation of Ms. Montgomery, you began to realize that due to her trauma history, Ms. Montgomery had trouble expressing her wishes directly?

A Sometimes Lisa could be very direct. Sometimes Lisa was not direct. The longer that she and I worked together, the more I felt like she was able to express her desires for certain things to me very directly. If that answers your question.

Q I guess I would just refer you to a memo you wrote in March of 2007.

A Okay.

Q It was after Ms. Montgomery had been in Philadelphia.

A Sure.

Q And you had been visiting her with your wife.

A Right. That was early on. That was basically within the first --
Q Well, you were appointed in May?
A Sure.
Q This was March, almost a year later?
A Well, like I said, nine to ten months.
Q And you indicated in your memo, and I'll read it directly, "She was not empowered to speak directly about her wishes."
A Yeah, in the earlier times. My understanding of your question was broader. If you're asking about the times prior to when I wrote that memo, sure, that memo is exactly right. I understood your question to be more generalized. Maybe you didn't mean to pose it that way.
Q I thought your observations in this memo were a more generalized observation.
A Sure, as of 2007. But I kept dealing with Lisa for the rest of 2007 into 2008, 2009, up to 2012, and really by the time that -- I mean, shortly after that time frame of that memo, things got much better in that regard.
Q But fair to say before this memo you had some troubles having to do with Ms. Montgomery's relational style?
A I just wouldn't put it that way. The way that I would put -- it wasn't her relational style. It was a whole milieu of problems that she was dealing with, which she worked very

hard at not making an issue; but in terms of her being able to communicate stuff that we were needing to be able to help her best, that was difficult for her, and one of the things that I identified as being a problem for her was the whole issue of not trusting men.

Another thing is that she spent a lifetime or certainly her childhood and young adulthood being told that she shouldn't ask to have her needs met, and so understanding all of those things, particularly at the time that I wrote that memo, what I was trying to do is communicate to the team basically where I thought problems were and ways we could deal with that to solve that to get what we needed from Lisa to be able to help her when it came time for trial.

Q And it seemed as if in your memo you were describing the talk you had with her about ways you all could communicate more effectively?

A And you mean "her," Lisa?

Q "Her," Lisa, yes.

A I certainly -- what I was trying to do in that was not only get information from her but also work with her to try to help me and our team so that we could better do things so that it wasn't so impactful to her.

Q Yes. And you indicated that you talked with Ms. Montgomery that curling in a ball in response to questioning or just saying I don't know or changing the subject really impeded

your ability to get -- move forward on the case?
A Well, what I tried to do is I tried to identify for her some of the things that I saw her doing and to ask her if she understood what she was doing and to try to work within what those things were, identifying why -- if she could even -- if she understood why she was doing those things.
Certainly the way you've described it, which is that they were self-protective kinds of things, was certainly my impression, and I'm almost sure I shared that with her verbatim but tried to do it in a way that I wasn't criticizing her but more in a way to say, How can we do this better so you don't have to feel that way?
Q And, though, you disagree with my colloquialism about a hard row to hoe, it seems that we actually agree in terms of the tasks you had to work through fairly laboriously with Ms. Montgomery so that the two of you could relate to each other?
A Your definition of hard row to hoe and mine may be very different.
Q They could be.
Let's talk some about how you found your file when you came to this case. The case had been going on for some time?
A I'm sorry. How I found my file? I didn't have a file when I came to the case.
Q Fair to say that the Federal Public Defender's Office

gave you documents relating to the case?
A The way that the file had been set up when I came into the case was that there was a tremendous amount of information which had already been accumulated and then more continued to be accumulated.

The way that it had been decided before John and I came into the case was that the Federal Public Defender would be the repository for the paper that was coming in related to the case.

What they had done also is put together what I've referred to as a database, maybe better referred to as a master file electronically, which contained most, though not all, of the same documents that were on paper. What happened when I came into the case is that I received a copy of the database, as I've referred to it, the electronic files, and that was what I used to get started on getting myself familiar with the facts of the case.
Q And that's what I was referring to by your file, fair?
A Our file I would think would be a better way of putting it, the master file; but if you like it "my file," I'll now know what you mean by that.
Q Thank you.

And you've made representations to the Court in the past that when you received your copy of this file, that there were no contracts for any experts in that file?

A There were no -- I don't think I've represented that there were no contracts for experts in the file. The only thing I think I've represented to the Court is that there are two experts that I've only found out in the context of these proceedings that Judy Clarke had enlisted, and I never saw any information related to those people until I asked current federal -- Western District Federal Public Defender Laine Cardarella to chase down a separate financial file that they had that reflected those things.
Q And so you only learned in 2013 that there were actually expert contracts?
A For those two experts. I think that -- I mean, there were a lot of what I would call experts already involved in the case. Certainly I don't know that any of those people were contracted for. But a lot of cadre that Judy Clarke used in connection with the case I would certainly call experts, and there were lots of references to the work that those folks had done. That's part of the reason I'm having a problem with the way that you're casting your questions. So anyway.
Q Well, if I could follow up.
A Sure.
Q You actually think the people who worked with Ms. Clarke were experts. Is that what you're saying?
A There were certain of the people that she had -- well, Dave Freedman, for example, I would call him an expert in his

field. Oh, golly. I'm trying to remember. She was utilizing Deb Garvey, I believe.

Q Yes.

A And I believe Deb is a mitigation specialist is what her title is. So certainly those two I think I would say have expertise, sure.

Q And you received rather a lot of documents that had been collected by that team?

A I didn't get the impression that they had collected much from what I understood. It seemed as though a lot of the documents had actually been accumulated -- and, I'm sorry, but this is my recollection from way like ten years ago. But it seemed to me like the lion share of the work had been done by Federal Public Defender Office staff.

Q Would it be because of that understanding that caused you to say things in your declaration like that there was meager work product produced by Ms. Clarke's team and that all that Judy Clarke did was, quote, ruffle feathers? I believe that's in your declaration.

A Well, you're taking a few of my words out of context. Certainly those are some of the words that I used. What I recall from the documents I looked -- I tried to look carefully at the documents to see what I could see that I could attribute to Judy's cadre, and I couldn't really identify anything that I could that much attribute to their work, and so certainly what

my impression was when I first came into the case, in looking at the file and looking at the materials, is that I was not very impressed with the work product level that had been done for the amount of time that Judy and her people had been connected with the case.

Q And, Mr. Duchardt, I've put on the screen Exhibit 101, which I will represent to you has been used throughout this proceeding and that it's been explained that both the yellow line here and red line here reflect document collection that occurred during the time that Deb Garvey was overseeing the document collection and during the time Judy Clarke was on the team. I understand that you don't know when all of those documents were collected. You weren't able to --

A Or who actually collected them.

Q Sure. But assuming this chart is correct, would that change your impressions?

A No, not at all. What you're saying is that during a particular time frame that the documents were collected. That's, I think, undoubtedly because Judy came into the case really not very long after the case originated. What my impression was is that in terms of work you could attribute to Judy and work you could attribute to Deb as for them having actually done the work, that's what I was not seeing.

Certainly there was an awful lot of documentation that was brought forth. That does not mean that they -- I

mean, they could have gotten all of those things and just not -- there wasn't any indication in the file that they did that work, but my impression in reviewing the file was that they were not the people that had done the work. That the people that had actually done the work were the people out of the Federal Public Defender's Office. Be that all as it may, they were all part of the same team and it was certainly an awful lot of information that was collected.

Q And if the Court heard testimony last week that it was all done at the direction of Ms. Garvey who had the contacts and the know-how and created to-do lists and orchestrated --

A Well, then, the judge is far ahead of me.

Q Yes. You wouldn't have any reason to dispute that testimony?

A I think that would probably be the judge's decision.

Q And so, Mr. Duchardt, I want to talk with you some about how documents got from your team as it was constituted with you, Mr. O'Connor, and Mr. Owen along with, I believe, the paralegal, Ms. Elliott and Mr. Ninemire, the investigator, and then at some point Ms. Waller, the mitigation person, how documents got from you to your experts in your case.

A Okay.

Q I believe when you provided your statement, you said that you provided all of your data to your experts believing that those experts would drill down in the data themselves

without it being synthesized for them and find out that which was germane to them?

A Correct.

Q You said at various points in your declaration that you were aware of all the data we had presented in our 2255 motion?

A What I said was that I had reviewed the experts that you had brought forth, the statements that they had made, and that I looked at the information that they relied upon and that I certainly did not detect anything that we were not -- that would not have come from our file, our database.

Q In fact, you said, I believe on page 34 of your declaration, that you found there to be "not one fact of substance about Lisa which was not contained in our database"?

A Right.

Q Also in your declaration you said that you did not present all of the information that we put forward in our motion because you just distrusted the accounts of Carl Boman and Judy Shaughnessy. I believe you said that at page 72 of your declaration?

A I'm going to need to drill down on your question because the first part of your question is very general, and the second part goes to two particular people. Which one do you want me to answer?

Q Which one do I want you to answer? I believe that you were addressing our claims that there was information that was

missing from your account to the jury.

A Yeah. That's the broad question. But then you took it down to two particular ones as if those were the only issues. That's where I'm having the problem with the way you're phrasing your question.

Q Why don't I read you what you said and then you can explain what you meant by it.

A Sure.

Q At page 71 you say, "I also note that, as current counsel for Ms. Montgomery account it, Ms. Vogelsang's narrative draws heavily from the say-sos of Judy Shaughnessy and Carl Boman."

A Right.

Q "Portraying Lisa as a bad mother, and even as a prostitute. I believe that Judy and Carl's statements are at best skewed and at worst downright false."

A Right. Absolutely.

Q You also -- so because of these -- your beliefs that these portrayals were false, you in fact then presented to the jury that Ms. Montgomery was a good mother?

A I presented to the jury that Lisa was a good mother, A, because she was, B, because that's what she wanted. One of the problems was that the approach on trying to value, I guess, Judy Shaughnessy and Carl Boman was that every time that that seemed to have been done previously by the former defense team

and even by the remaining members of that former defense team, it aided Lisa.

Lisa basically accounted in detail how these two people had done terrible things to her, which we could verify that they had done and that each of them had their own axes to grind. Each of them consistently misrepresented facts about what happened in various situations. I didn't feel I could trust Judy Shaughnessy or Carl Boman any further than I could throw them, and so the idea that I would rely upon their say-sos about those kinds of bad things about Lisa as against Lisa's own perceptions, which seemed to me to be a lot closer to the truth, no, I had no desire to approach that in that way because I didn't think it was factually right and I thought it was eviscerating Lisa.

Q And I'm hearing you say that you didn't have any contrary information in your file from Lisa's children or other community members about Lisa's functioning that would have made you think that maybe those narratives had value?

A Well, now you're asking a different question.

Q Yes, sir, I am.

A Are we finished with whether -- it sounds to me like you're asking me if there were things consistent with what Judy and Carl had said about Lisa being a prostitute and about Lisa being a bad mother, were those things corroborated by, for instance, the children?

Q Yes, sir, I am.
A The answer is no. The children at various times and most times said their mother had done her best, had worked her level best. I worked long and hard to talk to those kids to try to drill down past their anger at Lisa over what happened in connection with this case, and get to what they really believed was the truth about their mother, and I talked to and read the reports from other people who were involved, and essentially what my impression absolutely was and still is is that Carl and Judy tried to Satanize Lisa to an extent that was -- the bottom line of the thing is that Lisa was not a perfect mother. She was a flawed mother but she was somebody who loved and cared and was doing her level best.
Q And I don't disagree with your final conclusion there at all. I am trying to ask you if you were aware of facts in your file from the mitigation specialist, Lisa Rickert, and the mitigation specialist, Dani Waller, regarding acts of abuse that Lisa had committed against her children.
A Sure.
Q I would like for a moment to refer you to a record that wasn't actually in your file. It's a record from the District Court for Tulsa County, State of Oklahoma. We'll just show you the front page. This is a court order releasing records to habeas counsel that I don't believe you had, and I will tell you that this has already been marked as Defense Exhibit 148.

It's going to be hard for me to both show you and it register.

A You're doing fine.

Q And you see this is a family data intake worksheet from the Department of Human Services in Oklahoma?

A Okay.

Q It's regarding Kayla, C.J., Chelsea, and one older girl who would be Desiree?

A Uh-huh.

Q And you see there that the complainant said -- the complainant is the next-door neighbor of these four kids, and their mother describes the house as having parts of the floor missing, no furniture, no beds, walls missing, no water, electric, kids sleep on the floor, are always over at the caller's house, bathe -- the caller bathes and feeds the children, the kids play in the street, mom has a lot of men in and out, always drunk, saw her with a gun in the front yard. Notes windows and doors missing, that the home is partially burned, detectives looking for her for drugs. The mom just dropped the kids off at his house inside the fenced yard and left.

A Okay.

Q Fair to say you did not have this information in your file?

A It would be very difficult for me to tell you if that was in the file or not. You actually would have a better idea

of whether that is in the file or not since you both have this and the file.

Q Yes, sir. I represent to you it wasn't in your file.

A Okay.

Q But fair to say this information is somewhat consistent with some of the other narratives about Lisa's impaired functioning as a parent? And by other, I mean other than yours.

A Well, the first thing I would have done with this is I'd have gone out and talked to this person because that does not -- I saw the house too. That's not the way the house looks.

Q You saw the house in 1993 where the family was living?

A I believe -- I thought your date was 2003.

Q No, no. No, sir. This is from June of 1993.

A Very good. Actually I think that's one of Carl's old houses, if I recall correctly.

Q I don't believe it was.

A Okay. Where was this?

Q It was in Oklahoma.

A Sure.

Q On Kaw Avenue.

A In what town?

Q I did know that until you asked me. I believe it to be in Tulsa. Is that your recollection as well?

A My recollection was that Carl had relatives down there and they were staying in one of his homes.
Q You know how we can clarify this?
A There it is, home address, Kaw Street.
Q Actually, it's listed that Ms. Montgomery was living with a man named Brett Owens.
A Oh, sure. Got you. I'm familiar with that time frame.
Q Okay. And I'm just asking if generally this sort of documentation presents a different picture than that that you presented to the jury?
A No. I mean, did Lisa have problems? Of course she did. Again, we're talking about were there -- I guess what your question is does this convince me that the better way to approach it is to think that Lisa was not accounting for herself correctly and that Carl and Judy were? Am I tracking right your question?
Q I think you are in that I would not say that Carl and Judy were accurate.
A Then I guess I'm lost. Maybe I'll let you go back to ask, then, the questions. I was trying to figure out where you were going but I'll stop.
Q I'm just asking if you'd had this document, would it have given you more information on which to round out your picture of Ms. Montgomery 's functioning?
A I think we had -- if we did not have this document, we

had information from lots of folks about that same time frame that was consistent with -- I mean, Lisa at that time, which, of course, is ten years before all of what happened happened, was dating, going out with, sleeping with Brett. We knew that.

Q Yes, sir. You did. And you did not present any of this sort of biographical information showing Ms. Montgomery's limitations in functioning as a parent across time to the jury; fair to say?

A Did I -- I guess -- did I try to tell the jury that Lisa was a bad mother in 1993? Is that essentially the question?

Q Let's leave off the label. Did you try to tell the jury that Ms. Montgomery had significant impairments in her ability to parent her children over the course of her children's lives?

A Well, if you're asking me if I think I did, yeah. I mean, basically that's the whole deal of trying to explain the history of the abuse that she had and the uneven things. I certainly attempted to the jury to highlight the good parts. The government was doing a very good job of highlighting the bad parts.

Q In your declaration you noted that when you first came into the case you had some limitations on your time and that you had another capital case that was about to go to trial and, in fact, did go to trial?

A Sure. It went to trial three times.
Q I believe the Street trial began the first time in July of 2006, mistried in August, around August the 14th of 2006, then was retried in November of that year through mid December?
A Right.
Q At the same time, however, you were not wanting Ms. Montgomery's case to languish --
A Right.
Q -- while you were occupied. You knew from -- I believe your declaration has reflected that you knew even before you got Ms. Montgomery's case you wanted to work with Ruben Gur?
A When I identified through Judy and Susan that we were dealing with the kinds of mental health issues that it turned out we had with Lisa, what I felt was that what we needed to do is enlist the services first of Rob Fucetola to do neuropsych testing and then potentially -- well, certainly enlist Ruben Gur to the extent that the neuropsych testing justified him taking the whole process further.
Q And, Mr. Duchardt, I don't wish to quibble with you too much about a very, very small point; however, you were formally appointed on May the 16th and your billing records reflect that the following day before you even met Ms. Montgomery, you contacted Ruben Gur and you billed to this case for that conversation. So presumably you were talking to him about Ms. Montgomery's case the very next day on May the 17th.

A After I had talked to Judy and to Susan and I identified that as an issue, in light of the time frame I was operating under, I wanted to get those guys identified, see if they had the time to get involved in the case while I had time to shepherd that further.
Q And, again, not wanting to quibble too much, I do know it's been ten years, you didn't actually contact Rob Fucetola until August the 15th, a month after you talked to Ruben Gur. You first contacted him on the 15th to set up a call and then you had a call on the 17th.
A Sure. Was the idea -- I knew how busy that Ruben is and I knew how busy that Rob is. I knew from doing this in the past what the process needed to be. What I figured was that the person who would be the hardest to get in touch with and to get nailed down would be Ruben and that Rob would be a little easier, but certainly my thinking then and all the way through was that the process needed to go in the fashion that I've discussed.
Q Next line in your billing after your phone call with Rob Fucetola on August the 17th, you then talked with Mr. Owen for a very short call for something you coded as case issues. Would it be reasonable to think that might have been consulting with Mr. Owen about actually retaining Rob Fucetola since it was the next call?
A You know what, there are so many things I talked to

Dave about. It could have been. It might not have been. I just don't know.

Q The only reason I'm asking is because I'm very interested in how materials got from you or the Federal Defender to Rob Fucetola. You don't bill any more time until you send a letter to Rob Fucetola in September -- I'm sorry -- until Stephanie Elliott sends a letter -- you don't bill at all anymore with Rob Fucetola, but in September Stephanie Elliott sends materials under a cover letter to Dr. Fucetola, and I was wondering if you delegated that responsibility, then, to the Federal Defender.

A I'm almost certain that in terms of getting records to the experts, that I relied on Stephanie to do that.

THE COURT: Ms. Harwell, are we at a good point to stop for the day?

MS. HARWELL: That would be fine. As good as any.

THE COURT: Okay. Mr. Duchardt, I apologize for the fact --

THE WITNESS: No apologies necessary.

THE COURT: -- you had to wait around all day and we can't finish up.

THE WITNESS: I know how hard it is for you not to have witnesses. And I'll be happy to be here tomorrow.

THE COURT: Are you available at nine o'clock?

THE WITNESS: I'll be here. You want me earlier?

THE COURT: Nine o'clock.

MS. HARWELL: Oh, one more housekeeping matter, Your Honor. I was informed by -- to keep up with such things that I neglected to move Dr. Woods' PowerPoint into evidence at the close of his proof. I believe that was yesterday. We had run out of toner is why I didn't have a hard copy for either the Court or for the government. I would be happy to provide one now.

MR. VALENTI: I don't know I want a hard copy, but I certainly want an electronic copy.

MS. HARWELL: It's a little hard to email because it's so big.

MR. VALENTI: Or on a disk or something I can put it in.

I did have some issues with some of the repetitive nature of it, but it's based on information before the Court so I don't think I object.

THE COURT: Now, is Mr. Duchardt your last witness?

MS. HENRY: Yes, sir.

THE COURT: All right. Has the government decided whether you're going to call any witnesses or not?

MR. VALENTI: We have, and we're not going to.

THE COURT: Okay. So we'll be done when we're done with Mr. Duchardt tomorrow. You know, based upon what you told me, that should be some time in the morning tomorrow?

MR. VALENTI: I would think we should be done before noon, Your Honor. I have a couple of exhibits I would want to move in based on some of the testimony today. That shouldn't take long. I believe there's an issue with an outstanding juror question that we've not yet resolved.

THE COURT: All right. So my thought presently is that I would give each side an opportunity to sum up what you feel are the important matters that you've established in the presentation of the evidence tomorrow afternoon, and I'm going to take the case under advisement. I'm not looking for any briefing or suggestions beyond that; and if my position on that was to change, then as I look at it, I'll let you know.

And I would feel that an hour for each side ought to be sufficient to give a summary.

Ms. Henry?

MS. HENRY: More than sufficient.

THE COURT: Mr. Valenti?

MR. VALENTI: Much longer than I'll go.

THE COURT: I'm not saying you have to take all the time at all. So that's what we'll do. And when we finish with Mr. Duchardt, if you're ready to move in with that, into the summation, that's fine with me. If you want to take a break and come back, you know, first thing in the afternoon, we could do that. So I'll see where we're at when we finish with Mr. Duchardt. If either side wants that additional time before

your summation, I'll grant it. If either of you request that we do that first thing in the afternoon, then that's what we'll do.

MS. HENRY: Thank you, Your Honor.

THE COURT: All right. Nine o'clock in the morning.

(Court adjourned at 5:15 p.m. until 9 a.m. Thursday, November 10, 2016.)