UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI

LISA M. MONTGOMERY, )
)
Movant, )
)
vs. ) Case No.
) 12-CV-08001-GAF
UNITED STATES OF AMERICA, )
)
Respondent. )

TRANSCRIPT OF PROCEEDINGS - VOLUME IX
BEFORE THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
NOVEMBER 10, 2016
KANSAS CITY, MISSOURI

FOR THE MOVANT:
MS. KELLEY J. HENRY
MS. AMY D. HARWELL
Office of the Federal Public Defender
810 Broadway Street, Suite 200
Nashville, Tennessee 37203

MS. LISA G. NOURI
526 Holmes
Kansas City, Missouri 64108

Proceedings recorded by mechanical stenography, transcript produced by computer

KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

APPEARANCES
(continued)

FOR THE RESPONDENT:

MR. JEFFREY E. VALENTI
MR. DAVID M. KETCHMARK
United States Attorney's Office
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

# I N D E X

Page

OCTOBER 31, 2016

VOLUME I

MOVANT'S EVIDENCE


RUSSELL STETLER
Direct examination by Ms. Harwell. . . . . . . . . . . 55
Cross-examination by Mr. Valenti . . . . . . . . . . . 135
Redirect examination by Ms. Harwell. . . . . . . . . . 156
Recross-examination by Mr. Valenti . . . . . . . . . . 157

MARC BOOKMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 159
Cross-examination by Mr. Valenti . . . . . . . . . . . 215

I N D E X
(continued)

Page

NOVEMBER 1, 2016

VOLUME II


RONALD E. WURTZ
Direct examination by Ms. Henry. . . . . . . . . . . . 276

BRET DILLINGHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 288
Cross-examination by Mr. Valenti . . . . . . . . . . . 308
Redirect examination by Ms. Henry. . . . . . . . . . . 312

ANITA BURNS
Direct examination by Ms. Nouri. . . . . . . . . . . . 313

STEPHANIE ELLIOTT
Direct examination by Ms. Nouri. . . . . . . . . . . . 330

TROY SCHNACK
Direct examination by Ms. Nouri. . . . . . . . . . . . 361
Cross-examination by Mr. Valenti . . . . . . . . . . . 383

SUSAN HUNT
Direct examination by Ms. Nouri. . . . . . . . . . . . 386
Cross-examination by Mr. Valenti . . . . . . . . . . . 423

LISA RICKERT
Direct examination by Ms. Harwell. . . . . . . . . . . 428
Cross-examination by Mr. Ketchmark . . . . . . . . . . 453

KURT LIPANOVICH
Direct examination by Ms. Harwell. . . . . . . . . . . 460
Cross-examination by Mr. Valenti . . . . . . . . . . . 470

# I N D E X
(continued)

Page

NOVEMBER 2, 2016

VOLUME III

RICHARD BURR
Direct examination by Ms. Henry. . . . . . . . . . . . 523
Cross-examination by Mr. Ketchmark . . . . . . . . . . 594
Redirect examination by Ms. Henry. . . . . . . . . . . 607
Recross-examination by Mr. Ketchmark . . . . . . . . . 611

JUDY CLARKE
Direct examination by Ms. Henry. . . . . . . . . . . . 612

LAINE CARDARELLA
Direct examination by Ms. Nouri. . . . . . . . . . . . 683

HOLLY JACKSON
Direct examination by Ms. Harwell. . . . . . . . . . . 693

DEBRA GARVEY
Direct examination by Ms. Henry. . . . . . . . . . . . 719
Cross-examination by Mr. Valenti . . . . . . . . . . . 761



Case 4:12-cv-08001-GAF Document 225 Filed 05/04/17 Page 5 of 163

## I N D E X
(continued)

Page

NOVEMBER 3, 2016

VOLUME IV


DAVID FREEDMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 811
Cross-examination by Mr. Ketchmark . . . . . . . . . . 855

ROBERT PETER FUCETOLA
Direct examination by Ms. Henry. . . . . . . . . . . . 862
Cross-examination by Mr. Valenti . . . . . . . . . . . 885

ERIN GARMAN
Direct examination by Ms. Henry. . . . . . . . . . . . 897
Cross-examination by Mr. Ketchmark . . . . . . . . . . 908

CHRIS ARMSTRONG
Direct examination by Ms. Henry. . . . . . . . . . . . 911

WILLIAM LOGAN
Direct examination by Ms. Henry. . . . . . . . . . . . 920
Cross-examination by Mr. Valenti . . . . . . . . . . . 971

MARILYN ANN HUTCHINSON
Direct examination by Ms. Henry. . . . . . . . . . . . 982
Cross-examination by Mr. Valenti . . . . . . . . . . . 1060

# I N D E X
(continued)

Page

NOVEMBER 4, 2016

VOLUME V

CHRISTOS DAVATZIKOS
Direct examination by Ms. Henry. . . . . . . . . . . . 1120
Cross-examination by Mr. Valenti . . . . . . . . . . . 1165
Redirect examination by Ms. Henry. . . . . . . . . . . 1179

ANDREW NEWBERG
Direct examination by Ms. Henry. . . . . . . . . . . . 1182
Cross-examination by Mr. Valenti . . . . . . . . . . . 1236

CAMILLE ELIZABETH KEMPKE
Direct examination by Ms. Henry. . . . . . . . . . . . 1245
Cross-examination by Mr. Valenti . . . . . . . . . . . 1254

RUTH BOUTIN KUNCEL
Direct examination by Ms. Henry. . . . . . . . . . . . 1255
Cross-examination by Mr. Valenti . . . . . . . . . . . 1290
Redirect examination by Ms. Henry. . . . . . . . . . . 1302

I N D E X
(continued)

Page

NOVEMBER 7, 2016

VOLUME VI

CHARLES N. SANISLOW
Direct examination by Ms. Henry. . . . . . . . . . . . 1363
Cross-examination by Mr. Valenti . . . . . . . . . . . 1441
Redirect examination by Ms. Henry. . . . . . . . . . . 1455
Recross-examination by Mr. Valenti . . . . . . . . . . 1456

JANET VOGELSANG
Direct examination by Ms. Harwell. . . . . . . . . . . 1460
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1531
Redirect examination by Ms. Harwell. . . . . . . . . . 1534
Recross-examination by Mr. Ketchmark . . . . . . . . . 1535

DIANE MATTINGLY
Direct examination by Ms. Harwell. . . . . . . . . . . 1538

DANIELLE WALLER
Direct examination by Ms. Harwell. . . . . . . . . . . 1553

KATHERINE PORTERFIELD
Direct examination by Ms. Henry. . . . . . . . . . . . 1577

# I N D E X
(continued)

Page

NOVEMBER 8, 2016

VOLUME VII

KATHERINE PORTERFIELD (resumed)
Direct examination by Ms. Henry (cont'd.). . . . . . . 1636
Cross-examination by Mr. Ketchmark . . . . . . . . . . 1706
Redirect examination by Ms. Henry. . . . . . . . . . . 1709

SIDDHARTHA NADKARNI
Direct examination by Ms. Harwell. . . . . . . . . . . 1711
Cross-examination by Mr. Valenti . . . . . . . . . . . 1740
Redirect examination by Ms. Harwell. . . . . . . . . . 1744

GEORGE WASHINGTON WOODS, JR.
Direct examination by Ms. Harwell. . . . . . . . . . . 1746
Cross-examination by Mr. Valenti . . . . . . . . . . . 1847
Redirect examination by Ms. Harwell. . . . . . . . . . 1861

JOHN O'CONNOR
Direct examination by Ms. Henry. . . . . . . . . . . . 1864

I N D E X
(continued)

Page

NOVEMBER 9, 2016

VOLUME VIII

JOHN O'CONNOR (resumed)
Direct examination by Ms. Henry (cont'd.) . . . . . . . 1951
Cross-examination by Mr. Valenti . . . . . . . . . . . 1994
Redirect examination by Ms. Henry. . . . . . . . . . . 2022
Recross-examination by Mr. Valenti . . . . . . . . . . 2025

RUBEN GUR
Direct examination by Ms. Henry. . . . . . . . . . . . 2028
Cross-examination by Mr. Valenti . . . . . . . . . . . 2098
Redirect examination by Ms. Henry. . . . . . . . . . . 2127
Recross-examination by Mr. Valenti . . . . . . . . . . 2129

GEORGE PARNHAM
Direct examination by Ms. Henry. . . . . . . . . . . . 2131

DAVID OWEN
Direct examination by Ms. Henry. . . . . . . . . . . . 2136
Cross-examination by Mr. Valenti . . . . . . . . . . . 2153
Redirect examination by Ms. Henry. . . . . . . . . . . 2177
Recross-examination by Mr. Valenti . . . . . . . . . . 2186

FRED DUCHARDT
Direct examination by Ms. Harwell. . . . . . . . . . . 2189

I N D E X
(continued)

Page

NOVEMBER 10, 2016

VOLUME IX


FRED DUCHARDT
Direct examination by Ms. Harwell (cont'd.). . . . . . 2263
Cross-examination by Mr. Ketchmark . . . . . . . . . . 2273

BEN LEONARD
Direct examination by Ms. Henry. . . . . . . . . . . . 2324
Cross-examination by Mr. Valenti . . . . . . . . . . . 2327

Movant's closing argument . . . . . . . . . . . . . . . . . 2331

Respondent's closing argument . . . . . . . . . . . . . . . 2359

Movant's rebuttal closing argument. . . . . . . . . . . . . 2374

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE MOVANT: | | | |
| 1 | Declaration and supplemental declaration of Janet Vogelsang | 52 | 52 |
| 1-1 | Declaration of Thomas Allen Hedberg | 52 | 52 |
| 1-2 | Declaration of Lisa Rickert with interviews | 52 | 52 |
| 1-3 | Birth certificate of Marie Josephine Miller | 52 | 52 |
| 1-4 | Death certificate of Marie Josephine Miller | 52 | 52 |
| 1-5 | Declaration of Mary Lee Coleman | 52 | 52 |
| 1-6 | Declaration of John Joseph Patterson | 52 | 52 |
| 1-7 | Military records of John Joseph Patterson | 52 | 52 |
| 1-8 | Declaration of Christina Juarez Patterson | 52 | 52 |
| 1-9 | Declaration of Diane Rae Mattingly | 52 | 52 |
| 1-10 | Medical records of Mary Lee Coleman | 52 | 52 |
| 1-11 | Declaration of Heath Hedberg | 52 | 52 |
| 1-12 | Declaration of Lon Mac Hedberg Yates | 52 | 52 |
| 1-13 | Mary Lee Hedberg Coleman Gray Junior High | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-14 | School records of Desiree Boman | 52 | 52 |
| 1-15 | Marriage certificate of Robert Lee Patterson and Marie Miller | 52 | 52 |
| 1-16 | Birth certificate of Robert Lee Patterson | 52 | 52 |
| 1-17 | Draft card of Robert Lee Patterson | 52 | 52 |
| 1-18 | Declaration of Grace A. Figg Baum | 52 | 52 |
| 1-19 | Declaration of Wendy Alexander Treibs | 52 | 52 |
| 1-20 | Death certificate of Robert Patterson | 52 | 52 |
| 1-21 | Declaration of Ronald J. Figg | 52 | 52 |
| 1-22 | Enlistment records of Gordon Hedberg | 52 | 52 |
| 1-23 | Marriage license of John Hedberg/Joyce Hammer | 52 | 52 |
| 1-24 | Welfare report on Diane Hedberg | 52 | 52 |
| 1-25 | Riley County records on Diane Hedberg | 52 | 52 |
| 1-26 | Letter from Kings County on Diane Hedberg | 52 | 52 |
| 1-27 | Home Study on Hope Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-28 | Birth certificate of Judy Rignell | 52 | 52 |
| 1-29 | Testimony of Desiree Boman | 52 | 52 |
| 1-30 | Interview of Ron Gieck | 52 | 52 |
| 1-31 | Declaration of Teddy Kleiner | 52 | 52 |
| 1-32 | SSA earnings of Judy Shaughnessy | 52 | 52 |
| 1-33 | Certificate of still birth | 52 | 52 |
| 1-34 | Divorce decree of Leo Barabash/Judy Rignell | 52 | 52 |
| 1-35 | Divorce decree of John Hedberg/Judy Hedberg | 52 | 52 |
| 1-36 | Certificate of live birth of Lisa Marie Hedberg | 52 | 52 |
| 1-37 | Interview of Patty Hedberg | 52 | 52 |
| 1-38 | Marriage certificate of Jack Kleiner/Judy Hedberg | 52 | 52 |
| 1-39 | Divorce transcript of Kleiner v. Kleiner | 52 | 52 |
| 1-40 | Interview of Jerri Jo Kleiner Leonard | 52 | 52 |
| 1-41 | Second declaration of Tommy Lee Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-42 | Marriage license of Judy Boman/Hector Ochoa | 52 | 52 |
| 1-43 | Petition for divorce in Ochoa v. Ochoa | 52 | 52 |
| 1-44 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-45 | Declaration of Dani Waller | 52 | 52 |
| 1-46 | Declaration of Jessica Marie Robinson Thompson Brown | 52 | 52 |
| 1-47 | Mental health report of Diane Hedberg | 52 | 52 |
| 1-48 | Interview of Diane Rae Hedberg Mattingly | 52 | 52 |
| 1-49 | Death certificate of Jack Kleiner | 52 | 52 |
| 1-50 | Obituary information of Jack Kleiner | 52 | 52 |
| 1-51 | Records on Penny Craig | 52 | 52 |
| 1-52 | Divorce of Willadean Kleiner/Jack Kleiner | 52 | 52 |
| 1-53 | Telephone call summary of Josie Kleiner | 52 | 52 |
| 1-54 | Interview of Teddy Kleiner | 52 | 52 |
| 1-55 | Interview with Penny Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-56 | Interview with Tommy Kleiner | 52 | 52 |
| 1-57 | Declaration of Holly Jackson | 52 | 52 |
| 1-58 | Mental health exam of Teddy Kleiner | 52 | 52 |
| 1-59 | Vacation Bible School certificate | 52 | 52 |
| 1-60 | School records for Lisa Montgomery | 52 | 52 |
| 1-61 | School records for Lisa Montgomery | 52 | 52 |
| 1-62 | Declaration of John Francisco | 52 | 52 |
| 1-63 | Art certificate for Lisa Montgomery | 52 | 52 |
| 1-64 | Reading certificate for Lisa Montgomery | 52 | 52 |
| 1-65 | Medical records for Lisa Montgomery | 52 | 52 |
| 1-66 | Spelling award for Lisa Montgomery | 52 | 52 |
| 1-67 | Good citizenship award for Lisa Montgomery | 52 | 52 |
| 1-68 | Lisa Montgomery report to parents | 52 | 52 |
| 1-69 | Declaration of Eunice Copeland | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-70 | Declaration of Kenneth Alexander | 52 | 52 |
| 1-71 | Medical records for Kenneth Alexander | 52 | 52 |
| 1-72 | Kenneth Alexander Florida State Hospital | 52 | 52 |
| 1-73 | SSDI records for Kenneth Alexander | 52 | 52 |
| 1-74 | Kenneth Alexander Snowy Range Consulting | 52 | 52 |
| 1-75 | Kenneth Alexander Wyoming Behavioral | 52 | 52 |
| 1-76 | Kenneth Alexander Wyoming State Hospital | 52 | 52 |
| 1-77 | Kenneth Alexander admission note | 52 | 52 |
| 1-78 | School transcript for Lisa Montgomery | 52 | 52 |
| 1-79 | Declaration of Chelsea Boman Veal | 52 | 52 |
| 1-80 | Declaration of Jonathan Caleb Thompson | 52 | 52 |
| 1-81 | Declaration of Marvin Alexander | 52 | 52 |
| 1-82 | Declaration of Becky Perkey | 52 | 52 |
| 1-83 | Declaration of Jacqueline Moffett | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-84 | Declaration of Jeff Batson | 52 | 52 |
| 1-85 | Declaration of Penny Craig | 52 | 52 |
| 1-86 | Declaration of David L. Owen, Jr. | 52 | 52 |
| 1-87 | Declaration of Alice Mae Derry | 52 | 52 |
| 1-88 | Declaration of Mary Osborn Hodges | 52 | 52 |
| 1-89 | Declaration of Janet McNickle Eastman | 52 | 52 |
| 1-90 | Declaration of Rachael Bowman Johnson | 52 | 52 |
| 1-91 | Declaration of Brenda Cox | 52 | 52 |
| 1-92 | Interview with Lewis Priest | 52 | 52 |
| 1-93 | Tarrant County records of Jeff Batson | 52 | 52 |
| 1-94 | Interview of Allen Baldwin | 52 | 52 |
| 1-95 | Death certificate of Nils Rignell | 52 | 52 |
| 1-96 | Interview of Susan Barrow-Swartz | 52 | 52 |
| 1-97 | Declaration of Susan Barrow-Swartz | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-98 | Declaration of Nita Milburn Montgomery | 52 | 52 |
| 1-99 | Lisa Montgomery, Project Upward Bound | 52 | 52 |
| 1-100 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-101 | Interview of Patty Baldwin | 52 | 52 |
| 1-102 | Counseling records of Lisa Montgomery | 52 | 52 |
| 1-103 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-104 | Divorce file of Boman v. Boman | 52 | 52 |
| 1-105 | Declaration of Carl James Boman | 52 | 52 |
| 1-106 | Declaration of Richard Leroy Boman | 52 | 52 |
| 1-107 | School transcript of Lisa Montgomery | 52 | 52 |
| 1-108 | Enlistment records of Lisa Montgomery | 52 | 52 |
| 1-109 | School records of Michael Boman | 52 | 52 |
| 1-110 | School records of Michael Boman | 52 | 52 |
| 1-111 | State of Kansas v. Carl Boman | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-112 | Declaration of Ann Walker-King | 52 | 52 |
| 1-113 | Michael Boman Mar Vista High School | 52 | 52 |
| 1-114 | Declaration of David J. Stadler | 52 | 52 |
| 1-115 | Marriage certificate of Carl Boman/Lisa Hedberg | 52 | 52 |
| 1-116 | Birth certificate of Desiree Boman | 52 | 52 |
| 1-117 | Declaration of Darlene Alexander | 52 | 52 |
| 1-118 | C.J. Boman Deming School records | 52 | 52 |
| 1-119 | Birth certificate of C.J. Boman | 52 | 52 |
| 1-120 | SS statement of Lisa Montgomery | 52 | 52 |
| 1-121 | 1988 datebook | 52 | 52 |
| 1-122 | Birth records of C.J. Boman Jane Phillips | 52 | 52 |
| 1-123 | Competency exam of Kenneth Alexander | 52 | 52 |
| 1-124 | Jane Phillips - early labor for C.J. | 52 | 52 |
| 1-125 | 1989 datebook | 52 | 52 |
| 1-126 | Scripps Memorial Hospital Operative Report | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-127 | Medical records of Carl Boman | 52 | 52 |
| 1-128 | Carl Boman - C.B. Pettigrew, D.O. | 52 | 52 |
| 1-129 | Declaration of Gerald Upshaw | 52 | 52 |
| 1-130 | Birth records of Kayla Boman | 52 | 52 |
| 1-131 | Post-birth records of Kayla Boman | 52 | 52 |
| 1-132 | Kayla Boman Children's Hospital San Diego | 52 | 52 |
| 1-133 | C.J. Boman admitting physical exam | 52 | 52 |
| 1-134 | Desiree Boman, H&P exam | 52 | 52 |
| 1-135 | Children's Hospital San Diego | 52 | 52 |
| 1-136 | C.J. Boman Children's Hospital San Diego | 52 | 52 |
| 1-137 | Chelsea Boman, Scripps Memorial Hospital | 52 | 52 |
| 1-138 | Children's Hospital San Diego concussion | 52 | 52 |
| 1-139 | Discharge summary for Desiree Boman | 52 | 52 |
| 1-140 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-141 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-142 | Lisa Montgomery, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-143 | Chelsea Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-144 | School records of Desiree Boman | 52 | 52 |
| 1-145 | Desiree Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-146 | C.J. Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-147 | Declaration of Eithol Marie Boman Towery | 52 | 52 |
| 1-148 | Order Author. Disc of Records under protective order | 52 | 52 |
| 1-149 | Telephone interview of Brett Owens | 52 | 52 |
| 1-150 | Lisa Montgomery statement to Dr. Brian Shane | 52 | 52 |
| 1-151 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-152 | Divorce file in Boman v. Boman | 52 | 52 |
| 1-153 | Divorce decree of Kenneth Alexander/ Kimberly Alexander | 52 | 52 |
| 1-154 | Radiology report of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-155 | School records of Desiree Boman | 52 | 52 |
| 1-156 | Lisa Montgomery Tulsa Community College | 52 | 52 |
| 1-157 | School records of Desiree Boman | 52 | 52 |
| 1-158 | School records of Chelsea Boman | 52 | 52 |
| 1-159 | School records of Desiree Boman | 52 | 52 |
| 1-160 | Interview of Carl Boman | 52 | 52 |
| 1-161 | Interview of Roberta and James Upshaw | 52 | 52 |
| 1-162 | Medical records of Lisa Montgomery | 52 | 52 |
| 1-163 | School records of Chelsea Boman | 52 | 52 |
| 1-164 | School records of Kayla Boman | 52 | 52 |
| 1-165 | School records of Desiree Boman | 52 | 52 |
| 1-166 | Kayla Boman, Jane Phillips Medical Ctr. | 52 | 52 |
| 1-167 | Declaration of Kayla Deanne Boman | 52 | 52 |
| 1-168 | Declaration of Carl James Boman II | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-169 | Tommy Kleiner, Case No. 99-CR-3250 | 52 | 52 |
| 1-170 | C.J. Boman, Stormont Vail Regional Health | 52 | 52 |
| 1-171 | Lisa Montgomery, St. Francis records | 52 | 52 |
| 1-172 | Kevin Montgomery, St. Francis records | 52 | 52 |
| 1-173 | Montgomery v. Montgomery No. 97D-192 | 52 | 52 |
| 1-174 | Declaration of Kevin Montgomery | 52 | 52 |
| 1-175 | School records of Desiree Boman | 52 | 52 |
| 1-176 | School records of Chelsea Boman | 52 | 52 |
| 1-177 | School records of C.J. Boman | 52 | 52 |
| 1-178 | School records of Kayla Boman | 52 | 52 |
| 1-179 | Medical records of Kayla Boman | 52 | 52 |
| 1-180 | Workers' Comp claim of Lisa Montgomery | 52 | 52 |
| 1-181 | Interview of Teddy Kleiner | 52 | 52 |
| 1-182 | Medical records of Lisa Montgomery | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-183 | Marriage record of Danny Shaughnessy/ Judy Ochoa | 52 | 52 |
| 1-184 | Motion to temporarily stay child support | 52 | 52 |
| 1-185 | SS statement of Kevin Montgomery | 52 | 52 |
| 1-186 | C.J. Boman, St. Francis Hospital | 52 | 52 |
| 1-187 | Chelsea Boman, St. Francis Hospital | 52 | 52 |
| 1-188 | Desiree Boman, St. Francis Hospital | 52 | 52 |
| 1-189 | Lisa Montgomery, Lawrence Memorial Hos. | 52 | 52 |
| 1-190 | Kevin Montgomery, St. Francis Hospital | 52 | 52 |
| 1-191 | Alias citation in contempt | 52 | 52 |
| 1-192 | Medical records of Desiree Boman | 52 | 52 |
| 1-193 | USA v. Montgomery No. 05-06-002 | 52 | 52 |
| 1-194 | Lisa Montgomery, St. Francis Hospital | 52 | 52 |
| 1-195 | School transcript of Desiree Boman | 52 | 52 |
| 1-196 | Kayla Boman, Carroll High School | 52 | 52 |

## INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-197 | Declaration of Vanita June Boman | 52 | 52 |
| 1-198 | Declaration of Cheryl Fine | 52 | 52 |
| 1-199 | Notes of Dr. Sallye Wilkinson | 52 | 52 |
| 1-200 | Physical exam of Kayla Boman | 52 | 52 |
| 1-201 | Physical exam of C.J. Boman | 52 | 52 |
| 1-202 | Physical exam of Chelsea Boman | 52 | 52 |
| 1-203 | Chelsea Boman, Newman Memorial Co. Hospital | 52 | 52 |
| 1-204 | Sports physical of Kayla Boman | 52 | 52 |
| 1-205 | School records of Chelsea Boman | 52 | 52 |
| 1-206 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-207 | Justin Kleiner, The Farm History | 52 | 52 |
| 1-208 | Bonnie Jean Taylor and Teddy Kleiner Power of Attorney | 52 | 52 |
| 1-209 | Hospital records of C.J. Boman | 52 | 52 |
| 1-210 | Teddy Kleiner, intake and social history | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-211 | The Farm Court Report on Justin Kleiner | 52 | 52 |
| 1-212 | Interview of Lori Colwell | 52 | 52 |
| 1-213 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-214 | Interstate Compact on placement of children | 52 | 52 |
| 1-215 | Bonding out of Tommy Kleiner | 52 | 52 |
| 1-216 | Tommy Kleiner, Frankin County | 52 | 52 |
| 1-217 | Shaughnessy home study | 52 | 52 |
| 1-218 | Screening records of Justin Kleiner | 52 | 52 |
| 1-219 | Justin Kleiner, case log for monthly family contact | 52 | 52 |
| 1-220 | Hospital records for Chelsea Boman | 52 | 52 |
| 1-221 | Employment records of Lisa Montgomery | 52 | 52 |
| 1-222 | Cotton O'Neal Clinic | 52 | 52 |
| 1-223 | Kansas v. Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-224 | Hospital records of Lisa Montgomery | 52 | 52 |
| 1-225 | Kansas v. Tommy Kleiner, No. 98-CR-1335 | 52 | 52 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-226 | Interview of Kevin Montgomery | 52 | 52 |
| 1-227 | Death certificate of Lori Diane Blalock | 52 | 52 |
| 1-228 | Declaration of Jenny Hays | 52 | 52 |
| 1-229 | Request for leave form | 52 | 52 |
| 1-230 | State of OK v. Teddy Kleiner, No. CM-1999-3081 | 52 | 52 |
| 1-231 | Mental health and class report on Teddy Kleiner | 52 | 52 |
| 1-232 | Letter to Kevin from Lisa | 52 | 52 |
| 1-233 | Coffey Health Systems v. Montgomery, No. 2004-LM-0108 | 52 | 52 |
| 1-234 | James McMurray, DDS account history rpt. | 52 | 52 |
| 1-235 | Testimony of Lisa Montgomery | 52 | 52 |
| 1-236 | Montgomery v. Shaughnessy, No. 2004-DM-23 | 52 | 52 |
| 1-237 | Patient discharge sheet of Chelsea Boman | 52 | 52 |
| 1-238 | Chelsea Boman, Waverly Medical Clinic | 52 | 52 |

## INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-239 | School transcript of C.J. Boman | 52 | 52 |
| 1-240 | Medical records of Desiree Boman | 52 | 52 |
| 1-241 | Discharge from duty for Chelsea Boman | 52 | 52 |
| 1-242 | Discharge from duty for Kayla Boman | 52 | 52 |
| 1-243 | Tommy Kleiner v. Nina Green, No. 05-DM-226 | 52 | 52 |
| 1-244 | Interview of Cheryl Fine | 52 | 52 |
| 1-245 | Interview of Lisa Green | 52 | 52 |
| 1-246 | Kansas v. Tommy Kleiner, No. 03-CR-242 | 52 | 52 |
| 1-247 | Interview of Katheryn Dewey | 52 | 52 |
| 1-248 | School transcript of Kayla Boman | 52 | 52 |
| 1-249 | Interview of Kayla Boman | 52 | 52 |
| 1-250 | Interview of Mona Marcotte | 52 | 52 |
| 1-251 | Physical evidence glove box 1B15(18) | 52 | 52 |
| 1-252 | Evidence retrieved from house | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-253 | School records of Desiree Boman | 52 | 52 |
| 1-254 | Hospital records of Mary Lee Coleman | 52 | 52 |
| 1-255 | Interview of Judy Shaughnessy | 52 | 52 |
| 1-256 | Interview of Lisa Green | 52 | 52 |
| 1-257 | Home study of Judy Shaughnessy | 52 | 52 |
| 1-258 | Diane Rae Hedberg adoption registry | 52 | 52 |
| 1-259 | Central Assembly of God church, promotion beginner to primary | 52 | 52 |
| 1-260 | Central Assembly of God church, promotion primary to junior dept. | 52 | 52 |
| 1-261 | Pease Middle School records | 52 | 52 |
| 1-262 | Medical records for Wendy Treibs | 52 | 52 |
| 1-263 | Email from Lisa Montgomery to Lori Colwell | 52 | 52 |
| 1-264 | Home study on Judy and Danny Shaughnessy | 52 | 52 |
| 1-265 | Shield of Service discharge summary for Teddy Kleiner | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-266 | Montgomery v. Kleiner No. 03-DM-198 | 52 | 52 |
| 1-267 | Motion for modification of child support | 52 | 52 |
| 1-268 | History and physical of Carl Boman | 52 | 52 |
| 1-269 | Waiver of parental rights for Justin Kleiner | 52 | 52 |
| 1-270 | Case activity log for monthly family contact for Justin Kleiner | 52 | 52 |
| 1-271 | Psychiatric evaluation for Lisa Montgomery | 52 | 52 |
| 1-272 | Department of Human Services report | 52 | 52 |
| 1-272-1 | Neuropsychological evaluation of Lisa Montgomery | 52 | 52 |
| 1-273 | Jim Dale Eastom sex offender registry | 52 | 52 |
| 1-274 | Declaration of Dylan Montgomery | 52 | 52 |
| 1-275 | Residences chart of Lisa Montgomery | 52 | 52 |
| 1-276 | Declaration of Dustin Montgomery | 52 | 52 |
| 1-277 | Child abuse-neglect referral form | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-278 | Report to the district attorney | 52 | 52 |
| 1-279 | Child abuse-neglect referral form | 52 | 52 |
| 1-280 | Photograph | 52 | 52 |
| 1-281 | Declaration of Ben Leonard | 52 | 52 |
| 1-282 | 1999 Oklahoma DHS records | 52 | 52 |
| 1-283 | Interview of David Kidwell, Sr. | 52 | 52 |
| 1-284 | Declaration of Carl Boman | 52 | 52 |
| 1-285 | Declaration of Leon Michael Barabash | 52 | 52 |
| 1-286 | Declaration of James N. Miller | 52 | 52 |
| 1-287 | Declaration of Michael Harlow | 52 | 52 |
| 1-288 | Declaration of Sang Ye Seiffert | 52 | 52 |
| 1-289 | Declaration of Dr. Sallye Wilkinson | 52 | 52 |
| 1-291 | Declaration of Bret Dillingham | 52 | 52 |
| 1-292 | Declaration of Desiree Boman Offutt | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 1-293 | Chronology of disruption of child custody | 52 | 52 |
| 2 | Curriculum vitae of Janet Vogelsang | 52 | 52 |
| 3 | Residential map of Lisa Montgomery | 52 | 52 |
| 4 | Genogram | 52 | 52 |
| 5 | Chart of mental health symptoms | 52 | 52 |
| 6 | Chart of traumatic events | 52 | 52 |
| 7 | Report of Katherine Porterfield | 52 | 52 |
| 8 | Addendum to report of Katherine Porterfield | 52 | 52 |
| 9 | Curriculum vitae of Katherine Porterfield | 52 | 52 |
| 10 | Declaration of David Kidwell | 52 | 52 |
| 11 | Declaration of Ben Leonard re: David Kidwell | 52 | 52 |
| 12 | Declaration of Wesley Gann | 52 | 52 |
| 13 | Declaration of Carl Boman | 52 | 52 |
| 14 | Declaration of Linda Baker | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 15 | Declaration of Ben Leonard re: Linda Baker | 52 | 52 |
| 16 | Lisa Montgomery handwritten note | 52 | 52 |
| 17 | Kleiner v. Kleiner divorce proceedings | 52 | 52 |
| 18 | Obituary of Gerald "Shorty" Shipley | 52 | 52 |
| 19 | Declaration of Carl McClain | 52 | 52 |
| 20 | Report of George Woods | 52 | 52 |
| 21 | Addendum to report of George Woods | 52 | 52 |
| 22 | Curriculum vitae of George Woods | 52 | 52 |
| 23 | Report of Siddhartha Nadkarni | 52 | 52 |
| 24 | Declaration of Diane Bradford | 52 | 52 |
| 25 | Curriculum vitae of Diane Bradford | 52 | 52 |
| 26 | Declaration of Charles Sanislow | 52 | 52 |
| 27 | Curriculum vitae of Charles Sanislow | 52 | 52 |
| 28 | Reports of Ruben Gur | 52 | 52 |
| 29 | 2016 addendum to report of Ruben Gur | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 30 | Curriculum vitae of Ruben Gur | 52 | 52 |
| 31 | Curriculum vitae of Andrew Newberg | 52 | 52 |
| 32 | Testimony of Helen Mayberg | 52 | 52 |
| 33 | Testimony of Alan Evans | 52 | 52 |
| 34 | Report of Helen Mayberg and Alan Evans | 52 | 52 |
| 35 | Curriculum vitae of Christos Davatzikos | 52 | 52 |
| 36 | Deposition of V.S. Ramachandran | 52 | 52 |
| 37 | March 2005 letter of Marilyn Hutchinson | 52 | 52 |
| 38 | Curriculum vitae of Marilyn Hutchinson | 52 | 52 |
| 39 | 3/7/05 report of William Logan | 52 | 52 |
| 40 | 5/15/07 report of William Logan | 52 | 52 |
| 41 | Declaration of William Logan | 52 | 52 |
| 42 | Curriculum vitae of William Logan | 52 | 52 |
| 43 | Report of Ruth Kuncel | 52 | 52 |
| 44 | Curriculum vitae of Ruth Kuncel | 52 | 52 |

INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 45 | Report of Robert Fucetola | 52 | 52 |
| 46 | Curriculum vitae of Robert Fucetola | 52 | 52 |
| 47 | Declaration of Russell Stetler | 52 | 52 |
| 48 | Supplemental declaration of Russell Stetler | 52 | 52 |
| 49 | Curriculum vitae of Russell Stetler | 52 | 52 |
| 50 | Declaration of Denise Leboeuf | 52 | 52 |
| 51 | Curriculum vitae of Marc Bookman | 52 | 52 |
| 52 | Report of Lawrence Fox | 52 | 52 |
| 53 | Curriculum vitae of Lawrence Fox | 52 | 52 |
| 54 | Lisa Rickert resignation letter | 52 | 52 |
| 55 | Email from David Owen to Holly Jackson | 52 | 52 |
| 56 | Holly Jackson mitigation themes chart | 52 | 52 |
| 57 | To-do list of Deb Garvey | 52 | 52 |
| 58 | 4/3/07 transcript of proceedings | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 59 | 4/5/07 transcript of proceedings | 52 | 52 |
| 60 | Declaration of Susan Hunt | 52 | 52 |
| 61 | Declaration of Phil Thompson | 52 | 52 |
| 62 | Affidavit of David Owen | 52 | 52 |
| 63 | Declaration of Judy Clarke | 52 | 52 |
| 64 | Declaration of Deb Garvey | 52 | 52 |
| 65 | 4/30/06 letter from Susan Hunt to Richard Burr | 52 | 52 |
| 66 | 4/21/06 transcript of proceedings | 52 | 52 |
| 67 | 4/25/06 transcript of proceedings | 52 | 52 |
| 68 | 5/3/06 transcript of proceedings | 52 | 52 |
| 69 | Order banning Judy Clarke from CCA | 52 | 52 |
| 70 | Order regarding Judy Clarke's telephone number | 52 | 52 |
| 71 | Letter from Lisa Montgomery to Judge Fenner | 52 | 52 |

# INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 72 | Deposition of Ray Conrad | 52 | 52 |
| 73 | Declaration of Linda McCandless | 52 | 52 |
| 74 | Declaration of Ben Leonard re: Linda McCandless | 52 | 52 |
| 75 | Declaration of Charles Dedmon | 52 | 52 |
| 76 | Declaration of Melody Brannon | 52 | 52 |
| 77 | 4/5/07 transcript of In Chambers hearing | 52 | 52 |
| 78 | Stipulation regarding Denise Baker | 52 | 52 |
| 79 | Stipulation regarding Hugh Rineer | 52 | 52 |
| 80 | Declaration of James Brooks | 52 | 52 |
| 81 | Grand jury testimony of Park Dietz | 52 | 52 |
| 82 | Billing records of Fred Duchardt | 52 | 52 |
| 83 | Declaration of Chris Armstrong | 52 | 52 |
| 84 | Billing records of John O'Connor | 52 | 52 |
| 85 | CCA visitation records | 52 | 52 |
| 86 | ABA Guidelines 1989 | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 87 | Supplementary Guidelines 2008 | 52 | 52 |
| 88 | Guide to Judiciary Policy 2016 | 52 | 52 |
| 89 | Summary of deleted history | 52 | 52 |
| 90 | Amended plan for implementing the Criminal Justice Act | 52 | 52 |
| 91 | Order appointing Federal Public Defender | 52 | 52 |
| 92 | Motion to withdraw | 52 | 52 |
| 93 | Order appointing additional counsel | 52 | 52 |
| 94 | Motion to withdraw | 52 | 52 |
| 95 | 1/27/05 letter from Susan Hunt to CCA Warden | 52 | 52 |
| 96 | Mitigation Investigation: A Duty that Demands Expert Help but Can't Be Delegated | 52 | 52 |
| 97 | Getting it Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment | 52 | 52 |
| 98 | Curriculum vitae of David Freedman | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 99 | Letter to Susan Hunt from Reuben Camper Cahn | 52 | 52 |
| 100 | The Mystery of Mitigation | 52 | 52 |
| 101 | Records requested chart | 52 | 52 |
| 102 | Witnesses interviewed chart | 52 | 52 |
| 103 | ABA Guidelines 2003 | 52 | 52 |
| 104 | The Defense Team in Capital Cases 2003 | 52 | 52 |
| 105 | A New Profession for an Old Need 2003 | 52 | 52 |
| 106 | Mitigation Evidence in Death Penalty cases | 52 | 52 |
| 107 | Mental Disabilities and Mitigation | 52 | 52 |
| 108 | Commentary on Counsel's Duty to Seek and Negotiate a Disposition | 52 | 52 |
| 109 | Unknown Story of a Motherless Child | 52 | 52 |
| 110 | The ABA Guidelines and Norms | 52 | 52 |
| 111 | Mental Health Evidence and the Capital Defense Function | 52 | 52 |
| 112 | The ABA Guidelines: A Historical Perspective | 52 | 52 |

INDEX OF EXHIBITS
(continued)



| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 113 | New Strategies for the Defense of Capital Cases | 52 | 52 |
| 114 | The Trial for Life | 52 | 52 |
| 115 | The Penalty Phase Trial | 52 | 52 |
| 116 | The Nelson Case | 52 | 52 |
| 117 | Using the Mitigation Specialist and the Team Approach | 52 | 52 |
| 118 | The Mental Health Evaluation in Capital Cases: Standards of Practice | 52 | 52 |
| 119 | Mitigation Investigation | 52 | 52 |
| 120 | Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation | 52 | 52 |
| 121 | Cultural Competency in Capital Mitigation | 52 | 52 |
| 122 | Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases | 52 | 52 |
| 123 | Why Capital Cases Require Mitigation Specialists | 52 | 52 |
| 124 | Memo from Stephanie Elliott to defense team | 52 | 52 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 125 | Curriculum vitae of Siddhartha Nadkarni | 52 | 52 |
| 126 | Affidavit of Lisa Rickert | 52 | 52 |
| 127 | 1/6/05 letter from Lisa Rickert to Ron Ninemire | 52 | 52 |
| 128 | Hallmarks of bipolar disorder | 52 | 52 |
| 129 | Contract of Dani Waller | 52 | 52 |
| 130 | 9/12/06 memo from Dani Waller to team | 52 | 52 |
| 131 | Chart of similar cases | 52 | 52 |
| 132 | 3/5/05 letter from Susan Hunt to Isaac Johnson | 52 | 52 |
| 133 | Attorney timeline | 52 | 52 |
| 134 | Letter from John David Luton | 52 | 52 |
| 135 | The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert/Lay Testimony | 52 | 52 |
| 136 | U.S.D.C. Docket sheet | 52 | 52 |
| 137 | Notes by Roseann Ketchmark | 52 & 1954 | 52 & 1954 |
| 138 | Notes by Roseann Ketchmark | 52 & 1962 | 52 & 1962 |

INDEX OF EXHIBITS
(continued)

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 139 | Fred Duchardt's email to Department of Justice | 52 | 52 |
| 140 | Dillingham billing statement | 295 | 296 |
| 141 | Dillingham billing statement | 297 | 297 |
| 142 | Deposition of Tommy Kleiner | 475 | 476 |
| 143 | Report of Robert Fucetola | 876 | 876 |
| 144 | Chart | 885 | 885 |
| 145 | Contact notes | 905 | 905 |
| 146 | MMPI-2 report | 1070 | 1070 |
| 147 | Raw data | 1070 | 1070 |
| 148 | Printout from MIMneuro | 1232 | 1233 |
| 152 | Robert Fucetola's MMPI report | 1421 | 1421 |
| 153 | PAI report | 1456 | 1456 |
| 154 | Janet Vogelsang's Biopsychosocial History report | 1530 | 1530 |
| 155 | Katherine Porterfield's report | 1705 | 1705 |
| 157 | Memo of Fred Duchardt | 1988 | 1988 |
| 158 | Leona Hayes file | 1965 | 1965 |

## INDEX OF EXHIBITS
(continued)


| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| 159 | Dr. Woods PowerPoint | 2216 | 2216 |
| 160 | 2/12/07 fax memo from Fred Duchardt | 2323 | 2324 |
| 161 | Declaration of Torres | 2327 | 2327 |
| 162 | Torres jury questionnaire | 2326 | 2326 |
| FOR THE RESPONDENT: | | | |
| 41 | Statement of John O'Connor | 2022 | 2022 |
| 42 | Statement of Fred Duchardt | 2277 | 2277 |
| 44 | 2014 truncated transcript | 2329 | 2330 |
| 45 | Judge Gaitan's order on Nelson 2255 | 2329 | 2330 |

NOVEMBER 10, 2016

MORNING SESSION

(Court in session at 9 a.m.)

THE COURT: Good morning.

Ms. Harwell, are you ready?

MS. HARWELL: I am.

FRED DUCHARDT, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION (continued) BY MS. HARWELL:

Q Good morning, Mr. Duchardt.

A Good morning, Ms. Harwell. How are you?

Q Well. How are you?

A Well, I made it.

Q I believe where we left off yesterday we were discussing materials being sent to Rob Fucetola over in St. Louis.

A Okay.

Q It is the responsibility of the attorney to oversee what materials leaves the trial team?

A Sure.

Q And you knew that Marilyn Hutchinson had been a consultant with that team before you joined the team?

A Yes.

Q And you knew she had attended team meetings?

A You know, I don't know that I knew that they actually had her attend any team meetings. I don't remember any memos

with her name on them. I certainly knew that they had had enlisted her, much to my chagrin when I found out about it.

Q And you didn't look at her materials to realize she had notes of team meetings?

A I'm sorry?

Q You didn't realize she had notes of her attendance at the team meetings?

A She discussed that with me that she had, you know, kept notes. Now, in terms did I know that those generated out of team meetings? I don't have an independent recollection that I realized that.

Q Let's talk about team meetings.

A Okay.

Q The team you were a part of consisted of lawyers who were here locally?

A Okay.

Q Yes?

A The way you put your things -- I mean, you're making statements. Are you asking me did the team consist of lawyers? I mean, why don't we just go down the line? The lawyers who were on the team were me, John and Dave and Stephanie Elliott's an attorney but she was not acting in the capacity as an attorney.

Q And my question was all of you lived here locally?

A Did we? Yes.

Q And you had meetings, not weekly?
A I'm sorry. Are you asking did we have weekly meetings? No.
Q And you had meetings but not even biweekly?
A Did we have biweekly meetings as a rule? No.
Q And though you had meetings, they weren't even scheduled every month?
A I don't know if you'd average it out if we had meetings every month, but I -- you've got my time records at hand so you would have a better idea of that.
Q And I'll let you know, Mr. Duchardt, those have already been made an exhibit to these proceedings.
A I assumed.
Q So the Court is aware of your time.
A Sure.
Q You're not a big meetings guy?
A I believe in meetings when there's something to be accomplished by them.
Q You prefer generally to just email the person you wish to communicate with or call them?
A Depends on the circumstances. If I think that things can be accomplished quickly through quicker communications, I'll choose that. If I think that everybody needs to be together -- and I'm the one making the call about the thing, yeah. I'd say that -- again, I try to pick the tool to match

the job.

Q And you did not preserve your emails related to this case in your case file?

A Well, what I had is I had all of my emails related to this case on my laptop computer which was preserved in that fashion. I did not, as opposed to other things related to this case, I did not make a separate data file on an independent hard drive of that, and unfortunately my laptop computer that I was using at that time crashed, and I have not been able to retrieve all of the emails related to this case. That's the full explanation.

Q So the answer to my question is no?

A Well, your question asked did I preserve them? The answer to that question is I guess would be yes, but the method of preservation is kind of like you can preserve stuff and if it burns in a fire, did you preserve them? I guess in the end result, no; but in terms of the efforts, yes.

Q You did not provide your emails to us?

A Since I can't get them, that's true.

Q You did, however -- your file does, however, have some letters in it. I'm going to ask you about some letters both to the warden at FDC in Philadelphia and to the warden at BOP.

A Okay.

Q I'm going to show you what's been marked as Exhibit 160, see if you recognize those letters.

A Well, I wouldn't call them letters. I'd call them what they're titled as, which are fax memoranda, but yes.
Q And they're directed to variously two to the warden at the FDC Philadelphia and one to the warden at BOP Carswell?
A Yes, Ms. Harwell, that's correct.
Q And they're memorandum relating to your intent to visit with Mrs. Montgomery?
A Uh-huh.
Q Variously on February 12th?
A 2007.
Q Yes. I'm sorry. One of them is dated February 12th, 2007, regarding the need to visit on February 17th and 18th, the need to visit on March 5th and 6th, and then the third one regarding the need to visit March -- I have a lot of copies of the same thing, I'm now realizing. And then the need to visit April 22nd, 2008, in Carswell; is that correct?
A Yes, ma'am.
Q And in those memorandum you are asking for permission for you to visit and you note in the fourth paragraph, the one that begins with the word "second," if I could draw your attention to that paragraph. You note that you will be accompanied by your wife, Ryland Duchardt, and then you clarify, "Who also works with me as an expert on these capital cases." Do you see that?
A Sure.

Q Did you write that?
A Sure.
Q I'd like to turn now to sort of matters leading up to your conference with the judge on April the 30th. Do you remember the conference on April the 30th, the day you met in the U.S. Attorney's Office?
A Year?
Q I'm sorry?
A April 30th --
Q 2007. Not the 30th. I said the wrong date. No wonder you're confused. April 3rd, 2007.
A Okay. You're talking about ahead of our trial date in April?
Q Yes, sir.
A Okay. Sure.
Q At that point the team was working with two basic sort of theories and lines of inquiry, pseudocyesis and investigation of the Tommy defense?
A There were a lot of approaches we were taking to the case. Actually, in choosing pseudocyesis we were at the infancy of the pseudocyesis matter. Pseudocyesis had actually been -- I found references to that in what I call the database.
Q And the judge has heard testimony about the prior team's investigation of pseudocyesis.
A Okay.

Q I was just attempting to direct you to that. So I was going to ask you about on that day.
A What you were asking me is if those were the two things, and what I was trying to explain to you is that your characterization is, in my opinion, off in terms of the question, but you may wish to clarify all of that in a different way, so I'll let you.
Q Leading up to the meeting with the Court on April the 3rd you had done some research on mental health in March?
A I had done some research on mental health in March. You mean only or --
Q No. You had been investigating mental health. In your declaration you said, "I spent many hours researching mental health in March." Was that a true statement when you put it in your declaration?
A The problem with the way you're asking the question, Ms. Harwell, is that it makes it sound like I did it in March to the exclusion of other times.
Q I was just asking if you researched mental health in March, sir. Did you?
A If that's your question -- I don't think that's the way you asked it the first time, but if your question is did I do mental health research in March, the answer is I think so, but my time records would probably be the best accounting for that.
MS. HARWELL: And I'll just note for the record that

his records are Exhibit 82 for this hearing.
Q (By Ms. Harwell) Your records reflect that your first contact with Dr. Ramachandran was on April the 1st. Do you have any reason to dispute your records, your billing records in that regard?
A I have no reason to dispute my billing records.
Q Your billing records indicate on April the 1st that you communicated -- that's the word you used -- with Dr. Ramachandran?
A Telephone call.
Q And then on April the 2nd your billing records indicate that you did research and calls and the phrase you used was "to find Dr. Ramachandran," closed quote.
A Okay.
Q You didn't know where he was?
A His people at his office gave me information that led me to believe -- my best recollection that he was in India at the time.
Q And then on April the 2nd you actually had what you termed a phone conference with Dr. Ramachandran.
A Okay.
Q That's the first time that your records indicate a phone conference.
A Okay.
Q So would it be fair to say that's the first time you

spoke with him by telephone?
A That would be my guess, yes.
Q Then on April the 2nd your billing records indicated that you prepared materials.
A Okay.
Q And then on April the 3rd your billing records indicate that you drafted, back slash, dispatched communications to Dr. Ramachandran re case. Does that mean you then sent the materials that you prepared the day before?
A That's what I would mean by that language.
Q That's what you mean by dispatch?
A Well, dispatch means -- I mean, my best recollection here now almost ten years ago is that I put together a packet of information for him, and I don't recall exactly if I assembled all of the documents or if I had Stephanie help me assemble all the documents. My best recollection is I'm the one that sent it, but I just can't tell you absolutely today for certain if I'm the one who actually hand delivered it to the post office to send it.
Q But your records reflect that dispatch occurred on April the 3rd, and you don't have a memory to contradict that happening?
A Okay.
Q Is that right?
A In terms of written materials, that's right. Now,

before that I had emailed some materials to him.

Q And yet there's no indication in your billing records of any emails?

A I could probably try to backtrack and see, although there's where our problem is, with my loss of my emails, but I do have an independent recollection of having emailed some materials so that he could get started.

Q Okay. And so then you came to court on April the 3rd before this dispatch and you --

A Before which dispatch, ma'am?

Q The dispatch on April the 3rd.

A Before I mailed the stuff, yeah.

Q And when you came to court, you discussed with the Court that -- I'll just read what it says, "Issue that come to the fore before everything is a diagnosis called pseudocyesis," and you kindly spelled it, "and that will be a diagnosis that will impact on the first-phase defense in terms of mental disease or defect." Is that a fair representation of what you told his Honor?

A I certainly remember doing that. If you're reading what the transcript says, that would be great.

Q And the Court then asked you who was giving you those diagnoses and you said that it was Dr. Logan and Dr. Ramachandran.

A Okay.

Q Do you remember doing that?
A I'll rely on whatever you have there in the transcript to accurately reflect what I said to Judge Fenner.
Q So you have no independent memory that would contradict the transcript?
A Oh, no.
Q Okay. Good. And the Court asked you if Dr. Ramachandran was preparing a report and if the transcript reflects that you said "he is," that would be a fair assessment of what you said?
A Sure.

MS. HARWELL: If I might have just one moment, Your Honor.

THE COURT: All right.

MS. HARWELL: I don't think I have any further questions, Your Honor.

THE COURT: Mr. Ketchmark.

MR. KETCHMARK: Thank you, Your Honor.

CROSS-EXAMINATION BY MR. KETCHMARK:

Q Good morning, Mr. Duchardt. How are you?
A Mr. Ketchmark, good to see you, sir.
Q Before we get started, sir, is it an accurate statement that you and I never talked substantively about your representation of Ms. Montgomery?
A That's a fair statement.

Q In fact, I reached out to you to see if we could meet and you indicated it was your belief that you still had an attorney-client representation with her and that you weren't comfortable in providing us with material unless there was a court order or agreement between the parties?
A That's true.
Q So the first time that we've had discussion is as we engaged in this discussion this morning?
A Well, you and I talk to each other about the weather and about your lovely wife and things like that, but in terms of talking to us about this case, that's absolutely right.
Q And, Mr. Duchardt, I know the Court's heard a lot of testimony in the last week and a half about how you got involved in the case and what had happened before that and I don't want to talk to you about that.
A I'm sure the judge well remembers it too.
Q What I want to ask you is in terms of your involvement and how you were brought on this case. Did you petition or ask to be brought on this defense team?
A No, sir.
Q Did you make a request and raise your hand and say, Pick me, pick me, I'd really love to get involved in Ms. Montgomery's case?
A In general, I've always let the courts in the Western District know that I am willing to accept appointments

generally to these cases because of the work that I've done on them, but in terms of anything related to Mrs. Montgomery's case, no, I had not talked to anybody about Mrs. Montgomery's case until I was called.

Q And with respect to your experience, Mr. Duchardt, could you please, for the record, explain briefly your experience in capital litigation.

A Well, I came into it in 1984 because I was the Public Defender in Clay County in Liberty and we had a fairly gruesome murder that occurred there involving a man named Bill Worth, and my office at that time was charged with providing representation to all comers from the least serious to the most serious kinds of cases, and so we took over representation of that case. We ended up taking a change of venue and trying that in St. Joe in 1985.

That began a series of cases that I handled for the public defender system over the next ten years involving not really very many cases in Clay County, mostly cases in Jackson County that I was asked to handle because of conflicts and because of my experience in handling those kinds of cases.

So by the time it was all finished, I believe I had tried, gosh, five capital cases to jury that had -- had not gotten a death penalty and had gotten a couple outright acquittals on those cases.

Then Judge Maughmer when they had the first capital

case in federal court -- I had gone out into private practice in the summertime of 1995. Judge Maughmer had a capital case involving Dennis Moore that was -- they were needing someone with expertise in capital case litigation, and I agreed to the appointment to that case; and since then, there have been a string of capital case appointments that I've had on the trial, appellate, and postconviction level in federal court since 1995 and up to the present.

Q And is it an accurate statement, Mr. Duchardt, that your experience in federal court is it limited just to the Western District of Missouri?

A That's correct, both Eastern District of Missouri and District of Kansas.

Q Your co-counsel -- or one of your co-counsel in the trial of this matter was a gentleman by the name of John O'Connor, correct?

A That's correct, sir.

Q And did you have an occasion to wrap up a case in Kansas, Mr. Hargrove's case you worked?

A Demetrius Hargrove.

Q Was that also a capital case?

A That was.

Q Mr. Duchardt, is it an accurate statement that in response to a request from the government in this particular matter we had asked that you provide a declaration or a

statement under oath with respect to your response to some of the allegations filed in the amended 2255?

A Yes. I was under court order to -- basically about as broad as you can get -- respond to the petition.

MR. KETCHMARK: Your Honor, permission to approach.

THE COURT: Yes.

Q (By Mr. Ketchmark) Mr. Duchardt, I'm going to show you what has been marked as Government's Exhibit 42 and represent it's a 106-page document and ask you to take a look at the first and last page of that document.

A Yes, sir.

Q Do you recognize what's contained in Government's Exhibit 42?

A It certainly appears to be an accurate copy of the statement that I prepared for the Court under oath.

MR. KETCHMARK: Your Honor, at this time I move admission of Government's Exhibit 42 into evidence.

MS. NOURI: No objection.

THE COURT: Received.

Q (By Mr. Ketchmark) You understand, Mr. Duchardt, that the Court has granted an evidentiary hearing as it relates to certain accusations leveled -- that were leveled against you and other trial counsel and that's why we're here?

A That's my understanding.

Q And what I'd like to do, sir, is obviously the

declaration or the statement provides responses to all of the issues, but what I want to do is drill down on the specific issues that the Court wanted to grant the evidentiary hearing on if we can do that.

A That's fine with me, sir.

Q One of the issues, sir, talked about the manner and means in which you went about selecting the evidence -- or excuse me -- selecting experts in this matter, and there is an allegation that you failed to retain competent experts and you failed to sufficiently investigate Ms. Montgomery's life history before retaining those experts. Do you recall that allegation?

A I remember the generalities of it and that's probably a good way to summarize it. It was certainly much more extensive and detailed and multiple places in the petition where it was talked about.

Q And I believe when Ms. Harwell talked with you, she asked you about whether you were aware that prior counsel had had contact and that there were actually some contracts with the Federal Public Defender's Office for a Judy Herman and Dr. Delis. Do you recall that line of questioning yesterday?

A I do.

Q I think you mentioned yesterday as well, Mr. Duchardt, that you had reached out and had contact with Judy Clarke. Is that an accurate remembering of your testimony?

A Yeah. Basically I think that's pretty well accounted in my time records, and I reviewed those in anticipation of the hearing, and my best recollection from that refreshing is that there were two fairly long calls that Judy and I had.
Q Again, it's obvious but why did you reach out to Ms. Clarke?
A Well, in the first place basically we had a case that John and I were asked to take over that people had already, obviously to me at least, done some work on, and it just seemed to me to be the best to go or do something immediately to talk to the people who had been in the case, particularly talking to Susan and Judy because they seemed to be the people who were now out of the case, get their perspectives, not only on the case itself but also on what happened that caused them to no longer be on the case.
Q And, sir, is it your recollection during either of those calls with Ms. Clarke that the name of these two particular experts ever came up?
A Never.
Q You also talked about the extensive file that you inherited. I believe you indicated paper files were maintained at the Federal Public Defender's Office and that you had a digital file that you used as kind of your working file. Is that an accurate --
A That's true, sir.

Q Let me ask you this, Mr. Duchardt: Even though you had an electronic file, which you indicated wasn't the master file and that it didn't contain everything, did you have access to the paper documents?
A Oh, sure.
Q Did you review those documents in addition to working on your electronic files?
A Yes, sir.
Q As you sit here today, sir, is there anything about your memory that suggests that there was anything in that paper file or your electronic file to suggest that there had been consultation with either of these two experts?
A No, not a thing.
Q Now, you ultimately did retain experts in this particular case; is that correct?
A Yes, sir.
Q And I believe when Ms. Harwell talked with you yesterday, there was some discussion about how quickly you did that with -- in particular two experts, Dr. Fucetola as well as Dr. Gur?
A That's correct, sir.
Q In your capital experience, Mr. Duchardt, had you worked with these two experts before?
A Yes, sir.
Q Were you familiar with what expertise they could

potentially bring to the case?
A Yes, sir.
Q So when you reached out to them immediately after appointment, what was your thought process? Why were you doing that?
A Well, as Ms. Harwell brought out yesterday, my problem was that I had a window of opportunity right then to be able to get a goodly amount of work accomplished before I had to dive back into trying the Street case; and because of the situation, Lisa's case needing attention, I wanted to give it as much attention as I possibly could during that window of opportunity.
Also it seemed to me that the one problem that everybody had or the paramount problem that caused the devolution of the original trial team was that it appeared to me and to John that nobody had taken the necessary steps to pull the trigger and get experts involved into the case. Basically when we came into it, we thought we were starting from scratch.
Q And let me ask you this, Mr. Duchardt, as you got deeper and deeper into the case and you reviewed the volume of records that had been amassed and you got a better understanding or a handle on what you were dealing with -- that's the framework of my question. Okay?
A Sure.

Q As you start to acquire this more detailed knowledge of Ms. Montgomery and the circumstance, if you had found things to suggest that you needed to reach out to other experts and that maybe Dr. Gur and Dr. Fucetola weren't the only ones you needed to consult with, were you committed to only going down the path of Ruben Gur and Dr. Fucetola?

A No. Basically, though, I can tell you that -- maybe the best way to answer your question is if the -- if I had been told at the beginning that a couple of experts that that team, basically Judy and Susan, believed were good, they'd been the first people I'd called.

When I called Ruben Gur at the outset, my notion was that I needed to get somebody moving on that at that point because I knew it was going to take those people time to fit the work that needed to be done into their schedules, and I figured as with any doctor, the sooner you get them, the better the chance you're going to have to get them scheduled in a particular fashion. Does that answer your question?

Q I believe so, sir. Thank you.

You mentioned your obligations on another matter, United States v. Phil Street?

A Yes, sir.

Q And there is an allegation, sir, that you failed to maintain -- or work on Ms. Montgomery's matter because you were overextended with respect to your caseload. Do you recall that

allegation?

A I do.

Q And, sir, is it your belief that the Street matter impaired your ability to be effective in the representation of Ms. Montgomery?

A No. I mean, it would probably be nice for all of us lawyers to be able to only work on one case until that case came to its end, but the plain fact of the matter is that when I was a public defender and certainly in my practice since then, I've learned to be able to juggle multiple cases, as anyone has to, as you have to.

As I think any practicing attorney knows, and especially those who handle capital cases, there are going to be times when you are going to have to be in the middle of trial and you're not going to be able to do anything else, but at the times when you're not in that particular crunch time, you can work on multiple cases, and that's why I used the time I had available at the outset of my appointment to Lisa's case to get on it diligently, to get things started in terms of identifying and getting these experts started in the process; and, frankly, it was a good thing because as it turned out with Ruben Gur, he still couldn't get to it until the beginning of 2007 even with me having contacted him as early as I did.

Q And, Mr. Duchardt, you've been practicing for quite some time both in federal and State court?

A That's correct, sir.
Q Has your practice been exclusively with respect to criminal defense primarily?
A Primarily. I've also done civil plaintiff's work. I've done -- I've even done some prosecution albeit on the State and local level.
Q And what I'm asking, sir, is that if you get into a situation, especially in a capital case, where you find that you don't believe that you have adequate time to prepare, do you have any qualms or concerns about going to the Court and asking for a continuance to have additional time in which to get prepared?
A No. As a matter of fact, that came up in this case because Judge Fenner is a kind person but he wasn't necessarily enthused about our feeling like we needed a continuance in this case, and I felt, though, that it was necessary in April of 2007, and so I made clear what I felt like we needed.
Q And there was some discussion by Ms. Harwell at the end of her examination of you, sir, with respect to the proceedings that happened on April the 3rd where you were making representations regarding Dr. Logan and Dr. Ramachandran. Do you recall that line of questioning?
A I do.
Q And my understanding based on your answers is that I don't have an independent recollection but you would not

dispute the responses and the representations you made if they were contained as part of the court transcript?

A No. In terms of, you know, recalling the generalities of the thing, I recall the generalities just fine. I just don't remember the precise words that I used.

Q And what I'm curious, sir, let's assume for purposes of my question that representations in the transcript were correct. Okay?

A Sure.

Q And also assuming that the billing records that Ms. Harwell went over are accurate.

A Sure.

Q What I want to ask you, sir, is when you stood before Judge Fenner in this courtroom and made a representation as to where you were at in exploring pseudocyesis with these experts, did you lie or misrepresent what your position was?

A No, of course not.

Q Can you explain to the Court, then, with the timeline that they've established in the billing records and your contact with Dr. Ramachandran and Dr. Logan, what were you trying to convey to the Court when you were answering the questions about where you were at in terms of your level of preparation?

A Well, I think that the words in the transcript -- my only misgivings about talking about the words is this long ago

I don't know what exact words that I used, but in terms of the words that were said, you know, I'd endorse those just fine. I think they accurately said what happened, which is essentially that I talked to Dr. Ramachandran. We had a very good conversation. I was able to give him extensive information about the case, and in the context of that conversation I was able to discuss with him records that I would be sending to him.

And while no expert is going to tell you, give you a firm diagnosis, his feedback to me was absolutely that we were looking at a situation of pseudocyesis, and that's what I was trying to represent to Judge Fenner in my discussions is that I believed that our experts were in a position to be able to look at that issue and get that issue resolved; and, of course, they did and, of course, both of the experts, both Dr. Ramachandran and Dr. Logan, came back with those diagnoses. I guess I'm lost as to why anybody would think that's a misrepresentation, but maybe somebody will explain it to me some day.

Q Let me ask you this, Mr. Duchardt. There has been some allegations leveled against you and the trial team that it was a tactical error to plead a 12.2 defense of NGRI in this particular case and that it would have been better to have not pled that and simply incorporated the pseudocyesis and all of the other mental issues that Ms. Montgomery suffered from in the mitigation. Do you recall those allegations?

A I do.
Q Ultimately the reports that you received back and the testimony that you presented in the guilt phase from both Dr. Ramachandran and Dr. Logan, they provided and answered questions with respect to making a factual basis for you to submit and argue on an NGRI defense; is that a fair statement?
A I think they absolutely did, especially when you have Dr. Ramachandran who isn't licensed to practice medicine but is an expert in the field backstopped with Dr. Logan who is licensed to practice and is an expert in the field lending his support to the diagnosis. That was our idea.
Q Let me ask you this: Why did you make that decision to basically present that in the guilt phase versus saving that back in the penalty phase? What was your thought process or your rationale for doing that?
A Well, really I mean, it's -- to me a case presents itself to you in terms of what it is and what it means and the facts drive what you -- what you do with them. There were -- there are certainly schools of thought that say that even though the facts may drive things a certain way, you play things more conservatively and you don't advance those particular arguments. I just don't agree with that.
It seemed to me -- when we were preparing for trial and before I came to Judge Fenner to ask for the continuance with relation to developing the pseudocyesis defense that we

were anticipating -- that we ended up doing, it had been my intention to approach the defense exactly the way that -- or at least I think exactly the way that Ms. Montgomery's current counsel are describing because, frankly, that had been the only way that we could have done things. There was not any expert who believed that there was a mental disease or defect that excluded responsibility or even one that would amount to a statutory mitigating factor.

What we ended up with through the -- with the pseudocyesis defense is we actually ended up through that diagnosis with both a condition that amounted to an exclusion of responsibility according to the determinations of the experts and also mitigating factors that qualified under the FDPA.

Q Let me ask you this, Mr. Duchardt: In your prior capital experience have you in fact been involved in cases where you had mental health issues but that you didn't think rose to the level of a potential guilt-phase defense?

A Yes.

Q And what I'm getting at, sir, is you're aware in this district in cases that you've handled where if you have evidence that you want to present in a penalty phase or mitigation phase with respect to mental health issues, there can be a rolling off of the government counsel and a firewall counsel that is put in place so the trial counsel who is

actually in the courtroom doesn't have access to that mental health information?

A Well, at least in the first phase of the case.

Q Right. But you are aware that procedure exists and is a procedure that happens in this very district?

A Well, sure. I'm trying to remember if that procedure had actually been implemented back in 2007, and I just don't have the specific recollection about that, but in terms of that approach, the notion is that if you're wanting to keep that kind of information until the penalty phase, there are certain -- there's certainly been an understanding of procedures, for as long as I can remember, that that can be done.

Q And, sir, you understood, am I correct, that when you made the decision and you filed that 12.2 notice, that that was going to expose your client, Ms. Montgomery, to potential examination by government experts as it relates to her mental health?

A Sure.

Q And did you have that discussion with members of the trial team? Did you have that discussion with your client about if we go down this road, this is what we're going to have to do and we have to decide whether that's what we wanted?

A Sure. That's part of discussions. I can't tell you that we had a specific meeting that we sat down and that was

the major -- that that was the sole topic of conversation, but in terms of having discussed that that's what we were going to do and that was a natural consequence of it, sure.

Q There was discussion with Ms. Harwell as well, sir, about whether or not you had team meetings, whether they happened weekly, whether they happened biweekly. Do you recall that line of inquiry?

A Yes.

Q What I'm curious about, sir, and I recall your testimony but, in your opinion, was there dysfunction or a lack of cohesiveness that existed amongst you, the other attorneys, and the support staff that you were working on in the representation of Ms. Montgomery?

A None that I detected at the time, though I've seen affidavits from some of the members of the team when they are now indicating their perceptions, so obviously, at least as far as they were concerned, there was something amiss in their opinions. I do know about that.

Q And are you referring specifically to an affidavit that was filed by one of your co-counsel, David Owen?

A Dave Owen and also Dani Waller. Those two affidavits refer to -- Dani, if I can characterize it, is my understanding of it that she felt that she wasn't included enough, and Dave indicating that he had misgivings and/or downright objections to certain ways that certain things were being done. Neither

of which items were ever shared with me. As far as I know, never with John.

Q And if those were shared with you, Mr. Duchardt, would you have addressed those and basically had a discussion about whether or not those concerns were valid?

A Of course.

Q There's discussion in the amended petition about individuals like Ms. Waller who are mitigation specialists. Do you recall those discussions and the allegations you were defective because you don't like to use mitigation specialists?

A I don't know where all of that comes from, but, yes, I understand the particulars of that, yes.

Q And, so in this particular case Ms. Waller was a mitigation specialist and she was involved in the case?

A Right. And part of the problem that comes in is that people use the term "mitigation specialist" kind of loosely to describe a multiple number of roles that usually are played by different people, and there are more precise terms that should be used to kind of tease out those different -- those different roles, and that's the problem I always have with the moniker of mitigation specialist because nobody actually drills down to what the particular role is.

For instance, in this case we had Dani and she's nominally a mitigation specialist. There were other nominal mitigation specialists who essentially did investigation work

in this case along the lines of mitigation investigation. My problem with those kinds of mitigation investigators, which I've voiced many times, is that it's really, in many cases, an inefficient use of time because those people many times are not willing to go out and do the grunt work of actually doing mitigation investigation. Many of them are afraid to do it for a lot of different reasons. They can't get the job done.

For instance, in this case Dani many times wanted the investigator, Ron, to go with her on some of the investigations, and they were certainly investigations that Ron could have done himself. Certainly the two of them together handling that was just fine.

I have actually engaged so-called mitigation specialists in cases where they literally wouldn't go out to do the work because they were afraid to. They had to take along an investigator, and so I have said many times I would rather identify and develop a person who can do the whole thing, and that's what I've done in many other cases.

In this particular case we had the luxury of both people, and so I didn't have to worry about that particular problem. And as I've said in my affidavit, if you look at Dani's billing records, I can't see that there was a problem in her being able to do pretty much whatever she wanted and felt like she needed to do to help us. And my whole impression of everything she did was that she did a very good job.

Q And the information that she did or the resources that she brought were utilized by you in formulation not only of the guilt phase but also the penalty phase, correct?
A Sure. She's the one who actually identified Ruth Kuncel as -- who we essentially used as a forensic psychologist to kind of draw together a lot of the themes of Lisa's troubled background in terms of a summary witness during the penalty phase.
Q And, sir, there was some discussion yesterday with Ms. Harwell about your choice or your decision to try to paint Lisa as a good mother. And you recall that line of inquiry?
A Yes, I do.
Q And what I'm curious about is Ms. Harwell also pointed out to you some records that they had retained with respect to the time frame of when your client was living with a gentleman and there was a DFS report that was made on the family?
A Sure.
Q What I'm curious, sir, is you said that you had, maybe not that particular record, but you were aware of that type of factual information in what you guys had done in your mitigation investigation; is that an accurate summary?
A Absolutely.
Q Can you explain to the Court your thought process and the decision that you all made and why you elected to present the evidence in the fashion that you did and try to paint Lisa

as a good mother?

A Well, my problem is this whole idea of trying to paint Lisa as a good mother to the extent that -- what the best way for me to describe it is is that Lisa was a good mother, and I think I argued it in my closing argument that basically this was a woman who had all the bad cards dealt to her but she did her level best, and the proof was in the pudding as to how hard she had worked in that she had some of the sweetest, nicest kids who were in no trouble, who never got into any kind of trouble. And while Matt Whitworth tried to argue that Carl Boman could be attributed to that, Carl Boman didn't do a damn thing for those kids, and Carl Boman half the time the kids were having to take care of him. When the rubber met the road it was Lisa doing the work.

If that's the definition of a good mother, that was my definition of a good mother. Was she perfect? Of course not. Did she do some things that were wrong? Absolutely. Your guys did a very nice job, unfortunately, of bringing out a lot of that kind of stuff. I didn't want to add to that to bring out more of it. What I was trying to do is counterbalance that with the things that she was doing right; that she was bringing in an awful lot of the money into the family to support it; that those kids were getting much of what they needed. Was it perfect? No.

But in terms of her doing her best -- now, I mean, I

still get excited and animated in defending Lisa against the garbage that Carl and Judy were spewing out at every opportunity. What I was looking at on that one document yesterday as I was trying to figure out in my recollection as to whether this was one of Judy's friends that made that report, because that was Judy's modus operandi was to get people to come up with this kind of accusation, which most of them were completely unfounded, and that when investigations were done of these hearsay accounts, that there was no basis to them.

Was Lisa having an affair? Sure. Was she making the kids sleep on the floor and leaving them without help as was described in that report? Boy, there was no other independent evidence about that in anything that I found. That sounded like the kind of garbage that Judy consistently used with the authorities to basically allow herself to essentially kidnap those kids away from Lisa, and it was horrible for Lisa.

And Lisa, part of her posttraumatic stress was dealing with all of that kind of stuff that her mother and Carl had done to her over the years. So that kind of brings us to the whole question of whether our team catered to Carl and Judy so as not to alienate them, but I think I've answered your question so I'll stop there.

Q And to bring it full circle, Mr. Duchardt, is that why you submitted the Mitigating Factor No. 8 that despite having

been the victim of significant sexual, physical, and emotional abuse, Lisa Montgomery raised four good children and worked many jobs to support her children?
A That's why I put it that way as opposed to the way that keeps being talked, good mother.
Q In fact, nine of the jurors found that that mitigating factor to be present pursuant to the special verdict form?
A The only thing that surprised me was that all 12 didn't.
Q You mentioned earlier, sir, when we were talking, that initially you were looking at the mitigation strategy that this current counsel would suggest that you should have pursued until you got deeper into the pseudocyesis, and what I'm curious about, sir, is I believe in reading your affidavit, that you've had an opportunity to review the biopsychosocial history that was prepared by a woman in this case, Ms. Vogelsang; is that correct?
A Yes.
Q And I think you answered in your affidavit, but for the record were you aware of who Ms. Vogelsang was?
A Sure.
Q And was there a decision that you made consciously as to whether or not you wanted to pursue having her come in as a witness and do something similar to what they've tendered as an exhibit to the amended petition?

A I think we did something similar through Ruth Kuncel. I mean, that was -- and this is where you come back to the whole idea of a mitigation specialist that's really devolved down into two roles. One is a mitigation investigator and the other is a forensic either social worker or psychologist or psychiatrist who's charged with being kind of like you guys use the FBI agents as a summary witness to pull together information.

What we were trying to do and what Ms. Vogelsang -- what we were trying to do with Dr. Kuncel and what they have done in other cases with Ms. Vogelsang is to try to bring out information to the jury in a better package form to draw together multiple issues, try to reach certain conclusions from those and be able to package the information to the jury that way.

I felt that Ruth Kuncel was more qualified to do that, and the problems that I've seen confronted by Ms. Vogelsang is she's a social worker. She's not a psychologist. And so to the extent that objections are properly raised, there are some problems with some of the conclusions that Ms. Vogelsang likes to reach, because honestly it seems to me and it has certainly seemed to prosecutors and to courts that she pushes beyond the level of her expertise in some of the conclusions that she tends to reach.

Q And, Mr. Duchardt, are you aware that Dr. Kuncel is

alleging that she wasn't adequately prepared before her testimony in terms of what the scope and understanding of her testimony was? Are you aware that that is --

A I was not aware of that.

Q If I represent to you that that allegation has been made and there has been testimony with respect to that particular issue through the course of this evidentiary hearing, what would your response be?

A I wished she would have shared that with me at the time.

Q Did you yourself undertake preparing her prior to her testimony?

A Yes. Again, Dani brought her in to the team. I believe Dave worked with her to some degree early on. But as she got more and more -- I think Dani and Dave were the ones who arranged for her testing battery that she was trying to do and ended up getting interrupted because of Lisa's being moved to Philadelphia.

But as the case developed, we ended up with me pretty much taking over preparation of her, and I think my time records reflect the time that she and I spent together putting together things.

One of the problems that she had at the time was that she -- my recollection is she was sick, but it was either her being sick or a family member sick, but we had toyed with

the idea of bringing her, Ruth, in to town even as early as the first phase of the case because there were issues that arose with respect to her testing; and we didn't do that, A, because we didn't need to as it turned out, but, B, she also indicated she was having some health problems at the time.

But once it all sorted out, she and I were able to confer. I felt that she felt comfortable with the information she was imparting beforehand. I take it right now from what you're telling me she, like Dr. Logan and Dani Waller, is kind of having second thoughts about that.

Q I would say that's an accurate representation.

A Okay.

Q Next, if I could, I'd like to shift gears with you, Mr. Duchardt, and talk about what we've been calling the Tommy defense.

A Okay.

Q And what I'm curious about is when you first learned about Tommy Kleiner as possibly being a second perpetrator that was present with Lisa. Can you explain to the Court and the record when you first learned Tommy as the name of possibly that individual?

A Well, Lisa has a very difficult time expressing the traumas that she has suffered. She's described it -- she basically puts the traumas in a closet and doesn't want to bring them out but there come breakthroughs that she has in

terms of being able to share those things; and for a goodly period of time Lisa was telling the team, not me, but other members of the team about believing that someone else was with her. And, of course, we had evidence through the reports that would be consistent with that.

We had the mother, Bobbie Jo's mother, indicating that when she had talked on the telephone with Bobbie Jo, that she was saying the people were there to look at the dogs. We also had a witness who indicated that in seeing the car drive away from the house, that person saw two people in the car. So Lisa's discussion of this tracked in with other information that we had, was consistent with that.

I just honestly don't remember exactly when Tommy's name came out. My best recollection is it came out to me and to Ryland in the discussion that we had with Lisa in Philadelphia, but I'm just not absolutely certain of that at this point.

Q Mr. Duchardt, I'm going to show you what's been previously offered and admitted as Petitioner's Exhibit No. 157, and we'll report for the record that it's an eight-page document and ask you to take a quick look at that.

A Sure. That's my memo about the discussions that Ryland and I had with Lisa in Philadelphia.

Q There's a section in there that talks about Lisa's memories on the date Bobbie Jo was murdered, and I'll direct

your attention to that. It's beginning on page 4 and ask you to take a quick look at that section.

A Okay. And that's consistent with my recollection. I couldn't remember exactly whether that was the first time that Lisa actually said that it was Tommy, the person who was with her. I'm pretty sure that's right.

Q And for purposes of the record, this is a memo that's dated on March the 7th and it talks about meetings that you had with your client in Philadelphia on March 5th and 6th?

A Yes, sir.

Q So the information and Tommy's name coming up to you for this memo would have been basically the beginning of March of 2007?

A That's correct.

Q At that time, Mr. Duchardt, is it an accurate representation that the trial was still set to begin at the end of April?

A Yes, sir.

Q So at the time you're meeting with your client, you're within six to eight weeks of the then impending trial date?

A Sure.

Q And would you agree with me, Mr. Duchardt, that one of the important factors in terms of whether or not the death penalty should be sought and whether the death penalty should be imposed is whether or not there are other potential

perpetrators and how they're being handled in terms of what punishment they're receiving or if they're charged?

A Right.

Q And you were aware of that at this time frame in 2007?

A Sure.

Q Is it an accurate statement, Mr. Duchardt, that as a result of learning this information and Lisa finally identifying Tommy, that that's what prompted you to reach out, you or somebody on the defense team, to reach out to Matt Whitworth in our office to say, Matt, we need to have a meeting with you. We're learning information from our client suggesting that there was somebody else who was involved in the murder?

A Right. I think John took the lead on that is my best recollection. The answer to your question generally is yes.

Q And all of that culminates, does it not, Mr. Duchardt, in a meeting in the U.S. Attorney's Office that happened on March 30th, 2007, where you all present this information to the government about possibly Tommy's involvement?

A Sure. I don't remember the exact date. My time records would probably reflect that, but the bottom line is we had such a meeting.

Q And Mr. Valenti has corrected me that the meeting I think in our office occurred on April the 3rd, the morning before you appeared here before the Court.

A That would more track with my recollection was that it was in that same time frame of the request for continuance.
Q And let me ask you, Mr. Duchardt, isn't it in fact true that the reason you're having that meeting is because you were trying to get the government to entertain revisiting whether the issue of the death penalty is appropriate given the fact that there was somebody else who might have actually been the one who was the killer?
A Sure. That's part of what was going on. The whole process of making the decision on the death penalty, as you well know, for the government starts with the frontline prosecutor and goes from there to the United States Attorney and then to the committee and then finally to the Attorney General; and my experience has told me if you don't have the frontline prosecutor in your camp in terms of that, and especially during that time frame, that you would be very hard put to get any play up the chain in terms of looking for a non-death disposition, a decision not to seek the death penalty.
So we were starting where we felt that we needed to start, which was with Matt, and we were also looking -- I mean, just as important at that point is we were that close to trial, and so we were looking at needs in terms of discovery to be able to make sure that we were not seen as hiding the ball on anything when discovery deadlines, quite frankly, my best

recollection, had passed and so what we needed to be able to do is come forward with what information we were garnering there immediately so that there would not be any questions in that trial date coming up later that month about our ability to present it.

Q And going back to your meeting for the two days in Philadelphia with your client, sir, there's been some suggestion that you improperly questioned Ms. Montgomery with respect to what happened at the time of the offense.

A Okay.

Q There's been some suggestion that you're not trained in how to conduct that type of an interview when you're dealing with a client who suffers from PTSD and has mental conditions.

A Okay.

Q And what I'm curious, sir, the ultimate question is were you aware of those concerns and ultimately -- well, let me ask you this: You were aware obviously who your client was because you had spent some time with her up to that point; fair statement?

A Fair.

Q And what I want to ask you, sir, did you ask her questions in a suggested fashion? Did you in any way plant the notion that Tommy was the one who was involved with her?

A Of course not.

Q Did you in fact take steps to make sure you didn't do

that?

A Right. Yes.

Q There's been some suggestion, and obviously as we sit here today as Monday morning quarterback and look back in hindsight, that Tommy could not have been with her, at least for the records that show he was with his probation officer, Erin Garman, at the time of the actual murder; is that a fair statement?

A Well, I'm still the person who still thinks that those records don't prove that, and I was the one who argued all the way along that we should drill down further past those records because -- there were actually indications in other records that Tommy was actually present on a different date, because he was supposed to be in court on a different date and was supposed to go immediately to talk to his probation officer that date, but -- and so I believed that we were in good shape to make a very creditable, if not, strong argument that the -- what had been accounted into the computers by the probation officer was actually covering up that she had failed to make that accounting for her time on the date that Tommy actually appeared, which was the week before.

But having said all of that, yes, the records that were presented and that we essentially by decision of John for the team, we conceded that Tommy wasn't there.

Q And there's some allegation, sir, that with respect to

the defense that was put on in the guilt phase of pseudocyesis and this notion of the Tommy defense, that those were conflicting or somehow inconsistent. And my question to you is is it an accurate statement and your recollection, sir, that Dr. Ramachandran in particular used Lisa's recollection of Tommy being there as evidence of her mental illness and her involved in a dissociative state at the time of the killing?

A Well, specifically Dr. Ramachandran and I went over and prepared and he presented all of that to address that very issue.

Q So there was a way in which -- and they did work together?

A Of course.

Q Whether Tommy was actually there or whether Lisa believed Tommy was there, both of those did not conflict necessarily with the defense that you put on?

A I'm at a loss to understand why anyone would think that those two were inconsistent and nobody's done a very good job, in my estimation, of explaining that to me.

Q With respect to your meetings in Philadelphia, Ms. Harwell talked with you this morning, sir, about the fact that your wife, Ryland, accompanied you on those visits. She also talked about Ryland accompanying you to visit Lisa at BOP Carswell. What I'm curious about, sir, is you wrote those memos or those letters requesting permission to see Ms.

Montgomery and for your wife to also assist?
A Right.
Q Those letters, and I think the reason Ms. Harwell wanted to go over those with you is because you represented in there your wife was an expert who worked with you on capital cases.
A And she is.
Q Explain for the record, sir, what your utilization of your wife is in this and other cases if you've used her in that fashion.
A Let me clarify on the situation at Carswell. My best recollection is that Ryland didn't actually get to get in to see Lisa that time that we had the memo. I don't think I even got in that day because there were problems at the facility. So I don't think she actually was there on that -- for that particular meeting. I don't think she ever accompanied me to -- well, she accompanied me to try to get in but did not actually get in.
Q Okay.
A Just so you understand that. And that's my best recollection about that. But kind of the substance of what your question is I think I've -- well, I've at least tried my best to explain the role that Ryland played in this particular case, which was not to try to act as an expert but essentially to be my -- to kind of vouch for me, to be a protective

mechanism for Lisa as against Lisa's fears that I would somehow be like every other -- like the vast majority of men who had dealt with her before, that I would have some kind of sexual agenda with her.

It seemed to me that the best way to counter that would be to have my wife sitting there, and Ryland is a very sweet person. She has all of those capabilities. She has the training in social work and she has her bachelor's in social work and her master's in counseling, and so she has all of the tools to be an expert in those fields. So she knows how to ask questions and answer them. But she wasn't there for that purpose. She was there as the -- to prove to Lisa that I was not going to be a danger to her.

Q And, Mr. Duchardt, is it your assessment that what you were hoping to accomplish with Lisa in fact did happen as a result of your wife attending and being present when you were having these meetings?

A Worked like a champ.

Q And, in fact, in Petitioner's Exhibit No. 157, the memo regarding the Philadelphia visit, you start that letter or memorandum saying, "Good day to all. As you know, I was with Lisa in Philadelphia on Monday and Tuesday, March 5th and 6th. My wife Ryland went with me. I believe that I shared with everyone that I took Ryland with me to visit Lisa when I went to see her in Philly last month, and found that session,

between the three of us, was the most productive session I had ever had with Lisa."

A Sure.

Q So this memorandum, sir, too was sent to John O'Connor?

A Yes, sir.

Q Dave Owen?

A Yes, sir.

Q Stephanie Elliott?

A Yes, sir.

Q Ron Ninemire?

A Right.

Q Dani Waller?

A Right.

Q So in March it was no secret to the defense team, was it, sir, that you were utilizing your wife and that you were having success doing that?

A Sure.

Q So when the trial begins in October and your wife is at counsel table, should it have been a shock to anyone else on the defense team who Ryland was and why she was present in the courtroom?

A I can't speak for them as to what -- you know, what level -- at what level they get shocked. If you're asking me had I done my best to inform them about what was going on with her and her role with helping me with Lisa, I think so.

Q With respect to the trial, you're aware, are you not, sir, that there's allegations that Lisa had a flat affect because she was under medication and that you were defective or ineffective for not having the Court provide some level of a jury instruction to the jury explaining why she was presenting to the jury in that fashion. Do you recall that --
A Yes, sir.
Q -- accusation?
A Yes, sir.
Q And what I want to ask you, none of us, besides yourself, Judge Fenner and maybe the staff were present, what is your recollection of how Lisa was acting in front of the jury?
A I think the characterization that was made is silly. Lisa was consistently engaged with all of us. Lisa had the natural trepidation about being a defendant on trial and was obviously worried about that. That's part of the reason that we tried to make sure to have somebody with her to be able to answer the questions that she would ask; and Stephanie, I believe, is the one who came up with the mechanism of Lisa having a sticky notepad to be able to pose questions and be able to ask the things as things would go along. And, I mean, my best recollection is she was using pad after pad of those being able to interpose questions, whether it would be to Dave or to Stephanie or to Ryland.

John and I particularly kind of stayed away from that just so that we could pay attention to what was going on, but I observed all of that. I mean, Lisa, for my impression, worked very hard to pay very close attention to everything that was going on and did her best to interact and pass the notes. I saw nothing of a flat affect at all.

Q Let me ask you the next question, then, Mr. Duchardt. Had you observed Lisa to be sitting there with a flat affect, a blank stare on her face, something that caused you concern, what would you have done?

A Asked her what was going on.

Q And would you have taken corrective steps with the Court to ensure the jury understood why she was presenting in that fashion?

A Well, see, I didn't have any impression that there was anything that the jury would -- if I ever felt -- better way to answer your question. If I ever felt that there was something the client was doing that was untoward and needed an explanation, I'd make the explanation. I'd make sure that something was done for the record, whether it would be through an expert or something like that, to observe and say, Here's what she's looking like to me. Is she looking like that to you? And what do you think is going on? And bring that out. But she just wasn't presenting that way. I don't know who in the world thinks that that was the case.

Q So the bottom line, what I'm hearing is that you would have taken steps but there was nothing that you observed or anybody brought to your attention to suggest that you needed to do anything?
A No.
Q A similar question, Mr. Duchardt, is an allegation that Ms. Montgomery was somehow incompetent when tried, and we're hearing testimony in the course of this evidentiary hearing that there are various types of incompetency. There is the person who doesn't understand what the procedure is. They don't understand who a judge is. They don't understand that they're here on earth and they're on trial for a crime, and that truly is somebody who is incompetent to stand trial. Okay?
A Sure. Of course.
Q My understanding, based on hearing the testimony, that's not the allegation. The allegation is focusing more on her not being in a mental position or not being able to assist you all in developing the relevant life history, mitigation, telling you about the offense, because she's suffering from PTSD and other mental issues that is impairing her ability to effectively assist you all in communication.
A Now, are you talking about the opinions of Dr. Woods?
Q I'm talking generally about those allegations and Dr. Woods does opine on that.

A Okay. Because I'm just making sure to be able to answer your question. If you're specifically talking about Dr. Woods and his opinions, I would have additional answers to you.
Q Well, let's set Dr. Woods aside for a moment. Let's focus just on your interaction with her. Did you observe that level of concern when you were dealing with her where she wasn't in a position to assist you all and there was concerns about whether or not she was effectively assisting in her defense?
A The answer to that is yes.
Q Okay. Go ahead.
A The problem we had with Lisa all along and it starts -- well, it starts. One of the primary instances that you see is that memo that we talked about about the bringing out that Tommy was involved. Lisa because of her condition was in a position that information was dribbling out to us and it was coming in fits and starts and that had to do with Lisa's condition, her mental illness, her problems.
She -- you could explain to her until you're blue in the face that she really -- that we were on a time frame and we needed information from her as quickly as she could give it to us. The bottom line is she was giving it to us every bit as quickly as she could, and so we were coming up with information when she was able to give it and it was coming at, you know, the last minute as we were sitting there in March of 2007

before an April of 2007 trial date. That wasn't Lisa's fault. And so I absolutely attribute that to her mental illness.

Do I think she was incompetent to where a Court would determine that we should have some kind of continuance to be able to restore her to competence? Absolutely not. I didn't think there was anything that we could take that difficulty for -- that Lisa was experiencing and make that a viable argument as to her competence.

And we also felt -- I felt that Lisa, to the extent that there were any other things that she wasn't telling us, I wasn't certain that she'd ever be able to tell us, and so -- to the extent that someone would determine that to be an incompetence to proceed, I don't necessarily disagree with them. In terms of a colloquial way of putting it, in terms of a legal defense that would keep a person from being able to stand trial, I don't think so.

Q So what I'm hearing you say, Mr. Duchardt, is that there were roadblocks and impediments but those were things that you took head on and worked your way through in trying to basically arrive at the defense that you put on?

A Sure.

Q There is an allegation, sir, as well, with respect to one particular juror, and it's Juror No. 124, who they're alleging was wrongfully excluded because of her race, and they're keying in on a comment that you made at the bench,

"She's Cuban." Do you recall that accusation?

A Absolutely.

Q Sir, would you agree with me that the context of that statement in the record was when the parties approached and there was a discussion about removal of jurors and the judge indicated that it was apparent that she was having a hard time understanding the proceedings and what was going on and you responded, "She's Cuban"?

A Sure.

Q And there was an agreement of all of the parties that she would be removed?

A Correct.

Q And what I'm curious, Mr. Duchardt, is when you characterized or when you chose the words, "she's Cuban," what were you intending? Were you intending for that to be a comment on her racial background or heritage?

A It was a comment on her background being -- having Spanish as her -- it would appear obviously to be her primary language and having difficulties conversing in English with us, and also understanding the things that we were going to be talking to her about.

Q So the reason why she was removed was because it was apparent to everybody that she was having a hard time understanding and thought that she wasn't probably a juror to be sat in this particular case?

A Well, that was my excuse. I also felt that she was somebody that I would have used a peremptory challenge on because of other answers that she made; and that, frankly, as I'm sure you understand, we attorneys find other reasons to have jurors we are uncomfortable with on other levels removed for cause to the extent that we can in order to be able to save our peremptory challenges, and that was really my notion.

Q And just so I'm clear, your other reasons for wanting her to be removed under peremptory had nothing to do with the fact she was Cuban?

A Right.

Q It was other reasons that she answered in the questions that she answered about various things in the course of your finding about her views on the death penalty in the case and things of that nature?

A She gave answers that made me feel she would be a prosecution-oriented juror if she was allowed to serve.

Q Back to this concept of plea negotiations and we talked about your meeting with the attorneys in our office who handled this in April. Ultimately the trial does get continued until the fall, correct?

A Correct.

Q And you take steps, do you not, sir, in September where you reach out to Peggy Griffey at the Capital Case Unit and the Department of Justice in an attempt, as this current counsel

would characterize, on the eve of trial to get this --

A That's fair.

Q -- to get this case decertified?

A That's fair.

Q Can you explain why -- what was your rationale, if any, in terms of the timing of why you did that?

A The short answer is at that point we finally had a final report from Ruben Gur about his information. It had been difficult getting him to put together all of the raw data, as he finally called it sushi data, related to his testing, but all of that was finally in hand.

We did not have that in hand to be able to present earlier, but that really made me feel at that juncture that there was something more that we could go to the committee to give them specifics about in terms of what we knew at that juncture that we didn't have before.

But the whole thing of trying to convince the government to not seek the death penalty had been a very long process that had started with the first case team and went through into efforts that we tried to make with Matt as the frontline prosecutor, but there came a point at the end when we decided we could have done it earlier in terms of going essentially over Matt's head, which he always told us feel free to do, but it was really the whole notion that we finally did have all of the pieces of the puzzle of the pseudocyesis

defense coupled with all of the neurological testing and all of the final opinions from Dr. Gur, and so really that was the juncture when it was our best and last opportunity to go up. Did I think that that was likely to succeed? Of course not. But it was the classic nothing ventured nothing gained at that point.

THE COURT: Mr. Ketchmark, I sense that maybe you're about finished, but I think we'll go ahead and take a break now until a quarter till 11.

MR. KETCHMARK: Thank you, sir.

(Recess taken at 10:30 p.m.)

THE COURT: Mr. Duchardt -- Mr. Ketchmark.

MR. KETCHMARK: Thank you, Your Honor.

THE WITNESS: I'm usually on that side.

FRED DUCHARDT resumed the stand and testified:

CROSS-EXAMINATION (continued) BY MR. KETCHMARK:

Q Just a few more questions with you, Mr. Duchardt.

A Yes, sir.

Q I was talking with you when we broke about the letter you sent to Peggy Griffey and the department on September 29th, 2007. Do you recall us discussing that?

A Yes, sir.

Q And I'm curious -- and I'll show you what's been marked and received. This is a copy of Petitioner's Exhibit 139.

A Yes, sir.

Q And there's a particularly highlighted part of a sentence there. Do you see what I'm referring to?
A "It has recently come to my attention"?
Q Yes.
A Okay. You want me to read the rest of it?
Q Read that part to give context to the highlighted portion, please.
A Okay.
Q And I'm curious as to what your thought process was or why did you choose the language, "It has recently come to my attention that, when previous counsel had met with your committee early on and you had invited them to provide to you any mental health information," what do you mean by the choice of the words "recently come to my attention"?
A Well, I think what I was just trying to do -- my best recollection is what I was trying to do was kind of explain to them why I was coming back in the fashion that I did, just kind of as an intro. I think I had reviewed at that time, once again, some of the information that was put together or some of the accounts that were put together in terms of that earlier meeting.
Q And, similarly, sir, with that letter I believe that there were a number of attachments that you talked about, but those are all the reports of all the various experts and all of the additional information and that was included in that

request for reconsideration; is that a fair statement?

A Correct.

Q If I could, Mr. Duchardt, directing you back briefly to the discussion we had about Juror 124 and the "she's Cuban" reference, and what I'm curious about, sir, is when you indicated in your answer that you had other reasons why you would entertain removing her with a peremptory -- do you recall telling me that?

A Yes.

Q What I'm curious about, sir, as you sit here today, do you recall that in her questionnaire that she had indicated that one of the cases she found particularly interesting in the last ten years was the JonBenet Ramsey case and she was interested because she didn't know how someone could hurt a child?

A Sure.

Q Do you recall, as I represent to you, was that one of the reasons why you were thinking about potentially removing her?

A Did I put that in my affidavit? I don't remember if I did or not.

Q I don't recall. I don't know if that's in your affidavit, but I know that's present in Juror No. 124's questionnaire.

A And when I was called upon to prepare the affidavit,

one of the things I did was, as you did, go back to the questionnaire that she had completed, and the one thing that you're talking about is one of the things that I noted. I think there were some other things as well I noted and remembered in terms of my thinking process on that. So if that answers your question.

Q Were you aware, sir, that Ron Walker, the retired FBI agent who Park Dietz and Dan Martell utilized was the first responding law enforcement to the JonBenet Ramsey scene?

A I did not.

Q There's been some discussion, Mr. Duchardt, in this hearing that you hold an unenviable distinction of having more people on death row, and I think Ms. Henry then corrected it and said that you might be tied with Pat Berrigan and Jennifer Herndon.

A That's good company to be in.

Q Well, let me ask you that because I want the record to be clear. You have done a number of death penalty cases as we've talked about?

A Yes, sir.

Q -- and while you might have several clients who you were unsuccessful, is it accurate, sir, that you've had very good success in getting clients off or getting less than the death penalty for them?

A Sure. The overwhelming majority have been either

outright acquittals or non-death results.

Q And, in fact, we talked about in the Hargrove matter over in the state of Kansas you got less than a death sentence for that individual?

A Sure.

Q The Phil Street matter you got less than death, then that was overturned and you ultimately got Mr. Street an outright acquittal?

A Sure.

Q You also mentioned the Moore matter. In Dennis Moore's case you got less than a death sentence?

A Yes.

Q Carl Haskin case you got --

A Haskell.

Q Haskell, I'm sorry. You got less than a death sentence for that individual as well?

A Sure.

Q What I'm curious about, sir, is obviously you understand when you take these appointments or you work on these cases, that you literally have your client's life in your hands?

A Yes.

Q And that is a very big responsibility?

A Sure.

Q And am I correct, sir, based on what I have seen, that

you take that serious -- that obligation very seriously?
A Yes, sir.
Q And that you perform to the best of your ability in representing those clients?
A Sure.
Q And is it your opinion, sir, that you did that in this case as it relates to Ms. Montgomery, not only in the trial but your representation through appeal?
A That's up to Judge Fenner to decide.
Q But in your opinion, sir.
A I certainly did my best, yes, sir.

MR. KETCHMARK: One moment, Your Honor.

That's all I have.

MS. HARWELL: No further questions, Your Honor.

THE COURT: All right. Thank you, Mr. Duchardt. You're excused.

THE WITNESS: Good seeing you, sir.

THE COURT: Thank you.

(Witness excused.)

MS. HARWELL: Your Honor, I think by agreement we'll introduce Exhibit 140 into the record -- or 160. It had not originally been part of the group that the government allowed in.

MR. KETCHMARK: I have no objection, Your Honor. These are the letters that were referenced with Mr. Duchardt

with respect to his request to the warden at Carswell and Philadelphia.

THE COURT: All right. That's Exhibit 160? It's received.

Ms. Henry, you want to proceed to summation or do you want to come back this afternoon?

MS. HENRY: By agreement we had one very short witness. The government -- and then I want to come back this afternoon.

THE COURT: All right.

MS. HENRY: So at this point, Your Honor, the movant calls Ben Leonard.

THE COURT: Very well.

BEN LEONARD, being sworn by the courtroom deputy, testified:

DIRECT EXAMINATION BY MS. HENRY:

Q Sir, would you state your name for the record and spell your last name for the court reporter.

A Ben Leonard. Last name is spelled L-e-o-n-a-r-d.

Q And, Mr. Leonard, are you employed as an investigator in the Office of the Federal Public Defender for the Middle District of Tennessee?

A Yes, I am.

Q And do you in fact work in the Capital Habeas Unit in that office?

A Yes, I do.

Q And in fact you have worked for me since 2008; is that correct?
A 2007.
Q 2007. Sorry. And are your credentials as an investigator laid out in other declarations already received into evidence in this court?
A That's correct.
Q All right. So we'll move directly to the issue at hand. Mr. Leonard, did I ask you to locate and serve a subpoena on a juror who I believe is actually Juror 129. The number seems to be cut off at the top of her questionnaire, but a woman by the name of Doralis Torres?
A That's correct.
Q And she was Juror 129 in Mrs. Montgomery's case, correct?
A Yes.
Q And in order to find Ms. Torres, did you review her -- you did several things, but did you review her jury questionnaire prior to going out and serving the subpoena?
A I did.
Q Approaching you now, sir, showing you Movant's Exhibit 162. Is that the jury questionnaire completed by Ms. Torres?
A Yes.
MS. HENRY: Your Honor, I move for admission of

Movant's Exhibit 162.

MR. VALENTI: No objection.

THE COURT: Received.

Q (By Ms. Henry) The subpoena that we originally served on Ms. Torres was for a date that we determined would be after the conclusion of the evidence; is that fair to say?

A Yes.

Q And so I asked you to go back out and visit with Ms. Torres to determine whether or not she would -- to serve her and then also see if perhaps it would be her preference to offer a declaration rather than provide live testimony; is that correct?

A That's correct.

Q When you first met Ms. Torres and served the subpoena on her, did she address you in English?

A Yes, she did.

Q Were you able to understand her?

A Yes, I was.

Q When you went back to talk to Ms. Torres to either possibly reserve her a subpoena or obtain the declaration, did you -- did she tell you that in fact she can read, write, and understand English?

A Yes.

Q And did she say to you in her declaration that she understood all the questions that were asked of me and had no

problem understanding the attorneys or responding to their questions during the voir dire process in Ms. Montgomery's case?

A That's correct.

Q And did she tell you that she -- though she was originally from Cuba, that she had learned to speak English while she was still in Cuba?

A Yes.

Q And showing you now -- approaching you, sir, and showing you Movant's Exhibit 161, is that a copy of the declaration signed by Ms. Torres?

A Yes, it is.

Q Did she read that declaration in your presence?

A Yes, she did.

Q Is that declaration written in English?

A Yes, it is.

Q And did she sign it?

A Yes.

MS. HENRY: Your Honor, I move for admission of Movant's Exhibit 161.

MR. VALENTI: No objection.

THE COURT: Received.

MS. HENRY: Thank you. That's all I have, Mr. Leonard.

CROSS-EXAMINATION BY MR. VALENTI:

Q Mr. Leonard, did you prepare this declaration?
A I did not.
Q Who did?
A Lisa Nouri, the attorney.
Q So it was not prepared by Ms. Torres?
A No.
Q And her first name I believe is Doralis, D-o-r-a-l-i-s?
A That's correct.
Q So she was born in Havana, Cuba, correct?
A That's what she stated.
Q When did she learn English there?
A She didn't say. She just said she learned English before she came.
Q Did you ask her how old she was when she learned English?
A No.
Q At the time you met her she was a 42-year-old woman, correct?
A That's correct.
Q Would have made her approximately 33 years old during the trial of Ms. Montgomery in 2007; is that right?
A Yes.
Q Do you know when Ms. Torres immigrated to the United States?
A She said at the age of 20.

Q Okay. So you don't know when, though, she learned English, whether it was a year before or day before she left but sometime prior to her coming to the United States?
A That's correct.
Q Fair to say that Spanish was her first language?
A Yes.
Q Did you talk to her about her understanding in general of legal proceedings as you talked to her this week?
A No, sir.
Q Did you talk to her about her understanding of legal proceedings that she would have been able to comprehend in 2007?
A No, sir.

MR. VALENTI: That's all I have, Your Honor.

MS. HENRY: Thank you.

THE COURT: Thank you, Mr. Leonard.

(Witness excused.)

THE COURT: Is that all?

MS. HENRY: Your Honor, at this point movant rests.

THE COURT: All right. Government?

MR. VALENTI: The government does not intend to adduce any additional evidence other than I'd like to move for admission of two exhibits; Government's Exhibits 44 and 45. 44 is a truncated transcript of testimony provided by Dr. Gur before Judge Gaitan in 2014 dealing with the behavioral image,

and the other Exhibit 45 is Judge Gaitan's order on the Keith Nelson 2255. It's quite lengthy, 53 pages. I specifically point the Court's attention to page 24 where Judge Gaitan interprets Dr. Gur's testimony.

THE COURT: Any objection?

MS. HENRY: No objection.

THE COURT: Those exhibits are received.

MR. VALENTI: Thank you.

THE COURT: Anything further from the government?

MR. VALENTI: No, Your Honor.

THE COURT: All right. I'd like for you all to come back at one o'clock for your summations.

And Ms. Kelley [sic], will you be making the close for your team?

MS. HENRY: I will, Your Honor.

THE COURT: And do you want to divide your allocated time to allow for a reply?

MS. HENRY: Yes, sir, I would like to do that.

THE COURT: How do you want to divide it up?

MS. HENRY: How about 45 and 15?

THE COURT: 25 and 15?

MS. HENRY: 45 and 15.

THE COURT: 45 and 15?

MS. HENRY: Yes, sir.

THE COURT: All right. We'll be back at one

o'clock.

(The noon recess was taken at 11 a.m. until 1 p.m.)

AFTERNOON SESSION

THE COURT: Thank you. You can all be seated.

Ms. Henry, are you ready?

MS. HENRY: I am, Your Honor.

THE COURT: Mr. Valenti, are you ready?

MR. VALENTI: Yes, sir.

MS. HENRY: May it please the Court.

THE COURT: Ms. Henry.

MOVANT'S CLOSING ARGUMENT

MS. HENRY: Your Honor, this afternoon -- first of all, I'd like to thank you for giving us the opportunity to provide some sort of framework for which we'd like for you to consider the evidence that we've presented over the past nine days as well as the voluminous exhibits. I know the Court will read everything and take it all into full consideration.

Given the time constraints and where we all are in the case, I'd like to focus my comments this afternoon on the areas of ineffective assistance of counsel, our competency claim, our Riggins claim, and the claim -- separate claim respecting Dr. Gur; but, of course, if there's some area the Court would like for me to provide further clarification or even if the Court would prefer to have a dialogue, I'm open to that.

THE COURT: All right. Thank you.

MS. HENRY: I think we should start, Your Honor, by setting the table with what the legal standard is for the ineffective assistance of counsel claims, and that is that it is our obligation on behalf of Mrs. Montgomery to establish that her trial counsel, their conduct fell below the objectively reasonable professional norms; and that as a result of that deficient performance, Mrs. Montgomery was prejudiced, which under these circumstances in the way that we have pled the motion would mean that there is a reasonable probability that at least one juror would have voted to sentence Mrs. Montgomery to life.

It is not our burden to prove that we would have been able to present this evidence to a jury and get a not guilty -- get a life sentence by unanimous jury, and it is not our burden to prove that this evidence would have been established beyond a reasonable doubt. Instead, the Court looks at the evidence that we've presented under the evidentiary standard as it would have been presented to the jury and ask the question, Could one juror have reasonably decided that this evidence if properly presented would have been cause to vote for a sentence of life without parole for Mrs. Montgomery? Because, as the Court knows, it's only one vote that counts in a federal death penalty case. We believe we have set out that proof, Your Honor, in this matter.

It's important for the Court to understand, and I think we've been clear, we are not critical of trial counsel for failure to present this evidence as a first-phase defense. There may be some argument that the testimony presented, particularly from Dr. Porterfield and Dr. Woods and Dr. Nadkarni could have risen to the level of a not guilty by reason of insanity defense. However, we recognize how difficult that burden is in a federal case, and so do not suggest that that is the rubric the Court should consider.

Instead, we are critical of the decision to present a defense of not guilty by reason of insanity based on the myopic defense of pseudocyesis, and I'll discuss that more fully later.

But we should look to the case law that would govern the claim as we have framed it for the Court today, and that is primarily, as the Court knows, the standard in Strickland v. Washington, but the more relevant cases to look to would be those of Wiggins v. Smith, Rompilla v. Beard, and Sears v. Upton.

Rompilla v. Beard is particularly instructive for the Court because Rompilla involves a case where trial counsel did a lot of things. Trial counsel in Rompilla presented, I believe it was, three psychiatric experts on behalf of Mr. Rompilla. Mr. Rompilla's trial lawyers interviewed him and he gave information that led them to believe that the defense that

they were presenting was in fact true. Mr. Rompilla's lawyers interviewed Mr. Rompilla's family. They gave the same version that Mr. Rompilla did. Nonetheless, the United States Supreme Court found Rompilla's lawyers were deficient and he was thereby prejudiced simply because they failed to get one file out of the courthouse. Mr. Rompilla had a prior conviction and sitting in the courthouse was a presentence report that revealed a vastly different picture of Mr. Rompilla's background and upbringing.

Once that information was discovered, new psychiatric exams were completed. A new picture of Mr. Rompilla's life developed, and the United States Supreme Court held that to be sufficient to prove a reasonable probability of prejudice.

Here we have evidence that was available to trial counsel, which they either ignored due to a failure of institutional memory, due to a failure -- lack of insight on behalf of some of the trial counsel perhaps, and also due to a lack of follow-up and refusal to continue to investigate red flags that had been developed in the case.

Sears v. Upton is also instructive to the Court --

THE COURT: I suppose you're going to review what you believe that evidence was.

MS. HENRY: Yes, sir.

THE COURT: I mean, I'm not saying that I'm left in

the dark by your presentation but --

MS. HENRY: Yes, sir.

THE COURT: But presentation of the evidence that is over the last two weeks.

MS. HENRY: Yes, sir. The Sears case I would only cite to the Court because, again, it's one of those cases that talks about false picture.

So now I would like to get into the evidence that I believe showed to the Court that there was evidence not presented by trial counsel to the jury or presented in such a fragmented and incoherent way and against a backdrop of false testimony or of a false opinion about what happened in the case so as to prejudice Mrs. Montgomery.

So beginning with the standard of care, Your Honor. Last week we established through the testimony of Russ Stetler, Marc Bookman, and Dick Burr, to name just a few, that the standard of care that the trial counsel in this case was required to follow as adopted by the Judicial Conference of the United States Courts is the ABA Guidelines as well as the supplementary guidelines. That remains uncontradicted in this case.

When you look at what trial counsel chose to do, I anticipate that the government is going to argue that decisions about what was presented or what was not presented were all matters of trial strategy. So I think it's important for us to

talk about what it means to have a strategic decision because not every decision is strategic and not every strategic decision is reasonable.

In order for a decision to be reasonably strategic trial counsel is required to review all of the evidence, look at it from all sides and consider that evidence against the evidence, the incontrovertible evidence that the government is going to present.

Here we have testimony from Mr. Duchardt and others that they sought to simply ignore some of the negative evidence that the government was going to present, evidence of Mrs. Montgomery's failings as a mother, for example. Mr. Duchardt testified for us that he was simply not wanting to focus on that because the government was going to do a good job. What reasonably competent trial lawyers know is you have to wrap your arms around that negative evidence that the government is going to present and figure out how it works in your case.

In Mrs. Montgomery's case that evidence of the fact that she was not able to parent despite her best wishes, best desires to do so was actually a red flag. It was a red flag of her psychosis, it was a red flag of her bipolar disorder, and it was a red flag of her severe, pervasive, enduring trauma as Dr. Porterfield shared with the Court and taught us all about in her testimony this week.

So before I get into exactly the red flags that were

available to trial counsel, I know that the Court is going to have to make some credibility determinations about who testified and who to believe and who not to believe when you reach your decision, and we do want to suggest we're not here to be involved in these sort of character assassination attacks, but it does appear Mr. Duchardt attended a different trial than the rest of the team members, and the Court should consider not only his testimony but the testimony of Troy Schnack, Stephanie Elliott, as well as David Owen and John O'Connor and look at the records as they exist and look at some of the documents that have been presented by Mr. Duchardt.

I can provide the Court with at least ten instances of inconsistency in Mr. Duchardt's testimony and what the records actually reflect, and I would like to do so now basically in a list fashion before moving back to the rest of my presentation.

Starting with the unusual decision to involve his wife, Ryland Duchardt, in the defense of Mrs. Montgomery. We have established through evidence that Mr. Duchardt represented that Mrs. Duchardt was an expert on the case, yet he testified here this morning that she was not an expert.

THE COURT: I think -- I thought he said that she was an expert but she was not used in this case as an expert.

MS. HENRY: Correct, Your Honor, but what he said to the warden and what's in those memos that the Court will read

is that he represented to the warden at CCA -- or in Philadelphia that his wife was an expert who he used on these cases, and that was the way that he gained her access to Mrs. Montgomery at that facility, and that was in fact an untrue statement to the Bureau of Prisons.

We have, of course, the most striking example and what I will later describe as one of the great tipping points in this case which was the status conference on April the 3rd of 2007. The Court knows the record and will read the record. Mr. Duchardt stated that he had two witnesses who had diagnosed Mrs. Montgomery with pseudocyesis and that they were writing reports.

You will read in the transcript of Dr. Ramachandran's deposition that when he was asked if he had told Mr. Duchardt on the telephone in their first conversation on April the 2nd of 2007 that he had diagnosed Mrs. Montgomery, he stated that such a diagnosis would be inconceivable. He later stated in his deposition that he would never do such a thing and that he did not do such a thing.

He certainly did not indicate at that time that he was able to provide a first-phase defense under the Federal Rules of Evidence because as -- or the federal statute, I should say, because as Dr. Ramachandran has testified and is uncontroverted in this record, his understanding of what the insanity defense test was in federal court when he testified on

behalf of Mrs. Montgomery was the McNaughton Rule. He understood it to be the McNaughton Rule because he was trained at Cambridge. He learned -- you will see in his deposition and in his CV that he went to Cambridge decades ago.

Dr. Ramachandran also testified that he is not an expert in pseudocyesis despite Mr. Duchardt's numerous representations of such to this court and other experts in the case as was testified to.

THE COURT: He testified to the correct standard at the time of trial, didn't he?

MS. HENRY: He did answer a question, a leading question posed to him at the time of trial, yes, sir, he did. His deposition is what his deposition is and the Court can consider it.

The Court can also consider the fact that Dr. Ramachandran's expertise in pseudocyesis involves, as he admitted in his deposition, five pages of a chapter in a book that cites to others who has studied the phenomenon.

Dr. Ramachandran stated unequivocally in his deposition that he is not an expert in pseudocyesis and in fact he is not a licensed psychiatrist in this country. His training was in India. It was, as the Court will look at in the transcript during the trial, Mr. Whitworth who had to correct Mr. Duchardt when Mr. Duchardt referenced Dr. Ramachandran as a psychiatrist.

In his statement, his sworn statement filed with the Court and now admitted into evidence, a third instance of a misstatement of fact occurs. There he stated that his wife, Ryland Duchardt, was not with him when the Tommy revelation came from Lisa Montgomery. That's on page 48 of his statement. But today he stated Ryland was with him.

Who was with Mr. Duchardt at the time of that revelation is incredibly important, as the Court knows and as we will discuss, because it is our contention that through no ill will but simply through lack of insight, training, and understanding of Mrs. Montgomery's serious and severe psychiatric illness, Mr. Duchardt inadvertently created a memory in Mrs. Montgomery which was catastrophic for her defense at trial, taking her from having the ability to present it to the jury as an incredibly psychiatrically ill woman filled with remorse, as all of her trial team prior to Mr. Duchardt's team testified she was, as the records demonstrate she was. The records demonstrate she wanted to plead guilty from day one and quite upset when her lawyers pled her not guilty.

THE COURT: You know, part of what goes across my mind in that regard, Ms. Henry, about the whole Tommy defense thing is, I mean, I understand your argument that the memory was planted. Mr. Duchardt disputes that. But if Lisa Montgomery at some point, you know, whether it's through

improper questioning or whatever says that Tommy was there with her, they have to follow up on that, don't they?

MS. HENRY: They would have if it hadn't already been ruled out.

THE COURT: If it what?

MS. HENRY: If it hadn't already been ruled out. That's where the lack of institutional knowledge causes a problem. Mr. Owen testified -- we have testimony -- let's start back with Holly Jackson.

THE COURT: Okay. But the probation officer has no recollection of talking to anybody about it until the Duchardt/O'Connor team approached her, or whoever it was that pursued that.

MS. HENRY: What Erin Garman testified to is that she also filed the paperwork, the firearms restriction and the other paperwork that was introduced into evidence in this court in the criminal trial. That was filed as a public record in Franklin County in Mr. Kleiner's file. The records show that Susan Hunt and her investigator, Phil Thompson, obtained all of Tommy Kleiner's criminal records from those various courts. That substantiates the testimony of Holly Jackson and David Freedman and today -- or yesterday David Owen said the previous trial team had already on their own, because of Leona Hayes, they were trying to figure out if there was someone else involved. The only person they could think of was possibly

Tommy. So they investigated Tommy and they ruled him out.

Ms. Jackson had a very clear and very credible memory of David Owen at a team meeting stating that Tommy had an alibi and, therefore, could not be an alternative suspect. I can't explain how it is that David Owen couldn't get that message through to Fred Duchardt, but I posit to the Court that you heard testimony today and yesterday both from Mr. O'Connor and Mr. Duchardt that to this day they believe that Erin Garman falsified her records and that in fact Mr. Kleiner was in fact an alternate suspect. They still believe that. And if that is the perspective of their belief from which all other decisions flowed, that is objectively deficient performance because, A, it had already been ruled out; and, B, if you look at Mr. Kleiner, he's not a reasonable alternative suspect. Mrs. Montgomery had just had him sent back on a probation violation because he had violated a protective order. Why in the world would he then be going with her to this crime? It simply does not make sense.

But what we also heard from Ms. Garman and also from Mr. Kleiner that independently have a recollection of Mr. Lipanovich asking them whether or not they were having an affair because that is what the defense was going to claim. That was how sort of out of touch with reality this defense team was as they were approaching trial.

You saw Ms. Garman. It's understandable why Mr.

Lipanovich perhaps doesn't remember that conversation because that is simply ludicrous that Mr. Kleiner and Ms. Garman were having an affair. It is also ludicrous that Ms. Garman was falsifying her records. But that was the perspective with which this trial team was proceeding as late as September of 2007.

They believed Mrs. Montgomery when she was able to give them the name of Tommy, but I think it's important that we talk about that March 7th memo, and I know the Court will read it very closely; and as you read it, you will see that Mr. Duchardt makes it clear he was pressing Mrs. Montgomery to give him a name. He was telling her that she's got to stop curling up into a ball whenever they're asking her questions.

What that shows us is that Mr. Duchardt was normalizing his behavior -- her behavior and had no insight into how severe Mrs. Montgomery's psychiatric illness was, and he failed to recognize that Mrs. Montgomery's memories of feeling like someone else was present was actually a huge red flag for dissociative disorder and psychosis, which is really what was going on there.

And I understand that ultimately at trial Dr. Ramachandran did testify that, well, the Tommy story could be that it was a delusion, but that wasn't what his report said, and the government was able to use Mrs. Montgomery's new memory of Tommy Kleiner being present with her at trial to show that

she was no longer the remorseless woman wanting to take responsibility, the person who had an incredible psychiatric illness.

The government has stated repeatedly that the crime itself tells you that the person who did it is psychiatrically ill. All of that was lost once Mrs. Montgomery went on videotape with Park Dietz who is a skilled interrogator, though not treated a patient since 1985. That was devastating.

Moreover, the pseudocyesis defense that the Court was told had already been diagnosed on April the 3rd, going back to that untruth. Both Dr. Logan and Dr. Ramachandran have testified and they have not been impeached that they had not diagnosed Mrs. Montgomery with pseudocyesis on April the 3rd, and they were not writing reports diagnosing her with pseudocyesis and the defense of not guilty by reason of insanity on April 3rd as was represented to this court on that day.

Yes, ultimately they got there and as the testimony will show, every single psychiatric expert who refused to support pseudocyesis got pushed to the wayside because that was the defense they wanted to go forward with.

So let's look at pseudocyesis as a not guilty by reason of insanity defense. The only way that works under the federal law about whether or not Mrs. Montgomery knew right from wrong is if Mrs. Montgomery believed that Bobbie Jo

Stinnett had her baby, that it was Lisa Montgomery's baby inside Bobbie Jo Stinnett. There's no evidence of that. Mrs. Montgomery has never said that, ever. She was always very clear that was not her baby. It's not a first-phase defense. Game over right there.

But then we look at Dr. Logan. Again, his testimony is not controverted. Dr. Logan testified that he made very clear to the defense he did not feel -- he testified, I'll give you that. It was a hypothetical and you can -- as Mr. Valenti said, How many angels dance on the head of a pin, Dr. Logan? If you look closely at his testimony, he answered a hypothetical about NGRI. He didn't actually give the ultimate testimony, but be that as it may, he gave the impression.

But he told us here that he had warned trial counsel that this was not going to be a sufficient defense for NGRI, and he repeatedly requested access to email deletions. He told Mr. Duchardt that those email deletions were going to be important to him; and that if they existed, it was going to be devastating to the defense, and Mr. Duchardt told Dr. Logan that those email deletions were not available to him. Clearly that was untrue, and on cross-examination Mr. Whitworth used those email deletions to get Dr. Logan to admit that Lisa Montgomery knew right from wrong. At that point the not guilty by reason of insanity defense was no longer supported by the evidence, and Dr. Logan had foreshadowed that problem but was

ignored.

Dr. Kuncel, the Court saw, had been asked about -- her referral question was whether or not Mrs. Montgomery was not guilty by reason of insanity, and she stated she could not -- though she felt Mrs. Montgomery was not guilty by reason of insanity, she couldn't support pseudocyesis. So her testimony wasn't presented in the first phase because she didn't support pseudocyesis.

Which I guess brings me to what we should talk about, the claim about the experts that were used at trial. We brought this court every single expert, the ones that were used at trial, the ones that were available at trial, and the ones who are actually competent, the ones we've presented. Specifically Dr. Porterfield, Dr. Nadkarni, Dr. Woods, Ms. Vogelsang.

You heard Mr. Duchardt this morning say Dr. Kuncel was their equivalent of a Jan Vogelsang and Kate Porterfield, I guess all wrapped into one. The Court saw Dr. Kuncel last week. We didn't endorse Dr. Kuncel as our witness. We brought her in because she was the witness by the defense.

The Court saw Dr. Kuncel's testimony at trial. Her testimony at trial summarizing the social history evidence that we've gone over for several days in this court is from pages 3016 to 3032. Sixteen pages of transcript was Dr. Kuncel's summary of the social history data in Mrs. Montgomery's case.

I think the Court observed when Dr. Kuncel testified last week and more so at trial she was not a very responsive witness. She was an ineffective witness and certainly the fact her testing protocol was idiosyncratic and scientifically unreliable completely destroyed her credibility with the jury.

So let's talk about why her testing protocol was unreliable. Not her fault that her evaluation of Lisa Montgomery got cut off at CCA. That was trial counsel's responsibility. All trial counsel had to do was call CCA and say, I need Mrs. Montgomery to make sure and be there for the two days our expert will be present. That didn't happen. And so the evaluation was interrupted.

At that point Dr. Kuncel was no longer a valid or available witness for Mrs. Montgomery, yet she continued on and gave a battery of tests which everyone agrees is scientifically unreliable, and that was the person to stand in the shoes of Kate Porterfield at trial. It was not effective. And they should have known before trial because they had the reports of the government's experts that she was going to be destroyed on her testing protocol, and in fact was destroyed on her testing protocol during Dr. Martell's testimony.

So let's talk about Dr. Martell's testimony and Dr. Marilyn Hutchinson, an expert we brought to you who was available to the defense. There were several professionally unreasonable mistakes made with respect to Dr. Hutchinson's

testimony. Dr. Hutchinson was a consulting expert. She had in her file confidential attorney-client memos. She did not reach a final conclusion. She did not write a report. And testing data that was represented to be hers and notes that were represented to be hers in fact were not hers.

That was trial counsel's responsibility to see to it that a consulting expert's raw data and confidential attorney work product did not leave that office. That didn't happen. That information was sent along, and it was used to a devastating effect, because nobody on the trial team bothered to go back to Dr. Hutchinson and say, Tell us about these notes. What are these notes? Is this a report? Did you find malingering? You heard her testimony last week. If they had gone to her and asked her, she would have said, Those aren't even my notes. Those were my psychometrist's, Karen Willing, and all she was doing was summarizing a computer printout of an interpretive report. I didn't believe Lisa Montgomery was malingering. I believed Mrs. Montgomery was incompetent. And that was the only conclusion that I was drawing at that point.

Dr. Hutchinson, as the Court saw, is local, is a trauma expert. Would have been a far more compelling witness if you wanted to use her than Dr. Kuncel was. The fact that Marilyn Hutchinson's nonreport was testified to by Dr. Martell, and the Court can look at Dr. Martell's very brief direct examination, he doesn't rely so much on his report. He's talking about Dr.

Hutchinson, Dr. Hutchinson, Dr. Hutchinson. Because the government knew and he knew that if they could represent to the jury that someone on the defense wasn't going to present to them, was saying Mrs. Montgomery was malingering, that was going to be devastating, and Mr. Whitworth asked that question and they incurred, of course, testimony, again, unrebutted of what a disaster the cross-examination of Dr. Martell was. Where Mr. Schnack testified it was going so poorly, and Mr. O'Connor was writing note after note about why won't he just sit down? That Mr. Schnack had to actually get up and leave the courtroom so the jury wouldn't see his physical reaction to that cross-examination.

A properly prepared attorney would have known how to handle Dr. Martell. They wouldn't have allowed raw data to go out that was confidential attorney work product; and if they did, they would have gone back to Dr. Hutchinson and asked her to explain her data and would have been able to present what was a much more compelling story about Mrs. Montgomery's severe psychiatric illness and trauma history.

And the Court can compare Dr. Hutchinson with the testimony of Dr. Porterfield. Dr. Porterfield's testimony I think we can all agree was quite powerful and scientifically based. Unlike the witnesses at trial, the expert witnesses at trial, Dr. Porterfield did not rely solely on the word of Lisa Montgomery. Certainly she did a clinical interview, but she

then confirmed the details upon which she relied through a scientific methodology, one that is found in the book Trauma and Recovery by Judith Herman, Judith Herman who had been hired as a consultant in this case.

I know there's been a lot of examination about, Well, did Judy Clarke tell Fred Duchardt about Judith Herman? Did she not? Judy Clarke says she did. Mr. Duchardt says she didn't. Doesn't even matter. Because David Owen is the one who signed the contract. David Owen remained on the case. It's inconceivable that David Owen would not have shared with Mr. Duchardt that there were two experts, Dean Delis and Judith Herman, who had recently been hired.

But what Dr. Porterfield taught us and what a Judith Herman or someone of her stature could have told this jury is the fact that Mrs. Montgomery's severe, chronic, pervasive, repeated exposure to severe trauma actually changes the brain, changes the structure of the brain, and the U.S. Supreme Court has recognized that brain damage is like a super mitigator, and their observations is -- are confirmed by the jury studies in the Scott Sundby's article that both Mr. Bookman and Mr. Stetler discussed with the Court last week.

And it's also important these well, well researched evidence about the way trauma affects the brain in the book called The Body Keeps the Score, another treatise that was available to the Court by Bessel van der Kolk.

If the jury had heard about the extent of Mrs. Montgomery's trauma, it would have made a difference, Your Honor, I submit. There are, when we went through the transcript, at least 37 instances where the government or even defense counsel presented evidence that perhaps Mrs. Montgomery was a, quote, willing participant in the sexual abuse she suffered at the hands of her stepfather, and, of course, we know that can't be true. But it was presented so powerfully and argued so credibly by the government, that at least three jurors didn't even find that Mrs. Montgomery had been sexually abused by her stepfather.

THE COURT: You know, I know in the evidence I've heard in the last two weeks that there were references made by you that Dr. Martell and Dr. Dietz opined that Ms. Montgomery may have been a willing participant, and I don't remember that having happened. Do you -- do you have a cite to their testimony or is that what you're referring to here as part of that argument of the presentation of Ms. Montgomery being a willing participant?

MS. HENRY: The willing participant is in Dr. Martell's testimony. I can look up my memo and get you those pinpoint cites to the transcript to Martell and Dietz. It's on my iPad over there. I cannot tell you from memory right now.

THE COURT: That's fine. You can do it, if you have the opportunity, while Mr. Valenti is making his presentation

or we can wait afterwards if you prefer to do that and you can get that to me.

MS. HENRY: I will do so, sir.

THE COURT: All right.

MS. HENRY: In closing argument as well the government argued to the jury, well, perhaps maybe Mrs. Montgomery was abused by her stepfather on one occasion. I mean, after all her mother did walk in on the event occurring. Dr. Dietz refers to it in the transcript, I believe, as catching her in a compromising position with her stepfather. And argued to the jury that a single instance of sexual abuse of that nature was not sufficient to rise to the level of mitigation that should be weighed by the jury, and they were able to do that to great effect because of the failures of trial counsel.

Again, through no ill will, just a lack of understanding and a lack of following the ABA standards, a lack of teamwork, a lack of having these meetings. Perhaps if they had had these meetings and sat down and talked with one another, Mr. Owen could have said, Hey, guys, wait. We already looked at that. David Freedman, who today Mr. Duchardt referred to as an expert, he already looked at pseudocyesis. We've already figured out that's not going to work. Why don't we go all the way back to Bret Dillingham and what he was seeing in this case.

There were so many red flags not followed up on simply because this team didn't have the experience to deal with someone who is as psychiatrically ill as Mrs. Montgomery and they didn't have the background in trauma history and trauma investigation that one needed to represent Mrs. Montgomery. If they had, they would have recognized so many of the red flags that had been testified to here today.

When Mr. Duchardt talks about telling Mrs. Montgomery, You're not helping me by rolling up into a ball every time we talk. He told you that he was having a very difficult time talking to Mrs. Montgomery, and today testified he wasn't sure he was ever going to be able to get the whole story out of her. Well, that goes to our competency claim as well, but that also should have been a red flag to him, You know what? I need a trauma expert.

I get the idea of wanting to do something to make Mrs. Montgomery feel guilty -- or more comfortable. He recognized that Mrs. Montgomery had a hard time with men in the room. That was a red flag. That was a red flag for severe trauma that wasn't followed up on. You don't answer that red flag by bringing in your wife as nice as she may be. That was manipulative. That wasn't standard of care. That wasn't what the supplementary guidelines call for.

He had Dani Waller available to him. You heard his testimony today about Dani Waller and you will recall Dani

Waller. Though Dani Waller became quite emotional and was crying about the failure of the team to follow up on the red flag from David Kidwell, there was nothing about Dani Waller that suggested she was afraid to go talk to mitigation witnesses as posited by Mr. Duchardt. In fact, just the opposite. What Dani Waller testified to was that David Owen insisted that Ron Ninemire attend all mitigating -- mitigation interviews with her except those where David Owen attended and then apparently came forward and pulled out his newspaper during his interviews, which was certain to shut down lines of communication. Another instance where the Court's going to have to make decisions about the credibility of the competing testimony.

I'd like to focus now, Your Honor, on some more of the red flags that we saw. I'm about to run out of time so I should sum up. Let me get to what I think are three tipping points in this case. Tipping point No. 1 was when Anita Burns was removed from the case by Ray Conrad when David Owen's supervision of her became untenable for her.

Anita's own testimony shows we were trying to follow standard of care, trying to follow ABA Guidelines and supplemental guidelines, and each time she wanted to hire qualified experts she was overruled by Dave Owen and Mr. Conrad without explanation and so finally she left. Had Anita Burns stayed on the case and been able to follow the guidelines, I

think we would be in a different position. I don't think you and I would have ever met.

THE COURT: I'm not so sure about that. I think we'd still all be sitting right here this afternoon.

MS. HENRY: That gets to the question, Your Honor, of prejudice which, of course, I know you're going to have to consider whether or not all of the evidence we've presented here today, that we have been able to uncover is sufficient.

The Court has seen what happened in this case. These are stipulated to documents. This was what happened with record collection after Mr. Duchardt took over. Virtually nothing. This represents the interviews that were conducted pre-Mr. Duchardt and post-Mr. Duchardt when he decided to take over the mitigation.

Also in evidence for Your Honor to review as Movant's No. 6 is a chart summarizing all of the traumatic events in Lisa Montgomery's life which a competent expert such as Dr. Porterfield could have reviewed and used to come to conclusions similar to those she came to today.

This chart, Movant's No. 5, summarizes all the records and the multigenerational evidence of mental health symptoms that Ms. Vogelsang was able to testify to, and the government stipulated to her testimony as well researched and well documented. This evidence was not, not used by Mr. Duchardt in the trial, and that made a huge difference in terms

of his approach and his effect.

I would point the Court to the testimony of multiple witnesses that Mrs. Montgomery appeared to not understand what was going on. To the testimony of Dr. George Woods, his testimony is not controverted by any mental health expert that based on Mrs. Montgomery's multiple comorbid psychiatric illnesses, it's his opinion that she was unable to reasonably and rationally assist counsel in that she was not able to share with them her serious trauma history, particularly given the makeup of that ultimate team and the fact that they failed to use competent experts to assist her, to help her with her psychiatric disability.

Further, the expert testimony is the psychotropic medications that were given to Mrs. Montgomery would have changed her affect at trial. She would not have had the ability to volitionally overcome the chemical psychotropic effects of those medications. And you heard testimony from Troy Schnack, Stephanie Elliott, Dave Owen, and Susan Hunt that Mrs. Montgomery appeared in fact to have that flat affect, which would give the impression of lack of remorse and cold-bloodedness.

The case on that is Riggins v. Nevada, which says when an individual is under the influence of psychotropic drugs, it is incumbent upon trial counsel to inform the jury not only that they're on the medication, because that did

happen here. Dr. McCandless who was a terrible witness in the first phase. The Court was quite upset. You might recall her testimony last minute, leadoff witness for NGRI.

THE COURT: I recall.

MS. HENRY: She's provided an affidavit in this court that you can look at. She testified that she was giving medication but she did not testify about the effects of the medication on Mrs. Montgomery's affect.

At the end of the day, Your Honor, what this evidence could have done, could have presented to at least one juror is that the level of exposure that Mrs. Montgomery experienced starting at birth, starting prebirth with her mother's ingestion of alcohol up to the time, not just when Jack Kleiner was out of the house, it is uncontroverted that Carl Boman continued to rape Mrs. Montgomery. There's a rape tape. It's uncontroverted that Carl Boman showed his rape tape to his buddy who then proceeded to rape Mrs. Montgomery. It's uncontroverted that Kevin Montgomery subjected Mrs. Montgomery to seriously deviant violent sex throughout their marriage, and that was observed by lay witnesses and that testimony is in declarations stipulated to in Jan Vogelsang's --

THE COURT: That's all information that was discovered after the trial.

MS. HENRY: That is information discovered after the trial, Your Honor, but the red flags were there when Mrs.

Montgomery talked about how Carl would say to her, Well, you did it for Jack so you've got to do it for me.

The institutional failure of Mrs. Montgomery is striking that social services did get involved when that little girl, Diane Mattingly, was taken away from that woman, Judy Shaughnessy. When Mrs. Montgomery could have gone off to the military but her mother took away her birth control pills so she got pregnant and had one child right after another. When Mrs. Montgomery tried to get away from Carl Boman, that it ended up in another abusive relationship with Kevin Montgomery; and when Mrs. Montgomery tried to get away from Kevin Montgomery and he wouldn't let her go.

All of this evidence, particularly that of Dr. Porterfield and Dr. Nadkarni and Dr. Woods, would have actually complemented the government's evidence. It would not save her from life without parole. It would have given her, we believe, the chance for at least one juror to say we understand why it is the pressures from this woman, Judy Shaughnessy, on Lisa Montgomery at the time caused her to completely have a psychic break or whatever you want to call it. Not NGRI but so broken down psychologically, and the evidence is there to show her psychosis. It's in the record. That would have caused at least one juror to vote for life, we believe. And I think that's all my time.

THE COURT: It is a little bit extra but that's

okay.

Mr. Valenti.

MR. VALENTI: May it please the Court.

THE COURT: Mr. Valenti.

RESPONDENT'S CLOSING ARGUMENT

MR. VALENTI: Your Honor, as a matter of an initial starting point here, it's important to know that you know better than anyone in the courtroom today because you were there at the trial, that the trial teams that were originally constructed in this case were flawed. So much so you took it upon yourself to take off Susan Hunt. You took it upon yourself to take off Judy Clarke. It wasn't until you appointed John O'Connor and it wasn't until you appointed Fred Duchardt that this ship that was the representation of Lisa Montgomery steadied. They're experienced trial practitioners that know how to represent clients and those clients who face capital cases. They got in the case and they put their oar in the water and the ship steadied.

And they did what they were supposed to do. They went out. They took command of the file and understood what was going on. They came up with theories to how to prosecute or defend the case. They came up with theories of experts to hire and got them started doing their work.

When you know that, when you look at it in that context, it's not about what other teams did or didn't do or

what could have/should have happened with Anita Burns. It's about what Mr. O'Connor did. It's about what Mr. Duchardt did. It's about what that trial team did. They started in a place where they had an incredible uphill battle, and the uphill battle that they had was not because of the prior trial team failure, though that certainly did not help, their uphill battle was they had a horrible crime on their hands. They had a crime of a woman with superior intellect who took that intellect and put it in functional play and abducted an unborn child from an eight-month pregnant woman.

It doesn't take rocket scientists or seasoned practitioners to know that mental health was going to be an important defense. They knew that right away. They identified that right away and they began to act. As you well know, given that this is a civil proceeding, 2255, the postconviction counsel here carries the burden of proof and the burden of persuasion. Based upon what I've seen over the last nine days, I believe they've carried the burden to prove this. If you have more time, you can get more done.

The record doesn't reflect this but you know this sitting in court. Ms. Montgomery, though she's not here, has been well represented. She has three lawyers representing her here, three investigators here every day, a paralegal, and a legal assistant, eight people in the courtroom every day advocating for her, an army of investigators, of mitigation

people, and of experts with seemingly unlimited budget.

Have they found more? Of course. Because they didn't have trial deadlines that were imposed upon Mr. O'Connor and Mr. Duchardt. They got in the case in May of 2006. The case was scheduled to be tried less than a year later, and they ultimately got a continuance to October of 2007. So they had about 18 months. They didn't have years and years.

Postconviction counsel had time, almost seemingly unlimited time until they got their papers on file with this court in 2013, and when and only when this court granted a hearing did they go to do even more mitigation. And guess what? When they went and did it, they found more. I would submit to you that if you gave them two more years, they'd find more.

What was the bellwether of the beginning of this hearing was that this horrible sexual trafficking of Ms. Montgomery was just discovered. And it is horrible. No human being should be subjected to those degradations and deprivations. She bad a life, no doubt about it.

THE COURT: You know on that, and this is probably something that I should be asking Ms. Henry, but while you mention it, it brings a question to my mind. Is there any evidence before me of this trafficking, what's been described as trafficking and what's been described as gang rape?

MR. VALENTI: My understanding, and I'll let Ms.

Henry talk to her evidence more, but subsequent to 2013 in the pleadings here Mr. Kidwell gave a statement about a secret that had been confided to him years ago, and then Carl Boman similarly said that and they went and they re-interviewed people and they've talked about the plumber, carpenter, and various others.

THE COURT: Kidwell and Boman have made those statements?

MR. VALENTI: That's my belief, yes.

MS. HENRY: Yes, Your Honor.

MR. VALENTI: But only just recently. With the person that they submit to you is the gold standard of mitigation, Dr. Porterfield, who I have no doubt is qualified in her field, just found this out fall of this year in 2016, nine years later. So I submit that what has been proven to you the burden of proof is that they had more time, and with more time they got more done.

The question is what did Mr. Duchardt get done? What did Mr. O'Connor get done? Well, we know what the jury thought about what they'd done in the presentation because we've seen a special verdict form, and we know that there was submitted a number of questions, and one was, Did you find Lisa Montgomery -- I'm not quoting exactly, doing it from memory -- to be a victim of significant sexual abuse and physical abuse at the hands of Jack Kleiner? Eight of the jurors found that

to be true.

They were then asked, Did you find that despite having been a victim of significant physical and sexual abuse that Lisa Montgomery, nonetheless, overcame and was able to raise four good children? Nine jurors found that.

They were also asked about the emotional abuse that Ms. Montgomery was subjected to at the hands of her mother, Judy Shaughnessy. Some jurors -- and I can't remember the number off the top of my head -- admitted that happened. That's what we know the jury found.

Did some jurors not find it? No, they didn't. And why? I would submit to you if you go back to the nature of this case, Your Honor, it was a horrible crime, and you've seen these cases, been in them, you can concede things and even in concession some jurors won't find because they're so enraged by the underlying criminal act, and they have an idea based upon that and evidence and aggravation that it doesn't matter to them what they hear, and we don't have those jurors before us, but, quite frankly, we know what they found by their verdict form.

Some of the evidence that's important that I think to talk about, that has not really been discussed in any meaningful way is Dr. Gur and the mess it was Dr. Gur.

What is important about him? Well, what is important about him is that he doesn't really seemingly do

anything. He didn't do psychometric testing. He took the PET results from someone else. He took the MRI from someone else. He cobbled together a paper, came up with a behavioral image that is a unitless scale with no meaningful comparative value and come up with opinions based upon record review.

When pushed at the Daubert hearing and before this court he couldn't come up with the raw data, but to make it worse than that, he authored reports that were only signed by him, that did not identify the doctor that did the PET scan. It did not identify the doctor that did the MRI, and it never identified them by name until October 22nd, 2007, three weeks after the trial in this matter had commenced. Far too late.

Dr. Gur's work is shoddy. It's sloppy. He would have you believe from his findings, having really done nothing, that Ms. Montgomery had brain abnormalities that resulted in impulsivity. What about impulsivity is here? This case isn't about impulsivity. This is a case about a lot of premeditation and that was spent some time in the government's case back when this case was tried.

We're talking about a woman who did significant research, Lisa Montgomery, on the victim of this case on the Internet. She did significant research about how to conduct C-sections. She did significant research about the Rat Terrier dog trading community, whether they were pet-quality animals or whether they were show-quality animals. She took a knife. She

took a ligature device, a rope. She took a home birthing kit with her and she navigated herself from Kansas to Skidmore, Missouri, and inveigled herself into Bobbie Jo Stinnett's home until she was able to act, and she did. You remember the evidence. We haven't gone through that and shown the pictures again, but the blood all over the house as Bobbie Jo Stinnett fought to live.

You heard me saying Ms. Montgomery was a woman of superior intellect and she was. She put that into play. Many experts come in now and want to -- as I've said, how many angels can dance on the head of a pin? One of Monday morning quarterback, what happened before?

It doesn't change that she had a functional education enough to make this happen. How about the medical doctors that testified? They said it'd take years to be able to do a successful C-section. Well, it took Lisa Montgomery about 15 minutes on the Internet to find all she needed to know to cut a baby out of a woman and that baby survived. That girl will be 12 years old next month. She survived.

Several things that I'd like to point out that was brought to your attention. The strategy decision behind NGRI because it is that. It is a tactical decision. Ms. Henry correctly anticipated that I would suggest that to you, Your Honor. Mr. Duchardt and Mr. O'Connor talked about it. They said there were two things significantly important to them

about why they decided to go with NGRI knowing full well that it would expose their client to government experts earlier in the case. They wanted a coherent theory of defense from start to finish, and it was where the evidence took them. It was where the experts took them. It was the evidence in the case.

So they took that. And I think it might have been a colloquialism by Mr. O'Connor but it gave them two bites at the apple, because whatever complaint they want to allege against Dr. Ramachandran, against Dr. Logan, against Dr. McCandless, nonetheless, a not guilty by reason of insanity instruction was presented to the jury, Ms. Montgomery had the opportunity, if the jury so believed that testimony that got before them, she could have been found not guilty by reason of insanity. When it didn't work, for them to then take that evidence and argue that it showed significant mental disease or defect, maybe not rise to the level of a defense but sufficient for mitigation, was not inconsistent with what they had already argued with the jury. So they made a tactical decision.

They similarly made a tactical decision on the Tommy. You've heard so much about the Tommy Kleiner defense, and there is multiple things to talk about on that. It's important to know this when they are uncovering the Tommy Kleiner defense, it's in March of 2007. They have a trial date in April of 2007, just over the horizon, and she has for the first time disclosed to Mr. Duchardt not only was there just a

person there but she named that person. She named her brother, Tommy Kleiner.

We know that because there's a memorandum that Fred wrote to the trial team in March of 2007 explaining this, and that letter is pretty important for a couple reasons. One, it indicates that Mr. Kleiner has been named by Ms. Montgomery. I believe, Your Honor, that is -- I don't have it on me right now. It names Mr. Kleiner as being the participant in the crime, but also lets Mr. Duchardt inform the team that Ryland's in the case. So when you later hear people come in and say, I was surprised when I came in the trial and saw her, I had no idea, how is it possible in October of 2007 you don't know who she is but you've got a memorandum seven months earlier telling you who she was? So I don't credit that testimony from Dani Waller, from Troy Schnack. I don't credit that testimony from Mr. Owen. It's inconsistent with the documents and the facts of the case.

But in addition to Mr. Duchardt telling the team that she had disclosed Tommy Kleiner, he explains to the team that he's starting the process of telling her what it means to go with an NGRI defense. They will have to put their cards on the table. Those are important things because it shows the attorney-client process working the way it should. They're making decisions based upon the evidence in the case.

But when Mr. Duchardt starts to investigate that

case, he's up against a trial deadline. He is trying to get his experts prepared, to get all the reports in, which he doesn't quite have yet, but he has taken consultation. Dr. Ramachandran's deposition will tell you that he recalls a similar conversation, as Mr. Duchardt did, that he was in India and he had a phone consultation with Mr. Duchardt, and they talked about the likelihood of a possibility of pseudocyesis, but Dr. Ramachandran needed to see the document before he could give an official opinion. Feel free to read the deposition and you will see that.

It's told to you, Your Honor, that the previous trial team had discounted the Tommy defense; that they had discounted pseudocyesis; and that they discounted Dr. Ramachandran. That's just not true. They considered those things but they hadn't concluded it, because in their own Exhibit 57, what I would call the to-do list that Deb Garvey maintained, there was what I call the to-do side, things to do, and the to-done side, checked off or a concluding paragraph of what they would do when they were finished. Well, all those things were in the to-do list, but none of them were in the to-done list. If I remember David Freedman -- or Dr. Freedman's testimony, he said he was looking into those things, and then his representation in the case ended when Judy Clarke left, but he didn't say he was done looking into them.

And I think that's important because the Tommy

defense had certainly been looked into, but it wasn't done. We know that by Erin Garman's records. Your Honor pointed that out. Exhibit 145, she has very comprehensive notes of who contacted her when, and the first time she's contacted about Tommy is in April when Tommy himself calls her right after Special Agent Lipanovich is interviewed, and shortly thereafter Special Agent Lipanovich is calling her in April. And it isn't until June of 2007 that Ron Ninemire on behalf of the defense team calls him, and that's the only indication that any member of the defense team, whether it be under John O'Connor or Fred Duchardt or whether it was under the Judy Clarke or prior that they ever contacted her. So they might have looked into it but they hadn't looked and finished that looking into, Your Honor.

Mr. Duchardt had that information. They were still doing the work, and you heard that work from David Owen. He went and did an interview with Tommy Kleiner himself on March 29th, 2007, after Mr. Duchardt had come back from Philadelphia and disclosed that Tommy Kleiner was there, and what did Mr. Owen do? He surreptitiously got a cigarette butt from Mr. Kleiner so he could get a DNA profile.

What else did they do? They subjected their client the next day, March 30th, 2007, to a polygraph test to try to verify the story that she had told them. And the next thing they did is they came to our office, the United States Attorney's Office and with Matt Whitworth, Roseann Ketchmark,

Cynthia Cordes, and Kurt Lipanovich to make a pitch, and that pitch was there's another person out there. She'll cooperate. We have the witnesses, Leona Hayes who we've attempted an I.D. from, who we're going to take a statement from. We've got a polygraph. She'll cooperate, help you find this other equally culpable person. Take death off the table. They had to make that pitch on April 3rd. They could have held it back, and then had gone to trial maybe in April and they'd run the risk of taking it to trial, but on April 3rd when they came to our office, they had made a tactical decision that was in their client's best interest to try to negotiate death off the table.

It didn't work. Because it didn't work, that doesn't establish -- it doesn't mean they did anything wrong. It means they were unsuccessful. Later on in September of 2007 Mr. Duchardt, as a Hail Mary, tried to go back to the department to get them to decertify the case, and that was the letter you've seen in evidence dated September 29th, 2007, to Margaret or Peggy Griffey with the eight attachments, including the expert reports.

I think that shows, the April 3rd meeting, then the September 29th meeting, this team was working. They were working towards a goal with a purpose in mind, that they were collecting the evidence they needed to defend their client and they did so.

You're asked -- talk about the standard of care. I

don't need to lecture the Court about standard of care. You surely know what that is as well as the standard in a postconviction case. I would submit to you, though, that when you look at credibility, I think Dick Burr's credibility should be significantly looked at by you. Dick Burr was brought into this case as resource counsel and made two recommendations that we know of. One, go find Lisa Rickert. We know how that worked out. She was fired. Two, come meet Judy Clarke in Tulsa, Oklahoma, and she'll get you guys on track, and we know how that worked out.

So as Dick Burr sits before Your Honor last week testifying, I believe he was a biased witness, and I'd take his statements with a grain of salt because it makes him look bad what has happened in this case. And for a different outcome to come out will reflect better on him, so I don't think his credibility is all that useful.

You've heard me say what I think about the credibility of the trial team members that would come in and testify about not knowing who Ryland Duchardt is. I don't think that is well taken. But it's important to look at why Ryland was brought in the case by Mr. Duchardt. He brought her in because Ms. Montgomery had a history of having men take advantage of her, and he wanted to provide her a healthy environment that she was comfortable in so that Mr. Duchardt could further his attorney-client relationship with her.

Similarly, you heard John O'Connor say that he took members of his church group and prayer group to Ms. Montgomery to provide her a healthy environment for people who would not judge her, to provide other women around her that would pray for her and want her to get better and to receive salvation. Also to help provide clothing that Mr. O'Connor said was out of his element to try to get a woman dressed for court.

Both attorneys are looking at not just their client's legal situation but they're looking at her as a person, her whole person. They're trying to provide an environment around her to surround her that allows her to feel at peace with what's happening to the extent she's able given she's facing capital prosecution.

Dr. Logan, his testimony. He's the one where I said, How many angels can dance on the head of a pin? He testified -- I don't care how you want to characterize it. He was asked if pseudocyesis was a major medical -- mental disease. Yes. Does she have it? Yes. Does she suffer from incompetency issues? Yes. That's not the exact words. You have the testimony. You remember it. He wanted to play cute games. "That's not what I said, that's what I meant" kind of language.

Whatever he wants to say, Dr. Ramachandran testified and also provided a report that she suffered from pseudocyesis, false pregnancies, a delusional aspect that would have been

forced or hold on to by going into these dissociative states. Dr. Logan opined similarly in his report and then again on the stand.

Dr. Kuncel, though she said she did not want to make that medical diagnosis, said that everything she saw from the neuropsychological basis supported the pseudocyesis. Went so far as to write it in the conclusion of her report. So to say now in hindsight as Monday morning quarterback, second guessing, well, I didn't know I should have done that. They're professionals, Your Honor. They know what they're doing. Mr. Logan -- or Dr. Logan, rather, to be more fair has testified hundreds of times. He knows what he's doing. He's playing games, and I don't believe that he's believable.

As it relates to Dr. Hutchinson, if you recall her when she testified, I still don't think she's concluded anything in this case. She would want to say conclusion. We asked and she said, Well, I didn't conclude that. You just testified for 20 minutes. What was that? It wasn't a conclusion. So to say she hadn't concluded malingering or had included malingering, all notes attributed to her suggested symptom exaggeration, and I think her testimony was similarly self-serving and, therefore, unbelievable.

When it comes down to it, Your Honor, the question is, Did the defendants in this case get adequate representation? I think the answer is clearly yes. Did they

perform efficiently? Did they do so to the best of their ability? Did they do so with the best interest of their client at heart? Did they proceed in a professional manner? Yes.

It's easy to say, because they were unsuccessful, that it was deficient performance, but they've not established prejudice and they can't.

One thing that I would suggest to you that I meant to say earlier, when they're talking about the Tommy defense, if the team had previously ruled out the Tommy defense as postconviction counsel had believed, would David Owen really be taking DNA samples on March 29th? Would they really be doing polygraph exams on March 30th? No. They ruled it out. We told them to rule it out. They had ruled it out. It's a red herring attempted to take information in the file and expand it when it doesn't exist.

Mr. O'Connor and Mr. Duchardt provided professionally competent representation. They're experienced practitioners. They know what they're doing. Ms. Montgomery got a good trial. She got a bad result. That doesn't mean that they did anything wrong.

Thank you.

THE COURT: Thank you.

MOVANT'S REBUTTAL CLOSING ARGUMENT

MS. HENRY: Couple pinpoint cites for Your Honor, then I'll respond. The Martell testimony, the ones that I can

find right now, page 2477, 2554. I believe Dietz' compromising position testimony is at 2697. Your Honor requested where in the record there was evidence of the trafficking and gang rape. That would be Exhibits 8, 10, 13, 16, 18, and 154. A good bit of that was anticipated during Ms. Vogelsang's testimony, but the Court asked that that testimony move along. So you have that to review, and I would also suggest to the Court that the Court can draw an adverse inference from the failure of Dr. Dietz or Dr. Martell to testify on behalf of the government, though they were noticed witnesses in this case and have in fact been interviewed by both counsel, and I would suggest to you they would not support -- or that they would support the fact that Mrs. Montgomery was in fact trafficked and that has been adequately proven through the investigation.

To go quickly through just in order, Your Honor, because I know my time is short. With respect to the Dr. Gur issue, which I did not get a chance to get back to, I would suggest to you from the testimony that Dr. Gur's testimony was the cornerstone of the defense and yet Mr. Duchardt drug his feet.

Dr. Gur testified he was available early on, and that it was Mr. Duchardt who was in charge of the schedule. Mr. Duchardt chose not to start working on the case from May of 2016 until January -- or 2006 to January 2007; and then as the government has ably proven, they were rushing. They weren't

making good, reasonable decisions because they were making a Hail Mary pass with this Tommy thing.

Holly Jackson's testimony regarding Tommy having been ruled out and David Freedman's testimony is uncontroverted. Exhibit 57 is dated March the 30th. That to-do list had not been updated. They had been in the case another 20 days. And it was not updated once they were removed.

The idea that Dick Burr's credibility could be attacked is ridiculous, quite frankly. Dick Burr suggested other individuals before Lisa Rickert be appointed as mitigation specialist, and it was David Owen who got rid of -- or who overruled those decisions, and it was David Owen who Lisa Rickert testified suggested she was having an affair with Ron Ninemire causing her to get out of the case.

THE COURT: Did Mr. Burr suggest a replacement for Judy Clarke? There was some testimony about someone by the name of Leboeuf.

MS. HENRY: Yes. He suggested Denise Leboeuf who actually has given a declaration in this case. She's one of the country's foremost trauma capital litigators. She was unable to testify for us because of her other case commitments, and so Mr. Bookman came in her stead, but Denise Leboeuf was suggested as a possible person to come in instead of Mr. O'Connor, and that testimony is uncontroverted.

So I just don't get that. The idea that Mr. O'Connor brought in the church ladies to pray with Mrs. Montgomery, while that is laudable, it is a great thing, prayer is wonderful, it is not mitigation investigation, and that's not the sort of thing done on the eve of trial that's going to cause someone like Mrs. Montgomery to disclose multiple rapes to these nice church ladies. That's not going to happen. Dr. Hutchinson's --

THE COURT: I wouldn't assume it would. I mean, it was a nice gesture.

MS. HENRY: I would suggest to Your Honor that the activities of -- when we look at the time frame of January 2007 when Mr. Duchardt was able to turn his attention to the Montgomery case and April the 3rd, that is the critical tipping point which shows the prejudice from Mr. Duchardt's failure to maintain his caseload. He was way behind. He had at that point three months to come up with some sort of a Hail Mary pass as it is described, and it's also been described in the record credibly that Mr. Duchardt and Mr. O'Connor reject the alibi. That's why they were investigating Tommy. They think that Ms. Garman falsified her records. They still believe that. If that is the basis of your decision, that's objectively unreasonable. And the Court saw Ms. Garman. She's not going to falsify her records.

The testimony from Ms. Garman is that alibi was

available in a public file in Franklin County and the records before the Court establish that Mr. Kleiner's Franklin County court file was obtained by Susan Hunt and Phil Thompson in February of 2005, well before the team came on. So what we see is a failure of institutional memory because of the failure to follow the ABA Guidelines, which require regular team meetings.

Mr. O'Connor and Mr. Duchardt's billing records are in evidence. I suggest the Court look at them, look at every time there is a telephone conference or a team meeting and add them up. You'll see that we're talking less than 50 hours, and I'm giving you an overestimate. I did it over last weekend and I think I came up with a number under 30, but let's just go with 50, as my memory may be off right now. It was a small number of hours in a capital case to meet and discuss cases.

And, yes, we do have a large team. Your Honor sees before you a capital team that has worked under the ABA Guidelines. We are a Federal Public Defender organization. Our money comes from the exact same place as Mr. Conrad's and Mr. Owen's money came from. There's no evidence Mr. Conrad or Mr. Owen placed restrictions on the amount of funding.

THE COURT: They had a pretty big team too actually.

MS. HENRY: I'm sorry?

THE COURT: They had a pretty big team too.

MS. HENRY: They did. They also continued to have access even after Ms. Clarke was counsel of record to Mr.

Freedman, Ms. Garvey, Ms. Clarke, all of who said they would make themselves available, as they are charged to do under their contract with the Administrative Office of the Courts. They have free help available that they chose not to make use of, and that is because, as the Court will see in the statement of Chris Armstrong, that Mr. Duchardt finds the help of such people to be, quote-unquote, laughable.

My last item with respect to judging credibility, Your Honor, I think Your Honor should take a look at the motion Mr. Duchardt filed with the Court in this case asking for the, quote, audiotape of his interview with myself, Ms. Harwell, and Mr. Armstrong. The reason I suggest that is because he signed under Rule 11 that he was asked at the beginning of that meeting to the audiotape, and we had presented clear testimony through my investigator -- former investigator, Chris Armstrong, I never did that. I never do that. He filed that motion because he saw the affidavit was so much almost like a transcript. He wanted to find out if they surreptitiously recorded him, which we did not. That's something the Court can consider when you consider credibility.

I ask you to remember the testimony of Diane Mattingly because she was compelling, and she told you how her preparation of Mr. Duchardt talking to her and her not talking to him.

Mr. Kidwell testified. He testified only to the

fact that Judy Shaughnessy said that Lisa Montgomery brought the rapes on herself with no further clarification. That was presented by the defense.

Such myopia resulted in an unfair trial to Mrs. Montgomery. We believe that we have established that she is entitled to relief, and we look forward to the Court's order and any further instructions for posttrial briefing.

Thank you.

THE COURT: All right. Thank you all. You will be hearing from me.

(Adjournment)

CERTIFICATE OF OFFICIAL REPORTER

I, Katherine A. Calvert, Federal Official Court Reporter, in and for the United States District Court for the Western District of Missouri, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings in LISA M. MONTGOMERY, Movant, vs. UNITED STATES OF AMERICA, Respondent, No. 12-CV-08001-GAF.

Dated this 4th day of May, 2017.

________________________________
KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER